1   Robert A. Mittelstaedt #060359
    Caroline N. Mitchell #143124
2   Adam R. Sand #217712
    JONES DAY
3   555 California Street, 26th Floor
    San Francisco, CA  94104
4   Telephone:     (415) 626-3939
    Facsimile:     (415) 875-5700
5   ramittelstaedt@jonesday.com
    cnmitchell@jonesday.com
6   arsand@jonesday.com

7   Attorneys for Defendant
    APPLE COMPUTER, INC.

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12  **THOMAS WILLIAM SLATTERY,**          **Case No. C 05 00037 JW**
    **Individually, And On Behalf Of All**
13  **Others Similarly Situated,**

14              **Plaintiff,**                   **APPENDIX**

15        v.

16  **APPLE COMPUTER, INC.,**

17              **Defendant.**

18

19

20

21

22

23

24

25

26

27

28

SFI-519269v1                                        C 05 00037 JW

FILED

MAR - 4 2004

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALBERT O. STEIN, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PACIFIC BELL TELEPHONE COMPANY, SBC COMMUNICATIONS, INC., et al.,<br><br>　　　　　Defendants.<br>————————————————————/ | No. C 00-2915 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND DENYING MOTIONS TO EXCLUDE EVIDENCE AND TO STAY** |

The Court has six motions pending before it in this litigation. On February 27, 2004, the Court heard further argument from both parties regarding the impact on the litigation of the United States Supreme Court's decision in <u>Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP,</u> 02-682, 124 S.Ct. 872, 540 U.S. ___ (2004). Having carefully considered the arguments of the parties and the papers submitted, the Court GRANTS defendants' motion for summary judgment; DENIES plaintiff's motion for summary judgment on his California Business and Professions Code § 17200 claim and DISMISSES the claim without prejudice; DENIES as moot defendants' motion to exclude the reports and testimony of plaintiff's experts, Yale M. Braunstein and Kenneth Wilson; DENIES as moot plaintiff's motion to exclude defendants' evidence of broadband share; DENIES as moot plaintiff's August 4, 2003 miscellaneous administrative request to strike defendants' evidence of a consumer survey; and DENIES as moot defendants' motion to stay. Reasons for the Court's decisions are set forth below.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

Plaintiff Albert O. Stein ("Stein") brings this action on behalf of himself and others similarly situated to challenge alleged anticompetitive conduct by defendants (collectively "Pacific Bell"), relating to the offering of Digital Subscriber Line ("DSL") service. Stein claims that this anticompetitive conduct has denied consumers a competitive choice in DSL service providers.

DSL is a transmission service that provides consumers with dedicated, high-speed access to the internet and other computer networks. Second Amended Complaint ("SAC") ¶ 16. Utilizing new technology that permits simultaneous data exchange over traditional transmission lines, DSL service is provided through already existing telephone networks and facilities, thus allowing users to have concurrent access to the internet and traditional telephone service.

Pacific Bell is an incumbent local exchange carrier ("ILEC"), as defined by the Telecommunications Act of 1996 Act ("the 1996 Act" or "the Telco Act"). As an ILEC, Pacific Bell was required to negotiate in good-faith and to enter into interconnection agreements with competitors to make available its local telephone network. Id. at ¶ 18. As a result, Pacific Bell entered into several interconnection agreements with DSL competitors. Stein claims that, in violation of these interconnection agreements, Pacific Bell has "engaged in a pattern of anticompetitive conduct . . . generally designed to leverage Pacific's monopoly power obtained through its ubiquitous local telecommunications network . . . . with the intent and inevitable effect of injuring, thwarting or eliminating actual or potential [DSL service provider] competitors, to the detriment of consumers like Plaintiff and the Class." Id. at ¶ 28.

Based on such alleged anticompetitive behavior, Stein charged Pacific Bell with violating section 2 of the Sherman Act, 15 U.S.C. §§ 1 et seq.; the Cartwright Act, California Business and Professions Code §§ 16700 et seq.[1]; the Telecommunications Act of 1996, 47 U.S.C. §§ 151 et seq.[2]; and California Business and Professions Code § 17200. Defendants filed a motion to dismiss and the Court granted the motion in large part on February 3, 2001. Among the grounds for dismissal was this Court's finding

---

[1]This Court dismissed Count VI based on the Cartwright Act.

[2]This Court dismissed Count V based on the Telco Act.

2

1    that the filed rate doctrine barred claims alleging that defendants' anti-competitive conduct resulted in

2    payment of supracompetitive prices for Pacific Bell DSL service.[3]  Stein then amended his complaint

3    twice.

