1  Michael D. Braun (167416)
   Marc L. Godino (182689)
2  BRAUN LAW GROUP, P.C.
   12400 Wilshire Boulevard
3  Suite 920
   Los Angeles, CA 90025
4  Tel:   (310) 442-7755
   Fax:   (310) 442-7756
5
   Roy A. Katriel (*Pro Hac Vice Application filed*)
6  THE KATRIEL LAW FIRM, P.C.
   1101 30th Street, NW
7  Suite 500
   Washington, DC 20007
8  Tel:   (202) 625-4342
   Fax:   (202) 625-6774
9
   Jacqueline Sailer
10 Eric J. Belfi (*Admitted Pro Hac Vice*)
   MURRAY, FRANK & SAILER LLP
11 275 Madison Avenue
   Suite 801
12 New York, NY 10016-1101
   Tel:   (212) 682-1818
13 Fax:   (212) 682-1892

14 **Attorneys for Plaintiff**

15

16                **UNITED STATES DISTRICT COURT**

17              **NORTHERN  DISTRICT OF CALIFORNIA**

18                     **SAN JOSE DIVISION**

19

20 THOMAS WILLIAM SLATTERY,        )    **CASE NO.: C05-00037 JW**
   Individually, And On Behalf Of All Others )
21 Similarly Situated,             )    **CLASS ACTION**
                                   )
22            Plaintiff,           )    **MEMORANDUM OF POINTS AND**
                                   )    **AUTHORITIES IN SUPPORT OF**
23       vs.                       )    **PLAINTIFF'S OPPOSITION TO**
                                   )    **DEFENDANT'S MOTION TO DISMISS**
24 APPLE COMPUTER, INC.            )    **CLASS ACTION COMPLAINT**
                                   )
25            Defendant.           )    **Date:  March 21, 2005**
   _____)    **Time:  9:00 a.m.**
26                                      **Place: Courtroom 8, 4th Floor**

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO.: C05-00037 JW
\\Fileserver\shareddocs\BLG\APPLE\PLD-WPD\Dismiss Opp.wpd

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    APPLE'S ATTACKS ON SLATTERY'S TYING CLAIMS ARE
      MERITLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    An Express Refusal To Sell the Tying and Tied Products Separately
            Is Not An Indispensable Prerequisite To A Tying Violation . . . . . . . . . . . . . . . . . . 5

            1.    Apple's Conduct Falls Within the Tying Prohibition . . . . . . . . . . . . . . . . . 8

            2.    Other Uses To Which iTunes or iPod Can Be Put To Separately
                  Are Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            3.    Apple's "Technological Interrelationship" Defense Has Been
                  Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    Accepting Apple's Position Would Lead To Absurd Results . . . . . . . . . . . . . . . 10

      C.    Apple's Authorities Are Readily Distinguishable and Inapplicable . . . . . . . . . . . 11

II.   APPLE'S ATTACKS ON SLATTERY'S MONOPOLIZATION CLAIMS
      FAIL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    Slattery Properly Pleaded Apple's Monopoly Market Power . . . . . . . . . . . . . . . . 14

      B.    Apple's Attempt to Shoehorn This Case Into Trinko Is Meritless . . . . . . . . . . . . . 17

            1.    This Is Not A "Refusal to Deal" Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            2.    Slattery States A Monopolization Claim Based On Apple's Affirmative
                  Predatory and Exclusionary Design Changes to Its Products . . . . . . . . . . . 18

III.  BECAUSE APPLE MISSTATES THE LAW, ITS ATTACK ON SLATTERY'S
      MONOPOLY LEVERAGING CLAIMS MUST FAIL . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    The Ninth Circuit Recognizes Monopoly Leveraging Claims . . . . . . . . . . . . . . . . 21

      B.    This Court Has Read *Alaska Airlines* As Recognizing Monopoly
            Leveraging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.   SLATTERY HAS STATED PROPER STATE AND COMMON
      LAW CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

1

# TABLE OF AUTHORITIES

2

3

## FEDERAL CASES

4

*Advance Business System & Supply Co. v. SCM Corp.*,
415 F.2d 55 (4th Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5

*Alaska Airlines, Inc v. United Airlines*,
6     948 F.2d 536 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *in passim*

7     *American Prof'l Testing v. Harcourt Brace Jovanovich Legal*,
108 F.3d 1147 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8

*Amerinet, Inc. v. Xerox Corp.*,
9     972 F.2d 1483 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10     *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11

*Berkey Photo, Inc. v. Kodak Eastman Co.*,
12     603 F.2d 263 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

13     *Bogosian v. Gulf Oil Corp.*,
561 F.2d 434 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

14

*C.R. Bard, Inc. v. M3 System, Inc.*,
15     157 F.3d 1340 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

16     *Cost Management Services, Inc. v. Washington Natural Gas Co.*,
99 F.3d 937 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

17

*In re Data General Corp. Antitrust Litigation*,
18     490 F. Supp. 1089 (N.D. Cal.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19     *Foremost Pro Color, Inc. v. Eastman Kodak*,
703 F.2d 534 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

20

*In re IBM Peripheral CDP Devices Antitrust Litigation*,
21     481 F. Supp. 965 (N.D. Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

22     *Image Technical Srvcs, Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22, 23

23

*Innovation Data Processing, Inc. v. IBM Corp.*,
24     585 F. Supp. 1470 (D.N.J. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

25     *Jefferson Parish Hospital District No. 2 v. Hyde*,
466 U.S. 2 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26

*Lexmark International, Inc. v. Static Control Components, Inc.*,
27     387 F.3d 522 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 18

28

ii

*Los Angeles Land Co. v. Brunswick Corp.,*
6 F.3d 1422 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Microsoft v. United States,*
253 F.3d 34 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Nobel Scientific Industrial v. Beckman Instruments,*
670 F. Supp. 1313 (D. Md. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Northern Pacific Railway Co. v. United States,*
356 U.S. 1 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Oahu Gas Services v. Pacific Resources, Inc.,*
838 F.2d 360 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rebel Oil Co. v. Atlantic Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Response of Carolina v. Leasco Response,*
537 F.2d 1307 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rutman Wine Co. v. E. & J. Gallo Winery,*
829 F.2d 729 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Tate v. Pacific Gas & Electric Co.,*
230 F. Supp. 2d 1072 (N.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Transamerica Compensation Co., Inc. v. IBM,*
698 F.2d 1377 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. LSL Biotech.,*
379 F.3d 672 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Verizon Communications, Inc. v. Law Offices of Curtis Trinko, LLP,*
540 U.S. 398 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ways & Means v. IVAC Corp.,*
506 F. Supp. 697 (N.D. Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## STATE CASES

*Santa Cruz Medical Clinic v. Dominican Santa Cruz Hospital,*
1995 WL853037 (N.D. Cal. Sept. 7, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Ticketmaster Corp. v. Tickets.com, Inc.,*
2003 WL. 21397701 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## FEDERAL RULES AND STATUTES

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

15 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

iii

1

## TREATISES

2    Areeda and Hovenkamp, X Antitrust Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2    Apple Computer, Inc.'s ("defendant" or "Apple") motion to dismiss Thomas William

3  Slattery's ("plaintiff" or "Slattery") complaint is without merit, and should be rejected out of hand.

4    Apple predicates its attack on Slattery's tying claims by arguing that the indispensable

5  prerequisite to a tying claim is a seller's express refusal to sell the allegedly tying product without

6  the tied product.   As shown below, however, while the foregoing assuredly gives rise to a tying

7  offense, such express or explicit refusal is not an indispensable prerequisite.   Instead, this Court,

8  along with the Ninth Circuit and virtually every other court considering the question, has also found

9  that a tying case may be stated, even absent such an express condition, if the ability to purchase the

10  tying and tied products separately is not made available to the consumer on terms as favorable as if

11  the consumer purchased both products from the defendant.   Here, Slattery has alleged that Apple

12  prevents him from playing any of the music files bought from Apple's iTunes store on a portable

13  hard-drive digital music player unless Slattery purchases *both* the music file *and* the portable hard-

14  drive digital music player from Apple.   If Slattery purchases either one of these products from a

15  source other than Apple, then Apple implements a feature that prevents Slattery from playing his

16  purchased music file on the his portable hard-drive digital music player.   That the iPod device or

17  iTunes music file may still be used without the other for other unrelated purposes (to, for example,

18  play an iTunes file on a computer) does not negate that Apple prevents consumers from fully using

19  either product unless consumers agree not to buy the complementary product from a source other

20  than Apple.   That behavior suffices to state a tying claim under the applicable law.

21    Apple's attack on Slattery's Section 2 monopolization claims fares no better.  Apple's initial

22  argument, to the effect that Slattery has failed to plead the requisite monopoly market power, is

23  belied by the express allegations of the complaint, which clearly meet the "market power" notice

24  pleading requirements set forth by the Ninth Circuit.  Apple also tries to shoehorn plaintiff's case

25  into the United States Supreme Court's recent decision in *Verizon Communications, Inc. v. Law*

26  *Offices of Curtis Trinko, LLP,* 540 U.S. 398 (2004).  But *Trinko* has no application to this case.

