1   Michael D. Braun (167416)
    BRAUN LAW GROUP, P.C.
2   12400 Wilshire Boulevard
    Suite 920
3   Los Angeles, CA 90025
    Tel:    (310) 442-7755
4   Fax:    (310) 442-7756
    E-mail: service@braunlawgroup.com
5
    Roy A. Katriel (Admitted Pro Hac Vice)
6   THE KATRIEL LAW FIRM, P.C.
    1101 30th Street, NW
7   Suite 500
    Washington, DC 20007
8   Tel:    (202) 625-4342
    Fax:    (202) 625-6774
9   E-mail: rak@katriellaw.com

10  Brian P. Murray
    Eric J. Belfi (Admitted Pro Hac Vice)
11  MURRAY, FRANK & SAILER LLP
    275 Madison Avenue
12  Suite 801
    New York, NY 10016-1101
13  Tel:    (212) 682-1818
    Fax:    (212) 682-1892
14  Email:  ebelfi@murrayfrank.com

15  **Attorneys for Plaintiff**

16

17              **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19                      **SAN JOSE DIVISION**

20

21  THOMAS WILLIAM SLATTERY,           )    **CASE NO.: C05-00037 JW**
    Individually, And On Behalf Of All Others )
22  Similarly Situated,                )    **CLASS ACTION**
                                       )
23                      Plaintiff,     )    **FIRST AMENDED CLASS ACTION**
                                       )    **COMPLAINT**
24          vs.                        )
                                       )
25  APPLE COMPUTER, INC.               )
                                       )
26                      Defendant.     )
                                       )
27  _____  )

28

1    Pursuant to the Court's September 9, 2005 Order Grating in Part and Denying in Part

2  Defendant's Motion to Dismiss the Class Action Complaint, Plaintiff Thomas William Slattery

3  hereby files his First Amended Class Action Complaint.

4                              **NATURE OF THE ACTION**

5    1.    Plaintiff Thomas William Slattery ("Plaintiff" or "Slattery") brings this action

6  individually on behalf of himself and on behalf of all other similarly situated persons who have

7  purchased online music recordings directly from Apple's online iTunes music store for playback on

8  portable hard drive digital music players.  In the normal course of business, a music Compact Disc

9  ("CD") purchased at any neighborhood music store is playable on any CD player of the customer's

10  choosing.  Thus, it would be egregious and unlawful for a major retailer such as Tower Records, for

11  example, to require that all music CDs purchased by consumers at Tower Records stores be played

12  only with CD players purchased at Tower Records.  Yet, this is precisely what Apple has done.

13  Apple, which possesses monopoly market power in the relevant market for the legal sale of online

14  digital music files through its Apple iTunes online music store, prevents consumers who purchase

15  music recordings from Apple's iTunes online music store from playing this music on any portable

16  hard drive digital music player other than Apple's own iPod portable digital music player.  This

17  unlawful bundling and tying arrangement violates the federal antitrust laws and California's unfair

18  competition law by suppressing competition, denying consumer choice, and forcing consumers to

19  pay supra-competitive prices for their digital portable music players.  Worse yet, Apple similarly

20  requires that owners of its iPod portable hard drive digital music player only be able to purchase

21  music online to play directly on the iPod from Apple's own iTunes store.  Apple has rigged the

22  hardware and software in its iPod such that the device will not directly play any music files

23  originating from online music stores other than Apple's iTunes music store.

24    2.    Plaintiff brings this class action individually and on behalf of all other similarly

25  situated consumers to seek redress for Defendant's unlawful conduct.

26  ///

27  ///

28  ///

1

1

**JURISDICTION AND VENUE**

2      3.      Counts I and II of this Complaint are brought pursuant to Section 1 of the Sherman

3   Act, 15 U.S.C. § 1, to seek redress for Defendant's illegal tying and/or bundling conduct.  This

4   Court, therefore, has subject matter jurisdiction over these counts of the Complaint pursuant to 28

5   U.S.C. § 1331.

6      4.      Count III and IV of this Complaint are brought pursuant to Section 2 of the Sherman

7   Act, 15 U.S.C. § 2, to seek redress for Defendant's monopolization of the portable hard drive digital

8   music player market and the market for online sales of digital music files, respectively.  This Court,

9   therefore, has subject matter jurisdiction over these counts of the Complaint pursuant to 28 U.S.C. §

10  1331.

11     5.      Counts V and VI of this Complaint are brought pursuant to Section 2 of the Sherman

12  Act, 15 U.S.C. § 2 to seek redress for Defendants' unlawful attempted monopolization of the

13  relevant markets alleged herein.  This Court, therefore, has subject matter jurisdiction over these

14  counts of the Complaint pursuant to 28 U.S.C. § 1331.

15     6.      Count VII of this Complaint is brought pursuant to the California Cartwright Act,

16  California Business and Professions Code § 16700 et. seq. to seek redress for Defendant's unlawful

17  conduct in violation of state law.  Because the facts underlying this count share a common nucleus

18  of operative facts and law with the remaining counts of this Complaint, this Court has supplemental

19  subject matter jurisdiction over this Count of the Complaint pursuant to 28 U.S.C. § 1367.

20     7.      Count VIII of the Complaint is brought pursuant to California's Unfair Competition

21  Law, California Business and Professions Code Section 17200 et. seq.  Because the facts underlying

22  this count share a common nucleus of operative facts and law with the remaining counts of this

23  Complaint, this Court has supplemental subject matter jurisdiction over this Count of the Complaint

24  pursuant to 28 U.S.C. § 1367.

25     8.      Count IX of the Complaint is brought pursuant to the common law of

26  monopolization.

27

28

2

1    9.    Because the facts underlying this counts share a common nucleus of operative facts

2    and law with the remaining counts of this Complaint, this Court has supplemental subject matter

3    jurisdiction over these Counts of the Complaint pursuant to 28 U.S.C. § 1367.

4    10.    Defendant Apple Computer, Inc. is headquartered in Cupertino, California, transacts

5    significant business within this judicial district, and crafted the conduct giving rise to this complaint

6    within this judicial district.  Venue in this district is, therefore, proper pursuant to 28 U.S.C. § 1391

7    and 15 U.S.C. § 22.

8                                    **PARTIES**

9    11.    Plaintiff Thomas William Slattery is a resident of California.  During the Class

10   Period (as defined below), Plaintiff purchased music online from Apple's iTunes music store.  As

11   Apple has acted to prevent any portable hard drive digital music player, other than its own Apple

12   iPod, from playing digital music files purchased at Apple's iTunes online music store, Plaintiff was

13   also forced to purchase an Apple iPod device if he wished to play and portably enjoy the music he

14   purchased online from Apple's iTune's music store.  Similarly, as Apple has prevented any online

15   music store, other than its own iTunes store, from selling digital music files that can be directly

16   played on Apple's iPod device, Plaintiff has been forced to continue purchasing online digital music

17   files solely from Apple's iTunes store to the exclusion of all other online vendors of digital music

18   files.

19   12.    Defendant Apple Computer, Inc. ("Apple" or "Defendant") is a corporation

20   organized under the laws of the State of California, and has its principal place of business at 1

21   Infinite Loop in Cupertino, California 95014.  Apple designs, manufactures, and sells personal

22   computers and related software, services, peripherals, and network solutions.  Of particular

23   significance to this complaint, Apple also designs, develops, and markets a line of portable hard

24   drive digital music players, known as the Apple iPod, along with related accessories and services

25   including the online distribution, through its iTunes music store, of music and audio books.

