1  Michael D. Braun (167416)
   BRAUN LAW GROUP, P.C.
2  12400 Wilshire Boulevard
   Suite 920
3  Los Angeles, CA 90025
   Tel:   (310) 442-7755
4  Fax:   (310) 442-7756
   E-mail: service@braunlawgroup.com
5
   Roy A. Katriel (Admitted Pro Hac Vice)
6  THE KATRIEL LAW FIRM, P.C.
   1101 30th Street, NW
7  Suite 500
   Washington, DC 20007
8  Tel:   (202) 625-4342
   Fax:   (202) 625-6774
9  E-mail: rak@katriellaw.com

10

11

12

13

14

15

**FILED**

MAR 1 7 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

Brian P. Murray
Eric J. Belfi (Admitted Pro Hac Vice)
MURRAY, FRANK & SAILER LLP
275 Madison Avenue
Suite 801
New York, NY 10016-1101
Tel:   (212) 682-1818
Fax:   (212) 682-1892
Email: ebelfi@murrayfrank.com

**Attorneys for Plaintiff**

FILE VIA FAX

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

16  THOMAS WILLIAM SLATTERY,
    Individually, And On Behalf Of All Others
17  Similarly Situated,

18                          Plaintiff,

19          vs.

20  APPLE COMPUTER, INC.

21                          Defendant.

22

23

24

25

26

27

28

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.: C05-00037 JW**

**CLASS ACTION**

**COMPENDIUM OF NON-FEDERAL
AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR LEAVE TO
FILE A SECOND AMENDED
COMPLAINT**

DATE:    April 24, 2006
TIME:    9:00 a.m.
CRTM:    8, 4th floor

1                                       **STATE CASES**

2 *Carson v. Merrill, Lynch, Fenner & Smith Inc.,*

3 1998 WL. 34076402 (W.D. Ark. Mar. 30, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . EXHIBIT 1

4 *Hill v. Priority Financial Servcs. Inc.,*
2000 WL. 1876582 (S.D. Ill. Dec. 22, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . EXHIBIT 2

5

6 Dated: March 17, 2006                        Michael D. Braun

7                                         BRAUN LAW GROUP, P.C.

8

9                 By:

10                                Michael D. Braun
                               12400 Wilshire Boulevard

11                                Suite 920
                               Los Angeles, CA 90025

12                                Tel:    (310) 442-7755
                               Fax:   (310) 442-7756

13                                Roy A. Katriel
                               THE KATRIEL LAW FIRM, P.C.

14                                1101 30th Street, NW
                               Suite 500

15                                Washington, DC 20007
                               Tel:    (202) 625-4342

16                                Fax:   (202) 625-6774

17                                Brian P. Murray
                               Eric J. Belfi

18                                MURRAY, FRANK & SAILER LLP
                               275 Madison Avenue

19                                Suite 801
                               New York, NY 10016-1101

20                                Tel:    (212) 682-1818
                               Fax:   (212) 682-1892

21                                **Attorneys for Plaintiff**

22

23

24

25

26

27

28

# EXHIBIT 1

1998 U.S. Dist. LEXIS 6903, *

LEXSEE 1998 US DIST LEXIS 6903

**BRAD CARSON, Individually, and on Behalf of a Class of Similarly Situated Individuals, PLAINTIFFS v. MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; and MERRILL LYNCH & CO., INC., DEFENDANTS**

**Civil No. 97-5147**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF ARKANSAS, FAYETTEVILLE DIVISION**

*1998 U.S. Dist. LEXIS 6903*

**March 30, 1998, Decided**
**March 30, 1998, Filed**

**DISPOSITION:** [*1] Plaintiff's motion to amend granted; defendants' motions to dismiss and/or transfer denied.

**COUNSEL:** For BRAD CARSON, JAMES T CRAMER, SHIRLEY F CRAMER, plaintiffs: William B. Putman, Mashburn & Taylor, Fayetteville, AR.

For MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MERRILL LYNCH & CO., INC., defendants: Mark Holland, Rogers & Wells, New York, NY.

For MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MERRILL LYNCH & CO., INC., defendants: Scott E. Daniel, Brashear & Ginn, Omaha, NE.

**JUDGES:** H. Franklin Waters, United States District Judge.

**OPINIONBY:** H. Franklin Waters

**OPINION:**

**MEMORANDUM OPINION**

Currently before the court is plaintiff's motion for leave to file an amended complaint and defendants' response thereto. Also pending before the court are defendants' motions to dismiss and/or transfer. For the reasons set forth below, plaintiff's motion to amend is granted; defendants' motions to dismiss and/or transfer are denied.

**I. BACKGROUND**

A. Facts and Procedural History

Plaintiff Brad Carson ("Carson") commenced this lawsuit on September 4, 1997, alleging that defendants committed various violations of federal and state securities laws. Specifically, the [*2] complaint alleges violations of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*; Rule 10b-5 of the Securities and Exchange Commission, *17 C.F.R. § 240.10b-5*; § 12(2) of the Securities Act of 1933, *15 U.S.C. § 771(2)*; and *Arkansas Code § § 23-42-106* and 23-42-507. The complaint also asserts a cause of action for common law fraud.

Carson originally brought this action individually and on behalf of a class of persons who purchased warrants from the offering by defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") of 2,200,000 Constant Maturity U.S. Treasury Yield Increase Warrants (the "warrants"). Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") acted as the underwriter for the warrants. The warrants were sold to the public for $ 6.00 each, for a total sale of approximately $ 13.2 million. The substance of the complaint is that defendants misrepresented and/or omitted material information in the prospectus about the primary pricing mechanism for the warrants on the secondary market. The complaint alleges that defendants fraudulently induced the members of the class to purchase the warrants and that the class members were damaged because [*3] they were unable to resell the warrants at the price expected.

At the time the warrants were offered for sale, Carson was a representative of defendant MLPF&S, a wholly owned subsidiary of Merrill Lynch. Carson became aware of the offering through information provided to him by MLPF&S. In October, 1994, approximately two weeks before the warrants were offered for sale, Sandra Familet ("Familet"), an employee of Merrill Lynch at the time, traveled from New York to Arkansas to promote the sale of the warrants. Familet held a "road show" at a restaurant in Rogers, Arkansas.

Carson asserts that at this "road show," Familet described the warrants and stated that based on Merrill Lynch's research and analysis concerning interests rates, purchasers should look to sell their warrants within ninety days of the initial offering to realize a short-term profit.

Carson asserts that based on the information Familet provided at the road show, and on his review and analysis of the prospectus, he purchased 3,000 warrants for his own portfolio, and he recommended and sold warrants to a number of his customers. Specifically, Scott H. Shepard ("Shepard"), a Merrill Lynch representative and Carson's [*4] assistant, contacted James T. Cramer and Shirley F. Cramer (the "Cramers"), to discuss the warrant offering. Shepard explained the warrants to the Cramers, based on the information he obtained from Familet and the prospectus. The Cramers subsequently directed Shepard to purchase 1,500 warrants for their account. Carson and Shepard ultimately sold 83,100 warrants, which represented 3.8% of the total warrant offering.

After the sale of the warrants, Carson began to monitor their performance on the secondary market. Carson became concerned when he discovered that the warrants were decreasing in value and contacted his branch manager at MLPF&S, Mark Dutton ("Dutton"). Dutton allegedly informed Carson that the reason for the decline in the value of the warrants was that Merrill Lynch was using a derivative known as the "Eurodollar Synthetic Forward Rate" (the "Eurodollar Rate") as the primary pricing mechanism for the warrants on the secondary market instead of the criteria set forth in the prospectus. Familet allegedly confirmed Dutton's remarks and stated that Merrill Lynch had not included the fact that it intended use the Eurodollar Rate in the prospectus because it believed that [*5] such a disclosure would make the warrants unmarketable. The complaint alleges that Merrill Lynch's failure to disclose its intended use of the Eurodollar Rate in the prospectus constitutes a violation of the federal and state securities laws cited above. Both Carson and the Cramers sold their warrants for less than what they paid for them.

Defendants failed to timely respond to the complaint as required by *Rule 12(a) of the Federal Rules of Civil Procedure.* Plaintiff filed a motion for default judgment on October 2, 1997, and the clerk entered default as to both defendants on that same day. On October 10, 1997, defendants filed a motion to set aside the clerk's default and a motion for an enlargement of time to respond to the complaint. On October 15, 1997, the court, finding that good cause existed and that no prejudice had occurred to plaintiff from defendants' failure to answer, directed the clerk to set aside the entries of default and granted defendants additional time to file their responsive pleadings.

Defendants filed motions to dismiss and/or transfer Carson's complaint on October 29, 1997. Thereafter, plaintiff filed a motion for leave to file an amended complaint and a [*6] motion for an extension of time to file for class certification. By order dated December 3, 1997, the court granted plaintiff 45 days from the date on which the pending motions to transfer and/or dismiss are decided by the court to move for class certification.

A virtually identical class action complaint was filed in the Eastern District of Arkansas on October 20, 1995, against the same defendants in this case. *See, Forbes, et al. v. Merrill Lynch & Co., Inc., et al.,* LR-C-95-654. In *Forbes,* the plaintiffs alleged violations of the federal securities laws in connection with the offer and sale of the warrants. Defendants filed a motion to transfer. The motion was granted and the case was transferred to the Southern District of New York. On March 12, 1997, the parties in *Forbes* filed a stipulation with the court agreeing, among other things, that the class action allegations would be deleted from the complaint. The case was then transferred back to the Eastern District of Arkansas. On June 6, 1997, a second amended complaint, that omitted the class action allegations, was filed. Thereafter, the plaintiffs in *Forbes,* in view of the filing of the case presently before [*7] the court, requested a dismissal. The *Forbes* case was dismissed on October 2, 1997.

**B. Federal and State Securities Laws.**

Section 10 of the Securities and Exchange Act of 1934 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -
>
> * * *
>
>> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate

in the public interest or for the protection of investors.

*15 U.S.C. § 78j* (1997).

Commission Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange,
>
>> (a) To employ any device, scheme, or artifice to defraud,
>>
>> (b) To make any untrue statement of a material fact or to [*8] omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>>
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

*17 C.F.R. 240.10b-5* (1997).

"The text of § 10(b) does not provide for private claims. Such claims are of judicial creation, having been implied under the statute for nearly half a century." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 358, 111 S. Ct. 2773, 2779, 115 L. Ed. 2d 321 (1991)* (footnote and citations omitted).

Section 12(2) of the Securities Act of 1933 provides that:

> Any person who -
>
> * * *
>
>> (2) offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading [*9] . . .
>
> shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*15 U.S.C. § 77l*(a)(2) (1997).

The Arkansas Securities Act also makes it unlawful for a person to make a material misrepresentation or omission in connection with the offer, sale or purchase of any security. *Ark. Code Ann. 23-42-507* (Michie 1994). Like the federal statute, a person can recover under the Arkansas Securities Act the consideration paid for the security or damages if he no longer owns the security. *Ark. Code Ann. § 23-42-106(a)(1)* (Supp. 1997).

