1  Michael D. Braun (167416)
   BRAUN LAW GROUP, P.C.
2  12400 Wilshire Boulevard
   Suite 920
3  Los Angeles, CA 90025
   Tel:    (310) 442-7755
4  Fax:    (310) 442-7756
   E-mail: service@braunlawgroup.com
5
   Roy A. Katriel (Admitted Pro Hac Vice)          Brian P. Murray
6  THE KATRIEL LAW FIRM, P.C.                       Eric J. Belfi (Admitted Pro Hac Vice)
   1101 30th Street, NW                             MURRAY, FRANK & SAILER LLP
7  Suite 500                                        275 Madison Avenue
   Washington, DC 20007                             Suite 801
8  Tel:    (202) 625-4342                           New York, NY 10016-1101
   Fax:    (202) 625-6774                           Tel:    (212) 682-1818
9  E-mail: rak@katriellaw.com                       Fax:    (212) 682-1892
                                                    Email:  ebelfi@murrayfrank.com
10
   **Attorneys for Plaintiff**
11

12                   **UNITED STATES DISTRICT COURT**

13                **NORTHERN DISTRICT OF CALIFORNIA**

14                       **SAN JOSE DIVISION**

15

16  THOMAS WILLIAM SLATTERY,              )    **CASE NO.: C05-00037 JW**
    Individually, And On Behalf Of All Others )
17  Similarly Situated,                   )    **CLASS ACTION**
                                          )
18                  Plaintiff,            )    **DECLARATION OF MICHAEL D.**
                                          )    **BRAUN IN SUPPORT OF PLAINTIFF'S**
19          vs.                           )    **MOTION FOR LEAVE TO FILE A**
                                          )    **SECOND AMENDED COMPLAINT**
20  APPLE COMPUTER, INC.                  )
                                          )    **DATE:**     **May 8, 2006**
21                  Defendant.            )    **TIME:**     **9:00 a.m.**
                                          )    **CRTM:**     **8, 4th floor**
22  _____)

23                       **"REDACTED/PUBLIC VERSION"**

24

25

26

27

28

DECLARATION OF MICHAEL D. BRAUN IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT
CASE NO.: C05-00037 JW
\\Fileserver\shareddocs\BLG\APPLE\PLD-WPD\Braun Decl re Mx re Leave to File SAC - Redacted.wpd

Dockets.Justia.com

1  I, Michael D. Braun declare as follows:

2      1.      I am a principal with the Braun Law Group, P.C., counsel for plaintiff Thomas

3  William Slattery in the above entitled action and am admitted to practice in this District. I make this

4  declaration of my own personal knowledge in support of Plaintiff's Motion for Leave to File A

5  Second Amended Complaint, and if called upon to do so, could and would testify as stated herein.

6      2.      Attached hereto as Exhibit 1 is a true and correct copy of the proposed Second

7  Amended Complaint for which plaintiff seeks leave of Court to file.

8      3.      Attached hereto as Exhibit 2 is a true and correct copy of portions of the deposition

9  transcript of Thomas William Slattery taken by defendant Apple Computer, Inc. in this action on

10  January 30, 2006. [FILED UNDER SEAL].

11      4.      Attached hereto as Exhibit 3 is a true and correct copy of Plaintiff's First Set of

12  Interrogatories propounded on defendant Apple Computer, Inc. in this action on January 30, 2006.

13      I declare under the penalty of perjury under the laws of the United States of America that the

14  foregoing is true and correct.

15      Executed this 23rd day of March in Los Angeles, California.

16

17                                                                    S\ MICHAEL D. BRAUN
                                                                       Michael D. Braun
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Michael D. Braun (167416)
BRAUN LAW GROUP, P.C.
12400 Wilshire Boulevard
Suite 920
Los Angeles, CA 90025
Tel:    (310) 442-7755
Fax:    (310) 442-7756
E-mail: service@braunlawgroup.com

Roy A. Katriel (*Admitted Pro Hac Vice*)
THE KATRIEL LAW FIRM, P.C.
1101 30th Street, NW
Suite 500
Washington, DC 20007
Tel:    (202) 625-4342
Fax:    (202) 625-6774
E-mail: rak@katriellaw.com

Brian P. Murray
Eric J. Belfi (*Admitted Pro Hac Vice*)
MURRAY, FRANK & SAILER LLP
275 Madison Avenue
Suite 801
New York, NY 10016-1101
Tel:    (212) 682-1818
Fax:    (212) 682-1892
Email: ebelfi@murrayfrank.com

**Attorneys for Plaintiff**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| SOMTAI TROY CHAROENSAK and MARIANA ROSEN, Individually, And On Behalf Of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> APPLE COMPUTER, INC. <br><br> Defendant. | **CASE NO.: C05-00037 JW** <br><br> **CLASS ACTION** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1    Pursuant to Federal Rule of Civil Procedure 15, Plaintiff hereby files this Second Amended

2  Complaint.

3                              **NATURE OF THE ACTION**

4    1.    Plaintiffs Somtai Troy Charoensak ("Charoensak") and Mariana Rosen ("Rosen")

5  (collectively "plaintiffs") bring this action individually on behalf of themselves and on behalf of all

6  other similarly situated persons who have purchased online music recordings directly from Apple's

7  online iTunes music store for playback on portable hard drive digital music players. In the normal

8  course of business, a music Compact Disc ("CD") purchased at any neighborhood music store is

9  playable on any CD player of the customer's choosing. Thus, it would be egregious and unlawful

10  for a major retailer such as Tower Records, for example, to require that all music CDs purchased by

11  consumers at Tower Records stores be played only with CD players purchased at Tower Records.

12  Yet, this is precisely what Apple has done. Apple, which possesses monopoly market power in the

13  relevant market for the legal sale of online digital music files through its Apple iTunes online music

14  store, prevents consumers who purchase music recordings from Apple's iTunes online music store

15  from directly playing this music on any portable hard drive digital music player other than Apple's

16  own iPod portable digital music player.   This unlawful bundling and tying arrangement violates the

17  federal antitrust laws and California's unfair competition law by suppressing competition, denying

18  consumer choice, and forcing consumers to pay supra-competitive prices for their digital portable

19  music players. Plaintiffs bring this class action individually and on behalf of all other similarly

20  situated consumers to seek redress for defendant's unlawful conduct.

21                             **JURISDICTION AND VENUE**

22    2.    Count I of this Complaint is brought pursuant to Section 1 of the Sherman Act, 15

23  U.S.C. § 1, to seek redress for Defendant's illegal tying and/or bundling conduct. This Court,

24  therefore, has subject matter jurisdiction over this count of the Complaint pursuant to 28 U.S.C. §

25  1331.

26  ///

27  ///

28  ///

2

3.    Count II of this Complaint is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, to seek redress for Defendant's monopolization of the market for online sales of digital music files. This Court, therefore, has subject matter jurisdiction over this count of the Complaint pursuant to 28 U.S.C. § 1331.

4.    Counts III and IV of the Complaint is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2 to seek redress for Defendants' unlawful attempted monopolization of the relevant markets alleged herein. This Court, therefore, has subject matter jurisdiction over these counts of the Complaint pursuant to 28 U.S.C. § 1331.

5.    Count V of this Complaint is brought pursuant to the California Cartwright Act, California Business and Professions Code § 16700 et. seq. to seek redress for Defendant's unlawful conduct in violation of state law. Because the facts underlying this count share a common nucleus of operative facts and law with the remaining counts of this Complaint, this Court has supplemental subject matter jurisdiction over this Count of the Complaint pursuant to 28 U.S.C. § 1367.

