1  Robert A. Mittelstaedt #060359
   Caroline N. Mitchell #143124
2  Tracy M. Strong #221540
   JONES DAY
3  555 California Street, 26th Floor
   San Francisco, CA 94104
4  Telephone:    (415) 626-3939
   Facsimile:    (415) 875-5700
5  ramittelstaedt@jonesday.com
   cnmitchell@jonesday.com
6  tstrong@jonesday.com

7  Attorneys for Defendant
   APPLE COMPUTER, INC.
8

9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN JOSE DIVISION
12

13  SOMTAI TROY CHAROENSAK and          Case No. C 05 00037 JW
    MARIANA ROSEN, Individually, And On
14  Behalf Of All Others Similarly Situated,    CLASS ACTION

15              Plaintiffs,             DEFENDANT'S NOTICE OF MOTION
                                        AND MOTION TO DISMISS ANTITRUST
16       v.                             CLAIMS OF SECOND AMENDED
                                        COMPLAINT OR, ALTERNATIVELY,
17  APPLE COMPUTER, INC.,               REQUEST FOR LEAVE TO FILE RULE 56
                                        MOTION ON ANTITRUST CLAIMS
18              Defendant.
                                        DATE:    November 20, 2006
19                                      TIME:    9:00 a.m.
                                        JUDGE: Honorable James Ware
20                                      COURTROOM: 8

21

22

23

24

25

26

27

28

                                                      MOT. TO DISMISS
                                                      Case No. C 06 4457 JW

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

COMPLAINT ............................................................................................................. 3

ARGUMENT ............................................................................................................. 5

I.     THE SECTION 2 ALLEGATIONS FAIL TO STATE A CLAIM ................................... 6

       A.     Plaintiffs Must Allege Actionable Exclusionary Conduct, i.e., A Refusal
              To Deal ........................................................................................................ 6

       B.     Under *Trinko*, Plaintiffs' Allegations Do Not Constitute An Actionable
              Refusal to Deal ............................................................................................ 7

              1.     Under *Trinko*, Refusal-to-Deal Claims Are Actionable Only
                     Under Narrow Circumstances Not Present Here ........................................ 7

              2.     The *Trinko* Analysis Disposes Of Plaintiffs' Monopolization
                     Claims ........................................................................................................ 8

       C.     This Court's Previous Decision on Apple's Motion to Dismiss ........................ 11

II.    PLAINTIFFS' TYING ALLEGATIONS FAIL TO STATE A CLAIM ......................... 11

       A.     Plaintiffs Do Not Allege That Apple Coerced Them To Buy Anything.............. 12

       B.     Plaintiffs' Tying Theory Is Unprecedented and Wrong Because It
              Would Force Apple to Do Business with Microsoft and Other
              Competitors .................................................................................................. 14

       C.     This Court's Previous Decision on Apple's Motion to Dismiss ........................ 15

III.   FOR THE SAME REASONS, PLAINTIFFS' STATE LAW AND COMMON
       LAW ANTITRUST CLAIMS FAIL TO STATE A CLAIM ......................................... 16

CONCLUSION .......................................................................................................... 17

1

# TABLE OF AUTHORITIES

2

**Page**

3

Cases

4
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
    472 U.S. 585 (1985)..................................................................................................... 8

5

*Berkey Photo v. Eastman Kodak Co.*
6
    603 F.2d 263 (2d Cir. 1979)......................................................................................... 6

7
*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*
    509 U.S. 209 (1993)....................................................................................................... 6

8
*Covad Communications Co. v BellSouth Corp.*
9
    374 F.3d 1044 (11th Cir. 2004)..................................................................................... 8

10
*Eastman Kodak Co. v. Image Technical Servs., Inc.*
    504 U.S. 451 (1992)................................................................................................. 14, 15

11

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*
12
    703 F.2d 534 (9th Cir. 1983).......................................................................................... 13

13
*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
    123 F.3d 1195 (9th Cir. 1997)....................................................................................... 10

14
*Independent Serv. Orgs. Antitrust Litig.*
15
    203 F.3d 1322 (Fed. Cir. 2000)...................................................................................... 9

16
*Innovation Data Processing, Inc. v. IBM Corp.*
    585 F. Supp. 1470 (D.N.J. 1984) ................................................................................ 13

17
*International Salt Co. v. United States*
18
    332 U.S. 392 (1947)....................................................................................................... 14

19
*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*
    466 U.S. 2 (1984)........................................................................................................... 12

20
*Metro Mobile CTS, Inc. v. New Vector Communications, Inc.*
21
    892 F. 2d 62 (9th Cir. 1989).......................................................................................... 6

22
*Morris Communications Corp. v. PGA Tour, Inc.*
    364 F.3d 1288 (11th Cir. 2004)..................................................................................... 10

23
*Northern Pac. Ry. Co. v. United States*
24
    356 U.S. 1 (1958)........................................................................................................... 12

25
*Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car, Sys., Inc.*
    732 F.2d 1403 (9th Cir. 1984)....................................................................................... 12

26
*Seagood Trading Corp. v. Jerrico, Inc.*
27
    924 F.2d 1555 (11th Cir. 1991)..................................................................................... 10

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Schor v. Abbott Laboratories*
        2006 WL 2062117 (7th Cir. July 26, 2006) ................................................................. 1

