1  LERACH COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  BONNY E. SWEENEY (176174)
   GREGORY S. WESTON (239944)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  bonnys@lerachlaw.com
   gweston@lerachlaw.com
6
   THE KATRIEL LAW FIRM
7  ROY A. KATRIEL (*pro hac vice*)
   1101 30th Street, N.W., Suite 500
8  Washington, DC  20007
   Telephone:  202/625-4342
9  202/330-5593 (fax)
   rak@katriellaw.com
10
   Co-Lead Counsel for Plaintiffs
11
   [Additional counsel appear on signature page.]
12
                    UNITED STATES DISTRICT COURT
13
                    NORTHERN DISTRICT OF CALIFORNIA
14
                        SAN JOSE DIVISION
15

16 | THE APPLE IPOD ITUNES ANTI-TRUST | ) | Lead Case No. C-05-00037-JW |
   | LITIGATION | ) | |
17 | | ) | <u>CLASS ACTION</u> |
   | | ) | |
18 | This Document Relates To: | ) | CONSOLIDATED COMPLAINT FOR |
   | | ) | VIOLATIONS OF SHERMAN ANTITRUST |
   | ALL ACTIONS. | ) | ACT, CLAYTON ACT, CARTWRIGHT |
19 | | ) | ACT, CALIFORNIA UNFAIR |
   | | | COMPETITION LAW, CONSUMER LEGAL |
20 | | | REMEDIES ACT, AND CALIFORNIA |
   | | | COMMON LAW OF MONOPOLIZATION |
21

22                                          <u>DEMAND FOR JURY TRIAL</u>

23

24

25

26

27

28

### INTRODUCTION AND MARKET DEFINITIONS

1.    Plaintiffs Somtai Troy Charoensak, Mariana Rosen, and Melanie Tucker ("plaintiffs") on behalf of themselves and behalf of the Classes defined herein (the "Classes"), based on information and belief and investigation of counsel, except for information pertaining to the named plaintiffs, which is based on their personal knowledge, allege as follows:

2.    Apple, Inc. ("Apple" or "defendant") owns and operates iTunes Music Store ("Music Store"), an internet site that offers digital music and digital video computer files for online purchase and download ("Online Music" and "Online Video"). Unlike most internet sites, Music Store is accessed with proprietary Apple software rather than with a web browser.

3.    The "Online Music market" is defined as the market for digital music legally delivered to the consumer by way of internet download. Online Music presents consumers enormous advantages over purchasing music in compact disk ("CD") form at retail stores. Online Music stores offer for sale hundreds of thousands of songs at once, many times more than even the largest traditional music retailer. Online Music is attractive to consumers because it allows them to purchase *a la carte* only the songs that they want rather than having to buy an entire CD album in order to get only one or two desirable songs.

4.    Online Music is also attractive because it is more convenient, reliable, and better for the environment. Consumers do not have to drive to a store to make their purchase, trucks do not have to transport the CDs from factory to warehouse to retailer, and there is no material or packaging produced only to be thrown away. Online Music also promises superior audio fidelity over time because unlike CDs Online Music lasts indefinitely and cannot wear out or break.

5.    Apple has an approximately 85% market share of the Online Music market.

6.    The "Online Video market" is defined as the market for digital video files that are purchased and downloaded via the internet that can be viewed both on a home computer and a video enabled Digital Music Player. Popular examples of Online Video include commercial-free television shows, music videos, and short films. Just as with Online Music, the variety, reliability, convenience, and environmental friendliness of Online Video make it superior to DVDs purchased from traditional retail outlets.

1    7.    Apple's share of the Online Video market is 90%.

2    8.    The "Digital Music Player market" is defined as the market for portable battery-

3    powered devices that can store and play large numbers of digital music computer files.  For

4    technology savvy consumers, Digital Music Players are enormous improvements over portable CD

5    players.  While a traditional CD can hold no more than 15 to 25 songs, Digital Music Players, by

6    playing music that has been compressed into small digital files, can store from 150 to more than

7    20,000 songs.  Even larger Digital Music Players are now only a fraction of the size of a typical

8    portable CD player, and by having few moving parts are more reliable and offer a much longer

9    battery life.  Digital Music Players also dispense with the need to carry around CDs and allow

10   consumers to organize, categorize, and play their music in whatever manner or order they desire.

11   Further advantages include superior skip protection and in many models the ability to play video

12   games, play video files, and store digital photographs.

13   9.    Apple sells Digital Music Players known as the iPod, iPod shuffle and iPod nano

14   (collectively, the "iPod").  Apple designs some of the hardware and software of its iPod while

15   manufacturing is outsourced to Asia.

16   10.    Apple has an approximately 80% share of the Digital Music Player market.

17   11.    The three relevant product markets are the markets for Online Video, Online Music,

18   and Digital Music Players (collectively, the "Product Markets").

19   12.    Consumers and merchants have come to recognize the Online Music market as a

20   separate and distinct market from the market for music CDs.

21   13.    Barriers to entry into the Online Music market are high.  In addition the barriers to

22   entry into the Online Music market imposed by Apple's illegal anticompetitive behavior, discussed

23   in detail herein, other barriers to entry include the fact that: (1) the products are protected by

24   copyrights that any new entrant would have to obtain a license for in order to legally sell; (2) the

25   copyright holders are unlikely to license their copyrighted music files to any new entrant unless that

26   entrant can credibly show that it will be able to sell these files to a large audience, which the ties

27   effectively make impossible because most listeners of Online Music files are iPod owners; and

28

1    (3) any new entrant would have to offer an inventory of millions of music files, necessitating (in

2    addition to the copyright license requirement), an inordinate investment of capital and resources.

