# EXHIBIT 13

# EXHIBIT 13

Robert A. Mittelstaedt #060359
Caroline N. Mitchell #143124
Adam R. Sand #217712
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:   (415) 626-3939
Facsimile:   (415) 875-5700
ramittelstaedt@jonesday.com
cnmitchell@jonesday.com
arsand@jonesday.com

Attorneys for Defendant
APPLE COMPUTER, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MELANIE TUCKER, On Behalf Of Herself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLE COMPUTER, INC., a California Corporation<br><br>Defendant. | Case No. C 06 4457 JW<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS ANTITRUST CLAIMS**<br><br>DATE:   November 20, 2006<br>TIME:    9:00 a.m.<br>JUDGE:  Honorable James Ware<br>COURTROOM: 8 |

SF1-556677v3

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................ 1

I. *TRINKO* REQUIRES DISMISSAL OF THE MONOPOLIZATION CLAIM .......... 1

    A. Tucker Concedes That Her Core Allegation Is A Refusal-To-Deal Claim ............ 2

    B. *Trinko* and *Aspen Skiing* Govern Refusal-To-Deal Claims ................................... 2

    C. Tucker's Attempts To Distinguish *Trinko* Are Unavailing ..................................... 3

        1. *Trinko* Applies To Regulated And Unregulated Industries Alike ............. 3

        2. Tucker Misstates The *Trinko* Test .............................................................. 6

    D. Tucker's Fallback Claim That Apple Should Have Licensed Its DRM To Competitors Is Also Groundless ............................................................................. 9

II. TUCKER'S TYING CLAIM FAILS AS A MATTER OF LAW ............................... 10

    A. Tucker Fails To Allege That She Was Coerced In Any Way To Purchase Apple Products ...................................................................................................... 10

    B. The "Package Pricing" Cases Do Not Aid Tucker Because She Does Not Allege "Package Pricing" ...................................................................................... 11

    C. No Court Has Ever Found Unlawful Tying On The Basis That One Company's Products Are Interoperable with Each Other But Not With Competitors' Products ............................................................................................ 13

III. STATE LAW CLAIMS ................................................................................................. 15

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

Page

Cases

*Advance Business Systems & Supply Co. v. SCM Corp.*
415 F.2d 55 (4th Cir. 1969)..................................................................................................12

*Amerinet, Inc. v. Xerox Corp.*
972 F.2d 1483 (8th Cir. 1992)..............................................................................................11

*Applied Medical Resources Corp. v. Ethicon Inc.*
2006 U.S. Dist. LEXIS 12845 (C.D. Cal. Feb. 2, 2006) .....................................................5, 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
472 U.S. 585 (1985)........................................................................................................passim

*AT&T Corp. v. Iowa Utils. Bd.*
525 U.S. 366 (1999).................................................................................................................5

*Covad Communications Co. v. BellSouth Corp.*
374 F.3d 1044 (11th Cir. 2004)...........................................................................................3, 7

*Defiance Hospital v. Fauster-Cameron*
344 F. Supp. 2d 1097 (N.D. Oh. 2004).....................................................................................6

*Foam Supplies, Inc. v. Dow Chemical*
2006 U.S. Dist. LEXIS 53497 (E.D. Mo. 2006).......................................................................6

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*
703 F.2d 534 (9th Cir. 1983).......................................................................................1, 10, 13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*
125 F.3d 1195 (9th Cir. 1997).................................................................................................6

*Eastman Kodak Co. v. Image Technical Servs., Inc.*
504 U.S. 451 (1992)...............................................................................................................14

*International Salt Co. v. United States*
332 U.S. 392 (1947)...............................................................................................................14

*JamSports and Entertainment, LLC v. Paradama Productions, Inc.*
336 F. Supp. 2d 824 (N.D. Ill. 2006).......................................................................................6

*Jefferson Parish Hospital District No. 2 v. Hyde*
466 U.S. 2 (1984)...................................................................................................................13

*Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*
305 F.3d 89 (2d Cir. 2002).......................................................................................................3

*Lorain Journal Co. v. United States*
342 U.S. 143 (1951).................................................................................................................9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986).................................................................................................................3

*MetroNet Servs. Corp. v. Qwest Corp.*
383 F.3d 1124 (9th Cir. 2004).................................................................................................8

*Murphy v. Business Cards Tomorrow, Inc.*
854 F.2d 1202 (1988)............................................................................................................12

*New York Jets LLC v. Cablevision Systems Corp.*
2005 U.S. Dist. LEXIS 23763 (S.D.N.Y. Oct. 18, 2005).........................................................8

SFI-556677v3

- ii -

# TABLE OF AUTHORITIES
### (continued)

Page

*North Pacific Railway Co. v. United States*
356 U.S. 1 (1958).................................................................................................13

*Sethy v. Alameda County Water Dist.*
545 F.2d 1157, 1160 (9th Cir. 1976).....................................................................6

