# EXHIBIT 14

1   Robert A. Mittelstaedt #060359
    Caroline N. Mitchell #143124
2   Adam R. Sand #217712
    JONES DAY
3   555 California Street, 26th Floor
    San Francisco, CA  94104
4   Telephone:    (415) 626-3939
    Facsimile:    (415) 875-5700
5   ramittelstaedt@jonesday.com
    cnmitchell@jonesday.com
6   arsand@jonesday.com

7

    Attorneys for Defendant
8   APPLE COMPUTER, INC.

9

10              **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN JOSE DIVISION**

13

14   MELANIE TUCKER, On Behalf Of          **Case No. C 06 4457 HRL**
     Herself  And All Others Similarly Situated,
15                                          **CLASS ACTION**
                 Plaintiff,
16                                          **DEFENDANT'S NOTICE OF MOTION
         v.                                 AND MOTION TO DISMISS ANTITRUST
17                                          CLAIMS**
     APPLE COMPUTER, INC., a California
18   Corporation                           **DATE:**    September 26, 2006
                                            **TIME:**    10:00 a.m.
19               Defendant.                 **JUDGE:** Honorable Howard R. Lloyd
                                            **COURTROOM:**  2
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

COMPLAINT ........................................................................................................... 3

ARGUMENT ........................................................................................................... 4

I.      TUCKER'S SECTION 2 ALLEGATIONS FAIL TO STATE A CLAIM ...................... 5

    A.      Plaintiffs Must Allege Actionable Exclusionary Conduct, i.e., A Refusal to Deal ...................................................................................................... 5

    B.      Tucker's Allegations ...................................................................................... 6

    C.      Under Trinko, These Allegations Do Not Constitute An Actionable Refusal to Deal ................................................................................................ 7

        1.      Under Trinko, Refusal-to-deal Claims Are Actionable Only Under Narrow Circumstances Not Present Here. .............................. 7

        2.      The Trinko Analysis Disposes Of Tucker's Monopolization Claims .................................................................................................. 8

    D.      This Court's Slattery Decision ...................................................................... 10

II.     TUCKER'S TYING ALLEGATIONS FAIL TO STATE A CLAIM ........................... 11

    A.      Tucker Does Not Allege That Apple Coerced Her To Buy Anything ............ 11

    B.      Tucker's Tying Theory Is Unprecedented and Wrong Because It Would Force Apple to Do Business with Microsoft ................................................. 13

    C.      This Court's Slattery Decision ...................................................................... 14

III.    FOR THE SAME REASONS, TUCKER'S STATE LAW ANTITRUST CLAIMS FAIL TO STATE A CLAIM ................................................................. 15

CONCLUSION ...................................................................................................... 16

i

# TABLE OF AUTHORITIES

**Page**

Cases

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
472 U.S. 585 (1985).................................................................................8

*Berkey Photo v. Eastman Kodak Co.*
603 F.2d 263 (2d Cir. 1979)......................................................................6

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*
509 U.S. 209 (1993).................................................................................6

*Covad Communications Co. v BellSouth Corp.*
374 F.3d 1044 (11th Cir. 2004) ..................................................................8

*Eastman Kodak Co. v. Image Technical Servs., Inc.*
504 U.S. 451 (1992)...........................................................................14, 15

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*
703 F.2d 534 (9th Cir. 1983) ...............................................................11, 12

*Independent Serv. Orgs. Antitrust Litig.*
203 F.3d 1322 (Fed. Cir. 2000) ................................................................10

*Innovation Data Processing, Inc. v. IBM Corp.*
585 F. Supp. 1470 (D.N.J. 1984) ...............................................................13

*International Salt Co. v. United States*
332 U.S. 392 (1947)...............................................................................14

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*
466 U.S. 2 (1984)..................................................................................11

*Metro Mobile CTS, Inc. v. New Vector Communication, Inc.*
892 F. 2d 62 (9th Cir. 1989) .....................................................................5

*Northern Pac. Ry. Co. v. United States*
356 U.S. 1 (1958)..................................................................................11

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car, Sys., Inc.*
732 F.2d 1403  (9th Cir. 1984) .................................................................12

*Schor v. Abbott Laboratories*
2006 WL 2062117 (7th Cir. July 26, 2006)....................................................2

*Slattery v. Apple Computer, Inc.*
No. C 05-00037 JW, 2005 WL 2204981 (N.D. Cal. Sept. 9, 2005).......................1, 5, 10, 14, 15

*Spectrum Sports, Inc. v. McQuillan*
506 U.S. 447 (1993)...............................................................................10

**TABLE OF AUTHORITIES**
(continued)

                                                                                                    **Page**

*United States v. Colgate & Co.*
   250 U.S. 300 (1919)...................................................................................................7

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*
   540 U.S. 398 (2004)...................................................................2, 5, 6, 7, 8, 9, 10, 14

*Vinci v. Waste Management, Inc.*
   36 Cal. App. 4th 1811 .............................................................................................15

Statutes

Sherman Act § 2 .........................................................................................5, 7, 8, 9, 10

### NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on September 26, 2006 at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 2 of the above-captioned Court,[1] defendant Apple Computer, Inc. (Apple) will bring for hearing this motion for an order, pursuant to Federal Rule of Civil Procedure 12(b)(6), dismissing Counts I through IV and VII from the complaint filed by Melanie Tucker on July 21, 2006.

