# EXHIBIT 11

Case 4:05-cv-00037-YGR    Document 176-3    Filed 10/17/08    Page 2 of 45

# Wiki**Answers**™ Q&A the wiki way

- Browse Categories
- Advanced Search
- How to Contribute

- 
- 

Search unanswered questions...

Browse: Unanswered questions | Most-recent questions

Enter a question here...

Browse: Unanswered questions | Most-recent questions

·Ads by Google·    MP3 Player Deals    Sansa MP3    Sansa Sale    Sansa E260

Sign in:
Username
Password
Lost password?

☑ Remember me

Join now!

Join Now ⊚

Username

Password

Retype password

Email address ⊚

Case 4:05-cv-00037-YGR    Document 176-3    Filed 10/17/08    Page 3 of 45

☑ Send me the monthly WikiAnswers newsletter.

☐ I accept the community guidelines, terms of use and privacy policy. I ascertain that I am at least 13 years of age.

Already a member? Sign in

user-generated content: disclaimer

# Can you download music from iTunes to a Sandisk MP3 player?

**In:** Consumer Electronics

[Edit]

## A:

[Edit]

## Answer

You should be able to. but if the music is protected by DRM , you cannot download it your mp3 player directly, You may need to convert the DRM music to plain one. Two methods you can follow:

-use iTunes to burn audio CD and then rip audio back

-use an audio converter, such as NoteBurner, Daniusoft Digital Media Converter and TuneBite, to convert

http://www.wmatomp3-converter.com/digital-music-converter.html

Mp3 Player
Get unbiased buying advice on MP3 players at ConsumerReports.org
www.ConsumerReports.org

SanDisk 16GB USB Drives
Get USB Drives from the Inventor of Flash Memory. Learn More.
www.SanDisk.com/Store

Convert M4P to MP3
Convert all of your M4P files to MP3 format with just few clicks.
www.m4p-mp3.com

Ads by Google



First answer by ID1199651121. Last edit by Blueberry287. Contributor trust: 9 [recommend contributor]. Question popularity: 97 [recommend question]

Research your answer:

[                    ]

**Search**

## Can you answer other questions about consumer electronics? 

- What is the history of the electric clothes dryer?
- What is the activation fee for the lg dare?
- Personal opinion about the advantage and disadvantage of memory card?
- Which places a fax machine can be used?

EXHIBIT 12




**Décision n° 04-D-54 du 9 novembre 2004
relative à des pratiques mises en œuvre par la
société Apple Computer, Inc. dans les secteurs
du téléchargement de musique sur Internet et
des baladeurs numériques**

Le Conseil de la concurrence (section III A),

Vu la lettre enregistrée le 28 juin 2004 sous les numéros 04/0045F et 04/0046M par laquelle la société VirginMega a saisi le Conseil de la concurrence de pratiques mises en œuvre par la société Apple Computer France et a demandé que des mesures conservatoires soient prononcées sur le fondement de l'article L. 464-1 du code de commerce ;

Vu les articles 81 et 82 du traité instituant la Communauté européenne ;

Vu le livre IV du code de commerce relatif à la liberté des prix et de la concurrence et le décret 2002-689 du 30 avril 2002 fixant les conditions de son application ;

Vu les observations présentées par les sociétés VirginMega et Apple Computer France et par le commissaire du Gouvernement ;

Vu les autres pièces du dossier ;

Le rapporteur, le rapporteur général, le commissaire du Gouvernement et les sociétés VirginMega et Apple Computer France entendus lors de la séance du 19 octobre 2004 ;

Adopte la décision suivante :

# I.  Constatations

## A.  LES SECTEURS D'ACTIVITÉ

1.  Le secteur du téléchargement payant de musique sur Internet est naissant. Aux Etats-Unis, cette activité a débuté en 2002 et représente actuellement moins de 2 % du chiffre d'affaires total de l'industrie de la musique. En France, cette proportion est voisine de 0,1 %. Toutefois, les cabinets d'étude prévoient une forte croissance du secteur dans les prochaines années. Selon les prévisions les plus optimistes, par exemple celles du cabinet *Jupiter Research,* la musique numérique sur Internet pourrait représenter, en 2008, 5 % des recettes du marché de la musique en Europe.

2.     Ce n'est qu'en 2001 que l'industrie de la musique a pris conscience de la nécessité de protéger les titres musicaux et que sont apparus les premiers dispositifs de gestion des droits numériques (*Digital Rights Manager* ou DRM). A ce jour, l'immense majorité des titres musicaux téléchargés sur Internet le sont encore sur des réseaux d'échange sans redevance, dits *peer-to-peer*, qui utilisent le format d'encodage non sécurisé MP3. Aucun droit n'est perçu par les auteurs et les producteurs sur les titres échangés par ce moyen. Plusieurs mesures ont été prises pour lutter contre le téléchargement sans redevance et favoriser l'émergence du téléchargement payant. En France, une charte d'engagements a été signée, le 28 juillet 2004, par les principaux acteurs du secteur sous l'égide du ministre de l'économie conduisant, par exemple, à l'envoi par les fournisseurs d'accès à Internet de messages d'avertissement aux internautes. Enfin, les pouvoirs publics cherchent à encourager l'interopérabilité des différents systèmes DRM avec l'ensemble des matériels d'écoute. Il est impossible de prévoir l'efficacité de ces mesures, mais il est vraisemblable que le téléchargement payant devra cohabiter pendant plusieurs années avec les échanges sans redevance.

3.     Les baladeurs numériques sont eux aussi apparus très récemment. Les premiers baladeurs compatibles MP3 datent de la fin de l'année 1999. Apple a lancé le premier modèle de baladeur *iPod* en octobre 2001.

### B.    LES ENTREPRISES

4.     La société plaignante, VirginMega, est une filiale à 100 % du groupe Lagardère (via Hachette Distribution Services). Elle ne possède aucun lien capitalistique avec le groupe britannique Virgin. Le groupe Lagardère a acquis le droit d'usage de la marque Virgin. La société plaignante gère une plate-forme de musique en ligne, qui est active sur le seul territoire français.

5.     La société Apple Computer France est une filiale à 100 % de la société américaine Apple Computer, Inc., basée à Cupertino en Californie. Apple Computer France ne fait que distribuer les produits Apple en France pour le compte de sa maison mère. Elle ne dispose d'aucun accès ni d'aucune licence au logiciel DRM d'Apple, dénommé *FairPlay*. Le propriétaire légal de FairPlay est Apple Computer, Inc. Cette dernière société a été associée à l'ensemble de la procédure et a été entendue en séance.

### C.    LES PRATIQUES DÉNONCÉES

6.     Les consommateurs qui téléchargent des titres musicaux sur la plate-forme VirginMega ne peuvent pas les transférer directement sur les baladeurs numériques *iPod*, fabriqués et commercialisés par Apple. L'impossibilité de transfert direct provient de l'incompatibilité des DRM utilisés par la plate-forme VirginMega et les baladeurs *iPod*. VirginMega utilise le DRM de Microsoft, tandis que le seul DRM compatible avec l'iPod est le DRM propriétaire d'Apple, FairPlay.

7.     VirginMega a demandé, dès le lancement de sa plate-forme au printemps 2004, une licence à Apple, contre le paiement d'une redevance, de manière à avoir accès à FairPlay et s'est vu opposer un refus.

8.  VirginMega considère que ce refus d'accès constitue un abus de position dominante d'Apple. Selon la plaignante, Apple détient, avec son baladeur iPod, une position dominante sur le marché des baladeurs numériques sécurisés à disque dur ; selon elle, Apple détient probablement aussi, avec sa plate-forme *iTunes Music Store*, une position dominante sur le marché français du téléchargement payant de musique sur Internet. La saisine se fonde sur les articles L. 420-2 du code de commerce et 82 du traité européen.

9.  Accessoirement à sa saisine au fond, VirginMega demande au Conseil, sur le fondement de l'article L. 464-1 du code de commerce, de prononcer à l'encontre d'Apple la mesure conservatoire suivante : « *accorder à la société VirginMega, et à toute entreprise qui en ferait la demande, dans un délai d'un mois à compter de la décision à intervenir, et dans des conditions économiques équitables et non discriminatoires, un accès direct à tous les éléments permettant le téléchargement et le transfert des fichiers musicaux notamment sur lecteur iPod, tels que les formats et son logiciel DRM de gestion des droits numériques ou* « *digital rights management» FairPlay, avec la documentation technique associée permettant à l'homme de l'art d'exploiter les systèmes et de gérer les droits pour ledit téléchargement.* »

## II.  Discussion

10. L'article 42 du décret du 30 avril 2002 énonce que « *la demande de mesures conservatoires mentionnée à l'article L. 464-1 du code de commerce ne peut être formée qu'accessoirement à une saisine au fond du Conseil de la concurrence. Elle peut être présentée à tout moment de la procédure et doit être motivée* ». Une demande de mesures conservatoires ne peut donc être examinée que si la saisine au fond est recevable et que si le Conseil ne fait pas application de l'alinéa 2 de l'article L. 462-8 du code de commerce selon lequel : « *(...)il peut aussi rejeter la saisine par décision motivée lorsqu'il estime que les faits invoqués ne sont pas appuyés d'éléments suffisamment probants* ».

### A.    SUR LA RECEVABILITÉ DE LA SAISINE AU FOND

#### 1. SUR LES MARCHÉS

11. Trois secteurs sont concernés par la saisine : les dispositifs de gestion des droits numériques (DRM), les baladeurs numériques et le téléchargement de la musique en ligne.

### a) Sur les dispositifs de gestion des droits numériques (DRM)

12. Les systèmes de protection DRM peuvent s'appliquer à divers types de contenu : audio, vidéo, fichiers informatiques. D'une manière générale, les offreurs sur le(s) marché(s) de DRM sont des sociétés spécialisées dans le développement des dispositifs de protection informatique. Les demandeurs sont des sociétés qui veulent commercialiser sur Internet un contenu sécurisé, c'est-à-dire associé à des droits d'usage prédéfinis donnant lieu à paiement par le consommateur final.

13. Dans le secteur de la musique, la fonction des DRM est de restreindre l'usage possible des titres téléchargés par le consommateur, conformément aux droits qui ont été négociés entre le producteur (la « *maison de disques* ») et le distributeur (la plate-forme de téléchargement). Les droits en question concernent principalement le nombre d'ordinateurs différents sur lesquels la musique peut être téléchargée, écoutée et copiée, le nombre de gravures sur CD des titres téléchargés et le nombre de transferts autorisés vers des baladeurs numériques.

14. Il convient de distinguer les formats d'encodage et les DRM. Il n'est pas contesté que le problème d'interopérabilité à la base de ce dossier provient des seuls DRM, et non des formats d'encodage. Le format le plus connu, apparu en 1999, est le format MP3. C'est ce format qui est utilisé pour le téléchargement sans redevance. Les trois principaux formats alternatifs sont l'AAC (lié originellement au système Dolby), le WMA utilisé par Microsoft et l'ATRAC, qui est le format propriétaire de Sony. Les plates-formes payantes utilisent un couple formé d'un format d'encodage et d'un DRM : la plate-forme d'Apple, *iTunes Music Store,* utilise le couple (AAC, Fairplay), celle de Sony, *Sony Connect,* utilise le couple (ATRAC, Open MG), et toutes les autres plates-formes payantes françaises utilisent le format WMA et le DRM de Microsoft.

15. VirginMega se déclare prête à proposer à ses clients chaque titre dans deux formats différents, voire trois. Lors de l'instruction, le président de la société Universal France a rappelé qu'à l'époque où coexistaient disques vinyle, cassettes audio et disques compacts, les disquaires devaient stocker les titres dans ces trois formats. Cette situation entraînait des surcoûts pour les disquaires, mais n'a pas empêché la distribution de la musique. L'obstacle que rencontre VirginMega ne se situe pas au niveau de l'accès au format AAC (qui n'est pas la propriété d'Apple), mais au niveau de l'accès au DRM FairPlay.

16. La société Apple a développé son propre DRM pour pouvoir vendre de la musique sur Internet, d'abord aux possesseurs d'ordinateurs Macintosh, puis aux possesseurs d'ordinateurs fonctionnant sous Windows. Aux Etats-Unis, la plate-forme *iTunes Music Store* a ainsi été lancée en avril 2003, uniquement pour les utilisateurs de Macintosh, et a été rendue accessible aux utilisateurs de Windows à partir d'octobre 2003. La plate-forme a été lancée le 16 juin 2004 en Allemagne, en France et au Royaume-Uni.

17. Le DRM FairPlay n'a, à ce jour, fait l'objet d'aucune licence à un tiers. Il est installé exclusivement sur le logiciel de lecture *iTunes player,* sur la plate-forme *iTunes Music Store* et sur les baladeurs *iPod.*

18. Les marchés pertinents de DRM n'ont pas encore été définis par la jurisprudence. La question de savoir s'il faut segmenter les marchés par type de contenu (audio, vidéo, données informatiques) et/ou par type de matériel client (baladeur, téléphone portable, *personal digital assistant,* etc.) n'est pas tranchée. La Commission européenne examine actuellement le rachat conjoint de la société ContentGuard, spécialisée dans les dispositifs de protection informatique, par Microsoft et Time Warner. La Commission devrait procéder, à cette occasion, à une première délimitation du ou des marché(s) de DRM.

