# EXHIBIT 21

1        UNITED STATES DISTRICT COURT FOR THE

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4            ---oOo---

5

6  THE APPLE iPOD iTUNES ANTI-     No. C-050037-JW(RS)
    TRUST LITIGATION,

7

8  _____/

9

10

11        DEPOSITION OF ROGER G. NOLL, Ph.D.

12

13

14

15

16

17    Taken before EARLY K. LANGLEY, RPR, RMR

18          CSR No. 3537

19        September 19, 2008

20

21

22

23

24

25

Aiken Welch COURT REPORTERS

One Kaiser Plaza, Suite 505
Oakland, California 94612
Ph 510-451-1580
Fax 510-451-3797
www.aikenwelch.com

3

1    <u>DEPOSITION OF ROGER G. NOLL, Ph.D.</u>

2

3    BE IT REMEMBERED, that pursuant to Notice, and on

4    the 19th day of September 2008, commencing at the hour

5    of 10:10 a.m., in the offices of Jones Day, 555

6    California 26th Floor, San Francisco, California,

7    before me, EARLY K. LANGLEY, a Certified Shorthand

8    Reporter, personally appeared ROGER G. NOLL, Ph.D.,

9    produced as a witness in said action, and being by me

10   first duly sworn, was thereupon examined as a witness

11   in said cause.

12

13                      ---oOo---

14

15    BONNY E. SWEENEY, PAULA ROACH, Coughlin Stoia

16   Geller Rudman & Robbins LLP, 655 West Broadway, Suite

17   1900, San Diego, California 92101, appeared on behalf

18   of the Purchasers Plaintiffs.

19

20    HELEN I. ZELDES, Zeldes & Haeggquist, LLP, 655

21   West Broadway, Suite 1410, San Diego, California 92101,

22   appeared on behalf of the Indirect Purchaser

23   Plaintiffs.

24

25

4

1          ROBERT A. MITTELSTAEDT, MICHAEL SCOTT, Jones

2    Day, 555 California Street, 26th Floor, San Francisco,

3    California, 94104, appeared on behalf of the Defendant

4    Apple, Inc.

5

6          ALSO PRESENT:  Carlyn Clause.

7          Nick Silva, Videographer, Aiken & Welch Court

8    Reporters and Video, One Kaiser Plaza, Fifth Floor,

9    Oakland, California 94612.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                          --oOo--

2                 P R O C E E D I N G S

3                          --oOo--

4            THE VIDEOGRAPHER:  Stand by.  On the

5    record.                                        10:09

6            My name is Nick Silva.  I'm a qualified

7    video technician and a notary public for the

8    County of Alameda, State of California.

9            I'm videotaping on behalf of Aiken & Welch

10   Court Reporters at One Kaiser Plaza, Fifth Floor,   10:09

11   in Oakland, California 94612.  Today's date is

12   September 19th, 2008, and the present time is

13   10:10.  The location of this deposition is the

14   Jones Day law firm at 555 California Street, 26th

15   Floor, San Francisco, California 94101.         10:10

16           Today's witness is Roger G. Noll in the

17   case of Apple, Inc., versus the Apple iPod iTune

18   Anti-Trust Litigation, case no. C-05-00037-JW(RS),

19   filed in the United States District Court,

20   Northern District of California, San Jose        10:10

21   Division.

22           This deposition was noticed by a Robert A.

23   Mittelstaedt for the defendants.

24           Would the counsel for the parties please

25   identify themselves and for whom they are        10:10

6

1    appearing.

2            MS. SWEENEY:  Bonny Sweeney from the

3    Coughlin Stoia law firm representing the direct

4    purchaser plaintiffs.

5            MS. ROACH:  Paula Roach from Coughlin            10:10

6    Stoia representing plaintiffs.

7            MS. ZELDES:  Helen Zeldes from Zeldes &

8    Haeggquist representing the indirect purchaser

9    plaintiffs.

10           MR. MITTELSTAEDT:  And Bob Mittelstaedt        10:10

11   for the defendant with Jeff LeVee, Michael Scott

12   and Carlyn Clause.

13           THE VIDEOGRAPHER:  Would the counsel

14   please state any stipulations or statements that

15   they would like on the record at this time.           10:11

16           MR. MITTELSTAEDT:  None.

17           THE VIDEOGRAPHER:  The reporter may now

18   swear the witness.

19                   ROGER NOLL, Ph.D.

20               sworn as a witness,

21               testified as follows:

22   EXAMINATION BY MR. MITTELSTAEDT:

23       Q.  Good morning.  If you would state your

24   name and business address, please.

25       A.  My name is Roger G. Noll and I'm in the        10:11

9

1      Q.  What was the discussion?

2      A.  It was very brief.  She said, "I'm going

3  to go buy an iPod," and then she -- I said, "Fine.

