1  Robert A. Mittelstaedt #060359
   Craig E. Stewart #129530
2  JONES DAY
   555 California Street, 26th Floor
3  San Francisco, CA 94104
   Telephone:   (415) 626-3939
4  Facsimile:    (415) 875-5700
   ramittelstaedt@jonesday.com
5  cestewart@jonesday.com

6  Attorneys for Defendant
   APPLE INC.
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  **THE APPLE iPOD iTUNES ANTI-**          **Case No. C 05-00037 JW**
    **TRUST LITIGATION**                             **C 06-04457 JW**
13
                                            **CORRECTED COPY OF REDACTED**
14                                          **MEMORANDUM  IN OPPOSITION TO**
                                            **MOTION FOR CLASS CERTIFICATION**
15
16                                          **Date:** December 15, 2008
                                            **Time:** 9:00 A.M.
17                                          **Place:** Courtroom 8, 4th Floor

18

19

20

21

22

23

24

25

26

27

28

SFI-594890v1                                         Corrected Copy of Redacted Mem.
                                                       in Opp. to Class Certification
                                                                C 05-00037 JW

# **TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    iPods and the iTunes Store. ................................................................................ 3

    B.    iPods and iTunes Store Music Are Separately Available and Have Separate Uses. .............................................................................................................. 5

    C.    Plaintiffs' Testimony Confirms That The Existence or Extent of Coercion Is An Individual Issue. ................................................................................................ 6

    D.    Plaintiffs Now Concede That iTunes Store Music Can Be Played on iPod Competitors by Virtual and Physical Burning and Ripping, thus Changing the Nature of Their Tying Claim. ..................................................................... 8

    E.    Plaintiffs' Current Tying Claim ........................................................................ 10

    F.    Plaintiffs' Proposed Class. ............................................................................... 11

ARGUMENT ................................................................................................................... 11

I.    PLAINTIFFS BEAR THE BURDEN OF SHOWING THAT THE REQUIREMENTS FOR CLASS CERTIFICATION ARE MET. ................................. 11

II.    PLAINTIFFS' TYING CLAIM FAILS THE PREDOMINANCE, TYPICALITY AND ADEQUACY STANDARDS FOR CLASS CERTIFICATION. ....................... 12

    A.    Whether iPod Purchasers Were Tied Depends on Individual Proof. ................ 12

    B.    Separating Purchasers Who Benefited Under Plaintiffs' Theory of An Alleged Tie and Suffered No Injury Requires Individual Proof. ..................................... 18

    C.    Determining What Purchasers Would Have Done Absent the Alleged Tie Creates Further Individual Issues and Conflicts. ............................................... 19

III.    ADDING RESELLERS LIKE BEST BUY EXACERBATES THE PREDOMINANCE, TYPICALITY, ADEQUACY AND MANAGEABILITY PROBLEMS. ............................................................................................................ 22

IV.    PLAINTIFFS' SECTION 2 CLAIM LIKEWISE CANNOT BE CERTIFIED. ................ 24

V.    CERTIFICATION UNDER RULE 23(B)(2) IS ALSO IMPROPER. ................................ 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

Page

## Cases

A&M Records, Inc. v. Napster, Inc.,
  239 F.3d 1004 (9th Cir. 2001)....................................................................................... 4

Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.,
  475 F. Supp. 973 (D. Mass.1979) ................................................................................ 15

Bafus v. Aspen Realty, Inc.,
  236 F.R.D. 652 (D. Idaho 2006) .................................................................................. 14

Blades v. Monsanto Co.,
  400 F.3d 562 (8th Cir. 2005)....................................................................................... 19

Butt v. Allegheny Pepsi-Cola Bottling Co.,
  116 F.R.D. 486 (E.D. Va. 1987) .................................................................................. 22

Cascade Health Solutions v. PeaceHealth,
  515 F.3d 883 (9th Cir. 2008)....................................................................................... 14

Castano v. Am. Tobacco Co.,
  84 F.3d 734 (5th Cir. 1996)......................................................................................... 12

Chamberlain v. Ford Motor Co.,
  402 F.3d 9521 (9th Cir. 2005)..................................................................................... 11

Chase Parkway Garage Inc. v. Subaru, Inc.,
  94 F.R.D. 330 (D. Mass. 1982) ................................................................................... 13

Colburn v. Roto-Rooter Corp.,
  78 F.R.D. 679 (N.D. Cal. 1978)................................................................................... 13

Coleman v. Gen. Motors Acceptance Corp.,
  296 F.3d 443 (6th Cir. 2002)....................................................................................... 25

Collins v. Int'l Dairy Queen, Inc.,
  168 F.R.D. 668 (M.D. Ga. 1996) ................................................................................ 14

Daniels v. Amerco,
  No. 81 CIV.3801, 1983 WL 1794 (W.D. N.Y. Mar. 10, 1983).................................. 13

Digidyne Corp. v. Data Gen. Corp.,
  734 F.2d 1336 (9th Cir. 1984)..................................................................................... 15

Doninger v. Pac. Nw. Bell, Inc.,
  564 F.2d 1304 (9th Cir. 1977)..................................................................................... 24

*Dukes v. Wal-Mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007)..................................................................................... 12

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983)...................................................................................... 10

*Freeland v. AT & T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................... 13, 18, 19, 22

*Gen. Tel. Co. v. Falcon*,
   457 U.S. 147 (1982)................................................................................................ 11, 23

*Gray v. Shell Oil Co.*,
   469 F.2d 742 (9th Cir. 1972)...................................................................................... 20

*Hardy v. City Optical Inc.*,
   39 F.3d 765 (7th Cir. 1994)........................................................................................ 15

*Hill v. A-T-O, Inc.*,
   535 F.2d 1349 (2d Cir. 1976).................................................................................. 15, 16

*Illinois Tool Works Inc. v. Independent Ink, Inc.*
   547 U.S. 28 (2006).................................................................................................... 21

*Image Tech. Servs. v. Eastman Kodak Co.*,
   No. C 87-1686 BAC, 1994 WL 508735 (N.D. Cal. Sept. 2, 1994) ........................... 14

*In re Allstate Ins. Co.*,
   400 F.3d 505 (7th Cir. 2005)...................................................................................... 25

*In re Graphics Processing Units Antitrust Litig.*,
   No. C 06-07417 WHA, 2008 WL 2788089 (N.D. Cal. July 18, 2008) ............... 12, 25

*In re Methionine Antitrust Litig.*,
   204 F.R.D. 161 (N.D. Cal. 2001)................................................................................ 19

*In re SRAM Antitrust Litigation*,
   No. C 07-01819 CW, 2008 WL 4447584 (N. D. Cal. Sep. 29, 2008) ....................... 22

*In re Visa Check/Mastermoney Antitrust Litigation*,
   280 F.3d 124 (2d Cir. 2001)........................................................................................ 15

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)...................................................................................................... 14

*Krehl v. Baskin-Robbins Ice Cream Co.*,
   78 F.R.D. 108 (C.D. Cal. 1978) .................................................................................. 25

*Kypta v. McDonald's Corp.*,
   671 F.2d 1282 (11th Cir. 1982)................................................................................... 18

Corrected Copy of Redacted Mem.
in Opp. to Class Certification
C 05-00037 JW

*Lessig v. Tidewater Oil Co.,*
   327 F.2d 459 (9th Cir. 1964)................................................................................. 19, 21

*Lewallen v. Medtronic USA, Inc.,*
   No. C 01-20395 RMW, 2002 WL 31300899 (N.D. Cal. Aug. 28, 2002)................................... 25

*Little Caesar Enters., Inc. v. Smith,*
   172 F.R.D. 236 (E.D Mich. 1997) ........................................................................ 14

*Little Caesar Enters., Inc. v. Smith,*
   895 F. Supp. 884, 904 (E.D. Mich. 1995)............................................................... 13

*Molski v. Gleich,*
   318 F.3d 937 (9th Cir. 2003)................................................................................ 24

*Moore v. Jas. H. Matthews & Co.,*
   550 F.2d 1207 (9th Cir. 1977)......................................................................... 14, 16

*Muller v. Curtis Publ'g Co.,*
   57 F.R.D. 532 (E.D. Pa. 1973)............................................................................ 23

*Murphy v. Business Cards Tomorrow, Inc.,*
   854 F.2d 1202 (9th Cir. 1988)............................................................................. 16

*N. Pac. Ry. Co. v. United States,*
   356 U.S. 1 (1958)........................................................................................... 14

*Olmstead v. Amoco Oil Co.,*
   No. 76-247-Orl-Civ-Y, 1977 WL 1416 (M.D. Fla. Jun. 16, 1977) ........................................ 13

*Paladin Assocs., Inc. v. Mont. Power Co.,*
   328 F.3d 1145 (9th Cir. 2003)............................................................................. 15

