**EXHIBIT 1**

FILED
San Francisco County Superior Court
AUG 29 2000
GORDON PARK-LI, Clerk
BY: _____
Deputy Clerk

CALIFORNIA SUPERIOR COURT

CITY AND COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | | |
|---|---|---|
| COORDINATION PROCEEDINGS SPECIAL TITLE (Rule 1550(b)) | ) ) ) ) ) ) ) | NO.  J.C.C.P. No. 4106 |
| | | **ORDER RE CLASS CERTIFICATION** |
| MICROSOFT I – V CASES | | |

This is a coordinated proceeding brought by plaintiffs as representatives of two purported classes of California indirect purchasers of software products produced by defendant Microsoft Corporation.

The operative complaint for all of the coordinated actions[1] alleges causes of action under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.).  Plaintiffs allege that defendant engaged in numerous violations of these Acts in establishing and maintaining an illegal monopoly of the Intel-compatible personal

_____

[1] The Amended Complaint for Violations of California Business and Professions Code §§ 16720 and 17200 Seeking Damages, Restitution and Injunctive Relief; Class Action, filed March 19, 1999 in *Lingo v. Microsoft Corporation*, San Francisco Superior Court No. 301357 (hereafter "Complaint").

1

computer markets for operating systems software and for word processing and spreadsheet

applications software.  Plaintiffs allege that Microsoft harmed California consumers by

overcharging for its software as a result of the abuse of its monopoly power and by depriving

consumers of other benefits that would have been derived from competition in those markets.

Plaintiffs seek to bring this action on behalf of California individuals and entities that

purchased software programs indirectly from Microsoft.  Specifically, plaintiffs request that two

classes be certified:

> (1) The "Windows and MS-DOS Operating System Software Class:"  All persons or
> entities within the State of California who, on or after May 18, 1994, indirectly
> purchased "Microsoft Windows operating system software or MS-DOS operating
> system software" and who did not purchase it for the purpose of resale.
> (2) The "Word and Excel Software Class:"  All persons or entities within the State of
> California who, on or after May 18, 1994, indirectly purchased Microsoft "Word"
> word processing software and/or "Excel" spreadsheet software compatible with
> "Microsoft Windows operating system software or MS-DOS operating system
> software" and who did not purchase it for the purpose of resale.
> Excluded from the class[es] are government entities, Microsoft officers and directors,
> subsidiaries in which Microsoft has greater than a 50 percent ownership interest and any
> judges or justices assigned to hear any aspect of this litigation.  Also excluded are persons
> or entities who make their purchases after the date of notice to the class.[2]

Microsoft contends that the complexities of this case preclude common proof of the key

issue of whether any illegal practices adversely impacted California consumers, and that

certification is therefore inappropriate.  "[S]hort of making an individual inquiry as to each

proposed class member, [there is] no way of proving the key 'fact of injury' or 'impact' element

in an antitrust class action:  that the alleged monopolistic 'overcharge' actually worked a

discernible, tangible impact on the vast majority of end-users in the proposed class.  Nor could the

amount of the alleged overcharge, if any, passed on to an end-user be estimated without individual

investigation."  (Microsoft Corporation's Memorandum of Points and Authorities in Support of

Its Opposition to Plaintiffs' Renewed Motion for Class Certification ("Opp.") at p. 3.)

---

[2] Microsoft notes that because it does not actually "sell" its software to anyone (rather, it "licenses" its products), it is
technically incorrect to refer to putative class members as indirect "purchasers."  However, for the sake of simplicity,
the court will also adopt plaintiffs' use of the widely recognized terminology.  However, the term "licensed" should
be inserted in the definition of the classes to be certified.

COORDINATION PROCEEDINGS SPECIAL TITLE
(Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
CLASS CERTIFICATION – J.C.C.P. 4106

1   While plaintiffs urge that "[t]here is nothing extraordinary about [this] motion"

2   (Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Class

3   Certification ("Motion") at p. 1), the application for certification of a class in this case is hardly

4   run of the mill.  Unlike virtually all reported decisions in antitrust cases in which classes of

5   indirect purchasers have been certified, plaintiffs do not base their claim for recovery on

6   allegations that defendant committed a *per se* violation—a critical factor that would permit a

7   classwide presumption of injury.  Moreover, there undoubtedly is a basis for Microsoft's

8   emphasis on the number of software programs it has marketed over the purported class period, the

9   pricing differences that have existed over this period of more than six years, the rapid pace of

10   change in the computer industry over this period, the varied channels through which its software

11   has been distributed, and the critical fact that its software was frequently incorporated into

12   personal computers and represented only a small fraction of the consumers' purchase price.

13   These factors require the court to consider with utmost care the particular issues raised by the

14   allegations and the way in which plaintiffs intend to meet their burden of proof.  The question at

15   this point, however, is not whether plaintiffs will be able to prove their case, but only whether

16   their contentions can be evaluated in a manner that does not require consideration of so many

17   individualized circumstances as to be completely impracticable.

18      **A.      Standard for Class Certification.**

19   Class suits are authorized in California when "the question is one of a common or general

20   interest, of many persons, or when the parties are numerous, and it is impracticable to bring them

21   all before the court." (Code Civ. Proc., § 382.)  A class should be certified when the party

22   seeking certification has demonstrated the existence of an ascertainable class and a well-defined

23   community of interest among the class members. (*Richmond v. Dart Indus., Inc.* (1981) 29

24   Cal.3d 462, 470; see also *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 704.)  The community of

25   interest requirement embodies three factors: "(1) predominant common questions of law or fact;

26   (2) class representatives with claims or defenses typical of the class; and (3) class representatives

27

28

3

1  who can adequately represent the class." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435

2  (citing *Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at p. 470.) In addition, the party seeking

3  certification must establish that the class action is a superior method of adjudicating the matter.

