holding in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach* limits the purposes for which cases may be consolidated through the MDL process to pretrial proceedings.[32] This means that even when CAFA has allowed direct and indirect purchaser cases to be consolidated, those cases must be split up and returned to the originating federal courts for trial.


# 3. RECOMMENDATION AND FINDINGS

**47. Direct and indirect purchaser litigation would be more efficient and more fair if it took place in one federal court for all purposes, including trial, and did not result in duplicative recoveries, denial of recoveries to persons who suffered injury, and windfall recoveries to persons who did not suffer injury. To facilitate this, Congress should enact a comprehensive statute with the following elements:***

- **Overrule *Illinois Brick* and *Hanover Shoe* to the extent necessary to allow both direct and indirect purchasers to sue to recover for actual damages from violations of federal antitrust law. Damages in such actions could not exceed the overcharges (trebled) incurred by direct purchasers. Damages should be apportioned among all purchaser plaintiffs—both direct and indirect—in full satisfaction of their claims in accordance with the evidence as to the extent of the actual damages they suffered.**

---

* Commissioners Cannon, Carlton, and Garza do not join this recommendation.

Commissioner Cannon does not join this recommendation because he believes that the problems due to the conflict between federal and state policy in this area are likely to be ameliorated to a large extent by CAFA, which makes it easier for state antitrust claims to be combined with federal antitrust claims and litigated in one federal court proceeding.

Commissioner Carlton does not join this recommendation because he believes standing should be limited to direct purchasers except where federal courts currently recognize an exception to the rule, including where the direct purchaser is alleged to be participating in the conspiracy. He would also consider allowing, after some period, a class of indirect purchasers to sue in cases where an insufficient number of direct purchasers come forward to sue. Additional study would be needed to refine this exception and to determine how to precisely define "insufficient."

Although Commissioner Garza would not recommend preemption of those state laws allowing indirect purchasers to sue under state antitrust law, she would not abandon federal policy, which she considers to be the optimal policy for reasons explained in this Report. She concurs in the view of Commissioner Cannon that CAFA may substantially ameliorate much of the burden arising out of conflicting state and federal policies and is concerned that the benefits of legislation proposed by the Commission would not outweigh the detriment of abandoning federal policy. In addition, while she does not join in this recommendation as a whole, she supports legislation that would allow consolidation of all direct and indirect purchaser actions in a single forum for both pretrial and trial proceedings, and also supports legislation allowing removal of indirect purchaser actions brought under state antitrust law to federal court to the full extent permitted under Article III.

- Allow removal of indirect purchaser actions brought under state antitrust law to federal court to the full extent permitted under Article III.*

- Allow consolidation of all direct and indirect purchaser actions in a single federal forum for both pre-trial and trial proceedings.

- Allow for certification of classes of direct purchasers, consistent with current practice, without regard to whether the injury alleged was passed on to customers of the direct purchasers.

## A. Reasons for the Commission's Recommendation

*1. Duplicative federal direct purchaser and state indirect purchaser litigation imposes undue burdens on the judicial system and the parties, wastes resources, increases the risk of duplicative recoveries, skews the parties' incentives to settle, and hinders efficient global settlements*

The conflict between federal and state policies on indirect purchaser damage actions has created a variety of problems. Absent the consolidation of federal and state cases involving direct and indirect purchasers, defendants must respond to complaints about the same conduct in multiple courts.[33] Burdensome and uncoordinated discovery increases costs to defendants and disadvantages plaintiffs as well, because they do not have access to materials produced in other actions. Even when pretrial consolidation of federal direct and state indirect purchaser actions is possible under federal MDL rules, *Lexecon* requires that actions be returned to their originating courts for trial,[34] causing duplicative and wasteful trials. With trials proceeding in at least two, and maybe more, different courts, a defendant may be liable for duplicative damages—the amount of the overcharge to the direct purchaser in the first instance, plus whatever overcharges the direct purchaser was able to pass on to indirect purchasers.[35] Correspondingly, direct purchasers may receive "windfall" awards exceeding their actual damages. Furthermore, when all parties are not before a single court, it can be difficult to negotiate and implement a global settlement.[36] Defendants also may confront costs due to the asymmetric application of collateral estoppel: a finding by one court that the defendant did violate the antitrust law may be used by plaintiffs to establish

---

* Commissioner Delrahim does not join this aspect of the recommendation. He would not expand the availability of removal of state court actions to federal court.

  Although Commissioners Litvack, Shenefield, and Warden join this aspect of the recommendation, they would prefer to preempt state laws to require that any claim for damages by an indirect purchaser must be brought in federal court under federal antitrust law.

liability in other suits, but a finding in one suit that the defendant did not violate the antitrust laws may not be used by the defendant to seek dismissal of other suits.[37]

### 2. Current efforts to ameliorate these problems cannot alone provide sufficient remedies

The Commission commends the voluntary coordination among courts overseeing multiple proceedings and the parties involved to reduce the burdens on the parties and the courts. Such efforts alone are insufficient to address these problems, however, and the need for such coordination reveals the types of burdens on courts that duplicative direct and indirect purchaser actions create. Increased use of supplemental jurisdiction promotes consolidation and is therefore commendable, but it cannot adequately address the problem of duplicative litigation. Indirect purchasers of goods from a disbanded cartel cannot seek injunctive relief and therefore do not have a basis on which to request that a court invoke its supplemental jurisdiction. A federal court's supplemental jurisdiction is also not available to defendants as a basis for removal.

