COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
BONNY E. SWEENEY (176174)
THOMAS R. MERRICK (177987)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
johns@csgrr.com
bonnys@csgrr.com
tmerrick@csgrr.com

THE KATRIEL LAW FIRM
ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
Washington, DC  20007
Telephone:  202/625-4342
202/330-5593 (fax)
rak@katriellaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | Lead Case No. C-05-00037-JW(RS) |
| | CLASS ACTION |
| This Document Relates To: | DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN RESPONSE TO COURT'S JULY 17, 2009 ORDER AS TO INJUNCTIVE RELIEF SOUGHT |
| ALL ACTIONS. | |
| | Judge: Hon. James Ware |
| | Date: October 5, 2009 |
| | Time: 9:00 a.m. |
| | Ctrm: 8 – 4th Floor |

I.   INTRODUCTION

Plaintiffs Somtai Troy Charoensak, Mariana Rosen, and Melanie Tucker (collectively, "Direct Purchaser Plaintiffs") file this memorandum in response to the Court's July 17, 2009 Order ("Order"), which sought clarification from the parties whether, given the operative theories of liability and the injunctive relief class, as defined, the injunctive relief sought is an available remedy. Specifically, the Court invited briefing on the following issues:  (a) whether Apple's representation that it has stopped its practice of placing Digital Rights Management ("DRM") restrictions on iTMS purchases affects the injunctive relief sought; (b) whether iPod purchasers are entitled to the identified injunctive relief even though it relates to prior iTMS purchases and not to iPods; and (c) how the injunctive relief sought is available under theories of monopolization or attempted monopolization.  Order at 2-3.

For the reasons detailed below, Direct Purchaser Plaintiffs' request for injunctive relief remains necessary to redress Apple's anticompetitive conduct.

II.  APPLE'S VOLUNTARY REMOVAL OF DRM FROM iTMS MUSIC FILES DOES NOT DEFEAT DIRECT PURCHASER PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF

Apple  represents that it "has stopped its practice of placing Digital Rights Management ("DRM") restrictions on its iTMS purchases."  Order at 2.  However, DRM restrictions still exist on video files purchased from iTMS.  In addition, earlier iTMS music purchases remain "locked" unless the customer pays Apple a fee to remove DRM for each prior purchase.  Injunctive relief is therefore still necessary and appropriate.

When this case was originally filed, Apple encrypted all files sold through iTMS with its proprietary DRM, restricting iTMS purchasers' choice of compatible portable media players.  As pressure mounted for Apple to remove DRM from files sold on iTMS (through this class action and a large volume of customer complaints),[1] Apple slowly changed its policy.  On April 2, 2007, Apple

---

[1]   See Declaration of Thomas R. Merrick in Support of Direct Purchaser Plaintiffs' Memorandum in Response to Court's July 17, 2009 Order as to Injunctive Relief Sought, filed concurrently ("Merrick Decl.").

began offering a limited number of "DRM-free" music files.  *See* Press Release, Apple, *Apple Unveils Higher Quality DRM-Free Music on the iTunes Store* (Apr. 2, 2007) (available at http://www.apple.com/pr/library/2007/04/02itunes.html).  These files included only those on the EMI Music label.  When Apple began selling these files, it gave no indication how long the new program would last, or whether it would expand or change it.  Moreover, Apple did not make the "DRM-free" files equally available to DRM-encrypted files.  Instead, Apple exacted a premium from its customers, charging $1.29 for "DRM-free" music files, instead of the 99 cent price for the same music files that contained DRM restrictions.  *Id.*  Additionally, purchasers with existing DRM-protected EMI music files were required to pay an additional 30 cents to unlock these files.[2]

Almost two years later, on January 6, 2009, Apple announced that all music sold through iTMS would be in DRM-free format.  *See* Press Release, Apple, *Changes Coming to the iTunes Store* (Jan. 6, 2009) (available at http://www.apple.com/pr/library/2009/01/06itunes.html).  This meant that any music files purchased from iTMS going forward could be played on non-iPod portable digital media players.[3]  However, all previously purchased songs remain encrypted with Apple's DRM and can only be played directly on an iPod.  To unlock these previously purchased files, Apple charges an additional fee of 30 cents per song or 30% of the album price.  *Id.*  Thus, even though purchasers with existing libraries already paid Apple a fee to own the music, they are charged again to use this music on a device manufactured by one of Apple's competitors.

