# 8/31/09 Burtis Report:
# Exhibit B

Dockets.Justia.com

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4

5   STACIE SOMERS,              )  C-07-06507-JW
                                )
6           PLAINTIFF,          )  JUNE 30, 2009
                                )
7               V.              )
                                )
8   APPLE, INC.,                )  PAGES 1 - 94
                                )
9           DEFENDANT.          )
    _____    )
10

11

12        THE PROCEEDINGS WERE HELD BEFORE

13     THE HONORABLE UNITED STATES DISTRICT

14            JUDGE JAMES WARE

15  A P P E A R A N C E S:

16  FOR THE PLAINTIFF:  MEHRI & SKALET
                        BY:  CRAIG BRISKIN
17                           STEVEN SKALET
                        1250 CONNECTICUT AVENUE
18                      SUITE 300
                        WASHINGTON, DC 20036
19
                        ZELDES & HAEGGQUIST
20                      BY:  HELEN I. ZELDES
                             ALREEN HAEGGQUIST
21                      625 BROADWAY
                        SUITE 906
22                      SAN DIEGO, CALIFORNIA 92101

23      (APPEARANCES CONTINUED ON THE NEXT PAGE.)

24

    OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
25                      CERTIFICATE NUMBER 8074

                                                    1

1    A P P E A R A N C E S:  (CONT'D)

2    FOR THE DEFENDANT:  JONES DAY
                         BY:  ROBERT A. MITTELSTAEDT
3                             CRAIG E. STEWART
                         555 CALIFORNIA STREET
4                         26TH FLOOR
                         SAN FRANCISCO, CALIFORNIA 94104
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          2

1                    <u>INDEX OF PROCEEDINGS</u>

2

     FOR THE PLAINTIFF:
3

4    **GARY FRENCH**          DIRECT EXAM P. 6
                             CROSS-EXAM P. 24
5

     FOR THE DEFENDANT:
6

7    **DR. MICHELLE BURTIS** DIRECT EXAM P. 32
                             CROSS-EXAM P. 60
8                            REDIRECT EXAM P. 66

