# Exhibit 1

1          STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4   STACIE SOMERS, on Behalf of      )
    Herself and All Others          )
5   Similarly Situated,             )
                                    )
6                  Plaintiff,       )  Case No.: CV 07 6507
                                    )            HRL
7   -vs-                            )
                                    )
8   APPLE, INC., a California       )
    Corporation,                    )
9                                   )
                   Defendant.       )
10  _____)

11

12

13

14        DEPOSITION of GARY L. FRENCH, Ph.D.,

15        taken on behalf of Defendants at 555

16        California Street, 26th Floor, San

17        Francisco, California, on Friday, April

18        3, 2009, commencing at 10:09 a.m.

19        before LINDA VACCAREZZA, CRP, RPR, CLR,

20        CSR NO. 10201

21

22

23

24

25

2

BARKLEY
Court Reporters

```
10:10   1                    GARY L. FRENCH,
10:10   2         having been duly sworn, by the Certified
10:10   3    Shorthand Reporter, was examined and testified as
10:10   4                       follows:
10:10   5                     EXAMINATION
10:10   6    BY MR. MITTELSTAEDT:
10:10   7         Q    Okay.  If you'd state your full name for
10:10   8    the record, please.
10:10   9         A    Gary Leslie French.
10:10  10         Q    As I read your report, your opinion is
10:10  11    that there are two approaches for demonstrating
10:10  12    common proof of impact on the indirect
10:10  13    purchasers:  One is to show impact on the direct
10:10  14    purchasers, and then show that they passed on
10:10  15    some or all of the overcharge to indirect
10:10  16    purchasers.  And the other is to estimate the
10:10  17    overcharge directly at the retail level.
10:10  18              Do I have that right?
10:10  19         A    Yes.
10:10  20         Q    In this case, have you actually
10:11  21    undertaken either of those approaches?
10:11  22         A    No.  Not at the class certification
10:11  23    stage, no.
10:11  24         Q    In any other case, have you ever
10:11  25    actually done either approach, as opposed to just
```

                                6

Gary L. French, Ph.D.

BARKLEY
Court Reporters

02:26 1    Q    Do you know any way -- do you know any way to

02:26 2    measure, in your regression analysis, for a coolness

02:26 3    factor?

02:26 4    A    In a regression analysis?

02:26 5    Q    Right.

02:26 6    A    No, you couldn't measure by regression a

02:26 7    coolness factor.

02:26 8    Q    Now, the fact that there's a feature or a

02:26 9    function that increases the demand for a product,

02:26 10   that's not anti-competitive by itself, is it?

02:26 11   A    No.

02:26 12   Q    You need something more for an economist to

02:26 13   say a feature or a function is anti-competitive?

02:26 14   A    Well, you need to show that -- in the context

02:26 15   of the Section 2 or tying claim, you need to show

02:26 16   there's market power, not just that demand was

02:26 17   increased.

02:26 18   Q    Well, you need to show more than that,

02:26 19   right?  You can have market power and have a feature

02:26 20   in a product that increases the demand without

02:26 21   violating the antitrust laws, right?

02:26 22   A    Conceivably.

02:26 23   Q    Well, not just conceivably but every day.

02:26 24   A    Yeah.  I mean, you can have legitimately

02:26 25   obtained market power.  And unless you do something

125

BARKLEY
Court Reporters

```
1                    DEPOSITION OFFICER'S CERTIFICATE

2

3    STATE OF CALIFORNIA        }
                                }        ss.
4    COUNTY OF   SONOMA         }

5

6         I,  LINDA VACCAREZZA      , hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR  10201  issued by the Court

10   Reporter's Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a).)

12        I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1).)

17        I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28.)

22        I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                          / / /
```

197

BARKLEY
Court Reporters

1   of the testimony given by the witness. (Fed. R. Civ. P.

2   30(f)(1).)

3        Before completion of the deposition, review of

4   the transcript [xx] was [ ] was not requested. If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto. (Fed. R. Civ. P. 30(e).)

8   Dated:     04/06/09     ,

9

10                  _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

198

# Exhibit 2

1          UNITED STATES DISTRICT COURT FOR THE

2            NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4                    ---oOo---                    COPY

5

6   THE APPLE iPOD iTUNES ANTI-      No. C-050037-JW(RS)
    TRUST LITIGATION,

7

8   _____/

9

10

11          DEPOSITION OF ROGER G. NOLL, Ph.D.

12

13

14

15

16

17      Taken before EARLY K. LANGLEY, RPR, RMR

18              CSR No. 3537

19            September 19, 2008

20

21

22

23

24                          One Kaiser Plaza, Suite 505
                            Oakland, California 94612
25          Aiken          Ph  510-451-1580
            Welch          Fax 510-451-3797
            COURT          www.aikenwelch.com
            REPORTERS

6

1    appearing.

