COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
BONNY E. SWEENEY (176174)
THOMAS R. MERRICK (177987)
PAULA M. ROACH (254142)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
johns@csgrr.com
bonnys@csgrr.com
tmerrick@csgrr.com
proach@csgrr.com

THE KATRIEL LAW FIRM
ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
Washington, DC  20007
Telephone:  202/625-4342
202/330-5593 (fax)
rak@katriellaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) | Lead Case No. C-05-00037-JW(HRL) |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF SHERMAN ANTITRUST ACT, CLAYTON ACT, CARTWRIGHT ACT, CALIFORNIA UNFAIR COMPETITION LAW, CONSUMERS LEGAL REMEDIES ACT, AND CALIFORNIA COMMON LAW OF MONOPOLIZATION |
| ALL ACTIONS. | ) ) ) ) | |
| | | DEMAND FOR JURY TRIAL |

479616_1

**NATURE OF THE ACTION**

1.      This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of Plaintiffs, defined more fully below.

2.      Defendant Apple, Inc. ("Apple" or "Defendant") has used its dominant market position in the markets for Audio Downloads and Portable Digital Media Players to stifle competition and strengthen its monopoly in these markets.  Apple engaged in systematic conduct to shut out rivals' competing Audio Downloads and Portable Digital Media Players by cutting off their access to the marketplace.  In the process, Apple deprived consumers of choice and innovation in the Audio Download Market and Portable Digital Media Player Market.   Apple used unneeded technological restrictions in conjunction with software updates to suppress new products that threatened its monopoly power in the relevant product markets.   This strategy succeeded in maintaining Apple's monopolies at the expense of consumers who have been denied access to potentially superior, non-Apple products and lower prices.

3.      As alleged in further detail below, Apple initially gained its monopoly power through the use of proprietary software on Audio Downloads purchased from Apple's iTunes Store ("iTS") and Apple's iPod, known as FairPlay.  FairPlay prevented iPods from playing Audio Downloads purchased from competitors of iTS and prevented Audio Downloads purchased through iTS from playing on Portable Digital Media Players other than iPod.  Thus, a purchaser who wished to play Audio Downloads purchased from iTS on a Portable Digital Media Player had to purchase an iPod and a purchaser of an iPod who wished to buy Audio Downloads for direct playback on the iPod had to purchase them from iTS.

4.      When competitors attempted to enter either market by selling products compatible with Apple's market-leading iPod or iTS files, Apple promptly issued software updates to end the compatibility.  This allowed Apple to further entrench its monopolization of both markets and enabled it to sell the iPod at prices far above those that would prevail in a competitive market for Portable Digital Media Players.

5.      Apple's use of software updates, intended to shut out competitors, constitutes a violation of United States and California antitrust law.   None of the anticompetitive conduct described in this complaint had a legitimate business justification.

**PARTIES**

6.      Plaintiff Somtai Troy Charoensak is a resident of California.   During the Class Period, Mr. Charoensak purchased Audio Downloads and an iPod directly from Apple.   The amount paid to Apple for the iPod was supracompetitive; it was greater than he would have paid, but for the antitrust violations alleged herein.   Mr. Charoensak thereby suffered injury in his property, in the form of overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

7.      Plaintiff Mariana Rosen is a resident of New Jersey.   During the Class Period, Ms. Rosen purchased Audio Downloads and an iPod directly from Apple.   The amount paid to Apple for the iPod was supracompetitive; it was greater than she would have paid, but for the antitrust violations alleged herein.   Ms. Rosen thereby suffered injury in her property, in the form of overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

8.      Plaintiff Melanie Tucker is a resident of California.   During the Class Period, Ms. Tucker purchased Audio Downloads and iPods directly from Apple.   The amount paid to Apple for the iPods was supracompetitive; it was greater than she would have paid, but for the antitrust violations alleged herein.   Ms. Tucker thereby suffered injury in her property, in the form of overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

9.      Defendant Apple is a corporation organized under the laws of the State of California and has its principal place of business in Cupertino, California.   Though best known as a computer hardware and software company, the majority of Apple's revenues and profits now derive from its Audio Downloads and Portable Digital Media Player businesses.   At all times during the Class Period, Apple owned and operated the iTS and sold iPods directly to Mariana Rose, Melanie Tucker, and Somtai Troy Charoensak (collectively, "Plaintiffs") and members of the Class.

**JURISDICTION AND VENUE**

10.      Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§15 and 26, and 28 U.S.C. §§1331 and 1337.

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                    - 2 -

11.     Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391 because Defendant transacts business in this district, Defendant has its principle corporate office in this district, and because thousands of Class members are located in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will have, substantial anticompetitive effects in this district. A substantial number of putative plaintiffs reside in this district.

## TRADE AND COMMERCE

12.     During the Class Period, Apple marketed, distributed, and sold Portable Digital Media Players and Audio Downloads in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States.

## RELEVANT PRODUCT MARKETS

13.     For the claims that may require market definition, the relevant product markets for purposes of these allegations are as follows:

**Audio Download Market**

14.     The "Audio Download Market" is defined as the market for digital music, copies of which can be legally purchased by the consumer by way of internet download. In contrast to streaming audio services that sell temporary downloads that self-destruct after a predetermined time period or when a consumer stops paying for the service, the Audio Download Market consists of permanent downloads of digital music files. Audio Downloads present consumers enormous advantages over purchasing music in compact disk ("CD") form at retail stores. Audio Download stores offer for sale hundreds of thousands of songs at once, many times more than even the largest traditional music retailer. Audio Downloads are attractive to consumers because they can be purchased *a la carte* so that the purchaser gets only the songs that he/she wants rather than having to buy an entire CD album in order to get only one or two desirable songs. Audio Downloads remain portable because they can be easily downloaded onto a portable device capable of playing digital files.

