Robert A. Mittelstaedt #60359
ramittelstaedt@jonesday.com
Craig E. Stewart #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
Michael Scott #255282
michaelscott@jonesday.com
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
APPLE INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| **THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION** | Case No. C 05 00037 JW (HRL)<br>C 06-04457 JW(HRL)<br><br>**APPLE'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**<br><br>Date: April 26, 2010<br>Time: 9:00 a.m.<br>Courtroom: 8, 4th Floor<br><br>**REDACTED** |

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

Dockets.Justia.com

1

# TABLE OF CONTENTS

2

**Page**

3

NOTICE OF MOTION AND MOTION ........................................................................ 1

4

RELIEF SOUGHT ..................................................................................................... 1

5

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

INTRODUCTION ...................................................................................................... 1

6

BACKGROUND ....................................................................................................... 2

7

     A.     The Court's Rulings ....................................................................... 2

8

     B.     Amended Complaint ...................................................................... 2

     C.     The Record Labels' Contracts ....................................................... 3

9

     D.     iTS Launch and Attacks by Hackers .............................................. 3

10

     ████████████████████████████████████████████████ 4

11

     F.     The Redesign Also Disabled Harmony ........................................... 5

12

ARGUMENT ............................................................................................................. 6

13

I.     STANDARDS ................................................................................................. 6

     A.     Rules 12 and 56, Federal Rules of Civil Procedure ......................... 6

14

     B.     Section 2, Sherman Act .................................................................. 7

15

II.     APPLE DID NOT VIOLATE SECTION 2 OF THE SHERMAN ACT BY
     UPDATING ITS LAWFULLY ADOPTED SOFTWARE TO MAINTAIN ITS

16

     FUNCTIONALITY. ......................................................................................... 8

17

     A.     The Software Update Claim Should be Dismissed Under Rule 12(b)(6) for
            the Same Reasons the Original Claim was Dismissed ...................... 8

18

     B.     Alternatively, Summary Judgment Should Be Granted Because The
            Updates Were Issued To Stop Illegal Hacks And Comply With The Label

19

            Agreements ................................................................................... 10

20

     C.     Apple Was Not Required To Accommodate Harmony And Thus Is Entitled
            To Summary Judgment .................................................................. 12

21

          1.     Apple had no duty when updating its software to keep Harmony in

22

               operation .......................................................................... 13

          2.     Requiring that Apple keep Harmony in operation would also have

23

               impermissibly required that Apple engage in direct, ongoing
               dealings with a competitor ................................................ 15

24

III.     PLAINTIFFS' STATE LAW CLAIMS ARE SIMILARLY UNFOUNDED ................. 19

25

     A.     Cartwright Act .............................................................................. 20

     B.     Unfair Competition Law ................................................................ 20

26

     C.     Consumers Legal Remedies Act ..................................................... 21

27

     D.     Common Law Monopolization ....................................................... 22

CONCLUSION ......................................................................................................... 23

28

# TABLE OF AUTHORITIES

Page

## Cases

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................. 11

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)............................................................................... 12

*Accord Elevator Antitrust Litig.*,
  502 F.3d ................................................................................................................ 19

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*,
  592 F.3d 991 (9th Cir. 2010)................................................................... 7, 13, 14, 15

*Apple, Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................................... 21

*Aron v. U-Haul Co.*,
  143 Cal. App. 4th 796 (2006) ............................................................................... 21

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)............................................................................................ 6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 555 (2007)........................................................................................ 6

*Belton v. Comcast Cable Holdings, LLC*,
  151 Cal. App. 4th 1224 (2007) ............................................................................. 21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979).................................................................................... 7

*Bondi v. Jewels by Edwar, Ltd.*,
  267 Cal. App. 2d 672 (1968) ................................................................................. 20

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)................................................................................................. 7

*Chavez v. Whirlpool Corp.*,
  93 Cal. App. 4th 363 (2001) ................................................................................. 21

*Cont'l Paper Bag Co. v. E. Paper Bag Co.*,
  210 U.S. 405 (1908)............................................................................................... 17

*Covad Commc'ns Co. v. BellSouth Corp.*,
  374 F.3d 1044 (11th Cir. 2004).............................................................................. 18

*CSC Holdings, Inc. v. Greenleaf Elecs., Inc.*,
  No. 99 C 7249, 2000 U.S. Dist. LEXIS 7675 (N.D. Ill. June 1, 2000)................... 11

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994).................................................................................. 17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)................................................................................................. 8

*Ethyl Gasoline Corp. v. United States*,
  309 U.S. 436 (1940)............................................................................................... 17

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*
  703 F.2d 534 (9th Cir. 1983)......................................................... 2, 7, 9, 10, 12, 13, 15

C 05-00037 JW (HRL); C 06-04457 JW (HRL)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Gilley v. Atlantic Richfield Co.*,
      588 F.3d 659 (9th Cir. 2009)................................................................................ 6

4   *Harrell v. 20th Century Ins. Co.*,
      934 F.2d 203 (9th Cir. 1991)................................................................................ 19

5   *Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
      125 F.3d 1195 (9th Cir. 1997).............................................................................. 18

6   *Imagineering, Inc. v. Kiewit Pac. Co.*,
      976 F.2d 1303 (9th Cir. 1992).............................................................................. 19

7   *In re Canadian Import Antitrust Litig.*,
      470 F.3d 785 (8th Cir. 2006)................................................................................ 7

8   *In re Elevator Antitrust Litig.*,
      502 F.3d 47, 52 (2d Cir. 2007)............................................................................. 18

9   *In re Intel Corp. Microprocessor Antitrust Litig.*,
10    496 F. Supp. 2d 404 ............................................................................................ 22

11  *Kendall v. Visa U.S.A., Inc.*,
      518 F.3d 1042 (9th Cir. 2008).............................................................................. 6

12  *Law v. Nat'l Collegiate Athletic Ass'n*,
      134 F.3d 1010 (10th Cir. 1998)............................................................................ 12

13  *LiveUniverse, Inc. v. MySpace, Inc.*,
      304 F. App'x 554 (9th Cir. 2008) ........................................................................ 18

14  *Lorenzo v. Qualcomm Inc.*,
      603 F. Supp. 2d 1291 (S.D. Cal. 2009); ............................................................. 22

15  *MetroNet Servs. Corp. v. Qwest Corp.*,
      383 F.3d 1124 (9th Cir. 2004)....................................................................... 7, 17, 19

16  *Miller Insituform, Inc. v. Insituform of N. A., Inc.*,
      830 F.2d 606 (6th Cir. 1987)................................................................................ 17

17  *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
      309 F. Supp. 2d 1156 (N.D. Cal. 2004) .............................................................. 7

18  *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield*,
      883 F.2d 1101 (1st Cir. 1989) ............................................................................. 14

19  *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
      797 F.2d 370 (7th Cir. 1986)................................................................................ 14

20  *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
      129 S. Ct. 1109 (2009) ........................................................................................ 7

21  *Paladin Assocs., Inc. v. Mont. Power*,
      328 F.3d 1145 (9th Cir. 2003).............................................................................. 7

22  *RealNetworks, Inc. v. Streambox Inc.*,
      No. C99-2070P, 2000 U.S. Dist. LEXIS  1889, (W.D. Wa. Jan 18, 2000) ............ 11

