# EXHIBIT 1

http://news.cnet.com/Microsofts-Zune-to-rival-Apples-iPod/2100-1041_3-6097196.html



July 21, 2006 2:05 PM PDT

# Microsoft's Zune to rival Apple's iPod

By Ina Fried and Daniel Terdiman

Staff Writers, CNET News

Last modified: July 21, 2006 5:10 PM PDT

## Welcome Google user!

**More headlines related to "fried microsoft zune to rival ipod":**

- China alarmed by security threat from Net
- Windows 7: Moving beyond Vista
- In search of a do-it-yourself Wall-E
- A user's guide to robotics higher ed
- More matching headlines »

## Add CNET News to Google

**Add CNET News headlines to your Google homepage or Google reader.**

Google

### Related Stories

Microsoft making better music?
May 22, 2006

Public gets peek at Windows Media Player 11
May 15, 2006

**update After trying for years to compete with the iPod through an array of partners, Microsoft confirmed Friday that it plans to directly go after Apple Computer with its own rival, Zune.**

Confirming weeks of rumors, Microsoft said it will launch music software and players under the Zune brand, though the software maker left plenty unsaid in its confirmation.

"Today we confirmed a new music and entertainment project called Zune," Chris Stephenson, a general manager of marketing for the software maker, said in a statement. "Under the Zune brand, we will deliver a family of hardware and software products, the first of which will be available this year."

The initial device will have Wi-Fi and use a hard drive to store music, Microsoft said. Stephenson's statement also lent some credence to speculation that the company's player will use wireless connectivity to share music with other Zune devices.

"We see a great opportunity to bring together technology and community to allow consumers to explore and discover music together," Stephenson said. A Microsoft representative declined to offer further details, although Stephenson told Billboard magazine that other Zune devices, including a video player, are in the works.

The software maker has posted a teaser Web site, set to the song "Us" by Regina Spektor. Microsoft also noted its move on a blog, Zune Insider, whose author is part of the company's effort.

"So what's Zune?" writes Cesar Menendez, the author of the blog, who says he recently began working on the project. "It's Microsoft's new, holistic approach to music and entertainment. And yes, this year, we'll be releasing a device as part of the project. Under the Zune brand, we're looking to build a community for connecting with folks, all to discover new music and entertainment.

Microsoft is still apparently figuring out just how the wireless sharing will work. In the Billboard interview, Stephenson said the company is looking at several different options, including downloading music directly to a device, as well as sampling music from nearby devices.

Zune-branded devices are apparently only one part of Microsoft's strategy, though, with Stephenson telling the magazine that Microsoft's broader vision is to allow people to play and discover music from a variety of devices including computers, phones and the Xbox 360.

An Apple representative declined to comment on Microsoft's announcement.

This is not Microsoft's first attempt to go after iTunes and the iPod. Until now, though, the company has largely relied on

Yahoo! Buzz

http://news.cnet.com/Microsofts-Zune-to-rival-Apples-iPod/2100-1041_3-6097196.html

partners to make the players and software that use its Windows Media digital rights technology and tie into the Windows Media Player software built into its Windows operating system.

More recently, the company had tried to modify that strategy. While remaining open to other players and services, the company had been focused on promoting more heavily certain products, such as iRiver's Clix player and the Urge service it helped develop with MTV Networks.

One of the big question marks surrounding Zune is whether any Microsoft music service will work with all of the third-party players out there, such as the Clix and devices from Samsung, Creative and others. Also unclear is whether rival music services, such as Urge, RealNetworks' Rhapsody and Napster, will work with Microsoft's upcoming player.

An MTV Networks representative said the company couldn't say what if any role MTV and Urge would play with Zune.

"We're talking with Microsoft on a number of levels and we can't comment on those discussions at this time," the representative said. The representative said MTV is committed to "nurture and evolve" Urge, which it says has received a positive response since launching in test form two months ago. Urge is built into Windows Media Player 11, with the software available as a download for Windows XP, and it will be an integrated part of Windows Vista when it ships next year.

Dana Harris, a spokeswoman for Napster, said the company isn't worried about competing with Microsoft. "We've held our position as the No. 2 service through the launch of MSN and Urge and a host of others," she said. As far as any device goes, Harris said Napster would welcome a cool product that works with its service, but declined to comment on whether the Zune player would, in fact, work with Napster.

A RealNetworks representative declined to comment.

On the device side, iRiver America CEO Jonathan Sasse expressed hope that the Zune could help raise awareness of non-iPod devices such as the Clix.

"Microsoft is a great partner and we expect continued success moving forward," he said in a statement. "The potential launch of a device by Microsoft does not appear to threaten our relationship in any way."

As a result of its heritage, analysts say Microsoft faces a potential backlash now that it has decided to go it alone.

"This is the first step, and it comes with a sacrifice," said Shaw Wu, an analyst at American Technology Research. "They now must compete with their customers."

Wu also pointed out that Microsoft must do more than just add its brand name to have a winner.

"I think it's yet to be proven that they can come up with a seamless, integrated experience that iTunes and iPod provides today," he said. "They have to create something as fun and easy to use. Everybody else has failed. You have to remember that people have an emotional attachment to their iPods."

Apple has maintained a dominant share of both the music player and downloadable music businesses, selling more than 58 million iPods and more than a billion songs.

*CNET News.com's Greg Sandoval and Tom Krazit contributed to this report.*

**See more CNET content tagged:**
Microsoft Zune, MTV Networks, representative, MTV, software company

# EXHIBIT 2

1                    STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4   STACIE SOMERS, on Behalf of    )
    Herself and All Others         )
5   Similarly Situated,            )
                                   )
6              Plaintiff,          ) Case No.: CV 07 6507
                                   )              HRL
7   -vs-                           )
                                   )
8   APPLE, INC., a California      )
    Corporation,                   )
9                                  )
               Defendant.          )
10  _____)

11

12

13

            DEPOSITION of GARY L. FRENCH, Ph.D.,
14
            taken on behalf of Defendants at 555
15
            California Street, 26th Floor, San
16
            Francisco, California, on Friday, April
17
            3, 2009, commencing at 10:09 a.m.
18
            before LINDA VACCAREZZA, CRP, RPR, CLR,
19
            CSR NO. 10201
20

21

22

23

24

25

                            2

BARKLEY
Court Reporters

09:34 1      SAN FRANCISCO, CA; FRIDAY, April 3, 2009

09:34 2                   10:09 A.M.

3

10:09 4      THE VIDEOGRAPHER:  Good morning.  My name is

10:09 5  Michael Barber, I'm a videographer associated with

10:09 6  Barkley Court Reporters, located at 222 Front Street,

10:09 7  Suite 600, San Francisco, California 94111.

10:09 8      The date is April 3rd, 2009.  The time is

10:09 9  10:09 a.m.  This deposition is taking place at Jones

10:09 10  Day, 555 California Street, San Francisco, California

10:09 11  94104, in the matter of Stacie Somers versus Apple

10:09 12  Inc., Case No. C-076507-JW.  This is the videotape

10:09 13  deposition of Gary L. French, Ph.D., being taken on

10:09 14  behalf of the defense.

10:09 15      Counsel, would you please identify yourselves

10:09 16  for the record and state whom you represent?

10:09 17    MR. MITTELSTAEDT:  Bob Mittelstaedt for the

10:10 18  defendants.

10:10 19    MR. BRISKIN:  Craig Briskin for plaintiffs.

10:10 20    MS. HAEGGQUIST:  Alreen Haeggquist for the

10:10 21  plaintiffs.

10:10 22    MS. ROACH:  Paula Roach for plaintiffs.

10:10 23    THE VIDEOGRAPHER:  Thank you.

10:10 24      Would the court reporter please swear in

10:10 25  the witness?

5

Gary L. French, Ph.D.

BARKLEY
Court Reporters

GARY L. FRENCH,

having been duly sworn, by the Certified

Shorthand Reporter, was examined and testified as

follows:

EXAMINATION

BY MR. MITTELSTAEDT:

Q     Okay.  If you'd state your full name for

the record, please.

A     Gary Leslie French.

Q     As I read your report, your opinion is

that there are two approaches for demonstrating

common proof of impact on the indirect

purchasers:  One is to show impact on the direct

purchasers, and then show that they passed on

some or all of the overcharge to indirect

purchasers.  And the other is to estimate the

overcharge directly at the retail level.

Do I have that right?

A     Yes.

Q     In this case, have you actually

undertaken either of those approaches?

A     No.  Not at the class certification

stage, no.

Q     In any other case, have you ever

actually done either approach, as opposed to just

6

BARKLEY
Court Reporters

02:27 1    purposely to extend that market power, or to maintain

02:27 2    it, it's not necessarily illegal, is my understanding.

02:27 3        Q    Do you have any understanding of why Apple

02:27 4    used DRM?

02:27 5        A    Yeah.  Everybody uses the DRM.

02:27 6        Q    And any understanding of why?

02:27 7        A    Yeah.  They want to prevent piracy.

02:27 8        Q    And is it your understanding that the record

02:27 9    labels, the people who own the music, require the

02:27 10   lawful on-line storage to use DRM, at least at the

02:27 11   start, up until recently?

02:27 12       A    Well, it's my understanding that it came

02:27 13   about because, originally, people were doing it

02:27 14   without DRM and people avoided paying for the music.

02:27 15   And the record labels, rightfully, didn't like their

02:27 16   copyrighted products being given away.  And so,

02:27 17   therefore, they would have wanted, anyway, the seller

02:27 18   -- those sellers shut down the free ones, and any

02:27 19   legitimate ones, that is people who pay a price and

02:28 20   pay them a royalty, to somehow protect their

02:28 21   intellectual property rights.  And I think DRMs came

02:28 22   into play to do that.

02:28 23       Q    And do you think that concern on the part of

02:28 24   the record labels is a legitimate business concern?

02:28 25       A    Sure.

126

Gary L. French, Ph.D.

BARKLEY
Court Reporters

02:28  1        Q    Do you have any problem with the labels

02:28  2   requiring the music stores to use DRM to prevent

02:28  3   piracy?

02:28  4        A    I don't know that they do, but I'm sure they

02:28  5   are happy about it and would want them to.

02:28  6        Q    Legitimately?

02:28  7        A    Yeah.

02:28  8        Q    Do you agree that the I-Tunes Music Store was

02:28  9   a technological advance at the time it was launched?

02:28  10       A    Unless I'm mistaken, I think it was the first

02:28  11  one of its kind.  So, yes, it was, if I'm correct that

02:28  12  it was the very first one.

02:28  13            Now, if there was one that pre-dated it but

02:28  14  just for some reason wasn't successful, maybe not.

02:29  15  But I thought it was the first one.

02:29  16       Q    Have you made any study of what DRM

02:29  17  competitors used, either at that time or shortly after

02:29  18  that?

02:29  19       A    What DRM competitors?

02:29  20       Q    No.  What DRM was used by other music stores,

02:29  21  competing music stores?

02:29  22       A    I don't know if I remember all the technical

02:29  23  names.  But there are other -- there are other DRM

02:29  24  software, other than FairPlay, that people use.  In

02:29  25  fact, FairPlay is proprietary to Apple, as I

127

Gary L. French, Ph.D.

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA          )
                             )   ss.
COUNTY OF   SONOMA           )

I,   LINDA VACCAREZZA   , hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR  10201  issued by the Court Reporters Board of California and which is in full force and effect. (Fed. R. Civ. P. 28(a).)

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1).)

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. R. Civ. P. 28.)

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

197

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1).)

3         Before completion of the deposition, review of

4    the transcript [xx] was [ ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e).)

8    Dated:    04/06/09      ,

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

198

# EXHIBIT 3

http://www.justice.gov/atr/public/speeches/218316.htm

This document is available in three formats: this web page (for browsing content), PDF (comparable to original document formatting), and WordPerfect. To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.



# DEPARTMENT OF JUSTICE

## INTEROPERABILITY BETWEEN ANTITRUST AND INTELLECTUAL PROPERTY

**THOMAS O. BARNETT**
**Assistant Attorney General**
**Antitrust Division**
**U.S. Department of Justice**

**Presentation to the**

**George Mason University School of Law Symposium**
**Managing Antitrust Issues in a Global Marketplace**
**Washington, DC**

**September 13, 2006**

Good afternoon and thank you for inviting me today. I also extend a special thanks to our foreign guests for taking the time to come to today's event. Their presence does more to illustrate the importance of this conference's topic, antitrust issues in the global marketplace, than anything I might say this afternoon.

My remarks today focus on intellectual property in the global antitrust arena and certain difficulties with applying the concept of "dominance" to the market power that successful companies sometimes gain by creating new technologies and IP rights. In particular, regulatory second-guessing of private firms' solutions to technological problems, which I perceive to be on the increase, threatens to harm the very consumers it claims to help. To address this topic, I will start with some first principles on innovation and consumer welfare and then expand on the issues in the context of a specific example. Next, I will offer some general principles to guide the antitrust analysis of dominance and single-firm conduct. Finally, I will address what I consider to be a related topic: process integrity and the importance of carefully designing, and complying with, legal orders.

### I. Intellectual Property and Dynamic Efficiency

Let me begin, briefly, with first principles and some basic innovation economics. Antitrust and intellectual property policy are complements in that both seek to create a set of incentives to encourage an innovative, vigorously competitive marketplace that enhances efficiency and improves consumer welfare.[1] This concept of efficiency is crucial to understanding how IP law interacts with the world of antitrust.[2] To some, "efficiency" can mean static efficiency, which occurs when firms compete within an existing technology to streamline their methods, cut costs, and drive the price of a product embodying that technology down to something close to the cost of unit production. Static efficiency is a powerful force for increasing consumer welfare, but economists tell us that an even greater driver of consumer welfare is dynamic efficiency. Dynamic efficiency refers to gains that result from entirely new ways of doing business. The Austrian economist Joseph Schumpeter explained dynamic efficiency as:

> . . . competition from the new commodity, the new technology, the new source of supply, the new organization . . . competition which commands a decisive cost or quality advantage and which strikes not at the margins of the profits and the outputs of the existing firms but at their foundations and their very lives.[3]

A more colloquial term for dynamic efficiency, but a helpful one, is leapfrog competition — competition that does not merely improve upon old methods, but leaps ahead into something new.

