# EXHIBIT 10



# DEPARTMENT OF JUSTICE

## VIGOROUS ANTITRUST ENFORCEMENT
## IN THIS CHALLENGING ERA

**CHRISTINE A. VARNEY**
**Assistant Attorney General**
**Antitrust Division**
**U.S. Department of Justice**

Remarks as Prepared for the
United States Chamber of Commerce

May 12, 2009

## I.     Introduction

Good afternoon and on behalf of the Antitrust Division, I want to thank you for the opportunity to speak today about the importance of antitrust enforcement in a distressed economy. I am especially pleased to give remarks here at the Chamber of Commerce, which represents businesses of all sizes, sectors, and regions, and has focused the attention of its Antitrust Council and International Competition Working Group on domestic and international competition policy. I look forward to working with the business community and the Chamber throughout my tenure as AAG.

I have had a wonderful first month on the job. As I begin each day with the Division, I pass the photographs of all of the former AAGs for Antitrust. Among those photographs are former AAGs who faced the challenges posed by tumultuous economic conditions. Thurman Arnold is one. He served as the AAG for Antitrust just after the Great Depression, and the Antitrust Division played a very active role in bringing competition back to the market during his tenure. I keep such luminaries in mind as I consider the great challenges that lie ahead of us.

I want to talk with you today about three issues. First, I want to address the role of antitrust enforcement in a distressed economy. Second, I want to discuss the Antitrust Division's approach to enforcement regarding single-firm conduct under Section 2 of the Sherman Act. Finally, I want to share my thoughts on the challenges we face going forward.

II.     **Lessons Learned From Prior Economic Crises:  National Industrial Recovery Act and Industrial Codes**

The question on every American's mind is:  *"What can the Government do to help ease consumers' burden in these troubled economic times?"*  This question is particularly pressing for the Antitrust Division, which in the past has come forward to play a significant role in response to economic crises.  It is time for the Antitrust Division to step forward again.  I believe this country's prior experience in responding to economic crises must be considered in evaluating our response to current market conditions.  As Shakespeare once put it – "what's past is prologue."  In particular, I have considered the Government's response to the market conditions that followed the Great Depression, and I believe there are important lessons we can learn from that era.

At the turn of the century, after the passage of the Sherman Act, our country faced catastrophic events:  the Panic of 1907 and World War I.  The latter event brought a close to the Government's previous commitments to trust-busting. This lack of interest in antitrust enforcement continued through the 1920s. Significantly, the onset of the Great Depression did not cause the nation to reconsider the damaging effects of cartelization on economic performance. Instead of reinvigorating antitrust enforcement, the Government took the opposite tack.  Legislation was passed in the 1930s that effectively foreclosed competition. The National Industrial Recovery Act ("NIRA"), which created the National Recovery Administration ("NRA"), allowed industries to create a set of industrial

codes. These "codes of fair competition" set industries' prices and wages, established production quotas, and imposed restrictions on entry.

At the core of the NIRA was the idea that low profits in the industrial sectors contributed to the economic instability of those times. The purpose of the industrial codes was to create "stability" – *i.e.*, higher profits – by fostering coordinated action in the markets. The codes developed following the passage of the NIRA governed many of America's major industrial sectors: lumber, steel, oil, mining, and automobiles. Under this legislation, the Government assisted in the enforcement of the codes if firms contributed to a coordinated effort by permitting unionization and engaging in collective bargaining.

What was the result of these industrial codes? Competition was relegated to the sidelines, as the welfare of firms took priority over the welfare of consumers. It is not surprising that the industrial codes resulted in restricted output, higher prices, and reduced consumer purchasing power.

It was not until 1937, during the second Roosevelt Administration, that the country saw a revival of antitrust enforcement. From 1937-1939, the number of antitrust cases initiated by the Antitrust Division jumped to 48 cases, a significant up-tick from the 15 cases filed in the preceding three years. Under the leadership of Thurman Arnold, who served as the AAG for Antitrust from 1938 until 1943, the Department continued its enforcement efforts. As Thurman Arnold later commented, the Roosevelt Administration "was responsible for the first sustained program of antitrust enforcement on a nationwide scale" that the country had ever

3

had.  The cases brought by the Antitrust Division during this era represented the beginning of a strengthened competition policy.  Thurman Arnold's legacy of vigorous antitrust enforcement was thus a cornerstone of the New Deal's economic agenda and a part of that era's legacy for modern economic policy.

