Robert A. Mittelstaedt #60359
ramittelstaedt@jonesday.com
Craig E. Stewart #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
Michael Scott #255282
michaelscott@jonesday.com
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION** | **Case No. C 05 00037 JW (HRL)**<br>**C 06-04457 JW (HRL)**<br><br>**APPLE'S REPLY IN SUPPORT OF MOTION TO DISMISS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**<br><br>Date: May 10, 2010<br>Time: 9:00 a.m.<br>Courtroom: 8, 4th Floor<br><br>**<u>REDACTED</u>** |

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

I. THE MOTION TO DISMISS SHOULD BE GRANTED FOR THE REASONS PREVIOUSLY STATED BY THIS COURT. ....................................................... 2

II. SUMMARY JUDGMENT IS PROPER. ................................................................ 4

A. The Updates Were Issued To Stop Hacks And Ensure Compliance With The Label Agreements. ................................................................ 4

B. The Software Updates Were Product Improvements Under *Tyco.* ......................... 7

C. Apple Had No Antitrust Duty to Deal With RealNetworks.................................. 8

III. PLAINTIFFS' STATE LAW CLAIMS ARE SIMILARLY UNFOUNDED. ................. 10

A. Cartwright Act.............................................................................. 10

B. Unfair Competition Law. ............................................................... 11

C. Consumers Legal Remedies Act. .................................................... 11

D. Common Law Monopolization. ....................................................... 11

IV. PLAINTIFFS DO NOT SATISFY RULE 56(F). ............................................... 12

CONCLUSION ....................................................................................................... 14

- i -

Redacted Reply re Mot. to Dismiss or for Summ. Jgmt.
C 05-00037 JW (HRL); C 06-04457 JW (HRL)

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010)........ passim

*Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007)........ 11

*California v. Campbell*, 138 F.3d 772 (9th Cir. 1998)........ 12

*Chamberlain Group Inc. v. Skylink Techs. Inc.*, 381 F.3d 1178 (Fed. Cir. 2004)........ 6

*Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001)........ 11

*Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162 (9th Cir. 2006)........ 13

*Clement v. Kaiser Foundation Health Plan, Inc.*, 2004 WL 3049753 (C.D. Cal. 2004)........ 13

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986)........ 10

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983)........ passim

*Harrell v. 20th Century Ins. Co.*, 934 F.2d 203 (9th Cir. 1991)........ 10

*Home Diagnostics Inc. v. Lifescan, Inc.*, 120 F.Supp.2d 864 (N.D. Cal. 2000)........ 12

*Image Tech. Srvs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997)........ 3, 9

*Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303 (9th Cir. 1992)........ 10

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007)........ 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004)........ 6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ..... 9

*Moos-Holling v. Bayer Corp. Disability Plan*,
2010 WL 582604 (9th Cir. February 18, 2010) ..... 13

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Seagate Tech., Inc.*,
2005 WL 894704 (N.D. Cal. 2005) ..... 12, 13

*Ontiveros v. Kernan*,
2010 WL 829012 (9th Cir. March 9, 2010) ..... 13

*Schor v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006) ..... 8

*Universal City Studios v. Reimerdes*,
111 F. Supp. 2d 294, *aff'd* 273 F.3d 429 (2d Cir. 2001) ..... 6

*Universal City Studios v. Reimerdes*,
82 F. Supp. 2d 211 (S.D.N.Y. 2000) ..... 6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ..... 2, 8, 9, 12

*Yue v. Chordiant Software, Inc.*,
2009 WL 4931679 (N.D. Cal. 2009) ..... 12, 13

**OTHER AUTHORITIES**

H.R. Rep. No. 551 105th Cong., 2d Sess. 43 (July 22, 1998) ..... 6

Federal Rule of Civil Procedure
Rule 12(b)(6) ..... 1
Rule 56 ..... 12
Rule 56(f) ..... 2, 12, 13

Ninth Circuit Rule 36-3 ..... 13

## INTRODUCTION

In the wake of this Court's prior orders, plaintiffs are reduced to arguing that the antitrust laws prohibit Apple from updating its anti-piracy software to stop hackers. Plaintiffs' argument is insufficient as a matter of law and foreclosed by indisputable facts.

