1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5                                  )  C-05-00037-JW
                                   )  C-07-6507-JW
6                                  )
                                   )  MAY 10, 2010
7    THE APPLE IPOD ITUNES         )
     ANTI-TRUST LITIGATION.        )
8                                  )
                                   )  PAGES 1 -48
9                                  )
     _____       )
10

11

12            THE PROCEEDINGS WERE HELD BEFORE

13         THE HONORABLE UNITED STATES DISTRICT

14                   JUDGE JAMES WARE

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFFS: ROBBIN, GELLER, RUDMAN & DOWD
                         BY:  BONNY E. SWEENY
17                            PAULA M. ROACH
                              THOMAS R. MERRICK
18                       655 WEST BROADWAY
                         SUITE 1900
19                       SAN DIEGO, CALIFORNIA 92101

20                       ZELDES & HAEGGQUIST
                         BY:  HELEN I. ZELDES
21                            ALREEN HAEGGQUIST
                         625 BROADWAY
22                       SUITE 906
                         SAN DIEGO, CALIFORNIA 92101
23
          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
24

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074

1

1

2
     A P P E A R A N C E S: (CONT'D)

3
     FOR THE DEFENDANTS:        JONES DAY
                                BY:  ROBERT MITTELSTAEDT
4
                                     DAVID KIERNAN
                                555 CALIFORNIA STREET
5
                                26TH FLOOR
                                SAN FRANCISCO, CALIFORNIA
6
                                94104

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1    SAN JOSE, CALIFORNIA                    MAY 10, 2010

2

3                    P R O E E D I N G S

4              (WHEREUPON, COURT CONVENED AND THE

5    FOLLOWING PROCEEDINGS WERE HELD:)

6              THE CLERK:  CALLING CASE NUMBER 05-00037,

7    THE APPLE IPOD ITUNES ANTITRUST LITIGATION; AND

8    RELATED CASE 07-6507, STACIE SOMERS V. APPLE INC.

9              AS TO 05-0037 DEFENDANT'S MOTION TO DISMISS

10   15 MINUTES EACH SIDE.

