ZELDES & HAEGGQUIST, LLP
HELEN I. ZELDES (220051)
ALREEN HAEGGQUIST (221858)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone: 619/342-8000
Facsimile: 619/342-7878
alreenh@zhlaw.com
helenz@zhlaw.com

MEHRI & SKALET, PLLC
STEVEN A. SKALET  (admitted *pro hac vice*)
CRAIG L. BRISKIN  (admitted *pro hac vice*)
1250 Connecticut Ave. NW, Suite 300
Washington, DC 20036
Telephone: 202/822-5100
Facsimile: 202/822-4997
sskalet@findjustice.com
cbriskin@findjustice.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION<br><br>This Document Relates to:<br><br>*Somers v. Apple, Inc.*, No. C 07-6507 JW | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Lead Case No. C 05-0037-JW(HRL) JW<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

1    Plaintiff Stacie Somers, on her own behalf and behalf of the classes defined herein (the

2  "Classes"), based on information and belief and investigation of counsel, except for information

3  pertaining to the named Plaintiff, which is based on her personal knowledge, in this action

4  against Apple, Inc. ("Defendant" or "Apple"), alleges as follows:

5                                    **NATURE OF THE ACTION**

6    1.    When it introduced iTunes in 2001, Apple promoted the music software

7  application as "the best way to organize, browse, and play your digital media," and touted the

8  interoperability of iTunes with "MP3 players like Nomad and Rio."

9    2.    But when Apple launched the iTunes Music Store ("iTS") in 2003, it quietly

10  changed course, restricting iTS and iTunes to work only with its own portable digital media

11  player, the iPod, and restricting the iPod so it could only play files embedded with Apple's own

12  proprietary Digital Rights Management ("DRM") downloads called, ironically, "FairPlay," and

13  no one else's.  Apple quickly cornered the market by selling DRM-encoded music files in a

14  format that none of the other portable digital media players could use.  Apple gained monopoly

15  power through the use of its proprietary "FairPlay" software on Audio Downloads purchased

16  from iTS because FairPlay prevented Audio Downloads purchased through iTS from playing on

17  Portable Digital Media Players other than iPod.  Thus, a purchaser who wished to play Audio

18  Downloads purchased from iTS on a Portable Digital Media Player had to purchase an iPod, and

19  a purchaser of an iPod who wished to buy Audio Downloads for direct playback on the iPod had

20  to purchase them from iTS.  This restriction on DRM-embedded purchases remains to the

21  present day:  consumers are faced with the choice of paying Apple hundreds or even thousands

22  of dollars for DRM-free versions of their previous purchases, or buying another Apple product

23  that can play their DRM-protected music.

24    3.    But Apple did not stop there.  It maintained and further entrenched its monopolies

25  through so-called "software updates," signaling to its competitors that it would thwart any efforts

26  to achieve interoperability with its dominant products.  Apple regarded the products it had

27

28

AMENDED COMPLAINT – No. C 07-6507 JW                                                    - 1 -

already sold as products it could change at will to suit its anticompetitive purposes, without informing its customers or requesting their consent.

4.    As a result of Apple's efforts, consumers purchased billions of files from Apple's iTS Store, but they could only play those files on iPods, and could not play competitors' downloads on iPods.  When Apple finally stopped selling music downloads with its proprietary DRM restrictions in 2009, it maintained those restrictions on the last six years of music sales, requiring its customers to pay a substantial surcharge equal to 30% of the album price, or 30 cents per song, to convert their libraries to DRM-free tracks.

5.    Plaintiff Stacie Somers brings this class action, pursuant to Rule 23(b)(2) and (b)(3), on behalf of

>  (a) All persons or entities in the United States (excluding federal,
>      state and local governmental entities, Apple, its directors, officers
>      and members of their families) who have purchased FairPlay
>      DRM-encoded music files from Apple ("iTS Class"); and
>  (b) All persons or entities in the United States (excluding federal,
>      state and local governmental entities, Apple, its directors, officers
>      and members of their families) who purchased an iPod indirectly
>      from Apple ("iPod Class").

6.    Plaintiff brings this class action on behalf of herself and all others similarly situated, asserting claims under the Sherman Antitrust Act, 15 U.S.C. § 2, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL" or "§ 17200").

**JURISDICTION AND VENUE**

7.    Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.    This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA"), as to the named Plaintiff and every

1  member of the class, because the proposed class contains more than 100 members, the aggregate

2  amount in controversy exceeds $5 million, and members of the class reside across the United

3  States, and are therefore diverse from Defendant.

4      9.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28

5  U.S.C. § 1391, because Defendant transacts business in this district, Defendant has its principal

6  corporate office in this district, and because thousands of Class members are located in this

7  district.   Additionally, a substantial part of the interstate trade and commerce involved and

8  affected by the alleged violations of the antitrust laws was and is carried on in this district.  The

9  acts complained of have had, and will have, substantial anti-competitive effects in this district.

10  Finally, this case is part of a coordinated action that is pending in this Court.

11      10.    This Court has personal jurisdiction over Apple, because Apple maintains its

12  corporate headquarters in Cupertino, California, which is located in this District; it is authorized

13  to and does conduct business in California; and it has intentionally availed itself of the laws and

14  markets of California through the promotion, marketing, distribution and sale of its Portable

15  Digital Music Players and Audio Downloads in California.   In addition, Defendant is

16  headquartered in Santa Clara County, which is assigned to this Division of the Court.

17                          **INTRADISTRICT ASSIGNMENT**

18      11.    Assignment to the San Jose Division is proper, because a substantial portion of

19  the acts, events, and omissions giving rise to this action occurred in Santa Clara, which is within

20  the purview of the San Jose Division of this District.

21                                  **PARTIES**

22      12.    Plaintiff Stacie Somers resides in San Diego County, California.   On or about

23  November 2005, while in San Diego County, Ms. Somers purchased a 20GB iPod from Target

24  and, after that, music from iTS.

25      13.    Defendant Apple, Inc. is a corporation organized under the laws of the State of

26  California and has its principal place of business in Cupertino, California.   Though it has long

27

28

1    been known as a computer hardware and software company, Apple now derives the majority of

2    its revenues and profits from its sale of media players.

3                                    **SUMMARY OF FACTS**

4            14.    Apple entered the digital music scene in 2001 with the launch of its portable

5    music player, the iPod, and its music library software, iTunes.  Apple enticed consumers to

6    "Take MP3s on the Run" and claimed iTunes "lets you take your digital music library with you

7    wherever you go."  Apple touted the iPod's interoperability as a selling point, and made no

8    efforts to restrict the music that could be played on the device.  Similarly, iTunes users could

9    sync their libraries with non-Apple devices.

10           15.    Apple changed course in 2003, with the introduction of the iTunes Music Store

11   ("iTS").  Unbeknownst to consumers, Apple released a new generation of iPods and altered the

12   iTunes software so that iTunes and iPods were only interoperable with each other.

