Robert A. Mittelstaedt #60359
ramittelstaedt@jonesday.com
Craig E. Stewart #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
Michael Scott #255282
michaelscott@jonesday.com
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:    (415) 626-3939
Facsimile:    (415) 875-5700

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION** | Lead Case No. C 05-00037 JW (HRL) |
| | [CLASS ACTION] |
| _____ | **APPLE'S OPPOSITION TO RENEWED MOTION FOR CLASS CERTIFICATION** |
| This Document Relates To: | |
| ALL ACTIONS | Date:     April 18, 2011 |
| | Time:     9:00 a.m. |
| | Place:     Courtroom 8, 4th Floor |
| | **REDACTED PUBLIC VERSION** |

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.   Plaintiffs' Changing Allegations and Theory of Harm..................................3

    B.   Noll Report. ..........................................................................................4

    C.   Burtis Declaration. ...............................................................................6

ARGUMENT.......................................................................................................................7

II.   PLAINTIFFS FAIL TO DEMONSTRATE A CLASS-WIDE METHOD OF
     PROVING IMPACT AND DAMAGES. ..................................................................8

    A.   Plaintiffs Must Demonstrate That Impact To Each Class Member Can Be
        Established By Common Proof.................................................................8

    B.   Plaintiffs Have Failed To Carry Their Burden Of Showing A Class-Wide
        Method Of Proving Impact And Damages. .................................................9

        1.   Plaintiffs' new theory of impact requires isolating the updates' alleged
            impact on Harmony, and proving that the impact affected all iPods
            during the class period. ................................................................9

        2.   Dr. Noll's cursory report does not carry Plaintiffs' burden of showing
            that a class-wide method exists...................................................12

        3.   Plaintiffs do not contend that their remaining theories of harm can be
            proved on a common basis. .........................................................18

    C.   Plaintiffs Have Had Ample Opportunity to Make the Showing Required to
        Obtain Class Certification.....................................................................19

III.  PLAINTIFFS HAVE ALSO FAILED TO CARRY THEIR BURDEN TO SHOW
     THAT RESELLERS MAY PROPERLY BE INCLUDED IN THEIR CLASS. .................21

    A.   Plaintiffs Have Defaulted With Respect to Resellers. ..................................21

    B.   In Any Event, Resellers Are Not Situated Similarly to End-Users. ...............22

    C.   Plaintiffs Are Not Typical of the Resellers and Not Adequate Representatives. ........23

    D.   A Class Action Is Not The Superior Method for A Reseller Who Claims An
        Overcharge........................................................................................25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alabama v. Blue Bird Body Co., Inc.*,
   573 F.2d 309 (5th Cir. 1978) .............................................................................................8

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007)...............................................................................20, 24

*Am. Seed Co. v. Monsanto Ca.*,
   238 F.R.D. 394 (D. Del. 2006), *aff'd*, 271 Fed. Appx. 138 (3d Cir. 2008)..............................20

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003) .............................................................................................9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................................8

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) .............................................................................................9

*Butt v. Allegheny Pepsi-Cola Bottling Co.*,
   116 F.R.D. 486 (E.D. Va. 1987)........................................................................................20

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ...............................................................................................7

*Dukes v. Wal-Mart Stores, Inc.*,
   603 F.3d 571 (9th Cir.),
   *cert. granted*, 131 S. Ct. 795 (2010) .........................................................................7, 8, 19

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
   663 F.2d 253 (D.C. Cir. 1981)............................................................................................8

*In re Hydrogen Peroxide Antitrast Litig.*,
   552 F.3d 305 (3d Cir. 2008) .........................................................................................7, 20

*In re New Matar Vehicles Canadian Export Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008)...................................................................................................9

*Kline v. Coldwell, Banker & Co.*,
   508 F.2d 226 (9th Cir. 1974) .............................................................................................8

*Meijer v. Abbott Labs*,
   251 F.R.D. 431 (N.D. Cal. 2008)......................................................................................24

*Meijer v. Warner Chilcott Holdings Co. III, Ltd.*,
   246 F.R.D. 293 (D.D.C. 2007) .........................................................................................24

*Muller v. Curtis Publ'g Co.*,
   57 F.R.D. 532 (E.D. Pa. 1973)............................................................................................24

*Phillips v. Klassen*,
   502 F.2d 362 (D.C. Cir. 1974)...........................................................................................24

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 Fed. Appx. 296 (5th Cir. 2004)..................................................................................20

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ...............................................................................................8

*Sommers v. Abraham Lincoln Fed. Savs. & Loan Assoc.*,
   66 F.R.D. 581 (E.D. Pa. 1975)..........................................................................................24

*U.S. v. Ramm*,
   455 F.3d 990 (9th Cir. 2006) .............................................................................................22

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ........................................................................................24

*West v. Prudential Secs., Inc.*,
   282 F.3d 935 (7th Cir. 2002) ...............................................................................................8

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .............................................................................................7

### Other Authorities

7A C. Wright & A. Miller, *Federal Practice and Procedure* §1768 (3d. ed. 2010)......................24

Fed. R. Civ. P. 23 advisory committee's note, 2003 Amendments....................................................7

II P. Areeda, H. Hovenkamp & R. Blair, *Antitrust Law*, ¶ 331d, at 282 (2d ed. 2000)...................9

### Rules

Federal Rules of Civil Procedure
   Rule 23.........................................................................................................................7
   Rule 23(b)(3) .............................................................................................................25

## INTRODUCTION

Plaintiffs have changed their theory of liability since this Court last considered class certification. They acknowledge that Apple lawfully obtained the alleged "monopolies" in this case, *i.e.*, the success of iPods and the iTunes Store. They also admit, as they must, that Apple's use of proprietary DRM was entirely lawful. Their case now rests solely on the new theory that Apple unlawfully maintained the alleged monopolies when its DRM improvements resulted in RealNetworks' music no longer playing on iPods.

The factual and legal deficiencies of Plaintiffs' new theory are set forth in Apple's pending renewed Rule 56 motion. From a class certification perspective, there are two principal problems. First, Plaintiffs fail to demonstrate that the impact or amount of damages caused by the inability to play RealNetworks' music on iPods can be shown on a class-wide basis. Their theory of impact and damages—that eliminating one of many sources of music for iPods would tend to increase iPod demand and prices—is counterintuitive and implausible. As Plaintiffs' expert admitted, if there were any effect all, it would be the opposite of Plaintiffs' damage theory, at least initially. Indeed, Plaintiffs do not even show that, in light of all the other sources of music for iPods (including CD collections, peer-to-peer sharing services and, eventually, DRM-free music from Amazon.com, WalMart.com and multiple other sources), iPod prices were affected in *any* way, up or down, by whether iPods could also play RealNetworks' music.

