1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   JOHN J. STOIA, JR. (141757)
    BONNY E. SWEENEY (176174)
3   THOMAS R. MERRICK (177987)
    ALEXANDRA S. BERNAY (211068)
4   CARMEN A. MEDICI (248417)
    655 West Broadway, Suite 1900
5   San Diego, CA 92101
    Telephone: 619/231-1058
6   619/231-7423 (fax)
    johns@rgrdlaw.com
7   bonnys@rgrdlaw.com
    tmerrick@rgrdlaw.com
8   xanb@rgrdlaw.com
    cmedici@rgrdlaw.com
9
    THE KATRIEL LAW FIRM
10  ROY A. KATRIEL (*pro hac vice*)
    1101 30th Street, N.W., Suite 500
11  Washington, DC 20007
    Telephone: 202/625-4342
12  202/330-5593 (fax)
    rak@katriellaw.com
13
    Co-Lead Counsel for Plaintiffs
14
    [Additional counsel appear on signature page.]
15
                    UNITED STATES DISTRICT COURT
16
                  NORTHERN DISTRICT OF CALIFORNIA
17
                         SAN JOSE DIVISION
18
    THE APPLE IPOD ITUNES ANTI-TRUST        )   Lead Case No. C-05-00037-JW(HRL)
19  LITIGATION                              )
                                            )   CLASS ACTION
20  _____)
                                            )   PLAINTIFFS' MEMORANDUM IN
21  This Document Relates To:               )   OPPOSITION TO APPLE'S MOTION FOR
                                            )   SUMMARY JUDGMENT
22      ALL ACTIONS.                        )
    _____)   JUDGE:    Hon. James Ware
23                                              DATE:     April 18, 2011
                                                TIME:     9:00 a.m.
24                                              CTRM;     8, 4th Floor
25                              **[REDACTED]**
26
27
28

610352_2

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    APPLICABLE STANDARD FOR SUMMARY JUDGMENT ..........................2

III.   BACKGROUND ............................................................................................3

IV.    LEGAL ARGUMENT....................................................................................13

    A.     The Element of Willful Maintenance of Monopoly Power Presents Three Key Questions of Fact:  Exclusionary Action, Business Justification and Disproportionate Harm to Competition ................................................................13

    B.     Apple's Conduct Was Exclusionary ............................................................15

        1.     Apple's Software Updates Were Aimed at RealNetworks ......................16

        2.     Apple Falsely Disparaged and Threatened RealNetworks and Other Potential Competitors in Public Statements.....................................17

        3.     Apple's Refusal to Deal Is Not Protected .........................................18

    C.     Apple Lacks Valid Business Justifications for Its Exclusionary Actions Against Harmony ..............................................................................................20

        1.     Apple's Purported Need to Satisfy the Labels............................................21

        2.     Apple's Purported Need to Stop Hackers ......................................................21

        3.     Apple's Purported Right to Improve the iPod ...........................................22

        4.     Apple's Purported Right to Avoid Dealing with RealNetworks ..............23

    D.     The Anticompetitive Harm of Apple's Misconduct Outweighed Any Consumer Benefit Generated, Particularly Given Less Restrictive Alternative Means Available to Apple ..................................................................24

    E.     Plaintiffs' Derivative California UCL Claim Necessarily Survives .....................24

V.     CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abbott Labs. v. Teva Pharms. USA, Inc.,*
    432 F. Supp. 2d 408 (D. Del. 2006).......................................................................22

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group,*
    592 F.3d 991 (9th Cir. 2010) .....................................................................1, 22, 24

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Pub'ns, Inc.,*
    108 F.3d 1147 (9th Cir. 1997) .............................................................13, 14, 18

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505 (1986)...................................................................3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585, 105 S. Ct. 2847 (1985) ....................................................... *passim*

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979).......................................................................18

*Cal. Computer Prods., Inc. v. IBM, Inc.,*
    613 F.2d 727 (9th Cir. 1979) .....................................................................24

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,*
    148 F.3d 1080 (D.C. Cir. 1998) ...............................................................14

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) .....................................................................15

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 106 S. Ct. 2548 (1986)..............................................................2, 3

*Chavez v. Whirlpool Corp.,*
    93 Cal. App. 4th 363 (2001) .....................................................................25

*Chicago Bd. of Trade v. United States,*
    246 U.S. 231, 38 S. Ct. 242 (1918).......................................................................14

*Cont'l. Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690, 82 S. Ct. 1404 (1962)...................................................................15

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
    36 F. 3d 1147 (1st Cir. 1994).......................................................................15

*Eastman Kodak Co. v. Image Technical Servs., Inc.,*
    504 U.S. 451, 112 S. Ct. 2072 (1992)....................................................... *passim*

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                               - ii -

**Page**

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983) ............................................................................... 2, 22

*Image Technical Serv., Inc. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) ......................................................................... 2, 14, 20

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ............................................................................... passim

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
  623 F.2d 1255 (8th Cir. 1980) ............................................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574, 106 S. Ct. 1348 (1986) ............................................................................... 3

*Moore v. Jas H. Matthews & Co.*,
  550 F.2d 1207 (9th Cir. 1977) ............................................................................... 14

*Ritz Camera & Image v. SanDisk Corp.*,
  No. 10-cv-02787 JF/HRL, 2011 U.S. Dist LEXIS 18399
  (N.D. Cal. Feb. 24, 2011) ............................................................................... 18

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
  88 F.3d 780 (9th Cir. 1996) ............................................................................... 15

*State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*,
  935 F.2d 1469 (7th Cir. 1991) ............................................................................... 15

*Tele Atlas N.V. v. Navteq Corp.*,
  No. C-05-01673 RS, 2008 WL 4911230
  (N.D. Cal. Nov. 13, 2008) ............................................................................... 16

*Tucker v. Apple Computer, Inc.*,
  493 F. Supp. 2d 1090 (N.D. Cal. 2006) ............................................................................... 20

*United States v. Griffith*,
  334 U.S. 100, 68 S. Ct. 941 (1948) ............................................................................... 13

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................... passim

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*,
  540 U.S. 398, 124 S. Ct. 872 (2004) ............................................................................... passim

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ............................................................................... 14, 18

1

2                                                                                    **Page**

3  *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
      382 U.S. 172, 86 S. Ct. 347 (1965)..................................................................18
4

5  **STATUTES, RULES AND REGULATIONS**

6  15 U.S.C.
       §1....................................................................................................15, 24
7       §2................................................................................................... *passim*

8  California Business & Professions Code
       §17200..................................................................................................24
9

10 **SECONDARY AUTHORITIES**

11 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2008)
       ¶651.......................................................................................................15
12      ¶651b2...................................................................................................19
       ¶651e3 ..................................................................................................15
13      ¶651f.....................................................................................................16
       ¶651h.....................................................................................................18
14
   3 Phillip E. Areeda & D. Turner, Antitrust Law (1978)
15      ¶813.......................................................................................................13

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                                    - iv -

I.    **INTRODUCTION**

To prevail on its motion for summary judgment, Apple must show that no reasonable jury could fail to accept Apple's explanation for its suppression of the competitive threat posed by RealNetworks' Harmony technology. The problem for Apple is that its exculpatory explanation – that RealNetworks was an unintended collateral victim of Apple's efforts to block genuine hackers – is squarely at odds with the contemporaneous record.

