EXHIBIT 1

## Declaration of Howie Singer

I am Howie Singer, Senior Vice President, Strategic Technology and Chief Technology Officer for Warner Music Inc. ("WARNER").

WARNER is one of the world's leading music companies. The company discovers, develops, markets and distributes recorded music in a number of ways, including through licenses with various companies.

WARNER, like other music companies, entered into several agreements with Apple, Inc. ("Apple") for the sale of WARNER's sound recordings through Apple's iTunes Store. These agreements set forth the terms and conditions under which Apple would purchase and resell downloads of sound recordings to consumers. WARNER and Apple updated the agreements from time to time to make changes to the terms and conditions.

As part of the agreements, WARNER required that its sound recordings available for sale by Apple through the iTunes Store have content protection to guard against piracy. In particular, WARNER was concerned with consumers' ability to make an unrestricted number of copies of the sound recordings.

In 2003, Apple and WARNER entered into negotiations concerning the launch of iTunes for Windows. During these negotiations, WARNER proposed that WARNER's music sold through the iTunes Store be playable on an unlimited number of iPods and on competing digital players owned by the purchaser of the music. Apple did not agree to this proposal. and instead insisted that the music sold through the iTunes Store, including WARNER's sound recordings, only be compatible with iPods.

WARNER has an interest in having its music sold in the widest manner possible, through as many channels as possible.

During the relevant period, WARNER entered into agreements with other companies, including RealNetworks, which also set forth the terms and conditions under which WARNER's sound recordings were sold through online stores other than the iTunes Store.

WARNER was aware of RealNetwork's Harmony technology introduced in July, 2004, which purported to allow music purchased through RealNetworks' online store to be directly downloaded onto an iPod. Warner entered into a download deal with RealNetworks because music purchased through RealNetworks' online store contained a security solution that guarded against unauthorized duplication and distribution of WARNER's sound recordings.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of December, 2010, at New York, New York.

Howie Singer

# EXHIBIT 2

I am Lawrence Kanusher, Senior Vice President, Business & Legal Affairs for the Global Digital Business Group of Sony Music Entertainment.

Sony Music Entertainment ("SONY") is one of the world's leading music companies. The company discovers, develops, markets, sells and distributes recorded music in a number of ways, including through relationships with various companies.

SONY, like other music companies, entered into several agreements with Apple Inc. ("Apple") for the sale of downloads embodying their digital products through Apple's iTunes Store. These agreements set forth the terms and conditions under which Apple would purchase and resell SONY's digital products to consumers. SONY and Apple have updated the agreements from time to time.

As part of these agreements, SONY required that SONY's digital products available for re-sale by Apple through the iTunes Store have content protection to mitigate against piracy. In particular, SONY was concerned with consumers' ability to make an unrestricted number of copies.

In 2003, Apple and SONY entered into negotiations concerning the launch of iTunes for Windows. During ongoing negotiations, SONY and Apple discussed whether SONY digital product files protected by DRM could be playable on music players in addition to the iPod without compromising the security solution. Apple did not accommodate Sony's request for a solution that would both protect the content as well as be interoperable with other devices.

Several years later, in 2009, the parties agreed upon an unprotected solution which allowed SONY files to be played on other companies' devices.

In addition, SONY entered into agreements with other companies, including Real Networks, which also set forth the terms and conditions under which downloads embodying SONY's digital products were sold through online stores other than the iTunes Store in a secure format. During the relevant period, SONY's download deal with RealNetworks required a security solution that guarded against unauthorized duplication and distribution of downloads embodying SONY's digital products.

SONY was aware of RealNetwork's Harmony technology introduced in July, 2004, which allowed music purchased through RealNetworks' online store to be transferred to an iPod. Because music purchased through Real Networks' online store contained a security solution that guarded against unauthorized duplication and distribution of SONY's digital products, SONY did not object to the Harmony technology.


New York, New York
December 22, 2010

_____
Lawrence Kanusher
Senior Vice President, Business & Legal
Affairs for the Global Digital Business
Group of Sony Music Entertainment

EXHIBIT 3

I, Amanda Marks, declare as follows:

1.     I am Executive Vice President and General Manager of Universal Music Distribution and was formerly Senior Vice President, Universal Music Group - eLabs.  I have personal knowledge of the facts stated herein and would and could testify competently thereto if called as a witness in this matter.

2.     UMG Recordings, Inc. is a record company which is part of what is known as the Universal Music Group ("Universal").  Universal is one of the world's leading music companies.  Universal discovers, develops, markets and distributes recorded music in a number of ways, including through licenses or distribution agreements with various companies.

3.     Universal, like other music companies, entered into agreements with Apple, Inc. ("Apple") for the sale of Universal's sound recordings through Apple's iTunes Store.  These agreements set forth the terms and conditions under which Apple provided certain services, including the sale of downloads of sound recordings.  Universal and Apple updated the agreements from time to time to make changes to the terms and conditions.

4.     As part of the agreements, Universal required that its sound recordings available for sale by Apple through the iTunes Store have content protection to guard against piracy.  In or around 2004 Universal had discussions with Apple, in which Universal expressed to Apple that while Universal continued to require content protection, Universal wanted interoperability between its music sold through online stores and portable digital music players.  Universal has always had an interest in having its music sold in the widest manner possible, through as many channels as possible.

///

///

///

5.    During the relevant period, Universal entered into agreements with other companies, including RealNetworks, which set forth the terms and conditions under which Universal's music was sold through such companies' online stores.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed December 28, 2010, at Los Angeles, California.


AMANDA MARKS

EXHIBIT 4

DECLARATION

Mark Piibe declares as follows:  I am Executive Vice President, Global Business Development of EMI Music, an affiliate of Capitol Records, LLC.  I make this declaration on behalf of Capitol Records, LLC, dba EMI Music North America (hereinafter "EMI") based on information contained in EMI's records.

In or about 2003, Apple and EMI entered into negotiations concerning the launch of iTunes for Windows.

Apple's agreement with EMI defined compliant player devices to include only iPod models that were commercially available at the time and versions that subsequently would become available.

EMI was interested in having its recorded music made widely available through many different channels, and during the same period it had agreements with other companies, including RealNetworks and its predecessor, Listen.com, to sell downloads of EMI sound recordings to online services other than the iTunes service.

EMI personnel became aware of RealNetworks' Harmony DRM technology at some time in or after 2004.  RealNetworks' predecessor, Listen.com, represented that Harmony guarded against violations of the usage limitations and restrictions applicable to downloads of EMI recordings.  I have found no indication that EMI made any objection to the Harmony DRM technology.

Dated:  December 22, 2010

_____
Mark Piibe

# EXHIBITS 5-11
# [Filed Under Seal]

# EXHIBIT 12

  



 

You're viewing an article in TMO's historic archive vault. Here, we've preserved the comments and how the site looked along with the article. Use this link to view the article on our current site:
**iPod Claims 82% HD-Based Retail Market Share; 42% All Players (UPDATE)**

### iPod Claims 82% HD-Based Retail Market Share; 42% All Players (UPDATE)
by **Bryan Chaffin**, 3:30 PM EDT, October 11th, 2004



Apple's **iPod** and **iPod mini** had a 82% market share among hard drive-based portable music players in the last year, according to August figures from market research firm NPG Group. For all types of portable music players, Apple market share was 41.9%, the company told The Mac Observer, Monday.

A **published report from Bloomberg News** on Monday mistakingly gave the impression the 82% share was for all players.

The figure are for the month of August and are for US retail stores only, excluding direct sales and other online sales. The numbers are calculated using a percentage of actual unit sales reported by major retailers, such as Apple's retail stores, together with consumers surveys of buying habits.

The 82% market share of hard drive-based players is up from 64% from a year ago and 33% from two years ago, NPD said.

Among hard drive-based players, **Creative Technology** placed far second with a 3.7% share, followed by **Rio** at 3.2%.

Among all portable music players - hard drive-based as well as flash-based - Apple was first with 41.9%, Rio in second with 10.0%, **iRiver** in third with 9.3%, and **RCA** in fourth with 9.0%.

*Brad Gibson contributed to this article.*

**Bloomberg Article**

## Observer Comments

Show: **Subjects Only** | Full Comments

| | |
|---|---|
| **Name:** AFCdtLoeb   Posts: 2533   Joined: 20 Jul 2004 | **Close** |
| **Subject:** | Mon Oct 11, 2004 3:25 pm |

82%?! Holy mother of Pearl!!!!

**Reply**  |  **Quote**

---

**Name:** Guest                                          **Close**
**Subject:**  Bring on the 60 Gig                         **Mon Oct 11, 2004 4:47 pm**

Ã¢â‚¬Â¦my credit card is in hand and ready. Oh, and you can also bring on the lower capacity flash-based Apple players (iChips? microPods?), I'm sure there are legions waiting for those sub $100 players as well.

Question: how are they going to fit a click wheel on increasingly tiny players as well as a decent size screen?

**Reply**  |  **Quote**

---

**Name:** Guest                                          **Close**
**Subject:**  NPG Group claims iPods hold a 82% market share     **Mon Oct 11, 2004 4:59 pm**

Funny, that we're not seeing Reality Check's comments on this.

**Reply**  |  **Quote**

---

**Name:** Guest                                          **Close**
**Subject:**                                             **Mon Oct 11, 2004 5:02 pm**

> Question: how are they going to fit a click wheel on increasingly tiny
> players as well as a decent size screen?

My guess:

Apple flash players won't be (much) smaller than Mini's, just thinner.

I bet market research shows that if something is smaller than a credit card, people start to lose them. Probably there is also a point of diminishing returns on usability (big fingers and all that).

