Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Howard R. Lloyd, Magistrate Judge

```
                                )
                                )
 "The Apple iPod iTunes Anti-   )   No. C05-00037 JW
 Trust Litigation."             )
                                )
                                )
                                )
                                )
                                )
 _____  )
```

San Jose, California
Tuesday, March 15, 2011

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING**

**APPEARANCES:**

For Plaintiff:

                Robbins Geller Rudman and Dowd LLP
                655 W Broadway, Suite 1900
                San Diego, CA 92101
        **BY:  ALEXANDRA SENYA BERNAY**
              **CARMEN ANTHONY MEDICI**
              **ATTORNEYS AT LAW**

For Defendant:

                O'Melveny & Myers LLP
                2 Embarcadero Center, 28th Floor
                San Francisco, CA 94111
        **BY:  GEORGE A. RILEY**
              **RYAN JAMES PADDEN**
               **ATTORNEYS AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Transcribed By:      Stacy Wegner
                    Transcriber
                    smwtyping@yahoo.com
                    (859) 539-2802

**APPEARANCES:    (Continued)**

For Defendant:

                          Jones Day
                          555 California Street, 26th Floor
                          San Francisco, CA 94104
                **BY:**  **DAVID CRAIG KIERNAN**
                      **ATTORNEY AT LAW**

1    <u>Tuesday, March 15, 2011</u>                                    <u>10:32 a.m.</u>

2

3            **THE COURT:**  Apple iPod iTunes Anti-Trust Litigation.

4            **MR. RILEY:**  Good morning, Your Honor.  George Riley

5    of O'Melveny & Myers for the Defendant, Apple, and Mr. Steve

6    Jobs.

7            **MS. BERNAY:**  Good morning.  Alexandra Bernay from

8    Robbins Geller Rudman and Dowd for the Class Plaintiffs.

9            **THE COURT:**  Hello, Ms. Bernay.  Hello, Mr. Riley.

10    Okay.  Let's see.  I've never even held an iPod, so you're

11    just going to have to excuse my unfamiliarity with some of

12    this.

13            Up until March of '09, Apple used a digital rights

14    management software, DRM -- I loved all these acronyms --

15    called FairPlay, which allowed songs bought -- which allowed

16    songs bought from iTunes store to be played only on iPods, and

17    no song purchased elsewhere could be played on iPods.

18            Plaintiffs claim wrongful dual monopolies in both

19    the portable digital players market, as well as the digital

20    audio download market by using pretextual updates to the DRM

21    software, which kept out competitors.

22            Apparently, if the update is something legitimately

23    done for functionality, that's fine, but if it's done to

24    thwart competitors, that's not fine.

25            Am I right so far?

1      **MS. BERNAY:**  So far.

2      **THE COURT:**  Okay.  All right.  So apparently,

3  RealNetworks, a competing entity, an online store that sells

4  digital music, figured out how to make its tunes work on

5  iPods, only to have a product improvement by Apple to

6  FairPlay, which rendered RealNetworks supply tunes inoperable.

7      Apparently, there's also a program called -- I don't

8  know how to pronounce this -- JHymn?

9      **MS. BERNAY:**  JHymn.

10      **THE COURT:**  JHymn, which would allow iTunes

11  purchases to be played on non-iPod equipment, until another

12  product improvement to FairPlay blocked that from happening.

13      So here we are.  The question today is do the

14  Plaintiffs get to depose Steve -- Steve Jobs, who is

15  apparently back in action now.  I saw his picture in the paper

16  very recently.

17      This is an apex depo.  Does the proposed Defendant

18  have unique firsthand non-repetitive knowledge of the facts at

19  issue and have other less intrusive needs to get to the

20  information been exhausted by the party seeking the

21  deposition?

22      There are three possible areas of inquiry with

23  respect to Mr. Jobs that might be worth at least talking

24  about.  First is the original decision of Apple to maintain

25  closed-loop system through FairPlay.  And to that I would say

1   no-go because the complaint only targets Defendant's software

2   updates and not the original decision to maintain a closed-

3   loop system.

4        Second possibility is the Defendant's decision in

5   early 2004 not to license FairPlay to other companies.  And

6   Judge Ware apparently said, I'm told -- I didn't actually read

7   what -- where he said it, but said that that decision was okay

8   and that was not an issue, so therefore, that would not be an

9   issue for Jobs' deposition.

