Robert A. Mittelstaedt #60359
ramittelstaedt@jonesday.com
Craig E. Stewart #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
Michael Scott #255282
michaelscott@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:  (415) 626-3939
Facsimile:  (415) 875-5700

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No.   C 05-00037 JW (HRL)<br>[Class Action]<br><br>**APPLE'S OPPOSITION TO MOTION TO EXCLUDE THE OPINIONS OF DEFENDANT'S EXPERT, DR. MICHELLE M. BURTIS, Ph.D**<br><br>Date:   May 2, 2011<br>Time:   9:00 a.m.<br>Courtroom: 8, 4th Floor |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................. 1

II. BACKGROUND ................................................................................................................... 3

    A. Dr. Burtis' Expertise. ................................................................................................ 3

    B. Prof. Noll's January 2011 Report. ............................................................................ 4

    C. Dr. Burtis' February 28, 2011 Report. ..................................................................... 5

III. ARGUMENT ........................................................................................................................ 7

    A. Dr. Burtis' Qualifications to Evaluate Damage Studies and Regression Analyses Are Unquestioned. ................................................................................... 7

    B. Dr. Burtis' Report is Based on the Record and Her Expertise in Damages and Regression Analyses. ......................................................................................... 7

    C. Professor Noll's Reply Declaration Provides No Basis to Exclude Dr. Burtis' Opinions. ...................................................................................................... 9

CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

**Page**

Cases

*Dukes v. State*,
 428 F. Supp. 2d 1298 (N.D. Ga. 2006) ............................................................................ 8

*In re Air Crash Disaster at New Orleans*,
 795 F.2d 1230 (5th Cir. 1986) .......................................................................................... 8

*Stein v. Pacific Bell*,
 2007 U.S. Dist. Lexis 19193 (N.D. Cal. Mar. 19, 2007) ................................................. 9

## I. INTRODUCTION

Plaintiffs' motion to exclude Dr. Michelle Burtis' opinions relevant to class certification is devoid of any arguable merit. Dr. Burtis is a recognized expert on regression analyses and damage computations whose opinions have been relied on by federal courts, including this Court, in denying class certification. Her opinion that the methodology outlined by Plaintiffs' expert, Professor Noll, will not work is amply supported by her 44-paragraph declaration. Contrary to Plaintiffs' argument (p. 2), the assertions in Dr. Burtis' declaration are not "naked conclusions unsupported by any discernible analysis" and she is not "parroting Defendants' legal argument." Her declaration sets forth the detailed reasoning on which her conclusion is premised, and her economic analysis is the basis of Apple's legal argument, not the other way around.

At bottom, Plaintiffs' argument (p. 1) is that Dr. Burtis' opinion should be excluded because Professor Noll supposedly has now "demonstrate[d] the feasibility of the regression analysis that Dr. Burtis contends is impossible." They assert (p. 2) that Professor Noll's methods "have now been shown to work," and any contrary opinion by Dr. Burtis is therefore inadmissible. But the recent deposition of Professor Noll destroys these assertions. Professor Noll admitted that the "preliminary" regression he ran does not work and is not reliable: "I do not regard this as a damage model." Noll Dep. at 90.[1] "I am not here to defend as the final damages equation that which I have done because it's obviously incomplete." *Id.* at 110. Among other things, he admitted that he does not know whether his model contains any specification errors—*i.e.*, errors in constructing the model that could bias the results. When asked whether there is a "factor that's been excluded from this regression that leads to the wrong answer," he admitted "I don't know that. That's why I wouldn't offer this as a damages model." *Id.* at 91. He thus conceded that his model is "not proof that this is the right specification." *Id.* at 91-92; *id.* at 148 ("Of course I'm not assuming it was specified correctly.").

---

[1] All cited pages from the Noll deposition are found in Exhibit 1 to the Kiernan Declaration accompanying this opposition.

Professor Noll likewise admitted that his model does not account for such things as Apple's pricing strategy:

> Q. Does your current regression in your reply report account for the fact that Apple changed its retail prices and wholesale prices, list prices infrequently?
>
> A. No, that's why it's not a damage model. Remember, this is in response to the claim I can't estimate this regression. And I can, but to go from there to a damage model, you would take this stuff into account.

*Id.* at 185.

