1  Robert A. Mittelstaedt #60359
   ramittelstaedt@jonesday.com
2  Craig E. Stewart #129530
   cestewart@jonesday.com
3  David C. Kiernan #215335
   dkiernan@jonesday.com
4  555 California Street, 26th Floor
   San Francisco, CA  94104
5  Telephone:     (415) 626-3939
   Facsimile:     (415) 875-5700
6
7  Attorneys for Defendant
   APPLE INC.
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION** | Lead Case No. C 05-00037 JW (HRL) |
| ──────────────────────────── | [CLASS ACTION] |
| This Document Relates To: | **APPLE'S SUPPLEMENTAL BRIEF RE CLASS CERTIFICATION** |
| ALL ACTIONS | Date:    June 27, 2011<br>Time:   9:00 a.m.<br>Place:   Courtroom 8, 4th Floor |
| | **[REDACTED]** |

Supp. Br. re Class Cert.
C 05-00037 JW (HRL)

**INTRODUCTION**

Apple submits this brief in response to the Court's request for simultaneous briefs on the appropriate class definition and time period in light of the Court's summary judgment ruling. Doc. 627, p. 15.

The record to date does not provide enough information to answer the Court's question. The record certainly does not support the class definition and time period alleged in the operative complaint (direct purchasers of all iPod models from October 2004 to March 2009). Nor does it support the class definition and time period that Plaintiffs presumably will assert now (direct purchasers of all iPod models from September 2006 to March 2009).

The only remaining alleged anticompetitive act is the use of iTunes 7.0 for new iPod models introduced starting in September 2006. In moving to certify a class, Plaintiffs did not offer any evidence that iTunes 7.0 affected prices of any iPod, much less that iTunes 7.0 increased any iPod prices. Nor did they argue or attempt to show when any such impact would have occurred. Indeed, the testimony of Plaintiffs' damages expert suggests that iTunes 7.0 had no effect whatsoever on iPod pricing. Professor Noll testified that he suspected that consumers did not take advantage of the re-launch of Harmony which apparently occurred in April 2005. If so, disabling Harmony could not have affected iPod demand or prices even under Plaintiffs' own implausible theory that removing one of many sources of music playable on iPods could ever cause iPod prices to increase. In any event, under Plaintiffs' theory, any price effect on iPods would occur only in some indeterminate "long term" and certainly would not have occurred in September 2006.

Likewise, Plaintiffs have not offered any evidence that, if iTunes 7.0 eventually increased iPod prices, the effect would have persisted until their proposed end date for the class period of March 31, 2009. Under Plaintiffs' theory, the availability of DRM-free music would have eliminated or lessened the alleged "lock-in" effect that is the basis of Plaintiffs' theory of impact and damages. DRM-free music became available long before March 2009—starting in April 2007 on iTS (for EMI music), in August-September 2007 on Wal-Mart (EMI) and Amazon (EMI

and Universal), and then on all of Apple's major on-line digital music store competitors for all the major labels in early 2008.

Against this backdrop, before any class is certified (and without waiving Apple's previously-stated opposition to certification of any class), Plaintiffs should be required to submit credible evidence showing that the use of iTunes 7.0 on new iPod models starting in September 2006 caused prices for certain iPod models to be higher than they would have been without iTunes 7.0—and when that effect began and ended. The class should then be limited to direct purchasing consumers who bought those iPod models during that period.[1] If this case proceeds, Plaintiffs will need to make that showing anyway. No reason exists why they should not be required to do so now.[2]

## ARGUMENT: PLAINTIFFS HAVE NOT SATISFIED THEIR BURDEN TO SHOW WHAT THE CLASS PERIOD SHOULD BE AND WHICH IPOD MODELS SHOULD BE INCLUDED.

