1
2
3
4
5
6
7
8

Robert A. Mittelstaedt #60359
ramittelstaedt@jonesday.com
Craig E. Stewart #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:      (415) 875-5700

Attorneys for Defendant
APPLE INC.

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN JOSE DIVISION

12

13
14

**THE APPLE iPOD iTUNES ANTI-
TRUST LITIGATION**

15

_____

16

This Document Relates To:

17

ALL ACTIONS

18
19
20
21
22
23
24
25
26
27
28

Lead Case No. C 05-00037 JW (HRL)

[CLASS ACTION]

**APPLE'S SUPPLEMENTAL BRIEF RE
CLASS CERTIFICATION**

Date:        June 27, 2011
Time:        9:00 a.m.
Place:        Courtroom 8, 4th Floor

**[REDACTED]**

1

**<u>INTRODUCTION</u>**

2      Apple submits this brief in response to the Court's request for simultaneous briefs on the

3  appropriate class definition and time period in light of the Court's summary judgment ruling.

4  Doc. 627, p. 15.

5      The record to date does not provide enough information to answer the Court's question.

6  The record certainly does not support the class definition and time period alleged in the operative

7  complaint (direct purchasers of all iPod models from October 2004 to March 2009).  Nor does it

8  support the class definition and time period that Plaintiffs presumably will assert now (direct

9  purchasers of all iPod models from September 2006 to March 2009).

10      The only remaining alleged anticompetitive act is the use of iTunes 7.0 for new iPod

11  models introduced starting in September 2006.  In moving to certify a class, Plaintiffs did not

12  offer any evidence that iTunes 7.0 affected prices of any iPod, much less that iTunes 7.0

13  increased any iPod prices.  Nor did they argue or attempt to show when any such impact would

14  have occurred.  Indeed, the testimony of Plaintiffs' damages expert suggests that iTunes 7.0 had

15  no effect whatsoever on iPod pricing.  Professor Noll testified that he suspected that consumers

16  did not take advantage of the re-launch of Harmony which apparently occurred in April 2005.  If

17  so, disabling Harmony could not have affected iPod demand or prices even under Plaintiffs' own

18  implausible theory that removing one of many sources of music playable on iPods could ever

19  cause iPod prices to increase.  In any event, under Plaintiffs' theory, any price effect on iPods

20  would occur only in some indeterminate "long term" and certainly would not have occurred in

21  September 2006.

22      Likewise, Plaintiffs have not offered any evidence that, if iTunes 7.0 eventually increased

23  iPod prices, the effect would have persisted until their proposed end date for the class period of

24  March 31, 2009.  Under Plaintiffs' theory, the availability of DRM-free music would have

25  eliminated or lessened the alleged "lock-in" effect that is the basis of Plaintiffs' theory of impact

26  and damages.  DRM-free music became available long before March 2009—starting in April

27  2007 on iTS (for EMI music), in August-September 2007 on Wal-Mart (EMI) and Amazon (EMI

28

Supp. Br. re Class Cert.
C 05-00037 JW (HRL)

1  and Universal), and then on all of Apple's major on-line digital music store competitors for all the

2  major labels in early 2008.

3      Against this backdrop, before any class is certified (and without waiving Apple's

4  previously-stated opposition to certification of any class), Plaintiffs should be required to submit

5  credible evidence showing that the use of iTunes 7.0 on new iPod models starting in September

6  2006 caused prices for certain iPod models to be higher than they would have been without

7  iTunes 7.0—and when that effect began and ended.  The class should then be limited to direct

8  purchasing consumers who bought those iPod models during that period.[1]  If this case proceeds,

9  Plaintiffs will need to make that showing anyway.  No reason exists why they should not be

10  required to do so now.[2]

11      **ARGUMENT:  PLAINTIFFS HAVE NOT SATISFIED THEIR BURDEN**

12      **TO SHOW WHAT THE CLASS PERIOD SHOULD BE AND WHICH IPOD**

13      **MODELS SHOULD BE INCLUDED.**

14      The operative complaint and class certification motion seek a class of all direct purchasers

15  of all iPod models sold from October 1, 2004 to March 31, 2009.  The beginning of that requested

16  class period was based on the assertion that Apple unlawfully disabled Harmony in October 2004

17  when it released iTunes 4.7.  Plaintiffs did not contend, however, that iTunes 4.7 had the

18  immediate effect of raising iPod prices in October 2004.  Rather, their theory was Harmony

19  would have lowered prices only in the "long run" after sufficient Harmony sales had occurred.

