1

| | |
|---|---|
| 1 | Pages 1–39 |
| 2 | UNITED STATES DISTRICT COURT |
| 3 | NORTHERN DISTRICT OF CALIFORNIA |
| 4 | BEFORE THE HONORABLE JAMES WARE – CHIEF JUDGE |

```
 5
    THE APPLE iPOD iTUNES ANTI-          )
 6  TRUST LITIGATION,                    )
                                         )
 7  _____     )
                                         )No. CV-05-00037 JW
 8                                       ){Class Action}
    _____)Monday, June 27, 2011
 9                                        San Francisco, CA

10

11              TRANSCRIPT OF PROCEEDINGS
                    (MOTIONS HEARING)

12  APPEARANCES:

13  For the Plaintiffs:
                         ROBBINS, GELLER, RUDMAN & DOWD, LLP
14                       655 West Broadway
                         Suite 1900
15                       San Diego, CA 92101
                         BY:  BONNY E. SWEENEY, ESQ.
16                       and  ALEXANDRA S. BERNAY, ESQ.
                         and  CARMEN A. LEDICI, ESQ.
17
    For Defendants:
18                       JONES DAY
                         555 California Street, 26th Floor
19                       San Francisco, CA 94104
                         (415)626-3939
20                       BY: ROBERT A. MITTELSTAEDT, ESQ.
                         and DAVID C. KIERNAN, ESQ.
21                       and CRAIG E. STEWART, ESQ.

22

    REPORTED BY:  MARGARET "MARGO" GURULE, CCR
23                Pro Tem Court Reporter – USDC

24

25
```

```
 1        June 27, 2011                        9:20 a.m.

 2                          o0o

 3                   P R O C E E D I N G S

 4        THE CLERK:  Calling Case C-05-0037, Apple iPod iTunes

 5   Antitrust Litigation.

 6        Counsel, please approach and state your name for the

 7   record.

 8        MR. MITTELSTAEDT:  Good morning, Your Honor.  Bob

 9   Mittelstaedt, for Apple, along with Craig Stewart and David

10   Kiernan.

11        THE COURT:  Okay.

12        MS. SWEENEY:  Good morning, Your Honor.  Bonny Sweeney for

13   plaintiffs, and with me is Alexandra Bernay and Carmen Medici.

14        THE COURT:  So this is plaintiffs' motion for class

15   certification.

16        Ms. Sweeney, do you want to speak further to your motion?

17        MS. SWEENEY:  Thank you, Your Honor.  So I understand Your

18   Honor has given us 15 minutes for the -- there's actually two

19   motions on calendar.  There is a class certification motion and

20   plaintiffs' motion to exclude one of the expert reports

21   submitted by Apple in opposition.

22        I don't know if Your Honor wants to hear argument on that,

23   but I was thinking if you did, we would reserve just a couple

24   of minutes for that argument.  It wouldn't take very much time.

25        THE COURT:  Sure.  I actually had not given any thought to
```

1    the second motion for purposes of the argument here, so -- but

2    I will allow you -- why don't you come back in response, then,

3    for that, and give your opponents an opportunity to tell me why

4    I should consider it.  What is your basis for excluding it, by

5    the way?

6        **MS. SWEENEY:**  Well, Ms. Bernay is going to be arguing that

7    motion.  But the basis is essentially that Dr. Burtis', Apple's

8    expert, didn't conduct any analysis, didn't review any of

9    Apple's discovery, didn't review any of the data, so she wasn't

10   in a position to offer the opinions that she offered.

11       **THE COURT:**  Very well.  Go to the heart of your motion.

12       **MS. SWEENEY:**  Okay.  Thank you, Your Honor.  I'll begin by

13   addressing Your Honor's request the last week to address

14   some -- to through supplemental briefing, to address three

15   additional issues.

16       The first issue, Your Honor, asks the parties to address

17   of the impact of the Supreme Court's recent decision in

18   *Wal-Mart vs. Dukes*.  And as we say in our supplemental brief,

19   plaintiffs' position is that it has no impact whatsoever on

20   this antitrust case.  That case was an Article VII workplace

21   gender discrimination claim, and the issues, the only issues

22   before the Court were whether plaintiff had satisfied the

23   constitutionality requirement of 23A and whether it was

24   appropriate to certify the class under Rule 23(b)(2), even

25   though plaintiff also sought backpay.

1        And here, of course, Your Honor, we have a 23(b)(3) claim

2    where we already have submitted a very much heightened

3    standard.  We had to show that common issues predominate, not

4    just that there exist common issues, but in fact that common

5    issues predominate overall individual questions.  And as Your

6    Honor, pointed out, I don't really know where to stand -- I've

7    got to move this because I feel like I'm going to trip in that

8    outlet there.

9        **THE COURT:**  That's the trap door.

10       **MS. SWEENEY:**  If I go over my limit?  Got it.

11       So in 2008, Your Honor certified a very similar class and

12   ruled, then -- and it's true now that the many issues in this

13   case will be proved by common as opposed to individualized

14   proof in order to prove our Section 2 claims.  We have to

15   define the relevant market long product and geographic

16   parameters and that only can be proved through common proof.

17       There is no individual issue there.  In addition, we have

18   to prove that Apple, for our monopoly maintenance claim, that

19   Apple has maintained a monopoly in those markets that will we

20   proved through common proof.  For our monopolization claim, we

21   have to prove that Apple had a specific intent to maintain or

22   obtain monopolies in the market, and again that all goes to

23   Apple.  It has nothing to do with individual members of the

24   plaintiff class.

25       And as Your Honor recalls from the recent briefing and

1    argument on summary judgment, probably the most contested issue

2    in the case and the one that will require the most analysis and

3    evidence at trial is whether Apple's conduct was willful,

4    whether it unlawfully excluded competitors from the markets.

5        And then, finally, Your Honor, with respect to the expert

6    reports submitted by Professor Noll of Stanford, demonstrated

7    that common evidence will be used both to issue the fact of

8    impact as well as the amount of individual member's of the

9    class's damages.

