Robert A. Mittelstaedt  #60359
ramittelstaedt@jonesday.com
Craig E. Stewart  #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:      (415) 875-5700

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION** | Lead Case No.  C 05-00037 JW<br><br>**APPLE'S RESPONSE TO PROFESSOR NOLL'S JULY 18 DECLARATION** |

Apple Inc. submits this response to Professor Noll's July 18 declaration. This response is supported by the accompanying Supplemental Report of Dr. Michelle Burtis dated July 22, 2011.

Professor Noll continues to rely on the preliminary regression model that he previously submitted to try to address the impact of iTunes 4.7. As demonstrated at the June 27 hearing, Noll testified that his preliminary regression was unreliable for numerous reasons. Although he has now added a "dummy" variable for iTunes 7.0, he has not purported to fix the fundamental defects in his model. Thus, for the same reasons that forced him to admit that he was not relying on his model to prove anything with respect to iTunes 4.7, he cannot rely on his model to prove anything with respect to iTunes 7.0.

Even putting aside the fundamental reasons why his model continues to be unworkable, it does not show that iTunes 7.0 had any classwide impact. If it could be used to show anything, it

would show that iTunes 7.0 **lowered** iPod prices—the opposite of Plaintiffs' unsupportable impact and damages theory.

All of this underscores the importance of obtaining Noll's supplemental expert report on class certification—which is the next step ordered by the Court. Then Noll should be deposed and an evidentiary hearing should be held.

## I. THE COURT'S TWO-STEP PROCESS SHOULD BE ADHERED TO.

This Court's June 27 Order set up a two-step process:

- a declaration by Professor Noll—"stating that he can show antitrust impact and a methodology for measuring damages" for iTunes 7.0, with an optional response by Apple, to be followed by

- a Supplemental Expert Report by Professor Noll and a Supplemental Rebuttal Expert Report by Dr. Burtis, on a schedule to be agreed on by the parties.

Plaintiffs refuse to produce any materials relating to the regression analysis until Professor Noll submits his Supplemental Expert Report. (Declaration of David C. Kiernan In Support of Apple's Response to Professor Noll's July 18 Declaration, Ex. 1.) So it is impossible to know precisely how the regression was performed. For the reasons shown below, it is essential that Professor Noll produce his working materials and be subjected to cross-examination before the Court takes any action based on his declaration.

## II. PROFESSOR NOLL'S JULY 18 DECLARATION FAILS TO SHOW ANTITRUST IMPACT OR DAMAGES.

### A. Professor Noll has not remedied the defects that he admitted made the model unreliable as applied to iTunes 4.7.

In his report submitted last March (Dkt. 551), Noll stated that he had run a preliminary regression that produced "highly significant" results showing a price effect of $6 from Harmony being disabled by iTunes 4.7 in October 2004. He claimed that the adjusted $R^2$ for the equations was 0.98, which he said meant that his equations explain "virtually all of the variations in prices across models of iPods." In his report, the only qualification he placed on the reliability of the results was that there are some "remaining data problems."

1   At his deposition, however, he disavowed any reliance on the regression to determine
2   whether iTunes 4.7 had any impact on iPod prices. He admitted that "I drew no causal inferences
3   from that regression," that he couldn't say "whether the launch of Harmony or the disabling of
4   Harmony had any effect on iPod prices," and that he had not even attempted to determine "when,
5   if ever, the disabling of Harmony had an impact on iPod prices."[1]  The regression model's
6   problems, acknowledged by Noll, were not limited to incomplete or inaccurate data. Rather, he
7   admitted that, even apart from data issues, he hadn't done the required work to determine whether
8   the model itself was valid.[2]

9   With his latest report, Noll engages in the same exercise. Relying on the same admittedly
10  unreliable preliminary model, he asserts that, by adding a variable for iTunes 7.0, the model
11  indicates that iTunes 7.0 caused iPod prices to be elevated by $4.85. As before, he describes
12  these findings as "highly significant" and points to an adjusted $R^2$ of 0.98 as showing that the "fit
13  of the equation is very high."[3]  As explained below, however, his regression shows no such
14  thing—as Noll will have no choice but to admit when his deposition is taken again or an
15  evidentiary hearing is held, just as he admitted last time. In fact, if there were any validity to his
16  regression model, which he has already admitted there is not, it would indicate that iTunes 7.0
17  caused iPods to be priced **lower** than they otherwise would have been, by $1.69. *See*
18  Supplemental Report of Michelle Burtis, filed herewith, ¶ 3-5.

