UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **THE APPLE iPOD ANTI-TRUST LITIGATION** | Lead Case No. C 05-00037 JW (HRL) |

### Second Supplemental Declaration of Roger G. Noll on Class Certification [REDACTED]

Previously I submitted several declarations in this matter. All of my declarations, including this one, focus on whether liability, including anticompetitive harm and damages can be proved by methods that are predominantly common to members of the class. My most recent declarations, the *Supplemental Declaration of Roger G. Noll* (henceforth *Noll Supplement*) on July 18, 2011, and the *Reply Declaration of Roger G. Noll* (henceforth *Noll Reply*) of March 28, 2011, contain regression analyses of Apple's iPod transactions with resellers – direct purchasers that are either retailers or wholesalers.

In the *Noll Reply*, a single indicator variable was used that took the value of one for all periods after the release of iTunes 4.7. This variable was a valid indicator of the presence in the market of iTunes software that disabled Harmony. The *Noll Supplement*, reflecting the Court's ruling that iTunes 4.7 was not anticompetitive conduct, replaced the single indicator variable for disabling Harmony with two other variables, the first for the period after the release of iTunes 4.7 when disabling Harmony was ruled not to have been anticompetitive, and the second period beginning with the release of iTunes 7.0 when the issue of anticompetitive conduct has yet to be resolved. Otherwise, the specification of the two regressions was mostly the same. The regression in the *Noll Supplement* shows

that after the release of iTunes 7.0, iPod prices to resellers were higher than would have been the case had iTunes 7.0 not disabled the use of Harmony by iPod users.

## ASSIGNMENT

In the *Noll Supplement*, attorneys for the plaintiff asked me to determine whether anticompetitive impact and damages arising from the release of iTunes 7.0 could be proved using methods that are predominantly common to class members. For this declaration, attorneys for the plaintiffs have asked me to undertake two tasks. The first is to read submissions by Apple in response to the *Noll Supplement* to determine whether anything in this material causes me to alter the analysis and conclusions in my prior declarations. The second is to demonstrate the feasibility of constructing an econometric model for determining anticompetitive impact and calculating damages for direct purchasers of iPods from Apple that is predominantly common to class members who are end users of iPods.

To carry out the new tasks I have read *Apple's Response to Professor Noll's July 18 Declaration* (henceforth *Apple's Response*) and the *Supplemental Report of Dr. Michelle M. Burtis* (henceforth *Burtis Supplement*). I also have consulted other sources of information that I reference in this report. In this work I have been assisted by the staff at Economists, Inc.

## SUMMARY AND CONCLUSIONS

The *Noll Supplement* reported a regression analysis of Apple's reseller transaction data that demonstrated the feasibility of using a method that was predominantly common

among class members to prove anticompetitive impact and to calculate damages. The specification of this regression was almost identical to the specification in the *Noll Reply* with one exception. The regressions in the *Noll Reply* contained a single indicator variable that took the value of one after iTunes 4.7 was released. In essence, this variable measured the presence of iTunes software that disabled Harmony. Disabling Harmony causes consumers who own iPods to be more locked-in to iPods when they consider a replacement, and greater lock-in makes consumer demand for iPods more price-inelastic, thereby leading to higher prices.

The regression in the *Noll Supplement* replaced the single indicator variable with two new variables. The first variable represents the period after the introduction of iTunes 4.7 when the release of software that disabled Harmony was ruled not to have been anticompetitive conduct. This period ended with the release of iTunes 7.0. The second variable represents the period beginning with the release of iTunes 7.0, which is the period when plaintiffs now allege that disabling Harmony was anticompetitive.

*Apple's Response* and the *Burtis Supplement* argue that the regression analysis that is presented in the *Noll Supplement* is invalid and unreliable for four reasons, three of which, if true, also would apply to the regressions in the *Noll Reply*. First, the indicator variable for the release of iTunes 7.0 is not constructed correctly. Second, the indicator variables for the release of iTunes 7.0 (and iTunes 4.7) cannot be used to estimate their price effects on models that were introduced after the occurrence of that event. Third, I erred in interpreting the standard errors of the regression coefficients because the data set contained duplicate observations and suffers from problems arising from cluster effects. Fourth, the conclusions in the *Noll Reply* and *Noll Supplement* are inconsistent with my

testimony in my deposition. None of these criticisms is valid.

The first criticism asserts that the indicator variable for iTunes 4.7 should have been set to one from the date of its release until the end of the data period, and that if this procedure is followed, the actual effect of iTunes 7.0 is to reduce prices. This claim is not correct. If the iTunes 4.7 variable had been set to one from its release until the end of the data period, the proper interpretation is that the total effect of iTunes 7.0 is the sum of the coefficients on the iTunes 7.0 and iTunes 4.7 variables. A negative coefficient on iTunes 7.0 in this specification would imply that its effect on iPod prices was less than the effect of iTunes 4.7, not that iTunes 7.0 caused iPod prices to be lower than they would have been had iTunes 7.0 not disabled Harmony.

The second criticism is that the effect of an action by Apple that changes market conditions on the price of a product that was introduced after that event cannot be estimated because the data set contains no observations on transactions of the product that were not affected by the event. This criticism is invalid. Hedonic price regressions, which are widely used in economics, are a mechanism for incorporating the effect of evolving product attributes on prices in a market in which products are differentiated in that they differ in design and functionality. If the regression equation properly takes into account variations in attributes and market conditions among products over time, the regression validly can assess the effect of a change in market conditions on products that were not sold when the change occurred.

The third criticism is that the estimates of the coefficients and standard errors in my regressions are unreliable because the data contain duplicate observations and suffer from cluster effects. Again, this criticism is incorrect.



There is no error in including all such transactions in a data set, as economists routinely do when undertaking an econometric analysis of supply and demand.

Apple's transactions data do not satisfy the conditions under which a clustering problem can emerge. Clusters are distinct groups of individuals, such as residents of a city or students in a school. A clustering problem may occur if the effect of a causal variable of interest (a "treatment") is common to all members of a group and if members of a group also are commonly affected by another unobserved variable.

