# Exhibit 1

**Page 233**

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                     OAKLAND DIVISION
 4
    THE APPLE iPOD iTUNES      )   Lead Case No. C 05-00037
 5  ANTI-TRUST LITIGATION      )
 6                             )
 7  _____)
 8  This Document Relates To:  )
 9  ALL ACTIONS                )
10                             )
11  _____)
12
13
14
15       CONFIDENTIAL - ATTORNEYS' EYES ONLY
16    VIDEOTAPED DEPOSITION OF KEVIN M. MURPHY, PH.D.
17                       VOLUME II
18                   January 08, 2014
19                    Phoenix, Arizona
20
21
22  Reported By:
23  Cathy A. Miccolis
24  RPR, CRR, CSR No. 50068
25  Job No. 10009198
```

**Page 234**

```
 1                    A P P E A R A N C E S
 2
 3  For the Plaintiffs:    Bonny Sweeney, Esq.
                           ROBBINS GELLER RUDMAN & DOWD, LLP
 4                         655 West Broadway
                           Suite 1900
 5                         San Diego, CA  92101
                           619.231.1058
 6                         bonnys@rgrdlaw.com
 7
 8
 9
    For the Defendant Apple, Inc.:
10                         David C. Kiernan, Esq.
                           JONES DAY
11                         555 California Street
                           26th Floor
12                         San Francisco, CA  94104
                           415.626.3939
13                         dkiernan@jonesday.com
14
15
16  Also Present:          Thomas C. Tracy, videographer
17
18
19
20
21
22
23
24
25
```

**Page 235**

```
 1                     I N D E X
 2  Witness                                         Page
 3      KEVIN M. MURPHY, Ph.D.
 4
          EXAMINATION BY MS. SWEENEY                 237
 5
 6
 7
 8              E X H I B I T S
 9  Exhibit    Description                          Page
10  Exhibit 6  Supplemental Report                   257
```

**Page 236**

```
 1         THE VIDEOTAPED DEPOSITION OF KEVIN M. MURPHY,
 2  Ph.D., VOLUME II, was continued on January 8, 2014,
 3  commencing at 9:11 a.m. at the offices of BONNETT,
 4  FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 East Camelback
 5  Road, Suite 300, Phoenix, Arizona, before CATHY MICCOLIS,
 6  a Certified Reporter in the State of Arizona.
 7
 8         THE VIDEOGRAPHER:  The time on the record is
 9  9:11 a.m.  Today's date is January 8, 2014.  My name is
10  Tom Tracy of Aptus Court Reporting.  The court reporter is
11  Cathy Miccolis of Aptus Court Reporting located at 600
12  West Broadway, Suite 300, San Diego, California 92101.
13         This begins the videotaped deposition of Kevin
14  Murphy, Volume II, testifying in the matter of the Apple
15  iPod iTunes Trust (sic) Litigation, pending in the
16  District Court of California, Oakland Division, Case
17  Number C 05-00037 YGR.  This deposition is taking place at
18  2325 East Camelback, Suite 300, Phoenix, Arizona 85016.
19         Will counsel please identify themselves,
20  starting with the plaintiffs' counsel.
21         MS. SWEENEY:  Bonny Sweeney for the plaintiffs.
22         MR. KIERNAN:  David Kiernan for Defendant
23  Apple, and Scott Murray, in-house counsel from Apple, may
24  be on the phone.
25         Scott, are you on the phone?
```

Page 237

1    Okay.  No answer.
2        THE VIDEOGRAPHER:  Thank you, Counsel.  The
3  court reporter may swear in the witness so we can proceed.
4
5              KEVIN M. MURPHY, Ph.D.,
6  having been first duly sworn to tell the truth, the whole
7  truth, and nothing but the truth, was examined and
8  testified as follows:
9
10                  EXAMINATION
11 BY MS. SWEENEY:
12    Q.   Good morning, Professor Murphy.  We have met
13 before.  My name is Bonny Sweeney.  I'm going to be taking
14 your deposition again today in the Apple case.
15        MS. SWEENEY:  Before we get started, I just
16 wanted to ask counsel for Apple a question.  So I just
17 want to make sure, you have an open telephone line.  I
18 want to know anyone who is on that line.
19        MR. KIERNAN:  There is no one else on the line.
20        MS. SWEENEY:  Okay.
21        MR. KIERNAN:  It's just an open line for Scott
22 Murray, counsel from Apple, and if he joins, he will
23 announce himself.
24        MS. SWEENEY:  Will there be any indication as
25 to when and who joins?

Page 238

1        MR. KIERNAN:  There is a -- it makes a beeping
2  sound.
3        MS. SWEENEY:  Okay.
4  BY MS. SWEENEY:
5    Q.   So Professor Murphy, you remember that I
6  deposed you once before in this matter; correct?
7    A.   Yes, I do.
8    Q.   And that was in November of 2013?
9    A.   Sounds about right, although I couldn't tell
10 you for sure.
11   Q.   And since that deposition what work have you
12 done on the Apple case?
