*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 9
# [Filed Under Seal]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THE APPLE IPOD ITUNES            Lead Case No.
ANTI-TRUST LITIGATION.           C-05-00037-JW (HRL)
------------------------

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED 30(b)(6) DEPOSITION OF

EDDY CUE

ON BEHALF OF

APPLE, INC.

VOLUME I

December 17, 2010

9:22 a.m.

1755 Embarcadero Road

Palo Alto, California

Ana M. Dub, RMR, CRR, CSR 7445

---

APPEARANCES OF COUNSEL

For he Plaintiffs:
  ROBBINS GELLER RUDMAN & DOWD LLP
  ALEXANDRA S. BERNAY, ESQ.
  PAULA M. ROACH, ESQ.
  655 West Broadway, Suite 1900
  San Diego, California  92101
  619.231.1058
  xanb@rgrdlaw.com
  proach@rgrdlaw.com

For he Defendant Apple, Inc.:
  JONES DAY
  ROBERT A. MITTELSTAEDT, ESQ.
  555 California Street, 26th Floor
  San Francisco, California  94104
  415.626.3939
  ramittelstaedt@jonesday.com

Also Present:
  APPLE, INC.
  LISA OLLE, SENIOR CORPORATE COUNSEL LITIGATION
  1 Infinite Loop, MS 36-35U
  Cupertino, California  95014
  408.862.8888
  olle@apple.com

  APPLE, INC.
  KYLE ANDEER, Director, Competition Law & Policy
  1 Infinite Loop, MS 36-MAL
  Cupertino, California  95014
  408.862.9307
  kandeer@apple.com

  MATTHEW COPE, VIDEOGRAPHER

---

INDEX OF EXAMINATION

WITNESS:  EDDY CUE
EXAMINATION                     PAGE
By Ms. Bernay                   8
By Mr. Mittelstaedt             221

INDEX TO EXHIBITS

Exhibit     Description              Page

Exhibit 52    Letter on the Letterhead ........11
              of Jones Day Dated
              December 10, 2010 to
              Alexandra Bernay from
              David Kiernan

Exhibit 53    Defendant's Supplemental ........28
              Initial Disclosures
Exhibit 54    E-Mail Dated September 20, ......58
              2003 to Steve Jobs from
              Eddy Cue, Production
              Nos. Apple_AIIA00819405-07

Exhibit 55    E-Mail Dated November 9, ........67
              2004 to Phil Wiser from
              Eddy Cue, Production
              No. Apple_AIIA00808605
Exhibit 56    E-Mail Dated April 21, 2007 .....70
              to Zach Horowitz from Eddy
              Cue, Production
              Nos. Apple_AIIA00809105-07

Exhibit 57    E-Mail Dated April 27, ..........80
              2006 to Steve Jobs from
              Eddy Cue, Production
              Nos. Apple_AIIA00808925-26
Exhibit 58    E-Mail Dated December 5, ........84
              2006 to ET@group.apple.com
              from Steve Jobs, Production
              Nos. Apple_AIIA00320482-84

Exhibit 59    E-Mail Dated March 31, 2007 .... 89
              to Steve Jobs from Katie
              Cotton, Production
              Nos. Apple_AIIA00319516--18
Exhibit 60    E-Mail Dated March 19, 2007 ....107
              to Doug Morris from
              Steve Jobs, Produc ion
              Nos. Apple_AIIA00319506-07



EDDY CUE                                                    December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

41

1    A.  But it never got to that -- it never got
2   any further into specifics because there were two
3   criterias that we were looking at when they
4   certainly asked for interoperability or asked about
5   it, which was, number one:
6        We didn't think it was really technically
7   feasible in the sense that we were still making a
8   lot of changes to the way that the DRM worked.  And
9   we were able to do that because we had the device,
10  the software ourselves and we could make the changes
11  all at the same time.  And so we didn't think that
12  technically it would work very well if it was done.
13       And in hindsight, I think that was proven
14  to us in spades by WMA and Microsoft's plays for
15  sure, which failed miserably at trying to do that.
16       In addition to that, when we looked at it,
17  there was no one in the market that was -- either
18  had a successful store or a successful device that
19  we felt like, okay, let's go join that and work with
20  them to grow the market because they were
21  successful.
22       So neither of those two scenarios made it
23  viable.
24    Q.  Is it accurate -- just to sort of get an
25  idea of sort of what the universe was at the launch,

42

1   is it right that at the launch of the iTunes Music
2   Store, that songs purchased through the iTunes Store
3   could only be directly transferred onto iPods at the
4   launch?
5    A.  They could either be -- they could only be
6   transferred to an iPod or they could be burned to a
7   CD.  And then any CD could be ripped back to
8   digital.
9        So customers always had the capability, if
10  they really wanted to, to take a song that they
11  purchased on the store and move it to another
12  player.
13    Q.  But they could only be directly
14  transferred, isn't that correct, onto an iPod?
15       MR. MITTELSTAEDT:  Let me just ask a
16  clarification.  Are you saying other than playing on
17  the computer?  When you say "transfer," you mean --
18       MS. BERNAY:  Yes.  I'm talking about
19  moving music onto an iPod so that songs purchased
20  through the iTunes Store at the launch could only be
21  directly transferred onto an iPod.
22       MR. MITTELSTAEDT:  Object; asked and
23  answered.
24       THE WITNESS:  Again, a song could be
25  transferred to an iPod or burned to a CD.

43

1   BY MS. BERNAY:
2    Q.  Okay.  But directly transferred only; is
3   that correct?
4    A.  I --
5       MR. MITTELSTAEDT:  Object; compound, asked
6   and answered, ambiguous.
7       THE WITNESS:  Again, it can be transferred
8   to an iPod or burned to a CD.  Those were the two
9   ways that you could move songs off of iTunes.
10  BY MS. BERNAY:
11    Q.  Okay.  And at some point in time, is it
12  right that Apple had a deal with Motorola to have
13  sort of a music player on certain phones?
14    A.  Yes, that's correct.
15    Q.  Okay.  So is it right that at some point
16  in time, songs purchased through the iTunes Store
17  could be directly transferred onto iPods and to
18  certain Motorola phones that were compat ble with
19  FairPlay?
20    A.  Over time, songs could be transferred to
21  iPods, other Apple devices that we developed, and
22  the Motorola device and the HP iPod device.  So
23  there were other devices that were added over time.
24    Q.  And it's also right that at some point in
25  time, Apple went what's referred to as DRM-free; is

44

1   that right?
2    A.  That is correct.
3    Q.  And about when did that occur, that
4   DRM-free project?
5    A.  Well, it was done in multiple steps.
6   Originally, it was done with EMI only and the -- and
7   many of the independents.  And I don't recall the
8   exact date of that, but I'm sure we can look that
9   up.
10       And then approximately about a year later,
11  it was done with the three other majors that were
12  left.
13    Q.  And is it accurate that now everything
14  that can be purchased in the United States, at
15  least, through the iTunes Store is sold DRM-free?
16       MR. MITTELSTAEDT:  Music?
17       MS. BERNAY:  Music.  Thank you.
18       THE WITNESS:  Yes.  All music in the
19  world, with the exception of Japan, is purchased
20  DRM-free.
21  BY MS. BERNAY:
22    Q.  We talked a little bit at the beginning
23  about negotiations with the launch of the store, and
24  we'd mentioned independent labels.  Do you recall
25  that discussion?

EDDY CUE                                                December 17, 2010

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



EDDY CUE                                     December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Page 53**

1  myself.
2  Q

**Page 54**

1

**Page 55**

1

14  (Cellular telephone rings.)
15  MS. BERNAY:  He comes in.  Look at that.
16  (Mr. Andeer leaves the proceedings.)
17  BY MS. BERNAY:
18  Q.  Were there any music stores that you're
19  aware of that sold online digital music at the time
20  that the iTunes Store launched that sold their music
21  DRM-free?
22  A.  No, there were none that I was aware of.
23  Q.  What about later, you know, in the months
24  or years after the iTunes Music Store launched?
25  Were you aware of any stores that sold online

**Page 56**

1  content DRM-free?
2  A.  Yes.
3  Q.  And what are you -- what stores are you
4  aware of?
5  A.  Amazon, Wal-Mart.  There were many others.
6  Q.  What about eMusic?  Is that an online
7  store that you're familiar with?
8  A.  Yes, I am.
9  Q.  And what kind of music -- or what do they
10  offer to consumers?
11  A.  They offered DRM-free music, but they did
12  not have any of the major labels, and only
13  independent music and not all of it.  So they
14  offered a subset of music that, I believe, was
15  DRM-free.
16  Q.  And do you know whether eMusic existed at
17  the time that the iTunes Store launched in 2003?
18  A.  I don't recall.  I don't believe so, but I
19  don't recall.
20  Q.  Do you know whether or not the iTunes
21  Store sold some of the same music that was also
22  available through eMusic?
23  A.  Again, depending on the time frame, but
24  when they were both -- when they were both there,
25  I'm sure that there were songs that we had that were

EDDY CUE                                          December 17, 2010

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

57

1   on eMusic.  But as I said, 80 percent of the music
2   that was being sold was from majors, and they didn't
3   have it.
4            They weren't even trying to sell music at
5   an individual level.  They were trying to get people
6   to sign up for a monthly bill that included a
7   certain number of tracks.  So they offered a very
8   complicated and very, very small subset of music for
9   sale.
10       Q.  But it's accurate that some music was sold
11  both through eMusic and through iTunes; correct?
12       MR. MITTELSTAEDT:  Object; argumentative
13  and asked and answered.
14       THE WITNESS:  Yes, there were certain
15  songs that were in eMusic that were also in iTunes
16  that were sold.
17  BY MS. BERNAY:
18       Q.  And at that time, that music was protected
19  by Apple's DRM FairPlay on the iTunes Store; is that
20  correct?
21       A.  There were times where music was sold on
22  iTunes with DRM and eMusic had it in DRM-free.
23       MS. BERNAY:  This will be Exhibit 54.
24  It's a multipage document.  The Bates number is
25  Apple_AIIA00819405 through 407.

58

1            Here's an extra copy for Apple.
2            (Whereupon, Deposition Exhibit 54 was
3            marked for identification.)
4       MS. BERNAY:  And if you could take a
5   moment to review Exhibit 54, please.
6       THE WITNESS:  Would you like me to read
7   the whole thing?
8       MS. BERNAY:  Yes.  Thank you.  And we're
9   not going to speak in depth about anything on page 3
10  of the document and only a little bit on page 2 of
11  the document, if that --
12       THE WITNESS:  Okay.
13       MS. BERNAY:  -- directs you a little bit.
14       (Witness reviews document.)
15       MR. MITTELSTAEDT:  While he's reading
16  this, we're going to designate the deposition highly
17  confidential.
18            And the name of the person who came in is
19  Kyle Andeer, A-n-d-e-e-r.
20       (Witness reviews document.)
21       THE WITNESS:  Okay.
22  BY MS. BERNAY:
23       Q.  You've had a chance to look at Exhibit 54?
24       A.  Yes.
25       Q.  And what is Exhbit 54?



EDDY CUE                                                December 17, 2010

121

1    Q.  It was a technology that would strip the
2  DRM protection from protected songs.  Is that an
3  accurate description?
4    A.  I would describe it as a hack to remove
5  the DRM.
6    Q.  Okay.  And what about --
7    A.  Which was illegal.
8    Q.  Which was illegal?
9    A.  Yes.
10   Q.  And what are you basing that statement on,
11 that it was illegal?
12   A.  Two things.  Number one, the terms of
13 service that we gave to consumers certainly said
14 that when you buy the songs, these are the rights
15 that you gain by it and what you can do with it.
16       And secondly, we had the DRM protection on
17 there.  And my understanding is there's some laws
18 around DMCA and things about stripping the
19 protection away that made it illegal.
20   Q.  You said DMCA.  What's that?
21   A.  I don't -- again --
22   Q.  I just mean, do you know what the acronym
23 is?
24   A.  I don't know what the acronym is.
25   Q.  You just know that it's some --

122

1    A.  My attorneys have told me there's some
2  laws around stripping DRMs that are illegal.
3    Q.  Okay.  And what about something called
4  PyMusique?  What is that?
5    A.  It's a similar thing.  Again, there are
6  many, many hacks that have been done over the years
7  to try to rip music off from iTunes.
8    Q.  To rip music off from iTunes?  Is that
9  what you said?
10   A.  That's correct.
11   Q.  And is PyMusique a hack?
12   A.  It is also.
13   Q.  And it's something that strips the DRM
14 protection from a song?
15   A.  I believe so.  I can't recall every single
16 one of them, so . . .
17   Q.  Sure.  And is that something that is
18 illegal, this PyMusique, in your view?
19       MR. MITTELSTAEDT:  Objection; calls for a
20 legal conclusion.
21       THE WITNESS:  Again, that's certainly what
22 my attorneys have represented.
23       MR. MITTELSTAEDT:  Actually, don't --
24 let's strike that.  Don't ta k about conversations
25 with the attorneys.

123

1        THE WITNESS:  Okay.
2  BY MS. BERNAY:
3    Q.  And going back to RealNetworks now, is
4  that something that stripped the DRM protection off
5  of a song?
6    A.  No, it does not.  It tried to put a DRM
7  to, again, hack to look at -- make it look like it
8  was a FairPlay DRM song.
9    Q.  And would that be something that was
10 illegal, in your view?
11       MR. MITTELSTAEDT:  Objection; calls for a
12 legal conclusion.
13       THE WITNESS:  Again, I don't know.  I did
14 not have -- don't know the answer to the question.
15 BY MS. BERNAY:
16   Q.  Do you know whether JHymn actually
17 affected iTunes as opposed to the iPod?
18   A.  What do you mean by "affected"?
19   Q.  Just whether or not the way that it
20 functioned was at the software level of iTunes as
21 opposed to working on the firmware of the iPod.
22       MR. MITTELSTAEDT:  Objection; compound.
23 BY MS. BERNAY:
24   Q.  If you know.
25   A.  I don't know the answer to the question.

124

1    Q.  Do you know whether Apple ever sent any
2  cease and desist letters regarding JHymn?
3    A.  I don't recall.
4    Q.  Do you know whether Apple sent any cease
5  and desist letters regarding any hacks that it was
6  concerned about?
7    A.  I don't know what our legal team did.
8    Q.  That's not something that you followed up
9  on?  Or followed, rather?
10   A.  Well, we followed the hacks very closely.
11       But again, how legal responded is not
12 something that I -- most of these were done with
13 either people that were anonymous or people that
14 were in countries that -- were not in the U.S. and
15 other things to that nature that made it harder.  So
16 I don't know how legal responded or what they did.
17   Q.  Okay.  And do you have any information
18 regarding any cease and desist letters that may have
19 been sent by Apple to any other companies that
20 either stripped the DRM or provided their own
21 version of DRM?
22   A.  Again, I don't recall any.  I don't know.
23   Q.  Apart from any communications with the
24 labels, did you have any communications with other
25 people inside of Apple regarding RealNetworks'

EDDY CUE                                                December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**157**

1    Q.   You anticipated.  My next question was:
2    Who is Peter that's referred to here?
3        So this says it's a Q&A prep for Peter.
4    Do you see that?
5        A.  I do.
6        Q.   And is it accurate that on occasion, the
7    CFO of Apple would have to answer questions from the
8    press and others in public forums?
9        A.  Generally not from the press.  This would
10   generally be from analysts.
11       Q.   Okay.  And so it says:
12            "[He] wants to be prepared to
13           answer the following questions."
14           Do you see that?
15       A.  I do.
16       Q.   And is this something that -- again, I
17   think you testified earlier that you would work with
18   people in -- I guess mostly in media, PR
19   departments, helping to prepare public statements on
20   behalf of Apple; is that right?
21       A.  Yeah.  This is -- this is different.
22       Q.   How is it different?
23       A.  Because it's not meant for the press.
24   It's not with PR.
25           This is generally around giving Peter

**158**

1    mostly facts, numbers that have been -- that we have
2    that he wants to communicate, or just points that
3    we've already publicly made that he's asking about.
4    But again, geared toward analysts, not the press.
5

**159**

**160**

1    Apple's.
2        Q.   Was there ever a quarter that you're aware
3    of where the iTunes Music Store was not profitable?
4        A.  I don't believe so.  There may have been a
5    quarter where it was basically break-even, but I
6    don't believe there was any quarter where it was not
7    profitable.
8        Q.   Even going back to when it first launched?
9        A.  I would say if we looked at the first full
10   quarter, I don't know exactly, on a particular
11   month, if we launched on April -- we may have -- I
12   don't know whether we were profitable the first
13   month we were in business or not.
14       Q.   Fair enough.
15       A.  Certainly the first quarter we were in
16   business, we were.
17       Q.   There's a question, the third question
18   here is:
19            "Did you notice any impact from
20           the Microsoft or other music store
21           launches?"
22           Do you see that?
23       A.  I do.
24       Q.   And then you have:
25            "In the U.S. our market is around

EDDY CUE                                    December 17, 2010

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**181**

1  Bates-stamped Apple_AIIA00099494 through 95.
2          (Whereupon, Deposition Exhibit 70 was
3      marked for identification.)
4          (Witness reviews document.)
5          THE WITNESS:  Yes.
6  BY MS. BERNAY:
7      Q.  And can you identify Exhibit 70, please?
8      A.  It is an e-mail that I sent to my staff,
9  basically letting them know that we had crossed the
10  billion-dollar mark as far as revenue for the year.
11      Q.  And "the year" being 2006 at this point in
12  time?
13      A.  Fiscal 2006, yes.
14      Q.  Okay.  And so the people that it's to, are
15  those sort of your -- the top people in the iTunes
16  department that reported to you?
17      A.  In addition to my boss at the time who was
18  not Steve, but was Sina Tamaddon.
19      Q.  And then who's Steven Leung, that was also
20  cc'd here?
21      A.  He is the finance person who works on my
22  team for iTunes.
23      Q.  And so you're just sort of sharing the
24  good news with the people in your department?
25      A.  That's correct.

**182**

1      Q.  And then there's a bottom e-mail from
2  Mr. Leung to yourself and it's cc-ing Mark Donnelly.
3  Do you see that?
4      A.  Yes.
5      Q.  And who's Mark Donnelly?
6      A.  Mark Donnelly is Steven's boss in finance,
7  who works for Peter Oppenheimer.
8      Q.  So he's below the CFO, but he's in the
9  finance department?
10      A.  That's correct.
11      Q.  And this revenue number for iTunes that's
12  listed here, it's broken out by quarter; is that
13  right?
14      A.  That's correct.
15      Q.  And then each quarter, those are in
16  millions; is that correct?
17      A.  I hope so, so we can get to the billion.
18      Q.  Okay.  And then it's comparing that to
19  fiscal year '05 revenue of 414 million; is that
20  right?
21      A.  That is correct.
22      Q.  And it was more than doubled year over
23  year?
24      A.  That's correct.
25          MS. BERNAY:  You can put that to the side.

**183**

1          This will be Exhibit 71, and it's
2  Bates-stamped Apple_AIIA00327951 to 952.
3          (Whereupon, Deposition Exhibit 71 was
4      marked for identification.)
5          MS. BERNAY:  And if you could take a
6  moment and review Exhibit 71, please.
7          (Witness reviews document.)
8          THE WITNESS:  Yes.
9  BY MS. BERNAY:
10      Q.  You've had a chance to look at it?
11      A.  I have.
12      Q.  And it's something from Ms. Ameerally; is
13  that right?
14      A.  That's correct.
15      Q.  And it's to yourself and Mr. Jobs and
16  others; is that right?
17

**184**

EDDY CUE                                            December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 10
# [Filed Under Seal]

## 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

THE APPLE IPOD ITUNES        Lead Case No.
ANTI-TRUST LITIGATION.       C-05-00037-JW (HRL)
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

VIDEOTAPED 30(B)(6) DEPOSITION OF
APPLE COMPUTER, INC.
BY DESIGNEE: JEFFREY L. ROBBIN
VOLUME I

December 3, 2010
9:23 a.m.

1755 Embarcadero Road
Palo Alto, California

Ana M. Dub, RMR, CRR, CSR 7445

## 2

APPEARANCES OF COUNSEL

For the Plaintiffs
ROBB NS GELLER RUDMAN & DOWD LLP
ALEXANDRA S BERNAY ESQ
PAULA M ROACH ESQ
655 West Broadway Suite 1900
San Diego California 92101
619 231 1058
xanb@rgrdlaw com
proach@rgrdlaw com

and

BONNETT FA RBOURN FR EDMAN & BAL NT P C
TODD D CARPENTER ESQ
2901 N Central Avenue Suite #1000
Phoenix Arizona 85012
(619) 756 6978
tcarpenter@bffb com

For the Defendant Apple Computer nc
JONES DAY
ROBERT A M TTELSTAEDT ESQ
555 California Street 26th Floor
San Francisco California 94104
415 626 3939
ramittelstaedt@jonesday com

Also Present
L SA OLLE
ALEXE D AS V DEOGRAPHER

## 3

INDEX OF EXAMINATION

WITNESS: JEFFREY L. ROBBIN

| EXAMINATION | PAGE |
| --- | --- |
| By Ms. Bernay | 8 |
| By Mr. Mittelstaedt | 200 |

## 4

NDEX TO EXH B TS

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 1 | Digital Rights Management (DRM) Overview Draft, Bates Nos. APPLE_A A00094578-84 | 99 |
| Exhibit 2 | Digital Rights Management (DRM) Details, Bates Nos. Apple_A A00094571-77 | 109 |
| Exhibit 3 | E-Mail Chain, Top E-Mail Dated September 20, 2003, to Steve Jobs from Eddy Cue, Bates Nos. Apple_A 00098373-75 | 114 |
| Exhibit 4 | iTunes Version Spreadsheet, Bates Nos. Apple_A A 00330727-34 | 125 |
| Exhibit 5 | E-Mail Dated February 2, 2004 to Dave Heller, et al., from Grace Kvamme, Bates Nos. Apple_A A00091750-54 | 131 |
| Exhibit 6 | E-Mail Dated January 13, 2004 to Eddy Cue, et al, from Jeff Robbin, Bates Nos. Apple_A A00092493-94 | 135 |
| Exhibit 7 | E-Mail Chain, Top E-Mail Dated April 6, 2004, to Barney Wragg from Eddy Cue, Bates Nos. Apple_A A00090785-87 | 143 |
| Exhibit 8 | E-Mail Chain, Top E-Mail Dated April 22, 2004, to Jeff Robbin from Aidan Lawlor, Bates Nos. Apple_A A 00091816-17 | 148 |
| Exhibit 9 | E-Mail Chain, Top E-Mail Dated April 28, 2004, to Natalie Sequeira from Chris Bell, Bates No. Apple_A A 00091783 | 153 |



Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com





Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

49

1  of FairPlay as the digital rights management
2  solution on that Apple was offering?
3      A.  Yes.
4      Q.  And what did you do?  What work did you do
5  on that?
6      A.  In the very beginning, I helped design how
7  it would work.  I might have fixed some bugs in the
8  code as it was being developed.  I didn't do the
9  core implementation, but I worked on the
10  architecture for it.
11      Q.  And when you say you worked on the
12  architecture for that, can you explain to people
13  like me, who do not have a software brain, what that
14  means?
15      A.  It means that I would have worked with the
16  engineers to try to figure out the mechanisms for
17  implementing the DRM.  So trying to just figure out
18  how it would work, how we would keep it secret or
19  secure.  Its a broad . . .
20      Q.  Sure.  And I'm just trying to get at sort
21  of a general understanding as to what you -- how you
22  worked on it.
23      A.  Mm-hmm.
24      Q.  And s it -- I've seen some references to
25  something called an AAC audio stream.  Can you te

50

1  me what that s?
2      A.  AAC s an audio codec format.  Its how
3  you convert sound into a compressed form.
4      Q.  Okay.  And s it right that FairPlay files
5  were MP4 files with an encrypted AAC audio stream?
6  Is that accurate?
7      A.  FairPlay s a DRM.  Its more than just a
8  file format.  An MP4 s an AAC file that has
9  FairPlay applied to it.
10      Q.  Okay.  And s it right that Apple put
11  FairPlay on a music that it sold n the iTunes
12  Music Store once the iTunes Music Store was launched
13  or it was protected by FairPlay?
14      A.  A  songs that we sold when the iTunes
15  Music Store first opened were protected with
16  FairPlay.
17      Q.  Were there or have there been various
18  versions or iterations of FairPlay over the years?
19      A.  Yes.
20      Q.  Do you know how many versions of FairPlay
21  there've been over the years?
22      A.  No.
23      Q.  Have there been sort of major revisions
24  and minor revisions, as that term s understood by
25  you?

