1  Robert A. Mittelstaedt  #60359
   ramittelstaedt@jonesday.com
2  Craig E. Stewart  #129530
   cestewart@jonesday.com
3  David C. Kiernan #215335
   dkiernan@jonesday.com
4  JONES DAY
   555 California Street, 26th Floor
5  San Francisco, CA  94104
   Telephone:    (415) 626-3939
6  Facsimile:     (415) 875-5700

7  Attorneys for Defendant
   APPLE INC.
8

9                     UNITED STATES DISTRICT COURT
10                   NORTHERN DISTRICT OF CALIFORNIA
11                          OAKLAND DIVISION
12

13 | THE APPLE iPOD iTUNES ANTITRUST | Lead Case No. C 05-00037 YGR
14 | LITIGATION                     | [CLASS ACTION]
15 |                                | **DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL**
16 | This Document Relates To:      |
17 | ALL ACTIONS                    |
18 |                                | Date:      To be set by Court
   |                                | Time:      2:00 PM
19 |                                | Courtroom: 5

20
21
22
23
24         ***REDACTED/PUBLIC VERSION***
25
26
27
28

Reply ISO Mot. for Sum. Jgmt. and
To Exclude -- C 05-00037 YGR

**TABLE OF CONTENTS**

                                           **Page**

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................1

I. PLAINTIFFS MISSTATE THE SUMMARY JUDGMENT STANDARD. ...........................1

II. PLAINTIFFS HAVE NO EVIDENCE OF THE CRITICAL FACTS NECESSARY TO SHOW ANTITRUST IMPACT. ...................................................................................2

III. PLAINTIFFS' EXPERT TESTIMONY DOES NOT FILL THE VOID. .............................7

  A. Noll's Model is Inconsistent with Real-World Facts. .......................................7

  B. Noll Improperly Manipulates the iTunes 4.7 and 7.0 Variables. ......................8

  C. Noll Fails to Account for Effect of Unchallenged Aspects of iTunes 7.0. ......11

  D. Noll Fails to Account for Other Product Characteristics. ...............................11

  E. Noll's Model Does Not Produce Statistically Significant Results. .................13

IV. PLAINTIFFS HAVE NO EVIDENCE OF A PROPER RELEVANT PRODUCT MARKET. ........................................................................................................................14

CONCLUSION ..................................................................................................................15

# **TABLE OF AUTHORITIES**

Page

**CASES**

*Collins v. Assoc. Pathologists*,
  844 F.2d 473 (7th Cir. 1988)........................................................................................... 2

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ........................................................................................................ 7

*Freeland v. AT&T Corp.*,
  238 F.R.D. 130 (S.D. N.Y. 2006) ................................................................................. 13

*GE v. Joiner*,
  522 U.S. 136 (1997) ...................................................................................................... 11

*HDC Med. v. Minntech Corp.*,
  474 F.3d 543 (8th Cir. 2007)........................................................................................... 2

*Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*,
  598 F. Supp. 694 (N.D. Cal. 1984), *aff'd,* 794 F.2d 1359 (9th Cir. 1986)...................... 2

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997).............................................................................................. 2

*Thi-Hawaii, Inc. v. First Commerce Financial Corp.*,
  627 F.2d 991 (9th Cir. 1980)........................................................................................... 2

**INTRODUCTION**

Plaintiffs' opposition confirms the complete lack of evidence to support their claim. Neither they nor their expert have any evidence to support critical steps in their purported causal chain—*e.g.* that RealNetworks' Harmony sales were significant, that iPod users were buying RealNetworks music and using Harmony to play it on iPods, that anyone was forced to buy or not buy an iPod because of iTunes 7.0, or that Apple took any such incremental change in demand for iPods or competing devices into account in pricing iPods. Thus, their claim that iTunes 7.0 elevated iPod prices fails at every step. They lack even the most basic facts necessary to support even the possibility of the impact they claim.

Plaintiffs' reliance on their expert fares no better. They do not dispute that Noll has gathered no real-world facts to support his theory. Nor do they answer Apple's showing that Noll has improperly manipulated his model to jury-rig the results. This is most evident in his treatment of the critical variables for iTunes 4.7 and iTunes 7.0. Plaintiffs do not—and cannot—reconcile that treatment with Noll's own prior sworn testimony. Indeed, Noll does not attempt to defend his critical decision to change the iTunes 7.0 variable from what he previously admitted was the "right way to do it." Fixing just this transparent manipulation eliminates the claimed impact and damages. By itself, this is sufficient to exclude the model and grant summary judgment. When the model's other errors are considered, the case for exclusion is overwhelming.

