# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104.1500
TELEPHONE: 415.626.3939 • FACSIMILE: 415.875.5700

Direct Number: (415) 875-5710
ramittelstaedt@JonesDay.com

February 3, 2014

Hon. Yvonne Gonzalez Rogers
United States District Court
  for the Northern District of California
Courtroom 5, 2nd Floor
1301 Clay Street
Oakland, CA  94612

Re:   The Apple iPod iTunes Anti-Trust Litigation, Case No. C 05-00037 YGR

Dear Judge Gonzalez Rogers:

Apple submits this letter for the February 7th pre-filing conference. *See* Dkt. No. 760.

**1. Apple's Motion for Summary Judgment and to Exclude Noll:** Judge Ware dismissed or granted summary judgment on all of plaintiffs' original claims. The only remaining claim is that in 2006 – two years after this action was filed – Apple violated the antitrust laws by updating its iTunes software and DRM when it released iTunes 7.0 which, in effect, prevented digital music from RealNetworks' music store (RMS) from playing directly on iPods. Apple moved for summary judgment because plaintiffs cannot carry their burden to establish (1) that this alleged exclusionary act elevated iPod prices, which is their claim as to how consumers were harmed, or (2) that plaintiffs' definition of the relevant product markets is correct.

**Impact:** Plaintiffs' theory of impact is a convoluted and improbable chain of purported events. They first theorized that the 2006 update led RMS customers with iPods to switch to iTunes Store (iTS) music because RMS music could not play directly on iPods. These customers supposedly purchased so much iTS music due to the update that their costs of switching to a non-iPod increased to such a degree that when they needed to replace their iPod, they became "locked in" to buying an iPod even though they preferred a competing device. As summarized below, plaintiffs have no real-world evidence to support this theory.

After Apple's experts pointed out that, contrary to plaintiffs' damage claim, any theoretical impact from "lock-in" could not occur immediately, plaintiffs theorized that an immediate impact could be caused by customers with large RMS libraries being "locked out" from buying iPods because of their switching costs due to their large RMS libraries. According to plaintiffs, the "lock-out" would **reduce** iPod demand, which supposedly would lead Apple to charge **higher** prices to remaining customers who allegedly were less price sensitive. Again, plaintiffs have no evidence supporting this theory.

**JONES DAY**

Hon. Yvonne Gonzalez Rogers
February 3, 2014
Page 2

There are multiple real-world, factual prerequisites for plaintiffs' "lock-in" or "lock-out" theory to have any viability. RealNetworks must have been a significant enough source of music in September 2006 to affect iPod demand so much that Apple would raise iPod prices. That, in turn, requires sufficient numbers of consumers who, because of the update, became (1) locked in by their subsequent iTS purchases and, during the class period, purchased a replacement iPod due to those purchases when they otherwise would have bought another player, or (2) locked out by their RMS purchases and thus prevented from purchasing any iPod with the challenged aspects of the iTunes 7.0 update on it. The claim requires also that Apple knew of those customers and considered the alleged impact on demand in setting its prices *before* it sold any iPods with the iTunes 7.0 update on it and *before* it could possibly know whether the update would impact demand.

Not only do the undisputed facts fail to support any of the links in this tortured chain of proof, but the record is fundamentally at odds with it. *First*, RMS was insignificant in 2006, accounting for less than 3% of music downloads and far less than 1% of all music sold. *Second*, plaintiffs have no evidence regarding what portion, if any, of RealNetworks' small sales was to actual or potential iPod purchasers. Without such sales, plaintiffs' posited impact could not possibly have occurred. *Third*, plaintiffs have no proof of even a single customer who supposedly became locked in or out as a result of iTunes 7.0. Plaintiffs have not offered any consumer survey or other attempt to identify any such customer or determine how many might exist. *Even the named plaintiffs, who claim to be representative, do not allege that they were locked in or out as a result of iTunes 7.0.* *Fourth*, plaintiffs cannot identify any evidence that, in setting iPod prices, Apple ever considered the supposed impact of the challenged aspects of iTunes 7.0 on demand or elasticity of demand or the amount of RMS or any other online store sales. *Fifth*, plaintiffs' hypothesized price effect—*e.g.*, that Apple would have charged $185.63 for a iPod nano rather than $199--is irreconcilable with Apple's unwavering practice of setting prices with "aesthetic" appeal (*e.g.*, $399, $249, $199). And the fact is that Apple lowered, not raised, iPod prices when the update was issued and thereafter.

In short, plaintiffs' claim of impact falters at each step they must prove; it is not rooted in any real-world evidence and, in key respects, is contrary to it. It has been over seven years since Apple issued the challenged update. If there were any evidence supporting plaintiffs' implausible theory, they have had full opportunity to gather it. Their complete failure of proof requires that summary judgment be granted.

Plaintiffs' expert's regression model cannot fill the evidentiary void. *First*, it is not supported by any real-world evidence and is contrary to Apple's actual pricing strategy as shown above. *Second*, it uses the wrong "but for" world, assuming that iTunes 4.7 – a previous update that also had the effect of preventing RMS music from directly-playing on iPods – would not

JONES DAY

Hon. Yvonne Gonzalez Rogers
February 3, 2014
Page 3

exist. But Judge Ware has already granted summary judgment against plaintiffs' claim that iTunes 4.7 was an unlawful exclusionary act. So plaintiffs are required to isolate the incremental price effect of iTunes 7.0, which they have not done. *Third*, the regression does not account for major product characteristics and other factors relevant to price, such as battery life, display size, weight, screen resolution and USB connector. By omitting these relevant explanatory variables, the regression attributes their impact to the iTunes 7.0 variable.

As Apple's experts have shown, the purported impact disappears when the errors in the regression are corrected. And, when statistical significance is properly calculated, the regression results are not significantly different from zero.

**Relevant Product Market:** The other ground for summary judgment is that plaintiffs have no evidence of the relevant product market—an essential element of a monopolization claim. They rely again entirely on Dr. Noll, who purports to define two relevant product markets: the device market and the music market, which he opines consists solely of digital audio files. Amiri Decl., Ex. 6 at pp. 23-42. Dr. Noll's testimony should be excluded, because it is not the product of reliable economic principles and methods. He did not employ the economic methods courts have recognized as valid for defining a relevant market. Absent Dr. Noll's opinion, plaintiffs cannot prove a relevant market, making summary judgment appropriate on this ground as well. *See e.g., In re Live Concert*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012) (granting summary judgment for lack of proof of relevant market).

**2. Plaintiffs' Motion To Exclude:** On December 20, plaintiffs moved to exclude one aspect of the reports of Apple's economists—the opinion that Noll inflated the statistical significance by failing to "cluster" on the unsupported assumption that the errors are independent when in fact they are not. In support, plaintiffs filed a declaration of an undisclosed expert in violation of the scheduling order and Rule 26, which required that rebuttal reports be served by November 25, 2013. Apple's opposition shows that Noll's regression results are not statistically significant when generally accepted antitrust econometric methods are used.

**3. Plaintiffs' Motion To Strike:** Plaintiffs also moved to strike the supplemental report of Murphy and Topel. The motion violates Local Rule 7-3(a), which requires that all objections to evidence be included in the opposition brief. The motion is also substantively wrong. The supplemental report updated Murphy and Topel's analysis and computations in response to Noll's new regressions, offered for the first time in Noll's rebuttal report.

Sincerely,

Robert A. Mittelstaedt