PAGES 1 – 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE APPLE IPOD ITUNES        )
ANTITRUST LITIGATION,        )        NO. C-05-0037 YGR
_____)
                                     FRIDAY, FEBRUARY 7, 2014

                                     OAKLAND, CALIFORNIA

                                     CASE MANAGEMENT CONFERENCE
                                     PRE-FILING CONFERENCE

**BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

**FOR PLAINTIFF:**          ROBBINS GELLER RUDMAN & DOWD, LLP
                            655 WEST BROADWAY, SUITE 1900
                            SAN DIEGO, CALIFORNIA 92101
                    BY:  BONNY E. SWEENEY, ESQUIRE
                            CARMEN A. MEDICI, ESQUIRE


**FOR DEFENDANT:**          JONES DAY
                            555 CALIFORNIA STREET, 26TH FLOOR
                            SAN FRANCISCO, CALIFORNIA 94104
                    BY:  ROBERT A. MITTELSTAEDT, ESQUIRE
                            DAVID C. KIERNAN, ESQUIRE, ESQUIRE


**REPORTED BY:**            DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                            OFFICIAL COURT REPORTER


TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

| | |
|---|---|
| 1 | FRIDAY, FEBRUARY 7, 2014                               3:10 P.M. |
| 2 | P R O C E E D I N G S |
| 3 | MR. MITTELSTAEDT:  GOOD AFTERNOON, YOUR HONOR.  I'M |
| 4 | BOB MITTELSTAEDT FOR JONES DAY. |
| 5 | THE COURT:  GOOD AFTERNOON. |
| 6 | MS. SWEENEY:  GOOD AFTERNOON, YOUR HONOR.  BONNY |
| 7 | SWEENEY, OF ROBBINS, GELLER, RUDMAN & DOWD FOR THE PLAINTIFFS. |
| 8 | THE COURT:  LET US CALL THE CASE.  HOLD ON. |
| 9 | THE CLERK:  CALLING CIVIL ACTION 05-0037 APPLE IPOD |
| 10 | ITUNES ANTITRUST LITIGATION. |
| 11 | COUNSEL, PLEASE STATE YOUR APPEARANCES. |
| 12 | MS. SWEENEY:  BONNY SWEENEY FROM ROBBINS, GELLER, |
| 13 | RUDMAN & DOWD FOR THE PLAINTIFFS. |
| 14 | MR. MITTELSTAEDT:  ROBERT MITTELSTAEDT FOR JONES DAY |
| 15 | FOR APPLE.  I HAVE TWO COLLEAGUES AND SOMEONE FROM APPLE WHO |
| 16 | ARE GOING TO JOIN.  I THINK THEY WERE GOING TO BE HERE BY |
| 17 | 3:30.  THEY SHOULD BE HERE ANY TIME.  I'M FINE PROCEEDING, |
| 18 | THOUGH, YOUR HONOR. |
| 19 | THE COURT:  DID I SCHEDULE THIS FOR 3:30? |
| 20 | MS. SWEENEY:  YES, YOUR HONOR. |
| 21 | THE CLERK:  YES. |
| 22 | THE COURT:  OKAY.  WELL, I DON'T THINK IT'S GOING TO |
| 23 | TAKE THAT LONG. |
| 24 | THE ORDER TO SHOW CAUSE IS DISCHARGED.  THE REASON I |
| 25 | CALLED YOU IN IS BECAUSE I DO THESE PRE-CONFERENCE -- |

