PAGES 1 - 114

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

```
THE APPLE IPOD ITUNES            )
ANTITRUST LITIGATION,            )
_____)
THIS DOCUMENT RELATES TO:        )
ALL ACTIONS                      )  OAKLAND,
_____)  CALIFORNIA
                                    WEDNESDAY
                                    AUGUST 13, 2014
                                    10:00 O'CLOCK A.M.
```

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

```
FOR PLAINTIFFS:         ROBBINS GELLER RUDMAN & DOWD, LLP
                        655 WEST BROADWAY
                        SUITE 1900
                        SAN DIEGO, CALIFORNIA 92101
                BY:     BONNY E. SWEENEY, ATTORNEY AT LAW
                        ALEXANDRA S. BERNAY, ATTORNEY AT LAW
                        MICHAEL TORRES, ESQUIRE
                        CARMEN A. MEDICI, ESQUIRE
                        JENNIFER N. CARINGAL, ATTORNEY AT LAW


FOR DEFENDANT:          JONES DAY
                        555 CALIFORNIA STREET
                        26TH FLOOR
                        SAN FRANCISCO, CALIFORNIA 94104
                BY:     ROBERT A. MITTELSTAEDT, ESQUIRE
                        CRAIG E. STEWART, ESQUIRE
                        DAVID KIERNAN, ESQUIRE
                        KELSEY ISRAEL-TRUMMEL, ATTORNEY AT LAW
AND
                        SCOTT B. MURRAY, ESQUIRE
                        SENIOR LITIGATION COUNSEL FOR APPLE
```

*REPORTED BY:   KATHERINE WYATT, CSR 9866, RMR, RPR*
*OFFICIAL REPORTER - US DISTRICT COURT*
*COMPUTERIZED TRANSCRIPTION BY ECLIPSE*

```
 1   AUGUST 13, 2014                          10:00 O'CLOCK  A.M.

 2

 3                   P R O C E E D I N G S

 4        THE COURT:  CALLING CIVIL ACTION 05-0037, THE APPLE

 5   IPOD ITUNES ANTITRUST LITIGATION.

 6            COUNSEL, PLEASE COME FORWARD, AND STATE YOUR

 7   APPEARANCES.

 8            MS. SWEENEY:  GOOD MORNING, YOUR HONOR.  BONNY

 9   SWEENEY FROM ROBBINS GELLER RUDMAN & DOWD FOR THE PLAINTIFFS.

10   AND WITH ME ARE MY COLLEAGUES ALEXANDRA BERNAY, CARMEN MEDICI,

11   JENNIFER CARINGAL.

12            THE COURT:  HOLD ON.  HOLD ON.  I WOULD LIKE TO

13   ACTUALLY --

14            MS. SWEENEY:  I'M SORRY.  THIS IS MS. BERNAY.

15            MS. BERNAY:  GOOD MORNING, YOUR HONOR.

16            THE COURT:  GOOD MORNING.

17            MS. SWEENEY:  MR. MEDICI.

18            MR. MEDICI:  GOOD MORNING.

19            THE COURT:  GOOD MORNING.

20            MS. SWEENEY:  JENNIFER CARINGAL.

21            MS. CARINGAL:  GOOD MORNING.

22            THE COURT:  GOOD MORNING.

23            MS. SWEENEY:  AND MICHAEL TORRES IS WITH OUR

24   LITIGATION SUPPORT.  WE WERE GOING TO SHOW SOME SLIDES, BUT

25   WE'VE TALKED TO APPLE, AND BECAUSE WE HAVE SOME CONFIDENTIAL
```

```
 1    INFORMATION IN THERE WE'RE JUST GOING TO HAND YOU COPIES.

 2              THE COURT:  OKAY.

 3              MR. MITTELSTAEDT:  GOOD MORNING, YOUR HONOR.

 4              THE COURT:  GOOD MORNING.

 5              MR. MITTELSTAEDT:  FOR APPLE I AM BOB MITTELSTAEDT

 6    WITH JONES DAY.  AND WITH ME ARE CRAIG STEWART, KELSEY

 7    ISRAEL-TRUMMEL, DAVID KIERNAN.

 8              THE COURT:  HOLD ON.  OKAY.

 9              MR. MITTELSTAEDT:  DAVID KIERNAN.  AND FROM APPLE

10    SCOTT MURRAY.

11              THE COURT:  WELL, GOOD MORNING, AND WELCOME.  THIS

12    CASE, AS YOU KNOW, IS -- HAS A LOT OF HISTORY.  THAT HISTORY

13    DID NOT INVOLVE ME.  AND THAT MAKES IT CHALLENGING FOR ME,

14    BECAUSE I DIDN'T ISSUE THE SUMMARY JUDGMENT IN THIS CASE.  I

15    DIDN'T WORK THROUGH THESE ISSUES IN THE FIRST INSTANCE.

16              AND I NEED TO UNDERSTAND IT AND BE BRIEFED MORE

17    SPECIFICALLY ON THESE ISSUES BY YOU BECAUSE YOU HAVE

18    OVERWHELMED MY CHAMBERS WITH PAPER.  THERE'S A LOT THERE.  NOW,

19    BEING OVERWHELMED WITH PAPERS NOT UNCOMMON FOR A FEDERAL JUDGE.

20    HAPPENS TO US ALL THE TIME.  BUT USUALLY BEFORE WE GET

21    OVERWHELMED WITH IT ALL WE'VE HAD SOME EXPOSURE TO THE CASE.

22              WE'VE LEARNED THE CASE.  AND AS A CONSEQUENCE AS I

23    TRIED TO, NOW THAT WE'RE NOT IN A JUDICIAL EMERGENCY, AND WE

24    ACTUALLY HAVE HELP, AND OUR DOCKETS ARE NOT AS CRUSHING AS THEY

25    USED TO BE, FINALLY FORCED MYSELF TO TRY TO GET INTO THIS CASE.
```

```
1              IT WAS ON THE BACK BURNER, I WILL ADMIT.  IT'S ONE

2   OF THOSE THINGS WHERE YOU DON'T WANT TO THE TAKE YOUR MEDICINE,

3   AND SO I WASN'T.  AND I JUST LEFT IT THERE, AND IT'S NOT LIKE I

4   WASN'T DEALING WITH OTHER PRESSING ISSUES.  IT'S JUST IT WAS SO

5   MUCH TO TRY TO UNDERSTAND THAT I DIDN'T HAVE THE TIME.  NOT

6   THAT I NECESSARILY DO NOW, BUT I HAVE TO MAKE TIME FOR IT, I

7   UNDERSTAND THAT.

8              BUT I HAVE TO UNDERSTAND IT BETTER THAN I DO.  AND

9   YOU MAY BE ASKED TO COME BACK AGAIN, BECAUSE, LIKE I SAID, I

10  THINK THERE ARE SOME VERY COMPLICATED ECONOMIC ISSUES AT PLAY.

11  BUT I ALSO HAVE SOME CONCERNS ABOUT, REALLY, THE FUNDAMENTALS

12  AND THE BASICS OF THE ECONOMICS.  IF THE PREMISES, THE BASIC

13  PREMISES DON'T WORK, THEN ALL THE ECONOMICS FALL APART.

14             SO I HAVE TO UNDERSTAND BETTER WHAT IS GOING ON.

15  AND THIS IS YOUR OPPORTUNITY TO DO THAT.  I USUALLY AM VERY

16  ACTIVE IN ASKING QUESTIONS DURING ARGUMENT.  YOU WON'T FIND

17  THAT AS MUCH TODAY BECAUSE I'M REALLY HERE TO LISTEN MORE THAN

18  ANYTHING ELSE. SO DON'T BE SURPRISED.

19             AND MR. MITTELSTAEDT -- IS THAT HOW I SAY IT?

20             MR. MITTELSTAEDT:  YES.

21             THE COURT:  I'LL START WITH YOU.

22             MR. MITTELSTAEDT:  YOUR HONOR, I HAVE SOME HANDOUTS.

23             THE COURT:  DO YOU HAVE AN EXTRA?  IF YOU HAVE A

24  TOTAL OF THREE, THAT WOULD BE BEST.

25             MR. MITTELSTAEDT:  LET'S USE THIS FOR THE COURT
```

1    REPORTER JUST IN CASE THERE'S SOME MARKINGS ON IT.

2              THE COURT:  THANK YOU.  OKAY.  YOU MAY PROCEED.

3              MR. MITTELSTAEDT:  YOUR HONOR, I WILL GO BACK AND

4    PROVIDE SOME BACKGROUND.  BUT, I THINK THE PUNCHLINE FOR NOW

5    AND WHERE I WILL END UP IS TO SHOW THAT WE ARE DOWN TO A SINGLE

6    VERY NARROW CLAIM IN THIS CASE.  IT DEALS WITH ONE ASPECT OF

7    ONE SOFTWARE FIRMWARE UPGRADE THAT HAPPENED TWO YEARS AFTER THE

8    ORIGINAL COMPLAINT WAS FILED.  AND THE CLAIM IS THAT IT RAISED

9    IPOD PRICES.

10              OUR POSITION IS THAT FOR REASONS WE'VE LAID OUT IN

11    THE BRIEFS -- AND I'LL BRIEFLY SUMMARIZE -- IT'S IMPLAUSIBLE

12    THAT THAT ONE ASPECT OF THE ONE UPGRADE HAD ANY AFFECT ON IPOD

13    PRICING.

14              WE SHOW THAT THE PLAINTIFFS' THEORY, THEIR CLAIM,

15    IS AT ODDS AND CONTRADICTORY TO THE REAL-WORLD EVIDENCE ABOUT

16    WHAT AFFECTED IPOD PRICES.  AND WE SHOW THAT THEY HAVE NO

17    CONTRARY EVIDENCE THAT THIS UPGRADE, THIS ONE ASPECT OF THE

18    UPGRADE HAD ANY AFFECT ON THE IPOD PRICES.

19              THEY OFFER ONLY THE OPINION OF THEIR ECONOMIST AND

20    HIS REGRESSION ANALYSIS, AND WE SHOW THAT'S INSUFFICIENT.  AND

21    THE BASIC PROBLEM THEY HAVE IS THERE'S NO EVIDENCE OF THEIR

22    LOCK-IN THEORY THAT IT ACTUALLY WORKED IN PRACTICE AS A RESULT

23    OF THIS ONE ASPECT OF THE UPGRADE.

24              WHAT THEY HAVE TO SHOW IS THAT USERS SWITCHED FROM

25    REALNETWORKS MUSIC STORE TO APPLE'S ITUNES MUSIC STORE AS A

1    RESULT OF THIS ONE ASPECT OF THE UPGRADE.

2              AND THEN, THEY HAVE TO SHOW FURTHER THAT IF ANYBODY

3    ACTUALLY SWITCHED MUSIC STORES THAT THEY WERE BUYING FROM THEY

4    THEN BOUGHT SO MUCH MUSIC FROM APPLE THAT WHEN THE TIME CAME TO

5    BUY A REPLACEMENT DEVICE FOR PLAYING THAT MUSIC THEY WERE

6    FORCED TO BUY IPODS RATHER THAN ANOTHER DEVICE THAT THEY

7    PREFERRED.

8              THE PLAINTIFFS DO NOT FIT INTO THAT CATEGORY.  THEY

9    HAVE IDENTIFIED NO ONE WHO HAS FIT IN THAT CATEGORY.  THEY HAVE

10   NO DOCUMENTS SUGGESTING ANY IMPACT ON PRICE.  THEY JUST DON'T

11   HAVE ANY EVIDENCE AT ALL.

12             TO GO BACK AND PROVIDE SOME OF THE BACKGROUND,

13   THOUGH, I THINK THE SIMPLEST WAY IS TO TURN TO TAB ONE, WHICH

14   IS THE TIME LINE.

15             AND IN THE PROCESS OF WALKING THROUGH THIS BRIEFLY,

16   I'M GOING TO TRY AND DESCRIBE THE TECHNOLOGY IN THE PRODUCTS

17   THAT ARE AT ISSUE; DESCRIBE THE CLAIMS THAT PLAINTIFFS HAVE

18   MADE ALONG THE WAY; AND THEN DESCRIBE WHAT JUDGE WARE RULED ON

19   THOSE VARIOUS CLAIMS, WHICH WILL LEAVE US WITH THE ONE SINGLE

20   CLAIM WE HAVE NOW.

21             THERE ARE REALLY THREE PRODUCTS OR SERVICES THAT

22   ARE INVOLVED.  THE FIRST ONE IS NOT ON THIS CHART.  IT WOULD BE

23   TO THE LEFT OF THE IPOD, AND IT WOULD BE THE ITUNES SOFTWARE

24   APPLICATION.  WE CALL IT THE "JUKEBOX."  AND IT WAS INTRODUCED

25   BY APPLE IN JANUARY OF 2001.  IT'S BASICALLY SOFTWARE THAT AT

1    THAT TIME WAS AVAILABLE ONLY FOR THE MAC.  AND IT BASICALLY

2    ORGANIZED MUSIC ON YOUR COMPUTER, ON YOUR MAC.  AND THE MUSIC

3    AT THAT TIME WAS BASICALLY FROM CD COLLECTIONS WHERE YOU WOULD

4    COPY THE CD TO THE COMPUTER USING THE ITUNES APPLICATION.  AND

5    THEN, TO THE EXTENT PEOPLE WERE USING THESE FREE, ILLEGAL, IF

6    YOU WILL, PEER-TO-PEER SERVICES LIKE NAPSTER, THAT WAS ANOTHER

7    SOURCE OF MUSIC THAT PEOPLE USED.

8            AND ALL OF THAT COULD BE PLAYED ON MACS AT THE TIME

9    WITH ITUNES.  AND THEN, LATER THAT YEAR IN OCTOBER OF 2001,

10   APPLE INTRODUCED THE IPOD.  AND IT WAS A REVOLUTIONARY DEVICE

11   AND STEPPED FORWARD IN WHAT WE CALL -- AND I THINK CORRECTLY

12   SO -- "THE MUSIC REVOLUTION."

13           IT WAS NOT THE FIRST DEVICE THAT PLAYED MUSIC, MP3

14   FILES.  BUT JUST TO GIVE YOUR HONOR AN IDEA, AND WHEN WE WERE

15   HERE THE LAST TIME YOUR HONOR WAS ASKING ABOUT:

16               "WELL, WHAT ELSE WAS IN THE MARKET AT THE

17               TIME?  WHY WOULD PEOPLE BE BUYING IPODS?" AND

18   SO FORTH.

19           THIS IS ONE OF THE DEVICES THAT WAS IN THE MARKET.

20   IT WAS BY CREATIVE (INDICATING).  IT'S CALLED A "NOMAD

21   JUKEBOX."  AND THE IDEA WAS APPARENTLY TO MAKE IT LOOK LIKE A

22   CD PLAYER, LIKE A SONY WALKMAN.  SO THAT'S ONE OF THE THINGS

23   THAT WAS IN THE MARKET.  AND APPLE CAME UP WITH THIS IPOD

24   (INDICATING).

25           AND JUST LOOKING AT THESE TWO DEVICES, YOU KNOW,

1    IT'S NO WONDER THAT THE IPOD WON OUT.

2           SO THAT'S THE IPOD IN 2001.  AND THEN, A COUPLE OF

3    YEARS LATER IN APRIL OF 2003, APPLE IMPROVED THE ITUNES

4    APPLICATION, THE ITUNES SOFTWARE, BY INTRODUCING WHAT WE HAVE

5    REFERRED TO HERE AS "ITMS," THE ITUNES MUSIC STORE.

6           AND TO AVOID CONFUSION AT SOME POINT WHEN APPLE

7    STARTED OFFERING MOVIES AND VIDEO AND SO FORTH ON MUSIC STORE,

8    THEY DROPPED THE TERM "MUSIC," AND SO IT BECAME ITS, ITUNES

9    STORE.

10          IN ANY EVENT, IN 2003, A CONSUMER COULD OPEN UP

11   ITUNES SOFTWARE APPLICATION ON THE MAC, AND THERE WOULD BE AN

12   ICON THERE FOR THE MUSIC STORE.  AND YOU COULD CLICK ON THE

13   MUSIC STORE, AND THEN BUY MUSIC ON LINE.

14          WE'RE ALL SO ACCUSTOMED TO BUYING MUSIC ON LINE NOW

15   THAT IT'S EASY TO FORGET HOW HARD AT THE TIME IT WAS TO COME UP

16   WITH THIS.

17          MR. JOBS, WHO WAS BEHIND THIS, WHO WAS THE CREATIVE

18   GENIUS BEHIND THIS, FACED TWO PROBLEMS.  ONE WAS PEOPLE WERE

19   GETTING MUSIC, DIGITAL MUSIC ON LINE FOR FREE.  AND AS HE SAID

20   IT'S VERY HARD TO COMPETE WITH FREE.

21          SO HOW DO YOU COME UP WITH A MUSIC STORE WHERE

22   PEOPLE WILL PAY 99 CENTS TO BUY SOMETHING THAT THEY COULD GET

23   FOR FREE?  THAT WAS ONE CHALLENGE.

24          OTHER CHALLENGE WHICH WAS RELATED TO THAT WAS APPLE

25   DIDN'T OWN THE MUSIC.  AND SO IT HAD TO GO TO THE RECORD LABELS

1    WHO DID OWN THE MUSIC AND NEGOTIATE THE RIGHTS TO LICENSE THE

2    MUSIC OR MAKE IT AVAILABLE.

3              WELL, THE RECORD LABELS AT THAT TIME VIEWED PRIVACY

4    OR PIRACY AS A HUGE PROBLEM.  AND IT WAS FROM THE PERSPECTIVE

5    OF THE LABELS.  AND THEY WERE FIGHTING PIRACY AND FIGHTING

6    NAPSTER TOOTH AND NAIL.  AND YOU CAN IMAGINE WHEN MR. JOBS WENT

7    TO THEM AND SAID:

8                   "I'VE GOT A GREAT IDEA.  I'M GOING TO MAKE

9              YOUR MUSIC AVAILABLE ON LINE," THEY SAID:

10                  "WAIT A SECOND.  THAT'S JUST GOING TO ENHANCE

11             AND INCREASE PIRACY.  YOU KNOW, HOW ARE WE GOING TO

12             ACTUALLY SELL IT TO ONE PERSON AND HAVE THAT PERSON

13             NOT PROVIDE IT TO THE REST OF THE WORLD," WHICH WAS

14   GOING ON AT THE TIME.

15             SO THE RECORD LABELS INSISTED THAT APPLE -- AND

16   APPLE WAS THE FIRST ONE AT THIS TIME, FIRST ONE TO DO THIS,

17   REALLY.  THE RECORD LABELS HAD TRIED TO DO THIS ON THEIR OWN.

18   THEY HAD TWO MUSIC STORES THAT WERE JOINT VENTURES AMONG TWO OR

19   THREE OF THE FIVE LABELS.  BUT THAT DIDN'T WORK VERY WELL.

20             SO THEY SAID:

21             "YOU HAVE TO USE DIGITAL RIGHTS MANAGEMENT."  SOME

22   TECHNOLOGY -- WE CALL IT "DRM" -- TO RESTRICT USERS ON HOW MANY

23   COMPUTERS THEY CAN USE IT ON AND BASICALLY TO PREVENT PIRACY.

24             AND MR. JOBS DIDN'T HAVE ANY CHOICE, BUT HE AGREED.

25   YOU KNOW, IN EXCHANGE FOR GETTING THE RIGHTS TO BUY THE MUSIC

1   APPLE WOULD USE DIGITAL RIGHTS MANAGEMENT, DRM TECHNOLOGY, JUST

2   AS THE LABELS WERE USING FOR THEIR MUSIC STORES.

3           SO THEN THE QUESTION WAS:  OKAY.  WHOSE -- WHAT DRM

4   TECHNOLOGY DO YOU USE?  MICROSOFT HAD THIS TECHNOLOGY THAT IT

5   WAS LICENSING TO EVERYBODY OR TO SOME PEOPLE, AT LEAST, AND

6   THEY CALLED IT "PLAY FOR SURE."

7           AND IT TURNED OUT IT WAS TOO BIG A TASK EVEN FOR

8   MICROSOFT TO MAKE THIS TECHNOLOGY, THIS SOFTWARE, THAT WOULD

9   WORK WITH ALL SORTS OF DIFFERENT MUSIC STORES AND ALL SORTS OF

10  DIFFERENT DEVICES FOR PLAYING IT.

11          IT WAS JUST, YOU KNOW, A REAL PROBLEM, AND IT

12  WOULDN'T WORK WELL.  IT WOULD BE ANY TIME YOU HAVE MULTIPLE

13  COMPANIES PUTTING TOGETHER SOFTWARE AND HARDWARE THERE ARE

14  GOING TO BE PROBLEMS.

15          SO APPLE'S IDEA WAS IF WE REALLY WANT THIS TO WORK,

16  AND IF WE REALLY WANT THIS TO COMPETE WITH FREE, WE'RE GOING TO

17  HAVE TO MAKE SURE IT WORKS SEAMLESSLY.  IT'S INTEGRATED, ALL

18  THESE THREE PARTS ARE INTEGRATED, AND IT'S GOING TO WORK.

19          AND SO APPLE DEVELOPED ITS OWN PROPRIETARY DRM

20  CALLED "FAIRPLAY."

21          SONY GOT INTO THE MARKET AND USED ITS OWN

22  PROPRIETARY DRM.  OTHER COMPANIES GOT INTO THE MARKET AND USED

23  THEIR OWN PROPRIETARY DRM.  AND MICROSOFT HAD ITS DRM THAT IS

24  WAS LICENSING.

25          THE UPSHOT OF THIS WAS THAT MUSIC FROM ONE STORE

1   WOULD PLAY ON THE APPLICATIONS AND THE COMPUTERS OR THE

2   COMPUTERS AND THE PORTABLE DEVICES THAT SUPPORTED THAT

3   PARTICULAR DRM.

4           SO IF YOU BOUGHT MUSIC FROM APPLE WITH APPLE'S DRM

5   IT WOULD PLAY ON APPLE'S IPOD AND COMPUTER.  IF YOU BOUGHT

6   SONY'S, IT WOULD PLAY ON SONY'S, BUT NOT ON APPLE'S, AND SO

7   FORTH.

8           THE COURT:  I'M GOING TO INTERRUPT YOU FOR JUST A

9   MOMENT.

10          MR. MITTELSTAEDT:  YES.

11          SO IT WAS IN THAT CONTEXT THAT THE PLAINTIFFS SUED.

12  AND THEIR CLAIM AT THE START WAS THAT APPLE WAS TYING MUSIC TO

13  THE DEVICES AND THAT THE IPOD WORKED REALLY WELL WITH THE

14  ITUNES MUSIC STORE, BUT IT DIDN'T WORK WITH OTHER MUSIC STORES,

15  AND VICE VERSA.

16          AND THEY CLAIMED THAT BECAUSE THE IPOD BY THAT TIME

17  HAD GAINED LARGE MARKET SHARE -- WE SAY BECAUSE IT WAS SUCH A

18  REVOLUTIONARY DEVICE; THEY SAY BECAUSE IT WAS LINKED TO THE

19  MUSIC STORE -- IT WAS UNLAWFUL AS TIE IN AND MONOPOLIZATION.

20          JUDGE WARE GRANTED SUMMARY JUDGMENT, OR ACTUALLY

21  DISMISSED THAT CLAIM EARLY ON, ON THE BASIS OF A NINTH CIRCUIT

22  CASE:  FOREMOST PRO.  AND FOREMOST PRO HELD THAT THE LACK OF

23  INTEROPERABILITY IS NOT AN ACTIVE MONOPOLIZATION, AND IT CANNOT

24  SUPPORT A TIE IN CLAIM.

25          AND THE BASIC THRUST THERE WAS THAT A COMPANY HAS A

1    RIGHT TO THE MAKE ITS OWN PRODUCTS, TO MAKE THEM WORK

2    SEAMLESSLY TO INTEGRATE THEM, EVEN IF THEY DON'T WORK WITH

3    OTHER COMPANIES' PRODUCTS.

4            AND THE BASIC ANTITRUST RATIONALE IS:  IT'S OKAY TO

5    HAVE COMPETITION AMONG SYSTEMS.  WE HAD OUR SYSTEM.  SONY HAD

6    THEIR SYSTEM.  MICROSOFT HAD THEIR SYSTEMS, OR PLATFORMS, IF

7    YOU WILL.  AND THERE WOULD BE PLATFORM OR SYSTEM COMPETITIONS.

8            THE OTHER PRONG OF THAT RULING WAS -- OR THE OTHER

9    RATIONALE FOR OUR POSITION -- IS THAT THE SUPREME COURT IN THE

10   TRINCO CASE BASICALLY HELD THAT COMPANIES DO NOT HAVE TO HELP

11   OTHER COMPANIES.  YOU DON'T HAVE TO DEAL WITH COMPETITORS

12   ABSENT SOME LIMITED CIRCUMSTANCES.

13           AND SO, YOU KNOW, IT IS TRUE THAT THERE COULD BE

14   MORE INTEROPERABILITY IF APPLE WOULD LICENSE FAIRPLAY TO OTHER

15   COMPANIES.  BUT UNDER TRINCO WE DON'T HAVE TO LICENSE.  AND

16   THAT WOULD ADD COSTS AND SO FORTH.

17           SO, IN ANY EVENT, JUDGE WARE RULED THAT IT WAS

18   LAWFUL FOR APPLE TO USE A PROPRIETARY DRM, EVEN THOUGH THAT

19   MADE FOR INCOMPATIBILITY.

20           OKAY.  THAT'S STEP ONE.  STEP TWO IS RIGHT AFTER

21   THE MUSIC STORE WAS LAUNCHED IN APRIL, 2003, THE HACKERS WENT

22   TO WORK.  AND WHAT THE HACKERS WERE TRYING TO DO WAS FIND A WAY

23   TO DO EXACTLY WHAT THE RECORD LABELS DIDN'T WANT TO HAVE

24   HAPPEN.  AND THAT IS TO STRIP THE DRM PROTECTION SO THAT THE

25   MUSIC SOLD BY APPLE COULD BE TRANSFERRED AROUND THE GLOBE OVER

1    THE INTERNET WITHOUT PAYING FOR IT.

2              AND SO IN THE SUMMARY JUDGMENT RECORD THE FIRST

3    TIME -- OR AT THE SECOND STEP, WE SHOWED A NUMBER OF.  HACKERS,

4    DV JOHN, FOR EXAMPLE, WAS A MAJOR HACKER WHO FOUND WAYS TO

5    STRIP APPLE'S DRM.

6              SO IN EARLY 2004, APPLE STARTED TO WORK TO IMPROVE

7    ITS DRM, ITS FAIRPLAY.  AND WHAT IT WAS TRYING TO DO IS STAY A

8    STEP AHEAD OF THE HACKERS.  A STEP AHEAD OF THE HACKERS BY

9    CONSTANTLY OR PERIODICALLY CHANGING FAIRPLAY.  SO IF THE

10   HACKERS HAD FIGURED OUT HOW TO BREAK INTO IT THE FIRST TIME,

11   THEY WOULD BE FOILED.

12             JUST AFTER APPLE STARTED TO DO THAT, AND UNRELATED

13   TO IT, REALNETWORKS CAME UP WITH A WAY TO PLAY APPLE'S FAIRPLAY

14   MUSIC -- STRIKE THAT.

15             REALNETWORKS CAME UP WITH A WAY TO PLAY ITS MUSIC,

16   WHICH HAD ITS OWN PROPRIETARY DRM, ON APPLE'S IPODS.  AND IN

17   THE COMPLAINT THE PLAINTIFFS ACKNOWLEDGE THAT THE WAY

18   REALNETWORKS DID THAT WAS BY, TO QUOTE THE COMPLAINT:

19                  "DISCERNING THE SOFTWARE CODE OF FAIRPLAY."

20             WE SAY THAT MEANS REVERSE ENGINEERED.  BUT IN ANY

21   EVENT, THEY FOUND OUT WHAT THE SOURCE CODE WAS IN FAIRPLAY, AND

22   THEY FOUND A WAY TO MIMIC IT.

23             AND SO BY MIMICKING FAIRPLAY REALNETWORKSS' HARMONY

24   TECHNOLOGY BASICALLY TRICKED IPODS INTO THINKING THAT THE MUSIC

25   THAT THEY WERE GETTING TO PLAY WAS ACTUALLY MUSIC FROM ITUNES

1    WHEN, IN FACT, IT WAS FROM REALNETWORKS.

2              BY THAT POINT APPLE HAD IMPROVED FAIRPLAY AND

3    ISSUED AN UPDATE TO THE ITUNES SOFTWARE, WHICH IS 4.7, AND

4    WHICH IS THE NEXT LINE ON THE TIME LINE.  THAT'S THE

5    IMPROVEMENT THAT WAS IN THE WORKS BEFORE HARMONY 1, AND IT WAS

6    ADDRESSED TO THE HACKERS.

7              THE EFFECT OF 4.7, BY CHANGING FAIRPLAY, CHANGING

8    THE WAY THAT FAIRPLAY PROTECTED THE MUSIC, WAS TO MAKE HARMONY

9    INOPERABLE.  AND THAT'S BECAUSE FAIRPLAY HAD USED A FAIRLY

10   SIMPLE, RELATIVELY SIMPLE METHOD FOR ENCRYPTING THE MUSIC.

11             ITUNES 4.7 INCLUDED AN ADVANCEMENT AND IMPROVEMENT

12   CALLED "THE EMBEDDED KEYBAG, WHICH MADE IT HARDER FOR HACKERS

13   TO BREAK INTO.  BUT BY CHANGING FAIRPLAY HARMONY 1 COULD NO

14   LONGER MIMIC IT.  AND SO HARMONY 1 STOPPED WORKING.

15             BY MARCH OF -- AND LET ME JUST STOP THERE TO SAY

16   THAT THE PLAINTIFFS CHALLENGE THAT, AS WELL, AS AN ANTITRUST

17   MONOPOLISTIC ACT.  AND JUDGE WARE GRANTED SUMMARY JUDGMENT ON

18   THAT CLAIM ON THE BASIS OF THE NINTH CIRCUIT'S TYCO CASE.  AND

19   TYCO BASICALLY SAYS THAT IF A COMPANY IMPROVES ITS PRODUCT, THE

20   IMPROVEMENT CANNOT BE CLAIMED TO BE AN ANTITRUST VIOLATION, AN

21   ACT OF MONOPOLIZATION OR EXCLUSION.

22             SO EVEN IF A PRODUCT IMPROVEMENT MAKES LIFE MORE

23   DIFFICULT FOR A COMPETITOR, OR EXCLUDES THE COMPETITOR FROM THE

24   MARKET, EVEN, THAT'S NOT AN ANTITRUST VIOLATION.  AND THE NINTH

25   CIRCUIT SAID WE WANT -- THE RATIONALE, BASICALLY, WAS:

```
 1                    "WE WANT TO ENCOURAGE COMPANIES TO IMPROVE

 2                THEIR PRODUCTS, AND WE DON'T WANT COURTS OR OTHERS

 3                TO SECOND GUESS WHETHER THE PRODUCT IMPROVEMENT WAS

 4                ENOUGH TO MAKE UP FOR THE EFFECT ON COMPETITORS."

 5                SO JUDGE --

 6           THE COURT:  GO AHEAD.  FINISH THAT SENTENCE.

 7           MR. MITTELSTAEDT:  SO JUDGE WARE FOLLOWING THAT CASE

 8    SAID:

 9                    "I FIND THE UNDISPUTED EVIDENCE SHOWS THAT

10                ITUNES 4.7 IMPROVED FAIRPLAY, AND SO IT'S LAWFUL

11                AND CANNOT BE CHALLENGED BY THE PLAINTIFFS FOR ITS

12                EFFECT ON REALNETWORKS OR ANYBODY ELSE."

13           THE COURT:  WE HAVE A SIGNIFICANT ARGUMENT TO GO.

14    I'M GOING TO TAKE A BREAK.  I WANT TO HAVE YOU CONNECT ME TO

15    REALTIME, AND I'LL GET RESTARTED.

16           MR. MITTELSTAEDT:  THANK YOU.

17           (THEREUPON, A SHORT RECESS WAS TAKEN.)

18           THE COURT:  OKAY.  WE'RE BACK ON THE RECORD.  THE

19    RECORD WILL REFLECT THAT ALL THE PARTIES ARE PRESENT.

20           THANK YOU.

21           YOU MAY PROCEED.

22           MR. MITTELSTAEDT:  SO JUST TO RECAP, THE FIRST STEP

23    WAS JUDGE WARE'S FINDING THAT IT WAS LAWFUL UNDER THE ANTITRUST

24    LLAWS FOR APPLE TO DEVELOP AN INTEGRATED PLATFORM SYSTEM.

25           IN DR. MURPHY'S REPORT, STARTING AT PAGE 19, HE HAS
```

1    A WHOLE SECTION ON THE PROCOMPETITIVE REASONS FOR INTEGRATED

2    SYSTEMS AND THE COMPETITION BETWEEN SYSTEMS.  AND THEY INCLUDE

3    THINGS LIKE EASE OF USE.  IT'S EASIER TO INNOVATE.  WHEN YOU'RE

4    RESPONSIBLE FOR EACH ASPECT OF A SYSTEM, YOU DON'T HAVE TO RELY

5    ON OTHERS TO INNOVATE OR DEVELOP THEIR PART OF IT.

6              WHEN -- THE INVENT THAT SOME PART OF IT DOESN'T

7    WORK, CONSUMERS KNOW WHO TO COME TO, AND APPLE CAN FIX IT.  AND

8    THERE ARE A WHOLE HOST OF PROCOMPETITIVE REASONS.  AND THAT

9    THAT ALL SUPPORTS THE NINTH CIRCUIT'S AND JUDGE WARE'S VIEW

10   THAT A COMPANY DOES NOT HAVE TO MAKE ITS PRODUCTS

11   INTEROPERABLE.

12             **THE COURT:**  SO ONE OF THE THINGS THAT I WILL NOTE FOR

13   ALL OF YOU, GIVEN THE NUMBER OF OPENING REPORTS, CROSS REPORTS,

14   CROSS REBUTTAL REPORTS, REPLY REPORTS, THERE ARE SO MANY

15   REPORTS THAT IF YOU WANT -- I MADE A NOTE THAT YOU SAID "PAGE

16   19." BUT IF THERE IS A SPECIFIC -- IF IT'S VERY IMPORTANT THAT

17   I FIND THAT IN THE RECORD, YOU SHOULD USE DOCKET NUMBERS,

18   BECAUSE THERE ARE JUST SO MANY REPORTS OUT THERE THAT "THE

19   MURPHY REPORT, PAGE 19" COULD BE ONE OF MANY.

20             **MR. MITTELSTAEDT:**  UNDERSTOOD, YOUR HONOR.

