Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@JonesDay.com
Craig E. Stewart (State Bar No. 129530)
cestewart@JonesDay.com
David C. Kiernan (State Bar No. 215335)
dkiernan@JonesDay.com
Amir Q. Amiri (State Bar No. 271224)
aamiri@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:  +1.415.626.3939
Facsimile:  +1.415.875.5700

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **THE APPLE IPOD ITUNES ANTITRUST LITIGATION** | Case No. C-05-0037 YGR<br><br>[CLASS ACTION]<br><br>**DECLARATION OF DAVID C. KIERNAN IN SUPPORT OF APPLE'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE THE SUPPLEMENTAL REPORT OF KEVIN MURPHY AND ROBERT TOPEL DATED DECEMBER 20, 2013 (ECF NO. 750).** |

I, David C. Kiernan, declare as follows:

1.  I am a partner of Jones day, counsel of record for Defendant Apple Inc. I am an active, licensed member of the State Bar of California. I make this declaration in support of Apple's Opposition to Plaintiffs' Motion to Strike the Supplemental Report of Kevin Murphy and Robert Topel Dated December 20, 2013 (ECF No. 750). I am familiar with the file maintained by

1  Jones Day in this matter.  The facts stated in this declaration are true and based upon my own
2  personal knowledge, and if called to testify to them, I would competently do so.
3      2.  Attached hereto as **Exhibit 1** is a true and correct copy of portions of the transcript
4  of the deposition of Roger G. Noll, conducted May 16, 2013.  Portions of this deposition were
5  previously filed with the Court in connection with Apple's Motion for Summary Judgment (ECF
6  No. 74) and Plaintiffs' Opposition (ECF No. 751) thereto.  The full transcript is maintained by
7  Jones Day in its files in the ordinary course of business.
8      I declare under penalty of perjury under the laws of the United States of America, that
9  the foregoing is true and correct.  Executed this 27th day of January, 2014 in San Francisco, CA.

SFI-851009v1

  /s/ David Kiernan
  David C. Kiernan

- 2 -

Kiernan Decl. ISO Apple's Opposition
C-05-0037 YGR

# Exhibit 1

```
                                                         Page 1
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
 5    _____
                                            )
 6                                          )
      THE APPLE IPOD ITUNES ANTI-TRUST      )   No. C-05-0037 YGR
 7    LITIGATION                            )
                                            )
 8    _____)
 9
10
11
12         VIDEOTAPED DEPOSITION OF ROGER G. NOLL
13                San Francisco, California
14                Thursday, May 16, 2013
15                       Volume 1
16
17
18
19
20
21    Reported by:
22    JENNIFER L. FURIA, RPR, CSR
23    CA License No. 8394
24    Job No. 1663538
25    PAGES 1 - 262
```

## Page 6

```
 1        San Francisco, California, Thursday, May 16, 2013
 2                    9:15 a.m.
 3
 4            THE VIDEOGRAPHER:  Good morning.  We are on
 5   the video record at 9:15 a.m. on May 16th, 2013.  This    09:15:10
 6   is the video deposition of Mr. Roger Noll.
 7            My name is Alexei Dias and our court reporter
 8   today is Jennifer Furia.  We are here from Veritext
 9   Legal Solutions.  This deposition is being held at Jones
10   Day, 555 California Street, San Francisco.  The caption   09:15:30
11   of this case is In Re Apple iPod iTunes Antitrust
12   Litigation, case number is C-05-00037-JW(RS).
13            Counsel, would you please introduce
14   yourself.
15            MS. SWEENEY:  Bonny Sweeney, Robbins, Geller,    09:15:50
16   Rudman and Dowd, for the plaintiffs.
17            MR. MITTELSTAEDT:  And for the defendant, Bob
18   Mittelstaedt, David Kiernan, Kyle Andeer.
19            THE VIDEOGRAPHER:  Thank you.
20            Would the court reporter please swear in the     09:16:00
21   witness.
22                    ROGER G. NOLL,
23   having been administered an oath, was examined and
24   testified as follows:
25            THE WITNESS:  I do.                    09:16:01
```

