EXHIBIT 7

Robert A. Mittelstaedt  #60359
ramittelstaedt@jonesday.com
Craig E. Stewart  #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:    (415) 626-3939
Facsimile:    (415) 875-5700

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION<br><br>This Document Relates To<br><br>ALL ACTIONS | **Lead Case No. C 05-00037 YGR**<br><br>**[CLASS ACTION]**<br><br>**SUPPLEMENTAL DECLARATION OF AUGUSTIN FARRUGIA** |

I, Augustin Farrugia, declare as follows:

1.    I am the Senior Director, DRM Technologies at Apple Inc.  I am the head of Apple's DRM Technologies group.  In January 2011, I submitted a Declaration In Support of Defendant's Renewed Motion For Summary Judgment.  I submit this declaration to correct and clarify the timing of the release of the database verification code and new keybag architecture described in paragraphs 25-32 and clarify on which iPod models the codes were enabled.  The facts stated in this declaration are true based on information obtained by members of my team and others with relevant knowledge at Apple.

1        2.    The new keybag architecture for the iPod referenced in paragraphs 25, 29 and 32

2    was first shipped and enabled in the iPod nano 2nd generation introduced on September 12, 2006.

3    The new keybag architecture was later shipped and enabled in the iPod nano 3rd generation, iPod

4    classic 6th generation, and iPod touch 1st generation introduced on September 5, 2007, and on

5    later generations of iPod nano, iPod classic, and iPod touch.  The new keybag architecture was

6    not enabled and thus had no effect on any other iPods, including iPod shuffles, iPod nano 1st

7    generation or iPod classic 1st through 5th generations.

8        3.    The iPod database verification protocol referenced in paragraphs 25 and 29-31 was

9    shipped and enabled in the iPod nano 3rd generation, iPod classic 6th generation, and iPod Touch

10    1st generation introduced on September 5, 2007, and later generations of iPod nano, iPod classic,

11    and iPod touch.  The iPod database verification protocol was not enabled and thus had no effect

12    on any other iPods, including iPod shuffles, iPod nano 1st generation, iPod nano 2nd generation,

13    or iPod classic 1st through 5th generations.

14        I declare under penalty of perjury under the laws of the United States of America that the

15    foregoing is true and correct.

16        Executed this 2 day of July 2013 in Cupertino, California.

18    _____

19    Augustin Farrugia

# EXHIBIT 8

# The Apple iPod iTunes Anti-Trust Litigation

## Videotaped Deposition of
## ROGER NOLL, PH.D.
## December 18, 2013
## ***CONFIDENTIAL***

Media Included

| Exhibits | Transcript | Word Index |



**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                          The Apple iPod iTunes Anti-Trust Litigation

| Page 1 | Page 2 |
|---|---|
| 1    UNITED STATES DISTRICT COURT<br>2   NORTHERN DISTRICT OF CALIFORNIA<br>3     OAKLAND DIVISION<br>4<br>5 THE APPLE iPOD iTUNES  Lead Case No. C 05-00037<br>  ANTI-TRUST LITIGATION<br>6<br>7 _____<br>8 This Document Relates To:<br>9 ALL ACTIONS<br>10<br>11 _____<br>12<br>13<br>14   CONFIDENTIAL - ATTORNEYS' EYES ONLY<br>15  VIDEOTAPED DEPOSITION OF ROGER G. NOLL, PH.D.<br>16    Wednesday, December 18, 2013<br>17     Palo Alto, California<br>18<br>19<br>20<br>21<br>22<br>23 Reported by:<br>  Darcy J. Brokaw<br>24 RPR, CRR, CSR No. 12584<br>25 Job No. 10008944 | 1    UNITED STATES DISTRICT COURT<br>2   NORTHERN DISTRICT OF CALIFORNIA<br>3     OAKLAND DIVISION<br>4<br>5 THE APPLE iPOD iTUNES  Lead Case No. C 05-00037<br>  ANTI-TRUST LITIGATION<br>6<br>7 _____<br>8 This Document Relates To:<br>9 ALL ACTIONS<br>10<br>11 _____<br>12<br>13   CONFIDENTIAL - ATTORNEYS' EYES ONLY<br>14<br>15   Videotaped Deposition of ROGER G. NOLL, PH.D.,<br>16 taken on behalf of the Defendant, at 1755 Embarcadero<br>17 Road, Palo Alto, California, beginning at 9:06 a.m. and<br>18 ending at 11:54 p.m., on Wednesday, December 18, 2013,<br>19 before Darcy J. Brokaw, CSR No. 12584.<br>20<br>21<br>22<br>23<br>24<br>25 |

| Page 3 | Page 4 |
|---|---|
| 1     APPEARANCES<br>2<br>3<br>4 For the Plaintiffs and the deponent, Dr. Noll:<br>5  ROBBINS GELLER RUDMAN & DOWD, LLP<br>   BY: ALEXANDRA S. BERNAY, ESQ.<br>6  BY: JENNIFER N. CARINGAL, ESQ.<br>   655 West Broadway, Suite 1900<br>7  San Diego, California 92101<br>   (619)231-1058<br>8  xanb@rgrdlaw.com<br>9<br>10 For the Defendant, Apple Inc.:<br>11  JONES DAY<br>   BY: DAVID KIERNAN, ESQ.<br>12  BY: AMIR AMIRI, ESQ.<br>   BY: ROBERT MITTELSTAEDT, ESQ.<br>13  555 California Street, 26th Floor<br>   San Francisco, California 94104<br>14  (415)626-3939<br>   dkiernan@jonesday.com<br>15<br>16<br>17<br>18 Also present:<br>19  Peter Hibdon, Videographer<br>20<br>21<br>22<br>23<br>24<br>25 | 1    INDEX TO EXAMINATION<br>2    ROGER G. NOLL, PH.D.<br>3<br>4<br>5 EXAMINATION        PAGE<br>6 BY MR. KIERNAN        7<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25 |

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 5

1                    INDEX TO EXHIBITS

2                         EXPERT

3                    ROGER G. NOLL, PH.D.

4        The Apple iPod iTunes Anti-Trust Litigation

5              Wednesday, December 18, 2013

6    Darcy J. Brokaw, RPR, CRR, CLR, CSR No. 12584

7

8   MARKED        DESCRIPTION              PAGE

9   Exhibit 10   Rebuttal Declaration of Roger G.    6
              Noll on Liability and Damages

10

    Exhibit 11   Declaration of Roger G. Noll on     7
11              Liability and Damages

12  Exhibit 12   Corrections to Declaration of       7
              Roger G. Noll on Liability and

13              Damages

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1            PALO ALTO, CALIFORNIA

2        WEDNESDAY, DECEMBER 18, 2013, 9:06 a.m.

3

4            ROGER G. NOLL, PH.D.,

5    having been first duly sworn, was examined and

6            testified as follows:

7

8        (Defendant's Exhibit 10 marked.)

