ROBBINS GELLER RUDMAN
   & DOWD LLP
BONNY E. SWEENEY (176174)
THOMAS R. MERRICK (177987)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
JENNIFER N. CARINGAL (286197)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bonnys@rgrdlaw.com
tomm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
jcaringal@rgrdlaw.com

Class Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) Lead Case No. C-05-00037-YGR |
| | ) CLASS ACTION |
| This Document Relates To: | ) ) PLAINTIFFS' MEMORANDUM OF LAW |
| ALL ACTIONS. | ) IN OPPOSITION TO DEFENDANT'S ) MOTION FOR SUMMARY JUDGMENT ) AND TO EXCLUDE EXPERT TESTIMONY ) OF ROGER G. NOLL |
| | DATE:        February 18, 2014 TIME:         2:00 p.m. CTRM:       5, 2nd Floor JUDGE:      Hon. Yvonne Gonzalez Rogers |

976124_1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ..................................................................................1

    A. Procedural and Factual History......................................................................1

        1. Apple's Closed System Helped Apple Achieve Market Dominance ..........2

        2. RealNetworks' Harmony Challenges Apple's Market Dominance.............3

        3. Apple Shuts Down Harmony and Excludes Competition............................5

        4. Apple's Exclusionary Conduct Enabled It to Maintain and Enhance Its Monopoly, Causing Anticompetitive Injury ...........................................8

III. LEGAL ARGUMENT ............................................................................................9

    A. Summary Judgment Standard .........................................................................9

    B. Apple's Made-up Standards for Proving Impact Do Not Create Disputed Issues of Material Fact .................................................................................10

        1. Plaintiffs' Theory of Impact Does Not Depend on the Level of Harmony Sales to iPod Owners ...............................................................10

        2. Apple Set Prices Based on Competitors' Products ...................................12

        3. Noll's Regression Demonstrates Impact and Quantifies Damages ..........13

IV. PROFESSOR NOLL'S OPINIONS ARE ADMISSIBLE UNDER RULE 702 AND *DAUBERT* .................................................................................................14

    A. Professor Noll's Regression Fits the Facts and Theories of the Case...................14

    B. Professor Noll's Regression Accounts for All Relevant Variables and Produces Statistically Significant Results.....................................................15

        1. Professor Noll Does Not Use the Wrong But-For World .........................16

        2. Professor Noll's Regression Accounts for the Relevant Aspects of iTunes 7.0......................................................................................................17

        3. Apple's Experts' Assertion that More Variables Should Be Included Ignores Multicollinearity Issues....................................................18

        4. Apple's Litigation-Driven Clustering Theory Has No Basis in Economics....................................................................................................20

    C. Professor Noll Relied on Standard Economic Methods to Define the Relevant Markets ..........................................................................................21

976124_1

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR

- i -

1

2                                                                                                    **Page**

3
V.     CONCLUSION......................................................................................................................25
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group, LP,*
    592 F.3d 991 (9th Cir. 2010) ........................................................6

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.,*
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ..............................12

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...............9

*Aspen Highlands Skiing Corp.,*
    472 U.S. 585, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985) ...............9

*Bazemore v. Friday*
    478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2 315, (1986)................16

*Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n,*
    620 F.2d 1360 (9th Cir. 1980) ....................................10

*Bigelow v. RKO Radio Pictures, Inc.,*
    327 U.S. 251, 66 S. Ct. 574, 90 L. Ed. 652 (1946)................13

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, Inc.,*
    203 F.3d 1028 (8th Cir. 2000) ....................................18

*Brown Shoe Co. v. United States,*
    370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)................23

*Chevron Corp. v. Pennzoil Co.,*
    974 F.2d 1156, 1161 (9th Cir. 1992), *cert. denied,*
    __ U.S. __ , 132 S. Ct. 115, 181 L. Ed. 2d 40 (2011)................9

*Chevron Corp. v. Pennzoil Co.,*
    974 F.2d 1156 (9th Cir. 1992) ....................................9

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ...............................10, 12

*El Aguila Food Prods., Inc. v. Gruma Corp.,*
    301 F. Supp. 2d 612 (S.D. Tex. 2003),
    *aff'd,* 131 F. App'x 450 (5th Cir. 2005)................12

*FTC v. Staples,*
    970 F. Supp. 1066 (D.D.C. 1997) ...............................23

1

2                                                                              **Page**

3
*Hemmings v. Tidyman's Inc.*,
4     285 F.3d 1174 (9th Cir. 2002) ...............................................................16

5   *In re Dynamic Random Access Memory Antitrust Litig.*,
      No. M 02-1486, 2006 U.S. Dist. LEXIS 39841
6     (N.D. Cal. June 5, 2006) .......................................................................14

7   *In re eBay Seller Antitrust Litig.*,
8     433 F. App'x 504 (9th Cir. 2011) .........................................................10

9   *In re Graphics Processing Units Antitrust Litig.*,
      253 F.R.D. 478 (N.D. Cal. 2008) ..........................................................18
10

11  *In re Indus. Silicon Antitrust Litig.*,
      No. 95-2104, 1998 U.S. Dist. LEXIS 20464
12    (W.D. Pa. Oct. 13, 1998) ......................................................................13

13  *In re Live Concert Antitrust Litig.*,
      863 F. Supp. 2d 966 (C.D. Cal. 2012) ..............................................16, 18
14

15  *In re Lower Lake Erie Iron Ore Antitrust Litig.*,
      998 F.2d 1144 (3d Cir. 1993)................................................................13

16  *In re Methionine Antitrust Litig.*,
17    MDL No. 00-1311, 2003 U.S. Dist. LEXIS 14828
      (N.D. Cal. Aug. 22, 2003) .....................................................................18
18
    *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
19    No. C 09-1967 CW, 2013 U.S. Dist. LEXIS 160739
      (N.D. Cal. Nov. 8, 2013).......................................................................14
20

21  *In re REMEC Inc. Sec. Litig.*,
      702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................................18

22  *In re Se. Milk Antitrust Litig.*,
23    No. 08-MD-1000, 2012 U.S. Dist. LEXIS 44221 1032797
      (E.D. Tenn. Mar. 27, 2012)...............................................................10, 17
24
    *In re Se. Milk Antitrust Litig.*,
25    No. 12-5457, 2014 U.S. App. LEXIS 66
      (6th Cir. Jan. 3, 2014) ......................................................................10, 18
26

27  *In re Static Random Access Memory Antitrust Litig.*,
      No. 07-md-01819 CW, 2010 U.S. Dist. LEXIS 141670
28    (N.D. Cal. Dec. 7, 2010) .......................................................................14

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO
EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR          - iv -

1

2                                                                            **Page**

3

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-md-01819 CW, 2010 U.S. Dist. LEXIS 132172
    (N.D. Cal. Dec. 10, 2010) .................................................................10

*In re Titanium Dioxide Antitrust Litig.*,
    No. RDB-10-00318, 2013 U.S. Dist. LEXIS 62394
    (D. Md. May 1, 2013) ...............................................................15, 18

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) ............................................................12

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004)..................................................22

*Northrop Grumman Corp. v. Factory Mut. Ins. Co.*,
    No. 05-08444 DDP, 2013 U.S. Dist. LEXIS 100804
    (C.D. Cal. July 18, 2013) ................................................................10

*Oracle Corp. v. Druglogic, Inc.*,
    No. C-11-00910 JCS, 2013 U.S. Dist. LEXIS 164675
    (N.D. Cal. Oct. 16, 2013)....................................................................9

*Parker-Hannifin Corp. v. Wix Filtration Corp.*,
    No. CV 06-0098 LJO DLB, 2008 U.S. Dist. LEXIS 29388
    (E.D. Cal. Apr. 9, 2008)...................................................................10

*Perez v. State Farm Mut. Auto. Ins. Co.*,
    No. C 06-01962 JW, 2011 U.S. Dist. LEXIS 155921
    (N.D. Cal. Dec. 7, 2011), *cert. denied*,
    2012 U.S. Dist. LEXIS 66674 (N.D. Cal. May 2, 2012) ........................14

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993).............................................................16

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................22

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
    630 F.3d 866 (9th Cir. 2010) ..............................................................9

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    556 F. Supp. 825 (D.D.C. 1982).........................................................12

976124_1

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO
EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR          - v

**Page**

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
No. C-09-01201 RMW, 2011 U.S. Dist. LEXIS 93093
(N.D. Cal. Aug. 19, 2011)........................................................................................10

*United States v. E. I. Du Pont de Nemours & Co.*,
351 U.S. 377 76 S. Ct. 994, 100 L. Ed. 1264 (1956)...............................................22

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................................................23

*United States v. SunGard Data Sys.*,
172 F. Supp. 2d 172 (D.D.C. 2001).........................................................................23

*United States v. Western Elec. Co.*,
767 F. Supp. 308 (D.D.C. 1991)
*aff'd*, 993 F.2d 1572 (D.C. Cir. 1993) ....................................................................14

*Weisfeld v. Sun Chemical Corp.*,
210 F.R.D. 136 (D.N.J. 2002),
*aff'd*, 84 F. App'x 257 (3d Cir. 2004)......................................................................16

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 56(a)....................................................................................................................9

Federal Rules of Evidence
Rule 702....................................................................................................................14

**SECONDARY AUTHORITIES**

Jonathan Jacobson *et al.*, *Predatory Innovation: An Analysis of*
*Allied Orthopedic v. Tyco in the Context of Section 2 Jurisprudence*,
23 Loy. Consumer L. Rev. 1, 27 (2010) ...................................................................6

976124_1

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO
EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                        - vi -

## I.    INTRODUCTION

Apple's sixth attempt to dismiss Plaintiffs' claims relies on distortions of the factual record, ignores or misstates Plaintiffs' expert's analysis, and depends on unreliable and inadmissible expert testimony.  Examination of the ***actual*** factual record, as well as Plaintiffs' experts' opinions and analysis, demonstrates that Apple has not met its burden of demonstrating that summary judgment is warranted.

