EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) | Case No.: 05-CV-00037 YGR |
| _____ | ) ) | EXPERT REPORT OF DAVID M. MARTIN JR., PH.D. |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |
| _____ | ) | |

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

# Table of Contents

I.     Engagement ....................................................................................................... 4

II.    Methodology ..................................................................................................... 6

III.   Background ........................................................................................................ 6

IV.    iTunes and Related Products ............................................................................ 6

   IV.A.   FairPlay Encryption and Keys .................................................................... 7

      IV.A.1.   Keybags ........................................................................................... 8

   IV.B.   Transferring Songs to an iPod ................................................................... 8

V.     Timeline of Software and Events ...................................................................... 9

   V.A.   iTunes 4.6 ................................................................................................... 9

   V.B.   Harmony ..................................................................................................... 10

   V.C.   iTunes 4.7 ................................................................................................... 13

   V.D.   iTunes 4.7 and Harmony ............................................................................ 16

   V.E.   Harmony Update ......................................................................................... 30

   V.F.   iTunes 6.0 ................................................................................................... 31

   V.G.   iTunes 7.0.0 and the iPod Database Verification Code .............................. 31

      V.G.1.   Apple's March 2013 Correction to Database Verification Activation Dates ..................... 34

      V.G.2.   Database Verification in Apple's March 2013 Code Production ........................................ 35

      V.G.3.   Consequences of a Database That Does Not Verify ......................................................... 37

   V.H.   iTunes 7.0.0 and the iPod Keybag Verification Code .............................................. 38

VI.    Database and Keybag Verification Make iPod Failure and Customer Service Calls More Likely.... 39

VII.   Possible Alternatives to Detecting and Blocking Third-Party Software Using Database and Keybag Verification Code................................................................................................... 41

VIII.  Summary of Main Opinions......................................................................................... 42

IX.    Additional Topics .......................................................................................................... 44

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                                    3

X.      Documents Relied upon and Considered .......................................................................... 44

XI.     Signature ......................................................................................................................... 56

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# I.  Engagement

1. I receive compensation of $450 per hour for my time working on this matter plus reasonable expenses.  My compensation is in no way related to the outcome of this litigation.

2. The statements made in this report are made of my own personal knowledge and experience.

3. A curriculum vitae detailing my educational background and professional experience is attached as Exhibit A.

4. I have received the following honors throughout my academic and professional career: Teaching Excellence Award for U. Mass Lowell Computer Science Department (2007); Teaching Excellence Award for U. Mass Lowell Computer Science Department (2004); one of four nominees for Outstanding Research in Privacy Enhancing Technology Award  (2003); Outstanding Teaching Fellow, Department of Computer Science, Boston University (1996); University Graduate Fellowship, Boston University (1993-1994); Top Graduating Senior in Mathematics, Iowa State University, Spring (1993); Top Graduating Senior in Computer Science, Iowa State University, Spring (1993); Honorable Mention, National Science Foundation Graduate Fellowship (1993); Honorable Mention, Department of Defense Graduate Fellowship (1993); Phi Beta Kappa membership (liberal arts honor society) (1990); Phi Kappa Phi membership (engineering honor society) (1990); Pi Mu Epsilon (mathematics honor society) (1990); Upsilon Pi Epsilon (computer science honor society) (1990); Arthur Collins Foundation Scholarship, Spring (1992); Dio L. Holl Award for Outstanding Senior, Spring (1992); Shell Oil Foundation Scholarship, Spring (1991); Barry Goldwater Scholarship (1989-1990).

5. I have been a member in the following professional societies:  the Association for Computing Machinery and the Institute for Electrical and Electronics Engineers.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

6. I earned a Ph.D. in 1999 from Boston University in Computer Science.  I earned a Bachelor of Science, with distinction, in 1993 from Iowa State University in Computer Science and Mathematics.  My Ph.D. research was in the area of Internet security and privacy.

7. Since obtaining my Ph.D., I have worked at University of Denver as an Assistant Professor, Boston University as a Research Assistant Professor, and University of Massachusetts Lowell as an Assistant Professor.  In these positions, I performed research in the areas of computer security and privacy.

8. My experience also includes teaching courses in Introduction to Object Oriented Programming (C++); Foundations of (Theoretical) Computer Science; Computer Security I: Principles of Cryptography and Network Security; Computer Security II: Applied Computer Security; Unix Software Tools; Computer Networking; Introduction to Computer Science II (C++); Introduction to Computer Science I (C++); Special Topics in Systems: Computer Security; Advanced Unix Programming; Formal Languages and Automata; Introduction to Computer Science (C).

9. A complete list of my publications and my experience testifying at trial and in depositions during the previous four years can be found in my curriculum vitae, attached as Exhibit A.

10. If called as a witness, I would testify as to the statements and opinions contained in this report.

11. Significant portions of this report were previously submitted in my February 28, 2011 report titled Declaration of David M. Martin In Support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment. Since then, the Court has granted Defendant's Motion for Summary Judgment on all of Plaintiff's claims as to iTunes 4.7 and has denied Defendant's Motion for Summary Judgment on all of Plaintiff's claims as to iTunes 7.0.[1]  In this report, I reprise my explanation and findings regarding iTunes and iPods prior to iTunes 7.0 in order to explain the underlying technology and the context in which the iTunes 7.0 changes were made.  I have also considered additional material, including documents produced by Apple, publicly available documents and source code provided by Apple.

---

[1] See May 19, 2011 Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment; Denying as Premature Plaintiffs' Motion for Class Certification.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## II.    Methodology

12. In determining my conclusions, I considered evidence including produced source code, produced documents, publicly available information, and my own experiments.  I have cited these and other sources of evidence throughout the report.  Although I do not necessarily cite my own use of the products at issue in every instance, I have found my experience with the products to be consistent with the evidence.

## III.    Background

13. iPods are portable digital music players.[2]  In order to play songs on an iPod, a user must first connect it to a desktop computer (typically a PC or a laptop) and use appropriate software to transfer the songs to the iPod.   iTunes is software designed to perform this function.  iTunes can also play songs on a desktop computer, in addition to other functions.

14. Certain third-party programs, such as RealPlayer, Winamp, and Anapod, are also designed to be able to transfer songs to an iPod.  Like iTunes, these players have other functions as well.

## IV.    iTunes and Related Products

15. iPod and iTunes are part of Apple's suite of products and services involving music.  These related products include:

- iPods: the physical devices that are responsible for the storage and playback of music.
- iPod firmware: software specific to an iPod model that controls how the iPod behaves. Firmware runs on individual iPod devices.  Each iPod comes with firmware.  The firmware may also be updated, using standalone programs released by Apple, or by the iTunes program.
- iTunes: a program that manages music collections and transfers music and firmware updates to an iPod.  iTunes runs on the desktop (typically a PC or laptop computer).
- iTunes Store: an online store where users can buy music.  The iTunes Store is typically accessed through the iTunes program.

---

[2] Late iPod models have additional features such as video and games.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                7

- QuickTime: a desktop technology for playing media files, including those bought through the iTunes Store.
- FairPlay: Apple's Digital Rights Management (DRM) software. This is not a standalone program that a user runs, but rather a technology used by Apple that restricts the ways in which iTunes-Store content may be used.

16. Versions of these elements have changed over time. The version numbers for compatible elements are not identical, however. For example, I understand that an iPod Nano (2nd generation) from 2006[3] has the Apple codename of N36,[4] uses iPod firmware 1.1.3,[5] was supported by iTunes 7.0.0,[6] and uses version 3_2-024 of the FairPlay software.[7]

## IV.A. FairPlay Encryption and Keys

17. FairPlay encrypts songs in a way that makes them unplayable unless appropriate keys are used to decode the songs. Beginning on April 28, 2003,[8] Apple, through iTunes, began applying FairPlay encryption to all songs purchased through the iTunes Store.[9] iTunes only applies FairPlay encryption to songs purchased through the iTunes Store. FairPlay-encrypted songs typically have the .m4p extension. In order to play FairPlay-encrypted songs on any device—computer, iPod or otherwise—the decryption keys are necessary.

---

[3] See http://support.apple.com/kb/HT1353#ipodnano, accessed 2/14/11.
[4] See Apple_AIIA_B_001706.
[5] Version number 1.1.3 is reported by iTunes 10.0.0.68 when an iPod Nano (2nd generation) is attached.
[6] See Apple_AIIA00106006.
[7] See Apple Inc.'s Objections and Answers to Plaintiffs' Third Set of Interrogatories, p.5, later corrected by counsel.
[8] See Exhibit 4 at Apple_AIIA_00330728 (iTunes Store opened on April 28, 2003).
[9] See Robbin depo. 50:10-16 ("All songs that we sold when the iTunes Music Store first opened were protected with FairPlay"). This lasted until May 2007, when Apple began selling recordings from EMI in an unprotected format through the iTunes Store. See Apple news release http://www.apple.com/pr/library/2007/04/02itunes.html, fetched February 2011. In January 2009, Apple announced that it would begin selling most music without DRM. See http://www.bbc.co.uk/2/hi/technology/7813527.stm, fetched February 2011.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## IV.A.1.      Keybags

18. iTunes uses a data structure called a *keybag* to store the FairPlay keys needed to play FairPlay-encrypted songs on the desktop or an iPod.[10]  In order to enable such songs to be played both on computers and iPods, iTunes puts keybags in both places so that iTunes or the iPod firmware can later find these keys when needed.  Although the keybag contains keys for decrypting songs, the keybag itself is also locked using yet another key.  The precise form of the keybag depends on a number of factors including where the file is stored by the relevant iTunes software and iPod firmware versions.  The keybag form changed dramatically over time.  I explore some of the important differences in the sections below.

19. For songs not purchased from the iTunes Store, iTunes organizes the songs, allows for playback on the desktop, and supports the transfer of the songs to iPods.   For songs that aren't purchased from the iTunes Store, iTunes does not transfer FairPlay keys for these songs to the iPod.  Songs stored in files with names ending in .mp3 are usually songs that are not FairPlay-encrypted.  These songs can be played by many other media playback programs, including RealPlayer, Winamp, and Windows Media Player, in addition to iTunes and QuickTime.  Unencrypted files such as these can also be played on the iPod and many other competing digital music players.

## IV.B.  Transferring Songs to an iPod

20. When an iPod is attached to a compatible computer, it appears to be another disk drive on that computer.[11]  For example, it may appear as the E: drive on a Windows computer.

21. iTunes and comparable third-party programs transfer songs to the iPod by performing each of these steps:

---

[10] The keys contained in a keybag are called "account keys."
[11] Even iPods that do not contain physical disk drives may be accessed as if they were disk drives when connected to a computer.

Expert Report of David Martin, Ph.D.                                                    9

1) It copies the song files to appropriate locations on the iPod's disk drive, such as within E:\iPod_Control\Music.

2) It constructs an appropriate database file on the iPod's disk drive, such as E:\iPod_Control\iTunes\iTunesDB.  This is necessary because iPod firmware looks for a database file like this describing the songs that have been loaded on the device.  The database is the source of the iPod menus that allow a user to choose what songs to play.  A song on the iPod without an appropriate entry in the iPod database is not playable on the iPod.

3) ████████████████████████████████████ As described above, the keybag stores the keys needed to play FairPlay-encrypted songs stored on the iPod.[12]  If a FairPlay-encrypted song is present on the iPod, and has an appropriate database entry, but does not have an applicable key in the iPod keybag, then that song will not play on the iPod.

22. Thus, a third-party program can add songs to an iPod only if it knows how to perform the first two of these functions (copying music files and updating the database).  For a third-party program to transfer FairPlay songs that will playback on the iPod, it must know how to perform the third step (inserting keys into the keybag) as well.  The first requirement, copying files to the iPod device, is very easy.  The difficulty of the remaining two requirements — adding to the iPod database and adding to the iPod keybag — has changed over time, as I describe below.

## V.    Timeline of Software and Events

23. The rest of my report is arranged chronologically according to Apple's software releases.

24. To show how the Harmony interoperability software was affected by the changes Apple made in iTunes 4.7, I begin by describing the behavior of iTunes 4.6.

## V.A.   iTunes 4.6

25. iTunes 4.6 was released on June 9, 2004.[13]  In the iTunes 4.6 method, the desktop keybag was locked using a method very similar to the one used on the iPod keybag.  In order to add keys to either

---

[12] The keybag omits entries for songs that are not FairPlay encrypted, since these songs don't require keys to play.
[13] See Apple_AIIA00106004.

Expert Report of David Martin, Ph.D.

keybag, a program needed to first determine the key used to unlock both keybags. This applied both to iTunes 4.6 and any other program that wanted to add keys to the keybag. Having the key to unlock the keybag gave the program the ability to add, remove, and inspect keys within the keybag.

26. This is illustrated in Figure 1 below. Note that the keybag contains keys ultimately used to encrypt (and decrypt) songs, but the keybag itself is also locked. This makes sense because if the keybag were freely accessible, then it would be easy for someone familiar with encryption to decrypt corresponding songs by simply reaching inside, grabbing the key, and using it to decrypt them. As suggested by the diagram, the same key is used to lock and unlock the keybag, and the keybags on the desktop and the iPod are the same type of container.



Lockable des

**Figure 1: The iTunes 4.6 Keybag**

## V.B.   Harmony

27. On July 26, 2004, RealNetworks Inc. released RealPlayer 10.5, which included technology they called Harmony. Harmony enabled RealNetworks to sell songs through its own store and that were playable on iPods. To do this, Harmony only *added* encryption to songs; it did not strip FairPlay

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                    11

encryption from songs sold through the iTunes Store.  The help feature included with RealPlayer 10.5

explains:



© 2005 RealNetworks, Inc. All rights reserved.

