EXHIBIT 9

EDDY CUE                                              December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THE APPLE IPOD ITUNES          Lead Case No.
ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)
------------------------

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED 30(b)(6) DEPOSITION OF

EDDY CUE

ON BEHALF OF

APPLE, INC.

VOLUME I

December 17, 2010

9:22 a.m.

1755 Embarcadero Road

Palo Alto, California

Ana M. Dub, RMR, CRR, CSR 7445

---

## INDEX OF EXAMINATION

WITNESS: EDDY CUE

| EXAMINATION | PAGE |
| --- | --- |
| By Ms. Bernay | 8 |
| By Mr. Mittelstaedt | 221 |

---

### APPEARANCES OF COUNSEL

For he Plaintiffs:
 ROBBINS GELLER RUDMAN & DOWD LLP
 ALEXANDRA S. BERNAY, ESQ.
 PAULA M. ROACH, ESQ.
 655 West Broadway, Suite 1900
 San Diego, California 92101
 619.231.1058
 xanb@rgrdlaw.com
 proach@rgrdlaw.com

For he Defendant Apple, Inc.:
 JONES DAY
 ROBERT A. MITTELSTAEDT, ESQ.
 555 California Street, 26th Floor
 San Francisco, California 94104
 415.626.3939
 ramittelstaedt@jonesday.com

Also Present:
 APPLE, INC.
 LISA OLLE, SENIOR CORPORATE COUNSEL LITIGATION
 1 Infinite Loop, MS 36-35U
 Cupertino, California 95014
 408.862.8888
 olle@apple.com

 APPLE, INC.
 KYLE ANDEER, Director, Competition Law & Policy
 1 Infinite Loop, MS 36-MAL
 Cupertino, California 95014
 408.862.9307
 kandeer@apple.com

 MATTHEW COPE, VIDEOGRAPHER

---

### INDEX TO EXHIBITS

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 52 | Letter on the Letterhead of Jones Day Dated December 10, 2010 to Alexandra Bernay from David Kiernan | 11 |
| Exhibit 53 | Defendant's Supplemental Initial Disclosures | 28 |
| Exhibit 54 | E-Mail Dated September 20, 2003 to Steve Jobs from Eddy Cue, Production Nos. Apple_AIIA00319405-07 | 58 |
| Exhibit 55 | E-Mail Dated November 9, 2004 to Phil Wiser from Eddy Cue, Production No. Apple_AIIA00808605 | 67 |
| Exhibit 56 | E-Mail Dated April 21, 2007 to Zach Horowitz from Eddy Cue, Production Nos. Apple_AIIA00809105-07 | 70 |
| Exhibit 57 | E-Mail Dated April 27, 2006 to Steve Jobs from Eddy Cue, Production Nos. Apple_AIIA00808925-26 | 80 |
| Exhibit 58 | E-Mail Dated December 5, 2006 to ET@group.apple.com from Steve Jobs, Production Nos. Apple_AIIA00320482-84 | 84 |
| Exhibit 59 | E-Mail Dated March 31, 2007 to Steve Jobs from Katie Cotton, Production Nos. Apple_AIIA00319516--18 | 89 |
| Exhibit 60 | E-Mail Dated March 19, 2007 to Doug Morris from Steve Jobs, Produc ion Nos. Apple_AIIA00319506-07 | 107 |

Eddy Cue - Volume I                          December 17, 2010
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

33

1      A. I don't know specifically what all of
2   their concerns were. They certainly had concerns
3   about selling it the way we wanted to.
4      Q. And did those labels express to you
5   concerns regarding unauthorized copying of music,
6   for example?
7      A. Of course, yes.
8      Q. And is it right that Apple developed its
9   DRM system to help enforce those content usage rules
10  to limit, for example, copying and transfer of music
11  files sold on iTunes?
12         MR. MITTELSTAEDT: Let me object to that
13  question as argumentative, to the extent it's
14  implying that that's the only reason or that's
15  exactly how it came about.
16         THE WITNESS: When we went to go discuss
17  selling music for the labels, our interest was in
18  selling music in a DRM-free fashion a la what the
19  labels were selling their CDs with.
20         They came back and said: No. We're
21  getting killed with piracy. There's no way we're
22  going to license you that way. In order for you to
23  license, there are a set of rules that we want to
24  impose on the customer of those purchases.
25         And we spent a long time negotiating those

34

1   sets of rules because they wanted rules that were
2   much more stringent; we wanted rules that were much
3   more lenient, given that customers were legitimately
4   buying the music.
5         We came to a conclusion in order to --
6   once we decided what those rules and we came to some
7   form of an agreement with them, we had to impose
8   them, then, technically on the music that was being
9   purchased. And that basically required a DRM.
10  BY MS. BERNAY:
11     Q. And it required -- you said it required a
12  DRM; is that correct?
13     A. Correct.
14     Q. Okay. And whose idea was it specifically
15  that that DRM that be required be FairPlay?
16     A. Well, so when we started this at the time,
17  we were really defining what turned out to be kind
18  of the rules of the land of digital music. There
19  was nobody that had done the same set of rules that
20  we had done in the way we had done them.
21         And so we originally started by thinking,
22  well, we can do this in a very simple way, not a
23  very elaborate technical way, to protect the music
24  but quickly discovered that in order to truly
25  protect the music, it would require us to do some

35

1   significant development of what term -- what is
2   termed a DRM.
3         There were no alternatives in the
4   marketplace to go get these rules and the DRM as
5   they existed. So that wasn't an option that we
6   really looked at.
7         So we quickly started developing the DRM
8   ourselves, which became called FairPlay.
9      Q. Are you saying that there were no other
10  DRM systems that were out there in the market at the
11  time?
12     A. No, I didn't say that.
13         What I said was there were no DRM systems
14  in the market that applied or could do the rules the
15  way that we were doing them.
16         And so it was important to us, number one,
17  to do that.
18         Number two, we had to apply them in
19  multiple locations, both iTunes, the iPod, different
20  places. None of that existed.
21     Q. So it became determined that Apple needed
22  to have a proprietary DRM system in place?
23     A. And I don't -- "proprietary," I wouldn't
24  use the word. It became clear that we had to build
25  our DRM if we wanted to apply those rules.

36

1      Q. Did Apple consider looking at other DRM
2   schemes that were out there in the marketplace?
3      A. We discussed it, but again, there was
4   nothing really in the market at that point in time.
5   So there was -- that, again, gave us the flexibility
6   and the things that we were trying to apply.
7         In addition to that, it was very early
8   on, and so we were fairly confident that there were
9   going to be mistakes made and corrections that
10  needed to take place in the DRM. And so there was
11  nobody that was robust out there that had done the
12  things that we were trying to do.
13     Q. But was there any investigation of those
14  other potential DRM schemes, any analysis of them
15  that was created or done at the time?
16     A. Not that I'm aware of. Again, detailed
17  analysis. We didn't have to do that because they
18  were in the marketplace being used, and so we knew
19  how they worked.
20     Q. And you had mentioned some of the issues
21  that the record labels had. And I'd like to get
22  from you sort of what those demands were regarding
23  DRM. What did the labels specifically -- what did
24  they require?
25     A. They were --

EDDY CUE                                         December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

41

1    A.  But it never got to that -- it never got
2  any further into specifics because there were two
3  criterias that we were looking at when they
4  certainly asked for interoperability or asked about
5  it, which was, number one:
6       We didn't think it was really technically
7  feasible in the sense that we were still making a
8  lot of changes to the way that the DRM worked.  And
9  we were able to do that because we had the device,
10  the software ourselves and we could make the changes
11  all at the same time.  And so we didn't think that
12  technically it would work very well if it was done.
13       And in hindsight, I think that was proven
14  to us in spades by WMA and Microsoft's plays for
15  sure, which failed miserably at trying to do that.
16       In addition to that, when we looked at it,
17  there was no one in the market that was -- either
18  had a successful store or a successful device that
19  we felt like, okay, let's go join that and work with
20  them to grow the market because they were
21  successful.
22       So neither of those two scenarios made it
23  viable.
24    Q.  Is it accurate -- just to sort of get an
25  idea of sort of what the universe was at the launch,

42

1  is it right that at the launch of the iTunes Music
2  Store, that songs purchased through the iTunes Store
3  could only be directly transferred onto iPods at the
4  launch?
5    A.  They could either be -- they could only be
6  transferred to an iPod or they could be burned to a
7  CD.  And then any CD could be ripped back to
8  digital.
9       So customers always had the capability, if
10  they really wanted to, to take a song that they
11  purchased on the store and move it to another
12  player.
13    Q.  But they could only be directly
14  transferred, isn't that correct, onto an iPod?
15       MR. MITTELSTAEDT:  Let me just ask a
16  clarification.  Are you saying other than playing on
17  the computer?  When you say "transfer," you mean --
18       MS. BERNAY:  Yes.  I'm talking about
19  moving music onto an iPod so that songs purchased
20  through the iTunes Store at the launch could only be
21  directly transferred onto an iPod.
22       MR. MITTELSTAEDT:  Object; asked and
23  answered.
24       THE WITNESS:  Again, a song could be
25  transferred to an iPod or burned to a CD.

43

1  BY MS. BERNAY:
2    Q.  Okay.  But directly transferred only; is
3  that correct?
4    A.  I --
5       MR. MITTELSTAEDT:  Object; compound, asked
6  and answered, ambiguous.
7       THE WITNESS:  Again, it can be transferred
8  to an iPod or burned to a CD.  Those were the two
9  ways that you could move songs off of iTunes.
10  BY MS. BERNAY:
11    Q.  Okay.  And at some point in time, is it
12  right that Apple had a deal with Motorola to have
13  sort of a music player on certain phones?
14    A.  Yes, that's correct.
15    Q.  Okay.  So is it right that at some point
16  in time, songs purchased through the iTunes Store
17  could be directly transferred onto iPods and to
18  certain Motorola phones that were compatble with
19  FairPlay?
20    A.  Over time, songs could be transferred to
21  iPods, other Apple devices that we developed, and
22  the Motorola device and the HP iPod device.  So
23  there were other devices that were added over time.
24    Q.  And it's also right that at some point in
25  time, Apple went what's referred to as DRM-free; is

44

1  that right?
2    A.  That is correct.
3    Q.  And about when did that occur, that
4  DRM-free project?
5    A.  Well, it was done in multiple steps.
6  Originally, it was done with EMI only and the -- and
7  many of the independents.  And I don't recall the
8  exact date of that, but I'm sure we can look that
9  up.
10       And then approximately about a year later,
11  it was done with the three other majors that were
12  left.
13    Q.  And is it accurate that now everything
14  that can be purchased in the United States, at
15  least, through the iTunes Store is sold DRM-free?
16       MR. MITTELSTAEDT:  Music?
17       MS. BERNAY:  Music.  Thank you.
18       THE WITNESS:  Yes.  All music in the
19  world, with the exception of Japan, is purchased
20  DRM-free.
21  BY MS. BERNAY:
22    Q.  We talked a little bit at the beginning
23  about negotiations with the launch of the store, and
24  we'd mentioned independent labels.  Do you recall
25  that discussion?

45

1    A.  Yes.
2    Q.  And do you know whether or not, during the
3  negotiations with the independent labels, whether
4  those labels wanted the music to be protected by
5  FairPlay?
6         MR. MITTELSTAEDT:  Let me just object;
7  lack of foundation.
8         MS. BERNAY:  Sure.
9         MR. MITTELSTAEDT:  Go ahead.
10         THE WITNESS:  When we went to the -- one
11  of the big success factors that we believed in --
12  and I think was proven correct -- is that for
13  consumers, giving them different restrictions based
14  on which song they're buying was a disaster.
15         Both MusicNet and Pressplay did exactly
16  that, which is have different rules for different
17  songs.  And as a consumer, we thought that was a
18  nightmare and something that would never be
19  successful.
20         So we when launched our store, one of the
21  things that we wanted is a very clear set of rules
22  that we could apply to every single song.  So we
23  were adamant and required that all the same rules
24  would apply.
25         So when we went to the -- not just the

46

1  indies, but actually as we went to Sony and EMI, as
2  an example, or even Universal, which was the second
3  label, we had established what we thought were the
4  rules that had to apply.  And so there was very
5  little negotiation on our part in what we were
6  willing to switch beyond what was there.
7         So some of them wanted more burns, less
8  burns.  Some of them wanted more restrictions on
9  where the songs could be transferred.  And that's
10  not something we were open to at that point.
11         So once the rules got sort of decided by
12  Universal and Warner, those two, then there really
13  wasn't a whole lot of discussions that took place
14  with the others that we were willing to appease to.
15         But again, they all wanted different
16  levels or different types of restrictions.
17  BY MS. BERNAY:
18    Q.  And isn't it accurate, though, that the
19  independent labels wanted their music to be sold
20  DRM-free?
21         MR. MITTELSTAEDT:  Object; argumentative,
22  lack of foundation.
23         THE WITNESS:  No, I don't believe that's
24  true.  I think there are certainly some that may
25  have wanted that, but not all.

47

1  BY MS. BERNAY:
2    Q.  And isn't it right that at some point in
3  time, EMI, sort of on its own, went DRM-free on
4  Apple prior to the other labels going DRM-free?
5         MR. MITTELSTAEDT:  Object; argumentative,
6  asked and answered.
7         THE WITNESS:  Again, certainly, EMI never
8  went on its own.  We were the ones that were
9  pressing the labels to go DRM-free.
10         And we then were able to negotiate with
11  EMI to go DRM-free, and we'd hoped that they would
12  be the first.  We then negotiated with also
13  independents, and then we tried to negotiate with
14  all the labels, the remaining three major labels.
15         Some of the independents and the three
16  major labels decided not to go DRM-free at that
17  time.  But we were the ones that initiated that.
18  BY MS. BERNAY:
19    Q.  I guess what I'm getting at is that you
20  said previously that it would have been a problem in
21  the beginning if certain -- if there had been sort
22  of different rules for different labels.  But then
23  later, there were, in fact, different rules for
24  different labels, weren't there?
25         MR. MITTELSTAEDT:  Objection;

48

1  argumentative, compound.
2         THE WITNESS:  No, we didn't look at it
3  that way.  We looked at it as, we went to -- one,
4  when we were establishing a market early on, we
5  thought it was very important to have consistency
6  and clarity around it.
7         If we felt that DRM early on, which is
8  what we had requested from the labels when we first
9  met with them, was something we could have done, we
10  would have done that because that was our preferred
11  alternative.
12         MR. MITTELSTAEDT:  DRM-free?
13         THE WITNESS:  DRM-free.  Sorry.
14         If, at the time that we went back to them,
15  we felt like the market had been established, people
16  were clear on buying digital music, we wanted to go
17  DRM-free, we felt like EMI and others were willing
18  to do it.  And at that point it was about telling
19  people there were no restrictions as opposed to any
20  restrictions.
21         Early on it was an argument about how many
22  burns, how many this, how many that.  It was all
23  about which levels of restrictions.
24         And so once we could go to the market and
25  tell everyone there are no restrictions on these

53

1   myself.
2        Q.  And you mentioned Kevin Saul.  What was
3   his role in the negotiations?
4        A.  He's been the attorney that I've worked
5   with at Apple throughout all of the negotiations of
6   all of the music label agreements.
7        Q.  And he negotiates on behalf of Apple,
8   really?
9        A.  Well --
10       Q.  Or is he an Apple employee?
11       A.  He's an Apple employee.  But again, I
12  negotiate the deals.
13       Q.  Okay.
14       A.  So they're my responsibility.  Kevin
15  assists me with it.
16       Q.  Okay.  And he sort of deals with some of
17  the legal issues that may come up?  Or . . .
18       A.  Yes.
19       Q.  And who came to whom?  Did EMI approach
20  Apple, or did Apple approach EMI regarding this
21  decision to offer some of its music DRM-free?
22       A.  Well, you have to go back.  I mean, we had
23  been asking for DRM-free music from the very
24  beginning.  So we started by asking them for
25  DRM-free content.

