# EXHIBIT 21

Subject: A specific idea on working together
Date: Fri, 09 Apr 2004 18:01:26 -0700
From: "Rob Glaser" <robg@real.com>
To: <sjobs@apple.com>
Message-ID: <5.1.0.14.2.20040409175021.023ba370@mailonc.real.com>

---

Steve --

Hope all is well. I'm writing regarding a very specific and concrete idea
for working together.

As you know, Real today supports AAC as our main codec for ripping, for
DRM, and for store content.

We are seeing very interesting opportunities to switch to
WMA. Instinctively I don't want to do it because I think it leads to all
kinds of complexities in terms of giving Microsoft too much long-term
market momentum. However, given that we today can't send secure content
to the iPod, the emerging consensus at our company is that we should switch.

Before we switch, I am reaching out to you to see if there is a way we can
put together a smart tactical deal between Real and Apple. My idea is
simple: You would license us access to fairplay on the iPod, and we would
make the iPod our primary/preferred device for our Store and for the
RealPlayer.

We would be happy to make a big PR deal about this, talk about the iPod's
leadership, etc. I would also be willing to eat my words about future
market share dynamics.

If this is of interest let me know. I will be in the valley next Thursday
(4/15) and would be happy to meet with you or Shiller or Rubenstein or
whoever you want, but I figured rather before spending a lot of time on the
details I should make the proposal directly to you.

If you want to discuss please give me a call at 206.755.5196

Best,

Rob

---

------ end message ------

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01385106

EXHIBIT 22

STEVE JOBS - Volume I                                  April 12, 2011
CONFIDENTIAL - ATTORNEYS' EYES ONLY

---

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

THE APPLE iPOD iTUNES          Lead Case No.
ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)
------------------------

VIDEOTAPED DEPOSITION OF
STEVE JOBS
VOLUME I

April 12, 2011
10:03 a.m.

1 Infinite Loop
Cupertino, California

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Ana M. Dub, RMR, CRR, CSR 7445

---

**Page 3**

INDEX OF EXAMINATION

WITNESS: STEVE JOBS
EXAMINATION                    PAGE
By Ms. Sweeney                  7

---

**Page 2**

APPEARANCES OF COUNSEL

For the Direct Purchaser Plaintiffs:
ROBBINS GELLER RUDMAN & DOWD LLP
BONNY E. SWEENEY, ESQ.
ALEXANDRA S. BERNAY, ESQ.
CARMEN A. MEDICI, ESQ.
655 West Broadway, Suite 1900
San Diego, California 92101
619.231.1058
bsweeney@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

For the Indirect Purchaser Plaintiffs:
ZELDES & HAEGGQUIST, LLP
AARON M. OLSEN, ESQ.
625 Broadway, Suite 905
San Diego, California 92101
619.342.8000
aaron@zhlaw.com

For the Defendant Apple, Inc., and the Deponent:
O'MELVENY & MYERS LLP
GEORGE A. RILEY, ESQ.
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
415.984.8700
griley@omm.com

Also Present:
MATTHEW COPE, VIDEOGRAPHER

---

**Page 4**

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | E-mail Chain, Top E-mail Dated July 23, 2004 to Jeff Robbin from Eddy Cue, Production Nos. Apple_AIIA 00090405-07 | 9 |
| Exhibit 2 | E-mail Dated July 24, 2004 to Eddy Cue, et al., from Katie Cotton, Production No. Apple_AIIA01384973 | 14 |
| Exhibit 3 | E-mail Chain, Top E-mail Dated July 25, 2004 to Philip Schiller from Eddy Cue, Production Nos. Apple_AIIA 00090429-31 | 14 |
| Exhibit 4 | E-mail Chain, Top E-mail Dated July 26, 2004 to Philip Schiller, et al., from Steve Jobs, Production Nos. Apple_AIIA 00050875-76 | 25 |
| Exhibit 5 | E-mail Chain, Top E-mail Dated July 26, 2004 to Steve Jobs from Zach Horowitz, Production Nos. Apple_AIIA 01384975-76 | 27 |
| Exhibit 6 | July 29, 2004 Press Release | 32 |
| Exhibit 7 | CNETNews.com Article | 28 |
| Exhibit 8 | The Wall Street Journal Article | 43 |
| Exhibit 9 | Chicago Tribune Binary Beat Column | 6 |
| Exhibit 10 | Redacted E-mail Chain, Top E-mail Dated August 17, 2004, Production Nos. Apple_AIIA 00920838-43 | 52 |

STEVE JOBS - Volume I                                              April 12, 2011
CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | 21 |
|---|---|

| 10:24:26 | 1 | A. I don't remember -- I remember maybe |
|---|---|---|
| 10:24:28 | 2 | reading some press articles where they might say |
| 10:24:31 | 3 | that. They never said that to us. |
| 10:24:40 | 4 | Q. If you could turn to the second page of |
| 10:24:42 | 5 | Exhibit 3, about two-thirds of the way down the page |
| 10:24:51 | 6 | it says: |
| 10:24:53 | 7 | "In April, Apple chairman |
| 10:24:55 | 8 | Steve Jobs" -- |
| 10:24:56 | 9 | A. I'm sorry. Exhibit 3? |
| 10:24:58 | 10 | Q. Yeah. |
| 10:24:59 | 11 | Okay. On page what? |
| 10:25:01 | 12 | Q. Page 2. |
| 10:25:01 | 13 | A. Okay. Sorry. Yeah. Yeah. |
| 10:25:05 | 14 | Q. It's about two-thirds of the way down the |
| 10:25:06 | 15 | page. It says: |
| 10:25:07 | 16 | "In April, Apple chairman |
| 10:25:09 | 17 | Steve Jobs rebuffed Glaser's |
| 10:25:12 | 18 | request for a meeting to discuss |
| 10:25:13 | 19 | an alliance between the |
| 10:25:14 | 20 | companies . . . ." |
| 10:25:16 | 21 | Do you see that? |
| 10:25:17 | 22 | A. Mm-hmm. |
| 10:25:19 | 23 | Q. Did you rebuff a request from Mr. Glaser |
| 10:25:23 | 24 | in April of 2004 to license FairPlay to |
| 10:25:29 | 25 | RealNetworks? |

| | 22 |
|---|---|

| 10:25:30 | 1 | A. I don't remember that. I might have. I |
|---|---|---|
| 10:25:33 | 2 | don't really remember. |
| 10:25:37 | 3 | Q. Do you recall discussions with Mr. Glaser |
| 10:25:42 | 4 | at any time during 2004? |
| 10:25:44 | 5 | A. I don't recall any specific discussions. |
| 10:26:03 | 6 | I'm sorry I don't remember more of this |
| 10:26:05 | 7 | for you, but there's been a lot of water under that |
| 10:26:07 | 8 | bridge in seven years. So . . . |
| 10:26:09 | 9 | MS. SWEENEY: I understand. I've been |
| 10:26:11 | 10 | reading these documents, so it's different. |
| 04:48:10 | 11 | (Whereupon, Deposition Exhibit 11 was |
| 04:48:10 | 12 | marked for identification.) |
| 10:26:12 | 13 | BY MS. SWEENEY: |
| 10:26:14 | 14 | Q. Okay. I'm going to ask the court reporter |
| 10:26:15 | 15 | to hand you what's been marked as Jobs Exhibit 11. |
| 10:26:24 | 16 | A. Are you done with 3? |
| 10:26:25 | 17 | Q. Yes. |
| 10:26:26 | 18 | A. Thank you. |
| 10:27:02 | 19 | (Witness reviews document.) |
| 10:27:05 | 20 | THE WITNESS: Okay. I've read it. |
| 10:27:22 | 21 | BY MS. SWEENEY: |
| 10:27:22 | 22 | Q. Okay. Mr. Jobs, this is an e-mail from |
| 10:27:25 | 23 | Rob Glaser to you dated April 9th, 2004. Did you |
| 10:27:32 | 24 | receive this e-mail? |
| 10:27:34 | 25 | MR. RILEY: Hold on. |

| | 23 |
|---|---|

| 10:27:35 | 1 | I object to this. This was a document |
|---|---|---|
| 10:27:36 | 2 | that was in front of Judge Lloyd. He said you could |
| 10:27:39 | 3 | not question about this issue. It's outside the |
| 10:27:43 | 4 | three topics. |
| 10:27:45 | 5 | MS. SWEENEY: Well, I disagree because it |
| 10:27:49 | 6 | goes to Apple's response to the July 26 announcement |
| 10:27:52 | 7 | by RealNetworks. |
| 10:27:55 | 8 | MR. RILEY: It's hard to see that. This |
| 10:27:57 | 9 | isn't part of a response. This is a letter that |
| 10:27:59 | 10 | occurred a couple of months before that time. |
| 10:28:01 | 11 | MS. SWEENEY: Yes, but it establishes the |
| 10:28:03 | 12 | background for the events that occurred between June |
| 10:28:08 | 13 | and October of 2004. |
| 10:28:11 | 14 | MR. RILEY: I will let you ask some |
| 10:28:12 | 15 | background about this as it relates to the previous |
| 10:28:15 | 16 | document, but I think this is clearly outside the |
| 10:28:19 | 17 | scope. |
| 10:28:21 | 18 | MS. SWEENEY: Your objection is noted. |
| 10:28:22 | 19 | BY MS. SWEENEY: |
| 10:28:22 | 20 | Q. Mr. Jobs, do you recall the question? Did |
| 10:28:24 | 21 | you receive this e-mail from Mr. Glaser? |
| 10:28:26 | 22 | A. I don't remember receiving it, but I might |
| 10:28:28 | 23 | have. |
| 10:28:29 | 24 | Q. Is that the e-mail that you use at Apple? |
| 10:28:33 | 25 | A. Yes, it is. |

| | 24 |
|---|---|

| 10:28:34 | 1 | Q. Is there any reason to believe you didn't |
|---|---|---|
| 10:28:35 | 2 | receive this e-mail? |
| 10:28:37 | 3 | A. I don't know. I just don't remember |
| 10:28:41 | 4 | receiving it. |
| 10:28:47 | 5 | Q. Did you respond to Mr. Glaser's request |
| 10:28:53 | 6 | that Apple license RealNetworks' access to FairPlay |
| 10:28:58 | 7 | on the iPod? |
| 10:28:59 | 8 | A. I don't remember doing so, no, because I |
| 10:29:01 | 9 | don't even remember this e-mail. |
| 10:29:05 | 10 | Q. Is it possible that you spoke with |
| 10:29:07 | 11 | Mr. Glaser about his proposal after he sent you this |
| 10:29:11 | 12 | e-mail on April 9, 2004? |
| 10:29:14 | 13 | A. It's possible. I don't remember doing so, |
| 10:29:17 | 14 | but it's possible. |
| 10:29:20 | 15 | Q. Do you recall Mr. Glaser telling you that |
| 10:29:24 | 16 | RealNetworks was working on a product that could |
| 10:29:26 | 17 | make its music interoperable with iPods? |
| 10:29:32 | 18 | A. I don't recall that, no. |
| 10:29:33 | 19 | Q. Is it possible that you had that |
| 10:29:37 | 20 | discussion? |
| 10:29:37 | 21 | MR. RILEY: Object to the form. |
| 10:29:39 | 22 | THE WITNESS: It's possible I had any |
| 10:29:40 | 23 | discussion. I just don't remember. |
| 10:29:47 | 24 | BY MS. SWEENEY: |
| 10:29:48 | 25 | Q. If you could look at the next to last |

EXHIBIT 23

**From:** Eddy Cue
**Sent:** Sunday, July 25, 2004 12:46:58 PM
**To:** Philip Schiller
**CC:** Joswiak Greg; Robbin Jeff; Rubinstein Jon; Tony Fadell; Ng Stan; Jobs Steve
**Subject:** Re: RealNetworks Says Files Can Play on iPod

I didn't say they legally did it. Also they may have used the DVD John
hack that has been out there. We will be actively working with legal to
review this once we get our hands on it.

Lastly, remember that we are actively strengthening and changing our
DRM so they will definitely break on our next release. We would have to
work to not break them.

Eddy

On Jul 25, 2004, at 9:36 PM, Philip Schiller wrote:

> How can they put songs into FairPlay without reverse engineering our
> proprietary encryption algorithm?
>
>
> On Jul 25, 2004, at 9:29 PM, Eddy Cue wrote:
>
>> The labels are convinced that different formats are hurting their
>> growth. They want us to license our DRM to Real. Since Real has
>> assured them that they are putting the music in FairPlay, they are ok
>> with it (that is until there is a problem). Real is actually saying
>> they are playing a protected song on an authorized device for that
>> protection scheme.
>>
>> Also remember some labels at this point are also worried that we are
>> getting to be too dominant.
>>
>> Eddy
>>
>>
>> On Jul 25, 2004, at 9:13 PM, Philip Schiller wrote:
>>
>>> The music companies should take a fit about this!
>>> Real is advocating playing protected music on devices not designed
>>> or authorized for that protection scheme (thus undermining the whole



DEPOSITION
EXHIBIT
64

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090441

>>> idea of devices being designed to protect artists rights in that
>>> music)!
>>>
>>> http://story.news.yahoo.com/news?tmpl=story&u=/ap/20040726/
>>> ap_on_hi_te/realnetworks_ipod&cid=562&ncid=716
>>>
>>> RealNetworks Says Files Can Play on iPod
>>>
>>> 1 hour, 4 minutes ago
>>>
>>> By ALLISON LINN, AP Business Writer
>>>
>>> SEATTLE - RealNetworks Inc. says it has created technology that
>>> allows songs purchased through its online music services to be
>>> played on Apple Computer Inc.'s popular iPod player, just a few
>>> months after complaining that Apple was rebuffing attempts to form
>>> an alliance.
>>>
>>> In an interview Friday, RealNetworks chief executive Rob Glaser
>>> said he did not know how Apple would react to the new technology.
>>> Apple, based in Cupertino, Calif., did not return numerous phone
>>> calls from The Associated Press seeking comment.
>>>
>>> Glaser said the new system, called Harmony Technology, will let
>>> people securely transfer music bought using RealNetworks' music
>>> download services to an iPod or virtually any other portable music
>>> player.
>>>
>>> Previously, music purchased through RealNetworks' music download
>>> services could most easily be played on devices that supported its
>>> copyright protection technology. By the same token, the easiest way
>>> to get digital music onto the iPod player was through Apple's iTunes
>>> Music Store, which uses its own system. The same held true for
>>> devices that supported Microsoft's Windows Media Player anti-piracy
>>> technology.
>>>
>>> Microsoft said it could not immediately comment on the system.
>>>
>>> Glaser said the new the system works by essentially translating the
>>> various anti-piracy technologies, to make the players' systems
>>> compatible with RealNetworks' system. RealNetworks said it was not
>>> concerned that the system would be illegal.
>>>
>>> "We are making it so that consumers can buy music once and play it
>>> anywhere," Glaser said.
>>>
>>> A test version of Harmony will be available Tuesday on Real's Web

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090442

>>> site.
>>>
>>> In April, Apple chairman Steve Jobs (news - web sites) rebuffed
>>> Glaser's request for a meeting to discuss an alliance between the
>>> companies, prompting complaints from RealNetworks representatives
>>> about why Apple didn't want to make its popular system more open.
>>>
>>> There is already a way to make songs from RealNetworks' online
>>> music services play on the iPod, but it is cumbersome. To do so, a
>>> user would have to burn the songs from a computer to a CD, download
>>> them back onto the computer in a different format and then put them
>>> on the player.
>>>
>>> Phil Leigh, an analyst with Inside Digital Media in Tampa, Fla.,
>>> said he was surprised to hear that Real had developed the
>>> technology, since Apple has been careful about guarding its popular
>>> — and proprietary — system.
>>>
>>> He said the new system could be a potential boon for RealNetworks,
>>> because customers would be able to buy whatever player they want
>>> without worrying about whether it would work with Real's service.
>>> But he said it would only be a success if it was easy and reliable.
>>>
>>> "The question is, 'How well does it work?'" he said.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090443

EXHIBIT 24



CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00979727

EXHIBIT 25

Subject: iTunes market share - week ending Jan 28 2007
Date: Mon, 05 Feb 2007 11:09:24 -0800
From: Debra Ameerally <ameer.df@apple.com>
To: Eddy Cue <cue@apple.com>, Steve Jobs <sjobs@apple.com>, Jeff Robbin
<jrobbin@apple.com>, Alex Luke <aluke@apple.com>, Robert Kondrk <kondrk@apple.com>,
Patrice Gautier <pgautier@apple.com>, Sina Tamaddon <sina@apple.com>, Chris Bell
<chrisbell@apple.com>, Keith Moerer <kmoerer@apple.com>, Gary Stewart
<gstewart@apple.com>, Tracy Pirnack <pirnack1@apple.com>, Oliver Schusser
<schusser.o@euro.apple.com>, Kevin Saul <ksaul@apple.com>
Message-ID: <862D7C9F-98E1-4B7A-B95E-961440172179@apple.com>

---

• iTMS - US overall market share = 90%

**NOT RELEVANT**

---

**United States**

**US Digital tracks**
• US overall digital industry reported 16.6MM tracks
• Same time last year : 11.1MM

Apple reported week 4 : 14.7MM tracks
Apple reported week 4 last year : 9.4MM tracks

| last week | prev | prev-1 |
|-----------|------|--------|
| 90% | 90% | 88% |

**US Digital albums**
• US overall digital industry reported 889K digital albums
• Same time last year : 584K albums

Apple reported week 4 : 826K albums
Apple reported week 4 last year : 516K albums

| last week | prev | prev-1 |
|-----------|------|--------|
| 93% | 93% | 93% |

**OVERALL MARKET SHARE US (weighted average between track & album sales)**

| last week | prev | prev-1 |
|-----------|------|--------|
| 91% | 91% | 90% |

---

**NOT RELEVANT**



CONFIDENTIAL
Apple_AIIA00327951







------ end message ------

CONFIDENTIAL
Apple_AIIA00327952

EXHIBIT 26

| From: | Eddy Cue |
|---|---|
| **Sent:** | Tuesday, Feb 6 2007 04:47:48 AM |
| **To:** | Debra Ameerally |
| **Subject:** | Re: iTunes market share - week ending Jan 28 2007 |

These numbers are awesome...

