# EXHIBIT 50

# The Apple iPod iTunes Anti-Trust Litigation

Videotaped Deposition of

ROGER NOLL, PH.D.

December 18, 2013

***CONFIDENTIAL***

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

---

**Page 1**

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3     OAKLAND DIVISION

4

5   THE APPLE iPOD iTUNES        Lead Case No. C 05-00037

    ANTI-TRUST LITIGATION

6

7   _____

8   This Document Relates To:

9   ALL ACTIONS

10  _____

11

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15     VIDEOTAPED DEPOSITION OF ROGER G. NOLL, PH.D.

16          Wednesday, December 18, 2013

17            Palo Alto, California

18

19

20

21

22

23  Reported by:

    Darcy J. Brokaw

24  RPR, CRR, CSR No. 12584

25  Job No. 10008944

---

**Page 2**

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3     OAKLAND DIVISION

4

5   THE APPLE iPOD iTUNES        Lead Case No. C 05-00037

    ANTI-TRUST LITIGATION

6

7   _____

8   This Document Relates To:

9   ALL ACTIONS

10  _____

11

12

13      CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15     Videotaped Deposition of ROGER G. NOLL, PH.D.,

16  taken on behalf of he Defendant, at 1755 Embarcadero

17  Road, Palo Alto, California, beginning at 9:06 a.m. and

18  ending at 11:54 p.m., on Wednesday, December 18, 2013,

19  before Darcy J. Brokaw, CSR No. 12584.

20

21

22

23

24

25

---

**Page 3**

1              APPEARANCES

2

3

4   For the Plain iffs and the deponent, Dr. Noll:

5      ROBBINS GELLER RUDMAN & DOWD, LLP

       BY: ALEXANDRA S. BERNAY, ESQ.

6      BY: JENNIFER N. CARINGAL, ESQ.

       655 West Broadway, Suite 1900

7      San Diego, California  92101

       (619) 231-1058

8      xanb@rgrdlaw.com

9

10  For the Defendant, Apple Inc.:

11     JONES DAY

       BY: DAVID KIERNAN, ESQ.

12     BY: AMIR AMIRI, ESQ.

       BY: ROBERT MITTELSTAEDT, ESQ.

13     555 California Street, 26th Floor

       San Francisco, California  94104

14     (415) 626-3939

       dkiernan@jonesday.com

15

16

17

18  Also present:

19     Peter Hibdon, Videographer

20

21

22

23

24

25

---

**Page 4**

1           INDEX TO EXAMINATION

2           ROGER G. NOLL, PH.D.

3

4

5   EXAMINATION                   PAGE

6   BY MR. KIERNAN                 7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 21

1      A. Yeah, I know what you're doing. And I'm
2  saying these calculations are approximately
3  7.45 percent but not exactly. Okay.
4          And the reason for it is we would actually
5  need to get out a computer and actually do the
6  calculation in order to come up with what this
7  number actually is. But it is -- with a very small
8  amount of error, it's 7.45 percent.
9      Q. But, Dr. Noll, even if we used your
10 219.15, to calculate the price overcharge, you
11 wouldn't multiply column A and column B?
12         MS. BERNAY: Objection. Argumentative.
13 BY MR. KIERNAN:
14     Q. It would be column A divided by 1 plus
15 column B times column B; isn't that correct?
16         MS. BERNAY: Objection. Vague.
17         THE WITNESS: It would be explain --
18 explain it to me again.
19 BY MR. KIERNAN:
20     Q. It would be --
21     A. The actual overcharge would be -- so
22 the -- what the percentage damages is is the
23 percentage of the calculation you get from all the
24 independent variables, which is an estimate of the
25 transaction price you actually have. And the

Page 22

1  transaction price is -- has that overcharge of that
2  amount. All right.
3          So I'm not sure I understand --
4      Q. I'm focusing on the formula that's in C.
5      A. Yes.
6      Q. And the formula in C is taking the
7  percentage of the weighted average price. And my
8  question is --
9      A. That is the existing price. It's not the
10 but-for price.
11     Q. Right. And what I'm asking is: Isn't the
12 correct formula to determine the price overcharge
13 A divided by 1 plus column B times column B --
14         MS. BERNAY: Objection --
15 BY MR. KIERNAN:
16     Q. -- because column B reflects the change in
17 percentage between --
18     A. Yes, you're right --
19     Q. -- the but-for price and --
20         (Reporter admonishes.)
21         THE WITNESS: Yes, the 2.3.8 is an
22 approximation of what the -- what the exactly
23 precise calculation would be, yes.
24 BY MR. KIERNAN:
25     Q. Okay. If the residual errors in the

Page 23

1  regression are correlated within a particular group
2  and you don't do anything to correct for that, what
3  would be the impact on the reported standard errors?
4          MS. BERNAY: Objection. Vague and
5  ambiguous.
6          THE WITNESS: I didn't completely follow
7  the question. Ask it again.
8  BY MR. KIERNAN:
9      Q. If the residual errors in the regression
10 are correlated within a particular group and you
11 don't do anything to correct for that, what would be
12 the impact on the reported standard errors?
13         MS. BERNAY: Same objection.
14         THE WITNESS: It could be either way. It
15 could make them higher or it could make them lower,
16 depending on the nature of the correlation.
17 BY MR. KIERNAN:
18     Q. And why would it impact the reported
19 standard errors?
20     A. Well, it's all built up in the -- in the
21 nature of the assumptions one makes in doing a
22 regression analysis, which is an independence of the
23 standard errors. And if the standard errors -- if
24 the -- if the random shock that is --
25         (Reporter inquires.)

Page 24

1          THE WITNESS: If the random shock that is
2  in the regression equation does not satisfy the
3  independence assumption, then the effect on the
4  standard errors of the coefficients could be either
5  to elevate them or to reduce them, depending on the
6  nature of the violation of the independence
7  assumption.
8  BY MR. KIERNAN:
9      Q. Okay. And are there standard statistical
10 tests to test whether the residual errors are
11 correlated within a particular group?
12         MS. BERNAY: Objection. Vague.
13         THE WITNESS: There are many such tests
14 and many such corrections. But the effect is -- the
15 existence of even statistically significant
16 correlations is small unless those correlations are
17 high. All right.
18         So the corrections for autocorrelation of
19 residuals are not something that actually matters in
20 the vast majority of cases because the -- it's
21 almost never the case there's no correlation in
22 residual errors, but it's almost never the case that
23 making a correction for the auto- -- the correlation
24 that does exist matters in terms of the regression.
25         It's also the case here that we're not

Page 21..24

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 25

1  talking about a source of bias in the coefficients.
2  We're talking about a source of bias in the
3  estimated statistical significance, the —
4  BY MR. KIERNAN:
5      Q. The standard errors?
6      A. Yeah, the values of the — the expected
7  value of the regression coefficients is not
8  affected.
9      Q. The coefficients aren't affected, but the
10  calculations of the standard errors are affected?
11      A. Right, the calculations of the standard
12  errors are affected, but the — but the estimated
13  effect of the independent variable is the same, the
14  expected estimated effect.
15      Q. And if the residual errors are correlated
16  within a particular group, the standard errors could
17  either be overstated or understated?
18      A. Yes.
19      Q. Without a correction?
20      A. They could be. Although, again, the —
21  it's not — it's not a dichotomous issue. They —
22  A, they may be affected, and B, the magnitude of the
23  effect depends on the exact conditions.
24      Q. And to know the magnitude of effect, you'd
25  have to test it, you'd have to run one of the

Page 26

1  standard statistical tests?
2      MS. BERNAY: Objection. Calls for
3  speculation.
4      THE WITNESS: Well, actually, that's not
5  what most — what typically —
6  BY MR. KIERNAN:
7      Q. Can you just eyeball it?
8      A. — happens.
9      (Reporter inquires.)
10  BY MR. KIERNAN:
11      Q. Can you just eyeball it?
12      MS. BERNAY: Objection. Vague.
13      THE WITNESS: Can I finish my first answer
14  before I answer the next question?
15  BY MR. KIERNAN:
16      Q. Yes.
17      A. Okay. It is the case that if you plot the
18  errors, you will know from experience if you
19  actually have a problem that is causing the
20  regression equation to be unreliable. But so
21  "eyeball" is sort of a bizarre word.
22      What you actually do is you look at the
23  actual scatter plot of points around the regression
24  line and see if there is a clustering of
25  observations above and below it. The problem with

Page 27

1  that — that's a good way to see if there's positive
2  error correlation, but it's not a good way to see if
3  there's negative error correlation.
4      And the second point is that the nature of
5  the error correlation may be that it's dependent on
6  particular combinations of variables; and that one,
7  the standard tests wouldn't even tell you that it
8  exists.
9      Q. In this case, did you do anything to check
10  whether the residual errors in your regression set
11  forth in Exhibits 3A and 3B to Noll 10 are
12  correlated with any particular group?
13      MS. BERNAY: Objection. Vague and
14  ambiguous.
15      THE WITNESS: What do you mean by "group"?
16  BY MR. KIERNAN:
17      Q. Within any group.
18      A. What do you mean, "a group"? I don't
19  understand what you mean by a group.
20      Q. We've been using group for the last ten
21  minutes.
22      MS. BERNAY: Objection. Argumentative.
23  BY MR. KIERNAN:
24      Q. Same group that you've — the same group
25  that you've been referring to.

Page 28

1      A. I didn't refer to a group. I don't know
2  what you're talking about. I know I fully
3  intended —
4      Q. You used the term "cluster" —
5      (Reporter admonishes.)
6  BY MR. KIERNAN:
7      Q. You used the word cluster, within a
8  cluster.
9      A. I don't agree that there are any clusters
10  here.
11      MS. BERNAY: Objection.
12  BY MR. KIERNAN:
13      Q. That's not my question, Dr. Noll. I asked
14  you, did you do anything to check whether the
15  residual errors in your regressions set forth in
16  Exhibit 3A and 3B are correlated within any cluster
17  or group?
18      MS. BERNAY: Objection. Asked and
19  answered.
20      THE WITNESS: I don't know what you mean
21  by a group. And you used the word "or," and I don't
22  believe there are any clusters. So how can I test
23  for something when I don't — I think it either
24  doesn't exist or I don't understand what you're
25  asking?

Page 25..28

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                              The Apple iPod iTunes Anti-Trust Litigation

Page 33

1   there, so instead of having 100-odd iPod models, I
2   only had 20, and within those 20, I had just drawn a
3   sample of transactions instead of looking at the
4   entire universe, then, in principle, there might be
5   a clustering problem. But when you don't have a
6   sample of either the models or the transactions,
7   it's not a cluster problem.
8        So testing for cluster effects is a
9   non sequitur. It's inappropriate, because you don't
10  have cluster samples.
11       Q. Okay. And other than that basis that
12  there's not a clustering problem because it's not a
13  sample from a population, any other reason, any
14  other basis for your opinion that there's not a
15  clustering issue?
16       A. Only the fact it doesn't satisfy the
17  conditions for doing cluster analysis?
18       Q. The one that you just described.
19       A. Yes. That's why it isn't a cluster
20  problem, is because it's not a cluster sample. And
21  cluster sampling is a procedure you use when you are
22  sampling on both groups and people within a group.
23       If you have a population instead of a
24  sample, there's no cluster issue, by definition.
25       Q. And so if the mean residual errors within

Page 34

1   certain particular groups in the transaction data at
2   issue in this case are correlated, that is, they are
3   statistically significantly different from zero,
4   your opinion is it has no impact on the calculation
5   of the standard errors in the case?
6        A. That's not what I said.
7            MS. BERNAY: Objection. Misstates his
8   prior testimony.
9   BY MR. KIERNAN:
10       Q. What was wrong with – what do you
11  disagree with in the question I just asked?
12           MS. BERNAY: Objection. Vague.
13           THE WITNESS: First of all, if you look
14  within a – if you define the group as a particular
15  model of an iPod, and you look at the errors in
16  predicting that, and you find they're correlated, it
17  may be – it's perfectly explained if you took into
18  account all the values of all the other independent
19  variables.
20       So that test in and of itself doesn't
21  prove anything. All right. The only way it proves
22  something – again, let's go back to the reasons
23  cluster sampling can be a problem. And as stated in
24  the report, there's three reasons why it can be a
25  problem. One is a sample bias problem, and the

Page 35

1   other two are versions of omitted variable problems.
2        So the issue is, is there a sampling issue
3   here? The answer is no.
4        Are there omitted variables? I'm not
5   aware of any that would add statistical significance
6   to the regression equation without being so highly
7   multicollinear that they would destroy the
8   coefficient estimates.
9        So there can't – there isn't any – none
10  of the three reasons why you might have a problem
11  exist. So I don't care what the test is, because
12  it's testing for something that, in principle, can't
13  exist as a problem in the regression.
14  BY MR. KIERNAN:
15       Q. So if you run a test on a particular group
16  of transactions and the test shows that the mean
17  residual errors are statistically significantly
18  different from zero, your opinion is it has no
19  impact on the calculation of the standard errors?
20           MS. BERNAY: Objection. Vague and
21  ambiguous. Misstates prior testimony as well.
22  BY MR. KIERNAN:
23       Q. Let me put it differently. It does not
24  overstate or understate the standard errors that
25  you're calculating?

Page 36

1            MS. BERNAY: Same objection.
2            THE WITNESS: It may or may not. You
3   haven't – there's not enough information in your
4   question to make a prediction about the effect on
5   the calculation of the standard errors.
6   BY MR. KIERNAN:
7        Q. What additional information do you need?
8        A. You have to understand what is the source
9   of what you're measuring. All right. You have
10  to –
11       Q. The source of the observations?
12       A. No.
13           THE REPORTER: What's the question?
14       You guys are cutting each other off.
15           THE WITNESS: Yeah, he does this,
16  doesn't he?
17       The very first step is precisely what
18  residual errors are you correlating, what actually
19  is it. All right. And I don't know the answer to
20  that.
21       All you're telling me is that within a
22  model of iPods, the mean residual error isn't
23  zero. That's all you're telling me. You're not
24  telling me anything else about why it might be
25  different from zero.

Page 33..36

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 49

1   understand it.
2       Q. Well, yeah, okay.
3       MR. KIERNAN: Move to strike the last
4   part.
5   BY MR. KIERNAN:
6       Q. So the new iPod owners includes both
7   purchasers of iPods with 7.0 and iPods without 7.0?
8       A. To differing degrees, yes.
9       Q. Okay. And in the rest of the paragraph,
10  you state that the "lock-in would not have affected
11  the demand for subsequent iPods for a long period
12  because these purchasers would not soon make
13  repurchase decisions."
14      What's the basis for that?
15      A. That it's information we have about how
16  long people own electronic devices. They don't buy
17  a new electronic device with the same frequency they
18  buy music.
19      Q. And that's the 18-month to two-year period
20  that you referred to in your initial merits report?
21      A. I think that's those -- I don't remember
22  from memory, but that sounds about right as to
23  frequency of repurchase of iPods.
24      Q. Okay.
25      A. The mean frequency. Some are more, some

Page 50

1   are less. That's on average.
2       Q. And then in the last sentence, you state
3   that "for most of the damages period, the lock-in
4   effect on new iPod purchasers would not be an
5   important factor affecting iPod prices."
6       On the new -- when you refer to "new iPod
7   purchasers," are you referring to the new iPod
8   purchasers that occurred in late 2006?
9       A. I'm referring to people who bought -- what
10  this means, is about, is people who bought their
11  first iPod after -- in late 2006, yes.
12      Q. Okay. And those purchasers, you're
13  stating here, would not be an important factor
14  affecting iPod prices during most of the damages
15  period?
16      A. That's right. Because they wouldn't buy
17  another MP3 player until nearly the end of the
18  damages period.
19      Q. Okay. With respect to the lock-in theory,
20  are there any iPod owners that would impact the
21  demand for iPods during the damages period as a
22  result of lock-in?
23      MS. BERNAY: Objection. Vague and
24  ambiguous.
25      THE WITNESS: Yes. I mean, the people who

Page 51

1   are buying replacement iPods are the -- what this is
2   about is the fact that it's mainly people who are
3   buying replacement iPods that experience the
4   immediate effect of lock-in. They are, to some
5   degree, locked in. And the point of Harmony was to
6   reduce the degree to which existing users of iPods
7   were locked in.
8   BY MR. KIERNAN:
9       Q. Okay. And I think I'm following you now,
10  Dr. Noll. When you're referring to "new iPod
11  purchasers" in the last paragraph on page 27, you're
12  referring to customers who did not own an iPod
13  before that time?
14      A. Yes. This is new purchasers. This is not
15  replacement purchasers.
16      Q. Okay. And for a new purchaser in late
17  2006, your opinion is for most of the damages
18  period, they would not be an important factor
19  affecting iPod prices because they wouldn't purchase
20  a replacement for the 18- to 24-month period?
21      A. The -- yeah. Of course, it's not
22  dichotomous, it's continuous. Their importance
23  grows through time. But initially, it would not be
24  important because you don't replace your iPod every
25  month. All right. So it would take a while before

Page 52

1   you start to see an effect.
2       There would be other things happening that
3   would cause it to have some effect on demand, like
4   multiple iPods within the same family unit that want
5   access to the same music, things like that.
6       But the main immediate effect of lock-in
7   is the existing or established base. It's not the
8   new people. And the new people would just gradually
9   through time get added to the people who are
10  affected by lock-in in terms of their effect on the
11  demand for iPods.
12      MR. KIERNAN: Let's just take a short
13  break.
14      THE VIDEOGRAPHER: Off the record at
15  10:05.
16      (A brief recess was taken.)
17      THE VIDEOGRAPHER: On the record at 10:18.
18  BY MR. KIERNAN:
19      Q. In the regression that is in Exhibits 3A
20  and 3B to Noll 10, you turn on the dummy variable
21  for 7.0 at different times for different models; is
22  that right?
23      A. Well, the indicator is on for a model that
24  has 7.0 on it. So anything that was released after
25  the first date would have it, quote, turned on,

Page 49..52

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 53

1  unquote, after the September date when it was
2  introduced.  I don't fully understand what you mean
3  beyond that.
4      Q.  Okay.
5      A.  At the point at which a model of iPod
6  has 7.0 on it, then in fact that's when the 7.0
7  indicator gets turned on.  And it's never turned on
8  for the ones that never had it.
9      Q.  Okay.
10     A.  That's the main change, actually, between
11 this regression and the one that was in the first
12 merits report.
13     Q.  And so, for example, for the shuffle, 7.0
14 is never turned on in the regression?
15     A.  Yes.  Well, I'm assuming from memory --
16 I'm not being trapped -- that, in fact, the shuffle
17 never had 7.0 on it.  But if that's true, then it
18 would never be turned on.
19     Q.  Okay.  And 4.7, what you refer to as
20 "Harmony blocked" in the form of your regression,
21 that remains on for any model that did not have 7.0?
22     A.  Correct.
23     Q.  Why is that?  Why does 4.7 remain on for
24 models that did not have 7.0?
25     A.  Because the technology introduced in 4.7,

Page 54

1  I believe, is still on those things.  It was in
2  subsequent revisions that the mechanism that was
3  used to block Harmony, you know, in subsequent
4  versions of iTunes that were on that particular
5  model remain there.  That's my understanding.
6  That's what I think the 7.0 means.
7      But that's, again, derived from Apple
8  information.  So since that information changes
9  periodically, it might change again, but I'm relying
10 upon what I was told by Apple.
11     Q.  And by leaving 4.7 on for models that did
12 not have 7.0, what is the 4.7 variable capturing or
13 intended to capture?
14     MS. BERNAY:  Objection.  Vague.
15     THE WITNESS:  It's intended to capture
16 whatever the blocking mechanism is in an Apple that
17 is not being contested in this case.
18 BY MR. KIERNAN:
19     Q.  It's intended to capture the impact of 4.7
20 on that model?
21     MS. BERNAY:  Objection.  Misstates prior
22 testimony.
23     THE WITNESS:  That's not what I said.
24 BY MR. KIERNAN:
25     Q.  I didn't understand what you said.

Page 55

1      A.  Well, what is there about it that you
2  don't understand?  I don't know how -- I can repeat
3  it.
4      It is intended to capture whatever the
5  blocking mechanism is that's not being challenged
6  that initiates with 4.7 and is continued on in
7  various models through time.  And those aren't being
8  challenged, so whatever it is that blocks
9  imperfectly to some degree Harmony is still
10 applying.  So starting with 4.7 and continuing.
11     The distinction is between those that are
12 being challenged versus those that are not being
13 challenged.
14     Q.  Okay.  Under what conditions -- or strike
15 that.
16     And then assume that the 7.0 was not
17 implemented on the shuffle.  With me so far?
18     A.  Okay.
19     Q.  Okay.  And you don't turn on the 7.0
20 variable because it's not implemented on the
21 shuffle, correct --
22     A.  Right.
23     Q.  -- assuming that it's not on the shuffle?
24 Why is that?  Why keep turning if off?
25     A.  I don't fully understand.  Ask me the

Page 56

1  question again.  I don't fully understand.
2      Q.  Why do you not turn on 7.0 on models in
3  which it wasn't implemented?
4      A.  Because the challenged blocking software
5  isn't on those, so they can't be affected by it.
6      Q.  What can't be affected by it?
7      A.  The price of the shuffle is not affected
8  by 7.0 because it's not on it.
9      Q.  And how do you know that?
10     A.  From -- again, I don't know that.  I know
11 that because Apple says it's true, but I don't know
12 that it's true.
13     Q.  What I mean is how do you know that it did
14 not impact the price of the shuffle?
15     MS. BERNAY:  Objection.  Asked and
16 answered.
17     THE WITNESS:  Because I don't have any
18 reason to believe that software that isn't on a
19 device would cause a change in the value of that
20 device.
21 BY MR. KIERNAN:
22     Q.  Can you think of any conditions under any
23 circumstances in which 7.0 could impact the demand
24 of shuffles even though 7.0 is not implemented on
25 that shuffle?

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.             The Apple iPod iTunes Anti-Trust Litigation

1        MS. BERNAY: Objection. Calls for
2 speculation.
3        THE WITNESS: The conditions under which
4 it would happen would be, A, they're close
5 competitive substitutes and, B, the cost function of
6 the shuffle is such that the optimal price --
7        (Reporter inquires.)
8        THE WITNESS: The optimal price would
9 depend on the price of some other product. It
10 would -- you know, like if there were diseconomies
11 of scale and there was a shift in demand of the
12 shuffle, the price of the shuffle would go up, for
13 example.
14 BY MR. KIERNAN:
15    Q. When you state, "A, they are close
16 competitive substitutes," compared to what?
17    A. To other Apple products that contain the
18 7.0. I'm saying suppose there's two models of
19 iPods, one has 7.0 on it and one doesn't, then the
20 degree to which the price of the one that doesn't
21 have it is affected by the presence of 7.0 on the
22 other.
23      If 7.0 causes people -- the demand for
24 that product to become more inelastic and its price
25 goes up, then it's conceivable that some of the

1 people who bought -- who would have otherwise bought
2 the device with 7.0 on it would shift to a shuffle
3 because its price is a little lower, and that would
4 then cause, under some circumstances, the price of
5 the shuffle to go up.
6      The presence, however, of a statistically
7 significant effect of 7.0 indicates that they are
8 not close competitive substitutes, because if they
9 were, then putting 7.0 only on some devices would
10 not allow Apple to increase the price difference
11 between those with the 7.0 and those without it.
12 The coefficient on 7.0 would be zero if there were
13 close competitive substitutes that didn't have 7.0
14 on it.
15    Q. Are there any other circumstances under
16 which you can think of that 7.0 would impact the
17 demand for shuffles, other than what you just
18 described?
19        MS. BERNAY: Objection. Vague.
20        THE WITNESS: Again, the mechanism --
21 another mechanism would be multiple devices within
22 the same household that want access to the same
23 music.
24      But once again, the degree to which the
25 7.0 causes the price of devices without 7.0 on it to

1 go up will actually make the estimate of damages be
2 conservative, because they'll say there was some
3 spillover damage for the other products as well.
4      I'm assuming there is no spillover damage,
5 that there is no price effect on the others. If
6 there is a price effect, then the method I use will
7 understate damages.
8 BY MR. KIERNAN:
9    Q. How would you test whether your assumption
10 is correct that 7.0 had no impact on the prices of
11 iPods that did not contain 7.0?
12        MS. BERNAY: Objection. Misstates his
13 prior testimony. Also vague.
14        THE WITNESS: Well, first of all, the fact
15 that the 7.0 variable is statistically significant
16 indicates that whatever the effect is, it still
17 causes the gap between -- in the prices between the
18 two to go up.
19      The second mechanism would be -- I could
20 incorporate in the model a mechanism to try to
21 estimate the spillover effect of 7.0, and the model
22 would look a whole lot like the original model in
23 that -- but it would have a differentiating factor.
24      You'd have an interaction variable
25 between -- that was the -- took the value of one if

1 both -- if 7.0 had been introduced and the 4.7
2 variable were turned on, you'd have that interaction
3 variable in there and test whether that coefficient
4 was significant. And that would be a way to
5 attribute damages to the models that didn't have 7.0
6 on them.
7 BY MR. KIERNAN:
8    Q. And if the coefficients were statistically
9 significant, what would that tell you?
10    A. That the damage estimate is
11 underestimated, that we should be claiming damages
12 on models that didn't have 7.0 on them.
13    Q. And if you ran the test that you described
14 and the coefficient is statistically significant but
15 showing no damages for those particular models, what
16 would that tell you?
17    A. That would tell me that the whole exercise
18 was a waste of time and I should go back to the
19 original model.
20    Q. And what if you did the same analysis and
21 it lowered the damages for the models that had 7.0
22 on them? Would it change the coefficient for those
23 other models?
24        MS. BERNAY: Objection. Vague.
25        THE WITNESS: I'd have to know about what

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 61

1  happened to the entire equation, including the
2  interaction variable, to answer that question.
3  BY MR. KIERNAN:
4      Q.  Okay.
5      A.  The right way to think of the regression
6  model is that it's based on differences in prices
7  between two models.  All right.
8          And so the premise of the regression
9  equation is essentially with some amendment, because
10 there's differences in other independent variables,
11 that what you're really looking at to determine
12 damages is the price difference between those that
13 were affected and those that were not.
14          If they all were affected, that causes a
15 downward bias in the effect of 7.0 because the -- if
16 the difference is like this, and then after 7.0, it
17 goes up but both of them go up, all right, then
18 you're missing this part down here as part of the
19 damages.
20          And so it is -- you know, if one believed
21 that there were spillover effects of 7.0 onto the
22 other models, that would lead to a reduction in
23 overall damages estimates.
24          It might change the distribution of the
25 damages between those that had 7.0 on it and those

Page 62

1  that didn't, but it would unambiguously cause the
2  damage estimate to go up.
3      Q.  And are you assuming, for purposes of your
4  regression set forth in Exhibits 3 and 3B -- 3A and
5  3B, that 7.0 did not impact the prices of any iPods
6  that did not include 7.0?
7      A.  Yes.  The implicit assumption in the model
8  is that the other -- there were no damages
9  associated with the others, that's correct.
10     Q.  And if 7.0 -- well, strike that.
11         If 7.0 had the effect of shutting Harmony
12 out of -- and RealNetworks out of the market from
13 music downloads, would you expect any impact on the
14 prices of iPods that did not have 7.0?
15         MS. BERNAY:  Objection.  Incomplete
16 hypothetical.
17         THE WITNESS:  Well, that's already in the
18 regression model.  The Harmony effect on those
19 models would already be there.  So I don't -- it
20 wouldn't change.
21         The Harmony variable is already in there.
22 The second generation Harmony variable is already in
23 there, and it's already affecting those prices.
24         So I don't see why the introduction of 7.0
25 would change the effect of the Harmony variable on

Page 63

1  the other models.
2      Q.  Okay.  So that I understand, if
3  RealNetworks shut down Harmony the day after 7.0 was
4  released, your testimony is that the Harmony and the
5  Harmony -- I'll call it the Harmony 2 variable --
6  will capture any impact that that circumstance had
7  on the prices of models that did not have 7.0?
8          MS. BERNAY:  Objection.  Mischaracterizes
9  his prior testimony.
10         THE WITNESS:  What do you mean by "shut
11 down Harmony"?  I don't understand.
12 BY MR. KIERNAN:
13     Q.  So assume that the day after 7.0 was --
14 the day that 7.0 was released, RealNetworks no
15 longer offered Harmony to consumers.
16     A.  Well, they would have to --
17     Q.  Would that impact the price of iPods that
18 did not have iTunes 7.0?
19         MS. BERNAY:  Objection.
20         THE WITNESS:  They would have to do more
21 than that.  They would have to actually disable the
22 Harmony on everybody who had it, because Harmony is
23 sitting on people's computers.  So they would
24 actually have to disable it on people's computers so
25 they couldn't continue to use it.

Page 64

1  BY MR. KIERNAN:
2      Q.  So the existing Harmony sales -- the sales
3  from Harmony that already have completed, they will
4  continue to impact the price of models that did not
5  have 7.0?
6          MS. BERNAY:  Objection.  Vague and
7  ambiguous.
8          THE WITNESS:  Yes.  I mean, the -- first
9  of all, Harmony isn't sales.  All right.  But
10 Harmony is out there on people's computers, and it
11 can still be used to load songs onto devices
12 regardless of whether RealNetworks continues to
13 distribute it.  It's still out there, so it would
14 still continue to affect people, people's behavior.
15 BY MR. KIERNAN:
16     Q.  Would you expect that by including 7.0 on,
17 let's say, the iPod nano second generation, in
18 September of 2006, would cause any customers to
19 purchase iPod shuffles or iPod classics, any models
20 that did not have 7.0?  Would it shift demand?
21         MS. BERNAY:  Objection.  Calls for
22 speculation.
23         THE WITNESS:  I'm not -- would the
24 existence of 7.0 on what?
25 ///

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 65

1  BY MR. KIERNAN:
2      Q.  On the iPod nano second generation --
3      A.  Okay.
4      Q.  -- that was released in September 2006?
5      A.  Right.  Would that cause what?  A shift in
6  demand for what?
7      Q.  For iPod shuffles or classics or any
8  models of iPods that didn't include 7.0?
9      A.  It might, but that's the source of
10 underestimate of demand, all right, of damages, is
11 that if there were a shift in demand for other
12 devices, then the measured difference in price
13 between those with 7.0 and those without it would be
14 smaller.
15     And there would be some damages, sort of
16 secondary-effect damages to people who bought things
17 without 7.0 on them because -- if there was such a
18 price effect.  All right.  So -- and the magnitude
19 of the understatement of damages is essentially
20 determined by the degree of cross-elasticity of
21 demand between those with 7.0 and those without it.
22     Q.  Did you do anything to determine whether
23 or not 7.0 impacted the demand for iPods that did
24 not contain 7.0?
25     MS. BERNAY:  Objection.

Page 66

1      THE WITNESS:  No, I did not.  And I admit
2  that my damages estimates are probably
3  underestimated by failure to take account of the
4  damages to people who bought iPods without 7.0 on
5  them.
6      MR. KIERNAN:  Move to strike the last part
7  as nonresponsive.
8  BY MR. KIERNAN:
9      Q.  In your rebuttal report, you offer the
10 opinion that --
11     A.  You know, that last answer isn't right.
12 The original regression that assigned 7.0 to
13 everything would -- what it would give you would be
14 the average effect across those that had it and
15 those that didn't.
16     So although the damages associated with
17 any particular model would be wrong, there would be
18 too little assigned to the ones with 7.0 and too
19 much assigned to the ones without it.
20     The total damages would be -- the expected
21 estimate of that would be the unbiased sum of the
22 damages on both categories.  So the regression I
23 originally presented would actually get the right
24 answer on the damages.
25     Q.  So that would be a way to do it with your

Page 67

1  new regression, is to keep all your specifications
2  the same but turn 7.0 on for all models and then
3  turn 4.7 off for the same models starting in
4  September 2006, like you did in your original
5  regression?
6      A.  No.  I said -- my answer was correct long
7  ago, which is you'd interact 4.7 with 7.0 for those
8  that didn't have 7.0 on it.
9      Q.  Okay.  So when you were just referring to
10 your, what you refer to as your original regression,
11 and said that it would actually get the right answer
12 on the damages, what did you mean by that?
13     A.  Yeah, you wouldn't get the right
14 allocation among models, but the expected total
15 would be the right number.  It's just you'd
16 allocated it incorrectly between those that had 7.0
17 and those that didn't.
18     Q.  Okay.  And so if you were to turn on 7.0
19 for all models with your new regression and turn off
20 4.7 when you turn on 7.0, it would -- you would get
21 the right answer on the damages overall, just for
22 each individual model, it would be inaccurate?
23     A.  Well, the expected result.  It wouldn't be
24 precisely identical, but the expected number from
25 the regression would be the same.

Page 68

1      I mean, there could be differences owing
2  to whatever remaining specification errors there
3  are.  But basically you would expect that the
4  number -- the aggregate number would be correct, but
5  the allocation among models would be wrong.
6      Q.  Okay.  In your rebuttal report, Noll 10,
7  you discuss the impact of what you refer to as the
8  lock-out effect and that the effect on iPod prices
9  would be immediate.
10     MS. BERNAY:  Do you have a page reference
11 for that?
12     MR. KIERNAN:  I'm just going to -- I'm not
13 going to ask with the actual words.
14 BY MR. KIERNAN:
15     Q.  Who specifically would be locked out under
16 that theory, under your lock-out theory?
17     MS. BERNAY:  Objection.  Incomplete
18 question, vague.
19     THE WITNESS:  Lock-out arises because
20 somebody who uses another device pays a higher
21 switching cost to buy an Apple product.  And so if
22 somebody has used another device and has used that
23 device to download audio and video files from
24 RealNetworks, then they can't -- the cost of
25 switching to have their next MP3 player be an Apple

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 69

1   goes up if they no longer – if the act of doing it
2   would cause them no longer to be able to play
3   whatever files they had downloaded from the
4   RealNetworks site.
5          Harmony allows people to switch from MP3
6   players that access the RealNetworks site, that use
7   the RealNetworks DRM system, to an Apple iPod. And
8   if Harmony is disabled, then they can't have that
9   switch.
10         And so the extent of price competition
11  between manufacturers of MP3 players that can be
12  used for the Real- – on the RealNetworks site and
13  Apple MP3 players, the competition between them is
14  reduced. Both sides experience a more inelastic
15  demand curve instantaneously because of that effect.
16  BY MR. KIERNAN:
17      Q. For the owners of the non-iPods that you
18  were just describing with RealNetworks music, your
19  last point is that it would also impact the
20  inelasticity of demand for non-iPods?
21      A. That's the whole idea of lock-out. That's
22  the whole idea of walled garden, is that you –
23      Q. What impact on prices would that have on
24  the non-iPods?
25      A. It would go up. Well, except for the fact

Page 70

1   that the others ones are competitive. So the fact
2   that the market inelasticity and demand became more
3   inelastic for other MP3 players wouldn't necessarily
4   imply their price went up, because there's
5   competition in devices that use other DRM systems,
6   because there's multiple vendors of devices that can
7   be used for other sites, but there's only one vendor
8   that can be used for the Apple site.
9          So the increase in the inelasticity of
10  demand for MP3 players that can access RealNetworks
11  is dissipated in price competition among those
12  device manufacturers, but the increase in the
13  inelasticity of demand for iPods does not face
14  competition from other vendors of devices. And so
15  that would lead to a price increase.
16      Q. Okay. And with respect to – when you
17  refer to MP3 players, you're referring to non-iPods?
18  I just want to make sure we're using the same
19  definitions here.
20      A. MP3 players, I was making as the category,
21  and then there are subsets depending on which site
22  you can access. And general – you know, to be
23  clear, you know, usually people refer to all
24  portable digital media players as MP3 players,
25  including an iPod.

