EXHIBIT 56



Default iPod Manager
RealPlayer is not currently the default application to manage your iPod.
As your default application, RealPlayer can help prevent changes to your iPod software that might limit your ability to play or store Real Music Store content on your iPod. In addition, choosing RealPlayer as your default will also help preserve your ability to use your music library with other portable devices that you may choose in the future.
Would you like RealPlayer to be the default application to manage your iPod? (Recommended)
Do not ask me in the future
Tell Me More
Yes
No

# EXHIBIT 57



# Quarterly Update

# RealNetworks, Inc.

*3Q Results Good, Outlook Less So--Reiterate Neutral*

November 7, 2006

NEUTRAL

| | |
|---|---|
| RNWK - NASDAQ | $10.87 |
| PRICE TARGET | NA |
| 52-WEEK RANGE | $11.81-$7.20 |
| MARKET CAPITALIZATION | $1,741.6mm |
| SHARES OUTSTANDING | 160.2mm |
| FLOAT | 117.1mm |
| BOOK VALUE/SHARE | $5.07 |
| DEBT/TOTAL CAP. (%) | 17% |
| DIVIDEND/YIELD | NA/NM |
| AVG. DAILY VOLUME | 1,852,695 |



1 Year Price History for RNWK

RealNetworks is a leading distributor of digital media content on the Internet, including audio, video, and games. The company also provides a set of software and services enabling third parties' distribution of media over the Internet and to Internet-connected devices.

**A. Sasa Zorovic, Ph.D.**    617-428-5667
sasa.zorovic@opco.com

**Summary:** We reiterate our Neutral rating on RNWK. The company reported good 3Q results, above our top- and bottom-line estimates by $1mm and $0.01, respectively. However, sluggish growth in new music subscribers adds risk to segment estimates, in our view. Games growth continues to show strength with recent acquisitions. We are decreasing our EPS estimates for 4Q, and raising marginally for 2007 due to the acquisition of WiderThan.

**Reports good 3Q results.** The company reported revenue of $94mm, above our estimate of $93mm (guidance: $91mm to $94mm, consensus: $93mm), and EPS of $0.24 ahead of our estimate of $0.22 (guidance: $0.20 to $0.22, consensus: $0.22). EPS was helped by certain sales & marketing expenses that were delayed until 4Q, as well as R&D nearly $1mm lower than we had projected.

**Music segment growth slows further.** The company added roughly 25,000 music subscribers in 3Q (and only 50,000 in 2Q) vs. an average of 150,000 new subscribers for the previous four quarters (total paid subscriber count was up 50,000 QoQ). We estimate that ARPU in the music business dropped in the quarter as well. We believe the slowdown may indicate a lasting market preference for both music-as-a-download as well as end-to-end systems such as Apple's (AAPL, $79.71, Not Covered) iPod. Microsoft's (MSFT, $28.84, Not Covered) Zune is expected to launch November 14.

**Rhapsody DNA launched.** The technology platform enables the integration of Rhapsody into other manufacturer's products. While this should help RNWK to some degree, we are bearish on the music subscription business.

**On the acquisition of WiderThan, we are adjusting our 4Q and 2007 revenue and EPS estimates, though EPS will likely be up only marginally next year.**

- **For 4Q,** we are raising our revenue estimate from $99mm to $120mm (guidance: $117mm to $123mm, prior consensus: $100mm) and lowering EPS from $0.22 to $0.20 (guidance: $0.18 to $0.21, prior consensus: $0.23). Removing $2.7mm of charges related to the acquisition would increase EPS by $0.01. Net-net, we still estimate 2006 at $0.80.

- **For full-year 2007,** we are raising our revenue estimate from $426mm to $572mm (prior consensus: $427mm) but only increasing EPS from $0.33 to $0.34 (prior consensus: $0.37).

| Fiscal Year | Earnings Per Share Estimates (US$) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec | 1Q (Mar) | | 2Q (Jun) | | 3Q (Sep) | | 4Q (Dec) | | Year | | P/E |
| | Prior | Current | Prior | Current | Prior | Current | Prior | Current | Prior | Current | |
| 2005A | -- | 0.00 | -- | 0.03 | -- | 0.06 | -- | 1.61 | -- | 1.70 | 6.4x |
| 2006E | -- | 0.14A | -- | 0.22A | 0.22 | 0.24A | 0.22 | 0.20 | -- | 0.80 | 13.6x |
| 2007E | 0.25 | 0.23 | -- | 0.03 | 0.03 | 0.04 | 0.03 | 0.05 | 0.33 | 0.34 | 32.0x |
| 2008E | -- | -- | -- | -- | -- | -- | -- | -- | -- | 0.23 | 0.25 | 43.5x |

*GAAP EPS*

**See pages 4 - 6 for important disclosures**



**What we find bullish:**

- **Increasing estimates.** Due to the acquisition of WiderThan, we are raising our revenue estimates significantly. Estimated 4Q revenue goes from $99mm to $120mm (guidance: $117mm to $123mm, prior consensus: $100mm), while 2007 revenue shoots up from $426mm to $572mm.
- **Net growth of overall subscriptions.** After pausing in 2Q at 2.4mm, total subscriptions rose in 3Q by 50,000. Total subscriptions are up 11% YoY.
- **Greater international footprint.** From 23% a year ago, international revenue has grown to 26% of total revenues. The acquisition of WiderThan will only serve to accelerate this positive trend, in our view.

**What we find bearish:**
- **Ongoing competition.** The digital music business is a fiercely competitive one. Microsoft is a formidable opponent, and they are likely to grow stronger in this area over time. While not currently much of a threat to RNWK, we believe that Yahoo! (YHOO, $26.59, Neutral) is likely to improve its performance in this area as well.
- **Decreased numbers of added music subscriptions.** Music subscriptions grew only 25,000 in the quarter. While management seems to consider it to attributable to a temporary focus on other areas, we see a negative trend developing. Furthermore, we anticipate ARPUs will continue to fall.
- **Cautious about RBT (ringback tones) outlook.** While the acquired WiderThan will drive revenues significantly, it will also pull down margins. Gross margins at the acquired company are approximately 60%, compared to 81% in RNWK's technology segment, where results will be reported.

**What is otherwise of interest:**
- **Purchased 200,000 shares for $1.9mm.** The company bought back 200,000 shares at an average price of approximately $9.50. We believe the company has roughly $80mm outstanding in its share buyback authorization.

