# EXHIBIT 33
**REDACTED**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) ) ) ) ) ) | Case No.: 05-CV-00037 YGR<br><br>REBUTTAL EXPERT REPORT OF DAVID M. MARTIN JR., PH.D. |
| This Document Relates To:<br><br>    ALL ACTIONS. | | |

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# Table of Contents

I. Introduction ......................................................................................................................... 3

II. Keybag Verification Protocol.............................................................................................. 3

III. Database Verification Protocol ........................................................................................... 6

IV. Harmony.............................................................................................................................. 7

V. Third Party Jukeboxes ......................................................................................................... 8

VI. Apple and Third Party Cooperation .................................................................................. 11

VII. "Walled Garden" Considerations...................................................................................... 14

VIII. Signature ........................................................................................................................... 15

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                                                          3

## I.      Introduction

1. I write this report to rebut the opinions expressed by Dr. John P. J. Kelly in his expert report of July 19, 2013 and his deposition of October 2, 2013. I previously submitted a declaration dated February 28, 2011 and an opening expert report dated April 8, 2013.

2. In ¶¶8-11, Dr. Kelly describes "some of the features added from October 2004 to March 2009." If Dr. Kelly intends to express an opinion that these changes justify the introduction of the keybag verification and/or database verification protocols, then I would disagree. The description of the changes does not mention either verification protocol, and none of the changes intrinsically appear to require such verification protocols for their function.

## II.     Keybag Verification Protocol

3. In ¶¶40-42, Dr. Kelly offers opinions regarding the keybag verification protocols. Dr. Kelly does not state that this section of his report describes the actual reasons that the keybag verification protocols were added to FairPlay; instead, he speculates on possibilities. For example, "If the change was caused by corruption [...] the iTunes Software or the iPod firmware could unexpectedly quit as a result." This is a general statement about how software sometimes behaves rather than a specific analysis of iTunes' and/or the iPod firmware's historical or current requirements for correct behavior. Similarly, "If the change was caused by tampering, this could be an attempt by a hacker to gain information about FairPlay in order to discover the account keys and gain unauthorized access to the DRM-protected music," followed by a discussion of the "chosen-ciphertext attack". No Apple documents or testimony are cited that refer to the chosen-ciphertext attack as a motivation for the keybag verification protocol. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

██████████████████████████████████████████████████████████████ It is these local account keys that are the "natural target for attack", since they are present on a computer fully controlled by the end-user, such as a Mac or a PC.

4. In any case, Dr. Kelly offers no explanation as to how an attacker might be able to *practically* mount an attack against either local or iPod keybag account keys if the keybag verification protocol had never been deployed. The security of all of the cryptosystems used in FairPlay have their limits. The issue is not whether it might be *possible* for an attacker to deduce the encryption key, but rather, how much effort one would expect the attack to take in the average case. (After all, an attacker might luckily guess the encryption key on the first attempt – randomness is like that; no amount of engineering can absolutely prevent a lucky guess.) To evaluate the risk properly, one must at least specify the resources available to the attacker and what would constitute their success. For example, an attacker might have full debugging control of a modern, fast personal computer running iTunes, and want to determine an account key in order to permanently decrypt some music previously purchased from the iTunes Store, and might be willing to let the computer run at full speed for 1000 solid years[1] in order to do so. In this case, success would be that the user determined the account key within 1000 years, not simply that the attacker was able to "gain information about FairPlay". In other words, not all "information about FairPlay" constitutes success. Since Dr. Kelly did not specify anything more specific than this, it is hard to evaluate any claim that the keybag verification protocol was required to protect the secrecy of account keys.

5. Furthermore, recall that the keybag verification protocol causes FairPlay within iTunes to verify that a keybag was created by Apple before attempting to process it any further; if iTunes detects that the keybag was modified by a party other than Apple, then it rejects the keybag and consequently will not play any songs that are encrypted by keys from the keybag. An attacker who fully controls a

---

[1] Cryptosystems such as AES and RSA are engineered in terms of expected failure timescales that far exceed 1000 years.

Expert Report of David Martin, Ph.D. 5

computer running iTunes can presumably disable this verification step within iTunes and then attack the underlying cryptosystem as if the keybag verification protocol were not present at all.  For this reason, the underlying cryptosystem must have been engineered to withstand cryptanalytic attacks that do not depend on the keybag verification protocol for protection. Similar reasoning applies to attacks that rely on a running iPod, where the landscape may be even more difficult for an attacker.