4        This Court granted Stein's motion for class certification on July 24, 2002.  The class includes

5    all California subscribers to defendants' DSL services between May 20, 2000 and September 30, 2001.

6    Order granting motion at 1.  Pacific Bell has acknowledged that it ceased to provide DSL service and

7    withdrew its federal tariff in May 2000.  From that point forward, SBC Advanced Solutions, Inc.

8    ("ASI") became the SBC-affiliated provider of DSL service in California.[4]  ASI's DSL service was not

9    tariffed until September 10, 2001.

10       Now before the Court are defendants' motion for summary judgment, plaintiff's motion for

11   summary judgment on his California Business and Professions Code § 17200 claim, defendants' motion

12   to exclude the reports and testimony of plaintiff's experts, Yale M. Braunstein and Kenneth Wilson,

13   class plaintiffs' motion to exclude defendants' motion of broadband share, plaintiff's request to strike

14   defendants' consumer survey, and defendants' motion to stay.

15

16                                    **LEGAL STANDARD**

17       Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

18   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

19   material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

20   56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

21   material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323; 106 S.Ct. 2548 , 2553 (1986).  The

22   moving party, however, has no burden to negate or disprove matters on which the non-moving party will

23

24

25       [3]Stein argued that he could avoid the filed rate doctrine by amending to plead a claim based
26   on damages attributable to denial of access to *existing* lower filed rates.

27       [4]Pacific Bell is a wholly owned subsidiary of Pacific Telesis, which is a wholly owned
     subsidiary of SBC. SAC, ¶8. ASI was created when the Federal Communications Commission (FCC)
     required that DSL be offered through a separate affiliate where an SBC entity (Pacific Bell, in this
28   case) is the ILEC.

                                         3

1    have the burden of proof at trial.  The moving party need only point out to the Court that there is an

2    absence of evidence to support the non-moving party's case.  See id. at 325.

3            The burden then shifts to the non-moving party to "designate 'specific facts showing that there

4    is a genuine issue for trial.'"  See Celotex Corp., 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  To

5    carry this burden, the non-moving party must "do more than simply show that there is some

6    metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,

7    475 U.S. 574, 586; 106 S.Ct. 1348, 1356 (1986).  "The mere existence of a scintilla of evidence . . . will

8    be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving

9    party]."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252; 106 S.Ct. 2505, 2512 (1986).  In a motion

10   for summary judgment, the evidence is viewed in the light most favorable to the non- moving party, and

11   all justifiable inferences are to be drawn in its favor.  See id. at 255.  "Credibility determinations, the

12   weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

13   those of a judge . . . ruling on a motion for summary judgment."  Id.

14

15                                    **DISCUSSION**

16   **A.    Defendants' motion for summary judgment**

17        **1. The Supreme Court's Trinko opinion**

18        The opinion of the United States Supreme Court in Verizon Communications Inc. v. Law Offices

19   of Curtis V. Trinko, LLP, No. 02-682, 124 S.Ct. 872, 540 U.S. ___ (2004), governs this case.  As the

20   Supreme Court explained, "[t]he Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56,

21   imposes certain duties upon incumbent local telephone companies in order to facilitate market entry by

22   competitors, and establishes a complex regime for monitoring and enforcement."  Trinko, 124 S.Ct. at

23   875.  In Trinko, the Court considered "whether a complaint alleging breach of the incumbent's duty

24   under the 1996 Act to share its network with competitors states a claim under § 2 of the Sherman Act,

25   26 Stat. 209."  Id.

26        In Trinko, Verizon was the incumbent local exchange carrier (LEC) in the state of New York.

27   Trinko, 124 S.Ct. at 875.  Defendant SBC is the LEC in California.  Before the 1996 Act, incumbent

28   LECs enjoyed exclusive franchises in their local service areas.  Id.  "The 1996 Act sought to 'uproot'

United States District Court
For the Northern District of California

4

the incumbent LECs' monopoly and to introduce competition in its place." Id. (bracket and citation omitted). An "incumbent LEC's obligation under 47 U.S.C. § 251(c) to share its network with competitors" was "[c]entral" to the Act's statutory scheme. Id. at 875-76 (citation omitted).

Section 251(c)(3) of the 1996 Act obligated Verizon to provide "access to operations support systems (OSS), a set of systems used by incumbent LECs to provide services to customers and ensure quality." Trinko, 124 S.Ct. at 876. A rival could not fill its customers' orders without access to OSS; thus, for competition to occur, competitors absolutely needed access to OSS. Regulators received complaints that competitive LECs' orders remained unfilled, in apparent violation of Verizon's statutory obligation to provide access to OSS functions. Id. Parallel regulatory investigations ensued; the New York Public Service Commission (PSC) issued a "series of orders" causing Verizon to incur $10 million of liability to competitive LECs. Id. at 876-77. The FCC entered a consent decree with Verizon, under which Verizon made a $3 million "'voluntary contribution'" to the United States Treasury. Id. (citation omitted).