27  Instead, Slattery quite specifically alleges that Apple has purposefully rigged and altered the

28  voluntarily adopted AAC open-source music encoding format, by embedding within it an Apple-

1

1 | proprietary code, so as to prevent competing portable hard-drive digital music players from playing
2 | songs purchased from iTunes (and preventing music files purchased from a competing online
3 | vendor from playing on the iPod). Further, the complaint also documents how once competing
4 | online music sellers, like RealNetworks, sold songs that did manage to play on Apple's iPod, Apple
5 | once again changed its iPod lockout code for the explicit purpose of preventing such competing
6 | music vendors from selling songs capable of being played on the iPod. Under these circumstances,
7 | this Court's decisions and those of other federal appellate courts (and even *Trinko*), all recognize
8 | that a claim for unlawful monopolization may be stated.

9 |      Apple's most blatant misstatement of law comes in the form of its attack on Slattery's claim
10 | for unlawful monopolization through monopoly leveraging. Apple cites to *Alaska Airlines, Inc v.*
11 | *United Airlines*, 948 F.2d 536 (9th Cir. 1991) for the proposition that "the Ninth Circuit does not
12 | recognize monopoly leveraging claims," (Dft's Br. at 14:5), when, in fact, *Alaska Airlines* held the
13 | precise opposite. So too have the several Ninth Circuit decisions that have cited to *Alaska Airlines*
14 | as recognizing monopoly leveraging claims. Because Slattery alleges all the requisite elements of a
15 | monopoly leveraging claim under Ninth Circuit law, Apple's challenge to these claims should be
16 | summarily rejected.

17 |      Because Apple's attacks on Slattery's federal antitrust claims fail, so must Apple's
18 | challenges to Slattery's state law claims. The Cartwright Act specifically recognizes a cause of
19 | action for unlawful tying, as is properly alleged in Slattery's complaint. The California Unfair
20 | Competition Law reaches any unlawful and/or unfair business practice, and violations of the federal
21 | antitrust laws assuredly qualify as both. Lastly, Apple's contention that Slattery cannot state a claim
22 | for unjust enrichment because he has pled an actual contract between Apple and himself fails for at
23 | least two reasons. First, the Federal Rules of Civil Procedure allow Slattery to plead in the
24 | alternative, even when the alternative claims are inconsistent with one another. Second, Apple
25 | ignores that a contract that violates the antitrust laws is necessarily void ab initio and, therefore, has
26 | no legal effect, because an antitrust offense (such as a tying contract) is a criminal violation. Thus,
27 | if proven, Slaterry's allegations would render his contract with Apple void, thereby removing the
28 |

2

1  legal impediment that a valid contract forbids a plaintiff from also recovering under an unjust

2  enrichment quasi-contract theory.

3      For all of the foregoing reasons, and as is more fully detailed below, Apple's motion to

4  dismiss Slattery's class action complaint should be denied.

5  **FACTUAL BACKGROUND**

6      The facts underlying plaintiff's claims are set forth in Slattery's 27-page complaint. By way

7  of summary, this is a consumer antitrust putative class action complaint. Slattery, a consumer of

8  Apple's iPod portable hard-drive digital music player and of Apple's iTunes online music store,

9  alleges that there are two separate relevant markets pertinent to this action. The first is the relevant

10 market for the legal online sale of digital music files. Complt., at ¶ 11. In his complaint, Slattery

11 alleged with detailed specificity the reasons why such a relevant market definition was proper (*id.* at

12 ¶¶ 12-21), and further alleged that, through its iTunes online music store, Apple possessed

13 monopoly market power within this relevant market. *Id.* at ¶¶ 20-21. The second relevant market

14 alleged by Slattery is the market for portable hard-drive digital music players. *Id.* at ¶ 11. Again,

15 Slattery provided detailed reasons why this market was separate from the market for other different

16 music players like compact discs or cassette tapes. *Id.* at ¶ 22. Slattery further alleged that, through

17 its iPod device, Apple possessed monopoly market power in this second market, as it possessed over

18 90 percent market share. *Id.* at ¶ 24.

19     Although a number of antitrust violations are pled, all relate to Apple's anticompetitive

20 conduct in connection with the manner in which Apple forecloses iTunes digital music files from

21 being played on any portable hard-drive digital music player other than an iPod, and in the manner

22 in which Apple similarly forecloses music files downloaded from an online music vendor other than

23 iTunes from being played on the iPod. The complaint alleges that Apple adopted the open-source

24 AAC music encoding format for its digital music files—an open-source format used by many

25 competing vendors and players that would allow iTunes' music files to play on many different

26 competing portable hard drive digital players. *Id.* at ¶¶ 37-45. Slattery alleges that, in order to stifle

27 competition, Apple altered this open code AAC format by embedding within it a separate

28 proprietary code that locks out portable hard drive digital music players other than the iPod from

3

1  playing iTunes music files, and that also locks out songs bought from online music vendors other

2  than iTunes from being played on the iPod. *Id.* at ¶¶ 26-27, 37-45. Apple calls the AAC format that

3  it has altered by embedding this proprietary lock-out code, an "AAC Protected" format. *Id.* at ¶ 41.

4         The net effect of Apple's alteration and rigging of the AAC format in this manner is that in

5  order to play a music file purchased from Apple's iTunes (the monopolist) on a portable hard-drive

6  digital music player, the user must purchase *both* the online digital music file *and* the portable hard-

7  drive digital music player from Apple. *Id.* at ¶¶ 41-43. Apple's modification has turned the AAC

8  open-source format into the "AAC Protected" format, and, as Apple's own website explains, "only

9  iPod can play AAC protected songs." *Id.* at ¶ 41 and at Ex. A to Complt. Likewise, due solely to

10 Apple's actions, an owner of an Apple iPod digital player who wishes to legally purchase online

11 digital music files must also purchase such files only from Apple's iTunes to the exclusion of any

12 other competing online music vendor. *Id.* at ¶ 46. But for Apple's rigging and alteration of the open

13 source AAC format by inclusion of this lock-out code, iTunes files would be readily playable on any

14 number of competing portable hard-drive digital music players other than the iPod, and owners of

15 an iPod could have played online digital music files purchased from any number of competing

16 online music vendors other than Apple's iTunes store. *Id.* at ¶¶ 43, 46.

17        In addition to Apple's initial alteration of the open-source AAC format into its proprietary

18 "AAC Protected" format, Slattery also documented how when RealNetworks, a major competing

19 online vendor of digital music files, managed to independently sell digital music files that would

20 play on Apple's iPod, Apple immediately proceeded to once again change its software code so as to

21 lock out RealNetwork's files from being played on Apple's iPod devices. *Id.* at ¶¶ 46-50.  Thus,

22 even though RealNetworks' digital music files were being sold for half the price of Apple's iTunes

23 files, Apple's actions prevented consumers of the iPod (the monopoly product) from accessing these

24 competing music files. *Id.* at ¶¶ 48-49.

25        Counts I and II assert tying claims under Section 1 of the Sherman Act, claiming,

26 respectively, that, by its actions, Apple tied the purchase of iTunes' files to the purchase of an iPod,

27 and vice versa. Counts III and IV allege monopolization claims under Section 2 of the Sherman Act

28 of each of the relevant product markets. Counts V and VI allege unlawful monopolization of each

4

1   of the product markets under a theory of monopoly leveraging because Apple had used its monopoly

2   power in the online music sale market to obtain or attempt to obtain a monopoly in the separate

3   market for portable hard-drive digital music players, and vice-versa. Counts VII-X allege state and

4   common law claims based on the same underlying conduct as the federal antitrust claims.

5   **ARGUMENT**

6   **I.    APPLE'S ATTACKS ON SLATTERY'S TYING CLAIMS ARE MERITLESS.**

7           **A.    An Express Refusal To Sell the Tying and Tied Products Separately Is Not An
                    Indispensable Prerequisite To A Tying Violation.**

8

9           Apple attacks Slattery's tying claims (Counts I and II) on the sole ground that Apple does

10  not explicitly condition its sale of an iPod portable hard-drive digital music player on the buyer's

11  purchase of a music file from iTunes, or vice-versa. *See* Dft's Br. at 5:9-12. Absent such an explicit

12  refusal, Apple maintains, no tying violation can possibly exist. Apple's analysis, however, proves

13  much too facile.