26   ///

27   ///

28   ///

3

## MARKET DEFINITIONS AND MARKET POWER

13.    For purposes of this complaint, there are two relevant product markets. The first product market consists of the product market for legal online sales of digital music files. The second product market consists of the product market for portable hard drive digital music players. The relevant geographic market for both of these foregoing relevant product markets is the United States.

## THE MARKET FOR LEGAL ONLINE SALES OF DIGITAL MUSIC FILES

14.    In the days before the advent and prevalence of the Internet music, purchases of music were generally limited to sales of records, tapes, and/or compact disc recordings through traditional "brick and mortar" music stores. Although this sales channel continues to exist, the advent of the Internet has created a new market, wherein consumers can search for and purchase music tracks of their choice via their computer by simply logging onto the Internet. When this new market first came into being, its legality was called into question and was the subject of contentious litigation, as was epitomized by the much publicized "Napster" litigation. The result of this litigation history was that the marketplace recognized a need for legitimate outlets wherein consumers could avail themselves of their Internet access to make online purchases of digital music files in legitimate and

lawful transactions.

15.    Defendant Apple recognized the need and potential for such a market, and on approximately April 28, 2003 launched its iTunes online music store ("iTunes"). iTunes, which any consumer with Internet capabilities can access by merely logging onto the Apple iTunes' website, is both an online music selling venue and a software package. iTunes allows consumers to log onto Apple's iTunes online store, and browse for various digital files of songs and music recordings by thousands of individual artists and virtually all of the major music recording labels.

16.    Users of the iTunes store may then choose to purchase a particular track of music. Currently, iTunes charges $0.99 per track of music. Unlike a purchaser at a traditional "brick and mortar" music store, users of iTunes who purchase a track of music do not walk away with an audio cassette tape, record album or CD. Instead, upon purchasing a track of music and paying the

4

1  requisite price for the purchase, a digital file containing the music purchased is downloaded from

2  Apple's iTunes site to the user's computer or portable hard drive digital music player, where it may

3  be stored for further use by the user. The process by which this digital music file is transmitted and

4  used is described more fully in paragraphs 28-54 below.

5       17.    There is a recognized distinct product market for the legal purchase of digital music

6  files online. Consumers and merchants have come to recognize the online digital music file sale

7  market as a separate and distinct market.

8       18.    The online digital music file market offers a number of features not readily available

9  at traditional "brick and mortar" music stores, which help set this online digital music file market

10  apart as a distinct market. For example, whereas shoppers at traditional "brick and mortar" music

11  stores must typically purchase an entire album of the artist or group selected, online sales of digital

12  music files offer consumers the option to purchase only individual songs or tracks of music

13  separately. Further, unlike traditional "brick and mortar" music stores, online music selling venues

14  offer consumers the ability to create their own customized "playlists" wherein consumers can, in

15  effect, create their own customized music album comprising individual songs from various artists.

16  Thus, for example, a consumer of online music stores that had a liking for the song "Help" from the

17  Beatles and the song "Goodbye Yellow Brick Road" from Elton John could create a customized

18  playlist that would comprise just these two songs (as well as any other song from any other artist

19  that consumer wished to purchase). That consumer would only be charged for the particular songs

20  purchased (i.e. in this case, "Help" and "Yellow Brick Road"). By contrast, if that same consumer

21  wished to avail himself of these same two songs by making purchases at a traditional "brick and

22  mortar" music store, that consumer would have to purchase an entire Beatles album containing a

23  dozen songs or more, and an entire Elton John album, which also contains approximately a dozen

24  songs or tracks. Thus, while the consumer of the iTunes online music venue would only pay $1.98

25  for his total purchase (i.e. $0.99 per song), the price paid by the same consumer at a traditional

26  "brick and mortar" store would likely be approximately $30.00—i.e. the price for two complete

27  albums or CDs.

28

5

19.    In addition, the music selection available at online music stores is not coextensive with the music selection available at traditional "brick and mortar" music stores. Due to the efficiency with which music can be saved into computer digital format, online music stores provide a ready outlet for independent artists and music labels whose music is not readily available at traditional "brick and mortar" music stores that necessarily carry media in the more expensive CD, cassette or record format.

20.    In the eyes of consumers, the online digital music file market and the "brick and mortar" market are not in price-competition with one another. For one thing, as mentioned herein, whereas the online digital music file market focuses on selling individual tracks or songs, the "brick and mortar" market is focused on selling whole albums or CDs, thereby making price-comparison between these two distinct markets a non sequitur. Further, because of the ubiquitous nature of the Internet, online music sales are available to a whole host of consumers who do not have ready access to a nearby "brick and mortar" music store, let alone a nearby "brick and mortar" store stocking the particular recording desired by these consumers at any given time. Similarly, because search costs on the Internet are a fraction of search costs involved in the "brick and mortar" market, consumers are not likely to and do not forego a purchase of a music recording online even if they hypothetically would believe that the same recording could be obtained somewhat less expensively at a traditional "brick and mortar" store. The costs associated with traveling to "brick and mortar" music stores, searching one or more such stores for a particular recording, and comparison shopping between these "brick and mortar" music stores and online stores dissuade consumers from foregoing a purchase made from the comfort of their own home or office for the same piece of music, even if doing the foregoing tasks could hypothetically result in a savings of a few cents per song. Put differently, consumers are not likely to and do not travel miles to their nearest "brick and mortar" music store in the hopes of saving a few cents off a song purchase that they could make instantaneously on their home computer.

21.    For these and other reasons, the market for legal online sales of digital music files is and has been recognized as a separate relevant product market.

6

1      22.    Within the relevant market for online legal sales of digital music files, Defendant

2    Apple, through its iTunes online music store, possesses and has possessed throughout the Class

3    Period monopoly market power sufficient to exclude competition.  Upon information and belief,

4    during the Class Period iTunes' share of this relevant market has exceeded 80 percent.  Indeed, on

5    its website, Apple touts its iTunes online music store as the "#1 music download store according to

6    Nielsen Soundscan."  Apple's iTunes website also touts that iTunes is "[s]etting a new milestone for

7    the online music business, the iTunes Music Store has sold more than 200 million songs."  Further,

8    as early as November 5, 2003, Apple's CEO Steve Jobs publicly confirmed at a financial analyst

9    conference that Apple's iTunes store possessed at least an 80 percent share of the legal music

10    download market.

11      23.    Other legal online music selling stores exist, such as: Napster, Walmart.com,

12    Musicmatch, RealPlayer, Buy.com, Sony Connect, eMusic, Music Rebellion, Audio Lunch Box,

13    Live Downloads, and Bleep among others.  None of these other online music sites, however, posses

14    any significant market share in comparison to Apple's iTunes music store, and hence their existence

15    does not pose price-constraining competition to Apple's iTunes online music store.

16    **THE MARKET FOR PORTABLE HARD DRIVE DIGITAL MUSIC PLAYERS**

17      24.    The second relevant market pertinent to this complaint consists of the relevant

18    market for portable hard drive digital music players.  Portable hard drive digital music players are

19    portable devices that enable their users to listen to digital audio recordings without requiring users

20    to carry any external media, such as compact discs, cassette tapes, or cartridges.  Since

21    approximately November 10, 2001, Apple has manufactured, marketed, sold, and shipped a portable

22    hard drive digital music player known as the "iPod."