## II. MOTION TO AMEND

There are two reasons why Carson wants, or needs, to amend his complaint. First, Carson wants to substitute the Cramers to act as the representatives of the class. The reason is that defendants contend, in their motion to dismiss, that Carson's claims are time-barred. Thus, to avoid a possible dismissal, and to avoid further litigation [*10] on the issue, Carson wants to substitute himself with the Cramers. Carson does not concede that his claim is barred, however, he states "rather than fight the battle with Defendants over Carson's status as class representative, Plaintiff believes the wiser and more efficient course of action is to simply substitute [the Cramers] . . . ." *Brief in Support of Motion for Leave to File First Amended Class Action Complaint,* at 3.

The other reason why Carson wants to amend his complaint is to give the Cramers the opportunity to comply with the procedural requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). The PSLRA requires plaintiffs who bring private class actions to comply with certain provisions found at *15 U.S.C. § § 77z-1*(a) and 78u-4(a). It is undisputed that Carson has not complied with these provisions of the PSLRA. Thus, the first issue we must address is whether Carson's failure to comply with the provisions of the PSLRA is fatal to the maintenance of this class action.

1998 U.S. Dist. LEXIS 6903, *

## A. The PSLRA

The PSLRA was enacted to combat the filing of abusive and meritless lawsuits. *See, H.R. Conf. Rep.* No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. [*11] 730 (hereinafter cited as 1995 U.S.C.C.A.N. ). One problem confronting private securities litigation at the time the PSLRA was enacted was that of the "professional plaintiff," persons who purchase a nominal number of securities and then bring violations of the federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. *Id.,* at 731-32. Congress discovered that often times the professional plaintiff would be paid a bonus for participating as lead plaintiff in the lawsuit. *Id.,* at 732. Congress believed that these cases encouraged the filing of abusive lawsuits. *Id.* Congress also determined that these plaintiffs did not adequately represent the other class members. *Id.* Thus, the new rules were designed to discourage the use of "professional plaintiffs" and thereby reduce the number of meritless and abusive filings.

### 1. The Certification Requirement

The PSLRA requires that a plaintiff "seeking to serve as a representative party on behalf of a class shall provide a sworn certification" with the complaint. *15 U.S.C. § § 77z-1*(a)(2)(A) and 78u-4(a)(2)(A) (1997). The sworn statement must certify that the plaintiff: [*12] (i) reviewed and authorized the filing of the complaint; (ii) did not purchase the securities at the direction of counsel or in order to participate in a lawsuit; and (iii) is willing to serve as the lead plaintiff on behalf of the class. *Id.* In addition, the statement must also identify any transactions of the plaintiff in the security that is at issue in the case. *Id.*

### 2. The Notice Requirement

The PSLRA provides that once a class action complaint is filed, the plaintiff shall, within 20 days, provide notice to members of the purported class in a widely circulated national business publication or wire service. *15 U.S.C. § § 77z-1*(a)(3)(A)(i) and 78u-4((a)(3)(A)(i) (1997). This notice must identify the claims alleged in the lawsuit, the purported class period, and inform the potential class members that, within 60 days, they may move to serve as the lead plaintiff. *Id.* The notice requirement was included in the PSLRA to provide a method for determining the most adequate plaintiff. *See,* 1995 U.S.C.C.A.N. at 732. There is a presumption under the PSLRA that the class member with the "largest financial interest in the relief sought by the class" is the "most adequate [*13] plaintiff." *15 U.S.C. § § 77z-1*(a)(3)(B)(iii)(I) and 78u-4(a)(3)(B)(iii)(I) (1997). That presumption can be rebutted, however, if the member with the largest

financial interest would not fairly and adequately represent the interests of the class. *15 U.S.C. § § 77z-1*(a)(3)(B)(iii)(II) and 78u-4(a)(3)(B)(iii)(II) (1997).

Further, under the new rules, "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *15 U.S.C. § § 77z-1*(a)(3)(B)(v) and 78u-4(a)(3)(B)(v) (1997). As a result, Congress hopes that the plaintiff will choose the counsel, rather than the counsel choosing the plaintiff. *See,* 1995 U.S.C.C.A.N. at 734.

### 3. Discussion

Defendants contend that if the court allows Carson to file his proposed amended complaint, and in effect, gives plaintiffs an opportunity to publish belated notice, then the court would be permitting Carson's apparent and total disregard for the mandatory requirements of the PSLRA. Defendants assert that Congress specifically enacted the 20 day notice requirement so that the other purported members of the class would have an opportunity to move the court to serve as lead plaintiff. Defendants [*14] contend that because Carson did not file notice, the manner in which the Cramers were selected to substitute him as lead plaintiffs completely disregards the PSLRA. n1

> n1 Defendants also suggest in their letter to the court dated December 2, 1997, that plaintiffs' counsel, William B. Putman, may have violated Rule 7.3 of the Arkansas' Rules of Professional Conduct. Rule 7.3 prohibits a lawyer from soliciting prospective clients through direct in-person or live telephone contact. In response to defendants' allegations, Mr. Putman offers his own affidavit whereby he states under oath that he did not initiate the contact with the Cramers about their possible participation in this lawsuit. *See, Affidavit of William B. Putman,* at P 5. Mr. Putman asserts that as a result of defendants' motion to dismiss, he contacted Carson and expressed his concern about Carson's ability to act as class representative. *Id.* Mr. Putman states that Carson advised him that he would contact some of his former customers at MLPF&S who had previously expressed an interest in participating in the lawsuit. *Id.* Carson subsequently contacted the Cramers and discussed the issue with them. *Id.* After Carson talked with the Cramers and received their consent, he gave Mr. Putman the Cramers' home telephone number and told Mr. Putman that the Cramers wished to speak with him directly about the matter. *Id.* Mr. Putman then called the Cramers and discussed the issue of them acting as the lead plaintiffs in this lawsuit. *Id.,* P 6. Based

on Mr. Putman's affidavit, the court does not believe that a violation of the Arkansas' Rules of Professional Conduct has occurred in this case. Mr. Putman did not directly solicit the Cramers to act as lead plaintiffs in this lawsuit, therefore, the possibility of undue influence, intimidation and overreaching was not present.

[*15]

If the court allows Carson to amend his complaint and substitute the Cramers as the named plaintiffs, then the Cramers assert that they will file notice within 20 days of filing their amended complaint as required by the PSLRA. The other members of the class will have 60 days from that date to move the court to serve as lead plaintiff of the purported class. Thus, by allowing Carson to amend, the court is in no way stating that the Cramers are the most adequate plaintiffs to represent the interests of the class members in this lawsuit. The court will make that determination, as required by the PSLRA, not later than 90 days after the date on which notice to the other purported class members is published. *See, 15 U.S.C. § § 77z-1*(a)(3)(B)(i) and 78u-4(a)(3)(B)(i) (1997).

Carson has offered no explanation for his failure to comply with the mandatory notice provisions of the PSLRA. He argues, however, that dismissing his case for failure to file timely notice would be an extremely harsh result and that no binding authority exists to support such a decision. n2

n2 Carson also points out that defendants' failure to timely answer was forgiven by the court, and that defendants were permitted to file untimely responsive pleadings in this case. Thus, Carson argues, he should receive the same "reprieve." The court set aside the entry of default in this case and allowed defendants to file untimely pleadings because the court determined, as required by Rule 55(c), that defendants had shown good cause. Carson has not attempted to do the same.

[*16]

The PSLRA does not direct a court to dismiss a complaint when a plaintiff fails to comply with either the certification requirement or the notice provisions. The PSLRA does require, however, that a court dismiss a complaint when a plaintiff fails to properly plead the requirements of a § 10(b) securities fraud action. *15 U.S.C. § 78u-4*(b)(3)(A) (1997). Thus, if Congress had wanted the courts to dismiss a complaint when a plaintiff failed to file a sworn certification or publish timely notice, then Congress could have included such language in the PSLRA.

Defendants cite the case of *Greebel v. FTP Software, Inc., 939 F. Supp. 57, 60 (D. Mass. 1996)*, where the court stated that "failure of the named plaintiff to file a certification with the complaint and to serve notice to class members are fatal to maintenance of the putative class action." Defendants contend that *Greebel* stands for the proposition that the complaint must be dismissed when the plaintiff fails to comply with either the certification or the notice requirements of the PSLRA. We disagree. The court in *Greebel* was simply stating in dicta that if a plaintiff never complies with the provisions of the PSLRA, then [*17] the class action cannot go forward. n3 The court did not state that a named plaintiff could not correct such a failure to comply by filing a certification with an amended complaint and serving such notice within 20 days of the amended complaint. Therefore, we conclude that nothing under the PSLRA prohibits the court from allowing a plaintiff to file a sworn certification with an amended complaint and to publish belated notice to the other purported class members.

n3 The facts in *Greebel* are also dissimilar to the facts in the present case. In *Greebel*, the parties had already reached the stage in the lawsuit where notice had been published and other class members had come forward and moved the court to be appointed lead plaintiff. Thus, the court was in the process of determining which plaintiff should be appointed lead plaintiff. At that point, it is important that a plaintiff has properly complied with the certification and notice provisions of the PSLRA, so that the court can determine the most adequate plaintiff to represent the class.

[*18]

We now turn to the issue of whether the Federal Rules of Civil Procedure permit Carson to file his amended complaint. We also address the issue of whether the amended complaint relates back to the original filing date.

## B. The Federal Rules of Civil Procedure

Defendants contend that the court should deny Carson's motion for leave to file an amended complaint because the filing of the proposed amended complaint would be futile. Defendants assert that the amended complaint is barred by the statute of limitations.

### 1. Statute of Limitations

The United States Supreme Court has held that "litigation instituted pursuant to § 10(b) and Rule 10b-5 must be commenced within one year after the discovery

of the facts constituting the violation and within three years after such violation." *Lampf, 501 U.S. at 364, 111 S. Ct. at 2782.* Section 12(2) claims must be brought within one year after the discovery of the untrue statement or omission and no more than three years after the sale of the security. *15 U.S.C. § 77(m) (1997).* Thus, absent tolling, plaintiffs in this case must bring their claims within one year from the date they discovered the alleged material misrepresentation [*19] and/or omissions in the prospectus, and in any event, within three years from October 27, 1994, the date the warrants were sold. n4

> n4 The Arkansas Securities Act contains a five year statute of limitations, *Ark. Code Ann. § 23-42-106(f)* (Supp. 1997). Thus, neither Carson's nor the Cramers' state securities claims are time-barred.

## 2. Tolling

The United States Supreme Court held in *American Pipe & Const. Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974),* that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *Id., 414 U.S. at 554, 94 S. Ct. at 766* (footnote omitted). In addition, the Supreme Court made it clear in *Crown Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 353-54, 103 S. Ct. 2392, 2397, 76 L. Ed. 2d 628 (1983),* that the filing of a class action tolled the applicable statute of limitations as to all asserted class [*20] members, not just for intervenors. Therefore, under the tolling doctrine of *American Pipe,* both Carson's and the Cramers' *individual* claims were tolled during the pendency of the *Forbes* litigation.