6.    Count VI of the Complaint is brought pursuant to California's Unfair Competition Law, California Business and Professions Code Section 17200 et. seq. Because the facts underlying this count share a common nucleus of operative facts and law with the remaining counts of this Complaint, this Court has supplemental subject matter jurisdiction over this Count of the Complaint pursuant to 28 U.S.C. § 1367.

7.    Count VII of the Complaint is brought pursuant to the common law of monopolization. Because the facts underlying this counts share a common nucleus of operative facts and law with the remaining counts of this Complaint, this Court has supplemental subject matter jurisdiction over these Counts of the Complaint pursuant to 28 U.S.C. § 1367.

8.    Defendant Apple Computer, Inc. is headquartered in Cupertino, California, transacts significant business within this judicial district, and crafted the conduct giving rise to this complaint within this judicial district. Venue in this district is, therefore, proper pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.

3

**PARTIES**

9.     Plaintiff Somtai Troy Charoensak is a resident of California. During the Class Period (as defined below), Plaintiff purchased music online from Apple's iTunes music store. Plaintiff Mariana Rosen is a resident of New Jersey, and during the Class Period, Rosen purchased music online from Apple's iTunes music store. As Apple has acted to prevent any portable hard drive digital music player, other than its own Apple iPod, from directly playing digital music files purchased at Apple's iTunes online music store, Plaintiffs were also forced to purchase an Apple iPod device if they wished to play and portably enjoy the music they purchased online from Apple's iTune's music store.

10.     Defendant Apple Computer, Inc. ("Apple" or "Defendant") is a corporation organized under the laws of the State of California, and having its principal place of business at 1 Infinite Loop in Cupertino, California 95014. Apple designs, manufactures, and sells personal computers and related software, services, peripherals, and network solutions. Of particular significance to this complaint, Apple also designs, develops, and markets a line of portable hard drive digital music players, known as the Apple iPod, along with related accessories and services including the online distribution, through its iTunes music store, of music and audio books.

**MARKET DEFINITIONS AND MARKET POWER**

11.     For purposes of this complaint, there are two relevant product markets. The first product market consists of the product market for legal online sales of digital music files. The second product market consists of the product market for portable hard drive digital music players. The relevant geographic market for both of these foregoing relevant product markets is the United States.

**THE MARKET FOR LEGAL ONLINE SALES OF DIGITAL MUSIC FILES**

12.     In the days before the advent and prevalence of the Internet, purchases of music were generally limited to sales of records, tapes, and/or compact disc recordings through traditional "brick and mortar" music stores. Although this sales channel continues to exist, the advent of the Internet has created a new market, wherein consumers can search for and purchase music tracks of their choice via their computer by simply logging onto the Internet. When this new

4

1  market first came into being, its legality was called into question and was the subject of contentious

2  litigation, as was epitomized by the much publicized "Napster" litigation. The result of this

3  litigation history was that the marketplace recognized a need for legitimate outlets wherein

4  consumers could avail themselves of their Internet access to make online purchases of digital music

5  files in legitimate and lawful transactions.

6      13.    Defendant Apple recognized the need and potential for such a market,

7  and on approximately April 28, 2003 launched its iTunes online music store ("iTunes"). iTunes,

8  which any consumer with access to the Internet can access by merely logging onto the Apple

9  iTunes' website, is both an online music selling venue and a software package. iTunes allows

10  consumers to log onto Apple's iTunes online store, and browse for various digital files of songs and

11  music recordings by thousands of individual artists and virtually all of the major music recording

12  labels.

13      14.    Users of the iTunes store may then choose to purchase a particular track of

14  music. Currently iTunes charges $0.99 per track of music. Unlike a purchaser at a traditional

15  "brick and mortar" music store, users of iTunes who purchase a track of music do not walk away

16  with an audio cassette tape or record album. Instead, upon purchasing a track of music and paying

17  the requisite price for the purchase, a digital file containing the music purchased is downloaded

18  from Apple's iTunes site to the user's computer or portable hard drive digital music player, where it

19  may be stored for further use by the user. The process by which this digital music file is transmitted

20  and used is described more fully in paragraphs 28-54 below.

21      15.    There is a recognized distinct product market for the legal purchase of

22  digital music files online. Consumers and merchants have come to recognize the online digital

23  music file sale market as a separate and distinct market.

24      16.    The online digital music file market offers a number of features not

25  readily available at traditional "brick and mortar" music stores, which help set this online digital

26  music file market apart as a distinct market. For example, whereas shoppers at traditional "brick

27  and mortar" music stores must typically purchase an entire album of the artist or group selected,

28  online sales of digital music files offer consumers the option to purchase only individual songs or

5

1  tracks of music separately. Further, unlike traditional "brick and mortar" music stores, online music

2  selling venues offer consumers the ability to create their own customized "playlists" wherein

3  consumers can, in effect, create their own customized music album comprising individual songs

4  from various artists. Thus, for example, a consumer of online music stores that had a liking for the

5  song "Help" from the Beatles and the song "Goodbye Yellow Brick Road" from Elton John could

6  create a customized playlist that would comprise just these two songs (as well as any other song

7  from any other artist that consumer wished to purchase). That consumer would only be charged for

8  the particular songs purchased (i.e. in this case, "Help" and "Yellow Brick Road"). By contrast, if

9  that same consumer wished to avail himself of these same two songs by making purchases at a

10  traditional "brick and mortar" music store, that consumer would have to purchase an entire Beatles

11  album containing a dozen songs or more, and an entire Elton John album, which also contains

12  approximately a dozen songs or tracks. Thus, while the consumer of the iTunes online music venue

13  would only pay $1.98 for his total purchase (i.e. $0.99 per song), the price paid by the same

14  consumer at a traditional "brick and mortar" store would likely be approximately $30.00—i.e. the

15  price for two complete albums or CDs.

16      17.    In addition, the music selection available at online music stores is not

17  coextensive with the music selection available at traditional "brick and mortar" music stores. Due

18  to the efficiency with which music can be saved into computer digital format, online music stores

19  provide a ready outlet for independent artists and music labels whose music is not readily available

20  at traditional "brick and mortar" music stores that necessarily carry media in the more expensive

21  CD, cassette or record format.

22      18.    In the eyes of consumers, the online digital music file market and the "brick and

23  mortar" market are not in price-competition with one another. For one thing, as mentioned herein,

24  whereas the online digital music file market focuses on selling individual tracks or songs, the "brick

25  and mortar" market is focused on selling whole albums or CDs, thereby making price-comparison

26  between these two distinct markets a non sequitur. Further, because of the ubiquitous nature of the

27  Internet, online music sales are available to a whole host of consumers who do not have ready

28  access to a nearby "brick and mortar" music store, let alone a nearby "brick and mortar" store

6

1   stocking the particular recording desired by these consumers at any given time. Similarly, because
2   search costs on the Internet are a fraction of search costs involved in the "brick and mortar" market,
3   consumers are not likely to and do not forego a purchase of a music recording online even if they
4   hypothetically would believe that the same recording could be obtained somewhat less expensively
5   at a traditional "brick and mortar" store. The costs associated with traveling to "brick and mortar"
6   music stores, searching one or more such stores for a particular recording, and comparison shopping
7   between these "brick and mortar" music stores and online stores dissuade consumers from foregoing
8   a purchase made from the comfort of their own home or office for the same piece of music, even if
9   doing the foregoing tasks could hypothetically result in a savings of a few cents per song. Put
10  differently, consumers are not likely to and do not travel miles to their nearest "brick and mortar"
11  music store in the hopes of saving a few cents off a song purchase that they could make
12  instantaneously on their home computer.