4

    *Slattery v. Apple Computer, Inc.*
5        No. C 05-00037 JW, 2005 WL 2204981 (N.D. Cal. Sept. 9, 2005) ................................ 6, 11, 15

6    *Spectrum Sports, Inc. v. McQuillan*
        506 U.S. 447 (1993) ...................................................................................................... 11

7

    *United States v. Colgate & Co.*
8        250 U.S. 300 (1919) ...................................................................................................... 7

9    *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*
        540 U.S. 398 (2004) .............................................................................................. passim

10

    *Vinci v. Waste Management, Inc.*
11        36 Cal. App. 4th 1811 .................................................................................................. 16

12

Statutes

13

    Sherman Act § 2 ................................................................................................. *passim*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on November 20, 2006 at 9:00 a.m., or as soon thereafter

4

as counsel may be heard, in Courtroom 8 of the above-captioned Court, defendant Apple

5

Computer, Inc. (Apple) will bring for hearing this motion for an order, pursuant to Federal Rule

6

of Civil Procedure 12(b)(6), dismissing Counts I through V and VII from the second amended

7

complaint in this action.

8

**RELIEF SOUGHT**

9

Dismissal of Counts I through V and VII with prejudice, without leave to amend.

10

**MEMORANDUM**

11

**INTRODUCTION**

12

Two cases pending in this Court challenge Apple's iPod and iTunes Music Store as

13

antitrust violations: 1) the *Tucker* action filed July 21, 2006 (Case No. 06-4457-JW) and 2) the

14

*Charoensak* action in which plaintiffs Charoensak and Rosen recently replaced Slattery after the

15

Court dismissed him.  At bottom, both actions challenge Apple's refusal to deal with Microsoft,

16

*i.e.* Apple's decision to use its own digital rights management or DRM technology rather than

17

license Microsoft's.  That is the root of the tying and monopolization claims.

18

Those claims are wrong as a matter of law.  Far from condemning Apple's decision to

19

compete against Microsoft, the antitrust laws encourage Apple to compete against all of its rivals

20

rather than cooperate with them.  As Judge Easterbrook put it, "[c]ooperation is a *problem* in

21

antitrust, not one of its obligations."  *Schor v. Abbott Laboratories*, 2006 WL 2062117, at * 1

22

(7th Cir. July 26, 2006) (emphasis in original).  This is true even if the result is that Apple's

23

products work better or more "directly" with each other than with competitors' products.  It is

24

also true whether analyzed under tying or monopolization law.  As the Supreme Court made

25

clear in *Verizon Communications Inc. v. Trinko*, 540 U.S. 398, 408 (2004), not even an alleged

26

monopolist has any antitrust duty to deal with competitors absent a pre-existing voluntary course

27

of dealing which does not exist here.

28

Apple's motion to dismiss the antitrust claims in *Tucker* is set for hearing on October 23. This motion to dismiss the antitrust claims in *Charoensak* is set for hearing on November 20.[1] Both the *Tucker* motion and this motion should be granted—because both complaints fail to meet the tests for actionable refusal to deal under *Trinko* and for tying.

Unlike the operative complaint here, the *Tucker* complaint admits that the major record companies require Apple and other legal online music stores to use some form of DRM technology to guard against piracy. That fact demonstrates the fundamental flaw in the antitrust theory underlying the tying and monopolization claims in both complaints. It cannot be an antitrust violation for online music stores to comply with the record companies' insistence that they use DRM. Nor is there any antitrust requirement dictating that Apple must use Microsoft's DRM or license Apple's proprietary DRM for use by competitors. Indeed, as noted, the antitrust laws encourage competitors to compete rather than cooperate with each other. Competing to make complementary, innovative products that work seamlessly together is a plus for consumers, not an antitrust violation.[2]

As to the tying claim, unlike the original complaint by Slattery, the new plaintiffs Charoensak and Rosen fail to allege that they actually purchased the alleged tied product, an iPod, let alone that Apple coerced them to do so. A coerced purchase of the alleged tied product is a prerequisite for any tying claim. That is an added reason for dismissing their complaint.

We recognize that the Court denied a motion to dismiss the original complaint in this action. However, not only was the tying allegation different, but that motion was decided before the *Tucker* case was filed and related to this action. *Tucker* lays bare the true nature of the antitrust violation alleged in both actions as a straightforward, nonactionable refusal to deal. The *Charoensak* plaintiffs should not benefit from avoiding the reality that Tucker acknowledges in

---

[1]   This motion is addressed to the second amended complaint, which is the first complaint filed by the new plaintiffs.

[2]   Recognizing the value of an integrated approach, Microsoft itself recently announced its own "end-to-end solution" with a portable digital music player "designed to work seamlessly with" its online music store. *See* http://www.microsoft.com/presspass/press/2006/sep06/09-14ZuneUnveilingPR.mspx ("Microsoft's Zune Delivers Connected Music and Entertainment Experience," 9/14/06, and Zune Fact Sheet, September 2006).