3         14.    The Online Music market offers a number of features not readily available at

4    traditional "brick and mortar" music stores, which help set it apart as a distinct market.  For example,

5    whereas shoppers at traditional "brick and mortar" music stores must typically purchase an entire

6    album of the artist or group selected, online sales of Digital Music files offer consumers the option to

7    purchase only individual songs or tracks of music separately.  This is borne out by sales statistics

8    showing that on iTunes, for every sale of a complete album online there are approximately 20 songs

9    purchased individually.  By contrast, according to statistics compiled by the Recording Industry

10   Association of America, in the CD market in 2005, sales of CD albums were 705.4 million compared

11   to sales of CD singles of 2.8 million units.

12        15.    Further, unlike brick and mortar music stores, the Online Music market offers

13   consumers the ability to create their own customized "playlists" wherein consumers can, in effect,

14   create their own customized collection of songs from different artists.  Thus, for example, a

15   consumer of Online Music stores that had a liking for the song "Help" from the Beatles and the song

16   "Goodbye Yellow Brick Road" from Elton John could create a customized playlist that would

17   comprise of just these two songs.  That consumer would only be charged for the particular songs

18   purchased (*i.e.* in this case, "Help" and "Goodbye Yellow Brick Road").  By contrast, if that same

19   consumer wished to avail himself of these same two songs by making purchases at a brick and

20   mortar music store, that consumer would have to purchase an entire Beatles album containing a

21   dozen songs or more, and an entire Elton John album, which also contains approximately a dozen

22   songs or tracks.  Thus, while the Online Music purchaser would only pay in $1.98 (99 cents each) in

23   total to obtain these two songs, the price paid by the same consumer at a traditional brick and mortar

24   store would likely be approximately $30 – *i.e.*, the price for two CDs.

25        16.    In addition, the music selection available in the Online Music market is not

26   coextensive with the music selection available at brick and mortar music stores.  Online Music stores

27   provide a ready outlet for independent and less popular artists whose music is not readily available at

28

1   brick and mortar music stores, which only have room to carry a small fraction of the inventory of

2   Online Music stores.

3         17.    In the eyes of consumers, the Online Music market and the brick and mortar market

4   are not in price-competition with one another.  The Online Music market focuses on selling

5   individual tracks or songs while the brick and mortar market is focused on selling whole albums or

6   CDs, thereby making price-comparison between these two distinct markets a *non sequitur*.  Further,

7   because of the ubiquitous nature of the internet, Online Music sales are available to a whole host of

8   consumers who do not have ready access to a nearby brick and mortar music store, let alone a nearby

9   brick and mortar store stocking the particular recording desired by these consumers at any given

10  time.  Similarly, because search costs on the internet are a fraction of search costs involved in the

11  brick and mortar market, consumers are not likely to and do not forego a purchase of a music

12  recording online even if they hypothetically would believe that the same recording could be obtained

13  somewhat less expensively at a traditional brick and mortar store.  The costs associated with

14  traveling to brick and mortar music stores, searching one or more such stores for a particular

15  recording, and comparison shopping between these brick and mortar music stores and online stores

16  dissuade consumers from foregoing a purchase made from the comfort of their own home or office

17  for the same piece of music, even if doing the foregoing tasks could hypothetically result in a

18  savings of a few cents per song.  Put differently, consumers are not likely to and do not travel miles

19  to their nearest brick and mortar music store in the hopes of saving a few cents off a song purchase

20  that they could make instantaneously on their home computer.

21        18.    For these and other reasons, the Online Music market is and has been recognized as a

22  separate relevant product market.

23        19.    For similar reasons, the Online Video market is distinct from the brick and mortar

24  market for DVDs.  Again online consumers do not have to endure the hassle and expense of going to

25  a brick and mortar store selling DVDs.  Furthermore, most Online Video sales are for television

26  shows, and typically sell for $1.99 per episode, with "Season Passes" allowing for the download of

27  an entire season of TV shows that sell for less than when broken down on a per-episode basis.  Most

28  DVD sales are for movies, and while some television shows are eventually available on DVD,

1  consumers are unable to purchase single episodes, and have to wait months or years for the DVD of

2  the show to arrive in stores.  By contrast, Online Video copies of TV shows are typically available

3  the same day the show is first broadcast.  Finally, while portable DVD players exist, they are

4  significantly larger, heavier, more cumbersome, and have fewer features than video-enabled Digital

5  Music Players.  Another segment of the Online Video market is the sale of short music videos,

6  typically two to five minutes long, for $1.99. Short music videos are rarely, if ever, available in

7  DVD form.

8          20.     The relevant geographic market for the three Product Markets is the United States.

9          21.     Apple has and is engaged in tying and monopolizing behavior, placing unneeded and

10  unjustifiable technological restrictions on its most popular products in an effort to restrict consumer

11  choice and restrain competition in the Product Markets.  Apple's CEO Steve Jobs has himself

12  compared Apple's digital music dominance in the Online Music market to Microsoft's personal

13  computer operating system dominance, calling Apple's Music Store "the Microsoft of music stores"

14  in a meeting with financial analysts.

15          22.     As alleged in further detail below, Apple deliberately makes Online Music purchased

16  at the Music Store inoperable with its competitor's Digital Music Players.  Thus, a consumer who

17  wishes to play music from Apple's Music Store, the dominant Online Music retailer, directly on a

18  Digital Music Player can do so only with an iPod.  Accordingly, Apple can and does sell the iPod at

19  prices far above those that would prevail in a competitive market for Digital Music Players.

20          23.     Conversely, as also alleged in detail below, Apple deliberately makes the iPod unable

21  to play music sold at rival Online Music stores.  Consumers with iPods can only buy Online Music

22  to play on them from Apple's Music Store, allowing Apple to further entrench its monopoly in both

23  of these Product Markets.