*SmileCare Dental Group v. Delta Dental Plan*
88 F.3d 780 (9th Cir. 1996)...................................................................................6

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*
373 F. Supp. 2d 631 (S.D. W. Va. 2005)..............................................................6

*United Asset Coverage, Inc. v. Avaya Inc.*
409 F. Supp. 2d 1008 (N.D. Ill. 2006)...............................................................5, 7

*United States v. Colgate & Co.*
250 U.S. 300 (1919)......................................................................................3, 4, 5

*United States v. Microsoft*
253 F.3d 34 (D.C. Cir. 2001)...............................................................................14

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*
540 U.S. 398 (2004).....................................................................................passim

*Ways & Means v. IVAC Corp.*
506 F. Supp. 697 (N.D. Cal. 1979).....................................................................11

### Other Authorities

IIIA P. Areeda & H. Hovenkamp, *Antitrust Law*
(2d ed. 2002 & Supp. 2003)..................................................................................8

## INTRODUCTION

Plaintiff misuses the antitrust laws to try to force Apple to make its products directly interoperable with competitors' products. It is unclear whether she claims that Apple had this duty when it first introduced iPods or the iTunes Music Store, or only when those products became best-sellers. But either way, the antitrust laws impose no such duty, and plaintiffs cite no case to the contrary. Imposing a duty of interoperability would inhibit the very innovation and technological advances that the antitrust laws are designed to promote. Those laws permit, indeed encourage, "the introduction of a system of technologically related products . . . **even if the new products are incompatible with the products then offered by the competition . . . .**" *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542-43 (9th Cir. 1983) (emphasis added). The antitrust laws, in short, require companies to compete, not cooperate with each other.

### I.   *TRINKO* REQUIRES DISMISSAL OF THE MONOPOLIZATION CLAIM.

The complaint affirmatively alleges the valid reason for Apple to use technology that results in its products not being directly compatible with competitors' products. Although ignored in her opposition brief, Tucker admits in her complaint that the major record companies require Apple and the other legal online digital music stores to use some form of DRM to protect their copyright interests, and that Apple cannot use Microsoft's DRM without a license. Thus, the central issue here is whether the antitrust laws require Apple to license and use Microsoft's technology so as to make its products compatible with competitors that use Microsoft's technology. Tucker admits that, in antitrust parlance, this is a refusal-to-deal claim and that it is governed by the standards set forth in *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). *Trinko* establishes a bright-line test that a refusal to deal is not actionable absent a pre-existing, voluntary course of dealing, and termination thereof.

Tucker's attempts to escape *Trinko* are unavailing. No court has limited *Trinko* to regulated industries, and the Supreme Court's rationale was much broader than that. Tucker's various re-formulations of her claim all reduce to the claim that Apple should have done business with Microsoft or its competitors. And Tucker's footnote argument that she has met the *Trinko*

test of a pre-existing, voluntary course of dealing between Apple and Microsoft is unsupported in the complaint, and insufficient in any event because she does not claim that Apple has ever licensed Microsoft's DRM.

### A. Tucker Concedes That Her Core Allegation Is A Refusal-To-Deal Claim. Indeed, All of Her Claims Fit Into That Category.

The theory of Tucker's antitrust claims is that, to comply with the record companies' requirement to use some form of DRM to protect their copyright interests, Apple supposedly has an antitrust duty to license Microsoft's DRM rather than developing its own. Tucker concedes (Opp., pp. 1, 12) that this core allegation "can be analogized to" or "construed as" a refusal-to-deal claim.

Tucker lists (p. 12) five alleged acts by Apple that she contends, unlike her main claim, are not refusal-to-deal claims. But they are simply different formulations of the basic claim that Apple should use Microsoft's DRM rather than its own. She claims, for example, that Apple has "modif[ied]" chips so as not to "support" Microsoft's WMA. But Tucker does not allege that Apple could use those chips without a license. So it is just another way of saying that Apple has not obtained the requisite license from Microsoft. Tucker also claims that Apple uses "technological restrictions" to prevent iPods from playing rival music. But the "restrictions" are simply use of Apple's DRM rather than Microsoft's. Thus, no matter how she reformulates her claim, it comes back to the theory that Apple should be forced to do business with Microsoft.

### B. *Trinko* and *Aspen Skiing* Govern Refusal-To-Deal Claims.

*Trinko* and *Aspen Skiing* set forth the requirements for this type of claim. Plaintiff concedes this point. She agrees (pp. 8-9) that *Trinko* and *Aspen Skiing* state "the test for determining whether a refusal to deal allegation states a claim under the Sherman Act . . . ." Although she misstates the actual test, the point here is that she acknowledges that those two cases are governing.