### RELIEF SOUGHT

Dismissal of Counts I through IV and VII with prejudice, without leave to amend.

### MEMORANDUM

### INTRODUCTION

We recognize that this Court denied a motion to dismiss the antitrust claims in *Slattery v. Apple Computer, Inc.*, Case No. C 05-00037 JW, and that one would normally expect the same fate for a similar motion in this new related case. But this complaint is different from the *Slattery* complaint in a significant respect which, as we show below, demonstrates the fundamental flaw in the antitrust theory on which both complaints are premised.

The *Slattery* complaint portrayed Apple's use of digital rights management software or DRM as a sinister way to make its products incompatible with competitors' products. This complaint, however, explicitly admits that the major record companies that own the music at issue **require** Apple and the other online digital music stores to use DRM to address piracy problems. Use of DRM is what separates the legal online digital music stores from the illegal peer-to-peer websites. Without DRM, legal online music stores would not exist. Thus, this complaint does not challenge Apple's use of some form of DRM. Rather, it attacks Apple's decision to develop and use its own DRM rather than licensing and using Microsoft's.

---

[1] Apple has filed a Request for Reassignment and stipulated that this case is related to *Slattery v. Apple*. Assuming that this case is reassigned to Judge Ware, we ask that the hearing on this motion be held on September 25, 2006 at 9:00 a.m. in Judge Ware's courtroom.

1

1    As a matter of antitrust law, however, that theory is so unsupportable that plaintiff cannot

2  bring herself to identify Microsoft as the maker of the software that she contends Apple should

3  be forced to use. Enhancing Microsoft's dominance is obviously not a goal of the antitrust laws.

4  But the central flaw of this complaint is much broader than that. No matter who makes the

5  software, the antitrust laws simply do not require Apple or anyone else to use another company's

6  technology. As Judge Easterbrook put it, "[c]ooperation is a *problem* in antitrust, not one of its

7  obligations." *Schor v. Abbott Laboratories*, 2006 WL 2062117, at * 1 (7th Cir. July 26, 2006)

8  (emphasis in original). The antitrust laws encourage competitors to compete, not cooperate.

9  That is why no antitrust case in history has found a company liable for developing its own

10  technology rather than paying a competitor to use its technology. As the Supreme Court

11  reaffirmed in *Verizon Communications Inc. v. Trinko*, 540 U.S. 398, 408 (2004): "the Sherman

12  Act does not restrict the long recognized right of [a] trader or manufacturer . . . freely to exercise

13  his own independent discretion as to parties with whom he will deal." (citation omitted).

14    Plaintiff's related tying claim is ultimately based on the same faulty premise as her

15  monopolization claim—namely, that Apple supposedly must make its products compatible with

16  competitors' products by dealing with Microsoft rather than using Apple technology. The law

17  of tying, however, was designed to prevent a seller from refusing to sell one product unless

18  consumers agree to buy a second product that they do not want. It was not designed to force

19  companies to make their products compatible with competitors' products by using someone

20  else's technology.

21    Moreover, perhaps aware that Slattery disavowed his tying coercion claim at deposition,

22  this plaintiff stops short of alleging that Apple forced her to buy either an iPod or music from its

23  online music store. From all that appears in the complaint, she bought an iPod and obtained

24  music from the iTunes Music Store simply because they are superior products that work well

25  with each other. Coercion is a basic prerequisite of a tying claim. Without it, a tying claim fails

26  at the threshold.

27    In short, making complementary, innovative products that work seamlessly together is a

28  plus for consumers, not an antitrust violation. Indeed, recognizing the value of this approach,

MOT. TO DISMISS
Case No. C 06 4457 HRL

1  Microsoft itself recently announced that it is planning to introduce its own portable digital player

2  to complement its online music store and compete with iPod.[2]

3         For these reasons, the federal and state antitrust claims should be dismissed.

4                                    **COMPLAINT**

5         The pertinent allegations in the complaint, taken as true only for purposes of this motion,

6  can be summarized as follows.