19. Les évolutions technologiques sont très rapides dans le secteur des DRM, s'agissant notamment de la gestion de la sécurité lors des transferts vers les différentes catégories de matériels clients. Il est très difficile de prédire l'évolution de ce(s) marché(s), même à l'horizon de quelques mois.

**b) Sur les baladeurs numériques**

20. Il existe plusieurs types de baladeurs numériques : les baladeurs à disque dur (dont font partie tous les modèles d'iPod), les baladeurs « RAM Flash » (qui peuvent être chargés à partir d'une clé USB), les baladeurs CD compatibles MP3 et les baladeurs minidisc enregistreurs.

21. Les utilisateurs de baladeurs CD et minidisc doivent transporter la musique sur un support physique externe au baladeur lui-même et non sur une mémoire installée dans l'appareil. Cette caractéristique les distinguant nettement des baladeurs flash ou à disque dur, ils ne seront plus pris en compte dans la suite du raisonnement.

22. Le marché, hors baladeurs CD et minidisc, peut être présenté par ordre croissant de capacité de stockage et de prix, de la manière suivante :

- Les baladeurs *flash* dont la capacité de stockage ne dépassait pas, jusqu'à une date récente, 258 millions d'octets (Mo). Ordre de grandeur de prix : de 100 à 200 euros ;

- Des baladeurs à « *petit disque dur* », d'une capacité variant de 1,5 Go à 5 Go. L'iPod *mini* d'Apple appartient à cette catégorie. Ordre de grandeur de prix : de 200 à 350 euros ;

- Les baladeurs à disque dur dont la contenance varie de 20 Go à 80 Go. Les différents modèles d'iPod "classique" entrent dans cette catégorie. Ordre de grandeur de prix : de 350 à 500 euros.

23. Selon le cabinet GFK, les baladeurs avec disque dur représentent actuellement en France moins d'un tiers de la base installée. Selon le cabinet *Understanding and solution,* ce chiffre devrait rester stable dans les prochaines années. Autrement dit, le stock d'appareils fonctionnant aujourd'hui en France et le volume des ventes réalisées chaque mois sont deux fois plus importants pour les baladeurs sans disque dur que pour les baladeurs avec disque dur.

24. VirginMega soutient que les baladeurs à disque dur forment un marché pertinent au sens du droit de la concurrence, car la capacité de 1 Go serait une limite importante (plusieurs centaines de chansons, plus de dix heures de musique). Apple considère au contraire que cette segmentation suivant un critère technique ne correspond à aucune caractéristique avérée de la demande des consommateurs.

25. Il est difficile de prédire combien de temps la segmentation présentée au paragraphe 22 va rester valide, car la capacité des baladeurs *flash* augmente rapidement. Il existe déjà plusieurs modèles de baladeurs *flash* avec des capacités de stockage de 512 Mo (par exemple, la clé USB Key 015/00 de Philips, le baladeur MP3 Rhomba de Creative) et même de 1 Go (baladeurs IFP-799 et IFP-899 de marque iRiver). Ces baladeurs sont disponibles sur des sites français de vente en ligne.

26. Dans le segment intermédiaire des baladeurs de capacité de quelques Go, on devrait donc rapidement voir coexister des baladeurs à disque dur et des baladeurs flash. Or, ce segment a une importance particulière. Selon une étude de *Jupiter Research*, 77 % des consommateurs estiment que la capacité de stockage optimale d'un baladeur est d'un millier de chansons, soit 4 Go. Cette étude a montré que 90 % des consommateurs ont moins de 1 000 chansons sur leur ordinateur.

27. La délimitation des marchés pertinents est, donc, délicate dans un contexte d'évolution rapide des technologies. Toutefois, à ce stade de l'instruction, on ne peut exclure l'existence d'un marché pertinent des baladeurs numériques à disque dur.

28.  La société plaignante a proposé, dans ses dernières observations écrites et en séance, de définir un marché des baladeurs numériques à disque dur *sécurisés*, c'est-à-dire intégrant une protection DRM. Si un tel marché existe, son évolution est encore plus rapide que celle des baladeurs numériques à disque dur. En effet, des baladeurs numériques sécurisés, avec et sans disque dur, intégrant la dernière version du DRM de Microsoft et compatibles avec la plate-forme VirginMega, apparaissent sur le marché français et sont acquis selon un rythme élevé. Ainsi à ce stade de l'instruction, on ne peut pas exclure non plus l'existence d'un marché pertinent des baladeurs numériques sécurisés à disque dur.

### c) Sur le téléchargement payant de musique en ligne

29.  Il n'est pas contesté que le marché du téléchargement sur Internet est distinct de celui de la distribution physique, même si les deux concourent à l'acquisition de musique. En effet, les caractéristiques de deux circuits de distribution sont très différentes, tant du côté de la demande que de celui de l'offre, et les écarts de prix sont significatifs (de 1 à 5 pour les titres simples, de 1 à 2 pour les albums).

30.  Les réseaux d'échanges, dits *peer-to-peer*, ne donnent lieu à aucun paiement et à aucune perception de droits. Même s'ils exercent une pression concurrentielle sur le marché du téléchargement légal, il n'est pas possible de les inclure dans le même marché pertinent.

31.  Il n'est pas non plus contesté que la dimension géographique du marché du téléchargement payant est nationale. En effet, l'industrie de la musique impose aux distributeurs une segmentation par pays. Les principales maisons de disques négocient les droits avec les plates-formes sur une base nationale et leur imposent des contraintes destinées à s'assurer qu'elles ne vendent qu'à des internautes qui résident dans le pays correspondant. En France, les principaux labels viennent d'imposer que le paiement soit effectué en utilisant un numéro de compte bancaire français. De plus, les sociétés de collecte de droits d'auteur opèrent au plan national.

32.  Le *streaming* consiste en l'écoute d'un titre qui n'est pas fixé sur l'ordinateur. En France, ce segment semble aujourd'hui négligeable car le prix d'une écoute directe est de l'ordre de 1 centime d'euro et les volumes restent limités.

33.  Il est donc, en l'état actuel de l'instruction, possible d'envisager l'existence d'un marché national du téléchargement de la musique en ligne, hors réseaux d'échange et écoute directe.

### 2. SUR LA POSITION D'APPLE SUR LES DIFFÉRENTS MARCHÉS CONCERNÉS

### a) Sur le ou les marché(s) de DRM

34.  Le DRM FairPlay se trouve sur un segment spécifique du secteur des DRM, à savoir les DRM gestionnaires de contenus audio et opérant sur les baladeurs iPod. L'appréciation portée sur la position concurrentielle d'Apple dépend, donc, beaucoup de la délimitation précise du ou des marché(s) de DRM.

35.  Le DRM de Microsoft WMA est lié au système d'exploitation Windows, qui est installé sur la grande majorité des ordinateurs personnels (tandis que le DRM d'Apple est indépendant de tout système d'exploitation). L'intégration de WMA au sein de Windows donne à Microsoft l'assurance que son DRM sera très largement diffusé. De plus, cette intégration rend plus difficile le piratage.

36. Le WMA de Microsoft permet à l'utilisateur de déterminer, pour chaque titre, les restrictions d'usages qui y seront attachées. FairPlay, quant à lui, comporte des droits qui ont été déterminés une fois pour toutes (sept gravures, téléchargement sur trois ordinateurs). Ce manque de souplesse peut être un inconvénient pour les producteurs qui souhaitent pouvoir décider, pour chaque titre, des droits qui lui seront associés.

37. La dernière version du DRM de Microsoft permet, contrairement à FairPlay, la mise en œuvre du modèle de l'abonnement, qui repose sur le principe de la *location* de la musique (l'abonné a accès à l'intégralité du catalogue de la plate-forme, tant qu'il paie son abonnement). Cette fonctionnalité est mise en œuvre aux États-Unis par les plates-formes Napster et Rhapsody, qui possèdent plusieurs centaines de milliers d'abonnés.

38. Alors que les anciennes versions du DRM de Windows opéraient titre par titre, Fairplay est, depuis sa création, basé sur un système de « *compte* » (associé à une adresse e-mail) pouvant être alimenté de diverses manières (carte de paiement, cartes prépayées). La dernière version (Microsoft DRM 10) est, comme FairPlay, basée sur la notion de compte. Microsoft a donc rattrapé son retard sur Apple de ce point de vue.

39. La Commission européenne, dans le cadre de l'examen du rachat de la société ContentGuard par Microsoft et Time Warner, a publié un communiqué de presse dans lequel elle considère que le DRM de Microsoft est déjà leader sur le ou les marché(s) de DRM et qu'il existe un risque de renforcement de la position de Microsoft et d'un éventuel biais de l'évolution des technologies vers un « *standard* » Microsoft.

40. Il paraît donc peu probable, au vu des éléments disponibles à ce stade de la procédure, de considérer que Apple puisse détenir un pouvoir de marché suffisant pour lui conférer une position dominante sur un ou plusieurs marchés des DRM.

### b) Sur les marchés des baladeurs numériques

41. Pour apprécier le pouvoir de marché d'Apple, il semble approprié d'estimer les parts de marché *en valeur* sur les douze mois précédant la date de la saisine, la capacité de pratiquer un prix élevé faisant partie du pouvoir de marché. Selon les données de GFK, Apple a réalisé 25 % des ventes en valeur sur le marché des baladeurs MP3 avec et sans disque dur, durant la période allant de juin 2003 à mai 2004. Si on se restreint aux baladeurs possédant un disque dur, la part de marché en valeur est de 53 % sur la même période.

42. Si on prend en considération les seuls baladeurs numériques *sécurisés* équipés d'un disque dur, alors la part de marché d'Apple sur cette même période est nettement plus élevée, mais moins significative car calculée sur un marché très restreint : l'apparition de baladeurs sécurisés avec et sans disque dur intégrant le DRM de Microsoft étant récente sur le marché français. Ces appareils, dont la commercialisation débute à peine, ne représentent qu'une très faible part de la base installée, compte tenu de l'avance de l'iPod. Mais sur un marché en pleine croissance sur lequel on constate l'arrivée de nombreux concurrents, il ne serait pas légitime de considérer que les parts de marché de l'iPod à court terme préfigurent la situation de moyen terme.

43. Cette appréciation dynamique des parts de marché rend d'autant plus nécessaire la prise en compte d'autres critères pour apprécier la puissance de marché d'Apple dans le secteur des baladeurs numériques.

44. Selon une étude de *Jupiter Research*, le prix et la capacité de stockage ne sont pas les deux seuls paramètres de la concurrence entre baladeurs. Lorsqu'on leur demande quelle caractéristique du baladeur importe le plus pour eux, 55 % des consommateurs

mentionnent une batterie rechargeable, 52 % la taille du baladeur, 49 % la capacité à se connecter à l'ordinateur, 20 % la compatibilité avec le format MP3, 7 % avec le format WMA de Microsoft et moins de 1 % avec le format AAC d'Apple.

45. Plusieurs éléments démontrent qu'Apple est soumis à une forte pression concurrentielle de la part de concurrents nombreux et puissants : Sony, Creative, Rio, iRiver, Philips, Samsung, Thomson, par exemple.

46. Ainsi, le modèle *Zen Touch* de Creative est présenté dans plusieurs publications comme un rival direct de l'iPod : « *il ressemble furieusement à l'iPod*» (Micro-Hebdo du 9 septembre 2004) ou même comme « *un clone de l'iPod* » (journal *20 minutes* du 24 septembre 2004). Dans les deux cas, sont soulignés les propres atouts de ce nouveau modèle, notamment l'autonomie : « *On aime : l'autonomie exceptionnelle* » (Micro-Hebdo), « *il comble une faille de l'iPod : sa batterie offre une autonomie de 24 heures en lecture, contre seulement 12 heures pour son rival. De quoi faire réfléchir* » (20 minutes), et prix : « *D'autant que le Zen Touch est également moins cher : 299 €, au lieu de 349 €.* » (20 minutes).

47. La firme japonaise Sony, inventeur du « *walkman* », vient de lancer en France un baladeur numérique à disque dur de 20 Go, le NW-HD1. Son autonomie est de 30 heures. Il utilise le format propriétaire de Sony (ATRAC), mais dispose d'un convertisseur qui lui permet de lire le format MP3. Il supporte le DRM de Sony, Open MG, et est compatible avec la plate-forme Sony Connect. Pour mémoire, Sony a vendu, en 25 ans, 340 millions d'unités de *Walkman* (y compris CD et minidisc).

48. Face à ces nouveaux modèles proposés aux consommateurs, Apple continue d'investir des sommes considérables en communication pour maintenir l'avance de l'iPod. Les dépenses publicitaires d'Apple sont de l'ordre de plusieurs dizaines de millions de dollars sur le seul territoire américain. Apple a lancé le premier modèle d'iPod en octobre 2001 et propose chaque année un nouveau modèle : en juillet 2004, Apple a lancé l'*iPod mini*, d'une capacité de 4 Go.

49. Enfin, loin de pouvoir s'abstraire de la concurrence des nouveaux arrivants, il faut noter, qu'en juillet 2004, Apple a baissé de 25 % les prix de tous les modèles de baladeurs iPod.

50. La concurrence sur le ou les marché(s) de baladeurs numériques est, donc, très dynamique avec des baisses de prix, des nouveaux entrants et de nombreuses innovations technologiques, qui concernent l'autonomie, les dimensions, le poids, la capacité de stockage et les fonctionnalités techniques des appareils (notamment, les outils de navigation pour faciliter la recherche d'un titre). Dans ces conditions, il est particulièrement délicat d'apprécier dans quelle mesure Apple pourrait s'abstraire de la concurrence et se comporter de manière indépendante de ses concurrents, de ses clients et des consommateurs finaux.