4  Go buy an iPod."

5      Q.  Did she give you any reason why she wanted    10:13

6  to buy an iPod?

7      A.  No.

8      Q.  Do you know if she shopped around for

9  competing devices?

10     A.  I think -- I think she considered a          10:13

11 portable CD player, but I don't know how

12 seriously.  I don't know whether she shopped for

13 it.

14     Q.  Do you know if she considered any other

15 portable digital music players, MP3 players?        10:14

16     A.  I can't say for certain.  I don't know.

17 Because I wasn't -- I wasn't part of the search

18 process.

19     Q.  Okay.  Do you know whether your wife has

20 any -- has ever bought any music from Apple's       10:14

21 iTune's music store?

22     A.  Yes, I know whether she has.

23     Q.  And what's the answer?

24     A.  The answer is no.

25     Q.  Okay.  Do you have any information about     10:14

Aiken & Welch Court Reporters      R. G. Noll    9/19/08

15

1    Q.  And at what point did you think this case,

2    as it was described to you, sounded a lot like

3    Microsoft?

4    A.  Instantaneously.

5    Q.  And what was it about the description of    10:20

6    this case that led you to that initial reaction?

7    A.  We were talking about the tying aspect of

8    it, and that's what sounded like it was -- had a

9    similarity to tying middleware to operating

10   systems that were parts of numerous complaints    10:20

11   against Microsoft.

12   Q.  Do you have any information one way or

13   another whether a consumer can play music from the

14   iTune store on any portable digital player other

15   than iPod?    10:21

16   A.  Well, I'm -- yeah, I'm aware precisely

17   what their limitations are.  I mean, if you -- the

18   mechanism is to either do an actual or virtual

19   burn of the CD and then replay it.

20   Q.  And in that way, music can be played from    10:21

21   the iTunes store on portable players other than an

22   iPod; correct?

23   A.  If you go through that set of procedures,

24   yes.   Just like you could always use Netscape,

25   even though Internet Explorer was the default

21

1    Q.  Okay.  And what is the "it" there when you

2  say it shifted --

3    A.  The fact that there was a differential

4  ease of access that it was substantial between

5  iPods and competing portable digital media          10:28

6  players.

7    Q.  Okay.  And that differential ease of

8  access is the two extra steps, burning and

9  ripping; correct?

10    A.  The issue with -- yes.  The issue is the   10:28

11  question -- the core question is whether that is

12  substantial enough to -- to be the equivalent of a

13  small but significant nontransitory increase in

14  price.  That is to say, does it impose a cost that

15  is sufficient so that it affects peoples'            10:29

16  decisions about which portable digital media

17  player to buy.

18    Q.  Okay.  And, again, the "it" in that answer

19  is the two extra steps to get music from Apple's

20  music store to a competing player as opposed to an  10:29

21  iPod; is that correct?

22    A.  There's that aspect to it, plus there's

23  also a potential issue about the quality of

24  reproduction arising from undertaking those steps.

25    Q.  Okay.  Do you hold the view that that type  10:29

31

1   prepare your report and to complete your

2   assignment?

3       A.  I would have liked to have much more

4   discovery information.  But given the amount of

5   information I had, I didn't feel pressed for time.  10:41

6       Q.  All right.  Is there any place where you

7   think your report is particularly vulnerable or

8   questionable or where you're out on a limb?

9       A.  Not at all.  Seems to me this is a fairly

10  straightforward class certification case.  And      10:41

11  it's not anywhere near as complex as some other

12  class certification cases I've been involved in.

13      Q.  And if your students submitted your report

14  to you as an exam, you'd give it an A-plus?

15      A.  That's a very hard thing to say because I    10:41

16  have a -- this is my child.  I have a certain

17  affection for the way I say things.  So I'm not

18  sure I'm an objective grader of my own reports.

19  But I -- I don't have any -- I'm not -- there's

20  nothing in it that I feel uneasy about.              10:42

21      Q.  What do you think would be the strongest

22  defense for Apple in this case on the merits?

23          MS. SWEENEY:  Objection to the extent that

24  it calls for a legal conclusion.

25          THE WITNESS:  Well, I'm talking -- this is  10:42

32

1   a report about class certification.  So the issue

2   would be how -- what could Apple do or say to

3   undermine the idea that the class should be

4   certified.  But that's the only issue that I've

5   thought about.

6       I mean, I'm -- haven't reached a

7   conclusion on whether Apple actually did engage in

8   anticompetitive behavior that requires remedy in a

9   court.  So all I've thought about is whether the

10  case is legitimately a class.                       10:42

11      And so in that sense, the -- I don't have

12  information about how the wholesale market works

13  because that wasn't discovered.  And so, you know,

14  I suspect you can probably find an economist who

15  will say that something along the lines of          10:43

16  everybody in the wholesale market engages in

17  individual negotiations, there's no such thing as

18  a list price, and there is no systematic way to

19  represent the pricing process in a formula.