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.,*
   100 Fed. Appx. 296 (5th Cir. 2004)...................................................................... 22

*Siegel v. Chicken Delight, Inc.,*
   448 F.2d 45 (9th Cir. 1971).......................................................................... 16, 18

*Smith v. Denny's Rests., Inc.,*
   62 F.R.D. 459 (N.D. Cal. 1974)........................................................................... 13

*Sommers v. Abraham Lincoln Fed. Savs. & Loan Assoc.,*
   66 F.R.D. 581 (E.D. Pa. 1975)........................................................................... 23

*Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.,*
   172 F.R.D. 532 (N.D. Ga. 1997)........................................................................... 21

*Trans Sport, Inc. v. Starter Sportswear, Inc.,*
   964 F.2d 186 (2d Cir. 1992).............................................................................. 14

*U.S. v. Aluminum Co. of Am.*,
148 F.2d 416 (2d Cir. 1945)..................................................................................................... 10

*U.S. v. Microsoft*,
253 F.3d 34 (D.C. Cir. 2001) ....................................................................................................... 5

*Ungar v. Dunkin' Donuts, Inc.*,
531 F.2d 1211 (3d Cir. 1976)..................................................................................................... 13

*Valley Drug Co. v. Geneva Pharm.. Inc.*,
350 F.3d 1181 (11th Cir. 2003).................................................................................................. 19

*Waldo v. N. Am. Van Lines, Inc.*,
102 F.R.D. 807 (W.D. Pa. 1984)................................................................................................ 13

*Wetzel v. Liberty Mut. Ins. Co.*,
508 F.2d 239 (3d Cir. 1975)....................................................................................................... 25

*Wofford v. Safeway Stores. Inc.*,
78 F.R.D. 460 (N.D. Cal. 1978)........................................................................................... 23, 24

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001)............................................................................................. 11, 24

Statutes

Federal Rules of Civil Procedure
Rule 23 .................................................................................................................................. 2, 12
Rule 23(a)(3)......................................................................................................................... 3, 23
Rule 23(a)(4)......................................................................................................................... 3, 23
Rule 23(b)(2)....................................................................................................................... 24, 25
Rule 23(b)(3).............................................................................................................................. 3

Other Authorities

5 *Moore's Federal Practice* § 23.45[5][c] (3d ed. 2006) )............................................................ 13

7AA C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*,
§ 1781, pp. 249-51 (3d ed 2005)................................................................................................. 13

S. Calkins, *Enforcement Official's Reflections on Antitrust Class Actions*,
39 Ariz. L. Rev. 413 (1997)........................................................................................................ 13

X P. Areeda, E. Elhauge, & Hovenkamp, *Antitrust Law* (2d ed. 2004).................................... 14, 18

1

## INTRODUCTION

2        The iTunes Store, launched in 2003, was Apple's pioneering, innovative solution to the

3   problem of rampant piracy of music over the Internet. For the first time, it enabled consumers to

4   buy digital music files online—lawfully, conveniently and inexpensively. As the head of the

5   United States Justice Department Antitrust Division explained, Apple "solved a problem that

6   some observers . . . predicted might never be solved: how to create a consumer-friendly, yet legal

7   and profitable, system for downloading music and other entertainment from the Internet." *See*

8   Ex. 1, p. 3.[1]

9        As a condition for permitting Apple to distribute their music online, the record companies

10   required Apple to encrypt the music with anti-piracy, or digital rights management (DRM),

11   technology. To comply with that condition, Apple chose to develop its own proprietary

12   technology rather than use Microsoft's. The complaint alleges that, as a result, individuals who

13   purchase iTunes Store music have been forced to buy iPods because supposedly no other MP3

14   player can play that music. On that basis, plaintiffs now seek to represent

15   individuals who bought iPods directly from Apple since the launch of the iTunes Store in April

16   2003, and              businesses including Best Buy and Target that bought

17         additional iPods for resale during that period. The companion *Somers* case is waiting in

18   the wings, hoping to represent the consumers who, in turn, bought iPods from those resellers.

19        Contrary to the complaint, however, plaintiffs and their economist have now

20   acknowledged that iTunes Store music can in fact be played on competing players by the easy,

21   familiar step of "burning and ripping," *i.e.,* copying the music to a CD and importing it to a

22   computer. Thus, plaintiffs cannot possibly contend that all purchasers of iTunes Store music

23   were forced to buy iPods. Rather, their claim now is that this "differential ease-of-access"—their

24   economist's term for the minimal extra step of burning/ripping—has the potential to force

25   consumers with iTunes Store music to buy an iPod **under a very limited set of circumstances**.

26   Whether anyone was actually forced to do so depends on a "bunch of stuff" (their economist's

27   ─────────
[1]   Unless otherwise indicated, all "Ex." references are to the exhibits to the Scott Declaration,
28   filed herewith.

term) including how much music the individual obtained from the iTunes Store, how many of those songs the individual wants to transfer to a different player, how many of those songs are encrypted with Apple's DRM (one of the record labels permitted Apple to start selling DRM-free music last year), the individual's "technical acuity" in burning/ripping, and the strength of his preference for another player—all factors that vary from individual to individual.

The courts have developed a well-established test for determining whether a tying case meets the requirements of Rule 23, and this case does not. The test depends at the threshold on the nature of the alleged tying mechanism and whether it applies to all purchasers alike. If the defendant requires all purchasers to buy the allegedly unwanted (tied) product by means of a uniform contractual or similar requirement, the case meets at least the threshold requirements of a class. The cases plaintiffs cite all fall into this category of an across-the-board tie. On the other hand, in the absence of a tie that applies to all purchasers, the courts have consistently and repeatedly denied class certification. *Infra.* pp. 12-13.

This case falls in the latter category. Apple has not contractually or otherwise required all iTunes Store music purchasers to buy iPods. And unlike plaintiffs' cases, there are obvious reasons why consumers buy iPods, the allegedly tied or unwanted product, without regard to iTunes Store music, the allegedly tying or wanted product. After all, the award-winning iPod was the leading MP3 player **before** the iTunes Store was introduced. Plaintiffs themselves are the best proof that consumers buy iPods without being forced into it. All of them bought iPods **before** buying any iTunes Store music. They each likewise admitted at deposition that they voluntarily bought an iPod because it was "cool," recommended by friends or for some other reason having nothing to do with iTunes Store music. In fact, many iPod customers have not purchased any iTunes Store music at all, preferring instead to load their iPods with music from their CDs.

These named plaintiffs show that the tying theory is groundless. But if there were any differently situated customers who want to claim that they were forced to buy an iPod in the limited circumstances identified by plaintiffs' economist, the only way to identify them and prove

1  their claim would be through individual proof. This need for individual proof defeats class

2  certification under Rule 23(b)(3), as the courts have repeatedly held in tying cases.

3      Class certification is improper for other reasons as well. A fundamental prerequisite to

4  class certification in antitrust cases is that plaintiffs be able to establish impact and injury on a

5  common basis for all purchasers. In tying cases, the Ninth Circuit requires that plaintiffs prove

6  which product customers would have purchased absent the tie and whether they suffered a "net

7  overcharge" taking into account the prices of both the tying and tied product. For the reasons

8  discussed below (at 17-21), these issues cannot be resolved in this case with common evidence

9  but instead turn on individual proof specific to each customer. Plaintiffs assert that their

10  economist will try to do a regression analysis to determine whether any part of the iPod price can

11  be attributed to the "differential ease-of-access." But that approach is irreconcilable with

12  governing Ninth Circuit law, and plaintiffs' resort to it only confirms that this case may not

13  properly be certified for class treatment.

14      Finally, class certification is improper because the alleged class includes not only end-user

15  consumers who purchased iPods directly from Apple, but also retailers like Target and Best Buy

16  that purchased millions of iPods from Apple and resold them to consumers. If Target, Best Buy

17  or any other reseller wants to assert a claim, it does not need to rely on anyone else to pursue it,

18  let alone on end-user consumers who paid different prices for their iPods, know nothing of the

19  reseller's business and cannot adequately represent it. Nor is a class action the superior method to

20  adjudicate the claims of such large resellers. Accordingly, plaintiffs have failed to satisfy Rule

21  23(a)(3)-(4) and (b)(3).

22  <center>**BACKGROUND**</center>

23  **A.   iPods and the iTunes Store.**

24      Apple began selling iPods in November 2001. Within 18 months, the iPod had became

25  the most popular MP3 player in the United States. Ex. 2. As CNET recognized in proclaiming

26  the iPod the top new consumer product in the last ten years, "[i]t revolutionized and popularized

27  music players." Ex. 3.