4  (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1279-1280.) In the absence of

5  controlling state authority, California courts look to Rule 23 of the Federal Rules of Civil

6  Procedure and to the federal case law interpreting this rule. (*Richmond v. Dart Indus., Inc., supra*,

7  29 Cal.3d at pp. 469-470.)[3]

8          The party seeking certification of the class carries the burden of establishing that the

9  requirements for certification are met. (*Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at p.

10  470.) Courts encourage the use of the class action to "prevent a failure of justice in our judicial

11  system." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 434.) Consumers' individual damages

12  frequently are insufficient to justify the costs of litigation, so that in the absence of class

13  treatment, violations of law inflicting substantial damages in the aggregate would go unremedied.

14  But to ensure that no party suffers a failure of justice, it is necessary to "carefully weigh respective

15  benefits and burdens and to allow maintenance of the class action only where substantial benefits

16  accrue both to litigants and the courts." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 435.)

17          In considering a class certification motion, the court accepts the facts alleged in the

18  complaint as true. (See *Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 443; *Blackie v. Barrack*

19  (9th Cir. 1975) 524 F.2d 891, 901, fn. 17.) The Supreme Court has recently emphasized that

20  certification of a class is a procedural question that should not be conditioned upon a showing that

21  the class claims are likely to succeed on the merits. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at

22  pp. 439-440, 443.) The Supreme Court also has repeated that courts should resolve any doubt as

23

24  [3] Rule 23 of the Federal Rules of Civil Procedure requires that plaintiff show common questions of fact or law,
    numerosity of the class, typicality of the named plaintiff's claim and adequacy of representation. In addition, plaintiff

25  must show that the common questions of law or fact predominate over questions affecting only individual class
    members and that the class action is superior to other methods for fairly and efficiently resolving the dispute. (Fed.
    Rules Civ. Proc., Rule 23(a), (b)(3), 28 U.S.C.; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, (1987) 191

26  Cal.App.3d 1341, 1347, fn. 5.)

27                                      4

28                                                  COORDINATION PROCEEDINGS SPECIAL TITLE
                                                    (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
                                                    CLASS CERTIFICATION – J.C.C.P. 4106

1   to whether to certify a class in favor of certification. (See, e.g., *Richmond v. Dart Indus., Inc.,*

2   *supra*, 29 Cal.3d at pp. 473-475; *La Sala v. American Savings & Loan Ass'n* (1971) 5 Cal.3d 864,

3   883; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807.)

4        While issues affecting the merits may be enmeshed with class action requirements, the

5   issue at this stage of the proceedings is only whether the matter is suitable for resolution on a

6   classwide basis. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4[th] at p. 443.)  Plaintiffs are not now

7   required to prove their case. (See *id.*, at p. 438-39, 443; *Eisen v. Carlisle & Jacquelin* (1974) 417

8   U.S. 156, 177; *In re Catfish Antitrust Litigation* (N.D. Miss. 1993) 826 F.Supp. 1019, 1038-

9   1039.) Rather, they are required to make a "threshold showing" that the antitrust violations, if

10  proven, have had a common impact on the class. (*In re Catfish Antitrust Litigation, supra*, at pp.

11  1041-1042.) Plaintiffs are also required to advance a method for proving generalized damages on

12  a classwide basis "not so insubstantial that it amount[s] to no method at all." (*Id.*, at p..1042.) In

13  response to plaintiffs' showing that all of the requirements for class certification have been met,

14  Microsoft disputes only whether common questions of law or fact predominate.[4]

15

16      [4]    Microsoft does not seem to contest that the proposed classes are ascertainable. Whether a class is
ascertainable depends on the clarity of the class definition, the numerosity of the putative class and the means

17  available to identify potential class members. (*Reyes v. Board of Supervisors, supra*, 196 Cal.App.3d at p. 1974.)
The class definitions make clear that any California consumer of the software at issue who purchased the product(s)

18  for his, her or its own use and not for resale within the class period is a member of the class. The definitions also
make clear who is excluded from the classes. Moreover, according to declarations submitted with the moving papers,

19  the named plaintiffs who seek to represent one or both classes are themselves members of one or both of the classes.
    The numerosity requirement also is not disputed and is satisfied because the class members are so numerous

20  that it is "impracticable to bring them all before the court." (Code Civ. Proc., § 382.) There is no predetermined
number of class members necessary as a matter of law for the maintenance of a class action. (*Hebbard v. Colgrove*

21  (1972) 28 Cal.App.3d 1017 (not inappropriate to certify class involving a minimum of 28 members); *Clothesrigger,
Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605 (mere size of proposed class numbering over one million members did

22  not make proposed class action unmanageable).) Here plaintiffs allege there are "clearly millions of class members."
(Motion at p. 19.)
    The typicality requirement is satisfied if the representative plaintiff's claim "has the essential characteristics

23  common to the claims of the class." (*In re Flat Glass Antitrust Litigation* (1999) 191 F.R.D. 472, 479.) The named
plaintiffs' claims here, that they paid illegal overcharges due to defendant's antitrust violations, are identical to those

24  of the class, and are, therefore, typical of those of the class.
    Again, the parties do not take issue with the adequacy of representation requirement, which is met by (1)

25  retaining class counsel competent to handle the litigation; and (2) ensuring that the class representatives' interests are
not antagonistic to those of the class. In approving plaintiffs' proposed organization of counsel, this court found

26  plaintiffs' counsel to be well qualified to conduct this litigation. (See Pretrial Order No.1, filed Mar. 9, 2000, and
supporting documentation filed by plaintiffs in support thereof.) The named plaintiffs' claims arise through the same

27                    5

                COORDINATION PROCEEDINGS SPECIAL TITLE
                (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE

28                  CLASS CERTIFICATION – J.C.C.P. 4106

**B.    Indirect Purchaser Suits for Damages in California.**

California is one of a minority of states that permits indirect purchasers to maintain antitrust suits for damages. Rejecting *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, in which the United States Supreme Court held that such suits could not be maintained under the federal Sherman Act, the California Legislature amended the Cartwright Act specifically to permit indirect purchaser actions under California law. (Bus. & Prof. Code, § 16750(a).) The California Supreme Court noted that this legislative action constituted an endorsement of Justice Brennan's dissenting opinion in *Illinois Brick* and "a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits." (*Union Carbide v. Superior Court* (1984) 36 Cal.3d 15, 21-22.)