CAFA is likely to promote removal of state court indirect purchaser class actions, thereby permitting their consolidation in federal court. It may also lead more plaintiffs to file initially in federal court, likewise permitting consolidation. Indeed, if predictions of some are correct that CAFA will facilitate the removal of a large majority of state indirect purchaser actions to federal court—because CAFA's requirements will generally be met and its exceptions will seldom apply[38]—that could greatly reduce the waste of resources associated with multiple indirect purchaser actions in state courts, at least at the pretrial phase.[39] The Commission is loath to rely on such predictions, however. Because CAFA has several exceptions that may apply to indirect purchaser actions, plaintiffs may seek to use CAFA's exceptions to avoid removal, and a significant number of actions may remain in state court.[40] In addition, CAFA applies only to class actions—not to claims brought by large indirect purchasers, who can afford to bring lawsuits individually rather than through a class action. Moreover, indirect purchasers may opt out of a class action and assert their claims directly in state court; such actions would be outside CAFA's reach.[41] CAFA also does not apply to *parens patriae* actions by state attorneys general.[42]

Perhaps most importantly, CAFA does not overrule the Supreme Court's ruling in *Lexecon*, which permits consolidation of class actions in one federal district court only for pretrial matters, such as discovery, class certification, and summary judgment motions. For trial, the Supreme Court's ruling in *Lexecon* requires consolidated cases to be split up again and returned to their originating courts.[43] This rule frustrates the goal of resolving interrelated direct and indirect purchaser claims in one forum to avoid duplicative proceedings and recoveries. Finally, CAFA does not address substantive and procedural issues unique to indirect purchaser litigation.

### 3. Federalism and political pragmatism require deference to many states' clearly expressed preferences that indirect purchasers be allowed to sue for antitrust damages, and these values outweigh arguments in favor of limiting both federal and state recoveries to direct purchasers only

One way to simplify direct and indirect purchaser litigation would be for Congress explicitly to preempt state laws allowing indirect purchaser actions. A majority of the Commission concluded, however, that principles of federalism and practical political concerns counsel in favor of deference to the clear preference expressed by more than thirty-five states that allow indirect purchasers to pursue relief.

In evaluating possible recommendations on direct and indirect purchaser litigation, the Commission considered a wide variety of relevant policy considerations. The most fundamental criticism of the *Illinois Brick* rule is that it leaves many of those actually injured by antitrust violations without compensation.[44] Indirect purchaser actions can "provide[] an effective vehicle for compensating certain victims . . . including individual consumers";[45] on occasion, indirect purchaser actions yield significant distributions to injured indirect purchasers.[46] The evidence does not point only in one direction, however. Class actions sometimes yield very little compensation to injured indirect purchasers, even when those suits produce large settlements,[47] because the settlements take the form of vouchers, coupons, or product that few class members even bother to collect, or *cy pres*, typically benefiting worthy causes, but not injured purchasers.[48]

The record before the Commission was mixed on whether the deterrence of antitrust violations is best achieved by limiting recoveries to direct purchasers or permitting indirect purchasers to sue as well. Direct purchasers usually can better perceive the violation and prove overcharges and thus may be more likely to bring an antitrust suit.[49] Some witnesses argued that direct purchasers are more likely than indirect purchasers to bring antitrust lawsuits and thus to contribute more to the deterrence of antitrust violations.[50] A sample of indirect purchaser settlements provided by attorneys for indirect purchasers shows that, in virtually all cases, direct purchasers or other private enforcers also challenged the conduct at issue.[51] Nonetheless, indirect purchasers can bring actions in circumstances in which direct purchasers choose not to sue, for example, to avoid injuring business relationships with suppliers.[52] Moreover, data presented to the Commission show that indirect purchaser suits can provide additional deterrence by increasing the liability faced by violators.[53] Taken together, this evidence suggests that direct purchaser litigation is more likely to provide effective deterrence, but indirect purchaser litigation may supplement that deterrence.

If deterrence were the sole objective, one would prohibit indirect purchaser actions if allowing them would reduce the likelihood of direct purchaser actions. Under the existing regime, state indirect purchaser recoveries do not diminish recoveries under federal antitrust law by direct purchasers. However, several witnesses expressed concerns that, if direct pur-

chasers suing under federal antitrust law were required to share the right to recover with indirect purchasers, private enforcement would be significantly diminished.[54] Others disagreed.[55]

Another policy consideration involves the potential for duplicative recoveries. Proponents of the *Illinois Brick* rule worry that indirect purchaser litigation exposes defendants to duplicative recoveries—that is, direct purchasers recover for treble the entire overcharge, then indirect purchasers recover for treble the amount of the overcharge that the direct purchaser passed on to them, and so on. The American Bar Association, Section of Antitrust Law, among others, has highlighted such concerns.[56] Although no one identified an instance of unfair or multiple recovery,[57] that may simply reflect the difficulty of determining whether actual damage awards and settlements exceed total damages.[58]

Testimony revealed that a number of states expressly instruct courts to avoid duplicative damages; no state expressly affords duplicative damages.[59] Such state policies are important to reduce concerns about duplicative recovery. Nevertheless, the potential for duplicative recoveries remains a serious concern as long as direct and indirect purchaser actions proceed without coordination in separate courts.