There is no guarantee that Apple will not reverse its current DRM policy.  Apple's terms of service explicitly provides that "Apple reserves the right, at any time and from time to time, to update, revise, supplement, and otherwise modify this Agreement and to impose new or additional rules, policies, terms, or conditions on your use of the Service" *See* iTMS Terms of Service, ¶ 21, available at http://www.apple.com/legal/itunes/us/terms.html#SERVICE (last visited Aug. 27,

---

[2]   *See* Press Release, Apple Insider, *EMI Music Launches DRM-free iTunes Downloads in Higher-Quality* (Apr. 2, 2007) (available at http://www.appleinsider.com/articles/07/04/02/emi_music_launches_drm_free_itunes_downloads_in_higher_quality.html).

[3]   Two million of the ten million songs available on iTMS were not sold in "DRM-free" format until the end of March 2009.  *See Changes Coming to the iTunes Store*, *infra*.

2009). Without injunctive relief, Apple is still free to impose a technological restriction that prevents customers from directly playing their iTMS music on competing portable players in the future.

In addition, Apple has *never* offered any DRM-free option on any video files. Purchasers of iTMS video files are still locked into purchasing an iPod for direct playback on a portable player.

Viewed against this background, it is readily apparent that Apple's limited change of practice does not defeat Direct Purchaser Plaintiffs' claim for injunctive relief. The Supreme Court has long recognized that "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S. Ct. 894 (1953). As the Court explained in *W.T. Grant*, also an antitrust case, "The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." *Id.* (citations omitted). This policy is especially important to further the goals of antitrust law:

> When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of antitrust laws, courts will not assume that it has been abandoned without clear proof. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.

*United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333, 72 S. Ct. 690 (1952).

Dismissal of an injunctive relief claim upon a defendant's voluntary change of practice is appropriate only in narrow circumstances, and then only upon a strong showing by the defendant that there is no reasonable possibility that the complained of conduct may be undertaken once again. As the Court has explained, "[t]he case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' **The burden is a heavy one**." *W.T. Grant*, 345 U.S. at 633 (emphasis added); *see also Perfect 10, Inc. v. Amazon, com, Inc.*, 508 F.3d 1146, 1176 n.16 (9th Cir. 2007) (injunctive relief still available after activity at issue ended "because Amazon.com has not established 'that the allegedly wrongful behavior cannot reasonably be expected to recur'") (quoting *F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1238 (9th Cir. 1999)); *Gen. Cinema Corp. v. Vista Distrib. Co., Inc.*, 532 F. Supp. 1244, 1275 n.13 (C.D. Cal.

1  1982) (sufficient threat of injury demonstrated where defendant vehemently denied that its past
2  conduct was anticompetitive despite defendant's current cessation of the practice).

3  Here, of course, Apple cannot come close to satisfying that heavy burden. The Scott
4  Declaration, which triggered the Court's inquiry, provides no assurances about Apple's future plans
5  with respect to its DRM-removal policies. Further, the history of Apple's various practice changes,
6  even during the course of this litigation, Apple's explicit reservation of rights to unilaterally alter the
7  terms of service of its iTMS, and Apple's vehement denial that its conduct was anticompetitive,
8  make clear that Apple has not and cannot make a showing that there is no reasonable probability that
9  it will impose DRM or other technological restrictions limiting interoperability on iTMS music files
10 in the future. Of course, as to iTMS video files, DRM restrictions continue to be in place to this day
11 without any means of obtaining a DRM-free video file from iTMS.

12 Even assuming *arguendo* that Apple could make a convincing showing that it would never
13 go back on its present practice of offering a DRM-free music purchase option, injunctive relief is
14 still necessary. Apple's present policy does nothing to address any DRM restrictions on iTMS video
15 files. The present policy also does nothing to remedy its conduct in forcing additional payments
16 from customers to remove DRM from their existing music libraries. *See Wiley v. Nat'l Collegiate*
17 *Athletic Ass'n*, 612 F.2d 473, 476 (10th Cir. 1979) (voluntary cessation of conduct does not defeat
18 injunctive relief "when, as here, the amendment does not fully comport with the relief sought by the
19 plaintiff"). If Apple's DRM restrictions are shown to violate antitrust laws, injunctive relief is still
20 needed to force Apple to remove its DRM restrictions on **all** music and video files at no cost to the
21 customer and to enjoin Apple from imposing additional restrictions in the future. *See Cal. v. Nw*
22 *Pac. R.R. Co.*, 726 F.2d 505 (9th Cir. 1984) (affirming district court's issuance of a mandatory
23 injunction).