9

     PLAINTIFF'S REBUTTAL:
10

11   **GARY FRENCH**          FURTHER DIRECT EXAM P. 68
                             FURTHER CROSS-EXAM P. 71

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1    SAN JOSE, CALIFORNIA              JUNE 30, 2009
 2                 P R O C E E D I N G S
 3              (WHEREUPON, COURT CONVENED AND THE
 4    FOLLOWING PROCEEDINGS WERE HELD:)
 5              THE CLERK:  CALLING CASE NUMBER 07-6507,
 6    STACIE SOMERS V. APPLE, INC.
 7              ON FOR EVIDENTIARY HEARING ON PLAINTIFF'S
 8    MOTION FOR CLASS CERTIFICATION.
 9              FORTY-FIVE MINUTES EACH SIDE.
10              COUNSEL, PLEASE COME FORWARD AND STATE YOUR
11    APPEARANCES.
12              MR. BRISKIN:  CRAIG BRISKIN FOR MEHRI &
13    SKALET.
14              MS. HAEGGQUIST:  GOOD MORNING.  ALREEN
15    HAEGGQUIST FROM ZELDES & HAEGGQUIST FOR PLAINTIFF.
16              MR. SKALET:  GOOD MORNING, YOUR HONOR.
17    STEVE SKALET FROM MEHRI & SKALET FOR PLAINTIFFS.
18              MS. ZELDES:  HELEN ZELDES FROM ZELDES &
19    HAEGGQUIST FOR PLAINTIFFS.
20              MR. MITTELSTAEDT:  GOOD MORNING, YOUR
21    HONOR.  BOB MITTELSTAEDT AND CRAIG STEWART FOR
22    DEFENDANT.
23              THE COURT:  VERY WELL.  CALL YOUR
24    WITNESS.
25              MR. BRISKIN:  YOUR HONOR, CAN WE JUST ASK
```

5

1    A LITTLE GUIDANCE ON HOW YOU WANT TO STRUCTURE

2    THIS.  DO YOU WANT US TO CALL A WITNESS FIRST?

3         OKAY.

4         MR. MITTELSTAEDT:  AND, YOUR HONOR, IS

5    THE 45 MINUTES A SIDE BOTH FOR DIRECT AND CROSS OF

6    THE OTHER SIDE'S WITNESS?

7         THE COURT:  YES.

8         THE CLERK:  WOULD YOU PLEASE RAISE YOUR

9    RIGHT HAND.

10              **GARY L. FRENCH,**

11   BEING CALLED AS A WITNESS ON BEHALF OF THE

12   PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED

13   AND TESTIFIED AS FOLLOWS:

14        THE WITNESS:  I DO.

15        THE CLERK:  PLEASE BE SEATED.  WOULD YOU

16   PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

17   NAME FOR THE RECORD.

18        THE WITNESS:  GARY LESLIE FRENCH.

19   F-R-E-N-C-H.

20            **DIRECT EXAMINATION**

21   BY MR. BRISKIN:

22   Q    GOOD MORNING, DR. FRENCH.  COULD YOU TELL US

23   YOUR CURRENT PLACE OF EMPLOYMENT?

24   A    NATHAN & ASSOCIATES, INCORPORATED, IN

25   WASHINGTON, D.C. AREA.

6

1    Q    AND HOW LONG HAVE YOU WORKED THERE?

2    A    ALMOST 30 YEARS.

3    Q    AND WHAT IS YOUR POSITION?

4    A    I'M A SENIOR VICE-PRESIDENT.

5    Q    AND DO YOU HAVE ANY ADVANCED DEGREES?

6    A    YES.

7         THE COURT:  ACTUALLY I HAD THE BENEFIT OF

8    HIS DECLARATION SO SOME OF THAT YOU CAN SAVE BUT --

9         MR. BRISKIN:  OKAY.

10        THE COURT:  -- OTHER PARTS OF IT PERHAPS

11   YOU WOULD WISH TO GO THROUGH.

12   BY MR. BRISKIN:

13   Q    DO YOU HAVE EXPERIENCE IN PROVIDING TESTIMONY

14   AND ANALYSIS IN ANTITRUST CASES?

15   A    YES, I'VE BEEN INVOLVED IN ANTITRUST CASES

16   MOST OF THOSE 30 YEARS.

17   Q    AND WHAT WAS YOUR ASSIGNMENT IN THIS CASE?

18   A    TO LOOK INTO THE QUESTIONS OF THE IMPACT ON

19   THE CLASS AND THE AGGREGATE DAMAGES TO THE CLASS

20   AND WHETHER BOTH COULD BE ADDRESSED USING COMMON

21   EVIDENCE AND PROOF IN AN ECONOMIC ANALYSIS.

22   Q    AND WHAT DID YOU DO TO CARRY OUT THIS

23   ASSIGNMENT?

24   A    WELL, I STUDIED VARIOUS DOCUMENTS IN THE CASE

25   AND I STUDIED THE MARKETS FOR ON-LINE MUSIC AND

7

1    VIDEO SERVICES AND THE MARKET FOR DIGITAL PLAYERS.

2              AND AFTER DOING THAT THEN I LOOKED AT THE

3    QUESTIONS OF WHETHER OR NOT A MODEL COULD BE

4    CONSTRUCTED OR MODELS COULD BE CONSTRUCTED IN ORDER

5    TO ADDRESS THE QUESTIONS OF IMPACT AND DAMAGES, AND

6    I CAME UP WITH SEVERAL POSSIBLE MODELS.

7    Q    AND DID YOU COME TO ANY CONCLUSIONS AS A

8    RESULT OF YOUR ANALYSIS?

9    A    YES.  THESE MODELS ARE FEASIBLE AND WORKABLE

10   AND THEY DO RELY ON DATA AND INFORMATION THAT IS

11   COMMON TO ALL MEMBERS OF THE CLASS.

12   Q    COULD YOU GIVE US A GENERAL DESCRIPTION OF

13   WHAT REGRESSION ANALYSIS IS?

14   A    YES.  REGRESSION ANALYSIS IS A STATISTICAL

15   TECHNIQUE IN WHICH YOU SPECIFY AND EQUATE AN

16   EQUATION IN WHAT IS USUALLY KNOWN AS A REDUCED FORM

17   EQUATION AND IN WHICH YOU HAVE A DEPENDENT VARIABLE

18   OR THE VARIABLE OF INTEREST THAT YOU'RE TRYING TO

19   EXPLAIN AS A FUNCTION OF SEVERAL INDEPENDENT OR

20   EXPLANATORY VARIABLES.

21             THOSE EXPLANATORY VARIABLES ARE DEMAND

22   SIDE VARIABLES, APPLY SIDE VARIABLES AND PERHAPS

23   PRODUCT FEATURES AND OTHER VARIABLES THAT MIGHT

24   INFLUENCE THE VARIABLE IN QUESTION.

25             IN THIS CASE THE VARIABLE IN QUESTION IS

8

1    THE PRICE OF IPODS.  AND SO THAT'S A DEPENDENT

2    VARIABLE.

3            SO WHAT THE REGRESSION ANALYSIS DOES IS

4    THAT AFTER YOU SPECIFY THE EQUATION, YOU COLLECT

5    DATA ON ALL OF THE VARIABLES, BOTH THE DEPENDENT

6    VARIABLES AND THE INDEPENDENT VARIABLES, AND YOU

7    PLUG THE DATA INTO THE COMPUTER AND THEN THE

8    REGRESSION RESULTS OR THE REGRESSION ANALYSIS

9    QUANTIFIES THE RELATIONSHIP BETWEEN EACH OF THE

10   EXPLANATORY VARIABLES AND THE DEPENDENT VARIABLES

11   AND IN THIS CASE PRICE.

12            SO, FOR EXAMPLE, IF THERE'S A COEFFICIENT

13   THAT IS .4, IT MEANS THAT IF THE EXPLANATORY

14   VARIABLE GOES UP BY ONE, THEN THE PRICE WILL GO UP

15   BY POINT FOUR AND SO, THEREFORE, THAT'S HOW IT'S

16   DONE.

17            AND IF YOU GET STATISTICALLY SIGNIFICANT

18   RESULTS, THAT IS, THE .4 IS NOT .4 BY CHANCE OR

19   LUCK OR SAMPLING ERA BUT RATHER IT'S STATISTICALLY

20   SIGNIFICANT, THAT IS, IT IS DEFINITELY NOT ZERO.

21   IT IS A POSITIVE NUMBER OR A NEGATIVE NUMBER

22   DEPENDING ON WHAT EXPLANATORY VARIABLE IT IS.

23            AND THEN YOU CAN RELY ON THAT COEFFICIENT

24   TO DO THINGS LIKE ASSESS THE IMPACT OF THE VARIABLE

25   ON THE PRICE.

9

1    Q    AND IS THIS METHOD USED IN ANTITRUST CASES?

2    A    YES, IT'S FREQUENTLY USED IN ANTITRUST CASES

3    BECAUSE IN ANTITRUST CASES, REGARDLESS OF WHAT THE

4    WRONGDOING, WHETHER IT'S PRICE FIXING, GROUP

5    BOYCOTT, OR A TYING CASE, WHATEVER THE ALLEGED

6    WRONGDOING IS, IT HASN'T -- IT PRESUMABLY HAS AN

7    IMPACT ON PRICE, THAT IS, IT CAUSES THE PRICE TO BE

8    HIGH, HIGHER THAN IT OTHERWISE WOULD BE.  AND SO

9    YOU CAN USE THIS.

10        NOW, IN ANTITRUST CASES NORMALLY THERE'S

11   AN INDICATOR VARIABLE USED TO MEASURE THE ALLEGED

12   WRONGDOING.

13        AN INDICATOR, SOMETIMES CALLED A DUMMY

14   VARIABLE, IS A BINARY VARIABLE.  IT TAKES ON THE

15   VALUE OF ONE IF THE WRONGDOING IS PRESENT AND A

16   VALUE OF ZERO IF IT IS NOT.

17        SO, FOR EXAMPLE, IF YOU HAD A PERIOD OF

18   TIME WHEN THE WRONGDOING WAS GOING ON, THEN DURING

19   THAT PERIOD OF TIME OR DURING THE PERIOD AS IT'S

20   SOMETIMES REFERRED TO THE INDICATOR VARIABLE WOULD

21   ASSUME A VALUE OF ONE.

22        BUT IN PERIODS BEFORE OR AFTER THAT WHEN

23   THE ALLEGED WRONGDOING IS SUPPOSEDLY NOT HAPPENING,

24   THEN THE INDICATOR VARIABLE WOULD HAVE ZERO,

25   MEANING IT DOESN'T AFFECT PRICE IN THOSE PERIODS.

10

1    Q    NOW, YOU'VE PROPOSED SEVERAL MODELS TO MEASURE

2    IMPACT AND DAMAGES IN THIS CASE.  COULD YOU

3    DESCRIBE ONE OF THEM?

4    A    YES.  ONE APPROACH I DECIDED THAT WE COULD USE

5    WOULD BE TO JUST FIRST LOOK AT THE WHOLESALE PRICES

6    OF IPODS, WHERE THE DEPENDENT VARIABLE WOULD BE THE

7    WHOLESALE PRICES OF IPODS.

8          AND THE INDEPENDENT OR EXPLANATORY

9    VARIABLES WOULD BE DEMAND SIDE VARIABLES LIKE A

10   MEASURE OF THE CONSUMERS INCOME, THE NUMBER OF

11   SONGS IN THE ITUNES LIBRARY AND PERHAPS OTHER

12   VARIABLES AND THE SUPPLY SIDE VARIABLE LIKE THE

13   COST OF EACH IPOD MODEL, THE COST OF APPLE TO EACH

14   IPOD MODEL AND PERHAPS VARIOUS PRODUCT FEATURES.

15         PRODUCT FEATURES COULD INCLUDE ITS

16   DEMAND, GIVEN FEATURES WHEN THEY'RE ADDED TO THE

17   PRODUCT MIGHT MAKE THE PRODUCT MORE DESIRABLE AND

18   IT MIGHT STIMULATE THE DEMAND OF THE PRODUCT AND

19   THEY CAN ALSO INCREASE THE SUPPLY.  IT COULD

20   INCREASE THE COST.  YOU ADD A FEATURE AND THE COST

21   OF THE PRODUCT MAY GO UP.

22         AND SO YOU HAVE THIS FEATURE VARIABLES

23   AND YOU HAVE DEMAND SIDE VARIABLES AND YOU HAVE

24   SUPPLY SIDE VARIABLES AS ALL OF THIS EXPLANATORY

25   VARIABLES THAT TOGETHER DETERMINE WHAT THE PRICE OF

11

1    THE PRODUCT WOULD BE.

2              AND YOU WOULD HAVE AN INDICATOR VARIABLE

3    AND WHEN I'M LOOKING AT THE WHOLESALE PRICE THAT

4    INDICATOR VARIABLE WOULD BE WHETHER THE ALLEGED

5    WRONGDOING IS PRESENT.

6              SO IF I USE A TEMPORAL BENCHMARK AND IN

7    THIS CASE THE ALLEGATION IS THAT THE IPODS WERE

8    TIED TO ITUNES.  AND SO THAT COULDN'T HAPPEN UNTIL

9    ITUNES EXISTED, THAT IS, THE ITUNES MUSIC STORE

10   EXISTED WHICH DIDN'T EXIST BEFORE APRIL OF 2003.

11             SO SOME TIME AROUND APRIL OF 2003 TO

12   MAYBE WITHIN A YEAR OR SO OF THAT DATE THE MUSIC

13   STORE STARTED HAVING AN EFFECT IN THE MARKETPLACE

14   AND FROM THAT POINT FORWARD THE TIE THAT WAS

15   CREATED BY THE -- ALLEGEDLY CREATED BY THE FAIR

16   PLAY DRM WOULD THEN CAUSE THE DEMAND FOR IPODS TO

17   BE GREATER AND THE PRICE FOR IPODS TO BE GREATER

18   THAN IT OTHERWISE WOULD HAVE BEEN.

19             AND IT WOULD TEND TO FORECLOSE OTHER

20   MANUFACTURERS OF DIGITAL MUSIC PLAYERS FROM A

21   SIGNIFICANT PORTION OF THE MARKET THAT THE PORTION

22   OF CONSUMERS THAT IT WAS IMPORTANT TO BE ABLE TO

23   DIRECTLY DOWNLOAD MUSIC FROM THE ITUNES MUSIC

24   STORE.

25             AND SO YOU PUT IN THAT VARIABLE.  AND

                                                    12

1    THEN YOU RUN THE MODEL.  IF THAT VARIABLE IS

2    STATISTICALLY SIGNIFICANT AND A POSITIVE NUMBER, IT

3    SHOWS THEN THAT THERE WAS A PREMIUM AND THE PRICES

4    OF IPODS CAUSED BY THE TIE OR THE ALLEGED

5    WRONGDOING IN THE CASE.

6         AND SO IF WE DID THAT AT THE WHOLESALE

7    LEVEL WE WOULD SEE TO WHAT EXTENT THE WHOLESALE

8    PRICES CHARGED BY APPLE TO ITS CUSTOMERS WERE

9    HIGHER THAN THEY OTHERWISE WOULD HAVE BEEN ABSENT

10   THE WRONGDOING.  THEN THAT WOULD BE THE FIRST STAGE

11   OF THE MODEL.

12        THEN THE SECOND STAGE OF THE MODEL WOULD

13   BE A SECOND REGRESSION AND WHERE THE MOST IMPORTANT

14   EXPLANATORY VARIABLE WOULD BE THE PRICE THAT APPLE

15   CHARGES OR THE WHOLESALE PRICES OF IPODS AND IT

16   WOULD HELP TO EXPLAIN THE RETAIL PRICES OF IPODS.

17        AND SO TO THE EXTENT THAT THAT VARIABLE

18   IS STATISTICALLY SIGNIFICANT AND POSITIVE, IT WOULD

19   SAY SOME PORTION OF THAT OVERCHARGE PREMIUM AT THE

20   WHOLESALE LEVEL IS BEING PASSED ON TO THE RETAIL

21   LEVEL AS WELL.

22        AND IT'S THE RETAIL PRICES, OF COURSE,

23   THAT THE INDIRECT PURCHASERS IN THIS CASE PAY AND

24   SO WE WOULD HAVE TO GET TO THE RETAIL OVERCHARGE,

25   IF YOU WILL, AND WE CAN DO THAT WITH THAT TWO STAGE

13

1    MODEL I JUST DESCRIBED.

2          HOWEVER, WE COULD HAVE A ONE STAGE MODEL

3    WHERE INSTEAD OF USING WHOLESALE PRICES AS THE

4    DEPENDENT VARIABLE WE USE RETAIL PRICES, THAT IS,

5    THE PRICES THAT APPLE AND ITS OWN STORES CHARGES

6    RETAILERS AND THE PRICES THAT ALL OF THE OTHER

7    RETAILERS THAT SELL APPLE IPODS CHARGE CONSUMERS.

8          THOSE WOULD BE -- THOSE RETAIL PRICES

9    WOULD BE THE VARIABLE OF INTEREST, THE ONE WE'RE

10   TRYING TO EXPLAIN.  AND THEN YOU WOULD HAVE THE

11   SUPPLY AND DEMAND SIDE VARIABLES AS WELL AS THE

12   INDICATOR VARIABLE FOR THE ALLEGED WRONGDOING.

13         AGAIN, IT COULD BE A BEFORE AND DURING

14   BENCHMARK IN THE SENSE THAT WE COULD HAVE THE

15   INDICATOR VARIABLE TAKE ON THE VALUE OF ONE FROM

16   SOME TIME IN 2003 TO THE PRESENT OR TO AT LEAST

17   SOME TIME IN 2009 WHEN APPLE REMOVED THE FAIR PLAY

18   DRM SOFTWARE FROM -- AT LEAST PARTIALLY REMOVED IT

19   FROM ITS PRODUCTS.

20         OR IT COULD, IT COULD BE A PRODUCT

21   BENCHMARK.  INSTEAD OF USING TIME AS A BENCHMARK

22   WHERE YOU HAVE A BEFORE PERIOD WHERE THE ALLEGED

23   WRONGDOING DIDN'T COME INTO PLAY, DIDN'T EXIST, YOU

24   COULD HAVE A BENCHMARK THAT IS A PRODUCT BENCHMARK,

25   THAT IS, YOU COULD USE THE PRICES OF OTHER DIGITAL

14

1    MUSIC PLAYERS AS THE BENCHMARK.

2         IF YOU'RE DOING THAT, THEN YOUR

3    OBSERVATIONS, THE DATA OBSERVATIONS THAT YOU'RE

4    PLUGGING INTO THE REGRESSION ARE THE PRICE FOR A

5    GIVEN PRODUCT OF A GIVEN MANUFACTURER SOLD AT

6    RETAIL BY A GIVEN RETAILER AND A GIVEN MODEL OF

7    THAT PRODUCT WOULD BE THE DATA INPUT OR AN

8    OBSERVATION IN THE DATA THAT'S GOING INTO THE

9    REGRESSION MODEL.

10        AND THEN YOUR INDICATOR VARIABLE NOW, ON

11   THE RIGHT-HAND SIDE OF THE EQUATION WOULD BE AN

12   INDICATOR VARIABLE FOR WHETHER THE PRODUCT IS AN

13   APPLE IPOD AS OPPOSED TO MICROSOFT ZOOM OR SOME

14   OTHER DIGITAL MUSIC PLAYER.

15        AND SO WHEN IT IS AN APPLE IPOD, THEN YOU

16   PUT IN ONE.  AND WHEN IT ISN'T, THEN IT WOULD BE

17   ZERO.

18        AND IF THAT IS STATISTICALLY SIGNIFICANT,

19   IT WOULD INDICATE THAT THERE IS A PREMIUM FOR BEING

20   APPLE, PRESUMABLY CAUSED BY THE ALLEGED WRONGDOING

21   IN THIS CASE.

22        AND SO YOU COULD HAVE THAT PRODUCT

23   BENCHMARK AS WELL.

24        AND SO IF YOU HAVE THAT, THEN YOU ONLY

25   HAVE A ONE STAGE MODEL.  YOU'RE DIRECTLY EXPLAINING

15

1    THE RETAIL PRICES AND IN EXAMINING THE IMPACT OF

2    THE ALLEGED WRONGDOING ON THOSE PRICES DIRECTLY AS

3    OPPOSED TO FIRST DETERMINED ON WHOLESALE AND THEN

4    SEEING IF IT'S PASSED THROUGH TO RETAIL AND IF IT'S

5    LIKE WE HAD IN THE TWO STAGE MODEL.

6            SO THOSE ARE VARIOUS MODELS, ECONOMETRIC

7    MODELS THAT I COULD YOU USE.  AND IN EITHER OF THEM

8    YOU COULD USE THE TEMPORAL BENCHMARK OR THE PRODUCT

9    BENCHMARK TO ATTEMPT TO ASSESS THE WRONGDOING.

10           SO THERE'S A TOTAL OF FOUR ECONOMETRIC

11   MODELS TO BE USED OR TO EXAMINE THE QUESTIONS AT

12   ISSUE OR THE ONES THAT I WAS ASKED TO EXAMINE

13   ANYWAY.

14   Q    ARE THESE MODELS ANY DIFFERENT FROM WHAT YOU

15   WOULD USE TO MEASURE MONOPOLIZATION OR ATTEMPTED

16   MONOPOLIZATION IN THE PORTABLE MEDIA PLAYER MARKET?

17   A    NO.  WHETHER YOU CALL IT A TIE OR WHETHER YOU

18   CALL IT JUST EXCLUSIONARY CONDUCT IN SOME PORTION

19   IT MEASURES THE EFFECT ON PRICE OF THAT CONDUCT.

20   Q    NOW, HAVE YOU USED A PROPOSED SIMILAR METHOD

21   IN THE PAST?

22   A    I DID A COUPLE OF CASES, ONE CASE A LONG TIME

23   AGO INVOLVING CARBON BLACK -- I'M SORRY, NOT CARBON

24   BLACK -- CARBON DIOXIDE IN WHICH I USED AN

25   INDICATOR VARIABLE FOR PRICE FIXING CONSPIRACY.

16

1    THAT WAS WAY BACK IN THE '80S.  AND THEN MORE

2    RECENTLY I DID A SETTLEMENT STUDY INVOLVING

3    DIAMONDS AND ALLEGED WRONGDOING IN THE DIAMOND

4    INDUSTRY, PARTICULARLY IN MONOPOLIZATION OF ROUGH

5    DIAMONDS.

6              AND MY FIRM HAS DONE NUMEROUS STUDIES AND

7    IN NUMEROUS CASES USING THESE KINDS OF MODELS AND

8    INDICATOR VARIABLES.

9    Q    DO ANY COME TO MIND?

10   A    WELL, THERE'S BEEN A NUMBER OF THEM.  THERE

11   WAS THE OSB ANTITRUST LITIGATION, EDPM ANTITRUST

12   LITIGATION, LINER BOARD.  LET'S SEE.  WHAT ELSE?  I

13   HAD A LIST OF THEM HERE.

14             POLYESTER STAPLES ANTITRUST LITIGATION,

15   MONOSODIUM GRANULATE ANTITRUST LITIGATION, CARBON

16   BLACK LITIGATION, FLAT GLASS ANTITRUST LITIGATION.