2         MS. SWEENEY:  Bonny Sweeney from the

3    Coughlin Stoia law firm representing the direct

4    purchaser plaintiffs.

5         MS. ROACH:  Paula Roach from Coughlin        10:10

6    Stoia representing plaintiffs.

7         MS. ZELDES:  Helen Zeldes from Zeldes &

8    Haeggquist representing the indirect purchaser

9    plaintiffs.

10        MR. MITTELSTAEDT:  And Bob Mittelstaedt      10:10

11   for the defendant with Jeff LeVee, Michael Scott

12   and Carlyn Clause.

13        THE VIDEOGRAPHER:  Would the counsel

14   please state any stipulations or statements that

15   they would like on the record at this time.       10:11

16        MR. MITTELSTAEDT:  None.

17        THE VIDEOGRAPHER:  The reporter may now

18   swear the witness.

19               ROGER NOLL, Ph.D.

20               sworn as a witness,

21               testified as follows:

22   EXAMINATION BY MR. MITTELSTAEDT:

23        Q.  Good morning.  If you would state your

24   name and business address, please.

25        A.  My name is Roger G. Noll and I'm in the   10:11

Aiken & Welch Court Reporters        R. G. Noll   9/19/08

70

1   little variation, there's only two or three

2   product models, sometimes a simple little table

3   will do it.

4          So, but in principle, it is normally the

5   case that damages are estimated using a regression   11:31

6   model.  And I suspect that will happen here, but I

7   don't know that until I see the data.

8      Q.  Okay.  Have you concluded that you can use

9   a before-after method of determining whether

10  there's damages and, if so, the amount without a    11:31

11  regression analysis in this case?

12     A.  No.

13     Q.  Okay.

14     A.  I mean, what I described in the before or

15  after analysis is a method of estimating the        11:31

16  damages that is -- can have an implementation of

17  many forms.  All right.

18         And it is -- it is normally the case that

19  the implementation method is a price regression

20  that attempts to take into account variation in     11:31

21  price due to all of the factors that are likely to

22  affect supply and demand and then see if there's

23  anything left over that can be explained by the

24  anticompetitive act.

25     Q.  All right.  Have you done enough work in     11:32

72

1   advantage.  I don't know.

2        Q.  Okay.  Are you sure that the yardstick

3   method can be implemented in this case?

4        A.  As I have said in my report, that is the

5   one I'm least happy about, all right, in that it       11:33

6   requires identifying the appropriate comparative

7   products.  And my -- I believe that's -- that's

8   the hangup, is identifying the appropriate

9   benchmark products.

10          But, you know, as I've said in the report,  11:34

11   there are some candidates out there.  If the

12   plaintiffs had completed the market correctly,

13   then the most obvious candidates are the products

14   that are the closest functionally to portable

15   digital media players, but that are not in the      11:34

16   same market.

17        Q.  Okay.

18        A.  And I also gave an explanation of why it's

19   possible, although you normally don't do it, you

20   might even be able to use products in the same       11:34

21   market because of the effect that tying has in

22   segmenting the market, so that even though in the

23   absence of anticompetitive acts, all the products

24   would be in the same market, the anticompetitive

25   act may have reduced competition among portable      11:34

73

1    digital media players sufficiently such that you

2    can actually use the -- some of the competitors in

3    the portable digital media player market as a

4    yardstick.  So that's possible, but, again, it

5    requires data that I'm not sure exists.                11:35

6          So, I would say that's a candidate,

7    someone should pursue it, if they were going to

8    estimate damages, but I have more doubts that that

9    one will work than the other two.

10         Q.  Have you done enough work to determine if  11:35

11   the markup method can, in fact, be implemented in

12   this case?

13         A.  Well, actually, I'm not the one who did

14   the work.  I cited a paper that I found that was

15   fairly recently written that -- that essentially   11:35

16   does this.

17         Now, it doesn't have internal data,

18   unfortunately.  It has -- what they did is they

19   tried to build up the cost.

20         Q.  Okay.  Can you just answer the question?  11:35

21   And the question is:  Have you done enough work --

22   have you seen enough work to determine if the

23   markup method can, in fact, be implemented?

24         A.  Yes.

25         MS. SWEENEY:  Object.  He was answering      11:35

86

1    just used it when I had dinner with them on

2    Wednesday night.

3        Q.  In reference to?

4        A.  Oh, nothing to do with any of this.  It

5    had -- what were they referring to?                    11:50

6        Q.  Do you think the coolness factor affects

7    demand for iPod?