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                    - 3 -

15.     Audio Downloads are also attractive because they are more convenient, reliable, and better for the environment.  Consumers do not have to drive to a store to make their purchase, trucks do not have to transport the CDs from factory to warehouse to retailer, and there is no material or packaging produced only to be thrown away.  Audio Downloads also promise superior audio fidelity over time because, unlike CDs, Audio Downloads last indefinitely and cannot wear out or break. Additionally, another appealing feature of Audio Downloads is that they can be easily stored and played in mass quantities on a Portable Digital Media Player.

16.     Apple owns and operates iTS, formally known as the iTunes Music Store, an internet site that offers digital music and digital video computer files for online purchase and download. Unlike most internet sites, iTS is accessed with proprietary Apple software, known as iTunes, rather than with a web browser.

17.     At all relevant times, Apple has been a competitor in the Audio Download Market. Throughout the Class Period, Apple has maintained a market share of the United States Audio Download Market of 70% or more.

18.     Barriers to entry into the Audio Download Market are high.  In addition to the barriers to entry into the Audio Download Market imposed by Apple's illegal monopolistic anticompetitive behavior, discussed in detail herein, other barriers to entry include:  (a) Audio Downloads are protected by copyrights that any new entrant would have to obtain a license for or purchase at wholesale in order to legally sell; (b) the copyright holders are unlikely to license their copyrighted Audio Downloads to any new entrant unless that entrant can credibly show that it will be able to sell these files to a large audience; (c) any new entrant would have to offer an inventory of Audio Downloads comparable to that of existing music stores which would necessitate an inordinate investment of capital and resources; (d) purchasers are unlikely to switch to a new online Audio Download store because switching means learning a new software; (e) technological costs for things such as network fees are high; and (f) any new entrant would have to offer Audio Downloads that were operable on the most popular media players.

19.     Consumers and merchants have come to recognize the Audio Download Market as a separate and distinct market from the market for music CDs.

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                     - 4 -

20.     The Audio Download Market offers a number of features not readily available at traditional "brick and mortar" music stores, which help set it apart as a distinct market.  For example, whereas shoppers at traditional "brick and mortar" music stores must typically purchase an entire album of the artist or group selected, online sales of Audio Downloads offer consumers the option to purchase only individual songs or tracks of music separately.  This is borne out by sales statistics showing that on iTS, for every sale of a complete album online there are approximately 20 songs purchased individually.  By contrast, according to statistics compiled by the Recording Industry Association of America, in the CD market in 2005, sales of CD albums were 705.4 million compared to sales of CD singles of 2.8 million units.

21.     Further, unlike "brick and mortar" music stores, the Audio Download Market offers consumers the ability to create their own customized "playlists" wherein consumers can, in effect, create their own customized collection of songs from different artists.

22.     In addition, the music selection available in the Audio Download Market is not coextensive with the music selection available at "brick and mortar" music stores.  Audio Download sites provide a ready outlet for independent and less popular artists whose music is not readily available at "brick and mortar" music stores, which only have room to carry a small fraction of the inventory of Audio Download stores.

23.     In the eyes of consumers, the Audio Download Market and the "brick and mortar" market are not in price-competition with one another.  The Audio Download Market focuses on selling individual tracks or songs while the "brick and mortar" market is focused on selling whole albums or CDs, thereby making price-comparison between these two distinct markets a *non sequitur*. Further, because of the ubiquitous nature of the internet, Audio Download sales are available to a whole host of consumers who do not have ready access to nearby "brick and mortar" music stores, let alone a nearby "brick and mortar" store stocking the particular recording desired by these consumers at any given time.  Similarly, because search costs on the internet are a fraction of search costs involved in the "brick and mortar" market, consumers are not likely to and do not forego a purchase of a music recording online even if they hypothetically would believe that the same recording could be obtained somewhat less expensively at a traditional "brick and mortar" store.

1   The costs associated with traveling to "brick and mortar" music stores, searching one or more such

2   stores for a particular recording, and comparison shopping between these "brick and mortar" music

3   stores and online stores dissuade consumers from foregoing a purchase made from the comfort of

4   their own home or office for the same piece of music, even if doing the foregoing tasks could

5   hypothetically result in a savings of a few cents per song.  Put differently, consumers are not likely

6   to and do not travel miles to their nearest "brick and mortar" music stores in the hopes of saving a

7   few cents off a song purchase that they could make instantaneously on their home computer.

8       24.     For these and other reasons, the Audio Download Market is and has been recognized

9   as a separate relevant product market.

10  **Portable Digital Media Player Market**

11      25.     The "Portable Digital Media Player Market" is defined as the market for portable

12  consumer electronic battery-powered devices that can store and play large numbers of digital media

13  files.  Portable Digital Media Players are enormous improvements over portable CD players.  While

14  a traditional CD can hold no more than 15 to 25 songs, Portable Digital Media Players can store up

15  to 40,000 songs.  Even the largest Portable Digital Media Players are only a fraction of the size of a

16  typical portable CD player.  Portable Digital Media Players also dispense with the need to carry

17  around CDs and allow consumers to organize, categorize, and play their digital media files in

18  whatever manner or order they desire.  Further advantages include superior skip protection and in

19  many models the ability to play video games, video files, and store digital photographs.