23  *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
      532 F.3d 963 (9th Cir. 2008)................................................................................ 6

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*RLH Indus., Inc. v. SBC Commc'ns, Inc.,*
133 Cal. App. 4th 1277 (2005) ............................................................... 21

4

*SC Manufactured Homes, Inc. v. Liebert,*
162 Cal. App. 4th 68 (2008) ................................................................... 21

5

6

*SCFC ILC, Inc. v. Visa USA, Inc.,*
36 F.3d 958 (10th Cir. 1994) .................................................................. 14

7

*Schor v. Abbott Labs,*
457 F.3d 608 (7th Cir. 2006) .................................................................. 17

8

*SCM Corp. v. Xerox,*
645 F.2d 1195 (2d Cir. 1981) ............................................................ 10, 17

9

*SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.,*
88 F.3d 780 (9th Cir. 1996) .................................................................... 18

10

*Standard Oil Co. v. United States,*
221 U.S. 1 (1911) ................................................................................... 22

11

*United States v. Aluminum Co.,*
148 F.2d 416 (2d Cir. 1945) ................................................................... 10

12

13

*Universal City Studios, Inc. v. Corley*
273 F.3d 429 (2d Cir. 2001) ..................................................................... 4

14

*Universal City Studios, Inc. v. Reimerdes,*
111 F. Supp. 2d 294 (S.D.N.Y. 2000) ..................................................... 11

15

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2004) ............................................................ 7, 16, 17, 18, 19

16

17

**Statutes**

18

17 U.S.C. § 1201 ........................................................................... 10, 11

Cal. Bus. & Prof. Code § 16720 ................................................................. 20

19

Cal. Civ. Code § 1770(a)(19) ..................................................................... 21

20

Federal Rule of Civil Procedure 12(b)(6) ........................................... 1, 8, 10

Federal Rule of Civil Procedure 56 ...................................................... 1, 7, 8

21

**Other Authorities**

22

1 *Antitrust Law* § 104 .............................................................................. 22

23

1 Julian O. von Kalinowski et al., *Antitrust Laws and Trade Regulation* § 8.04 .......... 22

24

2 *Antitrust Law*, § 301a ............................................................................ 22

3A *Antitrust Law* ¶ 772c3 ......................................................................... 18

25

3A P. Areeda et al., *Antitrust Law* ¶ 775c ..................................................... 15

26

T. Nachbar, *Monopoly, Mercantilism, and the Politics of Regulation,*
91 Va. L. Rev. 1313 (2005) ..................................................................... 22

27

W. Letwin, *The English Common Law Concerning Monopolies,*
21 U. Chi. L. Rev. 355 (1954) ................................................................. 22

28

1

**NOTICE OF MOTION AND MOTION**

2       PLEASE TAKE NOTICE that on April 26, 2010 at 9 a.m., or as soon thereafter as the

3   matter may be heard, defendant Apple Inc. will bring on for hearing this motion to dismiss under

4   Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment under Federal

5   Rule of Civil Procedure 56.

6

**RELIEF SOUGHT**

7       Dismissal or summary judgment in defendant's favor on all claims.

8

**MEMORANDUM OF POINTS AND AUTHORITIES**

9

**INTRODUCTION**

10      The sole remaining claim in this antitrust case is that updates to Apple's anti-piracy

11  software were unlawful.  That claim is without merit as a matter of law.  As this Court has ruled,

12  it was lawful for Apple to use proprietary software even if it meant that Apple's products worked

13  better together than with rivals' products.  For the same reasons, it was also lawful for Apple to

14  update and maintain that software.

15      Moreover, as demonstrated in the accompanying declaration of Jeffrey Robbin, the

16  software updates challenged by plaintiffs were made in response to illegal hacks.  The hacks

17  facilitated music piracy by stripping the content protection that the record labels required as a

18  condition for permitting Apple to offer the music in the first place.  Apple was indisputably

19  entitled to update its anti-piracy software in these circumstances.  Indeed, Apple was required to

20  do so by its contracts with the record labels.

21       For the first five years of this litigation, plaintiffs acted as Microsoft's surrogate, arguing

22  that Apple should have used Microsoft's software instead of competing with Microsoft.  Plaintiffs

23  are now trying to salvage their case by doing the bidding of hackers.  As shown below, Apple is

24  entitled to dismissal or summary judgment on the actual and attempted monopolization claims,

25  and the related state law claims.

26

27

28

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

**BACKGROUND**

A.     **The Court's Rulings.**

In dismissing plaintiffs' tying claims, this Court held that "[t]he increased convenience of using the two products together due to technological compatibility does not constitute anticompetitive conduct under either *per se* or rule of reason analysis."  Dkt. 274, pp. 9-10 (citing *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir. 1983)).  That ruling also applies the monopolization claim, as the Court recognized in its December 21 Order.  Dkt. 303.  The alleged technological tie between Apple products "when they were first introduced to the market" was, "without more, . . . not anticompetitive" and thus does not constitute exclusionary conduct for a monopoly claim.  *Id.* at 2.  The Court accordingly directed plaintiffs to file an amended complaint to clarify "what actions they allege Apple took to maintain monopoly power beyond initial technological relationships between its products."  *Id.*

B.     **Amended Complaint.**

Plaintiffs filed their corrected amended complaint on January 26.  They admit that the record labels required that Apple offer their music in protected format to protect their copyrights.  Dkt. 322, ¶ 42.[1]  In accordance with the Court's ruling, plaintiffs no longer claim that Apple's decision to satisfy that requirement by using FairPlay, its proprietary digital rights management technology (DRM), is unlawful.  They have also dropped their "chip disabling" claim, presumably because they agree that, as Apple has stated from the outset, it was baseless.

The sole allegation in the amended complaint is that Apple's updates to maintain the integrity of FairPlay are purportedly anticompetitive.  In making that claim, plaintiffs reassert their RealNetworks allegations, including the admission that RealNetworks created its Harmony software by "discern[ing]" FairPlay code.  *Id.* ¶ 53.  They also challenge, for the first time, Apple's updates in reaction to hacks released between 2003 and 2006 such as QTFairUse, JHymn and PlayFair.  *Id.* ¶ 63-66.  Plaintiffs assert that these updates prevented the operation of such

---

[1]     The amended complaint acknowledges that, starting in 2007, EMI permitted Apple to offer their music on Apple's music store without DRM and that the rest of the labels went DRM-free in 2009.  Since April 2009, all music offered by Apple has been DRM-free. Dkt. 322, ¶¶ 68-70; Declaration of Jeffrey Robbin (Robbin Decl.), ¶ 2.

"software programs" "developed" to "create interoperability" between iTS music files and non-Apple portable media players. *Id.* ¶¶ 64, 66.

Plaintiffs do not allege that these "software programs" were lawful. They do not deny that, to the extent these programs could be said to promote interoperability, they did so by circumventing DRM. Nor do they allege that Apple could have remained in compliance with its contractual obligations to the labels if it did nothing to stop the hacks. In fact, as shown below, QTFairUse, JHymn and similar hacks were illegal under the Digital Millennium Copyright Act (DMCA), and Apple was legally entitled and contractually obligated to stop them.