It follows from the Schumpeterian view that antitrust law, with its focus on improving consumer welfare, has a keen interest in protecting innovation. Fostering innovation requires recognition of the benefits of dynamic efficiency and the dangers of focusing myopically on static efficiency. The same forces that yield the benefits of static efficiency — conditions that encourage rivals quickly to adopt a new business method and drive their production toward marginal cost — can discourage innovation (and thus dynamic efficiency) if the drive toward marginal costs occurs at such an early stage that it makes innovation uneconomical. Where innovation requires substantial up-front research and development (R&D) costs, a rational firm will elect not to innovate if it anticipates a selling environment that too quickly resolves to marginal cost of production. This problem is sometimes described as the need to recoup R&D costs and an expected profit sufficient to induce firms to direct their capital to risky R&D ventures.

Seen in this light, strong intellectual property protection is not separate from competition principles, but rather, is an integral part of antitrust policy as a whole. Intellectual property rights should not be viewed as protecting their owners *from* competition; rather, IP rights should be seen as encouraging firms to engage *in* competition, particularly competition that involves risk and long-term investment. Properly applied, strong intellectual property protection creates the competitive environment necessary to permit firms to profit from their inventions, which encourages innovation effort and improves dynamic efficiency.

Such a competitive environment is, to use an old cliché, the goose that lays golden eggs. Nurturing such an environment has created innumerable golden eggs in the U.S.: the telephone, the phonograph, light bulbs, lasers, computers, television, and countless new drugs and medical devices. Once these breakthrough inventions exist, however, it can be tempting to carve up the benefits and spread them around the economy. When Christmas dinner approaches, it is tempting to think, why not carve up the goose itself? We can find fault with the goose: she ought to be laying more eggs, and she might even be keeping an egg or two for herself. But we all know the moral lesson to this story. When you kill the goose, you end up without the eggs, and you quickly learn that the one big meal was not worth the long term cost.

Even in a competitive economy with sound antitrust laws, we cannot take capital-intensive innovation for granted. In a speech called "Competition and the End of Geography,"[4] which I commend to you, my predecessor as Assistant Attorney General, Hew Pate, described a view that

threatens to kill the proverbial goose. He explained that the traditional view of intellectual property as property, which he called the "asset faction," is under attack from the "access" and "redistribution" factions, which seek to limit or abolish copyrights and patents in order to make it easier to copy music, computer programs, drugs, and medical technology. Increasingly, these access and redistribution factions see "dominance" by successful innovators, meaning large market share, as a problem to be solved, and antitrust and consumer protection law as the solution.

## II. A Cautionary Tale for Applying "Dominance" to IP Rights

Access and redistribution can be a tempting "Christmas dinner" under a short term, static view, but this is ultimately misguided. The temptation persists even where the innovation has solved a vexing problem that everyone admits used to exist, and even where consumers flock to the innovation despite the availability of alternatives. I would like to illustrate this problem today with a discussion of Apple's iPod and iTunes, based on my general understanding without purporting to be an expert in the field.

### A. Napster, Grokster, and the Rise of iTunes

Apple's iTunes music service has (for the moment) solved a problem that some observers, less than five years ago, predicted might never be solved: how to create a consumer-friendly, yet legal and profitable, system for downloading music and other entertainment from the Internet. It is instructive to review the history of the problem. The technical capability to offer digital music over the Internet has existed at least since the early 1990s; nevertheless, digital music first moved online in a significant way only in 1999 with the launch of the Napster centralized file-sharing service. There were major flaws with the early attempts to offer downloadable music: Napster[5] and Grokster[6] were based principally on piracy, while recording industry efforts such as "MusicNet" and "pressplay" never achieved wide use and, in addition, were attacked as risking a recording industry monopoly over not just the songs, but technological development as well.[7] While it battled the music pirates, the music industry suffered huge losses, including a 25% drop in sales from 2001 to 2002, which could be measured in the billions of dollars. Reviewing that bleak picture, the head of the Recording Industry Association of America said in 2002, "I wish I could tell you that there is a silver bullet that could resolve this very serious problem. There is not."[8]

There was no silver bullet — there was, however, a little white box called the Apple iPod. The iPod was not an immediate success. When Apple announced the iTunes music service in January 2001, it was a software service without a device to match, and it worked only with Apple's computers. It took Apple almost a year to ship the first iPods, in late fall 2001, and again, iPods worked only with Apple's products. Sales were small. Apple did not offer the first PC-compatible iPod until July 2002, and even then the devices worked only with Apple's preferred FireWire port, not the USB 2.0 ports that are far more common on PCs, and the PC-compatible iPods connected only to the MusicMatch music service, not Apple's iTunes. Compatibility problems plagued the PC-iPod and hurt its sales. So by early 2003 — four years after the launch of Napster — there still was no clear legal, consumer-friendly solution. Many were trying, including Microsoft, which announced in March 2003 that it was entering the market with its "Media2Go" portable video and audio players, but no one had achieved real success.

The real revolution began in April and May 2003 when Apple unveiled the "third generation" iPods, which were directly compatible to USB 2.0 ports, and provided software to offer the same capability to older models. Apple also made all the iPods work with iTunes. These changes were a reaction to the discipline of the market — customer complaints and unsatisfactory sales — and once they were implemented, the reward was swift: suddenly, iTunes passed the one million songs downloaded. In June 2003, Apple sold its one-millionth iPod, and in September 2003, iTunes downloads passed the 10 million song mark. In January 2004, Apple introduced the iPod mini, and several variants followed; online music had truly arrived. But Apple was not the only game in town. Apple's success was a rising tide that lifted many boats, creating what one commentator has called

"the iPod effect," meaning that it proved a concept that others quickly imitated:

> With the proven success of Apple, the digital download gold rush began. The Big Five [record labels] began licensing their content to a wide number of entities in the United States and abroad, removing many restrictive music licensing terms . . . . A vast array of companies including Amazon, BuyMusic.com, MTV, Wal-Mart, Coke, Dell, Microsoft, Musicmatch, Woolworth's, Virgin Music, Yahoo, Starbucks, and even Oxfam now boast digital music download services for PCs.[9]

So there you have it. There was a history of an intractable problem, characterized by rampant piracy and declining legal sales. After some missteps, Apple's iTunes solved these problems: legal sales boomed; competition against the largest players — the recording industry and Microsoft — increased; the recording industry dropped many restrictive licensing terms; and consumers can now choose from a number of music services and music playing devices, not just the iPod (devices from Dell, iRiver, SanDisk, Sony, and others already exist, and Microsoft recently announced another push for a rival to the iPod, the "Zune"[10]). Apple nonetheless enjoys the lion's share of sales. You might think that by creating a product to which consumers have flocked of their own free will and by mitigating the piracy problem, Apple would be cheered for pioneering greater access to music. But you would be wrong. Apple is cheered by many, but by no means all.

## B. The "Dominance" and "Interoperability" Attack on Apple iTunes

Apple is now under assault in a number of jurisdictions on the grounds that iTunes is too dominant and does not "interoperate" with devices other than iPods.[11] One recent law, for example, may require sales of music or video to operate across a wide range of devices and creates a government body that can require a digital music provider to turn over information relating to its "technological measures" to the extent needed for interoperability with other devices. Some consumer protection agencies have announced that they are considering imposing similar measures through lawsuits.[12] Interestingly, the interoperable song format that is advocated — MP3 — is a compressed format of generally lower fidelity than iTunes files. So what consumer harm do these regulatory bodies seek to address?

One theory is that consumers are locked into buying songs only from the iTunes service and that they will have to pay too high a price for iTunes songs. But there are two problems with this theory. First, consumers can upload other formats (CD-ROMs and MP3 files) to Apple's devices, so they do not have to buy from iTunes. And while it is true that Apple's digital rights management (DRM) software ensures that the first recording of a song downloaded from iTunes can only play on an Apple device, consumers can re-record an iTunes song in an MP3 format and play it on other devices; in sum, it is hardly clear that they are locked in. Second, it appears that Apple has been depressing per-song prices, not raising them. A senior attorney from the Electronic Frontier Foundation, a proponent of the access faction who served as Grokster's lawyer before the Supreme Court, made the following claim:

> The [record] labels are pretty much locked into a system developed by Apple . . . They can't even raise prices beyond 99 cents per song — Steve Jobs simply said 'No.'[13]

That sounds like a benefit to consumers.

Another theory is that Apple is selling songs on the cheap but devices on the dear, and consumers are hurt because they are locked into buying the same expensive devices in the future. The cheap songs/expensive device model may indeed be Apple's strategy. But this type of business model has been criticized in the past because the cheap product was the one that was sold first — think cheap razors and expensive replacement blades or cheap printers and expensive replacement ink.[14] Apple's model is the opposite: consumers buy the expensive iPod device first, then have the option — not the obligation — to use the free iTunes software and buy the cheap iTunes songs.

A third theory is that, darn it, "information just wants to be free." That quote is so much in use on the Internet that I could not pin down its original source. Wikipedia attributes it first to a participant at a computer hacker's conference in 1984.[15] In any event, this argument is not based on competitive effects and consumer welfare. Information may want to be free, but information creators want to be paid — they will not create without rewards. Indeed, the difficulty of protecting digital information against easy, unlawful misappropriation underscores the need for measures to protect one's investments.

The fourth theory is that Apple may not be hurting consumers, but it is hurting competitors. Apple's products are so successful that competitors want in on the party and see Apple's property as the easiest way to get a piece of the pie. Let's examine this one in a little more detail.

Antitrust law protects competition, not competitors.[16] There are real costs to using antitrust law to protect competitors rather than competition. There is the problem of deterring innovation by the target of the "dominance" attack: if a firm knows it will have to share its intellectual property or be managed by a committee of government regulators, it may not innovate in the first instance. Or, just as likely, it will reduce its further innovation once the product has arrived on the market — either because its returns are diminishing, or because its personnel are forced to spend their time playing defense against the regulators, rather than playing innovation offense in the marketplace.

And there is another problem, perhaps a larger and more pernicious one: if the government is too willing to step in as a regulator, rivals will devote their resources to legal challenges rather than business innovation. This is entirely rational from an individual rival's perspective: seeking government help to grab a share of your competitor's profit is likely to be low cost and low risk, whereas innovating on your own is a risky, expensive proposition. But it is entirely irrational as a matter of antitrust policy to encourage such efforts. Rather, rivals should be encouraged to innovate on their own — to engage in leapfrog or Schumpeterian competition. New innovation expands the pie for rivals and consumers alike. We would do well to heed Justice Scalia's observation in *Trinko*, that creating a legal avenue for such challenges can "distort investment" of both the dominant and the rival firms:

> Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in . . . economically beneficial facilities.[17]

Importantly, letting competition in the market drive technological development does not necessarily mean less "access." The market has already disciplined Apple: remember, the iPod and iTunes originally worked only with Apple machines and FireWire ports, but Apple responded to consumer demand and opened up its technology to work on PCs and USB 2.0. The videotape standards struggle between VHS and Sony's Betamax provides another example: when Sony tried to keep tight control over its proprietary Betamax technology, the marketplace swiftly declared VHS the winner. Market discipline can be a powerful force.

My purpose today is not to benefit Apple Corporation. Apple can defend itself. Indeed, I have not undertaken an investigation of Apple's activities. But Apple provides a useful illustration of how an attack on intellectual property rights can threaten dynamic innovation.

## C.  Dominance and Single Firm Conduct: Some General Principles

I said that I would suggest some general principles for applying antitrust analysis in dominance investigations. I start by acknowledging that the analysis of unilateral conduct is one of the most difficult issues under debate in the antitrust community today; so much so, in fact, that the Department of Justice and the Federal Trade Commission are holding a series of hearings this year with a view toward improving the state of our knowledge in this area.[18] In my remarks to open that conference, I set forth six general principles to keep in mind:

First, individual firms with monopoly power can act anticompetitively and harm consumer welfare, and we should seek to identify and prosecute such conduct;

Second, mere size does not demonstrate harm to competition or a violation of the antitrust laws; the proper focus of antitrust law is on anticompetitive conduct and effect, not just size or market share;

Third, mere injury to a firm does not itself show that competition has suffered; indeed, a firm's inability to garner sales may indicate no more than the superiority of its competitors' products;

Fourth, both consumers and the business community benefit from clear, administrable, and objective rules; ambiguous rules or rules depending on future unknown events can chill businesses from undertaking procompetitive conduct, such as cutting prices, investing, and innovating;

Fifth, we should construe Section 2 of the Sherman Act to avoid chilling procompetitive conduct because efficiencies are hard to measure and false positives easy to find, and every time a firm is kept from engaging in aggressive conduct because it fears an unnecessarily expansive interpretation of the antitrust laws, competition is harmed; and

Sixth, we should not act unless we can describe a clearly procompetitive, administrable remedy.[19]

To these I would add, in the context of a dominance claim against a firm that obtains high market share through superior technology and innovation, a few more specific points:

- We should apply greater skepticism when the complaint about a dominant firm comes almost exclusively from rivals, not consumers, and where the remedy would deprive consumers of a choice.

- We should increase that skepticism when the complaining parties engage in forum shopping, failing to make their case before the first, most obvious jurisdiction or government body before taking their case elsewhere.

- We should avoid involving the government in the detailed re-engineering of products produced by private firms, under the guise of antitrust policy; we should question any claim that government regulators are more competent than private firms and consumers to choose the "best" design for a product, particularly when the "best" design must evolve rapidly to meet changing consumer demands.