The lessons learned from this historical example are twofold.  First, there is no adequate substitute for a competitive market, particularly during times of economic distress.  Second, vigorous antitrust enforcement must play a significant role in the Government's response to economic crises to ensure that markets remain competitive.

This country's prior experience raises the question of whether current economic challenges reflect a "failure of antitrust."  In other words, could United States antitrust authorities have done more?  As many observers agree, in past years, with the exception of cartel enforcement, the pendulum swung too far from Thurman Arnold's legacy of vigorous enforcement.

Americans have seen firms given room to run with the idea that markets "self-police," and that enforcement authorities should wait for the markets to "self-correct."  It is clear to anyone who picks up a newspaper or watches the evening news that the country has been waiting for this "self-correction," spurred innovation, and enhanced consumer welfare.  But these developments have not occurred.  Instead, we now see numerous markets distorted.  We are also seeing some firms fail and take American consumers with them.  It appears that a combination of factors, including ineffective government regulation, ill-considered

deregulatory measures, and inadequate antitrust oversight contributed to the current conditions. I believe that these extreme conditions require a recalibration of economic and legal analysis and theories, and a clearer plan for action. As antitrust enforcers, we cannot sit on the sidelines any longer – both in terms of enforcing the antitrust laws and contributing to sound competition policy as part of our nation's economic strategy.

**III.   Actions Ahead:  Enforcement Priorities**

<u>Section 2 Enforcement</u>

The Antitrust Division must step forward and take a leading role in the development of the Government's multi-faceted response to the current market conditions. Vigorous antitrust enforcement action under Section 2 of the Sherman Act will be part of the Division's critical contribution to this response.

Just as I do, my predecessors in the Antitrust Division saw the need for a clear Department policy regarding enforcement under Section 2 of the Sherman Act. Starting in June 2006, the Department of Justice, with the aid of the Federal Trade Commission, embarked on a year-long series of joint hearings to study issues relating to enforcement of Section 2 against single-firm conduct. The goal of these efforts was to clarify the analytical framework for assessing the legality of single-firm conduct and to provide guidance to the courts, antitrust counselors, and the business community. In September 2008, after review and analysis of the extensive hearing record, the Department of Justice issued its report, entitled *"Competition and Monopoly:  Single-Firm Conduct Under Section 2 of the*

*Sherman Act.*"[1]   The Section 2 Report reflected a significant effort by my predecessors and the FTC in collecting and evaluating the opinions and expertise of antitrust enforcement officials from the United States and abroad, leading economists and legal scholars, antitrust practitioners, and representatives of the business community.  To its credit, the Report provided a comprehensive evaluation of the history of single-firm enforcement and careful consideration of the risks and benefits of particular enforcement strategies.  The Report's ultimate conclusions, however, missed the mark.  In my view, the greatest weakness of the Section 2 Report is that it raised many hurdles to Government antitrust enforcement.

At the core of the Section 2 Report were several critiques of 1960s antitrust enforcement policy, which, taken to their extremes, counseled in favor of a significant limitation of Section 2 enforcement.  The Report sounded a call of great skepticism regarding the ability of antitrust enforcers – as well as antitrust courts – to distinguish between anticompetitive acts and lawful conduct, and raised the related concern that the failure to make proper distinctions may lead to "over-deterrence" with regard to potentially procompetitive conduct.[2]  I do not share these concerns.  I strongly believe that antitrust enforcers are able to separate the wheat from the chaff in identifying exclusionary and predatory acts.  As Judge

---

[1]     *Competition and Monopoly:  Single-Firm Conduct Under Section 2 of the Sherman Act*, UNITED STATES DEPARTMENT OF JUSTICE (2008) ("Section 2 Report" or the "Report").