**Apple's motion to dismiss:** It is not an antitrust violation for a company to adhere to its lawful decision to use proprietary anti-piracy software. For this reason, plaintiffs' claim fails as a matter of law under Rule 12(b)(6). Plaintiffs argue in essence that while *Foremost Pro* permits Apple to use proprietary software even if the result is that Apple's products worked better together than with competitors' products, that case prohibits Apple from doing anything to maintain or restore that software's integrity. Nothing in *Foremost Pro* supports that illogical interpretation. Just as it was lawful for Apple to adopt its own software, it was also lawful for Apple to repair and continue to use that software.

**Apple's motion for summary judgment:** In any event, the undisputed facts show that plaintiffs' claim is invalid. As plaintiffs concede, Apple was contractually obligated to remedy security breaches by hacks that stripped content protection, and the software updates at issue here were made to ensure compliance with this requirement. If Apple did not stop those hacks, its ability to continue offering music to consumers would be jeopardized, depriving consumers of what plaintiffs concede is the "huge benefit" of obtaining music on the iTunes Store.

Rather than disputing those dispositive points, plaintiffs argue that Apple was not contractually required to stop RealNetworks' Harmony program. But that is beside the point, because Apple was required to stop hacks that caused security breaches by stripping content protection. Regardless of the effect on Harmony, these updates cannot be the basis of a Section 2 claim for three independent reasons. First, the software updates were not willful exclusionary conduct and they were supported by valid business reasons, because Apple was contractually obligated to stop security breaches and, independently, because the hacks violated the DMCA. Second, as demonstrated by the Ninth Circuit's recent *Tyco* decision, an alleged monopolist is entitled to update and improve its product even if the result is that competitors' products no longer work with the updated product. Third, any attempt to keep Harmony in operation after the

FairPlay redesign would have required cooperation between Apple and RealNetworks. Absent narrow circumstances not present here, Section 2 does not impose any duty on rivals to cooperate and a claim under Section 2 cannot be based on a refusal to deal.

Plaintiffs' Rule 56(f) application should be denied. Plaintiffs do not even attempt to identify any specific facts that will prevent summary judgment. No amount of discovery will change the dispositive facts noted above.

## I. THE MOTION TO DISMISS SHOULD BE GRANTED FOR THE REASONS PREVIOUSLY STATED BY THIS COURT.

Plaintiffs' Section 2 claim should be dismissed as a matter of law because the allegation that products are more convenient to use with each other than with a competitor's product is, as *Foremost Pro* held, of "no assistance" in stating a Section 2 claim. *See* Mot., pp. 8-10; *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543-44 (9th Cir. 1983). As this Court ruled, "[t]he increased convenience of using the [iPod and iTS music] together due to technological compatibility does not constitute anticompetitive conduct under either *per se* or rule of reason analysis." Dkt. 274, pp. 9-10.

Plaintiffs argue (pp. 5-6) that the *Foremost Pro* principle should be limited to the introduction of a new product and not apply to subsequent changes to that product. This argument underscores that they are not challenging Apple's decision to use proprietary DRM technology but only challenging updates to that technology to maintain or restore its functionality. In doing so, however, they do not dispute the key point that the competitive effect of using DRM is the same whether they are challenging Apple's initial decision or later updates. Just as it was lawful for Apple to use its proprietary DRM to encrypt the labels' music, it was lawful for Apple to repair its DRM when the encryption method was hacked. Mot., pp. 8-9

Constricting *Foremost Pro* as plaintiffs urge would thwart innovation just as much as prohibiting incompatible products from the outset. The very aim of the antitrust laws is to promote innovation, including by encouraging companies to create "an infrastructure that renders them uniquely suited to serve their customers." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). As *Foremost Pro* makes clear, creating technological

incompatibilities actually "increases competition" by providing a choice among technologies and an incentive to develop other products of advanced technology. *See* Mot., p. 9. Those salutary effects would be fleeting if *Foremost Pro* applied only at launch.