11             ITEM NUMBER TWO AS TO 07-6507 ORDER TO SHOW

12   CAUSE RE DISMISSAL TEN MINUTES EACH.

13             THE COURT:  WELL, THAT'S MORE TIME THAN

14   I'VE GOT LEFT, BUT STATE YOUR APPEARANCES.

15             MR. MITTELSTAEDT:  GOOD MORNING, YOUR

16   HONOR.  BOB MITTELSTAEDT AND DAVID KIERNAN OF JONES

17   DAY FOR APPLE.

18             MS. SWEENY:  GOOD MORNING, YOUR HONOR.

19   BONNY SWEENEY FOR THE DIRECT PURCHASER PLAINTIFFS

20   AND WITH ME IS TOM MERRICK AND PAULA ROACH.

21             MS. ZELDES:  GOOD MORNING, YOUR HONOR.

22   HELEN ZELDES ON BEHALF OF PLAINTIFF STACIE SOMERS

23   AND WITH ME IS ALREEN HAEGGQUIST.

24             THE COURT:  GOOD MORNING ALL.  SO THIS IS

25   APPLE'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR

                                                        3

1    SUMMARY JUDGMENT OF OTHER MATTERS.

2             DO YOU WANT TO SPEAK FURTHER?

3             MR. MITTELSTAEDT:  YES, YOUR HONOR.  THIS

4    CASE IS NOW CONSIDERABLY NARROWER THAN THE LAST

5    SEVERAL TIMES THAT WE HAVE BEEN BEFORE YOUR HONOR.

6             IN FACT, FOR THE FIRST FOUR YEARS OF THIS

7    CASE THE PLAINTIFF'S MAIN CLAIM WAS THAT APPLE

8    VIOLATED THE ANTITRUST LAWS BY USING ITS OWN

9    PROPRIETARY ANTI-PIRACY OR DRM SOFTWARE INSTEAD OF

10   USING MICROSOFT'S.

11            AND LAST YEAR YOUR HONOR THREW THAT CLAIM

12   OUT BASICALLY RULING THAT THE INCREASED CONVENIENCE

13   OF USING TWO PRODUCTS TOGETHER DUE TO TECHNOLOGICAL

14   COMPATIBILITY WAS NOT ANTICOMPETITIVE EITHER UNDER

15   THE RULE OF REASON OR UNDER THE PER SE ANALYSIS.

16            AND YOUR HONOR'S RULING FOLLOWED THE

17   NINTH CIRCUIT IN THE FOREMOST PRO, THE KODAK CASE,

18   WHERE THE NINTH CIRCUIT SAID THAT THE INTRODUCTION

19   OF TECHNOLOGICALLY RELATED PRODUCTS, EVEN IF

20   THEY'RE INCOMPATIBLE WITH COMPETITOR'S PRODUCTS,

21   WAS NOT ANTICOMPETITIVE.

22            AND THE NINTH CIRCUIT IN THAT CASE WENT

23   ON TO SAY, AND BECAUSE THAT CONDUCT WAS NOT

24   ANTICOMPETITIVE, IT WAS OF NO ASSISTANCE IN THE

25   NINTH CIRCUIT'S WORDS TO THE PLAINTIFFS IN TRYING

4

1    TO STATE A SECTION 2 CLAIM BECAUSE AFTER ALL A

2    SECTION 2 CLAIM REQUIRES A SHOWING OF

3    ANTICOMPETITIVE CONDUCT.

4         SO LAST DECEMBER AFTER MAKING THOSE

5    RULINGS, YOUR HONOR SENT THE PLAINTIFFS BACK TO THE

6    DRAWING BOARD AND ASKED THEM TO COME UP WITH AN

7    AMENDED COMPLAINT TO POINT OUT IF THEY WERE

8    CONTINUING TO RELY ON ANYTHING OTHER THAN APPLE'S

9    USE OF ITS PROPRIETARY ANTI-PIRACY SOFTWARE.

10        THE PLAINTIFFS FILED AN AMENDED

11   COMPLAINT, AND THEY DROPPED FIVE OF THE SIX CLAIMS

12   THAT THEY HAD BEEN MAKING.

13        IN YOUR HONOR'S DECEMBER OF LAST YEAR

14   RULING, YOUR HONOR LISTED THE SIX TYPES OF

15   ANTICOMPETITIVE CONDUCT THAT THEY WERE COMPLAINING

16   ABOUT, BASICALLY NOT USING MICROSOFT'S SOFTWARE AND

17   NOT LICENSING ITS OWN SOFTWARE WHICH IS CALLED

18   FAIRPLAY.

19        THEY ALSO DROPPED -- THEY DROPPED ALL OF

20   THAT.  THEY ALSO DROPPED THE CLAIM THAT HAS BEEN IN

21   THE CASE SINCE THE START THAT APPLE DISABLED THE

22   PROCESSING CHIP IN THE IPOD.  THEY DROPPED THAT AND

23   THAT'S GONE AS WELL.

24        THE ONLY CLAIM THAT WAS REMAINING IS

25   THEIR CLAIM ABOUT REAL NETWORKS HARMONY PROGRAM AND

5

1    THEY ADDED A CLAIM.  AND I WANT TO START WITH THE

2    CLAIM THAT THEY ADDED.

3            WHAT THEY HAVE BASICALLY DONE IS CONCEDED

4    THAT IT'S OKAY UNDER THE ANTITRUST LAWS FOR APPLE

5    TO USE ITS OWN PROPRIETARY SOFTWARE.

6            BUT THEY CLAIM WHAT WAS UNLAWFUL IS THAT

7    APPLE UPDATED OR REPAIRED THAT SOFTWARE WHEN IT WAS

8    ATTACKED BY HACKERS.

9            SO NOW THEY HAVE GONE FROM SUPPORTING

10   MICROSOFT TO SUPPORTING HACKERS.

11           IN PARAGRAPH 64 OF THEIR AMENDED

12   COMPLAINT THEY REFER TO A SOFTWARE PROGRAM KNOWN AS

13   JHYMN.

14           AND THEY SAY JHYMN GAVE CONSUMERS A CLEAR

15   CHOICE OF USING AN IPOD TO PLAY BACK ITUNES STORE

16   PURCHASERS OR ALTERNATIVES DIGITAL MEDIA PLAYERS.

17           AND THEN THEY SAY THAT APPLE ISSUED A

18   SOFTWARE UPDATE THAT BLOCKED THAT SOFTWARE PROGRAM

19   KNOWN AS JHYMN.

20           WHAT THEY OMIT, YOUR HONOR, IS HOW JHYMN

21   AND THE OTHER SOFTWARE PROGRAMS THAT THEY'RE

22   TALKING ABOUT OPERATED.  THESE ARE THE SOFTWARE

23   PROGRAMS THAT THEY ALLEGE IN THE COMPLAINT THAT

24   WERE BLOCKED BY UPDATES BY APPLE TO ITS FAIRPLAY.

25           THEY OMIT HOW THOSE PROGRAMS WORKED.

6

1              WE HAVE SET FORTH IN THE DECLARATION OF

2     JEFF ROBBIN HOW THOSE HACKS WORK, AND THEY WERE

3     HACKS.  WHAT THEY DID WAS THAT THEY REVERSE

4     ENGINEERED FAIRPLAY, THEY STRIPPED THE CONTENT

5     PROTECTION PROVIDED BY FAIRPLAY, AND THEY

6     CIRCUMVENTED THAT DRM, AND THEY PERMITTED USERS TO

7     VIOLATE THE USAGE RULES THAT WERE ESTABLISHED BY

8     THE RECORD LABELS.

9              SO BY USING THOSE PROGRAMS, YOUR HONOR,

10    USERS WERE ABLE TO MAKE UNLIMITED COPIES, THEY

11    WERE -- OF THE MUSIC THEY DOWNLOADED FROM THE APPLE

12    STORE, AND THEY WERE ABLE TO GIVE THOSE COPIES TO

13    AS MANY PEOPLE AS THEY WANTED.

14             THAT'S PIRACY, AND IT'S A VIOLATION OF

15    THE MUSIC LABEL'S COPYRIGHTS AND THAT'S WHAT THE

16    PROGRAMS DID.

17             THE PLAINTIFFS SIMPLY SAY THAT THOSE

18    PROGRAMS CREATED CLEAR CHOICE OR INTEROPERABILITY.

19             BUT ALL THEY HAD TO DO, YOUR HONOR, IF

20    THEY WANTED TO KNOW WHAT THOSE PROGRAMS REALLY DID

21    OR HOW THEY DID IT, WAS TO LOOK AT THE WEB SITES OF

22    THOSE PROGRAMS.

23             JHYMN, FOR EXAMPLE, HAS A WEB SITE CALLED

24    HYMN PROJECTS AND HERE'S WHAT THE HYMN PROJECTS

25    SAID ABOUT JHYMN:  "SET YOUR ITUNES MUSIC FREE.

7

1    REMOVE DRM RESTRICTIONS.  YOU BUY SOME NEW MUSIC

2    THROUGH ITUNES, YOU RUN JHYMN.  AND WHEN YOU QUIT

3    JHYMN AND GO BACK TO ITUNES, ALL OF YOUR DRM

4    PROTECTED MUSIC HAS BEEN SEAMLESSLY REPLACED BY

5    UNLOCKED DRM MUSIC."  THAT'S A HACK.

6            ANOTHER EXAMPLE ON HYMN PROJECT, THE SAME

7    WEB SITE.  THEY KNOW WHAT THEY ARE DOING IS WRONG

8    AND THEY SAY THE VERY SOFTWARE PROVIDED ON THIS WEB

9    SITE ALLOWS YOU TO FREE YOUR ITUNES MUSIC STORE

10   PURCHASES FROM THEIR DRM RESTRICTIONS.

11           NOW, BEFORE USING ANY OF THIS SOFTWARE ON

12   THE WEB SITE THEY GO ON TO SAY YOU SHOULD BE AWARE

13   OF THE LEGAL STANDING OF DRM CIRCUMVENTION

14   TECHNOLOGY IN YOUR OWN COUNTRY AND MAKE YOUR OWN

15   DECISION WHETHER USING JHYMN PROJECT SOFTWARE IS

16   RIGHT FOR YOU.

17           THAT'S WHAT THE PLAINTIFFS WERE ALLEGING

18   THAT APPLE VIOLATED THE ANTITRUST LAWS BY STOPPING,

19   BY ISSUING SOFTWARE UPDATES TO FAIRPLAY.

20           SOFTWARE UPDATES THAT DID NOT CHANGE THE

21   LEVEL OF INTEROPERABILITY FROM WHAT IT HAD BEEN AT

22   THE START; IT SIMPLY RESTORED THE INTEGRITY OF THAT

23   ANTI-PIRACY SOFTWARE IN THE FACE OF HACKS LIKE

24   THIS.

25           NOW, PLAINTIFFS INSINUATE THAT THERE'S

8

1    SOMETHING WRONG IN APPLE STOPPING HACKS.

2              AND THEY DO THAT BY SAYING, WELL, THEY

3    PROMOTED CHOICE.

4              WELL, CHOICE IN THE SENSE THAT IF YOU

5    DIDN'T HAVE DRM RESTRICTIONS REQUIRED BY THE LABELS

6    THEN YOU COULD VIOLATE THE USAGE RULES.

7              BUT IT'S LIKE SAYING THAT THE MAN ON THE

8    STREET WHO SELLS FAKE WATCHES IS PROMOTING CONSUMER

9    CHOICE OR THE BANK ROBBER IS REDISTRIBUTING THE

10   WEALTH.

11             YOU KNOW, SURE, IN SOME SENSE.  BUT WHAT

12   THEY'RE DOING IS VIOLATING TRADEMARKS AND ROBBING

13   BANKS AND IN OUR CASE HACKING.

14             NOW, THE PLAINTIFFS, I THINK, IMPLICITLY

15   RECOGNIZE ALL OF THAT.  I THINK THEY RECOGNIZE THAT

16   IT DOESN'T MAKE ANY SENSE TO SAY THAT IT'S OKAY FOR

17   APPLE TO USE ITS OWN DRM ANTI-PIRACY SOFTWARE TO

18   ENFORCE THE USAGE RULES, BUT YOU CAN'T REPAIR IT TO

19   COMBAT HACKERS.

20             AND SO FOR THAT REASON IN THEIR

21   OPPOSITION BRIEF HERE, EVEN THOUGH THEY JUST ADDED

22   THESE ALLEGATIONS TO THE COMPLAINT A FEW MONTHS

23   AGO, THEY MAKE NO ATTEMPT TO DEFEND THOSE

24   ALLEGATIONS.

25             THE COURT:  WELL, LET ME -- HERE'S MY

9

1   QUESTION AND THAT'S THIS:  THIS IS IN THE LIFE OF

2   THIS LITIGATION PERHAPS EARLY BUT IN THE DISCOVERY