13           16.    Apple's anticompetitive behavior has caused harm to class members in three

14   ways.  First, Apple has impaired the iPod through "software updates," in order to make it

15   incapable of playing downloads from other music sellers, such as RealNetworks.  Plaintiff seeks

16   damages resulting from the overcharges Apple assessed for iTS downloads resulting from its

17   thwarting of a competitive market.  Plaintiff also seeks compensatory damages on behalf of

18   herself and all other indirect purchasers of iPods for the diminution in value to their iPods caused

19   by Apple's restrictive "updates."

20           17.    Second, Apple restricted its own downloads with proprietary "FairPlay" digital

21   rights management software ("DRM"), which only allows synchronization with Apple's own

22   products.  Apple's agreements with the record companies did not require its DRM to restrict

23   playback to Apple devices.  Rather, Apple elected to restrict Audio Downloads to play only on

24   its own products in order to maintain and exploit its monopolies in the Portable Digital Media

25   Player and Audio Download Markets.  In addition, it designed "software updates" whose true

26   purpose was to thwart any attempts to make iTS downloads interoperable with non-Apple

27   devices.  Consumers who purchased billions of albums and files from iTS continue to be limited

28

AMENDED COMPLAINT – No. C 07-6507 JW                                                    - 4 -

1    (to playing their iTS files on their iPods) by the DRM to the present day.  It is clear that the

2    DRM no longer serves any purpose in making Apple's products interoperable, because Apple,

3    Amazon and others now sell DRM-free Audio Downloads with no apparent interoperability

4    problems.

5            18.    Plaintiff seeks injunctive relief in the form of replacement of DRM-embedded

6    files with DRM-free files, and restitution of the substantial surcharges class members have been

7    forced to pay to Apple to obtain files free of DRM.

8            19.    Third, Plaintiff seeks an injunction against further attempts by Apple to limit

9    interoperability between iTS, iTunes and third-party products. Apple has used its dominant

10   market position in the markets for Audio Downloads and Portable Digital Media Players to stifle

11   competition and strengthen its monopoly in these markets.  Apple engaged in systematic conduct

12   to shut out rivals' competing Audio Downloads and Portable Digital Media Players by cutting

13   off their access to the marketplace. In the process, Apple deprived consumers of choice and

14   innovation in the Audio Download and Portable Digital Media Player Markets. Apple used

15   unneeded technological restrictions in conjunction with software updates to suppress new

16   products that threatened its monopoly power in the relevant product markets. This strategy

17   succeeded in maintaining Apple's monopolies at the expense of consumers, who have been

18   denied access to potentially superior, non-Apple products and lower prices.

19           20.    Through the use of the FairPlay DRM and software updates, Apple shut out

20   competitors.  Its actions constitute an unfair, unscrupulous business practice and a violation of

21   United States and California antitrust law.  None of the anticompetitive conduct described in this

22   complaint had a legitimate business justification.

23                              **RELEVANT PRODUCT MARKETS**

24           21.    For the claims that may require market definitions, the relevant product markets

25   for purposes of these allegations are as follows:

26

27

28

AMENDED COMPLAINT – No. C 07-6507 JW                                                      - 5 -

**Audio Download Market**

22.     The "Audio Download Market" is the market for digital music, which consumers purchase through downloading from the internet.  These purchases are "permanent," in that they are not designed to stop playing after a predetermined time, or when the customer terminates a subscription (e.g. Napster).

23.     The Audio Download Market is separate from and does not include the market for music purchased in compact disk ("CD") form at retail stores.  Stores in the Audio Download Market make available hundreds of thousands or even millions of songs for sale.  Currently iTS claims to offer over 11 million songs.  This is many times more than even the largest traditional music retailer.  Unlike CDs, purchasers in the Audio Download Market can purchase only the individual music tracks they want, whereas the CD comes as an album that may contain songs the customer does not want to pay for.

24.     A key distinguishing feature of the Audio Download Market is convenience.  Consumers do not have to travel to a store to make a purchase.  Instead, they can purchase music instantly and with a touch of a button, anywhere they have an internet connection, whether it is at home, or sitting at a café with a laptop computer.  Environmentally conscious consumers may favor audio downloads because of the resources conserved in packaging and transport of music sold in "brick and mortar" establishments.  In addition, Audio Downloads can be uploaded directly to portable music players.

25.     Apple owns and operates the iTS, which provides digital music through a software program called iTunes.  iTunes comes pre-installed on Apple computers, and is available by free download to consumers with non-Apple computers.  Consumers can access iTS through the iTunes program, and can purchase and download digital music and digital video computer files through an internet connection.

26.     At all relevant times, Apple has been a competitor in the Audio Download Market, and it has maintained a market share of the United States Audio Download Market of 70 percent or more.

27.    The Audio Download Market is characterized by high barriers to entry, in addition to the barriers posed by Apple's illegal and anticompetitive behavior detailed herein. Other barriers to entry include: (a) the investment of capital and other resources necessary to design, market and sell millions of Audio Downloads through an online store, including the design and development of software; (b) the cost and necessity of obtaining permission to distribute copyrighted material; and (c) the ability to persuade consumers to purchase Audio Downloads from a new vendor, instead of or in addition to their current vendor(s).

28.    Indeed, the two markets show very different purchasing patterns. Sales for Audio Downloads are predominantly for individual tracks:  for every one album sold online, twenty are purchased individually. By contrast, according to the Recording Industry Association of America, in 2005, 705.4 million CD albums were sold, compared to 2.8 million individual song sales. This stark difference reflects the fact that sellers in these markets are offering products in a different way, and that buyers are looking for different products as well.

29.    Of course, CDs are also available for sale on the internet. Amazon, for example, sells both CDs and downloadable music. Downloadable music is often priced more cheaply than the same music on CDs, at least in part because of the cost of packaging and transport. But even where CDs are priced lower than the same downloadable music, many or most customers forego the CD for the convenience and immediacy of the download.

30.    For these and other reasons, the Audio Download Market is a separate relevant product market.

**Portable Digital Media Player Market**

31.    The "Portable Digital Media Player Market" is the market for portable battery-powered devices that can store and play large numbers of digital media files.

32.    Portable Digital Media Players store much more music than the portable CD player, its most popular predecessor, which it has effectively displaced. While a traditional CD can hold no more than 15 to 25 songs, today's Portable Digital Media Players can store tens of thousands of songs, and songs can be added or deleted from the device. The amount of storage

available in Portable Digital Media Players has increased dramatically since their introduction to the market.  The first mass-produced player was the "MPMan," sold by Saehan Information Systems beginning in 1997, and had a storage capacity of 32 megabytes (MB), or about 6 songs. Just 3 years later, Creative sold a player with 6 gigabytes (GB) of storage, a 18,750 percent increase.  By 2008, players were available with as much as 250 GB of storage.  Thus, a consumer can easily store as many songs in a pocket-sized device as would fill multiple bookshelves of CDs. Portable Digital Media Players also feature superior skip protection, and many models can play video, files, games, and store digital photographs.

33.    At all relevant times, Apple has sold Portable Digital Media Players known as iPods.  These include all generations of the iPod Classic, iPod Shuffle, iPod Nano, iPod Mini and iPod Touch (collectively, the "iPod").

34.    At all relevant times, Apple has maintained a market share of the Portable Digital Media Player Market of 60 percent or more.