Plaintiffs theorize that, at some indeterminate point in the longer run, the inability of RealNetworks' music to play on iPods may have led iPod prices to increase. Their theory is that consumers who were unable to play RealNetworks' music on iPods would tend to buy music from Apple instead, which would make it less likely that they would switch to competing digital music players, thus preserving Apple's lawfully obtained market power and pricing levels. But Plaintiffs do not demonstrate that any class-wide method exists to discern whether the alleged longer-term impact ever occurred or, if so, when it occurred. Thus, they are unable to say *when* the class period should start, *i.e.*, when, under their theory, the DRM improvements' initial effect of benefiting consumers by means of lower iPod prices turned into the longer term effect of harming them by raising prices. Nor do Plaintiffs show any class-wide method of determining

the amount by which iPods were allegedly overpriced as a result of DRM improvements. And their alternative theories of harm—including alleged reduced innovation and higher prices paid for competing players—could only be proved on an individual basis, assuming they are cognizable at all.

Their expert, Roger Noll, largely recycles his earlier declaration submitted before Plaintiffs changed their theory. He does not explain how any of the "available" methods he describes will determine which, if any, iPod purchasers were overcharged under Plaintiffs' new theory. In particular, although he says he will measure the alleged impact by reference to purported "competitive benchmarks," he does not identify any benchmark that is even remotely similar to the alleged but-for world posited by Plaintiffs' new theory. And, even though this case has been pending for over five years and fact discovery is now complete, he has not attempted to gather the third-party data he says would be necessary to conduct his proposed analysis. Nor has he attempted to actually employ any of his proposed analyses here, and thus cannot opine that any of them will actually work. For all of these reasons, Plaintiffs' motion for class certification should be denied.

The second problem with class certification is that, even if Plaintiffs could make the requisite showing to certify a class of end-user consumers like themselves, the resellers like Best Buy and Target are situated so differently that they should not be included in the class. Unlike their 2008 motion, Plaintiffs' renewed motion does not expressly argue that resellers should be included in the consumer class they seek to represent. Indeed, some of their arguments apply only to end-users. They argue, for example (Mot. at 23) that the "modest amount at stake for individual plaintiffs" makes class treatment the only chance for recovery. That argument has no application to resellers because they bought ███████████ iPods, and the amounts at stake would be anything but "modest."

If, as their expert report suggests, Plaintiffs are silently seeking to represent not just consumers but also resellers, they have defaulted in presenting any argument as to why a reseller class would satisfy the requirements of Rule 23. In fact, resellers are not situated similarly to end-user consumers. ██████████████████████████████ Moreover,

as resellers, they have a different incentive than consumers when it comes to pricing. For resellers, the higher the retail price, the greater their profit. The consumers' interests, at least as advanced in this case, are the opposite. And Plaintiffs' expert acknowledges that he would need to use different methods to prove impact and damages for resellers. Thus, the end-user Plaintiffs are not adequate representatives for these differently-situated resellers.

Moreover, given the huge volume of their purchases, if any resellers want to pursue a claim that they were overcharged, a class action is not a necessary, much less "superior," method to do so.

Thus, even if Plaintiffs are seeking to include resellers without saying so and even if their silence is not taken as a waiver, they have failed to show that the Rule 23 requirements are met for resellers.

## BACKGROUND

### A.  Plaintiffs' Changing Allegations and Theory of Harm.

Plaintiffs' original theory was that Apple's use of a proprietary DRM—FairPlay—rather than Microsoft's DRM and its refusal to license FairPlay to competitors violated Section 2 of the Sherman Act. This Court rejected that theory. The Court held that it was lawful for Apple to adopt its own DRM, even if the result was to make Apple's products incompatible with competitors' products. Doc. 274, p. 10 ("'[T]he introduction of technologically-related products, even if incompatible with the products offered by competitors, is alone neither a predatory nor anticompetitive act.'") (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir. 1983)). As a result of the Court's rulings, Plaintiffs acknowledge that the initial success of iTS (which they erroneously call a monopoly) was lawful "because Apple was the first legal download service to offer a comprehensive library of music." Mot. at 7.[1] Plaintiffs also

---

[1]  When launched in April 2003, Apple's store was called the iTunes Music Store. Its name was later changed to the iTunes Store, and this brief refers to it as iTS.

concede that the iPod's success (which they again erroneously call a monopoly) was the result of lawful conduct. Plaintiffs attribute the success of iPods simply to the convenience of use with iTS. They ignore all the other reasons for the iPod's stand-alone success, including its path-breaking technology, innovative design and ease of use.

Plaintiffs now advance a new and different theory. They allege that Apple used its DRM software improvements and updates to exclude RealNetworks and maintain its lawfully obtained "monopoly power." Doc. 322, ¶ 52. Plaintiffs contend that Apple's first exclusionary act was in October 2004 when Apple updated its iPod and iTunes DRM software, which had the effect of preventing songs downloaded from RealNetworks' store from playing on iPods. *Id.* ¶ 60.[2]

Because their theory of anticompetitive conduct is now different, Plaintiffs' theory of harm is also different. Their previous theory was that iPod prices were higher than what they would have been if Apple had never used a proprietary DRM. Their expert proposed to measure that alleged overcharge by comparing Apple's prices to supposed "benchmark" prices for products or markets unaffected by proprietary DRM—such as sales of iPods before Apple began selling music with DRM or sales of other consumer electronics like televisions. Because Plaintiffs now concede that Apple's use of its own DRM was lawful—and that any resulting market power and effect on prices was therefore also lawful—their previous impact and damages theory does not work. Instead, Plaintiffs now try to show a price increase attributable to the software updates themselves, as distinct from any alleged effect on prices from the admittedly lawful use of DRM that would have continued to exist even absent the updates.

**B.    Noll Report.**

To try to carry their burden of demonstrating that they can show this alleged harm on a class-wide basis through common proof, Plaintiffs have proffered another declaration from Roger Noll. Doc. 479. They assert that he has "revised" his earlier declaration to take into account

---

[2] Plaintiffs' complaint also alleges that, in October 2005 and September 2006, Apple updated its software to block JHymn and other "similar software programs" that permitted iTS music to play on non-iPods. *Id.* ¶¶ 63-67. They do not rely on this allegation in their class certification motion, however, and their expert report states that Plaintiffs are no longer pursuing the allegation. Doc. 479, p. 9 n.6.

Plaintiffs' new theories. Mot. at 20. His report, however, is devoted largely to addressing matters not at issue in the present motion, such as market definition or the lawfulness of the software updates. He says little on the critical question of how he proposes to determine on a class-wide basis what, if any, overcharge resulted from the software updates. Where he does address that question, he undermines his assertion that any class-wide proof of injury is possible.

Dr. Noll admits that, if blocking Harmony had any impact, it would "initially" and for an indeterminate period of time undermine Plaintiffs' claim. Doc. 479, p. 54. As he explains, Harmony would, if anything, make iPods "more attractive to consumers" by offering yet another source of music downloads for iPods. *Id.* Thus, blocking Harmony would decrease the demand for and inferentially the price of iPods—just the opposite of Plaintiffs' theory.