As shown below, there is ample evidence to permit a jury to conclude that Apple used the *pretext* of fighting hackers – indeed going so far as to disparage RealNetworks itself as a hacker (a position it no longer seems to endorse) – to shut down a technology that would have dramatically enhanced competition and benefitted consumers by allowing them to play songs legally purchased from Apple's competitors on their iPods. Contrary to Apple's assertion, the record labels did not require Apple to shut down the competition. Rather, the labels *supported* Harmony because it provided interoperability while preserving digital rights management ("DRM") protection. Nor was Harmony merely an unintended victim of Apple's fight against "hacks" that stripped DRM protection from iTS songs. The record shows that Apple treated Harmony as a far more serious threat than any hack – as demonstrated by its swift and punishing response to RealNetworks' Harmony announcement – and deliberately re-designed its FairPlay DRM in ways that disabled Harmony but did not improve the software's ability to withstand attacks that stripped DRM encryption from iTunes Music Store (now called "iTunes Store" or " iTS") songs. Finally, Apple has failed to demonstrate that the software updates that disabled Harmony provided any benefit to consumers. Apple's claim that the labels would have stopped supplying music if it had not made the changes it did finds no support in the record. Moreover, Apple's own customer service reports demonstrate that consumers greatly preferred the interoperability provided by Harmony to the dubious "protection" Apple's software updates provided against the "injection of foreign DRM keys."

Neither of the two cases that pervade Apple's motion, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group*, 592 F.3d 991 (9th Cir. 2010) ("*Tyco*") and *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 124 S. Ct. 872 (2004) ("*Trinko*"), grant Apple the

1    broad immunity it claims.  To the contrary, the line between exclusionary conduct and legitimate

2    product improvement is a very fine one for a monopolist, requiring close examination by the fact-

3    finder of the unique facts and circumstances of each case.[1] *See, e.g., Eastman Kodak Co. v. Image*

4    *Technical Servs., Inc.*, 504 U.S. 451, 467, 112 S. Ct. 2072 (1992) (affirming reversal of summary

5    judgment on Section 2 claim); *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612,

6    620-21 (9th Cir. 1990) ("*Image Tech. Serv. I*") (reversing summary judgment on Section 2 claim);

7    *see also Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983) ("We

8    do not, of course, hold that product innovation is immune from antitrust scrutiny and may never

9    provide the requisite conduct element in support of a claim for monopolization or attempted

10    monopolization under section 2 of the Sherman Act.").

11         Therefore, Apple's admission that its actions "had the effect" of disabling competition from

12    RealNetworks only raise further disputed and genuine issues of material fact:  Did Apple engage in

13    exclusionary conduct beyond simply stopping genuine hackers or improving its product? Are

14    Apple's *post hoc* business justifications for its actions against Harmony valid and sufficient?  And,

15    do the anticompetitive effects of Apple's exclusionary conduct outweigh any even arguable

16    procompetitive benefits to consumers?   Under *Eastman Kodak* and the record presented, the

17    resolution of each of these factual questions remains the prerogative of the jury.

18    **II.    APPLICABLE STANDARD FOR SUMMARY JUDGMENT**

19         Apple's motion is based on the purported lack of a genuine dispute for trial as to two distinct

20    issues under Section 2 (though these two issues are frequently conflated in its motion):  (1) whether

21    Apple engaged in "exclusionary conduct"; and (2) the validity and sufficiency of Apple's "business

22    justifications" defense.  As movant, Apple bears the initial burden of demonstrating the lack of any

23    dispute for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986); *Eastman*

24    *Kodak*, 504 U.S. at 456 (the "respondents' version of any disputed issue of fact is presumed

25    correct").  If Apple carries that burden, Plaintiffs then must come forward with specific facts

26

27    [1]      Unless otherwise noted, citations are omitted and emphasis is added.

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)          - 2 -

1    demonstrating the presence of a genuine dispute for trial. *Celotex*, 477 U.S. at 324. All justifiable

2    inferences are to be drawn in Plaintiffs' favor. *Eastman Kodak*, 504 U.S. at 456 (citing *Anderson v.*

3    *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986)). Summary judgment is warranted

4    only where the record, taken as a whole, could not lead a rational trier of fact to find for the non-

5    moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.

6    1348 (1986).

7    **III.    BACKGROUND**

8         The factual record presents a compelling picture of unjustifiable exclusionary conduct by

9    Apple directed squarely against RealNetworks.[2]

10        When Apple and the record labels negotiated the terms under which Apple could sell digital

11   music files online through its iTS, most of the labels required that the recordings have "content

12   protection to guard against piracy," in order to prevent consumers from making an unlimited number

13   of copies.[3] Ex. 1, Declaration of Howie Singer ("Warner Decl."); Ex. 2, Declaration of Lawrence

14   Kanusher ("Sony Decl."); Ex. 3, Declaration of Amanda Marks ("Universal Decl."); Ex. 4,

15   Declaration of Mark Piibe ("EMI Decl."). ████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████████

18   ███████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████

20        Critically, none of the labels required Apple to use a proprietary DRM system that made iTS

21   music incompatible with portable digital media players other than the iPod. Rather, all of the labels

22   would have preferred a system that allowed their music to be played on multiple competing devices,

23   _____

24   [2]    Plaintiffs have developed this record despite the unprecedented and unfair "data dump" in the

25   final two weeks of the discovery period. *See* Dkt. No. 486 at 7 n.7. (Plaintiffs' Notice of Motion
     and Renewed Motion for Class Certification and Appointment of Lead Class Counsel).

26   [3]    Unless otherwise noted, all references to "Ex." and Exs." are to the exhibits attached to the

27   Declaration of Bonny E. Sweeney in Support of Plaintiffs' Opposition to Apple's Motion for
     Summary Judgment, filed concurrently.

28



1   because they had an interest in having their music sold "in the widest manner possible, through as

2   many channels as possible." Ex. 1, Warner Decl.; Ex. 3, Universal Decl.; *see also* Ex. 2, Sony Decl.