**Reply**  |  **Quote**

---

**Name:** Guest                                          **Close**
**Subject:**  He's busy                                   **Mon Oct 11, 2004 5:08 pm**

> **Quote**
> **Guest wrote:**
> Funny, that we're not seeing Reality Check's comments on this.

That's because he's out right now trying to buy up as many non-iPod players as he can, to single-handedly try and change the numbers.

**Reply** | **Quote**

---

**Name:** Guest                                                                    **Close**

**Subject:**  Missing MP3 players built into phones, palm/pda, etc.        **Mon Oct 11, 2004 5:37 pm**

Do these numbers incldue video players? Phones that play MP3? Palms?

Name another hard drive based music player! Can't? That's because they're no comparison to the iPod.

**Reply** | **Quote**

---

**Name:** slinky259    Posts: 91   Joined: 24 Jun 2004                              **Close**

**Subject:**                                                              **Mon Oct 11, 2004 8:40 pm**

> **Quote**
> **Guest wrote:**
> Do these numbers incldue video players? Phones that play MP3? Palms?
>
> Name another hard drive based music player! Can't? That's because they're no comparison to the iPod.

Umm... that Rio one... think it's called Karma or something... Creative Nomad Zen thing... dell jukebox... just off the top of my head.

not saying they are any competition - but people know they exist 

**Reply** | **Quote**

---

**Name:** Guest                                                                    **Close**

**Subject:**                                                              **Mon Oct 11, 2004 8:58 pm**

> **Quote**
> **Guest wrote:**
> Funny, that we're not seeing Reality Check's comments on this.

Yeah, I was hoping for some insightful comments from him as well.

**Reply** | **Quote**

---

**Name:** Guest                                                                    **Close**

**Subject:**  Will your next MP3 player be a cell phone?        **Mon Oct 11, 2004 10:41 pm**

**http://reviews.cnet.com/4520-6450_7-5535370-1.html?tag=cnetfd.sd**

Could this be the iPods undoing?

Maybe in about a year from now. Cell phones seem to be the more logical vector to assimilate these peripheral technologies like PDAs, cameras, etc.

And all the iPod fans shuddered at the thought.

**Reply** | **Quote**

---

**Name:** Intruder - TMO Mac Specialist  Posts: 3149  Joined: 07 Jul 2004    **Close**
**Subject:**    **Mon Oct 11, 2004 11:15 pm**

Nope.

**Reply** | **Quote**

---

**Name:** Guest    **Close**
**Subject:**  Cell Phones?????    **Tue Oct 12, 2004 12:24 am**

I'd be happy if they made a cell phone that worked like a phone, only a phone, and they can shove the rest of the "features" where the sun don't shine.

**Reply** | **Quote**

---

**Name:** Small White Car   Posts: 1960  Joined: 02 Jul 2004    **Close**
**Subject:**  Re: Will your next MP3 player be a cell phone?    **Tue Oct 12, 2004 12:28 am**

**Quote**
**Anonymous wrote:**
http://reviews.cnet.com/4520-6450_7-5535370-1.html?tag=cnetfd.sd

Could this be the iPods undoing?

Maybe in about a year from now. Cell phones seem to be the more logical vector to assimilate these peripheral technologies like PDAs, cameras, etc.

And all the iPod fans shuddered at the thought.


Whoo! $500 cell phones! Yeah, those'll take right off!

If they cost any less than that their features will be much less appealing than the iPod's.

**Reply** | **Quote**

---

**Name:** AyaSofya  Posts: 137  Joined: 11 May 2004    **Close**
**Subject:**  $500 cell phone, I bought one    **Tue Oct 12, 2004 1:32 am**

"Whoo! $500 cell phones! Yeah, those'll take right off!"

I bought my wife one, a Treo 600, because she is deaf and could use it for email communication.

The full keyboard makes it easier to compose messages, than trying to wrestle with the standard phone keypad found on most cell phones. With the cell phone feature we thought it a better deal than Blackberry. Actually the phone had a rebate at the time and the total cost was not much more than higher end cell phone.

However, this summer she had a cochlear implant, this unit bypasses her damaged inner ear and directly stimulates the audio nerve. She has regained over 50% of her hearing!
http://www.cochlearamericas.com/

**Reply**  |  **Quote**

---

**Name:** Guest                                                    **Close**
**Subject:**                                          Tue Oct 12, 2004 9:09 am

AyaSofya, nice to hear about the positive news concerning the wife.

oharag

**Reply**  |  **Quote**

---

**Name:** Biff    Posts: 1479   Joined: 08 Apr 2004                **Close**
**Subject:**  Re: Will RC's next MP3 player be a cell phone?      Tue Oct 12, 2004 11:03 am

**Quote**
**Guest wrote:**
http://reviews.cnet.com/4520-6450_7-5535370-1.html?tag=cnetfd.sd

Could this be the iPods undoing?

Maybe in about a year from now. Cell phones seem to be the more logical vector to assimilate these peripheral technologies like PDAs, cameras, etc.

And all the iPod fans shuddered at the thought.

Predictions of an iPod killer! All the others have been wrong but not this one! I mean come on could this guy be wrong?
http://i.i.com.com/cnwk.1d/i/col/hed_mi.jpg

I'll just wait for a nice top secret bluetooth accessory that will be out for 4G iPod.

**Reply**  |  **Quote**

---

**Name:** jimothy    Posts: 612   Joined: 04 Jun 2004               **Close**
**Subject:**                                          Tue Oct 12, 2004 2:19 pm

**Quote**
**AyaSofya wrote:**

However, this summer she had a cochlear implant, this unit bypasses her damaged inner ear and directly stimulates the audio nerve. She has regained over 50% of her hearing! http://www.cochlearamericas.com/

Best of luck to your wife! First thing I'd do for her after the operation--get her an iPod! 

**Reply** | **Quote**

---

**Name:** Guest                                                    **Close**
**Subject:** iRiver                                       Fri Oct 15, 2004 5:26 pm

iRiver make *much* better hdd mp3 players than apple's ipod.

The iHP140 - a 40GB player, plays ogg vorbis files, builtin fm tuner, builtin recorder, mounts directly as usb mass storage... the benefits go on an on.

And when I bought my iRiver, it was about $200AU cheaper than the same sized iPod, unbelievable!

**Reply** | **Quote**

---

**Name:** Guest                                                    **Close**
**Subject:** Will APPLE bring Flash iPod?                  Wed Dec 01, 2004 3:19 am

I've read some blog and news that Apple is contacting one chipmaker, a competitor of current chipmaker.
And Apple is ready to introduce flas memory player by the end of this year.
Could it be true?

**Reply** | **Quote**

---

**Name:** Suffolkmina    Posts: 2   Joined: 01 Dec 2004           **Close**
**Subject:** Will Apple bring Flash iPod?                  Wed Dec 01, 2004 3:30 am

I've heard the same thing.
That'll cannivalize iPod, mini, and photo.

**Reply** | **Quote**

---

**Name:** Mace    Posts: 9604  Joined: 07 Aug 2003             **Close**
**Subject:**                                              Wed Dec 01, 2004 1:09 pm

Flash based iPod will not cannabilize the other iPod because those going for flash based are casual buyers who do not buy much songs. Whereas those who have bought iPod tend to own/buy many songs. They are two separate market segment.

The market share figures are confusing me. SJ reported during the last quarter results that iPod has 92% of hdd based and 65% of all music players. Why this article said is 82% and 42%, are those figures for the whole year and SJ is talking about Q4 04 quarter only?

**Reply** | **Quote**

---

**Name:** Suffolkmina    Posts: 2   Joined: 01 Dec 2004          **Close**

| **Subject:** | **Tue Dec 07, 2004 12:04 am** |
|---|---|

I guess the MP3 market is just started market, so that there isn't much information that we can really rely on.
Even when we can get projections about the whole MP3 market, we can't get trustful data for all kinds...
Now, we can listen to MP3 music on our cell phone, and some cell phone mfrs have come up with HDD and memory card slot on cell phones. If we get long-life batteries for our cell phone, we no longer need MP3 player unless we need to store some data.

**Reply  |  Quote**

| **Name:** Mace   Posts: 9604   Joined: 07 Aug 2003 | **Close** |
|---|---|
| **Subject:** | **Tue Dec 07, 2004 2:18 am** |

**Quote**
**Suffolkmina wrote:**
... Now, we can listen to MP3 music on our cell phone, and some cell phone mfrs have come up with HDD and memory card slot on cell phones. If we get long-life batteries for our cell phone, we no longer need MP3 player unless we need to store some data.

You have forgotten that there are guys like me who don't carry cell phone. Electronic gadgets are now a fashion/status symbol just like jewelry not another functional device.

**Reply  |  Quote**

| **Name:** Guest | **Close** |
|---|---|
| **Subject:** It's surprising to see | **Thu Nov 03, 2005 10:21 pm** |

I can't believe apple has so many market shares

**Reply  |  Quote**

| **Name:** Guest | **Close** |
|---|---|
| **Subject:** full market share | **Mon Jan 08, 2007 2:53 pm** |

ahhhh help I'm doing research for my marketing course. Where can i find all the market share levels for mp3 players?!?

**Reply  |  Quote**

**Comment on this Article**

Guest Posts Visible. **Hide Them.**
**Back to top**  Page **1** of **1**

You **cannot** edit your comments.   You **cannot** delete your comments.