10        Is that what Ware said?

11        **MR. RILEY:**  Yes, Your Honor.  In the series of four

12   orders that have been given in this case, it is clear that the

13   decision not to license one's own intellectual property a

14   competitor --

15        **THE COURT:**  Okay.

16        **MR. RILEY:**  -- cannot be an anti-trust violation.

17        **THE COURT:**  And do you disagree with that?

18        **MS. BERNAY:**  We do, just to the extent that there

19   were decisions made sort of throughout the class period where,

20   in fact, the competitor, RealNetworks, came to Apple, wrote an

21   email directly to Mr. Jobs suggesting that perhaps licensing

22   of FairPlay would be one way that they could work together.

23   And then very soon after that is when RealNetworks came out

24   with their competing software that allowed music played from

25   Real to -- to play on this.

1      So the -- the issue of licensing, while we believe

2  is relevant because it -- it goes to the pretextual decisions

3  made by Apple throughout the class period.

4      **THE COURT:**  The third issue is the Defendant's

5  decision to shut down interoperability -- hard word to say --

6  interoperability created by RealNetworks' Harmony technology.

7      So here we have RealNetworks on July 26th, 2004,

8  announcing that it had achieved interoperability.  Its digital

9  tunes could be played on iPods thanks to RealNetworks'

10  technology, which it called Harmony.

11      That apparently prompted Apple's announcement on

12  July 29th, 2004, which in effect said, you know, "We're going

13  to do updates to our technology, our DRM, FairPlay, and we

14  wouldn't be surprised if RealNetworks' technology was no

15  longer interoperable with ours once we actually do those

16  updates."

17      The updates actually take place in October of '04,

18  or installed or put in place -- whatever is the correct word -

19  - and they indeed render the RealNetworks' digital music files

20  once again inoperable on iPods.

21      The Plaintiffs say that Steve Jobs' fingers are all

22  over that decision.

23      **MS. BERNAY:**  Yes, Your Honor.  He actually drafted

24  the statement that eventually made its way to the public

25  almost verbatim.  The words that he used calling this

1    competitor in the digital market space "a hacker," making the

2    threat that these updates might make purchase -- music

3    purchased through Real no longer work were actually written by

4    Mr. Jobs.

5            **THE COURT:**  So as to that, I'm -- I'm a little more

6    sanguine as a potential, legitimate source of -- a legitimate

7    subject, I should say, of potential deposition for Mr. Jobs.

8            What do you say, Mr. Riley?

9        **MR. RILEY:**  As to that third category, Your Honor,

10   there are several other individuals who participated in the

11   preparation of that statement.

12           **THE COURT:**  Right.  But the fact that -- that others

13   participated wouldn't exclude Jobs.

14       **MR. RILEY:**  No.  He did participate.  That is true.

15   But the question is does he have unique firsthand knowledge

16   that would entitle Plaintiffs to take his deposition --

17           **THE COURT:**  Right.

18       **MR. RILEY:**  -- under these circumstances, and he

19   clearly doesn't.

20           **THE COURT:**  Because?

21       **MR. RILEY:**  Because there were others who were

22   involved in the preparation of that statement, which the

23   Plaintiffs have not attempted to depose.

24           **THE COURT:**  Well, suppose he was driving the

25   statement.

1    **MR. RILEY:**  Same -- same issue.  There were others

2  who -- who were involved and understood exactly what was going

3  on.  Because what had happened in that case --

4        **THE COURT:**  Well, in apex a fellow or a person --

5  lady -- it could be a lady -- never works on his or her own.

6  There are other -- always other people involved.  If -- if I

7  took that definition, then you'd never get the apex person.

8        **MR. RILEY:**  But by the very nature of who they are,

9  they generally have knowledge of various things in the

10  corporation.

11        **THE COURT:**  Yeah.

12        **MR. RILEY:**  And so the question is always is their

13  knowledge unique?  Because if it's simply a test, do they have

14  knowledge or not, then they would always be deposed.  The

15  question is always is there a less burdensome --

16        **THE COURT:**  Well, what does it mean by firsthand

17  knowledge?  That -- that seems to be part of the test.

18        **MR. RILEY:**  Firsthand means that they're directly

19  involved.

20        **THE COURT:**  Well, wasn't he directly involved?