As a result of his failure to actually create a valid model, Professor Noll conceded that he cannot draw any "causal inferences from that regression" (*id.* at 90), including any inference on the very question for which Plaintiffs offer Professor Noll's testimony—*i.e.*, whether Apple's software update that disabled Harmony caused any change in the price of iPods. As he aptly summarized, "I cannot rule out anything based on the regression I have because I'm not relying on it for anything." *Id.* at 131. "This isn't a regression that I would use to calculate damages because I don't have enough information in it or enough variables in it." *Id.* at 120-21.

In short, contrary to Plaintiffs' assertion, Professor Noll has not run a "working regression analysis" that "demonstrates that impact and damages can be proven by relying on common proof." Doc. 550, pp. 2, 8. All that Professor Noll has shown is that he can create an unreliable model—*i.e.*, that he can take a set of data, input it into an incorrectly specified computer model, and generate unreliable results that are not probative on the relevant issues in this case. But the question is not whether Professor Noll can construct an unreliable model. The question is whether he and Plaintiffs have demonstrated that a valid method exists for establishing impact and damages on a class-wide basis. Professor Noll's deposition testimony confirms that they have not. And it therefore likewise confirms that, Dr. Burtis' opinion that Professor Noll has not shown that a valid damages model can be constructed is not only admissible, but entirely correct.

## II. BACKGROUND

### A. Dr. Burtis' Expertise.

Dr. Burtis' declaration incorporates the background and expertise sections from the first of her four reports in these coordinated actions. *See* Doc. 511, ¶ 1, incorporating *Somers* Doc. 74.[2] She obtained a Ph.D in Economics from the University of Texas at Austin and is a vice president at Cornerstone Research, an economic and finance consulting firm. As an economist, she has substantial experience with regression analyses. One of her two fields of specialization in her graduate study was econometrics. Her dissertation was based on econometric models of input substitution due to changes in relative prices. She has developed and analyzed numerous regression analyses for various purposes including to identify relevant product markets, to analyze reasons for gasoline price changes and to estimate damages. *See Somers* Doc. 74, ¶¶ 2-3 & Ex. 1.

Further demonstrating her expertise, Dr. Burtis' report in the *Somers* case, Doc. 74, contained a primer on regression analyses (Doc. 511, ¶¶ 13-20) and showed why the damage models proposed by the indirect purchaser's economist would not work (¶¶ 21-40). This Court found Dr. Burtis' testimony, offered at the June 30, 2009 evidentiary hearing, "far more persuasive" than that of the opposing economist. *See Somers* Doc. 80, p. 12. As the Court summarized, "Dr. Burtis gave specific testimony about how regression models work, and testified about the difficulties of constructing such a model to deal with the complex multi-variable situation underlying iPod pricing." *Id.*, p. 11. "Dr. Burtis contrasted the situation in this case with a successful regression model she constructed to deal with crude oil prices in the aftermath of Hurricane Katrina. The point of this testimony was to illustrate how a regression model may be successful where there is abundant data on pricing in the period prior to a clear price-altering event." *Id.* Here, by contrast, as Dr. Burtis testified, "there was no clear point at which the effects of anticompetitive conduct would be felt in iPod pricing. According to Dr. Burtis, this

---

[2] Her other two reports are Doc. 241 (August 31, 2009 report) and Doc. 286 (November 11, 2009 reply report).

1  latter uncertainty is exacerbated by the numerous factors that would have affected iPod pricing, as
2  well as by the continual introduction of new and cheaper iPod models throughout the proposed
3  class period. Ultimately, her testimony was that Dr. French had failed to propose a model that
4  could adequately account for the morass of variables that make up the iPod pricing dynamic." *Id.*,
5  pp. 11-12.[3]

### B. Prof. Noll's January 2011 Report.

In renewing their motion for class certification, Plaintiffs submitted a January 18, 2011 report by Professor Noll. *See* Doc. 479. Only about 15 pages address the impact and damages issues of relevance here, and much of that is simply a generic discussion of general methods for proving damages in antitrust cases. *Id.*, pp. 70-85. The other 70 pages consist of a lengthy summary and discussion of liability issues not at issue on the class certification motion.

Professor Noll recognizes that Plaintiffs' liability theory has been substantially narrowed. As he puts it, "the Court has ruled that Apple's initial [alleged] monopoly power in the [alleged] markets for audio downloads and portable digital media players that arose from the technical interdependence between iTMS and iPods was not the result of anticompetitive behavior." *Id.*, p. 8. He also recognizes, more explicitly than Plaintiffs acknowledge, that they have dropped their claim that it was unlawful for Apple to update its software to block DRM-stripping hacks—hacks that once were a mainstay of Plaintiffs' case and which they trumpeted as promoting "interoperability." *Id.*, p. 9, n.6; *see* Doc. 321, ¶ 63-66; Doc. 546, p. 1.