The operative complaint and class certification motion seek a class of all direct purchasers of all iPod models sold from October 1, 2004 to March 31, 2009. The beginning of that requested class period was based on the assertion that Apple unlawfully disabled Harmony in October 2004 when it released iTunes 4.7. Plaintiffs did not contend, however, that iTunes 4.7 had the immediate effect of raising iPod prices in October 2004. Rather, their theory was Harmony would have lowered prices only in the "long run" after sufficient Harmony sales had occurred.

---

[1] *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (denying class certification where the class included individuals who were not harmed by the alleged practice); *MidPeninsula Citizens For Fair Hous. v. Acco Mgmt. Co.*, 168 F.R.D. 647, 648-49 (N.D. Cal. 1996) (same); *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 288 (S.D. Ohio 2006) ("A proposed class may be deemed overly broad if it 'would include members who have not suffered harm at the hands of the Defendant and are not at risk to suffer such harm.'").

[2] In light of the limited scope of the Court's request for supplemental briefing, this memorandum addresses only the class definition and time period. But Plaintiffs' failure to offer any evidence that iTunes 7.0 affected iPod prices also means that they have failed to satisfy the Rule 23 requirement of showing a class-wide method of proving impact and damages. And, as demonstrated in Apple's earlier opposition memorandum (Doc. 512, pp. 21-25), resellers like Best Buy and Target are differently situated from end-user consumers like plaintiffs and their claims cannot properly be resolved together with such consumers.

1  Doc. 479, p. 54.³  Thus, under Plaintiffs' theory, iTunes 4.7 could not have raised iPod prices
2  until the point that the purported "long run" effect would have occurred.

3  Plaintiffs, however, steadfastly declined to identify the point at which this supposed
4  market effect would have happened—and thus when the alleged damages period started.  Their
5  expert testified only that resolving the question would require "empirical analysis of prices"—an
6  analysis that he had not done.  Doc. 551, pp. 8-9.

7  Plaintiffs' failure to identify a start date for their iTunes 4.7 claim is moot given this
8  Court's determination that the update was lawful.  But this same problem applies with even
9  greater force to their sole remaining claim.  Plaintiffs will now presumably contend that the class
10 period should begin in September 2006, when iTunes 7.0 was released for new iPod models
11 introduced after the date.  And they will presumably rely on a multiple-links-in-the-chain theory
12 similar to that they previously asserted with respect to iTunes 4.7—*i.e.*, that (1) with the use of
13 Harmony, RealNetworks was taking customers away from iTS, which (2) would have eventually
14 reduced the degree to which iTS consumers were allegedly "locked into" using only iPods, which
15 (3) would have offset Harmony's initial impact of making iPods more attractive and eventually
16 resulted in decreased demand for iPods and (4) thereby eventually resulted in lower iPod prices,
17 all other things being equal.

18 At the threshold, Plaintiffs have not alleged or offered any evidence of even the first
19 requirement of their multi-step theory, *i.e.*, that Harmony was in fact capturing sales from iTS in
20 2006 and would have continued to do so absent iTunes 7.0.  That was a key threshold premise of
21 their impact and damages theory for iTunes 4.7.  Citing evidence from August 2004, they argued
22 that antitrust impact and injury for iTunes 4.7 was shown by the fact that ████████████
23 ████████████████████████████████████████████████████████████████████████
24 ████████████████████████████████████████████████████████  Doc. 477, p. 7.

---

³  In more detail, their theory was that, as consumers purchased more music from Harmony
26  and less from iTS, they would be increasingly free to purchase competing players rather than
    iPods.  Plaintiffs posited that, given this new-found freedom, consumers would in fact opt for
27  players other than iPods and would do so in sufficiently large numbers that eventually iPod prices
    would decline.
28

1  ▮▮▮
2  ▮▮▮
3  ▮▮▮

4       Their expert made the same point, asserting that the "economic basis" of Plaintiffs' claim was that Harmony caused RealNetworks' market share to increase in 2004, with a resulting decrease in sales from the iTS. Doc. 479, p. 54. He reiterated this same point in his reply report, citing the "market impact of Harmony on iTMS sales" in 2004, which he claimed had caused "switching costs" to decline and would have continued to do so had Harmony not been disabled. Doc. 551, p. 8.