20  _____

21  [1]    *Mazur v. eBay Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009) (denying class certification
   where the class included individuals who were not harmed by the alleged practice); *MidPeninsula*

22  *Citizens For Fair Hous. v. Acco Mgmt. Co.*, 168 F.R.D. 647, 648-49 (N.D. Cal. 1996) (same);
   *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 288 (S.D. Ohio 2006) ("A proposed class may be

23  deemed overly broad if it 'would include members who have not suffered harm at the hands of
   the Defendant and are not at risk to suffer such harm.'").

24  [2]    In light of the limited scope of the Court's request for supplemental briefing, this

25  memorandum addresses only the class definition and time period.  But Plaintiffs' failure to offer
   any evidence that iTunes 7.0 affected iPod prices also means that they have failed to satisfy the

26  Rule 23 requirement of showing a class-wide method of proving impact and damages.  And, as
   demonstrated in Apple's earlier opposition memorandum (Doc. 512, pp. 21-25), resellers like

27  Best Buy and Target are differently situated from end-user consumers like plaintiffs and their
   claims cannot properly be resolved together with such consumers.

28

1    Doc. 479, p. 54.[3]  Thus, under Plaintiffs' theory, iTunes 4.7 could not have raised iPod prices

2    until the point that the purported "long run" effect would have occurred.

3         Plaintiffs, however, steadfastly declined to identify the point at which this supposed

4    market effect would have happened—and thus when the alleged damages period started.  Their

5    expert testified only that resolving the question would require "empirical analysis of prices"—an

6    analysis that he had not done.  Doc. 551, pp. 8-9.

7         Plaintiffs' failure to identify a start date for their iTunes 4.7 claim is moot given this

8    Court's determination that the update was lawful.  But this same problem applies with even

9    greater force to their sole remaining claim.  Plaintiffs will now presumably contend that the class

10   period should begin in September 2006, when iTunes 7.0 was released for new iPod models

11   introduced after the date.  And they will presumably rely on a multiple-links-in-the-chain theory

12   similar to that they previously asserted with respect to iTunes 4.7—*i.e.*, that (1) with the use of

13   Harmony, RealNetworks was taking customers away from iTS, which (2) would have eventually

14   reduced the degree to which iTS consumers were allegedly "locked into" using only iPods, which

15   (3) would have offset Harmony's initial impact of making iPods more attractive and eventually

16   resulted in decreased demand for iPods and (4) thereby eventually resulted in lower iPod prices,

17   all other things being equal.

18        At the threshold, Plaintiffs have not alleged or offered any evidence of even the first

19   requirement of their multi-step theory, *i.e.*, that Harmony was in fact capturing sales from iTS in

20   2006 and would have continued to do so absent iTunes 7.0.  That was a key threshold premise of

21   their impact and damages theory for iTunes 4.7.  Citing evidence from August 2004, they argued

22   that antitrust impact and injury for iTunes 4.7 was shown by the fact that ██████████████████

23   ████████████████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████  Doc. 477, p. 7.

25   _____

     [3]     In more detail, their theory was that, as consumers purchased more music from Harmony
26   and less from iTS, they would be increasingly free to purchase competing players rather than
     iPods.  Plaintiffs posited that, given this new-found freedom, consumers would in fact opt for
27   players other than iPods and would do so in sufficiently large numbers that eventually iPod prices
     would decline.
28

1

2

3

4          Their expert made the same point, asserting that the "economic basis" of Plaintiffs' claim

5    was that Harmony caused RealNetworks' market share to increase in 2004, with a resulting

6    decrease in sales from the iTS.  Doc. 479, p. 54.  He reiterated this same point in his reply report,

7    citing the "market impact of Harmony on iTMS sales" in 2004, which he claimed had caused

8    "switching costs" to decline and would have continued to do so had Harmony not been disabled.

9    Doc. 551, p. 8.

10          This necessary predicate for Plaintiffs' theory of class-wide injury (however implausible

11   and unsupportable the theory may be) is absent now that iTunes 4.7 is no longer part of the case.