10       And he submitted two very lengthy reports.  In the second

11   report, his reply report after Apple finally produced the data

12   that we had been requesting for some time, had some preliminary

13   regression analysis and demonstrated that in fact, his proposed

14   methodologies for showing impact and damage work.  He also, in

15   his reply report, he didn't rely solely on the regression

16   analysis which was a before-and-after methodology.  He also did

17   a sample analysis of a yardstick methodology.  So this presents

18   a very different picture than in *Dukes* where the plaintiff was

19   claiming gender discrimination, but yet it was undisputed that

20   Wal-Mart did not have a national policy on pay and promotion.

21   In fact, it said the opposite.  It said that individual

22   managers at store levels make all those decisions.  So that's

23   why the Supreme Court concluded in this case that plaintiff was

24   unable to show that her case depended upon a common contention

25   that could be determined through class-wide evidence.

1    And the contrast is especially sharp here, Your Honor,

2    because Apple's pricing was uniform, as has been admitted by

3    Apple and Apple's expert.  Apple set its price.  That price was

4    used in its online store and in its retail store.  And then

5    there was separate pricing for reseller.

6    And we have, through Professor Noll's report, conducted an

7    extensive analysis of the reseller prices paid, and there is a

8    uniform policy and practice of pricing.

9    **THE COURT:**  So let me weigh in on this issue.  One of the

10   Court's concerns was the various models of iPods that are

11   involved here.  And you have been advised that there are some

12   26 of them, various names, Shuffles, Touch, Nanos, et cetera,

13   various sizes of memory and other configurations.

14   So is it the plaintiffs' contention that all of them share

15   in common the iTunes 7.0 issue that the Court focused on in its

16   last visit to this issue?

17   **MS. SWEENEY:**  Yes, Your Honor.  In Exhibit A to my

18   declaration that was submitted on June 23rd, we have listed all

19   of the many iPod models that we have included in our class

20   definition that now Apple says in its brief that only certain

21   iPod models had 7.0 installed upon them.  And Apple said that

22   only those models that were produced after September of 2006,

23   even though some models were introduced prior to that time

24   period and continued to be sold throughout the class period,

25   our position is that whether those models actually had 7.0 on

 1  them or not, they were still impacted by the price effect, the

 2  market-wide price effect caused by Apple's exclusion of

 3  competitors that had the effect of enhancing its market power

 4  through the lock-in effect and there is --

 5     **THE COURT:**  Say that again for me.  Is the list that

 6  you're supplying to me a list of devices that were introduced

 7  prior to September 12, 2006?

 8     **MS. SWEENEY:**  Most of the iPod models on Exhibit A were

 9  introduced after September 12, 2006.  There are a few that were

10  introduced before, and I can go down the list and identify

11  those, if Your Honor would like.

12     **THE COURT:**  All right.  That would be helpful.

13     **MS. SWEENEY:**  Okay.

14     **THE COURT:**  And then as to those that were introduced

15  prior to that, I thought I heard you say that some were not

16  devices which were affected by iTunes 7.1 directly but somehow

17  there was an indirect effect.

18     **MS. SWEENEY:**  Correct.  It's an indirect effect in the

19  sense that it's the plaintiff's theory that the market-wide

20  effect of 7.1 was to maintain and enhance Apple's market so it

21  could charge a higher price for all of its iPod models.

22     **THE COURT:**  Let me ---

23     **MS. SWEENEY:**  Yes.

24     **THE COURT:**  So that that would limit you, to some extent,

25  to models that were introduced prior to September 12th, but

1  which were still being sold as of September 12th to the date of

2  March 31, 2009?

3      **MS. SWEENEY:**  That's correct.

4      **THE COURT:**  And so your list, as far as your contention is

5  concerned, are models that might have first been introduced

6  prior to September 12, 2006 but were still being sold and

7  affected by iTunes 7.1, September 12, 2006 and forward.

8      **MS. SWEENEY:**  Correct.

9      **THE COURT:**  Why is there, then, any limit -- in other

10  words, if it was sold prior to September 12, 2006.  Is it the

11  plaintiffs' contention that there were some which were not

12  affected by iTunes 7.0 and some that had been previously sold.

13      **MS. SWEENEY:**  The only iPods that are in our class are

14  those that were sold after iTunes 7 was lunched in September of

15  2006.

16      **THE COURT:**  All right.  So any that had been previously

17  purchased were affected by 7.0 are not in the class.

18      **MS. SWEENEY:**  That's correct, Your Honor.

19      **THE COURT:**  Why?

20      **MS. SWEENEY:**  Because the price effect caused by the

21  enhancement to market power caused by 7.0 didn't occur until

22  September 12, 2006.

23      **THE COURT:**  Now, when you say -- I guess I should study

24  this because this is where, for me, the *Dukes* case comes in, is

25  the price effect, a uniform effect for the various models

1  that -- some of which were introduced prior to September 12th

2  and somewhere still sold after that date, and many of which had

3  various configurations.  In other words, wouldn't there have to

4  be an individualized calculation based upon the date, the type,

5  the model, the size and all of the factors that would need to

6  be done in order to find what were the damages that and

7  wouldn't you have to make that assessment for every class

8  member that someone who is less affected isn't sharing the gain

9  that was realized by someone who was more affected.  That's a

10  very good question, and I think it's answered largely by

11  Professor Noll.  He described in detail the regression analysis

12  that he has performed, and that regression analysis has very

13  many variables that take just those kind of considerations into

14  account; for example, the type of iPod, the amount of memory,

15  the date purchased.  There wasn't.  So it will -- at the end of

16  the day, the regression results will come one a different

17  damages number for individual A than for individual C.  But

18  it's the exact same methodology.  But it does take into account

19  those variations.

20      And I would also like point out, Your Honor, that you

21  asked whether it would require an individual-by-individual,

22  class-member-by-class-member assessment, and it couldn't

23  possibly.  I mean, at most, it's an assessment based upon a

24  particular iPod sold at a particular time.  Because for one

25  iPod model sold on January 1, 2007, the price is identical for

1    all of the hundred thousand members of the class who purchased

2    it that day.

3        So the regression equation take into consideration all the

4    features of the particular iPod model, the dates and the price,

5    and it's not comparable.  Those determinations require no

6    individual assessment, whatever, by members of the class.