19  Although he is using essentially the same model as before, Noll does not attempt to
20  address the most fundamental problems that made it unreliable, either the problems

---

[1] Kiernan Decl., Ex. 2, pp. 92, 113, 202.

[2] Among the numerous reasons why the 4.7 regression model was not reliable, Noll admitted that he may not have included all the factors that influenced iPod prices (pp. 92-93, 123); he could have been measuring a price change that occurred before and unrelated to iTunes 4.7 (pp. 94-98); he "ran out of time" to determine whether his model was invalid due to lack of sufficient independent price observations (pp. 112-13); he was looking at average iPod prices, not prices for individual models (pp. 128-29, 146); and he failed to include a variable for the Harmony relaunch in April 2005 (pp. 146-48). That's why he was not "relying on it for anything" (p. 134). The foregoing pages are included in Exhibit 2 to the Kiernan Declaration.

[3] As demonstrated by the Burtis Supplemental Report (¶¶ 6-10), Noll's statements are misleading, which is why he distanced himself from them at deposition.

acknowledged by him at his last deposition or those identified by Dr. Burtis. Burtis Supp. Report, ¶¶ 6-15. Instead, pushing the bounds of advocacy, he asserts (p. 2) that "my prior analysis found that the 4.7 update elevated iPod prices." There is no way to square that assertion with his specific deposition admissions that his model was unreliable and did not show "whether the disabling of Harmony had any effect on iPod prices." Kiernan Decl., Ex. 2, p. 113. This is not a "battle between experts" as much as the difference between Noll's written work and his sworn testimony on cross-examination.

In short, Noll's July 18 declaration fails to provide any basis for showing antitrust impact, as required by this Court's June 27 Order. As he admitted with respect to the iTunes 4.7 version, he cannot rely on it for anything.

**B.     If Noll's regression model shows anything (and it doesn't), it would show that iTunes 7.0 did not cause any classwide antitrust impact or damages. Rather, it "caused" lower iPod prices.**

For reasons previously discussed (Doc. 633, pp. 3-5; Doc. 646, pp. 1-2), it remains implausible that iTunes 7.0 had any conceivable effect on iPod prices. Under Plaintiffs' theory, that update simply required the additional step of "burning/ripping" to play music from one of multiple sources on some new iPod models. Consumers could still play their CD collections directly on iPods and could still directly play all of their music (including RealNetworks' music) on existing iPods and on new iPod shuffles. They could also play RealNetworks' music on other new iPod models (e.g., iPod nano second generation) simply by copying ("burning") the music to a CD and loading ("ripping") it back to a computer for loading to an iPod. As Professor Noll has admitted, there is no theoretical basis for assuming that preventing RealNetworks' music from playing directly on certain iPods had any effect on iPod prices. Kiernan Decl., Ex. 2, pp. 151-53. Even now, Noll repeats (p. 2) that whether Apple set iPod prices above levels that would have otherwise existed "is an empirical matter."[4]

---

[4] Nor does Noll's purported conclusion that, without iTunes 7.0, iPods would have been priced $4.85 lower pass a basic reality test. That would mean that a 2GB iPod nano second generation shuffle priced at $149 supposedly would have been priced at $144.15. But that never would have happened given Apple's "aesthetic" pricing, e.g., at $149 or $199 rather than at

1  Noll's analysis fails to show empirically that Apple elevated iPod prices due to iTunes 7.0.
2  As submitted last March, his regression model used various "dummy" or indicator variables (*e.g.,*
3  the iTunes store, Harmony, 4.7, iTS competitors becoming DRM-free, *etc*.) and attempted to
4  measure the impact, if any, of those factors on iPod prices.  For his latest declaration, Noll adds a
5  new dummy variable for iTunes 7.0 to the same model.  If he had treated all the variables the
6  same, the result for the iTunes 7.0 variable (again putting aside all the other defects that render
7  the model invalid) would be negative $1.69, indicating that 7.0 caused iPod prices to be lower
8  than they otherwise would have.  Burtis Supp. Report, ¶¶ 3-5.