Apple's transactions data do not satisfy this condition because the groups in question are purchases of specific models of iPods for which the common effects on prices (model characteristics and cost) are observable and incorporated in the price regressions. Moreover, the importance of the clustering effect diminishes as the number of clusters (groups) and the number of individuals in a cluster increases. Even if the characteristics of iPod models were unobservable and so satisfied the conditions to be a cluster, the number of clusters and the number of observations per cluster are far too large for clustering to pose a problem.

The fourth criticism is that in my deposition I admitted that the regressions in the

*Noll Reply* (and so by implication in the *Noll Supplement*) were unreliable and made other statements that were inconsistent with the conclusions in my declarations. After reviewing this testimony in detail, I conclude that my deposition testimony is fully consistent with my declarations and contains no admission that my regressions are unreliable.

For the most part, the alleged admissions and inconsistencies arise from the following. First, I do not offer conclusions on the merits of plaintiffs' allegations, and do not claim that my regressions can be used to calculate damages. My declarations all focus on whether liability, including anticompetitive impact, and damages can be proved by methods that are predominantly common to class members. Second, I agree that unresolved problems with the data might, when resolved, cause me to change the specification of the regressions, and that these changes might produce different results. Third, in response to hypothetical questions based on a counter-factual assumption, the correct answer often is that the regression needs to be re-specified or estimated in a different way. But in every case, the re-estimation described in my answer would still be a regression equation using measures of product characteristics and market conditions to explain Apple's transactions that would measure anticompetitive impact and damages using a formula that is predominantly common to class members.

Finally, in this declaration I report the results of a new regression analysis on the data ███████████████████████████████████████ ██████. This data set suffers from more problems than the reseller transactions data. ███████████████████████████████████████ ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Notwithstanding these data issues, a hedonic regression can be estimated from these data that is very similar to the regression on the reseller data. The first step in this analysis is to estimate price and unit cost of each iPod product in each quarter by dividing revenues and costs by quantities. The estimated price is then regressed on the indicator variables for the product, estimated unit cost, and indicator variables for market conditions. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ Moreover, these data reliably can be used to demonstrate qualitatively that iPod prices were higher after iTunes 7.0 was released. The regression explains almost all of the variation in average quarterly prices, and indicates that the retail price of iPods was almost $5 higher after the release of iTunes 7.0.

After performing the analysis that is described in this report, I conclude that nothing in *Apple's Response* or the *Burtis Supplement* constitutes a valid criticism of my earlier declarations. I also conclude that the hedonic price approach is a valid, reliable method that is common to class members – including purchasers through the direct sales channel – for proving anticompetitive impact and calculating damages. Hence, I find no reason to alter any of the analysis or conclusions in my prior declarations.

**CRITICISMS IN THE *BURTIS SUPPLEMENT* AND *APPLE'S RESPONSE***

Apple's submissions of July 22, 2011, argue that the econometric method that is adopted in the *Noll Reply* and the *Noll Supplement* is invalid and unreliable for proving anticompetitive impact and calculating damages. Apple's submissions offer the following criticisms of my analysis.

(1) I erred in the construction of an indicator variable to be used to estimate the impact of releasing iTunes 4.7, and in any event the results are implausible.

(2) The indicator variable for the release of iTunes 7.0 cannot be used to estimate damages for any model that was introduced after the release date of iTunes 7.0 because there were no sales of these models before that date that can serve as the basis for estimating the overcharge.

(3) I erred in misinterpreting the standard errors of the coefficients in the regression model due to "clustering" of observations.

(4) Statements I made in my deposition are inconsistent with the conclusions in my last two reports that I had successfully demonstrated the feasibility of using econometric analysis to produce a reliable method for calculating damages.

This section explains why these criticisms are not valid.


***Specification and Interpretation***

The *Burtis Supplement* (pp. 1-4) raises three issues concerning the specification of the regression equation, and claims that these alleged misspecifications led me to misinterpret the coefficient on the indicator variable for the release of iTunes 7.0 and the

measures of fit of the regression equation.  This section discusses each of these criticisms and explains why none is valid.

*The iTunes 7.0 Indicator*

According to the *Burtis Supplement* (p. 1-2), the specification of the indicator variables for iTunes 4.7 and 7.0 in the *Noll Supplement* "is inconsistent with his treatment of other similar variables" and "is different from the way that Professor Noll specified all of the other 'dummy,' or indicator, variables in his regressions.  All of the other 'dummy' variables are specified to be 'on' beginning with the particular event and staying 'on' throughout the remainder of the estimation period."

In the specification in the *Noll Supplement*, the value of the indicator variable for iTunes 4.7  is set to one from its release date until the release date of iTunes 7.0, and the value of the iTunes 7.0 variable is set to one from its release date until the end of the data period.  Dr. Burtis claims that the preferred specification is for the value of the indicator variable for iTunes 4.7 to be one from its release date until the end of the data period.

Dr. Burtis is incorrect on two counts.  First, not "all of the other 'dummy' variables" take the value of one from the date at which they first appear until the end of the data period.  For example, the indicator variable for end-of-life applies only when, in fact, a particular iPod has been cancelled, is no longer being manufactured, but has remaining inventory that is being sold.  Likewise, the indicator variable for each memory size takes the value of one only when an iPod has that memory size.  The logic behind this choice is obvious – any indictor variable should be "on" only if the associated prices plausibly could be affected by it.  A particular memory size for a particular class of iPods

would not continue to affect its price after the product is no longer available in that size.

The same logic applies to the iTunes 4.7 software release. The iTunes 7.0 release replaced the prior version of iTunes software and contained new code for disabling Harmony. If the iTunes 4.7 release was not anticompetitive, but the iTunes 7.0 release was anticompetitive, as plaintiffs allege, then the appropriate specification is for the indicator variable for iTunes 4.7 to be reset to zero when it is replaced by iTunes 7.0.