13   A.   I have done the work that's reflected in the
14 declaration that I gave here.  I have continued to read
15 through the declarations prepared by plaintiffs' experts,
16 both Professor Noll and Professor Wooldridge, and evaluate
17 those reports and the claims that are made therein.
18   Q.   Okay.  When you say you've done the work that's
19 reflected in the declaration, are you referring to the
20 supplemental report that you submitted together with
21 Professor Topel dated December 20, 2013?
22   A.   Yes, because that was produced after our
23 earlier deposition, so when you asked me what we had
24 worked on since then, that was a component that I
25 definitely had worked on since that date.

Page 239

1    Q.   Okay.  And for the -- and we will just refer to
2  that as the supplemental Murphy and Topel report, if
3  that's okay with you.
4    A.   That's fine.
5    Q.   So with respect to the supplemental Murphy and
6  Topel report, did both you and Professor Topel write the
7  report?
8    A.   Yes, we worked on it together.
9    Q.   And how does that work when two people are
10 writing a single document in your case, how does that
11 work?
12   A.   We first talk about what it is we want to do
13 and what -- you know, what we are, what we are presenting
14 in the report.  We then set out to write that up.
15 Obviously one person at a time writes.  We don't sit next
16 to each other and write.  So one of us will take a
17 different part and work on writing that part up.  And then
18 the other one will review it, make changes, edits,
19 whatever, probably discuss it further back and forth
20 between us with writing and discussing material that's in
21 the report.
22   Q.   And you said that "each of us would take
23 different parts."  What part or parts did you have primary
24 responsibility for?
25   A.   You know, I don't really recall.  I don't

Page 240

1  recall whether I had primary responsibility for one or the
2  other.  I know I worked on the whole thing, so I don't
3  even remember which one I started with.
4    Q.   Did anyone assist you and Professor Topel in
5  writing the supplemental report?
6    A.   Yes, we had some assistance from Anita Garten
7  who we work with regularly.  And certainly in preparation
8  in terms of the tables and other things that went in
9  there, other people, Ricardo Cossa would be a primary
10 person who worked on doing a lot of the programming and
11 statistical work based on our direction that's in the
12 report.
13   Q.   Anyone else?
14   A.   There would be others.  I don't recall all the
15 people who worked on the statistical end of things.  In
16 terms of drafting the report it would be me, Professor
17 Topel, Anita Garten.  I believe other people looked at it
18 and gave us their thoughts.  That would be Ricardo Cossa
19 and Bin Chen I believe would be the other one and possibly
20 Naraj.
21   Q.   And when you and Professor Topel sat down to
22 put together the supplemental report, what were you
23 addressing in that report?
24   A.   We -- I think we state right at the beginning
25 of the report, we address some of the issues that

Page 241

1  Professor Noll brought up in his -- I don't know exactly
2  what the title of his rebuttal or his most recent report
3  that was filed after our earlier reports. So we based our
4  discussion there on the claims made by Professor Noll in
5  his report. And we focused on the topics he discussed in
6  his supplemental report or whatever the specific -- actual
7  name of it is, not back to his original report, and we
8  make reference to his original report only when it's
9  needed for context. I think this is described directly in
10 the report that we filed.
11      Q.   And in preparing the supplemental report, did
12 you or staff at CRA take any additional statistical
13 analysis?
14           MR. KIERNAN: Object to form.
15           THE WITNESS: Yes, I believe there is
16 statistical analyses presented in that report. Yes. So
17 we did do statistical analysis for purposes of that
18 report.
19 BY MS. SWEENEY:
20      Q.   Can you describe the analyses that you did?
21      A.   They are contained in the report. It mostly
22 consisted of variations of the regression model that
23 Professor Noll estimated, many of the variations we had
24 done before. Although since he had changed the
25 specification in some ways, it was a little different.

Page 242

1  But the basic take of what we did there in terms of
2  redoing his regression analysis was very similar to what
3  we had done before. It just simply worked with his latest
4  specification rather than the specification that was in
5  his earlier report. I think the substance of what we
6  discussed there is very similar. We went on and because
7  he had changed the way he did his weighting and
8  calculation of his standard errors, we went and did some
9  new work using the same methodology to illustrate that
10 there was still a correlation problem with his residuals
11 from his regression. That would be different than what we
12 had in the earlier report, not in the sense that the
13 methodology is different, is because he had done something
14 different. The specifics of the results would be somewhat
15 different, although the basic conclusion would be the same
16 that he continues to have a rather severe problem with
17 correlation between different observations in his dataset
18 that causes him to greatly understate the standard errors
19 of his estimates.
20      Q.   So when you say you conducted some new work
21 using the same methodology that you had used in your
22 previous reports, and when I say reports here I'm
23 referring to the earlier Murphy and Topel reports, am I
24 correct in sort of rephrasing to say that you didn't
25 conduct any new tests, but you just used the different

Page 243

1  data that were in the Noll rebuttal report?
2       A.   No, I think we did -- I think we did some
3  things that were different. I think the basic thrust of
4  what we did was very similar. I believe we did some
5  different things in this, in this report than we did in
6  the other. They are not inconsistent with what we did
7  before, but we did add some to that. But the biggest
8  difference, particularly in terms of the regression
9  models, would be the basis for those, would have been his
10 new regression specification rather than the old one.