51

1      A.  Yes.
2      Q.  Do you know where I would find out sort of
3  a complete version history of FairPlay?  Is that
4  something that Apple would maintain?
5      A.  No.
6      Q.  Okay.  Do you know whether there's sort of
7  documents documenting each change?  If there's not
8  sort of a version history, do you believe that there
9  are documents that explain what each version of
10  FairPlay over the years has been?
11      A.  No, I don't think there's a document that
12  describes each version of FairPlay.
13          MR. MITTELSTAEDT:  When you come to a
14  convenient stopping point, if we could take a short
15  break.
16          MS. BERNAY:  Why don't we do that now.
17  That's totally fine.  Is that alright?
18          MR. MITTELSTAEDT:  Sure.
19          THE VIDEOGRAPHER:  Off the record at
20  10:13 A.M.
21          (Recess taken.)
22          THE VIDEOGRAPHER:  And we are back on the
23  record at 10:20 A.M.
24          MS. BERNAY:  Thank you.  We come back from
25  our short break.

52

1          Ms. Court Reporter, would you mind just
2  reading back the last question and answer, please.
3          (Record read as follows:
4          "QUESTION:  Okay.  Do you know whether
5          there's sort of documents documenting
6          each change?  If there's not sort of a
7          version history, do you believe that
8          there are documents that explain what
9          each version of FairPlay over the years
10          has been?
11          "ANSWER:  No, I don't think there's a
12          document that describes each version of
13          FairPlay.")
14          MS. BERNAY:  Thank you.
15  BY MS. BERNAY:
16      Q.  We were just talking about that there were
17  a number of versions of FairPlay.  Is that accurate?
18      A.  Yes.
19      Q.  Okay.  Do you know whether at some point
20  in time, music sold at the -- on the iTunes Store
21  was no longer protected by FairPlay?
22      A.  Yes.
23      Q.  And when approximately did that occur?
24      A.  I don't remember the exact date.  And it's
25  not all music.  There's still some music still



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 11
# [Filed Under Seal]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THE APPLE IPOD ITUNES              Lead Case No.
ANTI-TRUST LITIGATION.             C-05-00037-JW (HRL)
---------------------------

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED 30(b)(6) DEPOSITION OF

AUGUSTIN J. FARRUGIA

ON BEHALF OF

APPLE, INC.

VOLUME I

December 8, 2010

9:16 a.m.

1755 Embarcadero Road

Palo Alto, California

Ana M. Dub, RMR, CRR, CSR 7445

---

## APPEARANCES OF COUNSEL

For the Plaintiffs:

BONNETT, FAIRBOURN, FRIEDMAN, & BALINT, P.C.
TODD D. CARPENTER, ESQ.
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona 85012
619.756.6978
tcarpenter@bffb.com

and

ROBBINS GELLER RUDMAN & DOWD LLP
PAULA M. ROACH, ESQ.
655 West Broadway, Suite 1900
San Diego, California 92101
619.231.1058
proach@rgrdlaw.com

For the Defendant Apple, Inc.:

JONES DAY
DAVID C. KIERNAN, ESQ.
555 California Street, 26th Floor
San Francisco, California 94104
415.875-5745
dkiernan@jonesday.com

and

JONES DAY
MICHAEL CULHANE HARPER, ESQ. (Morning Session)
1755 Embarcadero Road
Palo Alto, California 94303
650.739.3916
mcharper@jonesday.com

Also Present:

APPLE, INC.
LISA OLLE, SENIOR CORPORATE COUNSEL LITIGATION
1 Infinite Loop, MS 36-35U
Cupertino, California 95014
408.862.8888
olle@apple.com

MATTHEW COPE, VIDEOGRAPHER

---

## INDEX OF EXAMINATION

WITNESS: AUGUSTIN J. FARRUGIA

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Carpenter | 7 |
| By Mr. Kiernan | 212 |

---

## INDEX TO EXHIBITS

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 21 | Organization Chart, Bates No. Apple_AIIA00099092 | 13 |
| Exhibit 22 | Letter on the Letterhead of Jones Day Dated November 15, 2010 to Alexandra Bernay from David Kiernan | 23 |
| Exhibit 23 | E-Mail Chain, Top E-Mail Dated April 27, 2005, to Tom Neumayr from Greg Joswiak, Bates Nos. Apple_AIIA00090485-88 | 125 |
| Exhibit 24 | Printout of iChat, Bates Nos. Apple_AIIA00798326-27 | 132 |
| Exhibit 25 | Series of E-Mails, Top E-Mail Dated July 5, 2005, to Roger Pantos from Augustin J. Farrugia, Bates Nos. Apple_AIIA00099178-91 | 144 |
| Exhibit 26 | E-Mail Chain, Top E-Mail Dated November 7, 2005, to Jeff Robbin from Augustin J. Farrugia, Bates No. Apple_AIIA00091906 | 147 |
| Exhibit 27 | Printout of iChat, Bates No. Apple_AIIA00798303 | 154 |
| Exhibit 28 | E-Mail Dated April 25, 2006 to Dave Heller from Chris Wysocki and Attachment, Bates Nos. Apple_AIIA00094563-69 | 162 |


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

45

1  management technology or software; correct?
2      A.  What do you mean by "software"?  You put
3  "software" here.
4      Q.  Okay.  How about I leave out "software."
5      And the question is:  FairPlay is a
6  digital rights management technology; correct?
7      A.  Which is correct.
8      Q.  If I refer to digital rights management as
9  DRM, you'll understand what I'm talking about?
10     A.  Correct.
11         Excuse me.  Before you ask question, can I
12  have a glass of water, please?
13     Q.  Sure.
14         When was FairPlay originally developed?
15     A.  I cannot say about FairPlay before my
16  time, but I developed the first version of FairPlay
17  when I was at Apple.
18     Q.  I'm sorry.  Did you say that you developed
19  the first version of FairPlay when you came to
20  Apple?
21     A.  I cannot speak before my time --
22     Q.  Sure.
23     A.  -- because Apple has a FairPlay
24  implementation before my time and I cannot speak
25  about that.

---

46

1      But I did what I called the Version 1.0 of
2  FairPlay when I came.
3      Q.  And that Version 1.0, was that an update
4  to FairPlay?
5      A.  No.  It was a change on the architecture.
6  It was a complete redesign.
7      Q.  It was a complete redesign?
8      A.  Redesign, yes.
9      Q.  Are you familiar with an MPEG-4 file?
10     A.  M? MPEG-4, yes.
11     Q.  Okay.  Can you describe or explain what an
12  MPEG-4 is to me?
13     A.  It's a container which contain different
14  type of content.
15         THE COURT REPORTER:  I'm sorry.
16         THE WITNESS:  A container that contains
17  digital content.  It's a standard.
18  BY MR. CARPENTER:
19     Q.  Does Apple utilize MPEG-4 files -- strike
20  that.
21         Are the iTunes music contained in MP-4 --
22  MPEG-4 files?
23     A.  Maybe.
24     Q.  Okay.  When you say "maybe," you're not
25  sure?

---

47

1      A.  Yeah.
2      Q.  Okay.  How would you describe the music
3  file that's transferred to the end user's computer?
4      A.  It's a file that contain the song encoded
5  with ASE's encoding process.
6      Q.  In technical terms, what would you
7  describe the file as or how would you name the file?
8      A.  Song, digital song.
9      Q.  Okay.  Is it accurate to say that the song
10  that is transferred to the end user's computer is in
11  MPEG-4 container format?
12     A.  Maybe.
13     Q.  Is it your testimony that you're not aware
14  of what the song format is?
15     A.  I'm not -- I'm not sure about the format.
16     Q.  Okay.  What would you -- how would you
17  explain the primary purpose for developing or
18  redesigning FairPlay in the manner that you did once
19  you were with Apple, once you came to Apple?
20     A.  Developing or redesigning?
21     Q.  Developing.
22     A.  I rather answer the question about
23  redesigning first --
24     Q.  Sure.
25     A.  -- if you don't mind.

---

48

1      As a security expert, the first thing you
2  do when you come to a project I ke FairPlay is to
3  analyze what you have and to do a risk assessment.
4      And the risk assessment I saw at the time
5  was completely upside down, which mean that the
6  design and the architecture and the implementation
7  Apple had of FairPlay before my time was really
8  upside down.
9      The example I use is:  Do you like to wa k
10  with shoes with the heel on the front?  That was I
11  discover.  That's pretty difficult, right?
12      And this was my first initial reaction,
13  saying:  Look, your design is upside down.  We need
14  to redesign everything.
15     Q.  From a technical standpoint, why did you
16  believe that it was upside down?
17     A.  Because as a security expert, it was done
18  incorrectly.
19     Q.  Okay.  What leads you to say that it was
20  done incorrectly if we had to drill down into what
21  the actual process was?
22     A.  A common practice we know in security, and
23  you have -- you know what you design in security,
24  and it was done upside down vis-a-vis the common
25  practice we have in security.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



109

111

25    Q.  Okay.  How many new versions of FairPlay,

110

112

9    BY MR. CARPENTER:
10       Q.  Right.  Thank you.
11       Did any subsequent updates to FairPlay 1.0
12    have a similar effect to Harmony as you've described
13    this present version to have?
14       MR. KIERNAN:  Objection; lacks foundation,
15    misstates the testimony, calls for speculation.
16       THE WITNESS:  Could you define the
17    question?  For which product?
18    BY MR. CARPENTER:
19       Q.  I'm trying to gain an understanding of
20    whether later iterations of updates to FairPlay had
21    an effect on Harmony similar to the effect that
22    you've now descr bed.
23       A.  You understood that we said that's for new
24    product.  Now, the question is update for what?
25    That is my question to you.

1    or I guess you could say, new iPods were produced
2    during the time period of your tenure at Apple?
3       A.  I don't have this knowledge.  I don't
4    recall.
5       Q.  Who would have that knowledge?
6       A.  Marketing, the Internet.
7       Q.  Can you identify for me any version of
8    FairPlay updates for any of the iPods during this
9    time period which had an effect on RealNetworks'
10    Harmony?
11       THE WITNESS:  Could you repeat the
12    question for me.
13       (Record read as follows:
14       "QUESTION:  Can you identify for me any
15       version of FairPlay updates for any of
16       the iPods during this time period which
17       had an effect on RealNetworks'
18       Harmony?")
19       THE WITNESS:  No, I can't.
20       MR. KIERNAN:  Hold on.
21       Objection; lacks foundation, calls for
22    speculation, assumes that other updates to FairPlay
23    affected Harmony.  And he already testified he
24    didn't know.
25       THE WITNESS:  I don't know the answer to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



161

1      Q.  Okay.  And did you take any action to
2  react to this security concern?
3      A.  I never take any action.
4      Q.  Why did you never take any action if you
5  were concerned about this as a security threat?

162

1      Q.  But you had identified this as a problem,
2  that RealNetworks was storing the keys in its
3  digital music files that enabled them to be played
4  on the iPod; correct?
5      A.  Which is incorrect.  The things we
6  identified was the weakness and bad design of the
7  architecture.
8          MR. CARPENTER:  Can we go off the record
9  for a second?
10         MR. KIERNAN:  Yeah.
11         THE VIDEOGRAPHER:  We're off the record,
12  2:14 P.M.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  We're back on the
15  record at 2:26 P.M.
16         MR. CARPENTER:  I'd like to introduce
17  Exhibit No. 28 to the deposition of Mr. Farrugia.
18  It is Bates stamped AIIA00094564 -- actually, make
19  that 94563 -- and concluding at AIIA00094569.
20         (Whereupon, Deposition Exhibit 28 was
21          marked for identification.)
22         MR. CARPENTER:  Take a minute to review
23  this.
24         (Witness reviews document.)
25



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



15   MR. CARPENTER:  Let's go off the record.
16        THE VIDEOGRAPHER:  This marks the end of
17   Disk 2.  We're off the record at 3:03 P.M.
18        (Recess taken.)
19        THE VIDEOGRAPHER:  This marks the start of
20   Disk 3.  Back on the record at 3:17 P.M.
21   BY MR. CARPENTER:
22   Q.   Okay.  Mr. Farrugia, can I direct your
23   attention to page 51 of the same exhibit.
24   A.   Okay.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

193

1   A. Let me read.
2   Q. I'm sorry?
3   A. Can I read?
4       MR. KIERNAN: He said let him read.
5       MR. CARPENTER: Oh, absolutely.
6       (Witness reviews document.)
7       THE WITNESS: Yes, it has been implemented
8   partially.
9   BY MR. CARPENTER:
10  Q. When you say "partially," it has not been
11  implemented to the extent described by this
12  document?
13  A. This document were describing 2005, 2006.
14  And things has changed to have a better way of doing
15  that.
16  Q. So the particular description that's
17  provided by this document has evolved; is that
18  accurate?
19  A. Correct.
20  Q. Okay. And how has it evolved or improved?
21      MR. KIERNAN: Objection; lacks foundation.
22      THE WITNESS: Evolved because we want to
23  have better performances, for example.
24  BY MR. CARPENTER:
25  Q. I'm sorry. Did you say better

194

1   performances?
2   A. Yeah.
3   Q. What is your metric to determine whether
4   you're achieving better performances?
5   A. User. If it is too slow to play your
6   song, it's a bad performance. You have to admit
7   that if you play better -- you wait twenty second
8   before you have a song, it's not good.
9   Q. Is it accurate to say that the version
10  that's described by this document has been improved
11  by making it faster?
12  A. For example.
13  Q. What FairPlay version was it implemented
14  into -- first implemented into?
15  A. Guesstimate is the first version of
16  Core FP. Remember Core FP?
17  Q. Is it implemented into any subsequent
18  versions of Core FP?
19  A. Yes.
20  Q. All subsequent versions or particular
21  subsequent versions?
22  A. All, should be all version.
23  Q. When you're describing the evolved version
24  or the improved version, is that -- does that
25  correlate to a specific version of Core FP?

195

1   A. Not that I remember.
2   Q. Can I direct your attention to page 80,
3   please. In particular, the section that reads --
4   the section underneath the subheading ▮▮▮▮
5   ▮▮
6       (Witness reviews document.)
7   BY MR. CARPENTER:
8   Q. Are you ready?
9   A. Mm-hmm.
10  Q. Is the reference in this section to the
11  word "Real" a reference to RealNetworks?
12  A. Should be.
13  Q. Okay. Can you read the sentence that
14  begins ▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮
16  ▮▮                  ▮▮▮▮▮▮▮▮▮▮
17  ▮▮      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18  ▮▮
19  Q. Did you draft this section?
20  A. Correct.
21  Q. Did you draft this section?
22  A. Correct.
23  Q. Okay. What did you mean by Real could DRM
24  their music?
25  A. Is the thing we discussed about the
    injection.

196

1   Q. Okay. Does that mean that you're
2   acknowledging that Real could DRM their music to
3   make it compatible or able to be played on an iPod?
4       MR. KIERNAN: Objection; lacks foundation.
5   Objection; form.
6       THE WITNESS: We know that on the risk
7   management we have, and we have this flaw, and it
8   was exploited by Real.
9   BY MR. CARPENTER:
10  Q. Okay. And when you say the flaw was
11  exploited by Real, did you mean that Real was able
12  to make its music to be played on the iPod?
13  A. In any way. Yes, correct.
14  Q. Okay. Why would you describe that as a
15  flaw?
16  A. Because, like I said, if you inject things
17  improperly inside the ecosystem and you do it
18  improperly, the user will have a bad experience.
19  Q. If the user desired to have its
20  RealNetwork music played on the iPod, wouldn't that
21  be viewed as a positive experience?
22      MR. KIERNAN: Objection; lacks foundation,
23  calls for speculation, objection to form.
24      THE WITNESS: As we may have seen that we
25  have customers after that, they are calling us, and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

201
1  Music purchased from iTunes or music purchased from
2  Real?
3     A.  All the musics.
4     Q.  Okay.
5     A.  All the songs.
6     Q.  How would the music -- how would the music
7  be erased?

12    Q.  Okay.  What -- at what point in the
13  consumer experience would this problem occur?  When
14  the consumer sunk the iPod with its computer, or
15  when the consumer sunk the iPod with the RealNetwork
16  media player?
17    A.  It would be when the consumer tried to
18  play the music.
19    Q.  Okay.  I'm a little bit confused.  If the
20  consumer tried to play the music on the iPod,
21  wouldn't the -- strike that.
22        Would the iPod -- would the consumer not
23  be able to play its music from the moment it
24  downloaded the RealNetworks song?
25        MR. KIERNAN:  Objection to form; lacks

202
1  foundation.
2        THE WITNESS:  You are confusing me now.
3  BY MR. CARPENTER:
4     Q.  Okay.  What would immediately precede the
5  music being rendered inoperable?  What would the
6  last action the consumer would have taken have been?
7        MR. KIERNAN:  Objection; lacks foundation,
8  calls for speculation.  Objection; form.
9        THE WITNESS:  That will occur when the
10  consumer will sync the content on the iPod.
11        MR. CARPENTER:  I'm sorry.  Can you repeat
12  that.
13        (Record read as follows:
14        "THE WITNESS:  That will occur when the
15         consumer will sync the content on the
16         iPod.")
17  BY MR. CARPENTER:
18     Q.  What content are you referring to?
19     A.  Any content which is not synced with a
20  correct ecosystem.
21        MR. CARPENTER:  Okay.  Set that aside.
22        And can I introduce Exhibit No. 30, I
23  believe, to Mr. Farrugia's deposition, Bates stamped
24  AIIA00802966.
25

203
1        (Whereupon, Deposition Exhibit 30 was
2         marked for identification.)
3  BY MR. CARPENTER:
4     Q.  You ready?
5     A.  Mm-hmm.
6     Q.  Can you describe this document for me?
7     A.  It looks like it's e-mail that I sent Tony
8  Fadell and Guy, October 2006.
9     Q.  Okay.  And you believe this is an e-mail
10  that you sent to Tony Fadell and Guy Bar-Nahum?
11    A.  Mm-hmm.
12    Q.  And would you normally communicate with
13  them through e-mail in the normal course of
14  business?
15    A.  Correct.
16    Q.  Have you ever seen this e-mail before
17  today?
18    A.  Yes, I did.
19    Q.  Aside from when you originally drafted it?
20    A.  Yes, I should.  Yeah.
21    Q.  Can you explain the contents to me or put
22  it in context?
23

204
1     Q.  Can I turn your attention to the second
2  page.
3     A.  Mm-hmm.
4     Q.  Is this -- and can you explain to me what
5  this is?
6     A.  Looks like is a page of a forum from
7  RealNetworks.
8     Q.  Did you send this Web page to the
9  recipients of this e-mail?
10    A.  Probably.
11    Q.  Okay.  Do you recall why you sent this to
12  them?
13





ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**205**

1    MR. CARPENTER:  Can I have that answer
2  back.
3       (Record read as follows:

**207**

2       THE WITNESS:  I don't know what the
3  consumer going to say here because they are not
4  referring to any things you purchase on Real.  They
5  are saying if you transfer track from RealPlayer,
6  which means the client.  They are not speaking about
7  the purchase or the CD you rip.  They are speaking
8  about the transfer from the RealPlayer, which is a
9  player.
10  BY MR. CARPENTER:
11      Q.  So if you purchased a song from
12  RealNetworks, could you put it on the iPod at that
13  point?
14      A.  I don't know.  I don't know the format of
15  the song.  What I can tell you is if you rip your CD
16  you purchase, you were able to put on the iPod.
17      MR. CARPENTER:  I'm sorry.  Can you repeat
18  that.
19      (Record read as follows:
20      "ANSWER:  I don't know.  I don't know
21       the format of the song.  What I can
22       tell you is if you rip your CD you
23       purchase, you were able to put on the
24       iPod.")
25      THE WITNESS:  The CD you purchase through

**206**

**208**

1  Tower Record, iTunes allow you to rip the CD --
2  right? -- and you would be able to transfer that
3  inside your iPod.
4  BY MR. CARPENTER:
5      Q.  So you couldn't directly purchase the song
6  from RealNetworks and put it on your iPod without
7  ripping it; correct?
8      MR. KIERNAN:  Objection; lacks foundation,
9  calls for speculation.
10      THE WITNESS:  I don't know what was
11  RealNetworks at the time.
12  BY MR. CARPENTER:
13      Q.  But you sent this e-mail that demonstrated
14  that a song could not be transferred directly from
15  Real to the iPod; correct?
16      A.  Correct.
17      Q.  Okay.  So did you take that to understand
18  that at that point in time, you could not purchase a
19  song from Real and put it on the iPod?
20      A.  This is not my understanding.  My
21  understanding is you cannot transfer a song, where
22  ever you purchase it, using RealPlayer.
23      Q.  Okay.  Why would a purchase of a song be
24  any different than the transfer of a song if the
25  purchase of the song also involved the transfer of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 14
# [Filed Under Seal]

David K. Heller - Volume I                                    December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

     THE APPLE IPOD ITUNES            Lead Case No.

 6   ANTI-TRUST LITIGATION.           C-05-00037-JW (HRL)

 7   ~~~~~~~~~~~~~~~~~~~~~~

 8

 9

10        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12           VIDEOTAPED 30(b)(6) DEPOSITION OF

13                   DAVID K. HELLER

14                    ON BEHALF OF

15                     APPLE, INC.

16                      VOLUME I

17

18                 December 15, 2010

19                      9:16 a.m.