As shown below, plaintiffs also fail to salvage Noll's opinion on relevant market; they only further demonstrate that he applied no relevant expertise. Summary judgment is thus proper on this additional ground as well.

**ARGUMENT**

**I.   PLAINTIFFS MISSTATE THE SUMMARY JUDGMENT STANDARD.**

Contrary to plaintiffs' assertion (Opp. at 9-10), the Ninth Circuit has no rule that summary judgment should be "sparingly" granted in antitrust cases. While some cases (including the one plaintiffs cite) have urged caution in cases involving issues of motive and intent, any such caution is inappropriate outside that context. As the Ninth Circuit stated, "[t]he suggestion that summary procedures are less appropriate in antitrust cases may be put aside, for the Federal Rules make

absolutely no distinction between antitrust and other cases." *Thi-Hawaii, Inc. v. First Commerce Financial Corp.*, 627 F.2d 991, 994 n.2 (9th Cir. 1980) (quoting P. Areeda and D. Turner, *Antitrust Law* ¶ 316b (1978)).

Indeed, if anything, "[g]iven the enormous expenditure of time and other resources commonly necessary in antitrust cases, the complexity of the issues and general inexperience of jurors in this area, as well as the need for uniformity and foreseeability in interpretation of the antitrust laws, the court should, rather, be particularly alert to granting summary judgment in appropriate cases." *Ralph C. Wilson Indus., Inc. v. Am. Broad. Cos.*, 598 F. Supp. 694, 699 (N.D. Cal. 1984), *aff'd,* 794 F.2d 1359 (9th Cir. 1986).[1]

Nor, contrary to plaintiff's suggestion, is "an expert's report . . . a talisman against summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). As Apple's motion shows, summary judgment has frequently been granted in antitrust cases where the court, exercising its gatekeeper responsibility, finds the expert's testimony unreliable, contradictory or inconsistent with record facts.

## II. PLAINTIFFS HAVE NO EVIDENCE OF THE CRITICAL FACTS NECESSARY TO SHOW ANTITRUST IMPACT.

Apple's motion showed that plaintiffs cannot prove any of the critical links in their improbable theory that disabling a single, insignificant source of music for iPods triggered a cascading series of events that ultimately (or, under plaintiffs' theory, immediately) resulted in Apple overcharging for iPods. Plaintiffs' opposition confirms this failure of proof.

***First***, plaintiffs effectively admit that they have no evidence RealNetworks was a significant market participant at the time. They cite (Opp. at 11) a market analyst's report that RealNetworks had 2.4 million subscribers. But they offer no evidence that these subscribers purchased permanent downloads on which Harmony worked, rather than using RealNetworks'

---

[1] *See also Collins v. Assoc. Pathologists*, 844 F.2d 473, 475 (7th Cir. 1988) ("Supreme Court made clear that, contrary to the emphasis of some prior precedent, the use of summary judgment [in antitrust cases] is not only permitted but encouraged"); *HDC Med. v. Minntech Corp.*, 474 F.3d 543, 546-47 (8th Cir. 2007) ("where there has been ample opportunity for discovery, summary judgment is appropriate antitrust cases, just as in any other litigation").

Rhapsody subscription service. *See* ECF No. 751-6 at 11 (describing Harmony as allowing users to transfer downloads from the RealPlayer Music Store); *see also* "RealNetworks rekindles iPod Tech Tussle (Apr. 26, 2005) (noting Harmony worked only on downloads, not subscription service).[2] Nor do plaintiffs dispute that Real had only a 3% share of the digital downloads at the time. Plaintiffs assert (Opp. at 4) that Apple's share of digital music sales dropped when Harmony was launched. But that was in 2004, when RealNetworks promoted Harmony for three weeks with a half-price sale. RealNetworks' sales in 2004 are irrelevant here, because the disabling of Harmony in 2004 as a result of iTunes 4.7 was lawful and plaintiffs' only remaining challenge is to iTunes 7.0 issued in 2006. *See* ECF No. 627.[3]

***Second***, plaintiffs offer no evidence that any of RealNetworks' sales were to iPod users (or potential users). They dismiss that information as irrelevant, asserting that effect on demand is what is important. ECF No. 751-21 at Fact 3 ("Sep. St.").[4] But that is exactly why the missing evidence is critical—demand could not have been affected if iPod users (or potential buyers) were not purchasing RealNetworks' downloads in the first place.