1    PRE-SUMMARY JUDGMENT CONFERENCES AND WAS LOOKING AT MY DOCKET

2    AND ALL OF A SUDDEN I FIND MYSELF WITH THIS SUMMARY JUDGMENT

3    IN A VERY OLD ITUNES CASE, AND I DIDN'T KNOW WHAT IT WAS ALL

4    ABOUT.

5         AND I SAID, HOLD ON, HOW COME I DON'T KNOW ANYTHING ABOUT

6    THIS CASE?  AND THEN REALIZED THAT YOU FOLKS NEVER CAME IN TO

7    TALK TO ME.  AND I UNDERSTAND THAT THAT WAS IN PART BECAUSE I

8    HAVEN'T EVER SEEN THIS CASE AND BECAUSE JUDGE WARE HAD GIVEN

9    YOU A SCHEDULE, AND I GUESS I RUBBER STAMPED SOME STIPULATION

10   THAT YOU HAD FILED ABOUT TIMING.

11        BUT I DO LIKE TO UNDERSTAND WHAT THESE CASES ARE ABOUT AND

12   WHAT THE SUMMARY JUDGMENT IS ABOUT.  AND LIKE I SAID, IT'S A

13   VERY OLD CASE.  I'M TRYING TO FIGURE OUT THE CONTEXT.  AND THE

14   HEARING WAS SCHEDULED ON A DAY WHEN I WASN'T EVEN IN TOWN.

15        SO, ANYWAY, THAT IS THE PRIMARY PURPOSE OF BRINGING YOU

16   IN.  I HAVEN'T -- I CAN TELL YOU, I HAVE NOT LOOKED AT THE

17   SUMMARY JUDGMENT AT ALL.  I'VE BEEN IN TRIAL.  BUT I DO WANT

18   TO GET A SENSE OF IT BECAUSE FROM MY PERSPECTIVE, WHEN I

19   HAVE -- WHEN I UNDERSTAND THE BALLPARK, AND WHEN I GO TO THE

20   MOTION, IT ALLOWS ME TO REALLY FOCUS IN ON IT MUCH MORE

21   QUICKLY AND EFFICIENTLY, AND HEARING FROM THE PARTIES WHO KNOW

22   THEIR CASE SO MUCH BETTER THAN I DO ASSISTS ME IN THAT MATTER.

23        SO, IN A SENSE, IT'S AS IF YOU GET TO BE THE FIRST ONES TO

24   BRIEF ME ON THE ISSUES RATHER THAN A LAW CLERK WHO IS TRYING

25   TO GRASP IT JUST FROM THE PAPERS.

```
1        SO, I WOULD LIKE TO HEAR ABOUT THE HISTORY OF THE CASE,

2   WHAT GOT US HERE, AND REALLY WHAT IS LEFT AND WHAT THE MOTION

3   IS ALL ABOUT.  I'M STILL -- SO THAT'S REALLY THE POINT OF

4   THIS.  AND I APPRECIATE YOU COMING IN.

5        MS. SWEENEY:  SURE.  THANK YOU, YOUR HONOR.  I'LL

6   START AND JUST GIVE YOU A LITTLE BACKGROUND ABOUT THE CASE AND

7   WHY WE ARE HERE EIGHT YEARS LATER.

8        THE COURT:  ARE THOSE YOUR COLLEAGUES?

9        MR. MITTELSTAEDT:  YES.

10        THE COURT:  ALL RIGHT.  PERFECT.  I STARTED EARLY.

11   COME ON IN.  I'VE BEEN ON THE BENCH ALL DAY SO I'M READY TO

12   GET OFF AS SOON AS THIS IS DONE.

13        GO AHEAD.

14        MS. SWEENEY:  WE REPRESENT A CERTIFIED CLASS OF IPOD

15   PURCHASERS, BOTH CONSUMER PURCHASERS AND BUSINESSES THAT

16   PURCHASED IPODS DIRECTLY FROM APPLE.  AND OUR CLIENTS FILED A

17   SERIES OF CASES BEGINNING IN 2005 ALLEGING THAT APPLE HAD

18   UNLAWFULLY MONOPOLIZED THE MARKET FOR PORTABLE DIGITAL MEDIA

19   PLAYERS, WHICH IS WHAT AN IPOD IS.

20        UNFORTUNATELY, THE CASE HAS BEEN GOING ON SO LONG THE

21   TECHNOLOGY AND THE INDUSTRY HAS CHANGED CONSIDERABLY.  BUT

22   BACK IN 2005, PLAINTIFFS ALLEGED THAT APPLE HAD CREATED THIS

23   TECHNOLOGICAL TIE BETWEEN ITS DEVICE, THE MUSIC PLAYER, THE

24   IPOD AND ITS MUSIC STORY.  SO THAT IF YOU WANTED TO PLAY MUSIC

25   PURCHASED FROM THE APPLE ITUNE STORE ON A PORTABLE DEVICE, YOU
```

```
 1    HAD TO PLAY IT ON THE IPOD AND VICE VERSA.  IN OTHER WORDS, IT

 2    WAS A TIE BETWEEN THOSE TWO TECHNOLOGIES.  AND THAT AND OTHER

 3    THINGS ENABLED APPLE TO RAPIDLY GAIN MARKET SHARE IN THE

 4    MARKET FOR PORTABLE DIGITAL MEDIA PLAYERS.

 5        ALSO, IN THE ORIGINAL 2005 COMPLAINT AND SUCCESSIVE

 6    AMENDMENTS TO THAT COMPLAINT, PLAINTIFFS ALLEGE THAT APPLE NOT

 7    ONLY DEVELOPED THIS TECHNOLOGICAL TIE, BUT ALSO MAINTAINED

 8    THAT TIE THROUGH ISSUING PERIODIC SOFTWARE UPDATES TO ITS

 9    PRODUCTS THAT BLOCKED PRODUCTS THAT OTHERWISE WOULD HAVE

10    ERODED THAT, THAT MONOPOLY.

11        AND THE SPECIFIC EVENT THAT IS MOST RELEVANT NOW IN THIS

12    CASE IS A COMPANY CALLED REAL NETWORKS IN 2004 DEVELOPED A

13    PRODUCT CALLED HARMONY.  AND HARMONY --

14            THE COURT:  AND IS REAL NETWORKS A PLAINTIFF.

15            MS. SWEENEY:  REAL NETWORKS IS A COMPETITOR IN THE

16    MUSIC SIDE OF THE BUSINESS.  IN OTHER WORDS, THEY HAVE

17    DIFFERENT KINDS OF MUSIC.  THEY HAVE SUBSCRIPTION SERVICE AND

18    THEY ALSO SELL PERMANENT DOWNLOADS OF MUSIC, WHICH IS WHAT THE

19    ITUNES STORE SELLS.

20            THE COURT:  BUT ARE THEY A PLAINTIFF?

21            MS. SWEENEY:  NO, THEY ARE NOT, YOUR HONOR.

22            THE COURT:  OKAY.

23            MS. SWEENEY:  SO REAL NETWORKS DEVELOPED THIS PRODUCT

24    THAT ENABLED IPOD USERS TO PURCHASE SONGS DIRECTLY FROM REAL

25    NETWORKS AND PLAY THEM ON THEIR IPOD.  AND THE WAY THAT -- I
```

```
1    SHOULD BACK UP A MOMENT.
2         THE TECHNOLOGICAL TIE THAT I REFERRED TO WAS PUT ON BY
3    APPLE IN PART IN RESPONSE TO A REQUIREMENT THAT THEY HAD FROM
4    THE RECORD LABELS WHO WANTED WHAT'S CALLED DRM, DIGITAL RIGHTS
5    MANAGEMENT PROTECTION SO THAT SONGS COULDN'T JUST BE COPIED
6    ENDLESSLY AFTER THEY WERE PURCHASED.
7         SO WHAT REAL NETWORKS DID WAS, UNLIKE SOME OF THESE
8    HACKERS THAT YOU'VE READ ABOUT, THEY FIGURED OUT A WAY TO DO
9    IT THAT PRESERVED THE DRM SO THE RECORD LABELS WERE HAPPY, THE
10   CONSUMERS WERE HAPPY BECAUSE THEY COULD BUY ALL THESE MUSIC
11   DOWNLOADS, THEY COULD PLAY THEM ON THEIR IPOD.  TWO YEARS
12   LATER WHEN THEIR IPOD BREAKS OR IS STOLEN AND THEY WANT TO GET
13   A NEW PLAYER, THEY DON'T HAVE TO BUY ANOTHER IPOD, THEY CAN GO
14   BUY A COMPETING PRODUCT FROM RIO, OR CREATIVE, OR WHOEVER.  SO
15   THAT'S WHAT HAPPENED IN 2004.
16        APPLE REACTED SWIFTLY AND SORT OF VIOLENTLY, IN OUR VIEW.
17   THEY -- THEY ISSUED A PRESS REPORT -- A PRESS RELEASE
18   ATTACKING THIS COMPANY, AND THEN THEY QUICKLY ISSUED SOFTWARE
19   UPDATES THAT ESSENTIALLY DISABLED THIS INTEROPERABILITY.  AND
20   THAT'S WHAT WE CALL NOW IN OUR COMPLAINT THE 4.7 UPDATE.
21        NOW, IN OUR ORIGINAL COMPLAINT, BACK IN 2005, WE DIDN'T
22   KNOW IT WAS CALLED 4.7, SO WE DIDN'T CALL IT THAT, BUT THAT
23   WAS 4.7 AND THAT WAS IN 2005.
24        NOW, MEANWHILE THE CASE IS BEING LITIGATED IN FRONT OF
25   JUDGE WARE.  AND HE HEARD A NUMBER OF SUMMARY JUDGMENT AND --
```

```
1    MOTIONS, AS WELL AS MOTIONS TO DISMISS.  HE DISMISSED

2    PLAINTIFFS' TYING CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

3    THIS WAS THE TECHNOLOGICAL TIE CLAIM.  AND HE ALSO DISMISSED

4    PLAINTIFFS' STATE LAW CLAIMS, BUT HE PRESERVED PLAINTIFFS'

5    SECTION 2 MONOPOLIZATION CLAIM.

6        AND IN THE MOST RECENT ORDER THAT HE ISSUED, THIS IS A

7    SUMMARY -- PARTIAL SUMMARY JUDGMENT ORDER, PLAINTIFF HAD

8    ALLEGED THAT APPLE HAD MAINTAINED ITS MONOPOLY IN THE MARKET

9    FOR PORTABLE DIGITAL MEDIA PLAYERS FROM NOT JUST ONE SOFTWARE

10   UPDATE, IT'S NOT JUST 4.7, BUT ALSO A SUBSEQUENT ONE.

11       SO AFTER APPLE ISSUED 4.7 AND DISABLED HARMONY, HARMONY

12   KEPT AT IT.  THEY DEVELOPED ANOTHER PRODUCT.  THEY CAME BACK

13   IN.  THEY GOT THE PRODUCTS TO TALK TO EACH OTHER AGAIN.  AND

14   APPLE SUBSEQUENTLY ISSUED ANOTHER SOFTWARE UPDATE -- I SHOULD

15   SAY SOFTWARE AND FIRMWARE.  IT ALSO AFFECTED SOME FIRMWARE ON

16   THE IPOD -- CALLED 7.0.

17       SO IN THE LAST SUMMARY JUDGMENT MOTION, JUDGE WARE HELD

18   THAT 4.7 WAS NOT AN ANTICOMPETITIVE ACT BY APPLE.  AND THE

19   REASON HE HELD THAT WAS THAT HE FOUND THAT THEIR -- THE

20   PRODUCT ACTUALLY -- THE SOFTWARE UPDATE ACTUALLY HAD SOME

21   PRODUCT IMPROVEMENTS.  IT WASN'T SIMPLY TO DISABLE

22   REALNETWORKS.  AND HE RELIED ON A CASE CALLED TYCO.  WE

23   HAPPENED TO DISAGREE WITH JUDGE WARE'S INTERPRETATION OF THAT

24   CASE, BUT THAT'S THE BASIS FOR HIS RULING.

25       HOWEVER, JUDGE WARE HELD THAT THERE WASN'T EVIDENCE, THERE
```

1    WASN'T AN UNDISPUTED MATERIAL FACT AS TO 7.0 AND HE PROCEEDED

2    (SIC) PLAINTIFFS' TO PURSUE THAT CLAIM.