21             **THE COURT:**  GO AHEAD.

22             **MR. MITTELSTAEDT:**  AND THEN, STEP TWO WAS WHEN APPLE

23   ISSUED 4.7 IN 2004 TO BLOCK HACKERS AND IT DISABLED HARMONY,

24   JUDGE WARE FOUND THAT THAT WAS A PRODUCT IMPROVEMENT AND COULD

25   NOT BE ALLEGED TO BE AN ANTITRUST OR ANTICOMPETITIVE ACT.

 1          AND THEN -- AND THIS IS THE POINT WE WERE AT -- IN

 2    MARCH OF 2005, REALNETWORKS REVISED ITS HARMONY TECHNOLOGY AND

 3    LAUNCHED WHAT WE'VE REFERRED TO HERE AS "HARMONY 2."

 4          AND, BASICALLY, HARMONY 2 -- AND I THINK MAYBE THE

 5    BEST WAY TO DO THIS IS IF YOUR HONOR WOULD TURN TO TAB THREE.

 6          THIS IS JUST A DEMONSTRATIVE SHOWING THE MUSIC

 7    STORE LOADING MUSIC TO ITUNES, THE SOFTWARE APPLICATION, AND

 8    THEN LOADING THE MUSIC ONTO AN IPOD.

 9          AND PART OF WHAT ITUNES SOFTWARE DOES IS WRITE THE

10    DATABASE TO THE IPOD.  AND THE DATABASE IS BASICALLY AN INDEX

11    THAT HELPS THE IPOD PLAY THE MUSIC.  AND THEN, ALSO, ITUNES

12    WOULD WRITE OR CREATE THE KEYBAG.  AND THE KEYBAG IS THE PLACE

13    IN THE IPOD THAT WOULD HIDE THE ENCRYPTION KEY FROM HACKERS,

14    AND TRY AND MAKE IT DIFFICULT FOR HACKERS TO FIGURE OUT WHAT

15    THE ENCRYPTION KEYS WERE AND TO STRIP THE DRM.

16          AND FIGHTING HACKERS WAS NOT SOMETHING THAT APPLE

17    WAS DOING ON ITS OWN.  IT WAS REQUIRED BY ITS CONTRACTS WITH

18    THE RECORD LABELS TO STOP ANY HACKING OR ANY BREAKING INTO DRM.

19    THE RECORD LABELS REALLY WANTED DRM.  THEY DIDN'T NECESSARILY

20    WANT PROPRIETARY DRM, BUT THEY WANTED SOME DRM.  AND SO THEY

21    REQUIRED APPLE TO FIX ANY HOLES IN THE DRM.

22          THEN, ON THE NEXT PAGE -- AND THIS IS PAGE FOUR --

23    WE HAVE THE RHAPSODY OR THE REALNETWORK MUSIC STORE OVER ON THE

24    RIGHT.  AND THEY HAD THEIR OWN EQUIVALENT OF THE ITUNES

25    JUKEBOX.

1          AND IF I DIDN'T SAY IT, I SHOULD SAY THAT ITUNES

2    WAS FREE.  YOU CAN DOWNLOAD IT.

3          **THE COURT:**  WAIT A MINUTE.

4          **MR. MITTELSTAEDT:**  I'M STILL ON THE SAME TAB, TAB

5    THREE, THE NEXT PAGE.

6          **THE COURT:**  OH, I SEE.  OKAY.  I WENT TO TAB FOUR.

7    GO AHEAD.

8          **MR. MITTELSTAEDT:**  YES.  SO ITUNES IS THE FREE

9    JUKEBOX APPLICATION.  REALNETWORKS HAD ITS SAME TYPE OF THING

10   CALLED "REALPLAYER."  AND THEN, THEY INTRODUCED INTO IT THE

11   HARMONY TECHNOLOGY.  AND THAT'S THE TECHNOLOGY I DESCRIBED

12   BEFORE IN CONNECTION WITH 4.7.

13          AND, BASICALLY, WHAT HARMONY REALPLAYER WOULD TRY

14   AND DO IS THEY WOULD TRY AND WRITE THE DATABASE AND TRY AND

15   WRITE THE KEYBAG INTO THE IPOD, MIMICKING APPLE'S DRM AND

16   TRYING TO GET THE IPOD TO THINK THAT THE MUSIC WAS REALLY

17   ITUNES FAIRPLAY MUSIC.

18          THAT CAUSED PROBLEMS.  AT A BROAD LEVEL, ANY TIME

19   YOU HAVE A THIRD-PARTY APPLICATION TRYING TO WORK WITH ANOTHER

20   DEVICE THERE'S THE POTENTIAL FOR BUGS.  AND APPLE'S EXPERT, DR.

21   KELLY, SUBMITTED A DECLARATION.  I WILL PROVIDE THE ECF NUMBER

22   FOR THIS ONE.  AND AT PAGES -- OKAY.  IT'S ECF739, EXHIBIT

23   FIVE.

24          AND AT DR. KELLY'S REPORT, PARAGRAPHS 90, AND THEN

25   134 TO 150, HE WALKS THROUGH A SERIES OF TECHNOLOGY, TECHNICAL

1    PROBLEMS THAT REALPLAYER CREATED FOR THE IPOD.  AND THEY

2    INCLUDE THINGS LIKE REALPLAYER WOULD WRITE THE MUSIC DATABASE

3    INCONSISTENTLY, AND FAILS TO WRITE IT CORRECTLY WHEN THE DISK

4    IS FULL.  THAT'S A PROBLEM.

5             IT WOULD ALSO CONFLICT WITH ITUNES.  AND TO QUOTE A

6    COMPLAINT THAT WE GOT FROM THE INTERNET, BUT IT'S A REAL

7    REALNETWORKS -- A COMPLAINT MADE BY A CONSUMER TO REALNETWORKS.

8    AND THIS IS BEFORE 7.0.  AND IT SAYS:

9                  "IF YOU'VE ALREADY INSTALLED ITUNES IT CAN

10            CAUSE SOME CONFLICTS WITH REALPLAYER AND YOUR

11   IPOD."

12            AND SO THEY ARE SAYING THAT IF A CONSUMER HAS

13   ITUNES WORKING WITH THE IPOD, AND THEN THEY TRY AND USE

14   REALPLAYER, IT CAN CAUSE SOME CONFLICTS, MEANING THAT THE IPOD

15   IS NOT GOING TO WORK PROPERLY.

16            AND ONE OF THE WAYS IT WOULDN'T WORK IS SOMETIMES

17   SONGS WOULD SKIP.  SOMETIMES REALPLAYER WOULD CORRUPT AND

18   DELETE PLAY LISTS.  AND THE IPOD USER WOULD HAVE TO START ALL

19   OVER AND RESTORE THE IPOD.

20            SO THERE ARE DOCUMENTED PROBLEMS THAT USING

21   REALPLAYER INSTEAD OF ITUNES CAUSED.  AND A BIG ONE WAS AROUND

22   THIS TIME APPLE INTRODUCED VIDEOS, INCLUDING TV SHOWS AND

23   FULL-LENGTH MOVIES THAT WERE AVAILABLE ON THE ITUNES STORE, BUT

24   REALPLAYER COULD NOT SUPPORT THOSE.

25            SO IF YOU TRIED TO USE REALPLAYER INSTEAD OF ITUNES

```
 1   YOUR MOVIES WOULDN'T PLAY.  SO THERE WERE, AS I SAY, DOCUMENTED
 2   PROBLEMS CAUSED BY PEOPLE TRYING TO USE REALPLAYER.
 3            SO APPLE CAME UP WITH A WAY -- AND THIS IS THE NEXT
 4   PAGE IN THE SAME TAB.  AND IN SOME VERSIONS OF SOME COPIES OF
 5   THIS PAMPHLET IT'S ACTUALLY THE FIRST ONE IN TAB FOUR.  BUT IT
 6   LOOKS LIKE THIS (INDICATING).
 7            AND WHAT THIS DEPICTS IS WHAT APPLE DID ABOUT THIS
 8   SITUATION TO TRY AND STOP THIS CORRUPTION THAT REALPLAYER WAS
 9   CAUSING.  AS PART OF 7.0, WHICH WAS INTRODUCED IN SEPTEMBER OF
10   2006, APPLE HAD SOMETHING CALLED THE "KEYBAG VERIFICATION
11   CODE," WHICH WE CALL "KVC."
12            YOUR HONOR, IN SOME OF THE PAPERS EITHER SIDE WILL
13   REFER TO THIS BROADLY AS 7.0.  TECHNICALLY -- AND I THINK THIS
14   ACTUALLY IMPORTANT WHEN WE COME DOWN TO THE REGRESSION
15   ANALYSIS -- 7.0 DID A LOT OF THINGS.  LIKE IT MADE ITUNES
16   CAPABLE OF PLAYING MOVIES, VIDEOS AND SO FORTH, AND A LOT OF
17   OTHER THINGS.
18            KVC WAS JUST ONE PART OF IT.  AND WHAT KVC
19   BASICALLY DID WAS TO TELL THE IPOD NOT TO PLAY MUSIC UNLESS IT
20   WAS LOADED BY ITUNES.  IT REQUIRED THE ITUNES SIGNATURE TO BE
21   IN THE KEYBAG.  AND THE IDEA WAS TO MAKE THE IPOD WORK BETTER,
22   AND APPLE DIDN'T WANT TO BE BLAMED FOR IPODS CRASHING AS A
23   RESULT OF SOMEBODY USING REALNETWORKS.
24            SO THE IDEA WAS -- AND THIS IS WHAT KVC DID -- THE
25   IPOD WOULD VERIFY THAT THE KEYBAG WAS WRITTEN BY ITUNES.
```

1    **THE COURT:**  NOW, YOU SAID AS A RESULT OF SOMEONE

2    USING REALNETWORKS.  WERE THERE ANY -- I KNOW THAT WE'RE

3    DEALING WITH REALNETWORKS IN THIS CASE, AND HARMONY, BUT WAS

4    THAT THE ONLY ONE OUT THERE?

5    **MR. MITTELSTAEDT:**  YES, AT THAT TIME.

6    **THE COURT:**  OKAY.

7    **MR. MITTELSTAEDT:**  AND THEN, LET ME -- IF WE GO BACK

8    TO THE -- WELL, IT WAS THE ONLY -- REALNETWORKS WAS THE ONLY

9    STORE OR PLAYER, IF YOU WILL, THAT HAD HARMONY THAT TRIED TO

10   MIMIC FAIRPLAY SO THEIR MUSIC COULD PLAY ON AN IPOD.  THERE

11   WERE A LOT OF OTHER MUSIC STORES AT THE TIME, WITH THEIR OWN

12   DRM.

13   AND, ACTUALLY, TO ANSWER THAT QUESTION, YOUR HONOR,

14   TAB TWO WILL HELP ME EXPLAIN THIS.  THIS CHANGED OVER TIME, BUT

15   AS OF ABOUT 2006, THIS DEPICTS THE SOURCES OF MUSIC THAT COULD

16   PLAY ON AN IPOD.

17   AND SO FOR ALL TIME THE LARGEST PERCENTAGE OF MUSIC

18   LOADED ON AN IPOD WERE CD'S.  AND CD'S DID NOT HAVE DRM.  AND

19   IF CONSUMERS WANTED TO, IF THEY WERE BUYING MUSIC FROM, SAY,

20   SONY STORE OR A MICROSOFT STORE, AND IT HAD THEIR DRM ON IT SO

21   IT COULDN'T PLAY DIRECTLY TO ITUNES ON AN IPOD, ALL A CONSUMER

22   HAD TO DO WAS TAKE THE MUSIC, HIT "BURN CD," BURN A CD, AND

23   THEN LOAD IT INTO THE COMPUTER.  THE BURN AND RIP THAT SO MANY

24   PEOPLE USED.

25   ANYHOW, YOU COULD EITHER BUY A CD AT A STORE OR YOU

 1   COULD CREATE YOUR OWN CD FROM OTHER ONLINE MUSIC.  AND CREATING

 2   A CD FROM ONLINE MUSIC ON DRM STRIPPED THE DRM.  AND, YOU KNOW,

 3   THAT WAS NOT BY THE RECORD LABELS CONSIDERED HACKING.  IT WAS

 4   SOMETHING THAT EVERYBODY DID.

 5              AND SO THOSE WERE THE TWO SOURCES FOR CD MUSIC.

 6   AND SO I MAKE THAT POINT BECAUSE DOWN THE ROAD WHEN WE TALK

 7   ABOUT:  COULD REALNETWORKS MUSIC PLAY ON AN IPOD, YOU KNOW,

 8   AFTER 4.7 IT COULDN'T PLAY DIRECTLY.  AFTER 7.0 IT COULDN'T

 9   PLAY DIRECTLY, BUT IT COULD ALWAYS PLAY INDIRECTLY BY BURNING

10   AND RIPPING.

11              BUT IN ADDITION TO, YOU KNOW, THE MAJORITY OF THE

12   MUSIC ON IPODS COMING FROM CD'S, BY 2006 THERE WERE ALREADY 27

13   ONLINE SITES THAT ARE WERE DRM-FREE.  SO THE RECORD LABELS LET

14   SOME COMPANIES SELL MUSIC DRM-FREE AT THAT POINT.

15              ANOTHER MAJOR SOURCE -- AND NOBODY KNOWS FOR SURE

16   HOW MUCH THIS WAS -- IS THE BOTTOM LEFT, WHICH IS THE FREE

17   PEER-TO-PEER SERVICES.  BY THIS POINT, NAPSTER HAD BEEN SHUT

18   DOWN, AND THEN REOPENED AS A LAWFUL PLACE WITH ITS OWN DRM.

19   BUT HERE THIS DEPICTS KAZAA AND LIMEWIRE.

20              ANOTHER SOURCE OF MUSIC WAS ITUNES MUSIC STORE.

21   AND THEN, IN THE LOWER RIGHT-HAND CORNER IT'S THE DR -- MUSIC

22   THAT YOU BOUGHT AT ANOTHER STORE BUT YOU BURNED AND RIPPED IT,

23   WHICH I'VE ALREADY TALKED ABOUT.

24              SO THAT WAS THE STATE OF PLAY IN 2006.  AND THEN,

25   GOING BACK TO THE TIME LINE, OR NUMBER ONE, BY MID-2007, ALL

1   MUSIC STORES WERE DRM-FREE.  THE RECORD LABELS DECIDED NOT TO

2   REQUIRE DRM TO BE USED AT ANY MUSIC STORE EXCEPT APPLE'S.  AND

3   I THINK THE RECORD FAIRLY SHOWS, IF IT EVER BECAME IMPORTANT,

4   THAT THE REASON THE LABELS TRIED TO GET -- KEPT THIS RESTRAINT

5   ON APPLE, BUT LET THE OTHER STORES FREE FROM USING DRM, IS THEY

6   WERE TRYING TO GET NEGOTIATING POWER OVER APPLE.  AND THEY WERE

7   TRYING TO RESTRICT APPLE TO DRM-FREE.

8           IN ANY EVENT, BY EARLY 2009, THE RECORD LABELS

9   PERMITTED APPLE TO BE 80 PERCENT DRM-FREE.  AND THEN, BY APRIL

10  OF 2009, ALL THE MUSIC SOLD ON ITUNES THE RECORD LABELS

11  PERMITTED THAT TO BE DRM-FREE.

12          OKAY.  LET ME GO BACK TO ITUNES 7.0, WHICH IS

13  SEPTEMBER, 2006.  WE HAVE THE RELAUNCH OF HARMONY IN MARCH OF

14  2005.  AND IF ANYBODY WAS USING REALNETWORKS AT THE TIME AND

15  ANYBODY WAS USING THE HARMONY TECHNOLOGY AND BUYING MUSIC

16  BECAUSE THEY WANTED TO PLAY IT ON AN IPOD THEY COULD, DURING

17  THAT PERIOD UP UNTIL ITUNES 7.0, WITH KVC.

18          AT THAT POINT, KVC WAS ONLY INSTALLED ON THE NEW

19  GENERATION OF THE NANO, THE NANO SECOND GENERATION.  IT WAS NOT

20  INSTALLED ON THE CLASSIC, ANY OF THE CLASSIC MODELS.  IT WAS

21  NOT INSTALLED ON THE SHUFFLE, AND IT WAS NOT INSTALLED ON ANY

22  OF THE EXISTING BASE OF IPODS.

23          **THE COURT:**  WHY?

24          **MR. MITTELSTAEDT:**  I THINK -- I THINK ON THE EXISTING

25  BASE, I THINK IT PROBABLY WOULD HAVE BEEN TOO HARD TO GO BACK

 1    AND GET EVERYBODY'S IPOD AND PUT THE FIRMWARE ON IT.

 2              AND I THINK -- I THINK -- I'M NOT SURE, YOUR HONOR,

 3    WHAT THE RECORD SAYS ON WHY IT WASN'T INSTALLED IN THE OTHER

 4    ONES.

 5              BUT IT WAS INSTALLED ON THE OTHER ONES BY 2007 FOR

 6    THE NEXT GENERATION OF THE NANO, FOR THE NEXT GENERATION OF THE

 7    CLASSIC AND THE TOUCH, AS LISTED HERE, BUT NOT FOR THE SHUFFLE.

 8              AND THIS IS IMPORTANT BECAUSE WHEN WE GET TO THE

 9    PLAINTIFFS' THEORY ABOUT HOW THE KVC PART OF 7.0 LOCKED IN

10    CONSUMERS TO ITUNES, THE FACT OF THE MATTER IS IT ONLY APPLIED

11    FOR THE FIRST YEAR TO THE NANO, WHICH WAS JUST ONE OF THREE OR

12    FOUR MODELS, AND IT NEVER APPLIED TO THE SHUFFLE.

13              THAT BECOMES A VERY IMPORTANT PART WHEN WE LOOK AT

14    WHAT DR. NOLL DID ON HIS REGRESSION.

15              AND SO I THINK THE THIRD STEP HERE IS JUDGE WARE'S

16    RULING WITH RESPECT TO KVC OR ITUNES 7.0.  ON THAT HE FOUND

17    THAT THERE WAS A DISPUTE IN THE RECORD AS TO WHETHER KVC

18    IMPROVED THE PRODUCT OR NOT.

19              OUR POSITION IS THAT IT CLEARLY IMPROVED THE

20    PRODUCT BECAUSE, JUST LIKE 4.7, IT STOPPED HARMONY FROM WORKING

21    ON IPOD -- ON THE NANO, SECOND GENERATION, AND THEREFORE,

22    IMPROVED THE PRODUCT BY PREVENTING CORRUPTION.

23              THE PLAINTIFFS HAD A TECHNICAL EXPERT WHO SAID

24    OTHERWISE.  AND JUDGE WARE FOUND ON THE BASIS OF THAT THAT

25    THERE WAS A DISPUTE OF FACT, AND THAT'S THE ISSUE TO BE TRIED.

```
 1              YOU KNOW, WE THINK THAT'S WRONG.  WE THINK IT WAS A

 2   PRODUCT IMPROVEMENT, JUST LIKE 4.7 WAS A PRODUCT IMPROVEMENT.

 3              JUDGE WARE DID NOT REACH THE NEXT ISSUE, WHICH IS

 4   IF KVC WAS NOT A PRODUCT IMPROVEMENT, DID IT HAVE ANY IMPACT,

 5   ANY ANTITRUST INJURY?  DID IT CAUSE ANY PROBLEM?

 6              AND BEFORE I TURN TO THAT, LET ME JUST ADD ONE

 7   LAST POINT.

 8         THE COURT:  IS THAT BECAUSE HE DECLINED OR BECAUSE IT

 9   WAS NOT PRESENTED TO HIM?

10         MR. MITTELSTAEDT:  IT WAS NOT PRESENTED.  IT WAS NOT

11   PART OF THE MOTION.  AND THE REASON WAS EXPERT DISCOVERY ON

12   LIABILITY.  I DON'T THINK IT EVEN STARTED.  IT CERTAINLY HAD

13   NOT FINISHED.  AND SO WE DIDN'T HAVE, YOU KNOW, A RECORD ON

14   THEIR POSITION ON WHAT WAS -- WHAT THE IMPACT WAS.  AND IT WAS

15   CONTEMPLATED AT THE TIME THAT THERE WOULD BE ANOTHER ROUND OF

16   SUMMARY JUDGMENT MOTIONS IF THEY SURVIVED THAT ONE, WHICH

17   INDIRECTLY BRINGS US HERE TODAY.

18              OKAY.  THE LAST THING TO FILL IN THIS TIME LINE IS

19   ITUNES 7.0 -- 7.4 IN SEPTEMBER OF 2007.  KVC, A YEAR EARLIER,

20   WAS AIMED AT CORRUPTION CAUSED BY REALNETWORKS.  BUT AT THE

21   TIME THERE WERE OTHER THIRD-PARTY APPLICATIONS THAT PEOPLE

22   COULD USE TO TRY AND PLAY MUSIC ON THE IPOD.  BUT THOSE OTHER

23   STORES AND WINAMP, W-I-N-A-M-P, WAS AN EXAMPLE.  AND WHEN I

24   SAID "STORES," THAT'S WRONG.  THEY ARE APPLICATIONS, LIKE

25   ITUNES.
```

 1          BUT THEY WERE ALL DRM-FREE.  THEY DID NOT HANDLE OR

 2   ORGANIZE OR USE DRM MUSIC.  SO WINAMP, FOR EXAMPLE, COULD BE

 3   USED WITH CD'S.  PEOPLE COULD TRY AND LOAD CD'S THROUGH WINAMP

 4   ONTO THE IPOD INSTEAD OF USING ITUNES.

 5          THEY BASICALLY MIMIC THE ITUNES JUKEBOX, AND THEY

 6   TRIED TO WRITE THE MUSIC DATABASE ONTO THE IPOD.  BUT BECAUSE

 7   THEY DID NOT DEAL WITH DRM, THEY WERE NOT TRYING TO WRITE THE

 8   KEYBAG.  BUT, YOU KNOW, JUST LIKE REALNETWORKS WHICH CORRUPTED

 9   THE KEYBAG AND MADE IT DIFFICULT TO PLAY AN IPOD SOMETIMES,

10   THESE THIRD-PARTY JUKEBOX SERVICES, LIKE WINAMP, CORRUPTED

11   IPODS.  APPLE RECEIVED COMPLAINTS ABOUT IT.

12          DR. KELLY DISCUSSES SOME OF THOSE PROBLEMS, AND

13   MANY OF THE SAME PROBLEMS THAT REALNETWORKS CAUSED.  BUT KVC

14   DID NOT IMPACT THEM BECAUSE THOSE JUKEBOX DOES NOT USE KEYBAGS,

15   DID NOT TRY AND WRITE KEYBAGS.  AND KVC, AS THE NAME IMPLIES,

16   WAS ONLY ADDRESSED TO THE KEYBAG PROBLEMS.

17          BUT THEN, IN 2007, APPLE RELEASED AS PART OF 7.4

18   THE DATABASE VERIFICATION CODE, OR DVC.  AND JUST LIKE KEYBAG

19   VERIFICATION REQUIRED THE IPOD TO VERIFY THAT ITUNES HAD BEEN

20   USED TO WRITE THE KEYBAG, DVC, THE DATABASE VERIFICATION CODE,

21   CAUSED IPODS TO VERIFY THAT THE DATABASE WAS WRITTEN BY ITUNES.

22   AND DVC IN 2007 DISABLED WINAMP AND THE OTHERS ON NEW IPODS.

23          THE PLAINTIFFS DON'T MAKE A CLAIM WITH RESPECT TO

24   THAT, I THINK THEY WILL CONFIRM.  AND A REASON FOR THAT IS THIS

25   ONLY RELATED TO DRM-FREE MUSIC.  IT DIDN'T RELATE TO

 1    REALNETWORKS.  AND DRM-FREE MUSIC STILL WORKED ON THE IPOD.

 2    ALL YOU HAD TO DO WAS USE ITUNES INSTEAD OF WINAMP OR SOME

 3    OTHER THIRD-PARTY JUKEBOX APPLICATION.

 4          BUT THE REASON I MENTION DATABASE VERIFICATION CODE

 5    IS I THINK IT HELPS TO SHOW THAT THE PURPOSE OF KVC ON THE

 6    KEYBAG WAS TO STOP CORRUPTION.  HERE WAS ALSO CORRUPTION GOING

 7    ON ON THE DATABASE SIDE.  AND IT TOOK APPLE A YEAR TO FIGURE

 8    OUT WHAT TO DO ON THE DATABASE VERIFICATION SIDE TO STOP

 9    CORRUPTION FROM THESE DRM-FREE JUKEBOX APPLICATIONS.  AND THEY

10    RELEASED THAT IN 2007.

11          SO THAT, I THINK, BRINGS US TO WHERE WE ARE, WHERE

12    WE ARE NOW.  I GAVE YOUR HONOR THE SITE TO DR. MURPHY, AND I'LL

13    PROVIDE THE ECF SITE TO WHERE HE TALKS ABOUT THE BENEFITS OF

14    INTEGRATED SYSTEMS AND STOPPING OTHERS FROM BREAKING INTO IT.

15          DR. KELLY DISCUSSES THE SAME THING FROM A TECHNICAL

16    STANDPOINT AT PAGES 107.

17          IS THAT PARAGRAPHS OR PAGES?

18    **MR. KIERNAN:**  PAGES.