## Page 7

```
 1                    EXAMINATION
 2   BY MR. MITTELSTAEDT:
 3       Q  Good morning.
 4       A  Good morning.
 5       Q  What has your compensation been so far in this    09:16:19
 6   case?
 7       A  This has been going on so long, I can't
 8   possibly remember.  I haven't looked at it in a long
 9   time.  I mean it's, what, we're in six years or seven
10   years?  I don't remember.                        09:16:33
11       Q  Can you give us any estimate?
12       A  Somewhere -- no, each expert report is
13   somewhere in the range of 50 to a-hundred-thou and then
14   add to that the depositions, which are another few
15   thousand each.  So, 250 to 500, somewhere in that range,  09:17:01
16   but I don't know.
17       Q  What is your hourly rate?
18       A  Sev -- I've continued to charge what it was at
19   the time this started, which was 700.
20       Q  What is the compensation for Economists, Inc.?   09:17:19
21       A  I don't know.
22       Q  Do you have anything to do with that?
23       A  No.  I have nothing to do with that.
24       Q  They submit their bills directly to counsel?
25       A  Yes.                                    09:17:34
```

## Page 8

```
 1       Q  Do you have any estimate of what they've
 2   charged?
 3       A  No, I wouldn't know.  I don't know.
 4       Q  Do you teach at Stanford?
 5       A  Well, I -- I'm technically retired, but yes, I   09:17:46
 6   do teach a course a year.
 7       Q  Okay.  And what course are you teaching now?
 8       A  Well, right now I'm not teaching anything.  I
 9   taught a course in the winter quarter that was a seminar
10   on the economics of sports.                      09:17:57
11       Q  Economics of sports?
12       A  Yes.
13       Q  Is most of your compensation derived from
14   consulting as opposed to teaching?
15       A  Well, yeah.  I -- I'm -- I receive no          09:18:09
16   compensation for teaching.  I'm not paid to teach.  I
17   don't have any formal employment relationship with
18   Stanford.
19       Q  Do you have a corporate entity or a
20   partnership entity that you operate under or --         09:18:25
21       A  No.
22       Q  So the money that you're paid by plaintiffs
23   comes directly from plaintiffs or their counsel to
24   you?
25       A  Correct.                                09:18:34
```

## Page 9

```
 1       Q  Okay.  Have you done any work on this case
 2   since submitting your last report?
 3       A  The only work I've done has been
 4   conversations.  I haven't done anything other than that.
 5   I've had some conversations -- gave some instructions to  09:18:54
 6   the people at Economists, Inc. about some additional
 7   things to do.  But myself, I haven't done anything other
 8   than just prepare for the deposition.
 9       Q  What instructions did you give Economists,
10   Inc.                                           09:19:10
11       A  I asked them to run an additional regression
12   with the Shuffle dropped out after I found out a couple
13   of weeks ago that Mr. Fruggia (phonetic) hadn't told the
14   truth in his declaration and deposition.
15       Q  What did you ask him to -- what additional     09:19:23
16   regression did you ask him to run?
17       A  Run exactly the same regression that I
18   reported in my report, but with the 7.0 variable turned
19   off for the Shuffle during the period that 7.0 applied
20   to the others.                                 09:19:40
21       Q  And why did you do that?
22       A  Because of the representation by the
23   attorneys, which I don't know whether it's true or not,
24   that 7.0 was never loaded on the Shuffle.
25       Q  And whoever said it was?                 09:19:56
```

**Page 10**

1  A  Mr. Fruggia in both his deposition and his
2  declaration said all iPod models had 7.0 loaded in them
3  after September 2006.
4      Q  Didn't he say all new iPod models?
5      A  Yes.  Including new Shuffles.           09:20:14
6      Q  And what are the results of the additional
7  regression?
8      A  It roughly doubles the damages.  Apparently
9  there was no price elevation of the Shuffle in the
10 damages period, so the fraction -- the percentage    09:20:28
11 damages rate roughly doubles for both the direct and
12 indirect seller.
13     THE REPORTER:  "Both the direct and indirect"?
14     THE WITNESS:  Seller.
15     Shuffles account for roughly 16 percent of the   09:20:38
16 sales during the damages period, and if the damages for
17 them was zero that -- the coefficient on 7.0 was
18 suppressed.  And so it goes from 3.2 to 6.5 percent in
19 one regression and from 6.5 to 12.1 in another
20 regression.                                    09:20:55
21 BY MR. MITTELSTAEDT:
22     Q  And what sense does it make that if the
23 Shuffle was not affected by what you referred to as 7.0
24 damages would go up?
25     A  Well --                               09:21:05