9        THE VIDEOGRAPHER:  Good morning.

10       This is disc 1 in the deposition of

11   Dr. Roger Noll, Ph.D., in the matter of the Apple

12   iPod iTunes Anti-Trust Litigation, in the United

13   States District Court, Northern District of

14   California, Oakland Division, Case No. C-05-00037.

15       Today's date is December 18th, 2013, and

16   the time is 9:06 a.m.

17       Counsel, please identify yourselves and

18   state whom you represent.

19       MR. KIERNAN:  David Kiernan on behalf of

20   Apple.

21       MR. AMIRI:  Amir Amiri on behalf of Apple.

22       MS. BERNAY:  Alexandra Bernay, from

23   Robbins Geller Rudman & Dowd, on behalf of the

24   plaintiffs and Dr. Noll today.

25       MS. CARINGAL:  Jennifer Caringal on behalf

Page 7

1    of the plaintiffs and Dr. Noll.

2        THE VIDEOGRAPHER:  Thank you.

3        Would the court reporter please swear in

4    the witness.

5        (Witness sworn.)

6

7            EXAMINATION

8    BY MR. KIERNAN:

9        Q.  Good morning.

10       MS. BERNAY:  Just before we begin,

11   plaintiffs agreed to this deposition, limited to no

12   more than three hours, to avoid burdening the Court

13   and as a courtesy.

14       Plaintiffs still believe the operative

15   scheduling order in this case doesn't allow for such

16   deposition and that this, the sixth deposition of

17   Professor Noll, is cumulative and harassing.

18       But go forward.

19       MR. KIERNAN:  Let me mark that as Noll 11

20   and that as Noll 12.

21       (Defendant's Exhibits 11 and 12 marked.)

22   BY MR. KIERNAN:

23       Q.  Dr. Noll, I just handed you what's been

24   marked as Noll 10.  Can you identify that as your

25   rebuttal report that you've submitted in this

Page 8

1    matter?

2        A.  It appears to be, yes.

3        Q.  Okay.  And then I've handed you what's

4    been marked as Noll 11.  And is that your initial

5    merits report that you submitted in this matter?

6        A.  It appears to be, yes.

7        Q.  And then I've handed you what's been

8    marked as Noll 12.  And can you identify that as the

9    corrections that you made to your initial merits

10   report, which has been marked as Noll 11?

11       A.  Yes, that appears to be correct.

12       Q.  Okay.  And do these three reports, these

13   three exhibits reflect all the opinions that you

14   intend to offer at trial?

15       A.  Well, there's other reports before this.

16   And I don't know the extent to which everything in

17   these reports duplicates everything in the prior

18   reports, as I referenced them.

19       So how many reports have I written in this

20   case?  Six or seven?  So I don't know -- nothing --

21   I certainly don't intend to testify to anything that

22   isn't in any report, but I may be asked some

23   question that relates to any one of the multiple

24   reports that I've submitted.

25       So I don't know.  I can't answer the

EXHIBIT 9

# The Apple iPod iTunes Anti-Trust Litigation

**Videotaped Deposition of**

**ROBERT TOPEL, PH.D.**

**November 08, 2013**

**\*\*\*CONFIDENTIAL\*\*\***

| Exhibits | Transcript | Media Included |
| --- | --- | --- |
| | | Word Index |



866.999.8310 | aptusCR.com

COURT REPORTING

**Page 1**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  OAKLAND DIVISION

4
   THE APPLE iPOD iTUNES          Lead Case No. C 05-00037
5  ANTI-TRUST LITIGATION

6  _____

7  This Document Relates To:

8  ALL ACTIONS

9

10 _____

11

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15     VIDEOTAPED DEPOSITION OF ROBERT H. TOPEL, Ph.D.

16              Friday, November 8, 2013

17             San Francisco, California

18

19

20

21

22 Reported By:

23 Darcy J. Brokaw

24 RPR, CRR, CSR No. 12584

25 Job No. 10008160

**Page 1**

**Confidential - Attorneys' Eyes Only**

Robert Topel, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

---

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                    OAKLAND DIVISION