## II.    FACTUAL BACKGROUND

### A.    Procedural and Factual History

Plaintiffs represent a certified class of individuals and businesses that purchased iPods (Apple's portable digital media player) directly from Apple between September 12, 2006 and March 31, 2009.  Plaintiffs allege that Apple maintained and enhanced its monopoly power in the market for portable digital media players by implementing software and firmware updates – called the 7.0 updates – that disabled RealNetworks' Harmony, a product that allowed iPod users to download and play audio files from RealNetworks' on-line music store.  Before Harmony, Apple's proprietary digital rights management system ("DRM"), called FairPlay, blocked iPod owners from downloading music from on-line stores other than Apple's iTunes Store ("iTS").  With Harmony, iPod users could build music libraries with music from online sources that were *not* tied to the iPod, thus reducing the costs of switching to another portable digital music player.

Recognizing the threat that Harmony posed to its dominance in the markets for permanent, legal audio file downloads and for portable digital media players, Apple acted swiftly to break the interoperability Harmony created.  Apple disabled Harmony several months after its launch in 2004 by implementing the 4.7 updates.  Then, after RealNetworks modified Harmony to make it work again with the iPod in 2006, Apple broke Harmony through 7.0.  Disabling Harmony increased iPod owners' switching costs, enabling Apple to maintain and enhance its monopoly in the market for portable digital media players.  As a result, Apple was able to charge higher prices for iPods than it could have charged if it had not engaged in the anticompetitive conduct.

Plaintiffs' principal economic expert, Roger G. Noll, calculated damages and demonstrated the anticompetitive impact of Apple's conduct using a before-and-after multiple-variable regression

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR

1     analysis. Comparing prices of iPods before and after the competitive events (when Harmony was

2     operational, when Apple disabled Harmony, and when Apple and its competitors began selling

3     DRM-free audio files), and using a hedonic model of iPod prices that accounts for different iPod

4     models and their different features, Noll quantified the competitive effects of 7.0. The regressions

5     estimated an overcharge of 2.38% on iPods sold to resellers, and 7.45% on iPods sold to retail

6     customers, for total damages of $351,631,153. Ex. 1, Noll Damages Report at 71-72; Ex. 2, Noll

7     Rebuttal Report at 50-51.

8             **1.**       **Apple's Closed System Helped Apple Achieve Market Dominance**

9          When Apple and the record labels originally negotiated the terms under which Apple could

10    sell digital music files through its online iTS, most of the labels required that the recordings "have

11    content protection to guard against piracy."[1] Ex. 5, Declaration of Howie Singer ("Warner Decl.");

12    Ex. 6, Declaration of Lawrence Kanusher ("Sony Decl."); Ex. 7, Declaration of Amanda Marks

13    ("Universal Decl."). Apple implemented this requirement through a proprietary DRM system called

14    FairPlay. Ex. 9, Cue Dep. at 33:4-36:19. All music sold through iTS during the class period was

15    restricted through FairPlay, including music recorded by labels that did not require DRM. Ex. 10,

16    Robbin Dep. at 50:10-16; *see also* Ex. 9, Cue Dep. at 45:2-46:16, 56:6-57:16 (all music had same

17    restrictions); Ex. 1, Noll Damages Report at 9-10.

18          Despite Apple's suggestion to the contrary, none of the labels wanted Apple to use a

19    proprietary DRM system that made iTunes music incompatible with portable digital media players

20    other than the iPod. All of the labels would have preferred instead a system that allowed their music

21    to be played on multiple competing devices, because they had an interest in having their music sold

22    "in the widest manner possible, through as many channels as possible." Ex. 5, Warner Decl.; Ex. 7,

23    Universal Decl.; *see also* Ex. 6, Sony Decl. ("Apple did not accommodate Sony's request for a

24    solution that would both protect the content as well as be interoperable with other devices."); Ex. 8,

25    Declaration of Mark Piibe ("EMI Decl.").

---

26

27    [1]      All references to "Ex." are to the exhibits attached to Declaration of Bonny E. Sweeney in Support of Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and to Exclude Expert Testimony of Roger G. Noll, filed concurrently. Emphases is

28    added and citations are omitted throughout unless otherwise indicated.

1    Opting instead for a closed system, when Apple opened the iTS in 2003, it modified the iPod
2    so that it was compatible only with the FairPlay-encrypted files sold through iTunes.  Ex. 11,
3    Farrugia Dep. at 109:21-110:8; Ex. 12, Farrugia Decl., ¶¶29-31; Ex. 4, Martin Report, ¶17.  Apple
4    ensured that all new iPods were incompatible with files sold through other online stores,[2] even
5    though this was not necessary to maintain the security required by the labels.  Ex. 13,
6    Apple_AIIA00098417.

7    Apple's closed system  locked iTS customers into using the iPod for direct playback of their
8    digital audio files.  Ex. 9, Cue Dep. at 41:24-43:9; Ex. 10, Robbin Dep. at 36:25-37:23; Ex. 14,
9    Heller Dep. at 48:12-18.  Ex. 1 , Noll Damages Report at 14-15, 52-55.  As a result, iPod owners
10   who purchased digital audio files from other sites (such as Amazon.com or Walmart.com) could not
11   play these files directly on an iPod.  This closed system allowed Apple to rapidly leverage its market
12   power in the digital audio file market into the market for portable digital media players.  Ex. 1, Noll
13   Damages Report at 52-27; Ex. 9, Cue Dep. at 158:7-159:14, 209:21-210:11.  Before the launch of
14   iTS, Apple's market share was less than 30%.  Ex. 15, Apple_AIIA01278671.  With iTS, Apple was
15   able to achieve dominance in the portable digital media player market almost immediately, with a
16   market share exceeding 70%.  Ex. 1, Noll Damages Report at 48; Ex. 16, Apple_AIIA01202394; Ex.
17   17, Apple_AIIA00099408; Ex. 18, Press Release, *iPod Claims 82% HD-Based Retail Market Share;*
18   *42% All Players* (Oct. 11, 2004).  From that point forward, to compete in the digital audio download
19   market any would-be competitor had to make its music playable on the iPod.  Ex. 19, Declaration of
20   Lee Morse, ¶8.

21                    **2.    RealNetworks' Harmony Challenges Apple's Market
                              Dominance**
22           The first real challenge to Apple's locked-in market dominance occurred in January 2004,
23   when RealNetworks launched an online music store that competed directly with iTunes.  It sold
24   digital audio files licensed from the record labels and protected by DRM.   Ex. 20,
25   Apple_AIIA01278810; Ex. 5, Warner Decl.; Ex. 6, Sony Decl.; Ex. 7, Universal Decl.; Ex. 8, EMI
26   Decl.  Recognizing that RealNetworks could not compete successfully in the digital audio file

27   _____
28   [2]      Although FairPlay and other DRM systems can be circumnutated legally (by, for example,
     burning and ripping), the process "is cumbersome and costly."  Ex. 1, Noll Damages Report at 10.

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                    - 3 -

1    market unless iPod users could play its songs directly on the iPod, RealNetworks' CEO Rob Glaser

2    ("Glaser") first explored with Apple the possibility of entering into a licensing agreement.  After

3    Apple rebuffed this overture, RealNetworks developed a new technology that enabled iPod users to

4    play DRM-encrypted songs legally purchased from RealNetworks directly on the iPod, as well as

5    numerous other devices.[3]   Ex. 23, Apple_AIIA00090441 (Cue Dep. Ex. 64).   As Plaintiffs'

6    technology expert explains, and Apple's expert concedes, there is no evidence that Harmony was

7    ever intended or able to remove FairPlay encryption from any songs purchased from iTS.  Ex. 4,

8    Martin Report, ¶27, 31.   "Harmony only **added** encryption to songs; it did not strip FairPlay

9    encryption from songs sold through the iTunes Store."   *Id.* (emphasis in original).

10          Shortly after RealNetworks launched Harmony, Apple's share of the digital audio file market

11   fell below 70% for the first and only time since the launch of iTS.  Ex. 1, Noll Damages Report at

12   50; Ex. 17, Apple_AIIA_00099408; Ex. 24, Apple_AIIA_00979727.[4]

13          Customers flocked to RealNetworks not only because it offered better prices than iTS,[5] they

14   also valued the flexibility it provided.   Apple's own documents and Plaintiffs' testimony

15   demonstrate that iPod owners wanted the ability to play music purchased from online stores other

16   than iTS.  *See, e.g.*, Ex. 28, Apple_AIIA00090471 (Harmony offers "[c]ompatibility, choice and

17   quality" and that is "why so many customers have welcomed news of Harmony"); Ex. 27,

18   Apple_AIIA00090447-49 (article regarding doubling of RealNetworks' market share); Ex. 23,

19   Apple_AIIA_00090441-43 (Cue Dep. Ex. 64) (article detailing Harmony's ability to play songs on

20   iPods); Ex. 29, Apple_AIIA_00090467-68 (article on song sales and ability to transfer songs onto

21   more than 100 devices, including iPods).  *See also* Ex. 30, 2005 Digital Music Interoperability and

22   [3]     Glaser contacted Apple CEO Steve Jobs ("Jobs") on April 9, 2004, several weeks before
     Apple began its wholesale redesign of FairPlay.  Ex. 21, Apple_AIIA01385106 (Glaser email to
23   Jobs).  Glaser proposed to Jobs that Apple license FairPlay so that RealNetworks could sell music
     that was interoperable with the iPod, and RealNetworks would make the iPod its preferred device for
24   its online store.  *Id.*  Apple has not produced any response to the Glaser email, but Jobs testified that
     it was "possible" that he had had discussions with Glaser.  Ex. 22, Jobs Dep. at 24.
25   [4]     Apple's market share rebounded to more than 70% after Apple broke Harmony's
     interoperability.  *See* Ex. 1, Noll Damages Report at 50; Ex. 9, Cue Dep. at 184:15-18; Ex. 17,
26   Apple_AIIA00099408; Ex. 25, Apple_AIIA00327951 (Cue Dep. Ex. 71); Ex. 26,
     Apple_AIIA00091049-51.
27   [5]     In August 2004, RealNetworks sold its audio downloads for as low as 49 cents per track –
28   less than half the price of Apple's 99 cents per track price.  Ex. 27, Apple_AIIA00090447.