**Figure 2: Harmony Help**

28. This was a significant innovation for RealNetworks.  RealNetworks sold songs encrypted by a

digital rights management (DRM) scheme called Helix that, like FairPlay, encrypted songs in order to

restrict the way that the songs could be played.[14]  However, Helix was incompatible with both FairPlay

and iPods.  Before Harmony, customers who purchased Helix-encrypted songs from RealNetworks could

not play them on an iPod.

---

[14] See http://www.drmwatch.com/drmtech/article.php/3094921 ("RealNetworks announces Helix DRM. NO
Windows Media support."), fetched February 2011.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

29. To address this problem, RealNetworks determined how to create the keybag that the iPod needed to play encrypted songs, and they used this knowledge to write a Helix-to-FairPlay encryption translator.  They put the translator into the RealPlayer program and called the technology Harmony.  Now RealNetworks could sell Helix-encrypted songs to customers, and Harmony would translate the Helix encryption into FairPlay encryption to allow their customers to play these songs on an iPod.[15]

30. Thus, Harmony only *added* FairPlay encryption to songs, namely, those songs sold by RealNetworks.  I have seen no evidence that RealPlayer and Harmony were ever intended or able to strip FairPlay encryption from any songs purchased through the iTunes Store.

31. In ¶¶32-33 of his January 18, 2011 declaration, Apple's expert Dr. Kelly transfers an unencrypted .mp3 file from "RealPlayer 10.5 (with Harmony)" to an iPod.  Although his description of the transfer process appears to be accurate, his example does not illustrate Harmony's stated purpose of "translating the DRM"[16] to FairPlay.  Dr. Kelly does not actually state that Harmony was invoked in his example, nor was Harmony invoked in his example, despite calling the product "RealPlayer 10.5 (with Harmony)" in this section.  Since Dr. Kelly only illustrated using RealPlayer to transfer an *unencrypted .mp3 file* to his iPod, Harmony technology was simply not part of his demonstration.  Harmony is an encryption translator; to invoke Harmony, one must start with a Helix-encrypted file, such as a song purchased from RealNetworks.  Because Dr. Kelly did not use Harmony, his discussion in ¶¶34-35 is potentially misleading as it does not address what Harmony does, but rather what RealPlayer 10.5 does.[17]

---

[15] See Apple_AIIA_00090427 (email from Dave Heller reporting on use of Harmony).
[16] See Figure 2.
[17] Dr. Kelly confirmed in his deposition that he did not use Harmony to transfer a Helix-protected song purchased from RealNetworks to an iPod.  Kelly depo. 101:12-15.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                  13

## V.C.   iTunes 4.7

32. iTunes 4.7 was released on October 26, 2004.[18]  In iTunes 4.7, the keybags changed, both on the

desktop and on the iPod.

33. iTunes 4.7 introduced a radically different keybag format for the iPod.[19]  This keybag scheme is

called the "embedded keybag."  This keybag format is different than the previous one because while it is

relatively easy to add keys to the embedded keybag, it is a very difficult and an entirely different process

to inspect or remove keys from it.  This is shown in Figure 3, where I have depicted the iPod's embedded

keybag as a parking meter.  In a parking meter, it is very easy to add things (i.e. coins) to the meter, but

inspecting or removing the coins inside is much more difficult.

---

[18] See Apple_AIIA00106002-3, excerpt from "DRM Version Info."
[19] In order to use a particular keybag format on an iPod, the iPod firmware must know that keybag format, and
iTunes (and any other programs that will transfer keys to the iPod) must know that keybag format as well.  In the
case of iTunes 4.7, the first iPod that understood and required the embedded keybag format was the P98 iPod
Photo released in September 2004 (Heller depo. 121:1-16).  When iTunes 4.7 communicated with iPods that did
not know about the embedded keybag format, it used the old format.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Lockable

Figure 3: The iTunes 4.7 Embedded Keybag

34. Apple includes the following documentation in their FairPlay source code directory:[20]

EMBEDDED KEYBAG
A new keybag mechanism has been created for embedded devices (such as the iPod) that makes use of an RSA public/private keypair.  This keybag has no relationship to the PC based keybag in any way. [...]

35. Elsewhere the iTunes source code states, in a comment:

Embedded devices use a keybag format that uses public/private key encryption ███ ████████████████████████████████████ This means that the PC side can write the keys, but has no way to read them. [...][21]

36. The basic mechanism that provides this easy-to-write, hard-to-read iTunes 4.7 embedded keybag

is called the RSA cryptosystem.  RSA is an example of *public-key* or *asymmetric* cryptography.  In public-

---

[20] See DRM Version Info at Apple_AIIA_B_015552-3.
[21] See iTunes FP 4.7.0 DulcimerUtilities.c:1550-1554, Apple_AIIA_B_015708.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

key cryptography, instead of there being a single key to operate a lock (i.e., both encrypt and decrypt),

two keys are forged simultaneously when the lock is constructed.  The public key is used to lock it, and

the private key is used to unlock it.  Given an RSA lock, the public key simply won't unlock it; it can only

be used to put things into the bag protected by the lock.  To unlock an RSA lock, its private key is

needed.

37. Furthermore, a very important property of the RSA cryptosystem when properly deployed is that

it is considered nearly impossible for an attacker to use an RSA public key in order to find a matching

RSA private key.  This is why they are called "public" and "private" rather than more neutral terms such

as "left" and "right": the public key can be made public essentially without harm, while the private key

must be kept private.  As stated in the paper that introduced the RSA cryptosystem, written by its

inventors, "An encryption method is presented with the novel property that publicly revealing an

encryption key does not thereby reveal the corresponding decryption key."[22]

38. Using the RSA scheme, iTunes 4.7 possessed the *public* key allowing it to create entries in an iPod

keybag, but iTunes did not have the *private* key used by the iPod to extract the desired keys from the

iPod keybag for song playback.  As Dr. Kelly states in ¶30, "the RSA private key used by the iPod to

decrypt the ███████ was not stored on the customer's computer and could not be derived from

properties of the customer's computer."[23]

39. Although RSA private keys for the embedded keybag were indeed stored on iPods so that the

iPods could decrypt and play their songs, the RSA private keys were stored in a manner that made them

extremely difficult to extract.  As I previously explained in ¶20, programs like iTunes communicate with

the iPod by accessing it like a disk drive.  However, the iPod's private RSA keys used to extract keys from

---

[22] See *A Method for Obtaining Digital Signatures and Public-Key Cryptosystems* by Ronald L. Rivest, Adi Shamir, and Leonard M. Adleman, *Communications of the ACM* 21,2 (Feb. 1978), 120-126, available online at http://people.csail.mit.edu/rivest/Rsapaper.pdf.
[23] See also Apple_AIIA_B_000048, from the "FairPlay Next Generation" document.

the embedded keybag for playback are not visible in the disk drive view of the iPod. They are buried

deeper within the iPod firmware than the disk drive interface exposes.

40. The iTunes 4.7 desktop keybag was also built differently than the iTunes 4.6 desktop keybag,

however, the same key was still used to lock and unlock the iTunes 4.7 desktop keybag. This made it

possible for iTunes 4.7 to store songs securely, yet still be able to unlock the keybag in order to play

those songs on the desktop computer.

41. I understand that in his declaration, Mr. Robbin reports that iTunes 4.7 FairPlay was cracked by

attackers "within weeks" of its release.[24] These cracks appear to have attacked the iTunes Store and the

iTunes 4.7 *desktop* keybag. The *embedded* iPod keybag, however, was much more resistant to attack.[25]

I have seen no evidence that any attacker was ever able to strip FairPlay encryption from songs stored

on an iPod with an embedded keybag.


## V.D.   iTunes 4.7 and Harmony

42. The version of Harmony existing when iTunes 4.7 was released in October 2004 did not know

how to read or use the embedded keybag format that iTunes 4.7 used with compatible iPods.[26]

Therefore, this version of Harmony could not successfully transfer songs to such iPods.[27]

43. On pp. 15-17 of his January 18, 2011 declaration, Mr. Robbin discusses the possibility that Apple

could have shared technical information with RealNetworks to permit their RealPlayer/Harmony

product to work with iTunes 4.7 embedded keybag. Under the heading "Harmony Would Make FairPlay

Less Secure" on p. 16, Mr. Robbin argues that if Apple were to have shared its confidential technical

information with RealNetworks, then this "would have made FairPlay substantially less secure" because

---

[24] See Mr. Robbin's 2011-01-18 declaration at ¶45.
[25] See Apple_AIIA00798326 "That's what the embedded keybag is for, and that hasn't been cracked," chat from 2005-07-05.
[26] See Apple_AIIA0090427 (2004-07-27 email from Dave Heller, "Switching to the new embedded keybag will slow them down, but if they get the public key in iTunes, they can continue to do this.")
[27] Robbin Decl., ¶¶3, Kelly Decl., ¶¶34-35.

Expert Report of David Martin, Ph.D.                                                                    17

of the possibility of attacks against RealNetworks and RealPlayer/Harmony in addition to the possibility

of attacks against Apple and its products:

> Had Apple worked directly with RealNetworks and shared information about FairPlay
> technology, it would have greatly escalated the risk of leaks by giving non-Apple employees
> access to that information. In the end, Apple's ability to protect FairPlay's security would have
> been dependent on RealNetworks and the measures it may (or may not) have taken to protect
> Apple's information.  Harmony also would have provided hackers yet another point of attack on
> FairPlay. Because Harmony mimicked FairPlay, <u>if hackers were able to reverse engineer
> Harmony, they could have learned how FairPlay operates-e.g., how songs are decrypted</u>. They
> could have then used that information to hack FairPlay.  (Robbin decl. ¶59, emphasis added)

44. However, the evidence does not support Mr. Robbin's position.  My review of the embedded-

keybag architecture leads me to conclude that disclosing sufficient technical information to

RealNetworks in order to update Harmony for iTunes 4.7 should have been possible with *little or no*

threat to the security of FairPlay-encrypted songs sold through the iTunes Store.  This is directly due to

the architecture of embedded keybag architecture adopted in iTunes 4.7.  Recalling the steps used to

transfer music to an iPod as stated in ¶21 above:

1) RealPlayer 10.5 was able to copy the relevant song files to the appropriate locations on the
   iPod's disk drive before iTunes 4.7, so it would not have required significant, if any, engineering
   effort to preserve this functionality in order to make Harmony compatible with iTunes 4.7.

2) RealPlayer 10.5 was able to construct an appropriate database file on the iPod's disk drive
   before iTunes 4.7, so it would not have required significant, if any, engineering effort to
   preserve this functionality in order to make Harmony compatible with iTunes 4.7.

3) Although RealPlayer 10.5 was able to create an appropriate keybag file on the iPod's disk drive
   that was compatible with iTune 4.6, as discussed above, the iPod embedded keybag format
   introduced in iTunes 4.7 was different, and therefore some engineering effort would have been
   required to make Harmony compatible with iTunes 4.7.  However, in order to transfer songs to
   an iPod, Harmony only needed to *add* to a keybag.  Thus Harmony needed to know the RSA
   *public* keys for adding to embedded keybags, and the relevant algorithms, but it did not need to
   know the RSA *private* keys needed to play songs associated with keys in the embedded keybag.

45. In other words, if Apple had given the relevant RSA public keys and algorithms to RealNetworks,

then RealNetworks could have improved Harmony to be able to transfer songs to iPods using the iTunes

4.7 embedded keybag.  But RealNetworks would have been completely unable to use this knowledge to

strip FairPlay encryption from songs purchased from the iTunes Store and stored on an iPod with an iTunes 4.7 embedded keybag.  This is due to the asymmetric nature of RSA keys: it is not considered possible to use a public RSA key to find its matching private key.[28]  So Mr. Robbin's claim that "if hackers were able to reverse engineer Harmony, they could have learned how FairPlay operates-e.g., how songs are decrypted" does not make sense.  Apple's expert Dr. Kelly declined to endorse or address Mr. Robbin's claim in his declaration.