54

1        Over time, that discussion always was part
2   of the discussions as we renewed things, and so it
3   was always part of the discussions that took place.
4        It was only during this time frame that
5   EMI became receptive to it.  And they were receptive
6   to it because of the price increase, in particular.
7   They always, like all of the labels, major labels,
8   wanted price increases.
9        And so when we started having the
10  discussions around we were willing to potentially
11  look at different pricing for DRM-free, I think that
12  made them become very interested and then desiring
13  it.
14       Q.  What do you mean by looking at other
15  prices regarding DRM-free?
16       A.  All songs on the Music Store were sold at
17  99 cents to consumers.  The labels always wanted to
18  sell songs at a higher price.  We resisted that.  We
19  felt like 99 cents was a fair price, and we thought
20  if we would go higher, we would all lose.  We would
21  lose sales; we would lose to piracy, et cetera.  And
22  so over time we had been constantly fighting with
23  them about that.
24       In their desire to go to a higher price
25  point, we said:  Well, gee, what if we went to a

55

1   higher price point and offered it to consumers with
2   DRM-free and we offered them a higher quality than
3   we were shipping, better audio quality?
4        And so we said:  If we offer consumers
5   both a higher audio quality and DRM-free, maybe we
6   could charge more to the customers.
7        (Ms. Olle leaves the proceedings;
8        Mr. Andeer joins the proceedings.)
9   BY MS. BERNAY:
10       Q.  Do you know whether EMI approached other
11  stores about going DRM-free before Apple and EMI
12  engaged in these negotiations to go DRM-free?
13       A.  I don't recall that, no.
14       (Cellular telephone rings.)
15       MS. BERNAY:  He comes in.  Look at that.
16       (Mr. Andeer leaves the proceedings.)
17  BY MS. BERNAY:
18       Q.  Were there any music stores that you're
19  aware of that sold online digital music at the time
20  that the iTunes Store launched that sold their music
21  DRM-free?
22       A.  No, there were none that I was aware of.
23       Q.  What about later, you know, in the months
24  or years after the iTunes Music Store launched?
25  Were you aware of any stores that sold online

56

1   content DRM-free?
2        A.  Yes.
3        Q.  And what are you -- what stores are you
4   aware of?
5        A.  Amazon, Wal-Mart.  There were many others.
6        Q.  What about eMusic?  Is that an online
7   store that you're familiar with?
8        A.  Yes, I am.
9        Q.  And what kind of music -- or what do they
10  offer to consumers?
11       A.  They offered DRM-free music, but they did
12  not have any of the major labels, and only
13  independent music and not all of it.  So they
14  offered a subset of music that, I believe, was
15  DRM-free.
16       Q.  And do you know whether eMusic existed at
17  the time that the iTunes Store launched in 2003?
18       A.  I don't recall.  I don't believe so, but I
19  don't recall.
20       Q.  Do you know whether or not the iTunes
21  Store sold some of the same music that was also
22  available through eMusic?
23       A.  Again, depending on the time frame, but
24  when they were both -- when they were both there,
25  I'm sure that there were songs that we had that were

Eddy Cue - Volume I                    December 17, 2010
            HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

57

1    on eMusic.  But as I said, 80 percent of the music
2    that was being sold was from majors, and they didn't
3    have it.
4           They weren't even trying to sell music at
5    an individual level.  They were trying to get people
6    to sign up for a monthly bill that included a
7    certain number of tracks.  So they offered a very
8    complicated and very, very small subset of music for
9    sale.
10      Q.  But it's accurate that some music was sold
11   both through eMusic and through iTunes; correct?
12          MR. MITTELSTAEDT:  Object; argumentative
13   and asked and answered.
14          THE WITNESS:  Yes, there were certain
15   songs that were in eMusic that were also in iTunes
16   that were sold.
17   BY MS. BERNAY:
18      Q.  And at that time, that music was protected
19   by Apple's DRM FairPlay on the iTunes Store; is that
20   correct?
21      A.  There were times where music was sold on
22   iTunes with DRM and eMusic had it in DRM-free.
23          MS. BERNAY:  This will be Exhibit 54.
24   It's a multipage document.  The Bates number is
25   Apple_AIIA00819405 through 407.

58

1           Here's an extra copy for Apple.
2           (Whereupon, Deposition Exhibit 54 was
3           marked for identification.)
4           MS. BERNAY:  And if you could take a
5    moment to review Exhibit 54, please.
6           THE WITNESS:  Would you like me to read
7    the whole thing?
8           MS. BERNAY:  Yes.  Thank you.  And we're
9    not going to speak in depth about anything on page 3
10   of the document and only a little bit on page 2 of
11   the document, if that --
12          THE WITNESS:  Okay.
13          MS. BERNAY:  -- directs you a little bit.
14          (Witness reviews document.)
15          MR. MITTELSTAEDT:  While he's reading
16   this, we're going to designate the deposition highly
17   confidential.
18          And the name of the person who came in is
19   Kyle Andeer, A-n-d-e-e-r.
20          (Witness reviews document.)
21          THE WITNESS:  Okay.
22   BY MS. BERNAY:
23      Q.  You've had a chance to look at Exhibit 54?
24      A.  Yes.
25      Q.  And what is Exhibit 54?

59

1       A.  This was a -- basically an update on
2    negotiations that were taking place with EMI after
3    the initial launch when we were trying to acquire
4    Windows rights for the -- for selling music.
5       Q.  And there's an e-mail at the bottom of the
6    first page from yourself to Mr. Jobs, and you've
7    attached what on page 2 you've referred to as an
8    initial proposal from EMI.  Do you see that?
9       A.  I do.
10      Q.  And then Mr. Jobs writes back.  Do you see
11   that there --
12      A.  I do.
13      Q.  -- in the middle?
14          And then you write back at the top there,
15   and you include -- you send it to Mr. Jobs, but you
16   also include Mr. Robbin and Mr. Higa.  Is that
17   right?
18      A.  That's correct.
19      Q.  And this is a document that you drafted as
20   part of your job over at Apple; is that right?
21      A.  Yeah.  This was an update to Steve on how
22   our negotiations were going, since I was driving
23   them.
24      Q.  Okay.  And let's just look at the e-mail
25   that you wrote with the included proposal from EMI

60

1    at the bottom of the first page there.  You mention
2    at the very beginning:
3           "I talked to John Rose . . . ."
4           Do you see that?
5       A.  I do.
6       Q.  And who is Mr. Rose?
7       A.  He was the representative from EMI that I
8    was negotiating with.
9       Q.  And the proposal from EMI that you have
10   listed on the second page, is that something that
11   you cut and paste, do you recall, or is that your
12   sort of assessment of what the negotiating issues
13   were?
14          MR. MITTELSTAEDT:  Or both.
15   BY MS. BERNAY:
16      Q.  Or both.  And I'm beginning with the part
17   that begins "Below is the initial proposal . . . ,"
18   and then you have a series of items there.
19      A.  I can tell by the craziness that's written
20   in here that it was done by them.
21      Q.  Okay.  And then you did your best to sort
22   of explain what they were talking about; is that
23   right?
24          MR. MITTELSTAEDT:  Where is that?
25

EDDY CUE                                              December 17, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

121

1    Q.  It was a technology that would strip the
2    DRM protection from protected songs.  Is that an
3    accurate description?
4        A.  I would describe it as a hack to remove
5    the DRM.
6        Q.  Okay.  And what about --
7        A.  Which was illegal.
8        Q.  Which was illegal?
9        A.  Yes.
10       Q.  And what are you basing that statement on,
11   that it was illegal?
12       A.  Two things.  Number one, the terms of
13   service that we gave to consumers certainly said
14   that when you buy the songs, these are the rights
15   that you gain by it and what you can do with it.
16       And secondly, we had the DRM protection on
17   there.  And my understanding is there's some laws
18   around DMCA and things about stripping the
19   protection away that made it illegal.
20       Q.  You said DMCA.  What's that?
21       A.  I don't -- again --
22       Q.  I just mean, do you know what the acronym
23   is?
24       A.  I don't know what the acronym is.
25       Q.  You just know that it's some --

122

1        A.  My attorneys have told me there's some
2    laws around stripping DRMs that are illegal.
3        Q.  Okay.  And what about something called
4    PyMusique?  What is that?
5        A.  It's a similar thing.  Again, there are
6    many, many hacks that have been done over the years
7    to try to rip music off from iTunes.
8        Q.  To rip music off from iTunes?  Is that
9    what you said?
10       A.  That's correct.
11       Q.  And is PyMusique a hack?
12       A.  It is also.
13       Q.  And it's something that strips the DRM
14   protection from a song?
15       A.  I believe so.  I can't recall every single
16   one of them, so . . .
17       Q.  Sure.  And is that something that is
18   illegal, this PyMusique, in your view?
19       MR. MITTELSTAEDT:  Objection; calls for a
20   legal conclusion.
21       THE WITNESS:  Again, that's certainly what
22   my attorneys have represented.
23       MR. MITTELSTAEDT:  Actually, don't --
24   let's strike that.  Don't ta k about conversations
25   with the attorneys.

123

1        THE WITNESS:  Okay.
2    BY MS. BERNAY:
3        Q.  And going back to RealNetworks now, is
4    that something that stripped the DRM protection off
5    of a song?
6        A.  No, it does not.  It tried to put a DRM
7    to, again, hack to look at -- make it look like it
8    was a FairPlay DRM song.
9        Q.  And would that be something that was
10   illegal, in your view?
11       MR. MITTELSTAEDT:  Objection; calls for a
12   legal conclusion.
13       THE WITNESS:  Again, I don't know.  I did
14   not have -- don't know the answer to the question.
15   BY MS. BERNAY:
16       Q.  Do you know whether JHymn actually
17   affected iTunes as opposed to the iPod?
18       A.  What do you mean by "affected"?
19       Q.  Just whether or not the way that it
20   functioned was at the software level of iTunes as
21   opposed to working on the firmware of the iPod.
22       MR. MITTELSTAEDT:  Objection; compound.
23   BY MS. BERNAY:
24       Q.  If you know.
25       A.  I don't know the answer to the question.

124

1        Q.  Do you know whether Apple ever sent any
2    cease and desist letters regarding JHymn?
3        A.  I don't recall.
4        Q.  Do you know whether Apple sent any cease
5    and desist letters regarding any hacks that it was
6    concerned about?
7        A.  I don't know what our legal team did.
8        Q.  That's not something that you followed up
9    on?  Or followed, rather?
10       A.  Well, we followed the hacks very closely.
11       But again, how legal responded is not
12   something that I -- most of these were done with
13   either people that were anonymous or people that
14   were in countries that -- were not in the U.S. and
15   other things to that nature that made it harder.  So
16   I don't know how legal responded or what they did.
17       Q.  Okay.  And do you have any information
18   regarding any cease and desist letters that may have
19   been sent by Apple to any other companies that
20   either stripped the DRM or provided their own
21   version of DRM?
22       A.  Again, I don't recall any.  I don't know.
23       Q.  Apart from any communications with the
24   labels, did you have any communications with other
25   people inside of Apple regarding RealNetworks'

Eddy Cue - Volume I                                December 17, 2010
                HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

157

1    Q.  You anticipated.  My next question was:
2  Who is Peter that's referred to here?
3         So this says it's a Q&A prep for Peter.
4  Do you see that?
5    A.  I do.
6    Q.  And is it accurate that on occasion, the
7  CFO of Apple would have to answer questions from the
8  press and others in public forums?
9    A.  Generally not from the press.  This would
10  generally be from analysts.
11    Q.  Okay.  And so it says:
12       "[He] wants to be prepared to
13       answer the following questions."
14       Do you see that?
15    A.  I do.
16    Q.  And is this something that -- again, I
17  think you testified earlier that you would work with
18  people in -- I guess mostly in media, PR
19  departments, helping to prepare public statements on
20  behalf of Apple; is that right?
21    A.  Yeah.  This is -- this is different.
22    Q.  How is it different?
23    A.  Because it's not meant for the press.
24  It's not with PR.
25       This is generally around giving Peter

158

1  mostly facts, numbers that have been -- that we have
2  that he wants to communicate, or just points that
3  we've already publicly made that he's asking about.
4  But again, geared toward analysts, not the press.
5    Q.  That makes sense.  There's -- the first
6  question is asking about:
7       "Was the iTunes Music Store
8       profitable in the December quarter?"
9       Do you see that?
10    A.  I do.
11    Q.  And so that's referring to the quarter
12  that would have ended December 31, 2004?
13    A.  It may not have ended December 31, but it
14  would have ended sometime near the end of December.
15    Q.  Here it says:
16       "The iTunes Music Store has been
17       operating at slightly above
18       break-even . . . ."
19       Do you see that?
20    A.  I do.
21    Q.  What does that mean?
22    A.  That means we were profitable.
23       But one of the differences that you have
24  to understand here is when we're dealing with the
25  company of Apple and whether it's profitable or not

159

1  in the December quarter, most people are looking at
2  the profitability of the hardware, which is a much
3  bigger part of the business than the Music Store.
4       The Music Store is a distribution
5  business, not a manufacturing product business; and
6  so, therefore, it runs on very low margins.  And so
7  our margins in the iTunes Music Store, though
8  positive, were very low comparable to the rest of
9  Apple.
10    Q.  And when you say "very low comparable to
11  the rest of Apple," is there --
12    A.  It'd be in the single digits versus in the
13  20s, mid-20s, high 20s, low 30s, depending on which
14  quarter.  I don't know the specific quarter.
15    Q.  But the Music Store was always small- --
16  it's a -- what am I trying to say?
17       It had relatively small profits
18  throughout; is that accurate?
19    A.  Small to the rest of Apple.  It was always
20  profitable.  So --
21    Q.  Okay.
22    A.  -- depending on who you were speaking to,
23  they may look at it differently.
24       But yes, in general, toward all of Apple,
25  the Music Store's profits were a small percentage of

160

1  Apple's.
2    Q.  Was there ever a quarter that you're aware
3  of where the iTunes Music Store was not profitable?
4    A.  I don't believe so.  There may have been a
5  quarter where it was basically break-even, but I
6  don't believe there was any quarter where it was not
7  profitable.
8    Q.  Even going back to when it first launched?
9    A.  I would say if we looked at the first full
10  quarter, I don't know exactly, on a particular
11  month, if we launched on April -- we may have -- I
12  don't know whether we were profitable the first
13  month we were in business or not.
14    Q.  Fair enough.
15    A.  Certainly the first quarter we were in
16  business, we were.
17    Q.  There's a question, the third question
18  here is:
19       "Did you notice any impact from
20       the Microsoft or other music store
21       launches?"
22       Do you see that?
23    A.  I do.
24    Q.  And then you have:
25       "In the U.S. our market is around

181

1  Bates-stamped Apple_AIIA00099494 through 95.
2      (Whereupon, Deposition Exhibit 70 was
3      marked for identification.)
4      (Witness reviews document.)
5      THE WITNESS:  Yes.
6  BY MS. BERNAY:
7      Q.  And can you identify Exhibit 70, please?
8      A.  It is an e-mail that I sent to my staff,
9  basically letting them know that we had crossed the
10 billion-dollar mark as far as revenue for the year.
11     Q.  And "the year" being 2006 at this point in
12 time?
13     A.  Fiscal 2006, yes.
14     Q.  Okay.  And so the people that it's to, are
15 those sort of your -- the top people in the iTunes
16 department that reported to you?
17     A.  In addition to my boss at the time who was
18 not Steve, but was Sina Tamaddon.
19     Q.  And then who's Steven Leung, that was also
20 cc'd here?
21     A.  He is the finance person who works on my
22 team for iTunes.
23     Q.  And so you're just sort of sharing the
24 good news with the people in your department?
25     A.  That's correct.

182

1      Q.  And then there's a bottom e-mail from
2  Mr. Leung to yourself and it's cc-ing Mark Donnelly.
3  Do you see that?
4      A.  Yes.
5      Q.  And who's Mark Donnelly?
6      A.  Mark Donnelly is Steven's boss in finance,
7  who works for Peter Oppenheimer.
8      Q.  So he's below the CFO, but he's in the
9  finance department?
10     A.  That's correct.
11     Q.  And this revenue number for iTunes that's
12 listed here, it's broken out by quarter; is that
13 right?
14     A.  That's correct.
15     Q.  And then each quarter, those are in
16 millions; is that correct?
17     A.  I hope so, so we can get to the billion.
18     Q.  Okay.  And then it's comparing that to
19 fiscal year '05 revenue of 414 million; is that
20 right?
21     A.  That is correct.
22     Q.  And it was more than doubled year over
23 year?
24     A.  That's correct.
25         MS. BERNAY:  You can put that to the side.