On Feb 5, 2007, at 11:09 AM, Debra Ameerally wrote:

• iTMS - US overall market share = 90%

• iTMS - Canada overall market share = 92%

_____

**United States**

**US Digital tracks**
• US overall digital industry reported 16.6MM tracks
• Same time last year : 11.1MM

Apple reported week 4 : 14.7MM tracks
Apple reported week 4 last year : 9.4MM tracks

| last week | prev | prev-1 |
|---|---|---|
| 90% | 90% | 88% |

**US Digital albums**
• US overall digital industry reported 889K digital albums
• Same time last year : 584K albums

Apple reported week 4 : 826K albums
Apple reported week 4 last year : 516K albums

| last week | prev | prev-1 |
|---|---|---|
| 93% | 93% | 93% |

**OVERALL MARKET SHARE US (weighted average between track & album sales)**

| last week | prev | prev-1 |
|---|---|---|
| 91% | 91% | 90% |

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00091049

---

**United Kingdom**

**UK Digital Tracks**
• UK overall digital industry reported 1.4MM digital tracks
• Same time last year : 861K digital tracks

Apple reported week 4 2007 : 1.14MM tracks
Apple reported week 4 last year : 650K digital tracks

| last week | prev | prev-1 |
|-----------|------|--------|
| 80% | 80% | 80% |

---

**Canada**

**Canada Digital tracks**
• Canada overall digital industry reported 461K digital tracks
• Same time last year : 246K digital tracks

• Apple reported week 4 2007 : 425K
• Apple reported week 4 last year : 213K

| last week | prev | prev-1 |
|-----------|------|--------|
| 93% | 93% | 92% |

**Canada Digital albums**
• Canada overall digital industry reported 31K digital albums
• Same time last year : 16.5K digital albums

• Apple reported week 4 2007 : 30K albums
• Apple reported week 4 last year : 13K albums

| last week | prev | prev-1 |
|-----------|------|--------|
| 98% | 98% | 98% |

**OVERALL MARKET SHARE Canada (weighted average between track & album sales)**

| last week | prev | prev-1 |
|-----------|------|--------|
| 96% | 96% | 96% |

---

<pastedGraphic.tiff>

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00091050

<pastedGraphic.tiff>

<pastedGraphic.tiff>

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00091051

EXHIBIT 27

**From:** Patrice Gautier
**Sent:** Wednesday, September 08, 2004 12:28:44 PM
**To:** Debra Ameerally
**CC:** Rob Schoeben; Steve Jobs; Jeff Robbin; Eddy Cue; Alex Luke; Abhijit Sashittal; Robert Kondrk; Chris Bell; Carsten Dierksen/Apple; Sina Tamaddon
**Subject:** Re: Soundscan (US) market share data - digital singles and albums

> • Apple reported 60% (affected for the last 3 weeks by Rhapsody's 49
> cent tracks)

Real touting their short-term gains:
http://www.usatoday.com/money/industries/technology/2004-09-08-real_x.htm

The half-price promo ends thursday, but they are keeping the top 10 at 49c as a loss leader. I would love to know how many customers they've gained (as opposed to how many extra songs they've sold) as a result of that promo. Does anyone have data on that?

   -P

Real says digital song sale doubled market share
By Jefferson Graham, USA TODAY
RealNetworks, which kicked off the Internet's first digital music price war by selling songs at half-price, ends the sale on Thursday but will continue selling top-10 singles as 49-cent loss leaders.

The maker of the popular RealPlayer music/video software says it sold 3 million songs during the three-week sale. It says its market share rose to 20% from 10%, taking a bite out of Apple's 70% share, which Real says dropped to 60%.

Apple disputed that, saying that it did not see any drop in market share during the past three weeks and that its sales grew each week.

Real gained customers, but it will lose $2 million from the promotion, says market tracker Forrester Research.

Now, Real says, it will offer a weekly top-10 singles selection for 49 cents. Current artists include the Beastie Boys, Maroon 5 and Ray

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090447

Charles. Regular-priced songs are 99 cents.

"This is no different from how physical music stores work," says Real CEO Rob Glaser. They "offer loss leaders to get people in." Real's wholesale costs are about 75 cents a song.

"If the other songs were selling for $1.09 apiece, maybe this would make sense," Forrester analyst Josh Bernoff says. "But the top 10 is what most people buy. This is a prescription for a whole operation to keep losing money weekly."

Real hasn't been profitable for several years. It lost $21.5 million in 2003 and $4.6 million in the second quarter this year.

On the plus side, Bernoff says, Real's promotion broke it away from competitors such as Napster and Musicmatch to be the clear No. 2 download site after Apple.

Real's campaign began two weeks before rival Microsoft launched its music store on Sept. 2, a test site.

"Real wasn't on the map before, and now they are," Bernoff says.

Glaser says the finances will work out in the long term, as discounted songs are a cheap way to build his base. "This was the biggest promotion we've ever had. Sales went up six- or sevenfold," he says.

In launching the promotion, Real set its sights on Apple, which has sold about 125 million songs since April 2003.

Real introduced a technology, Harmony, that enabled purchased songs to be transferred to many portable devices, including Apple's popular iPod.

Previously, the only way to get songs easily onto the iPod was by buying them at Apple's iTunes Music Store.

Real was selling about 200,000 songs a week before the sale started, says research firm Inside Digital Media.

On Sep 8, 2004, at 8:59 AM, Debra Ameerally wrote:

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090448

> • US overall industry reported 3,123,000 digital tracks
> • Apple reported 60% (affected for the last 3 weeks by Rhapsody's 49
> cent tracks)
> • First week of Apple selling more than 2m digital tracks (not
> including digital album-tracks) - largely attributable to HP
> advertising
> • Microsoft is reporting, but a mere blip for last week (official
> launch set for first week of October)
> • Top 200 digital tracks market share heavily impacted by Ray Charles
> album selling as sum of tracks at Apple and as complete album
> elsewhere
>
>
> Digital tracks
>            last week       prev      prev-1
> Top 10        70%          64%        64%
> Top 20        67%          63%        64%
> Top 50        71%          63%        62%
> Top 100       70%          64%        62%
> Top 200       69%          63%        61%
> Overall       60%          60%        60%
>
>
> Digital albums
> • US overall industry reported 147,000 digital albums
> • Apple reported 72%
>
>            last week       prev
> Overall       72%          71%
>
> This is lower than anticipated because Soundscan does not have the
> same master data as Apple. The labels are not reporting the same UPC
> metadata to both Soundscan and Apple, causing Apple data to not get
> loaded into Soundscan for the charts.
>
>
> <pastedGraphic1.tiff>
>
>
> <pastedGraphic2.tiff>
>
>

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090449

EXHIBIT 28

**From:** Steve Jobs [sjobs@apple.com]
**Sent:** Thursday, July 29, 2004 12:45 PM
**To:** Katie Cotton; Jeff Robbin; ET; Greg Jozwiak; Eddy Cue
**Subject:** RealNetworks Statement

RealNetworks Statement about Harmony Technology and Creating Consumer Choice

RealNetworks®, Inc. (Nasdaq: RNWK) is delighted by initial consumer and music industry support for Harmony. Compatibility, choice and quality are critically important to consumers and Harmony provides all of these to users of the iPod and over 70 other music devices including those from Creative, Rio, iRiver, and others. RealPlayer Music Store provides the highest sound quality of any download music service. That's why so many consumers have welcomed news of Harmony. Consumers, and not Apple, should be the ones choosing what music goes on their iPod.
Harmony follows in a well-established tradition of fully legal, independently developed paths to achieve compatibility. There is ample and clear precedent for this activity, for instance the first IBM compatible PCs
from Compaq. Harmony creates a way to lock content from Real's music
store
in a way that is compatible with the iPod, Windows Media DRM devices, and Helix DRM devices. Harmony technology does not remove or disable any
digital rights management system. Apple has suggested that new laws
such
as the DMCA are relevant to this dispute. In fact, the DMCA is not designed to prevent the creation of new methods of locking content and explicitly allows the creation of interoperable software.
We remain fully committed to Harmony and to giving millions of consumers who own portable music devices, including the Apple iPod, choice and compatibility.
RealNetworks, RealPlayer, Harmony, and Helix are trademarks or registered trademarks of RealNetworks, Inc. All other companies or products listed herein are trademarks or registered trademarks of their respective owners.

CONFIDENTIAL
Apple_AIIA00090471

EXHIBIT 29

**From:** Patrice Gautier
**Sent:** Monday, August 23, 2004 11:21:47 PM
**To:** Eddy Cue; Chris Bell; Jeff Robbin; Alex Luke
**Subject:** RealNetworks sells one million songs in first week of 49-cent fire sale

http://www.macdailynews.com/comments.php?id=P3303_0_1_0

RealNetworks sells one million songs in first week of 49-cent fire sale

Tuesday, August 24, 2004 - 07:27 AM EDT

RealNetworks, Inc. today announced that more than one million songs
were sold in the first week of their so-called "Freedom of Choice"
campaign. The combination of the ongoing 49-cent-per-song RealPlayer
Music Store promotion and a simultaneous promotion of Rhapsody resulted
in the highest number of songs sold in a week by RealNetworks and the
busiest week ever for Rhapsody registrations.

  Last week, RealNetworks launched the 49-cent promotion and RealPlayer
10.5 with Harmony Technology (not available for Macintosh). Harmony
Technology enables consumers to play songs downloaded from the
RealPlayer Music Store on more than 100 portable music devices.

  "RealNetworks is the leader in subscription services and we now
believe we are clearly number two in a la carte download sales. Paired
with our free music offerings, Real is the clear leader in digital
music services today," said Richard Wolpert, Chief Strategy Officer,
RealNetworks in the press release. "We knew that the 49 cent promotion
and a campaign showcasing the need for compatibility in the digital
music industry would send a powerful message and we are very pleased
with the results."

  Real offers music libraries with more than 625,000 songs available for
downloading in the RealPlayer Music Store and more than 725,000 songs
for on-demand listening from Rhapsody. Apple's iTunes Music Store
offers a library of over 1 million songs.

  With the newly introduced Harmony Technology, consumers can transfer
their purchased songs to more than 100 portable music devices,
including the iPod (unless and until Apple updates the iPod and the

CONFIDENTIAL
Apple_AIIA00090467

songs no longer work). The 49-cent so-called "Freedom of Choice "promotion is still available for a limited time only.

MacDailyNews Take: Real cut song prices in half and the best they could manage to do was about a third of Apple's average weekly song sales? Sad. 49-cents times 1 million equals just $490,000. Not good. Perhaps Real's weak results are because Real offers a song library that's only 60% of Apple's iTunes Music Store? Or perhaps it's because iPod owners don't want to save 50-cents now only to lose the whole 50-cents when Apple updates the iPod and Real's "Harmony" hack no longer works? We'd rather bury our quarters in the backyard; at least we could dig them up later and they wouldn't be lost forever. As always, we must note the suspicion that many of RealNetwork's quarters end up in Krispy Kreme's coffers anyway.

CONFIDENTIAL
Apple_AIIA00090468

# EXHIBIT 30

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY          Page 1 of 35
Case 4:05-cv-00037-YGR Document 845-9 Filed 00/10/14 Page 29 of 92
Case 4:05-cv-00037-YGR Document 751-11 Filed 00/13/14 Page 6 of 36

[House Hearing, 109 Congress]
[From the U.S. Government Printing Office]


                    DIGITAL MUSIC INTEROPERABILITY
                         AND AVAILABILITY

=======================================================================

                              HEARING

                           BEFORE THE

              SUBCOMMITTEE ON COURTS, THE INTERNET,
                   AND INTELLECTUAL PROPERTY

                            OF THE

                   COMMITTEE ON THE JUDICIARY
                    HOUSE OF REPRESENTATIVES

                   ONE HUNDRED NINTH CONGRESS

                         FIRST SESSION


                         _____


                        APRIL 6, 2005


                         _____


                      Serial No. 109-9


                         _____


         Printed for the use of the Committee on the Judiciary


      Available via the World Wide Web: http://www.house.gov/judiciary



                         _____

                U.S. GOVERNMENT PRINTING OFFICE
20-389                  WASHINGTON : 2005
_____
For Sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512-1800; (202) 512 091800
Fax: (202) 512 092250 Mail: Stop SSOP, Washington, DC 20402 090001

                   COMMITTEE ON THE JUDICIARY

           F. JAMES SENSENBRENNER, Jr., Wisconsin, Chairman
HENRY J. HYDE, Illinois            JOHN CONYERS, Jr., Michigan
HOWARD COBLE, North Carolina       HOWARD L. BERMAN, California
LAMAR SMITH, Texas                 RICK BOUCHER, Virginia

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY    Page 2 of 35

Case 4:05-cv-00037-YGR   Document 845-8   Filed 10/10/14   Page 20 of 92
Case 4:05-cv-00037-YGR   Document 751-11   Filed 02/13/14   Page 30 of 36

```
ELTON GALLEGLY, California          JERROLD NADLER, New York
BOB GOODLATTE, Virginia             ROBERT C. SCOTT, Virginia
STEVE CHABOT, Ohio                  MELVIN L. WATT, North Carolina
DANIEL E. LUNGREN, California       ZOE LOFGREN, California
WILLIAM L. JENKINS, Tennessee       SHEILA JACKSON LEE, Texas
CHRIS CANNON, Utah                  MAXINE WATERS, California
SPENCER BACHUS, Alabama             MARTIN T. MEEHAN, Massachusetts
BOB INGLIS, South Carolina          WILLIAM D. DELAHUNT, Massachusetts
JOHN N. HOSTETTLER, Indiana         ROBERT WEXLER, Florida
MARK GREEN, Wisconsin               ANTHONY D. WEINER, New York
RIC KELLER, Florida                 ADAM B. SCHIFF, California
DARRELL ISSA, California            LINDA T. SANCHEZ, California
JEFF FLAKE, Arizona                 ADAM SMITH, Washington
MIKE PENCE, Indiana                 CHRIS VAN HOLLEN, Maryland
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TOM FEENEY, Florida
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
```

Philip G. Kiko, Chief of Staff-General Counsel
Perry H. Apelbaum, Minority Chief Counsel
------

Subcommittee on Courts, the Internet, and Intellectual Property

LAMAR SMITH, Texas, Chairman

```
HENRY J. HYDE, Illinois             HOWARD L. BERMAN, California
ELTON GALLEGLY, California          JOHN CONYERS, Jr., Michigan
BOB GOODLATTE, Virginia             RICK BOUCHER, Virginia
WILLIAM L. JENKINS, Tennessee       ZOE LOFGREN, California
SPENCER BACHUS, Alabama             MAXINE WATERS, California
BOB INGLIS, South Carolina          MARTIN T. MEEHAN, Massachusetts
RIC KELLER, Florida                 ROBERT WEXLER, Florida
DARRELL ISSA, California            ANTHONY D. WEINER, New York
CHRIS CANNON, Utah                  ADAM B. SCHIFF, California
MIKE PENCE, Indiana                 LINDA T. SANCHEZ, California
J. RANDY FORBES, Virginia
```

Blaine Merritt, Chief Counsel

David Whitney, Counsel

Joe Keeley, Counsel

Alec French, Minority Counsel

C O N T E N T S

----------

APRIL 6, 2005

OPENING STATEMENT

                                                                Page
The Honorable Lamar Smith, a Representative in Congress from the
    State of Texas, and Chairman, Subcommittee on Courts, the
    Internet, and Intellectual Property..........................    1
The Honorable Howard L. Berman, a Representative in Congress from
    the State of California, and Ranking Member, Subcommittee on
    Courts, the Internet, and Intellectual Property...............    2
The Honorable John Conyers, Jr., a Representative in Congress
    from the State of Michigan, and Ranking Member, Committee on
    the Judiciary................................................    4

                            WITNESSES

Mr. Mark Cooper, PH.D., Director of Research, Consumer Federation
    of America, on behalf of the Consumer Federation of America and
    Consumer Union
    Oral Testimony..............................................    5
    Prepared Statement..........................................    7
Mr. Raymond L. Gifford, President, The Progress & Freedom
    Foundation
    Oral Testimony..............................................    9
    Prepared Statement..........................................   11
Mr. William E. Pence, Ph.D., Chief Technology Officer, Napster
    Oral Testimony..............................................   14
    Prepared Statement..........................................   16
Mr. Michael Bracy, Policy Director, Future of Music Coalition
    Oral Testimony..............................................   18
    Prepared Statement..........................................   20

                            APPENDIX
              Material Submitted for the Hearing Record

Prepared Statement of the Honorable Howard L. Berman, a
    Representative in Congress from the State of California, and
    Ranking Member, Subcommittee on Courts, the Internet, and
    Intellectual Property.......................................   27
Prepared Statement of the Honorable John Conyers, Jr., a
    Representative in Congress from the State of Michigan, and
    Ranking Member, Committee on the Judiciary...................   28

                  DIGITAL MUSIC INTEROPERABILITY
                        AND AVAILABILITY

                          ----------


                     WEDNESDAY, APRIL 6, 2005

                     House of Representatives,
              Subcommittee on Courts, the Internet,
                    and Intellectual Property,
                          Committee on the Judiciary,
                                          Washington, DC.
      The Subcommittee met, pursuant to notice, at 10:37 a.m., in
Room 2141, Rayburn House Office Building, the Honorable Lamar
Smith, (Chairman of the Subcommittee) presiding.

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY    Page 4 of 35
Case 4:05-cv-00037-YGR   Document 845-11   Filed 10/10/14   Page 22 of 35
Case 4:05-cv-00037-YGR   Document 751-11   Filed 09/19/14   Page 32 of 92

Mr. Smith. The Subcommittee on Courts, the Internet, and Intellectual Property will come to order. I am going to recognize myself for an opening statement, and then recognize other Members, and then we will proceed to introduce the witnesses, and we will look forward to hearing from them.

Today, this Subcommittee continues its work to update music licensing for the digital era. New technologies are providing numerous and competing methods for delivering music content to consumers. Consumers can buy music on-line for immediate download, subscribe to unlimited amounts of music that can be downloaded to a portable device, listen to webcasts of their favorite radio stations on the Internet, and subscribe to music broadcasts from satellites in space.

Each of these different types of music services is a new and unique business model that brings different values and opportunities for consumers. Consumers have multiple choices for how they can purchase and listen to legal music. Unfortunately, just as the number of legal options has increased, so has the number of illegal ones.

Legitimate questions have been raised regarding the impact of digital interoperability on consumers. In the physical world, consumers didn't expect that music audio cassettes were interoperable with CD players. Consumers switching from music cassettes to CDs bought the same music for $10 to $20 per CD that they already owned. Consumers accepted this, since they felt they were getting something new with more value, a digital format that made every reproduction sound as good as the first playback.

Music is quickly becoming an on-line business with no connection to the physical world, except for the Internet connection. Even that connection is increasingly becoming wireless. Some of the same interoperability issues that occur in the physical world are now appearing here. Consumers who want to switch from one digital music service to another must often purchase new music files and sometimes new music players. For example, music purchased from the iTunes Music Store will only work on Apple's iPod music player. Music purchased from RealNetworks cannot be accessed on the iPod.

Last year, both companies became involved in a dispute over Real's attempt to offer software called ``Harmony,'' that would have allowed legal copies of music purchased from Real's on-line music store to be playable on Apple's iPod music player. Apple objected to this effort, calling it ``hacker-like,'' and invoking the DMCA. Apple blocked Real software from working a short time afterwards.

This interoperability issue is of concern, since consumers who bought legal copies of music from Real could not play them on the iPod. I suppose this is a good thing for Apple, but perhaps not for consumers. Apple was invited to testify today, but they chose not to appear. Generally speaking, companies with 75-percent market share of any business, in this case, the digital download market, need to step up to the plate when it comes to testifying on policy issues that impact their industry. Failure to do so is a mistake.