Page 71

1          But clearly an iPod is different because
2   of its tetheredness to Apple, like Zune is tethered
3   or was tethered to Microsoft.
4      Q. I'll just use the word "non-iPods."
5      A. Yeah, non-iPod MP3 players, and then
6   there's iPods.
7      Q. Fair enough.
8          Looking at the non-iPod side, as a result
9   of 7.0, your opinion is that certain consumers that
10  have music from RealNetworks are now locked out of
11  iPods?
12      MS. BERNAY: Objection. Misstates prior
13  testimony.
14      THE WITNESS: Yeah, lock-out in the sense
15  that they face a higher switching cost than they
16  would have faced prior to the introduction of 7.0.
17  BY MR. KIERNAN:
18      Q. And does that depend on how much
19  RealNetworks music they had?
20      A. Yes.
21      Q. What else would it depend on?
22      A. Well, the pure lock-out effect is just
23  that; it's the degree to which you contain a library
24  of files that can't be played on the iPod.
25         That's the – you know, there are other

Page 72

1   switching costs – normally we think of switching
2   costs as costs you have to bear from using one
3   device to using another. And the switching costs
4   there have to do with learning how to use it,
5   perhaps differences in – in prices of the things
6   you use. So there's other things that affect
7   switching costs.
8          But lock-out refers to the component of
9   switching costs that is due to incompatibility.
10      Q. And how much RealNetworks music would a
11  consumer need or have in its possession to be locked
12  out of an iPod?
13      MS. BERNAY: Objection. Vague.
14      THE WITNESS: Well, the question presumes
15  there's a dichotomous effect, and the whole point of
16  the last answer was to say there wasn't.
17         It depends on how much. It's just what
18  the inelasticity of the demand curve looks like,
19  that the – that the demand curve becomes more
20  inelastic.
21         But small changes in price still have an
22  effect on quantity. And so what the demand curve
23  tells you is the distribution of people in terms of
24  the magnitude of the lock-out effect.
25  ///

Page 69..72

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 73

1    BY MR. KIERNAN:
2         Q.  And do you have any estimate of the number
3    of people, number of customers who were locked out
4    from purchasing iPods as a result of 7.0?
5         A.  The number that faced higher switching
6    costs would be the number of people who had
7    libraries of files that used the DRM system of
8    RealNetworks.
9         Q.  All people that had libraries regardless
10   of size from RealNetworks?
11        A.  Yeah, the size determines the magnitude of
12   the lock-out but not the existence.  So the lock-out
13   effect is translated into the demand curve.  We said
14   that the demand curve becomes more inelastic.  We
15   didn't say it becomes perfectly inelastic; we said
16   it becomes more inelastic.
17        At low prices, there are some people still
18   with a low switching cost, and they'd be the ones
19   who for small price differentials still might
20   switch.
21        But the increase in the extent to which
22   the demand curve is inelastic reflects the
23   distribution of people who use MP3 players for
24   listening to RealNetworks DRM files.  That
25   distribution determines where they are on this new

Page 74

1    more inelastic demand curve.  How many of these
2    files they have determines where they are on that
3    demand curve.
4         Q.  And do you have an estimation or – do you
5    have an estimation of how many consumers that had
6    RealNetworks music were locked out of purchasing an
7    iPod because they deemed the switching costs to be
8    too high?
9         MS. BERNAY:  Objection.  Calls for
10   speculation.
11        THE WITNESS:  First of all, "lock-out"
12   refers to the switching cost itself.  And the only
13   way I can answer that is that there's no answer to
14   the question because it's not a meaningful question.
15   The demand curve becomes more inelastic.
16        So the greater the price differential
17   between an iPod and some other MP3 player, the fewer
18   people there are who would be prevented from
19   switching.  All right.
20        And the – where anybody is on that demand
21   curve is determined by the switching cost, and then
22   how many of them switch is determined by the
23   relative prices of the MP3 players and the iPods.
24        Remember that the other MP3 players also
25   might have a price increase, or it might not,

Page 75

1    depending on the nature of competition among those
2    devices.
3         So – and it's the gap, it's the
4    differential in the price that determines how many
5    people would actually switch, and that – the bigger
6    the gap, the more people would switch.
7         And everybody is going to set the price of
8    their player depending on two phenomenon, right?
9    One is within technology competition, of which
10   there's some for the other MP3 players and none for
11   Apple; and the across technology, cross-elasticity
12   of demand between the other players and Apple.  And
13   we're talking about the latter.
14        So if we take an extreme assumption and
15   assume that due to competition, 7.0 had no effect at
16   all on other MP3 player prices and the sole effect
17   was to raise the price of Apple, then they would
18   raise the price up to the point at which the loss to
19   them of losing switchers was exactly offset by the
20   gains from charging the higher price.
21        And I don't know how – what precise
22   number of people that is, but the number of people
23   who actually switched from others to Apple's was
24   probably not very large because it would not be in
25   Apple's interest to raise the price so high that it

Page 76

1    lost all possible switchers.
2    BY MR. KIERNAN:
3         Q.  With respect to the non-iPods – excuse
4    me.
5         With respect to the non-iPods and the
6    inelasticity of demand, did you do anything to
7    determine or analyze whether 7.0 impacted the
8    elasticity of demand for non-iPods?
9         A.  Well, that's what the coefficient tells
10   you, right?
11        Q.  Which coefficient?
12        A.  The coefficient on 7.0 is positive only
13   because the price went up, and the price went up
14   only because the demand curve became more inelastic.
15   All right.
16        Q.  The demand curve for non-iPods?
17        A.  Oh, excuse me.  No, no, I did not
18   examine – I thought you meant iPods.  Again, I'll
19   acknowledge –
20        Q.  Let me restate the question.  Focusing
21   just on non-iPods.
22        A.  Okay.  I'm sorry.  I didn't hear "non."
23        Q.  That's okay.  Understood.
24        Focusing on non-iPods, did you do anything
25   to analyze whether 7.0 impacted the elasticity of

Page 73..76

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                          The Apple iPod iTunes Anti-Trust Litigation

Page 77

1  demand for non-iPods?
2        A.  No, I did not.
3        Q.  With respect to non-iPods, would you
4  expect 7.0 to have any impact on the competition
5  between manufacturers of non-iPods?
6        MS. BERNAY:  Calls for speculation.
7        THE WITNESS:  In the long run, no.  In the
8  short run, it might, because the competition between
9  them and Apple had intensified with the introduction
10  of Harmony, and that goes away.  So there might be a
11  short-run effect.
12        But there's lots of producers of digital
13  electronic devices, so I would not expect in the
14  long run there would be a change in the intensity of
15  competition in the non-iPod MP3 market.
16  BY MR. KIERNAN:
17        Q.  And what impact on prices of non-iPods
18  would you expect 7.0 to have?
19        MS. BERNAY:  Calls for speculation.
20        THE WITNESS:  Exactly as I just said.  I
21  would not expect in the long run there would be any
22  price effect.  Conceivably, there could have been
23  one in the short run, but I doubt that that's true.
24  I wouldn't expect to find it.
25        If such a price increase did occur, that

Page 78

1  would be another anticompetitive effect of 7.0
2  because the consumers who bought those things were
3  harmed.  But I have basically assumed that's zero
4  because I think the supply conditions in the MP3
5  market would not make it possible for anybody to
6  sustain a significant price increase in that market
7  just because of 7.0.
8  BY MR. KIERNAN:
9        Q.  Okay.  And is your opinion, Dr. Noll, that
10  the impact on prices caused by 7.0 would be
11  immediate because of the lock-out effect?
12        A.  Yes.
13        Q.  Okay.  And why is that?  Why would it be
14  immediate?
15        A.  Because there's this group of people,
16  there's just a continuous flow of people who want to
17  replace an MP3 player that were available to Apple
18  before 7.0 was introduced and for at least some
19  models are not available to them afterwards.
20        Q.  And can you cite to me any evidence in the
21  case record in the case where Apple considered what
22  you just described as the lock-out effect in
23  determining the prices of any iPods that were sold
24  with iTunes 7.0?
25        MS. BERNAY:  Objection.  Vague and

Page 79

1  ambiguous.
2        THE WITNESS:  I'm not aware of any
3  documents that directly address the relationship
4  between lock-in and price.
5  BY MR. KIERNAN:
6        Q.  I asked about lock-out.  Let's talk about
7  that.
8        A.  Lock-out.  They're the same thing.  I
9  mean, one side being locked in is the other side
10  being locked out.
11        So I'm not aware of any documents that
12  explicitly analyze lock-in and lock-out.
13        Q.  Okay.  So what are you relying on for the
14  basis of your opinion that the impact on price would
15  be immediate due to lock-in or lock-out as a result
16  of 7.0?
17        A.  It would -- why a demand curve becomes
18  more inelastic is not really relevant to the
19  question of what is an increase in the degree of
20  inelasticity of the demand curve on price.  There's
21  no -- it doesn't matter what the cause is.  If the
22  demand curve becomes more inelastic, the profit
23  maximizing price goes up.
24        (Reporter inquires.)
25        THE WITNESS:  The profit maximizing price

Page 80

1  goes up.
2        And so the basis for it is the economic
3  theory of lock-in, the optimal pricing of a firm
4  that has a product with lock-in and other switching
5  costs, and then the empirical test of whether that
6  theory predicts what actually happened.
7  BY MR. KIERNAN:
8        Q.  But the impact of 7.0 on the elasticity of
9  demand wouldn't be known by Apple until sometime
10  after the release of 7.0, correct?
11        A.  I don't know that.  I assume that they
12  know what they're doing, that they --
13        Q.  Have you seen any -- can you cite to me
14  any evidence that Apple, when determining the price
15  of iPods that included 7.0, examined the impact of
16  7.0 on the elasticity of demand?
17        MS. BERNAY:  Objection.  Vague.
18        THE WITNESS:  No.  But I know that -- I
19  know that Apple is aware of the economic
20  consequences of closed systems.
21  BY MR. KIERNAN:
22        Q.  What are you relying on for that?
23        A.  Statements, you know, in other contexts.
24  I mean, long before I knew anything about this case,
25  I knew the strategies of Microsoft and Apple in the

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 81

1    information technology space.  And then there's
2    discussions of this in Jobs' biography.
3            So, I mean, I'm not relying on it in this
4    case, but I know that Apple is aware of the
5    advantages and disadvantages of having a closed
6    system.  And they have -- they have had the strategy
7    for a long time, since the 1990s, that for them, the
8    benefits of a closed system outweigh the costs.
9            So I view what's going on in the iPods as
10   simply a continuation of a policy that they
11   understood and thought was in their interests.
12       Q.  Okay.  And can you cite to any evidence in
13   the case record in this case that supports what you
14   just said?
15       A.  I don't recall ever having seen a specific
16   application of the walled-garden theory of
17   complimentary products to 7.0.  I don't know that
18   there's any document that says that.  I don't think
19   there is, but I don't know.
20       Q.  Okay.  Did you look to see if there was
21   any evidence that Apple took into account or
22   examined the expected impact of 7.0 when determining
23   the prices for iPods released in September 2006 that
24   included 7.0?
25           MS. BERNAY:  Objection.  Vague and

Page 82

1    ambiguous.
2            THE WITNESS:  I'm not aware of any
3    documents that say anything about that one way or
4    the other.
5    BY MR. KIERNAN:
6        Q.  And, Dr. Noll, what evidence are you
7    relying on for your opinion that 7.0 had an
8    immediate impact on the elasticity of demand for
9    iPods?
10           MS. BERNAY:  Objection.  Asked and
11   answered.
12           THE WITNESS:  There's a theory, and
13   there's an empirical test of the theory, and it's
14   confirmed.  So that's what we economists do.
15   BY MR. KIERNAN:
16       Q.  And what's the empirical test that you're
17   relying on?
18       A.  That the price went up.
19       Q.  Is that --
20       A.  The optimal price went up.
21       Q.  Do you mean the regression in Exhibits 3
22   and A?
23       A.  Yes.
24       Q.  3A and 3B?
25       A.  Yes.

Page 83

1        Q.  Okay.  Anything other than theory and the
2    empirical test set forth in Exhibits 3A and 3B to
3    Noll 10 that you're relying on for the opinion that
4    the immediate effect of 7.0 was to impact the
5    elasticity of demand of iPods?
6        A.  Yes, every other report that I've ever
7    written that does any empirical analysis.  Other
8    than theory and fact, I have no evidence in support
9    of this proposition.
10       Q.  Other than the theory and the regression
11   set forth in Exhibits 3A and 3B or other regressions
12   that you've run, do you have any evidence that 7.0
13   impacted the prices of iPods?
14           MS. BERNAY:  Objection.  Asked and
15   answered.
16           THE WITNESS:  The regression analysis is
17   the evidence that it affected -- not only in this
18   report but in prior reports.
19           And, you know, it goes all the way back to
20   class certification.  I've been writing reports on
21   this issue since July of 2008, so -- and I
22   haven't -- I haven't attempted to memorize every
23   single one of them in preparation for this
24   deposition because I thought this deposition was
25   about this report.

Page 84

1            But whatever evidence is in all those
2    reports would be what I'm relying on.
3    BY MR. KIERNAN:
4        Q.  Dr. Noll, I'm asking about Exhibits 3A and
5    3B, with all due respect.  You were talking about
6    other reports.
7        A.  You asked me what other evidence I have
8    besides 3A and 3B, and I'm telling you it would be
9    in other reports.  It would be regressions in other
10   reports and the data --
11       Q.  And you're relying on those regressions
12   for your opinions in this matter?
13           MS. BERNAY:  Objection.  Misstates the
14   prior testimony.
15   BY MR. KIERNAN:
16       Q.  Well, I want to know.
17       A.  I am relying --
18       Q.  You brought it up, not me.
19           MS. BERNAY:  Is that a question?
20           MR. KIERNAN:  Yeah.
21           THE WITNESS:  This is a reply to your
22   expert reports.  Obviously, whatever is in the
23   merits report also addresses the issue of did 7.0
24   cause the price to go up.
25           Likewise, other reports are about whether,

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                  The Apple iPod iTunes Anti-Trust Litigation

Page 85

1   in general, creating incompatibilities caused prices
2   to go up. And there's evidence in all those reports
3   that the creation of incompatibility causes prices
4   to go up, which is only true if it makes demand
5   curves more inelastic.
6           So anything in any report that discusses
7   the relationship between lock-in and prices is
8   evidence in support that 7.0 did, in fact, cause the
9   demand to become more inelastic.
10  BY MR. KIERNAN:
11      Q. With respect to the impact on prices on
12  iPods as a result of the lock-out effect, would you
13  expect the impact to be the same throughout the --
14  well, would you expect the impact on prices to
15  remain the same, to remain constant?
16          MS. BERNAY: Objection. Calls for
17  speculation.
18          THE WITNESS: I would expect it to be,
19  yeah, mostly constant through time, although toward
20  the end of the period, it might become worse.
21          But on the other hand, there are other
22  things in the model that would offset that, such as
23  the move to DRM-free files by competitors of the
24  iTunes Store.
25  ///

Page 86

1   BY MR. KIERNAN:
2       Q. If there are consumers who are no longer
3   locked out from purchasing an iPod because the music
4   that they purchase from a vendor is now
5   interoperable with an iPod, how would you expect
6   that to impact iPod prices?
7           MS. BERNAY: Objection. Calls for
8   speculation.
9           THE WITNESS: I'm sorry, I didn't follow
10  the question. Try it again.
11  BY MR. KIERNAN:
12      Q. If there are consumers who are no longer
13  locked out from purchasing an iPod because the music
14  they purchase from a vendor is interoperable with an
15  iPod, how would you expect that to impact iPod
16  prices?
17          MS. BERNAY: Same objection.
18          THE WITNESS: That's what I said. That's
19  exactly what I was referring to in the last answer,
20  is that when other sites adopt DRM-free music files,
21  that should increase the competition between Apple
22  and other manufacturers of MP3.
23          On the other hand, offsetting that is the
24  increased inventory of DRM-protected files that have
25  been downloaded from the iTunes Store.

Page 87

1           So the net effect of those two things
2   would be something in the middle. One makes things
3   worse for people who own iPods, and one makes things
4   better.
5           And the demand curve, the replacement
6   demand curve for people who already own iPods would
7   become more inelastic, and the replacement demand
8   curve for people who own other MP3s would become
9   more elastic. The net effect on that, on the demand
10  for iPods is -- I don't know.
11  BY MR. KIERNAN:
12      Q. So your opinion is that 7.0 locked out a
13  certain number of customers. What effect would that
14  have on iPod sales?
15          MS. BERNAY: Objection. Vague and
16  ambiguous.
17          THE WITNESS: The all-else-equal effect
18  would be less.
19          But, of course, remember that the optimal
20  price by Apple takes that into account, and they
21  only raise price to the extent it has a relatively
22  small effect on total sales.
23          And then there are other things going on
24  that cause sales to go up. In general, you know, in
25  the time frame at the beginning of the damages

Page 88

1   period, MP3 sales are going up, and they stopped
2   going up roughly at the end of the damage period. I
3   mean, the rate at which they increase declines
4   towards the end of the damage period.
5   BY MR. KIERNAN:
6       Q. One potential impact of 7.0 was to reduce
7   the profitability of iPod, the sale of iPods,
8   because they locked out a certain segment of
9   customers; isn't that true?
10          MS. BERNAY: Objection. Vague and
11  ambiguous.
12          THE WITNESS: No, they wouldn't raise the
13  price to cause the profit to go down. The profit
14  goes up but the sales goes down. In other words,
15  the point of the price increase is to raise the
16  profit per unit, knowing that it's going to cause
17  less in the way of sales. All right.
18  BY MR. KIERNAN:
19      Q. Let's say they don't make any changes to
20  price. All else is equal.
21      A. That's right.
22      Q. The effect of the lock-out would reduce
23  profits?
24      A. At any given price, they have fewer
25  people, that's right, buying it.

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.         The Apple iPod iTunes Anti-Trust Litigation

Page 89

1 Q. Right.
2 A. And then the off- -- the offsetting
3 advantage is that you get a higher profit per unit
4 because you can raise price. So that's the reason
5 you do it.
6 The reason you would create an
7 incompatibility is because you thought the price
8 effect exceeded the lock-out effect.
9 Q. And is it your opinion that's what Apple
10 decided with respect to 7.0?
11 A. My opinion is that Apple's behavior is
12 consistent with the economic theory of lock-in;
13 that, in fact, the profitability per unit of iPods
14 went up. That's what the coefficient in the
15 regression measures.
16 So, yes, the behavior of Apple is
17 consistent with the theory.
18 Q. What would Apple have to look at to
19 conduct the analysis that you just described where
20 you're looking at the number of people that you're
21 going to lose to non-iPods as a result of the
22 lock-out and how to adjust the price with respect to
23 iPod sales to counteract that impact?
24 MS. BERNAY: Objection. Compound.
25 ///

Page 90

1 BY MR. KIERNAN:
2 Q. What would they look at?
3 MS. BERNAY: Calls for speculation.
4 THE WITNESS: They would -- what companies
5 do is gather information from their salespeople
6 about what's going on in the market and how
7 sensitive they perceive the market to price and
8 factor that into their pricing decisions.
9 They would look at the prices of other
10 products. They'd look at the degree to which they
11 were winning or losing sales from other people,
12 things like that.
13 BY MR. KIERNAN:
14 Q. Would they look at how many people would
15 be locked out?
16 A. Yeah, one of the reasons that it's in the
17 interest of somebody with a 70 percent market share
18 to engage in lock-in is because it preserves that
19 market share. So that's why it's an interesting
20 contrast between Apple and Microsoft.
21 Microsoft was really foolish to lock
22 people in to the Zune because their market share was
23 so small; it was 1 or 2. So they were giving up
24 98 percent of the market in order to lock in
25 2 percent. That was a bad decision, and we know

Page 91

1 that it was a bad decision because they left the
2 market.
3 The larger your market share, the bigger
4 the benefits and the lower the costs from engaging
5 in a lock-in strategy.
6 So normally we would find lock-in strategy
7 only among firms with relatively large market
8 shares. And we would normally not observe a lock-in
9 strategy in a structurally competitive industry
10 because you're giving up too much when you do that:
11 Q. Wouldn't you also normally see in the
12 lock-in strategy a firm charging lower prices to
13 attract consumers into that ecosystem?
14 A. Well, the degree to which you use price to
15 attract customers is different in a system with
16 lock-in and lock-out than a system without it.
17 Yes, of course, one thing you always
18 consider on setting a price is your ability to
19 attract customers from others. But if there are
20 fewer others, that's less of a concern to you. So
21 the cost in that dimension is lower, of engaging in
22 lock-in.
23 So, yes, price competition still is a
24 relevant fact; it's just a less important fact when
25 there's lock-in. And it's a less important fact

Page 92

1 when you have a higher market share.
2 MR. KIERNAN: Why don't we take one more
3 break just so I can go through my notes.
4 MS. BERNAY: Absolutely.
5 THE VIDEOGRAPHER: Off the record at
6 11:10.
7 (A brief recess was taken.)
8 THE VIDEOGRAPHER: This is the end of
9 disc 1. Off the record at 11:14.
10 (A brief recess was taken.)
11 THE VIDEOGRAPHER: This is disc 2. On the
12 record at 11:24.
13 BY MR. KIERNAN:
14 Q. With respect to your regression analysis
15 set forth in Exhibits 3A and 3B, describe for me
16 what the but-for world is.
17 MS. BERNAY: Objection. Vague and
18 ambiguous.
19 THE WITNESS: One in which 7.0 doesn't
20 exist.
21 BY MR. KIERNAN:
22 Q. And is it also a world in which the
23 technology in 4.7 still exists?
24 A. Well, whatever technologies are around
25 then are captured in the model would be whatever

**Page 89..92**

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 93

1  they are throughout time. Like, you know, there's
2  still video capability, there's still this, that and
3  the other thing.
4       So it's not that technology stops
5  progressing; it's just that the 7.0 blocking
6  technology doesn't exist.
7       Q. If we look at, for example, how you dealt
8  with the shuffle in your regression reflected in
9  Exhibits 3A and 3B, you do not turn on 7.0, and you
10  leave the indicator variable for 4.7 on.
11       A. Right.
12       Q. What's the assumption for leaving 4.7 on?
13       A. That the blocking technology that's
14  embedded in 4.7 continued indefinitely but had
15  become essentially irrelevant because it gets offset
16  by the second-generation Harmony.
17       Q. Okay. And with respect to the iPod nano
18  second generation, you turn off 4.7 on the date that
19  7.0 is introduced, correct?
20       A. That's correct.
21       Q. And I know what your report says, but
22  explain to me why you turn off 4.7.
23       A. Because it's not there anymore. It's not
24  the blocking technology that's in there that's been
25  offset by the Harmony variable.

Page 94

1       Q. And it's been replaced by 7.0?
2       A. That's correct.
3       Q. In the but-for world in which 7.0 does not
4  exist with respect to the iPod nano second
5  generation, what technology would exist?
6       A. I don't know. That's up to Apple to
7  decide. It's like asking the question suppose they
8  had not introduced the next generation of an iPod,
9  what would have happened.
10       There's a variable in there. It could be
11  turned off, but they might have done something else.
12  I don't know what it is. But what I'm just looking
13  at is what's the impact of moving from 4.7 to 7.0.
14       Q. The incremental impact?
15       A. Yeah. Remember that we still have 4.7 on
16  for these other guys, so this is the differential
17  effect of 7.0 and 4.7.
18       Q. And how does your regression capture the
19  impact of the other technology that would exist if
20  7.0 had not been released on the iPod nano second
21  generation?
22       MS. BERNAY: Objection. Vague and
23  ambiguous.
24       THE WITNESS: In principle, it can't,
25  because we don't know what the technology would have

Page 95

1  been. We don't know what they would have done had
2  they never introduced 7.0.
3  BY MR. KIERNAN:
4       Q. Fair enough.
5       If the technology -- well, strike that.
6       The feature of 7.0 that is at issue in
7  this case was a change to the DRM; is that accurate?
8  Is that what your understanding is?
9       MS. BERNAY: Objection. Vague and
10  ambiguous.
11       THE WITNESS: Well, yes, the -- yes, 7.0
12  contains the new DRM system, yes.
13  BY MR. KIERNAN:
14       Q. And that replaced the DRM system that was
15  first introduced with 4.7?
16       A. That's my understanding, yes.
17       Q. Okay. And assume that the DRM system that
18  is in 4.7 is included on all iPods that do not
19  contain 7.0.
20       A. Assume the DRM system in 7.0 is --
21       Q. No, no.
22       Assume that on iPod models that did not
23  include 7.0, they had the DRM system that was in
24  place that was first introduced with 4.7.
25       A. That's what the model assumes.

Page 96

1       Q. That's what it assumes?
2       A. Yeah.
3       Q. Okay. So wouldn't that mean, then, that
4  the but-for world is a world in which the DRM system
5  that was first introduced by 4.7 would remain in
6  existence but for 7.0?
7       MS. BERNAY: Objection.
8       THE WITNESS: Maybe. I don't know. I
9  mean, the DRM -- first of all, we're not talking
10  about DRM. That's not what's being measured here.
11  What's being measured is the blocking technology.
12  BY MR. KIERNAN:
13       Q. That is the DRM.
14       A. No. Digitalized management is the
15  encryption, the system itself, and a component of it
16  is the -- is the component that blocks Harmony, that
17  tries to detect somebody who's trying -- and it
18  doesn't detect it in the sense of -- it's not
19  something about iTunes stuff. It's stuff about
20  RealNetworks.
21       Q. Right.
22       A. All right. And so DRM within the Apple
23  community is still there. The issue is what about
24  the element of the DRM system that blocks
25  RealNetworks.

Confidential - Attorneys' Eyes Only

**Roger Noll, Ph.D.**                    **The Apple iPod iTunes Anti-Trust Litigation**

Page 97

1      Q.  The keybag verification code that you
2  describe in your report?
3      A.  Yes.
4      Q.  That was added to the existing DRM
5  technology that was first introduced in 4.7?
6      A.  You want to call it the DRM technology.
7  It's not part of protecting files from the iTunes
8  Store.  That's not what its point is.  Its point is
9  to prevent people who own an iPod from buying things
10 from RealNetworks.  That's what the point of it is.
11     Q.  Okay.
12     A.  So it's not -- it's really more about the
13 RealNetworks DRM system than it is about the Apple
14 DRM system.  It's -- it's -- you know, it's not
15 about protecting Apple.
16     Q.  But with respect to -- well, strike that.
17         7.0 added the keybag verification
18 technology to the DRM system that was introduced --
19 technology that was introduced by 4.7?  Is that your
20 understanding?
21     A.  Yes, that's my understanding.
22     Q.  Okay.  And --
23     A.  But I wouldn't call it the iTunes Store
24 DRM system or the Apple DRM system.  It was a
25 mechanism to prevent Harmony from working on iPods.

Page 98

1  And that's not part of digital rights management for
2  Apple, it's part of digital rights management as it
3  applies to others.
4      Q.  What's the basis of that description?
5      A.  Because the issue here is RealNetworks
6  wanting to have customers who own iPods.  All right.
7  And so it says, ah-hah, here's a mechanism that will
8  cause your iPod to be able to read files from
9  RealNetworks.
10     Q.  Right.
11     A.  That doesn't protect Apple's DRM.  That
12 is -- what that does is overcome a potential use of
13 RealNetworks' DRM.
14         MR. KIERNAN:  And so the record is
15 accurate on this, when I'm saying "right," I don't
16 mean I agree with Dr. Noll's description.
17         THE WITNESS:  You can just say wrong.
18         MR. MITTELSTAEDT:  That's not a bad idea.
19 She ought to correct all the rights to wrongs.
20 BY MR. KIERNAN:
21     Q.  If you have the entire population that's
22 the dataset you're using in estimating the
23 regression, and you have a million transactions that
24 are all at one price, could you have a clustering
25 problem?

Page 99

1          MS. BERNAY:  Objection.  Incomplete
2  hypothetical.
3          THE WITNESS:  That's not what clustering
4  is about, no.
5  BY MR. KIERNAN:
6      Q.  Okay.  If the -- can you have an
7  independence problem?
8      A.  No.
9          MS. BERNAY:  Objection.
10 BY MR. KIERNAN:
11     Q.  Never?
12     A.  Never.
13         (Reporter inquires.)
14         MS. BERNAY:  I've lost my mic.
15 BY MR. KIERNAN:
16     Q.  And why are you so certain that you could
17 not have an independence problem if you have the
18 entire population and the one million transactions
19 that you are studying all had the same price?
20         MS. BERNAY:  Objection.  Asked and
21 answered.
22         THE WITNESS:  Independence isn't about the
23 value taken by the dependent variable.  Independence
24 is about the disturbance term in a regression
25 equation.

Page 100

1  BY MR. KIERNAN:
2      Q.  Okay.
3      A.  You know, you would have -- if there's
4  zero variance, there's zero variance to the random
5  error term.  So it's not an independence problem.
6          The only way -- in a world in which
7  everything is sold at exactly the same price and all
8  products have exactly the same technical
9  characteristics, the regression analysis has an
10 R-squared of 1.0, and it perfectly predicts price,
11 and all the residual errors are zero, and the value
12 taken by the residual error in the regression is
13 always zero; it has zero variance and means zero.
14         The only way that you can introduce
15 statistical variance and create something that you
16 could estimate is if you had measurement error on
17 either price, a dependent variable, or one of the
18 independent variables.  And then you would get some
19 variation here.
20         It's just a confusion to say that
21 independence has anything to do with the magnitude
22 of the dependent variable.  What independence has to
23 do with is the random shock to the deterministic
24 system that explains price.
25         And if the deterministic -- that's why I

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                      The Apple iPod iTunes Anti-Trust Litigation

Page 101

1  put in the stuff about trying to measure the
2  acceleration due to gravity. That you can have a
3  world in which everything is perfectly
4  deterministic, and if there's no measurement error,
5  and you have all the right variables in the
6  equation, and you have the equation specified
7  perfectly, then the random disturbance term will
8  have not only mean zero, it'll have variance zero.
9  But it doesn't make the observations not
10 independent.
11        That's as clearly as I think I've ever
12 explained it, by the way.
13        MS. BERNAY: Maybe some people are better
14 questioners.
15 BY MR. KIERNAN:
16     Q. Just so I'm clear about this, Dr. Noll --
17 because this was the first time I had read your
18 explication of the so-called lock-out effect on iPod
19 prices -- with respect to the lock-in effect, the
20 lock-in effect that we've talked about over many,
21 many reports, to what extent are you still relying
22 upon the lock-in effect?
23     A. The lock-in effect and the lock-out effect
24 are just two sides of the same coin, and they've
25 been in every report I've written. All the way back

Page 102

1  to the first class certification report, I've
2  explained lock-in and lock-out.
3        Q. And with respect to 7.0's impact on
4  lock-in -- we discussed this morning its impact on
5  lock-out -- the impact on lock-in, what is your
6  opinion with respect to what impact it had on
7  lock-in?
8        MS. BERNAY: Objection. Compound.
9        THE WITNESS: Lock-in and lock-out are the
10 same thing. They're just -- lock-in is about your
11 own device, lock-out is about the other guy's
12 device. But it's exactly the same phenomenon.
13        Lock-in here and lock-out there is the
14 same as lock-in there and lock-out here. They're
15 the same phenomenon.
16 BY MR. KIERNAN:
17     Q. Do they have the same impact on price?
18     A. The effect on price is the net effect of
19 all -- of both of them together. You can't have
20 it -- you can't have one without the other.
21     Q. And can they move in different directions?
22 That is, directionally, can they impact price in
23 different directions?
24     A. That's not a meaningful question because
25 they happen simultaneously. And what they have is

Page 103

1  an effect. You could -- if the question is, is it
2  possible for lock-in to cause prices to go down, in
3  principle, it could for the guy who has a really low
4  market share, because that person has a much bigger
5  incentive to compete with the guy with the really
6  big market share. All right.
7        So it's conceivable that the creation of
8  lock-out by the guy who has the big market share
9  could reduce the prices of the guy who was locked
10 out. It wouldn't necessarily happen that way, but
11 it could.
12        Most likely, it's going to have no effect.
13 But in principle, you can construct a model in which
14 other people's prices go down because the big guy
15 engaged in a lock-in.
16     Q. Do you have an opinion of whether 7.0
17 increased the amount of lock-in, maintained the
18 current levels of lock-in, reduced lock-in? What
19 impact did 7.0 have on lock-in?
20        MS. BERNAY: Objection. Compound.
21        THE WITNESS: Again, lock-in being the
22 combined effect of what happens to your own
23 customers versus what happens to the other
24 customers. You don't do it unless it causes the
25 demand curve to become more inelastic and causes

Page 104

1  your profits to go up.
2        So it would never happen unless you
3  expected it would be profitable to do so. So,
4  therefore, it would cause prices to go up. That
5  would always be the case. No rational company would
6  ever create lock-in if it was unprofitable to do so.
7  BY MR. KIERNAN:
8        Q. Although -- I'll push you on that a little
9  bit -- in your earlier reports, since you mentioned
10 them, you explained that the lock-in effect, both --
11 this is in your merits report -- the lock-in effect
12 occurred before 7.0 for the iPod side and for
13 RealNetworks and Sony and Microsoft because of the
14 obligations that were imposed upon them by the
15 record labels; isn't that right?
16     A. Well --
17        MS. BERNAY: Can I interpose my objection
18 that this deposition was supposed to just be on the
19 new material in the report?
20        MR. KIERNAN: And I'm focused on page --
21 fair enough. And I agree with that. I'm focusing
22 on now what's in 27 and trying to understand if
23 anything has changed.
24        MS. BERNAY: Got it.
25        THE WITNESS: Nothing has changed. The

Page 101..104

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 105

1    way you asked the question isn't quite right,
2    because the imposition of DRM didn't have to create
3    lock-in effects if the record companies had done
4    what they originally planned to do, which was
5    develop their own system and have everybody use it.
6             In fact, that was -- from the standpoint
7    of the welfare -- or the welfare of the record
8    companies, they'd have been much better off if they
9    would have developed a standard.
10            And that was the original intent.  If you
11   go back to the early 2000s -- which is outside the
12   case but the stuff I know just from knowing the
13   industry.  If you go back to the early 2000s, the
14   original idea of the record company was to create a
15   consortium to create its own DRM system because --
16   and then the reason they ended up with multiple ones
17   is that didn't really work.
18            And so they wanted to create -- what they
19   thought they were doing -- which was stupid -- was
20   create competition between -- among Microsoft,
21   RealNetworks and Apple by having them all have
22   different DRM systems.
23            But what that, in fact, did is create
24   lock-in and transfer profits from the record
25   companies to the people who sell digital downloads

Page 106

1    and who manufacture MP3 players.  So that was a bad
2    decision on their part.
3             But, yes, it's true that the record
4    companies were initially responsible for the fact
5    that when the iTunes Music Store was first launched,
6    it had a lock-in effect, because that technology was
7    not available to anybody else who later got into the
8    digital download business.
9    BY MR. KIERNAN:
10       Q.  And the lock-in effect, as you referred to
11   it, as a result of 7.0, does that level of lock-in
12   increase over time?
13            MS. BERNAY:  Objection.  Asked and
14   answered.
15            THE WITNESS:  For the base of customers,
16   the magnitude of the lock-in rises as they have more
17   files.
18            And so there's two things happening.  One
19   is, as time progresses, you may care less about the
20   older files, but then you're adding new ones.  And
21   so at some point you reach some sort of maximum
22   degree of "locked-in"ness, so -- but in general, the
23   switching cost gets higher the more files you have
24   in a proprietary technology.  So that's what happens
25   to the installed base.