Our financial model follows:

---

**See pages 4 - 6 for important disclosures**                                         Page 2



**RealNetworks**
**Income Statement (GAAP)**
Figures in $000 except per share data

| FY December | Year 2005 | Q1 3/06 | Q2 6/06 | Q3 9/06 | Q4E 12/06 | Year 2006E | Q1 3/07 | Q2 6/07 | Q3 9/07 | Q4 12/07 | Year 2007E | Year 2008E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total revenues** | 325,059 | 86,602 | 89,409 | 93,676 | 120,061 | 389,748 | 134,547 | 140,549 | 146,207 | 151,002 | 572,306 | 657,281 |
| | | | | | | | | | | | | |
| Cost of revenues | 98,249 | 26,753 | 26,646 | 28,389 | 37,594 | 119,382 | 42,259 | 44,165 | 43,952 | 44,015 | 174,390 | 200,985 |
| Loss on content agreement | | | | | | | | | | | | |
| Gross profit | 226,810 | 59,849 | 62,763 | 65,287 | 82,466 | 270,365 | 92,288 | 96,384 | 102,255 | 106,988 | 397,915 | 456,296 |
| | | | | | | | | | | | | |
| R & D | 70,631 | 18,099 | 18,684 | 18,344 | 23,157 | 78,284 | 24,860 | 25,358 | 25,865 | 26,382 | 102,465 | 112,161 |
| Sales & marketing | 130,515 | 36,083 | 37,961 | 37,560 | 48,119 | 159,723 | 51,816 | 52,852 | 53,909 | 54,987 | 213,565 | 236,579 |
| General & administrative | 50,869 | 13,226 | 14,317 | 14,243 | 18,579 | 60,165 | 19,451 | 19,657 | 19,865 | 20,076 | 79,049 | 84,760 |
| Goodwill amortization | | | | | | | | | | | | |
| Antitrust litigation | (422,500) | (39,835) | (57,858) | (61,861) | (61,250) | (220,804) | (61,250) | (500) | - | - | (61,750) | - |
| Loss on excess office facilities | - | 738 | | | | 738 | | | | | | |
| Personnel reduction, restructuring, and related charges | | | | | | | | | | | | |
| Stock-based compensation | 128 | | | | | | | | | | | |
| Non-recurring acquisition charges | | | | | | | | | | | | |
| Other operating expenses | (422,372) | (39,097) | (57,858) | (61,861) | (61,250) | (220,066) | (61,250) | (500) | - | - | (61,750) | - |
| Total operating expenses | (170,557) | 28,311 | 13,104 | 8,086 | 28,605 | 78,106 | 34,677 | 97,367 | 99,639 | 101,446 | 333,329 | 433,500 |
| **Operating income** | 397,367 | 31,538 | 49,659 | 57,201 | 53,861 | 192,259 | 57,411 | (983) | 2,616 | 5,542 | 64,587 | 22,796 |
| | | | | | | | | | | | | |
| Interest income | 14,511 | 7,979 | 9,381 | 10,618 | 8,448 | 36,426 | 11,465 | 12,230 | 12,317 | 12,436 | 48,447 | 53,213 |
| Equity in net loss of MusicNet | (1,068) | | | | | | | | | | | |
| Impairment of equity investments | 19,064 | | 2,286 | | | 2,286 | | | | | | |
| Other, net | (331) | 117 | 73 | 242 | (3,610) | (3,178) | (3,614) | (3,618) | (3,622) | (3,626) | (14,479) | (3,636) |
| Total other income (expense), net | 32,176 | 8,096 | 11,740 | 10,860 | 4,838 | 35,534 | 7,851 | 8,612 | 8,695 | 8,810 | 33,968 | 49,577 |
| Pretax income | 429,543 | 39,634 | 61,399 | 68,061 | 58,700 | 227,794 | 65,263 | 7,629 | 11,311 | 14,352 | 98,555 | 72,373 |
| Taxes | 117,198 | 14,751 | 22,521 | 25,908 | 21,954 | 85,134 | 24,408 | 2,851 | 4,230 | 5,364 | 36,854 | 27,048 |
| Net income | 312,345 | 24,883 | 38,878 | 42,153 | 36,746 | 142,660 | 40,854 | 4,778 | 7,081 | 8,988 | 61,701 | 45,325 |
| EPS (basic) | 1.84 | 0.15 | 0.24 | 0.26 | 0.23 | 0.89 | 0.25 | 0.03 | 0.04 | 0.06 | 0.38 | 0.28 |
| **EPS (diluted)** | 1.70 | 0.14 | 0.22 | 0.24 | 0.20 | 0.80 | 0.23 | 0.03 | 0.04 | 0.05 | 0.34 | 0.25 |
| | | | | | | | | | | | | |
| Shares (basic) | 170,178 | 160,887 | 159,938 | 160,578 | 161,218 | 160,655 | 161,418 | 161,618 | 161,818 | 162,018 | 161,455 | 162,255 |
| Shares | 184,161 | 176,923 | 177,337 | 178,913 | 180,489 | 178,416 | 180,689 | 180,889 | 181,089 | 181,289 | 180,989 | 181,789 |
| | | | | | | | | | | | | |
| GAAP Net income (loss) | 312,345 | 24,883 | 38,878 | 42,153 | 36,746 | 142,660 | 40,854 | 4,778 | 7,081 | 8,988 | 61,701 | 45,325 |
| Interest income, net | (14,511) | (7,979) | (9,381) | (10,618) | (8,448) | (36,426) | (11,465) | (12,230) | (12,317) | (12,436) | (48,447) | (53,213) |
| Taxes | 117,198 | 14,751 | 22,521 | 25,908 | 21,954 | 34,411 | 24,408 | 2,851 | 4,230 | 5,364 | 36,854 | 27,048 |
| Depreciation, amortization and stock compens | 16,321 | 7,890 | 7,640 | 9,282 | 9,599 | 34,411 | 9,465 | 9,734 | 10,012 | 10,298 | 39,510 | 36,653 |
| **EBITDA** | 431,403 | 39,545 | 59,658 | 66,725 | 59,851 | 225,779 | 63,263 | 5,134 | 9,007 | 12,214 | 89,618 | 55,813 |
| Antitrust litigation | (422,500) | (39,835) | (57,858) | (61,861) | (61,250) | (220,804) | (61,250) | (500) | - | - | (61,750) | - |
| Expenses from antitrust litigation | | 971 | 997 | 1,000 | 1,000 | 3,968 | 1,000 | - | - | - | 1,000 | - |
| Loss on content agreement | | - | - | - | - | - | - | - | - | - | - | - |
| **EBITDA excluding antitrust litigation and l** | 8,903 | 681 | 2,797 | 5,864 | (999) | 8,943 | 3,013 | 4,634 | 9,007 | 12,214 | 28,868 | 55,813 |

Source: Company reports & Oppenheimer & Co. estimates.