6. Dr. Kelly did not address two possible explanations present in the record for the keybag verification protocols.  First, as I described in my opening report and declaration, the conversation between Mr. Robbin and Mr. Farrugia at Apple_AIIA00798303 appears related to the decision to implement the protocols.  Second, the FairPlay Next Generation document of Mr. Farrugia explicitly identifies motivations.  At Apple_AIIA_B_000033, "The internal security validation process of the current iPod security shows that the security architecture has several flaws and one of them allows the injection in the iPod's Keybag without the control of the iPod Account Key manager. *The injection is then used to add DRMed songs in the library*" (emphasis added).  Apple_AIIA_B_000079-80 describes one of the "weaknesses of the current FairPlay 3.0.1 implementation" as "a well known flaw already exploited by Real to DRM their music to be compatible for iPod implementation of FairPlay."

7. In ¶46, Dr. Kelly describes changes made to the iTunes database over time.  I am aware that the database format has changed over time as well, although I did not attempt to verify his description of the changes, since they are largely unrelated to the database verification protocol.  I would note that the iTunes database also includes length and version fields, as is typical with structures such as these that may change over time.  The length and version fields allow software, including prior versions of iTunes software, prior versions of iPod firmware, and 3rd party software, to identify the areas of the database that they know how to manipulate and areas that they do not and should leave alone.  Such mechanisms make it possible to add fields to the database without necessarily introducing incompatibilities with other existing software.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## III.     Database Verification Protocol

8. Dr. Kelly characterizes the database verification protocol as an "improvement" in his section II.C.2 preceding ¶47. I recognize the database verification protocol as a change, but not as an improvement, as I have previously explained. After all, the database verification code transforms small errors that do not meaningfully interfere with the user experience into enormous ones that treat the database as being devoid of all data. As an example, Dr. Kelly describes in ¶138 how, prior to Apple's introduction of the database verification protocol, RealPlayer apparently caused the song named "Melõdiqúe" to be displayed as "MelÃµdiqÃºe" on the iPod. Yes, the name is garbled, but as long as the song plays correctly, the user might not even notice, particularly if it is one of many songs being played, as it appears to be in Dr. Kelly's screenshot of Figure 42. So this is an example of a small error: in the absence of the database verification protocol, the name displays incorrectly.

9. But if the database verification protocol were in force on the iPod, it would have prevented the iPod from playing this "MelÃµdiqÃºe" or any other songs stored on the iPod, or displaying any song names at all. The iPod would effectively appear to be empty until the user gave up on the third-party jukebox and used iTunes instead. This is what I mean when I say that the verification code transforms small errors into enormous ones.

10. Furthermore, this iPod-suddenly-seems-empty behavior is not because the Apple software detected that there's anything particularly wrong with the name "MelÃµdiqÃºe"; rather, Apple treats every change that any third-party program makes to the database as inherently suspect. If any third-party program touches the database, then Apple destroys the whole database. So not only does Apple transform small errors into enormous ones, it transforms all third-party changes that are otherwise completely safe into enormous errors as well.

11. In ¶58 and his deposition, Dr. Kelly discusses the ███████████████████ macro.
███████████████████████████████████████████████████████████████████

[REDACTED]

12. Dr. Kelly writes in ¶67 that "Since hackers continued to attack all aspects of the FairPlay architecture, it was reasonable for Apple to continue improving all aspects of the FairPlay architecture." But Dr. Kelly offers no evidence that *all aspects* were indeed being attacked; instead, he provides a list of different versions of iTunes and states that attacking software could "circumvent the protection in FairPlay" associated with those versions, without specifying which aspects of FairPlay were circumvented in any of those versions. This is not a sufficient methodology to conclude that "all aspects" were being attacked.

## IV.    Harmony

13. In ¶70, Dr. Kelly considers the issue of whether RealPlayer Harmony could in fact remove all existing DRM protection schemes from music, regardless of the music's publisher origin. He was asked to further clarify in deposition:

```
Kelly 2013 82:19-83:9
19        Q.   So let me ask you a question about that,
20   about the "any online music store."
21             Is it your contention, then, that
22   RealPlayer cracked every single DRM system that was
23   out there?
24             MR. KIERNAN:  Object to form.
 1             BY MS. BERNAY:
 2        Q.   Based -- based on this -- that you can use
 3   any online music store; is that your opinion, based
 4   on this?
 5             MR. KIERNAN:  Object to form.
 6             THE WITNESS:  I am -- I am describing -- I
 7   am -- I am looking at what Harmony says they can
```