The day after Verizon entered the consent decree with the FCC, Trinko, a New York City law firm and local telephone customer of AT&T, filed suit on behalf of itself and similarly situated customers. Trinko, 124 S.Ct. at 877. The complaint "alleged that Verizon had filled rivals' orders on a discriminatory basis as part of an anticompetitive scheme to discourage customers from becoming or remaining customers of competitive LECs, thus impeding the competitive LECs' ability to enter and compete in the market for local telephone service." Id. The complaint included a "single example of the alleged 'failure to provide adequate access to [competitive LECs],' namely the OSS failure that resulted in the FCC consent decree and PSC orders." Id. (internal quotation marks and brackets in the original). Trinko alleged that Verizon violated § 2 of the Sherman Act.[5] The district court dismissed the complaint, the Court of Appeals for the Second Circuit reversed, and the Supreme Court granted certiorari to determine if the Court of Appeals erred in reversing the district court's dismissal of Trinko's antitrust claims. Id.

The Supreme Court began by examining whether any antitrust liability could exist in the

[5]Trinko alleged other violations of federal statutes and state law, but the Supreme Court limited its grant of certiorari to the antitrust claims. Trinko, 124 S.Ct. at 877.

United States District Court
For the Northern District of California

1  presence of the Telco Act's detailed regulatory scheme. Although Congress created the duties, the

2  Court could not automatically conclude that the duties could be "enforced by means of an antitrust

3  claim." <u>Trinko</u>, 124 S.Ct. at 878. In fact, the Court considered and rejected the possibility of antitrust

4  immunity. The 1996 Telco Act barred a finding of statutory immunity since "[s]ection 601(b)(1) of the

5  1996 Act is an antitrust-specific saving clause." <u>Id.</u> The Court explained, though, that the statutory

6  "saving clause preserve[d] those 'claims that satisf[ied] established antitrust standards.'" <u>Id.</u> (brackets

7  added, internal quotation marks in the original, citation omitted). The Act "[did] not create new claims

8  that go beyond existing antitrust standards." <u>Id.</u>

9       The Court turned to an examination of the alleged anticompetitive conduct, namely the alleged

10  "deni[al of] interconnection services to rivals in order to limit entry," <u>Trinko</u>, 124 S.Ct. at 878, under

11  existing antitrust standards. If the Court were to find any antitrust liability, it explained that it would

12  need to do so under § 2 of the Sherman Act, "which declares that a firm shall not 'monopolize' or

13  'attempt to monopolize.'" <u>Id.</u>, <u>citing</u> 15 U.S.C. §2. In order to establish this offense, a plaintiff would

14  need to show possession of monopoly power in the relevant market and "'the willful acquisition or

15  maintenance of that power as distinguished from growth or development as a consequence of a superior

16  product, business acumen, or historic accident.'" <u>Id.</u> at 878-79, <u>citing</u> <u>United States v. Grinnell Corp.</u>,

17  384 U.S. 563, 570-571 (1966). In order to "safeguard the incentive to innovate," a court can find

18  antitrust liability only if "anticompetitive *conduct*" accompanies the possession of monopoly power.

19  <u>Id.</u> at 879.

20       The Court explained that the Sherman Act generally recognizes the right of a private business

21  to choose with whom it will deal. <u>Trinko</u>, 124 S.Ct. at 879, <u>citing</u> <u>United States v. Colgate & Co.</u>, 250

22  U.S. 300, 307 (1919). At the same time, the Court has recognized that "'[t]he high value that [it has]

23  placed on the right to refuse to deal with other firms does not mean that the right is unqualified.'" <u>Id.</u>,

24  <u>citing</u> <u>Aspen Skiing v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585, 601 (1985) (internal quotations

25  and first brackets in the original). The Court continued that "[u]nder certain circumstances, a refusal

26  to cooperate with rivals can constitute anticompetitive conduct and violate § 2." <u>Trinko</u>, 124 S.Ct. at

27  879. The Court warned that it is "very cautious in recognizing such exceptions." <u>Id.</u> With respect to

28  its case at hand, the Court needed to determine if the allegations of the complaint fit within the confines

6

of existing antitrust doctrine, or if the plaintiff had demonstrated grounds for establishing a new exception under traditional antitrust principles. Id.