14          Two products can still be found to be tied for purposes of a Section 1 violation even though,

15  as here, they can technically be purchased separately. This proposition is easily demonstrated. One

16  need only consider the example where a seller with market power in market A refuses to sell

17  product A unless buyers also agree to purchase product B from the seller. This is an explicit tie, as

18  even Apple acknowledges. Suppose, however, that in addition to the foregoing example, the same

19  seller also allows customers to buy both products separately, but provides that if they do so, product

20  A will cost the buyer $1 million more than if the products are bought together. Although the seller

21  technically allows consumers the "option" to purchase the products separately, he cannot escape

22  tying liability because this purported "separate products option" is not made available to consumers

23  on equivalently favorable terms as the tied option. Professors Areeda and Hovenkamp explain why

24  an explicit refusal to sell unless both products are purchased together is not (as Apple maintains) an

25  indispensable requirement for a tying violation:

26          If followed literally, this test would find no tie even when the defendant offers product A
            for a billion dollars and the package for a thousand. This would eviscerate tying scrutiny,
27          even under the rule of reason, for any seller could tie with impunity simply by setting a
            sufficiently large package discount. No matter how strong one's criticism is of
28          substantive tying doctrine, this loophole is unacceptable. Our conclusion is confirmed by

5

1

2

3
> Clayton Act §3 language, which calls for tying scrutiny of those who "fix a price . . . or discount . . . or rebate" on the condition that buyers not deal with the defendant's competitors. It is further confirmed by the many cases recognizing that a package discount can be a tie.

4   Areeda and Hovenkamp, X Antitrust Law, ¶1758(b) (citations omitted).

5          This Court, the Ninth Circuit, and all other federal courts considering the question have

6   adopted the foregoing rationale. None adopt Apple's simplistic argument that so long as the

7   defendant allows the two products to be sold separately, irrespective of the restrictions imposed on

8   such "separate sales," no tie can possibly exist. Thus, in *Ways & Means v. IVAC Corp.*, 506 F. Supp

9   697, 701 (N.D. Cal. 1979), *aff'd* 638 F.2d 143 (9th Cir. 1981), this Court went out of its way to hold

10  that "separate availability will not preclude antitrust liability where a defendant has established its

11  pricing policy in such a way that the only viable economic option is to purchase the tying and tied

12  products in a single package." *See also In re Data General Corp. Antitrust Litig.*, 490 F. Supp 1089,

13  1110-11 (N.D. Cal. 1980) (fact that computer manufacturer technically offered buyers option to

14  purchase its CPU and memory separately did not save defendant from tying offense because

15  practical reality of arrangement effectively meant that products would be bought together).

16         Echoing the foregoing and reaching the same opinion, the Fourth Circuit agreed that so long

17  as the "option" provided by the seller to purchase products separately is not viable, "[t]here need not

18  be an explicit condition that the buyer of the tying product buy the tied product." *Nobel Scientific*

19  *Indus. v. Beckman Instruments*, 670 F. Supp 1313, 1324 (D. Md. 1986), *aff'd* 831 F.2d 537 (4th Cir.

20  1987). Also in accord is the Eighth Circuit's decision in *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d

21  1483, 1500 (8th Cir. 1992), in which the court explained that "[i]n cases where there is no explicit

22  agreement which conditions the purchase of the tying product upon the purchase of the tied product,

23  an illegal arrangement may still be shown if the defendant's policy makes the purchasing of the tying

24  and tied products together the only viable economic option." Or, as the Third Circuit has also

25  confirmed, "[a] number of cases have recognized, however, that an illegal tie-in may exist even

26  when the seller has not expressly conditioned the sale of one product upon purchase of another, if

27  the existence of a tie-in can otherwise be established from business conduct." *Bogosian v. Gulf Oil*

28  *Corp.*, 561 F.2d 434, 450 (3d Cir. 1977).

1      Even the Supreme Court precedent cited by defendant contradicts Apple's underlying

2  argument.  Apple correctly cites to *Northern Pacific Railway Co. v. United States*, 356 U.S. 1

3  (1958), *cited in* Dft's Br. at 4-5, as the seminal Supreme Court case on tying.  But *Northern Pacific*

4  actually stands for the opposite proposition than that cited by Apple because its facts certainly did

5  *not* preclude customers from buying both the tying and the tied products separately.

6      Instead, as the Court explained, in *Northern Pacific*, the defendant railroad company owned

7  tracts of land and leased the land to lessees so long as the lessees agreed "to ship over its [i.e.

8  defendant's] lines all commodities produced or manufactured on the land, *provided that its rates*

9  *(and in some instances its service) were equal to those of competing carriers*." *Northern Pac. Ry.*

10  *Co.*, 356 U.S. at 3.  By the very terms of the contractual provision at issue, the lessees were still able

11  to lease the land from defendants and separately purchase transportation services from another

12  carrier if any other carrier offered the lessees less expensive transportation.  Thus, quite obviously,

13  the contract at issue did not categorically compel the lessees to buy both the land and the

14  transportation from the defendant.  Nevertheless, as Apple correctly points out, the Supreme Court

15  still held that such a clause constituted an unlawful tying arrangement, and rejected the defense that

16  because the contract still technically allowed the lessees the option to purchase their transport

17  separately from defendants' land lease no tie should lie.  *Id.* at 521-22.  The alleged tying

18  arrangement at issue here is even more pronounced than the one condemned by the Court in

19  *Northern Pacific* because here, unlike in *Northern Pacific*, Apple iPod customers are unable to play

20  music files on their iPod that are bought from a competing online music vendor to Apple's iTunes

21  store, even if these competing vendors sell their songs less expensively than iTunes.

22      At bottom, all of the foregoing authorities teach that while an explicit refusal to sell the tying

23  product unless the buyer also agrees to buy the tied product leads to a tying offense, tying may also

24  be shown even absent such an explicit refusal.  For this reason, Apple's overly simplistic attack on

25  Slattery's tying claims fails.  To avoid a tying offense, the "separate products" option must be made

26  available to consumers on like terms as are offered if both products are purchased from the

27  defendant.  Simply put, the correct legal standard is that "[t]ie-ins are non-coercive, and therefore

28  legal, *only if the components are separately available to the customer on a basis as favorable as the*

7

1 | *tie-in arrangement.*" *Advance Business Sys. & Supply Co. v. SCM Corp.*, 415 F.2d 55, 62 (4th Cir.
2 | 1969) (emphasis added).

### 1.    Apple's Conduct Falls Within the Tying Prohibition.

4 |      Given the foregoing standard, the pertinent question is whether Slattery has alleged
5 | sufficient facts from which a jury could find that Apple offers consumers the option to purchase the
6 | iPod device from Apple and online music files separately from another source on terms that are
7 | materially less favorable than if consumers purchase both products from Apple. As set forth by the
8 | explicit allegations of Slattery's complaint and by Apple's own documents (which are incorporated
9 | into the complaint), the answer is assuredly in the affirmative. The reason is that, by embedding its
10 | own proprietary code into the otherwise open-source AAC music encoding format, and altering it
11 | into Apple's so-called "AAC Protected" format, Apple disables a customer's ability to play a music
12 | file purchased from Apple's iTunes online music store on a portable hard-drive digital music player
13 | *unless the consumer also purchases that portable hard-drive music player from Apple (i.e.*
14 | *purchases an Apple iPod)*. (*See* Complt. at ¶¶ 26-27, 37-43). Put differently, while Apple lets
15 | consumers who purchase *both* online music songs *and* a portable hard-drive digital music player
16 | from Apple play those songs on the portable hard-drive digital music player, Apple overtly disables
17 | that option if the consumer elects to purchase his portable hard-drive digital music player from a
18 | source other than Apple. *See* Complt at Ex. A (Apple website's disclaimer that "only iPod can play
19 | AAC Protected songs.").

### 2.    Other Uses To Which iTunes or iPod Can Be Put To Separately Are Irrelevant.

22 |      Perhaps cognizant of the effect of these restrictions, Apple argues that consumers who do
23 | not purchase a portable hard-drive digital music player from Apple can, nevertheless, still play
24 | songs from Apple's iTunes music store on different devices altogether, such as a computer or a
25 | compact disc player. But being able to play an iTunes song on a computer is plainly not the same as
26 | being able to play that song on a portable hard-drive digital music player. It is self-evident that the
27 | crucial aspect of portability that allows users of portable hard-drive digital music players to listen to
28 | songs while they jog, are on the subway, or in any other mobile situation cannot be readily achieved

8

1   if one is required to lug around a computer to play the purchased song.  Similarly, being allowed to

2   play a song on a compact disc player (even if portable) is not tantamount to being allowed to play

3   songs on a portable hard-drive digital music player.  A compact disc player requires the user to also

4   carry around all of the different discs that contain the various songs that the user may wish to listen

5   to at any point in time, whereas a portable hard-drive digital music player does not require users to

6   carry any additional external media because all of the desired song files are saved in the device's

7   hard-drive.   For this reason (among others), the complaint alleged that there is a separate relevant

8   market for portable hard-drive digital music players, as "portable hard drive digital music players

9   are portable devices that enable their users to listen to digital audio recordings without requiring

10  users to carry any external media, such as compact discs, cassette tapes, or cartridges." Complt., at ¶

11  22.