23      25.    As stated, when a consumer purchases a digital music recording online, a digital file

24    with that music recording is downloaded to that consumer's computer or portable hard drive digital

25    music player for future use.  One use to which that digital audio file can be put to by the consumer is

26    to play back that audio digital file on a portable hard drive digital music player.

27      26.    Through its iPod device, Apple possesses monopoly market power in the market for

28    portable hard drive digital music players.  Apple's iPod accounts for over 90 percent of the market

7

1   for portable hard drive digital music players in the United States.  Indeed, as of October 2004, Apple

2   announced that it possessed 92 percent of the market for portable hard-drive digital music players,

3   and that its nearest competitor, Creative, possessed only 3.7 percent share of this market.  Other

4   portable hard drive digital music player manufacturers do exist, including: Rio, iRiver, Creative,

5   Archos, e.Digital, RCA, Panasonic, Nokia, Tatung, Epson, Gateway, and others.  These other

6   portable hard drive digital music player manufacturers, however, lack the market power possessed

7   by Apple's iPod, as the combined market share of all of these alternative portable hard drive digital

8   music players amounts to less than 10 percent of the market (in comparison to Apple iPod's over 90

9   percent market share).

10      27.    As detailed herein, Apple has unlawfully bundled, tied, and/or leveraged its

11  monopoly in the market for the sale of legal online digital music recordings to thwart competition in

12  the separate market for portable hard drive digital music players, and vice-versa.

13      28.    As shown more fully below, Apple has engaged in this wrongdoing by embedding a

14  code in all digital music files downloaded from Apple's iTunes online music store that forces

15  consumers wishing to play these files on a portable hard drive digital music player to do so only on

16  an Apple iPod.  Absent Apple's unlawful action, consumers purchasing music recordings from

17  Apple's iTunes music store would be able to play this music on the portable hard drive digital music

18  player of their choosing, including the portable hard drive digital music players manufactured by the

19  rival manufacturers listed in paragraph 24 herein.  By deliberately embedding its code in this

20  manner in all digital music files sold by iTunes, therefore, Apple has unlawfully leveraged, bundled

21  and/or tied its monopoly market power in the market for online sale of digital music files to thwart

22  competition in the separate market for portable hard drive digital music players.  At the same time,

23  by engaging in the foregoing conduct, Apple has managed to unlawfully maintain and/or attempt to

24  obtain monopoly market power over portable hard drive digital music players because purchasers of

25  tracks from Apple's iTunes music store, the monopoly market share holder in the online music

26  selling market, who wish to play their purchased tracks on a portable hard drive digital music player,

27  have no choice (given Apple's conduct) but to purchase an iPod player to the exclusion of all other

28  available players.

8

1    29.    Similarly, by embedding this code into all digital music files sold by Apple on its

2  iTunes store, Apple has been able to design and has designed its iPod portable hard drive digital

3  music player so that the iPod will only directly play digital music files purchased by the user online

4  if that music file was purchased online from Apple's iTunes music store. If the digital music file

5  was purchased from any other online music selling venues listed in paragraph 21, the iPod will not

6  directly play that music recording. By engaging in this unlawful conduct, therefore, Apple has tied,

7  bundled and/or leveraged its monopoly market power in the market for online music sales to thwart

8  competition in the separate market for portable hard drive digital music players. At the same time,

9  by engaging in this unlawful conduct, Apple has managed to unlawfully maintain and/or attempt to

10  obtain its monopoly market power in the market for online music sales because owners of the

11  monopolized iPod product who wish to purchase music tracks online have no choice, given Apple's

12  conduct, but to purchase these tracks only from Apple's iTunes store.

13              **APPLE'S ANTICOMPETITIVE CONDUCT**

14    30.    To more fully appreciate and understand the anticompetitive nature of Apple's

15  wrongdoing, it is helpful to understand a few fundamentals about the process of digitizing,

16  downloading, and playing digital music recordings.

17    31.    At their most basic level, digital music files, such as MP3 files, look a lot like any

18  other computer data file: a long series of 1s and 0s. In order to turn an analog signal (such as one

19  picked up by a standard microphone) into a digital stream, analog-to-digital converter ("ADC")

20  software measures the signal at a regular interval to find the sampling rate. These samples, if

21  measured close enough together, form a near-exact representation of the analog signal so as to

22  approximate the transmission using 1s and 0s that computers and MP3 players can read.

23    32.    Each second of true CD-quality sound takes up more than 1.3MB of disk space,

24  which is why file-compression technology is essential to digital audio, especially portable audio.

25  Using principles of psychoacoustics (how the brain perceives sound) and perceptual coding

26  (eliminating imperceptible sounds), engineers develop algorithms, called codecs (compression

27  decompression), that compress songs into the smallest possible sizes with minimal loss of quality.

28

9

33.    When a user plays a digital music file, the user essentially reverses the analog-to-digital process. A digital audio device, such as an MP3 player or a computer sound card, uses a DAC (digital-to-analog converter) to turn the 1s and 0s back into an analog signal that can then be amplified and broadcast over headphones or speakers. When a digital device plays music that has been compressed by a codec, software on its chip (called firmware) applies the codec to decode the file, then sends the decompressed 1s and 0s to the DAC. Thus, for a digital audio device to be able to play a compressed music file, that device's hardware must be able to recognize and decode the codec software format that was used to initially compress that audio file.

34.    The first format or codec to gain widespread acceptance was Motion Pictures Experts Group Layer 3, known more commonly as "MP3." Today, virtually every portable digital music player on the market is able to play digital music encoded using the MP3 format. Thus, virtually all portable digital music players are able to play MP3 music files.

35.    Over the years, however, codec formats other than MP3 have gained widespread acceptance. These formats include WMA, AIFF, AAC, AA, and others.

36.    Many major portable digital music players support a number of these formats in addition to the MP3 format. For example, most portable hard drive digital music players, except for iPod, support the WMA format, which is the acronym for Microsoft's Windows Media Audio format. Thus, digital music files compressed with the WMA codec can be played on most major portable digital music players on the market today, except for Apple's iPod.

37.    Of significance to this complaint, is a codec format commonly known by the acronym AAC. AAC stands for Advanced Audio Coding, and was a format developed by, *inter alia*, Dolby Laboratories. Compressing digital audio files using the AAC format purportedly allows more files to be stored per file size than would be possible if the same music files were compressed using the MP3 format. Of significance, under normal operation, files compressed with the AAC format, much like files originally compressed and saved on any other coded format, can be saved or converted to MP3 formatted files. Thus, under normal operation, a digital music file that was originally compressed and saved with an AAC codec format can be played either by a device supporting AAC encoded files, or alternatively, that music file can be converted to and saved as an

10

1  MP3 formatted file, which would then be playable on virtually every major portable hard drive

2  digital music player (because all portable hard drive digital music players support MP3 files).

3       38.    Apple's iPod is a portable digital music player capable of playing music files

4  compressed with the AAC codec format.  Other rival portable digital music players, including those

5  manufactured by Nokia, Creative, Panasonic, Epson, Tatung, Gateway, Digital Square, and others

6  are also similarly equipped to play AAC digital music files.  In addition, of course, because AAC

7  files can readily be converted to MP3 format, virtually every portable digital music player on the

8  market today can play a file that was originally encoded in AAC format by merely having that same

9  file converted and saved to MP3 format.