## 3. Subsequent Class Actions

Both *American Pipe* and *Parker* involved subsequent *individual* actions filed after a district court's denial of class certification. Thus, an issue arose in the courts as to whether the *American Pipe* tolling doctrine also applied to a subsequent *class* action filed after a district court's denial of class certification. The Courts of Appeal that have addressed this issue are in unanimous agreement that it does not. *See, Griffin v. Singletary, 17 F.3d 356 (11th Cir. 1994); Andrews v. Orr, 851 F.2d 146 (6th Cir. 1988); Robbin v. Fluor Corp., 835 F.2d 213 (9th Cir. 1987); Korwek v. Hunt, 827 F.2d 874 (2nd Cir. 1987); Salazar-Calderon v. Presidio Valley Farmers Ass'n, 765 F.2d 1334 (5th Cir. 1985). See also, In re Cypress Semiconductor Securities Litig., 864 F. Supp. 957 (N.D. Cal. 1994); Fleck v. Cablevision VII, Inc., 807 F. Supp. 824 (D.D.C. 1992); Smith v. Flagship Intern., 609 F. Supp. 58 (N.D. Tex. [*21] 1985).*

In each of the cases cited above, a subsequent class action was filed after a district court's prior denial of class certification. The courts dismissed the subsequent class action complaints on the basis that "the Supreme Court . . . did not intend to afford plaintiffs the opportunity to argue and reargue the question of class certification by filing new but repetitive complaints." *Andrews, 851 F.2d at 149 (quoting, Korwek, 827 F.2d at 879).* As the Fifth Circuit put it, the *American Pipe* tolling doctrine does not permit class members to "piggyback one class action onto another and thus toll the statute of limitations indefinitely . . . ." *Salazar-Calderson, 765 F.2d at 1351.*

Carson concedes that the *American Pipe* tolling doctrine does not apply to subsequent class actions filed after a district court's denial of class certification. Carson asserts, however, that in this case there has been no denial of class certification, and thus, the above line of cases do not apply. Specifically, Carson points out that in the Second Circuit's opinion in *Korwek,* the court held that "the tolling doctrine enunciated in *American Pipe* does not apply to permit a [*22] plaintiff to file a subsequent class action following a definitive determination of the inappropriateness of class certification." *Id., 827 F.2d at 879.* Carson contends that there has been no "definite determination" of the appropriateness of class certification in this case. Therefore, Carson asserts that the holding in *Korwek* does not apply to the present facts.

The court in *In re Westinghouse Securities Litig., 982 F. Supp. 1031 (W.D. Pa. 1997),* rejected the argument that *Korwek* only applies when there has been a denial of class certification. In *Westinghouse,* a class action complaint had been filed but the district court had dismissed the complaint with prejudice, never reaching the issue of class certification. A new plaintiff came along and filed a second class action complaint. The defendants argued that the claims were time-barred. The new plaintiff asserted that the statute of limitations had been tolled by the previous class action lawsuit. The court disagreed and held that the statute of limitations had not been tolled, stating that the previous dismissal of the entire class action was "definitive" and thus, under the Fifth Circuit's holding in *Korwek,* [*23] the tolling doctrine of *American Pipe* did not apply. *Id., at 1034-35.*

In *In re Crazy Eddie Securities Litig., 802 F. Supp. 804 (E.D.N.Y. 1992),* the district court certified the class, but at the completion of discovery determined that the named plaintiff could not adequately represent the members of the class. The court dismissed the claims, but held in dicta that the statute of limitations would be tolled for persons who wished to bring subsequent individual or class actions. The court opined that "in such a case a second class action would not be an attempt to relitigate the question of class certification by filing

03/17/2006 07:39 3104422756 BRAUN LAW GROUP PAGE 40/51
Case 4:05-cv-00037-YGR Document 48 Filed 03/17/06 Page 10 of 29

Page 7
1998 U.S. Dist. LEXIS 6903, *

repetitive claims." *Id., at 813* (citation omitted). The court believed that the concerns that existed under the facts of *Korwek* were not present in a case where no previous determination of class certification had been made. *See also, Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193 (S.D.N.Y. 1992)* (*Korwek* applies in the limited context where a plaintiff attempts to relitigate the issue of class certification).

The court in *Westinghouse* stated that the court's reasoning in *Crazy Eddie* made sense in cases where "persons who held colorable [*24] claims for fraud could well have relied on the pendency of the already certified class action to protect their interests, rather than opting-out of the class." *Id., 982 F. Supp. at 1035.* The court went on to state that when the court in *Crazy Eddie* determined that the named plaintiff could not represent the class, it would have been unfair at that stage in the lawsuit to hold the former class members' claims time-barred. *Id.* Because no class was ever certified in *Westinghouse,* the court stated that such reasonable reliance by the former class members was absent. *Id.*

Similarly in this case, no class has ever been certified, and under the reasoning of *Westinghouse,* no class member could have reasonably relied on the pending litigation in *Forbes* to toll their limitations period. Reliance is not required, however, to invoke the *American Pipe* tolling doctrine. The Supreme Court in *American Pipe* held that the tolling doctrine applies to a former class member's claim regardless of whether that class member relied on the filing of the class action suit or not. *Id., 414 U.S. at 551, 94 S. Ct. at 756.* Indeed, the Court stated that tolling applied even [*25] if the former member was unaware that such a suit existed. *Id.* Thus, under *American Pipe,* to invoke tolling, all a former member of a purported class has to prove is that he or she would have been a party to the lawsuit had the suit been permitted to continue as a class action. There is no dispute that the Cramers would have been members of the putative class had the *Forbes* case continued and been certified as a class action.

As stated above, all of the circuit courts that have reached this issue have held that *American Pipe* does not toll the statute of limitations for subsequent class action claims filed after a district court's denial of class certification. Otherwise, plaintiffs could indefinitely toll the statute of limitations and the issue of class certification could be argued and reargued in the district courts. Such a concern is not present, however, in this case, where the issue of class certification has never been reached by any court.

The *Forbes* case was dismissed, in part, because this lawsuit had been filed. It would be unfair to the purported members of the class to dismiss now, n5 without ever reaching the issue of whether this case is appropriate [*26] for class certification. Therefore, we

conclude that the *American Pipe* tolling doctrine applies to the present plaintiffs' claims, and thus, their individual and class action claims were tolled during the pendency of the *Forbes* litigation.

> n5 As discussed below, if the court dismisses this case now, there is a strong possibility that no future claims could be brought against defendants in connection with the sale of the warrants because such claims would be barred by the three year statute of limitations.

4. The Time-Line

On October 27, 1994, Merrill Lynch offered the warrants for sale to the public. Sometime in December, 1994, Carson discovered that Merrill Lynch was using the Eurodollar Rate as the primary pricing mechanism on the secondary market. On October 20, 1995, the *Forbes* class action complaint was filed. On March 12, 1997, the parties filed a stipulation stating that the plaintiffs had agreed to delete the class allegations from the complaint. On June 6, 1997, a second amended complaint, [*27] that omitted the class action allegations, was filed. On September 4, 1997, Carson's class action complaint was filed in this court. On October 2, 1997, the *Forbes* case was dismissed. On December 18, 1997, Carson filed a motion to amend his complaint and to substitute the Cramers as the named plaintiffs in this case.

5. The One Year Statute of Limitations

Carson discovered the alleged fraud in this case in December, 1994. The *American Pipe* tolling doctrine tolled his claims while the *Forbes* case was pending. By the time the *Forbes* case was filed, however, at least 10 months of the one year statute of limitations had run. When the parties agreed that the class action allegations would be deleted from the complaint on March 12, 1997, the statute of limitations began running again. n6 Thus, the one year statute of limitations as to Carson's claims had run by June 1997. Therefore, it is clear that Carson's claims were barred by the one year statute of limitations when he filed this class action complaint on September 4, 1997.

> n6 Even if we held that the statute of limitations was tolled until June 6, 1997, when the second amended complaint was filed, the one year statute of limitations would still have run by the time Carson filed this class action suit on September 4, 1997.

[*28]

According to Carson, however, the Cramers did not

1998 U.S. Dist. LEXIS 6903, *

discover the alleged misstatements and or omissions in the prospectus until the *Forbes* litigation was filed. n7 Thus, the one year statute of limitations as to the Cramers' claims did not begin to run until March 12, 1997. Therefore, the Cramers' claims will not be barred by the one year statute of limitations until March 12, 1998.

> n7 There is nothing in the record that indicates the Cramers actually discovered the alleged fraud before the filing of the *Forbes* complaint. Nor is there enough evidence to determine whether they had "inquiry notice" of such fraud, prior to the filing of the *Forbes* complaint, that triggered the one year limitations period. *See, Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc., 120 F.3d 893, 896-99 (8th Cir. 1997).*

### 6. The Three Year Statute of Limitations

The three year statute of limitations began to run on October 27, 1994, when defendants sold the warrants. Thus, absent tolling, the three year [*29] statute of limitations ran on October 27, 1997. Carson's claims were filed within the three years statute of limitations: the compliant was filed on September 4, 1997. The Cramers claims, however, were not asserted until December 18, 1997, almost two months after the three year statute of limitations had run.

Defendants assert that the *American Pipe* tolling doctrine does not apply to the three year statute of limitations. Thus, defendants contend that because Carson's claims are barred by the one year statute of limitations, and the Cramers' claims are barred by the three year statute of limitations, this lawsuit is time-barred.

### 7. Tolling the Three Year Statute of Limitations

Defendants rely on the Supreme Court's decision in *Lampf, supra,* for the proposition that the three year statute of limitations is an "outside limit" and that tolling principles do not apply. As Carson points out, however, the Court in *Lampf* only held that "equitable tolling" principles do not apply to toll the three year statute of limitations in § 10(b) cases. *Lampf, 501 U.S. at 363, 111 S. Ct. at 2782.* The Court did not address the issue of whether the commencement of a class action [*30] suspends the three year limitations period under the tolling doctrine of *American Pipe.* n8

> n8 Defendants cite several cases in their brief for the proposition that the three year statute of limitations cannot be tolled. Those cases,

however, hold that federal equitable tolling principles do not apply to toll the three year statute of limitations for federal securities law claims. The cases that defendants cite did not reach the issue of whether the *American Pipe* tolling doctrine tolls the three year statute of limitations for members of a purported class. *See, S. E. C. v. Seaboard Corp., 677 F.2d 1301 (9th Cir. 1982); Summer v. Land & Leisure, Inc., 664 F.2d 965 (5th Cir. 1981); LeCroy v. Dean Witter Reynolds, Inc., 585 F. Supp. 753 (E.D. Ark. 1984); Clute v. Davenport Co., 584 F. Supp. 1562 (D. Conn. 1984).*

In *Schaefer v. Overland Exp. Family of Funds, 169 F.R.D. 124, 131 (S.D. Cal. 1996),* the court held that "pursuant to the Supreme Court holding in *Lampf . . .* a class action [*31] can only be maintained for violations within three years prior to filing suit." Other courts have also stated that the three year statute of limitations is an absolute bar, or in other words, a statute of repose. *See, e.g., In re Westinghouse Securities Litig., supra.* In *In re Westinghouse,* the court stated that "the statute of limitations for the securities fraud claims alleged here is one year from the time the plaintiff discovers the facts constituting the violation, and, in any event, within three years after the violation takes place, whether discovered or not." *982 F. Supp. at 1033 (citing, Lampf, 501 U.S. at 364, 111 S. Ct. at 2782-83.)* n9

> n9 We can only find one unreported district court decision where a court held that *American Pipe* tolls the three year statute of limitations. *See, Salkind v. Wang, 1995 U.S. Dist. LEXIS 4327, 1995 WL 170122 (W.D. Mass. 1995).*

We do not have to reach the issue of whether the three year statute of limitations is an absolute bar to federal securities law claims, however, because the [*32] proposed amended complaint will relate back to the original filing date of September 4, 1997. Thus, the Cramers' claims would not barred by the three year statute of limitations, and therefore, the filing of the proposed amended complaint would not be futile.