13          19.    For these and other reasons, the market for legal online sales of digital
14  music files is and has been recognized as a separate relevant product market.

15          20.    Within the relevant market for online legal sales of digital music files,
16  Defendant Apple, through its iTunes online music store, possesses and has possessed throughout the
17  Class Period monopoly market power sufficient to exclude competition.   Upon information and
18  belief, during the Class Period iTunes' share of this relevant market has exceeded 80 percent.
19  Indeed, on its website, Apple touts its iTunes online music store as the "#1 music download store
20  according to Nielsen Soundscan." Apple's iTunes website also touts that iTunes is "[s]etting a new
21  milestone for the online music business, the iTunes Music Store has sold more than 200 million
22  songs." Further, as early as November 5, 2003, Apple CEO Steve Jobs publicly confirmed at a
23  financial analyst conference that Apple's iTunes store possessed at least an 80 percent share of the
24  legal music download market.

25          21.    Other legal online music selling stores exist, such as: Napster, Walmart.com,
26  Musicmatch, RealPlayer, Buy.com, Sony Connect, eMusic, Music Rebellion, Audio Lunch Box,

27

28

7

1   Live Downloads, and Bleep among others. None of these other online music sites, however, posses

2   any significant market share in comparison to Apple's iTunes music store, and hence their existence

3   does not pose price-constraining competition to Apple's iTunes online music store.

4   ## THE MARKET FOR PORTABLE HARD DRIVE DIGITAL MUSIC PLAYERS

5       22.    The second relevant market pertinent to this complaint consists of the

6   relevant market for portable hard drive digital music players. Portable hard drive digital music

7   players are portable devices that enable their users to listen to digital audio recordings without

8   requiring users to carry any external media, such as a compact discs, cassette tapes, or cartridges.

9   Since approximately November 10, 2001, Apple has manufactured, marketed, sold, and shipped a

10  portable hard drive digital music player known as the "iPod."

11      23.    As stated, when a consumer purchases a digital music recording online, a

12  digital file with that music recording is downloaded to that consumer's computer or portable hard

13  drive digital music player for future use. One use to which that digital audio file can be put to by the

14  consumer is to play back that audio digital file on a portable hard drive digital music player.

15      24.    Through its iPod device, Apple sells the best-selling portable hard drive

16  digital music player. Other portable hard drive digital music player manufacturers do exist,

17  including: Rio, iRiver, Creative, Archos, e.Digital, RCA, Panasonic, Nokia, Tatung, Epson,

18  Gateway, and others. Due to Apple's conduct detailed herein, however, none of these other portable

19  hard drive digital music player manufacturers can directly play digital music files purchased by

20  consumers from Apple's iTunes online music store.

21      25.    As detailed herein, Apple has unlawfully bundled, tied, and/or leveraged its

22  monopoly in the market for the sale of legal online digital music recordings to thwart competition in

23  the separate market for portable hard drive digital music players.

24      26.    As shown more fully below, Apple has engaged in this wrongdoing by

25  embedding a code in all digital music files downloaded from Apple's iTunes online music store that

26  forces consumers wishing to play these files on a portable hard drive digital music player to do so

27  only on an Apple iPod. Absent Apple's unlawful action, consumers purchasing music recordings

28  from Apple's iTunes music store would be able to play this music directly on the portable hard drive

8

1  digital music player of their choosing, including the portable hard drive digital music players

2  manufactured by the rival manufacturers listed in paragraph 24 herein. By deliberately embedding

3  its code in this manner in all  digital music files sold by iTunes, therefore, Apple has unlawfully

4  leveraged, bundled and/or tied its monopoly market power in the market for online sale of digital

5  music files to thwart competition in the separate market for portable hard drive digital music

6  players.

7  27.    Similarly, by embedding this code into all digital music files sold by Apple on its

8  iTunes store, Apple has been able to design and has designed its iPod portable hard drive digital

9  music player so that the iPod will only directly play digital music files purchased by the user online

10  if that music file was purchased online from Apple's iTunes music store. If the digital music file

11  was purchased from any other online music selling venues listed in paragraph 21, the iPod will not

12  directly play that music recording. By engaging in this unlawful conduct, therefore, Apple has tied,

13  bundled and/or leveraged its monopoly market power in the market for online music sales to thwart

14  competition in the separate market for portable hard drive digital music players. At the same time,

15  by engaging in this unlawful conduct, Apple has managed to unlawfully maintain and/or attempt to

16  obtain its monopoly market power in the market for online music sales because owners of the

17  monopolized iPod product who wish to purchase music tracks online have no choice, given Apple's

18  conduct, but to purchase these tracks only from Apple's iTunes store.

19  ## APPLE'S ANTICOMPETITIVE CONDUCT

20  28.    To more fully appreciate and understand the anticompetitive nature of

21  Apple's wrongdoing, it is helpful to understand a few fundamentals about the process of digitizing,

22  downloading, and playing digital music recordings.

23  29.    At their most basic level, digital music files, such as MP3 files, look a lot

24  like any other computer data file: a long series of 1s and 0s. In order to turn an analog signal (such

25  as one picked up by a standard microphone) into a digital stream, analog-to-digital converter

26  ("ADC") software measures the signal at a regular interval to find the sampling rate. These samples,

27  if measured close enough together, form a near-exact representation of the analog signal so as to

28  approximate the transmission using 1s and 0s that computers and MP3 players can read.

9

30. Each second of true CD-quality sound takes up more than 1.3MB of disk space, which is why file-compression technology is essential to digital audio, especially portable audio. Using principles of psychoacoustics (how the brain perceives sound) and perceptual coding (eliminating imperceptible sounds), engineers develop algorithms, called codecs (compression decompression), that compress songs into the smallest possible sizes with minimal loss of quality.

31. When a user plays a digital music file, the user essentially reverses the analog-to-digital process. A digital audio device, such as an MP3 player or a computer sound card, uses a DAC (digital-to-analog converter) to turn the 1s and 0s back into an analog signal that can then be amplified and broadcast over headphones or speakers. When a digital device plays music that has been compressed by a codec, software on its chip (called firmware) applies the codec to decode the file, then sends the decompressed 1s and 0s to the DAC. Thus, for a digital audio device to be able to play a compressed music file, that device's hardware must be able to recognize and decode the codec software format that was used to initially compress that audio file.

32. The first format or codec to gain widespread acceptance was Motion Pictures Experts Group Layer 3, known more commonly as "MP3." Today, virtually every portable digital music player on the market is able to play digital music encoded using the MP3 format. Thus, virtually all portable digital music players are able to play MP3 music files.

33. Over the years, however, codec formats other than MP3 have gained widespread acceptance. These formats include WMA, AIFF, AAC, AA, and others.

34. Many major portable digital music players support a number of these formats in addition to the MP3 format. For example, most portable hard drive digital music players, except for iPod, support the WMA format, which is the acronym for Microsoft's Windows Media Audio format. Thus, digital music files compressed with the WMA codec can be played on most major portable digital music players on the market today, except for Apple's iPod.

35. Of significance to this complaint, is a codec format commonly known by the acronym AAC. AAC stands for Advanced Audio Coding, and was a format developed by, *inter alia*, Dolby Laboratories. Compressing digital audio files using the AAC format purportedly allows more files to be stored per file size than would be possible if the same music files were compressed

10

1   using the MP3 format. Of significance, under normal operation, files compressed with the AAC

2   format, much like files originally compressed and saved on any other coded format, can be saved or

3   converted to MP3 formatted files. Thus, under normal operation, a digital music file that was

4   originally compressed and saved with an AAC codec format can be played either by a device

5   supporting AAC encoded files, or alternatively, that music file can be converted to and saved as an

6   MP3 formatted file, which would then be playable on virtually every major portable hard drive

7   digital music player (because all portable hard drive digital music players support MP3 files).