MOT. TO DISMISS
C-05-00037-JW

1    her pleading, and this case should be dismissed as well as *Tucker*.  However, if the Court

2    dismisses the related *Tucker* case, but concludes that the absence of similar allegations in

3    *Charoensak* defeats this motion to dismiss, Apple respectfully requests leave to file an early

4    motion for summary judgment in this action.  That summary judgment motion will demonstrate

5    that Tucker's admission is factually correct and applicable to Charoensak, and thereby put the

6    two actions on equal footing.  Thus, both actions can be dismissed—*Tucker* on a motion to

7    dismiss, and this action on a motion for summary judgment.[3]

8                                              **COMPLAINT**

9          The pertinent allegations in the complaint, taken as true only for purposes of this motion,

10   can be summarized as follows.

11         Apple introduced the iPod in November 2001.  It is a portable device that enables users

12   to listen to digital audio recordings.  Second Am. Compl. (SAC) ¶ 23.  Numerous competitors

13   sell other similar devices, including Rio, Creative, Panasonic, RCA, Nokia, Epson, Gateway,

14   four other identified companies and others.  ¶ 25.

15         In the wake of the Napster litigation where the legality of obtaining music on the Internet

16   was called into question, Apple recognized the need for a legal online store where digital music

17   could be lawfully purchased.  ¶ 13.  Accordingly, in April 2003, Apple launched iTunes Music

18   Store, or iTMS.  ¶ 14.  To access iTMS, consumers log onto the "iTunes site" where they can

19   browse music recordings and purchase individual songs (at 99 cents per song) instead of entire

20   CDs.  ¶¶ 13, 14, 16.  The purchased music is downloaded to the consumer's computer, where it

21   is stored for further use.  ¶ 14.

22         Numerous legal online music stores exist including the new Napster, Walmart,

23   Musicmatch, Sony, seven other identified companies and others.  ¶ 22.  (Plaintiffs omit

24   Microsoft's longstanding online store, MSN Music.)[4]  Consumers download digital music files

25   ───────────────────────

26         [3] On the other hand, if the Court denies the motion to dismiss in *Tucker* on grounds that
     the allegations state an antitrust claim even in light of the admission regarding the record
     companies' requirements, Apple would be inclined to withdraw this motion and seek leave to
27   pursue early summary judgment in both cases.  Those motions will demonstrate that the facts do
     not support the antitrust claims.

28         [4] *See* http://www.microsoft.com/windows/windowsmedia/player/10/onlinestores.aspx.

1  from those stores to their computer or portable hard drive digital music player.  ¶ 24.  "One use"

2  of the digital files is to play them back on a portable digital player.  *Id.*

3      The online music stores and digital players use various formats for compressing and

4  decompressing the digital files.  ¶¶ 30-35.  Apple uses AAC.  ¶ 37-38.  Others use Microsoft's

5  Windows Media Audio or WMA.  ¶¶ 35.

6      Apple uses a digital rights management software called FairPlay.  ¶ 39.  When FairPlay

7  is added to an AAC digital file, it is called an "AAC protected" file.  ¶ 42.  This means that

8  music from iTMS cannot play "directly" on portable digital players other than iPods.  ¶ 39.

9      Plaintiffs acknowledge, somewhat cryptically, Apple's position that "these

10 restrictions"—presumably DRM—are "necessary to protect the copyrights owned by the artists

11 or music labels" that own the music.  ¶ 52.  But plaintiffs stop short of incorporating the

12 admission in *Tucker* that the record companies require online music stores to use some form of

13 DRM.  Plaintiffs create the false impression that DRM serves no purpose but to prevent Apple's

14 music from being used on portable devices others than iPods.

15     Most digital players "support" the WMA format (¶ 35), meaning that the manufacturers

16 have licensed WMA from Microsoft and thus their players can play files in that format.[5]  Apple

17 has "steadfastly refused" to license FairPlay DRM to competitors.  ¶ 45.  The result is that the

18 Microsoft licensees' products are allegedly incompatible with Apple's products:  WMA music

19 cannot be directly played on Apple's players, and Apple's music cannot be directly played on

20 WMA players.  ¶¶ 25, 28.  Plaintiffs do not dispute that iTMS music can be played on

21 Microsoft-type players by burning the music to a CD first, and that an iPod can play music from

22 other online stores in the same way.  ¶¶ 33, 36, 42.

23     At some undisclosed time, plaintiffs bought music from iTMS.  ¶¶ 9-10.  They allege

24 that **if** they wanted to play the music portably, they were forced to buy an iPod.  ¶ 10.  But they

25 do not allege that they actually wanted to play the music portably or bought an iPod as a result.

26

27     [5]  Microsoft's "Playsforsure" webpage lists 126 digital music players that support WMA,
   made by 12 different companies including Creative Labs, Gateway, iRiver, Samsung and
28 Toshiba to name a few.  *See* http://www.playsforsure.com.

MOT. TO DISMISS
C-05-00037-JW

1    For their federal law claims, plaintiffs assert unlawful tying with iTMS music as the

2  tying product and iPod as the tied product (Count I); monopolization of a "legal online digital

3  music files market" (Count II); attempted monopolization of that "market" as well the "portable

4  hard drive digital music player market" (Counts III and IV); and common law monopolization

5  (Count VII).  For their state law claims, plaintiffs assert that the same conduct violates the

6  Cartwright Act (Count V) and California's Unfair Competition Law (UCL) (Count VI).

7                                      **ARGUMENT**

8    Underlying each antitrust claim in this action—as in *Tucker*—is the premise that the

9  antitrust laws prohibit Apple from using its own DRM if that makes its product incompatible

10  with competitors' products.  The actual and attempted monopolization claims are a direct attack

11  on Apple's unilateral business decision not to do business with Microsoft in this respect.  Those

12  claims fail because the Supreme Court's decision in *Trinko*, 540 U.S. 398, makes clear that a

13  competitor's refusal to do business with another competitor does not violate Sherman Act § 2.