24          24.     In the past two years, as improved hard drive and video compression technology have

25  made playing video content such as television shows on Digital Music Players feasible, Apple has

26  begun using these same illegal tactics to block consumers from purchasing and playing Online Video

27  from its rivals' online stores and video-enabled Digital Music Players.

28

CONSOLIDATED COMPLAINT - C-05-00037-JW                                          - 5 -

**PARTIES**

25.     Defendant Apple is a corporation organized under the laws of the State of California and has its principal place of business in Cupertino, California.  Though best known as a computer hardware and software company, the majority of Apple's revenues and profits now derive from its Online Video, Online Music, and Digital Music Player businesses.

26.     Plaintiff Somtai Troy Charoensak is a resident of California, plaintiff Mariana Rosen is a resident of New Jersey, and plaintiff Melanie Tucker is a resident of California.  During April 28, 2003 through the conclusion of the trial of this matter ("Class Period"), plaintiffs purchased iTunes music and iPods directly from Apple and plan to purchase and/or have purchased Online Videos from Apple.

**JURISDICTION AND VENUE**

27.     Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§15 and 26, and 28 U.S.C. §§1331 and 1337.

28.     Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391 because defendant transacts business in this district, defendant has its principle corporate office in this district, and because thousands of Class members are located in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district.  The acts complained of have had, and will have, substantial anticompetitive effects in this district.   A substantial number of putative plaintiffs reside in this district.

**TRADE AND COMMERCE**

29.     During the Class Period, Apple marketed, distributed, and sold Digital Music Players, Online Music, and Online Video in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States.

**CLASS ACTION ALLEGATIONS**

30.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(b)(2)-(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following Classes:

1

**INJUNCTIVE RELIEF CLASS**
**(For injunctive relief under the Clayton Act, 15 U.S.C. §26)**

2

3          31.    All persons or entities in the United States (excluding federal, state and local

4   governmental entities, Apple, its directors, officers and members of their families) who:

5   (a) purchased an iPod from Apple or (b) purchased audio or video files from the Music Store during

6   the Class Period.

**DAMAGES CLASS**
7   **(For damages under the Clayton Act, 15 U.S.C. §15)**

8          32.    All persons or entities in the United States (excluding federal, state and local

9   governmental entities, Apple, its directors, officers and members of their families) who purchased an

10  iPod directly from Apple during the Class Period.

11          33.    The Classes are so numerous that joinder of all members is impractical.  There are

12  thousands of members in each Class who are geographically dispersed throughout the United States.

13          34.    Plaintiffs' claims are typical of the claims of the members of the Classes because

14  plaintiffs and all Class members were damaged by the same wrongful conduct of the defendant

15  alleged herein.

16          35.    There are questions of law and fact common to the Classes which predominate over

17  any questions affecting only individual Class members.  Such common questions include:

18          (a)    the definition of the relevant markets;

19          (b)    Apple's market power within these markets;

20          (c)    whether Apple monopolized and continues to monopolize the relevant

21  markets;

22          (d)    whether Apple attempted to monopolize and continues to attempt to

23  monopolize the relevant markets;

24          (e)    whether the contractual conditions Apple imposes upon its customers are

25  unconscionable;

26          (f)    whether Apple's conduct caused damage to the plaintiffs and members of the

27  Classes, including the degree to which prices paid by the Classes are higher than the prices that

28  would be paid in a market free from tying, monopolization, and other illegal conduct; and

CONSOLIDATED COMPLAINT - C-05-00037-JW                                          - 7 -

1          (g)    the appropriateness of injunctive relief to restrain ongoing and future

2   violations of the law.

3          36.    The claims of the plaintiffs are typical of the claims of the Classes, and plaintiffs have

4   no interest adverse to the interest of other members of the Classes.

5          37.    Plaintiffs will fairly and adequately protect the interests of the Classes and have

6   retained counsel experienced and competent in the prosecution of complex class actions and antitrust

7   litigation.

8          38.    A class action is superior to other available methods for the fair and efficient

9   adjudication of the controversy.  Such treatment will permit a large number of similarly situated

10  persons to prosecute their common claims in a single forum simultaneously, efficiently, and without

11  duplication of effort and expense that numerous individual actions would engender.  Class treatment

12  will also permit the adjudication of relatively small claims by many Class members who could not

13  afford on their own to individually litigate an antitrust claim against a large corporate defendant.

14  There are no difficulties likely to be encountered in the management of this class action that would

15  preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient

16  adjudication of the controversy.

17                      **APPLE ENGAGES IN ILLEGAL TYING CONDUCT**

18         39.    Online Music comes in both unprotected and protected digital file formats.  Unlike

19  unprotected formats, protected formats include technological encumbrances designed to prevent

20  consumers from making illegal unauthorized copies of the digital file.

21         40.    The protected music file format used by most Online Music stores is the WMA

22  format.  Online Music stores that sell their protected music files in WMA format include America

23  Online, Wal-Mart, Napster, MusicMatch, Best Buy, Yahoo! Music, FYE Download Zone, and

24  Virgin Digital.

25         41.    Online Music purchased from the Music Store, however, is in AAC format encoded

26  by Apple with DRM restrictions that Apple calls "FairPlay."

27         42.    Apple encodes Online Music purchased from the Music Store with FairPlay-DRM

28  even as to: (i) public domain material; and (ii) music that the music labels and/or artists themselves

CONSOLIDATED COMPLAINT - C-05-00037-JW                                                    - 8 -

1  request be sold DRM-free, because doing so requires the consumer to use an iPod to transfer the

2  music directly to a Digital Music Player.