The applicable test under those cases is whether the defendant terminated a voluntary course of dealing with the competitor at issue: "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under

SF1-556677v3

- 2 -

1 *Aspen.*" *Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049 (11th Cir. 2004). *See*
2 Motion, pp. 7-9. As *Trinko* and its progeny show, it is not enough to allege in broad terms that a
3 defendant in a refusal-to-deal case engaged in "wilful acquisition or maintenance" of monopoly
4 power by exclusionary conduct. Rather, the standard in this area is much more precise, and
5 requires unilateral termination of a voluntary course of dealing. Otherwise, the standard would
6 be meaningless, and the Supreme Court would have permitted the *Trinko* complaint to proceed
7 on the basis of its general allegations of exclusionary conduct and intent.[1]

    **C.    Tucker's Attempts To Distinguish *Trinko* Are Unavailing.**

Tucker argues (pp. 6-9) that *Trinko* applies only in regulated industries or that, if it applies more broadly, the test for refusal-to-deal claims has nothing to do with termination of a pre-existing, voluntary agreement. Both arguments misstate *Trinko* and have been rejected by the courts.

    **1.    *Trinko* Applies To Regulated And Unregulated Industries Alike.**

*Trinko* is derived from the *Colgate* doctrine that companies, even monopolists, have no antitrust duty to do business with competitors. That doctrine has never been limited to regulated industries. Indeed, the case after which it is named arose in the unregulated "soap and toilet articles" industry. *United States v. Colgate & Co.*, 250 U.S. 300, 302 (1919). Most of the cases applying that doctrine over the last nearly 100 years have been in unregulated industries. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 601 (1986).

The rationale for the *Colgate* doctrine has nothing to do with whether the industry is regulated. As explained in *Trinko*, the rule is designed to protect a company's incentive to invest and innovate, to guard against turning "ill-suited" courts into "central planners" responsible for setting the prices and other terms for forced transactions among competitors, and to avoid the risk of collusion inherent in requiring competitors to cooperate with each other. *See Trinko*, 540

---

[1] Trinko alleged that Verizon breached its duties "in order to limit entry" by competitors and as "part of an anticompetitive scheme" to discourage customers from doing business with the competitors. 540 U.S. at 407, 404. Verizon allegedly "intended to exclude competition from the market 'by making it difficult for its competitors to provide service.'" *Law Offices of Curtis V. Trinko, LLP v. Bell Atlantic Corp.*, 305 F.3d 89, 95 (2d Cir. 2002), *rev'd sub nom. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

SFI-556677v3

- 3 -

1   U.S. at 407-8; Motion, pp. 8-9. These concerns apply to regulated and unregulated industries
2   alike.
3         The Supreme Court affirmed dismissal of Trinko's complaint not because the presence of
4   telecommunications regulation foreclosed antitrust liability; indeed, the Court held that
5   regulation did not preempt the antitrust laws. 540 U.S. at 406-7 (rejecting implied immunity
6   under the 1996 Telco Act and noting that the Telco Act "preserves claims that satisfy existing
7   antitrust standards.") Rather, as a threshold matter, it was the lack of a voluntary course of
8   dealing that precluded refusal-to-deal liability. *Id.* at 409 ("The refusal to deal alleged in the
9   present case does not fit within the limited exception recognized in *Aspen Skiing*. The complaint
10  does not allege that Verizon voluntarily engaged in a course of dealing with its rivals . . . ."). 
11  The Court relied on the existence of regulation to show that Verizon's pre-existing relationship
12  with AT&T was not voluntary; it was compelled by regulation and thus termination of that
13  relationship was not actionable as a refusal-to-deal. The Court did not suggest that the
14  requirement of a pre-existing, voluntary relationship applies only in regulated industries.
15        Tucker's quotations from *Trinko* dealing with telecommunications regulation (p. 7) are
16  stripped of context. After holding that the complaint did not satisfy the *Aspen Skiing* exception
17  to the *Colgate* rule because no pre-existing voluntary course of dealing existed, the *Trinko* Court
18  considered whether to create a new exception. It was at that point that the Court cited the
19  existence of regulation as one of several reasons not to create a new exception. The Court also
20  observed that erroneous rulings in the "difficult" § 2 area would "chill the very conduct the
21  antitrust laws are designed to protect," concluding that the "cost of false positives counsels
22  against an undue expansion of § 2 liability." 540 U.S. at 414 (citation omitted). That
23  consideration applies equally if not more so to unregulated industries.[2] The Court pointed to the

---

[2] This consideration applies here with full effect. As noted in our opening brief (pp. 6-7) and not responded to by plaintiff, forcing Apple to use Microsoft's DRM would reduce Apple's incentive to innovate and develop its own superior product. It would also place Apple at a competitive disadvantage as other competitors develop their own integrated player and music store systems. As noted, Microsoft itself recently announced that it is planning to introduce its own portable digital player to complement its online music store and compete with iPod. And RealNetworks is doing the same thing. *See* Microsoft to Put Zune Experience in Consumers' Hands on Nov. 14, *available at* http://www.microsoft.com/presspass/press/2006/sep06/09-28ZunePricingAvailabilityPR.mspx; *see also* Best Buy, SanDisk, RealNetworks Unveil Player,