7         The major record companies license their music to legal online music stores. Compl. ¶

8  34. Due to the "increasing problem of music piracy," the record companies are willing to do so

9  only if the music stores use "protected formats" when they sell the music. ¶ 34. The protected

10  format now used by most online music stores is the "WMA format."[3] ¶ 35. Online stores that

11  use the WMA format include America Online, Wal-Mart, (the new) Napster, MusicMatch, Best

12  Buy, Yahoo! Music, FYE Download Zone, and Virgin Digital. ¶ 35. (Tucker omits Microsoft's

13  online store, MSN Music.)[4]

14         Consumers buy music from these online stores to play on their home computers or

15  digital music players. ¶ 41. Most digital players "support" the WMA format (¶ 36), meaning

16  that the manufacturers have licensed WMA from Microsoft and thus their players can play files

17  in that format. (Microsoft's "Playsforsure" webpage lists 126 digital music players that support

18  WMA, made by 12 different companies including Creative Labs, Gateway, iRiver, Samsung and

19  Toshiba to name a few. *See* http://www.playsforsure.com.). Apple could license WMA for

20  $800,000 per year. ¶ 40. Instead of doing so, Apple uses its own protected format called

21  FairPlay. ¶ 37. The result is that the Microsoft licensees' products are allegedly incompatible

22  with Apple's products: WMA music cannot be played on Apple's players, and Apple's music

23

24         [2] *See* Ina Fried, "Microsoft's Zune to rival Apple's iPod," CNET News.com (July 21, 2006), *available at* http://news.com.com/Microsofts+Zune+to+rival+Apples+iPod/2100-

25  1041_3-6097196.html.

26         [3] This presumably refers to Microsoft's Windows Media Audio DRM which like plaintiff we refer to hereinafter as WMA. *See* http://www.microsoft.com/windows/

27  windowsmedia/forpros/ codecs/audio.aspx.

28         [4] *See* http://www.microsoft.com/windows/windowsmedia/player/10/ onlinestores.aspx.

1    cannot be played on WMA players.[5]  That is what the complaint means when it says that if

2    consumers who purchase music from Apple want to play it on a portable digital player, the iPod

3    is their only choice, and iPod owners' "only option to purchase online music is to purchase from

4    Apple's Music Store." ¶¶ 38, 41-42.

5        Turning to her own situation, Tucker alleges that, in April 2005, she purchased an iPod

6    from Apple and, beginning the same month and continuing to the present, she purchased music

7    from iTunes Music Store. ¶¶ 18-19.  She downloaded the music to her personal computer where

8    she could play it. ¶¶ 19-20.  She also uploaded it to her iPod. ¶ 20.

9        As noted, Tucker does not allege that she did not want to do any of this, or that Apple

10    coerced her to do anything.  In particular, she does not allege that Apple refused to sell an iPod

11    to her unless she also agreed to buy music from Apple, or that Apple refused to sell music to her

12    unless she also bought an iPod.  Nor does she allege that iTMS is the only source for music for

13    an iPod, or that an iPod is the only device that will play iTMS music.  Indeed, she acknowledges

14    that she can play the music on her personal computer.  ¶¶ 19, 41.

15        For her federal law claims, Tucker asserts unlawful tying with the iPod and iTMS

16    music/video as both the tying and tied products (Count I); monopolization of a "digital music

17    player market" (Count II); and attempted monopolization of that "market" as well as online

18    video and music "markets" (Count III).  For her state law claims, she asserts that the same

19    conduct violates the Cartwright Act (Count IV), common law (Count VII) and California's

20    Unfair Competition Law (UCL) (Count V).  She adds a UCL fraud claim (Compl. ¶ 111) and a

21    claim of unconscionability under the California Consumer Legal Remedies Act (Count VI).[6]

22                           **ARGUMENT**

23        Underlying each of Tucker's antitrust claims is the premise that the antitrust laws require

24    Apple to use Microsoft's WMA rather than its own DRM.  The actual and attempted

25

26        [5]  Unlike Slattery's complaint, Tucker does not acknowledge that iTMS music can be
played on Microsoft-type players by burning the music to a CD first, or that an iPod can play
27    music from other online stores in the same way.

        [6]  Tucker alleges the relevant geographic market is the United States, making her
28    allegations in ¶¶ 46-52 about Europe immaterial.

MOT. TO DISMISS
Case No. C 06 4457 HRL

1   monopolization claims are a direct attack on Apple's unilateral business decision not to do

2   business with Microsoft in this respect. Those claims fail because the Supreme Court's decision

3   in *Trinko,* 540 U.S. 398 (2004), makes clear that a competitor's refusal to do business with

4   another competitor does not violate Sherman Act § 2. Indeed, § 2 protects a company's right to

5   refuse to do business with anyone except in very narrow circumstances not present here. It

6   would stand the antitrust laws on their head to interpret them as relegating Apple to using

7   Microsoft's technology rather than developing better technology.

8        The tying claim attacks the same business decision, albeit more indirectly. The essence

9   of the tying claim is that, because Apple uses its own DRM, its products are allegedly

10   incompatible with the products of Microsoft's licensees and thus, if Apple iPod owners want

11   compatible online music, Apple's music store is the only option. That theory fails because the

12   elements of unlawful tying are not present. And where the underlying conduct leading to the

13   alleged tie is protected by § 2 it would be contrary to the purposes of the antitrust laws to expand

14   the tying law to prohibit the conduct.