51. Toutefois, et malgré les fortes incertitudes sur la puissance des acteurs sur le marché, on ne peut exclure, à ce stade de l'instruction, que la société Apple dispose d'une position dominante sur le marché des baladeurs numériques à disque dur, le cas échéant sécurisés.

### c) Sur le marché du téléchargement payant de la musique en ligne en France

52. Six acteurs principaux opèrent actuellement sur le marché français du téléchargement payant de musique sur Internet : la FNAC qui est, par ailleurs, le premier vendeur de musique physique en France ; VirginMega, filiale du groupe Lagardère et société sœur du distributeur Virgin MegaStores ; l'opérateur OD2, filiale française d'une entreprise britannique qui opère "en marque blanche" de nombreuses plates-formes (MSN, Wanadoo,

Tiscali Music, alapage, etc...) ; les plates-formes de Sony et d'Universal, *Sony Connect* et *E-Compil* ; la plate-forme *iTunes Music Store* d'Apple.

53. La part d'Apple, en volume sur le marché français du téléchargement payant, a été estimée par le rapporteur, sur la base des dernières données hebdomadaires disponibles, à environ 75 %. Tous les titres ont été comptabilisés, qu'ils aient été téléchargés de manière individuelle, dans le cadre d'un album ou d'une compilation, et payés à l'unité ou dans le cadre d'un forfait. Cette estimation est cependant fragile, car basée sur des durées courtes : la plate-forme *iTunes Music Store* a été lancée le 16 juin dernier, celle de Sony en juillet. La période estivale peut avoir un effet perturbateur. Le chiffre de 75 % est d'interprétation particulièrement délicate dans un marché en forte expansion où les positions respectives peuvent évoluer rapidement. Quinze semaines après son lancement, les ventes d'*iTunes Music Store* sont en baisse après un niveau initial élevé dans un marché global en expansion, si bien que la part de marché d'Apple diminue depuis la fin de l'été 2004.

54. Depuis le lancement de la plate-forme d'Apple en juin 2004, deux acteurs majeurs sont entrés sur le marché. La plate-forme de Sony, *Sony Connect*, a été lancée le 5 juillet 2004. La FNAC doit également être considérée comme un nouvel entrant sur le marché français du téléchargement, puisqu'elle a ouvert sa plateforme en propre le 18 septembre. Auparavant, le site de la FNAC était opéré par OD2, qui négociait directement les droits avec les maisons de disques. La FNAC n'est donc opérateur de musique sur Internet que depuis le mois de septembre.

55. S'agissant du coût *technique* d'installation d'une plate-forme de téléchargement de musique en France, la FNAC mentionne « *plusieurs millions d'euros* » ; Universal et Sony s'accordent sur un chiffre de l'ordre de 5 millions d'euros ; OD2 mentionne une fourchette de 20 à 80 millions de dollars (mais cette fourchette prend en compte le marché américain) ; Apple n'a pas donné de chiffre précis au niveau français (car ses serveurs sont répartis dans plusieurs pays européens). VirginMega, quant à lui, a déclaré envisager de dépenser une somme de l'ordre de 25 M€ entre 2003 et 2007 (« *date de rentabilité* » prévue dans le business plan) sans donner plus d'explication. Ces chiffres, assez peu concordants, doivent être mis en regard de la taille des entreprises ou des groupes concernés (Microsoft, Apple, Sony, VirginMega filiale de Lagardère, etc...). Le coût technique d'installation d'une plate-forme ne paraît pas être un obstacle susceptible de dissuader l'entrée d'entreprises bien connues du public et disposant d'une assise financière solide.

56. Il faut également mentionner, à côté de ces nouveaux entrants effectifs, de nombreux concurrents potentiels sur le marché français du téléchargement payant de musique sur Internet.

57. Le Conseil relève, ainsi, que la chaîne musicale MTV dispose déjà de plates-formes de téléchargement en Italie, en Allemagne et en Espagne. Il paraît très vraisemblable que MTV et des médias comparables, notamment des chaînes musicales de radio ou de télévision comme NRJ et M6, puissent développer, dans un proche avenir, la même activité sur le marché français et vendre sur Internet la musique qu'ils diffusent.

58. Les sociétés issues du secteur de l'informatique, comme Microsoft (qui vient d'entrer sur le marché américain) et Real Networks (qui opère la plate-forme Rhapsody aux Etats-Unis) sont également des concurrents potentiels, même si leur entrée effective sur le marché français n'est pas probable à court terme. Le Conseil relève que la puissance de Microsoft sur les marchés des systèmes d'exploitation pour ordinateurs personnels, des lecteurs média et des DRM, ainsi que l'intégration des trois composantes (Windows, Windows Media

Player et Microsoft DRM), lui confèrent un avantage concurrentiel sérieux sur le marché du téléchargement de musique.

59. Le Conseil relève également, qu'en Allemagne, AOL vend plusieurs dizaines de milliers de titres sur Internet par semaine. Les fournisseurs d'accès à Internet sont, donc, des concurrents potentiels crédibles sur le marché du téléchargement de la musique en ligne. Ils disposent d'un atout important, à savoir la facilité de l'opération de paiement de la musique, qui est réalisée par le biais du prélèvement bancaire habituel au titre de l'abonnement.

60. Enfin, les grands distributeurs ne devraient pas manquer de s'intéresser à ce secteur. Aux Etats-Unis, l'un des principaux concurrents d'Apple est Wal-Mart, leader mondial de la grande distribution, qui est entré sur le marché du téléchargement de la musique dès l'année 2003.

61. Aux Etats-Unis, la concurrence sur le marché du téléchargement est extrêmement intense avec les opérations promotionnelles de Real Networks (promotion récente à $ 0,49 par titre pendant trois semaines), l'entrée de Microsoft, la présence de Wal-Mart depuis 2003, l'annonce récente de l'arrivée du groupe britannique Virgin. Le marché américain commence, par ailleurs, à se consolider avec le rachat récent de la plate-forme MusicMatch par Yahoo! (le site Internet le plus visité selon Nielsen NetRatings) pour 160 millions de dollars.

62. La société Apple ne pratique que la vente à l'unité, à cause des limitations techniques de son DRM. Aujourd'hui, en France, seule la plate-forme E-compil d'Universal propose des forfaits mensuels (par exemple, 8 euros par mois pour 10 titres téléchargés, avec un engagement de six mois). Aux Etats-Unis, le modèle de l'abonnement, qui est pratiqué par les plates-formes Napster et Rhapsody, repose sur le principe de la *location* de la musique : l'abonné a accès à l'intégralité du catalogue de la plate-forme, tant qu'il paie son abonnement (cette fonctionnalité, rendue possible par le nouveau module Janus du DRM de Microsoft, permettra, dans les prochains mois, le transfert des titres sur baladeurs dans le cadre de l'abonnement). Ce modèle économique aurait représenté, en 2003, 113 millions de dollars de chiffre d'affaires, contre 158 millions de dollars pour le téléchargement permanent payé à l'unité. La vente par abonnement se développe vite et pourrait dépasser la vente à l'unité en 2008. En Europe, *Jupiter Research* prévoit la même tendance, mais avec du retard. Le chiffre de 70 %, qui sert souvent de référence pour la part de marché d'Apple aux Etats-Unis, ne concerne que le seul segment du téléchargement à l'unité. Sachant qu'Apple ne pratique pas l'abonnement, sa part de marché en valeur serait, aux Etats-Unis, inférieure à 40 %. La montée en puissance du modèle de l'abonnement, qui est avérée sur le marché américain, relativise la solidité de la position concurrentielle d'Apple.

63. S'agissant des avantages de l'intégration verticale dont profite Apple, il faut noter qu'en France, chaque opérateur dispose d'atouts propres. La FNAC et VirginMega profitent de synergies avec leurs magasins physiques et d'une bonne connaissance du marché français de la musique, sachant que plus de la moitié des titres vendus en France, quel que soit le circuit de distribution, sont produits par des artistes nationaux. Inversement, Apple, Universal et Sony sont moins bien placés pour connaître le marché domestique mais bénéficient de synergies provenant de l'intégration verticale avec la fabrication de matériel pour le premier, avec la production musicale pour le second et avec les deux composantes à la fois pour le dernier.

64. En résumé, le marché du téléchargement de musique en ligne est naissant. Le site *iTunes Music Store* n'opère en Europe que depuis le 16 juin dernier. La concurrence sur ce marché est dynamique, tant en France que dans les autres pays européens et aux Etats-Unis : de

nouveaux opérateurs entrent sur le marché et il existe de nombreux concurrents potentiels ; la concurrence en prix est intense, les marges sont réduites (de l'ordre de quelques centimes d'euro par titre), de nouveaux modèles économiques apparaissent. Il est difficile d'apprécier le pouvoir de marché d'Apple dans un tel contexte. Toutefois, à ce stade de l'instruction, on ne peut exclure que la société Apple dispose, avec sa plate-forme *iTunes Music Store*, d'une position dominante sur le marché du téléchargement payant de musique en ligne en France.

### 3. SUR LA PRATIQUE DÉNONCÉE ET LA CARACTÉRISATION D'UN ABUS

65. Dans ses observations finales, la société plaignante soutient que l'accès au DRM FairPlay est indispensable à l'exercice de l'activité d'opérateur de musique en ligne, que FairPlay est une ressource essentielle et que le refus d'accès de la part d'un opérateur dominant sur le marché connexe des baladeurs numériques sécurisés à disque dur constitue un abus.

66. La plaignante observe également que le refus d'Apple conduit à une absence d'interopérabilité des systèmes de protection des droits qui peut pénaliser les consommateurs. Le Conseil de la concurrence, sans méconnaître les inconvénients liés à l'absence de compatibilité entre logiciels et matériels pour les usagers des sites de téléchargement, ne peut que relever que des situations de ce type sont récurrentes dans les secteurs liées aux technologies de l'information, où les innovations se succèdent à un rythme élevé. Ces ajustements des marchés aux innovations ne révèlent pas nécessairement des atteintes au droit de la concurrence. Or, si le code de commerce, notamment ses articles L. 420-4 et L. 464-1, prévoit que le Conseil prend en compte, dans une certaine mesure, l'intérêt des usagers ou des consommateurs, il ne peut le faire que si l'atteinte constatée résulte d'une pratique prohibée par le droit de la concurrence.

67. Ainsi, l'abus allégué par la saisissante et sa demande de mesure conservatoire tendant à enjoindre Apple de lui accorder une licence obligatoire pour l'accès à son DRM sont finalement fondés sur la seule notion de ressource essentielle. Pour apprécier la validité de ses demandes, il convient de rappeler la jurisprudence des autorités françaises et communautaires de concurrence en matière d'accès à une facilité essentielle et de déterminer si les conditions posées par cette jurisprudence pour caractériser la présence d'un abus sont susceptibles d'être remplies dans le présent cas.

### a) La jurisprudence récente en matière d'accès à une facilité essentielle

68. Dans sa décision du 24 mars 2004 concernant l'interopérabilité du système d'exploitation Windows avec les serveurs d'administration, la Commission européenne expose, au paragraphe 585 : « *Dans Magill, Commercial Solvents et Télémarketing, un des éléments constitutifs de l'abus était le risque d'élimination de la concurrence du fait du comportement de l'entreprise dominante. Dans Bronner, la Cour de justice a clairement indiqué que, pour pouvoir s'appuyer sur l'arrêt Magill, il est nécessaire de montrer que l'accès est indispensable pour opérer sur le marché, ce qui signifie qu'il n'existe pas de substitut réel ou potentiel réaliste à l'accès.* »

69. Dans son arrêt Bronner du 26 novembre 1998, la Cour de justice a conclu que : « *Le fait pour une entreprise de presse, qui détient une part très importante du marché des quotidiens dans un État membre et qui exploite l'unique système de portage à domicile de journaux à l'échelle nationale existant dans cet État membre, de refuser, contre une*

*rémunération appropriée, l'accès au dit système à l'éditeur d'un quotidien concurrent qui, en raison de la faiblesse du tirage de celui-ci, ne se trouve pas en mesure de créer et d'exploiter, dans des conditions économiquement raisonnables, seul ou en collaboration avec d'autres éditeurs, son propre système de portage à domicile ne constitue pas un abus de position dominante au sens de l'article 86 du traité CE.* » Au paragraphe 43, la Cour a notamment indiqué que : « "*Il est en effet constant que d'autres modes de distribution de quotidiens, tels que la distribution par la voie postale et la vente dans les magasins et kiosques, même s'ils devaient être moins avantageux pour la distribution de certains d'entre eux, existent et sont utilisés par les éditeurs de ces quotidiens.* »

70. Pour appliquer la jurisprudence de la Cour de justice au cas particulier de l'interopérabilité de Windows avec les serveurs d'administration, la Commission a procédé de la manière suivante. Au paragraphe 586, elle a indiqué : « *Dans ce cas, le comportement de Microsoft s'agissant de la révélation des informations d'interface [*information permettant l'interopérabilité*] doit être analysé au regard des deux éléments clés soulignés ci-dessus. Premièrement, Microsoft bénéficie d'une position de force extraordinaire sur le marché des systèmes d'exploitation pour les ordinateurs PC clients. Deuxièmement, l'interopérabilité avec le système d'exploitation du PC client revêt une importance concurrentielle significative sur le marché des systèmes d'exploitation des serveurs d'administration* ». Pour établir ce dernier point, la Commission s'est appuyée sur diverses enquêtes auprès des acheteurs, notamment les responsables des systèmes informatiques au sein des entreprises, susceptibles de décider du choix du système d'exploitation des serveurs d'administration. Ces enquêtes ont démontré que les demandeurs, dans leur très grande majorité, accordaient une importance majeure à l'interopérabilité avec Windows. Enfin, au paragraphe 781, la Commission insiste encore sur le caractère avéré du risque d'élimination de la concurrence et sur la démonstration du lien causal entre l'évolution du marché et l'avantage de Microsoft en terme d'interopérabilité avec Windows.