20      That's my prediction about what's going to  10:43

21  happen with regard to class certification, but I

22  don't know that that's true because it depends on

23  what the information is.

24      I mean, you have a huge advantage because

25  you've prevented me from looking at the data, but   10:43

33

1   you will undoubtedly give that data to your

2   expert.  And so what I'll be confronted with is an

3   expert report that has much more information than

4   I do and I'll have a few weeks to respond to it.

5   So that'll be interesting.                          10:43

6   BY MR. MITTELSTAEDT:

7       Q.  You have spent some time thinking about

8   the merits of this case; correct?

9       A.  I've spent some time thinking about it,

10  but I don't have a conclusion about the merits.     10:44

11      Q.  You haven't formed an opinion one way or

12  another as to whether the alleged conduct by Apple

13  is anticompetitive; is that correct?

14      A.  I do not have a conclusion as to whether

15  Apple is liable for an antitrust violation, with    10:44

16  respect to its behavior.  But in order to have --

17  reach a conclusion, you have to do the things that

18  were outlined in my report.

19      Q.  I used the word "anticompetitive."  You

20  used the term "antitrust violation."               10:44

21      A.  Yes.

22      Q.  On purpose?

23      A.  On purpose, because there are -- as I said

24  earlier, there are acts that I would call

25  anticompetitive that are nonetheless not antitrust  10:44

64

1   certification is is to describe the method that

2   would provide an answer to the question.  The

3   answer may well be there was a zero effect.

4        So I can't sit here and say the conclusion

5   that will be reached from that will be that the          11:23

6   plaintiffs are correct.

7        All I can say is here's how you would

8   resolve that issue, and the plaintiffs will take

9   their shot at showing there was an effect.  Your

10  economists will take their shot at showing there          11:23

11  was no effect, and then that will be resolved in

12  court.

13       But the -- both sides will be using

14  methods of common proof.  And these are market

15  impacts of the -- if any -- of the decision not to  11:24

16  go with FairPlay in the way Apple did it.

17  BY MR. MITTELSTAEDT:

18       Q.  Do you agree that in the but-for world,

19  the world without the alleged anticompetitive act,

20  Apple could still have some market power for          11:24

21  iPods?

22       A.  I think they almost certainly would have

23  some market power in the world for -- market for

24  iPods.  There's no way that I believe their market

25  share is going to go drop down into single digits  11:24

65

1   or anything like that.  I would expect that Apple

2   would have a significant market.

3       Q.  Significant market power?

4       A.  Yeah, sure --

5           THE REPORTER:  I'm sorry.  He talked on

6   top of you.

7           MR. MITTELSTAEDT:  Well --

8           THE WITNESS:  He -- He interrupted me.

9           MR. MITTELSTAEDT:  You said "significant."

10  I said "significant market" power.  And he said

11  "sure."

12          THE WITNESS:  This -- when I get two

13  people interrupting me, it's more than twice as

14  bad.  So let's start over with where I was.

15  BY MR. MITTELSTAEDT:

16      Q.  You said you would expect that Apple would

17  have significant market.

18      A.  And then you interrupted.

19      Q.  And said do you mean significant market

20  power?                                        11:25

21      A.  Yeah.  That's what the interruption was.

22          Okay.  I believe that it's very possible,

23  but I don't know for certain, that Apple would

24  have substantial market power in the market for

25  portable digital media players regardless.    11:25

68

1   differential ease of access to the iTunes Music

2   Store for these competing MP3 players; correct?

3        A.  Well, that's one feature.  But another

4   feature would have been suppose that Apple had

5   licensed FairPlay to SanDisk which is a really          11:28

6   high quality product.  All right.  If you read

7   ratings of portable digital media players, SanDisk

8   is very high.

9        The additional benefit would have been the

10  people who buy SanDisk would have a qualitatively       11:28

11  superior experience to the already good experience

12  they have with SanDisk.

13       Q.  The way you're going to determine or try

14  to determine whether there is any impact of what

15  you call a tie on the price of iPods as opposed to      11:29

16  the impact from substantial market power that you

17  think Apple might have in the but-for world

18  anyway, is to run some regression analyses; is

19  that correct?

20       A.  Well, maybe, maybe not.  I can't tell you      11:29

21  what analysis I'm going to do to get at

22  anticompetitive impact as opposed to damages until

23  I know what data are available.

24       It would be completely foolish to say here

25  are the regressions I'm going to run independent        11:29

102

1    recordings from the major distribution companies

2    than any of its predecessors.