28

SFI-594890v1

Corrected Copy of Redacted Mem.
in Opp. to Class Certification
C 05-00037 JW

Plaintiffs' own testimony shows not only that iPods are purchased without regard to iTunes Store music but also that iPods are used for purposes other than to play iTunes Store music. Among other uses, iPods can play music imported from purchased CDs or downloaded from the Internet, store and display photographs, serve as hard drives to store other computer files, and provide calendar and alarm clock functions; some models can store and play video recordings and sync with Nike+ running shoes.[2] The iPod touch can also be used to access the internet, play video games and download applications from the Apple App Store.[3]

Apple launched the online iTunes Store (originally known as the iTunes Music Store) in April 2003. Plaintiffs' economist admits that introduction of this Store was "procompetitive" and a "huge benefit" to consumers." Ex. 21, 105:8-20. Fortune Magazine named the iTunes Store its 2003 "product of the year," observing that "[w]ith the success of its iTunes Music Store, Apple is almost single-handedly dragging the music industry, kicking and screaming, toward a better future." Ex. 4. With an initial inventory of 200,000 songs available for 99 cents each, it offered a legal alternative to Napster and other unlicensed and illegal peer-to-peer sites. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001). (Addendum 1 to this brief illustrates how iTunes Store music is purchased and loaded onto an iPod.)

Concerned about piracy and stung by the illegal peer-to-peer services, the major record labels were not willing to license their music for sale on the iTunes Store unless Apple encoded the music using DRM anti-piracy software. *See* Ex. 21, 102:4-105:7, 168:17-21, 225:4-12; Tucker Complaint (Case No. 06-04457 JW, Dkt. 1, filed 7/21/06), ¶¶ 33-34. To comply with the

---

[2]    *See* Ex. 19, 47:25-48:3 (when Tucker purchased her first iPod, her plan was to put her CD collection on it); Ex. 16, 75:14-18 (Charoensak) ("I intended to use [the iPod] to listen to my music . . . . And I also intended to use it as an external hard drive."); Ex. 17, 91:2-4 (Rosen) ("Q: Does your son watch cartoons on the iPod? A: He is not allowed, but he does."); Ex. 15, 300:8-10 (Slattery) ("Pretty much universally everybody seems to agree that [iPod is] just a cool piece of technology. It looks cool, has a lot of cool features.").

[3]    Although plaintiffs treat the iPod as a single device, there are in fact several different models at different prices. In addition to the original iPod, now called the iPod classic, Apple sells the iPod shuffle, the iPod nano, and the iPod touch. These different models were introduced at different times and their features evolved over time. Current prices from Apple range from $49 for the shuffle to $399 for the 32GB touch. (The iPods, their features, and the prices Apple charges are described at Apple.com.)

1    record companies' demand for DRM-enforced usage rules, Apple developed its own proprietary

2    DRM, known as FairPlay.  The complaint alleges that Apple could have licensed Microsoft's

3    DRM instead. Dkt. 107, Cmplt. ¶¶ 40, 49. But plaintiffs' economist has "no quarrel" with a

4    company electing to develop its own software. Ex. 21, 169:4-8. Prohibiting that conduct "would

5    be stupid" because it would freeze technology and "prohibit innovation." *Id.* at 170:4-22. And

6    becoming reliant on Microsoft can be particularly perilous, not just because of its penchant for

7    anti-competitive conduct but because its DRM system was viewed as unreliable.[4]

8            **B.      iPods and iTunes Store Music Are Separately Available and Have Separate**

9                    **Uses.**

10          This case is unlike all of those cited by plaintiffs where the allegedly tied products are

11   sold only as a package or where the tied product has no real use apart from the tying product, and

12   thus where tying (as plaintiffs use that term) can be shown uniformly for all class members.

13   iPods and iTunes Store music are sold separately and can be, and are, used independently. *See*

14   http://www.apple.com/itunes/.  As noted, Apple began selling iPods 18 months before launching

15   the iTunes Store, and iPods became the best selling portable music player even before Apple sold

16   any digital music.  After the iTunes Store launch, Apple has continued to sell iPods separately

17   from iTunes Store music, as plaintiffs admit.[5]

18          Millions of consumers have purchased iPods or received them as gifts without ever

19   purchasing any iTunes Store music.  Indeed, feedback from Apple's customers indicates that

20

21   _____

     [4] *See U.S. v. Microsoft*, 253 F.3d 34, 72-74 (D.C. Cir. 2001) (detailing how Microsoft coerced
     Apple into adopting Internet Explorer by threatening to stop supporting MS Office for Apple);
22   *see also* Ex. 5 (news article reporting that the revamped, legal Napster service believed technical
     glitches in Microsoft's DRM were hurting Napster's business); Ex. 6 (noting that Microsoft's
23   "PlaysForSure didn't live up to its moniker, and the portable services were plagued by glitches");
     Ex. 7 (noting that Microsoft Zune does not support PlaysForSure and questioning the future of
24   PlaysForSure services); Ex. 8 ("Microsoft's move away from its PlaysForSure DRM format has
     many of its longtime partners scrambling.").
25
     [5] *See* Ex. 17, 111:5-12 (Rosen) ("Q: When you bought your iPod[s], did anyone at Apple tell
26   you you couldn't buy an iPod unless you also agreed to buy music from Apple's online music
     store? . . . A: I don't think so, no."); Ex. 19, 54:19-55:2 (Tucker purchased her first iTunes song
27   "probably months" after purchasing her first iPod); Ex. 15, 30:3-8 (Slattery first bought iTunes
     Store music "within a matter of months" after buying an iPod").
28

1   ▮▮▮▮▮▮ of iPod purchasers have never purchased any music at all from the iTunes Store.

2   *See* Rangel Decl. Ex. 1, p. 35. Of the remaining iPod owners who use the iTunes Store according

3   to this feedback, as few as ▮▮▮▮▮ bought iTunes Store music before buying their iPods—

4   meaning that ▮▮▮▮▮ of all iPod purchasers could not possibly have been coerced

5   even under plaintiffs' theory. *See id.* Ex. 2, p. 34. This is consistent with the experience of

6   plaintiffs, each of whom purchased (or was given) an iPod before making any iTunes Store

7   purchases. *Infra*, pp. 6-8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Rangel Decl. Ex. 1, p. 35.

9       Even for consumers who buy iTunes Store music first, they have options for playing the

10  music other than on their iPods. The music can be played on their home computer.[6] Or it can be

11  burned to a CD that can be played just as any music CD can be played, including on home or car

12  stereos, boom boxes and portable CD players.[7] It can also be played on competing MP3 players

13  by burning and ripping.[8]

14      **C.    Plaintiffs' Testimony Confirms That The Existence or Extent of Coercion Is**

15          **An Individual Issue.**

16      Plaintiffs' testimony illustrates the individualized nature of their claims—and, indeed, the

17  absence of any tie between iPods and iTunes Store music. As noted, each of them bought or

18  received iPods for their own individual reasons unrelated to any coercion and unrelated to any

19  music from the iTunes Store:

20      Slattery, the original plaintiff, received his first iPod as a gift from his wife. He wanted it

21  because "it was cool." Ex. 15, 302:7-11. That had nothing to do with iTunes Store music

22  because he bought none before receiving the iPod. *Id.* at 30:3-31:2. He filled his iPod with music

---

23  [6] *E.g.,* Ex. 19, 59:6-19 (Tucker) (describing how she plays iTunes Store music with "the speakers

24  connected to [her] laptop"); Ex. 17, 28:24-29:3, 131:1-8 (Rosen).

25  [7] *E.g.,* Ex. 19, 132:13-15 (Tucker) ("Q: And you also know that you can burn it to a CD and play it any place you can play a CD, correct? A. Yes.").

26  [8] *Infra*, p. 9; Dkt. 166-2, Noll Decl. at 48 ("[T]he consumer can make physical copies of

27  [FairPlay] recordings and then read them back into a personal computer as DRM-free files."); Ex. 21, 15:12-24 (Noll) ("[T]he mechanism [to play iTunes files on competing players] is to either do

28  an actual or virtual burn of the CD and then replay it.").

from other sources, including 5,000 songs from free sites and 100 purchased CDs. *Id.* at 324:20-325:3. His complaint was not that he was forced to buy an iPod, but that Apple was charging for its music. In his view, "generally people should have free access to artistic stuff." *Id.* at 157:19-158:18. Far from ever being forced to buy an iPod, he purchased four competing players including a Creative Zen Xtra. *Id.* at 16:8-15.

Plaintiff Tucker bought her first iPod based on her friends' recommendation: "Q: And how did you choose an iPod? . . . A: I had friends that had iPods and had seen advertise-ments. . . . [They] were satisfied. Q: You bought your iPod voluntarily; is that correct? A: Yes." Ex. 19, 8:22-9:1, 11:4-5, 58:2-4. She did not have any iTunes Music at the time, using her CD collection as the source of her music instead. *Id.* at 47:25-48:11, 51:3-5, 52:21-23. She had no complaint about the iPod or the iTunes Store until a discussion with her former boyfriend in July 2006, at which point she became a plaintiff—and he became her counsel of record. *Id.* at 85:18-87:19, 90:11-21.[9] Six months after suing, she bought another iPod. She had less than 25 songs or about two CD's worth of music from the iTunes Store at the time. *Id.* at 43:8-45:18, 120:9-121:15.