**C.    Common Questions of Law or Fact Predominate over Individual Questions.**

Plaintiffs' burden is to establish that common questions of law or fact predominate over individual issues. This inquiry "turns on an interpretation of substantive issues of antitrust law." *(Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 751 (*Rosack*).) Federal case law interpreting the Sherman and Clayton Acts is applicable to interpretation of California's antitrust law. (*Ibid.*) To establish liability, plaintiffs must prove an antitrust violation and demonstrate that the class suffered injury or impact as a result of the violation. (*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1350 (*B.W.I. Custom Kitchen*).) For class certification purposes, plaintiffs may satisfy this requirement by making a "threshold showing that the antitrust violation, if proven, had a common impact on the class members." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at pp. 1038-1039.) "If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable." (*Rosack, supra,* 131

set of facts as do those of the class and their claimed injuries are the same. Through declarations, the named plaintiffs attest to their ability and willingness to prosecute the litigation and protect the interests of the class.

COORDINATION PROCEEDINGS SPECIAL TITLE
(Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
CLASS CERTIFICATION – J.C.C.P. 4106

Cal.App.3d at p. 752.) Plaintiffs' proposed method for generalized proof of damages must not be "so insubstantial that it amount[s] to no method at all." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.)

Plaintiffs frame the common questions presented by this action as follows:

· (1) whether Microsoft possesses monopoly power in the relevant computer software markets; (2) whether Microsoft has acquired, maintained and increased its market power through violations of the Cartwright Act and the Unfair Competition Act (Bus. & Prof. Code §§ 16720, 16727 and 17200); (3) whether Microsoft exploited its illegal monopoly to cause substantial harm to competition in the relevant markets; (4) whether Microsoft exploited its illegal monopoly to cause substantial harm to consumers by overcharging them for inferior products, suppressing innovation and denying consumers their freedom of choice in a competitive market; (5) whether Microsoft should be required to make full restitution for the harm it unlawfully inflicted upon consumers and the profit it unlawfully reaped from consumers; and (6) whether Microsoft should be enjoined from continuing its violations of law.

(Plaintiffs' Reply in Support of Renewed Motion for Class Certification ("Reply") at pp. 10-11.) The issues presented fall into three categories: ·(1) whether Microsoft violated California's antitrust law; (2) whether any such violation caused harm to the classes; and (3) what relief is appropriate.

**1.    Violation.**

Plaintiffs allege numerous antitrust violations by Microsoft that had the purpose and effect of establishing and maintaining an illegal monopoly of the personal computer operating systems, word processing and spreadsheet software markets. ·(Compl. at ¶¶ 37, 38, 104-107.) Plaintiffs allege that Microsoft exploited its monopoly power[5] to cause substantial harm to competition and to the ultimate consumers of Microsoft's products in California, including overcharges for the software programs at issue. (Compl. at ¶¶ 104, 105, 107.) Such conduct, if proven, violates the Cartwright Act, which prohibits combinations or conspiracies in restraint of trade. (Bus. & Prof. Code, § 16720 et seq.)

---

[5] Plaintiffs allege that Microsoft controls approximately 90% of the operating systems, word processing and spreadsheet software markets. (Compl. ¶¶ 31, 34, 36.)

7

As evidence of the substantiality of their claims and the susceptibility of these claims to classwide analysis, plaintiffs point to the Findings of Fact in the antitrust action brought by the United States against Microsoft. (*United States v. Microsoft Corp.* (D.D.C. 1999) 65 F.Supp.2d 1 [hereafter "Findings of Fact"]; see also *United States v. Microsoft Corp.* (D.D.C. 2000) 87 F.Supp.2d 30 [hereafter "Conclusions of Law"].) There, the District Court made detailed findings of various forms of anticompetitive conduct by Microsoft. Judge Jackson found that Microsoft engaged in anticompetitive conduct to protect Windows, its core asset, from competition (*e.g.* Findings of Fact ¶¶ 132, 194, 409-412; *see also* Conclusions of Law § I.2), including restrictions on personal computer manufacturers, internet access providers and internet content providers. (*E.g.* Findings of Fact ¶¶ 155, 203, 215, 221, 234, 235, 237, 242-336.) Judge Jackson found that Microsoft charged higher prices than it would have in a competitive environment, consistent with monopoly power (Findings of Fact ¶¶ 62, 63),[6] and concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.)

Such Sherman Act violations also constitute violations of the Cartwright Act and violations of the Unfair Competition Act (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 42-43), and will entail proof of the same conduct by Microsoft as to each class member. (*Rosack, supra*, 131 Cal.App.3d at p. 752; *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1039.) Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members. Thus, the proof required to demonstrate the "existence, implementation and effect" of the alleged unlawful conduct will require "a common thread of evidence" which will "correspond to evidence which otherwise would be introduced by absentee class members."

---

[6] In further support of their motion, plaintiffs submitted the opinion of Professor David J. Farber describing the nature of the competition that would have existed absent Microsoft's alleged anticompetitive conduct (the "but for" world) and opining that pricing for operating systems and applications software would have been lower had Microsoft not engaged in such conduct. (Declaration of David J. Farber in Support of Plaintiffs' Renewed Motion for Class Certification ("Farber Decl.") ¶¶ 34, 57.)

COORDINATION PROCEEDINGS SPECIAL TITLE
(Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
CLASS CERTIFICATION – J.C.C.P. 4106

1   (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1349 [quoting *In re Sugar Indus. Antitrust*

2   *Litigation* (E.D. Pa. 1976) 73 F.R.D. 322, 345]; *In re Flat Glass Antitrust Litigation* (W.D. Pa.