The burden on courts to manage the complexity of estimating the damages incurred by indirect purchasers was emphasized by the *Illinois Brick* Court[60] and has remained an important concern.[61] In particular, courts have found that estimating pass on for a potential class can be a significant barrier to class certification, "confirm[ing], in a new context, the magnitude of the problems of proof the Court sought to avoid in *Illinois Brick*."[62] Witnesses argued that recent advances in econometrics and other methodologies have made such assessments somewhat more manageable,[63] and at least some indirect purchaser claims may be "non-speculative."[64] Nonetheless, managing the complexity of damage calculation for direct and indirect purchasers remains a non-trivial problem.

Outweighing all of these considerations, however, are the values of federalism, compensating injured parties, and practical feasibility. Most states have implemented their preferences to allow indirect, as well as direct, purchasers to sue.[65] The authority of states to establish antitrust standards that differ from federal law is well established, including specifically with respect to indirect purchaser remedies.[66] Numerous state attorneys general (and many others) oppose "federal preemption of any state antitrust statutes, including indirect purchaser statutes."[67] In particular, they oppose any federal preemption of the right of state attorneys general to bring actions on behalf of their citizens pursuant to the *parens patriae* authority that Congress gave the states in 1976.[68] The congressional intent underlying the grant of *parens patriae* authority provides additional reason to defer to the rights of the states to allow indirect purchaser damage actions. Therefore, the Commission decided *not* to recommend that Congress pass legislation expressly to preempt state laws permitting indirect purchaser litigation.

## B. Specific Explanation of the Commission's Recommendation for the Management of Direct and Indirect Purchaser Litigation

In light of the Commission's recommendation that Congress not preempt state indirect purchaser laws, the question becomes how best to reach a solution that will enable courts to manage direct and indirect purchaser actions to achieve efficiency and fairness. Direct and indirect purchaser litigation would be more efficient and fairer if it took place in one federal court for all purposes, including trial, and did not result in duplicative liability, denial of recoveries to persons who suffered injury, and windfall recoveries to persons who did not suffer injury. These goals can be best achieved if all direct and indirect purchasers are entitled to recover their actual damages (trebled) under federal law, and if all claims arising out of the same alleged antitrust violation are heard in one federal court, to the maximum extent possible. The Commission's recommendation contains four interrelated components, which are explained below, to achieve these goals.

*1. Overrule* Illinois Brick *and* Hanover Shoe *to the extent necessary to allow both direct and indirect purchasers to sue to recover for actual damages from violations of the federal antitrust laws. Damages in such actions could not exceed the overcharges (trebled) incurred by direct purchasers*

To the maximum extent possible, a single federal court should hear all proceedings relevant to actions by direct and indirect purchasers alleging the same antitrust violation. To accomplish this, federal law should permit direct and indirect purchasers to recover the actual damages they suffer as the result of antitrust violations. The first step toward these goals is to overrule *Illinois Brick* and *Hanover Shoe* legislatively to the extent necessary to allow both direct and indirect purchasers to sue under federal law to recover for actual damages they suffer from antitrust violations resulting in an overcharge. Overruling *Illinois Brick* would increase fairness by ensuring that all indirect purchasers, not just those in states permitting such actions, could recover treble their actual damages under federal law for injuries attributable to antitrust violations. Overruling *Hanover Shoe* would limit direct purchasers to recovering treble their actual damages, rather than the full overcharge regardless of pass on, and will thus promote fairness by preventing windfall damage recoveries.

Legislative overruling of *Illinois Brick* may encourage the resolution of direct and indirect purchaser litigation in a single forum, because indirect purchasers may choose to sue under federal antitrust laws rather than to bring state claims. In conjunction with the procedural components of the Commission's recommendation, this also should make resolution of all claims in a single forum easier. Federal recognition of indirect purchaser standing also will promote the development of a body of federal law governing the allocation of damages among direct and indirect purchasers.[69] (The allocation of damages, a second part of this component of the Commission's recommendation, is described below.)

### 2. Allow removal of actions brought under state antitrust law by direct and indirect purchasers to federal court to the full extent permitted under Article III

To ensure that direct and indirect purchaser litigation involving the same alleged antitrust violation will take place in a single court, Congress should include as an element of its comprehensive legislation a provision that allows removal of direct and indirect purchaser actions brought pursuant to state law to federal court to the full extent permitted under Article III. It is true that CAFA now permits consolidation of state indirect purchaser actions in one federal district court to a much greater extent than previously was possible. The potential susceptibility of CAFA's exceptions to plaintiff efforts to avoid removal, and other circumstances to which CAFA does not apply, however, generate concern that CAFA will not operate as well as would be desirable in consolidating direct and indirect purchaser actions. An antitrust-specific provision allowing removal of state indirect purchaser actions to federal court to the full extent permitted by Article III would afford a more comprehensive solution. In combination with other components of the Commission's recommendation, removal to the maximum extent permitted will also facilitate the transfer and consolidation of all direct and indirect purchaser actions in a single federal court.