24 **III.  iPOD AND iTMS PURCHASERS ARE BOTH ENTITLED TO
       INJUNCTIVE RELIEF REMEDYING APPLE'S ANTICOMPETITIVE
25     CONDUCT**

26 The Court also raised two questions about the relationship between the injunctive relief class
27 as currently defined, consisting of only iPod purchasers, and the nature of the injunctive relief
28 sought. The Court noted that iTMS purchasers would benefit from injunctive relief which removed

1  DRM from existing iTMS libraries, and expressed concern that the class definition was limited to
2  iPod purchasers.  The Court also stated that it was unclear "how a class of iPod purchasers would be
3  entitled to equitable relief in the form of free access to DRM-free iTMS music and video files."
4  Order at 3.

5  In response to the Court's first inquiry, Direct Purchaser Plaintiffs agree that any injunctive
6  relief requiring removal of DRM in existing iTMS libraries would benefit iTMS purchasers, and are
7  concurrently filing a motion to modify the injunctive relief class definition to include iTMS
8  purchasers.[4]  The modified definition comports with the Class definition alleged in the Complaint.[5]
9  Complaint, ¶31.  If Apple's conduct is proven unlawful, iTMS purchasers would be as entitled as
10 iPod purchasers to injunctive relief in the form of removal of the DRM from: (a) their past
11 purchases of iTMS audio and video files; and (b) current and future purchases of iTMS video files.
12 In light of this motion for modification of the Class definition, it would be improper to strike Direct
13 Purchaser Plaintiffs' plea for injunctive relief.

14 In response to the Court's second inquiry, iPod purchasers will benefit from the injunctive
15 relief Direct Purchaser Plaintiffs seek because they remain locked in.  Direct Purchaser Plaintiffs
16 have alleged Apple used its monopoly power in digital downloads sold through iTMS
17 anticompetitively to gain market power in portable digital media players.  *Id.*, ¶¶21-22, 86.  By
18 forcing people who wished to purchase a portable digital media player for use with iTMS to
19 purchase an iPod, Apple increased demand to raise the price of iPods.  *Id.*, ¶¶72-74.  The harm from
20 this practice includes the iPod overcharge, but injunctive relief is needed to undo other harms caused
21 by Apple's anticompetitive conduct.[6]

---

[4]     Although Apple's data show that the vast majority of iTMS purchasers are also iPod purchasers, some consumers purchased iTMS files without being direct iPod purchasers.

[5]     *See* Complaint for Violations of Sherman Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumer Legal Remedies Act, and California Common Law of Monopolization, ("Complaint"), filed April 19, 2007.

[6]     Direct Purchaser Plaintiffs are not required at this stage of the litigation to identify with specificity all aspects of the injunctive relief they will seek if they prevail in this litigation.  *See Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, 543 F.3d 597, 605-06 (10th Cir. 2008) (at class

1  Technology in portable digital media players is advancing rapidly, as seen in expanded memory limits and the inclusion of Internet access capability in more recent models. *See, e.g.*, http://www.apple.com/ipodtouch/. If an owner of an iPod wishes to upgrade to a newer model, he cannot switch to a more preferred competitor's brand without losing the ability to play existing files purchased from iTMS. Even an iPod purchaser who has no current desire to purchase a new portable digital media player still benefits from the relief because if that iPod is lost or stolen, he or she is locked into replacing it with an iPod instead of a potentially more desirable substitute. *See, e.g.*, Merrick Decl., Ex. 1, Deposition of Melanie Tucker, taken October 26, 2007, at 12:20-13:5 (explaining that she purchased a second iPod after her first iPod broke because her existing library of iTMS songs could only be played on an iPod). These purchasers are made whole if Apple removes the DRM protection on the previously purchased files. The relief sought is not "free access to DRM-free iTMS music and video files." Order at 3. Rather, Direct Purchaser Plaintiffs seek the removal of Apple's DRM, which Apple has used to enhance its market power in the digital file market and to gain monopoly power in the portable player market.