17             A LOT OF CASES IN WHICH THERE WAS SOME

18   ALLEGED WRONGDOING, AND WE USED AN ECONOMETRIC

19   MODEL WITH AN INDICATOR VARIABLE TO ASSESS IMPACT

20   AND DAMAGES IN THOSE CASES.

21             AND IN MOST OF THE CASES THERE WERE

22   INDICATOR VARIABLES FOR MOST OF THE PRODUCT OR

23   CUSTOMER FEATURES AS WELL.

24   Q    IS IT UNUSUAL TO HAVE MULTIPLE INDICATOR

25   VARIABLES IN A MODEL?

                                                    17

1    A    NO.  SOME OF THE MODELS THAT OUR FIRM HAS HAD

2    HAS HAD HUNDREDS OR EVEN THOUSANDS OF INDICATOR

3    MODEL, OR VARIABLES IN THE MODELS.

4    Q    IN THE FIELD OF STATISTICS AND ECONOMICS IS

5    REGRESSION ANALYSIS A WELL ACCEPTED METHOD OF

6    COMPUTING THE EFFECT OF SOME VARIABLE ON ANOTHER

7    VARIABLE SUCH AS PRICE?

8    A    YES.  IN FACT, IN THIS DAY AND AGE IT'S PRETTY

9    MUCH AN INDISPENSABLE TOOL OF AN ECONOMIST.  IT'S

10   THE MOST COMMON TOOL THAT WE USE BEYOND THE

11   ECONOMIC THEORY, OF COURSE.

12   Q    HOW, HOW DO THE REGRESSION ANALYSIS TELL YOU

13   THAT THERE IS OR IS NOT IMPACT IN THE ALLEGED

14   WRONGDOING IN THIS CASE?

15   A    WELL, THE THEORY THE PLAINTIFFS HAVE IN THE

16   CASE IS THAT THERE WAS THIS TIE OR FORECLOSURE WITH

17   THE DRM SOFTWARE THAT HAD THE EFFECT OF INCREASING

18   THE DEMAND FOR APPLE IPODS OR LOWERING THE DEMAND

19   FOR OTHER PRODUCTS.  SO THEREFORE THERE WAS AN

20   INCREASE IN DEMAND WHICH WOULD THEN -- OTHER THINGS

21   THE SAME WOULD INCREASE THE PRICE OF IPODS AND THAT

22   INCREASE IN PRICE WAS PAID BY ALL PURCHASERS OF

23   IPODS, ALL MODELS OF IPODS.

24        AND SO, THEREFORE, THAT'S HOW THERE WAS

25   IMPACT ON ALL CLASS MEMBERS.

                                              18

1           SO IF THE ECONOMETRIC MODEL SHOWS THAT

2    INDEED THERE WAS A PREMIUM FOR THE ALLEGED

3    WRONGDOING, THEN ALL MEMBERS OF THE CLASS WERE

4    IMPACTED BY THAT WRONGDOING.

5    Q    DOES THE MODEL THAT YOU'RE USING HAVE TO

6    ACCOUNT FOR 100 PERCENT OF THE VARIATIONS OF THE

7    PRICES?

8    A    NO.  I'VE NEVER SEEN AN ECONOMETRIC MODEL

9    WORKS THAT WELL WHERE 100 PERCENT OF THE DEPENDENT

10   VARIABLE IS EXPLAINED BY THE MODEL.  IF YOU CAN GET

11   50 OR 60 PERCENT OF THE VARIATION, THAT'S

12   CONSIDERED TO BE GENERALLY VERY GOOD.  ANYTHING

13   MORE THAN THAT IS REALLY GOOD.  AND SO YOU WOULDN'T

14   EXPECT TO GET 100 PERCENT.

15          WHAT IS IMPORTANT IS THAT YOU HAVE SOME

16   SUBSTANTIAL SHARE OF THE VARIATION EXPLAINED AND

17   THAT THE PARAMETERS OR THE COEFFICIENTS OF THE

18   DIFFERENT EXPLANATORY VARIABLES ARE STATISTICALLY

19   SIGNIFICANT, ESPECIALLY THE ONE YOU'RE MOST

20   INTERESTED IN, IN THIS CASE THE INDICATOR VARIABLE

21   FOR THE ALLEGED WRONGDOING.

22          IF THAT ONE IS NOT SIGNIFICANT, THEN I

23   WOULD THINK YOU WOULD FAIL TO SHOW AN EFFECT OF THE

24   WRONGDOING.

25   Q    NOW, CAN YOU EXPLAIN HOW THE ALLEGED TYING IN

19

1    THIS CASE COULD BE ANTICOMPETITIVE OR RESULT IN

2    SUPER COMPETITIVE PRICES?

3    A    I'M SORRY?  SAY THAT AGAIN.

4    Q    COULD YOU EXPLAIN HOW THE ALLEGED TYING IN

5    THIS CASE OR ALLEGED MONOPOLIZATION IN THIS CASE

6    COULD BE ANTICOMPETITIVE AND COULD CAUSE INCREASE

7    IN PRICES?

8    A    WELL, I THINK I BRIEFLY SAID IT A MINUTE AGO.

9    PRESUMABLY WHEN THERE'S A DESIRABLE PRODUCT IN

10   WHICH MONOPOLY POWER IS BEING EXERCISED LIKE THE

11   ITUNES MUSIC STORE, THE SHARE OF IT -- APPLE'S

12   SHARE OF THE DIGITAL DOWNLOAD MUSIC MARKET IS, I

13   DON'T KNOW, 70, 80 PERCENT, IT'S A VERY HIGH

14   PERCENTAGE.  SO THEY HAVE THE DOMINANT SHARE OF

15   THAT MARKET AND IT'S A DESIRABLE PRODUCT.  PEOPLE

16   WANT TO DOWNLOAD MUSIC FROM THE MUSIC STORE.

17         IF YOU HAVE THAT SITUATION AND THEN YOU

18   CREATE THIS SOFTWARE, THE FAIR PLAY DRM, WHERE THE

19   ONLY WAY THAT THAT MUSIC CAN BE DIRECTLY DOWNLOADED

20   INTO THE COMPUTERS OF THE CONSUMERS IS IF THEY HAVE

21   AN APPLE IPOD BECAUSE ONLY THE IPOD CAN DECODE THE

22   DRM SOFTWARE, THEN IT BOOSTS THE DEMAND FOR IPODS

23   TO THE EXTENT THAT PEOPLE WANT TO USE THE MUSIC

24   STORE, THAT IS, THEY WANT TO PURCHASE MUSIC ON LINE

25   FROM THE MUSIC STORE.

                                                    20

1          AND THAT --

2          THE COURT:  I WANT TO INTERRUPT JUST TO

3     CLARIFY ONE MATTER.

4          THE WITNESS:  SURELY.

5          THE COURT:  IT IS MY UNDERSTANDING

6     THAT -- BECAUSE I THINK THAT I FOLLOW YOUR

7     ANALYSIS, BUT THERE'S A FACTUAL QUESTION THAT IS --

8     NEEDS TO BE CORRECTED OR MAYBE YOU NEED TO EXPLAIN

9     HOW YOU SEE IT.

10          MY UNDERSTANDING IS THAT THE ITUNES MUSIC

11    CAN BE DOWNLOADED TO A COMPUTER WITHOUT THE USE OF

12    AN IPOD AND IT'S REALLY THE DOWNLOADING FROM THE

13    COMPUTER INTO THE IPOD THAT IS OF CONCERN HERE THAT

14    THE DRM SOFTWARE IS IMBEDDED SOMEHOW IN THE

15    DOWNLOAD TO THE COMPUTER AS WELL AS TO THE IPOD,

16    BUT YOU'RE SOUNDING AS THOUGH YOU SEE THE

17    CONNECTION AS BEING DIRECT; THAT IS, THAT THE MUSIC

18    IS DOWNLOADED FROM THE STORE INTO THE IPOD BUT

19    THERE IS AN INTERMEDIARY STEP.

20          THE WITNESS:  YEAH, IT HAS TO GO THROUGH

21    THE COMPUTER.  IT'S DOWNLOADED INTO THE COMPUTER

22    AND THEN INTO THE IPOD.

23          THE COURT:  BUT YOUR ANALYSIS MAY BE THE

24    SAME, I'M JUST TRYING TO MAKE SURE THAT I

25    UNDERSTAND IT FACTUALLY THAT PEOPLE DESIRE TO USE

                                                      21

1    THIS STORE OF 70 OR 80 PERCENT OF MUSIC, BUT YOU

2    SAID ARE PREVENTED FROM DOWNLOADING IT BY THE DRM

3    SOFTWARE.

4              THE WITNESS:  RIGHT.  DOWNLOADING IT INTO

5    A MUSIC PLAYER.

6              THE COURT:  INTO A PLAYER.  BUT THEY'RE

7    ABLE TO DOWNLOAD IT INTO THE COMPUTER.

8              THE WITNESS:  THEY'RE ABLE TO DOWNLOAD IT

9    ONTO A COMPUTER AND THEY CAN LISTEN TO IT DIRECTLY

10   ON THEIR COMPUTER IF THEY WANTED TO BUT THEY

11   COULDN'T LISTEN TO IT ON AN IPOD OR ANY OTHER MUSIC

12   PLAYER UNLESS IT HAS DRM SOFTWARE.

13             THE COURT:  YOU WERE ASKED HOW THIS

14   RESULTED IN ANTICOMPETITIVE PRICING.  ALL RIGHT.

15   SO START OVER.

16             THE WITNESS:  ALL RIGHT.  WELL, SINCE

17   PEOPLE ULTIMATELY WANT IT INTO THEIR PLAYER AND

18   THEY WANT TO USE IT IN THEIR PLAYER AND IT HAS VERY

19   GOOD SPEAKER AND SOUND QUALITY AND OTHER FEATURES.

20             SO THEY WANT TO GET IT INTO THEIR PLAYER

21   FROM THE MUSIC STORE, AND YOU CAN'T DOWNLOAD IT

22   FROM YOUR COMPUTER ONTO ANY PLAYER BUT AN IPOD

23   BECAUSE DIRECTLY THERE IS ONE OTHER WAY TO TRY TO

24   DO IT.  THAT YOU HAVE TO DO THAT IF YOU HAVE THE

25   DRM SOFTWARE.

22

1           AND THE DRM SOFTWARE, THE FAIR PLAY

2     SOFTWARE IS IMBEDDED IN THE IPOD AND IT'S SOMEHOW

3     IMBEDDED IN THE MUSIC ITSELF SO THAT YOU HAVE TO

4     PLAY IT ON AN MP3 PLAYER AND SO YOU HAVE TO DO --

5     YOU HAVE TO HAVE AN IPOD TO PLAY IT ON THAT.

6           SO NOW ONCE YOU DO THAT AND IF IT'S

7     DESIRABLE TO HAVE IT ON THE PLAYERS, AND THESE

8     PLAYERS HAVE BECOME VERY POPULAR NOW, THEY'RE VERY

9     MASS SOLD, MASS PRODUCT AND IN THE CONSUMER SPHERE,

10    AND SO THEY -- THE FACT THAT IT CAN BE DOWNLOADED

11    ONTO AN IPOD ULTIMATELY FROM THE MUSIC STORE THEN

12    ALLOWS AND CAUSES THE DEMAND FOR IPODS TO GO UP TO

13    THE EXTENT THAT ITUNES MUSIC STORE OR HAVING ACCESS

14    TO MUSIC TO ULTIMATELY BE DOWNLOADED TO YOUR PLAYER

15    IS DESIRABLE TO CONSUMERS.

16          WELL, WE KNOW THAT THE ITUNES MUSIC STORE

17    HAS VERY LARGE POPULARITY.  IT HAS A DOMINANT SHARE

18    OF THE MARKET.  SO IT'S CLEAR THAT PEOPLE WANT TO

19    USE THE MUSIC STORE.

20          AND THE QUESTION IS WHAT PLAYER ARE THEY

21    GOING TO PUT IT ON?  WELL, THE SOFTWARE SAYS IF

22    THEY WANT TO DOWNLOAD IT IN THE SIMPLEST AND

23    EASIEST WAY, THEY HAVE TO HAVE AN IPOD THAT DECODES

24    THE FAIR PLAYER SOFTWARE WHEN IT'S DOWNLOADED TO

25    THE PLAYER.  SO THAT INCREASES THE DEMAND FOR THE

23

1     PLAYER.

2              IF THE DEMAND FOR THE PLAYER GOES UP,

3     THEN THAT ALLOWS THE HIGHER PRICE TO BE PAID FOR

4     THE PLAYER.  AND IF THE ECONOMETRIC MODEL SHOWS

5     THAT INDEED THERE IS A HIGHER PRICE, THEN THAT

6     HIGHER PRICE IS PAID BY ALL PURCHASERS OF ALL IPOD

7     MODELS AND SO THERE IS IMPACT ON ALL CONSUMERS FROM

8     THIS CONDUCT.

9              MR. BRISKIN:  I HAVE NOTHING FURTHER.

10    I'LL RESERVE THE REST OF MY TIME.

11             THE COURT:  VERY WELL.  YOU MAY

12    CROSS-EXAMINE.

13                   **CROSS-EXAMINATION**

14    BY MR. MITTELSTAEDT:

15    Q    GOOD MORNING, DR. FRENCH.

16    A    HI.  HOW ARE YOU?

17    Q    GOOD.

18             WHAT YOU WERE JUST TALKING ABOUT JUST NOW

19    WAS A THEORY OF IMPACT; CORRECT?

20    A    THAT'S THE PLAINTIFF'S THEORY OF IMPACT, YES.

21    Q    AND THERE ARE A LOT OF REASONS THAT IPODS ARE

22    IN DEMAND; CORRECT?

23    A    YES, THAT'S WHY YOU HAVE TO HAVE ALL OF THE

24    OTHER EXPLANATORY VARIABLES IN THE MODEL.

25    Q    AND A LOT OF FACTORS THAT CREATE DEMANDS FOR

                                                        24

1    IPODS; CORRECT?

2    A    YES, AND THERE WOULD BE A LARGE NUMBER OF THEM

3    IN THE ECONOMETRIC MODELS.

4    Q    I'M NOT TALKING ABOUT YOUR MODEL RIGHT NOW.

5    I'M JUST ASKING A BASIC QUESTION.

6            HAVE YOU DONE ANY STUDY OF WHETHER THE

7    AVAILABILITY OF ITUNES MUSIC STORE INCREASES DEMAND

8    FOR IPOD OR WHAT PERCENT OF THE IPOD DEMAND IS

9    CREATED BY THE MUSIC STORE?

10   A    THAT'S WHAT THE ECONOMETRIC MODELS ARE

11   DESIGNED TO DO, BUT WE HAVE NOT YET RUN THEM.

12   Q    SO THE ANSWER IS NO YOU HAVEN'T?

13   A    NO.  I PROPOSED HOW YOU WOULD DO IT AND THAT

14   IT WOULD RELY ON COMMON EVIDENCE AND PROOF.  BUT WE

15   HAVEN'T DONE IT YET.  THAT WOULD BE DONE AT THE

16   MERIT STAGE.

17   Q    NOW, AT THE DEPOSITION YOU TOLD ME THAT THE

18   THEORY OF LIABILITY YOU HAD IN MIND WAS NOT THAT

19   THERE WAS ANYTHING WRONG WITH APPLE USING FAIR PLAY

20   DRM WHEN IT OPENED THE MUSIC STORE.

21           YOUR UNDERSTANDING OF THE THEORY WAS THAT

22   THE ALLEGED VIOLATION WAS THAT AT SOME TIME LATER

23   APPLE DECIDED NOT TO LICENSE FAIR PLAY TO

24   COMPETITORS; IS THAT CORRECT?

25   A    RIGHT.  IF, IF OTHER MANUFACTURERS OF DIGITAL

                                                    25

1    MUSIC PLAYERS COULD LICENSE THE FAIR PLAY SOFTWARE

2    FROM APPLE FOR A FAIR PRICE, A REASONABLE PRICE,

3    THEN THEY COULD, THEY COULD HAVE THEIR PLAYERS BE

4    ABLE TO DIRECTLY ACCEPT MUSIC FROM THE ITUNES MUSIC

5    STORE AS WELL AND THAT WOULD REMOVE THE ADVANTAGE

6    THAT APPLE HAS.

7    Q    UM --

8    A    AND YET THEY WOULD BE COMPENSATED THROUGH

9    ROYALTIES PRESUMABLY FROM THE OTHER MANUFACTURERS.

10   Q    APPLE WOULD BE ENTITLED TO A ROYALTY FOR THE

11   LICENSE; CORRECT?

12   A    OH, SURELY.

13   Q    EXCUSE ME?

14   A    SURELY.

15   Q    YOU TALKED ABOUT IPODS.  NOW, DO YOU KNOW WHAT

16   THIS IS?

17   A    I CAN'T SEE IT FROM HERE.

18   Q    TOO SMALL TO SEE?

19   A    WELL, YEAH, FOR ME.  I DON'T HAVE MY DISTANCE

20   GLASSES WITH ME.

21   Q    MAY I APPROACH?

22          THE COURT:  SURE.

23   BY MR. MITTELSTAEDT:

24   Q    HAVE YOU EVER SEEN THAT BEFORE?

25   A    NO, I HAVEN'T.  BUT IT LOOKS LIKE EARPHONES.

26

1    IT LOOKS LIKE YOU'RE CONNECTING EARPHONES TO

2    SOMETHING.

3    Q    HAVE YOU EVER SEEN THIS BEFORE?

4    A    IS THAT A FLASH MEMORY CARTRIDGE?

5    Q    MAY I APPROACH?

6    A    OH, NO.  THIS IS AN ATTACHMENT TO THE PART OF

7    THE IPOD, BUT I HAVEN'T SEEN IT BEFORE.

8    Q    ATTACHMENT TO AN IPOD?

9    A    IT LOOKS LIKE IT.  IT HAS IPOD WRITTEN ON IT.

10   Q    AND DO YOU KNOW WHAT THIS IS, THIS --

11   A    THAT'S ONE OF THE IPOD MODELS.

12   Q    WHAT MODEL?

13   A    I DON'T REMEMBER THE NAME OF IT.  I DON'T KNOW

14   IF IT'S THE NANO OR THE MINI.

15   Q    IN YOUR BEFORE PERIOD, AND YOU SAY THAT THE

16   BEFORE PERIOD ENDS SOME TIME BETWEEN APRIL OF 2003

17   AND A YEAR OR SO LATER?

18   A    SOME TIME IN THAT PERIOD.  PROBABLY NOT QUITE

19   AS LONG AS A YEAR THE ALLEGED WRONGDOING WOULD

20   START HAVING AN IMPACT.  IT WOULDN'T NECESSARILY

21   HAVE AN IMPACT ON DAY ONE.

22   Q    DO YOU KNOW IF THIS MODEL OF AN IPOD WAS

23   INTRODUCED BEFORE WHATEVER DATE?

24   A    I WOULD HAVE TO GO BACK AND LOOK BUT THERE

25   WERE ONLY I THINK THREE OR FOUR MODELS INTRODUCED

27

1    PRIOR TO THAT DATE AND THE REST WERE INTRODUCED

2    AFTERWARDS.

3    Q    DO YOU KNOW WHAT THIS ONE IS?

4    A    IT'S ONE OF THE OTHER MODELS IT LOOKS LIKE.

5    Q    DO YOU KNOW WHEN IT WAS INTRODUCED?

6    A    NO, I HAVEN'T LOOKED TO SEE WHEN EACH ONE WAS

7    INTRODUCED.

8    Q    TO BE CLEAR, YOU HAVE NOT DONE A REGRESSION

9    MODEL IN THIS CASE; CORRECT?

10   A    NO, I HAVE ONLY PROPOSED DOING IT.  I HAVEN'T

11   DONE THEM YET.

12   Q    AND YOU YOURSELF HAVE NOT SUBMITTED A

13   REGRESSION ANALYSIS IN ANY INDIRECT PURCHASER CASE;

14   IS THAT CORRECT?

15   A    ONLY FOR SETTLEMENT PURPOSES IN THE DIAMOND

16   CASES.

17   Q    AND YOU SUBMITTED ONE REGRESSION ANALYSIS IN A

18   DIRECT PURCHASER CASE AND THAT WAS 15 YEARS AGO;

19   CORRECT?

20   A    FOR THIS PURPOSE, FOR WHAT WE'RE MEASURING

21   HERE, YES.

22   Q    AND YOU DON'T HAVE A COPY OF THAT ONE?

23   A    DO I HAVE A COPY OF IT?  I WOULD HAVE TO GO

24   BACK AND LOOK.  I PROBABLY DON'T.  IT'S A LONG TIME

25   AGO.

28

1    Q    REMEMBER AT YOUR DEPOSITION I ASKED YOU IF YOU

2    HAD A COPY AND YOU SAID YOU WOULD LOOK?

3    A    I'M AFRAID I DIDN'T AND I SHOULD HAVE, BUT I

4    HAVEN'T.

5    Q    AND -- BUT YOU HAVEN'T PRODUCED A COPY OF?

6    A    NO, I HAVEN'T.

7    Q    IN FACT, YOU HAVEN'T PRODUCED A COPY OF ANY

8    REGRESSION YOU HAVE EVER DONE; IS THAT RIGHT?  IN

9    THIS CASE YOU HAVEN'T PRODUCED A COPY?

10    A    I DON'T THINK SO.

11    Q    IN CLASS CERTIFICATION MATTERS, YOU TESTIFY

12    FOR PLAINTIFFS; CORRECT?

13    A    GENERALLY IN CLASS ACTION CASES MY FIRM AND I

14    ARE HIRED BY PLAINTIFFS, YES.

15    Q    A REGRESSION MODEL CANNOT ISOLATE THE EFFECTS

16    OF TWO THINGS THAT HAPPEN AT THE SAME TIME AND LAST

17    FOR THE SAME PERIOD OF TIME; CORRECT?

18    A    NOT NECESSARILY.

19    Q    AND AT YOUR DEPOSITION YOU DID NOT KNOW HOW TO

20    ISOLATE THE EFFECT OF A NEW IPOD WITH A USB

21    CONNECTION FROM THE LAUNCH OF THE ITUNES MUSIC

22    STORE, ASSUMING THEY HAPPENED AT THE SAME TIME;

23    CORRECT?

24    A    WELL, AT MY DEPOSITION I HADN'T THOUGHT ABOUT

25    IT BEFORE.  SINCE THEN I HAVE SOME AND I THINK

29

1    THERE MAY BE A WAY TO EXPLORE THAT.

2    Q    AND IN ANY EVENT, AT YOUR DEPOSITION, YOU

3    HADN'T THOUGHT ABOUT IT OR YOU COULDN'T COME UP

4    WITH A WAY; CORRECT?

5    A    YEAH, I THINK I HAVE A WAY OF ISOLATING IT NOW

6    OR DETERMINING IF IT NEEDS TO BE ISOLATED.

7    Q    NOW, IN YOUR REPORT -- AT YOUR DEPOSITION, YOU

8    TOLD ME -- WELL, STRIKE THAT.

9             A KEY ELEMENT IN ANY BEFORE AND DURING

10   REGRESSION ANALYSIS IS TO KNOW THE DATE OF THE

11   DIVIDING LINE BEFORE THE -- BETWEEN THE BEFORE AND

12   DURING THE DURING PERIOD; CORRECT?

13   A    WELL, YOU'RE GOING TO HAVE TO ASSIGN A VALUE

14   OF ONE TO THE INDICATOR VARIABLE IN THE DURING

15   PERIOD AND A VALUE OF ZERO BEFORE THE PERIOD.