8        A.  I don't know even how to answer the

9    question.  I think in the sense that I need to

10   back up.  I'd have to know what you meant by it.       11:50

11   I mean, people have attachments to products, and a

12   large part of what marketing is about is trying to

13   build those attachments.  Those -- those affect

14   demand.  But I'm having a hard time knowing how we

15   would go out and measure units of cool --             11:50

16       Q.  Well, that was going to be my next

17   question --

18       A.  -- for a regression analysis.

19       Q.  But the first question is:  Do you think

20   that type of attachment to a product is something     11:50

21   that affects demand?

22       A.  Well, it affects demand but it affects

23   it -- you can -- that's what determines elasticity

24   of demand.  All right.  So you're out there

25   estimating elasticity of demand and what's going      11:51

96

1          THE WITNESS:  Okay.

2          MR. MITTELSTAEDT:  Let's take a short

3    break now.

4          MS. SWEENEY:  Okay.

5          THE VIDEOGRAPHER:  This ends tape No. 1 of    12:01

6    the deposition Roger Noll.  The date is September

7    19th, 2008, and the time is 12:01.

8          We are now off the record.

9          (Break taken.)

10          THE VIDEOGRAPHER:  Test 1, 1, 2.              12:15

11          Stand by.  On the record.  This begins

12    tape No. 2 of the deposition of Roger Noll.  The

13    date is September 19th, 2008, and the time is

14    12:16.  We're back on the record.

15    BY MR. MITTELSTAEDT:                                12:16

16        Q.  For the before-after model, can you be any

17    more specific as to what variables you're going to

18    include in the regression analysis than to say as

19    you do in the report, "product features, input

20    cost and the stage of the product in its life       12:16

21    cycle"?

22        A.  Do you want specific examples of product

23    features and input costs?

24        Q.  I want whatever you are going to put in

25    your regression analysis as a variable.             12:16

Aiken & Welch Court Reporters        R. G. Noll   9/19/08

97

1    A.   I don't know what I am going to put in my

2  final regression analysis as a variable because I

3  haven't collected the data to see what's

4  significant and what isn't.

5        I can -- the -- the -- I think what you        12:16

6  really want to know is what things might be tried

7  as opposed to what's going to be in the final

8  model because I have no idea what would be in the

9  final model.

10   Q.   What variables are you going to put in      12:17

11 your various versions of your regression analysis

12 for the before-after model?

13   A.   Again, the -- I start off with the answer

14 I've given several times.

15        They would be specific functions the         12:17

16 product can perform, would be the first category,

17 such as what specifically can you do with it,

18 because that's changed over time.  All right.

19        An iPod today isn't the same thing an iPod

20 was in 19 -- or 2001.  And as time has progressed,  12:17

21 it's had greater and greater functionality, and,

22 you know, like the introduction of Internet

23 access, the adding of video, increases in memory

24 size.

25        So, it's -- it's -- it's the -- it's        12:17

Aiken & Welch Court Reporters        R. G. Noll    9/19/08

119

1  instead of a price estimate which you then plug

2  into the Cornell model of imperfect competition.

3       Q.  Okay.  And have you performed that

4  analysis in any case you've done?

5       A.  I personally have not done it in a case.    12:46

6  I have done it in a paper.  And I've seen it done

7  twice by Dan McFadden.

8       Q.  Okay.  What paper did you do it in?

9       A.  It's just -- the results of it are just in

10  footnotes in two papers.  I did it once in a    12:47

11  little paper I wrote a long time ago with Paul

12  McAvoy on competition among natural gas pipelines

13  and I did it again on -- in a paper about

14  intellectual property rights --

15       Q.  Okay.

16       A.  -- which was about five or six years ago.

17       Q.  After lunch I'll ask you to show me that

18  in a minute.

19       A.  Yeah.  If I can remember the title of it

20  looking at my CV and trying to remember what's in    12:47

21  papers by names.  I'm not sure I can do it, but

22  I'll try.

23       Q.  Okay.

24       A.  I know I can do the natural gas pipelines

25  one, because it's the only paper I've ever written    12:47

141

1  case, then the total monopoly profits go up, if

2  you can engage in tying.

3     Q.  Okay.  Have you made any analysis of the

4  impact of the alleged tying arrangement on the

5  price of music?  The price of iTunes music?                14:24

6     A.  I have done no analysis of the effects of

7  the alleged tying.  I don't have a merits

8  conclusion.  So I -- I haven't done it for the

9  tied product or the tying product, though.  This

10 is not the liability phase.  This is the class             14:24

11 certification phase.

12    Q.  Is it --

13    A.  I don't have a conclusion about what the

14 effects on the price of anything were.

15    Q.  Okay.  Is it plausible that if the                  14:24

16 plaintiffs were right that there was a tying

17 arrangement, it would have caused the price of

18 iTunes store music to drop?