20      26.     At all relevant times, Apple has sold Portable Digital Media Players known as iPods.

21  These include all generations of the iPod Classic, iPod Shuffle, iPod Nano, iPod Mini and iPod

22  Touch (collectively, the "iPod").

23      27.     During the Class Period, Apple has maintained a market share of the Portable Digital

24  Media Player Market of 60% or more.

25      28.     Barriers to entry in the Portable Digital Media Player Market are high.  In addition to

26  the barriers to entry into the Portable Digital Media Player Market imposed by Apple's illegal,

27  anticompetitive conduct, discussed in detail herein, other barriers to entry include:  (a) high fixed

28  costs related to product development, production, manufacturing and marketing; (b) purchasers are

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)          - 6 -

1   unlikely to switch to a new Portable Digital Media Player unless it is compatible with their existing

2   libraries of Audio Downloads; (c) new entrants were required to license Digital Rights Management

3   software ("DRM") so that their Portable Digital Media Players were capable of playing DRM-

4   encrypted Audio Downloads purchased from online stores; and (d) certain DRM's, including

5   FairPlay, were proprietary and not available to license.

6        29.   The relevant geographic market for the relevant product markets is the United States.

7   **CLASS ACTION ALLEGATIONS**

8        30.   Plaintiffs seek to represent the following Class:

9        31.   All persons or entities in the United States (excluding federal, state and local

10   governmental entities, Apple, its directors, officers and members of their families) who purchased an

11   iPod directly from Apple between October 1, 2004 and March 31, 2009 ("Class Period").

12        32.   The membership of the Class is so numerous that joinder of all members is

13   impractical.  There are millions of Class members who are geographically dispersed throughout the

14   United States.

15        33.   Plaintiffs' claims are typical of the claims of the members of the Class because

16   Plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendant

17   alleged herein.

18        34.   There are questions of law and fact common to the Class which predominate over any

19   questions affecting only individual Class members.  Such common questions include:

20        (a)   The definition of the relevant product markets;

21        (b)   Apple's market power within the relevant product markets;

22        (c)   Whether Apple monopolized and continues to monopolize the relevant

23   product markets;

24        (d)   Whether Apple attempted to monopolize and continues to attempt to

25   monopolize the relevant product markets;

26        (e)   Whether the contractual conditions Apple imposes upon its customers are

27   unconscionable; and

28

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)       - 7 -

(f)    Whether Apple's conduct caused damage to Plaintiffs and members of the Class, including the degree to which prices paid by the Class are higher than the prices that would have been paid in a market free from monopolization and other illegal conduct.

35.    The claims of Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interest adverse to the interest of other members of the Class.

36.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

37.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford on their own to individually litigate an antitrust claim against a large corporate defendant. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

**APPLE'S USE OF FAIRPLAY TO MAINTAIN MONOPOLY POWER**

38.    On January 9, 2001, Apple released a digital media player application known as iTunes that is used for playing and organizing digital media files on a personal computer.  iTunes allows the user to, *inter alia*, organize music, record CDs, and download the files onto a Portable Digital Media Player.

39.    On October 23, 2001, Apple released the iPod, its first Portable Digital Media Player. At the time, iPod was capable of playing only unprotected Audio Downloads in MP3 format either downloaded from the internet or transferred from a user's CD ("burned").

40.    On April 28, 2003, Apple opened iTS, known at the time as the iTunes Music Store. iTS offered over 200,000 songs from the major record labels for sale for 99 cents each.  This was the largest online music store of its time.  iTS now offers more than 11,00,000 songs.  iTS is accessible

1   only through iTunes.  At the same time as the release of iTS, Apple also released a new generation of

2   iPod and updated the iTunes software so that iTunes and iPod software was compatible with

3   FairPlay.

4       41.       Traditionally, Audio Downloads have come in both unprotected and protected digital

5   file formats.  Unlike unprotected formats, protected formats include technological encumbrances,

6   commonly known as DRM, designed to restrict a consumer's use of the file and illegal unauthorized

7   copies of the digital file.

8       42.       From the inception of Apple's iTS, the major record labels, Sony, Universal, EMI,

9   Warner, and BMG, all required Audio Downloads to be sold in protected format.  Apple elected to

10   encode the Audio Downloads sold through the iTS with its own proprietary software, FairPlay.

11       43.       Because FairPlay was not licensed to any other manufacturers of Portable Digital

12   Media Players or sellers of Audio Downloads, songs purchased from iTS that were encoded with

13   FairPlay were incapable of being played by Portable Digital Media Players other than iPods.  Thus,

14   consumers who purchased Audio Downloads from Apple had no choice but to buy an iPod if they

15   wanted to play those songs directly on a Portable Digital Media Player.  Conversely, iPods were

16   unable to play any files encrypted with a DRM format other than FairPlay that were sold on

17   competing Audio Download stores.

18       44.       Apple encoded all Audio Downloads sold through the iTS with FairPlay even as to:

19   (a) public domain material; and (b) music that certain music labels and/or artists themselves

20   requested be sold DRM-free.