**C.     The Record Labels' Contracts.**

As plaintiffs concede, as a condition of making music available to Apple, the record labels insisted at the outset on certain usage rules to guard against piracy. Dkt. 322, ¶ 42; Robbin Decl., ¶ 2, Ex. 1. The usage rules limited copying and distribution of the music files, such as limiting the number of computers authorized to play a protected song. Robbin Decl., ¶ 2, Ex. 1.

The labels also required that, should the DRM become compromised or ineffective, Apple must promptly repair the breach and restore its security. Robbin Decl., ¶ 2, Ex. 1.

*Id.* ¶ 3.

**D.     iTS Launch and Attacks by Hackers.**

In April 2003, Apple launched the iTunes Music Store (now called the iTunes Store ("iTS")). As admitted by plaintiffs' economist, iTS was "procompetitive" and a "huge benefit" to consumers. Dkt. 176, Ex. 21 at 105:8-20. It provided "enormous advantages" for consumers, expanding the number of available songs and allowing consumers to purchase individual songs

- 3 -

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

1    rather than albums.  Dkt. 322, ¶¶ 14-15, 40.

2           Almost from iTS's inception, hackers attacked FairPlay, seeking to circumvent it and

3    evade the labels' usage rules.  Robbin Decl., ¶ 4.  Although their precise methods varied, in

4    general the hackers cracked FairPlay to learn its secrets and then published programs on the

5    Internet that allowed users to strip the content protection from songs, thereby facilitating piracy.

6    In some cases, the hackers devised a way to unlock the keybag and access the keys to decrypt the

7    songs.  In others, the hackers wrote programs to intercept and copy the songs after they had been

8    decrypted by Apple's software.  *Id.*

9           In the fall of 2003 and the spring of 2004, the attacks increased in frequency.  For

10   example, an individual known as "DVD Jon" published QTFairUse in the fall of 2003 and

11   additional hacks in 2004 (VLC, DeDRMS, and FairKeys).[2]  Other hackers introduced PlayFair (a

12   predecessor of Hymn and JHymn) and FairTunes.  *Id.* ¶¶ 4, 8.  These hacks stripped off the

13   content protection, allowing unrestricted copying and distribution of the music files.  *Id.*

14   Avoiding use of the term "piracy," plaintiffs describe these programs as giving consumers

15   "choice."  Dkt. 322, ¶ 64.  They omit that the programs stripped content protection in

16   circumvention of the DRM.



22                                                                              *Id.* ¶¶ 5-8.

25   _____

26   [2]      DVD Jon, whose real name is Jon Lech Johansen, first gained notoriety for creating and
     distributing DeCSS, a program that removed DRM protection from DVDs.  In 2001, the Second
27   Circuit affirmed a permanent injunction against distributing that program because it violated the
     DMCA.  *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

28

1  ████████████████████████████████████████

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████

5  ████████████████████████████████████

6  **F.      The Redesign Also Disabled Harmony.**

7  On July 26, 2004, two months after Apple had begun its redesign of FairPlay,

8  RealNetworks announced its Harmony technology.  As plaintiffs explain it, RealNetworks

9  managed to "analyze[] the firmware within the iPod" and "discern[ed]" Apple's "software code."

10  Dkt. 322, ¶ 53.  By cracking FairPlay code, RealNetworks devised a way to make music

11  purchased from its website mimic Apple's then-existing encryption method and make it appear to

12  the iPod that the RealNetworks-protected music was actually iTS music protected by FairPlay.

13  *Id.*; Robbin Decl., ¶ 9.  When Apple released its redesigned software in October 2004, Harmony

14  no longer worked because it mimicked the previous encryption method.  Robbin Decl., ¶ 10.

15  For Harmony potentially to work after the FairPlay redesign, Apple and RealNetworks

16  would have had to work together well in advance of the redesign, sharing highly confidential and

17  proprietary information (likely including Apple's source code) about their technologies.  *Id.* ¶ 11.

18  RealNetworks would have needed to know how FairPlay was being redesigned and how the iPod

19  actually played music.  *Id.*  The parties would have had to continue dealing with each other,

20  indefinitely and at significant ongoing expense to Apple, so that future updates to FairPlay or the

21  iPod would not interfere with Harmony, and *vice versa*. *Id.*   In addition to financial expense,

22  supporting both FairPlay and Harmony on iPods would have made FairPlay substantially less

23  secure.  *Id.* ¶ 12.  ████████████████████████████

---

24  [3]      Plaintiffs' assertion (Dkt. 322, ¶ 60) that the release of iTunes 4.7 was the first time Apple

25  required users who wished to use iTS to upgrade to the new version of iTunes and FairPlay is
wrong on two counts.  Before iTunes 4.7 was released, Apple had required such users to upgrade

26  to earlier versions of iTunes.  Robbin Decl., ¶ 13.  And Apple did not require users who wished to
use iTS to upgrade to iTunes 4.7 until March 2005, five months after iTunes 4.7 was released.

27  Apple did so to stop the PyMusique hack.  *Id.*  iPod owners could avoid the upgrade by choosing

28  not to use iTS.

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

1     ████████████████████ Cooperating with RealNetworks would have greatly escalated the

2     risks of information leaks by giving non-Apple employees access to that information. ████

3     ████████████████████████████████████████

4     ████████████████████████████████████████

5     ████████████████████████████████████████

6     ████████████████████████████████████████

7     ████████████████████████████

8                              **ARGUMENT**

9     **I.      STANDARDS.**

10          **A.      Rules 12 and 56, Federal Rules of Civil Procedure.**

11          "While a complaint attacked by a [Rule 12 motion] does not need detailed factual

12    allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires

13    more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

14    will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and

15    quotations omitted); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (same).  Instead,

16    plaintiffs must allege enough facts "to state a claim to relief that is plausible on its face." *Iqbal*,

17    129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  No weight is given to "legal

18    conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere

19    conclusory statements." *Id.*  Otherwise, "a plaintiff with a largely groundless claim [would] be

20    allowed to take up the time of a number of other people, with the right to do so representing an

21    *in terrorem* increment of the settlement value." *Twombly*, 550 U.S. at 555 (internal citation and

22    quotation omitted).  This pleading standard applies to all civil cases. *Gilley v. Atlantic Richfield

23    Co.*, 588 F.3d 659, 662 (9th Cir. 2009).[4]

24          Even if a complaint is sufficient under Rule 12, summary judgment is proper under Rule

25    56 when "there is no genuine issue as to any material fact and . . . the movant is entitled to

26    _____

27    [4]      *See also Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 966-67, 970 (9th
      Cir. 2008) (following *Twombly*); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1044, 1047 (9th

28    Cir. 2008) (same).

1    judgment as a matter of law." Fed. R. Civ. P. 56 (c)(2).  Summary judgment is frequently granted

2    in antitrust cases when the alleged conduct is not exclusionary.  *See Allied Orthopedic*

3    *Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010) (affirming

4    summary judgment against claim that product design changes were exclusionary); *MetroNet*

5    *Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) (affirming summary judgment against

6    claim that defendant's pricing practices were exclusionary); *Paladin Assocs., Inc. v. Mont. Power*,

7    328 F.3d 1145 (9th Cir. 2003) (affirming summary judgment on tying and monopolization

8    claims); *Foremost Pro,* 703 F.2d 534 (same).