As a final consideration in this regard, in a globalized economy, antitrust authorities must be careful to consider the geographic scope of their actions. As the Antitrust Division advocated and the Supreme Court recognized in its 2004 *Empagran* decision, antitrust enforcement that reaches alleged harm outside a country's own borders "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs."[20] That risk is sometimes manageable, but it would be inappropriate for enforcement efforts against a global firm in one jurisdiction to effectively foreclose a choice of technology in another. To take a specific example, one jurisdiction might have the right to require Apple to strip its iPods of certain functionality, say, the higher fidelity of Apple's proprietary iTunes format. It is one thing for a jurisdiction to deny the benefits of innovation to its own consumers, but it is entirely another thing to seek to deny those benefits to consumers elsewhere.

**III. The Importance of Process Integrity and Compliance**

I have spent the last few minutes inveighing against certain kinds of government orders that would damage competition and harm consumer welfare. I turn now to a topic that at first blush might seem unrelated: process integrity. The topic is broader than I have time to cover, so I will focus on compliance issues. I will discuss four guiding principles and their application in three situations this past year.

The compliance process should be guided by four principles:

> First, antitrust authorities should ensure that any order is procompetitive, administrable, and clear enough to put the defendant on fair notice of what is required;

> Second, persons subject to the order must comply, even during an appeal;

> Third, all parties should periodically review the order and, where appropriate, request that it be updated to ensure that the order continues to serve the interests of competition and consumer welfare; and

> Fourth, if violations occur, there should be a penalty, but one that is reasonable in light of the particular circumstances.

The Department of Justice has put these principles into practice at least three times just this year. The first example is a consent decree involving Rolex Watch U.S.A. Under a 1960 civil decree, Rolex had agreed to restrictions on its policies regarding the use, resale, and pricing of watch parts purchased from Rolex. The Department found that, despite this order, Rolex had created a written policy of refusing to sell watch parts to independent watch repair facilities or watchmakers unless the watchmakers agreed that they would not use the parts in any watch that had non-Rolex parts or accessories. Rolex's policy also prohibited watchmakers from reselling spare watch parts and from certain types of pricing. When this policy came to the Department's attention, the Department concluded that the policies violated the terms of the 1960 decree. Rolex agreed to a settlement that included a $750,000 payment. The Department also determined, however, that market conditions and antitrust law had changed so that the consent decree was no longer warranted. Rather than continue with an outdated decree, and notwithstanding the recent violations by Rolex, the Department recommended that the Court terminate the original 1960 decree.[21]

The second example is a gun-jumping matter. Qualcomm and Flarion announced a merger in July 2005 and closed in early 2006 after the Department of Justice declined to challenge the merger. As many of you know, the Hart-Scott-Rodino Act requires companies planning certain transactions to observe a mandatory waiting period before the parties merge. The Department learned that Qualcomm obtained operational control over Flarion without observing the waiting period. The companies' merger agreement required Flarion to seek Qualcomm's consent before undertaking certain basic business activities, such as making new proposals to customers, and Flarion also sought and followed Qualcomm's guidance before making routine decisions, such as hiring consultants and employees. In April, the Department announced a settlement under which the parties agreed to pay a $1.8 million dollar fine. This was a significant fine, reflecting the important principle that merging parties must continue to operate independently until the end of the premerger waiting period regardless of whether there is harm to competition. The penalty nevertheless represented a substantial reduction from the statutory maximum because the companies voluntarily reported the existence of gun jumping problems to the Department and took some measures to change their contract and their conduct.[22]

The third example is another consent decree violation, this time by the American Bar Association. In June 1995, the Department filed an antitrust lawsuit against the ABA, alleging that the ABA had allowed its law school accreditation process to be misused by law school personnel with a direct economic interest in the outcome of accreditation reviews. In 1996, the court entered an agreed-upon final judgment prohibiting the ABA from fixing faculty salaries and compensation, boycotting

state-accredited law schools by restricting the ability of their students and graduates to enroll in ABA-approved schools, and boycotting for-profit law schools. The final judgment also required structural reforms and imposed compliance obligations. In Spring 2006, the Department concluded after an investigation that the ABA violated six structural and compliance provisions in the 1996 consent decree over an extended period of time. In a stipulation, the ABA acknowledged the violations and agreed to reimburse the United States $185,000 in fees and costs incurred in the Department's investigation.[23] At the same time, notwithstanding the violations, the Department did not seek to extend the term of the decree, which expired earlier this year.

Defendants certainly are entitled to defend themselves zealously and pursue all legal avenues to challenge or appeal an order. While the order is in force, however, the integrity of the process demands compliance. That said, reasonableness is important. An unduly severe penalty — whether in the form of an excessive fine or the extension of a decree that has outlived its purpose — can chill other procompetitive conduct and undermine the public confidence and support that is so vital to effective antitrust enforcement.

## IV. Conclusion

In closing, let me return to my theme of the complementarity of intellectual property and antitrust. Intellectual property is a true property right, and as the Supreme Court has observed, "like any property right, its boundaries should be clear. This clarity is essential to promote progress, because it enables efficient investment in innovation."[24] Profit is the reward that encourages firms to invest, innovate, and compete through the mechanism of dynamic efficiency, and in the words of an eminent American jurist, Learned Hand, "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins."[25] To antitrust lawyers, an *ex post facto* tinkering with a firm's product designs may be an interesting intellectual exercise, but "[b]usiness does not run this way"[26]: firms making investment decisions seek clear, predictable rules as to how the intellectual property and antitrust regimes will function together — or interoperate. If a successful firm's rivals believe that a different product would create more consumer welfare, antitrust policy should encourage them to create that product — they should not find government regulators willing to eliminate the need to design it at all.

## FOOTNOTES

1. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property § 1.0 (1995) ("The intellectual property laws and the antitrust laws share the common purpose of promoting innovation and enhancing consumer welfare."), *at* http://www.usdoj.gov/atr/public/guidelines/ipguide.pdf.

2. *See generally* Gerald F. Masoudi, Intellectual Property and Competition: Four Principles for Encouraging Innovation, address at the Digital Americas 2006 meeting (Sao Paolo, Brazil, April 2006) 13-15, *at* http://www.usdoj.gov/atr/public/speeches/215645.pdf.

3. Joseph Schumpeter, Capitalism, Socialism and Democracy 84 (Harper Perennial 1976) (1942).

4. R. Hewitt Pate, Competition and the End of Geography, address before the Progress & Freedom Foundation (Aspen, Colorado, August 2005) 17-19, *at* http://www.usdoj.gov/atr/public/speeches/205153.pdf.

5. *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002).

6. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913, 125 S. Ct. 2764 (2005).

7. A typical complaint was that the ventures were "[a] blatant monopoly . . . . allowing them to control the price, the technology, and the use of the music being downloaded." Kelly Donohoe, *MusicNet & PressPlay: To Trust or Antitrust?*, 2001 Duke L. & Tech. Rev. 39 (2001), *at* http://www.law.duke.edu/journals/dltr/articles/2001dltr0039.pdf. A federal district judge reviewing these ventures at an early stage said, "[e]ven if it passes antitrust analysis, it looks bad, sounds bad, smells bad." John Borland, Jim Hu & Rachel Konrad, *Music Industry's Plans Spark Concern*, C/Net News.com (Oct. 19, 2001), *at* http://news.com.com/2100-1023-274676.html. The Department of Justice opened an investigation but, after the rise of Apple iTunes and other competing services, ultimately took no action and closed the investigation. *See* Press Release, U.S. Dept. of Justice, Statement by Assistant Attorney General R. Hewitt Pate Regarding the Closing of the Digital Music Investigation (Dec. 23, 2003), *at* http://www.atrnet.gov/subdocs/201946.pdf.

8. CBS News, Online Music Sales Hit Sour Note (Nov. 2, 2002), *at* http://www.cbsnews.com/stories/2002/10/03/tech/main524304.shtml.

9. Cyrus Wadia, The Department of Justice's Investigation into Online Music (Jan. 1, 2005), *at* http://www.cwclaw.com/publications/articleDetail.aspx?id=56.

10. Ina Fried & Daniel Terdiman, *Microsoft's Zune to Rival Apple's iPod*, C/Net News.Com (July 21, 2006), *at* http://news.com.com/2100-1041_3-6097196.html.

11. *See* Thomas Crampton, *For Apple, Europe Becoming a Tougher Customer*, Int'l Herald Trib., July 17, 2006, at 8.

12. *Id.*

13. Wade Roush, *DRM Under Siege: the Yahoo Music Experiment*, Technology Review, July 27, 2006, *at* http://www.technologyreview.com/read_article.aspx?id=17212&ch=infotech.

14. *E.g.*, *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 126 S. Ct. 1281 (2006).

15. Wikipedia, *Information Wants to be Free*, *at* http://en.wikipedia.org/wiki/Information_wants_to_be_free (visited September 6, 2006).

16. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962))).

17. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).

18. *See generally* Hearings on Section 2 of the Sherman Act: Single Firm Conduct as Related to Competition, *at* http://www.ftc.gov/os/sectiontwohearings/index.htm.

19. Thomas O. Barnett, The Gales of Creative Destruction: the Need for Clear and Objective Standards for Enforcing Section 2 of the Sherman Act, address before the Hearings on Section 2 of the Sherman Act 16-17 (Washington, D.C., June 20, 2006), *at* http://www.usdoj.gov/atr/public/speeches/216738.pdf.

20. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004).

21. *See* Press Release, U.S. Dep't of Justice, Justice Department Settles Civil Contempt Claim Against Rolex Watch U.S.A. Inc. (February 28, 2006), *at* http://www.usdoj.gov/atr/public/press_releases/2006/214821.pdf.

22. *See* Press Release, U.S. Dep't of Justice, Qualcomm and Flarion Charged with Illegal Premerger

http://www.justice.gov/atr/public/speeches/218316.htm

Coordination (April 13, 2006), *at* http://www.usdoj.gov/atr/public/press_releases/2006/215617.pdf.

23. *See* Press Release, U.S. Dep't of Justice, Justice Department Asks Court to Hold American Bar Association in Civil Contempt (June 23, 2006), *at* http://www.usdoj.gov/atr/public/press_releases/2006/216804.pdf.

24. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 730-31 (2002).

25. *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945).

26. Masoudi, *supra* note 2, at 3.

# EXHIBIT 4

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Quarterly Period Ended June 30, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number 0-23137

# REALNETWORKS, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91-1628146** |
| (State of incorporation) | (I.R.S. Employer Identification Number) |
| **2601 Elliott Avenue, Suite 1000** | |
| **Seattle, Washington** | **98121** |
| (Address of principal executive offices) | (Zip Code) |

**(206) 674-2700**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
Yes ☑ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).
Yes ☑ No ☐

The number of shares of the registrant's Common Stock outstanding as of July 31, 2005 was 171,752,680.

TABLE OF CONTENTS

RealNetworks, Inc.

FORM 10-Q

FOR THE QUARTER ENDED JUNE 30, 2005

TABLE OF CONTENTS

| | Page |
|---|---|
| **Part I. Financial Information** | 3 |
| Item 1. Financial Statements | 3 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 47 |
| Item 4. Controls and Procedures | 48 |
| **Part II. Other Information** | 48 |
| Item 1. Legal Proceedings | 48 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 50 |
| Item 4. Submission of Matters to a Vote of Security Holders | 50 |
| Item 6. Exhibits | 50 |
| Signatures | 51 |
| EXHIBIT 31.1 | |
| EXHIBIT 31.2 | |
| EXHIBIT 32.1 | |
| EXHIBIT 32.2 | |

2

**Table of Contents**

Enforcement efforts against those in violation have not effectively shut down these services and there can be no assurance that these services will ever be shut down. The ongoing presence of these "free" services substantially impairs the marketability of legitimate services like ours.

*Video Products and Services.* Our video content services (including our RealOne SuperPass subscription service) face competition from existing competitive alternatives and other emerging services and technologies. We face competition in these markets from traditional media outlets such as television, radio, CDs, DVDs, videocassettes and others. We also face competition from emerging Internet media sources and established companies entering into the Internet media content market, including Time Warner's AOL subsidiary, Microsoft, Apple, Yahoo! and broadband Internet service providers. We expect that, as the market for Internet video content matures, more competitors will enter these new markets, making competition even more intense. Competing services may be able to obtain better or more favorable access to compelling video content than us, may develop better offerings than us and may be able to leverage other assets to promote their offerings.

*Games.* Our RealArcade service competes with other online distributors of downloadable PC games focused on the non-core, or casual, segment of the games market. Some of these distributors have high volume distribution channels and greater financial resources than us, including Yahoo! Games, MSN Gamezone, Pogo.com and Shockwave. We expect competition to intensify in this market from these and other competitors and no assurance can be made that we will be able to continue to grow our games distribution business or that we will be able to remain competitive in the downloadable games category in the future. We also own and operate GameHouse, a developer of downloadable PC games for the casual segment of the market and we recently acquired Mr. Goodliving, a developer and publisher of mobile games for mobile handsets. GameHouse competes with other developers of downloadable games in the casual segment of the market and Mr. Goodliving faces intense competition from a wide variety of mobile game developers and publishers, many of which are larger and devote substantially more resources to the mobile games business than we do.

**We may not be successful in the market for downloadable media and personal music management software.**

The market for software products that enable the downloading of media and personal music management software is still evolving. We may be unable to develop a revenue model or sufficient demand to take advantage of this market opportunity. We cannot predict whether consumers will adopt or maintain our media player products as their primary application to play, record, download and manage their digital music, especially in light of the fact that Microsoft bundles its competing Windows Media Player with its Windows operating system. Our inability to achieve or maintain widespread acceptance for our digital music architecture or widespread distribution of our player products could hold back the development of revenue streams from these market segments, including digital music content, and therefore could harm the prospects for our business.