[2]     This sentiment was expressed by a majority of FTC Commissioners upon the publication of the Section 2 Report in September 2008.  Statement of Commissioners Harbour, Leibowitz and Rosch on the Issuance of the Section 2 Report by the Department of Justice, FEDERAL TRADE COMMISSION, at 3-4 (Sept. 8, 2008).

Posner explained, "antitrust doctrine is supple enough...to take in stride the competitive issues presented by the new economy."[3]

The Section 2 Report also characterized a dominant firm's ability to act efficiently as a core concern in evaluating any possible anticompetitive impact of its conduct.[4] There is no dispute that the evaluation of potential economic efficiencies is an important aspect of the analysis of firm conduct. The Report, however, went too far in evaluating the importance of preserving possible efficiencies and understated the importance of redressing exclusionary and predatory acts that result in harm to competition, distort markets, and increase barriers to entry. The ultimate result is that consumers are harmed through higher prices, reduced product variety, and slower innovation.[5] Accordingly, I believe the Section 2 Report lost sight of an ultimate goal of antitrust laws – the protection of consumer welfare.

With its twin bases for skepticism, the Report counseled in favor of the exercise of extreme caution in enforcing Section 2 and called for the adoption of a number of safe harbors for certain conduct within its reach. While there is no question that Section 2 cases present unique challenges (for example, in the fashioning of injunctive remedies), the Report advocated extreme hesitancy in the

---

[3] Richard A. Posner, *Antitrust in the New Economy*, 69 ANTITRUST L.J. 925, 925 (2001).
[4] For a thoughtful development of the basis for this concern, see William E. Kovacic, *The Intellectual DNA of Modern U.S. Competition Law for Dominant Firm Conduct: The Chicago/Harvard Double Helix*, 2007 COLUM. BUS. L. REV. 1, 35-38.
[5] Harvey J. Goldschmidt, *Comment on Herbert Hovenkamp and the Dominant Firm: The Chicago School Has Made Us Too Cautious About False Positives and the Use of Section 2 of the Sherman Act*, in HOW THE CHICAGO SCHOOL OVERSHOT THE MARK 123 (Robert Pitofsky ed., 2008).

face of potential abuses by monopoly firms.[6]  We must change course and take a

new tack.

    For these reasons, I have withdrawn the Section 2 Report by the

Department of Justice.  Effective May 11, 2009, the Section 2 Report no longer

represents the policy of the Department of Justice with regard to antitrust

enforcement under Section 2 of the Sherman Act.  The Report and its conclusions

should not be used as guidance by courts, antitrust practitioners, and the business

community.

    In withdrawing the Section 2 Report, I made specific reference to the

Report's conclusions.  In particular, Chapter 3 of the Section 2 Report concluded

that where conduct-specific tests are not applicable, "the disproportionality test is

likely to be the most appropriate test[.]"[7]  With this baseline, conduct is only

considered anticompetitive where it results in harm to competition that is

disproportionate to consumer benefits and to the economic benefits to the

defendant.  In other words, the anticompetitive harm must substantially outweigh

procompetitive benefits to be actionable.  The Report's adoption of the

disproportionality test reflected an excessive concern with the risks of over-

deterrence and a resulting preference for an overly lenient approach to

enforcement.  The failing of this approach is that it effectively straightjacketed

antitrust enforcers and courts from redressing monopolistic abuses, thereby

---

[6]    *See* note 2 *supra.*
[7]    Section 2 Report at 45-46.

allowing all but the most bold and predatory conduct to go unpunished and undeterred.

While the Department is not proposing any one specific test to govern all Section 2 matters at this time, I believe the balanced analyses reflected in the leading cases interpreting the reaches of the Sherman Act provide important guidance in this regard.  In particular, leading Section 2 cases – from *Lorain Journal v. United States*[8] to *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*[9] to *United States v. Microsoft*[10] – highlight a common concern regarding the harmful effects of a monopolist's exclusionary or predatory conduct on competition and, ultimately, consumers.  Reinvigorated Section 2 enforcement will thus require the Division to go "back to the basics" and evaluate single-firm conduct against these tried and true standards that set forth clear limitations on how monopoly firms are permitted to behave.  There can be no better charter for our return to fundamental principles of antitrust enforcement.