Plaintiffs' assertion (p. 6) that they should prevail based on the *Kodak* and *Tyco* cases is erroneous. Neither case involved a company's decision simply to adhere to its initial, lawful product design. To the contrary, Kodak changed its long-standing practice and stopped selling parts to independent service operators after one of them won a contract with the State of California. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1213-14 (9th Cir. 1997). And Tyco, after gaining monopoly power, changed its product so that, for the first time, it did not work with competitors' complementary products. *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998-1003 (9th Cir. 2010). Even then, the Ninth Circuit **rejected** the Section 2 claim, holding that "a design change that improves a product by providing a new benefit to consumers does not violate Section 2 absent some associated anticompetitive conduct." *Id.* at 998-99. In addition, *Tyco* demonstrates that plaintiffs' claim fails at the threshold step—unlike the *Tyco* plaintiffs, plaintiffs here do not and could not allege that the FairPlay redesign changed the level of interoperability from the level that existed when iTS was introduced. With no change in the competitive impact, maintaining the functionality of Apple's anti-piracy software is just as lawful as the initial decision to adopt that software.

Plaintiffs' observation (p. 7) that conduct that is lawful for non-monopolists can be unlawful for monopolists is a truism, because Section 2 applies only to monopolists. But offering technologically related products that are incompatible with rivals' products is permissible for all companies, alleged monopolists and non-monopolists alike. Indeed, Kodak was an alleged monopolist when it introduced its technologically related products—conduct that *Foremost Pro* found pro-competitive and permissible under Section 2.

Contrary to plaintiffs' argument (p. 7), Apple is not seeking "immun[ity] from antitrust scrutiny because FairPlay was proprietary or was used in part to protect intellectual property interests." Rather, the Section 2 claim fails because, as this Court held, the fact that Apple's

products are more interoperable with each other than with competitors' products is simply not anticompetitive. *See* Mot., pp. 8-10.

**II. SUMMARY JUDGMENT IS PROPER.**

Alternatively, the indisputable facts show that Apple's software updates did not violate Section 2.

*See* Mot., pp. 5-6.

Based on these facts—none of which plaintiffs dispute with any evidence—Apple is entitled to summary judgment for the three independent reasons noted above: (1) the software updates were not willful exclusionary conduct, and Apple had valid business reasons to issue them; (2) the updates were product improvements and thus under *Tyco* cannot give rise to Section 2 liability; and (3) Apple has no antitrust duty to deal with RealNetworks.

**A. The Updates Were Issued To Stop Hacks And Ensure Compliance With The Label Agreements.**

For the first ground for summary judgment, the two dispositive facts are that and (2) the labels' contracts required Apple to remedy breaches to FairPlay as a condition for continuing to offer music. Based on these two facts, Apple indisputably had a valid business reason for the challenged updates—it could not continue to offer music without complying with the labels' requirement to fix security breaches, and the hacks were illegal under the DMCA.

As to the first fact——plaintiffs are silent. They fail to address it and offer no evidence to contradict it. Thus, it is undisputed.

As to the second fact—that Apple was contractually obligated to remedy security breaches—plaintiffs initially argue (p. 11) that it is "without factual support" and "contradicted by the evidence."

Rather than disputing these dispositive points, plaintiffs argue (p.11) that Apple was not required to issues software updates directed at Harmony. But that is irrelevant because the updates at issue here were directed at the content protection-stripping hacks. Nor do plaintiffs dispute that the reason Harmony failed to work after the FairPlay update was because Harmony was based on the encryption method of the original FairPlay.

Plaintiffs' assertion (p. 11) that the record labels approved of Harmony and favored interoperability is also meaningless. Whatever the labels may have thought of Harmony or interoperability, plaintiffs admit that the labels required content protection. Indeed, they cite a 2006 statement by Warner Records' chairman (Dkt. 166-17, Ex. 15): "Let me be clear: We advocate the continued use of DRM in the protection of our and of our artists' intellectual

property. The notion that music does not deserve the same protection as software, television, film, video games and other intellectual property . . . is completely without logic or merit."[2]

Moreover, because of the requirement imposed by the major labels, it is irrelevant whether, as plaintiffs argue (pp. 11, 24), the "non-major record labels ever required Apple to issue any software updates" or to use DRM in the first place. Apple still had contractual obligations to the major labels to fix FairPlay when its security was breached or risk losing the right to offer their substantial body of music.