3   LIFE OF THE CASE QUITE EARLY.

4           AND IT DOES SEEM TO ME THAT I NEED TO

5   KNOW THE TRUTH OF THAT BEFORE I CAN RULE ON IT.

6   AND SO ESSENTIALLY WHAT YOU'RE OFFERING IS BUSINESS

7   JUSTIFICATION FOR THESE SOFTWARE UPDATES.

8           AND WHAT I HEARD FROM THE PLAINTIFF IS AN

9   EMPHASIS THAT THESE SOFTWARES ALLOWED DOWNLOADS

10  WHICH WERE FROM OTHER SOURCES THAN ITUNES SO THAT

11  THE PLAYER WOULD HAVE GREATER UTILITY.

12          NOW, WHICH IS WHICH?  I DON'T KNOW AT

13  THIS POINT.

14          SO THIS IS A MOTION FOR SUMMARY JUDGMENT.

15  THERE'S A 56(F) MOTION THAT IS BEING MADE.  AND SO

16  THE QUESTION THAT I HAVE IS WHY SHOULDN'T I WAIT

17  AND ALLOW THE RECORD TO BE MORE FULLY DEVELOPED?

18          MR. MITTELSTAEDT:  FOR TWO REASONS, YOUR

19  HONOR.  FIRST, THERE'S ALSO A MOTION TO DISMISS.

20          THE COURT:  I UNDERSTAND.

21          MR. MITTELSTAEDT:  AND I WANT TO COME TO

22  THE RATIONALE FOR THAT MOTION TO DISMISS.

23          ON THE RULE 56 MOTION, IT IS IMPORTANT TO

24  KEEP IN MIND THE DIFFERENCE BETWEEN THE HACKS THAT

25  I HAVE JUST DESCRIBED, WHICH THEY DON'T ATTEMPT TO

10

1    DEFEND, AND THE HARMONY PROGRAM, WHICH THEY DO.

2             ON THE HACKS, NO DISCOVERY IS NEEDED TO

3    KNOW THAT THESE WERE HACKS THAT STRIPPED THE DRM

4    FROM ITUNES MUSIC.

5             AND THAT'S UNLAWFUL UNDER THE DMCA.  IT

6    VIOLATED THE INTEGRITY OF APPLE'S SOFTWARE.

7    THERE'S NO JUSTIFICATION FOR THOSE HACKS.  AND THE

8    PLAINTIFFS DON'T TRY AND DEFEND THEM.

9             WHAT THEY DO IS THAT THEY SWITCH TO

10   HARMONY.  HARMONY WAS SORT OF THE OPPOSITE, IF YOU

11   WILL.  HARMONY SOLD MUSIC ON ITS WEB SITE.  IT WAS

12   DRM PROTECTED BY HARMONY'S OWN DRM AND THEN IT

13   TRICKED THE IPOD INTO THINKING IT WAS FAIRPLAY OR

14   APPLE'S PROTECTED MUSIC.

15            ON THE FACE OF THE COMPLAINT THE

16   PLAINTIFFS SAY THAT REAL NETWORKS, WHICH MADE THE

17   HARMONY SOFTWARE, ANALYZED THIS APPLE SOFTWARE AND

18   IN THEIR OWN WORDS DISCERNED THE SOFTWARE CODE.

19            AND THEN BASED ON DISCERNING THE SOFTWARE

20   CODE IN APPLE'S FAIRPLAY, HARMONY MIMICKED THE THEN

21   EXISTING VERSION OF FAIRPLAY.  AND SO BY MIMICKING

22   IT, IT SORT OF TRICKED THE IPOD INTO THINKING IT

23   WAS THE SAME THING.

24            WHEN APPLE ISSUED SOFTWARE UPDATES TO

25   BLOCK THOSE HACKS, THE ONES THAT I TALKED ABOUT

11

1    BEFORE, THE PIRACY PROMOTING ONES, THE ONES THAT

2    THE PLAINTIFFS DON'T TRY AND DEFEND, APPLE DID THAT

3    AND SET FORTH IN DETAIL IN THE ROBBIN DECLARATION,

4    BUT IT DID IT BASICALLY BY REDESIGNING FAIRPLAY.

5             ONCE APPLE REDESIGNED FAIRPLAY, IT

6    BLOCKED THE HACKS AND TO MAKE IT MORE DIFFICULT FOR

7    HACKERS TO ATTACK IT IN THE FUTURE, OTHER SOFTWARE

8    PROGRAMS LIKE HARMONY THAT WERE BASED ON OR

9    MIMICKED, THE THEN EXISTING VERSION OF FAIRPLAY

10   NATURALLY DIDN'T WORK.

11            THE COURT:  WELL, THAT'S, THAT'S -- THOSE

12   ARE FACTUAL STATEMENTS THAT YOU'RE MAKING TO ME AND

13   I DO RECOGNIZE THAT THEY ARE BASED ON DECLARATIONS,

14   BUT WHY SHOULDN'T I ALLOW THE PLAINTIFFS AN

15   OPPORTUNITY TO CHECK THE RELIABILITY OF THOSE

16   DECLARATIONS AND TO SEE THAT THAT IS PURELY A

17   COINCIDENCE AS OPPOSED TO A DELIBERATE EFFORT TO

18   MAINTAIN AN ANTICOMPETITIVE BEHAVIOR POSITION?

19            MR. MITTELSTAEDT:  I WAS COMING TO THAT

20   IN A LONG WAY BY EXPLAINING WHAT HARMONY WAS AND

21   WHILE AT THE END OF THE DAY I DON'T THINK THERE'S

22   ANY DISPUTE ABOUT THIS.

23            BUT ON THE DISCOVERY FRONT THEY SERVED A

24   RULE 30(B)(6) NOTICE ON THE SOFTWARE UPDATE FOR A

25   DEPOSITION AND FOR DOCUMENTS.

12

1          WE HAVE PRODUCED THE DOCUMENTS THAT HAD

2     BEEN AGREED TO BE PRODUCED.  AND WE HAVE OFFERED UP

3     THE DECLARANT, JEFF ROBBIN OR ANOTHER 30(B)(6)

4     WITNESS TO TESTIFY.

5          WE OFFERED HYMN UP TWO OR THREE MONTHS

6     AGO.  THE PLAINTIFFS SAID THAT THEY WERE

7     UNAVAILABLE FOR SCHEDULING REASONS TO TAKE HIS

8     DEPOSITION.  WE OFFERED OTHER DATES.  WE OFFERED

9     OTHER DATES.  AND FINALLY THERE WAS AN AGREEMENT TO

10    TAKE HIS DEPOSITION LAST WEEK.

11         THEY CANCELLED THAT DEPOSITION.  THEY

12    DIDN'T GO FORWARD WITH IT.  I THINK THE REASON THEY

13    DIDN'T GO FORWARD WITH IT, YOUR HONOR, WAS FOR

14    TACTICAL REASONS.  THEY WANT TO COME HERE TODAY AND

15    SAY, WE HAVEN'T EVEN BEEN ABLE TO DEPOSE THE

16    DECLARANT.  HOW CAN RULE 56 BE RIPE?

17         THEY HAD THE CHANCE.  THEY HAVE HAD

18    SEVERAL CHANCES.

19         WHAT THEY SAY IS, WELL, THEY DIDN'T HAVE

20    ALL OF THE DOCUMENTS.

21         THEY HAVE THE DOCUMENTS THAT WE ASKED FOR

22    AND AGREED TO WITH TWO EXCEPTIONS.  ONE IS AFTER

23    FILING OUR MOTION, THEY CHANGED THEIR MIND AND THEY

24    SAID THAT THEY WANT ENGINEERING DOCUMENTS ON THE

25    SOFTWARE UPDATES AND THEY WANT OUR SOURCE CODE.

13

1          AND SOURCE CODE OBVIOUSLY IS SOMETHING

2     THAT WE DON'T WANT TO TURN OVER UNLESS IT'S NEEDED

3     AND WHEN YOU LOOK AT THEIR RULE 56 BRIEF, THIS IS

4     PAGE 4 OF THEIR REPLY, THEY GO CATEGORY BY CATEGORY

5     FOR WHAT THEY WANT.

6          AND THE FIRST THING THEY SAY IS THAT THEY

7     WANT DOCUMENTS RELEVANT TO THE CLAIM ABOUT THESE

8     UPDATES IN RESPONSE TO THESE ILLEGAL HACKS.

9          AND WHAT THEY SAY IS THAT THEY WANT TO

10    SEE IF THE HACKS WERE INTENDED FOR THE PURPOSE OF

11    ENABLING INTEROPERABILITY.

12         AND THEY SAY LINE 24, IF THE HACKS WERE

13    INTENDED FOR THIS PURPOSE, INTEROPERABILITY,

14    APPLE'S CONTENTION THAT THEY WERE ILLEGAL WOULD NOT

15    STAND.

16         WELL, THAT DOESN'T MAKE ANY SENSE ON A

17    NUMBER OF GROUNDS, YOUR HONOR.

18         FIRST OF ALL, IF THEY WANT TO FIND OUT

19    THE INTENT OF THE HACKS, COMING TO APPLE IS NOT THE

20    RIGHT PLACE.

21         BUT MORE THAN THAT, IF THEY WANT TO FIND

22    THE INTENT, ALL THEY HAVE TO DO IS GO TO THE WEB

23    SITE OF THOSE HACKS AND THAT SAYS WHAT THE, WHAT

24    THE INTENT IS.

25         BUT MORE THAN THAT, WHATEVER THE INTENT

                                                      14

1    OF THE HACKS, WHAT THEY DID WAS CLEAR.  THEY

2    STRIPPED THE CONTENT PROTECTION, THEY VIOLATED --

3    THEY CIRCUMVENTED THE DRM AND THEY PROMOTED PIRACY.

4           AND THE PLAINTIFF IN THEIR BRIEF MAKE NO

5    EFFORT TO JUSTIFY THOSE HACKS, AND THEY DON'T CLAIM

6    THAT APPLE TRIED TO STOP THOSE HACKS IS A VIOLATION

7    OF THE ANTITRUST LAWS.

8           AND SO, YES, YOUR HONOR, THEY HAVE

9    VARIOUS CATEGORIES OF INFORMATION THEY SAY THEY

10   NEED, BUT WHEN IT'S ANALYZED, THEY DON'T NEED IT TO

11   RESPOND TO OUR MOTION.

12          ON THE MOTION TO DISMISS THERE IS NO

13   ALLEGATION IN THE COMPLAINT, IN THE AMENDED

14   COMPLAINT THAT APPLE DID ANYTHING OTHER THAN

15   CONTINUE TO ADHERE TO ITS ANTI-PIRACY PROPRIETARY

16   SOFTWARE.

17          IT'S AGREED NOW IN THIS CASE THAT IT WAS

18   OKAY FOR APPLE TO ADOPT THAT SOFTWARE IN THE FIRST

19   PLACE WITH THE LEVEL OF INTEROPERABILITY THAT WAS

20   INHERENT IN IT.

21          OUR POSITION IS THAT IF IT WAS LAWFUL TO

22   ADOPT THAT, THAT SOFTWARE IN THE FIRST PLACE, IN

23   ORDER TO ENFORCE THE USAGE RULES, THEN IT WAS

24   LAWFUL TO ISSUE UPDATES, TO REPAIR THAT SOFTWARE

25   WHEN IT WAS ATTACKED BY HACKERS.

                                                    15

1          THERE IS NO CLAIM, AND I EMPHASIZE THIS,

2     NO CLAIM THAT THE EFFECT OF ANY OF THE UPDATES WAS

3     DIFFERENT FROM THE EFFECT OF THE ORIGINAL DECISION

4     TO USE A PROPRIETARY ANTI-PIRACY SOFTWARE.

5          THE LEVEL OF INTEROPERABILITY IS NOT

6     ALLEGED TO HAVE CHANGED FROM THE LAUNCH THROUGH THE

7     TIME OF THE SOFTWARE UPDATES.

8          THE COURT:  LET ME HEAR FROM YOUR

9     OPPONENT, AND I'LL LET YOU SAY A FEW WORDS.

10          MR. MITTELSTAEDT:  THANK YOU.

11          MS. SWEENY:  YOUR HONOR --

12          THE COURT:  THE WORD "HACKING" IS STILL

13     RINGING IN MY EAR.  WHAT DO YOU SAY ABOUT THAT?

14          MS. SWEENY:  I'LL START WITH THE

15     SO-CALLED "HACKERS" YOUR HONOR.

16          IT'S TRUE, AS MR. MITTELSTAEDT SAYS, THAT

17     WE IN OUR BRIEFING TREAT THE REAL NETWORK HARMONY

18     ISSUE DIFFERENTLY FROM THE OTHER ATTEMPTS AT