35.    The Portable Digital Media Player Market is and has been characterized by high barriers to entry, in addition to the barriers posed by Apple's illegal and anticompetitive behavior detailed herein.  Other barriers to entry include: (a) the high fixed costs involved in research and development, manufacturing, marketing and selling the product; (b) that purchasers are unlikely to switch to a new Portable Digital Media Player unless it is compatible with their existing libraries of Audio Downloads; (c) that new entrants were required to license DRM software so that their Portable Digital Media Players were capable of playing DRM-encrypted Audio Downloads purchased from online stores; and (d) certain DRMs, most importantly FairPlay, were proprietary and not available to license.

36.    The relevant geographic market for the relevant product markets is the United States.

**CLASS ACTION ALLEGATIONS**

37.    Plaintiff intends to move this Court, pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), to represent the following Classes:

1          (a)     All persons or entities in the United States (excluding federal, state and

2  local governmental entities, Apple, its directors, officers and members of their families) who

3  have purchased FairPlay DRM-encoded music files from iTS from December 31, 2003 to the

4  present ("iTS Class"); and

5          (b)     All persons or entities in the United States (excluding federal, state and

6  local governmental entities, Apple, its directors, officers and members of their families) who

7  purchased an iPod indirectly from Apple from December 31, 2003 to the present ("iPod Class").

8                         **Numerosity**

9      38.    The membership of the Classes is so numerous that joinder of all members is

10  impracticable.   There are millions of Class members who are geographically dispersed

11  throughout the United States.

12                         **Typicality**

13      39.    Plaintiff's claims are typical of the claims of the members of the Classes because

14  Plaintiff and all Class members were damaged by the same wrongful conduct of the Defendant

15  alleged herein and Plaintiff has no interest adverse to the interest of other members of the

16  Classes.

17                         **Commonality**

18      40.    There are questions of law and fact common to the Classes which predominate

19  over any questions affecting only individual Class members. Such common questions include:

20      (a)    The definition of the relevant product markets;

21      (b)    Apple's market power within the relevant product markets;

22      (c)    Whether Apple monopolized and continues to monopolize the relevant product

23           markets;

24      (d)    Whether Apple attempted to monopolize and continues to attempt to monopolize

25           the relevant product markets;

26      (e)    Whether Apple's conduct constitutes unlawful and unfair business acts and

27           practices under California law;

28

1    (g)    Whether the Defendant's conduct was otherwise unlawful or unfair; and

2    (h)    Whether Defendant was unjustly enriched.

3                     **Adequacy**

4    41.    Plaintiff will fairly and adequately protect the interests of the Classes, and has

5  retained counsel experienced and competent in the prosecution of complex class actions and

6  antitrust litigation.

7    42.    A class action is superior to other available methods for the fair and efficient

8  adjudication of the controversy. Such treatment will permit a large number of similarly situated

9  persons to prosecute their common claims in a single forum simultaneously, efficiently, and

10  without duplication of effort and expense that numerous individual actions would engender.

11  Class treatment will also permit the adjudication of relatively small claims by many Class

12  members who could not afford on their own to individually litigate an antitrust claim against a

13  large corporate defendant. There are no difficulties likely to be encountered in the management

14  of this class action that would preclude its maintenance as a class action, and no superior

15  alternative exists for the fair and efficient adjudication of the controversy.

16  **APPLE USED FAIRPLAY TO ACHIEVE AND MAINTAIN MONOPOLY POWER**

17    43.    On January 9, 2001, Apple released a downloadable digital media player

18  application known as iTunes, designed to organize and play digital media files on a personal

19  computer. The program allowed users to organize music, record CDs, and upload or "sync" the

20  files to a Portable Digital Media Player.

21    44.    On October 23, 2001, Apple introduced the iPod, its first Portable Digital Media

22  Player.  At the time, iPod was capable of playing only unprotected Audio Downloads in MP3

23  format, either downloaded from the internet, or transferred from a user's CD (called "burning").

24    45.    On April 28, 2003, Apple opened the iTunes Music Store, now known as "iTS."

25  iTS offered over 200,000 songs from the major record labels for 99 cents each. This was the

26  largest online music store of its time.  iTS now offers more than 11 million songs.  iTS is

27  accessible only through iTunes.  At the same time as the release of iTS, Apple also released a

28

1  new generation of iPods and secretly "updated" the iTunes software so that iTunes and its iPod

2  were compatible with FairPlay, Apple's proprietary DRM.

3        46.    Music retailers can sell Audio Downloads in both unprotected and protected

4  digital file formats. Unlike unprotected formats, protected formats include technological

5  restrictions, commonly known as DRM, designed to restrict a consumer's use and reproduction

6  of the file.

7        47.    At the beginning of Apple's iTS, the major record labels, Sony, Universal, EMI,

8  Warner, and BMG, all required Audio Downloads to be sold in a protected format designed to

9  prevent unauthorized reproduction. These companies, however, did not require Apple to limit

10  Audio Downloads to use with Apple products. It was Apple's choice to encode the Audio

11  Downloads sold through iTS with its own proprietary DRM, FairPlay.

12        48.    Apple added DRM to Audio Downloads at the point of purchase, through iTunes.

13        49.    Apple refused to license FairPlay to any other manufacturers of Portable Digital

14  Media Players or sellers of Audio Downloads, so none of these other players could play iTS

15  downloads. Thus, consumers who purchased Audio Downloads from Apple were forced to buy

16  an iPod if they wanted to transfer those songs to a Portable Digital Media Player. Conversely,

17  iPods were unable to play any files encrypted with any DRM format other than FairPlay.

18        50.    It is clear that Apple was not using FairPlay just to protect copyrights of the

19  record companies. Apple encoded *all* Audio Downloads it sold with FairPlay DRM, including

20  public domain material, and music that music labels and/or artists they themselves made

21  available for sale without any DRM restrictions.

22        51.    For example, as of 2007, a company called eMusic came to market with a library

23  of over 100 million downloads with no DRM, at the same time that Apple was selling most or

24  nearly all of these same files with DRM protection. Customers could play their eMusic

25  downloads on iPods and other devices.

26        52.    Apple used its FairPlay DRM to achieve a monopoly in the Audio Download and

27  Portable Digital Media Player markets: after the release of iTS in April 2003, Apple achieved

28

1   and maintained a market share of over 70 percent of the Audio Download Market; Apple had

2   only a 11 percent market share in the Portable Digital Media Player market before the release of

3   iTS, and **92 percent** afterwards. Josh Bernoff, principal analyst with Forrester Research, stated,

4   Apple's "overwhelming market share is based in large part on its ability to lock people into that

5   device."

6       53.    Apple's ability to achieve and maintain its monopolies is due in large part to its

7   refusal to license or otherwise make its FairPlay DRM available to other manufacturers of

8   Portable Digital Media Players, so that music purchased from the iTS could be transferred

9   directly to Portable Digital Media Players other than the iPod. Additionally, Apple refused to

10  license or otherwise make its FairPlay DRM available to other Audio Download stores so that

11  consumers could play music files from those stores directly on their iPods.