Dr. Noll asserts that consumers nonetheless eventually may have been harmed because the supposed "long run effect" of Harmony remaining in operation would have been to "reduc[e] the extent to which iPod users were locked in to iTMS." *Id.* This long-run effect would occur, he asserts, because, if iPod users could make future purchases from Harmony rather than the iTS, they would be less encumbered by their iTS purchases when and if those users "decided to replace an old iPod sometime after October 2004." *Id.* at 58. Dr. Noll does not explain at what point this supposed "long-run effect" of reduced lock-in (which would supposedly result in lower prices) would outweigh the "initial" effect of making iPods more attractive by providing an additional source of music (which would increase demand for iPods). Nor does he explain how he will make that determination, even though it is critical to identifying which, if any, class members suffered any harm and when the alleged class period starts.

Dr. Noll's reduction-in-lock-in theory also assumes the existence of a large number of consumers who (1) have already purchased an iPod, (2) wish to buy an additional or replacement player from a competitor, even though they purchased initially from Apple, (3) are not already locked in by their existing iTS purchases, and (4) would have elected to buy from Harmony rather than iTS had Harmony remained in operation. Under Plaintiffs' theory, only consumers fitting each of these criteria could possibly have had their purchasing decision affected by the shutdown of Harmony.

Dr. Noll asserts that he will measure the overcharge using a "competitive benchmark," which he defines as the kind of market that, absent the challenged conduct, "would have been present during the historical period that damages occurred." *Id.* at 69. Under Plaintiffs' theory, this requires that he find a benchmark in which Apple had lawful market power but in which it faced competition from other stores selling DRM-protected music that could play on iPods. As in his earlier declarations (offered before Plaintiffs changed their theory), he claims that the "period before the launch of iTMS" can serve as such a "competitive benchmark." *Id.* at 15. He does not explain how this period, in which he admits Apple had no market power, can show what prices should have been years later in a period in which, under Plaintiffs' own theory, Apple would have had lawful market power even absent the challenged updates.

In addition to the alleged iPod price increase, Dr. Noll and Plaintiffs advance several other theories of supposed harm to consumers. They assert that the updates resulted in (1) a "dead-weight . . . loss of welfare" from a reduction in output, (2) higher prices for competing digital players, (3) extra costs for consumers with iTS music who wished to purchase a competing player, and (4) reduced technological innovation. *Id.* at 64-65. Dr. Noll does not state how he would go about proving that these "harms" existed or that they could be shown by common proof to have been suffered by the class as a whole.

### C. Burtis Declaration.

Apple submits with this memorandum a declaration from Michelle Burtis, which sets out the reasons why Dr. Noll's proposed methods will not work. Dr. Burtis is the economist on whom the Court relied in denying the indirect purchaser's motion for class certification. *Somers* Doc. 80, pp. 10-12. As discussed in more detail below, Dr. Burtis demonstrates that Dr. Noll has not identified any viable benchmark against which any overcharge attributable to Apple's software updates could be measured. This failure is fatal to Dr. Noll's proposed methods, each of which depends on the existence of a product or market that shares the characteristics of the relevant market that Plaintiffs assert would have existed in the but-for world—*i.e.*, the world that they claim would have existed absent the challenged updates. Dr. Burtis also demonstrates that Dr. Noll has not shown that he can control for the numerous variables that affected iPod pricing

1   during the relevant period or that he can obtain the data necessary to carry out his proposed
2   methods. Instead, Dr. Noll merely repeats the same generic assertions he made over two years
3   ago when he filed his first declarations. Even if Dr. Noll's report was sufficient at that earlier
4   stage of the litigation, it is not sufficient now, after the Plaintiffs have changed their theory of
5   liability and harm, and now that fact discovery is complete.

6   ## ARGUMENT

7   Plaintiffs bear the burden of demonstrating that class certification is proper. *Zinser v.*
8   *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). "[D]istrict courts are not only
9   at liberty to, but must, perform a rigorous analysis to ensure that the prerequisites of Rule 23(a)
10  have been satisfied." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 594, 602-03 (9th Cir.), *cert.*
11  *granted*, 131 S. Ct. 795 (2010). Plaintiffs must adduce evidence that the manner in which the
12  case "would actually be tried" satisfies Rule 23. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745
13  (5th Cir. 1996); Fed. R. Civ. P. 23 advisory committee's note, 2003 Amendments ("A critical
14  need is to determine how the case will be tried.").

15  District courts "must make determinations that the requirements of Rule 23 have been
16  met" even when doing so "require[s] examining issues that overlap with the merits." *Dukes*, 603
17  F.3d at 587-88. The court is not bound by a plaintiff's allegations that class certification is proper.
18  "[C]ommon questions cannot simply arise from artful pleading. . . . [W]hether the suit is
19  appropriate for class resolution must be actually demonstrated, not just alleged, to the district
20  court's satisfaction." *Id.* at 590.

21  Plaintiffs assert (Mot. at 2-3) that doubts should be resolved in favor of class certification.
22  The Ninth Circuit, however, has not endorsed this notion, and other courts have rejected it. *In re*
23  *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008) (district courts must "not
24  suppress 'doubt' as to whether a Rule 23 requirement is met"). Rule 23 "reject[s] tentative
25  decisions on certification and encourage[s] development of a record sufficient for informed
26  analysis." *Id.* (citing Fed. R. Civ. P. 23 advisory committee's note, 2003 Amendments ("A court
27  that is not satisfied that the requirements of Rule 23 have been met should refuse certification
28  until they have been met.")). Nor does any presumption exist in favor of class certification in

1  antitrust cases. To the contrary, given their magnitude, antitrust class actions are prime

2  opportunities for abuse. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007).

3  It is not enough that Plaintiffs offer an expert opinion asserting that a class-wide method

4  exists. Rather, when faced with competing expert testimony, the testimony must be compared

5  and weighed. "Resolving expert disputes in order to determine whether a class certification

6  requirement has been met is always a task for the court—no matter whether a dispute might

7  appear to implicate the 'credibility' of one or more experts[.]" *In re Hydrogen Peroxide Antitrust*

8  *Litig.*, 552 F.3d 305, 324-25 (3d Cir. 2009). As the Ninth Circuit put it in *Dukes*, the expert must

9  present "properly-analyzed, scientifically reliable evidence tending to show that a common

10  question of fact . . . exists with respect to all members of the class." 603 F.3d at 602-03. A

11  plaintiff may not "obtain class certification just by hiring a competent expert." *West v. Prudential*

12  *Secs., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002).