3   ("Apple did not accommodate Sony's request for a solution that would both protect the content as

4   well as be interoperable with other devices."); Ex. 4.

5

6

7

8

9

10

11          Apple thus created a closed system that locked iTS customers into using the iPod for direct

12   playback of their digital audio files.

13                                              As a result, digital audio files purchased from other

14   internet sites (such as Amazon.com or Walmart.com) could not play directly on an iPod. Similarly,

15   songs purchased from the iTS could not play directly on any portable digital media player other than

16   the iPod. This closed system allowed Apple to rapidly leverage its market power in the digital audio

17   file market into the market for portable digital media players.

18                                                                                                With

19   iTS, Apple was able to achieve dominance in the portable digital media player market almost

20   immediately. By mid-2004, Apple had achieved positions of dominance in *both* the online audio

21   and portable digital media player markets, with market shares in both markets exceeding

22

23          From that point forward, to compete in the digital audio download market any would-be

24   competitor had to make its music playable on the iPod; by the same token, manufacturers of

25   competing portable digital media players could not effectively compete in that market because their

26   products were not compatible with the digital audio files sold through iTS.

27

28

1 ███████████████████████████████████████

2 ███████████████████████████████████████

3 ███████████████████████████████████████

4 ███████████████████████████████████████

5 ██

6 ███████████████████████████████████████

7 ███████████████████████████████████████

8 ███████████████████████████████████████

9 ███████████████████████████████████████

10 ███████████████████████████████████████

11 █████████████████████████████

12     RealNetworks launched an online music store that competed directly with iTS in January

13 2004. █████████████████████████████ Ex. 20; *see*

14 *also* Ex. 1, Warner Decl.; Ex. 2, Sony Decl.; Ex. 3, Universal Decl.; Ex. 4 EMI Decl.  From the

15 outset, RealNetworks recognized that in order to compete successfully in the digital audio file

16 market, its music had to be directly playable on the dominant portable digital media player, the iPod.

17 ███████████████████████████████████████

18 ███████████████████████████████████████

19 ███████████████████████████████████████

20 ███████████████████████████████████████

21 ███████████████████████████████████████

22 ███████████████████████████████████████

23 _____

24 [4]    *See* Apple's Motion for Summary Judgment ("Mtn.") at 8. █████████

25 ██████████████████████ *See* Declaration of Dr. John P. J. Kelly in Support of

26 Defendants' Renewed Motion for Summary Judgment, dated January 18, 2011 ("Kelly Decl."), ¶5.

27 [5]    *See* Dkt. No. 396 (Apple Inc.'s Motion for Protective Order Preventing the Deposition of

28 Steve Jobs). ████████████████████████████████



1

2

3

4

5

6

7

8

9  According to RealNetworks, the

10  Harmony technology followed "in a well-established tradition of fully legal, independently

11  developed paths to achieve compatibility. . . . Harmony creates a way to lock content from Real's

12  music store in a way that is compatible with the iPod, Windows Media DRM devices, and Helix

13  DRM devices.  Harmony technology does not remove or disable any digital rights management

14  [DRM] system." Ex. 23.

15

16

17  RealNetworks' Harmony technology represented the first real threat to Apple's monopoly in

18  the digital audio download market and, because dominance in the digital audio download market

19  enabled Apple to achieve dominance in the market for portable digital media players, that market as

20  well.  Moreover, RealNetworks' product was legal and received the full endorsement of the record

21  labels that had licensed content to Apple and RealNetworks.  Ex. 24; *see also* Ex. 1 ("WARNER has

22  an interest in having its music sold in the widest manner possible, through as many channels as

23  possible" and entered into an agreement with RealNetworks to sell Warner's sound recordings.);

24

25  Mr. Glaser has evaded service of Plaintiffs' deposition

26  subpoena. *See* Ex. 27, Affidavit of Reasonable Diligence.

27  [6]  *See* Declaration of David F. Martin in Support of Plaintiffs' Opposition to Apple's Motion
for Summary Judgment ("Martin Decl."), filed concurrently.

28

1  Ex. 2 ("SONY entered into agreements with other companies, including Real Networks.");

2  Ex. 3 ("Universal has always had an interest in having its music sold in the widest manner possible,

3  through as many channels as possible" and entered into an agreement with RealNetworks to sell

4  Universal's music.); Ex. 4 ("EMI was interested in having its recorded music made widely available

5  though many different channels" and had an agreement with RealNetworks to sell downloads of

6  EMI sound recordings.).

7  ███████████████████████████████████████████████████████████

8  ███████████████████████████████████████████████████████████

9  Customers flocked to RealNetworks because it offered better prices than iTS. *Id.* In August 2004,

10  RealNetworks sold its audio downloads for as low as .49 cents per-track – less than half the price of

11  Apple's .99 cent per-track price. *Id.* ████████████████████████████

12  █████████████████████████████████████████████████████

13       Apple's response to the RealNetworks threat was swift and punishing. ███████████

14  ███████████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████████████████

17  ██████████████████████████████████████████

18  █████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████████

22  ████████████████████████████████ Thus, instead of welcoming the interoperability

23  created by RealNetworks, Apple unfairly disparaged its competitor and made clear to any other

24  _____

25  [7] ███████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████████

27  [8] ███████████████████████████████████████████████████████

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                                    - 7 -

1  would-be rival that Apple would take all necessary steps to prevent any inroads into its dual

2  monopolies.

3  ████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ██████████████████████████████

14 ██████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                    - 8 -



PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)



PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                        - 10 -



PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)

1  ██████████████████████████████████████████████
2  ██████████████████████████████
3    ██████████████████████████████████████████████
4  ██████████████████████████████████████████████
5  ██████████████████████████████████████████████
6  ██████████████████████████████████████████████
7  ████████████████████
8    ██████████████████████████████████████████
9  ██████████████████████████████████████████████
10 ██████████████████████████████████████████████
11 ██████████████████████████████████████████████
12 ██████████████████████████████████████████████
13 ██████████████████████████████████████████████
14 ████████████████████████████████████
15   ████████████████████████████████████████████
16 ██████████████████████████████████████████████
17 ██████████████████████████████████████

18    Through its conduct, Apple sacrificed short-term profits (from the increased demand for iTS

19 music playable on portable digital players of any make) in order to maintain its monopolies in both

20 the portable digital media player and digital audio file markets. Ex. 46; Ex. 47. But for its long-term

21 strategy of excluding rivals, Apple's conduct would not have made economic sense.  Apple's

22 strategy ultimately succeeded:  by disabling legitimate competitive efforts at interoperability, Apple

23 was able to maintain its ███████ market share in the online music market and steadily increased

24 its share of the portable digital media market.