**Comments are currently closed. Please email the author instead.**

**Recent Headlines - Updated February 28th**

| | |
|---|---|
| Mon, 3:42 PM | Deal Brothers - **Panasonic Lumix DMC-FP3 14.1MP Compact Camera: $109.99** |
| 2:02 PM | Apple Stock Watch - **Analyst Meets w/Tim Cook, Foresees Cheaper iPhones** |
| 1:05 PM | News - **Google Accidentally Deletes User Email, Contacts** |
| 11:24 AM | News - **BlackHole RAT Trojan Hits the Mac** |
| 10:39 AM | TMO Appearances - **John F. Braun Discusses SSD Performance on NosillaCast** |
| 10:16 AM | Hot Forum Topic - **Reader Discussion: Mac OS X 10.7 Developer Preview** |
| 9:53 AM | Rumor - **iPad 2 Ship Date May be Only Days Away** |
| 9:01 AM | Rumor - **iPhone 5 Part Shows Bigger Display** |
| 8:26 AM | Product News - **Grungetastic Adds Distressed Effects to iPhone Photos** |
| Fri, 7:46 PM | News - **Apple Offers Lion Preview to Charlie Miller, Security Researchers** |
| 6:38 PM | News - **Consumer Reports: Verizon iPhone Has AT&T's Antenna Problem** |
| 5:27 PM | Apple Stock Watch - **AAPL Rally Brings Stock Back to $348** |

EXHIBIT 13

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

SOMTAI TROY CHAROENSAK and
MARIANA ROSEN, Individually and On Behalf
Of All Others Similarly Situated

         Plaintiffs,

         v.

APPLE COMPUTER, INC.

         Defendant.

Case No. 05-CV 37-JW

DECLARATION OF LEE MORSE

I, Lee Morse,  hereby declare:

1.   I am Director of Emerging Technology for Creative Labs, Inc. located at 1901 McCarthy Blvd., Milpitas, CA 95935.  The facts set forth in this declaration are true and correct and, if called as a witness, I could and would testify thereto.

2.   This declaration is provided in lieu of the deposition of Creative Labs, Inc., noticed by plaintiffs in this matter to be taken on January 12, 2007.  Creative served written objections to the subpoena, which are not waived, and hereby affirmed, by this declaration.

3.   Creative Labs, Inc. is the United States subsidiary of its Singapore-based parent company, Creative Technology Ltd. ("Creative").  Creative Labs, Inc. is the sales, marketing, training and customer support organization for Creative in the Americas.

4.   Creative is a worldwide leader in digital entertainment products for the personal computer and the Internet. Creative was founded in Singapore in 1981 with the vision that multimedia would revolutionize the way people interact with their personal computers.  Among

its product lines, Creative offers for sale the highly acclaimed Zen and MuVo lines of portable digital audio players.

5.   Portable digital music players are portable devices that enable their users to listen to digital audio recordings without requiring users to carry any external media, such as a compact discs, cassette tapes, or cartridges.

6.   Since January 1, 2003 until the present, Creative Labs, Inc. has offered for sale in the United States the following lines of portable digital audio players: Nomad, Nomad Jukebox, Zen, MuVo and Portable Media Center.   These portable digital audio players are or have been available for sale through Creative's website, www.creative.com as well as through other retailers and a number of distributors. Since January 1, 2003, Creative has sold approximately 5.5 million portable digital audio players in the United States.

7.   Generally, there are two sources from which consumers can legally acquire digital music files for playback on their portable digital music players.   The first is to copy compact discs ("CDs") that the consumers have purchased at traditional brick-and-mortar music stores. With few recent exceptions, these audio CDs are not copy protected, and the digital music files contained within these audio CDs can be copied onto a digital music player for playback by the user. The second source for legally acquiring digital music files for playback on portable digital audio players is comprised of legal online music stores that sell digital music files through the Internet.   Apple's iTunes Music Store is an example of such an online store.   In order for Creative to be successful in selling its line of portable digital music players, it is important for the customer to be able to legally purchase music online.

8.   Every file or song purchased from the iTunes Store is encoded with digital rights management (also referred to as "DRM") technology created by Apple.   This technology is not

recognized by other digital media players other than Apple's digital media players. As such, songs purchased from the iTunes Store cannot be directly recorded onto or played back on Creative's line of portable digital music players, which Creative believes has a negative impact on its sale of digital music players.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19 day of January, 2007 in Milpitas, California.

Lee Morse

# EXHIBITS 14-18
# [Filed Under Seal]

# EXHIBIT 19

Search

# Apple, Motorola & Cingular Launch World's First Mobile Phone with iTunes

## Motorola ROKR Available at Cingular Stores Nationwide

SAN FRANCISCO, SCHAUMBURG, Illinois and ATLANTA—September 7, 2005—Apple®, Motorola and Cingular Wireless today announced the availability of the world's first mobile phone with iTunes®, enabling music lovers to transfer up to 100 of their favorite songs from the iTunes jukebox on their Mac® or PC to their mobile phone. Apple's iTunes software on the Motorola ROKR features easy to use menus, simple navigation and playback, and the ability to simply switch from phone to music and back again with the push of a dedicated music key. The new Motorola ROKR is available today at www.cingular.com and will be sold exclusively in all Cingular retail locations beginning tomorrow.

"We've worked closely with Motorola to deliver the world's best music experience on a mobile phone," said Steve Jobs, Apple's CEO. "We're also thrilled to be working with Cingular, the largest wireless carrier in the US, to bring this pioneering phone to market."

"The ROKR brings music to the mobile phone in a way unlike any other, with the unrivaled ease of use that has become the signature of iTunes," said Ed Zander, chairman and CEO of Motorola. "We predict that the ROKR is going to be a hit this holiday season."

"We're excited to be the first wireless carrier to offer the world's first phone with iTunes to our customers nationwide," said Ralph de la Vega, chief operating officer of Cingular Wireless. "This innovative product represents a world class handset, connected to a world class network, delivering a world class application."

The new Motorola ROKR has a color display for viewing album art and features built-in dual-stereo speakers, as well as stereo headphones that also serve as a mobile headset with microphone. Music fans can randomly autofill or manually fill the mobile phone with playlists from their favorite music, audiobooks and Podcasts from their iTunes library via a USB connection. The Motorola ROKR pauses music automatically when users take a call and offers the ability to listen to music while messaging with friends or snapping a photo.

### Pricing & Availability

The new Motorola ROKR with iTunes pre-installed is available for $249.99 (US) with a two-year commitment at all Cingular stores nationwide and includes stereo headphones and a USB cable. iTunes for Mac and Windows includes the iTunes Music Store and is available as a free download from www.apple.com/itunes. Purchase and download of songs from the iTunes Music Store for Mac or Windows requires a valid credit card with a billing address in the country of purchase.

Apple ignited the personal computer revolution in the 1970s with the Apple II and reinvented the personal computer in the 1980s with the Macintosh. Today, Apple continues to lead the industry in innovation with its award-winning desktop and notebook computers, OS X operating system, and iLife and professional applications. Apple is also spearheading the digital music revolution with its iPod portable music players and iTunes online music store.

Motorola pioneered mobile technology in the 1930s with car radios and public safety radio networks, and space-to earth communication for the Apollo program. In the 1980s, Motorola revolutionized personalized communications with the first commercial handheld cellular phone. Today, its new smart devices, networks, and software are making communications not just mobile, but seamless. Continuously redefining "the device formerly known as the mobile phone," Motorola also leads the industry in design, with award-winning products like the iconic RAZR. Motorola had sales of U.S. $31.3 billion in 2004. For more information, please visit www.Motorola.com.

Cingular Wireless is the largest wireless carrier in the United States, serving 51.6 million customers. Cingular, a joint venture between SBC Communications Inc. (NYSE: SBC) and BellSouth Corporation (NYSE: BLS), has the largest digital voice and data network in the nation—the ALLOVER network—and the largest mobile-to-mobile community of any national wireless carrier. Cingular is the only U.S. wireless carrier to offer Rollover, the wireless plan that lets customers keep their unused monthly minutes. Details of the company are available at http://www.cingular.com.

Press Contacts:
Tom Neumayr
Apple
(408) 974-1972
tneumayr@apple.com

Elizabeth Cahill
Hill and Knowlton for Motorola
(323) 627-7871
(847) 606-1973
elizabeth.cahill@hillandknowlton.com

Jennifer Bowcock
Cingular
(404) 213-1204
jennifer.bowcock@cingular.com

NOTE TO EDITORS: For additional information visit Apple's PR website, or call Apple's Media Helpline at (408) 974-2042.

Apple, the Apple logo, Mac, Mac OS, Macintosh and iTunes are trademarks of Apple. Other company and product names may be trademarks of their respective owners.

Motorola and the Stylized M logo are registered in the U.S. Patent and Trademark Office ©All other product or service names are the property of their respective owners.tpMotorola, Inc, 2005.

Total storage capacity is limited by number of songs. Storage capacity is approximate and based on four minutes per song and 128-Kbps AAC encoding.

Network and/or SIM card dependent feature, not available in all areas. Airtime, data charges, and/or additional charges may apply.

Home>Press Info>Press Release

Shop the Apple Online Store (1-800-MY-APPLE), visit an Apple Retail Store, or find a reseller.

Apple Info
Site Map
Hot News
RSS Feeds
Contact Us


Copyright © 2010 Apple Inc. All rights reserved.