21        **MR. RILEY:**  He was -- he was -- he reviewed the

22  statement before it went out and was consulted about that, but

23  there were several others who were directly involved who are

24  not the CEOs of Apple in this case and -- and hence could be

25  deposed.

1          The issue with regard to -- to RealNetworks, to --

2    to be clear, is it -- they exploited a hack.  Someone had

3    hacked into the security system, had opened the door, so to

4    speak, made the keys available --

5          **THE COURT:**  Is that a jailbreak?

6          **MR. RILEY:**  I think it is a jailbreak.

7          **THE COURT:**  I -- I -- I -- I read that -- that word.

8    Go ahead.

9          **MR. RILEY:**  Because these systems only work because

10   a -- keys are deposited on your iPod -- in the iPod hard

11   drive, and those keys are then used to unlock the songs when

12   they're played.

13         So in order for RealNetworks to get its songs to

14   work on an iPod, they had to break into the safe, get the keys

15   out and unlock.  And that's a hack, and that's a violation of

16   Apple's rights.

17         In that issue they have had extensive discovery.

18         **THE COURT:**  I guess people might disagree on that.

19         **MR. RILEY:**  They -- they have had 30(b)(6)

20   depositions.  They've deposed three engineers on how this

21   issue worked, on exactly how the security systems work, and

22   exactly how the updates were done.  And not a single one of

23   those individuals pointed to Steve Jobs as having somehow

24   unique knowledge about this.

25         Moreover, the alleged victim in this case,

1    RealNetworks, they took no discovery from at all, none.  This

2    is simply just an effort to try and depose the CEO of Apple.

3         THE COURT:  Well, what is taking discovery from

4    RealNetworks get them?

5         MR. RILEY:  Well, if they're claiming that

6    RealNetworks was somehow injured by Apple's actions in

7    repairing a security breach --

8         THE COURT:  Well, they might, but they -- they want

9    Jobs, not to show that RealNetworks was damaged, but to show

10   that there was an intentional tinkering with the technology to

11   keep RealNetworks out --

12        MR. RILEY:  But that intent --

13        THE COURT:  -- as in anti-competitive actions.

14        MR. RILEY:  But they have to prove that the action

15   was anti- competitive.  The intent to -- to -- to compete

16   against another company is not evidence of anti-competitive

17   actions.  They have to be illegal actions.  And fixing a

18   security breach is certainly not an illegal action under any

19   interpretation at all.

20        THE COURT:  Well, that depends on how you spin the

21   facts, I suppose.

22        MR. RILEY:  But in -- but in this case, I think --

23   and I think we should all be aware of the fact -- we have a

24   motion for summary judgment that's pending that will be heard

25   on April 18th.  And unlike last year, when the Plaintiffs made

1    a Rule 56(f) request, they have made no Rule 56(f) request.

2           If this information from Mr. Jobs was really

3    relevant to this case, then I'm sure they would have asked for

4    an extension of time in order to complete this deposition, but

5    they did not do so.  And so I think it would be --

6           **THE COURT:**  So that's --

7           **MS. BERNAY:**  No.

8           **THE COURT:**  That's proof that this is not an

9    important depo to them?  They just want to take it to harass

10   Mr. Jobs?

11          **MR. RILEY:**  It -- it is proof that the information

12   that they seek is not relevant to the case.  It certainly

13   doesn't help them.

14          **THE COURT:**  Well, why would one seek information

15   that's not relevant to the case?

16          **MR. RILEY:**  In order to -- in order to burden

17   individuals.  I mean, the -- the -- the Apex Doctrine exists

18   because the courts have recognized the possibility of abuse in

19   these kinds of depositions.

20          **THE COURT:**  Oh, I understand that.

21          **MR. RILEY:**  And that's why we're (inaudible) is to

22   ensure that those considerations are fully respected.  Apple

23   is subject to lots of lawsuits.  Its success has attracted

24   lots of Plaintiffs.  And -- and if this Plaintiff could go

25   forward on this basis, then Mr. Jobs would be subject to a

1    multiplicity of depositions.

2         **THE COURT**:  Oh, my gosh.  It's like the floodgate

3    would open?

4         **MR. RILEY**:  We have quite a number of lawsuits, Your

5    Honor.  And again, just like Chrysler did this to stop a

6    deposition of Lee Iacocca -- IBM and others -- this Doctrine

7    exists to protect CEOs from potential abuse where the

8    information is available from other sources.