Although Professor Noll discusses a "before/after" method of determining an overcharge caused by a software update, his report does not attempt to demonstrate, by running a regression analysis or otherwise, that he can identify when the damage period begins, *i.e.*, when the alleged anticompetitive conduct would result in an increase in iPod prices. In other words, Plaintiffs allege that iTunes 4.7 released in October 2004 was anticompetitive. But Professor Noll's report

---

[3] At the time of that testimony, the liability theory of both the direct and indirect purchasers was that the anticompetitive conduct was using a propriety DRM system from the time Apple's music store was launched in April 2003. As detailed in Dr. Burtis' present report, the absence of a clear point at which the effects, if any, of the narrower alleged anticompetitive conduct occurred is even more acute now. *See* Doc. 511, ¶¶ 19-26.

does not purport to state when that software update would have caused iPod prices to be unlawfully elevated. Indeed, Professor Noll does not even assert that any cause-and-effect relationship necessarily existed between that software update and iPod prices. Nor does his report contain any actual regression analysis.

As to the resellers the end-user consumer Plaintiffs also seek to represent, Professor Noll acknowledges that he would need to conduct separate regression analyses for resellers and end-users. Dr. Noll asserts that, to prove the reseller claim, he will use wholesale transaction records to do a before-after analysis that will "take into account the characteristics of customers and the specific product that was sold." Doc. 479, p. 77. By contrast, however, he states that he will require different data to conduct an analysis of the prices for direct consumer purchases and that he is not able to describe "in as much detail" the analysis he will use for such prices because he currently lacks the requisite data. *Id.* He likewise admits that the viability of his proposed "yardstick" method differs as between resellers and consumers. He states that the method "is not likely to be the most cost-effective method for establishing a competitive benchmark for wholesale purchasers of iPods." *Id.* at 81. At the same time, however, he asserts that, "for retail direct purchasers, a form of yardstick analysis is more practical and is a plausible, reliable method for developing a competitive benchmark." *Id.*

C.   **Dr. Burtis' February 28, 2011 Report.**

This report incorporates Dr. Burtis' background and experience from her first report dated June 17, 2009, and describes her assignment as addressing "whether the methodologies and approaches proposed by Professor Noll in this case can be used to determine class-wide impact and to estimate class-wide damages under Plaintiffs' new theory of liability." Doc. 511, ¶ 4. That liability theory is that, while the initial interoperability of iTS and iPods resulting from Apple's use of its proprietary DRM was lawful, Apple's alleged market power was unlawfully maintained by software upgrades that blocked Harmony, a program that allowed music from RealNetworks Music Store to be played on iPods.

Dr. Burtis states her conclusions in paragraphs 7 through 14, and provides the detailed reasoning supporting those conclusions in paragraphs 15 to 44. The overall conclusion is that

"Professor Noll has not demonstrated that his proposed methods will work to determine impact and damages on a class-wide basis" based on Plaintiffs' new liability theory. Doc. 511, ¶ 7. That conclusion is supported by the following.

 ***First***, Professor Noll did not show that "the existence or not of Harmony—which allowed access to just one of multiple sources of music for iPods—would have had any impact on actual iPod prices for any time period, and given all the other factors affecting demand for iPods and [REDACTED]." *Id.*, ¶ 18.

 ***Second***, if Harmony had any impact on iPod prices, Professor Noll's theory was that Harmony would **increase** iPod attractiveness by adding another source of music and then, at some unspecified time, would decrease the alleged lock-in effect and create an offsetting influence. As a result of these conflicting influences over time, Professor Noll was unable to say when, if ever, the October 2004 software update would be expected to result in higher iPod prices.[4] A related consequence of his theory is that consumers may have paid a lower price as a result of the allegedly wrongful conduct—the opposite of Plaintiffs' theory. For these reasons, Professor Noll could not identify when the alleged damage period began or ended and thus could not identify which class members were impacted. *Id.*, ¶¶ 8, 15-20.

 ***Third***, Professor Noll did not identify any "benchmark" time period or product that could be used to measure whether the software updates caused any price change. *Id.*, ¶¶ 9-10, 28-35. The pre-iTS period cannot be used because Plaintiffs do not assert that Apple had any market power for iPods then, whereas their theory is that Apple would have had lawful market power even in their but-for world in which Harmony continued in existence. *Id.*, ¶¶ 32-34. The absence of any benchmark period or product renders infeasible his three proposed methods of proving

---

[4] [REDACTED] *Id.*, ¶ 24.