      This necessary predicate for Plaintiffs' theory of class-wide injury (however implausible and unsupportable the theory may be) is absent now that iTunes 4.7 is no longer part of the case. Under their own theory, Plaintiffs would have to establish that, after being disabled in 2004, Harmony was again gaining market share at the expense of iTS—and thus was reducing lock-in and would have continued to do so had iTunes 7.0 not been released. Absent such a showing, Plaintiffs' theory that iTunes 7.0 had any effect on the market or on iPod prices would fail at the threshold.

      To date, however, plaintiffs have not contended or presented any evidence that in 2006 RealNetworks was capturing sales from iTS as a result of Harmony and would have continued to do so absent iTunes 7.0. To the contrary, their expert admitted that he did not have any information about RealNetworks' sales in the time period leading up to September 2006. Scott Decl. Ex. A at 147. He said that there are "two parts to the story" that he would need to know: (1) did RealNetworks succeed in launching Harmony again after iTunes 4.7, and (2) did any consumers "actually take advantage of it." *Id.* at 147-48. As to the first, he said that he suspected the answer was yes. But as to the second, he suspected "the answer is no because the consumers

---

▮▮▮ Doc. 512, p. 10 & n.1. We are aware of no evidence that RealNetworks engaged in similar conduct after Harmony's reported relaunch.

had already experienced the prior disabling" (*id.* at 148)—"disabling" that this Court has now ruled was lawful.

But even if Plaintiffs could overcome that problem, their theory would again posit a price effect occurring, not when iTunes 7.0 was released, but only at some unidentified future time when enough purchasers of new iPods would have purchased enough songs from Harmony rather than iTS that their future purchases of players allegedly might have been affected. Indeed, in the case of iTunes 7.0, the notion of any immediate price effect is even more far-fetched, given that iTunes 7.0 applied only to new iPod models and had no effect on existing models sold after that date or on the tens of millions of other iPods already in circulation. Owners of those iPods remained free to buy RealNetworks' music, assuming they had any interest in doing so. But even assuming that some effect on RealNetworks' sales and then on iPod prices occurred at some point, Plaintiffs have made no attempt to determine when that point was. They have thus provided the Court with no basis for specifying the class period (even assuming they otherwise met the requirements of Rule 23, which Apple continues to contest).

The same problem exists with respect to the end date for any class period. Plaintiffs have previously alleged that the class period should end in March 2009, when Apple was permitted by all the record labels to sell their music DRM-free. But Plaintiffs' theory is that the availability of DRM-free music from ***any*** source would have reduced the effect of the alleged "lock-in." So the relevant question under Plaintiffs' theory is not only when Apple was allowed to sell DRM-free music, but when other on-line stores began selling DRM-free. As Plaintiffs admit, Apple began selling EMI music without DRM in April 2007, and its competitors began selling DRM-free music from EMI and Universal in August 2007, with all of the major on-line stores selling all of their music DRM-free by early 2008. Doc. 479, pp. 74-75. Plaintiffs assert that the alleged lock-in would have taken some time to erode. But, as with the beginning date, they do not offer any basis for deciding how long that period would be—let alone any basis for concluding that prices would continue to be affected until March 2009.

1   Because they have not offered any evidentiary basis for setting the beginning and ending
2 dates of the alleged class period, Plaintiffs have failed to carry their burden to justify certifying a
3 class.

4   Thus, Plaintiffs' motion for class certification should be denied or, alternatively, the
5 motion should be deferred until Plaintiffs submit credible evidence that iTunes 7.0 caused the
6 price of any iPod model to increase and the time period of that impact.

7 Dated:  June 6, 2011                              JONES DAY

                                                   By:/s/ Robert A. Mittelstaedt
                                                      Robert A. Mittelstaedt

                                                   Counsel for Defendant APPLE INC.

SFI-699162v6