12   Under their own theory, Plaintiffs would have to establish that, after being disabled in 2004,

13   Harmony was again gaining market share at the expense of iTS—and thus was reducing lock-in

14   and would have continued to do so had iTunes 7.0 not been released.  Absent such a showing,

15   Plaintiffs' theory that iTunes 7.0 had any effect on the market or on iPod prices would fail at the

16   threshold.

17          To date, however, plaintiffs have not contended or presented any evidence that in 2006

18   RealNetworks was capturing sales from iTS as a result of Harmony and would have continued to

19   do so absent  iTunes 7.0.  To the contrary, their expert admitted that he did not have any

20   information about RealNetworks' sales in the time period leading up to September 2006.  Scott

21   Decl. Ex. A at 147.  He said that there are "two parts to the story" that he would need to know:

22   (1) did RealNetworks succeed in launching Harmony again after iTunes 4.7, and (2) did any

23   consumers "actually take advantage of it."  *Id.* at 147-48.  As to the first, he said that he suspected

24   the answer was yes.  But as to the second, he suspected "the answer is no because the consumers

25   _____

26

27                                                                          Doc. 512, p. 10 & n.1.  We are
     aware of no evidence that RealNetworks engaged in similar conduct after Harmony's reported

28   relaunch.

1    had already experienced the prior disabling" (*id.* at 148)—"disabling" that this Court has now

2    ruled was lawful.

3            But even if Plaintiffs could overcome that problem, their theory would again posit a price

4    effect occurring, not when iTunes 7.0 was released, but only at some unidentified future time

5    when enough purchasers of new iPods would have purchased enough songs from Harmony rather

6    than iTS that their future purchases of players allegedly might have been affected.  Indeed, in the

7    case of iTunes 7.0, the notion of any immediate price effect is even more far-fetched, given that

8    iTunes 7.0 applied only to new iPod models and had no effect on existing models sold after that

9    date or on the tens of millions of other iPods already in circulation.  Owners of those iPods

10   remained free to buy RealNetworks' music, assuming they had any interest in doing so.  But even

11   assuming that some effect on RealNetworks' sales and then on iPod prices occurred at some

12   point, Plaintiffs have made no attempt to determine when that point was.  They have thus

13   provided the Court with no basis for specifying the class period (even assuming they otherwise

14   met the requirements of Rule 23, which Apple continues to contest).

15           The same problem exists with respect to the end date for any class period.  Plaintiffs

16   have previously alleged that the class period should end in March 2009, when Apple was

17   permitted by all the record labels to sell their music DRM-free.  But Plaintiffs' theory is that the

18   availability of DRM-free music from ***any*** source would have reduced the effect of the alleged

19   "lock-in."  So the relevant question under Plaintiffs' theory is not only when Apple was allowed

20   to sell DRM-free music, but when other on-line stores began selling DRM-free.  As Plaintiffs

21   admit, Apple began selling EMI music without DRM in April 2007, and its competitors began

22   selling DRM-free music from EMI and Universal in August 2007, with all of the major on-line

23   stores selling all of their music DRM-free by early 2008.  Doc. 479, pp. 74-75.  Plaintiffs assert

24   that the alleged lock-in would have taken some time to erode.  But, as with the beginning date,

25   they do not offer any basis for deciding how long that period would be—let alone any basis for

26   concluding that prices would continue to be affected until March 2009.

27

28

Supp. Br. re Class Cert.
C 05-00037 JW (HRL)

1        Because they have not offered any evidentiary basis for setting the beginning and ending

2  dates of the alleged class period, Plaintiffs have failed to carry their burden to justify certifying a

3  class.

4        Thus, Plaintiffs' motion for class certification should be denied or, alternatively, the

5  motion should be deferred until Plaintiffs submit credible evidence that iTunes 7.0 caused the

6  price of any iPod model to increase and the time period of that impact.

7  Dated:  June 6, 2011           JONES DAY

8

9                          By:/s/ Robert A. Mittelstaedt
                                Robert A. Mittelstaedt

10                         Counsel for Defendant APPLE INC.

11  SFI-699162v6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Supp. Br. re Class Cert.
C 05-00037 JW (HRL)