7        **THE COURT:**  Well, let me -- I need to study your expert

8    report and maybe I need to have a tutorial on it because those

9    kinds of theories are sometimes tougher, tougher for me to

10   digest on paper.  But if this were not a class action and I had

11   five people before me, all of them whom on January 1, 2007 had

12   purchased an iPod device, upon having purchased an iPod Touched

13   an another having purchased an iPod Nano, another having

14   purchased a Shuffle, and among those some having purchased a 2

15   gigabyte or a 16 gigabyte, would I be able -- would I be able

16   to treat them all the same when I regression analysis.  It

17   sounds like I'm trying to do an amalgamation and come up with a

18   number that I would apply on a per capita basis as opposed to

19   treating each of those individuals separately.  And then I can

20   understand, in a class action, maybe I would put everybody who

21   bought, on January 7 a Nano with a 2 gigabyte drive and say,

22   "Here are your damages."  And everybody who purchased a Shuffle

23   on January 7 with a 4 gigabyte drive, and I treat them the

24   same.  So if I study the model, would it allow me to come to

25   sort of a logical way of separating out the various people

1    that, as said, the most harmed person is not sharing damages

2    with the least harmed person?

3         **MS. SWEENEY:**  Absolutely.  The damage methodologies

4    proposed by Professor Noll take into account these differences

5    among products that each -- there is no reason to expect that

6    every member of the class will have the same damages.  Now we

7    show that common -- that impact is common to all members of the

8    class and that the same impact formulated methodology for

9    computing damages is the same.  But there is no requirement

10   before or after *Dukes* that each member of the class have

11   identical damages.

12        **THE COURT:**  What does impact mean?

13        **MS. SWEENEY:**  Impact is really sort of the touchstone of

14   the dominance inquiry in antitrust cases, and that really goes

15   to the question of injury.  It's the same thing as injury.  Was

16   a member of the class injured by Apple's conduct.  And because

17   we have an overcharge theory, that is that Apple's conduct

18   caused the price of all iPods to price every member of the

19   class was impacted to a greater or lesser degree.

20        **THE COURT:**  All right.  Thank you.  Why don't you reserve?

21        **MS. SWEENEY:**  Yes, I will reserve.  Thank you, Your Honor.

22        **THE COURT:**  Mr. Mittelstaedt.

23        **MR. MITTELSTAEDT:**  Thank you, Your Honor.

24        Three things have happened since Your Honor certified the

25   class and recertified the class.  And in a footnote in the

1    decertification a couple of years ago, Your Honor said you had

2    rejected -- the Court had rejected the judgments we were making

3    about Professor Noll and that the reason for decertification

4    was to figure out what theory of liability was and then what

5    the time period for a class would be.

6        I say that because after that point, these three things

7    happened they have changed the case.  One is that the only

8    remaining liability claim relates to 7.0.  The second is that

9    Professor Noll, after promising that he could do a regression

10   analysis that showed common impact, common injury, common

11   damages, actually tried to do one, and this was in his reply

12   declaration in March.

13       In that regression analysis, Dr. Noll, Professor Noll

14   failed to show that he could do a workable model, and I'll come

15   back to that.  And I'll come back to it because, in the

16   argument this morning and in the brief that the plaintiffs

17   filed on Thursday, they told the Court -- and I'm going to

18   quote from last week's brief, "Professor Noll developed a

19   working model which showed that damages exist and that Apple's

20   conduct impacted all members of the class."

21       And if they're referring to his March reply declaration,

22   that's incorrect.  If they're referring to work he's done since

23   then, we don't know about it.  And he ought to produce that and

24   produce it forthwith.

25       The third thing that has happened is the *Dukes* case.  And

1  let me start with *Dukes* and explain why we think that that's

2  important and that requires revisiting the basic issue of

3  whether a class ought to be certified here.

4      The questions that Your Honor has asked:  What is the time

5  period, what are the products, and then, this morning, how can

6  you show common impact, are the right questions, I think.  But

7  they reflect a deeper problem with class certification here,

8  given the three things that have happened.  And in a nutshell,

9  Your Honor, the plaintiffs do not have a coherent plausible

10  theory of impact from 7.0.

11      When Professor Noll was doing his regression, he was

12  focused on the earlier software update, 4.7.  Even as to that

13  one, he failed to show a workable model or any damages.  He has

14  not even attempted to do this for 7.0.

15      So the related question is:  Do they have any theory of

16  impact?  And they don't, Your Honor, because all 7.0 did was,

17  according to their theory, remove one source of music that

18  could play directly on new iPods.

19      Harmony's music could continue to play on existing iPods.

20  It could continue to play on new iPods by simply burning and

21  ripping, so there was an extra step.  But more than that, there

22  were plenty of other sources of music that could play on an

23  iPod.

24      I think the simplest way I can do this, Your Honor, is if

25  I could hand up some excerpts from Professor Noll's deposition

1    and a price chart that is derived from some exhibits.

2         **THE COURT:**  Sure.  Make sure your opponent has that.

3         **MR. MITTELSTAEDT:**  Yes.

4         **THE COURT:**  The first quote at the top is from their brief

5    where they say, He's developing a working model which showed

6    that damages exist and Apple's conduct impacted all members of

7    their class.

8         They couldn't be referring to 7.0 because Professor Noll

9    didn't refer to 7.0.  His regression was focused on 4.7.  But

10   even as to 4.7, he admitted at the deposition that he hadn't

11   done what they say he did.  And I have several quotes there.

12   Let me read the first one.

13        "Have you performed a regression analysis that shows

14   damages on a class-wide basis that you're satisfied with and

15   you believe is reliable?"

16        "ANSWER:  Of course not.  That's not what the purpose of

17   this was, to produce a reliable damages model.  That's not its

18   purpose."

19        And then the next bolded quote:  "From all the work you

20   have done in this case so far, can you tell us when, if ever,

21   the disabling of Harmony had an impact on iPod prices?"

22        "ANSWER:  I have not attempted even to answer that

23   question."

24        And then the next one:  "Do you have any opinion on

25   whether the launch of Harmony or the disabling of Harmony had

1   any effect on iPod prices?"

2        "No, I'm not going to be able to offer that conclusion."

3        And then he goes on:  "I cannot rule out anything based on

4   the regression I have because I'm not relying on it for

5   anything."

6        The second point that came from his deposition, and this

7   was last April:

8        "There is no theoretical way to say that there is impact."