9  To mask that result, Noll resorts to an inexcusable sleight-of-hand.  He turns off (p. 2) the
10 variable for 4.7 at the same time he turns on the variable for 7.0.  This is contrary to the way that
11 Noll treats all the other variables and is contrary to the way he treated the iTunes 4.7 variable in
12 his previous regression.  Burtis Supp. Report, ¶¶ 3-5.[5]  By turning off the variable despite his
13 theory that it would continue to cause "lock in," Noll creates the false impression that iTunes 7.0,
14 rather than iTunes 4.7, is causing the positive price effect.

15 Exhibit 1 to Noll's declaration shows (assuming *arguendo* that the regression model is
16 valid) the price effect of iTunes 4.7 from October 2004 to September 2006 is $6.54 and that the
17 price effect of iTunes 7.0 from September 2006 to March 2009 is $4.85.  If the model were able
18 to show anything, the difference between those two numbers would indicate that iTunes 7.0
19 caused average iPod prices to drop by $1.69.  Burtis Supp. Report, ¶¶ 3-5.  So the accurate way to

---

(continued…)

interim levels. Doc. 512, p. 12.  Noll acknowledged as much at his deposition.  Kiernan Decl, Ex. 2, pp. 208-13.

[5] In his previous regression, all variables including 4.7 are "left on" for the entire period. That is because they reflect the ongoing impact of those events.  The variable for iTMS, for example, would (at least, in theory) measure the total impact of iTMS on iPod price from the April 2003 launch to the end of the alleged class period, March 2009.  If that variable were turned off at, say, the date that the iPod shuffle was launched, the variable for the iPod shuffle would pick up the continuing impact of iTS as well (assuming the regression model were otherwise appropriate).  Noll does not explain why he didn't turn off the 4.7 variable in his previous regression.  Nor does he explain why he doesn't turn off that variable in his new regression at the time earlier iTunes updates like 4.8 , 4.9, 5.0 or 6.0 were released.

1  depict the "findings" of his analysis would be to say that iTunes 7.0 caused average iPod prices to
2  drop by $1.69 compared to what they would have been without the update.  *Id.*

3      At page 2 of his July 18 declaration, Noll tries to justify his trick by saying that turning off
4  the 4.7 variable permits a test of whether iTunes 7.0 "perpetuated elevated prices" for iPods.  But
5  when he says "perpetuate," he does not mean that the model measures whether iTunes 7.0 caused
6  the allegedly elevated but lawful prices attributed to iTunes 4.7 to remain elevated when they
7  otherwise would have been declining.  Instead, he is saying that the allegedly elevated prices
8  persisted even after iTunes 7.0 was released.  That is because the continued existence of a price
9  effect, rather than any causal effect from 7.0, is all that his model could possibly have been
10 measuring.  But that is not antitrust impact because iTunes 4.7 was lawful and any price effect
11 that may have persisted was likewise lawful.

12     Finally, at page 4, Noll states that the coefficient for the 7.0 variable "indicates that it
13 caused the wholesale price of iPods to be elevated by $4.85 compared to a price elevation of
14 $6.54 due to update 4.7."  When Noll is cross-examined at deposition and/or an evidentiary
15 hearing, he must retract that statement.  It is an inaccurate report of his results.  What he is really
16 saying is that iTunes 7.0's negative effect on prices caused the price effect of iTunes 4.7 to drop
17 from $6.54 to $4.85.  *See* Burtis Supp. Report, ¶¶ 3-5.  Again, that is not antitrust injury or
18 damages.

20 Dated: July 22, 2011                              Respectfully submitted,
21                                                  Jones Day

23                                                  By:  /s/ Robert A. Mittelstaedt
24                                                       Robert A. Mittelstaedt
25                                                  Counsel for Defendant