Dr. Burtis specifically mentions (p. 2) that the indicator variables for "post-iTMS," "Harmony," "competitors DRM free," "ITMS DRM free" and "iTunes 7.0" take the value one from the date of inception to the end of the data period. The reason for this specification is that iTMS and the other changes she cites remained in use to the end of the data period, whereas iTunes 4.7 did not. For example, if iTMS had been shut down before the end of the data period, or if iTMS had stopped selling DRM-free files and returned to using FairPlay, the associated variable would be reset to zero after the change.

As a practical matter, the specification issue that Dr. Burtis raises is irrelevant if the coefficients on the indicator variables are interpreted properly. Dr. Burtis claims that if the iTunes 4.7 indicator variable is included in the regression in the manner that she prefers, then the coefficient on the iTunes 7.0 variable is negative, showing that (p. 1) "iTunes 7.0 reduced iPod prices." Again, this claim is false. Because iTunes 7.0 replaced iTunes 4.7, the proper interpretation of Dr. Burtis's proposed regression is that the effect of iTunes 7.0 would be the sum of the coefficients of the two variables. That is, in Dr. Burtis's preferred specification, the coefficient on iTunes 7.0 is the change in prices arising from the switch from iTunes 4.7 to iTunes 7.0.

An easy way to understand the proper interpretation of coefficients is to walk

through the results of a regression in which, say, the 1GB memory indicator is set to one for a given iPod model when a version of this model having 1GB of memory is first introduced, but not set to zero again for subsequent models that had more memory. In this case, once 4 GB memory was introduced, its coefficient would measure the *incremental* price of that model as a result of moving from 1GB to 4GB, and the *total* effect of 4GB memory on price would be the sum of the two coefficients.

The same logic applies to understanding the proper interpretation of the coefficients on the iTunes software variables in a regression in which the iTunes 4.7 indicator is not reset to zero when iTunes 7.0 is introduced. After the introduction of iTunes 7.0, the coefficient on iTunes 4.7 becomes the hypothetical effect of iTunes 4.7 had Apple continued to use the software for disabling Harmony that was introduced in iTunes 4.7. The proper interpretation of a negative coefficient on iTunes 7.0 in Dr. Burtis's preferred regression would be that iTunes 7.0 had less impact on the market for portable digital media players than did iTunes 4.7, and so caused less of an elevation in iPod prices. But the fact that it had less of an impact is not the same as concluding that its impact was beneficial to Apple's customers. For the latter to be true, the coding in iTunes 4.7 that disabled Harmony would have to be equally effective throughout the data period had it not been replaced, notwithstanding attempts by RealNetworks and others to write software that removed the incompatibility between audio files downloaded from iTMS and portable digital media players other than iPods.

Plaintiffs originally alleged that updates to the iTunes software, beginning with iTunes 4.7 and continuing to the end of the class period, sought to create and to maintain incompatibility between iTMS and portable digital media players other than iPods. The

reason for dividing the period for measuring the effect of these upgrades is that the court

has ruled that the release of the software that disabled Harmony in iTunes 4.7 was not

anticompetitive conduct, but whether the release of new disabling software in iTunes 7.0

is anticompetitive remains unresolved.  Had the ruling about iTunes 4.7 gone the other

way, the interpretation of the coefficients would have been that, if the plaintiffs'

allegations are true, the anticompetitive effect of iTunes 4.7 was greater than the

anticompetitive effect of iTunes 7.0, not that iTunes 7.0 caused no anticompetitive harm

because it was less effective.  Had the ruling gone the other way and had plaintiffs then

proved their liability allegations, Apple could use a regression like mine to argue that

damages to purchasers of iPods after September 12, 2006, were lower than damages

before that date.

 *Apple's Response* makes another criticism about the reliability of the coefficient

on the iTunes 7.0 indicator.  According to *Apple's Response* (p. 4), the coefficient of

$4.85 on the iTunes 7.0 indicator does not "pass a basic reality test" because it implies

that in the absence of software in iTunes 7.0 to disable Harmony ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████

 For the reasons given above, there is no basis in econometric analysis for the

criticisms by Apple and their expert of either my specification of the variables for iTunes

software updates or my interpretation of the coefficients on these variables.

*Average Damages*

The *Burtis Supplement* argues (p. 6) that my regression analysis cannot reliably be used to calculate damages because the coefficient is an average impact of iTunes 7.0 across all models and all post-iTunes 7.0 time periods. The thrust of Dr. Burtis's argument is that the equation should have been specified in a different way in order to allow the estimated price effect of iTunes 7.0 to vary through time and among models.

Dr. Burtis is correct that I have not undertaken an evaluation of all possible specifications of the regression to determine which works best. In this case, one re-specification that would take into account Dr. Burtis's worries would be to estimate a logarithmic form of the regression. In such a specification, the coefficient on the iTunes 7.0 variable would be the percentage change in price attributable to this software upgrade, and the baseline price would vary according to model characteristics and through time (through the effect of the time-trend variable). Another possibility is to add to the current equation interactions between the iTunes 7.0 variable and the independent variables for iPod classes and the time trend. At the end of the day, one still would be left with an equation for calculating damages that contains the same variables that were used in my regression and that is common to all class members.

*Post-iTunes 7.0 Models*

The *Burtis Supplement* asserts (pp. 6-7): "Professor Noll's model does not, and indeed cannot, be (sic) used to measure impact for iPod models that were introduced for

the first time after the introduction of Harmony." Dr. Burtis then claims that this claim is "demonstrated" by estimating the regression in the *Noll Reply* using only data for the iPod touch, which was introduced a year after the release of iTunes 7.0 and more than three years after the release of Harmony.