11      Q.   So what are the different things that you did?
12      A.   You know, I don't recall each one of them
13 individually so there may be some that I leave out. For
14 example, I know we did some F-tests on various blocks of
15 coefficients in this draft that we had not done in the
16 earlier one. We did I think two different versions of
17 clustering in this particular report that we hadn't -- we
18 had done just the single version before. We also examined
19 the correlation of the residuals somewhat further from
20 what we had done in the previous example. So we had done
21 a few things different. I don't recall all of them off
22 the top of my head.
23      Q.   So you said you did F-tests on blocks of
24 coefficients. You hadn't done any F-tests prior to this
25 supplemental report?

Page 244

1       A.   I think -- I don't know if we did some F-tests
2  or not. I know we did some specific ones here I believe
3  than we did before.
4       Q.   And are those reflected in the report?
5       A.   Yes, they are reflected in I believe Table 5.
6  It's JT-5 or something like that is the table that has
7  those.
8       Q.   And then you said you did two different
9  versions of clustering, whereas in your prior report you'd
10 only done one different version of clustering. What do
11 you mean by that?
12      A.   In this one we did I believe clustering by
13 family as opposed to by family quarter. I think if I
14 recall correctly, that's -- I don't want to -- it's either
15 JT-3 or JT-4. I can't remember which one, but we did that
16 in this report.
17      Q.   And did you also do clustering by family
18 quarter?
19      A.   Yes. That's a primary thing, but that's what
20 we had done before, so that wouldn't be different. That
21 was how we had done it previously.
22      Q.   And when you say "family," what are you
23 referring to?
24      A.   It's the iPod family, which is a categorization
25 that Apple uses to distinguish different models of their

**Page 245**

1 iPod, so it might be like an iPod mini, second generation,
2 given quality level, say good, better or best, one of
3 those.
4    Q.  And then you said that you also examined
5 correlation of residuals in a way that you hadn't before.
6 Can you explain that a little more?
7    A.  I don't recall everything that we put -- that's
8 in the report, so I just know that we redid that analysis
9 based on his new results, and I'm not sure everything we
10 did there is exactly the same as what we did before. I'd
11 have to go back and look at the report to tell you.
12    Q.  You also testified that you evaluated the
13 plaintiffs' experts' declarations, including the
14 Wooldridge report. Have you done any subsequent
15 statistical analysis since reviewing the Wooldridge
16 report?
17    A.  Yes, I have. I have looked at the data to
18 evaluate whether his claims are correct or not, and I
19 think the data overwhelmingly say that his claims are
20 incorrect.
21    Q.  And when you say you looked at the data, what
22 data did you look at?
23    A.  The data based on Professor Noll's regression
24 data in his regression model.
25    Q.  And do you have -- do you anticipate doing any

**Page 246**

1 further writing of reports or presenting of analyses that
2 will reflect your conclusions regarding Professor
3 Wooldridge's analysis?
4    MR. KIERNAN: And I'm going to object and
5 instruct the witness not to answer any, to the extent it
6 reveals any communication or requests from counsel. So
7 I'm instructing you not to answer the question to the
8 extent that it would reveal requests from counsel.
9 BY MS. SWEENEY:
10    Q.  Are you going to answer the question?
11    A.  I have been instructed not to answer, so...
12    Q.  Well, let's break that up a little bit. So the
13 stipulation in this case says that certain categories of
14 data, information, documents and materials need not be
15 produced, and that includes written correspondence between
16 an expert and the attorneys, notes taken and prepared by
17 or for an expert in connection with the matter, including
18 notes of conversations with the attorneys, but then the
19 stipulation goes on to say, and what I was paraphrasing
20 was in paragraph 3 of the stipulation, goes on to say
21 paragraph 3 -- excuse me, paragraph 5 says, nothing in
22 paragraph 3 however shall be construed to prevent
23 substantive deposition questions with respect to
24 alternative theories, methodologies, variables, data,
25 production of materials or assumptions that the expert may

**Page 247**

1 have considered in preparing his or her report. And
2 paragraph 6 of the stipulation order should not be
3 construed to preclude reasonable questions at deposition
4 going to the expert's compensation, hours expended in
5 preparing his or her report and testimony and frequency
6 and duration of meetings with counsel.
7    So what I'm getting at is I think that counsel
8 for Apple has construed overly broadly the restrictions of
9 the stipulation. So let me ask you again --
10    MR. KIERNAN: Bonny?
11    MS. SWEENEY: Yeah.
12    MR. KIERNAN: I'm happy for you to ask him
13 about the categories in 5 or 6, but your question was
14 whether or not he has been asked to or that he will submit
15 any additional writing in response to either Drs. Noll's
16 or Wooldridge which is not covered by Categories 5 or 6.