20

21

                   1755 Embarcadero Road

22                 Palo Alto, California

23

24          Ana M. Dub, RMR, CRR, CSR 7445

25
```

David K. Heller - Volume I

December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1          APPEARANCES OF COUNSEL | 1          INDEX OF EXAMINATION |

**Page 2 (left column):**

```
 1          APPEARANCES OF COUNSEL
 2
 3   For the Plaintiffs:
 4      ROBBINS GELLER RUDMAN & DOWD LLP
        ALEXANDRA S. BERNAY, ESQ.
 5      PAULA M. ROACH, ESQ.
        655 West Broadway, Suite 1900
 6      San Diego, California  92101
        619.231.1058
 7      xanb@rgrdlaw.com
        proach@rgrdlaw.com
 8
 9
10   For the Defendant Apple, Inc.:
11      JONES DAY
        ROBERT A. MITTELSTAEDT, ESQ.
12      DAVID C. KIERNAN, ESQ.
        555 California Street, 26th Floor
13      San Francisco, California  94104
        415.626.3939
14      ramittelstaedt@jonesday.com
        415.875-5745
15      dkiernan@jonesday.com
16
17
18   Also Present:
19      APPLE, INC.
        LISA OLLE, SENIOR CORPORATE COUNSEL LITIGATION
20      1 Infinite Loop, MS 36-35U
        Cupertino, California  95014
21      408.862.8888
        olle@apple.com
22
23      MATTHEW COPE, VIDEOGRAPHER
24
25
                                        Page 2
```

**Page 3 (right column):**

```
 1           INDEX OF EXAMINATION
 2
 3   WITNESS:  DAVID K. HELLER
 4   EXAMINATION                    PAGE
 5   By Ms. Bernay                    9
 6   By Mr. Mittelstaedt            257
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 3
```

**Page 4 (lower left column):**

```
 1            INDEX TO EXHIBITS
 2
     Exhibit     Description        Page
 3
     Exhibit 32   E-Mail Chain, Top E-Mail .......115
 4                Dated April 23, 2004, to
                  Jeff Robbin from Chris
 5                Bell, Production
                  Nos. Apple_AIIA00092905-06
 6
     Exhibit 33   E-Mail Dated June 22, 2004 .....119
 7                to Jeff Robbin and Dave
                  Heller from Jennifer
 8                Cavaliere, Production
                  No. Apple_AIIA00093441
 9
     Exhibit 34   E-Mail Chain, Top E-Mail .......165
10                Dated July 27, 2004, to
                  Dave Heller from Max
11                Muller, Production
                  Nos. Apple_AIIA00090428
12
     Exhibit 35   E-Mail Chain, Top E-Mail .......169
13                Dated July 19, 2004, to
                  Dave Heller and Tom Dowdy
14                from Roger Pantos,
                  Production No.
15                Apple_AIIA00093332
16   Exhibit 36   E-Mail Chain, Top E-Mail .......178
                  Dated July 28, 2004, to
17                Meriko Borogove from
                  Jennifer Cavaliere,
18                Production No.
                  Apple_AIIA00092916
19
     Exhibit 37   Printout of Source Code, .......182
20                Production Nos.
                  Apple_AIIA0009034-51
21                (Retained by Counsel for
                  Defendant)
22
     Exhibit 38   E-Mail Dated August 11, ........194
23                2004, to Jeff Robbin from
                  Jennifer Cavaliere,
24                Production Nos.
                  Apple_AIIA000928748-52
25
                                        Page 4
```

**Page 5 (lower right column):**

```
 1        INDEX TO EXHIBITS - CONTINUED
 2
     Exhibit     Description        Page
 3
     Exhibit 39   E-Mail Dated August 19, ........204
 4                2004 to Jeff Robbin and
                  David Heller from Dave
 5                Heller, Production
                  Nos. Apple_AIIA00090666
 6
     Exhibit 40   E-mail Dated August 30, ....... 216
 7                2004 to Marc Sinykin et
                  al., from Dave Heller,
 8                Production Nos.
                  Apple_AIIA00090771
 9
     Exhibit 41   E-Mail Chain, Top E-Mail .......220
10                Dated September 3, 2004 to
                  Marc Sinykin from Bud
11                Tribble, Production
                  Nos. Apple_AIIA0092433-35
12
     Exhibit 42   E-Mail Chain, Top E-Mail .......224
13                Dated September 7, 2004, to
                  Jeff Robbin from Jennifer
14                Cavaliere, Production
                  Nos. Apple_AIIA00092918-23
15
     Exhibit 43   E-Mail Dated September 10, .... 227
16                2004 to Patrice Gautier
                  from Dave Heller,
17                Production No.
                  Apple_AIIA00091825
18
     Exhibit 44   E-Mail Dated September 16, .... 230
19                2004 to Grant Erickson from
                  Dave Heller, Production
20                No. Apple_AIIA00090826
21   Exhibit 45   Cloakware Document Entitled ....233
                  "Static Analysis of Binary
22                Executable iTunes 4.7
                  Release Candidate,"
23                Production Nos.
                  Apple_AIIA00093567-78
24
25
                                        Page 5
```

David K. Heller - Volume I

December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  order to purchase content on the iTunes Store, a
2  user had to update their iPod firmware?
3      MR. MITTELSTAEDT: And implicitly, you're
4  meaning to ask: And to play that on an iPod?
5      MS. BERNAY: I'm sorry.
6  BY MS. BERNAY:
7      Q. And to play that on an iPod.
8      Thank you, Bob.
9      A. I -- yeah. So the -- to answer the first
10 part of your question, there's never been a firmware
11 update that required you to update your iPod to buy
12 content from the store.
13     Q. Okay.
14     A. But to sync content down, I believe that I
15 can only recall the one time.
16     Q. Okay. You had mentioned there were a
17 number of file formats that that first generation of
18 iPods could play. Do you recall that --
19     A. Yes.
20     Q. -- testimony?
21     Do you know whether you could buy online
22 music from sources before the iTunes Music Store was
23 launched and play them on your iPod?
24     MR. MITTELSTAEDT: Object; scope.
25     THE WITNESS: If those -- if those sources

Page 46

1  were offering up standard MP3 or WAV or AIFF files,
2  those should have played on the pod just fine.
3  BY MS. BERNAY:
4      Q. Okay.
5      A. I'm not aware of specific examples of such
6  services.
7      Q. Do you know whether iTunes, the Desktop
8  Client, worked with any other media players prior to
9  the launch of the iTunes Store?
10     MR. MITTELSTAEDT: Objection; scope.
11     THE WITNESS: What do you mean by "media
12 player"?
13 BY MS. BERNAY:
14     Q. For example, a Zune or other device, a
15 non-iPod device.
16     A. iTunes had support for several specific
17 third-party devices in iTunes prior to the launch of
18 the Store.
19     Q. Do you know if iTunes had support for
20 other devices after the launch of the iTunes Store?
21     A. Yes, we did.
22     Q. What other devices?
23     A. It's the same set as before the Store.
24     Q. So I think one of the devices that
25 provided support -- or that iTunes provided support

Page 47

1  for was the Rio One. Are you familiar with that
2  device?
3      MR. MITTELSTAEDT: Objection; scope. Can
4  I have a continuing objection to this line on scope?
5      MS. BERNAY: Sure.
6      MR. MITTELSTAEDT: Thank you.
7      THE WITNESS: The Rio One was one of the
8  devices we added support for.
9  BY MS. BERNAY:
10     Q. And it's your testimony that the Rio One
11 could still play -- could it purchase -- I'm sorry.
12     Could a user of a Rio One, after the
13 launch of the iTunes Store, purchase content from
14 the iTunes Store and play it on the Rio One after
15 the launch of the iTunes Store?
16     A. To the best of my knowledge, the Rio One
17 did not support our protected format and that
18 content would not play.
19     Q. Okay. When the iTunes Store was launched,
20 it was only Mac compatible; is that right?
21     A. Yes.
22     Q. And do you know about when the iTunes
23 for -- iTunes Store for Windows was launched?
24     A. iTunes for Windows itself, which had the
25 support for the Store, was launched, I believe, in

Page 48

1  October of 2003.
2      Q. Prior to October of 2003, there was -- is
3  it right that there wasn't a desktop media player
4  iTunes version that was available for Windows?
5      MR. MITTELSTAEDT: Objection; scope.
6      THE WITNESS: Apple did not offer iTunes
7  on the Windows platform prior to the first -- that
8  first version of iTunes for Windows.
9  BY MS. BERNAY:
10     Q. Okay. Thank you.
11     Prior to the launch in October 2003 of the
12 iTunes -- is it right to say client for Windows or
13 the iTunes program?
14     A. iTunes application for Windows.
15     Q. Thank you.
16     Was there something for Windows that was
17 compatible with an iPod prior to that time?
18     A. Apple had an arrangement with Musicmatch
19 to do support within Musicmatch for putting files
20 onto an iPod. I don't recall when that arrangement
21 began, but that was a Windows solution for using
22 Windows with an iPod.
23     Q. So another topic -- and we've sort of been
24 talking about all these things because they do
25 overlap -- was the general overview of how updates

Page 49

13 (Pages 46 to 49)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   And is that something that you did
2  anything about?
3    A.   Can you clarify that?
4    Q.   What did the iTunes Team do in response to
5  that?
6         MR. MITTELSTAEDT:  Objection; assumes
7  facts not in evidence.
8         THE WITNESS:  As far as I know, we did
9  nothing to do anything about Harmony.
10 BY MS. BERNAY:
11   Q.   Did you investigate or look at the Harmony
12 software at any time?
13   A.   We did, yes.
14   Q.   Okay.  And why did you do that?
15   A.   We were looking to see what they were
16 doing to get their protected songs onto the iPod and
17 why the iPod would be able to play them.
18   Q.   Why did you do that?
19   A.   We wanted to see if this was a
20 DRM-circumvention hack.



Page 86

1    Q.   You said that they were mimicking Apple's
2  DRM system.
3    A.   They were encrypting the files the same
4  way that FairPlay does.
5    Q.   So how would that be a problem or a
6  circumvention?



Page 87

1  purchased from RealNetworks Harmony did anything to
2  the iPod database that caused any of the problems
3  that you just referred to?
4         MR. MITTELSTAEDT:  Objection; beyond the
5  scope.
6         THE WITNESS:  The -- RealNetworks did not
7  write a completely correct database that would cause
8  loss of functionality in the iTunes application.
9  BY MS. BERNAY:
10   Q.   What was not completely correct about it?
11   A.   They --
12        MR. MITTELSTAEDT:  Objection; beyond the
13 scope.
14        THE WITNESS:  They neglected to preserve
15 the song ID attributes and the artist and playlist
16 ID attributes, the songs purchased from the iTunes
17 Store.  The RealNetworks Harmony database neglected
18 to preserve what we called the DRM versions field of
19 the database, as well as neglecting to preserve a
20 lot of the iTunes UI aspects of the database.
21 BY MS. BERNAY:
22   Q.   Which iTunes UI of the database did it
23 neglect to preserve?
24   A.   The -- if a customer had gone through
25 their playlist on the iPod and set up custom views,

Page 88

1  custom columns, sorting, all that information was
2  lost when the RealNetworks database was written.
3    Q.   And is this something that actually
4  occurred that you're aware of?
5    A.   Yes.
6    Q.   And how are you aware that any of these
7  items that you mentioned occurred?
8    A.   Because my analysis of the database showed
9  that this data was being lost when RealNetworks
10 would save the database.
11   Q.   Did any customer ever tell you that any of
12 these issues -- or I'm sorry.
13        Did any customer ever tell Apple that any
14 of these issues occurred?
15        MR. MITTELSTAEDT:  Objection; beyond the
16 scope --
17        THE WITNESS:  I am --
18        MR. MITTELSTAEDT:  -- calls for
19 speculation, lack of foundation.
20        THE WITNESS:  I am not involved in
21 customer relations, so I do not know.
22 BY MS. BERNAY:
23   Q.   Are these problem that you're referring to
24 theoretical problems?
25        MR. MITTELSTAEDT:  Objection;

Page 89

David K. Heller - Volume I                                    December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    And that's a -- it says:
2        "(New iPod.)"
3    Do you see that?
4    A.  Yes.
5    Q.  And is that the photo iPod?
6    A.  No.  The color iPod --
7    Q.  Oh, I'm sorry.  Thank you.
8    A.  -- is that.
9    ███         is the iPod shuffle.  It's the first
10   iPod shuffle.
11   Q.  Okay.  And you mentioned that that was --
12   there was a specific iTunes update to deal just with
13   the iTunes shuffle earlier.
14   A.  Yes.  iTunes 4.7.1.
15       MS. BERNAY:  Put that to the side, please.
16       The next document was previously marked as
17   Exhibit 15.  It's a single-page document
18   Bates-stamped Apple_AIIA00090427.
19       If you could take a moment to review that,
20   please.
21       MR. MITTELSTAEDT:  15, did you say?
22       MS. BERNAY:  It was previously Exhibit 15.
23       (Witness reviews document.)
24       THE WITNESS:  Okay.
25
Page 126

1    BY MS. BERNAY:
2    Q.  You've had a chance to look at the
3    Exhibit 15?
4    A.  Yes.
5    Q.  And I think when we talked earlier today,
6    you said you had looked at a number of documents,
7    some of which had refreshed your recollection.
8        Is this one of those documents?
9    A.  Yes.
10   Q.  And what is Exhibit 15?
11   A.  Exhibit 15 is an e-mail I sent to Jeff
12   Robbin and others around what we discovered when we
13   first looked at Harmony.
14   Q.  And the bottom e-mail there is something
15   from Mr. Robbin.  Do you see that?
16   A.  Yes.
17   Q.  And it says:
18       "Hi guys:  I don't have a PC here,
19       but harmony appears to be
20       downloadable from . . . ."
21   And he lists the Web site.  He notes:
22       "I'm available on my cell phone at
23       any time."
24   Did I read that accurately?
25   A.  Yes.
Page 127

1    Q.  And did you perceive this e-mail from
2    Mr. Robbin as a request to do a technical evaluation
3    of the -- of Harmony?
4    A.  I believe this was a request, yes, for us
5    to go look at Harmony.
6    Q.  And why would Mr. Robbin have asked you to
7    do that?
8        MR. MITTELSTAEDT:  Object; beyond the
9    scope, calls for speculation, lack of foundation.
10       THE WITNESS:  Well, he is my boss.  And
11   the -- the time that these hacks come out, usually
12   it's his direction for us to go and look at
13   particular ones rather than for us to discover on
14   our own what was going on.
15   BY MS. BERNAY:
16   Q.  So you said "the time that these hacks
17   come out"?
18   A.  Yes.
19   Q.  So at this time, you believe that Harmony
20   was a hack?
21   A.  Yes.
22   Q.  And it notes here that:
23       ". . . harmony appears to be
24       downloadable . . . ."
25       Is this -- is it accurate that you had
Page 128

1    discussed with Mr. Robbin or others Harmony prior to
2    its release?
3        MR. MITTELSTAEDT:  Object; argumentative.
4        THE WITNESS:  It -- I don't recall.  It
5    probably was discussed around the fact that the
6    Harmony had a press release around the product, and
7    he's telling us here that it looks like it's
8    actually available for download now.
9    BY MS. BERNAY:
10   Q.  Do you know whether, in fact, you spoke to
11   anyone at Apple prior to the release of Harmony
12   about what it would be able to do before it was
13   released?
14   A.  I wasn't aware of it before it was
15   released.
16   Q.  What about when the press release came
17   out?  Is that when you first became aware of it?
18   A.  I can't say it was the same day as the
19   press release.
20   Q.  Okay.  Fair enough.
21       And it's from you and -- well, it's been
22   signed at the bottom there "The 'Dave & Tom' Show."
23   Do you see that?
24   A.  (Witness nods head.)
25   Q.  And that's you and Mr. Dowdy; is that
Page 129

David K. Heller - Volume I                                    December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1  correct? | 1      Q.   And I assume you have access to various |
| 2      A.   Yes. | 2   computers and iPods at your office; is that |
| 3      Q.   And you worked together to take a look at | 3   accurate? |
| 4   Harmony; is that right? | 4           MR. MITTELSTAEDT:  Objection; |
| 5      A.   Yes. | 5   argumentative. |
| 6      Q.   And do you have a specific or general | 6           THE WITNESS:  Yes, I do have access to |
| 7   recollection regarding actually taking a look at | 7   several iPods. |
| 8   Harmony? | 8   BY MS. BERNAY: |
| 9           MR. MITTELSTAEDT:  Objection; compound. | 9      Q.   Okay.  And so you note here that you took |
| 10           THE WITNESS:  I vaguely recall doing that | 10   a look at Harmony, and then you have: |
| 11   and composing this e-mail. | 11           "Here is what we found." |
| 12   BY MS. BERNAY: | 12           And then you have a list of 12 items; is |
| 13      Q.   What did you do? | 13   that right? |
| 14      A.   Pretty much what I needed to do to come up | 14      A.   Yes. |
| 15   with these items, which was install the Harmony | 15      Q.   Do you know whether there was anything |
| 16   software, get a Harmony store count -- whatever the | 16   that you discovered when looking at Harmony that you |
| 17   term was -- download a song, take that song and use | 17   did not include in this list? |
| 18   the Harmony software to put it on an iPod. | 18      A.   I don't recall. |
| | 19      Q.   Okay.  So the first thing here that you |
| | 20   note is: |
| | 21           "Downloaded song is 192kbps AAC." |
| | 22           Do you see that? |
| 23      Q.   And is this something that you did at the | 23      A.   Yes. |
| 24   office? | 24      Q.   What is that 192kpb -- bps AAC? |
| 25      A.   Yes. | 25      A.   It means 192 kilobits per second, which is |
| Page 130 | Page 131 |

| | |
|---|---|
| 1   a measurement of the audio bit rate and quality for | 1   BY MS. BERNAY: |
| 2   an AAC audio file. | 2      Q.   At some point did music at the iTunes |
| 3      Q.   Do you know what the audio bit rate was at | 3   Store -- I'm sorry. |
| 4   this time for music that was purchased from the | 4           At some point was music sold through the |
| 5   iTunes Store? | 5   iTunes Store sold at a rate higher or different than |
| 6      A.   It was 128 kbps. | 6   this 128 kbps? |
| 7      Q.   And is it accurate that generally | 7           MR. MITTELSTAEDT:  Objection; beyond the |
| 8   speaking, the 192 kbps is a better quality of audio | 8   scope. |
| 9   than the 128 kbps? | 9           THE WITNESS:  Most songs we offer in the |
| 10           MR. MITTELSTAEDT:  Objection; beyond the | 10   iTunes Store today are 256 kbps. |
| 11   scope -- | 11   BY MS. BERNAY: |
| 12           THE WITNESS:  If -- | 12      Q.   What about in 2007?  What was the kbps |
| 13           MR. MITTELSTAEDT:  -- lack of foundation. | 13   rate that was sold on music at the iTunes Store? |
| 14           THE WITNESS:  If the files are created | 14           MR. MITTELSTAEDT:  Objection; beyond the |
| 15   with the same encoder, 192 should be better.  But to | 15   scope. |
| 16   say that a file that's 192 is always better than 128 | 16           THE WITNESS:  I do not recall when we |
| 17   is not an accurate statement. | 17   started offering the higher bit rate songs. |
| 18   BY MS. BERNAY: | 18   BY MS. BERNAY: |
| 19      Q.   And why is that not an accurate statement? | 19      Q.   What -- after -- what was the first |
| 20           MR. MITTELSTAEDT:  Objection; beyond the | 20   upgrade or increase in kbps rates of music that was |
| 21   scope. | 21   sold through the iTunes Store? |
| 22           THE WITNESS:  The quality of the encoder | 22           MR. MITTELSTAEDT:  Objection; beyond the |
| 23   and the techniques used by the particular encoding | 23   scope. |
| 24   software is -- is very germane to the resulting | 24           THE WITNESS:  I'm sorry.  When you say |
| 25   file's quality. | 25   "what was"? |
| Page 132 | Page 133 |

David K. Heller - Volume I                                           December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. BERNAY:
2       Q.   In 2004, is it accurate that music sold
3   through the iTunes Store was at 128 kbps?
4           MR. MITTELSTAEDT:  Objection; beyond the
5   scope.
6           THE WITNESS:  It would have all been 128,
7   yes.
8   BY MS. BERNAY:
9       Q.   And then at some point in time did that
10  number increase to another number?
11          MR. MITTELSTAEDT:  Same objection.
12          THE WITNESS:  Apple started offering music
13  available at 256 in most cases.  There are still
14  places where it's still 128.
15  BY MS. BERNAY:
16      Q.   So I guess I'm asking if there was any
17  intermediate step between 128 and 256.
18          MR. MITTELSTAEDT:  Objection; beyond the
19  scope.
20          THE WITNESS:  There was not.
21  BY MS. BERNAY:
22      Q.   Okay.  Are you familiar with a thing
23  called iTunes Plus?
24      A.   Yes.
25      Q.   What is that?

Page 134

1       A.   iTunes Plus was the customer-facing name
2   for the new content being offered at 256 kbps
3   unencrypted.
4       Q.   Unencrypted?
5       A.   Yes.
6       Q.   Thank you.



Page 135

Page 136

21      A.   Not just that.  You could have legally
22  purchased songs on the computer but the computer's
23  not authorized as one of your five.
24      Q.   Thank you.
25          The next one there is:

Page 137

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 48
# [Filed Under Seal]

Mark Donnelly                                              December 20, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

**1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

--oOo--

THE APPLE IPOD ITUNES ANTI-TRUST
LITIGATION

                    Lead Case No. C-05-00037-JW(HRL)
This Document Relates To:
ALL ACTIONS
---------------------------------

VIDEOTAPED DEPOSITION OF
MARK DONNELLY
Monday, December 20, 2010
1:25 P.M.
1755 Embarcadero
Palo Alto, California

**HIGHLY CONFIDENTIAL, ATTORNEYS EYES ONLY**

Corey W. Anderson, CSR 4096

---

**2**

```
 1          APPEARANCES OF COUNSEL
 2
 3   FOR THE PLAINTIFF:
 4     ROBBINS GELLER RUDMAN & DOWD LLP
       655 West Broadway, Suite 1900
 5     San Diego, CA  92101
       BY:  PAULA M. ROACH, ESQ.
 6     619-231-7423
 7     ROBBINS GELLER RUDMAN & DOWD LLP
       655 West Broadway, Suite 1900
 8     San Diego, CA  92101
       BY:  ALEXANDRA BERNAY, ESQ.
 9     619-231-7423
10   FOR THE DEFENDANT:
11     JONES DAY
       555 California Street, 26th Floor
12     San Francisco, CA 94104
       BY:  ROBERT MITTELSTAEDT, ESQ.
13     415-626-3939
14
15            --oOo--
16
17   ALSO PRESENT:
18     ERICA GREULICH
19     LISA OLLE
20     FRANK CLAIRE, VIDEOGRAPHER
21
22
23
24
25
```

---

**3**

```
 1           INDEX OF EXAMINATION
 2   WITNESS: MARK DONNELLY
 3
 4   EXAMINATION                      Page
 5   EXAMINATION BY MS. ROACH           7
 6
 7           INDEX TO EXHIBITS
 8   No.       Description          Page
 9   Exhibit 95  Plaintiff's Rule 30(B)(6) Notice  10
                 Of Videotaped Deposition Of
10               Corporate Designees
11   Exhibit 96  Apple Computer, Inc. Minimum      15
                 Advertised Price (MAP)
12               Confidential Listing
                 (Apple_AIIA00972959-962)
13
                 Exhibit 97  Apple Computer, Inc.           27
14               Confidential Adjustment Price
                 Listing for FY03 Approved
15               Federal Contracts
                 (Apple_SOM00000600-603)
16
                 Exhibit 98  Apple Computer, Inc. Collegiate  29
17               Purchase Program Premier Price
                 List May 6, 2003
18               (Apple_SOM00000604-629)
19   Exhibit 99  Apple Computer, Inc. Collegiate   31
                 Purchase Program Demo Unit
20               Confidential Price List April
                 12, 2003 (Apple_SOM00000538)
21
                 Exhibit 100  Apple Computer, Inc. Direct      32
22               Purchase Resellers Confidential
                 Price List April 12, 2003
23               (Apple_SOM00000539-547)
24
25
```

---

**4**

```
 1   Exhibit 101  Apple Computer, Inc. Apple        36
                  Education Individual Purchase
 2                Program Price List April 12,
                  2003 (Apple_SOM00000548-555)
 3
     Exhibit 102  Apple Computer, Inc. Education,   38
 4                State And Local Government Price
                  List August 16, 2003
 5                (Apple_SOM00000916-941)
 6   Exhibit 103  Apple Computer, Inc. Wholesaler   41
                  Confidential Price List June 14,
 7                2003 (Apple_SOM00000766-775)
 8   Exhibit 104  Private Committee March 17, 2003  63
                  (Apple_AIIA_B_000104-114)
 9
     Exhibit 105  June 9, 2005 E-Mail from Davina   96
10                Takeda to Doug Smith, et al.
                  (Apple_AIIA_B_000340-347)
11
     Exhibit 106  June 30, 2004 E-Mail from Mark   102
12                Donnelly to Tim Cook, et al.
                  (Apple_AIIA_B_000190-192)
13
     Exhibit 107  Price Committee December 15,     105
14                2003 Decision: IPod, Xserve,
                  Xserve RAID
15                (Apple_AIIA_B_000150-176)
16   Exhibit 108  Price Committee February 13,     109
                  2006, Decision: Mac, Mini, iPod
17                (Apple_AIIA_B_000230-248)
18   Exhibit 109  August 14, 2008 E-Mail from Joe  114
                  Hardegger to Davina Takeda
19                (Apple_AIIA_B_000249-257)
20   Exhibit 110  Price Committee June 30, 2004,   117
                  Decision:  IPod
21                (Apple_AIIA_B_000193-203)
22   Exhibit 111  October 4, 2004 e-mail from      121
                  Davina Takeda to Stephanie
23                Anderson, et al.
                  (Apple_AIIA_B_000204-229)
24
25
```

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Mark Donnelly
December 20, 2010
HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY




ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY





Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Mark Donnelly
December 20, 2010

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

54

56


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 50
# [Filed Under Seal]

# The Apple iPod iTunes Anti-Trust Litigation

## Videotaped Deposition of
## ROGER NOLL, PH.D.
## December 18, 2013
## ***CONFIDENTIAL***

Confidential - Attorneys' Eyes Only

**Roger Noll, Ph.D.**                    **The Apple iPod iTunes Anti-Trust Litigation**

Page 1

```
1           UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3               OAKLAND DIVISION
4
5   THE APPLE iPOD iTUNES      Lead Case No. C 05-00037
    ANTI-TRUST LITIGATION
6
7   _____
8   This Document Relates To:
9   ALL ACTIONS
10  _____
11
12
13
14       CONFIDENTIAL - ATTORNEYS' EYES ONLY
15   VIDEOTAPED DEPOSITION OF ROGER G. NOLL, PH.D.
16        Wednesday, December 18, 2013
17           Palo Alto, California
18
19
20
21
22
23  Reported by:
    Darcy J. Brokaw
24  RPR, CRR, CSR No. 12584
25  Job No. 10008944
```

Page 2

```
1           UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3               OAKLAND DIVISION
4
5   THE APPLE iPOD iTUNES      Lead Case No. C 05-00037
    ANTI-TRUST LITIGATION
6
7   _____
8   This Document Relates To:
9   ALL ACTIONS
10  _____
11
12
13       CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15       Videotaped Deposition of ROGER G. NOLL, PH.D.,
16   taken on behalf of  he Defendant, at 1755 Embarcadero
17   Road, Palo Alto, California, beginning at 9:06 a.m. and
18   ending at 11:54 p.m., on Wednesday, December 18, 2013,
19   before Darcy J. Brokaw, CSR No. 12584.
20
21
22
23
24
25
```

Page 3

```
1               APPEARANCES
2
3
4   For the Plain iffs and the deponent, Dr. Noll:
5       ROBBINS GELLER RUDMAN & DOWD, LLP
        BY: ALEXANDRA S. BERNAY, ESQ.
6       BY: JENNIFER N. CARINGAL, ESQ.
        655 West Broadway, Suite 1900
7       San Diego, California  92101
        (619)231-1058
8       xanb@rgrdlaw.com
9
10  For the Defendant, Apple Inc.:
11      JONES DAY
        BY: DAVID KIERNAN, ESQ.
12      BY: AMIR AMIRI, ESQ.
        BY: ROBERT MITTELSTAEDT, ESQ.
13      555 California Street, 26th Floor
        San Francisco, California  94104
14      (415)626-3939
        dkiernan@jonesday.com
15
16
17
18  Also present:
19      Peter Hibdon, Videographer
20
21
22
23
24
25
```

Page 4

```
1           INDEX TO EXAMINATION
2           ROGER G. NOLL, PH.D.
3
4
5   EXAMINATION                    PAGE
6   BY MR. KIERNAN                  7
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                              The Apple iPod iTunes Anti-Trust Litigation



**Page 23**

1  regression are correlated within a particular group
2  and you don't do anything to correct for that, what
3  would be the impact on the reported standard errors?
4      MS. BERNAY:  Objection.  Vague and
5  ambiguous.
6      THE WITNESS:  I didn't completely follow
7  the question.  Ask it again.
8  BY MR. KIERNAN:
9      Q.  If the residual errors in the regression
10  are correlated within a particular group and you
11  don't do anything to correct for that, what would be
12  the impact on the reported standard errors?
13      MS. BERNAY:  Same objection.
14      THE WITNESS:  It could be either way.  It
15  could make them higher or it could make them lower,
16  depending on the nature of the correlation.
17  BY MR. KIERNAN:
18      Q.  And why would it impact the reported
19  standard errors?
20      A.  Well, it's all built up in the -- in the
21  nature of the assumptions one makes in doing a
22  regression analysis, which is an independence of the
23  standard errors.  And if the standard errors -- if
24  the -- if the random shock that is --
25      (Reporter inquires.)