Plaintiffs suggest that sales to iPod users can be inferred from customer complaints Apple received "after Apple blocked Harmony through 7.0." Opp. at 11. In fact, none of the complaints plaintiffs cite says anything about Harmony. Nearly all of them were made ***before*** the ▮▮▮ was issued—and thus could not have been about any effect from the ▮▮▮ *See* ECF No. 751-12 at Exhibit 35.[5] Instead, the customers were asking whether their DRM-protected music from stores

---

[2] Available at: http://news.cnet.com/2100-1027_3-5685286.html (Last accessed, Jan. 31, 2013).

[3] Indeed, many of the "facts" outlined in plaintiffs' opposition relate to events before iTunes 4.7 and thus are irrelevant. *See, e.g.*, ECF No. 751-21 at Fact 45.

[4] Plaintiffs' Responsive Separate Statement includes purported "additional material facts" (Nos. 42-48). Apple is not filing a separate responsive document to those purported facts, as the Court's Standing Order does not appear to contemplate or authorize one. Plaintiffs' asserted facts, however, are immaterial (e.g., Facts 42, 45) or unsupported (Facts 43, 44, 45, 46, 47, 48) for the reasons stated in Apple's moving and reply papers.

[5] Of the 19 complaints plaintiffs cite, only four were made after September 12, 2006, when the ▮▮▮ was released for new iPod nanos. Two of those complaints were from customers who had purchased music from the iTS and wanted to play that music on a non-iPod. That inquiry has nothing to do with the ▮▮▮ or Harmony. The other two were from consumers who wanted to
(continued)

such as Napster, Yahoo, or Walmart would play on their iPod. These inquiries reflect only that these stores' DRM was incompatible with Apple's FairPlay. Plaintiffs do not claim this had anything to do with iTunes 7.0. It was simply the result of Apple using FairPlay (rather than another DRM) which Judge Ware ruled was lawful. ECF No. 303, pp. 2, 10; ECF No. 274, p. 10.

Nor can Harmony sales to iPod users be inferred from the reaction of Apple's executives to Harmony. Plaintiffs cite documents from 2004 when RealNetworks first broke FairPlay's code. Opp. at 11. Again, however, Apple's issuance of iTunes 4.7 in 2004 was lawful, and the issue now is whether Harmony sales in 2006 were sufficient to affect iPod prices. None of the documents plaintiffs cite shed any light on that question.

***Third,*** even if iPod owners (or potential owners) were buying from RealNetworks, plaintiffs still do not point to any consumer who became locked in or locked out as a result. They cite testimony from two of the named plaintiffs that they bought an iPod because of their iTS purchases. Opp. at 5. But neither plaintiff testified that this had anything to do with Harmony or any updates to iTunes. Neither said he or she purchased from RealNetworks or would have done so absent the ▮▮▮, and was locked in or out as a result. Nor do plaintiffs identify anyone else whose decision to buy an iPod was influenced by the disabling of Harmony.

Plaintiffs suggest they should be excused from offering this pivotal evidence because they "have no way of identifying Harmony users, or determining exactly how many customers were locked in or locked out." Opp. at 11. This argument is flawed at every turn. First, litigants cannot get to trial—particularly in a suit of this size—simply by throwing up their hands and proclaiming that the necessary evidence cannot be found. Second, plaintiffs have not shown that the evidence is unavailable. This case has been pending for over eight years, and iTunes 7.0 was released over seven years ago. Plaintiffs have had ample opportunity to do whatever investigation was necessary—including consumer surveys, questionnaires and third-party discovery from RealNetworks or others—to establish the factual basis for their claim, if one existed. The point is not simply that plaintiffs do not know "exactly" how much music

---

play music from Napster or BearShare.com—again, an issue unrelated to the ▮▮▮ or Harmony.