3        SO, IN OTHER WORDS, JUDGE WARE HAS SIGNIFICANTLY NARROWED

4    THE SCOPE OF THE CASE IN TERMS OF THE CLASS PERIOD.  THE CLASS

5    PERIOD IS NOW FROM 2006 THROUGH 2009.  AND I SHOULD TELL YOU

6    WHAT HAPPENED IN 2009.

7        IN 2009, BEGINNING WITH APPLE'S COMPETITORS, AMAZON,

8    WAL-MART, ET CETERA, THE RECORD LABELS DECIDED THEY WERE GOING

9    TO GO DRM FREE.  THEY HEARD THE CONSUMERS.  CONSUMERS

10   COMPLAINED ABOUT BEING LOCKED INTO ONE PARTICULAR PRODUCT.

11   THEY WANTED TO EXPERIMENT WITH DIFFERENT PRODUCTS, USE MUSIC

12   FROM ONE SOURCE ON A PRODUCT, ON A DEVICE PURCHASED FROM

13   ANOTHER SOURCE.

14       SO, THE LABELS GOT RID OF DRM FOR APPLE'S COMPETITORS.  BY

15   THE END OF MARCH 2009, THE LABELS GOT RID OF DRM ALSO ON THE

16   SONGS THAT IT SOLD TO APPLE.  SO, APPLE'S WHOLE LIBRARY NOW IS

17   DRM FREE.  THAT'S WHY THE CLASS PERIOD ENDS WHEN IT ENDS

18   BECAUSE THE MUSIC WENT DRM FREE AND THE LOCK IS NO LONGER

19   THERE.

20       SO THAT'S THE SORT OF STATUS.  AND LIKE I SAID, THE CLASS

21   HAS BEEN CERTIFIED.  THE CLASS HAS BEEN SENT NOTICE.

22       WE'RE NOW IN A POSITION WHERE SUMMARY JUDGMENT IS FULLY

23   BRIEFED.  PLAINTIFFS HAVE MOVED TO EXCLUDE PORTIONS OF

24   DEFENDANT'S ECONOMIST'S TESTIMONY.  APPLE HAS MOVED TO EXCLUDE

25   PLAINTIFFS' PRINCIPAL ECONOMICS EXPERT, AND I THINK THAT'S

```
 1    WHERE WE ARE.
 2        IF YOU WANT, I CAN RESPOND TO APPLE'S SUMMARY JUDGMENT OR
 3    WE CAN HEAR FROM MR. MITTELSTAEDT NOW, OR WHATEVER YOU PREFER,
 4    YOUR HONOR.
 5            THE COURT:  WHY DON'T I HEAR FROM HIM FIRST.
 6            MR. MITTELSTAEDT:  AS YOUR HONOR KNOWS FROM JUST
 7    LOOKING AT THE FILE AND THE DATE OF THIS CASE, IT DOES GO BACK
 8    A LONG WAYS.
 9        I THINK THAT WHAT'S PERTINENT ABOUT WHAT HAPPENED BEFORE
10    IS IT SHOWS HOW NARROW THE CASE IS AND WHY WE HAVE NOW MOVED
11    FOR SUMMARY JUDGMENT ON THE QUESTION OF WHETHER THEY CAN SHOW
12    ANY IMPACT FROM THE ALLEGED EXCLUSIONARY ACT, WHICH NOW IS
13    DOWN TO ONE THING, AND IT'S THE UPDATE TO ITUNE 7.0 WHICH WAS
14    ISSUED IN SEPTEMBER 2006.
15        BEFORE I GET TO THAT, IF I CAN JUST TAKE A COUPLE OF
16    MINUTES ON THE QUICK BACKGROUND AND FILL IN A COUPLE OF THE
17    GAPS.
18        IF WE GO BACK TO THE EARLY 2000'S, PEOPLE WERE BUYING
19    MUSIC AT BRICK AND MORTAR STORES IN THE FORM OF CD'S AND
20    PEOPLE WERE DOWNLOADING MUSIC ON THE FIRST FORM OF NAPSTER AND
21    A COUPLE OF OTHER PEER-TO-PEER NOW ILLEGAL FILE SHARING
22    SERVICES.
23        STEVE JOBS CAME UP WITH THIS IDEA OF HAVING AN IPOD THAT
24    COULD PLAY DIGITAL MUSIC, WHICH WAS A TREMENDOUS ADVANCE
25    COMPARED TO THE OLD BOOMBOXES AND THE BIG CD PLAYERS.  AND HE
```

```
1    ALSO HAD THIS IDEA OF HAVING A STORE, AN ONLINE STORE WHERE

2    YOU COULD BUY DIGITAL MUSIC THAT WOULD COMPETE WITH THE FREE

3    ILLEGAL DOWNLOADS THAT PEOPLE WERE PROVIDING.

4        AND WHEN HE WENT TO THE RECORD LABELS, AND THEY -- THEY

5    WERE FIGHTING PIRACY TOOTH AND NAIL.  AND JOBS GOES TO THE

6    RECORD LABELS AND SAID, I'VE GOT THIS GREAT IDEA; I'M GOING TO

7    SELL YOUR MUSIC ONLINE IN DIGITAL FORM.  AND THE RECORD LABELS

8    PUSHED BACK AND SAID, THAT'S JUST GOING TO ENCOURAGE MORE

9    PIRACY.

10       SO THE DEAL THEY STRUCK WAS THAT APPLE COULD SELL DIGITAL

11   MUSIC ONLINE FROM THE RECORD LABELS, BUT THEY HAD TO PUT A

12   DIGITAL RIGHTS MANAGEMENT, SOME PIRACY PROTECTION ON IT.

13       AND THEN APPLE SAT DOWN AND SAID, WELL, WHAT KIND OF DRM

14   ARE WE GOING TO USE?  CONSISTENT WITH APPLE'S PROCESS OF

15   WANTING TO HAVE EVERYTHING WORK TOGETHER EVERYTHING MADE BY

16   APPLE, APPLE SAID, WE WANT TO HAVE OUR OWN PROPRIETARY DRM.

17       THEY COULD HAVE USED MICROSOFT.  MICROSOFT HAD A DRM THAT

18   SUPPOSEDLY WORKED ON EVERYTHING, BUT THEY DECIDED TO USE THEIR

19   OWN.  SO THEY ENDED UP WITH A MUSIC STORE AND AN IPOD.  THE

20   IPOD PLAYED A LOT OF MUSIC IN ADDITION TO MUSIC BOUGHT FROM

21   APPLE AT THE ITUNES MUSIC STORE, BUT IT ALSO BOUGHT MUSIC FROM

22   THE ITUNES MUSIC STORE.  AND THEY WORKED REALLY WELL TOGETHER.

23   ITUNES, WHICH WAS THE JUKEBOX, THE DIGITAL JUKEBOX, ITUNES

24   MUSIC STORE, AND THEN THE IPOD.  THEY WORKED GREAT TOGETHER.

25       THEN THE PLAINTIFFS COME ALONG REPRESENTING SOME
```

```
 1    CONSUMERS, AND THEY SAY THAT THAT SETUP WAS ILLEGAL BECAUSE
 2    THE MUSIC ITUNES APPLE WAS SELLING AT THE ITUNES STORE
 3    WOULDN'T PLAY WITH OTHER PLAYERS THAT USED SOME DIFFERENT DRM.
 4    SO THEY WERE BASICALLY SAYING, AS WE INTERPRETED IT, EVERYBODY
 5    SHOULD USE MICROSOFT'S GENERIC DRM SO EVERYTHING WILL BE
 6    INTEROPERABLE.
 7        THEY MADE A TYING CLAIM, AND THE ESSENCE OF THE TYING
 8    CLAIM WAS THAT APPLE WAS TYING MUSIC TO IPODS.  JUDGE WARE
 9    DISMISSED THAT CLAIM AND FOUND THAT UNDER THE FOREMOST PRO
10    CASE IN THE NINTH CIRCUIT THERE IS NO DUTY TO MAKE YOUR
11    PRODUCTS INTEROPERABLE.  SO HE THREW THAT -- THEIR BASIC
12    MONOPOLIZATION TYING CLAIM OUT OF THE CASE.
13        THEN THEY CAME BACK AND AMENDED, AND THERE WERE A LOT OF
14    PROCEDURAL THINGS BACK AND FORTH, BUT FINALLY THEY ENDED UP
15    WITH A CLAIM BASED ON WHAT HAPPENED AFTER THEY FILED THE
16    COMPLAINT, WHICH WAS ITUNES 7.0 IN SEPTEMBER 2006.  THEY HAD
17    THAT AND THE EARLIER ITUNES 4.7.
18        THE EFFECT OF BOTH OF THOSE WAS TO DISABLE MUSIC FROM
19    REALNETWORKS THAT USED THIS HARMONY SOFTWARE.  AND WHAT
20    HARMONY DID, WHAT REALNETWORKS DID WITH ITS HARMONY SOFTWARE
21    IS, AS THEY SAID IN THE COMPLAINT, SOMEHOW REALNETWORKS, IN
22    THEIR WORDS, DISCERNED THE SOURCE CODE IN APPLE'S DRM AND MADE
23    HARMONY SO IT MIMICKED IT.  AND APPLE DID RESPOND BY SAYING,
24    YOU KNOW, THAT'S HOW HACKERS DO IT.  IF YOU WANT TO DEVELOP
25    YOUR OWN DRM, YOU HAVE YOUR OWN MUSIC STORE, DO IT YOURSELF.
```