19    **MR. MITTELSTAEDT:**  PAGES 107 TO 111.  AND THAT'S

20    ECF739, EXHIBIT FIVE.

21          OKAY.  WITH THAT BACKGROUND, YOUR HONOR, I THINK

22    THERE ARE A COUPLE OF IMPORTANT POINTS THAT LEAD UP TO THE

23    DISCUSSION OF WHY THE REGRESSION ANALYSIS IS NOT ENOUGH TO SHOW

24    IMPACT.  AND WHERE WE ARE NOW IS UNLESS JUDGE WARE'S DECISION

25    ON 7.0 IS NOT BEING A PRODUCT -- LET ME PUT THAT A DIFFERENT

1    WAY.

2              UNLESS THAT SUMMARY JUDGMENT RULING IS REVISITED,

3    THE ISSUE NOW IS ASSUMING THE PLAINTIFFS WERE TO PREVAIL AT

4    TRIAL IN SHOWING THAT IT WAS NOT A PRODUCT IMPROVEMENT, ARE

5    THEY ABLE TO SHOW THAT IT HAD ANY IMPACT?  AND THE IMPACT THAT

6    THEY HAVE CHOSEN TO ASSERT IS NOT AN IMPACT ON THE PRICE OF

7    MUSIC.  IT'S IMPACT ON THE PRICE OF IPODS.

8              AND THERE ARE A COUPLE OF IMPORTANT PRELIMINARY

9    POINTS ON WHY THEY CANNOT PROVE THAT.  THE FIRST IS

10   DISAGGREGATION.  BECAUSE 4.7, WHICH DISABLED WHAT WE CALL

11   "HARMONY 1," HAS BEEN HELD TO BE LAWFUL.  THE PLAINTIFFS CANNOT

12   CLAIM ANY IMPACT OR DAMAGES FROM THAT.

13             WHAT THEY NEED TO SHOW IS THAT IF THERE WAS ANY

14   LOCK-IN -- AND WE'LL COME TO THAT -- BUT IF THERE WAS ANY

15   LOCK-IN THAT SUPPOSEDLY ENABLED APPLE TO RAISE PRICES THEY HAVE

16   TO SHOW IT WAS CAUSED ONLY BY 7.0, BY THE KVC IN 7.0, AND THAT

17   IT WAS NOT ANY LINGERING EFFECT OF 4.7, BECAUSE 4.7 IS LAWFUL.

18   ITS EFFECTS CANNOT BE CLAIMED AS DAMAGES.

19             IF THE PLAINTIFFS DO NOT PROPERLY SEPARATE OUT ANY

20   IMPACT FROM 4.7 ON IPOD PRICES, IF THERE WERE ANY, IF THEY HAVE

21   A DISAGGREGATION PROBLEM AND UNDER THE SUPREME COURT'S DECISION

22   IN COMCAST, AND THE CASES CITED IN OUR MOTION AT PAGE 17, THEY

23   SHOULD LOSE ON IMPACT, AND DR. NOLL'S REGRESSION SHOULD BE

24   THROWN OUT BECAUSE HE HAS A DISAGGREGATION PROBLEM.

25             THAT'S POINT ONE.  POINT TWO IS THAT THIS IS NOT A

1    CASE, UNLIKE SOME ANTITRUST CASES, LIKE PRICE-FIXING CASES

2    WHERE IMPACT IS OBVIOUS.  IN A PRICE-FIXING CASE WHERE THE

3    EVIDENCE SHOWS THAT COMPANIES GOT TOGETHER, AGREED TO RAISE

4    PRICES, AND THE NEXT DAY PRICES INCREASED.  IT'S NOT THAT HARD

5    TO SHOW THAT THERE WAS IMPACT.

6          YOU KNOW, PLAINTIFFS IN THOSE CASES COME UP WITH

7    THE REGRESSION ANALYSIS.  DEFENDANTS ALWAYS CHALLENGE THEM.

8    THE COURTS USUALLY SAY IT'S ENOUGH, BECAUSE THERE'S A LOT OF

9    OTHER EVIDENCE THAT PRICES INCREASED.

10          IN OUR CASE, IN THIS CASE, NOT ONLY WERE PRICES

11    GOING DOWN, BUT THERE'S JUST NOTHING IN THE PRICING HISTORY OR

12    PRICING CHARTS THAT SUGGEST THAT THE PRICE WOULD HAVE GONE DOWN

13    MORE BUT-FOR KVC.

14          SO UNLIKE THE RUN-OF-THE-MILL ANTITRUST CASE, IF

15    YOU WILL, PRICE-FIXING CASES, IMPACT IS NOT OBVIOUS HERE.  OUR

16    CASE IS A LOT MORE LIKE THE EBAY CASE AND THE LIVE NATION CASE

17    WHICH WE CITE IN THE BRIEFS WHERE THE COURTS FOUND EVEN THOUGH

18    THERE MIGHT BE ANTICOMPETITIVE CONDUCT, THE PLAINTIFFS HAD

19    FAILED TO SHOW THAT THERE WAS ANY IMPACT.

20          THE THIRD IMPORTANT POINT IS THAT KVC DID NOT

21    REMOVE ANY COMPETITOR FROM THE MARKET IN WHICH IPOD'S COMPETED.

22    REALNETWORKS DID NOT MAKE DEVICES FOR PLAYING MUSIC, AND THE

23    PLAINTIFFS DON'T IDENTIFY ANYBODY WHO DID MAKE DEVICES FOR

24    PLAYING MUSIC THAT WAS IMPACTED, EVEN ALLEGEDLY, BY KVC.

25          SO REALNETWORKS JUST MADE MUSIC OR SOLD MUSIC AND

1   PROVIDED A FREE JUKEBOX APPLICATION, BUT NO DEVICE THAT

2   COMPETED WITH IPODS.  AND THAT MAKES THEIR IMPACT ARGUMENT LESS

3   PLAUSIBLE.

4        IT WOULD BE ONE THING IF THEY SAID THE PRICE OF

5   MUSIC WAS AFFECTED BECAUSE THERE WAS ONE LESS MUSIC STORE.

6   WITH ALL THE NUMBERS OF MUSIC STORES, I THINK THAT WOULD BE A

7   VERY HARD ARGUMENT TO MAKE.  BUT THEY DON'T EVEN-- THAT'S NOT

8   WHAT THEY ARE TALKING ABOUT.  THEY ARE TALKING ABOUT AN IMPACT

9   IN A DIFFERENT MARKET.

10       ANOTHER REASON, ANOTHER OBSTACLE THEY HAVE TO

11  OVERCOME IS THAT THERE WERE MANY SOURCES OF MUSIC FOR IPODS,

12  AND REALNETWORKS WAS ONLY ONE OF THEM.  IT HAD A SMALL MARKET

13  SHARE AT THE TIME.  AND DR. MURPHY IN HIS SAME JULY, 2013

14  REPORT, PARAGRAPH 67 TO 69, WALKS THROUGH THE -- SOME

15  ARITHMETIC TO SHOW JUST HOW SMALL THEIR SHARE WAS.

16       BUT THE RELATED ISSUE IS FOR THEIR LOCK-IN THEORY

17  IT'S NOT JUST WHAT MARKET SHARE REALNETWORKS MIGHT HAVE HAD.

18  IT'S THE FRACTION OF THEIR SALES THAT WENT TO CONSUMERS WHO

19  USED HARMONY TO PLAY MUSIC ON AN IPOD.

20       AND THEY HAVEN'T ESTABLISHED WHAT THAT FRACTION IS.

21  AND DR. NOLL, QUOTED IN OUR MOTION AT PAGE NINE, ADMITS THAT

22  THAT'S THE RELEVANT FRACTION.  IT'S NOT THEIR MARKET SALES.

23  IT'S HOW MANY OF THEIR CUSTOMERS WERE USING HARMONY TO PLAY

24  MUSIC ON IPODS.  AND THE PLAINTIFFS HAVEN'T SHOWN WHAT THAT IS,

25  OR THAT IT'S SIGNIFICANT.  AND THAT MAKES THEIR IMPACT ARGUMENT

1   EVEN LESS PLAUSIBLE.

2            ANOTHER THING THAT MAKES THEIR IMPACT ARGUMENT MORE

3   AND MORE IMPLAUSIBLE IS, AS I SAID, KVC DID NOT AFFECT THE

4   INSTALLED BASE OF IPODS.  SO ALL THE IPODS SOLD BEFORE

5   SEPTEMBER, 2006, COULD STILL PLAY REALNETWORKS MUSIC VIA

6   HARMONY AND STILL CAN TODAY.  SO ANYBODY WHO HAS GOT A

7   PRESEPTEMBER 2006 IPOD CAN ALREADY DO THAT.

8            AND AS I WALKED THROUGH, THE KVC WAS LIMITED FOR

9   THE FIRST YEAR TO THE NANO SECOND GENERATION AND NEVER PUT ON

10  THE SHUFFLE.

11           SO THE PLAINTIFFS' THEORY —— AND I'M GOING TO TRY

12  AND STATE THIS LOCK-IN THEORY AS SIMPLY AS I CAN —— IS THAT

13  THERE WERE SOME PURCHASERS, SOME CONSUMERS WHO WANTED TO BUY

14  MUSIC FROM REALNETWORKS TO PLAY ON THE IPOD.  BUT WHEN KVC WAS

15  ISSUED THEY COULDN'T DO THAT ANYMORE.  AND SO OF ALL THE

16  CHOICES THEY HAD AT THE TIME, LIKE BUYING A DEVICE THAT WOULD

17  PLAY THE MUSIC OR JUST STOPPING BY NEW MUSIC OR BURNING AND

18  RIPPING THEIR CD'S, OF ALL THOSE OPTIONS THEY DECIDED TO STOP

19  BUYING MUSIC FROM REALNETWORKS AND START BUYING MUSIC FROM

20  ITUNES.

21           AND THEN, THE NEXT STEP IS —— AND THIS IS IN THE

22  LOCK-IN THEORY —— THE NEXT STEP IS THAT THOSE CONSUMERS BOUGHT

23  SO MUCH MUSIC FROM ITUNES, AS OPPOSED TO REALNETWORKS, THAT

24  WHEN THE TIME CAME TO BUY A REPLACEMENT FOR THEIR IPOD, EVEN

25  THOUGH THEY WANTED TO BUY A NON-IPOD, THEY WERE FORCED TO BUY

1  AN IPOD.

2           AND THE REASON I SAY IT THAT WAY IS IF CONSUMERS

3  WERE GOING TO BUY IPODS ANYWAY, JUST BECAUSE THEY REALLY LIKED

4  IPOD, AND IT HAD NOTHING TO DO WITH KVC OR WHERE THEY ARE

5  BUYING MUSIC, THEY ARE NOT AFFECTED BY KVC, AND SO THE DEMAND

6  FOR IPODS DOESN'T GO UP.  IT STAYS THE SAME AS IT WOULD ALWAYS

7  BE.  AND PLAINTIFFS' THEORY THAT DEMAND WENT UP, AND THEREFORE

8  PRICE WENT UP, WOULD FALL APART.

9           SO IT'S A VERY LIMITED GROUP OF PEOPLE THAT THEY

10 WOULD HAVE TO SHOW EXISTED IN ORDER TO BE LOCKED IN, NOT

11 OVERALL, BUT JUST LOCKED IN BY KVC.

12           AND SO THEN -- THEN WE LOOK AT WHETHER THE

13 PLAINTIFFS HAVE COME UP WITH -- HAVE IDENTIFIED ANYBODY WHO

14 FITS INTO THAT CATEGORY WHO CAN COME INTO COURT AND SAY:

15           "I WAS LOCKED IN," OR PROVIDE ANY BASIS FOR

16 DR. NOLL TO SAY THAT THERE WAS LOCK-IN.

17           AND SO NOW I'M GOING TO TALK ABOUT:  IS THERE ANY

18 EVIDENCE OF ANYBODY WHO FITS THEIR LOCK-IN THEORY WITH RESPECT

19 TO KVC?

20           FIRST OF ALL, IT'S NOT THE PLAINTIFFS.  BUT WE GOT

21 A CLASS ACTION, AND WE HAVE NAMED PLAINTIFFS WHO SAY THAT THEY

22 ARE REPRESENTATIVE, AND JUDGE WARE FOUND THAT THEY WERE

23 REPRESENTATIVE.

24           I'M GOING TO MAKE THE SAME FOOTNOTE POINT I MADE

25 LAST TIME WE WERE WITH YOUR HONOR, WHICH IS MOST OF THIS CLASS

1    ARE BIG RETAILERS LIKE BEST BUY, WALMART AND OTHER COMPANIES

2    THAT BUY IPODS FROM APPLE AND THEN RESELL THEM.

3            WE MADE AN ARGUMENT TO JUDGE WARE THAT THESE FOUR

4    CONSUMERS, INDIVIDUALS, SHOULD NOT BE ADEQUATE CLASS

5    REPRESENTATIVES FOR BEST BUY AND THE BIG RETAILERS.  WE LOST

6    THAT.  AND I RAISED IT AGAIN, AND WE LOST IT AGAIN.  SO WE'VE

7    LOST THAT.  BUT I STILL DON'T THINK IT'S RIGHT TO BE PROCEEDING

8    THE WAY WE ARE WITH RESPECT TO THE CLASS.

9            BUT, IN ANY EVENT, WE ARE HERE WITH THESE FOUR

10   NAMED PLAINTIFFS.  AND THE QUESTION IS:  COULD THEY FIT THIS

11   LOCK-IN THEORY SO THEY CAN CLAIM THAT THEY ARE EVIDENCE OF

12   THIS?

13           AND AT TAB FIVE, WE EXCERPT DEPOSITION TESTIMONY

14   FROM ONE OF THE PLAINTIFFS, MR. CHAROENSAK,

15   C-H-A-R-O-E-N-S-A-K.

16           AND I'M GOING TO REFER TO CHAROENSAK AND TUCKER

17   BECAUSE --

18           **THE COURT:**  CAN YOU SPELL THAT AGAIN?

19           **MR. MITTELSTAEDT:**  CHAROENSAK IS C-H-A-R-O, CHARO,

20   E-N-S-A-K, CHAROENSAK.  AND THE PLAINTIFFS SAY THESE ARE THE

21   TWO WHO OFFER EVIDENCE ABOUT THEIR LOCK-IN THEORY.

22           AND AT PAGE 124 -- 0AND THIS IS IN TAB FIVE -- I

23   ASKED MR. CHAROENSAK:

24               "DID YOU EVER HEAR OR READ THAT AT SOME POINT

25           A COMPANY NAMED 'REALNETWORKS' HAD COME UP WITH A

1          SOFTWARE, SOME PROGRAM THAT AFFECTED THE USE OF

2          MUSIC FROM ITUNES MUSIC STORE?"

3          AND HE SAID:

4               "ACTUALLY, I READ IT IN THE COMPLAINT AND KIND

5          OF RECALL SOMETHING HAPPENING.  I JUST -- BUT I

6          JUST REMEMBER IT WAS LIKE A NEWS STORY, SO IT

7          WASN'T - YEAH.  I DON'T REALLY -- I DIDN'T DOWNLOAD

8          DURING THAT TIME, SO I DIDN'T USE THE REALNETWORKS,

9          OR WHATEVER SITE."

10          SO THIS IS A PERSON WHO DIDN'T USE REALNETWORKS, SO

11     HE WAS DOING WHATEVER HE WAS DOING.  HE WASN'T AFFECTED BY KVC,

12     WHICH MEANT HE COULDN'T PLAY REAL MUSIC -- REALNETWORKS MUSIC

13     ON AN IPOD.

14          AND THEN, WE TURN TO TUCKER ON THE NEXT PAGE, AND I

15     ASKED HER AT LINE 21:

16               "HAVE YOU EVER ATTEMPTED TO USE REALNETWORKS

17          SOFTWARE?

18               "ANSWER:  NO, I HAVE NOT.

19               "WHY NOT?

20               "JUST HAVEN'T.

21               "BECAUSE YOU'VE BEEN SATISFIED WITH ITUNES

22          MUSIC STORE?

23               "JUST DIDN'T TAKE THE TIME TO LOOK INTO IT AND

24          USE IT.

25               "BECAUSE YOU WERE SATISFIED ENOUGH WITH

1          APPLE'S ONLINE MUSIC STORE THAT YOU DIDN'T WANT TO

2          TAKE THE TIME TO EXPLORE OTHERS; IS THAT CORRECT?

3              "ANSWER:  YES."

4          SO SHE'S NOT AN EXAMPLE OF SOMEBODY WHO FITS THE

5     PLAINTIFFS' LOCK-IN THEORY.

6          SO IS THERE ANYBODY ELSE?  AND THE FACT OF THE

7     MATTER, YOUR HONOR, IS THEY HAVE NOT IDENTIFIED ANY INDIVIDUAL,

8     ANY WITNESS WHO SAYS SHE WANTED TO BUY A COMPETING PLAYER, NOT

9     AN IPOD, BUT SHE SWITCHED AS A RESULT OF KVC TO BUYING MUSIC

10    FROM ITUNES INSTEAD OF REAL MUSIC.  AND AS A RESULT, WAS LOCKED

11    IN TO BUYING AN IPOD INSTEAD OF SOMETHING SHE PREFERRED.

12          THEY HAVEN'T TAKEN ANY SURVEY, ANY CONSUMER SURVEY.

13    THEY HAVEN'T OBTAINED ANY DISCOVERY FROM REALNETWORKS.  HARMONY

14    2 WAS IN EXISTENCE FOR ABOUT A YEAR-AND-A-HALF.  AND IF THERE'S

15    ANYBODY IN THIS CATEGORY ONE WOULD THINK THEY COULD FIND THE

16    PERSON.

17          IN ANY EVENT, THEIR INABILITY TO IDENTIFY ANYBODY

18    WHO FITS IN THIS CATEGORY CERTAINLY MAKES LESS PLAUSIBLE THEIR

19    CLAIM OF IMPACT.  AND THEN, WE'VE GOT A DISPUTE ABOUT THE

20    CONSUMER COMPLAINTS THAT APPLE RECEIVED.  WE SAY THERE'S NO

21    CONSUMER COMPLAINTS THAT APPLE RECEIVED OUT OF THE 20,000 THAT

22    WE'VE PRODUCED IN THIS CASE THAT SHOW THAT SOMEBODY WAS LOCKED

23    IN AS A RESULT OF KVC.

24          AND THEY HAVE COME BACK WITH 19 COMPLAINTS, ALL BUT

25    FOUR OF WHICH PREDATE 7.0 OR KVC.  AND SO THOSE CAN'T HELP THEM

```
 1    OR CAN'T PROVE THE POINT.

 2                AND THE REMAINING FOUR ARE IN TAB SEVEN.  AND THESE

 3    FIT INTO TWO CATEGORIES.  NEITHER OF THEM HAVE ANYTHING TO DO

 4    WITH REALNETWORKS.  SO THE FIRST ONE, WHICH IS SWEENEY EXHIBIT

 5    35, PAGE 17 IN THE TAB, THIS IS OCTOBER 24, 2006.  SO A MONTH

 6    PLUS AFTER KVC. AND IT SAYS THE ISSUE IS THE CUSTOMER WANTS TO

 7    MOVE MUSIC FROM WINDOWS MEDIA PLAYER -- ANOTHER JUKEBOX -- TO

 8    ITUNES, AS SHE WANTS TO TRANSFER MUSIC TO THE IPOD.

 9                AND THEN, GOING DOWN TO THE BOTTOM IT SAYS:

10                    "LATER CUSTOMER FOUND TEN SONGS EXISTING IN

11                    BEARSHARE FOLDER, WHICH WERE DOWNLOADED FROM AN

12                    ONLINE STORE CALLED 'BEARSHARE.'  TOLD CUSTOMER" --

13                    THIS IS THE CONSUMER SERVICE PERSON -- "TOLD THE

14                    CUSTOMER THAT THE SONGS WOULD BE PROTECTED WITH DRM

15                    BY BEARSHARE AND CANNOT BE ADDED TO ITUNES."

16                NOW, THIS SHOWS THAT THERE'S A CONSUMER OUT THERE

17    THAT BOUGHT MUSIC PROTECTED BY DRM FROM ONE STORE AND WANTED TO

18    PLAY IT ON AN IPOD.  BUT IT DOESN'T SHOW THAT ANYBODY WAS USING

19    REALNETWORKS, AND IT DOESN'T SHOW THAT ANYBODY USING

20    REALNETWORKS SWITCHED FROM REALNETWORKS TO ITUNES MUSIC STORE.

21                SO THIS DOESN'T GET THE PLAINTIFFS WHERE THEY NEED

22    TO GO.  IT SHOWS THAT THERE ARE SOME PEOPLE OUT THERE WHO

23    WANTED INTEROPERABILITY.  WE DON'T DISPUTE THAT.  WHAT WE

24    DISPUTE IS THAT THERE'S ANY EVIDENCE THAT PEOPLE WERE LOCKED IN

25    AS A RESULT OF KVC.
```

1          THE NEXT COMPLAINT IS THE SAME.  AND IN THE PORTION

2     THAT SHOULD BE HIGHLIGHTED IN YOUR HONOR'S COPY -- THIS IS FROM

3     AUGUST OF 2007.  SO THIS IS ALMOST A YEAR AFTER KVC.  AND THE

4     CONSUMER IS ASKING:

5               "WHAT'S THE BEST METHOD FOR IMPORTING MY

6               PROTECTED NAPSTER MUSIC INTO MY ITUNES LIBRARY?"

7          AGAIN, THE PERSON WOULD LIKE TO PLAY NAPSTER MUSIC

8     WITH ITS OWN DRM INTO ITUNES TO PLAY IT ON AN IPOD.  BUT THAT

9     WOULDN'T WORK.  THAT WOULDN'T WORK BEFORE OR AFTER KVC, AND IT

10    HAD NOTHING TO DO WITH KVC.  AND IT DOESN'T SHOW ANYBODY WAS

11    LOCKED IN BY KVC OR WANTED TO USE REALNETWORKS.

12          AND THEN, THE LAST TWO COMPLAINTS THAT POSTDATE KVC

13    ARE THE FLIP SIDE OF THE TWO WE JUST LOOKED AT.  SO THE NEXT

14    ONE, WHICH IS APRIL, 2007, THE CONSUMER ASKS:

15               "I WANT TO BE ABLE TO KNOW HOW TO CONVERT YOUR

16               AUDIO FORMAT" -- SO FAIRPLAY, OR AAC -- "INTO AN

17               MP3 FORMAT SO I CAN PLAY IT ON MY CREATIVE ZEN

18               MICRO PLAYER."

19          SO THIS SOMEBODY WHO BUYS MUSIC FROM ITUNES AND

20    WANTS TO TRY AND PLAY IT ON A COMPETING PLAYER.  AGAIN, THAT

21    COULDN'T BE DONE AT THE TIME BECAUSE THE MUSIC FROM ITUNES WAS

22    PROTECTED BY DRM.  THAT WAS INCOMPATIBLE WITH THE DRM USED BY

23    OR SUPPORTED BY CREATIVE ZEN, WHICH JUDGE WARE HAS FOUND

24    LAWFUL.

25          BUT IT WAS NOT AFFECTED BY KVC, AND IT HAS NOTHING

1    TO DO WITH REALNETWORKS OR HARMONY.

2            AND THE LAST OF THE FOUR COMPLAINTS ON THE NEXT

3    PAGE IS SAME THING.  SOMEBODY HAD BOUGHT SEVERAL SONGS FROM

4    ITUNES AND WANTED TO PLAY THEM ON A COMPETING DEVICE, OREGON

5    SCIENTIFIC DIGITAL MUSIC PLAYER.  AND COMPLAINED THAT THE MUSIC

6    WILL NOT PLAY, AND THAT'S BECAUSE APPLE USED ONE KIND OF DRM

7    AND OREGON SCIENTIFIC APPARENTLY USED A DIFFERENT KIND OF DRM.

8            AGAIN, THAT WOULDN'T HAVE BEEN AFFECTED BY KVC AND

9    HAS NOTHING TO DO WITH REALNETWORKS.  SO THAT POINT IS THE

10   PLAINTIFFS HAVEN'T IDENTIFIED ANYBODY WHO WAS LOCKED IN BY KVC.

11           I THINK THE NEXT STEP IS TO LOOK TO SEE IF THERE'S

12   ANY EVIDENCE THAT REGARDLESS OF WHETHER THEY CAN IDENTIFY

13   ANYBODY WHO WAS LOCKED IN, APPLE EVER TOOK INTO ACCOUNT IN

14   PRICING IPODS ANYTHING ABOUT HARMONY OR KVC'S IMPACT ON

15   HARMONY.

16           AND WE HAVE SAID THAT OUR PRICING COMMITTEE

17   DOCUMENTS SHOW WHAT WE TOOK INTO ACCOUNT.  AND I'VE GOT AN

18   EXAMPLE IN TAB SIX.

19           **THE COURT:**  AND YOU HAVE ABOUT HALF AN HOUR LEFT.

20           **MR. MITTELSTAEDT:**  OKAY.  TAB SIX IS FROM APPLE'S

21   PRICING COMMITTEE THAT DEALT WITH IPOD PRICING.  AND IT SHOWS

22   THE COMPETITORS THAT APPLE CONSIDERED, AND IT SHOWS THE

23   FEATURES:  DISPLAY, BATTERY, WEIGHT, SIZE AND SO FORTH CROSS

24   THE TOP.

25           IT DOESN'T SAY ANYTHING ABOUT MUSIC STORES.

1    DOESN'T SUGGEST THAT APPLE TOOK INTO ACCOUNT MUSIC STORES OR

2    HARMONY  OR REALNETWORKS IN SETTING IPOD PRICES.

3          THE PLAINTIFFS KNOW ABOUT THIS BECAUSE THE NEXT

4    DOCUMENT IN THE SAME TAB, SWEENEY EXHIBIT ONE, IS FROM THEIR

5    EXPERT, DR. NOLL, WHERE HE PUTS IN PRICE COMPARISONS BASED ON

6    THOSE DOCUMENTS, AND HE DOESN'T HAVE ANYTHING ABOUT MUSIC

7    STORES.

8          WHAT THE PLAINTIFFS DO IS THEY SUBMIT EXHIBIT 49,

9    WHICH IS THE NEXT TAB.  AND THEY SAY THIS SHOWS THAT APPLES

10   PRICING COMMITTEE LOOKED AT MUSIC PRICES AND MUSIC STORES.  AND

11   SURE ENOUGH, THE SECOND AND THIRD PAGES TALK ABOUT MUSIC RETAIL

12   MARKET SHARE.  SHOWS ITUNES FOR PHYSICAL AND DIGITAL IS

13   9 PERCENT.  AND ON THE NEXT PAGE IT'S GOT REALPLAYER MUSIC

14   STORE IN SPOT 39 AT .2 PERCENT.

15         BUT THE IMPORTANT THING ABOUT THIS, YOUR HONOR, IS

16   ON THE COVER PAGE IT SHOWS IN THE LOWER LEFT-HAND CORNER THAT

17   IT COMES FROM THE ITUNES PRODUCT MARKETING GROUP.  ITUNES

18   PRODUCT MARKETING GROUP.

19         THAT'S NOT THE IPOD PRICING GROUP.  BUT EVEN IF IT

20   WERE, IT DOESN'T SAY, DOESN'T SUGGEST THAT APPLE TOOK ANYTHING

21   INTO ACCOUNT ABOUT REALNETWORKS OR HARMONY IN COMING UP WITH

22   ITS PRICING DECISIONS.

23         I WANT TO TURN TO THE REGRESSION, BECAUSE I THINK,

24   YOU KNOW, IN A WAY THAT'S THE HARDEST THING TO UNDERSTAND THE

25   WAY IT'S BEEN PRESENTED.

1          BUT BEFORE I DO THAT I WANT TO MAKE TWO POINTS.

2     ONE IS THAT THE PLAINTIFFS' DAMAGE THEORY, THEIR IMPACT THEORY,

3     IS IRRECONCILABLE WITH THE REAL WORLD WAY IN WHICH APPLE SETS

4     PRICES.  AND AT TAB FOUR -- AT TAB FOUR, THIS DEMONSTRATIVE

5     SHOWS, YOU KNOW, TYPICAL PRICING BY APPLE FOR THE NANO, TWO

6     DIFFERENT GENERATIONS.  AND TYPICALLY APPLE WOULD CHANGE PRICES

7     ONLY WHEN A NEW VERSION OF A MODEL WAS INTRODUCED.

8          AND TYPICALLY APPLE WOULD USE WHAT WAS CALLED

9     "ESTHETIC PRICE POINTS," LIKE ONE FORTY-NINE, ONE NINETY-NINE.

10         THE PLAINTIFFS' THEORY IS SHOWN ON THE NEXT PAGE.

11    AND THEY SAY THAT THE PRICE APPLE WOULD HAVE CHARGED BUT FOR

12    KVC WOULD HAVE BEEN 137.90 AND 184.17.  AND IT'S JUST CONTRARY

13    TO THE REAL WORLD.  THAT'S NOT WHAT APPLE WOULD SET AS ITS LIST

14    RETAIL PRICE.

15         THE OTHER THING WRONG WITH THEIR --

16         **THE COURT:**  IS IT ALWAYS 49 AND 99?  I MEAN, THEY

17    WOULDN'T -- I UNDERSTAND THAT THEY GAVE A VERY PRECISE NUMBER.

18    BUT ISN'T IT POSSIBLE THAT IT WOULD BE 39 OR 29 OR 79?  I COULD

19    HAVE SWORN I BOUGHT SOME PRODUCT LIKE THAT WITH THE 79 ENDING.

20         **MR. MITTELSTAEDT:**  YES.  IF IT'S LESS THAN $100, YES.

21    AND I THINK THERE WAS ONE PRODUCT MORE THAN $100 THAT WAS ONE

22    SEVENTY-NINE AT ONE POINT.  BUT TYPICALLY IT WAS -- IT WAS A

23    NUMBER LIKE ONE FORTY-NINE OR ONE NINETY-NINE.

24         BUT THE OTHER IMPORTANT POINT IS THAT THE

25    PLAINTIFFS' LOCK-IN THEORY IS THAT AS MORE AND MORE PEOPLE

1    WOULD BUY ITUNES MUSIC, AS MORE AND MORE PEOPLE WOULD BUY

2    ITUNES MUSIC THEY WOULD GET GRADUALLY MORE AND MORE LOCKED IN.

3    THAT WOULD GRADUALLY INCREASE THE DEMAND FOR IPODS AND

4    GRADUALLY INCREASE THE PRICE FOR IPODS.  THAT'S THEIR THEORY.

5         DR. NOLL'S REGRESSION, THOUGH, COMES UP WITH AN

6    IMMEDIATE IMPACT, AND IT'S CONSTANT OVER TIME.  SO HE COMES UP

7    WITH -- I THINK IT'S A 2.3 PERCENT IMPACT ON PRICES FOR -- I

8    FORGET IF IT'S RESELLERS OR CONSUMERS.  BUT IT STAYS AT THE

9    SAME LEVEL FROM DAY ONE TO THE END.  AND THAT'S INCONSISTENT

10   WITH HIS LOCK-IN THEORY.

11        WHY WOULD IT HAPPEN IMMEDIATELY, AND WHY WOULD IT

12   BE CONSTANT OVER TIME?

13        THE OTHER POINT, YOUR HONOR -- AND THIS WILL BECOME

14   CLEAR WHEN WE TALK BRIEFLY ABOUT THE REGRESSION -- IS ONE WAY

15   WE KNOW SOMETHING IS WRONG WITH DR. NOLL'S REGRESSION IS THAT

16   HIS STATISTICAL SIGNIFICANCE, HIS T STATISTIC IS SO HIGH.  YOU

17   KNOW, NORMALLY IF SOMETHING IS OVER -- A T STATISTIC IS OVER

18   TWO, WHETHER IT'S PLUS OR MINUS, IT'S CONSIDERED STATISTICALLY

19   SIGNIFICANT.

20        DR. NOLL'S T STATISTICS ARE 300, 400, BIG NUMBERS

21   LIKE THAT.  AND WHAT THAT MEANS -- AND WE'VE EXPLAINED THIS IN

22   THE BRIEF -- IS THAT HE -- HE CLAIMS THIS IS SO PRECISE THAT

23   THERE WOULD ONLY BE A ONE IN ABOUT 5 BILLION CHANCE THAT THE

24   NUMBER -- THE BUT-FOR NUMBER IS ANYTHING OTHER THAN HE SAYS.

25        SO WHEN HE SAYS IT WOULD HAVE BEEN ONE THIRTY-SEVEN

```
 1   NINETY FOR A SECOND GENERATION TWO GIGABYTE NANO, HE'S SAYING

 2   THAT IF HIS REGRESSION IS RIGHT THERE'S ONLY ONE IN 5 BILLION

 3   CHANCES THAT THE NUMBER THAT APPLE WOULD CHARGE WOULD BE

 4   ANYTHING DIFFERENT THAN THAT.

 5             AND, YOU KNOW, THAT, I THINK, IS ABSURD, AND IT

 6   SHOWS THAT SOMETHING -- IT SUGGESTS THAT SOMETHING IS WRONG

 7   WITH THE REGRESSION.

 8             AND NOW I'D LIKE TO TURN TO THE REGRESSION.  AND I

 9   THINK THERE ARE SO MANY THINGS WRONG WITH IT, BUT I THINK THE

10   TWO EASIEST THINGS TO SEE ARE THAT IT USES THE WRONG BUT-FOR

11   WORLD.  AS A PRELIMINARY MATTER, BECAUSE THE PRICE DATA DO NOT

12   SHOW ANY IMPACT, THEY DON'T SHOW ANY INCREASE AT THE TIME OF

13   7.0.  THEY CONSISTENTLY DECLINED OVER TIME.  SO THE PLAINTIFFS

14   ARE RELYING ENTIRELY ON NOLL.  AND THE PROBLEM IS -- THE

15   STARTING PROBLEM IS HE DOESN'T HAVE ANY FACTS THAT SUPPORT HIS

16   LOCK-IN THEORY, AND HE'S JUST MAKING ASSUMPTIONS THAT ARE

17   CONTRARY TO WHAT THE REAL WORLD SHOWS.

18             SO HE ASSUMES APPLE WOULD MAKE SMALL, INCREMENTAL

19   ADJUSTMENTS, CONTRARY TO THE FACTS.  HE ASSUMES THAT 4.7 HAD NO

20   IMPACT AFTER SEPTEMBER, 2006.  AND HE ASSUMES OTHER THINGS.

21             BUT LET ME GO TO WHAT I THINK ARE THE TWO EASIEST

22   THINGS TO SEE ABOUT WHAT IS WRONG WITH HIS REGRESSION.  AT TAB

23   EIGHT, I TRY AND SET THE STAGE FOR THIS BY SAYING WHAT NOLL'S

24   STANDARD IS.  WHAT HE SAYS AT THE SECOND PAGE THERE DOWN AT THE

25   BOTTOM IS THAT ANY INDICATOR VARIABLE SHOULD BE ON.
```

```
1           THE COURT:  HOLD ON.  I'M AT TAB EIGHT.

2           MR. MITTELSTAEDT:  TAB EIGHT, THE SECOND PAGE.

3           THE COURT:  SO THE SECOND PAGE STARTS:

4              "MEASURES OF FIT"?

5           MR. MITTELSTAEDT:  YES.

6           THE COURT:  GO AHEAD.

7           MR. MITTELSTAEDT:  DOWN AT THE BOTTOM OF THAT, HE

8   SAYS ANY INDICATOR VARIABLE SHOULD BE ON ONLY IF THE ASSOCIATED

9   PRICES PLAUSIBLY COULD BE AFFECTED BY IT.  AND SO --

10          THE COURT:  I'M STILL LOOKING FOR THAT.

11          MR. MITTELSTAEDT:  OKAY.

12          THE COURT:  OH, I SEE IT NOW.  OKAY.

13          MR. MITTELSTAEDT:  AND TO TAKE A STEP BACK, YOUR

14  HONOR, THE REGRESSION ANALYSIS BASICALLY TAKES A BUNCH OF

15  VARIABLES, THE ACTUAL PRICE, AND THEN IT HAS A DUMMY VARIABLE

16  IN THERE.  AND THE DUMMY VARIABLE IN THIS CASE IS FOR KVC OR

17  7.0.

18          AND THE IDEA IS TO MEASURE THE RELATIONSHIP BETWEEN

19  THE VARIABLES AND PRICE, AND ANYTHING THAT CAN'T BE EXPLAINED

20  BY THE VARIABLES HE USES GOES INTO THE DUMMY VARIABLE, OR 7.0.

21  IF THIS WERE A CONSPIRACY CASE IT WOULD GO INTO THE CONSPIRACY

22  VARIABLE.

23          AND SO IT'S REAL IMPORTANT TO USE THE RIGHT

24  VARIABLES AND HAVE THEM ON THE RIGHT AMOUNT OF TIME.  AND MY

25  FOCUS HERE IS -- AND I THINK THIS IS ACTUALLY EASIER TO SEE IF
```

```
 1    YOU TURN TO THE SECOND TO LAST PAGE IN THIS TAB.  SO IT'S TAB

 2    EIGHT, AND IT'S THE TIME LINE THAT LOOKS LIKE THIS

 3    (INDICATING).

 4              AND SO THESE ARE SOME OF THE VARIABLES THAT DR.

 5    NOLL USES.  AND IT SHOWS HOW LONG HE LEAVES THEM ON.  SO DOWN

 6    AT THE BOTTOM HE SAYS THE EXISTENCE OF ITUNES STORE IS GOING TO

 7    HAVE AN EFFECT ON IPOD PRICES.  AND THAT'S GOING TO HAPPEN FROM

 8    THE DAY IT'S INTRODUCED IN 2003 UNTIL THE END OF THE CLASS

 9    PERIOD.

10         THE COURT:  NO TAB EIGHT.

11         MR. MITTELSTAEDT:  THIS SHOULD BE THE SECOND TO LAST

12    PAGE IN TAB EIGHT, PAGE 29, AND THE HEADING IS:

13              "TIME LINE OF EVENTS FOR INDICATOR VARIABLES."

14         THE COURT:  OKAY.

15         MR. MITTELSTAEDT:  AND SO ITUNES STORE PLAUSIBLY HAS

16    AN IMPACT ON IPOD PRICES, ACCORDING TO DR. NOLL.  SO THAT'S A

17    VARIABLE THAT IS IN HIS REGRESSION.  AND BASICALLY HE'S TRYING

18    TO FIGURE OUT HOW MUCH AN IMPACT ON PRICE DOES THE ITUNES STORE

19    HAVE.

20              AND THEN HARMONY 1, UNDER HIS THEORY, THAT HAS AN

21    IMPACT ON IPOD PRICES.  AND HE LEAVES THAT ON FOR THE WHOLE

22    TIME.  EVEN THOUGH HARMONY 1 WAS DISABLED AND REPLACED BY

23    HARMONY 2, HE LEAVES IT ON.  AND HE'S RIGHT TO LEAVE IT ON

24    BECAUSE PLAUSIBLY IT COULD HAVE AN IMPACT ON COMPETITION.

25              THEN HERE'S THE KEY POINT, WHEN HE GETS TO 4.7,
```