**Page 11**

1      MS. SWEENEY:  Objection, vague and
2  ambiguous.
3      THE WITNESS:  -- I just -- I just told you.
4  If -- if you have 16 percent of the product did not have
5  any, but you're putting it into the model as if it did,   09:21:14
6  because you were told that it was affected by 7.0, and
7  then you remove that, the coefficient on the 7.0
8  variable, prior to removing it, would have been an
9  average between zero and something else.  So it will
10 raise the damages, if there were no damages on the    09:21:32
11 Shuffle.
12 BY MR. MITTELSTAEDT:
13     Q  When -- in your regression that's in the
14 report --
15     A  Hm-m.                                09:21:44
16     Q  -- how does that regression -- how does
17 anything you did in that regression turn on whether
18 the -- the Shuffle was affected by what you're referring
19 to as 7.0?
20     A  Everything is exactly the same except the 7.0   09:21:53
21 variable, the indicator variable for 7.0 is not turned
22 on for observations of the Shuffle that occurred during
23 the damages period.
24     Q  So were you interacting 7.0 variable with the
25 individual models?                       09:22:10

**Page 12**

1      MS. SWEENEY:  Objection, vague and
2  ambiguous.
3      THE WITNESS:  In a logarithmic equation
4  they're all interactive.  That's what a logarithmic
5  equation is.  It's a -- the underlying equation is a     09:22:18
6  multiplicative equation where the price is determined by
7  the product of a bunch of variables raised to some
8  exponent, so they're already interactive.
9      Then you take the logarithm of both sides
10 and -- but the -- but when you -- then raise both sides   09:22:35
11 of the equation to e.
12 BY MR. MITTELSTAEDT:
13     Q  Raise it to what?
14     A  Well, you have price equals a, times x to the
15 alpha, times y to the beta.  You take a logarithm on     09:22:48
16 both sides, you estimate a alpha and beta.  And then to
17 calculate the actual damages you raise -- you take both
18 sides of the equation to the -- you raise them as if
19 they were an exponent on e.  And that brings you back to
20 a, x to the alpha, y to the beta, which are interactive.  09:23:09
21 They're multiplicative terms.
22     Q  Have you seen a printout of this new
23 regression?
24     A  No.  I -- what I have been told is that
25 essentially everything is the same except the       09:23:24