 4

   THE APPLE iPOD iTUNES       Lead Case No. C 05-00037

 5 ANTI-TRUST LITIGATION

 6 _____

 7 This Document Relates To:

 8 ALL ACTIONS

 9

10 _____

11

12

13

14        Videotaped Deposition of ROBERT H. TOPEL, Ph.D.,

15 taken on behalf of the Plaintiffs, at One Montgomery

16 Street, Suite 1800, San Francisco, California, beginning

17 at 8:10 a.m. and ending at 2:43 p.m., on Friday,

18 November 8, 2013, before Darcy J. Brokaw, CSR No. 12584.

19

20

21

22

23

24

25
```

Page 3

```
 1                    APPEARANCES

 2

 3 For the Plaintiffs:

 4    ROBBINS GELLER RUDMAN & DOWD, LLP
      BY: BONNY SWEENEY, ESQ.

 5    BY: ALEXANDRA S. BERNAY, ESQ.
      655 West Broadway, Suite 1900

 6    San Diego, California  92101
      (619)231-1058

 7    bonnys@rgrdlaw.com
      xanb@rgrdlaw.com

 8

 9

10 For the Defendant Apple Inc.:

11    JONES DAY
      BY: ROBERT A. MITTELSTAEDT, ESQ.

12    555 California Street, 26th Floor
      San Francisco, California  94104

13    (415)626-3939
      ramittelstaedt@jonesday.com

14

15    APPLE
      BY: SCOTT B. MURRAY, ESQ.

16    1 Infinite Loop, MS 169-2NYJ
      Cupertino, California  95014

17    (408)783-8369
      scott_murray@apple.com

18

19

20

21 Also present:

22    Erica E. Greulich

23    Monti Majthoub, Videographer

24

25
```

Page 4

```
 1              INDEX TO EXAMINATION

 2             ROBERT H. TOPEL, PH.D.

 3

 4 EXAMINATION                          PAGE

 5 BY MS. SWEENEY                         7

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

```
 1                INDEX TO EXHIBITS

 2                    EXPERT

 3              ROBERT H. TOPEL, PH.D.

 4      The Apple iPod iTunes Anti-Trust Litigation

 5            Friday, November 8, 2013

 6    Darcy J. Brokaw, RPR, CRR, CLR, CSR No. 12584

 7

 8 MARKED          DESCRIPTION              PAGE

 9 Exhibit 1   Document entitled "Expert Report      32
              of Robert H. Topel, August 19,

10            2013 (Amended)"

11 Exhibit 2   Document entitled "Corrections to     32
              Expert Report of Robert H. Topel

12            Submitted July 19, 2013"

13 Exhibit 3   Excerpt from Angrist and Pischke      59
              entitled "Chapter 8, Nonstandard

14            Standard Error Issues"

15 Exhibit 4   Excerpt from Angrist and Pischke      59
              entitled "40 Chapter 3"

16

17

18

19

20

21

22

23

24

25
```

Page 2..5

**Confidential - Attorneys' Eyes Only**

Robert Topel, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 46

1      Q.  All right.  Is it your understanding that
2  the dataset that Professor Noll used in his
3  regression constituted a sample of Apple's
4  transaction data?
5      A.  My understanding is that although there
6  could be missing transactions in the translation
7  that was given to Professor Noll, I don't believe
8  there are.  So it would be all the transactions.
9      Q.  So it's a population consisting of the
10 entire transactional database except for possibly a
11 few data points that had to be discarded?  Is that
12 your view?
13     A.  I don't know about "had to be discarded."
14 It is what he got.
15     Q.  Okay.  Let me rephrase then.
16         So is it your understanding that
17 Professor Noll relied on the complete Apple
18 transaction database?
19     A.  As complete as he got it.
20     Q.  So it's not a sample of the transaction
21 database?
22     A.  You mean it's not a random draw from the
23 transaction database?
24     Q.  Well, let's start with that.  Is it a
25 random draw from the transaction database --

Page 47

1      A.  No.  As I understand it --
2         (Reporter admonishes.)
3         THE WITNESS:  I'm sorry.
4         I think it -- I think it's the universe of
5  what was handed over to me.  He used every
6  observation.
7  BY MS. SWEENEY:
8      Q.  Now, how do you interpret the standard
9  error when the data on which a regression is run are
10 not a sample from the underlying population but,
11 rather, constitute the whole population itself?
12     A.  Your question is whether in the data as we
13 get it the experiment could be replicated.
14         So like if the transaction database -- if
15 all the transactions were running in, the data would
16 be what they are in that circumstance.
17     Q.  What do you mean when you're referring to
18 "that circumstance"?
19     A.  You might get a different set of outcomes
20 from running the -- running the process again.  So
21 we've got all the data that came from one process of
22 selling Apples -- selling iPods.
23     Q.  So is there a difference when you're using
24 a population versus a sample and you're determining
25 the statistical significance of standard errors?

Page 48

1      A.  I don't understand your question, but for
2  the purposes of this analysis, I don't think there
3  is.
4      Q.  And why don't you think there is a
5  difference?
6      A.  Because we're asking whether people are
7  making independent pricing decisions, and we have
8  to -- we have to think about the statistical
9  properties of those decisions.
10     Q.  So you talk about Best Buy as an example
11 of a purchaser in the reseller data that purchased a
12 lot of iPods for an identical price, and you have a
13 couple of examples using Best Buy and a couple other
14 big purchasers.
15     A.  Yes.
16     Q.  And then in paragraph 74 you say that:
17         "Apple set its iPod prices so that
18         virtually all of its iPods of a given
19         model with given characteristics sold at
20         roughly the same time would have the same
21         price no matter who the buyer was."
22         Do you see that?  That's on page 33,
23 paragraph 74.
24     A.  Paragraph 74, page 33.  What part?  That's
25 a long paragraph.  What are you looking at?

Page 49

1      Q.  It's the second sentence.
2      A.  I see that.
3      Q.  Okay.  So my first question -- and we've
4  talked about iPod models, and I just want to be
5  clear.  So what are you referring to when you talk
6  about an iPod model here?
7      A.  A family.
8      Q.  And can you give me an example?
9      A.  Sure.  If we go back to, I think, the
10 exhibit you were referring to.  I'll have to find
11 it.
12         Those are additional things from the
13 exhibits.
14         So the iPod Touch, N72B Good, it would be
15 a family for us.
16     Q.  You're looking at which exhibit?
17     A.  Exhibit 11, column 2, Best Buy.  $173 is
18 the average revenue per unit.
19     Q.  Okay.  And then so what do you mean by
20 "virtually all"?
21     A.  A large majority, large enough to be of
22 concern for econometric purposes.
23     Q.  Okay.  So does "large majority" mean more
24 than 90 percent?
25     A.  I didn't calculate it that way, no.  I

Confidential - Attorneys' Eyes Only

Robert Topel, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

**Page 50**

1  didn't make a threshold of saying is it 80 percent
2  or 90 percent.  The issue for us was whether it had
3  a material impact in the way you calculate the
4  model.
5       Q.  Well, I guess I'm not asking you whether
6  you calculated it.  I just -- I'm just trying -- I'm
7  trying to figure out what your words mean here.
8  Where you say "virtually all," does it mean less
9  than -- does it mean more than 99 percent, more than
10 90 percent?  "Virtually all" is a little vague in
11 this context.
12      MR. MITTELSTAEDT:  Objection --
13 BY MS. SWEENEY:
14      Q.  So I'm just trying to understand what you
15 meant when you used that phrase.
16      MR. MITTELSTAEDT:  Object to the question
17 as argumentative and compound.
18      THE WITNESS:  I mean that the residuals,
19 as demonstrated in another of my exhibits, shows
20 that within family and quarter, the -- when we
21 divided things randomly between -- into half of the
22 people in that family -- not people -- but half of
23 the iPods in that transaction, and the other half,
24 that the residuals were extremely highly correlated
25 in Professor Noll's model, which wouldn't occur