Availability Hearing Before the Subcommittee on Courts, the Internet and Intellectual Property of the Committee on the Judiciary, April 6, 2005, Statement of The Honorable Lamar Smith ("This interoperability issue is of concern, since consumers who bought legal copies of music from Real could not play them on the iPod.  I suppose this is a good thing for Apple, but perhaps not for consumers."). Ex. 58, Tucker Dep. at 12:20-13:5, 13:16-19; Ex. 60, Charoensak Dep. at 26:9-11 ("I was locked out of the music that I purchased, that was my main complaint."). *See, e.g.*, Ex. 35 (compendium of selected customer complaints) (Apple_AIIA00000674 (customer care email: customer unable to play 300 songs purchased from Real Guide/Real Player on his iPod); Apple_AIIA00002406 (customer care email: customer unable to transfer music from WMP to iTunes/iPod); Apple_AIIA00062113 (customer care email: customer unable to import music purchased via Napster into iTunes library); Apple_AIIA00057320 (customer care email: customer unable to use iPod to play Yahoo! music service); Apple_AIIA_00006477 ("[h]ow can I get these songs into iTunes and iPod"); Apple_AIIA_00007064 ("I was wondering why I can't copy music downloaded from Wal*Mart.com to my iPOD"); Apple_AIIA_00007549 ("I was upset to find out that my ipod doesn't work with Napster."); Apple_AIIA_0007579, Apple_AIIA_00008481, Apple_AIIA_00008484, Apple_AIIA_00008499, Apple_AIIA_00067464, Apple_AIIA_00067479, Apple_AIIA_00067605, Apple_AIIA_00067632, Apple_AIIA_00067979, Apple_AIIA_00069598, Apple_AIIA_00059009, Apple_AIIA_00059088 (a sample of individual customer complaints about iPod owners wanting the ability to play music acquired from sources other than iTS on their iPods.)).

### 3.     Apple Shuts Down Harmony and Excludes Competition

Apple's response to the RealNetworks threat was swift and punishing.  Before RealNetworks had even issued a public announcement about the Harmony technology, CEO Jobs drafted a public statement that called RealNetworks, a company that trades on NASDAQ, a "hack," accused it of questionable ethics, threatened legal action, and warned RealNetworks and its customers that future Apple software updates would break the interoperability created by Harmony:

> "We are stunned that Real has adopted the tactics and ethics of a hacker to break into the iPod, and we are investigating the implications of their actions under the DMCA and other laws.  We strongly caution Real and their customers that when we update our iPod software from time to time it is highly likely that Real's lock picking will cease to work on current and future iPods."

1   Ex. 36, Apple_AIIA00093875.  Instead of welcoming the interoperability created by RealNetworks,

2   Apple unfairly disparaged its competitor and made clear to any other would-be rival that Apple

3   would take all necessary steps to prevent any inroads into its dual monopolies.

4           Apple's top executives and engineers went into overdrive to figure out how to break

5   Harmony, performing a detailed technical analysis as soon as the Harmony program was available to

6   be downloaded.   Ex. 37, Apple_AIIA00090427; Ex. 38, Apple_AIIA00090428; Ex. 39,

7   Apple_AIIA00329373; Ex. 14, Heller Dep. at 128:1-5, 130:13-22.  The engineers confirmed that,

8   instead of stripping DRM from the music files, Harmony appeared to be "encrypting the files the

9   same way that FairPlay does."  Ex. 14, Heller Dep. at 87:1-4, 135:20-136:8; Ex 9, Cue Dep. at

10  123:3-25.

11          On October 26, 2004, Apple broke Harmony's interoperability with the iPod through its

12  release of iTunes 4.7.  Ex. 40, Apple_AIIA00093265 (Apple employee Grace Kvamme writes to

13  other Apple employees to give them "a heads-up that iTunes 4.7, along with soon-to-be released

14  iPod software" will "close the DRM hole that Real used to copy songs to an iPod").[6]

15          But RealNetworks did not give up.  By April 2005, RealNetworks had developed a response

16  to Apple's disabling of Harmony, and its music once again was playable on iPods.  Ex. 41,

17  Apple_AIIA00090483.  Apple engineers immediately began work on a new fix, "FairPlay 1.0," that

18  would disrupt the interoperability created by Harmony.  Ex. 11, Farrugia Dep. at 46:1-6.  Apple's

19  new security expert Augustin Farrugia and his team monitored competitor actions, including those of

20  RealNetworks, and explored modifications to FairPlay that would make interoperability with iPods

21  impossible.  Ex. 11, Farrugia Dep. at 164:9-24; Ex. 42, Apple_AIIA00094563.  Farrugia and his

22

---

23  [6]        In his Order dated May 19, 2011, Judge Ware granted summary judgment in Apple's favor as
    to the 4.7 claim only, holding that "[b]ecause iTunes 4.7 was a genuine improvement, the Court may
24  not balance the benefits or worth of iTunes 4.7 against its anticompetitive effects."  Dkt. No. 627 at 8
    (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group, LP*, 592 F.3d 991 (9th Cir.
25  2010) (Order Granting In Part and Denying In Part Defendant's Motion for Summary Judgment)).
    Plaintiffs respectfully submit that this interpretation is a misreading of antitrust law and preserve
26  their right to appeal Judge Ware's ruling.  *See, e.g.*, Jonathan Jacobson *et al.*, *Predatory Innovation:
    An Analysis of Allied Orthopedic v. Tyco in the Context of Section 2 Jurisprudence*, 23 Loy.
27  Consumer L. Rev. 1, 27 (2010) (arguing that such a reading of antitrust law would lead to substantial
    under-enforcement because anticompetitive conduct "would not constitute a valid claim if it
28  generated even minimal efficiency or improvement").

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR          - 6 -

1  team sought to correct a "flaw already exploited by Real to DRM their music to be compatible for

2  iPod." Ex. 4, Martin Report, ¶¶75-76; Ex. 11, Farrugia Dep. at 195:10-196:13. To stop this

3  compatibility, Apple redesigned FairPlay so that Apple could monitor the sources of music on

4  consumers' iPods and prevent rivals' music from working. Ex. 4, Martin Report, ¶¶76, 81; Ex. 42,

5  Apple_AIIA00094563; Ex. 11, Farrugia Dep. at 164:4-24.

6       Apple implemented the new FairPlay security system (the "keybag verification code" or

7  "KVC") through iTunes 7.0, which was released in September 2006 on certain iPod models. Ex. 4,

8  Martin Report, ¶¶75-106. As Plaintiffs' expert explains, 7.0 was "intended to prevent third-party

9  applications like RealPlayer . . . from directly transferring songs to an iPod, whether they were

10 encrypted or not." *Id.*, ¶76. The database verification code in 7.0 "did not make it more difficult for

11 attackers to strip FairPlay encryption from songs." *Id.*, ¶78. Instead of making it harder to read the

12 database in the iPod, database verification made it harder to write onto the databases. *Id.* Thus, 7.0

13 was not aimed at hacks that stripped content protection from music and so were required by Apple's

14 contracts with the labels. It was aimed, instead, at competing online music sources. Ex. 11, Farrugia

15 Dep. at 164:10-24 (Farrugia admits that this "problem" has nothing to do with the security of the

16 digital audio files sold through iTS); Ex. 11, Farrugia Dep. at 191:13-18; Ex. 4, Martin Report, ¶¶79,

17 100.

18      In October 2006 and January 2007, Apple confirmed the exclusionary effect of 7.0: digital

19 audio files purchased from RealNetworks could no longer be directly downloaded onto an iPod.

20 Ex. 11, Farrugia Dep. at 202:22-205:21; Ex. 43, Apple_AIIA00802966, Ex. 44,

21 Apple_AIIA00807080 ("Fortunately, Real's own support website states that iPod with video and

22 iPod nano do not work with Real Player due to changes we've made in the iPod software."). While

23 Apple executives applauded the change, iPods owners were infuriated by Apple disabling their

24 ability to play music, and complained to Apple by the thousands. *See, e.g.*, Ex. 35 (compendium of

25 selected customer complaints).

26      By late 2006, cracks began to appear in Apple's use of DRM to suppress competition, as the

27 record labels realized that dropping DRM was the only way around Apple's blocks on

28 interoperability. Ex. 45, Apple_AIIA00320482-84 (Cue Dep. Ex. 58). In early 2007, EMI

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR

1   approached several Apple online music competitors proposing to sell its music DRM- free.  Ex. 46,

2   Apple_AIIA0093504.    Finally,   after   other   music   services   were   selling   music   without   DRM

3   restrictions, on January 6, 2009, Apple announced at the Macworld conference that agreement had

4   been reached with all major labels to sell music on iTS without DRM at an increased price per track.