46. Dr. Kelly also confirmed that keys present on the desktop in iTunes 4.7 could not be used to strip DRM content from iPods:

> Q. Well, then how does this asymmetric encryption that you're talking about improve the security of 4.7 -- or improve the security of FairPlay through 4.7?
>
> A. Well, there are a number of things that it does, and I've laid those out in detail. But one of the significant things it does is it -- it prevents you from using a key that you may have retrieved from the desktop to go in and retrieve -- to strip the DRM content from the iPod itself.
>
> ***
>
> Q. Well, are the -- all right. So I'm trying to get at this private/public key distinction. And so the public key, at least as I understand the use of the public -- the expression "public key," that, beginning with 4.7, is in 18 iTunes; correct? And the private key with 4.7 is in the iPod; correct?
>
> A. That's correct.
>
> Q. Okay. And you say that this improves the security of the DRM-protected music; correct?
>
> A. Correct.
>
> Q. All right. And so I'm trying to figure out how it does that if part of the encryption is still on the desktop.
>
> A. Well, there -- there are a number of things that -- that happen between 4.5, 4.6, and 4.7, and those all improved the DRM technology. Specifically, the RSA asymmetric encryption, that -- the idea there is that even if you have the public key, that's not going to help you with respect to the iPod because the iPod -- even if you've managed to retrieve that public key, it's not going to help you in the operation of the iPod, to decrypt or to strip content from the iPod.[29]

---

[28] Apple's expert Dr. Kelly agreed with this basic fact about RSA in deposition.  Kelly depo. 90:7-21.
[29] See Kelly depo. 92:19-93:4, 93:13-94:11.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

47. Dr. Kelly discusses this version of Harmony in his January 18, 2011 declaration.  In ¶37, Dr. Kelly states that Harmony and other third-party applications presented a "significant risk to the proper functioning of the iPod," because they "did not have perfect knowledge regarding how FairPlay worked" and if they created errors in the iPod keybag or in the iPod database, these would have led to some or all songs being unplayable.  I agree that applications that destroy the database or keybag or song files would interfere with the ability of the iPod to play those songs, but I am not sure how this constitutes a "significant risk" as this would never be the intent or function of a program designed to play music on an iPod. Dr. Kelly presents absolutely no evidence that there were a "significant" number of problems with third-party applications relative to the problems encountered with iPods where no third-party applications were present. In his deposition, Dr. Kelly stated that he did not know how many iPod users were potential users of RealPlayer, nor how many complaints Apple received from all customers.[30]

48. In any case, Apple could have provided appropriate technical documentation if it were concerned about the quality of programs like Harmony and Winamp.  For example, Apple sells hundreds of thousands of third-party applications through its App Store for the iPhone.[31]  To make this possible, Apple publishes technical documents at its developer website.[32]  Security measures prevent third-party applications from searching the entire iPhone and harvesting private data, and the technical documents provided to aid in development do not give developers enough information to overcome these security measures.  This is similar to the situation created by the embedded keybag in iTunes 4.7, because using the iTunes 4.7 technique that allows content contributors (such as iTunes and Harmony) to add encrypted content to the iPod, effective security measures (namely, the RSA cryptosystem in the embedded keybag) prevented content contributors (such as iTunes and Harmony) from searching the entire iPod and harvesting private data (namely, stripping DRM from songs sold through the iTunes

---

[30] See Kelly depo. 121:10-18.
[31] See http://www.apple.com/iphone/apps-for-iphone/.
[32] See https://developer.apple.com/devcenter/ios/index.action.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Store).  Apple could have created technical documents that specified the iPod database format and all of the RSA public keys needed to transfer encrypted songs to the iPod, but which would not have provided enough information to overcome the RSA security measures that prevent stripping the DRM from songs sold through the iTunes Store.  In fact, Apple already dealt with this issue at some level, because the iTunes and iPod development teams were separate, yet somehow they had to agree on how files could be transferred to the iPods.[33]

49.  In ¶38, Dr. Kelly turns his attention to the iTunes database.  Dr. Kelly first states that "Apple received complaints from its customers that RealPlayer and other jukebox applications…corrupted those iPods."  Going on, Dr. Kelly states that "In the case of RealPlayer, this corruption likely occurred because RealPlayer modified the iPod internal database and added foreign files, interfering with the operation of the iPod."

50.  The cited customer incident reports contain nowhere enough detail to support this sweeping, aggregate conclusion.  I see little evidence that customers even made such complaints; rather, it appears that Apple employees and Dr. Kelly simply interpreted any iTunes/iPod problem in the presence of RealPlayer or another third-party application to be an instance of that application corrupting the iPod.  These complaints are far too ambiguous to warrant Dr. Kelly's conclusion as to the "likely cause" of the customer incidents.[34]  Nor do the incident reports establish that the *customers* had assigned blame to the third-party applications.

51.  For example, the first problem report that Dr. Kelly cites, Apple_AIIA_C_00205226, shows Apple agents concluding that a customer's difficulty with iTunes must be due to the presence of Anapod on the caller's computer, apparently because the agents found something similar described on the Anapod

---

[33] See Heller depo. 24:5-21.
[34] In fact, Apple employee Dave Heller wrote in an email that "Harmony will transfer to iPod, writing a valid v3 keybag and iPod DB."  Apple_AIIA_00090427.  In deposition, Mr. Heller explained that a "valid v3 keybag and iPod DB" meant "as far as the iPod was concerned, it met enough criteria so that the iPod would actually play the song."  Heller depo. 136:4-8.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

website.  The customer was then referred to the Anapod website.  The incident report is completely

silent on whether the iPod was corrupted or not; the issue was the behavior of the *iTunes application* on

a desktop computer where Anapod was also installed and possibly attempting to simultaneously access

the iPod.  And nowhere does the customer say that Anapod corrupted the iPod.

52. In Dr. Kelly's second problem report, Apple_AIIA_C_0020520, an Apple agent surmises that the

caller's RealOne Player had "apparently" synced with an iPod and erased its contents.  The Apple agent

then told the customer to reconfigure, disable, or uninstall RealPlayer.  Nowhere does the customer say

that RealOne Player corrupted the iPod.  Syncing with RealPlayer in a manner that ends up deleting the

files may not be what the customer wanted or thought would happen, but that does *not* mean that the

"likely cause" of the missing files was that RealPlayer modified the iPod database incorrectly.

53. In another of Dr. Kelly's examples, Apple_AIIA_C_00205493, the customer reports using Winamp,

which "worked great until recently." The customer reports a number of problems on the iPod such as

freezing, not playing songs, and changing tracks randomly.  But near the top of the complaint report, the

customer tellingly states that the iPod *won't hold a charge* and *won't charge through the computer's

USB port.*  In my opinion, the most plausible explanation for this is a battery or other hardware problem.

Failure to charge through the USB port is unlikely to have been a result of anything that Winamp did.  In

deposition, Dr. Kelly suggested a possible relationship between Winamp and this charging problem by

stating "it may well be that Winamp is using a whole bunch of processor cycles and that's what's

depleting the charge."[35]  This speculation does not warrant a characterization of this incident as being

one of the "complaints from [Apple's] customers that [RealPlayer and] other jukebox applications that

attempted to transfer content onto iPods corrupted those iPods."

54. Dr. Kelly also cites Apple_AIIA_C_00205677 as an instance of a customer complaining that a non-

iTunes application corrupted an iPod.  This incident report is extremely brief:

---

[35] See Kelly depo. 148:19-149:19.

**Case_ID:    63810570**

| | | | |
|---|---|---|---|
| *AP_Fiscal_Pd:* | FY2006P08 | *Date:* | 2006-06-01 00:17:10 |
| *Issue:* | (PC) iPod update fails | | |
| *Case_Title:* | Case Created From Retail | | |
| *Serial_Num:* | YM60165UTK2 | | |
| *Problem_Product:* | IPOD NANO,4GB,BLACK | | |

**Case Notes:**

> ISSUE: not syncing with pc  ACTION RESULTING IN FAILURE: undt. possible cause of
> conflict use of winamp plus itunes on same ipod.  POSSIBLE LIQUID DAMAGE: N
> ACCIDENTAL OR COSMETIC DAMAGE: minor scuffs  CONFIGURATION: ipod nano **4gb**
> black  ACTION: restored. test/  RESOURCES CONSULTED:  RESOLUTION: ntf  PHOTOS
> ON FILE:  IPOD SOFTWARE VERSION: up tod ate   CRENNE - R103  /  Apple Store
> Rockaway  -

55. In this case, the Apple agent actually in contact with the customer apparently considered the cause of the failure to be undetermined ("undt.") with a *possible* cause being the use of Winamp and iTunes on the same iPod.  Again, the customer was completely silent on the issue of whether Winamp corrupted anything at all.  There is no indication that the Apple agent actually witnessed any problem.  The phrase "RESOLUTION: ntf" may in fact mean "no trouble found."[36]  There are myriad possible explanations for this problem having nothing to do with a third-party player.

56. Dr. Kelly also cites Apple_AIIA_C_00205614, where a customer complains about "no songs playing on iPod."  Yet the report shows no evidence that a third-party jukebox program was *ever* used with the iPod.  The sequence of events described are:

a)   Agent determines that the iPod is broken for some reason and needs to be restored.

b)   Agent asks the customer to uninstall old software and then download and install new versions.

c)   Agent determines that customer was installing each program *twice simultaneously*, which was interfering with the installation.

---

[36] See, for example, http://forums.ilounge.com/ipod-classic-ipod-5g-video/186039-what-does-no-trouble-found-mean.html (fetched February, 2011).

Expert Report of David Martin, Ph.D.                                                                    23

   d)    Agent learns that customer had been downloading by using Netscape with a RealPlayer

"enhanced downloader."

   e)    Agent has customer instead use Internet Explorer to download iTunes, QuickTime, and iPod

Updater and eventually reports success restoring the iPod.

   57. The "Netscape with a RealPlayer enhanced downloader" in step d) does not at all sound like a

program that transfers songs to iPods.  At deposition, Apple's expert Dr. Kelly seemed unsure about

what it was:

   Q. Is Netscape a program that transfers songs to the iPod?

   A. No, it's not. It's a browser.

   Q. Okay. And Netscape with a RealPlayer enhanced downloader, is that a third-party jukebox?

   A. I don't recall as I sit here. The RealPlayer enhanced downloader, I don't recall.[37]

   58. As an alternative to using Netscape with the RealPlayer enhanced downloader, the agent told the

customer to use Internet Explorer.  Internet Explorer is not a program that transfers songs to iPods.

Again, the customer never reported that third-party software corrupted the iPod, nor does any of the

contemporaneous evidence indicate that was the case. Dr. Kelly nonetheless cited this incident report as

one of the "complaints from [Apple's] customers that RealPlayer and other jukebox applications that

attempted to transfer content onto iPods corrupted those iPods" in his declaration.

   59. Dr. Kelly also cites Apple_AIIA_C_00205261,[38] where a customer complains of an "iPod library

corrupted after battery ran out during an update" that was being done "via RealPlayer."  Here, it

appears the transfer was interrupted by a battery failure at an inopportune moment.  The customer may

have understood this perfectly and simply required assistance in recovering the iPod.  In any case, this

incident report does not indicate that the customer blamed RealPlayer for the problem.  Nor do the

facts indicate that RealPlayer was the problem; it appears that the problem was battery failure.

---

[37] See Kelly depo. 157:7-13.
[38] Dr. Kelly also reviewed the customer complaints attached to the Farrugia and Robbin declarations.  Kelly depo.
at 120:8-121:9.  This complaint is from Farrugia decl. Ex. 5.

Obviously, battery failure can happen during iTunes transfers too.  For example, see

http://discussions.apple.com/thread.jspa?threadID=1325146 (fetched February 2011), where an iPod

user explains, "I recently added around 6GB of music to my iTunes and, stupidly, tried to sync my iPod

video without having it fully charged. The result was that my iPod died mid-sync. I fixed the initial

problem by syncing it later while it was fully charged, but now I believe that all the music that had

synced previously before it died are now somewhere on my iPod and are taking up space under the

'Other' categorie in the iTunes Summary page of the iPod."

60.  Although the details vary tremendously in the remaining problem reports that Dr. Kelly cites, the

overall lack of detail in the reports is constant.    No evidence has been presented by Apple or Dr. Kelly

as to the methodology used by Apple customer agents when generating these incident reports.  Dr. Kelly

did not speak to anyone at Apple about them,[39] nor did he "read any training material or any other

material provided to Apple Help Desk employees in how to address customer complaints,"[40] nor did he

make any attempt to determine whether Apple employees had even examined the customer's iPod

when writing the incident report.[41]  The Apple agents who created the incident reports did not appear to

be tasked with discovering underlying causes of failure, but rather, appeared to be working towards a

conclusion of the incident.  Dr. Kelly testified that "they are – they are focused on describing the

problem and a solution.  And that's – that's what their focus is."[42]  Therefore, in my opinion, the

customer incident reports cited in the declarations of Dr. Kelly, Mr. Robbin, and Mr. Farrugia do not

constitute a sufficient basis for the conclusion that the iPod customers complained that their iPods were

corrupted by third-party programs, or a conclusion that the "likely cause" of any alleged corruption was

that "RealPlayer modified the iPod internal database," or a conclusion that third-party programs

constituted a "significant risk" to the proper functioning of the iPod.

---

[39] See Kelly depo. 123:11-20.
[40] See Kelly depo. 125:11-15.
[41] See Kelly depo. 134:13-135:15.
[42] See Kelly depo. 162:18-163:9.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                    25

61. Additionally, I am aware of no evidence that supports Dr. Kelly's proposition in ¶38 that RealPlayer "adding foreign files" along the lines of his illustration in Table 1 (p. 16) would *ever* corrupt an iPod. In my opinion, corruption due to "adding foreign files" is very unlikely. In fact, Apple provides instructions to its iPod owners on how to use the iPod as an external disk.[43] It is difficult to see how RealPlayer treating the iPod as an external disk would be any more hazardous to the iPod than the iPod's owner using the iPod as an external disk.

62. In their declarations, Mr. Farrugia, Mr. Robbin, and Dr. Kelly each claimed that RealNetworks' and other third parties' lack of proper technical documentation also constituted a risk to the proper functioning of the iPod.[44] This was obviously due to Apple's own refusal to provide technical information to RealNetworks and the other third parties.

63. Mr. Robbin also claimed that "third party jukeboxes could make FairPlay less secure."[45] The only evidence cited for this claim is an internal Apple email indicating that Winamp plugin #138888 was removed "because [it] includes support for HYMN, in order to strip FairPlay off music copied to and from iPod." The Winamp plugin directory identifies plugin #138888 as the "iPod Support Plug-in" authored by Will Fisher.[46] As explained by the internal Apple email, "The plug-in itself doesn't bundle Hymn, but it allows users to specify a path to the Hymn executable, which it uses to perform the DRM circumvention."[47] The Hymn Forum, an online bulletin board for topics related to the Hymn program, contains a statement from a poster identifying himself as Will Fisher that characterized this similarly, saying "We don't include any binarys for hymn, the user must specify the path of the windows binarys. I

---

[43] For example, see http://manuals.info.apple.com/en_US/iPod_nano_2nd_Gen_Features_Guide.pdf at p. 36, "You can use iPod nano as an external disk to store data files."