183

1          This will be Exhibit 71, and it's
2  Bates-stamped Apple_AIIA00327951 to 952.
3      (Whereupon, Deposition Exhibit 71 was
4      marked for identification.)
5      MS. BERNAY:  And if you could take a
6  moment and review Exhibit 71, please.
7      (Witness reviews document.)
8      THE WITNESS:  Yes.
9  BY MS. BERNAY:
10     Q.  You've had a chance to look at it?
11     A.  I have.
12     Q.  And it's something from Ms. Ameerally; is
13 that right?
14     A.  That's correct.
15     Q.  And it's to yourself and Mr. Jobs and
16 others; is that right?
17     A.  That's correct.
18     Q.  And the subject is:
19        "iTunes market share - week
20        ending January 28, 2007."
21     A.  That's correct.
22     Q.  And is this something that was issued
23 weekly, detailing the iTunes market share every
24 week?
25     A.  No.  We -- we generally did it during

184

1  either quarters or for a special time.
2      This is because it was a special time.
3      Q.  What was the special time?
4      A.  During the end of the year, the month of
5  December and the month of January, the iTunes
6  business increased significantly as far as sales
7  were concerned.
8      So our biggest month of the year is always
9  January.  Our second biggest month of the year is
10 generally between February and December.
11     So we see huge spikes in the iTunes
12 business mostly related to the iTunes gift card that
13 we have, and so we tend to see our sales go up and
14 our market share numbers go up.
15     And so this e-mail was highlighting the
16 fact that our sales skyrocketed during the Christmas
17 season here of '07 and drove our market share up to
18 90 percent during that time frame.
19     Q.  And this is relating to digital music
20 here, this market share number?
21     A.  That's correct.
22     Q.  And so I guess people get gift cards at
23 Christmas and then spend them at some point in time?
24     A.  Generally in the first two months of the
25 holiday season.

Eddy Cue - Volume I                          December 17, 2010
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

209

1      The only time that was not the case was,
2  when we had EMI, for a period of time we were paying
3  them 91 cents for tracks. And this was before we
4  got the other labels. The other labels then went
5  off and negotiated DRM-free higher quality at
6  99 cents with every other competitor. And so we
7  kept -- we were paying EMI 91 cents at that time.
8      And so we decided to lower our price to
9  99 cents to equal what the other competitors were
10  doing while we renegotiated the deal. And then as
11  soon as we renegotiated the deal, it was back to the
12  same price.
13     Q.  So --
14     A.  That was back in -- two or three years
15  ago.
16     Q.  And so were you losing money on EMI songs
17  at that point in time?
18     A.  We were. But EMI was a small part of the
19  market. So overall, Apple never lost money. And it
20  was for a short period of time.
21     Q.  Do you know approximately what the margin
22  is on iTunes on a yearly basis? Is it 2 percent,
23  10 percent?
24     A.  No. It runs in the single digits. And
25  it's been as low as the low single digits of 2 or

210

1  whatever, and probably as high as the high single
2  digits of 7 or 8.
3      Q.  And do you know what the margins are on
4  iPods?
5      A.  I don't know specifically on iPods. I
6  mean, I know in general what Apple's are because we
7  publicize it. I don't know the iPod model
8  specifically.
9      Q.  Do you know generally what that --
10     A.  They've been in the high 20s, low 30s
11  range.
12         MS. BERNAY: Let's take a look at another
13  exhibit. This will be Exhibit 73. It's a multipage
14  document. Here you go.
15         (Whereupon, Deposition Exhibit 73 was
16          marked for identification.)
17         MS. BERNAY: I think I'm giving away mine.
18         MS. ROACH: Yes.
19         MS. BERNAY: Sorry.
20         (Witness reviews document.)
21  BY MS. BERNAY:
22     Q.  And can you identify Exhibit 73?
23     A.  Yes. It looks like an agreement between
24  us and one of the indie labels.
25     Q.  And it's generally a form contract with

211

1  the indie labels?
2      A.  It is.
3      Q.  And is this something that -- for the most
4  part, that you would have negotiated with the
5  labels?
6      A.  There's very little negotiation. But if
7  something came up that needed to be changed, if it
8  was of any significance, then it would come to me.
9         If it was, you know, different words that
10  lawyers wanted to use, then my attorneys would
11  handle that.
12     Q.  But for the most part, these are form
13  contracts?
14     A.  Correct.
15     Q.  Okay. And if you'll look on page 94627,
16  which is page 11 of the document --
17     A.  Yes.
18     Q.  -- you'll see your signature there; is
19  that right?
20     A.  I do.
21     Q.  And you signed this as a V.P. of
22  Applications Division at the time?
23     A.  Correct.
24     Q.  And this is back in April of '04?
25     A.  That's correct.

212

1      Q.  And at some point in time, this recording
2  company had music for sale on the iTunes Store?
3      A.  Hopefully they still do.
4      Q.  Okay. And let's look at the very last
5  page. It's Exhibit B.
6      A.  Yes.
7      Q.  And it looks to be the company's schedule
8  of wholesale prices.
9      A.  Yes.
10     Q.  And can you explain the details here and
11  the differences between single track, multitrack
12  albums, and others and how that price is determined?
13     A.  This was saying that in a single-track
14  case, we would be paying them 65 cents for any
15  track.
16         For multitrack albums, we came up with
17  these different tiers of albums. They got to decide
18  where they fit in. So they would pick which
19  category that particular album came in.
20         And then we had other kinds of tracks
21  where it wasn't really an album. It might have been
22  a sub- -- smaller than an album, like what we would
23  call an LP or an EP, where it may have three or four
24  songs; or it could be like a box set that may have
25  50 songs or 100 songs. And obviously none of the

EXHIBIT 10

Jeffrey L. Robbin - Volume I                    December 3, 2010
HIGHLY CONFIDENTIAL

## 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

THE APPLE IPOD ITUNES          Lead Case No.
ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)

VIDEOTAPED 30(B)(6) DEPOSITION OF
APPLE COMPUTER, INC.
BY DESIGNEE: JEFFREY L. ROBBIN
VOLUME I

December 3, 2010
9:23 a.m.

1755 Embarcadero Road
Palo Alto, California

Ana M. Dub, RMR, CRR, CSR 7445

## 3

INDEX OF EXAMINATION

WITNESS: JEFFREY L. ROBBIN
EXAMINATION                    PAGE
By Ms. Bernay                  8
By Mr. Mittelstaedt            200

## 2

APPEARANCES OF COUNSEL

For the Plaintiffs
ROBBINS GELLER RUDMAN & DOWD LLP
ALEXANDRA S. BERNAY ESQ
PAULA M ROACH ESQ
655 West Broadway, Suite 1900
San Diego, California 92101
619 231 1058
xanb@rgrdlaw.com
proach@rgrdlaw.com

and

BONNETT FAIRBOURN FRIEDMAN & BALINT P C
TODD D CARPENTER ESQ
2901 N Central Avenue, Suite #1000
Phoenix, Arizona 85012
(619) 756 6978
tcarpenter@bffb.com

For the Defendant Apple Computer Inc
JONES DAY
ROBERT A MITTELSTAEDT ESQ
555 California Street, 26th Floor
San Francisco, California 94104
415 626 3939
ramittelstaedt@jonesday.com

Also Present
LISA OLLE
ALEXEI DIAS VIDEOGRAPHER

## 4

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | Digital Rights Management (DRM) Overview Draft, Bates Nos. APPLE_A A00094578-84 | 99 |
| Exhibit 2 | Digital Rights Management (DRM) Details, Bates Nos. Apple_A A00094571-77 | 109 |
| Exhibit 3 | E-Mail Chain, Top E-Mail Dated September 20, 2003, to Steve Jobs from Eddy Cue, Bates Nos. Apple_A A 00098373-75 | 114 |
| Exhibit 4 | iTunes Version Spreadsheet, Bates Nos. Apple_A A 00330727-34 | 125 |
| Exhibit 5 | E-Mail Dated February 2, 2004, to Dave Heller, et al., from Grace Kvamme, Bates Nos. Apple_A A00091750-54 | 131 |
| Exhibit 6 | E-Mail Dated January 13, 2004, to Eddy Cue, et al., from Jeff Robbin, Bates Nos. Apple_A A00052493-94 | 135 |
| Exhibit 7 | E-Mail Chain, Top E-Mail Dated April 6, 2004, to Barney Wragg from Eddy Cue, Bates Nos. Apple_A A00090785-87 | 143 |
| Exhibit 8 | E-Mail Chain, Top E-Mail Dated April 22, 2004, to Jeff Robbin from Aidan Lawlor, Bates Nos. Apple_A A 00091816-17 | 148 |
| Exhibit 9 | E-Mail Chain, Top E-Mail Dated April 28, 2004, to Natalie Sequeira from Chris Bell, Bates Nos. Apple_A A 00091783 | 153 |



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                      December 3, 2010

33

1      A.  I don't remember which ones -- I mean, as
2  part of negotiating the licenses for the music, we
3  had to discuss DRM, which included the possibilities
4  of what happens in the event of a hack.
5      MS. BERNAY:  I'm sorry.  Could you read
6  that back, please.
7      (Record read as follows:
8      "QUESTION:  I don't remember which ones
9          -- I mean, as part of negotiating the
10         licenses for the music, we had to
11         discuss DRM, which included the
12         possibilities of what happens in the
13         event of a hack.")
14 BY MS. BERNAY:
15     Q.  And why did you have to discuss DRM with
16 the label?
17     A.  Because labels required us to enforce
18 their content usage rules in order for them to give
19 us the music for sale.
20     Q.  So do you know whether, for example, Apple
21 had discussions with Warner regarding the
22 possibility of hacks, as you've defined them
23 earlier?
24     A.  Yes.
25     Q.  Okay.  Do you know when those discussions

34

1  took place?  And, again, I'm talking about the
2  possibility of hacks, not the . . .
3      A.  I think for -- it would have been before
4  two thousand-- -- April 2003.
5      Q.  And who at Apple was responsible for
6  having that conversation?
7      A.  Me.
8      Q.  Okay.  And what about with Universal?  Was
9  there a conversation with Universal regarding the
10 possibility of hacks?
11     A.  Universal Music?
12     Q.  Yes.
13     A.  Yes.
14     Q.  And did that -- when did that occur?
15     A.  Before April 2003.
16     Q.  And were you the person who had those
17 conversations?
18     A.  Yes.
19     Q.  Okay.  And what about Sony Music?  Were
20 there conversations with Sony Music regarding the
21 possibility of hacks?
22     A.  Yes.
23     Q.  And did those also occur prior to
24 April 2003?
25     A.  Yes.

35

1      Q.  And, again, were you the person who had
2  those conversations?
3      A.  Yes.
4      Q.  And what about BMG Music?  Were you the
5  person who had a con-- -- I'm sorry.
6          Was there such a conversation?
7      A.  Yes.
8      Q.  And did that also occur prior to
9  April 2003?
10     A.  Yes.
11     Q.  And, again, were you the person who had
12 that conversation?
13     A.  Yes.
14         I should clarify that it wasn't
15 necessarily just me.  Eddy Cue might have also been
16 involved in those conversations.  Might have also
17 had counsel there.
18     Q.  Okay.  Do you know whether or not, in
19 fact, Mr. Cue was at those -- you know, was a part
20 of these conversations?
21     A.  There were so many conversations, it's
22 hard for me to remember exactly.  He was probably in
23 some of them.
24     Q.  Okay.  And do you know for a fact whether
25 or not counsel was involved in any or all of those

36

1  conversations?
2      A.  Many, if not all.
3      Q.  And I may have left out one of the labels.
4  Do you know which one I may have left out?
5      MR. CARPENTER:  EMI.
6      MS. BERNAY:  Aah, EMI.  A little bird.
7  BY MS. BERNAY:
8      Q.  Did you have any conversations with EMI
9  regarding the possibility of hacks?
10     A.  Yes.
11     Q.  And, again, was that prior to the launch
12 of the iTunes Music Store in April '03?
13     A.  Yes.
14     Q.  And, again, you were at least one of the
15 main participants in that conversation?
16     A.  Yes.
17     Q.  And is it accurate that these discussions
18 with the major labels came up in relation to the
19 creation of contracts with Apple for the
20 distribution of music?  Is that an accurate
21 statement?
22     A.  Yes.  It would be for the sale and
23 distribution.  I mean, it was --
24     Q.  Thank you for the clarification.
25         You mentioned that the labels required


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey L. Robbin - Volume I        December 3, 2010
HIGHLY CONFIDENTIAL

---

**37**

1 enforcement of content usage rules. Do you remember
2 your testimony about that a minute ago?
3     A. Yes.
4     Q. And what do you mean by that?
5     A. In order for the labels to be willing to
6 allow us to sell their music through the iTunes
7 Store, they required us to enforce the customer's
8 usage rules, the content usage rules.
9     Q. And did the labels determine how those
10 content usage rules would be enforced?
11     A. Jointly with us.
12     Q. And what -- how -- what was the decision
13 regarding how to enforce those content usage rules,
14 just in a general sense?
15     A. Do you mean did they require us to use
16 DRM?
17     Q. That's my question, yes.
18     A. Yes, they required us to use DRM.
19     Q. Did they require you to use Apple's
20 proprietary DRM that we've been calling FairPlay?
21     A. They required us to use a DRM that
22 specifically worked a certain way with respect to
23 the content usage rules.
24     Q. And what do you mean by that?
25     A. The policies that we negotiated included

**38**

1 things like only working on five computers, the
2 content could only play on up to five computers, and
3 other rules. And we needed a DRM that would enforce
4 that.
5     In addition, one of the ways that we were
6 able to get them to be comfortable with selling the
7 content was by representing that we owned the
8 solution end to end, that they would be working just
9 with Apple. So that included all the technology
10 from the store through to the enforcement of the
11 DRM.
12     MS. BERNAY: Can you read that last answer
13 back. I'm sorry.
14     (Record read as follows:
15     "QUESTION: The policies that we
16     negotiated included things like only
17     working on five computers, the content
18     could only play on up to five
19     computers, and other rules. And we
20     needed a DRM that would enforce that.
21     "In addition, one of the ways that we
22     were able to get them to be comfortable
23     with selling the content was by
24     representing that we owned the solution
25     end to end, that they would be working

**39**

1 just with Apple. So that included all
2 the technology from the store through
3 to the enforcement of the DRM.")
4     MS. BERNAY: Thank you.
5 BY MS. BERNAY:
6     Q. So what caught me on that was this "we
7 owned the solution end to end."
8     Can you explain what that means?
9     A. It just meant that they were able to talk
10 to us and, if there was a problem or a hack, they'd
11 be dealing with us.
12     Q. Okay. And so is it accurate that
13 Apple's -- I'm sorry -- that the labels' main
14 concern was with the music being sold through the
15 iTunes Music Store? Is that --
16     MR. MITTELSTAEDT: Objection --
17 BY MS. BERNAY:
18     Q. -- accurate?
19     MR. MITTELSTAEDT: -- just for the record.
20 It calls for speculation, lack of foundation as to
21 what the labels' principal concern was.
22     THE WITNESS: I don't know what the labels
23 were thinking.
24 BY MS. BERNAY:
25     Q. When you had these meetings with the

**40**

1 labels, did the labels indicate that they were
2 concerned with the unauthorized, you know, multiple
3 copies, for example, being made of music being sold,
4 multiple unauthorized copies?
5     A. I'm sorry. Can you repeat the question?
6     Q. Did the labels, during these negotiations
7 that you had with them, was one of the concerns that
8 they had related to the -- to people making multiple
9 unauthorized copies?
10     MR. MITTELSTAEDT: One of the concerns
11 they expressed?
12     MS. BERNAY: They expressed.
13     THE WITNESS: Yes.
14     MS. BERNAY: Yes. Thank you.
15 BY MS. BERNAY:
16     Q. We talked -- just a moment ago we listed
17 all those labels.
18     Who from Warner did Apple primarily
19 negotiate with? Was there a point person from
20 Warner Bros.?
21     A. I don't remember the main negotiat- -- I
22 don't remember the main people involved.
23     Q. Okay. What about from Universal? Do you
24 know who the -- some of the main point people were
25 from Universal?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey L. Robbin - Volume I                                December 3, 2010
HIGHLY CONFIDENTIAL

---

49

1  of FairPlay as the digital rights management
2  solution that Apple was offering?
3      A.  Yes.
4      Q.  And what did you do?  What work did you do
5  on that?
6      A.  In the very beginning, I helped design how
7  it would work.  I might have fixed some bugs in the
8  code as it was being developed.  I didn't do the
9  core implementation, but I worked on the
10  architecture for it.
11      Q.  And when you say you worked on the
12  architecture for that, can you explain to people
13   like me, who do not have a software brain, what that
14  means?
15      A.  It means that I would have worked with the
16  engineers to try to figure out the mechanisms for
17  implementing the DRM.  So trying to just figure out
18  how it would work, how we would keep it secret or
19  secure.  It's a broad . . .
20      Q.  Sure.  And I'm just trying to get at sort
21  of a general understanding as to what you -- how you
22  worked on it.
23      A.  Mm-hmm.
24      Q.  And still -- I've seen some references to
25  something called an AAC audio stream.  Can you tell

50

1  me what that's?
2      A.  AAC is an audio codec format.  It's how
3  you convert sound into a compressed form.
4      Q.  Okay.  And is it right that FairPlay files
5  were MP4 files with an encrypted AAC audio stream?
6  Is that accurate?
7      A.  FairPlay is a DRM.  It's more than just a
8  file format.  An MP4 is an AAC file that has
9  FairPlay applied to it.
10      Q.  Okay.  And is it right that Apple put
11  FairPlay on a music that it sold in the iTunes
12  Music Store once the iTunes Music Store was launched
13  or it was protected by FairPlay?
14      A.  A songs that we sold when the iTunes
15  Music Store first opened were protected with
16  FairPlay.
17      Q.  Were there or have there been various
18  versions or iterations of FairPlay over the years?
19      A.  Yes.
20      Q.  Do you know how many versions of FairPlay
21  there've been over the years?
22      A.  No.
23      Q.  Have there been sort of major revisions
24  and minor revisions, as that term is understood by
25  you?