As a result of disputes like the one between Apple and Real, some have suggested that efforts to boost digital music interoperability should be encouraged by regulation or

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY        Page 5 of 35
Case 4:05-cv-00037-YGR   Document 845-11   Filed 10/10/14   Page 33 of 35
Case 4:05-cv-00037-YGR   Document 751-11   Filed 02/13/14   Page 33 of 92

legislation. Others have urged Congress to leave the issue to
the marketplace and let consumers decide what is best for them.

Just last week, the Supreme Court heard a copyright case
dealing with the 1984 decision in the Sony-Betamax case.
Consumers ultimately chose the VHS format over their Betamax as
their preferred technology in their homes without any
intervention by Congress. At the same time, broadcasters chose
the Betamax standard for their internal broadcast operations.
If anything, this example demonstrates not only how consumers
will decide for themselves what standard best meets their
needs, but also that multiple standards can survive in the
marketplace.

The digital music interoperability issue is of interest to
more than consumers. Performers and songwriters are affected by
the decisions made about how their music is made available.
Music that is made available on only one digital music service
will limit the options for artists to earn royalties. Many of
the licenses and rights in the music industry stem from
compulsory licenses and exclusive contracts. Since one of these
licenses, the compulsory section 115 mechanical license, is now
being updated for the digital era, the time is appropriate for
the Subcommittee to learn more about the impact of digital
interoperability on consumers and artists.

That concludes my opening statement, and the gentleman from
California, the Ranking Member, Mr. Berman, is recognized for
his.

Mr. Berman. Thank you very much, Mr. Chairman, for
scheduling this hearing on digital music interoperability. The
explosion of technologies that enable consumers to digitally
download music has provided many new opportunities to the music
lover. The ultimate goal is to provide consumers with their
choice of music any time, anywhere, in any format. However,
this new environment has come at a great cost; that of rampant
piracy on peer-to-peer networks. What is considered free music
available on the Internet comes at the expense of numerous
people involved in the development of the sound recording, the
artists, songwriters, musicians, sound engineers and others.

The consequences of piracy are felt throughout our economy,
but they are especially harmful in my district, as well as
several other Members on this Committee, where many jobs depend
on the lawful sale of music. The proliferation of legitimate
music distributors in the marketplace has helped stem the tide
of piracy. The number of available digital music delivery
alternatives has increased, enabling technology companies to
help copyright owners make inroads against unauthorized
downloading and sharing of music files. However, music
companies will always have to compete with free music, and
analysts claim that it will take a number of years before
download services can provide a significant sales boost for the
content creators.

One of the major impediments to achieving a more level
playing field according to analysis is the bewildering array of
competing technologies. As with any nascent industry, the
development of new business models have unintended results. In
the case of digital music, there are concerns that
interoperability barriers between the various suppliers could
actually hinder growth in the market.

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY     Page 6 of 35
Case 4:05-cv-00037-YGR  Document 845-8  Filed 00/10/14  Page 24 of 92
Case 4:05-cv-00037-YGR  Document 751-11  Filed 02/13/14  Page 3 of 36

Brandenburg, the father of the MP3, has warned that rival technologies will baffle consumer and risk alienating fans, driving them to unsanctioned file-sharing networks, where the songs are free and encoded in the unprotected MP3 format.

The International Federation of Phonographic Industry has noted that ``one important problem that hinders growth of the on-line music business is the lack of interoperability between services and devices. The danger is of wide-scale consumer confusion and wasted opportunities in a market which has an extraordinary growth potential.'' They observe that there is no easy solution, that all players in the on-line market need to work harder to solve the interoperability difficulties in 2005. Yet the market continues to develop. The portable player market already presents consumers with an array of choices.

Now, we see the convergence of music devices and mobile handsets. The goal of making music easier to buy than to steal is becoming a reality, and therefore these innovative services deserve our thanks. However, anti-piracy efforts must remain a focus for technology company industries as they develop their products. A legitimate distribution business model must be one that is based on payment and permission of the rights holder.

With digital music moving into the mainstream of consumer life, I believe it will be helpful to further this conversation by just guessing what, if any, impediments are facing companies that are now distributing digital music and how they are addressing consumers' needs for legitimate music. In an ideal world, we would all have the major players in the digital music market at the table to hear their opinions about this issue. The Chairman made reference to at least one party not at the table, but I do look forward from hearing these witnesses to help define some of the issues.

Thank you very much, Mr. Chairman.

Mr. Smith. Thank you, Mr. Berman.

I understand that the Ranking Member of the Judiciary Committee, Mr. Conyers, you have a statement?

Mr. Conyers. Only a comment or two, sir.

Mr. Smith. The gentleman is recognized.

Mr. Conyers. I will ask unanimous consent that my statement be put in the record.

Mr. Smith. Without objection.

Mr. Conyers. First of all, I welcome this panel, and I think this is an important discussion. I want to say that I commend the Ranking Member, Mr. Berman, on his very thoughtful presentation, which leads me to put mine in the record and let it go at that.

A couple of things have been said by witnesses that I just want to repeat; that market forces will continue to drive innovation and new ways to enjoy music and pricing and will eventually resolve the interoperability problem and that Government intervention can probably inhibit innovation.

Finally, I join with those who believe that consumers will ultimately choose the interoperable systems over closed platforms.

With that, I would return my time and thank the Chairman for his courtesy.

Mr. Smith. Thank you, Mr. Conyers.

I would, also, like to thank the gentlewoman from

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY    Page 7 of 35
Case 4:05-cv-00037-YGR  Document 845-8  Filed 10/10/14  Page 25 of 92
Case 4:05-cv-00037-YGR  Document 751-11  Filed 02/13/14  Page 3 of 36

California, Ms. Lofgren, and the gentleman from California, Mr.
Schiff, for their attendance here today as well.

Before I introduce the witnesses, I would like you all to
stand so I can swear you in.

[Witnesses sworn en masse.]

Mr. Smith. Thank you. Please be seated.

Our first witness is Mark Cooper--oh, excuse me, in
recognizing other Members who are present, I didn't look far
enough or long enough to my right to see Bob English, the
gentleman from South Carolina. We appreciate his presence as
well.

Our first witness is Mark Cooper, the director of Research
at the Consumer Federation of America, where he has
responsibility for energy, telecommunications and economic
policy analysis. Dr. Cooper is a fellow of both the Stanford
Law School Center for Internet and Society and the Donald
McGannon Communications Center at Fordham University. He is the
author of five books and has published numerous chapters and
edited works and journal articles focusing on digital society
issues. Dr. Cooper holds a Ph.D. from Yale University and is a
former Yale University and Fulbright Fellow.

Our next witness is Ray Gifford, president of the Progress
& Freedom Foundation and a member of its board. Before joining
the foundation in 2003, Mr. Gifford served as chairman of the
Colorado Public Utilities Commission for 4 years. Mr. Gifford
earned his law degree from the University of Chicago, where he
served as president of the Federalist Society and chairman of
the Edmund Burke Society. He earned a bachelor's degree in
philosophy from St. John's College in Annapolis, Maryland.

Later on, you can tell us the difference between the
Federalist Society and the Edmund Burke Society, if you will.

Our next witness is Dr. William Pence, chief technology
officer of Napster. In 2000, Dr. Pence joined Universal Music
Group as lead technologist for its on-line music initiative. In
2001, he became chief technology officer of Pressplay, a joint
venture between Sony and Vivendi Universal, designed to offer
an on-line music subscription service. In 2002, Roxio acquired
Pressplay and rebranded that service with the Napster name. Dr.
Pence led the effort to build a legitimate service on the
Pressplay technology infrastructure, culminating in the
relaunch of Napster in October 2003. Most recently, he led the
effort which resulted in the world's first portable music
subscription service--Napster To Go.

Dr. Pence holds several U.S. patents, he received a B.S.
degree in physics from the University of Virginia in 1984 and a
Ph.D. degree in electrical engineering from Cornell University.

Our final witness is Michael Bracy, co-founder of the
Future of Music Coalition, where he currently serves as a board
member and its policy director. He, also, co-owns Misra, an
independent record label based in Austin, Texas, which, as one
would expect, is a city I have a particular interest in.

The Future of Music Coalition is a not-for-profit
collaboration between members of the music, technology, public
policy and intellectual property law communities. The Coalition
seeks to educate about music technology issues and to bring
together diverse voices in an effort to come up with creative
solutions. The Coalition, also, aims to identify and promote

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY    Page 8 of 35
Case 4:05-cv-00037-YGR  Document 845-11  Filed 10/10/14  Page 26 of 92
Case 4:05-cv-00037-YGR  Document 751-11  Filed 02/13/14  Page 36 of 92

innovative business models that will help musicians and
citizens to benefit from new technologies. Mr. Bracy graduated
from Georgetown University.

By unanimous consent, as I think you all know, your
complete testimonies will be made a part of the record, and we
look forward to hearing your testimony now.

Dr. Cooper, we will begin with you.

TESTIMONY OF MARK COOPER, PH.D., DIRECTOR OF RESEARCH, CONSUMER
FEDERATION OF AMERICA, ON BEHALF OF THE CONSUMER FEDERATION OF
AMERICA AND CONSUMER UNION

Mr. Cooper. Thank you, Mr. Chairman.

Interoperability is an extremely valuable and important
trait in the digital economy. Digital products are inherently
networked, which means that they are made up of complimentary
components or the current terminology is they are layers of a
platform. These layers must interoperate if the product is to
function properly.

Over the past three decades, we have learned what I call
the Internet lesson. The more open the interfaces within the
platform, the more dynamic the development. Open platforms
create large network effects and an innovation-friendly
environment. Economists call them positive externalities
created by these open platforms.

However, it is extremely important to recognize that
interoperability plays different roles and needs different
policies at different points in this platform. The
communications network at the core of the digital economy must
be open and interoperable as a matter of obligation. Closed
proprietary platforms in the core destroy the vast array of
positive externalities that can develop above. Refusals to
deal, discrimination in functionalities, foreclosure,
anticompetitive bundling simply cannot be tolerated at the core
of the communications network, and that is why the
Communications Act requires just, reasonable, and
nondiscriminatory terms for interconnection and carriage.

But as we move above from that core or from the lower
layers to the upper layers, the basis for interoperability
changes. At the periphery of the digital platform, at the
applications layer it is called, interoperability is very
consumer friendly, but it needs to be enforced or created by
market forces. Applications are the widgets of the digital age,
the things that people make and sell directly to the public. In
the digital content and distribution of applications, like
music formats, the failure to interoperate affects the direct
consumer. It hurts the music consumer if you don't
interoperate, but only the music consumer. It doesn't damage
the rest of the economy.

If an applications developer fails to interoperate, we
believe that developer will ultimately pay the price because
consumers will migrate to interoperable offerings. We believe
consumers demand interoperability, will pick interoperability
if they have information, and they have a fair choice.

Disclosure and expectations play a key role. Consumers must
be aware that if they buy a certain product that will not
interoperate, they will be locked in and cut off. Once they

know that, they will exercise, they will vote with their feet.

Similarly, a refusal to interoperate should not be a lever for anticompetitive strategies. If we see lots of exclusive deals and only a very few widget manufacturers, antitrust authorities should become concerned because we expect the applications layer, the widget manufacturers, to be plentiful and competitive. If they don't behave in that fashion, if there aren't a lot of choices, then there is a legitimate antitrust concern.

As several Members have noted, last year, the recording industry finally accepted the inevitability of digital distribution of music. They sold more singles last year than any time in the previous 20 years, and consumers saved a great deal of money. The transition to digital distribution is inevitable because it reduces the cost of production marketing and distribution and may transform promotion as well. The cost of delivering music to the public will decline, and the nature of sales will shift from CDs and bundles to singles, and that is a good thing for consumers and artists who can make more money by selling lots of singles.

Now, those who had the foresight to see this digital transformation coming and to put digital distribution in the world, they have got a lead. They have, one, a first-mover advantage. But as the entirety of the industry moves toward digital distribution, there are no guarantees that that advantage will persist, especially if they make a mistake on interoperability.

It is not surprising to find that the very company that has a lead today also had a lead 25 years ago in the PC market. They were the dominant PC provider about a quarter of a century ago. They refused to interoperate. They refused to open their platform, and they were blown away. They are a niche market player today, with a market share around 5 or 6 percent of the market. Interoperability is consumer friendly, and it will prevail in the marketplace.

I thank the Committee for giving me this opportunity, for recognizing how important interoperability is in the digital industries, and I look forward to working with the Committee to find the right mix of public obligations at the core of the digital economy and private incentives at the periphery and in the widget manufacturers so that we can create competitive, dynamic platforms that serve consumers, the economy and artists.

Thank you.

[The prepared statement of Mr. Cooper follows:]

Prepared Statement of Dr. Mark Cooper

Mr. Chairman and Members of the Committee,

My name is Dr. Mark Cooper. I am Director of Research at the Consumer Federation of America. I appreciate the opportunity to testify on the subject of interoperability and commend the Committee for having the foresight to hold hearings to explore the implications of this important topic.

Interoperability is a critically important issue, not only for consumers, but also for producers and the economy. However, it is important for the Committee to appreciate that the role of

interoperability and public policies to promote it vary greatly
depending on the nature of the economic activity that is being
analyzed.

### INTEROPERABILITY SHOULD BE REQUIRED AS A MATTER OF
### PUBLIC POLICY IN CORE NETWORKS

     Ensuring interoperability is a critical and pressing public policy
concern when it affects the critical functions of a vital network in
our economy. For example, we demand interoperability in the
communications network, as a public obligation, because it is a vital
infrastructure at the core of our economy.\1\ Telephone networks have
interoperated for almost 100 years. The advent of the Internet has
brought with it amazing new opportunities for communication-WiFi-
enabled telephones can connect with computers. E-mail users can connect
to Blackberries. Macintosh users can send and receive files to and from
Windows users. Interoperability supports a vast array of other
activities and the failure to interoperate would chill innovation and
distort economic activity.
--------------------------------------------------------------------------
     \1\ Mark Cooper, Open Architecture as Communications Policy
(Stanford Law School Center for Internet and Society, 2004), available
for download under a Creative Commons License at http://
Cyberlaw.Stanford,edu/blogs.cooper/openarchitecture.pdf.
--------------------------------------------------------------------------

     Over the past quarter of a century, as the digital economy has
grown and influenced the broader economy, the importance of
interoperability has grown because ``platforms'' play an increasingly
important role. ``A platform is a common arrangement of components and
activities, usually unified by a set of technical standards and
procedural norms round which users organize their activities. Platforms
have a known interface with respect to particular technologies and are
usually 'open' in some sense.'' \2\
--------------------------------------------------------------------------
     \2\ Shane Greenstein, ``The Evolving Structure of the Internet
Market'' in Understanding the Digital Economy (Erik Brynjolfson and
Brian Kahin (Eds) (2000), p. 155.
--------------------------------------------------------------------------
     Interoperability to maximize the availability of functionality has
been the hallmark of digital platforms for a simple reason. By keeping
interfaces open and making the functionality available, the entire
platform is driven forward, expanding the opportunities for all who
build to and take from (use) the platform. ``Interfaces exist to entice
other firms to use them to build product that conform to the defined
standards and therefore work efficiently with the platform.'' \3\
--------------------------------------------------------------------------
     \3\ Anabelle Gawer and Michael A. Cusumano, Platform Leadership
(2002), p. 56.
--------------------------------------------------------------------------
     The superior value of interoperability of critical networks through
open interfaces was recognized by the National Research Council of the
National Academy of Sciences in a 1994 analysis of the Internet, just
before it exploded into wide popular use in America. ``The telephone
system is an example of an open network, and it is clear to most people
that this kind of system is vastly more useful than a system in which
the users are portioned into closed groups based, for example, on
service provider or the user's employer.'' \4\

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY        Page 11 of 35
Case 4:05-cv-00037-YGR   Document 985-21   Filed 12/12/14   Page 39 of 92
Case 4:05-cv-00037-YGR   Document 753-11   Filed 04/13/14   Page 39 of 92

---

    \4\ National Research Council, Realizing the Information Age
(1994), p. 43.

---

    In contrast, interoperability in the digital content and consumer
goods industries, like video games or music formats, is a consumer-
friendly way to do business. The failure of interoperability in the
music industry affects the music industry and the consumers who
purchase digital music. The failure of interoperability in the
communications industry affects the entire economy.

       INTEROPERABILITY SHOULD BE PROMOTED IN CONSUMER APPLICATIONS

    We believe that interoperability best serves the interest of
consumers and producers throughout the digital platform, but as the
question moves from the interoperability of the network, to how that
network is used for music it becomes important for the marketplace to
provide better clarity. If an application developer refuses to
interoperate, we believe that developer will ultimately pay the price,
because consumers will migrate to interoperable offerings. Applications
developers should be allowed to discover the consequences of their bad
decisions in the marketplace.
    We believe consumers demand interoperability, and will pick it when
given the choice. However, the development of converged or open
platforms takes time, and it requires that consumers understand their
options. Disclosure and consumer expectations should be taken into
consideration. Sellers of closed platforms need to better inform
consumers that their platforms are closed, and that consumers might be
locking themselves into future hardware and software purchases in that
platform.
    Consumers have certain expectations that they could pop a record
onto a turntable or a compact disc into a CD player and music would
come out. If digital formats are not going to replicate that
interoperability, retailers of digital music and digital music players
have a special obligation to inform consumers who have built up
expectations of interoperability over years, even decades of
experience. Given good information-such as where and how things will
work, and where it won't--we are confident consumers will choose the
interoperable systems over closed platforms,

           WHEN THE FAILURE TO INTEROPERATE RAISES CONCERNS

    An industry's refusal to interoperate should also not become a
lever for anticompetitive strategies. This is a special concern in
platform industries where a company may come to dominate one critically
important component (layer) of a platform and seeks to use that
dominance to frustrate competition in other components.\5\ This is a
problem of vertical leverage in antitrust analysis and it grows in
significance in platform industries precisely because of the heightened
importance of interfaces between components (layers) in these
platforms. Closing interfaces takes on special importance.
Unfortunately, antitrust practice has drifted away from concerns about
vertical leverage, at precisely the moment it demands greater scrutiny
and attention.