Page 107

1             And then there's the new customers and the
2    people who are customers that use other systems, all
3    right.  And the new customers obviously are not
4    locked in.  They're the ones that have freedom to
5    choose the first day.  Right.  They can pick what
6    system they're going to go into.  And that -- that
7    is the most intensive competition that exists among
8    the people who manufacture MP3 players and the
9    people who have alternative digital download sites.
10            And then there's the other folks who have
11   gotten locked in to somebody else's system, all
12   right.  And there, the issue is how quickly they can
13   switch themselves.  All right.
14            And so when RealNetworks observes that
15   it's got, you know, a few percent of the market --
16   you know, Apple has 70 or 80 percent, and they're
17   sitting with one-fourth of the rest or something
18   like that, they perceive -- it's really in their
19   interest to try to get access to Apple's customer
20   base that's locked in to the iTunes Store.
21            And that's what gives them the incentive
22   to invent Harmony, is to -- instead of having access
23   to 5 or 10 percent of the customer base, they can
24   get access to 75 or 80 percent of the customer base
25   with Harmony.

Page 108

1             If you go the other direction, for Apple,
2    it's much less interesting to get access to
3    RealNetworks' customer base because it's small.
4    They're already sitting on 75 percent; what's 5 or
5    10 percent more.  It's much less of an incentive to
6    create a mechanism that preserves the concept of
7    digital right management but eliminates the
8    proprietary aspects of the systems.  And so those
9    incentives are different.
10            And the RealNetworks, what it does is
11   reduce the lock-in effect for people who were using
12   RealNetworks' system.  And that's a loss for them,
13   but it gives them access to this huge customer base,
14   which is a gain for them.
15            So the economic incentive to RealNetworks
16   to try to reduce lock-in is much more powerful than
17   the economic incentive of Apple to reduce lock-in.
18   BY MR. KIERNAN:
19       Q.  Going back to the installed base, you
20   referred to sort of three segments.  There was the
21   installed -- as of the time of 7.0, there's the
22   installed base, the individuals that are new to
23   iPods that are not locked in, and then the
24   individuals that are locked into the non-iPods --
25       A.  Yeah, the installed base of the other

**Page 105..108**

**Confidential - Attorneys' Eyes Only**

Roger Noll, Ph.D.                                    The Apple iPod iTunes Anti-Trust Litigation

Page 109

1  guys.
2     Q.  Right.  Okay.
3        (Reporter inquires.)
4        THE WITNESS:  The installed base of the
5  other guys.
6  BY MR. KIERNAN:
7     Q.  The installed base for the non-iPods?
8     A.  The non-iPods.
9     Q.  All right.
10       So focusing on the installed base for
11  iPods, would the impact of 7.0 on locking them into
12  iPods or increasing the lock-in of those people on
13  iPods, that would occur over time depending upon
14  their future purchases, correct?
15    A.  Yeah.  And it's not just that.  As well,
16  it's also -- it doesn't really happen until they buy
17  their next device.
18       So there's not going to be an
19  instantaneous effect.  It's going to be a longer
20  term effect.  It's the lack of competition for the
21  other guys that is the principal short-term effect.
22    Q.  I've got to get one update.
23       Since your last deposition, have you
24  purchased any iPods?
25    A.  Probably not since my last one.  I bought

Page 110

1  my granddaughter a nano, but I think it was before
2  the last deposition.
3     Q.  And do you recall where you purchased the
4  nano from?
5     A.  Yes, I think.
6     Q.  Where was that?
7     A.  I think I got it from Best Buy.
8     Q.  And --
9     A.  Are you going to ask me if I've ever been
10  in the Apple Store?  The answer is, yes, I was in it
11  two days ago.
12    Q.  Have you ever purchased an iPod from an
13  Apple Store?
14    A.  I've never purchased an iPod from an Apple
15  Store, but I've purchased other things from an Apple
16  Store.
17    Q.  Did you pay the list price?
18       MS. BERNAY:  Objection.
19       THE WITNESS:  It depends on what it was.
20  Sometimes I did, and sometimes I didn't.
21  BY MR. KIERNAN:
22    Q.  At any time did you negotiate the price
23  for --
24    A.  No, you don't negotiate.  You either have
25  a coupon or you don't.

Page 111

1     Q.  Ever purchase a product from the iTunes --
2  strike that.
3        Did you ever purchase an iPod from the
4  online Apple Store?
5     A.  No.  I've never bought anything from the
6  online Apple Store.
7        MR. MITTELSTAEDT:  I don't know how you
8  can resist asking him what he bought at the Apple
9  Store.  He wants to tell you.
10       THE WITNESS:  Well, I'm just being
11  truthful, revealing all the dark ghosts in my family
12  here.
13  BY MR. KIERNAN:
14    Q.  Now I'm curious.  What did you purchase
15  recently from the Apple Store?
16    A.  The soft case for the iPad mini, which
17  is my granddaughter's Christmas present.  Her
18  parents are getting her the mini, and I'm getting
19  her the case for it.
20       (Sotto voce conversation.)
21       MR. MITTELSTAEDT:  Can I ask you something
22  for old time's sake?
23       THE WITNESS:  For old time's sake.
24       MR. MITTELSTAEDT:  Have you bought any
25  music from RealNetworks?

Page 112

1        THE WITNESS:  I have never bought any
2  music from any digital download site, but I've
3  bought gift cards for my grandchildren.
4        MR. MITTELSTAEDT:  Fair enough.
5  BY MR. KIERNAN:
6     Q.  This will be the last.
7     A.  I hope so.
8     Q.  Famous last words.
9        Can you go to page 7 of Noll 10, your
10  rebuttal report.  And it says -- it's the second
11  paragraph, Dr. Noll.  It starts with "second."
12    A.  Mm-hmm.
13    Q.  And it says -- it's the sentence that
14  starts with "While."
15       "While the extent of lock-in does
16       increase as a consumer buys more
17       recordings that can be played only on
18       iPods, this fact does not imply that, as a
19       theoretical matter, the price differential
20       would increase through time."
21       Can you explain what you mean there?
22    A.  The next sentence:  "The reason is..."
23    Q.  Before you get there, what I meant is I
24  don't understand the sentence.
25       So it states the price differential would

Page 109..112

Confidential - Attorneys' Eyes Only

Roger Noll, Ph.D.                                                    The Apple iPod iTunes Anti-Trust Litigation

Page 113

1  increase – strike that.
2       It says: "This fact does not imply that,
3  as a theoretical matter, that the price differential
4  would increase through time."
5       Explain to me what – the price
6  differential of what?
7       A.  Okay.  The price increase due to lock-in
8  would not necessarily be continuously increasing
9  over time because a degree of lock-in was increasing
10  over time.
11       Q.  Got it.
12       MR. KIERNAN:  That's all I have.
13       MS. BERNAY:  All done?
14       MR. KIERNAN:  We'll designate this
15  "Attorney's Eyes Only" under the Protective Order.
16       MS. BERNAY:  I think we're all done.
17       We'll read and sign.
18       THE VIDEOGRAPHER:  This is the end of
19  disc 2 of Roger Noll, Ph.D.
20       Off the record, 11:52.
21       (Discussion off the record.)
22       THE REPORTER:  Would you like a rough
23  draft?
24       MR. KIERNAN:  I definitely need a rough
25  draft.

Page 114

1       MS. BERNAY:  You probably want to expedite
2  it too?
3       MR. KIERNAN:  Yes.
4       And then the final as soon as possible,
5  please.
6       MS. BERNAY:  We'll take a rough and then
7  just regular turnaround on the final.
8       (Deposition concluded at 11:54 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 115

1       DECLARATION UNDER PENALTY OF PERJURY
2  Case Name: The Apple iPod iTunes Anti-Trust Litigation
3  Date of Deposition: 12/18/2013
4  Job No.: 10008944
5
6       I, ROGER G. NOLL, PH.D., the witness herein,
7  declare under penalty of perjury that I have read the
8  foregoing in its entirety; and that the testimony
9  contained therein, as corrected by me, is a true and
10  accurate transcription of my testimony elicited at said
11  time and place.
12
13       Executed this _____ day of
14  _____, 2013, at
15  _____, California.
16
17
18
19
20            ROGER G. NOLL, PH.D.
21
22
23
24
25

Page 116

1       DEPOSITION ERRATA SHEET
2  Page No. _____ Line No. _____
3  Change: _____
4  Reason for change: _____
5  Page No. _____ Line No. _____
6  Change: _____
7  Reason for change: _____
8  Page No. _____ Line No. _____
9  Change: _____
10  Reason for change: _____
11  Page No. _____ Line No. _____
12  Change: _____
13  Reason for change: _____
14  Page No. _____ Line No. _____
15  Change: _____
16  Reason for change: _____
17  Page No. _____ Line No. _____
18  Change: _____
19  Reason for change: _____
20  Page No. _____ Line No. _____
21  Change: _____
22  Reason for change: _____
23
24  _____    _____
25       ROGER G. NOLL, PH.D.              Dated

Page 113..116

# EXHIBIT 51

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

5     _____

                                      )

6                                     )

      THE APPLE IPOD ITUNES ANTI-TRUST   )   No. C-05-0037 YGR

7     LITIGATION                      )

                                      )

8     _____)

9

10

11

12         VIDEOTAPED DEPOSITION OF ROGER G. NOLL

13              San Francisco, California

14              Thursday, May 16, 2013

15                     Volume 1

16

17

18

19

20

21     Reported by:

22     JENNIFER L. FURIA, RPR, CSR

23     CA License No. 8394

24     Job No. 1663538

25     PAGES 1 - 262

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3              OAKLAND DIVISION
 4
 5    _____
                        )
 6                      )
      THE APPLE IPOD ITUNES ANTI-TRUST  ) No C-05-0037 YGR
 7    LITIGATION          )
                        )
 8    _____)
 9
10
11
12        Videotaped Deposition of ROGER G. NOLL, Volume
13    I, taken on behalf of Defendant, at Jones Day, 555
14    California Street, 26th Floor, San Francisco,
15    California, beginning at 9:15 a.m. and ending at 4:37
16    p.m. on Thursday, May 16, 2013, before JENNIFER L.
17    FURIA, Certified Shorthand Reporter No. 8394
18
19
20
21
22
23
24
25
                                        Page  2
```

```
 1    APPEARANCES (Continued):
 2
 3    Also present:
 4
 5        KYLE ANDEER
 6
 7
 8    Videographer:
 9
10        ALEXEI DIAS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page  4
```

```
 1    APPEARANCES:
 2
 3    For the Plaintiff:
 4
 5        ROBBINS GELLER RUDMAN & DOWD LLP
 6        BY:  BONNY E. SWEENEY, ESQ.
 7        655 West Broadway, Suite 1900
 8        San Diego, California 92101
 9        (619) 231-1058
10        bsweeney@rgrdlaw.com
11
12
13    For the Defendant
14
15        JONES DAY
16        BY:  ROBERT A. MITTELSTAEDT, ESQ.
17        and DAVID C. KIERNAN, ESQ.
18        555 California Street, 26th Floor
19        San Francisco, California 94104
20        (415) 626-3939
21        ramittelstaedt@jonesday.com
22        dkiernan@jonesday.com
23
24
25
                                        Page  3
```

```
 1                  INDEX
 2    WITNESS                    EXAMINATION
 3    ROGER G. NOLL
 4    Volume 1
 5
 6            BY MR. MITTELSTAEDT      7
 7
 8            EXHIBITS
 9    NUMBER          DESCRIPTION       PAGE
10    Exhibit 1    Declaration of Roger G. Noll   22
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page  5
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

1    Q  I'm asking you more in theory at this point.
2  If 7.0 did something more than what you've just
3  described --
4    A  Like, for example?
5    Q  -- and it's not captured in one of these      09:52:43
6  variables that you just referred to, capacity, whether
7  it's photo or video or the size or the cost,
8  then -- then the coefficient for 7.0 would pick up that,
9  right?
10    A  Like what?  I mean, I don't understand what   09:53:05
11  the -- what the 7.0 in principle could do.  What is it
12  in principle it could do?
13    Q  Anything that's not captured by one of your
14  other variables.  The effect of that would be captured
15  in your 7.0 variable, correct?  By definition.      09:53:22
16    A  So if you lick your iPod it tastes like wine?
17  Is that what 7.0 does, something like that?
18       I'm just -- I have no clue what you're talking
19  about, what it might be.  If there's some wonderful
20  attribute of iPods that cannot be obtained in any way   09:53:40
21  other than 7.0 and that component is in there, sure, it
22  would affect the price.  It would make the -- it would
23  make it more valuable, assuming it's unique, a unique
24  attribute that wasn't otherwise included, but I don't
25  know what it is and I've never seen anybody describe   09:53:57

                                          Page 34

1  anything like is that.
2    Q  And -- this is the point of my question.  The
3  effect of that other attribute would be included in your
4  7.0 variable, correct?
5    A  If there was one, yes.                09:54:11
6    Q  And what did you do, if anything, to determine
7  what 7.0 did over and above, as you put it, create the
8  incompatibility with Harmony?
9    A  I've read the technical expert's --
10    MS. SWEENEY:  Objection, asked and answered.   09:54:29
11    THE WITNESS:  I'm not the technical expert
12  about what's in 7.0.  I'm not neither your expert nor
13  the plaintiff's expert.  I relied upon their reports.
14  BY MR. MITTELSTAEDT:
15    Q  Did you read Apple's press release for 7.0?   09:54:38
16    A  Oh, at some point I've read it, yes.
17    Q  And did it say -- do you remember anything it
18  said on this topic?
19    A  Not sitting here, no.
20    Q  Is it accurate to say that your task was to   09:54:52
21  opine on whether 7.0 harmed competition in a market for
22  portable digital players and, if so, to opine on the
23  amount of damages to iPod purchasers from September 12,
24  2006 to March 31, 2009?
25    A  I was asked to do that, yes.           09:55:23

                                          Page 35

1    Q  And for purposes of your analysis were you
2  assuming that any market or monopoly power enjoyed by
3  Apple in any relevant market before September 12, 2006
4  was lawful and not anticompetitive?
5    MS. SWEENEY:  Objection, to the extent it's   09:55:46
6  asking for a legal conclusion.
7    THE WITNESS:  I have assumed for the purpose
8  of analysis that Apple's activities prior to the release
9  of 7.0 were legal.  I have also assumed for the purpose
10  of analysis that Apple does have a certain degree of   09:56:12
11  market power that is achieved for reasons other than
12  anticompetitive acts.  So other than -- I don't know how
13  to answer the question other than that.
14  BY MR. MITTELSTAEDT:
15    Q  Well, are you assuming that -- and the date I   09:56:31
16  want to focus on is December -- or, excuse me, September
17  12, 2006.
18       Are you assuming for purposes of your analysis
19  that any market or monopoly power Apple may have had as
20  of that date was lawful?                09:56:47
21    A  Well, I'm assuming it's not part of the case.
22  I'm not -- I'm not making -- I don't know whether it's
23  lawful or not.  In this case, I know that the only issue
24  is 7.0.  Whether the -- whether activities prior to
25  that, either that used to be part of this case, or that   09:57:07

                                          Page 36

1  never were part of this case, are or are not lawful, is
2  a legal question that I'm not competent to answer.
3    Q  Are you assuming for purposes of this case
4  that anything Apple did before the launch of 7.0 was
5  anticompetitive?                     09:57:25
6    A  No.  I'm not assuming whether it's
7  anticompetitive or procompetitive.  I'm just accepting
8  the status quo ante, as of September 11, 2006 and saying
9  all I'm interested in is the incremental market power
10  that occurs after that date.              09:57:39
11    Q  And you're not assessing damages against Apple
12  for anything done before September 12, 2006, correct?
13    A  Of course.
14    Q  How do you use the term market power
15  differently from monopoly power?            09:57:57
16    MS. SWEENEY:  You mean in his report?
17    MR. MITTELSTAEDT:  Yes.
18    THE WITNESS:  This is always a tough question
19  for economists, because economists tend to think of
20  market power as a continuous variable and lawyers tend   09:58:15
21  to think of it as two categories, market and monopoly.
22       Monopoly power hinges on unilateral activity.
23  That is to say, an individual firm has sufficient market
24  power that they, all by themselves, can affect price and
25  quantity and product quality in the market through their   09:58:46

                                          Page 37

**Sarnoff, A VERITEXT COMPANY**
**877-955-3855**

1    A  Well, that's an interesting question.
2    The -- the 7.0 -- the effect of 7.0 on prices is not
3    necessarily limited to just the products that were sold
4    that had 7.0 in them.
5        Once 7.0 had been released, and because        10:09:52
6    consumers would have the expectation that as products
7    came along that they would, in fact, be incompatible
8    with Harmony, so as I -- we went through this in the
9    last deposition.
10       It's not obvious that the right way to measure    10:10:12
11   the effect of 7.0 is to focus exclusively on the
12   products that had 7.0 loaded on them as of September
13   2006, because consumers' attitudes about iPods and
14   their -- their -- and -- and their degree to which
15   they're going to get locked in would depend, would be    10:10:35
16   perceived as depending on, not only what 7.0 is doing
17   now, but what it's going to be doing in the future.
18       So that, you know, that that is a problem to
19   be overcome.  Having said that, this is supposed to be
20   products sold during the class period.  That's what it's    10:10:52
21   supposed to be.
22    Q  With 7.0 loaded into them as you say?
23    A  I think so, but I'm not certain sitting here.
24   I would have to check to find out.
25    Q  Okay.  What would be the reason for doing it    10:11:22

Page 46

1    that way if it was done that way?
2        MS. SWEENEY:  Objection, vague and ambiguous.
3        THE WITNESS:  Yeah, I'm -- the reason is what
4    I just got through describing.  There's -- one possible
5    world is that it only matters with respect to the ones    10:11:37
6    that actually have 7.0 in them.  The other is the act of
7    causing RealNetworks to abandon Harmony, regardless of
8    whether a specific product was compatible with it, could
9    also have an effect.  And so what -- there's a reason
10   for doing it either way, is what I'm saying is -- that's    10:12:01
11   all.
12   BY MR. MITTELSTAEDT:
13    Q  Okay.  What I'm trying to ask is -- is when
14   you instructed Economist, Inc. to do this were you
15   instructing them to include only the iPods that had 7.0    10:12:12
16   loaded into them?
17    A  Let me try to refresh my memory by actually
18   reading this, because I -- I just sitting here don't
19   remember what the exact deal was.
20    Q  Okay.                    10:12:26
21        MS. SWEENEY:  So maybe, Bob, when we finish
22   with this line we can take a short break?  We've been
23   going for a bit.
24        MR. MITTELSTAEDT:  Fine.
25        THE WITNESS:  I think this one is -- is --    10:13:34

Page 47

1    I'm -- I'm going to have to check to be sure, but I
2    believe what's in -- in Exhibits 14 through 16 is all
3    the products that were sold during the class period as
4    opposed to just those that had 7.0 loaded on them.
5    BY MR. MITTELSTAEDT:                10:13:52
6    Q  Okay.  Let's take a break.
7    A  But I'm not certain of that.  And I'll have to
8    check to be sure.
9    Q  Okay.  Well, if -- do you remember what you
10   instructed Econ, Inc. to do in that respect?    10:14:01
11       MS. SWEENEY:  Objection, asked and answered.
12       THE WITNESS:  I think so, but I'm not
13   absolutely certain of it, because I just -- I've just
14   had --
15   BY MR. MITTELSTAEDT:                10:14:13
16    Q  Well, what's your best recollection of what
17   you instructed?
18    A  My best recollection is that it's supposed to
19   be the ones that had 7.0 on them, but I'm not certain of
20   that.                    10:14:21
21    Q  Okay.  And what would be the rationale for
22   doing it that way?
23       MS. SWEENEY:  Objection, vague and ambiguous.
24       THE WITNESS:  If you did it only for the ones
25   that had 7.0 on them, it would be because you thought    10:14:29

Page 48

1    that the effect was limited to just the products that
2    had 7.0 loaded.
3        If you, instead, did it for all products, it
4    was because you thought that the most important effect
5    was knocking Harmony out of the market.  And I -- I    10:14:45
6    think that the latter is actually correct, but I may
7    have told them to do the former.  I just don't remember.
8        I think knocking Harmony out of the market is
9    the key event and -- and causing -- causing RealNetworks
10   longer to try to compete to sell music to play on iPods    10:15:03
11   is the -- is -- is the market-defining event from the
12   standpoint of what the pricing strategy of portable
13   digital media players would be.
14       So I think that's the right way to do it, but
15   I'm not sure that's exactly what I asked them to do,    10:15:18
16   because I -- or they understood that that's what I asked
17   them to do.
18   BY MR. MITTELSTAEDT:
19    Q  In -- in this report did you do any analysis
20   or do you present any analysis of which one of those is    10:15:26
21   the right way to do it?
22    A  I think I -- I do talk about knocking Harmony
23   out of the market here yes, yes.
24    Q  But -- but specifically as to whether the
25   damages model should include models that don't have 7.0    10:15:46

Page 49

Pages 46 to 49

1   consumers' heads is whether it's going to be disabled
2   again, all right.  And so it could -- it could have a
3   less than a full effect, a full offset effect.
4        You -- this is something that only the data
5   can answer.  There's no -- there's no theoretically      10:50:28
6   correct answer to whether Harmony's relaunch would fully
7   offset the effect of 4.7.
8        You -- what it does is how consumers respond
9   and behave.  And if they don't trust that Harmony is
10  going to be permanently around, and if they believe that 10:50:44
11  eventually Apple will -- will become incompatible again
12  with it, and so they'll lose all the songs that they
13  bought from RealNetworks, then it would still have an
14  effect, even if that expectation weren't true.
15       So it's just not a theoretical question.  It's    10:51:02
16  an empirical question.  And it's basically a boring
17  empirical question, because 4.7 isn't in the case
18  anymore.  So what we get in the 4.7 coefficient is some
19  sort of an average at best.
20       Q  But what you're giving -- I -- I understand     10:51:21
21  when you say it's an empirical question.  But what
22  you're giving me would be the theoretical reason to
23  explain why you might see a continuing effect from 4.7
24  even after the launch of Harmony --
25       A  Right.                                           10:51:41

Page 66

1        Q  -- relaunch of Harmony.
2        A  Right
3        Q  And so just focus on the consumer that you
4   have in mind.  That consumer would think -- he knows
5   about 4.7, he knows that that made it so he couldn't use 10:51:54
6   Harmony music on an iPod, and that may have some
7   lingering effect on his purchase decisions regardless of
8   whether Harmony is ever relaunched.
9        A  Well, in principle it might  You can't tell
10  There's no theoretical reason to come to a conclusion on 10:52:18
11  the magnitude of that effect
12       If you -- if we -- if 4.7 were still in the
13  case, then we would have a serious issue here about how
14  exactly to measure the effect of Harmony and how it
15  would be different in different periods            10:52:36
16       The reason I haven't focused on that is
17  because by the time I got around to doing these
18  regressions 4.7 wasn't around anymore
19       So yes, there is a whole series of issues
20  about how would we actually tease out what the effect of 10:52:47
21  4.7 was  And I would expect the effect of it would be
22  greater during the period it worked than in the period
23  after Harmony was relaunched to offset it to some
24  degree
25       So, yes, there would be a differential      10:53:03

Page 67

1   effect.
2        Q  And what I'm asking is why would there --
3   under what circumstances, precisely as you can, would
4   you expect to see a continuing effect of 4.7 even after
5   Harmony's relaunched?                              10:53:16
6        MS. SWEENEY:  Objection, vague and ambiguous.
7        THE WITNESS:  Consumer expectations about the
8   durability of the relaunch.  About whether if I -- if I
9   actually use Harmony and buy a bunch of songs from
10  RealNetworks, from Rhapsody, am I going to be stuck six  10:53:30
11  months from now with them not working because it will be
12  disabled again.
13  BY MR. MITTELSTAEDT:
14       Q  And could that consumer expectation continue
15  even after 7.0 is issued?                          10:53:42
16       A  Exactly, it could.  And that's -- that's
17  precisely right.  7.0, you know, could -- could, in
18  fact, have, you know, a similar story to it.  But, in
19  fact, 7.0 was never undone, so we can't test that
20  hypothesis.                                        10:54:04
21       Q  What I mean is could the consumer expectation
22  created by 4.7 continue after 7.0 is issued?
23       A  It could in principle, yes.
24       Q  And under what circumstance would you expect
25  to see a continuing expectation created by 4.7 after 7.0 10:54:19

Page 68

1   is issued?
2        A  It would -- well, the effect of 7.0 is going
3   to be what was it like before 7.0 was -- 7.0 was
4   launched and what is it like afterwards, okay.  And so,
5   again, it's an empirical question whether -- what  10:54:45
6   people's state of mind was prior to the launch of 7.0.
7   I don't --
8        Q  Well, what I'm asking is if you -- if you did
9   the test, the regression, and you saw there was a
10  continuing effect of 4.7 after 7.0, what theory would   10:54:58
11  explain that?  The same one we've been talking about,
12  consumer expectation?
13       A  Yeah.  I mean the issue is how are people's
14  attitudes about Har -- remember, it's important to keep
15  our eye on the ball.  What we're interested in is what's 10:55:30
16  happening to the market for iPods.  And the market for
17  iPods is going to be enhanced regardless if there
18  were -- was anybody out there using Harmony and all of a
19  sudden they can't, all right.  That -- that market
20  effect is still going to be there regardless of what    10:55:49
21  expectations were.
22       The way expectations work here is whether
23  someone would want to actually -- would actually buy an
24  iPod with the expectation they were going to be able to
25  use Harmony indefinitely on iPods.  And if they had that 10:56:05

Page 69

Pages 66 to 69

1  expectation then 4.7 would have gone away entirely
2  within shortly after Harmony was relaunched. If they
3  didn't believe that, then it wouldn't -- it wouldn't
4  have all completely gone away and it would have had some
5  residual effect at the time that 7.0 was lunched.   10:56:27
6      Q And that approach how long would that
7  residual effect last after 7.0, residual effect from
8  4.7?
9      MS. SWEENEY: Objection, vague and ambiguous
10  and incomplete.                 10:56:38
11     THE WITNESS: Again, there's no way to know
12  except empirically to find out.
13  BY MR. MITTELSTAEDT:
14     Q What would be the theory that would explain
15  that; just what you gave?            10:56:45
16     A Yeah.
17     Q The consumer expectation point?
18     A Is it okay if I take a two-minute break? Just
19  one sec, I'll be right back.
20     Q Yes, sir.                10:56:53
21     Off the record.
22     THE VIDEOGRAPHER: Off the record 10:57 a.m.
23     (Recess.)
24  BY MR. MITTELSTAEDT:
25     Q Okay. Just to complete that, what I asked   10:59:00

Page 70

1      Q Okay. Competitors DRM-Free, what date did you
2  turn that on?
3      A Well, it's in the report. Again, it's -- it's
4  when -- it's when the all four -- I didn't do it on the
5  EMI, E-M-I, decision to do it all DRM-Free. I did it in 11:01:55
6  the dates. I think it's either December of 2007 or
7  January 2008, but it's -- it's the date at which all of
8  the major distribution companies allow the competitors
9  to be DRM-Free.
10     Q Okay. Do you think that the announcement of   11:02:1
11  that event which preceded the actual event could have
12  had an impact on iPod demand?
13     A Well, I suppose -- yeah, first of all, I did
14  look at the announcement dates, they weren't that far in
15  advance. It was like a month, even less than a month,   11:02:32
16  so.
17     Q Would it have been just as fair to use the
18  announcement date as the actual event date?
19     MS. SWEENEY: Objection to form.
20     THE WITNESS: I -- I think I -- the actual   11:02:52
21  launch date's better, because I don't think that the
22  vast majority of people read the trade press about
23  electronics, consumer electronics. So my expectation
24  would be that relatively few people knew about it until
25  it happened, but -- so I would, without more information 11:03:08

Page 72

1  just before the break was you described why there could
2  be a, theoretically, a lingering effect from 4.7 after
3  7.0. You explained it and I said that's the consumer
4  expectation point, correct?
5      A Well --                 11:00:28
6      MS. SWEENEY: I'm going to object and to
7  the --
8      Maybe the court reporter could read back the
9  last Q and A.
10     THE REPORTER: Certainly. You mean before we   11:00:33
11  went on the break?
12     MS. SWEENEY: Yes, please.
13     (Record read.)
14     THE WITNESS: Yes. The issue is whether
15  consumers expect in the future that they will be locked   11:01:01
16  in.
17  BY MR. MITTELSTAEDT:
18     Q On 13.2 going down the -- the variables. If
19  you wanted to test what the effect of Harmony relaunch
20  was -- I think this is an obvious question -- you would   11:01:22
21  include a variable for the Harmony relaunch, correct?
22     A Hm-m, that's correct.
23     Q And you'd turn it on as of the date of the
24  Harmony relaunch?
25     A Right.                  11:01:35

Page 71

1  I think I would prefer the launch date as opposed to the
2  announcement date
3  BY MR MITTELSTAEDT:
4      Q Okay. But if the announcement date had an
5  impact on iPod demand you'd want to use the announcement 11:03:19
6  date, by definition?
7      A Well, it -- you know, I -- I understand the
8  argument for using it  I don't think it's the right
9  thing to do  But, yes, if you want to use it, go ahead,
10  see what happens                11:03:39
11     Q What's the argument for using it?  The best
12  argument for using it.
13     A The best argument for using it would be that
14  consumers' plans about the portable digital media player
15  they are currently buying are affected by what's going   11:03:51
16  to be happening in the future  And they have perfect
17  rationale expectations about what's going to happen in
18  the future  So once the announcement is made, the fact
19  that they can't get things DRM-Free today won't dissuade
20  them because three weeks from now they will be able to   11:04:09
21  get them DRM-Free
22     Q Would you think that Apple would be aware of
23  the announcement?
24     A Of course Apple --
25     MS SWEENEY: Objection, calls for   11:04:26

Page 73

Pages 70 to 73

1    speculation.
2         THE WITNESS: I would expect Apple knew
3    that -- I'm not sure the announcement mattered to Apple.
4    I suspect Apple was negotiating DRM-Free with these guys
5    as well, so it may well have known before the      11:04:39
6    announcement date.
7    BY MR. MITTELSTAEDT:
8         Q  But if --
9         A  But I don't know when Apple knew.
10        Q  Okay.  But if under your theory the -- the      11:04:43
11   availability of DRM-Free in December 2007 or January
12   2008 had an impact on iPod demand such that it should be
13   included in your regression, would you expect the
14   announcement of that event to have some impact on
15   Apple's pricing decisions?      11:05:03
16        A  Well, if your first assumption is true then it
17   would -- you know, if the demand for iPods has shifted,
18   because of the announcement effect, then obviously Apple
19   would take that into account in doing pricing.  But
20   you're just assuming the answer.      11:05:17
21        Obviously, Apple's pricing decisions are based
22   upon demand.  And they're not going to -- they're not
23   going to cut the price of iPods until -- until they have
24   to.  And so it -- it all gets back to what is it that
25   consumers know and -- and how -- what is -- what are      11:05:33

Page 74

1    the -- what are the factors they take into account when
2    making a purchase
3         Q  Actually, I'm not assuming anything.  I'm --
4    what I was trying to ask was, your regression is based
5    on the assumption that the availability of DRM-Free from      11:05:48
6    competitors had some impact on iPod demand.  Correct so
7    far?
8         A  On testing the hypothesis that it did and my
9    expectation is that it would and the coefficient
10   indicates that it did have an effect on iPods      11:06:03
11        Q  Did you test the hypothesis that the
12   announcement also had an effect?
13        A  No  I didn't test it, because it doesn't seem
14   to be plausible, but if you want to go ahead and test
15   it, go ahead and do it      11:06:15
16        Q  And you said it's not plausible in part
17   because you don't know that many consumers would know
18   about it.  I'm asking, you agree that Apple would know
19   about it?
20        A  But that -- what matters is when you have to      11:06:29
21   cut the price in order to be competitive and when you --
22   so what Apple knows is irrelevant  What -- what --
23   what's accepted so far is they know something about
24   consumers  And the issue is when did the -- when did
25   the consumer behavior change      11:06:45

Page 75

1         Q  Okay.  Why didn't you have a variable for when
2    EMI went DRM-Free?
3         A  Because it's unimportant.
4         Q  Why is it unimportant?
5         A  It's a small fraction of the market.      11:06:53
6         Q  Unimportant to iPod demand?
7         A  Relatively unimportant.  It's -- EMI at this
8    point in time is on the order of 10 percent of the
9    market.
10        Q  And you consider that relatively unimportant      11:07:05
11   compared to Harmony?
12        A  No.  The -- the -- EMI is not sufficiently
13   important in the recorded music business, that -- EMI
14   doing it by itself is going to have much of an effect on
15   consumers, because their portfolio of recorded music is      11:07:29
16   going to have a fairly small fraction of EMI in it and
17   hence the degree to which they're locked into a
18   DRM-based system is not affected by -- by EMI's
19   decision.
20        They have -- you know, they're going to have      11:07:48
21   roughly 70 to 80 percent or more of their recorded music
22   is going to be DRM protected.  And that's going to lock
23   them in.  So EMI all by itself is not affecting the
24   degree of lock-in of these consumers.
25        What -- what does affect the degree of lock-in      11:08:10