# Important Disclosures and Certifications

Other companies mentioned in this report: AAPL, MSFT, YHOO





All price targets displayed in the chart above are for a 12-month period. Prior to March 30, 2004, Oppenheimer & Co. Inc. used 6-, 12-, 12- to 18-, and 12- to 24-month price targets and ranges. For more information about target price histories, please write to Oppenheimer & Co. Inc., 125 Broad St., 16th Fl., New York, NY 10004, Attention: Research Disclosure.

**Buy** - anticipates appreciation of 10% or more within the next 12 months, and/or a total return of 10% including dividend



payments, and/or the ability of the shares to perform better than the leading stock market averages or stocks within its particular industry sector.

**Neutral** - anticipates that the shares will trade at or near their current price and generally in line with the leading market averages due to a perceived absence of strong dynamics that would cause volatility either to the upside or downside, and/or will perform less well than higher rated companies within its peer group. Our readers should be aware that when a rating change occurs to Neutral from Buy, aggressive trading accounts might decide to liquidate their positions to employ the funds elsewhere.

**Sell** - anticipates that the shares will depreciate 10% or more in price within the next 12 months, due to fundamental weakness perceived in the company or for valuation reasons, or are expected to perform significantly worse than equities within the peer group.

| Distribution of Ratings/IB Services Firmwide and by Sector | | | | | TECHNOLOGY | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | IB Serv./Past 12 Mos. | | | | | IB Serv./Past 12 Mos. | |
| Rating | Count | Percent | Count | Percent | Rating | Count | Percent | Count | Percent |
| BUY [B] | 167 | 47.31 | 28 | 16.77 | BUY [B] | 28 | 48.28 | 4 | 14.29 |
| HOLD [N] | 175 | 49.58 | 20 | 11.43 | HOLD [N] | 28 | 48.28 | 1 | 3.57 |
| SELL [S] | 11 | 3.12 | 1 | 9.09 | SELL [S] | 2 | 3.45 | 0 | 0.00 |

Oppenheimer & Co. Inc. makes a market in the securities of AAPL.

Oppenheimer & Co. Inc. makes a market in the securities of RNWK.

Oppenheimer & Co. Inc. makes a market in the securities of YHOO.

***Analyst Certification -*** The author certifies that this research report accurately states his/her personal views about the subject securities, which are reflected in the ratings as well as in the substance of this report.The author certifies that no part of his/her compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in this research report.

**Additional Information Available**

**Please log on to http://www.opco.com or write to Oppenheimer & Co. Inc., 125 Broad Street, New York, NY 10004, Attention: Research Disclosure**

# Other Disclosures

Oppenheimer & Co. Inc. prepared the information and opinions in this report. Oppenheimer & Co. Inc. has no obligation to inform you when opinions or information in this report change. This report is based on public information. Oppenheimer & Co. Inc. makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete.

Past performance is not necessarily a guide to future performance. Estimates of future performance are based on assumptions that may not be realized.

The securities discussed in this report may not be suitable for all investors. This report does not provide individually tailored investment advice. It has been prepared without regard to the individual financial circumstances and objectives of persons who receive it. We recommend that investors independently evaluate particular investments and strategies, and



encourage investors to seek the advice of a financial advisor.

NASD Regulation, Inc. and the New York Stock Exchange have adopted rules that will prohibit research analysts from trading in securities of covered companies during specified time periods before and after the publication of research.

This report is not an offer to buy or sell any security or to participate in any trading strategy.

Oppenheimer & Co. Inc. is a member of the NYSE and all principal exchanges.

This report or any portion hereof may not be reprinted, sold, or redistributed without the written consent of Oppenheimer & Co. Inc. Copyright © Oppenheimer & Co. Inc. 2006.

**Oppenheimer and Co. Inc**
*125 Broad Street*
*New York, NY 10004*
*(212) 668-8000*

**Institutional Sales**

**New York**
*(800) 221-5588*
*(212) 943-9055*

**Boston**
*(800) 470-2750*
*(617) 428-5544*

**Atlanta**
*(800) 554-1386*
*(404) 262-5302*

**Houston**
*(800) 231-7509*
*(713) 650-2000*

**Chicago**
*(800) 621-2103*
*(312) 360-5500*

**San Francisco**
*(800) 820-6726*
*(415) 438-3000*

**Kansas City**
*(866) 377-3304*
*(816) 932-7021*

**Institutional Trading**

**New York**
*(800) 533-8987*
*(212) 668-8091*

**Boston**
*(800) 470-2750*
*(617) 428-5551*

**Dallas**
*(866) 618-5927*
*(972) 450-3844*

**San Francisco**
*(888) 693-9333*

# EXHIBIT 58

Page 2

08:59:01

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                      ---o0o---

4

5

6

MELANIE TUCKER, On Behalf of       )

7    Herself and All Others Similarly   )

     Situated,                          )

8                                       )

                    Plaintiff,          ) Case No. C 06

9                                       ) 4457 HRL

          vs.                           )

10                                      )

     APPLE COMPUTER, INC., a            )

11   California Corporation,            )

                                        )

12                  Defendant.          )

                                        )

13

14

15

16                      ---o0o---

17            FRIDAY, OCTOBER 26, 2007

18

          VIDEOTAPE DEPOSITION OF MELANIE TUCKER

19                      ---o0o---

20

21

22

23

24

     REPORTED BY: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

25

**MELANIE TUCKER**

## Page 3

```
 1          A P P E A R A N C E S
 2             ---o0o---
 3
 4
    FOR THE PLAINTIFF:
 5
       BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
 6       2901 North Central Avenue, Suite 1000
         Phoenix, Arizona 85012
 7       BY: TODD CARPENTER, ESQ.
 8       COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
         655 West Broadway, Suite 1900
 9       San Diego, California 92101
         BY: BONNY SWEENEY, ESQ.
10       GREG WESTON, ESQ.
11       MURRAY, FRANK & SAILER LLP
         275 Madison Avenue
12       New York, New York 10016
         BY: BRIDGETT HAMILL, ESQ.
13
    FOR THE DEFENDANT:
14
       JONES DAY
15       555 California Street, 26th Floor
         San Francisco, California 94104
16       BY: BOB MITTELSTAEDT, ESQ.
         LARA KOLLIOS, ESQ.
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1          E X A M I N A T I O N
 2             ---o0o---
 3    EXAMINATION BY MR. MITTELSTAEDT          5
      EXAMINATION BY MR. CARPENTER            146
 4    FURTHER EXAMINATION BY MR. MITTELSTAEDT  147
 5          E X H I B I T S
 6             ---o0o---
 7    1  CDs owned but not burned and CDs owned and  153
 8       burned list
 9    2  Purchase history list      153
10    3  Plaintiff's allegations    153
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1          SAN FRANCISCO, CALIFORNIA, OCTOBER 26, 2007
 2             ---o0o---
 3          BE IT REMEMBERED that on Friday, the 26th day of
 4    October, 2007, commencing at the hour of 9:11 a.m. thereof,
 5    at 555 California Street, 26th Floor, San Francisco,
 6    California, before me, Balinda Dunlap, a Certified Shorthand
 7    Reporter in and for the County of San Francisco, State of
 8    California, personally appeared:                    09:10:34
 9          THE VIDEOGRAPHER:  Good morning.  My name is Michael 09:10:34
10    Barber.  I am a videographer associated with Barkley Court  09:10:52
11    Reporters, located at 222 Front Street, Suite 600, San      09:10:56
12    Francisco, California 94111.  The date is October 26th, 2007. 09:11:00
13    The time is 9:11 a.m.                               09:11:06
14          This deposition is taking place at Jones Day, 555    09:11:08
15    California Street, San Francisco, California 94104 in the    09:11:14
16    matter of the Apple iPod iTunes antitrust litigation        09:11:18
17    appearing in the U.S. District Court for the Northern       09:11:22
18    District of California, San Jose Division, Case Numbers     09:11:26
19    C050037 JW and C0604457 JW.                          09:11:32
20          This is the videotape deposition of Melanie Tucker   09:11:39
21    being taken on behalf of the defense.               09:11:43
22          Counsel, would you please identify yourselves for the 09:11:45
23    record and state whom you represent.                09:11:47
24          MR. MITTELSTAEDT:  I'm Bob Mittelstaedt for the     09:11:49
25    defendant.                                           09:11:51
```