---

[2] See Apple_AIIA00094564.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

```
     8    do.  What, in fact -- whether this is accurate
     9    enough or not, I don't know.
```

14. Dr. Kelly appears to be saying that he's not sure whether Real's explanation of this aspect of Harmony is really "accurate enough."  He is right to be unsure of this, having identified no evidence other than Real's user-facing "help" pages within RealPlayer. Regardless of what Dr. Kelly thinks Real is saying in its "help" pages, he and I agree that being able to remove DRM protection from a song essentially means having broken the DRM protection scheme.  It defies imagination to think that Real Networks, with stockholders, corporate lawyers, and a fixed address, would have published software that breaks its competitors' DRM protection schemes, with the only evidence that this ever occurred being some documentation included with RealPlayer 10.5 – no news reports, no security conference and journal papers covering the technical details, and no lawsuits from competitors in the news.[3]  Even preliminary weaknesses in existing cryptographic schemes are big news in the security literature; the idea that Real's *published, working software* would crack even a single competitor's cryptosystem protecting music, without a single independent confirmation of this happening, is completely unbelievable. To go further and conclude that Real's software could in fact crack *all* competing schemes, again without any independent confirmation, is even the more unwarranted.

## V.     Third Party Jukeboxes

15. In the heading of section IV.B. preceding ¶89, Dr. Kelly writes that "There is overwhelming evidence of third party jukebox bugs."  I disagree; Dr. Kelly has not provided any metrics allowing a conclusion that evidence of third party jukebox bugs is "overwhelming" compared to any other software at all, including iTunes and the iPod firmware.

---

[3] For example, in 2001, the U.S. Department of Justice made the decision to arrest Mr. Dmitry Skylarov of the firm ElcomSoft for having marketed a "a product that could be used to circumvent security protections built into the Adobe Acrobat eBook Reader," following complaints by Adobe. See Adobe's explanation at http://www.adobe.com/aboutadobe/pressroom/pressreleases/200108/elcomsoftqa.html.

Expert Report of David Martin, Ph.D.                                                                                                                  9

16. Dr. Kelly writes in his footnote 83 on p. 62 that I appeared to misunderstand the purpose of the experiment he described in his prior declaration. To clarify his intent, he added emphasis to his prior explanation, so that it now reads that he "changed a single byte of the information added when the third song was transferred to the iPod *in order to simulate a bug* in the program that transferred the third song to the iPod." Yet Dr. Kelly does not merely seem to be saying that any program, including iTunes, is capable of being mistakenly released with a bug that destroys the iTunes database's magic number. His declaration beginning at ¶38 states that:

> 38. [...] Because RealNetworks did not have access to source code or other technical descriptions of the iPod database, its software would have been more likely to contain bugs or features that corrupted files on the iPod or otherwise interfered with the operation of the iPod.
>
> 39. To illustrate this, I conducted the following experiment to analyze the effect of a third-party modifying the internal database. [...]

17. Thus he appears to be "illustrating" the type of bug that would be expected to occur in software like Harmony. I still disagree that this particular bug (i.e., miswriting the database's magic value) should be considered representative of problems that are likely to exist in software such as Harmony. Yet Dr. Kelly did properly identify a drastic and undesirable effect, namely, that of making all of the songs on the device unplayable – and this is exactly the effect that Apple chose as appropriate when it detected a database that had been touched by non-Apple software.

18. I previously addressed the relevance of AppleCare records to the issues in this case in response to Dr. Kelly's declaration, in which he cited AppleCare records to support his conclusion as to the "likely cause" of alleged corruption. Now, in his report, Dr. Kelly lists some new cases as well and says only "The following are a few samples of cases opened by AppleCare responding to complaints about the operation of iPods by users who had used a third-party application to load and play music on the iPod". He does not state that these new cases support any particular conclusion. Dr. Kelly also abandoned a number of AppleCare cases he previously cited in his prior report. Without inspecting any of the devices, or interviewing any of the involved personnel, it is again very difficult to put these records in

perspective. In his deposition, Dr. Kelly admitted that he did not conduct any systematic analysis of complaints received by AppleCare, but instead had counsel for Apple provide him a collection of complaints allegedly involving third-party juke boxes. Kelly Deposition at 95:16-96:6. He further admitted he did not talk to anyone at AppleCare regarding the various complaints he detailed in his reports and did not examine any of the iPods customers were complaining about. Nor did he speak with any of the customers who submitted complaints. Kelly Deposition at 99:14-101:25.