The Court briefly summarized Aspen Skiing, which it characterized as the "leading case for §2 liability based on refusal to cooperate with a rival" and warned again that "Aspen Skiing is at or near the outer boundary of § 2 liability." Trinko, 124 S.Ct. at 879. In Aspen Skiing, the owners of different ski areas had cooperated to offer a multi-day, all-area lift ticket. When the owner of three of the areas ceased cooperation with the owner of the fourth, the Court upheld a jury verdict against the defendant. In Trinko, the Court explained that it had rested its finding of liability in Aspen Skiing on the "defendant's decision to cease participation in a cooperative venture." Trinko, 124 S.Ct. at 879-80. (citation omitted). The defendant in Aspen Skiing had "unilateral[ly] terminat[ed]' a "voluntary (and thus presumably profitable) course of dealing," reflecting an anticompetitive motive. Trinko, 124 S.Ct. at 880 (brackets added; emphasis in the original).

Turning to its case at hand, the Supreme Court in Trinko concluded that Verizon's anticompetitive conduct in its alleged refusal to deal failed to "fit within the limited exception recognized in Aspen Skiing." Trinko, 124 S.Ct. at 880. Verizon did not voluntarily cooperate with its rivals; instead, Verizon cooperated with its rivals because the 1996 Act required it to do so. The Court continued that Trinko differed from Aspen Skiing in a "more fundamental way." Id. at 10. The lift tickets at issue in Aspen Skiing were available to the public at retail; in contrast, the services allegedly withheld in Trinko were "not otherwise marketed or available to the public." Id. In fact, "[t]he unbundled elements offered pursuant to §251(c)(3) exist only deep within the bowels of Verizon; they are brought out only on compulsion of the 1996 Act and offered not to consumers but to rivals, and at considerable expense and effort." Id. Thus "Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." Id.

The Court briefly discussed the "essential facilities" doctrine, explaining that it has neither accepted nor rejected "such a doctrine." Trinko, 124 S.Ct. at 880-81. If the doctrine were accepted, access to facilities would need to be unavailable; "where access exists, the doctrine serves no purpose." Id. at 881. Although the plaintiff in Trinko argued that the regulatory sharing duties supported its case,

7

1    the Court found the opposite; the Act's requirement of access made it "unnecessary to impose a judicial

2    doctrine of forced access." Id. Thus the Court rejected the plaintiff's essential facilities argument. Id.

3         The Court also concluded that the plaintiff in Trinko had failed to justify adding its case "to the

4    few existing exceptions from the proposition that there is no duty to aid competitors." Trinko, 124 S.Ct.

5    at 881. The Court discussed at length the difficulties courts would face in enforcing antitrust laws in

6    the midst of a sophisticated regulatory regime and also emphasized the costs of judicial intervention.

7    In its case at hand, the Court recognized that the regulatory response to the "OSS failure" demonstrated

8    that the regulatory "regime was an effective steward of the antitrust function." Trinko, 124 S.Ct. at 881-

9    82. "[A]n incumbent LEC's failure to provide a service with sufficient alacrity might have nothing to

10   do with exclusion," and antitrust courts necessarily find the evaluation of alleged violations of the Telco

11   Act's sharing duties difficult. Id. at 882.

12        Finally, the Court concluded that the plaintiff had failed to state a claim under a monopoly

13   leveraging theory. Monopoly leveraging, the Court explained, presupposes anticompetitive conduct.

14   In its case at hand, anticompetitive conduct could exist only under a refusal to deal theory, which the

15   Court had rejected. Thus the Court necessarily also rejected plaintiff's monopoly leveraging theory.

16   Trinko, 124 S.Ct. at 883, n.4. In rejecting plaintiff's refusal to deal theory, its essential facilities claim,

17   and its monopoly leveraging theory, the Supreme Court held that Trinko had failed to state a claim

18   against Verizon under the Sherman Act. Id. at 883.

19

20        **2. Stein's antitrust claims, then and now**

21        Plaintiff Stein's antitrust claims have narrowed considerably since he filed this lawsuit. At this

22   litigation's outset, plaintiff broadly claimed that defendants' failures timely to comply with the

23   provisions of the Telco Act constituted antitrust violations. In his Second Amended Complaint, Stein

24   alleged that Pacific Bell enjoyed a market share in excess of 85% of the DSL market and controlled the

25   existing local telephone network and the supporting physical facilities through which DSL service must

26   be installed. SAC ¶ 17. Competitors wishing to enter the market for DSL service depend on Pacific

27   Bell's telephone lines and physical facilities. Id. at ¶ 22. Pacific Bell is an incumbent local exchange

28   carrier ("ILEC"), as defined by the Telco Act. As an ILEC, Pacific Bell was required to negotiate in

                                        8

1   good-faith and to enter into interconnection agreements with competitors to make available its local

2   telephone network. Id. at ¶ 18. As a result, Pacific Bell entered into several interconnection agreements

3   with DSL competitors. Stein claimed that, in violation of these interconnection agreements, Pacific Bell

4   "engaged in a pattern of anticompetitive conduct . . . generally designed to leverage Pacific's monopoly

5   power obtained through its ubiquitous local telecommunications network . . . . with the intent and

6   inevitable effect of injuring, thwarting or eliminating actual or potential [DSL service provider]

7   competitors, to the detriment of consumers like Plaintiff and the Class." Id. at ¶ 28.