12         The ability to play songs purchased from Apple's iTunes music store on a portable hard-

13  drive digital music player is an attribute of significance to consumers.  Because Apple prevents

14  consumers from exercising that option unless consumers purchase *both* the music file *and* the

15  portable digital hard-drive music player only from Apple, Apple has failed to make the separate

16  products available to consumers on equally favorable terms as they are made available if both are

17  purchased from Apple.  Apple, therefore, may be found liable for tying.

18         **3.    Apple's "Technological Interrelationship" Defense Has Been Rejected.**

19  Similarly unavailing is Apple's claim that tying cannot be found because there exists a

20  "technological interrelationship among [its] complementary products." Dft's. Br. at 6:9.  The

21  Supreme Court has explicitly rejected this defense in *Jefferson Parish Hospital District No. 2 v.*

22  *Hyde*, 466 U.S. 2 (1984), wherein it went out of its way to note that "[w]e have often found

23  arrangements involving functionally linked products at least one of which is useless without the

24  other to be prohibited tying devices." *Id.* at 21, n.30 (citing cases).  The same attempted defense

25  suffered an equally doomed fate in the recent seminal case of *Microsoft v. United States*, 253 F.3d

26  34, 66-67 and 96-97 (D.C. Cir. 2001) (*en banc*), wherein the *en banc* panel of the D.C. Circuit

27  rejected Microsoft's argument that the technological interrelationship between its Windows

28  operating system and its Internet Explorer browser necessarily justified the tie between the two.

9

1    Further, Apple's "technological-interrelationship" argument is particularly unavailing here because

2    Slattery's complaint alleges that, through their own technology, other competing online music

3    vendors, like RealNetworks, were able to sell songs online that *would* play on Apple's iPod, but that

4    upon learning of that, Apple proceeded to update its code to preclude songs sold by RealNetworks

5    from playing on Apple's iPod anymore. *See* Complt., at ¶¶ 46-50.[1]  Clearly then, it is not an

6    inherent technological feature that precludes competing vendors from selling their songs for play on

7    iPod, but it is the affirmative exclusionary conduct undertaken by Apple that precludes this result.

8              **B.    Accepting Apple's Position Would Lead To Absurd Results.**

9              Accepting Apple's argument that, under the alleged facts, no tie can exist as a matter of law

10   would lead to absurd, unacceptable, and anticompetitive results.  Assume for example, that Ford had

11   the requisite monopoly market power in the market for automobiles in the United States.  In Apple's

12   world, Ford could introduce an electronic code in its vehicles' fuel pumps that would prevent the

13   automobiles from reaching speeds above 20 miles per hour unless the automobile owner also

14   purchased gasoline sold only by Ford that contained a proprietary formula recognized by the

15   vehicle's fuel pump code.  In Apple's world, because the vehicle could still technically be used

16   without Ford's gasoline and could be purchased separately from the gasoline, no tie would exist.

17   Further, under Apple's argument, because the vehicle could still be used for travel at speeds below

18   20 miles per hour even while using a rival's gasoline, no tying violation could lie, even though no

19   user could travel on the highways unless they also bought the gasoline from Ford.

20             Not surprisingly, courts have rejected such attempts by monopolists to insert lock-out

21   devices whose purpose is to extend a monopolist's market power into complementary markets. *See*

22   *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 552 (6th Cir. 2004) (Merritt,

23   J., concurring) ("If we were to adopt Lexmark's reading of the statute, manufacturers could

24   potentially create monopolies for replacement parts simply by using similar, but more creative, lock-

25   out codes. Automobile manufacturers, for example, could control the entire market of replacement

26

27       [1]   Apple intimates that it was appropriate for it to alter its code because RealNetworks was
28   guilty of "hacking.".  Dft's Br. at 13, n.8.  Merely leveling such a self-serving accusation of hacking,
     without actually proving that allegation, cannot justify Apple's conduct.

                                          10

1 | parts for their vehicles by including lock-out chips. Congress did not intend to allow the DMCA to
2 | be used offensively in this manner.").

3 |     The same absurd scenario would result here if Apple's argument were adopted. To be sure,
4 | Apple's iPod may be put to some uses even without purchasing music files only from Apple (much
5 | like the Ford vehicle could be put to use without Ford's gasoline, but only below 20 mph), but
6 | material uses for which consumers purchase a portable hard-drive digital music player are rendered
7 | inoperable unless iPod owners also purchase their music files from Apple.

8 |     **C.    Apple's Authorities Are Readily Distinguishable and Inapplicable.**

9 |     Faced with the overwhelming authority undermining its argument, Apple relies principally
10 | on a single case— *Foremost Pro Color, Inc. v. Eastman Kodak*, 703 F.2d 534 (9th Cir. 1983).
11 | *Foremost*, however, is readily distinguishable. In *Foremost*, the plaintiff sued Kodak for, *inter alia*,
12 | a tying violation after Kodak introduced its new Kodak 110 Instamatic camera. *Id*. at 538. The crux
13 | of the claim was that Kodak's new camera technology required the use of new Kodak 110 film, and
14 | that such film could only be processed with new chemical and paper technology that Kodak
15 | introduced at the same time. *Id*. Thus, Foremost, a competing photo processor, claimed that if it
16 | purchased the new camera it would also be required to purchase Kodak's new paper and chemicals
17 | in order to provide developing service for customers of the new camera. *Id*. at 539-40. The Ninth
18 | Circuit refused to find a tie, and Apple now predicates its argument on that case.

19 |     As an initial matter, the Ninth Circuit emphasized that its opinion was limited to deciding
20 | whether the alleged conduct was unlawful per se under the antitrust laws because that is all that
21 | Foremost had pleaded. Thus, *Foremost* had no occasion to decide whether the same conduct would
22 | be found to be an unlawful tie under the rule of reason. The Ninth Circuit explicitly cautioned that
23 | it was reserving and not passing on this separate question. See Foremost, 703 F.2d at 541
24 | ("Foremost has not challenged the alleged tying arrangement under the rule of reason. Thus, the
25 | dispositive question before us is whether, under the *per se* rule, Foremost adequately pleaded the
26 | requisite coercion in its complaint."). Here, by contrast, Slattery has pleaded that Apple's alleged
27 | tie is unlawful under either/or the *per se* rule and/or the antitrust rule of reason. Complt, at ¶¶ 68,
28 | 75.

1     *Foremost*, moreover, is inapplicable to the instant case even as to its limited finding that

2 Kodak's conduct was not a *per se* unlawful tying offense. The reason is that in *Foremost*, all Kodak

3 was alleged to have done is to have come up with a new product, the Kodak 110 Instamatic camera.

4 The fact that there were as yet no other paper or chemical manufacturers that produced paper or

5 chemicals capable of being used with this new camera's film was merely an incidental effect of the

6 introduction of this new technology. There was, for example, no allegation that Kodak prevented

7 other rival manufacturers from manufacturing competing compatible paper or chemicals to kodaks'

8 camera if they so chose. Put simply, there was no conduct attributed to Kodak by which it

9 affirmatively sought to keep out competition in the paper or chemical market. As Professors Areeda

10 and Hovenkamp explain, Foremost decided that there was no *per se* tie under the particular facts

11 pleaded, "*[b]ut the court suggested a tying claim might have existed had the plaintiff alleged that*

12 *the defendant's 'dominant purpose . . . was to compel purchase of the entire system as a package,*

13 *rather than to achieve the legitimate role of marketing new, technologically superior products.'"*

14 *See* Areeda & Hovenkamp, X Antitrust Law, at ¶ 1757(a) n.7 (emphasis added), *quoting Foremost*,

15 703 F.2d at 542.

16     Unlike *Foremost*, Slaterry has pleaded facts that, if proven, would support a finding that

17 Apple's dominant purpose was to compel purchase of both the music file and the portable hard-

18 drive digital music player from Apple, thereby supporting a *per se* unlawful tying claim. By way of

19 example, Slattery alleged that when other competing online music vendors like RealNetworks

20 managed to sell song files that could be played on Apple's iPod device, Apple promptly changed its

21 proprietary lock-out code once again so as to ensure that these competing online music vendors

22 would be shut out from the iPod. Complt. at ¶¶ 46-50. In any event, unlike in *Foremost*, in the

23 instant action, Apple's lock-out of competing portable hard-drive digital music players or competing

24 online music vendors cannot be characterized as a mere "incidental" aspect of Apple's new

25 technology. It is, instead, the direct result of Apple's affirmative decision to embed its own

26 proprietary code within the open source AAC music encoding format, so as to foreclose competitors

27 from selling music files that would play on the iPod, or to foreclose other portable hard-drive digital

28 music players from playing songs purchased from iTunes. *Id.* at 26, 27, 37-45. Apple cannot claim

12

1   any new technology caused this circumstance. Apple, after all, used the same existing AAC

2   encoding format that would be compatible with many different vendors' music players and online

3   music files but for Apple's imposition of a lock-out code in the iPod and on iTunes' music files. *Id.*

4          Slattery's claim is in accord with *Response of Carolina v. Leasco Response*, 537 F.2d 1307

5   (5th Cir. 1976), in which franchisees of a computer time share business alleged that their franchisor

6   tied purchases of the franchise to the franchisees' agreement to purchase the requisite computer

7   hardware from the franchisor. *Id.* at 1310. The Fifth Circuit affirmed the grant of a JMOL in favor

8   of the defendant, after it found that the plaintiffs failed to provide any evidentiary support for their

9   claim that the defendant prevented them from purchasing the hardware components from a source

10  other than the defendant franchisor. *Id.* at 1329-30. The Fifth Circuit went out of its way, however,

11  to clarify that, "[o]f course, a different situation might be presented if Leasco refused to provide the

12  technical information necessary to assemble the components into the required configuration. But

13  there is no evidence in the record that such information was ever requested, or, if requested, would

14  have been refused by Leasco." *Id.* at 1330, n. 48.