10  **Apple's Unlawful Manipulation of the AAC Format To Force Use of Apple's iPod**

11       39.    Apple's iTunes online music store's music files are encoded in AAC format.  As the

12  foregoing illustrates, therefore, consumers purchasing music from iTunes should and would be free

13  to play the songs purchased from iTunes at any of a number of portable hard drive digital music

14  players that can play AAC formatted files, or at virtually any portable digital music player by merely

15  converting the AAC file to an MP3 file.

16       40.    Apple, however, has manipulated and rigged the AAC format to prevent this

17  competitive scenario.  Specifically, Apple has altered the AAC format used to compress and record

18  the song recordings available at its iTunes online music store so that these songs cannot be played

19  on any portable hard drive digital music player other than Apple's own iPod.  Apple has done so by

20  incorporating into the AAC file format an Apple addition known as Fairplay Digital Rights

21  Management ("DRM").

22       41.    Fairplay DRM is an extra piece of software code that Apple adds to every music file

23  sold by Apple on its iTunes online music store.  The addition of this extra software code has the

24  effect of preventing any portable hard drive digital music player, other than Apple's own iPod

25  player, from playing songs purchased from Apple's iTunes music store.  Users purchasing songs

26  from iTunes can still play those songs on their computers (whether they be manufactured by Apple

27  or not), but if these users wish to play the music they just purchased from iTunes on a portable hard

28  drive digital music player, they can only do so on an iPod.  Thus, in effect, Apple has turned an open

11

1    and interactive standard into an artifice that prevents consumers from using the portable hard drive

2    digital music player of their choice, even where players exist that would otherwise be able to play

3    these music files absent Apple's actions.

4           42.    Another consequence of Apple's manipulation of the AAC codec format, is that

5    Apple's addition of its Fairplay DRM code portion to these music files makes it impossible to

6    convert these AAC music files into MP3 files that can be decompressed and played by portable hard

7    drive music players other than the iPod.  Thus, whereas absent Apple's action, all AAC files could

8    be converted to MP3 format and therefore could be played on virtually any major portable hard

9    drive digital music player on the market, Apple's action prevents this from happening, and forces a

10   user to use only Apple's iPod device as the sole portable hard drive digital music player capable of

11   playing files purchased at Apple's iTunes music store.

12          43.    Apple calls this rigged digital format, obtained after incorporating Apple's extra

13   Fairplay DRM software code to the AAC file, an "AAC Protected" format or file.  Apple blatantly

14   announces that the difference between a regular AAC formatted music file and Apple's "Protected

15   AAC" music file is that if one desires to play the latter type of file (which is an artifice of Apple's

16   iTunes online music store) on a portable hard drive digital music player, one can only do so on an

17   Apple iPod player.  In this regard, Apple's website proclaims the following with respect to AAC,

18   AAC Protected music files, and the relationship between iTunes, iPod, and other portable players:

19               To play AAC and AAC Protected songs, your iPod must have iPod Software
                 1.3 or later installed.  Not all digital music players can play AAC songs and *only*
20               *iPod can play AAC Protected songs.*
                      . . . .
21
                 *Songs purchased from the iTunes Music Store are encoded using the AAC*
22               *Protected format and cannot be converted to MP3 format.*  You can burn them to
                 audio CDs and play them in consumer audio CD players.
23

24   A copy of Apple's webpage containing the foregoing restriction is attached hereto as Exhibit A to

25   this complaint.

26          44.    Thus, as Apple itself admits on its website, "[s]ongs purchased from the iTunes

27   Music Store are encoded using the AAC Protected format and cannot be converted to MP3 format."

28   Further, "only iPod can play AAC Protected songs."  The result is readily apparent-customers

                                                    12

1  buying music online from Apple's iTunes store can play their music at their computer or CD player,

2  but if they wish to play the music on a portable hard drive digital music player, they can do so only

3  via Apple's iPod. Moreover, this restriction, as Apple itself admits, is brought about only because

4  Apple has unilaterally incorporated its Fairplay DRM extra software code into the otherwise

5  interactive AAC format.

6      45.    But for Apple's action, any consumer owning any portable digital music player

7  would have been able to convert a song purchased on AAC format from iTunes into an MP3

8  formatted file, and could have played that file on his portable hard drive digital music player of

9  choice. This is necessarily the case because virtually any portable digital music player on the

10  market today is capable of playing MP3 music files. Further, even without this conversion from

11  AAC to MP3 formats, absent Apple's manipulation of the AAC format for the songs it sells through

12  iTunes, songs purchased from iTunes would have been able to be played on a whole host of portable

13  hard drive digital music players that are capable of playing AAC formatted files, such as players

14  manufactured by Panasonic, Nokia, Gateway, Epson, Tatung, and others. Apple's unilateral action

15  to rig the AAC format in this fashion for the songs it sells through iTunes, by inserting its own

16  Fairplay DRM extra software code onto the AAC format, prevents any of the foregoing from taking

17  place, and restricts consumers to using Apple's iPod as their only available portable hard drive

18  digital music player.

19      46.    Apple has steadfastly refused to license its Fairplay DRM or otherwise let any other

20  manufacturer of portable hard drive digital music players gain interactive access to files sold by

21  Apple through iTunes so that these music files could be played in the portable hard drive digital

22  music player of the consumer's choice.

23      47.    Through the foregoing actions, Apple has misused its monopoly market power in the

24  market for the legal sales of digital music files (which it holds by virtue of its iTunes online music

25  store) to unlawfully suppress competition in the separate market for portable hard drive digital

26  music players.

27

28

13

1    **Apple's Resistance to Rival Online Song Outlets for Apple iPod**

2        48.      As stated in paragraph 31, for a device to play a digital music file compressed with a

3    particular format, firmware within the chip of the device must be able to recognize and decode the

4    encoding format used to compress the music file. Because Apple has rigged the otherwise

5    interactive AAC format, through the addition of its extra Fairplay DRM software code to music files

6    sold via iTunes, only portable hard drive digital music players whose firmware recognizes this

7    "Protected AAC" format can decode and play songs purchased from iTunes. Apple has not licensed

8    or given access to this "Protected AAC" format to any other portable hard drive device

9    manufacturer, thereby ensuring two results-both of which are anticompetitive. First, through the

10   foregoing, Apple has managed to ensure that songs purchased from iTunes can only be played on

11   portable hard drive digital music players manufactured by Apple; namely, the Apple iPod. Second,

12   through the foregoing, Apple has managed to ensure that owners of iPod hard drive digital music

13   players wishing to purchase music files online to be directly played on their iPod can only do so by

14   purchasing these files at Apple's iTunes music store.