### 8. FRCP 15(a)

Rule 15(a) permits a party to amend his or her pleading "once as a matter of course at any time before a responsive pleading is served . . . ." *Fed. R. Civ. P. 15(a).* "Otherwise, a party may amend the party's pleading only by leave of Court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Id.*

"The Supreme Court has interpreted this to mean

that 'absent a good reason for denial -- such as undue
delay, bad faith or dilatory motive, repeated failure to
cure deficiencies by amendments previously allowed,
undue prejudice to the non-moving party, or futility of
the amendment -- leave to amend should be granted,"
*Brown v. Wallace, 957 F.2d 564, 565-66 (8th Cir. 1992)*
(quoting, *Thompson-El v. Jones, 876 F.2d 66, 67 (8th
Cir. 1989)* (in turn citing *Foman v. Davis. 371 U.S. 178,
182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962)).* In
addition, the Eighth [*33] Circuit has advised the district
courts that "leave to amend [a complaint] should be
granted liberally when justice so requires." *Frey v. City
of Herculaneum, 44 F.3d 667, 672 (8th Cir. 1995)*
(internal quotation marks and citation omitted).
Moreover, the Supreme Court has stated that, "if the
underlying facts or circumstances relied upon by plaintiff
may be a proper subject of relief, he ought to be afforded
an opportunity to test his claims on the merits." *Forman,
371 U.S. at 182, 83 S. Ct. at 230.*

### 9. FRCP 15(c)

Rule 15(c) provides that relation back is permitted in
three circumstances: (1) where the law that supplies the
statute of limitations authorizes relation back; (2) where
the amended pleading arises out of the same conduct,
transaction or occurrence; or (3) where the amended
pleading adds a new party, only if the party to be added
received notice of the institution of the action, and should
have known that, but for a mistake, the action would
have been brought against that party. *Fed. R. Civ. P.
15(c).* Defendants contend that because the amended
complaint does not meet the requirements of 15(c)(3), for
adding a new party, the amended complaint does not
relate [*34] back.

Rule 15(c) was amended in 1991 to change the result
in *Schiavone v. Fortune, 477 U.S. 21, 106 S. Ct. 2379, 91
L. Ed. 2d 18 (1979),* with respect to the problem of the
misnamed defendant. *Fed. R. Civ. P. 15 advisory
committee's notes.* Rule 15(c) does not expressly apply to
adding new plaintiffs, however, the advisory committee's
notes state that "the chief consideration of policy is that
of the statute of limitations, and the attitude taken in
revised Rule 15(c) toward change of defendants extends
by analogy to amendments changing plaintiffs." *Fed. R.
Civ. P. 15 advisory committee's notes.*

Defendants contend that because the Cramers were
not omitted from the original complaint by mistake, and
because defendants did not have notice of the Cramers'
claims by the filing of the original complaint, the
proposed amended complaint does not relate back to the
original filing date. We disagree.

> As long as defendant is fully apprised of a
> claim arising from specified conduct and
> has prepared to defend the action, his

ability to protect himself will not be
prejudicially affected if a new plaintiff is
added, and he should not be permitted to
invoke a limitations defense. [*35] This
seems particularly sound inasmuch as the
courts will require the scope of the
amended pleading to stay within the ambit
of the conduct, transaction, or occurrence
set forth in the original pleading.

6A Charles Alan Wright et al., *Federal Practice &
Procedure,* § 1501 at 154-55 (2nd ed. 1990) (footnote
omitted).

In addition, although defendants argue otherwise,
this case does not fall within Rule 15(c)(3). In this case,
the proposed amended complaint merely substitutes one
lead plaintiff for another in a class action lawsuit. When
this suit was commenced on September 4, 1997,
defendants were put on notice that there were other
members of the class who were asserting the same claims
as Carson. Thus, the proposed amended complaint should
be analyzed under Rule 15(c)(2). Because the Cramers'
claims arose out of the same conduct, transaction, or
occurrence as did Carson's claims, we hold that the
proposed amended complaint will relate back to the
original filing date.

Other courts have permitted new class members to
be substituted as class representatives where the named
class representative's claim was barred by the statute of
limitations. In *Davis v. Bethlehem Steel [*36]* Corp.,
*600 F. Supp. 1312, 1323 (D. Md. 1985),* for example, the
district court stated that "although[] the named class
representatives' claims have been held to be time barred,
that does not necessarily effect the viability of the class
action. 'If the named plaintiff's claim is barred by the
statute of limitations, a proper plaintiff may be
substituted to represent the class.'" *Id., at 1323* (quoting,
*Dameron v. Sinai Hosp. of Baltimore, Inc., 626 F. Supp.
1012, 1014 (D. Md. 1986)* (in turn citing, *International
Woodworkers of America, AFL-CIO, CLC v. Chesapeake
Bay Plywood Corp., 659 F.2d 1259, 1270 (4th Cir.
1981)).*

Defendants cite the case of *Gatto v. Meridian
Medical Associates Inc., 1989 U.S. Dist. LEXIS 1672,
1989 WL 23125 (D.N.J. 1989),* where the court refused to
apply the relation back doctrine of Rule 15(c). In *Gatto,*
the alleged fraud occurred on December 31, 1981. The
original complaint was filed on December 18, 1987, and
the first amended complaint, which added new plaintiffs,
was filed on February 29, 1988. Thus, the three-year
statute of limitations, which the court considered to be
absolute, had run almost three years prior to the filing of
the original complaint. Therefore, [*37] the court held
that even if it allowed the amended complaint to relate

back, the added plaintiffs' claims would still be time-barred. In this case, however, if the proposed amended complaint relates back to the September 4, 1997, filing date, the Cramers' claims are not time barred. Unlike the plaintiffs in *Gatto*, had the Cramers filed the complaint on September 4, 1997, their claims would not be barred by the statute of limitations.

## C. Conclusion

We conclude that because defendants have been put on notice regarding the class claims in this case, and because the claims asserted in the proposed amended complaint arose out of the same conduct, transaction or occurrence set forth in the original pleading, the proposed amended complaint will relate back to the original filing date. Therefore, pursuant to Rule 15(c)(2), Carson's motion for leave to file an amended complaint should be granted. The Cramers will be substituted as the named plaintiffs in this case upon the filing of the proposed amended compliant.

## III. MOTION TO DISMISS

A. Motion to Dismiss Standard n10

n10 Under the last sentence of Rule 12(b), a motion to dismiss for failure to state a claim upon which relief can be granted shall be converted to a motion for summary judgment if matters outside the pleadings are presented and considered by the court. *Fed. R. Civ. P. 12(b)*. Defendants attached an affidavit by Brad Carson, which was filed in the *Forbes* case, and other related pleadings from the *Forbes* case, in support of their motion to dismiss. The court will not consider any facts which are not present in the complaint in this case, or part of the prospectus that was attached thereto, because the court does not believe that it would be proper to convert defendants' motion to dismiss into one for summary judgment. In this case, discovery would be necessary prior to utilization of the summary judgment procedure.

[*38]

Dismissal of a complaint under *Federal Rule of Civil Procedure 12(b)(6)* is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir. 1997)* (internal quotations marks and citations omitted).

In addition, a complaint must be viewed

in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.

*Id.* (citation omitted).

## B. Defendants' Arguments

Defendants contend that the complaint should be dismissed for two reasons. n11 First, defendants assert that the complaint fails to adequately plead scienter as required by the PSLRA. Second, defendants contend that under the "bespeaks caution" doctrine the alleged misrepresentations and/or omissions in the prospectus [*39] are immaterial as a matter of law.

n11 Defendants' motion to dismiss was filed in opposition to Carson's original complaint, however, the proposed first amended complaint contains the same allegations of fraud. Thus, we will address the arguments made in defendants' motion to dismiss. The first two arguments made by defendants, however, have already been ruled on by the court above, namely, that the complaint should be dismissed because the federal securities law claims are time-barred, and because Carson failed to comply with the certification and notice requirements of the PSLRA. Therefore, the court will only address the remainder of defendants' arguments.

## 1. The Pleading Requirements of the PSLRA

Rule 10b-5, promulgated by the Securities and Exchange Commission pursuant to § 10(b) of the Securities Exchange Act of 1934, prohibits fraudulent conduct in the sale and purchase of securities. *15 U.S.C. 78j(b)* (1997); *17 C.F.R. § 240.10b-5* (1997).

To recover in a private action brought under Rule [*40] 10b-5, a plaintiff must establish: 1) that the defendant acted in a manner prohibited by the Rule, whether it be that the defendant employed a device, scheme, or artifice to defraud, made misrepresentations or omissions of

material fact, or engaged in acts, practices or courses of business that operate as a fraud or deceit: 2) causation, often analyzed in terms of materiality and reliance: 3) damages; and 4) that the fraudulent activity occurred in connection with the purchase and sale of a security.

*In re Nationsmart Corp. Securities Litig., 130 F.3d 309, 320 (8th Cir. 1997) (quoting, Harris v. Union Elec. Co., 787 F.2d 355, 362 (8th Cir. 1986)).* In addition, "proof of scienter, or the 'intent to deceive, manipulate, or defraud' is necessary to prevail in a 10b-5 action," *Nationsmart, 130 F.3d at 320 (quoting, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S. Ct. 1375, 1381, 47 L. Ed. 2d 668 (1976)).*

The PSLRA requires that in pleading a § 10(b) action, the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on [*41] information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1) (1997).* Furthermore, when scienter must be alleged, as in Rule 10b-5, the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2) (1997).* Under the PSLRA, the court must dismiss a complaint that fails to satisfy these pleading requirements. *15 U.S.C. § 78u-4(b)(3)(A) (1997).*

As stated above, defendants contend that the complaint should be dismissed because it fails to plead scienter with the particularity required by § 78u-4(b)(2) of the PSLRA. Defendants do not contend that the complaint fails to meet the pleading requirements of § 78u-4(b)(1). The court feels compelled to note that it has questioned whether the allegations in the present complaint meet the requirements of § 78u-4(b)(1). Specifically, the court is doubtful that the complaint adequately states the reason or reasons why the alleged statements and/or omissions are misleading. Defendants have not adequately raised this issue, however, and thus, the court [*42] will not address the pleading requirements of § 78u-4(b)(1) further.