8           36.     Apple's iPod is a portable digital music player capable of playing music

9   files compressed with the AAC codec format. Other rival portable digital music players, including

10  those manufactured by Nokia, Creative, Panasonic, Epson, Tatung, Gateway, Digital Square, and

11  others are also similarly equipped to play AAC digital music files. In addition, of course, because

12  AAC files can readily be converted to MP3 format, virtually every portable digital music player on

13  the market today can play a file that was originally encoded in AAC format by merely having that

14  same file converted and saved to MP3 format.

15  **Apple's Unlawful Manipulation of the AAC Format To Force Use of Apple's iPod**

16          37.     Apple's iTunes online music store's music files are encoded in AAC

17  format. As the foregoing illustrates, therefore, consumers purchasing music from iTunes should and

18  would be free to play the songs purchased from iTunes at any of a number of portable hard drive

19  digital music players that can play AAC formatted files, or at virtually any portable digital music

20  player by merely converting the AAC file to an MP3 file.

21          38.     Apple, however, has manipulated and rigged the AAC format to prevent

22  this competitive scenario. Specifically, Apple has altered the AAC format used to compress and

23  record the song recordings available at its iTunes online music store so that these songs cannot be

24  played directly on any portable hard drive digital music player other than Apple's own iPod. Apple

25  has done so by incorporating into the AAC file format an Apple addition known as Fairplay Digital

26  Rights Management ("DRM").

27

28

11

1    39.    Fairplay DRM is an extra piece of software code that Apple adds to every
2  music file sold by Apple on its iTunes online music store. The addition of this extra software code
3  has the effect of preventing any portable hard drive digital music player, other than Apple's own
4  iPod player, from playing songs purchased from Apple's iTunes music store. Users purchasing
5  songs from iTunes can still play those songs on their computers (whether they be manufactured by
6  Apple or not), but if these users wish to play the music they just purchased from iTunes on a
7  portable hard drive digital music player, they can only do so directly on an iPod. Thus, in effect,
8  Apple has turned an open and interactive standard into an artifice that prevents consumers from
9  using the portable hard drive digital music player of their choice, even where players exist that
10  would otherwise be able to play these music files absent Apple's actions.

11    40.    Another consequence of Apple's manipulation of the AAC codec format, is that
12  Apple's addition of its Fairplay DRM code portion to these music files makes it impossible to
13  convert these AAC music files into MP3 files that can be decompressed and played directly by
14  portable hard drive music players other than the iPod. Thus, whereas absent Apple's action, all
15  AAC files could be converted to MP3 format and therefore could be played on virtually any major
16  portable hard drive digital music player on the market, Apple's action prevents this from happening,
17  and forces a user to use only Apple's iPod device as the sole portable hard drive digital music player
18  capable of playing files purchased at Apple's iTunes music store.

19    41.    Apple calls this rigged digital format, obtained after incorporating Apple's
20  extra Fairplay DRM software code to the AAC file, an "AAC Protected" format or file. Apple
21  blatantly announces that the difference between a regular AAC formatted music file and Apple's
22  "Protected AAC" music file is that if one desires to play the latter type of file (which is an artifice of
23  Apple's iTunes online music store) on a portable hard drive digital music player, one can only do so
24  directly on an Apple iPod player. In this regard, Apple's website proclaims the following with
25  respect to AAC, AAC Protected music files, and the relationship between iTunes, iPod, and other
26  portable players:

27
28

12

1    To play AAC and AAC Protected songs, your iPod must have iPod Software 1.3 or
2    later installed. Not all digital music players can play AAC songs and *only iPod can*
     *play AAC Protected songs.*
3    . . . .

4    *Songs purchased from the iTunes Music Store are encoded using the AAC*
     *Protected format and cannot be converted to MP3 format.* You can burn them to
5    audio CDs and play them in consumer audio CD players.

6    A copy of Apple's webpage containing the foregoing restriction is attached hereto as Exhibit A to

7    this complaint.

8         42.    Thus, as Apple itself admits on its website, "[s]ongs purchased from the iTunes

9    Music Store are encoded using the AAC Protected format and cannot be converted to MP3 format."

10   Further, "only iPod can play AAC Protected songs." The result is readily apparent—customers

11   buying music online from Apple's iTunes store can play their music at their computer or CD player,

12   but if they wish to play the music on a portable hard drive digital music player, they can do so only

13   via Apple's iPod. Moreover, this restriction, as Apple itself admits, is brought about only because

14   Apple has unilaterally incorporated its Fairplay DRM extra software code into the otherwise

15   interactive AAC format.

16        43.    But for Apple's action, any consumer owning any portable digital music player

17   would have been able to convert a song purchased on AAC format from iTunes into an MP3

18   formatted file, and could have played that file on his portable hard drive digital music player of

19   choice. This is necessarily the case because virtually any portable digital music player on the

20   market today is capable of playing MP3 music files. Further, even without this conversion from

21   AAC to MP3 formats, absent Apple's manipulation of the AAC format for the songs it sells through

22   iTunes, songs purchased from iTunes would have been able to be played on a whole host of portable

23   hard drive digital music players that are capable of playing AAC formatted files, such as players

24   manufactured by Panasonic, Nokia, Gateway, Epson, Tatung, and others. Apple's unilateral action

25   to rig the AAC format in this fashion for the songs it sells through iTunes, by inserting its own

26   Fairplay DRM extra software code onto the AAC format, prevents any of the foregoing from taking

27   place, and restricts consumers to using Apple's iPod as their only available portable hard drive

28   digital music player.

13

44.    Apple has steadfastly refused to license its Fairplay DRM or otherwise let any other manufacturer of portable hard drive digital music players gain interactive access to files sold by Apple through iTunes so that these music files could be played in the portable hard drive digital music player of the consumer's choice.

45.    Through the foregoing actions, Apple has misused its monopoly market power in the market for the legal sales of digital music files (which it holds by virtue of its iTunes online music store) to unlawfully suppress competition in the separate market for portable hard drive digital music players.

## Apple's Resistance to Rival Online Song Outlets for Apple iPod

46.    As stated in paragraph 31, for a device to play a digital music file compressed with a particular format, firmware within the chip of the device must be able to recognize and decode the encoding format used to compress the music file. Because Apple has rigged the otherwise interactive AAC format, through the addition of its extra Fairplay DRM software code to music files sold via iTunes, only portable hard drive digital music players whose firmware recognizes this "Protected AAC" format can decode and play songs purchased from iTunes. Apple has not licensed or given access to this "Protected AAC" format to any other portable hard drive device manufacturer, thereby ensuring two results—both of which are anticompetitive. First, through the foregoing, Apple has managed to ensure that songs purchased from iTunes can only be played on portable hard drive digital music players manufactured by Apple; namely, the Apple iPod. Second, through the foregoing, Apple has managed to ensure that owners of iPod hard drive digital music players wishing to purchase music files online to be directly played on their iPod can only do so by purchasing these files at Apple's iTunes music store.