14  Indeed, § 2 protects a company's right to refuse to do business with anyone except in very

15  narrow circumstances not present here.  It would stand the antitrust laws on their head to

16  interpret them as relegating Apple to using Microsoft's technology rather than developing its

17  own better technology.

18    The tying claim attacks the same business decision, albeit more indirectly.  The essence

19  of the tying claim is that, because Apple uses its own DRM, its products are allegedly

20  incompatible with the products of Microsoft's licensees and thus, if Apple iPod owners want to

21  download compatible online music, Apple's music store is the only direct option.  That theory

22  fails because the basic elements of unlawful tying are not alleged.  As noted, the new plaintiffs

23  do not allege that they bought the tied product or were coerced to do so.  Adding those

24  allegations would not save their claim, however.  The law on tying has never been applied to

25  require a company to license something from or to a competitor so as to make their products

26  interoperable.  *See infra,* pp. 14-15.

27

28

1    **I.     THE SECTION 2 ALLEGATIONS FAIL TO STATE A CLAIM.**

2         **A.     Plaintiffs Must Allege Actionable Exclusionary Conduct, *i.e.*, A Refusal To**

3              **Deal.**

4         Broadly stated, a claim for monopolization requires the plaintiff to allege facts sufficient

5    to show that, first, defendant has monopoly power in relevant markets; second, that it "wilfully

6    acquired or maintained" that power; and third, that it caused antitrust injury.  *See Slattery v.*

7    *Apple Computer, Inc.*, No. C 05-00037 JW, 2005 WL 2204981, at *4 (N.D. Cal. Sept. 9, 2005).

8    This motion focuses on the second requirement—wilful acquisition or maintenance.[6]  Given the

9    ambiguity of that formulation, the courts have interpreted it to require allegations of specific

10   anticompetitive conduct such as predatory pricing (*e.g.*, *Brooke Group Ltd. v. Brown &*

11   *Williamson Tobacco Corp.*, 509 U.S. 209 (1993)); refusals-to-deal (*e.g.*, *Trinko*); or some other

12   cognizable unlawful exclusionary conduct (*e.g.*, *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d

13   263 (2d Cir. 1979) (product disparagement)).

14        As in *Trinko*, the claim of exclusionary conduct here is necessarily a claim of a refusal to

15   deal.  Plaintiffs allege that Apple refuses to use Microsoft's DRM ("most portable hard drive

16   digital music players, except for iPod, support the WMA format" (SAC ¶ 35)) and has "refused

17   to license its FairPlay DRM or otherwise let any other manufacturer of portable hard drive

18   digital music players gain interactive access to files sold by" iTMS (¶ 45).  If the only way that

19   the defendant could avoid alleged liability is by entering into a transaction with another

20   company, it is a refusal to deal claim and must be analyzed under the *Trinko* standards.

21

22

23

24

25        [6] Plaintiffs' allegations of monopoly power and relevant markets, although not a subject
     of this motion to dismiss, are demonstrably false.  For example, legal online digital music stores
26   clearly compete with illegal online services and traditional brick-and-mortar stores.  The large
     number of competing online stores and digital music players shows the absence of barriers to
27   entry, as does Microsoft's announced entry into both lines of business.  And market shares do
     not establish market power in nascent, emerging businesses.  *Metro Mobile CTS, Inc. v. New*
28   *Vector Comms., Inc.*, 892 F. 2d 62, 63 (9th Cir. 1989).

1

2

       **B.**       **Under *Trinko*, Plaintiffs' Allegations Do Not Constitute An Actionable Refusal to Deal.**

3

4

5

6

7

8

9

10

       Apple's decision to use its own DRM rather than Microsoft's and not license its DRM to competitors is not an unlawful exclusionary act.  No antitrust court has ever condemned a company for choosing not to pay a competitor for its technology rather than developing its own.  Nor has any antitrust court required a firm to license intellectual property to rivals.  Far from condemning Apple's refusal to deal with Microsoft, the antitrust laws encourage companies to compete rather than cooperate.  Those laws safeguard the incentive to innovate.  The rationale is that long-term consumer welfare is enhanced by competition and innovation even if some products are incompatible with others as a result of the competition and innovation.