3      43.     For the purposes of this Consolidated Complaint, the tied product is the iPod, and the

4  tying product is FairPlay-DRM Online Music purchased from the Music Store.  Apple deliberately

5  makes the FairPlay-DRM music files purchased from the Music Store incapable of being played by

6  other Digital Music Players.  Thus, consumers who have purchased Online Music from Apple will

7  have no choice but to buy an iPod if they want to play their music directly on a Digital Music Player.

8      44.     After purchasing their Digital Music library from the Music Store, consumers are

9  locked into making all future Digital Music Player purchases from Apple.  They might want to buy a

10  non-Apple Digital Music Player for a family member or to replace their original iPod, but to do so

11  would mean they could not utilize any of the songs they purchased from the Music Store in their new

12  Digital Music Player.  As Josh Bernoff, principle analyst with Forrester Research stated, Apple's

13  "overwhelming market share is based in large part on its ability to lock people into that device."

14      45.     Apple could license its FairPlay-DRM format to other manufacturers of Digital Music

15  Players, so that music purchased from the Music Store could be transferred directly to Digital Music

16  Players other than the iPod.

17      46.     There are no technological limitations preventing the iPod from supporting WMA

18  playback.  Apple outsources most of the production of the iPod to third party manufacturers in Asia.

19  One third party part used in the iPod is its "core processor," the Portal Player System-On-A-Chip.

20  The System-On-A-Chip by default supports the WMA format.  Apple, however, deliberately

21  designed the iPod's software so that it would only play a single protected digital format, Apple's

22  FairPlay-modified AAC format.  Deliberately disabling a desirable feature of a computer product is

23  known as "crippling" a product, and software that does this is known as "crippleware."

24      47.     The software Apple has designed for the iPod, which disables the iPod's inherent

25  ability to play WMA format files, is a classic example of crippleware.  By preventing the iPod from

26  playing WMA or any other protected music format besides FairPlay-DRM format, iPod owners only

27  option to purchase Online Music is to purchase from the Music Store.  This conduct reinforces the

28  illegal tie-in violation of the federal and state antitrust laws.

48.    In place of the Portal Player System-On-A-Chip, Apple uses the SigmaTel STMP3550 in its low end iPod shuffles.  Like the Portal Player System-On-A-Chip, the SigmaTel STMP3550 was designed to decode and play WMA files and does indeed play them on every Digital Music Player that contains the STMP3550 chip except the iPod.  As in its higher end models, Apple's crippleware operating system software prevents the iPod shuffle from playing WMA files.

49.    The cost to Apple of licensing the WMA format would likely not exceed $800,000 per year or less than two cents per iPod sold in 2006.

50.    Apple has not licensed or given access to its FairPlay-DRM format to any other Digital Music Player manufacturer, thereby ensuring two results – both of which are anticompetitive. First, through the foregoing, Apple has ensured that the iPod is the only Digital Music Player that can directly play songs purchased from the Music Store.  Second, through the foregoing, Apple has managed to ensure that owners of iPods wishing to purchase music files online to be directly played on their iPod can only do so by purchasing these files at the Music Store.

51.    Despite this anticompetitive restriction, RealNetworks, a rival seller of online digital music recordings through its RealNetworks music store, managed to independently analyze the firmware within the Apple iPod.  As a result of this analysis, RealNetworks was able to discern the necessary extra software code added by Apple to make downloaded songs playable on the iPod. Armed with this knowledge, RealNetworks was able to insert a corresponding code of its own into song files sold through its RealNetworks music store so that they too would be playable on the Apple iPod.

52.    Thus, on July 26, 2004, RealNetworks announced publicly that songs sold through its online RealNetworks music store would now be playable on the Apple iPod, thereby giving iPod owners a competitive outlet for their purchases of Online Music files.  This announcement was significant not only because it represented the first alternative to the stronghold that Apple's Music Store had heretofore exerted as the sole supplier of downloaded digital music files that could be played on the iPod, but also because RealNetworks began selling its digital online songs for as low as 49 cents per track, well below the 99 cents per track charged by Apple's Music Store.

1      53.     Rather than embracing this competitive offering to iPod owners, Apple immediately

2  threatened RealNetworks and iPod users.  On Thursday, July 29, 2004, merely four days after

3  RealNetworks' announcement, Apple issued its own public statement warning RealNetworks and

4  iPod users that "[w]e are stunned that RealNetworks has adopted the tactics and ethics of a hacker to

5  break into the iPod, and we are investigating the implications of their actions under the DMCA and

6  other laws.  We strongly caution Real and their customers that when we update our iPod software

7  from time to time it is highly likely that Real's Harmony technology will cease to work with current

8  and future iPods."

9      54.     True to its threat, by December 2004, Apple updated its iPod software to prevent

10  songs downloaded from RealNetworks music store (or any other Online Music store) from being

11  played on iPods.  Thus, Apple continues to impede competition, and forces iPod users who wish to

12  buy music online to do so exclusively from Apple's Music Store.

13      55.     In addition to the software change used to block music iPod owners from listening to

14  Online Music purchased from RealNetworks, at least twice Apple has changed iPod and Music Store

15  software, under the guise of "updating" it, to add new restrictions to music that customers previously

16  purchased from Apple.  Consumers, locked into Apple's monopoly in the Online Music market, are

17  subject to such unannounced, unilateral, and one-sided changes to their rights to listen to the music

18  they purchased from Apple by Apple's enormous market power.

19      56.     Apple's tying of the iPod to Online Music and Online Video constitutes a *per se*

20  violation of United States and California antitrust law.  None of the anticompetitive conduct

21  described in this complaint has a legitimate business justification, and all of it is in violation of

22  antitrust law under the rule of reason.