SFI-556677v3

- 4 -

1   practical difficulty of providing a remedy in refusal-to-deal cases with no pre-existing course of
2   dealing where the courts would be required to determine the terms for inter-competitor
3   cooperation, a task for which courts are "ill-suited." *Id.* at 414-15 ("We think that Professor
4   Areeda got it exactly right: 'No court should impose a duty to deal that it cannot explain or
5   adequately and reasonably supervise.'"). *See also AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366,
6   428 (1999) (Breyer, J., concurring in part and dissenting in part) ("Even the simplest kind of
7   compelled sharing, say, requiring a railroad to share bridges, tunnels, or track, means that
8   someone must oversee the terms and conditions of that sharing."). This concern is even more
9   acute in unregulated industries where the courts cannot turn to regulation for assistance in
10  fashioning the terms on which competitors must deal with each other.[3]

11  In short, *Trinko*'s observation that Verizon operated in a regulatory environment was
12  relevant in only two ways: first, it showed that Verizon's course of dealing with AT&T was
13  compelled, not voluntary, and thus did not satisfy the *Aspen Skiing* test of a pre-existing
14  voluntary course of dealing; and second, it, along with two other factors, counseled against
15  creating a further exception to the *Colgate* rule. Again, neither the holding nor the rationale of
16  *Trinko* suggests that it is limited to regulated industries.

17  Consistent with *Trinko*, the courts have recognized that *Trinko*'s treatment of refusal-to-
18  deal claims applies equally in unregulated industries. In *United Asset Coverage, Inc. v. Avaya
19  Inc.*, 409 F. Supp. 2d 1008, 1047 (N.D. Ill. 2006), for example, the court relied on *Trinko* in
20  rejecting a refusal-to-deal claim in an unregulated software industry. The two district court cases
21  cited in Tucker's footnote 7 do not support her attempt to limit *Trinko* to regulated industries.
22  *Applied Medical Resources Corp. v. Ethicon Inc.*, 2006 U.S. Dist. LEXIS 12845 (C.D. Cal. Feb.

---

(continued...)

Digital Music Store, *available at* http://www.informationweek.com/story/showArticle.jhtml?articleID=193104971&cid=RSSfeed_I WK_All.

[3] This consideration is particularly apt here, where plaintiffs are asking the Court to regulate the terms on which Apple and Microsoft should do business. *See* Motion, p. 9. Plaintiffs have no answer to the practical difficulties in judicial oversight of a forced relationship between Apple and Microsoft.

SF1-556677v3

- 5 -

1  2, 2006), was not a refusal-to-deal case; it dealt with bundled pricing and other alleged

2  exclusionary conduct. In any event, its effort to distinguish sales of sutures from a

3  "technologically complex, evolving industry" like telecommunications does not aid Tucker given

4  the complex, evolving nature of the industries at issue here. *Stand Energy Corp. v. Columbia*

5  *Gas Transmission Corp.*, 373 F. Supp. 2d 631 (S.D. W. Va. 2005), is too cryptic to be of much

6  value. The issue apparently was whether plaintiffs' reliance on violation of FERC regulations

7  implicated *Trinko*, and the court said nothing about limiting *Trinko* to regulated industries.[4]

8        2.    **Tucker Misstates The *Trinko* Test.**

9  Tucker's suggestion (pp. 10-11) that a voluntary, pre-existing course of dealing, and the

10  defendant's termination thereof, are not prerequisites to an *Aspen Skiing* refusal-to-deal claim is

11  mistaken. *Trinko*—and cases before and after *Trinko*—refute plaintiff's assertion.

12  Even before *Trinko*, courts had recognized that the linchpin of refusal-to-deal liability

13  under *Aspen Skiing* was the defendant's termination of a voluntary course of dealing. As the

14  Ninth Circuit put it, "[l]ike the Supreme Court in *Aspen Skiing*, we are faced with a situation in

15  which a monopolist made a conscious choice to change an established pattern of distribution."

16  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 (9th Cir. 1997)). As the

17  Ninth Circuit repeated in another case, in rejecting a refusal-to-deal claim: "[u]nlike the

18  defendant skiing company in *Aspen*, Delta Dental did not discontinue a marketing arrangement

19  with SmileCare." *SmileCare Dental Group v. Delta Dental Plan*, 88 F.3d 780, 786 (9th Cir.

20  1996).

21  In *Trinko*, the Court emphasized that the defendant in *Aspen Skiing* had terminated a

---

[4] Nothing of precedential value can be inferred from the three cases cited in Tucker's footnote 8. As she admits, none of them even cites *Trinko*, much less addresses whether *Trinko* should be restricted to regulated industries. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Sethy v. Alameda County Water Dist.*, 545 F.2d 1157, 1160 (9th Cir. 1976) (quotation marks and citation omitted). In any event, *Foam Supplies, Inc. v. Dow Chemical*, 2006 U.S. Dist. LEXIS 53497 (E.D. Mo. Aug. 2, 2006), dealt with discriminatory pricing, an issue not present here. *JamSports and Entertainment, LLC v. Paradama Productions, Inc.*, 336 F. Supp. 2d 824, 840 (N.D. Ill. 2006), dealt with "pressuring" other companies not to deal with plaintiff. And *Defiance Hospital v. Fauster-Cameron*, 344 F. Supp. 2d 1097 (N.D. Oh. 2004) did not cite either *Trinko* or *Aspen Skiing*.