15   **I.**     **TUCKER'S SECTION 2 ALLEGATIONS FAIL TO STATE A CLAIM.**

16       **A.**    **Plaintiffs Must Allege Actionable Exclusionary Conduct,** *i.e.,* **A Refusal-to-**

17            **deal.**

18        Broadly stated, a claim for monopolization requires the plaintiff to allege facts sufficient

19   to show that, first, defendant has monopoly power in relevant markets; second, that it "wilfully

20   acquired or maintained" that power; and third, that it caused antitrust injury. *See Slattery,* 2005

21   WL 2204981 at *4. This motion focuses on the second requirement—wilful acquisition or

22   maintenance.[7] Given the ambiguity of that formulation, the courts have interpreted it to require

23   allegations of specific anticompetitive conduct such as predatory pricing (*e.g., Brooke Group*

24

25        [7] Tucker's allegations of monopoly power and relevant markets, although not a subject

26   of this motion to dismiss, are demonstrably false. For example, legal online digital music stores
clearly compete with illegal online services and traditional brick-and-mortar stores. The large

27   number of competing online stores and digital music players shows the absence of barriers to
entry, as does Microsoft's announced entry into both lines of business. And market shares do

28   not establish market power in nascent, emerging businesses. *Metro Mobile CTS, Inc. v. New
Vector Comms., Inc.,* 892 F. 2d 62, 63 (9th Cir. 1989).

1    *Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)); refusals-to-deal (*e.g.*,

2    *Trinko*); or some other cognizable unlawful exclusionary conduct (*e.g.*, *Berkey Photo v.*

3    *Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (product disparagement)).

4         As in *Trinko*, the claim of exclusionary conduct here is necessarily a claim of a refusal to

5    deal.  If the only way that the defendant could avoid alleged liability is by entering into a

6    transaction with another company, it is a refusal to deal claim and must be analyzed under the

7    *Trinko* standards.

8         **B.    Tucker's Allegations.**

9         We start with what Tucker does not allege.  She does not challenge Apple's decision to

10   use some form of DRM.  Indeed, she acknowledges that the major record companies require

11   Apple and the other online digital music stores to use some form of DRM to discourage piracy.

12   She does not challenge the usage rules that the DRM is used to enforce, *e.g.*, the number of

13   devices on which a song may be stored or the number of times a playlist can be copied.  Nor

14   does she deny that consumers may buy music from AOL, MSN, Virgin Digital, Wal-Mart or

15   Yahoo (to name a few of the Microsoft licensees) and play that music not only on PCs but also

16   on any of the 126 portable digital music players made by the dozen companies that have

17   licensed Microsoft's WMA.

18        Instead, Tucker challenges only Apple's decision to develop and use its own DRM rather

19   than licensing and using Microsoft's WMA.  Her theory is that because most online digital

20   stores and most manufacturers of digital music players now use Microsoft's DRM, Apple should

21   be forced to do the same.  She alleges that, because Apple uses a different DRM, its iPod and

22   online digital music are not compatible with music or players from companies that use

23   Microsoft's DRM.  According to Tucker, if Apple paid Microsoft up to $800,000 a year to

24   license Microsoft's DRM, Apple's iPod and iTMS music could be made compatible with the

25   digital music and digital players sold by Microsoft's licensees like Yahoo and Creative. ¶¶ 33-40.

26

27

28

C.    **Under *Trinko*, These Allegations Do Not Constitute An Actionable Refusal to Deal.**

Apple's decision to use its own DRM rather than pay $800,000 a year to use Microsoft's is not an unlawful exclusionary act. No antitrust court has ever condemned a company for choosing not to pay a competitor for its technology rather than developing its own. Far from condemning Apple's refusal to deal with Microsoft, the antitrust laws encourage companies to compete rather than cooperate. Those laws safeguard the incentive to innovate. The rationale is that long-term consumer welfare is enhanced by competition and innovation even if some products are incompatible with others as a result of the competition and innovation.