71. On peut également mentionner l'arrêt de la Cour de justice du 29 avril 2004 *IMS Health* qui établit qu'un outil statistique d'échantillonnage destiné à permettre des études de marché peut être considéré comme une facilité essentielle. L'une des conditions, posées par la Cour pour que le refus d'octroyer une licence puisse être considéré comme abusif, est la suivante : « *L'entreprise qui a demandé la licence a l'intention d'offrir, sur le marché de la fourniture des données en cause, des produits ou des services nouveaux que le titulaire du droit de propriété intellectuelle n'offre pas et pour lesquels il existe une demande potentielle de la part des consommateurs* » .

72. Dans sa décision n° 03-MC-04, confirmée par l'arrêt du 12 février 2004 de la cour d'appel de Paris, le Conseil de la concurrence n'a pas exclu, au stade des mesures conservatoires, que « *le refus d'accès direct [*au tronc commun du logiciel Presse 2000*] opposé par les NMPP aux MLP puisse constituer une pratique prohibée par les dispositions de l'article L. 420-2 du code de commerce.* » De nombreux éléments versés au dossier démontraient que l'absence d'accès au tronc commun du logiciel Presse 2000 constituait pour les MLP un handicap concurrentiel majeur, susceptible de mettre en danger leur pérennité à court terme et donc d'éliminer toute concurrence sur le marché (les MLP étant le seul opérateur alternatif aux NMPP).

73. Ainsi, au paragraphe 56 de la décision, le Conseil a indiqué : « *Par ailleurs, il apparaît que, dans l'hypothèse où les MLP ne pourraient installer leur propre système parallèlement à celui des NMPP, le défaut d'accès direct au tronc commun de Presse 2000 pourrait constituer un handicap concurrentiel de nature à compromettre leur activité.* » En l'absence d'accès au tronc commun, les dépositaires de presse devaient, en effet, ressaisir

manuellement des informations en provenance et à destination des marchands de journaux, ce à quoi ils s'opposaient fermement selon les documents versés au dossier de la demande de mesures conservatoires. Le Conseil s'est notamment fondé sur un courrier du syndicat national des dépositaires de presse (SNDP) qui indiquait : *« Dans l'hypothèse où le déploiement à terme de ces modules nécessiterait une quelconque ressaisie du poste MLP vers Presse 2000, nous ne saurions l'accepter. »*

74. Le Conseil a également relevé, au paragraphe 84, que : *« Certains éditeurs se plaignent d'ailleurs de la qualité des prestations informatiques offertes par les messageries lyonnaises. Tel est le cas des éditeurs des titres* « Psychologies magazine » *et* « Cyber Press Publishing », *qui, dans des courriers en date respectivement du 13 septembre 2002 et du 21 juin 2002, font part aux MLP de leur décision de ne plus recourir à leurs services, en invoquant, pour le premier, le regret de ne pouvoir* « bénéficier d'un outil informatique performant » *et pour le second, l'espoir que les MLP soient très vite en mesure* « de mettre à la disposition des éditeurs un véritable outil de réglage ».* Enfin, le Conseil a constaté que de nombreux titres quittaient les MLP pour rejoindre les NMPP, ce qui confirmait le caractère indispensable de l'accès et le risque d'élimination de la concurrence.

### b) L'application de cette jurisprudence au cas d'espèce

75. Le caractère indispensable de l'accès à FairPlay pour le développement des plates-formes payantes de téléchargement de musique en ligne doit être apprécié au regard des trois éléments suivants : les usages actuels de la musique téléchargée, les éventuelles possibilités de contournement par les consommateurs et l'évolution de l'offre de baladeurs numériques.

#### Les usages actuels de la musique téléchargée

76. Les principaux usages de la musique téléchargée sont, aujourd'hui, l'écoute sur l'ordinateur (relié, le cas échéant, à des hauts-parleurs externes), le stockage et la gestion de la musique sur l'ordinateur, notamment la création de compilations personnelles, et la gravure de CD, qui peuvent ensuite être écoutés sur un baladeur CD, un autoradio ou une chaîne de salon compatibles MP3. Ces usages sont majoritaires aujourd'hui, loin devant le transfert sur baladeurs numériques.

77. Les constatations précédentes proviennent de deux études très récentes sur les habitudes actuelles de consommation de la musique numérique, l'une du cabinet *Forrester*, qui se fonde sur une enquête auprès des Internautes européens, l'autre du cabinet *Jupiter Research*, qui exploite des données américaines. Ces deux études s'accordent pour conclure que le transfert sur baladeurs est un usage encore minoritaire de la musique téléchargée.

78. L'étude de *Forrester*, datée du 25 août 2004, repose sur une enquête réalisée auprès de 22 907 personnes dans sept pays européens en avril et mai 2004. Il est simplement demandé aux consommateurs s'ils téléchargent régulièrement de la musique et, pour ceux qui téléchargent au moins une fois par mois, ce qu'ils font avec la musique téléchargée. Les résultats sont les suivants. Parmi les personnes qui téléchargent de la musique au moins une fois par mois (plusieurs milliers de personnes dans l'échantillon), 66 % déclarent qu'elles écoutent la musique sur leur ordinateur ; 53 % qu'elles gravent leur propres CD ; 44 % qu'elles stockent et gèrent la musique sur leur ordinateur ; 15 % qu'elles transfèrent la musique sur un baladeur numérique.

79. L'étude *Jupiter Research*, datée d'avril 2004, repose sur une enquête réalisée aux États-Unis, à laquelle 896 personnes ont répondu. A la question « *Quelle est la caractéristique*

13

*de la musique sur Internet la plus importante pour vous ? »*, 42 % des consommateurs répondent : « Faire mes propres compilations », 19 % répondent : « Faire des copies multiples pour les avoir en plusieurs endroits », 16 % répondent : « Transférer la musique sur un baladeur ».

80. Les résultats des rapports de Forrester et Jupiter contredisent la thèse selon laquelle l'essentiel de la musique téléchargée sur Internet est destiné à alimenter des lecteurs portables. Cette affirmation, contrairement aux études de *Jupiter* et de *Forrester*, ne se fonde sur aucune enquête statistique. VirginMega cite, par ailleurs, les résultats d'une étude de *Jupiter Research* ayant consisté en 24 interviews de chefs d'entreprise du secteur de la musique en Europe. Toutefois, les réponses obtenues dans ce cadre donnent beaucoup moins d'informations sur les comportements du public que les études statistiques portant directement sur la demande. De même, si VirginMega mentionne certaines études auprès des consommateurs, qui portent sur des souhaits ou des déclarations d'intention de la part de consommateurs potentiels, ces études ne décrivent pas les comportements présents des usagers actuels des plates-formes de téléchargement.

### *La possibilité de contournement par la gravure*

81. Le transfert sur un baladeur iPod de titres téléchargés sur VirginMega ou tout autre plate-forme est possible par l'intermédiaire d'une gravure, plus précisément par la manipulation suivante : télécharger le titre sur le site de VirginMega, le graver sur un CD, copier le titre du CD vers le disque dur de l'ordinateur en format MP3 ou AAC, par exemple à l'aide du logiciel gratuit *iTunes player* (cette opération est connue sous les vocables de *numérisation* ou de *ripping*) ; enfin, transférer le fichier sur l'iPod en utilisant le même logiciel.

82. Cette manipulation est légale, toutes les plates-formes autorisant au moins une gravure. Son coût financier est négligeable (de l'ordre, au maximum, de 3 centimes d'euro par titre, soit un surcoût d'environ 3 % par rapport au prix du téléchargement). Si ces opérations sont plus compliquées que le transfert direct de l'ordinateur sur le baladeur, elles sont très familières aux internautes et aux amateurs de musique. Ces derniers ont en effet une grande habitude de la gravure, comme le montrent les chiffres suivants. En 2003, les ventes de CD enregistrés ont représenté 140 millions d'unités, celles de CD vierges gravables 400 millions d'unités (sources FNAC et SNEP). On estime que les deux tiers des CD gravables vendus sont destinés à recevoir de la musique, ce qui représente le double des CD musicaux enregistrés.

83. Par ailleurs, selon une étude commandée par Universal, alors que seuls 15 % des clients de cette plate-forme avaient un baladeur en 2003, 80 % d'entre eux possédaient un graveur. Les amateurs de musique ont également une très grande habitude de l'opération de numérisation (ou *ripping*), puisqu'ils alimentent leur baladeur en musique, pour une très large part, à partir de leurs CD enregistrés personnels. Au total, la gravure permet donc, à court terme, de contourner relativement aisément l'absence d'interopérabilité. La FNAC a, d'ailleurs, publiquement indiqué ce moyen à ceux de ses clients qui pouvaient l'ignorer.

84. La gravure et la conversion des titres au format MP3 donnent accès non seulement aux baladeurs iPod mais aussi au très vaste ensemble des matériels d'écoute compatibles MP3 (nombreux baladeurs, lecteurs CD, de nombreuses chaînes Hi-Fi de salon...).

85. Certes, dans une optique de long terme, la manipulation précitée de contournement par la gravure pourrait se révéler inefficace, l'objet même de la musique numérique étant de s'affranchir du support physique. L'on peut donc se demander si elle ne sera pas amenée à

disparaître progressivement. Il reste qu'aujourd'hui, cette manipulation correspond à une pratique extrêmement répandue.

### L'apparition de nombreux baladeurs numériques avec et sans disque dur compatibles avec le DRM de Microsoft et la plate-forme VirginMega

86. La plate-forme VirginMega, comme celle de la FNAC, renvoie l'internaute désirant connaître les baladeurs compatibles vers une page du site américain de Microsoft qui présente une longue liste de baladeurs numériques compatibles avec la dernière version (version 10) du DRM de Microsoft. Ces baladeurs sont compatibles avec les plates-formes VirginMega et FnacMusic. La liste est régulièrement mise à jour, pour tenir compte de l'apparition de nouveaux baladeurs intégrant le DRM de Microsoft.

87. Parmi les baladeurs cités sur le site de Microsoft, une cinquantaine au moins est actuellement disponible sur des sites français de vente en ligne et donc accessible aux internautes français. Ces baladeurs, de marque Creative, Rio, iRiver, Samsung et Archos, couvrent toute la gamme de prix et de capacité, de la clé USB de 128 Mo au baladeur à disque dur de plusieurs dizaines de Go.

88. Le fabricant Thomson a indiqué que cinq de ses baladeurs seraient, avant la fin de l'année 2004, compatibles avec le format WMA sécurisé de Microsoft. Quant à Philips, il a déclaré : « *Il est impératif de se mettre en conformité avec les sites web de ventes en ligne qui ont adopté le format WMA sécurisé* ».

89. Le Conseil relève enfin qu'il n'existe aucun lien entre le fait pour un baladeur numérique d'être ou non équipé d'un disque dur et le fait d'être ou non sécurisé, c'est-à-dire de supporter un logiciel DRM, notamment la dernière version du DRM de Microsoft. Cette absence de lien technique a été indiquée, de la manière la plus nette, par Thomson et Philips dans leur réponse au questionnaire du rapporteur. Elle est confirmée par la simple observation du marché, qui démontre l'existence de nombreux modèles de baladeurs sécurisés *sans* disque dur. De plus, les ventes de baladeurs sans disque dur sont deux fois plus élevées que celles des baladeurs avec disque dur et ce chiffre devrait rester stable dans les prochaines années. La situation sur le marché des baladeurs à disque dur (si ce marché existe) ne contraint donc pas automatiquement la concurrence sur le marché du téléchargement payant de musique.

### Sur le lien entre la part de marché du site iTunes et l'accès au DRM Fairplay d'Apple

90. Une multiplicité de caractéristiques détermine l'attractivité d'une plate-forme payante de téléchargement de musique en ligne aux yeux des consommateurs :

- le prix et plus généralement les modalités de tarification de la musique en ligne ; les morceaux peuvent être vendus à l'unité (« à la carte »), soit individuellement soit dans le cadre d'un album (ou d'une compilation de dix ou vingt titres) ;

- la facilité, la simplicité et le confort d'utilisation de la plate-forme, les fonctionnalités techniques qu'elle offre à l'internaute : téléchargement permanent, écoute gratuite d'extraits, ainsi que le nombre de gravures autorisés et le nombre de transferts sur baladeurs ; parmi ces éléments techniques figurent aussi la possibilité et la facilité du transfert sur un baladeur numérique et la richesse du choix des baladeurs numériques compatibles avec la plate-forme ;

15

- les caractéristiques du catalogue proposé : le nombre de titres, mais aussi la nature qualitative des titres, leur adaptation au goût du public visé, ainsi que l'animation du site, les artistes mis en avant, les opérations promotionnelles ;

- la facilité et la simplicité des moyens de paiement proposés aux clients : cartes de paiement, facturation par le biais du téléphone mobile ou de l'abonnement du fournisseur d'accès à Internet (les clients sont souvent des adolescents qui ne possèdent pas nécessairement de carte de crédit). Sur ce plan, la reconnaissance de la marque est très importante pour acquérir la confiance des consommateurs.