3        Q.  Okay.

4        A.  That was its main -- the main thing that

5    happened in 2003 is that -- this doesn't have much        12:24

6    to do with Apple.  It's that between losing the

7    permanent injunction against Napster in February

8    of 2002 and the introduction of Apple, and then

9    subsequently having to spin-off MusicNet and

10   PressPlay because they were being attacked on           12:24

11   antitrust grounds.

12       Hollywood changed its mind about the role

13   of digital downloads in the music industry.

14   Sometime between the spring of 2002 and the fall

15   of 2002, it changed its mind and was -- and it          12:24

16   happened in a different sequence like BMG had

17   already decided that it was going to do this and

18   that's why it bought a piece of Napster and was in

19   the process of converting Napster to a legal site

20   when the cases took place in 2001 and 2002.             12:25

21       So BMG was the first, and then there were

22   others that were much later, and what had to

23   happen for this whole source of music to evolve as

24   an alternative to buying CDs, was that the

25   distribution companies had to change their mind        12:25

Aiken & Welch Court Reporters        R. G. Noll    9/19/08

103

1  about what they would allow people to sell as

2  permanent downloads on the Internet.  And that

3  took place, you know, sometime in the middle of

4  2002.

5      Q.  What's your view on the -- on why the                12:25

6  record labels insisted on use of DRM for the legal

7  stores?

8      A.  Well, we have to go back to history.

9  Right.

10         The label's original strategy was to take        12:25

11  over retailing, and they saw Digital Rights

12  Management and the Digital Millennium Copyright

13  Act as a means by which they had a window to

14  control retail distribution.  And, so, their

15  initial foray in the creation of MusicNet and         12:26

16  PressPlay was that digital downloads would be

17  available only through the websites owned by the

18  labels plus MusicNet and PressPlay.  And that

19  nobody else would basically be allowed to do it.

20  Now -- and with the exception of BMG.  BMG didn't       12:26

21  subscribe to that, but everybody else did.

22         And, so, what had to happen was through

23  litigation and negotiations, they had to be

24  disabused of the notion that that could work.

25         Now, an essential ingredient of that              12:27

104

1    strategy was encryption because they had a number

2    of business models that they thought they were

3    going to be able to introduce, like they -- and

4    you've seen it in other dimensions -- other

5    products, but not so much as it would have been in    12:27

6    digital downloads.

7            They wanted to move from selling a

8    physical product, whether it's a file or a CD, to

9    selling continuous access.  Basically they wanted

10   to be able to limit the number of uses of a file a    12:27

11   consumer could have and -- without the file

12   self-destructing.  And they actually tried to

13   implement that in video with DivX, and they

14   originally tried to implement that with digital

15   downloads with their own Digital Rights Management    12:27

16   system that would be exploding files, that you

17   would have them for a certain amount of time or a

18   certain amount of listens and then they would

19   self-destruct.

20           All right.  So Digital Rights Management    12:28

21   to Hollywood meant more than just protecting

22   against encryption.  It also meant a whole series

23   of monitoring features that would enable you to

24   control use.  And it wasn't until 2002 they

25   decided that wasn't going to work.    12:28

105

1          So Digital Rights Management changed its

2    meaning between the demise of Napster in the

3    summer of 2001 and the rise of iTMS in April of

4    2003.  Sometime in that intervening period they

5    changed the point of DRM to being this product        12:28

6    management and marketing concept to being

7    exclusively protection of intellectual property.

8       Q.  In that context, do you view the

9    introduction of Apple's iTunes Music Store as

10   procompetitive?                                         12:29

11      A.  Of course.  I mean, I -- the introduction

12   of a way to replace the CD with a digital download

13   directly to a player and the ability to burn your

14   own CDs was a huge benefit to consumers and it

15   could have happened five years earlier.                 12:29

16          I mean, Tower Records had done the work

17   necessary to create such a website in 1998.  They

18   just weren't allowed to do it because of the

19   restrictions that were put on them by the

20   distribution companies.                                 12:29

21      Q.  Do you think there is extensive

22   competition at the systems level among Apple,

23   Microsoft with its Zune, Microsoft with its

24   PlaysForSure Network, Real, and others, at the

25   systems level?                                          12:30

135

1   every method for estimating damages is in some

2   fashion a competitive benchmark method.  So I

3   think it fits into the stuff I discuss.

4         But maybe I'm missing something, because I

5   don't think there's anything out there that          14:17

6   wouldn't fit into the template that I discussed in

7   my report.

8         Q.  Okay.  Let's take a consumer who would

9   have preferred to buy a competing MP3 player and

10  was forced under the plaintiff's lock-in theory to   14:17

11  buy an iPod.