Plaintiff Rosen has purchased three iPods. She admits she was not coerced when she bought the first two, one of which was a gift for her sister. Ex. 17, 46:8-10, 62:2-5. She claims a lack of choice only as to the third one, but that claim is based largely on her mistaken belief that, if she bought a competing player, she would have to copy all of her music from her CDs again. *Id.* at 75:10-76:16, 156:19-157:7. That has nothing to do with her tying claim.[10]

Plaintiff Charoensak bought an iPod because he wanted a Mac-compatible device that he could use as an external hard drive. Ex. 16, 59:24-61:12. He did not buy any iTunes Store music

---

[9]  Tucker's counsel/former boyfriend instructed her not to answer whether he or she brought up the "concern" or if she developed her "concern" as a result of talking with him. Ex. 19, 88:2-90:24.

[10]  Rosen's problem, unrelated to Apple's anti-piracy software, was that when she ripped her CD collection into her iTunes library, she used the AAC format. Ex. 17, 29:9-30:15. To play that music on some MP3 players, she needs to convert it to MP3 format. She can do so simply by changing her import preference to "MP3 encoder" and, after selecting the music she wants to convert, clicking Advanced>Convert Selection to MP3. *See* Ex. 9.

1   until after he bought the iPod. *Id.* at 122:19-22. Most of the music on his iPod is from his CD

2   collection. *Id.* at 81:20-25. His main complaint is not incompatibility with other stores or devices

3   but rather that he did not know he should not delete music from his computer after syncing to his

4   iPod—again totally unrelated to the complaint here. *Id.* at 25:23-27:20.

5          Plaintiff Somers is an attorney formerly employed by Milberg Weiss, the predecessor to

6   the direct plaintiffs' counsel of record. Ex. 20, 8:17-23, 9:9-11. She bought her first iPod on a

7   friend's recommendation, and a second iPod as a gift for her mother. *Id.* at 37:14-38:4, 43:4-8.

8   She was not coerced either time: "Q: [D]id you feel that you were forced or coerced in any way

9   to buy that iPod? . . . A: I chose to purchase the iPod. Q: Did you feel that you were forced or

10  coerced to do it in any way? . . . A: No." *Id.* at 38:13-23, 43:14-20. Her main purpose in buying

11  an iPod was to load her CDs onto it, and the majority of the files she has downloaded from the

12  iTunes Store are free podcasts. *Id.* at 36:9-12, 122:9-11. She conceded that her choice of a

13  replacement MP3 player in the future would depend in part on how much she liked another player

14  and how long it would take to transfer her music. *Id.* at 104:1-105:6.[11]

15      **D.      Plaintiffs Now Concede That iTunes Store Music Can Be Played on iPod**

16              **Competitors by Virtual and Physical Burning and Ripping, thus Changing**

17              **the Nature of Their Tying Claim.**

18          The theory of a tying case is that consumers are required—against their will—to buy an

19  unwanted (or tied) product in order to obtain the desirable (or tying) product. Selecting which

20  product to characterize as unwanted was difficult for plaintiffs because they were choosing

21  between the CNET product of the decade—the iPod—and the Fortune product of the year—the

22  iTunes Store. Initially, they punted by making the unprecedented claim that both products were

23  both the tying and tied products. At the Court's prodding (*see* Case No. 06-04457 JW, Dkt. 27, p.

24  8, n.2), they now have cast their fate with iTunes Store music and video as the tying product, and

25

26  _____

27  [11]  Nor were plaintiffs' two economists coerced to buy an iPod. Pisarkiewicz bought his iPod to
    impress his nephews that he was "cool." Ex. 18, 76:19-22. Noll does not own an iPod. His wife

28  bought one, without ever buying any iTunes Store music before or since. Ex. 21, 9:19-24.

1   the iPod as the product that consumers supposedly buy only when forced into it. Dkt. 107,

2   Cmplt. ¶ 43.

3       Originally, plaintiffs' theory was that, as a result of Apple using its own anti-piracy

4   software and competitors using different software, an iPod was supposedly the only portable

5   music player that can play music downloaded from the iTunes Store. In fact, as plaintiffs and

6   their economist have now conceded, consumers need only burn the music onto a CD and then

7   import (or "rip") the music onto their computer. Ex. 21, 15:12-24 ("the mechanism is to either do

8   an actual or virtual burn of the CD and then replay it"), 156:18-157:5.[12] This process is simple

9   and widely known. Slattery testified:

10       Q. So you know that physically, when you get music from iTunes
      Music Store into your iTunes library, you can play that on competing
11       devices by burning to a CD and ripping back to the computer, correct?

12       A. Yeah.

13       . . . .

14       Q. And burning and ripping is a process that you have done
      numerous times, correct?

15       A. Oh, yeah, many.

16   Ex. 15, 265:7-12, 17-21.[13] The burning/ripping process is described on the Apple website

17   (Ex. 10) and is illustrated in Addendum 2 to this brief. Explanations of how to do it can also be

18   found by a Google search for "how to play iTunes music on competing players." *E.g.*, Ex. 11; *see*

19   *also* Exs. 12, 13 ¶¶ 81-84 (decision of French Competition Council rejecting allegations cited by

20

21

22

23

24   [12] "Virtual" burning refers to using software to "virtually burn" the customer's entire iTunes
Store music library by copying it to the hard drive on the customer's computer. Such virtually
25   burned songs can then be imported directly into an alternative player's jukebox software on that
same computer and be played portably on that player. *See* Ex. 11.

26   [13] Similarly, Tucker testified that she has already burned 25-30% of her songs to CDs and that it
takes "under a minute" of her time to burn or rip a CD. Ex. 19, 60:2-61:10. Somers likewise
27   testified that burning and ripping is "easy to do" and takes "less than a minute." Ex. 20, 49:2-18,
28   50:10-12. She has burned CDs 30 times and ripped 50 times. *Id.* at 49:24-50:1; 57:19-23.

SFI-594890v1           9            Corrected Copy of Redacted Mem.
in Opp. to Class Certification
C 05-00037 JW

1   plaintiffs in their complaint at ¶¶ 60-70, noting that burning and ripping is relatively easy,

2   familiar to music fans, has negligible cost, and resolves concerns of incompatibility).[14]

3   ### E.    Plaintiffs' Current Tying Claim

4   Plaintiffs are thus reduced to claiming that what their economist calls a "differential ease

5   of access" (Ex. 21, 21:1-10)—*i.e.*, that iTunes Store music can be played on competing MP3

6   players by the easy, familiar step of burning and ripping—creates an illegal tie. They assert that

7   some customers with a lot of iTunes Store music might feel "locked-in" to buying an iPod rather

8   than a competing player because they view the small extra burning and ripping step as too

9   inconvenient or because their preference for a competing player is too weak. As a legal matter,

10  this claim has no merit. The antitrust laws do not require that a company design its new products

11  to work equally well (or at all) with competitors' products—or worse, that a company is required

12  once its products became successful to redesign them to be fully interoperable with competitors'

13  products. "[T]he introduction of technologically related products, **even if incompatible with the**

14  **products offered by competitors**, is alone neither a predatory or anticompetitive act." *Foremost*

15  *Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) (emphasis added).

16  Even plaintiffs' economist agreed that it would be "completely idiotic" to require a new entrant to

17  design its products to be compatible with existing or future competitors' products. Ex. 21,

18  211:10-18.[15]

19

---

20  [14]  Plaintiffs further dressed up their complaint by alleging that Apple deliberately disabled a chip
21  in the iPod to make it unable to play music from other online stores. Plaintiffs and their
    economist, however, have been unable to identify any basis for the chip disabling allegation, and
22  it is patently false. As their economist put it, "the issue to me was never disabling the
    microprocessor; there would be no reason to do that." Ex. 21, 221:23-25. Far from disabling
23  anything, Apple and its competitors simply chose to use different DRM technology.

24  [15]  Plaintiffs' economist went on to try to construct an exception for a "dominant" company. Ex.
    21, 211:21-212:11. But Apple was clearly not "dominant" when it designed these products.
25  Apple was starting from scratch; the iPod and the iTunes Store were its first foray into selling
    music players and music, and it had no market share at the time as to either. And judging the
26  legality of a new product retroactively based on whether it became successful or "dominant" is no
    more permissible. It would punish success. "The successful competitor, having been urged to
27  compete, must not be turned upon when he wins." *U.S. v. Aluminum Co. of Am.*, 148 F.2d 416,
    430 (2d Cir. 1945) (internal quotation marks omitted).