3   1999) 191 F.R.D. 472, 484.) Plaintiffs have made a sufficient "threshold showing" that the issues

4   of fact and law regarding Microsoft's alleged violations of the Cartwright Act and the Unfair

5   Competition Act are subject to common proof.

6       **2.    Fact of Injury.**

7       Plaintiffs must also demonstrate that whether consumers suffered harm as a result of

8   Microsoft's anticompetitive conduct is also capable of proof on a classwide basis. *(B.W.I. Custom*

9   *Kitchen, supra*, 191 Cal.App.3d at p. 1350.)[7] "[A]n antitrust plaintiff's 'burden of proving the

10  fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy;

11  inquiry beyond this minimum point goes only to the amount and not the fact of damage.'" (*Ibid.*

12  [citing *Zenith Corp. v. Hazeltine* (1969) 395 U.S. 100, 114, fn. 9].) Plaintiffs contend that

13  Microsoft harmed the class by charging supracompetitive prices for its software. Plaintiffs must,

14  therefore, make a "threshold showing" that proof of the overcharge is common to the class.

15      There is considerable authority for the proposition that in a case alleging price fixing the

16  fact of injury may be determined on a classwide basis. (See, e.g., *B.W.I. Custom Kitchen, supra*,

17  191 Cal.App.3d 1341; *Rosack, supra*, 131 Cal.App.3d 741; *In re Catfish Antitrust Litigation,*

18  *supra*, 826 F.Supp. 1019; *In re Sugar Antitrust Litigation, supra*, 73 F.R.D. 322.) Because price

19  fixing is a *per se* violation of antitrust law, a presumption of harm arises from proof of such a

20  violation. (*B.W.I. Custom Kitchen, supra*, at pp. 1350-1353; *Rosack, supra*, at pp. 753-754.) "It

21  has been held that impact will be presumed once a plaintiff demonstrates the existence of an

22  unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices

23  beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra*, at p. 347.) A *per se*

---

24

25  [7] The parties acknowledge the distinction between the fact of harm or impact, on the one hand, and actual damages, on the other. "Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve

26  the quantum of injury, and relate to the appropriate measure of individual relief." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1350, fn. 7 [citation omitted].)

27                                   9

28                                          COORDINATION PROCEEDINGS SPECIAL TITLE
(Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
CLASS CERTIFICATION – J.C.C.P. 4106

1    violation raises a presumption of harm because conduct such as a conspiracy to fix prices has the

2    sole purpose of artificially raising the price of the item. It follows that consumers of the product

3    pay more than they would in a competitive market even if the prices charged to direct purchasers

4    vary. (*B.W.I. Custom Kitchen, supra*, at pp. 1350-1351.) Thus, a plaintiff need not provide

5    evidence of harm to direct purchasers above and beyond establishing "the existence of an

6    unlawful conspiracy that had the effect of stabilizing, maintaining, or establishing product prices

7    beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra*, at p. 347.)

8         Holding monopoly power, however, is not itself a violation of any antitrust provision.

9    Whether particular practices engaged in to acquire, maintain or extend such power constitute

10   violations must be evaluated under the rule of reason. (*Bert G. Gianelli Distrib. Co. v. Beck &*

11   *Co.* (1985) 172 Cal.App.3d 1020, 1047-1048; *Standard Oil Co. v. United States* (1910) 221 U.S.

12   1, 61-62.) Some practices that flow from the existence of monopoly power may benefit rather

13   than harm consumers, so that injury may not be presumed simply from proof that the defendant

14   engaged in the conduct in question. (*Standard Oil Co. v. United States, supra*, 221 U.S. at pp. 61-

15   62.) Here, Microsoft makes exactly that contention: that the various practices that are

16   challenged—such as preventing other products from being used with its operating systems and

17   bundling its internet browser with its operating system—have been of great benefit to the public

18   by enhancing product standardization and increasing the ease of computer use and internet access.

19        But while the presence of these additional issues in a monopolization case such as this

20   may preclude any presumption of harm, as in a price-fixing case, the existence of these issues

21   does not necessarily mean that common issues do not predominate. Without regard to the

22   possibility that some of the relevant issues in this case may be conclusively determined by the

23   final outcome in the Government's action against Microsoft, remaining issues concerning the

24   legality of defendant's practices are issues common to all members of the classes plaintiffs seek to

25   certify. As discussed in section C.1 above, the fundamental and predicate issues as to whether

26   defendant violated the Cartwright Act are not differentiated among individual consumers. In this

27

28

10

COORDINATION PROCEEDINGS SPECIAL TITLE
(Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
CLASS CERTIFICATION – J.C.C.P. 4106

1  respect, the situation is no different from a case involving an alleged conspiracy that would

2  constitute a *per se* violation of the statute.

3      If it should be determined that defendant's practices unlawfully elevated prices to direct

4  purchasers of Microsoft's software, the complexities of the marketplace to which defendant refers

5  will affect the ability to analyze whether, and the extent to which, these higher prices were passed

6  on to consumers. However, once the existence of unlawfully inflated prices at the direct

7  purchaser level has been established, the difficulties of determining whether the price increase

8  was absorbed by those direct purchasers or passed on to successive purchasers in the chain of

9  distribution are no greater in a monopolization case than in a *per se* price-fixing case. There is no

10  ascertainable difference between the analysis of the impact of the abuse of a monopoly and of

11  price fixing once the overcharge to direct purchasers has been established, and in response to the

12  court's inquiry at oral argument Microsoft offered none. The starting point in both situations is

13  artificially high prices set in an anticompetitive market. The same economic models and analyses

14  that have been accepted for purposes of tracing a supracompetitive price that results from a price

15  fixing conspiracy are relevant and applicable to trace the pass-through resulting from monopoly

16  abuse.

17      Unlike the conclusion reached by the Supreme Court in *Illinois Brick* and by the courts of

18  some other states, the California courts have made clear that the difficulties in tracing the pass-

19  through of artificially inflated prices do not necessarily create insuperable obstacles to classwide

20  analysis and to class certification. "In certifying a plaintiff class, the courts have found it

21  appropriate to look past surface distinctions among the products purchased by class members or

22  the marketing mechanisms involved when allegations of anticompetitive behavior embracing all

23  of the various products and distribution patterns have been credibly pleaded. [Citation omitted.]