### 3. Allow consolidation of all purchaser actions in a single federal forum for both pretrial and trial proceedings

In *Lexecon* the Supreme Court held that federal courts in which class actions are consolidated pursuant to the multidistrict litigation statute, 28 U.S.C. § 1407, may only conduct consolidated pretrial hearings on issues such as discovery, class certification, summary judgment, and other pretrial motions.[70] After that, the federal district court must remand the actions for trial in the courts in which they were originally brought.[71] Because *Lexecon* precludes consolidation for trial, the possibility of duplicative trial litigation and inconsistent results will remain.[72]

To avoid this result, Congress should legislatively overrule *Lexecon* for purposes of antitrust direct and indirect purchaser litigation only.[73] The benefits of consolidation, including reduced waste and enhanced coordination, will be far greater if the actions are consolidated for all purposes, including trial.[74] Moreover, such reform is especially necessary with respect to antitrust litigation involving claims by direct and indirect purchasers because, due to the problem of pass on, the amounts of injury suffered by different plaintiff groups are closely interrelated. Indeed, unless cases are consolidated for all purposes, it will be impractical to obtain a single determination of liability and damages and appropriately allocate damages awards among claimants, a critical element of the Commission's recommendation.

### 4. Damages should be apportioned among all purchaser plaintiffs—both direct and indirect— in full satisfaction of their claims in accordance with the evidence as to the extent of the actual damages they suffered

As explained above, one component of the Commission's recommendation calls for both direct and indirect purchasers to be able to recover their actual damages, trebled. Legislatively overruling *Illinois Brick* and *Hanover Shoe* will allow a limitation of the defendant's liability to treble the overcharges suffered by the direct purchasers as a result of the initial overcharge. These damages should be allocated among the different claimants, whether direct or indirect purchasers, according to the evidence regarding their actual damages.

To be sure, determinations of how to allocate damages among direct and indirect purchasers will often involve complex economic assessments of the extent to which each purchaser in the chain of distribution has suffered harm that can be traced to the overcharge. The federal courts have shown great ability to handle such complex economic issues, however, and they will develop rules and procedures to handle these issues. Consolidating all claims in a single proceeding will facilitate an appropriate allocation of relief among the claimants by the court. In addition, once all parties are before a single court, a global settlement becomes possible. Many of these disputes are likely to be settled; once liability and total damages are established, allocations of damages may often be determined by settlements among the claimants. Furthermore, limiting damages to the amount of the initial overcharge should streamline resolution of the litigation. Indeed, once the amount of overcharge has been determined, it may be possible to resolve the issues of how to allocate those damages among direct and indirect purchasers without the further involvement of the defendants.

Without a doubt, the management of a consolidated class action involving direct and indirect purchasers will be challenging. Such a proceeding will likely involve numerous claimants, the application of differing state laws, and difficult economic assessments of the extent to which overcharges flowed from direct to indirect purchasers and how best to apportion damages among claimants. Federal courts managing such proceedings should use their discretion to structure the proceedings as they see fit to achieve fairness and efficiency. Federal judges may wish to consider structuring the proceedings to make three distinct determinations: the liability of the defendants; the damages owed by the defendant (based on overcharges to the direct purchasers only); and the allocation of those damages among direct and indirect purchasers.* However, judges may choose from a variety of different mechanisms to best manage such cases. It is far preferable to have one federal judge oversee and manage the interrelationships among the claims and claimants than to have split proceedings in federal and state courts, as is now too frequently the case.

---

* Commissioner Burchfield is skeptical about the proposed use of such structured (or "trifurcated") proceedings.

### 5. Allow for certification of classes of direct purchasers, consistent with current practice, without regard to whether the injury alleged was passed on to customers of the direct purchasers

The Commission does not intend its recommended reforms to make class certification more difficult for direct and indirect purchasers to obtain than under current practice. In particular, the Commission recognizes the concerns of some that certification of direct purchaser actions may be rendered more difficult by the legislative overruling of *Hanover Shoe*.[75] *Hanover Shoe* simplifies the proof of the fact and extent of injury suffered by direct purchasers—the overcharge depends only on the price they actually paid and the price they would have paid absent the violation. If *Hanover Shoe* is overruled legislatively, however, the extent to which the direct purchasers may have passed on the overcharge may become an issue at trial. Defendants thus may seek to argue as well that the extent of pass on is not susceptible of common proof, which potentially provides a basis to deny class certification. Because the extent of pass on affects both direct purchasers' claims and the indirect purchasers' claims, it has the potential to prevent *any* class from being certified.

In order to ensure that the proposed reform does not make class certification of purchaser classes more difficult, the legislation should specify that courts should certify direct purchaser classes without regard to whether the injury alleged was passed on by direct purchasers. Thus, the degree of pass on will be an issue only at trial, not at the class certification stage of the proceedings. Because the purpose of this proposed reform is to ensure all injured parties are able to obtain appropriate recoveries, increasing obstacles by creating greater burdens to certify class actions would frustrate the objectives of the proposal.

## Notes

[1] Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see 15 U.S.C. § 15(a).

[2] *See generally* Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 110 n.5 (1986); Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 532–46 (1983).

[3] Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n.14 (1972) (emphasis added).

[4] Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494 (1968).

[5] Illinois Brick Co. v. Illinois, 431 U.S. 720, 728–29 (1977).

[6] Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified as amended at 28 U.S.C. § 1711 note).

[7] *Hanover Shoe*, 392 U.S. at 481.

[8] *Id.* at 494.

[9] *Illinois Brick*, 431 U.S. at 728–29.

[10] *Id.* at 728–30.

[11] *Id.* at 730–34.

¹² *Id.* at 749 (Brennan, J., dissenting).

¹³ *Id.* at 756–58 (Brennan, J., dissenting).

¹⁴ *Id.* at 758–60 (Brennan, J., dissenting).