Further, the continuation of Apple's policy of placing DRM restrictions on all iTMS video files locks in all iPod owners who own iTMS video files or who might want to purchase them in the future.

One means of remedying Apple's anticompetitive conduct is an injunction that: (1) requires Apple to remove DRM from already-purchased iTMS music files; (2) prohibits Apple from placing DRM on iTMS video files; and (3) prohibits Apple from placing DRM or other technological restrictions limiting interoperability on iTMS music or video files in the future. Because this relief would benefit iPod and iTMS purchasers alike, injunctive relief is appropriate.

---

certification stage, injunctive relief sought must only be detailed enough that the Court can "conceive" of satisfying federal rules). Nonetheless, as the Court recognized, Direct Purchaser Plaintiffs anticipate that one component of that relief will likely be the removal of DRM from already-purchased iTMS files.

## IV. INJUNCTIVE RELIEF IS CONSISTENT WITH THE OPERATIVE THEORIES OF LIABILITY

The Court has also sought clarification on how the plea for injunctive relief relates to the operative theories of liability now that the Court has dismissed Direct Purchaser Plaintiffs' *per se* tying claim.

First, Direct Purchaser Plaintiffs have asserted a tying theory under the rule of reason. If the Court sustains that tying claim and certifies it for class treatment, the injunctive relief Direct Purchaser Plaintiffs seek directly remedies the tying conduct.

In addition to Direct Purchaser Plaintiffs' rule of reason tying claim, Direct Purchaser Plaintiffs' monopolization and attempted monopolization claims are based on the forced link between the iPod and iTMS files caused by Apple's use of its proprietary FairPlay DRM. Complaint, ¶¶86, 90, 94, 99, 105, 111. By deliberately limiting the ability to play iTMS files on non-iPod portable players, Apple was able to achieve and/or maintain monopoly power in the portable digital media player, online music, and online video markets. Complaint, ¶¶21-23, 86, 90, 94. That is, as a result of its imposition of a technological restriction, Apple was able to exclude competing portable digital media player makers from competing for that large group of consumers who had purchased iTMS files (the largest source by far of online music files) and wished to play them on a portable digital media player, directly and exclude competitors in the online music and video markets from selling files that could be played on an iPod. *Id.*, ¶¶74-77, 86, 90, 94.

In order to prove that Apple's monopolization of the portable player, online music and online video markets violates Section 2 of the Sherman Act, Direct Purchaser Plaintiffs must show that Apple acquired or has maintained that monopoly through "willful" conduct, *i.e.*, improper conduct that has had the effect of excluding or driving rivals from the market on some basis other than competition on the merits. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-571 (1966); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32, 105 S. Ct. 2847 (1985) (defining willful element of monopolization claim as "behavior that not only tends to impair the opportunities of rivals, but also either does not further competition on the merits or does so in an unnecessarily restrictive way."). Here, Direct Purchaser Plaintiffs allege that Apple's deliberate

DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN RESPONSE TO COURT'S JULY 17, 2009
ORDER AS TO INJUNCTIVE RELIEF SOUGHT - C-05-00037-JW(RS)                                                           - 7 -

restriction of iTMS interoperability – through use of FairPlay DRM and continued software updates – constitutes such "willful" exclusionary conduct. Complaint, ¶¶86, 90, 94.

The exclusionary or predatory conduct that satisfies the "willfulness" element of a monopolization claim may also constitute a violation of Section 1 of the Sherman Act. For example, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 485-86, 112 S. Ct. 2072 (1992) the Court held that Kodak's tying of sales and service could, in addition to constituting an illegal tying arrangement under Section 1, also constitute a violation of Section 2. Similarly, in *United States v. Microsoft Corp.*, 253 F.3d 34, 64 (D.C. Cir. 2001), the government challenged Microsoft's dealings with its original equipment manufacturers as unlawful tying agreements ***and*** as unlawful exclusionary conduct under Section 2. *See also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 101 (2d Cir. 2005) (defendants' "Honor All Cards" policy was basis of alleged tying and Section 2 monopoly claims); *Tele Atlas N.V. v. NAVTEQ Corp.*, No. C-05-01673 RS, 2008 WL 4911230, at *2-*3 (N.D. Cal. Nov. 13, 2008) (holding that tying conduct could serve as the basis for plaintiff's Section 2 claim even though it was not found to violate Section 1 by itself).