16             SO YES, YOU HAVE TO KNOW WHEN THE PERIOD

17   BEGINS, BUT YOU MIGHT NOT KNOW INITIALLY

18   THEORETICALLY AND YOU MAY HAVE TO RUN THE

19   REGRESSION MODEL WITH SEVERAL ALTERNATIVE BEGINNING

20   PERIODS AND LET THE RESULTS TELL YOU WHEN IT WAS

21   EFFECTIVE VERSUS WHEN IT WASN'T.

22   Q    AT YOUR DEPOSITION YOU SAID THAT THE DIVIDING

23   DATE COULDN'T POSSIBLY BE BEFORE OCTOBER OF 2003

24   WHEN ITUNES FOR WINDOWS WAS INTRODUCED; CORRECT?

25   A    I DON'T THINK I SAID POSSIBLY.  I SAID IT

30

1    LIKELY ISN'T BEFORE ITUNES FOR WINDOWS WAS

2    INTRODUCED, BUT I WOULDN'T RULE THAT OUT.  IT'S

3    POSSIBLE THAT IT BECAME EFFECTIVE WHEN IT WAS JUST

4    AVAILABLE FOR MACINTOSH COMPUTERS.

5    Q    AS YOU SIT HERE TODAY, THOUGH, YOU CAN'T TELL

6    US WHAT THE START OF THAT PERIOD IS, CAN YOU?

7    A    WELL, I THINK IT'S IN THIS WINDOW OF SOME TIME

8    BETWEEN APRIL OF '03 AND MAYBE AS LONG AS A YEAR

9    AFTERWARDS AND I WOULD RUN THE MODEL WITH DIFFERENT

10   ASSUMED STARTING DATES AND SEE WHICH ONE WAS --

11   REVEALS WHEN IT ACTUALLY HAD AN EFFECT, WHEN IT

12   STARTED HAVING AN EFFECT.

13                MR. MITTELSTAEDT:  NO FURTHER QUESTIONS.

14                THE COURT:  ANY REDIRECT?

15                MR. BRISKIN:  NO, YOUR HONOR.

16                THE COURT:  VERY WELL.  THANK YOU VERY

17   MUCH.

18                DO YOU HAVE FURTHER WITNESSES?

19                MR. BRISKIN:  NO, YOUR HONOR.

20                THE COURT:  ALL RIGHT.  DO YOU HAVE

21   WITNESSES?

22                MR. MITTELSTAEDT:  YES, YOUR HONOR.

23                THE COURT:  CALL YOUR WITNESS.

24                MR. MITTELSTAEDT:  THE DEFENDANT CALL

25   DR. BURTIS.

31

1          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

2                    **DR. MICHELLE BURTIS,**

3     BEING CALLED AS A WITNESS ON BEHALF OF THE

4     DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED

5     AND TESTIFIED AS FOLLOWS:

6          THE WITNESS:  YES, I DO.

7          THE CLERK:  PLEASE BE SEATED.

8          MR. MITTELSTAEDT:  YOUR HONOR, I'M GOING

9     TO USE A COUPLE OF CHARTS WITH THE WITNESS AND ASK

10    THE WITNESS TO DRAW ON THE EASEL.

11         WHERE WOULD BE THE BEST PLACE TO DO THAT?

12         THE COURT:  PROBABLY UP AGAINST THAT BACK

13    WALL SO WE CAN ALL SEE IT.

14         THE CLERK:  WOULD YOU PLEASE STATE YOUR

15    NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

16         THE WITNESS:  MICHELLE BURTIS,

17    B-U-R-T-I-S.

18                    **DIRECT EXAMINATION**

19    BY MR. MITTELSTAEDT:

20    Q    IF YOU WOULD STATE YOUR OCCUPATION, PLEASE?

21    A    I'M AN ECONOMIST.

22    Q    AND BY WHOM ARE YOU EMPLOYED?

23    A    CORNERSTONE RESEARCH IN WASHINGTON, D.C.

24    Q    AND HOW LONG HAVE YOU BEEN AN ECONOMIST?

25    A    ABOUT 20 YEARS.

                                                  32

1    Q    AND WHAT IS YOUR EDUCATION?

2    A    I HAVE A BACHELOR'S DEGREE IN ECONOMICS AND

3    POLITICAL SCIENCE FROM THE UNIVERSITY OF COLORADO

4    IN BOULDER AND A PH.D. IN ECONOMICS FROM THE

5    UNIVERSITY OF TEXAS IN AUSTIN.

6    Q    AND DO YOU HAVE EXPERIENCE IN USING AND

7    EVALUATING REGRESSION ANALYSES?

8    A    YES, I DO.  I'VE USED REGRESSION AND EVALUATED

9    REGRESSIONS SINCE I WAS AN UNDERGRADUATE THROUGH MY

10   EDUCATION AND IN MY WORK AS AN ECONOMIST.  I HAVE

11   EVALUATED THE MODELS THAT PLAINTIFF'S EXPERTS HAVE

12   PUT FORWARD IN CLASS CERTIFICATION PROCEEDINGS AS

13   WELL.

14   Q    AND HAVE YOU PARTICIPATED IN ANY LAWSUITS

15   WHERE AT THE CLASS CERTIFICATION STAGE THE

16   PLAINTIFF'S ECONOMIST ACTUALLY PRODUCED A

17   REGRESSION MODEL RATHER THAN JUST PROPOSING HOW HE

18   WOULD GO ABOUT DOING IT?

19   A    YES.  I WORKED FOR THE DEFENDANTS IN THE GPU

20   ANTITRUST LITIGATION AND BOTH A DIRECT PURCHASER

21   AND INDIRECT PURCHASER CASE THE PLAINTIFF'S EXPERTS

22   ACTUALLY ESTIMATED OR RAN -- THEY COLLECTED THE

23   DATA AND OBTAINED RESULTS IN THEIR REGRESSION

24   ANALYSIS.

25             THE COURT:  NOW, ALTHOUGH I DIDN'T HAVE

                                                    33

1    DR. BURTIS'S BACKGROUND MATERIAL BEFORE THIS, I

2    QUICKLY READ THROUGH HER RESUME.  I'M SATISFIED

3    THAT YOU CAN MOVE DIRECTLY TO HER OPINIONS AND THE

4    REASONS FOR IT.

5              MR. MITTELSTAEDT:  OKAY.

6    Q    LET'S STEP BACK AT THE START FROM THE ECONOMIC

7    AND ECONOMETRIC JARGON AND LOOK AT THE BIG PICTURE.

8    SO I WANT TO ASK YOU A COUPLE OF PRELIMINARY

9    QUESTIONS.

10             AT HIS DEPOSITION, HOW DID DR. FRENCH

11   DESCRIBE THE CONDUCT, THE EFFECT OF WHICH HE WAS

12   TRYING TO MEASURE?

13   A    DR. FRENCH -- THE CONDUCT THAT DR. FRENCH WAS

14   TRYING TO EVALUATE WAS APPLE'S DECISION NOT TO

15   LICENSE FAIR PLAY FOR THE DRM.

16   Q    AND IN BASIC TERMS, HOW IS HE PROPOSING TO DO

17   THAT?

18   A    THE BASIC FRAMEWORK THAT DR. FRENCH IS

19   PROPOSING HERE WITH HIS REGRESSION ANALYSIS IS A

20   BEFORE VERSUS DURING COMPARISON.

21             SO WHAT HE'S, HE'S -- WHAT HE'S PROPOSING

22   TO DO IS TO USE THE PRICES OF IPOD PRODUCTS THAT

23   WERE SOLD PRIOR TO THE ALLEGED CONDUCT AS A

24   BENCHMARK FOR THE PRICES OF THE PRODUCTS THAT WERE

25   SOLD DURING THE ALLEGED CONDUCT.

                                                    34

1           AND I HAVE SOME EXAMPLES OF PRODUCTS HERE

2   AND I CAN SORT OF SHOW YOU WHAT --

3   Q    SHOW US A COUPLE EXAMPLES OF WHAT HE'S TRYING

4   TO DO?

5   A    SO THIS IS AN IPOD CLASSIC.  IT WAS SOLD IN

6   2001.

7           IT'S THE FIRST IPOD.  IT HOLDS ABOUT A

8   THOUSAND SONGS.  IT HAS -- IT'S, YOU KNOW, THE SIZE

9   IS KIND OF HEAVY BY TODAY'S STANDARDS.  IT HAS A

10  LITTLE CLICK WHEEL.

11          SO THIS SOLD -- APPLE SOLD THIS FOR $399

12  IN 2001.  SO THIS IS A PRODUCT THAT HE WOULD USE AS

13  A BENCHMARK PRODUCT TO PREDICT THE PRICES OF

14  PRODUCTS LIKE THIS.

15          THIS IS A SHUFFLE THAT WAS RECENTLY

16  INTRODUCED IN 2009.  IT SELLS FOR $79 BY APPLE.  IT

17  HOLDS ABOUT 800 SONGS.  YOU CAN WEAR IT.  IT TALKS

18  TO YOU SINCE IT DOESN'T HAVE A SCREEN.  AND YOU CAN

19  PRESS A BUTTON AND A VOICE WILL TELL YOU THE SONG

20  AND THE PERSON WHO IS PLAYING THE SONG.

21          UM, AND YOU KNOW, IT'S JUST DIFFERENT

22  OBVIOUSLY.

23          SO THIS IS ANOTHER PRODUCT THAT IS SOLD

24  ONLY DURING THE "DURING PERIOD."  THIS IS A TOUCH,

25  AN ITOUCH.  IT HAS A WAY BIGGER SCREEN.  AND IT HAS

35

1      THE ABILITY TO CONNECT TO THE INTERNET.  IT HAS

2      PHOTOS.  IT -- THE SCREEN IS, IS, FRANKLY, QUITE

3      UNUSUAL.  YOU CAN FLIP IT AND IT, IT WILL -- LIKE

4      THIS.  AND YOU CAN JUST FLIP IT AND -- SO ANYWAY,

5      IT HAS FEATURES THAT THIS PRODUCT DOES NOT.

6           BUT THE BASIC IDEA OF DR. FRENCH'S

7      REGRESSION IS TO TAKE THESE PRODUCTS WITH THESE

8      FEATURES AND THEIR PRICES AND USE THOSE AS A

9      BENCHMARK TO PREDICT WHAT THE PRICES OF THESE

10     PRODUCTS WOULD HAVE BEEN ABSENT THE CONDUCT.

11     Q    IF APPLE HAD LICENSED FAIR PLAY?

12     A    THAT'S CORRECT.

13     Q    AND WHAT WAS THE PRICE OF THE SHUFFLE IN --

14     WHEN IT WAS INTRODUCED IN 2009?

15     A    $79.

16     Q    SO THE PRICE CAME DOWN FROM THE 399 PRICE?

17     A    WELL, IT'S A DIFFERENT PRODUCT.

18     Q    OKAY.

19     A    BUT IT IS A LOWER PRICE, YES.

20     Q    OKAY.  DO YOU HAVE AN OPINION ON WHETHER

21     DR. FRENCH'S PROPOSED MODELS FOR PREDICTING WHAT

22     THE PRICE OF THESE NEW DIFFERENT MODELS DURING THE

23     "DURING PERIOD" WOULD HAVE BEEN ABSENT THE ALLEGED

24     CONDUCT?

25     A    YES, I DO NOT BELIEVE THAT THE MODEL THAT

36

1    DR. FRENCH HAS PROPOSED, THE ONE HE HAS DESCRIBED

2    CAN BE USED TO DETERMINE THE PRICES OF THESE

3    PRODUCTS THAT WERE INTRODUCED IN THE "DURING

4    PERIOD."

5    Q    OKAY.  DID YOU DO A REGRESSION ANALYSIS IN A

6    PAPER THAT WAS PUBLISHED DEALING WITH THE KATRINA

7    HURRICANE?

8    A    YES.

9    Q    IN YOUR REPORT YOU WALK THROUGH EXAMPLES OF

10   HOW REGRESSION ANALYSES WORK.

11         I'D LIKE TO ASK YOU TO USE YOUR

12   REGRESSION ANALYSIS FOR THE KATRINA HURRICANE TO

13   EXPLAIN BASICALLY HOW REGRESSIONS WORK AND THEN USE

14   THAT AS THE BASIS FOR EXPLAINING YOUR OPINION THAT

15   DR. FRENCH'S PROPOSED MODELS WILL NOT WORK.

16   A    OKAY.

17   Q    FIRST OF ALL, WHAT WAS -- WHAT WERE THE EVENTS

18   THAT YOU WERE TRYING TO ANALYZE IN THE REGRESSION

19   MODEL FOR THE HURRICANE KATRINA?

20         AND, YOUR HONOR, WOULD IT BE OKAY FOR THE

21   WITNESS TO GO TO THE EASEL AND DRAW THIS?

22         THE COURT:  SURE.

23         LIZ, WE HAVE A LAPEL MIKE.  I DON'T KNOW

24   IF WE'RE DOWN TO ONE.

25         THE CLERK:  WE DO NOT.

37

1          THE COURT:  WE DON'T.  THERE'S A MIKE

2     SITTING ON THE FLOOR DOWN BY MY -- THE THING THAT

3     JACKSON TOOK OUT.

4          THE CLERK:  THOSE WERE TO ANOTHER

5     COURTROOM.  THEY WERE SITTING RIGHT HERE

6     (INDICATING)?

7          THE COURT:  NO, NO.

8          (DISCUSSION OFF THE RECORD.)

9          THE COURT:  GO AHEAD.  WE'LL TRY AND GET

10    YOU A MIKE.

11         THE WITNESS:  OKAY.  SO I WROTE A PAPER

12    ABOUT THE EFFECT OF THE HURRICANE KATRINA ON CRACK

13    SPREADS.  AND A CRACK SPREAD IS LIKE A REFINER'S

14    MARGIN.  IT'S THE DIFFERENCE BETWEEN THE PRICE, THE

15    SPOT PRICE OF THE PETROLEUM PRODUCT AND THE CRUDE

16    PRICE.

17         SO WHAT HAPPENED IS DURING -- WELL, CRACK

18    SPREADS BECAUSE THEY'RE BASED ON SPOT PRICES ARE

19    QUITE VOLATILE.  THEY MOVE AROUND DAY-TO-DAY,

20    WEEK-TO-WEEK.

21         AND WHAT HAPPENED WHEN KATRINA OCCURRED

22    IS THAT THERE WAS A TREMENDOUS INCREASE IN THE

23    PRICE OF PETROLEUM PRODUCTS IN THE GULF AND OTHER

24    PLACES IN THE UNITED STATES AS WELL WHICH CAUSED A

25    REALLY LARGE INCREASE IN THE REFINER'S MARGINS,

38

1    THESE CRACK SPREADS.

2           IN FACT, YOU KNOW, IF YOU REMEMBER THERE

3    WAS RITA THAT CAME ABOUT A MONTH AFTERWARD.  AND IT

4    HAD A SIMILAR EFFECT.  AND SO THE MODEL, I DID A

5    REGRESSION MODEL TO TRY TO PREDICT WHAT THE CRACK

6    SPREADS WOULD HAVE BEEN HAD THERE BEEN NO KATRINA.

7    BY MR. MITTELSTAEDT:

8    Q    WHEN YOU'VE DRAWN THE SQUIGGLY LINE BEFORE THE

9    EFFECT OF THE HURRICANE, FOR HOW LONG OF A TIME

10   PERIOD DID YOU HAVE DATA?

11   A    YEAH, THIS WAS NOT REALLY DRAWN TO SCALE.

12   THIS IS ABOUT A FIVE-YEAR PERIOD.  THIS IS -- THIS

13   REALLY WAS ABOUT A TWO-WEEK PERIOD.

14   Q    OKAY.

15   A    AND BASICALLY WHAT I DID IS I TRIED TO

16   UNDERSTAND THE FACTORS THAT DETERMINED CRACK

17   SPREADS.  I IDENTIFIED THOSE FACTORS, COLLECTED

18   DATA ON EACH OF THEM, AND THEN RAN A REGRESSION

19   MODEL OVER THIS PERIOD OF TIME WITH THOSE FACTORS.

20          SO, FOR EXAMPLE, THE CRACK SPREAD ITSELF

21   IS WHAT I'M TRYING TO EXPLAIN.  AND THE EXPLANATORY

22   VARIABLES THAT I USED WERE THE CRACK SPREAD IN THE

23   PRIOR WEEK WHICH IS IT TURNS OUT TO BE A VERY

24   IMPORTANT VARIABLE, CRUDE PRICES, INVENTORY LEVELS,

25   AND SOME SEASONAL VARIABLES.

                                                    39

1              SO I COLLECTED DATA ON ALL OF THESE

2       FACTORS OVER THIS FIVE-YEAR PERIOD.  I USED THAT

3       DATA IN THE REGRESSION.  OUT OF THAT DATA I GOT

4       RESULTS FOR EACH ONE OF THESE VARIABLES

5       (INDICATING).

6              AND THEN WITH THE ACTUAL DATA, FOR

7       EXAMPLE, FOR CRUDE PRICES IN THIS PERIOD I PLUGGED

8       THE RESULTS OF THE REGRESSION IN WITH THIS DATA TO

9       GET A PREDICTION OF WHAT THE CRACK SPREADS WOULD BE

10      DURING THIS PERIOD OF TIME.

11      Q    OKAY.  NOW, IF YOU WERE ABLE TO DO THAT WITH

12      THAT DATA, I WANT TO TALK TO YOU ABOUT WHY

13      DR. FRENCH'S PROPOSED MODEL WON'T WORK HERE.

14             AND LET'S GO THROUGH THE VARIOUS REASONS.

15      IF YOU WOULD START WITH THE FIRST REASON WHY

16      DR. FRENCH'S MODEL WILL NOT WORK.

17      A    OKAY.  WELL, WHAT I WAS DOING HERE WAS IN THIS

18      FIVE-YEAR PERIOD AND MY BEFORE PERIOD IS I WAS

19      USING CRACK SPREADS.  I WAS PREDICTING CRACK

20      SPREADS.

21             WHAT DR. FRENCH IS DOING IS THAT HE IS

22      USING CERTAIN PRODUCTS IN HIS BEFORE PERIOD TO

23      PREDICT THE PRICES OF COMPLETELY DIFFERENT

24      PRODUCTS.

25             IT WOULD BE AS THOUGH IN MY REGRESSION I

40

1    WAS USING THIS FIVE YEARS WORTH OF DATA TO PREDICT

2    THE PRICES OF CRACK SPREADS IN MY REGRESSION BUT

3    THEN I WANTED TO USE THAT -- THOSE REGRESSION

4    RESULTS TO PREDICT THE PRICE OF SOME NEW ETHANOL

5    PRODUCT THAT WAS INTRODUCED AFTER THE HURRICANE.

6            I COULDN'T DO THAT.  MY MODEL WOULD NOT

7    DO THAT AND SO THAT'S A FUNDAMENTAL DIFFERENCE

8    BETWEEN WHAT DR. FRENCH IS PROPOSING TO DO HERE AND

9    WHAT I DID IN THIS REGRESSION.

10   Q    OKAY.  LET'S TALK ABOUT THE DIFFERENT FEATURES

11   OR DIFFERENT DEMAND FEATURES OR FACTORS THAT CAME

12   INTO PLAY ONLY IN THE "DURING PERIOD" IN THIS CASE.

13           AND LET ME PUT THIS CHART UP.  IF YOU

14   WOULD LOOK AT IT ON YOUR SCREEN.

15   A    OKAY.

16   Q    WHAT DOES THIS CHART DEPICT?

17   A    THESE ARE FACTORS THAT AFFECTED THE DEMAND FOR

18   IPOD, AT LEAST POTENTIALLY, THAT EXISTED ONLY

19   DURING THE DURING PERIOD.

20           SO, FOR EXAMPLE, UM, WELL, I'LL TAKE ONE

21   OF THESE, THE VIDEO PLAYBACK.  THAT'S A FEATURE

22   THAT DID NOT EXIST IN THE PRIOR PERIOD, IN THE

23   BEFORE PERIOD.

24           WHAT DR. FRENCH'S MODEL CAN'T DO IS THAT

25   IT CANNOT -- THERE'S NO BENCHMARK FOR THE VALUE OF

41

1    THE VIDEO PLAY BACK.

2          SO HE -- HIS MODEL CANNOT DISTINGUISH THE

3    VALUE OF VIDEO PLAYBACK FROM ANY OVERCHARGE THAT HE

4    MIGHT MEASURE.

5    Q    AND ANY OVERCHARGE THAT HE WOULD ATTRIBUTE TO

6    THE NONLICENSING OF FAIR PLAY?

7    A    THAT'S CORRECT.  AGAIN, REMEMBER, HIS APPROACH

8    IS AS HE DESCRIBED IT JUST NOW, A DUMMY VARIABLE

9    APPROACH, WHICH MEANS THAT IT'S JUST A ZERO ONE.

10   IT DOESN'T SAY, OH, HERE'S, HERE'S -- I'M ACTUALLY

11   MEASURING THE EFFECT OF THIS CONDUCT.

12         THE DUMMY VARIABLE IS JUST PICKING UP

13   WHAT IS DIFFERENT ABOUT THE TWO PERIODS.

14         AND VIDEO PLAY BACK IS SOMETHING THAT IS

15   DIFFERENT IN THE TWO PERIODS.

16   Q    OKAY.  SO, FOR EXAMPLE, IF VIDEO PLAYBACK HAD

17   X PERCENT EFFECT ON THE PRICE OF AN IPOD, AND

18   DR. FRENCH DIDN'T INCLUDE THAT AND JUST PUT IN HIS

19   DUMMY VARIABLE, WHAT WOULD THE DUMMY VARIABLE SHOW?

20   A    IT WOULD BE X PERCENT OR IT WOULD BE THE X

21   PERCENT WOULD GET SOAKED UP, IF YOU WILL, IN THE

22   DUMMY VARIABLE COEFFICIENT.

23   Q    OKAY.  LET'S GO TO THE SECOND DEFECT IN WHAT

24   DR. FRENCH HAS PROPOSED COMPARED TO WHAT YOU DID

25   WITH KATRINA.

42

1    A    WELL, THE SECOND PROBLEM OR THE DIFFERENCE

2    BETWEEN WHAT I WAS DOING AND WHAT DR. FRENCH

3    PROPOSES TO DO IS THAT I WAS NOT TRYING TO PICK UP

4    THE EFFECT OF HURRICANE KATRINA.  I KNEW THERE WAS

5    AN EFFECT.  I COULD SEE IT IN THE DATA.  THERE WAS

6    A HUGE SPIKE.  EVERYBODY KNEW THERE WAS A

7    HURRICANE.  I KNEW THE DATE OF THE HURRICANE.

8         DR. FRENCH IS DOING SOMETHING DIFFERENT.

9    HE'S LOOKING TO SEE WHETHER OR NOT THERE IS AN

10   IMPACT OF SOME CONTACT.  AND THAT'S VERY -- THOSE

11   ARE VERY DIFFERENT THINGS.

12   Q    OKAY.  A THIRD DIFFERENCE HAVING TO DO WITH