19    A.  Maybe, maybe not.

20    Q.  Compared to the but-for world?                      14:25

21    A.  There's -- you can't -- you cannot --

22 there's no theoretic answer to that question.

23 It's an empirical question.  Maybe, maybe not.  It

24 depends.

25    Q.  It depends on the results of a regression          14:25

198

1    curve effect.  You don't have to separate out the

2    magnitude of the cost differential and the number

3    of people who experience it.  What you have is the

4    cumulative effect of those two things determining

5    a change in the demand curve.                         15:56

6        Q.  So when you do your regression analysis,

7    if you do it right, you'll come up with a certain

8    amount of the iPod price that has not been

9    allocated or attributed to some other variable, it

10   will be sort of left over to your dummy variable    15:56

11   and then that dummy variable will reflect what you

12   say is the price effect of -- of whatever wasn't

13   measured in your various variables; is that right?

14       A.  Well, I'm not sure it's going to be a

15   dummy variable.  You know, as I said earlier, the   15:56

16   effect can depend on the nature of the

17   alternatives, and those may vary continuously.

18       Q.  I don't understand that.

19       A.  The magnitude of the lock-in effect in my

20   expectation went down in September of 2007.  So I   15:57

21   would -- I think a valid damage estimation would

22   at least have to admit the possibility and

23   estimate whether the anticompetitive harm was

24   affected by the events of September 2007.

25          And that's what I meant.  I mean what's      15:57

Aiken & Welch Court Reporters      R. G. Noll   9/19/08

239

1    A.  Oh, I'm sorry.  I'm sorry.  It's late in

2    the day.  Explain what we're after now.

3    Q.  You understand that the purported class

4    includes both direct consumers and resellers like

5    Best Buy?                                        17:01

6    A.  The wholesale market?

7    Q.  Yes.

8    A.  Yes.  Remind me what I was asked again.

9    Q.  Do you know whether or not you can use the

10   same regression analyses for both?               17:02

11       MS. SWEENEY:  Both being resellers and

12   consumers?

13   BY MR. MITTELSTAEDT:

14   Q.  Yes.

15   A.  My best guess is there's going to be two     17:02

16   regression analysis models because obviously the

17   wholesale price differs from the retail price.

18       What I -- what I need to know is how the

19   wholesale market actually works.  I need documents

20   about Apple's pricing policy in the wholesale     17:02

21   market.  I need transactions data in the wholesale

22   market and how I'll go about doing it -- doing

23   that part of the analysis would depend on those

24   details.

25       Let's take the simplest possible case,       17:02

240

1  which I doubt that it's true, but let's assume

2  that it's true.  Assume that the wholesale market

3  looks exactly like the retail market, that there's

4  a posted price for each model of iPod that's 30 or

5  40 percent below the retail price and everybody        17:03

6  can buy as much as they want at that posted price.

7         In that case, the -- a product-specific

8  dummy variable whether the buyer was a wholesaler

9  would be sufficient, right.  But that's almost

10  certainly not going to be true.  It might be true.   17:03

11        But I suspect there are quantity discounts

12  and advance purchase discounts, and, you know,

13  special promotional discounts if you spend some

14  money on advertising we'll pay some of it.  So

15  there's likely to be more complexity in the price   17:03

16  formation in the wholesale market than in the

17  retail market in which case there will probably

18  have to be two equations.

19        Q.  And can you tell me anything more than --

20  more than what is in your report on what the         17:03

21  equation will look like for the wholesale --

22        A.  Actually, if that's the case, it will look

23  a whole lot like the one I just did which is

24  static random access memory, static random access

25  memory, which is a different kind of case.  It's a   17:04

Aiken & Welch Court Reporters      R. G. Noll    9/19/08

264

1    STATE OF CALIFORNIA    )

2                          )        ss.

3    COUNTY OF ALAMEDA      )

4

5

6         I, EARLY LANGLEY, a Shorthand Reporter, State

7    of California, do hereby certify:

8         That ROGER G. NOLL, in the foregoing deposition

9    named, was present and by me sworn as a witness in the

10   above-entitled action at the time and place therein

11   specified;

12        That said deposition was taken before me at

13   said time and place, and was taken down in shorthand by

14   me, a Certified Shorthand Reporter of the State of

15   California, and was thereafter transcribed into

16   typewriting, and that the foregoing transcript

17   constitutes a full, true and correct report of said

18   deposition and of the proceedings that took place;

19   IN WITNESS WHEREOF, I have hereunder subscribed my hand

20   this 24th day of September 2008.

21

22   _____

23   EARLY LANGLEY, CSR NO. 3537
     State of California

24

25