21       45.       Apple used its proprietary DRM to gain an overwhelming market share in the Audio

22   Download and Portable Digital Media Player markets.

23       46.       After purchasing their Audio Download library from the iTS, purchasers were locked

24   into making all future Portable Digital Media Player purchases from Apple.  They may have wanted

25   to buy a non-Apple Portable Digital Media Player to replace their iPod, but to do so would mean

26   they could not utilize any of the FairPlay-protected songs they purchased from the iTS on their new

27   Portable Digital Media Player.

28

47.     This quickly increased Apple's market share in both the Portable Digital Media Player and Audio Download Markets.   After the release of iTS in April 2003, Apple steadily maintained a 70% or more market share of the Audio Download Market.   Additionally, prior to release of iTS, Apple's iPod maintained about 11% of the market compared to up to 92% after the release of iTS.   As Josh Bernoff, principle analyst with Forrester Research stated, Apple's "overwhelming market share is based in large part on its ability to lock people into that device."

48.     Apple could have licensed its FairPlay software to other manufacturers of Portable Digital Media Players, so that music purchased from the iTS could be transferred directly to Portable Digital Media Players other than the iPod.   Additionally, Apple could have licensed its FairPlay to other Audio Download stores so that music files purchased from those stores could be played directly on iPods.

49.     However, Apple did not license or give access to FairPlay to any other Portable Digital Media Player manufacturer, thereby ensuring two results.   First, Apple ensured that the iPod was the only Portable Digital Media Player that could directly play songs purchased from the iTS. Second, Apple ensured that owners of iPods who wanted to purchase Audio Downloads to be directly played on their iPod could only do so by purchasing these files at the iTS.

50.     But for Apple's anticompetitive intent, it would have been rational and profitable for Apple to license FairPlay to competing manufacturers of Portable Digital Media Players because it would have expanded the consumer base for iTS.   The more Portable Digital Media Players on the market that were interoperable with files purchased from iTS, the more profitable iTS would have been.

51.     Instead, Apple used its dominant position obtained as a result of FairPlay, to obtain monopoly power in the relevant product markets and to make substantial profits in the sale of iPods. Indeed, Apple claims that it has operated the iTS at just above cost, instead taking its monopoly profits in the sale of iPods.   In the first quarter of 2008, Apple reported $9.6 billion in revenue, 42% of which came from the sale of iPods.   Instead, Apple took its anticompetitive profits from the sale of iPods.

1
## APPLE'S ANTICOMPETITIVE USE OF SOFTWARE UPDATES

2      52.      In order to maintain its monopoly power in the market for Audio Downloads and the

3 market for Portable Digital Media Players, Apple has used software updates to shut out competitors

4 and cut off their access to the marketplace.  Apple's anticompetitive tactics were intended to, and

5 had the effect of, preventing and/or delaying entry of competitive products that threatened Apple's

6 monopolies in the relevant product markets.

7      53.      On July 26, 2004, RealNetworks, a rival seller of Audio Downloads, announced that

8 songs sold through its online store could be played on the iPod in addition to other competing

9 Portable Digital Media Players.  This gave iPod owners a competitive alternative to the iTS for their

10 purchases of Audio Downloads.  RealNetworks had independently analyzed the firmware within the

11 iPod and was able to discern the required extra software code added by Apple to make downloaded

12 songs playable on the iPod.  Armed with this knowledge, RealNetworks was able to convert their

13 Helix DRM into the necessary DRM so that Audio Downloads sold through RealNetworks' online

14 store could be playable on Apple's iPod.  This technology was known as Harmony.  RealNetworks

15 maintained that its conduct was legal.

16      54.      RealNetworks' Harmony was significant not only because it represented the first

17 alternative to Apple's monopolistic stronghold of Audio Downloads for playback on the iPod, but

18 also because RealNetworks began selling its Audio Downloads for as low as 49 cents per track, well

19 below the 99 cents per track charged by Apple's iTS.

20      55.      At the time of RealNetworks' announcement, although there were several Portable

21 Digital Media Players in the marketplace, the iPod was the number one seller and controlled 60%

22 market share.  Thus, in order to compete with Apple's iTS, which had 70% market share and was the

23 only Audio Download store that sold downloads compatible with iPod, RealNetworks had to make

24 its products compatible with iPods.

25      56.      Moreover, RealNetworks' announcement was met with approval from the major

26 record labels.  This was because RealNetworks sold its Audio Downloads with DRM protection that

27 ensured the files could not be improperly copied but also allowed for compatibility with over 100

28 Portable Digital Media Players, including Apple's iPod.

57.     Indeed, in its first three weeks of selling iPod-compatible music files, RealNetworks sold three million music files.  RealNetworks alleged that with Harmony RealNetworks increased its market share in the Audio Download Market to 20% from 10% and decreased Apple's market share from 60% to 70%.

58.     As Forrester Research pointed out about RealNetworks' actions at the time, "more compatibility means more competition."

59.     Rather than embracing this competitive offering to iPod owners, Apple immediately threatened RealNetworks and iPod users.  On July 29, 2004, merely four days after RealNetworks' announcement, Apple issued its own public statement warning RealNetworks and iPod users:  "We strongly caution Real and their customers that *when we update our iPod software from time to time it is highly likely that Real's Harmony technology will cease to work with current and future iPods*."  (emphasis added).

60.     True to its threat, beginning in October 2004, Apple updated its iPod and iTunes software to prevent songs downloaded from RealNetworks' music store from being played on iPods.  Unlike other software updates previously issued by Apple, purchasers were required to update the iTunes software in order to use iTS.  This sent a clear message to other Apple competitors, that Apple was not willing to allow genuine competition in the relevant product markets and would take aggressive steps to prevent competition.