9         **B.      Section 2, Sherman Act.**

10        A claim for monopolization requires that plaintiff prove that, first, defendant has

11   monopoly power in relevant markets; second, it "willfully acquired or maintained" that power;

12   and third, it caused antitrust injury.  *See* Dkt. 35 (*Slattery v. Apple Computer, Inc.*, No. C05-

13   00037JW (N.D. Cal. Sept. 9, 2005)).  Given the ambiguity of the second requirement—willful

14   acquisition or maintenance—the courts require allegations of specific anticompetitive conduct

15   such as predatory pricing (*e.g.*, *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509

16   U.S. 209 (1993)); refusals-to-deal (*e.g.*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V.*

17   *Trinko, LLP,* 540 U.S. 398 (2004)); *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 129 S. Ct.

18   1109 (2009)); or some other cognizable unlawful exclusionary conduct (*e.g.*, *Berkey Photo, Inc.*

19   *v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (product disparagement)).[5]

20        An antitrust plaintiff has the burden of demonstrating that the allegedly "excluded"

21   competition was lawful.  *See e.g.*, *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 790-92

22   (8th Cir. 2006) (no antitrust liability for conspiring to preclude unlawful import of drugs,

23   reasoning that antitrust laws provide no remedy for alleged restraints on illegal activity); *Modesto*

24   *Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D. Cal. 2004) ("an

25   action under the antitrust laws will not lie where the business conducted by the plaintiff, and

26   alleged to have been restrained by the defendant, was itself unlawful…. [Defendant's] response

---

27   [5]      Attempted monopolization similarly requires "predatory or anticompetitive conduct," in
28   addition to other elements.  *See* Dkt. 35, p. 6 (*Slattery*).

1    [to that unlawful activity]—however anti-competitive or seemingly monopolistic—could not

2    inflict a cognizable antitrust injury.").  Even where conduct is "exclusionary," section 2 liability is

3    not proper if the conduct is supported by "valid business reasons."  *Eastman Kodak Co. v. Image*

4    *Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

5    **II.      APPLE DID NOT VIOLATE SECTION 2 OF THE SHERMAN ACT BY**

6    **UPDATING ITS LAWFULLY ADOPTED SOFTWARE TO MAINTAIN ITS**

7    **FUNCTIONALITY.**

8            With their original theory rejected, plaintiffs are reduced to arguing that, while it was

9    lawful for Apple to comply with the labels' demand for anti-piracy software by using its own

10   DRM, it was unlawful for Apple to prevent hackers from illegally circumventing that same

11   DRM.  That argument is meritless.  Just as it was lawful for Apple to adopt its own software,

12   even if the result was that Apple's products work better together than with competitors'

13   products, it was also lawful for Apple to maintain and improve the functionality of that software.

14   For this reason, the amended complaint fails to state a claim and should be dismissed under Rule

15   12(b)(6).

16           Alternatively, under Rule 56, the undisputed facts show that the challenged software

17   updates did not violate section 2 of the Sherman Act or related California laws.  The hackers who

18   triggered Apple's 2004 redesign of FairPlay were engaged in illegal conduct that Apple had an

19   absolute right to stop and, moreover, was obligated to stop by its contracts with the labels.  Apple

20   had no antitrust duty to ensure that Harmony, which was based on the then-existing design of

21   FairPlay, would continue to work with FairPlay as redesigned to respond to other hackers.

22           **A.      The Software Update Claim Should be Dismissed Under Rule 12(b)(6) for the**

23           **Same Reasons the Original Claim was Dismissed.**

24            The theory of plaintiffs' software update claim is the same as their original claim:  the

25   lack of complete interoperability between one company's products and those of its competitors is

26   allegedly a problem under the antitrust laws and, thus, a company cannot use or maintain its own

27   proprietary software if incompatibility will result.  But as this Court correctly concluded, "[t]he

28   increased convenience of using the two products together due to technological compatibility

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

1      does not constitute anticompetitive conduct under either *per* se or rule of reason analysis."

2      Dkt. 274, p. 9.

3          As the Ninth Circuit ruled in *Foremost Pro,* "the introduction of technologically related

4      products, even if incompatible with the products offered by competitors," is not an

5      "anticompetitive act." Thus, it was of "no assistance to Foremost's efforts to state a claim for

6      relief for monopolization or attempted monopolization, both of which require at least some

7      allegation of anticompetitive conduct." 703 F.2d at 543-44. Indeed, the "creation of

8      technological incompatibilities" actually "increases competition" in two ways: it provides

9      consumers "with a choice among differing technologies" and it provides "competing

10     manufacturers the incentive to enter the new product market by developing similar products of

11     advanced technology." *Id.* at 542.[6] Condemning such decisions "would unjustifiably deter the

12     development and introduction of those new technologies so essential to the continued progress of

13     our economy." *Id.* at 543. As plaintiffs' economist has acknowledged, prohibiting a company

14     from developing its own software "would be stupid" because it would freeze technology and

15     "prohibit innovation." Dkt. 176, Ex. 21at 169-170.

16          This reasoning applies with full force here. The effect complained of by plaintiffs is the

17     same whether plaintiffs are challenging Apple's initial decision to adopt a proprietary DRM or

18     later updates to maintain or restore its functionality. Either way, Apple is simply adhering to a

19     lawful decision to use a proprietary system. In both instances, the result is simply that a few

20     additional steps are needed for consumers who wish to play iTS music on a competing player

21     rather than an iPod. Consumers can also continue to buy digital music from other online stores,

22     and play it on compatible devices. Updating the software to maintain or restore its functionality

23     does not create any new or different level of incompatibility and, thus, is just as lawful as that

24     initial decision.

25

26     [6]     That is precisely what occurred here, as other online digital music stores used their own
proprietary, non-licensed DRM (*e.g.*, Sony and Microsoft Zune) or the generic DRM that

27     Microsoft licensed under its PlaysForSure program. *See, e.g.,* Declaration of Michael Scott (Scott
Decl.), Ex. 1 (Ina Fried, "Microsoft's Zune to rival Apple's iPod," CNET News.com (July 21,

28     2006)).

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

- 9 -

1   Nor is it relevant that the updates were done after Apple allegedly achieved market power.

2   The Ninth Circuit rejected the claim in *Foremost Pro* even though Kodak introduced its product

3   after achieving market power.  *Foremost Pro,* 703 F.2d at 537.  That ruling applies *a fortiori* here,

4   because Apple adopted FairPlay when, as plaintiffs admit, Apple had no market power in either

5   alleged market.[7]  Having lawfully adopted FairPlay, Apple was not barred from continuing to use

6   and maintain it.  Forcing Apple to change its business model and stop protecting its DRM's

7   integrity after allegedly obtaining "monopoly" status would run afoul of the antitrust principle

8   that "[t]he successful competitor, having been urged to compete, must not be turned upon when

9   he wins."  *United States v. Aluminum Co.*, 148 F.2d 416, 430 (2d Cir. 1945) ; *SCM Corp. v.*

10  *Xerox*, 645 F.2d 1195 (2d Cir. 1981) (holding that a company that has lawfully acquired a patent

11  may continue to exercise the exclusionary power of that patent even after the patented product

12  becomes a commercial success and results in an economic monopoly).