**Our consumer businesses depend upon effective digital rights management solutions.**

Our consumer businesses depend upon effective digital rights management solutions that allow control of accessibility to online digital content. These solutions are important to the economics of these businesses and also to address concerns of content providers regarding online piracy. We cannot be certain that we can develop, license or acquire such solutions, or that content licensors, electronic device makers or consumers will accept them. In addition, consumers may be unwilling to accept the use of digital rights management technologies that limit their use of content, especially with large amounts of free content readily available. We may need to license digital rights management solutions to support our products. No assurance can be given that such solutions will be available to us on reasonable terms or at all. If digital rights management solutions are not effective, or are perceived as not effective, content providers may not be willing to include content in our services, which would harm our business and operating results.

Digital rights management technologies are frequently the subject of hostile attack by third parties seeking to illegally obtain content. If our digital rights management technology is compromised or otherwise malfunctions, we could be subject to lawsuits seeking compensation for any harm caused and our business could be harmed if content providers lose confidence in our ability to protect their content.

**Our Harmony Technology may not achieve consumer or market acceptance and may be subject to legal challenge.**

We recently created a new digital rights management translation technology called Harmony. Our Harmony technology enables consumers to securely transfer purchased music to digital music devices, including certain versions of the market leading iPod line of digital music players made by Apple Computer, as well as certain devices that use Microsoft Windows Media DRM. Harmony is designed to enable consumers to transfer music purchased from our RealPlayer Music Store to a wide variety of portable music

35

Table of Contents

devices, rather than being restricted to a specific portable device. We do not know whether consumers will accept Harmony or whether it will lead to increased sales of any of our consumer products or services or increased usage of our media player products.

There are other risks associated with our Harmony technology, including the risk that Apple will continue to modify its technology to "break" the interoperability that Harmony provides to consumers, which Apple has done in connection with the release of certain new products. If Apple chooses to continue this course of action, Harmony may no longer work with Apple's products, which could harm our business and reputation, or we may be forced to incur additional development costs to refine Harmony to make it interoperate again. Although we believe our Harmony technology is legal, there is no assurance that a court would agree with our position. If Apple decides to commence litigation against us in order to prevent interoperation with its products, we may be forced to spend money defending their legal challenge, which could harm our operating results.

*The success of our music services depend, in part, on interoperability with our customer's music playback hardware.*

In order for our Rhapsody service and our RealPlayer Music Store to continue to be successful we must design our service to interoperate effectively with a variety of hardware products, including home stereos, car stereos, portable digital audio players and PCs. We depend on significant cooperation with manufacturers of these products and with software manufacturers that create the operating systems for such hardware devices to achieve our business and design objectives. To date, Apple has not agreed to design its popular iPod line of portable digital audio players to function with our music services and users of our music services must rely on our Harmony technology for interoperability with iPods. If we cannot successfully design our service to interoperate with the music playback devices that our customers own, either through relationships with manufacturers or through our Harmony technology, our business will be harmed.

*We may not be able to successfully operate our software game development business because it is a new business for us, and certain distribution partners for our game development business compete with other products and services we offer.*

In 2004, we acquired GameHouse, a developer of downloadable PC games and we recently acquired Mr. Goodliving, a developer and publisher of mobile games for mobile handsets. Game development is a new business for us, and we may not be able to successfully develop and market software games in the future. In addition, certain competitors of our RealArcade service also distribute and promote games developed by GameHouse. No assurance can be made that these distributors will continue to distribute and promote games in the same manner as a result of our acquisition of GameHouse.

## Risks Related to Our Business Products and Services Business

*Our systems software business has been negatively impacted by the efforts of our competitors, and this business may not return to previous levels.*

The aggressive, and we believe illegal, competitive efforts of Microsoft, including the provision of free software and other incentives to induce customers to use its competing technology, have negatively impacted our systems software sales to customers in a variety of business market segments in recent periods. We cannot predict when, or if, we will experience increased demand for our systems software products from customers in these markets.

*Our Helix open source initiative is subject to risks associated with open source technology.*

There are a number of risks associated with our Helix Community initiative, including risks associated with market and industry acceptance, development processes and software licensing practices, and business models. The broader media technology and product industry may not adopt the Helix DNA Platform and/or the Helix Community as a development platform for media delivery and playback products and third parties may not enhance, develop or introduce technologies or products based on Helix DNA technology. While we have invested substantial resources in the development of the underlying technology within the Helix DNA technology and the Helix Community process itself, the market and industry may not accept them and we may not derive royalty or support revenue from them. The introduction of the Helix DNA Platform open source and community source licensing schemes may adversely affect sales of our commercial system software products to mobile operators, broadband providers, corporations, government agencies, educational institutions and other business and non-business organizations. In those areas where adoption of the Helix Community and Helix DNA occurs, our community and open source approach means that we no longer exercise sole control over many aspects of the development of the Helix DNA technology. In addition, we designed our commercial open source license to bear royalties when third parties sell products that include Helix DNA technology. To date, however, royalty revenue has not been significant.

36

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized, on August 5, 2005.

REALNETWORKS, INC.

By: /s/ Roy B. Goodman
      Roy B. Goodman
      Title: Senior Vice President, Chief Financial
      Officer and Treasurer
      (Principal Financial and Accounting Officer)

51

# EXHIBIT 5

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

# ASSEMBLY BILL                             No. 671

Introduced by Assembly Members Connelly and O'Connell

February 15, 1989

An act to add Sections 16728, 16729, 16730, and 16762 to the Business and Professions Code, relating to restraints of trade.

LEGISLATIVE COUNSEL'S DIGEST

AB 671, as introduced, Connelly. Restraint of trade: monopolies.

Under existing provisions of the federal Clayton Act, specified acquisitions are unlawful if the acquisition may substantially lessen competition or tend to create a monopoly. This bill would provide that it is unlawful for any person to monopolize or attempt to monopolize or to combine or conspire with any person to monopolize any part of trade or commerce and would incorporate specified portions of the Clayton Act into California law. The violation of these provisions may be prosecuted in a criminal proceeding brought by the Attorney General or district attorney of any county and thus, the bill would create a state-mandated local program.

The bill would require any person required to file a notification, as defined, with the Federal Trade Commission and the Assistant Attorney General in charge of the antitrust division of the United States Department of Justice to simultaneously file a copy with the Attorney General of this state if the acquiring or acquired person, as defined, has specified contacts with this state. The bill would provide that this notification is exempt from disclosure, as specified.

The bill would impose a civil penalty of up to $10,000 a day, as specified, for the failure of specified persons to file this required notification.

99   50

**AB 671**      — 2 —

The bill would provide that a court may order the divestiture of stock or assets for a violation of prohibited restraints on competition in the manner and within the time period fixed in the court's order.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1      SECTION 1. Section 16728 is added to the Business
2 and Professions Code, to read:
3      16728. It shall be unlawful for any person to
4 monopolize, or attempt to monopolize, or to combine or
5 conspire with any person or persons, to monopolize any
6 part of trade or commerce.
7      SEC. 2. Section 16729 is added to the Business and
8 Professions Code, to read:
9      16729. It shall be unlawful for any person to acquire,
10 directly or indirectly, the whole or any part of the stock,
11 or other share capital, or assets of any other person or
12 persons where the effect of the acquisition may be
13 substantially to lessen competition or tend to create a
14 monopoly in any line of trade or commerce.
15      It shall be unlawful for any person to acquire, directly
16 or indirectly, the whole or any part of the stock, or other
17 share capital, or assets of one or more persons where the
18 effect of the acquisition, or of the use of the stock by the
19 voting or granting of proxies or otherwise, may be
20 substantially to lessen competition or to tend to create a
21 monopoly in any line of trade or commerce.
22      This section shall not apply to persons purchasing the
23 stock solely for investment and not using the same by
24 voting or otherwise to bring about, or in attempting to
25 bring about, the substantial lessening of competition. Nor

99   80

— 3 —                                              AB 671

1  shall anything contained in this section prevent a
2  corporation engaged in commerce or in any activity
3  affecting commerce from causing the formation of
4  subsidiary corporations for the actual carrying on of their
5  immediate lawful business, or the natural and legitimate
6  branches or extensions thereof, or from owning and
7  holding all or a part of the stock of the subsidiary
8  corporations, when the effect of the formation is not to
9  substantially lessen competition.
10    SEC. 3.   Section 16730 is added to the Business and
11  Professions Code, to read:
12    16730.    (a)  For the purposes of this section:
13    (1) "Person" means a "person" as defined in Section
14  801.1 (a)(1) of Title 16 or the Code of Federal
15  Regulations.
16    (2) "Acquiring person" and "acquired person" means
17  an acquiring person or acquired person as defined in
18  Section 801.2 of Title 16 of the Code of Federal
19  Regulations.
20    (3) "Notification" means the notification, including
21  information and documentary materials, required under
22  Section 18a(a) of Title 15 of the United States Code and
23  includes any additional information or documentary
24  materials required under Section 18a(e) of Title 15 of the
25  United States Code.
26    (b)  Any person required to file a notification with the
27  Federal Trade Commission and the Assistant Attorney
28  General in charge of the antitrust division of the United
29  States Department of Justice, shall upon filing the
30  notification, simultaneously file a copy, with the Attorney
31  General of this state, if either the acquiring or the
32  acquired person satisfies any of the following:
33    (1)  Is incorporated in this state.
34    (2)  Has its principal place of business within this state.
35    (3)  Is registered to do business in this state.
36    (4)  Has any tangible assets, employees, or agents
37  within this state.
38    (c)  The notification filed with the Attorney General
39  pursuant to this section is exempt from disclosure under
40  the California Public Records Act and is not available to

99  110

AB 671                    — 4 --

1  the public unless it is relevant to an administrative or
2  judicial action or proceeding. Nothing in this section
3  prohibits the disclosure of the notification filed with the
4  Attorney General of this state to any other state Attorney
5  General, provided the state Attorney General certifies to
6  the Attorney General of this state that the notification
7  shall be maintained in confidence and used solely for law
8  enforcement purposes.
9      (d) Nothing in this section limits the authority of the
10 Attorney General of this state to secure at any time from
11 any person documentary material, oral testimony, or
12 other information under Article 2 (commencing with
13 Section 11180) of Chapter 2 of Title 2 of Division 3 of the
14 Government Code, or any other law.
15     (e) Any person, officer, director, or partner thereof,
16 who fails to comply with this section shall be liable for a
17 civil penalty of up to ten thousand dollars ($10,000) for
13 each day during which the person is in violation of this
19 section. The civil penalty shall be assessed and recovered
20 in a civil action brought in the name of the people of the
21 State of California by the Attorney General in any court
22 of competent jurisdiction.
23     SEC. 4.   Section 16762 is added to the Business and
24 Professions Code, to read:
25     16762.   Upon violation of this chapter by any person, in
26 addition to any other remedy provided by this chapter,
27 the court may order the divestiture of stock or assets in
28 the manner and within the time fixed by the court's
29 order.
30     SEC. 5.   No reimbursement is required by this act
31 pursuant to Section 6 of Article XIII B of the California
32 Constitution because the only costs which may be
33 incurred by a local agency or school district will be
34 incurred because this act creates a new crime or
35 infraction, changes the definition of a crime or infraction,
36 changes the penalty for a crime or infraction, or
37 eliminates a crime or infraction.

O

99  130

AMENDED IN ASSEMBLY APRIL 3, 1989

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

## ASSEMBLY BILL                        No. 671

**Introduced by Assembly Members Connelly and O'Connell**
*(Principal coauthor: Senator Stirling)*
*(Coauthor: Senator Rosenthal)*

February 15, 1989

An act to add Sections 16728, 16729, 16730, and 16762 to the
Business and Professions Code, relating to restraints of trade.

LEGISLATIVE COUNSEL'S DIGEST

AB 671, as amended, Connelly. Restraint of trade:
monopolies.

Under existing provisions of the federal Clayton Act,
specified acquisitions are unlawful if the acquisition may
substantially lessen competition or tend to create a monopoly.
. This bill would provide that it is unlawful for any person to
monopolize or attempt to monopolize or to combine or
conspire with any person to monopolize any part of trade or
commerce and would incorporate specified portions of the
Clayton Act into California law. The violation of these
provisions may be prosecuted in a criminal proceeding
brought by the Attorney General or district attorney of any
county and thus, the bill would create a state-mandated local
program.

The bill would require any person, *as defined, that is*
required to file a notification, as defined, with the Federal
Trade Commission and the Assistant Attorney General in
charge of the antitrust division of the United States
Department of Justice to simultaneously file a copy with the
Attorney General of this state if the acquiring or acquired
person, as defined, has specified contacts with this state. The

98   40

**AB 671** — 2 —

bill would provide that this notification is exempt from disclosure, as specified.