In 1951, the Supreme Court laid down a marker for Section 2 enforcement in its decision in *Lorain Journal*.[11]  In that case, the Court made a clear step forward in identifying single firm conduct that crossed the line separating lawful, fair competition from exclusionary, anticompetitive acts.[12]

---

[8]   342 U.S. 143 (1951).
[9]   472 U.S. 585 (1985).
[10]   253 F.3d 34 (D.C. Cir. 2001) (en banc).
[11]   342 U.S. at 155.
[12]   Indeed, in his seminal work, *Antitrust Paradox*, Judge Bork points to *Lorain Journal* as a touchstone for Section 2 enforcement.  *See* Robert H. Bork, ANTITRUST PARADOX:  A POLICY AT WAR WITH ITSELF 344-46 (1978); *see also* Robert H. Bork, Letter to the Editor, WALL STREET JOURNAL (May 15, 1998).

The Court addressed the conduct of a newspaper publisher, which was the only business disseminating news and advertising in an Ohio town until a small radio station began broadcasting in a neighboring community.[13]  The publisher, perceiving a threat posed by the radio station, took action to destroy this competitor.[14]  The publisher refused to sell advertising space to any parties that also used the radio station for local advertising.[15]  This practice forced numerous advertisers to refrain from using the radio station for advertising.[16]  The publisher's actions also threatened to deprive surrounding communities of their only nearby radio station.[17]  The Court found that the publisher's conduct violated Section 2 because its acts were plainly exclusionary in their ultimate effect, were not justified by any legitimate reason, and were aimed at the "complete destruction and elimination" of the radio station.[18]

In light of the publisher's purpose to create or maintain a monopoly and the plainly anticompetitive impact of its conduct, the *Lorain Journal* decision expressly rejected the claim that the publisher had a "right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases."[19]  As the Court explained its critical point:  *"We do not dispute the general right.  But the word 'right' is one of the most deceptive of*

---

[13]   *Lorain Journal*, at 146-47.
[14]   *Id.* at 148-50.
[15]   *Id.* at 149-50.
[16]   *Id.*
[17]   *Id.* at 150.
[18]   *Id.*
[19]   *Id.* at 153, 155 (internal citations omitted).

*pitfalls...Most rights are qualified.*"[20]   Consequently, the Court called for an injunction restraining the publisher from refusing to accept advertising from entities that also advertised in other media.[21]

The decisions that followed *Lorain Journal* echoed the Supreme Court's admonition to dominant firms regarding exclusionary and predatory conduct, and filled out the roadmap for Section 2 enforcement.  In *Aspen Skiing Co.*,[22] the Court again considered whether a monopolist can refuse to deal with its competitors, and reaffirmed that any such right is not unqualified.[23]   In that case, the Court considered the conduct of Ski Co., the owner of three of the four major downhill skiing facilities in Aspen, Colorado.[24]   After several years of cooperating with Highlands, the owner of the fourth Aspen skiing facility, to issue interchangeable ski passes that could be used at all four facilities, Ski Co. discontinued the practice.  Ski Co. offered to reinstate the 4-area pass only if Highlands would accept a fixed percentage of the revenue, which was considerably below Highlands's historical average revenue.[25]   After Highlands refused to accept Ski Co.'s offer to reinstate the 4-area pass, Ski Co. embarked upon a national advertising campaign that strongly implied to visitors that there were only three

---

[20]   *Id.* (internal citations omitted).
[21]   *Id.* at 156-58.
[22]   472 U.S. 585 (1985). While commentators have debated the implications of the Supreme Court's decisions in *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, – U.S. – , 129 S. Ct. 1109 (2009), and *Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP*, 540 U.S. 398 (2004), on the scope of the Section 2 analysis set forth in *Aspen Skiing*, particularly as it applies in limited, specific sectors subject to significant and specialized regulatory overlay, there is no question that these decisions reaffirmed *Aspen Skiing*'s limits on a monopolist's ability to engage in exclusionary or predatory conduct.
[23]   472 U.S. at 609-10.
[24]   *Id.* at 587-90.
[25]   *Id.* at 592-93.