In addition, the hacks that stripped content protection by circumventing FairPlay clearly violated the DMCA. Mot., pp. 10-11. This provides an additional basis for finding that Apple was entitled to update its software. Although they assert that Apple "overstates the scope of the DMCA" (p. 16), plaintiffs do not actually argue that the hacks were lawful. Nor could they. As plaintiffs concede (p. 16), the very purpose of the DMCA is to prohibit circumvention of technological protection measures like FairPlay that control access to copyrighted music. Illegal circumvention is precisely what these hacks did. Plaintiffs point to "reverse engineering" exceptions but, on their face and under the case law, the exceptions apply only to circumventing access control measures for certain "computer programs" under limited circumstances, not copyrighted digital works like music.[3]

---

2 Plaintiffs' related argument (p. 18) that "DRM and interoperability are not mutually exclusive concepts" also misses the mark. If someone made a generic DRM that worked flawlessly with any and all music stores and players, interoperability might be possible. But that possibility would not mean the antitrust laws **require** interoperability. As this Court correctly held, *Foremost Pro* rejects any such notion.

3 *See Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 218 (S.D.N.Y. 2000) (holding that "Section 1201(f) permits reverse engineering of copyrighted computer programs only and does not authorize circumvention of technological systems that control access to other copyrighted works, such as movies"); *see also* H.R. Rep. No. 551 (Part 2), 105th Cong., 2d Sess. 43 (July 22, 1998) ("Section [1201](f) applies to computer programs as such, . . . and not to works generally, such as music or audiovisual works"). The two cases cited by plaintiffs, *Chamberlain* and *Lexmark*, are inapplicable. They did not involve circumvention that facilitated infringement of a copyrighted work. *Chamberlain Group Inc. v. Skylink Techs. Inc.*, 381 F.3d 1178, 1195-1204 (Fed. Cir. 2004); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546-49 (6th Cir. 2004). Here, plaintiffs do not dispute that stripping FairPlay facilitated infringement by giving access to, and enabling unrestricted copying and distribution of, the labels' copyrighted works. *See, e.g., Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294, *aff'd* 273 F.3d 429

(continued)

For these reasons, Apple was indisputably entitled to issue software updates to stop these hacks. Thus, Apple is entitled to summary judgment on the ground that the software updates were not exclusionary and were supported by valid business reasons.

**B. The software updates were product improvements under *Tyco*.**

As a further independent ground for summary judgment, Apple's software updates are permissible under *Tyco* because they clearly improved the product. Mot., pp. 13-14. These updates helped ensure that Apple remained in compliance with its contractual obligations to the labels. Otherwise, Apple's ability to continue offering that music would be at risk, depriving consumers of what plaintiffs concede is the "huge benefit" of purchasing music through the iTunes Store. Mot., p. 3.

Plaintiffs agree that under *Tyco* any improvement is sufficient to defeat a Section 2 claim because the court does not balance the degree of product improvement against the degree of alleged anticompetitive effects. *See* Mot., p. 15; Opp., p. 10 n.3. Instead, plaintiffs argue that Apple's software update "could hardly be considered an 'improved product design.'" Opp., p. 10, n.3; *see also id.*, p. 11 (incorrectly arguing that Apple did not provide any evidentiary "support" that iTunes 4.7 provided a "new benefit to consumers"). If plaintiffs' position is that the software update did not provide **any** benefit, they are obviously incorrect. The redesigned FairPlay benefited consumers by ensuring that the major record labels continued to supply music to Apple and that the iTunes Store could stay in business.[4] If plaintiffs are instead claiming that the updates did not provide a **new** benefit, they are both incorrect and using the wrong standard. It would be like saying that redesigning a computer program so that it does not crash is not an improvement because it does not provide any benefit other than continued use of the program. *See* Robbin Decl., ¶ 7.

---

(2d Cir. 2001) (holding unlawful the "DeCSS" program, which stripped the content protection on the studios' movie files to allow unrestricted copying and distribution of those movies).

[4] iTunes 4.7 added various new features as well. Robbin Decl., ¶ 7; Kiernan Decl., Ex. 2 (describing added iPod photo support and ability to hide duplicate music files).