19     INTEROPERABILITY THAT MR. MITTELSTAEDT CALLS HACKS.

20          AND WE EXPLAINED IN OUR RULE 56(F)

21     APPLICATION THAT WE HAVE NOT YET HAD AN OPPORTUNITY

22     TO GET DISCOVERY ON THOSE OTHER EFFORTS IN ORDER TO

23     FIND OUT WHETHER THEY DID, IN FACT, VIOLATE THE

24     DMCA.

25          WE ARGUE IN OUR BRIEF, AND I THINK IT'S

16

1    SUPPORTED BY THE LIMITED NUMBER OF FACTS THAT WE

2    HAVE, THAT, IN FACT, BECAUSE WHAT THOSE PROGRAMS

3    ATTEMPTED TO DO WAS TO REVERSE ENGINEER FAIRPLAY,

4    IT FELL WITHIN AN EXCEPTION TO DMCA, AND,

5    THEREFORE, WAS NOT PROHIBITED EITHER BY THAT

6    STATUTE OR BY THE CONTRACTS BETWEEN APPLE AND THE

7    MAJOR LABELS.

8              AND ON THAT POINT, YOUR HONOR, I WOULD

9    JUST REFER YOU TO THE CONTRACTS THAT ARE ATTACHED

10   AS EXHIBITS TO THE ROBBIN DECLARATION, THAT'S

11   EXHIBIT 1 TO THE ROBBIN DECLARATION PARAGRAPH 9 AS

12   WELL AS THE CONTRACTS THAT ARE ATTACHED TO THE

13   MERRICK DECLARATION.

14             AND I THINK THOSE ARE EXHIBITS 2 AND 3.

15             AND IN SHORT, WHAT THAT CONTRACT

16   PROVISION SAYS -- AND I'M LOOKING FOR IT IN MY

17   NOTES.  BEAR WITH ME JUST ONE MOMENT -- IS THAT

18   "APPLE HAS AN OBLIGATION TO ACT WHEN THE," QUOTE,

19   "SECURITY SOLUTION IS INEFFECTIVE SUCH THAT

20   E-RECORDS ARE BEING WIDELY USED IN A MANNER THAT

21   VIOLATES THE CONTENT USAGE RULES.

22             WELL, ON THIS RECORD, YOUR HONOR -- AND

23   AGAIN, I'M ONLY TALKING ABOUT THE SO-CALLED

24   "HACKS."  I'M NOT TALKING ABOUT HARMONY.  I WANT TO

25   GET TO THAT IN A MOMENT.

17

1              BUT ON THIS RECORD I DON'T THINK THERE'S

2     SUFFICIENT BASIS FOR THE COURT TO DETERMINE THAT

3     THOSE SO-CALLED "HACKS" VIOLATED EITHER THE DMCA OR

4     REQUIRED APPLE TO TAKE ACTION UNDER THEIR

5     CONTRACTS.

6              NOW, UNLESS YOUR HONOR HAS A QUESTION

7     ABOUT THE SO-CALLED HACKS, I'LL MOVE ON TO REAL

8     NETWORKS AND HARMONY.

9              THE COURT:  WELL, IT DOES OCCUR THAT

10    YOU'RE ACKNOWLEDGING AND THAT THERE ARE CONTRACTS

11    WHICH REQUIRED APPLE TO HAVE SECURITY MEASURES,

12    LIMIT COPYING AND TO REPAIR BREACHES OF THOSE

13    PROTECTIONS.

14             MS. SWEENY:  THAT'S ABSOLUTELY RIGHT,

15    YOUR HONOR.

16             AND, AND THIS IS IMPORTANT BECAUSE IT'S

17    AN IMPORTANT ELEMENT OF APPLE'S ARGUMENT.

18             NOW, I WANT TO GO -- STEP BACK FOR A

19    LITTLE BIT AND GO INTO THE TIME LINE.

20             IN APRIL OF 2004, REAL NETWORKS

21    APPROACHED APPLE AND SAID, GEE, WE WOULD LOVE TO

22    COLLABORATE WITH YOU, SELL OUR SONGS SO THAT THEY

23    COULD BE PLAYABLE ON AN IPOD, AND APPARENTLY THOSE

24    EFFORTS WERE REBUFFED BY APPLE.

25             AND WE SOUGHT DISCOVERY ON THAT MATTER

                                                        18

1    AND WE HAVEN'T YET GOTTEN IT FROM APPLE, BUT WE

2    KNOW FROM PRESS REPORTS THAT THAT ATTEMPT AT A

3    RELATIONSHIP WAS INITIATED BY REAL NETWORKS.

4         SUBSEQUENTLY IN JULY OF 2004 THERE WAS AN

5    ANNOUNCEMENT THAT REAL NETWORKS HAD FIGURED OUT HOW

6    TO PRESERVE THE SECURITY SOLUTION, THAT IS THE DRM,

7    THE FAIRPLAY THAT WAS ON THE RECORDS.  IT COULD USE

8    ITS OWN SECURITY SOLUTION AND THEN IT WOULD BE

9    TRANSLATED SO THAT IT COULD BE PLAYED ON THE IPOD

10   AS MR. MITTELSTAEDT SAID.

11        SO, IN OTHER WORDS, WHAT REAL NETWORKS

12   DID WAS THAT IT MADE ITS MUSIC PLAYABLE ON IPODS

13   BUT PRESERVED THE DRM.

14        SO THE LABELS WERE HAPPY, THE CONSUMERS

15   WERE HAPPY, REAL NETWORKS WAS HAPPY BUT APPLE,

16   APPLE WAS FURIOUS.

17        AND IF YOU LOOK AT THE EXHIBITS TO

18   MR. MERRICK'S DECLARATION, AND PARTICULARLY

19   EXHIBITS 4 AND 5.  AND IF YOU DON'T HAVE THEM

20   HANDY, YOUR HONOR, I CAN HAND THEM UP.

21        THE COURT:  I HAVE THEM.

22        MS. SWEENY:  OKAY.

23        THE COURT:  GO AHEAD.

24        MS. SWEENY:  ALL RIGHT.  SO WHAT THESE

25   EXHIBITS REFLECT IS APPLE LEARNS THAT REAL NETWORKS

19

1    HAS MADE ITS MUSIC PLAYABLE ON IPODS AND THEIR

2    REACTION IS IMMEDIATE AND INTENDED TO SHUT DOWN

3    REAL NETWORKS.

4            AND IT GOES ON TO RELAY THE LABELS

5    RESPONSE.

6            NOW, IF YOU LOOK AT MR. ROBBIN'S

7    DECLARATION, AND MR. ROBBIN IS APPLE'S DECLARANT IN

8    SUPPORT OF THEIR SUMMARY JUDGMENT MOTION.

9            MR. ROBBIN SAYS THAT THE LABELS MADE US

10   SHUT DOWN THE HACKS AND REAL NETWORK.  AND HE

11   REALLY DOESN'T DRAW A DISTINCTION BETWEEN THE TWO.

12   HE SAYS IT WAS ALL PART OF THE SAME AND IT WAS ALL

13   LUMPED TOGETHER.

14           BUT, IN FACT, AND APPLE NEVER USED THESE

15   TWO E-MAILS IN ITS MOTION FOR SUMMARY JUDGMENT, BUT

16   THESE E-MAILS SHOW THAT, IN FACT, REAL NETWORKS

17   THROUGH HARMONY PRESERVED THE SECURITY SOLUTION AND

18   CREATED AN OPPORTUNITY FOR COMPETITION.

19           AS WE ALLEGE IN THE COMPLAINT, THESE

20   SONGS WERE NOW PLAYABLE NOT ONLY ON THE IPOD BUT ON

21   A HUNDRED COMPETING PORTABLE PLAYERS.  THAT'S WHAT

22   THE LABEL WANTED AND CONSUMERS WANTED, AND THAT'S

23   DEFINITELY WHAT APPLE DID NOT WANT.

24           AND SO IF YOU LOOK AT THE FIRST PAGE OF

25   EXHIBIT 4, THIS IS AN E-MAIL FROM SOMEONE AT APPLE

20

1    NAMED EDDY CUE TALKING ABOUT SPEAKING POINTS THAT

2    THEY WERE PUTTING OUT WITH RESPECT TO REAL NETWORKS

3    HARMONY.

4            AND HE SAYS, "I TALKED TO UNIVERSAL."

5    UNIVERSAL BEING, OF COURSE, ONE OF THE MAJOR

6    LABELS.  "THEY WERE AWARE OF IT.  FROM THEIR

7    VIEWPOINT, THEY'RE OKAY WITH IT BECAUSE THEY WANT

8    INTEROPERABILITY."

9            SIMILARLY, EXHIBIT 5 IS ANOTHER SERIES OF

10   E-MAILS RIGHT IN THE SAME TIMEFRAME, JULY 25TH,

11   2004.

12           AND AGAIN, EDDY CUE IS WRITING ABOUT THE

13   LABELS'S RESPONSE TO REAL NETWORKS AND HARMONY AND

14   MR. CUE SAYS THAT "THE LABELS ARE CONVINCED THAT

15   DIFFERENT FORMATS ARE HURTING THEIR GROWTH."

16           AND THEN HE TALKS ABOUT HOW THE LABELS

17   ACTUALLY WANT APPLE TO LICENSE DRM TO REAL

18   NETWORKS.

19           AND THEN HE SAYS "ALSO REMEMBER SOME

20   LABELS AT THIS POINT ARE ALSO WORRIED THAT WE ARE

21   GETTING TO BE TOO DOMINANT."

22           SO, IN FACT, THERE IS NO CREDIBLE CLAIM

23   BY APPLE THAT THE SOFTWARE UPDATES THAT WERE

24   IMPLEMENTED IN OCTOBER OF 2004 WERE REQUIRED BY THE

25   LABELS TO GET RID OF -- TO BREAK REAL NETWORK'S

21

1      HARMONY INTEROPERABILITY.

2              SO APPLE'S EXCUSE OF THE LABELS MADE US

3      DO IT.  IT WAS REQUIRED BY OUR CONTRACTS.  THAT'S

4      SIMPLY NOT TRUE.  IT'S REFUTED BY THE EVIDENCE THAT

5      THE PLAINTIFFS HAVE PUT IN THE RECORD, EVIDENCE

6      THAT COMES FROM APPLE THAT, THAT REFLECTS

7      COMMUNICATIONS WITH THE LABELS.

8              NOW, APPLE'S FALLBACK POSITION IS, WELL,

9      MAYBE REAL NETWORKS WAS NOT ILLEGAL, MAYBE HARMONY

10     WASN'T ILLEGAL, MAYBE THE LABELS DIDN'T CARE ABOUT

11     HARMONY, BUT WE JUST HAPPENED TO COINCIDENTALLY

12     DISABLE HARMONY WHEN WE WERE ADDRESSING THESE OTHER

13     HACKS WHICH WE THINK WERE ILLEGAL.

14             AND, YOUR HONOR, I WOULD SUBMIT THAT THE

15     EVIDENCE THAT THE PLAINTIFFS SUBMITTED SO FAR

16     REFUTES THAT AS WELL, AND THE CHRONOLOGY IS VERY

17     IMPORTANT HERE.

18             AS I SAID, IT WAS I THINK I SAID IN APRIL

19     OF 2004 THAT REAL NETWORKS APPROACHED APPLE.

20             SUBSEQUENTLY IN JULY -- OR EXCUSE ME --

21     AND THEN IN JUNE OF 2004, AND THIS IS SOMETHING

22     THAT WE SOUGHT ADDITIONAL DISCOVERY ON IN OUR

23     56(F), APPLE HIRED AN OUTSIDE SECURITY CONSULTANT,

24     ONE THAT, THAT THE RELATIONSHIP IS SECRET SO I'M

25     NOT ALLOWED TO IDENTIFY THE COMPANY.

                                                    22

1            BUT THAT HAPPENED SHORTLY AFTER THIS --

2    SHORTLY AFTER APPLE KNEW WHAT REAL NETWORKS WAS

3    WORKING ON.

4            AND THEN REAL NETWORKS ANNOUNCED ITS

5    PRODUCT, IT STARTED SELLING SONGS THAT WERE

6    PLAYABLE ON IPODS.

7            AND AS WE ALLEGE IN THE COMPLAINT, YOUR

8    HONOR, IT HAD AN IMMEDIATE, AN IMMEDIATE IMPACT.

9    WITHIN I THINK THREE WEEKS THEY HAD ALREADY SOLD

10   MILLIONS OF SONGS FOR PLAYBACK ON IPODS, AND THEY

11   INCREASED THEIR MARKET SHARE FROM 10 PERCENT TO

12   20 PERCENT.