12      54.    From the beginning, it would have been rational and profitable for Apple to

13  license or otherwise make available to competing manufacturers of Portable Digital Media

14  Players, because it would have expanded the consumer base for iTS. The more Portable Digital

15  Media Players on the market that were interoperable with files purchased from iTS, the more

16  profitable iTS would have been.

17      55.    Instead, Apple sacrificed short-term sales in the interest of gaining a dominant

18  market position -- obtained as a result of FairPlay -- to obtain monopoly power in the relevant

19  product markets.  Indeed, Apple has stated that it operates iTS at just above cost, so that it can

20  drive profits in the form of iPod sales.  In the first quarter of 2008, Apple reported $9.6 billion in

21  revenue, 42 percent of which came from the sale of iPods.

**APPLE USED DECEPTIVE SOFTWARE UPDATES**
**TO RESTRICT COMPETITION AND ENTRENCH ITS MONOPOLIES**

22

23

24      56.    Apple deceptively and secretly crippled the functionality, interoperability and

    usefulness of iPods through upgrades that were intended (at least in part) to block

25  interoperability and competition with other suppliers of electronic music.  iPods purchased prior

26  to the offending upgrades had interoperability features, and their value and usefulness were

27  wrongfully diminished by Apple, unbeknownst to consumers, and without their owner's consent.

28

1    Notably, Apple never meaningfully disclosed the true purpose and effect of the offending
2    upgrades.

3        57.    The intent of such software updates was to maintain and further entrench Apple's
4    monopoly power in the Audio Download and Portable Digital Media Player markets. Apple has
5    used software updates to shut out competitors and cut off their access to the marketplace and
6    profited handsomely for doing so. Apple's anticompetitive tactics were intended to, and had the
7    effect of, preventing and/or delaying entry of competitive products that threatened Apple's
8    monopolies in the relevant product markets.

9        58.    Apple has taken affirmative and continuing steps to make the iPod incapable of
10   playing downloads from competitors, in order to drive consumers to iTS.

11       59.    From the beginning of iTS, Apple designed the iPod's software so it could only
12   play a single protected digital format, Apple's FairPlay-modified AAC format. Apple refused to
13   use a format that other players could use, and refused to license its FairPlay format.

14       60.    Apple took deliberate steps to disable the iPod's ability to support the WMA
15   format. Indeed, the chips that it used in the iPods, the Portal Player System-On-A-Chip, and the
16   SigmaTel STMP3550, play WMA files in digital music players other than Apple's.

17       61.    The cost to Apple of licensing the WMA format beginning in 2005 would likely
18   not have exceeded $800,000 per year, or approximately three cents per iPod sold in 2005.

19       62.    When Apple entered the market for music downloads, the WMA format was the
20   industry standard protected music file format. Online music stores that sold their protected
21   music files in WMA format included America Online, Wal-Mart, Napster, MusicMatch, Best
22   Buy, Yahoo! Music, FYE Download Zone, and Virgin Digital.

23       63.    By rendering iPods physically incapable of playing WMA files, Apple signaled to
24   the industry that no other protected files would be playable on their dominant portable music
25   player.

26       64.    Through its End User License Agreements (EULAs), Apple expressly reserves
27   the right to unilaterally change at any time what customers could do with music they had already

28

AMENDED COMPLAINT – No. C 07-6507 JW                                      - 13 -

1    purchased.  For example, in April 2004, Apple decided to modify its DRM so customers could

2    only burn the same track on a playlist 7 times, when formerly the limit had been 10.  Apple

3    continues to limit the number of times and number of computers on which a customer can play

4    DRM-restricted content.

5        65.      On July 26, 2004, RealNetworks, a highly regarded and publicly traded digital

6    media company, announced that songs sold through its online store could be played on iPods as

7    well as other competing Portable Digital Media Players.  This gave iPod owners a real alternative

8    to the iTS for their purchases of Audio Downloads. This technology was known as "Harmony."

9    RealNetworks maintained that its conduct was legal.

10       66.      The import of competition was not insignificant.  RealNetworks' Harmony was an

11    alternative to Apple's stranglehold over the Audio Downloads market.  Moreover, the impact of

12    competition was immediate and clear: RealNetworks began selling its Audio Downloads for half

13    the cost charged by Apple:  as low as 49 cents per track, versus 99 cents per track charged by

14    Apple.

15       67.      At the time of RealNetworks' announcement, although there were several

16    Portable Digital Media Players in the marketplace, the iPod was the number one seller and

17    controlled 60 percent of the market.   Thus, in order to compete with Apple's iTS, which had a

18    70 percent market share and was the only Audio Download store that sold downloads compatible

19    with iPod, RealNetworks had to make its products compatible with iPods.

20       68.      RealNetworks' announcement was met with approval from the major record

21    labels, who had no interest in Apple maintaining and further entrenching its monopolies. This

22    was because RealNetworks sold its Audio Downloads with DRM protection that ensured the

23    files could not be improperly copied, but also allowed for compatibility with over 100 Portable

24    Digital Media Players, including Apple's iPod.

25       69.      In its first three weeks of selling iPod-compatible music files, RealNetworks sold

26    approximately three million music files. RealNetworks alleged that with Harmony,

27

28

AMENDED COMPLAINT – No. C 07-6507 JW          - 14 -

1    RealNetworks increased its market share in the Audio Download Market from 10 to 20%
2    percent, and decreased Apple's market share from 70 to 60 percent.

3        70.    As Forrester Research pointed out about RealNetworks' actions at the time, "more
4    compatibility means more competition."

5        71.    In response, Apple immediately threatened RealNetworks and iPod users. On July
6    29, 2004, only four days after RealNetworks' announcement, Apple issued its own public
7    statement, warning RealNetworks: "We strongly caution Real and their customers that ***when we***
8    ***update our iPod software from time to time it is highly likely that Real's Harmony technology***
9    ***will cease to work with current and future iPods***." (Emphasis added.)

10       72.    True to its threat, beginning in October 2004, Apple "updated" its iPod and
11   iTunes software to prevent songs downloaded from RealNetworks' music store from being
12   played on iPods. Unlike other software updates previously issued by Apple, purchasers were
13   ***required*** to update the iTunes software in order to use iTS, even though the "update" message
14   ***purposely omitted*** what the update actually contained.   These updates not only deceived
15   consumers, they also sent a strong message to competitors that Apple would promptly take
16   aggressive steps to thwart free and fair competition.

17       73.    In the wake of this episode, RealNetworks and other companies were reluctant to
18   invest the necessary capital to develop music stores that would allow them to compete with
19   Apple by selling Audio Downloads compatible with iPods. As RealNetworks stated in an SEC
20   filing in August 2005: "There are other risks associated with our Harmony technology, including
21   the risk that Apple will continue to modify its technology to 'break' the interoperability that
22   Harmony provides to consumers, which Apple has done in connection with the release of certain
23   new products. If Apple chooses to continue this course of action, Harmony may no longer work
24   with Apple's products, which could harm our business and reputation, or we may be forced to
25   incur additional development costs to refine Harmony to make it interoperate again."