13  **II.**    **PLAINTIFFS FAIL TO DEMONSTRATE A CLASS-WIDE METHOD OF**

14         **PROVING IMPACT AND DAMAGES.**

15         **A.**    **Plaintiffs Must Demonstrate That Impact To Each Class Member Can Be**

16              **Established By Common Proof.**

17         "Proof of injury is an essential substantive element" of an antitrust claim. *Kline v.*

18  *Coldwell, Banker & Co.*, 508 F.2d 226, 233 (9th Cir. 1974); *Rebel Oil Co. v. Atl. Richfield Co.*,

19  51 F.3d 1421, 1433 (9th Cir. 1995) ("causal antitrust injury[] is an element of all antitrust suits").

20         This is a matter not simply of calculating damages. The issue instead is whether

21  consumers were injured at all—an essential element of antitrust liability. Injury (also referred to

22  as impact or fact of damage) "must be proved with certainty." *Alabama v. Blue Bird Body Co.*,

23  *Inc.*, 573 F.2d 309, 327 (5th Cir. 1978); *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663

24  F.2d 253, 268 (D.C. Cir. 1981).

25         This requirement is not diminished in a class action. "[T]he fact that a case is proceeding

26  as a class action does not in any way alter the substantive proof required to prove up a claim for

27  relief . . . . [E]ach plaintiff must still prove [that the antitrust violation] did in fact cause him

28  injury." *Blue Bird*, 573 F.2d at 327; *In re New Motor Vehicles Canadian Export Antitrust Litig.*,

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

522 F.3d 6, 28 (1st Cir. 2008) (plaintiffs must present evidence "that each member of the class was in fact injured"). "[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003); *Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir. 2005) (affirming denial of class certification where plaintiffs' expert "did not show that injury could be proven on a classwide basis with common proof"). As the leading antitrust treatise recognizes:

> [T]he fact that some class members have not been damaged at all generally defeats certification, because the fact of injury, or "impact" must be established by common proof.

II P. Areeda, H. Hovenkamp & R. Blair, *Antitrust Law*, ¶ 331d, at 282 (2d ed. 2000).

### B. Plaintiffs Have Failed To Carry Their Burden Of Showing A Class-Wide Method Of Proving Impact And Damages.

#### 1. Plaintiffs' new theory of impact requires isolating the updates' alleged impact on Harmony, and proving that the impact affected all iPods during the class period.

As discussed above, Plaintiffs' claim is now fundamentally different from when the Court last considered class certification. Because they concede the lawfulness of the alleged monopoly power as of the October 2004 start of the class period, Plaintiffs can no longer assert that injury may be determined by comparing the actual market to a market unaffected by a proprietary DRM. Instead, they now must find a way to isolate the effect of the software updates, as distinct from the underlying use of FairPlay, and show when it occurred, if ever. And that method of proof must demonstrate that all iPod purchasers during the class period were affected on a common basis, without the need for individual evidence. Several significant hurdles make this task impossible:

*First*, Plaintiffs must address their own expert's admission that eliminating a source of music for iPods (the effect of blocking Harmony) would be expected to *decrease* demand for iPods, not increase it. They attempt to do so by theorizing that this effect would eventually be offset because Harmony would have reduced the number of people locked in by their iTS

purchases and those consumers would have started buying competing players rather than iPods.

They do not assert that they have identified any actual customers who fall within that category.
***Certainly, the named Plaintiffs do not allege that they fit that description.*** None of them asserts
that they purchased or would have purchased music from Harmony and would have purchased a
competing player rather than an iPod if Harmony had remained in operation. Nor have they
presented any other evidence regarding the number or identity of any customers who would have
switched to Harmony.

Plaintiffs refer to the number of songs Harmony sold when it first began operation and ran
a half-price promotion for three weeks (Mot. at 7), as if to suggest that this is evidence that
Harmony would have reduced iPod prices.[1] They do not attempt to identify who those purchasers
were, however. Thus, there is no class-wide way to know whether (as Plaintiffs' theory requires)
they were consumers who later bought an iPod but who would have bought a competing player if
Harmony had continued in business—or whether they were instead consumers who simply took
advantage of Harmony's artificially low introductory price and had no interest in replacing their
iPod with a competing player. Nor is there any class-wide way to know whether the Harmony
purchasers already had a large iTS library (or continued to also purchase from iTS because of its
better selection and ease of use) and thus would have continued to be "locked in" under Plaintiffs'
theory notwithstanding their Harmony purchases. Moreover, even those customers who did not
have large iTS libraries and who began purchasing from RealNetworks would have had an
incentive to continue purchasing iPods because only iPods would play both RealNetworks music
and iTS music. Under Plaintiffs' theory, buying a competing player would preclude them from

---

[1]  RealNetworks' sale began on August 17, 2004 and lasted only until September 9, 2004.
RealNetworks announced at the time time that it lost money on each song sold at the sale price.
Cnet News, "Real curtails half-price music sale," Sept. 9, 2004, available at
http://news.cnet.com/Real-curtails-half-price-music-sale/2100-1027_3-5357461.html; New York
Times, "Technology; RealNetworks Plans to Sell Digital Music at Half Price," Aug. 16, 2004,
available at http://www.nytimes.com/2004/08/17/business/technology-realnetworks-plans-to-sell-digital-music-at-half-price.html.

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

ever buying from iTS, with its much larger selection of music and other content like movies and television.

**Second,** assuming that the ultimate effect of Harmony, if it had continued to operate, would have been to decrease demand for iPods, that effect would occur only at some indefinite later time as customers begin purchasing new players and when the mix of their music purchases reached the point where Plaintiffs would say they were no longer locked in. Accordingly, Plaintiffs must devise some method to identify when, if ever, the effect of Harmony switched from increasing demand for iPods to decreasing it. Without that, there is no way of knowing which class members might have suffered any injury and which could not have been injured (or might even have benefited under Plaintiffs' theory). For that reason, there is no way of knowing when the class period should start under Plaintiffs' theory.

**Third,** Plaintiffs must identify an appropriate benchmark against which to measure the alleged effect of the software updates. Unlike before, Plaintiffs cannot now rely simply on a "before" or an "after" period in which music was sold without DRM. This Court has now ruled that Apple's adoption and use of its own DRM was lawful, and Apple continued to be contractually required to use DRM for the labels' music. Doc. 274, p. 10. Thus, even if Harmony would have remained in operation, Apple would have continued to lawfully sell music with DRM and consumers with large iTS libraries would have continued to possess those libraries. Under Plaintiffs' theory, those customers would have continued to be locked in. A benchmark time period or product that does not account for the lawful existence of DRM—and whatever effect that DRM has on the market—will not provide valid results.

**Fourth,** Dr. Noll admits that "several events other than Apple's alleged anticompetitive conduct plausibly influenced" iPod prices during the relevant time period. Doc. 479, p. 73. Thus, to constitute a valid common measure of any harm, Plaintiffs' proof must isolate the alleged effect of the software updates from the numerous other factors that may have affected iPod pricing during the alleged damage period or during the time periods Dr. Noll proposes to use as benchmarks. These factors (only some of which Dr. Noll acknowledges) include:

- The iTS was launched in April 2003, resulting in a lawful increase in demand for iPods arising from a new legal source of digital downloads.