25

26

27

28

1  IV.    **LEGAL ARGUMENT**

2      In order to prevail on their monopoly maintenance claim,[9] Plaintiffs must prove that

3  Apple: (1) possesses monopoly power in the relevant markets; (2) has willfully maintained that

4  power; and (3) has caused antitrust injury. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*

5  *Jovanovich Legal & Prof'l Pub'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997); *see also* Dkt. No. 377 at 5-8

6  (Motion to Dismiss Order) (sustaining Section 2 claim in Plaintiffs' Amended Complaint).  As in

7  previous motions, Apple challenges only Plaintiffs' ability to satisfy the willfulness element of their

8  Section 2 claim.  Mtn. at 11.

9          A.    **The Element of Willful Maintenance of Monopoly Power Presents**
               **Three Key Questions of Fact: Exclusionary Action, Business**
10              **Justification and Disproportionate Harm to Competition**

11      The willfulness element comprises actions taken "'to foreclose competition, to gain

12  competitive advantage, or to destroy a competitor.'" *Eastman Kodak*, 504 U.S. at 482-83 (quoting

13  *United States v. Griffith*, 334 U.S. 100, 107, 68 S. Ct. 941 (1948)).  Exclusionary conduct is conduct

14  that harms the competitive process and thereby harms consumers. *United States v. Microsoft Corp.*,

15  253 F.3d 34, 58 (D.C. Cir. 2001).  "If a firm has been 'attempting to exclude rivals on some basis

16  other than efficiency,' it is fair to characterize its behavior as predatory." *Aspen Skiing Co. v. Aspen*

17  *Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S. Ct. 2847 (1985).

18      Whether the conduct at issue is exclusionary is a question of fact grounded in context.

19  *Microsoft*, 253 F.2d at 65-66.  "Where a defendant maintains substantial market power, [its]

20  activities are examined through a special lens:  Behavior that might otherwise not be of concern to

21  the antitrust laws – or that might even be viewed as procompetitive – can take on exclusionary

22  connotations when practiced by a monopolist*."  Eastman Kodak*, 504 U.S. at 488 (Scalia, J.

23  dissenting) (citing 3 P. Areeda & D. Turner, Antitrust Law ¶813, at 300-02 (1978)); *Image Technical*

24

25
_____

26  [9]      Because Apple challenges only the willfulness element of Plaintiffs' Section 2 claims, and
   not the monopoly power element, Plaintiffs need not separately discuss their Section 2 attempted
27  monopolization claim.

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                                    - 13 -

1    *Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1217 (9th Cir. 1997) ("*Image Tech. Servs. II*")

2    (quoting same).

3        For example, a monopolist's false or disparaging comments about a competitor can be

4    exclusionary, especially when combined with other anticompetitive acts. *Am. Prof'l*, 108 F.3d at

5    1152; *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 & n.14 (3d Cir. 2010)

6    (collecting cases). Similarly, a monopolist does not have an absolute right to refuse to deal with a

7    competitor. Rather, such a right "exists only if there are legitimate competitive reasons for the

8    refusal." *Eastman Kodak*, 504 U.S. at 483 n.32 (citing *Aspen Skiing*, 472 U.S. at 602-05); *accord*

9    *Trinko*, 540 U.S. at 408; *Image Tech. Serv. I*, 903 F.2d at 620.

10        As one court of appeals has stated: "'Anticompetitive conduct' can come in too many

11    different forms, and is too dependent upon context, for any court or commentator ever to have

12    enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080,

13    1087 (D.C. Cir. 1998) (reversing in part the district court's dismissal of complaint and holding that

14    radio station's claim that defendants made misrepresentations to advertisers and the government in

15    order to protect its monopoly stated Section 2 claim). While it is true, as Apple argues, that

16    anticompetitive intent by itself is not sufficient to demonstrate a Section 2 claim, it is highly relevant

17    to the determination whether the Apple's conduct was exclusionary. *Microsoft*, 253 F.3d at 59

18    (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S. Ct. 242 (1918) ("knowledge

19    of intent may help. . . to interpret facts and predict consequences"); *Aspen Skiing*, 472 U.S. at 603.[10]

20        Evidence that a monopolist's conduct has caused anticompetitive effect moves the inquiry to

21    the existence and validity of any "'valid business reasons'" that might justify the conduct. *Eastman*

22    *Kodak*, 504 U.S. at 483; *Aspen Skiing*, 472 U.S. at 608-10. This inquiry into procompetitive

23    justifications is again fact-specific, with genuine disputes as to each purported justification to be

24    _____

25    [10]    Intent is an element of Plaintiffs' attempted monopolization claim. *Moore v. Jas H.*

26    *Matthews & Co.*, 550 F.2d 1207, 1219 (9th Cir. 1977) (attempted monopolization can be inferred from "either specific intent coupled with monopoly power or from 'proof of specific intent

27    to . . . exclude . . . competition accompanied by predatory conduct directed to accomplishing the unlawful purpose'").

28

1  resolved by the fact-finder. *Eastman Kodak*, 504 U.S. at 483-84; *see also Aspen Skiing*, 472 U.S. at

2  608 (the defendant bears the burden of "persuad[ing] the jury that its conduct was justified by any

3  normal business purpose").[11]

4      Finally, even if the monopolist's procompetitive justification "stands unrebutted," plaintiff

5  will prevail if it can demonstrate that the anticompetitive effects of the challenged conduct outweigh

6  any procompetitive benefits. *Microsoft*, 253 F.3d at 59; *accord Aspen Skiing*, 472 U.S. at 605 n.32

7  (exclusionary conduct includes conduct that furthers competition "in an unnecessarily restrictive

8  way"); *see generally* 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶651e3 at 121-22

9  (3d ed. 2008) ("Areeda"). This analysis is similar to the "rule of reason" analysis under Section 1 of

10  the Sherman Act. *Microsoft*, 213 F.3d at 59; Areeda, ¶651e3, at 122.

11      **B.     Apple's Conduct Was Exclusionary**

12      "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and

13  either does not further competition on the merits or does so in an unnecessarily restrictive way."