Terms of Use
Privacy Policy

# EXHIBITS 20-26
# [Filed Under Seal]

EXHIBIT 27

| | | |
|---|---|---|
| *Attorney or Party without Attorney:*<br>Todd D. Carpenter, Esq., Bar #234464<br>Bonnett Fairbourn Friedman<br>& Balint, P.C.<br>600 West Broadway, Suite 900<br>San Diego, CA  92101<br>*Telephone No:* 619-756-6978    *FAX: No:* 602-274-1199 | | *For Court Use Only* |

*Insert name of Court, and Judicial District and Branch Court:*
United States District Court - Western District Of Washington

*Plaintiff:* In re: Apple iPOD iTunes Anti-Trust LItigation
*Defendant:*

| **Affidavit of Reasonable Diligence** | *Hearing Date:*<br>Mon, Dec. 20, 2010 | *Time:*<br>9:00am | *Dept/Div:* | *Case Number:*<br>0500037JW(HRL) |
|---|---|---|---|---|

*Ref. No or File No.:*

1.  I, Mike  Noble, and any employee or independent contractors retained by Class Action Research & Litigation  are and were on the dates mentioned herein over the age of eighteen years and not a party to this action.  Personal service was attempted on Witness Robert  Glaser as follows:

2.  *Documents:*    Subpoena to Testify at a Deposition in a Civil Action..

| Day | Date | Time | Location | R e s u l t s |
|---|---|---|---|---|
| Tue | 12/14/10 | 7:00pm | Home | The subject was home, but answered from behind the door and is clearly familiar with service of process. He ordered me off his property and advised he was going to call the police.  I also called the police so they would be aware of why I was there and I waited for them to arrive. The police spoke to Robert, but they were inside the residence and I had no opportunity to be face to face with Robert to hand him the documents.  The police were friendly, but of course could not force Robert to come outside or accept service.  The police told me that Robert's attorneys had made him aware of impending service and instructed him not to accept service.  Attempt made by: Mike  Noble. Attempt at: 1724 Howell Place   Seattle WA 98122. |
| Fri | 12/17/10 | 2:00pm | Home | Returned Not Served on: Robert  Glaser Home - 1724 Howell Place Seattle, WA 98122 |

3.  *Person Executing*
    a. Mike  Noble
    **b. Class Action Research & Litigation**
    P O Box 740
    Penryn, CA  95663
    c. (916) 663-2562, FAX (916) 663-4955

Recoverable Costs Per CCP 1033.5(a)(4)(B)
**d. The Fee** *for service was:*
**e. I am:**    (3)  Not a Registered California Process Server

4.  *I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.*
    Date: Tue, Dec. 21, 2010

Affidavit of Reasonable Diligence                    (Mike  Noble)

le32.117563

# EXHIBIT 28
# [Filed Under Seal]

EXHIBIT 29

# Apple Accuses RealNetworks of Hacking

## RealNetworks reaffirms commitment to Harmony software that extends tunes to any player.

By Jim Dalrymple
Jul 30, 2004 11:00 AM

Apple has issued a statement accusing RealNetworks of hacker-like tactics for its Harmony technology, which will allow content from Real's music store to be played on Apple's IPod.

RealNetworks announced earlier this week that its updated software will let songs downloaded from its own music store be played on a variety of devices. The company quickly shot back to Apple's rebuke, saying it has done nothing wrong, and reaffirming its commitment to developing Harmony.

"We are stunned that RealNetworks has adopted the tactics and ethics of a hacker to break into the iPod, and we are investigating the implications of their actions under the DMCA and other laws, says Apple's statement. "We strongly caution Real and their customers that when we update our IPod software from time to time it is highly likely that Real's Harmony technology will cease to work with current and future IPods.

For its part, Real Networks says customers have welcomed the introduction of Harmony.

"Consumers, and not Apple, should be the ones choosing what music goes on their iPod," Real Networks says in a statement to MacCentral.

## A Legal Matter?

Apple's statement says the company will investigate the implications of RealNetwork's actions under the Digital Millennium Copyright Act. But representatives of RealNetworks say they are following well-established tradition of fully legal independent developed paths to achieve compatibility.

"There is ample and clear precedent for this activity, for instance the first IBM compatible PCs from Compaq," RealNetworks says in its statement. "Harmony creates a way to lock content from Real's music store in a way that is compatible with the iPod, Windows Media DRM devices, and Helix DRM devices. Harmony technology does not remove or disable any digital rights management system. Apple has suggested that new laws such as the DMCA are relevant to this dispute. In fact, the DMCA is not designed to prevent the creation of new methods of locking content and explicitly allows the creation of interoperable software."

Jupiter Research Senior Analyst Joe Wilcox is cautious about commenting on legal issues, but notes that Apple has other ways to deal with RealNetworks.

"I assume Real wouldn't have taken the risk without confidence there would be no legal consequences," Wilcox says. "However, there are always technological consequences.

Real reiterates its commitment to Harmony "and to giving millions of consumers who own portable music devices, including the Apple iPod, choice and compatibility."

# EXHIBITS 30-48
# [Filed Under Seal]

EXHIBIT 49

# Federal Trade Commission

---

**The Role of Static and Dynamic Analysis in Pharmaceutical Antitrust**

**Remarks of J. Thomas Rosch[*]**
**Commissioner, Federal Trade Commission**

**at the**

**Fifth Annual In-House Counsel Forum on Pharmaceutical Antitrust**

**New York, NY**

**February 18, 2010**

Good morning and thank you for the opportunity to speak to you today. You heard from a number of my colleagues yesterday regarding the FTC's position on several issues relevant to the pharmaceutical industry, including pay-for-delay settlements, follow-on biologics, and authorized generics. I've previously described my position respecting those issues and my remarks are posted on the FTC's website.[1] Since my colleagues have already covered the nuts-and-bolts of these issues, I'm going to try to offer some unifying principles that help explain the

---

[*] The views stated here are my own and do not necessarily reflect the views of the Commission or other Commissioners. I am grateful to my attorney advisor, Darren Tucker, for his invaluable assistance in preparing this paper.

[1] J. Thomas Rosch, Commissioner, Fed. Trade Comm., Pay-for-Delay Settlements, Authorized Generics, and Follow-on Biologics: Thoughts on the How Competition Law Can Best Protect Consumer Welfare in the Pharmaceutical Context, Remarks at World Generic Medicine Congress, Washington, D.C. (Nov. 19, 2009), *available at* http://www.ftc.gov/speeches/rosch/091119worldgenerics.pdf.

FTC's positions on these issues. I'll also comment with specificity about a few other antitrust topics relevant to the pharmaceutical industry, including refusals to license intellectual property, FDA citizen petitions, product hopping, and bundled discounts.

## I.

It's sometimes said that competition matters should be analyzed using one of two lenses – one focuses on static effects and one on dynamic effects – as though the analysis should not involve assessing both effects. The two effects are different from one another. Static analysis is based on neoclassical economics, which mostly looks at marginal prices and costs in the short run. The goal under a static approach is to avoid transactions or practices that have the effect of increasing prices or reducing output, either of which will reduce short-term consumer welfare. Firms that have some degree of pricing power (prices exceeding the marginal cost of production) are said to have market power and are typically subject to greater antitrust scrutiny than other firms.

In contrast, dynamic analysis focuses on long-run considerations like the creation of new products and services. For those of you that remember your Economics 101 class from college, what I'm talking about is shifting the supply curve out or creating an entirely new supply curve. The person most closely associated with this approach is economist Joseph Schumpeter, who emphasized that a certain amount of protection from competition is necessary for a firm to undergo the risks and costs of innovating and that innovation can have a great effect on consumer welfare.[2] A number of studies have confirmed his insight that technological progress

---

[2] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2100 (3d ed. 2007 supp. 2009) (citing Joseph Schumpeter, *Capitalism, Socialism and Democracy* (1942)).

may benefit consumers to a greater degree than the elimination of noncompetitive prices.[3]  The goal under the dynamic approach is to examine how a transaction or practice will affect innovation over time.

Proper antitrust enforcement considers both static and dynamic concepts.  Indeed, in its seminal opinion in *United States v. General Dynamics Corporation*,[4] the Supreme Court recognized that static analysis, standing alone, would not suffice in cases involving markets that were not static.  That is true of many, if not most, markets today in which producers of computer components or software or pharmaceuticals are the participants.  Those markets are dynamic.  As the Court indicated, in assessing whether current concentration and market shares are likely to be prologue for any substantial period of time it is appropriate to look at the market's history – at trends, stability over time, entry and repositioning, as well as other indicia that things are likely to change, such as whether and to what extent venture capital is flowing to market participants.[5]

The antitrust agencies condemn price fixing, for example, not only because of its obvious short-term harm to consumers, but also because cartels encourage complacency among suppliers and deaden competitive initiative.  As a former assistant attorney general at the DOJ explained: "The essence of cartel behavior is to reduce the competition that spurs dynamic efficiencies and

---

[3] *See, e.g.*, Frederic M. Scherer & David Ross, *Industrial Market Structure and Economic Performance* 613-85 (3d ed. 1990); Robert M. Solow, *Technical Change and the Aggregate Production Function*, 39 Rev. Econ. & Stat. 312 (1957); Robert M. Solow, *A Contribution to the Theory of Economic Growth*, 70 Q.J. Econ. 65 (1956).  *See generally* Michael A. Carrier, *Unraveling the Patent-Antitrust Paradox*, 150 U. Pa. L. Rev. 761, 813 (2002) ("The consensus among economists since Schumpeter is that the gains achieved from innovative efficiencies dwarf those derived from maximizing allocative efficiency and that innovation is the most important factor in the growth of the economy.").

[4] 415 U.S. 486 (1974).

[5] *Id*. at 506; *see also Lektro-Vend Corp. v. Vendo Co*., 660 F.2d 255, 276-77 (7th Cir. 1981); *United States v. Int'l Harvester Co.*, 564 F.2d 769, 777-801 (7th Cir. 1977).

long-term economic growth."[6]  Another good example is the merger context, where the antitrust agencies consider both static and dynamic performance with some regularity.  In many transactions, we look not only at a proposed transaction's immediate effect on prices and output, but also on the deal's implications to long-run innovation.  At the same time, however, public law enforcement agencies must be wary about ex post evidence that may be "trumped up" by the parties and should not look so far in the future that consumers are likely to suffer substantial injury before the changes in the market are likely to occur.