9         And in this case, they didn't take Katie Cotton's

10   deposition.  They didn't take Phil Schiller's deposition.

11   They didn't take Greg Jozwiak's deposition.  All of whom were

12   involved in the preparation of that statement.  Instead, they

13   want to go straight to the top, and that's what the Apex

14   Doctrine was intended to avoid.

15        **THE COURT**:  What do you need this info -- this

16   testimony for, if indeed, there's a summary judgment motion

17   pending?

18        **MS. BERNAY**:  Your Honor, we actually tried to notice

19   this deposition for November 30th, well within the discovery

20   cutoff deadline.  We've been trying to get this deposition for

21   many, many months.

22        Mr. Riley's contention that we failed to file a

23   56(f) completely misses the point, where we have been

24   discussing and being very cognizant of certain health issues

25   that Mr. Jobs has suffered, in trying to schedule this

1    deposition in a -- in a way that was actually at the end of

2    discovery, so that we could look through the discovery record

3    and see whether we needed it.

4            And in fact, in a number of cases, the people we

5    deposed, when we said, "What did Mr. Jobs mean by this

6    statement?"  They testified, "I don't know what Steve meant by

7    that."  That happened a number of times.

8            And while Mr. Riley -- it -- it appears to me he's

9    very much trying to limit this case to just these very

10   specific, you know, sort of lines of code, but really our case

11   is about whether or not Apple maintained or attempted to

12   maintain monopolies in these two markets, and whether it did

13   that through anti-competitive conduct under the pretext that

14   its actions were required by the record labels.

15           And one of the key things is that Mr. Jobs, after

16   receiving an email from this competitor -- that we, by the

17   way, received on the last day of discovery after -- you know,

18   along with 1.5 other million pages -- whether or not he took

19   actions in response to Mr. Glaser's email -- did he call him?

20   We don't know.

21           There's nobody else who can testify as to what he

22   did when he received this message from a competitor.  All we

23   know is that later he -- and if I could pass up the actual

24   document that he wrote.  I have it here for both counsel.

25           **THE COURT:**  When was this?

1    **MS. BERNAY:**  This was the -- the letter that he

2  wrote -- sorry -- so -- I'm sorry.  The letter that Mr. Glaser

3  wrote was in April and then --

4    **THE COURT:**  April of '04?

5    **MS. BERNAY:**  April of '04.  Be -- just before they

6  actually announced that they were able to do this.

7    **THE COURT:**  Well, they announced it in July.

8    **MS. BERNAY:**  Right, just a couple months before.  He

9  contacted Mr. Jobs directly, said, "I have an idea that we

10  could work together."  Then we don't know what happened.

11    **THE COURT:**  Well, wasn't that about licensing?

12    **MS. BERNAY:**  That was in part about licensing, but

13  it was also about potentially working together.  We don't

14  know.  We don't know whether Mr. Jobs ever contacted him.  We

15  have no way of knowing, but we believe that this is --

16    **THE COURT:**  Well, I wouldn't say you had no way of

17  knowing.  You can ask Mr. Glaser, I suppose.

18    **MS. BERNAY:**  We've actually tried to serve Mr.

19  Glaser repeatedly, and we -- the police were called when -- on

20  our process server.  He's turned them away on a number of

21  occasions.  We've -- we've made a number of efforts to serve

22  him.

23    But Your Honor, he also -- as -- as we've been

24  discussing, he actually wrote, himself, the statement saying,

25  you know, I -- it says, "I assume that they succeeded in

1    allowing music to be played on an iPod," and then he says, "I

2    propose going with this," and it's a statement that he wrote.

3            And the fact that other people may have been

4    involved doesn't really get us anywhere.  While other

5    witnesses may testify about some of this, the -- to quote the

6    *First National Mortgage* case, "The mere fact that other

7    witnesses may be able to testify as to what occurred at a

8    particular time or place doesn't mean that a high level

9    corporate officer's testimony would be repetitive.  It's not

10   uncommon for different witnesses to an event have different

11   recollections of what occurred."

12           And I'd also refer you to the *Blankenship* case in

13   the Ninth Circuit where the Court found that, "While some of

14   the testimony might be a little bit repetitive, the Plaintiff

15   should be granted the opportunity to determine whether Mr.