1  impact and damages, all of which require a comparable time period or product to use as the
2  baseline.
3  ***Fourth***, 
7  *Id.*, ¶¶ 11, 35.
8  ***Fifth***, Professor Noll's proposed yardstick and margin methods would not work because
9  he has not identified any product sold in a comparable market where the seller possessed lawfully
10  acquired "market power" that was decaying over time. *Id.*, ¶¶ 12-13, 36-42.
11  ***Sixth***, the other forms of harm described by Professor Noll would either not be felt by
12  iPod purchasers or would require individualized analysis. For example, Dr. Noll theorized that
13  some consumers were prevented from purchasing competing players or from obtaining the
14  features or prices they wanted. Each of those claims would require individual-by-individual
15  proof of a particular consumer's preferences. *Id.*, ¶¶ 14, 43-44.

16  **III.   ARGUMENT**

17       **A.   Dr. Burtis' Qualifications to Evaluate Damage Studies and Regression
18            Analyses Are Unquestioned.**

19  Plaintiffs do not challenge Dr. Burtis' expertise in the issues covered by her report. She
20  has a Ph.D in Economics with expertise in the use of regression analyses to determine impact and
21  damages in antitrust cases. This Court has relied on Dr. Burtis' expertise and analysis in denying
22  class certification in the indirect purchaser case.

23       **B.   Dr. Burtis' Report is Based on the Record and Her Expertise in Damages
24            and Regression Analyses.**

25  Without challenging Dr. Burtis' expertise, Plaintiffs argue that her report consists of
26  "merely naked conclusions unsupported by any discernible analysis." Mot., p. 2. They give no
27  example to back up that assertion. It is readily refuted by her report itself, as summarized above.
28

1  The problem for Plaintiffs is not in discerning or understanding Dr. Burtis' analysis—their
2  problem is in answering it.
3      Dr. Burtis' report bears no resemblance to the expert opinions excluded as being no
4  different from lawyers' argument in the two cases Plaintiffs cite. In *In re Air Crash Disaster at*
5  *New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986), the court found incredible an expert's
6  unsupported assumptions that the plaintiff's annual income would have increased by 8% each
7  year for 40 years, that his annual tax rate would be only 5% for that entire period, and that he
8  would have saved 20% of his annual income despite no history of doing so. Likewise, in *Dukes*
9  *v. State*, 428 F. Supp. 2d 1298, 1315 (N.D. Ga. 2006), the expert was a doctor proffered to testify
10 on the standard of care for HIV-positive inmates but who had never treated the condition at issue
11 and was not an expert on internal medicine or infectious diseases.
12     Plaintiffs' criticism of Dr. Burtis for information she did not consider or for opinions she
13 did not offer is unavailing. Although they assert (p. 3) that she did not review any of the 1.5
14 million documents produced by Apple, her cited testimony does not support that assertion. And
15 Plaintiffs disregard her testimony that she or her staff reviewed the relevant documents. Burtis
16 Dep. at 30-33.[5] Moreover, Plaintiffs do not in any event cite a single document that undermines
17 her opinions. The same is true of the other material referred to by Plaintiffs. They say (p. 2, n. 1)
18 that she only cited "isolated" portions of Apple depositions and declarations but they fail to
19 identify any other portions that undermine her report. ███████████████████████
20 ████████████████████████████████████████████████████████████
21 ████████████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████████████
23 ████████████████████████████████████████████████████████████
24 ████████████████████████████████████████████████████████████
25 *Id.*

---

[5] The cited Burtis deposition pages are found in Exhibit 2 to the Kiernan Declaration.

Likewise unfounded is Plaintiffs' argument (p. 3) that, because Dr. Burtis did not offer opinions on various topics (*e.g.*, market definition or share, etc.), she should not be permitted to offer the opinions in her report. They cite nothing to support that novel theory. Plaintiffs do not assert that an opinion on market definition or the other topics they mention has any bearing on the opinions Dr. Burtis offered. They just imply that, if an expert does not opine on all issues in a case, the expert cannot opine on any. That argument is meritless.