9        So I think this is perhaps the most important point, Your

10  Honor.

11       If this were a typical price-fixing case, typical

12  antitrust case, pricing-fixing meeting, come out of the

13  meeting, raise prices, it's pretty easy to tell when the start

14  date ought to be of that damage period.

15       But here, Noll says, "Is there any theoretical way to

16  ascertain if Harmony would have any impact on iPod prices?"

17       And he says, "I've addressed that in my report.  There are

18  effects pointing in the opposite direction, and you can't make

19  a robust theoretical position about the effect of Harmony."

20       And what he's talking about there is, as the plaintiffs

21  portray it, 7.0 -- and this really applied to 4.7 in that the

22  theory was the same -- made an iPod less functional.  It

23  couldn't play directly music from Harmony.

24       And so Professor Noll admitted, "One effect of that,

25  theoretically, would be to make iPods less valuable and to

1  lower their price."

2      And that goes opposite to the plaintiffs' theory about

3  damages.

4      He also says that maybe, in the long-term, disabling

5  Harmony would have an impact on lock-in.  But he couldn't tell

6  which effect would happen when.  He couldn't tell which would

7  outweigh the other.

8      And he said, "Theoretically, an economist can't say

9  whether there's any negative effect or positive effect or any

10  effect on iPod prices."

11      And then I asked him -- and this is like the fifth line on

12  the second page:  "Is the same thing true" -- meaning that it's

13  got to be empirical, not theoretical -- "Is the same thing true

14  for the impact of blocking Harmony on iPod prices."

15      And he says, "The same thing -- identically, the same

16  thing is true."

17      So unlike a typical antitrust case, they don't have any

18  theory that tells us that 7.0 had any impact on iPod prices at

19  all.

20      The other point there, Your Honor, is when Noll was doing

21  his analysis of 4.7, elicit in his theory that there was some

22  impact was that consumers were using Harmony, and so when it

23  was disabled, that must have had some impact.

24      I asked him in his deposition whether he looked at 7.0.

25  And he said -- and whether he had any theory about the impact.

1    And he said, "No," that there were two issues.  One issue was:

2    "Did Harmony really come back before 7.0, and if so, did

3    anybody use it?"

4        And he said, "I suspect that it did come back and it was

5    in existence."

6        But then as to the second one, he said, "I suspect nobody

7    was using it.  And if nobody was using it, then there would be

8    no impact if they couldn't use it after 7.0."

9        So we're going to -- and then the last point he makes here

10   is:  "If there were any impact of removing one direct source of

11   music when he had all these other sources that could play on

12   iPods, and you had Harmony that could continue to play on

13   existing iPods, if there was any impact and it was to raise

14   iPod prices, it was probably so small, even according to their

15   theory."

16       And so I asked him if he had -- well, let's say Apple

17   thought there was going to be a five-dollar swing because of

18   disabling Harmony, and Apple's pricing policy is not to make

19   small price changes.  So what would happen?

20       He'd say, "Well, there would be no effect on prices."

21       So they've got no theory.  They have no evidence.  They've

22   got no regression analysis that shows any impact, much less if

23   the impact were common.

24       And then finally, Your Honor, the price chart that we have

25   put on here shows that when 7.0 came into effect -- and this

starts with January '06, which was a price change. And if you

just take the top line, the red one, that's a 60 gigabyte iPod

classic.

    And then on the date that iTunes 7.0 was launched, the

price for that iPod dropped from $399 to $349; the iPod Classic

increased capacity by 20 gigabytes; and it had the video

capability.

    And then there are the prices for the other products as of

iTunes 7.0. The first price change was not until a year later,

in September of '07. And at that point, the 80 gigabyte

classic dropped to $249. And the 8 gigabyte Nano dropped from

$249 to $199.

    So what the plaintiffs are faced with are infrequent price

changes and price drops. And the other point worth making,

Your Honor, is: When that first price changed after the launch

of 7.0 in September of '07, by that time, Apple was DRM-3 for

EMI music. That happened in May, iTunes-Plus. And then in

September, RealNetworks started to go DRM-3 for some music, and

Amazon and Wal-Mart were DRM-3.

    And the significance of that is that DRM -- with DRM-3

music, consumers could go to those other stores, buy the music

and play it directly on an iPod. It was even better than

Harmony because it would work all the time. So it's hard to

see that they would have a theory that there was any price

impact before that first price change in September of '07, and

1    it's hard to see that there would be any theory -- that there

2    was any impact as of that time because DRM-3 had started.

3    Those are all problems they faced.

4         **THE COURT:**  Let me give you an observation.  As I'm

5    listening at this, what strikes me is this:  First, I'm not

6    prepared, at this point, to digest all of these movements in

7    prices and whether or not the drop or an increase in memory is

8    represented in a way that does not still inflict an antitrust

9    injury because I know that there is a complicated way of

10   pricing having to do with the price of memory and what it does

11   and those changes that have taken place in technology over

12   time.  So I'm a little uncomfortable basing my decision to

13   delay certifying the class on learning more about whether or

14   not that class can win the lawsuit ultimately.

15        And I do appreciate that some of this is designed to

16   convince me that it's going to require -- well, there is no

17   commonality is I guess the best way of saying what I'm

18   listening to.  But it does seem to me that what I have heard is

19   that, when iTunes 7.0 came in, it had an effect.  It had an

20   effect because the technology that it used disabled various

21   competitive music programs in ways that I understand the

22   plaintiffs' claim were unnecessary to what was being done.

23        And so I'm not hearing what is designed to persuade me

24   that that's not true.  But again, that would be on the merits.

25   In other words, at some point, I guess I'm going to hear the

1    case as to whether or not there was some noncompetitive,

2    technological reason why 7.0 was designed to do what it did and

3    why it did it.  But since I haven't heard that, I'm going to

4    assume that the plaintiffs have well stated the claim that that

5    was done for anticompetitive reasons.

6        Now -- so if it was done for an anticompetitive reason,

7    then the question becomes:  Is there an injury?

8        And so the second part I have heard is that the expert

9    that the plaintiffs are relying on, at least up to this point

10   in the case, which is well before they have to do any reports

11   and do any analysis, is done as to 4.7 and not 7.0.  I presume

12   that a further analysis will have to be done.