Dr. Burtis is correct that iPod touch transactions cannot be the only source of information for estimating the effect of an event that transpired before the iPod touch was introduced; however, Dr. Burtis is incorrect to claim that this fact makes estimating the effect of iTunes 7.0 on the price of the iPod touch impossible. One reason for using a hedonic price model with a time trend is to show how product attributes affect price, explaining the difference in price between products (for example, an iPod touch and an iPod nano) on the basis of differences in attributes. The resulting equation links the prices of different classes of iPods through time. The equation then can be used to estimate the price of any particular product at any time in the data period, including the expected price of a product if it had been introduced earlier.

In estimating my regression for only iPod touch transactions, Dr. Burtis discarded the information that is contained in the data about transactions of other iPods both during the period that the iPod touch has been available and the period before it was released. A regression does not need to be run to prove the obvious: with such restricted information, one cannot estimate the effect of using iTunes 7.0 to disable Harmony. But this fact does not justify the conclusion that iTunes 7.0 therefore could not plausibly have affected the price of the iPod touch. The practical question, then, is how to estimate this effect, given that the iPod touch has never been sold under market conditions in which Harmony was not disabled. The proper answer is to examine how Apple's price structure in general

was altered by the presence of iTunes 7.0, and to apply the findings to calculate the but-for price of the iPod touch. A hedonic regression, such as the one that I specified, accomplishes this objective and is a valid econometric procedure.

*Clustering and Fit Measures*

The *Burtis Supplement*, in discussing the precision of the coefficient estimates in the *Noll Reply* and *Noll Supplement*, states (p. 3): "The standard errors that Professor Noll reports are artificially small because he is using observations in his data set that are not independent from one another. Standard errors are determined, in part, by the number of observations in a sample (more data, in general, means more precise estimates). But the observations must be independent. If they are not, the calculated standard errors will be artificially small unless the model is appropriately corrected." Dr. Burtis then states (p. 4) that simply "duplicating the original data" will cause the standard error of the coefficients to fall but the explanatory power of the regression not to change. Dr. Burtis then states: "Professor Noll's results suffer from this problem… For example, on a given day, Professor Noll may have many price observations for a given product, but the prices are all the same and they are not independent from one another."

These statements are incorrect on many levels. Dr. Burtis is incorrect about the nature of the data, but also incorrect about the implications for econometric analysis even if her assertions about the data were correct. The data set does not include duplicate entries of the same observation, is not accurately characterized as a cluster sample, and in any case has too many groups and observations for clustering to be a serious problem.

**Duplication**



Dr. Burtis also mistakenly equates duplicating observations to using multiple transactions of the same product involving different buyers.[1]  Even if the issue were retail sales at the same posted price, the observations would not be duplicates because each transaction would be accounted for by a different buyer making an independent decision about whether to make a purchase and, if so, how many products to buy.  In this case, entering each purchase observation separately is appropriate.[2]  The issue of data duplication to which Dr. Burtis refers requires using the same transaction twice, not using two separate transactions with different buyers that happen to be at the same price.

---

[1]  Dr. Burtis also refers to this problem as arising from the fact that observations are not independent.  I am not aware of any book or article in economics that refers to duplication of data as the absence of independence of observations.  The use of the term independent refers to a standard assumption about the error term, which is that errors are independent draws from the same distribution function.

[2]  Economists frequently use data sets with many transactions at the same price to study supply and demand conditions in a market.  For example, a study of grocery transactions used all recorded retail sales to calculate the extent to which prices were correlated among stores and the extent to which retail price changes were in response to wholesale price changes.  On a given day, the price of any specific grocery item was likely to be identical in all sales, but differences in the identity of the purchaser and the quantity purchased made each transaction a valid observation.  See Emi Nakamura, "Pass-through in Retail and Wholesale," *American Economic Review Papers and Proceedings*, Vol. 98, No. 2 (May 2008), pp. 430-37.

Finally, even if the data contained duplicate observations, duplication can be a good thing! A commonly accepted technique for dealing with small data sets is "bootstrapping." The simple bootstrap method involves taking a random sample with replacement from the original data (i.e., randomly drawing an observation, recording it, and returning the observation to the data set before the next random draw).[3] Sampling with replacement implies that the same observation may be drawn more than once, causing duplication of observations. A regression is then estimated from this sample. This procedure is repeated many times to produce many estimates of the regression coefficients. The distribution of the regression coefficients is then used to construct an estimate of the true coefficient.

**Clustering: Definition**

After describing the non-issue of "repetitive data observations," Dr. Burtis states (p. 4): "This problem, well known in empirical economics, is called clustering." The only reference that Dr. Burtis cites is an article in a psychology journal about the use of analysis of variance (not multiple regression) in education.[4] Because Dr. Burtis does not clearly define the nature of the clustering problem or the connection of an article about analysis of variance to a multiple regression analysis, my discussion must begin with

---

[3] For a comprehensive discussion of bootstrapping, including methods that do not use sampling with replacement, see Joel L. Horowitz, "The Bootstrap," in James Heckman and Edward Leamer, *Handbook of Econometrics*, Vol. 5, North Holland (2001), pp. 3159-228. For a simpler discussion focused on regression analysis, see David A. Freedman and Stephen C. Peters, "Bootstrapping an Econometric Model: Some Empirical Results," *Journal of Business and Economic Statistics* Col. 2, No. 2 (April 1984), pp. 150-58.

[4] Larry V. Hedges and Christopher H. Rhoads, "Correcting an Analysis of Variance for Clustering," *British Journal of Mathematical and Statistical Psychology* Vol. 64, No. 1 (February 2011), pp. 20-37.

some details about this article and the statistical issues involved in clustering.

The focus of the cited article is statistical tests for "treatments effects" as a method of determining whether a particular technique for educating children (the treatment), such as smaller class size or a new instructional method, leads to changes in an educational outcome, such as test scores. The premise of the article is that a treatment is assigned to a group (cluster) of students (some students in a classroom, an entire classroom, an entire school, an entire school district). This treatment is common to all members of this selected group. The problem that the authors analyze is one in which the statistical analysis focuses exclusively on differences in outcomes between students that were subjected to the treatment and students that were not. This simple procedure ignores the effects of other common factors that affect the treatment group that might affect educational outcomes, such as peer effects, teacher effects, principal effects and neighborhood effects. The point of the article that Dr. Burtis cites is that the treatment effect variable is a measure of both the treatment and other causal factors that apply to students within a group, which can cause the treatment effect to appear to be more important than it really is.