17 So you can ask him about 5 or 6.
18    MS. SWEENEY: Let me ask you, David, is there
19 anything in the stipulation that prohibits oral questions
20 at deposition about the expert's discussions with the
21 attorneys? I see it talks about documents. I don't see
22 anything that says I can't ask him what the lawyers asked
23 him to do. If you can point that out to me, maybe I'm
24 missing it, but I don't see it.
25    MR. KIERNAN: Well, I will pull out previous

**Page 248**

1 objections and instructions that you gave Dr. Noll,
2 relying upon --
3    MS. SWEENEY: Good luck with that. I never
4 stopped him from answering those kind of questions.
5    MR. KIERNAN: Are you going to continue to
6 interrupt me?
7    MS. SWEENEY: No. Go ahead. Let's create this
8 record.
9    MR. KIERNAN: Okay.
10    -- instructing him not to answer questions
11 about communications between counsel and himself. And Xan
12 Bernay also instructed Dr. Martin not to answer any
13 questions about communications that she had or that you
14 had with Dr. Martin --
15    MS. SWEENEY: Well --
16    MR. KIERNAN: -- based on the stipulation.
17    MS. SWEENEY: Are you done? I'm sorry. I
18 don't want to interrupt you.
19    MR. KIERNAN: I am done.
20    MS. SWEENEY: I don't believe that that's a
21 proper interpretation of the stipulation, and to the
22 extent you let that pass, I can't explain that. I'm sure
23 I never instructed Professor Noll not to answer your
24 questions on that basis. And if you can point me to some
25 deposition testimony, I would be very, very surprised

**Page 249**

1  because that is just completely false. So if you're
2  instructing the witness not to answer, that is an improper
3  instruction, and I will take it to the court. So let me
4  make sure the record is clear on this.
5  BY MS. SWEENEY:
6      Q.  Professor Murr- -- strike that.
7      Professor Murphy, are you on the advice of
8  counsel for Apple refusing to answer my question about
9  communications that you had with Apple's counsel about
10 work that you have performed or will perform in this
11 matter?
12     A.  Yeah, I'm taking the advice of the counsel for
13 Apple. Since I'm not a lawyer, I can't tell you all the
14 interpretation, and I can -- best I can do is go with the
15 advice of counsel.
16     Q.  So you're refusing to answer any question that
17 I ask about instructions given to you by counsel for
18 Apple?
19     A.  If that's what I'm instructed to do by counsel
20 for Apple, that's presumably what I should do.
21     Q.  So if counsel for Apple has instructed you or
22 provided information to you that you've relied on, are you
23 going to refuse to answer questions about that based on
24 the advice of counsel?
25     MR. KIERNAN: Objection. Object to form.

**Page 250**

1      THE WITNESS: I --
2      MR. KIERNAN: And that was not the instruction
3  I gave.
4      THE WITNESS: -- will do my best to answer your
5  questions. If there are specific things that I'm not
6  supposed to answer because they are covered by
7  stipulation, the best I can do to comply with the desires
8  of the court I see is to try to follow those directions to
9  the best I can, and for that I need to rely on counsel.
10     MR. KIERNAN: And just so the record is clear,
11 I have not made a broad objection as you're stating --
12 that you're suggesting that Dr. Murphy -- this should go
13 question by question, and if there is a question you want
14 to ask him about whatever you want to ask him, then we
15 will go question by question, and if I feel that it's
16 violating or outside the stipulation, I will assert the
17 objection and instruct the witness not to answer. If I
18 feel that it's not covered by the stipulation, then I
19 won't assert the objection.
20     MS. SWEENEY: Well, this is an issue on which
21 we strongly disagree. I think that we will just see how
22 it goes, but this is something we will probably have to
23 raise with the Court.
24 BY MS. SWEENEY:
25     Q.  Professor Murphy, what additional work do you

**Page 251**

1  anticipate doing in this matter?
2      A.  I anticipate continuing my work, evaluating the
3  claims made by Professor Noll and by Professor Wooldridge,
4  that's ongoing, and I can -- I would, I would presume that
5  I would continue to do that in the coming days and weeks
6  and however long it takes.
7      Q.  Are you writing a report to be submitted next
8  week in opposition to plaintiffs' motion to exclude
9  portions of your testimony and Professor Topel's
10 testimony?
11     A.  I don't know whether there is going to be a
12 report submitted or not. I -- I know I'm continuing to do
13 work. And there is a possibility that that would lead to
14 a report. I would understand, but I can't tell you
15 whether there is going to be one submitted or not.
16 That's -- I'm just going to do my work and continue to try
17 to evaluate the claims of plaintiffs' experts.
18     Q.  Did you receive input from Apple's counsel in
19 your report, your supplemental report?
20     A.  What do you mean by received input from them?
21 They gave -- they gave us comments. That's pretty much
22 standard on drafts of the report. I don't know. Usually
23 that's covered by stipulation, the specifics of those
24 comments, but again, you guys are the lawyers, so, yes, we
25 did discuss the report and the contents of the report with

**Page 252**

1  counsel.
2      Q.  Did you adopt the suggestions of Apple's
3  counsel in your supplemental report?