**Page 24**

1      THE WITNESS:  If the random shock that is
2  in the regression equation does not satisfy the
3  independence assumption, then the effect on the
4  standard errors of the coefficients could be either
5  to elevate them or to reduce them, depending on the
6  nature of the violation of the independence
7  assumption.
8  BY MR. KIERNAN:
9      Q.  Okay.  And are there standard statistical
10  tests to test whether the residual errors are
11  correlated within a particular group?
12      MS. BERNAY:  Objection.  Vague.
13      THE WITNESS:  There are many such tests
14  and many such corrections.  But the effect is -- the
15  existence of even statistically significant
16  correlations is small unless those correlations are
17  high.  All right.
18      So the corrections for autocorrelation of
19  residuals are not something that actually matters in
20  the vast majority of cases because the -- it's
21  almost never the case there's no correlation in
22  residual errors, but it's almost never the case that
23  making a correction for the auto- -- the correlation
24  that does exist matters in terms of the regression.
25      It's also the case here that we're not

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 25

1  talking about a source of bias in the coefficients.
2  We're talking about a source of bias in the
3  estimated statistical significance, the –
4  BY MR. KIERNAN:
5      Q. The standard errors?
6      A. Yeah, the values of the – the expected
7  value of the regression coefficients is not
8  affected.
9      Q. The coefficients aren't affected, but the
10 calculations of the standard errors are affected?
11     A. Right, the calculations of the standard
12 errors are affected, but the – but the estimated
13 effect of the independent variable is the same, the
14 expected estimated effect.
15     Q. And if the residual errors are correlated
16 within a particular group, the standard errors could
17 either be overstated or understated?
18     A. Yes.
19     Q. Without a correction?
20     A. They could be. Although, again, the –
21 it's not – it's not a dichotomous issue. They –
22 A, they may be affected, and B, the magnitude of the
23 effect depends on the exact conditions.
24     Q. And to know the magnitude of effect, you'd
25 have to test it, you'd have to run one of the

Page 26

1  standard statistical tests?
2      MS. BERNAY: Objection. Calls for
3  speculation.
4      THE WITNESS: Well, actually, that's not
5  what most – what typically –
6  BY MR. KIERNAN:
7      Q. Can you just eyeball it?
8      A. – happens.
9      (Reporter inquires.)
10 BY MR. KIERNAN:
11     Q Can you just eyeball it?
12     MS. BERNAY: Objection. Vague.
13     THE WITNESS: Can I finish my first answer
14 before I answer the next question?
15 BY MR. KIERNAN:
16     Q. Yes.
17     A. Okay. It is the case that if you plot the
18 errors, you will know from experience if you
19 actually have a problem that is causing the
20 regression equation to be unreliable. But so
21 "eyeball" is sort of a bizarre word.
22     What you actually do is you look at the
23 actual scatter plot of points around the regression
24 line and see if there is a clustering of
25 observations above and below it. The problem with

Page 27

1  that – that's a good way to see if there's positive
2  error correlation, but it's not a good way to see if
3  there's negative error correlation.
4      And the second point is that the nature of
5  the error correlation may be that it's dependent on
6  particular combinations of variables; and that one,
7  the standard tests wouldn't even tell you that it
8  exists.
9      Q. In this case, did you do anything to check
10 whether the residual errors in your regression set
11 forth in Exhibits 3A and 3B to Noll 10 are
12 correlated with any particular group?
13     MS. BERNAY: Objection. Vague and
14 ambiguous.
15     THE WITNESS: What do you mean by "group"?
16 BY MR. KIERNAN:
17     Q. Within any group.
18     A. What do you mean, "a group"? I don't
19 understand what you mean by a group.
20     Q. We've been using group for the last ten
21 minutes.
22     MS. BERNAY: Objection. Argumentative.
23 BY MR. KIERNAN:
24     Q. Same group that you've – the same group
25 that you've been referring to.

Page 28

1      A. I didn't refer to a group. I don't know
2  what you're talking about. I know I fully
3  intended –
4      Q. You used the term "cluster" –
5      (Reporter admonishes.)
6  BY MR. KIERNAN:
7      Q You used the word cluster, within a
8  cluster.
9      A. I don't agree that there are any clusters
10 here.
11     MS. BERNAY: Objection.
12 BY MR. KIERNAN:
13     Q. That's not my question, Dr. Noll. I asked
14 you, did you do anything to check whether the
15 residual errors in your regressions set forth in
16 Exhibit 3A and 3B are correlated within any cluster
17 or group?
18     MS. BERNAY: Objection. Asked and
19 answered.
20     THE WITNESS: I don't know what you mean
21 by a group. And you used the word "or," and I don't
22 believe there are any clusters. So how can I test
23 for something when I don't – I think it either
24 doesn't exist or I don't understand what you're
25 asking?

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 33

1   there, so instead of having 100-odd iPod models, I
2   only had 20, and within those 20, I had just drawn a
3   sample of transactions instead of looking at the
4   entire universe, then, in principle, there might be
5   a clustering problem.  But when you don't have a
6   sample of either the models or the transactions,
7   it's not a cluster problem.
8        So testing for cluster effects is a
9   non sequitur.  It's inappropriate, because you don't
10  have cluster samples.
11       Q.  Okay.  And other than that basis that
12  there's not a clustering problem because it's not a
13  sample from a population, any other reason, any
14  other basis for your opinion that there's not a
15  clustering issue?
16       A.  Only the fact it doesn't satisfy the
17  conditions for doing cluster analysis?
18       Q.  The one that you just described.
19       A.  Yes.  That's why it isn't a cluster
20  problem, is because it's not a cluster sample.  And
21  cluster sampling is a procedure you use when you are
22  sampling on both groups and people within a group.
23       If you have a population instead of a
24  sample, there's no cluster issue, by definition.
25       Q.  And so if the mean residual errors within

Page 34

1   certain particular groups in the transaction data at
2   issue in this case are correlated, that is, they are
3   statistically significantly different from zero,
4   your opinion is it has no impact on the calculation
5   of the standard errors in the case?
6        A.  That's not what I said.
7             MS. BERNAY:  Objection.  Misstates his
8   prior testimony.
9   BY MR. KIERNAN:
10       Q.  What was wrong with -- what do you
11  disagree with in the question I just asked?
12            MS. BERNAY:  Objection.  Vague.
13            THE WITNESS:  First of all, if you look
14  within a -- if you define the group as a particular
15  model of an iPod, and you look at the errors in
16  predicting that, and you find they're correlated, it
17  may be -- it's perfectly explained if you took into
18  account all the values of all the other independent
19  variables.
20       So that test in and of itself doesn't
21  prove anything.  All right.  The only way it proves
22  something -- again, let's go back to the reasons
23  cluster sampling can be a problem.  And as stated in
24  the report, there's three reasons why it can be a
25  problem.  One is a sample bias problem, and the

Page 35

1   other two are versions of omitted variable problems.
2        So the issue is, is there a sampling issue
3   here?  The answer is no.
4        Are there omitted variables?  I'm not
5   aware of any that would add statistical significance
6   to the regression equation without being so highly
7   multicollinear that they would destroy the
8   coefficient estimates.
9        So there can't -- there isn't any -- none
10  of the three reasons why you might have a problem
11  exist.  So I don't care what the test is, because
12  it's testing for something that, in principle, can't
13  exist as a problem in the regression.
14  BY MR. KIERNAN:
15       Q.  So if you run a test on a particular group
16  of transactions and the test shows that the mean
17  residual errors are statistically significantly
18  different from zero, your opinion is it has no
19  impact on the calculation of the standard errors?
20            MS. BERNAY:  Objection.  Vague and
21  ambiguous.  Misstates prior testimony as well.
22  BY MR. KIERNAN:
23       Q.  Let me put it differently.  It does not
24  overstate or understate the standard errors that
25  you're calculating?

Page 36

1             MS. BERNAY:  Same objection.
2             THE WITNESS:  It may or may not.  You
3   haven't -- there's not enough information in your
4   question to make a prediction about the effect on
5   the calculation of the standard errors.
6   BY MR. KIERNAN:
7        Q.  What additional information do you need?
8        A.  You have to understand what is the source
9   of what you're measuring.  All right.  You have
10  to --
11       Q.  The source of the observations?
12       A.  No.
13            THE REPORTER:  What's the question?
14  You guys are cutting each other off.
15            THE WITNESS:  Yeah, he does do this,
16  doesn't he?
17       The very first step is precisely what
18  residual errors are you correlating, what actually
19  is it.  All right.  And I don't know the answer to
20  that.
21       All you're telling me is that within a
22  model of iPods, the mean residual error isn't
23  zero.  That's all you're telling me.  You're not
24  telling me anything else about why it might be
25  different from zero.

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 49

1  understand it.
2      Q. Well, yeah, okay.
3          MR. KIERNAN: Move to strike the last
4  part.
5  BY MR. KIERNAN:
6      Q. So the new iPod owners includes both
7  purchasers of iPods with 7.0 and iPods without 7.0?
8      A. To differing degrees, yes.
9      Q. Okay. And in the rest of the paragraph,
10  you state that the "lock-in would not have affected
11  the demand for subsequent iPods for a long period
12  because these purchasers would not soon make
13  repurchase decisions."
14      What's the basis for that?
15      A. That it's information we have about how
16  long people own electronic devices. They don't buy
17  a new electronic device with the same frequency they
18  buy music.
19      Q. And that's the 18-month to two-year period
20  that you referred to in your initial merits report?
21      A. I think that's those -- I don't remember
22  from memory, but that sounds about right as to
23  frequency of repurchase of iPods.
24      Q. Okay.
25      A. The mean frequency. Some are more, some

Page 50

1  are less. That's on average.
2      Q. And then in the last sentence, you state
3  that "for most of the damages period, the lock-in
4  effect on new iPod purchasers would not be an
5  important factor affecting iPod prices."
6      On the new -- when you refer to "new iPod
7  purchasers," are you referring to the new iPod
8  purchasers that occurred in late 2006?
9      A. I'm referring to people who bought -- what
10  this means, is about, is people who bought their
11  first iPod after -- in late 2006, yes.
12      Q. Okay. And those purchasers, you're
13  stating here, would not be an important factor
14  affecting iPod prices during most of the damages
15  period?
16      A. That's right. Because they wouldn't buy
17  another MP3 player until nearly the end of the
18  damages period.
19      Q. Okay. With respect to the lock-in theory,
20  are there any iPod owners that would impact the
21  demand for iPods during the damages period as a
22  result of lock-in?
23      MS. BERNAY: Objection. Vague and
24  ambiguous.
25      THE WITNESS: Yes. I mean, the people who

Page 51

1  are buying replacement iPods are the -- what this is
2  about is the fact that it's mainly people who are
3  buying replacement iPods that experience the
4  immediate effect of lock-in. They are, to some
5  degree, locked in. And the point of Harmony was to
6  reduce the degree to which existing users of iPods
7  were locked in.
8  BY MR. KIERNAN:
9      Q. Okay. And I think I'm following you now,
10  Dr. Noll. When you're referring to "new iPod
11  purchasers" in the last paragraph on page 27, you're
12  referring to customers who did not own an iPod
13  before that time?
14      A. Yes. This is new purchasers. This is not
15  replacement purchasers.
16      Q. Okay. And for a new purchaser in late
17  2006, your opinion is for most of the damages
18  period, they would not be an important factor
19  affecting iPod prices because they wouldn't purchase
20  a replacement for the 18- to 24-month period?
21      A. The -- yeah. Of course, it's not
22  dichotomous, it's continuous. Their importance
23  grows through time. But initially, it would not be
24  important because you don't replace your iPod every
25  month. All right. So it would take a while before

Page 52

1  you start to see an effect.
2      There would be other things happening that
3  would cause it to have some effect on demand, like
4  multiple iPods within the same family unit that want
5  access to the same music, things like that.
6      But the main immediate effect of lock-in
7  is the existing or established base. It's not the
8  new people. And the new people would just gradually
9  through time get added to the people who are
10  affected by lock-in in terms of their effect on the
11  demand for iPods.
12      MR. KIERNAN: Let's just take a short
13  break.
14      THE VIDEOGRAPHER: Off the record at
15  10:05.
16      (A brief recess was taken.)
17      THE VIDEOGRAPHER: On the record at 10:18.
18  BY MR. KIERNAN:
19      Q. In the regression that is in Exhibits 3A
20  and 3B to Noll 10, you turn on the dummy variable
21  for 7.0 at different times for different models; is
22  that right?
23      A. Well, the indicator is on for a model that
24  has 7.0 on it. So anything that was released after
25  the first date would have it, quote, turned on,

Page 49..52

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                          The Apple iPod iTunes Anti-Trust Litigation



Page 53

1  unquote, after the September date when it was
2  introduced. I don't fully understand what you mean
3  beyond that.
4     Q. Okay.

Page 54

1  I believe, is still on those things. It was in
2  subsequent revisions that the mechanism that was
3  used to block Harmony, you know, in subsequent
4  versions of iTunes that were on that particular
5  model remain there. That's my understanding.
6  That's what I think the 7.0 means.
7        But that's, again, derived from Apple
8  information. So since that information changes
9  periodically, it might change again, but I'm relying
10  upon what I was told by Apple.

14        MS. BERNAY: Objection.   'ague.
15        THE WITNESS: It's intended to capture
16  whatever the blocking mechanism is in an Apple that
17  is not being contested in this case.
18  BY MR. KIERNAN:
19     Q. It's intended to capture the impact of 4.7
20  on that model?
21        MS. BERNAY: Objection. Misstates prior
22  testimony.
23        THE WITNESS: That's not what I said.
24  BY MR. KIERNAN:
25     Q. I didn't understand what you said.

Page 55

1     A. Well, what is there about it that you
2  don't understand? I don't know how – I can repeat
3  it.
4        It is intended to capture whatever the
5  blocking mechanism is that's not being challenged
6  that initiates with 4.7 and is continued on in
7  various models through time. And those aren't being
8  challenged, so whatever it is that blocks
9  imperfectly to some degree Harmony is still
10  applying. So starting with 4.7 and continuing.
11        The distinction is between those that are
12  being challenged versus those that are not being
13  challenged.

Page 56

Page 53..56

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                           The Apple iPod iTunes Anti-Trust Litigation



Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 61

1  happened to the entire equation, including the
2  interaction variable, to answer that question.
3  BY MR. KIERNAN:
4      Q.  Okay.
5      A.  The right way to think of the regression
6  model is that it's based on differences in prices
7  between two models.  All right.
8          And so the premise of the regression
9  equation is essentially with some amendment, because
10  there's differences in other independent variables,
11  that what you're really looking at to determine
12  damages is the price difference between those that
13  were affected and those that were not.

REDACTED

Page 62

REDACTED

Page 63

REDACTED

Page 64

REDACTED

Page 61..64

REDACTED

REDACTED

1      I mean, there could be differences owing
2   to whatever remaining specification errors there
3   are.  But basically you would expect that the
4   number – the aggregate number would be correct, but
5   the allocation among models would be wrong.
6      Q.  Okay.  In your rebuttal report, Noll 10,
7   you discuss the impact of what you refer to as the
8   lock-out effect and that the effect on iPod prices
9   would be immediate.
10        MS. BERNAY:  Do you have a page reference
11   for that?
12        MR. KIERNAN:  I'm just going to – I'm not
13   going to ask with the actual words.
14   BY MR. KIERNAN:
15      Q.  Who specifically would be locked out under
16   that theory, under your lock-out theory?
17        MS. BERNAY:  Objection.  Incomplete
18   question, vague.
19        THE WITNESS:  Lock-out arises because
20   somebody who uses another device pays a higher
21   switching cost to buy an Apple product.  And so if
22   somebody has used another device and has used that
23   device to download audio and video files from
24   RealNetworks, then they can't – the cost of
25   switching to have their next MP3 player be an Apple

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 69

1  goes up if they no longer – if the act of doing it
2  would cause them no longer to be able to play
3  whatever files they had downloaded from the
4  RealNetworks site.
5      Harmony allows people to switch from MP3
6  players that access the RealNetworks site, that use
7  the RealNetworks DRM system, to an Apple iPod. And
8  if Harmony is disabled, then they can't have that
9  switch.
10     And so the extent of price competition
11 between manufacturers of MP3 players that can be
12 used for the Real– on the RealNetworks site and
13 Apple MP3 players, the competition between them is
14 reduced. Both sides experience a more inelastic
15 demand curve instantaneously because of that effect.
16 BY MR. KIERNAN:
17     Q. For the owners of the non-iPods that you
18 were just describing with RealNetworks music, your
19 last point is that it would also impact the
20 inelasticity of demand for non-iPods?
21     A. That's the whole idea of lock-out. That's
22 the whole idea of walled garden, is that you –
23     Q. What impact on prices would that have on
24 the non-iPods?
25     A. It would go up. Well, except for the fact

Page 70

1  that the others ones are competitive. So the fact
2  that the market inelasticity and demand became more
3  inelastic for other MP3 players wouldn't necessarily
4  imply their price went up, because there's
5  competition in devices that use other DRM systems,
6  because there's multiple vendors of devices that can
7  be used for other sites, but there's only one vendor
8  that can be used for the Apple site.
9      So the increase in the inelasticity of
10 demand for MP3 players that can access RealNetworks
11 is dissipated in price competition among those
12 device manufacturers, but the increase in the
13 inelasticity of demand for iPods does not face
14 competition from other vendors of devices. And so
15 that would lead to a price increase.
16     Q. Okay. And with respect to – when you
17 refer to MP3 players, you're referring to non-iPods?
18 I just want to make sure we're using the same
19 definitions here.
20     A. MP3 players, I was making as the category,
21 and then there are subsets depending on which site
22 you can access. And general – you know, to be
23 clear, you know, usually people refer to all
24 portable digital media players as MP3 players,
25 including an iPod.