1  RealNetworks was selling at the time to iPod users. Rather, they have no evidence that
2  RealNetworks was selling any Harmony music to iPod users—let alone in sufficient quantities to
3  affect iPod demand.

   *Fourth,* recognizing that Noll's regression results—an immediate, constant overcharge—
contradict his theory that consumers were gradually "locked-in" to buying iPods as they
purchased more iTS music relative to their RealNetworks' music libraries, plaintiffs and Noll
switch their focus to a "lock-out" theory, *i.e.*, that consumers with large RealNetworks' libraries
that became incompatible with the iPod nano second generation as a result of iTunes 7.0 (but still
compatible with other iPod models) would tend to buy something other than iPods. Opp. at 15.
Plaintiffs have no evidence that this series of events ever happened, let alone often enough to
have any noticeable effect on demand for iPods or non-iPods. Nor is there any evidence that, if
iTunes had the effect of reducing iPod demand or increasing non-iPod demand, the effect would
have been to increase iPod prices. [redacted]

---

[6] References to "Ex." are to exhibits to the Amiri Decl. (ECF No. 739).

[7] [redacted]

(continued)

1  ██████████████████████████████████████████████████████████
2  ██████████████████████████████████████████████████████████
3  ██████████████████████████████████████████████████████████
4  ██████████████████████████████████████████████████████████
5  ██████████████████████████████████████████████████████████
6  ██████████████████████████████████████████████████████████
7  ██████████████████████████████████████████████████████████
8  ██████████████████████████████████████████████████████████
9  ████████████████████████████████████████████████
10 ██████████████████████████████████████████████████████████
11 ██████████████████████████████████████████████████████████
12 ██████████████████████████████████████
13    ███████████████████████████████████████████████████████
14 ██████████████████████████████████████████████████████████
15 ██████████████████████████████████████████████████████████
16 ██████████████████████████████████████████████████████████
17 ██████████████████████████████████████████████████████████
18 ██████████████████████████████████████████████████████████
19 ████████████████████████████████████████████████████
20 ██████████████████████████████████████████████████████████
21 ██████████████████████████████████████████████████████████
22 ████████████████████████████████████[8]

In short, after years of litigation with every opportunity to develop the facts supporting their claim if any existed, plaintiffs offer only argument, not facts. This failure of proof requires that summary judgment be granted.

---

[8] ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

### III. PLAINTIFFS' EXPERT TESTIMONY DOES NOT FILL THE VOID.

Noll's regression does not cure this failure of proof. That regression is unsupported by any real-world facts, produces results contrary to the known facts, and has been improperly manipulated to show impact where there is none.

Predictably, plaintiffs argue that regression models are "standard and widely accepted" and that Apple's objections must be treated as going to weight rather than admissibility. Opp. at 16. But the courts have rejected this head-in-the-sand approach to expert testimony. Instead, exercising their "gatekeeping" role (*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)), they have frequently excluded expert regression models that fail to meet basic standards of reliability. *See* Mot. at 18 n.5 (citing cases). Regression models must be consistent with the real-world facts and with accepted econometric principles. Noll's regression fails that standard.

#### A. Noll's Model is Inconsistent with Real-World Facts.

As shown above, plaintiffs have no valid answer to the point that Noll's regression results are inconsistent with the indisputable evidence that RealNetworks was not a significant source of music downloads for iPod owners, that the postulated lock-out or lock-in effect did not occur, or that Apple was not aware of, and did not, consider any such lock-out or lock-in from the ▅▅▅▅ in setting its prices. Nor can plaintiffs reconcile Noll's results with the uncontradicted facts regarding how Apple sets its prices.

Likewise groundless is plaintiffs' effort to defend the immediate and constant overcharge postulated by Noll's model. They assert that it makes sense the overcharge amount would be immediate and unchanging because the alleged "lock-out" effect would occur immediately and remain constant throughout the period, while the alleged "lock-in" effect would not kick in at all during the damage period. Opp. at 15. As discussed, however, there is no factual basis for the posited immediate "lock-out" effect because there is no evidence that Apple knew about or considered any effect of the ▅▅▅▅ on elasticity of demand resulting from supposedly locked out customers.

As for the lock-in effect, plaintiffs quote Noll's rebuttal report as saying that "for new iPod purchasers" the lock-in effect "would not be an important factor affecting iPod prices." *Id*.