1    DON'T HACK INTO OURS OR DISCERN OUR CODE.

2        SO, THREE MONTHS LATER AFTER HARMONY WAS INITIALLY

3    LAUNCHED, APPLE UPDATED ITS DRM, AND IT CHANGED THE DRM, AS IT

4    DID FROM TIME TO TIME, TO STAY ONE STEP AHEAD OF THE HACKERS.

5    AND WHEN IT CHANGED ITS DRM, THAT MEANT THAT HARMONY WOULD NO

6    LONGER WORK BECAUSE THEY WERE MIMICKING THE DRM.

7        SO AT EACH TURN IN THIS CASE, WE WOULD HAVE CASE

8    MANAGEMENT CONFERENCES WITH JUDGE WARE, AND I WOULD TELL HIM

9    MY VIEW WAS THAT THERE WAS NO MERIT TO THIS CASE AND IT OUGHT

10   TO COME TO AN END.  HE FINALLY SAID, OKAY, MAKE A SUMMARY

11   JUDGMENT MOTION ON THE TWO UPDATES.

12       WE DID THAT, AND HE RULED THAT UNDER THE TYCO CASE IN THE

13   NINTH CIRCUIT, THE FIRST 4.7, THE FIRST UPDATE, WAS INDEED A

14   PRODUCT IMPROVEMENT.  THERE'S NO DISPUTED FACT ABOUT THAT.  IT

15   STOPPED THE HACKERS, AND SO IT WAS LAWFUL.  BUT HE FOUND THERE

16   WERE DISPUTED FACTS ON WHETHER THE SECOND ONE WAS A PRODUCT

17   IMPROVEMENT, AND SO THAT CLAIM PROCEEDED.

18       AT THAT POINT WE CAME TO YOUR HONOR'S COURT.  WE WORKED

19   OUT AN EXPERT DISCOVERY SCHEDULE AND THE EXPERT DISCOVERY HAS

20   NOW BEEN COMPLETED.

21       THEIR IMPACT THEORY, THEIR THEORY ON HOW THIS 7.0 UPDATE

22   IMPACTED IPOD PRICES IS VERY CONVOLUTED, BUT IT BASICALLY IS

23   WHAT'S CALLED A LOCK IN.  THEIR THEORY WAS THAT FROM THE VERY

24   START OF ITUNES MUSIC STORE WHEN CUSTOMERS BOUGHT ITUNES MUSIC

25   THAT WORKED WELL WITH IPODS, IT DIDN'T WORK WITH SOME OTHER

1   PLAYERS, SO CONSUMERS, AS THEY PUT IT, WERE LOCKED IN.  ALL

2   THAT MEANS IN ECONOMIC TERMS IS THEIR SWITCHING COSTS WERE

3   GREATER THAN IF THEY WENT TO SOME OTHER DEVICE.

4       SO, AT THAT POINT THEIR WHOLE CLAIM WAS BASED ON THIS, THE

5   LOCK IN FROM DAY ONE, IN APRIL OF 2003 WHEN THE STORE WAS

6   LAUNCHED FOR '03, '04, '05, '06, PEOPLE WERE LOCKED IN,

7   THEREFORE, THEY WERE MORE LIKELY TO BUY IPODS.  THAT INCREASED

8   THE DEMAND FOR IPODS AND, THEREFORE, THE PRICE OF IPODS WOULD

9   GO UP ALL BECAUSE THEY SAY BECAUSE OF THE ILLEGAL LOCK IN.

10      WHEN JUDGE WARE RULED THAT THE LOCK IN CAUSED BY THE

11  TECHNOLOGICAL TIE WAS COMPLETELY LAWFUL, THEN THEY WERE STUCK

12  WITH THE THEORY WHERE THEY SAID ALL THESE PEOPLE WERE LOCKED

13  IN AND NOW WHAT THEY HAD TO DO WAS SHOW THAT 7.0, INTRODUCED

14  VERY LATE IN THE GAME IN SEPTEMBER OF '06, INCREMENTALLY

15  INCREASED LOCK IN ENOUGH TO RAISE THE PRICE OF IPODS

16  UNLAWFULLY.

17      AND OUR VIEW IS THAT THAT THEORY IS REALLY HARD TO FOLLOW

18  AS A THEORETICAL MATTER BECAUSE IT IS A VERY LIMITED UNIVERSE

19  OF PEOPLE WHO WOULD CONCEIVABLY BE LOCKED IN INCREMENTALLY.

20      AND WHAT WE HAVE SAID IN THE SUMMARY JUDGMENT MOTION, YOUR

21  HONOR, IS THAT THEY HAVE NO REAL WORLD EVIDENCE, NO EVIDENCE

22  THAT ANYBODY WAS LOCKED IN BECAUSE OF 7.0.  IT REQUIRES

23  SOMEBODY WHO DIDN'T WANT TO BUY AN IPOD EVEN THOUGH THEY HAD

24  AN IPOD.  IT INVOLVES SOMEBODY WHO WASN'T ALREADY LOCKED IN BY

25  THREE YEARS OF PURCHASES.  IT INVOLVES SOMEBODY WHO WAS GOING

1    TO BUY MUSIC FROM REALNETWORKS, AND THEN AFTER 7.0 HAD TO

2    SWITCH TO ITUNES, AND THEN HAD TO BUY SO MUCH MUSIC THAT WHEN

3    IT CAME TO TIME TO DO A REPLACEMENT PURCHASE, THEY WANTED TO

4    BUY SOMETHING ELSE BUT THEY WERE STUCK BUYING AN IPOD.

5        THE NAMED PLAINTIFFS DO NOT FIT THAT DESCRIPTION.  THEY DO

6    NOT CLAIM THAT THEY WANTED TO BUY REALNETWORKS AND THEY WERE

7    LOCKED IN BY, YOU KNOW, HAVING TO SWITCH TO ITUNES BECAUSE OF

8    7.0.  SO THE NAMED PLAINTIFFS DON'T FIT THE DESCRIPTION OF

9    SOMEBODY THAT WAS IMPACTED.

10            **THE COURT:**  THE SUMMARY JUDGMENT DOESN'T DEAL WITH

11   THAT ISSUE; IS THAT CORRECT?

12            **MR. MITTELSTAEDT:**  THE SUMMARY JUDGMENT GOES TO THE

13   IMPACT ISSUE.  AND WHAT WE SAY IS THEY HAVE NO EVIDENCE TO

14   SUPPORT THEIR THEORY OF LOCK IN.

15       SO, WHAT WE MEAN BY THAT IS THE PLAINTIFFS DON'T SUPPORT

16   IT.  THEY HAVE TAKEN NO SURVEY OF CONSUMERS TO SUPPORT IT.

17   THEY HAVE NO DOCUMENTARY EVIDENCE.

18       IF THIS WAS SUCH A BIG DEAL, YOU WOULD THINK THERE WOULD

19   BE COMPLAINTS BY CONSUMERS TO APPLE OR TO SOMEBODY ELSE.  THEY

20   SUBMITTED A LOT OF COMPLAINTS ABOUT A LOT OF THINGS THAT

21   CONSUMERS SUBMITTED TO APPLE, BUT NONE OF THEM SAY WE'RE

22   LOCKED IN OR LOCKED OUT BECAUSE OF 7.0.

23       AND SO THEY HAVE, IN OUR VIEW, AND THIS IS WHAT THE

24   SUMMARY JUDGMENT MOTION SETS OUT, NO EVIDENCE THAT ANYBODY WAS

25   LOCKED OUT, LOCKED IN.  AND MORE THAN THAT, WHAT THEY WOULD

1    HAVE TO SHOW IS THAT SO MANY PEOPLE WERE LOCKED IN, THAT THAT

2    EFFECTED IPOD DEMAND SO MUCH THAT APPLE WOULD TAKE THAT INTO

3    ACCOUNT IN SETTING ITS PRICES.

4        AND WHAT WE HAVE SHOWN IS THAT THERE'S NO EVIDENCE THAT

5    APPLE EVER TOOK THE EFFECTS OF 7.0 INTO ACCOUNT.  THEIR EXPERT

6    SAYS, NOW HE'S DONE THIS REGRESSION ANALYSIS AND HE SAYS THERE

7    WOULD BE A RELATIVELY SMALL PRICE IMPACT.

8        BUT APPLE HAS A PRICING STRATEGY WHERE IT PRICES WHAT IT

9    CALLS AESTHETIC TERMS, 199, 299, SO FORTH.  THEIR EXPERT SAYS

10   WHEN HE DOES HIS REGRESSION, THE PRICE THAT SPITS OUT OF THE

11   REGRESSION IS $184.17.  AND THE EVIDENCE IS UNCONTROVERTED

12   THAT APPLE WOULD NEVER CHARGE $184.17.  THEY WOULD CHARGE 199.

13       SO WHAT THE MOTION DOES IS SET FORTH THE ABSENCE OF

14   EVIDENCE THAT IS NEEDED TO SUPPORT THEIR LOCK-IN THEORY, AND

15   THE REAL WORLD EVIDENCE THAT REFUTES THEIR LOCK-IN THEORY.

16       ONE LAST EXAMPLE IS THEY SAY THAT THERE WOULD BE AN

17   IMMEDIATE ORDER CHARGE ON IPODS AND IT WOULD BE CONSTANT

18   DURING THE THREE YEARS OF THE CLASS PERIOD.

19       BUT THEIR LOCK-IN THEORY WOULD NOT KICK IN IMMEDIATELY.

20   INDEED, THEIR EXPERT HAS ADMITTED THAT THE -- IF THERE WAS ANY

21   IMPACT FROM 7.0, THE INITIAL IMPACT WOULD BE TO REDUCE THE

22   DEMAND FOR IPODS BECAUSE THERE'S ONE LESS SOURCE OF MUSIC TO

23   PLAY ON AN IPOD, SO THERE WOULD BE LESS DEMAND FOR AN IPOD

24   BASED ON THEIR LOCK-IN THEORY INITIALLY.  SO THERE WOULD BE NO

25   IMMEDIATE ADVERSE IMPACT ON PRICE.  AND THEN IF THERE WAS ANY

```
1    IMPACT ON PRICE, ACCORDING TO THEIR OWN THEORY, IT WOULD BE

2    GRADUAL AND NOT CONSTANT.  BUT YET THEY COME UP WITH A

3    REGRESSION THAT SHOWS AN IMMEDIATE AND A CONSTANT EFFECT.

4        SO, THERE ARE REALLY TWO PARTS TO OUR MOTION, YOUR HONOR.

5    THE FIRST ONE THEY HAVE NO REAL WORLD EVIDENCE TO SUPPORT

6    THEIR IMPACT THEORY.  AND THE SECOND PART IS THEIR ECONOMIST'S

7    REGRESSION ANALYSIS DOESN'T SAVE THEM BECAUSE IT, TOO, IS

8    CONTRARY TO ALL THESE REAL WORLD FACTS.  AND PLUS IT SUFFERS

9    FROM A LOT OF MORE TECHNICAL, MORE TECHNICAL PROBLEMS.  THAT'S

10   THE ESSENCE OF THE IMPACT PART OF THE SUMMARY JUDGMENT.

11       THE SECOND PART OF THE SUMMARY JUDGMENT GOES TO RELEVANT

12   MARKET.  THIS IS A MONOPOLIZATION CASE.  THEY ALLEGE WE

13   MONOPOLIZED THE MARKET IN WHICH IPODS PLAYED A PART.  THEY

14   DEFINE THE MARKET VERY NARROWLY.  THE ONLY EVIDENCE TO DEFINE

15   A MARKET NARROWLY -- DEFINE A MARKET AT ALL FROM THE

16   PLAINTIFFS IS, AGAIN, THEIR EXPERT.  AND IN THE SUMMARY

17   JUDGMENT MOTION WE SET FORTH THE WAYS -- THE REASONS THAT THAT

18   EXPERT'S ANALYSIS OF THE MARKET IS INSUFFICIENT.

19       THAT'S THE ESSENCE OF IT, YOUR HONOR.

20           MS. SWEENEY:  SHALL I RESPOND, YOUR HONOR?

21           THE COURT:  YES, PLEASE.

22           MS. SWEENEY:  OKAY.

23       ALL RIGHT.  SO, I WANT TO TAKE ISSUE WITH A COUPLE OF

24   MR. MITTELSTAEDT'S COMMENTS.

25       FIRST OF ALL, IN -- HE SAID, AND I THINK HE MISSPOKE, HE
```

```
 1    SAID THAT JUDGE WARE THREW OUT THE MONOPOLIZATION CLAIMS.

 2    THAT'S NOT TRUE.  WE HAVE A MONOPOLIZATION CLAIM.  IT HAS BEEN

 3    IN THE CASE SINCE THE GET-GO AND THAT CLAIM IS STILL IN

 4    EFFECT.

 5         NOW, GOING TO THE IMPACT ARGUMENT AND THE LOCK-IN THEORY.

 6    APPLE HAS SORT OF CREATED THIS FALSE STANDARD THAT IT ASSERTS

 7    PLAINTIFFS MUST MEET.  AND WHAT APPLE IGNORES IS THAT THIS IS

 8    A STRAIGHTFORWARD MONOPOLIZATION CASE.

 9         PLAINTIFFS CLAIM THAT BECAUSE OF ITS CONDUCT IN LOCKING IN

10    ITS USERS AND LOCKING OUT COMPETITORS BY -- BY DISABLING THIS

11    PRODUCT WHICH WOULD HAVE INCREASED THE PRICE ELASTICITY FOR

12    IPODS, APPLE WAS ABLE TO INCREASE THE PRICE OF ITS IPODS.  AND

13    THERE IS NOTHING IN ECONOMIC THEORY, AND WE -- WE CITE TO

14    PROFESSION NOLL, AND HE HAS A VERY LONG DISCUSSION IN HIS

15    EXPERT REPORT ABOUT WHY APPLE'S THEORY DOES NOT MAKE SENSE AS

16    AN ECONOMIC MATTER.

17         OUR EXPERT IS PROFESSOR ROGER NOLL.

18              THE COURT:  I KNOW WHO HE IS.

19              MS. SWEENEY:  OKAY.  SO -- AND THEN, IN ADDITION,

20    APPLE CLAIMS THAT THERE'S NO REAL WORLD EVIDENCE THAT ANYONE

21    CARED ABOUT THIS.  WE HAVE THOUSANDS OF COMPLAINTS FROM

22    CONSUMERS WHO COMPLAIN ABOUT NOT BEING ABLE TO USE MUSIC

23    PURCHASED FROM OTHER SOURCES ON THEIR IPODS.

24         NOW, WE ONLY CITED A CERTAIN NUMBERS OF THEM IN OUR

25    SUMMARY JUDGMENT OPPOSITION IN ORDER NOT TO OVERBURDEN THE
```