1    UNDER HIS THEORY 4.7 HAD A BIG IMPACT ON IPOD DEMAND AND IPOD

2    PRICING.   THAT'S HIS THEORY BECAUSE OF THE LOCK-IN FROM 4.7.

3              BUT THE QUESTION IS:  SHOULD HE LEAVE IT ON FOR THE

4    WHOLE TIME PERIOD, OR SHOULD HE LEAVE IT ON ONLY DURING THE

5    TIME THAT 4.7 WAS INSTALLED ON VARIOUS -- OR AVAILABLE FOR

6    VARIOUS MODELS?

7              SO HE SAYS, YOU KNOW, SHUFFLE NEVER GOT 7.0.  IT

8    ALWAYS HAD 4.7, SO HE LEAVES IT ON FOR THE WHOLE TIME.  BUT FOR

9    THE NANO HE LIVES IT ON ONLY UNTIL 2006, AND THEN HE TURNS OFF

10   THE VARIABLE.  AND HE TURNS OFF THE VARIABLE FOR THE CLASSIC

11   THE NEXT YEAR.

12             WHAT THAT MEANS IS IF 4.7 BREAKING HARMONY THE

13   FIRST TIME HAD ANY IMPACT ON NANO PRICES, AFTER 7.0, AFTER

14   SEPTEMBER, 2006, THE PRICE IMPACT IS GOING TO SOME OTHER

15   VARIABLE.  AND MOST LIKELY IT'S GOING TO THE 7.0 OR HIS DUMMY

16   VARIABLE, WHICH IS 7.0.  AND I'LL EXPLAIN THAT A LITTLE MORE IN

17   A MINUTE.

18             AND THEN, HE TURNS HARMONY 2 ON WHEN IT'S LAUNCHED.

19   AND THEN, FOR 7.0, HE TURNS IT ON ONLY FOR THE PRODUCTS THAT

20   HAD IT.  AND, AGAIN, THAT RAISES THE SAME QUESTION:  SHOULD HE

21   TURN 7.0 ON FOR ALL THE PRODUCTS, INCLUDING THE SHUFFLE?  COULD

22   IT POSSIBLY UNDER HIS THEORY AFFECT SHUFFLE PRICES?  OR SHOULD

23   HE JUST HAVE IT ON FOR THE ONES HE DOES?

24             OKAY.  SO THE QUESTION IS -- LET'S GO TO 4.7.  THE

25   QUESTION IS:  SHOULD YOU TURN OFF 4.7 WHEN HE DOES, OR SHOULD

```
1    YOU LEAVE IT ON THE WHOLE PERIOD OF TIME?  AND WHAT IS HIS

2    STANDARD?

3                AND I'M WILLING TO SAY FOR PURPOSES OF DAUBERT WHAT

4    HE'S TESTIFYING HERE IS GENERALLY-ACCEPTED.  THIS IS THE METHOD

5    THAT EXPERTS SHOULD USE.  ANY INDICATOR VARIABLE, 4.7, SHOULD

6    BE ON IF THE ASSOCIATED PRICES PLAUSIBLY COULD BE AFFECTED BY

7    IT.

8                SO COULD IPOD PRICES UNDER THEIR THEORY BE AFFECTED

9    BY 4.7 AFTER 4.7 WAS REPLACED BY 7.0?  AND THEN, IF YOU GO TO

10   THE NEXT REPORT FROM DR. NOLL -- THIS IS PAGE 24, NUMBERED AT

11   THE BOTTOM -- HE SAYS IN THAT LAST PARAGRAPH:

12                    "INDICATOR VARIABLES ARE USED TO TAKE THE

13             VALUE OF ONE" -- MEANING THAT THEY ARE TURNED ON.

14        THE COURT:  OKAY.  WAIT.  YOU JUST YOU JUMPED.  WE'RE

15   BACK ON THE BRIEF?

16        MR. MITTELSTAEDT:  YES.  THIS IS NOLL'S NEXT

17   DECLARATION.  WE GOT THE COVER PAGE, AND THEN THE NEXT PAGE,

18   PAGE 72 IN NOLL'S REPORT, PAGE 24 IN THIS.

19        THE COURT:  OKAY.

20        MR. MITTELSTAEDT:  AND DOWN AT THE LAST PARAGRAPH

21   STARTING "FINALLY" HE REPEATS THAT INDICATOR VARIABLES ARE USED

22   TO TAKE THE VALUE OF ONE, TURNED ON, DURING PERIODS WHEN SOME

23   FACTOR THAT IS LIKELY TO AFFECT COMPETITION IS PRESENT.  AND

24   OTHERWISE IT'S ZERO.

25                SO, AGAIN, HE'S SAYING IF 4.7 COULD PLAUSIBLY
```

1    AFFECT COMPETITION -- IN THIS CASE IPOD PRICES -- AFTER 7.0

2    COMES INTO  BEING, HE'S GOT TO LEAVE IT ON.  HE'S GOT TO GIVE

3    IT A VALUE OF ONE.  OTHERWISE, ALL THE IMPACT OF 4.7 IS PICKED

4    UP BY 7.0 BECAUSE 7.0 BECOMES THE INDICATOR, THE DUMMY

5    VARIABLE.  SO IT'S REAL IMPORTANT TO KNOW HOW LONG TO LEAVE 4.7

6    ON.  OTHERWISE, YOU'RE INFLATING 7.0.

7              AND SO LET'S SEE NOW THAT NOLL HAS TOLD US WHAT THE

8    STANDARD IS, LET'S SEE WHAT HE DOES.  AND SO THE NEXT PAGE IS

9    FROM HIS DEPOSITION.  AND I ASKED HIM AT LINE 20:

10             "WHAT DO YOU UNDERSTAND HAPPENED WITH RESPECT

11             TO HARMONY IN APRIL OF 2005?"

12             THIS IS THE RELAUNCH OF HARMONY 2.

13             AND HE SAYS:

14             "THERE ARE TWO PARTS TO THE STORY, WHICH IS:

15             DID THEY REALLY SUCCEED IN OVERCOMING THE SOFTWARE

16             UPGRADES?"

17             SO DID HARMONY 2 WORK?

18             "AND THEN, NUMBER TWO WOULD BE:  DID CONSUMERS

19             ACTUALLY TAKE ADVANTAGE OF IT?  AND I SUSPECT THE

20             ANSWER TO THE FIRST IS 'YES," AND I SUSPECT THE

21             ANSWER TO THE SECOND IS 'NO,' BECAUSE THE CONSUMERS

22             HAD ALREADY EXPERIENCED THE PRIOR DISABLING."

23             SO WHAT HE'S SAYING IS THAT HE SUSPECTS THAT 4.7 BY

24    DISABLING HARMONY CONTINUED TO HAVE AN IMPACT, BECAUSE IT

25    DISSUADED PEOPLE FROM EVEN TRYING TO USE THE HARMONY RELAUNCH.

```
 1                    AND LATER ON AT THE NEXT DEPOSITION, OR ONE OF THE

 2  SUBSEQUENT DEPOSITIONS, ON THE NEXT PAGE, WE WENT OVER THIS

 3  AGAIN.  AND I ASKED HIM -- THIS IS PAGE 27 UP AT THE TOP:

 4                    "UNDER WHAT CIRCUMSTANCES, PRECISELY AS YOU

 5                    CAN, WOULD YOU EXPECT TO SEE A CONTINUING EFFECT OF

 6                    4.7 EVEN AFTER THE RELAUNCH?"

 7                    AND HE SAYS:

 8                     "CONSUMER EXPECTATIONS ABOUT THE DURABILITY

 9                    OF THE RELAUNCH."

10                    AND THEN, I ASKED HIM:

11                     "COULD THAT CONSUMER EXPECTATION CONTINUE EVEN

12                    AFTER 7.0?

13                     "EXACTLY IT COULD.  THAT'S PRECISELY RIGHT."

14                    AND THEN, GOING TO THE NEXT PAGE, AT LINE SIX, I

15  SAY:

16                     "UNDER THAT APPROACH HOW LONG WOULD THE

17                    RESIDUAL EFFECT LAST AFTER 7.0, THE RESIDUAL EFFECT

18                    FROM 4.7?"

19                    AND HE SAYS:

20                     "AGAIN, THERE'S NO WAY TO KNOW EXCEPT

21                    EMPIRICALLY TO FIND OUT."

22                    SO HE'S SAYING THAT IT COULD HAVE AN IMPACT, AND

23  THE ONLY WAY YOU CAN DO IT IS TO TEST IT.  AND THE WAY YOU

24  WOULD TEST IT IS TO LEAVE 4.7 ON AS LONG AS YOU THINK IT MIGHT

25  HAVE A CONTINUING EFFECT.
```

```
 1              BUT HE TURNS IT OFF.  HE TURNS IT OFF.  AND THE

 2   EFFECT OF TURNING IT OFF IS SHOWN ON THE LAST SLIDE IN

 3   EXHIBIT -- IN TAB EIGHT.

 4              AND WHAT THIS BASICALLY SHOWS IS THAT BY LEAVING

 5   ITUNES 4.7 -- BY TURNING IT OFF, WHEN HE TURNS IT OFF, EVEN

 6   THOUGH IN THIS MODEL IT HAD A 3.9 AFFECT ON PRICE, AND ITUNES

 7   7.0 ONLY HAD A 3.3 PERCENT IMPACT ON THE PRICE.  BY TURNING OFF

 8   4.7, HE FINDS A 7.2 PERCENT IMPACT OF 7.0, BECAUSE HE'S GIVING

 9   ALL THE IMPACT TO 4.7 TO 7.0.

10              NOW, THEIR ANSWER TO THIS, YOUR HONOR -- AND THEY

11   REALLY DON'T HAVE AN ANSWER, BUT IT'S -- GENERALLY IT'S:

12                  "LET THE JURY DECIDE THIS.  YOU KNOW, THIS

13                  ISN'T A DAUBERT ISSUE."

14              MY POSITION IS THAT DAUBERT REQUIRES THE

15   GATEKEEPER, THE COURT, TO DECIDE IF NOLL'S APPROACH VIOLATES

16   GENERALLY-ACCEPTED METHODS.  AND IN THIS CASE, IT'S PROBABLY AN

17   OVERSTATEMENT TO THE SAY THIS IS EASY.  BUT IN THIS CASE, NOLL

18   HAS TOLD US WHAT THE STANDARD IS.  HE'S TOLD US THAT HE

19   THINKS -- HE EXPECTS 4.7 WOULD CONTINUE TO HAVE AN IMPACT, AND

20   YET HE TURNS IT OFF SO THERE'S NO IMPACT.

21              ON 7.0, WHICH IS IN THE NEXT TAB, THE QUESTION IS

22   HOW LONG AND WHEN TO TURN 7.0 ON SO YOU START PICKING UP THE

23   EFFECT OF 7.0.

24              AND THE ISSUE HERE IS:  DO YOU TURN 7.0 ON ONLY FOR

25   THE IPODS THAT HAD IT OR FOR ALL THE IPODS?  AND THE QUESTION
```

1   THERE IS:  IS THERE ANY REASON TO THINK -- UNDER THEIR OWN

2   THEORY, BECAUSE WE DON'T THINK KVC HAD ANY IMPACT ON IPOD

3   PRICES AT ALL.  BUT UNDER THEIR THEORY:  WOULD KVC HAVE AN

4   IMPACT ON PRICES OF IPODS IT WASN'T LOADED ONTO?

5               AND SO AT THE BOTTOM OF 45, I ASKED DR. NOLL:

6                   "DID YOU ASK THEM" -- AND "THEM" REFERS TO

7                   THE ECONOMISTS THAT WERE WORKING WITH HIM TO DO HIS

8                   REGRESSION -- "TO INCLUDE ONLY IPODS THAT WERE

9                   AFFECTED BY 7.0, ONLY THE ONES THAT HAD IT ON IT?"

10              AND WHAT HE BASICALLY SAYS IS HE CAN'T REMEMBER

11  WHAT HE ASKED TO THEM DO.  AND THERE WOULD BE TWO WAYS TO DO

12  IT.

13              AND THEN, HE SAYS -- IN THE INTEREST OF TIME I'LL

14  SKIP TO LINE TEN ON THE NEXT PAGE, PAGE 46.

15              HE SAYS:

16                  "IT'S NOT OBVIOUS THAT THE RIGHT WAY IS TO

17                  MEASURE THE EFFECT.  TO MEASURE THE EFFECT IS TO

18                  FOCUS ONLY EXCLUSIVELY ON PRODUCTS THAT HAD 7.0

19                  LOADED ON THEM."

20              AND THEN, HE SAYS OVER AT PAGE 48, DOWN AT THE

21  BOTTOM:

22                  "IF YOU DID IT ONLY FOR THE ONES THAT HAD 7.0

23                  ON THEM IT MIGHT BE BECAUSE YOU THOUGHT THE EFFECT

24                  WAS LIMITED TO THEM.  IF, INSTEAD, YOU DID IT FOR

25                  ALL THE PRODUCTS, IT WOULD BE BECAUSE YOU THOUGHT

1            THE MOST IMPORTANT EFFECT WAS KNOCKING HARMONY OUT

2            OF THE MARKET."

3        AND THEN, HE SAYS:

4            "I THINK THE LATTER IS ACTUALLY CORRECT.  I

5            THINK KNOCKING HARMONY OUT OF THE MARKET IS THE KEY

6            EVENT IN CAUSING REALNETWORKS NO LONGER TO TRY TO

7            COMPETE TO SELL MUSIC ON IPODS."

8        AND THEN, THE NEXT PARAGRAPH STARTS OFF:

9            "SO I THINK THAT'S THE RIGHT WAY TO DO IT,"

10    MEANING YOU TURN ON 7.0 FOR EVERYTHING.

11        AND IF YOU THINK ABOUT IT, UNDER THEIR THEORY KVC

12    WOULD HAVE AN IMPACT ON DEMAND FOR ALL IPODS FOR THIS REASON:

13    THEIR THEORY IS YOU ARE LOCKED IN TO BUY AN IPOD BECAUSE YOU'VE

14    GOT ALL THIS MUSIC FROM ITUNES BECAUSE YOU CAN'T GET IT FROM

15    REALNETWORKS.

16        IF YOU ARE LOCKED IN TO BUY AN IPOD AND YOU GO TO

17    THE STORE, YOU DON'T SAY TO YOURSELF:

18            "WELL, I'M ONLY LOCKED IN TO BUY A NANO

19            BECAUSE THE NANO HAS KVC ON IT.  YOU MIGHT AS WELL

20            BUY A SHUFFLE, A CLASSIC OR SOMETHING THAT DOESN'T

21            HAVE KVC."

22        THE CONSUMER IS NOT GOING TO THINK:

23            "DOES THIS MODEL I AM BUYING HAVE KVC ON IT OR

24            NOT?"

25            THEY MIGHT NOT EVEN KNOW ABOUT IT.  SO AS NOLL SAYS

```
 1    IF KVC HAD ANY IMPACT ON IPOD DEMAND, IT WAS GOING TO HAVE AN

 2    IMPACT ON ALL DEMANDS.

 3              ANOTHER WAY OF LOOKING AT THAT IS IF YOU SAY TO

 4    YOURSELF:

 5                   "I DON'T -- I KNOW ALL THIS.  I DON'T WANT TO

 6                   BUY AN IPOD WITH KVC ON IT, BECAUSE I WANT TO

 7                   CONTINUE TO BE ABLE TO PLAY MY REALNETWORKS MUSIC."

 8                   WHEN YOU ARE GOING TO THE STORE, YOU SAY:

 9                   "I DON'T WANT TO BUY A NANO.  I WANT TO BUY A

10                   SHUFFLE, BECAUSE A SHUFFLE DOESN'T HAVE KVC ON IT."

11              SO, IF ANYTHING, UNDER THEIR THEORY KVC WOULD

12    INCREASE THE DEMAND, AND THE PRICE, THEY SAY, OF IPODS THAT

13    DIDN'T HAVE KVC.  THAT'S AN ADDED REASON WHY YOU WOULDN'T LIMIT

14    7.0 TO IPODS WITH KVC.

15              AND THEN, UNDER THAT THEORY IT'S BECAUSE YOU HAVE

16    SO MUCH ITUNES MUSIC THAT YOU WOULD BUY A SHUFFLE.  IF YOU ARE

17    LOCKED INTO BUYING AN IPOD AND YOU KNOW THE NANO HAS KVC ON IT,

18    YOU WOULD BUY AN IPOD.  YOU WOULD BUY A SHUFFLE OR SOMETHING

19    WITHOUT KVC.

20              OKAY.  LET ME -- I KNOW MY TIME IS GETTING SHORT,

21    SO LET ME SHOW YOU WHY THIS MATTERS.  AND IN TAB TEN -- AND I

22    HATE TO DO THIS AT THE END JUST BECAUSE IT'S A SPREADSHEET, AND

23    IT'S HEAVY GOING.  BUT I THINK THIS IS IMPORTANT.

24              THIS IS AN EXHIBIT TO THE JOINT MURPHY/TOPEL

25    REPORT, AND IT SUMMARIZES THE REGRESSION ANALYSIS BY DR. NOLL.
```

1  AND EVERY TIME I HAVE ONE OF THESE IN HERE I'VE GOT TWO

2  VERSIONS.  ONE IS FOR THE RESELLERS, THE BEST BUYS AND SO

3  FORTH.  AND THE NEXT ONE IS FOR THE DIRECT SALES, THE CONSUMER

4  SALES.

5          BUT FOR THE MOST PART WE JUST NEED TO REFER TO ONE.

6  THE COLUMN ON THE LEFT LISTS THE VARIABLES, SOME OF THE

7  VARIABLES THAT NOLL USED.  THIS IS A LITTLE BIT SIMPLIFIED, BUT

8  THE COMPLETE REGRESSIONS ARE ALSO EXHIBITS.

9          AND GOING DOWN THE LEFT-HAND COLUMN HE'S GOT

10  VARIABLES FOR THE EFFECT OF HARMONY, BLOCKING HARMONY.  THAT'S

11  4.7.  HARMONY 2.  ITUNES 7.  AND THEN, LET'S JUST STOP AT

12  ITUNES 7. AND THEN, DOWN AT THE BOTTOM THERE ARE OTHER

13  VARIABLES LIKE WHETHER IT HAD PHOTO CAPABILITY, WHETHER IT WAS

14  END OF LIFE AND SO FORTH.

15          IN COLUMN ONE, WHICH IS ENTITLED "NOLL'S REBUTTAL,"

16  THAT REFERS TO NOLL'S REBUTTAL REGRESSION.  SO HIS VERY LAST

17  REGRESSION.  AND THE ONLY CHANGE WE'VE MADE TO NOLL'S REBUTTAL

18  REGRESSION -- AND THE KEY THING HERE IS THE VARIABLE IDENTIFIED

19  IN YELLOW, HIGHLIGHTED IN YELLOW FOR ITUNES 7.0.

20          IN NOLL'S REBUTTAL REPORT THE ESTIMATE, THE

21  COEFFICIENT, IS ABOUT .023.  THAT TRANSLATES TO 2.3 PERCENT.

22          SO NOLL SAYS THAT HIS REGRESSION SHOWS A

23  2.3 PERCENT OVERCHARGE, POSITIVE COEFFICIENT ATTRIBUTED TO

24  ITUNES 7.0.  THAT'S THE PRICE EFFECT FOR THIS DUMMY VARIABLE.

25          BUT IF YOU TURN ON 7.0 FOR ALL MODELS, AS HE SAYS

```
 1   IS THE RIGHT WAY TO DO IT, THAT'S THE ONLY CHANGE WE'VE MADE.

 2   AND THAT'S INDICATED IN THE PARENTHESES IN THE HEADING.  BY

 3   MAKING JUST THAT CHANGE, THE ESTIMATE, THE COEFFICIENTS FOR HIS

 4   DUMMY VARIABLE GOES NEGATIVE, MEANING THAT THERE'S NO IMPACT.

 5              IT GOES NEGATIVE, AND THE T STATISTIC IS GREATER

 6   THAN SEVEN.  IT'S GREATER THAN TWO.  IT'S SEVEN.  AND IT

 7   DOESN'T MATTER IF IT'S NEGATIVE OR POSITIVE.  AND THAT SHOWS

 8   IT'S STATISTICALLY SIGNIFICANT.

 9              SO BY TURNING 7.0 ON FOR ALL MODELS HE HAS NO

10   IMPACT, NO DAMAGES AS A RESULT OF ITUNES 7.0.

11         THE COURT:  WHERE IS THE 2.3?

12         MR. MITTELSTAEDT:  2.3 IS ON -- LET ME GET THE

13   COMPARISON FOR THAT.

14         THE COURT:  IT'S NOT ON THIS PAGE.

15         MR. MITTELSTAEDT:  IT'S NOT ON THIS PAGE.

16         THE COURT:  OKAY.  I THOUGHT I WAS SUPPOSED TO BE

17   LOOKING FOR IT ON THIS PAGE.

18         MR. MITTELSTAEDT:  NO.  NO.  OKAY.  AND THEN, YOUR

19   HONOR, IF YOU WOULD TURN TO THE LAST PAGE IN THIS -- IN THIS

20   TAB, THIS IS EXHIBIT J2-2C2 (SIC).

21              AND WHAT WE'VE DONE HERE IS TO -- WE'VE TURNED ON

22   7.0 FOR ALL MODELS LIKE WE JUST SAW.  AND THEN, WE'VE

23   CALCULATED THE EFFECT ON DR. NOLL'S DAMAGES.  AND SO -- AND

24   LET'S LOOK AT THE LEFT-HAND SIDE WHICH IS THE RESELLERS.

25              THE FIRST LINE IS PROFESSOR NOLL'S REPORTED DAMAGE
```

1    CALCULATIONS WITH THE ONLY CHANGE BEING TURNING ON 7.0.  AND IT

2    GOES NEGATIVE 38,000,000.1.

3                    THE SECOND LINE SAYS:

4                        "CORRECTING NOLL'S USE OF ACTUAL PRICE INSTEAD

5                    OF BUT-FOR PRICE."

6                    THAT'S A CHANGE THAT HE ACKNOWLEDGES WAS A MISTAKE

7    AND THAT HE NEEDS TO MAKE.  SO THAT'S REALLY THE RIGHT NUMBER.

8                    AND THEN, THE NEXT LINE, WHICH SAYS:

9                        "INCREMENTAL EFFECT OF 7.0," IF WE TRY AND

10   ISOLATE THE INCREMENTAL EFFECT OF 7.0 BY LEAVING 4.7 ON, WHICH

11   IS THE FIRST THING WE TALKED ABOUT, IF YOU JUST MAKE THAT ONE

12   ADDITIONAL CHANGE, THE DAMAGES ARE NEGATIVE, A NEGATIVE

13   33,000,000, WHICH MEANS THAT THERE'S NO IMPACT.

14                   AND THEN, IF YOU COME OVER TO THE DIRECT SALES, THE

15   RIGHT-HAND SIDE, IF YOU -- UP AT THE TOP, THE 98,000,000 IN

16   ESTIMATED DAMAGES, THE SECOND ONE OVER, SECOND COLUMN OVER FROM

17   THE LEFT, IF YOU JUST TURN ON 7.0 AND DON'T CHANGE ANYTHING

18   ELSE THAT NOLL DID, YOU STILL GET POSITIVE DAMAGES 98,000,000.

19                   AND IF YOU CORRECTED FOR THE THING EVERYBODY AGREES

20   YOU NEED TO CORRECT IT FOR, THAT COMES DOWN TO 95,000,000.  BUT

21   THEN, IF YOU LEAVE 4.7 ON TO ISOLATE THIS INCREMENTAL EFFECT OF

22   7.0, THE DAMAGES THAT HE CALCULATES FOR DIRECT SALES GOES

23   NEGATIVE, AS WELL, MEANING THERE'S NO IMPACT.

24                   SO JUST MAKING THOSE TWO CORRECTIONS, CORRECTIONS

25   THAT ARE BASED ON THE STANDARD THAT HE IDENTIFIED, THERE IS NO

1    IMPACT IN THIS CASE AS A RESULT OF KVC.

2            AND, YOUR HONOR, THIS IS NOT A TECHNICALITY.  IT'S

3    NOT SOMETHING THAT WE'VE COME UP WITH TO TRY AND DISPROVE

4    IMPACT IN A CASE WHERE THERE'S OBVIOUS IMPACT.  THERE'S NO

5    OBVIOUS IMPACT HERE.

6            THE IMPACT IS IMPLAUSIBLE.  AND JUST BY MAKING

7    THOSE TWO CHANGES THAT HE ACKNOWLEDGED MEET HIS STANDARD, THE

8    IMPACT GOES TO ZERO, WHICH IS WHAT WOULD YOU EXPECT IN THIS

9    CASE WHERE THEY ARE TRYING TO FIND SOME PRICE EFFECT IN ONE

10   MARKET BASED ON SOMETHING THAT HAPPENED IN A DIFFERENT MARKET,

11   AND IT WAS INSIGNIFICANT AT THE TIME.

12        **THE COURT:**  LET ME ASK, THE TIME THAT THE DEPOSITIONS

13   WERE TAKEN THAT WERE REFERENCED, HOW DOES THAT FIT INTO THE

14   WRITING OF ALL THESE REPORTS?

15           AND IF YOU DON'T KNOW IT, THEN MAYBE YOU DO IT

16   WHILE I HEAR FROM THE PLAINTIFFS IN TERMS OF A SPECIFIC TIME

17   LINE.

18        **MR. MITTELSTAEDT:**  YES.  THERE WAS ALWAYS -- ALMOST

19   ALWAYS A DEPOSITION TAKEN AFTER A REPORT.  BUT THE CALCULATIONS

20   THAT WE'RE GOING ON NOW ARE THE ONES -- ARE HIS VERY LAST ONES,

21   SO THEY ARE AFTER -- WELL, AFTER ALL BUT THE LAST DEPOSITION.

22           BUT SOME OF THESE, I THINK IT'S -- I UNDERSTAND THE

23   QUESTION.  IT'S AN IMPORTANT ONE, BECAUSE AT SOME POINT HE WAS

24   STILL CLAIMING DAMAGES FOR 4.7, BEFORE JUDGE WARE THREW THAT

25   OUT.  AND SO --

1        **THE COURT:**  WELL, THE CHANGE IN POSITION GIVEN THE

2   COURT'S RULINGS ARE IMPORTANT, BECAUSE IT -- WELL, IT'S AN

3   IMPORTANT FACT IN TERMS OF UNDERSTANDING WHETHER THEY ARE

4   CHANGING IT FOR THE SAKE OF CHANGING IT OR SOME OTHER -- SOME

5   OTHER REASON.

6        **MR. MITTELSTAEDT:**  CAN I SAY ONE LAST THING, YOUR

7   HONOR?  WHICH IS I WON'T PUT YOU THROUGH THIS, EVEN IF YOU

8   WOULD LET ME.  BUT THERE IS ANOTHER WAY THAT JUST BY CHANGING

9   TWO THINGS WE GET TO NO IMPACT.  AND THAT'S THE -- LET ME JUST

10  GET THIS RIGHT.  THAT IS ADDING THE -- ACTUALLY, I'M GETTING

11  AHEAD OF MYSELF, SO LET ME NOT MISSTATE IT.  BUT THERE IS

12  ANOTHER WAY OF MAKING ONE OF THOSE TWO CHANGES, PLUS ANOTHER

13  CHANGE.  AND IT'S EITHER ADDING -- YES, IT'S ADDED OMITTED

14  VARIABLES THAT RESULTS IN NO DAMAGES.

15        SO IF WE -- AND I FORGET WHETHER IT'S TURNING ON

16  7.0 FOR EVERYTHING OR LEAVING 4.7 ON FOR THE WHOLE TIME PERIOD.

17  BUT IF YOU DO ONE OF THOSE, AND YOU ADD THE VARIABLES THAT ARE

18  LISTED ON THE PRICE COMMITTEE DOCUMENT:  BATTERY, WEIGHT AND SO

19  FORTH, THAT CLEARLY AFFECT IPOD DEMAND.  IF YOU PUT THOSE

20  OMITTED VARIABLES IN, DAMAGES GO TO ZERO, AND THERE'S NO

21  IMPACT.

22        I CAN WALK THROUGH THAT.  IT'S IN THIS.  IT'S IN

23  THESE CHARTS, AND AT SOME POINT I WOULD LIKE TO WALK THROUGH

24  HERE BECAUSE THAT'S ANOTHER, I THINK, EASY WAY TO SHOW.

25        OKAY.  MAY I TAKE JUST A MINUTE AND GET THIS RIGHT,

1    OR SHOULD I COME BACK ON THIS?

2    **THE COURT:**  WHY DON'T YOU COME BACK?  AND LET ME ASK

3    YOU WAS -- DID THOSE QUESTIONS GET ASKED OF PROFESSOR NOLL, AND

4    IS THERE DEPOSITION TESTIMONY WITH RESPECT TO THAT LAST POINT?

5    THAT IF HE HAD ADDED EACH ONE OF THOSE FACTORS, HOW THAT WOULD

6    AFFECT THE ANALYSIS?

7    OKAY.  IF YOU DON'T KNOW --

8    **MR. MITTELSTAEDT:**  NO, I THINK THE ANSWER IS "NO,"

9    BUT -- AND THE BUT IS THERE'S NO DISPUTE.  I DON'T THINK

10    THERE'S ANY DISPUTE WITH RESPECT TO THE TABULATIONS HERE.  I

11    MEAN, IT'S JUST NUMBERS AT THAT POINT.

12    THE QUESTION IS HOW HE SHOULD HAVE DONE THAT, AND

13    THAT'S THE TESTIMONY THAT I'VE GONE OVER.

14    **THE COURT:**  OKAY.