**Page 13**

1  coefficient on the 7.0 variable.
2      Q  And how does that change?
3      A  It roughly doubles.
4      Q  When did Econ One -- is Econ One the --
5      A  Yeah.  Well, no, not Econ One.  That's Jeff     09:23:39
6  Leitzinger.  This is Economist, Inc.
7      Q  Okay, fair enough.
8      Is Econ One -- does that have anything to do
9  with this case?
10     A  No.  It has nothing to do with this case.       09:23:52
11     Q  Who at Ec -- who at Economics, Inc. told you
12 about this new regression?
13     A  Bob Stoner.
14     Q  Bob Stoner?
15     A  Uh-huh.                                09:24:00
16     Q  When did he tell you the --
17     A  A couple of days ago.
18     Q  Okay.  Do you think he had some hard copy or
19 some printout of this?
20     A  I don't think he did, because I think it was     09:24:07
21 done by somebody in the Washington, D.C. office of
22 Economist, Inc. and I think they just had a phone
23 conversation about it, but I'm not sure.
24     I mean, I didn't pursue it, because, you know,
25 I thought the deposition was going to be about my      09:24:23

```
 1    report, so I didn't -- I -- I asked them to do this, but
 2    it wasn't in preparation for the deposition.  It was
 3    just because I thought we should do it in preparation
 4    for what I anticipate to be a new Fruggia declaration or
 5    by somebody, which changes the story about when 7.0 was    09:24:42
 6    loaded onto new models of iPods.
 7         Q  When did counsel tell you about this
 8    information about the Shuffle that you're referring
 9    to?
10         A  I don't recall.  It was soon -- it was after    09:24:59
11    my report was submitted.  Probably around the time that
12    David Martins was reported, something like that.
13         Q  And then how long after that did you ask
14    Stoner to run an additional regression?
15         A  Well, we had talked about doing it.  I don't    09:25:17
16    remember.  I mean, again, there was no sense of urgency,
17    because I was anticipating this would be something that
18    would be an issue in June as opposed to now.
19         Q  Have you asked Stoner or his group to do
20    anything else?                                           09:25:34
21         A  No, not yet.
22         Q  Do you anticipate asking them to do anything
23    else?
24         A  Depends what additional information I get
25    changing the story from Apple.                           09:25:42
                            Page 14
```

```
 1         Q  Are you anticipating receiving any?
 2         A  I am anticipating receiving something other
 3    than information from a lawyer as to what -- what models
 4    had 7.0 loaded on them when.  I anticipate that you will
 5    probably have a technical expert actually submit like a   09:26:01
 6    sworn declaration about -- about that.  And that would
 7    then be the basis for running some new regressions if
 8    necessary.
 9         Q  Okay.  What assumption did you make in your
10    most recent report about which iPods were affected by     09:26:18
11    7.0?
12         A  I assumed that all new iPods as of September
13    2006 going forward were affected.  I relied on
14    Fruggia.
15         Q  And by what you just said, do you mean any        09:26:33
16    iPod that was sold after September 12, 2006?
17         A  Yes.  Any -- any iPod that -- yes, any model
18    that was released after September 2006, yes.
19         Q  Well, are you saying -- when you say model,
20    what do you mean?                                         09:26:53
21         A  Generation, class generation.
22         Q  And did you do any investigation before your
23    most recent report to verify that assumption?
24         A  Well, I --
25            MS. SWEENEY:  Objection, vague and ambiguous,    09:27:14
                            Page 15
```

```
 1    overbroad.
 2            THE WITNESS:  I -- only in the sense I --
 3    ultimately I have to rely upon David Martin for the
 4    technical expertise, so I'm not doing any independent
 5    assessment of my own about when a particular iPod became   09:27:29
 6    incompatible with Harmony.  I'm relying upon him for
 7    that.
 8    BY MR. MITTELSTAEDT:
 9         Q  You're relying on Mr. Martin for that?
10         A  Yes.                                              09:27:43
11         Q  Your most recent report, did you write every
12    word yourself?
13         A  Yes.
14         Q  Did you do all the charts and exhibits
15    yourself?                                                 09:27:50
16         A  Yes and no.  I mean I -- they were done under
17    my instruction and -- but, actually making them pretty
18    is not my job.
19         Q  But substantively.
20         A  Substantively I did them, yes.                    09:28:02
21         Q  And did you check them for accuracy?
22         A  I did, but I wouldn't be the right person to
23    do that.  We actually have research assistants who
24    double-check everything for accuracy.
25         Q  By "we" who do you mean?                          09:28:15
                            Page 16
```

```
 1         A  Economist, Inc.
 2         Q  What is your relationship with Economist,
 3    Inc.?
 4         A  My relationship to Economist, Inc. is that I
 5    have been on the board of directors of Economist, Inc.    09:28:23
 6    since its founding, but I have no financial stake in it
 7    at all.  And I'm not paid anything at all as a cut of
 8    their billings.
 9         Q  Okay.  Do you have a practice about whether
10    you use them for support when you're an expert            09:28:34
11    witness?
12         A  No, I -- sometimes I do, sometimes I don't.  I
13    I -- I have -- I have -- I have been supported by
14    several economics consulting firms over the years.
15         Q  Do you have any other matters that you're         09:28:49
16    doing with any of the plaintiff's counsel in this
17    case?
18         A  No.  I don't think so.  They may -- may be
19    secondary counsel on something, but I don't have any
20    direct dealings with anybody from their law firm.         09:29:00
21         Q  Other than what you've testified about so far
22    today about the Shuffle, are you aware of any mistakes
23    or flaws or problems with the regressions that are
24    reported in your --
25         A  No.  I mean, the only thing I'm aware of is       09:29:15
                            Page 17
```

1
2
3
4      I, Jennifer L. Furia, holding CSR License No.
5  8394, a Certified Shorthand Reporter, licensed by the
6  State of California, hereby certify:
7      That the foregoing proceedings were taken
8  before me at the time and place herein set forth; that
9  any witnesses in the foregoing proceedings, prior to
10 testifying, were placed under oath; that a verbatim
11 record of the proceedings was made by me using machine
12 shorthand which was thereafter transcribed by me or
13 under my direction; further, that the foregoing is an
14 accurate transcription thereof.
15     I further certify I am neither financially
16 interested in the action, nor a relative or an employee
17 of any attorney or party to this action.
18     IN WITNESS WHEREOF, I have on this date
19 subscribed my name.
20
21 Dated:   6/3/2013
22
23              *Jennifer L. Furia* (signature)
               _____
               JENNIFER L. FURIA
               Certified Shorthand Reporter
24             California License No. 8394
25