**Page 51**

1  unless the large majority of those transactions were
2  occurring at the same price with identical
3  characteristics.
4  BY MS. SWEENEY:
5       Q.  So you're saying that it's your regression
6  that supports your conclusion that virtually all of
7  the iPods of a given model with given
8  characteristics sold at roughly the same time?  Is
9  that fair?
10      A.  In inspection of the data.  But I'm not
11 telling you that I made a threshold that says, well,
12 it's 90 percent, so I've got some metric like -- I'm
13 trying to say, oh, that's a large majority, and
14 80 percent is a pretty large majority, and
15 70 percent is a sort of large majority.
16      I don't have anything like that.  I didn't
17 do anything like that.
18      Q.  And then focusing on that same sentence in
19 paragraph 74, what time period do you mean when you
20 say "roughly the same time"?  Are you talking about
21 a week, a month, a quarter, or something else?
22      A.  I'm actually talking about sort of all of
23 those because I was looking at a particular point in
24 time and looking at the transactions.  And I looked
25 within a quarter, and you can see, for the large

**Page 52**

1  ones back here, that iPods that were sold in the
2  same quarter are selling for the same price in those
3  large transactions.
4       And then when we did our clustering by
5  family and quarter, you could see the very high
6  correlation in the -- in the residuals from the
7  model.
8       Q.  Now, you said that you also looked at the
9  data.  Did you look at the data to determine the
10 level of price variation for particular iPod models?
11      A.  In a literal sense, yes.
12      Q.  What do you mean by "in a literal sense"?
13      A.  Well, there were end-of-life-cycle prices,
14 and the way the data are constructed, you could have
15 some end-of-life-cycle and not-end-of-life-cycle
16 transactions in the same quarter.
17      Q.  Is it your understanding that when
18 Apple -- during the class period, when Apple sold
19 iPods, a particular model -- using model as you've
20 defined model, is it your understanding that when
21 Apple sold a particular model of iPod to, say, Best
22 Buy, at that same time Apple would be selling that
23 same model iPod to other resellers at exactly the
24 same price?
25      A.  I think the table shows that that happens.

**Page 53**

1       Q.  And which table is that?
2       A.  Of Exhibit 11.
3       So I've got -- I mean, the ones I have
4  here are -- let's see.  2007.  I've got a 12/31/2007
5  and an 11/14/2007, columns 1 and 4.  IPod nano third
6  generation.  That's Radio Shack buying 30,000 units
7  at a unit -- for 3.9 million, which is a unit price
8  of $130.
9       You look over to column 4, Best Buy,
10 they're buying 3.2 million units -- excuse me.
11 They're buying 24,610 units for 3.199 million, $130
12 each.
13      Q.  So looking at column 1, are these -- does
14 column 1 attempt to depict all of the sales of iPods
15 to resellers on December 31st, 2007?
16      A.  Oh, no.
17      Q.  It's just a couple of reseller sales,
18 correct?
19      MR. MITTELSTAEDT:  Column 1?
20      MS. SWEENEY:  Yes.
21      THE WITNESS:  Column 1 is one.
22 BY MS. SWEENEY:
23      Q.  Okay.  It's just one.
24      A.  Yes.
25      Q.  All right.  And then so the other -- but

Confidential - Attorneys' Eyes Only

Robert Topel, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 54

1  there were sales to other resellers on that date or
2  in that time period other than what are depicted in
3  Exhibit 11?
4        A.  Yes.
5        Q.  So this is just a small sample of those
6  reseller sales during the relevant period, correct?
7        A.  Yes.  It's meant to illustrate a point.
8        Q.  So sticking still with paragraph 74, you
9  say:
10              "If I know what Best Buy paid for a
11          particular iPod model in January 2005, I
12          can be quite confident that in other
13          transactions with Best Buy and with other
14          buyers who purchased around that date, the
15          price would be exactly or nearly the
16          same."
17          And so my question --
18        A.  I recall writing that, and I'm trying to
19  find -- I've got to get back to paragraph 74 again.
20  So I just want to see exactly where we are.
21          Okay.  So in the middle.  "So if I know
22  what Best Buy" -- okay.  Go ahead.
23        Q.  So is your testimony that it's exactly the
24  same, or is it nearly the same?
25        A.  There can be other transactions that did

Page 55

1  not occur at precisely that price.
2        Q.  So it's not exactly?
3        A.  No, it's exactly the same price on
4  transactions within Best Buy, and there will be
5  other transactions in many retailers -- with many
6  retail -- resellers at exactly that price.  But I'm
7  not testifying that every price is the same.
8        Q.  Well, what do you mean when you say
9  "nearly the same"?
10        A.  Because the prices are moving closely
11  together.  And if you -- again, I go back to the
12  proof is in the pudding.  When you look at the --
13  it's not sufficient to say -- to defeat this point
14  in any way, to say that somebody paid a different
15  price at that point in time.
16          What matters is whether those prices were
17  highly correlated across transactions at that point
18  in time.  And our data indicates precisely that.
19        Q.  Now, what's your understanding of how
20  Apple sets prices for resellers?
21        A.  They have a --
22        Q.  Let me strike that.
23        A.  Okay.
24        Q.  What's your understanding for how Apple
25  set its prices of iPods to resellers during the

Page 56

1  class period?
2        A.  In broad strokes, they have a pricing
3  committee that considers different scenarios for
4  prices.  Sometimes they show some sort of
5  sensitivity analysis of what would happen if they
6  charged $50 less, $100 less for a particular model,
7  and the resellers purchase the iPods for a lower
8  price than the typical retail price.  I think their
9  margin is set so that they get about -- I think the
10  wholesale price is set so they get a 13 percent
11  margin.
12        Q.  Is it your understanding that during the
13  class period, this differential between wholesale
14  prices and the prices for the consumers, that is,
15  the iPods sold in the Apple Store online, was
16  13 percent?
17        A.  No, I've just seen that there was a target
18  margin of 13 percent.
19        Q.  But it's your understanding that that was
20  the target margin during the whole class period?
21        A.  No.  I'm just -- I'm just referring to
22  certain pricing committee documents that I looked
23  at.
24        Q.  So what's your understanding of the range
25  of margin between reseller and direct consumer sales

Page 57

1  during the class period?
2        A.  I don't have any recollection of what the
3  range is.
4        Q.  So you say that Professor Noll
5  underestimated the true standard errors of --
6          MR. MITTELSTAEDT:  Where are you reading
7  from, Bonny?
8          MS. SWEENEY:  I was looking for that.  I'm
9  just going to paraphrase.  Then we won't have to
10  find it.  I'm not going to ask about that particular
11  sentence.
12  BY MS. SWEENEY:
13        Q.  You say that Professor Noll underestimated
14  the true standard errors of his results by not
15  accounting for clustering.  And you rely on a couple
16  sources.  One of them is Angrist and Pischke?  Is
17  that how you say that?
18        A.  Pischke.
19        Q.  Pischke.
20          And then you also rely on a monograph
21  published by the ABA antitrust section called
22  "Proving Antitrust Damages."
23          Are there any other works in economics
24  that you can identify that support your assertion?
25        A.  Yes.