5   *See* Ex. 47, BBC News.com, *Apple to end music restrictions* (Jan. 7, 2009).  Eight million tracks

6   were made available without FairPlay on that day, and the entire iTS music catalog became DRM

7   free on March 31, 2009.  *See* Dkt. No. 322 (Amended Consolidated Complaint), ¶31.[7]

8           **4.      Apple's Exclusionary Conduct Enabled It to Maintain and
                       Enhance Its Monopoly, Causing Anticompetitive Injury**

9           Plaintiffs' expert, Professor Roger G. Noll, has conducted an economic analysis of Apple's

10  conduct.  He has concluded, among other things, that:

11  •       Apple's blocking of Harmony through 7.0 increased "lock-in" for iPods owners by
            increasing switching costs and network effects.
12

13  •       Apple possessed market power during the class period in the market for portable
            digital media players and the market for permanent downloads of digital audio files.

14  •       Apple's blocking of Harmony through 7.0 enhanced and maintained its monopoly
            power in the portable digital media player market.
15

16  •       As a result, Apple was able "to charge higher prices for iPods than otherwise would
            have been the case."

17  Ex. 1, Noll Damages Report at 4-5, 14-22, 42-57, 59-61.

18          Using an econometric model that quantifies the effect of the lock-in on iPod prices, as well as

19  the pro-competitive benefits from Harmony and the end of DRM, Professor Noll demonstrates that

20  "the magnitude of the pro-competitive benefit of DRM-free audio not only was substantial, but was

21  greater than the anticompetitive harm due to iTunes 7.0."  *Id.* at 61.  The overcharge estimated by

22  Professor Noll's regression analysis equals 2.38% of the transaction price for resellers and 7.45% of

23  the transaction price for direct sales buyers.  Total damages, estimated conservatively, are more than

24  $350 million, before trebling.  Ex. 2, Noll Rebuttal at 51.

25

26

27  _____
    [7]      As Professor Noll predicted, after music iTS became DRM-free, the lock-in effect eroded,
28  and the price of iPods decreased.  Ex. 51, 5/16/13 Noll Dep. at 81:13-82:10; Ex. 1, Noll Damages
    Report at 56-57.

1    Apple's re-establishment of lock-in through 7.0 was anticompetitive because it was costly to

2    implement, provided no benefits to consumers, and increased Apple's profits by increasing its

3    market power.  Ex. 1, Noll Damages Report at 59-60; Ex. 4, Martin Report, ¶80 (the specified

4    purpose was to transform very small errors into very serious errors).  But for its long-term strategy of

5    excluding rivals, Apple's conduct would not have made economic sense.  *Aspen Highlands Skiing*

6    *Corp.*, 472 U.S. 585, 608, 610-611, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985) (conduct that

7    "sacrifice[ s] short-run benefits," such as immediate income and consumer goodwill, undertaken

8    because it "reduce[s] competition . . . over the long run").  Apple's strategy ultimately succeeded by

9    disabling legitimate competitive efforts at interoperability.  Apple was able to maintain its 70% or

10   more market share in the online music market and steadily increased its share of the portable digital

11   media market.  Ex. 1, Noll Damages Report at 50.

12   Far from an "incoherent chain of events," the record evidence demonstrates Apple's quest for

13   dominance in the digital player and digital music markets by any means necessary, including by

14   improperly shutting down would-be rivals.

15   **III.    LEGAL ARGUMENT**

16   **A.    Summary Judgment Standard**

17   A motion for summary judgment may not be granted unless the moving party shows both: (1)

18   that there is no genuine issue as to any material fact; and (2) that it is entitled to judgment in its favor

19   as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "On summary judgment, the court draws all

20   reasonable factual inferences in favor of the non-movant."  *Oracle Corp. v. Druglogic, Inc.*, No. C-

21   11-00910 JCS, 2013 U.S. Dist. LEXIS 164675, at *13 (N.D. Cal. Oct. 16, 2013).  "Credibility

22   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

23   are jury functions, not those of a judge . . . ruling on a motion for summary judgment."  *Anderson v.*

24   *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "Where material

25   factual disputes exist, the court must allow a jury to resolve them."  *Rezner v. Bayerische Hypo-Und*

26   *Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010) (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d

27   1156, 1161 (9th Cir. 1992)), *cert. denied*, __ U.S. __ , 132 S. Ct. 115, 181 L. Ed. 2d 40 (2011).  "'In

28   antitrust cases, these general standards are applied even more stringently and summary judgment

1    granted more sparingly.'" *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-

2    01819 CW, 2010 U.S. Dist. LEXIS 132172, at *41-*42 (N.D. Cal. Dec. 10, 2010) (citing *Beltz*

3    *Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980)).  Where, as here,

4    the motion rests so heavily on conflicting expert opinion, summary judgment is even more inapt.

5    *See Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, No. 05-08444 DDP, 2013 U.S. Dist. LEXIS

6    100804, at *27 (C.D. Cal. July 18, 2013); *Parker-Hannifin Corp. v. Wix Filtration Corp.*, No. CV

7    06-0098 LJO DLB, 2008 U.S. Dist. LEXIS 29388, at *14 (E.D. Cal. Apr. 9, 2008) ("such

8    contradictory expert reports alone raise a material issue rendering summary judgment

9    inappropriate"); *Synthes USA, LLC v. Spinal Kinetics, Inc.*, No. C-09-01201 RMW, 2011 U.S. Dist.

10    LEXIS 93093, at *57 (N.D. Cal. Aug. 19, 2011) ("Where, as here, conflicting expert testimony

11    raises genuine issues of material fact that are appropriate for consideration by a jury, summary

12    judgment is inappropriate.").

### B.    Apple's Made-up Standards for Proving Impact Do Not Create Disputed Issues of Material Fact

13    

14    Apple makes up standards for proving impact that are completely unmoored from established

15    antitrust principles and then faults Plaintiffs for purportedly having failed to meet them.  Each of

16    these arguments must fail.[8]

#### 1.    Plaintiffs' Theory of Impact Does Not Depend on the Level of Harmony Sales to iPod Owners

17    

18    First, Apple argues that Plaintiffs cannot prove impact because "Harmony was insignificant

19    in 2006,"  and because Plaintiffs have not identified which RealNetworks' sales were to iPod owners

20    (or potential iPod owners) or the exact number of people who became locked in or locked out as a

21    

22    

23    

---

[8]    The cases Apple relies upon are inapposite.  *See In re eBay Seller Antitrust Litig.*, 433 F. App'x 504, 506 (9th Cir. 2011) (expert's first model was never actually implemented or tested and expert's second model utilized the company's "take rate" as proxy for the overcharge – a model (one not used in this action) not designed to connect the anticompetitive acts with the charging of supracompetitive fees); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054-58, 1063 (8th Cir. 2000) (expert's model failed to account for market events that both sides agreed were not related to any anticompetitive conduct).  Further, *In re Se. Milk Antitrust Litig.*, No. 08-MD-1000, 2012 U.S. Dist. LEXIS 44221 1032797, at *4-*6 (E.D. Tenn. Mar. 27, 2012), was reversed and remanded by *In re Se. Milk Antitrust Litig.*, No. 12-5457, 2014 U.S. App. LEXIS 66 (6th Cir. Jan. 3, 2014) (finding that expert did not need to include all factors in damages model).

result of 7.0.[9]  Def's Mem. at 9.  Besides being incorrect as a factual matter, this argument is contrary to well-established economic theory.  As Professor Noll explains:

> [N]othing in the economic theory of demand indicates . . . that some threshold level of users of Harmony among iPod owners is necessary for Harmony to have had an effect on iPod prices.  Instead, the effect of a technology that allows consumers to buy complementary products from different vendors is to make the price of these components more elastic, and the effect of conduct that eliminates this possibility is to make demand for components less elastic.

Ex. 2, Noll Rebuttal at 14; *see also* Ex. 1, Noll Damages Report at 14-22.

It also is not true that Harmony was "insignificant" in 2006.  At that time, RealNetworks had approximately 2.4 million subscribers, a significant number under any metric.  Ex. 57, November 7, 2006 Oppenheimer Quarterly Update on RealNetworks, Inc. at 67.  And while Plaintiffs have no way of identifying Harmony users, or determining exactly how many customers were locked in or locked out because of 7.0, Apple's own documents demonstrate that the interoperability and flexibility offered by RealNetworks' Harmony was highly valued by its customers, many of whom complained after Apple blocked Harmony through 7.0.  *See, e.g.*, Ex. 35 (compendium of selected customer complaints).

Moreover, the reaction by Apple's top executives to the launch of Harmony in 2004 and its re-appearance in 2006 demonstrates that Apple itself viewed RealNetworks as a serious threat to its monopoly and monopoly pricing.  *See supra*, §II.A.  Members of Apple's Pricing Committee, including Jobs, Tim Cook, Phil Schiller and Peter Oppenheimer, among others, carefully followed developments related to Harmony, and were well aware of the security team's work to break Harmony's interoperability.  Jobs, for example, drafted the press release condemning Real as a "hacker."  Ex. 48, Donnelly Dep. at 45;[10] Ex. 36, Apple_AIIA00093875.  These facts demonstrate

---

[9]    Throughout this brief, Plaintiffs use "7.0" to refer to the keybag verification code changes implemented through 7.0, and what Apple refers to as "KVC."

[10]    Donnelly further testified that the Pricing Committee would have the leaders of different business units discuss various issues before setting prices, including "the head of engineering, the senior vice-president or vice-president engineering for that product line, so that person is available to answer any questions from the executive team as to any issues or concerns or about the product . . . a few experts will come in on different aspects of the product and support the committee."  Ex. 48, Donnelly Dep. at 59.

976124_1

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                    - 11 -

1    that Apple viewed Harmony as a competitive threat and was able to raise prices on its iPods once

2    that threat was quashed.