[44] See Farrugia decl. ¶24, Robbin decl. ¶¶61-62, Kelly decl. ¶¶37-38.

[45] See Robbin footnote 6 and exhibit 42. Mr. Farrugia made essentially the same claim with the same evidence in his declaration at ¶21 and exhibit 6.

[46] See http://web.archive.org/web/20050427081409/http://www.winamp.com/plugins/details.php?id=138888, archived April 27, 2005.

[47] See Robbin decl. exhibit 42.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

hope this will protect me from a lawsuit from apple."[48] The fact that a user could add this plugin to *Winamp*, independently locate and install Hymn, and configure the plugin to rely upon Hymn to attack FairPlay DRM, certainly does not logically imply that *RealPlayer* made "make FairPlay less secure." RealPlayer and Winamp were independent products, and no evidence has been presented to suggest that RealPlayer supported this Winamp plugin.  Nor was any evidence presented that the effect of this particular combination of three separate programs was in any way representative of "third party jukeboxes" generally.

64. In ¶39, Dr. Kelly describes how he proceeded to "analyze the effect of a third-party modifying the internal database."  Dr. Kelly reports that he changed an unspecified lowercase 'm' character somewhere within the iPod database into an uppercase 'M' character, resulting in songs going missing on the iPod.

65. Dr. Kelly testified that this 'm' he found in the iPod database and changed to an 'M' was actually the first 'm' character visible in the database.[49]  To determine which 'm' character this could have been, I consulted the iTunes 4.6.0 source code.  The source code requires that a valid iPod database begin with the letters 'mhbd.'[50]  Therefore, the 'm' character that Dr. Kelly changed was actually the very first character in the iPod database.  Due to the encoding used in the iPod database,[51] the characters 'mhbd' that appear in the database actually correspond to places in the source code where those characters are stated in reversed order, namely, 'dbhm.'  The source code directly associates these characters 'dbhm' with the identifier name "kDDBFileHeaderMagic" (underlining added).[52]  Thus these characters 'dbhm' appear to be an abbreviation for "database header magic".[53]  In other words, the 'm' character in

---

[48] See http://www.hymn-project.org/forums/viewtopic.php?t=88, fetched February 2011.
[49] See Kelly depo. 174:18-175:11.
[50] See iTunes 4.6.0 DulcimerDatabase.c:3823; DulcimerDBFileFormat.h:276,459.
[51] This encoding is implemented in iTunes 4.6.0 DulcimerDatabase.c:410-696.
[52] See iTunes 4.6.0 DulcimerDBFileFormat.h:276.
[53] Subsequent lines of the file suggest further obvious associations: 'dshm' with database section header magic, 'tlhm' with track list header magic, 'tihm' with track info header magic, etc.

Expert Report of David Martin, Ph.D.                                              27

'dbhm' is part of the "magic number" for the database header.  In deposition, Dr. Kelly explained the

concept of a magic number:

> Q. And what is a magic number?

> A. Well, it has different meanings; but in this context, it is a -- it is something basically that identifies the type of entry that's present in this struct.

> Q. And can you predict what the likely effect is of changing a magic number in a file like this one?

> A. Well, there are a number of possibilities, and you'd have to know what the change was to be sure. But there are a number of possibilities, and you could certainly predict what some of those possibilities would be.

> Q. Can you give me some examples?

> A. Sure. The -- the struct would be misinterpreted. It would be interpreted as some other type of struct because the magic number got changed, or it could cause an internal fault. I mean, those are possibilities. And it could cause the program not to be able to understand the contents at all. There are various possibilities.[54]

66. Dr. Kelly's experiment amounted to changing the magic number that identifies the database as a

whole, and he then characterized this as "analyz[ing] the effect of a third party modifying the internal

database."  But this experiment bears no similarity to a third-party modifying the iPod's database.  If the

'mhbd' characters in the database header are modified, the database is absolutely guaranteed to be

destroyed.  These four characters must always be present in the first four characters of any iPod

database compatible with iTunes 4.6.0, and thus, putting them in the database is practically the easiest

thing for a third-party to do correctly.[55]  This experiment, exhibiting the failure to write these characters

correctly, could not possibly be considered representative of the actual behavior of RealPlayer, Winamp,

or any other third-party program that was able to transfer songs to iPods.

---

[54] See Kelly depo. 185:1-22.
[55] While Mr. Farrugia notes that official documentation for the iPod was not publicly available (Farrugia decl. ¶24), the WikiPodLinux description of the iTunes database, a third-party reverse engineering effort, also indicates that the first four characters of the iTunes database are always 'mhbd'.  See http://web.archive.org/web/20050206174417/http://ipodlinux.org/ITunesDB from 2005 and http://web.archive.org/web/20071214010257/http://ipodlinux.org/ITunesDB from 2007.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

67. In deposition, Dr. Kelly was shown a copy of DulcimerDBFileFormat.h[56] and asked whether the 'm' character that he changed *could have* come from one of the magic numbers listed there, including 'mhbd', 'mhsd', and so on.  He was not familiar enough with the magic numbers defined in the file to answer:

> Q. Okay. So just to make sure that the record's clear, I'll ask my question again because now I'm a little confused. So is it possible that the M that you changed in the iTunes database from a lowercase M to a capital M came from one of the M characters listed within the 4_character_code constructs on the lines on page 15641?
>
> A. Without a further analysis, I can't say one way or the other.
>
> Q. So it's possible, but you're just not sure?
>
> A. Well, no. It's more than I'm not sure. I mean, I would have to trace through this to determine if it's even possible. I don't know if it's even possible. I would have to trace through the code to see if this ends up in an appropriate place on the iPod. If it does, then I would agree that it's possible. But if it doesn't, then I would have to say it's impossible. And I just don't have enough information, as I sit here, to call it one way or the other.[57]

68. Earlier in the day, when Dr. Kelly was asked what analysis he had conducted to determine whether iPod databases were, in fact, corrupted in the ways he identified as risks in his declaration, among his answers he cited this 'm'-and-'M' experiment and his "detailed understanding of how – how the database is constructed and built based on review of the source code."[58]  But Dr. Kelly's review of the source code must not have covered the code that actually reads or writes an iPod database, for within 20 lines of code after iTunes begins reading an iPod database, the iTunes code rejects the database if its first bytes do not match the 'mhbd' magic number.[59] Additionally, within 20 lines of creating the iPod database file, the iTunes code deposits the 'mhbd' characters at the very beginning of the file.[60]  It appears that Dr. Kelly did not actually correlate his "experiment to analyze the effect of a third-party modifying the internal database" with his "detailed understanding of how the database is

---

[56] Although Dr. Kelly was shown the iTunes 4.7.0 version of this file rather than the iTunes 4.6.0 version, the block of source code Dr. Kelly was asked to examine is virtually identical in these two versions.
[57] See Kelly depo. 183:20-184:17.
[58] See Kelly depo. 68:22-69:17.
[59] See iTunes 4.6.0 DulcimerDatabase.c:3810-3823.
[60] See iTunes 4.6.0 DulcimerDatabase.c:2289-2306.

Expert Report of David Martin, Ph.D.                                                              29

constructed and built based on review of the source code."   It would be immediately obvious that

modifying any of the first four bytes in the iPod database, including 'm,' would destroy the database

under even a cursory examination of the source code by an expert.

69. Finally, Dr. Kelly states in ¶40 that "To avoid blocking Harmony and at the same time ensuring the

intended operation of the iPod, Apple would have had to share confidential information (including

specifications, design information, and perhaps source code) with RealNetworks prior to updating

products containing FairPlay."   As I explained, when the ███████████ is applied as intended, as I

believe it was in the embedded keybag, there is no need to keep the ████████████

Furthermore, Dr. Kelly sets the goal too high when addressing the burden involved "to avoid blocking

Harmony," resulting in supposed "limits to the changes that Apple could make to address hackers and

also limits on new product features since all changes would have to be compatible with Harmony."[61]  As

discussed above in ¶¶45-46, instead of "promising to avoid blocking Harmony," Apple could have

provided technical specifications to RealNetworks for the purpose of interoperability without

guaranteeing that the specifications would be set in stone for all time.   Then if Apple needed to make

changes to the iPod database or keybag, it could simply tell RealNetworks what was changing so that

they would have an opportunity to update Harmony appropriately and provide continuity in service to

their own customers.

70. By comparison, Apple does not promise that it will never change its iPhone software.   Instead, it

gives its app developers advance notice and documentation to help them make required changes once

Apple rolls out the new software.   For example, see the iOS 4 Readiness Checklist at

http://developer.apple.com/devcenter/ios/checklist/ (fetched February 10, 2011) and a list of

differences between iOS 3.2 and iOS 4.0 at

---

[61] Mr. Robbin stated this issue similarly; see Robbin decl. ¶¶55-58, ¶65.

http://developer.apple.com/library/ios/#releasenotes/General/iPhone40APIDiffs/index.html#//apple_ref/doc/uid/TP40009698 (fetched February 10, 2011).


## V.E.   Harmony Update

71. RealNetworks reportedly announced an update to Harmony on or about April 26, 2005, saying that Harmony was now compatible with "all shipping iPods, including iPod Photo."[62] Apple's internal emails confirm that Harmony did regain compatibility.[63] This suggests that RealNetworks determined the algorithms introduced by iTunes 4.7, discovered the appropriate ████████, and updated their software accordingly.

72. As I previously stated, I have seen no evidence that any attacker was ever able to strip FairPlay encryption from songs stored on an iPod with an embedded keybag. This includes those attackers who may have attempted to reverse engineer an updated version of Harmony from April 2005 containing the ████████ associated with the embedded keybags. In an online chat between Apple employees Dave Heller and Augustin Farrugia on July 5, 2005, Mr. Heller stated that the embedded keybag "hasn't been cracked"[64] as of that date.

73. The iTunes 4.7 embedded keybag resisted attack so well because of the appropriate use of ██ ████████ in its design. It is misleading to suggest that the iTunes embedded keybag would have crumbled before attackers if Apple had given RealNetworks that technical documentation that specified how to add keys to a keybag.

---

[62] See http://news.cnet.com/RealNetworks-rekindles-iPod-tech-tussle/2100-1027_3-5685286.html.
[63] See Apple_AIIA00093862-63, where an Apple employee describes the "Real & iPod current situation": "I just confirmed. It still works. I was able to connect a 5G iPod, buy a song from Real's store, sync it, and play it right on the iPod." (March, 2006)
[64] See Apple_AIIA00798326.

Expert Report of David Martin, Ph.D.                                                    31

## V.F.    iTunes 6.0

74. iTunes 6.0 was released in October 2005.[65]  Although iTunes 6.0 introduced a variety of changes

to FairPlay, it does not appear to have interfered with Harmony.[66]

## V.G.    iTunes 7.0.0 and the iPod Database Verification Code

75. In April 2006, leading up to the release of iTunes 7.0.0, Mr. Rod Schultz prepared a proposal for

iPod Database Verification at the direction of Mr. Augustin Farrugia, the Senior Director for DRM

Technologies at Apple.[67]  The proposal is at Apple_AIIA00094564-94569.  It begins:

76. The problem statement above clearly indicates that the modification is intended to prevent third-

party applications like RealPlayer and Winamp ("clients other than iTunes") from directly transferring

songs to an iPod, whether they were encrypted or not. ████████████████████████

████████████████████████████████████████████████████ .

---

[65] See Apple_AIIA00106005.
[66] See footnote 63.
[67] See Farrugia depo. 8:8-10.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

According to Mr. Farrugia, this proposal was implemented through iTunes and in new iPods when iTunes 7.0.0 was released in September 2006.[68]

77. As described below in paragraph 83, Apple later revised its assessment of the activation date of the database verification proposal to 2007.

78. The database verification code does not make it more difficult for attackers to strip FairPlay encryption from songs. In particular, as Mr. Farrugia stated in deposition, database verification did not make it any harder to *read* data from the database or the keybag.[69] ████████████████████████

██████████ is to make it harder to *write* onto the database.

79. In support of its Renewed Motion for Summary Judgment, Apple pointed to the concern that third-party applications might degrade an iPod user's experience. Specifically, Mr. Farrugia described how third-party software was thought to "corrupt the iPod music database and thus interfere with the user experience," such as "iPods not playing music after using third-party jukeboxes like Winamp" and describes these problems as motivators for the database verification code.[70] Mr. Robbin warned that Harmony might contain bugs that "could corrupt the iPod, preventing users from playing music or performing other functions on the iPod correctly."[71] And Dr. Kelly warned, based on the highly questionable conclusions derived from customer complaints above, that "If RealPlayer wrote the internal database incorrectly, the iPod may not have been able to locate some or all songs in its database,"[72] and warned that very small errors, such as changing a single byte, "have the potential to prevent the iPod from functioning as intended and expected"[73] and attempted to illustrate this with his 'm'-and-'M' experiment as I described above.

---

[68] See Farrugia depo. 109:21-110:8; Farrugia decl. ¶29; February 8, 2011 Errata to Declaration of Augustin Farrugia in Support of Defendant's Renewed Motion for Summary Judgment; and Apple_AIIA_00106003.
[69] See Farrugia depo. 174:15-23.
[70] See Farrugia decl. at ¶20 and ¶29.
[71] See Robbin decl. at ¶60 and a similar statement at ¶64.
[72] See Kelly decl. at ¶37.
[73] See Kelly decl. at ¶39.