51

1      A.  Yes.
2      Q.  Do you know where I would find out sort of
3  a complete version on history of FairPlay?  Is that
4  something that Apple would maintain?
5      A.  No.
6      Q.  Okay.  Do you know whether there's sort of
7  documents documenting each change?  If there's not
8  sort of a version on history, do you believe that there
9  are documents that explain what each version of
10  FairPlay over the years has been?
11      A.  No, I don't think there's a document that
12  describes each version of FairPlay.
13      MR. MITTELSTAEDT:  When you come to a
14  convenient stopping point, if we could take a short
15  break.
16      MS. BERNAY:  Why don't we do that now.
17  That's totally fine.  Is that a right?
18      MR. MITTELSTAEDT:  Sure.
19      THE VIDEOGRAPHER:  Off the record at
20  10:13 A.M.
21      (Recess taken.)
22      THE VIDEOGRAPHER:  And we are back on the
23  record at 10:20 A.M.
24      MS. BERNAY:  Thank you.  We come back from
25  our short break.

52

1      Ms. Court Reporter, would you mind just
2  reading back the last question and answer, please.
3      (Record read as follows:
4      "QUESTION:  Okay.  Do you know whether
5          there's sort of documents documenting
6          each change?  If there's not sort of a
7          version history, do you believe that
8          there are documents that explain what
9          each version of FairPlay over the years
10          has been?
11      "ANSWER:  No, I don't think there's a
12          document that describes each version of
13          FairPlay.")
14      MS. BERNAY:  Thank you.
15  BY MS. BERNAY:
16      Q.  We were just talking about that there were
17  a number of versions of FairPlay.  Is that accurate?
18      A.  Yes.
19      Q.  Okay.  Do you know whether at some point
20  in time, music sold at the -- on the iTunes Store
21  was no longer protected by FairPlay?
22      A.  Yes.
23      Q.  And when approximately did that occur?
24      A.  I don't remember the exact date.  And it's
25  not all music.  There's still some music still

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

EXHIBIT 11

Augustin J. Farrugia - Volume I                    December 8, 2010
           HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

**Page 1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

THE APPLE IPOD ITUNES          Lead Case No.
ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)
--------------------------

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED 30(b)(6) DEPOSITION OF

AUGUSTIN J. FARRUGIA

ON BEHALF OF

APPLE, INC.

VOLUME I

December 8, 2010

9:16 a.m.

1755 Embarcadero Road

Palo Alto, California

Ana M. Dub, RMR, CRR, CSR 7445

---

**Page 3**

### INDEX OF EXAMINATION

WITNESS: AUGUSTIN J. FARRUGIA

| EXAMINATION | PAGE |
|---|---|
| By Mr. Carpenter | 7 |
| By Mr. Kiernan | 212 |

---

**Page 2**

APPEARANCES OF COUNSEL

For the Plaintiffs:
BONNETT, FAIRBOURN, FRIEDMAN, & BALINT, P.C.
TODD D. CARPENTER, ESQ.
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona 85012
619.756.6978
tcarpenter@bffb.com

and

ROBBINS GELLER RUDMAN & DOWD LLP
PAULA M. ROACH, ESQ.
655 West Broadway, Suite 1900
San Diego, California 92101
619.231.1058
proach@rgrdlaw.com

For the Defendant Apple, Inc.:
JONES DAY
DAVID C. KIERNAN, ESQ.
555 California Street, 26th Floor
San Francisco, California 94104
415.875-5745
dkiernan@jonesday.com

and

JONES DAY
MICHAEL CULHANE HARPER, ESQ. (Morning Session)
1755 Embarcadero Road
Palo Alto, California 94303
650.739.3916
mcharper@jonesday.com

Also Present:
APPLE, INC.
LISA OLLE, SENIOR CORPORATE COUNSEL LITIGATION
1 Infinite Loop, MS 36-35U
Cupertino, California 95014
408.862.8888
olle@apple.com

MATTHEW COPE, VIDEOGRAPHER

---

**Page 4**

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 21 | Organization Chart, Bates No. Apple_AIIA00099092 | 13 |
| Exhibit 22 | Letter on the Letterhead of Jones Day Dated November 15, 2010 to Alexandra Bernay from David Kiernan | 23 |
| Exhibit 23 | E-Mail Chain, Top E-Mail Dated April 27, 2005, to Tom Neumayr from Greg Joswiak, Bates Nos. Apple_AIIA00090485-88 | 125 |
| Exhibit 24 | Printout of iChat, Bates Nos. Apple_AIIA00798326-27 | 132 |
| Exhibit 25 | Series of E-Mails, Top E-Mail Dated July 5, 2005, to Roger Panlos from Augustin J. Farrugia, Bates Nos. Apple_AIIA00099178-91 | 144 |
| Exhibit 26 | E-Mail Chain, Top E-Mail Dated November 7, 2005, to Jeff Robbin from Augustin J. Farrugia, Bates No. Apple_AIIA00091906 | 147 |
| Exhibit 27 | Printout of iChat, Bates No. Apple_AIIA00798303 | 154 |
| Exhibit 28 | E-Mail Dated April 25, 2006 to Dave Heller from Chris Wysocki and Attachment, Bates Nos. Apple_AIIA00094563-69 | 162 |

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin J. Farrugia - Volume I                    December 8, 2010
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

45

1   management technology or software; correct?
2       A.  What do you mean by "software"?  You put
3   "software" here.
4       Q.  Okay.  How about I leave out "software."
5       And the question is:  FairPlay is a
6   digital rights management technology; correct?
7       A.  Which is correct.
8       Q.  If I refer to digital rights management as
9   DRM, you'll understand what I'm talking about?
10      A.  Correct.
11      Excuse me.  Before you ask question, can I
12  have a glass of water, please?
13      Q.  Sure.
14      When was FairPlay originally developed?
15      A.  I cannot say about FairPlay before my
16  time, but I developed the first version of FairPlay
17  when I was at Apple.
18      Q.  I'm sorry.  Did you say that you developed
19  the first version of FairPlay when you came to
20  Apple?
21      A.  I cannot speak before my time --
22      Q.  Sure.
23      A.  -- because Apple has a FairPlay
24  implementation before my time and I cannot speak
25  about that.

46

1       But I did what I called the Version 1.0 of
2   FairPlay when I came.
3       Q.  And that Version 1.0, was that an update
4   to FairPlay?
5       A.  No.  It was a change on the architecture.
6   It was a complete redesign.
7       Q.  It was a complete redesign?
8       A.  Redesign, yes.
9       Q.  Are you familiar with an MPEG-4 file?
10      A.  M? MPEG-4, yes.
11      Q.  Okay.  Can you describe or explain what an
12  MPEG-4 is to me?
13      A.  It's a container which contain different
14  type of content.
15      THE COURT REPORTER:  I'm sorry.
16      THE WITNESS:  A container that contains
17  digital content.  It's a standard.
18  BY MR. CARPENTER:
19      Q.  Does Apple utilize MPEG-4 files -- strike
20  that.
21      Are the iTunes music contained in MP-4 --
22  MPEG-4 files?
23      A.  Maybe.
24      Q.  Okay.  When you say "maybe," you're not
25  sure?

47

1       A.  Yeah.
2       Q.  Okay.  How would you descr be the music
3   file that's transferred to the end user's computer?
4       A.  It's a file that contain the song encoded
5   with ASE's encoding process.
6       Q.  In technical terms, what would you
7   describe the file as or how would you name the file?
8       A.  Song, digital song.
9       Q.  Okay.  Is it accurate to say that the song
10  that is transferred to the end user's computer is in
11  MPEG-4 container format?
12      A.  Maybe.
13      Q.  Is it your testimony that you're not aware
14  of what the song format is?
15      A.  I'm not -- I'm not sure about the format.
16      Q.  Okay.  What would you -- how would you
17  explain the primary purpose for developing or
18  redesigning FairPlay in the manner that you did once
19  you were with Apple, once you came to Apple?
20      A.  Developing or redesigning?
21      Q.  Developing.
22      A.  I rather answer the question about
23  redesigning first --
24      Q.  Sure.
25      A.  -- if you don't mind.

48

1       As a security expert, the first thing you
2   do when you come to a project l ke FairPlay is to
3   analyze what you have and to do a risk assessment.
4       And the risk assessment I saw at the time
5   was completely upside down, which mean that the
6   design and the architecture and the implementation
7   Apple had of FairPlay before my time was really
8   upside down.
9       The example I use is:  Do you like to wa k
10  with shoes with the heel on the front?  That was I
11  discover.  That's pretty difficult, right?
12      And this was my first initial reaction,
13  saying:  Look, your design is upside down.  We need
14  to redesign everything.
15      Q.  From a technical standpoint, why did you
16  believe that it was upside down?
17      A.  Because as a security expert, it was done
18  incorrectly.
19      Q.  Okay.  What leads you to say that it was
20  done incorrectly if we had to drill down into what
21  the actual process was?
22      A.  A common practice we know in security, and
23  you have -- you know what you design in security,
24  and it was done upside down vis-a-vis the common
25  practice we have in security.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Augustin Farrugia                                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

109

1  Q.  Okay.  So if you had downloaded music from
2  RealNetworks on your iPod prior to the
3  implementation of FairPlay 1.0 for the iPod, it
4  would continue to work subsequent to the
5  implementation of FairPlay 1.0?
6  A.  This is an incorrect statement.
7  Q.  Okay.  Why do you say that?
8  A.  Because we change the architecture on the
9  new product, on the new iPod.
10  Q.  Okay.
11  A.  And that was where we had the 1.0 version.
12  Q.  I understand.
13  THE COURT REPORTER:  I'm sorry?
14  THE WITNESS:  The new version of the 1 --
15  the new version -- the new 1.0 version.
16  BY MR. CARPENTER:
17  Q.  Was the new 1.0 version of FairPlay also
18  available for download through the Music Store for
19  an older or existing iPod?
20  A.  It's incorrect.
21  Q.  Okay.  So the only iPod that contained the
22  new version of FairPlay 1.0 would be new iPods sold
23  at that time?
24  A.  This is correct.
25  Q.  Okay.  And what version of the iPod are

110

1  you referring to?
2  A.  To my recollection, should be Nano,
3  something like this.  But I don't have any
4  recollection.
5  Q.  Okay.
6  THE WITNESS:  Could we say the code name?
7  MR. KIERNAN:  Yes.
8  THE WITNESS:  N36.
9  BY MR. CARPENTER:
10  Q.  Right.  Thank you.
11  Did any subsequent updates to FairPlay 1.0
12  have a similar effect to Harmony as you've described
13  this present version to have?
14  MR. KIERNAN:  Objection; lacks foundation,
15  misstates the testimony, calls for speculation.
16  THE WITNESS:  Could you define the
17  question?  For which product?
18  BY MR. CARPENTER:
19  Q.  I'm trying to gain an understanding of
20  whether later iterations of updates to FairPlay had
21  an effect on Harmony similar to the effect that
22  you've now described.
23  A.  You understood that we said that's for new
24  product.  Now, the question is update for what?
25  That is my question to you.

111

1  Q.  Updates to FairPlay.
2  A.  But for what product?
3  Q.  You've previously described them as
4  being -- as 14 updates to FairPlay; correct?
5  A.  But you're speaking for the iPod or for
6  the desktop?  The 14 we discussed is for the
7  desktop.
8  Now we are speaking for the iPod.  This is
9  why I'm trying to clarify.
10  Q.  I understand.  So let's backtrack.
11  How many updates were made to FairPlay for
12  the iPod during the same time period?
13  A.  Define "iPod" for me.  We have so many
14  version of iPods.
15  Q.  Are the FairPlay updates specific to each
16  individual iPod, or do you make a FairPlay update
17  that applies to all iPods?
18  A.  We are not -- the statement is incorrect.
19  We are making a version of FairPlay for the iPod, no
20  update.
21  Q.  Okay.  So is it accurate to say that you
22  would make a new or updated version of FairPlay for
23  each new iPod?
24  A.  Which is correct.
25  Q.  Okay.  How many new versions of FairPlay,

112

1  or I guess you could say, new iPods were produced
2  during the time period of your tenure at Apple?
3  A.  I don't have this knowledge.  I don't
4  recall.
5  Q.  Who would have that knowledge?
6  A.  Marketing, the Internet.
7  Q.  Can you identify for me any version of
8  FairPlay updates for any of the iPods during this
9  time period which had an effect on RealNetworks'
10  Harmony?
11  THE WITNESS:  Could you repeat the
12  question for me.
13  (Record read as follows:
14  "QUESTION:  Can you identify for me any
15  version of FairPlay updates for any of
16  the iPods during this time period which
17  had an effect on RealNetworks'
18  Harmony?")
19  THE WITNESS:  No, I can't.
20  MR. KIERNAN:  Hold on.
21  Objection; lacks foundation, calls for
22  speculation, assumes that other updates to FairPlay
23  affected Harmony.  And he already testified he
24  didn't know.
25  THE WITNESS:  I don't know the answer to

Augustin Farrugia                                      December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

161

1      Q.  Okay.  And did you take any action to
2   react to this security concern?
3      A.  I never take any action.
4      Q.  Why did you never take any action if you
5   were concerned about this as a security threat?
6      A.  Because we did a change on the
7   architecture because the -- those people, they were
8   exploiting bad architecture to do that.  And if the
9   architecture was correct, we would not have that, in
10  the first place.
11     Q.  Okay.  So you realized that by correcting
12  the architecture, that the security threat of
13  RealNetworks placing keys within digital music files
14  that enabled them to be played on the iPod would be
15  eliminated?
16     A.  This is an incorrect statement.
17     Q.  Why is that statement incorrect?
18     A.  Because you're putting the statement the
19  other way around.
20     Q.  How would you put it?
21     A.  I would say that we did a change, we did a
22  security assessment on the FairPlay I had at the
23  time I joined the company, and I saw a lot of
24  weaknesses inside.  Changed the architecture, and
25  consequently, Real name and other hack was closed.

162

1      Q.  But you had identified this as a problem,
2   that RealNetworks was storing the keys in its
3   digital music files that enabled them to be played
4   on the iPod; correct?
5      A.  Which is incorrect.  The things we
6   identified was the weakness and bad design of the
7   architecture.
8          MR. CARPENTER:  Can we go off the record
9   for a second?
10         MR. KIERNAN:  Yeah.
11         THE VIDEOGRAPHER:  We're off the record,
12  2:14 P.M.
13         (Recess taken.)
14         THE VIDEOGRAPHER:  We're back on the
15  record at 2:26 P.M.
16         MR. CARPENTER:  I'd like to introduce
17  Exhibit No. 28 to the deposition of Mr. Farrugia.
18  It is Bates stamped AIIA00094564 -- actually, make
19  that 94563 -- and concluding at AIIA00094569.
20         (Whereupon, Deposition Exhibit 28 was
21          marked for identification.)
22         MR. CARPENTER:  Take a minute to review
23  this.
24         (Witness reviews document.)
25

163

1   BY MR. CARPENTER:
2      Q.  Are you ready?
3      A.  Mm-hmm.
4      Q.  Can I direct your attention to the second
5   page, actually, the one that is entitled "iPod
6   Database Verification API."
7      A.  Mm-hmm.
8      Q.  Have you ever seen this document before,
9   Mr. Farrugia?
10     A.  Yes.
11     Q.  Okay.  Can you describe the general
12  contents to me?
13     A.  This is a description for an
14  implementation of some feature we wanted to put
15  inside the database that goes inside the iPod.
16     Q.  And what feature is that you're
17  referencing?
18     A.  Is a cryptographic process we wanted to
19  introduce inside database to make sure that database
20  is not corrupted.
21     Q.  Was this document drafted by Rod Schultz?
22     A.  Correct.
23     Q.  Did Mr. Schultz work underneath you at the
24  time he generated this document?
25     A.  Correct.