---

    \5\ Mark Cooper, ``Antitrust as Consumer Protection in the New
Economy: Lessons from the Microsoft Case,'' Hastings Law Journal, 52:4,

2001. Available at http://www.consumerfed.org/cooper--hastings--law--
review--200106.pdf
--------------------------------------------------------------------------
    We believe that music, movies and other digital content could
quickly grow to become that anti-competitive lever, if it is not
already. For the consumer who purchased any digital music player other
than an iPod, there's no simple recourse when R.E.M. releases a series
of songs exclusively on iTunes Music Store.\6\ Nor is there any
recourse at all for a Mariah Carey fan with an iPod on a Macintosh when
she releases an exclusive song on MSN Music--a platform that simply
won't work with Macintosh or iPods.\7\
--------------------------------------------------------------------------
    \6\ While iTunes allows consumers to burn purchased protected
digital music to a CD--n open platform--it must be pointed out that a
consumer would need to install a new program, purchase the song, burn
the song to CD, rip the burned CD into a format their current player
will understand and then enter all the song information manually--a
cumbersome process digital music stores were supposed to make
automatic.
    \7\ A consumer with an iPod and Windows might have more luck if
they followed the steps in Footnote 6, but users with a Mac are out of
luck--and won't be able to download that song legally.
--------------------------------------------------------------------------
    Consumers who run up against these problems with music, movies or
other digital content will increasingly turn to methods that
potentially infringe copyright to get the song they want, including
searching the Internet for a copy of the song converted to an open
format. This is a less-than-adequate solution, and one that all parties
should be wary of inadvertently promoting. Both the content and device
industries surely recognize that every time they drive a consumer to
infringe copyright because of their support for a closed platform, they
create new incentive to create and deliver an open platform.

              DIGITAL DISTRIBUTION OF MUSIC HAS JUST BEGUN:
                 INTEROPERABILITY WILL LIKELY PREVAIL

    Last year, when the recording industry finally accepted the
inevitability of digital distribution of music, the industry sold more
singles than at any time in the past two decades. The transition to
digital distribution has begun in earnest. This transition is
inevitable. Digital distribution reduces the costs of production,
marketing, and distribution. It may also radically alter the approach
to promotion. The cost of delivering music to the public will decline
by 50 percent or more and the selling of music will shift from bundles
of songs to singles.
    Major record labels--whose artists account for over 80% of the
music purchased in America--are belatedly considering alternative
business models for digital distribution. This lead to subscription
services like Real Rhapsody and Napster 2.0 or a la carte services like
those two companies offer, iTunes Music Store, and others.
    The music industry is not facing a format war, like the battle they
are currently fighting over high-definition music--where some labels
exclusively sell content on SuperAudio CD while others only release
premium music on the DVD-Audio format. A format war clearly would have
impeded the adoption of digital music. But as the amount music
exclusively available on one format increases, and as consumers
discover they've purchased thousands of dollars of music to fill up

their digital music devices, locking themselves to one type of player forever, they are more likely to get confused and frustrated. To alleviate both, record labels and device manufacturers should proactively inform consumers about the limitations of their closed systems, and work to develop open standards.

Those who had foresight and created a digital music platform with portable digital music players and digital music download stores now have a lead, winning a first-mover advantage. But as the entirety of the music industry makes the inevitable transition to digital distribution, there are no guarantees that the initial advantage will persist, especially if mistakes are made with regard to interoperability. A quarter of a century ago a closed platform dominated the computer desktop market. A more open platform quickly replaced it, forcing all platforms to improve compatibility. Given a choice that is not distorted by anticompetitive practices and good information consumers will prefer and migrate to the interoperable platforms.

                              CONCLUSION

Last week oral argument in two critical cases (National Cable and Telecommunications Association et al. v. Brand X Internet Services et. al and Metro-Goldwyn Mayer Studios Inc. et al v. Grokster) that will determine the future of the Internet made it clear that technology policy requires a careful balance between the public and private interests. Interoperability in core infrastructure industries has been a key ingredient in this nation's economic success since the railroad track was standardized and the telecommunications network was obligated to provide interconnection and carriage on just, reasonable and nondiscriminatory rates, terms and conditions.

I thank the Committee for recognizing that in the digital economy interoperability has even broader implications and I look forward to working with the committee to find the right mix of public obligations and private incentives to achieve open, competitive platforms that provide a dynamic, consumer-friendly economy.

Mr. Smith. Thank you, Dr. Cooper.
Mr. Gifford?

          TESTIMONY OF RAYMOND L. GIFFORD, PRESIDENT,
              THE PROGRESS & FREEDOM FOUNDATION

Mr. Gifford. Thank you, Mr. Chairman.
When I begin to agree with my friend, and sometimes nemesis, Mark Cooper I start to doubt myself, but I appreciate the opportunity to speak with you today and the Members of the Subcommittee.

In seizing on this topic, the Committee has hit upon one of the key conundrums of the digital age, namely, the role of standard-setting and the subsidiary goal of interoperability. Interoperability is a key challenge to firms and network industries. The success of a given platform depends on its attractiveness to consumers, and a key value for consumers is the platform's ability to interoperate with a variety of applications. Interoperability, to be sure, is a value to consumers and firms, but it is not an absolute value.

The Progress and Freedom Foundation recently hosted a

series of events in Europe on standard-setting and
interoperability. My conclusions from those events will serve
as my introduction here.

First, standard-setting is hard. We do not know, before the
fact, the optimal method or amount of standards or
interoperability. For public policy, this should inspire a
great deal of caution from mandating any given outcome or
particular standard. Because there are undeniable tradeoffs
from any standard-setting or interoperability decision
Governments should be wary of thinking they have sufficient
foresight to make proper interoperability decisions and
deferential to private attempts to achieve interoperability.

Finally, for public policymakers, we can never forget the
lessons of public choice theory, which predict that firms and
interest groups will seek Government favor in promoting their
interoperability solution and in handicapping their rivals.

I have three specific theses:

First, protect the Schumpeterian incentives to innovate and
compete for not just in the market;

Second, allow open and closed platform business models to
compete;

And, third, permit the freedom to use digital rights
management.

First, much of the brow-furrowing over interoperability and
digital music stems from the success of the Apple iPod
platform. I urge this Subcommittee not to give into the
politics of platform envy. Joseph Schumpeter, you may recall,
was the economist who described capitalism as a process of
creative destruction, with new firms and new products spurring
innovation and creating new markets. Digital music is a new
market, and the iPod platform and its remarkable success is the
harbinger of those types of markets and what they can be. The
law, intellectual property and antitrust law, specifically,
should encourage this dynamism.

Second, a related question to the types of competition that
is occurring in this market is the platform models that firms
choose to compete in the market. This gets to the heart of
interoperability as different firms opt for platforms of
varying degrees of openness on the one hand or closed
integration on the other.

From a business standpoint, you can see the tradeoffs and
strategic decisions the companies are making. By opting for a
more open platform, the firm hopes to attract more users to its
platform and increase the number of applications compatible
with its platform. The tradeoff involves sharing more of the
profits from that platform and, also, perhaps some of the
quality control over the whole consumer experience. In
contrast, a more closed platform rather audaciously attempts to
gather all of the rents from production, but perhaps at a cost
of interoperability.

Should public policy be concerned with these business
decisions? Probably not. If you start looking for standards to
scrutinize, you will see them everywhere, from razors and
blades, to PSPs and disk drives, to MP3 Players and iPods.
Because we cannot know in advance what consumers will prefer or
what is truly superior, we should forbear from interfering.

A final value of public policy should be to ratify the

Case 4:05-cv-00037-YGR   Document 955-11   Filed 04/10/14   Page 43 of 92

acceptability and use of digital rights management or DRM
technologies. DRM allows content providers a reasonable degree
of confidence in bringing digital music to market and consumers
the ability to purchase digital music. DRM will be integral to
consumers' access to digital content and, hence, must be
allowed its place as a valid market mechanism.

Standards are hard. Interoperability is a good thing, but
not an absolutely good thing. Consumers' tastes for the most
part will drive toward interoperable platforms, but not
necessarily. Intellectual property law, antitrust and
administrative regulation point in slightly different
directions on these issues, but are up to the task of
confronting the policy challenges presented by digital
technologies. From Congress's point of view, the best course
would be to resist calls for mandates or technology limitations
in this dynamic space.

I thank the Committee for the opportunity to testify today
and look forward to your questions.

[The prepared statement of Mr. Gifford follows:]

Prepared Statement of Raymond Gifford

Good morning, Mr. Chairman, Mr. Berman and members of the
subcommittee. Thank you for the opportunity to speak to you today on
digital music interoperability and availability. In seizing on this
topic, the Committee has hit upon one of the key conundrums of the
digital age; namely, the role of standard setting and the subsidiary
goal of interoperability. As you know, markets for digital music are
nascent and emerging. Different platforms, different file formats and
different digital rights management systems are competing for
dominance. Indeed, even different business models are duking it out,
with Napster To Go's subscription model taking on iTunes and Wal Mart's
(among others) pay-per-song model. All of this indicates a competitive,
functioning market working within the bounds of copyright and patent
law, with a backstop of antitrust should unlawful monopoly concerns
arise.

Interoperability is a key challenge to firms in network industries.
The success of a given platform depends on its attractiveness to
consumers, and a key value for consumers is the platform's ability to
interoperate with a variety of applications. Interoperability, to be
sure, is a value to consumers and firms, but it is not an absolute
value. Standards and interoperability can be achieved through a variety
of institutions: within single firms, within private consortia, with
government blessing and with government mandate. Standards can be open
and non-propriety, or closed and proprietary, and gradations in between
these extremes. In digital music markets we see all of these models, to
varying degrees. There is the relatively more closed and integrated
iPod platform; there are the relatively more open MP3 platforms. There
are different file formats; there are different DRM solutions.

I appreciate the opportunity to speak to you on this topic because
I have been thinking about it so much myself. The Progress & Freedom
Foundation recently hosted a series of events in Europe. My conclusions
from those events serve as my introduction here:

First, standard setting is hard. We do not know ex ante the
optimal method for standard setting, or the optimal model. Are
open standards preferable? In some cases, yes; in others, no--

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY    Page 16 of 35
Case 4:05-cv-00037-YGR  Document 955-81  Filed 10/10/14  Page 44 of 92
Case 4:05-cv-00037-YGR  Document 955-81  Filed 04/13/14  Page 17 of 36

you are making a trade-off. Are proprietary or non-proprietary standards going to give the greatest amount of innovation? We cannot be sure. Do we prefer competition for a standard or competition within a standard? Depends on the quality of the standard you start with, and also requires recognition of the (unknown and unknowable) costs of the standard foregone.

For public policy, all this should inspire a great deal of caution for mandating any given outcome or specific standard. Because there are undeniable trade-offs from any standard-setting decision, governments should be: a) wary of thinking they have sufficient foresight to make proper standard-setting decisions; and b) deferential to private attempts at standard setting. Different business models will emerge, different appetites for risk will be revealed--some firms will hedge risk and cooperate with others in standard setting; others will audaciously seek to ``win'' the standard with a fully closed, vertically integrated model (large parts of the iPod business model come to mind here). Only where the collective action problem seems overwhelming should government deign to enter the standard setting sphere.

Finally, for public policy makers, we can never forget the lessons of public choice theory, which predicts that firms and interest groups will seek government favor in promoting their standards solution and handicapping their rivals. Any call for government to prefer one standard or model over another must be subject to the most exacting skepticism given what we know about the propensity for the public policy process to be perverted toward private ends.

With that, let me address three issues relating to digital music interoperability that occasioned this hearing today. I have three specific theses: first, protect the Schumpeterian incentives to innovate and compete for, not just in, the market; second, allow open and closed platform business models to compete; and, third, permit the freedom to use digital rights management technology so digital music will be brought to market.

PROTECT THE SCHUMPETERIAN INCENTIVE TO INNOVATE AND CREATE NEW PLATFORMS

    Much of the brow-furrowing over interoperability in digital music stems from the success of Apple's iPod platform. I urge this Subcommittee not to give in to the politics of platform envy, however. Instead of being concerned with the business decisions of a firm, and the preferences of consumers, the Committee should celebrate the triumph of the iPod platform as Schumpeterian competition at its best.
    Joseph Schumpeter, you may recall, was the economist who described capitalism as a process of ``creative destruction,'' with new firms and new products spurring innovation and creating new markets. Digital music is a new market, and the iPod platform and its remarkable success is the harbinger of that market and what it can be. In turn, this competition for the market has spurred other innovation, other platforms and other business models to emerge to challenge the iPod platform. This is a type of competition that benefits consumers immeasurably. It is the type of dynamic competition that is making

digital music a reality to millions of American consumers. The law--intellectual property and antitrust law, specifically--should encourage this dynamism.

     There are at least three benefits to this Schumpeterian competition: firms compete to build a valuable customer base, firms bring new products to market more quickly for fear of being displaced, and companies are driven to develop superior technologies. All of these are benefits we are now seeing from inter-platform competition for digital music markets. To be sure, this competition may create some hiccups and difficulties for interoperability as it goes on, but the innovation benefits are worth it. Furthermore, these markets usually trend toward interoperability, as that is usually where consumer preference directs them.

     By contrast, government-mandated interoperability sacrifices the dynamic competition for the standard for competition within the standard. This mandate would appropriate the value that the platform innovator has created, and allow others to interoperate on the platform. Long-term, such mandated unbundling of digital music platforms in the name of interoperability will quell innovation and investment in the platform. Furthermore, this call for mandated interoperability is, by definition, going to be opportunistic. No one calls for access to failed platforms, say the Betamax, the Commodore 64, or the Digital Audio Tape.

     One of the questions here is how law will treat cases of reverse engineering, such as Real Networks has attempted to do with the iPod, and various hackers have done with the Fairplay DRM system and the Napster To Go DRM. Interestingly, copyright law tends to be more solicitous of reverse engineering, while patent law tends to be hostile toward reverse engineering attempts. On balance, it seems to me that IP law should encourage this inter-platform competition such as we see happening in digital music, and thus be suspicious of attempts to reverse engineer and de facto ``unbundle'' the successful platform.

     So, my first advice is: don't give into platform envy and mandate some sort of interoperability. Antitrust law and the common law-like doctrines of intellectual property law are adequately suited to address the challenges from new digital music platforms.

               (RELATIVELY) MORE OPEN AND MORE CLOSED PLATFORM MODELS
                          WILL COMPETE FOR DOMINANCE

     A related question to the type of competition that is occurring in this market is the platform models that firms choose to compete in the market. This gets to the heart of interoperability, as different firms opt for platforms of varying degrees of ``openness,'' on the one hand, or closed integration, on the other. For Congress, I do not think this should be of particular concern because the market will sort out what is superior, or at the very least make a better judgment about the inevitable trade-offs involved.

     From a business standpoint, you can see the trade-offs and strategic decisions that companies are making. By opting for a more ``open'' platform, the firm hopes to attract more users to its platform and increase the number of applications compatible with its platform. The trade-off involves sharing more of the profits from that platform, and also perhaps some of the quality control over the whole consumer experience. In contrast, a more closed platform rather audaciously attempts to garner all of the ``rents'' from production, but at a cost (perhaps) of interoperability. We saw this very dynamic in the

competition for the personal computer standard with the lower-cost,
modular Wintel platform competing with the higher-cost, more tightly
integrated Apple MacIntosh platform. We see reflections of that same
business strategy difference now with digital music players.

Recently, The Wall Street Journal had a story about a new trend
toward ``closed'' non-interoperable platforms--in coffee makers. Yes,
coffee makers, which have traditionally been ``open-architectured''
devices with standard filter basket design and open to any brand or
grind of coffee. Now, companies such as Nestle with a Nespresso, Sara
Lee with Senseo and Kraft with a Tassimo, are making closed-platformed
coffee makers that use special fiters and coffees that work just with
the specific maker. And just last week a new, relatively closed
standard emerged on the consumer electronics scene, the Sony PSP. I
know this because my 10 year old son is bugging me for one. The PSP
uses a disk size that is proprietary to Sony. As a consumer, I may fear
``lock in'' on these closed platforms, but I can make the decisions
whether to buy or not.

Should public policy be concerned with this turn in the annals of
coffee maker platform design or video game devices? Probably not. If
you start looking for standards to scrutinize, you will see them
everywhere--from razors and blades, to PSPs and disk drives, to MP3
Players and iPods. Because we cannot know in advance what consumers
will prefer or what is truly superior, we should forbear from
interfering.

FREEDOM TO USE DIGITAL RIGHTS MANAGEMENT

A final value for public policy should be to ratify the
acceptability and use of digital rights management or DRM technologies.
DRM allows content providers a reasonable degree of confidence in
bringing digital music to market, and consumers the ability to purchase
digital music. DRM will be integral to consumers' access to digital
content and hence must be allowed its place as a valid market mechanism
to bring digital music to market.

Some argue that DRM is a limitation on consumers' freedom and its
used should be circumscribed. This is wrong on two fronts. First, the
price system in a functioning market takes this into account and
reduces consumers' costs correspondingly. If I purchase a song with DRM
attached that limits its platform compatibility, those limits are in
the price I pay. Because the nature of digital technologies allows
perfect, costless copying, my consent as a consumer to purchase a DRM-
restricted song may be the only way I can enjoy digital music. If the
choice is between digital music with DRM and no digital music, I will
take the former.

The argument that DRM--and its associated technological arms races
to break it--is socially wasteful proves too much. By this logic, my
investment of locks on my home is socially wasteful because a
determined burglar will be able to break in anyway. DRM does, as we
see, inspire a hack and counter-hack arms race, and this is indeed not
salutary for the mass of consumers who want to properly use licensed
digital music. And indeed, DRM can be overrestrictive to consumers'
desires for interoperability. But right now, I do not have a better
idea. More important, the market opportunity for more-tailored DRM
should provide the opportunity for it to become better and more
accommodating of consumers' wishes.

Indeed, HR 1201, pending in another committee, would in effect
remove DRM as a marketplace option. By permitting consumers to

circumvent copy-protection mechanisms, currently a violation of the
Digital Millennium Copyright Act, any contract between a consumer and a
content provider involving a fixed payment for a fixed set of rights
could be unilaterally voided by the consumer.

   We are constantly hearing calls for more flexible business models
in digital content. If HR 1201 were to pass, I could approach the
existing smorgasbord of digital music offerings, for example, and
purchase the most affordable option, which likely involves limitations
on platforms and devices, enforced through DRM technology. I could then
legally hack through those protections and use the content however I
may see fit, gaining the same flexibility of use as a consumer who paid
full price for that use. It's not hard to imagine that in a world where
DRM hacking is legal, there would be little incentive for content
providers to compete with various rights models, as we see now with
Napster To Go. That would mean less content with fewer price options,
and thus a loss for consumers.

                            CONCLUSION

   Standards are hard. Interoperability is a good thing, but not an
absolutely good thing. Consumers' tastes, for the most part, will drive
toward interoperable platforms, but not necessarily.

   Intellectual property law, antitrust and administrative regulation
point in slightly different directions on these issues, but are up to
the task of confronting the policy challenges presented by digital
technologies. From Congress' point of view, the best course would be to
resist calls for mandates or technology limitations in this dynamic
space.

   I thank the Committee for this opportunity and ask that my written
remarks be made part of the record. I am happy to answer any questions
you may have.

   Mr. Smith. Thank you, Mr. Gifford.
   Dr. Pence.

        TESTIMONY OF WILLIAM E. PENCE, PH.D.,
          CHIEF TECHNOLOGY OFFICER, NAPSTER

   Mr. Pence. Thank you, Mr. Chairman, Mr. Berman, Members of
the Subcommittee for inviting me here today. Thank you, also,
for the leadership that you have exercised in the fight against
piracy and for recognizing the importance of the legitimate on-
line music marketplace.