Page 76

1    in consumers is when everybody goes DRM-Free, because
2    then no matter what they buy they can play it on
3    anything
4         Q  Okay, but so you think that EMI going DRM-Free
5    has less of an impact on iPod demand than RealNetwork      11:08:24
6    making its music available to play on an iPod?
7         A  Yes, because the difference is that Harmony
8    applies to all DRM protected products, not just one
9    label's worth  If Harmony had only worked for EMI
10   would not have anticipated it would have had any      11:08:44
11   effect
12        Q  Okay.  What was -- isn't the relative effect
13   of Harmony versus EMI going DRM-Free an empirical
14   question?
15        A  Yeah, it is, of course, an empirical question,      11:08:59
16   but I'm just saying that if you start with the theory of
17   lock-in, Harmony unlocks everybody  EMI doesn't unlock
18   anyone, unless there -- unless there's a customer out
19   there who only buys EMI music and that's extremely
20   unlikely      11:09:21
21        Q  What did you do to test?
22        A  I didn't test it  I just think it's
23   implausible, all right
24        Q  Does RealNetworks market share at any point in
25   time affect your analysis?      11:09:31

Page 77

Pages 74 to 77

**Page 78**

1    A  Not really, no.
2    Q  Does it affect your view on the plausibility
3    of -- of Harmony or 7.0 having an effect on iPod
4    demand?
5    A  The magnitude of Harmony's effect on the    11:09:47
6    demand elasticity of iPods depends on their market
7    share, but it's again a continuous thing.  The -- the --
8    what -- what Harmony does is make the demand more
9    elastic, all right.  And so, again, it's an empirical
10   question, how much more elastic it made it.    11:10:07
11   Q  DRM-Free music also makes the demand less
12   elastic, correct?
13   A  That's exactly right.  And so when everybody
14   goes DRM-Free that should have the same effect of making
15   the demand more elastic.    11:10:19
16   The reason EMI -- the parallel you're trying
17   to draw between EMI and Harmony isn't valid, because
18   Harmony applies to everything.  And there's a subset of
19   consumers who become not locked in.  And then the
20   effect -- and then they have a more elastic demand.  EMI  11:10:34
21   by itself does not make the demand for iPods more
22   elastic, because it's too small.  It doesn't end the
23   lock-in, because most of people's portfolio of sound
24   recordings are not EMI, the vast majority of it.
25   Q  Most people's sound recordings do not come    11:10:52

**Page 79**

1    from RealNetwork, correct?
2    A  That's correct.
3    Q  Okay.
4    A  But among those who did buy from RealNetworks,
5    they were no longer locked in, so that -- the aggregate  11:11:01
6    demand curve for iPods became less elastic to buy -- buy
7    share of -- of Rhapsody's market share.
8    Q  And if -- well, not Rhapsody, right?  You know
9    what Rhapsody is?
10   A  Well, Rhapsody Music Store.    11:11:19
11   Q  What's that?
12   A  It's where Rhap -- it's where you buy songs
13   from other than if you -- it's the RMS is the
14   counterpart to ITS for Rhapsody.
15   Q  For RealNetwork?    11:11:38
16   A  For RealNetworks, yeah.
17   Q  And what was the -- do you know at some point
18   Rhapsody was subscription?
19   A  Yes.
20   Q  Okay.  And do you know what the market share    11:11:49
21   for what you're calling Rhapsody Music Store, the
22   nonsubscription part was at any point?
23   A  Single-digit percentages.
24   Q  Well, that's -- that's being charitable,
25   right?    11:12:05

**Page 80**

1    A  No.  It was a -- no, what I -- it was
2    single-digit percentage.
3    Q  In August of 2006 what was RealNetworks --
4    A  Well, I don't have them memorized.
5    Q  -- music share?    11:12:18
6    A  A few percent.  I don't remember the exact
7    number.
8    Q  Less than three?
9    A  Well, it changed.  It roughly doubled at that
10   time and I -- from what to what I don't remember.    11:12:31
11   Q  Okay.  Roughly doubled when and because of?
12   A  Two to four, three to six.  Something on that
13   order of magnitude.
14   Q  Doubled during what time period?
15   A  In late 2006.    11:12:41
16   Q  You're not talking about the original Harmony
17   in July 2004, are you?
18   A  Oh, excuse me.  I'm sorry.  2004 that's -- I
19   am thinking of 2004, yes.
20   Q  Okay.  So now, if you would, focus on --    11:12:53
21   A  Yeah, I don't remember.
22   Q  -- just before 7.0 in August of 2006, what was
23   RealNetworks' market share?
24   A  Again, single digit percentages, but I don't
25   remember the exact number.  I -- I it's been too long    11:13:07

**Page 81**

1    since I looked at that.
2    Q  But less than five?
3    A  Yeah.  In that -- single-digit percent.  I
4    don't remember the exact number.  I know that it was
5    small, yes.    11:13:17
6    Q  And does the size of RealNetworks' market
7    share, would you expect that to have some impact on the
8    degree to which it impacted iPod demand under your
9    theory if there was any impact at all?
10   A  If there was an impact it is the fraction of    11:13:38
11   people who used Harmony to play stuff on an iPod.
12   They're the ones whose demand became elastic.
13   Q  And then your next variable, going back to
14   13.2, is ITMS all DRM-Free.  Why did you include that
15   variable?    11:14:04
16   A  Well, because the -- the main vehicle for the
17   lock-in effect on the Apple side is using Fair Play and
18   when Apple stops using Fair Play on ITS, then anything
19   you buy from ITS from that point on can play on
20   anything.  So you're no longer locked into an iPod if    11:14:27
21   you buy your music from ITS, so that -- that strikes me
22   as a big deal.  A very important deal.
23   Q  And under your analysis what impact did that
24   have on iPod pricing?
25   A  It caused them to go down.    11:14:49

Pages 78 to 81

1  **Q  By how much?**
2  A  Well, what's the coefficient?  Six percent.
3  **Q  Okay.  And did it cause iPod prices to go down**
4  **immediately upon the launch of the iTunes Music Store**
5  **going all DRM-Free?**    11:15:06
6  A  This is -- this is the -- this is the effect
7  over the period afterwards in the dataset.  I think it
8  probably had a fairly dramatic immediate effect, yes,
9  but you know, that's the number.  It's six percent in
10  this regression and seven percent in the other.    11:15:23
11  **Q  Have you made any analysis of what you would**
12  **say the price change was the first month or the second**
13  **month or the third month.  This is -- or is this just an**
14  **average over the -- the whole three-year period?**
15  A  This is -- well, it's two years.  We only have    11:15:37
16  two years of data, I believe, beyond, you know?  What
17  is -- when does the data period end?  What's the end of
18  the data period?  I can find it.  March 26, 2011, so
19  it's two years.
20  **Q  March 26, 2000 and --**    11:16:00
21  A  A '11 is end of the data period, I believe.
22  Isn't it?
23  **Q  But what's the end of the period for which you**
24  **are measuring what you assert are damages?**
25  A  ITMS becomes DRM-Free on April 1st, 2009, so    11:16:12

Page 82

1  it's about two years worth of DRM-Free data for --
2  for -- in the dataset.
3  **Q  But my -- my question is different.  It's what**
4  **the end of the period for which you were measuring what**
5  **you claim are damages?**    11:16:30
6  A  April 1st.  That's it.  The damages stop at
7  when ITMS goes DRM-Free.
8  **Q  Why would you expect there to be a dramatic**
9  **immediate impact on iPod prices from the music store**
10  **going DRM-Free?**    11:16:50
11  A  Well, first of all, there was a transition,
12  but no, it's because that it's the end of the lock-in.
13  And looking forward, consumers are not going to be
14  locked in.
15  And so, you know, what, something like half of    11:17:02
16  iPod sales are original sales.  And so for them going
17  forward, none of those customers are going to be locked
18  in.
19  And then among the customers who are buying a
20  replacement iPod, their new music is not always -- is    11:17:17
21  going to be subject to the lock-in.  And they can, if
22  they want to, get the DRM-Free version of what they
23  have, so -- for the things they want to keep.  So it's
24  my expectation that it's a big deal to go DRM-Free.
25  That that basically ends the problem of lock-in in    11:17:36

Page 83

1  portable digital media players.
2  **Q  Okay.  The next variable you use is -- is**
3  **Classic and then Mini, Nano and Shuffle.  Your variable**
4  **for Classic or your coefficient for Classic variable is**
5  **positive and it's negative for Mini, Nano and Shuffle.**    11:18:01
6  A  Remember that the actual effect of a model
7  that's in the equation is the different -- is the
8  combination of the interceptor plus that -- the
9  intercept is essentially the Touch.  And then these are
10  adjustments to the Touch effect from -- due to other    11:18:22
11  models.
12  **Q  Okay.**
13  A  And so these coefficients are what you would
14  expect if your theory was right?
15  MS. SWEENEY:  Objection, vague and    11:18:36
16  ambiguous.
17  THE WITNESS:  I have no idea what that
18  question means.
19  BY MR. MITTELSTAEDT:
20  **Q  Okay.  Do you see anything anomolous in these**    11:18:41
21  **coefficients?**
22  A  No, not at all.  It just -- it tells you that
23  cheaper products have lower -- have a lower intercept
24  term in the regression.
25  Remember you want to subtract each one of    11:18:54

Page 84

1  these from the intercept, so what you got is sort of a
2  baseline price before you do anything else.  And all
3  this is telling you is that cheaper ones have lower
4  intercepts, which is the average price over the whole
5  period of a more expensive model is going to be higher.    11:19:11
6  That's all that it tells you.
7  **Q  For this variable, the Classic variable, how**
8  **do you determine when to turn that on and when to turn**
9  **that off?**
10  A  When it's a Classic that's in the transaction.    11:19:23
11  When the transaction is a Classic.
12  **Q  Okay.  And so for the Shuffle, when you say**
13  **you've asked Econ, Inc. to run the regression turning**
14  **the Shuffle off --**
15  A  No, that's not what I said.  I said you've    11:19:38
16  turned -- you turn the 7.0 variable off for Shuffles.
17  **Q  Okay.  And how do you do that?**
18  A  You just -- you just run exactly the same
19  regression except an observation for a Shuffle never has
20  7.0 turned on, even if it's in the damages period.    11:19:55
21  **Q  But I thought the 7.0 variable was either on**
22  **or off?**
23  A  It's on --
24  **Q  Excuse me.  Depending on the time period.  So**
25  **as of September 12, 2006 you turned it on and gave it**    11:20:10

Page 85

Pages 82 to 85

**Sarnoff, A VERITEXT COMPANY**
**877-955-3855**

1   the interesting question  The interesting question is
2   had the price been higher would they have switched
3   BY MR MITTELSTAEDT:
4       Q  But, for example, if -- if you take somebody
5   who says I'm never going to buy anything other than          11:58:31
6   iPod, no matter what, no matter what the price is.
7       A  They are the beneficiaries of competition
8   among those who would switch  Those who have extremely
9   high willingness to pay for any particular brand name
10  are the beneficiaries of competition for the people who       11:58:47
11  are willing to shop
12      Q  No, but what I'm -- what I'm trying to focus
13  on is people whose demand is at the margin and who make
14  a difference because of 7.0.  You know, what's the
15  profile of -- of those people where there's an                11:59:03
16  incremental impact where they decide -- they decide
17  costs are such that they buy an iPod where they would
18  have preferred to buy something else.  And if what I'm
19  positing is, you can't include in that group people who
20  were going to buy an iPod no matter what.                     11:59:24
21      MS SWEENEY: Objection --
22  BY MR MITTELSTAEDT:
23      Q  You have to include only the people who
24  decided to buy an iPod instead of something else,
25  because of their switching costs caused incrementally         11:59:32

                                              Page 106

1   after 7.0?
2       MS. SWEENEY: Objection to form, vague and
3   ambiguous, compound.
4       THE WITNESS: I have no idea what you're --
5   what you're talking about.                                    11:59:43
6       Yes, there are people who are willing to pay a
7   premium for an iPod and switching costs are one reason
8   why they might be willing to pay a premium.  Just being
9   in love with Apple is another reason.  And then there
10  are other people who are at the margin, who plus or           11:59:54
11  minus ten percent in price, can affect their decision.
12  And it's the latter that determine pricing and the
13  extent of competition among brands of portable digital
14  media players.
15  BY MR. MITTELSTAEDT:                                          12:00:10
16      Q  Okay.  And how many people fit that profile of
17  being at the margin where their purchase decision
18  changed from a non-iPod to an iPod because of 7.0?  How
19  many people are in that category?
20      A  We have no way of knowing that.                        12:00:24
21      Q  Is it -- is it ten people or 10,000?
22      A  We have no way of knowing what the number is.
23  All we observe is the actual pricing behavior and the
24  implicit change in the elasticity of demand.
25      We're talking about a fairly small fraction           12:00:36

                                              Page 107

1   of -- a fairly small increase in price, three-to-six
2   percent, okay  And so what that basically means is it's
3   a few percentage points of people went from the category
4   of moveable to not moveable
5       Q  So how many people?                    12:00:52
6       A  I don't know how many people
7       MS SWEENEY: Objection, asked and answered
8   BY MR MITTELSTAEDT:
9       Q  Well, when you say a few percentage points
10  what do you mean?  A few percentage points of what?   12:00:58
11      A  A few percentage points of sales were at
12  stake  For -- in order for it to make sense, to be
13  profit maximizing for Apple to raise its price by three
14  percent, all right, it has to be the case that the
15  number of people who switch out used to be too many and  12:01:13
16  now it's not -- not too many to make that a profitable
17  price increase, okay
18      So, normally, in the case of, you know, if --
19  if Apple is going to increase price three percent, it
20  better have the effect on sales be less than three       12:01:31
21  percent  So we move from a world in which the effect
22  might have been three-and-a-half percent to a world in
23  which it now is two-and-a-half percent  So it made
24  sense to raise the price by three percent after the fact
25  and it didn't make sense before the fact        12:01:48

                                              Page 108

1       And that's the -- the issue of how many are
2   there is -- is indeterminate.  It's just -- it used to
3   be profitable to have the price be three percent lower
4   and now it's profitable to have it be three percent
5   higher.  And that's because the number of customers you  12:02:07
6   lose by raising the price has gone down by enough to
7   make the net revenue be positive instead of negative.
8       Q  Okay.
9       A  And it could be three people.  I mean if you
10  were close enough to the margin, the mag -- the number   12:02:18
11  of people is not what matters.  The -- what matters is
12  why didn't you raise the price by three percent
13  anyway.
14      Q  Okay.
15      A  And the answer must be because you expected    12:02:29
16  sales to go down by -- enough to -- that the higher
17  price times the lower sales would be less profitable.
18  Now it's more.  So it could be a very small number of
19  people, just -- less than a percent, as the difference
20  in sales before and after 7.0 that caused the price    12:02:47
21  increase to be profitable, when you're talking about a
22  price increase that's this small.
23      Q  Okay.  So are you saying that it could take
24  only three people buying an iPod instead of a non-iPod
25  as a result of 7.0 to have the price effect that you are  12:03:05

                                              Page 109

EXHIBIT 52

# The Apple iPod iTunes Anti-Trust Litigation

**Videotaped Deposition of**

**ROBERT TOPEL, PH.D.**

**January 08, 2014**

**\*\*\*CONFIDENTIAL\*\*\***

**Volume II**

Volume II                     **Confidential - Attorneys' Eyes Only**
Robert Topel, Ph.D.                      The Apple iPod iTunes Anti-Trust Litigation

Page 194

```
 1        UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA
 3           OAKLAND DIVISION
 4
   THE APPLE iPOD iTUNES      )  Lead Case No. C 05-00037
 5 ANTI-TRUST LITIGATION      )
 6                            )
 7 _____  )
 8 This Document Relates To:  )
 9 ALL ACTIONS                )
10                            )
11 _____  )
12
13
14       CONFIDENTIAL - ATTORNEYS' EYES ONLY
15  V DEOTAPED DEPOSITION OF ROBERT H. TOPEL, Ph.D.
16            VOLUME II
17         January 08, 2014
18         Phoenix, Arizona
19
20
21
22 Reported By:
23 Cathy A. Miccolis
24 RPR, CRR, CSR No. 50068
25 Job No. 10009199
```

Page 195

```
 1            A P P E A R A N C E S
 2
 3 For the Plaintiffs:   Bonny Sweeney, Esq.
                         ROBBINS GELLER RUDMAN & DOWD, LLP
 4                        655 West Broadway
                         Suite 1900
 5                        San Diego, CA  92101
                         619.231.1058
 6                        bonnys@rgrdlaw.com
 7
 8
 9
   For the Defendant Apple, Inc.:
10        David C. Kiernan, Esq.
          JONES DAY
11         555 California Street
          26th Floor
12         San Francisco, CA  94104
          415.626.3939
13         dkiernan@jonesday.com
14
15
16 Also Present:       Thomas C. Tracy, videographer
17
18
19
20
21
22
23
24
25
```

Page 196

```
 1           I N D E X
 2 Witness                    Page
 3 ROBERT TOPEL, Ph.D.
 4
       EXAMINATION BY MS. SWEENEY      198
 5
 6
 7
 8         E X H I B I T S
 9 Exhibit  Description      Page
10      (No newly marked exhibits.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 197

```
 1        THE VIDEOTAPED DEPOSITION OF ROBERT TOPEL,
 2 Ph.D., VOLUME II, was continued on January 8, 2014,
 3 commencing at 12:56 p.m. at the offices of BONNETT,
 4 FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 East Camelback
 5 Road, Suite 300, Phoenix, Arizona, before CATHY MICCOLIS,
 6 a Certified Reporter in the State of Arizona.
 7
 8        THE VIDEOGRAPHER:  We are now on the record.
 9 The time is approximately 12:56 p.m.  Today's date is
10 January 8, 2014.  My name is Tom Tracy of Aptus Court
11 Reporting.  The court reporter is Cathy Miccolis of Aptus
12 Court Reporting, located at 600 West Broadway, Suite 300,
13 San Diego, California 92101.
14        This begins the videotaped deposition of Robert
15 Topel, Volume II, testifying in the matter of the Apple
16 iPod iTunes Antitrust Litigation pending in the District
17 Court of California, Division of Oakland, Case Number C
18 05-00037 YGR, taken at 2325 East Camelback, Suite 300,
19 Phoenix, Arizona 85016.
20        Counsel, will you please identify yourself and
21 whom you represent for the record at this time, starting
22 with the plaintiffs' counsel.
23        MS. SWEENEY:  Bonny Sweeney for the plaintiffs.
24        MR. KIERNAN:  David Kiernan for Apple.
25        THE VIDEOGRAPHER:  Thank you, Counsel.  The
```

Volume II
Robert Topel, Ph.D.

**Confidential - Attorneys' Eyes Only**
The Apple iPod iTunes Anti-Trust Litigation

Page 218

1  as true? Because I think I said, you know, it could have
2  been that I did something like that, but it's been months
3  and I can't remember.
4  BY MS. SWEENEY:
5      Q.   Well, it may have been months, but you just
6  submitted a report on December 20th with these regressions
7  and these additional variables, and I want to know how you
8  picked those variables.
9          MR. KIERNAN:  Argumentative.
10         THE WITNESS:  They are the same ones that we
11 used in the last round.  We didn't change anything.
12 BY MS. SWEENEY:
13     Q.   Okay.  So my question is, you didn't -- so I
14 will represent to you, and you can go back and check it --
15     A.   Okay.
16     Q.   -- that you took some variables that were in
17 the dataset that were not used by Noll and put them in the
18 regression, but not all of them, and then in addition you
19 took some variables that were not in the dataset and added
20 them.  So I'm trying to figure out how you made the
21 determination about which variables to add to the
22 regressions.
23         MR. KIERNAN:  Asked and answered.
24         THE WITNESS:  It's been months.  You know, if
25 you asked me which one, I couldn't tell you.  It's been,

Page 219

1  you know, it's been more than months.  It's been a really
2  long time.
3  BY MS. SWEENEY:
4      Q.   Other than what you alluded to earlier, that
5  is, the regression output, are there standard tests that
6  economists use to determine whether variables are
7  correlated?
8          MR. KIERNAN:  Object to form.
9          THE WITNESS:  Sure.
10 BY MS. SWEENEY:
11     Q.   Can you give me some examples?
12     A.   Well, since you're talking about
13 multicollinearity, if I had some variable, call it Z, and
14 I could -- if it's a problem of multicollinearity you're
15 concerned with, you could regress Z on all the other Xs
16 and see how much residual variation there is in Z, that
17 is, how much -- what's the coefficient of multiple
18 determination for Z regressed in all the other Xs.
19     Q.   Is there a name for that?
20     A.   Regression.  (Laughter.)
21         That's -- you know, it's -- you're finding the
22 multiple correlation coefficient between Z and the other
23 stuff.
24     Q.   And did you do that in this case on your added
25 variables?

Page 220

1      A.   Well, implicitly, yes, because as I said
2  before, the way the regression coefficient is calculated
3  formally is it's using that part of -- I was using the
4  term Z, so I will say Z -- that part of Z that's not
5  correlated, not predictable from the other Xs, and it's
6  using that variation to identify the coefficient on Z in
7  that regression.  So the fact that -- as I said before,
8  the fact that that residual variation, the stuff that's
9  not correlated with the other stuff, can identify a
10 statistically significant coefficient means that the
11 collinearity between Z and the other Xs isn't so large
12 that you're not able to identify a statistically
13 significant effect.
14     Q.   Did you compute a variance inflation factor for
15 each of the additional variables that you used?
16     A.   I don't know what you mean by a variance
17 inflation factor for each variable.
18     Q.   Do you have any understanding of what a
19 variation -- did I say that wrong?  A variance inflation
20 factor, do you know what that is?
21     A.   I assume the context in which you're using it
22 is to something to inflate the variance, but no.
23     Q.   Do you know what a condition number is?
24     A.   A condition number?  Not in the context in
25 which we are using it here.

Page 221

1      Q.   Now, you keep referring back to the results of
2  the regression.  Did you add in the variables separately
3  and see what the results were, or did you just conduct the
4  regression where you added in all your additional
5  variables and then ran the regression?
6      A.   Are you asking me whether we kind of dropped
7  them in some particular order to watch what happened?  No,
8  I don't recall that we did anything sequential like that.
9  We found the characteristics.  We put them in.
10     Q.   So what's the basis for your opinion that
11 whether an iPod is part of the Hewlett-Packard OEM sale,
12 that that particular attribute is one that would impact
13 the price of that iPod?
14     A.   Because it has Hewlett -- for one reason it's
15 got Hewlett-Packard's brand name on it, and whatever deal
16 Hewlett-Packard might have reached with Apple could affect
17 the price at which Hewlett-Packard was able to acquire
18 iPods.
19     Q.   Did you see any evidence in the record on that
20 issue?
21     A.   Well, yeah, I just said the brand name of
22 Hewlett-Packard could affect it, but -- which is a
23 different brand name than Apple.
24     Q.   I'm sorry.  That wasn't my question.  Perhaps I
25 didn't phrase it well.

Page 218..221

EXHIBIT 53

# The Apple iPod iTunes Anti-Trust Litigation

**Videotaped Deposition of**

**KEVIN MURPHY, PH.D.**

**January 08, 2014**

**\*\*\*CONFIDENTIAL\*\*\***

**Volume II**

Volume II                    **Confidential - Attorneys' Eyes Only**
Kevin Murphy, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 233

```
1            UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3                 OAKLAND DIVISION
4
   THE APPLE iPOD iTUNES    )  Lead Case No. C 05-00037
5  ANTI-TRUST LITIGATION    )
6                           )
7  _____ )
8  This Document Relates To:  )
9  ALL ACTIONS              )
10                          )
11 _____ )
12
13
14
15        CONFIDENTIAL - ATTORNEYS' EYES ONLY
16    V DEOTAPED DEPOSITION OF KEV N M. MURPHY, PH.D.
17              VOLUME II
18            January 08, 2014
19             Phoenix, Arizona
20
21
22  Reported By:
23  Cathy A. Miccolis
24  RPR, CRR, CSR No. 50068
25  Job No. 10009198
```

Page 234

```
1          A P P E A R A N C E S
2
3  For the Plaintiffs:    Bonny Sweeney, Esq.
4        ROBBINS GELLER RUDMAN & DOWD, LLP
          655 West Broadway
          Suite 1900
5          San Diego, CA  92101
           619.231.1058
6          bonnys@rgrdlaw.com
7
8
9
   For the Defendant Apple, Inc.:
10        David C. Kiernan, Esq.
          JONES DAY
11         555 California Street
           26th Floor
12         San Francisco, CA  94104
           415.626.3939
13         dkiernan@jonesday.com
14
15
16  Also Present:    Thomas C. Tracy, videographer
17
18
19
20
21
22
23
24
25
```

Page 235

```
1            I N D E X
2  Witness                          Page
3     KEVIN M. MURPHY, Ph.D.
4
      EXAMINATION BY MS. SWEENEY          237
5
6
7
8            E X H I B I T S
9  Exhibit   Descrip ion              Page
10 Exhibit 6  Supplemental Report       257
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 236

```
1        THE VIDEOTAPED DEPOSITION OF KEVIN M. MURPHY,
2  Ph.D., VOLUME II, was continued on January 8, 2014,
3  commencing at 9:11 a.m. at the offices of BONNETT,
4  FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 East Camelback
5  Road, Suite 300, Phoenix, Arizona, before CATHY MICCOLIS,
6  a Certified Reporter in  he State of Arizona.
7
8        THE VIDEOGRAPHER:  The time on  he record is
9  9:11 a.m.  Today's date is January 8, 2014.  My name is
10 Tom Tracy of Aptus Court Reporting.  The court reporter is
11 Ca hy Miccolis of Aptus Court Reporting located at 600
12 West Broadway, Suite 300, San Diego, California 92101.
13        This begins the videotaped deposition of Kevin
14 Murphy, Volume II, testifying in the matter of  he Apple
15 iPod iTunes Trust (sic) Litigation, pending in  he
16 District Court of California, Oakland Division, Case
17 Number C 05-00037 YGR.  This deposition is taking place at
18 2325 East Camelback, Suite 300, Phoenix, Arizona 85016.
19        Will counsel please identify themselves,
20 starting wi h he plaintiffs' counsel.
21        MS. SWEENEY:  Bonny Sweeney for he plaintiffs.
22        MR. KIERNAN:  David Kieman for Defendant
23 Apple, and Scott Murray, in-house counsel from Apple, may
24 be on  he phone.
25        Scott, are you on the phone?
```

Page 293

1  it's always going to be a judgment.  You always have to
2  use some judgment.  You're not going to write down some
3  set of rules because there is going to be a circumstance
4  that satisfy those rules, and you'd say no, that doesn't
5  make any sense in that context.  I think you have to use
6  your judgment.
7  BY MS. SWEENEY:
8      Q.   When you use your judgment, what other
9  considerations are you taking account of that might lead
10  you in your judgment to exclude certain product
11  characteristics from your regression?
12      A.   I guess we have to look at it case-by-case
13  basis.  I don't see any of the problems with these
14  characteristics that would lead me to exclude them.  You
15  know, I gave you the example of occupation.  That would be
16  one that I definitely would exclude from an
17  education/earnings relationship because that --
18  controlling for that is going to miss a substantial impact
19  of education, which it works through changing your
20  occupation.  So again, you could say, well, economics says
21  occupation should matter for earnings, but it's not
22  something in general you'd want to hold constant.
23      Q.   Did you conduct any analyses to see whether any
24  of these additional variables that you added to the
25  regression are collinear with variables already in

Page 294

1  Professor Noll's regression?
2      A.   Yes, I did.  And the easiest way to see that is
3  to evaluate the effect it has on the standard errors of
4  the other variables.  If they were highly collinear with
5  those other variables, that will generally show up as a
6  large increase in the standard error of the other
7  variables in the regression.  And when it comes to the
8  iTunes 7 variable, for example, you don't see that at all.
9  You don't see that this has any substantial impact on the
10  standard error of the estimate.  And that's what you're
11  worried about with multicollinearity, that when variables
12  are highly multicollinear, it's hard to separate the
13  effects out, and the precision of your estimate of the
14  other variable will become less precise if you include
15  this variable in your regression, and that's --
16      Q.   Now, so you --
17      A.   I didn't even pause that time; correct?
18      Q.   I thought you had, but go ahead.
19      A.   I don't think my mouth even closed.
20      Q.   I have asked you to continue your response.
21  Please do so.
22      A.   I have lost my train of thought.  I'm sorry.
23      Q.   Other than the effect on the standard errors,
24  did you conduct -- or strike that.
25          So you said that because the results of your

Page 295

1  regression show that you don't have a collinearity problem
2  because of otherwise you would see it in the standard
3  errors, are there any other tests that one could conduct
4  to determine whether the product characteristic variables
5  that you added to the regression are collinear with
6  variables already in Professor Noll's regression?
7          MR. KIERNAN:  Objection; argumentative.
8          THE WITNESS:  There are, but I think you could
9  basically back those out from the standard errors because
10  the other primary test that people do is kind of an
11  auxiliary regression test where you look at the R-squared
12  from regressing that variable on the other included
13  variables in the regression.  But you can actually back
14  that out from the change in the standard errors and the
15  change in the residual variance of the equation.  So they
16  amount to almost the same thing.  That's something else
17  you can look at.
18  BY MS. SWEENEY:
19      Q.   Did you do that here?
20      A.   No, because you can really -- you can see
21  what's going on with one from looking at the other.  They
22  are essentially capturing the same phenomena.
23      Q.   So other than looking at the standard errors
24  and conducting what you called an auxiliary regression
25  test, are there any other tests that one could conduct to

Page 296

1  determine whether the variables that you added to the
2  regression were collinear with variables already in the
3  model?
4          MR. KIERNAN:  Object to form.
5          THE WITNESS:  You could.  I mean, I assume you
6  could do other things.  Those are the two primary ones
7  that people use.
8  BY MS. SWEENEY:
9      Q.   Well, can you give me some specific examples of
10  other kinds of tests you could conduct?
11      A.   I mean, it would all amount to essentially the
12  same thing because you're trying to evaluate the extent to
13  which this variable is a linear combination of the other
14  variables that are in the regression, so I think anything
15  else you do would be very similar.
16      Q.   So, but you can't give me any names of specific
17  kinds of statistical tests you could conduct?
18      A.   I wouldn't recall the names, but they would
19  be -- they would essentially amount to looking at the same
20  types of things.
21      Q.   Well, what is a variance inflation factor?
22      A.   That's looking essentially at how much the
23  standard errors go up when you include the additional
24  variable.
25      Q.   So did you compute a variance inflation factor

**Confidential - Attorneys' Eyes Only**

1  for each of he variables that you added to the
2  regression?
3      A.  I did not specifically calculate it hat way.
4  I mean, you can calculate it from what we did.  We have
5  he variance inflation here that you could calculate by
6  comparing the standard errors you get in he two different
7  ways of calculating  he model wi h or without  hose
8  additional variables.
9      Q.  But – so I'm not understanding.  So you said,
10  "I did not specifically calculate it hat way."  So is
11  your testimony  hat you can do  hat and you can back it
12  out, but you didn't go through hat extra step?
13      A.  Yeah, because I didn't like take the ratio of
14  the two numbers and square them.  You could do  hat if you
15  wanted.
16      Q.  What about, what is a condition number?
17      A.  A condition number is a characteristic of the
18  matrix used to calculate the standard errors.  I don't
19  recall the specifics of how it's calculated.  But again,
20  it's looking at much of the same concept as you're looking
21  at here in terms of  he variance inflation factor or the
22  ratio of the standard errors.  All those things are
23  looking at the same basic concept.
24      Q.  So in other words, you can use a condition
25  number to check who her  here is collinearity between

1  variables that you've added and variables  hat were
2  already in the regression?
3      A.  I presume you could.  I have never done it that
4  way.  But  hat would be one  hing  hat would presumably
5  reflect the impact.  I think  he bottom-line impact that
6  you care most about is what happens to the standard errors
7  because  hat is the bottom-line concern.  That's why I
8  think that's  he most direct and easiest to understand
9  approach.
10      Q.  And so going back to  he condition number, you
11  didn't use a condition number to check whether there was
12  high collinearity between variables that you added and
13  variables already in the model; correct?
14      A.  I did not specifically do  hat.
15      Q.  Let's assume that the variables  hat you added
16  are highly collinear with  he model in Professor Noll's
17  model.  If  hat's true, what is the added value of
18  including them?
19      A.  Well, you can see it – in terms of explanatory
20  power, you can see it in the results on  he table.  And we
21  talk about  his in the report.  I mean, if you look at  he
22  fraction of  he remaining variance that's explained, you
23  could compare, for example, you know, column – column one
24  and column two.  You can see  hat adding those
25  characteristics explain almost half of  he remaining

1  variance, which is the standard one generally uses when
2  hinking about adding variables.
3          If you're worried about collinearity, you
4  realize  hat, for example, in JT-6a  hat actually the
5  standard error, the precision wi h which according to
6  Professor Noll's analysis you can estimate  he iTunes 7
7  coefficient actually is improved, not reduced.  So the
8  problem you're worried about under collinearity of making
9  it much more difficult to identify the existing variables,
10  at least as far as it goes for Professor Noll's iTunes 7
11  variable, doesn't happen.
12      Q.  So is it your opinion  hat all of  he
13  added value of adding  hese variables is reflected in the
14  regression output that's in your tables?  I guess what I'm
15  trying to get at is, is  here any hing else?  I mean, I
16  asked you, what is the added value of adding  hese
17  variables if there is collinearity, and you responded by
18  pointing to the regression output.  Other than the
19  regression output, can you identify for me any added value
20  of adding variables to your regression?
21      A.  I think  hat –
22      MR. KIERNAN:  Objection; argumentative and to
23  he extent it misstates his prior testimony.
24      THE WITNESS:  I think there is some added value
25  hat's also – it is reflected in the tables, but I would

1  say something we haven't talked about yet is that adding
2  hose coefficients makes a substantial difference to his
3  estimated coefficients, for example –
4          (Reporter clarification.)
5      A.  Adding  hose variables has a substantial effect
6  on his estimated coefficients, which underscores what we
7  have talked about numerous times, which is his problem or
8  potential problem with omitted variables.  These are just
9  some potential variables you could think about bringing
10  in  he analysis, and just including  hese made a
11  dramatic difference to his results.
12  BY MS. SWEENEY:
13      Q.  Are you suggesting that  here are o her
14  variables  hat you could add to the regression?
15      A.  I don't know if  hey are ones that we have, but
16  it makes the point that his analysis is sensitive to  he
17  existence of omitted variables and you, you know, I don't
18  think – we kind of know we don't have everything that
19  would determine pricing, and  hat makes us worried that
20  o her variables could cause his coefficients to change
21  even more.
22      Q.  So if you add variables to your regression that
23  are highly collinear with variables that are already in
24  the model, can one effect be to reduce the reliability of
25  the model?

Volume II
Kevin Murphy, Ph.D.