## Page 6

```
 1          MS. KOLLIOS:  Lara Kollios for the defendant.      09:11:52
 2          MS. HAMILL:  Bridget Hamill, Murray, Frank & Sailer 09:11:54
 3    for plaintiff Mary Ann Arusen.                       09:11:58
 4          MR. WESTON:  Greg Weston from Coughlin Stoia       09:12:01
 5    representing the class.                              09:12:05
 6          MS. SWEENEY:  Bonny Sweeney.                       09:12:06
 7          MR. CARPENTER:  Todd Carpenter from Bonnett,       09:12:09
 8    Fairbourn, Friedman & Balint representing the plaintiffs.   09:12:13
 9          THE VIDEOGRAPHER:  Thank you.  Would the court     09:12:14
10    reporter please swear in the witness.               09:12:16
11                MELANIE TUCKER                            09:12:24
12    called as a witness by the Defense, having been sworn to tell
13    the truth, the whole truth, and nothing but the truth, was
14    examined and testified as follows:
15             ---o0o---                                   09:12:26
16          EXAMINATION BY MR. MITTELSTAEDT                 09:12:26
17    Q.  If you would state your full name and address for the  09:12:27
18    record, please.                                      09:12:29
19    A.  Melanie Christine Tucker, 4431 Cleveland Avenue, No.   09:12:29
20    2, San Diego, California 92116.                      09:12:36
21    Q.  Have you ever had your deposition taken before?      09:12:40
22    A.  No, I have not.                                   09:12:43
23    Q.  What have you done to prepare for the deposition?    09:12:44
24    A.  I met with my counsel briefly.                    09:12:48
25    Q.  For how long?                                     09:12:50
```

**MELANIE TUCKER**

**Page 11**

| | | |
|---|---|---|
| 1 | A.  I thought there were others, but I didn't look into | 09:17:31 |
| 2 | them. | 09:17:34 |
| 3 | Q.  And why didn't you look into them? | 09:17:35 |
| 4 | A.  Because I had friends that had the iPod and were | 09:17:36 |
| 5 | satisfied. | 09:17:41 |
| 6 | Q.  Okay.  At that time did you think the price that you | 09:17:42 |
| 7 | paid for the iPod was a fair price? | 09:17:44 |
| 8 | MR. CARPENTER:  Objection.  Vague and ambiguous as to | 09:17:47 |
| 9 | "fair." | 09:17:49 |
| 10 | THE WITNESS:  I thought it was highly priced. | 09:17:50 |
| 11 | Q.  BY MR. MITTELSTAEDT:  More than you wanted to pay? | 09:17:53 |
| 12 | A.  More than I wanted to pay. | 09:17:55 |
| 13 | Q.  But why did you buy it anyway? | 09:17:57 |
| 14 | A.  More than I could afford.  Because I wanted it.  I | 09:17:59 |
| 15 | had decided I wanted it. | 09:18:09 |
| 16 | Q.  Did I hear you right to say that it was more than you | 09:18:10 |
| 17 | could afford? | 09:18:13 |
| 18 | A.  Yes. | 09:18:14 |
| 19 | Q.  Where did you get the money? | 09:18:15 |
| 20 | A.  I had to save extra for it. | 09:18:17 |
| 21 | Q.  But at the end of the day, you thought it was | 09:18:21 |
| 22 | worthwhile paying the price that you paid? | 09:18:24 |
| 23 | MR. CARPENTER:  Objection.  That misstates her | 09:18:26 |
| 24 | testimony. | 09:18:28 |
| 25 | THE WITNESS:  Can you reask the question? | 09:18:31 |

**Page 12**

| | | |
|---|---|---|
| 1 | Q.  BY MR. MITTELSTAEDT:  You made the decision to buy | 09:18:33 |
| 2 | the iPod at the price that it was offered? | 09:18:35 |
| 3 | A.  Yes. | 09:18:38 |
| 4 | Q.  And you thought it was worth it? | 09:18:38 |
| 5 | MR. CARPENTER:  Objection. | 09:18:42 |
| 6 | Q.  BY MR. MITTELSTAEDT:  At the time you bought it? | 09:18:43 |
| 7 | MR. CARPENTER:  Pardon me.  Objection to form. | 09:18:44 |
| 8 | THE WITNESS:  I was hoping it would be worth it. | 09:18:47 |
| 9 | Q.  BY MR. MITTELSTAEDT:  At the time you bought the | 09:18:51 |
| 10 | first iPod, had you heard anything about Apple's online music | 09:19:02 |
| 11 | store? | 09:19:07 |
| 12 | A.  Not that I recall. | 09:19:08 |
| 13 | Q.  Had either of those friends, Travis or Sean, said | 09:19:10 |
| 14 | anything about the Apple's iTunes music store? | 09:19:14 |
| 15 | A.  I don't recall them mentioning the iPod's store. | 09:19:22 |
| 16 | Q.  At the time you bought your first iPod, did you have | 09:19:26 |
| 17 | any information as to what music those two friends put on | 09:19:30 |
| 18 | their iPod? | 09:19:34 |
| 19 | A.  No. | 09:19:35 |
| 20 | Q.  Other than that first iPod that you bought in April | 09:19:40 |
| 21 | of 2005, how many other iPods have you bought? | 09:19:42 |
| 22 | A.  One. | 09:19:46 |
| 23 | Q.  When did you buy that? | 09:19:47 |
| 24 | A.  December of 2006. | 09:19:49 |
| 25 | Q.  And why did you buy that one? | 09:20:00 |