19. Dr. Kelly and I agree that most programs have bugs.[4] In ¶100 and following, he discusses many undesirable behaviors of third-party software that appear to be due to bugs. I did not attempt to verify his specific findings, but I find it unsurprising that third-party jukeboxes are no exception to the rule that most programs have bugs. Dr. Kelly offers no methodology for assessing how problematic these bugs are for Apple's customers, or for Apple itself, or even if such an assessment would be relevant to determining whether third-party jukebox software should be detected and its music made unplayable by iTunes and the iPod firmware.

20. Most of the specific apparent bugs that he discusses have a far more subtle effect than making all songs on the iPod unplayable. At ¶100 "ml_ipod Plugin Overwrites iTunes Data," the effects of the apparent bug are not clearly stated. At ¶102 "ml_iPod Plugin Deletes iTunes Playlists", it appears that playlists are deleted, but songs remain playable. At ¶106 "ml_ipod Plugin Prevents the iPod from Playing Videos," it appears that songs can still be played. At ¶109 "ml_ipod Plugin Deletes On-The-Go Playlists," it appears that songs can still be played. At ¶116, songs remained playable. At ¶119 "pmp_ipod Plugin Deletes On-The-Go Playlists," songs remained playable. At ¶120 "pmp_ipod May Leave the iTunes Database in an Inconsistent State," songs remained playable. At ¶124, songs remained playable. The effect of the "fixes" enumerated in ¶125 are generally unclear.

---

[4] See, e.g., Kelly Deposition at 91:3-22.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                                                                  11

21. Regarding Harmony, at ¶¶129-131 "iTunes Database Contents Are Inconsistent," the effects of the "inconsistencies" are unstated. It appears that songs remain playable. At ¶¶132-134 "Playlists Are Corrupted," songs remained playable for some of the time; the problem involves interactions between iTunes and RealPlayer. A customer who used only RealPlayer would not appear to encounter the behavior described here. At ¶135 "RealPlayer Deletes On-The-Go Playlists," songs remain playable. At ¶138 "RealPlayer Does Not Handle Special Characters in Song Tags," songs remain playable; the only undesirable effect is that some characters with accent marks are displayed incorrectly. At ¶139 "RealPlayer Leaves Orphan Files on The iPod," songs remain playable. At ¶140 "RealPlayer Does Not Support the iPod Video," songs remain playable.

22. Regarding "Other Customer Complaints" at ¶¶144-150, Dr. Kelly summarizes forum postings of problem descriptions. It is difficult to assess the nature of these problems given only forum descriptions, but most of the incidents appear to be less serious than the iPod not playing any songs at all. Dr. Kelly admitted at deposition that he did not speak to any of the people who posted in the forum or message boards that he cites to in his report.[5]

## VI.     Apple and Third Party Cooperation

23. In ¶151, Dr. Kelly states that "Apple would have had to share confidential information". Although Apple did designate such information as confidential, Dr. Kelly has not demonstrated that the information *needed* to be kept confidential for security purposes. He writes further that "As Dr. Martin seems to recognize, Apple would also have to modify the iPod firmware and iTunes Software to make the iPod firmware and iTunes software work seamlessly with the dozens of third-party applications – including RealPlayer and Winamp – that were available to the public." I do not recall what modifications

---

[5] See Kelly Deposition Tr. at 105-112.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

he is referring to here and consequently do not understand why he feels that I have agreed with him on this point.

24. Dr. Kelly states that publishing accurate interoperability specifications might not be sufficient for third-party applications to achieve the "requisite level of compatibility" in ¶152. I agree that it takes work to implement software according to a specification and that bugs in these implementations are possible, just as bugs also occur in iTunes and the iPod firmware. But broadly speaking, the fact that third-party jukeboxes written to an accurate specification might behave differently than iTunes – whether because their features are implemented better, merely implemented differently, or even are malfunctioning – is pretty much exactly the point. Obviously, third-party developers do not aim to perfectly replicate iTunes. If that's all they wanted to do, then they could just use iTunes as-is.