8       According to the Second Amended Complaint, Pacific Bell has "routinely and arbitrarily" denied

9   physical collocation with its equipment and misrepresented the availability of space for collocation. Id.

10  at ¶¶ 28-33. Pacific Bell has allegedly also stifled competition by requiring and charging unreasonable

11  prices for collocation cages. Id. at ¶¶ 34-37. Furthermore, Pacific Bell allegedly has discriminated

12  against and imposed "hindrances and delays" on competitors trying to enter the DSL market by refusing

13  timely to deliver collocation cages, dedicated unbundled transport lines, and installed unbundled loops.

14  Id. at ¶¶ 38-42. Based on such alleged anticompetitive behavior, Stein charged Pacific Bell with

15  violating section 2 of the Sherman Act, 15 U.S.C. §§ 1 et seq.

16      When defendants moved for summary judgment, the Supreme Court had not decided Trinko.

17  As a result, the motion was broad and addressed plaintiff's theories of antitrust liability allegedly

18  resulting from defendants' regulatory violations with regard to both collocation and the provision of

19  loop qualification information. Before Trinko, plaintiff sought to show defendants' monopoly or

20  attempted monopoly and proffered three theories of antitrust liability, namely refusal to deal, denial of

21  essential facilities, and monopoly leveraging.[6] The Supreme Court has now made it absolutely clear that

22  all these theories of liability fail.

23      After Trinko, plaintiff understandably seeks to narrow his antitrust claim considerably. The

24

25      [6]In their original motion for summary judgment, defendants argued that they lacked market
    power in the relevant market; that no actionable conduct had occurred, even under plaintiff's pre-
26  Trinko theories of liability; and that plaintiff had failed to show any antitrust injury or damage to
    consumers. Because the Supreme Court's opinion in Trinko made the landscape so clear, this Court
27  need not reach all these issues to find that plaintiff fails to survive defendants' motion for summary
    judgment with respect to plaintiff's antitrust claims. Thus the definition of the relevant market is not
28  to be decided.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    arguments concerning spectral requirements and collocation practices have disappeared. Oppo.

2    Regarding Trinko, at 9 (Oppo.). Now, in an effort to survive Trinko, plaintiff simply argues, at great

3    length, that defendants voluntarily agreed to provide loop qualification information to competitors as

4    part of an effort to earn regulatory approval of SBC's merger with Ameritech. When defendants

5    "reneged" on their commitment to provide the loop qualification information, according to Stein, they

6    violated § 2 of the Sherman Act.

7          The Telco Act required defendants to provide the loop qualification information at issue; most

8    important, even if defendants had voluntarily agreed to provide the loop qualification information, the

9    regulatory breaches that occurred simply do not afford the basis for antitrust liability. As the Supreme

10   Court made abundantly clear, the refusal to deal set forth in Aspen Skiing is extremely narrow. In this

11   case, as in Trinko, the regulatory "regime was an effective steward of the antitrust function." Trinko,

12   124 S.Ct. at 882.[7]

13         An entity hoping to provide DSL service needs access to loop qualification information. George

14   Guerra, Pacific's Area Manager for Regulatory Affairs, testified, "you need [a] loop to be of the

15   appropriate parameters, so as to be able to support the DSL service that you're seeking to obtain and

16   provide." Ex. 8 to Kolbe Decl. at 91:25-92:3. He continued to explain that "if any one of those

17   components are absent, you will not be able to provide DSL service." Id. at 92:10-12. The OSS access

18   obligations that Verizon failed to fulfill in Trinko were mandated by §§ 251 and 271 of the Telco Act.

19   Oppo. at 7, citing Trinko, 124 S.Ct. at 876. According to plaintiff, in contrast, defendants in the instant

20   case voluntarily agreed to provide competitors with loop qualification information. Oppo. at 9.