15         The evidentiary proof found lacking in *Leasco* is alleged in Slaterry's complaint. Slattery

16  alleges (and Apple effectively concedes) that Apple refuses to make available to competitors the

17  code added by Apple to its iTunes files and iPod players that would be required in order to allow

18  competing vendors to sell music files for play on the iPod, or to sell competing portable hard-drive

19  digital music players that could play iTunes' music files. *See* Complt, ¶ 44. Under these facts,

20  *Leasco* holds that a tying claim may lie.[2]

21

22

23

_____

24         [2]  The only other case cited by Apple in support of its tying argument, is *Innovation Data Processing, Inc. v. IBM Corp.*, 585 F. Supp 1470 (D.N.J. 1984), *cited in* Dft's Br. at 7. But

25  *Innovation Data* did not deal with whether the complaint survived a Rule 12(b)(6) challenge. Instead, as Apple is forced to concede, *Innovation Data* was a *summary judgment* decision in which

26  the court acknowledged that the plaintiff was granted the "taking all of the discovery it had requested from IBM." *Id.* at 1471. Whether Slattery's case will ultimately survive summary

27  judgment (the only issue before the court in *Innovation Data*), however, is not before the Court in

28  Apple's current Rule 12(b)(6) motion.

13

1    Because Slattery alleges sufficient facts from which a jury could reasonably find the

2    existence of a tie between Apple's iPod and digital files purchased from Apple's iTunes music

3    store, defendant's attacks on Counts I and II of the complaint should be denied.

4    **II.    APPLE'S ATTACKS ON SLATTERY'S MONOPOLIZATION CLAIMS FAIL.**

5          Counts III and IV of the complaint allege that Apple has unlawfully monopolized the

6    markets for portable hard-drive digital music players and for online music files, respectively. See

7    Complt, at ¶¶ 76-85. Apple's attack on these claims is twofold. First, it claims erroneously that

8    "Slattery's allegations of market power in the two alleged markets are deficient." Dft's Br. at 8:9.

9    Second, Apple claims that Counts III and IV allege "only lawful refusals to deal" (*id*. at 9:27) that

10   are sheltered under the Supreme Court's recent decision in Trinko. *Id*. at 10:6-14:4, *citing Trinko*.

11   Neither argument is on point.

12         **A.    Slattery Properly Pleaded Apple's Monopoly Market Power.**

13         It is undisputed that Slattery explicitly pleaded that Apple possesses the requisite monopoly

14   market power in both of the alleged relevant markets. In unambiguous terms, Slattery alleged that,

15   "[w]ithin the relevant market for online legal sales of digital music files, Defendant Apple, through

16   its iTunes online music store, possesses and has possessed throughout the Class Period monopoly

17   market power sufficient to exclude competition. Upon information and belief, during the Class

18   Period, iTunes' share of this relevant market has exceeded 80 percent." Complt., at ¶ 20. Slatttery

19   further alleged, that although other online music venues existed, due to their low market presence,

20   none of these vendors "pose price-constraining competition to Apple's iTunes online music store."

21   *Id*. at ¶ 21. Similarly, as to the market for portable hard-drive digital music players, Slattery

22   likewise alleged that, "[t]hrough its iPod device, Apple possesses monopoly market power in the

23   market for portable hard drive digital music player. Apple's iPod accounts for over 90 percent of

24   the market for portable hard drive digital music players in the United States." *Id*. at ¶ 24. Courts

25   have generally found that a 65% market share establishes a prima facie case of market power. *See*

26   *Image Technical Srvcs, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). Not

27   surprisingly, therefore, the Ninth Circuit has emphasized, that generally *"an allegation of a specific*

28   *market share is sufficient, as a matter of pleading, to withstand a motion for dismissal."  Cost Mgmt.*

14

1   *Srvcs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 936, 951 (9th Cir. 1996) (emphasis in original).

2   Apple's "market power" based attack, therefore, fails.

3          Further undermining Apple's argument, the Ninth Circuit just last year reiterated the already

4   well-established rule that "[n]otice pleading is all that is required for a valid antitrust complaint."

5   *United States v. LSL Biotech.*, 379 F.3d 672, 698 (9th Cir. 2004). Here, Slattery assuredly meets that

6   pleading standard and then some by alleging that Apple has the requisite market power and

7   evidencing that market power with specific market share figures. Nevertheless, playing "fast and

8   loose" with the holdings it purports to cite, Apple claims that the Ninth Circuit has repeatedly

9   rejected such allegations as insufficient. *See* Dft's Br. at 8:18-9:18 (citing cases). None of the cases

10  relied upon by Apple, however, were decided at the Rule 12(b)(6) pleadings stage on a motion to

11  dismiss. Instead, *American Prof'l Testing v. Harcourt Brace Jovanovich Legal*, 108 F.3d 1147 (9th

12  Cir. 1997), *cited in* Dft's Br. at 8:18-22, was decided on a JMOL after a full trial. Similarly, *Rebel*

13  *Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), *cited in* Dft's Br. at 8:22-25, was

14  decided on summary judgment after discovery showed that defendant's market share did not exceed

15  44 percent. Likewise *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993), *cited*

16  *in* Dft's Br. at 8:25-9:2), was decided after a full trial on the merits, as was *Oahu Gas Services v.*

17  *Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir. 1988), *cited in* Dft's Br. at 9:2-4. And,

18  *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21397701 (C.D. Cal. 2003), *cited in* Dft's Br. at

19  9:4-6, a district court case from outside this jurisdiction, was decided only on summary judgment.

20         That none of these cases was decided at the pleadings stage once the plaintiff gave notice

21  pleading that the defendant possessed the requisite market power is not surprising. The very case

22  cited by Apple holds that it is improper to dismiss a complaint at the Rule 12(b)(6) stage on the

23  basis that a defendant claims it lacks the market power alleged in the complaint, as market power is

24  a factual question for a jury to decide. *See Oahu Gas Serv.*, 838 F.2d at 363 ("Our previous

25  decisions establish that both market definition and market power are essentially questions of fact.").[3]

26  _____

27         [3]  Apple mischaracterizes *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir.
    1987) as "affirming grant of motion to dismiss where plaintiff failed to allege monopoly power with

28  requisite specificity." (Dft's Br. at 9:20-21.). The reason that *Rutman* was dismissed on the
    pleadings did not involve the *specificity* with which the plaintiff pleaded the defendant's market

15

1   Having pled the requisite allegations of market power, the complaint survives Apple's Rule 12(b)(6)

2   motion.

3           Ignoring the notice pleading requirements applicable to antitrust laws, and the Ninth

4   Circuit's holding that an allegation of market share suffices to allege market power at the pleading

5   stage, Apple claims that Slattery has failed to plead that there exist high barriers to entry into the

6   relevant markets.  Of course, no case actually holds that "high barriers to entry" is an actual pleading

7   requirement (instead, entry barriers may be factual *evidence* of actual monopoly power).  Even were

8   such a requirement necessary, Apple is plainly wrong in asserting in conclussory fashion that the

9   complaint fails to provide any basis for finding high entry barriers.  As the complaint pleads, and as

10  is self-evident, the online music songs forming part of that relevant market are protected by

11  copyright. *See* Complt., at ¶ 51 (noting copyright protection of underlying songs). That necessarily

12  prevents any would-be new entrant from simply launching a new competing online music sales

13  business to challenge Apple's dominant iTunes store.  Such a potential entrant would first have to

14  negotiate separate copyright licenses for each and every song it wished to offer for sale.  That

15  necessarily cost and time-consuming process necessarily impedes ease of entry of new competitors.

16          Further, the complaint alleges, that other than Apple, all other manufacturers of portable

17  hard drive digital music players (including such giants as Panasonic, Nokia, and Gateway) have

18  managed to garner less than ten percent of the online music market combined.  Complt., at ¶ 24.

19  That such corporate giants are unable to rise above a ten percent market share (as compared to

20  Apple's 92% market share) negates any suggestion that the relevant markets offer ease of entry and

21  competition by new entrants.  Even years after Apple's initial entry into the market, there is no

22  evidence that its market power has become less entrenched.