15       49.      Despite this anticompetitive restriction, RealNetworks, a rival seller of online digital

16   music recordings through its RealNetworks Music Store, managed to independently analyze the

17   firmware within the Apple iPod portable hard drive digital music player. As a result of this analysis,

18   RealNetworks was able to discern the necessary extra software code added by Apple to make

19   downloaded songs playable on the Apple iPod. Armed with this knowledge, RealNetworks was

20   able to insert a corresponding code of its own into song files sold through its RealNetworks Music

21   Store so that they too would be playable on the Apple iPod.

22       50.      Thus, on July 26, 2004, RealNetworks announced publicly that songs sold through its

23   online RealNetworks Music Store would now be playable on the Apple iPod portable hard drive

24   digital music player, thereby giving iPod owners a competitive outlet for their purchases of online

25   music files. This announcement was significant not only because it represented the first alternative

26   to the stronghold that Apple's iTunes store had heretofore exerted as the sole supplier of

27   downloaded digital music files that could be played on Apple's iPod player, but also because

28

14

1   RealNetworks began selling its digital online songs for as low as 49 cents per track, well below the

2   99 cents per track charged by Apple's iTunes store.

3       51.    Rather than embracing this competitive offering to consumers and owners of its iPod

4   device, Apple immediately threatened RealNetworks and iPod users. On Thursday, July 29, 2004,

5   merely four days after RealNetworks' announcement, Apple issued its own public statement

6   warning RealNetworks and iPod users that "[w]e are stunned that RealNetworks has adopted the

7   tactics and ethics of a hacker to break into the iPod, and we are investigating the implications of

8   their actions under the DMCA and other laws. We strongly caution Real and their customers that

9   when we update our iPod software from time to time it is highly likely that Real's Harmony

10  technology will cease to work with current and future iPods."

11      52.    True to its threat, by December 2004, Apple updated its iPod software to prevent

12  songs downloaded from RealNetworks Music Store (or any other online music store) from being

13  played on Apple iPod devices. Thus, Apple continues to impede competition, and forces iPod users

14  who wish to buy music online to do so exclusively from Apple's iTunes store.

15  **Apple's Proffered Justification For Rigging the AAC Format In This Restrictive Manner Is**
    **Irrelevant, And In Any Event, Unavailing**
16

17      53.    Faced with the obvious anticompetitive effect and impact of its actions to restrict the

18  use of music purchased on iTunes to only iPod portable music players, and to restrict the source of

19  online music files playable on its iPod device to only its own iTunes store, Apple has attempted to

20  defend its actions by citing that these restrictions are necessary to protect the copyrights owned by

21  the artists or music labels for the songs sold through iTunes. That defense, however, is both

22  irrelevant and unavailing.

23      54.    In fact, other than Apple's iTunes, no other online music vendor has such a

24  restriction in place; yet these other online vendors still manage to provide copyright protection

25  mechanisms to artists and record labels-often the same artists and labels whose same songs are sold

26  online through iTunes.

27      55.    Similarly, Apple's Fairplay DRM addition to the otherwise interactive AAC

28  encoding format is not a device that effectively controls access to copyrighted works because, as

15

1 | Apple itself admits, the extra Fairplay DRM software code inserted by Apple has no effect
2 | whatsoever on the ability of any user using any computer to access, purchase, and playback any of
3 | the song files sold through Apple's iTunes music store on the user's computer. Only when the user
4 | wishes to play the song on a portable hard drive digital music player does Apple restrict that user to
5 | using the iPod device, presumably to protect Apple's market dominance in that market.

6 |       56.    In truth and in fact, as widely reported in the press, artists and record label companies
7 | have urged Apple to release its stronghold on the online source for music files playable on the Apple
8 | iPod, and to allow music files from other legitimate online music vendors play on the Apple iPod.
9 | Opening this restriction would benefit both the artists and record labels by providing them with
10 | additional outlet channels for selling music playable on the most prevalent portable hard drive
11 | digital music player (i.e. the iPod). Similarly, opening this restriction would also benefit consumers
12 | by providing iPod owners with a competitive choice of where they can purchase their online music
13 | files for playback on their iPod devices. Despite these pleas and the anticompetitive impact of
14 | Apple's actions, Apple has steadfastly refused to permit any vendors other than its own iTunes store
15 | to sell digital music files that can be played on Apple's iPod. At the same time, Apple has also
16 | steadfastly refused to allow the music files Apple sells through its iTunes store from being played
17 | on any portable hard drive digital music player other than the iPod.

18 | **ANTICOMPETITIVE EFFECT ON CONSUMERS - ANTITRUST INJURY**

19 |       57.    As a direct, proximate, and foreseeable result of Apple's actions, consumers, like
20 | Plaintiff and the members of the Class he seeks to represent, have been injured in their business
21 | and/or property. By restricting the sources of online digital music files that can be directly played
22 | on Apple's iPod to only such files purchased from Apple's iTunes online music store, Apple has
23 | restrained competition, denied consumers a competitive choice of online music sellers for use on
24 | their iPod devices, maintained its monopoly and/or attempted to obtain a monopoly in the market
25 | for portable hard drive digital music players, and forced consumers to pay supra-competitive prices
26 | for their purchases of online digital music files and their purchases of portable hard drive digital
27 | music players. Similarly, by restricting the portable hard drive digital music players that can play
28 | songs downloaded from the iTunes online music store to just the Apple iPod device, Apple has

16

1    restrained competition, denied consumers a competitive choice of portable hard drive digital music

2    players, unlawfully maintained and/or attempted to obtain a monopoly in the market for the legal

3    sale of online digital music files, and caused consumers to pay supra-competitive prices for their

4    purchases of portable hard drive digital music players, and for their purchases of online music files.

5    ## CLASS ACTION ALLEGATIONS

6        58.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf

7    of himself and on behalf of all other similarly situated consumers who, during the period of April

8    28, 2003 to the present ("the Class Period") purchased an iPod device directly from Apple, and

9    online digital music files from Apple's iTunes store. Excluded from the Class are all judicial

10   officers and their staff, as well as all governmental entities.

11       59.    The number of putative class members is sufficiently large, such that joinder of all

12   individual class members would be impracticable, if not impossible. Although the precise number

13   of class members is not presently known to Plaintiff, based on the sales volumes of the Apple iPod

14   device and the iTunes online music store during the Class Period, it is reasonable to assume that the

15   number of individual class members is at least in the tens or hundreds of thousands.

16       60.    Plaintiff's claims are typical of the claims of the class. Specifically, Plaintiff claims

17   that by restricting the use of the iPod to only those online digital music files purchased from iTunes,

18   Apple has injured Plaintiff and the class members in their business and/or property, in violation of

19   the federal and state antitrust laws, California's unfair competition law, and the common law.

20   Similarly, Plaintiff claims that by restricting the portable hard drive digital music players that can

21   play music files purchased from the iTunes store to only the iPod, Apple has injured Plaintiff and

22   the class members in their business and/or property, in violation of the federal and state antitrust

23   laws, California's unfair competition law, and the common law. There are no conflicts or defenses

24   unique to Plaintiff that would render his claim atypical from the claims of the absent class members.

25       61.    Common questions of fact and law exist in this litigation, and these common

26   questions affecting the class as a whole predominate over any individual questions that may affect

27   only individual class members. Among these common questions of fact or law are the following:

28

17

a.     the definition of the relevant market(s);

b.     Apple's market power within these relevant market(s);

c.     whether Apple unlawfully restrained competition in any or all of these
relevant markets;

d.     whether any unlawful restriction of competition caused by Apple caused
injury to the business or property of Plaintiff and the class members;

e.     the extent of any such injury;

f.     the appropriate remedy for any such injury.