Congress amended the Securities Exchange Act of 1934 to include this heightened pleading standard for scienter because it determined that *Federal Rule of Civil Procedure 9(b)* had not been applied to prevent the abusive and meritless private securities class action lawsuits. n12 *See,* 1995 U.S.C.C.A.N. 730, 740. Moreover, Congress recognized that the courts of appeal have interpreted Rule 9(b)'s requirements differently, and thus, it wanted to establish a more uniform and more

stringent pleading standard that would prevent the filing of such frivolous lawsuits. *Id.*

n12 Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Fed. R. Civ. P. 9(b).*

It is not clear, however, what § 78u-4(b) demands when it requires that the complaint "state with particularity [*43] facts giving rise to a strong inference that the defendant acted with the required state of mind." No appellate court has decided this issue and the district courts are split on what the PSLRA requires. n13

n13 For a thorough discussion on this issue, *see,* Scott Bieler and Corinne Alyanakian Whitaker, *Judicial Interpretation of Certain Procedural Aspects of the Private Securities Litigation Reform Act of 1995,* 1015 P.L.I. 899 (1997).

Prior to the enactment of the PSLRA, the Second Circuit had been applying the most stringent pleading standard, requiring that the plaintiff state facts with particularity, and that those facts, in turn, give rise to a strong inference of the defendants' fraudulent intent. *See,* 1995 U.S.C.C.A.N. 730, 740. A "strong inference" could be proven in the Second Circuit by establishing either motive and opportunity to commit fraud or by establishing circumstantial evidence of either reckless or conscious behavior. *See, In re Glenayre Technologies, Inc. Securities Litig.,* [*44] *982 F. Supp. 294, 297 (S.D.N.Y. 1997).* Congress declined to adopt the Second Circuit's pleading standard, however, because it wanted to strengthen the existing pleading standards further. n14 *See,* 1995 U.S.C.C.A.N. 730, 740.

n14 In the Conference Report, Congress explained that "for this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity or recklessness." 1995 U.S.C.C.A.N. 730, 747 n.23.

Thus, some courts have held that a plaintiff must plead more than motive and opportunity to satisfy the pleading requirements of the PSLRA. *See, In re Glenayre, 982 F. Supp. at 298. See also, In re Buesa Securities Litig., 969 F. Supp. 238, 242 (S.D.N.Y. 1997).*

1998 U.S. Dist. LEXIS 6903, *

In *In re Glenayre*, Judge Baer stated that although motive and opportunity would no longer suffice to raise a strong inference of scienter that "does not mean that facts relating to motive and opportunity are not relevant to the scienter analysis. Such facts must be considered - along [*45] with other facts pled - in assessing whether a complaint raises a strong inference of knowing misrepresentation." *Id., 982 F. Supp. at 298.*

Other courts have held that the PSLRA incorporated, in part or in whole, the Second Circuit's pleading standard, and thus have held that motive and opportunity still suffice to adequately plead scienter under the PSLRA if a strong inference of fraudulent intent may be inferred from such allegations. *See, e.g., In re Health Mgmt. Inc. Securities Litig., 970 F. Supp. 192, 201 (E.D.N.Y. 1997).* In this case, plaintiffs have alleged that defendants' motive in misrepresenting or omitting the information regarding the Eurodollar Rate was in making the warrants more marketable. We believe that such allegations are relevant to the court's scienter analysis.

The courts are also split on whether under the PSLRA. it is sufficient to allege reckless behavior, or whether a complaint must contain allegations of knowing misbehavior on the part of defendants. Some courts have held that under the PSLRA, a plaintiff must plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants. *See. Norwood Venture* [*46] *Corp. v. Converse, Inc., 959 F. Supp. 205 (S.D.N.Y. 1997). See also, In re Glenayre, 982 F. Supp. at 298.* Judge Baer authored the opinions in both *Norwood* and *In re Glenayre.* In *Norwood,* he stated that under the PSLRA, a plaintiff must plead facts that create a "knowing misrepresentation on the part of the defendants." *Id., 959 F. Supp. at 208* (citation omitted). Judge Baer attempted to explain his reasoning for holding that the PSLRA required a "knowing misrepresentation" in *In re Glenayre,* by stating that the PSLRA "did not change the substantive law but merely the pleading requirement necessary to survive a motion to dismiss, *i.e.* that the complaint state facts raising a strong inference of scienter." *Id., 982 F. Supp. at 298.* The court stated that the required scienter remains the same, however, and in the Second Circuit included recklessness. *Id.* Judge Baer defined recklessness as something that "approximates actual intent" and not just a "heightened form of negligence." *Id. See also, In re Baeoa, 969 F. Supp. at 241* (stating the recklessness still suffices to meet the definition of scienter under the PSLRA, but that recklessness includes [*47] some form of "conscious disregard" for the truth).

In *In re Health Mgmt.,* Judge Spatt disagreed with Judge Baer and held that if Congress meant to impose a pleading standard of "knowing misbehavior" in the PSLRA, it would have done so. *Id., 970 F. Supp. at 201.* Thus, Judge Spatt held that a plaintiff could satisfy the

pleading requirement under the PSLRA by "pleading motive and opportunity, conscious misbehavior, recklessness or by impressing upon the court a novel legal theory." *Id.* The court stated that the pleading requirement of the PSLRA "did not abrogate the Second Circuit's standard of pleading scienter for a securities fraud violation." *Id.*

The Eighth Circuit has held, although not under the PSLRA, that in a § 10(b) action, a plaintiff must allege facts that establish a strong inference of scienter, which requires that a plaintiff allege facts establishing that defendants made knowing or intentional misrepresentations or omissions. *Alpern v. Utilicorp United, Inc., 84 F.3d 1525, 1534 (8th Cir. 1996).* The court stated that it followed the majority rule that recklessness also satisfies the scienter requirement. *Id.* Specifically, the court stated that [*48] in § 10(b) or Rule 10b-5 cases, "if the defendants stated untrue facts with reckless disregard for their truth or falsity, there is scienter." (internal quotation marks and citation omitted). As stated above, the court was not deciding the case under the PSLRA's pleading requirements, however, the court's holding in *Alpern* may indicate that the court would follow *In re Health Mgmt.,* and hold that pleading recklessness, without any conscious component, still suffices under the PSLRA.

Nevertheless, we do not have to reach the issue of whether under the PSLRA a plaintiff has to plead "conscious misbehavior" or can merely allege "reckless behavior" on the part of the defendants. Moreover, we do not have to decide the issue of whether pleading motive and opportunity still suffices under the PSLRA. In this case, we believe that under either standard, the allegations in the complaint give rise to a strong inference that defendants knowingly misrepresented or omitted information regarding the Eurodollar Rate in the prospectus.

2. The Allegations in the Complaint

The complaint in this case basically asserts two general allegations of fraud on the part of defendants. First, the [*49] complaint alleges that "Merrill Lynch made a deliberate, knowing and intentional decision, prior to the initial offering of the Warrants, not to disclose to prospective purchasers that the Eurodollar Rate was to be the primary pricing mechanism for the Warrants on the secondary market." *First Amended Class Action Complaint,* at 14. The complaint alleges that Merrill Lynch intentionally did not disclose this information in order to insure the marketability for the warrants. The complaint further alleges that Merrill Lynch knew of the omission at the time the warrants were offered because Familet stated to Carson that had Merrill Lynch included the fact that the Eurodollar Rate was going to be used as the primary pricing mechanism on the secondary market, the warrants would not been

marketable.

The other allegation of fraud in the complaint is that Merrill Lynch failed to disclose that they intended to make a market in the warrants prior to the initial offering. The complaint alleges that this was communicated to certain MLPF&S' representatives in advance of the offering, but was not included in the prospectus.

Specifically, the complaint alleges that the prospectus stated that [*50] the cash settlement value of the warrants would be based on the following equation: "U.S. $ 100 X 4 X (Spot Yield - Strike Yield) = Cash Settlement Value)." *Proposed First Amended Class Action Complaint* at P 9. The complaint alleges that the Strike Yield was represented in the prospectus to be 6.78% and the Spot Yield was represented to equal the "CMT Yield." *Id.* The complaint further alleges it was represented in the prospectus, clearly and unequivocally, that the CMT Yield was to be derived from the yield of certain United States Treasury securities. *Id.*, at P 12. Therefore, the complaint alleges that because defendants actually intended to use the Eurodollar Rate to value the warrants, the prospectus contained material misrepresentations and/or omissions.

Plaintiffs' allegations regarding the misrepresentations made in the prospectus are based on the alleged statements made by Dutton and Familet. Dutton allegedly told Carson that the reason for the decline in the value of the warrants on the secondary market was because Merrill Lynch was using the Eurodollar Rate as the primary pricing mechanism. *Id.*, at P 23. Familet allegedly confirmed this in a telephone conversation [*51] with Carson when she stated that MLPF&S was pegging the value of the warrants to the Eurodollar Rate. *Id.*, at P 24. Carson claims that Familet stated that Merrill Lynch did not disclose that is was using the Eurodollar Rate in the prospectus because it believed that such a disclosure would make the warrants unmarketable. *Id.*, at P 24. Familet also allegedly told Carson that MLPF&S was executing buy and sell orders for the warrants placed by MLPF&S registered representatives, and therefore, MLPF&S was acting as a primary maker for the warrants. *Id.*

3. Discussion

Three reasons have been advanced for requiring particularity in the pleading of fraud. In *Parnes*, the court reiterated the three purposes:

> First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel in terrorem settlements. Second, it protects against damage to professional reputations resulting from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense.

*Parnes, 122 F.3d at 549* (citation omitted).

The court explained [*52] that, "for Rule 9(b), circumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby. . . . Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Id.* (citations omitted). In other words, the complaint must allege the "who, what, when, where, and how: the first paragraph of any newspaper story." *Id.*, *at 550*. Under the PSLRA's heightened pleading standard, such facts must raise a strong inference that defendants acted with the required state of mind.

Defendants assert that the allegations in the complaint do not satisfy the pleading requirements of the PSLRA. Defendants contend that Familet is not an officer, director, or other person with the capacity to bind Merrill Lynch by her statements. Further, defendants contend that the complaint fails to assert that Familet had any involvement in drafting the prospectus for the warrants, nor does the complaint allege that anyone at Merrill Lynch had any knowledge that the Eurodollar Rate would be used as the primary pricing mechanism [*53] for the warrants on the secondary market at the time the prospectus was drafted.

Under the PSLRA, all discovery is stayed during the pendency of any motion to dismiss. *15 U.S.C. § 78u-4(b)(3)(B)* (1997). Thus, it is unlikely that the plaintiffs in this case have discovered exactly who was involved in drafting the prospectus. We do not believe, however, that plaintiffs must allege such facts in order satisfy the pleading requirements of the PSLRA.