47.    Despite this anticompetitive restriction, RealNetworks, a rival seller of online digital music recordings through its RealNetworks Music Store, managed to independently analyze the firmware within the Apple iPod portable hard drive digital music player. As a result of this analysis, RealNetworks was able to discern the necessary extra software code added by Apple to make downloaded songs playable on the Apple iPod. Armed with this knowledge, RealNetworks

14

1  was able to insert a corresponding code of its own into song files sold through its RealNetworks

2  Music Store so that they too would be playable on the Apple iPod.

3       48.    Thus, on July 26, 2004, RealNetworks announced publicly that songs sold through

4  its online RealNetworks Music Store would now be playable on the Apple iPod portable hard drive

5  digital music player, thereby giving iPod owners a competitive outlet for their purchases of online

6  music files. This announcement was significant not only because it represented the first alternative

7  to the stronghold that Apple's iTunes store had heretofore exerted as the sole supplier of

8  downloaded digital music files that could be played on Apple's iPod player, but also because

9  RealNetworks began selling its digital online songs for as low as 49 cents per track, well below the

10  99 cents per track charged by Apple's iTunes store.

11       49.    Rather than embracing this competitive offering to consumers and owners

12  of its iPod device, Apple immediately threatened RealNetworks and iPod users. On Thursday, July

13  29, 2004, merely four days after RealNetworks' announcement, Apple issued its own public

14  statement warning RealNetworks and iPod users that "[w]e are stunned that RealNetworks has

15  adopted the tactics and ethics of a hacker to break into the iPod, and we are investigating the

16  implications of their actions under the DMCA and other laws. We strongly caution Real and their

17  customers that when we update our iPod software from time to time it is highly likely that Real's

18  Harmony technology will cease to work with current and future iPods."

19       50.    True to its threat, by December 2004, Apple updated its iPod software to prevent

20  songs downloaded from RealNetworks Music Store (or any other online music store) from being

21  played on Apple iPod devices. Thus, Apple continues to impede competition, and forces iPod users

22  who wish to buy music online to do so exclusively from Apple's iTunes store.

23  **Apple's Proffered Justification For Rigging the AAC Format In This Restrictive Manner Is**
**Irrelevant, And In Any Event, Unavailing**

24

25       51.    Faced with the obvious anticompetitive effect and impact of its actions to restrict the

26  use of music purchased on iTunes to only iPod portable music players, and to restrict the source of

27  online music files playable on its iPod device to only its own iTunes store, Apple has attempted to

28  defend its actions by citing that these restrictions are necessary to protect the copyrights owned by

15

1  the artists or music labels for the songs sold through iTunes. That defense, however, is both

2  irrelevant and unavailing.

3      52.    In fact, other than Apple's iTunes, no other online music vendor has such a

4  restriction in place; yet these other online vendors still manage to provide copyright protection

5  mechanisms to artists and record labels—often the same artists and labels whose same songs are

6  sold online through iTunes.

7      53.    Similarly, Apple's Fairplay DRM addition to the otherwise interactive

8  AAC encoding format is not a device that effectively controls access to copyrighted works because,

9  as Apple itself admits, the extra Fairplay DRM software code inserted by Apple has no effect

10  whatsoever on the ability of any user using any computer to access, purchase, and playback any of

11  the song files sold through Apple's iTunes music store on the user's computer. Only when the user

12  wishes to play the song on a portable hard drive digital music player does Apple restrict that user to

13  using the iPod device, presumably to protect Apple's market dominance in that market.

14      54.    In truth and in fact, as widely reported in the press, artists and record label companies

15  have urged Apple to release its stronghold on the online source for music files playable on the Apple

16  iPod, and to allow music files from other legitimate online music vendors play on the Apple iPod.

17  Opening this restriction would benefit both the artists and record labels by providing them with

18  additional outlet channels for selling music playable on the most prevalent portable hard drive

19  digital music player (i.e. the iPod). Similarly, opening this restriction would also benefit consumers

20  by providing iPod owners with a competitive choice of where they can purchase their online music

21  files for playback on their iPod devices. Despite these pleas and the anticompetitive impact of

22  Apple's actions, Apple has steadfastly refused to permit any vendors other than its own iTunes store

23  to sell digital music files that can be played on Apple's iPod. At the same time, Apple has also

24  steadfastly refused to allow the music files Apple sells through its iTunes store from being played

25  on any portable hard drive digital music player other than the iPod.

26  ///

27  ///

28  ///

16

1

## ANTICOMPETITIVE EFFECT ON CONSUMERS – ANTITRUST INJURY

2    55.    As a direct, proximate, and foreseeable result of Apple's actions, consumers, like

3    Plaintiff and the members of the Class he seeks to represent, have been injured in their business

4    and/or property.  By restricting the sources of online digital music files that can be directly played

5    on Apple's iPod to only such files purchased from Apple's iTunes online music store, Apple has

6    restrained competition, denied consumers a competitive choice of online music sellers for use on

7    their iPod devices, maintained its monopoly and/or attempted to obtain a monopoly in the market

8    for portable hard drive digital music players, and forced consumers to pay supra-competitive prices

9    for their purchases of online digital music files and their purchases of portable hard drive digital

10   music players.  Similarly, by restricting the portable hard drive digital music players that can play

11   songs downloaded from the iTunes online music store to just the Apple iPod device, Apple has

12   restrained competition, denied consumers a competitive choice of portable hard drive digital music

13   players, unlawfully maintained and/or attempted to obtain a monopoly in the market for the legal

14   sale of online digital music files, and caused consumers to pay supra-competitive prices for their

15   purchases of portable hard drive digital music players, and for their purchases of online music files.

16

## CLASS ACTION ALLEGATIONS

17   56.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action on behalf

18   of himself and on behalf of all other similarly situated consumers who, during the period April 28,

19   2003 to the present ("the Class Period") purchased an iPod device directly from Apple, and online

20   digital music files from Apple's iTunes store.  Excluded from the Class are all judicial officers and

21   their staff, as well as all governmental entities.

22   57.    The number of putative class members is sufficiently large, such that joinder of all

23   individual class members would be impracticable, if not impossible.  Although the precise number

24   of class members is not presently known to Plaintiff, based on the sales volumes of the Apple iPod

25   device and the iTunes online music store during the Class Period, it is reasonable to assume that the

26   number of individual class members is at least in the tens or hundreds of thousands.

27

28

17

1        58.     Plaintiff's claims are typical of the claims of the class. Specifically, Plaintiff claims

2 that by restricting the use of the iPod to only those online digital music files purchased from iTunes,

3 Apple has injured Plaintiff and the class members in their business and/or property, in violation of

4 the federal and state antitrust laws, California's unfair competition law, and the common law.

5 Similarly, Plaintiff claims that by restricting the portable hard drive digital music players that can

6 play music files purchased from the iTunes store to only the iPod, Apple has injured Plaintiff and

7 the class members in their business and/or property, in violation of the federal and state antitrust

8 laws, California's unfair competition law, and the common law. There are no conflicts or defenses

9 unique to Plaintiff that would render his claim atypical from the claims of the absent class members.

10        59.     Common questions of fact and law exist in this litigation, and these common

11 questions affecting the class as a whole predominate over any individual questions that may affect

12 only individual class members. Among these common questions of fact or law are the following:

13        a.       The definition of the relevant market(s);

14        b.       Apple's market power within these relevant market(s);

15        c.       Whether Apple unlawfully restrained competition in any or all of these relevant

16                markets;

17        d.       Whether any unlawful restriction of competition caused by Apple caused injury to

18                the business or property of Plaintiffs and the class members;

19        e.       The extent of any such injury;

20        f.       The appropriate remedy for any such injury.

21        60.     Plaintiff is an adequate representative of the interests of the absent class members in

22 this litigation. During the Class Period, Plaintiff purchased an Apple iPod directly from Apple, and

23 purchased music files for use on his iPod directly from Apple's iTunes music store. Plaintiff has

24 retained competent counsel experienced in antitrust and class action litigation to vigorously

25 prosecute and litigate this action on behalf of the putative class members.