11

12

       **1.**       **Under *Trinko*, Refusal-to-Deal Claims Are Actionable Only Under Narrow Circumstances Not Present Here.**

13

14

15

16

17

18

19

20

       In *Trinko*, affirming dismissal of a monopolization complaint at the pleading stage, the Supreme Court held that, subject to very narrow exceptions, companies do not have any antitrust duty to cooperate and share their facilities with competitors even though consumers would allegedly benefit from the cooperation.  The Court relied on the *Colgate* rule that "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"  *Trinko*, 540 U.S. at 408, *quoting United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

21

22

23

24

25

26

27

       The Court rested its decision on three policy grounds.  *Id.* at 407-08.  First, requiring companies to cooperate is in "some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  *Id.*  Second, "[e]nforced sharing . . . requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited."  *Id.* at 408.  Finally, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion."  *Id.*

28

1    The Court stressed that the exceptions in which a refusal to cooperate with rivals may

2    constitute anticompetitive conduct are narrow: "We have been very cautious in recognizing

3    such exceptions, because of the uncertain virtue of forced sharing and the difficulty of

4    identifying and remedying anticompetitive conduct by a single firm." *Id.* at 408. The exception

5    permitted in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585 (1985), was "at or

6    near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. In *Aspen Skiing* the defendant

7    owner of three of four mountains in the Aspen area had cooperated with the plaintiff, who

8    owned the fourth mountain, to offer joint, multi-day, all-area ski tickets. After years of such

9    cooperation, defendant canceled the joint tickets and refused even to permit plaintiff to buy

10   defendant's tickets at retail prices. *Aspen Skiing*, 472 U.S. at 593-94. The Court upheld a jury

11   verdict for plaintiff, reasoning that the jury could reasonably conclude that defendant "elected to

12   forgo these short-run benefits because it was more interested in reducing competition . . . over

13   the long run by harming its smaller competitor." *Id.* at 608.

14   In *Trinko*, the Court contrasted the facts before it with the key aspects of *Aspen Skiing*.

15   In *Aspen Skiing* the defendant had voluntarily entered into a course of dealing and "had

16   cooperated for years" with its competitor, after which it had unilaterally terminated a voluntary

17   relationship. *See Trinko*, 540 U.S. at 408-09. This was central to the Court's decision because

18   the prior course of dealing was presumed to be profitable and abandoning it suggested a

19   willingness to forsake short-term profits to achieve an anticompetitive end. *Id.* at 409. By

20   contrast, in *Trinko,* there was no allegation that "Verizon voluntarily engaged in a course of

21   dealing with its rivals, or would ever have done so absent statutory compulsion." *Id.*

22   **2.    The *Trinko* Analysis Disposes Of Plaintiffs' Monopolization Claims.**

23   As in *Trinko* and unlike *Aspen Skiing*, plaintiffs are not alleging that Apple cut off a

24   voluntary course of dealing. Instead, plaintiffs assert that Apple has refused to deal with

25   Microsoft or other competitors, period. This dooms their claim. *See Covad Comms. Co. v*

26   *BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004) ("*Trinko* now effectively makes the

27   unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal

28   claim under *Aspen*").

MOT. TO DISMISS
C-05-00037-JW

1    The same policy reasons cited by the Supreme Court apply here.  First, as in *Trinko*,

2  forcing Apple to deal with others "may lessen the incentive" for Apple or rivals to innovate and

3  invest in "economically beneficial facilities."  *Trinko*, 540 U.S. at 408.  Indeed, if plaintiffs'

4  theory were the law and Apple were forced to use Microsoft's technology, Apple would have

5  had no incentive to innovate and develop its own.  And the ability of Apple to provide the

6  seamless iPod/iTMS integration valued by consumers would be dependent on how well or

7  poorly a Microsoft product works.

8    Second, forcing Apple to deal with Microsoft would require antitrust courts "to act as

9  central planners, identifying the proper price, quantity, and other terms of dealing—a role for

10  which they are ill-suited."  *Id.*  If Apple were required to license Microsoft's WMA, at what

11  price and on what terms?  What standards would this Court use in determining the price and

12  terms?  Would Apple be required to license WMA even though it would give Microsoft a

13  monopoly in the DRM market?  What if consumers complain that the Microsoft technology does

14  not work as well as Apple's?  Would all other competitors be required to do the same thing,

15  ensuring a monopoly for Microsoft?  And what if Microsoft attempted to extract a higher price

16  once Apple designed its products to use Microsoft's software?  When Microsoft starts selling its

17  own digital music player to complement its online music store, attempting to emulate Apple's

18  seamless integration (*see supra*, p. 2, n.2), would Apple still be required to use the Microsoft

19  technology?

20    Third, theoretically at least, forcing Apple to negotiate with rivals "may facilitate the

21  supreme evil of antitrust: collusion."  *Id.*  The bias of the antitrust laws is that consumers are

22  better off with companies competing rather than cooperating—and for the marketplace rather

23  than the courts to answer the questions noted above.  *Trinko*, in short, stands for the proposition

24  that the Courts should not encourage cooperation that could lead to collusion.

25    The *Trinko* approach is particularly compelling where the refusal-to-deal is a refusal to

26  license intellectual property.  Courts have repeatedly held that § 2 does not require even a

27  dominant firm to create competition against itself within its own technology by licensing

28  intellectual property to rivals.  In *Independent Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1326

1  (Fed. Cir. 2000), the Federal Circuit held that refusals to license are beyond the reach of the

2  Sherman Act, absent a showing of tying, sham litigation or fraud in obtaining the intellectual

3  property rights.  Even market power resulting from control of a patent "does not impose on the

4  intellectual property owner an obligation to license the use of that property to others."  *Id.*

5  (citations omitted).  No such showing is possible here.  Only tying is even alleged and, as shown

6  below, there is no cognizable tie.  Moreover, after Trinko, any refusal-to-deal claim requires

7  proof of a pre-existing voluntary course of dealing.[7]