23      57.     Apple applies its FairPlay-DRM to Online Music sold through the Music Store even

24  though it admits that doing so serves no genuine antipiracy purpose.  In a web-posting dated

25  February 6, 2007, Apple's CEO Steve Jobs conceded that "DRM's haven't worked, and may never

26  work, to halt music piracy."

27      58.     These ongoing injuries can be halted and abated by an injunction that would compel

28  Apple to: (a) make Online Music and Online Video sold through the Music Store compatible with

CONSOLIDATED COMPLAINT - C-05-00037-JW                   - 11 -

1  Digital Music Players other than the iPod; and (b) make the iPod compatible with Online Music and

2  Online Video purchased on stores other than Music Store.

3       59.    Apple has acted on grounds generally applicable to the Injunctive Relief Class,

4  thereby making final injunctive relief appropriate with respect to the Class as a whole.  Such an

5  injunction would be of immense benefit to the plaintiffs, the Classes, and the general public while

6  imposing only a trifling burden upon Apple.

7  **IN EUROPE, APPLE'S MONOPOLY PRICING AND TYING CONDUCT HAS BEEN THE TARGET OF FORMAL GOVERNMENT INVESTIGATIONS, PRIVATE LAWSUITS, AND LEGISLATION SPECIFICALLY DESIGNED TO COUNTER APPLE'S ANTICOMPETITIVE CONDUCT**

8

9       60.    In France, a consumer rights organization has filed suit against Apple for deliberately

10  making the iPod and Online Music purchased from Music Store incompatible with competing

11  products.

12       61.    Also in France, the nation's Parliament has approved a law that specifically was

13  designed to force Apple to allow other companies to sell protected music files on the iPod, and to

14  force Apple to make music purchased on its Music Store compatible with competing Digital Music

15  Players.  In an interview, a French official explained that his government believes that "[s]omeone

16  who buys a song has to be able to listen to it, no matter which device or the software of choice" and

17  that Apple is designing its products to prevent consumers from using other companies' products is

18  "not in the interest of the consumer, nor the interest of the creator.  It only benefits the company and

19  we're there to defend the consumer, our citizens."  Apple unsuccessfully lobbied against the law,

20  calling it "state sponsored piracy."

21       62.    Denmark's Minister of Culture plans on introducing in 2007 legislation similar to the

22  French law.

23       63.    The Office of the Norwegian Consumer Ombudsman on July 6, 2006 ruled that Apple

24  violates Norwegian law by tying purchases of music from its Music Store to the purchase of an

25  Apple iPod, stating that "[t]he way Apple uses DRM is illegal."  Using language that echoes the

26  American common law standard of an unconscionable contract, Ombudsman Bjørn Erik Thon ruled:

27              [Apple] goes to great lengths to ensure that its standard customer contract
28      protects the company's own interest. . . .  "The contracts are both vague and hard to

1    understand for the customers, and they're clearly unbalanced to disfavor the
     customer. The consumers are clearly the inferior partner in the contract, and this in
2    itself is illegal . . . ." "[Apple's restrictive] technology renders the customers without
     rights in dealing with a company which on a whim can dictate what kind of access
3    customers will have to products they have already paid for . . . ."

4    64.    Norway may begin levying fines or shut down Apple's Norway iTunes store if it does

5    not cease violating Norwegian law by a September 30, 2007 deadline.

6    65.    In the Netherlands, the Consumer Ombudsman has also filed suit against what it calls

7    Apple's "illegal practices" and "abuse of dominant market position" noting that "[w]hat we want

8    from Apple is that they remove the limitations that prevent you from playing a song you download

9    from iTunes on any player other than an iPod . . . .  When you buy a music CD it doesn't play only

10   on players made by Panasonic.  People who download a song from iTunes shouldn't be bound to an

11   iPod for the rest of their lives."

12   66.    Similar investigations of Apple's anticompetitive practices in tying the iPod to Music

13   Store downloads are underway in Finland, Sweden, Denmark, and Germany.

14   67.    The European Union Consumer Affairs Commissioner criticized Apple on March 12,

15   2007, saying "Do you think it's fine that a CD plays in all CD players but that a song purchased from

16   iTunes only plays in an iPod?  I don't."

17   68.    Several of the above European governments issued a joint statement saying "[w]e

18   believe consumers have a right to play material purchased online on a portable device of their own

19   choice.  Contract clauses that make this impossible or too inconvenient are unfair and should be

20   revoked."

21   69.    European and British antitrust authorities are currently investigating Apple's pricing

22   practices in the European Union.  Leveraging its worldwide monopoly power in the Online Music

23   market, Apple has set the price of music downloads in the United Kingdom higher than countries

24   that use the Euro as their currency, which in turn are priced higher than downloads in the United

25   States, and maintains these higher prices by placing technological restrictions preventing European

26   residents from purchasing music from Apple's non-EU Music Store sites.

27   70.    On April 3, 2007 the European Commission issued a press release announcing it had

28   sent Apple a "Statement of Objections" regarding its anticompetitive price-discrimination policies.

CONSOLIDATED COMPLAINT - C-05-00037-JW                                              - 13 -

1    The press release noted that "Statements of Objections are a formal step in European antitrust
2    investigations."
3        71.    Following these governmental investigations and public denunciations, and after
4    Apple's repeated motions to dismiss the antitrust claims brought by plaintiffs were denied by this
5    Court, Apple announced on April 2, 2007, that it would begin selling a limited number of songs
6    without the FairPlay-DRM restrictions, but for the higher price of $1.29, while continuing to sell the
7    same songs with the FairPlay-DRM for 99 cents.  Apple also offered to remove FairPlay DRM on
8    songs consumers had already purchased, but only if the consumer paid the 30 cents difference in
9    price for each song, and only for the limited number of songs it sells without FairPlay DRM.