SF1-556677v3

- 6 -

long-standing, voluntary course of dealing with plaintiff, and described that case as "at or near the outer boundary of §2 liability." 540 U.S. at 409. The Court held that, by contrast, Verizon could not be charged with actionable refusal-to-deal because there was no allegation that "Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." *Id.*

After *Trinko*, as noted, courts have continued to hold that termination of a pre-existing, voluntary course of dealing is a pre-requisite to refusal-to-deal liability. As the Eleventh Circuit put it: "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under *Aspen*." *Covad Commc'ns*, 374 F.3d at 1049.

The district court in *United Asset Coverage* confirmed this approach. It treated defendant's policy of protecting its proprietary software as a refusal-to-deal claim, and rejected the claim because there was no pre-existing voluntary course of dealing with competitors. As the court explained:

> To be sure, *Aspen Skiing* ... has said that 'the high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.' But more recently, ... *Trinko* ... has made clear that *Aspen Skiing* is a refusal-to-deal decision that 'is at or near the outer boundary of §2 liability.' Even as to a monopolist, [*Trinko*] explains further that the Court has been 'very cautious' to deem a 'refusal to cooperate with rivals' as anticompetitive conduct under Section 2, 'because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm.'"

409 F. Supp. 2d at 1047. With that background, the Court held (*id.*):

> This is plainly a case for inaction, for [defendant's] decisions are well beyond the outer bounds of liability established by *Aspen Skiing*. [Defendant] correctly urges that it has never engaged in any voluntary course of conduct with [plaintiff] or any unauthorized service provider....[5]

The leading antitrust treatise, relied on extensively in *Trinko,* similarly has recognized that the critical fact in *Aspen Skiing* was the "defendant's abandonment of a joint venture initially

---

[5] This case answers plaintiff's truncated discussion (p. 8) of *Aspen Skiing*. The right not to deal with rivals is not absolute, but the exceptions are quite narrow and do not extend beyond the facts of *Aspen Skiing*.

SFI-556677v3

- 7 -

entered voluntarily. The Court did not impose a prospective duty to deal where no such dealing had occurred previously, and there is no reason for thinking that it would have done so." IIIA P. Areeda & H. Hovenkamp, *Antitrust Law,* ¶ 772c3, p. 190 (2d ed. 2002 & Supp. 2003). By stressing that *Aspen Skiing* is "at or near the outer boundary of section 2 liability," 540 U.S. at 409, *Trinko* confirms this reading of *Aspen Skiing.*

There are several reasons that the existence of a prior voluntary course of dealing is critical to imposing refusal-to-deal liability. It shows that defendant considers dealing with its rival desirable, so there is less danger that forcing defendant to continue that particular dealing will diminish incentives to innovate or invest in beneficial facilities. *Id.* at 407-8. It also reduces or eliminates the difficulty courts face in "identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* at 408; *see also id.* at 415 ("An antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations."). As the Ninth Circuit explained, the prerequisite of a pre-existing, voluntary course of dealing is important because it permits a court "to impose a judicial remedy that does not require the court to 'assume the day-to-day controls characteristic of a regulatory agency.' [Instead, t]he court can simply order the defendant to deal with its competitors on the same terms that it already deals with others . . . ." *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1133 (9th Cir. 2004).[6]

Contrary to Tucker's related assertion (pp. 10-11), *Aspen Skiing* and *Trinko* do not impose a duty to deal with rivals simply because the deal would be profitable. Such a lenient test would not meet the policy concerns underlying the *Trinko* rule. It would result in forcing a company to do anything that might turn a profit, even if not efficient, optimal or as profitable as other alternatives. The pre-existing voluntary course of dealing supports an inference that the

---

[6] Contrary to plaintiffs' argument (p. 9), *MetroNet* reaffirmed that termination of a pre-existing, voluntary relationship was a prerequisite to refusal-to-deal liability. It went even further and held that such termination would be actionable only if it entailed "a sacrifice of short-term profits for long-term gain from the exclusion of competition." *Id.* at 1134. *New York Jets LLC v. Cablevision Systems Corp.,* 2005 U.S. Dist. LEXIS 23763 (S.D.N.Y. Oct. 18, 2005), involved not only a refusal to accept advertisements but also efforts to coerce others not to accept the ads. But to the extent that case permits a stand-alone refusal-to-deal claim with no pre-existing voluntary course of dealing, it conflicts with *Trinko.*