1.    **Under *Trinko*, Refusal-to-deal Claims Are Actionable Only Under Narrow Circumstances Not Present Here.**

In *Trinko*, affirming dismissal of a monopolization complaint at the pleading stage, the Supreme Court held that, subject to very narrow exceptions, companies do not have any antitrust duty to cooperate and share their facilities with competitors even though consumers would allegedly benefit from the cooperation. The Court relied on the *Colgate* rule that "the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408, *quoting United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

The Court rested its decision on three policy grounds. *Id.* at 407-08. First, requiring companies to cooperate is in "some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* Second, "[e]nforced sharing . . . requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* at 408. Finally, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.*

The Court stressed that the exceptions in which a refusal to cooperate with rivals may constitute anticompetitive conduct are narrow: "We have been very cautious in recognizing

7

1    such exceptions, because of the uncertain virtue of forced sharing and the difficulty of

2    identifying and remedying anticompetitive conduct by a single firm." *Id.* at 408.  The exception

3    permitted in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), was "at or

4    near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409.  In *Aspen Skiing* the defendant

5    owner of three of four mountains in the Aspen area had cooperated with the plaintiff, who

6    owned the fourth mountain, to offer joint, multi-day, all-area ski tickets.  After years of such

7    cooperation, defendant canceled the joint tickets and refused even to permit plaintiff to buy

8    defendant's tickets at retail prices.  *Aspen Skiing*, 472 U.S. at 593-94.  The Court upheld a jury

9    verdict for plaintiff, reasoning that the jury could reasonably conclude that defendant "elected to

10   forgo these short-run benefits because it was more interested in reducing competition . . . over

11   the long run by harming its smaller competitor." *Id.* at 608.

12          In *Trinko*, the Court contrasted the facts before it with the key aspects of *Aspen Skiing*.

13   In *Aspen Skiing* the defendant had voluntarily entered into a course of dealing and "had

14   cooperated for years" with its competitor, after which it had unilaterally terminated a voluntary

15   relationship. *See Trinko*, 540 U.S. at 408-09.  This was central to the Court's decision because

16   the prior course of dealing was presumed to be profitable and abandoning it suggested a

17   willingness to foresake short-term profits to achieve an anticompetitive end. *Id.* at 409.  By

18   contrast, in *Trinko*, there was no allegation that "Verizon voluntarily engaged in a course of

19   dealing with its rivals, or would ever have done so absent statutory compulsion." *Id.*

20          **2.    The *Trinko* Analysis Disposes Of Tucker's Monopolization Claims.**

21          As in *Trinko* and unlike *Aspen Skiing*, Tucker is not alleging that Apple cut off a

22   voluntary course of dealing.  Instead, she asserts that Apple has refused to deal with Microsoft,

23   period.  This dooms her claim. *See Covad Comms. Co. v BellSouth Corp.*, 374 F.3d 1044, 1049

24   (11th Cir. 2004) ("*Trinko* now effectively makes the unilateral termination of a voluntary course

25   of dealing a requirement for a valid refusal-to-deal claim under *Aspen*").

26          The same policy reasons cited by the Supreme Court apply here.  First, as in *Trinko*,

27   forcing Apple to deal with others "may lessen the incentive" for Apple or rivals to innovate and

28   invest in "economically beneficial facilities." *Trinko*, 540 U.S. at 408.  Indeed, if Tucker's

1  theory were the law and Apple were forced to use Microsoft's technology, Apple would have

2  had no incentive to innovate and develop its own. And the ability of Apple to provide the

3  seamless iPod/iTMS integration valued by consumers would be dependent on how well or

4  poorly a Microsoft product works.

5      Second, forcing Apple to deal with Microsoft would require antitrust courts "to act as

6  central planners, identifying the proper price, quantity, and other terms of dealing—a role for

7  which they are ill-suited." *Id.* If Apple were required to license Microsoft's WMA, at what

8  price and on what terms? What standards would this Court use in determining the price and

9  terms? Would Apple be required to license WMA even though it would give Microsoft a

10 monopoly in the DRM market? What if consumers complain that the Microsoft technology does

11 not work as well as Apple's? Would all other competitors be required to do the same thing,

12 ensuring a monopoly for Microsoft? And what if Microsoft attempted to extract a higher price

13 once Apple designed its products to use Microsoft's software? When Microsoft starts selling its

14 own digital music player to complement its online music store, attempting to emulate Apple's

15 seamless integration (*see* n.2, *supra*), would Apple still be required to use the Microsoft

16 technology?

17     Third, theoretically at least, forcing Apple to negotiate with rivals "may facilitate the

18 supreme evil of antitrust: collusion." *Id.* The bias of the antitrust laws is that consumers are

19 better off with companies competing rather than cooperating—and for the marketplace rather

20 than the courts to answer the questions noted above. *Trinko*, in short, stands for the proposition

21 that the Courts should not encourage cooperation that could lead to collusion.