91.    Si la hiérarchisation des facteurs précités ne fait pas l'objet d'un consensus entre les acteurs, il est acquis que la concurrence entre plates-formes est largement multidimensionnelle. De ce point de vue, on relève les différences suivantes entre Apple et ses concurrents :

- Apple a innové en affichant un tarif *uniforme,* donc très lisible pour les consommateurs : un prix unique pour tous les titres, indépendant de l'ancienneté et du label, fixé à un niveau psychologique : 0,99 € en Europe, 0.99 $ aux Etats-Unis. Les prix des autres plates-formes sont souvent variables suivant les titres et les labels. Le niveau de prix d'Apple est en moyenne inférieur à celui de VirginMega, qui vend les titres à l'unité au prix de 0,99 € ou 1,19 € selon le label et l'ancienneté du titre. L'étude de *UFC Que choisir* du 22 septembre 2004 retient le prix moyen de 1,19 € pour les titres vendus individuellement par VirginMega. Selon les réponses fournies par VirginMega aux questionnaires du rapporteur, son prix moyen par titre serait de 1,12 € TTC. L'écart de prix entre Apple et VirginMega serait donc d'au moins 12 %. Les représentants de VirginMega ont toutefois déclaré en séance avoir aligné, au cours du mois de septembre dernier, leur politique tarifaire sur celle d'Apple ;

- Apple semble disposer d'une avance en terme de taille du catalogue mis en ligne. Les chiffres, retenus par l'étude de *UFC Que Choisir* du 22 septembre, sont de 700 000 titres pour Apple contre 350 000, au maximum, pour les concurrents. Toutes les plates-formes ont des accords avec les principales maisons de disques, mais Apple semble disposer d'un nombre plus élevé de titres en provenance des labels dits "indépendants". En tout état de cause, l'avance d'Apple en terme de taille du catalogue n'est que temporaire, la taille des catalogues de toutes les plates-formes devrait, selon les observateurs du marché, converger à court terme vers un million de titres ;

- Apple autorise un nombre *illimité* de gravures pour les titres individuels et sept gravures pour les compilations. Le nombre de gravures autorisés par e-compil et Sony Connect est respectivement un et trois. VirginMega, quant à elle, autorise au moins sept gravures pour chaque titre ;

- La plate-forme *iTunes Music Store* est la seule à proposer gratuitement des clips et bandes annonces en *streaming* (source : comparatif du Journal du Net) ;

- Apple a dépensé des sommes considérables en publicité et en communication. Il ne semble pas que les concurrents aient entrepris des dépenses équivalentes. De plus, Apple bénéficie certainement d'un effet de réseau indirect, au sens où les possesseurs d'iPod sont, toutes choses égales par ailleurs, incités à télécharger sur la plate-forme d'Apple. Par ailleurs, Apple profite d'une économie de gamme pour les coûts de publicité et de communication, ses campagnes de publicité portant souvent à la fois sur le baladeur iPod et sur la plate-forme *iTunes Music Store.*

16

92. Au total, de nombreux facteurs, autres que son interopérabilité avec les baladeurs iPod, peuvent expliquer le différentiel constaté entre les niveaux de ventes d'*iTunes Music Store* et des autres plates-formes.

93. S'agissant, enfin, des motifs de son refus d'accorder des licences de FairPlay à des opérateurs tiers, la société Apple expose qu'elle est amenée à modifier FairPlay à chaque fois qu'une faille de sécurité est repérée, ce qui se produit à intervalles réguliers. Elle cite certaines clauses de ses contrats avec les *majors*, qui impliquent, selon elle, qu'en cas de licence de FairPlay, elle serait dans l'obligation de maintenir un contrôle total sur la mise en œuvre du DRM par toutes les parties tierces qui en auraient la licence. Apple devrait consacrer des moyens humains importants pour satisfaire cette obligation contractuelle et juge plus rentable de consacrer ces moyens à la lutte contre la piraterie et à l'installation de la plate-forme *iTunes Music Store* dans de nouveaux pays européens.

94. De plus, Apple soutient qu'une obligation de licence impliquerait une modification de l'architecture de FairPlay (dont les caractéristiques de sécurité sont actuellement cachées en trois emplacements : le logiciel *iTunes Player*, la plate-forme *iTunes Music Store* et le baladeur *iPod*), ce qui fragiliserait la sécurité du dispositif.

95. Sans qu'il soit nécessaire de se prononcer, à ce stade, sur la validité de ces arguments, le Conseil relève que le caractère non justifié du refus de licence, élément exigé par la jurisprudence pour caractériser un abus, n'est pas appuyé d'éléments suffisants dans la saisine du demandeur.

### *Sur la caractérisation suffisante d'un abus*

96. La jurisprudence pose des conditions très strictes sur le caractère indispensable de l'accès à une facilité essentielle, notamment le fait qu'il ne doit pas exister de substitut réel ou potentiel réaliste. Pour que le refus d'accès puisse être considéré comme abusif, la jurisprudence exige que le risque d'élimination de la concurrence soit bien établi. Elle impose enfin l'existence démontrée d'un lien de causalité entre la position dominante et l'abus. En l'espèce, aucun de ces trois éléments n'est présent.

97. En outre, la jurisprudence communautaire et nationale précitée exige que le caractère indispensable de l'accès à une facilité essentielle soit prouvé. Or, en l'espèce, le caractère indispensable de l'accès au DRM d'Apple n'apparaît pas prouvé pour trois raisons :

- le caractère minoritaire du transfert sur baladeur dans les usages actuels de la musique téléchargée ;

- l'existence d'une possibilité simple, peu coûteuse et très courante de contournement de l'incompatibilité des DRM : la gravure sur CD ;

- l'apparition récente en France de nombreux baladeurs numériques, avec et sans disque dur, sécurisés avec le DRM de Microsoft et compatibles avec la plate-forme VirginMega.

98. Enfin, les différences d'attractivité des différentes plate-formes de téléchargement peuvent s'expliquer par de multiples éléments qui sont sans lien avec le caractère indispensable ou non de l'accès au DRM d'Apple.

99. Il est donc exclu, avec les éléments apportés par la saisine et recueillis au cours de l'instruction contradictoire menée à l'occasion de l'examen de la demande de mesure conservatoire, que le DRM *FairPlay* puisse être considéré, dans l'état actuel du marché,

comme une facilité essentielle pour les plates-formes légales de téléchargement de musique en ligne.

100. Quant au risque d'élimination de la concurrence, il paraît très réduit, au moment où deux opérateurs majeurs (Sony Connect et Fnacmusic) viennent d'entrer sur le marché où la concurrence, notamment en prix entre les six acteurs présents, est très intense et où de nombreux concurrents potentiels sont susceptibles d'apparaître à court et moyen terme.

101. Enfin, le lien de causalité entre la position éventuellement dominante d'Apple sur le marché des baladeurs à disque dur et la situation de la concurrence sur le marché du téléchargement n'est pas établi. En effet, de multiples modèles de baladeurs, avec et sans disque dur, intégrant le DRM de Microsoft et compatibles avec la plate-forme VirginMega, apparaissent sur le marché français. Au surplus, les baladeurs à disque dur ne représentent pas la majorité des ventes de baladeurs numériques. Ils sont et resteront longtemps dominés par les baladeurs *flash*, qui peuvent également intégrer le DRM de Microsoft (plusieurs modèles sécurisés sont déjà disponibles en France).

102. A titre subsidiaire, on peut aussi relever que la condition posée par la Cour de justice dans l'arrêt *IMS Health* n'est pas non plus remplie, VirginMega n'ayant pas déclaré vouloir proposer un produit ou un service nouveau qu'Apple ne souhaiterait pas offrir et dont la commercialisation serait conditionnée à un accès au DRM d'Apple.

103. Au total, même à supposer qu'il existe un marché des baladeurs numériques sécurisés à disque dur et que la société Apple dispose d'une position dominante sur ce marché, les éléments suffisamment probants de nature à caractériser un abus ne sont pas, en l'état actuel du dossier, réunis et la saisine doit être rejetée en application L. 462-8 du code de commerce. La demande de mesure conservatoire, qui ne peut être formée qu'accessoirement à une saisine au fond, doit donc également être rejetée par voie de conséquence.

**CONCLUSION**

104. Il résulte de l'ensemble de ce qui précède que les faits dénoncés par la saisine ne sont pas appuyés d'éléments suffisamment probants de nature à caractériser, en l'état actuel du marché, l'existence de pratiques qui auraient pour objet ou pour effet d'entraver le libre jeu de la concurrence au sens des dispositions des articles L. 420-2 du code de commerce et 82 du Traité CE. Il convient, en conséquence, de faire application des dispositions de l'article L. 462-8 du code de commerce.

105. Le Conseil de la concurrence souligne qu'un tel rejet ne fait pas obstacle à ce que les entreprises du secteur, dans le cas où elles feraient état d'éléments nouveaux provenant de l'observation ultérieure du marché, puissent saisir utilement le Conseil.

## DÉCISION

Article 1<sup>er</sup> : La saisine enregistrée sous le numéro 04/0045 F est rejetée.

Article 2 : La demande de mesure conservatoire enregistrée sous le numéro 04/0046 M est rejetée.

Délibéré sur le rapport oral de M. Choné, par M. Lasserre, président, M. Nasse, Mmes Aubert et Perrot, vice-présidents, Mmes Behar-Touchais et Renard-Payen, MM. Bidaud, Flichy, Gauron et Ripotot, membres.

La secrétaire de séance                    Le président


Marie-Pierre Binard                    Bruno Lasserre

© Conseil de la concurrence

# EXHIBIT 13

**French Republic
Competition Council**

**Decision 04-D-54 of 9 November 2004 on the practices of Apple Computer, Inc. in the
sectors for online music and digital portable players**

The Competition Council (Section III A),

In view of the letter filed on 28 June 2004 (Cases No. 04/0045F and 04/0046/M), by which
VirginMega challenged the practices of Apple Computer France before the Competition Council
and requested the granting of provisional measures on the basis of Article L. 464-1 of the
Commercial Code;

In view of Articles 81 and 82 of the Treaty establishing the European Community;

In view of Volume IV of the Commercial Code on the freedom of price and competition and
Decree 2002-689 of 30 April 2002 establishing the conditions for its application;

In view of the observations presented by VirginMega and Apple Computer France and by the
DGCCRF;

In view of other elements of the file;

The rapporteur, the rapporteur général, the DGCCRF and VirginMega and Apple Computer
France were heard during the hearing on 19 October 2004;

Adopts the following decision:

# I.    Findings

## A.    THE SECTORS OF ACTIVITY

1. The sector of for-pay online music is nascent. In the U.S., this activity commenced in 2002 and currently represents less than 2% of total revenues in the music industry. In France, this percentage is about 0.1%. Nonetheless, market researchers are forecasting strong growth in the sector in the coming years. According to the most optimistic forecasts (for example, that of Jupiter Research), in 2008 online digital music could represent 5% of music sales in Europe.

2. It was only in 2001 that the music industry recognized the necessity of protecting music titles and that the first DRM technologies appeared. Currently, the vast majority of online music is still on no-fee exchange networks (so-called *peer-to-peer*), which use the non-secure MP3 encoding format. No royalties are collected by the authors and producers for titles exchanged by this method. Various measures have been taken to counter free downloads and to favor the development of for-pay downloads. In France, a charter of commitments was signed on 28 July 2004 by the leading players in the sector, under the leadership of the Minister of Economy. This charter seeks, for example, to have Internet access providers send warning messages to Internet users. The public authorities are also seeking to encourage interoperability of different DRM systems with the variety of listening equipment on the market. It is impossible to anticipate the effectiveness of such measures, but it seems likely that for-pay downloads will be obliged to co-exist with no-fee exchanges for several years.

3. Portable digital players have also appeared very recently. The first MP3-compatible portable players date from 1999. Apple launched its first portable player model, *iPod*, in October 2001.

## B.    THE COMPANIES

4. The plaintiff, VirginMega, is a 100% subsidiary of the Lagardère group (via Hachette Distribution Service Services). It is fully independent of the British Virgin group. The Lagardère group acquired the rights to the Virgin brand. The plaintiff manages an online music platform, which is active only on the French territory.

5. Apple Computer France is a 100% subsidiary of the U.S. Apple Computer, Inc. company, based in Cupertino, California. It only distributes Apple products in France on behalf of its parent company. It has no access, nor any license over Apple's DRM software, *FairPlay*. The legal owner of FairPlay is Apple Computer, Inc., which was involved in the all of the proceedings and was given the opportunity to be heard.

## C.    THE CHALLENGED PRACTICES

6. Consumers who download music from the VirginMega platform cannot directly transfer such music to the iPod digital portable player, which is made and commercialized by Apple. The impossibility of direct transfer arises from the incompatibility of the DRMs

used by the VirginMega platform and the iPod player. VirginMega uses the Microsoft DRM, while the only DRM compatible with the iPod is Apple's proprietary DRM, FairPlay.