12        A.  Yes.

13        Q.  And, so, did you consider whether that

14  person's damage claim would be measured by the

15  delta between the iPod price and the price of the    14:17

16  competing player that he preferred?

17        A.  I didn't use that as damages because that

18  is conventionally not used as damages because it

19  introduces an unsolvable problem which is what is

20  the relative willingness to pay of the alternative   14:17

21  versus the item in question at the individual

22  level.  That isn't -- to my knowledge, that's not

23  a doable product.

24        The issue is -- here's -- here's the

25  reason that if the -- if the price of an iPod        14:18

148

1   say.  A com -- the fact that the market --

2   remember this is all about market power, number

3   one, and, number two, about a method for

4   estimating damages.  All right.

5          This is what it's about.                    14:33

6          Now, with regard to the market power part,

7   market power -- remember, market power isn't

8   necessarily the result of an anticompetitive act.

9   Firms can have market power for a variety of

10  reasons, and in a product differentiated market,   14:34

11  they will tend to have market power.

12         All right.  We -- if you recall, I don't

13  believe, and I think it would be foolish to assume

14  that the but-for world is a perfectly competitive

15  market.                                             14:34

16         In fact, I think it's probably the case,

17  although I don't know this for sure, that the

18  but-for world is one in which the leading producer

19  of portable digital media players is Apple.  So

20  that's the problem.  Right.  If you have to figure  14:34

21  out not what the competitive price is to get at

22  the damages question, but at the market power

23  level, you -- it is evidence of market power

24  defined price -- prices in excess of marginal

25  cost.  Differences in products that represent

156

1   or in this case really three complementary

2   products, quote, "work seamlessly," isn't

3   sufficient to answer the question, because in the

4   end it's consumers who are supposed to decide

5   whether the seamlessness of how the products work    14:44

6   together is worth the price.  And it's not the

7   producer who is supposed to make that.

8          So the fact that Apple believes that its

9   products are the best thing that had ever happened

10  since salted peanuts is a basis for them to    14:45

11  believe that they would have been successful in

12  all the complementary products regardless, but to

13  insist that they be bought together, is -- has at

14  least the potential for being anticompetitive,

15  unless one can demonstrate there is a permanent    14:45

16  efficiency gain that can only be achieved through

17  the tying.

18         Q.  You're not suggesting that Apple insist

19  that in order to buy an iPod, you have to buy

20  music from its Music Store, are you?    14:45

21         A.  No.  That's not what it says is if you are

22  a person who wants -- if you are a person who

23  wants to buy a portable digital player for the

24  purpose of playing permanent digital downloads

25  over the Internet from iTMS, then you must buy an    14:45

Aiken & Welch Court Reporters        R. G. Noll    9/19/08

157

1   iPod.

2         Q.   Unless you want to burn and rip?

3         A.   Well, yes.   Unless you want to -- unless

4   you want to have -- there's other things you can

5   do to get around the encryption.                    14:46

6         Q.   Okay.

7         A.   You can -- if you want to buy one of the

8   hacker programs as well.   Although they -- there's

9   quality issues there and there's legality issues

10  there.                                               14:46

11        Q.   Or use DuroSport compatibility kit?

12        A.   Yeah.   I mean, that's an example.   That's

13  30 bucks or something.

14        Q.   Where did you find that product?

15        A.   Searching from the Internet.             14:46

16        Q.   Where did you search for?

17        A.   I was looking for anything I could find on

18  the Internet about how to get around FairPlay.

19  And there are some hacker programs out there that

20  I would never touch with a ten-foot pole.   And --  14:46

21  but there are also some real products out there,

22  so.

23        Q.   Okay.

24        A.   And that was one of them.

25        Q.   Let's go back to a couple of questions    14:46

168

1        So there are some examples of mandatory

2   licensing of intellectual property.  There are

3   examples like terminal railroads or RFK Stadium --

4   Hetck versus Pro Football where they're required

5   to share capital investment.  But, they're fairly     15:09

6   rare.  I mean that, you know, the number of such

7   cases is five to ten or something like that.

8        Q.  Essential facility cases?

9        A.  Well, they can -- yeah.  That's -- that's

10  the most obvious one, but there's -- it's hard to     15:09

11  think, you know, like the settlement of the 1954

12  version of the AT&T case is not really an

13  essential facilities case.