28

1    The critical point for present purposes, however, is that plaintiffs' lock-in-resulting-from-

2    differential-ease-of-access theory of tying depends on inherently individual proof that cannot be

3    managed on a class-wide basis.  Proof that one customer was locked in under this differential-

4    ease-of-access theory will not establish that any other customer was locked in, let alone all

5    customers.  As plaintiffs' expert admitted, "the degree to which any given person is locked in . . .

6    just depends on a bunch of stuff," including the size of the library of iTunes Store music with

7    DRM, how technically literate the person is, how easy it is for them to burn and rip, and so forth.

8    Ex. 21, 195:1-8.

9         **F.    Plaintiffs' Proposed Class.**

10        As noted, determining which, if any, consumers might meet plaintiffs' economist's

11   definition of locked-in would be a highly individualized inquiry.  Hoping to obscure this

12   undeniable conclusion, plaintiffs seek to represent not only those consumers but every single

13   person who bought any one of the ████████       iPods sold directly by Apple to consumers in

14   the United States since April 2003, plus the ████ resellers that bought ████████ iPods

15   from Apple during that same period.  *See* Knysh Decl. ¶¶ 2-3.  The latter reseller group includes

16   huge volume purchasers such as Wal-Mart or Target that bought iPods for resale in their own

17   retail stores, and smaller distributors that bought iPods for resale to retail stores.  The class is so

18   broad that it includes customers who bought iPods in the first months after the iTunes Store was

19   launched, when Apple clearly had no market power under any conceivable theory.

20                         **ARGUMENT**

21   **I.    PLAINTIFFS BEAR THE BURDEN OF SHOWING THAT THE REQUIRE-**

22   **      MENTS FOR CLASS CERTIFICATION ARE MET.**

23        Plaintiffs bear the burden of demonstrating that the requirements for class certification are

24   met.  *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982); *Zinser v. Accufix Research Inst., Inc.,*

25   253 F.3d 1180, 1186 (9th Cir. 2001).  The court must engage in a "rigorous analysis" before

26   deciding that a class action is proper.  *Chamberlain v. Ford Motor Co.,* 402 F.3d 952, 961 (9th

27   Cir. 2005) (quoting *Falcon,* 457 U.S. at 161).

28

1    Pointing to the allegations of their complaint or making (or having their expert make)

2  unsupported assertions as to how they hope to prove their case is not enough. Plaintiffs must

3  instead adduce evidence—and the Court must determine as a factual matter—that the case as it

4  "would actually be tried" satisfies Rule 23. *Castano v. Am. Tobacco Co.*. 84 F.3d 734, 745 (5th

5  Cir. 1996). "[C]ourts are not only 'at liberty to' but *must* 'consider evidence which goes to the

6  requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to

7  the underlying merits of the case.'" *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1178 (9th Cir. 2007)

8  (empahsis in orginal).

9    Similarly, plaintiffs must offer something more than an expert's *ipse dixit* that the

10  proposed class meets Rule 23's requirements. The expert must present "properly-analyzed,

11  scientifically reliable evidence tending to show that a common question of fact . . . exists with

12  respect to all members of the class." *Dukes*, 509 F.3d at 1179; *In re Graphics Processing Units

13  Antitrust Litig.*, No. C 06-07417 WHA, 2008 WL 2788089, at *18 (N.D. Cal. July 18, 2008)

14  (denying class certification where the plaintiffs' expert testimony was "conclusory," "artificial,"

15  and "evad[ed] the very burden he was supposed to shoulder").

16  **II.    PLAINTIFFS' TYING CLAIM FAILS THE PREDOMINANCE, TYPICALITY**

17  **AND ADEQUACY STANDARDS FOR CLASS CERTIFICATION.**

18    **A.    Whether iPod Purchasers Were Tied Depends on Individual Proof.**

19    Plaintiffs claim that class certification is routine, asserting that courts "have consistently

20  certified tying claims for class-wide resolution." Mot. at 4. But plaintiffs rely entirely on cases

21  where the seller refused to sell the products separately, and thus a tie could be shown across-the

22  board without the need for individual proof. That simply is not the case here, where the products

23  are sold separately and the iPod was wildly successful both before and after the alleged tying

24  product was introduced. Indeed, no court has ever found that a highly acclaimed product,

25  extremely popular in its own right, was the unwanted "tied" product that consumers were forced

26  to buy.

27    Far from routinely certifying tying claims in cases like this, no case has ever certified a

28  tying claim like the one here. The cases have instead uniformly denied class certification where,

as here, the products are sold separately and obvious reasons exist for purchasing them without regard to any alleged tie. *E.g., Freeland v. AT & T Corp.*, 238 F.R.D. 130, 155 (S.D.N.Y. 2006) (denying class certification where "plaintiffs have not offered to prove the existence of a tie through a common contractual provision to which all class members are subject"); *Little Caesar Enters., Inc. v. Smith*, 895 F. Supp. 884, 904 (E.D. Mich. 1995) (denying class certification because the tie was not "apparent from the face of a contract, or from reasonable inferences based on the contract and related documents"); *Colburn v. Roto-Rooter Corp.*, 78 F.R.D. 679, 681-82 (N.D. Cal. 1978) (denying class certification of tying claim where, although named plaintiffs' contract with defendants had a tying provision, there was no evidence of similar contracts for other alleged class members); *Smith v. Denny's Rests., Inc.*, 62 F.R.D. 459, 461 (N.D. Cal. 1974) (denying class certification because franchise contract did not require purchase of supplies from franchisor); *Chase Parkway Garage Inc. v. Subaru, Inc.*, 94 F.R.D. 330, 332 (D. Mass. 1982) ("[T]he tie-in is not contained in the agreement in express terms. Individual proof of coercion, therefore, will be necessary to establish the existence of a tie-in."); *Ungar v. Dunkin' Donuts, Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976) (class certification not proper where "plaintiff franchisees place no reliance on express contractual tie-ins"); *Daniels v. Amerco*, No. 81 CIV.3801, 1983 WL 1794, at *7-8 (W.D. N.Y. Mar. 10, 1983) (certification inappropriate where proof of coercion of individual dealers would be required for monopolization claim); *Waldo v. N. Am. Van Lines, Inc.*, 102 F.R.D. 807, 814 (W.D. Pa. 1984) (denying class certification because proof of actual coercion on an individual basis is necessary to prove the existence of a tie); *Olmstead v. Amoco Oil Co.*, No. 76-247-Orl-Civ-Y, 1977 WL 1416, at *3 (M.D. Fla. Jun. 16, 1977) (class action denied because leases did not require tie on their face).[16]

---

[16] Commentators agree. "In the absence of a common contractual provision, proof of a tie-in is an individual question, and individual questions will predominate." 5 *Moore's Federal Practice* § 23.45[5][c] (3d ed. 2006); 7AA C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 1781, pp. 249-51 (3d ed 2005) ("individual issues predominate and certification is inappropriate" in tying cases where no common contractual requirement exists); S. Calkins, *Enforcement Official's Reflections on Antitrust Class Actions*, 39 Ariz. L. Rev. 413, 448 (1997) ("Courts regularly regard proof of coercion as requiring so much individualized proof as to prevent class certification.").

1          The result in these cases flows from basic tying requirements. A tying arrangement is "an

2   agreement by a party to sell one product but only on the condition that the buyer also purchases a

3   different (or tied) product." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). "[T]he

4   essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its

5   control over the tying product to force the buyer into the purchase of a tied product that the buyer

6   either did not want at all, or might have preferred to purchase elsewhere on different terms."

7   *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). "[W]here the buyer is free to

8   take either product by itself there is no tying problem." *Id.* at 12 n.17. As the Ninth Circuit

9   explained, "the Supreme Court has emphasized that the coerced purchase of the tied product is

10  the key aspect of an illegal tie." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913

11  (9th Cir. 2008); *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 192 (2d Cir. 1992)

12  ("[u]nless the buyer can prove that it was the unwilling purchaser of the allegedly tied products,

13  actual coercion has not been established and a tying agreement cannot be found to exist"); *see* X

14  P. Areeda, E. Elhauge, & Hovenkamp, *Antitrust Law*, ¶ 1753c, at 276 n.12 (2d ed. 2004)

15  (recognizing that buyer who "purchased no amount of the tied product that [he] would not have

16  purchased anyway" would lack standing to obtain damages, with the result that "tying

17  arrangement purchaser class actions seeking damages cannot be certified if the class might

18  include some purchasers who would have purchased the tied product in any event").