24  Identical products, uniform prices, and unitary distribution patterns are not indispensable for class

25  certification in this context." (*B.W.I. Custom Kitchen*, *supra*, 191 Cal.App.3d at p. 1350 [quoting

26  *Shelter Realty Corp. v. Allied Maintenance Corp.* (S.D.N.Y. 1977) 75 F.R.D. 34, 37]; *Rosack*,

27

28

11

1    *supra*, 131 Cal.App.3d at p. 757 [same].) "[C]ontentions of infinite diversity of product,

2    marketing practices, and pricing have been made in numerous cases and rejected." (*Rosack*,

3    *supra*, 131 Cal.App.3d at p. 755 [quoting *In re Folding Carton Antitrust Litigation* (N.D. Ill.

4    1977) 75 F.R.D. 727, 734].) "It should also be emphasized that courts have applied these

5    principles to markets, such as this one, characterized by individually negotiated prices, varying

6    profit margins, and intense competition." (*B.W.I. Custom Kitchen*, *supra*, at p. 1351.)

7        Nonetheless, defendant argues that the complexity and changing nature of the software

8    markets over the past six years have been so great as to render classwide analysis "impossible" in

9    this case. (Opp. at p. 1.) Focusing almost exclusively on the market for operating systems

10   software, defendant emphasizes that over the class period it marketed a progression of product

11   "families"—from MS DOS to the most current Windows NT Workstation system. The variety of

12   illegal practices in which defendant allegedly engaged necessarily affected the price defendant

13   was able to and did charge at different times and for different products. If defendant engaged in

14   predatory pricing, the price to some purchasers presumably would have been less than a

15   competitively determined price, so that some class members may have benefited from the

16   practice, rather than having been damaged by it. Because of the high level of competition among

17   computer manufacturers ("original equipment manufacturers" or "OEMs"), each OEM that

18   purchased software directly from Microsoft made its own pricing decisions and therefore each

19   may have absorbed rather than passed on a different portion of any excess in the price paid to

20   Microsoft. Because the software represents only a small percentage of the cost of the computer,

21   and because there are many other factors which may inhibit passing on price changes (such as

22   "focal point" pricing and "menu costs"), whether, and the extent to which, any given OEM passed

23   on the excess will differ from case to case. The amount passed through by distributors or retailers

24   purchasing from the OEMs, or purchasing directly from Microsoft, may also vary, so that the fact,

25   much less the amount, of any overcharge reaching a consumer will be a function of so many

26   variables, defendant argues, that the impact of any violation cannot possibly be considered

27                                                    12

28                                        COORDINATION PROCEEDINGS SPECIAL TITLE
                                          (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
                                          CLASS CERTIFICATION – J.C.C.P. 4106

1   collectively. In the words of Microsoft's economist, Professor Jerry A. Hausman, "any analysis of

2   whether an overcharge may have been passed on to an eventual final purchaser would require an

3   evaluation of a large number of individual-specific facts that essentially will amount to an

4   individualized inquiry for each final purchaser." (Declaration of Jerry A. Hausman ("Hausman

5   Decl.") ¶ 32.)

6        Such a broad statement proves too much. If true, it would invalidate the entire study of

7   microeconomics. In his Findings of Fact, Judge Jackson concluded that Microsoft's conduct had

8   "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.) To

9   demonstrate that impact on consumers can be proven on a non-individualized and classwide basis,

10  plaintiffs rely heavily on the expert opinion of Professor Jeffrey K. MacKie-Mason, an economist.

11  Accepting the allegations in the Complaint and the Findings of Fact, and based upon his

12  knowledge of the industry, Professor MacKie-Mason opined that plaintiffs could demonstrate

13  common impact on the classes "by showing that, as a result of Microsoft's monopoly power

14  (derived from or maintained by the anticompetitive conduct alleged) consumers (1) were charged

15  supra-competitive prices for [the relevant software] and (2) experienced less choice and

16  innovation in [the relevant software markets] than they would have enjoyed in a competitive

17  market." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Renewed Motion for

18  Class Certification ("MacKie-Mason Decl.") ¶ 6(a), (c).) "When a monopolist sets prices above

19  competitive levels to its distributors, it generally results that all customers suffer harm."

20  (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Reply re Renewed Motion for

21  Class Certification ("MacKie-Mason Reply Decl.") ¶ 5.) Summarizing his conclusions, Professor

22  MacKie-Mason stated:

23        As is well known in economic theory and practice, at least some of the overcharge will be
          passed on by distributors to end consumers. When the distribution markets are highly
24        competitive, as they are here, all or nearly all of the overcharge will be passed through to
          ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic
25        phenomenon of cost pass through, and how it works in competitive markets. This general
          phenomenon of cost pass through is well established in antitrust law and economics as
26        well."

27                                        13

28

1   (MacKie-Mason Reply Decl. ¶ 6.)

2       Professor MacKie-Mason described several recognized methods to estimate what

3   Microsoft's prices to its direct purchasers would have been in a hypothetical "but for" world in

4   which Microsoft had not engaged in the allegedly anticompetitive conduct.  These include the use

5   of "yardstick" prices based on the prices of products when the markets were more competitive or

6   the prices of similar goods sold in more competitive markets; the comparative margin method

7   (calculating the price at which Microsoft's margin on a product would equal the average margin

8   of other software manufacturers); and constructing models of equilibrium in the relevant markets.

9   (MacKie-Mason Decl. ¶¶ 28-36.)  He further described two methods to measure the extent to

10  which particular increased costs were passed on to final purchasers, both based on equilibrium

11  models of distribution channels.  (Mackie-Mason Decl. ¶¶ 38-40.)