¹⁵ Andrew I. Gavil, *Federal Judicial Power and the Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*, 69 Geo. Wash. L. Rev. 860, 867–69 (2001) [hereinafter Gavil, *Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*]; Stephen Calkins, Illinois Brick *and Its Legislative Aftermath*, 47 Antitrust L.J. 967, 967–68 (1979) [hereinafter Calkins, Illinois Brick *and Its Legislative Aftermath*].

¹⁶ For example, Senator Kennedy charged that "the *Illinois Brick* decision effectively frustrates the clear legislative intent of Congress." *Fair and Effective Enforcement of the Antitrust Laws, S. 1874: Hearings Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 95th Cong. 2 (1977) (statement of Senator Edward Kennedy).

¹⁷ *See, e.g.*, S. 1874, 95th Cong. § 5 (1978); H.R. 11942, 95th Cong. § 3 (1978); *see also* Calkins, Illinois Brick *and Its Legislative Aftermath*, at 967.

¹⁸ Edward D. Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*, 17 Loy. Consumer L. Rev. 1, 19, 26 (2004) [hereinafter Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*] (the bills to repeal *Illinois Brick* all died in committee; the most recent, introduced in 1983, would have allowed state attorneys general to sue on behalf of indirect purchasers); *see also* Edward D. Cavanagh, *The* Illinois Brick *Dilemma: Is There a Legislative Solution?*, 48 Alb. L. Rev. 273, 294–307 (1984).

¹⁹ Ronald W. Davis, *Indirect Purchaser Litigation:* ARC America's *Chickens Come Home to Roost on the* Illinois Brick *Wall*, 65 Antitrust L.J. 375, 391–93 (1997).

²⁰ Gavil, *Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*, at 867–68.

²¹ California v. ARC Am. Corp., 490 U.S. 93, 102–06 (1989).

²² Kevin J. O'Connor, *Is the* Illinois Brick *Wall Crumbling?*, 15 Antitrust, Summer 2001, at 34, 34–35 [hereinafter O'Connor, *Is the* Illinois Brick *Wall Crumbling?*] (reporting that "thirty-six states and the District of Columbia, representing over 70 percent of the nation's population, now provide for some sort of right of action on behalf of some or all indirect purchasers"); Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*, at 19 ("[S]ome thirty states . . . permit[] antitrust suits by indirect purchasers under state law."); American Bar Association, Section of Antitrust Law, *Report on Remedies*, at 2 (2004) [hereinafter 2004 Task Force Report] ("more than half the states permit" indirect purchaser antitrust suits). There are a variety of remedies available to indirect purchasers under state law. *See* Mark J. Bennett & Ellen S. Cooper, Statement at AMC Indirect Purchaser Hearing, at 18–19 (June 27, 2005) [hereinafter Bennett & Cooper Statement] (describing state law remedies available to indirect purchasers, including consumer protection and Little FTC Acts); Indirect Purchaser Transcript at 103–04 (Cooper) (June 27, 2005); Dan E. Gustafson, Statement at AMC Indirect Purchaser Hearing, at 6–8 (June 27, 2005) [hereinafter Gustafson Statement]; Joel M. Cohen & Trisha Lawson, *Navigating Multistate Indirect Purchaser Lawsuits*, 15 Antitrust, Summer 2001, at 29, 30–31 [hereinafter Cohen & Lawson, *Navigating Multistate Indirect Purchaser Lawsuits*] (describing features of *Illinois Brick* repealers that vary by state).

²³ Indirect Purchaser Trans. at 41 (Zwisler); *id.* at 42–43 (Cuneo); William H. Page, *Class Certification in the* Microsoft *Indirect Purchaser Litigation*, 1 J. Competition L. & Econ., 303, 335–38 (2005) [hereinafter Page, *Class Certification in the* Microsoft *Indirect Purchaser Litigation*] (appendix listing class certification decisions in indirect purchaser actions, nearly all dating since the mid-1990s).

²⁴ *See, e.g.*, Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*, at 30 (describing the "proliferation of litigation of indirect purchaser cases involving a common nucleus of operative fact"); Gavil, *Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*, at 876–78.

²⁵ H. Laddie Montague, Jr., Statement at AMC Indirect Purchaser Hearing, at 2 (June 27, 2005) [hereinafter Montague Statement]; *see* Indirect Purchaser Trans. at 135–36 (Gustafson) (describing how "negotiated coordination" results in agreements to coordinate); *see also* O'Connor, *Is the* Illinois Brick *Wall Crumbling?*, at 34, 36–37 ("recent attempts at coordination initiated by state attorneys general, in con-

junction with private plaintiffs' and defendants' counsel," have reduced costs and facilitated settlement); Cohen & Lawson, *Navigating Multistate Indirect Purchaser Lawsuits*, at 31–32 ("indirect purchaser litigation has the potential to become unmanageable and extraordinarily expensive," but courts and plaintiffs' counsel are "frequently receptive to efforts to avoid unnecessary burden").

[26] Indirect Purchaser Trans. at 48–50 (Montague).

[27] *Id.*; Montague Statement, at 11–12.

[28] Pamela A. MacLean, *Federal Courts May Face Flood of Price-Fixing Allegations*, NAT'L L.J. (Sept. 21, 2005) (reporting that "[i]ndirect purchaser antitrust cases have flooded back to federal court using pendant state law antitrust claims"). At least eleven federal court pharmaceutical indirect purchaser actions may have been consolidated in this manner. *See* Patrick E. Cafferty et al., Public Comments Submitted to AMC (June 2, 2006) [hereinafter Cafferty Comments] (listing 11 indirect purchaser actions settled in federal court in recent years, some or all of which may have been brought relying on supplemental jurisdiction).