Of course, the alleged exclusionary or predatory conduct that gives rise to a monopolization claim need not amount to a stand-alone tying claim or other violation of Section 1. *See id.* (allowing evidence of tying conduct as basis for Section 2 claim because although the tie was not illegal in and of itself, when combined with the foreclosure of competition, the tie may have had an anticompetitive effect). Were it otherwise, that would lead to the absurd proposition that a party could never successfully assert a Section 2 monopolization claim unless it also proved, as part of its monopolization case, a separate Section 1 offense. That is not the law. *See Granddad Bread, Inc. v. Cont'l Baking Co.*, 612 F.2d 1105, 1111 (9th Cir. 1979) ("the essential elements of a Section One offense are substantially different than for a Section Two offense"). Thus, whether or not tying remains a viable cause of action, Apple's alleged conduct still forms the basis for the predatory or exclusionary conduct element of the Class' Section 2 monopolization claims. Thus, an injunction that eliminates the DRM restrictions that have enabled Apple to acquire and/or maintain a monopoly in the portable digital media player, online music, and online video markets remain appropriate even if Direct Purchaser Plaintiffs have not alleged a tying claim under Section 1.

1   Both because the Court has not ruled on Direct Purchaser Plaintiffs' rule of reason tying claim, and because the tying conduct forms part of the predatory behavior underlying Direct Purchaser Plaintiffs' monopolization claims, it would be improper to strike the injunctive relief claim.

## V.   CONCLUSION

For all the foregoing reasons, Direct Purchaser Plaintiffs have properly pleaded a prayer for injunctive relief, and that plea should not be stricken.

DATED:  August 31, 2009                    Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
BONNY E. SWEENEY
THOMAS R. MERRICK


           s/ Thomas R. Merrick
            THOMAS R. MERRICK

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

THE KATRIEL LAW FIRM
ROY A. KATRIEL
1101 30th Street, N.W., Suite 500
Washington, DC  20007
Telephone:  202/625-4342
202/330-5593 (fax)

Co-Lead Counsel for Plaintiffs

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
ELAINE A. RYAN
TODD D. CARPENTER
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

BRAUN LAW GROUP, P.C.
MICHAEL D. BRAUN
12304 Santa Monica Blvd., Suite 109

| | |
|---|---|
| 1 | Los Angeles, CA 90025 |
| | Telephone: 310/442-7755 |
| 2 | 310/442-7756 (fax) |
| 3 | MURRAY, FRANK & SAILER LLP |
| | BRIAN P. MURRAY |
| 4 | JACQUELINE SAILER |
| | 275 Madison Avenue, Suite 801 |
| 5 | New York, NY 10016 |
| | Telephone: 212/682-1818 |
| 6 | 212/682-1892 (fax) |
| 7 | GLANCY BINKOW & GOLDBERG LLP |
| | MICHAEL GOLDBERG |
| 8 | 1801 Avenue of the Stars, Suite 311 |
| | Los Angeles, CA 90067 |
| 9 | Telephone: 310/201-9150 |
| | 310/201-9160 (fax) |
| 10 | |
| | Additional Counsel for Plaintiffs |

S:\CasesSD\Apple Tying\BRF 00061429.doc

DIRECT PURCHASER PLAINTIFFS' MEMORANDUM IN RESPONSE TO COURT'S JULY 17, 2009
ORDER AS TO INJUNCTIVE RELIEF SOUGHT - C-05-00037-JW(RS) - 10 -

CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 31, 2009.

s/ Thomas R. Merrick
THOMAS R. MERRICK

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  tmerrick@csgrr.com

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com,valdajani@jonesday.com

- **Thomas Robert Merrick**
  tmerrick@csgrr.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Adam Richard Sand , Esq**
  invalidaddress@invalidaddress.com

- **Michael Tedder Scott**

michaelscott@jonesday.com,gwayte@jonesday.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Tracy Strong**
  invalidaddress@invalidaddress.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,E_file_sd@csgrr.com,christinas@csgrr.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Todd David Carpenter
Bonnett, Fairbourn, Friedman, & Balint
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

Elaine A. Ryan
Bonnett Fairbourn Friedman & Balint, P.C
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012
```