13   DATA?

14   A    YES.  OKAY.  SO, AS I SAID, THIS WAS FIVE

15   YEARS OF DATA THAT I HAD IN MY REGRESSION.  IT WAS

16   WEEKLY DATA.  SO I HAD QUITE A BIT OF DATA.

17        BUT THE OTHER NICE THING THAT I HAD WAS

18   THAT MY DATA MOVED AROUND A LOT.  AND SO THE WAY

19   THAT A REGRESSION WORKS, ANY REGRESSION, IT WORKS

20   BY SORT OF CORRELATING THE MOVEMENTS IN THESE

21   VARIABLES WITH THE MOVEMENT IN THIS VARIABLE.

22        SO IF YOU HAVE A LOT OF MOVEMENT IN YOUR

23   DATA, A LOT OF CHANGES, THAT'S A LOT OF INFORMATION

24   FOR THE REGRESSION.  IT HELPS THE REGRESSION, YOU

25   KNOW, PROVIDE A RELIABLE RESULT.

43

1         IF YOU DON'T, IF YOU JUST HAVE PERIODS OF

2    TIME WHERE THERE'S NO CHANGES, THEN THERE'S NOT

3    INFORMATION FOR THE REGRESSION TO PRODUCE RELIABLE

4    RESULTS.

5         SO HERE I HAD A FAIRLY GOOD AMOUNT OF

6    DATA, AND IT WAS QUITE VARIABLE BECAUSE THESE

7    THINGS CHANGE.  THESE THINGS CHANGE EVERY SINGLE

8    DAY.

9         BY CONTRAST, DR. FRENCH'S BEFORE PERIOD

10   HAS FEW PRODUCTS AND FEW PRICES.

11   Q    DO YOU HAVE A CHART THAT REFLECTS THAT?

12   A    YES.

13   Q    IT'S ACTUALLY ON THE BACK OF THAT ONE.  CAN

14   YOU TURN THAT ONE AROUND?

15   A    YES.

16   Q    LET ME HELP YOU.  OKAY.  IF YOU WOULD DESCRIBE

17   THIS CHART, PLEASE.

18   A    THESE ARE THE PRICES OF IPODS, THESE ARE THE

19   RETAIL PRICES THAT APPLE SOLD IN IPODS FROM OCTOBER

20   OF 2001 THROUGH JANUARY OF 2004, WHICH, YOU KNOW,

21   BASED ON WHAT DR. FRENCH HAD DESCRIBED EARLIER, I

22   THINK WOULD ENCOMPASS THE DATES HE WOULD SELECT

23   POSSIBLY AS THE BEFORE PERIOD.

24        WHAT THIS CHART SHOWS IS DIFFERENT

25   GENERATIONS OF IPODS.  THESE ARE THE GREEN ONES ARE

                                                      44

1    ALL ONE GENERATION.  THEY ARE ALSO LABELLED IN

2    TERMS OF THE CAPACITY.  SO 5 GIGABYTE IS A 1000

3    SONGS, 10 GIGABYTES IS 2000 SONGS.

4         AND SO A FEW THINGS ABOUT THE CHART.

5    FIRST THERE AREN'T VERY MANY PRICES.  TWO IS THAT

6    THE PRICES TEND TO GO DOWN.

7         YOU CAN SEE HERE'S THE 10 GIGABYTE GOING

8    DOWN, 5 GIGABYTE GOING DOWN, BUT THERE'S NOT A LOT

9    OF CHANGES.  IT'S NOT LIKE IT'S HAPPENING EVERY

10   WEEK.

11        THIS IS OCTOBER OF 2001, AND THE NEXT

12   PRICE CHANGE IS JULY OF 2002.  SO THERE'S, YOU

13   KNOW, A FAIR AMOUNT OF TIME WHERE THE PRICES ARE

14   JUST, YOU KNOW, STEADY.

15   Q    AND, DR. BURTIS, THE JULY 2002 LINE, THE TOP

16   TWO ENTRIES THERE, THOSE DIAMONDS, THAT REFLECTS

17   WHAT?

18   A    YEAH.  SO THIS IS THE NEW GENERATION OF THE

19   PRODUCT AND WHAT YOU TEND TO SEE IS THAT THE PRICE

20   REDUCTIONS IN THE PRIOR GENERATION OCCUR WHEN THE

21   NEXT GENERATION GETS INTRODUCED.

22        SO, YOU KNOW, THE NEW 10 GIGABYTE CAME

23   OUT AND THE OLD 10 GIGABYTE PRICE FALLS.  THAT IS

24   THE, THE -- A VERY TYPICAL PATTERN.

25   Q    AND THEN IT'S REPEATED WITH THE APRIL 2003

45

1    THIRD GENERATION?

2    A    RIGHT.  THESE ARE THE RED ONES.

3    Q    OKAY.

4    A    YES.

5    Q    SO JUST TO GO ACROSS THE TOP LINE AT 499, THE

6    10 GIGABYTE FIRST GENERATION IS INTRODUCED IN MARCH

7    OF 2002; AND THEN IN JULY OF 2002 THE SECOND

8    GENERATION WITH TWICE THE CAPACITY FOR THE SAME

9    PRICE; AND THEN IN APRIL OF 2003 THE THIRD

10   GENERATION AT AN ADDITIONAL 10 GIGABYTE AND THE

11   PRICE STAYS THE SAME FOR THE GREATER CAPACITY AND

12   ADDITIONAL FEATURES OF THE THIRD GENERATION?

13   A    RIGHT.

14   Q    OKAY.  NOW, THERE IS NO SPIKE IN PRICES

15   FORMING THE DIVIDING LINE BETWEEN THE BEFORE AND

16   DURING PERIOD ON THE IPOD CHART COMPARED WITH YOUR

17   KATRINA CHART.  WHAT IS THE SIGNIFICANCE OF THAT?

18   A    WELL, IT, AS I SAID BEFORE, THERE'S NO

19   OBVIOUS -- IT'S NOT OBVIOUS WHAT WE'RE LOOKING FOR

20   HERE.

21        IT'S WHAT DR. FRENCH'S PROPOSED MODEL IS

22   SUPPOSED TO DO IS TO, IS, YOU KNOW, DETECT THIS

23   SOMEHOW.

24        AND IN MY KATRINA EXAMPLE IT WAS EASY,

25   YOU DIDN'T HAVE TO LOOK TOO HARD TO PREDICT IT.  IT

46

1    WAS OBVIOUS.  HERE IT IS NOT SO OBVIOUS AND THAT

2    MAKES IT MORE DIFFICULT.  IT MAKES IT MORE

3    DIFFICULT TO SEE WHAT THE EFFECT OF SOMETHING IS.

4    Q   OKAY.  AND IF YOU WOULD TAKE YOUR SEAT AND

5    LET'S TURN TO YOUR REVIEW OF PRICES IN THE LATER

6    PERIOD IN THE "DURING PAPER" AND LET ME PUT THIS

7    CHART UP.

8         CAN YOU BRIEFLY EXPLAIN WHAT THIS CHART

9    IS AND THE SIGNIFICANCE OF IT?

10   A   YEAH, THIS IS A CHART THAT SHOWS THE DATES OF

11   INTRODUCTION OF DIFFERENT PRODUCTS.

12        MINE IS PRETTY BLURRY.

13        MS. HAEGGQUIST:  YEAH, SO IS MINE.  I WAS

14   JUST GOING TO INTERRUPT.

15        MR. MITTELSTAEDT:  OKAY, LET'S FOCUS IT.

16        THE COURT:  YES, AND YOU ALSO HAVE THE

17   BOTTOM LIGHT ON WHICH IS THE X-RAY LIGHT INSTEAD OF

18   THE TOP LIGHT.

19        MR. MITTELSTAEDT:  IS THAT BETTER?

20        THE WITNESS:  A LITTLE BIT.  IT APPEARS

21   TO BE.

22        THE COURT:  YOU CAN ZOOM IN A LITTLE BIT

23   SO WE CAN SEE THE -- I TAUGHT THIS CLASS ON

24   ELECTRONIC EVIDENCE AND WE HAD A WHOLE SESSION ON

25   ELMO USE.

47

1          MR. MITTELSTAEDT:  I'LL TELL YOU, I'M OLD

2     FASHIONED ENOUGH.  CAN I JUST USE A HARD COPY?

3          THE COURT:  SURE.  YOU CAN GIVE THAT TO

4     THE WITNESS, BUT IT HELPS US TO SEE IT AS WELL.

5     THE MONITOR I NOTICE IS NOT ON FOR MY JURY OVER

6     THERE.

7          SO WE GET OUR ORIENTATION ON IT, CAN YOU

8     ZOOM IN ON IT SO WE CAN JUST KIND OF SEE IT.

9          THERE YOU GO.  JUST SLIDE IT OVER SO WE

10    CAN SEE THE DATA LINE.  COME IN EVEN CLOSER.

11          AND THERE'S AN AUTOFOCUS BUTTON THAT WILL

12    HELP YOU THERE.

13          THERE YOU GO.

14    BY MR. MITTELSTAEDT:

15    Q    I THINK YOU CAN COME IN EVEN CLOSER.  LIKE

16    THAT?

17          OKAY.  IF YOU WOULD JUST WALK US THROUGH

18    THAT BRIEFLY.

19    A    OKAY.  SO THIS IS A CHART THAT SHOWS THE DATES

20    THAT DIFFERENT PRODUCTS WERE AVAILABLE.

21          AND THE RED AND BLUE ARE JUST -- WERE

22    JUST ALTERNATING COLORS THERE SO THAT IT'S EASIER

23    TO SEE THE DIFFERENT PRODUCTS.

24          BUT BASICALLY WHAT THIS SHOWS, AND THE

25    LINE IS DRAWN SEPARATING THE LAST -- REALLY, THE

                                                    48

1    LINE IS DRAWN FOR JANUARY OF 2004.  AND SO WHAT

2    THIS SHOWS IS A FEW THINGS.

3              ONE IS THAT THERE ARE ONLY A FEW PRODUCTS

4    THAT ARE SOLD IN BOTH THE BEFORE PERIOD AND THE

5    DURING PERIOD.

6              AND THOSE ARE THE PRODUCTS REALLY THAT

7    ARE GOING TO BE USED, YOU KNOW, BECAUSE YOU CAN

8    ACTUALLY COMPARE THEM IN THE TWO -- THEIR PRICES IN

9    THE TWO PERIODS, THOSE ARE GOING TO BE THE ONES

10   THAT, THAT -- THOSE ARE THE BENCHMARK PRODUCTS

11   REALLY.

12             THE SECOND THING IS THAT THERE ARE, YOU

13   KNOW, ALMOST -- WELL, THERE ARE HOWEVER MANY THERE

14   ARE, NUMEROUS PRODUCTS THAT ARE SOLD ONLY DURING

15   THE DURING PERIOD.

16   Q    AND WHEN YOU LOOKED AT THE PRICES, WHAT

17   PATTERN DID YOU SEE IN THE DURING PRICES?

18   A    WELL, IT'S A VERY SIMILAR PATTERN.  THE PRICES

19   TEND TO BE STABLE FOR FAIRLY LONG PERIODS OF TIME.

20   THEY'RE NOT MOVING AROUND WEEK-TO-WEEK OR ANYTHING.

21             THEY TEND TO GO DOWN.  AND THEY GO DOWN

22   WHEN THE NEXT GENERATION OF PRODUCT IS INTRODUCED.

23   Q    SO WE'RE DEALING WITH PRICE DECREASES DURING

24   THE DURING PERIOD?

25   A    YES.

49

1    Q    OKAY.  LET'S GO TO THE FOURTH REASON.  WAS

2    THERE ANY DIFFERENCE IN THE TYPES OF VARIABLES THAT

3    YOU USED AND THAT DR. FRENCH IS PROPOSING TO USE?

4    A    THERE IS A DIFFERENCE BECAUSE THE VARIABLES

5    THAT I HAVE USED IN THE KATRINA PAPER WERE -- I WAS

6    FAIRLY COMFORTABLE THAT THOSE WERE THE IMPORTANT

7    VARIABLES THAT WERE -- THAT I COULD USE TO PREDICT

8    CRACK SPREADS AND IMPORTANTLY I COULD COLLECT DATA

9    ON ALL OF THOSE VARIABLES.

10           I COULD ACTUALLY INCLUDE THEM IN MY

11   MODEL.

12           IN THIS CASE -- SHOULD I TAKE ONE OF

13   THESE OFF?  DOES IT SOUND GOOD?

14           THE COURT:  NO, IT SOUNDS FINE.  BUT

15   MS. GARCIA CAN ADJUST IT.  IS IT TOO LOUD TO YOU?

16           MR. MITTELSTAEDT:  YOU'RE DOUBLE MIKED

17   NOW.

18           THE WITNESS:  EVERY ONCE IN A WHILE IT

19   SEEMS LIKE I WAS BOOMING, BUT IF IT'S OKAY.

20           THE COURT:  BOOMING IS GOOD.

21           THE WITNESS:  OH, OKAY.

22           SO IN THIS CASE FOR IPODS THERE ARE

23   FACTORS THAT MAY AFFECT THE PRICE OF IPODS THAT ARE

24   NOT MEASURABLE.

25           IN MY REPORT I TALK ABOUT COOLNESS, THAT

                                                    50

1    PEOPLE BUY THIS PRODUCT, THE DEMAND FOR THIS

2    PRODUCT IS AFFECTED BY THE PERCEPTION THAT IT'S

3    COOL.

4              THERE'S NO DATA ON COOLNESS.  AND SO WHAT

5    THAT MEANS IS YOU CAN'T PUT THAT VARIABLE IN THE

6    EQUATION.  YOU CAN'T PUT IT IN THE REGRESSION.

7              AND IF THERE IS AN IMPORTANT VARIABLE

8    THAT YOU CANNOT PUT IN THE REGRESSION, THEN THE

9    RESULTS THAT YOU GET OUT OF THE REGRESSION THAT YOU

10   ACTUALLY RUN WILL BE WRONG.

11             YOU KNOW, IN KATRINA CRACK SPREADS

12   WEREN'T COOL.  I DIDN'T HAVE THAT PROBLEM.

13             ANOTHER EXAMPLE IS APPLE'S PRICING

14   STRATEGY.  YOU SEE THEIR PRICES ARE CONSTANT OVER A

15   FAIRLY LONG PERIOD OF TIME.  THAT MEANS THAT THESE,

16   YOU KNOW, THESE PRODUCTS HAVE HUNDREDS OF

17   COMPONENTS.  AND IT'S VERY, IT'S VERY LIKELY THAT,

18   THAT THE PRODUCT -- THE COST OF SOME OF THOSE

19   COMPONENTS ARE MOVING AROUND OVER THE SIX-MONTH

20   PERIOD OR YEAR PERIOD THAT THE PRICE IS CONSTANT.

21             SO APPLE HAS DECIDED, FOR WHATEVER

22   REASON, THAT IT WANTS TO KEEP ITS PRICES AT A

23   CERTAIN LEVEL.

24             SO THAT'S ANOTHER PRICING STRATEGY, YOU

25   KNOW, IT'S A VARIABLE THAT IS VERY DIFFICULT TO

51

1    MEASURE AND TO INCLUDE IN A REGRESSION.

2            YOU MAY NOT BE ABLE TO MEASURE IT AND PUT

3    IT IN THE REGRESSION.

4    BY MR. MITTELSTAEDT:

5    Q    OKAY.  LET'S GO TO THE FIFTH AND FOR THIS

6    MORNING THE FINAL DIFFERENCE BETWEEN WHAT YOU DID

7    AND WHAT DR. FRENCH IS PROPOSING, SIMULTANEITY, CAN

8    YOU DISCUSS THAT?

9    A    YES.  WHAT I MEAN BY THAT IS THAT THERE ARE

10   EVENTS THAT OCCUR AT THE SAME TIME AS THE DUMMY

11   VARIABLE THAT DR. FRENCH WANTS TO USE TO MEASURE

12   IMPACT.

13           SO I'M JUST GOING TO GO OVER HERE ONE

14   MORE TIME.  SO WE DON'T KNOW WHEN THE BEGINNING OF

15   THE IMPACT PERIOD IS.

16           AND -- BUT AT VARIOUS TIMES I THINK MAYBE

17   EVEN TODAY DR. FRENCH SUGGESTED THAT APRIL OF 2003

18   COULD BE A POSSIBLE DATE THAT HE WOULD USE AS THE

19   BEGINNING OF THE IMPACT PERIOD.

20           AND REMEMBER THE WAY THAT THIS WORKS IS

21   IF THAT'S THE DATE, THEN HIS DUMMY VARIABLE IS

22   SIMPLY ZERO BEFORE THAT DATE AND THEN ONE AFTER

23   THAT DATE.

24           AND THAT VARIABLE, WHICH HE CALLS THE

25   MISCONDUCT INDICATOR VARIABLE, IS GOING TO PICK UP

52

1    WHATEVER DIFFERENCES THERE ARE BETWEEN THAT PERIOD

2    AND THAT PERIOD.

3              SO IF APRIL 2003 IS THE DATE THAT HE

4    SELECTS, THERE WERE OTHER -- THERE WERE THINGS THAT

5    HAPPENED IN APRIL OF 2003.  THERE WAS THE

6    INTRODUCTION OF THE MUSIC STORE.

7              THERE WERE -- THERE WAS THE INTRODUCTION

8    OF NEW PRODUCTS.

9              AND SO TO THE EXTENT THAT THOSE THINGS

10   CAUSED AN INCREASE IN A DEMAND FOR IPODS AND LED TO

11   IPOD PRICES BEING HIGHER, HIS MISCONDUCT VARIABLE

12   WILL PICK THAT UP.

13             BUT HE WILL ATTRIBUTE THAT TO MISCONDUCT

14   WHEN, IN FACT, ALL THAT MAY BE HAPPENING IS IPOD

15   DEMAND WENT UP BECAUSE THERE ARE MORE PRODUCTS OR

16   IPOD DEMAND WENT UP BECAUSE THERE WAS THE ITUNES

17   MUSIC STORE WHICH IS, YOU KNOW, THAT'S NOT THE

18   ALLEGED CONDUCT HERE.

19             SIMILARLY HE TALKS ABOUT OCTOBER 2003

20   BEING A POSSIBLE DATE.  AROUND OCTOBER OF 2003

21   THERE WAS THE INTRODUCTION OF NEW PRODUCTS.

22             IN OCTOBER OF 2003, ITUNES BECAME

23   AVAILABLE FOR WINDOWS.

24             AND WHAT THAT MEANT IS THAT THE -- YOU

25   KNOW, YOU COULDN'T REALLY USE AN IPOD IF YOU HAD A

                                                53

1    WINDOWS COMPUTER UNTIL OCTOBER OF 2003.

2              AND AT THAT TIME I DON'T KNOW WHAT THE

3    PERCENTAGE WAS ABOUT 90, 95 PERCENT OF THE

4    COMPUTERS WERE WINDOWS COMPUTERS.

5              SO THAT EVENT IN OCTOBER OF 2003

6    CERTAINLY COULD HAVE INCREASED THE DEMAND FOR

7    IPODS.

8              SO IF THE MISCONDUCT VARIABLE IS OCTOBER

9    2003 THEN, THEN -- AND YOU GET A NUMBER, IF YOU GET

10   10, THEN MAYBE YOU'RE JUST PICKING UP THE FACT THAT

11   ITUNES FOR WINDOWS WAS NOW AVAILABLE.

12             ANOTHER TIME IN HIS DEPOSITION DR. FRENCH

13   SUGGESTED THAT A COUPLE MONTHS AFTER ITUNES FOR

14   WINDOWS BECAME AVAILABLE SHOULD BE THE DATE.

15   AGAIN, THAT COULD BE THE INTRODUCTION OF NEW

16   PRODUCTS.

17             OR IT COULD JUST BE THAT, YOU KNOW, A

18   COUPLE OF MONTHS -- IT TOOK A COUPLE MONTHS FOR

19   PEOPLE WITH WINDOWS COMPUTERS TO START BUYING

20   IPODS.

21             SO THE PROBLEM HERE IS THAT WHEN YOU USE

22   A DUMMY VARIABLE, IF YOU WANT TO USE A DUMMY

23   VARIABLE, YOU HAVE TO BE SURE THAT THERE ARE NO

24   OTHER EVENTS THAT ARE OCCURRING, THAT ARE OCCURRING

25   AT THAT TIME BECAUSE IF THERE ARE, THE COEFFICIENT

54

1    THAT YOU GET OUT OF THAT REGRESSION IS -- IT CANNOT

2    TELL YOU HOW MUCH IS MISCONDUCT AND HOW MUCH IS THE

3    INTRODUCTION OF ITUNES.  IT CAN'T.  THERE'S ONLY

4    ONE COEFFICIENT, AND THERE'S ONLY ONE NUMBER AND

5    IT'S NOT GOING TO TELL YOU HOW MUCH IS, YOU KNOW,

6    WHICH OF THOSE EFFECTS.

7    Q    OKAY.  THANK YOU.  NOW, AS A RESULT -- YOU CAN

8    TAKE YOUR SEAT, IF YOU WOULD.

9              AS A RESULT OF ALL OF THOSE DIFFERENCES,

10   THE FIVE DIFFERENCES BETWEEN WHAT YOU DID AND WHAT

11   DR. FRENCH PROPOSES TO DO, HOW DOES THAT AFFECT HIS

12   ABILITY TO COME UP WITH A REGRESSION THAT ACTUALLY

13   WORKS?

14   A    WELL, YOU KNOW, I DO NOT BELIEVE HIS MODEL.  I

15   DON'T BELIEVE THAT THE ANSWER THAT HE WOULD GET OUT

16   OF THE MODEL WOULD RELIABLY SHOW OR MEASURE IMPACT.

17   Q    LET'S TALK BRIEFLY ABOUT THIS START DATE FOR

18   THE ALLEGED IMPACT PERIOD IF THERE WAS ANY IMPACT.

19              AT HIS DEPOSITION, NOT TODAY, BUT AT HIS

20   DEPOSITION HE SAID THAT HE WOULD DETERMINE THE

21   START DATE BY LOOKING AT MUSIC SALES AND LOOKING TO

22   SEE WHEN THERE WAS A QUANTUM LEAP IN MUSIC SALES.

23              DO YOU REMEMBER THAT?

24   A    YES.

25   Q    AND WHY DOESN'T THAT WORK?

55

1    A    BECAUSE -- SO WHAT HE'S TRYING TO FIGURE OUT

2    IS AT WHAT POINT IN TIME WERE PEOPLE BUYING IPODS

3    BECAUSE EVEN THOUGH THEY WANTED TO BUY SOME OTHER

4    MP3 PLAYER, THAT'S WHAT HE WANTS TO FIND THERE'S NO

5    REALLY CONNECTION BETWEEN THAT, BETWEEN WHAT HE'S

6    TRYING TO FIND, AND JUST LOOKING AT MUSIC SALES.

7         IN ORDER TO DETERMINE WHAT HE WANTS TO

8    DETERMINE, HE WOULD HAVE TO UNDERSTAND WHY PEOPLE

9    WERE BUYING IPODS AND WHETHER OR NOT THEY WERE

10   BUYING IPODS BECAUSE THEY LIKED IPODS OR THEY

11   HAD -- THEY FELT THAT THEY HAD TO BUY IPODS, YOU

12   KNOW, THAT'S THE ISSUE.