61.     In the wake of this episode, RealNetworks and other companies were reluctant to invest the necessary capital to develop music stores that would allow them to adequately compete with Apple by selling Audio Downloads compatible with iPods.  As RealNetworks stated in an SEC filing in August 2005:  "There are other risks associated with our Harmony technology, including the risk that Apple will continue to modify its technology to 'break' the interoperability that Harmony provides to consumers, which Apple has done in connection with the release of certain new products.  If Apple chooses to continue this course of action, Harmony may no longer work with Apple's products, which could harm our business and reputation, or we may be forced to incur additional development costs to refine Harmony to make it interoperate again."

62.     Because Apple was able to maintain its monopoly power in the Audio Download Market, competing manufacturers of Portable Digital Media Players were unable to compete with Apple's iPod because any media player they created would not be compatible with iTS.  Consumers who purchased Audio Downloads from iTS would not purchase a Portable Digital Media Player unless those iTS files could be played on their Portable Digital Media Player.  Because iTS maintained 70% or more of the Audio Download Market, interoperability with files purchased from iTS was critical.  However, because Apple would not license FairPlay and issued software updates intended to prevent interoperability when achieved, competitors were unable to genuinely compete.  Accordingly, Apple willfully maintained its monopoly of both the Audio Download Market and Portable Digital Media Player Market.

63.     Apple also issued several software updates intended to prevent Audio Downloads purchased from iTS from being played on competing Portable Digital Media Players.

64.     For example, in or about the beginning of 2005, a software program known as JHymn was developed so that Audio Downloads purchased from iTS could be played on any AAC-compatible music player, including Apple's iPod or any non-Apple device.  This gave consumers a clear choice of using an iPod for playback of their iTS purchases or an alternative Portable Digital Media Player.

65.     Apple immediately began issuing software updates to prevent iTS files that were made interoperable with other Portable Digital Media Players using JHymn software from being played.  In October 2005, iTunes 6.0 was released and included changes specifically intended to stop JHymn and other similar software programs.

66.     Again in September 2006, Apple released iTunes 7.0 intended to prevent JHymn and other programs from being used to create interoperability between Audio Downloads purchased from iTS and non-Apple Portable Digital Media Players.  Throughout the Class Period, Apple issued software updates intended to prevent the use of other similar programs including QTFairUse and PlayFair.

67.     Apple continually redesigned its software even though it admitted that doing so served no genuine antipiracy purpose.  In a web-posting dated February 6, 2007, Apple's CEO Steve

AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)          - 13 -

1   Jobs conceded that "DRMs haven't worked, and may never work, to halt music piracy." Moreover,

2   the record companies that contractually required DRM did not require all of the anticompetitive

3   software updates issued by Apple.

4   **Removal of FairPlay**

5   68.   On April 2, 2007, EMI began selling its entire catalog of music on iTS without DRM

6   restrictions and hence no FairPlay.  As Eric Nicoli, CEO of EMI Group stated, "[b]y providing

7   DRM-free downloads, we aim to address the lack of interoperability which is frustrating for many

8   music fans.  We believe that offering consumers the opportunity to buy higher quality tracks and

9   listen to them on the device or platform of their choice will boost sales of digital music."  This

10  represented only a fraction of the entire catalog available on iTS at the time.

11  69.   In January 2008, Amazon.com became the first music store to sell all Audio

12  Downloads without DRM restrictions.  Its initial catalog contained over 2 million songs.  The current

13  catalog now offers over 10 million songs.

14  70.   In January 2009, Apple announced that it would begin selling most Audio Downloads

15  through iTS without FairPlay restrictions.  Purchasers that previously bought Audio Downloads

16  from iTS in the past could also upgrade these files to a FairPlay-free format for an additional cost of

17  30 cents per file or 30% of the original album price.  By the end of March 2009, all Audio

18  Downloads sold through iTS were FairPlay-free.

19  71.   This presented the first time when all iPod owners could freely purchase Audio

20  Downloads from any online store for playback on their iPods.  This also presented the first time

21  when Apple could no longer re-design FairPlay software through software updates to control

22  competition in the relevant product markets and restrict consumer choice.  Indeed, in 2009, Apple's

23  market share in the Audio Download Market began to slip for the first time since its creation.

24  Apple's share in the Audio Download Market slipped from 68.3% to 67.1%, whereas, by

25  comparison Amazon's MP3 Store jumped from 6.2% to 9.1%.

26  72.   Despite Apple's decision to sell Audio Downloads unencumbered by FairPlay on a

27  going-forward basis, the impact of Apple's prior conduct did not end.  The billions of songs already

28  downloaded by consumers that remain locked by FairPlay continued to allow Apple to charge

1    monopoly prices for its iPod because it is the only Portable Digital Media Player that can play those

2    files.

3    **APPLE'S CONDUCT HAS BEEN THE TARGET OF FORMAL GOVERNMENT INVESTIGATIONS AND LEGISLATION IN EUROPE**

4

5    73.    In August 2006, France's government approved a law that was specifically designed

to force Apple to allow other companies to sell protected music files on the iPod, and to force Apple

to make music purchased on its iTS compatible with competing Portable Digital Media Players. In

an interview, a French official explained that his government believes that "[s]omeone who buys a

song has to be able to listen to it, no matter which device or the software of choice" and that Apple is

designing its products to prevent consumers from using other companies' products is "not in the

interest of the consumer, nor the interest of the creator. It only benefits the company and we're there

to defend the consumer, our citizens." Apple unsuccessfully lobbied against the law, calling it "state

sponsored piracy."