13       For these reasons, plaintiffs fail to state a valid claim, and the complaint should be

14  dismissed under Rule 12 (b)(6).

15  **B.      Alternatively, Summary Judgment Should Be Granted Because The Updates**

16               **Were Issued To Stop Illegal Hacks And Comply With The Label Agreements.**

17       The indisputable facts set forth in the Robbin declaration show that the updates were not

18  exclusionary acts and that Apple had a legitimate justification for them.  Thus, plaintiffs cannot

19  carry their burden and summary judgment should be granted for Apple.

20       QTFairUse, JHymn, PlayFair and similar hacks referred to in the amended complaint

21  violated the DMCA.  The DMCA prohibits any technology designed "to circumvent[] a

22  technological measure that effectively controls access" to a copyrighted work or otherwise

23  protects rights of copyrights owners.  17 U.S.C. § 1201(a)(2)(A) & 1201(b)(1)(A).  These

24  prohibitions include software written "to decrypt an encrypted work, or otherwise to . . .

25  bypass . . . a technological measure, without the authority of the copyright owner."  *Id.*

26     —————————————————

27  [7]      At the iTS launch, Apple obviously had no share of any alleged music market.  And
plaintiffs allege that, at that time, iPod sales were only 11% of the alleged market (even with

28  plaintiffs' improperly narrow market definition.)  Dkt. 322, ¶ 47.

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

- 10 -

1  § 1201(a)(3)(A) & 1201(b)(2)(A); *see 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.

2  Supp. 2d 1085 (N.D. Cal. 2004) (granting permanent injunction under the DMCA against

3  program that circumvented copy protection on DVDs).[8]

4       The hacks cited in the amended complaint fall squarely within these prohibitions.

5  Plaintiffs admit that the record labels hold valid copyrights to the music they permit Apple to

6  offer on iTS.  Dkt 322, ¶ 18.  Plaintiffs further admit that DRM like FairPlay is a "technological

7  encumbrance[] . . . designed to restrict a consumer's use of the file and illegal unauthorized

8  copies of the digital file."  *Id.* ¶¶ 41-42; *see also* Robbin Decl., ¶¶ 2-3.  Thus, FairPlay controls

9  access to the files and protects the reproduction right of the copyright owner within the meaning

10 of the DMCA.  By circumventing FairPlay (*id.* ¶¶ 4, 8), JHymn and the similar hacks alleged in

11 the complaint violated the DMCA.

12      When Apple updated its software to thwart these hacks, it was simply exercising rights

13 that Congress expressly afforded to copyright holders and others to protect copyrighted works.[9]

14 To argue that protecting these rights violates the Sherman Act would be absurd and contradict the

15 rule discussed above (pp. 7-8) that the Sherman Act does not impose liability for combating

16 conduct illegal under other laws.

17      Even without the DMCA, it would still be lawful for Apple to stop these hacks.  As noted,

18 in addition to requiring that Apple offer their copyrighted music in protected format, the labels

19 also required that Apple promptly repair any beaches of that security.  As holders of the

20 copyrights on the music, the labels were entitled to make that demand.  As the indirect plaintiff's

21 ───────────────

22 [8]     A protection scheme "effectively" controls access if it limits access to the work by
   encryption or similar means.  17 U.S.C. § 1201(a)(3)(B) & 1201(b)(2)(B).  That hackers may

23 have succeeded in breaking the scheme is irrelevant.  To rule otherwise would "offer protection
   where none is needed but [] withhold protection precisely where protection is essential."

24 *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 318 (S.D.N.Y. 2000), *aff'd*
   *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

25 [9]     A claim under the DMCA can be brought by copyright owners and "'any
   person'…injured by a violation of" the DMCA.  Thus, entities like Apple that distribute

26 copyrighted works of others may sue for violations of the DMCA.  *See RealNetworks, Inc. v.*
   *Streambox Inc.*, No. C99-2070P, 2000 U.S. Dist. LEXIS 1889, at * 15-16 (W.D. Wa. Jan 18,

27 2000); *see also CSC Holdings, Inc. v. Greenleaf Elecs., Inc.*, No. 99 C 7249, 2000 U.S. Dist.
   LEXIS 7675 (N.D. Ill. June 1, 2000).

28

economist admitted, the record labels have a "legitimate business concern" in requiring DRM to prevent "their copyrighted products [from] being given away."  Scott Decl., Ex. 2 (French Dep. 126:3-127:7).  These plaintiffs do not allege otherwise.

Apple was entitled to agree to the labels' demand as part of the indisputably "pro-competitive" launch of iTS which provided a "huge benefit" to consumers."  *Supra,* at 3.  By offering a legal alternative to Napster and other unlicensed and illegal peer-to-peer sites (*see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)), iTS expanded the lawful avenues for sale of music to consumers and produced "enormous advantages" for consumers. This creation of innovative new products is precisely the pro-competitive, pro-consumer outcome the antitrust laws were enacted to foster.[10]  As a recent head of the U.S. Department of Justice Antitrust Division observed, Apple "solved a problem that some observers, less than five years ago, predicted might never be solved: how to create a consumer-friendly, yet legal and profitable, system for downloading music and other entertainment from the Internet."  Scott Decl., Ex. 3.

In short, the antitrust laws do not provide a safe haven for hackers whose conduct is unlawful under the DMCA, and they do not prevent companies from complying with contractual obligations to protect copyrights.  Thus, plaintiffs' claim is without merit.

**C.      Apple Was Not Required To Accommodate Harmony And Thus Is Entitled To Summary Judgment.**

Trying to distinguish RealNetworks' Harmony technology from programs offered by DVD Jon and other hackers, plaintiffs allege that Harmony "met with approval from the major record labels" and that, unlike the other hacks alleged in the complaint, the songs remained protected by DRM.  Dkt. 322, ¶ 56.  Plaintiffs' allegations regarding Harmony do not state an antitrust claim, and the undisputed facts show that any such claim is meritless as a matter of law.

---

[10]     *See Foremost Pro*, 703 F.2d at 546 ("creat[ing] demand for new products is perfectly consistent with the competitive forces the Sherman Act was intended to foster"); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1023 (10th Cir. 1998) (recognizing that antitrust laws favor "increasing output, creating operating efficiencies, making a new product available, enhancing product or service quality, and widening consumer choice").

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

- 12 -

1
2

**1.     Apple had no duty when updating its software to keep Harmony in operation.**

3      As discussed above, ███████████████████████████████████████

4   ████████████████ Harmony operated by mimicking FairPlay's then-existing encryption method

5   to make it appear that RealNetworks songs were protected by FairPlay. ██████████████

6   ██████████████████████████████████████████████████████████████

7   ████████████████████ This conduct does not violate section 2 of the Sherman Act because, as

8   the Ninth Circuit recently held, even an alleged monopolist "has no duty to help its competitors

9   survive or expand when introducing an improved product design." *Tyco,* 592 F.3d at 1002.