The bill would impose a civil penalty of up to $10,000 a day, as specified, for the *willful* failure ~~of specified persons~~ to file this required notification. *The bill would also impose a civil penalty of up to $1,000 a day, as specified, for the negligent failure to file the notification. The bill would also specify that for purposes of this notification requirement, the term "person" means an ultimate parent entity and all entities which it controls directly or indirectly.*

The bill would provide that a court may order the divestiture of stock or assets for a violation of prohibited restraints on competition in the manner and within the time period fixed in the court's order.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1  SECTION 1.  Section 16728 is added to the Business
2  and Professions Code, to read:
3  16728.  It shall be unlawful for any person to
4  monopolize, or attempt to monopolize, or to combine or
5  conspire with any person or persons, to monopolize any
6  part of trade or commerce.
7  SEC. 2.  Section 16729 is added to the Business and
8  Professions Code, to read:
9  16729.  It shall be unlawful for any person to acquire,
10 directly or indirectly, the whole or any part of the stock,
11 or other share capital, or assets of any other person or
12 persons where the effect of the acquisition may be
13 substantially to lessen competition or tend to create a
14 monopoly in any line of trade or commerce.
15  It shall be unlawful for any person to acquire, directly

98  60

— 3 —                                          AB 671

1  or indirectly, the whole or any part of the stock, or other
2  share capital, or assets of one or more persons where the
3  effect of the acquisition, or of the use of the stock by the
4  voting or granting of proxies or otherwise, may be
5  substantially to lessen competition or to tend to create a
6  monopoly in any line of trade or commerce.
7     This section shall not apply to persons purchasing the
8  stock solely for investment and not using the same by
9  voting or otherwise to bring about, or in attempting to
10 bring about, the substantial lessening of competition. Nor
11 shall anything contained in this section prevent a
12 corporation engaged in commerce or in any activity
13 affecting commerce from causing the formation of
14 subsidiary corporations for the actual carrying on of their
15 immediate lawful business, or the natural and legitimate
16 branches or extensions thereof, or from owning and
17 holding all or a part of the stock of the subsidiary
18 corporations, when the effect of the formation is not to
19 substantially lessen competition.
20    SEC. 3.  Section 16730 is added to the Business and
21 Professions Code, to read:
22    16730.   (a) For the purposes of this section:
23    (1) "Person" means a "person" as defined in Section
24 801.1 (a) (1) of Title 16 of the Code of Federal
25 Regulations.
26    (2) "Acquiring person" and "acquired person" means
27 an acquiring person or acquired person as defined in
28 Section 801.2 of Title 16 of the Code of Federal
29 Regulations.
30    (3) "Notification" means the notification, including
31 information and documentary materials, required under
32 Section 18a(a) of Title 15 of the United States Code and
33 includes any additional information or documentary
34 materials required under Section 18a(e) of Title 15 of the
35 United States Code.
36    (b) Any person required to file a notification with the
37 Federal Trade Commission and the Assistant Attorney
38 General in charge of the antitrust division of the United
39 States Department of Justice, shall upon filing the
40 notification, simultaneously file a copy, with the Attorney

98  80

84

AB 671                    — 4 —

1  General of this state, if either the acquiring or the
2  acquired person satisfies any of the following:
3      (1)  Is incorporated in this state.
4      (2)  Has its principal place of business within this state.
5      (3)  Is registered to do business in this state.
6      (4)  Has any tangible assets, employees, or agents
7  within this state.
8      (c)  The notification filed with the Attorney General
9  pursuant to this section is exempt from disclosure under
10  the California Public Records Act and is not available to
11  the public unless it is relevant to an administrative or
12  judicial action or proceeding. Nothing in this section
13  prohibits the disclosure of the notification filed with the
14  Attorney General of this state to any other state Attorney
15  General, provided the state Attorney General certifies to
16  the Attorney General of this state that the notification
17  shall be maintained in confidence and used solely for law
18  enforcement purposes.
19      (d)  Nothing in this section limits the authority of the
20  Attorney General of this state to secure at any time from
21  any person documentary material, oral testimony, or
22  other information under Article 2 (commencing with
23  Section 11180) of Chapter 2 of Title 2 of Division 3 of the
24  Government Code, or any other law.
25      (e)  Any person, officer, director, or partner thereof,
26  who *willfully* fails to comply with this section shall be
27  liable for a civil penalty of up to ten thousand dollars
28  ($10,000) for each day during which the person is in
29  violation of this section. The civil penalty shall be assessed
30  and recovered in a civil action brought in the name of the
31  people of the State of California by the Attorney General
32  in any court of competent jurisdiction.
33      *(f)  Any person who negligently fails to comply with*
34  *this section shall be liable for a civil penalty of up to one*
35  *thousand dollars ($1,000) for each day during which the*
36  *person is in violation of this section. The civil penalty shall*
37  *be assessed and recovered in a civil action brought in the*
38  *name of the people of the State of California by the*
39  *Attorney General in any court of competent jurisdiction.*
40      *(g)  Nothing in this section shall be deemed to impose*

98  100

85

— 5 —    AB 671

1  any personal liability on any officer, director, or partner
2  of any person, as defined in paragraph (1) of subdivision
3  (a), for the failure to comply with this section.
4    SEC. 4.  Section 16762 is added to the Business and
5  Professions Code, to read:
6    16762.  Upon violation of this chapter by any person, in
7  addition to any other remedy provided by this chapter,
8  the court may order the divestiture of stock or assets in
9  the manner and within the time fixed by the court's
10  order.
11    SEC. 5.  No reimbursement is required by this act
12  pursuant to Section 6 of Article XIII B of the California
13  Constitution because the only costs which may be
14  incurred by a local agency or school district will be
15  incurred because this act creates a new crime or
16  infraction, changes the definition of a crime or infraction,
17  changes the penalty for a crime or infraction, or
18  eliminates a crime or infraction.  *Notwithstanding*
19  *Section 17580 of the Government Code, unless otherwise*
20  *specified in this act, the provisions of this act shall become*
21  *operative on the same date that the act takes effect*
22  *pursuant to the California Constitution.*

O

98    120

AMENDED IN ASSEMBLY MAY 1, 1989

AMENDED IN ASSEMBLY APRIL 3, 1989

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

# ASSEMBLY BILL                                    No. 671

**Introduced by Assembly Members Connelly and O'Connell**
~~(Principal coauthor: Senator Stirling)~~
*(Coauthor: Assembly Member Clute)*
(Coauthor: Senator Rosenthal)

February 15, 1989

An act to add Sections 16728, 16729, 16730, *16731*, and 16762 to the Business and Professions Code *, and to add Section 854.1 to the Public Utilities Code*, relating to restraints of trade.

### LEGISLATIVE COUNSEL'S DIGEST

AB 671, as amended, Connelly. Restraint of trade: monopolies.

Under existing provisions of the federal Clayton Act, specified acquisitions are unlawful if the acquisition may substantially lessen competition or tend to create a monopoly.

This bill would provide that it is unlawful for any person to monopolize or attempt to monopolize or to combine or conspire with any person to monopolize any part of trade or commerce and would incorporate specified portions of the Clayton Act into California law. The violation of these provisions may be prosecuted in a criminal proceeding brought by the Attorney General or district attorney of any county and thus, the bill would create a state-mandated local program.

The bill would require any person, as defined, that is required to file a notification, as defined, with the Federal Trade Commission and the Assistant Attorney General in charge of the antitrust division of the United States

97  40

87

**AB 671** — 2 —

Department of Justice to simultaneously file a copy with the Attorney General of this state if the acquiring or acquired person, as defined, has specified contacts with this state. The bill would provide that this notification is exempt from disclosure, as specified.

The bill would impose a civil penalty of up to $10,000 a day, as specified, for the willful failure to file this required notification. The bill would also impose a civil penalty of up to $1,000 a day, as specified, for the negligent failure to file the notification. The bill would also specify that for purposes of this notification requirement, the term "person" means an ultimate parent entity and all entities which it controls directly or indirectly.

*This bill would exempt any acquisition, merger, or similar transaction from these restrictions if an application for approval or authorization of the acquisition, merger, or similar transaction was pending before the Public Utilities Commission on February 15, 1989.*

The bill would provide that a court may order the divestiture of stock or assets for a violation of prohibited restraints on competition in the manner and within the time period fixed in the court's order.

*Existing law prohibits any person or corporation from acquiring or controlling, directly or indirectly, any public utility organized and doing business in this state without first securing authorization to do so from the Public Utilities Commission.*

*This bill would require that before the commission may authorize any acquisition, merger, or similar transaction with respect to which an application for approval or authorization was pending before the commission on February 15, 1989, the commission must find that the acquisition, merger, or similar transaction does not adversely affect competition. The bill would require the commission to request an advisory opinion from the Attorney General as to whether competition will be adversely affected and what measures may be adopted to avoid this adverse affect.*

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for

97  60

— 3 —                                              AB 671

making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1  SECTION 1.  Section 16728 is added to the Business
2  and Professions Code, to read:
3    16728  It shall be unlawful for any person to
4  monopolize, or attempt to monopolize, or to combine or
5  conspire with any person or persons, to monopolize any
6  part of trade or commerce.
7    SEC. 2.  Section 16729 is added to the Business and
8  Professions Code, to read:
9    16729.  It shall be unlawful for any person to acquire,
10 directly or indirectly, the whole or any part of the stock,
11 or other share capital, or assets of any other person or
12 persons where the effect of the acquisition may be
13 substantially to lessen competition or tend to create a
14 monopoly in any line of trade or commerce.
15   It shall be unlawful for any person to acquire, directly
16 or indirectly, the whole or any part of the stock, or other
17 share capital, or assets of one or more persons where the
18 effect of the acquisition, or of the use of the stock by the
19 voting or granting of proxies or otherwise, may be
20 substantially to lessen competition or to tend to create a
21 monopoly in any line of trade or commerce.
22   This section shall not apply to persons purchasing the
23 stock solely for investment and not using the same by
24 voting or otherwise to bring about, or in attempting to
25 bring about, the substantial lessening of competition. Nor
26 shall anything contained in this section prevent a
27 corporation engaged in commerce or in any activity
28 affecting commerce from causing the formation of
29 subsidiary corporations for the actual carrying on of their
30 immediate lawful business, or the natural and legitimate
31 branches or extensions thereof, or from owning and
32 holding all or a part of the stock of the subsidiary

89                                          97  90

AB 671                    — 4 —

1   corporations, when the effect of the formation is not to
2   substantially lessen competition.
3       SEC. 3.   Section 16730 is added to the Business and
4   Professions Code, to read:
5       16730.   (a)  For the purposes of this section:
6       (1)  "Person" means a "person" as defined in Section
7   801.1  (a) (1)  of Title 16 of the Code of Federal
8   Regulations.
9       (2)  "Acquiring person" and "acquired person" means
10  an acquiring person or acquired person as defined in
11  Section  801.2  of Title  16  of the  Code  of  Federal
12  Regulations.
13      (3)  "Notification" means the notification, including
14  information and documentary materials, required under
15  Section 18a (a) of Title 15 of the United States Code and
16  includes any additional information or documentary
17  materials required under Section 18a (e) of Title 15 of the
18  United States Code.
19      (b)  Any person required to file a notification with the
20  Federal Trade Commission and the Assistant Attorney
21  General in charge of the antitrust division of the United
22  States Department of Justice, shall upon filing the
23  notification, simultaneously file a copy, with the Attorney
24  General of this state, if either the acquiring or the
25  acquired person satisfies any of the following:
26      (1)  Is incorporated in this state.
27      (2)  Has its principal place of business within this state.
28      (3)  Is registered to do business in this state.
29      (4)  Has any tangible assets, employees, or agents
30  within this state.
31      (c)  The notification filed with the Attorney General
32  pursuant to this section is exempt from disclosure under
33  the  California  Public  Records  Act  *(Chapter  3.5*
34  *(commencing with Section 6250), Division 7, Title 1,*
35  *Government Code)* and is not available to the public
36  unless it is relevant to an administrative or judicial action
37  or proceeding. Nothing in this section prohibits the
38  disclosure of the notification filed with the Attorney
39  General of this state to any other state Attorney General,
40  provided the *other* state Attorney General certifies to the

97   110

1  Attorney General of this state that the notification shall
2  be maintained in confidence and used solely for law
3  enforcement purposes.
4      (d)  Nothing in this section limits the authority of the
5  Attorney General of this state to secure at any time from
6  any person documentary material, oral testimony, or
7  other information under Article 2 (commencing with
8  Section 11180) of Chapter 2 of ~~Title 2 of Division 3~~
9  *Division 3 of Title 2* of the Government Code, or any
10 other law.
11     (e)  Any person who willfully fails to comply with this
12 section shall be liable for a civil penalty of up to ten
13 thousand dollars ($10,000) for each day during which the
14 person is in violation of this section. The civil penalty shall
15 be assessed and recovered in a civil action brought in the
16 name of the people of the State of California by the
17 Attorney General in any court of competent jurisdiction.
18     (f)  Any person who negligently fails to comply with
19 this section shall be liable for a civil penalty of up to one
20 thousand dollars ($1,000) for each day during which the
21 person is in violation of this section. The civil penalty shall
22 be assessed and recovered in a civil action brought in the
23 name of the people of the State of California by the
24 Attorney General in any court of competent jurisdiction.
25     (g)  Nothing in this section shall be deemed to impose
26 any personal liability on any officer, director, or partner
27 of any person, as defined in paragraph (1) of subdivision
28 (a), for the failure to comply with this section.
29     SEC. 4.  *Section 16731 is added to the Business and*
30 *Professions Code, to read:*
31     16731.  *Section 16728, 16729, or 16730 shall not apply to*
32 *any acquisition, merger, or similar transaction with*
33 *respect to which an application for approval or*
34 *authorization was pending before the Public Utilities*
35 *Commission on February 15, 1989. Except as provided in*
36 *Section 854.1 of the Public Utilities Code, Section 16728,*
37 *16729, or 16730 does not modify, reverse, alter, or*
38 *otherwise affect the jurisdiction of the Public Utilities*
39 *Commission or any provision of the Public Utilities Code.*
40     SEC. 5.  Section 16762 is added to the Business and

97  140

AB 671                    — 6 —

1  Professions Code, to read:
2      16762.   Upon violation of this chapter by any person, in
3  addition to any other remedy provided by this chapter,
4  the court may order the divestiture of stock or assets in
5  the manner and within the time fixed by the court's
6  order.
7      ~~SEC. 5.~~
8      SEC. 6.   Section 854.1 is added to the Public Utilities
9  Code, to read:
10      854.1.   Before authorizing any acquisition, merger, or
11  similar transaction with respect to which an application
12  for approval or authorization was pending before the
13  commission on February 15, 1989, the commission shall
14  find that the merger, acquisition, or similar transaction
15  does not adversely affect competition. In making this
16  finding, the commission shall request an advisory opinion
17  from   the   Attorney   General   regarding   whether
18  competition   will   be   adversely   affected   and   what
19  mitigation   measures   may   be   adopted   to   avoid   this
20  adverse   affect   on   competition.   The   commission   may
21  require   mitigating   conditions   to   prevent   significant
22  adverse consequences that may result from the merger,
23  acquisition, or similar transaction.
24      SEC. 7.   No reimbursement is required by this act
25  pursuant to Section 6 of Article XIII B of the California
26  Constitution because the only costs which may be
27  incurred by a local agency or school district will be
28  incurred because this act creates a new crime or
29  infraction, changes the definition of a crime or infraction,
30  changes the penalty for a crime or infraction, or
31  eliminates a crime or infraction. Notwithstanding Section
32  17580 of the Government Code, unless otherwise
33  specified in this act, the provisions of this act shall become
34  operative on the same date that the act takes effect
35  pursuant to the California Constitution.