ski mountains in the area.[26]  Ski Co. also made efforts to frustrate Highlands's

ability to market its own multi-area package by refusing to accept Highlands's

vouchers, each equal to the price of a daily lift ticket at a Ski Co. mountain, which

were guaranteed by an Aspen bank and could be redeemed for face value.[27]

Echoing its previous decision in *Lorain Journal*, the Supreme Court noted

that "[t]he high value that we have placed on the right to refuse to deal with other

firms does not mean that the right is unqualified."[28]  The critical question before

the Court was therefore whether Ski Co.'s decision to make "an important change

in the pattern of distribution that had originated in a competitive market" was

unlawfully exclusionary.[29]  In finding that Ski Co. had violated Section 2, the

Court considered not only Highlands's steady decline in market share, but

significantly, considered the impact of Ski Co.'s conduct on consumers.[30]  Expert

testimony and anecdotal evidence indicated that the elimination of the 4-area pass

deprived skiers of a desired choice; many wanted to ski all four mountains, but

would not because their ticket would not permit it.[31]  Finally, the Court identified

indicia of Ski Co.'s anticompetitive motivation to discourage skiers from doing

business with Highlands.  In particular, Ski Co. was unwilling to accept

Highlands's vouchers, even though it entailed no cost to itself and would have

satisfied potential customers.  In other words, Ski Co. appeared willing to sacrifice

---

[26]     *Id.* at 593.
[27]     *Id.* at 593-94.
[28]     *Id.* at 601.
[29]     *Id.* at 603-05.
[30]     *Id.* at 605-10.
[31]     *Id.* at 605-06.

short-run benefits and consumer goodwill in exchange for a perceived long-run impact on Highlands's business.[32]  Moreover, Ski Co. acted markedly different in Aspen than it did in another Colorado ski area, where it owned only one mountain and continued to cooperate in providing access to a four mountain pass.[33]  Thus, as Judge Posner put it, *Aspen Skiing* stands for the proposition that dominant firms can be expected to deal with their rivals where "cooperation is indispensable to effective competition."[34]

Following these Supreme Court cases, the Government and private parties have successfully challenged unlawful exclusionary conduct that harms consumers and competitors.  *United States v. Dentsply International, Inc.*,[35] *United States v. Microsoft*,[36] and *Conwood Co. v. United States Tobacco Co.*[37] are strong examples of successful challenges to exclusionary conduct and the Department will look to them in establishing its Section 2 enforcement priorities.  In particular, following the D.C. Circuit's decision in *United States v. Microsoft*, we will need to look closely at both the perceived procompetitive and anticompetitive aspects of a dominant firm's conduct, weigh these factors, and determine whether on balance the net effect of this conduct harms competition and consumers.  Going forward,

---

[32]     *Id.* at 610-11.

[33]     *Id.* at 603 n.30.

[34]     *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 377–78 (7th Cir. 1986).  Carl Shapiro, Deputy Assistant Attorney General for Economics, elaborated on this principle as to network industries, explaining that the strategic denial of access to a network facility controlled by a dominant firm can deny "consumers the full benefits of technological progress that a dynamically competitive market would offer."  Carl Shapiro, *Exclusivity in Network Industries*, 7 Geo. Mason L. Rev. 673, 674 (1999).

[35]     399 F.3d 181 (3d Cir. 2005).

[36]     253 F.3d 34 (D.C. Cir. 2001) (en banc).

[37]     290 F.3d 768 (6th Cir. 2002).

the Department is committed to aggressively pursuing enforcement of Section 2 of the Sherman Act in furtherance of the principles embodied in these cases.

We did not lightly withdraw the Report. In this instance, however, we concluded that the message sent by the doctrinal implications of this Report was too problematic to let stand. In short, while preserving the right of firms with market power to continue to compete, we cannot allow them a free pass to undertake predatory or unjustified exclusionary acts.

## Section 1 Enforcement

Continued criminal and civil enforcement under Section 1 of the Sherman Act will also be an important part of the Antitrust Division's response to the distressed economy.