With no answer to these dispositive points, plaintiffs again seek to divert. As plaintiffs note (p. 10), Apple did not want to use DRM in the first place and now sells music without DRM. Those facts do not help plaintiffs. What is relevant, and undisputed, is that—at the time of the updates—Apple had a contractual obligation to use DRM and to close security breaches if it wanted to continue offering the labels' music.[5]

The *Microsoft* case cited by plaintiffs (p. 12) does not change this conclusion. Integrating Microsoft's operating system and browser might not have been a product improvement. But redesigning FairPlay to stop hacks and enable Apple to continue to offer music to consumers indisputably was. This ground, alone, is sufficient for summary judgment under *Tyco*.

**C. Apple Had No Antitrust Duty to Deal With RealNetworks.**

Alternatively, the Section 2 claim fails because any attempt to keep Harmony in operation would have required cooperation between Apple and RealNetworks. As shown in Apple's motion (pp. 15-19), absent narrow circumstances that do not apply here, Section 2 does not impose any duty on rivals to cooperate. Indeed, "[c]ooperation is a *problem* in antitrust, not one of its obligations." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006).

In response, plaintiffs erroneously claim (p. 13) that Apple "has provided no evidence to demonstrate that such cooperation would be required" for Harmony to continue to work. To the contrary, as summarized in Apple's motion (pp. 5-6), the Robbin declaration (¶¶ 11-12) sets forth in detail why cooperation would be required. [redacted] Plaintiffs offer nothing to refute Apple's showing, or to raise a triable issue.

Plaintiffs also argue that if trying to keep Harmony in operation would have required inter-company cooperation, then it was a violation of Section 2 for Apple not to so cooperate.

---

[5] Also diversionary is plaintiffs' assertion (p. 1) that Apple updated its software for the "purpose" of excluding competition. Not only is that assertion unsupported by any evidence, but plaintiffs do not dispute that *Tyco* rejected alleged anticompetitive intent as a permissible basis for finding a Section 2 violation. *See* Mot., p. 14 & n.11.

That argument is wrong as a matter of law. *Trinko* holds that even alleged monopolists generally have no duty to cooperate with a rival. Post-*Trinko* cases are virtually uniform that "the sole exception to the broad right of a firm to refuse to deal with its competitors" arises when a company has voluntarily entered into—and then unilaterally terminates—a prior course of dealing with that competitor. *See* Mot., p.18 and n.15. Plaintiffs have no answer to the five cases from the Second, Ninth and Eleventh Circuits or the leading antitrust treatise that Apple cited for that proposition. So they ignore those authorities, except for one which they misconstrue.[6] They also ignore the three-part rationale of *Trinko* which underscores why no duty to deal with RealNetworks exists. *See* Mot., pp. 16-18. As *Tyco* reiterates, even an alleged monopolist "has no duty to help its competitors survive or expand when introducing an improved product design." 592 F.3d at 1002; Mot., p. 13.[7]

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004), does not establish a different threshold standard. To the contrary, it held that even if an alleged monopolist unilaterally changes a pre-existing, voluntary course of dealing, it still does not face Section 2 liability unless, as plaintiffs note (p. 15), it "sets its retail price at an unprofitable level in the short run merely to exclude competition in the long run." Here, plaintiffs meet neither the threshold requirement (unilaterally changing a pre-existing course of dealing) nor the additional one (setting price at short-term, unprofitable level). As discussed in Apple's motion (p. 19), Qwest

---

[6] Plaintiffs cite *Kodak* as holding that a "pretextual" refusal to deal is actionable. In fact, the express predicate for liability was that Kodak had changed an "established pattern of distribution" for providing parts to independent service organizations. 125 F.3d at 1211; Mot., p. 18, n.15.

Nor does this Court's ruling on the *Tucker* complaint assist plaintiffs. That decision was issued before the Ninth Circuit made clear in *Tyco* that liability under section 2 does not turn on alleged bad intent (see Mot., p. 14) and before the Second Circuit's decision in *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007), confirming that a prior course of dealing is required. Moreover, the Court's ruling pertained to plaintiffs' original claim that Apple was required to make its products interoperable, not the current claim that its software updates were unlawful.