13           SO HERE APPLE IS FACED FOR THE FIRST TIME

14   WITH A REAL COMPETITIVE THREAT, AND THEY REACTED.

15           AND IF YOU COMPARE THE E-MAILS WITHIN

16   APPLE SURROUNDING THE REAL NETWORKS INCIDENT TO THE

17   E-MAILS WITHIN APPLE CONCERNING THE SO-CALLED

18   "HACKS" YOU NOTICE A MARKED DIFFERENCE IN HOW APPLE

19   RESPONDED.

20           SO EXHIBITS 2 THROUGH 5 -- EXCUSE ME -- 2

21   THROUGH 6 TO THE ROBBIN DECLARATION ARE E-MAILS

22   THAT MR. ROBBIN SAYS SUPPORT APPLE'S ARGUMENT THAT

23   THE LABELS REQUIRE APPLE TO SHUT DOWN THE HACKS AND

24   REAL NETWORKS, BUT, IN FACT, ALL OF THESE E-MAILS

25   JUST REFER TO THE NON-REAL NETWORKS COMPANIES, LIKE

23

1   JHYMN, WHICH MR. MITTELSTAEDT REFERRED TO.

2          AND NONE OF THEM REFER TO HARMONY AND

3   ALMOST NONE OF THEM OR EACH IN THE SAME TIMEFRAME

4   EXHIBIT 2 IS 2003 AND EXHIBIT 3 IS APRIL 2004 AND

5   EXHIBIT 5 IS MARCH 2005 AND EXHIBIT 6 IS

6   OCTOBER 2005 AND SO THEY ARE COMPLETELY IRRELEVANT

7   TO HARMONY.

8          THE ONLY E-MAIL THAT IS REFERENCED BY

9   MR. ROBBIN THAT IS EVEN IN THE SAME TIMEFRAME IS

10  FROM UNIVERSAL AND IT'S DATED AUGUST 20TH, 2004,

11  AND IT REFERS TO QUOTE, "VARIOUS HACKS," CLOSED

12  QUOTE.

13         BUT WE KNOW FROM THE OTHER E-MAIL THAT I

14  REFERENCED A MOMENT AGO THAT IS IN MR. MERRICK'S

15  DECLARATION THAT UNIVERSAL WANTED REAL TO SUCCEED.

16  THEY DIDN'T WANT APPLE TO BREAK HARMONY.  THEY

17  WANTED REAL AND THEY WANTED HARMONY AND THEY WANTED

18  HARMONY TO BE ABLE TO BE PLAYED ON IPOD AND ON THE

19  HUNDRED COMPETING PLAYERS THAT WERE OUT THERE AT

20  THE TIME.

21         THE COURT:  WELL, AGAIN, THAT DOES CREATE

22  FOR ME A PROBLEM DESCRIBING WHAT THESE COMPANIES

23  WANTED, AND I REALIZE THERE'S SOME EVIDENCE THAT

24  ACTUALLY GIVES MORE FORCE AND EFFECT TO YOUR 56(F)

25  REQUEST, BUT AT THE HEART OF APPLE'S ARGUMENT IS A

24

1    CONCERN WITH WHAT IS AN ADMISSION ON THE PART OF

2    THE PLAINTIFFS THAT THESE SOLUTIONS DID HAVE THE

3    EFFECT OF DISABLING THE DIGITAL RIGHTS MANAGEMENT

4    TOOL THAT WAS PART OF THE APPLE SOFTWARE AND PUT IN

5    PLACE SOMETHING THAT THE PLAINTIFF CLAIMS WAS JUST

6    AS ADEQUATE AND AT LEAST IN ONE CASE.

7           BUT THAT WOULD PUT APPLE IN A POSITION

8    OF, ONE, HAVING TO RELY UPON THAT.  AND THE

9    QUESTION THAT THE COURT WOULD HAVE IS DOES IT

10   DEPRIVE APPLE OF A BUSINESS JUSTIFICATION IF

11   SOMEONE SAYS, WELL, WE'VE REPLACED YOURS.  WE'VE

12   DISABLED SOMETHING THAT YOU HAD EVERY RIGHT TO HAVE

13   THERE, BUT WE HAVE REPLACED IT WITH SOMETHING THAT

14   YOU CAN REST ASSURED SOLVES THAT PROBLEM WITHOUT IT

15   BEING LICENSED THROUGH APPLE OR APPLE HAVING ANY

16   CONTROL OVER IT.

17          AND THE SECOND IS THAT IF APPLE IS UNDER

18   A CONTRACT WITH THE LABELS TO MAINTAIN ITS

19   PROTECTION KNOWING THAT THE DRM HAD BEEN DISABLED,

20   UNLESS THERE'S SOME OTHER BASIS FOR ACTING, WHY

21   SHOULDN'T IT BE ABLE TO RESPOND TO THAT?

22          THE HEART OF WHAT I CONSIDER TO BE YOUR

23   ALLEGATION IS THAT THESE THINGS WERE DONE AND THEY

24   SERVED NO GENUINE ANTI-PIRACY PURPOSE.

25          NOW, THAT'S WHY I THINK MAYBE THE

25

1       12(B)(6) OUGHT TO BE OVERRULED AND WE GET ON TO A

2       QUESTION OF WHETHER OR NOT THERE IS A BASIS FOR

3       SAYING THAT THERE'S NO GENUINE ANTI-PIRACY PURPOSE,

4       THIS WAS DONE PURELY -- THAT THERE WAS ADEQUATE

5       PIRACY PROTECTIONS, THAT THERE WAS NO LEGITIMATE

6       CONCERN ON THE PART OF APPLE WITH RESPECT TO THE

7       DISABLING OF ITS DRM, AND, THEREFORE, THIS WAS DONE

8       PURELY FOR AN ANTICOMPETITIVE PURPOSE.

9               AND SO SHOULDN'T I BE WORRIED ABOUT THAT

10      AT THIS POINT?

11              MS. SWEENY:  WELL, LET ME ANSWER THAT IN

12      TWO PARTS.

13              FIRST OF ALL, I THINK YOUR HONOR SAID

14      THAT THE PLAINTIFFS HAVE ADMITTED THAT APPLE, THAT

15      THESE ALTERNATIVES STRIPPED AWAY THE DRM AND

16      PLAINTIFFS HAVE NOT ADMITTED THAT.

17              WITH RESPECT TO JHYMN AND THE OTHER

18      COMPANIES OTHER THAN REAL NETWORKS, PLAINTIFFS HAVE

19      NOT -- WE'RE JUST NOT IN A POSITION TO KNOW THAT

20      YET NOT HAVING RECEIVED SUFFICIENT DISCOVERY FROM

21      APPLE.  WE BELIEVE THAT'S NOT NECESSARILY TRUE, BUT

22      WE DON'T KNOW THE FACTS ON THAT.

23              WE DO KNOW, HOWEVER, WITH RESPECT TO REAL

24      NETWORKS AND HARMONY, THERE WAS NO COMPROMISE OF

25      THE DRM AND APPLE ADMITS THAT AND THE LABELS

26

1      SUPPORT THAT AND AFTER ALL IT'S NOT --

2            THE COURT:  WELL, WHAT I READ IN THE

3      E-MAILS IS SOME CONCERN THAT WHAT HAD BEEN DONE

4      WOULD MAKE IT VERY EASY TO DO OTHER TECHNOLOGICAL

5      THINGS AND IT TALKED ABOUT THE FRONT END, AND I

6      KNOW I NEED TO LEARN A LOT MORE ABOUT THIS BEFORE I

7      COULD FINALLY UNDERSTAND IT.

8            BUT THE ISSUE THAT I HAVE BEFORE ME IS

9      THAT WEREN'T THEY RESPONDING A LEGITIMATE BUSINESS

10     CONCERN AS OPPOSED TO WE'VE GOT TO STOP THESE

11     PEOPLE?

12           MS. SWEENY:  WELL, THAT'S I THINK THE

13     DISPUTED QUESTION HERE, YOUR HONOR.  THE PLAINTIFFS

14     BELIEVE, AND WE BELIEVE THE EVIDENCE SUPPORTS AND

15     WE BELIEVE WE'LL BE ABLE TO GET ADDITIONAL EVIDENCE

16     IF WE'RE ALLOWED TO COMPLETE DISCOVERY THAT, IN

17     FACT, APPLE WAS ONLY RESPONDING TO THE COMPETITIVE

18     THREAT.

19           IT MAY HAVE WANTED GENUINELY TO RESPOND

20     TO SOME OF THESE SO-CALLED HACKS, BUT IT WENT OUT

21     OF IT'S WAY, WE ALLEGE IN OUR COMPLAINT, AND I

22     THINK WE HAVE SOME EVIDENCE THAT SUPPORTS THIS, TO

23     ALSO AT THE SAME TIME SHUT DOWN REAL NETWORKS

24     WHICH -- AND I JUST WANT TO REMIND YOUR HONOR OF AN

25     IMPORTANT ISSUE WHICH IS THAT THE INTELLECTUAL

27

1      PROPERTY RIGHTS THAT ARE AT ISSUE HERE ARE THE

2      RIGHTS OF THE ARTISTS AND THE LABELS.

3              THERE ARE THE ONES -- IT'S NOT APPLE'S

4      INTELLECTUAL PROPERTY RIGHTS THAT IS BEING

5      PROTECTED BY THESE SECURITY SOLUTIONS THAT ARE IN

6      THE CONTRACTS WITH THE LABELS.

7              AND SO WE HAVE ASKED, FOR EXAMPLE, APPLE

8      TO PRODUCE ALL OF THE COMMUNICATIONS WITH THE

9      LABELS DESCRIBING, YOU KNOW, NEGOTIATIONS FOR THESE

10     CONTRACTS AND THE SECURITY SOLUTIONS, RESPONSES TO

11     A SUPPOSED ATTACKS ON THE SYSTEM, ET CETERA.

12             AND WE HAVE GOTTEN CONTRACTS AND A FEW

13     OTHER THINGS, BUT WE CERTAINLY BY NO MEANS HAVE

14     GOTTEN --

15             THE COURT:  WHAT IS THE STATE OF THE

16     RECORD AS TO WHETHER THE LABELS LOOKED AT THE WHOLE

17     NETWORK SOLUTION AND SAID, FINE, WE'RE SATISFIED

18     WITH THAT BEING ADEQUATE PROTECTION?

19             MS. SWEENY:  WELL, WE DON'T HAVE THE FULL

20     RECORD, YOUR HONOR.  WE HAVE SUBPOENAED THE LABELS,

21     AND WE EXPECT TO GET ADDITIONAL DOCUMENTS AND

22     ADDITIONAL TESTIMONY.

23             THE RECORD WE DO HAVE IS IN EXHIBITS 4

24     AND 5 TO THE MERRICK DECLARATION AND THAT

25     SUGGESTS -- WELL, IN THOSE E-MAILS, THE LABELS ARE

28

1       SAYING WE ARE HAPPY WITH THE SECURITY SOLUTION THAT

2       REAL NETWORKS HAS PROVIDED THROUGH HARMONY.

3               THE COURT:  NOW, CAN I INTERRUPT YOUR

4       ARGUMENT -- I'M RUNNING OUT OF TIME HERE QUICKLY --

5       AND TO HEAR FROM THE INDIRECT PURCHASERS.  I'LL LET

6       YOU COME BACK IN A MINUTE.

7               MS. SWEENY:  OKAY.

8               THE COURT:  SO YOU THINK YOU HAVE A GROUP

9       NOW THAT CAN PROCEED GIVEN THE NATURE OF WHAT IS

10      BEING ALLEGED BY THE DIRECT PURCHASERS?

11              MS. ZELDES:  YES, YOUR HONOR.

12              AS MR. MITTELSTAEDT MENTIONED EARLIER,

13      THE CASES HAVE BEEN NARROWED CONSIDERABLY.

14              THE DIRECT PURCHASERS DID FILE AN AMENDED

15      COMPLAINT AND AS YOU INVITED THE PARTIES TO DO, NOT

16      BASED ON TYING FACTS BUT OTHER ALLEGATIONS THAT

17      WE'VE BEEN DISCUSSING TODAY.  AND THEY'RE ONLY

18      SEEKING TO REPRESENT THE DIRECT PURCHASERS OF IPOD.

19              THEY'RE SEEKING A (B)(3) CLASS SEEKING