26       74.    Because Apple was able to artificially maintain its monopoly power in the Audio
27   Download Market, competing manufacturers of Portable Digital Media Players were unable to

28

AMENDED COMPLAINT – No. C 07-6507 JW                                              - 15 -

1    compete with Apple's iPod, because any media player they created would not be compatible

2    with iTS. Consumers who purchased Audio Downloads from iTS would not purchase a Portable

3    Digital Media Player unless those iTS files could be played on their Portable Digital Media

4    Player. Because iTS maintained 70 percent or more of the Audio Download Market,

5    interoperability with files purchased from iTS was critical. However, because Apple would not

6    license or otherwise make FairPlay available, and issued software updates intended to "break"

7    interoperability when achieved, competitors were unable to genuinely compete. Accordingly,

8    Apple willfully maintained its monopoly in both the Audio Download and Portable Digital

9    Media Player Markets.

10        75.    Apple also has taken affirmative and continuing steps to make the iPod incapable

11   of playing downloads from competitors, in order to drive consumers to iTS.

12        76.    Although Apple could have chosen to use the ubiquitous industry standard DRM

13   (called WMA), it did not.  From the beginning of iTS, Apple designed the iPod's software so that

14   it could only play a single protected digital format, Apple's own proprietary FairPlay-DRM.

15   From the inception of iTS, Apple signaled to the industry that no other protected files would be

16   playable on its dominant portable music player.

17        77.    Apple also issued several software updates intended to prevent Audio Downloads,

18   and eliminate this threat to its monopolies in the Portable Digital Media Player and Audio

19   Download markets.

20        78.    For example, in or about the beginning of 2005, a software program known as

21   JHymn (short for "Java Hear Your Music aNywhere") was developed by an organization called

22   the Hymn Project, so that Audio Downloads purchased from iTS could be played on any AAC-

23   compatible music player, including Apple's iPod or any non-Apple device.   The Hymn Project

24   states on its website that the purpose of its software was to allow consumers to enjoy the fair use

25   of their purchases consistent with federal copyright law.  It identifies several restrictions Apple

26   established that violate purchasers' fair use rights:  the inability to play downloads on non-Apple

27

28

AMENDED COMPLAINT – No. C 07-6507 JW                                                      - 16 -

1    devices; the inability to play downloads on more than five computers; and to play downloads on

2    operating systems for which no version of iTunes exists, such as Linux.

3          79.    Apple immediately began issuing software updates to thwart JHymn.  In October

4    2005, Apple released iTunes 6.0, with the specific purpose of thwarting JHymn and other similar

5    software programs.

6          80.    Again in September 2006, Apple released iTunes 7.0, which it designed to

7    neutralize JHymn and other programs that could create interoperability between Audio

8    Downloads purchased from iTS and non-Apple Portable Digital Media Players.  Apple has

9    repeatedly issued software updates intended to prevent the use of other similar programs,

10   including QTFairUse, developed by John Lech Johansen, and PlayFair (also developed by the

11   Hymn Project).

12         81.    In July 2009, Apple issued a software update, iTunes 8.2.1, to prevent syncing

13   functionality with non-Apple media players.  For example, prior to this "update," owners of the

14   Palm "Pre" phone could sync their music directly through iTunes.  Palm Pre re-enabled the

15   synching functionality, in a release called webOS 1.1.  Palm stated at the time:  "Palm believes

16   that openness and interoperability offer better experiences for users by allowing them the

17   freedom to use the content they own without interference across devices and services."  Apple

18   clearly disagreed.  It introduced iTunes 9 in September 2009, blocking Palm yet again.  Palm

19   released webOS 1.2.1 in October 2009, re-enabling iTunes sync.  By the end of that month,

20   Apple responded with iTunes 9.0.2, again disabling syncing with the Palm.  These "updates"

21   were intended to and did thwart competition, and were not, as Apple represented them, merely

22   general updates geared to improve the product or services.

23         82.    Similarly, one of Apple's biggest competitors, Research in Motion, introduced

24   software in 2008 to sync its Blackberry devices with iTunes.  But the program is only able to

25   sync non-DRM-protected files.  The same is true for Android-based products.

26         83.    Apple continually redesigned its software even though it admitted that doing so

27   served no genuine antipiracy purpose. In a web-posting dated February 6, 2007, Apple's CEO

28

AMENDED COMPLAINT – No. C 07-6507 JW                                                      - 17 -

1   Steve Jobs conceded that "DRMs haven't worked, and may never work, to halt music piracy."

2   Moreover, the record companies did not require Apple to create its own version of DRM to lock

3   out competition – indeed, such a development would be counterproductive to the music

4   industry's goal of selling music.

5        84.    Apple has also taken affirmative steps to prevent iPods from being interoperable

6   with anything other than iTS and iTunes.  In 2008, when a discussion developed on bluwiki, a

7   public website, regarding possible ways to write software to sync with the iPod – instead of

8   using iTunes – Apple sent the website's creators a cease and desist letter.

9        85.    In testimony before the Federal Trade Commission, the non-profit Electronic

10  Frontier Foundation explained that DRM did nothing to protect music sellers against organized

11  piracy, and only served to entrench dominant sellers in the market and frustrate consumers'

12  proper uses of their media purchases:

13            First, DRM helps industry leaders dominate digital media markets
              and impede innovation.  Second, DRM endangers consumers by
14            rendering their computers insecure and violating consumers'
              reasonable expectations of privacy.  Third, DRM harms consumers
15            by degrading products and restricting consumers' ability to make
              otherwise lawful uses of their personal property, upsetting the
16            traditional balance between the interests of copyright owners and
              the interests of the public.[1]
17

18  **Removal of FairPlay – But DRM Remains**

19       86.    On April 2, 2007, the record label EMI began selling its entire catalog of music

20  on iTS without DRM restrictions.  EMI CEO Eric Nicoli stated, "[b]y providing DRM-free

21  downloads, we aim to address the lack of interoperability which is frustrating for many music

22  fans.  We believe that offering consumers the opportunity to buy higher quality tracks and listen

23  to them on the device or platform of their choice will boost sales of digital music."  This was an

24  important development, but EMI's catalog represented only a fraction of all music available on

25  iTS at the time.

26  ───────────────

27  [1] http://www.eff.org/files/filenode/DRM/DRMCOMMENTS_final.pdf.

28

1      87. In January 2008, Amazon.com became the first music store to sell all Audio

2    Downloads without DRM restrictions. Its initial catalog contained over 2 million songs. The

3    current catalog now offers over 11 million songs.

4      88. In January 2009, Apple announced that it would begin selling most Audio

5    Downloads through iTS without FairPlay restrictions. Purchasers that previously bought Audio

6    Downloads from iTS in the past could upgrade their files to a FairPlay-free format, but only by

7    paying 30 cents per file, or 30 percent of the original album price. By the end of March 2009, all

8    Audio Downloads sold through iTS were FairPlay-free.

9      89. This presented the first time when all iTS purchasers could purchase Audio

10   Downloads that would be playable both on iPods and on other Portable Audio Players.  This also

11   presented the first time when Apple could no longer re-design FairPlay software through

12   software updates to control competition in the relevant product markets and restrict consumer

13   choice. As a result, in 2009, Apple's market share in the Audio Download Market began to slip

14   for the first time since its creation, from 68.3 percent to 67.1 percent.  At the same time,

15   Amazon's market share jumped from 6.2 percent to 9.1 percent.  In 2010, Amazon's market

16   share has grown to over 12 percent.