- In October 2003, the iTunes Store became available to Windows users for the first time, thus dramatically increasing the demand for iPods by expanding the number of potential iTS customers from just Apple computer owners to essentially all computer owners.

- Throughout the relevant period, Apple regularly introduced (at consistently lower prices) new and dramatically improved iPod models, with greater capacity, smaller sizes, longer battery life, and new features, such as color screens, video capability, touch screens, wi-fi capability and ability to run hundreds of thousands of apps. This constant product innovation and decreasing prices is the antithesis of the monopoly market that plaintiffs hypothesize.

- The number and features of devices competing with iPods likewise changed regularly throughout the relevant period.

- Beginning in April 2007, the record labels began allowing their music to be sold online without DRM protection, with all of the principal online stores other than Apple selling DRM-free by March 2008 and Apple being allowed by the labels to sell DRM-free by April 2009.

- Apple did not change its prices whenever it experienced any fluctuations in demand or costs of supplies, whether increases or decreases.

As shown by Dr. Burtis, all of these factors make it impossible for Dr. Noll or anyone else to divine from the price of, say, the original white iPod in 2002 what the price should have been in 2008 for the iPod shuffle, which cost only $79, has no screen, and is roughly the size of a Post-It tag.

### 2. Dr. Noll's cursory report does not carry Plaintiffs' burden of showing that a class-wide method exists.

Plaintiffs do not address any of these issues in their motion. They instead mostly just recite in boilerplate fashion the various class certification requirements and assert that they are met. They acknowledge that proving antitrust impact on a class-wide basis is often the critical

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

1    issue in whether class treatment is proper. Mot. at 19. But they address that issue only in passing,

2    stating that their expert has "confirmed" that impact and damages can be resolved on a common

3    basis here using "recognized methodologies" and "economic evidence." *Id.* at 20-21.

4         Dr. Noll's report, however, is also devoid of answers to the issues described above. Like

5    Plaintiffs' motion, the report mostly just recites Plaintiffs' allegations and addresses issues such

6    as relevant market definition that are not at issue in this motion. On the critical questions of

7    proving impact and damages on a common basis for all iPod purchasers, Dr. Noll asserts only that

8    certain methods are "available"—the "before-after," "yardstick," and "mark-up" methods. Doc.

9    479, pp. 72-84. He describes these methods in generic fashion and admits that there are "compli-

10   cating factors" to using them in this case. But he does not describe all of the complicating factors

11   and does not explain how he will overcome those he does identify. *Id.* at 73. He has not actually

12   employed any of his proposed methods in this case—and thus has he has no concrete basis for

13   opining that any of them will actually work.

14        Dr. Noll's proposed methods are in fact not adequate to show class-wide injury on a

15   common basis. At the threshold, Dr. Noll's report offers no explanation as to how he will

16   determine when the alleged long-run effect of blocking Harmony would have occurred. Burtis

17   Decl. ¶¶ 19-26. Thus, he has not shown that he will be able to identify which class members, if

18   any, were impacted and which were not. By itself, this renders Dr. Noll's proposed methods

19   insufficient to support class certification.

20        The specific and additional defects in each of Dr. Noll's proposed methods are discussed

21   in the following paragraphs and detailed in the accompanying declaration of Michelle Burtis.

22        ***Before-after***

23        Dr. Noll focuses mostly on the "before-after" method, which he describes as measuring

24   damages by comparing the prices of the product at issue during the damage period with the price

25   for the same product either before or after the damage period. *Id.* at 72. But his report is not

26   clear as to what before or after period he proposes to use. With respect to a before period, he

27   suggests he may use the period before the iTS launch in April 2003. *Id.* at 15. But, as discussed

28   above, this period does not represent the "but for" world because it does not reflect the lawful

impact Plaintiffs assert exists from Apple's sale of music encoded with FairPlay. *See* Burtis Decl. ¶¶ 31-33. The necessary predicate of Plaintiffs' claim is that, even before the software updates beginning in October 2004, customers were locked into buying iPods by their purchases of iTS music, which raised the demand for and prices of iPods. Plaintiffs admit that, until the updates began, this alleged price effect was lawful. To determine the damages, if any, from the updates, Plaintiffs must therefore use a benchmark period that accounts for this lawful price effect. The period before Apple sold any music at all from iTS, and thus in which no customer could even arguably have been locked in, is not such a period. Dr. Noll does not address this issue, let alone explain how he will overcome it.

Importantly, Dr. Noll does not assert that the period from July 2004 until October 2004 in which Harmony was selling music is a permissible "before" period. As discussed, Dr. Noll himself recognizes that, if Harmony had any effect on iPod sales, it would at least initially have been to increase demand for iPods by providing another source of music for iPod users. He presumably also recognizes that any effect from Harmony would likely have been skewed by Harmony's introductory 49 cent per song price. As Dr. Noll admits, Harmony discontinued that price three weeks after it was launched. Doc. 479, p. 54 n.65. But whatever his reason for not proposing the July-October period as a benchmark, his recognition that the time period in which Harmony was actually in operation is not a valid "before" period is strong evidence that no valid "before" period exists at all.

Dr. Noll also states that impact sometimes may be determined by reference to prices in the period "after" the alleged anticompetitive conduct has ceased. But he does not appear to propose actually doing so here. Instead, he states that the alleged price effect here was not likely to disappear even after the labels permitted Apple and the other stores to sell music without DRM because, under Plaintiffs' theory, iPod users would still be locked in by their prior iTS purchases. He asserts that the "after" period was thus likely to "exhibit a slow price transition to the new price regime." *Id.* at 73. He does not suggest that he has any method for overcoming that hurdle.

In any event, the "after" period would not be a valid benchmark because Plaintiffs' but-for world is not one in which Apple or all of its major competitors were selling DRM-free music.

Instead, it is a world in which the labels were still demanding use of DRM with only one of Apple's competitors (RealNetworks) selling DRM music that could be played on iPods as well as other players. Burtis Decl. ¶ 34. Dr. Noll does not suggest that any period exists—either before or after the alleged damage period here—that reflected those circumstances.

Dr. Noll's "before-after" approach is also invalid because he has not demonstrated that he can control for all of the technological and other market changes that were occurring throughout the relevant period and that would be expected to affect iPod pricing. As discussed above, Dr. Noll acknowledges that these changes were occurring. He further acknowledges that any determination of injury and damages "must take into account" such changes. Doc. 479, p. 77. Dr. Noll must, for example, explain how the price that Apple charged in 2002 for the original 5 GB iPod has any relevance to the but-for price for a 32 GB iPod touch sold in 2007 with a multi-touch screen, video and photo capability, wi-fi capability and the ability to run thousands of apps. But Dr. Noll offers no such explanation. He says that his model would include measures of "the technical features of a product in each damage period." *Id.* at 78. But he does not describe how he proposes to measure the effect on demand or price of the kinds of innovations Apple was introducing. Each was a pioneering advance by Apple for a new, unique and constantly evolving set of products. It cannot simply be assumed, without any investigation or factual showing, that they can be quantified, measured and accounted for in a valid damages analysis.