14  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing*,

15  472 U.S. at 605 n.32); *see generally* Areeda, ¶651. Apple engaged in a series of actions that a

16  reasonable jury could easily conclude tended to impair the opportunities of its rivals other than on

17  the merits and did so in an unnecessary or unnecessarily restrictive way.  This is particularly true

18  when the exclusionary acts of Apple are considered together, as they must be.  *Cont'l. Ore Co. v.*

19  *Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S. Ct. 1404 (1962) (jury must look to the

21  [11]     On page 16 n.8 of its motion, Apple cites three cases, two that are inapplicable because they
22  simply stand for the position that an antitrust action cannot survive where no anticompetitive effects
    are alleged. *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir.
23  1996) (Ninth Circuit dismissed plaintiff's claims on a 12(b)(6) because it failed to allege any
    anticompetitive effects); *State of Ill. ex. rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469,
24  1480-1481, 1484 (7th Cir. 1991) (pipeline company's "'lawful refusal to cut its own throat' . . . by
    excusing customers from their contractual obligations 'was not anticompetitive'").  These cases are
25  not applicable here where the record is replete with anticompetitive effects. Apple's misquotes the
    third case on page 16 n.8.  Had it left the quote in context, it would be it supports plaintiffs'
26  position: The "pursuit of efficiency and quality control *might* be legitimate competitive reasons for
    an otherwise exclusionary refusal to deal, while the desire to maintain a monopoly share or thwart
27  the entry of competitors would not." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F. 3d
    1147, 1183 (1st Cir. 1994).

28

1   monopolist's conduct as a whole); *Tele Atlas N.V. v. Navteq Corp.*, No. C-05-01673 RS, 2008 WL

2   4911230, at *2 (N.D. Cal. Nov. 13, 2008) ("What matters is whether the 'synergistic effect' of the

3   alleged conduct is to harm competition, and thus perpetuate a monopoly.").

4          **1.     Apple's Software Updates Were Aimed at RealNetworks**



14         The facts demonstrate that Apple's conduct was intended to and had the effect of excluding

15  rivals from the marketplace:

16         ***Most exclusionary conduct by dominant firms is strategic***.  Nondominant firms
           acting unilaterally typically lack the market position to make much strategic conduct
17         work.   Consider the *Microsoft* litigation.   A nondominant seller of computer
           operating systems would have every incentive to maximize compatibility with other
18         types of software, such as Internet browsers or word processors, even if it sold these
           applications itself.   After all, it would be competing in the market with sellers of
19         other operating systems, and customer choice would be heavily driven by
           compatibility concerns.   ***But a market-dominating seller of operating systems***
20         ***stands in a different position: by limiting compatibility with rivals' software***
           ***applications it can force buyers to switch to its own applications.  Thus it becomes***
21         ***important to restrain the innovations of others or keep them out of the market***.

22  Areeda ¶651f, at 123.

23         Apple's efforts to identify countervailing, procompetitive effects of its exclusion of Harmony

24  fall short, because none of them demonstrates (and certainly not as a matter of law) how excluding

25  Harmony advanced any particular ***consumer*** interest.  Particularly lacking is evidence of any actual

26  economic efficiencies gained by its effort to stifle the interoperability introduced by Harmony.

27         First, Apple argues that it actions were procompetitive because its *earlier* launch of iTS was

28  a "huge benefit" to consumers.  Mtn. at 14, 15.  But even assuming that is true, procompetitive

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                                          - 16 -

1   benefits from Apple's launch of iTS do not shield all of Apple's subsequent actions from antitrust

2   scrutiny.  As an initial matter, Apple has failed to show that its Harmony-blocking updates were

3   necessary to maintain those procompetitive benefits.  Apple has adduced no evidence that the record

4   labels threatened to withhold music from Apple or required Apple to undertake major revisions of its

5   FairPlay DRM in order to stop DRM-stripping hacks.  Rather, Apple used the hacks as a pretext to

6   modify the software in ways that did not necessarily increase the security of the DRM, but did have

7   the effect of excluding its only real competitive threat. *See supra* at 9-10.  Moreover, as a matter of

8   law, pre-monopoly procompetitive conduct does not shield a monopolist from challenges to

9   subsequent exclusionary conduct. *See, e.g., Eastman Kodak*, 504 U.S. at 488 ("Behavior that might

10   otherwise not be of concern to the antitrust laws – or that might even be viewed a procompetitive –

11   can take on exclusionary connotations when practiced by a monopolist.").

12        Second, Apple argues its actions were procompetitive because, according to Apple, the

13   actions of hackers (not RealNetworks) violated the Digital Millennium Copyright Act ("DMCA").

14   Mtn. at 15.  Again Apple misses the point, for it identifies no economic efficiencies achieved that

15   benefit **consumers**.  Preventing purported third-party violations of copyright law may be salutary,

16   but it is no shield against antitrust scrutiny. *Image Tech. Servs. II*, 125 F.3d at 1219 ("Neither the

17   aims of intellectual property law, nor the antitrust laws justify allowing a monopolist to rely upon

18   pretextual business justification to mask anticompetitive conduct.").  Moreover, Apple's contention

19   is factually meritless, for the record is clear that its exclusionary actions against RealNetworks were

20   not prompted by any genuine threat to DRM or the security solutions it had promised the music

21   labels. *See supra* at §III.

22         **2.**     **Apple Falsely Disparaged and Threatened RealNetworks and**
23                **Other Potential Competitors in Public Statements**

24        Apple's software updates that disabled Harmony are not the only actions Apple took to

25   exclude rivals.  When RealNetworks first announced the Harmony technology in July 2004, and later

     when RealNetworks once again enabled Harmony-iPod interoperability, Apple issued public
26

27   statements that disparaged RealNetworks, falsely implied that RealNetworks had violated the law,

28

1   and warned RealNetworks and any other would-be competitors that Apple would disable any

2   interoperability. Ex. 28; *see supra* at 7.

3          In *American Professional*, the Ninth Circuit recognized that disparagement of a competitor

4   can rise to the level of exclusionary conduct sufficient to support a Section 2 violation where there is

5   evidence of a "significant and enduring adverse impact on competition." *Am. Prof'l*, 108 F.3d at

6   1152. *See also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979); *Int'l Travel*

7   *Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1268, 1270 (8th Cir. 1980) (affirming Section 2

8   liability based on disparagement of competitor); *see generally UPMC*, 627 F.3d at 109 & n.14

9   (collecting cases); Areeda, ¶651h, at 126 ("Of course, in the presence of substantial market power,

10  some kinds of tortious behavior could anticompetitively create or sustain a monopoly, and it would

11  then warrant condemnation under §2.").

12         In this case, Plaintiffs have adduced ample evidence that Apple's disparagement of

13  RealNetworks, together with its repeated software revisions intended to block interoperability, had a

14  significant and enduring adverse impact on competition. *See supra* at 13; Ex. 48 at 494; Ex. 25.