Nevertheless, antitrust enforcement has historically focused more on static than dynamic analysis.  I believe that is true for a number of reasons.  First is inertia.  The antitrust community – both lawyers and economists – has far greater familiarity and comfort with static analysis than dynamic analysis.  There is undoubtedly reluctance to abandon what one knows best.  Second, there is little incentive for parties to take the time to develop arguments premised on dynamic analysis, given the courts' and antitrust agencies' focus on static analysis.  Third, there's the perception – right or wrong – that dynamic analysis is less well developed and more difficult to apply than static analysis.[7]  Or, to put a sharper point on that, static considerations are likely to

---

[6] Thomas O. Barnett, *Remark: Maximizing Welfare Through Technological Innovation*, 15 Geo. Mason L. Rev. 1191, 1202-03 (2008).

[7] For example, it is not clear that greater concentration impedes optimal dynamic performance.  *See* Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy* Ch. 2 at 12-15 (2003) [hereinafter FTC Innovation Report] ("Statistical cross-section studies examining multiple industries have not identified any clear relationship between concentration and innovation."); *see also* Statement of Chairman Timothy J. Muris, Genzyme Corporation / Novazyme Pharmaceuticals, Inc., FTC File No. 021 0026 (Jan. 13, 2004), *available at* http://www.ftc.gov/os/2004/01/murisgenzymestmt.pdf ("[N]either economic theory nor empirical research supports an inference regarding the merger's likely effect on innovation (and hence patient welfare) based simply on observing how the merger changed the number of independent R&D programs.  Rather, one must examine whether the merged firm was likely to have a reduced incentive to invest in R&D, and also whether it was likely to have the ability to conduct R&D more successfully.").

be more measurable.  I don't think it is difficult to appreciate that predicting and measuring the long-term effects on R&D and innovation may be more challenging than predicting a transaction or practice's immediate price and output effects.[8]

## II.

Trying to analyze both static and dynamic performance is not unique to antitrust law. Another example where both static and dynamic performance matter relates to the patent system. As the Supreme Court has explained, the Constitution's "Patent Clause reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition . . . ."[9]  In addition to years of exclusivity rights, patent holders are accorded certain advantages in litigation – such as the presumption of validity[10] – and the right to license or transfer their patent rights to others.  So, the patent system provides a number of incentives for research and innovation – and thus dynamic welfare gains – by helping inventors capitalize on the value of their inventions.[11]

However, from a static, allocative perspective, providing patent rights can be inefficient. The grant of a legal monopoly to an inventor harms consumer welfare insofar as the inventor is be able to charge a higher price or reduce output, both of which are detrimental to consumers and result in what economists call a deadweight loss.  In addition, a patent holder may spend

---

[8] Another problem is that there is no consensus as to how to weigh static and dynamic efficiencies when they point in different directions.

[9] *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989).

[10] 35 U.S.C. § 282 ("A patent shall be presumed valid.").

[11] U.S. Const. art. I, § 8, cl. 8; (granting Congress the authority to establish a system of patents and copyrights to "promote the Progress of Science and useful Arts"); *Graham v. John Deere Co.*, 383 U.S. 1, 8-9 (1966) (describing a patent as "a reward, an inducement, to bring forth new knowledge").

significant resources obtaining and protecting his intellectual property, and the threat of infringement litigation – whether legitimate or baseless – can act as a barrier to entry by potential competitors.[12] These are also detrimental to consumer welfare.

These static costs may be justified when the promise of a patent helps motivate the investment in (or disclosure of) an invention. It is generally accepted that patents motivating invention (or disclosure) generate more dynamic efficiencies than static losses. But bestowing patents on inventions that would have occurred (or would have been disclosed) without the promise of patent protection results in a windfall to the inventor and higher prices to consumers. Put another way, patenting an invention that would have occurred and been disclosed absent the inducement of a patent is unambiguously detrimental because there is a static consumer loss and no dynamic efficiencies.[13]

What may be less obvious is that providing *overly generous* patent rights may not only harm static efficiency but also dynamic efficiency. As the Supreme Court has explained, our patent system is designed not only "to foster and reward invention" but also to "promote[] disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires."[14] If patent rights are too generous, innovation costs will

_____

[12] FTC Innovation Report, *supra* note 7, at Ch. 2 p. 8 ("Patentee suits against entrants for infringement can 'tax' entry. The threat of being sued for infringement by an incumbent – even on a meritless claim – may 'scare . . . away' venture capital financing."), and at Ch. 2 p. 11 ("Amassing patent portfolios . . . is, as one commenter noted, a 'rather costly arms race.' It generates a 'lot of resource waste,' some panelists noted since firms spend 'a significant amount on legal bills to apply for patents . . . .'").

[13] *KSR International Co. v. Teleflex, Inc*., 550 U.S. 398, 419 (2007) ("Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress.").

[14] *Aronson v. Quick Point Pencil Co*., 440 U.S. 257, 262 (1979); *see also Bonito Boats*, 489 U.S. at 146 ("From their inception, the federal patent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement

become excessive because of the need to design around existing patents or, alternatively, to negotiate and pay for licenses from existing patent holders. Independent follow-on inventions in particular will be discouraged.

In theory, there is an optimal level of patent protection that balances the static and dynamic considerations. Researchers have tried to determine whether Congress and the courts have made these tradeoffs correctly,[15] but significant debate remains about even the fundamental question of whether patents are needed to stimulate innovation.

Several studies have found that firms prefer a variety of appropriability mechanisms, such as secrecy and lead time over competitors, to patent protection. An early and relatively small study of 100 firms concluded that patents were essential for innovation in only two of twelve industries: pharmaceuticals and chemicals.[16] A subsequent study of 650 firms found that patents were rated last out of five strategies for protecting new processes, and fourth for

---

through imitation are both necessary to invention itself and the very lifeblood of a competitive economy."); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974) ("When a patent is granted and the information contained in it is circulated to the general public and those especially skilled in the trade, such additions to the general store of knowledge are of such importance to the public weal that the Federal Government is willing to pay the high price of 17 years of exclusive use for its disclosure, which disclosure, it is assumed, will stimulate ideas and the eventual development of further significant advances in the art."); *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1513, 1516 (9th Cir. 1993) (Kozinski, J., dissenting from denial of rehearing en banc) ("Overprotecting intellectual property is as harmful as underprotecting it. Creativity is impossible without a rich public domain. . . . Intellectual property rights aren't free: They're imposed at the expense of future creators and of the public at large.").

[15] For example, there is considerable debate as to the optimal duration and scope of intellectual property rights. *See, e.g.*, Richard Gilbert & Carl Shapiro, *Optimal Patent Length and Breadth*, 21 Rand J. Econ. 106 (1990); Paul Klemperer, *How Broad Should the Scope of Patent Protection Be?*, 21 Rand. J. Econ. 113 (1990).

[16] Edwin Mansfield, *Patents and Innovation: An Empirical Study*, 32, Mgmt. Science 173 (1986).

protecting new products.[17]  The same study found considerable variation by industry, with patents more useful for protecting pharmaceuticals and certain chemicals.[18]  A third study found that firms protect profits from invention primarily through secrecy and lead time, with patent protection the least important strategy [19]  The study concluded that "patents are unambiguously the least central of the major appropriability mechanisms overall."[20]  Like the other studies, this one found that the importance of patents varied by industry, with medical equipment and pharmaceuticals standing out at the high end and semiconductors and communications equipment at the low end.[21]

A few years ago, the ABA Section of Antitrust Law reviewed the empirical studies and concluded that patents are an important inducement to innovation in only a few industries and that expanding the rights provided by an existing patent system does not increase overall inventive activity.[22]  The ABA report found that patents helped stimulate R&D in the pharmaceutical industry in particular but not in some high-tech industries where "the advantages that come with a head start, including setting up production, sales, and service structures and moving down the learning curve, were judged much more effective than patents as an

---

[17] Richard C. Levin et al., *Appropriating the Returns from Industrial R&D*, Brookings Papers on Economic Activity 783, 794-95 (1987).  The five ways of protecting new processes and products in the survey were lead time, learning curve advantages, complementary sales or service advantages, secrecy, and patents.

[18] *Id*.

[19] Wesley M. Cohen, Richard R. Nelson & John P. Walsh, *Protecting Their Intellectual Assets: Appropriability Conditions and Why U.S. Manufacturing Firms Patent (or Not)* (Nat'l Bureau of Econ. Research Working Paper No. 7552, 2000).

[20] *Id*. at 9.

[21] *Id*. Table 1.

[22] ABA Section of Antitrust Law, *The Economics of Innovation: A Survey* § II.E. (2002).

inducement to R&D."[23]  Several other surveys of the empirical data have also concluded that there is little or no link between the degree of patent protection and innovation in many industries.[24]

The most recent study that I'm aware of is by David Abrams, an economist at the University of Pennsylvania.[25]  In a paper published last year, he studied the effects of the 1995 TRIPS agreement, as a result of which the United States changed the duration of patent protection from 17 years from the grant date to 20 years from the application date.[26]  Abrams concluded that this change increased innovation and overall welfare, but suggested that "biological patents [were] responsible for the bulk of the observed impact of TRIPS."[27]

---

[23] *Id.*  For a contrary view, see Yi Qian, *Do National Patent Laws Stimulate Domestic Innovation in a Global Patenting Environment?  A Cross Country Analysis of Pharmaceutical Patent Protection, 1978-2002*, 89 Rev. Econ. & Statistics 436 (2007) (concluding that patent protection does not stimulate pharmaceutical innovation).