16   Hearst," in that case, "had information that others did not."

17   And we believe here Mr. Jobs does have information that others

18   do not.

19           This isn't the case -- Mr. Riley mentioned Lee

20   Iacocca.  That was a case where a 1975 Dodge Van overturned, I

21   believe.  And it was a wrongful death case, and the Plaintiffs

22   were trying to get Lee Iacocca's deposition.

23           In this case Mr. Jobs has his hands all over this

24   company.  We have documents where he says, "Let me see the new

25   sale page.  I want to see how they've written, you know, add

1    copy."  He then changes that add copy.  He couldn't be a more

2    hands-on person.

3          And it -- again and again throughout this case -- we

4    have at least 800 documents, Your Honor, that we believe he

5    was -- either wrote or it was to or from that are relevant and

6    important to issues raised in this anti-trust matter.

7          **MR. RILEY:**  Your Honor, we've only seen a handful of

8    documents, none of which go to the issue of updates.  None of

9    the documents that are in the record before this Court is

10   Steve Jobs discussing updates to FairPlay or how to create

11   them or why to create them.  That's just not in the record at

12   all.

13         And again, as the Court recognizes, if they were

14   truly interested in pursuing discovery about their discussions

15   or what Mr. Glaser proposed, they could have pursued that

16   through RealNetworks, and they didn't.

17         There really is nothing that relates to the issue in

18   this case, as this Court has framed it, that is in the

19   documents that were attached to the record in this motion.

20         **THE COURT:**  You get the last word.  Oh, wait.  This

21   is your motion.

22         **MR. RILEY:**  Yes.  This is our -- our motion.

23         **THE COURT:**  You get the last word.  All right.

24         **MS. BERNAY:**  Could I -- a couple things.  In a

25   number of cases -- again and again, certainly in this Circuit,

1  high level officers who may have some personal knowledge

2  regarding the litigation over and over again are allowed to go

3  forward --

4           **THE COURT:**  No, I know.  Don't talk about other

5  cases.  Every case is different on the facts.

6           **MS. BERNAY:**  In -- in this --

7           **THE COURT:**  Mr. Jobs has his fingers all over this -

8  - this particular --

9           **MS. BERNAY:**  He does.

10          **THE COURT:**  -- press -- press release, announcement,

11  whatever the heck it was.

12          **MS. BERNAY:**  Right.  And then there --

13          **THE COURT:**  He's also the face of Apple.

14          **MS. BERNAY:**  That's right.  And there's other --

15          **THE COURT:**  So you don't need to tell me that.

16          **MS. BERNAY:**  There's other cases -- there's other

17  issues in this case.  He wrote an email at the beginning

18  talking about other -- Apple shutting out other DRM systems.

19  And then that -- when they said, "Well, maybe we should also

20  have it be compliant with Windows Media," he wrote, "this is

21  bad," because over and over again what he was trying to do is

22  maintain this closed network.

23          And then when somebody tried to get into that closed

24  network through means that we believe were completely legal,

25  they were a competitor, Apple sprung into action, and Mr. Jobs

1    in particular, went on the today attack threatening this, and

2    in fact, threatening so much to -- to the extent that when one

3    of the record labels that they've claimed all along, you know,

4    required all these updates -- when one of the record label's

5    executives told the public that they had no problem with what

6    Harmony was doing, Steve Jobs himself wrote an email saying,

7    "We're darn mad about this," to Universal and made them issue

8    a retractive press release.

9            **THE COURT:**  Well, maybe you've got this information

10   and you don't need Mr. Jobs.

11           **MS. BERNAY:**  I -- I believe that we do need Mr. Jobs

12   to find out exact -- he has this information in his head that

13   no one else has.  Over and over again we've been told --

14           **THE COURT:**  Well, you're saying you've got -- you've

15   got documents, which show the tracks of what was in his head.

16           **MS. BERNAY:**  We do, but you know, a document isn't

17   enough, especially when we've been trying since November to

18   work with them on a method to deal with issues related to

19   admissibility and authenticity that we've provided, at least

20   four that I'm aware of, proposals regarding issues related to

21   documents so that maybe a document would be enough.  A

22   document that Mr. Jobs wrote right now, I think we would claim

23   it would be an admission, but really we do have these

24   outstanding evidentiary issues, and we've proposed -- in fact,

25   we've provided a list of documents to Apple just a few weeks

1  ago asking if they would -- instead of going through this

2  process, if they would agree to the admissibility of --

3          **THE COURT:**  When's the --

4          **MS. BERNAY:**  -- various documents.