Plaintiffs' argument (p. 3) that Dr. Burtis did not conduct an "independent evaluation" of Professor Noll's proposed methodologies is incorrect. Her report *is* an independent evaluation.[6] If they wanted to learn more about the bases for her opinions, Plaintiffs were free to ask questions at the deposition they took, which was the third time that Dr. Burtis has testified in these coordinated cases. At the March 14 deposition, Plaintiffs questioned her for nearly four hours on her 44-paragraph report. They do not cite a single instance where Dr. Burtis was asked about her reasoning and was unable to answer.[7]

### C. Professor Noll's Reply Declaration Provides No Basis to Exclude Dr. Burtis' Opinions.

Even if Professor Noll had been able to perform a regression analysis explaining iPod pricing, it would provide no basis to exclude Dr. Burtis' opinions. But Professor Noll has not done so. As discussed, Professor Noll admits that he has not done the work to determine that a valid, correctly specified model can be constructed—*i.e.*, a model that properly accounts for all the relevant variables and permits a reliable conclusion that could form the basis for a class-wide determination of impact and damages. At best, he has shown only that he can construct an invalid,

---

[6] *Stein v. Pacific Bell*, 2007 U.S. Dist. Lexis 19193 (N.D. Cal. Mar. 19, 2007), is irrelevant. There, the expert purported to opine that certain telephone carriers had incurred additional costs. But he had not investigated whether the costs were actually incurred, instead relying only on unproven allegations in complaints filed by those carriers.

[7] The issue of whether Plaintiffs have conceded the correctness of this Court's previous rulings is irrelevant. Whether conceded or not, Plaintiffs agree that they are no longer challenging the use of proprietary anti-piracy software *per se* and that they are only challenging the software updates starting with iTunes 4.7 in October 2004 that affected the use of Harmony.

unreliable model. This does nothing to support plaintiffs' claim, let alone make inadmissible Dr. Burtis' conclusion that Professor Noll has not shown that a workable method exists.

As explained in the accompanying Burtis Declaration, even a cursory analysis of Professor Noll's model confirms his admissions that the model is "obviously incomplete" and cannot be relied upon. Among other things, Professor Noll's model is unable to separate out the effects of such things as the launch or shutdown of Harmony from other contemporaneously occurring circumstances. Of critical importance here, Professor Noll's model attributes to the launch of Harmony a drop in some iPod prices associated with new product introductions on July 19, 2004, a week *before* Harmony was announced. Burtis Decl. ¶¶ 17-24. This price change resulted in average iPod prices being lower in the period in which Harmony was in operation, as compared to the average prices before the change. Professor Noll's model treats that price reduction as a response to Harmony, even though it was planned and announced before the RealNetworks made known that it was launching Harmony. When confronted at his deposition with these facts, Professor Noll admitted that, if a price drop that occurred near the time of the Harmony launch was prompted by some independent factor that is not accounted for in the model (such as a pre-planned new product launch), the result would be a "spurious correlation"—*i.e.*, wrongly attributing the price change to the Harmony launch rather than the independent factor. Noll Dep. at 87-89. As Professor Noll put it, "if there is an excluded variable from the regression, that is correlated with the Harmony period, then the Harmony coefficient could be biased." *Id.* at 87-88. Despite this admission, Professor Noll's model makes no attempt to account for such contemporaneously occurring events. Nor does he offer any explanation how he might account for those events.

Professor Noll's analysis is flawed in other respects as well. As Dr. Burtis explains, among other things, it does not include any mechanism for validly estimating any price impact on iPod models introduced for the first time after Harmony was disabled. Instead, it simply extrapolates from models sold before and during the existence of Harmony, without attempting to control for the differences between the models. Burtis Decl. ¶¶ 9-13. Professor Noll's model is also limited to wholesale prices. He admitted at his deposition that he has not yet determined


Opp. Mot. to Exclude Dr. Burtis
Case No. C 05-0037 JW (HRL)

1  whether the retail price data that is available will allow him to construct a model for the retail
2  prices paid by the end-user consumers like Plaintiffs who comprise more than one-third of the
3  class. Noll Dep. at 48 ("The issue is estimating an equation. The hard part is to decide given the
4  data you actually can accumulate, what can you actually estimate and I don't know the answer to
5  that yet."). See Supp. Burtis Decl. ¶¶ 25-27.
6     In short, Professor Noll's reply report only confirms the reliability of Dr. Burtis' opinion.
7  He has not constructed a valid model, and he has not shown that he is capable of doing so.

## CONCLUSION

For these reasons, the motion to exclude should be denied.

Dated: April 11, 2011

JONES DAY

By:/s/ Robert A. Mittelstaedt
    Robert A. Mittelstaedt

Counsel for Defendant APPLE INC.

SFI-673565v1