13       And I can appreciate how experts, if they are true to the

14   integrity of their process, would not wish to sign on to some

15   theoretical because they're trying to do something that is

16   empirically based, that they can be sure of.

17       And the language that you're citing to me convinced me

18   that you've got a very careful person here who is not willing

19   to go too far.  But I haven't heard, "And it's impossible," or,

20   "I can't do the analysis," or, "The analysis won't work."

21       I've heard, "I don't have enough information."

22       And so that argues for more time to do a better analysis.

23       So why should I delay class certification just because

24   more work has to be done?

25       **MR. MITTELSTAEDT:**  Because of *Dukes*.  I think it was the

1    law before.

2        In the *Somers* case, the indirect purchaser case, Your

3    Honor held an evidentiary hearing, listened to both experts,

4    and decided that the plaintiffs' expert, even though he

5    promised he could do this, he promised he could show class-wide

6    impact, was unable to and you were persuaded, the Court was

7    persuaded, by Apple's expert, Ms. Burtis.

8        **THE COURT:**  So if *Dukes* is the model, now, *Dukes* was

9    complicated by the sociological evidence that was involved

10   there.  And maybe economy and sociology are the same

11   disciplines and there is going to be enough of that.  But I see

12   economics as having a mathematical basis.  So I'm not convinced

13   that I have a *Dukes* problem in that sense.

14       And that was a case where the Court found that it needed

15   to assess whether or not there was intentional discrimination

16   in the cultural sense within Wal-Mart, and they found that to

17   be a very difficult issue to rule was common throughout the

18   class, and it was not an economic regression analysis.

19       Lots of antitrust cases have been based upon an economic

20   regression analysis.  And so I don't hear you saying, "One is

21   impossible here," but just, "This person hasn't done it for

22   this generation of iTunes."

23       So I'm not prepared to find that *Dukes* is disabling.

24       **MR. MITTELSTAEDT:**  Okay.  I am saying it's impossible, but

25   more important, Dr. Burtis says it won't work.

 1    And Professor Noll has tried to make it work and he can't

 2  make it work, or he hasn't made it work so far.

 3    **THE COURT:**  So that would argue for allowing -- so that's

 4  a battle between the experts and that is going to be waged at

 5  some point in the case.  And as I have demonstrated in the

 6  past, I won't hesitate to find that the class needs to be

 7  decertified or to -- that it was improvident to be granted if I

 8  am convinced of that.

 9    I'm not persuaded at this point, given the seven years of

10  litigation here having at least come in my mind to a claim that

11  has significant antitrust implications, to wait until I'm on

12  the merits.  Although courts are now challenged to look at the

13  merits and look at them closely at class certification, there

14  is a line between certification and actual trial, and I don't

15  want to convert the certification process to a trial here.

16    **MR. MITTELSTAEDT:**  Two points on that, Your Honor:

17    First, on *Dukes*.  You know, over the next months and

18  years, a lot is going to be written by the Courts and

19  commentators on *Dukes* and what exactly it means.

20    Here's what I think it means:  I think it means that when

21  there is an issue that's going to be -- require individualized

22  proof, unless the plaintiffs can show some common-wide method,

23  class-wide method, at the certification stage, they have to

24  show, as *Dukes* says, convincing proof that they can show this

25  on a class-wide basis.

1    And so in *Dukes*, the Court said, "You're alleging

2  company-wide discrimination.  If you can't prove that, we're

3  going to have a bunch of individualized inquiries."

4    And so the Court said -- and this is at page 19, "Because

5  respondents provided no convincing proof of company-wide

6  discriminatory policy, we have concluded that they have not

7  established the existence of any common question."

8    So the Supreme Court is saying, "Even though that's really

9  a merit-based inquiry, you have to show it at the class stage,

10  because if you can't, we're going to end up with individualized

11  questions."

12    **THE COURT:**  Now, I would put you on all fours with *Dukes*

13  if you were arguing and 7.0 was not introduced for this group

14  of devices, or 7.0 was not used, those ought to be excluded.

15  Because it does seem to me that commonality is satisfied by the

16  claim that Apple introduced 7.0 for an anticompetitive purpose.

17  And all of the devices -- that was the question I asked your

18  opponent.

19    Her claim is that all of those devices are affected by 7.0

20  in terms of their pricing.  And you've got to undo that claim

21  before I am convinced to delay class certification.

22    **MR. MITTELSTAEDT:**  I can undo it in part by saying that

23  the Shuffle, the new models of Shuffle, did not have the code

24  that has been challenged here, the 7.0 code.

25    **THE COURT:**  How do I know that?

1      **MR. MITTELSTAEDT:**  Well, right now you have my word for

2   it, but we can submit something.

3      **THE COURT:**  When you say "new model," do you mean the

4   second generation?  There is a third generation.  Shuffle is

5   a -- I have a first generation, second generation, a third

6   generation, and then a 5 -- 12 gigabyte.

7      **MR. MITTELSTAEDT:**  Yeah.  And the second generation and

8   the third generation were introduced after 7.0.  The iPod

9   Shuffle first generation 1 gig, at the bottom of the

10  plaintiffs' first page, that was introduced before 7.0.  So it,

11  like all of the models launched before 7.0, did not have the

12  challenge code.

13     **THE COURT:**  But her claim is that it's on the list because

14  it was still being sold after September 12, 2006.  Is that

15  true?

16     **MR. MITTELSTAEDT:**  Yes.

17     **THE COURT:**  So it could be that I'm going to learn that

18  the effect that she's arguing for is a far-more-complicated

19  issue.  But I'm not at a point where I know enough to make that

20  conclusion at this point.

21     **MR. MITTELSTAEDT:**  And that's the crux of the matter:  How

22  much do they have to show at this point?  And I've said what I

23  thought about *Dukes* on the discrimination claim.

24     But footnote 6 in *Dukes* talks about security fraud cases

25  and the fraud on the market claim.  And as Your Honor knows,

when -- without this fraud on the market, efficient market

presumption in securities fraud cases, you would be stuck with

individual reliance claims.

    And so in footnote 6, the Court approvingly cites the

cases that say, "At the class cert stage, the plaintiff must

prove efficient market so that they can rely on the fraud, on

the market presumption."  And why is that?  I mean, why don't

the Courts just says, "Well, that's a merits-based thing, as

long as the plaintiffs allege that that's enough," like they're

saying here.