Dr. Burtis does not explain how a paper about analysis of variance, which tests whether a treatment has a statistically significant effect on an outcome measure, is related to her claims about the precision of coefficient estimates in a regression, or why a procedure to deal with the problem of clustering in an analysis of variance bears any relationship to the procedures for dealing with the problem in a regression. Indeed, Dr. Burtis simply jumps from a statement that clustering can cause a problem to a statement that she has re-estimated my regression with data that are "corrected for clustering." Dr.

Burtis provides no further explanation of the cluster problem that she regards as present in the data or her choice of a method for correcting it.

The goal of analysis of variance is to determine whether a particular variable has a significant effect on the mean of another variable. In the simplest case, one group is subject to a treatment and the other is not. In analysis of variance, the means of the two groups are compared to ascertain whether the means are statistically significantly different. If so, the difference in the two means is the estimated treatment effect.

The simple analysis of variance procedure is essentially equivalent to a regression analysis in which the dependent variable, $Y_{ig}$, is the outcome (e.g., test score) for person i in group g.[5] The independent variables are a constant, $A$, and an indicator variable, $X_g$, that takes the value one if group g, to which person i belongs, received the treatment and zero otherwise. The regression that is equivalent to an analysis of variance estimates equation (1):

(1)        $Y_{ig} = A + bX_g + e_{ig}$,

in which $b$ is the coefficient that is estimated from the data and $e_{ig}$ is the error in the estimate of the estimated value of Y for person i in group g. The standard assumption about the error term is that it is independent and identically distributed with a mean of zero, which means that the value of $e_{ig}$ does not depend on any of the other variables in the equation and that the variance of the error term is the same for each observation.

At this point, the discussion is out of the realm of analysis of variance and in the realm of multiple regression analysis. The proper references to consult are articles in

---

[5]  The standard notation in cluster analysis is based on the convention of separately numbering the members of each group, so that $Y_{14}$ refers to the first person in the fourth group and $Y_{16}$ refers to the first person in the sixth group.

econometrics that deal with clustering in the context of multiple regression analysis.[6] The more general regression framework assumes that the regression contains two types of independent variables. The first type, $X_g$, applies commonly to all members of group g. For example, if a treatment is applied to some groups but not other, $X_g$ is one for groups with the treatment, and zero otherwise. The second type, $Z_{ig}$, is any variable that takes different values for individuals within a group. A variable of this type may or may not apply to more than a single group. The outcome variable is $Y_{ig}$ for person i in group g, and the estimated regression equation is then:

(2)         $Y_{ig} = A + bX_g + cZ_{ig} + e_{ig}$,

in which c is the regression coefficient on $Z_{ig}$. Of course, there can be several different treatment variables ($X_g$) and individual variables ($Z_{ig}$), in which case all the variables are interpreted as vectors, but I ignore this complexity here.


**Clustering: Problems**

The econometric problems that can arise in the more general specification involving clusters are as follows. First, the outcome of a group may be affected by common factors other than the treatment variable. Second, the outcome of an individual may be influenced by an individual-level variable that is not included in the regression. Third, the assumption of independence and identical distributions for the error terms may

---

[6] The analysis presented here is based on discussions of cluster effects in Jeffrey M. Wooldridge, *Econometric Analysis of Cross Section Data*, MIT Press (2002), especially Chapter 11, Section 11.5, pp. 328-332; Jeffrey M. Wooldridge, "Cluster Sample Analysis in Applied Econometrics" *American Economic Review* Vol. 93, No. 2 (May 2003), pp. 133-38; and Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometric: An Empiricists Companion*, Chapter 8, pp. 293-325, Princeton University Press, 2009.

be violated.

The first two problems are examples of an omitted variable, which is a form of specification error. The first problem arises because the treatment and other common causal factors are all rolled into the same variable, the group indicator $X_g$. The second problem arises because not all individual-level variables are represented in $Z_{ig}$. Omitted variables create a problem only if they are correlated with an independent variable that is included in the regression. Omitting group level influences from equation (2) creates a problem because of the presumed correlation between the treatment, $X_g$, and the excluded common group-level influences. Omitting individual level variables is not a problem if the omitted variable is not correlated with the variable of interest – in this case, the treatment effect. Omitting such a variable will reduce the explanatory power of the equation and distort the estimation of the effect of any other variable with which it is correlated, but it will not undermine the validity of the estimate of the treatment. The standard solution for omitted variables problems is not to omit variables.

The third potential problem in equation (2) is that the error terms may not be independent and identically distributed. Instead they may exhibit autocorrelation (e.g., if observations are arranged by group, errors within a group will tend not to average zero) and/or heteroskedasticity (e.g., the variance of the error term may differ among groups). In an analysis in which individual observations are assigned to groups, the variance of the standard errors can differ among groups if the number of observations in each group differs or if excluded variables apply to some groups but not others.

The importance of problems related to the error term depends on the nature of the data. One standard solution to these problems is to add more data. As the number of

groups (clusters) grows larger, the importance of within-cluster error problems diminishes. The other standard solution is to test for and correct autocorrelation and heteroskedasticity.


**Clustering:  Relevance to iPod Data**

The next issue is how clustering problems relate to estimating the price effect of a change in competitive conditions in the market for iPods. The backup material to the *Burtis Supplement* identifies four clusters:  the class, generation and capacity of an iPod and the time trend. The implication is that iPod transactions can be regarded as divided into clusters, each of which corresponds to a single class, generation and capacity of an iPod in a specific quarter during the data period.