4      A.  Not really.
5      Q.  Did they write any of the report, that is,
6  Apple's counsel?
7      A.  No.
8      Q.  Did you write or did Professor Topel write all
9  of the supplemental report?
10     A.  No, there would have been help from -- I
11 believe Anita Garten helped. Ricardo Cossa maybe did a
12 little bit. I know he provided some comments and edits,
13 but I would say we wrote the report between Bob and
14 myself. Some of the cites and footnotes were filled in by
15 people. We would say cite to a particular document or
16 particular book or chapter. We wouldn't necessarily know
17 the exact title it would be, you know, cite to Angrist and
18 Pischke. Somebody would have to fill it in with the
19 entire Angrist and Pischke cite. So if you consider that
20 writing a report, other people filled in the rest of those
21 footnotes and things like that. But the substance was
22 written by Bob and myself.
23     Q.  How long -- strike that.
24     How many hours did you spend preparing the
25 supplemental report?

Page 253

1   A.   I don't recall.
2   Q.   More than 10?
3   A.   Yeah, it would have been more than 10.
4   Q.   More than 100?
5   A.   It would have been less than 100.
6   Q.   Less than 50?
7   A.   I would assume so.
8   Q.   Less than 40?
9   A.   That I -- now we are getting down to -- my
10  level of resolution I think is about that level.
11  Q.   Do you know how much time Professor Topel spent
12  on it?
13  A.   I do not.  You'd have to ask him.
14  Q.   Is there anything today that you would like to
15  revise or correct in your supplemental report?
16  A.   Nothing that specifically I'm aware of, no.
17  Q.   Is there anything in your prior report that you
18  want to correct or revise?
19  A.   No, not that I'm aware of.
20  Q.   Have you reviewed the Wooldridge deposition
21  transcript?
22  A.   I skimmed through it.  I just got it yesterday,
23  and I was busy at school with things yesterday, so I only
24  had a chance to skim through it.
25  Q.   And did you review the deposition transcript

Page 254

1   from Professor Noll's deposition?
2   A.   I did.  I did, but that was a while back.
3   Q.   Can you summarize for me the opinions that are
4   stated in your supplemental report?
5   A.   Probably not all of them.  I mean, I think
6   there is some basic ones.  One is I think the first and
7   foremost is Professor Noll has continued to overstate the
8   significance of his results by un -- by failing to account
9   for the strong degree of correlation across transactions,
10  and that's a very substantial error.  It results in him
11  calculating standard errors that are roughly 100 times too
12  small.  I mean, not always exactly that.  Sometimes a lot
13  more; sometimes less.  But it's a gross misestimate of the
14  precision of his estimates.
15       That the -- his reasons for not taking account
16  of the correlation are invalid, and we go through each of
17  those in the report.  The residuals at the family by
18  quarter level are demonstrably correlated to a high
19  degree.  The fact that he has all the transactions,
20  actually nearly -- or nearly all the transactions, what he
21  calls it's a population rather than a sample doesn't
22  diminish the need to account for the correlation that's
23  present in the data that he has.
24       That he continues to have omitted variables in
25  his regression, that important determinants of iPod

Page 255

1   pricing that he leaves out which biases his results and
2   causes him to misestimate the impact of any of the iTunes
3   7.0 release.  He continues to use the wrong but-for world
4   and the wrong specification of the impact of iTunes 7 on
5   iPod prices.
6        The basic methodology he continues to use is
7   greatly flawed because of the fact that again his
8   estimates are not isolating the impact of the challenged
9   conduct, that simultaneous with the release of iTunes 7
10  other things in the marketplace changed, including the
11  models being offered by Apple, the characteristics of
12  those products, and rendering his analysis sort of invalid
13  conceptually.  Those are the ones I remember.  There might
14  be some more conclusions, but those are the basic ones.
15  Q.   And are the bases for all of the opinions that
16  you've just summarized set forth in your supplemental
17  report?
18  A.   Yes.  I think we tried to summarize the bases
19  for those opinions at the time we wrote the report, yes.
20  Q.   Now, you said that Professor Noll has continued
21  to overstate the significance of his results, and you say
22  that there is a strong degree of correlation.  Did you
23  rely upon any economic literature other than the
24  literature you cited in your first report to support your
25  conclusions regarding the clustering?

Page 256

1   A.   I don't recall what all we cited in our first
2   report.  There is certainly a broad economic literature
3   that supports what we put forward there.  I would say what
4   we cite here is certainly you could find other cites that
5   would echo the same points.  The articles we have cited,
6   you know, sort of Cameron and Miller and Donald and Lang
7   and Angrist and Pischke and the Hansen, Chris Hansen's
8   work, I mean a number of things that we have referred to
9   and looked at all support the same thing.
10       If you want to see more, I think Cameron and
11  Miller have a pretty extensive discussion of the
12  underlying further literature that you might want to look
13  at if you wanted more literature, but we didn't cite those
14  directly.
15  Q.   Do you consider yourself an expert on
16  clustering issues?
17  A.   I would consider myself an expert at applied
18  econometrics generally and in particular methods to be
19  used for these type of data.  I have spent my career
20  analyzing aggregate -- more aggregated phenomena using
21  microdata, so this is an area I'm very familiar with.  So
22  it's something that I would say, yeah, I would consider
23  myself very well versed in.