Page 71

1      But clearly an iPod is different because
2  of its tetheredness to Apple, like Zune is tethered
3  or was tethered to Microsoft.
4      Q. I'll just use the word "non-iPods."
5      A. Yeah, non-iPod MP3 players, and then
6  there's iPods.
7      Q. Fair enough.
8      Looking at the non-iPod side, as a result
9  of 7.0, your opinion is that certain consumers that
10 have music from RealNetworks are now locked out of
11 iPods?
12     MS. BERNAY: Objection. Misstates prior
13 testimony.
14     THE WITNESS: Yeah, lock-out in the sense
15 that they face a higher switching cost than they
16 would have faced prior to the introduction of 7.0.
17 BY MR. KIERNAN:
18     Q. And does that depend on how much
19 RealNetworks music they had?
20     A. Yes.
21     Q. What else would it depend on?
22     A. Well, the pure lock-out effect is just
23 that; it's the degree to which you contain a library
24 of files that can't be played on the iPod.
25     That's the – you know, there are other

Page 72

1  switching costs – normally we think of switching
2  costs as costs you have to bear from using one
3  device to using another. And the switching costs
4  there have to do with learning how to use it,
5  perhaps differences in – in prices of the things
6  you use. So there's other things that affect
7  switching costs.
8      But lock-out refers to the component of
9  switching costs that is due to incompatibility.
10     Q. And how much RealNetworks music would a
11 consumer need or have in its possession to be locked
12 out of an iPod?
13     MS. BERNAY: Objection. Vague.
14     THE WITNESS: Well, the question presumes
15 there's a dichotomous effect, and the whole point of
16 the last answer was to say there wasn't.
17     It depends on how much. It's just what
18 the inelasticity of the demand curve looks like,
19 that the – that the demand curve becomes more
20 inelastic.
21     But small changes in price still have an
22 effect on quantity. And so what the demand curve
23 tells you is the distribution of people in terms of
24 the magnitude of the lock-out effect.
25 ///

**Page 69..72**

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                          The Apple iPod iTunes Anti-Trust Litigation

Page 73

1  BY MR. KIERNAN:
2      Q. And do you have any estimate of the number
3  of people, number of customers who were locked out
4  from purchasing iPods as a result of 7.0?
5      A. The number that faced higher switching
6  costs would be the number of people who had
7  libraries of files that used the DRM system of
8  RealNetworks.
9      Q. All people that had libraries regardless
10  of size from RealNetworks?
11      A. Yeah, the size determines the magnitude of
12  the lock-out but not the existence. So the lock-out
13  effect is translated into the demand curve. We said
14  that the demand curve becomes more inelastic. We
15  didn't say it becomes perfectly inelastic; we said
16  it becomes more inelastic.
17          At low prices, there are some people still
18  with a low switching cost, and they'd be the ones
19  who for small price differentials still might
20  switch.
21          But the increase in the extent to which
22  the demand curve is inelastic reflects the
23  distribution of people who use MP3 players for
24  listening to RealNetworks DRM files. That
25  distribution determines where they are on this new

Page 74

1  more inelastic demand curve. How many of these
2  files they have determines where they are on that
3  demand curve.
4      Q. And do you have an estimation or – do you
5  have an estimation of how many consumers that had
6  RealNetworks music were locked out of purchasing an
7  iPod because they deemed the switching costs to be
8  too high?
9          MS. BERNAY: Objection. Calls for
10  speculation.
11          THE WITNESS: First of all, "lock-out"
12  refers to the switching cost itself. And the only
13  way I can answer that is that there's no answer to
14  the question because it's not a meaningful question.
15  The demand curve becomes more inelastic.
16          So the greater the price differential
17  between an iPod and some other MP3 player, the fewer
18  people there are who would be prevented from
19  switching. All right.
20          And the – where anybody is on that demand
21  curve is determined by the switching cost, and then
22  how many of them switch is determined by the
23  relative prices of the MP3 players and the iPods.
24          Remember that the other MP3 players also
25  might have a price increase, or it might not,

Page 75

1  depending on the nature of competition among those
2  devices.
3          So – and it's the gap, it's the
4  differential in the price that determines how many
5  people would actually switch, and that – the bigger
6  the gap, the more people would switch.
7          And everybody is going to set the price of
8  their player depending on two phenomenon, right?
9  One is within technology competition, of which
10  there's some for the other MP3 players and none for
11  Apple; and the across technology, cross-elasticity
12  of demand between the other players and Apple. And
13  we're talking about the latter.
14          So if we take an extreme assumption and
15  assume that due to competition, 7.0 had no effect at
16  all on other MP3 player prices and the sole effect
17  was to raise the price of Apple, then they would
18  raise the price up to the point at which the loss to
19  them of losing switchers was exactly offset by the
20  gains from charging the higher price.
21          And I don't know how – what precise
22  number of people that is, but the number of people
23  who actually switched from others to Apple's was
24  probably not very large because it would not be in
25  Apple's interest to raise the price so high that it

Page 76

1  lost all possible switchers.
2  BY MR. KIERNAN:
3      Q. With respect to the non-iPods – excuse
4  me.
5          With respect to the non-iPods and the
6  inelasticity of demand, did you do anything to
7  determine or analyze whether 7.0 impacted the
8  elasticity of demand for non-iPods?
9      A. Well, that's what the coefficient tells
10  you, right?
11      Q. Which coefficient?
12      A. The coefficient on 7.0 is positive only
13  because the price went up, and the price went up
14  only because the demand curve became more inelastic.
15  All right.
16      Q. The demand curve for non-iPods?
17      A. Oh, excuse me. No, no, I did not
18  examine – I thought you meant iPods. Again, I'll
19  acknowledge –
20      Q. Let me restate the question. Focusing
21  just on non-iPods.
22      A. Okay. I'm sorry. I didn't hear "non."
23      Q. That's okay. Understood.
24          Focusing on non-iPods, did you do anything
25  to analyze whether 7.0 impacted the elasticity of

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 77

1  demand for non-iPods?
2  A. No, I did not.
3  Q. With respect to non-iPods, would you
4  expect 7.0 to have any impact on the competition
5  between manufacturers of non-iPods?
6  MS. BERNAY: Calls for speculation.
7  THE WITNESS: In the long run, no. In the
8  short run, it might, because the competition between
9  them and Apple had intensified with the introduction
10 of Harmony, and that goes away. So there might be a
11 short-run effect.
12 But there's lots of producers of digital
13 electronic devices, so I would not expect in the
14 long run there would be a change in the intensity of
15 competition in the non-iPod MP3 market.
16 BY MR. KIERNAN:
17 Q. And what impact on prices of non-iPods
18 would you expect 7.0 to have?
19 MS. BERNAY: Calls for speculation.
20 THE WITNESS: Exactly as I just said. I
21 would not expect in the long run there would be any
22 price effect. Conceivably, there could have been
23 one in the short run, but I doubt that that's true.
24 I wouldn't expect to find it.
25 If such a price increase did occur, that

Page 78

1  would be another anticompetitive effect of 7.0
2  because the consumers who bought those things were
3  harmed. But I have basically assumed that's zero
4  because I think the supply conditions in the MP3
5  market would not make it possible for anybody to
6  sustain a significant price increase in that market
7  just because of 7.0.
8  BY MR. KIERNAN:
9  Q. Okay. And is your opinion, Dr. Noll, that
10 the impact on prices caused by 7.0 would be
11 immediate because of the lock-out effect?
12 A. Yes.
13 Q. Okay. And why is that? Why would it be
14 immediate?
15 A. Because there's this group of people,
16 there's just a continuous flow of people who want to
17 replace an MP3 player that were available to Apple
18 before 7.0 was introduced and for at least some
19 models are not available to them afterwards.
20 Q. And can you cite to me any evidence in the
21 case record in the case where Apple considered what
22 you just described as the lock-out effect in
23 determining the prices of any iPods that were sold
24 with iTunes 7.0?
25 MS. BERNAY: Objection. Vague and

Page 79

1  ambiguous.
2  THE WITNESS: I'm not aware of any
3  documents that directly address the relationship
4  between lock-in and price.
5  BY MR. KIERNAN:
6  Q. I asked about lock-out. Let's talk about
7  that.
8  A. Lock-out. They're the same thing. I
9  mean, one side being locked in is the other side
10 being locked out.
11 So I'm not aware of any documents that
12 explicitly analyze lock-in and lock-out.
13 Q. Okay. So what are you relying on for the
14 basis of your opinion that the impact on price would
15 be immediate due to lock-in or lock-out as a result
16 of 7.0?
17 A. It would – why a demand curve becomes
18 more inelastic is not really relevant to the
19 question of what is an increase in the degree of
20 inelasticity of the demand curve on price. There's
21 no – it doesn't matter what the cause is. If the
22 demand curve becomes more inelastic, the profit
23 maximizing price goes up.
24 (Reporter inquires.)
25 THE WITNESS: The profit maximizing price

Page 80

1  goes up.
2  And so the basis for it is the economic
3  theory of lock-in, the optimal pricing of a firm
4  that has a product with lock-in and other switching
5  costs, and then the empirical test of whether that
6  theory predicts what actually happened.
7  BY MR. KIERNAN:

REDACTED

17 MS. BERNAY: Objection. Vague.
18 THE WITNESS: No. But I know that – I
19 know that Apple is aware of the economic
20 consequences of closed systems.
21 BY MR. KIERNAN:
22 Q. What are you relying on for that?
23 A. Statements, you know, in other contexts.
24 I mean, long before I knew anything about this case,
25 I knew the strategies of Microsoft and Apple in the

**Page 77..80**

Confidential - Attorneys' Eyes Only

**Roger Noll, Ph.D.**                    **The Apple iPod iTunes Anti-Trust Litigation**

Page 81

1  information technology space. And then there's
2  discussions of this in Jobs' biography.
3        So, I mean, I'm not relying on it in this
4  case, but I know that Apple is aware of the
5  advantages and disadvantages of having a closed
6  system. And they have – they have had the strategy
7  for a long time, since the 1990s, that for them, the
8  benefits of a closed system outweigh the costs.
9        So I view what's going on in the iPods as
10 simply a continuation of a policy that they
11 understood and thought was in their interests.

REDACTED

Page 82

REDACTED

5  BY MR. KIERNAN:
6        Q. And, Dr. Noll, what evidence are you
7  relying on for your opinion that 7.0 had an
8  immediate impact on the elasticity of demand for
9  iPods?
10       MS. BERNAY: Objection. Asked and
11 answered.
12       THE WITNESS: There's a theory, and
13 there's an empirical test of the theory, and it's
14 confirmed. So that's what we economists do.
15 BY MR. KIERNAN:
16       Q. And what's the empirical test that you're
17 relying on?
18       A. That the price went up.
19       Q. Is that –
20       A. The optimal price went up.
21       Q. Do you mean the regression in Exhibits 3
22 and A?
23       A. Yes.
24       Q. 3A and 3B?
25       A. Yes.

Page 83

1        Q. Okay. Anything other than theory and the
2  empirical test set forth in Exhibits 3A and 3B to
3  Noll 10 that you're relying on for the opinion that
4  the immediate effect of 7.0 was to impact the
5  elasticity of demand of iPods?
6        A. Yes, every other report that I've ever
7  written that does any empirical analysis. Other
8  than theory and fact, I have no evidence in support
9  of this proposition.
10       Q. Other than the theory and the regression
11 set forth in Exhibits 3A and 3B or other regressions
12 that you've run, do you have any evidence that 7.0
13 impacted the prices of iPods?
14       MS. BERNAY: Objection. Asked and
15 answered.
16       THE WITNESS: The regression analysis is
17 the evidence that it affected – not only in this
18 report but in prior reports.
19       And, you know, it goes all the way back to
20 class certification. I've been writing reports on
21 this issue since July of 2008, so – and I
22 haven't – I haven't attempted to memorize every
23 single one of them in preparation for this
24 deposition because I thought this deposition was
25 about this report.

Page 84

1        But whatever evidence is in all those
2  reports would be what I'm relying on.
3  BY MR. KIERNAN:
4        Q. Dr. Noll, I'm asking about Exhibits 3A and
5  3B, with all due respect. You were talking about
6  other reports.
7        A. You asked me what other evidence I have
8  besides 3A and 3B, and I'm telling you it would be
9  in other reports. It would be regressions in other
10 reports and the data –
11       Q. And you're relying on those regressions
12 for your opinions in this matter?
13       MS. BERNAY: Objection. Misstates the
14 prior testimony.
15 BY MR. KIERNAN:
16       Q. Well, I want to know.
17       A. I am relying –
18       Q. You brought it up, not me.
19       MS. BERNAY: Is that a question?
20       MR. KIERNAN: Yeah.
21       THE WITNESS: This is a reply to your
22 expert reports. Obviously, whatever is in the
23 merits report also addresses the issue of did 7.0
24 cause the price to go up.
25       Likewise, other reports are about whether,

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 85

1  in general, creating incompatibilities caused prices
2  to go up. And there's evidence in all those reports
3  that the creation of incompatibility causes prices
4  to go up, which is only true if it makes demand
5  curves more inelastic.
6        So anything in any report that discusses
7  the relationship between lock-in and prices is
8  evidence in support that 7.0 did, in fact, cause the
9  demand to become more inelastic.
10  BY MR. KIERNAN:
11      Q. With respect to the impact on prices on
12  iPods as a result of the lock-out effect, would you
13  expect the impact to be the same throughout the --
14  well, would you expect the impact on prices to
15  remain the same, to remain constant?
16        MS. BERNAY: Objection. Calls for
17  speculation.
18        THE WITNESS: I would expect it to be,
19  yeah, mostly constant through time, although toward
20  the end of the period, it might become worse.
21        But on the other hand, there are other
22  things in the model that would offset that, such as
23  the move to DRM-free files by competitors of the
24  iTunes Store.
25  ///

Page 86

1  BY MR. KIERNAN:
2      Q. If there are consumers who are no longer
3  locked out from purchasing an iPod because the music
4  that they purchase from a vendor is now
5  interoperable with an iPod, how would you expect
6  that to impact iPod prices?
7        MS. BERNAY: Objection. Calls for
8  speculation.
9        THE WITNESS: I'm sorry, I didn't follow
10  the question. Try it again.
11  BY MR. KIERNAN:
12      Q. If there are consumers who are no longer
13  locked out from purchasing an iPod because the music
14  they purchase from a vendor is interoperable with an
15  iPod, how would you expect that to impact iPod
16  prices?
17        MS. BERNAY: Same objection.
18        THE WITNESS: That's what I said. That's
19  exactly what I was referring to in the last answer,
20  is that when other sites adopt DRM-free music files,
21  that should increase the competition between Apple
22  and other manufacturers of MP3.
23        On the other hand, offsetting that is the
24  increased inventory of DRM-protected files that have
25  been downloaded from the iTunes Store.

Page 87

1        So the net effect of those two things
2  would be something in the middle. One makes things
3  worse for people who own iPods, and one makes things
4  better.
5        And the demand curve, the replacement
6  demand curve for people who already own iPods would
7  become more inelastic, and the replacement demand
8  curve for people who own other MP3s would become
9  more elastic. The net effect on that, on the demand
10  for iPods is -- I don't know.
11  BY MR. KIERNAN:
12      Q. So your opinion is that 7.0 locked out a
13  certain number of customers. What effect would that
14  have on iPod sales?
15        MS. BERNAY: Objection. Vague and
16  ambiguous.
17        THE WITNESS: The all-else-equal effect
18  would be less.

REDACTED

23        And then there are other things going on
24  that cause sales to go up. In general, you know, in
25  the time frame at the beginning of the damages

Page 88

1  period, MP3 sales are going up, and they stopped
2  going up roughly at the end of the damage period. I
3  mean, the rate at which they increase declines
4  towards the end of the damage period.
5  BY MR. KIERNAN:
6      Q. One potential impact of 7.0 was to reduce
7  the profitability of iPod, the sale of iPods,
8  because they locked out a certain segment of
9  customers; isn't that true?
10        MS. BERNAY: Objection. Vague and
11  ambiguous.
12        THE WITNESS: No, they wouldn't raise the
13  price to cause the profit to go down. The profit
14  goes up but the sales goes down. In other words,
15  the point of the price increase is to raise the
16  profit per unit, knowing that it's going to cause
17  less in the way of sales. All right.
18  BY MR. KIERNAN:
19      Q. Let's say they don't make any changes to
20  price. All else is equal.
21      A. That's right.
22      Q. The effect of the lock-out would reduce
23  profits?
24      A. At any given price, they have fewer
25  people, that's right, buying it.

Page 85..88

Page 89

1    Q. Right.
2    A. And then the off-- the offsetting
3 advantage is that you get a higher profit per unit
4 because you can raise price. So that's the reason
5 you do it.
6        The reason you would create an
7 incompatibility is because you thought the price
8 effect exceeded the lock-out effect.
9    Q. And is it your opinion that's what Apple
10 decided with respect to 7.0?
11    A. My opinion is that Apple's behavior is
12 consistent with the economic theory of lock-in;
13 that, in fact, the profitability per unit of iPods
14 went up. That's what the coefficient in the
15 regression measures.
16        So, yes, the behavior of Apple is
17 consistent with the theory.
18    Q. What would Apple have to look at to
19 conduct the analysis that you just described where
20 you're looking at the number of people that you're
21 going to lose to non-iPods as a result of the
22 lock-out and how to adjust the price with respect to
23 iPod sales to counteract that impact?
24        MS. BERNAY: Objection. Compound.
25 ///

Page 90

1 BY MR. KIERNAN:
2    Q. What would they look at?
3        MS. BERNAY: Calls for speculation.
4        THE WITNESS: They would -- what companies
5 do is gather information from their salespeople
6 about what's going on in the market and how
7 sensitive they perceive the market to price and
8 factor that into their pricing decisions.
9        They would look at the prices of other
10 products. They'd look at the degree to which they
11 were winning or losing sales from other people,
12 things like that.
13 BY MR. KIERNAN:
14    Q. Would they look at how many people would
15 be locked out?
16    A. Yeah, one of the reasons that it's in the
17 interest of somebody with a 70 percent market share
18 to engage in lock-in is because it preserves that
19 market share. So that's why it's an interesting
20 contrast between Apple and Microsoft.
21        Microsoft was really foolish to lock
22 people in to the Zune because their market share was
23 so small; it was 1 or 2. So they were giving up
24 98 percent of the market in order to lock in
25 2 percent. That was a bad decision, and we know

Page 91

1 that it was a bad decision because they left the
2 market.
3        The larger your market share, the bigger
4 the benefits and the lower the costs from engaging
5 in a lock-in strategy.
6        So normally we would find lock-in strategy
7 only among firms with relatively large market
8 shares. And we would normally not observe a lock-in
9 strategy in a structurally competitive industry
10 because you're giving up too much when you do that.
11    Q. Wouldn't you also normally see in the
12 lock-in strategy a firm charging lower prices to
13 attract consumers into that ecosystem?
14    A. Well, the degree to which you use price to
15 attract customers is different in a system with
16 lock-in and lock-out than a system without it.
17        Yes, of course, one thing you always
18 consider on setting a price is your ability to
19 attract customers from others. But if there are
20 fewer others, that's less of a concern to you. So
21 the cost in that dimension is lower, of engaging in
22 lock-in.
23        So, yes, price competition still is a
24 relevant fact; it's just a less important fact when
25 there's lock-in. And it's a less important fact

Page 92

1 when you have a higher market share.
2        MR. KIERNAN: Why don't we take one more
3 break just so I can go through my notes.
4        MS. BERNAY: Absolutely.
5        THE VIDEOGRAPHER: Off the record at
6 11:10.
7        (A brief recess was taken.)
8        THE VIDEOGRAPHER: This is the end of
9 disc 1. Off the record at 11:14.
10        (A brief recess was taken.)
11        THE VIDEOGRAPHER: This is disc 2. On the
12 record at 11:24.
13 BY MR. KIERNAN:
14    Q. With respect to your regression analysis
15 set forth in Exhibits 3A and 3B, describe for me
16 what the but-for world is.
17        MS. BERNAY: Objection. Vague and
18 ambiguous.
19        THE WITNESS: One in which 7.0 doesn't
20 exist.
21 BY MR. KIERNAN:
22    Q. And is it also a world in which the
23 technology in 4.7 still exists?
24    A. Well, whatever technologies are around and
25 then are captured in the model would be whatever

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                          The Apple iPod iTunes Anti-Trust Litigation

Page 93

1 they are throughout time. Like, you know, there's
2 still video capability, there's still this, that and
3 the other thing.
4     So it's not that technology stops
5 progressing; it's just that the 7 0 blocking
6 technology doesn't exist.
7     Q. If we look at, for example, how you dealt
8 with the shuffle in your regression reflected in
9 Exhibits 3A and 3B, you do not turn on 7 0, and you
10 leave the indicator variable for 4.7 on.
11     A. Right.
12     Q. What's the assumption for leaving 4.7 on?
13     A. That the blocking technology that's
14 embedded in 4.7 continued indefinitely but had
15 become essentially irrelevant because it gets offset
16 by the second-generation Harmony.
17     Q. Okay. And with respect to the iPod nano
18 second generation, you turn off 4.7 on the date that
19 7 0 is introduced, correct?
20     A. That's correct.
21     Q. And I know what your report says, but
22 explain to me why you turn off 4.7.
23     A. Because it's not there anymore. It's not
24 the blocking technology that's in there that's been
25 offset by the Harmony variable.

Page 94

1     Q. And it's been replaced by 7.0?
2     A. That's correct.
3     Q. In the but-for world in which 7.0 does not
4 exist with respect to the iPod nano second
5 generation, what technology would exist?
6     A. I don't know. That's up to Apple to
7 decide. It's like asking the question suppose they
8 had not introduced the next generation of an iPod,
9 what would have happened.
10     There's a variable in there. It could be
11 turned off, but they might have done something else.
12 I don't know what it is. But what I'm just looking
13 at is what's the impact of moving from 4.7 to 7.0.
14     Q. The incremental impact?
15     A. Yeah. Remember that we still have 4.7 on
16 for these other guys, so this is the differential
17 effect of 7.0 and 4.7.
18     Q. And how does your regression capture the
19 impact of the other technology that would exist if
20 7 0 had not been released on the iPod nano second
21 generation?
22     MS. BERNAY: Objection. Vague and
23 ambiguous.
24     THE WITNESS: In principle, it can't,
25 because we don't know what the technology would have

Page 95

1 been. We don't know what they would have done had
2 they never introduced 7.0.
3 BY MR. KIERNAN:
4     Q. Fair enough.
5     If the technology – well, strike that.
6     The feature of 7.0 that is at issue in
7 this case was a change to the DRM; is that accurate?
8 Is that what your understanding is?
9     MS. BERNAY: Objection. Vague and
10 ambiguous.
11     THE WITNESS: Well, yes, the – yes, 7.0
12 contains the new DRM system, yes.
13 BY MR. KIERNAN:
14     Q. And that replaced the DRM system that was
15 first introduced with 4.7?
16     A. That's my understanding, yes.
17     Q. Okay. And assume that the DRM system that
18 is in 4.7 is included on all iPods that do not
19 contain 7.0.
20     A. Assume the DRM system in 7.0 is –
21     Q. No, no.
22     Assume that on iPod models that did not
23 include 7.0, they had the DRM system that was in
24 place that was first introduced with 4.7.
25     A. That's what the model assumes.

Page 96

1     Q. That's what it assumes?
2     A. Yeah.
3     Q. Okay. So wouldn't that mean, then, that
4 the but-for world is a world in which the DRM system
5 that was first introduced by 4.7 would remain in
6 existence but for 7.0?
7     MS. BERNAY: Objection.
8     THE WITNESS: Maybe. I don't know. I
9 mean, the DRM – first of all, we're not ta king
10 about DRM. That's not what's being measured here.
11 What's being measured is the blocking technology.
12 BY MR. KIERNAN:
13     Q. That is the DRM.
14     A. No. Digitalized management is the
15 encryption, the system itself, and a component of it
16 is the – is the component that blocks Harmony, that
17 tries to detect somebody who's trying – and it
18 doesn't detect it in the sense of – it's not
19 something about iTunes stuff. It's stuff about
20 RealNetworks.
21     Q. Right.
22     A. All right. And so DRM within the Apple
23 community is still there. The issue is what about
24 the element of the DRM system that blocks
25 RealNetworks.

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 97

REDACTED

4     Q. That was added to the existing DRM
5   technology that was first introduced in 4.7?
6     A. You want to call it the DRM technology.
7   It's not part of protecting files from the iTunes
8   Store. That's not what its point is. Its point is
9   to prevent people who own an iPod from buying things
10  from RealNetworks. That's what the point of it is.
11    Q. Okay.
12    A. So it's not – it's really more about the
13  RealNetworks DRM system than it is about the Apple
14  DRM system. It's – it's – you know, it's not
15  about protecting Apple.
16    Q. But with respect to – well, strike that.

REDACTED

22    Q. Okay. And –
23    A. But I wouldn't call it the iTunes Store
24  DRM system or the Apple DRM system. It was a
25  mechanism to prevent Harmony from working on iPods.

Page 98

1   And that's not part of digital rights management for
2   Apple, it's part of digital rights management as it
3   applies to others.
4     Q. What's the basis of that description?
5     A. Because the issue here is RealNetworks
6   wanting to have customers who own iPods. All right.
7   And so it says, ah-hah, here's a mechanism that will
8   cause your iPod to be able to read files from
9   RealNetworks.
10    Q. Right.
11    A. That doesn't protect Apple's DRM. That
12  is – what that does is overcome a potential use of
13  RealNetworks' DRM.
14        MR. KIERNAN: And so the record is
15  accurate on this, when I'm saying "right," I don't
16  mean I agree with Dr. Noll's description.
17        THE WITNESS: You can just say wrong.
18        MR. MITTELSTAEDT: That's not a bad idea.
19  She ought to correct all the rights to wrongs.
20  BY MR. KIERNAN:
21    Q. If you have the entire population that's
22  the dataset you're using in estimating the
23  regression, and you have a million transactions that
24  are all at one price, could you have a clustering
25  problem?

Page 99

1         MS. BERNAY: Objection. Incomplete
2   hypothetical.
3         THE WITNESS: That's not what clustering
4   is about, no.
5   BY MR. KIERNAN:
6     Q. Okay. If the – can you have an
7   independence problem?
8     A. No.
9         MS. BERNAY: Objection.
10  BY MR. KIERNAN:
11    Q. Never?
12    A. Never.
13        (Reporter inquires.)
14        MS. BERNAY: I've lost my mic.
15  BY MR. KIERNAN:
16    Q. And why are you so certain that you could
17  not have an independence problem if you have the
18  entire population and the one million transactions
19  that you are studying all had the same price?
20        MS. BERNAY: Objection. Asked and
21  answered.
22        THE WITNESS: Independence isn't about the
23  value taken by the dependent variable. Independence
24  is about the disturbance term in a regression
25  equation.