1  At his deposition, however, Noll admitted that, by "new iPod purchasers," he meant only
2  consumers who had not purchased an iPod before September 2006. Ex. 11 at 51:9-15. For those
3  consumers, his view is that, on average, they would not be purchasing a new player for another 18
4  to 24 months—which, according to him, means any increased demand for iPods from those
5  consumers would not be felt until then. *Id*. at 51:16-52:1. He admitted, however, that (under his
6  theory) the lock-in effect would occur earlier for consumers who already owned iPods. As to
7  those consumers, he said he would expect they would be buying new iPods earlier and the lock-in
8  effect as to them would therefore impact demand during the damages period. ECF No. 751-15 at
9  Exhibit 50, 50:19-52:11. And he admits that (again, under his theory) that lock-in effect—
10 beginning within the damage period—would increase over time. Ex. 8 at 7. These admissions—
11 lock-in for some consumers, lock-out for others, with differing times of impact for each—are
12 irreconcilable with the single, unchanging overcharge amount predicted by his damages model.

### B. Noll Improperly Manipulates the iTunes 4.7 and 7.0 Variables.

Contradicting a basic econometric principle that he previously endorsed Noll changed his latest regressions to turn off the iTunes 4.7 variable as of September 2006 for iPod models on which iTunes 7.0 was implemented and turn on the iTunes 7.0 variable only for those same models. The right approach would have been to leave on both variables for all iPod models. As shown in Apple's motion, correcting for this manipulation results in no impact or damages.

**iTunes 4.7 variable:** Plaintiffs' sole argument for turning off the iTunes 4.7 variable is that the ███ in iTunes 7.0 supposedly "replaced" iTunes 4.7's DRM technology. Opp. at 16. This argument fails for two reasons. First, turning off the iTunes 4.7 variable is improper because it assumes that, in the actual world, iTunes 4.7 had no possible continuing effect. But Noll testified that iTunes 4.7's blocking of Harmony in 2004 could continue to affect demand for iPods even after iTunes 7.0 was released and replaced iTunes 4.7. Ex. 10 at 68:2-70:16 ("Q: And could that consumer expectation continue even after 7.0 is issued? A: Exactly, it could.").[9] Thus,

---

[9] Contrary to plaintiffs' footnote 17, Noll's testimony is clear that iTunes 4.7 could continue to have an effect after iTunes 7.0. The supposedly contrary testimony cited by plaintiffs is directed at the continuing effects of iTunes 7.0. He said that iTunes 7.0 might have had a "similar story"

(continued)

1  the proper treatment of iTunes 4.7 was to leave it on for all models.

2  Second, by turning off the iTunes 4.7 variable, Noll's regressions cannot begin to answer
3  the critical question of what the price would have been but for iTunes 7.0. *See* Mot. at 15-16; Ex.
4  4 ¶¶ 88-97; Ex. 14 ¶ 13. To answer that question, the regression must compare the prices after
5  iTunes 7.0 replaced iTunes 4.7 to the prices before iTunes 7.0 replaced iTunes 4.7—*i.e.*, a world
6  in which iTunes 4.7 existed. But turning off the iTunes 4.7 variable forced the regressions to
7  compare prices after iTunes 7.0 replaced iTunes 4.7 to a period before iTunes 4.7 was released
8  (the three-month period from July to October 2004)—*i.e.*, a world in which iTunes 4.7 did not
9  exist. This causes the iTunes 7.0 variable to estimate the cumulative impact of iTunes 4.7 and
10  iTunes 7.0. Ex. 4 ¶¶ 88-97.[10] ████████████████████████
11  ████████████████████████████████████████
12  ████████████████████████████████[11]

13  In his "supplemental rebuttal" report, Noll tries to defend using the wrong but-for world
14  by asserting that he has seen no evidence that iTunes 4.7 would have continued to work on iPods
15  if iTunes 7.0 had not been implemented—*i.e.*, no evidence that iTunes 4.7 would have continued
16  to exist in the but-for world. ECF No. 751-5 at 14. But plaintiffs' liability case is premised on
17  the notion that Harmony would have continued to work in the but-for world. For that to be the
18  case, iTunes 4.7 would have had to continue to work on iPods because Harmony, as relaunched in

---

to iTunes 4.7 in causing consumers to stay away from Harmony even after iTunes 7.0 was replaced or overcome. "But, in fact, 7.0 was never undone, so we can't test that hypothesis." Ex. 10 at 68:14-20. This testimony has nothing to do with testing for the continuing effect of iTunes 4.7.