1    COURT WITH EVERY SINGLE EXAMPLE.  AND WHAT'S MORE, CONTRARY TO

2    WHAT MR. MITTELSTAEDT SAID, OUR PLAINTIFFS TESTIFIED AND WE

3    HAVE THE TESTIMONY ALSO IN OUR OPPOSITION, THAT THEY -- AFTER

4    THEIR FIRST IPOD PURCHASE, THEIR SECOND OR PERHAPS THIRD IPOD

5    PURCHASES WERE BECAUSE THEY HAD ASSEMBLED A LIBRARY OF MUSIC

6    THAT THEY PURCHASED FROM THE ITUNES STORE, AND IT WOULD HAVE

7    BEEN TOO COSTLY TO SWITCH TO ANOTHER PRODUCT.

8        SO THAT'S SIMPLY NOT TRUE THAT THERE'S NO REAL WORLD

9    EVIDENCE.  THERE, A, IS NO ECONOMIC THEORY BEHIND APPLE'S

10   ARGUMENT AND, B, IT'S NOT TRUE THAT THERE'S NO REAL WORLD

11   EVIDENCE TO SUPPORT PLAINTIFFS' LOCK-IN THEORY.

12       NOW, PROFESSOR NOLL TOOK ALL OF APPLE'S TRANSACTIONAL DATA

13   AND CONDUCTED A VERY THOROUGH --

14       **THE COURT:**  CAN YOU EXPLAIN THAT?  I'M TRYING TO

15   UNDERSTAND HOW THEY SAY THAT THEY ARE DAMAGED.  SO, THEY ARE

16   DAMAGED BECAUSE --

17       **MS. SWEENEY:**  YEAH, I CAN EXPLAIN THAT, YOUR HONOR.

18       ALL RIGHT.  SO PROFESSOR NOLL'S ANALYSIS IS A

19   MULTIVARIABLE REGRESSION ANALYSIS, AND IT'S INTENDED TO AND

20   DOES SHOW TWO THINGS.  ONE, IT QUANTIFIES THE DAMAGES, BUT

21   ALSO DEMONSTRATES IMPACT.  IT DEMONSTRATES THE FACT OF

22   DAMAGES.  THIS IS WHAT HE DOES.  HE TAKES -- HE STARTS WITH A

23   HEDONIC, IT'S CALLED A HEDONIC PRICE REGRESSION.

24       SO HE LOOKS AT THE DIFFERENT FACTORS THAT WOULD EFFECT THE

25   PRICE OF AN IPOD, AND THEN HE PLUGS INTO THE EQUATION A NUMBER

1    OF WHAT HE CALLS COMPETITIVE VARIABLES.

2        SO, FOR EXAMPLE, THE INTRODUCTION OF HARMONY IN 2004.

3    APPLE'S DISABLING OF HARMONY WITH 4.7 AND THEN APPLE'S

4    SUBSEQUENT DISABLING OF HARMONY WITH 7.0, AND THEN HE ALSO

5    LOOKS AT WHAT HAPPENS WHEN THE MUSIC INDUSTRY GOES DRM FREE.

6        AND WHAT PROFESSOR NOLL FINDS IS EXACTLY CONSISTENT WITH

7    HIS ECONOMIC THEORY, AND, THAT IS, WHEN HARMONY WAS

8    INTRODUCED, IPOD PRICES WENT DOWN.  WHEN HARMONY WAS DISABLED,

9    IPOD PRICES WENT UP.  WHEN THE MUSIC INDUSTRY WENT DRM FREE,

10   IPOD PRICES WENT DOWN.

11       SO, IN OTHER WORDS, THERE IS A VERY RECOGNIZABLE AND

12   SIGNIFICANT IMPACT THAT ARISES FROM APPLE'S CONDUCT OF

13   SHUTTING OUT THIS ONE COMPETITOR WHO TRIED TO MAKE AN INROAD

14   INTO APPLE'S MONOPOLIZATION.

15           **THE COURT:**  BUT THE COMPETITOR IS NOT A PARTY.