15    ALL RIGHT.  I'LL HEAR FROM THE PLAINTIFFS.

16    **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

17    MR. MEDICI IS HANDING OUT OUR SLIDES.

18    YOU'VE HEARD APPLE'S COUNSEL TALK A LOT ABOUT HOW

19    THIS CASE HAS EVOLVED, AND I'M NOT GOING TO SPEND TOO MUCH TIME

20    ON THE BACKGROUND.  I DON'T WANT TO REPEAT THINGS THAT WE DON'T

21    DISAGREE WITH.  BUT I WOULD LIKE TO EMPHASIZE A FEW THINGS.

22    FIRST OF ALL, MR. MITTELSTAEDT PRESENTS PLAINTIFFS'

23    CASE AS IF IT'S A CASE ABOUT A SMALL COMPANY CALLED

24    "REALNETWORKS" WITH AN INSIGNIFICANT MARKET SHARE.

25    AND IF YOUR HONOR WERE TO GO BACK AND LOOK AT THE

1   VERY FIRST COMPLAINT THAT WAS FILED IN THIS CASE BACK IN 2005,

2   YOU'LL SEE THAT THIS CASE HAS ALWAYS BEEN ABOUT APPLE'S ATTEMPT

3   TO ACQUIRE AND THEN MAINTAIN ITS MONOPOLY POWER.  ITS MONOPOLY

4   POWER IN THE MARKET FOR PORTABLE DIGITAL PLAYERS AND IT'S

5   MONOPOLY POWER IN THE MARKET FOR PERMANENT, LEGAL, DIGITAL

6   DOWNLOADS.

7          NOW, APPLE TRIES TO PUT ALL THE FOCUS ONTO

8   REALNETWORKS.  AND IT'S CERTAINLY TRUE, YOUR HONOR, THAT

9   REALNETWORKS IS A COMPANY THAT MADE THE MOST SIGNIFICANT

10  INROADS INTO APPLE'S MONOPOLY BY VIRTUE OF ITS TECHNOLOGICAL

11  ACHIEVEMENT OF TRYING TO FIGURE OUT HOW TO PLAY ITS SONGS ON

12  IPODS.

13          HOWEVER, APPLE'S TECHNOLOGICAL CHANGES TO 4.7 TO

14  7.0, THEY DIDN'T JUST AFFECT REALNETWORKS.  THEY EXCLUDED OTHER

15  COMPETITORS.  THEY EXCLUDED OTHER WOULD-BE COMPETITORS.

16          THIS CASE IS A CASE ABOUT APPLE'S PRESERVATION OF

17  ITS MONOPOLY POWER THROUGH EXCLUSION OF RIVALS, ALL RIVALS.

18  AND APPLE, WHICH JUST IN THE LAST YEAR HAS BEEN FOUND GUILTY IN

19  ONE CASE, AND THERE'S GOOD EVIDENCE IN THE OTHER, HAS SHOWN A

20  SORT OF LACK OF DISREGARD FOR U.S. ANTITRUST LAWS.

21          AND I'M REFERRING TO THE EBOOKS CASE NEW YORK AND

22  THE HIGH-TECH EMPLOYEE CASE HERE IN THIS DISTRICT.

23          SO THIS CASE, I JUST WANT TO REFOCUS THE EMPHASIS

24  IS ON SECTION TWO OF THE SHERMAN ACT, APPLE'S MONOPOLY, AND ITS

25  ATTEMPT THROUGHOUT THE PERIOD 2006 THROUGH 2009 TO PRESERVE ITS

```
 1    MONOPOLIES.

 2            SO AS MR. MITTELSTAEDT EXPLAINED, APPLE CREATED THE

 3    IPOD AND THE ITUNES SO THAT THEY WERE COMPATIBLE ONLY WITH EACH

 4    OTHER, WHAT APPLE CALLS "WALLED GARDENS."  AND APPLE SAYS THAT

 5    THERE WERE JUSTIFICATIONS FOR THAT.  WHETHER OR NOT THERE WERE

 6    IS NOT AT ISSUE IN THIS CASE.  AND, IN FACT, JUDGE WARE HAS

 7    ALREADY DENIED SUMMARY JUDGMENT AS TO PART OF APPLE'S SUMMARY

 8    JUDGMENT ON THAT POINT.

 9            NOW --

10        THE COURT:  WAIT.  WAIT.  WAIT.

11        MS. SWEENEY:  SURE.

12        THE COURT:  HE'S GRANTED SUMMARY JUDGMENT WITH

13    RESPECT TO PORTIONS OF IT, AS WELL.  SO YOUR -- AND I JUST WANT

14    TO MAKE SURE I'M WITH ALL OF YOU IN TERMS OF WHAT THE LAW OF

15    THIS CASE IS, AND WHAT IS NOT, BECAUSE THE PLAINTIFFS HAVE

16    ALREADY LOST THROUGH JUDGE WARE A NUMBER OF ITS SECTION TWO

17    COMPLAINTS.

18        MS. SWEENEY:  SURE.  LET ME EXPLAIN.  SO JUDGE WARE

19    RULED THAT 4.7, THE APPLE UPDATE OF 2004, WAS NOT A VIOLATION

20    OF SECTION TWO.  AND THE REASON HE MADE THAT RULING, YOUR

21    HONOR, IS THAT HE FOUND THAT THERE WERE ASPECTS OF THAT

22    SOFTWARE UPDATE THAT IMPROVED THE PRODUCT, AND SO IT COULDN'T

23    BE CONSIDERED WILLFUL CONDUCT UNDER SECTION TWO OF SHERMAN ACT.

24            NOW, APPLE LOST, THOUGH, ON THE 7.0 PART OF THAT

25    MOTION.  JUDGE WARE FOUND THAT PLAINTIFFS HAD DEMONSTRATED A
```

1    GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER 7.0, AND THIS IS

2    2006 UPDATE --

3              **THE COURT:** RIGHT.

4              **MS. SWEENEY:** -- ACTUALLY HAD IMPROVEMENTS.  AND

5    APPLE TRIES -- AND WE HEARD IT TODAY -- APPLE TRIES TO TALK

6    ABOUT THE BENEFITS OF THAT PRODUCT AND THE BENEFITS OF HAVING

7    INTEGRATED COMPONENTS.  BUT THAT IS AN ISSUE FOR TRIAL.  THAT

8    ISSUE HAS ALREADY -- FOR PURPOSES OF SUMMARY JUDGMENT IS NOT

9    BEFORE YOUR HONOR.

10              NOW, EVEN THOUGH THE EVENTS OF 2004 AND 4.7 ARE NO

11    LONGER PART OF THE CASE, I'M GOING TO GO BACK A LITTLE BIT AND

12    TALK ABOUT THOSE EVENTS, BECAUSE I THINK IT'S IMPORTANT WHEN

13    YOU GET TO 2006, AND YOU SEE WHAT HAPPENS WHEN REALNETWORKS

14    MADE ITS SECONDS INROAD INTO APPLE'S MONOPOLY POWER WITH ITS

15    REVISED VERSION OF HARMONY.

16              IN 2004, REALNETWORKS LAUNCHED HARMONY, WHICH

17    LEGALLY CREATED INTEROPERABILITY BETWEEN SONGS THAT IT SOLD AND

18    THE IPOD.  AND THIS IS VERY IMPORTANT, BECAUSE AT THAT TIME

19    APPLE HAD A VERY DOMINANT SHARE OF THE PORTABLE PLAYER MARKET.

20              REALNETWORKS KNEW, LIKE ALL OTHER SELLERS OF MUSIC,

21    THAT IF IT WANTED TO HAVE A GO AT IT IT HAD TO GET ITS SONGS

22    ONTO THE IPOD.

23              NOW, WHEN THIS HAPPENED IN 2004, CONSUMERS WERE

24    PLEASED BECAUSE THEY GAINED INTEROPERABILITY.  THEY NO LONGER

25    HAD TO PURCHASE ITUNES SONGS IN ORDER TO PLAY THEM ON THEIR

1    IPOD.  THEY COULD DIRECTLY PLAY MUSIC PURCHASED FROM ANOTHER

2    SOURCE AND PUT IT ON THEIR IPOD.

3            IN ADDITION, THE LABELS WERE -- NOW, YOU HEARD

4    MR. MITTELSTAEDT TALK ABOUT HOW THE LABELS WERE ALWAYS TELLING

5    APPLE:  "YOU HAVE TO STOP THE HACKS."

6            WHEN IN FACT THE LABELS WERE VERY EXCITED BY THIS

7    INROAD MADE BY REALNETWORKS IN 2004 BECAUSE THEY WANTED

8    INTEROPERABILITY.  THEY WANTED MUSIC PLAYED ON AS MANY DEVICES

9    AS POSSIBLE.

10           AND WE HAVE -- IN THE RECORD, YOUR HONOR, WE HAVE

11   SUBMITTED THE DECLARATIONS OF THE MAJOR MUSIC LABELS:  WARNER,

12   SONY, UNIVERSAL AND EMI, STATING THAT WHILE THEY DIDN'T WANT

13   HACKS, THEY DIDN'T NECESSARILY WANT APPLE TO HAVE A CLOSED

14   SYSTEM.  THEY WANTED INTEROPERABILITY.

15           **THE COURT:**  WHAT ARE THOSE DOCUMENTS?

16           **MS. SWEENEY:**  THOSE ARE EXHIBITS FIVE, SIX, SEVEN AND

17   EIGHT TO MY DECLARATION.  AND IF YOU PARDON ME ONE MOMENT I'LL

18   FIND YOU THAT ECF NUMBER.

19           AND THAT'S EFC -- MY DECLARATION IS 751.  SO THOSE

20   ARE EXHIBITS FIVE, SIX, SEVEN AND EIGHT TO ECF751.

21           NOW, THE ECONOMIC EFFECT OF PRODUCTS LIKE HARMONY

22   WAS TO --

23           **THE COURT:**  WAIT.  CAN I STOP YOU?

24           **MS. SWEENEY:**  YES.

25           **THE COURT:**  WOULD YOU DEFINE FOR ME -- IF WE WENT TO

 1  TRIAL NEXT WEEK, DEFINE FOR ME WHAT YOU CLAIM THE MARKET TO BE.

 2       **MS. SWEENEY:**  THERE ARE TWO RELEVANT MARKETS.  THE

 3  FIRST MARKET IS THE MARKET FOR PORTABLE DIGITAL MUSIC PLAYERS.

 4  THAT'S WHERE THE IPOD FITS IN.

 5       THE SECOND MARKET IS THE MARKET FOR LEGALLY

 6  DOWNLOADABLE AND PERMANENT DIGITAL AUDIO RECORDINGS.  AND

 7  THERE'S A LOT OF WORDS IN THERE, AND LET ME UNPACK THAT FOR

 8  YOU.

 9       PROFESSOR NOLL OPINED -- AND HE HAD PLENTY OF

10  EVIDENCE TO SUPPORT HIS OPINION, AND I'LL GET TO THAT LATER IN

11  MY COMMENTS -- THAT ILLEGAL SOURCES OF MUSIC ARE NOT IN THE

12  SAME PRODUCT MARKET.  AND THERE'S A LOT OF REASONS FOR THAT.

13  LOTS OF FOLKS DON'T WANT TO BUY -- DON'T WANT TO DOWNLOAD MUSIC

14  ILLEGALLY.  AND, IN FACT, THE LABELS HAVE GONE AFTER SOME

15  INDIVIDUALS WHO DID THAT.

16       IN ADDITION, THERE ARE ALSO STREAMING SOURCES OF

17  MUSIC.  THOSE WEREN'T A BIG SOURCE OF MUSIC DURING THE CLASS

18  PERIOD.  THOSE ARE NOT PERMANENT DOWNLOADS, AND SO THOSE ALSO

19  ARE NOT PART OF THE MARKET.  SO THAT'S THE SECOND MARKET.

20       **THE COURT:**  AND HIS ULTIMATE CONCLUSION, WHAT ARE

21  YOUR DAMAGES ON THE FIRST MARKET?

22       **MS. SWEENEY:**  THE DAMAGES PLAINTIFFS ARE SEEKING ARE

23  ONLY IN THE PORTABLE DIGITAL PLAYER MARKET.  THAT IS THE MARKET

24  IN WHICH THE IPOD IS FOUND.  OUR PLAINTIFFS AND THE MEMBERS OF

25  OUR CERTIFIED CLASS ARE IPOD PURCHASERS, AND SO --

 1          **THE COURT:**  WHAT IS THAT SOUND?  ALL RIGHT.  WE'RE AT

 2   WHAT, 5? 530? 350?

 3          **MS. SWEENEY:**  IT'S AROUND $350 MILLION.  AND THAT'S

 4   FOR THE INCREASE IN THE PRICE OF IPODS DURING THE PERIOD FROM

 5   SEPTEMBER, 2006, THROUGH THE END OF MARCH, 2009.

 6          **THE COURT:**  SO THE SECOND -- SECOND MARKET -- AND

 7   THAT'S WHY I ASKED THE QUESTION, BECAUSE I WAS READING ABOUT

 8   TWO DIFFERENT MARKETS.  THE SECOND MARKET YOU IDENTIFY, BUT

 9   YOU'RE NOT CLAIMING ANY DAMAGES WITH RESPECT TO IT, IS THAT --

10          **MS. SWEENEY:**  THAT'S RIGHT, YOUR HONOR.  IT'S

11   IMPORTANT, THOUGH, TO KEEP THAT MARKET IN MIND, BECAUSE IT WAS

12   THE COMPLEMENTARY OF THESE PRODUCTS.  AND THE INOPERABILITY

13   THAT WAS CREATED BY HARMONY THAT CAUSES APPLE'S SHUTDOWN OF

14   HARMONY TO INCREASE THE LOCK-IN, WHICH INCREASED THE PRICES OF

15   IPODS.

16          AS PROFESSOR NOLL DESCRIBES IT, CUSTOMERS HAD

17   SWITCHING COSTS.  AFTER THEY PURCHASED A LOT OF ITUNES SONGS

18   FOR THEIR IPODS, IT WAS EXPENSIVE FOR THEM TO THEN MOVE TO

19   ANOTHER PLAYER.  BUT WITH PRODUCTS LIKE HARMONY, WHERE THERE

20   WAS INTEROPERABILITY THOSE SWITCHING COSTS ARE REDUCED.

21          **THE COURT:**  THE SWITCHING COSTS, IS THAT JUST TIME?

22   OR WHAT KIND OF SWITCHING COSTS DOES HE SAY THERE'S EVIDENCE

23   OF?  I HAVE TO TELL YOU ONE OF THE BIG ISSUES THAT I HAVE WITH

24   THE PLAINTIFFS' CASE IN THE CURRENT POSTURE IS:  WHAT AM I

25   SUPPOSED TO BE TRYING?  WHO IS GOING TO TESTIFY?  WHY ARE THERE

1    NO CUSTOMER SURVEYS?

2            THOSE ARE THE KINDS OF THINGS THAT I WOULD EXPECT A

3    JURY WOULD HAVE TO SEE OR HEAR ABOUT.  I MEAN, I DON'T

4    UNDERSTAND IF WHAT YOU'RE CLAIMING IS IS YOU WANT ME TO PUT

5    EXPERTS FROM BOTH SIDES UP ON THE STAND, AND THAT'S THE TRIAL.

6            MS. SWEENEY:  THAT'S CERTAINLY NOT WHAT WE'RE

7    EXPECTING YOUR HONOR TO DO.

8            THE COURT:  THERE HAS TO BE A FACTUAL BASIS FOR ANY

9    EXPERT'S OPINION.

10           MS. SWEENEY:  ABSOLUTELY, YOUR HONOR.  NOW, LET --

11           THE COURT:  SO WHERE IS THAT?

12           MS. SWEENEY:  WELL, OUR PLAINTIFFS TESTIFIED THAT

13    THEY PURCHASED THEIR SECOND IPODS BECAUSE THEY WERE LOCKED IN

14    TO THE IPOD BY VIRTUE OF HAVING ACQUIRED A MUSIC LIBRARY.

15            NOW, AS MR. MITTELSTAEDT POINTED OUT, THEY MAY NOT

16    HAVE KNOWN WHAT REAL WAS.  BUT THAT'S NOT WHAT THIS CASE IS

17    ABOUT.  THIS CASE IS ABOUT APPLE LOCKING OUT ALL RIVALS BY

18    VIRTUE OF ITS LACK OF INTEROPERABILITY BETWEEN THE DOMINANT

19    PORTABLE PLAYER AND THE DOMINANT MUSIC STORE.

20           THE COURT:  YOU GAVE ME A COUPLE OF NAMES OF

21    PLAINTIFFS.  ARE THERE OTHER PLAINTIFFS THAT HE DIDN'T MENTION

22    THAT ARE GOING TO PROVIDE THAT TESTIMONY?

23           MS. SWEENEY:  WE CITE IN OUR OPPOSITION TO SUMMARY

24    JUDGMENT THE TESTIMONY OF PLAINTIFFS CHAROENSAK AND TUCKER FOR

25    THIS POINT.

1    **THE COURT:**  SO THE SAME TWO PLAINTIFFS THAT HE CITES

2    FOR THE OPPOSITE CONCLUSION?

3    **MS. SWEENEY:**  MR. MITTELSTAEDT CITES THE TESTIMONY

4    FOR A LIMITED PURPOSE, AND THAT'S TO SHOW THAT THEY DIDN'T

5    PURCHASE SONGS FROM REALNETWORKS.  BUT THEY STILL TESTIFIED --

6    AND THIS IS THE BASIS OF THE CASE -- THAT IT WAS THE LACK OF

7    INTEROPERABILITY AND THE INABILITY OF THEM TO USE SONGS

8    PURCHASED FROM ANOTHER SOURCE THAT CAUSED THEM TO GET

9    REPLACEMENT IPODS INSTEAD OF SWITCHING TO ANOTHER PLAYER.

10   AND THESE SONGS ARE EXPENSIVE.  DURING THE CLASS

11   PERIOD MOST ITUNES SONGS WERE 99 CENTS EACH, SO IT DOESN'T TAKE

12   LONG TO ACQUIRE A SUBSTANTIAL LIBRARY THAT'S EXPENSIVE TO

13   REPLACE.

14   THEN, IN ADDITION, YOUR HONOR, WE PRODUCED -- OR

15   EXCUSE ME -- APPLE PRODUCED TO US A DATABASE OF CONSUMER

16   COMPLAINTS.

17   THERE ARE -- AS MR. MITTELSTAEDT, I THINK, ALLUDED

18   TO I THINK THERE ARE MILLIONS OF COMPLAINTS IN THAT DATABASE.

19   NOW, WE SUBMITTED ONLY A HANDFUL OF THOSE COMPLAINTS TO YOUR

20   HONOR.  AND THIS IS IN EXHIBIT 35 TO MY DECLARATION, WHICH,

21   AGAIN, IS ECF751.

22   NOW, THOSE COMPLAINTS WE CITED FOR THE PURPOSE OF

23   DEMONSTRATING THAT CUSTOMERS WANTED -- DURING THE CLASS PERIOD

24   THEY WANTED INTEROPERABILITY.  AND THEY COMPLAINED WHEN THEY

25   PURCHASED SONGS OTHER THAN ITUNES AND THEY COULDN'T PLAY THEM

1    ON THEIR IPOD.  THEY COMPLAINED TO APPLE.

2              NOW, MR. MITTELSTAEDT SAYS YOU HAVE TO DISREGARD

3    THOSE COMPLAINTS BECAUSE NO ONE IS TALKING ABOUT REAL HERE.

4              WELL, WE DIDN'T CHOOSE THOSE FROM THE DATABASE, BUT

5    WE HAVE -- AND WE HAVE THEM ACTUALLY HERE IN COURT.  WE LOOKED

6    THROUGH THE DATABASE AGAIN, AND WE FOUND THOUSANDS OF

7    COMPLAINTS AFTER 2006, SEPTEMBER, 2006, WHEN CONSUMERS WERE

8    COMPLAINING THEY COULDN'T PLAY SONGS PURCHASED FROM OTHER

9    SOURCES ON THEIR IPODS.  AND HUNDREDS OF THOSE THOUSANDS OF

10   COMPLAINTS SPECIFICALLY REFERENCED THEIR REALNETWORKS SONGS.

11             SO THAT'S THE REAL LIFE PERCIPIENT WITNESS

12   TESTIMONY THAT APPLE SAYS WE DON'T HAVE.  THAT'S PART OF IT.

13   WE HAVE OUR PLAINTIFFS' TESTIMONY.  WE HAVE COMPLAINTS THAT

14   APPLE ITSELF HAS PRODUCED TO US.  APPLE HAS ACQUIRED THESE

15   CONSUMER COMPLAINTS OVER MANY, MANY YEARS, SO THEY ARE NOT

16   UNAWARE OF THEM.

17             AND THEN IN ADDITION, YOUR HONOR, WE HAVE APPLE'S

18   OWN DOCUMENTS.  WE HAVE -- WE HAVE EVIDENCE IN THE RECORD.  WE

19   HAVE AN ESPECIALLY ROBUST RECORD ON THIS POINT FROM THE FIRST

20   SUMMARY JUDGMENT MOTION BECAUSE 4.7 WAS STILL AN ISSUE.  BUT WE

21   HAVE MANY DOCUMENTS SHOWING THAT APPLE ITSELF VIEWED

22   REALNETWORKS AS A REAL THREAT.  PEOPLE AT THE HIGHEST LEVEL OF

23   THE COMPANY WERE SHOCKED AND ALARMED WHEN HARMONY MADE ITS

24   DEBUT IN 2004.

25             STEVE JOBS DRAFTED A PRESS RELEASE EVEN BEFORE

1  HARMONY PUBLICLY ANNOUNCED ITS PRODUCT THAT SAID:

2          "REALNETWORKS IS A HACKER.  WE'RE GOING TO

3          SHUT IT DOWN."

4          AND IT WARNED ANY WOULD BE -- ANY OTHER WOULD BE

5  RIVALS THAT IT WOULD SHUT THOSE KINDS OF ATTEMPTS TO MAKE IPODS

6  INTEROPERABLE DOWN, AS WELL.  SO -- AND IT'S NOTABLE THAT MR.

7  JOBS AND THAT OTHER HIGH LEVEL EXECUTIVES AT APPLE WERE KEY

8  PARTICIPANTS IN THE SHUTDOWN OF HARMONY IN 2004, BECAUSE THEY

9  WERE ON THE PRICING COMMITTEE.

10         STEVE JOBS IS ON THE PRICING COMMITTEE.  I ACTUALLY

11  HAVE A SLIDE IN HERE THAT SHOWS THE MEMBERS OF THE PRICING

12  COMMITTEE.  IT'S A SMALL COMMITTEE.  I THINK THERE'S ONLY FOUR

13  MEMBERS DURING THE CLASS PERIOD, OR MAYBE FIVE. AND TWO OF THEM

14  WERE KEY PLAYERS IN 2004 WHEN HARMONY WAS SHUT DOWN.  AND THEN,

15  YOU SEE -- THERE'S ACTUALLY SIX.

16      **MR. MEDICI:**  SLIDE SIX.

17      **MS. SWEENEY:**  SLIDE SIX.  EXCUSE ME.  THIS IS PAGE

18  SIX OF OUR PACKAGE OF SLIDES.

19         STEVE JOBS AND PHIL SCHILLER, MEMBERS OF THE

20  PRICING COMMITTEE, WERE AT THE FOREFRONT OF THE EFFORT TO SHUT

21  REALNETWORKS DOWN IN 2004.

22         NOW, WE ALSO HAVE SUBMITTED DOCUMENTS SHOWING THAT

23  IN 2006 AT THE TIME OF 7.0, APPLE WAS STILL MONITORING ALL OF

24  ITS COMPETITORS, INCLUDING IN THE DIGITAL MUSIC SPACE AND

25  INCLUDING REALNETWORKS.  THERE ARE FEWER DOCUMENTS DURING THIS

1    TIME PERIOD COMPLAINING ABOUT REALNETWORKS BECAUSE, AFTER ALL,

2    BY THAT POINT, YOUR HONOR, WE HAD FILED THIS LAWSUIT.

3         **THE COURT:**  WITH RESPECT TO THE -- TO YOUR STATEMENT

4    THAT YOU'VE GOT THOUSANDS OF THESE COMPLAINTS OUT THERE, WHY

5    AREN'T THEY PART OF THE RECORD?

6              THAT IS, WHY WEREN'T THEY -- WHY DIDN'T YOU CITE TO

7    THOSE IN TERMS OF THE OPPOSITION OF THE MOTION FOR SUMMARY

8    JUDGMENT GIVEN THAT THEY ARE NOT IN FRONT OF ME?

9         **MS. SWEENEY:**  YOUR HONOR, BECAUSE WE HAD ALREADY

10   SUFFICIENT EVIDENCE -- IN OUR VIEW WE HAD SUFFICIENT EVIDENCE

11   IN THE RECORD TO SHOW THAT THERE'S A DISPUTED ISSUE OF FACT,

12   AND THOSE -- I MEAN, IT'S VOLUMINOUS.  WE HAVE -- IT'S A BOX OF

13   DOCUMENTS.  WE'RE HAPPY TO SUPPLEMENT THE RECORD, IF YOUR HONOR

14   WOULD LIKE TO HAVE THOSE COMPLAINTS IN THE RECORD.

15        **THE COURT:**  WELL, DON'T GIVE ME A BOX OF DOCUMENTS.

16   AT LEAST NOT YET.  OKAY.

17        **MS. SWEENEY:**  SO THOSE ARE THE THREE CATEGORIES OF

18   EVIDENCE OTHER THAN EXPERT WITNESS TESTIMONY THAT WE WILL RELY

19   UPON AT TRIAL TO SHOW THAT APPLE'S CLOSURE OF HARMONY AND OTHER

20   RELATED KINDS OF PRODUCTS PRESERVED ITS MONOPOLIES IN BOTH

21   THOSE MARKETS.

22        **THE COURT:**  DO YOU HAVE THE DEPOSITIONS OF JOBS,

23   COOK, SCHILLER AND OPPENHEIMER?

24        **MS. SWEENEY:**  WE HAVE THE DEPOSITION OF MR. JOBS.  I

25   THINK WE HAVE -- MS. BERNAY CAN SPEAK TO THIS PROBABLY BETTER

1    THAN ME.  BUT WE HAVE THE DEPOSITIONS OF SOME PEOPLE WHO WORKED

2    WITH THE PRICING COMMITTEE OTHER THAN MR. JOBS, OBVIOUSLY, WHO

3    WAS ON THE PRICING COMMITTEE.

4            **THE COURT:**  OTHER PEOPLE WHO WORKED -- OKAY.  SO WHAT

5    DO YOU HAVE?  IF SHE NEEDS TO ADDRESS THAT ISSUE, THAT'S FINE.

6            **MS. SWEENEY:**  I THINK THERE'S THE DEPOSITION OF MR.

7    DONNELLY, AND WE'VE CITED SOME OF HIS TESTIMONY IN OPPOSITION

8    TO SUMMARY JUDGMENT.  AND THEN, THERE'S SOME OTHER WITNESSES

9    WHO WE CITED TESTIMONY SHOWING THAT -- I THINK IT WAS THE

10   DONNELLY WITNESS WHO DESCRIBED HOW THE PRICING COMMITTEE MADE

11   ITS DECISIONS AND WHAT IT TOOK INTO ACCOUNT.  AND IT WAS A VERY

12   BROAD RANGE OF THINGS THAT THE PRICING COMMITTEE TOOK INTO

13   ACCOUNT, ALL OF ITS COMPETITORS, AS WE POINT OUT IN THE

14   OPPOSITION TO SUMMARY JUDGMENT.

15           **THE COURT:**  OKAY.

16           THAT'S OKAY.  CONTINUE.

17           **MS. SWEENEY:**  OKAY, THANK YOU, YOUR HONOR.

18           NOW, SO PICKING UP WITH 7.0, AS MR. MITTELSTAEDT

19   SAID, BY APRIL, 2005, REAL HAD REDESIGNED HARMONY SO THAT ITS

20   SONGS WERE ONCE AGAIN PLAYABLE ON IPODS.  AND APPLE ONCE AGAIN

21   BROKE HARMONY WITH ITS 7.0 UPDATE.

22           AND WE SUBMITTED THE EXPERT TESTIMONY OF OUR

23   TECHNOLOGICAL EXPERT, DAVID MARTIN, WHO EXPLAINED THAT THIS

24   UPDATE HAD NO BENEFITS TO CONSUMERS.  IT HAD THE EFFECT OF

25   ACTUALLY ERASING SONGS ON CUSTOMERS' IPODS.  AND SO UNLIKE 4.7,

1   WHICH JUDGE WARE FOUND TO HAVE PRODUCT IMPROVEMENTS, 7.0 DID

2   NOT MAKE IT HARDER FOR HACKERS TO STRIP DRM PROTECTION.

3   INSTEAD, IT -- AS MR. MITTELSTAEDT, I THINK, REFERRED TO THIS

4   WHAT IT DID WAS IT LOOKED TO SEE IF SONGS CAME FROM A SOURCE

5   OTHER THAN ITUNES.  AND IF IT DID, THOSE SONGS WERE NO LONGER

6   PLAYABLE.  AND THAT'S WHY JUDGE WARE DENIED APPLE'S MOTION FOR

7   SUMMARY JUDGMENT WITH RESPECT TO 7.0.

8           AND THEN, JUST TO FINISH UP THE HISTORY, SO APPLE

9   RESTORED ITS MONOPOLY.  AND THEN, WE HAVE -- WE ALSO HAVE

10  EVIDENCE IN THE RECORD ABOUT THE MARKET SHARE OF REALNETWORKS.

11  APPLE SAYS THAT REALNETWORKS WAS A VERY INSIGNIFICANT

12  COMPETITOR, PARTICULARLY 2006.  WELL, APPLE'S EXPERTS' OWN DATA

13  SHOWS THAT IN AUGUST, 2006, ONE MONTH BEFORE APPLE SHUT HARMONY

14  DOWN FOR THE SECOND TIME, IT HAD A SHARE OF APPROXIMATELY

15  3.7 PERCENT.  THESE ARE APPLE'S FIGURES.