**Page 54..57**

**Confidential - Attorneys' Eyes Only**

Robert Topel, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 94

1  apply a different clustering adjustment method to
2  serially correlate residuals versus cross-sectional
3  residuals?
4         A.  It depends on whether one wants to assume
5  some parametric form for serial correlation or not.
6         Q.  I'm not sure I can understand that answer,
7  so I'll just --
8         A.  It's kind of a statistical question, so
9  it's a statistical answer.
10        Q.  So is a gross layperson way of describing
11 your answer to say maybe?
12        A.  There are different ways of dealing with
13 serial correlation.  And the clustering method,
14 where you cluster within some group, is a robust way
15 of doing that.
16            Others might decide, well, I have a
17 particular form in which I think the serial
18 correlation occurs.  So they might parameterize the
19 covariance matrix of the residuals in that way.
20            (Reporter inquires.)
21            THE WITNESS:  The covariance matrix of the
22 residuals in that way.
23 BY MS. SWEENEY:
24        Q.  Okay.  So it is possible to use different
25 methodologies for serially correlated residuals

Page 95

1  versus cross-sectional residuals, correct?
2         A.  Sure.
3         Q.  You didn't do that here, right?  You just
4  used the same methodology for both kinds of
5  residuals?
6         A.  Ours are robust, yes.  They're robust
7  estimates, given the definition of the groups.
8         Q.  So that's why you didn't use an
9  alternative method; is that right?
10        A.  Yes.  As I said, this was sufficient to
11 demonstrate my point.
12        Q.  Are you familiar with the shortcomings
13 that Professor Noll identified in the dataset that
14 he used?
15        A.  I read them.
16        Q.  Did you do anything when you conducted
17 your regression analyses to correct for those
18 shortcomings?
19        A.  The specific ones that he referred to?
20        Q.  Yes.
21        A.  No.  We took the data, as he had analyzed,
22 as a given, and we showed the flaws in his analysis.
23        Q.  Did you ask Apple for any additional data?
24        A.  Not that I recall.  We got this data, I
25 think -- as I indicated, we went out and looked for

Page 96

1  other attributes.  That was collected from Apple's
2  websites and the websites of others.
3         Q.  Did you ask Apple for any further
4  explanation of the observations of different aspects
5  of the dataset that you received?
6         A.  Well, if you define "you" there as my
7  staff and me -- and my staff might have been trying
8  to understand something that they didn't
9  understand -- I can't tell you that, say, Ricardo
10 didn't have a conversation with somebody.  But it
11 wasn't on my radar screen.
12        Q.  Were you aware that the data that
13 Professor Noll used and which you then subsequently
14 used do not fully reflect variation in the prices
15 paid, actually paid by customers?
16        A.  You mean in the sense that they might not
17 have rebates or something like that?
18        Q.  Correct.
19        A.  Yeah, I was aware of that.
20        Q.  And did you do anything to account for
21 that?
22        A.  No.  Using the dif- -- to the best of my
23 recollection, I did not.
24        Q.  So you just took the data as you received
25 it from Professor Noll and applied your clustering

Page 97

1  adjustment, correct?
2         A.  I believe that's a simplified way of
3  putting it.  I think that my staff went to the
4  trouble of reconstructing the data in the way they
5  thought it should be reconstructed and comparing it
6  to Professor Noll, because I told them to go out and
7  reproduce what Professor Noll had done.  And they
8  said the data came out pretty much the way
9  Professor Noll had it, so we're going to go with
10 that.
11        Q.  Well, what do you mean by "reconstructed"?
12        A.  We got the same files, as I recall, that
13 Professor Noll got.  And so he ran his regressions
14 on a particular dataset.  I think we were able to
15 reproduce what Professor Noll did.
16        Q.  But going to this point of what
17 Professor Noll described as shortcomings in the
18 data, you didn't do any further adjustments to
19 account for the discounts or coupons, et cetera,
20 correct?
21        A.  I don't think I had those information.
22        Q.  Did you ask for that information?
23        A.  I physically didn't ask for it.
24        Q.  Did you -- I'm sorry.
25        A.  I think I asked somebody at some point, is

**Confidential - Attorneys' Eyes Only**

Robert Topel, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 106

1 those things that's statistically independent, then
2 you're okay, statistically, assuming that the
3 observations are independent.
4 BY MS. SWEENEY:
5      Q.  So is it your view that Roger's regression
6 analysis suffers from an omitted variable problem?
7      A.  You're on another problem now.  That's not
8 the reason for the clustering analysis we did.
9      Q.  What is the reason for the clustering
10 analysis that you did?
11      A.  I think all the reasons I've given earlier
12 today:  that Professor Noll is pretending to have
13 the data generate much more independent variation,
14 vastly more independent variation than they actually
15 do.
16      Q.  Talking only about reseller data for a
17 moment, would you agree that for a given iPod --
18 strike that.
19           For a given family within a quarter, when
20 you're talking about reseller prices, would you
21 agree that there is some variation in the prices
22 that Apple charged to resellers during the class
23 period?
24      A.  I believe I would agree with that.
25           I would also say that to the extent that's