### 2.    Apple Set Prices Based on Competitors' Products

4    Apple also asserts that Plaintiffs' theory is implausible because Apple adhered

5    "unwaveringly" to a practice of setting "aesthetically appealing" prices.  Def's Mem. at 10-11.  The

6    problem with this argument is that it is demonstrably false.[11]  While many of Apple's list prices

7    ended in a 9, Apple did not rely solely on "aesthetic" pricing.  Significant discounts – which varied

8    widely – were applied by Apple's pricing committee.  Ex. 48, Donnelly Dep. at 43-44; Ex. 2, Noll

9    Rebuttal at 33 & Appendix B.  Discounts were also provided in a variety of circumstances, including

10   to educational sellers and Apple employed a wide variety of end-of-life pricing.  *Id.*

11   Far more important than "aesthetic" pricing points were Apple's competitors.  Apple closely

12   tracked all competitive threats.[12]  Donnelly testified that Apple's practice was to "look[] at the

13   competitive situation when . . . setting the price of the new product."  Ex. 48, Donnelly Dep. at 54.

14   The committee would examine documents showing the "competitive situation summary . . . with

15   layouts of features and benefits and prices for competitive products, that may be a short list, it may

16   be a long list." *Id.* at 60;[13] Ex. 1, Noll Damages Report at Exhibits 2-7; *id.* at 32-33.

17   ―――――――――――――――

[11]    Apple's true pricing strategy is exactly why their reliance on *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031 (N.D. Cal. 2001) is misguided.  In that case, the expert's model failed to take into account the actual retail pricing policies at issue, which included "discounts received by defendants [that] were passed on to consumers." *Id.* at 1040.  Here, it is Apple that has conveniently ignored the fact that its pricing practices did not "unwaveringly" adhere to an "aesthetic" pricing strategy, as demonstrated by their actual transaction records.  For this same reason, Apple's additional "authority" fails.  In *Concord Boat*, 207 F.3d at 1055-57, the expert "ignored inconvenient evidence," which in this instance is exactly what Apple has done concerning their pricing strategy. Similarly, in *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1077-79 (D.D.C. 1982), the expert's model contained an "obvious inconsistency between real world competitive conditions and . . . assumptions about competition in the imaginary 'but for' world," whereas here, as discussed above, there is much support in the record for the basis of Noll's analysis on Apple's pricing strategy.  *See also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (damages evidence had "scant basis in the record"); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625 (S.D. Tex. 2003) ("the record is void of evidence" that supported expert's model), *aff'd*, 131 F. App'x 450 (5th Cir. 2005).

[12]    In internal market studies, Apple identified its competitors in the digital music retailers market as Napster, Wal-Mart, Rhapsody, Yahoo Music Unlimited, Urge, Best Buy Dig Music Store, RealPlayer, MySpace, MusicMatch, Buy Music, Sony Connect and Zune.  Ex. 49, Apple_AIIA00187793 at 95.

[13]    Apple makes the implausible argument that in order for Plaintiffs to succeed on their claims, they would have to come forward with evidence that the Pricing Committee "attempted to measure

976124_1

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                    - 12

1    Even to the extent Apple's prices were dictated by "aesthetics," that does not undermine

2    Plaintiffs' damages theory.  Apple argues that Professor Noll's regression results would have

3    required Apple to "depart" from its usual practice and charge $184.17 for a $199 nano.  Def's Mem.

4    at 11.  This is nonsense.  Apple could have easily charged $189 or some other "aesthetically

5    pleasing" price and still reaped improper overcharge benefits.  "[A]n antitrust plaintiff need not

6    prove damages with mathematical certainty, but rather, he need only introduce sufficient evidence of

7    damages to allow a jury to estimate the amount of damages."  *In re Indus. Silicon Antitrust Litig.*,

8    No. 95-2104, 1998 U.S. Dist. LEXIS 20464, at *13 (W.D. Pa. Oct. 13, 1998); *see In re Lower Lake*

9    *Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993).  Once causation of damages is

10   determined in an antitrust case,

11   > The jury may make a just and reasonable estimate of the damage based on relevant
     > data, and render its verdict accordingly.  In such circumstances "juries are allowed to

12   > act upon probable and inferential, as well as direct and positive proof."  Any other
     > rule would enable the wrongdoer to profit by his wrongdoing at the expense of his

13   > victim.  It would be an inducement to make wrongdoing so effective and complete in
     > every case as to preclude any recovery, by rendering the measure of damages

14   > uncertain.

15   *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S. Ct. 574, 90 L. Ed. 652 (1946).

16   ### 3.    Noll's Regression Demonstrates Impact and Quantifies Damages

17   The proof, as they say, is in the pudding.  Despite Apple's claim that the shutdown of

18   Harmony could not possibly have affected Apple's pricing, Professor Noll's regression results

19   demonstrate that it had a real and significant impact. After conducting an extensive analysis of all of

20   Apple's iPod pricing data, iPod product information, Apple's pricing practices and other relevant

21   economic variables, Professor Noll developed a multi-variable regression model that shows that

22   shutting down Harmony through 7.0 enabled Apple to charge 2.38% more and 7.45% more,

23

24

25   whether the KVC affected elasticity of demand." Def's Mem. at 11. This is nonsensical. Plaintiffs
     have come forward with facts demonstrating that Apple determined pricing by looking at the

26   competition, that Harmony was a competitive threat, and that Apple's blocking of Harmony through
     its update to iTunes affected iPod pricing. Plaintiffs have demonstrated impact and damages through

27   use of a standard regression model and have supported that model with facts regarding how Apple
     actually set prices – with reference to evidence, including testimony from Apple's 30(b)(6) designee

28   regarding pricing.

1   respectively, to resellers and retail customers, than it could have charged in the but-for world.  Ex. 2,

2   Noll Rebuttal at 48-51 & Exhibits 4-6; Ex. 1, Noll Damages Report at 68-69.

3   **IV.    PROFESSOR NOLL'S OPINIONS ARE ADMISSIBLE UNDER RULE 702
        AND *DAUBERT***

4       **A.    Professor Noll's Regression Fits the Facts and Theories of the Case**

5           Not surprisingly, Apple has not challenged the qualifications of Professor Noll.[14]  Instead,

6   Apple argues that Professor Noll's regression model does not "fit" the facts or theories of the case.

7   Def's Mem. at 12-14.  But each of Apple's "fit" arguments is contradicted by compelling evidence,

8   which Apple conveniently ignores.  Apple ignores, for example, evidence showing that members of

9   its Pricing Committee were at the forefront of Apple's response to the threat posed by Harmony.  *See*

10  *supra*, §III.B.1.  Thus, its claim that the committee had no "awareness" of the likely effect of 7.0 on

11

---

12  [14]     Professor Noll graduated with a B.S. in honors in mathematics from California Institute of Technology and a Ph.D. in economics from Harvard University.  He is currently a Professor

13  *Emeritus* of Economics at Stanford University, a Senior Fellow in the Stanford Institute for Economic Policy Research (SIEPR), and Co-Director of the SIEPR Program in Regulatory Policy.

14  He is also the author, co-author or editor of 14 books and the author or co-author of over 300 articles.  As a renowned expert in antitrust economics, Professor Noll has served as a consultant to

15  the Antitrust Division of the U.S. Department of Justice, the U.S. Federal Trade Commission, the Federal Communications Commission, and the Senate Subcommittee on Antitrust and Monopoly.

16  Further, Professor Noll has served as an economic expert in numerous other cases where he has testified, submitted expert reports and/or been deposed.  His expertise has been relied upon and

17  accepted repeatedly over the years in many courts around the country – including the Northern District of California.  *See, e.g.*, *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No.

18  C 09-1967 CW, 2013 U.S. Dist. LEXIS 160739, at *40-*41 (N.D. Cal. Nov. 8, 2013) (Professor Noll "offered relevant testimony regarding whether the question of antitrust liability can be resolved

19  through class-wide proof and analysis and each witness based his opinions on a sufficiently reliable methodology.  He was also Plaintiffs' class certification expert in this case.  *See also In re Static*

20  *Random Access Memory Antitrust Litig.*, No. 07-md-01819 CW, 2010 U.S. Dist. LEXIS 141670, at *51-*52 (N.D. Cal. Dec. 7, 2010) (breadth of Professor Noll's expert analysis and damages

21  sufficient to prove class-wide injury and class certification); *United States v. Western Elec. Co.*, 767 F. Supp. 308, 320 (D.D.C. 1991) ("The Court is convinced by the Noll analysis; indeed, it regards

22  conclusions based on the facts which underlie that analysis as well-nigh irrefutable.") *aff'd*, 993 F.2d 1572 (D.C. Cir. 1993); *In re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486,

23  2006 U.S. Dist. LEXIS 39841, at *45-*46 (N.D. Cal. June 5, 2006) (granting class certification after noting that Professor Noll's "report, supported by actual publication, market, and sales data

24  produced thus far, provides an adequate basis from which to conclude that the proof plaintiffs will adduce to establish defendants' conspiracy to fix prices, and the resulting effect of the conspiracy on

25  all prices paid for DRAM, would be common to all class members").  He was also Plaintiffs' Class certification expert in this case.  Professor Noll's expert testimony has never been excluded on the

26  basis of a *Daubert* motion.  *See Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2011 U.S. Dist. LEXIS 155921, at *13-*14 (N.D. Cal. Dec. 7, 2011) (denying defendant's motion to

27  exclude Professor Noll and stating that "[u]pon review, the Court finds that Noll is qualified to offer expert testimony on methodologies for calculating class-wide damages"), *cert. denied*, 2012 U.S.