Expert Report of David Martin, Ph.D.                                                    33

80. However, the *specified purpose* of the database verification code was to transform small errors in the database, such as changing a composer's name from "Bach, J.S." to "bach, J.S.," into very serious errors.  The specification reads:



81. In other words, if the database content was not last edited by a program (such as iTunes) that knows the secret database generation key, then "the database or song is invalid and cannot be used or played."  In effect, the database verification code transforms small errors that do not meaningfully interfere with the user experience into enormous ones that treat the database as being devoid of all data.  A consequence is that a third-party application that does not know the secret database generation key cannot change iPod database entries without destroying the entire database and effectively making all songs on the iPod unplayable.  I have verified that the iTunes 7.0.0 source code contains the ability to treat iPod databases in this manner.[75]

82. In deposition, Mr. Farrugia testified that preventing the playback of non-iTunes digital audio files on an iPod was not an intended effect of the FairPlay updates at this time, and that he could not remember whether he suspected or believed that it might have that effect as a consequence.[76]  This statement is inconsistent with the clear specification for rejecting non-iTunes databases, made at his own direction.

---

[74] See Apple_AIIA00094565.  It follows that a third-party application adding or removing songs from the database would similarly be treated as a very serious error, with the result that the database is invalid and the songs cannot be played.

[75] See, e.g., DulcimerDatabase.c:5216, 3870, 3889, 798, 758.

[76] See Farrugia depo. 120:17-122:1.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

## V.G.1. **Apple's March 2013 Correction to Database Verification Activation Dates**

83.  Counsel for Apple has indicated that a declaration it submitted at summary judgment was incorrect.  A portion of my declaration in support of plaintiffs' opposition to Apple's summary judgment motion relied on that information for activation dates and versions of the database verification protocol.  Counsel for Apple has provided additional information correcting the inaccuracies in that declaration.  None of this new information—the revised activation dates of the keybag verification code and database verification—changes any of the conclusions in my prior declaration, as I describe in paragraph 92.

84.  In his January 2011 declaration, his February 2011 Errata thereof, and his December 2010 deposition, Mr. Farrugia indicated that the database verification protocol was present in new iPods starting with the iPod Nano 2nd generation (N36) and iTunes 7.0 in September 2006.  I understand that counsel for Apple have stated that a further correction is forthcoming that will be consistent with the following:[77]

---

Keybag verification code:

It was was first enabled in 2nd gen nano (aka N36) introduced in September 2006 by the iPod firmware (Minos iPod SW) and iTunes 7.0.  It was not included on 5th gen classic (aka M25) for songs or videos.
It was later enabled in 3rd gen nano (aka N46) introduced in September 2007 by the iPod firmware (Imos iPod SW) and iTunes 7.4 and enabled in 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.
It was never included on any iPod shuffle models.

Database verification code:

It was first enabled in 3rd gen nano (aka N46) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4 and the 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.
It was never included on iPod shuffle models.

---

**Figure 4: Apple's Statement of Activation Versions and Dates**

---

[77] Source: April 1, 2013 email from Apple counsel with subject "Timing of updates."

Expert Report of David Martin, Ph.D.                                                                                    35

## V.G.2. **Database Verification in Apple's March 2013 Code Production**

85. In order to see if this new information affected any of my original conclusions, I reviewed

additional documents and source code from Apple engineers over a 3-day period in March 2013 at the

Jones Day offices in San Francisco.  Taking this new material into account, I maintain the opinions stated

in my previous declaration.  I have not observed any inconsistencies between the revised activation

dates and versions and the newly produced materials.

86. The remaining paragraphs in this section detail some of the statements by Apple engineers

concerning the activation version and dates.

87. The HAVE_IPOD_DATABASE_MAC was changed to 1 according to AIIA_SC_001091-93 in the

source code directory called CL84714.  The changelist entry is identified as being submitted by

"rwormley@projects on 2007/08/18"[78] and further states:

> This source is the source that turned on Candy (database validation) for the N46 (4G Mini) and
> N25 (6G Classic) project.  The code was shipped in the 1.0 release (first release) of software for
> those iPods (i.e. day 1 of sales in September 2007).
>
> …
>
> Risk details: this mod invalidates prior iPod databases; you'll need to resync w/iTunes >=7.4a11

88. Along with this changelist log entry, Apple produced two other files in the directory named

CL84714.  These two files are in the list of the eight "affected files" associated with the changelist; Apple

did not produce the remaining six files for inspection.  The iTunesToGoPrefix.h file shows the definition

of HAVE_IPOD_DATABASE_MAC as 1 and BUILDING_IPOD as 1.  The other file DulcimerDatabase.c

contains code that reads, writes, and updates the database.

89. The  document AIIA_SC_001000 associates Imos DulcimerDatabase.c with the explanation "Calls

to the Candy API wrapped by the HAVE_IPOD_DATABASE_MAC macro" and associates Imos

iTunesToGoPrefix.h with the explanation "Definition of the macro HAVE_IPOD_DATABASE_MAC to 1

when building the firmware."

---

[78] According to Apple_AIIA00256090, rwormley is Brett Wormley.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

90. These documents and source code indicate that the keybag verification code was first enabled in the iPod model N36 introduced in September 2006 by the iPod firmware (Minos iPod SW) and iTunes 7.0.  It was later enabled in 3rd gen nano (aka N46) introduced in September 2007 by the iPod firmware (Imos iPod SW) and iTunes 7.4 and enabled in 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.

91.  These documents and source code also indicate that the database verification code was first enabled in 3rd gen nano (aka N46) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4 and the 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.

92. This information does not contradict the conclusions I stated in my prior declaration, because:

    a.    Apple has not changed its assessment of the activation dates and versions of the keybag verification protocol; it just added more detail.

    b.    I did not offer or reach an independent conclusion regarding the activation date or version of the database verification protocol; I instead relied on Mr. Farrugia's testimony regarding this as I stated above in paragraph 76.

93. Despite the difference in dates now provided by Apple, the Harmony user experience going back to 2006 would be the same as I previously described it: namely, the keybag verification protocol "had the effect of preventing the injection of foreign material, including DRM keys, into the keybag."  As a result, Harmony would not have been able to add DRM-protected songs to the iPod without causing the keybag to be considered invalid.  An invalid keybag would have made all FairPlay-encrypted songs unplayable, even those that weren't add by Harmony.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

### V.G.3. **Consequences of a Database That Does Not Verify**

94. In order to determine how iTunes and iPods would behave when a database failed to verify (as would be expected when a user tried to use a third-party program to manage the iPod), I reviewed Apple source code and documents and conducted experiments with various iPods, including the N46 iPod nano (3rd generation) and N25 iPod Classic (6th generation).  My conclusion is that Apple designed the system to detect whether the database verifies or not, but when it detected a failure, to be vague about the nature of the problem and offer the user no recovery option other than erasing the entire device.

95. For example, in AIIA_SC_001001 dated July 8 2007, Brett Wormley states that "DB load time should be negligible since the plan of record now is to hash the entire header/index, using master mode SHA1. […]  Error screen is not recommended, since this reveals the specifics of failure.  The preferred response is for user to resync with iTunes for unknown reason -- should never happen for a non-hacker user."  In Apple_AIIA00304445, Brett Wormley also states "A reminder: if you update/restore to changelist 84174 or later, your older iPod database will seem to be empty."

96. My review of the source code and my experiments concerning iPods with databases that fail to verify are consistent with a database that seems to be empty, with the lack of a descriptive error screen on the iPod, and with the requirement for user to resync "for unknown reason."  iPods with databases that fail to verify simply report "No Music."[79]  The iTunes 7.4.0 source code explains this situation using the error message "iTunes cannot read the contents of the iPod "*[iPod name]*". Go to the Summary tab

---

[79] To make an iPod database fail to verify, I started from a iTunesDB created by iTunes (i.e., one with a database that does verify correctly) and then transposed two unequal bytes within the file's fileMAC field.  The result is a database that fails to verify but otherwise has identical content.  Alternatively, I also induced verification failure by changing a song's title within iTunesDB without updating the corresponding fileMAC, as a third-party application without the database verification protocol might do.

38                                                          Expert Report of David Martin, Ph.D.

in iPod preferences and click Restore to restore this iPod to factory settings."[80]  For example, the

following screenshot shows iTunes 7.4.0.28 responding to an iPod with a database that fails to verify:



97. The user is not told the reason that the error message appears and iTunes offers no option to the

user other than to restore, which "erases the iPod's disk and restores iPod to its original factory

condition."[81]  A user who restores the iPod would therefore lose all content on the iPod, including all

music content purchased or obtained from third parties.


## V.H.   iTunes 7.0.0 and the iPod Keybag Verification Code

98. On November 18, 2005, Mr. Robbin told Mr. Farrugia that he wanted to "lock down the keybag"

so that if "[iTunes] 6.0.2 touches the keybag, the iPod will only recognize it if it comes from us."[82]  iTunes

7.0.0 also contains keybag verification code that is similar in concept to the database verification code.

In ¶32 of his declaration, Mr. Farrugia stated that this change "had the effect of preventing the injection

of foreign material, including DRM keys, into the keybag."  In other words, the change made it harder for

programs other than iTunes to add entries to the keybag.

99. My analysis of the iTunes 7.0.0 and relevant FairPlay source code indicates that the effect of the

keybag verification code was to ensure that a change anywhere within the keybag would be easily

detectable by iTunes and the iPod, unless it is done by a party (such as iTunes) that knows the secret

"integrity key" associated with the iPod.  When reading an iPod keybag, the iTunes 7.0.0 code will reject

---

[80] See DulcimerDatabase.cpp:6911, DulcimerHandler.cpp:15183,15200, and iPodStrings.h:31.
[81] See http://support.apple.com/kb/HT1339, fetched March 2013.
[82] See Apple_AIIA00798303.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

it and consider it devoid of contents if the keybag verification code indicates it has been changed by a party that did not possess the integrity key.[83]  An iPod cannot play a FairPlay-encrypted song if it cannot locate a matching key in its keybag.

100.  The keybag verification code appears to have little or no relationship to security measures that resist attempts to strip FairPlay encryption from songs. The only apparent function of the keybag verification code is to prevent content from being placed on an iPod.

101.  In order to determine how iPods would behave when a keybag failed to verify (as would be expected when user tried to use a third-party program to manage FairPlay-protected songs on the iPod), I reviewed Apple source code and documents and conducted experiments with the N36 iPod nano (2nd generation).  As expected, an N36 with a keybag that failed to verify made all of its FairPlay-protected songs unable to play.[84]  Although the affected songs were still visible through the iPod user interface, they stopped playing immediately after attempting to play them, and the iPod tried to play the next song in the playlist.

## VI.    Database and Keybag Verification Make iPod Failure and Customer Service Calls More Likely

102.  Enabling the database and keybag verification protocols didn't make the affected iPods able to play any music they couldn't play before, nor did it make them any faster, smaller, lighter, more brightly colored, nor cheaper to manufacture, nor faster to synchronize, nor able to store more songs, nor easier for a user to manage.  The only "feature" added is that of increased incompatibility.  The affected iPods became *more likely to fail* than before.  This is not hard to see: when verification was turned on, the

---

[83] See, *e.g.,* AuthorizationDB.c:828, 836, from iTunes 7.0.0 and FairPlayPublic.c:358, KeybagAccounts.c:1342, Safe.c:334, 344 from FairPlay-3_2-024.
[84] To create a keybag that failed to verify but was otherwise intact, I started from an N36 IC-Info.sidb keybag produced by iTunes and transposed two unequal bytes of its "integrity value" field as described in FairPlay-3_2-024 Safe.c:340.  The result was a keybag that failed to verify.

essential change was that iPods got a new reason to refuse to play songs – namely, when the database or keybag doesn't verify.

103. Furthermore, the database verification protocol didn't simply make the iPod just *somewhat* more likely to fail to play songs. Apple's design documents and source code show that the point is to *ensure*, to the greatest possible extent, that if a third-party application changed even the smallest portion of the database that can affect the songs that an iPod could play,[85] then *all* of the songs would be unplayable. The entire collection of songs would be treated as the appropriate collateral damage for a user who let a third-party application manage their iPod. Similarly, an iPod keybag that fails to verify renders all of the keys within it useless, and none of the DRM-protected songs will play.

104. I would expect that breaking the capability of the iPod to interact with third-party software and adding new ways to corrupt the iPod database would cause increased service calls from customers compared to the previous situation where the iPod was permitted to interact with third-party software.

105. Additionally, by programming in a lack of a descriptive error screen on iPods that had the database verification enabled, and with the requirement for user to resync "for unknown reason," when third-party music or content was detected, Apple further increased the likelihood that iPod users would call Apple to complain about their user experience.

106. The source code evidence and documents from Apple engineers previously cited indicate that N25s and N46s could have been built with database verification disabled. One approach would have been to ███████████████████████████ In addition, Chris Wysocki indicates another technique for building N25s and N46s without database verification: "It would be interesting to disable database integrity on N25 ███████████████████████████…"[86]

---

[85] This follows from the security properties of the message authentication code (MAC) that Apple used.
[86] See Apple_AIIA00294222.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                          41

## VII.   Possible Alternatives to Detecting and Blocking Third-Party Software Using Database and Keybag Verification Code

107. The database verification code and keybag verification code in iTunes 7.0.0 interrupted access to songs when third-party application changes to the iPod database or iPod keybag were detected. Apple points to possible bugs in third-party applications as a justification for taking these steps, as I described in ¶79 above.