164

1      Q.  Did you assign him with the task of
2   creating this document?
3      A.  Correct.
4      Q.  Okay.  Can I direct your attention to the
5   statement underneath the subheading "Problem"?
6      A.  Uh-huh.
7      Q.  Can you read that into the record for me,
8   please.
9      A.  "To prevent injection of content
10         and iPod databases for [sic] clients
11         other than iTunes into the iPod (DRM
12         protected or non-DRM protected
13         content), a method for verifying the
14         source of the content needs to be
15         implemented."
16     Q.  Did you task Mr. Schultz with solving this
17  particular problem?
18     A.  Which is correct.
19     Q.  Okay.  And did you agree that the
20  injection of content and iPod databases from clients
21  other than iTunes into the iPod, parenthesis, DRM
22  protected or non-DRM protected content, is or was a
23  problem that needed to be solved?
24     A.  Which is correct.
25     Q.  Why did you believe this was a problem

189

1 right.
2        THE WITNESS:  Can I have the question
3 back, please.
4        (Record read as follows:
5        "QUESTION:  With respect to the
6        integrity verification mechanism that
7        you've described in the proposal, what
8        function would it serve other than to
9        shut out interoperable software?")
10       MR. KIERNAN:  Same objections.
11       THE WITNESS:  I don't like very much the
12 end of the section, but basically this integrity
13 verification is to prevent the entry of the
14 database.
15       MR. CARPENTER:  I'm sorry.  What was his
16 answer?
17       (Record read as follows:
18       "THE WITNESS:  I don't like very much
19       the end of the section, but basically
20       this integrity verification is to
21       prevent the entry of the database.")
22       THE WITNESS:  To prevent people changing
23 the entries of the database.
24       MR. CARPENTER:  People prevent changing?
25       (Record read as follows:

190

1        "THE WITNESS:  To prevent people
2        changing the entries of the database.")
3 BY MR. CARPENTER:
4     Q.  What do you mean by "the entries of the
5 database"?
6     A.  The content of database.
7     Q.  Why would anyone change the content of the
8 database?
9     A.  If you want to play a song, you need to
10 put into the database.
11       In other word, if you play -- if you put a
12 song on the iPod, it would not exist if you don't
13 change the entry -- if you don't put the entry in
14 database.
15       MR. CARPENTER:  Let's go off the record.
16       THE VIDEOGRAPHER:  This marks the end of
17 Disk 2.  We're off the record at 3:03 P.M.
18       (Recess taken.)
19       THE VIDEOGRAPHER:  This marks the start of
20 Disk 3.  Back on the record at 3:17 P.M.
21 BY MR. CARPENTER:
22    Q.  Okay.  Mr. Farrugia, can I direct your
23 attention to page 51 of the same exhibit.
24    A.  Okay.
25    Q.  Can you explain to me what a message

191

1 authentication code is?
2    A.  Message authentication is what we call a
3 cryptographic signature and is the proof that what
4 you sign didn't change.
5    Q.  So what is its purpose with respect to the
6 iPod database integrity verification?
7    A.  Is the piece of information we going to
8 use to verify that the database didn't change.
9        Basically, you have a piece of information
10 we call a payload.  You use the payload to produce
11 a -- what we call a signature.  And if you change a
12 bit of the payload, the signature going to change.
13    Q.  Does it result in the prevention of the
14 removal of DRM from the content?
15    A.  No.  This is incorrect.
16    Q.  Why not?
17    A.  Because it address database, not the
18 content.
19    Q.  Would it have the effect of preventing the
20 removal of DRM?
21    A.  Which is incorrect.
22    Q.  Can I direct your attention to page 56, in
23 particular, the subheading "Public Key
24 Infrastructure."
25       Want to take a moment to review it and let

192

1 me know when you're ready.
2        (Witness reviews document.)
3        THE WITNESS:  Okay.
4 BY MR. CARPENTER:
5    Q.  Was this particular public key
6 infrastructure ever implemented?
7    A.  No.
8    Q.  Why not?
9    A.  Time and resources and priorities.
10    Q.  Do you intend to implement it at some
11 point in the future?
12       MR. KIERNAN:  Objection; irrelevant to
13 this case.
14       THE WITNESS:  Maybe.
15 BY MR. CARPENTER:
16       MR. CARPENTER:  I'm going to take Dave's
17 word for it.
18 BY MR. CARPENTER:
19    Q.  Can I direct your attention to page 60,
20 please.
21    A.  60?
22    Q.  Yes.  In particular, the "FairPlay
23 Security and Message Signing" section.
24    A.  Okay.
25    Q.  Same question.  Was this ever implemented?

Augustin Farrugia                                    December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

193

1      A.  Let me read.
2      Q.  I'm sorry?
3      A.  Can I read?
4          MR. KIERNAN:  He said let him read.
5          MR. CARPENTER:  Oh, absolutely.
6          (Witness reviews document.)
7          THE WITNESS:  Yes, it has been implemented
8   partially.
9   BY MR. CARPENTER:
10     Q.  When you say "partially," it has not been
11  implemented to the extent described by this
12  document?
13     A.  This document were describing 2005, 2006.
14  And things has changed to have a better way of doing
15  that.
16     Q.  So the particular description that's
17  provided by this document has evolved; is that
18  accurate?
19     A.  Correct.
20     Q.  Okay.  And how has it evolved or improved?
21         MR. KIERNAN:  Objection; lacks foundation.
22         THE WITNESS:  Evolved because we want to
23  have better performances, for example.
24  BY MR. CARPENTER:
25     Q.  I'm sorry.  Did you say better

194

1   performances?
2      A.  Yeah.
3      Q.  What is your metric to determine whether
4   you're achieving better performances?
5      A.  User.  If it is too slow to play your
6   song, it's a bad performance.  You have to admit
7   that if you play better -- you wait twenty second
8   before you have a song, it's not good.
9      Q.  Is it accurate to say that the version
10  that's described by this document has been improved
11  by making it faster?
12     A.  For example.
13     Q.  What FairPlay version was it implemented
14  into -- first implemented into?
15     A.  Guesstimate is the first version of
16  Core FP.  Remember Core FP?
17     Q.  Is it implemented into any subsequent
18  versions of Core FP?
19     A.  Yes.
20     Q.  All subsequent versions or particular
21  subsequent versions?
22     A.  All, should be all version.
23     Q.  When you're describing the evolved version
24  or the improved version, is that -- does that
25  correlate to a specific version of Core FP?

195

1      A.  Not that I remember.
2      Q.  Can I direct your attention to page 80,
3   please.  In particular, the section that reads --
4   the section underneath the subheading "Keybag
5   Transpose For iPod."
6          (Witness reviews document.)
7   BY MR. CARPENTER:
8      Q.  Are you ready?
9      A.  Mm-hmm.
10     Q.  Is the reference in this section to the
11  word "Real" a reference to RealNetworks?
12     A.  Should be.
13     Q.  Okay.  Can you read the sentence that
14  begins "This key translation creates"?
15     A.  "This key translation creates a
16         well-known flaw already exploited by
17         Real to DRM their music to be
18         compatible for iPod implementation on
19         FairPlay."
20     Q.  Did you draft this section?
21     A.  Correct.
22     Q.  Okay.  What did you mean by Real could DRM
23  their music?
24     A.  Is the thing we discussed about the
25  injection.

196

1      Q.  Okay.  Does that mean that you're
2   acknowledging that Real could DRM their music to
3   make it compatible or able to be played on an iPod?
4          MR. KIERNAN:  Objection; lacks foundation.
5   Objection; form.
6          THE WITNESS:  We know that on the risk
7   management we have, and we have this flaw, and it
8   was exploited by Real.
9   BY MR. CARPENTER:
10     Q.  Okay.  And when you say the flaw was
11  exploited by Real, did you mean that Real was able
12  to make its music to be played on the iPod?
13     A.  In any way.  Yes, correct.
14     Q.  Okay.  Why would you describe that as a
15  flaw?
16     A.  Because, like I said, if you inject things
17  improperly inside the ecosystem and you do it
18  improperly, the user will have a bad experience.
19     Q.  If the user desired to have its
20  RealNetwork music played on the iPod, wouldn't that
21  be viewed as a positive experience?
22         MR. KIERNAN:  Objection; lacks foundation,
23  calls for speculation, objection to form.
24         THE WITNESS:  As we may have seen that we
25  have customers after that, they are calling us, and

Augustin Farrugia                                December 8, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

201

1  Music purchased from iTunes or music purchased from
2  Real?
3      A.  All the musics.
4      Q.  Okay.
5      A.  All the songs.
6      Q.  How would the music -- how would the music
7  be erased?
8      A.  The music, per se, is not erased; but it
9  does not -- the user doesn't see the music anymore
10  or he going to decrypt corrupt music because the
11  index of the keys is incorrect.
12      Q.  Okay.  What -- at what point in the
13  consumer experience would this problem occur?  When
14  the consumer sunk the iPod with its computer, or
15  when the consumer sunk the iPod with the RealNetwork
16  media player?
17      A.  It would be when the consumer tried to
18  play the music.
19      Q.  Okay.  I'm a little bit confused.  If the
20  consumer tried to play the music on the iPod,
21  wouldn't the -- strike that.
22          Would the iPod -- would the consumer not
23  be able to play its music from the moment it
24  downloaded the RealNetworks song?
25          MR. KIERNAN:  Objection to form; lacks

202

1  foundation.
2          THE WITNESS:  You are confusing me now.
3  BY MR. CARPENTER:
4      Q.  Okay.  What would immediately precede the
5  music being rendered inoperable?  What would the
6  last action the consumer would have taken have been?
7          MR. KIERNAN:  Objection; lacks foundation,
8  calls for speculation.  Objection; form.
9          THE WITNESS:  That will occur when the
10  consumer will sync the content on the iPod.
11          MR. CARPENTER:  I'm sorry.  Can you repeat
12  that.
13          (Record read as follows:
14          "THE WITNESS:  That will occur when the
15              consumer will sync the content on the
16              iPod.")
17  BY MR. CARPENTER:
18      Q.  What content are you referring to?
19      A.  Any content which is not synced with a
20  correct ecosystem.
21          MR. CARPENTER:  Okay.  Set that aside.
22          And can I introduce Exhibit No. 30, I
23  believe, to Mr. Farrugia's deposition, Bates stamped
24  AIIA00802966.
25

203

1          (Whereupon, Deposition Exhibit 30 was
2              marked for identification.)
3  BY MR. CARPENTER:
4      Q.  You ready?
5      A.  Mm-hmm.
6      Q.  Can you describe this document for me?
7      A.  It looks like it's e-mail that I sent Tony
8  Fadell and Guy, October 2006.
9      Q.  Okay.  And you believe this is an e-mail
10  that you sent to Tony Fadell and Guy Bar-Nahum?
11      A.  Mm-hmm.
12      Q.  And would you normally communicate with
13  them through e-mail in the normal course of
14  business?
15      A.  Correct.
16      Q.  Have you ever seen this e-mail before
17  today?
18      A.  Yes, I did.
19      Q.  Aside from when you originally drafted it?
20      A.  Yes, I should.  Yeah.
21      Q.  Can you explain the contents to me or put
22  it in context?
23      A.  It's a confirmation that the change inside
24  the architecture we did for N36 stop all the
25  injections of keys inside the iPod.

204

1      Q.  Can I turn your attention to the second
2  page.
3      A.  Mm-hmm.
4      Q.  Is this -- and can you explain to me what
5  this is?
6      A.  Looks like is a page of a forum from
7  RealNetworks.
8      Q.  Did you send this Web page to the
9  recipients of this e-mail?
10      A.  Probably.
11      Q.  Okay.  Do you recall why you sent this to
12  them?
13      A.  For confirmation about the change on the
14  architecture we did on N36.
15      Q.  Was this e-mail confirming that the
16  RealPlayer could no longer play songs from iTunes?
17      A.  It doesn't confirm that.  It says simply
18  that you cannot transfer.
19      Q.  Does this confirm that -- strike that.
20          Does this confirm that songs purchased
21  from Real could no longer be played on the
22  fifth-generation iPod?
23      A.  As a consequence, maybe.  But I am just
24  confirming the transfer, syncing from player to the
25  iPod.

Augustin Farrugia                              December 8, 2010
         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

205

1       MR. CARPENTER:  Can I have that answer
2   back.
3       (Record read as follows:
4       "ANSWER:  As a consequence, maybe.  But
5       I am just confirming the transfer,
6       syncing from player to the iPod.")
7   BY MR. CARPENTER:
8       Q.  Why would it be important to confirm that?
9       A.  Because the change on the architecture we
10  did is to avoid people putting things on something
11  they don't know.  Right?  The transfer, transferring
12  thing to something they don't understand.
13      Q.  So why would that impact a consumer
14  transferring a file purchased from RealNetwork onto
15  their iPod?
16      A.  This is what the forum says.  I'm just
17  referring what the page says.  It's a transfer.  I'm
18  not speaking the playback.  The transfer.
19          Transfer means that you cannot transfer
20  the content you had on your computer to an iPod
21  fifth generation, which is N36.
22      Q.  And what content are you referring to that
23  could no longer be transferred?  Is it content
24  purchased from Real?
25      A.  I don't know.  I have to read what the

206

1   forum says.
2       (Witness reviews document.)
3       THE WITNESS:  It doesn't say that.  It say
4   that when you try to transfer a track from
5   RealPlayer to the fifth-generation iPod -- right? --
6   you may get an unsupported media type.
7   BY MR. CARPENTER:
8       Q.  Okay.  And why would you receive that
9   error message if you tried to transfer content from
10  the Real media player to your iPod?
11      A.  Because the change on the architecture we
12  did basically avoid that people who doesn't
13  understand properly how to put something on the
14  iPod, they are stopped because we change the
15  architecture.
16      Q.  Isn't it accurate --
17      A.  It was a flaw.
18      Q.  I'm sorry.
19      A.  It was a flaw in the architecture and we
20  fixed.
21      Q.  Okay.  Isn't it accurate, from the
22  consumer standpoint, that they would believe they
23  could no longer play music they purchased on Real on
24  their iPod?
25      MR. KIERNAN:  Objection to form; calls for

207

1   speculation, lacks foundation.
2       THE WITNESS:  I don't know what the
3   consumer going to say here because they are not
4   referring to any things you purchase on Real.  They
5   are saying if you transfer track from RealPlayer,
6   which means the client.  They are not speaking about
7   the purchase or the CD you rip.  They are speaking
8   about the transfer from the RealPlayer, which is a
9   player.
10  BY MR. CARPENTER:
11      Q.  So if you purchased a song from
12  RealNetworks, could you put it on the iPod at that
13  point?
14      A.  I don't know.  I don't know the format of
15  the song.  What I can tell you is if you rip your CD
16  you purchase, you were able to put on the iPod.
17      MR. CARPENTER:  I'm sorry.  Can you repeat
18  that.
19      (Record read as follows:
20      "ANSWER:  I don't know.  I don't know
21      the format of the song.  What I can
22      tell you is if you rip your CD you
23      purchase, you were able to put on the
24      iPod.")
25      THE WITNESS:  The CD you purchase through

208

1   Tower Record, iTunes allow you to rip the CD --
2   right? -- and you would be able to transfer that
3   inside your iPod.
4   BY MR. CARPENTER:
5       Q.  So you couldn't directly purchase the song
6   from RealNetworks and put it on your iPod without
7   ripping it; correct?
8       MR. KIERNAN:  Objection; lacks foundation,
9   calls for speculation.
10      THE WITNESS:  I don't know what was
11  RealNetworks at the time.
12  BY MR. CARPENTER:
13      Q.  But you sent this e-mail that demonstrated
14  that a song could not be transferred directly from
15  Real to the iPod; correct?
16      A.  Correct.
17      Q.  Okay.  So did you take that to understand
18  that at that point in time, you could not purchase a
19  song from Real and put it on the iPod?
20      A.  This is not my understanding.  My
21  understanding is you cannot transfer a song, where
22  ever you purchase it, using RealPlayer.
23      Q.  Okay.  Why would a purchase of a song be
24  any different than the transfer of a song if the
25  purchase of the song also involved the transfer of

# EXHIBIT 12

1   Robert A. Mittelstaedt  #60359
    ramittelstaedt@jonesday.com
2   Craig E. Stewart  #129530
    cestewart@jonesday.com
3   David C. Kiernan #215335
    dkiernan@jonesday.com
4   Michael T. Scott #255282
    michaelscott@jonesday.com
5   JONES DAY
    555 California Street, 26th Floor
6   San Francisco, CA  94104
    Telephone:     (415) 626-3939
7   Facsimile:      (415) 875-5700

8   Attorneys for Defendant
    APPLE INC.

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14   THE APPLE iPOD iTUNES ANTI-TRUST          Lead Case No. C 05-00037 JW (HRL)
     LITIGATION.
15                                             [CLASS ACTION]

16   This Document Relates To

17   ALL ACTIONS                               DECLARATION OF AUGUSTIN
                                               FARRUGIA IN SUPPORT OF
18                                             DEFENDANT'S RENEWED
                                               MOTION FOR SUMMARY
19                                             JUDGMENT

20

21

22

23   I, Augustin Farrugia, declare as follows:

24          1.      I am the Senior Director, DRM Technologies at Apple Inc.  I am the head of

25   Apple's DRM Technologies group and have personal knowledge about Apple's FairPlay Digital

26   Rights Management (DRM) technology and updates thereto after April 11, 2005 when I was hired

27   by Apple.  The facts stated in this declaration are true and based upon my own personal

28   knowledge and, if called to testify to them, I would competently do so.