   Like our colleagues in the on-line music industry, Napster
has a vision for what consumers want in a service: great music,
deep catalog, easy-to-use technology, high-quality files
without spyware, pornography or viruses, and flexibility and
portability all at a fair price.

   Recently, as you may be aware, Napster introduced the first
portable music subscription service, Napster To Go, that allows
consumers to enjoy our large catalog of music on a variety of
portable devices for a plat price of only $15 a month. Combined
with unlimited downloading and streaming, we believe this
service provides consumers with all of the key elements they
want in a digital music service: freedom to discover music on
an unlimited basis and the ability to take that music with them
wherever they go.

For many users, this is a more attractive option than buying individual tracks for 99 cents. We support an ala carte download store as well, and we strive to offer as many choices to consumers as possible. All of these choices, and more to come, are enabled through our underlying digital rights management platform which is based on Microsoft software components.

I have been asked to testify today specifically about digital music interoperability, about the value of interoperability to consumers, creators, and legitimate on-line music marketplace and about when full digital music interoperability may be available. In particular, some have asked whether Congress should help jump-start the legitimate marketplace by mandating digital music interoperability so that consumers will no longer be confused, so that they will know for sure that every digital song they acquire lawfully will play on any portable music player and on any PC.

We have been asked whether digital interoperability might be the magic bullet that enables legitimate on-line music to win the battle against piracy and black-market networks.

As a technologist, it seems important to appreciate that each digital song file has two essential components, the audio compression software and the digital rights management software and that each can be a source of interoperability confusion. You may be familiar with audio compression software or codecs that have been developed by Real Networks and Microsoft, as well as the MP3 format developed by Fraunhofer and the AAC format utilized by Apple. But there were literally dozens of audio codecs offered in the late 1990's.

Historically, codecs were incompatible, and if one downloaded a song in the MP3 format, it would not play if your PC utilized a different format. Today, however, this is less of an issue, generally, because audio codecs have been in the marketplace for several years, and traditional marketplace forces have evaluated the qualities and sustainability of each. As a result, only two or three codecs are relevant in the on-line marketplace today, and interoperability is considered essential and made possible by licenses that are easily available and economically reasonable.

For consumers, the generally successful outcome is that PCs and portable music devices today support more than one of the surviving codecs, minimizing, although not eliminating, dysfunction for end users. Today, for example, users can copy their CD collection onto their PC in the MP3 format and combine those music files with songs purchased from Napster in the Microsoft WMA format and seamlessly transfer all to portable devices without ever knowing that two separate formats were involved.

In contrast, DRM interoperability has remained at the center of debate in the on-line music industry. In the last several years, high-quality DRM technologies have been developed and offered by dozens of companies. While the market has narrowed the field from dozens of DRM technologies to less than a handful today that are commercially meaningful, the DRM market is still significantly less mature than the codec market, and the competing offerings are not fully rationalized or stabilized.

More importantly, DRM technology is still in a stage of
rapid innovation. This is best demonstrated by the pace of new
business models being introduced in the market, including our
own Napster To Go service. As consumers' on-line services and
copyright owners have become more sophisticated, technology
innovators have responded rapidly and brought improved products
to market, but DRMs are still being developed, tested,
challenged and upgraded, and I encourage Congress to welcome
and promote this innovation and the improved music offerings
that result.

It is my belief, and the essential point of my
participation today, that marketplace forces will continue to
drive innovation in the DRM arena with the tenant consumer
benefits, new ways to enjoy digital music at a variety of
different price points, while also gradually solving the
interoperability problem.

The solutions will be evident through a combination of
consumer devices that support multiple DRM formats and services
that will translate from one DRM format to another, as content
flows legitimately between devices, always maintaining the user
rules as defined by the service that originally makes the
content available. Already we see evidence of DRM market forces
in action, as companies coalesce around platforms.

Historically, the Government has not been a participant in
competition between early-stage consumer technologies.
Government intervention in the innovation business can lead to
politicizing and inhibiting such innovations rather than
allowing the marketplace, based on actual demand, to select
winners that must continue to provide viable solutions.

In contrast, Napster wholeheartedly endorses the
conclusions of Chairman Smith and Representative Berman that
were offered in a recent Subcommittee hearing about our music
licensing laws. Congress has a critical role to play in
facilitating the legitimate on-line music marketplace by
modernizing the Copyright Act.

Thank you, again, for providing the opportunity for Napster
to address the issues that continue to hamper industry and for
your continuing support in helping royalty-paying, on-line
music services defeat piracy.

[The prepared statement of Mr. Pence follows:]

Prepared Statement of William E. Pence

Mr. Chairman, Mr. Berman, and Members of the Subcommittee:
Thank you for inviting me, on behalf of Napster, to testify at
today's hearing at which the Subcommittee is considering the importance
of digital music interoperability. Thank you also for the leadership
that you and the Members of the Subcommittee have exercised in the
fight against piracy, and for recognizing the importance of the
legitimate online music marketplace, both for its independent value as
an opportunity for creators and consumers to distribute and enjoy more
and different types of music, and for the value of royalty-paying
online music as the marketplace solution to piracy.

Napster is also particularly appreciative of the Subcommittee's
leadership with regard to the education and youth market. Napster, as
you know, is working closely with the recording industry and a number
of universities to bring legal music to the campuses of America in a

Case 4:05-cv-00037-YGR   Document 955-11   Filed 10/13/14   Page 50 of 92

manner that encourages this important consumer group to respect the
legitimate marketplace while recognizing its hunger for a full-featured
digital music service at a reasonable price.

   Like our colleagues in the online music industry Napster has a
vision of what consumers want in an online music service: great music,
deep catalog, easy-to-use technology, high-quality files without
spyware, pornography, or viruses, and flexibility and portability, all
at a fair price. Moreover, our company story demonstrates that
consumers are willing to pay for this: from a standing start four years
ago as PressPlay to today's Napster, we now have more than 400,000
paying subscribers worldwide, including more than 50,000 subscribers on
college campuses.

   Recently, as you may be aware, Napster introduced the first
portable music subscription service, Napster-to-Go, that allows
consumers to enjoy our large catalog of music on a variety of portable
devices for a flat price of only $15 a month. Combined with unlimited
downloading and streaming, we believe this service provides consumers
with all the key elements they want in a digital music service--freedom
to discover music on an unlimited basis, and the ability to take that
music with them wherever they go. For many users, this is a more
attractive value than buying individual tracks for $0.99, though we
support an a la carte download store as well, and we strive to offer as
many choices to consumers as possible. All of these choices, and more
to come, are enabled through our underlying digital rights management
platform, which is based on Microsoft software components.

   I have been asked to testify today specifically about digital music
interoperability--about the value of interoperability to consumers,
creators, and the legitimate online music marketplace--and about when
full digital music interoperability may be available. In particular,
some have asked whether Congress should help jump-start the legitimate
marketplace by mandating digital music interoperability so that
consumers will no longer be confused, and rather they will know for
sure that every digital song they acquire lawfully will play on any
portable music player, on any PC, and if burned to a compact disc that
it will play on every CD player. We have been asked whether digital
interoperability might be the magic bullet that enables legitimate
online music to win the battle against black market networks that
enable music theft and generate no royalties to artists.

   As a technologist, it seems important to appreciate that each
digital song file has two essential components--the audio format
software and the digital rights management software--that can each be a
source of incompatibility. You may be familiar with audio format
softwares, or codecs, that have been developed by RealNetworks and
Microsoft, as well as the MP3 format developed by Fraunhofer and the
AAC format utilized by Apple. But there were literally dozens of audio
codecs offered in the late 1990s, including software developed by AT&T
Labs and Universal Music.

   Historically codecs were incompatible, and if one downloaded a song
in the MP3 format it would not play if your PC utilized Liquid Audio
software, and vice-versa. Today, however, this is less of an issue,
generally because audio codecs have been in the marketplace for several
years and traditional marketplace forces have evaluated the qualities
and sustainability of each. As a result only two or three codecs are
relevant in the online music industry today, and interoperability is
considered essential and is made possible by licenses that are easily
available and economically reasonable. And for consumers, the generally
successful outcome is that PCs and portable music devices today support

more than one of the surviving codecs, minimizing (although not eliminating) dysfunction for end users. Today, for example, users can copy their CD collection onto their PC in the MP3 format and combine those music files with songs purchased from Napster in the Microsoft WMA format, and seamlessly transfer all to portable devices without ever knowing that two separate formats were being integrated.

In contrast, DRM interoperability has emerged recently as the center of debate in the online music industry. In the last several years high-quality DRM technologies have been developed and offered by dozens of companies, including Liquid Audio, AT&T Labs, Universal Music, RealNetworks, IBM, Microsoft, Contentguard, Intertrust, Verance and Macrovision. While the market has narrowed the field from dozens of DRM softwares to less than a handful today that are commercially meaningful, the DRM market is significantly less mature than the codec market, so the competing offerings are not fully rationalized or stabilized.

Importantly, the market's immaturity is driven by the technology's immaturity, as DRM technology is still in a stage of rapid innovation. This is best demonstrated by the pace of new business models being introduced in the market, including our own Napster to Go service, based on the just released DRM10 technology from Microsoft. As consumers, online services and copyright owners have become more sophisticated, technology innovators have responded rapidly and brought improved products to market, but DRMs are still being developed, tested, challenged, and upgraded--and I encourage Congress to welcome and promote this innovation and the improved music offerings that result.

It is my belief, and the essential point of my participation today, that marketplace forces will continue to drive innovation in the DRM arena with attendant consumer benefits--new ways to enjoy digital music at a variety of different price points--while also gradually ``solving'' the interoperability problem. The solutions will be evident through a combination of consumer devices that support multiple DRM formats, and services that will translate from one DRM format to another as content flows legitimately between devices, always maintaining the user rules as defined by the service that originally makes the content available.

Already we see evidence of DRM market forces in action as companies coalesce around platforms. A good example of this is the many online services and device manufacturers that have licensed and deployed the Microsoft DRM. Others, such as Apple, have chosen not to license their technology platform under any terms to services and manufacturers eager to offer innovative business models to consumers. Perhaps Apple is confident that its market-leading position is best maintained by promoting a closed environment, and that is a legitimate business decision that some endorse and others may question. Napster believes that allowing the iPod to work with multiple service offerings would benefit consumers. Nevertheless, I do not see Government intervention as the solution, as it would stifle competition and innovation that will benefit consumers and copyright owners at a very early stage of the market's development.

Historically the Government has not been a participant in competition between early-stage consumer technologies, such as between the VHS and the Betamax, the cassette and the 8-track tape, USB and Firewire, or the current competition between DVD Audio and Super Audio CD. Similarly, it does not seem prudent for Government to pick a winner in the continuing (but still quite early-stage) marketplace battle

between Apple's Fairplay DRM and its competitors. Government intervention in the innovation business can lead to politicizing and inhibiting such innovation, rather than allowing the marketplace, based on actual demand, to select ``winners'' that must continue to provide viable solutions or lose their market--deservedly--to the next great offering that someone develops in his or her garage or corporate lab.

In contrast, Napster wholeheartedly endorses the conclusions of Chairman Smith and Representative Berman that were offered in the recent Subcommittee hearing about our music licensing laws. Congress has a critical role to play in facilitating the legitimate online music marketplace, by modernizing the Copyright Act--in particular, Sections 115 and 112 as they relate to music publishing rights and royalties. Napster and our legitimate online music competitors compete with pirate services, and it is critical to creators and all who support them that royalty-paying services win the day.

If this Subcommittee helps legal services to secure blanket licenses for music publishing rights, we will offer the full catalog of music that, ironically, only the black market networks players can currently provide to consumers. Once we are actually functioning on an equal music playing field, Napster believes that our then-significantly larger number of consumers who realize that our features and functionality are so much more robust and appealing than the virus-ridden free option, will speak out on the subject of interoperability and encourage the market to adapt.

Thank you again for providing the opportunity for Napster to address the issues that continue to hamper our industry, and for your continuing support in helping royalty-paying online services defeat piracy.

    Mr. Smith. Thank you, Dr. Pence.
    Mr. Bracy?

                TESTIMONY OF MICHAEL BRACY, POLICY DIRECTOR,
                        FUTURE OF MUSIC COALITION

    Mr. Bracy. Thank you, Mr. Chairman, Mr. Berman, Mr. Conyers, for being here today, and the rest of the Subcommittee. We appreciate the opportunity to present some testimony, some thoughts.

You have our written statement, so I am just going to kind of give some reflections off that if that is okay with the Committee.

As we are preparing for this hearing, it occurred to us that this is actually the 5-year anniversary of the formation of Future Music Coalition, and it gave us an opportunity to reflect on sort of what we have seen over the last 5 years and some kind of larger themes.

I think one of the things that is important to recognize is that a lot of what we are dealing with in the music community is the idea that new technologies have dropped the cost of actually getting involved in the music community, that technology creates more musicians because more people have access to capital to create music and to distribute music, to promote themselves, and to build that one-on-one relationship with friends.

The challenge that you see, as more and more people come into the community, is that the existing music structures, the

historic music structures don't really support the amount of
content that comes into the marketplace, and, frankly, didn't
support in the traditional models the way and the ability for
consumers to then to access that content.

And while there is a lot of disagreement and a lot of
different sort of visions as far as how you get to the end
game, as far as the legitimate digital marketplace for music,
there are some themes that we think cut across all aspects of
the music community of musicians an songwriters; the first
being that whenever possible artists need to maintain control
over their copyright and their career decisions.

Second is that artists, as independent entrepreneurs, need
the ability to compete in the marketplace, meaning they need
access to the basic networks, they need the ability to be
compensated for their work, and they need the ability to access
consumers.

The third is something that you have done a great job
throughout this process with the Committee is that artists need
to be seen by policymakers as valued participants in this
process, that is, the new systems are designed, new structures
are designed that artists need to be at the table, and we
certainly appreciate your leadership.

Now, this transition, as we said, is necessary and it is
welcome, and it is important, and that as more people get into
this marketplace, you are starting to see the type of
experimentation that really leads to this development of a
legitimate marketplace. Five years ago, we said the only way to
compete with Napster, an unlicensed Napster, was with a legal
Napster, that you have to really try to create incentives in
the marketplace to grow the market, to create legitimate
models.

And in the music community and among musicians, you really
see an embracing of those technologies. We recently published a
study with the Pew Internet and American Life project that
really had two major conclusions:

The first is that, on a universal basis, artists are
embracing the Internet. They are embracing technology. They are
trying to integrate that into their careers as a way to reach
their fans directly and to promote their work.

Of course, at the same time, there is this wide diversity
of opinions as far as where we are today. There are a lot of
different opinions in terms of peer-to-peer. You see that
emerging artists embrace peer-to-peer, to a certain degree,
because it gives them exposure. It is a way to get their name
out there. Existing artists, established artists, they are
concerned about what is happening to their revenue streams.
They are skeptical about what is happening with the new models,
and they are eager to see revenue flow into them directly. They
see what is going on with their checks.

Now, as the other witnesses have talked about, you are
starting to really see this digital marketplace emerging. It is
remarkable, 5 years on, to think about the growth of satellite
radio, digital subscription services, music blogs, e-zines,
Internet radio, webcasting, podcasting, iTunes.

Consumers are demonstrating their willingness to adopt
legitimate digital services. The marketplace is beginning to
take hold. The question is can we continue to see a legitimate

marketplace that really will benefit musicians and music fans.
In fact, the point is not that this industry is perfect or that
there even is a ``solution'' in place. It is a complicated
process. It includes multiple competing markets which are
dependent on evolving, technological innovation and regulatory
policy decisions. The future music marketplace will be driven,
to a large degree, by consumer adoption of broadband and high-
speed services to the home, which has its own regulatory and
technological uncertainty. Spectrum policy and the transition
to digital radio are going to play a big part of this as well.
    So vigilant congressional oversight to date has been
critical to this process. We are making a lot of inroads. We
are seeing the growth of the market. Now, there are a lot of
other sort of issues that are involved here that some don't
have the jurisdiction of this Committee, some do, but that help
sort of inform the growth of this digital marketplace.
    They include looking at issues of consolidation of the
existing commercial radio industry, accusations of structural
payola that limit the amount of songs or the type of songs they
can get on the public airwaves, expanding community-based low-
power radio networks into urban markets, looking at the digital
audio broadcasting question to make sure that DAB is
implemented in a way that addresses the fundamental concerns
about localism, competition and diversity that we have raised
as far as what is happening in the commercial radio
marketplace, and bringing digital radio in line with other
noninteractive digital transmission services that are required
to pay an additional performance royalty to performers for the
use of the music.
    Finally, I want to echo Mark Cooper's point, which is that,
as independent entrepreneurs, it is absolutely critical that
musicians and artists have access to the underlying networks,
that they can't be blocked off of the main channels.
    So, again, we appreciate the opportunity to testify. We
look forward to answering any questions and thank the Committee
for their leadership.
    [The prepared statement of Mr. Bracy follows:]

                Prepared Statement of Michael Bracy

    My name is Michael Bracy. As a founder and the Policy Director of
the Future of Music Coalition, I appreciate the opportunity to speak
with you today.
    FMC was founded on the belief that the terrestrial music industry
is fundamentally broken. By that we mean that the structures that
dominate the marketplace underserve the majority of creators and music
fans. We did not form FMC simply to complain, but to effect substantive
change in the music community by injecting the critical voices of
artists and creators in the midst of this transition from analog to
digital. By including these often absent voices at this critical
juncture, we work to build more equitable and responsive models. By
that we mean:

        1. Whenever possible, artists must maintain control over
        copyright and career decisions.

        2. Artists must be able to compete fairly in the marketplace,

meaning they must be able to receive compensation for their
work and have access to consumers.