**Confidential - Attorneys' Eyes Only**

The Apple iPod iTunes Anti-Trust Litigation

Page 301

1      MR. KIERNAN:  Object to form.  Vague.
2      THE WITNESS:  If in fact they were highly
3  collinear, you could have hat problem, but generally hat
4  will be reflected in he standard errors, and he impact
5  it has is going to depend on the other variable you're
6  concerned about.  If I introduce a variable hat's highly
7  correlated with variable A, but it's not highly correlated
8  in a multi-varied sense with variable B, it may affect the
9  precision which I can affect – estimate the coefficient
10  on A, but it may not have much effect at all –
11      (Reporter clarification.)
12      A.  – the precision with which I can estimate he
13  coefficient on the variable where it has a strong
14  relationship, but often won't have an impact on my
15  precision of estimating the other variable.  And so you
16  don't want to like have this blanket statement across the
17  regression.
18      And what's key here is hat the precision wi h
19  which I can estimate the iTunes 7 variable, which is I
20  think he primary variable of interest here, is not
21  reduced substantially by and in some cases actually
22  increased by adding these additional variables.
23  BY MS. SWEENEY:
24      Q.  So looking at Exhibit JT-1a, which is the –
25  this reflects at least in the right-hand columns when you

Page 302

1  added in  he additional characteristics; correct?
2      A.  Yes.
3      Q.  And did you do any analysis whereby you just
4  added these additional variables one at a time?  Is that
5  reflected anywhere in your report or in his exhibits?
6      MR. KIERNAN:  Object to form.
7      THE WITNESS:  It's not reflected in he
8  exhibits.  I don't recall whether we did that or not.
9  BY MS. SWEENEY:
10      Q.  I had – let's see.  Strike that.
11      You talk in your report about additional
12  characteristics that you have added having joint
13  significance.  What do you mean by that?
14      A.  That is, you're asking how much do they add to
15  the explanatory power on a combined basis, not on a
16  one-off basis.  You're asking – joint significance says
17  formally if you're thinking about a statistical test,
18  you're testing he hypo hesis that the coefficients on all
19  the variables are zero, hat he true model is zero
20  coefficient on all he variables.  You're not testing
21  whether any one of them is zero.  You're testing whe her
22  they are all jointly equal to zero.  That's the hypothesis
23  being tested in that joint test.
24      Q.  Can you have joint significance in a regression
25  that also exhibits high multicollinearity?

Page 303

1      MR. KIERNAN:  Object to form.  Vague.
2      THE WITNESS:  You could in principle, but he
3  evidences in this case is there isn't high degree of
4  multicollinearity between  hat and the o her variables of
5  interest in  his regression, which is what really matters
6  for  he purpose of our analysis.
7  BY MS. SWEENEY:
8      Q.  Is here high collinearity between  hat and
9  variables other than the variables of interest?
10      MR. KIERNAN:  Object to form.
11      THE WITNESS:  I don't know about high.  I –
12  there – here are going to be varying degrees to which
13  they are correlated wi h o her variables in  he
14  regression.  But he impact of  hat is primarily going to
15  be on he coefficients of  hose variables, not on he
16  coefficients of the variables  hat continue to have
17  substantial amounts of independent variation.
18  BY MS. SWEENEY:
19      Q.  You say in your report that  he additional
20  characteristics that you've added,  he additional
21  variables, increases  he R-squared of  he regressions.
22  Can a regression  hat exhibits high multicollinearity have
23  a high R-squared?
24      MR. KIERNAN:  Object to form.  Vague.
25      THE WITNESS:  Yeah, you could have a high

Page 304

1  R-squared with high multicollinearity, but if they were
2  really – but  hat's kind of lke orthogonal to what we
3  are talking about here.  The key here is that adding hese
4  variables added to the explanatory power of the regression
5  substantially.  In  he limit if these things were just
6  multicollinearity with what you already had,  hey wouldn't
7  add any hing.  And they are not reducing the precision
8  wi h which I can estimate  he other coefficients.
9  That's – and particularly the coefficient of interest.
10  That's the key question about whether you have an issue
11  here wi h multicollinearity.
12  BY MS. SWEENEY:
13      Q.  Did you look at the extent to which  he
14  additional characteristics that you added are correlated
15  with particular iPod models or families?
16      MR. KIERNAN:  Object to form.
17      THE WITNESS:  My suspicion is they would be
18  correlated.  In some sense that's why you're controlling
19  for them.  One of the major reasons you control for
20  variables is  hat they are correlated wi h o her aspects
21  of the model you have.
22  BY MS. SWEENEY:
23      Q.  And in some cases isn't it true that some of
24  these characteristics are probably 100 percent correlated
25  with a particular iPod model?

http://www.yeslaw.net/help

**Page 301..304**

EXHIBIT 54

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

APPLE IPOD ITUNES
ANTITRUST LITIGATION

Lead Case No. C-05-00037-YGR

DECLARATION OF JEFFREY M. WOOLDRIDGE IN SUPPORT OF PLAINTIFF'S DAUBERT MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF ROBERT H. TOPEL AND KEVIN M. MURPHY

## 1. Introduction

My name is Jeffrey M. Wooldridge. I am a University Distinguished Professor of Economics at Michigan State University (MSU), where I have taught since 1991. My first academic appointment was as an assistant professor in the economics department at the Massachusetts Institute of Technology, where I taught from 1986 to 1991.

## 2. Qualifications

I received bachelor's degrees in computer science and economics from the University of California, Berkeley, in 1982, and I received my doctorate in economics from the University of California, San Diego, in 1986. I am trained as an econometrician and have taught and done research on econometric methods for almost 30 years. One of my areas of expertise is problems associated with nonrandom sampling, including missing data, stratified sampling, and cluster sampling. I have written several articles about these subjects, and have given many lectures and short courses on approaches to handling nonrandom samples. I have written two popular textbooks in econometrics, an introductory book and a graduate-level text, *Econometric Analysis of Cross Section and Panel Data Methods* (2010, MIT Press, 2e). I use my MIT Press book for a

CONFIDENTIAL – ATTORNEYS EYES ONLY

year-long course in microeconometric methods for second-year Ph.D. students, and I have based several short summer school courses on the contents of the book.

I am a Fellow of the *Econometric Society* and of the *Journal of Econometrics*. I have served on several editorial boards, including as editor of the *Journal of Business and Economic Statistics* from 1998 to 2000, as co-editor of *Econometric Theory* from 2003 to 2005, and as econometrics co-editor of *Economics Letters* from 1995 to 1998.

I have served as an econometrics consultant several times, including work for Charles Rivers Associates when I taught at MIT, Arthur Andersen, Deloitte Consulting, and, currently, for Industrial Economics, Inc, on a damage assessment project for the National Oceanic and Atmospheric Administration.

Other evidence of my qualifications as an expert in econometrics generally and on sampling issues specifically is given in my curriculum vita, which is included as Appendix A.

## 2. Assignment

I have been asked by the attorneys for the plaintiffs in this litigation to evaluate and reconcile differing claims about the proper calculation of standard errors in separate expert reports written by three economists, Roger G. Noll (for the plaintiffs), Kevin M. Murphy (for the defendant), and Robert H. Topel (for the defendant). In separate reports, Professors Murphy and Topel criticize the statistical inference in Professor Noll's hedonic regression analysis for not properly accounting for cluster correlation when computing standard errors for the regression coefficients – and, in particular, the standard errors for the coefficients used to estimate damages. In what follows I restrict my comments to issues associated with computing proper standard errors and do not discuss model specification. In the remainder of this declaration I describe the

CONFIDENTIAL – ATTORNEYS EYES ONLY

clustering problem somewhat generally and determine whether and how the standard errors

should be adjusted for cluster correlation in Professor Noll's regressions.

## 3. When is a Sample a Cluster Sample?

The simplest example of a cluster sample is when individual units are grouped, a priori,

into clusters, and those clusters are sampled from a population of clusters. After the clusters have

been chosen, sampling within the clusters may occur to obtain a subset of units, but the

substantive problem for computing standard errors is created when the clusters are originally

chosen. An example is when elementary schools in a state are sampled from the population of all

elementary schools in the state. After the schools have been drawn, data are collected for the

individual students – say, test scores and class sizes. If we wish to study the effects of class size

on test scores then we need to address the fact that student outcomes within a school are likely to

be influenced by common factors determined at the school level, such as (unmeasured) teacher

or principal quality. There are a couple of appropriate responses in such settings. One is to

include school "fixed effects" in the regression as a way of eliminating the cluster correlation

(and also allowing the policy variable, class size, to be systematically different across schools).

Or, one may compute standard errors that allow for correlation in the errors within a school. As I

argue in Wooldridge (2003), in some cases one may want to try both solutions at the same time.

A common misunderstanding with cluster sampling is that a clustering problem arises if

individual units that have been randomly sampled from the population are identified, ex post, as

belonging to certain groups, which are then turned into clusters. For example, suppose a random

sample of fourth-grade students is taken from the state of Michigan, and test scores and family

background variables are collected. A school identifier for each student is also included in the

data set. It would not be uncommon to sort the resulting data set so that students from the same

CONFIDENTIAL – ATTORNEYS EYES ONLY

school are in adjacent rows in the data set. Such a data set, which was obtained via random sampling, is indistinguishable *in appearance* from a data set that was obtained by first sampling schools and then obtaining a sample of students within each sampled school. But the resemblance is superficial: When applying statistical methods, the latter requires the use of methods for cluster samples while the former does not.

A simple logical exercise demonstrates that ex post grouping of a randomly drawn sample cannot cause a clustering problem when it comes to statistical inference. After all, each randomly drawn student is also associated with a school district. If we include a school district identifier should we then treat the district as the cluster? In Michigan, groups of school districts form what are known as intermediate school districts (ISDs). Is the ISD now the appropriate level of clustering? We can keep going. Each ISD is either in the lower or upper peninsula of Michigan. Does this mean we only have two independent clusters? Taking the argument to its extreme, each student lives in the state of Michigan. Is it appropriate to think we have only a single cluster, in which case no statistical inference is possible? The final perspective is clearly preposterous, but by getting to it we see that viewing the data as a cluster sample at any level of aggregation is incorrect. If we started with a random sample then we can and should analyze the data using basic tools of statistics and econometrics based on random sampling. How we might choose to group the students ex post is irrelevant provided the variables we use in our analysis are collected as part of the random sampling scheme.

I will show in the next section that the clustering exercise undertaken by Professors Murphy and Topel fits into the framework of ex post clustering, and is therefore an inappropriate and unreliable application of clustering.

4

CONFIDENTIAL – ATTORNEYS EYES ONLY

It is important to know that computing so-called "cluster-robust" standard errors is not harmless when the data have come from a random sample. (The same comment holds when the sample is the population, a point that follows from the discussion in Section 5.) Clustering can produce standard errors that are vastly inflated compared with the true precision of the estimates. In other words, estimates that are properly deemed to be statistically significant when the correct standard errors are used can be statistically insignificant when "cluster-robust" standard errors are used. Empirical researchers sometimes fall into the trap of thinking conservative inference is somehow preferred, but that is incorrect when appropriate methods of inference are available that are not conservative. If we are interested in estimating the effect of an intervention we want our confidence intervals to be as reliable as possible.

A separate problem with clustering is that, even when it is legitimate – so that the data have actually been collected by sampling clusters – we need enough clusters that are relatively small in order to justify the large-sample approximations. Hansen (2007) shows that when applied to true cluster samples one should have a reasonably large number of clusters without very large cluster sizes. See also the discussion in Donald and Lang (2007) and Wooldridge (2003). Hansen's simulations show that clustered standard errors perform reasonably well with 50 clusters and 20 observations per cluster. But clustered standard errors are not justified with, say, 10 clusters and 200 observations per cluster. The higher is the ratio of observations per cluster to number of clusters, the more poorly clustered standard errors behave. Generally, it is difficult to know how well clustering approximates the true sampling error when the number of clusters is small and cluster sizes are large. The resulting "cluster-robust" standard errors can be very misleading as estimates of statistical precision. As I discuss in Section 4, Murphy and Topel

5

use clustering in a setting where the cluster sizes are much larger than the number of clusters. This is a second reason why their analysis is invalid.

There is a final, important point that needs to be emphasized before turning specifically to Professor Noll's analysis and the critiques by Professors Murphy and Topel. Namely, it is inappropriate to use the amount of variation in either the explanatory variables or the response variable across subgroups of the population as a guide for whether a data set constitutes a cluster sample. Clustering is a property of how the data are collected and has nothing to do with how much variation there is in the underlying population variable or variables. For example, suppose we are interested in testing whether a chain of fast-food restaurants practices price discrimination across two different kinds of neighborhoods – say "poor" and "not poor." We randomly sample transactions at fast food restaurants and obtain a sample of prices of purchased items. When we sample a transaction, we observe the item bought (say, a medium soda), its price, and the kind of neighborhood (poor or not poor). Particularly if the transactions data are collected over a narrow time interval the price variation for a particular item in a particular geographic region may be small. In fact, many of the transactions would have identical prices for identical menu items – for example, small, medium, and large sodas. This does not mean that those three groups of sodas should be treated as three clusters. In fact, this would be a bad idea for the two reasons discussed above: (i) The ex post clustering of the data creates the illusion of a cluster sampling problem where none exists, seriously understating the amount of independent information we have on prices. (ii) The standard errors obtained using three clusters, probably with several hundred or thousand observations within each cluster, have no statistical justification and are for all practical purposes worthless. On the other hand, computing the average prices for each item and obtaining

6

standard errors under random sampling is appropriate, and standard comparison-of-means tests across poor and non-poor neighborhoods is entirely appropriate.

In this example, it would also be inappropriate to treat "poor" and "not poor" as two clusters, in which case no statistical inference concerning the difference in means would be possible because we could not even compute a standard error. [See, for example, Wooldridge (2003).] It is also inappropriate to use, say, census blocks as clusters. If the transactions have been randomly sampled from the population of all transactions then the data should be analyzed using standard statistical methods for random sampling.

**4. Clustering in Professor Noll's Hedonic Regressions**

I now turn to an evaluation of the claims made by Professors Noll, Murphy, and Topel concerning the proper computation of standard errors using the transactions data for Apple iPods. In determining whether clustering is needed, it is important to understand a couple of features of the data. First, as explained by Professor Noll (rebuttal, 11/25/13), the data on transactions – apart from dropping some records with missing data or outliers in prices – effectively represents the entire population of transactions. Under a scenario that I describe in Section 5 – which views the prices as counterfactual outcomes under different "treatment" regimes (before Harmony was blocked and after it was blocked) – the standard errors computed as if the sample is random are at least conservative. Therefore, if one is satisfied with conservative inference, one need not worry about corrections that are sometimes used when the sample and population coincide.

A more important issue is the appropriate unit of observation. In Professor Noll's rebuttal (page 19), he describes computing the average price of iPod units included in a particular shipment by dividing total revenue by the number of units – a sensible approach and the only option that seems available. As Professor Noll makes clear in his rebuttal (page 19), he treats

CONFIDENTIAL – ATTORNEYS EYES ONLY

each transaction as a separate observation, which is appropriate. Professor Noll does *not* create a separate observation for each iPod unit in a particular shipment. On page 48, paragraph 94 of the *Murphy Report*, Professor Murphy writes, "He (Professor Noll) then assigns this price to every one of the 18,480 iPod Nanos in this single transaction, and his regression analysis treats each one of them as providing an independent price observation." Based on my understanding of the econometrics used by Professor Noll in his rebuttal report, Professor Murphy's assertion is no longer relevant. In the analysis that forms the basis for his rebuttal report, Professor Noll did not expand each transaction into an observation for each iPod unit sold. Professor Noll *does* use quantity weights that account for the number of units in each transaction and, strictly speaking, these are the optimal weights for weighted least squares only when the unit-specific equations have independent errors. However, as I have emphasized in my introductory textbook (Wooldridge, 2013, pages 290-292), the weighted least squares standard errors can be made robust to allow for the use of non-optimal weights. The same point is discussed, in the context of sampling, in Solon, Haider, and Wooldridge (forthcoming). Professor Noll properly uses the robust standard errors. But the more important point is that Professor Noll properly uses each transaction as the unit of observation. There is no clustering problem introduced in Professor Noll's rebuttal report by expanding a transaction into several hundred or thousand observations on individual iPod units.

If one properly views a transaction as a unit of observation, as is done by Professor Noll, the data need not be treated as a cluster sample. In particular, the clustering procedure suggested by Professors Murphy and Topel, which is to cluster the data at the product family/quarter level, is inappropriate. With each shipment there is a new draw of characteristics of the units shipped, quantity, and average price, and it is appropriate to treat these as independent pieces of

CONFIDENTIAL – ATTORNEYS EYES ONLY

information. By contrast, Professors Murphy and Topel make the mistake described in Section 3. Namely, they use an ex post clustering based on characteristics of the shipments – product family and time period. In his report, Murphy writes, "There are standard techniques that allow for clustering in the calculation of regression standard errors. If it were the case that clustering is unimportant, as assumed by Professor Noll, he could have employed these techniques to demonstrate that accounting for clusters does not affect his results" (page 51). Professor Murphy makes the mistake of assuming that clustering in the context of Professor Noll's analysis at the product family/quarter level is statistically valid. For the two reasons I explained in Section 3, clustering is not valid, and likely to produce inference that is much too conservative: (i) The clustering of the data by product family/quarter is done ex post, artificially creating cluster correlation and unnecessarily producing conservative sampling variances. (ii) The number of observations per cluster swamps the number of clusters, rendering the cluster standard errors useless, even if we accepted the idea that clustering is needed in the first place (which I do not).

It may help to cover a simple case to further see the key difference between what is the correct standard error calculation used by Professor Noll and the incorrect calculation by Professors Murphy and Topel. Suppose there is only one iPod model with a fixed set of characteristics. We obtain transaction records for this model both before and after Harmony was blocked. For each transaction we obtain a price per iPod unit sold, and then compute the average price within the two groups. A valid standard error and $t$ statistic is obtained by treating the transactions as independent draws – the approach used by Professor Noll. In this case, if we treat the product class as a cluster, as suggested by Murphy and Topel, we cannot even compute a standard error: the observations within the control and treatment groups are allowed to be arbitrarily correlated. Wooldridge (2003) discusses essentially this same example, and points out

CONFIDENTIAL – ATTORNEYS EYES ONLY

that, if one follows the Murphy and Topel view, the staple of introductory statistics and basic policy analysis with random interventions, a simple comparison of means, cannot be carried out.

With more product classes and multiple time periods then, technically, one can compute clustered standard errors at the product family/quarter level – as is done in the *Murphy Report* and the *Topel Report*. But it should not be done because it produces very unreliable standard errors.

## 5. Inference when the Sample is the Population

Professor Noll comments in his rebuttal (page 10) that he is using the entire population of transactions, and therefore there can be no cluster sampling problem because there is no sampling. I agree with this assessment. As discussed by Professor Noll, his analysis of the transactions data is essentially an event study, or an intervention analysis. Thus, it is important to ask: At what level is the intervention? In my view, it is at the transaction level, and that is the approach taken by Professor Noll.

If we observe the entire population of shipments, how can one meaningfully introduce sampling uncertainty into the estimates? After all, if we can compute a price for every transaction in the population, we can compute the differences in average prices among various product family/time period groups without error.

One possibility, which fits well with intervention analysis, is to view the prices we observe as only one possible set of prices from a set of counterfactual prices. Consider a simple example, where there is only a single product (a particular iPod with a given set of features) and a single intervention (Harmony is blocked). Then we can view each shipment $i$ in the population as having two potential prices, $p_i(0)$ and $p_i(1)$. The first of these is the price in the regime where Harmony is not blocked, and the second is in the regime where Harmony is blocked. The

CONFIDENTIAL – ATTORNEYS EYES ONLY

goal is to estimate the so-called average treatment effect – see, for example, Imbens and

Wooldridge (2009) – here defined as

$$\tau = N^{-1} \sum_{i=1}^{N} [\, p_i\,(1) - p_i\,(0)],\qquad\qquad(1)$$

where $N$ is the size of the population. The counterfactual nature of the thought experiment is

crucial, as we observe only one of $p_i\,(0)$ and $p_i\,(1)$. Which price we observe depends on the

intervention status for transaction $i$, which we denote using a binary (dummy) variable $X_i$. This

variable is equal to zero for transactions observed when Harmony is not blocked and equal to one

when Harmony is blocked. The observed price is then a random variable, and can be written as

$$P_i = (1 - X_i)p_i\,(0) + X_i p_i\,(1)\qquad\qquad(2)$$

$P_i$ is random because $X_i$ is random.

Assume that $X_i$ is assigned independent of the counterfactual prices – this is called the

"unconfoundedness" assumption in the treatment effects literature (see Imbens and Wooldridge,

2009). The standard estimator of $\tau$ is the difference in the sample averages between the "treated"

and "control" groups, which we denote

$$\hat{\tau} = \bar{P}_1 - \bar{P}_0.\qquad\qquad(3)$$

This is an unbiased estimator of $\tau$ when the unconfoundedness assumption holds. For the

purposes of statistical inference, it can be shown that the variance of the estimator, conditional

on the number of treated units, $N_1$, is

$$Var(\hat{\tau}\,|\,N_1) = \frac{\sigma_1^2}{N_1} + \frac{\sigma_0^2}{N_0} - \frac{\sigma_{0,1}^2}{N},\qquad\qquad(4)$$

where $N_0 = N - N_1$ is the number of control units, $\sigma_1^2 = (N-1)^{-1}\sum_{i=1}^{N}[p_i\,(1) - \mu_1]^2$ is the

population variance of the $p_i\,(1)$, $\sigma_0^2$ is the population variance of the $p_i\,(0)$, and $\sigma_{0,1}^2$ is the

population variance of the treatment effects, $p_i\,(1) - p_i\,(0)$. The first two terms in equation (4)

comprise the usual expression, which can be found in introductory texts on mathematical

CONFIDENTIAL – ATTORNEYS EYES ONLY

statistics, for the variance of the difference in means when obtaining random samples from a large population. The last term is a correction that results from having access to the entire population. When the treatment effect is constant, so that $p_i(1) - p_i(0) = \tau$ for all $i$, the last term is zero, and the usual variance formula obtained under random sampling holds when we observe the entire population. In general, the usual formula is actually conservative. An important implication is that the reported standard errors actually overstate the sampling variation in $\hat{\tau}$, resulting in conservative inference: If one finds statistical significance using the usual standard errors then the estimates would be significant if one accounted for the final term in (4).

The analysis for multiple regression is more complicated but the findings are similar: using the usual heteroskedasticity-robust variance matrix estimator is at least conservative. Professor Noll uses the heteroskedasticity-robust variance matrix estimator and so his inference is appropriate.

The previous discussion also has relevance for the cluster sampling issue. Because, hypothetically, each transaction could have been in multiple states of the world – different time periods, different models shipped, before and after Harmony was blocked – it makes sense to view the intervention for each transaction as an independent assignment. Therefore, there can be no cluster sampling issue in the setting analyzed by Professor Noll. On the other hand, if we sampled an entire population of clusters – such as all elementary schools in a particular state – in order to evaluate a school-level intervention, then we should treat each school as its own cluster of individual students. The conclusion would be that the usual cluster-sample inference obtained for sampling clusters from a large population results in conservative inference. But this is a different setting than the one studied by Professor Noll.

CONFIDENTIAL – ATTORNEYS EYES ONLY

**6. Summary**

(i) Clustering is inappropriate where, as here, the regressions use the entire population of transactions.  There can be no cluster sampling problem because there is no sampling.

(ii) Professor Noll's use of heteroskedasticity-robust standard errors is appropriate. By contrast, Professors Murphy and Topel, who suggest clustering at the family product/quarter level, are guilty of ex post clustering. Their standard error calculations are much too imprecise.

(iii) Computing "cluster-robust" standard errors where, as here, clustering is not appropriate, is not harmless.  Clustering can produce standard errors that are vastly inflated compared with the true precision of the estimates.

I declare that the foregoing is true to the best of my knowledge and belief.



_____
Jeffrey M. Wooldridge

Executed at Mason, Michigan, December 20, 2013

CONFIDENTIAL – ATTORNEYS EYES ONLY

# References

Donald, S.G. and K. Lang (2007), "Inference with Difference-in-Differences and Other Panel Data," *Review of Economics and Statistics* 89, 221-233.

Hansen, C.B. (2007), "Asymptotic Properties of a Robust Variance Matrix Estimator for Panel Data when T is Large," Journal of Econometrics 141, 597-620.

Imbens, G.W. and J.M. Wooldridge (2009), "Recent Developments in the Econometrics of Program Evaluation." *Journal of Economic Literature* 47, 5–86.

Solon, G., S.J. Haider, and J.M. Wooldridge (forthcoming), "What Are We Weighting For?" *Journal of Human Resources*.

Wooldridge, J.M. (2003), "Cluster-Sample Methods in Applied Econometrics," *American Economic Review* 93, 133-138.

Wooldridge, J.M. (2010), *Econometric Analysis of Cross Section and Panel Data*, second edition. Cambridge, MA:  MIT Press.

CONFIDENTIAL – ATTORNEYS EYES ONLY

# Appendix A

## CURRICULUM VITAE

## JEFFREY M. WOOLDRIDGE

Office Address:  Department of Economics
Michigan State University
110 Marshall-Adams Hall
East Lansing, MI  48824-1038
Phone: 517-353-5972
Fax: 517-432-1068
E-mail: wooldri1@msu.edu

## 1. ACADEMIC POSITIONS HELD

University Distinguished Professor of Economics, Michigan State University: July 1, 2001 to present.

Co-Director, Economics of Education Specialization, Michigan State University: July 2009 to present.

Professor of Economics, Michigan State University: July 1, 1993 to June 30, 2001.

Associate Professor of Economics, Michigan State University: September 1, 1991 to June 30, 1993.

Assistant Professor of Economics, Massachusetts Institute of Technology: June 1, 1986 to June 30, 1991.

## 2. ACADEMIC BACKGROUND

Ph.D., Economics, University of California, San Diego, 1986

B.A., Computer Science, B.A., Economics, University of California, Berkeley, 1982 (With High Distinction in General Scholarship)

## 3. TEACHING

Graduate:  Linear Models, Nonlinear Econometrics, Cross Section and Panel Data Econometrics, Applied Econometrics, Mathematical Statistics, Mathematics for Economics

Undergraduate:  Econometrics, Applied Econometrics, Statistics

15

CONFIDENTIAL – ATTORNEYS EYES ONLY

## 4. SOCIETY MEMBERSHIPS

American Economic Association
American Statistical Association
Econometric Society
Midwest Economics Association

## 5. EDITORIAL BOARDS

Co-Editor, *Journal of Econometric Methods*, 2010 to present.

Editorial Board, *Journal of Economic Literature*, 2004 to 2010.

Co-Editor, *Econometric Theory*, 2003 to 2005.

Advisory Editor, the *Palgrave Handbook of Econometrics*, 2004-2005.

Editor, *Journal of Business and Economic Statistics*, 1998 to 2000.

Co-Editor, *Economics Letters*, 1995 to 1998.

Associate Editor, *Stata Journal*, 2002 to present.

Associate Editor, *Journal of Business and Economic Statistics*, 1995 to 1997.

Associate Editor, *Journal of Econometrics*, 1995 to 1997; 2001 to 2005.

Associate Editor, *Review of Economics and Statistics*, 1993 to 1997.

## 6. AWARDS AND HONORS

President, Midwest Economics Association, 2010-2011.

Fellow, Institute for the Study of Labor (IZA), Bonn, Germany, elected 2009.

President-elect, Midwest Economics Association, 2009-2010.

First Vice President, Midwest Economics Association, 2005-2006.

Fellow of the Econometric Society, elected 2002.

Plura Scripsit Award, *Econometric Theory*, elected 2001.

Benjamin Meaker Visiting Professorship, University of Bristol, England, July 2000.

16

Richard Stone Prize for "Econometric Methods for Fractional Response Variables with an Application to 401(k) Plan Participation Rates" (with Leslie E. Papke), *Journal of Applied Econometrics*, 1998. (Best paper in two volumes.)

Multa Scripsit Award, *Econometric Theory*, elected 1997.

*Journal of Econometrics* Fellow, elected November 1995.

Alfred P. Sloan Research Fellow, 1991-1994.

Teacher of the Year Award, Graduate Economics Association, MIT, 1991-1992.

Teacher of the Year Award, Graduate Economics Association, MIT, 1990-1991.

Teacher of the Year Award, Graduate Economics Association, MIT, 1988-1989.

Alfred P. Sloan Doctoral Dissertation Fellowship, 1985-1986.

Sea Grant Predoctoral Traineeship, 1983.

Regents Fellowship, University of California, 1982-1984.

## 7. PROFESSIONAL

Econometric Society Fellows Nominating Committee, 2006.

Scientific Committee, International Panel Data Conference, 2006, 2009, 2011, 2012.

Advisory Panel, National Science Foundation, Mathematical Social and Behavioral Sciences Competition, Arlington, VA, May 2005.

Occasional Consultant, Industrial Economics, Inc.

Occasional Consultant, Stratus Consulting

Occasional Consultant, Deloitte Consulting

Occasional Consultant, Washington State Institute for Public Policy

Occasional Consultant, Arthur Andersen, Chicago, Illinois, 1995 to 2001

Occasional Consultant, Charles River Associates, Boston, Massachusetts, 1987 to 1996

CONFIDENTIAL – ATTORNEYS EYES ONLY

## 8. PRESENTATIONS AT MEETINGS

Invited Speaker, Mainz Econometrics Workshop, "Control Function Methods in Applied Econometrics," Mainz, Germany, August 2013.

Invited Speaker, Sydney Econometric Theory Workshop: "Quasi-Maximum Likelihood Estimation and Testing for Nonlinear Models with Endogenous Explanatory Variables," Sydney, Australia, July 2012.

A.W. Phillips Lecture, Econometric Society Australasian Meeting, "Nonlinear Panel Data Models with Heterogeneity and Endogeneity," Melbourne, Australia, July 2012.

Invited Speaker, Stata Conference: "Fractional Response Models with Endogenous Explanatory Variables and Heterogeneity," Chicago, IL, July 2011.

Invited Speaker, Causality, Prediction, and Specification Analysis: Recent Advances and Future Directions – A Conference in Honore of Halbert L. White, Jr.: "Quasi-Maximum Likelihood Estimation and Testing for Nonlinear Models with Endogenous Explanatory Variables," La Jolla, CA, May 2011.

Presidential Address, Midwest Economics Association: "Thoughts on Heterogeneity in Econometric Models," St. Louis, MO, March 2011.

Keynote Speaker, Health Econometrics Workshop: "Correlated Random Effects Models with Unbalanced Panels," Ann Arbor, MI, October 2010.

Invited Speaker, 15th Conference on Panel Data: "Nonlinear Correlated Random Effects Models with Unbalanced Panels," Bonn, Germany, July 2009.

Invited Speaker, Canadian Econometrics Study Group: "Nonlinear Dynamic Panel Data Models with Unobserved Effects," Montréal, Quebec, September 2008.

"Nonparametric and Semiparametric Estimation of Partial Effects for Nonlinear Panel Data Models," Workshop on Nonparametric/Semiparametric Econometric Methods, Carleton University, Ottawa, Ontario, September 2008.

Invited Speaker, Summer North American Stata Users Group: "Inference for Partial Effects in Nonlinear Panel Data Models using Stata," Chicago, IL, July 2008.

Featured Speaker, National Value-Added Modeling Conference: "Some Econometric Considerations for Value-Added Modeling," Madison WI, April 2008.

"Estimating Average Treatment Effects with Continuous and Discrete Covariates: The Case of Swan-Ganz Catheterization," Winter Meetings of the American Economic Association, New Orleans, January 2008.

CONFIDENTIAL – ATTORNEYS EYES ONLY

Panel Member, "How to Mentor Junior Economists," Winter Meetings of the American Economic Association, New Orleans, January 2008.

"Panel Data Methods for Fractional Response Variables with an Application to Test Pass Rates" (with L.E. Papke), Conference on *The Use of Econometrics in Informing Public Policy Makers*, Rice University, April 2006.

Panel Member, Midwest Economics Association, Chicago, March 2006: "Teaching Econometrics."

Discussant, Midwest Economics Association, Chicago, March 2006: "Applied Time Series."

Discussant, Winter Meetings of the Econometric Society, Philadelphia, January 2005: "Causal Inference and Matching."

"Inverse Probability Weighted M-Estimators for General Missing Data Problems," Texas Camp Econometrics, Fort Worth, TX, February 2004.

"On the Robustness of Fixed Effects and Related Estimators in Correlated Random Coefficient Panel Data Models," Midwest Econometrics Group, Columbia, MO, October 2003.

"Cluster-Sample Methods in Applied Econometrics," Winter Meetings of the American Economic Association," Washington, DC, January 2003.

Discussant, Winter Meetings of the Econometric Society, Washington, DC, January 2003: "Difference-in-Differences and Panel Data Estimation."

"Inverse Probability Weighted M-Estimators for Sample Selection, Attrition, and Stratification," CeMMAP Microeconometrics Workshop, London, February 2002.

"Inverse Probability Weighted M-Estimators for Sample Selection, Attrition, and Stratification," Midwest Econometrics Group, Kansas City, October 2001.

"Unobserved Heterogeneity and Estimation of Average Partial Effects," National Science Foundation Symposium on *Identification and Inference for Econometric Models*, Berkeley, August 2001.

"Applications of Generalized Method of Moments Estimation," Winter Meetings of the American Economic Association," New Orleans, January 2001.

Discussant, Winter Meetings of the Econometric Society, New Orleans, January 2001: "Recent Advances in Nonlinear Time Series."

Invited Speaker, ESRC Econometric Study Group Conference, Bristol, England, July 2000: "The Initial Conditions Problem in Dynamic, Nonlinear Panel Data Models with Unobserved Heterogeneity."

CONFIDENTIAL – ATTORNEYS EYES ONLY

Discussant, Joint Statistical Meetings, Indianapolis, August 2000:  *Journal of Business and Economic Statistics* Invited Session.

Plenary Speaker, Research Triangle Econometrics Conference, December 1998:  "Estimating Average Partial Effects Under Conditional Moment Independence Assumptions."

Discussant, Winter Meetings of the Econometric Society, Chicago, January 1998:  "Panel Time Series" and "New Developments in Technical Econometrics."

"Selection Corrections with a Censored Selection Variable," Canadian Econometrics Study Group, Windsor, September 1994.

Discussant, Joint Statistical Meetings, Toronto, August 1994:  "Analysis of Data on Durations and Counts."

Discussant, Summer Meetings of the Econometric Society, Quebec City, June 1994:  "Panel Data Methods" and "Testing Using Nonparametric Methods."

Discussant, Winter Meetings of the Econometric Society, Anaheim, January 1993:  "Simulation and Semiparametric Methods" and "Estimation and Testing in Systems of Equations."