**Page 13**

| | | |
|---|---|---|
| 1 | A.  Because my first one broke. | 09:20:01 |
| 2 | Q.  And how did you choose an iPod rather than, say, an | 09:20:04 |
| 3 | iRiver at that point? | 09:20:09 |
| 4 | A.  Because all of my music was already on my iTunes and | 09:20:11 |
| 5 | that would have the only way to keep my music. | 09:20:15 |
| 6 | Q.  Did you do anything to research how you could put | 09:20:18 |
| 7 | that music onto another digital player other than an iPod? | 09:20:21 |
| 8 | A.  I did not. | 09:20:25 |
| 9 | Q.  Have you ever researched that? | 09:20:26 |
| 10 | A.  No. | 09:20:33 |
| 11 | Q.  Did anyone tell you that it was impossible to put | 09:20:34 |
| 12 | your music that you had on the iPod onto a competing digital | 09:20:39 |
| 13 | music player like an iRiver? | 09:20:45 |
| 14 | MR. CARPENTER:  Objection to form. | 09:20:47 |
| 15 | THE WITNESS:  Can you repeat the question? | 09:20:49 |
| 16 | Q.  BY MR. MITTELSTAEDT:  Did anyone ever tell you that | 09:20:51 |
| 17 | you could not put music that you had on your iPod onto a | 09:20:53 |
| 18 | competing digital music player? | 09:20:57 |
| 19 | A.  I was aware of that. | 09:20:59 |
| 20 | Q.  But did anyone ever tell you that? | 09:21:00 |
| 21 | A.  No. | 09:21:04 |
| 22 | Q.  How did you become aware of that, as you say? | 09:21:07 |
| 23 | A.  I was reading about it. | 09:21:12 |
| 24 | Q.  Where? | 09:21:18 |
| 25 | A.  Online. | 09:21:18 |

**Page 14**

| | | |
|---|---|---|
| 1 | Q.  Where? | 09:21:19 |
| 2 | A.  I don't remember. | 09:21:20 |
| 3 | Q.  Any idea? | 09:21:22 |
| 4 | A.  I do not have an idea. | 09:21:23 |
| 5 | Q.  Was it on an Apple website? | 09:21:25 |
| 6 | MR. CARPENTER:  She's already said that she doesn't | 09:21:28 |
| 7 | remember. | 09:21:33 |
| 8 | THE WITNESS:  I don't remember. | 09:21:33 |
| 9 | Q.  BY MR. MITTELSTAEDT:  Did you have any information -- | 09:21:40 |
| 10 | strike that. | 09:21:42 |
| 11 | At the time that you were buying your iPod in | 09:21:43 |
| 12 | December 2 of '06, did you still have the music that was on | 09:21:46 |
| 13 | the iPod on a computer? | 09:21:51 |
| 14 | A.  Yes. | 09:21:54 |
| 15 | Q.  And what computer? | 09:21:54 |
| 16 | A.  My personal laptop. | 09:21:56 |
| 17 | Q.  And did you ever research whether you could take the | 09:21:59 |
| 18 | music that you had on your personal computer and put it on an | 09:22:02 |
| 19 | iRiver or some portable digital player other than an iPod? | 09:22:06 |
| 20 | MR. CARPENTER:  Objection to form. | 09:22:11 |
| 21 | THE WITNESS:  Did I -- sorry.  Repeat. | 09:22:14 |
| 22 | Q.  BY MR. MITTELSTAEDT:  Yes.  Did you ever research | 09:22:17 |
| 23 | whether you could put the music that was on your laptop onto | 09:22:19 |
| 24 | a competing portable digital player other than an iPod? | 09:22:22 |
| 25 | MR. CARPENTER:  Same objection. | 09:22:26 |

Pages 11 to 14

**MELANIE TUCKER**

EXHIBIT 59

1  Robert A. Mittelstaedt  #60359
   ramittelstaedt@jonesday.com
2  Craig E. Stewart  #129530
   cestewart@jonesday.com
3  David C. Kiernan #215335
   dkiernan@jonesday.com
4  JONES DAY
   555 California Street, 26th Floor
5  San Francisco, CA  94104
   Telephone:    (415) 626-3939
6  Facsimile:     (415) 875-5700

7  Attorneys for Defendant
   APPLE INC.

8

9                      UNITED STATES DISTRICT COURT

10                   NORTHERN DISTRICT OF CALIFORNIA

11                          OAKLAND DIVISION

12

13  THE APPLE iPOD iTUNES ANTI-TRUST          **Lead Case No. C 05-00037 YGR**
    LITIGATION
14                                            **[CLASS ACTION]**

15  This Document Relates To

16  ALL ACTIONS                               **SUPPLEMENTAL DECLARATION
                                              OF AUGUSTIN FARRUGIA**

17

18

19

20

21  I, Augustin Farrugia, declare as follows:

22         1.      I am the Senior Director, DRM Technologies at Apple Inc.  I am the head of

23  Apple's DRM Technologies group.  In January 2011, I submitted a Declaration In Support of

24  Defendant's Renewed Motion For Summary Judgment.  I submit this declaration to correct and

25  clarify the timing of the release of the database verification code and new keybag architecture

26  described in paragraphs 25-32 and clarify on which iPod models the codes were enabled.  The

27  facts stated in this declaration are true based on information obtained by members of my team and

28  others with relevant knowledge at Apple.

1      2.     The new keybag architecture for the iPod referenced in paragraphs 25, 29 and 32

2    was first shipped and enabled in the iPod nano 2nd generation introduced on September 12, 2006.

3    The new keybag architecture was later shipped and enabled in the iPod nano 3rd generation, iPod

4    classic 6th generation, and iPod touch 1st generation introduced on September 5, 2007, and on

5    later generations of iPod nano, iPod classic, and iPod touch.  The new keybag architecture was

6    not enabled and thus had no effect on any other iPods, including iPod shuffles, iPod nano 1st

7    generation or iPod classic 1st through 5th generations.

8      3.     The iPod database verification protocol referenced in paragraphs 25 and 29-31 was

9    shipped and enabled in the iPod nano 3rd generation, iPod classic 6th generation, and iPod Touch

10    1st generation introduced on September 5, 2007, and later generations of iPod nano, iPod classic,

11    and iPod touch.  The iPod database verification protocol was not enabled and thus had no effect

12    on any other iPods, including iPod shuffles, iPod nano 1st generation, iPod nano 2nd generation,

13    or iPod classic 1st through 5th generations.