25. Dr. Kelly states "Among other things, Dr. Martin would have Apple perform a full verification analysis of the iTunes database" in ¶153. I do not recall stating this and I do not know exactly what Dr. Kelly means by the phrase "full verification analysis." He makes it sound extremely burdensome. But Dr. Kelly has not shown that the database code prior to the introduction of the database verification protocol was unusually fragile, or that ensuring that appropriate bounds-checking and other sanity tests are present would itself be a burdensome effort. Scrutinizing data in this way is standard practice in software development. Dr. Kelly points towards one aspect of such scrutiny in ¶84: "Every possible action available to the user must be tested including sequences of actions that were not envisioned by the specification or software architecture." Since it is rarely possible to test every possible sequence of actions available to the user, the ability of the software to react correctly to such sequences of actions is instead verified by considering the spectrum of possible values in the underlying data structures that describe the user's actions, and ensuring that the program is constrained to work within that spectrum of values. In other words, the programmers perform bounds-checking and sanity checking on those values.

26. Also in ¶153, Dr. Kelly writes "And it is wrong to suggest that making the device or software more 'robust' would eliminate bugs that could interfere with the operation of the iPod."  I agree that it is hard to completely eliminate all bugs, but that is not what I described as the desired outcome.  Rather, I was addressing the fact that Apple pointed to possible bugs in third-party applications as a justification for detecting third-party applications and making iPod songs unplayable as a result.  So I wrote that "Another possibility would have been for Apple to code for robustness rather than rapid failure due to the detection of third-party software."  Making iPod songs unplayable simply because a third-party program touched the database in a benign fashion sounds more like fragility than robustness.

27. In ¶154, Dr. Kelly appears to be saying that the situation with iPhone, where Apple welcomes third-party developers to contribute software to the iPhone platform and provides extensive documentation on how to do so correctly and securely, is fundamentally different from the issue of third-party access to the iPod – essentially because Apple designed a solution for iPhone but never intended to allow one for the iPods.  This is not a compelling argument that no such interoperability is possible on the iPod platform.  Clearly, providing appropriate documentation to third-party developers should result in improved interoperability.  There should be little question that Apple is capable of producing such documentation.  Given that third-party developers such as Real and Winamp were able to provide jukeboxes that interoperated with iPods well enough to attract customers *without* this type of technical documentation, if they had been equipped with appropriate documentation, then their results should be even better.

28. Finally, at the end of ¶154, Dr. Kelly writes "Third, since such software would necessarily use FairPlay, providing this type of access would make FairPlay less secure."  The logic appears to be that FairPlay is so fragile and sensitive that any third-party use of any aspect of it would be an unacceptable risk.  This is a superficial analysis.  FairPlay is a security system engineered to protect data in specific ways.  Some aspects of FairPlay must be kept secret (such as its secret keys), but other aspects do not

Case4:05-cv-00037-YGR   Document819-8   Filed10/10/14   Page15 of 16

14                                                                                          Expert Report of David Martin, Ph.D.

need to be kept secret. It is simply not possible to conclude that FairPlay's protection would necessarily degrade or fail simply because some third-party software might "use FairPlay" in some unspecified manner.

## VII.     "Walled Garden" Considerations

29. In ¶¶155-166, Dr. Kelly describes the "walled garden" platform approach in generally favorable terms. But it is unclear how this relates to his opinions in this case. For example, he does not say that the "benefits" of the walled garden that he describes depend on the keybag or database verification protocols being enabled. In any case, the walled garden "benefits" he describes certainly do not benefit the users who want to use third-party jukebox software with iPods if the necessary effects of the walled garden include making those users' songs unplayable.

30. Nor are all aspects of a walled garden intrinsically positive. From a software developer's perspective, working in a "walled garden" or "closed platform" means that products intended to work in the platform are inherently subject to the approval and schedule of the platform owner. A product that does not meet with the platform owner's approval runs the risk of being summarily disabled, and therefore, the relationship to the developer's customers is threatened. Developing software or providing content to run within the closed platform may require entering into legal agreements with the platform owner, including confidentiality agreements, acceptable use agreements, restrictions on decompilation and disassembly, and the requirement to pay fees to the platform owner. The platform owner may reserve to itself functionality that a developer thinks they can do better than the platform owner.

31. There is nothing about a closed platform that inherently leads to a better user experience. The closed platform simply limits the number of parties making the decisions; it does not guarantee that

these parties actually make good decisions.  Fewer parties making decisions may mean fewer opportunities for innovation.

## VIII.     Signature

32. I reserve the right to supplement or amend this report as necessary or appropriate to take into account additional information obtained through discovery or otherwise, including the upcoming depositions of Kevin Murphy and Robert Topel.

Signed October 30, 2013 in Ames, Iowa.

_____

David M. Martin Jr., Ph.D.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*