21   Plaintiffs argue that when defendants voluntarily agreed to provide competitors loop qualification

22   information and "unilaterally reneged on that undertaking" by "filter[ing]" the information, they

23   "deceptively misled competitors into believing that loops serving California premises could not support

24   DSL," thereby allegedly violating the antitrust laws. Oppo. at 9. Plaintiff argues that this unilateral

25   breach of a voluntary commitment allows him to survive summary judgment, even after Trinko. This

26

27         [7]Plaintiff argues that Trinko failed to address whether a monopolist's bad faith breach of a
     statutorily mandated duty can constitute a refusal to deal. Oppo. at 8, n.1. Defendants correctly point
28   out that the Trinko plaintiff made exactly such an allegation of bad faith by alleging that the
     defendants engaged in an "anticompetitive scheme." Trinko, 124 S.Ct. at 877.

10

United States District Court

For the Northern District of California

1  Court disagrees, but also finds that defendants were statutorily obligated to provide the loop

2  qualification information under § 251(c)(3) of the Telecommunications Act. Plaintiff cannot distinguish

3  his case from <u>Trinko</u>.

4          In an effort to demonstrate that defendants voluntarily agreed to provide competitors access to

5  loop qualification information, plaintiff introduces Appendix C to the FCC Merger Order concerning

6  SBC's merger with Ameritech. Kolbe Decl., Ex. 6. Plaintiff argues that SBC voluntarily agreed, after

7  extensive negotiations, to provide its competitors with loop qualification information in an effort to earn

8  regulatory approval of its proposed merger with Ameritech. The Court does not find that any conditions

9  entered into by defendants in order to earn regulatory approval of the merger were voluntary in any real

10  sense of the word; instead, defendants made some concessions as part of the price they had to pay to

11  earn regulatory approval of the merger. More important, defendants introduced evidence showing that

12  the Telco Act has always required defendants to provide loop qualification information, thus placing

13  the instant case squarely within <u>Trinko</u>'s confines.

14          Telco Act § 251(c)(3) requires incumbents, such as defendants, to provide "access to network

15  elements on an unbundled basis." 47 U.S.C. § 251(c)(3). The FCC ruled in 1996 that "operations

16  support systems and the information they contain fall squarely within the definition of 'network

17  element' and must be unbundled upon request under section 251(c)(3)." <u>In the Matter of</u>

18  <u>Implementation of the Local Competition Provisions in the Telecommunications Act of 1996</u>, CC

19  Docket No. 96-98, First Report and Order, 11 FCC Rcd 15499, ¶¶ 516, 523 (1996) (First Report and

20  Order). For this conclusion, the FCC relied on the statutory definition of "network element" as

21  including "databases" and "information sufficient for billing and collection or used in the transmission,

22  routing, or other provision of telecommunications service." First Report and Order, ¶ 516.

23          In 1998, the FCC repeated this statutory requirement and explicitly ruled that it includes

24  information about loop qualification information for the provision of DSL:

25          Under our existing rules, incumbent LECs are also required to provide competing carriers with
           nondiscriminatory access to the operations support systems (OSS) functions for pre-ordering,
26         ordering, and *provisioning loops*. If new entrants are to have a meaningful opportunity to
           compete, they must be able to determine during the pre-ordering process as quickly and
27         efficiently as can the incumbent, *whether or not a loop is capable of supporting xDSL-based
           services*. <u>In the Matters of Deployment of Wireline Services Offering Advanced</u>
28         <u>Telecommunications Capability</u>, CC Docket No. 98-147, Memorandum Opinion and Order, and

                                              11

1    Notice of Proposed Rulemaking, 13 FCC Rcd 24011, ¶ 56 (1998) (emphasis added).

2    In 1999, the FCC issued its <u>UNE Remand Order</u> and confirmed the requirement to provide loop

3    qualification information:

4        [P]ursuant to our existing rules, an incumbent LEC must provide the requesting carrier with
         nondiscriminatory access to the same detailed information about the loop that is available to the
5        incumbent, so that the requesting carrier can make an independent judgment about whether the
         loop is capable of supporting the advanced services equipment the requesting carrier intends to
6        install.   <u>In the Matter of Implementation of the Local Competition Provisions of the
         Telecommunications Act of 1996</u>, CC Docket No. 96-98, Third Report and Order and Fourth
7        Further Notice of Proposed Rulemaking, 15 FCC Rcd 3696, ¶ 427 (1999).