23

24  share. Instead, the court merely found that the market share actually pleaded in the complaint (25%
    of the market), even if proven, was insufficient as a matter of law to give rise to a finding of

25  monopoly market power.  Presumably, pleading a higher market share, as Slattery has done, would
    have sufficed. As the Ninth Circuit explained, "Appellant states that Gallo comprises 25% of

26  Rutman's business, and that Rutman is the largest wine distributor in the county. . . . Even assuming
    the 25% refers to Gallo's share of Rutman's business in the county, Rutman thereby admits that

27  three-quarters of its business is attributable to the twenty-eight other product lines it carries, among

28  which are Inglenook and Taylor." *Rutman*, 829 F.2d at 736.

16

1

**B.    Apple's Attempt to Shoehorn This Case Into Trinko Is Meritless.**

2    Apple's second attack on Slattery's monopolization claims is premised on the erroneous

3    premise that Slattery has alleged monopolization based on a "refusal to deal," and that Apple's

4    conduct is lawful under *Trinko*. But Slattery's claims are not premised on a "refusal to deal"

5    allegation, and Apple's contrived attempt to fit this case within the shelter of Trinko is unavailing.

6    **1.    This Is Not A "Refusal to Deal" Claim.**

7    In *Trinko*, the Supreme Court was called upon to decide whether a telecommunications

8    carrier that was subject to regulation by the Telecommunications Act of 1996 ("Telco Act") could

9    be held liable for unlawful monopolization when the extent of its alleged wrongdoing was its failure

10    to live up to statutory requirements imposed upon it solely by the Telco Act. Trinko, 540 U.S. at

11    401. Specifically, under Section 251 of the Telco Act, Verizon was required to assist its rivals by

12    allowing competing local exchange carriers to interconnect to otherwise purchase components of

13    Verizon's network. *Id.* at 402-03. Plaintiffs, relying on a finding made by the FCC that Verizon

14    had failed to properly adhere to this requirement, sued Verizon for antitrust violations, claiming that

15    Verizon's failure to assist its rivals as was required by the Telco Act stifled competition and led to

16    antitrust liability. *Id.* at 404. The Supreme Court rejected the claim because its noted that the

17    violation, while a possible breach of the Telco Act, did not violate any duties imposed upon Verizon

18    under the antitrust laws, as antitrust laws do not generally affirmatively require a firm to assist its

19    rivals. *Id.* at 407-10. Such duties only arose from the Telco Act's regulatory prescriptions, but were

20    not a requirement of the Sherman Act. *Id.*

21    Of significance, in *Trinko*, Verizon had not taken any affirmative act to shut out competition.

22    Rather, its alleged antitrust liability was predicated solely on its failure to fully adhere to Section

23    251 of the Telco Act, which called for it to assist its rivals. *Id.* Here, by contrast, the issue is not

24    whether Apple failed to assist its rivals. Instead, the complaint alleges that Apple took affirmative

25    steps of its own to ensure that no competitor to Apple's iTunes could possibly provide online music

26    songs that could be played on Apple's iPod, and that no portable hard-drive digital music player that

27    competes with iPod could ever play any song purchased from Apple's iTunes store. The complaint

28    documents at least two affirmative acts undertaken by Apple to ensure that such competition would

17

1    be stifled. First, Apple altered and rigged the open-source AAC music encoding format by

2    embedding within it a separate proprietary code that would prevent AAC players other than the iPod

3    from playing songs purchased from iTunes. Complt. at ¶ 26-27, 37-43. Had Apple not taken that

4    conduct, the complaint alleges, numerous competing players would be able to play iTunes' music

5    files because a number of such files adopted the open-source AAC music format. *Id.* at ¶ 43.

6    Second, the complaint alleges that once competing vendors like RealNetworks did manage to

7    provide online music files that could be played on the iPod, Apple once again altered the proprietary

8    code it embedded within its music files and on the iPod so that these competing music files would

9    no longer be able to be played on the iPod. *Id.* at ¶¶ 47-50. At the same time, Apple also threatened

10   consumers not to purchase such competing products as Apple would likely disable their connectivity

11   in the future. *Id.* at ¶ 49.

12              **2.    Slattery States A Monopolization Claim Based On Apple's Affirmative
                        Predatory and Exclusionary Design Changes to Its Products.**

13

14         These allegations are a far cry from the claim presented in *Trinko*. Here, the allegation is not

15   that Apple merely failed to live up to a regulatory obligation, but rather, that Apple took affirmative

16   steps in the way it altered its product design, so as to lock out competitors. Lexmark (cited at pp.

17   11, *supra*), decided post-*Trinko* indicates that such affirmative conduct to lock-out competitors is

18   impermissible. Similarly, this Court and the Ninth Circuit have recognized that an alleged

19   monopolist's design changes can trigger liability for unlawful monopolization when they are

20   implemented for the purpose of excluding competition. Thus, in *In re IBM Peripheral CDP*

21   *Devices Antitrust Litig.*, 481 F. Supp 965 (N.D. Cal. 1979), *aff'd sub. nom. Transamerica Comp.*

22   *Co., Inc. v. IBM*, 698 F.2d 1377 (9th Cir. 1988), this Court explained that:

23              It is not difficult to imagine situations where a monopolist could utilize the design of
                its own product to maintain market control or to gain a competitive advantage. For

24              instance, the PCMs were only able to offer IBM's customers an alternative because
                they had duplicated the interface, the electrical connection between the IBM

25              System/360 CPU and the IBM peripheral (or peripheral subsystem). *Had IBM*
                *responded to the PCMs' inroads on its assumed monopoly by changing the*

26              *System/360 interfaces with such frequency that PCMs would have been unable to*
                *attach and unable to economically adapt their peripherals to the ever-changing*

27              *interface designs, and, if those interface changes had no purpose and effect other*
                *than the preclusion of PCM competition, this Court would not hesitate to find that*

28              *such conduct was predatory. Or, if a monopolist frequently changed the*

                                                    18

1    *teleprocessing interface by which its computers communicate with remote terminals*
     *in such a way that its terminals would continue to function while others would fail,*
2    *and, if the only purpose and effect of the change was to gain a competitive advantage*
     *in the terminal market (where the monopolist lacked monopoly power), that use of*
3    *monopoly power would be condemned.*

4    *Id.* at 1002-03 (emphasis added).

5        The Court then went on to explicate the legal standard by which an alleged monopolist's

6    design changes would be scrutinized to determine whether they were subject to antitrust liability for

7    unlawful monopolization:

8        A more generalized standard, one applicable to all types of otherwise legal conduct
         by a monopolist, and one recently adopted by the Ninth Circuit, must be applied to
9        the technological design activity at issue here. *If the design choice is unreasonably*
         *restrictive of competition, the monopolist's conduct violates the Sherman Act. This*
10       *standard will allow the factfinder to consider the effects of the design on*
         *competitors; the effects of the design on consumers; the degree to which the design*
11       *was the product of desirable technological creativity; and the monopolist's intent,*
         *since a contemporaneous evaluation by the actor should be helpful to the factfinder*
12       *in determining the effects of a technological change.*

13   *Id.* at 1003, *citing Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 452 n.46 (9th Cir. 1979)

14       Slattery assuredly pled facts from which a jury could conclude that Apple's design changes

15   to the AAC format used in its iPod and iTunes songs are, in the words of this Court, "unreasonably

16   restrictive of competition." Slattery, for example, alleges that virtually all other online music

17   vendors and makers of portable hard-drive digital music players have managed to provide copyright

18   protection mechanisms in their digital files and players without instituting the restrictions put in

19   place by Apple. *See* Complt, at ¶ 52. Similarly, Slattery has alleged that Apple's design changes

20   have had unreasonably deleterious effects on competition by precluding any rival portable hard-

21   drive digital music players from playing iTunes songs, and by preventing any rival online music

22   vendors from selling songs for play on the iPod. *Id.* at ¶¶ 38, 40, 43. Moreover, the fact that Apple

23   once again changed its lock-out code in precise response to RealNetworks launch of music files that

24   could be played on the iPod, provides evidence of Apple's true intent—the intent to stifle

25   competition as opposed to provide a technological enhancement. Under Ninth Circuit standards,

26   therefore, Slattery has sufficiently pleaded a claim for unlawful monopolization.

27       *In re IBM Peripheral* is not a lone holding. In *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d

28   1340 (Fed. Cir. 1998), a patentee, C.R. Bard, faced an antitrust counterclaim. A competitor alleged

19

1  that C.R. Bard monopolized the market for replacement biopsy needles for its patented Biopty gun

2  by implementing design changes to its biopsy gun that precluded the use of competing replacement

3  needles on C.R. Bard's gun. *Id.* at 1382. Citing to *In re IBM Peripheral*, the Federal Circuit held

4  that "[i]n order to prevail on its claim of an antitrust violation based on Bard's modification of its

5  Biopty gun to prevent the use of competing replacement needles, M3 was required to prove that

6  Bard made a change in its Biopty gun for predatory reasons, *i.e.,* for the purpose of injuring

7  competitors in the replacement needle market, rather than for improving the operation of the gun."