62.    Plaintiff is an adequate representative of the interests of the absent class members in this litigation. During the Class Period, Plaintiff purchased an Apple iPod directly from Apple, and purchased music files for use on his iPod directly from Apple's iTunes music store. Plaintiff has retained competent counsel experienced in antitrust and class action litigation to vigorously prosecute and litigate this action on behalf of the putative class members.

63.    This action is manageable as a class action. The identity of all class members, or of a significant majority, is ascertainable, as each class member, by definition, must have made online purchases from Apple iTunes store, requiring the class member to provide his identifying information. Prosecuting this action on an individual, as opposed to a classwide basis, would risk the prospect of conflicting findings and adjudications with respect to the rights and obligations of the parties. Further, the average overall amount of monetary injury sustained by each individual class members is likely to be too small relative to the costs of individual litigation of this action so that classwide litigation effectively provides the only available means for individual class members to seek judicial redress for their injuries.

## COUNT I

### (UNLAWFUL TYING OR BUNDLING OF APPLE iTUNES TO PURCHASE OF APPLE iPOD IN VIOLATION OF 15 U.S.C. § 1)

64.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with the same force and effect as if fully restated herein.

18

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO.: C05-00037 JW
\\Fileserver\shareddocs\BLG\APPLE\PLD-WPD\FAC.wpd

1    65.    Through its iTunes online music store, Apple has monopoly market power in the

2    U.S. market for legal sales of online digital music files. In any event, Apple has sufficient market

3    power in this relevant market to coerce consumers of Apple's iTunes store to purchase an Apple

4    iPod portable hard drive digital music player, even if these same consumers would have preferred to

5    purchase a portable hard drive digital music player other than Apple's iPod.

6    66.    There are manufacturers and models of portable hard drive digital music players,

7    other than Apple's iPod, that, but for Apple's anticompetitive conduct, would be able to play digital

8    music files downloaded from Apple's iTunes music store.

9    67.    During the Class Period, Apple has rigged the otherwise interactive and open AAC

10   codec format in the manner described herein, such that digital music files purchased from Apple's

11   iTunes online music store could not be played back on any portable hard drive digital music player

12   other than Apple's iPod.

13   68.    As a direct and proximate result of Apple's anticompetitive actions, consumers of

14   Apple's iTunes store who wish to play the digital music files they purchased from iTunes on a

15   portable hard drive digital music player must also purchase an Apple iPod device, even where other

16   portable hard drive digital music players exist at lower prices that would otherwise be able to

17   playback the music files sold by Apple's iTunes store.

18   69.    Apple's actions have caused injury to the business and/or property of Plaintiff and

19   the class members he seeks to represent by: forcing consumers to buy Apple's iPod as the portable

20   hard drive digital music player of their choice, to the exclusion of all competing portable hard drive

21   digital music players; suppressing competition in the market for portable hard drive digital music

22   players; and, forcing consumers to pay supra-competitive prices for their portable hard drive digital

23   music players.

24   70.    Apple's unlawful bundling or tying of its Apple iTunes store to use of its Apple iPod

25   portable hard drive digital music player is unlawful per se under the antitrust laws. Alternatively,

26   Apple's unlawful bundling or tying of its Apple iTunes store to use of its Apple iPod portable hard

27

28

19

1   drive digital music player is unlawful under the antitrust rule of reason because the anticompetitive

2   effects of this conduct are not outweighed by procompetitive considerations.

3                                    **COUNT II**

4   **(UNLAWFUL TYING OR BUNDLING OF APPLE'S iPOD TO APPLE iTUNES IN**
    **VIOLATION OF 15 U.S.C. § 1)**
5

6        71.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

7   the same force and effect as if fully restated herein.

8        72.    Through its iPod device, Apple has monopoly market power in the U.S. market for

9   portable hard drive digital music players. In any event, Apple has sufficient market power in this

10  relevant market to coerce consumers of Apple's iPod device to make purchases of online music files

11  only from Apple's iTunes online music store, even if these same consumers would have preferred to

12  purchase their online music files from a source other than iTunes.

13       73.    There are online music stores, other than Apple's iTunes music store, that, but for

14  Apple's anticompetitive conduct, would and could sell online music files to consumers for direct

15  playback on Apple's iPod portable hard drive digital music player.

16       74.    During the Class Period, Apple has rigged the otherwise interactive and open AAC

17  codec format in the manner described herein, such that owners of Apple iPods cannot purchase

18  digital music files online from online music stores, other than Apple's iTunes store, for direct play

19  back on the iPod.

20       75.    As a direct and proximate result of Apple's anticompetitive actions, consumers of

21  Apple's iPod who wish to purchase music online for use in their iPods must make their purchases

22  only from Apple's iTunes music store, even where other online music stores exist that, but for

23  Apple's unlawful conduct, would otherwise be able to sell online digital music files for playback on

24  an iPod at less expensive prices than the prices charged by iTunes.

25       76.    Apple's actions have caused injury to the business and/or property of Plaintiff and

26  the class members he seeks to represent by: forcing consumers to buy online digital music files only

27  from Apple's iTunes store, to the exclusion of all other competing legal online digital music file

28  vendors, if consumers wished to play downloaded songs on their iPod devices; suppressing

                                           20

1  competition in the market for the legal online sale and purchase of digital music files; and, forcing

2  consumers to pay supra-competitive prices for their online purchases of digital music files.

3      77.    Apple's unlawful bundling or tying of its Apple iPod device to purchases from

4  Apple's iTunes store is unlawful per se under the antitrust laws.  Alternatively, Apple's unlawful

5  bundling or tying of its Apple iPod device to purchases from its Apple iTunes store is unlawful

6  under the antitrust rule of reason because the anticompetitive effects of this conduct are not

7  outweighed by procompetitive considerations.

8                                    **COUNT III**

9                  **(UNLAWFUL ACQUISITION OR MAINTENANCE OF MONOPOLY
                   MARKET POWER IN MARKET FOR LEGAL ONLINE DIGITAL MUSIC FILES**
10                            **IN VIOLATION OF 15 U.S.C. § 2)**

11     78.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

12  the same force and effect as if fully restated herein.

13     79.    Through its iPod device, Apple possesses monopoly market power in the U.S. market

14  for portable hard drive digital music players.

15     80.    Given the prevalence of the iPod, owners of this device have a need for legal online

16  sellers of digital music files to be played on the iPods.  Although a number of competing legal

17  online sellers of digital music files exist, Apple has rigged the operating AAC codec format and

18  corresponding firmware in the iPod so that only online digital music files purchased from Apple's

19  iTunes music store, to the exclusion of all other online music files purchased from any other online

20  store, can be directly played on the iPod.  In this manner, Apple has been able to acquire and/or

21  maintain monopoly market power in the U.S. market for the legal sale of digital music files.  But for

22  Apple's rigging of the AAC codec format and firmware in the iPod, any number of existing legal

23  sellers of digital music files, other than Apple's iTunes music store, would be able to sell competing

24  digital music files for play back on the iPod.

25     81.    Thus, Apple has acquired and/or maintained its monopoly market power in

26  the U.S. market for the legal sale of online digital music files, not through superior skill, business

27  acumen, or enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

28

                                        21

1     82.     Apple's monopolization of the U.S. market for the legal sale of online digital music

2   files has injured Plaintiff and the Class members in their business and/or property by suppressing

3   competition in this relevant market, and forcing consumers to pay supra-competitive prices for their

4   online purchases of digital music files.