We believe that the complaint, while it is a close question, sufficiently alleges facts which give rise to a strong *inference* of scienter. The allegations that are contained in plaintiffs' complaint are that defendants knowingly misrepresented in the prospectus that the primary pricing mechanism for the warrants on the secondary market would be the yield of certain United States Treasury securities, when in fact, defendants knew that the Eurodollar Rate was going to be used. The complaint therefore alleges the "who, what, when, where and how." As a matter of pleading, even under the heightened pleading requirements of the PSLRA, more is not required. As the Second Circuit stated, "one may indeed doubt whether plaintiffs will be able [*54] to demonstrate actual knowledge on the part of [defendants] at a trial, but in the absence of a sufficiently supported

motion for summary judgment on this subject, a course still open to . . . defendants, they are entitled to an opportunity to do this." *IIT, and Intern. Inv. Trust v. Cornfeld, 619 F.2d 909, 924 (2nd. Cir. 1980).*

A review of the complaint in this case would clearly put the defendants on adequate notice of the class claims and enable them to prepare a responsive pleading and defense. We do not see how, without discovery, plaintiffs could plead with more particularity in this case. Therefore, we conclude that the complaint pleads facts that give rise to a strong inference that defendants knowingly misrepresented or omitted material facts in the prospectus.

C. Materiality

Defendants contend that even if the prospectus contained the alleged misrepresentations, such false statements are immaterial as a matter of law, and are not actionable under the federal securities laws. The Eighth Circuit has stated that there are a variety of reasons why an alleged misrepresentation or omission may be immaterial as a matter of law. For example, some matters are such [*55] common knowledge that a reasonable investor can be presumed to understand them. *Parnes, 122 F.3d at 546.* In addition, "alleged misrepresentations may also present or conceal such insignificant data that, in the total mix of information, it simply would not matter to a reasonable investor." *Id.*

"Puffing" statements are also not considered to be material because such statements are so vague that no reasonable investor would rely on them. *Id.* The final reason why a misrepresentation or omission may, as a matter of law, be immaterial is under the "bespeaks caution" doctrine.

1. The Bespeaks Caution Doctrine

The "bespeaks caution" doctrine provides that:

> when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*Parnes, 122 F.3d at 548 (quoting, In re Donald J. Trump Casino Securities [*56] Litig., 7 F.3d 357, 371*

*(3d Cir. 1993)).* Furthermore, "the cautionary language must relate directly to that by which plaintiffs claim to have been misled." *Id.* (internal quotation marks and citations omitted).

The Eighth Circuit also instructed that "[a] dismissal of a securities fraud complaint under Rule 12(b)(6) should be granted under the bespeaks caution doctrine only where the documents containing defendants' challenged statements include *enough* cautionary language or risk disclosure that reasonable minds could not disagree that the challenged statements were not misleading." *Parnes, 122 F.3d at 548* (internal quotation marks and citation omitted).

2. The Cautionary Language in the Prospectus

The cover page of the prospectus contained the following warning:

> The Warrants involve a high degree of risk, including the risk of expiring worthless unless the CMT Yield increases. Investors therefore should be prepared to sustain a total loss of the purchase price of their Warrants, and are advised to carefully consider the information under "Risk Factors Relating to the Warrants", "Description of the Warrants", "Description of the Warrants - Automatic Exercise [*57] Prior to the Expiration Date" and "Certain United States Federal Income Tax Considerations Concerning the Warrants".

*Exhibit "A" to Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Complaint* (boldface in the original). n15

> n15The prospectus was attached to both the original complaint and the defendants' brief in support of their motion to dismiss, thus, it is proper that this court consider the text of the prospectus in ruling on defendants' motion to dismiss. We note that both parties refer to the text of the "prospectus" when actually it is the text of the October 27, 1994, "prospectus supplement" that contains the cited cautionary language. We will continue to refer to the document as the prospectus, however, to avoid confusion.

Defendants also point to the warning contained in the prospectus supplement regarding the secondary market trading of the warrants, where Merrill Lynch explains:

It is not possible to predict the price at which the Warrants will trade in the secondary [*58] market or whether such market will be liquid or illiquid. The trading value of a Warrant is expected to be dependant upon a number of complex interrelated factors, including the CMT Yield, the volatility of the CMT Yield and the time remaining to the expiration of the Warrants.

*Id.*, at S-4.

### 3. Discussion

Plaintiffs contend that defendants' failure to disclose that the Eurodollar Rate was going to be used as the primary pricing mechanism on the secondary market was a material factor. In addition, plaintiffs assert that the prospectus did not advise potential investors that Merrill Lynch intended to be a market maker for the warrants. Plaintiffs contend that any reasonable investor would have wanted to know that Merrill Lynch intended to make a market for the warrants. Plaintiffs assert that Merrill Lynch disclosed such facts to certain employees prior to offering the warrants, however, such information was omitted from the prospectus. Plaintiffs contend that such omission renders other statements in the prospectus regarding the valuation criteria and the trading of the warrants on the secondary market misleading. Plaintiffs contend that none of the boilerplate cautionary [*59] language contained in the prospectus makes those factors immaterial.

In addition, plaintiffs contend that the "bespeaks caution" doctrine only applies to forward looking statements and not to known facts. Thus, plaintiffs argue that the "bespeaks caution" doctrine does not apply in this case because the alleged misrepresentations were misrepresentations of known facts.

The Eighth Circuit in *Parnes* stated that the "bespeaks caution" doctrine applied to cautionary language in "forecasts, opinions or projections." *Parnes, 122 F.3d at 548.* In addition, several courts have specifically held that the "bespeaks caution" doctrine does not apply to present facts and only applies to misrepresentations or omissions regarding future projections and forecasts. *See, e.g., Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st. Cir. 1996)* (bespeaks caution doctrine applies to forward looking statements, not to statements of present facts).

Even if the doctrine applies in this case, however, we do not believe that the cautionary language contained in the prospectus relates directly to the alleged

misrepresentations. Plaintiffs claim that the prospectus was misleading [*60] because it represented to investors that the warrants were going to be priced on the secondary market according to the "CMT Yield" which in turn was going to be based on the yield of certain United States Treasury securities. Plaintiffs contend that defendants actually valued the warrants according to the Eurodollar Rate, and defendants do not seem to deny this allegation.

The prospectus contains various statements warning prospective investors that the warrants involve a high degree of risk and that investors may sustain a total loss of the purchase price. Those cautionary statements, however, do not specifically address plaintiffs' claims.

Specifically, the prospectus states that it would not be possible to predict the price at which the warrants would trade in the secondary market. The prospectus states that "the trading value of a Warrant is expected to be dependant upon a number of complex interrelated factors, including the CMT Yield, the volatility of the CMT Yield and the time remaining to the expiration of the Warrants." *Exhibit "A" to Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Complaint,* at S-4. Nowhere does the prospectus state that the Eurodollar [*61] Rate may be used to value the warrants on the secondary market. The cautionary language is simply not sufficient to warn investors that the trading value of the warrants on the secondary market may be dependant on the Eurodollar Rate, or at least defendants have not persuaded this court of the same. In addition, defendants have pointed the court to no cautionary language which relates to the issue of whether or not Merrill Lynch intended to make a market for the warrants.

Based on the above analysis, we conclude that the alleged misrepresentations and/or omissions in this case may have affected the "total mix" of information in the prospectus provided to investors. Therefore, the alleged misrepresentations and/or omissions are not immaterial as a matter of law.

### D. Conclusion

Based on the above analysis, the court denies defendants' motion to dismiss since plaintiff has adequately plead scienter as required by the PSLRA. In addition, the alleged misrepresentations and/or omissions in the prospectus are not, as a matter of law, immaterial under the "bespeaks caution" doctrine.

### IV. MOTION TO TRANSFER

Defendants contend that the court should exercise its discretionary power [*62] to transfer this action to the Southern District of New York pursuant to § 1404(a). Defendants assert that the purported class members have only minimal connections to the Western District of

03/17/2006    07:39    3104427756    BRAUN LAW GROUP    PAGE    49/51

Case 4:05-cv-00037-YGR    Document 48    Filed 03/17/06    Page 19 of 29

1998 U.S. Dist. LEXIS 6903, *    Page 16

Arkansas, and in contrast, have strong, continuing and significant contacts to the Southern District of New York. In addition, defendants contend that if this action is certified as a class action, a transfer would not inconvenience the class members, but instead would facilitate their access to proof, while substantially reducing the burdens on defendants and non-party witnesses.

Plaintiffs object to defendants' motion to transfer and contend that plaintiffs' choice of forum should be given great weight. Plaintiffs assert that it is much more convenient for plaintiffs to maintain this action in this district than the Southern District of New York. Furthermore, plaintiffs assert that defendants bear the burden of proof on the motion to transfer, and submit that they have failed to meet that burden.

A. Discussion

Section 1404(a) provides: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or [*63] division where it might have been brought." 28 U.S.C. § 1404(a) (1993). A determination of whether a case should be transferred requires a case-by-case evaluation of the "particular circumstances at hand and a consideration of all relevant factors." Terra Intern., Inc. v. Mississippi Chemical Corp., 119 F.3d 688, 691 (8th Cir. 1997), cert. denied,    U.S.    , 139 L. Ed. 2d 609, 118 S. Ct. 629 (Dec. 15, 1997) (citations omitted).

As a preliminary matter, the court notes that the Southern District of New York is a venue in which this case could have been brought, and thus, a request to transfer this case to that district is proper under § 1404(a). Specifically, defendants are residents of New York; a substantial part of the events giving rise to this case occurred in New York, i.e. the prospectus was prepared in New York and the warrants traded on the AMEX in New York; and defendants are subject to personal jurisdiction in New York. See, 28 U.S.C. § 1391 (1993).

In Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 1055 (1947), the Supreme Court listed specific factors for courts to consider when deciding transfer motions. The private [*64] factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and

> inexpensive. . . . The plaintiff may not, by choice of an inconvenient forum, vex, harass, or oppress the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy.

Id., 330 U.S. at 508, 67 S. Ct. at 843 (internal quotation marks, footnote and citation omitted). The public factors deal with such things as court congestion, burdensome jury duty in a community unrelated to the litigation, the interest of having a local dispute decided in that locality, and the preference of having a state-law governed case decided in the forum familiar with that law. Id., 330 U.S. at 509, 67 S. Ct. at 843.

1. Plaintiffs' Choice of Forum

The Supreme Court has emphasized that trial courts must give deference to a plaintiff's forum choice. In Gilbert, the Court stated that "unless the [*65] balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." 330 U.S. at 508, 67 S. Ct. at 843. Despite this general rule, however, a plaintiff's choice of forum is often accorded less weight in the context of class actions. For example, in Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524, 67 S. Ct. 828, 832, 91 L. Ed. 1067 (1947), the Supreme Court held that:

> where there are hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporation's cause of action and all of whom could with equal show of right go into their many home courts, the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened.

This holding has been explicitly extended to securities class action lawsuits. See, e.g., Blake Constr. Co., Inc. v. Int'l Harvester Co., 521 F. Supp. 1268, 1271-72 (N.D. Ill. 1981); Shulof v. Westinghouse Elec. Corp., 402 F. Supp. 1262 (S.D.N.Y. 1975).