26        61.     This action is manageable as a class action. The identity of all class members, or of a

27 significant majority, is ascertainable, as each class member, by definition, must have made online

28 purchases from Apple iTunes store, requiring the class member to provide his identifying

18

1    information. Prosecuting this action on an individual, as opposed to a classwide, basis would risk

2    the prospect of conflicting findings and adjudications with respect to the rights and obligations of

3    the parties. Further, the average overall amount of monetary injury sustained by each individual

4    class members is likely to be too small relative to the costs of individual litigation of this action so

5    that classwide litigation effectively provides the only available means for individual class members

6    to seek judicial redress for their injuries.

7                                              **COUNT I**

8    **(UNLAWFUL TYING OR BUNDLING OF APPLE iTUNES TO PURCHASE OF APPLE
     iPOD IN VIOLATION OF 15 U.S.C. § 1)**

9

10       62.    Plaintiff hereby incorporates by reference all of the allegations of this

11   complaint with the same force and effect as if fully restated herein.

12       63.    Through its iTunes online music store, Apple has monopoly market power in the

13   U.S. market for legal sales of online digital music files. In any event, Apple has sufficient market

14   power in this relevant market to coerce consumers of Apple's iTunes store to purchase an Apple

15   iPod portable hard drive digital music player, even if these same consumers would have preferred to

16   purchase a portable hard drive digital music player other than Apple's iPod.

17       64.    There are manufacturers and models of portable hard drive digital music

18   players, other than Apple's iPod, that, but for Apple's anticompetitive conduct, would be able to

19   play digital music files downloaded from Apple's iTunes music store.

20       65.    During the Class Period Apple has rigged the otherwise interactive and

21   open AAC codec format in the manner described herein, such that digital music files purchased

22   from Apple's iTunes online music store could not be played back on any portable hard drive digital

23   music player other than Apple's iPod.

24       66.    As a direct and proximate result of Apple's anticompetitive actions,

25   consumers of Apple's iTunes store who wish to play the digital music files they purchased from

26   iTunes on a portable hard drive digital music player must also purchase an Apple iPod device, even

27   where other portable hard drive digital music players exist at lower prices that would otherwise be

28   able to playback the music files sold by Apple's iTunes store.

                                                19

1    67.    Apple's actions have caused injury to the business and/or property of Plaintiff and

2    the class members he seeks to represent by: forcing consumers to buy Apple's iPod as the portable

3    hard drive digital music player of their choice, to the exclusion of all competing portable hard drive

4    digital music players; suppressing competition in the market for portable hard drive digital music

5    players; and, forcing consumers to pay supra-competitive prices for their portable hard drive digital

6    music players.

7    68.    Apple's unlawful bundling or tying of its Apple iTunes store to use of its Apple iPod

8    portable hard drive digital music player is unlawful per se under the antitrust laws.  Alternatively,

9    Apple's unlawful bundling or tying of its Apple iTunes store to use of its Apple iPod portable hard

10    drive digital music player is unlawful under the antitrust rule of reason because the anticompetitive

11    effects of this conduct are not outweighed by procompetitive considerations.

12    ## COUNT II

13    **(UNLAWFUL ACQUISITION OR MAINTENANCE OF MONOPOLY MARKET POWER
14    IN MARKET FOR LEGAL ONLINE DIGITAL MUSIC FILES IN VIOLATION OF 15
U.S.C. § 2)**

15    69.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

16    the same force and effect as if fully restated herein.

17    70.    Through its iPod device, Apple possesses monopoly market power in the U.S. market

18    for portable hard drive digital music players.

19    71.    Given the prevalence of the iPod, owners of this device have a need for legal online

20    sellers of digital music files to be played on the iPods.  Although a number of competing legal

21    online sellers of digital music files exist, Apple has rigged the operating AAC codec format and

22    corresponding firmware in the iPod so that only online digital music files purchased from Apple's

23    iTunes music store, to the exclusion of all other online music files purchased from any other online

24    store, can be directly played on the iPod.  In this manner, Apple has been able to acquire and/or

25    maintain monopoly market power in the U.S. market for the legal sale of digital music files.  But for

26    Apple's rigging of the AAC codec format and firmware in the iPod, any number of existing legal

27    sellers of digital music files, other than Apple's iTunes music store, would be able to sell competing

28    digital music files for play back on the iPod.

20

1      72.     Thus, Apple has acquired and/or maintained its monopoly market power in the U.S.

2   market for the legal sale of online digital music files, not through superior skill, business acumen, or

3   enterprise, but rather through the foregoing anticompetitive and exclusionary conduct.

4      73.     Apple's monopolization of the U.S. market for the legal sale of online digital music

5   files has injured Plaintiff and the Class members in their business and/or property by suppressing

6   competition in this relevant market, and forcing consumers to pay supra-competitive prices for their

7   online purchases of digital music files.

8

**COUNT III**

9

**(UNLAWFUL ATTEMPTED MONOPOLIZATION OF MARKET FOR PORTABLE
HARD DRIVE DIGITAL MUSIC PLAYERS IN VIOLATION OF 15 U.S.C. § 2)**

10

11      74.     Plaintiff hereby incorporates by reference all of the allegations of this complaint with

12   the same force and effect as if fully restated herein.

13      75.     The foregoing allegations of predatory and/or anticompetitive conduct, including,

14   *inter alia*: a) Apple's rigging of the open AAC format to an "AAC-protected" format; b) Apple's

15   predatory change to its software to prevent less expensive music files sold by RealNetworks from

16   playing directly on Apple's iPod; c) the tying allegations forming part of Counts I and II of this

17   Complaint; and, d) Apple's unlawful monopoly leveraging, wherein Apple has used its monopoly

18   market power, however acquired, in the market for legal sales of online digital music files, in an

19   attempt to monopolize the separate market for portable hard drive digital music players, all form

20   part of an unlawful attempted monopolization offense under 15 U.S.C. § 2.

21      76.     Apple undertook the foregoing conduct with the specific intent tomonopolize the

22   relevant market for portable hard drive digital music players.

23      77.     If left unrestrained, Apple's attempt to monopolize the market for portable hard drive

24   digital music players is likely to succeed.

25      78.     The foregoing conduct has caused injury to Plaintiff and the class members in their

26   business and/or property by unlawfully thwarting competition in the market for portable hard drive

27   digital music players and by forcing consumers, like Plaintiff and the class members, to pay supra-

28   competitive prices for their portable hard drive digital music players.

21

1

## COUNT IV

2

### (ATTEMPTED MONOPOLIZATION OF MARKET FOR THE LEGAL ONLINE SALE OF DIGITAL MUSIC FILES, IN VIOLATION OF 15 U.S.C. § 2)

3

4      79.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

5    the same force and effect as if fully restated herein.

6

7      80.    The foregoing predatory and/or anticompetitve allegations, including, *inter alia*: a)

8    Apple's rigging of the open AAC format to an "AAC-protected" format; b) Apple's predatory

9    change to its software to prevent less expensive music files sold by RealNetworks from playing

10   directly on Apple's iPod; c) the tying allegations forming part of Counts I and II of this Complaint;

11   and, d) Apple's unlawful monopoly leveraging conduct, wherein Apple has used its monopoly

12   market power, however acquired, in the market for portable hard drive digital music players, in an

13   attempt to and actual monopolization of the separate market for the legal online sale of digital music

14   files, all form part of Apple's unlawful attempt to monopolize the relevant market for the legal

15   online sales of digital music files, in violation of 15 U.S.C. § 2.