8        Plaintiffs' allegations regarding a competitor, RealNetworks, underscore that Apple did

9  not voluntarily engage in a course of dealing with rivals.  According to the second amended

10  complaint, RealNetworks cracked the code in Apple's FairPlay DRM so that music from

11  RealNetworks Music Store could be played directly on the iPod without the intermediary step of

12  burning to a CD.  ¶¶ 48-51.[8]  Apple was "stunned" by RealNetworks' decision to adopt "the

13  tactics and ethics of a hacker" and allegedly updated its iPod software to prevent this

14  circumvention of its DRM.  ¶¶ 50-51.  Hacking is not what the Supreme Court had in mind in

15  referring to a voluntary, presumably profitable course of dealing, the termination of which is

16  presumably motivated by anti-competitive intent and may constitute an actionable refusal-to-

17  deal.  Under *Trinko*, RealNetworks' efforts to force dealing do not create an antitrust duty on

18  Apple to cooperate and facilitate dealing on a going forward basis, particularly where

19  RealNetworks pays nothing and simply free rides on the economic rewards of Apple's

20  innovation.  *See Morris Communications Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th

21  Cir. 2004), *citing Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991)

22

23  [7]  In one pre-*Trinko* case where a refusal to license gave rise to § 2 liability, the
defendant had voluntarily dealt with competitors and allegedly changed its policies over time
24  based on its desire to exclude increasingly aggressive competitors.  *See Image Tech. Servs., Inc.
v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997).  If that decision survives *Trinko* and
25  *Independent Serv. Org.*, which is doubtful, it still does not help plaintiffs because they do not
and cannot allege any voluntary course of dealing with respect to FairPlay DRM, let alone a
26  termination thereof.

27  [8]  Using euphemisms for hacking, plaintiffs allege that RealNetworks "managed to
independently analyze the firmware" in the iPod, "was able to discern" Apple's software code,
28  and inserted a "corresponding code" into its own song files so that music from its own online
store could play on the iPod.  ¶ 48.

1  ("[I]t 'is not a function of the antitrust laws' to equip plaintiffs with defendants' competitive

2  advantages.").

3      In short, plaintiffs allege nothing more than a consistent refusal by Apple to license

4  WMA from Microsoft and license FairPlay DRM to competitors.  That claim is insufficient as a

5  matter of law and should be dismissed.

6      Plaintiffs' attempt to monopolize claims fail for the same reason.  An essential element is

7  "predatory or anticompetitive conduct."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456

8  (1993) (citing multiple cases).  Here, for the same reasons that Apple's refusal to deal with

9  Microsoft cannot be found exclusionary, it cannot be deemed anticompetitive.  *See Trinko*, 540

10  U.S. at 841 (leveraging "presupposes anticompetitive conduct, which in this case could only be

11  the refusal-to-deal claim we have rejected.")

12      **C.      This Court's Previous Decision on Apple's Motion to Dismiss.**

13      This Court denied the earlier motion to dismiss the monopolization claim in the original

14  complaint.  The Court held that the allegation that Apple had "rigged" the operating AAC codec

15  format and the firmware in the iPod, if proven, "could be found to suggest the conclusion that

16  Defendant has wilfully acquired or maintained" monopoly power.  Then-plaintiff Slattery

17  argued that this rigging satisfied the requirement in *Trinko* of a pre-existing, voluntary course of

18  dealing, the termination of which may be actionable refusal to deal.  The Court did not expressly

19  address the *Trinko*-based argument.  *See Slattery*, 2005 WL 2204981, at *4.  For the reasons

20  stated above, we believe that the *Trinko* analysis disposes of the monopolization claim in the

21  second amended complaint.

22  **II.     PLAINTIFFS' TYING ALLEGATIONS FAIL TO STATE A CLAIM**

23      Plaintiffs' tying claim is premised on the same faulty theory—that Apple should have

24  used Microsoft's DRM or licensed FairPlay DRM to competitors—but is even more attenuated.

25  The law on tying addresses a narrow category of anticompetitive conduct, namely where a seller

26  offers to sell a product for which it has market power only if consumers agree to buy an

27  unwanted product at the same time.  It was never intended, and has never been applied, to bar a

28  company from developing and marketing complementary, integrated products that work together

1    seamlessly. And it certainly has never been applied to require one company to license

2    something from a competitor so as to make their products more compatible. Applying tying law

3    in that manner would discourage innovation by making the development of complementary

4    products much more expensive, if not impossible. And in this case, extending tying law to these

5    circumstances would further enhance Microsoft's dominance of the DRM market.

6          **A.      Plaintiffs Do Not Allege That Apple Coerced Them To Buy Anything.**

7          A tying arrangement is "an agreement by a party to sell one product but only on the

8    condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v.*

9    *United States*, 356 U.S. 1, 5-6 (1958) (footnote omitted). The element of "forcing" or

10    "coercion" to purchase the second, unwanted product is essential. *Jefferson Parish Hosp. Dist.*

11    *No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d

12    534, 540 (9th Cir. 1983) (coercion is "significant element of an illegal tying arrangement").