10                          **ANTITRUST INJURY TO CONSUMERS**

11       72.    Through the unlawful acts and practices described above Apple has harmed
12    competition, consumers and innovation by causing consumers to pay supracompetitive prices for
13    iPods.  Those practices, described herein, have also allowed Apple to obtain and maintain illegal
14    monopolies in the three Product Markets.

15       73.    By preventing consumers who have purchased music files from Music Store from
16    playing their music on its competitors' Digital Music Players, Apple has been able to charge
17    purchasers of the iPod a supracompetitive price.

18       74.    Likewise, by preventing owners of iPods from buying music from any Online Music
19    retailer other than Music Store, Apple deters consumers from even considering doing business with
20    its competitors' music and video stores, allowing it to monopolize these markets, and further exclude
21    competing Digital Music Players from the market, lock consumers into iPod and iTunes, and charge
22    supracompetitive prices for the iPod.

23       75.    Consumers have been further injured as innovative companies such as Dell, Olympus,
24    and Rio have begun to withdraw from the Digital Music Player markets.  These companies had little
25    choice but to give up and exit the market because Apple's anticompetitive conduct excluded them
26    from reaching the majority of their potential customers no matter how much cheaper or how much
27    better their products were.  There can be no real competition in the Online Music, Online Video, and

28

1   Digital Music Player markets as long as Apple's conduct forecloses even the possibility of its

2   competitors reaching most potential customers.

3        76.    Apple's anticompetitive conduct has deterred the development of competing

4   products, damaging consumers by depriving them of a choice of products with different and possibly

5   superior sets of features.

6        77.    Normally markets for consumer electronic goods such as Digital Music Players are

7   characterized by intense competition and narrow profit margins.  Apple's pricing in the Digital

8   Music Player market, by contrast, is exactly that of a monopolist, excessive and arbitrary.  For

9   example, in June 2006 the only difference between the 1GB and 4GB models of the iPod nano was

10  the capacity of their NAND flash memory parts.  At spot prices in the NAND flash memory market

11  at the time, the 1GB part cost approximately $4.15, while the 4GB part cost approximately $9.67.

12  Nonetheless, Apple charged an additional one hundred dollars for the 4GB model.

13       78.    Plaintiffs and the Classes have been injured by this anticompetitive conduct and will

14  continue to suffer injury unless the relief prayed for herein is granted.

15                         **COUNT I: TYING**

16      **(For Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1)**

17              **Violations Resulting from Unlawful Tying of the Apple
                iPod to Online Video and FairPlay Protected Music Files**
18

19       79.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth

    above on behalf of the Classes.
20

21       80.    Apple has substantial market power in the Online Music and Online Video markets.

22       81.    All of these markets are for goods and not services.

23       82.    There is no appropriate or legitimate business justification for Apple's use of

24  technological restrictions to force those who purchase Online Music and Online Video from Music

25  Store to also purchase only Apple's Digital Music Players that would counterbalance the clear

26  anticompetitive effects of its tying conduct, including the foreclosure of competition in the Digital

    Music Player market.
27

28

83.     This unlawful conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple.  Prices in the Digital Music Player market are higher than they would have been in a competitive market; the supply and selection of products available is lower than it would be in a competitive market; and the number and effectiveness of competitors have been diminished by unlawful means.

84.     The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §1.

### COUNT II: MONOPOLIZATION

### (For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)

**Violations Resulting from the Unlawful Acquisition or Maintenance
of Monopoly Power in the Digital Music Player Market**

85.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

86.     Through the actions described herein, Apple has willfully acquired and maintained monopoly power in the Digital Music Player market.  This conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple.  Prices in the Digital Music Player market are higher than they would be in a competitive market; the supply and selection of products available is lower than it would be in a competitive market; and the number and effectiveness of competitors have been diminished by unlawful means.

87.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Digital Music Player market.

88.     The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Acquisition or
Maintenance of Monopoly Power in the Online Music Market**

89.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

90.    Through the actions described herein, Apple has willfully acquired and maintained monopoly power in the Online Music market. This conduct has harmed competition in that market, making the supply and selection of products available lower in the Online Music market than they would be in a competitive market. The number and effectiveness of competitors have also been diminished by Apple's unlawful conduct.

91.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Online Music market.

92.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

<b>Violations Resulting from the Unlawful Acquisition<br>or Maintenance of Monopoly Power in the Online Video Market</b>

93.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

94.    Through the actions described herein, Apple has willfully acquired and maintained monopoly power in the Online Video market. This conduct has harmed competition in that market, making the supply and selection of products available lower than they would be in a competitive market. The number and effectiveness of competitors have also been diminished by Apple's conduct.

95.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Online Video market.

96.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

<b>COUNT III: ATTEMPTED MONOPOLIZATION</b>

<b>(For Violation of Section of the Sherman Antitrust Act, 15 U.S.C. §2)</b>

<b>Violations Resulting from Unlawful Attempted<br>Monopolization of the Digital Music Player Market</b>

97.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

98.    Apple has acted with specific intent to monopolize the Digital Music Player market.

99.    There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Digital Music Player market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Digital Music Player market will allow Apple to obtain an illegal monopoly over the Digital Music Player market.

100.    This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Digital Music Player market and forced consumers to pay higher prices in the Digital Music Player market than they would in a competitive market.

101.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Digital Music Player market.