SFI-556677v3

- 8 -

1  defendant itself viewed the dealing not only as profitable but as an "optimal distribution pattern"
2  that was "more efficient than alternative patterns." *Aspen Skiing Co. v. Aspen Highlands Skiing
3  Corp.*, 472 U.S. 585, 604 & n.31 (1985). The danger of "false positives"—imposing liability for
4  pro-competitive conduct—would substantially increase if liability for business decisions on
5  whether to deal with rivals turned on an after-the-fact jury determination as to whether the deal
6  would have been profitable. Thus, Tucker's speculation (p. 9) that Apple could have made
7  money licensing its proprietary DRM is irrelevant. What Tucker would need to allege—but does
8  not and cannot allege—is that Apple had a pre-existing licensing arrangement with Microsoft or
9  competitors that it unilaterally terminated.[7]

10  Contrary to Tucker's argument (p. 10), this case is not analogous to *Lorain Journal Co. v.
11  United States*, 342 U.S. 143 (1951). There, the defendant newspaper tried to drive the local radio
12  station out of business by refusing to sell advertisements to anyone who also advertised on the
13  radio station. Here, Apple does not refuse to sell iPods or music to anyone.

### D. Tucker's Fallback Claim That Apple Should Have Licensed Its DRM To Competitors Is Also Groundless.

16  With no real answer to *Trinko* and unable to allege the requisite termination of a pre-
17  existing, voluntary course of dealing, Tucker claims (p. 5) that Apple "misconstrues" her theory.
18  Rather than a claim that Apple should have dealt with Microsoft by licensing its DRM, she now
19  says her real theory is that Apple should have made its products interoperable with competitors
20  in ways that did not involve doing business with Microsoft, including by licensing Apple's
21  FairPlay DRM to competitors.

22  This fallback argument has three fatal flaws. First, it assumes that an antitrust duty exists

---

[7] Apple has "steadfastly refused to license its Fairplay DRM" is what plaintiffs alleged in the companion *Charoensak* case (Document 77, ¶ 45). Tucker's contrary argument in footnote 6 that she can satisfy *Trinko*'s requirement of a pre-existing course of dealing because Apple has dealt with Microsoft in other contexts is insufficient. Not only are the allegations not pled in the complaint, but under *Trinko* the pre-existing course of dealing must be the dealing at issue in the litigation, and the termination of the course of dealing must be the cause of the injury at issue. Here, Tucker does not claim that any of the referenced relationships are relevant to her case, much less that they have been terminated. (The website cited in the footnote relates to unprotected WMA, not WMA protected with Microsoft's DRM).

SF1-556677v3

- 9 -

to make products interoperable where none exists. *See Foremost Pro Color*, 703 F.2d at 542. Plaintiff cites no case holding that such a duty exists. Second, in this case, making products interoperable is really the same as saying Apple should have used the same DRM as its competitors, *i.e.*, Microsoft's. So Tucker is back where she started, faced with the absence of any antitrust duty for Apple to deal with Microsoft. Third, the claim that Apple should have licensed its DRM to competitors suffers the same defect as her original theory. The antitrust laws do not require a company to deal with competitors, either by licensing products to or from them. *See* Motion, p. 9 n.7. Tucker does not address, let alone refute, this point.

## II.   TUCKER'S TYING CLAIM FAILS AS A MATTER OF LAW.

If Tucker were forced to buy an iPod or iTMS music, it would be simple enough for her to so allege. But she does not. Even if she did so allege, the law against tying would still not fit here. It has never been used to force a company to make its products compatible or interoperable with competing products. Nor has it ever been used to prevent a company from developing and using its own technology even if the end result is that its products do not work directly with competing products for certain uses. Rather, the law on tying has been applied only where a company—either expressly or as the result of package pricing—conditions the sale of one product on the purchase of an unwanted product, and where the remedy is simply to require the company to offer the two products separately. Here, there is no allegation that Apple conditions the sale of one product on the purchase of another, either expressly or by package pricing. And Apple already offers the two products separately. As a matter of law, the claim that consumers buy iPods and iTMS music because they work together seamlessly is not an actionable tying claim.

### A.   Tucker Fails To Allege That She Was Coerced In Any Way To Purchase Apple Products.

Coercion is a "significant element of an illegal tying arrangement." *Foremost Pro Color*, 703 F.2d at 540. But Tucker fails to allege that **she** was coerced to buy an iPod or iTMS music. Trying to finesse that failure, she misconstrues Apple's argument as asserting (p. 13) that she failed to allege that "consumers" were coerced. In fact, our argument is that she failed to allege

SFI-556677v3

- 10 -

1  that **she** was coerced. *See* Motion, p. 2 ("[P]erhaps aware that Slattery disavowed his tying
2  coercion claim at deposition, this plaintiff stops short of alleging that Apple forced her to buy
3  either an iPod or music from its online music store."), p. 11 ("Tucker Does Not Allege that
4  Apple Coerced Her to Buy Anything"). Indeed, her complaint says nothing about her
5  circumstances other than that she purchased an iPod from Apple and music from iTunes Music
6  Store, downloaded it to her personal computer where she could play it, and uploaded it to her
7  iPod. ¶ 20. She does not allege that she did not want to do any of this, or that Apple coerced her
8  to do anything. That is fatal to her individual claim.