22     The applicability of *Trinko* is not altered by Tucker's allegations regarding the central

23 processing chip used in the iPod. Compl. ¶¶ 37-39. She claims that the chip is capable of

24 supporting WMA but that Apple does not use that capability because it does not have a license

25 from Microsoft to do so. Whether characterized as "disabling" the chip, as Tucker does, or

26 simply as not using the capability that would require a license from Microsoft, the antitrust

27 analysis under *Trinko* is the same. Absent a voluntary and thus presumably profitable pre-

28

MOT. TO DISMISS
Case No. C 06 4457 HRL

1  existing course of dealing with Microsoft, Apple has no antitrust duty to do business with

2  Microsoft.[8]

3      In short, Tucker alleges nothing more than a consistent refusal by Apple to license

4  Microsoft's product. That claim is insufficient as a matter of law and should be dismissed.

5      Tucker's attempt to monopolize claims fail for the same reason. An essential element is

6  "predatory or anticompetitive conduct." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456

7  (1993) (citing multiple cases). Here, for the same reasons that Apple's refusal to deal with

8  Microsoft cannot be found exclusionary, it cannot be deemed anticompetitive. *See Trinko*, 540

9  U.S. at 841 (leveraging "presupposes anticompetitive conduct, which in this case could only be

10 the refusal-to-deal claim we have rejected.")

11     **D.    This Court's *Slattery* Decision.**

12     In *Slattery*, this Court denied the motion to dismiss the monopolization claim. The Court

13 held that the allegation that Apple had "rigged" the operating AAC codec format and the

14 firmware in the iPod, if proven, "could be found to suggest the conclusion that Defendant has

15 wilfully acquired or maintained" monopoly power. Slattery argued that this rigging satisfied the

16 requirement in *Trinko* of a pre-existing, voluntary course of dealing, the termination of which

17 may be actionable refusal to deal. The Court did not expressly address the *Trinko*-based

18 argument. *See Slattery*, 2005 WL 2204981, at *4.

19     By contrast, Tucker does not allege that Apple "rigged" anything. Instead, as noted,

20 Tucker's focus is on Apple's decision not to license and use WMA. Although we think the

21 same argument underlies Slattery's claim, Tucker is much clearer that this is her claim.

22 Tucker's claim therefore is a refusal-to-deal claim, and under *Trinko* it falls short. Because

23

24     [8] The complaint does not, and cannot, allege that Apple is obligated to license its DRM
   to competitors. Courts have repeatedly held that § 2 does not require even a dominant firm to
25 create competition against itself within its own technology by licensing intellectual property to
   rivals. In *Independent Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000), the
26 Federal Circuit held that refusals to license are beyond the reach of the Sherman Act, absent a
   showing of tying, sham litigation or fraud in obtaining the intellectual property rights. Even any
27 resulting market power from control of a patent "does not impose on the intellectual property
   owner an obligation to license the use of that property to others." *Id.* (citations omitted).
28 Moreover, after *Trinko*, any refusal-to-deal claim requires proof of a pre-existing voluntary
   course of dealing.

                                                              MOT. TO DISMISS
                                                              Case No. C 06 4457 HRL

1    plaintiff Trinko failed to meet the requirements for a refusal-to-deal claim, the Supreme Court

2    affirmed dismissal of the monopolization complaint at the pleading stage without permitting the

3    plaintiff to fall back on a generic "wilful maintenance" claim. *See Trinko*, 540 U.S. at 415.

4    Likewise here, Tucker's Section 2 claims should be dismissed at this pleading stage because the

5    only allegedly anticompetitive conduct is a refusal-to-deal claim that does not satisfy the *Trinko*

6    requirements.

7    **II.    TUCKER'S TYING ALLEGATIONS FAIL TO STATE A CLAIM**

8        Tucker's tying claim is premised on the same faulty theory—that Apple should have

9    used Microsoft's DRM—but is even more attenuated.  The law on tying addresses a narrow

10   category of anticompetitive conduct, namely where a seller offers to sell a product for which it

11   has market power only if consumers agree to buy an unwanted product at the same time.  It was

12   never intended, and has never been applied, to bar a company from developing and marketing

13   complementary, integrated products that work together seamlessly.  And it certainly has never

14   been applied to require one company to license something from a competitor so as to make their

15   products more compatible.  Applying tying law in that manner would discourage innovation by

16   making the development of complementary products much more expensive if not impossible.

17   And in this case, extending tying law to these circumstances would further enhance Microsoft's

18   dominance of the DRM market.

19       **A.    Tucker Does Not Allege That Apple Coerced Her To Buy Anything.**

20       A tying arrangement is "an agreement by a party to sell one product but only on the

21   condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v.*

22   *United States*, 356 U.S. 1, 5-6 (1958) (footnote omitted).  The element of "forcing" or

23   "coercion" to purchase the second, unwanted product is essential. *Jefferson Parish Hosp. Dist.*

24   *No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d

25   534, 540 (9th Cir. 1983) (coercion is "significant element of an illegal tying arrangement").