7. VirginMega requested, at the launch of its platform in Spring 2004, to have access to FairPlay by paying for a license from Apple. This was refused.

8. VirginMega considers that this access refusal is an abuse of Apple's dominant position. According to the complainant, Apple, through the iPod player, holds a dominant position on the market for secure portable digital players with hard drive. According to VirginMega, Apple probably also holds, through its iTunes Music Store platform, a dominant position on the French market for online music. The complaint is based on Articles L. 420-2 of the Commercial Code and Article 82 of the EC Treaty.

9. In connection to its complaint, VirginMega requested, on the basis of Article L. 464-1 of the Commercial Code, that the Council impose the following provisional measure against Apple: "*to grant VirginMega, and any other company that so requests, within a period of one month from the forthcoming decision, and under fair and non-discriminatory economic conditions, direct access to all components enabling the download and transfer of music files, particularly to the iPod music player, such as the formats and its digital rights management software (DRM) software FairPlay, with the related technical documentation that would allow an expert in the field to operate the systems and manage the rights for such downloading*".

## II.   Discussion

10. Article 42 of the Decree of 30 April 2002 provides that "*the request for provisional measures mentioned in Article L. 464-1 of the Commercial Code can only be requested in conjunction with a complaint on the merits to the Competition Council. Such request may be made at any time during the procedure and must be justified*". A request for interim measures, thus, may only be considered if the complaint is admissible and if the Council does not apply para. 2 of Article L.462-8 of the Commercial Code, according to which: "*(...) it may also reject the complaint by a reasoned decision where it finds that the facts presented are insufficiently probative*".

## A.   On the admissibility of the complaint

### 1.   On the markets

11. Three sectors are concerned by the complaint: DRM technologies, digital portable players, and the download of online music.

#### (a)   On the features of digital rights management (DRM)

12. DRM protection systems can apply to various types of content: audio, video, computer files. Generally, suppliers on the DRM market(s) are businesses specialized in the

development of software protection. Buyers are companies that wish to sell secure online content; that is, in connection with pre-defined usage rights giving rise to payment by the final consumer.

13. In the music sector, DRMs are used to restrain the possible use of downloaded titles by the consumer, in conformity with the rights negotiated between the producer (the "record labels") and the distributor (the online music service). The rights in question primarily concern the number of different computers on which music may be downloaded, listened to and copied, the times that a downloaded title can be burned on a CD, and the number of authorized transfers to portable digital players.

14. It is appropriate to distinguish encoding formats and DRMs. It is not disputed that the interoperability problem at the heart of this case arises only from DRMs, not encoding formats. The most well-known format, released in 1999, is the MP3 format. This is the format that is used for free downloads. The principal alternative formats are AAC (originally linked to the Dolby system), Microsoft's WMA, and Sony's proprietary ATRAC. For-pay platforms pair an encoding format with a DRM: the Apple platform *iTunes Music Store* uses the pair AAC/Fairplay; the Sony platform *Sony Connect* uses the pair ATRAC/Open MG; and all other for-pay French platforms use the WMA format and the Microsoft DRM.

15. VirginMega asserts that it is ready to offer its customers with titles in two or even three different formats. During the current proceedings, the president of Universal France recalled that when vinyl records, audio cassettes, and compact discs co-existed, it was necessary for music stores to stock titles in the three formats. This situation engendered an added cost for music shops, but did not impede the distribution of music. The obstacle faced by VirginMega is not at the level of access to the AAC format (which is not owned by Apple), but at the level of access to the FairPlay DRM.

16. Apple developed its own DRM in order to sell music online, first to owners of Macintosh computers, and then to owners of computers operating with Windows. In the U.S., the *iTunes Music Store* platform was thus launched in April 2003, but only for Macintosh users. The platform was made available to Windows users as of October 2003. On 16 June 2004, the platform was launched in Germany, France, and the UK.

17. The FairPlay DRM is currently not licensed to any third party. It is exclusively installed in the software of the *iTunes player*, on the *iTunes Music Store* platform, and *iPod* portable players.

18. The relevant DRM markets have not yet been defined in the caselaw. The question of whether the markets must be segmented by type of content (audio, video, software data) and/or by type of user equipment (portable player, portable telephone, personal digital assistant, etc.) is unclear. The European Commission is now examining the joint acquisition of ContentGuard, which is specialized in software protection, by Microsoft and Time Warner. In this context, the Commission must proceed towards an initial demarcation of the DRM market(s).

19. Technological developments are very fast-paced in the DRM sector, and notably concern security management during the transfer to different types of customer equipment. It is very difficult to anticipate the evolution of such market(s), even in the coming months.

**(b)    On portable digital players**

20. There are several types of portable digital players: portable players with hard drive (which include all iPod models), "RAM Flash" portable players (which may be charged from a USB key), MP3-compatible CD portable players, and minidisc recording portable players.

21. Users of CD portable players and minidisc players must transfer music onto physical equipment that is external to the portable player itself, and not onto a memory installed in the player. This characteristic clearly distinguishes portable players from flash players or players with hard drive, which will therefore not be considered in the rest of the assessment.

22. The market, excluding CD portable players and minidisc players, must be presented in ascending order by storage capacity and price, as follows:

• *Flash* players, whose storage capacity did not surpass, until recently, 258 million octets (Mo). Price range: 100 - 200 euros;

• Portable players with "small hard drive", whose capacity ranges from 1.5 Go to 5 Go. Apple's iPod *mini* belongs to this category. Price range: 200 - 350 euros;

• Portable players with hard drive, whose capacity ranges between 20 Go and 80 Go. Various "classic" iPod models belong to this category. Price range: 350-500 euros.

23. According to GFK, portable players with hard drive currently represent less than a third of the current existing base of players in France. According to Understanding and Solution, this figure should remain constant in the coming years. In other words, the number of players currently in use in France, and the volume of sales achieved each month are twice as much for portable players without hard drive than for players with hard drive.

24. VirginMega asserts that portable players with hard drive constitute the relevant market in the context of competition law, since the 1 Go capacity is a significant limitation (several hundred songs, or over ten hours of music). Apple considers, to the contrary, that this segmentation based on a technical criteria does not correspond to any demonstrated consumer demand characteristic.

25. It is difficult to anticipate for how long the segmentation presented in Paragraph 22 will remain valid, as the capacity of flash portable players is rising rapidly. There are already several models of flash players with storage capacities of 512 Mo (for example, Philips' USB Key, and Creative's Rhomba MP3 player) and even of 1 Go (iRiver's IFP-799 and IFP-899 players). These players are available on French online sales sites.

BRI-1323425v1

26. In the intermediary segment of portable players with a capacity of several Go, it should be expected to quickly see the coexistence of players with hard drive and flash players. This segment has particular importance. According to a *Jupiter Research* study, 77% of consumers believe that the optimal storage capacity for a portable player is 1000 songs, or 4 Go. This study indicates that 90% of consumers have less than 1000 songs on their computer.

27. The delimitation of the relevant markets is, thus, difficult to carry out in the context of the rapid evolution of technologies. Nonetheless, at this stage of the investigation, the existence of a relevant market for digital portable players with hard drive cannot be excluded.

28. The complainant suggested, in its final written observations and during its hearing, defining a market for *secure* digital portable players with hard drive; that is, those integrating DRM protection. If such a market exists, its evolution would be even more rapid than that of digital portable players with hard drive. In fact, *secure* digital portable players (with and without hard drive) integrating the latest version of Microsoft's DRM and compatible with the VirginMega platform, have appeared on the French market and are being purchased at a brisk pace. Thus, at this stage of the proceedings, the existence of a relevant market for *secure* digital portable players with hard drive cannot be excluded.

**(c)    On the for-pay download of online music**

29. It is not disputed that the market for online downloading is distinct from that of physical distribution, even if both concern the acquisition of music. The characteristics of the two means of distribution are very different, both on the supply and demand side, and the price differentials are significant (between 1 to 5 for singles, and 1 to 2 for albums).

30. *Peer-to-peer* exchange networks do not give rise to any kind of payments or compliance with copyrights. Even if these exercise a competitive constraint on the market for legal downloading, it is not possible to include them in the same relevant market.

31. It is also not disputed that the geographic dimension of the for-pay downloading market is national. Indeed, the music industry imposes on distributors a segmentation by country. The main record companies negotiate the rights with platforms on a national basis and impose constraints on them to ensure that they only sell to internet users residing in the particular country. In France, the principal labels have just imposed the requirement that payment be effectuated using a French bank account number. Furthermore, collecting societies operate on a national basis.

32. *Streaming* consists of listening to a title that is not copied to the computer. In France, this segment seems negligible, since the price of direct listening is around 1 eurocent and volumes remain limited.

33. Thus, in the current state of the proceedings, it is possible to envisage the existence of a national market for online music, outside of exchange networks and direct listening.

BRI-1323425v1

**2.     On Apple's position on the different relevant markets**

**(a)     On the DRM market(s)**

34. The FairPlay DRM occupies a specific segment of the DRM sector; that is, of DRMs managing audio content and operating on iPod players. An assessment of Apple's competitive position heavily depends, therefore, on the exact demarcation of the DRM market(s).

35. The Microsoft WMA DRM is linked to the Windows operating system, which is installed on the vast majority of personal computers (while the Apple DRM is independent of any operating system). The integration of WMA within Windows assures Microsoft that its DRM will be very widely diffused. In addition, this integration impedes piracy.

36. The Microsoft WMA permits the user to determine the use restrictions that are attached to each title. FairPlay consists of rights that are determined once and for all (seven burnings, and downloading on three computers). This lack of flexibility can be inconvenient for producers who wish to decide the rights that will be associated with each particular title.

37. The latest version of the Microsoft DRM allows, unlike FairPlay, the use of a subscription model that is based on the principle of music *rental* (the subscriber has access to the platform's entire catalog, as long as his subscription is paid). This approach was launched in the U.S. by the Napster and Rhapsody platforms, which have hundreds of thousands of subscribers.

38. While the old versions of the Windows DRM operated title by title, FairPlay has been based since its inception on an "account" system (associated with an e-mail address). This account may be filled by various means (credit card, pre-paid cards). The latest version (Microsoft DRM 10) is, like FairPlay, based on the concept of an account. Microsoft has thus caught up to Apple in this regard.

39. The European Commission, in the framework of examining the acquisition of ContentGuard by Microsoft and Time Warner, published a press release in which it considers that the Microsoft DRM is already a leader on the DRM market(s) and that there is a risk of reinforcing Microsoft's dominant position, as well as favoring an eventual technological evolution towards a Microsoft "standard".

40. In view of the elements available at this stage of the investigation, the Competition Council considers it unlikely that Apple would possess sufficient market power to gain a dominant position on the market(s) for DRM solutions.

**(b) On the market for digital portable players**

41. To assess Apple's market power, it would appear appropriate to estimate the market shares in *value* over the twelve months preceding the date of the complaint, since the

ability to apply higher prices denotes market power. According to GFK, Apple held a market share of 25% on the global market for MP3 players from June 2003 to May 2004. If the market only included portable players with hard drive, Apple's market share would have been 53%.

42. If only secure portable players were taken into account, Apple's market share would have been even higher, although less significant since it would have been calculated on a very narrow market: the appearance of secure portable players (with or without hard drive) integrating the Microsoft DRM is recent on the French market. Such equipment, whose commercialization is only just beginning, only represents a very small part of the existing base of players, taking into consideration iPod's head-start. However, it would be inaccurate to consider that Apple's short term market shares will foreshadow the medium-term situation, given that the market is growing and many new products are entering.

43. A dynamic assessment of market shares requires, even more so, taking into account other factors to determine Apple's market power in the digital portable player sector.

44. According to a *Jupiter Research* study, price and storage capacity are not the only two parameters for competition between players. When asked what portable player characteristic is the most important for them, 55% of consumers mentioned a rechargeable battery, 52% the size of the player, 49% the capability of connecting to a computer, 20% the compatibility with the MP3 format, 7% with the Microsoft WMA format, and less than 1% with the Apple AAC format.

45. Several elements demonstrate that Apple is under strong competitive pressure from numerous and powerful competitors such as, for example, Sony, Creative, Rio, iRiver, Philips, Samsung, and Thomson.

46. Also, Creative's *Zen Touch* model is featured in several publications as a direct rival of iPod: "*it strongly resembles iPod*" (Micro-Hebdo of 9 September 2004) or even "*an iPod clone*" (20 Minutes of 24 September 2004). In both cases, the particular features of this new model are highlighted, and notably its autonomy: "*We like it: an exceptional autonomy*" (Micro-Hebdo), "*it overcomes a weakness of the iPod: it's battery offers a 24 hour use autonomy, against only the 12 hours of its rival. Think about it.*" (20 Minutes), and price: "*And the Zen Touch is also less expensive: 299 Euros, instead of 349 Euros*". (20 Minutes).

47. In France, the Japanese firm Sony, inventor of the "Walkman", just launched a digital portable player with hard drive of 20 Go, the NW-HD1. It has an autonomy of 30 hours. It uses the proprietary Sony format (ATRAC), but has a converter that permits it to read the MP3 format. It carries the Sony DRM (Open MG) and is compatible with the Sony Connect platform. It should be recalled that over the past 25 years, Sony has sold 340 million Walkmans (including CD and minidisc).