14       Q.  Okay.  So, just to take the first step

15  here, if it turns out that -- let me strike that.     15:09

16  Let me go back to the very first step.

17       You don't have any quarrel as an economist

18  with Apple using some form of DRM for its Music

19  Store; correct, because they were required to do

20  that --                                               15:09

21       A.  They had no choice.  That's not the issue.

22       Q.  Okay.  So the next step is whether to use

23  a DRM that was compatible or incompatible with

24  other music players other than the iPod, and if it

25  turns out that it was least costly for Apple to       15:10

168

1          So there are some examples of mandatory

2     licensing of intellectual property.  There are

3     examples like terminal railroads or RFK Stadium --

4     Hetck versus Pro Football where they're required

5     to share capital investment.  But, they're fairly          15:09

6     rare.  I mean that, you know, the number of such

7     cases is five to ten or something like that.

8          Q.  Essential facility cases?

9          A.  Well, they can -- yeah.  That's -- that's

10    the most obvious one, but there's -- it's hard to          15:09

11    think, you know, like the settlement of the 1954

12    version of the AT&T case is not really an

13    essential facilities case.

14         Q.  Okay.  So, just to take the first step

15    here, if it turns out that -- let me strike that.          15:09

16    Let me go back to the very first step.

17          You don't have any quarrel as an economist

18    with Apple using some form of DRM for its Music

19    Store; correct, because they were required to do

20    that --                                                    15:09

21         A.  They had no choice.  That's not the issue.

22         Q.  Okay.  So the next step is whether to use

23    a DRM that was compatible or incompatible with

24    other music players other than the iPod, and if it

25    turns out that it was least costly for Apple to            15:10

169

1    make a DRM that was incompatible, you don't have

2    any trouble with that decision from a competitive

3    standpoint; correct?

4        A.  I wouldn't describe that as the second

5    decision.  I would describe the second decision as   15:10

6    shall we make our own or shall we buy one.  All

7    right.  And I have no quarrel with the decision to

8    make your own.

9            And then the -- once you've decided to

10   make your own, then the third decision is shall we   15:10

11   license it or shall we keep it inhouse.  In other

12   words, shall we allow people to compete with iPods

13   or not.

14       Q.  Okay.  And on the second step, why don't

15   you have any quarrel with Apple's decision to make   15:10

16   its own?

17       A.  Because I have no basis for

18   second-guessing that.  I mean, in principle, I

19   suppose one might be able to prove that they --

20   that -- that in an ex-ante before-the-facts sense,   15:11

21   they shouldn't have attempted to make their own

22   DRM.  I, you know, without having discovery,

23   there's no way I'm going to assert that's true.  I

24   would have to know a lot about the decisions being

25   made inside Apple in 2001, 2002, that gave rise to   15:11

Aiken & Welch Court Reporters      R. G. Noll   9/19/08

170

1    FairPlay.  And I don't know, and I don't have

2    anywhere near enough of information to

3    second-guess that decision at this point.

4        Q.  But why, in general, do you think a

5    company entering a market is entitled to develop        15:11

6    its own software to do that rather than being

7    forced, for example, to use Microsoft's software?

8        A.  Because they think -- they think they can

9    do it better.  All right.  And you don't want to

10   have a rule that says even if you think you can do      15:11

11   it better, you never can.  All right.  That's not

12   the right rule to have.

13       The right rule to have has got to be

14   something different than that, because you don't

15   want to say we're going to freeze the technology        15:12

16   forever, whatever it was in 2001.  And you can't

17   do anything differently than that without

18   violating the antitrust laws.  That would be

19   stupid.

20       Q.  Why would it be stupid?                          15:12

21       A.  Well, because it would prohibit

22   innovation.  The issue is not did you innovate or

23   did you attempt to innovate.  The issue is what

24   did you do with it once you got it.  And was there

25   something about the decision that was affected by       15:12

195

A.  It's how technically literate they are.
How easy it is for them to switch the file format,
to do the things necessary to switch the file
format.  Whether they have a CD burner.  Not
everybody has a CD burner.                          15:52

        So there are -- the degree to which any
given person is locked in is -- just depends on a
bunch of stuff.

        What's necessary for the lock-in effect to
matter is that, indeed, it creates a sufficiently    15:52
less elastic demand curve that there is a small
but significant nontransitory increase in price
arising from the lock-in effect.

        Q.  Is another variable in deciding whether a
particular person is locked in and buys an iPod     15:52
because of the lock-in rather than a competing
player that they prefer the -- the degree to which
they prefer the other MP3 player, in other words,
the stronger -- the weaker the preference for the
other MP3 player, the less they're locked in?       15:53

        A.  Well, yes.  Obviously, how they value the
alternatives is relevant.

        Q.  Is it also --

        A.  I mean the reality is anybody who bought
an iPod, if there was a lock-in effect, anybody     15:53

211

1    products because that's what it does?  Is it the

2    case that people who own SanDisks are more likely

3    to be charged with violation of intellectual

4    property rights than people who own iPods?  Those

5    are kinds of things you could get at to answer          16:15

6    whether that business justification was adequate.