19         Plaintiffs' cases are not to the contrary. In each of them, the ground for class certification

20  was that the defendant refused to sell the products separately, either by explicitly requiring that

21  customers buy them together or by making it impossible for customers to buy them separately.[17]

22

23  _____
[17] *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 654 (D. Idaho 2006) (the defendant real estate
    agent required buyers to pay a commission on the prospective home price as a condition of

24  obtaining agency services to purchase the underlying undeveloped lot); *Image Tech. Servs. v.
    Eastman Kodak Co.*, No. C 87-1686 BAC, 1994 WL 508735, at *1 (N.D. Cal. Sept. 2, 1994)

25  (Kodak required copier purchasers to also purchase maintenance services from Kodak); *Little
    Caesar Enters., Inc. v. Smith,* 172 F.R.D. 236, 240 (E.D Mich. 1997) (contractual provision

26  precluded franchisees from seeking alternative suppliers of logoed restaurant supplies); *Collins v.
    Int'l Dairy Queen. Inc.*, 168 F.R.D. 668, 674-75 (M.D. Ga. 1996) (franchisor never granted

27  approval for purchasing supplies from alternative vendors and prevented vendors from being able

28  to supply franchisees); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977)
                                                                                      (continued)

1   The courts permitted class certification on the basis that all customers were necessarily coerced—
2   it literally was not possible to buy one product without the other. Thus, the tie could be shown by
3   common evidence for all purchasers. These cases do not support class certification where, as
4   here, the products are separately available and have separate uses; where the claim is simply that
5   some customers may have felt locked in to buying the tied product in highly individualized
6   circumstances; and where obvious reasons exist for buying the allegedly unwanted product
7   wholly unrelated to the alleged tie.

8        Plaintiffs' economist's testimony confirms that this case is precisely the kind of tying
9   claim for which the courts consistently deny class certification. He expects that the iPod would
10  have significant market share even absent the alleged tie resulting from his asserted differential-
11  ease-of-access.[18] This means that, even under plaintiffs' theory, consumers would be purchasing
12  the allegedly unwanted "tied" product anyway. Because there is no way—except by individual-
13  by-individual proof—to segregate such consumers from those, if any, who would not have
14  purchased the iPod absent the alleged tie, no class can be certified.

15

16

17

18  (sale of cemetery plots tied to purchase of grave markers and marker installation services); *Hardy*
    *v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994) (defendant adopted a "blanket policy" that
19  effectively required that customers purchase eye examinations and contact lens together); *Hill v.*
    *A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976) (defendant admitted that it had a policy of never
20  selling its buying plan memberships separately from its vacuum cleaner); *Anderson Foreign*
    *Motors, Inc. v. New England Toyota Distrib., Inc.*, 475 F. Supp. 973, 988 (D. Mass. 1979)
21  (express terms of standard form contract conditioned sale of automobiles on use of defendant's
22  new car delivery service); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1339 (9th Cir.
    1984) (defendant refused to sell its operating system separately from its CPUs); *In re Visa Check/*
23  *Mastermoney Antitrust Litigation*, 280 F.3d 124, 136 (2d Cir. 2001) (affirming the district court's
    conclusion that "coercion was . . . amenable to proof on a class-wide basis because the contractual
24  provision to which all class members were subject . . . would establish the requisite coercion");
    *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1160-62 (9th Cir. 2003) (finding no
25  tying arrangement because there was no evidence that defendant required that products be
26  purchased together or effectively prevented their separate purchase).

27  [18] Ex. 21, 64:18-65:4 (iPods would have "significant market power" absent the alleged tie),
    148:16-19 ("I think it's probably the case, although I don't know this for sure, that the but-for
28  world is one in which the leading producer of portable digital media players is Apple.").

1    Plaintiffs rely on the statement in *Moore*, 550 F.2d at 1217, that coercion may be implied

2    from evidence that an "appreciable number of buyers" accepted the tie. Mot. at 15.[19] *Moore*,

3    however, did not dispense with the coercion requirement. A tie was established in that case

4    because the seller expressly required purchasers of cemetery plots to also purchase grave markers

5    or burial services. In the *dictum* on which plaintiffs rely, the court indicated only that the

6    existence of a tie "may be implied" circumstantially by evidence of actual tied purchases by a

7    sufficiently large sample of purchasers. 550 F.2d at 1217. If all or essentially all purchases were

8    made on a package basis in circumstances where some consumers would be expected to buy one

9    of the products from a different supplier or not at all, the courts have been willing to assume

10   (absent contrary evidence) that the seller was refusing to sell separately. That was the

11   circumstance, for example, in the case on which *Moore* relied, *Hill v. A-T-O, Inc.*, 535 F.2d 1349

12   (2d Cir. 1976), in which the seller never sold the tying product without requiring that the

13   customers also buy the tied product. Similarly, in *Siegel v. Chicken Delight, Inc.*, 448 F.2d 45

14   (9th Cir. 1971), the tie consisted of a "contractual requirement" that franchisees purchase supplies

15   from the franchisor "as a condition of obtaining a Chicken Delight trade-mark franchise." *Id.* at

16   46. Here, by contrast, iPods and iTunes Store music have always been separately available and

17   have always functioned independently.

18        Effectively conceding that they must show that Apple imposed a requirement on a

19   common basis on all purchasers, plaintiffs repeatedly assert that Apple had an "unremitting

20   policy" of requiring that iTunes Store music purchasers also buy iPods. Mot. at 1, 7, 16, 17. But

21   the "policy" to which plaintiffs refer is simply Apple's developing its own DRM. That is not any

22   sort of requirement, unremitting or otherwise, that iTunes Store music purchasers buy iPods. At

23   best, under plaintiffs' "lock-in" theory, Apple's use of its own technology potentially could have

24

25   ---

26   [19] In opposing dismissal, plaintiffs argued that they need not show that they or other customers
     were coerced because "market-level coercion" is supposedly sufficient, citing *Murphy v. Business
27   Cards Tomorrow, Inc.*, 854 F.2d 1202 (9th Cir. 1988). They no longer advance this argument,
     which neither *Murphy* nor any other case supports. Their new argument based on *Moore* is
28   equally unsupportable.

had that effect only for a very small number of purchasers. Identifying them would depend on their individual circumstances and a "bunch of stuff" to use their economist's term, including

- Whether they bought music from the iTunes Store with DRM before buying their iPod;

- Whether they wanted to play that music portably;

- Whether were aware of and preferred to use a portable music player other than an iPod;

- Whether they had a sufficiently large number of songs from the iTunes Store with DRM that they still wanted to play to affect their decision;

- Whether they were unaware that iTunes Store songs can be played on other portable players by burning and ripping them (or alternatively whether they considered burning and ripping to be too burdensome); and

- Whether they purchased their iPod because of this alleged lock-in.

Each factor requires individual proof that cannot possibly be addressed on any across-the-board basis. Proof that any customer satisfies any one of these criteria, let alone all of them, would not prove that any other customer does so. These are the quintessential kinds of individual issues that the courts have repeatedly held preclude class certification in tying cases.[20]

Plaintiffs' allegations that the alleged tie extended to video only create further individual issues. Apple did not even begin offering video on the iTunes Store until October 2005. And even after that, it is a virtual certainty that no one purchased an iPod due to any alleged lock-in from video purchases. Apple's consumer information indicates that, as of March 2007, iTunes Store customers had on average purchased only ▮ music videos, ▮ TV shows and ▮ movies— and that ▮ iPod owners had not purchased any video at all. Rangel Ex. 1 (p. 37), Ex. 2 (p. 33). But even if some customers could plausibly claim to have been locked in by having purchased one or two movies or maybe a TV show episode, that could only be shown by

_____

[20]    In reality, it is extremely doubtful that **anyone** has a claim. Of the small percentage of iPod owners who purchased their iPod after purchasing iTunes Store music, it is highly unlikely that any of them (1) had any interest in or even considered purchasing a different player, (2) had a large enough iTunes library to create even the possibility of lock-in, or (3) if they had iTunes Store music, considered it too burdensome to take the few minutes necessary to burn and rip whatever songs they wanted to transfer.

1    individual proof—and it would be proof different from whatever proof may exist regarding the

2    effect of music purchases from the iTunes Store.

3            **B.**      **Separating Purchasers Who Benefited Under Plaintiffs' Theory of An Alleged**

4                      **Tie and Suffered No Injury Requires Individual Proof.**

5          Plaintiffs' effort to represent all iPod purchasers fails for another independent reason.  The

6    rule in the Ninth Circuit is that impact and damages in a tying case may not be determined simply

7    by the amount of any "overcharge" on the tied product alone, but must be measured on a

8    "package" approach—*i.e.*, by determining the net overcharge on the tied product after taking into

9    account any reduction in the tying product price occurring as a result of the tie.  *Siegel*, 448 F.2d

10    at 52.  If any price reduction on the tying product exceeds the amount of any overcharge, the

11    purchaser has not suffered any injury.  *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th

12    Cir. 1982) (following the Ninth Circuit *Siegel* rule; "[u]nless the fair market value of both the tied

13    and tying products are determined and an overcharge in the complete price found, no injury can

14    be claimed").