12      Professor MacKie-Mason did not commit himself to the use of any one or more of these

13  approaches, nor did he make the necessary calculations or attempt to prove that any of these

14  methods ultimately will be able to support plaintiffs' burden of proof at trial.  Nonetheless, his

15  declarations contain a good bit more than a plea to "trust me," as the defendant would

16  characterize his testimony.  (Opp. at p. 3.)

17      In addition to proposing several methodologies shown to be widely accepted within the

18  profession, plaintiffs submitted several published works by prominent economists and consumer

19  groups that have conducted empirical analyses to demonstrate general harm to consumers as a

20  result of Microsoft's conduct.  (Hall, *Toward A Quantification of the Effects of Microsoft's*

21  *Conduct* (2000) American Economic Review 90; Fisher & Rubinfeld, *United States v. Microsoft:*

22  *An Economic Analysis* in Did Microsoft Harm Consumers?  Two Opposing Views (AEI-

23  Brookings Joint Center for Regulatory Studies 2000); Fisher & Rubinfeld, *Misconceptions,*

24  *Misdirection, and Mistakes* in Did Microsoft Harm Consumers?  Two Opposing Views (AEI-

25  Brookings Joint Center for Regulatory Studies 2000); Consumer Federation of America, Media

26  Access Project, U.S. Public Interest Research Group, The Consumer Cost of the Microsoft

27                                  14

28

1    Monopoly: $10 Billion of Overcharges and Counting (Jan. 1999).)  Moreover, the opposing

2    experts agree that equilibrium economic models can be used to calculate damages in antitrust

3    cases.  According to the defense expert, Professor Hausman:

4          Economists have developed various theoretical models of competition in markets with
           limited numbers of sellers.  These models are based on a series of strong simplifying
5          assumptions.  They can provide useful bases for suggestive theoretical analyses, but they
           do not provide reliable bases for calculating damages *unless carefully designed and*
6          *calibrated to fit the actual conditions of the market in question.*

7    (Hausman Decl. ¶ 125 (emphasis added).)

8          Professor Hausman asserts that none of the methods proposed by Professor MacKie-

9    Mason will work because none of them "accounts for the real world complexities of the products

10   and the distribution chains at issue." (Hausman Decl. ¶ 113.)  However, the experts agree on the

11   importance of product differentiation in reaching dependable conclusions (Hausman Decl. ¶ 126;

12   MacKie-Mason Decl. ¶108.), but, not surprisingly, disagree over the extent to which Professor

13   MacKie-Mason's anticipated models will reflect reality.  (See, e.g., Hausman Decl. at pp. 43-52;

14   MacKie-Mason Decl. at pp. 38-52.)  The question at this stage is not whether plaintiffs will be

15   able to carry their burden of proving that their experts' analyses are reliable, but whether it

16   appears that the differences between the experts can be intelligently presented and evaluated

17   within the framework of a class action.  On a motion for class certification, it is inappropriate to

18   resolve a "battle of the experts." (*In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p.

19   1042.)  "Whether or not [plaintiff's expert] is correct in his assessment of common impact/injury

20   is for the trier of fact to decide at the proper time.  [Citations omitted.]  For now, the court is

21   persuaded that for the purposes of a class certification motion, plaintiffs have made [the required]

22   threshold showing . . . ." (*Ibid.*)  The court is similarly persuaded here.

23         It may be, as defendant has argued, that closer examination of the facts will disclose that

24   not all class members were harmed by Microsoft's practices.[8]  However, plaintiffs need not prove

25   ─────────────────────────

26   [8] Some skepticism is warranted as to the extent to which defendant will be able to prove its assertion in this regard.
     Microsoft contends, for example, that its conduct benefited rather than harmed consumers because consumers

27                                        15
                                             COORDINATION PROCEEDINGS SPECIAL TITLE
28                                           (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
                                             CLASS CERTIFICATION – J.C.C.P. 4106

1    that each and every class member paid a supracompetitive price for the relevant software

2    products. As explained in *Rosack*, "[t]he courts have rejected the notion that each member of the

3    purported class must prove that he or she absorbed at least some portion of the overcharges in

4    order to establish liability. [Citations omitted] '[C]lass certification does not require that

5    common questions be completely dispositive . . . as to all potential members of the class. .

6    [Citations omitted.] The fact that certain members of the class may not have been injured at all

7    does not defeat class certification. [Citations omitted.]" (*Rosack*, *supra*, 131 Cal.App.3d at pp.

8    753-754.) Similarly, the *B.W.I. Custom Kitchen* court pointed out that "[e]ven if it were shown

9    that certain class members escaped having to pay any of the overcharge . . . , the fact remains that

10   in the vast majority of cases at least a portion of the illegal overcharge was passed on by the

11   independent distributors to class members in the form of higher prices." (*B.W.I. Custom Kitchen*,

12   *supra*, 191 Cal.App.3d at p. 1353.) Whether that is true in this case will depend upon an

13   evaluation of the evidence at trial.

14        Defendant is correct that the multiple products embraced within each of the two proposed

15   classes, the multiple distribution channels, and the extraordinary rate at which changes have

16   occurred in the relevant markets over the six-year class period will complicate the analysis of the

17   impact of any illegal practices in which Microsoft is found to have engaged. The trier of fact

18   undoubtedly will be required to do more than make a single determination of whether any

19   damages were incurred by the respective classes over the six-year period. However, plaintiffs

20   advise that their evidence and expert studies will be presented in a manner that will permit, at a

21   minimum, annual comparisons of prices paid by consumers for particular software products with

22   the prices that would have prevailed in the hypothetical "but for" world in the absence of the

23

24   received Microsoft's Web browser, Internet Explorer, at "no charge." Judge Jackson found that Microsoft's practice
     of bundling its Web browser with Windows was designed to harm the ability of Netscape's Navigator Web browser to
25   compete and caused harm to consumers. (Findings of Fact ¶¶ 143, 155-160, 166-168, 171-177; Conclusions of Law
     at pp. 38-40, 42-43.) Moreover, as Professor Mackie-Mason explained, the effect of an overcharge is not cured by
26   the marketing strategy: "buy three tires; get the fourth tire free." (Mackie-Mason Reply Decl. ¶ 23.)