[29] *See* 28 U.S.C. § 1407 ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.").

[30] Ian Simmons & Charles E. Borden, *The Class Action Fairness Act of 2005 and State Law Antitrust Actions*, 20 ANTITRUST, Fall 2005, at 19, 19 [hereinafter Simmons & Borden, *CAFA and State Law Antitrust Actions*].

[31] *Id.* at 20. The "Home State" exception is of the greatest potential relevance to the removal of state indirect purchaser class actions. It provides that a class action that otherwise meets CAFA's requirements is not subject to removal under CAFA if, *inter alia*, "(1) all of the primary defendants are citizens of the state in which the class action is being brought, and (2) at least two-thirds of the members of the putative class are also citizens of that state." *Id.* (citing 28 U.S.C. § 1332(d)(4)(B)). Moreover, under this provision, if between one-third and two-thirds of the members of the putative class are citizens of the same state as the defendant or defendants, then a federal court has discretion over whether it will exercise jurisdiction over the class action; it is not obligated to do so. *Id.* (citing 28 U.S.C. § 1332(d)(3)).

There is also a "Local Controversy" exception. *See* Bruce V. Spiva & Jonathan K. Tycko, *Indirect Purchaser Litigation on Behalf of Consumers After CAFA*, 20 ANTITRUST, Fall 2005, at 12, 14–15 [hereinafter Spiva & Tycko, *Indirect Purchaser Litigation*] (discussing both exceptions).

[32] Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 28 (1998).

[33] *See, e.g.*, Gavil, *Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*, at 863 ("[T]he artificial division of cases that now flows from *Illinois Brick* imposes unnecessary litigation burdens on the parties and leads to unjustifiable systemic inefficiencies."); Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*, at 30 (state indirect litigation outside the scope of federal consolidation poses a "logistical nightmare for the courts").

[34] *Lexecon* held that a federal district court conducting pretrial proceedings pursuant to the multidistrict litigation statute has no authority to invoke the change-of-venue provisions of 28 U.S.C. § 1404(a) to assign a transferred case to itself for trial, but rather must remand the transferred case "at or before the conclusion of such pretrial proceedings to the district from which it was transferred," as provided by 28 U.S.C. § 1407(a). *Lexecon*, 523 U.S. at 34–37.

[35] A series of ABA Reports had emphasized concerns for duplicative recoveries in identifying numerous problems raised by indirect purchaser suits. *See* American Bar Association, Section of Antitrust Law, *The State of Federal Antitrust Enforcement—2004*, at 50; 2004 Task Force Report, at 1–2; American Bar Association, Section of Antitrust Law, *Report of the Indirect Purchaser Task Force*, 63 ANTITRUST L.J. 993, 995–96 (1995); American Bar Association, Section of Antitrust Law, *Report of the American Bar Association Section of Antitrust Law Task Force to Review the Supreme Court's Decision in* California v. ARC America Corp., 59 ANTITRUST L.J. 273, 283–87 (1990); American Bar Association, Section of Antitrust Law, *Report of the American Bar Association Section of Antitrust Law Task Force to Review Proposed Legislation to Repeal or Modify* Illinois Brick, 52 ANTITRUST L.J. 841, 841 (1983) [hereinafter 1983 Task Force Report]; *see also* Donald I. Baker, *Federalism and Futility: Hitting the Potholes on the* Illinois Brick

*Road*, 17 ANTITRUST, Fall 2002, at 14, 15 (stating that the current regime "has produced duplicative lit-igation and recoveries" on a scale the Court could "scarcely have imagined"); Business Roundtable, Public Comments Submitted to AMC, at 8 (Nov. 4, 2005).

[36] Michael L. Denger, Statement at AMC Indirect Purchaser Hearing, at 4 (June 27, 2005) [hereinafter Denger Statement]; Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*, at 27 (without being sub-ject to a federal court's pressure to settle, plaintiffs may "behave strategically to exact more favorable settlement terms").

[37] Indirect Purchaser Trans. at 9 (Tulchin) (stating that this "domino effect of collateral estoppel" makes it exceedingly difficult for defendants to go to trial); *id.* at 14, 90–91 (Zwisler) (emphasizing the "colos-sal damage exposure" from potential liability to indirect purchasers); Margaret M. Zwisler, Statement at AMC Indirect Purchaser Hearing, at 7–8 (June 27, 2005) [hereinafter Zwisler Statement].

[38] The three requirements of CAFA "will be satisfied in the overwhelming majority of indirect purchaser class actions," and "[m]ost of these exceptions [to CAFA's applicability] will rarely, if ever, apply in the context of indirect purchaser class actions." Simmons & Borden, *CAFA and State Law Antitrust Actions*, at 19–20.

[39] *Id.* at 19 (CAFA should "dramatically reduce the duplication in discovery and work product that defen-dants currently incur when facing multiple statewide indirect purchaser class actions"); Jonathan W. Cuneo, Statement at AMC Indirect Purchaser Hearing, at 8 (June 27, 2005) [hereinafter Cuneo Statement] (CAFA "will, without doubt, have the effect of moving the vast majority of state indirect purchaser class actions from state to federal court"); Montague Statement, at 3, 5 ("there is good reason to believe that [under CAFA] the federal courts can manage the direct and indirect purchaser cases in the same man-ner in which they managed them pre-*Illinois Brick*"—that is, "together in federal court"); Indirect Purchaser Trans. at 47–48 (Bennett) (predicting that state attorneys general would file in federal court if *Illinois Brick* were overruled and that few private cases would stay in state court).