13   Q    OKAY.  YOU HEARD DR. FRENCH SAY THAT THE

14   THEORY WAS THAT APPLE SHOULD HAVE LICENSED FAIR

15   PLAY AT SOME POINT AND HE ACKNOWLEDGED THAT APPLE

16   COULD CHARGE A REASONABLE ROYALTY FOR THAT.

17        DOES HIS MODEL TAKE INTO ACCOUNT THAT

18   APPLE COULD CHARGE A REASONABLE ROYALTY IN THE

19   BUT-FOR WORLD UNDER THE PLAINTIFF'S THEORY?

20   A    NO.  AT LEAST AS HE HAS DESCRIBED IT, HE DOES

21   NOT -- IT DOES NOT TAKE THAT INTO ACCOUNT.

22        AND, OF COURSE, THE ISSUE THERE IS THAT

23   IF THESE COMPETITORS WERE PAYING APPLE A ROYALTY,

24   THE, THE -- THEY WOULD BE AT A COMPETITIVE

25   DISADVANTAGE FOR THAT REASON BECAUSE THEIR COSTS

56

1    WOULD BE HIGHER.

2            SO THAT WOULD HAVE THE -- THAT WOULD TEND

3    TO HAVE THE OPPOSITE EFFECT MAKING IPOD PRICES

4    HIGHER.

5    Q    OKAY.  SO IS IT POSSIBLE THAT GIVEN THE

6    ROYALTIES THAT WOULD BE PAID BY CUSTOMERS BY

7    COMPETITORS THAT THERE WOULD BE NO CHANGE IN THE

8    IPOD PRICE?

9    A    IT'S CERTAINLY POSSIBLE.

10   Q    LET'S SAY THAT THERE IS SOME IMPACT, BUT IT'S

11   SMALL.  DOES THE SIZE OF THE IMPACT AFFECT WHETHER

12   HIS MODEL WOULD WORK IN DETECTING THAT IMPACT, IF

13   ANY?

14   A    YES.  SO ANY REGRESSION, THE RESULTS OF ANY

15   REGRESSION ARE STATISTICS.

16           AND AROUND THOSE, YOU KNOW, YOU GET A

17   NUMBER OF TEN, BUT AROUND THAT NUMBER IS LIKE A

18   CONFIDENCE INTERVAL.

19           LIKE IN MY KATRINA REGRESSION I FOUND

20   THAT PREDICTED CRACK SPREAD OF 10, BUT I WAS 95

21   PERCENT CERTAIN THAT THE CRACK SPREAD WAS BETWEEN

22   15 AND 5, WHICH IS A PRETTY BIG, YOU KNOW, BIG

23   INTERVAL.

24           NOW, THAT WAS FINE FOR ME BECAUSE KATRINA

25   HAD A HUGE IMPACT ON THE CRACK SPREADS.

57

1          BUT IF IT HAD BEEN A SMALL IMPACT, THEN I

2     COULDN'T HAVE -- I WOULDN'T HAVE BEEN COMFORTABLE

3     CONCLUDING THAT THERE WAS ACTUALLY -- IT WOULD HAVE

4     GOTTEN LOST IN THAT BAND ESSENTIALLY.

5     Q    TWO LAST QUESTIONS.

6          DR. FRENCH MENTIONED TODAY THAT HE MIGHT

7     ALSO USE COMPETITORS' PRODUCTS AS A YARDSTICK.

8     THAT'S NOT REALLY SPELLED OUT IN HIS REPORT, BUT

9     WHAT IS YOUR REACTION TO WHETHER THAT WOULD WORK?

10    A    WELL, IT'S A VERY SIMILAR PROBLEM.  YOU WOULD

11    HAVE TO FIND A PRODUCT THAT HAD IDENTICAL

12    CHARACTERISTICS.

13         AND TO THE EXTENT THAT THEY WERE NOT

14    IDENTICAL, YOU WOULD NEVER BE ABLE TO KNOW IF THEY

15    WERE DIFFERENT IN PRICE IF THAT DIFFERENCE IN PRICE

16    WAS ATTRIBUTABLE TO THE CONDUCT OR WHATEVER WAS

17    DIFFERENT ABOUT THEM.

18         AND, YOU KNOW, THESE PRODUCTS ARE, YOU

19    KNOW, VERY DIFFERENTIATED PRODUCTS SO THAT'S GOING

20    TO BE VERY DIFFICULT TO DO.

21    Q    DR. FRENCH SAID THAT IF HE WOULD FIND A

22    PREMIUM, A DIFFERENCE BETWEEN AN APPLE PRODUCT AND

23    A COMPETITOR'S PRODUCT, PRESUMABLY THAT WAS CAUSED

24    BY FAILURE TO LICENSE.

25         DO YOU KNOW ANY BASIS FOR PRESUMING THE

                                                      58

1    ANSWER IN THIS CASE?

2    A    NO.

3    Q    AND THEN FINALLY, DR. FRENCH TALKED ONLY ABOUT

4    PRICES OF IPOD.  UNDER THEIR THEORY WHERE MUSIC

5    CAN'T BE PLAYED ON ALL COMPETING PRODUCTS, MUSIC

6    FROM ITUNES MUSIC STORE CAN'T BE PLAYED ON ALL

7    COMPETING PRODUCTS AT LEAST NOT WITHOUT BURNING AND

8    RIPPING, WHAT WOULD YOU EXPECT TO BE THE EFFECT ON

9    THE PRICE OF MUSIC AS COMPARED TO THE PRICE OF

10   IPOD?

11   A    WELL, THE ISSUE IS THAT WE WOULD HAVE TO

12   ANALYZE THAT, BUT WITHIN THEIR THEORY GIVEN THAT

13   THESE TWO PRODUCTS THAT THE MUSIC AND THE PLAYERS

14   ARE VERY CONNECTED, IF THERE WERE PEOPLE WHO

15   DECIDED THAT THEY DIDN'T WANT TO BUY ITUNES BECAUSE

16   THEY DIDN'T WANT THE IPOD, THEN IN THE BUT-FOR

17   WORLD WHERE THEY COULD HAVE ACCESS TO ITUNES WITH

18   ANY PLAYER, THEY WOULD GO OUT, THEY WOULD BUY THE

19   PLAYER, THAT WOULD INCREASE THE DEMAND FOR THE

20   MUSIC.

21         UNDER DR. FRENCH'S THEORY THAT INCREASE

22   IN THE DEMAND OF THE MUSIC WOULD LEAD TO AN

23   INCREASE IN PRICE.

24   Q    YOU'RE TALKING ABOUT THE BUT-FOR WORLD BUT

25   UNDER THEIR THEORY THE PRICE OF MUSIC WOULD HAVE AN

59

1   UNDERCHARGE AND THE IPOD WOULD HAVE AN OVERCHARGE?

2   A   THAT'S CORRECT, DEPENDING ON THE CONSUMER OR

3   HOW MUCH MUSIC THEY BUY THEY WOULD BE BETTER OFF OR

4   WORSE OFF IN THE BUT-FOR WORLD DEPENDING ON THE

5   SIZE OF THOSE TWO EFFECTS.

6   Q   THANK YOU.  THAT'S ALL OF THE QUESTIONS,

7   DR. BURTIS.

8        THE COURT:  YOU MAY CROSS-EXAMINE.

9                   **CROSS-EXAMINATION**

10  BY MR. BRISKIN:

11  Q   WOULD YOU CHARACTERIZE THE PORTABLE MUSIC

12  PLAYER AS COMPETITIVE DURING THE 2001 TO 2003

13  PERIOD?

14  A   I REALLY -- I DON'T KNOW.  I HAVE NOT REALLY

15  EVALUATED THAT.

16  Q   HOW ABOUT DURING THE 2003 TO 2009 PERIOD?

17  A   AGAIN, IT CERTAINLY HAS SOME CHARACTERISTICS

18  OF THAT, BUT IT'S NOT SOMETHING THAT I WAS ASKED TO

19  DO.

20  Q   NOW, THOSE PRICES UP THERE, ARE THOSE PRICES

21  TO INDIRECT PURCHASERS?

22  A   NOW THOSE ARE THE PRICES THAT APPLE SOLD IPODS

23  TO AND AT ITS RETAIL STORES.

24  Q   OKAY.  SO YOU'RE AWARE THAT THIS IS THE

25  INDIRECT PURCHASER CASE?

60

1    A    THAT'S CORRECT.

2    Q    SO I'M A LITTLE CONFUSED, IF THIS IS A

3    COMPETITIVE MARKET, WOULDN'T YOU TEND NOT TO RELY

4    ON THE DIRECT PURCHASER PRICES IN ANALYZING

5    PURCHASING IN THIS CASE?

6    A    WELL, THESE PRICES -- THE INDIRECT PURCHASER

7    PRICES TO THE EXTENT THAT THEY ARE DIFFERENT WOULD

8    BE I THINK SCATTERED AROUND THESE PRICES.

9    Q    HOW DO YOU KNOW THAT?

10   A    WELL, THERE'S SOME DATA THAT DR. FRENCH

11   PRODUCED THAT SUGGESTS THAT.

12   Q    HAVE YOU ANALYZED ANY OTHER PRICING DATA OTHER

13   THAN WHAT DR. FRENCH PROVIDED IN HIS REPORT?

14   A    JUST THESE AND DR. FRENCH'S DATA.

15   Q    WAS APPLE RESTRICTING THE PRICES THAT

16   RETAILERS COULD CHARGE FOR IPODS AT ANY TIME?

17   A    I DON'T BELIEVE SO.

18   Q    DO YOU KNOW?

19   A    BASED ON WHAT I KNOW THEY DID NOT RESTRICT THE

20   PRICES.

21   Q    SO CAN YOU REACH ANY CONCLUSIONS ABOUT WHETHER

22   PRICES ARE ACCURATELY REFLECTED HERE THAT HAVE

23   NOTHING TO DO WITH THE INDIRECT PURCHASES IN CASE?

24   A    YES.  I THINK THAT THESE ARE INFORMATIVE AND

25   REMEMBER ONE OF DR. FRENCH'S MODELS RELATES TO --

61

1   THE WHOLESALE PRICES THAT APPLE CHARGED TO THE

2   DEMAND AND SUPPLY FACTORS OF IPODS AND THESE

3   PRODUCTS -- THESE PRICES WOULD BE RELATED CERTAINLY

4   TO THOSE PRICES.

5   Q    SO YOU CAN SEE THAT THE -- THE PATH WOULD JUST

6   MEASURE SOME AMOUNT OF THE OVERCHARGE THAT IS IN

7   THESE PRICES?

8   A    I'M SORRY.  I DIDN'T UNDERSTAND.

9   Q    YOU HAVEN'T OPINED AT ALL ON THE TYING

10  ALLEGATIONS IN THIS CASE; CORRECT?

11  A    I'VE OPINED -- I'VE JUST OPINED WITH WHAT I

12  JUST TALKED ABOUT SO I'M NOT SURE WHAT YOU MEAN.

13  Q    WELL, YOU HAVEN'T OPINED ON WHETHER THE

14  ALLEGATIONS OF TYING IN THIS CASE COULD PRODUCE AN

15  OVERCHARGE?

16  A    NO, I HAVE NOT BEEN ASKED TO DO THAT.

17  Q    AND, IN FACT, YOU TESTIFIED THAT IT'S POSSIBLE

18  THAT THE TYING ALLEGATIONS IN THIS CASE COULD HAVE

19  PRODUCED AN OVERCHARGE?

20  A    I DON'T KNOW EXACTLY WHAT YOU'RE REFERRING TO

21  BUT IT WAS NOT SOMETHING THAT I --

22           MR. BRISKIN:  MAY I APPROACH THE WITNESS?

23           THE COURT:  CERTAINLY.

24           MR. MITTELSTAEDT:  COUNSEL, WHAT PAGE?

25           MR. BRISKIN:  150 AND 151.

62

1            THE WITNESS:  YES, I'VE --

2            (PAUSE IN PROCEEDINGS.)

3            THE WITNESS:  YES, I'VE READ IT.

4            THE COURT:  JUST WAIT FOR A QUESTION.

5            THE WITNESS:  I'M SORRY.

6     BY MR. BRISKIN:

7     Q    WAS IT YOUR TESTIMONY THAT IT'S POSSIBLE THAT

8     THERE COULD HAVE BEEN AN OVERCHARGE RESULTING FROM

9     THE ALLEGATIONS IN THIS CASE?

10    A    CAN I READ WHAT THE TESTIMONY SAYS OR --

11           THE COURT:  NO, NO.  YOU'VE BEEN ASKED

12    THAT QUESTION.  YOU HAVE TO ANSWER THAT QUESTION

13    AND IT COULD BE YES OR NO OR I DON'T KNOW.

14           BUT IF THE QUESTION IS UNDERSTOOD THEN

15    YOU HAVE TO ANSWER THE QUESTION.

16           THE WITNESS:  OKAY.  ASK AGAIN.  DID I

17    TESTIFY?

18    BY MR. BRISKIN:

19    Q    YOU TESTIFIED THAT IT'S POSSIBLE THAT THE

20    TYING ALLEGATIONS CASE COULD PRODUCE AN OVERCHARGE?

21    A    YES.

22    Q    HAVE YOU PERFORMED ANY STATISTICAL ANALYSIS OF

23    ANY OF THE PRICING INFORMATION FOR INDIRECT

24    PURCHASERS IN THIS CASE?

25    A    NO.

                                                    63

1    Q    HOW ABOUT DIRECT PURCHASERS?

2    A    NO.

3    Q    HAVE YOU MEASURED HOW MUCH CHANGE THERE WAS IN

4    IPOD PRICES IN ANY STATISTICAL WAY?

5    A    I'M SORRY, THE CHANGE IN IPOD?

6    Q    PRICES?

7    A    PRICES?

8    Q    IN ANY WAY?

9    A    WELL, I MEAN, LIKE YOU CAN SEE THEM HERE.

10    Q    RIGHT.

11    A    AND SO I CAN COMPARE THEM AND MEASURE THEM BY

12    SUBTRACTING THEM IF THAT'S WHAT YOU MEAN.

13    Q    RIGHT.  HAVE YOU DONE ANYTHING OTHER THAN --

14    HAVE YOU DONE ANY STATISTICAL -- USED ANY

15    STATISTICAL METHODS TO ANALYZE PRICES?

16    A    NO.

17    Q    HAVE YOU EXAMINED THE PRICES OF ANY COMPETITOR

18    PRODUCTS AT VIZIO?

19    A    NO.

20    Q    HAVE YOU ENGAGED -- HAVE YOU DONE ANY

21    STATISTICAL ANALYSIS OF ANY COMPETITOR PRODUCTS?

22    A    NO.

23    Q    HAVE YOU EVER SEEN REGRESSION ANALYSIS USED TO

24    ANALYZE THE PRICES OF SOMETHING THAT YOU WOULD

25    CONSIDER COOL?

64

1    A    I CAN'T THINK OF ANY AS I SIT HERE, NO.

2    Q    IS THE COOLNESS FACTOR SOMETHING THAT YOU

3    WOULD FIND IN AN ECONOMIC TEXTBOOK?

4    A    NO, I DON'T THINK SO.

5    Q    WHEN IS -- DO YOU KNOW WHEN THE FIRST TIME WAS

6    THAT YOU HEARD THE COOLNESS FACTOR MENTIONED?

7    A    I DON'T KNOW.

8    Q    IS IT POSSIBLE IT WAS IN THIS CASE?

9    A    WELL, THE NOTION OF COOLNESS I PROBABLY HEARD

10   WHEN I WAS IN FIFTH GRADE SO.

11   Q    HOW ABOUT THE TERM "COOLNESS FACTOR"?

12   A    YOU KNOW, THE USE OF THE WORD "FACTOR" FOR ME

13   IS I PROBABLY USE IT A HUNDRED TIMES A DAY SO I

14   DON'T KNOW.

15   Q    HOW ABOUT THE TERM "COOLNESS FACTOR"?

16   A    I DON'T KNOW WHEN I FIRST HEARD THAT OR USED

17   IT.

18   Q    ARE YOU FAMILIAR WITH THE STATE MICROSOFT

19   CASES INVOLVING MICROSOFT OFFICE AND EXPLORER?

20   A    NOT REALLY.

21   Q    DO YOU KNOW HOW MANY DIFFERENT KINDS OF

22   LAPTOPS AND COMPUTERS AND BRANDS OF COMPUTERS WERE

23   AT ISSUE IN THAT CASE IN THOSE CONSUMERS CASES?

24   A    I DO NOT.

25   Q    AND DO YOU KNOW IF THERE WAS A BEFORE OR

65

1    DURING PERIOD IN THOSE CASES?

2    A    I DO NOT KNOW WHAT WAS GOING ON IN THOSE

3    CASES.

4    Q    DO YOU KNOW WHETHER IF AT THE CLASS

5    CERTIFICATE STAGE THE EXPERT KNEW OF THE DIVIDING

6    LINE BEFORE AND DURING THE PERIODS WERE IN THOSE

7    ANALYSES?

8    A    NO.

9    Q    YOU HAVEN'T PROPOSED YOUR OWN MODEL TO

10   DETERMINE WHETHER THERE IS IMPACT AND DAMAGE IN

11   THIS CASE; IS THAT CORRECT?

12   A    THAT'S CORRECT.

13   Q    AND IN RESPONSE TO MY QUESTION ABOUT WHETHER

14   YOU COULD DO IT, YOU SAID YOU WOULD HAVE TO THINK

15   ABOUT IT; IS THAT CORRECT?

16   A    AT MY DEPOSITION?  I BELIEVE THAT'S CORRECT,

17   YES.

18   Q    I HAVE NOTHING FURTHER.

19           THE COURT:  ANY REDIRECT?

20           MR. MITTELSTAEDT:  JUST ONE QUESTION,

21   YOUR HONOR, JUST TO CLARIFY.

22                    **REDIRECT EXAMINATION**

23   BY MR. MITTELSTAEDT:

24   Q    DO YOU STILL HAVE THE DEPOSITION UP THERE?

25   A    YES.

66

1    Q    AND LET ME JUST READ IT.  YOU WERE ASKED THE

2    QUESTION:  "DO YOU HAVE AN OPINION ON WHETHER GIVEN

3    THOSE ALLEGATIONS THE PRICE OF IPODS COULD HAVE

4    BEEN HIGHER THAN THEY OTHERWISE WOULD HAVE BEEN, ET

5    CETERA?"

6              AND YOU SAY, "I WOULD JUST REPEAT WHAT I

7    WAS SAYING BEFORE, IT'S A COMPLICATED QUESTION.

8    IT'S NOT SOMETHING THAT I HAVE STUDIED OR ANALYZED,

9    AND I'M NOT GOING TO SPECULATE ON WHETHER IT DID OR

10   DIDN'T."

11             QUESTION BY MR. BRISKIN, "BUT IS IT

12   POSSIBLE THAT IT COULD HAVE?"

13             AND YOUR ANSWER WAS, "WHEN I SAY

14   SOMETHING IS POSSIBLE I MEAN MAYBE GRAVITY WOULD BE

15   SUSPENDED TODAY, THAT'S POSSIBLE.  SO IS IT

16   POSSIBLE?  ANYTHING IS POSSIBLE."

17             WAS THAT THE ANSWER YOU GAVE?

18   A    YES.

19   Q    OKAY.  THANK YOU.

20             THE COURT:  FURTHER QUESTIONS?

21             MR. BRISKIN:  WE WOULD LIKE TO OFFER

22   DR. FRENCH ON REBUTTAL IF THAT'S --

23             THE COURT:  CERTAINLY.  YOU MAY STEP

24   DOWN, DOCTOR.

25   /   /   /   /

                                                        67

1    /   /   /   /

2                **FURTHER DIRECT EXAMINATION**

3    BY MR. BRISKIN:

4    Q    AS AN ECONOMIST HAVE YOU EVER HEARD OF THE

5    TERM "COOLNESS FACTOR"?

6    A    NOT BEFORE THIS CASE.

7    Q    CAN YOU MEASURE COOLNESS?

8    A    UM, IT WOULD, IT WOULD -- IT DEPENDS.  I

9    THOUGHT ABOUT A WAY OF MEASURING IT IN THIS CASE.

10   I COULD GO TO THE BEFORE PERIOD AND PUT IN A DUMMY

11   FOR APPLE AGAINST THE OTHER PRODUCTS USED IN THE

12   OTHER PRODUCTS AS THE BENCHMARK BUT NOT BEFORE THE

13   MUSIC STORE WAS INTRODUCED AND SEE IF THERE'S A

14   PREMIUM IN THE BEFORE PERIOD.

15            IF THERE IS, THAT MIGHT BE ATTRIBUTABLE

16   TO SOMETHING WE MIGHT CALL THE COOLNESS FACTOR OR

17   THE BRAND FACTOR OR THE FACT THAT FOR WHATEVER

18   REASONS APPLES ARE DIFFERENTIATED AND PEOPLE LIKE

19   THEM, APPLE IPODS.

20            AND SO YOU COULD DO THAT, PERHAPS, UNLESS

21   SUPPOSE YOU HAVE A STATISTICALLY SIGNIFICANT

22   POSITIVE RESULT.

23            WELL, THEN WHEN YOU RUN THE OTHER MODELS

24   WHERE YOU PUT THE INDICATOR MODEL ONLY IN THE

25   DURING PERIOD THAT IS LATER, THEN IF YOU GET A

                                              68

1    STATISTICALLY SIGNIFICANT RESULT THERE, YOU MIGHT

2    SUBTRACT THE ONE YOU GOT THERE FROM THE COOLNESS

3    FACTOR FROM THAT IF YOU INDEED BELIEVE THAT THE

4    INDICATOR VARIABLE I PROPOSE IS PICKING UP BOTH THE

5    ALLEGED WRONGDOING AND SOMETHING CALLED THE

6    COOLNESS FACTOR.

7            BUT I MEAN, IF THERE IS A COOLNESS

8    FACTOR, IT'S IN EVERY INDUSTRY, EVERY PRODUCT,

9    EVERY CASE IN WHICH THERE'S A BRAND IN WHICH

10   THERE'S SOME PRODUCT DIFFERENTIATING FROM ONE

11   SELLER TO THE OTHER.  I'VE NEVER SEEN ANYONE REALLY

12   TRY TO TAKE THAT INTO ACCOUNT IN ANY OF THESE

13   REGRESSION MODELS IN ANY OF THESE OTHER CASES SO

14   I'M NOT SURE IT'S NECESSARY.

15           BUT THERE MIGHT BE A WAY TO LOOK INTO IT.

16   AND AS I JUST DESCRIBED AND I MAY WELL DO THAT AT

17   THE MERIT STAGE OF THE CASE.

18   Q    AND CAN A PRODUCT BE BOTH COOL AND OVERPRICED?

19   A    YES, IT COULD BE.

20   Q    AND COULD YOUR REGRESSION MEASURE THAT?

21   A    WELL, IN THE WAY I JUST DESCRIBED IT, IF I

22   FIND THAT I MIGHT BE ABLE TO ADJUST, IF YOU WILL,

23   WHAT OTHERWISE WOULD BE THE OVERCHARGE TO SUBTRACT

24   OUT THE COOLNESS FACTOR FROM THAT.

25   Q    AND IF THERE IS AN EVENT OCCURRING AT THE SAME

                                                        69

1     TIME AS THE INDICATOR VARIABLE FOR MISCONDUCT, HOW

2     WOULD YOU SEPARATE IT OUT OR ACCOUNT FOR THAT?

3     A    WELL, FIRST OF ALL, I'M NOT CONVINCED THAT