74.    In 2006, the consumer ombudsmen in Norway, the Netherlands, Finland, Sweden,

Denmark, and Germany began investigating Apple's use of FairPlay.

75.    On July 6, 2006, the Office of the Norwegian Consumer Ombudsman found "[t]he

way Apple uses DRM is illegal." Using language that echoes the American common law standard of

an unconscionable contract, Ombudsman Bjørn Erik Thon ruled:

> [Apple] goes to great lengths to ensure that its standard customer contract
> protects the company's own interest. . . . "The contracts are both vague and hard to
> understand for the customers, and they're clearly unbalanced to disfavor the
> customer. The consumers are clearly the inferior partner in the contract, and this in
> itself is illegal . . . ." "[Apple's restrictive] technology renders the customers without
> rights in dealing with a company which on a whim can dictate what kind of access
> customers will have to products they have already paid for . . . ."

76.    Similarly, in the Netherlands, the Consumer Ombudsman filed suit against what it

called Apple's "illegal practices" "abuse of dominant market position" noting that "[w]hat we want

from Apple is that they remove the limitations that prevent you from playing a song you download

from iTunes on any player other than an iPod . . . . When you buy a music CD it doesn't play only

on players made by Panasonic. People who download a song from iTunes shouldn't be bound to an

iPod for the rest of their lives."

AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)      - 15 -

77.     The European Union Consumer Affairs Commissioner criticized Apple on March 12, 2007, saying: "[d]o you think it's fine that a CD plays in all CD players but that an iTunes song only plays in an iPod?  I don't."

78.     Several of the above European governments issued a joint statement saying "[w]e believe consumers have a right to play material purchased online on a portable device of their own choice.  Contract clauses that make this impossible or too inconvenient are unfair and should be revoked."

79.     In 2008, with the support of other European countries, Norway brought a formal action against Apple.  In September 2008, Norway's Consumer Ombudsman, Bjørn Erik Thon, referred Apple to the Norwegian Market Council.  Bjørn Erick Thon indicated that since his last meeting with Apple in February 2008, when Apple stated that it shared the goal of complete interoperability, Apple had done nothing to advance that goal.

80.     Norway dropped its action against Apple in early 2009, when Apple announced that it would begin selling Audio Downloads through iTS without FairPlay so that they could be played on Portable Digital Media Players other than iPods.

## ANTITRUST INJURY TO CONSUMERS

81.     Through the unlawful acts and practices described above, Apple has harmed competition and innovation by forcing out competitors in the relevant product markets and harmed consumers by causing them to pay supracompetitive prices for iPods.  Those practices, described herein, have also allowed Apple to obtain and maintain illegal monopolies in the relevant product markets.

82.     Apple engaged in willful anticompetitive conduct to maintain its monopoly in both the Audio Download Market and Portable Digital Media Player Market through the use of software updates intended to prevent competitors from selling Audio Downloads that were compatible with iPods.  As a result of this conduct and the technological link created by FairPlay, Apple was able to preserve its monopoly in both markets and charge purchasers of iPods a supracompetitive price.

83.     Likewise, by preventing owners of iPods from buying music from any Audio Downloads retailer other than iTS, Apple deterred consumers from even considering doing business

1    with its competitors' music stores, allowing it to monopolize the Audio Download Market, and

2    further exclude competing Portable Digital Media Players from the market, lock consumers into iPod

3    and iTunes, and charge supracompetitive prices for the iPod.

4          84.    Moreover, through the use of software updates intended to prevent interoperability

5    between Audio Downloads purchased through the iTS and competing Portable Digital Media

6    Players, Apple was able to discourage the purchase of competitors products, allowing it to

7    monopolize the Portable Digital Player Market and charge supracompetitive prices for iPods.

8          85.    Consumers have been further injured as innovative companies such as Dell, Olympus,

9    and Rio have withdrawn from the Portable Digital Media Player Market.  These companies had little

10   choice but to give up and exit the market because Apple's anticompetitive conduct excluded them

11   from reaching the majority of their potential customers no matter how much cheaper or how much

12   better their products were from iPods.  There could be no real competition in the Audio Download

13   and Portable Digital Media Player Market as long as Apple's conduct foreclosed even the possibility

14   of its competitors reaching most potential customers.

15         86.    Apple's anticompetitive conduct has deterred the development of competing

16   products, damaging consumers by depriving them of a choice of products with potentially different

17   and innovative features.

18         87.    Normally markets for consumer electronic goods such as Portable Digital Media

19   Players are characterized by intense competition and narrow profit margins.  Apple's pricing in the

20   Portable Digital Media Player Market, by contrast, is exactly that of a monopolist, excessive and

21   arbitrary.  For example, in June 2006 the only difference between the 1GB and 4GB models of the

22   iPod nano was the capacity of their NAND flash memory parts.  At spot prices in the NAND flash

23   memory market at the time, the 1GB part cost approximately $4.15, while the 4GB part cost

24   approximately $9.67.  Nonetheless, Apple charged an additional one hundred dollars for the 4GB

25   model.

26         88.    Plaintiffs and the Class have been injured by this anticompetitive conduct.  As a direct

27   result of Apple's anticompetitive use of software updates, Plaintiffs and members of the Class paid

28   supracompetitive prices for iPods.