10      The plaintiff in *Tyco* argued that Tyco violated section 2 by introducing, after gaining

11   monopoly power, a product change that made Tyco's products incompatible with the plaintiffs'

12   existing complementary products. The Ninth Circuit rejected that claim. Affirming summary

13   judgment for Tyco, the Court held that a company with monopoly power is entitled to update and

14   improve its products, even if the result is that a competitor's product no longer works with the

15   updated product. *Id.* at 998-03. It relied in part on *Foremost Pro*, discussed above. As the *Tyco*

16   court described *Foremost Pro,* the plaintiff alleged that Kodak maintained its monopoly "by

17   continually researching and developing new photographic products . . . that are incompatible with

18   then existing photographic products." *Id.* at 999 (quoting *Foremost Pro*, 703 F.2d at 543). Such

19   allegations of "technological predation" do not state a section 2 claim, because even monopolists

20   are "permitted and indeed encouraged to compete aggressively on the merits." *Id.* at 998-99

21   (quoting *Foremost Pro*, 703 F.2d at 544-45).

22      This analysis applies fully here. ████████████████████████████████

23   ███████████████████████████████████ This benefited not only the record

24   labels but also consumers. ████████████████████████████████████

25   ██████████████████████████████████████████████████████████████

26   ████████████████ Dkt. 322 , ¶ 14. As RealNetworks acknowledged in its 10-Q just

27   before the portion quoted by plaintiffs (*id.* ¶ 61), DRM "technologies are frequently the subject of

28   hostile attack by third parties seeking to illegally obtain content. If our digital rights management

technology is compromised . . . our business could be harmed if content providers lose confidence in our ability to protect their content." Scott Decl., Ex. 4.  Apple faced that same risk and was entitled to protect against it by modifying its software.  In doing so, Apple had no duty to ensure that RealNetworks' Harmony – or any other software or device that operated with the superseded versions of FairPlay – remained in operation.

Indeed, *Tyco* applies with particular force here, because Harmony was not simply a complementary product but was itself an unauthorized program that Apple would have been entitled to disable even apart from the other hacks.  RealNetworks created Harmony by "discerning" and then mimicking Apple's proprietary encryption code.  Leaving such an unauthorized program unaddressed would undermine the integrity of Apple's security system and increase its vulnerability to future hacks ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Apple was not required to sit idly while its property was broken into and made less secure.

*Tyco* also shows that anti-competitive intent such as plaintiffs allege here does not change the result.  The *Tyco* plaintiffs pointed to evidence that Tyco "hoped its new technology would constitute a barrier to entry" by its competitors.  *Tyco,* 592 F.3d at 1001.  But the Ninth Circuit held that "[s]tatements of an innovator's intent to harm a competitor through genuine product improvement are insufficient by themselves to create jury question under Section 2" because "even legitimate product improvement can have the effect of harming or even destroying competitors."  *Id.*[11]

---

[11]     This holding is consistent with section 2 case law generally, which adopts an objective test out of recognition that every competitor wants to harm its competitors and gain an advantage. *E.g., Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969-70 (10th Cir. 1994) (same); *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield*, 883 F.2d 1101, 1113 (1st Cir. 1989) ("[T]he desire to crush a competitor, standing alone, is insufficient to make out a violation of the antitrust laws.").

As the leading antitrust treatise puts it, making liability in product design cases turn on intent is "the worst way to handle claims that innovation violates the antitrust laws."  3A P.

(continued)

*Tyco* also rejected the argument that the legality of a product design change should be determined by balancing the "benefits or worth of a product improvement . . . against its anticompetitive effects." *Tyco*, 592 F.3d at 1000. So long as the change improves the product, the change is "necessarily tolerated by the antitrust laws." *Id.* (quoting *Foremost Pro*). As the Court explained,

> "To weigh the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable. There are no criteria that courts could use to calculate the 'right' amount of innovation, which would maximize social gains and minimize competitive injury . . . The balancing test proposed by plaintiffs would require court to balance as-yet-unknown benefits against current competitive injury. Our precedents and the other precedents we have relied upon strongly counsel against such a test."

*Id.* The only exception is if the defendant engaged in improper conduct beyond the product change. *Id.* Plaintiffs do not and could not allege any such conduct here. Their claim is predicated solely on software updates. These updates, which stopped hacks and restored or enhanced FairPlay's security are, indisputably, product improvements. Indeed, as shown above, the "huge" benefit that iTS offered to consumers would never have occurred but for Apple's use of DRM and efforts to maintain its integrity, as required by the labels. Plaintiffs do not allege otherwise. Their claim therefore fails for the same reasons as the claim in *Tyco*.

### 2. Requiring that Apple keep Harmony in operation would also have impermissibly required that Apple engage in direct, ongoing dealings with a competitor.

The foregoing shows that Apple was not obligated to keep Harmony in operation even if it could have done so without having to deal directly with RealNetworks. But plaintiffs' claim fails for the additional, independent reason that any attempt to prevent the updates from disabling Harmony would have required extensive, close cooperation between Apple and RealNetworks.

---

Areeda et al., *Antitrust Law* ¶ 775c. "An antitrust rule permitting juries to sift through records pertaining to a firm's intent cannot help but chill perfectly appropriate behavior that the antitrust laws are intended to encourage." *Id.*

- 15 -

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

1    *See* Robbin Decl., ¶¶ 11-12.[12]  Apple and RealNetworks (competitors in providing music) would

2    have had to exchange highly confidential, proprietary information regarding their respective

3    technologies, likely including Apple's source code, so that RealNetworks could try to mimic the

4    latest version of FairPlay.  Apple would have had to disclose to RealNetworks how FairPlay was

5    being modified, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ so that RealNetworks could modify

6    Harmony to match the updated FairPlay.  RealNetworks would likewise have had to disclose to

7    Apple how Harmony worked and then cooperate with Apple to attempt to prevent Harmony from

8    interfering with the iPods' and FairPlay's operation.  This cooperation and exchange of

9    confidential information would have had to continue indefinitely, at substantial cost to Apple, so

10   that future updates responding to other hacks or otherwise improving FairPlay would not interfere

11   with Harmony.  Robbin Decl., ¶ 11.[13]

12       The antitrust laws, however, do not impose a duty to cooperate with competitors in this

13   manner.  In *Trinko*, the plaintiff sought to impose such a duty, alleging that Verizon had refused

14   to give competing carriers access to its network, thereby preventing them interoperating their

15   systems with Verizon's.  The Supreme Court rejected that claim at the pleading stage, holding

16   that, as a general rule, "there is no duty [under the antitrust laws] to aid competitors."  540 U.S. at

17   411.  The antitrust laws permit, indeed encourage, companies to establish "an infrastructure that

18   renders them uniquely suited to serve their customers."  *Trinko,* 540 U.S. at 407.  Compelling

19   companies to "share the source of their advantage" would be in "tension with the underlying

20   purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to

21   invest in those economically beneficial facilities."  *Id.* at 407-08.  It would also require courts to

---

22   [12]     *See also* Dkt. 278, Ex. 1 ("We would have to engineer and work with [RealNetworks] not
23   to break [Harmony].").