O

97   170

AMENDED IN SENATE MAY 30, 1989

AMENDED IN ASSEMBLY MAY 1, 1989

AMENDED IN ASSEMBLY APRIL 3, 1989

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

# ASSEMBLY BILL

## No. 671

**Introduced by Assembly Members Connelly and O'Connell**
**(Coauthor: Assembly Member Clute)**
**(Coauthor: Senator Rosenthal)**

February 15, 1989

An act to add Sections 16728, 16729, 16730, 16731, and 16762 to the Business and Professions Code, and to add Section 854.1 to the Public Utilities Code, relating to restraints of trade.

### LEGISLATIVE COUNSEL'S DIGEST

AB 671, as amended, Connelly. Restraint of trade: monopolies.

Under existing provisions of the federal Clayton Act, specified acquisitions are unlawful if the acquisition may substantially lessen competition or tend to create a monopoly.

This bill would provide that it is unlawful for any person to monopolize or attempt to monopolize or to combine or conspire with any person to monopolize any part of trade or commerce and would incorporate specified portions of the Clayton Act into California law. The violation of these provisions may be prosecuted in a criminal proceeding brought by the Attorney General or district attorney of any county and thus, the bill would create a state-mandated local program.

The bill would require any person, as defined, that is required to file a notification, as defined, with the Federal Trade Commission and the Assistant Attorney General in

Corrected 6-1-89—See last page.

93

96   50

**AB 671**                                    — 2 —

charge of the antitrust division of the United States Department of Justice to simultaneously file a copy with the Attorney General of this state if the acquiring or acquired person, as defined, has specified contacts with this state. *The bill would provide that any person required to provide the Attorney General of this state with notification shall also provide the Attorney General with additional information, as defined, upon the written request of the Attorney General.* The bill would provide that ~~this~~ the notification ~~is~~ and additional information are exempt from disclosure, as specified.

The bill would impose a civil penalty of up to $10,000 a day, as specified, for the willful failure to file this required notification. The bill would also impose a civil penalty of up to $1,000 a day, as specified, for the negligent failure to file the notification. The bill would also specify that for purposes of this notification requirement, the term "person" means an ultimate parent entity and all entities which it controls directly or indirectly.

This bill would exempt any acquisition, merger, or similar transaction from these restrictions if an application for approval or authorization of the acquisition, merger, or similar transaction was pending before the Public Utilities Commission on February 15, 1989.

The bill would provide that a court may order the divestiture of stock or assets for a violation of prohibited restraints on competition in the manner and within the time period fixed in the court's order.

Existing law prohibits any person or corporation from acquiring or controlling, directly or indirectly, any public utility organized and doing business in this state without first securing authorization to do so from the Public Utilities Commission.

This bill would require that before the commission may authorize any acquisition, merger, or similar transaction with respect to which an application for approval or authorization was pending before the commission on February 15, 1989, the commission must find that the acquisition, merger, or similar transaction does not adversely affect competition. The bill would require the commission to request an advisory opinion

94

— 3 —                                      **AB 671**

from the Attorney General as to whether competition will be adversely affected and what measures may be adopted to avoid this adverse affect.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1  SECTION 1.  Section 16728 is added to the Business
2  and Professions Code, to read:
3    16728.  It shall be unlawful for any person to
4  monopolize, or attempt to monopolize, or to combine or
5  conspire with any person or persons, to monopolize any
6  part of trade or commerce.
7    SEC. 2.  Section 16729 is added to the Business and
8  Professions Code, to read:
9    16729.  It shall be unlawful for any person to acquire,
10  directly or indirectly, the whole or any part of the stock,
11  or other share capital, or assets of any other person or
12  persons where the effect of the acquisition may be
13  substantially to lessen competition or tend to create a
14  monopoly in any line of trade or commerce.
15    It shall be unlawful for any person to acquire, directly
16  or indirectly, the whole or any part of the stock, or other
17  share capital, or assets of one or more persons where the
18  effect of the acquisition, or of the use of the stock by the
19  voting or granting of proxies or otherwise, may be
20  substantially to lessen competition or to tend to create a
21  monopoly in any line of trade or commerce.
22    This section shall not apply to persons purchasing the
23  stock solely for investment and not using the same by
24  voting or otherwise to bring about, or in attempting to
25  bring about, the substantial lessening of competition. Nor
26  shall anything contained in this section prevent a

95

96  100

**AB 671**                    — 4 —

1  corporation engaged in commerce or in any activity
2  affecting commerce from causing the formation of
3  subsidiary corporations for the actual carrying on of their
4  immediate lawful business, or the natural and legitimate
5  branches or extensions thereof, or from owning and
6  holding all or a part of the stock of the subsidiary
7  corporations, when the effect of the formation is not to
8  substantially lessen competition.
9      SEC. 3.  Section 16730 is added to the Business and
10 Professions Code, to read:
11     16730.   (a)  For the purposes of this section:
12     (1)  "Person" means a "person" as defined in Section
13 801.1  (a)(1) of Title 16 of the Code of Federal
14 Regulations.
15     (2)  "Acquiring person" and "acquired person" means
16 an acquiring person or acquired person as defined in
17 Section 801.2 of Title 16 of the Code of Federal
18 Regulations.
19     *(3) "Additional information" means any additional*
20 *information or documentary materials required under*
21 *Section 18a(e) of Title 15 of the United States Code.*
22     ~~(3)~~
23     *(4)*  "Notification" means the notification, including
24 information and documentary materials, required under
25 Section 18a(a) of Title 15 of the United States Code ~~and~~
26 ~~includes any additional information or documentary~~
27 ~~materials required under Section 18a(e) of Title 15 of the~~
28 ~~United States Code.~~ .
29     (b)  Any person required to file a notification with the
30 Federal Trade Commission and the Assistant Attorney
31 General in charge of the antitrust division of the United
32 States Department of Justice, shall upon filing the
33 notification, simultaneously file a copy, with the Attorney
34 General of this state, if either the acquiring or the
35 acquired person satisfies any of the following:
36     (1)  Is incorporated in this state.
37     (2)  Has its principal place of business within this state.
38     (3)  Is registered to do business in this state.
39     (4)  Has any tangible assets, employees, or agents
40 within this state.

96   140

1   *(c)  Any person required by this section to provide the*
2   *Attorney General of this state with notification shall also*
3   *provide   the   Attorney   General   with   additional*
4   *information upon the written request of the Attorney*
5   *General.*
6      (c)
7      *(d)*  The notification *and additional information* filed
8   with the Attorney General pursuant to this section is
9   exempt from disclosure under the California Public
10  Records Act (Chapter 3.5 (commencing with Section
11  6250). Division 7, Title 1, Government Code) and is not
12  available to the public unless it is relevant to an
13  administrative or judicial action or proceeding. Nothing
14  in this section prohibits the disclosure of the notification
15  *or additional information* filed with the Attorney General
16  of this state to any other state Attorney General, provided
17  the other state Attorney General certifies to the Attorney
18  General of this state that the notification *and additional*
19  *information* shall be maintained in confidence and used
20  solely for law enforcement purposes.
21     (d)
22     *(e)*  Nothing in this section limits the authority of the
23  Attorney General of this state to secure at any time from
24  any person documentary material, oral testimony, or
25  other information under Article 2 (commencing with
26  Section 11180) of Chapter 2 of Division 3 of Title 2 of the
27  Government Code, or any other law.
28     (e)
29     *(f)*  Any person who willfully fails to comply with this
30  section shall be liable for a civil penalty of up to ten
31  thousand dollars ($10,000) for each day during which the
32  person is in violation of this section. The civil penalty shall
33  be assessed and recovered in a civil action brought in the
34  name of the people of the State of California by the
35  Attorney General in any court of competent jurisdiction.
36     (f)
37     *(g)*  Any person who negligently fails to comply with
38  this section shall be liable for a civil penalty of up to one
39  thousand dollars ($1,000) for each day during which the
40  person is in violation of this section. The civil penalty shall

96   170

AB 671                    — 6 —

1   be assessed and recovered in a civil action brought in the
2   name of the people of the State of California by the
3   Attorney General in any court of competent jurisdiction.
4   (g)
5   (h)  Nothing in this section shall be deemed to impose
6   any personal liability on any officer, director, or partner
7   of any person, as defined in paragraph (1) of subdivision
8   (a), for the failure to comply with this section.
9      SEC. 4.   Section 16731 is added to the Business and
10  Professions Code, to read:
11     16731.   Section 16728, 16729, or 16730 shall not apply to
12  any acquisition, merger, or similar transaction with
13  respect to which an application for approval or
14  authorization was pending before the Public Utilities
15  Commission on February 15, 1989. Except as provided in
16  Section 854.1 of the Public Utilities Code, Section 16728,
17  16729, or 16730 does not modify, reverse, alter, or
18  otherwise affect the jurisdiction of the Public Utilities
19  Commission or any provision of the Public Utilities Code.
20     SEC. 5.   Section 16762 is added to the Business and
21  Professions Code, to read:
22     16762.   Upon violation of this chapter by any person, in
23  addition to any other remedy provided by this chapter,
24  the court may order the divestiture of stock or assets in
25  the manner and within the time fixed by the court's
26  order.
27     SEC. 6.   Section 854.1 is added to the Public Utilities
28  Code, to read:
29     854.1.   Before authorizing any acquisition, merger, or
30  similar transaction with respect to which an application
31  for approval or authorization was pending before the
32  commission on February 15, 1989, the commission shall
33  find that the merger, acquisition, or similar transaction
34  does not adversely affect competition. In making this
35  finding, the commission shall request an advisory opinion
36  from the Attorney General regarding whether
37  competition will be adversely affected and what
38  mitigation measures may be adopted to avoid this
39  adverse affect on competition. The commission may
40  require mitigating conditions to prevent significant

96  180

**AB 671**

1  adverse consequences that may result from the merger,
2  acquisition, or similar transaction.
3      SEC. 7.    *If any provision of this act or the application*
4  *thereof to any person or circumstances is held invalid,*
5  *that invalidity shall not affect other provisions or*
6  *applications of the act which can be given effect without*
7  *the invalid provision or application, and to this end the*
8  *provisions of this act are severable.*
9      SEC. 8.    No reimbursement is required by this act
10 pursuant to Section 6 of Article XIII B of the California
11 Constitution because the only costs which may be
12 incurred by a local agency or school district will be
13 incurred because this act creates a new crime or
14 infraction, changes the definition of a crime or infraction,
15 changes the penalty for a crime or infraction, or
16 eliminates a crime or infraction. Notwithstanding Section
17 17580 of the Government Code, unless otherwise
18 specified in this act, the provisions of this act shall become
19 operative on the same date that the act takes effect
20 pursuant to the California Constitution.
21
22
23 **CORRECTIONS**
24 Text—Page 6.
25
26

O

96   230

AMENDED IN SENATE JUNE 30, 1989

AMENDED IN SENATE MAY 30, 1989

AMENDED IN ASSEMBLY MAY 1, 1989

AMENDED IN ASSEMBLY APRIL 3, 1989

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

# ASSEMBLY BILL                          No. 671

**Introduced by Assembly Members Connelly and O'Connell
(Coauthor: Assembly Member Clute)
(Coauthor: Senator Rosenthal)**

**February 15, 1989**

An act to add Sections 16728, 16729, 16730, ~~16731,~~ and 16762 to the Business and Professions Code ~~; and to add Section 854.1 to the Public Utilities Code~~, relating to restraints of trade.

LEGISLATIVE COUNSEL'S DIGEST

AB 671, as amended, Connelly. Restraint of trade: monopolies.

Under existing provisions of the federal Clayton Act, specified acquisitions are unlawful if the acquisition may substantially lessen competition or tend to create a monopoly.

This bill would provide that it is unlawful for any person to monopolize or attempt to monopolize or to combine or conspire with any person to monopolize any part of trade or commerce *in this state or any section of this state* and would incorporate specified portions of the Clayton Act into California law. The violation of these provisions may be prosecuted in a criminal proceeding brought by the Attorney General or district attorney of any county and thus, the bill would create a state-mandated local program.