### Criminal Enforcement

The Antitrust Division's criminal enforcement program in recent years has obtained unprecedented success in cracking large domestic and international cartels, resulting in increasingly higher criminal fines and longer jail sentences for offenders. In the first six months of the current fiscal year, nearly $1 billion in criminal fines were obtained against corporate defendants, and the longest jail sentence for a one-count Sherman Act offense was imposed. In the last three years, over $2 billion in criminal fines and more than 162 years in jail time have been imposed in cases prosecuted by the Division.

With the higher levels of concentration and economic instability, markets are increasingly vulnerable to collusion and other fraudulent activity. We are

14

especially concerned that the recent infusion of vast amounts of federal funding to distressed industries and stimulus money to federal, state, and local governments may lead to increased collusion and fraudulent activity. Outreach and cooperation with those involved in the public procurement process are important parts of preventing and identifying such illegal conduct.

I am pleased to report that the Antitrust Division is pioneering new territory in its efforts to reach at-risk public sectors. We have launched the Antitrust Division Recovery Initiative, a program developed in response to the enactment of the American Recovery and Reinvestment Act ("ARRA"), an act that provides for significant appropriations to stimulate the country's economic recovery. Recognizing the substantial risk that ARRA funded agencies will be vulnerable to collusion and other fraudulent activity, the Antitrust Division has dedicated significant resources to assist agencies receiving ARRA funds in detecting and deterring criminal antitrust offenses. As part of this Initiative, the Division is providing training to the investigative arms of agencies receiving ARRA funds, as well as the procurement officials from those agencies responsible for the expenditure of such funds. By the end of this month, Division attorneys will have provided training to over 8,000 agents, auditors, grant recipients, and other procurement professionals. Through this Initiative, the Antitrust Division hopes to make a significant impact on the overall prevention of fraud, waste, and abuse relating to the use of ARRA funds.

We will work hard to enable the Antitrust Division program to establish direct lines of communication with agency Inspector Generals ("IGs") and state investigative authorities to assist these officers in preventing – as well as detecting – fraud and abuse. Consequently, in the event that preventive efforts fail, we will be there to investigate and swiftly prosecute individuals and entities responsible for criminal antitrust violations.

*Civil Merger and Non-Merger Enforcement*

On the civil front, the Antitrust Division will continue its push forward with merger and non-merger investigations. In particular, it is my hope that the Antitrust Division, drawing upon the significant expertise of my new leadership team, will have the opportunity to explore vertical theories and other new areas of civil enforcement, such as those arising in high-tech and Internet-based markets. Increasingly, Americans are relying on high-tech solutions in the home and the workplace and enjoying the fruits of innovation in those markets that have been spurred on by competition between rival firms. We thus plan to devote attention to understanding the unique competition-related issues posed by these markets. In the past, the Antitrust Division was a leader in its enforcement efforts in technology industries, and I believe we will take this mantle again. In so doing, I am cognizant that we must find the right balance to ensure that when intellectual property is at issue, competition is not thwarted through its misuse or illegal extension.

## IV.   Thinking Ahead:  New Ideas

Antitrust authorities must continue to look forward in order to remain at the forefront of the dialogue, economic learning, and the development of legal doctrine.  While our most pressing challenges relate to enforcement in the distressed economy, there are other important issues awaiting our attention.

Not only is the Antitrust Division charged with enforcing the antitrust laws, but it also supports the development of competition policy more broadly.  In my view, we cannot develop sound antitrust policy merely on a case-by-case basis.  Instead, as I have charged the Division's staff, we must consider the overall state of competition in the industries in which we are reviewing potentially anticompetitive conduct or mergers, or providing guidance to regulatory agencies charged with industry oversight.  We thus must consider market trends and dynamics, and not lose sight of the broader impacts of antitrust enforcement.

Rigorous economic analysis has been, and will continue to be, at the foundation of the Division's antitrust policy.  The focus of this fundamental analysis needs to be on the power of competition in the market to ensure the American consumer's access to the best products at the lowest prices.  We need to bring the focus of the economic discourse back to the basic and practical principle: when markets are competitive, the consumer "wins."