[7] Contrary to plaintiffs' further argument (p. 14), Apple need not prove that dealing with RealNetworks "would have been detrimental to the security of Apple's products." [REDACTED] [REDACTED], application of *Trinko* does not depend on any such showing.

changed its dealings with MetroNet to prevent it from continuing to obtain a volume discount. The Ninth Circuit held that the change did not violate Section 2 because Qwest was simply seeking to maintain the business strategy it had originally adopted. *MetroNet*, 383 F.3d at 1133. The same is true here. *Accord Elevator Antitrust Litig.*, 502 F.3d at 49 (rejecting refusal to deal liability despite allegation that the defendants had "intentionally design[ed]" their product to be incompatible with competitors' products).

Plaintiffs argue (p. 13) that it would be "possible" for Apple to cooperate with RealNetworks because Apple cooperated with HP and Motorola in other respects. But nothing in Section 2 jurisprudence suggests that rivals must cooperate whenever it is possible for them to do so. Quite the contrary, the antitrust laws discourage cooperation and impose no such duty.[8]

## III. PLAINTIFFS' STATE LAW CLAIMS ARE SIMILARLY UNFOUNDED.

Although plaintiffs assert (p. 21) that it is "generally preferable" for a federal court to remand state law claims when federal law claims are dismissed, they do not attempt to show that is appropriate in the circumstances of this case. Here, the state law claims are similar to and based on the same facts as the federal law claims. The case has been pending for five years in the federal court, the forum selected by plaintiffs. And the issues are fully briefed. In these circumstances, retaining jurisdiction and deciding the state law claims furthers the interests of economy and comity (*Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991)) and avoids the "waste of judicial resources." *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992).

### A. Cartwright Act.

As shown in Apple's motion (p. 20), the Cartwright Act does not include any counterpart to Section 2 of the Sherman Act dealing with single-firm conduct as opposed to combinations and

---

[8] In any event, as shown by plaintiffs' description and the documents they cite (p. 14), the HP and Motorola deals were quite unlike Harmony. HP simply sold iPods under the HP brand and pre-installed the iTunes jukebox application on HP computers. Motorola sold certain phones that could download and play iTS music. Neither of those arrangements involved trying to make another company's music with its own DRM play on iPods, with all the complexities that would entail.

conspiracies. Plaintiffs' argument to the contrary is meritless. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir. 1986) (holding that plaintiff's monopoly claim was "not cognizable under the Cartwright Act, for it fails to allege any combination"). In any event, plaintiffs do not suggest that, if the Cartwright Act were to reach single-firm conduct, its standards would be any different from Section 2 standards. Accordingly, because the Section 2 claims are invalid, the identical claim even if it were cognizable under the Cartwright Act would also fail.

**B. Unfair Competition Law.**

Plaintiffs assert that their UCL claim is based not only on their Section 2 claim but also on the claim that Apple undertook "specific aggressive actions to entrench its monopolies" and to overcharge iPod customers. But that is just using different words to describe the same conduct as their Section 2 claim. Under *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001), where "the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." That is the end of the matter as shown by the cases applying *Chavez* cited in Apple's motion (p. 21, n.16) and ignored by plaintiffs.

**C. Consumers Legal Remedies Act.**

Plaintiffs concede that their challenge to iPod pricing is not actionable under the CLRA. They now assert (p. 20) that Apple's "usage rules and upgrade requirements" are "unconscionable." No such allegations are made in their amended complaint. Nor would any such allegations state a claim, even if they had been made. *See, e.g., Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007).

**D. Common Law Monopolization.**

As shown in Apple's motion (p. 22), California law does not recognize a common law monopolization claim. In arguing to the contrary, plaintiffs rely on cases predating the two federal court cases applying California law that Apple cited. Plaintiffs have no answer to the reasoning of those more recent cases and Apple's other authority. In any event, plaintiffs do not

contend that a claim that is insufficient under Section 2 would be actionable under any such common law claim. Thus, this claim should fare no better than the federal law claims.