20      THE OVERCHARGE FOR THE IPOD.

21              THEY'RE NOT SEEKING ANY INJUNCTIVE

22      RELIEF.  AND THEY'RE NOT SEEKING TO REPRESENT ANY

23      ITUNES CONSUMERS.

24              WHEREAS THE SOMERS PLAINTIFFS CLAIMS, OUR

25      CLASS, IS SEEKING THAT.  WE'RE SEEKING TO REPRESENT

                                                        29

1    EVERYBODY ELSE WHO PURCHASED AN IPOD BESIDES

2    DIRECTLY FROM APPLE AS WELL AS THE ITUNES

3    CONSUMERS.

4            AND RIGHT NOW THOSE MILLIONS OF FOLKS ARE

5    NOT BEING REPRESENTED.  AND IF THIS COURT DOES FIND

6    OR ULTIMATELY FIND THAT APPLE'S CONDUCT WAS

7    ANTICOMPETITIVE, THAT THERE WAS NO LEGITIMATE

8    BUSINESS PURPOSE, THOSE MILLIONS OF CONSUMERS WOULD

9    NOT BE REPRESENTED IN THIS ACTION.

10           THE COURT:  ALL RIGHT.  SO LET ME GIVE

11   YOU A TENTATIVE YES THAT YOU HAVE DISTINGUISHED

12   YOURSELF SUFFICIENTLY AND HEAR FROM YOUR OPPONENT

13   ON THAT AS WELL AS THE OTHER MATTERS.

14           MR. MITTELSTAEDT:  I'M GOING TO START

15   WITH THE DIRECT.

16           WE HAVE TWO ASPECTS OF THIS.  THE HACKS

17   LIKE JHYMN AND HARMONY.  ON THE HACKS LIKE JHYMN,

18   WE DON'T HAVE ANY MORE DOCUMENTS TO GIVE ON THAT.

19           WHEN THEY SAY THEY WANT TO KNOW WHAT

20   JHYMN DID, ALL THEY HAVE TO DO, AS I SAY, IS LOOK

21   AT THE WEB SITE OR GET DISCOVERY FROM JHYMN, BUT IT

22   JUST CANNOT BE DISPUTED THAT JHYMN CIRCUMVENTED THE

23   DRM.  THEY HAVE ADMITTED THAT ON THEIR WEB SITES.

24           THE RECORD LABELS REQUIRED APPLE TO USE

25   DRM AND TO RESTORE SECURITY BREACHES.  IT WOULDN'T

30

1    MAKE ANY SENSE TO SAY USE DRM, BUT IF IT'S HACKED

2    INTO SO IT'S STRIPPED FROM THE MUSIC YOU SELL,

3    DON'T WORRY ABOUT IT.

4            SO APPLE HAD TO WORRY ABOUT IT FROM THE

5    LABEL'S PERSPECTIVE.  IT ALSO HAD TO WORRY ABOUT IT

6    FROM ITS OWN PROSPECTIVE.

7            IT HAS ANTI-PIRACY SOFTWARE AND SOMEBODY

8    HAS DISCERNED HOW THE SOURCE CODE WORKS.  SOMEBODY

9    HAS DISCERNED HOW IT WORKS.  IT HAS JEOPARDIZED THE

10   SECURITY OF THE DRM.  SO APPLE OBVIOUSLY HAS AN

11   INTEREST, A LEGITIMATE INTEREST IN BLOCKING THOSE

12   HACKS.

13           THEY'RE THE ONES WHO MADE THIS COMPLAINT

14   AND THEY'RE UNABLE TO STAND UP IN FRONT OF YOUR

15   HONOR AND SAY --

16           THE COURT:  WELL, HERE'S MY CONCERN FROM

17   THE APPLE SIDE OF THIS CASE IS THAT IT'S THE WORD

18   "HACK" THAT RINGS INTO MY EARS, BUT IS IT A TERM

19   THAT MEANS THAT ANY TIME ANY OTHER MUSIC IS ABLE TO

20   PLAY ON AN IPOD?

21           MR. MITTELSTAEDT:  NO, NO.  WHAT IT

22   MEANS -- THERE'S A LOT OF MUSIC IT CAN PLAY ON

23   IPODS.

24           BUT MUSIC THAT PLAYS ON IPODS -- LET ME

25   GO BACK A STEP.

31

1          THESE HACKS WERE NOT DESIGNED TO GET

2     MUSIC TO PLAY ON IPODS.

3          THESE HACKS WERE DESIGNED TO STRIP THE

4     CONTENT PROTECTION, THE DRM, FROM MUSIC SOLD ON

5     ITUNES MUSIC STORE SO THAT PEOPLE EITHER ON AN IPOD

6     OR SOMETHING ELSE COULD PLAY IT JUST AS IF IT

7     DIDN'T HAVE DRM PROTECTION TO START WITH.

8          THE COURT:  ON ANY PLAYER?

9          MR. MITTELSTAEDT:  ON ANY PLAYER.

10         THE COURT:  ALL RIGHT.  SO -- BUT HACK

11    WORKS BOTH WAYS.

12         IF -- WOULD IT BE A HACK IF ITUNES MUSIC

13    WAS ABLE TO PLAY ON A DIFFERENT PLAYER BY

14    DEFINITION?

15         MR. MITTELSTAEDT:  NOT BY DEFINITION.

16    YOU TAKE NOW WHEN THERE IS NO DRM.

17         THE COURT:  WELL, NO.  I'M TALKING BACK

18    HISTORICALLY.  I KNOW THINGS HAVE CHANGED, BUT I'VE

19    GOT TO DEAL WITH THIS CASE.

20         AND, QUITE FRANKLY, PERHAPS YOU ALL OUGHT

21    TO SETTLE THIS CASE GIVEN THE ADVANCEMENTS IN

22    TECHNOLOGY.

23         BUT IT SEEMS TO ME THAT IF I HAVE YOUR

24    POSITION CORRECTLY, IT -- YOU'D HAVE TO ANSWER YES,

25    ANY OPPORTUNITY -- THERE'S NO WAY TO PLAY ITUNES

                                                    32

1    MUSIC ON ANOTHER PLAYER WITHOUT THERE BEING A HACK.

2              MR. MITTELSTAEDT:  WELL, WE'VE TALKED A

3    LOT ABOUT BURNING AND RIPPING.

4              THE COURT:  WELL, DIRECTLY.

5              MR. MITTELSTAEDT:  OKAY.  I THINK THAT'S

6    RIGHT.  I CAN'T THINK OF A WAY.  AND CERTAINLY WHAT

7    THEY'RE ALLEGING ARE THESE HACKS.

8              BUT WHAT IS WRONG WITH A HACK IS NOT JUST

9    THAT.

10             WHAT IS WRONG WITH A HACK IS THAT IT

11   MEANS THAT YOU CAN MAKE UNLIMITED COPIES, YOU CAN

12   DISTRIBUTE COPIES TO EVERYBODY.  IT'S THE PIRACY.

13             AND THAT'S WHY THE LABEL SAID, LOOK,

14   WE'RE NOT GOING TO LET YOU DISTRIBUTE OUR MUSIC

15   WITHOUT SOME USAGE RULES, BECAUSE WE DON'T WANT TO

16   HAVE SOME NAPSTER, WE WANT USAGE RULES.  AND YOU

17   HAVE TO ENFORCE THAT THROUGH DRM.

18             SO WHEN WE'RE TALKING ABOUT PROTECTING

19   THE INTEGRITY OF THE DRM, THE REAL ISSUE IS DID THE

20   DRM EVER CHANGE SO THAT IT DID SOMETHING MORE THAN

21   ENFORCE THE SAME USAGE RULES?  AND IT DIDN'T.

22             AND THERE'S NO ALLEGATION THAT THESE

23   HACKS BLOCKING THESE HACKS THAT WE'RE TALKING ABOUT

24   EVER DID ANYTHING MORE THAN REPAIR THE DRM SO THAT

25   IT COULD CONTINUE TO ENFORCE THE SAME USAGE RULES.

33

1              AND THAT'S WHY I SAY, IT JUST DOESN'T

2    MAKE ANY SENSE TO SAY, OKAY, FROM AN ANTITRUST

3    POINT IT'S OKAY TO HAVE --

4              THE COURT:  LET ME ACCEPT THAT AS THE

5    BEGINNING PROPOSITION.

6              WHY SHOULD I ACCEPT THAT AS A MATTER OF

7    UNCONTESTED FACT?

8              MR. MITTELSTAEDT:  WELL, THAT PART THEY

9    DON'T CONTEST.

10             WHAT THEY'RE CONTESTING IS, WELL, HOW

11   ABOUT HARMONY AND HARMONY IS DIFFERENT BECAUSE IT

12   ALLOWED HARMONY'S MUSIC TO PLAY ON AN IPOD.  IT

13   DIDN'T STRIP THE DRM.  AND SO THEY SAY, AND THEY

14   SHOW YOU EXHIBIT 2, THAT THE LABELS WERE OKAY WITH

15   HARMONY.

16             WHAT THEY LEAVE OUT THOUGH IS THE LABELS

17   WERE NOT OKAY WITH THESE HACKS THAT STRIPPED THE

18   DRM, AND THAT'S WHAT THESE OTHER EXHIBITS ARE

19   ABOUT.

20             AND REMEMBER IT'S THE LABELS THAT

21   REQUIRED DRM IN THE FIRST PLACE AND THE LABELS WHO

22   REQUIRED APPLE TO --

23             THE COURT:  SO IF I SIMPLY STRIKE THE

24   JHYMN ALLEGATIONS AND LEFT ONLY THE REAL NETWORK,

25   THE JULY 2004 EVENTS, WHAT WOULD THAT DO TO YOUR

                                                    34

1    ARGUMENT?

2         MR. MITTELSTAEDT:  WELL, THERE'S TWO

3    REASONS THAT THEIR ABANDONMENT OR YOUR HONOR

4    STRIKING THE JHYMN ALLEGATIONS IS IMPORTANT.  ONE

5    IS THAT IT GETS RID OF THAT CLAIM.

6         BUT APPLE'S CONDUCT IN ISSUING THE

7    SOFTWARE UPDATES THAT BLOCKED JHYMN, THAT WAS THE

8    SOFTWARE UPDATE THAT ALSO MADE IT SO HARMONY

9    WOULDN'T CONTINUE TO WORK.

10         THE COURT:  NOW, WHY SHOULDN'T I ACCEPT

11    THAT AS AN UNCONTESTED FACT?

12         MR. MITTELSTAEDT:  WELL, BECAUSE WE HAVE

13    GIVEN THEM THE DOCUMENTS.  AND, YOUR HONOR, THE

14    VERY SAME EXHIBIT THAT THEY READ TO YOU -- THIS IS

15    UNDER SEAL SO I'M NOT GOING TO READ IT.

16         BUT IF YOU READ THE NEXT SENTENCE, THEY

17    READ YOU THE FIRST THREE SENTENCES.

18         THE COURT:  WHICH EXHIBIT IS THAT?

19         MR. MITTELSTAEDT:  WHICH IS EXHIBIT 2.

20         THE COURT:  TO ROBBIN.

21         MR. MITTELSTAEDT:  IT'S EDDY CUE.

22         THE COURT:  OKAY.

23         MR. MITTELSTAEDT:  THEY READ YOU RIGHT UP

24    TO WHERE IT SAYS THIS IS ONE ABOUT TALKING WITH

25    UNIVERSAL.

                                                    35

1          THE COURT:  YES.

2          MR. MITTELSTAEDT:  UNIVERSAL IS OKAY WITH

3    IT BECAUSE THEY WANTED INTEROPERABILITY.  AND THEN

4    THEY LEFT OFF THE NEXT SENTENCE.

5          AND I WOULD JUST AS SOON NOT READ IT IF

6    YOUR HONOR HAS IT.  IT'S THE ONE THAT THEY TOLD

7    REAL.

8          THE COURT:  ALL RIGHT.  I'LL LOOK AT

9    THAT.

10          MR. MITTELSTAEDT:  AND THEN IF YOU GO TO

11   THE NEXT PARAGRAPH IT SAYS -- IT TALKS ABOUT IT'S

12   NOT GOING TO WORK AFTER 4.7 SHIPS.

13          4.7 IS THE ITUNES UPDATE.