17     90. Despite Apple's decision to sell Audio Downloads unencumbered by FairPlay on

18   a going-forward basis, the impact of Apple's prior conduct did not end. The billions of songs

19   already downloaded by consumers remain locked by FairPlay and cannot be unlocked except by

20   substantial payment to Apple.

21          **GOVERNMENT INVESTIGATIONS**

22     91. Apple's restrictive use of DRM has been the focus of investigation and activity by

23   competition authorities throughout Europe.  In June 2006, the consumer protection enforcement

24   entities of Norway, Sweden and Denmark, later joined by Germany and France, filed a complaint

25   against Apple regarding the restrictions placed on iTS audio downloads.  Among other things,

26   the countries pursued the consumer's right to play music on any device.

27

28

AMENDED COMPLAINT – No. C 07-6507 JW        - 19 -

1      92.     The New York Times recently reported that the United States Justice Department

2   was examining Apple's tactics in the market for digital music.  "The antitrust inquiry is in the

3   early stages . . . and the conversations have revolved broadly around the dynamics of selling

4   music online."  Brad Stone, "Apple Is Said To Face Inquiry About Online Music," *New York

5   Times*, May 25, 2010.

6                              **ANTITRUST INJURY TO CONSUMERS**

7      93.     Through the unlawful acts and practices described above, Apple has harmed

8   competition and innovation by forcing out competitors in the relevant product markets and

9   harmed consumers by causing them to buy Apple downloads and media players when they

10  otherwise would have been able to purchase competitors' products. Those practices, described

11  herein, have also allowed Apple to obtain and maintain illegal monopolies in the relevant

12  product markets.

13     94.     Apple engaged in willful anticompetitive conduct to maintain its monopolies in

14  the Audio Download Market and Portable Digital Media Player Market, through the use of

15  software updates intended to prevent competitors from selling Audio Downloads that were

16  compatible with iPods as well as other devices.  As a result of this conduct and the technological

17  link created by FairPlay, Apple was able to preserve its monopoly in both markets and restrict

18  consumer choices.

19     95.     Apple deterred consumers from buying Audio Downloads from its competitors'

20  music stores, in order to maintain its monopoly in the Audio Download Market, further exclude

21  competing Portable Digital Media Players from the market, and lock consumers into iPod and

22  iTunes.

23     96.     Defendant's maintenance of Fairplay protection on billions of iTS downloads,

24  even while it now sells the same tracks without such protection, continues to restrict consumer

25  choice and free competition.  Customers are faced with the choice of paying substantial amounts

26  of money, in the hundreds and even thousands of dollars, to "free" their libraries, or purchasing

27  an Apple product to play their purchases.

28

AMENDED COMPLAINT – No. C 07-6507 JW                                                    - 20 -

1       97.    The amounts that Apple has been able to collect for unlocking its customers'

2 previous purchases constitutes antitrust injury to consumers, resulting from Apple's

3 anticompetitive behavior.

4       98.    Consumers have been further injured because competitors such as Dell, Olympus,

5 and Rio were forced to withdraw from the Portable Digital Media Player Market. These

6 companies had little choice but to give up and exit the market because Apple's anticompetitive

7 conduct excluded them from reaching the majority of their potential customers, no matter

8 whether these products were cheaper, lighter, had better battery life, or offered functions that the

9 iPod did not have.  Even as a greater variety of competitors' devices are now capable of playing

10 audio downloads, consumers must continue to purchase Apple devices to play their "captive"

11 libraries, or pay a substantial fee to obtain DRM-free tracks.  There can be no free and fair

12 competition in the Audio Download and Portable Digital Media Player Market as long as Apple

13 continues to foreclose its competitors from reaching these customers.

14       99.    Moreover, through the use of "software updates" that prevent interoperability

15 between Audio Downloads purchased through the iTS and competing Portable Digital Media

16 Players, Apple has been able to discourage the purchase of competitors' products, allowing it to

17 monopolize the Portable Digital Player Market, charge higher prices for products with less

18 functionality, and restrict consumer choice.

19      100.    Even if the Plaintiffs in the related case, brought on behalf of direct purchasers of

20 iPods, prevail in their entirety, the antitrust injury set forth herein will continue:  consumers will

21 continue to sustain injury in the form of restricted choices and restricted ability to play their iTS

22 purchases.

23      101.    In addition, through affirmative and covert acts to limit the interoperability of the

24 iPod, Apple has impaired the uses, usefulness and value of  iPods purchased by Indirect

25 Purchasers, without the purchasers' consent.  As a result, iPods were less valuable to Plaintiff

26 and the Class, because they were unable to download music tracks that would have been

27 available from competitors at lower prices.

28

102.    Apple's anticompetitive conduct has deterred the development of competing products, damaging consumers by depriving them of a choice of products with potentially different and innovative features, or at a lower cost.

103.    Plaintiff and the Class have been injured by this anticompetitive conduct. As a direct result of Apple's anticompetitive use of software updates, Plaintiff and members of the Class were restricted in their ability to choose competitors' products.  The relief Plaintiff seeks will remedy the antitrust injury Defendant has inflicted, and open these markets to free competition.

## COUNT I:  MONOPOLIZATION

### (Injunctive Relief and Restitution For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)

### Violations Resulting from the Unlawful Maintenance of Monopoly Power in the Audio Download Market

104.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the iTS Class.

105.    Apple has monopoly power in the Audio Download Market.

106.    Through Apple's anticompetitive use of software updates described herein, Apple has willfully maintained monopoly power in the Audio Download Market. This conduct has harmed competition in that market, making the supply and selection of products available lower in the Audio Download Market than they would be in a competitive market. The number and effectiveness of competitors have also been diminished by Apple's unlawful conduct.

107.    This conduct has cause injury to all buyers of DRM-encoded Audio Downloads from Apple.  iTS purchasers suffer continuing harm in that they cannot use non-Apple devices to play their iTS downloads encumbered with Fairplay DRM.  In addition, Apple continues to restrict the number of authorized computers on which iTS Audio Downloads can be played, and it restricts the number of times a FairPlay-encrypted track on a playlist can be copied to a CD. Apple demands payment to obtain DRM-free music that is a sizable percentage of the original

1    purchase price, thus restricting customers from choosing its competitors' Portable Digital Media

2    Players.

3       108.    There is no appropriate or legitimate business justification for the actions and

4    conduct that have facilitated Apple's monopolization of the Audio Download Market.

5       109.    The anticompetitive conduct described herein has damaged Plaintiff and the

6    alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

7

8

**Violations Resulting from the Unlawful Maintenance
of Monopoly Power in the Portable Digital Media Player Market**

9       110.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth

10    above, on behalf of the iTS Class.

11       111.    Apple has monopoly power in the Portable Digital Player Market.