Nor does Dr. Noll address how he will account for Apple's pricing strategy. Burtis Decl. ¶ 35. He acknowledges that Apple changes prices only infrequently, but he asserts that sufficient price variation exists "among the many versions of each class of iPod" for him to run his models. *Id.* at 76. Pointing to different prices for different iPod models, however, does not address the problem posed by Apple's infrequent price changes, which mean that Apple pricing did not necessarily reflect fluctuations in demand resulting from such things as sales from a single competing online store.

███████████████████████████████████████████████████
███████████████████████████████████████████

### *Yardstick*

Dr. Noll describes the yardstick method as estimating impact by reference to "the prices of other products that are subject to similar underlying market forces." Doc. 479, p. 79. According to Dr. Noll, "this method depends on identifying other consumer products that have similar technical capabilities . . . and that plausibly have a market structure that is similar to the market structure for portable digital players that would have arisen in the but for world." *Id.* at 80.

This approach suffers the same fundamental flaw discussed above. Even if Dr. Noll could identify a product with similar technical capabilities to the revolutionary iPod, he offers no basis to believe that any such product would have been sold in a market even remotely comparable to the but-for world Plaintiffs hypothesize here—*i.e.*, a world in which a large number of purchasers are allegedly lawfully locked in to purchasing only iPods but in which that alleged lock-in is being slowly eroded by a competitor's sales. By itself, this flaw prevents use of this method here. *See* Burtis Decl. ¶¶ 37-39.

Even putting this defect aside, Dr. Noll does not state that he has determined that any otherwise comparable products exist. He refers to "several products" that could "plausibly" be benchmarks for "at least part of the damage period." *Id.* at 80. But he does not opine that any of them—alone or in combination—could actually suffice for the entire period. And he offers no analysis to show that any of the products he lists—smart phones, personal digital assistants or portable CD/DVD players—could even "plausibly" be considered comparable in either technical capability or market forces to iPods. To the contrary, he laments the difficulty of conducting his proposed analysis because of the "complexity of the method for highly differentiated products like consumer electronics." *Id.* at 80-81.[2]

---

[2] With respect to retail purchasers, Dr. Noll says he might use competing digital music players selling at the competitive fringe (and thus unaffected by the alleged anticompetitive effect) as a yardstick. *Id.* at 81. But he offers no opinion that such competing players exist, stating that it is "possible" that they might. Moreover, he does not state he could use such products to actually measure any impact. Instead, he states only that they might provide a "lower bound estimate of (continued)

- 16 -

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

This absence of any analysis is particularly inexcusable given Dr. Noll's admission, when he was deposed over two years ago in September 2008, that he was not sure that any products with the requisite similarity to iPod exist. Kiernan Decl. Ex. 3 at 72:2-9. Nor did he know then whether he could obtain the necessary price, cost and technical data about the candidate products to make his analysis work. *Id.* at 73:4-5. And at least with respect to determining alleged wholesale prices, he continues to admit that the need to obtain "extensive third-party discovery of prices, costs and technical features of comparable products," and then to do a "price analysis that isolates the relationship between cost and price," makes it unlikely that this method would actually be a cost-effective method for proving injury. Doc. 479, pp. 80-81. If Dr. Noll's yardstick method actually were a viable method for determining injury in this case, there is no reason why Dr. Noll could not have gathered the data and done the requisite analysis to confirm that in the more than two years since that deposition (or in the six months after the Court directed Plaintiffs in July 2010 to renew their class certification motion). Instead, he offers only an equivocal, qualified report that does not come close to satisfying Plaintiffs' burden.

### *Mark-up*

Dr. Noll's proposed mark-up is similarly flawed. He asserts that he will determine the overcharge by comparing the mark-up (*i.e.*, price above cost) on iPods to mark-ups on Apple's other product lines or on other consumer products. *Id.* at 82. As Dr. Noll acknowledges, like his other methods, this method depends on the markets for the comparative products being similar to the market for iPods in all material ways except for the challenged conduct. *Id.* at 17, 56. Again, however, Dr. Noll does not point to any such product—*i.e.*, a product as to which the seller possessed lawful market power from an alleged lock-in that was being eroded over time. Burtis Decl. ¶ 41.

As to competitors' products, Dr. Noll also does not present any viable mechanism for obtaining the cost information that would be necessary to conduct this analysis. He asserts he can get the information from "public financial reports." *Id.* at 83. But he does not identify any

---

the effects of the alleged anticompetitive acts." *Id.*

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

companies that include a product-by-product breakdown of their costs. Burtis Decl. ¶ 42. And if such companies exist, he does not explain why he has not obtained the data. He admits that he has obtained Apple's cost data. Nothing has prevented him from obtaining competitor data (if it truly is available) and demonstrating that this method will work (if it truly is viable). His failure to do so defeats his claim that this is an "available" method.

Dr. Noll also suggests that he might use a "game theoretic model" in which he would estimate prices by looking at market concentration in "other consumer electronics markets" and comparing that to the estimated market concentration in the but-for world. *Id.* at 84. As he admits, the validity of this model "hinges on accurately estimating market concentration in the but-for world." *Id.* He does not explain, however, how he proposes to make that estimation. And, again, he does not identify any "consumer electronics market" that shares the characteristics of the alleged market here. This proposal thus fails for the same reasons discussed above.

### 3. Plaintiffs do not contend that their remaining theories of harm can be proved on a common basis.

Without any viable method for proving their overcharge claim on a common basis, Plaintiffs are left with their remaining theories of supposed harm—"dead-weight . . . loss of welfare," higher prices for competing digital players, switching costs, and reduced innovation. *Id.* at 64-65. Although they recite these harms, Plaintiffs do not contend that any of them can be proved on a common basis. Dr. Noll's declaration similarly is silent as to how these harms would be proved.

In fact, none of the theories of harm is susceptible to proof on a class-wide basis, assuming that any could support a Section 2 claim at all. *See* Burtis Decl. ¶ 44. Dr. Noll asserts that "loss of welfare" is the "reduction in output that occurs when prices exceed the incremental cost of production." *Id.* at 64. A reduction in output, however, does not establish any impact on iPod purchasers separate from whatever overcharge those purchases may have incurred. This claim thus suffers from the same problems discussed above.