15         Similarly, threats of legal action designed to deter lawful conduct by competitors are

16  actionable under Section 2. *See, e.g., Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,

17  382 U.S. 172, 86 S. Ct. 347 (1965) (holding that complaint alleging defendant attempted to

18  monopolize by threatening to and pursuing legal enforcement of patent procured by fraud on Patent

19  Office stated claim under Section 2); *Ritz Camera & Image v. SanDisk Corp.*, No. 10-cv-02787

20  JF/HRL, 2011 U.S. Dist LEXIS 18399 (N.D. Cal. Feb. 24, 2011) (Fogel, J.) (upholding complaint

21  alleging Section 2 violations based on unfounded patent infringement actions); *see generally* Areeda

22  ¶651h, at 126. Here, in order to maintain its market power, Apple threatened RealNetworks with

23  legal action for purported violations of the DMCA. *See supra* at 7.

### 3.     Apple's Refusal to Deal Is Not Protected

25         Apple's selective licensing of FairPlay also raises a triable issue of exclusionary conduct,

26  because Apple's refusal to license FairPlay to actual or potential competitors tended to impair the

27  opportunities of its rivals to compete other than on the merits, and did so in an unnecessary or

28  unnecessarily restrictive way.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                              - 18 -

1    *Aspen Skiing* refutes Apple's argument that Apple had "no duty to ensure that competitors'

2    products would continue to work with Apple's." Mtn. at 3, 19-24. In *Aspen Skiing*, the Supreme

3    Court held that a monopolist's right to refuse to deal is not unqualified. *Aspen Skiing*, 472 U.S. at

4    600-01. Affirming the judgment for the plaintiff in a unanimous opinion, the Court found that the

5    record "comfortably supports an inference that the monopolist made a deliberate effort to discourage

6    its customers from doing business with its smaller rival." *Id.* at 610.

7        In *Aspen Skiing* the Supreme Court specifically condemned conduct demonstrating that the

8    defendant "was not motivated by efficiency concerns and . . . was willing to sacrifice short-run

9    benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival. *Id.*

10   at 610-11. This so-called "sacrifice" test examines the defendant's willingness to sacrifice short-

11   term revenues or profits in exchange for larger revenues anticipated to result from monopoly power

12   or increased dominance. Areeda ¶651b2, at 102. That is precisely what Apple did here: it sacrificed

13   the short-term profits it would have gained from interoperability in exchange for the monopoly

14   profits it gained by excluding potential rivals.

15       Apple's argument that *Aspen Skiing* is limited to cases of prior cooperation misstates the law.

16   Relying on out-of-circuit authority, Apple baldly asserts that a "unilateral refusal to license

17   intellectual property is not an antitrust violation." Mtn. at 22-23. But Apple ignores binding Ninth

18   Circuit authority holding that in certain circumstances a unilateral refusal to license intellectual

19   property can be an antitrust violation. In *Image Tech. Servs. II*, the Ninth Circuit squarely held that a

20   monopolist's unilateral refusal to license intellectual property can violate Section 2 if not supported

21   by a valid business justification. *Image Tech. Servs. II*, 125 F.3d 1195. In that case (as here), the

22   defendant offered up a pretextual business justification for its refusal to deal, which was rejected by

23   the court. *Id.* While Apple will likely argue that *Image Tech. Servs. II*, was limited by the Supreme

24   Court's subsequent *Trinko* decision, *Trinko* did not overrule *Image Tech. Servs. II*, and the language

25   upon which Apple relies (stating that "there is no duty to aid competitors") is dictum. *See* J. Thomas

26   Rosch, Commissioner, Federal Trade Commission, *The Role of Static and Dynamic Analysis in*

27   *Pharmaceutical    Antitrust,* (Feb. 18, 2010) (Ex. 49, at 11-12, *available    at*

28   www.ftc.gov/speeches/rosch/100218pharmaantitrust.pdf) (noting a circuit split between the Ninth

and Federal Circuits on whether a unilateral refusal to license intellectual property can violate Section 2, and noting that Justice Scalia's statements regarding whether monopolists have a duty to deal with rivals was dictum). Apple's reliance, therefore, on out-of-circuit authority in its brief is therefore squarely in conflict with Ninth Circuit authority and unavailing.[12]

Moreover, as previously recognized by this Court (*Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1100 (N.D. Cal. 2006)), while the *Trinko* court found the defendant's decision to cease participation in a prior cooperative venture in *Aspen Skiing* significant, it did not confine refusal to deal cases to those situations where there exists a prior course of dealing. Rather, the Court focused on the defendant's prior conduct to "[shed] light upon the motivation of its refusal to deal – upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice." *Trinko*, 540 U.S. at 409.

### C.  Apple Lacks Valid Business Justifications for Its Exclusionary Actions Against Harmony

As demonstrated above, Apple acted to exclude Harmony "on some basis other than efficiency." The burden therefore shifts to Apple to prove a valid business justification for its actions. *Aspen Skiing*, 472 U.S. at 605, 608. The validity and sufficiency of a proffered business justification is a factual issue for the jury. *Image Tech. Serv. I*, 903 F.2d at 620 & n.10.

In *Eastman Kodak*, 18 independent service organizations ("ISO's") that serviced Kodak copying and micrographic equipment brought a Section 2 action against Kodak to challenge its policies limiting the availability of Kodak parts. As to the issue of willful acquisition or maintenance of monopoly power, the Court stated that there was evidence Kodak "took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market." *Eastman Kodak*, 504 U.S. at 483. Kodak could therefore escape liability under Section 2 *only* if it could explain its actions on the basis of valid business reasons,

---

[12]    Apple's attempt to diminish the holding of *Image Tech. Servs. II*, (*see* Mtn. at 23 n.13), is similarly unavailing. Apple, like Kodak, did change its practices by modifying its software, and nothing in *Trinko* or *Image Tech. Servs. II*, requires that those prior practices necessarily entail a prior agreement with the rival.

1   which was the fact-finders' prerogative to accept or reject. *Id.* The Supreme Court therefore reversed

2   summary judgment on the validity and sufficiency of Kodak's purported business justifications, and

3   remanded for trial. *Id.*

4           Here, as in *Eastman Kodak*, none of the business justifications proffered by Apple is

5   dispositive as a matter of law.

6                   **1.      Apple's Purported Need to Satisfy the Labels**

7           As it has throughout this litigation, Apple asserts that its actions against Harmony were

8   required by the record labels. Mtn. at 2 ("the record labels could have closed down iTS if Apple did

9   not repair the DRM"); *id.* at 17 ("Whether or not DRM was effective or a good idea, the labels

10  required it as a condition of selling music to Apple . . . . "). Notably, however, Apple presents no

11  evidence that suggests the record labels viewed RealNetworks' Harmony as a hack or a threat to

12  DRM. Rather, the record labels ***supported*** Harmony because they wanted interoperability.

13          As declarations by the labels attest:

14      •   "WARNER has an interest in having its music sold in the widest manner
            possible, through as many channels as possible" and entered into an
15          agreement with RealNetworks to sell Warner's sound recordings., Ex. 1.