[24] *See, e.g,.* FTC Innovation Report, *supra* note 7, Ch. 2(II)(A)(2), at 11 (2003) ("Empirical study has shown that in some industries, firms often innovate to exploit first-mover advantages, learning-curve advantages, and other advantages, not to gain patent protection."); *see also id.* ch. 2(I)(A)(1), at 5 ("[A] number of studies have shown that [other] measures typically are more important than patents for protecting appropriability in many industries."); Cohen, *supra* note 19, at 2 (stating that prior studies "suggest that patent protection is important in only a few industries, most notably pharmaceuticals"); Adam B. Jaffe, *The U.S. Patent System in Transition: Policy Innovation and the Innovation Process*, 29 Research Policy 531, 540, 554 (2000) (noting that there is "little empirical evidence" that strengthening patent protection in the 1980s increased innovation and that several studies suggest "that patents are not central to appropriating the returns to R&D in most industries"); Michele Boldrin & David K. Levine, *Does Intellectual Monopoly Help Innovation?* 13 (Working Paper 2009) ("We have identified twenty three economic studies that have examined the issue empirically.  The executive summary: they find weak or no evidence that strengthening patent regimes increases innovation; they find strong evidence that strengthening the patent regime increases patenting!").

[25] David S. Abrams, *Did TRIPS Spur Innovation? An Analysis of Patent Duration and Incentives to Innovate*, 157 U. Pa. L. Rev. 1613 (2009).

[26] Uruguay Round Agreements Act, Pub. L. No. 103-465, § 532(a), 108 Stat. 4809, 4984-85 (1994).

[27] Abrams, *supra* note 25, at 1640.

Thus, it appears that patent protection may stimulate innovation in the pharmaceutical industry to a far greater degree than most other industries. This is not entirely surprising, given the large upfront costs and degree of risk developing a new product and the relative ease of developing copycat products.

## III.

A hotly debated antitrust issue with implications for the pharmaceutical industry is the legal standard for evaluating a firm's refusal to license intellectual property. Section 271(d) of the Patent Act declares that refusing to license a patent cannot be patent misuse, even when done by a monopolist.[28] Likewise, a number of courts have held that a refusal to license intellectual property, standing alone, cannot be an antitrust violation.[29] It has been asserted that a contrary result could reduce the incentives for innovation both by the original inventors, as well as by

---

[28] 35 U.S.C. § 271(d) ("No patent owner otherwise entitled to relief for infringement . . . of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . refused to license or use any rights to the patent . . . .").

[29] *See, e.g.*, *Hartford-Empire Co. v. United States*, 323 U.S. 386, 432 (1945) ("A patent owner is not in the position of a quasi-trustee for the public or under any obligation to see that the public acquires the free right to use the invention. He has no obligation either to use it or to grant its use to others."); *United States v. United Shoe Mach. Co. of N.J.*, 247 U.S. 32, 57 (1918) ("[A patent's] strength is in the restraint, the right to exclude others from the use of the invention . . . . Its exertion within the field . . . is not an offense against the Anti-Trust Act."); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999) ("[T]he antitrust laws do not negate the patentee's right to exclude others from patent property."); *Cygnus Therapeutic Sys. v. Alza Corp.*, 92 F.3d 1153, 1160 (Fed. Cir. 1996) (patentee "under no obligation to license" under antitrust laws); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186 (1st Cir. 1994) ("The courts appear to have partly settled an analogous conflict between the patent laws and the antitrust laws, treating the former as creating an implied limited exception to the latter."); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir. 1981) ("A patent holder who lawfully acquires a patent cannot be held liable under Section 2 of the Sherman Act for maintaining the monopoly power he lawfully acquired by refusing to license the patent to others."); *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) ("The right to license [a] patent, exclusively or otherwise, or to refuse to license at all, is 'the untrammeled right' of the patentee."); *W.L. Gore & Assocs., Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976) ("right to refuse to license is the essence of the patent holder's right").

rivals seeking their own alternatives to the monopolist's patents. Thus, the FTC stated in its 1980 *DuPont* case that the "imposition of a duty to license might serve to chill the very kind of innovative process that led to duPont's cost advantage."[30] Likewise, the Supreme Court has asserted that compelling firms to assist their rivals "may lessen the incentive for the monopolist, the rival, or both to invest in . . . economically beneficial facilities."[31]

Nevertheless, the Ninth Circuit in *Image Technical Services v. Eastman Kodak Co.* held that a unilateral refusal to license intellectual property by a monopolist could violate Section 2 of the Sherman Act if not supported by a valid business justification.[32] In that case, the court found that Kodak's reliance on intellectual property rights as a justification for refusing to license was largely pretextual. This may have been the first time a federal court imposed antitrust liability for the refusal to license a patent.

When confronted with a similar issue a few years later in the *Xerox/ISO* case, the Federal Circuit rejected the Ninth Circuit's approach.[33] The Federal Circuit concluded that the refusal to license intellectual property cannot be an antitrust violation regardless of the reason for the

---

[30] *In re E.I. DuPont de Nemours & Co.*, 96 F.T.C. 653, 748 (1980); *see also* Department of Justice/Federal Trade Commission Guidelines for the Licensing of Intellectual Property (1995) § 2.2, *reprinted in* 4 Trade Reg. Rep. (CCH) ¶ 13,132 (an intellectual property owner has no general duty to license its protected product).

[31] *Verizon Communs. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).

[32] 125 F.3d 1195 (9th Cir. 1997).

[33] *See In re Independent Service Organizations Antitrust Litigation (ISO)*, 203 F.3d 1322 (Fed. Cir. 2000); *see also Intel v. Intergraph*, 195 F.3d 1346 (Fed. Cir. 1999); *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997). Chief Justice John Roberts represented the plaintiffs on appeal in both the Xerox case and the Intel case when he was in private practice.

refusal.[34]  The court explained that we "will not inquire into [the patent holder's] subjective motivation for exerting his statutory rights, even though his refusal to sell or license his patented invention may have an anticompetitive effect, so long as that anticompetitive effect is not illegally extended beyond the statutory patent grant."[35]

The Seventh Circuit likewise rejected the Ninth Circuit's approach in a 2006 decision in favor of the Federal Circuit's approach.[36]  And, arguably, a more significant development was the Supreme Court's 2004 *Trinko* decision,[37] which suggests that the Court may not look favorably on the Ninth Circuit's approach.  In *Trinko*, Justice Scalia wrote that monopolists do not have a duty to deal with rivals except under narrow circumstances.

That said, the circuit split remains, and it cannot be that that *Trinko* resolved the split because that portion of Justice Scalia's opinion was dictum, not holding.  Nor can it be said that the federal enforcement agencies have reached a consensus on the issue.  In 2007 the FTC and DOJ issued a report on antitrust enforcement and intellectual property rights that weighed in on this subject.  The report concluded that "antitrust liability for mere unilateral refusals to license patents will not play a meaningful part in the interface between patent rights and antitrust protections."[38]  However, as the Commission majority explained in criticizing the DOJ's 2008

---

[34] The opinion suggested that a patent holder would be subject to antitrust liability under only three circumstances: (1) where it had fraudulently obtained the patent; (2) where it had fraudulently engaged in infringement litigation; and (3) where it had attempted to enlarge the scope of its patent by, for example, tying the sale of the patented good to the sale of an unpatented good.  *ISO*, 203 F.3d at 1327.

[35] *Id.* at 1327-28

[36] *Schor v. Abbott Labs*., 457 F.3d 608 (7th Cir. 2006).

[37] *Verizon Communs. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

[38] U.S. Dep't of Justice & Fed. Trade Comm., *Antitrust Enforcement and Intellectual Property Rights: Protecting Innovation and Competition* 30 (2007).

report on single firm conduct,[39] the word "mere" must be emphasized: if and to the extent that the refusal to license does not stand alone, it may be challenged, if employed by firms with monopoly power.[40]

## IV.

A few years ago, four FTC officials, including the then-Director and Deputy Directors of the FTC's Bureau of Competition argued that combating what they called "cheap exclusion" should be an enforcement priority for the FTC.[41]  They defined cheap exclusion as "conduct that costs or risks little to the firm engaging in it" and "does not raise any cognizable efficiency claims."[42]  They asserted that the FTC's enforcement resources should be directed toward this type of conduct (compared to other types of exclusionary conduct) because of the frequency of its use, the relative ease of the antitrust analysis, and the low risk of investigating what turns out to be a pro-competitive practice.[43]  Cheap exclusion involves conduct with no plausible benefits – static or dynamic – and thus does not present the analytical challenges we've seen in some other contexts.

---

[39] U.S. Dep't of Justice, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act (2008).

[40] Statement of Commissioners Harbour, Leibowitz and Rosch on the Issuance of the Section 2 Report by the Department of Justice at 8-9 (Sept. 8, 2008), *available at* http://www.ftc.gov/os/2008/09/080908section2stmt.pdf.

[41] *See* Susan A. Creighton, D. Bruce Hoffman, Thomas G. Krattenmaker & Ernest A. Nagata, *Cheap Exclusion*, 72 Antitrust L.J. 975 (2005) [hereinafter Creighton, *Cheap Exclusion*]; *see also* Susan A. Creighton & Thomas G. Krattenmaker, *Appropriate Role(s) for Section 5*, Antitrust Source, Feb. 2009, at 7, http://www.abanet.org/antitrust/at-source/09/02/Feb09-Creighton2-26f.pdf ("Section 5 could be a significant tool in preventing cheap exclusion, although most forms of cheap exclusion can and should be reached via straightforward application of the Sherman Act.")

[42] Creighton, *Cheap Exclusion*, *supra* note 41, at 977.

[43] *Id*. at 977-78.