5          **THE COURT:**  When's the summary judgment hearing?

6          **MR. RILEY:**  April 18th, Your Honor.

7          **THE COURT:**  Have you -- is the -- is the briefing

8  completed yet?

9          **MR. RILEY:**  It will be completed in a few days when

10  we file a response brief.  Their opposition has been filed.

11          **MS. BERNAY:**  On the 28th.

12          **THE COURT:**  Well, what are you going to do with

13  Jobs' testimony if I give it to you?

14          **MS. BERNAY:**  Well, because of the health issues, we

15  had to put it aside.  But we feel like if there is a chance to

16  get this information into the record, we believe Judge Ware

17  would allow us to supplement prior to the hearing, if

18  necessary.

19          **THE COURT:**  Okay.  All right.  Last word.

20          **MR. RILEY:**  Your Honor, I think that that raises the

21  precise issue.  If -- if any deposition is ordered, it should

22  go forth only if the case survives motion for summary

23  judgment.

24          This case has been going on for six years.  It's

25  been whittled down to this narrow issue of software updates.

1  Nothing that counsel has referred to with regard to Mr. Jobs'

2  public statements or discussions or proposals by RealNetworks

3  has anything to do with software updates.

4          So there is no proper basis to go forward with the

5  deposition, and certainly no basis to go forward with a

6  deposition that could be completely mooted in our -- in a --

7  in a month --

8          **THE COURT:**  Of course --

9          **MR. RILEY:**  -- with the summary judgment.

10          **THE COURT:**  -- they've been -- they've been trying

11  for some time to get this deposition, haven't they?

12          **MR. RILEY:**  They started after the case was five and

13  a half years old.  That's when they started.

14          **THE COURT:**  Oh, when did --

15          **MR. RILEY:**  Here they are --

16          **THE COURT:**  When did they start?

17          **MR. RILEY:**  In November of this year, after the case

18  was five and a half years old.

19          When the first motion for summary judgment was filed

20  in this case in April of 2010, they made a Rule 56(f) request.

21  They didn't ask for Steve Jobs' deposition then.  They only

22  asked on the -- literally the eve of the close of discovery in

23  this case, and that -- that's when they asked for it.

24          We -- we appreciate their efforts to accommodate Mr.

25  Jobs' very serious health condition, and -- and we don't

1  question their professional courtesy there, but they did wait

2  until the -- literally the eve of discovery, after the case

3  had been going on for five and a half years.

4          THE COURT:  Well, that doesn't --

5          MS. BERNAY:  Your Honor --

6          THE COURT:  That doesn't disqualify them from asking

7  for his deposition just because they waited five and a half

8  years.

9          MR. RILEY:  But as all cases must be decided on

10  their facts, in this case the particular facts of waiting so

11  long to question him about documents that are a matter of

12  public record indicates that this is a not brought to try and

13  discover legitimate evidence.  Otherwise, they would have --

14  they would have instituted the efforts years ago.

15          THE COURT:  Okay.

16          MS. BERNAY:  Your Honor, if I may make one quick

17  point?  None of the fact discovery depositions began until

18  December 3rd in this case, primarily because we had no

19  documents.

20          On November 3rd is the day we actually asked for Mr.

21  Jobs' deposition.  It was the same day that we asked for a

22  number of the depositions that went forward in this case,

23  because we document have the documents from the Defendants,

24  particularly custodial documents.

25          It's a false argument to say that we waited until

1  the eve of trial.  None of the depositions were done until the

2  first week of December, going forward until December 20th, the

3  last day of discovery.

4          **THE COURT:**  Final word?

5          **MR. RILEY:**  Your Honor, they have not established a

6  basis for discovery of Mr. Jobs on the only issue remaining in

7  the case, which is software updates.  Nothing counsel has said

8  indicates that.

9          **THE COURT:**  Okay.  Is the matter submitted?

10         **MR. RILEY:**  Yes.

11         **THE COURT:**  Thank you.

12         **MS. BERNAY:**  Thank you.

13              (Proceedings adjourned at 10:55 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U. S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____    3/21/11

Signature of Transcriber    Date