    And the answer, I think, because, if the plaintiffs don't

prove that, you're going to end up with a bunch of individual

issues of reliances.  And so before Courts are going to certify

classes and all that entails, the Court is going to see if the

plaintiffs, not just are saying they can avoid individual

issues, but whether they really can.

    And here, to come to our case, the crux of their claim is

that 7.0 injured them by raising iPod prices.  If it didn't,

then it had no effect.  Then it was just some theoretical

thing, some academic thing.  For this antitrust case, the

treble damage case, they have got to show impact.  And it's

like -- it's like in *Dukes* where the Court says,

"Commonality" -- at page 9, "Commonality requires the plaintiff

to demonstrate that class members," quote, "have suffered the

same injury."

 1          And here they have to show that they suffer the same

 2    injury and that can prove it on a class-wide basis.

 3          And here's the key point, Your Honor --

 4          **THE COURT:**  Let me ask this:  So raising iPod prices being

 5    the key to your argument, would there be a crux damages if iPod

 6    prices, although not raised, do not fall commensurate with the

 7    prices of other devices, can -- in other words, can an

 8    anticompetitive effect be felt by -- in a market where things

 9    are being reduced because memory is cheaper by not changing the

10    price or going less -- by having less of a price difference

11    than it would otherwise be?

12          **MR. MITTELSTAEDT:**  Yes.

13          **THE COURT:**  All right.  So I've got to find that out,

14    right?  I've got to know that by evidence.

15          **MR. MITTELSTAEDT:**  Yes.  And they have to show you that

16    they can do it on a class-wide basis, because if they can't --

17          **THE COURT:**  Well, the price is the same, right?  In other

18    words, you price all of your devices at a uniform price.  There

19    are no -- it's not like securities where reliance is necessary.

20    The purchaser purchases at a set price, and so everybody is

21    affected by the price?

22          **MR. MITTELSTAEDT:**  Yes.  But the twist here, Your Honor,

23    is they have alleged other types of antitrust injury or harm,

24    and it's at -- Dr. Burtis refers to this at paragraph 14 of her

25    reply brief, which is docket 511.  We refer to this in our

1    February 28 opposition at pages 18 and 19.  They have alleged

2    reduction in consumer choice.

3        If they can't prove this iPod overcharge on a class-wide

4    basis, then this case would devolve into individual issues

5    about whether a particular consumer -- this is under their

6    theory.  I don't buy any of this, but this is under their

7    theory.  They would fall back to these other claims of harm

8    which are individualized.

9        Did the -- was the consumer damaged by having a reduction

10   of choice?  Was the consumer damaged by not being able to buy

11   another, you know, iPod rival.

12       So just like *Dukes*, where if they couldn't prove

13   class-wide discrimination, you were going to have

14   individualized inquiries, just like the securities fraud cases,

15   they couldn't prove efficient market; you would have individual

16   reliance.  So in this case.  If they can't prove class-wide

17   overcharge of iPod prices, we're going to be left with

18   individualized issues about whether a consumer was harmed in

19   some other way under their own theory.  And so that's why I

20   think this case is like *Dukes*, like the securities fraud cases

21   and governed by it.

22       And Your Honor, the plaintiffs have proposed a schedule

23   where they propose that their expert reports would be due in

24   six weeks from now.  I think what makes sense is to hold an

25   evidentiary hearing, have a tutorial, or wait in what I think

 1    is a short six weeks, in the overall scheme of this case, and

 2    rather than certify and decertify once again -- and we've been

 3    through that, why don't we just wait?

 4        They stand before Your Honor and say, "Roger Noll has done

 5    a workable model that shows damages exist and they're common to

 6    all the members of the class."

 7        I would like to know, are they referring to his March

 8    reply where he gave this testimony saying that he didn't do

 9    that and he doesn't know what damages are, or are they

10    referring to some new work?

11    **THE COURT:**  Let's hear from your opponent on that issue.

12    I am a little surprised to hear, having not studied the Noll

13    report, that his work was done on 4.7 which the Court has

14    already rejected.  So that caught my attention.  How do you

15    respond to that?

16    **MS. SWEENEY:**  Sure.  It's true that the focus of Professor

17    Noll's report was on 4.7 on both his initial report and his

18    reply report.  However, there is no reason that the methodology

19    that he proposes doesn't work for 7.0.

20        As Professor Noll explained, he can determine the rate of

21    increase in lock-in and its erosion as a result of these

22    various events that happened during the class period.  Now, if

23    you remember, our class period initially began in 2004 when we

24    still had 4.7 in the case.  And so Professor Noll, he did what

25    he called he interacted a time variable.

1    **THE COURT:**  Has he expressed an opinion that the feature

2    of 4.7 -- and I'll have to search back because I thought that

3    7.0 operated in a very different way than 4.7.  That's why I --

4    because I had that before me the last time and made a

5    distinction between the two.  And I could revisit that as part

6    of trying to decide what to do here.

7    But has Professor Noll come to an opinion, not having done

8    the analysis, but that what he did with respect to 4.7 can be

9    equally applied to 7.0?

10   **MS. SWEENEY:**  He wasn't asked to render that opinion

11   previously because, at the time he issued his report, 4.7 was

12   still in the case.

13   **THE COURT:**  Don't I need that?

14   **MS. SWEENEY:**  Well, let me tell you why I don't think you

15   do.  And if you -- if you look at Professor Noll's reply

16   report, and in particular, pages 21 and pages 38 through 39 --

17   and this is where Professor Noll explains how he can look at

18   different events that occurred at different points in time

19   because of the variables that he's put into his equations and

20   determine the affects of those events.

21   **THE COURT:**  Yeah.

22   **MS. SWEENEY:**  Now, he didn't do it for 7.0, but he could.

23   And for example, he looked at the date when Harmony became

24   operational, and he saw a $30 price effect, the price of iPods

25   down by $30.

1      He also looked at an event, the subsequent event when

2   Harmony was disabled, October 2004, and found a price effect of

3   $6, iPods went up by $6.