Dr. Burtis does not explain why she decided to define clusters in this way. In fact, these clusters bear no relationship to the clustering problem in econometrics. The entering assumption of clustering models is that the individuals that are represented in the data can be divided into groups that are affected by common factors. "A cluster sample is typically a cross-section on individuals… where each individual is part of a cluster."[7] The individuals in the Apple transaction data are resellers – distributors and retailers who sell Apple iPods. Except for the puzzling and still unexplained observations for customers who made very few purchases, most Apple customers appear in many (perhaps all) clusters. The data are *not* analogous to test scores of students from different classrooms. Likewise, on the supply side of the transaction, the seller always is Apple – the clusters do not represent different individual sellers.

---

[7] Wooldridge, 2002, *op. cit.*, p. 229.

The inappropriateness of Dr. Burtis's choice of clusters is most apparent in the decision to separate observations by time period. The necessary condition for a correction for clustering to be useful is that strictly "within-cluster correlation" is "substantial, which means the usual OLS standard errors can be very misleading."[8] There is no plausible reason to believe that a distinct group-specific effect influences transaction prices for a given class, generation and capacity of iPod in two adjacent quarters. Neither the seller nor the product changes between quarters. For the most part the identity of the buyers does not change as well. There is no basis for assuming that two clusters that are adjacent in time but otherwise represent sales of the same iPod are substantially affected by different common group-level effects. Dr. Burtis has not identified any source of an unobserved cluster effect that applies differently to each cluster as she defines them.

A second problem is that clustering is a problem of small samples. Assume that several clusters are subjected to the same common treatment effect, but, as is required for cluster analysis to be useful, each cluster is affected by a distinct group-level common variable that is unobserved. In this case, cluster indicator variables will account for the cluster-specific effects, with the efficacy of the cluster dummies in dealing with the cluster problem rising as the number of clusters increases. The number of clusters identified by Dr. Burtis is in the hundreds, which is far more than the number that econometricians normally would regard as creating a potential problem.[9]

---

[8] Wooldridge, 2003, *op. cit.*, p. 134.

[9] Angrist and Pischke, *op. cit*, whimsically state that 42 is the magic number of clusters that is sufficient to stop worrying about the distribution of errors. Of course, no magic solution exists, but the effects of violating the standard assumptions about the distribution of errors declines as the number of clusters increases.

In this case, one can also have statistical problems if the number of observations in each cluster differs. Substantial disparity in sample sizes among groups will affect the efficiency of the estimate of a cluster effect and cause heteroskedasticity across groups. But in this case, the number of observations in each of Dr. Burtis's clusters – the total number of transactions of a class, generation and capacity of iPod in one quarter – also is large. As a result, the impact of heteroskedasticity is small. With large sample sizes within clusters, the mean value of the dependent variable within each cluster is a very precise estimate of the true mean, regardless of whether the error terms in the observations in each cluster have the same variance.[10]

Dr. Burtis also does not identify the treatment effect that is the focus of her cluster analysis. If the relevant treatment effect is the release of iTunes 7.0, then all of Dr. Burtis's hypothesized clusters that occur after the introduction of iTunes 7.0 were commonly affected by its introduction. The issue is whether the estimated magnitude and statistical significance of the treatment effect are influenced by clustering.

One underlying factor that gives rise to the clustering problem is unobserved influences on outcomes at the group level. "Observations within a cluster are thought to be correlated as a result of an unobserved cluster effect."[11] Another problem with Dr. Burtis's analysis is now apparent: the regressions in the *Noll Reply* and the *Noll Supplement* contain variables to measure within-cluster effects separately from the measurement of the treatment effect.

Equations (1) and (2) are regressions in which the treatment is an independent variable, but neither indicator variables for the clusters nor independent variables that

---

[10] Wooldridge, 2003, *op. cit,* p. 136.

[11] Wooldridge, 2002, *op. cit.*, p. 229.

might have a common effect within a cluster enter the regression. By comparison, the regressions reported in the *Noll Reply* and the *Noll Supplement* include indicator variables for the clusters, other characteristics of products (e.g., cost), and separate indicator variables for treatment effects (different competitive conditions in the market). Thus, the condition for clustering to be a problem – unobserved common effects – is not present.

To illustrate the clustering problem, regressions like (1) have generated results implying that smaller class sizes cause improvements in test scores. Subsequent analysis shows that this simple model over-estimates the magnitude and statistical significance of the effect of class size because smaller class sizes tend to be found in schools in which students have wealthier, more educated parents and better teachers. If these other factors are included in a regression, the effect of class size falls substantially (some estimates are zero). Moreover, the new estimate of the class-size effect is much smaller than the lower bound of the 95 percent confidence interval on the coefficient for class size in the simple regression. This result shows that the simple regression under-estimated the standard error of the regression coefficient as well as over-estimated the value of the coefficient.

Finally, even if Dr. Burtis had some valid basis for selecting her clusters, the method that she applied to correct for clustering effects also is invalid. Dr. Burtis used the cluster command in the SURVEYREG procedure of the SAS statistical software to separate the data into clusters and to adjust the data for clustering effects.[12] This procedure is designed to deal with clustering problems from survey data. An example of this procedure that is given in the manual is a sample of the populations of municipalities in Sweden in 1975 and 1995. A random sample of five clusters that contain 32

---

[12] This procedure is described at http://support.sas.com/documentation/cdl/en/statug/ 63962/HTML/default/viewer.htm#statug_surveyreg_sect001.htm.

municipalities was drawn from 50 geographic clusters of 284 municipalities. The 1995 population was regressed on the 1975 population with and without correcting for cluster effects. This procedure has three sources of estimation problems: factors that cause population growth to differ among regions (clusters) are excluded; a sampling error arises because only five clusters with 32 municipalities were included from a population of 50 clusters and 284 municipalities; and the variance of within-cluster population estimates differs among clusters because the number of municipalities in the clusters differed. The purpose of the clustering procedure is to adjust the estimates for these factors. The adjustment caused no change in the estimated population growth rate, but caused a 20 percent increase in the estimated standard error of this coefficient.