24  Q.   Have you ever written any articles that have
25  been published specifically relating to clustering?

Page 257

1    A.   I don't think I published any specific articles
2  on clustering.  I have certainly talked about how you use
3  data of this type where you have market-level phenomena
4  you're interested in and micro-level data used to estimate
5  it.
6         I did a lot of well-cited work on the wage
7  structure, which we made exactly the point that we are
8  talking about here, that even though you might have
9  hundreds of thousands of observations from underlying
10 datasets, when it comes to estimating the determinants of
11 market prices, you have much less data because in fact you
12 only have data on a limited number of market equilibrium.
13 And that's exactly the same point that's being made here.
14 And my work in that area goes back probably almost 30
15 years.
16     Q.   Now, why don't we go ahead and mark the
17 supplemental report as Murphy Exhibit 6, because there
18 were five exhibits marked in your prior deposition.
19         (Exhibit 6 marked.)
20     Q.   Now, you said that you and Professor Topel
21 jointly wrote the report; correct?
22     A.   That's correct.
23     Q.   For those parts that you didn't yourself write,
24 do you agree with them?
25     A.   Yeah, I mean, I worked on every part of the

Page 258

1  report.  I mean, we didn't like write them and then glue
2  them together and send them in.  We worked on them back
3  and forth.  We talked about it before we ever wrote
4  anything.  Even if one of us wrote the paragraph the first
5  time, the other one went through it, and we ended up with
6  something we were both satisfied with.
7      Q.   So you agree with all the statements in the
8  report; is that correct?
9      A.   To the best of my knowledge, yes.
10     Q.   In paragraph 5.a., you say that Professor Noll
11 simply ignores the clustering problem.  In your opinion
12 did Professor (sic) in his rebuttal --
13         MR. KIERNAN:  Page 2.
14 BY MS. SWEENEY:
15     Q.   -- report ignore the clustering problem?



Page 259

1      Q.   Professor Noll disagrees with you that there is
2  a clustering problem; isn't that correct?
3      A.   Yes, but he disagrees by just denying it, not
4  by presenting evidence that there is no correlation.  He
5  doesn't -- he doesn't calculate the correlation and say,
6  look, the correlation is low.  He never -- he never does
7  that.  I mean, we present a graphical representation of
8  just how highly correlated the residuals are and uses --
9  you know, he just asserts things without really doing any
10 analysis.
11     Q.   That's interesting.
12         Did you perform any cluster analyses that are
13 not presented in your exhibits?
14     A.   What does that mean?
15     Q.   Well, you and your staff at CRA performed some
16 analyses on the clusters; correct?
17     A.   We have continued to work on the clustering
18 analysis.  Well, it's actually not really the clustering
19 analysis.  Analysis of Professor Noll's model and analysis
20 of the error terms in that model and their properties.  So
21 we have continued to work on that subsequent to the
22 report.  Is that what you're asking?
23     Q.   No.  What I want to know is, did you perform
24 any analyses that relate to your opinion regarding
25 clustering that are not presented in the tables in your

Page 260

1  supplemental report?
2      A.   Are you referring to analyses done before the
3  report or after the report?
4      Q.   Let's start with before the report.
5      A.   Yeah, I'm sure we did additional analyses that
6  we are not relying on.  I don't -- there is nothing that
7  would be inconsistent with what we have done there.  There
8  are often many ways to do things, and when it comes time
9  to write a report, you settle on one that you think
10 accurately what you did.  But nothing that I'm relying on,
11 no.
12     Q.   And is that true also for your initial report,
13 that is, that you conducted certain analyses relating to
14 your clustering opinions that are not reflected in the
15 tables and exhibits attached to your report?
16         MR. KIERNAN:  Objection; argumentative.
17         THE WITNESS:  Nothing that I would be relying
18 on.
19 BY MS. SWEENEY:
20     Q.   But nonetheless, is it your testimony, let's
21 start with the supplemental report, that those analyses
22 that are not reflected in your exhibits in which you're
23 not relying on are nonetheless consistent with your
24 opinions?
25     A.   Yes, I would say the analysis we have done is

65

[redacted] And we settled on quarter
because we thought it represented a reasonable compromise
between taking account of that correlation while still
allowing for some independence over time. I think that's
the best justification you have for focusing on quarters.
If somebody wanted to aggregate further, I think that
could be reasonable. I think aggregating less is going in
the wrong direction. I think I would continue to stand by
that. And certainly doing what Professor Noll did because
it neither aggregates over time nor across transactions at
a point in time doesn't make any sense.
BY MS. SWEENEY:
   Q. So you think it's going in the wrong direction
to cluster at any shorter time interval, but you don't
know in fact whether your staff at CRA conducted the
clustering analysis by week; correct?
       MR. KIERNAN: Object to form.