Page 100

1   BY MR. KIERNAN:
2     Q. Okay.
3     A. You know, you would have – if there's
4   zero variance, there's zero variance to the random
5   error term. So it's not an independence problem.
6         The only way – in a world in which
7   everything is sold at exactly the same price and all
8   products have exactly the same technical
9   characteristics, the regression analysis has an
10  R-squared of 1.0, and it perfectly predicts price,
11  and all the residual errors are zero, and the value
12  taken by the residual error in the regression is
13  always zero; it has zero variance and means zero.
14        The only way that you can introduce
15  statistical variance and create something that you
16  could estimate is if you had measurement error on
17  either price, a dependent variable, or one of the
18  independent variables. And then you would get some
19  variation here.
20        It's just a confusion to say that
21  independence has anything to do with the magnitude
22  of the dependent variable. What independence has to
23  do with is the random shock to the deterministic
24  system that explains price.
25        And if the deterministic – that's why I

Confidential - Attorneys' Eyes Only

**Roger Noll, Ph.D.**                    **The Apple iPod iTunes Anti-Trust Litigation**

Page 101

1  put in the stuff about trying to measure the
2  acceleration due to gravity. That you can have a
3  world in which everything is perfectly
4  deterministic, and if there's no measurement error,
5  and you have all the right variables in the
6  equation, and you have the equation specified
7  perfectly, then the random disturbance term will
8  have not only mean zero, it'll have variance zero.
9  But it doesn't make the observations not
10  independent.
11      That's as clearly as I think I've ever
12  explained it, by the way.
13      MS. BERNAY: Maybe some people are better
14  questioners.
15  BY MR. KIERNAN:
16      Q. Just so I'm clear about this, Dr. Noll –
17  because this was the first time I had read your
18  explication of the so-called lock-out effect on iPod
19  prices – with respect to the lock-in effect, the
20  lock-in effect that we've talked about over many,
21  many reports, to what extent are you still relying
22  upon the lock-in effect?
23      A. The lock-in effect and the lock-out effect
24  are just two sides of the same coin, and they've
25  been in every report I've written. All the way back

Page 102

1  to the first class certification report, I've
2  explained lock-in and lock-out.
3      Q. And with respect to 7.0's impact on
4  lock-in – we discussed this morning its impact on
5  lock-out – the impact on lock-in, what is your
6  opinion with respect to what impact it had on
7  lock-in?
8      MS. BERNAY: Objection. Compound.
9      THE WITNESS: Lock-in and lock-out are the
10  same thing. They're just – lock-in is about your
11  own device, lock-out is about the other guy's
12  device. But it's exactly the same phenomenon.
13      Lock-in here and lock-out there is the
14  same as lock-in there and lock-out here. They're
15  the same phenomenon.
16  BY MR. KIERNAN:
17      Q. Do they have the same impact on price?
18      A. The effect on price is the net effect of
19  all – of both of them together. You can't have
20  it – you can't have one without the other.
21      Q. And can they move in different directions?
22  That is, directionally, can they impact price in
23  different directions?
24      A. That's not a meaningful question because
25  they happen simultaneously. And what they have is

Page 103

1  an effect. You could – if the question is, is it
2  possible for lock-in to cause prices to go down, in
3  principle, it could for the guy who has a really low
4  market share, because that person has a much bigger
5  incentive to compete with the guy with the really
6  big market share. All right.
7      So it's conceivable that the creation of
8  lock-out by the guy who has the big market share
9  could reduce the prices of the guy who was locked
10  out. It wouldn't necessarily happen that way, but
11  it could.
12      Most likely, it's going to have no effect.
13  But in principle, you can construct a model in which
14  other people's prices go down because the big guy
15  engaged in a lock-in.
16      Q. Do you have an opinion of whether 7.0
17  increased the amount of lock-in, maintained the
18  current levels of lock-in, reduced lock-in? What
19  impact did 7.0 have on lock-in?
20      MS. BERNAY: Objection. Compound.
21      THE WITNESS: Again, lock-in being the
22  combined effect of what happens to your own
23  customers versus what happens to the other
24  customers. You don't do it unless it causes the
25  demand curve to become more inelastic and causes

Page 104

1  your profits to go up.
2      So it would never happen unless you
3  expected it would be profitable to do so. So,
4  therefore, it would cause prices to go up. That
5  would always be the case. No rational company would
6  ever create lock-in if it was unprofitable to do so.
7  BY MR. KIERNAN:
8      Q. Although – I'll push you on that a little
9  bit – in your earlier reports, since you mentioned
10  them, you explained that the lock-in effect, both –
11  this is in your merits report – the lock-in effect
12  occurred before 7.0 for the iPod side and for
13  RealNetworks and Sony and Microsoft because of the
14  obligations that were imposed upon them by the
15  record labels; isn't that right?
16      A. Well –
17      MS. BERNAY: Can I interpose my objection
18  that this deposition was supposed to just be on the
19  new material in the report?
20      MR. KIERNAN: And I'm focused on page –
21  fair enough. And I agree with that. I'm focusing
22  on now what's in 27 and trying to understand if
23  anything has changed.
24      MS. BERNAY: Got it.
25      THE WITNESS: Nothing has changed. The

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                          The Apple iPod iTunes Anti-Trust Litigation

Page 105

1  way you asked the question isn't quite right,
2  because the imposition of DRM didn't have to create
3  lock-in effects if the record companies had done
4  what they originally planned to do, which was
5  develop their own system and have everybody use it.
6         In fact, that was – from the standpoint
7  of the welfare – or the welfare of the record
8  companies, they'd have been much better off if they
9  would have developed a standard.
10        And that was the original intent.  If you
11 go back to the early 2000s – which is outside the
12 case but the stuff I know just from knowing the
13 industry.  If you go back to the early 2000s, the
14 original idea of the record company was to create a
15 consortium to create its own DRM system because –
16 and then the reason they ended up with multiple ones
17 is that didn't really work.
18        And so they wanted to create – what they
19 thought they were doing – which was stupid – was
20 create competition between – among Microsoft,
21 RealNetworks and Apple by having them all have
22 different DRM systems.
23        But what that, in fact, did is create
24 lock-in and transfer profits from the record
25 companies to the people who sell digital downloads

Page 106

1  and who manufacture MP3 players.  So that was a bad
2  decision on their part.
3         But, yes, it's true that the record
4  companies were initially responsible for the fact
5  that when the iTunes Music Store was first launched,
6  it had a lock-in effect, because that technology was
7  not available to anybody else who later got into the
8  digital download business.
9  BY MR. KIERNAN:
10        Q.  And the lock-in effect, as you referred to
11 it, as a result of 7.0, does that level of lock-in
12 increase over time?
13        MS. BERNAY:  Objection.  Asked and
14 answered.
15        THE WITNESS:  For the base of customers,
16 the magnitude of the lock-in rises as they have more
17 files.
18        And so there's two things happening.  One
19 is, as time progresses, you may care less about the
20 older files, but then you're adding new ones.  And
21 so at some point you reach some sort of maximum
22 degree of "locked-in"ness, so – but in general, the
23 switching cost gets higher the more files you have
24 in a proprietary technology.  So that's what happens
25 to the installed base.

Page 107

1         And then there's the new customers and the
2  people who are customers that use other systems, all
3  right.  And the new customers obviously are not
4  locked in.  They're the ones that have freedom to
5  choose the first day.  Right.  They can pick what
6  system they're going to go into.  And that – that
7  is the most intensive competition that exists among
8  the people who manufacture MP3 players and the
9  people who have alternative digital download sites.
10        And then there's the other folks who have
11 gotten locked in to somebody else's system, all
12 right.  And there, the issue is how quickly they can
13 switch themselves.  All right.

REDACTED

21        And that's what gives them the incentive
22 to invent Harmony, is to – instead of having access
23 to 5 or 10 percent of the customer base, they can
24 get access to 75 or 80 percent of the customer base
25 with Harmony.

Page 108

REDACTED

10        And the RealNetworks, what it does is
11 reduce the lock-in effect for people who were using
12 RealNetworks' system.  And that's a loss for them,
13 but it gives them access to this huge customer base,
14 which is a gain for them.
15        So the economic incentive to RealNetworks
16 to try to reduce lock-in is much more powerful than
17 the economic incentive of Apple to reduce lock-in.
18 BY MR. KIERNAN:
19        Q.  Going back to the installed base, you
20 referred to sort of three segments.  There was the
21 installed – as of the time of 7.0, there's the
22 installed base, the individuals that are new to
23 iPods that are not locked in, and then the
24 individuals that are locked into the non-iPods –
25        A.  Yeah, the installed base of the other

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 109

1  guys.
2      Q.  Right.  Okay.
3          (Reporter inquires.)
4      THE WITNESS:  The installed base of the
5  other guys.
6  BY MR. KIERNAN:
7      Q.  The installed base for the non-iPods?
8      A.  The non-iPods.
9      Q.  All right.
10         So focusing on the installed base for
11  iPods, would the impact of 7.0 on locking them into
12  iPods or increasing the lock-in of those people on
13  iPods, that would occur over time depending upon
14  their future purchases, correct?
15     A.  Yeah.  And it's not just that.  As well,
16  it's also – it doesn't really happen until they buy
17  their next device.
18         So there's not going to be an
19  instantaneous effect.  It's going to be a longer
20  term effect.  It's the lack of competition for the
21  other guys that is the principal short-term effect.
22     Q.  I've got to get one update.
23         Since your last deposition, have you
24  purchased any iPods?
25     A.  Probably not since my last one.  I bought

Page 110

1  my granddaughter a nano, but I think it was before
2  the last deposition.
3      Q.  And do you recall where you purchased the
4  nano from?
5      A.  Yes, I think.
6      Q.  Where was that?
7      A.  I think I got it from Best Buy.
8      Q.  And –
9      A.  Are you going to ask me if I've ever been
10  in the Apple Store?  The answer is, yes, I was in it
11  two days ago.
12     Q.  Have you ever purchased an iPod from an
13  Apple Store?
14     A.  I've never purchased an iPod from an Apple
15  Store, but I've purchased other things from an Apple
16  Store.
17     Q.  Did you pay the list price?
18         MS. BERNAY:  Objection –
19         THE WITNESS:  It depends on what it was.
20  Sometimes I did, and sometimes I didn't.
21  BY MR. KIERNAN:
22     Q.  At any time did you negotiate the price
23  for –
24     A.  No, you don't negotiate.  You either have
25  a coupon or you don't.

Page 111

1      Q.  Ever purchase a product from the iTunes –
2  strike that.
3          Did you ever purchase an iPod from the
4  online Apple Store?
5      A.  No.  I've never bought anything from the
6  online Apple Store.
7          MR. MITTELSTAEDT:  I don't know how you
8  can resist asking him what he bought at the Apple
9  Store.  He wants to tell you.
10         THE WITNESS:  Well, I'm just being
11  truthful, revealing all the dark ghosts in my family
12  here.
13  BY MR. KIERNAN:
14     Q.  Now I'm curious.  What did you purchase
15  recently from the Apple Store?
16     A.  The soft case for the iPad mini, which
17  is my granddaughter's Christmas present.  Her
18  parents are getting her the mini, and I'm getting
19  her the case for it.
20         (Sotto voce conversation.)
21         MR. MITTELSTAEDT:  Can I ask you something
22  for old time's sake?
23         THE WITNESS:  For old time's sake.
24         MR. MITTELSTAEDT:  Have you bought any
25  music from RealNetworks?

Page 112

1          THE WITNESS:  I have never bought any
2  music from any digital download site, but I've
3  bought gift cards for my grandchildren.
4          MR. MITTELSTAEDT:  Fair enough.
5  BY MR. KIERNAN:
6      Q.  This will be the last.
7      A.  I hope so.
8      Q.  Famous last words.
9          Can you go to page 7 of Noll 10, your
10  rebuttal report.  And it says – it's the second
11  paragraph, Dr. Noll.  It starts with "second."
12     A.  Mm-hmm.
13     Q.  And it says – it's the sentence that
14  starts with "While."
15         "While the extent of lock-in does
16         increase as a consumer buys more
17         recordings that can be played only on
18         iPods, this fact does not imply that, as a
19         theoretical matter, the price differential
20         would increase through time."
21         Can you explain what you mean there?
22     A.  The next sentence:  "The reason is..."
23     Q.  Before you get there, what I meant is I
24  don't understand the sentence.
25         So it states the price differential would

Page 109..112

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 113

```
1  increase – strike that.
2      It says: "This fact does not imply that,
3  as a theoretical matter, that the price differential
4  would increase through time."
5      Explain to me what – the price
6  differential of what?
7      A. Okay. The price increase due to lock-in
8  would not necessarily be continuously increasing
9  over time because a degree of lock-in was increasing
10 over time.
11     Q. Got it.
12         MR. KIERNAN: That's all I have.
13         MS. BERNAY: All done?
14         MR. KIERNAN: We'll designate this
15 "Attorney's Eyes Only" under the Protective Order.
16         MS. BERNAY: I think we're all done.
17         We'll read and sign.
18         THE VIDEOGRAPHER: This is the end of
19 disc 2 of Roger Noll, Ph.D.
20         Off the record, 11:52.
21         (Discussion off the record.)
22         THE REPORTER: Would you like a rough
23 draft?
24         MR. KIERNAN: I definitely need a rough
25 draft.
```

Page 114

```
1      MS. BERNAY: You probably want to expedite
2  it too?
3      MR. KIERNAN: Yes.
4      And then the final as soon as possible,
5  please.
6      MS. BERNAY: We'll take a rough and then
7  just regular turnaround on the final.
8      (Deposition concluded at 11:54 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 115

```
1      DECLARATION UNDER PENALTY OF PERJURY
2  Case Name: The Apple iPod iTunes Anti-Trust Litigation
3  Date of Deposition: 12/18/2013
4  Job No.: 10008944
5
6      I, ROGER G. NOLL, PH.D., the witness herein,
7  declare under penalty of perjury that I have read the
8  foregoing in its entirety; and that the testimony
9  contained therein, as corrected by me, is a true and
10 accurate transcription of my testimony elicited at said
11 time and place.
12
13     Executed this _____ day of
14 _____, 2013, at
15 _____, California.
16
17
18
19     _____
20         ROGER G. NOLL, PH.D.
21
22
23
24
25
```

Page 116

```
1         DEPOSITION ERRATA SHEET
2  Page No. _____ Line No. _____
3  Change: _____
4  Reason for change: _____
5  Page No. _____ Line No. _____
6  Change: _____
7  Reason for change: _____
8  Page No. _____ Line No. _____
9  Change: _____
10 Reason for change: _____
11 Page No. _____ Line No. _____
12 Change: _____
13 Reason for change: _____
14 Page No. _____ Line No. _____
15 Change: _____
16 Reason for change: _____
17 Page No. _____ Line No. _____
18 Change: _____
19 Reason for change: _____
20 Page No. _____ Line No. _____
21 Change: _____
22 Reason for change: _____
23
24 _____         _____
25     ROGER G. NOLL, PH.D.         Dated
```

Page 113..116

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 51
# [Filed Under Seal]

Page 1

1                   UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        OAKLAND DIVISION

4

5       _____

                                          )

6                                         )

        THE APPLE IPOD ITUNES ANTI-TRUST  )   No. C-05-0037 YGR

7       LITIGATION                        )

                                          )

8       _____)

9

10

11

12            VIDEOTAPED DEPOSITION OF ROGER G. NOLL

13                  San Francisco, California

14                   Thursday, May 16, 2013

15                        Volume 1

16

17

18

19

20

21      Reported by:

22      JENNIFER L. FURIA, RPR, CSR

23      CA License No. 8394

24      Job No. 1663538

25      PAGES 1 - 262

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3              OAKLAND DIVISION
 4
 5    _____
                              )
 6                            )
      THE APPLE IPOD ITUNES ANTI-TRUST  )  No  C-05-0037 YGR
 7    LITIGATION              )
                              )
 8    _____)
 9
10
11
12        Videotaped Deposition of ROGER G  NOLL, Volume
13    1, taken on behalf of Defendant, at Jones Day, 555
14    California Street, 26th Floor, San Francisco,
15    California, beginning at 9:15 a m  and ending at 4:37
16    p m  on Thursday, May 16, 2013, before JENNIFER L
17    FURIA, Certified Shorthand Reporter No  8394
18
19
20
21
22
23
24
25
```

Page 2

```
 1    APPEARANCES (Continued):
 2
 3    Also present:
 4
 5        KYLE ANDEER
 6
 7
 8    Videographer:
 9
10        ALEXEI DIAS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1    APPEARANCES:
 2
 3    For the Plaintiff:
 4
 5        ROBBINS GELLER RUDMAN & DOWD LLP
 6        BY:  BONNY E. SWEENEY, ESQ.
 7        655 West Broadway, Suite 1900
 8        San Diego, California 92101
 9        (619) 231-1058
10        bsweeney@rgrdlaw.com
11
12
13    For the Defendant
14
15        JONES DAY
16        BY:  ROBERT A. MITTELSTAEDT, ESQ.
17        and DAVID C. KIERNAN, ESQ.
18        555 California Street, 26th Floor
19        San Francisco, California 94104
20        (415) 626-3939
21        ramittelstaedt@jonesday.com
22        dkiernan@jonesday.com
23
24
25
```