[10] Noll has admitted that leaving on the iTunes 4.7 variable would cause the iTunes 7.0 variable to estimate only the incremental impact of iTunes 7.0 on price. He explained that where variable A (which represents a given technology) is left on after variable B (which represents new technology that replaces variable A) is turned on, variable B "measure[s] the incremental" impact on price "as a result from moving from" one technology (variable A) to the new technology (variable B). The effect then of turning off variable A is to cause variable B to measure the cumulative effect of both technologies. *See* ECF No. 685 at 10-11.

[11] As Apple's experts and Noll explain, to determine the incremental effect of iTunes 7.0, one need only subtract the coefficient of iTunes 4.7 from the coefficient of iTunes 7.0. *See* Ex. 4 at 41; *see also* ECF No. 685 at 11. ████████████████
████████

April 2005, mimicked the DRM in iTunes 4.7. If iTunes 4.7 could not have continued to be implemented after September 2006, the postulated but-for world could not exist and there could not possibly be impact or damages.

**iTunes 7.0 variable**: Noll's treatment of this variable in his most recent regressions is also inconsistent with his prior regressions. This time, he turns it on only for the models in which it was implemented, not for all models as he previously had done. In effect, he is treating iTunes 7.0 as having no possible effect on the other models. This, however, is directly contrary to his admission that "the right way to do it" is to turn on the iTunes 7.0 variable for all models because, in his view, blocking Harmony in September 2006 likely impacted the prices of all models. Ex. 10 at 46:2-4, 49:14. Neither Noll nor plaintiffs say anything in response to this point, thus effectively conceding that his current treatment of the iTunes 7.0 variable is indefensible.

Plaintiffs' assertion that Noll testified as to the "right way" before Apple provided a declaration confirming that the [REDACTED] was implemented on certain iPods ( Sep. St., Fact 17) is unavailing. As he admitted at his May deposition, Noll already knew that fact at the time of his deposition, two months before the declaration. ECF No. 758-8 at 9:9-10:5. Even after receiving the declaration, Noll reconfirmed in his December 2013 deposition that iTunes 7.0 could affect all models. Ex. 11 at 64:16-65:21. In any event, whether Noll knew which models had the [REDACTED] is irrelevant to answering whether it could affect other models.

The reason Noll changed his treatment of the iTunes 7.0 variable from the "right way to do it" is not hard to decipher. When the iTunes 7.0 variable is turned on for all models, as Noll admitted it should be, and the iTunes 4.7 variable is left on for all models, as the indisputable evidence shows it should have been, damages and impact are reduced to zero.[12]

---

[12]  [REDACTED]

### C. Noll Fails to Account for Effect of Unchallenged Aspects of iTunes 7.0.

Plaintiffs concede that, in addition to the ▮, iTunes 7.0 included numerous other enhancements that would likely affect demand for iPods. They concede also that these features, added at the same time as the ▮ must be accounted for to avoid erroneously attributing their impact to the ▮ Their sole response on this point is simply to quote their expert's assurance that his other variables are adequate to capture the effect of these features. Opp. at 17.

But neither plaintiffs nor Noll answer the point that none of his other variables are capable of measuring the effect. Noll points to his variables for "class, other product attributes and time (to represent improved technology)." *Id.* But he does not explain how any of these product and time variables could measure the effect of such things as album cover views, higher resolution video or availability for the first time of full-length movies. If these variables were the all-purpose panacea he claims, he would not have needed the other variables for such things as the opening of the iTS, the number of downloads available on iTS, the date when music was available without DRM, etc. These variables reflect that factors other than product attributes or time can affect iPod prices. He included those variables because just knowing that an iPod is a nano or that it was sold in 2007 does not tell you whether the demand for that iPod was affected by whether it can be used to watch full-length movies available on iTS through iTunes. The court need not "admit opinion evidence that is connected to existing the underlying data "only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. 136, 146 (1997). Noll's opinion does not rise above that level and should be excluded.