16           **MS. SWEENEY:**  THAT'S TRUE.  AND HERE'S WHERE WE GET

17   TO HOW OUR CLIENTS' CONSUMERS AND BUSINESSES WERE IMPACTED.

18       SO WHAT PROFESSOR NOLL'S REGRESSION ANALYSIS DOES, IT

19   QUANTIFIES THE IMPACT ON THE IPOD PURCHASERS.  THOSE ARE THE

20   ONES WHO WERE INJURED BY APPLE'S CONDUCT.  SO THAT INCLUDES

21   STORES LIKE BEST BUY.  IT INCLUDES CONSUMERS WHO PURCHASED

22   FROM THE APPLE STORE.  AND HE CONCLUDED THAT THEY SUFFERED

23   SIGNIFICANT DAMAGES.  HE ESTIMATED THE AMOUNT OF OVERCHARGE

24   PAID BY THOSE PURCHASERS.  HE ESTIMATED DAMAGES AT LITTLE OVER

25   $350 MILLION FOR BOTH, WHAT WE CALL THE RESELLER SEGMENT OF

1    THE CLASS AND THE CONSUMER SEGMENT OF THE CLASS, AND THAT'S

2    SINGLE DAMAGES, YOUR HONOR.

3        SO THAT'S HOW WE GET TO IMPACT.  WE RELY ON ECONOMIC

4    THEORY.  IT'S A MONOPOLIZATION CLAIM, AND PROFESSOR NOLL HAS

5    DEMONSTRATED IMPACT THROUGH HIS REGRESSION ANALYSIS.

6        NOW, APPLE'S RESPONSE IS NOT ONLY TO ATTACK PROFESSION

7    NOLL'S THEORY, BUT ALSO TO PICK APART HIS REGRESSION ANALYSIS.

8    AND IT HAS A NUMBER OF CRITICISMS.  APPLE BRINGS IN ITS OWN

9    EXPERTS.  ONE OF THOSE CRITICISMS IS THAT PROFESSION NOLL'S

10   RESULTS SUPPOSEDLY ARE NOT STATISTICALLY SIGNIFICANT.  AND

11   APPLE SAYS THIS IS BECAUSE PROFESSION NOLL SHOULD HAVE

12   CLUSTERED THE ERRORS, CLUSTERED THE STANDARD ERRORS, AND IF HE

13   HAD DONE THAT, THEN HE WOULD FIND THAT THE RESULTS AREN'T

14   SIGNIFICANT SO YOU CAN'T REPLY UPON THEM.

15       WELL, THAT THEORY SIMPLY DOES NOT HOLD UP UNDER THESE

16   FACTUAL CIRCUMSTANCES BECAUSE IT'S -- IT'S A VERY SPECIALIZED

17   ECONOMIC -- ECONOMETRIC ISSUE WHICH APPLIES IN OTHER CASES,

18   FOR EXAMPLE, WHERE YOU DRAW A, WHAT'S CALLED A CLUSTER SAMPLE

19   OF DATA.  HERE WE HAVE THE ENTIRE UNIVERSE OF DATA.  WE HAVE

20   EVERY APPLE IPOD TRANSACTION FOR THE CLASS PERIOD.  SO WE HAVE

21   MOVED TO EXCLUDE APPLE'S EXPERT'S TESTIMONY ON THE CLUSTERING

22   ANALYSIS.

23       AND WE PUT IN ANOTHER DECLARATION BY PROFESSOR NOLL AND WE

24   ALSO PUT IN A DECLARATION BY A PROFESSOR AT MICHIGAN STATE

25   UNIVERSITY, PROFESSOR WOOLDRIDGE WHO IS AN ECONOMETRICIAN WHO

1    SPECIALIZES IN THIS FAIRLY ESOTERIC AREA OF SAMPLING AND

2    CLUSTER SAMPLING.  SO WE -- NOT ONLY DO WE DISAGREE, WE ARE

3    MOVING TO EXCLUDE THAT OPINION ALTOGETHER.

4        APPLE ALSO CRITICIZES PROFESSOR NOLL FOR OMITTING WHAT

5    THEY CALL SIGNIFICANT VARIABLES IN THE REGRESSION ANALYSIS.

6    NOW, PROFESSOR NOLL RESPONDED TO THAT CRITICISM, AND WE THINK

7    IT'S COMPLETELY UNMERITED.  HE LOOKED AT ALL THE DIFFERENT

8    FACTORS THAT AFFECT PRICE, AND THERE ARE A FEW FACTORS THAT

9    APPLE SAYS HE SHOULD HAVE INCLUDED IN HIS ANALYSIS.  PROFESSOR

10   NOLL LOOKED AT THOSE FACTORS AND CONCLUDED THAT THEY DON'T ADD

11   ANY EXPLANATORY POWER TO THE REGRESSION.

12       AND WHAT'S MORE, THEY -- BECAUSE THEY ARE CORRELATING WITH

13   ONE ANOTHER, THESE INDEPENDENT VARIABLES, THEY LEAD TO A

14   PROBLEM CALLED MULTICOLLINEARITY, WHICH WOULD DESTROY THE

15   EXPLANATORY POWER OF THE ANALYSIS.

16       THEY ALSO CLAIM -- AND THIS IS SORT OF AN ODD CRITICISM

17   THAT APPLE MAKES.  APPLE -- ABOUT -- PROFESSOR NOLL PUT IN HIS

18   EXPERT REPORT ON DAMAGES LAST APRIL.  AT THAT TIME PLAINTIFFS

19   WERE UNDER THE UNDERSTANDING BASED ON TESTIMONY AND A SWORN

20   DECLARATION BY APPLE'S WITNESS THAT ALL IPODS SOLD AFTER

21   SEPTEMBER 6TH, 2006 HAD THIS 7.0 UPDATE.  AND SO THAT'S HOW HE

22   RAN THE REGRESSIONS BACK THEN.

23       WELL, SUBSEQUENT TO PUTTING THAT IN THE REPORT, APPLE

24   PRODUCED A CORRECTED DECLARATION FROM THIS EMPLOYEE.  AND IT

25   TURNS OUT THAT NOT ALL IPODS HAD 7.0 ON IT.  SO, IN OTHER

1   WORDS, SOME OF THEM WERE NOT UPDATED WITH THE 7.0 SOFTWARE

2   THAT DISABLED HARMONY.  SO IN HIS REBUTTAL REPORT, PROFESSOR

3   NOLL TOOK THIS INTO ACCOUNT AND HE MODIFIED HIS REGRESSIONS.

4       NOW, INTERESTINGLY, APPLE HAS ATTACKED PROFESSOR NOLL FOR

5   MAKING THAT CORRECTION.  AND THEY SAY THAT IF YOU MAKE THIS

6   CORRECTION, YOU ADD IN THESE FACTORS THAT THEY SAY ARE

7   IMPORTANT, AND YOU TREAT ALL THE REGRESSION ANALYSIS AS IF 7.0

8   AFFECTED IPODS THAT WE NOW KNOW WERE NOT AFFECTED, THEN YOU

9   END UP WITHOUT ANY DAMAGES.  IT'S A -- IT'S A VERY SORT OF

10  STRANGE ARGUMENT, BUT CONVENIENTLY GETS APPLE TO ZERO DAMAGES

11  AND, THEREFORE, ZERO IMPACT.

12      SO WE OBVIOUSLY CONTEST APPLE'S CRITICISM OF PROFESSOR

13  NOLL'S IMPACT AND DAMAGES REPORT.

14          **THE COURT:**  IS THERE A MOTION, A <u>DAUBERT</u> MOTION?

15          **MS. SWEENEY:**  THERE IS.  YOUR HONOR, WE HAD MOVED TO

16  EXCLUDE, AS I SAID, THE CLUSTERING PORTIONS OF APPLE'S EXPERT

17  OPINIONS AND APPLE HAS MOVED TO EXCLUDE ALL OF PROFESSOR

18  NOLL'S OPINION.

19          **MR. MITTELSTAEDT:**  YOUR HONOR, COULD I FILL IN ONE

20  PART THERE?

21          **THE COURT:**  HOLD ON.

22      I'M STILL TRYING TO UNDERSTAND THE CONNECTION BETWEEN THE

23  DAMAGES ANALYSIS, THE CAUSATION, THE NEXUS BETWEEN A PURCHASER

24  AND --

25          **MS. SWEENEY:**  SURE.

1        **THE COURT:**  –– AND WHAT?

2        **MS. SWEENEY:**  SURE.  YEAH.

3        **THE COURT:**  WHERE IS THE NEXUS TO WHAT PROFESSOR NOLL

4    IS OPINING ON?

5        **MS. SWEENEY:**  SURE.

6      MEMBERS OF THE CLASS PURCHASED IPODS THAT WE ALLEGE APPLE

7    CHARGED INFLATED PRICES FOR.  AND THE REASON APPLE WAS ABLE TO

8    DO THAT WAS BECAUSE IT HAD MONOPOLY POWER IN THIS MARKET.  AND

9    THE WAY ––

10        **THE COURT:**  BUT ––

11        **MS. SWEENEY:**  YEAH.

12        **THE COURT:**  OKAY.  GO AHEAD.

13        **MS. SWEENEY:**  SO, THE LOCK IN OCCURS BECAUSE ONCE AN

14    IPOD USER ASSEMBLES A LIBRARY OF SONGS THAT ARE PURCHASED FROM

15    ITUNES, AND BACK THEN THEY WERE PRETTY MUCH 99 CENTS A SONG,

16    YOU CAN GET TO A FAIRLY SIGNIFICANT SUM OF MONEY PRETTY

17    QUICKLY –– ONCE YOU ACQUIRE A LIBRARY OF ITUNE SONGS YOU

18    PURCHASED FROM APPLE'S ITUNE STORE ––

19        **THE COURT:**  HOW DOES THAT RELATE TO THIS 7.0 UPGRADE

20    THAT DEALT WITH THIS PARTY THAT'S NOT –– THIS ENTITY THAT'S

21    NOT A PARTY?

22        **MS. SWEENEY:**  WELL, THIS IS –– BECAUSE IT'S A

23    MONOPOLIZATION CASE.  WHAT HARMONY –– WHAT REALNETWORKS DID

24    WAS IT UNDERMINED APPLE'S MONOPOLY.  AND APPLE WAS ABLE TO

25    MAINTAIN SUPER COMPETITIVE PRICES AS A RESULT OF HAVING THIS

24

```
 1    MONOPOLY.

 2              THE COURT:  WELL, IS THERE AN ANALYSIS -- I'VE BOUGHT

 3    PLENTY OF IPODS.  I CAN'T NOW REMEMBER IN 2005, YOU KNOW, WHAT

 4    ELSE WAS ON THE MARKET AT THE TIME AND WHETHER -- SOMETIMES

 5    WHAT WE DO SEE IS WE SEE AN ANALYSIS OF VARIOUS PRODUCTS IN

 6    THE MARKET.  I JUST -- I'M STRUGGLING TO THINK BACK AND FIGURE

 7    OUT WHAT THE MARKET LOOKED LIKE AT THAT JUNCTURE.

 8              MS. SWEENEY:  WELL, PROFESSOR NOLL HAS ANALYZED THE

 9    MARKET IN HIS EXPERT REPORT, YOUR HONOR, AND HE DESCRIBES THE

10    VARIOUS PRODUCTS THAT WERE ON THE MARKET, AND THEIR PROS AND

11    CONS, AND EXPLAINS HOW APPLE WAS ABLE TO ACHIEVE A HUGE MARKET

12    SHARE.  AND PART OF THE REASON THAT INITIALLY ARRIVED AT ITS

13    MONOPOLY POWER WAS THROUGH THIS LOCK-IN EFFECT CREATED BY ITS

14    TIE --

15              THE COURT:  BUT THAT WAS THROWN OUT OF THE CASE.

16              MS. SWEENEY:  THAT'S RIGHT.  BUT WHAT PERSISTED, YOUR

17    HONOR, WHAT WE CHALLENGE AND WHAT JUDGE WARE PERMITTED US TO

18    PURSUE IS THE CLAIM THAT APPLE -- ONCE THERE WERE CHINKS IN

19    THE ARMOR, IN OTHER WORDS, JUDGE WARE HELD IT WAS OKAY FOR

20    APPLE TO ESTABLISH THE MONOPOLY IN THE FIRST INSTANCE, BUT THE

21    LAW SAYS, THE LAW OF MONOPOLIZATION SAYS YOU CAN ACQUIRE A

22    MONOPOLY LEGALLY, BUT YOU CAN TAKE CERTAIN ACTIONS THAT RENDER

23    THE CONTINUED MAINTENANCE OF THAT MONOPOLY ILLEGAL.

24         SO THAT'S REALLY WHAT IT IS, IT'S MONOPOLY MAINTENANCE

25    CLAIM.  IN OTHER WORDS, APPLE TOOK DIRECT CONDUCT TO EXCLUDE
```

1    COMPETITORS TO MAINTAIN ITS MONOPOLY, AND THAT'S HOW IT KEPT

2    PRICES ABOVE WHAT THEY WOULD HAVE BEEN IN A COMPETITIVE MARKET

3    IN WHICH APPLE HAD NOT MAINTAINED ITS MONOPOLY.

4         **THE COURT:**  ALL RIGHT.  NOW YOU CAN RESPOND.