16          SO THAT'S NOT AN INSIGNIFICANT MEASURE, BY ANY

17  MEANS. AND APPLE HAS NEVER SAID, ITS EXPERTS HAVE NEVER SAID

18  WHAT MARKET SHARE WOULD BE SIGNIFICANT.

19          BEGINNING IN --

20       **THE COURT:**  BUT THIS IS ON THE SECOND MARKET YOU'VE

21  DEFINED, NOT THE MARKET ON WHICH YOU WERE SEEKING DAMAGES.

22       **MS. SWEENEY:**  THAT'S CORRECT, YOUR HONOR.  BUT THE

23  MARKETS REINFORCE ONE ANOTHER.  THAT IS, APPLE IS ABLE TO

24  ACHIEVE ITS DOMINANCE IN THE IPOD -- IN THE PORTABLE PLAYER

25  MARKET BY VIRTUE OF ITS ITUNES STORE.

1        BEFORE APPLE INTRODUCED ITS ITUNES STORE IN 2003,

2   IT HAD A RELATIVELY SMALL MARKET SHARE.  AND PROFESSOR NOLL

3   TALKS ABOUT THIS IN HIS REPORT.  AND THAT IS EXHIBIT ONE TO MY

4   SUMMARY JUDGMENT DECLARATION, WHICH IS ECF751.

5        PROFESSOR NOLL EXPLAINED HOW IN THE PERIOD PRIOR TO

6   THE LAUNCH OF THE ITUNES STORE APPLE'S SHARE OF THE PORTABLE

7   PLAYER MARKET, I BELIEVE IT WAS LESS THAN 40 PERCENT.  AND

8   THEN, ONCE APPLE OPENED THE ITUNES STORE, ITS MARKET SHARE

9   JUMPED FAIRLY QUICKLY TO AROUND 70 PERCENT, AND FOR MANY YEARS

10  STAYED IN THE 70 PERCENT RANGE.

11       THE ONLY TIME IT DIPPED DOWN BELOW 70 PERCENT WAS

12  IN 2004 AFTER REALNETWORKS HAD LAUNCHED HARMONY.  AND I'D JUST

13  LIKE TO GO BACK TO THE STANDARD FOR THIS MOTION.  AND I'M

14  ARGUING, OF COURSE, AGAINST APPLE'S SUMMARY JUDGMENT MOTION AND

15  AGAINST ITS DAUBERT MOTION AGAINST PROFESSOR NOLL.

16       AND SO WITH RESPECT TO THE MOTION FOR SUMMARY

17  JUDGMENT, WE WILL HAVE THE BURDEN AT TRIAL OF PROVING FOUR

18  ELEMENTS.  ONE, THAT APPLE POSSESSED MONOPOLY POWER IN A

19  RELEVANT MARKET.  TWO, THAT APPLE ACQUIRED OR MAINTAINED THAT

20  MONOPOLY WILLFULLY.  AND BY "WILLFULLY" THE COURTS HAVE SAID --

21  AND I'M REFERRING TO THE UNITED STATES SUPREME COURT IN THE

22  ASPEN SKIING CASE.  A MONOPOLY IS WILLFULLY ACQUIRED IF IT'S --

23  OR MAINTAINED -- IN THIS CASE IT'S A MONOPOLY MAINTENANCE

24  CASE -- IF THE COMPANY HAS EXCLUDED OR DRIVEN RIVALS FROM THE

25  MARKET ON SOME BASIS OTHER THAN COMPETITION ON THE MERITS.

 1          THAT'S WHAT WE ALLEGE, YOUR HONOR, THAT APPLE HAS

 2   WILLFULLY MAINTAINED ITS MONOPOLY IN THESE TWO MARKETS BECAUSE

 3   IT HAS DRIVEN RIVALS FROM THE MARKET ON A BASIS OTHER THAN

 4   MERITS.

 5          THE OTHER TWO ELEMENTS WE HAVE TO PROVE ARE THAT

 6   APPLE'S CONDUCT CAUSED ANTICOMPETITIVE EFFECTS.  THAT IS THE

 7   KINDS OF INJURY THAT THE ANTITRUST LAWS ARE INTENDED TO

 8   FORESTALL.  AND, FINALLY, THAT PLAINTIFFS AND CLASS MEMBERS

 9   WERE INJURED IN THEIR BUSINESS OR PROPERTY AS A RESULT.

10          NOW, IN ITS MOTION FOR SUMMARY JUDGMENT, APPLE

11   CHALLENGES ONLY TWO OF THESE ELEMENTS.  THEY CHALLENGE MONOPOLY

12   POWER IN A RELEVANT MARKET.  AND IT'S IMPORTANT TO NOTE THAT

13   WHAT THEY CHALLENGE THERE IS NOT THAT APPLE HAS MONOPOLY POWER

14   IN EITHER OF THE MARKETS THAT PLAINTIFFS HAVE DEFINED.  RATHER,

15   THEY CHALLENGE THE MARKET DEFINITION ITSELF.  AND I'LL GET TO

16   THAT IN A MINUTE.

17          AND THE SECOND ELEMENT -- AND THIS IS WHERE

18   MR. MITTELSTAEDT FOCUSED MOST OF HIS COMMENTS -- IS APPLE

19   CHALLENGES -- APPLE SAYS THAT PLAINTIFFS CAN'T SHOW IMPACT,

20   INJURY TO CLASS MEMBERS.  AND IN RESPONSE TO YOUR HONOR'S

21   QUESTIONS, I HAVE TALKED ABOUT THE THREE KINDS OF EVIDENCE

22   OTHER THAN EXPERT WITNESS EVIDENCE THAT WE WILL USE AT TRIAL TO

23   SHOW IMPACT.

24          AND NOW I'D LIKE TO TALK A LITTLE BIT ABOUT

25   PROFESSOR NOLL'S OPINIONS.  BUT BEFORE I DO THAT I'D ALSO JUST

1    LIKE TO MENTION THAT THERE ARE MANY ANTITRUST CASES THAT HOLD

2    THAT AN EXPERT WITNESS WHO SUPPLIES TESTIMONY IN AN ANTITRUST

3    CASE CAN TESTIFY AS TO IMPACT.

4            SO PROFESSOR NOLL'S TESTIMONY IS NOT THE ONLY BASIS

5    FOR IMPACT, BUT IT'S CERTAINLY AN ACCEPTABLE BASIS.  PROFESSOR

6    NOLL IS A PROFESSOR EMERITUS AT STANFORD.

7            **THE COURT:**  I KNOW WHO HE IS.

8            **MS. SWEENEY:**  OKAY.

9            **THE COURT:**  DON'T WASTE YOUR TIME.

10           **MS. SWEENEY:**  OKAY. PROFESSOR NOLL HAS BEEN THE

11   EXPERT FOR PLAINTIFFS SINCE THIS CASE WAS FILED.  HE WAS THE

12   EXPERT ON CLASS CERTIFICATION.  AT CLASS CERTIFICATION APPLE'S

13   EXPERTS -- THEY ACTUALLY HAD A DIFFERENT EXPERT AT THAT TIME.

14   SHE MADE THE SAME CRITICISMS THAT ITS EXPERTS ARE CURRENTLY

15   MAKING, CHALLENGING PROFESSOR NOLL'S TREATMENT OF 4.7,

16   CHALLENGING THE VARIABLES THAT HE USED, AND ALSO ASSERTING THAT

17   HE SHOULD HAVE CLUSTERED HIS STANDARD ERRORS.

18           APPLE MADE THOSE ARGUMENTS THEN.  APPLE LOST.

19   JUDGE WARE CERTIFIED THE CLASS ON THE BASIS OF PROFESSOR NOLL'S

20   EXPERT OPINION ON IMPACT AND HOW HE WAS GOING TO CALCULATE

21   DAMAGES.

22           IN THAT CONTEXT, HE HAS PRODUCED IN THIS CASE TEN

23   EXPERT REPORTS.  I THINK FOUR OF THEM IN THE LAST TWO YEARS,

24   AND THE OTHERS ALL PERTAINED TO CLASS CERTIFICATION.  HE'S BEEN

25   DEPOSED SIX TIMES.  SO IT'S VERY INTERESTING THAT APPLE

1    CONTINUES TO BRING OUT SNIPPETS OF HIS TESTIMONY.

2                AS YOUR HONOR POINTED OUT, IT'S IMPORTANT TO KNOW

3    THE DATES OF THOSE DEPOSITIONS BECAUSE SOME OF THE TESTIMONY

4    THAT MR. MITTELSTAEDT WAS QUOTING TODAY WAS EARLIER IN 2011,

5    AROUND THE TIME OF CLASS CERTIFICATION WHEN PROFESSOR NOLL --

6    AND I THINK HE SAID THIS IN SOME OF THE TESTIMONY THAT WAS

7    QUOTED.  HE SAID IT WAS AN EMPIRICAL ISSUE; THAT HE DIDN'T HAVE

8    THE DATA, BUT IT WAS AN EMPIRICAL ISSUE.  SO SOME OF THE

9    TESTIMONY IS TAKEN OUT OF CONTEXT, AND WE'D BE HAPPY TO SUPPLY

10   THE FULL CONTEXT TO SOME OF THOSE REMARKS, BECAUSE I DON'T

11   BELIEVE THAT ALL OF THAT TESTIMONY THAT MR. MITTELSTAEDT PUT IN

12   THE SLIDES WAS IN THE RECORD BEFORE TODAY.

13               SO PROFESSOR NOLL HAS REACHED A NUMBER OF

14   CONCLUSIONS AS PART OF HIS MERITS AND LIABILITY AND DAMAGES

15   REPORTS.  HE HAS OPINED THAT APPLE ENJOYED MARKET POWER DURING

16   THE CLASS PERIOD IN TWO RELEVANT ANTITRUST MARKETS.  AND THESE

17   ARE THE MARKETS THAT I MENTIONED BEFORE.

18               FIRST, THE MARKET FOR PORTABLE DIGITAL MEDIA

19   PLAYERS, WHICH INCLUDES THE IPODS.  AND, SECONDLY, THE MARKET

20   FOR PERMANENT DOWNLOADS OF DIGITAL AUDIO FILES, WHICH INCLUDES

21   APPLE'S ITUNES SERVICES.

22               SECOND, PROFESSOR NOLL OPINED THAT APPLE'S BLOCKING

23   OF HARMONY THROUGH 7.0 INCREASED LOCK-IN BY INCREASING

24   CONSUMERS' SWITCHING COSTS.  AND THIRD, THAT BY VIRTUE OF

25   BLOCKING HARMONY APPLE ENHANCED AND MAINTAINS ITS MONOPOLY

 1   POWER IN THE DIGITAL MEDIA PLAYER.  AND THEN, AS A RESULT,

 2   APPLE WAS ABLE TO CHARGE HIGHER PRICES FOR HIS IPODS.  AND HE

 3   CONDUCTED A VERY SOPHISTICATED MULTIPLE VARIABLE REGRESSION

 4   ANALYSIS AND CALCULATED DAMAGES, AS I MENTIONED, AT AROUND

 5   $350 MILLION.

 6            NOW, APPLE'S CHALLENGES ARE PRIMARILY TO PROFESSOR

 7   NOLL'S OPINIONS, AND SO I'M GOING TO TALK MOSTLY ABOUT THOSE

 8   OPINIONS.

 9            FIRST OF ALL, APPLE COMPLAINS THAT PROFESSOR NOLL'S

10   REGRESSION ANALYSIS AND ITS RESULTS ARE UNREALISTIC BECAUSE

11   APPLE ADHERED UNWAVERINGLY TO WHAT IT CALLS "ESTHETIC PRICE

12   POINTS."

13            BUT PROFESSOR NOLL DEMONSTRATED USING APPLE'S DATA

14   THAT THERE WAS TREMENDOUS VARIETY IN PRICING.  NOT ALL APPLE'S

15   PRICES ENDED IN A NINE.  AND THESE PRICES ARE REFLECTED IN

16   APPENDIX B TO THE NOLL REBUTTAL REPORT.  AGAIN, THAT'S EXHIBIT

17   ONE TO MY DECLARATION WHICH IS ECF751.

18            THERE WAS A TREMENDOUS AMOUNT OF VARIATION IN

19   APPLE'S PRICING.  IT WASN'T ALL ESTHETIC PRICING, AS APPLE

20   SAYS.  AND THAT IS JUST DISPROVEN BY THE RECORD.  APPLE ALSO

21   MAKES THE POINT:

22            "WELL, BUT PROFESSOR NOLL CALCULATED THAT

23   DAMAGES WOULD BE THIS VERY SPECIFIC AMOUNT, AND APPLE NEVER

24   PRICED PRODUCTS THAT WAY."

25            AND I WOULD JUST LIKE TO REFER YOUR HONOR TO THE

 1   LEADING ANTITRUST CASES ON PROOF OF DAMAGES.  AND THAT WOULD BE

 2   THE SUPREME COURT'S BIGELOW CASE AND THE J. TRUETT PAYNE CASE,

 3   AND BOTH OF THOSE CASES HOLD THAT ONCE IT GETS TO DAMAGES

 4   PLAINTIFFS ARE NOT OBLIGATED IN AN ANTITRUST CASE TO PROVE THE

 5   AMOUNT OF DAMAGES WITH EXACTITUDE.

 6           ALL RIGHT.  AND THEN, PROFESSOR NOLL HAD A LOT OF

 7   VARIABLES IN HIS MODEL.  APPLE ALSO CRITICIZES PROFESSOR NOLL'S

 8   MULTIPLE REGRESSION ANALYSIS FOR NOT INCLUDING ALL VARIABLES.

 9   THIS IS WHAT APPLE REFERS TO AS ITS ADMITTED VARIABLES

10   ARGUMENT.

11           AND THERE ARE, I THINK, A HANDFUL OF VARIABLES.

12           **THE COURT:**  I'M GOING TO INTERRUPT YOU --

13           **MS. SWEENEY:**  SURE.

14           **THE COURT:**  BECAUSE I AM LOOKING AT APPENDIX B TO

15   YOUR EXHIBIT ONE.

16           **MS. SWEENEY:**  YES.

17           **THE COURT:**  WHICH IS 751.  LOOKS LIKE PERHAPS FOUR.

18   IS THAT NOT --

19           **MS. SWEENEY:**  OH, FORGIVE ME, YOUR HONOR.  I SHOULD

20   HAVE -- IT SHOULD BE TO MY EXHIBIT TWO.  IT'S THE REBUTTAL

21   DECLARATION OF ROGER C. NOLL -- G. NOLL.

22           **THE COURT:**  OKAY.  THIS EXHIBIT APPENDIX B IS

23   DISTRIBUTION OF THE RESELLER PRICE OVER A YEAR-END QUARTER.

24           **MS. SWEENEY:**  YES.  AND I THINK IF YOU --

25           **THE COURT:**  HOW DOES THAT SHOW THE ESTHETIC PRICE

1  POINTS?

2  **MS. SWEENEY:**  IT SHOWS THAT THERE WAS -- WELL, APPLE

3  MAKES TWO POINTS ABOUT THE PRICES.  FIRST, IT SAYS THERE WAS

4  ALMOST NO VARIATION IN PRICES.  AND, SECONDLY, IT SAYS THAT

5  APPLE ALWAYS PRICED IN THE ESTHETIC PRICE POINT, WHICH IT KEPT

6  ON FOR THE WHOLE DURATION OF A PRODUCT'S LIFE.  AND THAT'S

7  SIMPLY NOT SUPPORTED BY THE RECORD.  ESPECIALLY TO THE

8  RESELLERS, APPLE'S PRICES WERE ALL OVER THE PLACE.  AND THAT'S

9  WHAT THOSE DIAGRAMS DEPICT.

10  YOUR HONOR, PROBABLY LIKE YOU, WE FOUND THOSE

11  HISTOGRAMS SOMEWHAT DIFFICULT TO UNDERSTAND FROM A LAYPERSON'S

12  POINT OF VIEW, SO WE TOOK THAT SAME DATA AND TURNED THEM INTO

13  BAR CHARTS.  I COULD HAND THOSE UP, IF YOUR HONOR WOULD LIKE.

14  **THE COURT:**  YOU CAN'T HAND ME ANYTHING WITHOUT THE

15  DEFENSE SEEING IT.

16  **MR. MEDICI:**  THE LAST EIGHT PAGES OF THE

17  PRESENTATION.  SHE ALREADY HAS THEM.

18  **MS. SWEENEY:**  OH, OKAY.  FORGIVE ME, YOUR HONOR.  YOU

19  ALREADY HAVE THEM.  THE LAST EIGHT PAGES OF THE SLIDE

20  PRESENTATION, SO APPLE HAS THEM, AS WELL.

21  **THE COURT:**  OKAY.

22  **MS. SWEENEY:**  STARTING, THEY ARE PAGES 44, AND THEY

23  GO OUT OF ORDER 44, 40, 45, 41, 46, 42, 47 AND 43.

24  **THE COURT:**  OKAY.  MY --

25  **MS. SWEENEY:**  AND FOR --

1          **THE COURT:**  SO AFTER 39, YOU SWITCHED THE PAGES, 44,

2     40, 45, 41, 42, 47 AND 43.  THAT'S WHAT I HAVE.

3          **MS. SWEENEY:**  YES.  AND THE REASON WE DID THAT, YOUR

4     HONOR, IS TO PUT THEM IN A CERTAIN KIND OF ORDER THAT REFLECTS

5     THERE ARE SORT OF TWO PURCHASER SEGMENTS IN THE CLASS.  ONE IS

6     WHAT WE CALL "THE RESELLERS," AND THE OTHERS ARE CALLED "DIRECT

7     SALES."  AND THOSE ARE THE CONSUMER PURCHASERS IN THE CLASS.

8          **THE COURT:**  OKAY.  GO AHEAD.

9          **MS. SWEENEY:**  OKAY.  SO NOW LET'S TALK ABOUT 4.7.

10    APPLE MAKES A LOT OUT OF THE FACT THAT PROFESSOR NOLL SHOULD

11    HAVE TURNED OFF THE VARIABLE FOR 4.7 WHEN SEVEN -- OR, EXCUSE

12    ME -- SHOULD NOT HAVE TURNED OFF 4.7 WHEN APPLE IMPOSED THE 7.0

13    UPDATE.

14          AND PROFESSOR NOLL CONSIDERED THAT CRITICISM.  HE

15    CONSIDERED IT IN THE CONTEXT OF APPLE'S EXPERTS' TESTIMONY BACK

16    IN 2011 AT THE TIME OF CLASS CERTIFICATION.  HE REJECTED IT

17    THEN, AND HE CONTINUES TO REJECT IT NOW AS HAVING NO BASIS IN

18    ECONOMIC THEORY.

19          HE SAID -- AND THIS IS BASED ON THE RECORD -- THAT

20    THERE'S NO EVIDENCE THAT THOSE MODELS IN WHICH APPLE

21    IMPLEMENTED 7.0, IN THOSE MODELS 4.7 COULD NO LONGER WORK.

22          SO THERE'S NO REASON TO LEAVE THAT VARIABLE ON.

23          **THE COURT:**  SAY THAT AGAIN.  SAY THAT AGAIN.

24          THERE'S NO EVIDENCE THAT WHAT?

25          **MS. SWEENEY:**  7.0 REPLACED 4.7 IN THOSE MODELS WHERE

1    THE 7.0 UPDATE WAS IMPLEMENTED.  SO THOSE FEATURES OF 4.7 THAT

2    LOCKED OUT HARMONY WERE NO LONGER OPERABLE.  SO IT DOESN'T MAKE

3    SENSE TO INCLUDE THAT VARIABLE WHEN IT DIDN'T WORK ANY LONGER

4    ON THOSE PARTICULAR MODELS OF IPODS.

5            NOW, IT'S ALSO IMPORTANT BECAUSE JUDGE WARE HELD

6    THAT 4.7 DID HAVE SOME PRODUCT IMPROVEMENTS.  SO IT'S IMPORTANT

7    TO DELINEATE THE 4.7 FROM THE 7.0 UPDATES IN ORDER TO MEASURE

8    THE IMPACT OF 7.0.

9            AND, IMPORTANTLY, I DON'T KNOW IF MR. MITTELSTAEDT

10   MENTIONED THIS, BUT EVEN IF YOU ADOPTED APPLE'S CRITICISM --

11   AND PROFESSOR NOLL EXPLAINS WHY IT'S NOT A VALID CRITICISM --

12   IF YOU DID THAT IT WOULDN'T REALLY CHANGE THE RESULTS.  THERE

13   IS STILL SIGNIFICANT POSITIVE IMPACT.

14           IN PARTICULAR, THE RESELLER DAMAGES WOULD DECREASE

15   BY LESS THAN 5 PERCENT, AND THE DIRECT PURCHASERS' DAMAGES

16   WOULD DECREASE BY APPROXIMATELY 55 PERCENT.

17           AND THE SUPPORT FOR THIS, YOUR HONOR, IS IN THE

18   APPENDICES TO THE JOINT MURPHY/TOPEL REPORT.  AND THAT'S

19   APPLE'S EXPERTS.  AND ALSO NOLL'S SUPPLEMENTAL REPORT AT PAGES

20   14 AND 15.  AND PROFESSOR NOLL'S SUPPLEMENTAL REPORT IS EXHIBIT

21   THREE TO MY DECLARATION, WHICH IS ECF751.

22           SO, REALLY, EVEN IF IT HAD AN ECONOMIC BASIS AND

23   YOU ACCEPTED IT, IT WOULDN'T CHANGE THE RESULT.  THERE'S STILL

24   POSITIVE IMPACTS, AND THERE'S STILL SIGNIFICANT DAMAGES.

25           NOW, THE ONLY WAY THAT APPLE CAN GET TO ZERO

```
1    DAMAGES AND ZERO IMPACT IS BY LUMPING TOGETHER ALL OF ITS

2    CRITICISMS.  AND I THINK IT'S VERY INTERESTING TO SEE HOW APPLE

3    CHERRY-PICKED DIFFERENT KINDS OF CRITICISMS, AND THEN ADDED

4    THEM TOGETHER IN ORDER TO GET RID OF PROFESSOR NOLL'S RESULTS.

5              SO APPLE SAYS NOT ONLY SHOULD PROFESSOR NOLL HAVE

6    LEFT ON 4.7, BUT THEY SAY IT SHOULD HAVE -- PROFESSOR NOLL

7    SHOULD HAVE HAD 7.0 ON FOR ALL THE IPODS.

8              NOW, WHAT MR. MITTELSTAEDT DIDN'T MENTION IS THAT

9    VERY LATE IN THE WHOLE EXPERT DECLARATION PROCESS APPLE

10   REVEALED TO US FOR THE FIRST TIME THAT INFORMATION WE HAD

11   RECEIVED YEARS AGO ABOUT WHICH MODELS HAD 7.0 WAS INCORRECT.

12             SO AFTER PROFESSOR NOLL SUBMITTED HIS FIRST

13   LIABILITY REPORT, WE LEARNED INFORMALLY, OR MAYBE AROUND THE

14   SAME TIME, WE LEARNED INFORMALLY THROUGH APPLE'S ATTORNEYS THE

15   INFORMATION WE HAD WAS WRONG.

16             BY THE TIME OF PROFESSOR NOLL'S REBUTTAL REPORT

17   APPLE HAD SUBMITTED A DECLARATION THAT GAVE US THE NEW

18   CORRECTED INFORMATION.  AND THIS WAS A DECLARATION FROM MR.

19   FARUJA (PHONETIC).  SO FOR THE FIRST TIME WE HAD ACCURATE

20   INFORMATION ABOUT WHICH MODELS HAD 7.0.

21             SO PROFESSOR NOLL IN HIS REGRESSION ANALYSIS, HE

22   ENABLED THE 7.0 VARIABLE ONLY FOR THOSE MODELS THAT HAD IT,

23   WHICH IS A VERY SENSIBLE THING TO DO.

24             NOW, MR. MITTELSTAEDT POINTS TO PROFESSOR NOLL'S

25   TESTIMONY SAYING:
```

1              "WELL, IT COULD HAVE IMPACTED MODELS WHERE IT

2         WASN'T ENABLED."

3              BUT PROFESSOR NOLL NEVER EVER SAID THAT THAT WAS

4    HIS OPINION THAT IT DID AFFECT THOSE MODELS, NOR DID HE EVER

5    SUGGEST THAT THE IMPACT WOULD BE NEARLY AS GREAT AS FOR THOSE

6    MODELS WHERE IT WAS IMPLEMENTED.  ALL HE SAID WAS:

7              "YES, IT COULD."

8              SO IT WAS PERFECTLY REASONABLE FOR PROFESSOR NOLL

9    TO HAVE 7.0 ON FOR THE MODELS WHERE IT WAS ENABLED AND NOT TO

10   HAVE IT ON FOR THOSE MODELS WHERE IT WAS NOT ENABLED.  AND IT'S

11   REALLY SORT OF A SILLY ARGUMENT, BUT ONCE YOU SEE THAT IF YOU

12   ADD THE 4.7 CHANGES THAT APPLE WANTS, PLUS THE 7.0 CHANGES THAT

13   APPLE WANTS, AND YOU GET TO ZERO DAMAGES YOU CAN SEE THAT THEIR

14   EXPERTS' CRITICISMS OF PROFESSOR NOLL ARE VERY LITIGATION

15   DRIVEN.

16             I THINK I WAS STARTING TO TALK ABOUT APPLE'S

17   OMITTED VARIABLES ARGUMENT, YOUR HONOR, WHEN WE GOT

18   SIDETRACKED.  IF I DID ALREADY GET TO THIS, THEN I APOLOGIZE.

19             SO APPLE'S EXPERTS SUGGEST THAT PROFESSOR NOLL

20   SHOULD HAVE ADDED FIVE VARIABLES TO HIS REGRESSION ANALYSIS,

21   AND THAT THIS WOULD HAVE IMPROVED THE EXPLANATORY POWER OF THE

22   REGRESSION.

23             PROFESSOR NOLL DISAGREES.  HE HAS A LENGTHY

24   STATEMENT IN HIS OPINION AS TO WHY HE DISAGREES.  BUT THERE'S A

25   COUPLE OF REASONS IN ADDITION THAT I'D LIKE TO POINT OUT.  SO

1    APPLE'S OWN EXPERT ADMITS THAT THESE ADDITIONAL VARIABLES WOULD

2    HAVE VERY LITTLE EXPLANATORY POWER.

3              AND PROFESSOR TOPEL STATES THAT IN DEPOSITION AT

4    PAGES 149 THROUGH 50?  AND THIS IS IN A NOLL'S REBUTTAL REPORT,

5    PAGES 31 AT NOTE EIGHT, WHICH IS EXHIBIT TWO TO MY DECLARATION.

6              AND, IMPORTANTLY, IT'S IMPORTANT NOT TO ADD THESE

7    VARIABLES BECAUSE THEY CREATE A PROBLEM OF MULTICOLLINEARITY.

8    WHAT THAT MEANS IS THAT WHEN THERE ARE CERTAIN VARIABLES IN THE

9    REGRESSION THAT CAPTURE THE SAME INFORMATION, IT DOESN'T

10   ACCURATELY PRESENT THE RESULTS.

11             SO PROFESSOR NOLL CONDUCTED A NUMBER OF TESTS TO

12   DETERMINE WHETHER THE ADDITIONAL VARIABLES PROPOSED BY APPLE'S

13   EXPERTS CREATED MULTICOLLINEARITY.  AND HE FOUND THAT FOR ALL

14   BUT ONE OF THOSE VARIABLES THEY DID CREATE MULTICOLLINEARITY.

15   AND THIS IS IN HIS REBUTTAL REPORT AT 31.

16             SO, IN OTHER WORDS, PROFESSOR NOLL HAS A VERY

17   ROBUST MODEL THAT ACCOUNTS FOR MORE THAN 95 PERCENT OF THE

18   VARIATION.  AND THESE ADDITIONAL VARIABLES NOT ONLY DON'T ADD

19   MUCH TO THAT RESULT, BUT THEY HARM THE RESULT.  SO THEY

20   SHOULDN'T HAVE BEEN ADDED.

21             AND, FINALLY, I WOULD JUST LIKE TO POINT YOUR HONOR

22   TO THE RELEVANT CASE LAW ON THIS TOPIC.  AND THE MOST PROMINENT

23   IS THE UNITED STATES SUPREME COURT'S DECISION IN BAZEMORE,

24   WHICH HELD THAT WHEN THERE IS A CASE OF OMITTED VARIABLES, IT

25   TYPICALLY GOES TO THE WEIGHT OF THE EXPERT'S TESTIMONY, NOT THE

```
1    ADMISSIBILITY.

2              ANOTHER OF THE CRITICISMS THAT APPLE'S EXPERTS

3    LAUNCH AGAINST PROFESSOR NOLL IS THEIR SO-CALLED CLUSTERING

4    ARGUMENT.  AND THIS, AGAIN, IS AN ARGUMENT THAT APPLE'S EXPERT

5    MADE A CLASS CERTIFICATION.  IT WAS MADE BY THEIR THEN EXPERT,

6    MICHELLE BURTIS.  AND IT WAS REJECTED BY JUDGE WARE AT THAT

7    TIME.  AND IT HAS BEEN -- PROFESSOR NOLL HAS BEEN CONSISTENT IN

8    HIS REJECTION OF THIS ARGUMENT.

9              AND IT'S ON THIS BASIS, YOUR HONOR, THAT PLAINTIFFS

10   HAVE ALSO MOVED TO EXCLUDE PORTIONS OF APPLE'S EXPERTS'

11   TESTIMONY.  UNLIKE APPLE, WE DON'T SEEK TO EXCLUDE THE ENTIRETY

12   OF PROFESSORS MURPHY AND TOPEL'S REPORT, JUST THEIR OPINIONS AS

13   THEY RELATE TO CLUSTERING.

14             AND IN SUPPORT OF OUR MOTION, WE RELY NOT ONLY ON

15   THE OPINIONS OF PROFESSOR NOLL, BUT WE HAVE SUBMITTED THE

16   OPINIONS OF PROFESSOR WOOLDRIDGE.  PROFESSOR WOOLDRIDGE IS A

17   ECONOMETRICIAN WHO SPECIALIZES IN SAMPLING PROBLEMS.  HE'S AT

18   MICHIGAN STATE UNIVERSITY.  AND HE'S SUBMITTED TWO

19   DECLARATIONS.

20             THE FIRST ONE IS EXHIBIT ONE TO MY DECLARATION IN

21   SUPPORT OF OUR DAUBERT MOTION, WHICH IS ECF737.  I'M AFRAID I

22   DON'T HAVE THE ECF NUMBER FOR THE SUPPLEMENTAL REPORT.

23             APPLE ARGUES THAT PROFESSOR NOLL'S REGRESSION

24   RESULTS ARE NOT STATISTICALLY SIGNIFICANT.  AND THE REASON

25   APPLE SAYS IS THAT BECAUSE PROFESSOR NOLL SHOULD HAVE CLUSTERED
```

1    THE STANDARD ERRORS.  AND THIS IS A HIGHLY-TECHNICAL

2    ECONOMETRIC ISSUE DEALING WITH SAMPLES.

3              PROFESSOR NOLL EXPLAINS -- AND WE HAVE SLIDES, YOUR

4    HONOR, ON THIS TOPIC.  THESE ARE THE SLIDES BEGINNING AT PAGE

5    18.  AND THE FIRST AND MOST FUNDAMENTAL RESPONSE TO APPLE'S

6    CLUSTERING ARGUMENT IS THAT CLUSTERING IS INAPPROPRIATE HERE

7    BECAUSE THERE IS NO CLUSTERING PROBLEM.  AS PROFESSOR NOLL PUT

8    IT, CLUSTERING PROBLEMS ARISE BECAUSE OF THE WAY THAT A SAMPLE

9    OF OBSERVATIONS IS DRAWN FROM A LARGER POPULATION.

10             NOW, HERE PROFESSOR NOLL DID NOT RELY ON A SAMPLE

11   OF APPLE'S TRANSACTION DATA, MUCH LESS A CLUSTERED SAMPLE OF

12   THOSE DATA.  HE USED THE ENTIRE DATABASE OF TRANSACTIONS,

13   HUNDREDS OF MILLIONS OF TRANSACTIONS.  AND HE USED THOSE ALL IN

14   HIS REGRESSION ANALYSIS, EXCEPT FOR THE HANDFUL OF OUTLIERS

15   THAT HE COULDN'T USE AS WELL AS SOME DATA POINTS WHERE APPLE

16   HAD NOT PROVIDED SUFFICIENT INFORMATION FOR HIM TO TIE THEM TO

17   PARTICULAR TRANSACTIONS.

18             NOW, BOTH PROFESSORS NOLL AND WOOLDRIDGE GIVE AN

19   EXAMPLE OF A TYPICAL CLUSTERING PROBLEM WHICH REQUIRES THIS

20   CLUSTERING ADJUSTMENT THAT APPLE TALKS ABOUT.  AND THAT'S IN

21   THE CONTEXT OF EDUCATION.

22             IF YOU ARE TRYING TO FIND OUT THE EFFECT OF CLASS

23   SIZE, FOR EXAMPLE, ON STUDENT TEST PERFORMANCE, IF YOU WERE TO

24   TAKE A SAMPLE FROM FOUR ELEMENTARY SCHOOLS IN CALIFORNIA, THEN

25   YOU WOULD HAVE A PROBLEM OF CLUSTERED SAMPLES, BECAUSE THERE

1    ARE OTHER UNOBSERVED FACTORS IN THOSE FOUR SCHOOLS THAT WOULD

2    AFFECT THOSE TEST RESULTS.

3            WELL, HERE WE DON'T EVEN HAVE A RANDOM SAMPLE, MUCH

4    LESS A CLUSTERED SAMPLE.  SO THE WHOLE IDEA OF CLUSTERING THE

5    STANDARD ERRORS SIMPLY MAKES NO SENSE.  AND PROFESSOR NOLL AND

6    PROFESSOR WOOLDRIDGE HAVE EXPLAINED THAT.

7            AND SO WHAT MURPHY AND TOPEL DO IS THEY IGNORE THE

8    FACT THAT THERE AREN'T ANY CLUSTER SAMPLES HERE.  THEY CLUSTER

9    THE STANDARD ERRORS, ANYWAY.  AND THE EFFECT OF THAT IS TO

10   REDUCE, TO JUST SIMPLY IRRADICATE THE SIGNIFICANCE OF PROFESSOR

11   NOLL'S RESULTS.

12           AND THE WAY THAT HAPPENS IS THEY TAKE THESE

13   HUNDREDS OF MILLIONS OF TRANSACTIONS, ALL THESE SEPARATE

14   INDEPENDENT DATA POINTS, ALL THESE OBSERVATIONS, AND THEY

15   COLLAPSE THEM.  IN OTHER WORDS, AS PROFESSOR NOLL PUT IT, THIS

16   IS THE EQUIVALENT OF TAKING AN AVERAGE OF ALL THOSE DIFFERENT

17   TRANSACTIONS.

18           SO YOU MOOSH OUT ALL THE VARIATION, AND YOU HAVE

19   MUCH LESS PRECISION.  AND WHAT HAPPENS IS YOU NOT ONLY

20   DESTROYED THE RELIABILITY AND PRECISION, BUT YOU DESTROYED THE

21   EXPLANATORY POWER OF THE REGRESSION ANALYSIS.

22           PROFESSOR WOOLDRIDGE EXPLAINS THAT YOU SEE

23   RESEARCHERS SOMETIMES MAKING THIS MISTAKE BY TAKING GROUPS THAT

24   HAVE BEEN RANDOMLY -- SAMPLES THAT HAVE BEEN RANDOMLY SAMPLED

25   WHERE YOU DON'T HAVE A CLUSTERING PROBLEM, AND THEN GROUPING

1    THEM AFTERWARDS.

2          AND IT'S CALLED "EX POST CLUSTERING." THAT'S WHAT

3    PROFESSOR WOOLDRIDGE CALLS IT, AND IT'S SIMPLY INAPPROPRIATE IN

4    THIS CASE.  NOW, THE PROBLEM WITH CLUSTERING WHEN YOU DON'T

5    HAVE A CLUSTERED SAMPLE IS, AS I SAID, TO INCREASE GREATLY THE

6    STANDARD ERRORS.  AND IT REDUCES THE TRUE PRECISION OF THE

7    ESTIMATES.  AND FORGIVE ME FOR USING WORDS, ALL THESE

8    ECONOMETRIC TERMS.  THE PROBLEM WITH THIS IS -- AND APPLE'S

9    EXPERTS SAY:

10          "OH, IT DOESN'T MATTER.  IF THERE ISN'T A

11          CLUSTERING PROBLEM IT DOESN'T HURT TO CLUSTER THE

12          STANDARD ERRORS."  AND THAT'S SIMPLY NOT TRUE,

13    BECAUSE WHAT YOU HAVE IS YOU TAKE A RESULT THAT, AS PROFESSOR

14    NOLL OPINES, HIS REGRESSION RESULTS AREN'T STATISTICALLY

15    SIGNIFICANT.  AND YOU OBLITERATE THAT SIGNIFICANCE.

16          SO IT'S NOT SIMPLY CONSERVATIVE.  IT'S ACTUALLY

17    WRONG.  SO OUR EXPERTS HAVE EXPLAINED IN GREAT DETAIL WHY THE

18    CLUSTERING ADJUSTMENT THAT APPLE'S EXPERTS WANT TO DO IS

19    WRONG-HEADED FROM THE POINT OF ECONOMICS AND ECONOMETRICS.  AND

20    IT'S ALSO LITIGATION-DRIVEN, BECAUSE IT HAS THE CONVENIENT

21    EFFECT OF REDUCING TO NOTHING THE SIGNIFICANCE OF PROFESSOR

22    NOLL'S RESULTS.

23          ONE OTHER THING I'D LIKE TO MENTION ABOUT

24    CLUSTERING IS THAT --

25          **THE COURT:**  REMIND ME WHERE THOSE EXPERTS ARE FROM.