Page 107

1 true, it would be reflected within the group
2 covariances that are estimated.
3      Q.  What do you mean by that?
4      A.  Groups don't assume that things are
5 perfectly correlated.  They just assume that within
6 that group -- they don't even assume.  They allow
7 within that group for a correlation to be revealed.
8      Q.  So assuming there is variation in a given
9 iPod family sold to resellers during the class
10 period, did your clustering eliminate this
11 variation?
12      A.  Could you read that back again?  Or you
13 could ask it.  I don't care.
14           (The record was read back by the
15           reporter as follows:
16           "Q.  So assuming there is variation
17           in a given iPod family sold to resellers
18           during the class period, did your
19           clustering eliminate this variation?")
20           MS. SWEENEY:  I can rephrase that.
21           THE WITNESS:  Yeah.
22 BY MS. SWEENEY:
23      Q.  So you agree that for a given iPod family
24 in a given quarter, there was some variation in the
25 prices of iPods sold to resellers during the class

Page 108

1 period.
2           And my question is:  Does your clustering
3 adjustment eliminate the price variation that did
4 exist?
5      A.  No.
6      Q.  And why not?
7      A.  Because the price variation is in the
8 data.  We didn't throw away the observation.
9      Q.  Does your clustering reduce the price
10 variation?
11      A.  No.
12      Q.  Does it mask the price variation?
13      A.  No.
14      Q.  Is it your opinion that there is no way to
15 capture or determine the amount of impact caused by
16 the keybag verification code on iPod prices?
17      A.  Well, that's an abstract level.  If the
18 keybag verification code were to impact a -- if
19 there was evidence that it would impact a
20 substantial amount of sales, one could at least
21 conceive that one might be able to see something.
22      Q.  And using that assumption -- so assuming
23 that the keybag verification code impacted a
24 substantial amount of sales, what methodology would
25 you use to capture and determine the amount of such

Page 109

1 impact?
2           MR. MITTELSTAEDT:  Object.  Incomplete
3 hypothetical.
4           THE WITNESS:  Well, you're conditioning on
5 an assumption that -- that there's evidence that it
6 impacted a significant amount of sales, that people
7 were in fact purchasing from the Real Music Store
8 for usage on iPods in significant numbers.  And so
9 the predicate assumption is not satisfied.
10           So in the world as we see it, it's
11 difficult to conceive how the data as analyzed by
12 Professor Noll and the data as we have them are
13 going to find something that even economic theory
14 says wouldn't be there at the time that
15 Professor Noll looked for it.
16 BY MS. SWEENEY:
17      Q.  When you say that a missing predicate is
18 that people were in fact purchasing from the Real
19 Music Store for usage on iPods in significant
20 numbers, what do you mean when you say "significant
21 numbers"?
22      A.  Well, the question is how many for lockin
23 is the incremental number --
24           (Reporter inquires.)
25           THE WITNESS:  The question for lockin is

# EXHIBIT 10

**Confidential - Attorneys' Eyes Only**

Kevin Murphy, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  OAKLAND DIVISION