28  Dist. LEXIS 66674 (N.D. Cal. May 2, 2012).

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                    - 14 -

1  its ability to price iPods higher is not plausible.  Apple also ignores its own pricing data, which show

2  a dramatic variation in the actual prices paid.  Ex. 2, Noll Rebuttal at 33 & Appendix B.  And Apple

3  distorts Professor Noll's findings regarding pricing variation, claiming the pricing variation

4  Professor Noll found can be attributed "mostly to coupon deals."  Instead, Noll found Apple's

5  assertion of price uniformity "wildly incorrect" because the data shows substantial within-quarter

6  variation, with no mention of coupon deals.  *Id.*

7      Apple also argues that Professor Noll's regression is "inconsistent with his own economic

8  theory" because the overcharge attributed to iPods remains constant in the regression.  Apple

9  ignores, however, Professor Noll's rejection of this very point.  As Professor Noll explains, Apple's

10  argument "focuses on only one way in which the creation of a mandatory closed system of products

11  reduces competition and raises prices."  Ex. 2, Noll Rebuttal at 27.

12      [Apple] ignores the fact that iTunes 7.0 immediately locked out a customer who has
       been using a portable digital media player that used the RealNetworks DRM format
13     and who had purchased downloads from RMS.  The immediate effect of iTunes 7.0
       was to reduce the expected benefit to Apple in increased iPod sales from engaging in
14     price competition with these other portable digital media players, thereby causing the
       demand for iPods to be less price elastic.

15

16  *Id.*  "The effect of lock-out is immediate, and the principal anticompetitive effect of blocking

17  Harmony on iPod prices arises from the general reduction in competition among iPods and other

18  portable digital media players arising from the lock-out effect."  *Id.*  Noll further explains that

19  Apple's argument is incorrect because while new iPod owners in 2006 became more locked in to

20  iPods over time, the effect of that lock-in would not have affected the demand for later iPods,

21  because those purchasers would not be likely to replace their device for a long period.  "Thus, for

22  most of the damages period, the lock-in effect on new iPod purchasers would not be an important

23  factor affecting iPod prices."  *Id.*

       **B.    Professor Noll's Regression Accounts for All Relevant Variables and
24             Produces Statistically Significant Results**

25      Apple launches a multi-part attack on Professor Noll's regression model, but each argument

26  fails.  Not only are Apple's and its experts' criticisms misguided; these arguments go to the weight,

27  not the admissibility, of Professor Noll's testimony.  *See, e.g.*, *In re Titanium Dioxide Antitrust*

28  *Litig.*, No. RDB-10-00318, 2013 U.S. Dist. LEXIS 62394, at *55-*58 (D. Md. May 1, 2013) ("[T]he

976124_1

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR

- 15

1    Supreme Court in [*Bazemore v. Friday*] found that inadequacies in a multiple regression analysis

2    normally 'affect the analysis' probativeness, not its admissibility.') [478 U.S. 385, 400, 106 S. Ct.

3    3000, 92 L. Ed. 2 315, (1986).] In addition, the Court of Appeals for the Ninth Circuit in *Hemmings*

4    *v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) reasoned that '[i]n most cases, objections to

5    the inadequacies of a study are more appropriately considered an objection going to the weight of the

6    evidence rather than its admissibility.'"). Professor Noll has used standard and widely accepted

7    economic methods to demonstrate that Apple's anticompetitive conduct enabled it to charge higher

8    iPod prices than it would have charged but for the wrongful conduct.[15] Apple's motion to exclude

9    his testimony must be rejected.

10                    **1.    Professor Noll Does Not Use the Wrong But-For World**

11            Apple argues that the regression does not properly account for the "lawful effect" of iTunes

12    4.7 and thus uses the wrong but-for world. But as Professor Noll explains in his rebuttal report and

13    his supplemental rebuttal report, Apple's and its experts' opinion is simply wrong as a matter of

14    economics. Apple's experts argue that the "Harmony Blocked" variable, which represents Apple's

15    introduction of 4.7 in 2004, should be set to one (*i.e.*, remain "on") until the end of the data period.[16]

16    But as Professor Noll explains, the 7.0 technology ***replaced*** the 4.7 technology. Thus: "For these

17    models of iPods [with 7.0], Apple replaced technology that was ruled by the Court to be legal with

18    new technology that plaintiffs allege was not legal. The proper way to measure the impact of

19    enabling the KVCs and using iTunes 7.0 is not to assume that these models contained the old

20    ───────────────

      [15]    "Regression analysis is a well-recognized tool in determining antitrust damages." *Live Concert*, 247 F.R.D. 98, 145 (C.D. Cal. 2007); *see, e.g.*, *Petruzzi's IGA Supermarkets, Inc. v.*

21    *Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1237-39 (3d Cir. 1993) (admitting multiple regression analysis for use in calculating antitrust damages); *Weisfeld v. Sun Chemical Corp.*, 210 F.R.D. 136,

22    143, 145-46 (D.N.J. 2002) (observing that courts have "recognized the validity" of the regression analysis method for demonstrating class-wide impact), *aff'd*, 84 F. App'x 257 (3d Cir. 2004).

23    [16]    On page 16 of their Motion, Apple's lawyers misunderstand their own expert's opinions. In the quoted section, Apple's experts were making the argument that Professor Noll's model is

24    sensitive to small changes. To show this purported sensitivity, Apple's expert's applied old assumptions used by Professor Noll on iTunes 7.0/iTunes 4.7 in his merits report (before he knew

25    about Farrugia's change) to his present model. This is not the "correction" that Apple's experts actually suggest. Instead, according to Apple's experts' reports, even correcting for supposed errors,

26    the damages are significant. When they "correct Noll's errors" by moving to what they call the "iTunes 7_0 Incremental Model" (*i.e.*, the model that keeps 4.7/Harmony Blocked turned on forever

27    even for affected iPod models), damages drop from Plaintiffs' figure of $346.6 million to $221.6 million ($137.9 for resellers and $83.7 for direct sellers). *See* 12/20/13 Supplemental Report of

28    Kevin M. Murphy and Roger H. Topel, Exhibit JT-3c2.

1   blocking technology from iTunes 4.7, which is the implicit assumption in the proposal by Professors

2   Murphy and Topel."  Ex. 2, Noll Rebuttal at 26.  *See also* Ex. 50 , 12/18/13 Noll Dep. at 53:19-

3   54:17, 56:4-57:6, 93:13-25 (explaining the effect of both leaving 4.7 on for models that did not have

4   7.0 and the reasoning for not turning on 7.0 for models it was not implemented in).[17]   In his

5   Supplemental Rebuttal Report, Professor Noll reiterates his rejection of Apple's criticism.  Ex. 3,

6   Supp. Noll Rebuttal at 13-15.  He also points out that, even were he to accept Apple's criticism,

7   respecifying the regression to keep iTunes 4.7 "on" for iPods with 7.0 would not reduce estimated

8   damages to zero.  Instead, the damages to resellers would fall by less than 5 percent, and damages to

9   direct purchasers would fall by 55 percent.  *Id.* at 14.

10              **2.     Professor Noll's Regression Accounts for the Relevant Aspects
                        of iTunes 7.0**

11          Apple also urges this Court to exclude Professor Noll's testimony because the regression

12   purportedly fails to account for the "impact of the unchallenged aspects" of iTunes 7.0.  This

13   argument, however, is flatly contradicted by the regression model itself, as Professor Noll explains:

14              This criticism ignores the fact that the regression equation that explains price
                includes indicator variables for class, other product attributes, and time (to represent
15              improved technology), which measure the effect of the characteristics of an iPod.

16   Ex. 2, Noll Rebuttal at 4-5.  *See also* Ex. 51, 5/16/13 Noll Dep. at 34:23-25 (Professor Noll knew of

17   no unique aspect of iTunes 7.0 that was not already captured by other variables in the regression

18   model).  Apple's counsel's disagreement with Professor Noll's opinion is not grounds for excluding

19   his testimony.

20          Moreover, the cases on which Apple relies do not support its position.  Apple's principal case

21   was recently reversed by the Sixth Circuit, as explained in *Se. Milk Antitrust*.  In rejecting

22   defendants' claims that plaintiff's expert damages model failed to prove antitrust injury because he

23   did not account for every factor, the Sixth Circuit found that the expert "did not completely ignore

24   commercial realities.  He may have neglected to include important facts . . . .  But actual inputs were

25

---

26   [17]     Apple manufacturers a supposed admission by citing a snippet of deposition out of context.
     In fact, the testimony (which appears to indicate agreement with a hypothetical posed by Apple's
27   counsel), shows that Professor Noll explained that because iTunes 7.0 was never undone, the
     hypothesis that the effects of iTunes 4.7 could continue after the KVC was issued could not be
28   tested.  Ex. 51, 5/16/13 Noll Dep. at 68:18-20.

1    considered . . . . Including some facts while omitting others goes to the 'accuracy of the conclusions,

2    not to the reliability of the testimony.'"  2014 U.S. App. LEXIS 66, at *40-*41.  As a result, the

3    court determined that the expert's regression model sufficiently supported evidence of the alleged

4    antitrust injury.  *Id.* at *53.

5          Similarly, here, Plaintiffs' expert has opined that his model sufficiently accounts for all

6    relevant characteristics.  That Apple disagrees does not render Professor Noll's opinions

7    inadmissible.[18]  "'While the omission of variables from a regression analysis may render the analysis

8    less probative than it otherwise might be, it can hardly be said' that the analysis must be deemed

9    inadmissible . . . '[n]ormally, failure to include variables will affect the analysis' probativeness, not

10   its admissibility.'"  *Titanium Dioxide*, 2013 U.S. Dist. LEXIS 62394, at *51-*52.

11           **3.    Apple's Experts' Assertion that More Variables Should Be
                     Included Ignores Multicollinearity Issues**

12         Apple also argues that Professor Noll's opinion should be excluded because the regression

13   does not account for every technical characteristic that differentiates models of iPods.[19]  Def's Mem.