108. Another possibility would have been for Apple to code for robustness rather than rapid failure due to the detection of third-party software.  Whenever designing software, it is a good practice to anticipate errors and to respond gracefully if possible.  For example, Web browsers such as Apple Safari, Microsoft Internet Explorer, Google Chrome, and Firefox compete with each other in part through their ability to usefully display imperfectly specified web pages.

109. In fact, the iTunes code already shows this sort of robustness in some of its behavior.  For example, the function SetDulcimerName in iTunes 4.7.0 includes special code when setting the name of an iPod: if the operating system reports that the desired name is too long, then the function repeatedly tries to use shorter names.  The explanation given in the source code is that Japanese names are particularly likely to cause this behavior.[87]

110. Further examples of Apple's software accommodating problems between programs can be seen in its source code.[88]

111. In addition, an effective way to help minimize incompatibilities or bugs in third-party applications is to publish technical documents that accurately reflect the requirements for interoperability.

---

[87] See iTunes 4.7.0 DulcimerUtilities.c:1448-1512.
[88] See, e.g., N36 iTunesDataEngine.c:5000, iTunesDataEngine.c:5757, iTunesDataEngine.c:6076, CodeDrops/DulcimerDatabase.c:303, CodeDrops/DulcimerDatabase.c:1501, IapIncomingProcess.cpp:621-647, and iTunes 7.4.0/iTunes/iPod/DulcimerDatabase.cpp:709.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## VIII.   Summary of Main Opinions

112.  In this section I summarize my main opinions, which are described in detail above.

1)  RealPlayer Harmony allowed FairPlay-encrypted songs to be transferred to and played on iPods during the period corresponding to iTunes 4.6.

2)  RealPlayer Harmony did not strip FairPlay encryption from songs sold through the iTunes Store.

3)  The initial release of RealPlayer Harmony was incompatible with the iTunes 4.7 embedded keybag for the iPod.

4)  Songs stored on an iPod and encrypted using the embedded keybag method, including those sold through the iTunes Store, could not be decrypted for playback or stripped of FairPlay encryption without using the iPod's ███████████

5)  ████████████████████████████████████████████████████

████████████████████████  RealPlayer Harmony did not need to use any of the iPod's ███████████

████  in order to add FairPlay-encrypted songs to an iPod using the embedded keybag method.

6)  Technical documentation could have been provided to RealNetworks that would have enabled RealPlayer Harmony to achieve compatibility with embedded keybag iPods, but which would not have meaningfully assisted an attacker who sought to strip FairPlay encryption from iTunes songs stored using the embedded keybag method.

7)  Assuming that an updated version of Harmony would then have been constructed on the basis of this technical documentation with functionality comparable to the original release of Harmony, the updated version of Harmony would not have meaningfully assisted an attacker who sought to strip FairPlay encryption from iTunes songs stored using the embedded keybag method.

8)  The customer incident reports cited in the declarations of Dr. Kelly, Mr. Farrugia, and Mr. Robbin do not justify a conclusion that there was a "significant risk to the proper functioning of the iPod" due to Harmony and other third-party applications.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

9) The 'm'-and-'M' experiment described in Dr. Kelly's declaration is highly misleading, cannot possibly be considered representative behavior of third-party programs that transferred songs to iPods, and adds no support to the claim that there was a "significant risk to the proper functioning of the iPod" due to Harmony and other third-party applications.

10) The other primary suggested cause of the alleged risk to the proper operation of the iPod described in the Apple declarations, namely, that RealNetworks and other third parties did not possess official technical documentation for the iPod database and keybag, was an immediate consequence of Apple not releasing this very same official technical documentation.

11) The purpose and effect of the iPod Database Verification Code of iTunes 7.0.0 is to prevent third-party applications from transferring songs to or otherwise managing content on iPods.

12) When the database verification protocol rejects a database on an iPod, the iPod appears to have no playable content, but does not otherwise communicate to the iPod user that anything is wrong.

13) When the database verification protocol rejects a database in iTunes, then iTunes treats the iPod as corrupt and prompts the user to restore the iPod to factory settings, which if done, would erase all of the iPod's contents, including music from third-party sources.

14) The purpose and effect of the iPod Keybag Verification Code of iTunes 7.0.0 is to prevent third-party applications from transferring songs to iPods.

15) The database verification protocol and the keybag verification protocol did not make it more difficult for third-party software to read iPod contents.

16) The database and keybag verification protocols increase the chances that an iPod will fail to play songs, and consequently, the verification protocols can be expected to increase customer service calls.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# IX.    Additional Topics

113. I reserve the right to supplement or amend this report as necessary or appropriate to take into account additional information obtained through discovery or otherwise.  Furthermore, in support of the discussion and the opinions given above, I would expect at trial to rely upon demonstratives or exhibits that may consist of copies of the documents referenced or portions thereof (or of documents cited or relied upon by other experts in this case), and may also rely upon charts, graphics, animations or slides designed to summarize or illustrate the background of the technology and the basis for my opinions.

114. If called as a witness, I would testify as to the statements and opinions contained in this report. I may demonstrate some of the relevant functionality at trial. I may also create or assist in the creation of certain demonstrative exhibits that rely on analogies between the products at issue in this case and other consumer products.  I may also rely upon graphics or an animation in presenting a tutorial to the jury.  Finally, I expect that certain documents used as exhibits may be enlarged, highlighted or otherwise emphasized for use as exhibits during trial.  I have not yet selected or created the particular exhibits that might be used.


# X.    Documents Relied upon and Considered

In some cases below I have cited only the Bates number of the first page of a multipage document, intending it to be understood as encompassing the entire document.

**Documents relied upon in preparing this declaration:**

1. All documents, depositions, declarations, exhibits, and web pages specifically cited above

2. Depositions and exhibits thereto of Jeffrey Robbin, Augustin Farrugia, Dave Heller, John Kelly

3. Declarations and exhibits thereto of Jeffrey Robbin, Augustin Farrugia, John Kelly

4. 2010-12-20 Defendant Apple Inc.'s Objections and Answers to Plaintiffs' Third Set of Interrogatories, subsequently corrected by counsel for Apple (FairPlay version "3_2-023" was corrected to "3_2-024")

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                      45

5.  Source code provided on Apple's source code computer on December 20, 2010; January 27-28, 2011, February 3, 2011, and March 20-22 at the Jones Day offices in San Francisco

6.  Source code produced by Apple in this case

7.  iTunes 4.6, 4.7 (executable program)

8.  RealPlayer 10.5 (executable program)

9.  http://support.apple.com/kb/HT1378 "iPod iconology or what does this picture on my iPod mean?"

10. http://support.apple.com/kb/TS1405 "iPod displays a folder icon with an exclamation point"

11. http://support.apple.com/kb/HT1353 "Identifying iPod models"

12. Apple_AIIA_B_000001 FairPlay Next Generation

13. iTunes and iPod firmware versions produced by Apple in March-April 2013

**Documents considered in preparing this declaration:**

1.  All documents relied upon and listed above

2.  iTunes 6.4, 7.0, 7.4, 7.5, 7.7, 8.2, 10.1 (executable program)

3.  RealOne Player v2, RealPlayer 11 (executable program)

4.  All documents marked Restricted Source Code

5.  Amended Consolidated Complaint for Violations of Sherman Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumers Legal Remedies Act, and California Common Law of Monopolization

6.  Apple's Motion to Dismiss or, Alternatively, for Summary Judgment; Declaration of Michael Scott in Support of Apple's Motion to Dismiss or, Alternatively, for Summary Judgment; and Declaration of Jeffrey Robbin in Support of Apple's Motion to Dismiss or, Alternatively, for Summary Judgment

7.  Apple's Motion for Summary Judgment; Declaration of David C. Kiernan in Support of Apple's Renewed Motion for Summary Judgment; Declaration of Augustin Farrugia in Support of Defendant's Renewed Motion for Summary Judgment; Declaration of Dr. John P. J. Kelly in Support of Defendant's Renewed Motion for Summary Judgment; and Declaration of Jeffrey Robbin in Support of Defendant's Renewed Motion for Summary Judgment

8.  http://www.ilounge.com/index.php/news/comments/apple-disables-realnetworks-music-on-ipod-photo/

9.  http://www.ilounge.com/index.php/news/comments/realnetworks-restores-ipod-compatibility/

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

10. http://hymn-project.org/forums/viewtopic.php?p=5952 "Real Networks apparently knew the mystery of the iPod's iEKInfo file"

11. http://news.cnet.com/RealNetworks-rekindles-iPod-tech-tussle/2100-1027_3-5685286.html

12. http://mlipod.sourceforge.net/index.php?page=home&show=all

13. http://en.wikipedia.org/wiki/Magic_number_%28programming%29

14. Alfred Menezes, Paul van Oorschot, and Scott Vanstone, *Handbook of Applied Cryptography,* CRC Press 1997.

15. Bates-numbered documents:

    Apple_AIIA00088845 iTunes Software updates list
    Apple_AIIA00090405
    Apple_AIIA00090426
    Apple_AIIA00090427
    Apple_AIIA00090428
    Apple_AIIA00090453
    Apple_AIIA00090498
    Apple_AIIA00090527
    Apple_AIIA00090666
    Apple_AIIA00090769
    Apple_AIIA00090771
    Apple_AIIA00090937
    Apple_AIIA00090960-62
    Apple_AIIA00091693
    Apple_AIIA00091720
    Apple_AIIA00091748
    Apple_AIIA00091765
    Apple_AIIA00091784
    Apple_AIIA00091785-86
    Apple_AIIA00091825
    Apple_AIIA00091906
    Apple_AIIA00091967
    Apple_AIIA00091978
    Apple_AIIA00092237-38
    Apple_AIIA00092282
    Apple_AIIA00092282-83
    Apple_AIIA00092311-12
    Apple_AIIA00092315-16
    Apple_AIIA00092317-19
    Apple_AIIA00092338-40
    Apple_AIIA00092345-87
    Apple_AIIA00092389-90
    Apple_AIIA00092393-94
    Apple_AIIA00092413-14

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                47

Apple_AIIA00092431
Apple_AIIA00092453
Apple_AIIA00092595-96
Apple_AIIA00092599
Apple_AIIA00092673
Apple_AIIA00092698
Apple_AIIA00092909
Apple_AIIA00092914
Apple_AIIA00093265
Apple_AIIA00093316-19
Apple_AIIA00093441
Apple_AIIA00093560-66
Apple_AIIA00093567-78
Apple_AIIA00093579-87
Apple_AIIA00093711
Apple_AIIA00093729-35
Apple_AIIA00093860
Apple_AIIA00093862-63
Apple_AIIA00093869-70
Apple_AIIA00093877
Apple_AIIA00094064
Apple_AIIA00094118-20
Apple_AIIA00094498
Apple_AIIA00094532-600
Apple_AIIA00094564
Apple_AIIA00094564
Apple_AIIA00094571
Apple_AIIA00094571 DRM Detail 2002 v1.0
Apple_AIIA00094578 DRM Overview 2002 v.04
Apple_AIIA00094585
Apple_AIIA00094872
Apple_AIIA00097104
Apple_AIIA00097106
Apple_AIIA00097107
Apple_AIIA00097110
Apple_AIIA00097121
Apple_AIIA00097211
Apple_AIIA00097222
Apple_AIIA00098387
Apple_AIIA00098417
Apple_AIIA00098435
Apple_AIIA00098491
Apple_AIIA00098510
Apple_AIIA00098524
Apple_AIIA00098568
Apple_AIIA00098796
Apple_AIIA00099034
Apple_AIIA00099169

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Apple_AIIA00099178
Apple_AIIA00099192
Apple_AIIA00099814
Apple_AIIA00103972
Apple_AIIA00106003
Apple_AIIA00116631 DRM Overview 2005 v.04 redlined
Apple_AIIA00116646 DRM Overview 2005 v.2
Apple_AIIA00116673
Apple_AIIA00116674
Apple_AIIA00116729 DRM Overview 2005 v.3 redlined
Apple_AIIA00293651
Apple_AIIA00294038
Apple_AIIA00330735
Apple_AIIA00797459
Apple_AIIA00797486
Apple_AIIA00797631
Apple_AIIA00797862
Apple_AIIA00797947
Apple_AIIA00798303
Apple_AIIA00798326
Apple_AIIA00816907
Apple_AIIA00974463
Apple_AIIA01288177 FairPlay Public Key Infrastructure Version 1.0
Apple_AIIA01288181
Apple_AIIA01288272 iPod Database Signing Verification API
Apple_AIIA01288280 eApp DRM Testing Workflow
Apple_AIIA01288284 FairPlay Extension M53
Apple_AIIA01288294 FairPlay White Paper 2.1
Apple_AIIA01288309 Rod Schultz FairPlay Overview
Apple_AIIA01288312 FairPlay Security Access Protocol
Apple_AIIA01288475 Key Rotation
Apple_AIIA01288511 Use of Smart Cards with Apple FairPlay
Apple_AIIA01288540 iPod Database Verification 4.2006 version
Apple_AIIA01288580 FairPlay 3.2 presentation
Apple_AIIA01288692
Apple_AIIA01288702
Apple_AIIA01288713
Apple_AIIA01288715
Apple_AIIA01288723
Apple_AIIA01288739
Apple_AIIA01288815
Apple_AIIA01288852
Apple_AIIA01288886
Apple_AIIA01288887
Apple_AIIA01288897
Apple_AIIA01288913
Apple_AIIA01288922
Apple_AIIA01289072