1    2.    I was hired by Apple in April 2005 to improve FairPlay by making it more secure

2    and less susceptible to hacking. As part of that process, in October 2005 and again in October

3    2006, we changed the architecture of FairPlay. In this declaration, I first provide an overview of

4    how FairPlay worked as of April 2005. I then identify some aspects of FairPlay that were

5    vulnerable to attack by hackers attempting to strip content protection and avoid content usage

6    rules. And finally I described the changes of the architecture in 2005 and 2006 which improved

7    FairPlay and the user experience.

8                                    **How FairPlay Worked in 2005**

9    3.    The following is a general overview of how Apple's FairPlay Digital Rights

10    Management (DRM) scheme operated when I was hired in April 2005. *See generally* Exs. 1, 2.

11    4.    The music received from content providers was stored on servers in a repository

12    maintained by Apple. A mirror of the iTS repository was maintained on the servers of Akamai, a

13    third party that assisted Apple with the delivery of music to iTS users. When a customer

14    purchased music from iTS, the iTunes software delivered the music to the customer's computer.

15    5.    "iTunes" or "iTunes software" refers to Apple's jukebox application. iTunes was

16    a free application available for download at Apple's website. Among other things, iTunes

17    allowed users to import music from CDs, store music on the computer's hard drive, organize and

18    manage music, create playlists, and transfer or burn music to CDs. Customers could purchase

19    music from many sources and manage and play the content using iTunes. iTunes stored and

20    organized music in the iTunes library. iTS was a component of iTunes.

21    6.    iTunes could also be used to transfer music to an iPod. To do so, iTunes "wrote" a

22    database on the iPod that would organize the music (the "iPod music database"). Each time

23    iTunes added songs to an iPod, it would rewrite the database to include the additional songs.

24    7.

25

26

27

28

Farrugia Decl. ISO Defendant's
Renewed Mot. to Dismiss or for Summary Judgment
C 05 00037 JW (HRL), C 06-04457 JW (HRL)



8.

9.

10.

11.     Like most if not all DRM, FairPlay was not immune to attacks or attempts by others to reverse engineer it to figure out the encryption and decryption schemes. That is one of the things that we refer to as "hacking." If a hacker were successful, its program would remove the FairPlay DRM so that usage rules could not be enforced thus allowing the content to be distributed for free to an unlimited number of people.

## Vulnerability Study

12.     After being hired by Apple, I performed a vulnerability and risk analysis of FairPlay. My analysis identified a number of vulnerabilities that had been or could be exploited

1  by hackers. █████████████████████████████████████

2  ███████████  *See, e.g.*, Ex. 3.  The following paragraphs describe some of the security

3  vulnerabilities identified.

4  ███  13.  █████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ██████████████████████████████████  This presented a number of security risks.  Among others, a

7  ████████████████████████cept the song and "download key" before iTunes applied

8  FairPlay, allowing the song to be decrypted and thus converted to DRM-free that then could be

9  shared over the Internet or otherwise without restriction.  This vulnerability was exploited by

10  PyMusique. *See, e.g.*, Exs. 3A-3B.

11  14.  Because iTunes applied FairPlay on the user's desktop, hackers had access to the

12  executable code that applied FairPlay, allowing them to observe the operations and cryptographic

13  computations.  Hackers thus could perform crypto-analysis, static analysis, and other reverse

14  engineering techniques to determine how FairPlay was applied, the locations of keys, how keys

15  were computed, and how to strip FairPlay or, as mentioned above, how to intercept the

16  unprotected song before iTunes applied the FairPlay.

17  15.  Another vulnerability was that the communication protocol between Apple servers

18  and iTunes did not have sufficient authentication protections to ensure that only iTunes could

19  retrieve music and keys from the Apple servers.  These vulnerabilities allowed hacker programs

20  like PyMusique to communicate directly with Apple's servers, request and receive music and

21  "download keys" *before* iTunes applied FairPlay.  As a result, such programs gave users DRM-

22  free iTS music.

23  16.  The "account keys" were also vulnerable to attack when they were downloaded

24  from Apple's servers to iTunes, while stored in the iTunes or iPod keybags, and during playback

25  on a user's computer and iPods.

26  17.  The iTunes keybag was also vulnerable ███████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1

2 ███████████████████████████████████████████ And although the keybag was

3 encrypted, the "account keys" within the local keybag were not. Thus, if a hacker cracked the

4 keybag, it could steal and use the "account keys" to decrypt music.

5      18.    The iPod keybag was also vulnerable to attack. There was a risk of crypto-

6 analysis by a hacker when the keys were exchanged between iTunes keybag and the iPod keybag.

7 To transfer iTS music and associated keys to an iPod, iTunes read the local keybag, extracted the

8 "account keys" for the iTS music, and re-encrypted them using the key protection key. During

9 this process, the "account keys" were a point of attack.

10      19.    I understand that the hacker software programs like Hymn/JHymn exploited the

11 keybag vulnerabilities described in paragraph 17 to find and obtain the "account keys" from the

12 local keybag to decrypt FairPlay-protected music. *See, e.g.*, Exs. 4A-4C. According to Hymn's

13 authors, they accomplished this by "reverse engineering" the key that protected the keybag. *See,*

14 *e.g.*, Ex. 4A.

15      20.    There was no authentication protocol between iTunes and iPods. As a result, non-

16 iTunes jukebox applications could download and manage music (e.g., music from CDs or

17 computer hard drives) on an iPod. This presented a host of problems. In particular, the injection

18 of music (regardless of whether it was DRM protected) by a non-iTunes jukebox could corrupt

19 the iPod music database and thus interfere with the user experience. *See, e.g.*, Ex. 5. This

20 occurred because the applications had to rewrite the iPod music database. The authors of the

21 applications, however, could not have known exactly how the database had to be written, which

22 meant that the applications likely contained bugs that would interfere with playback. I

23 investigated calls from Apple customer support regarding users who had called Apple to

24 complain about their iPods not playing music after using third-party jukeboxes like WinAmp.

25      21.    Third-party jukebox applications also presented a security risk, by serving as a

26 convenient platform to strip content protection. For example, in 2005, WinAmp evidently

27 included a plug-in that supported the hacker program Hymn that stripped FairPlay off music

28 stored on iPods. *See, e.g.*, Ex. 6.

**RealNetworks' Harmony**

22.    RealNetworks' Harmony program exploited the weak protection on the iPod keybag to inject its keys into the iPod keybag. In addition to exploiting a security weakness, Harmony presented additional risks.

23.    To put RealNetworks-protected music on an iPod, Harmony must have rewritten the iPod music database to organize the RealNetworks-protected songs. It also must have cracked open the iPod keybag to store RealNetworks' DRM decryption keys.

24.    Because RealNetworks could not have known the proper way to write the iPod database (the information was not publicly available), it was likely that Harmony, like WinAmp and other third-party jukeboxes, would interfere with the operation of the iPod. *See, e.g.*, Ex. 7. Similarly, it was likely that the foreign DRM keys injected by Harmony would conflict with the legitimate iTS "account keys" used by iPods, preventing iPods from decrypting and playing iTS music. For example, for the iPod to play RealNetworks-protected music, Harmony must have included certain identifiers so that the iPod could find the keys associated with a particular song. If the identifiers used by Harmony were already in use or to be used by an iTS user (e.g., the key ID used by Harmony may have already been in use), the iPod may have been unable to locate the correct "account key" to play a FairPlay-protected song, the RealNetworks-protected song, or both.[1]

**Redesigned FairPlay**

25.    In response to these vulnerabilities described in paragraphs 7-19 above, among other things, I designed a new architecture for FairPlay. The new architecture for FairPlay was

---

[1]    To illustrate this, assume a user has downloaded RealNetworks-protected songs and FairPlay-protected songs to his iPod. When a user selected a FairPlay-protected song for play back, the iPod would attempt to read the rewritten database to locate the FairPlay-protected song; attempt to use the "identifiers" to locate and obtain the appropriate "account key," complete the process of decrypting the "account key," and then use that key to decrypt the FairPlay-protected song. If the music database was not written correctly by Harmony, the iPod would be unable to locate the FairPlay-protected song. Moreover, if the "identifiers" conflicted with the Harmony "identifiers," the iPod would be unable to locate and use the "account keys" to decrypt and playback the FairPlay-protected music.

Farrugia Decl. ISO Defendant's
Renewed Mot. to Dismiss or for Summary Judgment
C 05 00037 JW (HRL), C 06-04457 JW (HRL)

- 6 -

1   developed and released in two stages. The first change was a new architecture for FairPlay on

2   iTunes that coincided with the release of iTunes 6.0 in October 2005. The second was a new

3   architecture for FairPlay on iPods that was shipped only on new iPod products starting with the

4   iPod nano second generation that shipped in October 2006. That is, the new architecture for

5   iPods was not implemented on legacy iPods that had shipped before October 2006.

6                                    **FairPlay Released With iTunes 6.0**

7           26.     The new version of FairPlay released with iTunes 6.0 in October 2005 included a

8   number of features to improve the DRM to protect against hackers that tried to strip the DRM to

9   avoid the content usage rules.

10          27.     Among others, it included a new architecture for FairPlay for iTunes.

11

12

13                                  This removed a point of attack for hackers. In addition to the

14  changes to the architecture, the new version of FairPlay also included protections for the local

15  keybag to make it more difficult to attack.

16          28.     After the introduction of the new FairPlay released with iTunes 6.0, programs like

17  PyMusique and JusteTune could no longer obtain the keys from Apple's servers, and programs

18  like JHymn and its predecessors could no longer locate and obtain the "account keys."

19                                    **FairPlay Released In October 2006**

20          29.     In October 2006, Apple released a new version of FairPlay that, among other

21  things, improved FairPlay to make it less vulnerable to attack and addressed the vulnerabilities

22  and risks presented by (i) third-party applications that rewrote the iPod music database described

23  in paragraphs 20-24; (ii) the iPod/iTunes synchronization of the "account keys" discussed in

24  paragraph 18; and (iii) third-party applications that put foreign DRM keys in the iPod keybag

25  described in paragraphs 20-24 above. As described in more detail above, allowing third-party

26  applications to sync with iPods or place foreign keys or other material in the iPod keybag could

27  cause iPods not to play music.

28

Farrugia Decl. ISO Defendant's
Renewed Mot. to Dismiss or for Summary Judgment
C 05 00037 JW (HRL), C 06-04457 JW (HRL)

30.   First, the new version of FairPlay included an iPod database verification protocol that made sure that only the iTunes jukebox was used to download and manage music on an iPod. In essence, this change prevented non-iTunes jukebox applications from corrupting the iPod music database, because they no longer would be able to rewrite the iPod music database.

31.   The iPod database verification protocol was included in the firmware for only new iPods starting with iPod nano second generation shipped in October 2006. Users with legacy iPods could and can continue to use third-party jukebox applications to download and manage music on their iPods.

32.   Second, the new version of FairPlay added an improved architecture for the iPod keybag that made the keybag more secure against attacks. This change had the effect of preventing the injection of foreign material, including DRM keys, into the keybag. As with the iPod database verification protocol, the new architecture was included only on new iPods starting with the iPod nano second generation shipped in October 2006. Users with older iPods could continue to use third-party applications to inject foreign material, including DRM keys, into the iPod keybag.

### QTFairUse6

33.   In early 2006, a hacker released QTFairUse6, which copied a version of the song stored in temporary memory after QuickTime decrypted the song for playback. *See, e.g.*, Ex. 8. During playback, a decrypted version of the iTS song was saved in temporary memory. This was a vulnerability I identified during my vulnerability and threat analysis in 2005. Apple included an update to FairPlay that was released with iTunes 7.0 to close this hole, which effectively made the version of the song sitting in memory virtually unusable to a hacker.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of January 2011 in Cupertino, California.

_____
Augustin Farrugia

Farrugia Decl. ISO Defendant's
Renewed Mot. to Dismiss or for Summary Judgment
C 05 00037 JW (HRL), C 06-04457 JW (HRL)

- 8 -

EXHIBIT 13

.

| From: | Steve Jobs [sjobs@apple.com] |
|---|---|
| Sent: | Thursday, May 08, 2003 9:34 AM |
| To: | Philip Schiller |
| Cc: | Jeff Robbin; Eddy Cue; Jon Rubinstein |
| Subject: | Re: Music Match |

Right — they will need a DRM in any portable device to satisfy the music companies, and we can simply deny any request to put their DRM in our iPod.

Steve

On Thursday, May 8, 2003, at 09:29 AM, Philip Schiller wrote:

There is nothing in our agreement that denies them the right to put any class of content on an iPod.
But, since we don't know what they are doing it is possible that they have some DRM model and that it would take work on our part to support it on a device (I don't know). If so we can certainly decide not to do that work.

On Thursday, May 8, 2003, at 09:16 AM, Steve Jobs wrote:

> Guys —
>
> We need to make sure that when Music Match launches their download
> music store they cannot use iPod.  Is this going to be an issue?  Do
> they have the rights to use iPod with their own service?
>
> Steve
>
>
>
> Begin forwarded message:
>
>> From: Jon Rubinstein <ruby@apple.com>
>> Date: Wed May 7, 2003  6:24:11  PM US/Pacific
>> To: Phil Schiller <schiller@apple.com>, Steve Jobs <sjobs@apple.com>
>> Subject: Fwd: I think you guys know this
>>
>> We know this and shouldn't be surprised...
>>
>> Begin forwarded message:
>>
>>> From: Brett Bullington <bullington@pacbell.net>
>>> Date: Wed May 7, 2003  1:08:29 PM US/Pacific
>>> To: Jon Rubenstein <ruby@apple.com>
>>> Subject: I think you guys know this
>>>
>>> But at some point, sooner than later, MusicMatch will offer a music
>>> download service.
>>
>

1

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00098417

EXHIBIT 14

David K. Heller - Volume I                                    December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

     THE APPLE IPOD ITUNES          Lead Case No.

 6   ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)

 7   ~~~~~~~~~~~~~~~~~~~~~~~

 8

 9

10       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11

12           VIDEOTAPED 30(b)(6) DEPOSITION OF

13                   DAVID K. HELLER

14                   ON BEHALF OF

15                    APPLE, INC.

16                     VOLUME I

17

18                December 15, 2010

19                    9:16 a.m.