3.  Artists must be seen by the policymaking community as
valued stakeholders in policy debates

The music community is in the midst of a necessary and welcome
transition to a digital business model. Major labels and commercial
radio stations have became integrated into huge corporations focused
less on music and culture but on maximizing revenues. The fundamental
basics of the major label structure--the need for huge capital
investment and scarcity of promotion and retail outlets--have been
overrun by technological innovation.
    This innovation has reshaped the way that music is recorded,
manufactured, promoted and distributed. Digital studios and software
programs dramatically reduce production costs. The Internet vastly
increases promotional and sales opportunities. The marketplace for
independent music has exploded, as indie labels proliferate to serve
the expanding artist community. While much of this music is simply not
aimed at the kinds of mass audiences of interest to major labels or
commercial radio, there clearly is a market for this music, and
alternate and Internet-based economies have begun to take shape.
    As these digital models take flight, many musicians are embracing
new business models that allow greater independence, direct contact
with their fans and more control over their careers. Others point out
the uncertainty of these times, and express skepticism that legitimate
digital distribution structures can be monetized at a level that would
replicate their revenue streams they are used to receiving from
previous models.
    In this context, the results of a recent study conducted by FMC and
the Pew Internet and American Life Project should not be surprising, or
controversial. This study found that musicians fully embrace the
Internet to promote and sell their work but remain divided over the
question of file-sharing.
    To a large degree, we found that these results could be tracked
according to demographic factors--emerging artists were more likely to
embrace file sharing services as a way to promote and distribute their
work, while established artists who made a majority of their income
from being a musician or songwriter raised more concerns.
    From our standpoint, it is important to recognize that we are still
in the early days of a significant marketplace transition. While peer-
to-peer remains extraordinarily popular, a legitimate digital
marketplace is emerging. Consumers are exploring new, licensed ways of
accessing and enjoying music, including satellite radio, digital
subscription services like Rhapsody, Emusic and Napster, music blogs
and ezines, the growth of Internet radio, webcasting, podcasting and
digital download stores like iTunes. This trend demonstrates consumers'
willingness to adopt legitimate digital services, and reinforces the
critical notion that the combination of technical innovation, access to
the underlying delivery mechanisms and reasonable licensing terms can
create a revitalized industry that serves both musicians and music
fans.
    The point is not that this industry is now perfect, or that we even
can see the ``solution''. Rather, we all should acknowledge that the
digital transition is complicated. It includes multiple competing
markets, dependent on evolving technological innovation and regulatory
policy decisions. The future music marketplace will be driven by

consumer adoption of broadband to the home, an area full of regulatory
and technological uncertainty of its own. Spectrum policy and the
transition to digital terrestrial radio will play a significant role in
determining how consumers are able to access digital content, and how
performers will be compensated in the future.

    Vigilant Congressional oversight of the transition of the music
marketplace has played a critical role in its success to date. At the
same time FMC sees a number of potential opportunities for action
today. Will Congress listen to the concerns of the music community by
addressing consolidation of the commercial radio industry and
accusations of structural payola that limit the songs that appear on
the public airwaves? Will the FCC be permitted by Congress to expand
the wildly popular non-commercial Low Power Radio licenses to urban
markets? Will Digital Audio Broadcasting be implemented in a way that
addresses the fundamental concerns about localism, competition and
diversity in the radio marketplace? And will digital radio be brought
in line with other non-interactive digital transmission platforms that
are required to pay an additional performance royalty to performers?

    Most importantly, will Congress be able to defend the ability of
musicians and songwriters to compete in the marketplace by ensuring
access to high speed networks? As independent entrepreneurs, musicians
and songwriters require that the fundamental open structures of the
Internet remain in place and that innovation is allowed to continue.

    Over the past five years, the Future of Music Coalition has been
fortunate to collaborate with dozens of organizations, representing
hundreds of thousands of musicians, songwriters, retailers, promoters,
community broadcasters and fans. The transition to a digital economy
represents real threats and real opportunities to these communities.
That being said, there are core themes that cut across all aspects of
the music community. These shared values of artists' control over their
copyright and career decision, ability to compete in the marketplace by
receiving compensation for their work and accessing consumers, and
being active participants in the policy process can serve us going
forward.

    Thank you again for the opportunity to participate in this hearing,
and I look forward to answering your questions.


    Mr. Smith. Thank you, Mr. Bracy.
    Dr. Cooper, in your testimony you said sellers of closed
platforms need to better inform consumers that their platforms
are closed. How would you suggest that they do that? Are you
just talking about a warning label or something else? And if
there's anyone who disagrees with that, I'd like to know that
as well.
    Mr. Cooper. You know, we could hypothesize a labeling
program which would be an obligation, but I don't necessarily
want to get there because that creates a process of gaming that
Mr. Gifford talked about.
    But the simple fact of the matter is, imagine if we had--if
iPods had to be labeled that said, ``This music won't play on
anything else,'' or vice versa. That would actually, people
would then start to think. And as people build up libraries and
they discover that they can't move their music from one device
to another, although if that continues what you'll get is
hackers who will start making it possible because innovation is
hard to quell in this marketplace.
    So the point is that policymakers need to engage in a

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY          Page 29 of 35

Case 4:05-cv-00037-YGR   Document 915-1   Filed 10/10/14   Page 57 of 92
Case 4:05-cv-00037-YGR   Document 753-11   Filed 10/13/14   Page 30 of 96

little bit of jawboning here, as maybe instead of a regulatory
position.
     Mr. Smith. So maybe not a Government mandate, but still
full disclosure.
     Mr. Cooper. Sure. Full disclosure, and attorneys general
ought to be asking these questions, this Committee, et cetera.
Jawboning can frequently get you a lot of help in the
marketplace rather than having a formal process about is this
labeled.
     Mr. Smith. Is there anyone who disagrees with the idea of
full disclosure and labeling for the consumers?
     [No response.]
     Mr. Smith. Okay. Mr. Gifford, I'm tempted to ask you if you
think Schumpeter should be the patron saint of Congress, but
let me ask you a more colloquial question, which is, do you see
any role for Government at all in the process?
     And that's a question I'd like the other members to address
as well.
     Mr. Gifford. Not at this time, Congressman. You have an
emerging nascent market. I think Dr. Pence spoke well, that you
have DRM technologies that are less mature than file format
technologies, and there's a lot of foment going on right now in
this marketplace, a lot of business models that are being
tried, a lot of reliance interests that are just taking root,
and I don't know how Government can do anything but upset that
very tentative equilibrium we're seeing.
     Mr. Smith. Dr. Pence and Mr. Bracy, what do you think about
any role for Government?
     Mr. Pence. Well, I mentioned the 115 issue in my opening
remarks. Short of that I don't there is much of a role to
play at this time. We think the market is very dynamic. We've
been introducing new business models as some of our competitors
have been, and we think the market is in the early stages where
it should be allowed to evolve and offer more choices to
consumers. So we don't--I don't see any additional role at this
time.
     Mr. Smith. Okay. Mr. Bracy?
     Mr. Bracy. Mr. Chairman, I think one of the challenges is
that to a certain extent it's important that Congress look at
ways of demonstrating that there is this broader marketplace
for local and independent music. I mean one of the realities of
the music community is that it is local, it's independent. The
music community has very little to do as far as the mass
marketing of music that you see in terms of major, you know,
huge platinum selling artists. And there are little things that
I mentioned in our testimony that can be done tangentially,
less on technology mandates or DRM discussions or things like
that, but more on looking at the existing ways that most
consumers access music and making sure they have access to
independent voices.
     Mr. Smith. Okay. Thank you, Mr. Bracy.
     Mr. Bracy, let me ask you and Dr. Pence to go beyond your
testimony. And you don't have to answer this question if you
don't want to, but I want to ask you about the Apple business
model, whether you think limiting the interoperability to
iTunes and the iPod is going to be a successful business model
or not, just your opinion?

Mr. Bracy. You know, with the understanding that this is
really we have very limited expertise, but as a personal on the
specific concept, you know, business people do business and we
do different things, but, you know, that we are glad to see the
market evolving and obviously they have first mover advantage,
but you know, the challenge is will the market speak? And the
question is will the market speak or not? And I don't really
have an opinion on that.

Mr. Smith. Dr. Pence, do you have a----

Mr. Pence. I do have an opinion. I think it is a business
model that has clearly had some success. It's actually--the ala
carte model is one that we offer as well. However, we have
offered other business models and we expect to offer additional
models in the future, so we think choice is very, very
critical, and that's the path we've embraced, choice not only
in business models but an open approach to devices and support
on different platforms. The choice Apple has made about
retaining a closed environment is a legitimate business choice
they have made and time will tell whether the marketplace will
reward that or not.

Mr. Smith. And I think as the market evolves you're
probably going to have consumers want more choice, but that's
also just my opinion as well.

Mr. Gifford, anything to add to that?

Mr. Gifford. Well, actually, I think, and I mentioned----

Mr. Smith. Well, actually, Dr. Cooper. I called on Mr.
Gifford, but then I'll ask you for your response in a minute
too.

Mr. Cooper. I think this history of the last 25 years
really, I started from that one example of--I'm sure Mac thinks
they had a very successful business model, and they have 5
percent of the market now, and that may make them happy. But we
can go back and find other examples.

One really interesting example has to do with the World
Wide Web, and the predecessor to World Wide Web was a service
known as Gopher. It was an application, and some people in this
room may remember that. And there was a key moment where the
owners of Gopher, the creators of Gopher had said, hey, we're
going to start charging people royalties and reorganizing this,
and folks dropped it like a rock. And the World Wide Web came
along, which is a magnificently open system. And I could give
you other examples.

So what happens here is that business people can make
decisions about what serves their interest, and they'll be
happy with a nice little niche market, but our society is much
better served by the drive toward open platform.

Mr. Smith. Thank you, Dr. Cooper.

Anything to add, Mr. Gifford?

Mr. Gifford. First of all, Mr. Chairman, I've been on
enough panels with Dr. Cooper to know that he can't help
himself. [Laughter.]

I don't think I have anything to add. I think you could,
you can recognize a general trend, that digital markets tend
toward interoperability, but not necessarily.

Mr. Smith. Agreed. And despite the sort of divergent
backgrounds of the four panelists today, it's interesting that
almost everybody seems to agree on the issue at hand.

So I thank you all for your testimony, and the gentleman from California, Mr. Berman, is recognized.

Mr. Berman. Thank you very much, Mr. Chairman.

So, Dr. Pence, even though my daughter complains about not being able to get the Napster service on her iPod, you don't think Congress should make iPod get the Napster service?

Mr. Pence. Well, Congressman, we have a very active community in the Napster service, as I'm sure your daughter knows, and we have very active message boards, and so the issue of iPod compatibility is raised all the time to our customer care group, to us directly. And there's no question that we would benefit with interoperability with iPod.

However, having said that, I think to take that into a Government mandate for some sort of interoperability solution is not the right answer. The Apple service has been very successful. We announced 2 days ago very, very strong growth in our own business, as you may have heard. So we feel very confident that over time by offering choice and using every legitimate means to license the various platforms to take the Napster service to all devices and all platforms, we think that is the best way for us to proceed, and we think it's in the best interest of consumers in the market.

Mr. Berman. All right. I'm going to tell her to quit bothering me and go to your message board. [Laughter.]

Dr. Cooper, you make a differentiation in your testimony about when it's okay to demand interoperability, and you cite as an example the music industry is limited in that it affects only the music business, while the railroad industry affects the entire economy. Ignoring the fact that you brush over the role of music and the productivity of the workforce, I want to carry out your assertion, take the logic of your assertion and apply it to something else here. When you say the marketplace and not Government intervention or legislation should and will resolve the interoperability question for technology, why doesn't this analysis work for the copyright owners who use too restrictive DRM? Won't they also pay the price, consumers will choose formats more convenient for them? Isn't that the most efficient way for consumers to let it be known to the copyright owner instead of through legislation? What is the difference between the developer and the content owner in this particular area?

Mr. Cooper. No. I agree. I think that DRM, once we have choices out there, different people will choose the level of use that they're allowing to their customers. And you've heard examples of different kinds of models. And the marketplace will decide that. I do also think that a too restrictive DRM is going to be a form of failure of interoperability and consumers will--we will get competition for DRM as well. And so I do think because--but that's still the widgets part, and we think that that marketplace will actually also address that problem. So I accept your challenge. And we consistently will argue and have argued that give consumers choices about the level of functionality and they will make their choice and it will drive the marketplace.

Mr. Berman. Good answer. Not consistent with the Consumer Federation's position on some legislation that's come to Congress, but a good answer.

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY     Page 32 of 35
Case 4:05-cv-00037-YGR  Document 955-1  Filed 10/10/14  Page 60 of 92
Case 4:05-cv-00037-YGR  Document 755-11  Filed 04/13/14  Page 33 of 35

Mr. Cooper. Well, I think it went too far but----

Mr. Berman. The legislation the Consumer Federation endorsed or the ones it opposed?

Mr. Cooper. No, no. We endorse a reasonable definition of ``fair use'' for consumer and oppose the legislation that we think----

Mr. Berman. And a mandate on labeling requirements, okay. You state that the retailers of digital music--well, actually what I'd like to--the French Consumer Federation, in effect, which is a better way for you to hear about this than me trying to pronounce the French name, has launched a legal action over the two companies' proprietary music formats, claiming that the respective digital rights management used by both Sony and Apple which prevents songs brought from their online music shops from being played on other manufacturers' media players is limiting consumers' choice. The total absence of interoperability between DRM removes not only consumers' power to independently choose their purchase and where they buy it, but also constitutes a significant restraint on the free circulation of creative works, that group said.

It's interesting how the French perspective on this is different than the Consumer Federation's. Could you develop that?

Mr. Cooper. Well, look, our testimony is clear. When we get to widgets, and in my opinion applications of widgets in the digital age, we believe market forces will solve these problems. I've identified the situation in which as the market matures if we have lots of exclusive deals and not lots of competition widgets, then we would get some antitrust concerns. But at this stage of this game, especially with the recording industry, the established recording industry just getting into this business--last year was our watershed year--we think that this is not the time or the place to impose mandates. We think we still have platform competition going on at the level of widgets, and we think that we are going to be much better served with the industry now adopting a digital distribution and allowing innovators to continue to innovate, including all forms of distribution.

Mr. Berman. The only thing I'll say in closing because my time has expired is I understand this position and it makes a lot of sense to me. What I don't understand is supporting my friend's bill in the context of why won't the same market forces end up creating music that individuals be able to pass to their friends and take in other formats in their home and do all those things because it will serve a need that consumers want? Why are we getting into trying to draft the exact contours of that?

Mr. Cooper. Well, the--one of the central concerns about DRM is that it is taking away some of my rights that I thought I had in terms of my fair use rights, and that's a source of concern to us. So that we used to be able to listen to music in a variety of ways, to make copies to share, and those were fair uses, and maybe unregulated uses that were not bones of contention. And our concern is that we don't want to lose a lot of functionality and flexibility in this transition, which is supposed to be increasing my functionality and flexibility. And so we'll be glad to come back and testify on that legislation

- DIGITAL MUSIC INTEROPERABILITY AND AVAILABILITY        Page 33 of 35
Case 4:05-cv-00037-YGR   Document 915-8   Filed 10/10/14   Page 61 of 92
Case 4:05-cv-00037-YGR   Document 955-11   Filed 04/13/14   Page 84 of 96

too, if I can wangle an invite.
    Mr. Smith. Thank you, Mr. Berman.
    The gentlewoman from California, Ms. Lofgren, is recognized
for questions.
    Ms. Lofgren. I'll be brief because our joint session of
Congress is about to begin. But I'll just say that this has
been interesting to hear such unanimity actually from all of
the witnesses, that this is a situation where Congress doesn't
have to get involved. I mean there are some interoperability
issues that demand congressional attention in fire services and
the like, but this is not one of them. So I appreciate the
intelligent commentary and the pitch to get a hearing on my
bill, which would be great.
    I yield back. Thank you.
    Mr. Smith. Thank you, Ms. Lofgren.
    There are no other Members here, no other questions, so we
thank you for your expert testimony today. It's been very, very
helpful and very, very conducive to our being able to move
forward with the process. So thank you all very much.
    And we stand adjourned.
    [Whereupon, at 10:52 a.m., the Subcommittee was adjourned.]


                        A P P E N D I X

                        ----------


                Material Submitted for the Hearing Record

Prepared Statement of the Honorable Howard L. Berman, a Representative
      in Congress from the State of California, and Ranking Member,
      Subcommittee on Courts, the Internet, and Intellectual Property


    Mr. Chairman,
    Thank you for scheduling this hearing on digital music
interoperability. I hope the testimony will be helpful in our
continuing discussion of issues concerning the availability of
legitimate distribution mechanisms for digital music.
    The explosion of technologies that enable consumers to digitally
download music has provided many new opportunities to the music lover.
The ultimate goal is to provide consumers with their choice of music
anytime, anywhere, in any format. However, this new environment has
come at a great cost, that of rampant piracy on Peer to Peer Networks.
What is considered ``free'' music available on the internet comes at
the expense of the numerous people involved in the development of the
sound recording: the artists, songwriters, musicians, sound engineers,
and others. The consequences of piracy are felt throughout our economy,
but they are especially harmful in my district where many jobs depend
on the lawful sale of music.
    The proliferation of legitimate music distributors in the
marketplace has helped stem the tide of piracy. The number of available
digital music delivery alternatives has increased enabling technology
companies to help copyright owners make inroads against unauthorized
downloading and sharing of music files. However, music companies will
always have to compete with free music and analysts claim it will take
a number of years before download services can provide a significant

sales boost for the content creators. One of the major impediments to
achieving a more level playing field, according to analysts, is the
bewildering array of competing technologies.

    As with any nascent industry, the development of new business
models can lead to unintended results. In the case of digital music,
there are concerns that interoperability barriers between the various
suppliers could actually hinder growth in the market. Brandenburg, the
father of the MP3, has warned that rival technologies will baffle
consumers and risk alienating fans, driving them to unsanctioned file
sharing networks where the songs are ``free'' and encoded in the
unprotected MP3 format.

    The International Federation of the Phonographic Industry (IPFI)
has noted that ``one important problem that hinders growth of the
online music business is the lack of interoperability between services
and devices. The danger is of wide-scale consumer confusion and wasted
opportunities in a market which has extraordinary growth potential.''
They observe that there is no easy solution, but that all the players
in the online market need to work harder to solve the interoperability
difficulties in 2005.

    Yet the market continues to develop. The portable player market
already presents consumers with an array of choices. Now we see the
convergence of music devices and mobile handsets. The goal of making
music easier to buy then to steal is becoming a reality, and therefore
these innovative services deserve our thanks.

    However, anti-piracy efforts must remain a focus for technology
companies industries as they develop their products. A legitimate
distribution business model must be one that is based on payment and
permission of the rights holder.

    With digital music moving into the mainstream of consumer life, I
believe it will be helpful to further this conversation by discussing
what, if any, impediments are facing companies that are now
distributing digital music and how they are addressing consumers' needs
for legitimate music.

    In an ideal world, we would have all the major players in the
digital music market at the table to hear their opinions about the
issue--but I look forward to hearing from these witnesses to help
define some of the issues.

                            ----------


Prepared Statement of the Honorable John Conyers, Jr., a Representative
  in Congress from the State of Michigan, and Ranking Member, Committee
                          on the Judiciary


    Content owners and the high-tech industry should be commended for
responding to consumer demand for digital music. For years, consumers
have been clamoring for access to digital content. Because content
protection technology and content owners had not caught up with the
Internet, music lovers turned to illegal download sites like Napster
and Kazaa for digital content.

    We had heard that, if the content industry would just create a
legal avenue for obtaining digital music, consumers would embrace it.
The premonition was largely true. The record industry and high-tech
worked together to develop digital content protection, to clear the
rights needed to get music online, and to get music on the Internet.
According to the Pew Internet and American Life Project, the response
to legitimate digital content has been overwhelming: in 2004, only

Case 4:05-cv-00037-YGR   Document 533-11   Filed 10/13/14   Page 56 of 96

twenty-four percent of music downloaders had tried legitimate download sites; in 2005 to date, the number jumped to forty-three percent.