"Multiplicative Panel Data Models without the Strict Exogeneity Assumption," Midwest Econometrics Group, South Bend, IN, September 1991.

Discussant, Winter Meetings of the Econometric Society, Washington, DC, December 1990: "Semiparametric Methods," "Unit Roots and Cointegration:  Methodology," and "Specification Testing."

"Some Results on Specification Testing Against Nonparametric Alternatives," Summer Meetings of the Econometric Society, Ann Arbor, MI, July 1989.

Discussant, Summer Meetings of the Econometric Society, Ann Arbor, MI, July 1989: "Specification Tests."

"An Encompassing Approach to Conditional Mean Tests with Applications to Testing Nonnested Hypotheses," Winter Meetings of the Econometric Society, New York, December 1988.

Discussant, Summer Meetings of the Econometric Society, Minneapolis, July 1988:  "Time Series I."

"A Capital Asset Pricing Model with Time-Varying Covariances," World Congress of the Econometric Society, Cambridge, MA, August 1985.

CONFIDENTIAL – ATTORNEYS EYES ONLY

## 9. SEMINARS

"A Control Function Approach to Estimating Switching Regression Models with Endogenous Explanatory Variables and Endogenous Switching," MSU, 2013.

"Evaluating Specification Tests in the Context of Value-Added Estimation," Vanderbilt, 2012.

"Quasi-Maximum Likelihood Estimation and Testing for Nonlinear Models with Endogenous Explanatory Variables," EIEF, 2011. U.C. Riverside, University College London, 2012.

"Correlated Random Effects Models with Unbalanced Panels," MSU, 2009; Bank of Italy, 2011.

"Minimum Distance Estimation Using Pseudo Panel Data," MSU, Michigan, 2008.

"Panel Data Methods for Fractional Response Variables with an Application to Test Pass Rates": Harvard/MIT, British Columbia, 2007-2008.

"Inverse Probability Weighted Estimation for General Missing Data Problems": Berkeley, Harvard/MIT, Michigan, Montreal, Notre Dame, Ohio State, Penn State, Texas, 2002-2006.

"On the Robustness of Fixed Effects and Related Estimators in Correlated Random Coefficient Panel Data Models": Texas A&M, 2004.

"Unobserved Heterogeneity and Estimation of Average Partial Effects": UCLA, UCSD, 2003.

"Simple Solutions to the Initial Conditions Problem for Dynamic, Nonlinear Panel Data Models with Unobserved Effects": Michigan, 2002.

"Instrumental Variables Estimation of the Average Treatment Effect in the Correlated Random Coefficient Model": NYU, 2000.

"Inverse Probability Weighted M-Estimators for Sample Selection, Attrition, and Stratification": University College London, 2000.

"The Initial Conditions Problem for Dynamic, Nonlinear Panel Data Models with Unobserved Heterogeneity": Penn State, 2000.

"Estimating Average Partial Effects Under Conditional Moment Independence Assumptions": Princeton, Northwestern, Harvard/MIT, Chicago, Bristol, 1997-2000.

"Asymptotic Properties of Weighted M-Estimators for Variable Probability Samples": Michigan, Research Triangle Institute, 1996-1997.

"Selection Corrections with a Censored Selection Variable": Georgia State, Texas, Texas A&M, Arizona State, Montreal, Florida, Virginia, 1994-1996.

CONFIDENTIAL – ATTORNEYS EYES ONLY

"Selection Corrections for Panel Data Models Under Conditional Mean Independence Assumptions": Research Triangle Institute, UCSD, Ohio State, Harvard/MIT, 1992-1993.

"Multiplicative Panel Data Models without the Strict Exogeneity Assumption": Northwestern, Purdue, Texas A&M, Rice, Windsor, Wisconsin, 1991-1992.

"Distribution-Free Estimation of Some Nonlinear Panel Data Models": Yale, Harvard, Michigan, Michigan State, Northeastern, 1990-1991.

"Some Alternatives to the Box-Cox Regression Model": Boston College, Montreal, 1989.

"A Test for Functional Form Against Nonparametric Alternatives": Harvard, Berkeley, UCSD, UCSB, Pennsylvania, Rochester, 1989.

"On the Application of Robust, Regression-Based Diagnostics to Models of Conditional Means and Conditional Variances": Princeton, Johns Hopkins, Indiana, Illinois, Board of Governors of the Federal Reserve, Brown, 1988-1989.

"A Unified Approach to Robust, Regression-Based Specification Tests": Brandeis, Carnegie-Mellon, Queen's, Toronto, Johns Hopkins, Chicago Graduate School of Business, Northwestern, Cornell, UCSD, Penn State, Columbia, 1987-1988.

"Specification Testing and Quasi-Maximum Likelihood Estimation": Harvard, Yale, Johns Hopkins, 1986-1987.

## 10. LECTURES AND SHORT COURSES

University of Mainz Summer School, "New Developments in Panel Data Econometrics," Mainz, Germany, August 2013.

University of Crete Advanced Summer School in Economics and Econometrics, "Panel Data Econometrics and Treatment Effect Estimation," Crete, Greece, July/August 2013.

IZA European Summer School in Labor Economics, "Correlated Random Effects Panel Data Models," Buch/Ammersee, Germany  May 2013.

American Accounting Association Workshop, "Linear and Nonlinear Panel Data Models," Washington, DC, August 2012.

National Centre for Econometric Research, Queensland University of Technology, "Panel Data Econometrics," Brisbane, Australia, July 2012.

Programme Evaluation for Policy Analysis, Institute for Fiscal Studies, "Microeconometric Methods in Policy Evaluation," London, June 2012.

CONFIDENTIAL – ATTORNEYS EYES ONLY

Distinguished Visitor, "Control Function Methods in Econometrics," University of California, Riverside, May 2012.

American Economic Association, "Cross-Section Econometrics" (with Guido Imbens), Chicago, January 2012.

American Accounting Association (FARS Division), "Treatment Effect Estimation with Unconfounded Assignment," Chicago, January 2012.

LABOUR Lectures, EIEF, "Topics in Microeconometrics," Rome, October 2011.

CIDE Summer School in Econometrics, "Topics in Panel Data Econometrics," Bertinoro, Italy, June 2011.

Czech National Bank, "Topics in Panel Data Econometrics," Prague, May 2011.

Bonn Graduate School of Economics/IZA, "Treatment Effect Estimation and Selection Models," Bonn, Germany, July 2009.

Cemmap/University College London, "New Developments in Econometrics" (with Guido Imbens), London, June 2009.

Canadian Labour Market and Skills Researcher Network/Canadian Economics Association, "A Workshop in Applied Econometrics" (with Guido Imbens), Toronto, ON, May 2009.

International Monetary Fund, "Limited Dependent Variables," Washington, DC, April 2009.

American Economic Association, "Cross-Section Econometrics" (with Guido Imbens), San Francisco, CA, January 2009.

Federal Reserve Board, "A Course in Applied Econometrics," Washington, DC, September-October 2008.

Michigan State University Center for Statistical Training and Consulting, "Control Function and Related Methods," East Lansing, MI, October 2008.

Invited Speaker, Canadian Econometrics Study Group, "Nonlinear Dynamic Panel Data Models with Unobserved Effects," Montreal, QU, September 2008.

Carleton University Workshop on Robust Nonparametric Methods, "Semiparametric and Nonparametric Estimaton of Partial Effects in Nonlinear Panel Data Models," Ottawa, ON, September 2008.

Institute for Research on Poverty, University of Wisconsin, Madison, "A Course in Applied Microeconometrics" (with Guido Imbens), August 2008.

CONFIDENTIAL – ATTORNEYS EYES ONLY

Stata North American Users' Group, "Inference for Partial Effects in Nonlinear Panel Data Models using Stata," Chicago, IL, July 2008.

National Conference on Value-Added Modeling, "Some Econometric Considerations for Value-Added Modeling," Madison, WI, April 2008.

Michigan State University Center for Statistical Training and Consulting, "Regression and Propensity Score Methods for Treatment Effect Estimation and Policy Evaluation," East Lansing, MI, April 2008.

Michigan State University Department of Accounting, "Research Workshop on Selection Models," East Lansing, MI, April 2008.

Bureau of Economic Analysis/Federal Trade Commission, "A Course in Applied Microeconometrics" (with Guido Imbens), Washington, DC, January/February 2008.

National Bureau of Economic Research Summer Institute (with Guido Imbens), Cambridge MA: "What's New in Econometrics?" July/August 2007.

Invited Lecturer, University of Helsinki/MTT, "Econometric Methods with Censored Data," Helsinki, Finland, June 2007.

Michigan State University Center for Statistical Training and Consulting, "Propensity Score Methods for Treatment Effect Estimation and Policy Evaluation," East Lansing, MI, April 2007.

Michigan State University Center for Statistical Training and Consulting, "Binary Response Models for Longitudinal Data," East Lansing, MI, August 2006.

Invited Lecture, NIPE Summer School, University of Minho, "Topics in Program Evaluation," Minho, Portugal, June 2006.

Invited Lecturer, CIDE Summer School in Econometrics, "Topics in Panel Data Econometrics," Bertinoro, Italy, June 2005.

Mathematical Economics Forum, Wake Forest University: "Econometric Issues in Estimating Performance Effects of Spending in K-12 Schools," October 2004.

Invited Lecturer, Banco de Portugal, Lisbon: "Topics in Microeconometrics," June 2004.

Seminars on Analytical Methods, Statistics Canada, Ottawa, Ontario: "Cluster-Sample Methods in Applied Econometrics," April 2004.

XIVth Summer School of the European Economic Association, London: "Discrete Response Models," September 2003.

CONFIDENTIAL – ATTORNEYS EYES ONLY

Methods Workshop, Lister Hill Center for Health Policy, University of Alabama, Birmingham: "Cluster-Sample Methods in Applied Econometrics," March 2003.

Rodgers Clark Invited Lecturer, North Carolina State University: "Simple Solutions to the Initial Conditions Problem in Nonlinear, Dynamic Panel Data Models with Unobserved Effects," April 2002.

Invited Lecturer, Western Michigan University: "Estimation and Inference for Dependent Processes" and "Selection Corrections for Cross Section and Panel Data," February-March 1994.

Invited Lecturer, University of Pennsylvania: "Topics in Specification Testing," January 1991.

Invited Lecturer, Universidad Complutense de Madrid: "The Econometric Treatment of Nonstationary Time Series," November 1990.

## 11. BIBLIOGRAPHY

**Journal Articles**

"What Are We Weighting For?" (with G. Solon and S.J. Haider), forthcoming, *Journal of Human Resources*.

"Can Value-Added Measures of Teacher Performance be Trusted?" (with C.M. Guarino and M.D. Reckase), forthcoming, *Education Finance and Policy*.

"Quasi-Maximum Likelihood Estimation and Testing for Nonlinear Models with Endogenous Explanatory Variables," forthcoming, *Journal of Econometrics*.

"Estimation of Dynamic Panel Data Models with Sample Selection" (with A. Semykina), *Journal of Applied Econometrics* 28, 47-61, January/February 2013.

"Partial Maximum Likelihood Estimation of Spatial Probit Models" (with H. Wang and E.M. Iglesias), *Journal of Econometrics* 172, 77-89, January 2013.

"A Simple Method for Estimating Unconditional Heterogeneity Distributions in Correlated Random Effects Models," *Economics Letters* 113, 12-15, October 2011.

"Estimating Panel Data Models in the Presence of Endogeneity and Selection" (with A. Semykina), *Journal of Econometrics* 157, 375-380, August 2010.

"On Estimating Firm-Level Production Functions Using Proxy Variables to Control for Unobservables," *Economics Letters* 104, 112-114, September 2009.

CONFIDENTIAL – ATTORNEYS EYES ONLY

"Efficient Estimation of Average Treatment Effects with Mixed Categorical and Continuous Data" (with Q. Li and J.S. Racine), *Journal of Business and Economic Statistics* 27, 206-223, April 2009.

"Recent Developments in the Econometrics of Program Evaluation" (with G.W. Imbens), *Journal of Economic Literature* 47, 5–86, March 2009.

"Difference-in-Differences Estimation," *Quantile* 6, 25-46, March 2009. (In Russian.)

 "Panel Data Methods for Fractional Response Variables with an Application to Test Pass Rates" (with L.E. Papke), *Journal of Econometrics* 145, 121-133, July 2008.

"Estimating Average Treatment Effects with Continuous and Discrete Covariates: The Case of Swan-Ganz Catheterization" (with Q. Li and J.S. Racine), *American Economic Review* 98, 357-362, May 2008.

"Fixed Effects Instrumental Variables Estimation in Correlated Random Coefficient Panel Data Models" (with I. Murtazashvili), *Journal of Econometrics* 142, 539-552, January 2008.

"Inverse Probability Weighted M-Estimation for General Missing Data Problems," *Journal of Econometrics* 141, 1281-1301, December 2007.

"Violating Ignorability of Treatment by Controlling for Too Many Factors," *Econometric Theory* 21, 1026-1028, October 2005.

"Instrumental Variables Estimation with Panel Data," *Econometric Theory* 21, 865-869, August 2005.

"Fixed Effects and Related Estimators for Correlated Random-Coefficient and Treatment Effect Panel Data Models," *Review of Economics and Statistics* 87, 385-390, May 2005.

"A Computational Trick for Delta-Method Standard Errors" (with L.E. Papke), *Economics Letters* 86, 413-417, March 2005.

"Simple Solutions to the Initial Conditions Problem for Dynamic, Nonlinear Panel Data Models with Unobserved Heterogeneity," *Journal of Applied Econometrics* 20, 39-54, January 2005.

"Cluster-Sample Methods in Applied Econometrics," *American Economic Review* 93, 133-138, May 2003.

"Further Results on Instrumental Variables Estimation of Average Treatment Effects in the Correlated Random Coefficient Model," *Economics Letters* 79, 185-191, May 2003.

"$\sqrt{n}$ -Consistent Estimation of a Partial Linear Model with Generated Regressors" (with Q. Li), *Econometric Theory* 18, 625-645, June 2002.

CONFIDENTIAL – ATTORNEYS EYES ONLY

"Inverse Probability Weighted M-Estimators for Sample Selection, Attrition, and Stratification," *Portuguese Economic Journal* 1, 117-139, June 2002.

"Applications of Generalized Method of Moments Estimation," *Journal of Economic Perspectives* 15, 87-100, November 2001.

"Asymptotic Properties of Weighted M-Estimators for Standard Stratified Samples," *Econometric Theory* 17, 451-470, April 2001.

"A Framework for Estimating Dynamic, Unobserved Effects Panel Data Models with Possible Feedback to Future Explanatory Variables," *Economics Letters* 68, 245-250, September 2000.

"Asymptotic Properties of Weighted M-Estimators for Variable Probability Samples," *Econometrica* 67, 1385-1406, November 1999.

"Efficient Estimation of Panel Data Models with Strictly Exogenous Explanatory Variables" (with K.S. Im, S.C. Ahn, and P. Schmidt), *Journal of Econometrics* 93, 177-201, November 1999.

"Distribution-Free Estimation of Some Nonlinear Panel Data Models," *Journal of Econometrics* 90, 77-97, May 1999.

"On Two Stage Least Squares Estimation of the Average Treatment Effect in Random Coefficient Models," *Economics Letters* 56, 129-133, October 1997.

"Multiplicative Panel Data Models without the Strict Exogeneity Assumption," *Econometric Theory* 13, 667-678, October 1997.

"Econometric Methods for Fractional Response Variables with an Application to 401(k) Plan Participation Rates" (with L.E. Papke), *Journal of Applied Econometrics* 11, 619-632, November-December, 1996.

"Estimating Systems of Equations with Different Instruments for Different Equations," *Journal of Econometrics* 74, 387-405, October 1996.

"Selection Corrections for Panel Data Models Under Conditional Mean Independence Assumptions," *Journal of Econometrics* 68, 115-132, July 1995.

"A Simple Test for the Consistency of Dynamic Linear Regression in Rational Distributed Lag Models" (with K.T. McClain), *Economics Letters* 48, 235-240, June 1995.

"On the Limits of GLM for Specification Testing: A Comment on Gurmu and Trivedi," *Econometric Theory* 10, 409-418, June 1994.

"A Simple Specification Test for the Predictive Ability of Transformation Models," *Review of Economics and Statistics 7*6, 59-65, February 1994.

CONFIDENTIAL – ATTORNEYS EYES ONLY

"Contrastes de Especifiacion en Modelos Lineales con Variables Integrades" (Specification Testing in Linear Models with Integrated Variables), *Cuadernos Economicos de ICE* 55, 243-261, 1993.

"An Empirical Investigation of the Box-Cox Model and a Nonlinear Least Squares Alternative" (with E. Berndt and M. Showalter), *Econometric Reviews* 12, 65-102, March 1993.

"A Test for Functional Form Against Nonparametric Alternatives," *Econometric Theory* 8, 452-475, December 1992.

"Some Alternatives to the Box-Cox Regression Model," *International Economic Review* 33, 935-955, November 1992.

"Quasi-Maximum Likelihood Estimation and Inference in Dynamic Models with Time-Varying Covariances" (with T. Bollerslev), *Econometric Reviews* 11, 143-172, September 1992.

"A Note on Computing R-Squared and Adjusted R-Squared for Trending and Seasonal Data," *Economics Letters* 36, 49-54, May 1991.

"Specification Testing and Quasi-Maximum Likelihood Estimation," *Journal of Econometrics* 48, 29-55, April 1991.

"On the Application of Robust, Regression-Based Diagnostics to Models of Conditional Means and Conditional Variances," *Journal of Econometrics* 47, 5-46, January 1991.

"A Note on the Lagrange Multiplier and F-statistics for Two Stage Least Squares Regressions," *Economics Letters* 34, 151-155, November 1990.

"An Encompassing Approach to Conditional Mean Tests with Applications to Testing Nonnested Hypotheses," *Journal of Econometrics* 45, 331-350, September 1990.

"A Unified Approach to Robust, Regression-Based Specification Tests," *Econometric Theory* 6, 17-43, March 1990.

"A Computationally Simple Heteroskedasticity and Serial Correlation Robust Standard Error for the Linear Regression Model," *Economics Letters* 31, 239-243, December 1989.

"Some Invariance Principles and Central Limit Theorems for Dependent Heterogeneous Processes" (with H. White), *Econometric Theory* 4, 210-230, August 1988.

"A Capital Asset Pricing Model with Time-Varying Covariances" (with T. Bollerslev and R.F. Engle), *Journal of Political Economy* 96, 116-131, February 1988.

CONFIDENTIAL – ATTORNEYS EYES ONLY

**Books**

*Solutions Manual and Supplementary Materials for Econometric Analysis of Cross Section and Panel Data*, second edition.  Cambridge, MA:  MIT Press, 2011.

*Econometric Analysis of Cross Section and Panel Data*, second edition. Cambridge, MA:  MIT Press, 2010.

*Introductory Econometrics:  A Modern Approach*, fourth edition.  Cincinnati, OH:  South-Western College Publishing, 2009.

*Introductory Econometrics: A Modern Approach*, International Edition, Thomson, 2006.

*Introductory Econometrics: A Modern Approach* (Greek Translation), Thomson, 2006.

*Introductory Econometrics:  A Modern Approach*, third edition.  Cincinnati, OH:  South-Western College Publishing, 2006.

*Introductory Econometrics: A Modern Approach* (Chinese Translation), Thomson, 2006.

*Solutions Manual and Supplementary Materials for Econometric Analysis of Cross Section and Panel Data*.  Cambridge, MA:  MIT Press, 2003.

*Introductory Econometrics:  A Modern Approach*, second edition.  Cincinnati, OH:  South-Western College Publishing, 2003.

*Econometric Analysis of Cross Section and Panel Data*.  Cambridge, MA:  MIT Press, 2002.

*Introductory Econometrics: A Modern Approach* (Spanish Translation), Thomson, 2001.

*Introductory Econometrics:  A Modern Approach*.  Cincinnati, OH:  South-Western College Publishing, 2000.

CONFIDENTIAL – ATTORNEYS EYES ONLY

**Book Chapters**

"Teaching Undergraduate Econometrics," in *International Handbook on Teaching and Learning Economics*, Gail Hoyt and KimMarie McGoldrick (eds.), 452-462. Cheltenham, United Kingdom: Edward Elgar, 2011

"Econometrics: Panel Data Methods," in *Complex Systems in Finance and Econometrics*. Roberts Meyers (ed.), 215-237. Heidelberg, Germany: Springer, 2011.

"Stratified and Cluster Sampling," in *The New Palgrave Dictionary of Economics*, second edition. Stephen Durlauf and Lawrence E. Blume (eds.). London: Palgrave Macmillan, 2008.

"Probabilistic Sampling," in the *Handbook of Probability: Theory and Applications*. Tamás Rudas (ed.), 187-203. Los Angeles: Sage Publications, 2008.

"Instrumental Variables Estimation of the Average Treatment Effect in Correlated Random Coefficient Models," in *Advances in Econometrics*, Volume 21 (Modeling and Evaluating Treatment Effects in Econometrics). Daniel Millimet, Jeffrey Smith, and Edward Vytlacil (eds.), 93-117. Amsterdam: Elsevier, 2008.

"Unobserved Heterogeneity and Estimation of Average Partial Effects," in *Identification and Inference for Econometric Models: Essays in Honor of Thomas Rothenberg*. D.W.K. Andrews and J.H. Stock (eds.), 27-55. Cambridge: Cambridge University Press, 2005.

"Central Limit Theorems for Dependent Heterogeneous Processes with Trending Moments" (with H. White), in *New Perspectives in Econometric Theory: The Selected Works of Halbert White, Volume Two*, 464-481. Cheltenham, UK: Edward Elgar, 2004.

"Diagnostic Testing," in *Companion to Theoretical Econometrics*. B.H. Baltagi (ed.), 180-200. Oxford: Blackwell, 2001.

"Asymptotic Properties of Some Specification Tests in Linear Models with Integrated Processes," in *Cointegration, Causality, and Forecasting*. R.F. Engle and H. White (eds.), 366-384. Oxford: Oxford University Press, 1999.

"Quasi-Likelihood Methods for Count Data," in *Handbook of Applied Econometrics*, Volume 2. M.H. Pesaran and P. Schmidt (eds.), 352-406. Oxford: Blackwell, 1997.

"Score Diagnostics for Linear Models Estimated by Two Stage Least Squares," in *Advances in Econometrics and Quantitative Economics*. G.S. Maddala, P.C.B. Phillips, and T.N. Srinivasan (eds.), 66-87. Oxford: Blackwell, 1995.

"Estimation and Inference for Dependent Processes," in *Handbook of Econometrics*, Volume 4. R.F. Engle and D.L. McFadden (eds.), 2639-2738. Amsterdam: North-Holland, 1994.

"Some Results on Sieve Estimation with Dependent Observations," (with H. White), in *Semiparametric and Nonparametric Methods in Econometrics and Statistics*. W.J. Barnett, J.

30

CONFIDENTIAL – ATTORNEYS EYES ONLY

Powell, and G. Tauchen (eds.), 459-493.  Cambridge: Cambridge University Press, 1991. Reprinted as Chapter 15 in H. White, *Artificial Neural Networks: Approximation and Learning Theory*. Oxford: Blackwell, 1992.

**Book Reviews**

Book review of <u>Dynamic Econometrics</u>, by David F. Hendry, *Economica* 65, 296-298, May 1998.

Book review of <u>Co-integration, Error-Correction, and the Econometric Analysis of Non-stationary Data</u>, by A. Banerjee, J. Dolado, J.W. Galbraith, and D.F. Hendry, *Journal of Economic Literature* 3, 820-821, June 1995.

Book review of <u>Analog Estimation Methods in Econometrics</u> by Charles F. Manski, *Journal of Economic Literature* 28, 1738-1740, December 1990.

**Miscellaneous**

"Acknowledgement of Related Prior Work," *Econometric Theory* 22, 1177-1178, December 2006.

"Statistical Significance is Okay, Too: Comment on 'Size Matters'," *Journal of Socio-Economics* 33, 577-579, November 2004.

"Fixed Effects Estimation of the Population-Averaged Slopes in a Panel Data Random Coefficient Model," Solution, *Econometric Theory* 20, 428-429, April 2004.

"Fixed Effects Estimation of the Population-Averaged Slopes in a Panel Data Random Coefficient Model," Problem, *Econometric Theory* 19, 411-412, April 2003.

"Robustness of Tests for Functional Form to Serial Correlation," Solution, *Econometric Theory* 16, 795-796, October 2000.

"Robustness of Tests for Functional Form to Serial Correlation," Problem, *Econometric Theory* 15, 778-780, October 1999.

"Consistency of OLS in the Presence of a Lagged Dependent Variable and Serially Correlated Errors," Solution, *Econometric Theory* 15, 260-261, April 1999.

"Consistency of OLS in the Presence of a Lagged Dependent Variable and Serially Correlated Errors," Problem, *Econometric Theory* 14, 285, April 1998.

"Asymptotic Properties of Tests for Heteroskedasticity Under Measurement Error," Solution, *Econometric Theory* 12, 402-403, June 1996.

CONFIDENTIAL – ATTORNEYS EYES ONLY

"The Asymptotic Power of RESET for Detecting Omitted Variables," Solution, *Econometric Theory* 12, 205, March 1996.

"Econometrics," *Encyclopedia Americana*, page 614, 1996.

"Efficient Estimation Under Heteroskedasticity," Solution, *Econometric Theory* 11, 797-798, October 1995.

"Asymptotic Properties of Tests for Heteroskedasticity Under Measurement Error," Problem, *Econometric Theory* 11, 399-400, June 1995.

"The Asymptotic Power of RESET for Detecting Omitted Variables," Problem, *Econometric Theory* 10, 968-969, December 1994.

"Efficient Estimation Under Heteroskedasticity," Problem, *Econometric Theory* 10, 223, March 1994.

"Comments on the Papers by McCall, Mullahy, and Sueyoshi," *American Statistical Association 1994 Proceedings of the Business and Economic Statistics Section*, 17-19.

"Efficient Estimation with Orthogonal Regressors," Problem, *Econometric Theory* 9, 687, December 1993.

"Solution Set" in *Asymptotic Theory for Econometricians* by Halbert White, 191-223. Academic Press: Orlando, 1984.

**Papers under Review and Recent Unpublished Working Papers**

"A Control Function Approach to Estimating Switching Regression Models with Endogenous Explanatory Variables and Endogenous Switching" (with I. Murtazashvili), mimeo.

"Control Function Methods in Applied Econometrics." Revised and resubmitted to *Journal of Human Resources*.

"Correlated Random Effects Models with Unbalanced Panels," mimeo, Michigan State University Department of Economics, 2009. Under revision for *Journal of Econometrics*.

"An Evaluation of Empirical Bayes' Estimation of Value-Added Teacher Performance Measures" (with C.M. Guarino, M. Maxfield, M.D. Reckase, and P. Thompson), mimeo, MSU Department of Economics, 2012. Submitted to *Journal of Educational and Behavioral Statistics*.

"Evaluating Specification Tests in the Context of Value-Added Estimation" (with C.M. Guarino, M.D. Reckase, F. Smart, and B. Stacy), mimeo, Michigan State University Department of Economics, 2012.

"Should Instrumental Variables be Used as Matching Variables?" mimeo, Michigan State University Department of Economics, 2009.

CONFIDENTIAL – ATTORNEYS EYES ONLY

33

CONFIDENTIAL – ATTORNEYS EYES ONLY

**Appendix B**

**Documents Considered by Professor Jeffrey M. Wooldridge**

Declaration of Roger G. Noll on Liability and Damages, dated April 3, 2013 (including Exhibits 1-16 and Appendices A-C).

Corrections to Declaration of Roger G. Noll on Liability and Damages, dated May 31, 2013 (including Exhibits 14, 15.1, 15.2, 16.1, 16.2).

Rebuttal Declaration of Roger G. Noll on Liability and Damages, November 25, 2013 (including Exhibits 1-6 and Appendices A-B).

Amended Expert Report of Robert H. Topel, dated August 19, 2013 2013 (including Exhibits 1-16 and Appendices A-D).

Corrections to Expert Report of Robert H. Topel Submitted July 19, 2013.

Amended Expert Report of Kevin M. Murphy, dated August 19, 2013 (including Exhibits 1-17 and Appendices A-D).

Corrections to Expert report of Kevin M Murphy Submitted July 19, 2013.

CONFIDENTIAL – ATTORNEYS EYES ONLY

EXHIBIT 55

# Horizontal Merger Guidelines




U.S. Department of Justice

and the

Federal Trade Commission

Issued: August 19, 2010

# Table of Contents

1.    Overview .................................................................................................................... 1

2.    Evidence of Adverse Competitive Effects ............................................................ 2
2.1   Types of Evidence .................................................................................................. 3
2.1.1   Actual Effects Observed in Consummated Mergers .......................................... 3
2.1.2   Direct Comparisons Based on Experience ......................................................... 3
2.1.3   Market Shares and Concentration in a Relevant Market ................................... 3
2.1.4   Substantial Head-to-Head Competition ............................................................ 3
2.1.5   Disruptive Role of a Merging Party ................................................................... 3
2.2   Sources of Evidence .............................................................................................. 4
2.2.1   Merging Parties .................................................................................................. 4
2.2.2   Customers ........................................................................................................... 5
2.2.3   Other Industry Participants and Observers ........................................................ 5

3.    Targeted Customers and Price Discrimination .................................................. 6

4.    Market Definition ................................................................................................... 7
4.1   Product Market Definition .................................................................................... 8
4.1.1   The Hypothetical Monopolist Test ..................................................................... 8
4.1.2   Benchmark Prices and SSNIP Size ................................................................. 10
4.1.3   Implementing the Hypothetical Monopolist Test ............................................ 11
4.1.4   Product Market Definition with Targeted Customers ...................................... 12
4.2   Geographic Market Definition ............................................................................ 13
4.2.1   Geographic Markets Based on the Locations of Suppliers ............................. 13
4.2.2   Geographic Markets Based on the Locations of Customers ........................... 14

5.    Market Participants, Market Shares, and Market Concentration ................. 15
5.1   Market Participants .............................................................................................. 15
5.2   Market Shares ...................................................................................................... 16
5.3   Market Concentration .......................................................................................... 18

6.    Unilateral Effects ................................................................................................. 20
6.1   Pricing of Differentiated Products ...................................................................... 20
6.2   Bargaining and Auctions ..................................................................................... 22
6.3   Capacity and Output for Homogeneous Products ............................................... 22
6.4   Innovation and Product Variety .......................................................................... 23

7.    Coordinated Effects ............................................................................................. 24
7.1   Impact of Merger on Coordinated Interaction ................................................... 25
7.2   Evidence a Market is Vulnerable to Coordinated Conduct ............................... 25

8.    Powerful Buyers ................................................................................................... 27

9.      Entry ....................................................................................................................... 27
9.1         Timeliness ............................................................................................................ 29
9.2         Likelihood ............................................................................................................ 29
9.3         Sufficiency ........................................................................................................... 29

10.     Efficiencies ............................................................................................................. 29

11.     Failure and Exiting Assets .................................................................................... 32

12.     Mergers of Competing Buyers ............................................................................. 32

13.     Partial Acquisitions ............................................................................................... 33

# 1.     Overview

These Guidelines outline the principal analytical techniques, practices, and the enforcement policy of the Department of Justice and the Federal Trade Commission (the "Agencies") with respect to mergers and acquisitions involving actual or potential competitors ("horizontal mergers") under the federal antitrust laws.[1] The relevant statutory provisions include Section 7 of the Clayton Act, 15 U.S.C. § 18, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Most particularly, Section 7 of the Clayton Act prohibits mergers if "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The Agencies seek to identify and challenge competitively harmful mergers while avoiding unnecessary interference with mergers that are either competitively beneficial or neutral. Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger proceeds as compared to what will likely happen if it does not. Given this inherent need for prediction, these Guidelines reflect the congressional intent that merger enforcement should interdict competitive problems in their incipiency and that certainty about anticompetitive effect is seldom possible and not required for a merger to be illegal.

These Guidelines describe the principal analytical techniques and the main types of evidence on which the Agencies usually rely to predict whether a horizontal merger may substantially lessen competition. They are not intended to describe how the Agencies analyze cases other than horizontal mergers. These Guidelines are intended to assist the business community and antitrust practitioners by increasing the transparency of the analytical process underlying the Agencies' enforcement decisions. They may also assist the courts in developing an appropriate framework for interpreting and applying the antitrust laws in the horizontal merger context.

These Guidelines should be read with the awareness that merger analysis does not consist of uniform application of a single methodology. Rather, it is a fact-specific process through which the Agencies, guided by their extensive experience, apply a range of analytical tools to the reasonably available and reliable evidence to evaluate competitive concerns in a limited period of time. Where these Guidelines provide examples, they are illustrative and do not exhaust the applications of the relevant principle.[2]

---

[1]     These Guidelines replace the Horizontal Merger Guidelines issued in 1992, revised in 1997. They reflect the ongoing accumulation of experience at the Agencies. The Commentary on the Horizontal Merger Guidelines issued by the Agencies in 2006 remains a valuable supplement to these Guidelines. These Guidelines may be revised from time to time as necessary to reflect significant changes in enforcement policy, to clarify existing policy, or to reflect new learning. These Guidelines do not cover vertical or other types of non-horizontal acquisitions.

[2]     These Guidelines are not intended to describe how the Agencies will conduct the litigation of cases they decide to bring. Although relevant in that context, these Guidelines neither dictate nor exhaust the range of evidence the Agencies may introduce in litigation.

The unifying theme of these Guidelines is that mergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise. For simplicity of exposition, these Guidelines generally refer to all of these effects as enhancing market power. A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives. In evaluating how a merger will likely change a firm's behavior, the Agencies focus primarily on how the merger affects conduct that would be most profitable for the firm.

A merger can enhance market power simply by eliminating competition between the merging parties. This effect can arise even if the merger causes no changes in the way other firms behave. Adverse competitive effects arising in this manner are referred to as "unilateral effects." A merger also can enhance market power by increasing the risk of coordinated, accommodating, or interdependent behavior among rivals. Adverse competitive effects arising in this manner are referred to as "coordinated effects." In any given case, either or both types of effects may be present, and the distinction between them may be blurred.

These Guidelines principally describe how the Agencies analyze mergers between rival suppliers that may enhance their market power as sellers. Enhancement of market power by sellers often elevates the prices charged to customers. For simplicity of exposition, these Guidelines generally discuss the analysis in terms of such price effects. Enhanced market power can also be manifested in non-price terms and conditions that adversely affect customers, including reduced product quality, reduced product variety, reduced service, or diminished innovation. Such non-price effects may coexist with price effects, or can arise in their absence. When the Agencies investigate whether a merger may lead to a substantial lessening of non-price competition, they employ an approach analogous to that used to evaluate price competition. Enhanced market power may also make it more likely that the merged entity can profitably and effectively engage in exclusionary conduct. Regardless of how enhanced market power likely would be manifested, the Agencies normally evaluate mergers based on their impact on customers. The Agencies examine effects on either or both of the direct customers and the final consumers. The Agencies presume, absent convincing evidence to the contrary, that adverse effects on direct customers also cause adverse effects on final consumers.