14      I declare under penalty of perjury under the laws of the United States of America that the

15    foregoing is true and correct.

16      Executed this _2_ day of July 2013 in Cupertino, California.

Augustin Farrugia

EXHIBIT 60

**Charoensak v Apple Computer, Inc.   Depo of Somtai Charoensak   1-12-07**

**Page 1 to Page 178**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**Aiken & Welch Court Reporters**
**One Kaiser Plaza, Suite 505**
**Oakland, CA  94612**
**Phone:  510-451-1580**

BSA     Charoensak v Apple Computer, Inc.   Depo of Somtai Charoensak   1-12-07     XMAX(1/74)

**Page 1**

[1]       UNITED STATES DISTRICT COURT
[2]          NORTHERN DISTRICT
[3]          ---oOo---
[4] SOMTAI TROY CHAROENSAK, and
     MARIANA ROSEN, individually,
[5] and on behalf of all others
     similarly situated,
[6]
[7]    Plaintiff,
[8] vs.        No. C0500037 JW
[9] APPLE COMPUTER, INC.,
[10]     Defendants.
[11] _____/
[12]
[13]
[14]
[15]    DEPOSITION OF SOMTAI TROY CHAROENSAK
[16]
[17]
[18]
[19]
[20]     Taken before EARLY K. LANGLEY, RMR
[21]        CSR No. 3537
[22]       January 12, 2007
[23]
[24]
[25]

**Page 2**

[1]        I N D E X
[2]            PAGE
[3] EXAMINATION BY MR. MITTELSTAEDT     7, 174
[4] EXAMINATION BY MR. KATRIEL       170
[5]
[6]
[7]
[8]
[9]
[10]      E X H I B I T S
[11] DEFENDANTS'           PAGE
[12] 1    Documents that have been produced    98
      and marked Charoensak
[13]    2, 3, 5, 6 and 7
[14] 2    Printout of music files      149
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 3**

[1]      DEPOSITION OF SOMTAI TROY CHAROENSAK
[2]
[3]     BE IT REMEMBERED, that pursuant to Notice, and on
[4] the 12th day of January 2007, commencing at the hour of
[5] 9:07 a.m., in the offices of Jones Day, 555 California
[6] Street, 26th Floor, San Francisco, California, before
[7] me, EARLY K. LANGLEY, a Certified Shorthand Reporter,
[8] personally appeared SOMTAI TROY CHAROENSAK, produced as
[9] a witness in said action, and being by me first duly
[10] sworn, was thereupon examined as a witness in said
[11] cause.
[12]
[13]        ---oOo---
[14]
[15]    ROY A. KATRIEL, The Katriel Law Firm, 1101 30th
[16] Street NW, Suite 500, Washington, D.C. 20007, appeared
[17] on behalf of the Plaintiff.
[18]
[19]    MICHAEL M. GOLDBERG, Glancy, Binkow & Goldberg,
[20] LLP, 1801 Avenue of the Stars, Suite 311, Los Angeles,
[21] California 90067, appeared on behalf of the Plaintiff.
[22]
[23]
[24]
[25]

**Page 4**

[1]    ROBERT A. MITTELSTAEDT, TRACY STRONG, Jones
[2] Day, 555 California Street, 26th Floor, San Francisco,
[3] California, appeared on behalf of the Defendant Apple
[4] Computer.
[5]
[6]     ALSO PRESENT:     Nick Silva, Tele-Video
[7]    Production Services, Oakland, California.
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**Page 25**

[1] time, my -- my computer doesn't have a lot of --
[2] didn't have a lot of storage capacity, so I would
[3] delete the music, thinking that I had it on my
[4] iPOD, and that, because I purchased it, it is mine
[5] and I could, you know, later use it, but I soon
[6] realized that that is not the case.
[7]    Q.    So, initially, you got the music into your
[8] iTunes library, put it onto your iPOD, and then
[9] deleted it from the iTunes library on your
[10] computer?
[11]    A.    Correct.
[12]    Q.    And then when you wanted to burn a CD with
[13] that music that you had deleted, you encountered
[14] problems, is that what you are saying?
[15]    A.    Correct.
[16]    Q.    And then at some point, did you stop
[17] deleting the music from the iTunes library on your
[18] computer?
[19]    A.    Yes, I did.
[20]    Q.    And once you stopped deleting that music,
[21] then were you able to burn CDs?
[22]    A.    Only on that computer, yes.
[23]    Q.    So the problem that you encountered was
[24] that you were deleting music from the iTunes
[25] library and that made it impossible, as you

**Page 26**

[1] understood it at least, to burn CDs with that
[2] music that had been deleted; right?
[3]    A.    Correct.
[4]    Q.    And that's the problem you were
[5] complaining to Ms. Wong about?
[6]    A.    Not -- not exactly.
[7]    Q.    Okay.  What problem were you complaining
[8] to Ms. Wong about then?
[9]    A.    That I was -- I was locked out of the
[10] music that I purchased.  I think that's the main
[11] complaint, that I realized that the music on my
[12] iPOD, although that I paid for it and it was mine,
[13] I had no access to it.  That was the main
[14] complaint that I had.  The fact that I couldn't
[15] burn a CD was just a result of that, that I was
[16] locked out of my own music that I purchased.
[17]    Q.    Well, you weren't locked out of it as you
[18] used that term, as long as you kept the music in
[19] your iTunes library on your computer; correct?
[20]    A.    I -- I was locked out of it because I had
[21] only one choice of being able to use that music.
[22] It was either on my iPOD or in the iTunes that I
[23] initially purchased the iTunes on the computer
[24] that I used to purchase the music, and then any
[25] other time I would try to have access to that file

**Page 27**

[1] I would not be able to have access to it.
[2]    Q.    Okay.  When you -- when you keep the music
[3] from Apple Store in the iTunes library, you
[4] continue to have access to it; correct?
[5]    A.    Just on the computer that I purchase, and
[6] using the iTunes, yes.
[7]    Q.    And you know you can also burn a copy of
[8] that music as long as you have not deleted it from
[9] your iTunes library; correct?
[10]    A.    I know that, yes, yes.
[11]    Q.    When did you learn that?
[12]    A.    After -- well, after I deleted the file,
[13] once or twice, I figured it out that I would have
[14] to burn it on the computer that I purchased it,
[15] and then I would be able to delete it because then
[16] I had a -- a, I guess a backup or I would have the
[17] CD.
[18]    Q.    And have you done that now already, burned
[19] copies of music that you downloaded from Apple?
[20]    A.    Yes.
[21]    Q.    How many times have you done that?
[22]    A.    I don't know the exact number.
[23]    Q.    More than -- more than ten times?
[24]    A.    I would say at least more than eight
[25] times.