8    Finally, the FCC confirmed that the obligation extended to all information possessed by the ILEC,

9    regardless whether the ILEC provided the information to its own retail provider:

10       [U]nder our existing rules, the relevant inquiry is not whether the retail arm of the incumbent
         has access to the underlying loop qualification information, but rather whether such information
11       exists anywhere within the incumbent's back office and can be accessed by any of the incumbent
         LEC's personnel. Denying competitors access to such information, where the incumbent (or an
12       affiliate, if one exists) is able to obtain the relevant information for itself, will impede the
         efficient deployment of advanced services. <u>Id.</u> at ¶ 430.
13
     Thus the Telco Act of 1996, in addition to the FCC Rules implementing it, required defendants to
14
     provide loop qualification information to competitors and <u>Trinko</u> governs the case at hand.[8]
15
         Plaintiff introduces evidence attempting to show breaches of defendants' duties to provide loop
16
     qualification information. For example, plaintiff relies on the testimony of John Mileham and Carol
17
     Chapman, in addition to a Notice of Apparent Liability issued by the FCC. The Notice of Liability,
18
     however, primarily concerned defendants' submission of inaccurate affidavits and, in any event,
19
     concluded that the loop qualification errors were not "competitively significant under the
20
     circumstances." Kolbe Decl. Ex. 14 at ¶ 90.
21

22   _____

23       [8]Plaintiff filed a surreply, to which defendants filed a response. In the surreply, plaintiff argued
     that the "pre-existing UNE Remand Order did not compel defendants to provide real-time electronic
24   access to defendants' online loop qualification database. Instead, SBC was permitted to provide such
     information in manual form – a difference that, as shown below, is competitively significant." Surreply
25   at 1. Plaintiff's case does not fall within the confines of <u>Aspen Skiing</u> and reducing his case to this
     possible tiny failure to satisfy a regulatory obligation simply demonstrates the chimerical quality of
26   plaintiff's antitrust claims. In his surreply, plaintiff concludes that "[t]o prevail on summary judgment,
     defendants must show that, <i>inter alia,</i> there is no factual dispute that defendants' duty to provide
27   competitors with real-time computerized access to defendants' loop qualification information in
     electronic form about all loops serving a particular address was a statutorily compelled duty under the
28   FCC's UNE Remand Order." Surreply at 2. In <u>Trinko</u>, the Supreme Court clearly held that such
     regulatory minutiae are not the concern of antitrust law.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    More important, the evidence of regulatory action is exactly the type of evidence that the

2  Supreme Court in <u>Trinko</u> found persuasive when it found that regulatory enforcement, as opposed to

3  judicial enforcement, more effectively supports antitrust goals.  <u>Trinko</u>, 124 S.Ct. at 882.  Plaintiff

4  incorrectly argues that a material question of fact exists as to whether the FCC could compel defendants

5  to provide loop qualification information.  The Telco Act mandates that the FCC can impose a forfeiture

6  penalty for violation of "any of the provisions of this chapter or of any rule, regulation, or order issued

7  by the Commission under this chapter."  47 U.S.C. § 503(b)(1)(B).  In fact, plaintiff submitted evidence

8  of this very type of enforcement with regard to defendants' provision of loop qualification information

9  when it presented the FCC's Notice of Apparent Liability for the Court's consideration.  Kolbe Decl.

10  Ex. 14 at ¶ 5 ("The    *UNE Remand Order* required, among other things, that an incumbent local

11  exchange carrier such as SBC make loop qualification information available to competitors as part of

12  the pre-ordering functionality of its OSS.").  The FCC merger order did not impose any additional loop

13  qualification obligations on defendants.

14    Even assuming *arguendo* that defendants voluntarily obligated themselves to provide

15  competitors with loop qualification information, this case does not fit within the very narrow confines

16  of the refusal to deal doctrine, most recently articulated by the Supreme Court in <u>Trinko</u>.  In <u>Aspen</u>

17  <u>Skiing</u>, two competitors voluntarily cooperated to offer an attractive product to the public at retail.

18  When the dominant partner ceased cooperation despite the weaker partner's increasingly desperate

19  efforts to have the venture continue, the Court allowed an inference of the stronger partner's

20  anticompetitive purpose, namely that it "was not motivated by efficiency concerns and that it was

21  willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run

22  impact on its smaller rival."  <u>Aspen Skiing v. Aspen Skiing Highlands Corporation</u>, 472 U.S. 585, 610-

23  611 (1985); <u>see also</u> <u>Trinko</u>, 124 S.Ct. at 879-80.

24    The ski area in  <u>Aspen Skiing</u> sold its lift tickets to the public at retail for profit.  In contrast,

25  defendants in this case did not offer loop qualification information directly to the public.  Instead, like

26  the OSS access at issue in <u>Trinko</u>, the loop provision information at issue in this case "exist[s] only deep

27  within the bowels of" defendants, <u>Trinko</u>, 124 S.Ct. at 880, and is not directly available to the public,

28  much less directly available to the public at a profit under a voluntarily cooperative venture between

13

United States District Court

For the Northern District of California

1    competitors. In <u>Aspen Skiing</u>, the formerly dominant partner terminated the joint venture, whereas in

2    the case at hand, defendants simply failed to comply exactly with the requirements of a regulatory

3    scheme.