8  *Id., citing In re IBM Peripherals*, 481 F. Supp at 1002. The Federal Circuit upheld the jury's verdict

9  on monopolization against C.R. Bard after confirming that "[t]he evidence was sufficient to support

10  . . . the jury's conclusion that Bard maintained its monopoly position by exclusionary conduct, to

11  wit, modifying its patented gun in order to exclude competing replacement needles." *Id.*

12      Here, the theory of monopolization liability that Slattery has actually pleaded, as opposed to

13  the one fabricated by Apple, is that Apple's anticompetitive design changes to the AAC music file

14  format and its iPod unlawfully restricted competition. Because Slattery has pleaded the requisite

15  elements for such a claim, Apple's challenge to plaintiff's monopolization claims must be rejected.[4]

16  **III.   BECAUSE APPLE MISSTATES THE LAW, ITS ATTACK ON SLATTERY'S
           MONOPOLY LEVERAGING CLAIMS MUST FAIL.**

17

18      Counts V and VI of the complaint allege claims for monopoly leveraging, in that Apple used

19  its monopoly market power in the market for online music sales to unlawfully monopolize or

20  attempt to monopolize the altogether separate market for portable hard-drive digital music players,

21  and vice versa. *See* Complt., at ¶¶ 86-91. In its most blatant misstatement of law, Apple represents

22      [4]  Even assuming *arguendo*, that it were proper to recast Slattery's monopolization claims as

23  being premised on a "refusal to deal" theory governed by *Trinko* and *Aspen Skiing Co. v. Aspen
    Highlands Skiing Corp.*, 472 U.S. 585 (1985), Apple's motion would still fail. Unlike *Trinko*,

24  Slattery alleges that Apple voluntarily adopted the AAC format as the method of disseminating its
    online music files to consumers, and used its original format for several years. Only once

25  competitors, like RealNetworks, began offering competing music files that could also be played on

26  Apple's iPod, did Apple suddenly terminate its way of dealing, and changed its voluntarily adopted
    AAC format so as to preclude the continued access to the iPod by competing music vendors. This

27  suffices to state a claim even under *Aspen Skiing* and *Trinko*. *See Trinko*, 540 U.S. at 399 (because
    Verizon's prior conduct was not voluntary, but statutorily compelled, departure from that prior

28  conduct does not lead to inference of anticompetitive intent).

20

1    to this Court that "the Ninth Circuit does not recognize monopoly leveraging claims." Dft's Br. at

2    14:5. Apple cites to *Alaska Airlines* for its representation, but in truth and in fact, as we show

3    *Alaska Airlines* and its progeny hold the precise opposite.

4    **A.    The Ninth Circuit Recognizes Monopoly Leveraging Claims.**

5         The doctrine of "monopoly leveraging" originated with the Second Circuit's decision in

6    *Berkey Photo, Inc. v. Kodak Eastman Co.*, 603 F.2d 263 (2d Cir. 1979). *Berkey Photo* announced

7    and applied the rule that "a firm violates § 2 by using its monopoly power in one market *to gain a*

8    *competitive advantage in another, albeit without an attempt to monopolize the second market*." *Id.*

9    at 275 (emphasis added), *quoted in Alaska Airlines*, 948 F.2d at 546. Berkey *Photo* thus represented

10   a rather easy standard to meet for "monopoly leveraging" because, in order to prevail, a plaintiff

11   need not have even shown that the defendant actually obtained or attempted to obtain monopoly

12   market power (the hallmark of any Section 2 claim) in the allegedly leveraged market—it sufficed if

13   the plaintiff merely showed that the defendant had used its monopoly power in the first market to

14   "gain a competitive advantage" in another. The question presented in *Alaska Airlines*, therefore,

15   was whether the Ninth Circuit would adopt this loosened standard advocated by the Second Circuit

16   in *Berkey*, not whether it would accept or reject "monopoly leveraging" as a whole. Not

17   surprisingly, *Alaska Airlines* rejected *Berkey Photo's* watered-down legal standard for monopoly

18   leveraging. Alaska Airlines, 948 F.2d at 547 ("We now reject *Berkey's* monopoly leveraging

19   doctrine as an independent theory of liability under Section 2.") (emphasis added). At the same

20   time, *Alaska Airlines* confirmed that, if a plaintiff could show that the defendant used its market

21   power to not only "gain a competitive advantage" in the second market, but instead, used it to

22   monopolize or, at least, to attempt to monopolize the second (i.e. leveraged) relevant market, then

23   liability under the "monopoly leveraging" doctrine would lie. *Id.* As *Alaska Airlines* explained:

24           *Berkey Photo's* monopoly leveraging doctrine fails to differentiate properly among
             monopolies. The anticompetitive dangers that implicate the Sherman Act are not
25           present when a monopolist has a lawful monopoly in one market and uses its power
             *to gain a competitive advantage* in the second market. By definition, the monopolist
26           has failed to gain, or attempt to gain, a monopoly in the second market. Thus, such
             activity fails to meet the second element necessary to establish a violation of Section
27           2. *Unless the monopolist uses its power in the first market to acquire and maintain a
             monopoly in the second market*, or to attempt to do so, there is no Section 2
28           violation.

21

1    *Id.* at 548 (emphasis added).

2          Thus, *Alaska Airlines* did not reject the "monopoly leveraging" doctrine, but merely held

3    that in the Ninth Circuit, unlike in the Second Circuit, to assert such a claim, the plaintiff cannot

4    simply allege that the defendant used its monopoly power in one market to gain a "competitive

5    advantage" in the second leveraged market. Instead, under *Alaska Airlines*, monopoly leveraging is

6    a cognizable theory of Section 2 liability, but requires a pleading that the defendant used its

7    monopoly power in the first market to either obtain or attempt to obtain a monopoly in the second

8    leveraged market. This is precisely the allegation that Slattery has made. *See* Complt. at ¶¶ 87, 90.

9          *Alaska Airlines* is not the Ninth Circuit's lone opinion on the viability of the "monopoly

10    leveraging" doctrine. Five years after *Alaska Airlines*, the Ninth Circuit decided *Cost Mgmt.*

11    *Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937 (9th Cir. 1996). Therein, citing to Alaska

12    Airlines, the Ninth Circuit reiterated in the most plain, unambiguous, and straightforward terms that:

13          ***It is clear from our analysis, however, that to the extent that "monopoly***
      ***leveraging" is defined as an attempt to use monopoly power in one market to***
14          ***monopolize another market, this theory remains a viable theory under Section 2.***

15    *Cost Mgmt Services, Inc.*, 99 F.3d at 951 (emphasis added), *citing Alaska Airlines*, 948 F.2d at 547.

16          In light of this clear pronouncement, Apple cannot possibly adhere to its stance that "the

17    Ninth Circuit does not recognize monopoly leveraging claims," (Dft's Br. at 14:5), or that "the

18    Ninth Circuit has rejected the monopoly leveraging doctrine as an independent theory of liability

19    under Section 2." *Id.* at 14:11-12. Instead, all that the Ninth Circuit has rejected is the Second

20    Circuit's unique formulation of the elements of that doctrine in *Berkey Photo*, while retaining the

21    viability of "monopoly leveraging" if market power in the leveraged market is shown. As if the

22    foregoing citations were not enough, one year after deciding *Cost Management*, the Ninth Circuit

23    again endorsed "monopoly leveraging" claims raised in *Image Technical Services, Inc. v. Eastman*

24    *Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997). Affirming, over Kodak's objection, the district court's

25    jury instruction on monopoly leveraging, the Ninth Circuit again explained the limited confines of

26    *Alaska Airlines*, and the continued vitality of "monopoly leveraging":

27          In *Alaska Airlines,* we held that "monopoly leveraging" could not exist as a basis for
      §2 liability *in the absence of the defendant using its monopoly in one market to*
28          *monopolize or attempt to monopolize the downstream market.* 948 F.2d at 547. We

22

1    characterized *Berkey Photo*'s downstream monopoly requirement—"to gain a
2    competitive advantage" --as too "loose."

3    *Image Technical Servcs., Inc.*, 125 F.3d at 1209 (emphasis added).