5                                      **COUNT IV**

6   **(UNLAWFUL ACQUISITION AND/OR MAINTENANCE OF MONOPOLY MARKET
    POWER IN THE U.S. MARKET FOR PORTABLE HARD DRIVE DIGITAL MUSIC**

7   **PLAYERS IN VIOLATION OF 15 U.S.C. § 2)**

8     83.     Plaintiff hereby incorporates by reference all of the allegations of this complaint with

9   the same force and effect as if fully restated herein.

10     84.     Through its iTunes online music store, Apple possesses monopoly market power in

11   the U.S. market for the legal online sale of digital music files.

12     85.     Given the popularity and market penetration of iTunes, there is a need for a portable

13   hard drive digital music player that can play back music files downloaded from iTunes.  Although a

14   number of competing manufacturers and models of portable hard drive digital music players exist,

15   Apple has rigged the operating AAC codec format in the music files sold through iTunes, as well as

16   the corresponding firmware in the iPod, so that the only portable hard drive digital music player that

17   will be able to be used to play back music files purchased from iTunes is the Apple iPod, to the

18   exclusion of any other portable hard drive digital music players.  In this manner, Apple has been

19   able to acquire and/or maintain monopoly market power in the U.S. market for portable hard drive

20   digital music players.  But for Apple's rigging of the AAC codec format in music files sold through

21   iTunes and of the firmware in the iPod, any number of existing portable hard drive digital music

22   players, other than Apple's iPod, would be able to play back digital music files sold through iTunes.

23     86.     Thus, Apple has acquired and/or maintained its monopoly market power in the U.S.

24   market for portable hard drive digital music players, not through superior skill, business acumen, or

25   enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

26     87.     Apple's monopolization of the U.S. market for portable hard drive digital

27   music players has injured Plaintiff and the Class members in their business and/or property by

28

22

1   suppressing competition in this relevant market, and forcing consumers to pay supra-competitive

2   prices for their portable hard drive digital music players.

3                                  **COUNT V**

4   **(UNLAWFUL ATTEMPTED MONOPOLIZATION OF MARKET FOR PORTABLE**
    **HARD DRIVE DIGITAL MUSIC PLAYERS IN VIOLATION OF 15 U.S.C. § 2)**
5

6       88.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

7   the same force and effect as if fully restated herein.

8       89.    The foregoing allegations of predatory and/or anticompetitive conduct, including,

9   *inter alia*: a) Apple's rigging of the open AAC format to an "AAC-protected" format; b) Apple's

10  predatory change to its software to prevent less expensive music files sold by RealNetworks from

11  playing directly on Apple's iPod; c) the tying allegations forming part of Counts I and II of this

12  Complaint; and, d) Apple's unlawful monopoly leveraging, wherein Apple has used its monopoly

13  market power, however acquired, in the market for legal sales of online digital music files, in an

14  attempt to monopolize the separate market for portable hard drive digital music players, all form

15  part of Apple's unlawful attempted monopolization of the market for portable hard drive digital

16  music players.

17      90.    Apple undertook the foregoing conduct with the specific intent to monopolize the

18  relevant market for portable hard drive digital music players.

19      91.    If left unrestrained, Apple's attempt to monopolize the market for portable hard drive

20  digital music players is likely to succeed.

21      92.    The foregoing conduct has caused injury to Plaintiff and the class members in their

22  business and/or property by unlawfully thwarting competition in the market for portable hard drive

23  digital music players and by forcing consumers, like Plaintiff and the class members, to pay supra-

24  competitive prices for their portable hard drive digital music players.

25

26  ///

27  ///

28  ///

                                    23

1

## COUNT VI

2

## (ATTEMPTED MONOPOLIZATION OF MARKET FOR THE LEGAL ONLINE SALE OF DIGITAL MUSIC FILES, IN VIOLATION OF 15 U.S.C. § 2)

3

4      93.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

5  the same force and effect as if fully restated herein.

6      94.    The foregoing predatory and/or anticompetitve allegations, including, *inter alia*: a)

7  Apple's rigging of the open AAC format to an "AAC-protected" format; b) Apple's predatory

8  change to its software to prevent less expensive music files sold by RealNetworks from playing

9  directly on Apple's iPod; c) the tying allegations forming part of Counts I and II of this Complaint;

10  and, d) Apple's unlawful monopoly leveraging conduct, wherein Apple has used its monopoly

11  market power, however acquired, in the market for portable hard drive digital music players, in an

12  attempt to and actual monopolization of the separate market for the legal online sale of digital music

13  files, all form part of Apple's unlawful attempt to monopolize the relevant market for the legal

14  online sales of digital music files, in violation of 15 U.S.C. § 2.

15      95.    Apple undertook the foregoing conduct with the specific intent to monopolize the

16  relevant market for the legal online sales of digital music files.

17      96.    If left unrestrained, Apple's attempt to monopolize the market for the legal online

18  sales of digital music files is likely to succeed.

19      97.    The foregoing conduct has caused injury to Plaintiff and the class members in their

20  business and/or property by unlawfully thwarting competition in the market for the legal online

21  purchases of digital music files, and by forcing consumers, like Plaintiff and the class members, to

22  pay supra-competitive prices for their purchases of online digital music files.

23

## COUNT VII

24

## (VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CALIF. BUS. AND PROFESSIONS CODE SECTION 16700 ET. SEQ.)

25

26      98.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

27  the same force and effect as if fully restated herein.

28

24

1    99.    Through the conduct alleged herein, Apple has violated the California Cartwright

2  Act, California Business and Professions Code Section 16700 et. seq.

3    100.    Apple's violations of the Cartwright Act have injured Plaintiff and the class members

4  in their business and/or property by, *inter alia*, suppressing competition, and by forcing consumers,

5  like Plaintiff and the class members, to pay supra-competitive prices for their purchases of online

6  digital music files and/or their purchases of portable hard drive digital music players.

7                                        **COUNT VIII**

8    **(VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CALIF. BUS. AND
   PROF. CODE SECTION 17200 ET. SEQ.)**

9

10    101.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

11  the same force and effect as if fully restated herein.

12    102.    The foregoing conduct amounts to an unlawful and/or unfair business practice within

13  the meaning of the California Unfair Competition Law, California Business and Professions Code,

14  Section 17200 et. seq.

15    103.    Apple's violations of California's Unfair Competition Law have injured Plaintiff and

16  the class members in their business and/or property by, *inter alia*, suppressing competition, and by

17  forcing consumers, like Plaintiff and the class members, to pay supra-competitive prices for their

18  purchases of online digital music files and/or their purchases of portable hard drive digital music

19  players.

20    104.    Because Plaintiff and the class members have conveyed money directly onto Apple,

21  and Apple has violated the Unfair Competition Law in connection with that transaction, Plaintiff

22  and the Class members are entitled to restitution of the moneys paid by them to Apple, and to an

23  injunction restraining and enjoining Apple from continuing to engage in this conduct.

24                                        **COUNT IX**

25                          **(COMMON LAW MONOPOLIZATION)**

26    105.    Plaintiff hereby incorporates by reference all of the allegations of this Complaint

27  with the same force and effect as if fully restated herein.

28

25

1    106.    The foregoing acts amount to unlawful monopolization under the common law of the

2  relevant U.S. markets for the legal online sale of digital music files and/or the market for portable

3  hard drive digital music players.