The Ninth Circuit, however, has continued to accord substantial weight to the plaintiffs' choice of forum when there are significant contacts with the forum and [*66] the issues raised in the litigation relate to those contacts. See, Securities Investor Protector Corp. v. Vigman, 764 F.2d 1309 (9th Cir. 1985). In addition, a district court in Ohio stated that although "the plaintiff's choice of forum in a class action may be less important than in a non-class action, this does not mean, however, that plaintiff's

1998 U.S. Dist. LEXIS 6903, *

choice of forum is deserving of little weight." *International Union, U.A.W. v. Aluminum Co. of America, 875 F. Supp. 430, 433 (N.D. Ohio 1995)* (internal quotation marks and citation omitted). The court in *Int'l Union* held that the plaintiffs choice of forum should be accorded equal weight.

In *In re ML-Lee Acquisition Fund II, L.P., 816 F. Supp. 973 (D. Del. 1993),* another class action lawsuit filed against defendants, the court stated that:

> while transfer of a case will generally be regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its home turf or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice [*67] weigh strongly in favor of transfer.

*Id., at 976* (citation omitted).

In the present case, there are contacts with the cause of action and the Western District of Arkansas. Specifically, defendants maintained offices in this district, marketed the warrants in this district, and 83,100, or 3.8%, of the warrants were sold by MLPF&S representatives in this district. Moreover, the Cramers reside in this district and purchased their warrants in this district. Therefore, we will accord plaintiffs' choice of forum with at least equal weight.

2. The Convenience of the Parties and Witnesses

Defendants assert that the Merrill Lynch employees and attorneys responsible for structuring the warrants and drafting the prospectus are located in New York. In addition, defendants assert that all secondary market trading occurred on the AMEX in New York, and thus, the persons involved with the trading of the warrants on the secondary market are located in New York. Moreover, defendants assert that Familet, who is no longer an employee of defendants, resides in New York along with a man named Richard George ("George"), the "father of the Warrant issue." *Memorandum in Support of Defendants'* [*68] *Motion to Transfer Venue,* at 12. Defendants point out that the only Arkansas-based witnesses are Dutton and plaintiffs.

In addition, defendants contend that the absence of key Merrill Lynch employees would disrupt defendants' business activities. Defendants assert that "requiring Merrill Lynch to litigate this action more than 1,000 miles away, and requiring the relevant witnesses to travel and to attend a complex trial, makes little practical sense,

given that the Southern District of New York is located just blocks from Merrill Lynch's headquarters." *Memorandum in Support of Defendants' Motion to Transfer Venue,* at 13. In summary, defendants assert that because its principal place of business is in New York, and most of the evidence and witnesses are located in New York, the convenience of the parties mandates that this action be transferred to the Southern District of New York.

Plaintiffs contend that defendants maintain offices in this district, that copies of the prospectus was disseminated in this district, and that 83,100 of the 2.2 million warrants were sold in this district. Thus, plaintiffs contend that key documents are located in this forum and that it is much more [*69] convenient for plaintiffs to maintain their cause of action in the Western District of Arkansas.

In addition, plaintiffs assert that important witnesses are located in this district. Plaintiffs state that Dutton, Carson and the Cramers will testify at trial. Plaintiffs also assert that the MLPF&S representatives who attended the "road show" where Familet marketed the warrants may be called to testify in this case. Moreover, plaintiffs assert that most of the witnesses, identified by defendants, that are located in New York, are employees or agents of Merrill Lynch. Plaintiffs assert that most of those witnesses will be deposed, and if any of them do not wish to appear at trial, their testimony may be offered by way of deposition. Plaintiffs assert that no matter where the trial is held, it is likely that some deposition testimony will have to be used at trial.

Plaintiffs contend that there are only two witnesses identified by defendants that are not employees of defendants, Familet and George, and thus, cannot be compelled by either defendants or the court to attend trial. Plaintiffs contend that similarly, the district court in New York would be unable to compel the attendance of [*70] Dutton at trial, a key plaintiffs' witness in this case.

Plaintiffs concede that it will be inconvenient for defendants' employees and witnesses to attend trial in Arkansas, however, they assert that it is not an insurmountable burden for defendants to overcome - especially in light of defendants' financial resources. Plaintiffs further assert that most of defendants' employees and other witnesses will only need testify for a short period of time and that most can keep in touch with their offices through telephones, computers and fax machines. Therefore, plaintiffs assert, defendants' business activities will not be as adversely affected as defendants contend.

Plaintiffs also assert that the financial burden of litigating this case in Arkansas weighs in favor of plaintiffs. Plaintiffs assert that the transportation, meals

and lodging for the few New York witnesses that would have to testify at trial would be substantially less than the cost for plaintiffs who would have to pay the same expenses for the entire duration of the trial. In addition, plaintiffs assert that the majority of the costs associated with gathering evidence will be in copying documents, not in shipping them to [*71] Arkansas. Plaintiffs point out that either way, whether the trial is held in New York or Arkansas, defendants will have to incur the expense of gathering and copying the relevant documents.

### 3. The Interests of Justice

Defendants assert that overall, the interests of justice requires that this court transfer the case to the Southern District of New York. Defendants assert that the operative facts at issue in this case took place in New York. Specifically, defendants assert that the prospectus was drafted in New York and that the warrants traded on the AMEX in New York. Defendants point out that only a small number of the total warrants sold were sold in Arkansas.

In addition, defendants assert that a transfer would not result in any waste of judicial resources. Defendants point out that this case is in its early stages. Defendants assert that according to the Federal Management Statistics of Administrative Office of the United States for the year ending 1996, there were 361 pending civil filings in this district, while there were 375 filings in the Southern District of New York. In addition, defendants assert that in this court, the average time between filing a case and disposition [*72] of the case was 7 months in 1996, while it was 8 months in the Southern District of New York. Thus, defendants contend that plaintiffs will not be prejudiced by a transfer and will still be able to receive a expeditious hearing of their claims.

Plaintiffs concede that their case would be resolved in about the same amount of time in New York as here. Plaintiffs contend, however, that some delay will occur in transferring the case, and thus there is reason to believe that the case will be resolved more expeditiously in this forum.

Plaintiffs contend that the administration of justice requires that this court deny defendants' motion for transfer. Plaintiffs assert that § 78aa was intended to give plaintiffs the widest possible choice of forums. Section 78aa provides that any private securities action lawsuit may be brought in any district where "the defendant is found or is an inhabitant or transacts business . . ." 15 U.S.C. 78aa (1997). Plaintiffs contend that Congress was concerned about forcing defrauded plaintiffs to litigate their claims on the defendant's home turf and thus drafted § 78aa in a way that allowed plaintiffs to choose the most convenient forum.

Plaintiffs contend [*73] that although the financial resources are not the key determinant of a venue dispute,

in this case, because the financial resources of the parties are so grossly disproportionate, the comparative resources of the parties should be taken into account. Plaintiffs contend that the financial considerations of the parties strongly favor denying defendants' motion to transfer.

Both parties cite Judge Wilson's decision in *Forbes* where the court transferred the *Forbes* case to the Southern District of New York. Judge Wilson stated in that opinion that the Eastern District of Arkansas had very few connections to the case. Indeed, none of the named plaintiffs resided in the Eastern District. Thus, the court found that after weighing all of the factors, the interests of justice was served by transferring the case to New York. Plaintiffs assert that the *Forbes* case can be distinguished from the present case because in this case there are connections to the Western District of Arkansas and the plaintiffs reside in this district. In Judge Wilson's opinion he stated that "the most damaging aspect of Plaintiffs argument for not transferring this case is the fact that they have chosen a [*74] forum where clearly few, if any, of the witnesses, documents, parties, or acts giving rise to this lawsuit occurred." *Defendant's Exhibit "D,"* at 8.

Plaintiffs also cite the court to a similar case in the district court of Ohio. In *Shapiro v. Merrill Lynch & Co., 634 F. Supp. 587 (S.D. Ohio 1986)*, Merrill Lynch made essentially all of the arguments it makes in this case, *i.e.* Merrill Lynch argued that its principal officers, key employees and prospective witnesses were located in New York and thus, it would be greatly inconvenienced if it was required to litigate the case in Ohio. The court found Merrill Lynch's argument unpersuasive and stated that "the mere fact that some witnesses from the proposed transferee district may be called, is by itself, inadequate to warrant a transfer where it is not shown that they would be severely inconvenienced or that they are key witnesses." *Id., at 590* (citation omitted).

The court also stated that the defendant had not adequately proven that it would be necessary to transport a large number of documentary evidence. The court stated that there had been no showing "as to the necessity of transporting a large volume of documents [*75] nor that the volume cannot somehow be consolidated through other devices." *Id., at 590.*

The court recognized that defendant carried on a nationwide business and held that Merrill Lynch "may not obtain a transfer to the district where its main office is solely for that reason. By undertaking a nation-wide business, a corporation assumes the risk of amenability to suit throughout the nation." *Id.*

Defendants assert that *Shapiro* is distinguishable from the present case because in *Shapiro* there were also other related actions pending in the district court in Ohio.

1998 U.S. Dist. LEXIS 6903, *

In regard to the other pending actions, however, the court stated that it was just "an additional reason for not transferring the action." *Id.* It was not the controlling factor, in other words, but merely one of the factors the court used in balancing the convenience of the parties.

4. Discussion

We believe that this case presents a close question, however, given the fact that the burden rests on the defendants to show that this case should be transferred, the court will deny defendants' motion for the following reasons. First, as stated above, we believe that the plaintiffs' choice of forum deserves [*76] equal weight to all of the other factors in this case. While the Cramers may not be the named plaintiffs if this case is certified as a class action, they are the named plaintiffs at this point in the lawsuit (or will be after the amended complaint is filed). In the event that another person from outside this district comes forward, is found to be the most adequate plaintiff and replaces the Cramers as the named plaintiffs, the court will reconsider defendants' motion to transfer.

As to the number of witnesses that reside in New York and may be required to testify in this case, most of those witnesses are employees or agents of defendants and can be compelled by defendants to testify in this case. Defendants have only named two other witnesses who do not work for Merrill Lynch that may be called to testify. Plaintiffs named one witness, Dutton, who similarly could not be compelled to testify in New York. Thus, either way, there will be witnesses who will be outside the reach of the court's subpoena powers.

In addition, defendants contend that they will incur

substantial expense if forced to send so many of its employees to Arkansas to testify. Defendants will not have to bear the [*77] entire burden for the costs of transporting witnesses in this case. Plaintiffs will have to bear the burden of paying for the transportation of witnesses they call, if those witnesses agree to testify in this case. Thus, while we believe that defendants will have to bear some expense in litigating this case in Arkansas, we do not find that it is so extraordinary that it warrants a transfer in this case. Similarly, we do not believe that defendants have shown that the burden of having to transport the relevant documents in this case is so great that it warrants a transfer.