16     81.    Apple undertook the foregoing conduct with the specific intent tomonopolize the

17   relevant market for the legal online sales of digital music files.

18     82.    If left unrestrained, Apple's attempt to monopolize the market for the legal online

19   sales of digital music files is likely to succeed.

20     83.    The foregoing conduct has caused injury to Plaintiff and the class members in their

21   business and/or property by unlawfully thwarting competition in the market for the legal online

22   purchases of digital music files, and by forcing consumers, like Plaintiff and the class members, to

23   pay supra-competitive prices for their purchases of online digital music files.

24

## COUNT V

25

### (VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CALIF. BUS. AND PROFESSIONS CODE SECTION 16700 ET. SEQ.)

26

27     84.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

28   the same force and effect as if fully restated herein.

22

1    85.    Through the conduct alleged herein, Apple has violated the California Cartwright

2  Act, California Business and Professions Code Section 16700 et. seq.

3    86.    Apple's violations of the Cartwright Act have injured Plaintiff and the class members

4  in their business and/or property by, *inter alia*, suppressing competition, and by forcing consumers,

5  like Plaintiff and the class members, to pay supra-competitive prices for their purchases of online

6  digital music files and/or their purchases of portable hard drive digital music players.

7                                  **COUNT VI**

8    **(VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CALIF. BUS. AND**
    **PROF. CODE SECTION 17200 ET. SEQ.)**
9

10    87.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

11  the same force and effect as if fully restated herein.

12    88.    The foregoing conduct amounts to an unlawful and/or unfair business practice within

13  the meaning of the California Unfair Competition Law, California Business and Professions Code,

14  Section 17200 et. seq.

15    89.    Apple's violations of California's Unfair Competition Law have injured Plaintiff and

16  the class members in their business and/or property by, *inter alia*, suppressing competition, and by

17  forcing consumers, like Plaintiff and the class members, to pay supra-competitive prices for their

18  purchases of online digital music files and/or their purchases of portable hard drive digital music

19  players.

20    90.    Because Plaintiff and the class members have conveyed money directly onto Apple,

21  and Apple has violated the Unfair Competition Law in connection with that transaction, Plaintiff

22  and the Class members are entitled to restitution of the moneys paid by them to Apple, and to an

23  injunction restraining and enjoining Apple from continuing to engage in this conduct.

24                                  **COUNT VII**

25                          **(COMMON LAW MONOPOLIZATION)**

26    91.    Plaintiff hereby incorporates by reference all of the allegations of this complaint with

27  the same force and effect as if fully restated herein.

28

                                     23

92.     The foregoing acts amount to unlawful monopolization under the common law of the relevant U.S. markets for the legal online sale of digital music files and/or the market for portable hard drive digital music players.

93.     As a result of Apple's unlawful monopolization under the common law, Plaintiff and the class members have been injured in their business and/or property by being denied true and unfettered competition in the relevant markets described herein, and by being forced to pay supra-competitive prices for their purchases on online digital music files and/or their purchases of portable hard drive digital music players.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for an Order from the Court as follows:

a.     Entering Judgment for Plaintiffs and the class and against Defendant on all counts;

b.     Certifying this action as a class action on behalf of the class defined herein, and designating Plaintiffs and their counsel as class representatives and class counsel, respectively;

c.     Directing that notice of this action be disseminated to the absent class members at Defendant's expense;

d.     Awarding Plaintiffs and the class members their compensatory and statutory money damages, including trebled damages and punitive damages where appropriate;

e.     Awarding Plaintiffs' counsel their reasonable attorneys' fees, expenses, and costs of suit;

f.     Declaring Defendant's actions to be violations of the federal and state antitrust laws, state law of unfair competition, and the common law, and enjoining Defendant from carrying on such conduct;

g.     Requiring Defendant to disgorge its ill-gotten gains, and awarding the proceeds of this disgorgement to Plaintiffs and the class members;

h.     Requiring Defendant to provide restitution to Plaintiffs and the class members of moneys paid by Plaintiffs and the class members to Defendant;

i.     Requiring Defendant to establish a common fund from which compensation can be

24

1    made to Plaintiffs and the class members, and from which Plaintiffs' counsel may

2    recover their reasonable attorneys' fees, expenses, and costs of suit;

3        j.    Awarding such other relief as this Court deems just and appropriate.

4    **JURY DEMAND**

5        Plaintiffs demand a trial by jury on all counts so triable.

6

7    Dated: March 17, 2006

                    Michael D. Braun
                    BRAUN LAW GROUP, P.C.

8

9            By:

10                       Michael D. Braun
                    12400 Wilshire Boulevard

11                       Suite 920
                    Los Angeles, CA 90025

12                       Tel:    (310) 442-7755
                    Fax:   (310) 442-7756

13

14                       Roy A. Katriel
                    THE KATRIEL LAW FIRM, P.C.

15                       1101 30th Street, NW
                    Suite 500

16                       Washington, DC 20007
                    Tel:    (202) 625-4342
                    Fax:   (202) 625-6774

17

18                       Brian P. Murray
                    Eric J. Belfi

19                       MURRAY, FRANK & SAILER LLP
                    275 Madison Avenue

20                       Suite 801
                    New York, NY 10016-1101
                    Tel:    (212) 682-1818

21                       Fax:   (212) 682-1892

22                       **Attorneys for Plaintiff**

23

24

25

26

27

28

25

# EXHIBIT A



# EXHIBIT 2

**DEPOSITION TRANSCRIPT OF**
**THOMAS WILLIAM SLATTERY**
**TAKEN BY DEFENDANT APPLE COMPUTER, INC.**
**IN THIS ACTION ON JANUARY 30, 2006.**

**[FILED UNDER SEAL]**

# EXHIBIT 3

1  Michael D. Braun (#167416)
   BRAUN LAW GROUP, P.C.
2  12400 Wilshire Boulevard,
   Suite 920
3  Los Angeles, CA 90025
   Telephone: (310) 442-7755
4  Facsimile: (310) 442-7756

5
   Roy A. Katriel (*pro hac vice*)
6  THE KATRIEL LAW FIRM
   1101 30ᵀᴴ Street, NW
7  Suite 500
   Washington, DC 20007
8  Telephone: (202) 625-4342

9  Jacqueline Sailer
   Eric J. Belfi (*pro hac vice*)
10 MURRAY, FRANK & SAILER LLP
   275 Madison Avenue
11 Suite 801
   New York, NY 10016-1101
12 Telephone: (212) 682-1818
   Facsimile: (212) 682-1892
13
   *Counsel for Plaintiff*
14
                    UNITED STATES DISTRICT COURT
15                 NORTHERN DISTRICT OF CALIFORNIA
                        SAN JOSE DIVISION
16
   THOMAS WILLIAM SLATTERY,              No. C-05-00037 JW
17 Individually and on Behalf of All Others
   Similarly Situated,
18                                       PLAINTIFF'S FIRST SET OF
                            Plaintiff,   INTERROGATORIES DIRECTED AT
19                                       DEFENDANT APPLE COMPUTER, INC.
20            v.
21 APPLE COMPUTER, INC.,
22                          Defendants.
23
24         Propounding Party:   Plaintiff Thomas William Slattery
25
           Responding Party:    Defendant Apple Computer, Inc.
26
27         Set:                 One
28

:Pltf's First Set of Interrogatories
*Slattery v. Apple Computer*, Inc., No. C-05-00037 JW

Pursuant to Federal Rule of Civil Procedure 33 and this Court's Case Management Order, Plaintiff Thomas William Slattery, by and through his undersigned counsel, hereby propounds this First Set of Interrogatories on Defendant Apple Computer, Inc.  Defendant Apple Computer Corporation is directed to serve its responses to these interrogatories within 30 days after service.