13    "[W]here the buyer is free to take either product by itself there is no tying problem." *Jefferson*

14    *Parish,* 466 U.S. at 12, n.17 (quoting *North Pac. Ry. Co.*, 356 U.S. at 6 n.4). No tying exists

15    where the buyer purchases the second product on account of its "intrinsic superiority" rather

16    than any coercion by the seller. *North Pac. Ry Co.*, 356 U.S. at 10-11; *see also Robert's Waikiki*

17    *U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984) (no tying

18    where an airline and a rental car company offered a package deal with discounted rates on

19    airfare and rental car fees but consumers were free to purchase airline travel and rental car

20    services separately, albeit at a higher price).

21          Plaintiffs' allegations as to their individual situations do not meet this standard.

22    Plaintiffs do not allege that they were coerced to buy an iPod or iTMS music. Indeed, plaintiffs

23    do not even allege that they bought an iPod—coerced or otherwise. SAC ¶¶ 9-10. Plaintiffs

24    allege, as noted, only that they purchased iTMS music and that "*if* they wished to play and

25    portably enjoy the music they purchased" from iTMS, then they would be "forced to purchase

26    an Apple iPod." ¶ 10 (emphasis added). That is insufficient to satisfy the coercion element.

27          Alleging that one product is the only option available for using the other product in a

28    complementary, integrated way does not suffice. As noted, tying law was never intended and

1  has never been applied to prevent development or sale of integrated products. In *Foremost Pro*

2  *Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), the Ninth Circuit considered a

3  tying challenge to Kodak's decision to introduce its Instamatic camera, a new film and

4  developing process, and the equipment necessary to process the new film. A competitor alleged

5  an unlawful tying arrangement because the new Kodak system was "incompatible" with existing

6  products. *Id.* at 544. Affirming dismissal for failure to state a claim, the Ninth Circuit held that

7  a "technological interrelationship among complementary products" does not constitute the type

8  of coerced or forced purchase of two products that constitute unlawful tying. *Id*. at 542. The

9  claim that the "effective use" of one product "necessitates purchase of some or all of the others"

10  is insufficient where the products are separately available for purchase. *Id.* at 543. "Any other

11  conclusion would unjustifiably deter the development and introduction of those new

12  technologies so essential to the continued progress of our economy." *Id.* "Quite obviously, a

13  firm that pioneers new technology will often introduce the first of a new product type along with

14  related, ancillary products that can only be utilized effectively with the newly developed

15  technology." *Id.* at 542. In short, the Ninth Circuit held that "the introduction of

16  technologically related products, even if incompatible with the products offered by competitors,

17  is alone neither a predatory nor anticompetitive act." *Id.* at 544.

18  　　　In accord is *Innovation Data Processing, Inc. v. IBM Corp.*, 585 F. Supp. 1470 (D.N.J.

19  1984), in which a data recovery software company brought a tying claim against IBM. The key

20  issue was whether IBM had tied sales of its data recovery software (DFDSS) to a package of

21  software updates (IPOJ), by including it in the integrated version of IPOJ. The competitor

22  alleged that although the various pieces of software could be licensed separately, IBM had tied

23  DFDSS to IPOJ "as a practical matter" because customers would want "to avoid the technical

24  and administrative problems" of licensing competing data recovery software. *Id.* at 1474. The

25  district court granted summary judgment to IBM:

26  　　　　　　[A]s a matter of law, in the absence of evidence that the purchase
　　　　　　of the alleged tied product was required as a condition of sale of
27  　　　　　　the alleged tying product—rather than merely as a prerequisite for
　　　　　　practical and effective use of the tying product—[plaintiff] has
28

MOT. TO DISMISS
C-05-00037-JW

1

2

>                 failed to show the requisite coercion necessary to establish a per se
>                 illegal tying arrangement.

*Id.* at 1475-76.

3

4

5

    Thus, because plaintiffs do not allege that they actually purchased an iPod and cannot

allege that Apple refuses to sell iTMS music to consumers who do not purchase an iPod,

plaintiffs' tying claim is insufficient as a matter of law, and Count I should be dismissed.

6

7

> **B.    Plaintiffs' Tying Theory Is Unprecedented and Wrong Because It Would**
>
> **Force Apple to Do Business with Microsoft and Other Competitors.**

8

9

10

11

12

    As noted, plaintiffs are not alleging that Apple refuses to sell iTMS music to customers

unless they agree to purchase an iPod.  Rather, plaintiffs claim that Apple's products are

incompatible with competitors' products because Apple and its competitors use different DRM

(and, as Tucker admits, DRM is required by the music copyright holders).  Tying law, however,

has never been used to prevent a company from using technology it chooses.

13

14

15

16

17

18

19

20

21

22

23

    This can be readily seen by asking what a defendant would have to do to avoid engaging

in the allegedly unlawful tie.  In the paradigm tying case, the defendant can comply with the law

simply by offering its two products for sale separately rather than conditioning the sale of the

wanted item on the simultaneous purchase of the unwanted item.  In this important sense, the

remedy in a tying case is, as the Supreme Court said in a different context, "amenable to a

remedy that does not require judicial estimation of free-market forces."  *Trinko*, 540 U.S. at 410.

For example, to avoid the tie in *International Salt Co. v. United States*, 332 U.S. 392 (1947), the

defendant could simply offer its salt-using machines for sale without forcing customers to buy

salt from it.  Or Kodak could have offered to sell copier parts to anyone without requiring them

to purchase service from Kodak.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504

U.S. 451, 463 (1992), discussed in the next section.