102.    The anticompetitive conduct described herein, if not halted and abated, will damage plaintiffs and the alleged Classes, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Attempted
Monopolization of the Online Music Market**

103.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

104.    Apple has acted with specific intent to monopolize the Online Music market.

105.    There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Online Music market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Online Music market will allow Apple to obtain an illegal monopoly over the Online Music market.

106.    This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted

1    monopolization has also reduced the number and effectiveness of competitors in the Online Music

2    market.

3       107.    There is no appropriate or legitimate business justification for the actions and conduct

4    which have facilitated Apple's attempted monopolization of the Online Music market.

5       108.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged

6    Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

7                          **Violations Resulting from the Unlawful**
                 **Attempted Monopolization of the Online Video Market**
8

9       109.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth

10   above on behalf of the Classes.

11      110.    Apple has acted with specific intent to monopolize the Online Video market.

12      111.    There was and is a dangerous possibility that Apple will succeed in its attempt to

13   monopolize the Online Video market because Apple controls a large percentage of that market and

14   has the ability and actually does exclude its competitors through use of anticompetitive technological

15   restrictions on its products.  Further success in excluding competitors from the Online Video market

16   will allow Apple to obtain an illegal monopoly over the Online Video market.

17      112.    This conduct has harmed competition of the Online Video market, making the supply

18   and selection of products available lower than they would be in a competitive market.  Apple's

19   unlawful attempted monopolization has also reduced the number and effectiveness of competitors in

20   the Online Video market.

21      113.    There is no appropriate or legitimate business justification for the actions and conduct

22   which have facilitated Apple's attempted monopolization of the Online Video market.

23      114.    The anticompetitive conduct described herein, if not halted and abated, will damage

24   plaintiffs and the alleged classes, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

25                                 **COUNT IV**

26        **(For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq.*)**

27      115.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth

28   above on behalf of the Classes.

116.    Apple's actions as described above constituted an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act, §§16270, *et seq.* of the California Business and Professions Code.

117.    The Classes have been injured in their business and property as a result of Apple's illegal conduct, for which they seek damages (trebled where appropriate) including pre-judgment interest.

118.    Apple's conduct is continuing and unless equitable relief is granted, artificially inflated prices for Portable Music Players will continue unabated.

## COUNT V

**(For Violation of California Unfair Competition Law,
Bus. & Prof. Code §§17200, *et seq.*)**

119.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

120.    The conduct alleged in this Consolidated Complaint constitutes unlawful, unfair, and fraudulent business acts and practices within the meaning of the California Unfair Competition Law, §§17200, *et seq.* of the California Business and Professions Code.  Plaintiffs and the Classes have suffered injury in fact and lost money or property as a result of Apple's violations of law and wrongful conduct.

121.    Apple's actions are unlawful and unfair because it has violated, *inter alia*, the Sherman Antitrust Act, the Cartwright Act, the Consumers Legal Remedies Act and because it has monopolized the markets for Online Music, Online Video, and Digital Music Players in violation of California common law.

122.    Apple's actions are unfair because in its pursuit of monopoly pricing it has made its products less useful to consumers and prevented them from choosing which companies to do business within the relevant markets based on the merits of each company's products.  Moreover, there is no legitimate business justification for Apple's conduct, and any business justification is further outweighed by the harm Apple's conduct has caused to consumers and competitors.

123.    Apple's actions are fraudulent and unfair because it does not inform the purchasers of its products that it has deliberately made them incompatible with the products of its competitors. Apple has deceived consumers who reasonably believed that the Online Video and Online Music they could purchase from Music Store are compatible with any standard Portable Music Player and that they could purchase Online Music and Online Video from any store to play on Apple's Digital Music Player products.  These beliefs are reasonable under the circumstances given that consumers when purchasing media products are accustomed to the fact that the CDs, DVDs, audio cassettes, and VHS cassettes they purchase from any American store are compatible with any standard CD, DVD, audio cassette, and VHS cassette player.

124.    Accordingly, Apple has violated the Unfair Competition Law proscription against engaging in unlawful, unfair, and fraudulent business practices.

125.    As a result of this unlawful, unfair, and fraudulent conduct, Apple has been unjustly enriched at the expense of plaintiffs, other members of the Classes, and the general public.

126.    Apple's conduct is continuing and unless equitable relief is granted, artificially inflated prices for Digital Music Players will continue unabated.

**COUNT VI**

**(For Violation of the Consumer Legal Remedies Act,
Cal. Civil Code §§1750, *et seq.*)**

127.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

128.    Plaintiffs and each member of the Class are "consumers" within the meaning of Consumer Legal Remedies Act, California Civil Code §1761(d) ("CLRA").

129.    On July 7, 2006, plaintiff Melanie Tucker sent a letter to Apple's general counsel demanding Apple cease its conduct in violation of the CLRA.

130.    The CLRA applies to Apple's actions and conduct, described herein, because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

1  131.  Apple is a monopolist with market shares of 75% or more in each of the relevant

2  markets and a stock market capitalization of more than fifty billion dollars.  The unnecessary

3  technological restrictions it places on its products offer no benefit to consumers while preventing

4  them from using any Apple product they have already bought from being used with a competitor's

5  Digital Music Player or online store.

6  132.  Apple's size, completely dominant market share, and unreasonable and unfair

7  technological restrictions, place it in a greatly unequal bargaining position relative to consumers in

8  each of the relevant markets.

9  133.  Apple unconscionably exploits this unequal bargaining power by imposing prices,

10  contractual terms, and one sided technological restrictions into contracts with consumers in the

11  digital music markets.  This behavior has violated and continues to violate the Consumers Legal

12  Remedies Act, California Civil Code §§1750, *et seq*.

13  **COUNT VII**

14  **(For Common Law Monopolization Business Practices)**

15  134.  Plaintiffs re-alleges and incorporate by reference each of the allegations set forth

16  above on behalf of the Classes.