9  Saying that Apple designed products to "force consumers" at large to buy both of them is
10 not the same as saying that anyone was forced to buy them, much less that she personally was
11 forced to do so. No allegation is made that an individual would buy an iPod only if he had
12 already bought iTMS music, or only as a result of coercion.[8]

13 **B.   The "Package Pricing" Cases Do Not Aid Tucker Because She Does Not
14        Allege "Package Pricing."**

15 Tucker cites several cases in which the courts held that pricing policies that force
16 consumers to buy an unwanted product to obtain a wanted product may constitute unlawful tying.
17 *E.g., Ways & Means v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D. Cal. 1979) (holding that tying
18 may exist where, as a result of the package pricing, "the only viable economic option" is to
19 purchase the tying product and the tied product in a single package); *Amerinet, Inc. v. Xerox
20 Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992) (rejecting tying claim where products were
21 separately available, and package pricing was not extreme). But those cases are expressly
22 limited to package pricing. And Tucker does not allege that Apple engages in any such practice.[9]

---

[8] Any such allegation would be nonsensical given the volume of iPods sold before iTMS was launched. Nor is there any allegation that an individual would buy iTMS music only if he had already bought an iPod. Countless consumers buy iTMS music and play it on their personal computers without ever purchasing an iPod or any other portable digital player.

[9] Indeed, as shown on Apple's website, iPods are separately priced, and iTMS music is separately priced. They are not sold in a bundle—the price for an iPod is the same whether a consumer buys zero or 1,000 songs from iTMS, and the price of a song on iTMS is the same whether or not a consumer buys an iPod.

SFI-556677v3
- 11 -

1  Tucker asserts (pp. 15-16) that an illegal tie occurs unless the two products are separately
2  available to consumers "on a basis as favorable as" the two products together, with the
3  implication that this test is not limited to pricing effects. As support, however, she cites only
4  *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 62 (4th Cir. 1969), another
5  package pricing case where the price of using defendant's copier with a rival's supplies was so
6  high that the Court concluded that the copier and supplies "cannot realistically be regarded as
7  separately available." Nothing in that case suggests that tying can be found absent package
8  pricing that is so extreme that the separate availability of the products is illusory. As noted,
9  Tucker asserts no such claim as to Apple.[10]

10  If *arguendo* the "illusory separate availability" test applied outside the pricing area, it
11  would not be satisfied here. Tucker admits (p. 16) that iPods and iTMS are "separately
12  available." Claiming that they are not interoperable with competitors' products for one
13  purpose—playing digital music directly on a portable player—does not make their separate
14  availability illusory; they can still be used for the other purposes such as playing a CD collection.
15  Nor is this a matter of defining the relevant market for purposes of the § 2 claim. Regardless
16  whether digital and non-digital music, or portable and stationary players, are in the same relevant
17  market, iPods and iTMS music are separately available even if they are not directly interoperable
18  with competitors' products for one particular use. To succeed on this point, even assuming
19  "illusory separate availability" applied outside the pricing area (and doing so would be
20  unprecedented and would raise the serious problems discussed in the next section), plaintiff
21  would need to allege at a minimum that iPods and iTMS cannot be used independently for any
22  reasonable purpose. She does not and cannot make that allegation.

23  Tucker asserts (p. 14; emphasis added) that "overwhelming authority establish[es]
24  coercion where **exclusionary design** forces a consumer to purchase the tying and tied products

---

[10] In *Murphy v. Business Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 (9th Cir. 1988), the Ninth Circuit rejected a tying claim where plaintiffs failed to assert or prove that they were persuaded by defendant to buy an equipment package from defendant rather than elsewhere. Contrary to plaintiffs' suggestion (p. 14), the court's truncated statement of the elements of tying have never been interpreted as eliminating the requirement of explicit tying or tying enforced by extreme package pricing.

1  together." But the only authority cited relates to "package pricing." No case holds or suggests
2  that it is an unlawful tie to make complementary products that work better with each other than
3  with competitors' versions, or products that are not interoperable with competitors'. Indeed, the
4  Supreme Court rejected that approach, holding that no tying arrangement exists where the buyer
5  purchases the second product on account of its "intrinsic superiority." *North Pac. Ry. Co. v.*
6  *United States*, 356 U.S. 1, 11 (1958).[11] Otherwise, every time a seller of a product with market
7  power also sold accessories that enhanced the usefulness of that product and were superior to
8  those sold by its competitors, it would be liable for tying if they were not also interoperable with
9  competitors. The negative impact of such a rule on a company's incentive to innovate and
10 develop superior products is manifest.