26   "[W]here the buyer is free to take either product by itself there is no tying problem." *Jefferson*

27   *Parish*, 466 U.S. at 12, n.17 (quoting *North Pac. Ry. Co.*, 356 U.S. at 6 n.4).  No tying exists

28   where the buyer purchases the second product on account of its "intrinsic superiority" rather

                                                    11                          MOT. TO DISMISS
                                                                          Case No. C 06 4457 HRL

1    than any coercion by the seller. *North Pac. Ry Co.*, 356 U.S. at 10-11; *see also Robert's Waikiki*

2    *U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984) (no tying

3    where an airline and a rental car company offered a package deal with discounted rates on

4    airfare and rental car fees but consumers were free to purchase airline travel and rental car

5    services separately, albeit at a higher price).

6         Tucker's allegations as to her individual situation do not meet this standard. She alleges

7    only that she bought both products—not that she was coerced to do so, not that she did not want

8    either product, and not that Apple refused to sell the two products separately. Some people buy

9    iPods and never buy music from iTMS. Other people buy music from iTMS and never buy an

10    iPod. That some people, like Tucker, choose to buy both does not constitute unlawful tying.

11         Alleging that one product is the "only option" available for using the other product in a

12    complementary, integrated way does not suffice. As noted, tying law was never intended and

13    has never been applied to prevent development of products that work well together. In

14    *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), the Ninth Circuit

15    considered a tying challenge to Kodak's decision to introduce its Instamatic camera, a new film

16    and developing process, and the equipment necessary to process the new film. A competitor

17    alleged an unlawful tying arrangement because the new Kodak system was "incompatible" with

18    existing products. *Id.* at 544. Affirming dismissal for failure to state a claim, the Ninth Circuit

19    held that a "technological interrelationship among complementary products" does not constitute

20    the type of coerced or forced purchase of two products that constitute unlawful tying. *Id.* at 542.

21    The claim that the "effective use" of one product "necessitates purchase of some or all of the

22    others" is insufficient where the products are separately available for purchase. *Id.* at 543. "Any

23    other conclusion would unjustifiably deter the development and introduction of those new

24    technologies so essential to the continued progress of our economy." *Id.* "Quite obviously, a

25    firm that pioneers new technology will often introduce the first of a new product type along with

26    related, ancillary products that can only be utilized effectively with the newly developed

27    technology." *Id.* at 542. In short, the Ninth Circuit held that "the introduction of

28

1    technologically related products, even if incompatible with the products offered by competitors,

2    is alone neither a predatory nor anticompetitive act." *Id.* at 544.

3        In accord is *Innovation Data Processing, Inc. v. IBM Corp.*, 585 F. Supp. 1470 (D.N.J.

4    1984), in which a data recovery software company brought a tying claim against IBM. The key

5    issue was whether IBM had tied sales of its data recovery software (DFDSS) to a package of

6    software updates (IPOJ), by including it in the integrated version of IPOJ. The competitor

7    alleged that although the various pieces of software could be licensed separately, IBM had tied

8    DFDSS to IPOJ "as a practical matter" because customers would want "to avoid the technical

9    and administrative problems" of licensing competing data recovery software. *Id.* at 1474. The

10   district court granted summary judgment to IBM:

> [A]s a matter of law, in the absence of evidence that the purchase
> of the alleged tied product was required as a condition of sale of
> the alleged tying product—rather than merely as a prerequisite for
> practical and effective use of the tying product—[plaintiff] has
> failed to show the requisite coercion necessary to establish a per se
> illegal tying arrangement.

*Id.* at 1475-76.

        Thus, because she does not and cannot allege that Apple refuses to sell iPods to

consumers who do not download music from iTMS, or vice versa, Tucker's tying claim is

insufficient as a matter of law, and Count I should be dismissed.

    **B.    Tucker's Tying Theory Is Unprecedented and Wrong Because It Would**

           **Force Apple to Do Business with Microsoft.**

        As noted, Tucker is not alleging that Apple refuses to sell iPods to customers unless they

agree to download music from iTMS, or *vice versa*. Rather, she claims that Apple's products

are incompatible with competitors' products because the music owners require music stores to

use DRM and because Apple and its competitors use different DRM. Tying law, however, has

never been used to prevent a company from using technology it chooses.

        This can be readily seen by asking what a defendant would have to do to avoid engaging

in the allegedly unlawful tie. In the paradigm tying case, the defendant can comply with the law

simply by offering its two products for sale separately rather than conditioning the sale of the

MOT. TO DISMISS
                                                 Case No. C 06 4457 HRL

1   wanted item on the simultaneous purchase of the unwanted item.  In this important sense, the

2   remedy in a tying case is, as the Supreme Court said in a different context, "amenable to a

3   remedy that does not require judicial estimation of free-market forces." *Trinko*, 540 U.S. at 410.