48. In the face of these new models available to consumers, Apple is continuing to invest considerably in advertising to maintain the iPod's leading position. Apple's advertising expenses are in the tens of millions of dollars in the U.S. alone. Apple

- 8 -

launched its first iPod model in Oct 2001 and has offered a new model each year. In July 2004, Apple launched the *iPod mini*, with a 4 Go capacity.

49.      Finally, far from having the ability to behave independently of other competitors, Apple was obliged to decrease its prices on all iPod models by 25% in July 2004.

50.      Competition in the market(s) for portable players is therefore very dynamic, with price cuts, new entrants, innovation in terms of *i.a.* autonomy, dimension, weight, storage capacity, and the technical features of such equipment (notably, navigation tools that facilitate title searches). Under these circumstances, it is particularly difficult to determine how Apple could ignore competition and behave independently of competitors, clients, and final consumers.

51.      Nonetheless, and despite the considerable uncertainties regarding the power of market players, the Council cannot exclude, at this stage of the investigation, the existence of a dominant position by Apple in the market for (secure) portable players with hard drive.

### (c)      On the market for for-pay online music in France

52. There are currently six principal players in the French market for for-pay online music: the FNAC (which is also the leading seller of physical music in France); VirginMega (subsidiary of the Largardère group and companion company of the distributor Virgin MegaStores); OD2 (French subsidiary of a British company that operates a "generic brand" of numerous platforms (MSN, Wanadoo, Tiscali Music, alapage, etc.); the platforms of Sony and Universal, *Sony Connect* and *E-Compil*; and Apple's *iTunes Music Store*.

53. Apple's share, in terms of volume on the for-pay online music market in France, has been estimated by the rapporteur at around 75%, based on the latest weekly data available. All titles were counted, regardless of whether they were downloaded individually, in the framework of an album or compilation, or paid by the unit or lump sum. This estimate is nonetheless tenuous, as it is based on short periods. The *iTunes Music Store* was launched on 16 June 2004, and Sony's platform was launched in July 2004. The summer period could have had a disruptive effect. The figure of 75% is a particularly difficult estimate in the context of a market in full expansion and where market positions can rapidly change. Fifteen weeks after its launch, *iTunes Music Store* sales are falling after an initially high level in this expanding global market. In fact, Apple's market share has been declining since the end of summer 2004.

54. Since the launch of the Apple platform in June 2004, two major players have entered the market. Sony's *Sony Connect* platform was launched on 5 July 2004. FNAC must also be considered as a new entrant on the French online music market, since it opened its own platform on 18 September 2004. Previously, the FNAC site had been operated by OD2, which directly negotiated rights with the record houses. The FNAC, thus, was not in the business of online music until September of this year.

55. As concerns the *technical* cost of establishing a platform for online music in France, the FNAC mentioned "*several million euros*"; Universal and Sony set forth an estimate of some 5 million euros; OD2 mentioned the range of between 20 - 80 million dollars (but this estimate takes into account the U.S. market); Apple did not give a precise figure for the French market (since its servers are distributed among several European countries). VirginMega stated that it anticipated spending an estimated 25 million euros between 2003 and 2007 ("profitability date" anticipated in the business plan), without giving further explanation. These figures, which are quite varied, must be considered in view of the size of the companies or groups concerned (Microsoft, Apple, Sony, VirginMega as a subsidiary of Largardère, etc). The technical cost of establishing a platform does not appear to be an obstacle likely to dissuade the entry of companies that are well-known to the public and that have a solid financial background.

56. It must also be noted that, in addition to these actual new entrants, there are numerous potential competitors on the French market for online music.

57. The Council also notes that the MTV music chain already has online platforms in Italy, Germany, and Spain. It seems very likely that MTV and other comparable entities (notably radio or TV music chains, such as NRJ and M6) could develop, in the near future, the same activity on the French market and make online sales of the music it plays.

58. Companies in the software sector, such as Microsoft (which just entered the U.S. market) and Real Networks (which operates the Rhapsody platform in the U.S.) are also potential competitors, even if their actual entry on the French market is unlikely in the short term. The Council notes that Microsoft's power on the markets for operating systems for personal computers, media readers and DRM, as well as the integration of three components (Windows, Windows Media Player, and the Microsoft DRM), confers it with a serious competitive advantage in the online music market.

59. The Council further notes that in Germany, AOL sells tens of thousands of titles online each week. Internet access providers are, therefore, credible potential competitors on the market for online music. They have a key asset, which is the ease of payment operations for the music, which is done through ordinary withdrawal from the bank account of the subscription holder.

60. Finally, large distributors are undoubtedly interested in this market. In the U.S., Wal-Mart is one of Apple's main competitors. Wal-Mart, the world leader in mass distribution, entered the online music market in 2003.

61. In the U.S., competition in the online market is extremely fierce, with the promotional offers of Real Networks (recently promoting $ 0.49 titles for three weeks), the entry of Microsoft, the presence of Wal-Mart since 2003, and the recent announcement of the entry of the British Virgin group. The U.S. market is also starting to consolidate, with the recent buy-out of the MusicMatch platform by Yahoo! (the most-visited Internet site, according to Nielsen NetRatings) for 160 million dollars.

62. Apple only makes unit sales, because of the technical limitations of its DRM.  Today, in France, only Universal's E-compil platform offers monthly subscription packages (for example, 8 euros/month for 10 downloaded titles, with a 6-month commitment).  In the U.S., the subscription model, which is used by the Napster and Rhapsody platforms, relies on the principal of *rental* of the music.  The subscriber has access to the platform's entire catalog, as long as his subscription fee is paid (this feature, made possible by Microsoft's new Janus DRM model, will allow the transfer in the coming months of titles onto players in the context of subscriptions).  In 2003, this economic model represented revenues of 113 million dollars.  For permanent downloads paid by the unit, revenues were 158 million dollars.  However, subscription sales are developing quickly and could surpass unit sales by 2008.  In Europe, *Jupiter Research* forecasts the same trend, but with some delay.  The 70% figure, which often serves as a reference for Apple's market share in the U.S., only concerns the segment for downloading by unit.  Since Apple does not offer subscriptions, its market share in value would be less than 40% in the U.S.  The growing importance of the subscription model, which has appeared on the U.S. market, would relativize the apparent stability of Apple's competitive position.

63. Concerning the advantages of vertical integration that Apple benefits from, it must be noted that in France, each business has its own strengths.  The FNAC and VirginMega benefit from synergies with their physical stores and from a solid knowledge of the French music market.  Indeed, more than half of the titles sold in France, regardless of the distribution means, are produced by national artists.  By contrast, Apple, Universal, and Sony are less well-placed to understand the domestic market, but benefit from synergies arising from vertical integration (Apple manufactures equipment, Universal produces music, and Sony does both).

64. The Council considers, in summary, that the market is nascent.  The *iTunes Music Store* has only operated in Europe since 16 June 2004.  Competition in this market is dynamic in France, other European countries, and the U.S.  New undertakings are entering the market and there are many potential competitors.  Price competition is intense, margins are limited (around several eurocents per title), and new business models are appearing.  In this context, it is difficult to appraise Apple's market power.  However, at this stage of the proceedings, the Council does not exclude that Apple, with its *iTunes Music Store*, would have a dominant position on the French market for online music.

### 3.      On the challenged practices and the alleged abuse

65. In its final observations, the complainant maintained that FairPlay is an essential facility, in so far as access to it is indispensable to the development of online music services.  The complainant further maintained that as an entity dominant on the market for secure digital portable players with hard drive, Apple's refusal to grant access constituted an abuse of dominant position.

66. According to VirginMega, Apple's refusal leads to a lack of interoperability, to the detriment of consumers.  The Council notes that, while the lack of interoperability can constitute an inconvenience for consumers, such situation is not uncommon in the

BRI-1323425v1

information technology sector, where innovations rapidly succeed each other. Market adaptation to such a succession of innovations does not necessarily constitute a violation of competition law. Even if the Commercial Code (notably Articles L. 420-4 and L. 464-1) provides that the Council take into account, to some degree, the interests of users or consumers, the Council may only do so if the alleged harm results from a practice prohibited by competition law.

67. The alleged abuse, as well as the complainant's request for interim measures to force Apple to license access to its DRM, are both ultimately founded on the sole notion of an essential facility. To assess the validity of the complainant's demands, it is appropriate to refer to the case law of the French and EU competition authorities regarding access to an essential facility and to determine if the conditions set out by this case law are satisfied in the present case.

### (a)    Recent case law on essential facilities

68. In its decision of 24 March 2004 on the interoperability of the Windows operating system with work group servers, the European Commission stated (in paragraph 585): "*In Magill, Commercial Solvents and Télémarketing, one of the constituent elements of the abuse finding was that the dominant undertakings' behaviour risked eliminating competition. In Bronner, the Court of Justice clarified that, for the judgment in Magill to be relied upon, it was necessary to show that supply is indispensable to carry on business in the market, which means that there is no realistic actual or potential substitute to it.*"

69. In its *Bronner* judgement of 26 November 1998, the Court of Justice concluded that (paragraph 47): "*the refusal by a press undertaking which holds a very large share of the daily newspaper market in a Member State and operates the only nationwide newspaper home-delivery scheme in that Member State to allow the publisher of a rival newspaper, which by reason of its small circulation is unable either alone or in cooperation with other publishers to set up and operate its own home-delivery scheme in economically reasonable conditions, to have access to that scheme for appropriate remuneration does not constitute abuse of a dominant position within the meaning of Article 86 of the Treaty*". In paragraph 43, the Court noted, in particular, that: "*In the first place, it is undisputed that other methods of distributing daily newspapers, such as by post and through sale in shops and at kiosks, even though they may be less advantageous for the distribution of certain newspapers, exist and are used by the publishers of those daily newspapers.*"

70. In applying the Court of Justice's case law to the case of Windows operability with work group servers, the Commission took the following approach. At paragraph 586, it indicated that: "*In this case, Microsoft's behaviour as regards disclosures of interface information [information permitting interoperability] must be analysed against the backdrop of two key elements, which have been outlined above. First, Microsoft enjoys a position of extraordinary market strength on the client PC operating system market. Second, interoperability with the client PC operating system is of significant competitive importance in the market for work group server operating systems*". To establish this last

point, the Commission relied on various inquiries amongst buyers (notably software systems managers within companies), who are likely to select the operating system of the work group server. These inquiries demonstrated that a great majority of users place great importance on interoperability with Windows. Finally, in paragraph 781, the Commission against insisted on demonstrating the risk of eliminating competition and on the causal link between market evolution and Microsoft's advantage in terms of Windows interoperability.

71. The judgement of the Court of Justice of 29 April 2004 *IMS Health* also established that a statistical testing tool to enable market studies could be considered as an essential facility. One of the conditions set out by the Court, such that a refusal to license be regarded as an abuse, is the following: "*the undertaking which requested the licence does not intend to limit itself essentially to duplicating the goods or services already offered on the secondary market by the owner of the copyright, but intends to produce new goods or services not offered by the owner of the right and for which there is a potential consumer demand*". (paragraph 49).

72. In Decision No. 03-MC-04, confirmed by the judgement of 12 February 2004 of the Paris Court of Appeal, the Competition Council did not exclude, at the interim measures stage, that "*the refusal for direct access [to the common part of Presse 2000 software] by the NMPP against MLPs could constitute a practice prohibited by the provisions of Article L. 420-2 of the Commercial Code*". Numerous elements provided in the file demonstrated that the absence of access to the common part of the Presse 2000 software constitutes a major competitive handicap for MLPs, capable of endangering their short-term survival and thus eliminating all competition on the market (the MLPs constituted the only alternative operator to NMPP).

73. Furthermore, in paragraph 56 of the Decision, the Council indicated that: "*it also appears that, under the hypothesis that MLPs could not establish their own system parallel to that of the NMPP, the lack of access to the* common part of the Presse 2000 software could constitute a competitive handicap that would compromise their activities". In the absence of access to a common part, the press distributors must, in effect, manually retyping information to and from newspaper vendors. They firmly oppose this, as explained in the documents contained in the request for interim measures. Notably, the Council relied on a letter from the national union of press distributors (SNDP), which indicated that: "*In the event that the deployment of these modules requires some sort of retyping of mail from MLP to Presse 2000, we could not accept this*".

74. The Council also noted in paragraph 84 that: "*Certain editors also complain of the quality of software services provided by the Lyonnaise distributors. This is the case with editors of "Psychologies Magazine" and "Cyber Press Publishing", who in letters dated respectively 13 September 2002 and 21 June 2002, inform the MLP of their decision to no longer use their services. Psychologies indicates that it is does not 'benefit from an effective software tool' and Cyber Press expresses the hope that the MLP will very quickly be capable of 'providing editors with an appropriate tool'*". Finally, the Council stated that numerous titles had left the MLP to rejoin the NMPP, which thus confirmed the indispensable nature of the access and the risk of eliminating competition.

**(b)     Application of the case law to the facts**

75.     The alleged indispensable character of FairPlay for the development of for-pay online music platforms must be assessed in light of three elements: (i) the current uses of online music, (ii) the possibility to circumvent DRM protection, and (iii) the evolution towards a greater availability of competing portable music players.

*The current uses of online music*

76.     The principal uses of online music are currently: listening on a computer (eventually linked to external speakers), the storing and managing of music on a computer (notably the creation of personal compilations), and the burning of CDs (which may then be listened to on a portable CD player, a car radio, or a home audio system compatible with MP3). These uses are the principal ones today, far ahead of the transfer to portable digital players.