7        Q.  Let me try a question that I asked before

8    that I didn't ask very well or at least let me

9    just ask it.

10           Do you have a view on what -- as an          16:15

11   economist -- on what the effects on competition

12   and innovation would be if the rule were that a

13   company cannot introduce a new Music Store unless

14   it works as well with competitors' digital music

15   players as it does with that company's own player,  16:15

16   and here I'm talking about devices?  In other

17   words --

18       A.  That would be a completely idiotic rule.

19       Q.  Why?

20       A.  Because it goes so far beyond what a tying  16:16

21   violation is.  I mean the only issue here is can

22   Apple do it.  Nobody else is a candidate for

23   having a dominant position or monopoly power in

24   the Music Store business, so it's not an antitrust

25   violation for Microsoft to have done it.  It       16:16

212

1    wouldn't be an antitrust violation for

2    RealNetworks to do it certainly wouldn't be an

3    antitrust violation for any one of the dozen other

4    free software media player people to do it.  So

5    the -- the rule would be ridiculous.                16:16

6          The only issue that arises here is

7    something that can happen to at most one firm that

8    either there's a dominant firm or there isn't.  If

9    there is a dominant firm, then they can engage in

10   behavior that's anticompetitive that if engaged in  16:17

11   by other people would not be anticompetitive.

12        Q.  Let's say that contrary to what you and I

13   both believe, Microsoft's Zune player takes over

14   the world, and Microsoft --

15        A.  God, I hope not.                            16:17

16        Q.  -- ends up with the same what you referred

17   to as dominant position as Apple has now.

18        A.  Then we have Microsoft, the 173rd

19   antitrust case against Microsoft because there's

20   no way they are go going to do that without         16:17

21   fussing around.

22        Q.  Let's keep Microsoft out because of your

23   experience with them.

24          Let's say Roger Noll comes up with --

25   you're driving home tonight and you're thinking,    16:17

221

1    cost to Apple to thwart Real Network's hack, or

2    whatever you want to call it?

3              MS. SWEENEY:  Objection.  Incomplete

4    hypothetical.  Asked and answered.

5              THE WITNESS:  You have to change the          16:30

6    wording on some of those a little bit.

7              But, right, if every single allegation of

8    an anticompetitive act didn't happen then, of

9    course, there is no anticompetitive effect.

10   BY MR. MITTELSTAEDT:                                    16:31

11       Q.  That answer that doesn't do me much good.

12       A.  I thought that's what you did is you gave

13   me a list of the allegations of the

14   anticompetitive acts and said assume none of them

15   actually happened, right, that this was no          16:31

16   positive proactive --

17       Q.  Which words do you have to change to agree

18   with what I said?

19       A.  Well, we --

20              MS. SWEENEY:  Objection to form.             16:31

21              THE WITNESS:  We discussed the

22   microprocessor issue before which is it's not --

23   it's not -- the issue to me was never disabling

24   the microprocessor, but there would be no reason

25   to do that.                                             16:31

Aiken & Welch Court Reporters      R. G. Noll    9/19/08

225

1    are kind of expensive so they haven't had a huge

2    success in the market but they're there, they're

3    out there.

4        Q.  Let me go back to my question.  The basic

5    question is:  What facts would satisfy you that          16:36

6    Apple's conduct was not anticompetitive, and let

7    me just list them again and stop me when you think

8    the wording ought to be different:  Number one,

9    Apple used DRM because the labels required it?

10       A.  We agreed to that.  I don't think there's        16:36

11   an issue there.  Everybody, not only Apple, but

12   everybody was required to use DRM initially.

13       Q.  But that -- that's one factor that will

14   lead you to conclude that Apple's conduct was not

15   anticompetitive because if it were the other way,      16:36

16   if Apple had decided let's use DRM and the labels

17   didn't require it that would cause you some

18   concern?

19       A.  Maybe, maybe not.  I mean that's not

20   sufficient, all right.                                  16:36

21       Q.  Okay.  No. 2, Apple decided to develop its

22   own DRM rather than using somebody else's; that's

23   okay, right?

24       A.  In principle that's not wrong.  It depends

25   how and how they implement it.  The act of doing       16:37

Aiken & Welch Court Reporters        R. G. Noll    9/19/08

239

1    A.  Oh, I'm sorry.  I'm sorry.  It's late in

2  the day.  Explain what we're after now.

3    Q.  You understand that the purported class

4  includes both direct consumers and resellers like

5  Best Buy?                                    17:01

6    A.  The wholesale market?

7    Q.  Yes.

8    A.  Yes.  Remind me what I was asked again.

9    Q.  Do you know whether or not you can use the

10  same regression analyses for both?           17:02

11      MS. SWEENEY:  Both being resellers and

12  consumers?