15          This rule precludes class certification here because plaintiffs have not proposed any

16    methodology for determining the amount of any net overcharge on a common basis.  It is

17    generally recognized that, "if a tie causes a buyer to pay more than the market price for the tied

18    product, the buyer is most likely paying less than the price that the seller could profitably charge

19    for the tying product if sold separately." *Freeland,* 238 F.R.D. at 150 (internal quotations

20    omitted); *see also* X *Antitrust Law*, ¶ 1769c, at 413 ("in most cases a premium price on the tied

21    product must be accompanied by a reduction in the price of the tying product").  Here, although

22    Apple denies that any tie exists, plaintiffs' expert testified that under plaintiffs' theory the price of

23    iTunes Store music may have been reduced.  Ex. 21, 141:15-19.  If that were true, consumers

24    with relatively large iTunes Store purchases would have benefited because they may have saved

25    more on their iTunes Store purchases than the amount of any overcharge on the iPod.  Which

26    consumers benefited under plaintiffs' theory depends on individual circumstances, including the

27    number of their iTunes Store purchases, the iPod model purchased and the date of the purchases.

28

SFI-594890v1                          18                       Corrected Copy of Redacted Mem.
in Opp. to Class Certification
C 05-00037 JW

1    To justify class treatment, therefore, plaintiffs must show that the price of iTunes Store

2  music was not lower as a result of the alleged tie or they must provide some methodology for

3  establishing a **net** overcharge on music and iPods for all consumers.[21]  They have done neither.

4  As the court recognized in *Freeland*, this precludes class certification.  238 F.R.D. at 150

5  ("Plaintiffs' inability to identify a methodology to demonstrate that [purchasers did not benefit

6  from a lower price on the tying product] precludes a showing of injury on a classwide basis.");

7  *see also Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189-90 (11th Cir. 2003) (A

8  "fundamental conflict exists where some party members claim to have been harmed by the same

9  conduct that benefited other members of the class. . . .  [N]o circuit has approved of class

10  certification where some class members derive a net economic benefit from the very same

11  conduct alleged to be wrongful by the named representatives of the class.").

12    **C.    Determining What Purchasers Would Have Done Absent the Alleged Tie**

13       **Creates Further Individual Issues and Conflicts.**

14    Plaintiffs' theory is that Apple was able to charge higher prices for iPods because the

15  alleged tie (now limited to a "differential ease-of-access" to play iTunes Store music on

16  competing players) prevented some customers from purchasing competing players. *See* Dkt. 107,

17  Cmplt. ¶ 73.  If any such customers actually existed, the typical method for determining whether

18  the consumer was overcharged on the tied product purchase (before considering any reduction in

19  the tying product price) is to examine the difference between the price of the competing player

20  the consumer would have purchased and the price paid for the iPod.  This was the method used in

21  *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir. 1964).  There, the defendant tied the sale of

22  tires, batteries and accessories ("TBA") to the purchase of petroleum products.  The court held

23  that the tied product overcharge was the difference between the price the plaintiff paid for the

24

25

---

26  [21] *See Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir. 2005) (affirming denial of class
    certification where plaintiffs' expert "did not show that injury could be proven on a classwide
27  basis with common proof"); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164-67 (N.D. Cal.
28  2001) (denying certification where conspiracy proof was common, but injury proof was not).

1   TBA and the price "at which such items were available from other sources." *Id.* at 471-72. *See*

2   *also Gray v. Shell Oil Co.*, 469 F.2d 742, 751 (9th Cir. 1972).

3       This method of proving injury and damages creates individual issues that further

4   preclude class certification. Determining which customers would have purchased an alternative

5   player, identifying the alternative player they would have purchased, and then finding the price

6   differential, if any, that might have existed between that player and the iPod are highly

7   individualized inquiries that cannot be done on any common basis. This is particularly true

8   because a large number of alternative players have been available on the market, with signifi-

9   cantly varying prices and features.[22]

10      Plaintiffs ignore this method of proving injury and damages, for two likely reasons. First,

11  as noted, it raises individual issues as their economist acknowledged. Ex. 21, 135:17-22 ("I

12  didn't use that as damages because … it introduces an unsolvable problem which is what is the

13  relative willingness to pay [for] the alternative versus the item in question **at the individual**

14  **level**.") (emphasis added). Second, plaintiffs have no interest in pursuing that method because

15  each of them purchased an iPod before buying any iTunes Store music and admittedly without

16  considering alternative players, and thus cannot possibly claim they would have purchased a

17  different player.[23]

18      Plaintiffs assert instead that their economist will attempt to determine injury and damages

19  for all iPod purchasers (even any who would have purchased an alternative player) by trying to

20  perform a very complex regression analysis designed to figure out whether the iPod price would

21  _____

22  [22] Competing device manufacturers included SanDisk, Creative Zen, iRiver, Nokia, Microsoft,
    Archos, Samsung, Sony, Phillips, Toshiba, Ibiza and Cowon. *See, e.g.*, Dkt. 166-2, Noll Decl.

23  at 26. Many of these manufacturers sell many different models, some of them more expensive
    and some less expensive than comparable iPods. Competitor players that are comparable to

24  Apple's iPod shuffle 2GB currently range from players that cost approximately the same as the
    shuffle (Sansa Express 2GB) to a player that costs $19 less (Creative MuVo T200), with

25  numerous models in between. Similarly, the models comparable to Apple's iPod nano 16GB

26  range from $19 less (Sansa View 16GB) to $100 more (Sony 16GB Walkman Video). Ex. 14.

27  [23] *See supra.* pp. 6-8; Ex. 20, 27:23-24 (Somers) ("Q: Did you look at competing MP3 players?
    A: No."); Ex. 17, 45:15-17 (Rosen) ("Q: But did you shop around and compare the iPod with

28  others? A: No.").

1  have been lower without the "differential ease of access." This approach, however, both ignores

2  governing Ninth Circuit law and confirms that plaintiffs are neither typical nor adequate

3  representatives of the class they purport to represent. The law does not permit class plaintiffs to

4  seek certification by ignoring or forfeiting claims of consumers they seek to represent.[24] Here, if

5  there is any consumer who fits within plaintiffs' theory of lock-in, that individual may well prefer

6  to try to establish injury and damages by the traditional *Lessig* method rather than trying to

7  calculate an alleged overcharge on the iPod using the speculative, uncertain regression analysis

8  approach that plaintiffs' economist advances. Nor does the law permit named plaintiffs to

9  represent the absent class members when the named plaintiffs do not share their interest in

10  pursuing a damage theory that may maximize their recovery, if any unlawful conduct could be

11  shown in the first place. *See Telecomm Tech. Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 172

12  F.R.D. 532, 545-46 (N.D. Ga. 1997) (denying class certification of tying claim where some

13  members of the class benefited from the tie and had interests antagonistic to those of the named

14  plaintiffs).

15  Moreover, even as to the purchasers who would have stayed with the iPod, plaintiffs'

16  expert admitted that he does not know whether his proposed methodology will work. Ex. 21,

17  68:20-23 ("I can't tell you what analysis I am going to do to get at anticompetitive impact as

18  opposed to damages until I know what data are available."). His report reads like a generic

19  economic analysis. It is devoid of actual analysis (regression or otherwise) that would support his

20  conclusions. Accordingly, plaintiffs' economist had no idea whether he would, ultimately, be

21  able to opine that some identifiable group of iPod purchasers had, in fact, been "coerced" into

22

23  _____

24  [24] The wide variety of alternative, highly differentiated products distinguishes this case from
other tying cases. In the typical tying case, the tying product is the desirable, differentiated one
and the tied product is a fungible commodity (*e.g.*, printer as the tying product and ink cartridges

25  as the tied product, *see Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006)). In
such cases, it generally will not matter whether a customer would have purchased the tied product

26  from a competitor or what the price may have been, because the nature of the products at issue is
such that they will all have comparable prices. That is not true in this case, however. Indeed, as

27  noted (*supra*, p. 15), plaintiffs' economist admits that, even absent the alleged tie, the iPod would

28  likely still be the most popular music player because of its broad consumer appeal.

1    purchasing iPods, or whether any of those consumers (much less the entire class) had suffered

2    cognizable damages (Dkt. 166-2, Noll Decl. at 52). The courts have consistently rejected such

3    speculative expert testimony as a permissible basis for certifying a class.[25]

4          Finally, even if plaintiffs' economist could perform a regression analysis to determine

5    whether the price of the iPod at any time was elevated as a result of the "differential ease-of-

6    access," neither he nor plaintiffs have offered any method for proving a **net** overcharge on the

7    alleged tied and tying products as required in the Ninth Circuit. *Supra*, pp. 17-18.