27                                          16
                                                    COORDINATION PROCEEDINGS SPECIAL TITLE
28                                                  (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
                                                    CLASS CERTIFICATION – J.C.C.P. 4106

1    unlawful practices. Moreover, since the relevant comparison is not between actual prices and

2    prices in a perfectly competitive market, or even between actual prices and prices lawfully

3    obtained in a monopoly market, plaintiffs' evidence will need to establish "the price increment

4    caused by the anticompetitive conduct that originated or augmented the monopolist's control over

5    the market." (*Berkey Photo, Inc. v. Eastman Kodak Co.* (2d Cir. 1979) 603 F.2d 263, 297.) The

6    task is formidable, but not impossible. As the case proceeds towards trial, careful consideration

7    will have to be given to the possibility of creating subclasses, bifurcating issues, making special

8    findings, or using other techniques that may facilitate the presentation and consideration of the

9    relevant evidence. At this point, the court is not persuaded that a comprehensible analysis of

10   these issues cannot be made within the context of properly managed trial proceedings.

11       **3.    Calculation of Damages.**

12       Plaintiffs must also meet their burden of demonstrating that the amount of damages is

13   susceptible to classwide proof. With respect to calculating damages once liability has been

14   established, individual issues will not bar certification of a class. (*B.W.I. Custom Kitchen, supra,*

15   191 Cal.App.3d at p. 1354; *Rosack, supra,* 131 Cal.App.3d at p. 761.) "[I]t has been recognized

16   consistently that differences among potential class members concerning damages do not preclude

17   class treatment so long as common questions regarding conspiracy and impact allegations

18   predominate." (*Rosack, supra,* at p. 761.) Courts recognize a somewhat relaxed standard of

19   proof once the antitrust violation and resulting injury have been proven. (*In re Catfish Antitrust*

20   *Litigation, supra,* 826 F.Supp. at p. 1042.) This is the logical result of an inability to ascertain

21   exactly what "plaintiff's position would have been in the absence of defendant's antitrust

22   violation." (*Ibid.*) "Hence, the willingness to accept some uncertainty stems from a simple,

23   equitable notion that the wrongdoer should not be allowed to profit by an insistence upon an

24   unattainable standard of proof." (*Id.,* at pp. 1042-1043; see also *Bigelow v. RKO Radio Pictures,*

25   *Inc.* (1946) 327 U.S. 251, 264.)

26       The basic measure of damages for overcharges resulting from Microsoft's alleged

27                                     17

28

1  anticompetitive conduct is the difference between the price paid by a class member for a

2  particular product and the price that would have been paid absent the alleged anticompetitive

3  conduct. (See *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; MacKie-Mason

4  Decl. ¶¶ 25, 40.) To determine this amount, as discussed in section C.2 above, it is of course

5  necessary to determine both the amount of the overcharge by Microsoft and the amount of such

6  overcharge passed through to the consumer. Total classwide damages are the sum of the

7  overcharges on all software programs sold to class members during the class period. (MacKie-

8  Mason Decl. ¶ 40.)

9        Plaintiffs need not present a method to calculate each class member's damage

10  individually. California courts permit calculation of damages in the aggregate for a class and do

11  not require summing all individual claims. (*Daar v. Yellow Cab Co., supra*, 67 Cal.2d at pp. 706,

12  714, 716; *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 128-129 & fn. 4.) A reasonable

13  basis for computing damages is permissible, even if it involves approximation or estimation.

14  (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545;

15  *Bigelow, supra*, 327 U.S. at pp. 264-265.) Other courts in antitrust proceedings have found

16  similar approaches to be sufficiently viable for purposes of class certification. (See, e.g., *In re

17  Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; *In re Domestic Air Transportation

18  Antitrust Litigation* (N.D. Ga. 1991) 137 F.R.D. 677, 692; *In re Corrugated Container Antitrust

19  Litigation* (S.D. Tex. 1978) 80 F.R.D. 244, 251.) Moreover, it is not necessary that plaintiffs

20  demonstrate to a certainty that their proposed methods will succeed, and it would be improper for

21  the court to make a determination as to the likely success of plaintiffs' proposed methods. (*In re

22  Domestic Air Transportation Antitrust Litigation, supra*, at p. 693; *In re Flat Glass Antitrust

23  Litigation, supra*, 191 F.R.D. at p. 487.)

24        The method of calculating the amount of any recovery that will be received by each class

25  member and the method of distributing damages to class members are different questions ·

26  altogether that need not be addressed at this point, and which the parties have not argued. Suffice

27                                    18

28

1    it to say that there is no reason to presume that conventional techniques for notifying class

2    members of their right to submit claims and for submitting and processing claims will not be

3    feasible in this litigation.  Nor is there any reason to assume that the amounts to which individual

4    class members may be entitled will be insufficient to justify the effort and expense of a claim

5    procedure.  Moreover, as noted by plaintiffs, fluid class recovery is also a possibility.  (*Bruno,*

6    *supra,* 127 Cal.App.3d at p. 135; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th

7    116, 119-120.)  Should problems in calculating damages appear to outweigh the benefits of class

8    treatment, the court may reconsider its certification order and vacate or amend the certification.

9    (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1348 [citations omitted].)

10   **D.    A Class Action Is a Superior Method of Adjudicating the Matter.**

11   Finally, plaintiffs must demonstrate that a class action would be of substantial benefit to

12   the litigants and the court.  (See *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 385.)

13   This requirement incorporates the superiority standard of Rule 23 of the Federal Rules of Civil

14   Procedure.  (*Schneider v. Vennard* (1986) 183 Cal.App.3d 1340, 1347.)  The matters pertinent to

15   this determination include:

16        (A) the interest of members of the class in individually controlling the prosecution or
          defense of separate actions; (B) the extent and nature of any litigation concerning the
17        controversy already commenced by or against members of the class; (C) the desirability or
          undesirability of concentrating the litigation of the claims in the particular forum; (D) the
18        difficulties likely to be encountered in the management of a class action.