[40] *See* Indirect Purchaser Trans. at 135–36 (Gustafson); *id.* at 53 (Tulchin); *id.* at 144 (Gavil); David B. Tulchin, Statement at AMC Indirect Purchaser Hearing, at 11–12 (June 27, 2005) [hereinafter Tulchin Statement].

[41] *See* Indirect Purchaser Trans. at 134–35 (Denger) (observing that many indirect purchasers and third-party payers are "substantial commercial entities" who could opt out of a class action and thereby avoid application of CAFA if their interests were better served in state court); *see also* Bennett & Cooper Statement, at 7–10 (reporting that some third party payers opted out of class actions and settled sep-arately in the *Mylan*, *Buspirone*, and *Taxol* cases); Indirect Purchaser Trans. at 158 (Denger) ("[I]ncreas-ingly, in the last four or five years there have been a lot of opt out settlements.").

[42] Bennett & Cooper Statement, at 16; 46 State Attorneys General, Public Comments Submitted to AMC, at 8 (July 20, 2006) [hereinafter Comments of 46 State Attorneys General] (*parens patriae* actions are not subject to removal under CAFA).

[43] *See Lexecon*, 523 U.S. at 34–37.

[44] *See, e.g.*, Cavanagh, Illinois Brick: *A Look Back and a Look Ahead*, at 23–24 (*Illinois Brick* "failed to com-pensate the real victims of price-fixing"); Andrew I. Gavil, *Antitrust Remedy Wars Episode I:* Illinois Brick *from Inside the Supreme Court*, 79 ST. JOHN'S L. REV. 553, 565 (2005) (explaining that, under the *Illinois Brick* rule, there is "no compensation whatsoever for the indirect purchasers who were the true victims of the illegal overcharge").

[45] Thirty Antitrust Practitioners, Public Comments Submitted to AMC, at 15 (June 17, 2005) [hereinafter Thirty Antitrust Practitioners Comments].

[46] For example, Bennett and Cooper report that in several antitrust cases involving pharmaceuticals there were substantial sums paid to the injured class members. *See* Bennett & Cooper Statement, at 7–10; *see also* Indirect Purchaser Trans. at 24–25, 60–61, 94–95 (Bennett); *id.* at 178–79 (Cooper).

[47] Tulchin Statement, at 9–10; Zwisler Statement, at 8–9.

48 *See* Tulchin Statement, at 9–10. For example, even using extraordinary efforts to contact potential claimants in the *United States Tobacco* litigation, plaintiffs still achieved only a 26 percent participation rate among class members. Zwisler Statement, at 8–9; *see also* John E. Lopatka & William H. Page, *Indirect Purchaser Suits and the Consumer Interest*, 48 ANTITRUST BULL. 531, 536 (2003). CAFA contains several provisions directed at reforming the use of coupons in settlements of class actions. *See, e.g.*, Charles B. Casper, *The Class Action Fairness Act's Impact on Settlements*, 20 ANTITRUST, Fall 2005, at 26, 27–28.

49 William M. Landes & Richard A. Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick, 46 U. CHI. L. REV. 602, 608–15 (1979) [hereinafter Landes & Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws?*]; Page, *Class Certification in the* Microsoft *Indirect Purchaser Litigation*, at 305 (the Supreme Court in *Illinois Brick* reasoned that concentrating the right to recovery in direct purchasers would ensure more effective deterrence).

50 *See* Indirect Purchaser Trans. at 37 (Montague); Zwisler Statement, at 13; *see also* 1983 Task Force Report, at 856–57.

51 *See* Cafferty Comments, at 1–25.

52 *See* Professor Andrew I. Gavil, Statement at AMC Indirect Purchaser Hearing, at 17–18 (June 27, 2005); American Antitrust Institute, Public Comments Submitted to AMC Regarding Remedies, at 18–19 (June 17, 2005); Indirect Purchaser Trans. at 24 (Bennett); Cuneo Statement, at 5–6.

53 Thirty Antitrust Practitioners Comments, at 13–14, 19; Indirect Purchaser Trans. at 23–24 (Bennett). Some witnesses reported on large settlements recently obtained on behalf of indirect purchasers though class action suits by state attorneys general. Bennett & Cooper Statement, at 7–10 (*Mylan*—approximately $137 million total payouts to indirect purchasers; *Buspirone*—$240 million; *Taxol*—$70 million). According to one commenter, in 11 recent pharmaceutical cases (including *Mylan*, *Buspirone*, and *Taxol*) brought in federal court, indirect purchasers received over $900 million in recoveries. Cafferty Comments, at 1–4 (reporting settlement amounts). Three actions brought in state court—*Vitamins*, *Brand Name Prescription Drugs*, and *Infant Formula*—resulted in settlements totaling $424.9 million in cash and $160.5 million in product. *Id.* at 5–19. Recent actions brought on behalf of indirect purchasers in fifteen states against Microsoft resulted in the provision of vouchers worth up to $1.9 billion. *See id.* at 20–23; *see also* Community Catalyst, Public Comments Submitted to AMC, at 3–4 (July 22, 2005) (reporting recoveries for consumers and third party payers in pharmaceutical cases).

54 *See, e.g.*, Indirect Purchaser Trans. at 18, 91 (Montague); *id.* at 130–31 (Gustafson).