4     SUCH EXISTS.

5          I MEAN, IT WOULD HAVE TO BE A

6     STATISTICALLY SIGNIFICANT EFFECT.

7          AGAIN, ANOTHER THING I MIGHT DO IS LOOK

8     AT THE -- RUN THE MODEL WITHOUT THE INDICATOR,

9     WITHOUT THE INDICATOR FOR THE ALLEGED WRONGDOING AT

10    ALL AND JUST PUT IN INDICATORS FOR ALL OF THE OTHER

11    VARIABLES AND SEE WHICH ONES ARE STATISTICALLY

12    SIGNIFICANT AND WHICH ONES AREN'T.

13         AND IT REMAINS TO BE SEEN IF THERE IS ONE

14    WHOSE TIME PERIOD EXACTLY COINCIDES WITH THE

15    ALLEGED -- WITH THE INDICATOR VARIABLE FOR THE

16    ALLEGED WRONGDOING.

17         I'M NOT EVEN SURE THAT WILL BE TRUE, BUT

18    IF THERE IS, IT WOULD ONLY BE A PROBLEM IF IT'S

19    STATISTICALLY SIGNIFICANT OTHERWISE YOU COULD DROP

20    IT FROM THE MODEL BECAUSE IT DOESN'T HAVE A

21    SIGNIFICANCE ON PRICE.

22         A LOT OF THE VARIABLES AND OTHER THINGS

23    WE TALK ABOUT MAY WELL EFFECT PRICE AND THAT'S WHY

24    WE WOULD PUT THEM IN THE INITIAL SPECIFICATION OF

25    THE MODEL WHEN WE RUN THE MODEL, BUT A LOT OF THEM

70

1    MAY TURN OUT NOT TO BE STATISTICALLY SIGNIFICANT,

2    MEANING THAT THERE'S NO REAL EFFECT ON PRICE OF

3    THEM OR IT'S NEGLIGIBLE AND SO WE WOULD DO THAT ALL

4    ALONG THE WAY AS WE RUN DIFFERENT ALTERNATIVE

5    SPECIFICATIONS AND IN HER PETROLEUM TRACK STUDY

6    MICHELLE BURTIS I THINK RAN 30 SPECIFICATIONS ALONG

7    THE WAY.

8              WE WOULD DO THINGS LIKE THAT, TOO.  WE

9    WOULD RUN A NUMBER OF SPECIFICATIONS AND DEAL WITH

10   ANY STATISTICAL PROBLEMS OR SPECIFICATION PROBLEMS

11   THAT WE CAME UP WITH ALONG THE WAY AND THEN GET A

12   FINAL BEST MODEL, AND NO DOUBT THE DEFENDANTS WILL

13   CRITICIZE THAT MODEL, TOO, AT THE MERITS STAGE.

14   THAT'S PART OF WHAT HAPPENS AT ADVERSARIAL

15   PROCEEDINGS BUT THAT'S HOW WE WOULD PROCEED WITH

16   IT.

17             MR. BRISKIN:  I HAVE NOTHING FURTHER.

18             THE COURT:  ANY CROSS?

19                **FURTHER CROSS-EXAMINATION**

20   BY MR. MITTELSTAEDT:

21   Q    DR. FRENCH, I ASKED YOU AT YOUR DEPOSITION

22   WHETHER YOU KNEW ANY WAY TO MEASURE IN YOUR

23   REGRESSION ANALYSIS A COOLNESS FACTOR.  DO YOU

24   REMEMBER THAT?

25   A    YEAH, I COULDN'T THINK OF ANY DURING MY

71

1    REGRESSION BUT IT'S BEEN ON MY MIND SINCE AND SO I

2    THOUGHT ABOUT IT SINCE.

3    Q    I CAN IMAGINE.  WHEN YOU LOOK IN THE BEFORE

4    PERIOD AND YOU SEE THAT APPLE'S IPOD HAS A PREMIUM

5    OVER A COMPETITOR --

6    A    UH-HUH.

7    Q    -- THAT COULD REFLECT THAT APPLE'S PRODUCT WAS

8    DIFFERENT FROM A COMPETITORS.  IT COULD HAVE BEEN

9    THAT IT WAS SMALLER, FOR EXAMPLE.  IT COULD HAVE

10   BEEN ANY NUMBER OF THINGS?

11   A    WHAT YOU'RE REALLY TALKING ABOUT WHEN YOU SAY

12   COOLNESS FACTOR IS THAT APPLE IS DIFFERENTIATING IN

13   SOME FASHION.  IT'S A BRAND AND A DIFFERENT BRAND

14   THAN THE OTHERS.  IT'S NOT EXACTLY THE SAME AS THE

15   OTHERS OR AT LEAST IT'S NOT PERCEIVED TO BE THE

16   SAME IN THE MINDS OF CONSUMERS AND IT MAY BE MORE

17   DESIRABLE, THAT'S WHAT I WOULD CALL THE COOLNESS

18   FACTORS ALL OF THE OTHER WAYS IT'S DIFFERENTIATED

19   FROM OTHERS.

20   Q    THERE ARE A LOT OF BRANDS THAT DON'T HAVE A

21   COOLNESS FACTOR ASSOCIATED WITH IT; CORRECT?

22   CHEVRON GASOLINE, FOR EXAMPLE, THAT DOESN'T -- THAT

23   HAS A BRAND BUT NOT A COOLNESS FACTOR; CORRECT?

24   A    PROBABLY NOT BECAUSE IT'S A HOMOGENEOUS

25   PRODUCT AND THERE'S NO REAL DISTINCTION BETWEEN IT

72

1     AND EXXON AND SHELL OR WHAT HAVE YOU.

2          BUT IT'S CONCEIVABLE THAT THERE'S A BRAND

3     EFFECT EVEN ON SUCH A HOMOGENOUS PRODUCT.

4     Q    AND THERE ARE DIFFERENCES BETWEEN APPLE'S

5     IPODS, THE VARIOUS MODELS, AND COMPETITOR'S

6     PRODUCTS; CORRECT?

7     A    YES, THAT'S WHY I WOULD USE ALL OF THESE

8     PRODUCT CHARACTERISTICS FOR BOTH THE IPOD MODELS

9     AND THE OTHER MODELS AND THE MODELS IN THE

10    OBSERVATIONS THAT I'M LOOKING AT.

11          IT'S EXACTLY THEY'RE ALL INCLUDED EXACTLY

12    TO SEPARATE OUT THEIR INFLUENCE FROM THE ALLEGED

13    WRONGDOING INFLUENCE.

14    Q    DO YOU KNOW WHEN THE COOLNESS FACTOR KICKED

15    IN, WHEN THAT BECAME A FACTOR AFFECTING THE DEMAND

16    FOR IPODS?  DO YOU THINK IT KICKED IN ON OCTOBER OF

17    2001 WITH THE FIRST INTRODUCTION?

18    A    I DON'T KNOW.

19    Q    MAY I APPROACH THE CHART, YOUR HONOR?

20          ON THIS DUMMY VARIABLE IDEA, IF YOU THINK

21    THE START OF THIS PERIOD WAS APRIL 2003, YOU WOULD

22    PUT IN A DUMMY VARIABLE HERE; RIGHT?

23    A    YOU MEAN FOR THE ALLEGED WRONGDOING?

24    Q    WHEN --

25    A    WHENEVER YOU THINK IT STARTED, THAT'S WHEN IT

73

1    WOULD BECOME ONE.

2    Q    OKAY.  SO LET'S SAY YOU THOUGHT IT WAS APRIL

3    OF 2003 SO YOU PUT IN A ONE HERE?

4    A    YES.

5    Q    AND WHAT THAT VARIABLE WOULD PICK UP WOULD BE

6    EVERYTHING THAT AFFECTED THE DEMAND OR THE PRICE

7    FOR THE IPOD THAT OCCURRED AT THIS TIME; RIGHT?

8    A    WELL, NO.  I WOULD HAVE OTHER INDICATOR

9    VARIABLES FOR ALL OF THOSE PRODUCTS AND ALL OF

10   THOSE MODELS.

11   Q    AND YOU WOULD HAVE AN INDICATOR FOR THE

12   INTRODUCTION OF THE ITUNES MUSIC STORE; RIGHT?

13   A    NO.  I WOULDN'T HAVE AN INDICATOR FOR IT.  THE

14   WAY I WOULD TRY TO ATTRACT THAT IS WHAT I SAID

15   EARLIER.

16         I WOULD MEASURE THE NUMBER OF THE SONGS

17   IN THE LIBRARY OF THE ITUNES MUSIC STORE OVER TIME.

18   Q    BUT IF YOU HAVE A DUMMY VARIABLE HERE THAT

19   PICKS UP THE THINGS THAT YOU HAVEN'T ACCOUNTED FOR

20   WITH OTHER VARIABLES THAT OCCURRED IN APRIL OF

21   2003, YOU WOULD HAVE A PROBLEM TO THE EXTENT THAT

22   THE MUSIC STORE INCREASED DEMAND FOR IPODS IN A WAY

23   THAT IS NOT CHALLENGED IN THIS CASE; CORRECT?

24   A    WELL, THAT'S WHY I'M GOING TO PUT IN THE

25   NUMBER OF SONGS.  THE MORE SONGS IT HAS, THE MORE

74

1    IT WOULD INCREASE THE DEMAND FOR REASONS OTHER THAN

2    FAIR PLAY SOFTWARE.

3    Q    OKAY.  DIDN'T YOU TELL ME AT THE DEPOSITION

4    THAT IF YOU HAVE TWO THINGS OCCURRING AT THE SAME

5    TIME AND YOU PUT IN DUMMY VARIABLES FOR BOTH OF

6    THEM, YOU CAN'T TELL WHAT, WHAT -- WHICH VARIABLE

7    IS GETTING THE MISCONDUCT ATTRIBUTED TO IT -- LET

8    ME PUT IT DIFFERENTLY.

9         IF YOU HAVE TWO DUMMY VARIABLES AT THE

10   SAME TIME, FIRST OF ALL, YOU CAN'T DO THAT, CAN

11   YOU?  YOU CAN'T USE TWO DUMMY VARIABLES AT THE SAME

12   TIME?

13   A    WELL, YOU PROBABLY SHOULDN'T NECESSARILY, BUT

14   YOU CAN UNDER CERTAIN CIRCUMSTANCES AND YOU HAVE TO

15   FIRST CHECK, AS I SAID I WOULD, WHETHER THEY'RE

16   STATISTICALLY SIGNIFICANT.

17        IF SOME OF THEM DON'T HAVE ANY NEGLIGIBLE

18   EFFECT WHEN YOU TEST THEM SEPARATELY ON THE PRICE,

19   THEN YOU WOULDN'T INCLUDE THEM IN THE MODEL AT ALL

20   BECAUSE THEY HAVE NO EFFECT ON PRICE.

21   Q    IN ANY EVENT, DR. FRENCH, YOU HAVE NOT

22   ACTUALLY RUN A MODEL FOR THIS CASE, HAVE YOU?

23   A    NO, BUT WE HAVE AND IN ALL OF THESE OTHER

24   CASES THAT I MENTIONED AND SOME OF THEM HAVE AS

25   MANY AS A COUPLE OF THOUSAND DUMMY VARIABLES WHICH

75

1     ALL HAVE DIFFERENT TIME PERIODS AND ALL OF THE SAME

2     ISSUES THAT DR. BURTIS AND YOU WERE TALKING ABOUT

3     IN THIS CASE.

4     Q     DO YOU HAVE A COPY THAT YOU CAN GIVE US OF ANY

5     REGRESSION THAT YOU YOURSELF HAVE RUN THAT YOU HAVE

6     SUBMITTED IN THE LITIGATION?

7     A     WELL, I COULD GO BACK AND LOOK AND SEE IF I

8     HAVE IT.  I TOLD YOU I HAD THE DIAMOND CASE ONE.

9     Q     OKAY.  THAT'S WHAT I ASKED YOU TO LOOK FOR;

10    RIGHT?

11    A     NO, THE DIAMOND CASE.

12    Q     THANK YOU.  NO FURTHER QUESTIONS.

13            THE COURT:  FURTHER QUESTIONS?

14            MR. BRISKIN:  YOUR HONOR, DR. FRENCH WAS

15    REFERRING TO A LIST OF CASES AND IF THE COURT PERMITS

16    WE CAN SUBMIT IT AS ADDITIONAL MATERIAL.

17            THE COURT:  IT'S NOT INFORMATIVE.

18            MR. BRISKIN:  VERY WELL.  NOTHING

19    FURTHER.

20            THE COURT:  VERY WELL.  THE WITNESS IS

21    EXCUSED.  THANK YOU.

22            (PAUSE IN PROCEEDINGS.)

23            THE COURT:  VERY WELL.  I WAS JUST

24    CHECKING TO REMIND MYSELF THERE IS A CASE

25    MANAGEMENT CONFERENCE THAT WE HAVE IN ANOTHER PART

                                                    76

1    OF THIS CASE, BUT I WANTED TO GIVE YOU AN

2    OPPORTUNITY AT LEAST TO HAVE ABOUT FIVE MINUTES

3    EACH TO COMMENT ON WHAT YOU THINK THE COURT SHOULD

4    DRAW FROM THE EVIDENCE, AND THEN I'LL TAKE THIS

5    PART UNDER SUBMISSION WITH RESPECT TO THE MOTION.

6              MR. BRISKIN:  THANK YOU, YOUR HONOR.

7              APPLE HAS GIVEN A NICE PREVIEW OF WHAT

8    KIND OF CASE IT MIGHT PRESENT AT TRIAL, BUT AT THE

9    CLASS CERT STAGE THE STANDARD IS PRETTY DIFFERENT.

10             DR. FRENCH HAS SET OUT THE KIND OF

11   REGRESSION ANALYSIS THAT HE WOULD DO BASED ON A

12   MARKET ANALYSIS TO DETERMINE ANTITRUST IMPACT AND

13   DAMAGES.

14             AND IT'S NOT HIS BURDEN TO SHOW THAT THE

15   MODEL WILL WORK.  HE HAS TO SHOW THAT HE CAN

16   SPECIFY A MODEL THAT HE CAN USE THAT CAN SHOW

17   IMPACT AND DAMAGES ON A CLASS WIDE BASIS.

18             THERE ARE MANY CASES THAT ARE INSTRUCTIVE

19   HERE THAT WE CITE IN OUR CASE, BUT ONE I WANT TO

20   HIGHLIGHT IS THE EDPM CASE WHICH WAS RECENTLY

21   ISSUED.

22             IN THAT CASE MERIT DISCOVERY WAS ALMOST

23   COMPLETE AT THE TIME THE COURT TOOK UP THE CLASS

24   CERT MOTION AND PLAINTIFF'S EXPERT PROPOSED TO

25   REDUCE FORM MULTIPLE REGRESSION EQUATION, A SINGLE

77

1    EQUATION THAT TAKES INTO CONSIDERATION THE FACT OF

2    BOTH SUPPLY AND DEMAND AS WELL AS THE IMPACT OF THE

3    ALLEGED CONSPIRACY.

4              THAT'S THE SAME TYPE OF REGRESSION

5    ANALYSIS THAT DR. FRENCH HAS PROPOSED HERE.

6              THE TIME PERIOD IN THAT CASE WASN'T

7    CERTAIN AND SIMILAR TO HERE YOU CAN'T ALWAYS KNOW

8    EXACTLY HOW AN ANTITRUST IMPACT IS GOING TO REVEAL

9    ITSELF OVER TIME BUT YOU TEST YOUR HYPOTHESIS BY

10   RUNNING DIFFERENT RUNS OF THE REGRESSION.

11             NOW, THE DEFENSE ARGUED JUST LIKE THE

12   DEFENDANT HERE THAT THE CONSPIRACY DUMMY VARIABLE

13   IS TOO INDEFINITE TO CAPTURE ANYTHING AND KEY

14   VARIABLES WERE MISSING.

15             SO THE DEFENDANTS ARE ASKING THE COURT TO

16   DETERMINE WHICH REGRESSION MODEL IS THE MOST

17   ACCURATE THE COURT SAID, WHICH IS ULTIMATELY A

18   MERITS DECISION.

19             A LESSON FROM EDPM IS THAT THE INQUIRY

20   HERE IS WHETHER THE PLAINTIFFS HAVE OFFERED A

21   METHOD OF PROOF THAT IS COMMON.

22             BY THIS STANDARD IT'S CLEAR THAT THE

23   DEFENDANT IS NIBBLING ON THE EDGES BY USING

24   ANECDOTAL DATA ABOUT PRICES IT LIKES AND DID WE USE

25   A VARIABLE FOR USB OR DID WE USE THE RIGHT VARIABLE

                                                    78

1    FOR VIDEO PLAYBACK.

2              NOW, OUR THEORY OF THE CASE IS THAT WHEN

3    THE IPOD WAS FIRST INTRODUCED IT WAS WELL RECEIVED,

4    BUT IT WASN'T ACTUALLY THAT POPULAR.  SALES DID NOT

5    ACTUALLY TAKE OFF UNTIL THE ITUNES MUSIC STORE WAS

6    RELEASED IN 2003 AND IT LOOKS LIKE SPECIFICALLY THE

7    IPOD SALES TOOK OFF AFTER IPOD -- ITUNES WAS

8    RELEASED FOR WINDOWS AS THIS CHART SHOWS.

9              IS THIS THE RIGHT WAY?

10              THE COURT:  YEAH, YOU HAVE A MONITOR

11   THERE SO YOU CAN ALWAYS SEE IT.

12              MR. BRISKIN:  IN OTHER WORDS, ITUNES

13   DROVE IPOD SALES, JUST AS APPLE INTENDED.

14              DURING THIS PERIOD THERE WERE A GROWING

15   NUMBER OF IPOD PURCHASERS WITH A GROWING NUMBER OF

16   DRM PROTECTED SONGS IN THEIR LIBRARIES.

17              WHAT DROVE THE SUDDEN SPIKE IN IPOD SALES

18   WASN'T SUDDENLY NEW TO IPOD.  THERE WERE ALREADY

19   THREE GENERATIONS IN THE MARKET.  WHAT WAS DRIVING

20   THIS WAS ITUNES.  THAT'S WHAT WE ALLEGE IN THIS

21   CASE.

22              AND WHAT DR. FRENCH'S MODEL WILL DO WILL

23   SHOW HOW DRM ON ITUNES DOWNLOADS CONTINUES TO DRIVE

24   IPOD SALES.

25              NOW, COMPARED TO OTHER MARKET -- CASES

79

1    WHERE CLASSES HAVE BEEN CERTIFIED, THE FEATURES OF

2    THIS MARKET MAKE IT ESPECIALLY CONDUCIVE TO CLASS

3    WIDE ANALYSIS.

4         THERE'S ONE DEFENDANT.  PLAINTIFFS ARE

5    CONSUMERS, NOT BUSINESSES.  THEY HAVE NO BARGAINING

6    POWER AND THIS IS A CASE ABOUT AN OVERCHARGE, NOT

7    LOST PROFITS.

8         THERE'S A VERY CONCENTRATED RESELLING

9    MARKET MAKING IT EASY TO CAPTURE THE UNIVERSE OF

10   PRICES.

11        THE DISTRIBUTION CHAIN IS EXTRAORDINARILY

12   SIMPLE.  THERE'S ONE FINISHED PRODUCT.  IT DOESN'T

13   CHANGE AT ALL GOING FROM APPLE TO THE CONSUMER.

14   PRICING REALLY ISN'T THAT COMPLICATED AS DEFENDANTS

15   CONCEDE IN ITS APPLE RETAIL STORE.

16        AND COMPARE THIS WITH OTHER CASES LIKE

17   THE MICROSOFT CASES IN WHICH EXPERTS WERE TRACKING

18   DIFFUSE OVERCHARGES THAT WERE MAKING THEIR WAY

19   THROUGH COMPLICATED PURCHASING CHAINS LIKE LAPTOPS

20   AND HOME COMPUTERS WHERE SOMETHING WAS IMBEDDED IN

21   A PRODUCT THAT HAD VALUE ADDED.

22        THAT'S A MUCH MORE COMPLICATED MODEL.

23   AND THE GORDON V. MICROSOFT CASE IN THE ADVANCED

24   STAGES OF THE LITIGATION RIGHT BEFORE TRIAL AND THE

25   COURT DECIDED TO DECERTIFY THE CLASS AND BASICALLY

80

1    USED A MUCH LESS STRINGENT METHOD OF PENNY FOR

2    PENNY DAMAGES THAN DEFENDANT ARGUES HERE THAT WE

3    ADOPT AT THE CLASS CERT STAGE.

4            NOW, THE DEFENDANTS ARE ARGUING THAT

5    SHOWING CLASS WIDE IMPACT ISN'T EVEN ENOUGH.  AS

6    THEY PUT IN THE OPPOSITION BRIEF, AND I'M QUOTING

7    FROM PAGE 12, "SUPPOSE ONE CUSTOMER PAID A $10

8    OVERCHARGE AND ANOTHER PAID NONE.  ONLY THE

9    OVERCHARGE CUSTOMER HAS BEEN INJURED AND HAS ANY

10   RIGHT TO SUE."  THAT'S A GREAT WAY OF IMMUNIZING

11   YOURSELF FROM ANTITRUST LIABILITY, BUT THE CASE LAW

12   IS MORE SOPHISTICATED THAN THAT.

13           FOR IMPACT ALL YOU NEED IS SOME PROOF OF

14   DAMAGES FLOWING FROM THE ANTICOMPETITIVE BEHAVIOR.

15           AND WE HAVE DONE THAT.  WE HAVE BOTH --

16   WE HAVE SHOWN THAT THE TYING MONOPOLIZATION

17   PLAINTIFF IS ALLEGED BY THEIR NATURE PRODUCES A

18   CLASS WIDE IMPACT BUT WE ALSO DID IT THROUGH MARKET

19   ANALYSIS.

20           NOW, THESE AREN'T REALLY IMPACT ISSUES.

21   THEY'RE DAMAGES ISSUES BY SHOWING THAT THESE

22   DIFFERENT PRICES AND HOW MUCH THEY MIGHT VARY

23   BETWEEN AMAZON AND BEST BUY.  THOSE AREN'T IMPACT

24   ISSUES.  THERE'S DISCOUNTING IN THE BUT-FOR WORLD,

25   TOO.  THERE ARE COUPONS IN THE BUT-FOR WORLD, TOO.

81

1           ONE COURT IN THE NASDAQ MARKET MAKERS

2     CASE A 1996 SOUTHERN DISTRICT OF NEW YORK CASE

3     STATED THAT "EVEN IF IT COULD BE SHOWN SOME

4     INDIVIDUAL CLASS MEMBERS WERE NOT INJURED, CLASS

5     CERTIFICATION NEVERTHELESS IS APPROPRIATE WHERE THE

6     ANTITRUST VIOLATION HAS CAUSED WIDESPREAD INJURY TO

7     THE CLASS."

8           THE COURT:  BOTH THIS NASDAQ CASE AND THE

9     GORDON CASE YOU'RE CITING TO ME WERE INDIRECT

10    PURCHASER CASES?

11          MR. BRISKIN:  I BELIEVE THE NASDAQ WAS A

12    SECURITIES CASE.  THE GORDON V. MICROSOFT CASE WAS

13    AN ANTITRUST CASE AND THE CLASS WAS CONSUMERS OF

14    WHOM BOUGHT LAPTOP COMPUTERS AND DESKTOP COMPUTERS

15    THAT HAD MICROSOFT OFFICE AND MICROSOFT WINDOWS

16    IMBEDDED IN THEM AND THE TASK WAS TO TRACE THE

17    AMOUNT OF THE OVERCHARGE THAT WAS IMBEDDED IN A