**COUNT I:  MONOPOLIZATION**

**(For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)**

**Violations Resulting from the Unlawful Maintenance
of Monopoly Power in the Portable Digital Media Player Market**

89.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

90.     Apple has monopoly power in the Portable Digital Player Market.

91.     Through the anticompetitive use of software updates described herein, Apple has willfully maintained its monopoly of the Portable Digital Media Player Market.  This conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple during the Class Period.  Prices in the Portable Digital Media Player Market were higher than they would have been in a competitive market; the supply and selection of products available was lower than it would have been in a competitive market; innovation has been stifled; and the number and effectiveness of competitors have been diminished by unlawful means.

92.     As a result of this violation of law, Apple's prices for iPods paid by the Class and Plaintiffs were higher than they otherwise would have been.

93.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Portable Digital Media Player Market.

94.     The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Maintenance
of Monopoly Power in the Audio Download Market**

95.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

96.     Apple has monopoly power in the Audio Download Market.

97.     Through Apple's anticompetitive use of software updates described herein, Apple has willfully maintained monopoly power in the Audio Download Market.  This conduct has harmed competition in that market, making the supply and selection of products available lower in the Audio

Download Market than they would be in a competitive market.  The number and effectiveness of competitors have also been diminished by Apple's unlawful conduct.

98.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Audio Download Market.

99.     The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

## COUNT II: ATTEMPTED MONOPOLIZATION

### (For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)

**Violations Resulting from Unlawful Attempted
Monopolization of the Portable Digital Media Player Market**

100.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

101.     Apple has acted with specific intent to monopolize the Portable Digital Media Player Market by using software updates intended to stifle competition and restrict consumer choice.

102.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Portable Digital Media Player Market because Apple controls a large percentage of that market and has the ability, and actually does, exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Portable Digital Media Player Market will allow Apple to obtain an illegal monopoly over the Portable Digital Media Player Market.

103.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Portable Digital Media Player Market and forced consumers to pay higher prices in the Portable Digital Media Player Market than they would in a competitive market.

104.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Portable Digital Media Player Market.

105.     The anticompetitive conduct described herein, if not halted and abated, will damage Plaintiffs and the alleged Class, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

### Violations Resulting from the Unlawful Attempted
### Monopolization of the Audio Download Market

106.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

107.     Apple has acted with specific intent to monopolize the Audio Download Market by issuing software updates intended to stifle competition and restrict consumer choice.

108.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Audio Download Market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Audio Download Market will allow Apple to obtain an illegal monopoly over the Audio Download Market.

109.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Audio Download Market.

110.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Audio Download Market.

111.     The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

### COUNT III

### (For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq.*)

112.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

113.     Apple's actions as described above constituted an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act, §§16270, *et seq.* of the California Business and Professions Code.

114.    The Class has been injured in their business and property as a result of Apple's illegal conduct, for which they seek damages (treble damages where appropriate) including pre-judgment interest.

## COUNT IV

### (For Violation of California Unfair Competition Law, Bus. & Prof. Code §§17200, *et seq.*)

115.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

116.    The conduct alleged herein constitutes unlawful and unfair business acts and practices within the meaning of the California Unfair Competition Law, §§17200, *et seq.* of the California Business and Professions Code ("UCL").  Plaintiffs have suffered injury in fact and lost money or property as a result of Apple's violations of law and wrongful conduct.

117.    Apple's actions are unlawful under the UCL because they violate, *inter alia*, the Sherman Antitrust Act, the Cartwright Act, the Consumers Legal Remedies Act and because Apple has monopolized the markets for Audio Downloads and Portable Digital Media Players in violation of California common law.

118.    Apple's actions are unfair under the UCL because, in its pursuit of monopoly pricing, it has shut out competitors who attempted to enter the relevant product markets thus preventing consumers from choosing which companies to do business with in the relevant product markets based on the merits of each company's products.  Such conduct is immoral, unethical, oppressive and/or unscrupulous and causes injury to consumers.  Moreover, there is no legitimate business justification for Apple's conduct, and any business justification is further outweighed by the harm Apple's conduct has caused to consumers and competitors.

119.    Accordingly, Apple has violated the UCL by engaging in unlawful and unfair business practices.

120.    As a result of this unlawful and unfair conduct, Apple has been unjustly enriched at the expense of Plaintiffs, other members of the Class, and the general public.

**COUNT V**

**(For Violation of the Consumers Legal Remedies Act,
Cal. Civil Code §§1750, *et seq.*)**

121.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

122.    Plaintiffs and each member of the Class are "consumers" within the meaning of Consumers Legal Remedies Act, California Civil Code §1761(d) ("CLRA").

123.    On July 7, 2006, Plaintiff Melanie Tucker sent a letter to Apple's general counsel demanding Apple cease its conduct in violation of the CLRA.

124.    The CLRA applies to Apple's actions and conduct, described herein, because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

125.    Apple is a monopolist with market shares of 70% or more in each of the relevant product markets and a stock market capitalization of more than fifty billion dollars.  Through the use of FairPlay, Apple has continued to shut out competitors at no benefit to consumers while preventing them from using any Apple product they have already bought from being used with a competitor's Portable Digital Media Player or iTS.

126.    Apple's size, completely dominates market share, and unreasonable and unfair technological restrictions along with its use of software updates, place it in a greatly unequal bargaining position relative to consumers in each of the relevant product markets.

127.    Apple unconscionably exploits this unequal bargaining power by imposing prices, contractual terms, and one sided technological restrictions into contracts with consumers in the Audio Download Market and Portable Digital Media Player Markets.  This behavior has violated and continues to violate the CLRA.