24   [13]     This close, ongoing cooperation between two competitors would carry its own risks.  Even
     with significant expenditure of time and money, there would be no assurance that undiscovered
25   bugs or glitches in trying to meld two different DRM technologies would not adversely affect the
     iPod.  Similarly, as noted, dealing with RealNetworks would have made FairPlay less secure
26   because it would (1) increase the number of people with knowledge of Apple's highly
     confidential, proprietary encryption methods and (2) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
27   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
28

"act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are illsuited." *Id.* at 408. As the Ninth Circuit amplified, "'[a]n antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations.'" *MetroNet*, 383 F.3d at 1133 (quoting *Trinko*). And "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko,* 540 U.S. at 408.[14]

Consistent with these concerns, courts have held for over a century that unilateral refusal to license intellectual property is not an antitrust violation. *See Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 429 (1908) (exclusion of competitor's use of patented improvement of paper bag machines is the "very essence of the right conferred by the patent"); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 457 (1940) (patentee has the "right to refuse to sell or to permit his license to sell the patented products"); *SCM Corp.*, 645 F.2d at 1206 (no liability under Sherman or Clayton act for refusal to license patents for copying process); *Miller Insituform, Inc. v. Insituform of N. A., Inc.*, 830 F.2d 606, 609 (6th Cir. 1987); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994).

The analysis of these cases applies fully here. Plaintiffs are seeking to require Apple to engage in an expensive, ongoing course of dealing with a competitor to share in the success of Apple's groundbreaking innovative products. This claim raises each concern that led the *Trinko* Court to reject a forced interoperability claim. Forced dealing would chill the incentive to invest in developing innovative products. It would thrust the court into the role of overseeing Apple's forced efforts to ensure that Harmony stayed in operation while guarding against significant incremental risks to iPod operations and the security of Apple's DRM. And it would force two competitors into a close, cooperative relationship with the sharing of highly confidential, proprietary commercial information. Indeed, due to the complexity and difficulty of court oversight of forced dealings between Apple and RealNetworks, and the type of information that

---

[14] *See also Schor v. Abbott Labs*, 457 F.3d 608, 610 (7th Cir. 2006) (citing *Trinko* for proposition that "Cooperation is a *problem* in antitrust, not one of its obligations.") (emphasis in original).

1   they would need to share, this case shows even more pointedly than *Trinko* and *MetroNet* why the

2   antitrust laws do not force companies to deal with each other to achieve interoperability.

3       Plaintiffs cannot escape *Trinko*.  "The sole exception to the broad right of a firm to refuse

4   to deal with its competitors" arises when a company has voluntarily entered into—and then

5   unilaterally terminated—a prior course of dealing with competitors.  *In re Elevator Antitrust*

6   *Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).  Applying that rule, the Second Circuit affirmed the

7   dismissal of a claim that the defendant elevator manufacturers had violated section 2 by designing

8   their elevators to require "proprietary maintenance tools which are not made available to

9   competing service companies (*e.g.*, embedded computer systems that can only be interfaced with

10  defendant-controlled handheld units)."  *Id.* at 49.  The Second Circuit held that no valid claim was

11  stated because "the complaint does not allege that defendants terminated a prior relationship with

12  elevator service providers."  *Id.* at 54.  The Eleventh Circuit has likewise ruled that "*Trinko* now

13  effectively makes the unilateral termination of a voluntary course of dealing a requirement for a

14  valid refusal-to-deal claim …"  *Covad Commc'ns Co. v. BellSouth Corp.*, 374 F.3d 1044, 1049

15  (11th Cir. 2004).  These rulings are consistent with Ninth Circuit rulings that, even before *Trinko*,

16  refused to impose a duty to deal absent a prior voluntary course of dealing.[15]

17      Plaintiffs cannot satisfy that exception here because they do not and cannot allege that

18  Apple ever entered into any course of dealing with RealNetworks, voluntary or otherwise.

19  Moreover, just as Verizon was not in the business of selling access to its network in *Trinko*,

---

[15]    *E.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 (9th Cir. 1997)
("Like the Supreme Court in *Aspen Skiing*, we are faced with a situation in which a monopolist
made a conscious choice to change an established pattern of distribution…."); *SmileCare Dental
Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) ("Unlike the defendant
skiing company in *Aspen*, Delta Dental did not discontinue a market arrangement with
SmileCare.").  *See also LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir.
2008) ("LiveUniverse contends a refusal-to-deal claim does not require 'an affirmative decision
or agreements to cooperate' between competitors.  LiveUniverse is mistaken.").

    The Areeda treatise, relied on extensively in *Trinko*, similarly recognizes that the critical
basis for imposing refusal-to-deal liability is the "defendant's abandonment of a joint venture
initially entered into voluntarily.  The Court did not impose a prospective duty to deal where no
such dealing had occurred previously, and there is no reason for thinking that it would have done
so."  3A *Antitrust Law* ¶ 772c3.

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

- 18 -

1   Apple is not in the business of licensing its DRM software to others and thus had not "refused to

2   provide to its competitor . . . a product that it already sold at retail." 540 U.S. at 410.  Thus, just

3   as in *Trinko*, dealing with RealNetworks would require Apple to develop licensing systems and

4   procedures that do not already exist.  *Id.*

5        As noted (p. 14), plaintiffs' allegations of bad intent do not give rise to a duty to deal.  The

6   Supreme Court rejected refusal-to-deal liability in *Trinko*, at the pleading stage, despite

7   allegations that the defendant had refused to deal "as part of an anticompetitive scheme" and "in

8   order to limit entry" by competitors.  540 U.S. at 404, 407.  The Ninth Circuit reached a similar

9   result in *MetroNet*.  Qwest had adopted a volume discount plan for customers with 20 or more

10  phone lines.  MetroNet sought to avoid the volume requirement by aggregating the phone orders

11  of numerous small businesses with less than 20 lines into a single purchase order and then

12  reselling the purchased lines to the individual businesses.  In response, Qwest revised its discount

13  plan to require that the twenty or more lines be at a single location.  Even though this change in

14  the plan was specifically to prevent MetroNet from continuing to obtain the volume discount, the

15  Ninth Circuit held that the change did not violate section 2 because Qwest was simply seeking to

16  maintain the business strategy it had originally adopted.  *MetroNet,* 383 F.3d at 1133.  The same

17  is true here.  *Accord Elevator Antitrust Litig*., 502 F.3d at 49 (rejecting refusal to deal liability

18  despite allegation that the defendants had "intentionally design[ed]" their product to be

19  incompatible with competitors' products).

20        For all these reasons, plaintiffs' federal antitrust claim fails.

21  **III.    PLAINTIFFS' STATE LAW CLAIMS ARE SIMILARLY UNFOUNDED.**

22        Because the state law claims are based on the same allegations and derived from the

23  Sherman Act claim and because the Court and the parties have already devoted extensive time

24  and resources to this litigation, the Court should decide the state law claims on the merits.  *See,*

25  *e.g.*, *Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) (affirming dismissal of

26  plaintiffs' federal and state law claims, reasoning that retaining jurisdiction over the state law

27  claims furthered the interests of economy, convenience, fairness, and comity); *Imagineering, Inc.*

28  *v. Kiewit Pac. Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992) (same, noting that "[o]ur circuit

1  frequently has upheld decisions to retain pendent claims on the basis that returning them to state

2  court would be a waste of judicial resources").