~~The bill would require any person, as defined, that is~~

95   40

AB 671                       — 2 —

~~required to file a notification, as defined, with the Federal~~
~~Trade Commission and the Assistant Attorney General in~~
~~charge of the antitrust division of the United States~~
~~Department of Justice to simultaneously file a copy with the~~
~~Attorney General of this state if the acquiring or acquired~~
~~person, as defined, has specified contacts with this state. The~~
~~bill would provide that any person required to provide the~~
~~Attorney General of this state with notification shall also~~
~~provide the Attorney General with additional information, as~~
~~defined, upon the written request of the Attorney General.~~
~~The bill would provide that the notification and additional~~
~~information are exempt from disclosure, as specified.~~

~~The bill would impose a civil penalty of up to $10,000 a day,~~
~~as specified, for the willful failure to file this required~~
~~notification. The bill would also impose a civil penalty of up~~
~~to $1,000 a day, as specified, for the negligent failure to file the~~
~~notification. The bill would also specify that for purposes of~~
~~this notification requirement, the term "person" means an~~
~~ultimate parent entity and all entities which it controls~~
~~directly or indirectly.~~

This bill would exempt any acquisition, merger, or similar
transaction from these restrictions ~~if an application for~~
~~approval or authorization of the acquisition, merger, or~~
~~similar transaction was pending before the Public Utilities~~
~~Commission on February 15, 1989~~ *if the Attorney General of*
*this state filed a complaint with respect to the merger,*
*acquisition, or similar transaction on or before February 15,*
*1989, as specified, and would also exempt any merger,*
*acquisition, or similar transaction among the corporations or*
*other entities named in the above action and their wholly*
*owned subsidiaries if the corporation or other entities have*
*been continuously wholly owned, directly or indirectly, by a*
*single common parent corporation or other entity since the*
*filing of the above action.*

The bill would provide that a court may order the
divestiture of stock or assets for a violation of prohibited
restraints on competition in the manner and within the time
period fixed in the court's order.

~~Existing law prohibits any person or corporation from~~
~~acquiring or controlling, directly or indirectly, any public~~

95  60

— 3 —                                    AB 671

~~utility organized and doing business in this state without first~~
~~securing authorization to do so from the Public Utilities~~
~~Commission.~~

~~This bill would require that before the commission may~~
~~authorize any acquisition, merger, or similar transaction with~~
~~respect to which an application for approval or authorization~~
~~was pending before the commission on February 15, 1989, the~~
~~commission must find that the acquisition, merger, or similar~~
~~transaction does not adversely affect competition. The bill~~
~~would require the commission to request an advisory opinion~~
~~from the Attorney General as to whether competition will be~~
~~adversely affected and what measures may be adopted to~~
~~avoid this adverse affect.~~

The California Constitution requires the state to reimburse
local agencies and school districts for certain costs mandated
by the state. Statutory provisions establish procedures for
making that reimbursement.

This bill would provide that no reimbursement is required
by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes.
State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1    SECTION 1.  Section 16728 is added to the Business
2  and Professions Code, to read:
3    16728.  It shall be unlawful for any person to
4  monopolize, or attempt to monopolize, or to combine or
5  conspire with any person or persons, to monopolize any
6  part of trade or commerce *in this state or any section of*
7  *this state.*
8    SEC. 2.  Section 16729 is added to the Business and
9  Professions Code, to read:
10    16729.  It shall be unlawful for any person to acquire,
11  directly or indirectly, the whole or any part of the stock,
12  or other share capital, or assets of any other person or
13  persons where the effect of the acquisition may be
14  substantially to lessen competition or tend to create a
15  monopoly in any line of trade or commerce *in this state*
16  *or any section of this state.*

95  80

AB 671 — 4 —

1   It shall be unlawful for any person to acquire, directly
2   or indirectly, the whole or any part of the stock, or other
3   share capital, or assets of one or more persons where the
4   effect of the acquisition, or of the use of the stock by the
5   voting or granting of proxies or otherwise, may be
6   substantially to lessen competition or to tend to create a
7   monopoly in any line of trade or commerce *in this state*
8   *or any section of this state.*
9       This section shall not apply to persons purchasing the
10  stock solely for investment and not using the same by
11  voting or otherwise to bring about, or in attempting to
12  bring about, the substantial lessening of competition. Nor
13  shall anything contained in this section prevent a
14  corporation engaged in commerce or in any activity
15  affecting commerce from causing the formation of
16  subsidiary corporations for the actual carrying on of their
17  immediate lawful business, or the natural and legitimate
18  branches or extensions thereof, or from owning and
19  holding all or a part of the stock of the subsidiary
20  corporations, when the effect of the formation is not to
21  substantially lessen competition.
22      SEC. 3.   Section 16730 is added to the Business and
23  Professions Code, to read:
24      16730.   ~~(a) For the purposes of this section:~~ *Nothing*
25  *in Section 16728 or 16729 shall apply to any merger,*
26  *acquisition, or similar transaction against which the*
27  *Attorney General of this state has filed a complaint on or*
28  *before February 15, 1989, in any federal court based in*
29  *whole or in part on Section 7 of the Clayton Act (Section*
30  *18 of Title 15 of the United State Code) or to any merger,*
31  *acquisition, or similar transaction among the corporations*
32  *or other entities named in the action and their wholly*
33  *owned subsidiaries if the corporations or other entities*
34  *have been continuously wholly owned, directly or*
35  *indirectly, by a single common parent corporation or*
36  *other entity since the filing of the action.*
37      ~~(1) "Person" means a "person" as defined in Section~~
38  ~~801.1 (a)(1) of Title 16 of the Code of Federal~~
39  ~~Regulations.~~
40      ~~(2) "Acquiring person" and "acquired person" means~~

95   110

— 5 —                              AB 671

1   an acquiring person or acquired person as defined in
2   Section 801.2 of Title 16 of the Code of Federal
3   Regulations.
4       (3) "Additional information" means any additional
5   information or documentary materials required under
6   Section 18a(e) of Title 15 of the United States Code.
7       (4) "Notification" means the notification, including
8   information and documentary materials, required under
9   Section 18a(a) of Title 15 of the United States Code.
10      (b) Any person required to file a notification with the
11  Federal Trade Commission and the Assistant Attorney
12  General in charge of the antitrust division of the United
13  States Department of Justice, shall upon filing the
14  notification, simultaneously file a copy, with the Attorney
15  General of this state, if either the acquiring or the
16  acquired person satisfies any of the following:
17      (1) Is incorporated in this state.
18      (2) Has its principal place of business within this state.
19      (3) Is registered to do business in this state.
20      (4) Has any tangible assets, employees, or agents
21  within this state.
22      (c) Any person required by this section to provide the
23  Attorney General of this state with notification shall also
24  provide the Attorney General with additional
25  information upon the written request of the Attorney
26  General.
27      (d) The notification and additional information filed
28  with the Attorney General pursuant to this section is
29  exempt from disclosure under the California Public
30  Records Act (Chapter 3.5 (commencing with Section
31  6250), Division 7, Title 1, Government Code) and is not
32  available to the public unless it is relevant to an
33  administrative or judicial action or proceeding. Nothing
34  in this section prohibits the disclosure of the notification
35  or additional information filed with the Attorney General
36  of this state to any other state Attorney General, provided
37  the other state Attorney General certifies to the Attorney
38  General of this state that the notification and additional
39  information shall be maintained in confidence and used
40  solely for law enforcement purposes.

95   130

AB 671                    — 6 —

1     (e) Nothing in this section limits the authority of the
2     Attorney General of this state to secure at any time from
3     any person documentary material, oral testimony, or
4     other information under Article 2 (commencing with
5     Section 11180) of Chapter 2 of Division 3 of Title 2 of the
6     Government Code, or any other law.
7        (f) Any person who willfully fails to comply with this
8     section shall be liable for a civil penalty of up to ten
9     thousand dollars ($10,000) for each day during which the
10    person is in violation of this section. The civil penalty shall
11    be assessed and recovered in a civil action brought in the
12    name of the people of the State of California by the
13    Attorney General in any court of competent jurisdiction.
14       (g) Any person who negligently fails to comply with
15    this section shall be liable for a civil penalty of up to one
16    thousand dollars ($1,000) for each day during which the
17    person is in violation of this section. The civil penalty shall
18    be assessed and recovered in a civil action brought in the
19    name of the people of the State of California by the
20    Attorney General in any court of competent jurisdiction.
21       (h) Nothing in this section shall be deemed to impose
22    any personal liability on any officer, director, or partner
23    of any person, as defined in paragraph (1) of subdivision
24    (a), for the failure to comply with this section.
25    SEC. 4.   Section 16731 is added to the Business and
26    Professions Code, to read:
27       16731.   Section 16728, 16729, or 16730 shall not apply to
28    any acquisition, merger, or similar transaction with
29    respect to which an application for approval or
30    authorization was pending before the Public Utilities
31    Commission on February 15, 1989. Except as provided in
32    Section 854.1 of the Public Utilities Code, Section 16728,
33    16729, or 16730 does not modify, reverse, alter, or
34    otherwise affect the jurisdiction of the Public Utilities
35    Commission or any provision of the Public Utilities Code.
36    SEC. 5.
37    SEC. 4.   Section 16762 is added to the Business and
38    Professions Code, to read:
39       16762.   Upon violation of this chapter by any person, in
40    addition to any other remedy provided by this chapter,

93   150

105

1   the court may order the divestiture of stock or assets in
2   the manner and within the time fixed by the court's
3   order.
4   ~~SEC. 6.   Section 854.1 is added to the Public Utilities~~
5   ~~Code, to read:~~
6   ~~854.1.   Before authorizing any acquisition, merger, or~~
7   ~~similar transaction with respect to which an application~~
8   ~~for approval or authorization was pending before the~~
9   ~~commission on February 15, 1989, the commission shall~~
10  ~~find that the merger, acquisition, or similar transaction~~
11  ~~does not adversely affect competition.   In making this~~
12  ~~finding, the commission shall request an advisory opinion~~
13  ~~from    the    Attorney    General    regarding    whether~~
14  ~~competition will be adversely affected and what~~
15  ~~mitigation measures may be adopted to avoid this~~
16  ~~adverse affect on competition. The commission may~~
17  ~~require mitigating conditions to prevent significant~~
18  ~~adverse consequences that may result from the merger,~~
19  ~~acquisition, or similar transaction.~~
20  ~~SEC. 7.~~
21  *SEC. 5.*   If any provision of this act or the application
22  thereof to any person or circumstances is held invalid,
23  that invalidity shall not affect other provisions or
24  applications of the act which can be given effect without
25  the invalid provision or application, and to this end the
26  provisions of this act are severable.
27  ~~SEC. 8.~~
28  *SEC. 6.*   No reimbursement is required by this act
29  pursuant to Section 6 of Article XIII B of the California
30  Constitution because the only costs which may be
31  incurred by a local agency or school district will be
32  incurred because this act creates a new crime or
33  infraction, changes the definition of a crime or infraction,
34  changes the penalty for a crime or infraction, or
35  eliminates a crime or infraction. Notwithstanding Section
36  17580 of the Government Code, unless otherwise
37  specified in this act, the provisions of this act shall become
38  operative on the same date that the act takes effect
39  pursuant to the California Constitution.

O

95   170

AMENDED IN SENATE JUNE 7, 1990

AMENDED IN SENATE JUNE 30, 1989

AMENDED IN SENATE MAY 30, 1989

AMENDED IN ASSEMBLY MAY 1, 1989

AMENDED IN ASSEMBLY APRIL 3, 1989

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

# ASSEMBLY BILL                    No. 671

**Introduced by Assembly Members Connelly and O'Connell**
**(Coauthor Assembly Member Clute)**
**(Coauthor: Senator Rosenthal)**

February 15, 1989

An act to add Sections 16728, 16729, ~~16730,~~ and 16762 to the
Business and Professions Code, relating to restraints of trade.

### LEGISLATIVE COUNSEL'S DIGEST

AB 671, as amended, Connelly. Restraint of trade:
monopolies.

Under existing provisions of the federal Clayton Act,
specified acquisitions are unlawful if the acquisition may
substantially lessen competition or tend to create a monopoly.

This bill would provide that it is unlawful for any person to
monopolize or attempt to monopolize or to combine or
conspire with any person to monopolize any part of trade or
commerce in this state or any section of this state and would
~~incorporate specified portions of the Clayton Act into
California law~~ *prohibit the acquisition of stock or assets where
the effect of the acquisition or the use of the stock may tend
to create a monopoly, as specified.* The violation of these
provisions may be prosecuted in a criminal proceeding
brought by the Attorney General or district attorney of any

94  40

AB 671                    — 2 —

county and thus, the bill would create a state-mandated local program.

~~This bill would exempt any acquisition, merger, or similar transaction from these restrictions if the Attorney General of this state filed a complaint with respect to the merger, acquisition, or similar transaction on or before February 15, 1989, as specified, and would also exempt any merger, acquisition, or similar transaction among the corporations or other entities named in the above action and their wholly owned subsidiaries if the corporation or other entities have been continuously wholly owned, directly or indirectly, by a single common parent corporation or other entity since the filing of the above action.~~

The bill would provide that a court may order the divestiture of stock or assets for a violation of prohibited restraints on competition in the manner and within the time period fixed in the court's order.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1   SECTION 1.  Section 16728 is added to the Business
2   and Professions Code, to read:
3     16728.  It shall be unlawful for any person to
4   monopolize, or attempt to monopolize, or to combine or
5   conspire with any person or persons, to monopolize any
6   part of trade or commerce in this state or any section of
7   this state.
8     SEC. 2.  Section 16729 is added to the Business and
9   Professions Code, to read:
10    16729.  It shall be unlawful for any person to acquire,
11  directly or indirectly, the whole or any part of the stock,
12  or other share capital, or assets of any other person or

94   60

— 3 —                                                                    AB 671

1 persons where the effect of the acquisition may ~~be~~
2 ~~substantially to lessen competition or~~ tend to create a
3 monopoly in any line of trade or commerce in this state
4 or any section of this state.
5    It shall be unlawful for any person to acquire, directly
6 or indirectly, the whole or any part of the stock, or other
7 share capital, or assets of one or more persons where the
8 effect of the acquisition, or of the use of the stock by the
9 voting or granting of proxies or otherwise, may ~~be~~
10 ~~substantially to lessen  competition or to~~ tend to create a
11 monopoly in any line of trade or commerce in this state
12 or any section of this state.
13 ~~This section shall not apply to persons purchasing the~~
14 ~~stock solely for investment and not using the same by~~
15 ~~voting or otherwise to bring about, or in attempting to~~
16 ~~bring about, the substantial lessening of competition. Nor~~
17 ~~shall  anything  contained  in  this  section  prevent  a~~
18 ~~corporation  engaged  in  commerce  or  in  any  activity~~
19 ~~affecting  commerce  from  causing  the  formation  of~~
20 ~~subsidiary corporations for the actual carrying on of their~~
21 ~~immediate lawful business, or the natural and legitimate~~
22 ~~branches  or  extensions  thereof,  or  from  owning  and~~
23 ~~holding  all  or  a  part  of  the  stock  of  the  subsidiary~~
24 ~~corporations,  when  the  effect  of  the  formation  is  not  to~~
25 ~~substantially lessen competition.~~
26    ~~SEC. 3.  Section 16730 is added to the Business and~~
27 ~~Professions Code, to read:~~
28    ~~16730.   Nothing in Section 16728 or 16729 shall apply~~
29 ~~to any merger, acquisition, or similar transaction against~~
30 ~~which the Attorney General of this state has filed a~~
31 ~~complaint on or before February 15, 1990, in any federal~~
32 ~~court based in whole or in part on Section 7 of the Clayton~~
33 ~~Act (Section 18 of Title 15 of the  United State Code) or~~
34 ~~to any merger, acquisition, or similar transaction among~~
35 ~~the corporations or other entities named in the action and~~
36 ~~their  wholly  owned  subsidiaries  if  the  corporations  or~~
37 ~~other  entities  have  been  continuously  wholly  owned,~~
38 ~~directly  or  indirectly,  by  a  single  common  parent~~
39 ~~corporation or other entity since the filing of the action.~~
40    SEC. 4.