Beyond recalibrating our economic analysis, another important and pragmatic aspect of sound antitrust policy is an understanding of the regulatory frameworks governing the industries that are subject to antitrust enforcement.  The

Antitrust Division cannot operate in a vacuum, nor can it only focus on the case before it. Antitrust policy and enforcement undoubtedly have a significant impact on affected industries. For this reason, we must bring to our antitrust analysis a comprehensive knowledge of the economic and regulatory environments in which industries operate. This broader understanding of the playing field is particularly critical now, in light of our distressed economy and the new administration's pledge of broad-reaching reforms across numerous industries.

Another challenge we will face is how to pursue effective enforcement in an era of change and reform. The Obama Administration has pledged broad reforms across numerous industries, including banking, healthcare, energy, telecommunications, and transportation. The Antitrust Division will need to contribute our experience and expertise to these reform efforts. Indeed, part of our efforts will be to foster inter-agency discussions regarding the competition-related issues posed by existing and proposed regulations and policies, and to play an active role in competition advocacy. Our review of these industries may reveal that antitrust enforcement is but one of the necessary elements of a broader approach requiring the expertise of other agencies and potential legislative solutions. If that is the case, the Antitrust Division will be at the table with other key decision-makers to make the case for competition policy, underscore the importance of antitrust enforcement, and advocate for America's consumers.

Finally, I want to address the issue of collaboration with other antitrust authorities, which I know is an issue of significant concern with the Chamber and

its members in the business community. I am in search of ways to renew enforcement collaboration between the Antitrust Division and the FTC. Unfortunately, our policies and processes have diverged too frequently in recent years. While we are sister agencies with certain differences in terms of our operations, we have many shared enforcement goals. We will be even closer to reaching those goals if we can collaborate in pursuing our shared concerns regarding threats to competition. We will focus our efforts on working through our previously divergent policies regarding single-firm conduct and pursuing vigorous enforcement on the Section 2 front. We will also look at whether there is common ground between the two agencies in Section 1 enforcement, and in particular, with regard to vertical arrangements and in the review of mergers and acquisitions. In addition, I am focused on merger clearance with the hope of smoothing that process over time.

In the same spirit, I would like the Division to continue its fruitful collaboration with international antitrust enforcement authorities. I want to assure you that the withdrawal of the Section 2 Report does not mean that we are abandoning our efforts to work with our international colleagues. To the contrary, I believe that as targets of antitrust enforcement have expanded their operations worldwide, there is a greater need for U.S. authorities to reach out to other antitrust agencies.

We will therefore need to continue the efforts described in Chapter 10 of the Section 2 Report, and also find new ways to encourage collaboration in the

international antitrust community.  The Division is an unparalleled resource for other nations that are developing their own antitrust policies, and we will continue to play a leading role as an international advocate for competition policy. Although differing international legal frameworks pose certain hurdles to the convergence in substantive laws, we can still explore ways in which antitrust authorities around the world can pursue shared enforcement goals.  We will therefore remain active participants in the International Competition Network and the Organization for Economic Cooperation and Development.  We will provide continued support to emerging antitrust regimes around the world through technical cooperation with young antitrust agencies.  We will also be looking for additional opportunities for bilateral cooperation with our sister antitrust authorities abroad.

In short, I believe that greater coordination with the FTC and foreign antitrust authorities is in the best interests of America's business community and consumers.  Cooperation between antitrust agencies will not only contribute to the development of clearer legal standards around the world, but also may assist in improving cartel, merger, and non-merger enforcement in our respective jurisdictions.

## V.      Conclusion

The current economic challenges raise unique issues for antitrust authorities and private sectors.  We are faced with market conditions that force us to engage in a critical analysis of previous enforcement approaches.  That analysis makes

clear that passive monitoring of market participants is not an option. Antitrust must be among the frontline issues in the Government's broader response to the distressed economy. Antitrust authorities – as key members of the Government's economic recovery team – will therefore need to be prepared to take action. The Antitrust Division will be ready to take a lead role in this effort.

Thank you for the opportunity to speak to you this morning. I am happy to answer any questions you may have at this time.