**IV. PLAINTIFFS DO NOT SATISFY RULE 56(F).**

To defer the Rule 56 motion, it is not enough that plaintiffs think that undiscovered evidence will "shed light on the contested issues related to Apple's willful conduct" (p. 23), that they "would like to obtain" information "to more fully respond" to Apple's motion (p. 24) or that they think discovery will "likely reveal additional sources of information that will likewise need to be evaluated." Roach Decl., ¶ 18. Rather, they must show that "specific facts" exist that are "'essential' to resist the summary judgment motion" (*California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)) and that those facts "would prevent summary judgment." *Yue v. Chordiant Software, Inc.*, 2009 WL 4931679, *6 (N.D. Cal. Dec. 21, 2009) (J. Ware).[9]

Plaintiffs do not purport to meet this standard. They refer (p. 23) to broad topics for discovery like "Apple's negotiations and contracts with record labels" and "the technical aspects of Apple's software updates." But they fail to identify any specific fact they hope to discover, much less any specific fact that will preclude summary judgment. In particular, they do not identify any fact that could contradict the showing that the major labels' contracts required Apple to remedy security breaches. That is what the contracts expressly say, as plaintiffs concede. Likewise, plaintiffs do not identify any fact that could contradict the showing that iTunes 4.7 was a product improvement. Nor do they identify any fact showing that Harmony could have continued to work without cooperation between Apple and RealNetworks—the threshold issue on the alternative *Trinko* ground for summary judgment. Plaintiffs' counsel's declaration adds nothing of substance, and is insufficient for the reasons set forth in the accompanying Apple's counsel's accompanying declaration.

---

9 *See also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Seagate Tech., Inc.*, 2005 WL 894704, *4 (N.D. Cal. April 18, 2005) (J. Ware) (denying Rule 56(f) request where party "failed to show how additional discovery would preclude summary judgment against it"), rev'd on other grounds, 233 Fed. Appx. 614 (9th Cir. 2007); *Home Diagnostics Inc. v. Lifescan, Inc.*, 120 F.Supp.2d 864, 869 (N.D. Cal. 2000) (J. Ware) (party required to state "specifically what information…would preclude summary judgment").

Instead of attempting to comply with the correct Rule 56(f) standard, plaintiffs argue for a more lenient standard. They rely (p. 22) on a 12-year old unpublished Ninth Circuit opinion, purporting to cite it "pursuant" to Ninth Circuit Rule 36-3. In fact, that Rule bars citation of pre-January 1, 2007 unpublished opinions except for limited purposes inapplicable here.[10] Nor did *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162 (9th Cir. 2006) establish a more lenient rule. It cited the standard applied in *Garrett v. City and County of San Francisco*, which explained that "[u]nder Rule 56(f), an opposing party must make clear what information is sought and how it would preclude summary judgment." 818 F.2d 1515, 1518 (9th Cir. 1987). That standard has been repeatedly applied by the Ninth Circuit. *See, e.g.*, *Ontiveros v. Kernan*, 2010 WL 829012 (9th Cir. Mar. 9, 2010); *Moos-Holling v. Bayer Corp. Disability Plan*, 2010 WL 582604, *1 (9th Cir. Feb. 18, 2010); *Yue*, 2009 WL 4931679, *6 (N.D. Cal. 2009); *Seagate Tech.*, 2005 WL 894704 at *4.[11]

In short, plaintiffs fail to carry their burden under Rule 56(f) of showing that discovery is needed to obtain specific facts that will preclude summary judgment.

---

[10] The exceptions are "when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion, . . . for factual purposes, such as to show double jeopardy, sanctionable conduct, notice, entitlement to attorneys' fees, or the existence of a related case, . . . in a request to publish a disposition or order, . . . or in a petition for panel rehearing or rehearing en banc." Ninth Cir. Rule 36-3.

[11] Attempting to avoid this well-established requirement, plaintiffs cite *Clement v. Kaiser Foundation Health Plan, Inc.*, 2004 WL 3049753 (C.D. Cal. Dec. 17, 2004), a case in which the court did not rule on plaintiff's Rule 56(f) request, instead granting summary judgment based on preemption. *Id*. at *3. Plaintiffs also cite a Fifth Circuit case, which cannot change the 56(f) standard used in this Circuit.

## **CONCLUSION**

For these reasons, Apple's motion to dismiss or for summary judgment should be granted.

Dated: April 12, 2010                    JONES DAY

By:/s/ Robert A. Mittelstaedt
   Robert A. Mittelstaedt

Counsel for Defendant
APPLE INC.