14          AND THEN IT GOES ON TO SAY WHAT WOULD

15   HAVE TO HAPPEN FOR IT TO CONTINUE TO WORK.

16          THIS IS CONTEMPORANEOUS.  THIS ISN'T

17   SOMETHING THAT -- IT'S ACTUALLY EXHIBIT 4 TO

18   MERRICK'S DECLARATION.

19          THIS IS NOT SOMETHING THAT WAS MADE UP

20   FOR LITIGATION.  THIS IS CONTEMPORANEOUS, JULY OF

21   2004.

22          AND WHAT IT'S SAYING IS THAT HARMONY IS

23   GOING TO BE STOPPED WHEN WE ISSUE 4.7, WHICH IS IN

24   RESPONSE TO THE HACKS.

25          AND THE ONLY WAY FOR HARMONY NOT TO WORK

36

1    IS THAT WE WOULD HAVE TO ENGINEER TO DO SOMETHING

2    OVER AND ABOVE AND BEYOND THAT.

3              YOUR HONOR, ONE OF YOUR CASES, THE -- WE

4    CITED IT, THE SEAGATE TECHNOLOGY CASE.

5              THE COURT:  YEAH.

6              MR. MITTELSTAEDT:  IT DENIES A RULE 56(F)

7    MOTION ON THIS GROUND, AND I'M GOING TO READ IF I

8    MAY, "SEAGATE PROVIDES NO BASIS WHATSOEVER FOR

9    BELIEVING THAT THE INSURER'S REFUSAL TO DEFEND WAS

10   FOR ANY REASON OTHER THAN THAT WHICH THEY HAVE

11   CONSISTENTLY AND REASONABLY STATED."

12             I THINK THAT APPLIES HERE.

13             THE CONTEMPORANEOUS DOCUMENTS ARE

14   CONSISTENT WITH OUR ARGUMENT HERE TODAY.  JEFF

15   ROBBIN'S DECLARATION, WHICH AGAIN IS UNDER SEAL

16   BECAUSE OF THE SENSITIVE NATURE OF WHAT IT'S

17   DEALING WITH, WALKS THROUGH IN DETAIL WHY APPLE DID

18   WHAT IT DID.  IT'S CONSISTENT AND REASONABLE.

19             AND WHEN THEY SAY WE DON'T HAVE ANY

20   DOCUMENTS, THE STUFF THEY'RE CITING TO YOUR HONOR

21   ARE THINGS WE HAVE BEEN PRODUCING.  THEY HAVE THE

22   DOCUMENTS AND THEY HAVE THE RIGHT AND THE

23   OPPORTUNITY TO DEPOSE MR. ROBBIN AND THEY TURNED IT

24   DOWN.

25             THE POINT I WANT TO END WITH, YOUR HONOR,

                                                    37

1    ARE THERE ARE THREE GROUNDS FOR SUMMARY JUDGMENT

2    AND THE FIRST VALID BUSINESS REASON, AND THE SECOND

3    BETWEEN THE TIME OF YOUR HONOR'S DECEMBER ORDER AND

4    NOW THE NINTH CIRCUIT DECIDED THE TYCO CASE.

5              AND IN THAT CASE THE COURT ADDRESSED THE

6    QUESTION OF WHETHER A PRODUCT DESIGN CHANGE COULD

7    VIOLATE SECTION 2 BECAUSE IT CREATED

8    INCOMPATIBILITY.

9              NOW, ITUNES 4.7 DID NOT CREATE

10   INCOMPATIBILITY, IT SIMPLY RESTORED THE SAME LEVEL

11   OF INTEROPERABILITY AS EXISTED AT THE LAUNCH.

12             BUT EVEN IF THEY WERE RIGHT THAT IT

13   CREATED A LACK OF INTEROPERABILITY AND SOME MORE

14   INCOMPATIBILITY.  EVEN IF THEY'RE RIGHT, AND

15   THEY'RE WRONG, BUT EVEN IF THEY'RE RIGHT, THAT

16   UPDATE WOULD STILL BE LAWFUL UNDER TYCO.

17             THE TEST TYCO SETS OUT IS WHETHER THE

18   DESIGN CHANGE, AND LET'S ASSUME HERE A SOFTWARE

19   UPDATE THAT JUST RESTORES THE INTEGRITY OF THE

20   EXISTING SOFTWARE IS A DESIGN CHANGE.

21             IF IT IMPROVES THE PRODUCT AT ALL, IF IT

22   BENEFITS CONSUMERS AT ALL, EVEN THE SLIGHTEST BIT,

23   IT'S BEYOND THE REACH OF SECTION 2.

24             AND IN DECIDING TYCO, AND TYCO, YOUR

25   HONOR, IS AS IMPORTANT TO THIS MOTION AS FOREMOST

                                                    38

1    PRO WAS TO THE TYING MOTION.

2              BECAUSE IN TYCO, THE COURT WALKS THROUGH

3    THE NINTH CIRCUIT JURIS PRUDENCE AND IT GOES BACK

4    TO THE I.B.M. CALCOM CASE AND IT SAYS, I.B.M. HAD A

5    RIGHT TO REDESIGN ITS PRODUCT, IT WAS UNDER NO DUTY

6    TO HELP CALCOM OR ANY OTHER PERIPHERAL EQUIPMENT

7    MANUFACTURER SURVIVOR EXPAND.

8              AND THEN THE NINTH CIRCUIT IN TYCO GOES

9    ON TO DISCUSS FOREMOST PRO AND THEN IT SAYS CALCOM

10   AND FOREMOST PRO STAND FOR THE UNCONTROVERSIAL

11   PROPOSITION THAT PRODUCT IMPROVEMENT BY ITSELF DOES

12   NOT VIOLATE SECTION 2 EVEN IF IT IS PERFORMED BY A

13   MONOPOLIST AND HARMS COMPETITORS AS A RESULT.

14             AND THE NINTH CIRCUIT GOES ON TO SAY EVEN

15   IF IT INTENDED TO HARM COMPETITORS.  SO EVEN IF

16   THIS WAS INTENDED TO HARM HARMONY, AS LONG AS IT'S

17   A PRODUCT IMPROVEMENT.

18             AND WHY DOES THE COURT SAY THAT?  IT GOES

19   ON TO SAY WE'RE NOT GOING TO BALANCE THE BENEFIT

20   THE WORTH OF PRODUCT IMPROVEMENT AGAINST ITS

21   ANTICOMPETITIVE EFFECTS.

22             IT SAYS ANTITRUST SCHOLARS HAVE LONG

23   RECOGNIZED THE UNDESIRABILITY OF HAVING COURTS

24   OVERSEE PRODUCT DESIGN AND ANY DAMPENING OF

25   TECHNOLOGICAL INNOVATION WOULD BE AT CROSS-PURPOSES

                                                    39

1    WITH THE ANTITRUST LAWS.

2              AND THEN IT SAYS, TO ASK A COURT TO

3    DECIDE, YOU KNOW, ARE THE BENEFITS OF THIS CHANGE

4    WORTH IT OR DID THEY HURT COMPETITION TOO MUCH, IT

5    IS UNADMINISTERABLE.  I WASN'T SURE THAT WAS A WORD

6    BUT THAT'S THE WORD THEY USED.

7              AND THEN THEY GO ON TO SAY THERE'S NO

8    CRITERIA THAT COURTS CAN USE TO CALCULATE THE RIGHT

9    AMOUNT OF CHANGE OR THE RIGHT AMOUNT OF INNOVATION.

10             AND FINALLY, A SEEMINGLY MINOR

11   TECHNOLOGICAL IMPROVEMENT TODAY CAN LEAD TO MUCH

12   GREATER ADVANCES IN THE FUTURE.

13             SO IN THAT CASE THE COURT FOUND ON

14   SUMMARY JUDGMENT THERE WAS SOME PRODUCT IMPROVEMENT

15   IN THE REDESIGN AND THAT WAS THE END OF THE MATTER.

16             THAT CASE I THINK IS ON ALL FOURS WITH

17   OUR CASE EVEN IF ONE ASSUMES THAT ITUNES 4.7 DIDN'T

18   JUST BLOCK THE ILLEGAL HACKS BUT ALSO WAS INTENDED

19   TO ATTACK OR BLOCK HARMONY.  IT WAS A PRODUCT

20   IMPROVEMENT.

21             AND MY FINAL POINT --

22             THE COURT:  LET ME, LET ME -- I

23   UNDERSTAND WHAT IS GOING ON HERE, AND I DO NEED TO

24   STUDY THE TYING.

25             THE PROXIMITY IS SOMETHING THAT I HADN'T,

40

1    WITH THE JHYMN CIRCUMSTANCE, WAS NOT SOMETHING THAT

2    I HAD GIVEN A LOT OF THOUGHT TO, SO I WILL.

3            I DID FIND THERE TO BE A PROXIMITY

4    BETWEEN THE REAL NETWORK NOTICE OF ITS FINDING A

5    SOLUTION THAT ALLOWED ITS MUSIC TO BE PLAYED ON THE

6    IPODS AND TO BE DOWNLOADED AND PLAYED AND THE

7    CHANGE.

8            AND THAT GAVE ME CONCERN, QUITE FRANKLY,

9    AS OPPOSED TO ALLEVIATED THE COURT'S CONCERNS.

10           AND SO I WANT TO GO BACK TO BOTH OF THESE

11   NOW AND SEE WHAT I WOULD MAKE OF THE PLAINTIFF'S

12   REQUEST TO ENGAGE IN SOME DISCOVERY.

13           I AM SENSITIVE TO THE NATURE OF THE

14   TECHNOLOGY HERE AND PROTECTING THE INTEREST OF THE

15   TWO SIDES, AND I REALIZE THAT WHENEVER YOU GET DOWN

16   TO SOURCE CODE LEVEL KIND OF DISCOVERY, IT CREATES

17   THOSE KINDS OF CONCERNS.

18           AND I WON'T PUT YOU IN THAT POSITION IF I

19   FIND AS A MATTER OF LAW THAT THIS IS NOT A CASE

20   THAT THE PLAINTIFFS HAVE A THEORY ON WHICH THEY CAN

21   PROCEED, OR AS A MATTER OF LAW THEY HAVE ALREADY

22   CONCEDED FACTS THAT ENTITLE THE DEFENDANT TO

23   JUDGMENT AS A MATTER OF LAW.

24           I'M NOT THERE YET, BUT THIS HAS ASSISTED

25   ME, AND I REALIZE THE ANXIETY THAT THESE KINDS OF

41

1    PROBLEMS CREATE FOR BOTH SIDES, BUT I DON'T KNOW

2    THAT I WOULD BE BENEFITTED BY FURTHER BRIEFING.

3    YOU'VE DONE A VERY GOOD JOB SO FAR ON BOTH SIDES OR