12       112.    Through the anticompetitive use of software updates described herein, Apple has

13    willfully maintained its monopoly of the Portable Digital Media Player Market. The supply and

14    selection of products available was lower than it would have been in a competitive market,

15    innovation was stifled, and the number and effectiveness of competitors were diminished.

16       113.    As a result of this anticompetitive behavior, iTS purchasers are restricted in their

17    ability to play their files, and they are restricted in their choices of Portable Digital Media

18    Players.

19       114.    There is no appropriate or legitimate business justification for the actions and

20    conduct which have facilitated Apple's continuing monopolization of the Portable Digital Media

21    Player Market.

22       115.    The anticompetitive conduct described herein has damaged Plaintiff and the

23    alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

24

25

26

27

28

**COUNT II:  ATTEMPTED MONOPOLIZATION**

**(Injunctive Relief and Restitution For Violation of
Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)**

**Violations Resulting from the Unlawful Attempted Monopolization
of the Audio Download Market**

116.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the iTS Class.

117.    Apple has acted with specific intent to monopolize the Audio Download Market, by issuing software updates intended to stifle competition and restrict consumer choice.

118.    There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Audio Download Market, because Apple controls a large percentage of that market, and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products. Further success in excluding competitors from the Audio Download Market will allow Apple to obtain an illegal monopoly over the Audio Download Market.

119.    This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market. Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Audio Download Market.

120.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Audio Download Market.

121.    The anticompetitive conduct described herein has damaged Plaintiff and the alleged Class, and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

**Violations Resulting from Unlawful Attempted Monopolization
of the Portable Digital Media Player Market**

122.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the iTS Class.

123.    Apple has acted with specific intent to monopolize the Portable Digital Media Player Market by using "software updates" to stifle competition and restrict consumer choice.

124.    There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Portable Digital Media Player Market because Apple controls a large percentage of that market and has the ability, and actually does, exclude its competitors through use of anticompetitive technological restrictions on its products. Further success in excluding competitors from the Portable Digital Media Player Market will allow Apple to obtain an illegal monopoly over the Portable Digital Media Player Market.

125.    iTS purchasers also have been harmed in that they cannot use non-Apple devices to play their iTS downloads.  If they wish to purchase another Portable Digital Media Player, either as an additional purchase, or as a replacement for a previous purchase, they either have to purchase an iPod, or pay Apple 30 cents per song, 30 percent of the current album price, and 60 cents per music video to obtain DRM-free versions of their iTS purchases

126.    This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market. Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Portable Digital Media Player Market and forced consumers to pay higher prices in the Portable Digital Media Player Market than they would in a competitive market.

127.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Portable Digital Media Player Market.

128.    Defendant should not be allowed to retain the funds it obtained through the charge it assessed for DRM-free audio downloads.

129.    The anticompetitive conduct described herein, if not halted and abated, will damage Plaintiff and the alleged Class, and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

## COUNT III:  MONOPOLIZATION

### (Damages For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)

130.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the Class.

131.    Apple has monopoly power in both the Portable Digital Player and Audio Download markets.

132.    Defendant took anticompetitive action against RealNetworks, with the express purpose of ensuring that only Audio Downloads from iTS would be playable on iPods, and not on its competitors' Portable Digital Media Players.  Defendant also made clear that it would take similar action to prevent anyone else who sold Audio Downloads from making them playable on iPods, in order to protect its monopoly in the Audio Download market.

133.    Real Networks made clear its intention to offer competition in the market for Audio Downloads that could be played on iPods, pricing its Audio Downloads at a significant discount to the prices charged by Apple.  Through its unjustified actions, Apple destroyed that competition.

134.    Plaintiff and the Class were and are customers in the markets that were restrained, and suffered antitrust injury as a result of Defendant's actions, in the form of the higher prices they paid for Audio Downloads from Apple than they would have paid in a competitive market.

135.    The anticompetitive conduct described herein has damaged Plaintiff and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

**COUNT IV:  MONOPOLIZATION**

**(Damages and Injunctive Relief For Violation of
Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)**

136.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the iPod Class.

137.    Apple has monopoly power in both the Portable Digital Player and Audio Download markets.

138.    Defendant took anticompetitive action against RealNetworks, the Hymn Project, and John Lech Johansen, and others, with the purpose of restricting the interoperability of iTunes, iTS and iPods, restraining competition, and further entrenching its monopoly, in the market for Audio Downloads and Portable Digital Media Players.

139.    Plaintiff and the Class were and are customers in the markets that were restrained, and suffered antitrust injury as a result of Defendant's actions.

140.    With these actions and statements, Apple has made clear to all actual and potential competitors that it would take prompt and aggressive action to thwart interoperability between iTS and non-Apple players, and between non-Apple music stores and the iPod.

141.    Apple's anticompetitive actions included efforts it made to degrade the capability of the iPods of Plaintiff and the Class to play competitors' downloads.  Apple made significant changes to products that Plaintiff and the Class rightfully owned, without their informed consent. These changes restricted the iPod's capability, and lessened its uses, usefulness and value to Plaintiff and the Class.

142.    The anticompetitive conduct described herein has damaged Plaintiff and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

**COUNT V**

**(For Violation of California Unfair Competition Law,
Bus. & Prof. Code § 17200 *et seq.*)**

143.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the iTS Class.

144.    The conduct alleged herein constitutes unlawful and unfair business acts and practices within the meaning of the California Unfair Competition Law, § 17200 *et seq.* of the California Business and Professions Code ("UCL").

145.    Plaintiff and class members have suffered injury in fact and lost money or property as a result of Apple's violations of law and wrongful conduct.  Such injuries and losses include, but are not limited to, Apple's continued efforts through Fairplay DRM to thwart consumers from freely using their Audio Downloads purchased from iTS, both on other Portable Digital Media Players and elsewhere, and its ability to charge supracompetitive prices for iTS downloads, after updating its iPod software to eliminate competition.

146.    Apple's actions are unlawful under the UCL because they violate, *inter alia*, the Sherman Antitrust Act.

147.    Apple's actions are unfair under the UCL because, in its pursuit of monopoly pricing, it has shut out competitors who *attempted* to enter the relevant product markets, thus preventing consumers from choosing which companies to do business with in the relevant product markets based on the merits of each company's products. Such conduct is immoral, unethical, oppressive and/or unscrupulous and causes injury to consumers. Moreover, there is no legitimate business justification for Apple's conduct, and any business justification adduced is outweighed by the harm Apple's conduct has caused to consumers and competitors.

148.    Accordingly, Apple has violated the UCL by engaging in unlawful and unfair business practices.

149.    As a result of this unlawful and unfair conduct, Apple has been unjustly enriched at the expense of Plaintiff, other members of the Class, and the general public.

150.    Plaintiff, on behalf of herself and members of the Class, seeks an order of this Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under Section 17200 *et seq.*

**COUNT VI**

**(For Violation of California Unfair Competition Law,
Bus. & Prof. Code § 17200 *et seq.*)**

151.    Plaintiff re-alleges and incorporates by reference each of the allegations, set forth above, on behalf of the iPod Class.