The other theories also cannot be proved on any common basis; they would require instead individual-by-individual proof. Any claimed inability to buy a competing player would

require proof that a particular customer wanted to purchase a competing player and was prevented from doing so by Apple's software updates. A customer who had no interest in purchasing a different player or who was not prevented by the updates from doing so would not have suffered any injury. That can be determined only on an individual-by-individual basis. Similarly, the alleged harm of buying a competing player at a higher price than an iPod cannot be shown on a common basis. Each individual class member would have to prove that he or she actually bought a competing player and that the player purchased was more expensive as a result of Apple's software updates.

Likewise, harm from reduction of choice and diminished innovation would depend on numerous individual factors, including whether any particular customer was unhappy with the existing products, would have benefited from whatever features might have been available, would have been willing to pay for those features, and so on.

In short, because Plaintiffs have not demonstrated that their expert can prove through common proof that all class members suffered an overcharge, this case will inevitably result in a series of individual mini-trials seeking relief on alternative theories of harm that can only be established on an individual basis. Class certification in these circumstances is improper.

**C.      Plaintiffs Have Had Ample Opportunity to Make the Showing Required to Obtain Class Certification.**

No doubt recognizing that they have not demonstrated an actual, viable method of proving injury and damages on a common basis, Plaintiffs assert that there is no requirement at this stage that they do so. They claim that all that is required is that they propose a "plausible" method and that the Court should not entertain a "battle of the experts." Mot. at 20, 22.

The Court should reject this argument for two reasons. First, as discussed above, the courts recently have made clear that class certification may not be obtained simply by retaining an expert who asserts in general terms that common proof is available. As the Ninth Circuit held in *Dukes*, the expert must present "properly-analyzed, scientifically reliable evidence," not conclusory assertions unsupported by actual analysis. *Dukes*, 603 F.3d at 602-03. "Expert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls

for rigorous analysis." *In re Hydrogen Peroxide*, 552 F.3d at 323. Thus, to support class certification, a plaintiff's expert must do more than provide a general explanation of purportedly available methods. Instead, the expert must "conduct [a] meaningful economic analysis" of proposed benchmarks to show that "a workable damage formula" exists. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007).[3]

Second, even if a generic showing of the kind Plaintiffs proffer here could suffice in other circumstances, it should be rejected here where the case has been pending for more than five years, fact discovery is now complete, and Plaintiffs have had more than six months to prepare their motion following the denial of Apple's earlier summary judgment motion. If Plaintiffs' proposed method of proving injury and damages were viable, Plaintiffs and their expert have had ample to time to gather whatever evidence they need to demonstrate as much. Their failure to do so is telling evidence that they cannot do so. Certainly, no class should be certified unless and until their expert actually conducts the analysis he proposes and demonstrates to the satisfaction of the Court that it will work in the circumstances here.

Plaintiffs suggest that Dr. Noll has not been able to complete his analyses because he did not obtain the requisite data in usable form from Apple until shortly before Plaintiffs' motion was due. In fact, the Apple pricing data that Dr. Noll says he requires has been publicly available to Plaintiffs and Dr. Noll throughout the entire litigation. Kiernan Decl. ¶ 16. Even as to the data

---

[3] *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296, 300 (5th Cir. 2004) (denying certification where plaintiffs did not prove that "a reliable formula for damages can be devised which will yield statistically significant results, that the data which would have to be plugged into such a formula can be assembled, that the relevant variables like negotiating skill can be quantified, and that all of this can be used to reliably measure antitrust damages for each of the many thousands of members of the proposed class"); *Am. Seed Co. v. Monsanto Co.*, 238 F.R.D. 394, 402 (D. Del. 2006) (denying class certification where plaintiff's expert did not independently analyze produced documents, did not interview any class members or distributors, and did not know if the data would support his theory, and thus had not "sufficiently grounded his theory of injury in the factual setting of the case to justify class certification"), *aff'd*, 271 Fed. Appx. 138 (3d Cir. 2008); *Butt v. Allegheny Pepsi-Cola Bottling Co.*, 116 F.R.D. 486, 492 (E.D. Va. 1987) (denying class certification where "[p]laintiff's expert states, in very general terms, that statistical methods exist by which individual damages may be calculated, and plaintiff asserts that a workable formula can be developed").

1   Dr. Noll did not receive from Apple until early December 2010, Dr. Noll had more than six
2   weeks after receiving that data in which to complete his analysis and submit his report. He offers
3   no explanation why that was not sufficient time. It is clear from his report (and his failure to
4   gather even the third-party and other data that he identified over two years ago as being necessary)
5   that Plaintiffs have elected to simply not have him conduct the necessary analysis. Instead, no
6   doubt fearful that undertaking that effort would reveal that his methods will not work, Plaintiffs
7   ask the Court to certify a class simply on hope that they might later be able to justify it. At this
8   late stage of the litigation, that invitation should be declined. At the very least, the Court should
9   require the Plaintiffs and their expert to complete their analyses now, before the Court rules on
10  their motion.

11  **III.    PLAINTIFFS HAVE ALSO FAILED TO CARRY THEIR BURDEN TO SHOW**
12  **THAT RESELLERS MAY PROPERLY BE INCLUDED IN THEIR CLASS.**

13          Plaintiffs do not separately address whether business entities such as Target and Best-Buy
14  that purchase iPods for resale to consumers may properly be represented by the named Plaintiffs
15  here and their claims decided together. Indeed, they do not mention the word "resellers" in their
16  brief. Their failure to say a word about purchasers that account for ███████ iPod purchases
17  during the alleged class period shows that they are not adequate class representatives and waives
18  any right to represent them. Alternatively, if Plaintiffs still seek to represent resellers and have
19  not waived that claim, their request should be denied. Resellers are not similarly situated to
20  consumers such as Plaintiffs, and Plaintiffs have no personal stake in presenting the facts
21  necessary for resellers to recover. Moreover, to the extent that any resellers actually wish to
22  pursue a claim, a class action is not necessary for them to do so.

23          **A.      Plaintiffs Have Defaulted With Respect to Resellers.**

24          The named Plaintiffs are all individuals who purchased one or more iPods from an Apple
25  retail store. They paid Apple's retail price. They bought their iPod for their personal or family
26  use, not for the purpose of gaining an economic profit by reselling the iPod to consumers. When
27  plaintiffs Charoensak and Rosen, represented by current counsel, moved for class certification,
28  they explicitly limited their motion to end-user consumers like themselves. Doc. 93, p. 8.

Following consolidation, Plaintiffs moved to certify a class of end-users and resellers, which the Court granted without explicitly addressing the resellers. Doc. 198, p. 2 (order on Apple's request for clarification). With this history, it is telling that Plaintiffs' renewed motion to certify only mentions end-user consumers like themselves and does not mention resellers. If they think they can meet the Rule 23 requirements for resellers, they should have said so, so that Apple could respond to their arguments. Having failed to do so, they have waived any right to seek to represent them. *U.S. v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("arguments not raised by a party in its opening brief are waived").