16      •   "SONY entered into agreements with other companies, including Real
            Networks.", Ex. 2.
17
        •   "Universal has always had an interest in having its music sold in the widest
18          manner possible, through as many channels as possible" and entered into an
            agreement with RealNetworks to sell Universal's music., Ex. 3; and
19
        •   "EMI was interested in having its recorded music made widely available
20          though many different channels" and had an agreement with RealNetworks to
            sell downloads of EMI sound recordings., Ex. 4.
21
    Indeed, Apple executives acknowledged in July 2004 that the labels wanted Apple to license
22
    FairPlay to RealNetworks. Ex. 22. Because (as the record labels recognized) RealNetworks posed
23
    no threat to DRM, Apple's contractual obligation to protect DRM cannot justify its exclusionary
24
    actions against RealNetworks.
25
                    **2.      Apple's Purported Need to Stop Hackers**
26
            Apple's main argument is that stopping hacks constituted a procompetitive business
27
    justification. Mtn. at 17. While stopping genuine hackers may be a salutary goal, that is not the end
28

1  of the inquiry. *Cf. Microsoft*, 253 F.3d at 71 (Microsoft's justification "is not an unlawful end, but

2  neither is it a procompetitive justification for the specific means here in question."); *Image Tech.*

3  *Servs. II*, 125 F.3d at 1219 ("Neither the aims of intellectual property law, nor the antitrust laws

4  justify allowing a monopolist to rely upon pretextual business justification to mask anticompetitive

5  conduct."). The record presented here demonstrates that Apple's software updates and threats were

6  intended to, and had the effect of, stopping competition by a rival seller of online music files. *See*

7  *supra* at 9-11.

8              **3.    Apple's Purported Right to Improve the iPod**

9        Apple argues that it had the right to improve its product, citing *Tyco*, 592 F.3d 991. Mtn. at

10  18. But as described above, Apple's exclusionary conduct did not improve the performance of its

11  iPod. Indeed, Apple's actions were specifically designed to ***restrict*** the existing performance

12  capabilities of its product, by disabling its ability to play online music files not purchased through

13  Apple and making the iPod databases more likely to be erased. Martin Decl., ¶¶74, 79. A

14  reasonable juror need not necessarily view Apple's changes to FairPlay as a product improvement.

15        Judicial deference to product innovation or improvement does not mean that that a

16  monopolist's product design decisions are per se lawful. *Microsoft*, 253 F.3d at 65 (citing, among

17  other cases, *Foremost*, 703 F.2d at 545). Apple's suggestion that *Tyco* holds otherwise is incorrect.

18  *See, e.g.*, Mtn. at 14 ("*Tyco* holds that companies do not engage in exclusionary conduct when they

19  modify a product to improve it.").

20        In *Tyco*, the Ninth Circuit held that "a design change that improves a product ***by providing a***

21  ***new benefit to consumers*** does not violate Section 2 ***absent some associated anticompetitive***

22  ***conduct*.**" *Tyco*, 592 F.3d at 998-99. *Tyco* is distinguishable on both counts: here Apple's purported

23  product improvements  (a) did not provide any new benefit ***to consumers***; and (b) were accompanied

24  by associated anticompetitive conduct (*i.e.*, targeted action against Harmony, refusals to deal and

25  disparaging and false statements). *Cf. Microsoft*, 253 F.3d at 65-67 (integration of browser excluded

26  competition but did not improve product and so violated Section 2); *Abbott Labs. v. Teva Pharms.*

27  *USA, Inc.*, 432 F. Supp. 2d 408, 423 (D. Del. 2006) (upholding Section 2 claims alleging defendant's

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                                                                      - 22 -

1  introduction of new drug and discontinuation of old drug was motivated by anticompetitive

2  intentions and did not provide any added medical benefit to consumers).

3  **4.  Apple's Purported Right to Avoid Dealing with RealNetworks**

4  Apple argues that allowing Harmony to operate "would have required extensive, close

5  cooperation between Apple and RealNetworks." Mtn. at 20-21. Apple relies on *Trinko*, 540 U.S.

6  398, for the proposition that it cannot be forced to deal with a competitor absent a pre-existing

7  course of dealing between the two. Mtn. at 23-24. As discussed above, Apple has misstated the law

8  governing refusals to deal.  Equally important, Apple's assertion is belied by the record, which

9  confirms that RealNetworks managed to produce Harmony and keep it operating for months *without*

10  Apple's cooperation.  *See supra* at 7-9.  Apple's only obligation was to refrain from acts that

11  impaired competition that legitimately arose through entirely legal (and record label-endorsed)

12  attempts at interoperability.

13  Moreover, Apple's claim that allowing Harmony to operate would have required "extensive,

14  close cooperation" between Apple and RealNetworks, and that such cooperation would have

15  compromised the security of FairPlay, is not supported by the record. As Plaintiffs' expert explains,

16  Apple would have had to disclose very limited technical information to RealNetworks, even after the

17  4.7 revision, with little or no threat to the security of FairPlay encrypted songs, in order to maintain

18  interoperability.  Martin Decl., ¶¶43-47, 64-65.

19  Likewise off-base is Apple's suggestion that, unless the Court grants summary judgment, it

20  could be faced with the need to act as a "central planner" or to serve as a "day-to-day enforcer" of

21  Apple's shared obligations with RealNetworks.  Mtn. at 22.  Plaintiffs are not seeking "forced

22  efforts," "forced dealings" or any other such order to "force two competitors into a close,

23  cooperative relationship." Mtn. at 22-24. The class period in this case ended on March 31, 2009, the

24  date by which all music sold through iTS was DRM-free.  Plaintiffs seek only damages through the

25  date that Apple's exclusionary conduct ceased to affect the market.

26

27

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                              - 23 -

1  **D.    The Anticompetitive Harm of Apple's Misconduct Outweighed Any**
       **Consumer Benefit Generated, Particularly Given Less Restrictive**
2      **Alternative Means Available to Apple**

3          Even if the Court were to find that Apple's asserted procompetitive justifications were non-

4  pretextual, Plaintiffs would be able to show that Apple could have advanced these goals through less

5  restrictive means, or that the anticompetitive harm caused by Apple's conduct outweighed any

6  procompetitive benefit. *Microsoft*, 253 F.3d at 58-59. As the Ninth Circuit stated in *Cal. Computer*

7  *Prods., Inc. v. IBM, Inc.*, 613 F.2d 727 (9th Cir. 1979): "The plaintiff need not show that the

8  conceded monopolist's acts were of a kind that would be unlawful for an ordinary enterprise.