The FTC has investigated alleged cheap exclusion in the pharmaceutical industry. An early example involved brand companies improperly listing patents in the Orange Book and then filing infringement actions against ANDA applicants. As a result, the brand companies were able to obtain 30-month stays of the ANDA approval. The FTC entered into consent agreements with two companies engaged in this practice resolving the FTC's concerns.[44] Like other examples of cheap exclusion, making false Orange Book filings involves highly asymmetric costs, that is, the cost to the brand company of making a false filing was trivial compared to the benefit.

Another type of cheap exclusion we have seen in the pharmaceutical sector is "product hopping" or "product switching." This is the practice of introducing new patented products with minor or no substantive improvements by brand companies in the hopes of preventing substitution to lower-priced generics.[45] The practice is most likely to arise when generic entry is imminent.

Of course, the antitrust laws don't seek to discourage the introduction of new products or product line extensions.[46] Here the concern is that the new product is, in a sense, a sham whose

---

[44] *Biovail Corp.*, FTC Docket No. C-4060 (Oct. 2, 2002) (consent order), *available at* http://www.ftc.gov/os/2002/10/biovaildo.pdf; *Bristol-Myers Squibb Co.*, FTC Docket No. C-4076 (Apr. 14, 2003) (consent order), *available at* http://www.ftc.gov/os/2003/04/bristolmyerssquibbdo.pdf. Congress also addressed this abuse by passing the Medicare Prescription Drug Improvement and Modernization Act of 1993, which precludes successive 30-month stays in most circumstances. *See* 21 U.S.C. § 355(j)(5)(B).

[45] Mark A. Lemley, *Ignoring Patents*, 2008 Mich. State L. Rev. 19, 30 (product hopping involves "[p]atent holders . . . changing the product they sell and restarting the regulatory clock once their patent on the existing product expires or is invalidated").

[46] Many courts are reluctant to find that product improvements by themselves violate Section 2, even if done by a monopolist and competitors are harmed as a result. *See, e.g.*, *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, -- F.3d --, 2010 WL 22693 (9th Cir. 2010) ("Absent some form of coercive conduct by the monopolist, the ultimate worth of a genuine product improvement can be adequately judged only by the market itself.").

only purpose is to delay generic competition without any consumer benefits. Thus, the practice results in a significant static welfare loss without any plausible dynamic benefits.

Product hopping concerns are relatively recent and, as a result, there are few litigated cases and enforcement actions in this area. In 2005, the FTC filed a complaint in federal District Court alleging that Warner Chilcott had entered into an agreement with Barr to forestall generic entry for the birth control product Ovcon.[47] While the case was pending in court, the FTC learned that Warner Chilcott intended to launch a new, chewable version of Ovcon and stop selling the tablet version of Ovcon, in order to convert consumers to the new product. Such a strategy would have essentially destroyed the market for generic Ovcon because if regular Ovcon were unavailable, generic substitution at the pharmacy would be unavailable. To prevent that development, the FTC filed for a preliminary injunction to require Warner Chilcott to continue to make regular Ovcon. The day that the FTC filed its motion, Warner Chilcott waived the exclusionary provision in its agreement with Barr that prevented Barr from marketing its generic version of Ovcon, and Barr then announced its intention to start selling a generic version of the product. The Commission and Warner Chilcott subsequently entered into a final order requiring Warner Chilcott to take steps to preserve the market for the tablet form of Ovcon providing Barr the opportunity to compete with its generic version.

In *Abbott Labs. v. Teva Pharmaceuticals U.S.A., Inc.*,[48] Teva alleged that Abbott had "responded to the threat of generic entry . . . by changing the formulation of TriCor, not to improve the product, but simply to prevent generic formulations from becoming AB-rated for

---

[47] Complaint for Injunctive and Other Equitable Relief, FTC v. Warner Chilcott Holdings Company III, Ltd, Civil Action No. 1:05-cv-02179-CKK (D.D.C. Nov. 7, 2005), *available at* http://www.ftc.gov/os/caselist/0410034/051107comp0410034%20.pdf

[48] 432 F. Supp. 2d 408 (D. Del. 2006).

substitution with TriCor."[49]  The district court denied Abbott's motion to dismiss, explaining that

"an antitrust inquiry into the benefits provided by Defendants' product changes is appropriate."[50]

Relying on the balancing test from the *Microsoft* decision, the court explained that "if Plaintiffs

show anticompetitive harm from the formulation changes, that harm will be weighed against any

benefits presented by Defendants."[51]  Applying this test, the court found that plaintiffs had

adequately alleged anticompetitive harm because Abbott had allegedly barred competitors from

the most cost-efficient means of distribution.  (Earlier this year 24 states reached a $22.5 million

settlement with Abbott and Fournier to resolve their own claims involving TriCor product

hopping.)[52]

     A different result occurred in *Walgreen Co. v. AstraZeneca Pharmaceuticals*,[53] where a

federal district court granted defendant's motion to dismiss a "product hopping" claim.  Plaintiffs

alleged that as the branded drug Prilosec was about to lose patent protection, AstraZeneca

introduced Nexium, a drug that was "virtually identical" to Prilosec but offered no incremental

medical benefits.  However, unlike the situation in *Abbott Labs. v. Teva*, the case did not involve

---

[49] *Id*. at 415.

[50] *Id*. at 422.

[51] *Id*.

[52] Press Release, California Dep't of Justice, California and 23 States Reach $22.5 Million Settlement Against Pharmaceutical Companies that Blocked Generic Drugs (Jan. 7, 2010), *available at* http://www.ag.ca.gov/newsalerts/release.php?id=1844.  The states alleged that Abbott and Fournier forced customers to convert to new formulations of TriCor before generic entry by "reformulating TriCor with only minor changes to a form and dosage strength, which did not provide any significant new clinical benefit" and by "removing the old TriCor formulation from the market, so as to make it commercially unavailable by the time a generic competitor could enter the market."  First Amended Complaint ¶ 4, Florida v. Abbott Labs., Case No. 08-155 (SLR) (D. Del. Apr. 18, 2008).

[53] 534 F. Supp. 2d 146 (D.D.C. 2008).

the withdrawal of a product from the market.  The court found this distinction to be significant.[54]
The court stressed that AstraZeneca had not limited consumer choice by withdrawing any
product from the market.  To the contrary, the court found that AstraZeneca had *added* choices.

Another potential type of cheap exclusion in the pharmaceutical industry is the improper
filing of citizen petitions to delay the FDA's approval of ANDAs.[55]  Citizen petitions are
submissions designed to alert the FDA to possible scientific and safety issues related to regulated
products or agency procedures.[56]  Generic pharmaceutical companies have alleged that brand
companies have improperly used citizen petitions to block or delay their entry by raising
frivolous or untimely concerns about ANDA filings.

In a 2002 report, the FTC recognized the potential for misuse of citizen petitions, but
concluded that no actual anticompetitive effects had resulted.[57]  In particular, the report found

---

[54] *Id*. at 151 ("The elimination of choice was a critical factor in the court's decision to deny
Abbott's motion to dismiss the complaint.").  The *Abbott v. Teva* court also noted the importance
of this distinction.  432 F. Supp. 2d at 421 ("[W]hen the introduction of a new product by a
monopolist prevents consumer choice, greater scrutiny is appropriate."), and at 422 ("But here,
according to Plaintiffs, consumers were not presented with a choice between fenofibrate
formulations.  Instead, Defendants allegedly prevented such a choice by removing the old
formulations from the market while introducing new formulations.").

[55] For a more detailed review of this issue, see Darren S. Tucker, *FDA Citizen Petitions: A
New Means of Delaying Generic Entry?*, Antitrust Health Care Chronicle, Nov. 2006, *available
at* http://ssrn.com/abstract=1531776.

[56] 21 C.F.R. § 10.30; *see also* section 505(j) of the Federal Food, Drug, and Cosmetic Act, 21
U.S.C. § 355.

[57] Fed. Trade Comm., *Generic Drug Entry Prior to Patent Expiration* 65-68 (2002) (the
citizen petitions studied "did not affect the timing of generic entry").  In March 2000, the FTC
submitted comments to the FDA explaining how the cost of filing an improper citizen petition is
negligible compared to the value of securing a delay of a rival's entry.  *See* Comment of the Staff
of the Bureau of Competition and the Office of Policy Planning of the Federal Trade
Commission Before the Food and Drug Administration, FDA Docket No. 99N-2497 (Mar. 2,
2000), avai*lable at* http://www.ftc.gov/be/v000005.pdf; *see also* Jon Leibowitz, Commissioner,
Fed. Trade Comm., Remarks at the Second Annual In-House Counsel's Forum on
Pharmaceutical Antitrust (Apr. 24, 2006), *available at*

that citizen petitions did not affect the timing of generic entry.  To date the FTC has not brought

an enforcement proceeding on these grounds, and private plaintiffs have generally not fared well

in court.[58]

## V.

The final topic I'd like to discuss is the antitrust analysis applied to bundled rebates,

which are similar to volume discounts but awarded when a customer makes a sufficient number

of purchases across product lines.  The concern with bundled rebates is largely a static one,

namely that the rebates may be so large that it would be economically irrational to purchase a

single product from another customer, regardless of the merits of the competing product.  The

justifications for bundled rebates are also largely static, namely that they reduce prices to

consumers.

This is a matter about which the courts have struggled to articulate a consistent

framework.  In *SmithKline Corp. v. Eli Lilly & Co.*,[59] the Third Circuit condemned Eli Lilly's

---

http://www.ftc.gov/speeches/leibowitz/060424PharmaSpeechACI.pdf (noting that that citizen
petitions are low cost to file in comparison to the "value of securing even a brief delay in a
rival's entry").