4      And then he goes through -- and Mr. Mittelstaedt alluded

5   to this.  DRM-3 happened sort of gradually.  Apple's

6   competitors went DRM-3 before Apple did.  And so he looked at

7   those events, as well, and he found a $9 price effect when

8   Apple's competitors went DRM-3, and a $13 price effect when

9   Apple went DRM-3.  So, in other words, his methodology is

10  designed to take into account events that took place at

11  different times.

12      In addition, Your Honor, there is a -- I think I alluded

13  to earlier, he conducted a preliminary yardstick analysis.  And

14  this is -- I'm afraid I don't have the page reference.  But he

15  compared the price of one of the Shuffles to a Sandisk product,

16  a competing product, because Apple's pricing committee had

17  identified that product as the competitor of the Shuffle.  And

18  he found price effects at different points in time, including

19  the price effect in September 2006.

20      So while Professor Noll didn't focus on 7.0 because we

21  didn't ask him to -- because at that time, 4.7 was in the

22  case -- there is no reason why his methodology wouldn't apply

23  equally to 7.0.

24      **THE COURT:**  But I need to have him say that, don't I?  In

25  other words, I shouldn't trust the advocates because you all

1    will say anything to win an argument.  If we're going to be

2    relying on the expert -- because he might well say no.

3        I understand the logic of your point, that if you can put

4    in various points and make a regression analysis based upon

5    those variables as they are introduced, this is simply another

6    variable.  I understand the logic of that.

7        But given the challenge based on *Dukes* where the Supreme

8    Court has expressed some concern that commonality is -- needs

9    close examination, I should pay attention to that and at least

10   start the case by saying, I have an expert who says that there

11   is a way of getting to a common effect using an economic

12   analysis.  And it doesn't sound to me like it's very difficult

13   for you to get there.

14       Now, the other suggestion is that I not rely upon even

15   just another declaration, but bring the two people in, have

16   them go up -- take me to school and explain why it works.  So

17   that at least I can say, at class certification, I understood

18   the model and that it -- although the two people might disagree

19   with one another, I was convinced that there is a scientific or

20   economically viable basis for the analysis, a workable model --

21   not that it has been worked, but it's workable.

22       And so I'm satisfied if I can find that there is at least

23   a workable model.  And then the two sides can go after each

24   other trying to convince the fact-finder that, although

25   workable, they don't work, which is a different question.  Why

1    shouldn't I do that?

2        **MS. SWEENEY:**  Well, because I think then, Your Honor, you

3    are -- then you're accepting Apple's invitation to actually

4    make a merits decision.  In class certification, our burden,

5    our duty is to show that there is a methodology that can be

6    used that will show common impacts and produce a formulaic

7    damages result even with those damages being different among

8    class members.  And we've done that with Professor Noll's

9    report.

10        But I think if you go back and look at both his initial

11   report and his reply report, you will see that his model can

12   easily accommodate the event of 7.0 in September 2006.  And

13   again, I would just -- harking back to what is our burden in

14   class certification, *Dukes* certainly is an important decision,

15   but we have already met our burden, even if it is heightened

16   under *Dukes* and *Dukes* doesn't address, of course, 23(b)(3) by

17   putting in a very detailed extensive expert analysis.  And of

18   course, we have been at it, as Your Honor pointed out for --

19   since 2005.

20        So, in the interest of moving the case forward, I would

21   submit that plaintiffs have already met their burden under Rule

22   23.  We shouldn't have to do any more.  We should get to the

23   merits analysis, the merits battle that Mr. Mittelstaedt wants

24   to get to, but not on this motion.

25        **THE COURT:**  Now, I wanted to give you an opportunity to

 1  argue about some paper you wanted me to ignore.  Is that the --
 2  is that the opposing expert's analysis?
 3      **MS. SWEENEY:**  Yes, Your Honor, and I'm going to ask
 4  Ms. Bernay to address that.  Thank you very much.
 5      **THE COURT:**  Very well.
 6      **MS. BERNEY:**  Good morning, Your Honor.
 7      **THE COURT:**  Ms. Bernay.
 8      **MS. BERNAY:**  We move to strike the first Burtis report
 9  because, in plaintiffs' opinion, that report failed to meet the
10  standards for the admission of expert testimony under Rule 702.
11      The opinion that she provided is a 44-paragraph opinion
12  that is just completely devoid of empirical analysis, and
13  really it's a substitute for lawyer argument.  And what is
14  really important is that she failed to consider a number of
15  critical materials.  For example, she failed to consider
16  documents dealing with iPod sales, costs and pricing, documents
17  produced in a massive reseller transaction database that was
18  received that had millions of observations in it.  And these
19  are all things that Professor Noll did, in fact, consider in
20  his report.
21      She didn't look at other material that Professor Noll
22  relied on.  She didn't look at discovery about Apple's pricing
23  decisions.  She didn't look at economic literature or studies.
24  She didn't read the named plaintiffs' depositions.  These are
25  all things that plaintiffs -- it's plaintiffs' position that

1    these are important and critical documents that an expert would

2    consider as a part of that -- the material that would be

3    helpful for a trier of fact to review.

4         Instead, really, it was her report or subjective beliefs,

5    unsupported assertions.  What she does in her report repeatedly

6    is say that the methodology that Professor Noll provided will

7    not work.

8         Now, this -- as we've been talking about this morning, is

9    sort of the crux of the argument, is that we believe Professor

10   Noll has provided a workable methodology that details impact

11   and damages on a class-wide basis.  And what they came back

12   with was just a statement repeatedly saying, "No, it won't

13   work."

14        Just before the hearing that we had on April 18th up in

15   San Jose with Your Honor, Apple actually filed another expert

16   report of Dr. Burtis and we move to strike that motion and we

17   move also further even -- to date, the Court has not ruled on

18   that motion for leave on that second untimely report that was

19   filed long after the class certification briefing was due.

20        So in addition to this motion to strike that we have

21   before you, we would also ask you to consider the motion that

22   we filed on April 17th asking the Court for leave to strike the

23   second untimely document that the defendants submitted.

24        And Your Honor, even if you do consider the Burtis report,

25   as the argument has demonstrated here today by Ms. Sweeney, we

1  believe that there are -- using the Noll report, you can find

2  class-wide impact and damages.  So even if you do determine

3  that the Burtis report does not need to be excluded, even full

4  consideration of that, we believe, would still demonstrate that

5  a class would be proper.