The important point to emphasize is that *none* of the problems giving rise to a clustering adjustment is present in the iPod transactions data. First, variables to account for differences among clusters were not taken into account in the regression on Swedish municipal populations, but were included in the regressions on transactions prices. Second, the regressions on iPod transactions were not a sample of types of iPods, but included all transactions for all types, whereas the Swedish regression used only a sample of regions. Thus, the iPod data require no correction to adjust for sampling. Third, the sample sizes within clusters in the Swedish example were very small (an average of six observations per cluster), whereas the number of observations on transactions for each type of iPod was large. In short, Dr. Burtis has applied a procedure for dealing with survey data in which the sample is small compared to the underlying population to a data set that does not have any of the traditional problems of sample survey data.

The final question is what harm can arise from using, as Dr. Burtis does, an

inappropriate technique for adjusting the data to a data set that does not fit the conditions that would make the adjustment appropriate. The problem is that if there is no clustering effect, the standard procedure for "improving" the estimates of the standard errors actually makes matters worse by causing an upward bias in the estimates of the standard errors of the regression coefficients.[13] For this reason, Dr. Burtis's decision to apply cluster adjustments to a data set that does not actually contain clusters and that does not have a problem of confounding unobserved effects of iPod models with the relevant treatment effect (the introduction of iTunes 7.0) is not only unhelpful, but likely to cause more harm than good in the quality of the regression estimates.

### Alleged Inconsistencies

According to *Apple's Response* (pp. 2-4), in my deposition I admitted that the regression that was proposed in my declarations of March 28, 2011, and July 18, 2011, were unreliable and made statements that were inconsistent with the conclusions in these declarations. Here I show that these alleged admissions and inconsistencies do not exist. Moreover, I show that hypothetical problems raised by Apple, if they existed, would be solved by making changes to the regression model that I presented. The model that remains would still use the same hedonic approach with mostly the same variables, and would yield a formula for calculating damages that was common among class members. None of these hypothetical problems suggests that a valid damage model is impossible or that Apple's conduct had individualized effects on iPod prices paid by direct purchasers that cannot be accounted for in a regression analysis.

---

[13] Angrist and Pischke, *op. cit.*, pp. 293-308.

*Overview of Alleged Inconsistencies*

The supposed inconsistency between my reports and my deposition testimony is as follows.  In my reports, I state that the regressions are precisely estimated in that the equations explain virtually all of the variation in the price of iPods and that the standard errors of estimate of the coefficients are small, indicating that confidence intervals – the values that collectively are 95 percent likely to include the true value – are tiny compared to the estimated coefficient.  The alleged inconsistency in my deposition is that I testified that I did not draw causal inferences about the effect of Harmony and iTunes 4.7 on iPod prices because I agreed that the regression was unreliable.

The source of Apple's allegation of inconsistency is that, when asked, I did not offer conclusions on the merits of plaintiffs' allegations about liability and damages.  My assignment was to show that economic analysis that is predominantly common to class members could be used to prove liability and damages.  A valid test for proving the feasibility of a method to prove anticompetitive harm and damages is to show that price variations among iPod models can be explained in a hedonic price regression that includes variables for competitive conditions in the market.[14]  One of the factors that could affect competitive conditions is Apple's conduct in creating and maintaining a proprietary system for storing and playing audio files that are downloaded from the iTunes Music Store (iTMS, later called iTunes Store [iTS]) and its competitors.

Regardless of whether creating and maintaining a proprietary system is

---

[14]  Hedonic price regressions are accepted and extensively used in economics, including in studies of information technology.  For example, see P. D. Chwelos, E. R. Berndt and I. M. Cockburn, "Faster, Smaller, Cheaper:  An Hedonic Price Analysis of PDAs," *Applied Economics* Vol. 40, No. 22-24 (November-December 2008), pp. 2839-56.

anticompetitive, an econometric pricing model can measure the effects of Apple's conduct in creating and maintaining such a system. Apple's proprietary system prevents owners of other portable digital media players from using files that were obtained from iTMS/iTS and owners of iPod owners from using files that were obtained from other Internet vendors of audio files. From an econometric pricing model alone, one can not conclude anything about whether the measured effects indicate anticompetitive harm and damages. These are determined by legal principles that are beyond my expertise and by proving liability, which includes undertaking the economic analysis that was described in my prior expert reports. For purposes of carrying out my analysis, I assumed that the allegations of the plaintiffs are true; however, I did not prove them, and until the allegations are proved, I cannot make causal inferences from my regression analysis about anticompetitive harm and damages.

*Apple's Examples*

*Apple's Response* contains a list of statements in my deposition in which, according to Apple, I admit that my regression analysis is unreliable. Dr. Burtis repeats the same claim, stating (p. 5): "At his deposition, Professor Noll testified that his earlier preliminary regression analysis with respect to iTunes 4.7 was unreliable, incomplete, had omitted variables, may be biased, may be affected by spurious correlation, did not take Apple's pricing strategy into account, and should not be used to draw any inferences about issues fundamental to the case, such as the price effect of the launch of iTS, the entry of Harmony, or the disabling of Harmony."

I have read all of the passages in my deposition that are cited in *Apple's Response*

as examples of inconsistencies or admissions that my regression analysis was unreliable. The issue raised by Apple is whether the conclusions in the *Noll Reply* and *Noll Supplement* are consistent with statements in my deposition that not all possible specifications and econometric tests were tried. The answers that I gave to questions about econometric problems that might be present in the data were to re-specify the equation or to make a correction in the data.

In most cases, these approaches had not been tried. Nearly all of these questions discuss possible omitted variables or possible violations of the assumption that the errors in the observations were independent and drawn from the same distribution. As discussed in the preceding sections, many of these questions were based on assumptions about Apple's transactions data that are not true, so that re-estimation to take these factors into account is unnecessary.