       THE WITNESS: I don't believe they did because
I didn't ask them to do that because I wouldn't have
thought going in that direction made much sense. It's not
something that would tell -- economics or the data or the

Page 266

documents or anything in this case would tell me to move
in that direction. So that's not something I would have
instructed them to do, at least as I recall. I can't tell
you what all -- anything they did, but not that I know of.
It's the best answer I can give.
BY MS. SWEENEY:
   Q. You testified a little bit ago about the
difference that Professor Noll asserted between samples of
data and the population of data. Are you familiar with
any other instance in which the kind of adjustment that
you performed with respect to the standard errors was used
to adjust standard errors for clustering when the dataset
was a population rather than a sample?
   A. Yeah. I mean, for example, in Professor
Wooldridge's work that he did on unilateral divorce, the
sample -- the data on divorce there are population. They
are the divorces that occurred in each state from vital
statistics, which is a population, not a, not a sample.
The --
   Q. Anything else?
   A. Yeah. I mean, in like price-fixing cases and
things like that where you have all the transactions for a
company, you don't -- and you're doing a price analysis,
you typically don't treat all the prices as independent
because they are determined by common factors. You would

Page 267

allow for clustering.
       Or when people analyze -- go back to the
original work of Fama and McBeth. They have -- you know,
they have all the stock market data. They have all the
closing prices on a daily basis for all the stocks in
their universe. They don't have a sample of dates. They
got every date, and they have got, you know, all the
stocks in their universe. They didn't draw -- they didn't
draw a random sample. They had that. And Fama and
McBeth, they essentially did original work actually kind
of related to clustering. They used a different
methodology, but they were concerned with exactly that
same phenomena.
   Q. Anything else?
   A. I mean, there is bunches of them, but there is
nothing, there is nothing unusual about that, about doing
it.
       I think Professor Wooldridge in his textbook
talks about the Michigan teachers and clustering in the
context of --
       (A brief interruption.)
   A. So he has one on Michigan teachers I believe in
his textbook where again he is dealing essentially with
population data. So yeah, it's not hard to find examples
of that.

Page 268

   Q. So I asked you whether you tested weekly -- I
asked about weekly. Did I ask about monthly clusters?
Did you conduct that analysis?
   A. You know, I don't recall whether we did or not.
It's not something I remember. We might have done that as
a sensitivity check back when. It's not something I have
done recently. Might have done that before the first
report, but I don't recall one way or the other.
   Q. But if you --
   A. It's not relying on it for sure.
   Q. If you did do that, it's not reflected in the
report or its exhibits or attachments; correct?
   A. Yeah, because I wasn't relying on that. I
don't recall doing it specifically, but I don't want to
say something that's not true, so best I can say is I
don't recall.
   Q. So you don't know whether if you created
clusters at the weekly level, for example, the results
would be statistically significant?
   A. Yeah, but --
       MR. KIERNAN: Object to form.
       THE WITNESS: But if you do that and find the
standard errors fall significantly, it's mostly because of
the fact that you have inappropriately ignored correlation
that exists in the data. So that's what I'm saying. It's

Page 277

1  that if you wanted to. You could do lots of different
2  things. But the whole point is his analysis is not valid.
3  He assumes that they are independent regardless of which
4  one you did.
5  BY MS. SWEENEY:
6      Q.   If you have a situation where there are no
7  clusters and you do this kind of clustering analysis, is
8  that harmless error in your view?
9      A.   You know, I'm going to say, I think it's, I
10 think it's -- if you suspect there is correlation, which
11 we have strong reason to do in this case, economics tells
12 us there will be correlation, the data tells us there is
13 correlation, the documents in this case tells us there is
14 going to be correlation, there is just so overwhelming
15 prior that there will be correlation, then I think it's
16 proper to allow for that correlation. I think that is the
17 only prudent approach. To just bury your head in the sand
18 and ignore the fact that they are correlated as Professor
19 Noll does doesn't make any sense.
20     Q.   I'm going to move to strike as nonresponsive,
21 and I'm going to ask the court reporter to read my
22 question back.
23     MR. KIERNAN: I oppose the motion.
24     (Record read.)
25     THE WITNESS: I don't want to -- here is what I

Page 278

1  wanted to say is, it's -- the right way to proceed is to
2  allow for the correlation if you think it's going to be
3  there. You wouldn't want to allow for correlation if you
4  had no reason to believe it were there. That doesn't make
5  a whole lot of sense, but when economics tells you there
6  is going to be correlation, when the facts of the case
7  tells you there is going to be correlation, you should
8  allow for that correlation.
9      Now, is it harmless? I should say it's the
10 opposite of harmless. It's necessary; it's needed. And
11 there is no reason to believe there isn't correlation in
12 this case. You would expect that there would be
13 correlation.
14 BY MS. SWEENEY:
15     Q.   Okay. Well, listen to my question. If you
16 have a case where there is no reason to believe there is
17 correlation and you conduct this kind of clustering, is
18 that harmless error in your view?