Page 3

```
 1                 INDEX
 2    WITNESS                      EXAMINATION
 3    ROGER G. NOLL
 4    Volume 1
 5
 6             BY MR. MITTELSTAEDT      7
 7
 8             EXHIBITS
 9    NUMBER          DESCRIPTION          PAGE
10    Exhibit 1    Declaration of Roger G. Noll    22
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

Pages 2 to 5

1      Q I'm asking you more in theory at this point.
2 If 7.0 did something more than what you've just
3 described --
4      A Like, for example?
5      Q -- and it's not captured in one of these    09:52:43
6 variables that you just referred to, capacity, whether
7 it's photo or video or the size or the cost,
8 then -- then the coefficient for 7.0 would pick up that,
9 right?
10     A Like what? I mean, I don't understand what   09:53:05
11 the -- what the 7.0 in principle could do. What is it
12 in principle it could do?
13     Q Anything that's not captured by one of your
14 other variables. The effect of that would be captured
15 in your 7.0 variable, correct? By definition.    09:53:22
16     A So if you lick your iPod it tastes like wine?
17 Is that what 7.0 does, something like that?
18     I'm just -- I have no clue what you're talking
19 about, what it might be. If there's some wonderful
20 attribute of iPods that cannot be obtained in any way  09:53:40
21 other than 7.0 and that component is in there, sure, it
22 would affect the price. It would make the -- it would
23 make it more valuable, assuming it's unique, a unique
24 attribute that wasn't otherwise included, but I don't
25 know what it is and I've never seen anybody describe  09:53:57

1 anything like is that.
2     Q And -- this is the point of my question. The
3 effect of that other attribute would be included in your
4 7.0 variable, correct?
5     A If there was one, yes.      09:54:11
6     Q And what did you do, if anything, to determine
7 what 7.0 did over and above, as you put it, create the
8 incompatibility with Harmony?
9     A I've read the technical expert's --
10     MS. SWEENEY: Objection, asked and answered.  09:54:29
11     THE WITNESS: I'm not the technical expert
12 about what's in 7.0. I'm not neither your expert nor
13 the plaintiff's expert. I relied upon their reports.
14 BY MR. MITTELSTAEDT:
15     Q Did you read Apple's press release for 7.0?  09:54:38
16     A Oh, at some point I've read it, yes.
17     Q And did it say -- do you remember anything it
18 said on this topic?
19     A Not sitting here, no.
20     Q Is it accurate to say that your task was to  09:54:52
21 opine on whether 7.0 harmed competition in a market for
22 portable digital players and, if so, to opine on the
23 amount of damages to iPod purchasers from September 12,
24 2006 to March 31, 2009?
25     A I was asked to do that, yes.    09:55:23

1     Q And for purposes of your analysis were you
2 assuming that any market or monopoly power enjoyed by
3 Apple in any relevant market before September 12, 2006
4 was lawful and not anticompetitive?
5     MS. SWEENEY: Objection, to the extent it's  09:55:46
6 asking for a legal conclusion.
7     THE WITNESS: I have assumed for the purpose
8 of analysis that Apple's activities prior to the release
9 of 7.0 were legal. I have also assumed for the purpose
10 of analysis that Apple does have a certain degree of  09:56:12
11 market power that is achieved for reasons other than
12 anticompetitive acts. So other than -- I don't know how
13 to answer the question other than that.
14 BY MR. MITTELSTAEDT:
15     Q Well, are you assuming that -- and the date I  09:56:31
16 want to focus on is December -- or, excuse me, September
17 12, 2006.
18     Are you assuming for purposes of your analysis
19 that any market or monopoly power Apple may have had as
20 of that date was lawful?      09:56:47
21     A Well, I'm assuming it's not part of the case.
22 I'm not -- I'm not making -- I don't know whether it's
23 lawful or not. In this case, I know that the only issue
24 is 7.0. Whether the -- whether activities prior to
25 that, either that used to be part of this case, or that  09:57:07

1 never were part of this case, are or are not lawful, is
2 a legal question that I'm not competent to answer.
3     Q Are you assuming for purposes of this case
4 that anything Apple did before the launch of 7.0 was
5 anticompetitive?      09:57:25
6     A No. I'm not assuming whether it's
7 anticompetitive or procompetitive. I'm just accepting
8 the status quo ante, as of September 11, 2006 and saying
9 all I'm interested in is the incremental market power
10 that occurs after that date.     09:57:39
11     Q And you're not assessing damages against Apple
12 for anything done before September 12, 2006, correct?
13     A Of course.
14     Q How do you use the term market power
15 differently from monopoly power?     09:57:57
16     MS. SWEENEY: You mean in his report?
17     MR. MITTELSTAEDT: Yes.
18     THE WITNESS: This is always a tough question
19 for economists, because economists tend to think of
20 market power as a continuous variable and lawyers tend  09:58:15
21 to think of it as two categories, market and monopoly.
22     Monopoly power hinges on unilateral activity.
23 That is to say, an individual firm has sufficient market
24 power that they, all by themselves, can affect price and
25 quantity and product quality in the market through their  09:58:46



Page 47

Page 49

**Sarnoff, A VERITEXT COMPANY**
**877-955-3855**

1  consumers' heads is whether it's going to be disabled
2  again, all right.  And so it could -- it could have a
3  less than a full effect, a full offset effect.
4      You -- this is something that only the data
5  can answer.  There's no -- there's no theoretically        10:50:28
6  correct answer to whether Harmony's relaunch would fully
7  offset the effect of 4.7.
8      You -- what it does is how consumers respond
9  and behave.  And if they don't trust that Harmony is
10 going to be permanently around, and if they believe that    10:50:44
11 eventually Apple will -- will become incompatible again
12 with it, and so they'll lose all the songs that they
13 bought from RealNetworks, then it would still have an
14 effect, even if that expectation weren't true.
15     So it's just not a theoretical question.  It's     10:51:02
16 an empirical question.  And it's basically a boring
17 empirical question, because 4.7 isn't in the case
18 anymore.  So what we get in the 4.7 coefficient is some
19 sort of an average at best.
20     **Q But what you're giving -- I -- I understand**        10:51:21
21 **when you say it's an empirical question.  But what**
22 **you're giving me would be the theoretical reason to**
23 **explain why you might see a continuing effect from 4.7**
24 **even after the launch of Harmony --**
25     A Right.        10:51:41

Page 66

---

1      **Q -- relaunch of Harmony.**
2      A Right
3      **Q And so just focus on the consumer that you**
4  **have in mind.  That consumer would think -- he knows**
5  **about 4.7, he knows that that made it so he couldn't use**    10:51:54
6  **Harmony music on an iPod, and that may have some**
7  **lingering effect on his purchase decisions regardless of**
8  **whether Harmony is ever relaunched.**
9      A Well, in principle it might  You can't tell
10 There's no theoretical reason to come to a conclusion on    10:52:18
11 the magnitude of that effect
12     If you -- if we -- if 4 7 were still in the
13 case, then we would have a serious issue here about how
14 exactly to measure the effect of Harmony and how it
15 would be different in different periods        10:52:36
16     The reason I haven't focused on that is
17 because by the time I got around to doing these
18 regressions 4 7 wasn't around anymore
19     So yes, there is a whole series of issues
20 about how would we actually tease out what the effect of    10:52:47
21 4 7 was  And I would expect the effect of it would be
22 greater during the period it worked than in the period
23 after Harmony was relaunched to offset it to some
24 degree
25     So, yes, there would be a differential        10:53:03

Page 67

---

1  effect.
2      **Q And what I'm asking is why would there --**
3  **under what circumstances, precisely as you can, would**
4  **you expect to see a continuing effect of 4.7 even after**
5  **Harmony's relaunched?**        10:53:16
6      MS. SWEENEY:  Objection, vague and ambiguous.
7      THE WITNESS:  Consumer expectations about the
8  durability of the relaunch.  About whether if I -- if I
9  actually use Harmony and buy a bunch of songs from
10 RealNetworks, from Rhapsody, am I going to be stuck six    10:53:30
11 months from now with them not working because it will be
12 disabled again.
13 BY MR. MITTELSTAEDT:
14     **Q And could that consumer expectation continue**
15 **even after 7.0 is issued?**        10:53:42
16     A Exactly, it could.  And that's -- that's
17 precisely right.  7.0, you know, could -- could, in
18 fact, have, you know, a similar story to it.  But, in
19 fact, 7.0 was never undone, so we can't test that
20 hypothesis.        10:54:04
21     **Q What I mean is could the consumer expectation**
22 **created by 4.7 continue after 7.0 is issued?**
23     A It could in principle, yes.
24     **Q And under what circumstance would you expect**
25 **to see a continuing expectation created by 4.7 after 7.0**    10:54:19

Page 68

---

1  is issued?
2      A It would -- well, the effect of 7.0 is going
3  to be what was it like before 7.0 was -- 7.0 was
4  launched and what is it like afterwards, okay.  And so,
5  again, it's an empirical question whether -- what        10:54:45
6  people's state of mind was prior to the launch of 7.0.
7  I don't --
8      **Q Well, what I'm asking is if you -- if you did**
9  **the test, the regression, and you saw there was a**
10 **continuing effect of 4.7 after 7.0, what theory would**        10:54:58
11 **explain that?  The same one we've been talking about,**
12 **consumer expectation?**
13     A Yeah.  I mean the issue is how are people's
14 attitudes about Har -- remember, it's important to keep
15 our eye on the ball.  What we're interested in is what's    10:55:30
16 happening to the market for iPods.  And the market for
17 iPods is going to be enhanced regardless if there
18 were -- was anybody out there using Harmony and all of a
19 sudden they can't, all right.  That -- that market
20 effect is still going to be there regardless of what        10:55:49
21 expectations were.
22     The way expectations work here is whether
23 someone would want to actually -- would actually buy an
24 iPod with the expectation they were going to be able to
25 use Harmony indefinitely on iPods.  And if they had that    10:56:05

Page 69

Pages 66 to 69

1  expectation then 4.7 would have gone away entirely
2  within shortly after Harmony was relaunched.  If they
3  didn't believe that, then it wouldn't -- it wouldn't
4  have all completely gone away and it would have had some
5  residual effect at the time that 7.0 was lunched.    10:56:27
6      Q  And under that approach how long would that
7  residual effect last after 7.0, residual effect from
8  4.7?
9      MS. SWEENEY:  Objection, vague and ambiguous
10  and incomplete.                    10:56:38
11      THE WITNESS:  Again, there's no way to know
12  except empirically to find out.
13  BY MR. MITTELSTAEDT:
14      Q  What would be the theory that would explain
15  that; just what you gave?                10:56:45
16      A  Yeah.
17      Q  The consumer expectation point?
18      A  Is it okay if I take a two-minute break?  Just
19  one sec, I'll be right back.
20      Q  Yes, sir.            10:56:53
21      Off the record.
22      THE VIDEOGRAPHER:  Off the record 10:57 a.m.
23      (Recess.)
24  BY MR. MITTELSTAEDT:
25      Q  Okay.  Just to complete that, what I asked    10:59:00

Page  70

1  just before the break was you described why there could
2  be a, theoretically, a lingering effect from 4.7 after
3  7.0.  You explained it and I said that's the consumer
4  expectation point, correct?
5      A  Well --                    11:00:28
6      MS. SWEENEY:  I'm going to object and to
7  the --
8      Maybe the court reporter could read back the
9  last Q and A.
10      THE REPORTER:  Certainly.  You mean before we    11:00:33
11  went on the break?
12      MS. SWEENEY:  Yes, please.
13      (Record read.)
14      THE WITNESS:  Yes.  The issue is whether
15  consumers expect in the future that they will be locked   11:01:01
16  in.
17  BY MR. MITTELSTAEDT:
18      Q  On 13.2 going down the -- the variables.  If
19  you wanted to test what the effect of Harmony relaunch
20  was -- I think this is an obvious question -- you would   11:01:22
21  include a variable for the Harmony relaunch, correct?
22      A  Hm-m, that's correct.
23      Q  And you'd turn it on as of the date of the
24  Harmony relaunch?
25      A  Right.                    11:01:35

Page  71

1      Q  Okay.  Competitors DRM-Free, what date did you
2  turn that on?
3      A  Well, it's in the report.  Again, it's -- it's
4  when -- it's when the all four -- I didn't do it on the
5  EMI, E-M-I, decision to do it all DRM-Free.  I did it in  11:01:55
6  the dates.  I think it's either December of 2007 or
7  January 2008, but it's -- it's the date at which all of
8  the major distribution companies allow the competitors
9  to be DRM-Free.
10      Q  Okay.  Do you think that the announcement of    11:02:11
11  that event which preceded the actual event could have
12  had an impact on iPod demand?
13      A  Well, I suppose -- yeah, first of all, I did
14  look at the announcement dates, they weren't that far in
15  advance.  It was like a month, even less than a month,    11:02:32
16  so.
17      Q  Would it have been just as fair to use the
18  announcement date as the actual event date?
19      MS. SWEENEY:  Objection to form.
20      THE WITNESS:  I -- I think I -- the actual    11:02:52
21  launch date's better, because I don't think that the
22  vast majority of people read the trade press about
23  electronics, consumer electronics.  So my expectation
24  would be that relatively few people knew about it until
25  it happened, but -- so I would, without more information  11:03:08

Page  72

1  I think I would prefer the launch date as opposed to the
2  announcement date
3  BY MR  MITTELSTAEDT:
4      Q  Okay.  But if the announcement date had an
5  impact on iPod demand you'd want to use the announcement  11:03:19
6  date, by definition?
7      A  Well, it -- you know, I -- I understand the
8  argument for using it  I don't think it's the right
9  thing to do  But, yes, if you want to use it, go ahead,
10  see what happens                11:03:39
11      Q  What's the argument for using it?  The best
12  argument for using it.
13      A  The best argument for using it would be that
14  consumers' plans about the portable digital media player
15  they are currently buying are affected by what's going    11:03:51
16  to be happening in the future  And they have perfect
17  rationale expectations about what's going to happen in
18  the future  So once the announcement is made, the fact
19  that they can't get things DRM-Free today won't dissuade
20  them because three weeks from now they will be able to    11:04:09
21  get them DRM-Free
22      Q  Would you think that Apple would be aware of
23  the announcement?
24      A  Of course Apple --
25      MS SWEENEY:  Objection, calls for    11:04:26

Page  73

Pages  70 to 73

1    speculation.
2        THE WITNESS:  I would expect Apple knew
3    that -- I'm not sure the announcement mattered to Apple.
4    I suspect Apple was negotiating DRM-Free with these guys
5    as well, so it may well have known before the        11:04:39
6    announcement date.
7    BY MR. MITTELSTAEDT:
8        **Q But if --**
9        A But I don't know when Apple knew.
10       **Q Okay.  But if under your theory the -- the        11:04:43**
11   **availability of DRM-Free in December 2007 or January**
12   **2008 had an impact on iPod demand such that it should be**
13   **included in your regression, would you expect the**
14   **announcement of that event to have some impact on**
15   **Apple's pricing decisions?        11:05:03**
16       A  Well, if your first assumption is true then it
17   would -- you know, if the demand for iPods has shifted,
18   because of the announcement effect, then obviously Apple
19   would take that into account in doing pricing.  But
20   you're just assuming the answer.        11:05:17
21       Obviously, Apple's pricing decisions are based
22   upon demand.  And they're not going to -- they're not
23   going to cut the price of iPods until -- until they have
24   to.  And so it -- it all gets back to what is it that
25   consumers know and -- and how -- what is -- what are        11:05:33

Page  74

1    the -- what are the factors they take into account when
2    making a purchase
3        **Q Actually, I'm not assuming anything.  I'm --**
4    **what I was trying to ask was, your regression is based**
5    **on the assumption that the availability of DRM-Free from 11:05:48**
6    **competitors had some impact on iPod demand.  Correct so**
7    **far?**
8        A  On testing the hypothesis that it did and my
9    expectation is that it would and the coefficient
10   indicates that it did have an effect on iPods        11:06:03
11       **Q Did you test the hypothesis that the**
12   **announcement also had an effect?**
13       A  No  I didn't test it, because it doesn't seem
14   to be plausible, but if you want to go ahead and test
15   it, go ahead and do it        11:06:15
16       **Q And you said it's not plausible in part**
17   **because you don't know that many consumers would know**
18   **about it.  I'm asking, you agree that Apple would know**
19   **about it?**
20       A  But that -- what matters is when you have to        11:06:29
21   cut the price in order to be competitive and when you --
22   so what Apple knows is irrelevant  What -- what --
23   what's accepted so far is they know something about
24   consumers  And the issue is when did the -- when did
25   the consumer behavior change        11:06:45

Page  75

1        **Q Okay.  Why didn't you have a variable for when**
2    **EMI went DRM-Free?**
3        A  Because it's unimportant.
4        **Q Why is it unimportant?**
5        A  It's a small fraction of the market.        11:06:53
6        **Q Unimportant to iPod demand?**
7        A  Relatively unimportant.  It's -- EMI at this
8    point in time is on the order of 10 percent of the
9    market.
10       **Q And you consider that relatively unimportant        11:07:05**
11   **compared to Harmony?**
12       A  No.  The -- the -- EMI is not sufficiently
13   important in the recorded music business, that -- EMI
14   doing it by itself is going to have much of an effect on
15   consumers, because their portfolio of recorded music is        11:07:29
16   going to have a fairly small fraction of EMI in it and
17   hence the degree to which they're locked into a
18   DRM-based system is not affected by -- by EMI's
19   decision.
20       They have -- you know, they're going to have        11:07:48
21   roughly 70 to 80 percent or more of their recorded music
22   is going to be DRM protected.  And that's going to lock
23   them in.  So EMI all by itself is not affecting the
24   degree of lock-in of these consumers.
25       What -- what does affect the degree of lock-in        11:08:10

Page  76

1    in consumers is when everybody goes DRM-Free, because
2    then no matter what they buy they can play it on
3    anything
4        **Q Okay, but so you think that EMI going DRM-Free**
5    **has less of an impact on iPod demand than RealNetwork        11:08:24**
6    **making its music available to play on an iPod?**
7        A  Yes, because the difference is that Harmony
8    applies to all DRM protected products, not just one
9    label's worth  If Harmony had only worked for EMI I
10   would not have anticipated it would have had any        11:08:44
11   effect
12       **Q Okay.  What was -- isn't the relative effect**
13   **of Harmony versus EMI going DRM-Free an empirical**
14   **question?**
15       A  Yeah, it is, of course, an empirical question,        11:08:59
16   but I'm just saying that if you start with the theory of
17   lock-in, Harmony unlocks everybody  EMI doesn't unlock
18   anyone, unless there -- unless there's a customer out
19   there who only buys EMI music and that's extremely
20   unlikely        11:09:21
21       **Q What did you do to test?**
22       A  I didn't test it  I just think it's
23   implausible, all right
24       **Q Does RealNetworks market share at any point in**
25   **time affect your analysis?        11:09:31**

Page  77

**Sarnoff, A VERITEXT COMPANY**
**877-955-3855**

1      A  Not really, no.

2      Q  **Does it affect your view on the plausibility**

3  **of -- of Harmony or 7.0 having an effect on iPod**

4  **demand?**

5      A  The magnitude of Harmony's effect on the        11:09:47

6  demand elasticity of iPods depends on their market

7  share, but it's again a continuous thing.  The -- the --

8  what -- what Harmony does is make the demand more

9  elastic, all right.  And so, again, it's an empirical

10  question, how much more elastic it made it.        11:10:07

11      Q  **DRM-Free music also makes the demand less**

12  **elastic, correct?**

13      A  That's exactly right.  And so when everybody

14  goes DRM-Free that should have the same effect of making

15  the demand more elastic.        11:10:19

16      The reason EMI -- the parallel you're trying

17  to draw between EMI and Harmony isn't valid, because

18  Harmony applies to everything.  And there's a subset of

19  consumers who become not locked in.  And then the

20  effect -- and then they have a more elastic demand.  EMI  11:10:34

21  by itself does not make the demand for iPods more

22  elastic, because it's too small.  It doesn't end the

23  lock-in, because most of people's portfolio of sound

24  recordings are not EMI, the vast majority of it.

25      Q  **Most people's sound recordings do not come**        11:10:52

Page 78

---

1  from RealNetwork, correct?

2      A  That's correct

3      Q  **Okay.**

4      A  But among those who did buy from RealNetworks,

5  they were no longer locked in, so that -- the aggregate  11:11:01

6  demand curve for iPods became less elastic to buy -- buy

7  share of -- of Rhapsody's market share

8      Q  **And if -- well, not Rhapsody, right?  You know**

9  **what Rhapsody is?**

10      A  Well, Rhapsody Music Store        11:11:19

11      Q  **What's that?**

12      A  It's where Rhap -- it's where you buy songs

13  from other than if you -- it's the RMS is the

14  counterpart to ITS for Rhapsody

15      Q  **For RealNetwork?**        11:11:38

16      A  For RealNetworks, yeah

17      Q  **And what was the -- do you know at some point**

18  **Rhapsody was subscription?**

19      A  Yes

6

7      share, would you expect that to have some impact on the

8      degree to which it impacted iPod demand under your

9      theory if there was any impact at all?

10      A  If there was an impact it is the fraction of        11:13:38

11      people who used Harmony to play stuff on an iPod.

12      They're the ones whose demand became elastic.

13      Q  And then your next variable, going back to

14      13.2, is ITMS all DRM-Free.  Why did you include that

15      variable?        11:14:04

16      A  Well, because the -- main vehicle for the

17      lock-in effect on the Apple side is using Fair Play and

18      when Apple stops using Fair Play on ITS, then anything

19      you buy from ITS from that point on can play on

20      anything.  So you're no longer locked into an iPod if   11:14:27

21      you buy your music from ITS, so that -- that strikes me

22      as a big deal.  A very important deal.

Pages  78  to  81

Page 106

```
 1   the interesting question   The interesting question is
 2   had the price been higher would they have switched
 3   BY MR MITTELSTAEDT:
 4       Q  But, for example, if -- if you take somebody
 5   who says I'm never going to buy anything other than      11:58:31
 6   iPod, no matter what, no matter what the price is.
 7       A  They are the beneficiaries of competition
 8   among those who would switch  Those who have extremely
 9   high willingness to pay for any particular brand name
10   are the beneficiaries of competition for the people who  11:58:47
11   are willing to shop
12       Q  No, but what I'm -- what I'm trying to focus
13   on is people whose demand is at the margin and who make
14   a difference because of 7.0  You know, what's the
15   profile of -- of those people where there's an          11:59:03
16   incremental impact where they decide -- their switching
17   costs are such that they buy an iPod where they would
18   have preferred to buy something else.  And if what I'm
19   positing is, you can't include in that group people who
20   were going to buy an iPod no matter what.               11:59:24
21       MS SWEENEY:  Objection --
22   BY MR MITTELSTAEDT:
23       Q  You have to include only the people who
24   decided to buy an iPod instead of something else,
25   because of their switching costs caused incrementally   11:59:32
```

Page 107

```
 1   after 7.0?
 2       MS. SWEENEY:  Objection to form, vague and
 3   ambiguous, compound.
 4       THE WITNESS:  I have no idea what you're --
 5   what you're talking about.                              11:59:43
 6       Yes, there are people who are willing to pay a
 7   premium for an iPod and switching costs are one reason
 8   why they might be willing to pay a premium.  Just being
 9   in love with Apple is another reason.  And then there
10   are other people who are at the margin, who plus or     11:59:54
11   minus ten percent in price, can affect their decision.
12   And it's the latter that determine pricing and the
13   extent of competition among brands of portable digital
14   media players.
15   BY MR. MITTELSTAEDT:                                    12:00:10
16       Q  Okay.  And how many people fit that profile of
17   being at the margin where their purchase decision
18   changed from a non-iPod to an iPod because of 7.0?  How
19   many people are in that category?
20       A  We have no way of knowing that.                  12:00:24
21       Q  Is it -- is it ten people or 10,000?
22       A  We have no way of knowing what the number is.
23   All we observe is the actual pricing behavior and the
24   implicit change in the elasticity of demand.
25       We're talking about a fairly small fraction        12:00:36
```

Page 108

```
 1   of -- a fairly small increase in price, three-to-six
 2   percent, okay  And so what that basically means is it's
 3   a few percentage points of people went from the category
 4   of moveable to not moveable
 5       Q  So how many people?                              12:00:52
 6       A  I don't know how many people
 7       MS  SWEENEY:  Objection, asked and answered
 8   BY MR MITTELSTAEDT:
 9       Q  Well, when you say a few percentage points
10   what do you mean?  A few percentage points of what?     12:00:58
11       A  A few percentage points of sales were at
12   stake  For -- in order for it to make sense, to be
13   profit maximizing for Apple to raise its price by three
14   percent, all right, it has to be the case that the
15   number of people who switch out used to be too many and  12:01:13
16   now it's not -- not too many to make that a profitable
17   price increase, okay
18       So, normally, in the case of, you know, if --
19   if Apple is going to increase price three percent, it
20   better have the effect on sales be less than three      12:01:31
21   percent  So we move from a world in which the effect
22   might have been three-and-a-half percent to a world in
23   which it now is two-and-a-half percent  So it made
24   sense to raise the price by three percent after the fact
25   and it didn't make sense before the fact               12:01:48
```

Page 109

```
 1       And that's the -- the issue of how many are
 2   there is -- is indeterminate.  It's just -- it used to
 3   be profitable to have the price be three percent lower
 4   and now it's profitable to have it be three percent
 5   higher.  And that's because the number of customers you  12:02:07
 6   lose by raising the price has gone down by enough to
 7   make the net revenue be positive instead of negative.
 8       Q  Okay.
 9       A  And it could be three people.  I mean if you
10   were close enough to the margin, the mag -- the number   12:02:18
11   of people is not what matters.  The -- what matters is
12   why didn't you raise the price by three percent
13   anyway.
14       Q  Okay.
15       A  And the answer must be because you expected     12:02:29
16   sales to go down by -- enough to -- that the higher
17   price times the lower sales would be less profitable.
18   Now it's more.  So it could be a very small number of
19   people, just -- less than a percent, as the difference
20   in sales before and after 7.0 that caused the price     12:02:47
21   increase to be profitable, when you're talking about a
22   price increase that's this small.
23       Q  Okay.  So are you saying that it could take
24   only three people buying an iPod instead of a non-iPod
25   as a result of 7.0 to have the price effect that you are  12:03:05
```

Pages 106 to 109

3    Q  Okay.  And did it cause iPod prices to go down
4  immediately upon the launch of the iTunes Music Store
5  going all DRM-Free?                    11:15:06
6    A  This is -- this is the -- this is the effect
7  over the period afterwards in the dataset.  I think it
8  probably had a fairly dramatic immediate effect, yes,
9  but you know, that's the number.  It's six percent in
10  this regression and seven percent in the other.    11:15:23
11    Q  Have you made any analysis of what you would
12  say the price change was the first month or the second
13  month or the third month.  This is -- or is this just an
14  average over the -- the whole three-year period?
15    A  This is -- well, it's two years.  We only have  11:15:37
16  two years of data, I believe, beyond, don't we?  What
17  is -- when does the data period end?  What's the end of
18  the data period?  I can find it.  March 26, 2011, so
19  it's two years.
20    Q  March 26, 2000 and --                11:16:00
21    A  '11 is end of the data period, I believe.
22  Isn't it?
23    Q  But what's the end of the period for which you
24  are measuring what you assert are damages?
25    A  ITMS becomes DRM-Free on April 1st, 2009, so   11:16:12

Page 82

1  it's about two years worth of DRM-Free data for --
2  for -- in the dataset.
3    Q  But my -- my question is different.  It's what
4  the end of the period for which you were measuring what
5  you claim are damages?                 11:16:30
6    A  April 1st.  That's it.  The damages stop at
7  when ITMS goes DRM-Free.
8    Q  Why would you expect there to be a dramatic
9  immediate impact on iPod prices from the music store
10  going DRM-Free?                        11:16:50
11    A  Well, first of all, there was a transition,
12  but no, it's because that it's the end of the lock-in.
13  And looking forward, consumers are not going to be
14  locked in.
15        And so, you know, what, something like half of  11:17:02
16  iPod sales are original sales.  And so for them going
17  forward, none of those customers are going to be locked
18  in.
19        And then among the customers who are buying a
20  replacement iPod, their new music is not always -- is   11:17:17
21  going to be subject to the lock-in.  And they can, if
22  they want to, get the DRM-Free version of what they
23  have, so -- for the things they want to keep.  So it's
24  my expectation that it's a big deal to go DRM-Free.
25  That that basically ends the problem of lock-in in     11:17:36

Page 83

1  portable digital media players.
2    Q  Okay.  The next variable you use is -- is
3  Classic and then Mini, Nano and Shuffle.  Your variable
4  for Classic or your coefficient for Classic variable is
5  positive and it's negative for Mini, Nano and Shuffle.  11:18:01
6    A  Remember that the actual effect of a model
7  that's in the equation is the different -- is the
8  combination of the interceptor plus that -- the
9  intercept is essentially the Touch.  And then these are
10  adjustments to the Touch effect from -- due to other   11:18:22
11  models.
12    Q  Okay.
13    A  And so these coefficients are what you would
14  expect if your theory was right?
15        MS. SWEENEY:  Objection, vague and         11:18:36
16  ambiguous.
17        THE WITNESS:  I have no idea what that
18  question means.
19  BY MR. MITTELSTAEDT:
20    Q  Okay.  Do you see anything anomolous in these  11:18:41
21  coefficients?
22    A  No, not at all.  It just -- it tells you that
23  cheaper products have lower -- have a lower intercept
24  term in the regression.
25        Remember you want to subtract each one of       11:18:54

Page 84

1  these from the intercept, so that what you got is sort of a
2  baseline price before you do anything else.  And all
3  this is telling you is that cheaper ones have lower
4  intercepts, which is the average price over the whole
5  period of a more expensive model is going to be higher.  11:19:11
6  That's all that it tells you.
7    Q  For this variable, the Classic variable, how
8  do you determine when to turn that on and when to turn
9  that off?
10    A  When it's a Classic that's in the transaction.  11:19:23
11  When the transaction is a Classic.
12    Q  Okay.  And for the Shuffle, when you say
13  you've asked Econ, Inc. to run the regression turning
14  the Shuffle off --
15    A  No, that's not what I said.  I said you've      11:19:38
16  turned -- you turn the 7.0 variable off for Shuffles.
17    Q  Okay.  And how do you do that?
18    A  You just -- you just run exactly the same
19  regression except an observation for a Shuffle never has
20  7.0 turned on, even if it's in the damages period.     11:19:55
21    Q  But I thought the 7.0 variable was either on
22  or off?
23    A  It's on --
24    Q  Excuse me.  Depending on the time period.  So
25  as of September 12, 2006 you turned it on and gave it   11:20:10

Page 85

Pages  82 to 85

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 52
# [Filed Under Seal]

# The Apple iPod iTunes Anti-Trust Litigation

**Videotaped Deposition of**

**ROBERT TOPEL, PH.D.**

**January 08, 2014**

**\*\*\*CONFIDENTIAL\*\*\***

**Volume II**

Volume II
Robert Topel, Ph.D.

**Confidential - Attorneys' Eyes Only**

The Apple iPod iTunes Anti-Trust Litigation

---

Page 194

```
1          UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF CALIFORNIA
3              OAKLAND DIVISION
4
   THE APPLE iPOD iTUNES    )  Lead Case No. C 05-00037
5  ANTI-TRUST LITIGATION    )
6                           )
7  _____ )
8  This Document Relates To:    )
9  ALL ACTIONS               )
10                           )
11 _____ )
12
13
14       CONFIDENTIAL - ATTORNEYS' EYES ONLY
15    V DEOTAPED DEPOSITION OF ROBERT H. TOPEL, Ph.D.
16              VOLUME II
17           January 08, 2014
18           Phoenix, Arizona
19
20
21
22 Reported By:
23 Cathy A. Miccolis
24 RPR, CRR, CSR No. 50068
25 Job No. 10009199
```

Page 195

```
1              A P P E A R A N C E S
2
3  For the Plaintiffs:   Bonny Sweeney, Esq.
                       ROBBINS GELLER RUDMAN & DOWD, LLP
4                        655 West Broadway
                       Suite 1900
5                        San Diego, CA  92101
                       619.231.1058
6                        bonnys@rgrdlaw.com
7
8
9
   For the Defendant Apple, Inc.:
10       David C. Kiernan, Esq.
       JONES DAY
11       555 California Street
       26th Floor
12       San Francisco, CA  94104
       415.626.3939
13       dkiernan@jonesday.com
14
15
16 Also Present:      Thomas C. Tracy, videographer
17
18
19
20
21
22
23
24
25
```

Page 196

```
1              I N D E X
2  Witness                          Page
3    ROBERT TOPEL, Ph.D.
4
      EXAMINATION BY MS. SWEENEY        198
5
6
7
8          E X H I B I T S
9  Exhibit   Description              Page
10    (No newly marked exhibits.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 197

```
1         THE VIDEOTAPED DEPOSITION OF ROBERT TOPEL,
2  Ph.D., VOLUME II, was continued on January 8, 2014,
3  commencing at 12:56 p.m. at he offices of BONNETT,
4  FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 East Camelback
5  Road, Suite 300, Phoenix, Arizona, before CATHY MICCOLIS,
6  a Certified Reporter in he State of Arizona.
7
8         THE VIDEOGRAPHER:  We are now on the record.
9  The time is approximately 12:56 p.m.  Today's date is
10 January 8, 2014.  My name is Tom Tracy of Aptus Court
11 Reporting.  The court reporter is Cathy Miccolis of Aptus
12 Court Reporting, located at 600 West Broadway, Suite 300,
13 San Diego, California 92101.
14        This begins the videotaped deposition of Robert
15 Topel, Volume II, testifying in he matter of the Apple
16 iPod iTunes Antitrust Litigation pending in he District
17 Court of California, Division of Oakland, Case Number C
18 05-00037 YGR, taken at 2325 East Camelback, Suite 300,
19 Phoenix, Arizona 85016.
20        Counsel, will you please identify yourself and
21 whom you represent for the record at this time, starting
22 with the plaintiffs' counsel.
23        MS. SWEENEY:  Bonny Sweeney for he plaintiffs.
24        MR. KIERNAN:  David Kiernan for Apple.
25        THE VIDEOGRAPHER:  Thank you, Counsel.  The
```

http://www.yeslaw.net/help

**Page 194..197**

Volume II
Robert Topel, Ph.D.