### D. Noll Fails to Account for Other Product Characteristics.

Plaintiffs argue: (1) that Apple's experts failed to explain why the omitted product characteristics could impact price and (2) that the variables for those characteristics should be excluded in any event because they present "multicollinearity" issues that "worsen[] the precision of the estimates." Opp. at 20. Neither assertion has any merit.

Apple's experts showed that the product features plausibly could affect price given that

1  Apple marketed these features to attract customers (*e.g.*, battery life, display size and screen
2  resolution), ███████████████████████████████████████████████████████████████
3  ████████████████████████████████████████████ They then confirmed the
4  importance of the features by showing that adding them significantly improves the explanatory
5  power of the regressions while not affecting the precision of the coefficient on the iTunes 7.0
6  variable. Ex. 3 at 56 & Exhibit 15 thereto, Ex. 4 at 48-49 & Exhibit 13 thereto, Exhibit 14 at 10-
7  11 & Exhibit JT-5 thereto. Plaintiffs do not answer any of these points.

8  Plaintiffs' multicollinearity argument is likewise flawed. As Noll recognized,
9  multicollinearity among a set of explanatory variables may affect the precision of the estimates
10 for some variables but not others. Ex. 8 at 31; *see also* ECF No. 754-8 at Exhibit 3 (American
11 Bar Assoc., Proving Antitrust Damages (2d. Ed. 2010) at 151 (hereafter "ABA"). And
12 multicollinearity may present a problem only when the variables in question are highly collinear
13 with the variable of interest, here the iTunes 7.0 variable: "[i]f the precision of the coefficient
14 estimate on the variable of primary interest [here iTunes 7.0 variable] is not substantially affected
15 by the multicollinearity, there is no reason to drop any variables that have a strong economic
16 rationale for inclusion…. ***dropping variables that are truly important could lead to omitted***
17 ***variable bias…. Therefore, in general the best course of action in that case would be to retain***
18 ***the collinear variables***." ABA 151 (emphasis added).

19 Here, although Noll says he belatedly ran tests that show that the omitted variables are
20 collinear with explanatory variables in the model, none of those tests show that they are highly
21 collinear with the iTunes 7.0 variable as opposed to other variables in the model. *See* ECF No.
22 751-5 at 10-12. By contrast, applying a standard test, Apple's experts show that the omitted
23 variables are not highly collinear with the iTunes 7.0 variable and have no impact on the precision
24 of the estimated coefficient for that variable. Ex. 14 at 12-13 & Exhibit JT-6 thereto.[13]

---

[13] Plaintiffs assert that "Professor Murphy admitted to running no tests to determine whether there was a multicollinearity problem." Opp. at 19. This is contradicted by the very pages they cite. When asked if he tested whether the additional variables are collinear with the existing variables, Murphy answered, "Yes, I did," and then described those tests. ECF No. 751-15 at Exhibit 53, 294:2-15.

Finally, if Noll were correct that adding the omitted features would cause severe multicollinearity with the iTunes 7.0 variable, that is an added reason to exclude his regressions as unreliable. *See* ABA 152 ("With severe multicollinearity between the variable of interest and other economically important explanatory variables, the coefficient on the variable of interest cannot be estimated precisely, and the regression model may therefore be unreliable for estimating damages."). As Noll has recognized, the standard procedure for handling multicollinearity is to drop one or both of the variables that are highly collinear with each other. ECF No 751-5 at 10. But when the "variable of interest is affected by the multicollinearity, . . . [g]enerally no valid basis exists for choosing to retain the variable of interest [here iTunes 7.0] as opposed to retaining the variable(s) with which it is collinear." ABA 151. And "[d]ropping explanatory variables to reduce the multicollinearity without a sound economic reason does not fix the problem"; indeed, it "'amounts to elevating ignorance to arrogance.'" ABA 152 & n.2 (quoting Jacques Dreze, Comment, Nonspecialist Teaching of Econometrics: A Personal Comment and Personalistic Lament, 2 Econometric Reviews 291, 296 (1983)); *see also Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D. N.Y. 2006) (rejecting multicollinearity argument and excluding regressions for omitting variables).