5         **MR. MITTELSTAEDT:**  THEIR THEORY FROM THE START HAS

6    BEEN, THEIR THEORY OF IMPACT HAS BEEN LOCK IN.  AND WHEN YOUR

7    HONOR ASKED TO LAY OUT THE THEORY, THE REASON THE RESPONSE WAS

8    AS IT IS IS BECAUSE WHEN YOU LAY OUT THE LOCK-IN THEORY

9    SPECIFICALLY, AND WHEN THEY SAY WHAT THEY WOULD HAVE TO PROVE,

10   IT'S CLEAR THAT THEY HAVEN'T PROVED IT AND THEY CAN'T PROVE IT

11   BECAUSE THERE IS -- IT'S COMPLETELY IMPLAUSIBLE AND COMPLETELY

12   UNPROVEN THAT THERE WOULD BE ANY IMPACT NOT FROM ITUNES STORE

13   IN GENERAL, BUT FROM 7.0.  AND I WILL -- I'LL SAY THIS MORE

14   SLOWLY BECAUSE IT IS COMPLICATED TO TRY AND FIGURE OUT THIS

15   CHAIN OF EVENTS THAT WOULD HAVE TO HAPPEN FOR THEIR IMPACT

16   THEORY TO BE RIGHT.

17        FIRST OF ALL, IT WOULD NOT INCLUDE CONSUMERS WHO PREFER

18   IPODS FOR REASONS UNRELATED TO ITUNES MUSIC STORE.  SO, IF YOU

19   LIKE AN IPOD BECAUSE IT'S SLEEK, IT PLAYS A LOT OF MUSIC, IT'S

20   BETTER THAN HUNDREDS OF THE OTHER PLAYERS THAT WERE ON THE

21   MARKET, YOU'RE GOING TO STAY WITH AN IPOD, AND ITUNES 7.0

22   ISN'T GOING TO INCREASE YOUR DEMAND FOR AN IPOD.  SO, THEY

23   HAVE TO FIND PEOPLE WHO DIDN'T PREFER IPODS FOR REASONS

24   UNRELATED TO 7.0.

25        THEN THEY HAVE TO FIND PEOPLE WHO WERE NOT ALREADY, UNDER

1    THAT THEORY, LOCKED IN BECAUSE THEY HAD BIG ITUNES MUSIC STORE

2    LIBRARIES LONG BEFORE 7.0.  SO THOSE TWO UNIVERSES OR SUBSETS

3    OF PEOPLE DON'T HELP THEM IN THIS CASE.

4        WHAT THEY NEED TO FIND, AND I TRIED TO WRITE THIS AS

5    PRECISELY AS I COULD, FOR THEIR LOCK-IN THEORY TO ARISE FROM

6    7.0, THEY NEED ONLY PEOPLE WHO OWNED IPODS AS OF

7    SEPTEMBER 2006 BUT WANTED TO SWITCH TO A NONIPOD BUT COULDN'T

8    SWITCH BECAUSE INSTEAD OF BUYING -- CONTINUING TO BUY MUSIC

9    FROM REALNETWORKS TO PLAY ON THE IPOD, AFTER 7.0 THEY SWITCHED

10   TO THE ITUNES MUSIC STORE AND, THEREFORE -- OR THEREAFTER

11   BUILT UP A LIBRARY AND THAT LED THEM TO BUY AN IPOD RATHER

12   THAN THEIR PREFERRED NONIPOD.

13       TO JUST SAY THAT THAT WAY I THINK SHOWS HOW IMPLAUSIBLE IT

14   IS THAT THERE'S ANYBODY IN THAT GROUP.

15       THE BASIS FOR OUR SUMMARY JUDGMENT IS IF THERE'S NOBODY IN

16   THAT GROUP, THE IMPACT ARGUMENT -- IMPACT THEORY IS DEAD AT

17   THE START.  IF THERE ARE PEOPLE IN THE GROUP, THEY STILL NEED

18   TO SHOW THAT THE DEMAND IMPACT WAS HIGH ENOUGH, THAT APPLE

19   ACTUALLY TOOK IT INTO ACCOUNT, AND THAT APPLE WAS GOING TO

20   DEPART FROM ITS VERY, VERY FIRM POLICY OF ADHERING TO

21   AESTHETIC PRICING.

22       BUT EVEN ON THAT FIRST STEP, YOUR HONOR, YOU KNOW, WHO'S

23   IN THIS GROUP THAT'S SUPPOSEDLY LOCKED IN, OUR POINT IS, YOU

24   KNOW, THEY SAY THE PLAINTIFFS, BUT WHEN YOU LOOK AT THE

25   DEPOSITION TESTIMONY, IT'S CLEAR THE PURCHASES BY THE

1    PLAINTIFFS OF IPODS HAD NOTHING TO DO WITH 7.0 OR HARMONY.

2    THEY NEVER SAID THEY WERE GOING TO USE HARMONY.  THEY NEVER

3    SAID 7.0 SWITCHED THEM BACK TO ITUNES AND THEN MADE THEM BUY

4    AN IPOD AGAINST THEIR WILL.

5        SO THE PLAINTIFFS, IF THEY'RE REPRESENTATIVE, YOU KNOW,

6    THAT MEANS THERE AREN'T PEOPLE IN THIS GROUP.  BUT MORE THAN

7    THAT, THEY DON'T POINT TO ANYBODY WHO WAS.  THEY DON'T TELL US

8    IT WAS A BIG GROUP.  THEIR ONLY RESPONSE TO THAT, YOUR HONOR,

9    AND THIS IS IN THE THREE-PAGE LETTER IS THEY SAY WE'RE

10   SUPPOSEDLY ASKING THEM FOR THE EXACT NUMBER OF PEOPLE WHO

11   BECAME LOCKED IN.  WE ARE NOT ASKING FOR THE EXACT NUMBER,

12   WE'RE ASKING FOR A SHOWING THAT THERE WAS ANYBODY IN THERE OR

13   A SUFFICIENT NUMBER THAT IT WAS GOING TO EFFECT DEMAND.

14       AND THEY REFER TO A LOT OF COMPLAINTS.  IN THE RECORD,

15   YOUR HONOR, THERE IS NO COMPLAINT WHERE SOMEBODY SAID 7.0 KEPT

16   ME FROM BUYING REALNETWORKS, MADE ME PLAY ITUNES OR BUY ITUNES

17   MUSIC AND THAT MADE ME BUY AN IPOD.

18           **THE COURT:**  I THINK THE QUESTION IS, AND I'LL SEE

19   WHEN I LOOK AT THE PAPERS, IS THERE -- HAVE YOU CITED TO LAW

20   THAT DEALS WITH WHAT IS FUNDAMENTALLY A NEXUS REQUIREMENT?

21   THAT'S WHAT I HEAR YOU SAYING IS THERE IS NO NEXUS BETWEEN THE

22   DAMAGES CLAIM AND ANY CLASS MEMBER.

23       WHAT I HEAR THE OTHER SIDE SAYING IS, WE DON'T NEED A

24   NEXUS, ALL WE NEED TO SHOW IS THAT THEY WERE MAINTAINING THEIR

25   MONOPOLY.

1          **MS. SWEENEY:**  WELL, I DON'T -- I DON'T THINK I

2     WOULD -- I THINK WE HAVE TO SHOW A NEXUS AND I BELIEVE WE HAVE

3     SHOWN A NEXUS.  BUT YOU'RE CORRECT, YOUR HONOR, THAT APPLE

4     NEVER, IN ITS MOTION FOR SUMMARY JUDGMENT, PUT IT THAT WAY OR

5     CITED ANY CASE LAW IN SUPPORT OF ITS ARGUMENT.  IT'S JUST MADE

6     THESE AD HOMONYM ATTACKS ON THE WHOLE LOCK-IN THEORY THAT

7     PERTAIN TO SOME OTHER CASE OUTSIDE THE MONOPOLY SECTION 2

8     CONTEXT.

9          ALSO, I JUST WANT TO CORRECT ONE THING MR. MITTELSTAEDT

10    SAID.  HE SAID THAT NONE OF THE COMPLAINTS THAT WE CITED

11    COMPLAIN ABOUT 7.0.  WELL, THAT'S TRUE.  I'M SURE THAT NO

12    CONSUMER WHO FILED A COMPLAINT KNEW THAT 7.0 WAS THE NAME OF

13    APPLE'S SOFTWARE UPDATE, BUT THERE WERE CERTAINLY COMPLAINTS

14    AFTER SEPTEMBER 6, 2006.

15         **THE COURT:**  YEAH, BUT WHAT WERE THEY COMPLAINING

16    ABOUT?

17         **MS. SWEENEY:**  THEY WERE COMPLAINING THAT THEY COULD

18    NOT USE MUSIC THAT THEY PURCHASED FROM ANOTHER SOURCE,

19    INCLUDING REALNETWORKS HARMONY ON THEIR IPOD.

20         **THE COURT:**  OKAY.  WELL, I THINK I HAVE A SENSE OF

21    WHAT'S IN THE BOX OR BOXES.  I DON'T EVEN KNOW HOW MUCH IT IS.

22         **MR. MITTELSTAEDT:**  YOUR HONOR, COULD I JUST ADD ONE

23    THING?

24         THEY ARE CLAIMING A MONOPOLIZATION OF THE DEVICE MARKET.

25    AND REALNETWORKS WAS NOT IN THE DEVICE MARKET.  REALNETWORKS