1          **MS. SWEENEY:**  APPLE'S EXPERTS?

2          **THE COURT:**  YES.

3          **MS. SWEENEY:**  THEY ARE BOTH AT THE UNIVERSITY OF

4    CHICAGO.

5          **THE COURT:**  NOT A BAD INSTITUTION.

6          **MS. SWEENEY:**  NOT A BAD INSTITUTION.

7          **THE COURT:**  SOME PEOPLE SAY THEY CAN DO ECONOMICS

8    THERE.

9          NOW, PERHAPS THE ECONOMICS ON THE RIGHT AND THE

10   ECONOMICS ON THE LEFT ARE DIFFERENT.  AND CHICAGO CERTAINLY HAS

11   A SCHOOL OF THOUGHT.  DOESN'T THIS ALL GO TO WEIGHT, JUST LIKE

12   YOUR CLAIM THAT NOLL SHOULD NOT BE EXCLUDED WITH RESPECT TO HIS

13   OMITTING OF VARIABLES?

14         IF I ALLOW NOLL TO OPINE, GIVEN HIS VIEW OF

15   ECONOMETRICS, WHY WOULDN'T I LET THE OPPOSING EXPERTS PROVIDE

16   THEIR VIEW ON THESE ECONOMETRICS ISSUES?

17         **MS. SWEENEY:**  WELL, IN OUR VIEW, YOUR HONOR, THE

18   MISTAKES MADE BY PROFESSORS MURPHY AND TOPEL ARE MUCH MORE

19   FUNDAMENTAL, AND THEY ARE COMPLETELY AT ODDS WITH ECONOMETRICS

20   LITERATURE.

21         **THE COURT:**  IS THERE AN ALL ECONOMETRIC LITERATURE?

22   IF I LOOKED AT THEIR REPORTS I'M NOT GOING TO FIND ANYTHING

23   THAT SUGGESTS THAT CLUSTERING IN THIS KIND OF ENVIRONMENT IS

24   NOT APPROPRIATE?

25         **MS. SWEENEY:**  WELL, THEY CITED TO A COUPLE OF -- THEY

1    CITED TO AN ABA MONOGRAPH.  AND THEY ALSO CITE TO A CHAPTER IN

2    A BOOK ON SAMPLING.  BUT THE BOOK THAT THEY CITE IS ACTUALLY

3    TALKING ABOUT CLUSTERED SAMPLES.  SO IT'S NOT AN APPROPRIATE

4    CITATION.

5              AND THE ABA MONOGRAPH SAYS WHEN YOU DON'T HAVE

6    CLUSTERED SAMPLES IT DOESN'T HURT TO CLUSTER THE STANDARD

7    ERRORS, ANYWAY.  AND APPLE'S OWN EXPERTS, PROFESSORS MURPHY AND

8    TOPEL, BOTH AGREED AT DEPOSITION THAT IF YOU CLUSTER STANDARD

9    ERRORS WHERE YOU DON'T HAVE A CLUSTERING PROBLEM YOU CAN BIAS

10   THE STANDARD.

11             SO OUR VIEW, YOUR HONOR, IS THAT THE --

12        **THE COURT:**  THAT IT'S SO FAR OUT THERE THAT IT

13   SHOULDN'T BE PRESENTED TO THE JURY.  SO IF I HAD THE PARTIES

14   HIRE A WELL-KNOWN ECONOMICS PROFESSOR TO SERVE AS A COURT'S

15   EXPERT TO ANSWER SIMPLE QUESTIONS LIKE:  IS THIS REALLY THAT

16   FAR OUT THERE?  DOES NO ONE ELSE IN THE FIELD OF ECONOMICS

17   BELIEVE THIS?  IS THAT WHAT THEY ARE GOING TO TELL ME?

18        **MS. SWEENEY:**  THAT'S WHAT I WOULD SAY, YOUR HONOR.

19   I'M SURE THAT MR. MITTELSTAEDT WOULD GIVE A DIFFERENT ANSWER,

20   BUT --

21        **THE COURT:**  SO WOULD YOU OBJECT TO THE COURT FINDING

22   AN ECONOMICS PROFESSOR WHO CAN ANSWER THESE BASIC QUESTIONS

23   BECAUSE YOUR VIEW IS THEY ARE SO BASIC?

24        **MS. SWEENEY:**  WE WOULD CERTAINLY BE INTERESTED TO

25   LEARN MORE ABOUT THE PROCESS.

1      **THE COURT:**  MR. MITTELSTAEDT?

2      **MR. MITTELSTAEDT:**  I WOULD HAVE THE SAME RESPONSE.  I

3  WOULD WANT TO TALK WITH MY CLIENT, JUST VERY BRIEFLY.

4      **THE COURT:**  BOTH OF YOU, YOU KNOW -- AND WE'RE GOING

5  TO TAKE A BREAK HERE IN A MINUTE.  YOU'LL HAVE MORE TIME TO

6  FINISH UP.  THE COURT REPORTER HAS BEEN GOING FOR AWHILE.

7      THE ECONOMICS THAT ARE POSITED IN THESE VARIOUS

8  REPORTS ARE, YOU KNOW, THEY ARE NOT THE RUN-OF-THE-MILL

9  ECONOMICS.  THEY ARE NOT.  IT'S COMPLICATED STUFF.

10      AND I CAN JUST LOOK AT IT ALL, IF I -- YOU KNOW,

11  AND FIGURE:

12      "WELL, I COULD LET THE JURY DECIDE."

13      IF I HAVE TO REALLY MASTER IT, I DON'T HAVE AN

14  ECONOMICS DEGREE.  I DON'T REALLY HAVE TIME TO GO GET ONE

15  BETWEEN NOW AND WHEN I'M SURE YOU WANT AN ORDER.

16      SO I HAVE THOUGHT ABOUT THAT.  WHETHER THAT IS

17  SOMETHING THAT I SHOULD HAVE THE PARTIES DO IN TERMS OF BEING

18  ABLE TO PROVIDE SOME SUPPORT IN TERMS OF THOSE KINDS OF BASIC

19  ECONOMIC QUESTIONS.

20      WE DO THESE IN ALL KINDS OF DIFFERENT WAYS, IN

21  TERMS OF COURT EXPERTS.  BUT -- AND PERHAPS I DON'T EVEN NEED

22  TO GET THERE.  I DON'T KNOW.  BUT IT CERTAINLY IS SOMETHING

23  THAT I HAVE THOUGHT ABOUT.

24      SO PERHAPS YOU THINK ABOUT -- THINK ABOUT IT AMONG

25  YOURSELVES.  WE'LL TAKE A BREAK FOR TEN MINUTES, THEN WE'LL GET

1    RESTARTED.

2              **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

3              (THEREUPON, A RECESS WAS TAKEN.)

4              **MR. MEDICI:**  MS. SWEENEY IS BEHIND US.  SHE'LL JUST

5    BE ANOTHER MINUTE.

6              **THE COURT:**  OKAY.  WE'RE BACK ON THE RECORD.  THE

7    RECORD WILL REFLECT THAT THE PARTIES ARE BACK.

8              COUNSEL, WHEN WE GO TO TRIAL, TEN MINUTES MEANS TEN

9    MINUTES.  IT MEANS YOU SHOULD BE IN THE COURTROOM IN EIGHT,

10   MINUTES SO YOU ARE READY TO GO IN TEN MINUTES.

11             **MS. SWEENEY:**  MY APOLOGIES, YOUR HONOR.

12             **THE COURT:**  YOU MAY PROCEED.

13             **MS. SWEENEY:**  BEFORE I TURN BACK TO MY OUTLINE, YOUR

14   HONOR, I HAVE A HOUSEKEEPING MATTER.  IN ADDITION TO THE MOTION

15   FOR SUMMARY JUDGMENT AND THE TWO DAUBERT MOTIONS, THERE ARE TWO

16   OTHER MOTIONS RELATING TO THE EXPERTS WHICH MS. BERNAY WAS

17   GOING TO ARGUE.  ONE IS OUR MOTION TO EXCLUDE THE SUPPLEMENTAL

18   JOINT REPORT OF MURPHY AND TOPEL BECAUSE IT WAS OUTSIDE OF THE

19   SCHEDULING ORDER.

20             AND THE SECOND IS APPLE'S MOTION TO EXCLUDE THE

21   SUPPLEMENTAL REPORT OF OUR EXPERT, PROFESSOR WOOLDRIDGE. SO I'M

22   JUST TRYING TO FIND OUT IF YOUR HONOR WANTS TO HEAR ARGUMENTS

23   ON THOSE.  AND IF SO, I WILL RESERVE SOME TIME FOR MS. BERNAY.

24             **THE COURT:**  THOSE THINGS ARE NOT VERY COMPLICATED FOR

25   ME.  IF YOU WANT TO TAKE YOUR TIME TO ARGUE THOSE, YOU ARE

 1    WELCOME TO ARGUE THEM, BUT THAT'S YOUR TIME.

 2            **MS. SWEENEY:**  I'M GOING TO TURN TO MONOPOLY POWER IN

 3    THE RELEVANT MARKETS.  AND IN THE SLIDE PACKET THAT WE GAVE

 4    YOU, YOUR HONOR, THAT WE HAVE A NUMBER OF SLIDES AT PAGES 27

 5    THROUGH 33.

 6            SO AS I MENTIONED EARLIER, PROFESSOR NOLL HAS GIVEN

 7    AN OPINION AS TO TWO RELEVANT MARKETS IN THIS CASE, THE MARKET

 8    FOR PORTABLE DIGITAL MUSIC PLAYERS, AND THEN THE MARKET FOR

 9    PERMANENT DIGITAL DOWNLOADS OF AUDIO FILES.

10            NOW, APPLE DOESN'T CLAIM THAT IT DOESN'T HAVE

11    MONOPOLY POWER IN EITHER ONE OF THOSE MARKETS.  WHAT IT ARGUES

12    AND WHAT ITS EXPERTS ARGUE IS THAT THOSE DEFINITIONS ARE

13    INCORRECT.

14            PROFESSORS MURPHY AND TOPEL ARGUE, FOR EXAMPLE,

15    THAT IT SHOULD HAVE INCLUDED MORE PRODUCTS IN BOTH MARKETS.

16    FOR THE PLAYER MARKET IT SHOULD HAVE ALSO INCLUDED HOME

17    STEREOS, COMPUTERS, ET CETERA.  AND APPLE MAKES THE ARGUMENT

18    THAT PROFESSOR NOLL DID NOT RELY ON THE KINDS OF EVIDENCE HE

19    SHOULD HAVE RELIED ON TO COME TO HIS CONCLUSIONS ABOUT MONOPOLY

20    POWER AND RELEVANT MARKETS AND IN DEFINING THE MARKET.

21            WE RESPONDED TO THIS ARGUMENT IN OUR OPPOSITION TO

22    THE MOTION FOR SUMMARY JUDGMENT.  PROFESSOR NOLL HAS COMPLIED

23    WITH THE RELEVANT LAW IN TERMS OF WHAT KINDS OF INDICIA HE

24    LOOKED AT BEFORE HE FORMED HIS OPINIONS ABOUT THE RELEVANT

25    MARKETS.

1          PROFESSOR NOLL, AS YOUR HONOR KNOWS, IS A

2    WELL-RECOGNIZED ECONOMIST, AND HE HAS BEEN ACTIVELY INVOLVED IN

3    THE COMMUNICATIONS INDUSTRY, INCLUDING THE MUSIC INDUSTRY, AS

4    AN ECONOMIST FOR MORE THAN 45 YEARS.  HE'S GIVEN TESTIMONY IN

5    NUMEROUS CASES INVOLVING SPECIFICALLY DIGITAL MUSIC.  FOR

6    EXAMPLE, THE NAPSTER CASE, THE RECENT ASCAP HEARING IN NEW

7    YORK.

8          SO HE'S INDISPUTABLY WELL-QUALIFIED TO GIVE AN

9    OPINION AS TO THESE RELEVANT MARKETS.  AND I'D JUST LIKE TO

10   NOTE THE BROWN SHOE DECISION, THE UNITED STATES SUPREME COURT

11   DECISION WHICH TALKS ABOUT THE KINDS OF EVIDENCE ECONOMISTS

12   SHOULD LOOK AT WHEN THEY ARE DEFINING THE RELEVANT MARKET,

13   BECAUSE APPLE MAKES AN ARGUMENT UNSUPPORTED BY LAW OR

14   EXPERIENCE THAT SAYS:

15          "WELL, GEE, PROFESSOR NOLL SHOULD HAVE DONE X,

16

17          Y AND Z."

18          AND, IN FACT, PROFESSOR NOLL LOOKED AT THE KINDS OF

19   THINGS ECONOMISTS TYPICALLY LOOK AT AND THE KINDS OF EVIDENCE

20   THAT THE UNITED STATES SUPREME COURT HAS SPECIFICALLY

21   SANCTIONED AS BEING PERMISSIBLE IN DETERMINING WHAT IS THE

22   RELEVANT MARKET.

23          AND IF YOU LOOK AT PROFESSOR NOLL'S LIABILITY

24   REPORT -- AND THIS IS EXHIBIT ONE TO MY DECLARATION, WHICH IS

25   ECF751 -- HE LOOKED AT INTERNAL APPLE DOCUMENTS.  HE EXAMINED

```
 1   APPLE EMPLOYEE TESTIMONY.  HE LOOKED AT APPLE'S INTERROGATORY

 2   RESPONSES.  HE EXAMINED HUGE AMOUNTS OF GOVERNMENT DATA,

 3   REPORTS BY FINANCIAL ANALYSTS, INDUSTRY EXPERTS, CONGRESSIONAL

 4   TESTIMONY, ET CETERA.  AND HE RELIED UPON HIS EXTENSIVE

 5   EXPERIENCE AS AN ECONOMIST ANALYZING THESE ISSUES OVER THE LAST

 6   FIFTY YEARS TO REACH HIS CONCLUSIONS.

 7            AND I WON'T SPEND ANY MORE TIME ON THAT, YOUR

 8   HONOR.  THOSE ARE PAGES 28 THROUGH 30 OF OUR SLIDES.

 9            SO I'D ALSO LIKE TO RESPOND BRIEFLY TO AN ARGUMENT

10   THAT APPLE MAKES WITH RESPECT TO OUR EXPERT ON CLUSTERING,

11   PROFESSOR WOOLDRIDGE.  APPLE ARGUES THAT HIS OPINIONS SHOULD BE

12   EXCLUDED BECAUSE THEY WERE, QUOTE:

13                "CUSTOM MANUFACTURED FOR THIS LITIGATION."

14            AND IF YOU LOOK AT THE DEPOSITION TESTIMONY THAT

15   APPLE HAS CITED IN SUPPORT OF THESE ARGUMENTS, HIS TESTIMONY

16   DOES NOT SAY WHAT THEY SAY IT SAYS.

17            PROFESSOR WOOLDRIDGE IS AN EXPERT IN A QUITE

18   SPECIALIZED AREA OF ECONOMETRICS.  AS HE MENTIONED, HE

19   SPECIALIZES IN SAMPLING ISSUES. HE'S ONE OF THE FOREMOST

20   EXPERTS ON THESE ISSUES.

21            SO WHEN APPLE CRITICIZED HIM FOR NOT RELYING ON

22   PUBLISHED WORKS IN THE FIELD, BUT AS PROFESSOR WOOLDRIDGE

23   TESTIFIED AND AS HIS SUPPLEMENTAL DECLARATION SAYS, HE WAS

24   RELYING UPON HIS OWN PUBLISHED WORKS FOR SUPPORT FOR HIS

25   OPINIONS.
```

```
 1              HE'S WORKED ON CLUSTERED SAMPLE ISSUES FOR A NUMBER

 2    OF YEARS.  HE'S BEEN COLLABORATING WITH A COLLEAGUE ON A PAPER

 3    ON THE WHOLE QUESTION OF WHETHER YOU SHOULD CLUSTER IN THE

 4    CONTEXT OF A WHOLE POPULATION AS OPPOSED TO SAMPLES.

 5              AND APPLE SAYS THAT HIS OPINIONS IN THIS CASE ARE

 6    CONTRADICTED BY HIS PAST WORK.  AND THE EXAMPLES THAT APPLE

 7    CITED ARE INAPPOSITE.  IT'S VERY SORT OF ESOTERIC ISSUE, BUT

 8    PROFESSOR WOOLDRIDGE WAS TALKING ABOUT CLUSTERING IN TWO

 9    DIFFERENT CONTEXTS THAT DID NOT INVOLVE A WHOLE POPULATION LIKE

10    WE HAVE HERE.

11              HE WAS TALKING ABOUT PANEL DATA AND CROSS-SECTIONAL

12    DATA.

13              AND I THINK I DON'T HAVE ANYTHING MORE, YOUR HONOR.

14    I WOULD LIKE TO RESERVE A FEW MINUTES, IF YOUR HONOR HAS ANY

15    QUESTIONS, OR IF YOU ARE GOING TO PERMIT MR. MITTELSTAEDT TO

16    SPEAK AGAIN ON THE ISSUES AS TO WHICH PLAINTIFF BEARS THE

17    BURDEN OF PROOF.

18              THE COURT:  OKAY.  DO YOU WANT YOUR COLLEAGUE TO

19    ADDRESS THE COURT?

20              MS. SWEENEY:  YES.  JUST VERY BRIEFLY, YOUR HONOR.  I

21    THINK SHE'S GOT A VERY SHORT PRESENTATION.

22              THE COURT:  WOULD THAT BE MEDICI?

23              MS. BERNAY:  ALEXANDRA BERNAY. GOOD AFTERNOON, YOUR

24    HONOR.

25              THE COURT:  OH, CARMEN ANTHONY MEDICI.  I TAKE IT
```

1    MEDICI IS ITALY?

2                **MR. MEDICI:**  YES.

3                **THE COURT:**  OKAY.  GO AHEAD.

4                **MS. BERNAY:**  I DON'T HAVE SUCH AN ILLUSTRIOUS

5    BACKGROUND.

6                **THE COURT:**  NEITHER DO I.  GO AHEAD.

7                **MS. BERNAY:**  GOOD AFTERNOON.  YOUR HONOR, I WOULD

8    LIKE TO SPEAK JUST BRIEFLY ABOUT PLAINTIFFS' MOTION TO STRIKE

9    THE DECEMBER 20TH SUPPLEMENTAL EXPERT REPORT THAT WAS FILED BY

10   PROFESSORS MURPHY AND TOPEL.

11               THE REASON WHY WE'RE SEEKING TO STRIKE THIS IS ON A

12   NUMBER OF REASONS.  FIRST, THE FILING OF THE REPORT VIOLATES

13   THE COURT'S VARIOUS SCHEDULING ORDERS.  ON JUNE 5TH AND

14   NOVEMBER 1ST OF 2013, THE COURT ORDERED DEFENDANTS TO COMPLETE

15   THEIR EXPERT DISCLOSURES BY MID-JULY OF THAT SAME YEAR.

16               YOU ALSO -- THE COURT ALSO ORDERED THE PARTIES HAD

17   UNTIL DECEMBER 20TH TO FILE ANY SUMMARY JUDGMENT MOTIONS.  AND

18   DURING THE TIME PERIOD THAT THE PARTIES WORKED OUT THESE TYPES

19   OF SCHEDULES THAT THE COURT SIGNED OFF ON, NO ADDITIONAL EXPERT

20   REPORTS WERE CONTEMPLATED.

21               NOW, APPLE CLAIMS -- ONE OF THEIR ARGUMENTS IS THAT

22   THE MOTION TO STRIKE IS PROCEDURALLY IMPROPER.  THAT'S NOT

23   ACCURATE.  WE PROPERLY MOVED UNDER LOCAL RULE 7-8, WHICH STATES

24   A MOTION FOR SANCTIONS MUST BE SEPARATELY FILED.

25               HERE WHERE WE WERE REQUESTING EXCLUSIONARY

1   SANCTIONS UNDER RULE 37, THE PROPER RULE TO FILE UNDER WAS 7.8

2   AND NOT 7.3.  PRIMARILY, OUR ISSUE, HOWEVER, IS THAT THIS IS

3   NOT A PROPER SUPPLEMENT UNDER FRCP 26 (E).

4              APPLE'S SOLE JUSTIFICATION FOR SUBMITTING THIS

5   UNAPPROVED AND YOU UNTIMELY REPORT IS THAT THEY ARE RESPONDING

6   TO NEW MATERIAL.  HOWEVER, ANY -- ANY NEW MATERIAL IN THE NOLL

7   REBUTTAL REPORT, YOUR HONOR.

8              BUT REALLY THE ONLY PART OF THE REBUTTAL THAT IS

9   NEW IS DIRECTLY RESPONSIVE TO CRITICISMS IN THE MURPHY AND

10  TOPEL ORIGINAL REPORT, OR WAS MADE NECESSARY BY APPLE'S LATE

11  PRODUCTION OF ACCURATE INFORMATION IDENTIFYING THE ACTUAL IPOD

12  MODELS THAT WERE AFFECTED.  AND MS. SWEENEY DISCUSSED WITH YOU

13  THAT WE DID NOT FIND OUT UNTIL JULY THROUGH THE FARUJA

14  DECLARATION THE EXACT MODELS THAT HAD THE KVC ON THEM.

15             AND PROFESSOR NOLL HAD EVEN SAID IN HIS LIABILITY

16  REPORT IF DID HE GET INFORMATION REGARDING THE SPECIFIC MODELS

17  HE MAY HAVE TO REESTIMATE HIS DAMAGES.

18             SO UNDER FEDERAL RULE 26, REBUTTAL EVIDENCE IS

19  PRETTY CLEAR.  IT'S EVIDENCE THAT IT'S INTENDED SOLELY TO

20  CONTRADICT OR REBUT EVIDENCE ON THE SAME SUBJECT MATTER

21  IDENTIFIED BY ANOTHER PARTY.

22             SO OUR VIEW HERE IS THAT THAT'S EXACTLY WHAT NOLL'S

23  REBUTTAL DID.  IT RESPONDED DIRECTLY TO THOSE SPECIFIC

24  CRITICISMS THAT THE DEFENDANTS HAD.  AND PROFESSOR NOLL MADE

25  SOME OF THE ADJUSTMENTS THAT THEY RECOMMENDED, AND AS TO OTHERS

1    HE FOUND THAT AS A MATTER OF ECONOMICS THAT THOSE CHANGES, IN

2    HIS VIEW, WERE IMPROPER.

3            SO FOR ALL OF THOSE REASONS, YOUR HONOR, WE BELIEVE

4    THAT THAT MOTION SHOULD BE STRICKEN.  AND, REALLY, THAT'S ALL

5    WE HAVE ON THAT POINT.  I DON'T KNOW IF APPLE --

6            **THE COURT:**  SO --

7            **MS. BERNAY:**  YES.

8            **THE COURT:**  -- YOU MEAN YOU WANT THE MOTIONS TO BE

9    GRANTED.

10           **MS. BERNEY:**  YES, YOUR HONOR.

11           **THE COURT:**  LET ME ASK YOU --

12           **MS. BERNEY:**  SURE.

13           **THE COURT:**  -- WHAT PRACTICAL EFFECT DOES IT HAVE?

14   THAT IS, YOU NOW KNOW IN ADVANCE WHAT THEIR REBUTTAL IS TO YOUR

15   EXPERT'S REPORT.  SO OF WHAT PRACTICAL EFFECT IS THIS?

16           **MS. BERNAY:**  WELL, I GUESS WHAT I WOULD SAY IS PART

17   OF THE ISSUE IS THAT IT BECOMES THIS NEVER ENDING BACK AND

18   FORTH OF ONE REPORT AFTER ANOTHER.  AND, FRANKLY, YOUR HONOR,

19   THIS HAS BEEN A HISTORY IN THIS CASE WHERE, YOU KNOW, APPLE

20   WILL, AS PART OF ANOTHER MOTION OR AN OPPOSITION, ANOTHER

21   EXPERT REPORT WILL COME IN THAT THEN PLAINTIFFS HAVE TO SPEND

22   TIME AND EFFORT UNDERSTANDING.

23           AND, YOU KNOW, AT SOME POINT I THINK WE WOULD WANT

24   THE ISSUES NARROWED AND THE WORLD KNOWN.  AND IF THERE IS GOING

25   TO BE THIS NEVER-ENDING CYCLE OF EXPERT REPORTS I THINK THAT

```
1    WOULD BE A PROBLEM.

2             I DO UNDERSTAND WHAT YOUR HONOR IS SAYING.  KIND OF

3    GOOD TO KNOW IN ADVANCE WHAT THEIR RESPONSES WILL BE.  HOWEVER,

4    I DON'T THINK THAT APPLE SHOULD BE, YOU KNOW, GETTING ANY

5    CREDIT FOR THEIR BAD BEHAVIOR, FRANKLY.

6             THE COURT:  OKAY.

7             WELL, YOU DON'T HAVE ANY TIME LEFT.

8         MR. MITTELSTAEDT:  I'LL USE IT QUICKLY, THEN.

9             THE COURT:  HOLD ON.  OKAY, FIVE MINUTES.

10        MR. MITTELSTAEDT:  JUST ON THAT LAST POINT, OUR

11   SUPPLEMENTAL REPORTS RESPONDED TO WHAT NOLL DID.  THE CHARTS

12   THAT I SHOWED YOUR HONOR THIS MORNING, OR THIS AFTERNOON, ARE

13   THE CHARTS THAT DEAL WITH HIS REBUTTAL REGRESSION.

14            THE COURT:  I UNDERSTAND THAT.

15        MR. MITTELSTAEDT:  OKAY.

16            THE COURT:  BUT EVERYBODY ALWAYS WANTS TO SAY MORE.

17   YOU DIDN'T HAVE AUTHORITY TO ISSUE IT, DID YOU?  I

18   DIDN'T -- THERE'S NO ORDER THAT ALLOWS YOU TO DO THAT, IS

19   THERE?

20        MR. MITTELSTAEDT:  NO.  WHAT WE WERE -- ACTUALLY, I

21   DON'T WANT TO -- I'M SORRY I EVEN RAISED THIS, BECAUSE THEY

22   HAVE -- NOLL -- THEY DEPOSED OUR PEOPLE AFTER THAT.  NOLL HAS

23   DONE A SUPPLEMENTAL REPORT, SO HE'S HAD THE LAST WORD.  IF THEY

24   ARE COMPLAINING THEY DON'T HAVE THE LAST WORD --

25            THE COURT:  IS THAT RIGHT THAT NOLL DID A REPORT
```

1    AFTER?  WHAT'S THE DOCKET?

2            **MR. KIERNAN:**  JANUARY 2014 IS SECOND SUPPLEMENTAL

3    REBUTTAL REPORT.  I'LL GET THE DOCKET.

4            **MS. BERNAY:**  AND YOUR HONOR, WE FILED THAT REPORT AS

5    PART OF -- WHAT WE SAID IN THE MOTION TO STRIKE IS THAT

6    ALTERNATIVELY WE BE ALLOWED TO SUBMIT THAT REPORT.  AND APPLE

7    DID NOT CONTEST THAT.  AND, IN FACT, AGREED THAT THAT COULD

8    BE -- I APOLOGIZE.

9            **THE COURT:**  SO IS THE -- THERE IS A REPORT WHICH

10   FOLLOWED.  IS THAT RIGHT?

11           **MS. BERNEY:**  THERE IS A REPORT WHICH FOLLOWED,

12   CORRECT.  JANUARY 14, I BELIEVE, 2014.  AND I'M SORRY.  I DON'T

13   HAVE THE DOCKET NUMBER.  I CAN FIND OUT.

14           **THE COURT:**  BUT IS IT IN THE DOCKET?