 4
    THE APPLE iPOD iTUNES        Lead Case No. C 05-00037
 5  ANTI-TRUST LITIGATION

 6

 7  _____

 8  This Document Relates To:

 9  ALL ACTIONS

10

11  _____

12

13

14

15         CONFIDENTIAL - ATTORNEYS' EYES ONLY

16     VIDEOTAPED DEPOSITION OF KEVIN M. MURPHY, PH.D.

17            Tuesday, November 12, 2013

18            San Francisco, California

19

20

21

22  Reported By:

23  Darcy J. Brokaw

24  RPR, CRR, CSR No. 12584

25  Job No. 10008261
```

**Page 1**

1    Q. And is it your practice to have your staff
2 prepare portions of your report?
3    A. I think we work together. I mean, usually
4 the way it works is I -- we have -- first, before we
5 ever do anything on a report, we do some work, we
6 figure out what we're doing and what the analysis
7 is.
8         I think at some point you get to the point
9 where you say, okay, we've done enough analysis to
10 know the basic contours of the testimony.
11        At that point I usually individually -- or
12 sit down with people -- and try to come up with an
13 outline of how we'll structure the report, what
14 topics to be covered. At that point you usually
15 have basic opinions in mind based on the analysis
16 you've done.
17        Then it becomes a matter of fleshing out
18 that outline. And, you know, either I will take the
19 first crack at fleshing out parts of the outline or
20 the staff will. Most often I'll take the first
21 crack at, you know, kind of the core parts of the
22 report, the analysis of the economics, the empirical
23 analysis and things like that. The staff's more
24 likely to take the first stab at some of the
25 background sections and things like that.

1         And then -- but then I'll go over whatever
2 they've done, and I'll ask them to look at whatever
3 I've done, and then we go back and forth. And so
4 it's really a back-and-forth process between myself
5 and the staff.
6         But usually it starts with kind of an
7 outline or structure that I either do myself or in a
8 meeting or sitting down with staff.
9    Q. Now, in your Appendix 2 -- I'm sorry,
10 Appendix B, where you identify all the materials
11 that you specifically relied upon to reach your
12 conclusions, did you personally review all those
13 materials?
14   A. No.
15   Q. Did you review any of the materials in
16 Exhibit B?
17   A. Oh, yes, many of them.
18   Q. And so how did you -- how was the
19 knowledge that was gained by someone reviewing
20 Appendix B? How was that passed on to you?
21   A. Usually it came about because we would be
22 asking a particular issue. I'd ask, you know, I
23 need to learn about this; can you look for documents
24 or data or other things related to a specific topic?
25        And they would go out and look for that

1 information, and they'd bring back what they found.
2         Usually that would spur more questions,
3 and then they'd go back.
4         So it would be kind of an iterative
5 process where they would do kind of searching based
6 on my direction as to what kinds of issues we were
7 interested in trying to understand.
8    Q. Did you ask Apple for an opportunity to
9 interview any Apple employees?
10   A. Not that I recall. We've been working on
11 this a long time, so -- but I don't recall any
12 specific interviews in this case.
13   Q. How long have you been working on this
14 case?
15   A. Several years, as I recall.
16        I know enough not to guess, because people
17 are very bad at recalling how far back in time
18 things are. So I wouldn't want to -- wouldn't want
19 to offer a guess, but it's been quite a while.
20   Q. Did you ask for any data that were not
21 among the materials supplied to you by Apple?
22   A. I believe we did. I think we've asked for
23 data and we received data that we asked for.
24   Q. And what was the data that you asked for
25 and received?

1    A. I mean, I think we got some data on some
2 consumer surveys that are talked about in --
3 customer surveys that are in our -- were talked
4 about in the report. That's the one that comes to
5 my mind. I'm sure there are others, but those are
6 the ones that came to my mind.
7         I don't remember if we got the NPD data
8 from them or how that came about. But there were a
9 number of cases where we received data from Apple
10 based on things we were interested in looking into.
11   Q. The transactional datasets that you used
12 in your regression analyses, did you ask Apple for
13 clarification about those datasets?
14   A. I didn't personally. I believe the staff
15 did, but I can't -- I don't have a specific
16 recollection of any questions that were there.
17   Q. Do you know who that would be on your
18 staff?
19   A. Probably Ricardo Cossa, I would think, or
20 Anita Garten would be the most likely people.
21   Q. And did you or your staff ask Apple for
22 additional transactional data?
23   A. I don't know. I mean, we did talk to them
24 about transactional data, but I don't know if we
25 asked them for additional beyond what we got. That,

**Confidential - Attorneys' Eyes Only**

Kevin Murphy, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

**Page 46**

1  I don't know.
2      Q. And did you use the same dataset that
3  Professor Noll used?
4      A. I think we did. We tried to. I mean, I
5  think we thought that would make it more simple for
6  people to look at the results.
7      It's always more difficult if the two
8  parties are using different data. Then it's harder
9  to make comparisons, because some of the differences
10 might be due to the data, some of the differences
11 might be due to what you do with the data.
12     So we felt that working with the same data
13 to the extent possible made sense.
14     Q. Now, can you explain what your clustering
15 criticism is of Professor Noll?
16     A. Yeah. I mean, when you do statistical
17 inference, you have to have a way of assessing the
18 precision of your estimates, and the precision of
19 your estimates depends on the amount of information
20 that are contained in the data that you're
21 analyzing.
22     And one of the key issues that comes up in
23 analyses is whether different pieces of data are
24 really independent, that is, they provide additional
25 information above and beyond what's contained in

**Page 47**

1  other observations. And not just whether they have
2  additional information, whether they have unique
3  pieces of information that's distinct from the
4  information in other observations.
5      And it's, you know, common in economics to
6  then think about, well, is there a dependence among
7  the different observations in your dataset?
8      So the outcome or what you see in one
9  observation has information that's correlated with
10 or similar to the information contained in other
11 observations.
12     And Professor Noll ignores that in
13 calculating his standard errors and doing his
14 statistical inference. In this case, it's a rather
15 egregious error.
16     If you look, comparing the standard errors
17 once you correct for that dependence with the
18 standard errors that he calculates, they were off by
19 a factor of a hundred or more, which is pretty big.
20 I mean, it's saying, you know, I think -- I'm saying
21 the precision is within plus or minus 1, when
22 actually it's plus or minus 100, I mean, or more.
23     And that failure, I think, really means
24 that the statistical inference that he engages in
25 is --

**Page 48**

1      THE REPORTER: I'm sorry. "And that
2  failure, I think, really" --
3      (Reporter inquires.)
4      THE WITNESS: -- results in the
5  statistical inference he engages in being completely
6  inappropriate and misleading.
7  BY MS. SWEENEY:
8      Q. Now, did you serve as an expert in the
9  High-Tech Employee case?
10     A. Yes, I did.
11     Q. And who were you retained by in that case,
12 what defendant?
13     A. I was retained by a group of defendants,
14 joint defense group.
15     Q. Including Apple?
16     A. Including Apple and a number of other --
17 Intel, Adobe, Intuit, Intel, Google, Pixar, Lucas
18 Films.
19     Q. And you submitted an expert report in that
20 case, correct?
21     A. Yes, I did.
22     Q. And did you submit a supplemental expert
23 report in that case?
24     A. I believe I did, yes.
25     Q. And in that case, did you criticize

**Page 49**

1  plaintiffs' expert for engaging in a -- in a
2  problem -- well, strike that.
3      Did you assert that plaintiffs' expert
4  should have clustered the standard errors in his
5  regression?
6      A. Yes, I did.
7      Q. And did the court accept your opinion on
8  that issue?
9      MR. KIERNAN: Object to the form.
10     THE WITNESS: I don't know if they said it
11 was -- I think in the original order, I think she
12 said something along the lines of it was unclear
13 whether he needed the cluster or not.
14     I think Professor Leamer, who was the
15 expert on the other side, has subsequently agreed
16 that his standard errors are not correct and that
17 you do need to do something to account for
18 clustering. And, in fact, the court's opinion also
19 reflected that.
20     And the question is what method should be
21 used to make a correction for his failure to do that
22 analysis.
23 BY MS. SWEENEY:
24     Q. You said that the court -- the court's
25 opinion also reflected that Professor Leamer needed

**Confidential - Attorneys' Eyes Only**

Kevin Murphy, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 50