14   at 18-20.  As Professor Noll demonstrates, however, the variables that Apple asserts should have

15   been included have an "extremely small effect" on the explanatory power of Noll's regressions and

16   _____

17   [18]     Apple repeatedly mis-quotes Professor Noll to support its arguments.  Here, Apple claims
     that Professor Noll "does not deny the need to control for the other, unchallenged aspects of iTunes
18   7.0 – and he admits that failing to control for them would result in erroneously attributing to the
     KVC a price effect caused by something else.  Def's Mem. at 17.  Professor Noll's actual testimony,
19   however, makes clear that he knew of no unique aspect of iTunes 7.0 that was not already included
     in the regression model.  Ex. 51, 5/16/13 Noll Dep. at 34:23-35:1.

20   [19]     As Defendant's own authority states, "the Court cannot simply assume that variables omitted
     from the analysis are, in fact, 'major factors' which should have been included.  There must be some
21   indication that the excluded variables would have impacted the results."  *In re Live Concert Antitrust
     Litig.*, 863 F. Supp. 2d 966, 973-83 (C.D. Cal. 2012).  Including the omitted variables in this instance
22   certainly would have altered the results – but not in the manner as Apple suggests.  Including the
     additional characteristics would have caused extreme multicollinearity and skewed the efficiency of
23   the estimates of the coefficients.  There is sound reasoning here for Professor Noll to exclude the
     variables that he omitted, unlike the experts in the legal authority Apple relies upon.  *See id.* (expert
24   himself admitted to excluding variables that would affect prices); *In re REMEC Inc. Sec. Litig.*, 702
     F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010) (expert "makes no attempt to account for other possible
25   causes"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 496-97 (N.D. Cal.
     2008) (expert admitted that he omitted variables that would have a significant impact on
26   demonstrating price); *In re Methionine Antitrust Litig.*, MDL No. 00-1311, 2003 U.S. Dist. LEXIS
     14828, at *9-*10 (N.D. Cal. Aug. 22, 2003) (in a simple regression analysis, the expert managed to
27   account for only 8% of the significant factors); *Blomkest Fertilizer, Inc. v. Potash Corp. of
     Saskatchewan, Inc.*, 203 F.3d 1028, 1038 (8th Cir. 2000) (expert admitted model failed to account
28   for dramatic events).  Here, Professor Noll included all significant factors; adding any of the
     extraneous characteristics would create multicollinearity.

1   adding these characteristics makes the model unreliable.  Ex. 2, Noll Rebuttal at 30.  "If the
2   additional technical characteristics that Professors Murphy and Topel discuss are added to the
3   equation, the effect is to cause extreme multicollinearity (*i.e.*, a high correlation between separate
4   independent variables in the equation)."  Ex. 2, Noll Rebuttal at 5, 30-32; *see also* Ex. 50, 12/18/13
5   Noll Dep. at 35:4-8 ("Are there omitted variables?  I'm not aware of any that would add statistical
6   significance to the regression equation without being so highly multicollinear that they would
7   destroy the coefficient estimates.").

8       Multicollinearity causes a reduction in the precision of the estimated coefficients in the
9   regression, making them less reliable.  Ex. 2, Noll Rebuttal at 31; Ex. 3, Supp. Noll Rebuttal at 7.
10  Because Professor Noll's regressions include a large number of product characteristics that affect
11  iPod prices, regressions with any additional attributes should be tested for multicollinearity.  Ex. 3,
12  Supp. Noll Rebuttal at 8.  Despite being well aware of this issue, Apple's experts did not conduct
13  any of the standard tests for multicollinearity (or at least if they did so, they did not report the results
14  in any of their reports).  *Id.* at 8-9.  Nor did they provide any support for their opinion that the
15  regressions they ran do not suffer from multicollinearity.  *Id.* at 10.  Professor Topel admitted that he
16  did not sequentially study the effect of adding various product attributes to see if a multicollinearity
17  problem occurred.  Professor Murphy also admitted to running no tests to determine whether there
18  was a multicollinearity problem.  *See* Ex. 53, 1/8/14 Murphy Dep. at 294:25-298:14.  Instead,
19  Apple's experts put characteristics into the model without considering each one's potential to create
20  multicollinearity problems.  Ex. 52, 1/8/14 Topel Dep. at 221:1-9.  Nor do Apple's experts offer any
21  justification as to why the variables they added can be expected to affect prices other than their bald
22  assertion that these variables should affect prices.  Ex. 2, Noll Rebuttal at 29-32.

23      Professor Noll, in contrast, did test Apple's experts' regressions (with the additional
24  attributes) for multicollinearity.  Using standard tests, Professor Noll determined that, almost without
25  exception, the iPod attributes that Professors Murphy and Topel insist must be added to the
26  regression "cause severe multicollinearity."  *Id.* at 9-10.  In fact, as Professor Noll details in his
27  Supplemental Rebuttal Report, the results of these three standard tests – adjusted R-squared,
28

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR

1   condition number and VIF – reveal that all but one of the iPod attributes added by Apple's experts to

2   the regressions generate multicollinearity problems.  *Id.* at 10-11.

3           Critically, nothing in Professors Murphy or Topel's analysis indicates that the addition of any

4   of the attributes they added improve the quality of the regression model.  *See* Ex. 53, 1/8/14 Murphy

5   Dep. at 300-01 (admitting that a regression's reliability can be affected by adding highly collinear

6   variables).  Instead, as Professor Noll explains, "[a]dding these attributes to the model worsens the

7   precision of the estimates and renders the estimates sensitive to small changes in the data and in the

8   specification of the regression equation."  Ex. 3, Supp. Noll Rebuttal at 13.

9           Finally, even if Apple's experts' suggestions were adopted, adding the variables they suggest

10  would not reduce damages to zero.  Instead, reseller damages would remain unchanged and direct

11  sales damages would be reduced by approximately 22%.  *Id.*

12                  **4.      Apple's Litigation-Driven Clustering Theory Has No Basis in Economics**

13          As Plaintiffs demonstrate in their *Daubert* Motion to Exclude Certain Opinion Testimony of

14  Kevin M. Murphy and Robert H. Topel ("Plaintiffs' *Daubert* Motion"), filed December 20, 2013,

15  Apple's "clustering" attack on Professor Noll's regression is completely without merit.  Murphy's

16  and Topel's clustering adjustment is inappropriate because none of the clustering issues they raise is

17  present in Noll's regressions.  First, and foremost, clustering does not apply because Noll used the

18  entire population of data, not a sample.  Plaintiffs' *Daubert* Motion at 9.  As explained by Noll and

19  by Professor Jeffrey Wooldridge, a renowned econometrician with expertise in clustering issues,

20  "'there can be no cluster sampling problem because there is no sampling.'"  *Id.* Apple's experts'

21  clustering adjustment suffers from additional flaws, including that it relies on the erroneous

22  assumption that Apple's prices are uniform, assumes non-independence simply because the seller in

23  each transaction (Apple) is the same, and ignores well-established principles about

24  observation/cluster ratios that render their clustering adjustment inappropriate.  *Id.* at 9-12.

25          Not only is Apple's clustering criticism incorrect, its experts' adjustment is actually harmful.

26  The "sole effect" of Apple's correction of the non-existent clustering problem "is vastly to reduce

27  the number of transactions observations that are used to estimate the regression equation, thereby

28

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                                    - 20 -

1    reducing the explanatory power of the regression analysis [and] destroying the reliability and

2    precision of the regression results." Ex. 2, Noll Rebuttal at 11. As Professor Wooldridge puts it,

3    "[c]omputing "cluster-robust" standard errors where, as here, clustering is not appropriate, is not

4    harmless. Clustering can produce standard errors that are vastly inflated compared with the true

5    precision of the estimates." Ex. 54, Wooldridge Decl. at 13.

6          In his Supplemental Rebuttal Report, Professor Noll confirms that Apple's experts'

7    clustering adjustment is inappropriate, and agrees with Professor Wooldridge that Professors

8    Murphy and Topel are guilty of "ex post" clustering, which occurs when groups in either a sample or

9    a population are identified as belonging to a certain group and then subsequently labeled a "cluster."

10    Ex. 3, Supp. Noll Rebuttal at 3; *see generally id.* at 3-7. Professor Noll also analyzes Apple's

11    experts' purported basis for clustering (their correlation of residual errors) and concludes that

12    clustering is "unmotivated" and "unreliable" because there is no reason to believe that a calendar

13    quarter is an appropriate basis for clustering the data. *Id.* at 4-6. To demonstrate the unreliability of

14    Professors Murphy's and Topel's clustering adjustment, Professor Noll used their procedures to

15    divide the data by two other time periods, family/month and family/week. The results are

16    "qualitatively identical" to clustering by family/quarter. *Id.* at 6 & Exhibits 1a, 1b, 2a, 2b. These

17    results demonstrate that "there is no basis in the correlation analysis for picking quarterly data as the

18    hypothetical clusters, as opposed to weekly or monthly data, or even daily or yearly data. The

19    correlations of residual errors are not due to the standard problem of cluster samples – the presence

20    of unobserved variables that affect outcomes differentially among the groups – but are the expected

21    result of dividing the residual errors into a larger number of arbitrarily selected groups." *Id.* at 6. In

22    short, Apple's experts' litigation-driven and unreliable clustering argument is completely lacking in

23    economic basis, and their testimony on this issue should be excluded.