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                    49

Apple_AIIA01289079
Apple_AIIA01289081
Apple_AIIA01289092
Apple_AIIA01289122
Apple_AIIA01289143
Apple_AIIA01289146
Apple_AIIA01289161
Apple_AIIA01289333
Apple_AIIA01289341
Apple_AIIA01289367
Apple_AIIA01289397
Apple_AIIA01289403
Apple_AIIA01289404
Apple_AIIA01289465
Apple_AIIA01289527
Apple_AIIA01289529
Apple_AIIA01289549
Apple_AIIA01349812
Apple_AIIA01371986
Apple_AIIA01372011
Apple_AIIA_B-000001
Apple_AIIA_B_001706-54
Apple_AIIA_B_001755-57
Apple_AIIA_B_001758-63

Apple_AIIA00019916
Apple_AIIA00042247
Apple_AIIA00042401
Apple_AIIA00042418
Apple_AIIA00042838
Apple_AIIA00042905
Apple_AIIA00049006
Apple_AIIA00049400
Apple_AIIA00057978
Apple_AIIA00062113
Apple_AIIA00089936
Apple_AIIA00089937
Apple_AIIA00089938
Apple_AIIA00089939
Apple_AIIA00090334
Apple_AIIA00090350
Apple_AIIA00090472
Apple_AIIA00092158
Apple_AIIA00092454
Apple_AIIA00093711
Apple_AIIA00093729
Apple_AIIA00093858
Apple_AIIA00093859

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

Apple_AIIA00093895
Apple_AIIA00094086
Apple_AIIA00095142
Apple_AIIA00095169
Apple_AIIA00095170
Apple_AIIA00096956
Apple_AIIA00097184
Apple_AIIA00097185
Apple_AIIA00097188
Apple_AIIA00097194
Apple_AIIA00099084
Apple_AIIA00101375
Apple_AIIA00102445
Apple_AIIA00102487
Apple_AIIA00105655
Apple_AIIA00105931
Apple_AIIA00105959
Apple_AIIA00106003
Apple_AIIA00106024
Apple_AIIA00113574
Apple_AIIA00115922
Apple_AIIA00116092
Apple_AIIA00116382
Apple_AIIA00116422
Apple_AIIA00122467
Apple_AIIA00142141
Apple_AIIA00164871
Apple_AIIA00165562
Apple_AIIA00165759
Apple_AIIA00182671
Apple_AIIA00185670
Apple_AIIA00187610
Apple_AIIA00187793
Apple_AIIA00230354
Apple_AIIA00231292
Apple_AIIA00231314
Apple_AIIA00231314
Apple_AIIA00231322
Apple_AIIA00231333
Apple_AIIA00231465
Apple_AIIA00232273
Apple_AIIA00233512
Apple_AIIA00234674
Apple_AIIA00256090
Apple_AIIA00256090
Apple_AIIA00256113
Apple_AIIA00256119
Apple_AIIA00256728

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                51

Apple_AIIA00289151
Apple_AIIA00289375
Apple_AIIA00289709
Apple_AIIA00290330
Apple_AIIA00290330
Apple_AIIA00290624
Apple_AIIA00291320
Apple_AIIA00291509
Apple_AIIA00291806
Apple_AIIA00292063
Apple_AIIA00292063
Apple_AIIA00292784
Apple_AIIA00293801
Apple_AIIA00293999
Apple_AIIA00294002
Apple_AIIA00294055
Apple_AIIA00294056
Apple_AIIA00294222
Apple_AIIA00294222
Apple_AIIA00294880
Apple_AIIA00294880
Apple_AIIA00294909
Apple_AIIA00294911
Apple_AIIA00294914
Apple_AIIA00294970
Apple_AIIA00294970
Apple_AIIA00294978
Apple_AIIA00294979
Apple_AIIA00294985
Apple_AIIA00295538
Apple_AIIA00295668
Apple_AIIA00296193
Apple_AIIA00296202
Apple_AIIA00297255
Apple_AIIA00297255
Apple_AIIA00300193
Apple_AIIA00300195
Apple_AIIA00300199
Apple_AIIA00300204
Apple_AIIA00302118
Apple_AIIA00302239
Apple_AIIA00303635
Apple_AIIA00303635
Apple_AIIA00303708
Apple_AIIA00303708
Apple_AIIA00303709
Apple_AIIA00303710
Apple_AIIA00303712

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

Apple_AIIA00303714
Apple_AIIA00303720
Apple_AIIA00303723
Apple_AIIA00303726
Apple_AIIA00303729
Apple_AIIA00303733
Apple_AIIA00304033
Apple_AIIA00304038
Apple_AIIA00304054
Apple_AIIA00304351
Apple_AIIA00304366
Apple_AIIA00304444
Apple_AIIA00305359
Apple_AIIA00305360
Apple_AIIA00305362
Apple_AIIA00305363
Apple_AIIA00305364
Apple_AIIA00305373
Apple_AIIA00305374
Apple_AIIA00305375
Apple_AIIA00305377
Apple_AIIA00305379
Apple_AIIA00305384
Apple_AIIA00305393
Apple_AIIA00305434
Apple_AIIA00305438
Apple_AIIA00305440
Apple_AIIA00305511
Apple_AIIA00305545
Apple_AIIA00305561
Apple_AIIA00305562
Apple_AIIA00305564
Apple_AIIA00305566
Apple_AIIA00305568
Apple_AIIA00305570
Apple_AIIA00305573
Apple_AIIA00305577
Apple_AIIA00305579
Apple_AIIA00305586
Apple_AIIA00305587
Apple_AIIA00306827
Apple_AIIA00306957
Apple_AIIA00307078
Apple_AIIA00307205
Apple_AIIA00307342
Apple_AIIA00307482
Apple_AIIA00307928
Apple_AIIA00307929

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                      53

Apple_AIIA00307942
Apple_AIIA00307943
Apple_AIIA00307944
Apple_AIIA00307946
Apple_AIIA00307948
Apple_AIIA00307950
Apple_AIIA00307960
Apple_AIIA00307963
Apple_AIIA00307966
Apple_AIIA00307969
Apple_AIIA00307972
Apple_AIIA00307975
Apple_AIIA00307979
Apple_AIIA00307983
Apple_AIIA00308174
Apple_AIIA00308901
Apple_AIIA00308904
Apple_AIIA00308907
Apple_AIIA00308914
Apple_AIIA00308918
Apple_AIIA00308923
Apple_AIIA00308929
Apple_AIIA00308935
Apple_AIIA00308942
Apple_AIIA00308949
Apple_AIIA00308956
Apple_AIIA00308978
Apple_AIIA00308980
Apple_AIIA00308988
Apple_AIIA00308989
Apple_AIIA00309174
Apple_AIIA00309175
Apple_AIIA00318740
Apple_AIIA00322727
Apple_AIIA00325894
Apple_AIIA00330298
Apple_AIIA00797947
Apple_AIIA00798033
Apple_AIIA00798119
Apple_AIIA00798119
Apple_AIIA00798211
Apple_AIIA00798211
Apple_AIIA00799628
Apple_AIIA00799672
Apple_AIIA00801467
Apple_AIIA00801597
Apple_AIIA00801753
Apple_AIIA00801909

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Apple_AIIA00803347
Apple_AIIA00803378
Apple_AIIA00803472
Apple_AIIA00803474
Apple_AIIA00803476
Apple_AIIA00803719
Apple_AIIA00803855
Apple_AIIA00804003
Apple_AIIA00804170
Apple_AIIA00804326
Apple_AIIA00804496
Apple_AIIA00807085
Apple_AIIA00812423
Apple_AIIA00816952
Apple_AIIA00817263
Apple_AIIA00817408
Apple_AIIA00924813
Apple_AIIA00924823
Apple_AIIA00924825
Apple_AIIA00925323
Apple_AIIA00928375
Apple_AIIA00928486
Apple_AIIA00928878
Apple_AIIA00940807
Apple_AIIA00942002
Apple_AIIA00960350
Apple_AIIA00974519
Apple_AIIA00974838
Apple_AIIA00974904
Apple_AIIA00976211
Apple_AIIA00983892
Apple_AIIA01025117
Apple_AIIA01026210
Apple_AIIA01026473
Apple_AIIA01026480
Apple_AIIA01026485
Apple_AIIA01026488
Apple_AIIA01026495
Apple_AIIA01026503
Apple_AIIA01026512
Apple_AIIA01026521
Apple_AIIA01026526
Apple_AIIA01026531
Apple_AIIA01026536
Apple_AIIA01026542
Apple_AIIA01026548
Apple_AIIA01044664
Apple_AIIA01044830

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                55

Apple_AIIA01055551
Apple_AIIA01056176
Apple_AIIA01071045
Apple_AIIA01071222
Apple_AIIA01072060
Apple_AIIA01072123
Apple_AIIA01072452
Apple_AIIA01115498
Apple_AIIA01203889
Apple_AIIA01205270
Apple_AIIA01209939
Apple_AIIA01213489
Apple_AIIA01230360
Apple_AIIA01232836
Apple_AIIA01234400
Apple_AIIA01234663
Apple_AIIA01234670
Apple_AIIA01234675
Apple_AIIA01234678
Apple_AIIA01234685
Apple_AIIA01234693
Apple_AIIA01234702
Apple_AIIA01234711
Apple_AIIA01234716
Apple_AIIA01234721
Apple_AIIA01234726
Apple_AIIA01234732
Apple_AIIA01234738
Apple_AIIA01245226
Apple_AIIA01288873
Apple_AIIA01288977
Apple_AIIA01289350
Apple_AIIA01289351
Apple_AIIA01333263
Apple_AIIA01333268
Apple_AIIA01333274
Apple_AIIA01333622
Apple_AIIA01349710
Apple_AIIA01373607
Apple_AIIA01373827
Apple_AIIA01373945
Apple_AIIA01373953
Apple_AIIA01375042
Apple_AIIA01375094
Apple_AIIA01376058
Apple_AIIA01376059
Apple_AIIA01376060
Apple_AIIA01377907

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

Apple_AIIA01377909
Apple_AIIA01377918
Apple_AIIA01378991
Apple_AIIA01379134
Apple_AIIA01385473
Apple_AIIA_C_00000411
Apple_AIIA_C_00003450

## XI.   Signature

Signed April 8, 2013 in Des Plaines, Illinois

_____

David M. Martin Jr., Ph.D.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# APPENDIX A

**David Martin, Ph.D.**
1153 Lee St. #251
Des Plaines, IL   60016-6516
224 633 9802 voice
dmartin@acm.org

April 8, 2013

# CURRICULUM VITAE

---

## A. SUMMARY

I have been working in the computer software field for over 30 years, in the roles of developer, designer, professor, and expert consultant.  I hold a Ph.D. in computer science and a B.S. in mathematics and computer science.

## B. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education

1999    Ph.D.    Department of Computer Science, Boston University

1993    B.S.    Iowa State University, awarded "with distinction"
Major: Mathematics
Major: Computer Science
Minor: German

### 2. Academic Experience

2002-2007    Assistant Professor
Department of Computer Science
University of Massachusetts Lowell
(On leave of absence during 2005-2006)

2001-2002    Research Assistant Professor
Department of Computer Science
Boston University

1998-2001    Assistant Professor
Department of Mathematics and Computer Science
University of Denver

### 3. Teaching

Introduction to Object Oriented Programming (C++), Foundations of (Theoretical) Computer Science, Computer Security I: Principles of Cryptography and Network Security, Computer Security II: Applied Computer Security, Unix Software Tools, Computer Networking, Introduction to Computer Science I (C++), Introduction to Computer Science II (C++), Special Topics in Systems: Computer Security, Advanced Unix Programming, Formal Languages and Automata, Introduction to Computer Science (C)

David Martin                                                                                    2

## C. PROFESSIONAL ACTIVITIES

### 1. Testifying expert experience

| | |
|---|---|
| 2011 | Global Sessions LP v. Travelocity et al. (report) |
| 2010 | The Apple iPod iTunes Anti-trust Litigation (report, deposition) |
| 2009 | University of California and Eolas Technologies Inc. v. Adobe Systems Inc. et al. (report, trial, deposition) |
| 2008 | Northeastern University and Jarg Corporation v. Google, Inc. (report, deposition) |
| 2007 | i4i Limited Partnership v. Microsoft Corporation (report, trial, deposition) |
| 2006 | Computer Acceleration Corporation v. Microsoft Corporation (report, trial, deposition) |
| 2006 | Comes et al. (Iowa consumer class) v. Microsoft Corporation (report, deposition) |
| 2003 | Gordon et al. (Minnesota Consumer Class) v. Microsoft Corporation (report, deposition) |
| 2004 | Lingo et al. (California Consumer Class) v. Microsoft Corporation (report, deposition) |
| 2000 | Rich Media v. LaGarde (hearing) |

### 2. Consulting expert experience

| | |
|---|---|
| 2013 | Lodsys Group, LLC |
| 2013 | Unwired Planet, LLC |
| 2012 | VirnetX, Inc. |
| 2012 | Droplets, Inc. v. E*TRADE Fin. Corp. et al., Droplets, Inc. v. Amazon.com, Inc. et al., and Droplets, Inc. v. eBay, Inc. et al. |
| 2011 | Robocast Inc. v. Microsoft and Robocast Inc. v. Apple |
| 2010 | In the Matter of Certain Authentication Systems, Including Software and Handheld Electronic Devices, Investigation No. 337-TA-697, on behalf of Research in Motion, Ltd. |
| 2010 | TiVo, Inc. v. EchoStar et al. |
| 2009 | Prism Technologies LLC v. Research in Motion, Ltd. and Microsoft Corporation |

David Martin                                                                                      3

| 2009 | Bedrock Computer Technologies, LLC v. Softlayer Technologies Inc. et al. |
|------|-------------------------------------------------------------------------|
| 2009 | Nelson Bumgardner Casto, P.C. |
| 2008 | Peer Communications, LLC v. Skype Technologies SA et al. |
| 2008 | Sun Microsystems v. Versata Enterprises |
| 2006 | Comes et al. (Iowa consumer class) v. Microsoft Corporation |
| 2005 | PlusFunds v. OTC, Inc. |

**3.  Other Work Experience**

2005-2008    **Cofounder,** Boston Software Forensics.  Developed software analysis and protective tools for software publishers and OEMs and provided software forensics consulting services.