20

21

                 1755 Embarcadero Road

22               Palo Alto, California

23

24       Ana M. Dub, RMR, CRR, CSR 7445

25
```

Page 1

David K. Heller - Volume I                                    December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

**Page 2**

```
 1        APPEARANCES OF COUNSEL
 2
 3   For the Plaintiffs:
 4   ROBBINS GELLER RUDMAN & DOWD LLP
     ALEXANDRA S. BERNAY, ESQ.
 5   PAULA M. ROACH, ESQ.
     655 West Broadway, Suite 1900
 6   San Diego, California  92101
     619.231.1058
 7   xanb@rgrdlaw.com
     proach@rgrdlaw.com
 8
 9
10   For the Defendant Apple, Inc.:
11   JONES DAY
     ROBERT A. MITTELSTAEDT, ESQ.
12   DAVID C. KIERNAN, ESQ.
     555 California Street, 26th Floor
13   San Francisco, California  94104
     415.626.3939
14   ramittelstaedt@jonesday.com
     415.875-5745
15   dkiernan@jonesday.com
16
17
18   Also Present:
19   APPLE, INC.
     LISA OLLE, SENIOR CORPORATE COUNSEL LITIGATION
20   1 Infinite Loop, MS 36-35U
     Cupertino, California  95014
21   408.862.8888
     olle@apple.com
22
23   MATTHEW COPE, VIDEOGRAPHER
24
25
```

---

**Page 3**

```
 1            INDEX OF EXAMINATION
 2
 3   WITNESS:  DAVID K. HELLER
 4   EXAMINATION                      PAGE
 5   By Ms. Bernay                      9
 6   By Mr. Mittelstaedt              257
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1          INDEX TO EXHIBITS
 2
     Exhibit   Description        Page
 3
     Exhibit 32   E-Mail Chain, Top E-Mail .......115
 4               Dated April 23, 2004, to
                 Jeff Robbin from Chris
 5               Bell, Production
                 Nos. Apple_AIIA00092905-06
 6
     Exhibit 33   E-Mail Dated June 22, 2004 .....119
 7               to Jeff Robbin and Dave
                 Heller from Jennifer
 8               Cavaliere, Production
                 No. Apple_AIIA00093441
 9
     Exhibit 34   E-Mail Chain, Top E-Mail .......165
10               Dated July 27, 2004, to
                 Dave Heller from Max
11               Muller, Production
                 Nos. Apple_AIIA00090428
12
     Exhibit 35   E-Mail Chain, Top E-Mail .......169
13               Dated July 19, 2004, to
                 Dave Heller and Tom Dowdy
14               from Roger Pantos,
                 Production No.
15               Apple_AIIA00093332
16   Exhibit 36   E-Mail Chain, Top E-Mail .......178
                 Dated July 28, 2004, from
17               Meriko Borogove from
                 Jennifer Cavaliere,
18               Production No.
                 Apple_AIIA00092916
19
     Exhibit 37   Printout of Source Code, .......182
20               Production Nos.
                 Apple_AIIA00099034-51
21               (Retained by Counsel for
                 Defendant)
22
     Exhibit 38   E-Mail Dated August 11, ........194
23               2004, to Jeff Robbin from
                 Jennifer Cavaliere,
24               Production Nos.
                 Apple_AIIA00928748-52
25
```

---

**Page 5**

```
 1       INDEX TO EXHIBITS - CONTINUED
 2
     Exhibit   Description        Page
 3
     Exhibit 39   E-Mail Dated August 19, ........204
 4               2004 to Jeff Robbin and
                 David Heller from Dave
 5               Heller, Production
                 Nos. Apple_AIIA0090666
 6
     Exhibit 40   E-Mail Dated August 30, ....... 216
 7               2004 to Marc Sinykin et
                 al., from Dave Heller,
 8               Production Nos.
                 Apple_AIIA00090771
 9
     Exhibit 41   E-Mail Chain, Top E-Mail .......220
10               Dated September 3, 2004 to
                 Marc Sinykin from Bud
11               Tribble, Production
                 Nos. Apple_AIIA00092433-35
12
     Exhibit 42   E-Mail Chain, Top E-Mail .......224
13               Dated September 7, 2004, to
                 Jeff Robbin from Jennifer
14               Cavaliere, Production
                 Nos. Apple_AIIA00092918-23
15
     Exhibit 43   E-Mail Dated September 10, .... 227
16               2004 to Patrice Gautier
                 from Dave Heller,
17               Production No.
                 Apple_AIIA00091825
18
     Exhibit 44   E-Mail Dated September 16, .... 230
19               2004 to Grant Erickson from
                 Dave Heller, Production
20               No. Apple_AIIA00090826
21   Exhibit 45   Cloakware Document Entitled ....233
                 "Static Analysis of Binary
22               Executable iTunes 4.7
                 Release Candidate,"
23               Production Nos.
                 Apple_AIIA00093567-78
24
25
```

David K. Heller - Volume I                                                    December 15, 2010

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1  order to purchase content on the iTunes Store, a<br>2  user had to update their iPod firmware?<br>3       MR. MITTELSTAEDT:  And implicitly, you're<br>4  meaning to ask:  And to play that on an iPod?<br>5       MS. BERNAY:  I'm sorry.<br>6  BY MS. BERNAY:<br>7       Q.  And to play that on an iPod.<br>8       Thank you, Bob.<br>9       A.  I -- yeah.  So the -- to answer the first<br>10 part of your question, there's never been a firmware<br>11 update that required you to update your iPod to buy<br>12 content from the store.<br>13      Q.  Okay.<br>14      A.  But to sync content down, I believe that I<br>15 can only recall the one time.<br>16      Q.  Okay.  You had mentioned there were a<br>17 number of file formats that that first generation of<br>18 iPods could play.  Do you recall that --<br>19      A.  Yes.<br>20      Q.  -- testimony?<br>21      Do you know whether you could buy online<br>22 music from sources before the iTunes Music Store was<br>23 launched and play them on your iPod?<br>24      MR. MITTELSTAEDT:  Object; scope.<br>25      THE WITNESS:  If those -- if those sources<br><div align="right">Page 46</div> | 1  were offering up standard MP3 or WAV or AIFF files,<br>2  those should have played on the pod just fine.<br>3  BY MS. BERNAY:<br>4       Q.  Okay.<br>5       A.  I'm not aware of specific examples of such<br>6  services.<br>7       Q.  Do you know whether iTunes, the Desktop<br>8  Client, worked with any other media players prior to<br>9  the launch of the iTunes Store?<br>10      MR. MITTELSTAEDT:  Objection; scope.<br>11      THE WITNESS:  What do you mean by "media<br>12 player"?<br>13 BY MS. BERNAY:<br>14      Q.  For example, a Zune or other device, a<br>15 non-iPod device.<br>16      A.  iTunes had support for several specific<br>17 third-party devices in iTunes prior to the launch of<br>18 the Store.<br>19      Q.  Do you know if iTunes had support for<br>20 other devices after the launch of the iTunes Store?<br>21      A.  Yes, we did.<br>22      Q.  What other devices?<br>23      A.  It's the same set as before the Store.<br>24      Q.  So I think one of the devices that<br>25 provided support -- or that iTunes provided support<br><div align="right">Page 47</div> |
| 1  for was the Rio One.  Are you familiar with that<br>2  device?<br>3       MR. MITTELSTAEDT:  Objection; scope.  Can<br>4  I have a continuing objection to this line on scope?<br>5       MS. BERNAY:  Sure.<br>6       MR. MITTELSTAEDT:  Thank you.<br>7       THE WITNESS:  The Rio One was one of the<br>8  devices we added support for.<br>9  BY MS. BERNAY:<br>10      Q.  And it's your testimony that the Rio One<br>11 could still play -- could it purchase -- I'm sorry.<br>12      Could a user of a Rio One, after the<br>13 launch of the iTunes Store, purchase content from<br>14 the iTunes Store and play it on the Rio One after<br>15 the launch of the iTunes Store?<br>16      A.  To the best of my knowledge, the Rio One<br>17 did not support our protected format and that<br>18 content would not play.<br>19      Q.  Okay.  When the iTunes Store was launched,<br>20 it was only Mac compatible; is that right?<br>21      A.  Yes.<br>22      Q.  And do you know about when the iTunes<br>23 for -- iTunes Store for Windows was launched?<br>24      A.  iTunes for Windows itself, which had the<br>25 support for the Store, was launched, I believe, in<br><div align="right">Page 48</div> | 1  October of 2003.<br>2       Q.  Prior to October of 2003, there was -- is<br>3  it right that there wasn't a desktop media player<br>4  iTunes version that was available for Windows?<br>5       MR. MITTELSTAEDT:  Objection; scope.<br>6       THE WITNESS:  Apple did not offer iTunes<br>7  on the Windows platform prior to the first -- that<br>8  first version of iTunes for Windows.<br>9  BY MS. BERNAY:<br>10      Q.  Okay.  Thank you.<br>11      Prior to the launch in October 2003 of the<br>12 iTunes -- is it right to say client for Windows or<br>13 the iTunes program?<br>14      A.  iTunes application for Windows.<br>15      Q.  Thank you.<br>16      Was there something for Windows that was<br>17 compatible with an iPod prior to that time?<br>18      A.  Apple had an arrangement with Musicmatch<br>19 to do support within Musicmatch for putting files<br>20 onto an iPod.  I don't recall when that arrangement<br>21 began, but that was a Windows solution for using<br>22 Windows with an iPod.<br>23      Q.  So another topic -- and we've sort of been<br>24 talking about all these things because they do<br>25 overlap -- was the general overview of how updates<br><div align="right">Page 49</div> |

<div align="right">13 (Pages 46 to 49)</div>

DAVID HELLER                                      December 15, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

85

1    Q.  And they sold music to consumers?
2    A.  I believe so, yes.
3    Q.  And RealNetworks was a competitor of
4  Apple's?
5        MR. MITTELSTAEDT:  Objection; beyond the
6  scope.
7        THE WITNESS:  I don't -- I'm not involved
8  in marketing or --
9  BY MS. BERNAY:
10   Q.  Sure.
11   A.  -- or identifying competitors of Apple.
12   Q.  But you understand that the RealNetworks
13 store competed with the iTunes Store, just generally
14 speaking?
15       MR. MITTELSTAEDT:  Objection;
16 argumentative, beyond the scope.
17       THE WITNESS:  I -- I don't -- I don't know
18 that I know enough to say that that's true.
19 BY MS. BERNAY:
20   Q.  Okay.  Are you aware that in 2004
21 RealNetworks claimed that this Harmony technology
22 would allow music that you bought at the
23 RealNetworks store to be played on an iPod?
24   A.  I have seen the press release that
25 RealNetworks put out.

86

1    Q.  And is that something that you did
2  anything about?
3    A.  Can you clarify that?
4    Q.  What did the iTunes Team do in response to
5  that?
6        MR. MITTELSTAEDT:  Objection; assumes
7  facts not in evidence.
8        THE WITNESS:  As far as I know, we did
9  nothing to do anything about Harmony.
10 BY MS. BERNAY:
11   Q.  Did you investigate or look at the Harmony
12 software at any time?
13   A.  We did, yes.
14   Q.  Okay.  And why did you do that?
15   A.  We were looking to see what they were
16 doing to get their protected songs onto the iPod and
17 why the iPod would be able to play them.
18   Q.  Why did you do that?
19   A.  We wanted to see if this was a
20 DRM-circumvention hack.
21   Q.  And why would that be something that your
22 team would care about?
23   A.  Because we have contracts with the record
24 labels that required us to make sure that usage
25 rights were enforced for our content.

87

1    Q.  You said that they were mimicking Apple's
2  DRM system.
3    A.  They were encrypting the files the same
4  way that FairPlay does.
5    Q.  So how would that be a problem or a
6  circumvention?
7    A.  The -- in addition to the FairPlay aspect
8  of it, they also had to write the iPod database to
9  the device.
10       The database is the -- is the point where
11 iPod determines what files are or are not on the
12 device.  It also determines potentially what the
13 usage rules are for a file in that database.
14       And historically, apps other than iTunes
15 that wrote the database have bugs.  They do not
16 write the database completely correctly, and these
17 have caused problems for us.
18   Q.  What problems?
19   A.  Crashing iTunes.
20   Q.  What other problems?
21   A.  Crashing the iPod.
22   Q.  Any other problems?
23   A.  Loss of customer data.  Inability to
24 function correctly for files that are on the iPod.
25   Q.  And do you know whether, in fact, music

88

1  purchased from RealNetworks Harmony did anything to
2  the iPod database that caused any of the problems
3  that you just referred to?
4        MR. MITTELSTAEDT:  Objection; beyond the
5  scope.
6        THE WITNESS:  The -- RealNetworks did not
7  write a completely correct database that would cause
8  loss of functionality in the iTunes application.
9  BY MS. BERNAY:
10   Q.  What was not completely correct about it?
11   A.  They --
12       MR. MITTELSTAEDT:  Objection; beyond the
13 scope.
14       THE WITNESS:  They neglected to preserve
15 the song ID attributes and the artist and playlist
16 ID attributes, the songs purchased from the iTunes
17 Store.  The RealNetworks Harmony database neglected
18 to preserve what we called the DRM versions field of
19 the database, as well as neglecting to preserve a
20 lot of the iTunes UI aspects of the database.
21 BY MS. BERNAY:
22   Q.  Which iTunes UI of the database did it
23 neglect to preserve?
24   A.  The -- if a customer had gone through
25 their playlist on the iPod and set up custom views,

DAVID HELLER                                          December 15, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

125

1    here is:
2         "Transcoding to iPod."
3         Do you see that?
4    A.  Yes.
5    Q.  What is that?
6    A.  That is --
7         MR. MITTELSTAEDT:  Beyond the scope.
8         THE WITNESS:  That is a feature whereby
9    higher bit rate songs that are in your iTunes
10   library would be automatically converted to lower
11   bit rates when copying to the iPod so that you can
12   get more songs on an iPod.
13   BY MS. BERNAY:
14   Q.  There's a reference to something called
15   Q61.  Do you see that?
16   A.  Yes.
17   Q.  And what is that?
18        MR. MITTELSTAEDT:  Objection; beyond the
19   scope.
20        THE WITNESS:  Q61.  So Q61 was the AirPort
21   Express.  And this is what we today call AirPlay but
22   back then we called AirTunes audio playback.
23   BY MS. BERNAY:
24   Q.  And there's:
25        "Q98 Support."

126

1         And that's a -- it says:
2         "(New iPod.)"
3         Do you see that?
4    A.  Yes.
5    Q.  And is that the photo iPod?
6    A.  No.  The color iPod --
7    Q.  Oh, I'm sorry.  Thank you.
8    A.  -- is that.
9         Q98 is the iPod shuffle.  It's the first
10   iPod shuffle.
11   Q.  Okay.  And you mentioned that that was --
12   there was a specific iTunes update to deal just with
13   the iTunes shuffle earlier.
14   A.  Yes.  iTunes 4.7.1.
15        MS. BERNAY:  Put that to the side, please.
16        The next document was previously marked as
17   Exhibit 15.  It's a single-page document
18   Bates-stamped Apple_AIIA00090427.
19        If you could take a moment to review that,
20   please.
21        MR. MITTELSTAEDT:  15, did you say?
22        MS. BERNAY:  It was previously Exhibit 15.
23        (Witness reviews document.)
24        THE WITNESS:  Okay.
25

127

1    BY MS. BERNAY:
2    Q.  You've had a chance to look at the
3    Exhibit 15?
4    A.  Yes.
5    Q.  And I think when we talked earlier today,
6    you said you had looked at a number of documents,
7    some of which had refreshed your recollection.
8         Is this one of those documents?
9    A.  Yes.
10   Q.  And what is Exhibit 15?
11   A.  Exhibit 15 is an e-mail I sent to Jeff
12   Robbin and others around what we discovered when we
13   first looked at Harmony.
14   Q.  And the bottom e-mail there is something
15   from Mr. Robbin.  Do you see that?
16   A.  Yes.
17   Q.  And it says:
18        "Hi guys:  I don't have a PC here,
19        but harmony appears to be
20        downloadable from . . . ."
21        And he lists the Web site.  He notes:
22        "I'm available on my cell phone at
23        any time."
24        Did I read that accurately?
25   A.  Yes.

128

1    Q.  And did you perceive this e-mail from
2    Mr. Robbin as a request to do a technical evaluation
3    of the -- of Harmony?
4    A.  I believe this was a request, yes, for us
5    to go look at Harmony.
6    Q.  And why would Mr. Robbin have asked you to
7    do that?
8         MR. MITTELSTAEDT:  Object; beyond the
9    scope, calls for speculation, lack of foundation.
10        THE WITNESS:  Well, he is my boss.  And
11   the -- time that these hacks come out, usually
12   it's his direction for us to go and look at
13   particular ones rather than for us to discover on
14   our own what was going on.
15   BY MS. BERNAY:
16   Q.  So you said "the time that these hacks
17   come out"?
18   A.  Yes.
19   Q.  So at this time, you believe that Harmony
20   was a hack?
21   A.  Yes.
22   Q.  And it notes here that:
23        ". . . harmony appears to be
24        downloadable . . . ."
25        Is this -- is it accurate that you had

DAVID HELLER                                    December 15, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

129

1  discussed with Mr. Robbin or others Harmony prior to
2  its release?
3      MR. MITTELSTAEDT:  Object; argumentative.
4      THE WITNESS:  It -- I don't recall.  It
5  probably was discussed around the fact that the
6  Harmony had a press release around the product, and
7  he's telling us here that it looks like it's
8  actually available for download now.
9  BY MS. BERNAY:
10     Q.  Do you know whether, in fact, you spoke to
11 anyone at Apple prior to the release of Harmony
12 about what it would be able to do before it was
13 released?
14     A.  I wasn't aware of it before it was
15 released.
16     Q.  What about when the press release came
17 out?  Is that when you first became aware of it?
18     A.  I can't say it was the same day as the
19 press release.
20     Q.  Okay.  Fair enough.
21     And it's from you and -- well, it's been
22 signed at the bottom there "The 'Dave & Tom' Show."
23 Do you see that?
24     A.  (Witness nods head.)
25     Q.  And that's you and Mr. Dowdy; is that

130

1  correct?
2      A.  Yes.
3      Q.  And you worked together to take a look at
4  Harmony; is that right?
5      A.  Yes.
6      Q.  And do you have a specific or general
7  recollection regarding actually taking a look at
8  Harmony?
9      MR. MITTELSTAEDT:  Objection; compound.
10     THE WITNESS:  I vaguely recall doing that
11 and composing this e-mail.
12 BY MS. BERNAY:
13     Q.  What did you do?
14     A.  Pretty much what I needed to do to come up
15 with these items, which was install the Harmony
16 software, get a Harmony store count -- whatever the
17 term is -- download a song, take that song and use
18 the Harmony software to put it on an iPod, and then
19 go look at the database and the keybag files that
20 were put onto the device by the Harmony software to
21 see what they -- what was being put in there, as
22 well as look at the validity of the files in iTunes.
23     Q.  And is this something that you did at the
24 office?
25     A.  Yes.

131

1      Q.  And I assume you have access to various
2  computers and iPods at your office; is that
3  accurate?
4      MR. MITTELSTAEDT:  Objection;
5  argumentative.
6      THE WITNESS:  Yes, I do have access to
7  several iPods.
8  BY MS. BERNAY:
9      Q.  Okay.  And so you note here that you took
10 a look at Harmony, and then you have:
11     "Here is what we found."
12     And then you have a list of 12 items; is
13 that right?
14     A.  Yes.
15     Q.  Do you know whether there was anything
16 that you discovered when looking at Harmony that you
17 did not include in this list?
18     A.  I don't recall.
19     Q.  Okay.  So the first thing here that you
20 note is:
21     "Downloaded song is 192kbps AAC."
22     Do you see that?
23     A.  Yes.
24     Q.  What is that 192kpb -- bps AAC?
25     A.  It means 192 kilobits per second, which is

132

1  a measurement of the audio bit rate and quality for
2  an AAC audio file.
3      Q.  Do you know what the audio bit rate was at
4  this time for music that was purchased from the
5  iTunes Store?
6      A.  It was 128 kbps.
7      Q.  And is it accurate that generally
8  speaking, the 192 kbps is a better quality of audio
9  than the 128 kbps?
10     MR. MITTELSTAEDT:  Objection; beyond the
11 scope --
12     THE WITNESS:  If --
13     MR. MITTELSTAEDT:  -- lack of foundation.
14     THE WITNESS:  If the files are created
15 with the same encoder, 192 should be better.  But to
16 say that a file that's 192 is always better than 128
17 is not an accurate statement.
18 BY MS. BERNAY:
19     Q.  And why is that not an accurate statement?
20     MR. MITTELSTAEDT:  Same objection.
21     THE WITNESS:  The quality of the encoder
22 and the techniques used by the particular encoding
23 software is -- is very germane to the resulting
24 file's quality.
25

DAVID HELLER                                    December 15, 2010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

133