It is probably safe to say that the reason for this overwhelming response is the late 2003 launch of Apple iTunes. In business for a little over a year, iTunes has sold a record-breaking 300 million songs through its online store. Other download sites, like Napster and Rhapsody, are gaining speed by offering alternatives such as monthly subscription services instead of just downloads and allowing transfers to numerous digital music players. No matter how you view it, the marketplace is working.

Digital piracy existed long before legitimate services like iTunes came onto the market and, unfortunately, it likely will continue no matter how much easier the songwriters, recording artists, and record labels make it to obtain music digitally.

EXHIBIT 31

**From:** Eddy Cue
**Sent:** Friday, July 23, 2004 8:57:48 AM
**To:** Jeff Robbin
**Subject:** Fwd: Draft 1 of Speaking Points

Jeff,
Anything else you can think of?

Eddy

Begin forwarded message:

> From: Eddy Cue <cue@apple.com>
> Date: July 23, 2004 5:55:53 PM PDT
> To: Greg Joswiak <joz@apple.com>
> Cc: Katie Cotton <katiec@apple.com>
> Subject: Re: Draft 1 of Speaking Points
>
> I talked to Universal. They were aware of it. From their viewpoint,
> they are ok with it because they want interoperability. They told Real
> it wasn't worth doing because they know it would not work in the
> future. They would prefer us to license Real and make it legitimate.
>
> We should definitely throw in the not working because I can assure
> that will be the case in Oct when 4.7 ships. We would have to engineer
> and work with them not to break it. Now, they can keep trying to
> reengineer it, but it will be a pain in the ass.
>
> I would leave out the we didn't authorize it as that make us sound
> like the big bad guy.
>
> As we continue to invest and innovate in making the industry leading
> iTunes and iPod product even better, we feel it is necessary to warn
> Real and their customers that we do not expect this hack will work in
> the future.
>
> - Eddy
>
>
>
> On Jul 23, 2004, at 5:30 PM, Greg Joswiak wrote:
>

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090405

>> I like the statement form, but I think we should throw into the not
>> working (we're not definitive in the statement).  It throws the
>> appropriate uncertainty and doubt into the situation.
>>
>> Ok?
>> Joz
>>
>>
>>
>> On Jul 23, 2004, at 5:22 PM, Katie Cotton wrote:
>>
>>>
>>> I think this is great.  Do you like it in a condensed form for the
>>> initial reaction on Monday i.e.:
>>>
>>> "The fact that Real is willing to invest their limited engineering
>>> resources to create a hack to try to capitalize on the great success
>>> of the iPod is a great testiment to how important the iPod has
>>> become. Normally one would be concerned that someone is going to
>>> break your house to steal your stereo.  In this case, it appears
>>> that someone is breaking into our house and setting up their own
>>> stereo – but they're still breaking in.  We are looking at possible
>>> implications of what they've done with the DMCA and to ensure there
>>> aren't any violations of Apple's intellectual property and
>>> copyrights."
>>>
>>> I'd save not working with future versions until after we've dug a
>>> bit deeper.
>>>
>>> Agree?
>>>
>>> Katie
>>>
>>> On Jul 23, 2004, at 5:09 PM, Greg Joswiak wrote:
>>>
>>>> Eddy and Katie,
>>>>
>>>> Here's the draft set of speaking points that I would suggest using
>>>> on Monday:
>>>>
>>>> - Its certainly a great reflection of how important the iPod has
>>>> become that Real is willing to invest their limited engineering
>>>> resources to create a hack to try to capitalize on the great
>>>> success of the iPod.  Its obviously important enough to them to
>>>> choose to do this over making their own products better and to do
>>>> this knowing that there's a risk to being sued.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090406

>>>>
>>>> - Describe the situation using Steve's analogy: "Normally you're
>>>> concerned that someone is going to break your house to steal your
>>>> stereo.  In this case, it appears that someone is breaking into our
>>>> house and setting up their own stereo – but they're still breaking
>>>> in."
>>>>
>>>> - Apple did not authorize Real Networks to do this hack.  Further,
>>>> we'll have to investigate the possible implications of what they've
>>>> done with the DMCA.  Additionally, there may be violations of
>>>> Apple's intellectual property and copyrights.
>>>>
>>>> - Because we did not authorize this and because we continue to
>>>> invest in making our industry leading iTunes and iPod products even
>>>> better, we feel it is necessary to warn Real and their customers
>>>> that we do not expect this hack will work in the future.
>>>>
>>>> Once we see the product and get specifics, I suggest we create a
>>>> second set of points that have a more informed position on the
>>>> tactics and customer downsides, to what they've done.
>>>>
>>>> Eddy -- any word from the labels?
>>>>
>>>> Thoughts?
>>>> Joz
>>>>
>>>>
>>>
>>
>

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090407

EXHIBIT 32

**From:** Eddy Cue
**Sent:** Sunday, July 25, 2004 12:29:54 PM
**To:** Philip Schiller
**CC:** Joswiak Greg; Robbin Jeff; Rubinstein Jon; Tony Fadell; Ng Stan; Jobs Steve
**Subject:** Re: RealNetworks Says Files Can Play on iPod


The labels are convinced that different formats are hurting their
growth. They want us to license our DRM to Real. Since Real has assured
them that they are putting the music in FairPlay, they are ok with it
(that is until there is a problem). Real is actually saying they are
playing a protected song on an authorized device for that protection
scheme.

Also remember some labels at this point are also worried that we are
getting to be too dominant.


Eddy



On Jul 25, 2004, at 9:13 PM, Philip Schiller wrote:

> The music companies should take a fit about this!
> Real is advocating playing protected music on devices not designed or
> authorized for that protection scheme (thus undermining the whole idea
> of devices being designed to protect artists rights in that music)!
>
> http://story.news.yahoo.com/news?tmpl=story&u=/ap/20040726/
> ap_on_hi_te/realnetworks_ipod&cid=562&ncid=716
>
> RealNetworks Says Files Can Play on iPod
>
>  1 hour, 4 minutes ago
>
> By ALLISON LINN, AP Business Writer
>
> SEATTLE -  RealNetworks Inc. says it has created technology that
> allows songs purchased through its online music services to be played
> on Apple Computer Inc.'s popular iPod player, just a few months after
> complaining that Apple was rebuffing attempts to form an alliance.
>
>  In an interview Friday, RealNetworks chief executive Rob Glaser said
> he did not know how Apple would react to the new technology. Apple,
> based in Cupertino, Calif., did not return numerous phone calls from

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090429

> The Associated Press seeking comment.
>
> Glaser said the new system, called Harmony Technology, will let
> people securely transfer music bought using RealNetworks' music
> download services to an iPod or virtually any other portable music
> player.
>
> Previously, music purchased through RealNetworks' music download
> services could most easily be played on devices that supported its
> copyright protection technology. By the same token, the easiest way to
> get digital music onto the iPod player was through Apple's iTunes
> Music Store, which uses its own system. The same held true for devices
> that supported Microsoft's Windows Media Player anti-piracy
> technology.
>
> Microsoft said it could not immediately comment on the system.
>
> Glaser said the new the system works by essentially translating the
> various anti-piracy technologies, to make the players' systems
> compatible with RealNetworks' system. RealNetworks said it was not
> concerned that the system would be illegal.
>
> "We are making it so that consumers can buy music once and play it
> anywhere," Glaser said.
>
> A test version of Harmony will be available Tuesday on Real's Web
> site.
>
> In April, Apple chairman Steve Jobs (news - web sites) rebuffed
> Glaser's request for a meeting to discuss an alliance between the
> companies, prompting complaints from RealNetworks representatives
> about why Apple didn't want to make its popular system more open.
>
> There is already a way to make songs from RealNetworks' online music
> services play on the iPod, but it is cumbersome. To do so, a user
> would have to burn the songs from a computer to a CD, download them
> back onto the computer in a different format and then put them on the
> player.
>
> Phil Leigh, an analyst with Inside Digital Media in Tampa, Fla., said
> he was surprised to hear that Real had developed the technology, since
> Apple has been careful about guarding its popular — and proprietary —
> system.
>
> He said the new system could be a potential boon for RealNetworks,
> because customers would be able to buy whatever player they want
> without worrying about whether it would work with Real's service. But

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090430

> he said it would only be a success if it was easy and reliable.
>
> "The question is, 'How well does it work?'" he said.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090431

EXHIBIT 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE APPLE IPOD ITUNES ANTI-TRUST           )     Case No.: 05-CV-00037 YGR
LITIGATION                                 )
_____    )
                                           )     REBUTTAL EXPERT REPORT OF
                                           )     DAVID M. MARTIN JR., PH.D.
This Document Relates To:                   )
                                           )
        ALL ACTIONS.                        )
_____    )

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# Table of Contents

I.      Introduction ................................................................................................................ 3

II.     Keybag Verification Protocol ..................................................................................... 3

III.    Database Verification Protocol .................................................................................. 6

IV.     Harmony ...................................................................................................................... 7

V.      Third Party Jukeboxes ............................................................................................... 8

VI.     Apple and Third Party Cooperation ....................................................................... 11

VII.    "Walled Garden" Considerations ............................................................................ 14

VIII.   Signature .................................................................................................................... 15

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# I.        Introduction

1. I write this report to rebut the opinions expressed by Dr. John P. J. Kelly in his expert report of July 19, 2013 and his deposition of October 2, 2013.  I previously submitted a declaration dated February 28, 2011 and an opening expert report dated April 8, 2013.

2. In ¶¶8-11, Dr. Kelly describes "some of the features added from October 2004 to March 2009."  If Dr. Kelly intends to express an opinion that these changes justify the introduction of the keybag verification and/or database verification protocols, then I would disagree.  The description of the changes does not mention either verification protocol, and none of the changes intrinsically appear to require such verification protocols for their function.

# II.        Keybag Verification Protocol

3. In ¶¶40-42, Dr. Kelly offers opinions regarding the keybag verification protocols. Dr. Kelly does not state that this section of his report describes the actual reasons that the keybag verification protocols were added to FairPlay; instead, he speculates on possibilities.  For example, "If the change was caused by corruption [...] the iTunes Software or the iPod firmware could unexpectedly quit as a result."  This is a general statement about how software sometimes behaves rather than a specific analysis of iTunes' and/or the iPod firmware's historical or current requirements for correct behavior.  Similarly, "If the change was caused by tampering, this could be an attempt by a hacker to gain information about FairPlay in order to discover the account keys and gain unauthorized access to the DRM-protected music," followed by a discussion of the "chosen-ciphertext attack".  No Apple documents or testimony are cited that refer to the chosen-ciphertext attack as a motivation for the keybag verification protocol. ████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████  It is these

local account keys that are the "natural target for attack", since they are present on a computer fully

controlled by the end-user, such as a Mac or a PC.

4. In any case, Dr. Kelly offers no explanation as to how an attacker might be able to *practically*

mount an attack against either local or iPod keybag account keys if the keybag verification protocol had

never been deployed.  The security of all of the cryptosystems used in FairPlay have their limits.  The

issue is not whether it might be *possible* for an attacker to deduce the encryption key, but rather, how

much effort one would expect the attack to take in the average case.  (After all, an attacker might luckily

guess the encryption key on the first attempt – randomness is like that; no amount of engineering can

absolutely prevent a lucky guess.)  To evaluate the risk properly, one must at least specify the resources

available to the attacker and what would constitute their success.  For example, an attacker might have

full debugging control of a modern, fast personal computer running iTunes, and want to determine an

account key in order to permanently decrypt some music previously purchased from the iTunes Store,

and might be willing to let the computer run at full speed for 1000 solid years[1] in order to do so.  In this

case, success would be that the user determined the account key within 1000 years, not simply that the

attacker was able to "gain information about FairPlay".  In other words, not all "information about

FairPlay" constitutes success.  Since Dr. Kelly did not specify anything more specific than this, it is hard to

evaluate any claim that the keybag verification protocol was required to protect the secrecy of account

keys.

5. Furthermore, recall that the keybag verification protocol causes FairPlay within iTunes to verify

that a keybag was created by Apple before attempting to process it any further; if iTunes detects that

the keybag was modified by a party other than Apple, then it rejects the keybag and consequently will

not play any songs that are encrypted by keys from the keybag.  An attacker who fully controls a

---

[1] Cryptosystems such as AES and RSA are engineered in terms of expected failure timescales that far exceed 1000
years.

Expert Report of David Martin, Ph.D.                                                                5

computer running iTunes can presumably disable this verification step within iTunes and then attack the underlying cryptosystem as if the keybag verification protocol were not present at all.  For this reason, the underlying cryptosystem must have been engineered to withstand cryptanalytic attacks that do not depend on the keybag verification protocol for protection. Similar reasoning applies to attacks that rely on a running iPod, where the landscape may be even more difficult for an attacker.

6. Dr. Kelly did not address two possible explanations present in the record for the keybag verification protocols.  First, as I described in my opening report and declaration, the conversation between Mr. Robbin and Mr. Farrugia at Apple_AIIA00798303 appears related to the decision to implement the protocols.  Second, the FairPlay Next Generation document of Mr. Farrugia explicitly identifies motivations.  At Apple_AIIA_B_000033, "The internal security validation process of the current iPod security shows that the security architecture has several flaws and one of them allows the injection in the iPod's Keybag without the control of the iPod Account Key manager. *The injection is then used to add DRMed songs in the library*" (emphasis added).  Apple_AIIA_B_000079-80 describes one of the "weaknesses of the current FairPlay 3.0.1 implementation" as "a well known flaw already exploited by Real to DRM their music to be compatible for iPod implementation of FairPlay."

7. In ¶46, Dr. Kelly describes changes made to the iTunes database over time.  I am aware that the database format has changed over time as well, although I did not attempt to verify his description of the changes, since they are largely unrelated to the database verification protocol.  I would note that the iTunes database also includes length and version fields, as is typical with structures such as these that may change over time.  The length and version fields allow software, including prior versions of iTunes software, prior versions of iPod firmware, and 3rd party software, to identify the areas of the database that they know how to manipulate and areas that they do not and should leave alone.  Such mechanisms make it possible to add fields to the database without necessarily introducing incompatibilities with other existing software.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## III.        Database Verification Protocol

8. Dr. Kelly characterizes the database verification protocol as an "improvement" in his section II.C.2 preceding ¶47.  I recognize the database verification protocol as a change, but not as an improvement, as I have previously explained. After all, the database verification code transforms small errors that do not meaningfully interfere with the user experience into enormous ones that treat the database as being devoid of all data. As an example, Dr. Kelly describes in ¶138 how, prior to Apple's introduction of the database verification protocol, RealPlayer apparently caused the song named "Melõdiqúe" to be displayed as "MelÃµdiqÃºe" on the iPod.  Yes, the name is garbled, but as long as the song plays correctly, the user might not even notice, particularly if it is one of many songs being played, as it appears to be in Dr. Kelly's screenshot of Figure 42.  So this is an example of a small error: in the absence of the database verification protocol, the name displays incorrectly.

9. But if the database verification protocol were in force on the iPod, it would have prevented the iPod from playing this "MelÃµdiqÃºe" or any other songs stored on the iPod, or displaying any song names at all.  The iPod would effectively appear to be empty until the user gave up on the third-party jukebox and used iTunes instead.  This is what I mean when I say that the verification code transforms small errors into enormous ones.

10. Furthermore, this iPod-suddenly-seems-empty behavior is not because the Apple software detected that there's anything particularly wrong with the name "MelÃµdiqÃºe"; rather, Apple treats every change that any third-party program makes to the database as inherently suspect.  If any third-party program touches the database, then Apple destroys the whole database.  So not only does Apple transform small errors into enormous ones, it transforms all third-party changes that are otherwise completely safe into enormous errors as well.

11.  In ¶58 and his deposition, Dr. Kelly discusses the ███████████████████ macro.

██████████████████████████████████████████████████████████

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                          7



12. Dr. Kelly writes in ¶67 that "Since hackers continued to attack all aspects of the FairPlay architecture, it was reasonable for Apple to continue improving all aspects of the FairPlay architecture." But Dr. Kelly offers no evidence that *all aspects* were indeed being attacked; instead, he provides a list of different versions of iTunes and states that attacking software could "circumvent the protection in FairPlay" associated with those versions, without specifying which aspects of FairPlay were circumvented in any of those versions.  This is not a sufficient methodology to conclude that "all aspects" were being attacked.

## IV.      Harmony

13. In ¶70, Dr. Kelly considers the issue of whether RealPlayer Harmony could in fact remove all existing DRM protection schemes from music, regardless of the music's publisher origin.  He was asked to further clarify in deposition:

```
Kelly 2013 82:19-83:9
19      Q.   So let me ask you a question about that,
20   about the "any online music store."
21           Is it your contention, then, that
22   RealPlayer cracked every single DRM system that was
23   out there?
24           MR. KIERNAN:  Object to form.
1            BY MS. BERNAY:
2      Q.   Based -- based on this -- that you can use
3   any online music store; is that your opinion, based
4   on this?
5            MR. KIERNAN:  Object to form.
6            THE WITNESS:  I am -- I am describing -- I
7   am -- I am looking at what Harmony says they can
```

---

[2] See Apple_AIIA00094564.

Expert Report of David Martin, Ph.D.

```
8   do.  What, in fact -- whether this is accurate
9   enough or not, I don't know.
```

14. Dr. Kelly appears to be saying that he's not sure whether Real's explanation of this aspect of

Harmony is really "accurate enough."  He is right to be unsure of this, having identified no evidence

other than Real's user-facing "help" pages within RealPlayer. Regardless of what Dr. Kelly thinks Real is

saying in its "help" pages, he and I agree that being able to remove DRM protection from a song

essentially means having broken the DRM protection scheme.  It defies imagination to think that Real

Networks, with stockholders, corporate lawyers, and a fixed address, would have published software

that breaks its competitors' DRM protection schemes, with the only evidence that this ever occurred

being some documentation included with RealPlayer 10.5 – no news reports, no security conference and

journal papers covering the technical details, and no lawsuits from competitors in the news.[3]  Even

preliminary weaknesses in existing cryptographic schemes are big news in the security literature; the

idea that Real's *published, working software* would crack even a single competitor's cryptosystem

protecting music, without a single independent confirmation of this happening, is completely

unbelievable. To go further and conclude that Real's software could in fact crack *all* competing schemes,

again without any independent confirmation, is even the more unwarranted.


## V.        Third Party Jukeboxes

15. In the heading of section IV.B. preceding ¶89, Dr. Kelly writes that "There is overwhelming

evidence of third party jukebox bugs."  I disagree; Dr. Kelly has not provided any metrics allowing a

conclusion that evidence of third party jukebox bugs is "overwhelming" compared to any other software

at all, including iTunes and the iPod firmware.