Enhancement of market power by buyers, sometimes called "monopsony power," has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers. See Section 12.

## 2.    Evidence of Adverse Competitive Effects

The Agencies consider any reasonably available and reliable evidence to address the central question of whether a merger may substantially lessen competition. This section discusses several categories and sources of evidence that the Agencies, in their experience, have found most informative in predicting the likely competitive effects of mergers. The list provided here is not exhaustive. In any given case, reliable evidence may be available in only some categories or from some sources. For each category of evidence, the Agencies consider evidence indicating that the merger may enhance competition as well as evidence indicating that it may lessen competition.

## 2.1 Types of Evidence

### 2.1.1 Actual Effects Observed in Consummated Mergers

When evaluating a consummated merger, the ultimate issue is not only whether adverse competitive effects have already resulted from the merger, but also whether such effects are likely to arise in the future. Evidence of observed post-merger price increases or other changes adverse to customers is given substantial weight. The Agencies evaluate whether such changes are anticompetitive effects resulting from the merger, in which case they can be dispositive. However, a consummated merger may be anticompetitive even if such effects have not yet been observed, perhaps because the merged firm may be aware of the possibility of post-merger antitrust review and moderating its conduct. Consequently, the Agencies also consider the same types of evidence they consider when evaluating unconsummated mergers.

### 2.1.2 Direct Comparisons Based on Experience

The Agencies look for historical events, or "natural experiments," that are informative regarding the competitive effects of the merger. For example, the Agencies may examine the impact of recent mergers, entry, expansion, or exit in the relevant market. Effects of analogous events in similar markets may also be informative.

The Agencies also look for reliable evidence based on variations among similar markets. For example, if the merging firms compete in some locales but not others, comparisons of prices charged in regions where they do and do not compete may be informative regarding post-merger prices. In some cases, however, prices are set on such a broad geographic basis that such comparisons are not informative. The Agencies also may examine how prices in similar markets vary with the number of significant competitors in those markets.

### 2.1.3 Market Shares and Concentration in a Relevant Market

The Agencies give weight to the merging parties' market shares in a relevant market, the level of concentration, and the change in concentration caused by the merger. See Sections 4 and 5. Mergers that cause a significant increase in concentration and result in highly concentrated markets are presumed to be likely to enhance market power, but this presumption can be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

### 2.1.4 Substantial Head-to-Head Competition

The Agencies consider whether the merging firms have been, or likely will become absent the merger, substantial head-to-head competitors. Such evidence can be especially relevant for evaluating adverse unilateral effects, which result directly from the loss of that competition. See Section 6. This evidence can also inform market definition. See Section 4.

### 2.1.5 Disruptive Role of a Merging Party

The Agencies consider whether a merger may lessen competition by eliminating a "maverick" firm, i.e., a firm that plays a disruptive role in the market to the benefit of customers. For example, if one of the merging firms has a strong incumbency position and the other merging firm threatens to

disrupt market conditions with a new technology or business model, their merger can involve the loss of actual or potential competition. Likewise, one of the merging firms may have the incentive to take the lead in price cutting or other competitive conduct or to resist increases in industry prices. A firm that may discipline prices based on its ability and incentive to expand production rapidly using available capacity also can be a maverick, as can a firm that has often resisted otherwise prevailing industry norms to cooperate on price setting or other terms of competition.

## 2.2        Sources of Evidence

The Agencies consider many sources of evidence in their merger analysis. The most common sources of reasonably available and reliable evidence are the merging parties, customers, other industry participants, and industry observers.

### 2.2.1        *Merging Parties*

The Agencies typically obtain substantial information from the merging parties. This information can take the form of documents, testimony, or data, and can consist of descriptions of competitively relevant conditions or reflect actual business conduct and decisions. Documents created in the normal course are more probative than documents created as advocacy materials in merger review. Documents describing industry conditions can be informative regarding the operation of the market and how a firm identifies and assesses its rivals, particularly when business decisions are made in reliance on the accuracy of those descriptions. The business decisions taken by the merging firms also can be informative about industry conditions. For example, if a firm sets price well above incremental cost, that normally indicates either that the firm believes its customers are not highly sensitive to price (not in itself of antitrust concern, see Section 4.1.3[3]) or that the firm and its rivals are engaged in coordinated interaction (see Section 7). Incremental cost depends on the relevant increment in output as well as on the time period involved, and in the case of large increments and sustained changes in output it may include some costs that would be fixed for smaller increments of output or shorter time periods.

Explicit or implicit evidence that the merging parties intend to raise prices, reduce output or capacity, reduce product quality or variety, withdraw products or delay their introduction, or curtail research and development efforts after the merger, or explicit or implicit evidence that the ability to engage in such conduct motivated the merger, can be highly informative in evaluating the likely effects of a merger. Likewise, the Agencies look for reliable evidence that the merger is likely to result in efficiencies. The Agencies give careful consideration to the views of individuals whose responsibilities, expertise, and experience relating to the issues in question provide particular indicia of reliability. The financial terms of the transaction may also be informative regarding competitive effects. For example, a purchase price in excess of the acquired firm's stand-alone market value may indicate that the acquiring firm is paying a premium because it expects to be able to reduce competition or to achieve efficiencies.

---

[3]    High margins commonly arise for products that are significantly differentiated. Products involving substantial fixed costs typically will be developed only if suppliers expect there to be enough differentiation to support margins sufficient to cover those fixed costs. High margins can be consistent with incumbent firms earning competitive returns.

## 2.2.2    Customers

Customers can provide a variety of information to the Agencies, ranging from information about their own purchasing behavior and choices to their views about the effects of the merger itself.

Information from customers about how they would likely respond to a price increase, and the relative attractiveness of different products or suppliers, may be highly relevant, especially when corroborated by other evidence such as historical purchasing patterns and practices. Customers also can provide valuable information about the impact of historical events such as entry by a new supplier.

The conclusions of well-informed and sophisticated customers on the likely impact of the merger itself can also help the Agencies investigate competitive effects, because customers typically feel the consequences of both competitively beneficial and competitively harmful mergers. In evaluating such evidence, the Agencies are mindful that customers may oppose, or favor, a merger for reasons unrelated to the antitrust issues raised by that merger.

When some customers express concerns about the competitive effects of a merger while others view the merger as beneficial or neutral, the Agencies take account of this divergence in using the information provided by customers and consider the likely reasons for such divergence of views. For example, if for regulatory reasons some customers cannot buy imported products, while others can, a merger between domestic suppliers may harm the former customers even if it leaves the more flexible customers unharmed. See Section 3.

When direct customers of the merging firms compete against one another in a downstream market, their interests may not be aligned with the interests of final consumers, especially if the direct customers expect to pass on any anticompetitive price increase. A customer that is protected from adverse competitive effects by a long-term contract, or otherwise relatively immune from the merger's harmful effects, may even welcome an anticompetitive merger that provides that customer with a competitive advantage over its downstream rivals.

> *Example 1:* As a result of the merger, Customer C will experience a price increase for an input used in producing its final product, raising its costs. Customer C's rivals use this input more intensively than Customer C, and the same price increase applied to them will raise their costs more than it raises Customer C's costs. On balance, Customer C may benefit from the merger even though the merger involves a substantial lessening of competition.

## 2.2.3    Other Industry Participants and Observers

Suppliers, indirect customers, distributors, other industry participants, and industry analysts can also provide information helpful to a merger inquiry. The interests of firms selling products complementary to those offered by the merging firms often are well aligned with those of customers, making their informed views valuable.

Information from firms that are rivals to the merging parties can help illuminate how the market operates. The interests of rival firms often diverge from the interests of customers, since customers normally lose, but rival firms gain, if the merged entity raises its prices. For that reason, the Agencies do not routinely rely on the overall views of rival firms regarding the competitive effects of the

merger. However, rival firms may provide relevant facts, and even their overall views may be instructive, especially in cases where the Agencies are concerned that the merged entity may engage in exclusionary conduct.

> *Example 2:* Merging Firms A and B operate in a market in which network effects are significant, implying that any firm's product is significantly more valuable if it commands a large market share or if it is interconnected with others that in aggregate command such a share. Prior to the merger, they and their rivals voluntarily interconnect with one another. The merger would create an entity with a large enough share that a strategy of ending voluntary interconnection would have a dangerous probability of creating monopoly power in this market. The interests of rivals and of consumers would be broadly aligned in preventing such a merger.

# 3.    Targeted Customers and Price Discrimination

When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products. Such differential impacts are possible when sellers can discriminate, e.g., by profitably raising price to certain targeted customers but not to others. The possibility of price discrimination influences market definition (see Section 4), the measurement of market shares (see Section 5), and the evaluation of competitive effects (see Sections 6 and 7).

When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for other customers. A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away. When discrimination is reasonably likely, the Agencies may evaluate competitive effects separately by type of customer. The Agencies may have access to information unavailable to customers that is relevant to evaluating whether discrimination is reasonably likely.

For price discrimination to be feasible, two conditions typically must be met: differential pricing and limited arbitrage.

First, the suppliers engaging in price discrimination must be able to price differently to targeted customers than to other customers. This may involve identification of individual customers to which different prices are offered or offering different prices to different types of customers based on observable characteristics.

> *Example 3:* Suppliers can distinguish large buyers from small buyers. Large buyers are more likely than small buyers to self-supply in response to a significant price increase. The merger may lead to price discrimination against small buyers, harming them, even if large buyers are not harmed. Such discrimination can occur even if there is no discrete gap in size between the classes of large and small buyers.

In other cases, suppliers may be unable to distinguish among different types of customers but can offer multiple products that sort customers based on their purchase decisions.

Second, the targeted customers must not be able to defeat the price increase of concern by arbitrage, e.g., by purchasing indirectly from or through other customers. Arbitrage may be difficult if it would void warranties or make service more difficult or costly for customers. Arbitrage is inherently impossible for many services. Arbitrage between customers at different geographic locations may be

6

impractical due to transportation costs. Arbitrage on a modest scale may be possible but sufficiently costly or limited that it would not deter or defeat a discriminatory pricing strategy.

# 4.    Market Definition

When the Agencies identify a potential competitive concern with a horizontal merger, market definition plays two roles. First, market definition helps specify the line of commerce and section of the country in which the competitive concern arises. In any merger enforcement action, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition. Second, market definition allows the Agencies to identify market participants and measure market shares and market concentration. See Section 5. The measurement of market shares and market concentration is not an end in itself, but is useful to the extent it illuminates the merger's likely competitive effects.

The Agencies' analysis need not start with market definition. Some of the analytical tools used by the Agencies to assess competitive effects do not rely on market definition, although evaluation of competitive alternatives available to customers is always necessary at some point in the analysis.

Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market. Such evidence also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares.

Where analysis suggests alternative and reasonably plausible candidate markets, and where the resulting market shares lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects.

Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service. The responsive actions of suppliers are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry.

Customers often confront a range of possible substitutes for the products of the merging firms. Some substitutes may be closer, and others more distant, either geographically or in terms of product attributes and perceptions. Additionally, customers may assess the proximity of different products differently. When products or suppliers in different geographic areas are substitutes for one another to varying degrees, defining a market to include some substitutes and exclude others is inevitably a simplification that cannot capture the full variation in the extent to which different products compete against each other. The principles of market definition outlined below seek to make this inevitable simplification as useful and informative as is practically possible. Relevant markets need not have precise metes and bounds.

Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance as proportional to their shares in an expanded market.

> *Example 4:* Firms A and B, sellers of two leading brands of motorcycles, propose to merge. If Brand A motorcycle prices were to rise, some buyers would substitute to Brand B, and some others would substitute to cars. However, motorcycle buyers see Brand B motorcycles as much more similar to Brand A motorcycles than are cars. Far more cars are sold than motorcycles. Evaluating shares in a market that includes cars would greatly underestimate the competitive significance of Brand B motorcycles in constraining Brand A's prices and greatly overestimate the significance of cars.

Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers. However, a group of products is too narrow to constitute a relevant market if competition from products outside that group is so ample that even the complete elimination of competition within the group would not significantly harm either direct customers or downstream consumers. The hypothetical monopolist test (see Section 4.1.1) is designed to ensure that candidate markets are not overly narrow in this respect.

The Agencies implement these principles of market definition flexibly when evaluating different possible candidate markets. Relevant antitrust markets defined according to the hypothetical monopolist test are not always intuitive and may not align with how industry members use the term "market."

Section 4.1 describes the principles that apply to product market definition, and gives guidance on how the Agencies most often apply those principles. Section 4.2 describes how the same principles apply to geographic market definition. Although discussed separately for simplicity of exposition, the principles described in Sections 4.1 and 4.2 are combined to define a relevant market, which has both a product and a geographic dimension. In particular, the hypothetical monopolist test is applied to a group of products together with a geographic region to determine a relevant market.

## 4.1     Product Market Definition

When a product sold by one merging firm (Product A) competes against one or more products sold by the other merging firm, the Agencies define a relevant product market around Product A to evaluate the importance of that competition. Such a relevant product market consists of a group of substitute products including Product A. Multiple relevant product markets may thus be identified.

### 4.1.1          The Hypothetical Monopolist Test

The Agencies employ the hypothetical monopolist test to evaluate whether groups of products in candidate markets are sufficiently broad to constitute relevant antitrust markets. The Agencies use the

hypothetical monopolist test to identify a set of products that are reasonably interchangeable with a product sold by one of the merging firms.

The hypothetical monopolist test requires that a product market contain enough substitute products so that it could be subject to post-merger exercise of market power significantly exceeding that existing absent the merger. Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.[4] For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant. The SSNIP is employed solely as a methodological tool for performing the hypothetical monopolist test; it is not a tolerance level for price increases resulting from a merger.

Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose. The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group in response to a price increase.

> *Example 5:* Products A and B are being tested as a candidate market. Each sells for $100, has an incremental cost of $60, and sells 1200 units. For every dollar increase in the price of Product A, for any given price of Product B, Product A loses twenty units of sales to products outside the candidate market and ten units of sales to Product B, and likewise for Product B. Under these conditions, economic analysis shows that a hypothetical profit-maximizing monopolist controlling Products A and B would raise both of their prices by ten percent, to $110. Therefore, Products A and B satisfy the hypothetical monopolist test using a five percent SSNIP, and indeed for any SSNIP size up to ten percent. This is true even though two-thirds of the sales lost by one product when it raises its price are diverted to products outside the relevant market.

When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute for the first product than is the second product. The third product is a closer substitute if, in response to a SSNIP on the first product, greater revenues are diverted to the third product than to the second product.

> *Example 6:* In Example 5, suppose that half of the unit sales lost by Product A when it raises its price are diverted to Product C, which also has a price of $100, while one-third are diverted to Product B. Product C is a closer substitute for Product A than is Product B. Thus Product C will normally be included in the relevant market, even though Products A and B together satisfy the hypothetical monopolist test.

The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market. The Agencies may evaluate a merger in any relevant market

---

[4]   If the pricing incentives of the firms supplying the products in the candidate market differ substantially from those of the hypothetical monopolist, for reasons other than the latter's control over a larger group of substitutes, the Agencies may instead employ the concept of a hypothetical profit-maximizing cartel comprised of the firms (with all their products) that sell the products in the candidate market. This approach is most likely to be appropriate if the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market. This could occur, for example, if the candidate market is one for durable equipment and the firms selling that equipment derive substantial net revenues from selling spare parts and service for that equipment.

satisfying the test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects. Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test.

> *Example 7:* In Example 4, including cars in the market will lead to misleadingly small market shares for motorcycle producers. Unless motorcycles fail the hypothetical monopolist test, the Agencies would not include cars in the market in analyzing this motorcycle merger.

### 4.1.2        *Benchmark Prices and SSNIP Size*

The Agencies apply the SSNIP starting from prices that would likely prevail absent the merger. If prices are not likely to change absent the merger, these benchmark prices can reasonably be taken to be the prices prevailing prior to the merger.[5] If prices are likely to change absent the merger, e.g., because of innovation or entry, the Agencies may use anticipated future prices as the benchmark for the test. If prices might fall absent the merger due to the breakdown of pre-merger coordination, the Agencies may use those lower prices as the benchmark for the test. In some cases, the techniques employed by the Agencies to implement the hypothetical monopolist test focus on the difference in incentives between pre-merger firms and the hypothetical monopolist and do not require specifying the benchmark prices.

The SSNIP is intended to represent a "small but significant" increase in the prices charged by firms in the candidate market for the value they contribute to the products or services used by customers. This properly directs attention to the effects of price changes commensurate with those that might result from a significant lessening of competition caused by the merger. This methodology is used because normally it is possible to quantify "small but significant" adverse price effects on customers and analyze their likely reactions, not because price effects are more important than non-price effects.

The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value. However, what constitutes a "small but significant" increase in price, commensurate with a significant loss of competition caused by the merger, depends upon the nature of the industry and the merging firms' positions in it, and the Agencies may accordingly use a price increase that is larger or smaller than five percent. Where explicit or implicit prices for the firms' specific contribution to value can be identified with reasonable clarity, the Agencies may base the SSNIP on those prices.

> *Example 8:* In a merger between two oil pipelines, the SSNIP would be based on the price charged for transporting the oil, not on the price of the oil itself. If pipelines buy the oil at one end and sell it at the other, the price charged for transporting the oil is implicit, equal to the difference between the price paid for oil at the input end and the price charged for oil at the output end. The relevant product sold by the pipelines is better described as "pipeline transportation of oil from point A to point B" than as "oil at point B."

---

[5]    Market definition for the evaluation of non-merger antitrust concerns such as monopolization or facilitating practices will differ in this respect if the effects resulting from the conduct of concern are already occurring at the time of evaluation.

*Example 9:* In a merger between two firms that install computers purchased from third parties, the SSNIP would be based on their fees, not on the price of installed computers. If these firms purchase the computers and charge their customers one package price, the implicit installation fee is equal to the package charge to customers less the price of the computers.

*Example 10:* In Example 9, suppose that the prices paid by the merging firms to purchase computers are opaque, but account for at least ninety-five percent of the prices they charge for installed computers, with profits or implicit fees making up five percent of those prices at most. A five percent SSNIP on the total price paid by customers would at least double those fees or profits. Even if that would be unprofitable for a hypothetical monopolist, a significant increase in fees might well be profitable. If the SSNIP is based on the total price paid by customers, a lower percentage will be used.

### 4.1.3          *Implementing the Hypothetical Monopolist Test*

The hypothetical monopolist's incentive to raise prices depends both on the extent to which customers would likely substitute away from the products in the candidate market in response to such a price increase and on the profit margins earned on those products. The profit margin on incremental units is the difference between price and incremental cost on those units. The Agencies often estimate incremental costs, for example using merging parties' documents or data the merging parties use to make business decisions. Incremental cost is measured over the change in output that would be caused by the price increase under consideration.

In considering customers' likely responses to higher prices, the Agencies take into account any reasonably available and reliable evidence, including, but not limited to:

- how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions;

- information from buyers, including surveys, concerning how they would respond to price changes;

- the conduct of industry participants, notably:

  o sellers' business decisions or business documents indicating sellers' informed beliefs concerning how customers would substitute among products in response to relative changes in price;

  o industry participants' behavior in tracking and responding to price changes by some or all rivals;

- objective information about product characteristics and the costs and delays of switching products, especially switching from products in the candidate market to products outside the candidate market;

- the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market, with a higher recapture percentage making a price increase more profitable for the hypothetical monopolist;

- evidence from other industry participants, such as sellers of complementary products;

- legal or regulatory requirements; and

- the influence of downstream competition faced by customers in their output markets.

When the necessary data are available, the Agencies also may consider a "critical loss analysis" to assess the extent to which it corroborates inferences drawn from the evidence noted above. Critical loss analysis asks whether imposing at least a SSNIP on one or more products in a candidate market would raise or lower the hypothetical monopolist's profits. While this "breakeven" analysis differs from the profit-maximizing analysis called for by the hypothetical monopolist test in Section 4.1.1, merging parties sometimes present this type of analysis to the Agencies. A price increase raises profits on sales made at the higher price, but this will be offset to the extent customers substitute away from products in the candidate market. Critical loss analysis compares the magnitude of these two offsetting effects resulting from the price increase. The "critical loss" is defined as the number of lost unit sales that would leave profits unchanged. The "predicted loss" is defined as the number of unit sales that the hypothetical monopolist is predicted to lose due to the price increase. The price increase raises the hypothetical monopolist's profits if the predicted loss is less than the critical loss.

The Agencies consider all of the evidence of customer substitution noted above in assessing the predicted loss. The Agencies require that estimates of the predicted loss be consistent with that evidence, including the pre-merger margins of products in the candidate market used to calculate the critical loss. Unless the firms are engaging in coordinated interaction (see Section 7), high pre-merger margins normally indicate that each firm's product individually faces demand that is not highly sensitive to price.[6] Higher pre-merger margins thus indicate a smaller predicted loss as well as a smaller critical loss. The higher the pre-merger margin, the smaller the recapture percentage necessary for the candidate market to satisfy the hypothetical monopolist test.

Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition. The Agencies follow the hypothetical monopolist test to the extent possible given the available evidence, bearing in mind that the ultimate goal of market definition is to help determine whether the merger may substantially lessen competition.

### 4.1.4        *Product Market Definition with Targeted Customers*

If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a SSNIP. Markets to serve targeted customers are also known as price discrimination markets. In practice, the Agencies identify price discrimination markets only where they believe there is a realistic prospect of an adverse competitive effect on a group of targeted customers.

> *Example 11:* Glass containers have many uses. In response to a price increase for glass containers, some users would substitute substantially to plastic or metal containers, but baby food manufacturers would not. If a

---

[6]    While margins are important for implementing the hypothetical monopolist test, high margins are not in themselves of antitrust concern.

hypothetical monopolist could price separately and limit arbitrage, baby food manufacturers would be vulnerable to a targeted increase in the price of glass containers. The Agencies could define a distinct market for glass containers used to package baby food.

The Agencies also often consider markets for targeted customers when prices are individually negotiated and suppliers have information about customers that would allow a hypothetical monopolist to identify customers that are likely to pay a higher price for the relevant product. If prices are negotiated individually with customers, the hypothetical monopolist test may suggest relevant markets that are as narrow as individual customers (see also Section 6.2 on bargaining and auctions). Nonetheless, the Agencies often define markets for groups of targeted customers, i.e., by type of customer, rather than by individual customer. By so doing, the Agencies are able to rely on aggregated market shares that can be more helpful in predicting the competitive effects of the merger.

## 4.2       Geographic Market Definition

The arena of competition affected by the merger may be geographically bounded if geography limits some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers. Both supplier and customer locations can affect this. The Agencies apply the principles of market definition described here and in Section 4.1 to define a relevant market with a geographic dimension as well as a product dimension.

The scope of geographic markets often depends on transportation costs. Other factors such as language, regulation, tariff and non-tariff trade barriers, custom and familiarity, reputation, and service availability may impede long-distance or international transactions. The competitive significance of foreign firms may be assessed at various exchange rates, especially if exchange rates have fluctuated in the recent past.

In the absence of price discrimination based on customer location, the Agencies normally define geographic markets based on the locations of suppliers, as explained in subsection 4.2.1. In other cases, notably if price discrimination based on customer location is feasible as is often the case when delivered pricing is commonly used in the industry, the Agencies may define geographic markets based on the locations of customers, as explained in subsection 4.2.2.

### 4.2.1       *Geographic Markets Based on the Locations of Suppliers*

Geographic markets based on the locations of suppliers encompass the region from which sales are made. Geographic markets of this type often apply when customers receive goods or services at suppliers' locations. Competitors in the market are firms with relevant production, sales, or service facilities in that region. Some customers who buy from these firms may be located outside the boundaries of the geographic market.

The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a SSNIP from at least one location, including at least one location of one of the merging firms. In this exercise the terms of sale for all products produced elsewhere are held constant. A single firm may operate in a number of different geographic markets, even for a single product.

*Example 12:* The merging parties both have manufacturing plants in City X. The relevant product is expensive to transport and suppliers price their products for pickup at their locations. Rival plants are some distance away in City Y. A hypothetical monopolist controlling all plants in City X could profitably impose a SSNIP at these plants. Competition from more distant plants would not defeat the price increase because supplies coming from more distant plants require expensive transportation. The relevant geographic market is defined around the plants in City X.

When the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market are counted, regardless of the location of the customer making the purchase.

In considering likely reactions of customers to price increases for the relevant product(s) imposed in a candidate geographic market, the Agencies consider any reasonably available and reliable evidence, including:

- how customers have shifted purchases in the past between different geographic locations in response to relative changes in price or other terms and conditions;

- the cost and difficulty of transporting the product (or the cost and difficulty of a customer traveling to a seller's location), in relation to its price;

- whether suppliers need a presence near customers to provide service or support;

- evidence on whether sellers base business decisions on the prospect of customers switching between geographic locations in response to relative changes in price or other competitive variables;

- the costs and delays of switching from suppliers in the candidate geographic market to suppliers outside the candidate geographic market; and

- the influence of downstream competition faced by customers in their output markets.

### 4.2.2          *Geographic Markets Based on the Locations of Customers*

When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers.[7] Geographic markets of this type often apply when suppliers deliver their products or services to customers' locations. Geographic markets of this type encompass the region into which sales are made. Competitors in the market are firms that sell to customers in the specified region. Some suppliers that sell into the relevant market may be located outside the boundaries of the geographic market.

The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the region would impose at least a SSNIP on some customers in that region. A region forms a relevant geographic market if this price increase would not be defeated by substitution away from the relevant product or by arbitrage,

---

[7]    For customers operating in multiple locations, only those customer locations within the targeted zone are included in the market.

e.g., customers in the region travelling outside it to purchase the relevant product. In this exercise, the terms of sale for products sold to all customers outside the region are held constant.

> *Example 13:* Customers require local sales and support. Suppliers have sales and service operations in many geographic areas and can discriminate based on customer location. The geographic market can be defined around the locations of customers.

> *Example 14:* Each merging firm has a single manufacturing plant and delivers the relevant product to customers in City X and in City Y. The relevant product is expensive to transport. The merging firms' plants are by far the closest to City X, but no closer to City Y than are numerous rival plants. This fact pattern suggests that customers in City X may be harmed by the merger even if customers in City Y are not. For that reason, the Agencies consider a relevant geographic market defined around customers in City X. Such a market could be defined even if the region around the merging firms' plants would not be a relevant geographic market defined based on the location of sellers because a hypothetical monopolist controlling all plants in that region would find a SSNIP imposed on all of its customers unprofitable due to the loss of sales to customers in City Y.

When the geographic market is defined based on customer locations, sales made to those customers are counted, regardless of the location of the supplier making those sales.

> *Example 15:* Customers in the United States must use products approved by U.S. regulators. Foreign customers use products not approved by U.S. regulators. The relevant product market consists of products approved by U.S. regulators. The geographic market is defined around U.S. customers. Any sales made to U.S. customers by foreign suppliers are included in the market, and those foreign suppliers are participants in the U.S. market even though located outside it.

# 5.   Market Participants, Market Shares, and Market Concentration

The Agencies normally consider measures of market shares and market concentration as part of their evaluation of competitive effects. The Agencies evaluate market shares and concentration in conjunction with other reasonably available and reliable evidence for the ultimate purpose of determining whether a merger may substantially lessen competition.

Market shares can directly influence firms' competitive incentives. For example, if a price reduction to gain new customers would also apply to a firm's existing customers, a firm with a large market share may be more reluctant to implement a price reduction than one with a small share. Likewise, a firm with a large market share may not feel pressure to reduce price even if a smaller rival does. Market shares also can reflect firms' capabilities. For example, a firm with a large market share may be able to expand output rapidly by a larger absolute amount than can a small firm. Similarly, a large market share tends to indicate low costs, an attractive product, or both.

## 5.1   Market Participants

All firms that currently earn revenues in the relevant market are considered market participants. Vertically integrated firms are also included to the extent that their inclusion accurately reflects their competitive significance. Firms not currently earning revenues in the relevant market, but that have committed to entering the market in the near future, are also considered market participants.

Firms that are not current producers in a relevant market, but that would very likely provide rapid supply responses with direct competitive impact in the event of a SSNIP, without incurring

significant sunk costs, are also considered market participants. These firms are termed "rapid entrants." Sunk costs are entry or exit costs that cannot be recovered outside the relevant market. Entry that would take place more slowly in response to adverse competitive effects, or that requires firms to incur significant sunk costs, is considered in Section 9.

Firms that produce the relevant product but do not sell it in the relevant geographic market may be rapid entrants. Other things equal, such firms are most likely to be rapid entrants if they are close to the geographic market.

> *Example 16:* Farm A grows tomatoes halfway between Cities X and Y. Currently, it ships its tomatoes to City X because prices there are two percent higher. Previously it has varied the destination of its shipments in response to small price variations. Farm A would likely be a rapid entrant participant in a market for tomatoes in City Y.

> *Example 17:* Firm B has bid multiple times to supply milk to School District S, and actually supplies milk to schools in some adjacent areas. It has never won a bid in School District S, but is well qualified to serve that district and has often nearly won. Firm B would be counted as a rapid entrant in a market for school milk in School District S.

More generally, if the relevant market is defined around targeted customers, firms that produce relevant products but do not sell them to those customers may be rapid entrants if they can easily and rapidly begin selling to the targeted customers.

Firms that clearly possess the necessary assets to supply into the relevant market rapidly may also be rapid entrants. In markets for relatively homogeneous goods where a supplier's ability to compete depends predominantly on its costs and its capacity, and not on other factors such as experience or reputation in the relevant market, a supplier with efficient idle capacity, or readily available "swing" capacity currently used in adjacent markets that can easily and profitably be shifted to serve the relevant market, may be a rapid entrant.[8] However, idle capacity may be inefficient, and capacity used in adjacent markets may not be available, so a firm's possession of idle or swing capacity alone does not make that firm a rapid entrant.

## 5.2      Market Shares

The Agencies normally calculate market shares for all firms that currently produce products in the relevant market, subject to the availability of data. The Agencies also calculate market shares for other market participants if this can be done to reliably reflect their competitive significance.

Market concentration and market share data are normally based on historical evidence. However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data. For example, if a new technology that is important to long-term competitive viability is available to other firms in the market, but is not available to a particular firm, the Agencies may conclude that that firm's historical market share

---

[8]   If this type of supply side substitution is nearly universal among the firms selling one or more of a group of products, the Agencies may use an aggregate description of markets for those products as a matter of convenience.

overstates its future competitive significance. The Agencies may project historical market shares into the foreseeable future when this can be done reliably.

The Agencies measure market shares based on the best available indicator of firms' future competitive significance in the relevant market. This may depend upon the type of competitive effect being considered, and on the availability of data. Typically, annual data are used, but where individual transactions are large and infrequent so annual data may be unrepresentative, the Agencies may measure market shares over a longer period of time.

In most contexts, the Agencies measure each firm's market share based on its actual or projected revenues in the relevant market. Revenues in the relevant market tend to be the best measure of attractiveness to customers, since they reflect the real-world ability of firms to surmount all of the obstacles necessary to offer products on terms and conditions that are attractive to customers. In cases where one unit of a low-priced product can substitute for one unit of a higher-priced product, unit sales may measure competitive significance better than revenues. For example, a new, much less expensive product may have great competitive significance if it substantially erodes the revenues earned by older, higher-priced products, even if it earns relatively few revenues. In cases where customers sign long-term contracts, face switching costs, or tend to re-evaluate their suppliers only occasionally, revenues earned from recently acquired customers may better reflect the competitive significance of suppliers than do total revenues.

In markets for homogeneous products, a firm's competitive significance may derive principally from its ability and incentive to rapidly expand production in the relevant market in response to a price increase or output reduction by others in that market. As a result, a firm's competitive significance may depend upon its level of readily available capacity to serve the relevant market if that capacity is efficient enough to make such expansion profitable. In such markets, capacities or reserves may better reflect the future competitive significance of suppliers than revenues, and the Agencies may calculate market shares using those measures. Market participants that are not current producers may then be assigned positive market shares, but only if a measure of their competitive significance properly comparable to that of current producers is available. When market shares are measured based on firms' readily available capacities, the Agencies do not include capacity that is committed or so profitably employed outside the relevant market, or so high-cost, that it would not likely be used to respond to a SSNIP in the relevant market.

> *Example 18:* The geographic market is defined around customers in the United States. Firm X produces the relevant product outside the United States, and most of its sales are made to customers outside the United States. In most contexts, Firm X's market share will be based on its sales to U.S. customers, not its total sales or total capacity. However, if the relevant product is homogeneous, and if Firm X would significantly expand sales to U.S. customers rapidly and without incurring significant sunk costs in response to a SSNIP, the Agencies may base Firm X's market share on its readily available capacity to serve U.S. customers.

When the Agencies define markets serving targeted customers, these same principles are used to measure market shares, as they apply to those customers. In most contexts, each firm's market share is based on its actual or projected revenues from the targeted customers. However, the Agencies may instead measure market shares based on revenues from a broader group of customers if doing so would more accurately reflect the competitive significance of different suppliers in the relevant market. Revenues earned from a broader group of customers may also be used when better data are thereby available.

## 5.3　　Market Concentration

Market concentration is often one useful indicator of likely competitive effects of a merger. In evaluating market concentration, the Agencies consider both the post-merger level of market concentration and the change in concentration resulting from a merger. Market shares may not fully reflect the competitive significance of firms in the market or the impact of a merger. They are used in conjunction with other evidence of competitive effects. See Sections 6 and 7.

In analyzing mergers between an incumbent and a recent or potential entrant, to the extent the Agencies use the change in concentration to evaluate competitive effects, they will do so using projected market shares. A merger between an incumbent and a potential entrant can raise significant competitive concerns. The lessening of competition resulting from such a merger is more likely to be substantial, the larger is the market share of the incumbent, the greater is the competitive significance of the potential entrant, and the greater is the competitive threat posed by this potential entrant relative to others.

The Agencies give more weight to market concentration when market shares have been stable over time, especially in the face of historical changes in relative prices or costs. If a firm has retained its market share even after its price has increased relative to those of its rivals, that firm already faces limited competitive constraints, making it less likely that its remaining rivals will replace the competition lost if one of that firm's important rivals is eliminated due to a merger. By contrast, even a highly concentrated market can be very competitive if market shares fluctuate substantially over short periods of time in response to changes in competitive offerings. However, if competition by one of the merging firms has significantly contributed to these fluctuations, perhaps because it has acted as a maverick, the Agencies will consider whether the merger will enhance market power by combining that firm with one of its significant rivals.

The Agencies may measure market concentration using the number of significant competitors in the market. This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure revenues in the relevant market. The Agencies also may consider the combined market share of the merging firms as an indicator of the extent to which others in the market may not be able readily to replace competition between the merging firms that is lost through the merger.