**Page 28**

[1]    Q.    Have you done that with all the music that
[2] you've obtained from Apple since you learned that
[3] you shouldn't be deleting it?
[4]    A.    Most of it.  The rest I have, I just keep
[5] on my hard drive.  I upgraded my computer, so I
[6] just keep it there.
[7]    Q.    And how did you learn that you shouldn't
[8] delete the music from your iTunes library?
[9]    A.    Trial and error.
[10]    Q.    And when did you learn that?
[11]    A.    At a couple of -- like I said, after a
[12] couple of times after purchasing music I figured
[13] it out that I don't have access to it any other
[14] way.
[15]    Q.    Can you put a date or a month on that?
[16]    A.    No, I cannot.
[17]    Q.    Sometime in 2006?
[18]    A.    No.  I mean that would have been 2000 --
[19] late 2004 after I purchased my first couple of
[20] iTunes purchases.
[21]    Q.    You know, when you -- when you first went
[22] to your computer to try to burn a CD from music
[23] that you had downloaded from Apple, why were you
[24] wanting to burn a CD of that music?
[25]    A.    So that I could play it in my car.

# EXHIBIT 61

Subject: Fwd: A Real Rival for Apple's iPod? (Business Week)
Date: Tue, 19 Sep 2006 06:10:59 -0700
From: Tony Fadell <tfadell@apple.com>
To: Steve Jobs <sjobs@apple.com>, Greg Joz Joswiak <joz@apple.com>, Phil Schiller
<schiller@apple.com>, Jeff Williams <jwilliams@apple.com>, Eddy Cue <cue@apple.com>, Jeff
Robbin <jrobbin@apple.com>
Message-ID: <92AD7EEF-3790-49B4-A894-4573F67D0D39@apple.com>

---

SEPTEMBER 19, 2006


Technology
By Arik Hesseldahl

 A Real Rival for Apple's iPod?
 RealNetworks, which runs the Rhapsody music service, teams with SanDisk as
Real CEO Rob Glaser offers his vision of a "jukebox in the sky"

 There was a moment, about two years ago, when the relevance of RealNetworks
(RNWK) seemed to be in question.

Apple Computer (AAPL) was well on its way to making consumer-electronics
history with its inimitable iPod. RealNetworks, in contrast, was spinning
its wheels. **It had a music-download service called Rhapsody—the result of
its acquisition of Listen.com in 2003—but it lacked a music player of its
own. So Rhapsody made its songs compatible with Apple's iPod, without
getting Apple's permission. This initiative, called Harmony, sparked intense
controversy, and the situation still remains unresolved.**

But Real's fortunes changed suddenly on Sept. 18 when it teamed up with
SanDisk (SNDK), a maker of flash-memory chips that also builds the Sansa
line of MP3 players. Sansa has quietly emerged as the second-most popular
brand of players in the U.S., after the iPod. Later this year, SanDisk will
release a new line of Sansas that will support Rhapsody right out of the
box, just as iPods are primed to deliver music downloaded from Apple's
iTunes.

NARROWING THE GAP.  **Rhapsody currently boasts some 1.6 million subscribers,
making it the second-most popular music download service after iTunes**. Apple
still rules, of course. It doesn't disclose the number of iTunes users, but
it has clocked more than 1.5 billion song downloads since the service
launched in 2003, while selling more than 60 million iPods. Still, Real's
Sansa deal could help narrow the gap.

The announcement with SanDisk comes on the heels of two other major deals
for Real. Rhapsody is now available as a subscription service through the

CONFIDENTIAL
Apple_AIIA00325894

Sonos Digital Music System, a system for streaming music throughout the home. (Unlike iPods and their associated gear, the Sonos players can download tunes from Rhapsody on their own—no need for a computer.) Additionally, **Real announced last week that it has acquired WiderThan (WTHN), a wireless entertainment company that provides content to 25 different wireless carriers around the world, including Cingular Wireless, which is a joint venture of AT&T (T) and BellSouth (BLS); Sprint Nextel (S); and Verizon Wireless, which is a joint venture of Verizon Communications (VZ) and Vodafone (VOD), in the U.S.**

Clearly, RealNetworks has a plan, which doesn't involve taking a permanent back seat to Apple. As Real CEO Rob Glaser sees it, digital music doesn't begin and end with the coupling of a player and a service—the iPod-iTunes model. A bigger concept is coming into view, something **Glaser calls "the jukebox in the sky." According to this scheme, constant and pervasive connections to the Internet make it possible for music to follow you practically anywhere you go.** It's not really about killing off the iPod, so much as giving consumers new ways to enjoy the music and videos they love. Here's how Glaser spells it all out:

People constantly compare RealNetworks to Apple. Is that a fair comparison? It's one of those funny things. People lump us in with Apple—and we're in the digital music space, so it's understandable—but we have a fundamentally different paradigm at the center of what we're doing. **Apple's paradigm is the iPod, and that has obviously worked great for them. Our paradigm is the jukebox in the sky. It's related to the WiderThan acquisition we did, because it's our belief that in a world where the Internet is everywhere, you should have access to the celestial jukebox anywhere you are, whether it's on a wireless device or a phone or a device like the Sansa e200.**

All those modes are tied to the same idea. What is different about music, at the end of the day, is not that you can just distribute it digitally. That's just the first phase. **The second phase is that if you as a consumer get the rights to all of the world's music. That changes everything because you don't have to be locked into the disadvantages of owning it, but not having it with you at a given time.** That's what's good about Rhapsody. We keep track of what you like, you create a virtual library, and we bring that music to you wherever you are.

So, you're not so interested in competing head-to-head with Apple? No, that's not what we're doing. It's more of what Microsoft (MSFT) is doing with the Zune player (see BusinessWeek.com, 9/15/06, "Coming Zune: Microsoft's Music Player"). That's more of a pure-play, zero-sum strategy, which is the sort of thing you associate with the Microsoft warrior culture. To us it was clear that, with Apple deciding to make the iPod a proprietary device, the right way for us to manifest our strategy was a set of end-to-end collaborations like what we've done with Sonos and with SanDisk, which will deliver the experience wherever people are. But if Apple were to open up the iPod, we'd love to support the iPod, too.