4        Thus, under <u>Trinko</u>, this Court GRANTS defendants' motion for summary judgment on

5    plaintiff's antitrust claims. As a matter of law, plaintiff's case does not fit within the narrow confines

6    of the refusal to deal doctrine articulated by the Supreme Court in <u>Trinko</u>. The Court also finds, as a

7    matter of law and based on <u>Trinko</u>, that defendants have prevailed on their motion for summary

8    judgment with respect to plaintiff's monopoly leveraging and essential facilities antitrust claims.

9

10 **B.**      **Plaintiff's motion for summary judgment**

11        Plaintiff has moved for summary judgment on his supplemental state law claim under California

12    Business and Professions Code § 17200. Now that the Court has granted defendants' motion for

13    summary judgment, the landscape has changed because the antitrust claims which originally conferred

14    jurisdiction on this Court have disappeared. 28 U.S.C. § 1367(c) lists situations in which a federal court

15    may decline to exercise supplemental jurisdiction. Such a situation arises when "the district court has

16    dismissed all claims over which it has original jurisdiction." This Court finds that it may, and should,

17    decline to exercise its discretionary jurisdiction over plaintiff's state law claim, since the Court has

18    dismissed all the claims over which it had original jurisdiction and because the case raises complex

19    issues of state law. The Court DENIES plaintiff's motion for summary judgment and DISMISSES

20    plaintiff's § 17200 claim without prejudice.

21

22 **C.**      **Plaintiff's motion to exclude evidence of broadband share**

23

24        Plaintiff has moved to strike defendants' evidence regarding defendants' share of the broadband

25    market. Given the Court's ruling on the underlying antitrust claims in light of <u>Trinko</u>, the admissibility

26    of the evidence has become moot and, on that ground, the motion is DENIED.

27

28   ///

**United States District Court**
For the Northern District of California

1  **D.    Defendants' motion to exclude testimony and reports of Braunstein and Wilson**

2          Defendants have moved to exclude the testimony and reports of plaintiff's experts, Yale M.

3  Braunstein and Kenneth Wilson. Given the Court's ruling on the antitrust claims, the admissibility of

4  this evidence has become moot and, on that ground, the motion is DENIED.

5

6                                    **CONCLUSION**

7

8          For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment;

9  DENIES plaintiffs' motion for summary judgment and DISMISSES class plaintiff's California Business

10 and Professions Code § 17200 claim without prejudice; DENIES defendants' motion to exclude the

11 reports and testimony of Braunstein and Wilson; and DENIES plaintiff's motion to exclude defendants'

12 evidence of broadband share. [Docket ## 238, 260, 261, 264 and 265] The Court also DENIES as moot

13 plaintiffs' administrative request to strike defendants' evidence of consumer survey [docket # 274] and

14 defendants' motion to stay. [Docket ## 274, 303 and 317]

15

16         **IT IS SO ORDERED.**

17

18 Dated: March 4, 2004

19                                                    _____

20                                                    SUSAN ILLSTON

21                                                    United States District Judge

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ALBERT O. STEIN,

          Plaintiff,

  v.

PACIFIC BELL,

          Defendant.

_____/

Case Number: CV00-02915 SI

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 4, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Bobby C. Lawyer
Pacific Telesis Group
140 New Montgomery St
11th Flr
San Francisco, CA 94105

Bryan L. Clobes
Miller Faucher & Cafferty
One Logan Square
Suite 1700
Philadelphia, PA 19103

Christopher R. Ball
Pillsbury Winthrop LLP
50 Fremont St
5th Flr
San Francisco, CA 94105

Craig E. Stewart
Jones Day
555 California Street
25th Floor
San Francisco, CA 94104

Douglas G. Thompson
Finkelstein Thompson & Loughran
1050 30th Street NW
Washington, DC 20007

Juden Justice Reed
Schubert & Reed LLP
Two Embarcadero Center
Ste 1660
San Francisco, CA 94111

Lawrence W. Schonbrun
86 Eucalyptus Rd
Berkeley, CA 94705

Nicholas E. Chimicles
Chimicles & Tikellis LLP
361 W Lancaster Ave
One Haverford Centre
Haverford, PA 19041

Robert A. Mittelstaedt
Jones Day
555 California Street
25th Floor
San Francisco, CA 94104

Roy A. Katriel
The Katriel Law Firm PLLC
1101 30th Street, NW
Suite 500
Washington, DC 20007

Dated: March 4, 2004

                    Richard W. Wieking, Clerk
                    By: Tracy Sutton, Deputy Clerk

2