4      Rejecting Kodak's objection to the jury instruction on monopoly leveraging, the Ninth

5    Circuit explained, "Kodak accuses the district court of incorporating *Berkey Photo*'s repudiated

6    language into the court's instructions. We disagree. Instruction No. 29 required the jury to find that

7    Kodak's monopoly conduct be undertaken '*in order to maintain a* monopoly' in the downstream

8    market. *Berkey Photo*'s watered-down standard does not go this far." *Id.* (emphasis added).  Further

9    emphasizing that, while not adopting *Berkey Photo*'s "watered-down" standard," the doctrine of

10    "monopoly leveraging" was legally cognizable doctrine, the Ninth Circuit underscored that, "[t]he

11    ISOs proceeded under a "monopoly leveraging" theory, alleging that Kodak used its monopoly over

12    Kodak parts *to gain or attempt to gain a monopoly over the service of Kodak equipment*. The

13    Supreme Court endorsed this theory in *Kodak.*" *Id.* at 1208 (emphasis added), *citing Eastman*

14    *Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482-83 (1992).

15      **B. This Court Has Read *Alaska Airlines* As Recognizing Monopoly Leveraging.**

16      This Court has heeded the Ninth Circuit's recognition that monopoly leveraging remains a

17    cognizable claim, so long as one does more than rely on *Berkey Photo*'s lenient standards.  Thus, in

18    *Tate v. Pacific Gas & Elec. Co.*, 230 F. Supp.2d 1072 (N.D. Cal. 2002), this Court noted that:

19      It is correct that the Ninth Circuit has rejected the Second Circuit's view that 'a firm
  violates § 2 by using its monopoly power in one market to gain a competitive
20      advantage in another, albeit without an attempt to monopolize the second market.' It
  is not enough, the Ninth Circuit held, merely to obtain a competitive advantage in the
21      second market. Rather, the firm must at least attempt to monopolize the second
  market. . . . Plainly, however, plaintiffs here allege that PG & E *has* attempted to
22      monopolize the downstream market. It has attempted to use its monopoly over the
  distribution of natural gas in its service area to suffocate nascent competitive
23      technology in the downstream market within its service territory. This theory is
  viable under Ninth Circuit law.

24

25    *Id.* at 1081 (emphasis in original) (internal citations omitted).

26      Apple cites *to Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, 1995 WL 853037, at

27    *2, (N.D. Cal. Sept. 7, 1995), *cited in* Dft's Br. at 14:13-15, as support of its ill-founded contention

28    that the Ninth Circuit does not recognize monopoly leveraging claims. Apple notes that in *Santa*

23

1    *Cruz*, the "plaintiff voluntarily dismissed leveraging claims in light of *Alaska Airlines* decision."

2    Dft's Br. at 14:14-15.   Apple fails to mention, however, that the reason the "monopoly leveraging"

3    claim was voluntarily dismissed in *Santa Cruz* was not because the claim was not cognizable, but

4    rather because the plaintiffs failed to plead that the defendants had acquired monopoly power in the

5    leveraged market—an allegation that Slattery has made. *See* Complt, at ¶¶ 87, 90.   As this Court

6    explained, "Plaintiffs have agreed to the dismissal of their channeling claim in light of the law in

7    this circuit on 'monopoly leveraging' set forth in Alaska Airlines, Inc. v. United Airlines, Inc., 948

8    F.2d 536, 546-49 (9th Cir. 1991) *that requires plaintiffs to demonstrate monopoly power in the*

9    *ancillary services market*." *Santa Cruz*, 1995 WL 853037, at *2 (emphasis added).

10        Because the Ninth Circuit recognizes monopoly leveraging claims under Section 2, and

11   because Slattery pleads the requisite elements, Apple's attack on Counts V and VI must be rejected.

12   **IV.    SLATTERY HAS STATED PROPER STATE AND COMMON LAW CLAIMS.**

13        Because Slattery's federal antitrust claims withstand Apple's motion to dismiss, Apple's

14   motion must also be denied with respect to Slattery's state law claims.   Count VII must be sustained

15   because the Cartwright Act reaches tying claims, and Slattery has properly pleaded such claims. *See*

16   *Santa Cruz*, 1994 WL 619288, at *3 (tying is cognizable under the Cartwright Act).   Count VIII

17   must also be sustained.   Section 17200 of California's Unfair Competition Law reaches a

18   defendant's unlawful and/or unfair business conduct, such as the antitrust violations alleged.

19        As to Slattery's common law claim for unjust enrichment (Count IX), Apple argues that

20   Slattery cannot recover in quasi-contract for unjust enrichment, on the one hand, while at the same

21   time alleging that he purchased products from Apple as part of an actual contract. Dft's Br. at

22   17:23-25.   Apple's argument is misplaced for two reasons.   First, under Federal Rule of Civil

23   Procedure 8(e)(2), Slattery is allowed to plead alternative causes of action, even if the alternative

24   claims are inconsistent with one another. *See* Fed. R. Civ. P. 8(e)(2) ("A party may also state as

25   many separate claims or defenses as the party has regardless of consistency.").   Second, Apple's

26   argument is ill-founded because, if Slattery actually proves that Apple violated the antitrust laws,

27   then any contract that Slattery had with Apple would, *a fortiorari*, be rendered void, as antitrust

28   violations represent a criminal offense. *See* 15 U.S.C §§ 1 and 2 (violation of either section is a

24

1  felony). Any impediment to a party to a *valid* contract recovering under an unjust enrichment quasi-

2  contract theory would, therefore, necessarily be removed.    The common law monopolization claim

3  (Count X) withstands scrutiny for the same reason as do the federal monopolization claims.

### CONCLUSION

5        For the foregoing reasons, Apple's motion to dismiss the complaint should be DENIED.

7  Dated: February 28, 2005                          Michael D. Braun
                                                     Marc L. Godino
8                                                    BRAUN LAW GROUP, P.C.

10                                    By:    S/ MICHAEL D. BRAUN
                                             Michael D. Braun
11                                           12400 Wilshire Boulevard
                                             Suite 920
12                                           Los Angeles, CA 90025
                                             Tel:    (310) 442-7755
13                                           Fax:    (310) 442-7756

14                                           Roy A. Katriel
                                             THE KATRIEL LAW FIRM, P.C.
15                                           1101 30th Street, NW
                                             Suite 500
16                                           Washington, DC 20007
                                             Tel:    (202) 625-4342
17                                           Fax:    (202) 625-6774

18                                           Jacqueline Sailer
                                             Eric J. Belfi
19                                           MURRAY, FRANK & SAILER LLP
                                             275 Madison Avenue
20                                           Suite 801
                                             New York, NY 10016-1101
21                                           Tel:    (212) 682-1818
                                             Fax:    (212) 682-1892

22                                           **Attorneys for Plaintiff**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO.: C05-00037 JW
\\Fileserver\shareddocs\BLG\APPLE\PLD-WPD\Dismiss Opp.wpd

1                               **PROOF OF SERVICE**

2   STATE OF CALIFORNIA          )
                                        )ss.:

3   COUNTY OF LOS ANGELES   )

4        I am employed in the county of Los Angeles, State of California, I am over the age of 18 and
5   not a party to the within action; my business address is 12400 Wilshire Boulevard, Suite 920, Los Angeles, CA 90025.

6        On February 28, 2005, using the Northern District of California's Electronic Case Filing System, with the ECF ID registered to Michael D. Braun, I filed and served the document(s) described as:
7

8   **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT**

9        The ECF System is designed to send an e-mail message to all parties in the case, which constitutes service. According to the ECF/PACER system, for this case, the parties served are as
10  follows:

11   Eric J. Belfi, Esq.                                          ebelfi@murrayfrank.com

12   **Attorney for Plaintiff**

13   Adam Richard Sand , Esq.                        arsand@jonesday.com
                                             mlandsborough@jonesday.com
14                                                 cyip@jonesday.com

15   **Attorney for Defendant**

16   On February 28, 2005, I served the document(s) described as:

17   **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLASS ACTION COMPLAINT**
18

19   Roy A. Katriel, Esq.
    THE KATRIEL LAW FIRM, P.C.
    1101 30th Street, NW
20   Suite 500
    Washington, DC 20007
21   Tel:   (202) 625-4342
    Fax:  (202) 625-6774
22

23   Jacqueline Sailer, Esq.
    MURRAY, FRANK & SAILER LLP
    275 Madison Avenue
24   Suite 801
    New York, NY 10016
25   Tel:   (212) 682-1818
    Fax:  (212) 682-1892
26

    **Attorneys for Plaintiff**
27

28

1    by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

2          I served the above document(s) as follows:

3          BY MAIL.  I am familiar with the firm's practice of collection and processing correspondence
     for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with
4    postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware
     that on motion of the party served, service is presumed invalid if postal cancellation date or postage
5    meter date is more than one day after date of deposit for mailing in an affidavit.

6          I further declare, pursuant to Civil L.R. 23-2, that on the date hereof I served a copy of the
     above-listed document(s) on the Securities Class Action Clearinghouse by electronic mail through the
7    following electronic mail address provided by the Securities Class Action Clearinghouse:

8                              **christi@law.stanford.edu**

9          I declare that I am employed in the office of a member of the bar of this Court at whose direction
     the service was made.
10
           Executed on February 28, 2005, at Los Angeles, California 90025.
11

12
                                          s/ LEITZA MOLINAR
13                                           Leitza Molinar

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28