4    107.    As a result of Apple's unlawful monopolization under the common law, Plaintiff and

5  the class members have been injured in their business and/or property by being denied true and

6  unfettered competition in the relevant markets described herein, and by being forced to pay supra-

7  competitive prices for their purchases on online digital music files and/or their purchases of portable

8  hard drive digital music players.

9    **PRAYER FOR RELIEF**

10    **WHEREFORE,** Plaintiff prays for an Order from the Court as follows:

11    A.    Entering Judgment for Plaintiff and the class and against Defendant on all counts;

12    B.    Certifying this action as a class action on behalf of the class defined herein, and

13  designating Plaintiff and his counsel as class representative and class counsel, respectively;

14    C.    Directing that notice of this action be disseminated to the absent class members at

15  Defendant's expense;

16    D.    Awarding Plaintiff and the class members their compensatory and statutory money

17  damages, including trebled damages and punitive damages where appropriate;

18    E.    Awarding Plaintiff's counsel their reasonable attorneys' fees, expenses, and costs of

19  suit;

20    F.    Declaring Defendant's actions to be violations of the federal and state antitrust laws,

21  state law of unfair competition, and the common law, and enjoining Defendant from carrying on

22  such conduct;

23    G.    Requiring Defendant to disgorge its ill-gotten gains, and awarding the proceeds of

24  this disgorgement to Plaintiff and the class members;

25    H.    Requiring Defendant to provide restitution to Plaintiff and the class members of

26  moneys paid by Plaintiff and the class members to Defendant;

27

28

26

1    I.    Requiring Defendant to establish a common fund from which compensation can be

2  made to Plaintiff and the class members, and from which Plaintiff's counsel may recover their

3  reasonable attorneys' fees, expenses, and costs of suit;

4    J.    Awarding such other relief as this Court deems just and appropriate.

5                              **JURY DEMAND**

6    Plaintiff demands a trial by jury on all counts so triable.

7

8  Dated: September 23, 2005                Michael D. Braun
                                           BRAUN LAW GROUP, P.C.
9

10

                                  By:     S/ MICHAEL D. BRAUN
11                                        Michael D. Braun
                                          12400 Wilshire Boulevard
12                                        Suite 920
                                          Los Angeles, CA 90025
13                                        Tel:   (310) 442-7755
                                          Fax:   (310) 442-7756
14
                                          Roy A. Katriel
15                                        THE KATRIEL LAW FIRM, P.C.
                                          1101 30th Street, NW
16                                        Suite 500
                                          Washington, DC 20007
17                                        Tel:   (202) 625-4342
                                          Fax:   (202) 625-6774
18
                                          Brian P. Murray
19                                        Eric J. Belfi
                                          MURRAY, FRANK & SAILER LLP
20                                        275 Madison Avenue
                                          Suite 801
21                                        New York, NY 10016-1101
                                          Tel:   (212) 682-1818
22                                        Fax:   (212) 682-1892

23                                        **Attorneys for Plaintiff**

24

25

26

27

28

                                    27

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO.: C05-00037 JW
\\Fileserver\shareddocs\BLG\APPLE\PLD-WPD\FAC.wpd

# EXHIBIT A

iTunes 4 for Mac OS X: Compatible Players

Page

| ● | Store | iPod + iTunes | .Mac | QuickTime | Mac OS X |

Advanced Search ► Downloads ► 1040 Date ► Specifications ► Manuals ► Product Specs ► Training ► Services ►

## iTunes 4 for Mac OS X: Compatible Players

Learn which digital music players and CD & MP3 players you can use with iTunes 4 and Mac OS X.

iTunes 4 for Mac OS X has built-in support for digital music players and for CD & MP3 players.

**Notes**

1. To play AAC and AAC-protected songs, your iPod must have iPod Software 1.3 or later installed. Not all digital music players can play AAC songs and only iPod can play AAC-protected songs.
2. Songs you import from an audio CD using the AAC format can be converted to MP3 files, which you can burn to MP3 CDs or play on third-party digital music players.
3. Songs purchased from the iTunes Music Store are encoded using the AAC-protected format and cannot be converted to MP3 format. You can burn them to audio CDs and play them in consumer audio CD players.

| Digital Players | Manufacturer | Connection |
|---|---|---|
| iPod | Apple | FireWire/USB |
| Nomad II | Creative Labs | USB |
| Nomad II MG | Creative Labs | USB |
| Nomad II c | Creative Labs | USB |
| Nomad Jukebox | Creative Labs | USB |

http://docs.info.apple.com/article.html?artnum=93548

12/3/03

1                                 **PROOF OF SERVICE**

2    STATE OF CALIFORNIA          )
                                   )ss.:

3    COUNTY OF LOS ANGELES    )

4         I am employed in the county of Los Angeles, State of California, I am over the age of 18 and
not a party to the within action; my business address is 12400 Wilshire Boulevard, Suite 920, Los

5    Angeles, CA 90025.

6         On September 23, 2005, using the Northern District of California's Electronic Case Filing
System, with the ECF ID registered to Michael D. Braun, I filed and served the document(s) described

7    as:

8                     **FIRST AMENDED CLASS ACTION COMPLAINT**

9         The ECF System is designed to send an e-mail message to all parties in the case, which
constitutes service. According to the ECF/PACER system, for this case, the parties served are as

10    follows:

11    Eric J. Belfi, Esq.                                       ebelfi@murrayfrank.com
                                                       rak@katriellaw.com

12    Roy A. Katriel, Esq.

13    **Attorneys for Plaintiff**

14    Caroline N. Mitchell, Esq.                           cnmitchell@jonesday.com
                                               mlandsborough@jonesday.com

15                                                    cyip@jonesday.com

16    Robert A. Mittelstaedt, Esq.                        ramittelstaedt@jonesday.com
                                                 ybennett@jonesday.com

17                                                    arsand@jonesday.com

18    Adam Richard Sand , Esq.                          arsand@jonesday.com

19
20    **Attorneys for Defendant**

   On September 23, 2005, I served the document(s) described as:

21
22                    **FIRST AMENDED CLASS ACTION COMPLAINT**

   by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

23
24    Brian P. Murray
   MURRAY, FRANK & SAILER LLP
   275 Madison Avenue

25    Suite 801
   New York, NY 10016

26    Tel:    (212) 682-1818
   Fax:   (212) 682-1892

27
   **Attorneys for Plaintiff**

28

1    I served the above document(s) as follows:

2    BY MAIL. I am familiar with the firm's practice of collection and processing correspondence
for mailing. Under that practice it would be deposited with U.S. postal service on that same day with
3    postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware
that on motion of the party served, service is presumed invalid if postal cancellation date or postage
4    meter date is more than one day after date of deposit for mailing in an affidavit.

5    I further declare, pursuant to Civil L.R. 23-2, that on the date hereof I served a copy of the
above-listed document(s) on the Securities Class Action Clearinghouse by electronic mail through the
6    following electronic mail address provided by the Securities Class Action Clearinghouse:

7                                **jcarlos@law.stanford.edu**

8    I declare that I am employed in the office of a member of the bar of this Court at whose direction
the service was made.
9
10   Executed on September 23, 2005, at Los Angeles, California 90025.

11
                                            S/ LEITZA MOLINAR
12                                          Leitza Molinar

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28