Finally, the court is also persuaded by the fact that defendants transact business nation-wide, including in the Western District of Arkansas. Indeed, defendants traveled to Arkansas to market and sell their warrants. Thus, defendants knew that they would be subject to suit in this district. Therefore, defendants have not met their burden of showing that the convenience of the parties and witnesses and the interests of justice would be better served if this case was transferred to the Southern District of New York. We will defer to plaintiffs' choice of forum and deny defendants' motion to transfer at this time. [*78]

Dated: March 30, 1998

H. Franklin Waters

United States District Judge

********** Print Completed **********                        122H7V

Time of Request:    March 17, 2006  09:16 AM EST

Print Number:       1821:89296047
Number of Lines:    996
Number of Pages:

Send To:  MOLINAR, LEITZA
          BRAUN LAW GROUP
          12400 WILSHIRE BLVD STE 920
          LOS ANGELES, CA 90025

# EXHIBIT 2

2000 U.S. Dist. LEXIS 18590, *

LEXSEE 2000 US DIST LEXIS 18590

## JOHNATHAN S. HILL, on behalf of himself and all others similarly situated, Plaintiff, vs. PRIORITY FINANCIAL SERVICES, INC., Defendant.

### IP 98-1319-C-B/S

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION

### *2000 U.S. Dist. LEXIS 18590*

#### December 22, 2000, Decided

**DISPOSITION:** [*1] Plaintiff's Motion for Class Certification GRANTED.

**COUNSEL:** For HILL, JOHNATHAN S, plaintiff: CLIFFORD W SHEPARD, CONSUMER PROTECTION LAW OFFICE, INDIANAPOLIS, IN.

For PRIORITY FINANCIAL SERVICES INC, defendant: GREGORY A PURVIS, SPANGLER JENNINGS & DOUGHERTY PC, INDIANAPOLIS, IN.

**JUDGES:** SARAH EVANS BARKER, CHIEF JUDGE, United States District Court, Southern District of Indiana.

**OPINIONBY:** SARAH EVANS BARKER

**OPINION:**

#### ENTRY GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

In our September 29, 2000 Entry Resolving Pending Motions, we granted Plaintiff leave to amend the Complaint to substitute Johnathan Hill as proposed class representative and expressed our view that this case satisfies the requirements set forth in *Rule 23 of the Federal Rules of Civil Procedure* for class certification. We did not certify the cause as a class action under Rule 23(b)(3) at that time; instead, we decided to wait for the Defendant, Priority Financial Services, Inc. (PFS), to conduct some discovery in the event that there was some reason "why we should not: certify this action as a class action under *Federal Rule of Civil Procedure 23(b)(3)*, define the class as those individuals who were sent a Notice [*2] of Claim by Brian Jennings on behalf of PFS to collect some consumer debt between September 24, 1997 and September 23, 1998, name Johnathan Hill as class representative and Clifford Shepard as class counsel, order Plaintiff to send notices of opt-out rights to absent class members, and set a date for a bench trial." n1 September 29, 2000 Entry Resolving Pending Motions.

n1 We noted that, "pursuant to Magistrate Judge V. Sue Shields' November 16, 1999 Entry, the parties would have 30 days from the date of our final decision regarding class certification to file summary judgment motions on liability issues."

In the previous entry, we hoped to emphasize that if PFS wished to attack Hill's adequacy as a class representative, it should focus on the key issue of whether Hill has interests antagonistic to those of the class-at-large. In its response to our show-cause order, PFS did not demonstrate that Hill's interests conflict in any way with those of other class members. Instead, PFS continued to offer reasons for challenging [*3] Hill's representation of the class that are unsupported by the facts or the case law.

PFS argued that Hill would be a poor representative due to his condition as "a mental patient" and the fact that Hill once failed to appear at a small claims hearing because he was in jail. After reviewing the relevant portions of Hill's deposition testimony, we believe that PFS vastly overstated the extent of Hill's emotional problems. For example, PFS would have us believe that Hill thinks Yvonne Clark, the previous proposed class representative, was abducted by aliens. However, upon reading the "alien" exchange in context, it seems to us that Hill was using sarcasm to convey to defense counsel that he (Hill) had no idea what happened to Clark. See Hill Dep. at 84. There is nothing to suggest that Hill is currently undergoing treatment for mental illness; but, even if he were "a mental patient," PFS has no evidence that Hill's depression or other disorder would affect his understanding of the case, his processing of information, or his ability to perform his duties as class representative. Furthermore, the fact that Hill missed a court date in 1998 because he was in jail n2 does not prove that [*4] Hill is likely to be an irresponsible representative; there

2000 U.S. Dist. LEXIS 18590, *

is no evidence that Hill has been in trouble with the law since that occasion. Hill's appearance at the deposition indicates that he will be able to meet his obligations as class representative, and we note that we may decertify the class if Hill becomes unavailable and it appears that there is no adequate class representative.

> n2 Although the child molestation charges against Hill are not relevant to his ability to represent this class, we note that the charges were dropped.

PFS contends that we should not certify the class because Hill is not financially capable of supporting this litigation. The law of our circuit does not place such an onerous burden on a class action plaintiff. See *Rand v. Monsanto Co., 926 F.2d 596,* (7th Cir. 1991) (discussing economics of class actions with small individual stakes and holding "that a district court may not establish a per se rule that the representative plaintiff must be willing to bear all (as [*5] opposed to a pro rata share) of the costs of the action.") Hill testified that he is willing and able to pay his fair share of the costs. Dep. at 103.

Similarly unavailing is PFS's argument that Hill does not understand the legal process or grasp the legal issues underlying this case. In Rand, the court emphasized an inquiry into the named plaintiff's commitment to pursuing the action to ensure that "the 'representative' in a class action is not a fictive concept." *926 F.2d at 599.* We will not require a named plaintiff to memorize all of the facts of the case before we deem him an adequate class representative; Hill's deposition testimony reveals his familiarity with the facts underlying the suit, his conception of its basic legal propositions, and his desire to pursue the FDCPA claims of the class against PFS. "Proposed representatives are not lawyers expected to understand intimately the legal nuances of the case." *Hubler Chevrolet, Inc., et. al. v. General Motors Corp., 193 F.R.D. 574, 578 (S.D. Ind. 2000).* Hill's knowledge and his genuine interest in the outcome of this litigation are sufficient to make him an adequate representative of the class. [*6] PFS has not demonstrated any conflict between Hill's interests and those of the class; to the contrary, Hill affirmed his understanding of his duty to represent the entire class fairly and equally.

Conclusion

PFS has not demonstrated that Hill is an inadequate class representative, that Plaintiff's proposed class otherwise fails to satisfy the requirements of Rule 23(a), or (in contrast to the findings set forth in our September 30, 2000 Entry Resolving Pending Motions) that the case is not maintainable under Rule 23(b)(3). Therefore, Plaintiff's Motion for Class Certification is GRANTED. Johnathan Hill will serve as the named class

representative and Clifford Shepard as class counsel. The class is defined as all individuals who were sent a Notice of Claim by Brian Jennings on behalf of PFS to collect a consumer debt between September 24, 1997 and September 23, 1998. Plaintiff will be responsible for notifying all class members about the action and their right to opt-out pursuant to Rule 23(b)(3) and (c)(2), as detailed in our attached order. Certification of the class is conditional, subject to our power at any time prior to final judgment to revoke or alter class certification [*7] in the interests of justice and to ensure compliance with the requirements of Rule 23. See *Fed. R. Civ. P. 23(c)(1); Alliance to End Repression v. Rochford, 565 F.2d 975, 977 (7th Cir.1977).*

It is so ORDERED this 22nd day of December 2000.

SARAH EVANS BARKER, CHIEF JUDGE

United States District Court

Southern District of Indiana

**ORDER**

Upon consideration of the positions of the parties regarding the Plaintiff's March 15, 1999 Motion for Rule 23 Class Certification and for the reasons set forth in this Court's September 29, 2000 Entry Resolving Pending Motions and its Entry filed herewith,

IT IS HEREBY ORDERED that Plaintiff's Motion for Class Certification is GRANTED and a class under *Fed. R. Civ. P. 23(b)(3)* is certified, subject to alteration or amendment under *Fed. R. Civ. P. 23(c),* as follows:

> All individuals who were sent a Notice of Claim by Brian Jennings on behalf of Defendant, Priority Financial Services to collect a consumer debt between September 24, 1997 and September 23, 1998.

IT IS FURTHER ORDERED that, subject to further order of the Court, Mr. Johnathan Hill is designated as class representatives and Clifford W. Shepard [*8] of the Consumer Protection Law Office is designated as counsel for the class.

IT IS FURTHER ORDERED that counsel for the class shall cause notice to be mailed by first class mail, postage prepaid, to all members of the class who can be identified through reasonable effort. The notice shall comply in all respects with *Fed. R. Civ. P. 23(c)(2),* shall inform class members of their right to opt out of the class, and shall be filed with the Court for approval no later than January 22, 2001. The final version shall be mailed to the class before February 20, 2001.

IT IS FURTHER ORDERED that class members

Page 3

2000 U.S. Dist. LEXIS 18590, *

may exclude themselves from the class by filing with counsel for the class written notification that they request exclusion from the class by April 2, 2001.

IT IS FURTHER ORDERED that counsel for the class file with the Clerk of Court by April 23, 2001, an affidavit identifying the persons to whom notice has been mailed and who have not timely requested exclusion. All dates are subject to the Court's modification or upon motion of the parties.

SARAH EVANS BARKER, CHIEF JUDGE

United States District Court

Southern District of Indiana

December [*9] 22nd, 2000

**PROOF OF SERVICE**

STATE OF CALIFORNIA            )
                               )ss.:
COUNTY OF LOS ANGELES          )

    I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 12400 Wilshire Boulevard, Suite 920, Los Angeles, CA 90025.

On March 17, 2006, I served the document(s) described as **COMPENDIUM OF NON-FEDERAL AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT** by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

**SEE ATTACHED SERVICE LIST**

    I served the above document(s) as follows:

    BY MAIL. The envelope(s) was/were mailed with postage thereon fully prepaid. I am familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in an affidavit.

    I further declare, pursuant to Civil L.R. 23-2, that on the date hereof I served a copy of the above-listed document(s) on the Securities Class Action Clearinghouse by electronic mail through the following electronic mail address provided by the Securities Class Action Clearinghouse:

**jcarlos@law.stanford.edu**

    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on March 17, 2006, at Los Angeles, California 90025.

LEITZA MOLINAR
Type or Print Name

Signature

1

## SERVICE LIST

2    Roy A. Katriel, Esq.
     THE KATRIEL LAW FIRM, P.C.
3    1101 30th Street, NW
     Suite 500
4    Washington, DC 20007
     Tel:   (202) 625-4342
5    Fax:   (202) 625-6774

6    Jacqueline Sailer, Esq.
     Eric J. Belfi, Esq.
7    MURRAY, FRANK & SAILER LLP
     275 Madison Avenue
8    Suite 801
     New York, NY 10016-1101
9    Tel:   (212) 682-1818
     Fax:   (212) 682-1892

10

11    **Attorneys for Plaintiff**

12    Robert A. Mittelstaedt, Esq.
     Caroline N. Mitchell, Esq.
13    Adam R. Sand, Esq.
     JONES DAY
14    555 California Street
     26th Floor
15    San Francisco, CA 94104
     Tel:   (415) 626-3939
     Fax:   (415) 875-5700
16

17    **Attorneys for Defendant**

18

19

20

21

22

23

24

25

26

27

28