## DEFINITIONS

1.     "YOU," "YOUR," "YOURSELF" OR "DEFENDANT" means Apple Computer, Inc., and all persons acting or purporting to act on its behalf, including attorneys.

2.     "iTMS" means the iTunes ONLINE MUSIC STORE.

3.     "ONLINE MUSIC STORE" means any place on the Internet from which DIGITAL MUSIC FILES may be purchased or acquired.

4.     "iPod" refers to the PORTABLE HARD DRIVE DIGITAL MUSIC PLAYER manufactured by Apple and all versions of that product.

5.     "PORTABLE HARD DRIVE DIGITAL MUSIC PLAYER" means any device that can be easily transported, is capable of playing a DIGITAL MUSIC FILE, employs a hard drive within the device, but does not employ external media such as compact discs, cartridges, cassettes, etc.

6.     "DIGITAL MUSIC FILE" means a computer file regardless of format, including without limitation, AAC, MP3, Real Audio, WAV, WMA, and MIDI, that allows music to be played on a computer or other device that utilizes computer software (e.g., a PORTABLE DIGITAL MUSIC PLAYER).

7,     The term "RIP" or "RIPPING" is used herein in the same manner as used in page 1 of Apple Computer, Inc.'s Reply In Support of Its motion to Dismiss Class Action Complaint filed in this action.

8.     "APPLE" means Apple Computer, Inc., the defendant in this action.

## INTERROGATORIES

1.     Other than the iPod, identify by brand and model number and/or name each and every PORTABLE HARD-DRIVE DIGITAL MUSIC PLAYER that you contend is

capable of playing DIGITAL MUSIC FILES purchased from iTMS without first altering in any way the DIGITAL MUSIC FILE (including without limitation altering and/or converting the file format, encryption format, Digital Rights Management codes or programs associated with the file).

2. Other than the iPod, identify by brand and model number and/or name, each and every PORTABLE DIGITAL HARD DRIVE DIGITAL MUSIC PLAYER that is capable of playing DIGITAL MUSIC FILES encoded in Apple's "AAC Protected" format in that file's native form, without first altering the file in any way (including without limitation altering and/or converting the file format, encryption format, Digital Rights Management codes or programs associated with the file).

3. Other than the iPod, identify by brand and model number and/or name each and every PORTABLE HARD-DRIVE DIGITAL MUSIC PLAYER that is capable of playing DIGITAL MUSIC FILES containing Apple's Fairplay Digital Rights Management in that file's native form, without first altering the file in any way (including without limitation altering and/or converting the file format, encryption format, Digital Rights Management codes or programs associated with the file).

4. Do you contend that under the iTMS Terms of Service agreement, which is attached hereto as Ex. A, it is permissible for consumers who purchase a DIGITAL MUSIC FILE from iTMS that is subject to Apple's Fairplay Digital Rights Management to burn a copy of that file to a compact disc and rip or transfer that file back to the consumer's computer so that the file may be played in a digital portable hard-drive music player other than an iPod?

5. Do you contend that burning onto a compact disc a DIGITAL MUSIC FILE that is purchased from iTMS and "RIPPING" that file back into a computer so as to circumvent Apple's Fairplay Digital Rights Management violates any of Apple's Terms of Service, agreements, policies, licenses, rules, policies, and/or practice that are or were in effect during any portion of the Class Period identified in the First Amended Complaint in this action?

6. Unless your answer to Interrogatory No. 5 is an unequivocal "No," identify with specificity each such agreement, Term of Service, policy, license, rule, policy, or practice that

Pltf's First Set of Interrogatories
*Slattery v. Apple Computer*, Inc., No. C-05-00037 JW

you contend the conduct described in Interrogatory No. 5 violates.

     7.    How many DIGITAL MUSIC FILES have been sold by iTMS since April 28, 2003 to date ?

     8.    How many iPod units have been sold by Apple since April 28, 2003 to date ?

Dated: January 30, 2006

                                      Respectfully submitted:

                                        Roy A. Katriel (*pro hac vice*)
                                        THE KATRIEL LAW FIRM
                                        1101 30TH Street, NW
                                        Suite 500
                                        Washington, DC 20007
                                        Telephone: (202) 625-4342

                                        Counsel for Plaintiff

1    **PROOF OF SERVICE**

2    STATE OF CALIFORNIA          )
                                  )ss.:
3    COUNTY OF LOS ANGELES        )

4        I am employed in the county of Los Angeles, State of California, I am over the age of 18 and
     not a party to the within action; my business address is 12400 Wilshire Boulevard, Suite 920, Los
5    Angeles, CA 90025.

6        On March 24, 2006, using the Northern District of California's Electronic Case Filing System,
     with the ECF ID registered to Michael D. Braun, I filed and served the document(s) described as:
7
8    **DECLARATION OF MICHAEL D. BRAUN IN SUPPORT OF PLAINTIFF'S MOTION
     FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT
     "REDACTED/PUBLIC VERSION"**
9
        The ECF System is designed to send an e-mail message to all parties in the case, which
10   constitutes service.  According to the ECF/PACER system, for this case, the parties served are as
     follows:
11
     Eric J. Belfi, Esq.                          ebelfi@murrayfrank.com
12                                                 rak@katriellaw.com
     Roy A. Katriel, Esq.
13
     **Attorneys for Plaintiff**
14
     Caroline N. Mitchell, Esq.                    cnmitchell@jonesday.com
15                                                 mlandsborough@jonesday.com
                                                   cyip@jonesday.com
16
     Robert A. Mittelstaedt, Esq.                  ramittelstaedt@jonesday.com
17                                                 ybennett@jonesday.com
                                                   arsand@jonesday.com
18
     Adam Richard Sand , Esq.                      arsand@jonesday.com
19
20   **Attorneys for Defendant**

21       On March 24, 2006, I served the document(s) described as:

22   **DECLARATION OF MICHAEL D. BRAUN IN SUPPORT OF PLAINTIFF'S MOTION
     FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT
23   "REDACTED/PUBLIC VERSION"**

24

25

26   ///

27   ///

28   ///

1    by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

2    Jacqueline Sailer, Esq.
     MURRAY, FRANK & SAILER LLP
3    275 Madison Avenue
     Suite 801
4    New York, NY 10016
     Tel:    (212) 682-1818
5    Fax:    (212) 682-1892

6    **Attorneys for Plaintiff**

7          I served the above document(s) as follows:

8          BY MAIL. I am familiar with the firm's practice of collection and processing correspondence
     for mailing. Under that practice it would be deposited with U.S. postal service on that same day with
9    postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware
     that on motion of the party served, service is presumed invalid if postal cancellation date or postage
10   meter date is more than one day after date of deposit for mailing in an affidavit.

11         I further declare, pursuant to Civil L.R. 23-2, that on the date hereof I served a copy of the
     above-listed document(s) on the Securities Class Action Clearinghouse by electronic mail through the
12   following electronic mail address provided by the Securities Class Action Clearinghouse:

13                              **jcarlos@law.stanford.edu**

14         I further declare that I am employed in the office of a member of the bar of this Court at whose
     direction the service was made.
15
           I further declare under penalty of perjury under the laws of the United States that the above is
16   true and correct.

17         Executed on March 24, 2006, at Los Angeles, California 90025.

18

19                                              _____ s/ LEITZA MOLINAR _____
                                                      Leitza Molinar
20

21

22

23

24

25

26

27

28