24

25

26

27

    Here, however, it is beyond dispute that Apple already sells iPods and iTMS music

separately, so avoiding plaintiffs' (erroneous) theory of liability would require Apple to do

something more than selling the two products separately.  Indeed, Apple would be required not

only to change the design of its products but also to license Microsoft's DRM.  No case has ever

28

1    found tying liability in these circumstances.  In short, plaintiffs are seeking to use tying law to

2    circumvent the result mandated by *Trinko* that Apple has no antitrust obligation to deal with

3    Microsoft or anyone else.  That is not an appropriate application of the tying law.

4         **C.     This Court's Previous Decision on Apple's Motion to Dismiss.**

5         This Court's decision on Slattery's tying claim does not prevent dismissal of the new

6    plaintiffs' tying claim.  Their tying allegations set forth in the second amended complaint differ

7    from Slattery's allegations in the original complaint that was the subject of this Court's decision.

8    Specifically, Slattery alleged that (i) he bought iTMS music, (ii) he was forced to buy an iPod if

9    he wanted to play the music portably, and (iii) because iTMS music was the only music he could

10   play directly on iPod, he was "forced to continue purchasing" iTMS music.  First Am. Compl.

11   ¶ 11.  The clear implication was that he in fact purchased an iPod and was forced to do so—

12   otherwise the allegation that he was forced to continue purchasing iTMS music would have

13   made no sense.  The new plaintiffs, however, omit the third step.  Thus, they are left only with

14   the allegation that they bought iTMS music and the conditional allegation that they were forced

15   to buy an iPod if they wanted to play the music portably.  They stop short of alleging that they

16   actually bought an iPod, much less that they were forced to do so.  Without an allegation of an

17   actual coerced purchase of the tied product, the tying claim fails at the threshold.[9]

18        In any event, plaintiffs do not and cannot allege that Apple sells the two products only as

19   a package.  The separate availability of the two products would defeat the tying claim even if

20   plaintiffs alleged facts showing coercion.  In its earlier ruling, this Court relied on *Eastman*

21   *Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 463 (1992), for the proposition that

22   "the fact that Plaintiff can purchase the items separately does not dismiss a tying claim."

23   *Slattery*, 2005 WL 2204981, at * 4.  On closer examination, however, that is not what that case

---

[9]  Slattery's allegation of a coerced purchase of an iPod turned out to be false.  He admitted at deposition that it was a birthday gift and that he had not previously bought any iTMS music.  *See* Apple's Admin. Req. for Leave to File Mot. for Summ. Jdgmt, pp. 2-4, Docket Item No. 44, filed Feb. 21, 2006.  Based on this experience with Slattery, it is especially appropriate to enforce the rule that these plaintiffs clearly allege facts sufficient to show standing—*e.g.,* that plaintiffs actually bought the allegedly tied product (an iPod) after they bought the alleged tying product (iTMS music), and that they did so as a result of coercion.

1   held.  The plaintiffs in *Kodak* could not purchase the items separately.  Kodak would sell copier

2   replacement parts to them only if they agreed to obtain service from Kodak.  504 U.S. at 463.

3   Kodak's defense was that parts and service were not separate products and thus could not be the

4   subject of tying.  Rejecting that defense, the Court noted that Kodak sold parts to another

5   category of customers, those that provided their own service rather than using independent

6   service organizations.  That is what this Court referred to in *Slattery*.  But that category of

7   customers did not have a tying claim, because Kodak sold parts to them without conditions.  It

8   was only the other category of customers—the copier owners that did not provide their own

9   service—that were victims of the tie.

10       In short, *Kodak* stands for the proposition that the separate availability of products to one

11   class of customers establishes that the products are separate, and when the defendant refuses to

12   make those products available separately to another class of customers, an unlawful tie may

13   exist with respect to that latter class of customers.  Here, Apple indisputably makes its products

14   separately available to **all** customers.  So no unlawful tying exists for **any** customer.  Indeed, no

15   case has ever found an unlawful tie-in where the plaintiff was able to buy the two products

16   separately on financial terms comparable to buying them together.

17   **III.    FOR THE SAME REASONS, PLAINTIFFS' STATE LAW AND COMMON LAW**

18   **ANTITRUST CLAIMS FAIL TO STATE A CLAIM.**

19       Plaintiffs re-allege the same claims under the Cartwright Act (Count V) and "common

20   law monopolization" (Count VII).  "Because the Cartwright Act has objectives identical to the

21   federal antitrust acts, the California courts look to cases construing the federal antitrust laws for

22   guidance in interpreting the Cartwright Act."  *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811,

23   1814 n.1 (1995).  Just as plaintiffs' federal antitrust claims are without merit, so are their state

24   law antitrust claims.  Putting aside whether the Cartwright Act reaches single-firm conduct and

25   whether any "common law monopolization" exists, those laws should not be construed to find

26   violations where the conduct at issue is lawful under federal antitrust laws.

27

28

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For these reasons, Counts I through V and VII should be dismissed without leave to amend because the defects are incurable.

Dated: September 15, 2006                    JONES DAY


By: /s/ Robert A. Mittelstaedt
        Robert A. Mittelstaedt

Attorneys for Defendant

SFI-554535v3