17  135.  The conduct described in this Consolidated Complaint is in violation of California

18  common law prohibiting monopolization.

19  **PRAYER FOR RELIEF**

20  WHEREFORE, plaintiffs, on their own behalf and on behalf of the putative classes pray that

21  the Court declare, adjudge and decree the following:

22  A.  That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the

23  Federal Rules of Civil Procedure with respect to plaintiffs' claims for injunctive relief, and

24  Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages and

25  other monetary relief, and declaring plaintiffs as representatives of the Classes and their counsel as

26  counsel for the Classes;

27

28

1       B.      That the conduct alleged herein constitutes unlawful tying, monopolization, and

2   attempted monopolization in violation of the Cartwright Act, California common law, and Sections 1

3   and 2 of the Sherman Antitrust Act;

4       C.      That the conduct alleged herein is in violation of the California Unfair Competition

5   Law and appropriate restitutionary and other injunctive relief be granted pursuant to this law;

6       D.      That the conduct alleged herein is in violation of the Consumer Legal Remedies Act;

7   and appropriate damages and injunctive relief be granted pursuant to this law;

8       E.      For an order permanently restraining and enjoining Apple from continuing the unfair

9   and anticompetitive activities alleged herein;

10      F.      That plaintiffs and the Classes are entitled to damages, penalties and other monetary

11  relief provided by applicable law, including treble damages;

12      G.      That plaintiffs and the Classes recover their costs of suit, including reasonable

13  attorneys' fees and pre- and post-judgment interest;

14      H.      For an order requiring full restitution of all funds acquired from Apple's unfair

15  business practices, including disgorgement of revenues and/or profits;

16      I.      Awarding plaintiffs and the Classes their expenses and costs of suit, including

17  reasonable attorneys' fees, to the extent provided by law; and

18      J.      That plaintiffs and the Classes are granted such other, further, and different relief as

19  the nature of the case may require or as may be determined to be just, equitable, and proper by this

20  Court.

21

22

23

24

25

26

27

28

1    **JURY DEMAND**

2    Plaintiffs respectfully demand a trial by jury on all issues so triable.

3    DATED:  April 19, 2007                    LERACH COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
4                                              BONNY E. SWEENEY
                                                GREGORY S. WESTON
5

6
                                                _____
                                                        s/BONNY E. SWEENEY
7                                                        BONNY E. SWEENEY

8                                              655 West Broadway, Suite 1900
                                                San Diego, CA  92101
9                                              Telephone:  619/231-1058
                                                619/231-7423 (fax)
10

11                                             THE KATRIEL LAW FIRM
                                                ROY A. KATRIEL
12                                             1101 30th Street, N.W., Suite 500
                                                Washington, DC  20007
                                                Telephone:  202/625-4342
13                                             202/330-5593 (fax)

14                                             Co-Lead Counsel for Plaintiffs

15                                             BONNETT, FAIRBOURN, FRIEDMAN
                                                & BALINT, P.C.
16                                             ANDREW S. FRIEDMAN
                                                FRANCIS J. BALINT, JR.
17                                             ELAINE A. RYAN
                                                TODD D. CARPENTER
18                                             2901 N. Central Avenue, Suite 1000
                                                Phoenix, AZ  85012
19                                             Telephone:  602/274-1100
                                                602/274-1199 (fax)
20

21                                             BRAUN LAW GROUP, P.C.
                                                MICHAEL D. BRAUN
22                                             12400 Wilshire Blvd., Suite 920
                                                Los Angeles, CA  90025
                                                Telephone:  310/442-7755
23                                             310/442-7756 (fax)

24                                             MURRAY, FRANK & SAILER LLP
                                                BRIAN P. MURRAY
25                                             JACQUELINE SAILER
                                                275 Madison Avenue, Suite 801
26                                             New York, NY  10016
                                                Telephone:  212/682-1818
27                                             212/682-1892 (fax)

28

1

2   GLANCY BINKOW & GOLDBERG LLP
    MICHAEL GOLDBERG
3   1801 Avenue of the Stars, Suite 311
    Los Angeles, CA  90067
4   Telephone:  310/201-9150
    310/201-9160 (fax)
5
    Additional Counsel for Plaintiffs
6   S:\CasesSD\Apple Tying\CPT00041079-AMD.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on April 19, 2007, I electronically filed the foregoing with the Clerk of

3    the Court using the CM/ECF system which will send notification of such filing to the e-mail

4    addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5    mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6    participants indicated on the attached Manual Notice List.

7    I certify under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.  Executed on April 19, 2007.

9

 s/ BONNY E. SWEENEY

10    BONNY E. SWEENEY

11    LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
12    655 West Broadway, Suite 1900
      San Diego, CA  92101-3301
13    Telephone:  619/231-1058
      619/231-7423 (fax)
14

15    E-mail:BonnyS@LerachLaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael David Braun**
  service@braunlawgroup.com

- **Roy A. Katriel**
  rak@katriellaw.com rk618@aol.com

- **Caroline N. Mitchell**
  cnmitchell@jonesday.com mlandsborough@jonesday.com;ybennett@jonesday.com

- **Robert A. Mittelstaedt**
  ramittelstaedt@jonesday.com ybennett@jonesday.com

- **Brian P Murray**
  bmurray@rabinlaw.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Adam Richard Sand, Esq**
  arsand@JonesDay.com mlandsborough@jonesday.com

- **John J. Stoia, Jr**
  jstoia@lerachlaw.com

- **Tracy Strong**
  tstrong@jonesday.com dharmon@jonesday.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)