    **C.    No Court Has Ever Found Unlawful Tying On The Basis That One Company's Products Are Interoperable with Each Other But Not With Competitors' Products.**

14  Tucker has no persuasive answer to the Ninth Circuit's holding in *Foremost Pro Color*
15 that "the introduction of a system of technologically related products . . . **even if the new**
16 **products are incompatible with the products then offered by the competition**," does not
17 constitute coerced or forced purchase of two products. 703 F. 2d at 542-44 (emphasis added).
18 Tucker argues only (p. 19) that *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984),
19 "rejected this defense." But *Jefferson Parish* dealt with hospitals and anesthesiological services,
20 not with technologically related products incompatible with competitors' products. *Jefferson*
21 *Paris* noted that "functionally linked products" like salt and salt machines in the classic example
22 could be considered separate products for tying purposes. *Id.* at 20-21. It did not say that
23 "functionally linked" products are unlawful tying arrangements where sold separately. In other
24 words, salt and a salt machine are considered separate products for a tying analysis even though

---

[11] Contrary to Tucker's argument (p. 17), *Northern Pacific Railway* did not eliminate the coercion element. Indeed, the coercion element was satisfied by proof that lessees of land from defendant railroad were forced to purchase transportation services from the railroad as a condition of leasing land. That the requirement was enforced only when the transportation services were competitively priced did not eliminate the coercive effect of the contractual provision. 356 U.S. at 11-12.

SF1-556677v3

1  they are functionally related. But that does not mean that they constitute an unlawful tie where
2  available separately. The vice in *International Salt Co. v. United States*, 332 U.S. 392 (1947),
3  was not that the defendant sold "functionally linked" products separately—it was that the
4  defendant refused to sell salt and salt machines separately.

5  Tucker misunderstands (pp. 17-18) the purpose of our discussion of *International Salt*
6  and *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992). *Compare* Motion,
7  pp. 14-15 *with* Opp., pp. 17-19. The point is that tying law has never been used to force one
8  company to do business with a competitor or to make their products interoperable, and is not
9  well-suited for that purpose. It is one thing for a court to require International Salt to offer its
10 machines for sale without forcing customers to buy salt from it, or for Kodak to sell copiers and
11 service separately. But here Apple already sells its player and music separately. So plaintiff
12 wants the Court to intervene in the design of the iPod or iTMS, and require Apple to license
13 Microsoft's DRM. Tucker has no answer to the practical problems that this unprecedented use
14 of tying law would foster. Nor does Tucker have any response to our showing that tying law has
15 never been applied where the remedy would require a court to supervise the defendant's efforts
16 to make its products interoperable with competitors' products.[12]

17 This is a telling point. To avoid liability under plaintiffs' theory, it would not be enough
18 for Apple to sell iPods and music separately. Nor would it be enough for Apple to design iPods
19 so they play music from sources other than iTMS (such as CD collections). All of that is already
20 true, and plaintiff does not contend otherwise. But unlike every other tying case, that is not
21 enough to avoid liability under plaintiff's theory. Rather, Apple would be required to license
22 Microsoft's DRM (or to license Apple's proprietary DRM to competitors) so that an iPod could

---

[12] Nothing in *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), supports Tucker's theory. There, the allegation the Court relied on was not simply that Microsoft's browser worked better with its operating system. It was instead that Microsoft physically integrated the browser in the operating system and refused to allow most OEMs to uninstall the browser or consumers to choose another browser. *Id.* at 66. No such allegations are made here. Moreover, unlike plaintiff's theory here, Microsoft was not required to license anyone else's technology, or license its own technology to anyone else.

SFI-556677v3

play music, directly rather than indirectly as it now can do, from competing music stores, and so that iTMS music could be played, again directly, on non-iPod portable digital players. The policy concerns on which the Supreme Court rested its decision in *Trinko* apply equally in this context. Innovation would be chilled; courts would be called on to supervise forced dealings among competitors; and requiring competitors to cooperate rather than compete would increase the risk of collusion. *See Trinko*, 540 U.S. at 408; Motion, pp. 7-8.

In short, tying law is not designed to cure all potential competitive problems. It applies in the relatively narrow circumstances where a company refuses to sell two products separately or uses a pricing structure that makes the separate availability illusory, and where a simple remedy is available. Here, no allegation is made that Apple does either, and forcing Apple to make its products interoperable would not be a simple remedy.

In all events, as shown above, no allegation is made that the plaintiff herself was coerced to buy either product.

### III. STATE LAW CLAIMS

Tucker does not dispute that if her federal antitrust claims are dismissed, her state antitrust claims should also be dismissed. She simply argues the flip side that if the federal claims are not dismissed, the state claims should not be either.

### CONCLUSION

For these reasons, the motion to dismiss the antitrust claims should be granted. Tucker has not proffered any new allegations that would cure the defects of her complaint. So the motion should be granted without leave to amend.

Dated: November 7, 2006

Respectfully submitted,

JONES DAY

By:   /s/ Robert A. Mittelstaedt
Robert A. Mittelstaedt

Counsel for Defendant

SFI-556677v3