4   For example, to avoid the tie in *International Salt Co. v. United States*, 332 U.S. 392 (1947), the

5   defendant could simply offer its salt-using machines for sale without forcing customers to buy

6   salt from it.  Or Kodak could have offered to sell copier parts to anyone without requiring them

7   to purchase service from Kodak.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504

8   U.S. 451, 463 (1992), discussed in the next section.

9       Here, however, it is beyond dispute that Apple already sells iPods and iTMS music

10  separately, so avoiding Tucker's (erroneous) theory of liability would require Apple to do

11  something more than selling the two products separately.  Indeed, Apple would be required not

12  only to change the design of its products but also to license Microsoft's DRM.  No case has ever

13  found tying liability in these circumstances.  In short, plaintiff is seeking to use tying law to

14  circumvent the result mandated by *Trinko* that Apple has no antitrust obligation to deal with

15  Microsoft or anyone else.  That is not an appropriate application of the tying law.

16      **C.    This Court's Slattery Decision.**

17      This Court's decision on the tying claim in *Slattery* does not prevent dismissal here.

18  Unlike Slattery, Tucker does not allege that she personally was coerced to buy anything.

19  Coercion, as noted, is the *sine qua non* for a tying claim.  Slattery alleged coercion, although his

20  allegation proved false.[9]  Tucker does not even make that allegation.

21      Moreover, this Court relied on *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504

22  U.S. 451, 463 (1992), for the proposition that "the fact that Plaintiff can purchase the items

23  separately does not dismiss a tying claim."  *Slattery*, 2005 WL 2204981, at * 4.  On closer

24  examination, however, that is not what that case held.  The plaintiffs in *Kodak* could not

25  purchase the items separately.  Kodak would sell copier replacement parts to them only if they

26

_____

27      [9]  Slattery admitted at deposition that his iPod was a birthday gift and that he filled his
    iPod with free music and had not bought any music from iTMS when he sued.  *See* Apple's
28  Admin. Req. for Leave to File Mot. for Summ. Jdgmt, pp. 2-4, *Slattery v. Apple Computer, Inc.*,
    Docket Item No. 44, filed Feb. 21, 2006.

1    agreed to obtain service from Kodak. 504 U.S. at 463. Kodak's defense was that parts and

2    service were not separate products and thus could not be the subject of tying. Rejecting that

3    defense, the Court noted that Kodak sold parts to another category of customers, those that

4    provided their own service rather than using independent service organizations. That is what

5    this Court referred to in *Slattery*. But that category of customers did not have a tying claim,

6    because Kodak sold parts to them without conditions. It was only the other category of

7    customers—the copier owners that did not provide their own service—that were victims of the

8    tie.

9        In short, *Kodak* stands for the proposition that the separate availability of products to one

10    class of customers establishes that the products are separate, and when the defendant refuses to

11    make those products available separately to another class of customers, an unlawful tie may

12    exist with respect to that latter class of customers. Here, Apple indisputably makes its products

13    separately available to **all** customers. So no unlawful tying exists for **any** customer. Indeed, no

14    case has ever found an unlawful tie in where the plaintiff was able to buy the two products

15    separately on financial terms comparable to buying them together.

16        Even more fundamentally, as discussed above, Tucker's admission that the major record

17    companies require use of DRM puts this case in a much different light than Slattery's complaint.

18    As shown above, whether judged under monopolization or tying standards, Apple's decision to

19    develop its own technology to comply with requirements imposed by the music owners is

20    protected by the antitrust laws.

21    **III.    FOR THE SAME REASONS, TUCKER'S STATE LAW ANTITRUST CLAIMS**

22    **FAIL TO STATE A CLAIM.**

23        Tucker re-alleges the same claims under the Cartwright Act (Count IV) and California

24    "common law monopolization" (Count VII). "Because the Cartwright Act has objectives

25    identical to the federal antitrust acts, the California courts look to cases construing the federal

26    antitrust laws for guidance in interpreting the Cartwright Act." *Vinci v. Waste Mgmt., Inc.*, 36

27    Cal. App. 4th 1811, 1814 n.1 (1995). Just as Tucker's federal antitrust claims are without merit,

28    so are her state law antitrust claims. Putting aside whether the Cartwright Act reaches single-

                                                        MOT. TO DISMISS
                                                        Case No. C 06 4457 HRL

1  firm conduct and whether any "common law monopolization" exists, there is no reason to think

2  that those laws would be construed to find violations where the conduct at issue is lawful under

3  federal antitrust laws.

4                                    **CONCLUSION.**

5      For these reasons, Counts I through IV and VII should be dismissed without leave to

6  amend because the defects are incurable.

7  Dated: August 21, 2006                    JONES DAY

8

9                                    By: /s/ Robert A. Mittelstadet
                                         ────────────────────────────
10                                        Robert A. Mittelstaedt

11                                   Attorneys for Defendant

12  SFI-546160v4

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28