77.     The preceding assertions come from two very recent studies on current uses of digital music. One is done by *Forrester*, which is based on a survey among European Internet users. The other is done by *Jupiter Research*, which relies on U.S. data. These two studies indicate that transfer to a portable player is a minor use of online music.

78. The *Forrester* study, dated 25 August 2004, is based on a survey of 22,907 people in seven European countries in April and May 2004. The survey asked consumers if they regularly downloaded music. For those who downloaded at least once a month, they were asked what they did with the downloaded music. The results are as follows: Among those who downloaded at least once a month (several thousand persons among those surveyed), 66% listen to such music on their PC, 53% burn the music on CDs, and 15% transfer the music onto a portable digital player.

79. The *Jupiter* study, dated April 2004, is based on a study conducted in the U.S., to which 896 persons responded. In response to the question "*What characteristic of online music is the most important to you?*", 42% of consumers answered "*To make my own compilations*", 19% answered "*To make multiple copies to have them in several locations*", 16% responded "*Transferring music onto a portable player*".

80. The findings of the Forrester and Jupiter reports contradict the assertion that most online music is destined to fill portable players. This assertion, contrary to the Jupiter and Forrester studies, is not based on any statistical inquiry. VirginMega cites, for example the results of a Jupiter Research study consisting of 24 managers in the music sector in Europe. However, the responses obtained in this context give much less information about public behavior than the statistical studies that directly address demand. Similarly, even if VirginMega refers to certain studies on consumers, which concern the wishes or intentions of potential consumers, these studies do not describe the current behavior of actual users of online music.

BRI-1323425v1

*The possibility of circumventing DRM protection*

81.    The transfer to an iPod of music downloaded from VirginMega or any other platform is possible by CD burning, and more specifically, by the following process: Download a title from the VirginMega site; burn it on a CD; copy the title from the CD to the hard drive of a computer in MP3 or AAC format, for example, with the assistance of the free *iTunes player* software (this procedure is known by the terms digitizing or *ripping*); and finally, transfer the file to an iPod by using the same software.

82.    This procedure is legal, and all platforms authorize at least one burning.  The financial cost is negligible (around a maximum of 3 eurocents per title, or an additional cost of about 3% in relation to the price of downloading).  Even if these procedures are more complicated than direct transfer from a computer to a portable player, they are very familiar to Internet users and music fans.  The latter group widely uses burning, as shown by the following figures.  In 2003, sales of recorded CDs represented some 140 million units, while blank CDs were at 400 million units (source: FNAC and SNEP).  It is estimated that two-thirds of blank CDs sold are destined to record music, amounting to twice the number of recorded CDs.

83.    Furthermore, according to a study commissioned by Universal, while only 15% of this platform's customers owned a portable player in 2003, 80% of its customers own a burner.  Music lovers are also very accustomed to digitizing (or ripping), since they fill their portable players with music that largely comes from their personally-recorded CDs.  On the whole, burning thus permits (in the short term), the relatively easy circumvention of the absence of interoperability.  The FNAC, furthermore, has publicly indicated this method for those of its customers who may not be aware of it.

84.    Burning and the conversion of titles into MP3 format gives access not only to iPod players, but also to a vast ensemble of MP3-compatible listening equipment (numerous portable players, CD readers, a large variety of home-stereo systems, etc.).

85.    Certainly, in a long-term perspective, the above-mentioned procedure of circumventing through burning could become inefficient, since the objective of digital music is to go beyond physical equipment.  Whether such method will progressively disappear could be subject to speculation.  Presently, this procedure represents an extremely wide-spread practice.

*The emergence of numerous digital portable players, with and without hard drive, compatible with the Microsoft DRM and the VirginMega platform*

86.    The VirginMega platform, like FNAC's, directs Internet users who wish to learn about compatible players to Microsoft's U.S. site.  This Microsoft site presents a long list of digital portable players compatible with the latest version (version 10) of the Microsoft DRM.  These platforms are compatible with the VirginMega and FnacMusic platforms. The list is regularly updated to take into account the release of new portable players integrating the Microsoft DRM.

- 15 -

87.    Among the list of portable players on Microsoft's website, there are currently around 50 players available for sale on French online sites, and thus accessible to French Internet users. These players (Creative, Rio, iRiver, Samsung, and Archos) cover the full range of price and capacity, from the USB key of 128 Mo to the portable player with hard drive of several dozen Go.

88.    The manufacturer, Thomson, has indicated that five of its players will be compatible with Microsoft's secure WMA format before end-2004. Philips also declared: "*It is imperative to become compatible with sites for online sales that have adopted the secure WMA format*".

89.    The Council finally notes that there is no relationship between the fact that a digital portable player does or does not contain a hard drive, and the fact that it is secure or not (*i.e.*, compatible with DRM software, and notably, the last version of the Microsoft DRM). This absence of a technical link was indicated more clearly by Thomson and Philips in their response to the rapporteur's questionnaire. It is confirmed by a simple observation of the market, which demonstrates the existence of numerous new portable players *without* hard drive. In addition, sales of portable players without hard drive are twice as high as those of players with hard drive, and such figure should remain stable in the coming years. Thus, the situation on the market for portable players with hard drive (if this market exists) does not automatically restrict competition on the market for online music.

***On the relationship between the iTunes site's market share and access to Apple's FairPlay DRM***

90.    There are many elements that determine the attractiveness of a for-pay online music platform:

- price, and more generally, the approach to pricing online music; extracts can be sold by the unit ("*à la carte*"), either individually or in the context of an album (or a compilation of ten or twenty titles);

- the ease, simplicity, and comfort of using the platform, and the technical functions that it offers the user: listening to extracts without any charge, as well as the number of authorized burnings and the number of transfer to portable players; among the relevant technical elements is also the possibility and ease of transfer to a digital portable player and the many choices of digital portable players compatible with the platform;

- the characteristics of the catalogue offered: the number of titles, but also the qualitative nature of the titles, their adaptation to the taste of targeted consumers, as well as the presentation of the site, the featured artists, and promotional efforts;

- the ease and simplicity of payment means that are offered to customers: credit cards, billing through cell phones or by subscription through the Internet access provider (customers are often adolescents who do not necessarily have a credit card). In view of this, brand recognition is very important to acquire consumer confidence.

91.    If the hierarchy of the above-cited factors is not the subject of consensus among market players, it is agreed that competition between the platforms is largely multi-dimensional. From this perspective, the following differences between Apple and its competitors may be identified:

- Apple innovated by creating a *uniform* price, and thus a price clearly understandable to consumers: a single price for all titles, regardless of when the title was released or of its label, and fixed at a psychologically-strategic level: 0.99 euros in Europe and 0.99 USD in the U.S. The prices of other platforms often vary according to the title and label. Apple's price is, on average, lower than VirginMega's. VirginMega sells its titles at between 0.99 euros to 1.19 euros, depending on the label and time of the title's release. The study *UFC Que Choisir* of 22 September 2004 takes the average price of 1.19 euros for titles sold individually by VirginMega. According to the responses given by VirginMega to the rapporteur's questionnaire, the average price per title would be 1.12 euros (VAT included). The price difference between Apple and VirginMega is therefore less than 12%. VirginMega's representatives nonetheless declared during the hearings that it has aligned its pricing policy with that of Apple's during the course of September 2004.

- Apple seems to have the advantage in terms of its online catalog size. The figures (used by the *UFC Que Choisir* study of September 22) are 700,000 titles for Apple and a maximum of 350,000 for its competitors. All of the platforms have agreements with the leading record labels, but Apple appears to have a greater number of titles from so-called "independent" labels. In any event, Apple's lead in terms of catalog size is only temporary. The size of all other platform catalogs should, according to market observers, converge towards one million titles in the short term;

- Apple authorizes an *unlimited* number of burnings for individual titles and seven burnings for compilations. The number of burnings authorized by e-compil and Sony Connect are respectively one and three. VirginMega authorizes a minimum of seven burnings per title;

- The *iTunes Music Store* is the only one to offer free clips and trailers in streaming (source: comparison by *Journal du Net*);

- Apple has spent considerable sums in advertising and communication. It does not appear that its competitors have undertaken similar expenditures. In addition, Apple undoubtedly benefits from an indirect network effect, in that iPod owners, with all other things being equal, are motivated to download from the Apple platform. Furthermore, Apple benefits from synergies in advertising and communications costs, since its publicity campaigns are often for both the iPod player and the *iTunes Music Store* platform.

92.    On the whole, numerous factors, other than interoperability with the iPod player, could explain the differential between the sales volumes of the *iTunes Music Store* and other platforms.

93.    Finally, as concerns the reasons for its refusal to license FairPlay to third parties, Apple has stated that it must modify FairPlay each time a security weakness is detected and that this regularly occurs.  Apple also cites certain clauses in its contracts with the Majors, according to which Apple states that in the event it licenses FairPlay, it would be required to maintain full control over the DRM's implementation by all third-party licensees.  Apple would have to dedicate considerable resources to satisfy this contractual obligation, and Apple believes that it is more beneficial to dedicate such resources to the fight against piracy and towards establishing the *iTunes Music Store* in additional European countries.

94.    In addition, Apple maintains that a licensing obligation would implicate a modification in FairPlay's architecture (whose security features are currently hidden in three places: the *iTunes Player* software, the *iTunes Music Store* platform, and the *iPod player*).  Such modification would weaken the security features.

95.    Although it is unnecessary at this stage to decide on the validity of these arguments, the Council finds that the unjustified nature of the refusal to license, which must be present under the caselaw to characterize an abuse, is not sufficiently demonstrated in the present complaint.

### On the sufficient characterization of an abuse

96.    The caselaw sets forth very strict conditions on the indispensable nature of access to an essential facility, and notably, the fact that there must be no actual or realistically potential substitute.  For an access refusal to be considered as abusive, the caselaw requires that the risk of eliminating competition be well-established.  It also requires the demonstrated existence of a causal link between the dominant position and the abuse.  In the present case, none of the three elements is present.

97.    Furthermore, the above-mentioned EC and national caselaw requires proving the indispensable nature of access to an essential facility.  In the present case, the indispensable nature of access to the Apple DRM does not appear to be proven for three reasons:

- the low incidence of transfers to portable players in the actual uses of downloaded music;

- the existence of a simple, inexpensive, and widely-used possibility to circumvent DRM incompatibility, *i.e.* CD burning;

- the recent emergence in France of numerous digital portable players, with and without hard drive, which are secured with the Microsoft DRM and compatible with the VirginMega platform.

98.    Finally, the differences in the attractiveness of various downloading platforms could be explained by multiple factors that are unrelated to whether access to the Apple DRM is indispensable.

- 18

99.    Thus, it cannot be concluded, based on the elements presented in the complaint and received in the course of the investigation held during the review of the request for interim measures, that the *FairPlay* DRM can be considered (in the current state of the market) as an essential facility for legal online music platforms.

100.    As concerns the risk of eliminating competition, this seems unlikely, as two major players (Sony Connect and Fnacmusic) have just entered the market.  Such market is intensely competitive (notably as concerns price between the six current players), and numerous potential competitors are likely to emerge in the short to medium term.

101.    Finally, the causal link between Apple's eventual dominant position on the market for portable players with hard drive and the competitive situation on the market for online music is not established.  In effect, various portable players (with and without hard drive), integrating the Microsoft DRM and compatible with the VirginMega platform, are appearing on the French market.  In addition, portable players with hard drive do not represent the majority of sales of portable players.  These players are and will long be dominated by *flash* players, which may also integrate the Microsoft DRM (several secure models are already available in France).

102.    On a subsidiary point, it may also be noted that the condition set forth by the Court of Justice in the *IMS Health* judgement is also not satisfied.  Indeed, VirginMega did not state that it wished to offer a new product or service, which Apple did not wish to offer, and whose commercialization would depend on access to the Apple DRM.

103.    In sum, even if it was presumed that there was a market for secure digital portable players and that Apple had a dominant position on this market, the current state of the case does not present elements that are sufficiently probative to demonstrate an abuse.  The complaint must be rejected, in application of Article L. 462-8 of the Commercial Code.  Thus, the request for interim measures, which may only be presented in conjunction with a complaint on the merits, must also be rejected.


**CONCLUSION**

104.    On the basis of the above findings, the practices challenged by the complaint are not proven by elements sufficiently probative to demonstrate, in the current state of the market, the existence of practices intended to impede free competition within the meaning of Articles L. 420-2 of the Commercial Code and Article 82 of the EC Treaty.  Thus, it is appropriate to apply the provisions of Article L. 462-8 of the Commercial Code.

105.    The Competition Council emphasizes that such refusal does not impede businesses in the sector from submitting a complaint to the Council, should they present new facts arising from future market developments.

BRI-1323425v1

**DECISION**

Article 1:  The complaint registered under No. 04/0045F is rejected.

Article 2:  The request for interim measures registered under No. 04/0046M is rejected.

Decided under the oral report of Mr. Choné, by Mr. Lasserre (President), Mr. Nasse, Ms. Aubert and Ms. Perrot (Vice-Presidents), Ms. Behar-Touchais, Ms. Renard-Payen, Mssrs. Bidaud, Flichy, Gauron and Ripotot (Members).

|  |  |
|---|---|
| The hearing secretary | The President |
| Marie-Pierre Binard | Bruno Lasserre |

Anne Frederic-Moreau