13  BY MR. MITTELSTAEDT:

14    Q.  Yes.

15    A.  My best guess is there's going to be two   17:02

16  regression analysis models because obviously the

17  wholesale price differs from the retail price.

18      What I -- what I need to know is how the

19  wholesale market actually works.  I need documents

20  about Apple's pricing policy in the wholesale    17:02

21  market.  I need transactions data in the wholesale

22  market and how I'll go about doing it -- doing

23  that part of the analysis would depend on those

24  details.

25      Let's take the simplest possible case,    17:02

240

1    which I doubt that it's true, but let's assume

2    that it's true.  Assume that the wholesale market

3    looks exactly like the retail market, that there's

4    a posted price for each model of iPod that's 30 or

5    40 percent below the retail price and everybody          17:03

6    can buy as much as they want at that posted price.

7         In that case, the -- a product-specific

8    dummy variable whether the buyer was a wholesaler

9    would be sufficient, right.  But that's almost

10   certainly not going to be true.  It might be true.     17:03

11        But I suspect there are quantity discounts

12   and advance purchase discounts, and, you know,

13   special promotional discounts if you spend some

14   money on advertising we'll pay some of it.  So

15   there's likely to be more complexity in the price       17:03

16   formation in the wholesale market than in the

17   retail market in which case there will probably

18   have to be two equations.

19        Q.  And can you tell me anything more than --

20   more than what is in your report on what the             17:03

21   equation will look like for the wholesale --

22        A.  Actually, if that's the case, it will look

23   a whole lot like the one I just did which is

24   static random access memory, static random access

25   memory, which is a different kind of case.  It's a     17:04

250

1          But, see, when you get to damages, you're

2    not really -- you're not really concerned about

3    the cross-elasticity of demand and the prices and

4    quantities of all the other players, you're just

5    focusing on the price and quantity of the product,    17:17

6    the referenced product.  And so that makes it

7    easier.

8          Q.  Would you expect that Amazon.com makes

9    more money on sales of some devices portable

10   digital players than on the sale of other portable    17:17

11   digital players?

12         A.  It would be inconceivable to me that the

13   profitability of every single product on

14   Amazon.com is the same.

15         Q.  But for this type of product?    17:17

16         A.  That's what I meant.

17         Q.  For portable digital players?

18         A.  For portable digital players, I would be

19   very surprised if the profitability of every

20   single player is identically the same for    17:17

21   Amazon.com.

22         Q.  Would you expect significant differences?

23         A.  What do you mean by "significant"?  In a

24   statistical sense?  Or in a magnitude sense?

25         Q.  Magnitude.    17:17

251

1    A.  I don't really know.  Part of it would

2  have to do with volume versus margin, you know.

3  So, there's costs associated with selling stuff

4  from the standpoint of Amazon.com that go beyond

5  just the wholesale cost of a device so I don't      17:18

6  know what to expect.

7        I don't know enough about Amazon.com's

8  pricing policies or cost structure to know whether

9  they do have big price differences across these

10 products.                                           17:18

11   Q.  Do you know what a playlist is?

12   A.  I think I know what a playlist is.

13   Q.  What do you think it is?

14   A.  It's a list of things you play.

15   Q.  In the context of Apple's Music Store.       17:18

16   A.  Yeah.  I think it is the things that you

17 have access to, but I'm not certain what you mean.

18 So, let's -- maybe you can define it for me.

19   Q.  Let me ask you two final questions.  You

20 say at page 28, and let me just read it to you.      17:18

21 If you want to see it, that's fine.

22        "If a large fraction of consumers purchase

23 all products from the same vendor, economic

24 analysis can determine whether the cause is tying

25 or bundling rather than a true preference for an    17:19

Aiken & Welch Court Reporters     R. G. Noll   9/19/08

264

1   STATE OF CALIFORNIA      )

2                            )        ss.

3   COUNTY OF ALAMEDA        )

4

5

6        I, EARLY LANGLEY, a Shorthand Reporter, State

7   of California, do hereby certify:

8        That ROGER G. NOLL, in the foregoing deposition

9   named, was present and by me sworn as a witness in the

10  above-entitled action at the time and place therein

11  specified;

12       That said deposition was taken before me at

13  said time and place, and was taken down in shorthand by

14  me, a Certified Shorthand Reporter of the State of

15  California, and was thereafter transcribed into

16  typewriting, and that the foregoing transcript

17  constitutes a full, true and correct report of said

18  deposition and of the proceedings that took place;

19  IN WITNESS WHEREOF, I have hereunder subscribed my hand

20  this 24th day of September 2008.

21

22

23      EARLY LANGLEY, CSR NO. 3537
        State of California

24

25

Aiken & Welch Court Reporters       R. G. Noll    9/19/08