8    **III.    ADDING RESELLERS LIKE BEST BUY EXACERBATES THE PREDOMI-**

9          **NANCE, TYPICALITY, ADEQUACY AND MANAGEABILITY PROBLEMS.**

10         When the first class certification motion was filed, plaintiffs Charoensak and Rosen

11   sought only to represent individual consumers. (That motion was withdrawn when a consolidated

12   complaint was filed.) Although the definition of the putative class remained the same in the

13   consolidated complaint, this time plaintiffs are seeking to represent not only individual consumers

14   but also business entities and others who purchased iPods for resale. Apple has sold iPods to over

15   ▮      such resellers, including such large entities as Wal-Mart, Best Buy, and Target. Knysh

16   Decl. ¶ 3.

17         These entities are obviously not in the same position as individual end-user purchasers.

18   They do not purchase at the retail price paid by end-users, and their interest in challenging the

19   alleged tie and pursuing a damage recovery is affected by factors that do not apply to end-user

20   
21   [25]   *See. e.g., Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296,
      299–301 (5th Cir. 2004) (affirming the district court's finding that the plaintiffs had failed to
22   show class-wide impact because the plaintiffs' expert had failed to show that the model would
      actually work); *Freeland*, 238 F.R.D. at 135-36 (denying certification where the plaintiffs'
23   regression analysis was incomplete and defective); *Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116
      F.R.D. 486, 492 (E.D. Va. 1987) (denying class certification where "[p]laintiff's expert states, in
24   very general terms, that statistical methods exist by which individual damages may be calculated,
      and plaintiff asserts that a workable formula can be developed").
25   
      *In re SRAM Antitrust Litigation,* No. C 07-01819 CW, 2008 WL 4447584 (N. D. Cal.
26   Sept. 29, 2008), cited in plaintiffs' supplemental filing, does not help them. That was a price-
      fixing conspiracy case that did not involve the kind of individual issues present in a tying case,
27   including whether purchasers were coerced, whether they benefited from the tie and whether they
      are better off recovering damages based on price of alternative products.
28

1   purchasers. Assuming a tie existed and resulted in increased sales of iPods, some resellers may

2   have no interest in having the tie invalidated because iPod sales are relatively more profitable to

3   them and because of profits they earn on selling accessories for the iPod. Plaintiffs' expert

4   admitted that costs (beyond just the wholesale cost of the device) and profit margins likely vary

5   among resellers for both the iPod and competing devices. Ex. 21, 250:8-251:10. Such potentially

6   differing interests preclude class certification. *Gen. Tel. Co.*, 457 U.S. at 156 ("We have

7   repeatedly held that a class representative must be a part of the class and possess the same interest

8   and suffer the same injury as the class members.") (internal quotation marks omitted).

9        Moreover, even if all resellers shared a common interest with each other and with

10  plaintiffs in challenging the tie and recovering damages, the named plaintiffs cannot adequately

11  represent the resellers because proving the resellers' claims involves facts that are immaterial to

12  end-user plaintiffs.[26] To establish the reseller claims, plaintiffs would need to prove the

13  wholesale price the resellers paid, demonstrate that that price did not vary among resellers (or that

14  any variations can be handled through a common methodology), and then show the competitive

15  price that each reseller would have paid absent the alleged unlawful conduct. Plaintiffs would

16  also have to address the effect of lost revenues to the resellers resulting from decreased sales of

17  iPod accessories in the but-for world. None of these issues is relevant to an end-user's claim, and

18  none of the named plaintiffs has any interest in adducing proof on any of them.

19       Reflecting this complete lack of interest, plaintiffs as noted above did not seek to represent

20  resellers in their first class motion; their papers now are virtually silent on the reseller issues; they

21  have not taken any discovery on the issues in the nearly four years this case has been pending;

22  and their economist admitted that he had not looked into them. Ex. 21, 31:21-33:5, 239:9-240:18.

23  Class certification in this circumstance is improper under Rule 23(a)(3)-(4) because plaintiffs are

24  neither typical of such resellers nor adequate representatives. *See Wofford v. Safeway Stores*,

---

[26] *Sommers v. Abraham Lincoln Fed. Savs. & Loan Assoc.*, 66 F.R.D. 581, 587 (E.D. Pa. 1975) (finding named plaintiffs atypical/inadequate where their claims would require consideration of less complex issues and less evidence than unrepresented portion of the class); *Muller v. Curtis Publ'g Co.*, 57 F.R.D. 532, 535-36 (E.D. Pa. 1973) (finding plaintiff's claims atypical where members of the proposed class would be subject to defenses to which he was not).

1   *Inc.*, 78 F.R.D. 460, 475 (N.D. Cal. 1978) (typicality requirement "ensur[es] that the named

2   plaintiffs' interests are sufficiently aligned with those of class members to assure that they not

3   only can but will press each such claim to a full and equal extent").

4   **IV.   PLAINTIFFS' SECTION 2 CLAIM LIKEWISE CANNOT BE CERTIFIED.**

5           Plaintiffs' monopolization and attempted monopolization claims under section 2 cannot be

6   certified for the same reasons as their Section 1 claim. Plaintiffs admit that the gravamen of their

7   complaint is the alleged tie. *See* Dkt. 102, Consol. Br., pp. 3-4 ("Gravamen . . . is that there is a

8   tie between the purchase of an iTunes file and an iPod from Apple (as only the iPod can directly

9   play iTunes files)."). They do not allege any exclusionary conduct unrelated to the alleged tie.

10  Thus, proof of any section 2 claim depends on the same individualized showing required for the

11  section 1 claim—*i.e.*, that individual customers were subjected to the tie.

12          Moreover, each of the other individual injury and damages issues discussed above also

13  exists for any section 2 claim. Just as under their section 1 claim, individual proof will be

14  required to determine which customers suffered no injury because they benefited from a lower

15  price on their iTunes Store purchases. Similarly, the individualized inquiry to determine injury

16  and damages for customers by examining whether they would have purchased an alternative

17  player rather than an iPod (and, if so, which player and at what price) applies equally to any claim

18  under section 2. Plaintiffs do not cite any case holding that a tying claim found unsuitable for

19  class treatment under section 1 could nonetheless be certified for class treatment simply by

20  asserting the same tying allegations as a section 2 claim.[27]

21  **V.    CERTIFICATION UNDER RULE 23(B)(2) IS ALSO IMPROPER.**

22          Nor are plaintiffs entitled to class certification under Rule 23(b)(2). "Class certification

23  under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or

24  injunctive." *Zinser*, 253 F.3d at 1195. Any claim for monetary damages must be "merely

25  incidental" or "secondary" to the litigation. *See Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir.

26  2003); *see also Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1314 (9th Cir. 1977) (affirming

27  ─────────────
    [27] Plaintiffs admit that their state law claims are governed by the same analysis as their federal
28  claims. Mot. at 24. Thus, class certification of those claims is likewise improper.

1    denial of class certification under Rule 23(b)(2) where the action "the action seeks as a major

2    portion of the claimed relief, monetary restitution").

3      Plaintiffs cannot credibly claim that their request for monetary damages meets this test.

4    Their complaint identifies as the supposed injury to consumers that Apple has allegedly charged

5    "supracompetitive prices," for which plaintiffs seek "damages, penalties and other monetary

6    relief . . ., including treble damages." Dkt. 107, Cmplt, ¶ 72 & p. 23. The courts have repeatedly

7    denied certification under Rule 23(b)(2) of cases alleging such claims for antitrust treble

8    damages. *E.g.*, *In re Graphics Processing Units*, 2008 WL 2788089, at *34; *Krehl v. Baskin-*

9    *Robbins Ice Cream Co.*, 78 F.R.D. 108, 117 (C.D. Cal. 1978).

10      Moreover, certification under Rule 23(b)(2) is improper because that rule requires that the

11    proposed class be cohesive and homogeneous. *Lewallen v. Medtronic USA, Inc.*, No. C 01-20395

12    RMW, 2002 WL 31300899, at *3 (N.D. Cal. Aug. 28, 2002) ("to be certified under Rule

13    23(b)(2), the class must be cohesive"); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 256 (3d Cir.

14    1975) ("The very nature of a (b)(2) class is that it is homogeneous without any conflicting

15    interests between members of the class").[28] A proposed class of tens of millions of purchasers

16    (including both end-user purchasers and ███ resellers), in which proof of individual coercion is

17    required to determine who if anyone was tied, in which many purchasers may have benefited

18    from any alleged tie under plaintiffs' theory, and in which class members have conflicting

19    interests as to the appropriate measure of damages, does not meet this standard.

20    ### CONCLUSION

21      For these reasons, plaintiffs' motion for class certification should be denied.

22    Dated: October 17, 2008     JONES DAY

23

24              By:/s/ Robert A. Mittelstaedt
            Robert A. Mittelstaedt

25              Counsel for Defendant

26

27    [28] *See also Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 448 (6th Cir. 2002); *In re*

28    *Allstate Ins. Co.*, 400 F.3d 505, 507-08 (7th Cir. 2005).

SFI-594890v1        25     Corrected Copy of Redacted Mem.
in Opp. to Class Certification
C 05-00037 JW