19   (Fed. Rules Civ. Proc., Rule 23(b)(3), 28 U.S.C.)  The various indirect purchaser claims filed in

20   California against Microsoft already have been consolidated in this court, which is specifically

21   called upon to utilize innovative methods to manage complex cases as part of the Judicial

22   Council's Complex Civil Litigation pilot program.  (See also *B.W.I. Custom Kitchen, supra,* 191

23   Cal.App.3d at p. 1355 [calling upon courts to adopt innovative methods for handling indirect

24   purchaser class actions].)

25   This case involves a very large number of claimants with relatively small amounts at

26   stake.  Most consumers have little incentive to litigate independently since the costs of litigation

27                                    19

28   COORDINATION PROCEEDINGS SPECIAL TITLE
     (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE
     CLASS CERTIFICATION – J.C.C.P. 4106

**EXHIBIT 2**

# FILED UNDER SEAL

**EXHIBIT 3**

Case 4:05-cv-00037-YGR    Document 217-1    Filed 05/19/09    Page 24 of 25

Yahoo!   My Yahoo!   Mail   More       **Make Y! My Homepage**                 **Hi, Craig**   Sign Out   Help

FINANCE    Search                                            **WEB SEARCH**

| Dow | **8,521.20** | 17.12 (0.20%) | Nasdaq | **1,743.61** | 11.25 (0.65%) | S&P 500 | **913.63** | 3.92 (0.43%) |
| 30-yr Bond | **4.20** | 0.0260 (0.62%) | NYSE Volume | **4,228,214.50** | 0.00 (0.00%) | Nasdaq Volume | **1,278,434.00** | 0.00 (0.00%) |
| SP MidCap | **571.38** | 4.74 (0.84%) | SP Small Cap | | **263.50** | 0.47 (0.18%) |

Dow  0.20% Nasdaq  0.65%              Tue, May 19, 2009, 1:50PM ET · **U.S. Markets close in 2hrs 10mins**

---

| GET QUOTES | Finance Search

# Apple Inc. (AAPL)

At 1:35PM ET: **128.66**  2.01 (1.59%)

## Profile

Get Profile for:    GO

**Apple Inc.**                                 ADVERTISEMENT
1 Infinite Loop
Cupertino, CA 95014
United States - Map
Phone: 408-996-1010
Fax: 408-996-0275
Web Site: http://www.apple.com

#### DETAILS

| Index Membership: | S&P 100 |
| | S&P 500 |
| | S&P 1500 Super Comp |
| | Nasdaq 100 |
| Sector: | Technology |
| Industry: | Personal Computers |
| Full Time Employees: | 32,000 |

#### BUSINESS SUMMARY

Apple Inc. and its wholly owned subsidiaries design, manufacture, and market personal computers, portable digital music players, and mobile communication devices, and sell various related software, services, peripherals, and networking solutions. The company sells its products worldwide through its online stores, its retail stores, its direct sales force, and third-party wholesalers, resellers, and value-added resellers. In addition, it sells various third-party Macintosh, iPod, and iPhone compatible products, including application software, printers, storage devices, speakers, headphones, and various other accessories and peripherals through its online and retail stores, and digital content through the iTunes Store. The company sells its products to consumer, small and mid-sized business, education, enterprise, government, and creative customers. As of December 27, 2008, it had 251 retail stores. Apple Inc., formerly known as Apple Computer, Inc., was founded in 1976. The company is headquartered in Cupertino, California.
**Key Statistics**

#### COMPANY WEBSITES
- Home Page

#### CORPORATE GOVERNANCE

Apple Inc.'s Corporate Governance Quotient (CGQ®) as of 7-May-09 is better than 38.1% of S&P 500 companies and 91.9% of Technology Hardware & Equipment companies.
Brought to you by Institutional Shareholder Services.
**View Financials**

#### KEY EXECUTIVES

| | Pay | Exercised |
| --- | --- | --- |
| **Mr. Steven P. Jobs** , 53<br>Co-Founder, Chief Exec. Officer | $ 0 | $ 14.64M |
| **Mr. Peter Oppenheimer** , 46<br>Chief Financial Officer and Sr. VP | $ 1.20M | $ 55.85M |
| **Mr. Timothy D. Cook** , 48<br>Chief Operating Officer | N/A | N/A |
| **Mr. Robert Mansfield** , 48<br>Sr. VP of Mac Hardware Engineering | $ 898.00K | $ 13.56M |
| **Mr. Sina Tamaddon** , 52<br>Sr. VP of Applications | N/A | N/A |

Dollar amounts are as of 31-Dec-08 and compensation values are for the last fiscal year ending on that date. "Pay" is salary, bonuses, etc. "Exercised" is the value of options exercised during the fiscal year.
**View Insiders**

Case 4:05-cv-00037-YGR    Document 217-1    Filed 05/19/09    Page 25 of 25

- Employment
- Divisions

Search Yahoo! for:
More on Apple Inc.

**HOTJOBS JOB POSTINGS**

- Finance Manager, HW Product Marketing
- iPhone ATE Software Engineering Manager
- iPhone Automation QA Engineer

More job openings...
Brought to you by HotJobs

Add to Portfolio    .  Set Alert      Email to a Friend

Get Profile for Another Symbol:       GO    Symbol Lookup

- Annual Reports              • Sector Analysis

Copyright © 2009 Yahoo! All rights reserved. Privacy Policy - Terms of Service - Copyright Policy - Send Feedback

**Quotes delayed,** except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Industry data provided by Morningstar, Inc.. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. Quotes are updated automatically, but will be turned off after 25 minutes of inactivity. Quotes are delayed at least 15 minutes. Real-Time continuous streaming quotes are available through our premium service. You may turn streaming quotes on or off. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.