55 *Id.* at 129 (Cooper); *id.* at 129–30 (Denger) ("[T]here is no shortage of plaintiffs' lawyers willing to bring actions."); *id.* at 132–33 (Steuer) ("[E]ven though the incentive may be then divided up . . . there remains ample incentive collectively to pursue the suit.").

56 *See, e.g.*, 2004 Task Force Report, at 1–2 (2004) (expressing concern for multiple litigation, duplicative exposure, and lack of recovery for indirect purchasers in states without repealers, and citing previous studies).

57 Montague Statement, at 3–4 ("I am not aware of any instance in which an antitrust defendant has paid in settlements or in satisfaction of judgments as much or more than treble damages, or in most cases, more than single damages."); Indirect Purchaser Trans. at 23 (Bennett) ("The testimony from both panels, I think, is stark in that no one could actually point to any case, despite the large number of *Illinois Brick* repealers, in which any defendant had actually paid too much."); Gustafson Statement, at 15; Cuneo Statement, at 9.

58 Indirect Purchaser Trans. at 38–39 (Tulchin) (identifying an instance of unfair multiple recovery is "very difficult" because you would need to know the actual damages suffered); *id.* at 41–42 (Zwisler); Denger Statement, at 6–8.

59 Indirect Purchaser Trans. at 164–65 (Steuer). Other witnesses believe preemption of indirect purchaser rights under state law may be necessary to ensure that duplicative recoveries do not occur. *Id.* at 161–62 (Gavil).

[60] *Illinois Brick*, 431 U.S. at 731–37.

[61] 1983 Task Force Report, at 852–55; Chris S. Coutroulis & D. Matthew Allen, *The Pass-on Problem in Indirect Purchaser Class Litigation*, 44 ANTITRUST BULL. 179 (1999) [hereinafter Coutroulis & Allen, *The Pass-on Problem*]; William H. Page, *The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of* Illinois Brick, 67 ANTITRUST L.J. 1, 12–19 (1999) [hereinafter Page, *The Limits of State Indirect Purchaser Suits*]; *see also In re* Brand Name Prescription Drugs Litig., 123 F.3d 599, 605 (7th Cir. 1997) (Posner, J.) ("Tracing a price hike through successive resales is an example of what is called 'incidence analysis,' and is famously difficult."); Landes & Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws?*, at 615–21. *But see* Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 269, 354 (1979) (stating that "there is simply no credible argument that courts cannot handle passing-on issues").

[62] Page, *The Limits of State Indirect Purchaser Suits*, at 5; *see* Coutroulis & Allen, *The Pass-on Problem*, at 184–88. Some Commission witnesses argued that evaluating injury to indirect purchasers would make proceedings very difficult or even "totally unworkable." Indirect Purchaser Trans. at 91 (Montague); *see also* Tulchin Statement, at 3–8.

[63] Bennett & Cooper Statement, at 6–7 (while difficulties remain, advances in "data capture, storage and manipulation, as well as in econometric modeling has made such allocation less problematic"). Professor Hovenkamp has also argued that the difficulty of computing pass on can largely be avoided by applying standard methods for damage estimation to each level in the chain of distribution. *See* HERBERT HOVENKAMP, THE ANTITRUST ENTERPRISE 74–76 (2005).

[64] Bennett & Cooper Statement, at 13–14.

[65] O'Connor, *Is the* Illinois Brick *Wall Crumbling?*, at 34–35 (reporting that "thirty-six states and the District of Columbia, representing over 70 percent of the nation's population, now provide for some sort of right of action on behalf of some or all indirect purchasers"); *see also generally* Comments of 46 State Attorneys General, at 4–7 (arguing that state laws permitting indirect purchasers to assert antitrust claims should not be preempted); Bennett & Cooper Statement, at 16–19.

[66] *See ARC America*, 490 U.S. 93.

[67] Bennett & Cooper Statement, at 16; *id.* app. at 2–3; *see also* Comments of 46 State Attorneys General, at 1. Others share these views. *See* American Antitrust Institute, Public Comments Submitted to AMC Regarding Indirect Purchaser Litigation, at 8 (July 10, 2006) [hereinafter AAI Comments re Indirect Purchaser Litigation] (opposing strongly "any changes to federal law that would result in preemption of state indirect purchaser remedies").

[68] See Indirect Purchaser Trans. at 101–02, 159 (Cooper); Bennett & Cooper Statement, at 19.

[69] Furthermore, direct and indirect purchasers will be encouraged to develop and present appropriate methods for estimating damages.

[70] *Lexecon*, 523 U.S. at 34–37; Spiva & Tycko, *Indirect Purchaser Litigation*, at 16.

[71] *Lexecon*, 523 U.S. at 34–37; Spiva & Tycko, *Indirect Purchaser Litigation*, at 16.

[72] Indirect Purchaser Trans. at 134–35 (Denger).

[73] The Commission does not take a position as to whether overruling *Lexecon* would be desirable in other circumstances as well.

[74] Consolidation for all purposes would also avoid one arguably unfair aspect of defending multiple actions. If defendants lose one action, it will face collateral estoppel in subsequent actions against it on the same claim. However, a win in one of those actions may not be used against a different plaintiff in a subsequent action.

[75] *See* AAI Comments re Indirect Purchaser Litigation, at 4–6 (repeal of *Hanover Shoe* "would fuel arguments that proof of impact is an individualized question" not susceptible of common proof).