18    PRODUCT THAT HAD THIS SOFTWARE IN IT.

19          AND SO THERE'S A VALUE ADDED PRODUCT

20    MOVING THROUGH THE SUPPLY CHAIN.  THERE ARE

21    MULTIPLE PRICE INCREASES AT ISSUE AND THERE WAS

22    EVIDENCE IN THE RECORD THAT THE RESALERS WEREN'T

23    PASSING ON THE PRICES IMMEDIATELY AND THERE WAS

24    DELAY IN THE PASS ON AND THERE WERE A LOT OF

25    INDEFINITE FACTORS IN THAT CASE.

                                              82

1          AND THE COURT SAID WE DON'T NEED THAT

2     LEVEL OF GRANULARITY WHERE WE CAN PROVE IMPACT, THE

3     DAMAGES THRESHOLD IS LOWER THAN PROVING THE EXACT

4     PENNY OF DAMAGES TO EACH INDIVIDUAL CLASS MEMBER.

5          UNLESS THE COURT HAS ANY OTHER QUESTIONS,

6     I HAVE NOTHING FURTHER.

7          THE COURT:  VERY WELL.  ANY COMMENT?

8          MR. MITTELSTAEDT:  LET ME START OFF, IF I

9     MAY, YOUR HONOR, WITH THEIR BRIEF ARGUMENT ON THE

10    MERITS BECAUSE I THINK THAT THIS EXPLAINS A KEY

11    PROBLEM THAT DR. FRENCH HAS.

12         THE MUSIC STORE IS INTRODUCED IN APRIL OF

13    '03.

14         AND THEY SAY IPOD SALES TOOK OFF STARTING

15    AROUND OCTOBER 2003 WHEN ITUNES FOR WINDOWS WAS

16    LAUNCHED.

17         THEY ARE CONFUSING ITUNES, THE SOFTWARE

18    APPLICATION, THE JUKEBOX APPLICATION THAT IS ON

19    YOUR COMPUTER AND IT HELPS YOU LOAD CD'S AND SO

20    FORTH WITH ONE PART OF ITUNES SOFTWARE WHICH IS THE

21    MUSIC STORE.

22         THE REASON IPOD SALES TOOK OFF WHEN

23    ITUNES FOR WINDOWS WAS LAUNCHED, MADE AVAILABLE IN

24    OCTOBER OF 2003, WAS THAT WAS BEFORE -- THAT WAS

25    THE FIRST TIME A PC OWNER COULD USE AN IPOD.

83

1      BEFORE THAT, IPODS COULD BE USED ONLY

2  WITH MACINTOSH COMPUTERS.

3      WHEN THIS SOFTWARE, ITUNES FOR WINDOWS

4  WAS MADE AVAILABLE, THAT MEANT THAT YOU COULD LOAD

5  ITUNES, THE SOFTWARE APPLICATION, ONTO A PC AND

6  LOAD YOUR IPOD THROUGH YOUR PC.

7      BEFORE OCTOBER OF 2003 IPODS COULD ONLY

8  BE USED WITH 5 PERCENT OF THE COMPUTERS IN THE

9  UNITED STATES, MACINTOSH COMPUTERS.

10      LAUNCHING ITUNES FOR WINDOWS IN OCTOBER

11  OF 2003 OPENED UP THE IPOD MARKET TO THE 95 PERCENT

12  OF OTHER COMPUTER OWNERS, THE PC OWNERS THAT USED

13  WINDOWS.

14      THAT HAS NOTHING TO DO WITH THE

15  AVAILABILITY OF MUSIC FROM ITUNES MUSIC STORE.

16      EVEN IF THERE HAD NEVER BEEN ITUNES MUSIC

17  STORE, THE AVAILABILITY OF ITUNES FOR WINDOWS, THE

18  JUKEBOX APPLICATION, MAKING IT POSSIBLE FOR IPOD

19  USERS TO USE PC'S IS WHAT WOULD HAVE DRIVEN THE

20  INCREASE IN DEMAND.

21      IN OTHER WORDS, IF YOU WANTED TO BUY AN

22  IPOD BEFORE OCTOBER OF 2003, YOU HAD TO HAVE A MAC.

23  AFTER OCTOBER OF 2003, YOU COULD LOAD IT FROM A PC.

24      THAT HAS NOTHING TO DO WITH THE MUSIC

25  STORE, BUT IT POINTS OUT A MAJOR PROBLEM THAT

84

1    DR. FRENCH HAS.

2          HE'S GOING TO SAY, LOOK, YOUR HONOR, AND

3    LADIES AND GENTLEMEN OF THE JURY, IPOD SALES TOOK

4    OFF, BUT HE CAN'T TELL YOU HOW MUCH OF THAT

5    INCREASE IN IPOD SALES AFTER OCTOBER OF 2003 WAS

6    THE RESULT OF ITUNES FOR WINDOWS HAVING NOTHING TO

7    DO WITH THE MUSIC STORE.

8          HE CAN'T TELL YOU HOW MUCH OF THAT

9    INCREASE IN DEMAND HAD TO DO WITH THE AVAILABILITY

10   OF MUSIC ON THE MUSIC STORE.  THEY'RE NOT ALLEGING

11   THAT THE MUSIC STORE WAS ILLEGAL.  THEY'RE ONLY

12   ALLEGING THAT THE NONLICENSING WHICH CAME SOME TIME

13   LATER AFTER THEY SAY APPLE GOT MARKET SHARE WAS

14   ILLEGAL.

15         SO THEY SAY THE ILLEGALITY STARTED SOME

16   TIME LATER.

17         SO WHAT HE CAN'T DO, HE CAN'T EVEN TELL

18   US WHEN IT STARTED.  AND IF YOU CAN'T TELL US WHEN

19   IT STARTED, YOU CAN'T SHOW THE BEFORE AND THE

20   DURING.  YOU HAVE TO KNOW THE DIVIDING POINT AND HE

21   DOESN'T KNOW THE DIVIDING POINT.

22         IF HE KNEW THE DIVIDING POINT, HE CAN'T

23   SEPARATE THE VARIOUS THINGS THAT AFFECT THE IPOD

24   DEMAND, THE AVAILABILITY OF THE MUSIC STORE, THE

25   AVAILABILITY OF IPODS ON PC'S, OR THEIR THEORY

85

1    ABOUT THE NONLICENSING.

2              THE POINT THERE, YOUR HONOR, IS THAT WHAT

3    THEY ARE SEARCHING FOR IS A NEEDLE IN A HAYSTACK,

4    THE EFFECT OF APPLE'S NONLICENSING.  AND IT'S A

5    NEEDLE, IT'S EVEN WORSE BECAUSE THE NEEDLE PROBABLY

6    DOESN'T EXIST.

7              DR. BURTIS'S TESTIMONY IS UNREBUTTED THAT

8    UNDER THEIR THEORY OF NONLICENSING, THE PRICE OF

9    THE IPOD MAY WELL HAVE BEEN A WASH.  IT MAY HAVE

10   BEEN A NEUTRAL EFFECT.

11             THEIR THEORY IS THAT MORE COMPETITION

12   FROM MP3 PLAYERS WOULD HAVE DRIVEN THE PRICE DOWN

13   BUT THEY ADMIT THAT APPLE COULD HAVE DRIVEN A

14   ROYALTY WHICH WOULD HAVE DRIVEN THE PRICE UP.  IF

15   THAT'S A WASH, THERE'S NO IMPACT AND YOU CAN'T FIND

16   AN IMPACT.

17             IF THERE IS AN IMPACT, IT COULD BE VERY

18   SMALL AND IT'S THE NEEDLE IN THE HAYSTACK AND HIS

19   REGRESSION MODEL IS NOT PRECISE ENOUGH TO IDENTIFY

20   THAT.

21             THE TWO MOST INSTRUCTIVE CASES, I THINK,

22   ARE JUDGE ALSUP'S RECENT DECISION IN GPU AND IN THE

23   FREELAND CASE, BOTH OF WHICH WE CITED.

24             IN BOTH OF THOSE CASES DR. FRENCH'S

25   COUNTERPART SUBMITTED A REGRESSION ANALYSIS.  HE

                                                  86

1    DIDN'T JUST COME IN WITH, WITH -- WHERE IS IT? --

2    FIVE PAGES OF A REPORT THAT WERE SO GENERIC THEY

3    COULD HAVE BEEN SUBMITTED IN ANY CASE.  I COULD DO

4    THIS, I COULD DO THAT, I NEED TO LOOK AT THE DATA,

5    I NEED TO LOOK AT THE DATA.  I DON'T HAVE THE DATA.

6    IT'S GENERIC.  THAT WOULDN'T HAVE GOTTEN TO FIRST

7    BASE IN THOSE CASES.  IN THE OTHER CASES THE

8    PLAINTIFF'S EXPERT ACTUALLY DID A REGRESSION AND

9    THE COURT STILL THREW THEM OUT.

10            IN FREELAND THE COURT SAID THAT IN THIS

11   CASE THE REGRESSION PERFORMED BY THE ECONOMIST IS

12   SO INCOMPLETE AS TO BE INADMISSIBLE AS IRRELEVANT.

13            WE DON'T HAVE A CHANCE TO MAKE THAT

14   SHOWING BECAUSE HE HASN'T EVEN COME UP WITH THE

15   REGRESSION.

16            BUT WE HAVE POINTED OUT ALL OF THE

17   DEFECTS AND HE DOESN'T HAVE AN ANSWER AND IF HE HAD

18   AN ANSWER, HE WOULD HAVE RUN THE REGRESSION.

19            WHY HAVEN'T THEY RUN THE REGRESSION?

20   IT'S NOT FOR THE UNAVAILABILITY OF DATA.  THIS CASE

21   HAS BEEN PENDING FOR ABOUT 18 MONTHS.  CLASS

22   DISCOVERY HAS BEEN OPEN THE WHOLE TIME, AND THEY

23   HAVE NO ONE TO BLAME EXCEPT THEMSELVES FOR NOT

24   HAVING DONE A REGRESSION.

25            DR. BURTIS HAS WALKED THROUGH THE

87

1    PROBLEMS, THE DEFECTS, THE REASONS THAT DR. FRENCH

2    CANNOT DO WHAT HE SAYS.  AND IT'S NOT BECAUSE SHE

3    DOESN'T BELIEVE IN REGRESSION ANALYSES.  SHE SHOWED

4    YOUR HONOR AN APPROPRIATE USE OF A REGRESSION.

5           HIS BASIC PROBLEM, DR. FRENCH'S BASIC

6    PROBLEM IS THAT HE'S TAKING AN IPOD, THE ORIGINAL

7    GENERATIONS ONE, TWO, AND THREE THAT WERE SOLD

8    SEVEN TO NINE YEARS AGO, AND HE'S TRYING TO TELL

9    YOUR HONOR THAT BASED ON SUPPLY, DEMAND, AND COST

10   VARIABLES RELATED TO THIS 399 OR 499 PRICE OF THE

11   FIRST IPOD HE CAN PREDICT WHAT THE PRICE OF THIS

12   SHUFFLE SHOULD HAVE BEEN IN 2009.

13          SO THE PRICE GOES FROM $399 IN 2001 TO

14   $79 FOR A MUCH SMALLER, MUCH MORE ADVANCED PRODUCT

15   AND HE'S SAYING, WELL, THAT'S NOT GOOD ENOUGH.

16   HE'S GOING TO BE ABLE TO SHOW YOUR HONOR THAT THE

17   PRICE SHOULD HAVE BEEN EVEN LOWER.

18          AND AT HIS DEPOSITION I ASKED HIM ARE YOU

19   GOING TO MODEL HOW MUCH THE PRICE SHOULD HAVE

20   DECLINED MORE THAN IT DECLINED?

21          I THINK AT THE DEPOSITION HE WAS THINKING

22   THE PRICES STEADILY INCREASED, AND HE WAS GOING TO

23   BE ABLE TO FIND AN OVERCHARGE IN THE PRICE

24   INCREASE.

25          WHEN I ASKED HIM ARE YOU GOING TO MODEL

88

1 PRICE DECLINES AND HE SAID HEAVENS NO AND THAT'S AT

2 PAGE 76 OF HIS DEPOSITION.  THAT'S AN UNDERTAKING

3 TO TRY TO MODEL HOW MUCH PRICES SHOULD HAVE FALLEN

4 BEYOND WHERE THEY FELL.

5   SO, YOUR HONOR, HE'S TAKING PRICES SEVEN

6 TO NINE YEARS AGO ON ONE PRODUCT AND TRYING TO

7 PREDICT WHAT PRICES WOULD BE ON ALL OF THESE

8 DIFFERENT MODELS ARE JUST TO THE EYE ARE MUCH

9 DIFFERENT.  THEIR FEATURES ARE DIFFERENT.  THE WAY

10 THEY CAN BE USED IS DIFFERENT.

11   I MEAN, THIS ONE NANO YOU CAN PUT ON

12 YOURSELF AND RUN WITH IT.  YOU COULDN'T DO THAT

13 WITH THIS BIG ONE.  THE WAY THEY CAN BE USED ARE

14 DIFFERENT.  THE CAPACITIES ARE DIFFERENT.  YOU

15 KNOW, ALMOST EVERYTHING IS DIFFERENT ABOUT THEM.

16   THIS TOUCH CAN DO THINGS THAT THE

17 ORIGINAL IPOD COULDN'T DO IT.  IT HAS VIDEO AND

18 PHOTO.  IT CAN CONNECT TO THE INTERNET.  IT HAS

19 WIRELESS.  YOU CAN SEND E-MAILS AND IT'S LIKE A PDA

20 AND WITH A CALENDAR AND SO FORTH.

21   THERE'S NO WAY TO PREDICT FROM THE PRICE

22 OF THIS ONE, WHAT THE PRICE OF THIS ONE WOULD HAVE

23 BEEN SEVEN YEARS LATER.  AND HE CERTAINLY HASN'T

24 TRIED TO DO IT.

25   THE COURT'S AND JUDGE ALSUP WENT THROUGH

89

1    THIS IN GREAT DETAIL, ARE INCREASINGLY SKEPTICAL OF

2    PLAINTIFF'S EXPERTS WHO OFFER ONLY A PROMISE OF A

3    METHOD FOR PROVING CLASS WIDE IMPACT.

4            AND WHAT JUDGE ALSUP SAID WAS, HE QUOTED

5    A SCHOLAR WHO SAID "WE'RE INCREASINGLY SKEPTICAL OF

6    PLAINTIFF'S EXPERTS WHO OFFER ONLY GENERALIZED AND

7    THEORETICAL OPINIONS THAT A METHODOLOGY MAY SERVE

8    THIS PURPOSE WITHOUT ALSO SUBMITTING A FUNCTIONING

9    MODEL THAT IS TAILORED TO MARKET FACTS IN THE CASE

10   AT HAND."

11           DR. FRENCH HAS NOT DONE THAT.  BUT THAT'S

12   NOT THE ONLY REASON FOR DENYING THIS MOTION.

13           DR. FRENCH ALSO ADMITS THAT IF HE COULD

14   DO WHAT HE PURPORTS TO BE ABLE TO DO ALL HE WOULD

15   END UP WITH IS AN AVERAGE OVERCHARGE.

16           AND IT'S AT PAGE 20 OF HIS DEPOSITION.

17   "I'M NOT GOING TO DO THE PASS THROUGH ANALYSIS ON

18   AN INDIVIDUAL TRANSACTION BASIS."

19           PAGE 21, "I'M NOT GOING TO BE CONCERNED

20   WITH WHETHER SOME PRICES HAVE NO PASS THROUGH AND

21   OTHERS DO."

22           HE'S GOING TO COME UP WITH ONE

23   OVERCHARGE, MAYBE JUST ONE OVERCHARGE FOR ALL IPODS

24   LUMPED TOGETHER.  AND SO THAT WOULD RUN THE

25   POSSIBILITY THAT, YOU KNOW, THIS LITTLE ONE WAS

90

1    UNDERPRICED BY A CERTAIN AMOUNT.  THE TOUCH WAS

2    OVERPRICED BY A CERTAIN AMOUNT.  THE SHUFFLE WAS

3    EXACTLY RIGHT.  HE'S GOING TO AVERAGE THOSE ALL

4    TOGETHER, AND HE MIGHT COME UP WITH AN OVERCHARGE

5    THAT HE WOULD THEN APPLY TO EVERYONE, TO ALL IPODS.

6              OR EVEN IF HE DOES IT IPOD MODEL BY IPOD

7    MODEL, HE'S STILL ONLY GOING TO COME UP WITH AN

8    AVERAGE OVERCHARGE FOR ALL PURCHASERS.  HE'S

9    AVOIDING INDIVIDUAL ISSUES BY IGNORING THE

10   INDIVIDUAL ISSUES.

11             AND WHEN I SAY HE MIGHT COME UP WITH AN

12   OVERCHARGE ON THIS NANO, THERE'S NO WAY HE CAN DO

13   THAT BECAUSE THE NANO WASN'T OFFERED FOR SALE IN

14   HIS BEFORE PERIOD, SO HE HAS NO BASE LINE.

15             THE COURT:  BRING YOUR ARGUMENT TO A

16   CLOSE.

17             MR. MITTELSTAEDT:  TWO LAST POINTS.

18   DR. BURTIS'S TESTIMONY IS UNREBUTTED THAT UNDER THE

19   PLAINTIFF'S THEORY IF THERE'S AN OVERCHARGE ON AN

20   IPOD, THERE MIGHT BE AN UNDERCHARGE ON THE MUSIC

21   FOR REASONS SHE DESCRIBED.

22             AND IF YOU THINK ABOUT AN UNDERCHARGE ON

23   THE MUSIC FOR OF SAY TEN CENTS AND AN OVERCHARGE ON

24   THE IPOD OF FIVE DOLLARS, AS SOON AS -- IF YOU HAVE

25   A CONSUMER THAT BOUGHT 50 SONGS, YOU KNOW, IT'S A

91

1    WASH.  HE'S SAVED FIVE DOLLARS ON SONGS.  HE'S PAID

2    FIVE DOLLARS ON OVERCHARGE ON IPOD.  HE'S NOT

3    INJURED.

4             NOW, THEY SAY, WELL, THAT IMMUNIZE APPLE.

5    THAT'S NOT WHAT THIS IS ABOUT.  THE NINTH CIRCUIT

6    IN THE SIEGLE CASE SAID THAT IN A CASE LIKE THIS,

7    THAT THE PLAINTIFF HAS TO SHOW A NET OVERCHARGE

8    TAKING INTO ACCOUNT BOTH PRODUCTS FOR OBVIOUS

9    REASONS.

10            THEY DEFAULT COMPLETELY ON TRYING TO SHOW

11   A NET OVERCHARGE.  THEY ONLY FOCUS ON ONE PRODUCT.

12            AND WHY DO THEY DO THAT?  WHY DO THEY

13   IGNORE THE NET OVERCHARGE ISSUE?  I THINK THE

14   REASON IS OBVIOUS.  THE ONLY WAY TO DETERMINE

15   WHETHER AN INDIVIDUAL PAID A NET OVERCHARGE IS TO

16   COMPARE HIS PURCHASES OF MUSIC AGAINST HIS

17   PURCHASES OF IPODS, THE RELATIVE NUMBER OF

18   PURCHASES TAKEN TOGETHER WITH THE RELATIVE

19   UNDERCHARGE ON ONE AND OVERCHARGE ON ANOTHER

20   DETERMINES WHETHER THERE'S A NET OVERCHARGE FOR

21   THAT INDIVIDUAL.  AND YOU CAN ONLY DO THAT

22   INDIVIDUAL BY INDIVIDUAL WHICH IS WHY THEY IGNORE

23   IT.

24            THEY CAN READ THE CASE.  THEY CAN READ

25   SIEGLE AND SEE THAT, YOU KNOW, SEE THAT YOU NEED TO

92

1     DO A NET OVERCHARGE BUT THEY FAILED TO DO THAT.

2              AND I THINK THAT'S IT, YOUR HONOR.

3              THE COURT:  THANK YOU.

4              MR. MITTELSTAEDT:  THANK YOU.

5              THE COURT:  WELL, I CERTAINLY WANT TO

6     REFLECT ON WHAT I HAVE HEARD.

7              MY IMMEDIATE REACTION TO THIS IS THAT THE

8     CONCERNS THAT PROMPTED THIS HEARING REMAIN AND THAT

9     IS TRYING TO DETERMINE WHETHER OR NOT INDIRECT

10    PURCHASERS IS A MODEL OR A METHOD FOR DETERMINING

11    WHETHER OR NOT ANY ALLEGED OVERCHARGE IS PASSED

12    THROUGH TO THE CLASS HERE.

13             THE -- THERE ARE MANY ASPECTS OF THIS

14    THAT I WANT TO THINK ABOUT, ONE OF THEM BEING THE

15    IMPACT OF BIG BOX DIRECT PURCHASERS WHO WOULD BE A

16    MEMBER OF THE DIRECT PURCHASER CLASS.  ON THAT CASE

17    THIS WOULD EXPAND THE CLASS TO ALLOW INDIRECT

18    PURCHASERS AS A SEPARATE CLASS FROM THOSE DIRECT

19    PURCHASERS.

20             I AM CONCERNED WITH PLAINTIFF'S ARGUMENT

21    THAT IT'S NOT ITS BURDEN TO PROVE THAT THE MODEL

22    WILL WORK.

23             IT SEEMS TO ME THE RELIABILITY OF THE

24    METHOD IS EXACTLY WHAT I WAS LISTENING FOR TO SEE

25    WHETHER OR NOT IT CAN FACTOR OUT.

93

1          I HAVE THE WITNESS'S OPINION THAT THEY

2     CAN FACTOR OUT THE MANY FACTORS, BUT HAVING NOT

3     DEMONSTRATED IT TO MY SATISFACTION, IT LEAVES THE

4     COURTS WITH CONCERNS.

5          AND IT COULD BE THAT THE COURT WOULD DENY

6     THE MOTION AT THIS POINT SUBJECT TO WHAT

7     PLAINTIFF'S COUNSEL INDICATED WERE SITUATIONS WHERE

8     THE COURT ALLOWED THE METHOD AFTER IT WAS CLEARLY

9     DEMONSTRATED LATER IN THE CASE, BUT THAT'S MY

10    PREDISPOSITION.

11         I'LL CERTAINLY GIVE THIS FURTHER

12    CONSIDERATION.  SO THE MOTION FOR CERTIFICATION

13    BASED ON THE PREVIOUSLY SUBMITTED PAPERS AS WELL AS

14    THE EVIDENTIARY MATTER WITH RESPECT TO THE INDIRECT

15    PURCHASER ANTITRUST CLASS IS UNDER SUBMISSION TO

16    THE COURT.

17         FOR PURPOSES OF OUR CASE MANAGEMENT

18    CONFERENCE ON THE OTHER PART OF THE CASE, I PROPOSE

19    TO GO OFF THE RECORD AND CONDUCT IT INFORMALLY,

20    UNLESS THERE'S SOME MATTER THAT THE PARTIES WISH TO

21    HAVE ON THE RECORD.  LET ME KNOW NOW BEFORE I LET

22    MY COURT REPORTER GO.

23         MR. MITTELSTAEDT:  THAT'S FINE, YOUR

24    HONOR.

25         MR. BRISKIN:  THAT'S FINE, YOUR HONOR.

94

1              MR. SKALET:  THAT'S FINE, YOUR HONOR.

2              THE COURT:  MS. RODRIGUEZ, YOU MAY BE

3    EXCUSED FOR THAT PURPOSE.

4              COME FORWARD THE REST OF YOU.

5              (WHEREUPON, THE PROCEEDINGS IN THIS

6    MATTER WERE CONCLUDED.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

95