**COUNT VI**

**(For Common Law Monopolization Business Practices)**

128.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

1    129.    The conduct described herein is in violation of California common law prohibiting

2    monopolization.

### PRESERVATION OF CLAIMS FOR APPEAL

4    130.    Plaintiffs expressly incorporate by reference from the April 19, 2007 Consolidated

5    Complaint all allegations in support of: Count 1 Tying (for violation of Section 1 of the Sherman

6    Antitrust Act, 15 U.S.C. §1) under both a *per se* and rule of reason analysis.  Plaintiffs likewise

7    incorporate Count II Monopolization and Count III Attempted Monopolization (for violations of

8    Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2) arising solely from the existence of a

9    technological tie between iTS and iPods prior to October 1, 2004.  Plaintiffs incorporate these

10   allegations out of an abundance of caution, solely for the purpose of preserving such claims for

11   appeal.  *See London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981) and *USS-POSCO*

12   *Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 812 (9th

13   Cir. 1994).

### PRAYER FOR RELIEF

15   WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the putative Class, pray

16   that the Court declare, adjudge and decree the following:

17   A.    That this action may be maintained as a class action pursuant to Rule 23(b)(3) of the

18   Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief,

19   and declaring Plaintiffs as representatives of the Class and their counsel as counsel for the Class;

20   B.    That the conduct alleged herein constitutes unlawful monopolization and attempted

21   monopolization in violation of the Cartwright Act, California common law, and Section 2 of the

22   Sherman Antitrust Act;

23   C.    That the conduct alleged herein is in violation of the UCL and appropriate

24   restitutionary relief be granted pursuant thereto;

25   D.    That the conduct alleged herein is in violation of the CLRA; and appropriate damages

26   be granted thereto;

27   E.    That Plaintiffs and the Class are entitled to damages, penalties and other monetary

28   relief provided by applicable law, including treble damages;

1      F.      That Plaintiffs and the Class recover their costs of suit, including reasonable pre- and

2  post-judgment interest;

3      G.      For an order requiring full restitution of all funds acquired from Apple's unfair

4  business practices, including disgorgement of revenues and/or profits;

5      H.      Awarding Plaintiffs and the Class their expenses and costs of suit, including

6  reasonable attorneys' fees, to the extent provided by law; and

7      I.      That Plaintiffs and the Class are granted such other, further, and different relief as the

8  nature of the case may require or as may be determined to be just, equitable, and proper by this

9  Court.

10                                  **JURY DEMAND**

11      Plaintiffs respectfully demand a trial by jury on all issues so triable.

12  DATED:  January 25, 2010                    COUGHLIN STOIA GELLER
                                                RUDMAN & ROBBINS LLP
13                                              JOHN J. STOIA, JR.
                                                BONNY E. SWEENEY
14                                              THOMAS R. MERRICK
                                                PAULA M. ROACH
15

16
                                                _____
17                                                    s/ Bonny E. Sweeney
                                                      BONNY E. SWEENEY
18
                                                655 West Broadway, Suite 1900
19                                              San Diego, CA  92101
                                                Telephone:  619/231-1058
20                                              619/231-7423 (fax)

21                                              THE KATRIEL LAW FIRM
                                                ROY A. KATRIEL
22                                              1101 30th Street, N.W., Suite 500
                                                Washington, DC  20007
23                                              Telephone:  202/625-4342
                                                202/330-5593 (fax)

24                                              Co-Lead Counsel for Plaintiffs

25                                              BONNETT, FAIRBOURN, FRIEDMAN
                                                    & BALINT, P.C.
26                                              ANDREW S. FRIEDMAN
                                                FRANCIS J. BALINT, JR.
27                                              ELAINE A. RYAN
                                                TODD D. CARPENTER
28                                              2901 N. Central Avenue, Suite 1000

1   Phoenix, AZ  85012
    Telephone:  602/274-1100
2   602/274-1199 (fax)

3   BRAUN LAW GROUP, P.C.
    MICHAEL D. BRAUN
4   12304 Santa Monica Blvd., Suite 109
    Los Angeles, CA  90025
5   Telephone:  310/442-7755
    310/442-7756 (fax)

6
    MURRAY, FRANK & SAILER LLP
7   BRIAN P. MURRAY
    JACQUELINE SAILER
8   275 Madison Avenue, Suite 801
    New York, NY  10016
9   Telephone:  212/682-1818
    212/682-1892 (fax)

10
    GLANCY BINKOW & GOLDBERG LLP
11  MICHAEL GOLDBERG
    1801 Avenue of the Stars, Suite 311
12  Los Angeles, CA  90067
    Telephone:  310/201-9150
13  310/201-9160 (fax)

14  Additional Counsel for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 26, 2010.

<u>                      s/ Bonny E. Sweeney                      </u>
BONNY E. SWEENEY

COUGHLIN STOIA GELLER
          RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:BonnyS@csgrr.com

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com

- **Todd David Carpenter**
  tcarpenter@bffb.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com,valdajani@jonesday.com

- **Thomas Robert Merrick**
  tmerrick@csgrr.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Paula Michelle Roach**
  proach@csgrr.com

- **Elaine A. Ryan**

eryan@bffb.com,pjohnson@bffb.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Michael Tedder Scott**
  michaelscott@jonesday.com,gwayte@jonesday.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,proach@csgrr.com,E_file_sd@csgrr.com,christinas@csgrr.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`