3  **A.      Cartwright Act.**

4      The Cartwright Act does not include any counterpart to section 2 of the Sherman Act.

5  Rather than reaching single-firm, unilateral conduct, it applies only to multi-firm conspiracies.

6  *See* Cal. Bus. & Prof. Code § 16720 (prohibiting certain "trusts," which are defined as "a

7  combination of capital, skill or acts by two or more persons"); *Bondi v. Jewels by Edwar, Ltd.*,

8  267 Cal. App. 2d 672, 677-78 (1968) (§ 16720 "contemplates concert of action by separate

9  individuals or entities maintaining separate and independent interests").

10     By definition, plaintiffs' section 2 claim addresses only single-firm, unilateral conduct and

11 thus is not cognizable under the Cartwright Act.

12 **B.      Unfair Competition Law.**

13     Plaintiffs allege that Apple engaged in "unlawful" or "unfair" conduct within the meaning

14 of the UCL.  Apple did neither.

15     The "unlawfulness" allegation (¶ 117) simply incorporates the claims under the Sherman

16 Act, Cartwright Act, Consumer Legal Remedies Act and purported common law monopolization.

17 Because each claim is without merit as shown in this motion, the derivative claim of unlawfulness

18 under the UCL also falls.

19     The "unfairness" allegation (¶ 118) likewise falls with plaintiffs' antitrust claim.

20 Plaintiffs assert that Apple's conduct was unfair because Apple engaged in "monopoly pricing"

21 that impaired competition and harmed consumers without any business justification.  *Id.*  But

22 California courts have rejected such attempts to repackage an invalid antitrust claim into a UCL

23 "unfairness" claim:

24        If the same conduct is alleged to be both an antitrust violation and an "unfair"
          business act or practice for the same reason—because it unreasonably restrains
25        competition and harms consumers—the determination that the conduct is not an
          unreasonable restraint of trade necessarily implies that the conduct is not "unfair"
26        toward consumers.   To permit a separate inquiry into essentially the same
          question under the unfair competition law would only invite conflict and
27        uncertainty and could lead to the enjoining of procompetitive conduct.

28

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

1   *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).[16]

2       **C.      Consumers Legal Remedies Act.**

3       Unlike the UCL, the CLRA does not contain any general prohibition on unfair or

4   fraudulent conduct.  It is limited to specified practices.  Plaintiffs seek to invoke the prohibition

5   against "[i]nserting an unconscionable provision in the contract" (Cal. Civ. Code § 1770(a)(19))

6   by alleging that Apple "unconscionably exploits [its] unequal bargaining power" in its contracts

7   with its purchasers.  Dkt. 322, ¶ 127.  The only "contractual terms" to which plaintiffs point,

8   however, are Apple's prices and its supposed "one sided technological restrictions."  *Id.*   Neither

9   violates the CLRA.

10      Apple is not aware of any authority finding a price to be unconscionable based on a large

11  market share or "technological restrictions" that limited compatibility.  The doctrine of

12  unconscionability is not a vehicle for courts to regulate prices or supplant the analysis required by

13  the antitrust laws.  To the contrary, the courts have repeatedly rejected challenges to a company's

14  prices on unconscionability grounds.  *E.g., Aron v. U-Haul Co.*, 143 Cal. App. 4th 796 (2006)

15  (holding that $20 refueling fee—on top of the price of the gasoline itself—imposed by truck

16  rental company was not unconscionable).

17      Nor do the alleged "technological restrictions" violate the CLRA.  The CLRA is limited to

18  a specified list of prohibited practices, none of which apply to technological restrictions of the

19  type pled here.  Plaintiffs allude to the prohibition of unconscionable contract provisions, but are

20  not challenging any such provision.  In any event, there is nothing unconscionable about a

21  company making a product that is not interoperable with competitors' products.  Indeed, even if

22  Apple had sold iPods and iTS music only as a package, it would not violate the CLRA.  *See*

23  *Belton,* 151 Cal. App. 4th at 1247 (rejecting claim that Comcast violated CLRA by packaging

24  music service with basic cable TV service; "To hold that it is 'unconscionable' for a business that

25  ───────────────

26  [16]      *Accord Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008)
    (dismissing UCL unfairness claim after concluding no antitrust claim existed); *SC Manufactured*
27  *Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 92-93 (2008) (same); *RLH Indus., Inc. v. SBC*
    *Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1286 (2005) (same); *Belton v. Comcast Cable Holdings,*
28  *LLC*, 151 Cal. App. 4th 1224, 1240 (2007) (same)

has the technical and legal capability to offer a service or good separately, to instead offer it only

as part of a package, would be an unwise excursion into an area of economic policy that is better

left to the Legislature.").

**D.    Common Law Monopolization.**

California law does not recognize a common law monopolization claim.  Although some

earlier California trial court decisions overruled demurrers without any significant analysis, more

recent decisions that considered the issue in depth have uniformly ruled that no such claim exists.

*See, e.g., Lorenzo v. Qualcomm Inc.,* 603 F. Supp. 2d 1291, 1305-06 (S.D. Cal. 2009); *In re Intel*

*Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 419-20 (D. Del. 2007).

These decisions reflect that the common law did not recognize a damages action for

single-firm, unilateral monopolization.  As the United States Supreme Court recognized shortly

after the Sherman Act was enacted, "nowhere at common law can there be found a prohibition

against the creation of monopoly by an individual."  *Standard Oil Co. v. United States*, 221 U.S.

1, 55 (1911).  Antitrust commentators have similarly observed that "[t]here was no common-law

tort of 'monopolization.'"  T. Nachbar, *Monopoly, Mercantilism, and the Politics of Regulation*,

91 Va. L. Rev. 1313, 1323 (2005); 1 Julian O. von Kalinowski et al., *Antitrust Laws and Trade*

*Regulation* § 8.04 ("There was no developed body of law regarding unilateral monopolization.");

1 *Antitrust Law* § 104 (observing that case law under the Sherman Act "very quickly deviated

from common law principles," and included "pursu[ing] unilateral conduct for the first time").[17]

In 2006 and on two earlier occasions, the California Legislature rejected proposals to adopt a

private damages action for unilateral monopolization.  Scott Decl., Exs. 5-7.  This legislative

---

[17]    Common law was concerned not with private monopolization, but with governmental grants of an exclusive right to engage in a given trade in a particular locale.  *See Standard Oil*, 221 U.S. at 51; 2 *Antitrust Law*, § 301a (observing that "the monopoly known to the common law was that granted or held by public or quasi-public authority").  Such government-bestowed monopolies were found illegal by the English courts and outlawed by Parliament in the Statute of Monopolies.  *See, e.g.,* W. Letwin, *The English Common Law Concerning Monopolies*, 21 U. Chi. L. Rev. 355, 356-67 (1954) (available at www.heinonline.org).  This historical prohibition on government-granted monopolies does not help plaintiffs here.

1   action is strong evidence that no private damages remedy for monopolization now exists in

2   California law.

3        If, however, California recognized a common law monopolization claim, Apple's conduct

4   would not qualify as unlawful monopolization for the reasons discussed above.

5                                    **<u>CONCLUSION</u>**

6        For these reasons, Apple's motion to dismiss or for summary judgment should be granted.

7

8   Dated: February 22, 2010                    JONES DAY

9

10                                    By:/s/ Robert A. Mittelstaedt
                                          Robert A. Mittelstaedt

11                                    Counsel for Defendant
                                      APPLE INC.
12

13   SFI-630215v9

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Redacted Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)