AB 671                           — 4 —

1    *SEC. 3.*  Section 16762 is added to the Business and
2    Professions Code, to read:
3       16762.    Upon violation of this chapter by any person, in
4    addition to any other remedy provided by this chapter,
5    the court may order the divestiture of stock or assets in
6    the manner and within the time fixed by the court's
7    order.
8    ~~SEC. 5.~~
9    *SEC. 4.*   If any provision of this act or the application
10   thereof to any person or circumstances is held invalid,
11   that invalidity shall not affect other provisions or
12   applications of the act which can be given effect without
13   the invalid provision or application, and to this end the
14   provisions of this act are severable.
15   ~~SEC. 6.~~
16   *SEC. 5.*   No reimbursement is required by this act
17   pursuant to Section 6 of Article XIII B of the California
18   Constitution because the only costs which may be
19   incurred by a local agency or school district will be
20   incurred because this act creates a new crime or
21   infraction, changes the definition of a crime or infraction,
22   changes the penalty for a crime or infraction, or
23   eliminates a crime or infraction. Notwithstanding Section
24   17580 of the Government Code, unless otherwise
25   specified in this act, the provisions of this act shall become
26   operative on the same date that the act takes effect
27   pursuant to the California Constitution.

O

94   90

AMENDED IN SENATE JUNE 27, 1990

AMENDED IN SENATE JUNE 7, 1990

AMENDED IN SENATE JUNE 30, 1989

AMENDED IN SENATE MAY 30, 1989

AMENDED IN ASSEMBLY MAY 1, 1989

AMENDED IN ASSEMBLY APRIL 3, 1989

CALIFORNIA LEGISLATURE—1989-90 REGULAR SESSION

# ASSEMBLY BILL                    No. 671

**Introduced by Assembly Members Connelly and O'Connell**
**(Coauthor: Assembly Member Clute)**
~~(Coauthor: Senator~~ *(Coauthors: Senators Kopp and*
*Rosenthal)*

February 15, 1989

An act to add Sections 16728 ~~, 16729,~~ and 16762 to the Business and Professions Code, relating to restraints of trade.

LEGISLATIVE COUNSEL'S DIGEST

AB 671, as amended, Connelly. Restraint of trade: monopolies.

~~Under existing provisions of the federal Clayton Act, specified acquisitions are unlawful if the acquisition may substantially lessen competition or tend to create a monopoly.~~

*Existing law defines a trust as including a combination of capital, skill, or acts by 2 or more persons to create or carry out restrictions in trade or commerce, and makes trusts illegal. Existing provisions of the federal Sherman Act make every contract, combination, or conspiracy in restraint of trade or commerce among the several states illegal.*

This bill would provide that it is unlawful for any person to

AB 671                    — 2 —

monopolize or attempt to monopolize or to combine or conspire with any person to monopolize any part of trade or commerce in this state or any section of this state and would ~~prohibit the acquisition of stock or assets where the effect of the acquisition or the use of the stock may tend to create a monopoly. as specified~~ *provide that federal judicial interpretations of the federal Sherman Act are applicable to the interpretation of that provision.* The violation of these provisions may be prosecuted in a criminal proceeding brought by the Attorney General or district attorney of any county and thus, the bill would create a state-mandated local program.

The bill would provide that a court may order the divestiture of stock or assets for a violation of prohibited restraints on competition in the manner and within the time period fixed in the court's order.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

Vote: majority. Appropriation: no. Fiscal committee: yes. State-mandated local program: yes.

*The people of the State of California do enact as follows:*

1    SECTION 1.   Section 16728 is added to the Business
2  and Professions Code, to read:
3    16728.  It shall be unlawful for any person to
4  monopolize, or attempt to monopolize. or to combine or
5  conspire with any person or persons, to monopolize any
6  part of trade or commerce in this state or any section of
7  this state.
8    ~~SEC. 2.  Section 16729 is added to the Business and~~
9  ~~Professions Code, to read:~~
10    ~~16729.  It shall be unlawful for any person to acquire,~~
11  ~~directly or indirectly, the whole or any part of the stock,~~
12  ~~or other share capital, or assets of any other person or~~
13  ~~persons where the effect of the acquisition may tend to~~

93  70

— 3 —                                                AB 671

1    create a monopoly in any line of trade or commerce in
2    this state or any section of this state.
3       It shall be unlawful for any person to acquire, directly
4    or indirectly, the whole or any part of the stock, or other
5    share capital, or assets of one or more persons where the
6    effect of the acquisition, or of the use of the stock by the
7    voting or granting of proxies or otherwise, may tend to
8    create a monopoly in any line of trade or commerce in
9    this state or any section of this state.
10      SEC. 3.
11     *Federal judicial interpretations of Section 2 of the*
12   *Sherman Act (15 U.S.C. Sec. 2) are applicable to the*
13   *interpretation of this section.*
14     *SEC. 2.*   Section 16762 is added to the Business and
15   Professions Code, to read:
16      16762.   Upon violation of this chapter by any person, in
17   addition to any other remedy provided by this chapter,
18   the court may order the divestiture of stock or assets in
19   the manner and within the time fixed by the court's
20   order.
21      SEC. 4.
22     *SEC. 3.*   If any provision of this act or the application
23   thereof to any person or circumstances is held invalid,
24   that invalidity shall not affect other provisions or
25   applications of the act which can be given effect without
26   the invalid provision or application, and to this end the
27   provisions of this act are severable.
28      SEC. 5.
29     *SEC. 4.*   No reimbursement is required by this act
30   pursuant to Section 6 of Article XIII B of the California
31   Constitution because the only costs which may be
32   incurred by a local agency or school district will be
33   incurred because this act creates a new crime or
34   infraction, changes the definition of a crime or infraction,
35   changes the penalty for a crime or infraction, or
36   eliminates a crime or infraction. Notwithstanding Section
37   17580 of the Government Code, unless otherwise
38   specified in this act, the provisions of this act shall become
39   operative on the same date that the act takes effect
40   pursuant to the California Constitution.

O

AB 671

ASSEMBLY THIRD READING

AB 671 (Connelly) - As Amended: May 1, 1989

ASSEMBLY ACTIONS:

COMMITTEE _____ JUD. ____ VOTE 8-0   COMMITTEE ____ W. & M. ____ VOTE 12-6

Ayes:

Ayes:  Burton, Campbell, Clute,
       Hannigan, Harris, Killea,
       O'Connell, Polanco, Roos,
       Roybal-Allard, Speier, M. Waters

Nays:

Nays:  Baker, D. Brown, Felando,
       Nolan, Seastrand, Wright

## DIGEST

Existing law does not "reach a merger or acquisition" and does not expressly provide for the remedy of divestiture.  It is also unclear if the Cartwright Act "reaches monopolistic practices by individual firms."

This bill amends the Cartwright Act stating that:

1)  It shall be unlawful for any person to monopolize, attempt to monopolize, or combine or conspire to monopolize, any part of trade or commerce.

2)  It shall be unlawful for any person to acquire the stock, capital, or assets of another person where such acquisition may substantially lessen competition or tend to create a monopoly.

3)  A court may order divestiture of the assets of any person in violation of the act.

4)  Any person in the process of merger or acquisition who is required to file specified documents with federal regulatory agencies, as currently required by federal law, will have to file an additional copy of the required documents with the State Department of Justice.

5)  It does not apply to any merger or acquisition for which an "application for approval or authorization" was pending before the Public Utilities Commission (PUC) on February 15, 1989.

With regard to any such merger, however, the PUC may only approve the merger if it finds that the merger or acquisition "does not adversely affect competition."  In making this finding, the PUC must request an advisory opinion from the Department of Justice.  Lastly, the PUC has the authority to impose mitigation conditions on the merger to ameliorate any

- continued -

114

AB 671
Page 1

adverse anticompetitive results.

### FISCAL EFFECT

Contains a crime and infractions disclaimer.

### COMMENTS

1) Generally, the Cartwright Act provides that "every trust is unlawful, against public policy and void." Trusts are defined as any "combination of capital, skill, or acts by two or more persons" for the following purposes:

   a) To create or carry out restrictions in trade or commerce.

   b) To limit or reduce production, or increase the price of any commodity.

   c) To prevent competition in the making, transportation, or purchase of any commodity.

   d) To fix or control the price of any commodity to the public.

   Combinations which "promote, encourage, or increase competition in any trade or industry, or which are in furtherance of any trade" are not unlawful, however.

   Any person "who is injured in his or her business or property" by reason of any unlawful combination may sue for injunctive relief, treble damages, interest on the actual damages, and reasonable attorney fees. District attorneys and the Attorney General may bring similar lawsuits.

   Additionally, the act provides for the criminal prosecution of persons who violate the act.

2) In 1984, Texaco, Inc. and Getty Oil Company entered into an agreement under which Texaco would acquire Getty's stock and merge Getty's assets into its business. The Attorney General filed a lawsuit, alleging among other things that the Texaco/Getty merger would substantially lessen competition in violation of the Cartwright Act. Specifically, it was argued that the merger would:

   a) Eliminate actual competition between Texaco and Getty in the marketing of California crude oil.

   b) Impede access by California's independent crude oil refineries to crude oil supplies.

   c) Restrict access to pipeline transmission facilities and retail product markets.

- continued -

d) Produce significantly higher concentration ratios in the relevant markets.

e) Reduce competition in the marketing of motor gasoline and other refined products so that prices of these commodities might be effected.

These issues were never litigated.  In a 4-3 vote, the California Supreme Court ruled that the Cartwright Act does not apply to acquisitions or mergers, even, as in the Texaco/Getty case, where it is argued that the merger will substantially lessen competition or tend to create a monopoly.

In a pure statutory construction analysis, the court concluded that in 1907, when the Legislature first enacted the Cartwright Act, the Legislature did not intend for the act to cover mergers or acquisitions. The court concluded that the act only extends to combinations "in which separate entities that maintain separate and independent interests, act in concert . . . and continue to maintain their separate identities and interests."

The court continued by noting that "a bona fide merger, however, is not such a relationship; in a merger the entities lose forever their separate identities, and become a new, independent entity."  Accordingly, because the Texaco/Getty merger did not involve a "combination" by two separate entities which maintained their separate identities, but rather, a merger in which the identities of the separate entities were "forever lost," the court ruled that the act did not apply to the merger.

3) The Attorney General, the sponsor of this bill, believes that the Texaco/Getty ruling is potentially very damaging to California's competitive marketplaces and the economic well-being of its citizens. Moreover, this bill becomes even more critical given the "unprecedented wave of corporate mergers" in recent years.  While "many [of these mergers] offer the potential for improved economic performance and do not offend the anti-trust laws," some of the mergers "have permitted enormous consolidations of competitors."

The problem of voluminous mergers is compounded by the federal government's acquiescence in this area.  Federal enforcement of the Sherman and Clayton Acts has dropped precipitously this decade.  It is imperative that California have adequate, independent authority to contest anticompetitive mergers, particularly, as in the Texaco/Getty case, where there are dramatic "California-only" impacts.

Lastly, the Attorney General notes that the provisions of this bill have ample precedent in federal law and the law of numerous states.

4) The Center for Public Interest Law also supports this bill.  It notes that many mergers may be entirely local in nature.  Moreover, these mergers may result in a monopoly in the relevant geographic area.  In the absence of this bill, there is no "public redress" for such a merger because after

- continued -

Texaco/Getty the Cartwright Act "only covers conspiracies between separate entities."

The California Cattlemen's Association notes that recent mergers of retail grocery concerns have "significantly reduced the market for beef cattle in this state." Out-of-state "beef packing concerns" now control over 80% of the market." This bill will "provide for a review of the facts and potential implications of mergers on California businesses."

5) Southern California Edison Company (SCE) is concerned about this bill. SCE is currently negotiating a merger with San Diego Gas & Electric Co. (SDG&E) and has formally commenced the regulatory approval process for the merger with the relevant regulatory agencies. SCE is concerned that the provisions of this bill may be invoked to delay its merger with SDG&E. It argues that the anticompetitive effects of the merger, if any, will be adequately considered by the relevant regulatory agencies, including the PUC.

The exemption in this bill pertaining to merger applications filed with the PUC prior to February 15, 1989 was drafted in consultation with SCE.

G. ERBIN
324-7593
5/4/89:asadj

AB 671
Page 4

117