4    ALL THREE SIDES, QUITE FRANKLY.

5              MR. MITTELSTAEDT:  YOUR HONOR, COULD I

6    JUST ADD ONE POINT?

7              THE COURT:  ONE POINT.

8              MR. MITTELSTAEDT:  IN TEN SECONDS OR

9    LESS.

10             THE OTHER THING THAT TYCO HELPS ON IS

11   WHAT WE CALL THE TRINCO POINT, THAT APPLE HAD NO

12   DUTY TO KEEP HARMONY IN BUSINESS AND AT THE END OF

13   TYCO, TYCO SAYS, "OUR PRECEDENCE MAKES CLEAR THAT A

14   MONOPOLIST HAS NO DUTY TO HELP COMPETITORS SURVIVE

15   OR EXPAND WHEN INTRODUCING AN IMPROVED PRODUCT

16   DESIGN."

17             THE COURT:  AND I CAN ADOPT ALL OF THAT

18   AND SO FAR AS I'M CONCERNED THOSE ARE TRUISMS IN

19   ANTITRUST LAW, BUT THAT DOESN'T MEAN THAT THERE IS

20   NO ROOM UNDER THAT CIRCUMSTANCE FOR THE KINDS OF

21   CLAIMS THAT THE PLAINTIFFS MAKE IF IT IS DOING SO

22   SERVES NO GENUINE ANTI-PIRACY PURPOSE.  IT'S THAT

23   LANGUAGE THAT I WONDER WHETHER OR NOT THE PLAINTIFF

24   HAS ANY EVIDENCE TO BACK UP.

25             BUT IT DOES SEEM TO ME THAT I'VE GOT TO

42

1    RAISE THAT AS A GENUINE ISSUE HERE AND SEE WHAT THE

2    ANSWER IS.

3            MR. MITTELSTAEDT:  AND WHEN YOUR HONOR

4    LOOKS AT THAT, WHEN THEY SAY THAT THE E-MAIL

5    TRAFFIC FROM THE LABELS HAS NOTHING TO DO WITH

6    ITUNES 4.7 IN OCTOBER OF '04, WHEN THEY READ OFF

7    THE DATES NOVEMBER OR DECEMBER OF '03, APRIL OF

8    '04, AND WHEN YOUR HONOR LOOKS AT JEFF ROBBIN'S

9    DECLARATION HE WALKS THROUGH THE SEQUENCE THAT

10    MAKES CLEAR THAT 4.7 IS A PRODUCT IMPROVEMENT

11    BECAUSE IT BLOCKED THOSE ILLEGAL HACKS.

12            AND ON THE INDIRECTS, OUR POSITION IS

13    LET'S SORT THIS OUT.  THEY WANT TO FILE A MOTION.

14    THEY WANT TO FILE AN AMENDED COMPLAINT.

15            I THINK WHAT SHOULD HAPPEN IS THAT THIS

16    PRESENT MOTION -- WHAT IS BEFORE THE COURT IS THEY

17    WANT TO FILE AN AMENDED COMPLAINT, THE INDIRECTS

18    WANT TO.  AND OUR POSITION IS THAT THAT OUGHT TO

19    WAIT FOR YOUR HONOR'S DECISION ON THIS MOTION.

20            IF THE DIRECTS CASE IS THROWN OUT, THAT

21    SHOULD TAKE CARE OF THE INDIRECTS CASE AS WELL ON

22    THE MERITS, I'M TALKING ABOUT 12(B)(6) OR RULE 56.

23            IF SOME PART OF THIS CASE SURVIVES THE

24    CURRENT MOTIONS, THEN I THINK THE INDIRECTS SHOULD

25    FILE AN AMENDED COMPLAINT AND THAT TAKES INTO

43

1    ACCOUNT WHAT YOUR HONOR HAS RULED.

2         BUT FOR THEM TO FILE A COMPLAINT NOW AND

3    FOR US TO START BRIEFING AND MOVING TO DISMISS OR

4    FOR SUMMARY JUDGMENT WHILE THESE MOTIONS ARE STILL

5    PENDING, IT DOESN'T SEEM EFFICIENT TO US.

6         THE COURT:  WELL, I WILL TRY AND RESOLVE

7    IT IN A WAY THAT WILL NOT LEAVE THE INDIRECTS UP IN

8    THE AIR ANY LONGER.  EITHER THEY'RE IN OR THEY'RE

9    OUT.

10        MS. ZELDES:  CAN I MAKE ONE QUICK COMMENT

11   ABOUT WHAT BOB JUST SAID?

12        YOUR HONOR, IT WOULD BE VERY UNFAIR TO

13   MAKE THE INDIRECTS WAIT ON THE SIDELINES.  WE HAVE

14   TWO TOTALLY SEPARATE CLASSES THAT ARE NOT

15   REPRESENTED IN THE CASE, AND WE WOULD LIKE TO MOVE

16   ON WITH DISCOVERY AND IT'S BEEN PENDING FOR YEARS.

17        MS. SWEENY:  I KNOW IT'S NOT MY MOTION,

18   YOUR HONOR, ON THE MOTION FOR SUMMARY JUDGMENT, BUT

19   MR. MITTELSTAEDT ALWAYS GOES OVER AND I FEEL LIKE I

20   HAVE A FEW MORE THINGS TO SAY AND WE HAVE A REPLY

21   ON OUR RULE 56 APPLICATION.  SO WITH YOUR HONOR --

22   IF YOUR HONOR PERMITS, I'LL JUST SAY A COUPLE

23   WORDS.

24        THE COURT:  A COUPLE WORDS.

25        MS. SWEENY:  FIRST OF ALL, WE AGREE THAT

                                                      44

1   THE RECENT TYCO CASE IN THE NINTH CIRCUIT IS AN

2   IMPORTANT DECISION AND WE NOT SURPRISINGLY THINK IT

3   STANDS FOR US.

4         AND WHAT TYCO SAYS IS CHANGES IN PRODUCT

5   DESIGN ARE NOT IMMUNE FROM ANTITRUST SCRUTINY AND

6   IN SOME CASES MAY CONSTITUTE AN UNLAWFUL MEANS OF

7   MAINTAINING A MONOPOLY.

8         AND I THINK MR. MITTELSTAEDT QUOTED PART

9   OF THE FOLLOWING, "A DESIGN CHANGE THAT IMPROVES

10  THE PRODUCT BY PROVIDING A NEW BENEFIT TO CONSUMERS

11  DOES NOT VIOLATE SECTION 2 ABSENT SOME ASSOCIATED

12  ANTICOMPETITIVE CONDUCT."

13        FIRST OF ALL, WE HAVE ALLEGED NO BENEFIT,

14  AND THEN SECONDARILY WE ALLEGE THAT EVEN IF THOSE

15  UPDATES THAT RESULTED IN 4.7 KNOCKED OUT SOME

16  ILLEGAL HACKS, THE ADDITIONAL PROGRAMMING THAT

17  APPLE DID TO GET RID OF HARMONY IS A DELIBERATE

18  ANTICOMPETITIVE EFFECT THAT IS NOT PROTECTED BY

19  TYCO.

20        AND MR. MITTELSTAEDT POINTS TO MR. CUE'S

21  CONTEMPORANEOUS RESPONSE.  WELL, THAT IT WOULDN'T

22  WORK.  THAT, THAT REAL WOULDN'T WORK; HARMONY

23  WOULDN'T WORK AFTER THEY IMPLEMENTED 4.7.

24        WELL, WHETHER IT'S CONTEMPORANEOUS OR NOT

25  IS NOT THE QUESTION.

                                                    45

1          THE QUESTION IS WHETHER IT WAS

2     PRETEXTUAL, AND WE BELIEVE AND WE HAVE ASSERTED AND

3     WE BELIEVE THAT THE EVIDENCE SUPPORTS US THAT IT

4     WAS PRETEXTUAL.  THAT APPLE KNEW FROM LONG BEFORE

5     JULY OF 2004 WHEN REAL NETWORKS APPROACHED STEVE

6     JOBS AND SAID CAN WE COLLABORATE, THAT THIS WAS IN

7     THE WORKS.

8          SO PLAINTIFFS BELIEVE THAT THERE IS

9     SUFFICIENT EVIDENCE IN THE RECORD ALREADY, AND WE

10    CERTAINLY WANT TO EXPLORE IT AS TO WHAT THE

11    TECHNOLOGICAL CHANGES THAT WERE INCLUDED IN 4.7

12    WERE, WHICH ONES WERE CORRECTED DIRECTLY AT HARMONY

13    AND WHICH ONES WERE NOT.

14          AND AS MR. MITTELSTAEDT SAID, WE, WE HAVE

15    ASKED FOR SOURCE CODE.  WE HAVE ALSO ASKED FOR ALL

16    KINDS OF TECHNICAL DOCUMENTS WHICH ARE NOT SOURCE

17    CODE WHICH APPLE HAS NOT PRODUCED.  EVEN THE

18    E-MAILS AND ET CETERA, THEY STILL ARE PRODUCING

19    THAT ON A ROLLING BASIS.  WE GOT SOME DOCUMENTS

20    JUST LAST WEEK WHEN THEY SAID THAT THEY'VE

21    COMPLETED PRODUCING THE INFORMATION.

22          SO I KNOW I HAVE -- YOU'VE INDULGED ME

23    FOR A WHILE NOW, BUT I WOULD REQUEST YOUR HONOR TO

24    LOOK AT OUR RULE 56(F) REPLY BECAUSE I DON'T HAVE

25    TIME NOW TO GO INTO ALL OF THE DIFFERENT CATEGORIES

                                                      46

1    OF DISCOVERY THAT WE BELIEVE WE HAVE BEEN DENIED,

2    AND WE THINK WE COULD USE TO ADDRESS APPLE'S

3    MOTION.

4           THE COURT:  THANK YOU.  WELL, I ALWAYS

5    WANT YOU ALL TO LEAVE WITH THE FEELING THAT I'VE

6    BEEN OVERLY PATIENT.  I HOPE I HAVE ACHIEVED THAT.

7           THANK YOU.  AND MATTER IS SUBMITTED.

8           MS. SWEENY:  THANK YOU, YOUR HONOR.

9           MR. MITTELSTAEDT:  THANK YOU, YOUR HONOR.

10          (WHEREUPON, THE PROCEEDINGS IN THIS

11   MATTER WERE CONCLUDED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    47

1

2

3

4                    CERTIFICATE OF REPORTER

5

6

7

8          I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13          THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23              /S/

                 _____
24              IRENE RODRIGUEZ, CSR, CRR
                CERTIFICATE NUMBER 8074
25

                                                        48