152.    The conduct alleged herein constitutes unlawful and unfair business acts and practices within the meaning of the California Unfair Competition Law, § 17200 *et seq.* of the California Business and Professions Code ("UCL").

153.    Plaintiff and class members have suffered injury in fact and lost money or property as a result of Apple's violations of law and wrongful conduct.  Such injuries and losses include, but are not limited to, the diminution of value of class members' iPods resulting from Apple's efforts to thwart its competitors from selling interoperable Audio Downloads, Apple's efforts to thwart consumers from playing Audio Downloads purchased from iTS on other Portable Digital Media Players, and/or being charged a 30% of the current album price or 30 cents per song to replace DRM-protected files with DRM-free files.

154.    Apple's deceptive "software updates" are malicious downloads that reduce the value of a consumer's iPod without warning.  Apple's actions are unlawful under the UCL because they violate, *inter alia*, the Sherman Antitrust Act, the Consumers Legal Remedies Act *and bec*ause Apple has monopolized the markets for Audio Downloads and Portable Digital Media Players in violation of California common law.

155.    Apple's actions are unfair under the UCL because, in its pursuit of monopoly pricing, it has shut out competitors who *attempted* to enter the relevant product markets, thus preventing consumers from choosing which companies to do business with in the relevant product markets based on the merits of each company's products. Such conduct is immoral, unethical, oppressive and/or unscrupulous and causes injury to consumers. Moreover, there is no legitimate business justification for Apple's conduct, and any business justification adduced is outweighed by the harm Apple's conduct has caused to consumers and competitors.

1    156.    Accordingly, Apple has violated the UCL by engaging in unlawful and unfair

2    business practices.

3    157.    As a result of this unlawful and unfair conduct, Apple has been unjustly enriched

4    at the expense of Plaintiff, other members of the Class, and the general public.

5    158.    Plaintiff, on behalf of herself and members of the Class, seeks an order of this

6    Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under §

7    17200 *et seq.*

8    **PRESERVATION OF CLAIMS FOR APPEAL**

9    159.    Plaintiff expressly incorporates by reference from the December 31, 2007

10   Complaint all allegations in support of:  Count I: Tying (for violation of Section 1 of the

11   Sherman Antitrust Act, 15 U.S.C. §1) under both a *per se* and rule of reason analysis. Plaintiffs

12   likewise incorporates Count II: Monopolization and Count III: Attempted Monopolization (for

13   violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2) and Count IV: (for violation

14   of the Cartwright Act, Cal. Bus. & Prof. Code §16270 *et seq.*) arising solely from the existence

15   of a technological tie between iTS and iPods prior to October 1, 2004.  Plaintiff also incorporates

16   allegations that she is entitled to damages pursuant to Federal Rule of Civil Procedure, Rule

17   23(b)(3), for the overcharge of the iPod, and on behalf of those similarly situated.  Plaintiff

18   further incorporates allegations that her allegations in both the December 31, 2007, and in this

19   Complaint, constitute out violations of California's Cartwright Act, Consumers Legal Remedies

20   Act, and common law monopolization, which related claims were dismissed by the Court in an

21   Order dated June 29, 2010 (Docket No. 99).  Plaintiff incorporates these allegations out of an

22   abundance of caution, solely for the purpose of preserving such claims for appeal. *See London v.*

23   *Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981) and *USS-POSCO Indus. v. Contra Costa*

24   *County Bldg. & Constr. Trades Council, AFL-CIO,* 31 F.3d 800, 812 (9th Cir. 1994).

25   **PRAYER FOR RELIEF**

26   WHEREFORE, Plaintiff, on behalf of herself and on behalf of the putative Class, prays

27   that the Court declare, adjudge and decree the following:

28

AMENDED COMPLAINT – No. C 07-6507 JW                                    - 30 -

A.      That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to the claims for injunctive relief and restitution, and pursuant to Rule 23(b)(3) with respect to the claims for compensatory damages and restitution, and declaring Plaintiff as representative of the Class and her counsel as counsel for the Class;

B.      That the conduct alleged herein constitutes unlawful monopolization and attempted monopolization in violation of Section 2 of the Sherman Antitrust Act;

C.      That the conduct alleged herein is in violation of the UCL and appropriate restitutionary relief be granted pursuant thereto;

D.      That Plaintiff and the Class are entitled to damages, penalties and other monetary relief provided by applicable law, including treble damages;

E.      That Plaintiff and the Class recover their expenses and costs of suit, including attorneys' fees, and reasonable pre-and post-judgment interest; and

F.      That Plaintiff and the Class are granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury on all issues so triable.

3

DATED:  July 9, 2010                                    ZELDES & HAEGGQUIST, LLP
                                                                        HELEN I. ZELDES

4                                                                       ALREEN HAEGGQUIST

5                                                                       /s/ Alreen Haeggquist

6

625 Broadway, Suite 906
San Diego, CA 92101

7

Telephone:  619/342-8000
Facsimile:  619/342-7878

8

alreenh@zhlaw.com
helenz@zhlaw.com

9

MEHRI & SKALET, PLLC

10

STEVEN A. SKALET
CRAIG L. BRISKIN

11

1250 Connecticut Ave. NW, Suite 300
Washington, DC 20036

12

Telephone:  202/822-5100
Facsimile:  202/822-4997

13

sskalet@findjustice.com
cbriskin@findjustice.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on July 9, 2010, I electronically filed the foregoing with the Clerk of

3   the Court using the CM/ECF system, which will send notification of such filing to the e-mail

4   addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5   mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6   participants indicated on the attached Manual Notice List.

7        I certify under penalty of perjury under the laws of the United States that the foregoing is

8   true and correct.  Executed on July 9, 2010.

9                                                  /s/ Alreen Haeggquist

10                                         ZELDES & HAEGGQUIST, LLP
                                          HELEN I. ZELDES
11                                        ALREEN HAEGGQUIST
                                          625 Broadway, Suite
12                                        San Diego, CA  92101
                                          Telephone:  619/342-8000
13                                        Fax:  619/342-7878

14                                        Email Addresses:   helenz@zhlaw.com
                                                            alreenh@zhlaw.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT – No. C 07-6507 JW                                    - 33 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com
- **Michael D Braun**
  service@braunlawgroup.com
- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com
- **Todd David Carpenter**
  tcarpenter@bffb.com,pjohnson@bffb.com,rcreech@bffb.com
- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com
- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com
- **Roy Arie Katriel**
  rak@katriellaw.com,rk618@aol.com
- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com
- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com
- **Thomas Robert Merrick**
  tmerrick@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com
- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com
- **Brian P Murray**
  bmurray@murrayfrank.com
- **Paula Michelle Roach**
  proach@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Elaine A. Ryan**
  eryan@bffb.com,pjohnson@bffb.com
- **Jacqueline Sailer**
  jsailer@murrayfrank.com
- **Michael Tedder Scott**
  michaelscott@jonesday.com,amhoward@jonesday.com
- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com
- **John J. Stoia , Jr**
  jstoia@rgrdlaw.com
- **Bonny E. Sweeney**
  bonnys@rgrdlaw.com,christinas@rgrdlaw.com,E_file_sd@rgrdlaw.com,proach@rgrdlaw.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)