**B.     In Any Event, Resellers Are Not Situated Similarly to End-Users.**

Even if the issue were not waived, however, the resellers are much different from end-user consumers and may not be included in the same class. The resellers include large electronics stores (e.g., Best Buy, Circuit City, CompUSA), mid- to low-priced large retail stores (Target, Wal-Mart), discount warehouses (Costco, Sam's), specialty stores (Fry's), large on-line retailers (Amazon) and hundreds of smaller or specialty on-line outlets (PC Connection, J&R Computer).

Plaintiffs say that, as consumers, they want lower retail prices for iPods. Resellers, however, benefit from higher retail prices. A reseller, for example, that purchases iPods at a 13% discount from Apple's retail prices will pay $87 for an iPod with a $100 retail price. If the reseller charges the same retail price as Apple, the reseller will earn $13 on that iPod. If the retail price drops to $90, however, the same reseller would earn only $11.70 on that same iPod. Similarly, if a reseller with a 13% discount sells at $5 less than Apple's retail price, that reseller would earn $8 if Apple's retail price is $100. If Apple's retail price drops to $90, and the reseller dropped its price accordingly to $85, the retailer would earn only $6.70. Thus, with respect to iPod sales, the resellers' interests are aligned with Apple, not with consumers such as Plaintiffs who seek lower prices.[4]

---

[4] It is possible, of course, that some resellers might try to mitigate any loss from lower retail
(continued)

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

To the extent that resellers suffered any harm, they are also differently situated because Dr. Noll admits that a different analysis will be required to prove and quantify that harm. Dr. Noll asserts that, to prove the reseller claim, he will use wholesale transaction records to do a before-after analysis that will "take into account the characteristics of customers and the specific product that was sold." Doc. 479, p. 77. He asserts that he believes the necessary data to conduct this reseller analysis exists. By contrast, however, he states that he will require different data to conduct an analysis of the prices for direct consumer purchases and that he is not able to describe "in as much detail" the analysis he will use for such prices because he currently lacks the requisite data. *Id.*

He likewise admits that the viability of his proposed "yardstick" method differs as between resellers and consumers. He states that the method "is not likely to be the most cost-effective method for establishing a competitive benchmark for wholesale purchasers of iPods." *Id.* at 81. At the same time, however, he asserts that, "for retail direct purchasers, a form of yardstick analysis is more practical and is a plausible, reliable method for developing a competitive benchmark." *Id.*

Resellers are also differently situated with respect to Plaintiffs' other theories of harm. Whether any reseller was harmed by such things as higher prices for competing products, inability to purchase competing products or lack of technological innovation would not only vary from reseller to reseller, but would turn on an entirely different set of facts from those relevant to any consumer claim.

### C. Plaintiffs Are Not Typical of the Resellers and Not Adequate Representatives.

The differing situations of consumers like Plaintiffs and the commercial entities that purchase iPods for resale preclude certification of a class that includes both. A named plaintiff is not typical and is not an adequate representative when proving his claim involves different proof

---

prices (or perhaps even benefit) by seeking to maintain their own retail prices even as Apple's retail prices drop. For example, a reseller that had been selling at $5 discount from Apple's retail prices, might try to reduce the discount to $3 when Apple's price decreases. But assuming such resellers would have existed, that would be only further reason to deny class certification because identifying such resellers would require highly individualized mini-trials.

from that required to prove class members' claims. *Sommers v. Abraham Lincoln Fed. Savs. & Loan Assoc.*, 66 F.R.D. 581, 587 (E.D. Pa. 1975) (finding named plaintiffs atypical/inadequate where their claims would require consideration of less complex issues and less evidence than unrepresented portion of the class); *Muller v. Curtis Publ'g Co.*, 57 F.R.D. 532, 535-36 (E.D. Pa. 1973) (finding plaintiff's claims atypical where members of the proposed class would be subject to defenses to which he was not).

Similarly, "[i]t is axiomatic that a putative class representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented." 7A C. Wright & A. Miller, *Federal Practice and Procedure* §1768 (3d. ed. 2010). That is the situation here, because higher iPod prices are more profitable for the resellers. "A fundamental conflict exists where some members [of a class] claim to have been harmed by the same conduct that benefited other members of the class." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). For that reason, the Eleventh Circuit held that plaintiffs could not adequately represent the interests of resellers that "appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off" as a result of the conduct. *Id. See also Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974) ("Unless the relief sought by the particular plaintiffs who bring the suit can be thought to be what would be desired by the other members of the class, it would be inequitable to recognize plaintiffs as representative, and a violation of due process to permit them to obtain a judgment binding absent plaintiffs.").[5] "A conflict is 'fundamental' when it goes to the specific issues in controversy, or where, as here, some plaintiffs claim to have been harmed by the same conduct that benefited other members of the class, preventing the named representatives from 'vigorously prosecut[ing] the interests of the class through qualified counsel.'" *Allied Orthopedic*, 247 F.R.D. at 177 (internal citations omitted). "[T]o [the Tyco

---

[5] *But see Meijer v. Abbott Labs*, 251 F.R.D. 431, 433 (N.D. Cal. 2008) (rejecting *Valley Drug* as inconsistent with *Ill. Brick/Hanover Shoe* and suggesting that opt-out mechanism resolves the issue); *see also Meijer v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303 (D.D.C. 2007). In both cases, the class members supposedly in conflict with the remainder of the class explained to the court that they saw no conflict.

Opp. To Mot. For Class Cert.
C 05-00037 JW (HRL)

court's] knowledge, no circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Id.*

### D. A Class Action Is Not The Superior Method for A Reseller Who Claims An Overcharge.

Rule 23(b)(3) imposes an independent requirement that a class action be the superior method for resolving the claims at issue. This requirement defeats certification of a class here that includes resellers, even if the consumer Plaintiffs were otherwise typical and adequate representatives. Certainly, class treatment of the resellers claim is not necessary to ensure that the claim be brought. Resellers that have purchased ██████████ iPods have a large enough stake to litigate on their own if they believe it is in their own interest to pursue the claim.

Even more fundamentally, it is more efficient for such resellers to litigate on their behalf than to have individual consumer Plaintiffs assert their claims. Only the resellers know the circumstances of their own contracts and sales margins, and their profits associated with selling iPods. Having individual consumer Plaintiffs attempt to present these facts will be litigation by proxy. Moreover, because none of the facts relevant to showing injury and damages of the resellers is pertinent to the consumer claims at issue here, adjudicating them in this action will only increase expense to individual class members.

### CONCLUSION

For these reasons, no class should be certified. Alternatively, any class should be limited to end-users.

Dated: February 28, 2011          JONES DAY

                                  By:/s/ Robert A. Mittelstaedt
                                      Robert A. Mittelstaedt

                                  Counsel for Defendant APPLE INC.

SFI-662507v5