9  Rather, the plaintiff must show that the defendant's acts 'unnecessarily excluded competition' from

10 the relevant market," analogously to the rule of reason analysis under Section 1 of the Sherman Act.

11 *Id.* at 735-36.

12         Nothing in *Tyco* precludes such balancing in this case.  In *Tyco* the Ninth Circuit properly

13 questioned the application of the balancing analysis in cases lacking any evidence of exclusionary

14 conduct.  *Tyco*, 592 F.3d at 1000 ("***If*** a monopolist's design change is an improvement, it is

15 'necessarily tolerated by the antitrust laws' ***unless*** the monopolist abuses or leverages its monopoly

16 power in some other way when introducing the product."); *id.* ("***Absent*** some form of coercive

17 conduct by the monopolist, the ultimate worth of a ***genuine*** product improvement can be adequately

18 judged only by the market itself.").  But where (as here) the record demonstrates exclusionary

19 conduct (which, as shown above, here involves far more than mere product improvement), then the

20 balancing analysis endorsed by *Microsoft* and *Cal. Computer Prods.* is not only permitted under

21 *Tyco*, it is ***required*** by the broad prohibitory language of Section 2.

22     **E.    Plaintiffs' Derivative California UCL Claim Necessarily Survives**

23         Apple argues that Plaintiffs' claim under California Business & Professions Code §17200,

24 which is premised on Apple's violation of Section 2, must be dismissed if Plaintiffs' Section 2

25 claims are dismissed. Conversely, Plaintiffs' derivative UCL claim survives so long as Apple is not

26 entitled to judgment on Plaintiffs' Section 2 claims as a matter of law. *See* Dkt. No. 377 at 8 (ruling

27 that Plaintiffs' UCL claim survives if their Sherman Act claim does).

28

1    Additionally, California courts have recognized that an unfair business act or practice need

2  not violate an antitrust law to be actionable under the UCL. *Chavez v. Whirlpool Corp.*, 93 Cal.

3  App. 4th 363, 375 (2001).  Where the conduct unreasonably restrains competition and harms

4  consumers, the conduct is deemed unfair.  *Id.*  Apple engaged in unfair actions to entrench its

5  monopolies and subsequently overcharged consumers for iPods.  This unreasonable restraint on

6  competition and harm to consumers is sufficient within the meaning of the UCL even if Apple

7  succeeds on its motion against Plaintiffs Section 2 claims.

8  **V.    CONCLUSION**

9    The Supreme Court has recognized that most antitrust claims should be resolved "on a case-

10 by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak*, 504 U.S.

11 at 467.  The record presented here is ample to permit a reasonable jury to find exclusionary conduct,

12 invalid or pretextual procompetitive justifications and disproportionate anticompetitive effect – all of

13 which would support a finding for Plaintiffs on their Section 2 claims against Apple.  Accordingly,

14 Apple's motion for summary judgment must be denied.

15 DATED:  February 28, 2011                    Respectfully submitted,

16                                              ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
17                                              JOHN J. STOIA, JR.
                                                BONNY E. SWEENEY
18                                              THOMAS R. MERRICK
                                                ALEXANDRA S. BERNAY
19                                              CARMEN A. MEDICI

20

21                                                    s/ Bonny E. Sweeney
                                                      BONNY E. SWEENEY
22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
JUDGMENT - C-05-00037-JW(HRL)                                              - 25 -

1

2          655 West Broadway, Suite 1900
           San Diego, CA  92101
3          Telephone:  619/231-1058
           619/231-7423 (fax)

4          THE KATRIEL LAW FIRM
           ROY A. KATRIEL
5          1101 30th Street, N.W., Suite 500
           Washington, DC  20007
6          Telephone:  202/625-4342
           202/330-5593 (fax)

7
           Co-Lead Counsel for Plaintiffs
8
           BONNETT, FAIRBOURN, FRIEDMAN
9              & BALINT, P.C.
           ANDREW S. FRIEDMAN
10         FRANCIS J. BALINT, JR.
           ELAINE A. RYAN
11         TODD D. CARPENTER
           2901 N. Central Avenue, Suite 1000
12         Phoenix, AZ  85012
           Telephone:  602/274-1100
13         602/274-1199 (fax)

14         BRAUN LAW GROUP, P.C.
           MICHAEL D. BRAUN
15         10680 West Pico Blvd., Suite 280
           Los Angeles, CA  90064
16         Telephone:  310/836-6000
           310/836-6010 (fax)

17
           MURRAY, FRANK & SAILER LLP
18         BRIAN P. MURRAY
           JACQUELINE SAILER
19         275 Madison Avenue, Suite 801
           New York, NY  10016
20         Telephone:  212/682-1818
           212/682-1892 (fax)

21
           GLANCY BINKOW & GOLDBERG LLP
22         MICHAEL GOLDBERG
           1801 Avenue of the Stars, Suite 311
23         Los Angeles, CA  90067
           Telephone:  310/201-9150
24         310/201-9160 (fax)

25         Additional Counsel for Plaintiffs

26

27

28

610352_2   PLAINTIFFS' MEMORANDUM IN OPPOSITION TO APPLE'S MOTION FOR SUMMARY
           JUDGMENT - C-05-00037-JW(HRL)                                    - 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 28, 2011.

<u>s/ Bonny E. Sweeney</u>
BONNY E. SWEENEY

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:       bonnys@rgrdlaw.com

610352_2

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Alexandra Senya Bernay**
  xanb@rgrdlaw.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com

- **Todd David Carpenter**
  tcarpenter@bffb.com,pjohnson@bffb.com,rcreech@bffb.com

- **Andrew S. Friedman**
  khonecker@bffb.com,rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com

- **Roy Arie Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com

- **Carmen Anthony Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com

- **Thomas Robert Merrick**
  tmerrick@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

CAND-ECF-                                                                    Page 2 of 2

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **George A. Riley**
  griley@omm.com,lperez@omm.com,cchiu@omm.com

- **Elaine A. Ryan**
  eryan@bffb.com,pjohnson@bffb.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Michael Tedder Scott**
  michaelscott@jonesday.com,amhoward@jonesday.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@rgrdlaw.com

- **Bonny E. Sweeney**
  bonnys@rgrdlaw.com,christinas@rgrdlaw.com,E_file_sd@rgrdlaw.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)