[58] *See, e.g.*, *Aventis Pharma S.A. v. Amphastar Pharmaceuticals, Inc.*, Case Nos. 5:03-00887-
MRP (PLA) and 5:04-00333-MRP (PLA) (C.D. Cal. Feb. 17, 2009) (unpublished opinion
dismissing antitrust counterclaim that Aventis filed a materially false citizen petition delaying
generic entry; court ruled that plaintiff failed to show that conduct was beyond the protection of
*Noerr*); *Louisiana Wholesale Drug Co. v. Sanofi-Aventis*, Case No. 07-cv-07343 (S.D.N.Y. Nov.
21, 2008) (jury verdict in favor of Sanofi on the ground that its citizen petition was not baseless
under *Noerr*).  *But see In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 694 (2d
Cir. 2009) (reversing dismissal of antitrust claim on the basis that allegations in the complaint
"indicate the plaintiffs could plausibly show the citizen petition to have been a sham" and noting
"the possibility that the sham petition caused a delay in generic competition"); *Roxane Labs.,
Inc. v. Smithkline Beecham Corp.*, Civil Action No. 09-CV-1638, 2010 WL 331704 (E.D. Pa.
Jan. 26, 2010) (generic company had antitrust standing to challenge citizen petitions allegedly
intended to delay FDA approval of its ANDA filing).

[59] 575 F.2d 1056 (3d Cir. 1978).

discount on a bundle of three products, two of which were available only from Eli Lilly. The bundle violated the Sherman Act, according to the court, because the defendant linked the sale of products for which it faced no competition with products that did face competition.

The next important bundled discount case was *Ortho Diagnostic Systems v. Abbott Laboratories*,[60] which again involved a company's bundling of products that faced competition with products available only from the company. The district court articulated a more restrictive test for liability than the *Eli Lilly* court, holding that the plaintiff:

> must allege and prove either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce.[61]

The Third Circuit took up the issue of bundled rebates again in *LePage's Inc. v. 3M Co.*[62] In that case, the jury found that the defendant's exclusive dealing agreements and bundled discounting program violated Section 2 of the Sherman Act. The en banc Third Circuit affirmed the jury's verdict after it concluded that these arrangements allowed 3M to exclude LePage's from the market. The court found that it was impossible for LePage's to meet 3M's discounts because it did not sell the same array of products and also pointed to evidence that 3M's policies were intended to exclude competitive rivals.

In its 2007 decision in *PeaceHealth*, however, the Ninth Circuit rejected *LePage's* and held that defendant's bundling practices did not violate Section 2.[63] Instead, the Ninth Circuit declared that a plaintiff challenging a monopolist's bundled pricing "must establish that, after

---

[60] 920 F. Supp. 455 (S.D.N.Y. 1996).

[61] *Id*. at 469.

[62] 324 F.3d 141 (3d Cir. 2003) (en banc).

[63] *Cascade Health Solutions v. PeaceHealth*, 502 F.3d 895 (9th Cir. 2007).

allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them."[64]  The court explained that its new test was intended to make "bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product."[65]

However, in a perceptive analysis written by District Court Judge Claudia Wilkin in *Meijer, Inc. v. Abbott Laboratories*,[66] the assertion was made that average variable cost would not be the appropriate cost standard in cases involving pharmaceutical products, whose costs were mostly fixed or sunk upfront costs; the court reasoned that in such a case, the average variable cost would be *de minimis* so that the price of the competitive product would always exceed its measure of cost, however the discount was allocated.  Unfortunately, although Judge Wilkin certified her decision to the Ninth Circuit for interlocutory review, subsequent events made the case moot.

\* \* \* \*

Notwithstanding the unsettled standards in some of the areas I've discussed today, the FTC remains committed to investigating and, where appropriate, challenging conduct in the pharmaceutical industry that harms competition.  In doing so, however, the Commission will

---

[64] *Id*. at 912.  The court did not require proof of recoupment, a requirement in a single-product predatory pricing case.

[65] *Id*. at 906.

[66] 544 F. Supp. 2d 995, 999-1005 (N.D. Cal. 2008) ("Thus, as applied here, the *Cascade* rule does not achieve its stated goal of prohibiting equally efficiency competitors.  This failure is attributable to the unique structural characteristics of the pharmaceutical industry, where fixed costs in the form of investment in research and development dwarf variable costs."); *see also id*. at 1004 ("[U]sing average variable cost as a gauge of anticompetitive pricing leads to an exclusive concern with promoting manufacturing efficiency.  But such a concern is not relevant" in the context of competition with a patented drug.).

take into consideration both short-term (static) and long-run (dynamic) consumer welfare.  While we will rely on economic theory when weighing these considerations, I will probably accord greater weight to empirical data and the parties' intent.

# EXHIBITS 50-52
# [Filed Under Seal]

EXHIBIT 53



Collapse -                                                                                          Verizon iPhone: Who should buy?



Avoid getting buried in technical debt

# RealNetworks breaks Apple's hold on iPod

0

- 
- 

July 26, 2004, 2:06pm PDT Recommend 0 Votes **0 Comments**                more +*Stay on top of the latest tech news with our free IT News Digest e-newsletter, delivered each weekday.* **Automatically sign up today!**

By John Borland
Staff Writer, CNET News.com

RealNetworks announced Monday that it has unlocked some of Apple Computer's most tightly held technology secrets, giving its music a way onto the popular iPod digital music player.

The announcement is part of a broader release of RealNetworks software, which will let songs sold from the company's online store play on a variety of portable devices, including the iPod and Microsoft-compatible rivals. RealNetworks has been selling songs from its digital song store since January, but the files could previously be played only on a few portable devices.

The new Harmony software, which RealNetworks said mimics the proprietary copy protection used in Apple's iTunes store, is sure to be controversial. Apple has previously refused to provide licenses to companies seeking iPod compatibility, and RealNetworks did not seek permission before releasing its own version of iPod-friendly software.

"This is actually a natural extension to a decision we made two years ago with respect to different formats," said RealNetworks Chief Strategy Officer Richard Wolpert. "We think consumer choice is going to win out over proprietary formats."

RealNetworks' move marks a step away from what had been an increasingly confusing world of incompatible

digital music formats and devices.

Record companies and consumer groups have been deeply critical of technology companies' decision to tie certain devices to specific music formats. Traditionally, CDs and DVDs have worked on any manufacturers' players, they note, while music downloads have been tied to specific brands of devices.

Indeed, several record company executives praised RealNetworks' independent steps to achieve compatibility with the iPod, even without Apple's consent.

"Up to now, the world of downloads has been far too close to a world where the CD you buy in one store wouldn't play on the CD player you bought in another," Larry Kenswil, president of Universal Music's eLabs division, said in a statement. "We applaud RealNetworks' efforts to help correct this situation and appeal to all people and companies in this area to work toward a world of universal interoperability."

Apple did not return requests for comment.

Apple maintains a dominant market share in the music download business, and RealNetworks hopes that the new compatibility with the iPod will help drive customers to its online store.

**Dangerous ground?**
RealNetworks has previously thumbed its nose at rivals in a similar way. Its 2002 Helix server, which sends media files out over the Internet, included the ability to stream Microsoft-formatted files--a capability only Microsoft servers previously had.

Last January, RealNetworks also announced that it had figured out how to let its PC software play songs purchased from Apple's iTunes store and save them onto the iPod.

The new Harmony software's ability to work with Microsoft devices is fairly straightforward. When a customer buys a song from RealNetworks' online store, the software will check what kind of portable device is attached to the computer and change the song into Microsoft's format if necessary. Microsoft has provided licenses to its Windows Media technology to many companies.

Harmony also will automatically change songs into an iPod-compatible format. But because Apple has not licensed its FairPlay copy-protection software to anyone, RealNetworks executives said its engineers had to re-create their own version in their labs in order to make the device play them back.

Although the company said this action wasn't technically "reverse engineering," the software could trigger intense legal scrutiny.

The license accompanying Apple's iPod says purchasers cannot "copy, decompile, reverse engineer, disassemble, (or) attempt to derive the source code of" the software.

Boston patent attorney Bruce Sunstein said courts have issued mixed opinions on how much reverse engineering is allowed for purposes such as making compatible products.

"The law is unsettled," Sunstein said. "We might find some litigation if Apple wanted to be aggressive."

Indeed, lawsuits have been sparked by similar previous cases. In one famous example, Atari Games subsidiary Tengen created cartridges that worked with Nintendo's NES game machine in the late 1980s, when Nintendo was barring any other company from doing so.

Nintendo sued and won when it was discovered that Tengen had obtained part of Nintendo's software code from the U.S. Copyright Office and used it to make its games compatible.

RealNetworks has staunchly maintained that it has not illegally used any of Apple's copyrighted software code, however.

"We certainly feel we have all the licenses and rights to do what we've done or we wouldn't have done it," RealNetworks' Wolpert said.

Analysts welcomed the move as a good step for consumers, who would be able to buy music from RealNetworks' store and not worry about having to stay permanently with one brand of player to use music purchased online.

"Right now if you're a consumer, you have to pick sides," said Forrester Research analyst Josh Bernoff. "With every track you buy you're going further down the path of incompatibility...This is going to create some pressure on Microsoft and Apple to provide similar levels of interoperability."

The Harmony software will be available in test form on RealNetworks' site Tuesday, and will ultimately find its way into a variety of products, the company said.

Popular on CBS sites: US Open | PGA Championship | iPad | Video Game Reviews | Cell Phones © 2011 CBS Interactive. All rights reserved. Privacy Policy | Ad Choice | Terms of Use | Advertise | Jobs Visit other CBS Interactive Sites:

BNET  Go

# EXHIBITS 54-57
# [Filed Under Seal]