6      **THE COURT:**  I'll tell you what.  It does seem to me that,

7  with the reliance both sides are giving to expert reports, it

8  does not seem to me to be too far from what I should be doing

9  in class certification to have them in and to ask the questions

10  myself:

11      Why doesn't this work?  Explain it to me in words that I

12  can understand, as opposed to relying on the declarations.

13      It seems odd that I can use declarations, even though

14  you're making a motion to strike, but I can't bring them in for

15  an evidentiary hearing.  It sounds like you're trying to hide

16  something from me -- not you -- but that might be more

17  revealing if I had the experts here and having them walk me

18  through it.

19      I do it a lot in patent claim constructions, and this is

20  similar, it seems to me, these kinds of economic analyses.

21      So I may or may not take you up on it.  I'll address your

22  motions to strike.  It seems to me that, ordinarily, the

23  timeliness is not an issue of great moment to me.  I would deny

24  it for that reason and take it into consideration, but then

25  move on to:  What does it say and why it's -- why should I

1    listen to it or be persuaded by it?

2        But thank you very much, Ms. Bernay.

3        **MS. BERNAY:**  Thank your, Your Honor.

4        Final word?

5        **MR. MITTELSTAEDT:**  Just a couple of small things, Your

6    Honor -- maybe not so small.  One is, when counsel says that

7    Dr. Noll found price effects from 4.7 on iPods, if there is an

8    evidentiary hearing, Your Honor will hear that that is

9    incorrect.

10        Professor Noll will not claim he found any price effect.

11    He simply did a regression and he got some coefficients.  One

12    of the coefficients he got, if it were true, would show that

13    the launch of the iTunes Store had a negative effect on iPod

14    prices.  And nobody believes that.  Noll doesn't believe that.

15        And that was one of the things that led him to the

16    deposition admissions that we went over earlier.  So what we

17    have here is Dr. Noll saying something in a declaration, and

18    then he comes in at the deposition and he says, "No, no, no, I

19    wasn't suggesting that this is a workable model.  I wasn't

20    suggesting I actually found damages.  And I certainly wasn't

21    suggesting I had any price effect because this is just -- I

22    can't do this theoretically.  I need to do it empirically, and

23    I haven't been able to do it yet."

24        **THE COURT:**  Well, all right.  I'm still in the same place

25    on that.  He didn't say, "And I can't do it."

1          **MR. MITTELSTAEDT:**  Right.

2          **THE COURT:**  He just says, "I haven't done it yet."

3          **MR. MITTELSTAEDT:**  Right.  And you know, if this were the

4    start of this case, and they came in and they didn't have an

5    expert saying, "I can have a class-wide method of showing

6    impact and damages for 7.0 -- let's say the complaint had been

7    limited to 7.0 -- that wouldn't get them to first base.  And it

8    wouldn't get them, you know, even under the law before *Dukes*.

9          And now, after *Dukes*, if they have got to show convincing

10   proof, they don't have anything on that.  So it's like a blank

11   slate when we come to the only remaining theory of liability in

12   this case.

13         The second thing is, Your Honor had asked some questions

14   earlier about whether Noll's approach to date showed averages.

15   And at page 55 of his deposition, he makes clear that what he's

16   looking as is an average for all iPods.

17         And then the final point I want to make, Your Honor, is:

18   The other issue in this case is, if there were any price

19   impact, when would it happen?  And they don't have any theory

20   as to why an impact should be immediate as of the time of 7.0.

21         Their theory is that, when somebody got around to getting

22   a replacement iPod, you know, maybe they would be encouraged to

23   get an iPod.  But because the music continued to play on

24   existing iPods, there was no need to do anything as of

25   September '06, even under their theory.

1        A final, final point:  Again, I think the important thing

2   is Dr. Noll has said that any impact, if there were any

3   impact -- and he doesn't know whether Harmony is available or

4   Harmony is unavailable has any impact on iPod prices.  If there

5   is any impact, he doesn't know which direction it is.  Maybe it

6   makes him more valuable, maybe it makes him less valuable, and

7   he certainly hasn't offered any testimony in this Court that

8   7.0 had any effect or that he can show it on a class-wide

9   basis.

10       **THE COURT:**  He is -- did I hear that he was associated

11  with Stanford?

12       **MR. MITTELSTAEDT:**  Yes.

13       **THE COURT:**  So he's local.  All right.

14       **MR. MITTELSTAEDT:**  And Your Honor, just one last footnote

15  point:  When the Court does reach the merits of the class cert

16  issue, we have argued in our briefs that resellers like

17  Wal-Mart, coincidentally, are in a different position.

18       None of the plaintiffs are resellers.  They bought in

19  different ways.  Dr. Noll has admitted -- and we might be able

20  to hear him say this -- that the regression analysis he would

21  try to do for wholesalers, resellers would be different.  He

22  would have different data than through the consumer.  So he

23  would need to do two regression analyses.

24       And then we've offered based on the *Valley Drug* case that

25  resellers are in a different position because they have a

1    different incentive when it comes to pricing.  And so when we

2    get to that point, I think those are important considerations

3    on this issue.

4        **THE COURT:**  Thank you both.  The matter is submitted.

5    I'll get back to you.

6        **MS. SWEENEY:**  Thank you, Your Honor.

7                    *(Proceedings concluded at 10:22 a.m.)*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1

2          I, the undersigned, hereby certify that the foregoing

3 proceedings were reported by me, a certified shorthand

4 reporter, and were thereafter transcribed under my direction

5 into typewriting; that the foregoing is a full, complete and

6 true record of said proceedings.

7          I further certify that I am not of counsel or attorney for

8 either or any of the parties in the foregoing proceedings and

9 caption named, or in any way interested in the outcome of the

10 cause named in said caption.

11          The fee charged and the page format for the transcript

12 conform to the regulations of the judicial conference.

13          Furthermore, I certify the invoice does not contain

14 charges for the court reporter's certification page.

15          IN WITNESS WHEREOF, I have hereunto set my hand this 8th

16 day of July 2011.

17

18                              /s/ Margo Gurule
                              _____
19                              MARGARET "MARGO" GURULE, CSR

20

21

22

23

24

25