Two of Apple's examples of alleged admissions and inconsistencies pertain to whether the effect of the introduction of Harmony on iPod prices that is estimated from the equation is incorrect because the price changes near the date that Harmony was launched were due to other reasons. My answers state that product characteristics and market conditions that explain prices are included in the equation. When asked to assume that not all such factors are included and to state what then could be done to fix the problem, I answered that the problem would have been an omitted variable and that the solution is to include that variable in the equation. This testimony is in no way inconsistent with my prior declarations or an admission of unreliability in the model.

Some questions in my deposition refer to issues in the data that had not been resolved at the time that the *Noll Reply* was written and my deposition was taken. In the

section that presents my econometric analysis, the *Noll Reply* (p. 28) states: "The analysis in this section is presented as an illustration of the viability of econometric analysis, not as an actual model for calculating damages in this case, due to continuing problems in obtaining the necessary data from Apple… A proper damage model cannot be estimated until Apple supplies more data and responds to questions about its data that remain unanswered." This statement is followed by five pages that discuss the shortcomings of the data. The *Noll Reply* also states (p. 39): "To reiterate, these results are not damage calculations due to remaining data problems. Instead, they are provisional estimates of the average effect of various market events on iPod prices over long periods of time."

By the time that the *Noll Supplement* was submitted, some data problems had been resolved. The changes in the underlying data are described on pages 2-3 of the *Noll Supplement*. The original equation is re-specified in the *Noll Supplement* to separate the effects of iTunes 4.7 and iTunes 7.0 and to reflect additional data production by Apple. The concluding statement: "The new data productions do not solve all of the problems that were listed in my prior report. Because important data problems still remain unsolved, regressions that are based on these data must be regarded as provisional."

## DIRECT SALES TO END USERS

This section reports the results of a regression analysis of Apple's data for the ████████████████████████████████████████████████████ ████████████████ This analysis is preliminary due to limitations in the data that Apple has produced. Notwithstanding these limitations, the regression demonstrates that a

hedonic price regression can explain nearly all of the variation in the prices paid by end users and so is a feasible way to prove anticompetitive impact and to calculate damages using a method that is predominantly common to class members.

***Data Issues***

The regression model for end users must be altered because ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████

Apple provides a one-year warranty on iPods, and consumers can pay to extend the warranty for a second year.[15]  If a consumer returns an iPod that is under warranty,

---

[15]  Apple's warranty is described at http://support.apple.com/kb/index?page=servicefaq&

the iPod may be repaired, replaced with an equivalent new product, or replaced with an equivalent refurbished product, or the customer may receive a refund. Another possible outcome, which can be determined through discovery, is that Apple may give a credit towards the purchase of a better iPod.

███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

---

geo=United_States&product=ipod. The warranty states: "If a hardware defect arises and a valid claim is received by Apple within the Warranty Period, at its option and to the extent permitted by law, Apple will either (1) repair the product at no charge, using new parts or refurbished parts that are equivalent to new in performance and reliability, (2) exchange the product with a product that is new or refurbished that is equivalent to new in performance and reliability and is at least functionally equivalent to the original product, or (3) refund the purchase price of the product. Apple may request that you replace defective parts with user-installable new or refurbished parts that Apple provides in fulfillment of its warranty obligation. A replacement product or part, including a user-installable part that has been installed in accordance with instructions provided by Apple, assumes the remaining warranty of the original product or ninety (90) days from the date of replacement or repair, whichever provides longer coverage for you." Warranty is at: http://images.apple.com/legal/warranty/docs/ipodisight.pdf.





*Analysis of the Data*

The results of this regression are reported in Exhibit 1. Exhibit 1A reports the baseline hedonic regression without the events or unit cost, and Exhibit 1B reports the regression that includes unit cost and the events, including the release of iTunes 7.0. The results are qualitatively quite similar to the results from the reseller regression. The regression in Exhibit 1B that includes unit cost and measures of market conditions explains almost all of the variation in prices ($R^2 = .98$) and the coefficients are generally estimated with high precision. The point estimate for the effect of iTunes 7.0 on prices is slightly less than $5. These results demonstrate that a hedonic price regression is a reliable method for producing a formula to calculate damages that is common to class members who are end users.

Again, estimated effect of the release of iTunes 7.0 in this regression cannot be interpreted as an estimate of damages, even assuming that the liability allegations of the

plaintiffs have been proved.  The results of the regression are likely to differ ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

      Nevertheless, if other elements of liability are proved, this regression, or one similar to it that is re-specified and re-estimated to reflect additional information about sales in the direct channel, constitutes a common method for providing qualitative proof of anticompetitive impact.  The coefficient on the iTunes 7.0 variable can be used to test the hypothesis that iPod prices were higher because iTunes 7.0 extended the period in which Harmony was disabled for iPod users.  Regardless of the accuracy of the point estimate of the coefficient for purposes of calculating damages, a coefficient that is positive with a high degree of statistical significance is proof that the prices of iPods were higher than otherwise would have been the case after the release of iTunes 7.0.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief. Executed on September 23, 2011, at Stanford, California.

Roger G. Noll

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 23, 2011.

s/ Bonny E. Sweeney
BONNY E. SWEENEY

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        bonnys@rgrdlaw.com

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Alexandra Senya Bernay**
  xanb@rgrdlaw.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com

- **Todd David Carpenter**
  tcarpenter@bffb.com,pjohnson@bffb.com,rcreech@bffb.com

- **Andrew S. Friedman**
  khonecker@bffb.com,rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com,winkyc@zhlaw.com

- **Roy Arie Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com

- **Carmen Anthony Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com

- **Thomas Robert Merrick**
  tmerrick@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,mlandsborough@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **George A. Riley**
  griley@omm.com,lperez@omm.com,cchiu@omm.com

- **Elaine A. Ryan**

eryan@bffb.com,nserden@bffb.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Michael Tedder Scott**
  invalidaddress@invalidaddress.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@rgrdlaw.com

- **Bonny E. Sweeney**
  bonnys@rgrdlaw.com,christinas@rgrdlaw.com,E_file_sd@rgrdlaw.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)