19     MR. KIERNAN: Objection; asked and answered.
20     THE WITNESS: I would say it will not -- if we
21 do it -- I don't want to apply it to an abstract world
22 other than this one. In the context like this given the
23 number of clusters that we have, which is upwards of 300
24 in one case and upwards of 400 in the other case, and
25 given the nature of the data that we have here, I would

Page 279

1  say there is very little downside to allowing for that
2  clustering, and the reason is it doesn't create a bias.
3  It doesn't bias your standard errors upward. If anything,
4  it's going to tend to make your standard errors a little
5  bit smaller is what the literature suggests. It's not
6  generally going to lead to an upward bias in your standard
7  errors.
8  BY MS. SWEENEY:
9      Q.   Now, you added a number of characteristics to
10 Professor Noll's regression; correct?
11     A.   Yes, this -- that's not new to this report. We
12 had done that in the previous report as well.
13     Q.   And are the -- where in your report are those
14 characteristics listed?
15     A.   Well, they are listed in the regression tables
16 themselves.
17     Q.   Okay. Point to me a particular table that --
18     A.   Like just go to -- well, might as well just
19 start at the beginning. Go to Table 1. They are listed
20 at the bottom of the table. Well, not the very bottom,
21 but the bottom of the coefficient portion. See where
22 there is like a white space in the first three columns and
23 then there is numbers in the last two columns? Those
24 would be the additional characteristics.
25     Q.   So the first one is HP_OEM?

Page 280

1      A.   Correct. And it runs down to
2  log_recharge_hours.
3      Q.   What is HP_OEM?
4      A.   That was the specific iPods that were I believe
5  HP-branded at one point in time, so they were a little bit
6  different. So that allows for it was an OEM iPod as
7  opposed to an Apple iPod. That sort of refers to some
8  specific models.
9      Q.   What about -- what is USB?
10     A.   USB is whether the Ap- -- whether the iPod is
11 USB-compatible. Some of the early generation iPods were
12 not USB-compatible. They were FireWire based.
13     Q.   And so the next one, FireWire, is that sort of
14 the opposite then of USB? Either it has USB or it has
15 FireWire?
16     A.   No. There was some that I think had both,
17 which is why there -- both effects can be there. The
18 majority either had one or the other as I recall, and I
19 don't remember the fraction that had both. There were
20 some particular models as I recall that had both. That's
21 why they are both in there.
22     Q.   So do you know whether all iPods sold to class
23 members during the class period had USB capability?
24     A.   I'd have to go back and check. I don't recall.
25 But that doesn't affect whether you'd want a control for

## Page 345

1  (Concluded at 12:07 p.m.)

## Page 346

1  DECLARATION UNDER PENALTY OF PERJURY
2  Case Name:  The Apple iPod iTunes Anti-Trust Litigation
3  Date of Deposition:  1/8/2014
4  Job No:  10009199

6      I, KEVIN M. MURPHY, Ph.D., the witness herein,
7  declare under penalty of perjury that I have read the
8  foregoing in its entirety; and that the testimony
9  contained therein, as corrected by me, is a true and
10 accurate transcription of my testimony elicited at said
11 time and place.
12     Executed this ____ day of _____,
13 2014, at _____.

15 _____        _____
    KEVIN M. MURPHY, Ph.D.                  Date

## Page 231

1           DEPOSITION ERRATA SHEET
2  Page No. ____ Line No. ____
3  Change: _____
4  Reason for change: _____
5  Page No. ____ Line No. ____
6  Change: _____
7  Reason for change: _____
8  Page No. ____ Line No. ____
9  Change: _____
10 Reason for change: _____
11 Page No. ____ Line No. ____
12 Change: _____
13 Reason for change: _____
14 Page No. ____ Line No. ____
15 Change: _____
16 Reason for change: _____
17 Page No. ____ Line No. ____
18 Change: _____
19 Reason for change: _____
20 Page No. ____ Line No. ____
21 Change: _____
22 Reason for change: _____
23
24 _____    _____
    KEVIN M. MURPHY, PH.D.            Dated

## Page 348

1  STATE OF ARIZONA    )
                       ) ss.
2  COUNTY OF MARICOPA  )
3      BE IT KNOWN that the foregoing deposition was
4  taken before me, Cathy A. Miccolis, RPR, a Certified
5  Reporter, Certificate #50068, for the State of Arizona,
6  and by virtue thereof authorized to administer an oath;
7  that the witness before testifying was duly sworn by me to
8  testify to the whole truth; that the questions propounded
9  to the witness and the answers of the witness thereto were
10 taken down by me in shorthand and thereafter reduced to
11 print by computer-aided transcription under my direction;
12 that pursuant to request, notification was provided that
13 the deposition is available for review and signature; that
14 the transcript consisting of pages 233 through 348 is a
15 full, true and accurate transcript of all proceedings and
16 testimony had and adduced upon the taking of said
17 deposition, all done to the best of my skill and ability.
18     I FURTHER CERTIFY that I am in no way related to
19 nor employed by any of the parties hereto nor am I in any
20 way interested in the outcome hereof.
21     DATED at Phoenix, Arizona, January 9, 2014.

                    *[signature: Cathy Miccolis]*
                    Cathy A. Miccolis, RPR, CRR
24                  Certified Reporter #50068