**Confidential - Attorneys' Eyes Only**
The Apple iPod iTunes Anti-Trust Litigation

Page 218

1 as true? Because I hink I said, you know, it could have
2 been hat I did something like hat, but it's been mon hs
3 and I can't remember.
4 BY MS. SWEENEY:
5     Q.  Well, it may have been mon hs, but you just
6 submitted a report on December 20 h with these regressions
7 and these additional variables, and I want to know how you
8 picked hose variables.
9        MR. KIERNAN:  Argumentative.
10        THE WITNESS:  They are he same ones that we
11 used in the last round.  We didn't change anything.
12 BY MS. SWEENEY:
13     Q.  Okay.  So my question is, you didn't – so I
14 will represent to you, and you can go back and check it –
15     A.  Okay.
16     Q.  – that you took some variables that were in
17 the dataset hat were not used by Noll and put hem in he
18 regression, but not all of them, and hen in addition you
19 took some variables hat were not in the dataset and added
20 them.  So I'm trying to figure out how you made he
21 determination about which variables to add to the
22 regressions.
23        MR. KIERNAN:  Asked and answered.
24        THE WITNESS:  It's been mon hs.  You know, if
25 you asked me which one, I couldn't tell you.  It's been,

Page 219

1 you know, it's been more han months.  It's been a really
2 long time.
3 BY MS. SWEENEY:
4     Q.  Other han what you alluded to earlier, hat
5 is, the regression output, are there standard tests hat
6 economists use to determine whe her variables are
7 correlated?
8        MR. KIERNAN:  Object to form.
9        THE WITNESS:  Sure.
10 BY MS. SWEENEY:
11     Q.  Can you give me some examples?
12     A.  Well, since you're talking about
13 multicollinearity, if I had some variable, call it Z, and
14 I could – if it's a problem of multicollinearity you're
15 concerned wi h, you could regress Z on all the other Xs
16 and see how much residual variation there is in Z, that
17 is, how much – what's the coefficient of multiple
18 determination for Z regressed in all the other Xs.
19     Q.  Is here a name for that?
20     A.  Regression.  (Laughter.)
21        That's – you know, it's – you're finding he
22 multiple correlation coefficient between Z and the other
23 stuff.
24     Q.  And did you do that in this case on your added
25 variables?

Page 220

1     A.  Well, implici ly, yes, because as I said
2 before, he way the regression coefficient is calculated
3 formally is it's using that part of – I was using he
4 term Z, so I will say Z – hat part of Z hat's not
5 correlated, not predictable from the o her Xs, and it's
6 using that variation to identify he coefficient on Z in
7 hat regression.  So he fact that – as I said before,
8 he fact hat that residual correlation, the stuff that's
9 not correlated with he o her stuff, can identify a
10 statistically significant coefficient means hat he
11 collinearity between Z and the other Xs isn't so large
12 that you're not able to identify a statistically
13 significant effect.
14     Q.  Did you compute a variance inflation factor for
15 each of he additional variables that you used?
16     A.  I don't know what you mean by a variance
17 inflation factor for each variable.
18     Q.  Do you have any understanding of what a
19 variation – did I say that wrong?  A variance inflation
20 factor, do you know what that is?
21     A.  I assume the context in which you're using it
22 is to some hing to inflate the variance, but no.
23     Q.  Do you know what a condition number is?
24     A.  A condition number?  Not in the context in
25 which we are using it here.

Page 221

1     Q.  Now, you keep referring back to he results of
2 he regression.  Did you add in the variables separately
3 and see what the results were, or did you just conduct the
4 regression where you added in all your additional
5 variables and hen ran the re ression?

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 53
# [Filed Under Seal]

# The Apple iPod iTunes Anti-Trust Litigation

**Videotaped Deposition of**

**KEVIN MURPHY, PH.D.**

**January 08, 2014**

**\*\*\*CONFIDENTIAL\*\*\***

**Volume II**

Volume II
Kevin Murphy, Ph.D.

**Confidential - Attorneys' Eyes Only**

The Apple iPod iTunes Anti-Trust Litigation

---

Page 233

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

  THE APPLE iPOD iTUNES    )    Lead Case No. C 05-00037

5  ANTI-TRUST LITIGATION    )

6                 )

7  _____  )

8  This Document Relates To:    )

9  ALL ACTIONS           )

10                )

11  _____  )

12

13

14

15          CONFIDENTIAL - ATTORNEYS' EYES ONLY

16      V DEOTAPED DEPOSITION OF KEV N M. MURPHY, PH.D.

17               VOLUME II

18            January 08, 2014

19             Phoenix, Arizona

20

21

22  Reported By:

23  Cathy A. Miccolis

24  RPR, CRR, CSR No. 50068

25  Job No. 10009198

---

Page 234

1            A P P E A R A N C E S

2

3  For the Plaintiffs:    Bonny Sweeney, Esq.

                   ROBBINS GELLER RUDMAN & DOWD, LLP

4                   655 West Broadway

                   Suite 1900

5                   San Diego, CA  92101

                   619.231.1058

6                   bonnys@rgrdlaw.com

7

8

9

   For the Defendant Apple, Inc.:

10          David C. Kiernan, Esq.

          JONES DAY

11           555 California Street

          26th Floor

12           San Francisco, CA  94104

          415.626.3939

13           dkiernan@jonesday.com

14

15

16  Also Present:      Thomas C. Tracy, videographer

17

18

19

20

21

22

23

24

25

---

Page 235

1                I N D E X

2  Witness                         Page

3     KEVIN M. MURPHY, Ph.D.

4

       EXAMINATION BY MS. SWEENEY          237

5

6

7

8            E X H I B I T S

9  Exhibit    Descrip ion              Page

10  Exhibit 6   Supplemental Report         257

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 236

1          THE VIDEOTAPED DEPOSITION OF KEVIN M. MURPHY,

2  Ph.D., VOLUME II, was continued on January 8, 2014,

3  commencing at 9:11 a.m. at the offices of BONNETT,

4  FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 East Camelback

5  Road, Suite 300, Phoenix, Arizona, before CATHY MICCOLIS,

6  a Certified Reporter in he State of Arizona.

7

8          THE VIDEOGRAPHER:  The time on he record is

9  9:11 a.m.  Today's date is January 8, 2014.  My name is

10  Tom Tracy of Aptus Court Reporting.  The court reporter is

11  Ca hy Miccolis of Aptus Court Reporting located at 600

12  West Broadway, Suite 300, San Diego, California 92101.

13          This begins the videotaped deposition of Kevin

14  Murphy, Volume II, testifying in the matter of he Apple

15  iPod iTunes Trust (sic) Litigation, pending in he

16  District Court of California, Oakland Division, Case

17  Number C 05-00037 YGR.  This deposition is taking place at

18  2325 East Camelback, Suite 300, Phoenix, Arizona 85016.

19          Will counsel please identify themselves,

20  starting with he plaintiffs' counsel.

21          MS. SWEENEY:  Bonny Sweeney for he plaintiffs.

22          MR. KIERNAN:  David Kiernan for Defendant

23  Apple, and Scott Murray, in-house counsel from Apple, may

24  be on he phone.

25          Scott, are you on the phone?

**Page 233..236**

Volume II
Kevin Murphy, Ph.D.

**Confidential - Attorneys' Eyes Only**

The Apple iPod iTunes Anti-Trust Litigation

Page 293

1  it's always going to be a judgment.  You always have to
2  use some judgment.  You're not going to write down some
3  set of rules because there is going to be a circumstance
4  hat satisfy hose rules, and you'd say no, hat doesn't
5  make any sense in that context.  I think you have to use
6  your judgment.
7  BY MS. SWEENEY:
8      Q.  When you use your judgment, what other
9  considerations are you taking account of hat might lead
10  you in your judgment to exclude certain product
11  characteristics from your regression?
12      A.  I guess we have to look at it case-by-case
13  basis.  I don't see any of he problems wi h these
14  characteristics that would lead me to exclude hem.  You
15  know, I gave you the example of occupation.  That would be
16  one hat I definitely would exclude from an
17  education/earnings relationship because hat --
18  controlling for hat is going to miss a substantial impact
19  of education, which it works hrough changing your
20  occupation.  So again, you could say, well, economics says
21  occupation should matter for earnings, but it's not
22  something in general you'd want to hold constant.
23      Q.  Did you conduct any analyses to see whether any
24  of these additional variables that you added to the
25  regression are collinear with variables already in

Page 294

1  Professor Noll's regression?
2      A.  Yes, I did.  And the easiest way to see that is
3  to evaluate he effect it has on the standard errors of
4  he o her variables.  If hey were highly collinear with
5  hose other variables, hat will generally show up as a
6  large increase in he standard error of the other
7  variables in he regression

16      Q.  Now, so you --
17      A.  I didn't even pause that time; correct?
18      Q.  I hought you had, but go ahead.
19      A.  I don't hink my mou h even closed.
20      Q.  I have asked you to continue your response.
21  Please do so.
22      A.  I have lost my train of hought.  I'm sorry.
23      Q.  O her than he effect on the standard errors,
24  did you conduct -- or strike that.
25          So you said that because he results of your

Page 295

1  regression show that you don't have a collinearity problem
2  because of o herwise you would see it in the standard
3  errors, are here any other tests hat one could conduct
4  to determine whether the product characteristic variables
5  hat you added to he regression are collinear wi h
6  variables already in Professor Noll's regression?
7          MR. KIERNAN:  Objection; argumentative.
8          THE WITNESS:  There are, but I hink you could
9  basically back those out from he standard errors because
10  the other primary test that people do is kind of an
11  auxiliary regression test where you look at the R-squared
12  from regressing that variable on the other included
13  variables in the regression.  But you can actually back
14  that out from he change in he standard errors and the
15  change in the residual variance of he equation.  So hey
16  amount to almost the same thing.  That's some hing else
17  you can look at.
18  BY MS. SWEENEY:
19      Q.  Did you do that here?
20      A.  No, because you can really -- you can see
21  what's going on with one from looking at the other.  They
22  are essentially capturing he same phenomena.
23      Q.  So o her than looking at he standard errors
24  and conducting what you called an auxiliary regression
25  test, are there any other tests hat one could conduct to

Page 296

1  determine whether he variables that you added to the
2  regression were collinear with variables already in he
3  model?
4          MR. KIERNAN:  Object to form.
5          THE WITNESS:  You could.  I mean, I assume you
6  could do o her things.  Those are he two primary ones
7  that people use.
8  BY MS. SWEENEY:
9      Q.  Well, can you give me some specific examples of
10  other kinds of tests you could conduct?
11      A.  I mean, it would all amount to essentially the
12  same thing because you're trying to evaluate the extent to
13  which this variable is a linear combination of he o her
14  variables hat are in the regression, so I think anything
15  else you do would be very similar.
16      Q.  So, but you can't give me any names of specific
17  kinds of statistical tests you could conduct?
18      A.  I wouldn't recall the names, but hey would
19  be -- hey would essentially amount to looking at the same
20  types of hings.
21      Q.  Well, what is a variance inflation factor?
22      A.  That's looking essentially at how much he
23  standard errors go up when you include he additional
24  variable.
25      Q.  So did you compute a variance inflation factor

**Page 293..296**

**Volume II**
Kevin Murphy, Ph.D.

**Confidential - Attorneys' Eyes Only**

**The Apple iPod iTunes Anti-Trust Litigation**

Page 297

1 for each of the variables that you added to the
2 regression?
3      A.  I did not specifically calculate it that way.
4 I mean, you can calculate it from what we did.  We have
5 the variance inflation here that you could calculate by
6 comparing the standard errors you get in the two different
7 ways of calculating the model with or without those
8 additional variables.
9      Q.  But -- so I'm not understanding.  So you said,
10 "I did not specifically calculate it that way."  So is
11 your testimony that you can do that and you can back it
12 out, but you didn't go through that extra step?
13      A.  Yeah, because I didn't like take the ratio of
14 the two numbers and square them.  You could do that if you
15 wanted.
16      Q.  What about, what is a condition number?
17      A.  A condition number is a characteristic of the
18 matrix used to calculate the standard errors.  I don't
19 recall the specifics of how it's calculated.  But again,
20 it's looking at much of the same concept as you're looking
21 at here in terms of the variance inflation factor or the
22 ratio of the standard errors.  All those things are
23 looking at the same basic concept.
24      Q.  So in other words, you can use a condition
25 number to check whether there is collinearity between

Page 298

1 variables that you've added and variables that were
2 already in the regression?
3      A.  I presume you could.  I have never done it that
4 way.  But that would be one thing that would presumably
5 reflect the impact.  I think the bottom-line impact that
6 you care most about is what happens to the standard errors
7 because that is the bottom-line concern.  That's why I
8 think that's the most direct and easiest to understand
9 approach.
10      Q.  And so going back to the condition number, you
11 didn't use a condition number to check whether there was
12 high collinearity between variables that you added and
13 variables already in the model; correct?
14      A.  I did not specifically do that.
15      Q.  Let's assume that the variables that you added
16 are highly collinear with the model in Professor Noll's
17 model.  If that's true, what is the added value of
18 including them?
19      A.  Well, you can see it -- in terms of explanatory
20 power, you can see it in the results on the table.  And we
21 talk about this in the report.  I mean, if you look at the
22 fraction of the remaining variance that's explained, you
23 could compare, for example, you know, column -- column one
24 and column two.  You can see that adding those
25 characteristics explain almost half of the remaining

Page 299

1 variance, which is the standard one generally uses when
2 thinking about adding variables.
3          If you're worried about collinearity, you
4 realize that, for example, in JT-6a that actually the
5 standard error, the precision with which according to
6 Professor Noll's analysis you can estimate the iTunes 7
7 coefficient actually is improved, not reduced.  So the
8 problem you're worried about under collinearity of making
9 it much more difficult to identify the existing variables,
10 at least as far as it goes for Professor Noll's iTunes 7
11 variable, doesn't happen.
12      Q.  So is it your opinion then that all of the
13 added value of adding these variables is reflected in the
14 regression output that's in your tables?  I guess what I'm
15 trying to get at is, is there any thing else?  I mean, I
16 asked you, what is the added value of adding these
17 variables if there is collinearity, and you responded by
18 pointing to the regression output.  Other than the
19 regression output, can you identify for me any added value
20 of adding variables to your regression?
21      A.  I think that --
22          MR. KIERNAN:  Objection; argumentative and to
23 the extent it misstates his prior testimony.
24          THE WITNESS:  I think there is some added value
25 that's also -- it is reflected in the tables, but I would

Page 300

1 say something we haven't talked about yet is that adding
2 those coefficients makes a substantial difference to this
3 estimated coefficients, for example --
4          (Reporter clarification.)
5      A.  Adding those variables has a substantial effect
6 on his estimated coefficients, which underscores what we
7 have talked about numerous times, which is his problem or
8 potential problem with omitted variables.  These are just
9 some potential variables you could think about bringing
10 into the analysis, and just including these made a
11 dramatic difference to his results.
12 BY MS. SWEENEY:
13      Q.  Are you suggesting that there are other
14 variables that you could add to the regression?
15      A.  I don't know if they are ones that we have, but
16 it makes the point that his analysis is sensitive to the
17 existence of omitted variables and, you know, I don't
18 think -- we kind of know we don't have everything that
19 would determine pricing, and that makes us worried that
20 other variables could cause his coefficients to change
21 even more.
22      Q.  So if you add variables to your regression that
23 are highly collinear with variables that are already in
24 the model, can one effect be to reduce the reliability of
25 the model?

**Page 297..300**

Page 301

1    MR. KIERNAN: Object to form. Vague.

2    THE WITNESS: If in fact they were highly

3 collinear, you could have hat problem, but generally hat

4 will be reflected in he standard errors, and he impact

5 it has is going to depend on the other variable you're

6 concerned about. If I introduce a variable hat's highly

7 correlated with variable A, but it's not highly correlated

8 in a multi-varied sense with variable B, it may affect he

9 precision which I can affect -- estimate the coefficient

10 on A, but it may not have much effect at all --

11    (Reporter clarification.)

12    A.  -- the precision with which I can estimate he

13 coefficient on the variable where it has a strong

14 relationship, but often won't have an impact on my

15 precision of estimating the other variable. And so you

16 don't want to like have this blanket statement across the

17 regression.

18    And what's key here is hat the precision wi h

19 which I can estimate the iTunes 7 variable, which is I

20 think he primary variable of interest here, is not

21 reduced substantially by and in some cases actually

22 increased by adding these additional variables.

23 BY MS. SWEENEY:

24    Q.  So looking at Exhibit JT-1a, which is the --

25 this reflects at least in the right-hand columns when you

Page 302

1 added in he additional characteristics; correct?

2    A.  Yes.

3    Q.  And did you do any analysis whereby you just

4 added these additional variables one at a time? Is that

5 reflected anywhere in your report or in he exhibits?

6    MR. KIERNAN: Object to form.

7    THE WITNESS: It's not reflected in he

8 exhibits. I don't recall whether we did that or not.

9 BY MS. SWEENEY:

10    Q.  I had -- let's see. Strike that.

11    You talk in your report about additional

12 characteristics that you have added having joint

13 significance. What do you mean by that?

14    A.  That is, you're asking how much do they add to

15 the explanatory power on a combined basis, not on a

16 one-off basis. You're asking -- joint significance says

17 formally if you're thinking about a statistical test,

18 you're testing he hypo hesis that the coefficients on all

19 the variables are zero, that he true model is zero

20 coefficient on all he variables. You're not testing

21 whether any one of them is zero. You're testing whe her

22 they are all jointly equal to zero. That's the hypothesis

23 being tested in that joint test.

24    Q.  Can you have joint significance in a regression

25 that also exhibits high multicollinearity?

Page 303

1    MR. KIERNAN: Object to form. Vague.

2    THE WITNESS: You could in principle, but he

3 evidences in this case is there isn't that high degree of

4 multicollinearity between hat and the o her variables of

5 interest in his regression, which is what really matters

6 for he purpose of our analysis.

7 BY MS. SWEENEY:

8    Q.  Is here high collinearity between hat and

9 variables other than the variables of interest?

10    MR. KIERNAN: Object to form.

11    THE WITNESS: I don't know about high. I --

12 there -- here are going to be varying degrees to which

13 they are correlated wi h o her variables in he

14 regression. But he impact of hat is primarily going to

15 be on he coefficients of hose variables, not on he

16 coefficients of the variables hat continue to have

17 substantial amounts of independent variation.

18 BY MS. SWEENEY:

19    Q.  You say in your report that he additional

20 characteristics that you've added, he additional

21 variables, increases he R-squared of he regressions.

22 Can a regression hat exhibits high multicollinearity have

23 a high R-squared?

24    MR. KIERNAN: Object to form. Vague.

25    THE WITNESS: Yeah, you could have a high

Page 304

1 R-squared with high multicollinearity, but if they were

2 really -- but hat's kind of like orthogonal to what we

3 are talking about here. The key here is that adding hese

4 variables added to the explanatory power of the regression

5 substantially. In he limit if these things were just

6 multicollinearity with what you already had, hey wouldn't

7 add any hing. And they are not reducing the precision

8 wi h which I can estimate he other coefficients.

9 That's -- and particularly the coefficient of interest.

10 That's the key question about whether you have an issue

11 here wi h multicollinearity.

12 BY MS. SWEENEY:

13    Q.  Did you look at the extent to which he

14 additional characteristics that you added are correlated

15 with particular iPod models or families?

16    MR. KIERNAN: Object to form.

17    THE WITNESS: My suspicion is they would be

18 correlated. In some sense that's why you're controlling

19 for them. One of the major reasons you control for

20 variables is hat they are correlated wi h o her aspects

21 of the model you have.

22 BY MS. SWEENEY:

23    Q.  And in some cases isn't it true that some of

24 these characteristics are probably 100 percent correlated

25 with a particular iPod model?

*APPLE'S (PROPOSED) REDACTIONS*

# EXHIBIT 62
# [Filed Under Seal]

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4                      ---oOo---

5   THE APPLE iPOD iTUNES
    ANTITRUST LITIGATION
6

7                              No.  C-05-00037-JW(RS)

8
    _____/
9

10

11

12        VIDEOTAPED DEPOSITION OF ROGER G. NOLL

13                      VOLUME I

14                 (Pages 1 to 215)

15

16           Taken before ERIN F. ROBINSON

17                  CSR NO. 12199

18                  April 7, 2011

19

20

21

22

23

24

25

**210**



**212**

**211**

**213**

```
 6        MR. MEDICI:  Object to form.
 7        THE WITNESS:  If they assume that it.
 8  BY MR. MITTELSTAEDT:
 9     Q. -- then they wouldn't change prices?
10     A. Then they wouldn't change prices.
11        MR. MITTELSTAEDT:  Okay.  Why don't we stop
12  there for the day.
13        THE WITNESS:  Okay.
14        THE VIDEOGRAPHER:  This concludes Volume 1 of
15  Dr. Roger Noll.  We are off the record at 3:38.
16        (Whereupon, the deposition was adjourned at
17        3:38 p.m.)
18
19
                              _____
20
21                             SIGNATURE OF WITNESS
22
23
24
25
```