### E.   Noll's Model Does Not Produce Statistically Significant Results.

Plaintiffs' attempt to defend Noll's calculation of his standard errors (and thus the claimed statistical significance of his results) consists of summarizing the arguments in plaintiffs' recent motion to exclude Dr. Murphy's and Topel's opinions on this issue. ECF No. 737-4. Apple has opposed that motion (ECF No. 754-6) and respectfully refers the Court to that brief. As shown there, plaintiffs' arguments are refuted by their own newly (and belatedly) offered expert on this issue. Contrary to plaintiffs' assertion that correlation of standard errors can never be a problem when the regression uses the entire population of data rather than a sample, their new expert admits that his graduate textbook in econometrics says the opposite, as does the ABA's treatise on econometrics in antitrust cases. The new expert's textbook similarly endorses the use of the "ex post" clustering that he and plaintiffs claim was improperly used by Apple's experts. And plaintiffs' argument that clustering in these circumstances can bias the results by overestimating

1  the standard errors is contradicted by the very authorities on which Noll and the new expert rely.
2  Far from refuting Apple's showing that Noll's results are not statistically significant, plaintiffs
3  have only confirmed as much, further demonstrating that his model should be excluded.

4  **IV.    PLAINTIFFS HAVE NO PROOF OF A PROPER PRODUCT MARKET.**

5  Plaintiffs do not dispute that, without Noll's testimony, they lack sufficient evidence to
6  withstand summary judgment on the issue of the relevant product market—another key element
7  of their claim. The question then is whether Noll has the relevant expertise and has done the
8  requisite analysis to make his opinion on this issue admissible.  He has not.

9  Plaintiffs admit that Noll did not estimate cross-elasticity of demand or employ the
10 hypothetical monopolist test.  They claim that the data to conduct these accepted economic
11 methods was "unavailable."  Opp. at 23.  But neither they nor Noll cite any evidence in support,
12 nor offer any explanation why they could not have obtained data "on percentage changes in price
13 and quantity from competing firms."  *Id*. at 23:4-5.  Noll did not even attempt such analysis.

14 But even if Noll had adequately demonstrated that no quantitative analysis was possible,
15 his testimony is still inadmissible because he did not engage in any other reliable expert analysis.
16 As evidence of Noll's supposed expert analysis, plaintiffs point to a list of materials Noll
17 purportedly considered.  Opp. at 24.  This argument is flawed for at least two reasons.

18 First, plaintiffs do not show that Noll employed any relevant expertise in reviewing these
19 materials.  They do not claim that he has worked in the music or music player industry or
20 otherwise possesses specialized knowledge about such industries or about what participants in
21 these industries perceive about competition.  His discussion about what competitors or consumers
22 thought, or about supposed product similarities or dissimilarities, is thus not informed by any
23 particular expertise beyond the ability to search the internet and read a report.  Plaintiffs assert he
24 has "45 years of experience in analyzing the economics of the communications industry" (Opp. at
25 24:7), but they do not explain how that qualifies him to opine on whether CDs compete with
26 digital music or what devices consumers consider as substitutes to digital players.  *See* Mot. § IV.

27 Second, reflecting that he was simply reading documents without any relevant expertise,
28 Noll's analysis is fundamentally flawed, incomplete and misleading.

1 ▮
2 ▮
3 ▮
4 ▮
5 ▮
6 ▮
7 ▮
8 ▮
9 ▮
10 ▮

11     Noll's purported reliance on other sources is equally misguided. For example, plaintiffs'
12 claim that Noll relied on industry analysts, citing to page 28 of his report. But the cited articles
13 assert, contrary to Noll's opinion, that smartphones are substitutes for iPods. Noll asserts this did
14 not actually happen until after the damage period. But he relied for that assertion on his belief
15 that smartphones could not replace iPods until smartphones became capable of downloading
16 music over a wireless network—ignoring that iPods have never had the capability.

17     In short, this portion of Noll's report is not expert testimony at all. It is simply his own
18 untrained, subjective and deeply flawed view of an issue as to which he failed to conduct the
19 required investigation or analysis. It should be excluded and summary judgment granted on the
20 additional ground that plaintiffs lack evidence to establish a proper relevant product market.

## CONCLUSION

For the reasons above, Apple is entitled to summary judgment.

Dated: January 31, 2014          Respectfully submitted,

By: /s/ Robert A. Mittelstaedt
     Robert A. Mittelstaedt

Counsel for Defendant APPLE INC.

SFI-851314v6