1   WAS SELLING MUSIC.  SO THEY HAVE, AGAIN, AN ATTENUATED

2   ARGUMENT WHICH WE DON'T THINK IS SUPPORTED.

3         **THE COURT:**  THE ONLY POINT THAT I HEAR ABOUT THE ROLE

4   OF THAT PARTICULAR COMPANY IS THAT IT IS THE -- IT IS THE

5   TRIGGER FOR THE CONDUCT THAT YOU'RE ALLEGING MAINTAINED THE

6   MONOPOLY.  THAT'S WHAT I HEAR.

7         **MS. SWEENEY:**  CORRECT, YOUR HONOR.  THEY --

8   REALNETWORKS ESTABLISHED THIS PROGRAM THAT WOULD HAVE ALLOWED

9   CONSUMERS TO MIGRATE AWAY FROM IPODS AND THEREBY REDUCING

10  APPLE'S MONOPOLY POWER AND ITS ABILITY TO PRICE AT SUPER

11  COMPETITIVE LEVELS.

12        **MR. MITTELSTAEDT:**  YOUR HONOR, IF I COULD LEAVE YOU

13  WITH ONE THOUGHT, WHICH IS, WE TALKED ALL THIS TIME ABOUT

14  THEIR LOCK-IN THEORY.  IN THE VERY LAST ROUND OF EXPERT

15  REPORTS AND SUBMISSIONS, THEIR EXPERT DR. NOLL SAYS, AS IT

16  TURNS OUT, LOCK IN IS NOT IMPORTANT FOR NEW PURCHASERS OF

17  IPODS.

18     AND THE REASON HE SAID THAT -- AND THEN HE QUICKLY WENT ON

19  TO, BUT THEY ARE STILL A LOCK OUT, WHICH IS REALNETWORKS'

20  MUSIC PURCHASERS NOT BEING ABLE TO BUY AN IPOD.

21     THE REASON HE SAID THAT IS HE RECOGNIZED THE STRENGTH OF

22  OUR ARGUMENT THAT LOCK IN DOESN'T GET HIM AN IMMEDIATE IMPACT,

23  IT DOESN'T GET HIM A CONSTANT IMPACT, SO IT IS INCONSISTENT

24  WITH THE OUTPUT OF HIS REGRESSION AND SHOWS THERE'S A PROBLEM

25  WITH HIS REGRESSION.

```
1          SO HE SAYS, DESPITE LOCK IN BEING THEIR THEORY, THE THEORY

2     THAT GOT HIM CLASS CERTIFIED -- AND ONE THING ON THE CLASS

3     BECAUSE MS. SWEENEY MENTIONED THIS.  THIS CLASS IS VERY

4     STRANGE BECAUSE 70 PERCENT OF THE PURCHASES, DIRECT PURCHASES

5     ARE BY RESELLERS LIKE BEST BUY, TARGET, AND OTHERS.  AND WE'VE

6     GOT -- I LOST THIS ARGUMENT BEFORE JUDGE WARE, BUT I JUST WANT

7     TO NOTE IT.

8          WE HAVE THREE INDIVIDUAL CONSUMERS WHO CLAIM THEY BOUGHT

9     MUSIC DIRECTLY FROM APPLE, AND THEY SEEK TO REPRESENT NOT JUST

10    CONSUMERS WHO BOUGHT MUSIC FROM APPLE -- IPODS FROM APPLE, BUT

11    THEY ALSO SEEK TO REPRESENT THE WAL-MARTS AND THE BEST BUYS OF

12    THE WORLD WHO DIRECTLY BUY IPODS FROM APPLE AND THEN RESELL

13    THEM.

14         SO WE'VE GOT WHAT I THINK IS UNACCEPTABLE, IT IS CERTAINLY

15    AN UNUSUAL SITUATION WHERE THE VAST MAJORITY OF THE CLASS ARE,

16    IN MY VIEW, DIFFERENT FROM THE NAMED PLAINTIFFS.

17         BUT BE THAT AS IT MAY FOR THE TIME BEING, NOW DR. NOLL

18    SAYS THE REAL BASIS FOR HIS DAMAGES IS LOCK OUT, THAT

19    CONSUMERS WHO HAD THESE BIG REALNETWORKS LIBRARIES HAD TO BUY

20    DEVICES OTHER THAN IPODS, THEREBY DECREASING THE DEMAND FOR

21    THE IPOD.

22         SO BASIC ECONOMIC SAYS IF YOU DECREASE THE DEMAND, IT'S

23    GOING TO REDUCE THE PRICE.  BUT THEIR THEORY IS NO LOCK OUT

24    MEANS APPLE WOULD INCREASE THE PRICE.

25         FINAL POINT, WHEN COUNSEL SAYS THAT IPOD PRICES WENT UP AS
```

1    A RESULT OF THIS, IPOD PRICES NEVER WENT UP.  THEIR THEORY IS

2    THAT THEY WOULD HAVE GONE DOWN FASTER.  WHEN YOU LOOK AT THE

3    IPOD PRICE CHART, WHICH IS IN THE RECORD, IPOD PRICES

4    CONTINUALLY WENT DOWN.

5         **MS. SWEENEY:**  YOUR HONOR, YOU'VE BEEN VERY PATIENT.

6    I APPRECIATE THAT.  I JUST WOULD WANT TO POINT OUT THAT I

7    THINK MR. MITTELSTAEDT LOST THE CLASS ARGUMENT TWICE ON

8    WHETHER THE RESELLERS COULD BE INCLUDED IN THE CLASS.  IT WAS

9    AN EXTENSIVE SEPARATE BRIEFING ON THE WHOLE QUESTION OF

10   WHETHER PLAINTIFFS ADEQUATELY REPRESENTED THOSE PURCHASERS.

11       WITH RESPECT TO PROFESSOR NOLL LOCK IN VERSUS LOCK OUT,

12   PROFESSOR NOLL HAS BEEN THE EXPERT IN THIS CASE THROUGH CLASS

13   CERTIFICATION THROUGH TODAY.  I THINK HE SUBMITTED SOMETHING

14   LIKE SIX REPORTS.  OVER AND OVER HE HAS TALKED ABOUT BOTH LOCK

15   IN AND LOCK OUT, SO APPLE'S CONTENTION THAT THIS IS A BRAND

16   NEW THEORY IS SIMPLY NOT CONSISTENT WITH THE VERY AMPLE

17   RECORD.

18       **THE COURT:**  WELL, I WILL LOOK AT IT ALONG WITH MY

19   OTHER ANTITRUST CASES.  I APPARENTLY HAVE MORE THAN ANYONE

20   ELSE IN THE DISTRICT.  BUT THAT COULD HAVE BEEN BECAUSE OF THE

21   MDL THAT WAS HERE BEFORE YOU.

22       ALL RIGHT.  WELL, I APPRECIATE IT.  I WILL PROBABLY, THE

23   WAY I DO THESE THINGS, HAVING SPENT MOST OF THE DAY ON A

24   PATENT TRIAL, SO I'M NOT REALLY FOCUSED ON ANTITRUST RIGHT

25   NOW.  I AM GOING TO HAVE A NUMBER OF ANTITRUST MOTIONS THAT

1   I'M DEALING WITH IN THE CONTEXT OF THE MDL, AND I WILL

2   PROBABLY DEAL WITH THIS ONE WHEN I'M DEALING WITH THOSE.  I

3   TEND TO DO THINGS IN CHUNKS.

4       I HAD A COUPLE OF ANTITRUST ORDERS THAT CAME OUT IN

5   DECEMBER, ONE OF THEM WHICH DEALT WITH AN APPLE ISSUE.  SO,

6   I'M NOT EXACTLY SURE WHEN I WILL GET TO IT, BUT I WILL GET TO

7   IT AS SOON AS I CAN.

8       OKAY?

9           **MR. MITTELSTAEDT:**  THANK YOU, YOUR HONOR.

10          **THE COURT:**  IF I NEED ADDITIONAL ARGUMENT YOU'LL HEAR

11  FROM ME.  I WILL GET YOU ON THE CALENDAR.  BUT I DO WANT -- I

12  DID WANT TO HAVE A SENSE BEFORE I STARTED WORKING THROUGH THE

13  PAPERS.

14      ALL RIGHT.  THANK YOU VERY MUCH.

15          **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

16          **THE CLERK:**  COUNSEL, COULD I GET CASE CARDS?

17

18          (PROCEEDINGS ADJOURNED AT 4:03 P.M.)

19

20

21

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

1

2                          **CERTIFICATE OF REPORTER**

3              I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE

4    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

5    CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                    *Diane E. Skillman*

9              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

10                  THURSDAY, FEBRUARY 13, 2014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25