15           **MS. BERNEY:**  I BELIEVE IT IS IN THE RECORD, YES.

16           **MS. SWEENEY:**  IT'S SWEENEY, WHICH WAS DOCKET

17   NUMBER --

18           **MS. BERNEY:**  751?

19           **MR. STEWART:**  -- 751, EXHIBIT THREE.

20           **THE COURT:**  AND THERE'S NO MOTION TO STRIKE THAT ONE?

21           **MR. MITTELSTAEDT:**  NO, YOUR HONOR.  WE ACTUALLY

22   AGREED THAT THEY COULD FILE THAT.

23           **THE COURT:**  ALL RIGHT.

24           **MR. MITTELSTAEDT:**  IF I CAN GO BACK TO THE BIG

25   PICTURE AND A COUPLE OF QUESTIONS YOUR HONOR ASKED.  FIRST OF

1    ALL, WE THINK THE MOST IMPORTANT THING IS THAT THE FACTS DON'T

2    SUPPORT ANY SHOWING OF IMPACT.  AND THE REGRESSION ANALYSIS IS

3    NOT ENOUGH, IN PART, BECAUSE IT'S CONTRARY TO THE FACTS.

4              SO ON YOUR HONOR'S QUESTION ABOUT WHAT THE NEXT

5    STEP SHOULD BE FROM A PROCEDURAL STANDPOINT AND WHETHER AN

6    EXPERT SHOULD BE HIRED, OUR VIEW IS WHETHER THE COURT'S HAD

7    ENOUGH OF THIS ON THE PAPERS AND TODAY'S ARGUMENT, OR WHETHER

8    THE COURT WOULD LIKE US BACK TO ADDRESS SOME ISSUES WE DIDN'T

9    GET TO OR FURTHER ISSUES, FURTHER DISCUSSION OF WHAT WE DID

10   TALK ABOUT.  WE THINK IT CAN BE DISPOSED OF AND GRANTED BASED

11   ON THE LACK OF REAL WORLD FACTS.

12             AND, VERY BRIEFLY, THEY HAVE PEOPLE WHO ARE GOING

13   TO TALK ABOUT HOW MUCH THEY LIKE INTEROPERABILITY.  THEY HAVE

14   NO ONE WHO IS GOING TO TESTIFY THAT THEY WERE LOCKED OUT

15   BECAUSE OF KVC, WHICH IS THE ONLY ISSUE IN THIS CASE NOW.

16             WHEN THEY SAY THAT HARMONY BLOCKED OTHER PEOPLE,

17   THERE'S NOTHING IN THE RECORD TO SUPPORT THAT.  IF THE QUESTION

18   IS:  WHAT WITNESSES ARE THEY GOING TO CALL AT TRIAL TO PROVE

19   THEIR CASE ON IMPACT, THE ONLY ONE WHO CAN SAY ANYTHING ABOUT

20   KVC IS NOLL.  AND OUR VIEW IS THAT THAT'S NOT ENOUGH.

21             IN BAZEMORE, THE SUPREME COURT CASE THEY RELY ON,

22   THE SUPREME COURT WENT TO GREAT LENGTHS TO TALK ABOUT, AS IT

23   CALLED IT:

24                  "THE IMPRESSIVE ARRAY OF EVIDENCE TO SUPPORT

25                  THE CONTENTION OF DISCRIMINATION."

1          IT'S AT 478 US 401 TO 403.

2          IN FACT, THE DEFENDANT ADMITTED THE SALARY

3    DISPARITY, AND SO THE COURT IS SAYING THE REGRESSION GETS TO

4    COME IN.  IT REALLY DOESN'T AMOUNT TO MUCH WHEN THE COURT GOES

5    THROUGH ALL THE OTHER RECORD EVIDENCE THAT SUPPORTED THE

6    PLAINTIFF'S CASE.

7          IN THE LIVE CONCERT CASE, THE COURT SAID THAT

8    BAZEMORE DOES NOT GIVE BLANKET APPROVAL TO THE INTRODUCTION OF

9    ALL EVIDENCE DERIVED FROM REGRESSION ANALYSIS.  AND THE COURT

10   GOES ON.

11         SO WE THINK THERE'S ENOUGH JUST TO SAY -- THERE'S

12   NO REAL WORLD EVIDENCE THAT SUPPORTS THE IMPACT CLAIM.  IF WE

13   GET TO THE REGRESSION ANALYSIS, I THINK, YOUR HONOR, THERE'S

14   ENOUGH IN THE PAPERS TO SHOW THAT NOLL'S REPORT SHOULD BE

15   EXCLUDED.

16         BUT IF YOUR HONOR WOULD LIKE ASSISTANCE FROM A

17   NEUTRAL ECONOMIST TO HELP YOUR HONOR DISCHARGE THE GATEKEEPING

18   RESPONSIBILITY, WE WOULD NOT OBJECT TO THAT.  WE DON'T THINK

19   IT'S NEEDED IN THIS CASE FOR THE REASON I TRIED TO EXPLAIN

20   BEFORE, WHICH IS NOLL HAS ADMITTED WHAT THE STANDARD IS FOR

21   INCLUDING OR EXCLUDING, TURNING ON OR TURNING OFF VARIABLES.

22         THEIR ONLY REAL RESPONSE TO THAT IS TO SAY WHEN HE

23   MADE THE STATEMENT, THE ADMISSIONS THAT I QUOTED ABOUT WHETHER

24   HE SHOULD LEAVE 4.7 OR 7.0 ON, HE DIDN'T KNOW THAT 7.0 WASN'T

25   ON SHUFFLE.

1              WELL, WHY SHOULD THAT MATTER TO HIS THEORETICAL

2    DISCUSSION ABOUT WHEN YOU LEAVE A VARIABLE ON OR WHEN YOU TURN

3    IT ON AND FOR WHAT MODELS?  THE POINT IS THAT THAT'S A

4    THEORETICAL ECONOMIC POINT, AND HIS STANDARD IS YOU LEAVE IT ON

5    IF YOU THINK IT'S GOING TO HAVE ANY EFFECT ON COMPETITION.  AND

6    HE ADMITTED THAT BECAUSE 7.0 IS A MARKET-DEFINING EVENT, YOU

7    SHOULD LEAVE IT ON.  THE REASON --

8         **THE COURT:**  FIVE MINUTES ARE UP.

9         **MR. MITTELSTAEDT:**  THANK YOU, YOUR HONOR.

10        **THE COURT:**  ALL RIGHT.  RESPONSE?

11        **MS. SWEENEY:**  I JUST WANTED TO ADDRESS YOUR HONOR'S

12   SUGGESTION OF A MOMENT AGO.  AND, ONE, LIKE MR. MITTELSTAEDT I

13   BELIEVE THAT YOUR HONOR HAS SUFFICIENT INFORMATION BEFORE HER

14   TO RULE AGAINST APPLE AND DENY ITS MOTION FOR SUMMARY JUDGMENT.

15             WE HAVE DEMONSTRATED THAT THERE ARE MANY GENUINE

16   ISSUES OF MATERIAL FACT, BOTH THROUGH OUR EXPERT REPORTS AND

17   THROUGH THE OTHER TESTIMONY AND DOCUMENTS THAT WE'VE INTRODUCED

18   INTO THE RECORD.

19             I DISAGREE WITH MR. MITTELSTAEDT'S CHARACTERIZATION

20   OF NOLL'S TESTIMONY.  I THINK HE'S TAKEN THE TESTIMONY OUT OF

21   CONTEXT.  AND I THINK REVIEWING THE ACTUAL DEPOSITION

22   TRANSCRIPT DEMONSTRATES THAT.  BUT I WAS GOING TO SUGGEST, YOUR

23   HONOR, IF YOU HAVE -- WOULD YOU LIKE COUNSEL FOR THE PARTIES TO

24   DISCUSS THE POSSIBILITY OF ANOTHER EXPERT AND COME BACK TO YOU

25   WITH A REPORT OR --

1    **THE COURT:**  I WILL LET YOU KNOW IF I GET THERE.

2    **MS. SWEENEY:**  OKAY.

3    THANK YOU, YOUR HONOR.

4    **THE COURT:**  ALL RIGHT.  LET ME SAY A COUPLE OF

5    THINGS, AND I'M GOING TO GIVE YOU A TRIAL DATE.  YOU SHOULD

6    HAVE A TRIAL DATE.

7    ONE IS THAT AS I GO THROUGH THIS, THESE SUMMARY

8    JUDGMENTS, AND I HAPPEN TO -- ONE THE REASONS THAT I SCHEDULED

9    YOU FOR NOW IS THAT I RECENTLY HAD MY ANTITRUST MDL IN, SO I

10   TRY TO ALWAYS THINK ABOUT THESE TOPICS COLLECTIVELY.  NOT THAT

11   THAT'S NOT A -- THAT'S A PRICE-FIXING CASE.  THIS IS A

12   DIFFERENT CASE.

13   BUT STILL, IT HELPS.  SO I AM GOING TO TRY TO WORK

14   THROUGH AND RESOLVE THESE MOTIONS.  ON THE OTHER HAND, I AM

15   STARTING A MULTIPLE-WEEK PATENT TRIAL.  EVIDENCE BEGINS

16   SEPTEMBER 2ND UNLESS THEY SETTLE, BUT I DON'T THINK THEY ARE

17   GOING TO.

18   ALL THAT SAID, AS I WORK THROUGH IT IF I FIND THAT

19   THERE ARE FACTS, TRIABLE ISSUES THAT NEED TO BE RESOLVED BY A

20   JURY, I WILL LET YOU KNOW RIGHT NOW:  DO NOT EXPECT A LONG

21   ORDER FROM ME.

22   I AM TELLING YOU THAT BECAUSE YOU HAVE SPENT A LOT

23   OF MONEY AND TIME AND RESOURCES PUTTING THESE MOTIONS TOGETHER.

24   AND IT HAS TO BE DONE.  THAT IS, YOU DON'T GET SUMMARY JUDGMENT

25   UNLESS THE COURT CAN EVALUATE EVERYTHING THAT IS IN FRONT OF

1    THE COURT.

2              OR YOU DON'T GET TO DAUBERT UNLESS I HAVE ALL THE

3    REPORTS AND UNDERSTAND HOW THE ANALYSIS WORKS.  BUT IF I'M

4    GOING TO TRY THE CASE, I AM NOT GOING TO OPINE ON WHAT THE

5    FACTS ARE.  I NEVER DO.  IT'S JUST I THINK IT IS BAD PRACTICE

6    FOR A TRIAL JUDGE TO SIT THERE AND SPEND A LOT OF TIME

7    INDICATING IN AN ORDER WHAT THE FACTS ARE WHEN I HAVE DECIDED

8    THAT IT'S REALLY UP FOR THE JURY TO DECIDE.

9              SO I'M JUST GIVING YOU A HEADS-UP.  THAT IF I WORK

10   THROUGH IT AND DECIDE THAT WE'RE GOING TO TRIAL, YOU ARE GOING

11   TO GET BACK SOMETHING VERY SHORT.

12             MR. MITTELSTAEDT, YOUR CLIENT IS SITTING IN THE

13   AUDIENCE, SO HE KNOWS I'M NOT JOKING.  THAT'S JUST THE WAY IT

14   WORKS.  BUT LET'S TALK ABOUT A TRIAL.  LET'S ASSUME FOR

15   PURPOSES OF ARGUMENT THAT WE ARE GOING TO HAVE A TRIAL.  AS I

16   SAID, THIS CASE DID NOT FOLLOW MY TRADITIONAL MODE.  IF IT DID

17   YOU WOULD HAVE HAD A TRIAL DATE BY NOW.  YOU PROBABLY WOULD

18   HAVE HAD AN ORDER BY NOW.  BUT IT IS WHAT IT IS.

19             SO IF THE CASE WENT TO TRIAL, WHAT IS THE PLAINTIFF

20   EXPECTING IN TERMS OF TIME?

21             **MS. SWEENEY:**  YOUR HONOR --

22             **THE COURT:**  WHAT YOU ARE YOU EXPECTING IN TERMS OF

23   ASKING ME FOR TIME?

24             **MS. SWEENEY:**  YOUR HONOR, WE BELIEVE WE COULD PUT ON

25   THE CASE WITH 10 TO 12 TRIAL DAYS.

1          **THE COURT:**  WELL, YOU PROBABLY WON'T GET THAT.  I

2     DON'T EVEN GIVE MY PATENT CASES THAT MANY.

3               MR. MITTELSTAEDT?

4               JUST YOUR PORTION YOU'RE SAYING 10 TO 12 DAYS?

5          **MS. SWEENEY:**  NO.  NO.  NO.  FOR ALSO FOR OUR --

6          **THE COURT:**  YOU THINK THE WHOLE THING CAN BE TRIED IN

7     10 TO 12 DAYS.

8          **MS. SWEENEY:**  NO, I GUESS I SHOULD BACK UP.  TEN TO

9     12 DAYS FOR PLAINTIFFS PUTTING ON THE CASE, OPENINGS, CLOSINGS,

10    ET CETERA.  BUT I DON'T KNOW HOW MUCH TIME THE DEFENSE WOULD

11    REQUIRE.

12         **MR. MITTELSTAEDT:**  WELL, I THINK JUST AS A RULE OF

13    THUMB I WOULD HATE TO ANTE FOR LESS TIME THAN THEY GET.  BUT I

14    WILL SAY I THINK 10 TO 12 DAYS FOR THEIR CASE, I DON'T KNOW WHO

15    THEY WOULD PUT ON FOR -- IF THAT'S, YOU KNOW, TWO DAYS FOR

16    OPENING AND CLOSING AND PICKING THE JURY, THAT'S EIGHT TO TEN

17    DAYS OF TESTIMONY.  AND I THINK IT'S ROGER NOLL AND THE

18    PLAINTIFFS.

19              BUT HAVING SAID THAT, I THINK WE CAN PUT ON OUR

20    WITNESSES IN A WEEK.

21         **MS. SWEENEY:**  WE COULD PROBABLY BE FASTER THAN WHAT I

22    INITIALLY SAID TO YOUR HONOR.

23         **THE COURT:**  WELL, I CAN SLOT YOU IN NOVEMBER 17TH.

24    CALENDAR'S OPEN FOR TRIAL NOVEMBER 17TH.

25         **MR. MITTELSTAEDT:**  OKAY.

KATHERINE WYATT, CERTIFIED COURT REPORTER # 9866
925-212-5224  CSR  RPR  RMR

1          **MS. SWEENEY:**  THAT'S FINE FOR PLAINTIFFS, YOUR HONOR.

2          **THE COURT:**  OKAY.  WHAT WE WILL PROBABLY DO IS

3    BECAUSE IT'S THE THANKSGIVING WEEK.  THAT'S THE FOLLOWING WEEK.

4    PICK THE JURY NOVEMBER 10TH.  THAT WILL GIVE THEM A WEEK TO GET

5    THEIR AFFAIRS IN ORDER.

6          EVIDENCE BEGINS THEN NOVEMBER 17TH.  I WILL TELL

7    THEM WE WON'T BE IN SESSION WEDNESDAY THROUGH FRIDAY IN CASE

8    THEY HAVE FAMILY PLANS. AND THEN, IF WE NEEDED TO WE'LL FINISH

9    UP THE FIRST WEEK OF DECEMBER.  THAT MEANS I'LL HAVE A PRETRIAL

10   CONFERENCE WITH YOU ON OCTOBER 14, AT 9:30 A.M.

11         THAT'S A TUESDAY.  THAT'S A TUESDAY.

12         GIVEN THAT YOU ALREADY HAVE THE DAUBERT, I MEAN,

13   AND THAT IT SOUNDS LIKE THIS IS PRIMARILY GOING TO BE AN EXPERT

14   CASE --

15         **MR. MITTELSTAEDT:**  YOUR HONOR, I HAVE A --

16         **THE COURT:**  -- TOO MUCH.  I MAY NOT GIVE YOU ENOUGH

17   TIME.

18         **MR. MITTELSTAEDT:**  I HAVE A VACATION OUT OF THE

19   COUNTRY, AND I'M SCHEDULED TO COME BACK ON OCTOBER 18TH.  I

20   WONDER IF WE CAN AT LEAST PUSH THE SCHEDULE BACK A WEEK OR TWO.

21   THAT INTERFERES ONLY WITH THE PRETRIAL CONFERENCE.

22         **THE COURT:**  WELL, THAT'S PROBABLY BETTER TO GIVE YOU

23   A LITTLE MORE TIME.  ALL RIGHT.  THIS IS WHAT I'LL DO.

24   OCTOBER 28 WILL BE YOUR PRETRIAL.

25         DO YOU ANTICIPATE SIGNIFICANT MOTION PRACTICE GIVEN

1   THAT MOST OF THE MOTION PRACTICE IS ALREADY HERE?

2           **MS. SWEENEY:**  PLAINTIFFS DO NOT, YOUR HONOR.

3           **MR. MITTELSTAEDT:**  CERTAINLY WE'VE GOT THE SUMMARY

4   JUDGMENT WE'VE ALREADY DONE.  THE DAUBERT WE'VE ALREADY DONE.

5   THERE MAY BE SOME IN LIMINE MOTIONS, BUT I THINK IT WILL BE

6   LESS EXTENSIVE THAN OTHER CASES.

7           **THE COURT:**  SO FOR PURPOSES OF YOUR -- AS YOU START

8   TO PREPARE -- AND I WILL TRY TO GET SOMETHING OUT.  THIS CASE

9   HAPPENS TO BE ON MY CJRA LIST, AND I HATE HAVING ANYTHING ON MY

10  CJRA LIST.  SO THE ORDER WILL COME OUT BY THE 30TH, IF I HAVE

11  ANYTHING TO DO WITH IT, WHICH I GUESS I DO SINCE I'M THE JUDGE.

12          BUT IF WE GO TO TRIAL, THEN YOUR MOTIONS WILL HAVE

13  BEEN DENIED, OR AT LEAST PORTIONS OF IT WILL HAVE BEEN DENIED.

14          SO DO NOT IN YOUR MOTIONS IN LIMINE TRY TO

15  RELITIGATE SOMETHING THAT I'VE ALREADY DECIDED ON.  SO DO NOT

16  BRING ME A MOTION TO EXCLUDE A PORTION OF TESTIMONY THAT WAS IN

17  YOUR DAUBERT.  I WILL HAVE ALREADY RESOLVED THAT.  OKAY?

18          MY PRETRIAL ORDER IS VERY COMPREHENSIVE, AND IT

19  REQUIRES THAT YOU -- THEY ARE VERY SPECIFIC ABOUT HOW MANY

20  MOTIONS IN LIMINE YOU CAN HAVE, HOW LONG THEY CAN BE.

21          WHAT I REQUIRE THAT YOU DO IS THAT YOU PREPARE

22  THEM, AND THEN YOU SERVE THEM.  YOU DO NOT FILE THEM. AFTER

23  SERVING THEM YOU MUST MEET AND CONFER AND TRY TO RESOLVE THEM.

24  IF YOU CAN'T RESOLVE THEM, THAT'S THE POINT AT WHICH YOU CAN

25  FILE THEM WITH YOUR OPPOSITION.

```
 1              NO REPLIES ARE ALLOWED, OKAY?

 2              HOW MANY TRIALS HAVE YOU TRIED?

 3         MS. SWEENEY:  TWO.

 4         THE COURT:  JURY?

 5         MS. SWEENEY:  ONE OF THEM WAS A JURY TRIAL.

 6         THE COURT:  WILL YOU BE THE LEAD TRIAL ATTORNEY?

 7         MS. SWEENEY:  I BELIEVE SO, YOUR HONOR.

 8         THE COURT:  OKAY.  HUNDREDS OR WHAT?

 9         MR. MITTELSTAEDT:  WELL, NOT HUNDREDS, BUT 20.

10         THE COURT:  OKAY.

11              SO I AM HOPEFUL THAT YOU WILL ALL GET ALONG AND NOT

12    BRING ME LOTS OF DUMB MOTIONS.  AND I USE THE WORD "DUMB" AS

13    NICELY AS I CAN.

14              BUT HERE'S THE ISSUE.  I REQUIRE THAT YOU MEET AND

15    CONFER ON EXHIBITS.  TO THE EXTENT THAT YOU CAN AGREE, YOU

16    SHOULD AGREE.

17              I REQUIRE THAT TO THE EXTENT YOU ARE GOING TO USE

18    DEPOSITIONS THAT YOU HAVE DESIGNATIONS; THAT YOU SHARE THOSE

19    DESIGNATIONS; THAT THE OTHER SIDE CAN THEN COUNTERDESIGNATE.

20    IN TERMS OF TIME, BECAUSE YOU WILL EACH -- EACH SIDE WILL BE

21    GIVEN A LIMIT IN TERMS OF TRIAL TIME.

22              I AM NOT HERE TO TRY YOUR CASE.  WHAT I'M HERE TO

23    DO IS MAKE SURE THAT THE APPROPRIATE EVIDENCE GETS IN AND THAT

24    THE JURY HAS -- UNDERSTANDS THE EVIDENCE OR THAT THE EVIDENCE

25    COMES IN IN A WAY THAT IS UNDERSTANDABLE.
```

1              SO I HAD A CASE ONCE WHERE THE PARTIES GAVE ME A

2    CHART THAT WAS HUNDREDS OF PAGES LONG, WITH DISPUTES OVER

3    DEPOSITION DESIGNATIONS.  THOSE FOLKS CAME IN EVERY WEEK FOR

4    WEEKS UNTIL THEY GOT THIS DOWN TO 35 PAGES.  AND I FINALLY

5    STARTED MAKING THEIR CLIENTS SHOW UP, TOO.

6              THAT'S WHAT I MEAN BY "DUMB."  THAT IS, I SHOULD

7    NOT HAVE TO RESOLVE THOSE KINDS OF DISPUTES.  PEOPLE ARE GOING

8    TO BE ALLOWED TO PUT ON TESTIMONY TO THE EXTENT THAT IT'S

9    RELEVANT.  AND THAT'S GOING TO COST YOU TIME.

10             BUT WHAT YOU CAN'T DO IS -- THERE IS THIS LINE, AND

11   THIS IS WHERE I THINK IT'S IMPORTANT FOR ME TO BE INVOLVED.

12   THERE IS A LINE WHERE IT'S REALLY -- THE OTHER SIDE'S

13   DESIGNATION IS REALLY REBUTTAL.  OR IT'S CROSS-EXAMINATION.  IF

14   A PARTY IS -- THEY ARE SEEKING TO HAVE DEPOSITION TESTIMONY

15   READ OR ON A VIDEO, PRESENTED IN A WAY THAT LEAVES OUT HALF THE

16   ANSWER, AND THE CROSS DESIGNATION IS FOR THE OTHER HALF OF THE

17   ANSWER, I'M GOING TO REQUIRE THAT THE WHOLE ANSWER BE PUT IN AT

18   THE SAME TIME.

19             ON THE OTHER HAND, IF IT'S REHABILITATION THAT YOU

20   WOULD NORMALLY DO ON A REEXAMINATION OR A CROSS-EXAMINATION,

21   DEPENDING ON WHERE IT IS, YOU HAVE TO WAIT.  PUT IT ON IN YOUR

22   CASE-IN-CHIEF OR IN YOUR OWN CASE.

23             SO TRY TO THINK -- TRY TO THINK IN THOSE TERMS WHEN

24   YOU'VE MEETING AND CONFERRING.  AND SOMETIMES I FIND THAT IT IS

25   THE JUNIOR PEOPLE WHO ARE MEETING AND CONFERRING THAT CAUSE THE

1    PROBLEMS BECAUSE THEY HAVE NEVER TRIED A CASE BEFORE.  THEY

2    FIGHT OVER THINGS BECAUSE THEY ARE TOLD TO FIGHT.

3              IF I HAVE TO -- IF I GET THAT KIND OF -- THOSE

4    KINDS OF DISPUTES, I WILL START -- AND YOU ARE ALL ON NOTICE --

5    I WILL START WITH TAKING A LOG AND SAYING:

6                   "WHO GETS THE GOOD RULING AND WHO DOESN'T?"

7    AND SOMEONE IS GOING TO GET SANCTIONED AT THE END OF IT,

8    BECAUSE I JUST AM NOT INTERESTED IN PUTTING UP WITH THAT

9    GAME-PLAYING.

10             AND I SAY THIS NOT BECAUSE I HAVE ANY EXPERIENCE

11   WHICH WOULD SUGGEST THAT YOU WILL ACT IN THAT WAY, BUT IT'S

12   HAPPENED TOO OFTEN, AND SO I'M GIVING YOU A HEADS-UP IN

13   ADVANCE.

14             YOU KNOW, THERE ARE CLIENTS, THERE ARE PARTIES WHO

15   WILL SAY TO THE JUNIOR PERSON:

16                  "FIND EVERY OBJECTION YOU CAN FIND."

17             YOU WILL PAY FOR IT.  IF I HAVE TO GO THROUGH THOSE

18   THINGS YOU ARE GOING TO PAY FOR IT.  JURIES CANNOT OR I WILL

19   NOT ALLOW JURIES TO SEE -- JURORS TO SEE ANY EXHIBITS UNLESS

20   THEY HAVE BEEN ADMITTED INTO EVIDENCE.  SO YOU NEED TO FIGURE

21   OUT WHAT YOU ARE GOING TO AGREE ON, WHAT YOU'RE NOT GOING TO

22   AGREE ON.  IF YOU HAVE SOME OBJECTION THAT -- BUT YOU CAN AGREE

23   THAT IT'S AN AUTHENTIC DOCUMENT, AT LEAST, AGREE ON THAT.

24             IF THERE ARE EXHIBITS THAT YOU ARE JUST USING THAT

25   YOU HAVE NO INTENTION OF ASKING THE COURT TO ADMIT, BUT YOU

1   KNOW THAT YOU MAY NEED IT IN TERMS OF REFRESHING RECOLLECTION,

2   FOR INSTANCE, PUT IT ON THE EXHIBIT LIST SO THAT IT IS MARKED.

3            BUT JUST INDICATE THAT IT'S FOR JUST BEING MARKED

4   ONLY.  YOU DO NOT EXPECT IT TO BE ADMITTED.  HALF THE TIME, YOU

5   KNOW, THAT ELIMINATES HALF THE DISPUTES.

6            SO I WILL NEED -- LIKE I SAID, IF YOU HAVEN'T

7   LOOKED AT THE TRIAL ORDER RECENTLY, GO BACK TO YOUR OFFICES AND

8   LOOK AT IT.  BUT YOU'LL NEED TO DO JOINT WITNESS LISTS, JOINT

9   EXHIBIT LISTS, JURY INSTRUCTIONS, ALL OF THAT IN ADVANCE.  WE

10   CAN MEET ON THE 28TH, BUT I PROBABLY NEED TO SEE -- USUALLY I

11   SEE THAT STUFF A FEW WEEKS IN ADVANCE.

12            SO FILE YOUR PRETRIAL STATEMENTS AND ALL OF THE

13   RELATED DOCUMENTS BY OCTOBER 14.  YOU CAN GET THOSE DONE BEFORE

14   YOU LEAVE FOR VACATION, RIGHT?

15           **MR. MITTELSTAEDT:**  YES.

16          **THE COURT:**  THAT WAY YOU'LL ENJOY YOUR VACATION.

17           **MR. MITTELSTAEDT:**  YES.

18          **THE COURT:**  DO YOU WANT ME TO SET IT EVEN EARLIER?

19           **MR. MITTELSTAEDT:**  THAT WILL BE FINE.

20          **THE COURT:**  OKAY.  LET ME SEE WHAT ELSE YOU MAY NEED

21   TO KNOW.

22           **MR. MITTELSTAEDT:**  YOUR HONOR, WOULD IT BE USEFUL --

23   AND I THINK IT WOULD -- FOR THE PARTIES TO MEET AND CONFER SO

24   WE CAN THINK A LITTLE BIT MORE ABOUT THE NUMBER OF WITNESSES

25   AND THE TIME?  BECAUSE I THINK OUR ESTIMATE REALLY IS GOING TO

1  DEPEND TO SOME EXTENT ON WHAT THEIR ESTIMATE IS.  AND BEFORE

2  LOCKING INTO SOME NUMBER I WOULD LIKE TO HAVE THE OPPORTUNITY

3  TO CONFER.

4          **THE COURT:**  I'M NOT GOING TO -- I'M NOT GOING TO SET

5  THE HOURS YET.  MY ORDER REQUIRES THAT YOU IDENTIFY EACH OF THE

6  WITNESSES, GIVE ME A QUICK SUMMARY OF WHAT YOU ANTICIPATE THEIR

7  TESTIMONY TO BE AND YOUR ESTIMATE OF HOW LONG IT'S GOING TO

8  TAKE.

9          SO THAT'S HOW I ULTIMATELY COME TO MY CONCLUSION.

10  I CAN JUST TELL YOU THAT MY VIEW OF EFFICIENCY IS MUCH

11  DIFFERENT FROM LAWYERS' VIEW OF EFFICIENCY.

12          SO I THINK THE OTHER -- JUST THINKING ABOUT IT, THE

13  OTHER IMPORTANT THING FOR THIS PARTICULAR CASE IS HOW YOU'RE

14  GOING TO DEAL WITH EXPERT REPORTS.  AND TO THE EXTENT THAT YOU

15  CAN AGREE AND MEET AND CONFER ON THAT, THAT'S PROBABLY AN

16  IMPORTANT PIECE.

17          EXPERT REPORTS TYPICALLY ARE NOT -- THEY ARE FULL

18  OF HEARSAY.  THEY TYPICALLY ARE NOT ADMITTED AS EXHIBITS.  IF

19  THE PARTIES THEMSELVES WANT TO DO IT AND AGREE AND STIPULATE

20  BECAUSE BOTH SIDES WANT TO DO THAT, THEN I WILL TEND TO LET

21  THEM IN.  BUT THEY GENERALLY ARE NOT ALLOWED IN, AT LEAST UNDER

22  MY VIEW.

23          AND ALL THAT SAID, YOU STILL NEED -- FREQUENTLY YOU

24  NEED THE CHARTS.  YOU NEED EXHIBITS THAT ARE SOMETIMES ATTACHED

25  TO THE REPORTS.  SO YOU NEED TO THINK ABOUT THOSE THINGS.  I

1   THINK IT'S PROBABLY IMPORTANT FOR BOTH SIDES IF THIS CASE GOES

2   TO TRIAL.  IT'S, YOU KNOW, A HEAVY ECONOMICS CASE, SO THE JURY

3   IS GOING TO HAVE TO HAVE SOMETHING TO LOOK AT AND BE ABLE TO

4   EVALUATE.

5           THIS COURTROOM IS STILL NOT FULLY TRIAL READY.  IT

6   WILL BE HOPEFULLY BY NEXT YEAR.  BUT YOU NEED TO THINK ABOUT

7   THAT, TOO, IN TERMS OF EVIDENCE PRESENTATION.  IT'S A PATENT

8   CASE.  THEY MAY DO A GOOD JOB, YOU MAY SEE.  POP IN THE NEXT

9   MONTH AND SEE WHAT YOU THINK ABOUT WHAT THEY DID.

10          OKAY.  QUESTIONS?

11          **MS. SWEENEY:**  NO, YOUR HONOR.

12          **THE COURT:**  ANYTHING?

13          **MR. MITTELSTAEDT:**  NO.  NO, YOUR HONOR.  THANK YOU.

14          **THE COURT:**  ALL RIGHT.  THANK YOU.  WE'RE ADJOURNED.

15          **MS. SWEENEY:**  THANK YOU.

16          (THEREUPON, THIS HEARING WAS CONCLUDED.)

17   STENOGRAPHY CERTIFICATION

18      "I CERTIFY THAT THE FOREGOING IS A CORRECT
     TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
19   ABOVE-ENTITLED MATTER."
         AUGUST 21, 2014
20       KATHERINE WYATT

21   _____

22

23

24

25

KATHERINE WYATT, CERTIFIED COURT REPORTER # 9866

925-212-5224  CSR  RPR  RMR