1  to do something about clustering?  Is that what you
2  said?
3      A.  No.  He had to do something to address the
4  correlation of the residuals.  And Professor Leamer
5  said there's more than one way to do that.
6  Clustering is one method, there are other methods.
7      And so then the question is which method
8  should be used.  I think Professor Leamer has
9  recognized that, in fact, his residuals were not
10 independent, and therefore, something needed to be
11 done, of which clustering is probably the most
12 standard solution to that problem.
13     Q.  But the court concluded, didn't it, that
14 Dr. Leamer's failure to cluster the standard errors
15 did not provide a sufficient basis to conclude that
16 the regression at issue failed to provide a reliable
17 methodology for class certification?  Were you aware
18 of that?
19     MR. KIERNAN:  Object to the form.
20     THE WITNESS:  I think that sounds like
21 what the court said.  Of course, they're not saying
22 that he doesn't need to cluster and that's not a
23 mistake.  He's just saying -- I think the court is
24 inferring that they still think they can use the
25 regression based on other things.

Page 51

1      But it clearly -- and I think Professor
2  Leamer ultimately has admitted that he does need to
3  do something about his standard errors.  His claim
4  was that he would do something different.  In fact,
5  in his revised report, he did something different,
6  which dramatically changed his standard errors.
7  BY MS. SWEENEY:
8      Q.  Did you say -- or strike that.
9      Is it your view that a model's results
10 need not necessarily be statistically significant to
11 be reliable?
12     A.  I think I have said things along those
13 lines.  What I'm referring to is the fact that you
14 can think of statistical significance at the
15 5 percent level.  And for large datasets, you can
16 think about having a T statistic bigger than 2 as
17 getting you past that 5 percent level.
18     What I'm saying is if your T statistic is
19 1.95 versus 2.05, you don't want to say those are
20 somehow magically different because one's on one
21 side of 2 and one's on the other side.
22     That's, I think, the fallacy that people
23 fall into, thinking that there's a bright line there
24 at 2.0 that says, if I'm less than 2, I've got
25 nothing; if I'm more than 2, I have enough.

Page 52

1      I mean, the answer is 1.95 isn't very
2  different than 2.05.  And that was my testimony in
3  that case, that was my testimony in every other
4  case, is that you've just got to look at the results
5  and say, how precise are they?  Are they
6  sufficiently precise that I can make a reasonable
7  statement?  And there's no bright line that says
8  bigger than 2 is good and a little bit less than 2
9  is bad.  And that's what I meant by that statement.
10     Q.  So I think you alluded to this earlier,
11 but so is it your view that there are methods for
12 addressing nonindependence between observations
13 other than adjusting the standard errors through
14 clustering?
15     A.  Yes, you can.  You can aggregate up to a
16 level such that your observations are independent,
17 which is basically aggregate away the dependence.
18 So you're saying -- you're basically recognizing --
19     THE REPORTER:  "Aggregate away" --
20     THE WITNESS:  -- the dependence.
21     So you're actually recognizing that you
22 have fewer observations than the raw number of
23 observations in your dataset.
24 BY MS. SWEENEY:
25     Q.  Are there any other methods?

Page 53

1      A.  Yeah, there are various other methods to
2  try to estimate the degree of correlation.  Actually
3  put a parametric model on the correlation that you
4  can try to do.  That's another method that's common.
5      Those would probably be the three most
6  common.  I'd say clustering is currently the most
7  common way that people address it.
8      Aggregation is a second method that can be
9  helpful.  In some cases, it's basically the same as
10 clustering.
11     The other one is some kind of parametric
12 model for the degree of dependence among
13 observations, which is another somewhat common;
14 probably less common than the clustering approach.
15     Q.  So when you say that another method is the
16 parametric model for the degree of dependence among
17 observations, what do you mean by that?
18     A.  You actually specify a model that tells
19 you how and in what way different observations are
20 not independent.  So you allow specifically for
21 correlation of a particular form between individual
22 observations.
23     Q.  Do you do that by including variables in
24 the regression that explain some of the
25 commonalities?

Kevin Murphy, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 134

1  for any particular reason, that much closer to the
2  regression line.
3         Q.  So if you are estimating damages in a case
4  like this one where you're trying to estimate
5  damages per unit, isn't it beneficial to make the
6  error in the damage calculation per unit of sale the
7  same regardless of the transaction quantity?
8         MR. KIERNAN:  Objection.  Incomplete
9  hypothetical and argumentative.
10        THE WITNESS:  No.  I mean, again, you
11 don't control the size of the error.  The error is
12 what it is.  There's going to be some error of our
13 model for different transactions of different size.
14        Your goal is to try to do two things:
15 One, estimate the impact.
16        And you can use weighting to do that, but
17 you would use a different form of weighting than
18 what Professor Noll used.  You would use some type
19 of analytical weights, which would weight the
20 observations from the point of view of analysis,
21 without doing the same independence-type assumption
22 that Professor Noll did for the statistical
23 significance calculation.
24        So you can do weighting in a different way
25 to get at that issue.  It still doesn't solve the

Page 135

1  other problems with nonindependence of this data.
2  But if you're worried about that one, you could use
3  a different form of weights than Professor Noll
4  used.
5  BY MS. SWEENEY:
6         Q.  Now, in paragraph 95, you also mentioned
7  the Best Buy example.  But in paragraph 9, you're
8  talking about a different issue; that is, clusters
9  of observations among different purchasers, correct?
10        A.  Paragraph 9?
11        Q.  95.  Sorry, 95.
12        A.  I believe you said 9.  That's what
13 confused me.
14        Is it correct we're talking 95 then,
15 right?
16        Q.  Yes.
17        A.  Okay.  Yeah, because again, there are
18 common influences on pricing for sales to different
19 customers.  When the pricing committee decides how
20 to price a product, that's going to have a common
21 effect across the different customers.
22        It doesn't mean everybody's going to pay
23 exactly the same price, but it means it's going to
24 influence the prices paid by, you know, basically
25 all of the customers.

Page 136

1         And the existence of that common effect is
2  what creates the statistical problem of correlated
3  residuals that needs to be corrected to do
4  appropriate statistical inference.
5         Q.  So when you say in paragraph 95 "and
6  virtually all of them, large and small, paid the
7  same or nearly the same price as Best Buy," you
8  don't really mean that they paid the same price,
9  right?
10        I mean, you just said it doesn't mean
11 everybody's going to pay exactly the same price.  So
12 you're recognizing that not all the buyers of the
13 same nano third generation iPod on a particular date
14 paid the same price, correct?
15        MR. KIERNAN:  Hang on.
16        Objection, compound.  Vague for when.
17        THE WITNESS:  Okay.  What I'm saying is,
18 no, I'm not requiring them to pay the same price.
19 There can be differences.
20        What matters is not the fact that there
21 are differences, but there were common elements to
22 the pricing.  And those common elements generate the
23 kind of correlation that needs to be accounted for
24 in doing appropriate statistical inference.  And
25 clustering is one methodology for doing that.

Page 137

1  BY MS. SWEENEY:
2         Q.  And when you say "common elements," these
3  are what you referred to a moment ago?  That is, the
4  same factors that the pricing committee at Apple
5  takes into account, it takes into account for all
6  the prices that it sets for iPods?
7         A.  I mean, a simple way to think about it is
8  Apple says, okay, we're targeting a retail price of
9  $199.
10        They then back off some amount of that to
11 say, well, for resellers, we'll give them -- we'll
12 target a margin of whatever, 13 percent or whatever
13 they're targeting.  And then different retailers
14 will negotiate a little more or a little less than
15 that.
16        But the fact that Apple decided to price
17 at $199 versus a different price is going to affect
18 all those prices, not just one of them.  And it's
19 that commonality, among others, that would lead to
20 correlation across different purchasers and the
21 need, therefore, to account for that correlation in
22 doing statistical inference.
23        Q.  Now, we talked earlier about your
24 criticism that -- strike that.
25        We talked earlier about whether iPod