24          **C.    Professor Noll Relied on Standard Economic Methods to Define the
                 Relevant Markets**

25          Apple's argument that Professor Noll did not use "reliable economic principles and methods"

26    to support his relevant market opinions is flatly contradicted by Professor Noll's report.[20] Def's

27    _____

28    [20]    Apple waived this argument. It could have easily moved for summary judgment on the issue
        of relevant market earlier, but chose not to. *See* Dkt. No. 627 ("'There are three essential elements

Mem. at 22.  In support of its argument, Apple provides no evidence to counter Professor Noll's detailed examination of the market, nor does it provide a possible alternate market definition that Plaintiffs should have used.[21]

As Professor Noll explains, the core question that needs to be answered in the determination of a relevant market is whether the products at issue are sufficiently close substitutes.  From the demand side, this means that customers would move their business from one firm to another in response to a price increase or a corresponding non-price change such as reduction in product quality or service.  On the supply side, this means that sellers would switch production in response to a small price increase.  Ex. 1, Noll Damages Report at 23, 25 ("the key characteristic of portable digital media players is the ability to play a large number of digital audio files on a compact mobile device"); Ex. 55, U.S. Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines, at 7 (Aug.  19, 2010).  At base, "[i]f consumers view the products as substitutes, the products are part of the same market."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995); *see generally United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 399 76 S. Ct. 994, 100 L. Ed. 1264 (1956); Ex. 55, Merger Guidelines at 4-6, 10-11.

There are several methods for identifying the relevant market, including analyzing the cross-elasticity of demand, using the "hypothetical monopolist" test or, commonly, using information regarding the industry gleaned from internal documents and publicly available information about the structure of the market.  *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1120 (D. Colo. 2004) (noting that "cross-elasticity of demand is not always necessary to determine a relevant market," and finding the expert's market definition acceptable where "he did rely on other economic data including industry materials, pricing data, and public

---

to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'"   In this case, Defendant does not contest the sufficiency of Plaintiffs' Amended Consolidated Complaint as to the first and third elements.).

[21]    Notably, Apple's own expert fails to apply the methods of antitrust economics in his market analysis, and offers no economic evidence to support the conclusion that other forms of recordings are as close competitive substitutes for iTS as are other download sites.  *See also* Ex. 2, Noll Rebuttal at 4.

1   recognition of the market, all of which have been held relevant to determining the scope of a

2   market").

3          In this case, as in most antitrust cases, it is not possible to assess perfectly the cross-elasticity

4   of demand because of the unavailability of data on percentage changes on price and quantity from

5   competing firms.  Ex. 1, Noll Damages Report at 23-24.  Here, econometric estimation of cross-

6   elasticities of demand is even more unlikely because it involves products that have extensive product

7   differentiation and that are rapidly evolving.  Ex. 2, Noll Rebuttal at 23-24.  If reliable estimation of

8   cross-elasticity of demand is not feasible, economists look for indirect evidence that products are

9   close substitutes: similarity of components and functional uses, statements outside the context of

10  litigation by executives and industry analysts about their beliefs about which products are close

11  competitors, and surveys of buyers about which products they considered before buying a product

12  that is a candidate to be included in a relevant market.

13         Because reliable estimation of cross-elasticity of demand is often not feasible, both

14  economists and courts recognize that indirect evidence that products are close substitutes, derived

15  from qualitative evidence such as internal documents, pricing data, testimony from employees and

16  consumers, and other anecdotal evidence, is sufficient to demonstrate the relevant market.  *See, e.g.*,

17  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) (a

18  distinct relevant market such can be shown by indicia as industry recognition, unique products or

19  pricing, and specialized vendors (among others)); *United States v. SunGard Data Sys.*, 172 F. Supp.

20  2d 172, 178 (D.D.C. 2001) (relevant market identified through testimony of executives and evidence

21  showing substantial overlap in customers of competing firms); *United States v. H&R Block, Inc.*, 833

22  F. Supp. 2d 36, 52 (D.D.C. 2011) ("when determining the relevant product market, courts often pay

23  close attention to the defendants' ordinary course of business documents"); *FTC v. Staples*, 970 F.

24  Supp. 1066, 1076-78 (D.D.C. 1997) (in the Staples/Office Depot merger, the FTC supported its

25  market definition with record documentary and pricing evidence, evidence that prices varied across

26  varying geographic locations where there were fewer office store competitors and evidence that

27  office superstores had different characteristics than other stores selling office supplies).

28

1    Professor Noll analyzed a vast quantity of this type of information in reaching his opinions

2    on market definition.  *See* Ex. 1, Noll Damages Report at 2-3 ("In undertaking this assignment I have

3    read the legal submissions by the parties and the decisions by the court in this case, the defendant's

4    answers to interrogatories, the expert reports submitted on behalf of the defendant in earlier phases

5    of the litigation, numerous discovery documents and depositions, and many publications about the

6    sound recording, consumer electronics and wireless communications industries. . . . I also have relied

7    on my 45 years of experience in analyzing the economics of the communications industry.").

8    Although Apple chooses to ignore completely Professor Noll's comprehensive market

9    analysis,[22] his reports detail the type of information on which he relied.  For example:

10   • He considered internal Apple documents.  *See, e.g.*, Ex. 1, Noll Damages Report,
     Exhibits 2-7 (a series of exhibits based on documents produced in the litigation
11     revealing the competing products that Apple took into account in setting prices of
     iPods); *id.* at 32-33 (an analysis of Apple's market studies for the sales of permanent
12     downloads of audio recordings).

13   • He considered Apple employees' testimony.  *See* Ex. 1, Noll Damages Report at 47
     n.82 (discussing how an Apple employee testified about how Apple uses industry
14     reports about competing portable digital music players to determine market share).

15   • He considered Apple's interrogatory responses.  *See* Ex. 1, Noll Damages Report at
     26 n.33 (citing Apple's interrogatory identifying the list of competitors to the iPod,
16     including Microsoft, Creative, SanDisk, Dell, Cowon Sony, Archos, Toshiba, iRiver,
     Coby, Phillips, Samsung, Latte Communications, Rio, HTC, LG, Sony Ericsson,
17     RIM, Nokia and Motorola).

18   • He considered government information, financial analysts, industry expert analysis,
     news articles, consumer reviews and historical data about the market.  *See* Ex. 1, Noll
19     Damages Report at 26 (citing seller data and industry articles regarding the
     competitors to iPods); *id.* at 28 (citing financial analysts' discussion of competing
20     products to iPod); *id.* at 29-30 (citing FCC data); *id.* at 31-32 (using his industry
     expertise and industry publications to demonstrate that CD players were obsolete
21     during the class period and are not properly included in the market); *id.* at 7-12
     (analyzing the history of audio downloads and portable digital music players, using
22     articles by industry experts, hearings before Congress and customer surveys); *id.* at
     39 & Exhibit 1 (using data on music sales to demonstrate that CDs are not in
23     competition with digital music downloads); *id.* at 40-41 (analysis of a survey which
     compared 80 industry studies about the effects of file-sharing on CD sales).

24

25   _____

26   [22]    Apple's suggestion that Professor Noll is required to estimate the cross-elasticity of demand
     has no basis in law.  If that were the law, it would be difficult to define a market in any complex
27   antitrust case.  Further, Apple's claims that Professor Noll should have analyzed the market by
     employing the "hypothetical monopolist" test called for by the merger guidelines ignores the fact
28   that is just one method of establishing the substitutability of iPod and other portable digital
     music players, and again suffers from the same data problems mentioned above.

- He considered Apple's SEC filings. *See, e.g.*, Ex. 1, Noll Damages Report, Exhibit 8 (using iPod sales numbers from Apple's financial statements compared with NPD industry expert information to compare sales of different portable digital media players).

- He relied on Plaintiffs' technical expert, Dr. David Martin, in analyzing the technical specifications of the iPod, iTunes and FairPlay source code. Ex. 1, Noll Damages Report at 13-14, 46, 52-53, 59-60.

This is exactly the type of information that experts and courts routinely rely on to determine relevant product markets. Apple has not even come close to demonstrating that Professor Noll's opinions on the relevant market for portable digital media players can be excluded, and thus its motion for summary judgment and to exclude testimony must fail.

## V.     CONCLUSION

For the foregoing reasons Apple's motion for summary judgment and motion to exclude the testimony of Professor Noll should be denied.

DATED: January 13, 2014                Respectfully submitted,

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        BONNY E. SWEENEY
                                        THOMAS R. MERRICK
                                        ALEXANDRA S. BERNAY
                                        CARMEN A. MEDICI
                                        JENNIFER N. CARINGAL


                                                s/ Bonny E. Sweeney
                                        BONNY E. SWEENEY

                                        655 West Broadway, Suite 1900
                                        San Diego, CA 92101
                                        Telephone: 619/231-1058
                                        619/231-7423 (fax)

                                        Class Counsel for Plaintiffs

                                        THE KATRIEL LAW FIRM
                                        ROY A. KATRIEL
                                        1101 30th Street, N.W., Suite 500
                                        Washington, DC 20007
                                        Telephone: 202/625-4342
                                        202/330-5593 (fax)

976124_1

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR                     - 25 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
ELAINE A. RYAN
2325 E. Camelback Road, Suite 300
Phoenix, AZ  85016
Telephone:  602/274-1100
602/274-1199 (fax)

BRAUN LAW GROUP, P.C.
MICHAEL D. BRAUN
10680 West Pico Blvd., Suite 280
Los Angeles, CA  90064
Telephone:  310/836-6000
310/836-6010 (fax)

GLANCY BINKOW & GOLDBERG LLP
BRIAN P. MURRAY
122 East 42nd Street, Suite 2920
New York, NY  10168
Telephone:  212/382-2221
212/382-3944 (fax)

GLANCY BINKOW & GOLDBERG LLP
MICHAEL GOLDBERG
1925 Century Park East, Suite 2100
Los Angeles, CA  90067
Telephone:  310/201-9150
310/201-9160 (fax)

Additional Counsel for Plaintiffs

976124_1

PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY OF ROGER G. NOLL - C-05-00037-YGR    - 26 -