1997    **E-mail survey programmer and administrator**, Boston University School of Management, Summer

1996    **Student researcher**, Bellcore Inc., Summer
Conducted research in firewall technology, Java security, and cryptography.

1995    **Contract programmer**, BitFlow Inc., Summer
Ported device drivers for a digital camera interface board to Windows NT and Windows 95.

1995    **Database and statistical consultant** for Boston University expert witness, Spring

1987-1993    **System programmer and administrator**, Iowa State University.
Wrote administration and support code for ISU's distributed network of hundreds of Unix systems.  Provided programming and system administration support to Computer Science faculty.

1989    **Student intern programmer**, Hewlett-Packard Germany, Spring
Designed and implemented a hypertext help system based on a precursor of Motif for the X Window System under HP Unix while participating in a foreign exchange program.

1986    **Contract programmer**, Lucasfilm Ltd., Fall
Designed and implemented a sound sequencer for a computer game in 6502 assembler; arranged music and sound effects for the soundtrack.

1985-1986    **Lead programmer**, Sensor Scan Inc.
Designed and implemented object-oriented system and application software for a custom microcomputer-based security control device in 6303 assembler.

1984-1985    **Programmer**, Waveform Corp.

Developed software infrastructure for home computer music products in 6502 assembler.

1979-1983     **Part-time programmer**, Cyberia, Inc.
Contributed to development of microcomputer software products in BASIC and 6502 assembler, including peripheral-sharing technologies, farm management software, and games.

## 4. Professional Memberships

Association for Computing Machinery (ACM)

## 5. Honors and Awards

| | |
|---|---|
| 2007, 2004 | Teaching Excellence Award for U. Mass Lowell Computer Science Department |
| 1996 | Outstanding Teaching Fellow, Department of Computer Science, Boston University |
| 1993-1994 | University Graduate Fellowship, Boston University |
| 1993 | Top Graduating Senior in Mathematics, Iowa State University, Spring |
| 1993 | Top Graduating Senior in Computer Science, Iowa State University, Spring |
| 1990 | Phi Beta Kappa membership (liberal arts honor society) |
| 1990 | Phi Kappa Phi membership (engineering honor society) |
| 1990 | Pi Mu Epsilon (mathematics honor society) |
| 1990 | Upsilon Pi Epsilon (computer science honor society) |
| 1989-1990 | Barry Goldwater Scholarship |
| 1988-1989 | Participated in Congress-Bundestag Youth Exchange to Germany |

## 6. Academic and Professional Publications

### Refereed Publications

2008     Stanley J. Barr, Samuel J. Cardman, and David M. Martin Jr., *A Boosting Ensemble for the Recognition of Code Sharing in Malware*.  Journal of Virology 4:4, 2008.

2005     Jesse M. Heines and David M. Martin Jr., *Development and Deployment of a Web-based Course Evaluation System*.  In Proceedings of the 2005 International Conference on Web Information Systems and Technologies.

2003          D. Martin, H. Wu, A. Alsaid, *Hidden Surveillance by Web Sites: Web Bugs in Contemporary Use*, Communications of the ACM 46:12ve, December 2003.

2002          D. Martin and A. Schulman, *Deanonymizing Users of the SafeWeb Anonymizing Service*. In Proceedings of the 11th USENIX Security Symposium, August 2002.

2002          A. Alsaid and D. Martin, *Detecting Web Bugs With Bugnosis: Privacy Advocacy Through Education*. In Privacy Enhancing Technologies, Springer Lecture Notes in Computer Science volume 2482, 2002.

2001          J. Burns, P. Gurung, D. Martin, S. Rajagopalan, P. Rao, D. Rosenbluth, and A.V. Surendran, *Automatic Management of Network Security Policy by Self-securing Networks*, Proceedings of DISCEX II, 2001.

2000          D. Martin, R. Smith, M. Brittain, I. Fetch, and H. Wu, *The Privacy Practices of Web Browser Extensions*, Communications of the ACM, February 2001. Extended version available from Privacy Foundation, December 2000.

1998          A. Bestavros, M. Crovella, J. Liu, and D. Martin, *Distributed Packet Rewriting and its Application to Scalable Server Architectures*, Proceedings of the 1998 International Conference on Network Protocols, October 1998.

1997          D. Martin, S. Rajagopalan, and A. Rubin, *Blocking Java Applets at the Firewall*, Proceedings of the Internet Society Symposium on Network and Distributed System Security, January 1997.

1995          R. Book, J. Lutz, and D. Martin, *The Global Power of Additional Queries to Random Oracles*, Information and Computation 120:1, July 1995.

## Book Chapters

2004          D. Martin, "Privacy Analysis for the Casual User with Bugnosis", in *Designing Security Systems That People Can Use*, O'Reilly and Associates, 2005.

## Book Editor

2005          Privacy Enhancing Technologies, 4th International Workshop, David Martin and Andrei Serjantov (eds.), Lecture Notes in Computer Science 3424, Springer-Verlag 2005.

2006          Privacy Enhancing Technologies, 5th International Workshop, George Danezis and David Martin (eds.), Lecture Notes in Computer Science 3856, Springer-Verlag 2006.

## Software distributions

2001          A. Alsaid, J. Boak, and D. Martin, The Bugnosis Web Bug Detector (Web site and downloadable software), *www.bugnosis.org*, June 2001.

David Martin                                                                 6

**Magazine and Web site articles**

2001            D. Martin, "TiVo's Data Collection and Privacy Practices", *Privacy Foundation*, March 2001.

2001            R. Smith and D. Martin, "E-Mail Wiretapping", *Privacy Foundation*, February 2001.

1998            D. Martin, "Internet Anonymizing Techniques", *;login:* Magazine, May 1998.

**Technical reports**

2007            S. Barr, S. Cardman, and D. Martin, Matching Global Data References in Related Executables.  Computer Science Department Technical Report No. 2007-003.

1999            D. Martin, *Local Anonymity in the Internet*, Ph.D. thesis, May 1999.

# EXHIBIT 5

## Declaration of Howie Singer

I am Howie Singer, Senior Vice President, Strategic Technology and Chief Technology Officer for Warner Music Inc. ("WARNER").

WARNER is one of the world's leading music companies. The company discovers, develops, markets and distributes recorded music in a number of ways, including through licenses with various companies.

WARNER, like other music companies, entered into several agreements with Apple, Inc. ("Apple") for the sale of WARNER's sound recordings through Apple's iTunes Store. These agreements set forth the terms and conditions under which Apple would purchase and resell downloads of sound recordings to consumers. WARNER and Apple updated the agreements from time to time to make changes to the terms and conditions.

As part of the agreements, WARNER required that its sound recordings available for sale by Apple through the iTunes Store have content protection to guard against piracy. In particular, WARNER was concerned with consumers' ability to make an unrestricted number of copies of the sound recordings.

In 2003, Apple and WARNER entered into negotiations concerning the launch of iTunes for Windows. During these negotiations, WARNER proposed that WARNER's music sold through the iTunes Store be playable on an unlimited number of iPods and on competing digital players owned by the purchaser of the music. Apple did not agree to this proposal. and instead insisted that the music sold through the iTunes Store, including WARNER's sound recordings, only be compatible with iPods.

WARNER has an interest in having its music sold in the widest manner possible, through as many channels as possible.

During the relevant period, WARNER entered into agreements with other companies, including RealNetworks, which also set forth the terms and conditions under which WARNER's sound recordings were sold through online stores other than the iTunes Store.

WARNER was aware of RealNetwork's Harmony technology introduced in July, 2004, which purported to allow music purchased through RealNetworks' online store to be directly downloaded onto an iPod. Warner entered into a download deal with RealNetworks because music purchased through RealNetworks' online store contained a security solution that guarded against unauthorized duplication and distribution of WARNER's sound recordings.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd day of December, 2010, at New York, New York.

Howie Singer

# EXHIBIT 6

I am Lawrence Kanusher, Senior Vice President, Business & Legal Affairs for the Global Digital Business Group of Sony Music Entertainment.

Sony Music Entertainment ("SONY") is one of the world's leading music companies. The company discovers, develops, markets, sells and distributes recorded music in a number of ways, including through relationships with various companies.

SONY, like other music companies, entered into several agreements with Apple Inc. ("Apple") for the sale of downloads embodying their digital products through Apple's iTunes Store. These agreements set forth the terms and conditions under which Apple would purchase and resell SONY's digital products to consumers. SONY and Apple have updated the agreements from time to time.

As part of these agreements, SONY required that SONY's digital products available for re-sale by Apple through the iTunes Store have content protection to mitigate against piracy. In particular, SONY was concerned with consumers' ability to make an unrestricted number of copies.

In 2003, Apple and SONY entered into negotiations concerning the launch of iTunes for Windows. During ongoing negotiations, SONY and Apple discussed whether SONY digital product files protected by DRM could be playable on music players in addition to the iPod without compromising the security solution. Apple did not accommodate Sony's request for a solution that would both protect the content as well as be interoperable with other devices.

Several years later, in 2009, the parties agreed upon an unprotected solution which allowed SONY files to be played on other companies' devices.

In addition, SONY entered into agreements with other companies, including Real Networks, which also set forth the terms and conditions under which downloads embodying SONY's digital products were sold through online stores other than the iTunes Store in a secure format. During the relevant period, SONY's download deal with RealNetworks required a security solution that guarded against unauthorized duplication and distribution of downloads embodying SONY's digital products.

SONY was aware of RealNetwork's Harmony technology introduced in July, 2004, which allowed music purchased through RealNetworks' online store to be transferred to an iPod. Because music purchased through Real Networks' online store contained a security solution that guarded against unauthorized duplication and distribution of SONY's digital products, SONY did not object to the Harmony technology.

New York, New York
December 22, 2010

Lawrence Kanusher
Senior Vice President, Business & Legal
Affairs for the Global Digital Business
Group of Sony Music Entertainment

# EXHIBIT 7

1        I, Amanda Marks, declare as follows:

2        1.        I am Executive Vice President and General Manager of Universal Music

3    Distribution and was formerly Senior Vice President, Universal Music Group - eLabs. I have

4    personal knowledge of the facts stated herein and would and could testify competently thereto if

5    called as a witness in this matter.

6        2.        UMG Recordings, Inc. is a record company which is part of what is known as the

7    Universal Music Group ("Universal"). Universal is one of the world's leading music companies.

8    Universal discovers, develops, markets and distributes recorded music in a number of ways,

9    including through licenses or distribution agreements with various companies.

10       3.        Universal, like other music companies, entered into agreements with Apple, Inc.

11   ("Apple") for the sale of Universal's sound recordings through Apple's iTunes Store. These

12   agreements set forth the terms and conditions under which Apple provided certain services,

13   including the sale of downloads of sound recordings. Universal and Apple updated the

14   agreements from time to time to make changes to the terms and conditions.

15       4.        As part of the agreements, Universal required that its sound recordings available for

16   sale by Apple through the iTunes Store have content protection to guard against piracy. In or

17   around 2004 Universal had discussions with Apple, in which Universal expressed to Apple that

18   while Universal continued to require content protection, Universal wanted interoperability

19   between its music sold through online stores and portable digital music players. Universal has

20   always had an interest in having its music sold in the widest manner possible, through as many

21   channels as possible.

22   ///

23   ///

24   ///

25

26

27

28

5.      During the relevant period, Universal entered into agreements with other companies, including RealNetworks, which set forth the terms and conditions under which Universal's music was sold through such companies' online stores.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed December 28, 2010, at Los Angeles, California.

AMANDA MARKS

Case 4:05-cv-00037-YGR   Document 751   Filed 04/15/14   Page 9 of 10

# EXHIBIT 8

DECLARATION

Mark Piibe declares as follows: I am Executive Vice President, Global Business Development of EMI Music, an affiliate of Capitol Records, LLC. I make this declaration on behalf of Capitol Records, LLC, dba EMI Music North America (hereinafter "EMI") based on information contained in EMI's records.

In or about 2003, Apple and EMI entered into negotiations concerning the launch of iTunes for Windows.

Apple's agreement with EMI defined compliant player devices to include only iPod models that were commercially available at the time and versions that subsequently would become available.

EMI was interested in having its recorded music made widely available through many different channels, and during the same period it had agreements with other companies, including RealNetworks and its predecessor, Listen.com, to sell downloads of EMI sound recordings to online services other than the iTunes service.

EMI personnel became aware of RealNetworks' Harmony DRM technology at some time in or after 2004. RealNetworks' predecessor, Listen.com, represented that Harmony guarded against violations of the usage limitations and restrictions applicable to downloads of EMI recordings. I have found no indication that EMI made any objection to the Harmony DRM technology.

Dated: December 22, 2010

_____
Mark Piibe