```
 1   BY MS. BERNAY:
 2       Q.  At some point did music at the iTunes
 3   Store -- I'm sorry.
 4           At some point was music sold through the
 5   iTunes Store sold at a rate higher or different than
 6   this 128 kbps?
 7           MR. MITTELSTAEDT:  Objection; beyond the
 8   scope.
 9           THE WITNESS:  Most songs we offer in the
10   iTunes Store today are 256 kbps.
11   BY MS. BERNAY:
12       Q.  What about in 2007?  What was the kbps
13   rate that was sold on music at the iTunes Store?
14           MR. MITTELSTAEDT:  Objection; beyond the
15   scope.
16           THE WITNESS:  I do not recall when we
17   started offering the higher bit rate songs.
18   BY MS. BERNAY:
19       Q.  What -- after -- what was the first
20   upgrade or increase in kbps rates of music that was
21   sold through the iTunes Store?
22           MR. MITTELSTAEDT:  Objection; beyond the
23   scope.
24           THE WITNESS:  I'm sorry.  When you say
25   "what was"?
```

134

```
 1   BY MS. BERNAY:
 2       Q.  In 2004, is it accurate that music sold
 3   through the iTunes Store was at 128 kbps?
 4           MR. MITTELSTAEDT:  Objection; beyond the
 5   scope.
 6           THE WITNESS:  It would have all been 128,
 7   yes.
 8   BY MS. BERNAY:
 9       Q.  And then at some point in time did that
10   number increase to another number?
11           MR. MITTELSTAEDT:  Same objection.
12           THE WITNESS:  Apple started offering music
13   available at 256 in most cases.  There are still
14   places where it's still 128.
15   BY MS. BERNAY:
16       Q.  So I guess I'm asking if there was any
17   intermediate step between 128 and 256.
18           MR. MITTELSTAEDT:  Objection; beyond the
19   scope.
20           THE WITNESS:  There was not.
21   BY MS. BERNAY:
22       Q.  Okay.  Are you familiar with a thing
23   called iTunes Plus?
24       A.  Yes.
25       Q.  What is that?
```

135

```
 1       A.  iTunes Plus was the customer-facing name
 2   for the new content being offered at 256 kbps
 3   unencrypted.
 4       Q.  Unencrypted?
 5       A.  Yes.
 6       Q.  Thank you.
 7           The second item on your list here is:
 8           "Harmony will transfer to iPod,
 9   writing a valid v3 keybag and iPod
10   DB."
11           Do you see that?
12       A.  Yes.
13       Q.  And we've talked a little bit about this
14   v3 keybag.  Can you explain what you meant here when
15   it notes that Harmony will transfer to iPod, writing
16   a valid v3 keybag?
17       A.  The keybag that it was writing, at the
18   time there was -- the two options on an iPod were a
19   v1 encrypted keybag and a v3 encrypted keybag.
20           And so what Harmony was doing at the time
21   was writing a v3, a Version 3, encrypted keybag.
22       Q.  And then it says:
23           ". . . and iPod DB."
24           What does that mean?
25       A.  The keybag only contains DRM keys, but if
```

136

```
 1   you're going to put a song on the iPod that you want
 2   to actually play, it must also be in the iPod
 3   database.
 4       Q.  And what did you mean by "a valid v3
 5   keybag and iPod DB"?
 6       A.  It means that as far as the iPod was
 7   concerned, it met enough criteria so that the iPod
 8   would actually play the song.
 9       Q.  Do you know why this was the case, that it
10   wrote a valid v3 keybag and iPod DB?
11           MR. MITTELSTAEDT:  Objection; beyond the
12   scope.
13           THE WITNESS:  I'm sorry.  I don't
14   understand.
15   BY MS. BERNAY:
16       Q.  Does it indicate, when you were doing this
17   analysis, that Harmony was not actually
18   circumventing iTunes' security because it actually
19   wrote a valid v3 keybag and iPod DB?
20       A.  Well, in order for a song to play at all
21   it must be in the database.
22           The security -- this is the first time
23   that a key was being added to a keybag, as far as we
24   knew, from any third-party thing.  And the -- by
25   doing that, it did present possible problems with
```

DAVID HELLER                                    December 15, 2010
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

137

1  our ability to enforce our account limits and things
2  like that.  But the encryption was correct, meaning
3  the iPod could decrypt it.
4      Q.  The next thing there is:
5          "Harmony will also transfer
6      authorized iTMS songs to the iPod."
7      Do you see that?
8      A.  Yes.
9      Q.  What does that mean there?
10     A.  If I recall correctly, it means that
11 Harmony was also taking iTunes songs that were in
12 the Harmony program and copying them to the iPod, as
13 well as moving keys from the desktop key database to
14 the iPod keybag.
15     Q.  And what does "authorized" mean here in
16 this context?
17     A.  Songs for which you have the playback key
18 on the computer.
19     Q.  That you perhaps legally purchased through
20 the iTunes Music Store?
21     A.  Not just that.  You could have legally
22 purchased songs on the computer but the computer's
23 not authorized as one of your five.
24     Q.  Thank you.
25         The next one there is:

138

1          "Harmony will not let you burn
2      authorized iTunes Music Store" --
3      well, it says "iTMS songs."
4      Do you see that?
5      A.  Yes.
6      Q.  And can you explain to me what that means?
7      A.  Harmony had the ability to burn songs to a
8  CD.  And the -- for whatever reason, it did not let
9  you actually do it to an iTunes Music Store song.
10     Q.  Did you investigate that issue further?
11     A.  No.
12     Q.  Do you have any understanding as to why
13 that may have been the case, that it wouldn't let
14 you burn authorized iTunes Music Store songs?
15     A.  I don't have an understanding as to why
16 that was the case.
17     Q.  Okay.  The next item is:
18         "Harmony appears to be using a
19      'random' user ID in the keybag/sinf."
20      Do you see that?
21     A.  Yes.
22     Q.  And can you tell me, first of all, what
23 this keybag/SInf is?
24     A.  So when you buy a song from the iTunes
25 Store, there's an account ID associated with it.

139

1          That account ID is stored in the song in
2  an area we call the SInf, the secure information
3  atom.  And that's used to match up the key in the
4  keybag later when you want to actually decrypt it.
5          And so the ID being used by Harmony, at
6  the time I wrote this, I thought was random.  It did
7  not look like something that would be in our
8  customer ID space.  But I later determined it wasn't
9  random and it was just a constant number.
10     Q.  So you thought at first that it was random
11 in that it wasn't necessarily the user ID that was
12 linked with a given iPod -- I'm sorry -- iTunes
13 account holder's account?
14     A.  It looked to be a number much larger than
15 I would normally associate with an iTunes Store
16 account.
17     Q.  Are iTunes Store accounts a set number of
18 letters and digits?
19     A.  At the time, it was my understanding that
20 they tended to be in a set range.  That turned out
21 not to be true.  They've actually been a larger
22 range.  And it's definitely not true today.
23     Q.  Okay.  And you said you later found out
24 that it wasn't a random user ID.  And I'm sorry.
25 You said it wound up being what?

140

1      A.  A constant number.
2      Q.  And was this constant number the same --
3  how did you determine that?
4      A.  Using a second Harmony account to buy a
5  second song from the Harmony store.  The ID that was
6  used to put that second song on from a different
7  Harmony account was actually this exact same number.
8      Q.  And that led you to believe, then, that it
9  was not random?
10     A.  Correct.
11     Q.  So you, at some point in time, activated
12 another Harmony account and downloaded another song?
13     A.  I don't recall how we arrived at the
14 second account.  I don't know if this was -- to be
15 honest, if this was somebody sending me the database
16 from what they did or if we did a second account.
17     Q.  Do you know why that second account was
18 created, though?  Was it to determine what you have
19 here, this Item 5?
20     A.  I don't know.
21     MR. MITTELSTAEDT:  Objection; compound.
22 BY MS. BERNAY:
23     Q.  Okay.  Number 6 here says:
24         "Harmony is also filling in the
25      vendor ID field with some (large)

# EXHIBIT 15

**From:** Steve Jobs
**Sent:** Wednesday, March 12, 2003 11:25:28 PM
**To:** et@group.apple.com; Jeff Robbin; Tony Fadell
**Subject:** Media2Go and iPod market share


Notice the iPod market share stats:

Apple would have as a starting point success in the portable music
player market, where iPod is a leader in retail sales. During the
fourth quarter, Apple's dollar market share reached 27 percent compared
with about 10 percent for second-ranked Rio, according to NPDTechworld.
In terms of unit sales, Apple captured 11.2 percent market share,
following closely behind Rio at 11.3 percent and top-ranked RCA at 13
percent.



Steve



Media2Go team gets Creative

By Joe Wilcox
Staff Writer, CNET News.com
March 13, 2003, 4:00 AM PT

Microsoft on Thursday added Creative Technologies to its coffer of
manufacturers developing Media2Go portable devices capable of playing
digital video and music.

Microsoft made the Creative Media2Go announcement at CeBit 2003 in
Hannover, Germany.

Creative will join iRiver, Samsung, Sanyo and ViewSonic, which also
plan to develop Media2Go devices. But Creative's success in delivering
PC audio and video technologies makes the company's support potentially
the biggest endorsement to date for Media2Go, say analysts.

"Creative has done a great job over the years in terms of trying to
turn some of those portable technologies into great products," said
Stephen Baker, analyst at market research firm NPDTechworld. "They've
always had a great design flare, and they have strong technology areas

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01278671

such as sound and graphics they can bring to bear as well."

Brian Riseland, product manager for Microsoft's Embedded and Appliance
Platforms group, also regarded Creative as a big-win manufacturer for
Microsoft. "We're really excited because they're the largest
manufacturer of hard disk drive-based audio players," he said. "They're
going to market with a Media2Go device for the holidays."

Still, Creative is not a retail leader in portable audio devices,
mainly "because their stuff is pretty expensive compared to some of the
other players," Baker said. Most portable music players are sold at
retail.

During the fourth quarter, Creative ranked five in retail portable
music player sales, as measured in dollars, with nearly 8.1 percent
market share, according to NPDTechworld. In terms of unit sales,
Creative ranked sixth, with 7.2 percent market share.

Redmond, Wash.-based Microsoft unveiled Media2Go , which runs the
upcoming "McKendric" version of the Windows CE .Net operating system,
during the Consumer Electronics Show in January. Built around a hard
drive, as are Apple Computer's iPod or Creative's Nomad , Media2Go will
be capable of storing or playing back digital video, music or photos.

The devices will be capable of playing Windows Media Audio or MP3 audio
files and Windows Media Video and MPEG 4 video files. Support for
Windows Media 9 Series and MPEG 4 means the devices can play back
fairly high-quality video at lower file sizes than that available with
other formats, such as MPEG-2.

Manufacturers optionally will be able to add support for other audio
and video formats, such as Apple's QuickTime or RealNetwork's Real
Audio, according to Microsoft.

Media2Go devices can play about 175 hours of VHS-quality video or 8,000
songs stored in Windows Media format. Battery life is expected to be
about six hours.

Riseland would not discuss an official launch date for Media2Go devices
or pricing, although Microsoft has set a target of holiday availability.

Media2Go or no go?
As Microsoft and its hardware partners prep their Media2Go devices,
Apple looms as a potentially threatening competitor, say analysts. The
Cupertino, Calif.-based company reportedly has been testing several
iterations of a portable video device that would build on the success

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01278672

of iPod . Like Media2Go, Apple's portable video devices, if ever brought to market, would be built around a hard drive.

Apple would have as a starting point success in the portable music player market, where iPod is a leader in retail sales. During the fourth quarter, Apple's dollar market share reached 27 percent compared with about 10 percent for second-ranked Rio, according to NPDTechworld. In terms of unit sales, Apple captured 11.2 percent market share, following closely behind Rio at 11.3 percent and top-ranked RCA at 13 percent.

Still, Baker remained skeptical the portable video player category would take off anytime soon. For one thing, "it usually takes a few iterations to get this kind of thing right," he said. "This was certainly the case with music players."

Using the limited demand for computer DVD burners and other video technologies as a gauge, Baker concluded "the demand is quite small" for a portable video player.

But Riseland disagreed. In testing, "the technology really resonates with consumers, because they see it as a natural extension of the audio devices they have today," he said. "A lot of people already do video on their PCs, so they can take it with them."

The software giant, in fact, already is laying the groundwork for portable video. In January, Microsoft started selling Plus Digital Media Edition , an add-on pack to Windows XP. One of the features lets consumers sync content with Pocket PC handhelds and cell phones, including audio and video from Web sites.

Microsoft sees Media2Go's larger appeal as helping people reduce the number of portable devices they might carry. "They can now have one device that will tackle both audio and video, and pictures if they like," Riseland said.

More important, the company is betting that public transit commuters would be interested in a video device for playing recorded TV shows. For this reason, Microsoft is working on technology for synchronizing Media2Go devices with PCs running Windows XP Media Center Edition .

Windows Media Center PCs, which are capable of recording TV shows to the hard drive, offer a second user interface for accessing the operating system's digital media features. Media2Go devices will use the same interface.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01278673

"Media2Go would be a great companion to Media Center, because it would give you portable access to that digital media," Riseland said. "We're hard at work on how to make that a consumer experience."

The second version of Windows Media Center, code-named Harmony , is in the first round of beta testing. Microsoft is expected to release Harmony in the third quarter.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01278674