---

[3] For example, in 2001, the U.S. Department of Justice made the decision to arrest Mr. Dmitry Skylarov of the firm
ElcomSoft for having marketed a "a product that could be used to circumvent security protections built into the
Adobe Acrobat eBook Reader," following complaints by Adobe. See Adobe's explanation at
http://www.adobe.com/aboutadobe/pressroom/pressreleases/200108/elcomsoftqa.html.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

16. Dr. Kelly writes in his footnote 83 on p. 62 that I appeared to misunderstand the purpose of the experiment he described in his prior declaration.  To clarify his intent, he added emphasis to his prior explanation, so that it now reads that he "changed a single byte of the information added when the third song was transferred to the iPod *in order to simulate a bug* in the program that transferred the third song to the iPod."  Yet Dr. Kelly does not merely seem to be saying that any program, including iTunes, is capable of being mistakenly released with a bug that destroys the iTunes database's magic number.  His declaration beginning at ¶38 states that:

> 38. [...] Because RealNetworks did not have access to source code or other technical descriptions of the iPod database, its software would have been more likely to contain bugs or features that corrupted files on the iPod or otherwise interfered with the operation of the iPod.

> 39. To illustrate this, I conducted the following experiment to analyze the effect of a third-party modifying the internal database. [...]

17. Thus he appears to be "illustrating" the type of bug that would be expected to occur in software like Harmony.  I still disagree that this particular bug (i.e., miswriting the database's magic value) should be considered representative of problems that are likely to exist in software such as Harmony.  Yet Dr. Kelly did properly identify a drastic and undesirable effect, namely, that of making all of the songs on the device unplayable – and this is exactly the effect that Apple chose as appropriate when it detected a database that had been touched by non-Apple software.

18. I previously addressed the relevance of AppleCare records to the issues in this case in response to Dr. Kelly's declaration, in which he cited AppleCare records to support his conclusion as to the "likely cause" of alleged corruption.  Now, in his report, Dr. Kelly lists some new cases as well and says only "The following are a few samples of cases opened by AppleCare responding to complaints about the operation of iPods by users who had used a third-party application to load and play music on the iPod".  He does not state that these new cases support any particular conclusion.  Dr. Kelly also abandoned a number of AppleCare cases he previously cited in his prior report.  Without inspecting any of the devices, or interviewing any of the involved personnel, it is again very difficult to put these records in

Expert Report of David Martin, Ph.D.

perspective.  In his deposition, Dr. Kelly admitted that he did not conduct any systematic analysis of

complaints received by AppleCare, but instead had counsel for Apple provide him a collection of

complaints allegedly involving  third-party juke boxes.  Kelly Deposition at 95:16-96:6.  He further

admitted he did not talk to anyone at AppleCare regarding the various complaints he detailed in his

reports and did not examine any of the iPods customers were complaining about.  Nor did he speak with

any of the customers who submitted complaints.  Kelly Deposition at 99:14-101:25.

19. Dr. Kelly and I agree that most programs have bugs.[4]  In ¶100 and following, he discusses many

undesirable behaviors of third-party software that appear to be due to bugs.  I did not attempt to verify

his specific findings, but I find it unsurprising that third-party jukeboxes are no exception to the rule that

most programs have bugs.  Dr. Kelly offers no methodology for assessing how problematic these bugs

are for Apple's customers, or for Apple itself, or even if such an assessment would be relevant to

determining whether third-party jukebox software should be detected and its music made unplayable

by iTunes and the iPod firmware.

20. Most of the specific apparent bugs that he discusses have a far more subtle effect than making

all songs on the iPod unplayable.  At ¶100 "ml_ipod Plugin Overwrites iTunes Data," the effects of the

apparent bug are not clearly stated.  At ¶102 "ml_iPod Plugin Deletes iTunes Playlists", it appears that

playlists are deleted, but songs remain playable.  At ¶106 "ml_ipod Plugin Prevents the iPod from

Playing Videos," it appears that songs can still be played.  At ¶109 "ml_ipod Plugin Deletes On-The-Go

Playlists," it appears that songs can still be played.  At ¶116, songs remained playable.  At ¶119

"pmp_ipod Plugin Deletes On-The-Go Playlists," songs remained playable.  At ¶120 "pmp_ipod May

Leave the iTunes Database in an Inconsistent State," songs remained playable.  At ¶124, songs remained

playable.  The effect of the "fixes" enumerated in ¶125 are generally unclear.

---

[4] See, e.g., Kelly Deposition at 91:3-22.

Expert Report of David Martin, Ph.D.                                                                11

21. Regarding Harmony, at ¶¶129-131 "iTunes Database Contents Are Inconsistent," the effects of the "inconsistencies" are unstated.  It appears that songs remain playable. At ¶¶132-134 "Playlists Are Corrupted," songs remained playable for some of the time; the problem involves interactions between iTunes and RealPlayer.  A customer who used only RealPlayer would not appear to encounter the behavior described here.  At ¶135 "RealPlayer Deletes On-The-Go Playlists," songs remain playable.  At ¶138 "RealPlayer Does Not Handle Special Characters in Song Tags," songs remain playable; the only undesirable effect is that some characters with accent marks are displayed incorrectly.  At ¶139 "RealPlayer Leaves Orphan Files on The iPod," songs remain playable.  At ¶140 "RealPlayer Does Not Support the iPod Video," songs remain playable.

22. Regarding "Other Customer Complaints" at ¶¶144-150, Dr. Kelly summarizes forum postings of problem descriptions.  It is difficult to assess the nature of these problems given only forum descriptions, but most of the incidents appear to be less serious than the iPod not playing any songs at all.  Dr. Kelly admitted at deposition that he did not speak to any of the people who posted in the forum or message boards that he cites to in his report.[5]

# VI.        Apple and Third Party Cooperation

23. In ¶151, Dr. Kelly states that "Apple would have had to share confidential information". Although Apple did designate such information as confidential, Dr. Kelly has not demonstrated that the information *needed* to be kept confidential for security purposes. He writes further that "As Dr. Martin seems to recognize, Apple would also have to modify the iPod firmware and iTunes Software to make the iPod firmware and iTunes software work seamlessly with the dozens of third-party applications – including RealPlayer and Winamp – that were available to the public."  I do not recall what modifications

---

[5] See Kelly Deposition Tr. at 105-112.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

he is referring to here and consequently do not understand why he feels that I have agreed with him on this point.

24. Dr. Kelly states that publishing accurate interoperability specifications might not be sufficient for third-party applications to achieve the "requisite level of compatibility" in ¶152. I agree that it takes work to implement software according to a specification and that bugs in these implementations are possible, just as bugs also occur in iTunes and the iPod firmware. But broadly speaking, the fact that third-party jukeboxes written to an accurate specification might behave differently than iTunes – whether because their features are implemented better, merely implemented differently, or even are malfunctioning – is pretty much exactly the point. Obviously, third-party developers do not aim to perfectly replicate iTunes. If that's all they wanted to do, then they could just use iTunes as-is.

25. Dr. Kelly states "Among other things, Dr. Martin would have Apple perform a full verification analysis of the iTunes database" in ¶153. I do not recall stating this and I do not know exactly what Dr. Kelly means by the phrase "full verification analysis." He makes it sound extremely burdensome. But Dr. Kelly has not shown that the database code prior to the introduction of the database verification protocol was unusually fragile, or that ensuring that appropriate bounds-checking and other sanity tests are present would itself be a burdensome effort. Scrutinizing data in this way is standard practice in software development. Dr. Kelly points towards one aspect of such scrutiny in ¶84: "Every possible action available to the user must be tested including sequences of actions that were not envisioned by the specification or software architecture." Since it is rarely possible to test every possible sequence of actions available to the user, the ability of the software to react correctly to such sequences of actions is instead verified by considering the spectrum of possible values in the underlying data structures that describe the user's actions, and ensuring that the program is constrained to work within that spectrum of values. In other words, the programmers perform bounds-checking and sanity checking on those values.

26. Also in ¶153, Dr. Kelly writes "And it is wrong to suggest that making the device or software more 'robust' would eliminate bugs that could interfere with the operation of the iPod."  I agree that it is hard to completely eliminate all bugs, but that is not what I described as the desired outcome.  Rather, I was addressing the fact that Apple pointed to possible bugs in third-party applications as a justification for detecting third-party applications and making iPod songs unplayable as a result.  So I wrote that "Another possibility would have been for Apple to code for robustness rather than rapid failure due to the detection of third-party software."  Making iPod songs unplayable simply because a third-party program touched the database in a benign fashion sounds more like fragility than robustness.

27. In ¶154, Dr. Kelly appears to be saying that the situation with iPhone, where Apple welcomes third-party developers to contribute software to the iPhone platform and provides extensive documentation on how to do so correctly and securely, is fundamentally different from the issue of third-party access to the iPod – essentially because Apple designed a solution for iPhone but never intended to allow one for the iPods.  This is not a compelling argument that no such interoperability is possible on the iPod platform.  Clearly, providing appropriate documentation to third-party developers should result in improved interoperability.  There should be little question that Apple is capable of producing such documentation.  Given that third-party developers such as Real and Winamp were able to provide jukeboxes that interoperated with iPods well enough to attract customers *without* this type of technical documentation, if they had been equipped with appropriate documentation, then their results should be even better.

28. Finally, at the end of ¶154, Dr. Kelly writes "Third, since such software would necessarily use FairPlay, providing this type of access would make FairPlay less secure."  The logic appears to be that FairPlay is so fragile and sensitive that any third-party use of any aspect of it would be an unacceptable risk.  This is a superficial analysis.  FairPlay is a security system engineered to protect data in specific ways.  Some aspects of FairPlay must be kept secret (such as its secret keys), but other aspects do not

Expert Report of David Martin, Ph.D.

need to be kept secret.  It is simply not possible to conclude that FairPlay's protection would necessarily

degrade or fail simply because some third-party software might "use FairPlay" in some unspecified

manner.

## VII.    "Walled Garden" Considerations

29. In ¶¶155-166, Dr. Kelly describes the "walled garden" platform approach in generally favorable

terms.  But it is unclear how this relates to his opinions in this case.  For example, he does not say that

the "benefits" of the walled garden that he describes depend on the keybag or database verification

protocols being enabled. In any case, the walled garden "benefits" he describes certainly do not benefit

the users who want to use third-party jukebox software with iPods if the necessary effects of the walled

garden include making those users' songs unplayable.

30. Nor are all aspects of a walled garden intrinsically positive.  From a software developer's

perspective, working in a "walled garden" or "closed platform" means that products intended to work in

the platform are inherently subject to the approval and schedule of the platform owner.  A product that

does not meet with the platform owner's approval runs the risk of being summarily disabled, and

therefore, the relationship to the developer's customers is threatened. Developing software or

providing content to run within the closed platform may require entering into legal agreements with the

platform owner, including confidentiality agreements, acceptable use agreements, restrictions on

decompilation and disassembly, and the requirement to pay fees to the platform owner. The platform

owner may reserve to itself functionality that a developer thinks they can do better than the platform

owner.

31. There is nothing about a closed platform that inherently leads to a better user experience.  The

closed platform simply limits the number of parties making the decisions; it does not guarantee that

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                          15

these parties actually make good decisions.  Fewer parties making decisions may mean fewer

opportunities for innovation.


## VIII.    Signature

32. I reserve the right to supplement or amend this report as necessary or appropriate to take into

account additional information obtained through discovery or otherwise, including the upcoming

depositions of Kevin Murphy and Robert Topel.


Signed October 30, 2013 in Ames, Iowa.

David M. Martin Jr., Ph.D.

EXHIBIT 34

| From: | Greg Joswiak |
|-------|--------------|
| Sent: | Wednesday, Apr 27 2005 03:52:51 PM |
| To: | Tom Neumayr |
| Cc: | Eddy Cue; Katie Cotton; Natalie Sequeira |
| Subject: | Re: Real statement |

Ok, then why don't we go with what Nat proposed yesterday:

"As we've said before, we strongly caution Real and their customers that when we update our iPod software it is highly likely that Real's Harmony technology will cease to work with current and future iPods."

On Apr 27, 2005, at 7:58 AM, Tom Neumayr wrote:

> Eddy, Joz,
>
> The RealNetworks' iPod claim is getting lots of pick up in the press and we expect this will spark more inquiries today.
>
> Borland's c|net story says: "RealNetworks' Harmony software, which allows songs to be played directly on an iPod or on a Microsoft-based device, is limited to the company's pay-per-song store." Benny Evangelista with the Chronicle writes: "The program is also compatible with Apple's iPods, although Apple has released iPod upgrades that block that compatibility.
>
> When do you guys think we might have an answer on this so we can draft a reactive press comment? Thanks.
>
> - Tom
>
> RealNetworks rekindles iPod tech tussle
> Published: April 26, 2005, 1:07 PM PDT
> By John Borland
> Staff Writer, CNET News.com
>
> In the midst of a broader music release, RealNetworks has quietly renewed its iPod technology battle with Apple Computer.
>
> Last year, RealNetworks released a technology called Harmony that for the first time let copy-protected songs from a music store other than Apple's iTunes play directly on the iPod. RealNetworks had independently mimicked the antipiracy tools used by Apple and hadn't gotten Apple's permission first.
>
> Apple called the company's actions "hacker tactics" and a few months later changed its software to break the compatibility, at least on iPod Photo devices. On Tuesday, a

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AllA00090485

RealNetworks executive said his company had re-established compatibility with all iPods.

"Harmony now supports all shipping iPods, including iPod Photo," said RealNetworks Chief Strategy Officer Richard Wolpert.

The technology tussle, which focuses on a relatively small portion of RealNetworks' music business, nevertheless aims at the heart of one of the most controversial issues in online music.

Incompatibility between the major download stores and music players has fragmented the digital market. For example, songs purchased from Apple's iTunes store can only be played directly on Apple's iPod, while songs purchased from Napster or Microsoft cannot be played on the iPod.

Record company executives have been bitterly critical of this balkanization, and have asked technology executives--primarily Apple CEO Steve Jobs--to reconsider their technology decisions. As yet, no broad move toward compatibility has emerged.

RealNetworks' Harmony software, which allows songs to be played directly on an iPod or on a Microsoft-based device, is limited to the company's pay-per-song store. Songs downloaded through the new Rhapsody portable subscription service are compatible only with a small number of Windows-based MP3 players.

An Apple representative could not immediately be reached for comment.

Free song service tunes up
 RealNetworks has a new offer for subscribers
Benny Evangelista, Chronicle Staff Writer
Wednesday, April 27, 2005

RealNetworks Inc., hoping to lure music fans away from both Apple Computer Inc. and other, more popular file-sharing networks, began offering free songs Tuesday in a major overhaul of its online music services.

The Seattle audio and video software company introduced a free version of its Rhapsody music service that lets users hear up to 25 songs per month without paying.

RealNetworks is hoping the new program, called Rhapsody 25, will bring in more customers for its subscription services, which let users download songs into a compatible portable digital audio player.

The giveaway strategy is not new for the 10-year-old company, which built its success by distributing its audio and video playback software to millions of computer users around the world.

"We think we can unleash the same kind of phenomenon with Rhapsody 25,'' RealNetworks chief executive Rob Glaser said during a news conference in New York's Radio City Music Hall.

This is RealNetworks' first overhaul of Rhapsody since the firm acquired the service in 2003 by buying San Francisco's Listen.com Inc. for $36 million. Since then, Apple Computer's iTunes Music Store has become the dominant online music service, with more than 300 million songs sold at 99 cents per track, or about $9.99 per album.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090486

And last year, the new Napster Inc. of Los Angeles started a $15-per- month subscription service called Napster To Go, which lets members download songs into portable players. Napster has more than 410,000 subscribers.

RealNetworks has about 1 million music subscribers, although the company won't reveal how many use Rhapsody and how many use its online radio services.

The three new levels of Rhapsody service borrow elements from its main competitors.

Rhapsody 25 includes a free music management program, called a jukebox, for computers that run on Microsoft Windows.

The program's approach is similar to Apple's free iTunes program for both Windows and Macintosh platforms. Rhapsody 25 users can store and play songs copied from CDs or can listen to songs streamed over the Internet.

The program is also compatible with Apple's iPods, although Apple has released iPod upgrades that block that compatibility. Apple representatives had no immediate comment.

Glaser said the company can afford to offer free or discounted tracks because it also has advertising with automaker DaimlerChrysler AG's Chrysler Group and Web portal Google Inc.

Analyst P.J. McNealy of San Francisco's American Technology Research said RealNetworks' latest strategy is creative, but it is too soon to tell if it will take off. "This is just part of a larger experimental phase," he said.

Mike McGuire, a research director at GartnerG2, said a barrier for RealNetworks and Napster is that many people don't like to rent songs on a monthly subscription because they are used to owning music outright.

RealNetworks to offer 25 free songs a month
By Jefferson Graham, USA TODAY

Digital music service RealNetworks  (RNWK) will let people listen to 25 songs a month for free as part of its strategy to lure customers away from digital music leader Apple Computer (AAPL).

The Seattle-based maker of the RealPlayer audio/video software introduced a new version of its Rhapsody digital music program Tuesday. Previously, subscribers paid $9.99 a month for access to more than 1 million songs, which could be listened to via personal computer.

Now, a mini-version of Rhapsody is available, with 25 free songs to listen to monthly. That could be two plays of Bruce Springsteen's new 12-song Devils & Dust album or a mix of favorite Motown songs.

It differs from free Internet radio programs such as those offered at Yahoo Music and MSN in that the Rhapsody songs can be listened to on demand.

"We think this will be transformational," says Real CEO Rob Glaser. " If you say to people, 'Go try it, with no obligation,' that's incredibly powerful."

No credit card is required to use the Rhapsody 25 service, he says.

Real pays about a penny per song in royalties to the record labels each time a song is

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090487

accessed, but has made arrangements with Internet search giant Google and car manufacturer Chrysler to subsidize costs. Both companies are paying RealNetworks to be associated with Rhapsody 25.

Apple dominates digital music with sales of more than 350 million downloads in two years at its iTunes Music Store and sales of more than 10 million iPod digital music players.

Real says it has more than 1 million subscribers to its digital music offerings, which include Rhapsody and online radio services. Napster has 410,000 subscribers.

David Card, an analyst at market tracker Jupiter Research, thinks Real's move will pay off. "When we've done consumer surveys, we find that people are six times more likely to convert to paying customers after they try it out."

Card believes subscription services are on track to overtake downloads by 2009. In 2005, digital music revenue will reach $500 million, according to Jupiter, with about $300 million for downloads. In 2009, Card pegs the market at $1.7 billion, with $900 million for subscriptions and $800 million for downloads.

Analysts are enthusiastic about subscriptions because they're more economical for consumers in the long run. Rhapsody Tuesday joined Napster in offering an enhanced service that lets subscribers transfer unlimited songs to a portable device. Rhapsody to Go costs $14.99.

The catch is that for now, Rhapsody to Go supports only two devices, from Creative Technology and iRiver, and bypasses the most popular: the iPod.

Still, Glaser predicts that a year from now, more people will be using Rhapsody 25 than iTunes, because the free songs will be more appealing to consumers than the 30-second song previews used on iTunes.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090488