The Agencies often calculate the Herfindahl-Hirschman Index ("HHI") of market concentration. The HHI is calculated by summing the squares of the individual firms' market shares,[9] and thus gives proportionately greater weight to the larger market shares. When using the HHI, the Agencies

---

[9]　For example, a market consisting of four firms with market shares of thirty percent, thirty percent, twenty percent, and twenty percent has an HHI of 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI ranges from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). Although it is desirable to include all firms in the calculation, lack of information about firms with small shares is not critical because such firms do not affect the HHI significantly.

consider both the post-merger level of the HHI and the increase in the HHI resulting from the merger. The increase in the HHI is equal to twice the product of the market shares of the merging firms.[10]

Based on their experience, the Agencies generally classify markets into three types:

- Unconcentrated Markets: HHI below 1500

- Moderately Concentrated Markets: HHI between 1500 and 2500

- Highly Concentrated Markets: HHI above 2500

The Agencies employ the following general standards for the relevant markets they have defined:

- *Small Change in Concentration:* Mergers involving an increase in the HHI of less than 100 points are unlikely to have adverse competitive effects and ordinarily require no further analysis.

- *Unconcentrated Markets:* Mergers resulting in unconcentrated markets are unlikely to have adverse competitive effects and ordinarily require no further analysis.

- *Moderately Concentrated Markets:* Mergers resulting in moderately concentrated markets that involve an increase in the HHI of more than 100 points potentially raise significant competitive concerns and often warrant scrutiny.

- *Highly Concentrated Markets:* Mergers resulting in highly concentrated markets that involve an increase in the HHI of between 100 points and 200 points potentially raise significant competitive concerns and often warrant scrutiny. Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power. The presumption may be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

The purpose of these thresholds is not to provide a rigid screen to separate competitively benign mergers from anticompetitive ones, although high levels of concentration do raise concerns. Rather, they provide one way to identify some mergers unlikely to raise competitive concerns and some others for which it is particularly important to examine whether other competitive factors confirm, reinforce, or counteract the potentially harmful effects of increased concentration. The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns and the greater is the likelihood that the Agencies will request additional information to conduct their analysis.

---

[10]   For example, the merger of firms with shares of five percent and ten percent of the market would increase the HHI by 100 ($5 \times 10 \times 2 = 100$).

# 6. Unilateral Effects

The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition. Such unilateral effects are most apparent in a merger to monopoly in a relevant market, but are by no means limited to that case. Whether cognizable efficiencies resulting from the merger are likely to reduce or reverse adverse unilateral effects is addressed in Section 10.

Several common types of unilateral effects are discussed in this section. Section 6.1 discusses unilateral price effects in markets with differentiated products. Section 6.2 discusses unilateral effects in markets where sellers negotiate with buyers or prices are determined through auctions. Section 6.3 discusses unilateral effects relating to reductions in output or capacity in markets for relatively homogeneous products. Section 6.4 discusses unilateral effects arising from diminished innovation or reduced product variety. These effects do not exhaust the types of possible unilateral effects; for example, exclusionary unilateral effects also can arise.

A merger may result in different unilateral effects along different dimensions of competition. For example, a merger may increase prices in the short term but not raise longer-term concerns about innovation, either because rivals will provide sufficient innovation competition or because the merger will generate cognizable research and development efficiencies. See Section 10.

## 6.1 Pricing of Differentiated Products

In differentiated product industries, some products can be very close substitutes and compete strongly with each other, while other products are more distant substitutes and compete less strongly. For example, one high-end product may compete much more directly with another high-end product than with any low-end product.

A merger between firms selling differentiated products may diminish competition by enabling the merged firm to profit by unilaterally raising the price of one or both products above the pre-merger level. Some of the sales lost due to the price rise will merely be diverted to the product of the merger partner and, depending on relative margins, capturing such sales loss through merger may make the price increase profitable even though it would not have been profitable prior to the merger.

The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral price effects. Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice. The Agencies consider any reasonably available and reliable information to evaluate the extent of direct competition between the products sold by the merging firms. This includes documentary and testimonial evidence, win/loss reports and evidence from discount approval processes, customer switching patterns, and customer surveys. The types of evidence relied on often overlap substantially with the types of evidence of customer substitution relevant to the hypothetical monopolist test. See Section 4.1.1.

Substantial unilateral price elevation post-merger for a product formerly sold by one of the merging firms normally requires that a significant fraction of the customers purchasing that product view

products formerly sold by the other merging firm as their next-best choice. However, unless pre-merger margins between price and incremental cost are low, that significant fraction need not approach a majority. For this purpose, incremental cost is measured over the change in output that would be caused by the price change considered. A merger may produce significant unilateral effects for a given product even though many more sales are diverted to products sold by non-merging firms than to products previously sold by the merger partner.

> *Example 19:* In Example 5, the merged entity controlling Products A and B would raise prices ten percent, given the product offerings and prices of other firms. In that example, one-third of the sales lost by Product A when its price alone is raised are diverted to Product B. Further analysis is required to account for repositioning, entry, and efficiencies.

In some cases, the Agencies may seek to quantify the extent of direct competition between a product sold by one merging firm and a second product sold by the other merging firm by estimating the diversion ratio from the first product to the second product. The diversion ratio is the fraction of unit sales lost by the first product due to an increase in its price that would be diverted to the second product. Diversion ratios between products sold by one merging firm and products sold by the other merging firm can be very informative for assessing unilateral price effects, with higher diversion ratios indicating a greater likelihood of such effects. Diversion ratios between products sold by merging firms and those sold by non-merging firms have at most secondary predictive value.

Adverse unilateral price effects can arise when the merger gives the merged entity an incentive to raise the price of a product previously sold by one merging firm and thereby divert sales to products previously sold by the other merging firm, boosting the profits on the latter products. Taking as given other prices and product offerings, that boost to profits is equal to the value to the merged firm of the sales diverted to those products. The value of sales diverted to a product is equal to the number of units diverted to that product multiplied by the margin between price and incremental cost on that product. In some cases, where sufficient information is available, the Agencies assess the value of diverted sales, which can serve as an indicator of the upward pricing pressure on the first product resulting from the merger. Diagnosing unilateral price effects based on the value of diverted sales need not rely on market definition or the calculation of market shares and concentration. The Agencies rely much more on the value of diverted sales than on the level of the HHI for diagnosing unilateral price effects in markets with differentiated products. If the value of diverted sales is proportionately small, significant unilateral price effects are unlikely.[11]

Where sufficient data are available, the Agencies may construct economic models designed to quantify the unilateral price effects resulting from the merger. These models often include independent price responses by non-merging firms. They also can incorporate merger-specific efficiencies. These merger simulation methods need not rely on market definition. The Agencies do not treat merger simulation evidence as conclusive in itself, and they place more weight on whether their merger simulations consistently predict substantial price increases than on the precise prediction of any single simulation.

---

[11] For this purpose, the value of diverted sales is measured in proportion to the lost revenues attributable to the reduction in unit sales resulting from the price increase. Those lost revenues equal the reduction in the number of units sold of that product multiplied by that product's price.

A merger is unlikely to generate substantial unilateral price increases if non-merging parties offer very close substitutes for the products offered by the merging firms. In some cases, non-merging firms may be able to reposition their products to offer close substitutes for the products offered by the merging firms. Repositioning is a supply-side response that is evaluated much like entry, with consideration given to timeliness, likelihood, and sufficiency. See Section 9. The Agencies consider whether repositioning would be sufficient to deter or counteract what otherwise would be significant anticompetitive unilateral effects from a differentiated products merger.

## 6.2      Bargaining and Auctions

In many industries, especially those involving intermediate goods and services, buyers and sellers negotiate to determine prices and other terms of trade. In that process, buyers commonly negotiate with more than one seller, and may play sellers off against one another. Some highly structured forms of such competition are known as auctions. Negotiations often combine aspects of an auction with aspects of one-on-one negotiation, although pure auctions are sometimes used in government procurement and elsewhere.

A merger between two competing sellers prevents buyers from playing those sellers off against each other in negotiations. This alone can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the buyer, than the merging firms would have offered separately absent the merger. The Agencies analyze unilateral effects of this type using similar approaches to those described in Section 6.1.

Anticompetitive unilateral effects in these settings are likely in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business. These effects also are likely to be greater, the greater advantage the runner-up merging firm has over other suppliers in meeting customers' needs. These effects also tend to be greater, the more profitable were the pre-merger winning bids. All of these factors are likely to be small if there are many equally placed bidders.

The mechanisms of these anticompetitive unilateral effects, and the indicia of their likelihood, differ somewhat according to the bargaining practices used, the auction format, and the sellers' information about one another's costs and about buyers' preferences. For example, when the merging sellers are likely to know which buyers they are best and second best placed to serve, any anticompetitive unilateral effects are apt to be targeted at those buyers; when sellers are less well informed, such effects are more apt to be spread over a broader class of buyers.

## 6.3      Capacity and Output for Homogeneous Products

In markets involving relatively undifferentiated products, the Agencies may evaluate whether the merged firm will find it profitable unilaterally to suppress output and elevate the market price. A firm may leave capacity idle, refrain from building or obtaining capacity that would have been obtained absent the merger, or eliminate pre-existing production capabilities. A firm may also divert the use of capacity away from one relevant market and into another so as to raise the price in the former market. The competitive analyses of these alternative modes of output suppression may differ.

A unilateral output suppression strategy is more likely to be profitable when (1) the merged firm's market share is relatively high; (2) the share of the merged firm's output already committed for sale at prices unaffected by the output suppression is relatively low; (3) the margin on the suppressed output is relatively low; (4) the supply responses of rivals are relatively small; and (5) the market elasticity of demand is relatively low.

A merger may provide the merged firm a larger base of sales on which to benefit from the resulting price rise, or it may eliminate a competitor that otherwise could have expanded its output in response to the price rise.

> *Example 20:* Firms A and B both produce an industrial commodity and propose to merge. The demand for this commodity is insensitive to price. Firm A is the market leader. Firm B produces substantial output, but its operating margins are low because it operates high-cost plants. The other suppliers are operating very near capacity. The merged firm has an incentive to reduce output at the high-cost plants, perhaps shutting down some of that capacity, thus driving up the price it receives on the remainder of its output. The merger harms customers, notwithstanding that the merged firm shifts some output from high-cost plants to low-cost plants.

In some cases, a merger between a firm with a substantial share of the sales in the market and a firm with significant excess capacity to serve that market can make an output suppression strategy profitable.[12] This can occur even if the firm with the excess capacity has a relatively small share of sales, if that firm's ability to expand, and thus keep price from rising, has been making an output suppression strategy unprofitable for the firm with the larger market share.

## 6.4    Innovation and Product Variety

Competition often spurs firms to innovate. The Agencies may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger. That curtailment of innovation could take the form of reduced incentive to continue with an existing product-development effort or reduced incentive to initiate development of new products.

The first of these effects is most likely to occur if at least one of the merging firms is engaging in efforts to introduce new products that would capture substantial revenues from the other merging firm. The second, longer-run effect is most likely to occur if at least one of the merging firms has capabilities that are likely to lead it in the future to develop new products that would capture substantial revenues from the other merging firm. The Agencies therefore also consider whether a merger will diminish innovation competition by combining two of a very small number of firms with the strongest capabilities to successfully innovate in a specific direction.

The Agencies evaluate the extent to which successful innovation by one merging firm is likely to take sales from the other, and the extent to which post-merger incentives for future innovation will be lower than those that would prevail in the absence of the merger. The Agencies also consider whether the merger is likely to enable innovation that would not otherwise take place, by bringing together

---

[12]   Such a merger also can cause adverse coordinated effects, especially if the acquired firm with excess capacity was disrupting effective coordination.

complementary capabilities that cannot be otherwise combined or for some other merger-specific reason. See Section 10.

The Agencies also consider whether a merger is likely to give the merged firm an incentive to cease offering one of the relevant products sold by the merging parties. Reductions in variety following a merger may or may not be anticompetitive. Mergers can lead to the efficient consolidation of products when variety offers little in value to customers. In other cases, a merger may increase variety by encouraging the merged firm to reposition its products to be more differentiated from one another.

If the merged firm would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product. If there is evidence of such an effect, the Agencies may inquire whether the reduction in variety is largely due to a loss of competitive incentives attributable to the merger. An anticompetitive incentive to eliminate a product as a result of the merger is greater and more likely, the larger is the share of profits from that product coming at the expense of profits from products sold by the merger partner. Where a merger substantially reduces competition by bringing two close substitute products under common ownership, and one of those products is eliminated, the merger will often also lead to a price increase on the remaining product, but that is not a necessary condition for anticompetitive effect.

> *Example 21:* Firm A sells a high-end product at a premium price. Firm B sells a mid-range product at a lower price, serving customers who are more price sensitive. Several other firms have low-end products. Firms A and B together have a large share of the relevant market. Firm A proposes to acquire Firm B and discontinue Firm B's product. Firm A expects to retain most of Firm B's customers. Firm A may not find it profitable to raise the price of its high-end product after the merger, because doing so would reduce its ability to retain Firm B's more price-sensitive customers. The Agencies may conclude that the withdrawal of Firm B's product results from a loss of competition and materially harms customers.

# 7.    Coordinated Effects

A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers. Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. These reactions can blunt a firm's incentive to offer customers better deals by undercutting the extent to which such a move would win business away from rivals. They also can enhance a firm's incentive to raise prices, by assuaging the fear that such a move would lose customers to rivals.

Coordinated interaction includes a range of conduct. Coordinated interaction can involve the explicit negotiation of a common understanding of how firms will compete or refrain from competing. Such conduct typically would itself violate the antitrust laws. Coordinated interaction also can involve a similar common understanding that is not explicitly negotiated but would be enforced by the detection and punishment of deviations that would undermine the coordinated interaction. Coordinated interaction alternatively can involve parallel accommodating conduct not pursuant to a prior understanding. Parallel accommodating conduct includes situations in which each rival's response to competitive moves made by others is individually rational, and not motivated by

retaliation or deterrence nor intended to sustain an agreed-upon market outcome, but nevertheless emboldens price increases and weakens competitive incentives to reduce prices or offer customers better terms. Coordinated interaction includes conduct not otherwise condemned by the antitrust laws.

The ability of rival firms to engage in coordinated conduct depends on the strength and predictability of rivals' responses to a price change or other competitive initiative. Under some circumstances, a merger can result in market concentration sufficient to strengthen such responses or enable multiple firms in the market to predict them more confidently, thereby affecting the competitive incentives of multiple firms in the market, not just the merged firm.

## 7.1 Impact of Merger on Coordinated Interaction

The Agencies examine whether a merger is likely to change the manner in which market participants interact, inducing substantially more coordinated interaction. The Agencies seek to identify how a merger might significantly weaken competitive incentives through an increase in the strength, extent, or likelihood of coordinated conduct. There are, however, numerous forms of coordination, and the risk that a merger will induce adverse coordinated effects may not be susceptible to quantification or detailed proof. Therefore, the Agencies evaluate the risk of coordinated effects using measures of market concentration (see Section 5) in conjunction with an assessment of whether a market is vulnerable to coordinated conduct. See Section 7.2. The analysis in Section 7.2 applies to moderately and highly concentrated markets, as unconcentrated markets are unlikely to be vulnerable to coordinated conduct.

Pursuant to the Clayton Act's incipiency standard, the Agencies may challenge mergers that in their judgment pose a real danger of harm through coordinated effects, even without specific evidence showing precisely how the coordination likely would take place. The Agencies are likely to challenge a merger if the following three conditions are all met: (1) the merger would significantly increase concentration and lead to a moderately or highly concentrated market; (2) that market shows signs of vulnerability to coordinated conduct (see Section 7.2); and (3) the Agencies have a credible basis on which to conclude that the merger may enhance that vulnerability. An acquisition eliminating a maverick firm (see Section 2.1.5) in a market vulnerable to coordinated conduct is likely to cause adverse coordinated effects.

## 7.2 Evidence a Market is Vulnerable to Coordinated Conduct

The Agencies presume that market conditions are conducive to coordinated interaction if firms representing a substantial share in the relevant market appear to have previously engaged in express collusion affecting the relevant market, unless competitive conditions in the market have since changed significantly. Previous express collusion in another geographic market will have the same weight if the salient characteristics of that other market at the time of the collusion are comparable to those in the relevant market. Failed previous attempts at collusion in the relevant market suggest that successful collusion was difficult pre-merger but not so difficult as to deter attempts, and a merger may tend to make success more likely. Previous collusion or attempted collusion in another product market may also be given substantial weight if the salient characteristics of that other market at the time of the collusion are closely comparable to those in the relevant market.

25

A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. Even if terms of dealing are not transparent, transparency regarding the identities of the firms serving particular customers can give rise to coordination, e.g., through customer or territorial allocation. Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

A market typically is more vulnerable to coordinated conduct if a firm's prospective competitive reward from attracting customers away from its rivals will be significantly diminished by likely responses of those rivals. This is more likely to be the case, the stronger and faster are the responses the firm anticipates from its rivals. The firm is more likely to anticipate strong responses if there are few significant competitors, if products in the relevant market are relatively homogeneous, if customers find it relatively easy to switch between suppliers, or if suppliers use meeting-competition clauses.

A firm is more likely to be deterred from making competitive initiatives by whatever responses occur if sales are small and frequent rather than via occasional large and long-term contracts or if relatively few customers will switch to it before rivals are able to respond. A firm is less likely to be deterred by whatever responses occur if the firm has little stake in the status quo. For example, a firm with a small market share that can quickly and dramatically expand, constrained neither by limits on production nor by customer reluctance to switch providers or to entrust business to a historically small provider, is unlikely to be deterred. Firms are also less likely to be deterred by whatever responses occur if competition in the relevant market is marked by leapfrogging technological innovation, so that responses by competitors leave the gains from successful innovation largely intact.

A market is more apt to be vulnerable to coordinated conduct if the firm initiating a price increase will lose relatively few customers after rivals respond to the increase. Similarly, a market is more apt to be vulnerable to coordinated conduct if a firm that first offers a lower price or improved product to customers will retain relatively few customers thus attracted away from its rivals after those rivals respond.

The Agencies regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination. Coordination generally is more profitable, the lower is the market elasticity of demand.

Coordinated conduct can harm customers even if not all firms in the relevant market engage in the coordination, but significant harm normally is likely only if a substantial part of the market is subject to such conduct. The prospect of harm depends on the collective market power, in the relevant market, of firms whose incentives to compete are substantially weakened by coordinated conduct. This collective market power is greater, the lower is the market elasticity of demand. This collective market power is diminished by the presence of other market participants with small market shares and little stake in the outcome resulting from the coordinated conduct, if these firms can rapidly expand their sales in the relevant market.

Buyer characteristics and the nature of the procurement process can affect coordination. For example, sellers may have the incentive to bid aggressively for a large contract even if they expect strong responses by rivals. This is especially the case for sellers with small market shares, if they can realistically win such large contracts. In some cases, a large buyer may be able to strategically undermine coordinated conduct, at least as it pertains to that buyer's needs, by choosing to put up for bid a few large contracts rather than many smaller ones, and by making its procurement decisions opaque to suppliers.

# 8. Powerful Buyers

Powerful buyers are often able to negotiate favorable terms with their suppliers. Such terms may reflect the lower costs of serving these buyers, but they also can reflect price discrimination in their favor.

The Agencies consider the possibility that powerful buyers may constrain the ability of the merging parties to raise prices. This can occur, for example, if powerful buyers have the ability and incentive to vertically integrate upstream or sponsor entry, or if the conduct or presence of large buyers undermines coordinated effects. However, the Agencies do not presume that the presence of powerful buyers alone forestalls adverse competitive effects flowing from the merger. Even buyers that can negotiate favorable terms may be harmed by an increase in market power. The Agencies examine the choices available to powerful buyers and how those choices likely would change due to the merger. Normally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer.

> *Example 22:* Customer C has been able to negotiate lower pre-merger prices than other customers by threatening to shift its large volume of purchases from one merging firm to the other. No other suppliers are as well placed to meet Customer C's needs for volume and reliability. The merger is likely to harm Customer C. In this situation, the Agencies could identify a price discrimination market consisting of Customer C and similarly placed customers. The merger threatens to end previous price discrimination in their favor.

Furthermore, even if some powerful buyers could protect themselves, the Agencies also consider whether market power can be exercised against other buyers.

> *Example 23:* In Example 22, if Customer C instead obtained the lower pre-merger prices based on a credible threat to supply its own needs, or to sponsor new entry, Customer C might not be harmed. However, even in this case, other customers may still be harmed.

# 9. Entry

The analysis of competitive effects in Sections 6 and 7 focuses on current participants in the relevant market. That analysis may also include some forms of entry. Firms that would rapidly and easily enter the market in response to a SSNIP are market participants and may be assigned market shares. See Sections 5.1 and 5.2. Firms that have, prior to the merger, committed to entering the market also will normally be treated as market participants. See Section 5.1. This section concerns entry or adjustments to pre-existing entry plans that are induced by the merger.

As part of their full assessment of competitive effects, the Agencies consider entry into the relevant market. The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers.

The Agencies consider the actual history of entry into the relevant market and give substantial weight to this evidence. Lack of successful and effective entry in the face of non-transitory increases in the margins earned on products in the relevant market tends to suggest that successful entry is slow or difficult. Market values of incumbent firms greatly exceeding the replacement costs of their tangible assets may indicate that these firms have valuable intangible assets, which may be difficult or time consuming for an entrant to replicate.

A merger is not likely to enhance market power if entry into the market is so easy that the merged firm and its remaining rivals in the market, either unilaterally or collectively, could not profitably raise price or otherwise reduce competition compared to the level that would prevail in the absence of the merger. Entry is that easy if entry would be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.

The Agencies examine the timeliness, likelihood, and sufficiency of the entry efforts an entrant might practically employ. An entry effort is defined by the actions the firm must undertake to produce and sell in the market. Various elements of the entry effort will be considered. These elements can include: planning, design, and management; permitting, licensing, or other approvals; construction, debugging, and operation of production facilities; and promotion (including necessary introductory discounts), marketing, distribution, and satisfaction of customer testing and qualification requirements. Recent examples of entry, whether successful or unsuccessful, generally provide the starting point for identifying the elements of practical entry efforts. They also can be informative regarding the scale necessary for an entrant to be successful, the presence or absence of entry barriers, the factors that influence the timing of entry, the costs and risk associated with entry, and the sales opportunities realistically available to entrants.

If the assets necessary for an effective and profitable entry effort are widely available, the Agencies will not necessarily attempt to identify which firms might enter. Where an identifiable set of firms appears to have necessary assets that others lack, or to have particularly strong incentives to enter, the Agencies focus their entry analysis on those firms. Firms operating in adjacent or complementary markets, or large customers themselves, may be best placed to enter. However, the Agencies will not presume that a powerful firm in an adjacent market or a large customer will enter the relevant market unless there is reliable evidence supporting that conclusion.

In assessing whether entry will be timely, likely, and sufficient, the Agencies recognize that precise and detailed information may be difficult or impossible to obtain. The Agencies consider reasonably available and reliable evidence bearing on whether entry will satisfy the conditions of timeliness, likelihood, and sufficiency.

## 9.1    Timeliness

In order to deter the competitive effects of concern, entry must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect.

Even if the prospect of entry does not deter the competitive effects of concern, post-merger entry may counteract them. This requires that the impact of entrants in the relevant market be rapid enough that customers are not significantly harmed by the merger, despite any anticompetitive harm that occurs prior to the entry.

The Agencies will not presume that an entrant can have a significant impact on prices before that entrant is ready to provide the relevant product to customers unless there is reliable evidence that anticipated future entry would have such an effect on prices.

## 9.2    Likelihood

Entry is likely if it would be profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits. Profitability depends upon (a) the output level the entrant is likely to obtain, accounting for the obstacles facing new entrants; (b) the price the entrant would likely obtain in the post-merger market, accounting for the impact of that entry itself on prices; and (c) the cost per unit the entrant would likely incur, which may depend upon the scale at which the entrant would operate.

## 9.3    Sufficiency

Even where timely and likely, entry may not be sufficient to deter or counteract the competitive effects of concern. For example, in a differentiated product industry, entry may be insufficient because the products offered by entrants are not close enough substitutes to the products offered by the merged firm to render a price increase by the merged firm unprofitable. Entry may also be insufficient due to constraints that limit entrants' competitive effectiveness, such as limitations on the capabilities of the firms best placed to enter or reputational barriers to rapid expansion by new entrants. Entry by a single firm that will replicate at least the scale and strength of one of the merging firms is sufficient. Entry by one or more firms operating at a smaller scale may be sufficient if such firms are not at a significant competitive disadvantage.

# 10.    Efficiencies

Competition usually spurs firms to achieve efficiencies internally. Nevertheless, a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products. For example, merger-generated efficiencies may enhance competition by permitting two ineffective competitors to form a more effective competitor, e.g., by combining complementary assets. In a unilateral effects context, incremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price. Efficiencies also may lead to new or improved products, even if they do not immediately and directly affect price. In a

coordinated effects context, incremental cost reductions may make coordination less likely or effective by enhancing the incentive of a maverick to lower price or by creating a new maverick firm. Even when efficiencies generated through a merger enhance a firm's ability to compete, however, a merger may have other effects that may lessen competition and make the merger anticompetitive.

The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies.[13] Only alternatives that are practical in the business situation faced by the merging firms are considered in making this determination. The Agencies do not insist upon a less restrictive alternative that is merely theoretical.

Efficiencies are difficult to verify and quantify, in part because much of the information relating to efficiencies is uniquely in the possession of the merging firms. Moreover, efficiencies projected reasonably and in good faith by the merging firms may not be realized. Therefore, it is incumbent upon the merging firms to substantiate efficiency claims so that the Agencies can verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific.

Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. Projections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process. By contrast, efficiency claims substantiated by analogous past experience are those most likely to be credited.

Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service. Cognizable efficiencies are assessed net of costs produced by the merger or incurred in achieving those efficiencies.

The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market.[14] To make the requisite determination, the Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price

---

[13] The Agencies will not deem efficiencies to be merger-specific if they could be attained by practical alternatives that mitigate competitive concerns, such as divestiture or licensing. If a merger affects not whether but only when an efficiency would be achieved, only the timing advantage is a merger-specific efficiency.

[14] The Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in any relevant market. In some cases, however, the Agencies in their prosecutorial discretion will consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s). Inextricably linked efficiencies are most likely to make a difference when they are great and the likely anticompetitive effect in the relevant market(s) is small so the merger is likely to benefit customers overall.

increases in that market.[15] In conducting this analysis, the Agencies will not simply compare the magnitude of the cognizable efficiencies with the magnitude of the likely harm to competition absent the efficiencies. The greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies, and the more they must be passed through to customers, for the Agencies to conclude that the merger will not have an anticompetitive effect in the relevant market. When the potential adverse competitive effect of a merger is likely to be particularly substantial, extraordinarily great cognizable efficiencies would be necessary to prevent the merger from being anticompetitive. In adhering to this approach, the Agencies are mindful that the antitrust laws give competition, not internal operational efficiency, primacy in protecting customers.

In the Agencies' experience, efficiencies are most likely to make a difference in merger analysis when the likely adverse competitive effects, absent the efficiencies, are not great. Efficiencies almost never justify a merger to monopoly or near-monopoly. Just as adverse competitive effects can arise along multiple dimensions of conduct, such as pricing and new product development, so too can efficiencies operate along multiple dimensions. Similarly, purported efficiency claims based on lower prices can be undermined if they rest on reductions in product quality or variety that customers value.

The Agencies have found that certain types of efficiencies are more likely to be cognizable and substantial than others. For example, efficiencies resulting from shifting production among facilities formerly owned separately, which enable the merging firms to reduce the incremental cost of production, are more likely to be susceptible to verification and are less likely to result from anticompetitive reductions in output. Other efficiencies, such as those relating to research and development, are potentially substantial but are generally less susceptible to verification and may be the result of anticompetitive output reductions. Yet others, such as those relating to procurement, management, or capital cost, are less likely to be merger-specific or substantial, or may not be cognizable for other reasons.

When evaluating the effects of a merger on innovation, the Agencies consider the ability of the merged firm to conduct research or development more effectively. Such efficiencies may spur innovation but not affect short-term pricing. The Agencies also consider the ability of the merged firm to appropriate a greater fraction of the benefits resulting from its innovations. Licensing and intellectual property conditions may be important to this enquiry, as they affect the ability of a firm to appropriate the benefits of its innovation. Research and development cost savings may be substantial and yet not be cognizable efficiencies because they are difficult to verify or result from anticompetitive reductions in innovative activities.

---

[15] The Agencies normally give the most weight to the results of this analysis over the short term. The Agencies also may consider the effects of cognizable efficiencies with no short-term, direct effect on prices in the relevant market. Delayed benefits from efficiencies (due to delay in the achievement of, or the realization of customer benefits from, the efficiencies) will be given less weight because they are less proximate and more difficult to predict. Efficiencies relating to costs that are fixed in the short term are unlikely to benefit customers in the short term, but can benefit customers in the longer run, e.g., if they make new product introduction less expensive.

# 11.   Failure and Exiting Assets

Notwithstanding the analysis above, a merger is not likely to enhance market power if imminent failure, as defined below, of one of the merging firms would cause the assets of that firm to exit the relevant market. This is an extreme instance of the more general circumstance in which the competitive significance of one of the merging firms is declining: the projected market share and significance of the exiting firm is zero. If the relevant assets would otherwise exit the market, customers are not worse off after the merger than they would have been had the merger been enjoined.

The Agencies do not normally credit claims that the assets of the failing firm would exit the relevant market unless all of the following circumstances are met: (1) the allegedly failing firm would be unable to meet its financial obligations in the near future; (2) it would not be able to reorganize successfully under Chapter 11 of the Bankruptcy Act; and (3) it has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed merger.[16]

Similarly, a merger is unlikely to cause competitive harm if the risks to competition arise from the acquisition of a failing division. The Agencies do not normally credit claims that the assets of a division would exit the relevant market in the near future unless both of the following conditions are met: (1) applying cost allocation rules that reflect true economic costs, the division has a persistently negative cash flow on an operating basis, and such negative cash flow is not economically justified for the firm by benefits such as added sales in complementary markets or enhanced customer goodwill;[17] and (2) the owner of the failing division has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed acquisition.

# 12.   Mergers of Competing Buyers

Mergers of competing buyers can enhance market power on the buying side of the market, just as mergers of competing sellers can enhance market power on the selling side of the market. Buyer market power is sometimes called "monopsony power."

To evaluate whether a merger is likely to enhance market power on the buying side of the market, the Agencies employ essentially the framework described above for evaluating whether a merger is likely to enhance market power on the selling side of the market. In defining relevant markets, the Agencies

---

[16]   Any offer to purchase the assets of the failing firm for a price above the liquidation value of those assets will be regarded as a reasonable alternative offer. Liquidation value is the highest value the assets could command for use outside the relevant market.

[17]   Because the parent firm can allocate costs, revenues, and intra-company transactions among itself and its subsidiaries and divisions, the Agencies require evidence on these two points that is not solely based on management plans that could have been prepared for the purpose of demonstrating negative cash flow or the prospect of exit from the relevant market.

focus on the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist.

Market power on the buying side of the market is not a significant concern if suppliers have numerous attractive outlets for their goods or services. However, when that is not the case, the Agencies may conclude that the merger of competing buyers is likely to lessen competition in a manner harmful to sellers.

The Agencies distinguish between effects on sellers arising from a lessening of competition and effects arising in other ways. A merger that does not enhance market power on the buying side of the market can nevertheless lead to a reduction in prices paid by the merged firm, for example, by reducing transactions costs or allowing the merged firm to take advantage of volume-based discounts. Reduction in prices paid by the merging firms not arising from the enhancement of market power can be significant in the evaluation of efficiencies from a merger, as discussed in Section 10.

The Agencies do not view a short-run reduction in the quantity purchased as the only, or best, indicator of whether a merger enhances buyer market power. Nor do the Agencies evaluate the competitive effects of mergers between competing buyers strictly, or even primarily, on the basis of effects in the downstream markets in which the merging firms sell.

> *Example 24:* Merging Firms A and B are the only two buyers in the relevant geographic market for an agricultural product. Their merger will enhance buyer power and depress the price paid to farmers for this product, causing a transfer of wealth from farmers to the merged firm and inefficiently reducing supply. These effects can arise even if the merger will not lead to any increase in the price charged by the merged firm for its output.

# 13.   Partial Acquisitions

In most horizontal mergers, two competitors come under common ownership and control, completely and permanently eliminating competition between them. This elimination of competition is a basic element of merger analysis. However, the statutory provisions referenced in Section 1 also apply to one firm's partial acquisition of a competitor. The Agencies therefore also review acquisitions of minority positions involving competing firms, even if such minority positions do not necessarily or completely eliminate competition between the parties to the transaction.

When the Agencies determine that a partial acquisition results in effective control of the target firm, or involves substantially all of the relevant assets of the target firm, they analyze the transaction much as they do a merger. Partial acquisitions that do not result in effective control may nevertheless present significant competitive concerns and may require a somewhat distinct analysis from that applied to full mergers or to acquisitions involving effective control. The details of the post-acquisition relationship between the parties, and how those details are likely to affect competition, can be important. While the Agencies will consider any way in which a partial acquisition may affect competition, they generally focus on three principal effects.

First, a partial acquisition can lessen competition by giving the acquiring firm the ability to influence the competitive conduct of the target firm. A voting interest in the target firm or specific governance rights, such as the right to appoint members to the board of directors, can permit such influence. Such

influence can lessen competition because the acquiring firm can use its influence to induce the target firm to compete less aggressively or to coordinate its conduct with that of the acquiring firm.

Second, a partial acquisition can lessen competition by reducing the incentive of the acquiring firm to compete. Acquiring a minority position in a rival might significantly blunt the incentive of the acquiring firm to compete aggressively because it shares in the losses thereby inflicted on that rival. This reduction in the incentive of the acquiring firm to compete arises even if cannot influence the conduct of the target firm. As compared with the unilateral competitive effect of a full merger, this effect is likely attenuated by the fact that the ownership is only partial.

Third, a partial acquisition can lessen competition by giving the acquiring firm access to non-public, competitively sensitive information from the target firm. Even absent any ability to influence the conduct of the target firm, access to competitively sensitive information can lead to adverse unilateral or coordinated effects. For example, it can enhance the ability of the two firms to coordinate their behavior, and make other accommodating responses faster and more targeted. The risk of coordinated effects is greater if the transaction also facilitates the flow of competitively sensitive information from the acquiring firm to the target firm.

Partial acquisitions, like mergers, vary greatly in their potential for anticompetitive effects. Accordingly, the specific facts of each case must be examined to assess the likelihood of harm to competition. While partial acquisitions usually do not enable many of the types of efficiencies associated with mergers, the Agencies consider whether a partial acquisition is likely to create cognizable efficiencies.