CONFIDENTIAL
Apple_AIIA00325895

**What's the latest on the Harmony initiative, which allows Rhapsody songs to be played on the iPod? Apple didn't like it, but Harmony still seems to work.**
**It's still there. Every time Apple has updated iTunes and the iPod we've maintained compatibility with it, and for every customer who wants to use it, we support them. But we've found it's much better to offer a great end-to-end experience with partners who want to be our partners as the primary effort. That is what we're doing with SanDisk and Sonos.**

**Have you and Steve Jobs ever talked about this whole Harmony-iTunes controversy from 2004?**
**We may have said hello at a conference or something, but it's not like my phone number is unlisted or anything.**

Let's talk about another partner of yours, Microsoft. They are clearly about to change the way they do digital music yet again with the Zune player. You have a handful of overlapping relationships with Microsoft. What does the Zune mean to you?
We have a solid relationship with their games group, and we have a solid relationship with their MSN group, where we do a bunch of things around MSN Messenger. Microsoft is not a monolith in the music business. But what they have done, as near as we can tell, is de-emphasize this "Plays for Sure" technology they touted, which doesn't work very well. Their portable-device focus is this Zune thing, which they have decided to take in a proprietary direction. And so it's quite fortuitous that we have our own end-to-end technology, and that we have been working on our own partnerships around that for about a year and a half.

Tell us about the deal with Sonos. They make an interesting product for home users, but it's priced awfully high.
The guys on the Sonos team are an awesome product group. They are excellent at the ergonomics of product design. They are great at thinking through the customer experience. With the kind of product that Sonos has created, you assume a broadband connection. To us, getting direct access to Rhapsody [on that] just seemed natural. Their controller and box run Linux. The product teams had a common vision. So we and they designed this new Rhapsody direct service in that way.

Sonos today is not a super high-volume partner, but they build world-leadership products. I, for one, have had a lot of success in my career working with partners who do leading-edge products that then become mainstream later on. Twenty years ago, I was doing Microsoft Word. At that time, Word was the best word processor at handling fancy fonts, but laser printers cost $3,000. So we did a joint promotion with Hewlett-Packard (HPQ) where we marketed the laser printer with Word. People thought we were crazy to do it, but laser printers became mainstream, and very quickly Word went from No. 5 in the market to No. 2. It passed WordPerfect a few years later.

CONFIDENTIAL
Apple_AIIA00325896

If you're on the right side of history, there's nothing wrong with starting out with a product at the high end and then riding that into the mainstream. That is the path we're on with Sonos.

Hesseldahl is a reporter for BusinessWeek.com

color ff2f2c flags 9160621185 original-mailbox imap://cue@mail.apple.com/Temp remote-id 45094

------ end message ------

CONFIDENTIAL
Apple_AIIA00325897

# EXHIBIT 62

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4                            ---oOo---

5     THE APPLE iPOD iTUNES
      ANTITRUST LITIGATION
6

7                                      No.  C-05-00037-JW(RS)

8
      _____/
9

10

11

12          VIDEOTAPED DEPOSITION OF ROGER G. NOLL

13                         VOLUME I

14                     (Pages 1 to 215)

15

16           Taken before ERIN F. ROBINSON

17                    CSR NO. 12199

18                    April 7, 2011

19

20

21

22

23

24

25

**210**

1 pricing committee wouldn't take that change into
2 account in setting its price?
3    A. Anything is possible, but the premise, of
4 course, we need to emphasize which is Harmony had no
5 effect on the price elasticity of demand of iPods. If
6 that's true, then it would be perfectly reasonable if
7 the price committee didn't take Harmony or anything
8 else like Harmony into account.
9    Q. And what you've seen in reviewing the price
10 committee reports is that Apple didn't change prices
11 based on small changes in the marketplace or supply and
12 demand that just had, you know, small dollar amount
13 impacts?
14    A. Well, they did take into account changes in
15 other people's prices. And those sometimes are small.
16 So that's not an accurate characterization of what the
17 price committee documents actually contain in them.
18    Q. Focused on retail prices, if Apple has a retail
19 price of 199 for a product and it turns out the
20 competitors are charging 195 or 193 or 189, have you
21 seen any instance where Apple lowers its price by that
22 small an amount?
23    A. Not that small of an amount, no. But they do
24 reprice the same model periodically.
25    Q. So if disabling Harmony had, you know, a

**211**

1 similarly small effect on iPod demand, would you expect
2 Apple to change its price?
3    A. I would expect Apple to change its price if it
4 anticipated that Harmony would have a bigger effect
5 than the initial effect, yes. I would expect them to,
6 in their long-run pricing plans, to base their pricing
7 decisions on what the anticipated effect of more
8 competition owing to Harmony and products like it would
9 be.
10    Q. But let's say hypothetically Apple's pricing
11 committee thought the impact of disabling Harmony was
12 going to be $6, from what you've seen, do you expect
13 Apple would have changed its prices for that reason?
14    A. Remember, this is again retail list prices.
15 Regression model says they change their price that
16 much. It's not about do I think the price committee
17 decided a price change that small. The actual price
18 association is that, which you're assuming is accurate
19 and I don't want to assume that, but assuming that it
20 is, then that's an actual price.
21       How that feeds into a retail price is
22 different, and the data that I have about retail prices
23 are different. And the long-run retail price of iPods,
24 as you say, is determined two or three times a year,
25 and that would be based on expectations of the future

**212**

1 about what the competitive landscape for iPods is going
2 to be over the next few months.
3       And so it wouldn't necessarily be what happened
4 in the first three weeks after Harmony was reduced. It
5 would be a longer run calculation based on what you
6 thought -- if Apple had decided, the but-for world is
7 Apple decides it's not going to use iTunes updates to
8 disable programs that convert FairPlay file into a
9 Windows media file, all right?
10       If that had been their decision, then a whole
11 bunch of other things would have followed from that,
12 which is other people would have produced Harmony like
13 products that do the same thing. There would have been
14 more extensive use of things like that because it would
15 have been -- there would have been a market for it.
16       There are people out there who want that stuff,
17 all right? And there would have been people who wanted
18 to produce that, and in particular Microsoft would have
19 been one of them. So if you're Apple, you have to
20 think ahead of what are the implications if we disable
21 Harmony and what are the implications if we don't.
22       And the implication if we don't is a completely
23 different competitive landscape, and that might very
24 well cause you to reduce the price of iPods for the
25 purpose of reducing the incentive for people to try to

**213**

1 get around FairPlay.
2    Q. But if you thought that -- if Apple's pricing
3 committee thought that whatever they do or don't do
4 with respect to Harmony's going to make the equivalent
5 of a $5 swing in iPod demand --
6       MR. MEDICI: Object to form.
7       THE WITNESS: If they assume that it.
8 BY MR. MITTELSTAEDT:
9    Q. -- then they wouldn't change prices?
10    A. Then they wouldn't change prices.
11       MR. MITTELSTAEDT: Okay. Why don't we stop
12 there for the day.
13       THE WITNESS: Okay.
14       THE VIDEOGRAPHER: This concludes Volume 1 of
15 Dr. Roger Noll. We are off the record at 3:38.
16       (Whereupon, the deposition was adjourned at
17       3:38 p.m.)
18
19                              _____
                               SIGNATURE OF WITNESS
20
21
22
23
24
25