1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   BONNY E. SWEENEY (176174)
    ALEXANDRA S. BERNAY (211068)
3   PATRICK J. COUGHLIN (111070)
    CARMEN A. MEDICI (248417)
4   JENNIFER N. CARINGAL (286197)
    655 West Broadway, Suite 1900
5   San Diego, CA  92101
    Telephone:  619/231-1058
6   619/231-7423 (fax)
    bonnys@rgrdlaw.com
7   xanb@rgrdlaw.com
    patc@rgrdlaw.com
8   cmedici@rgrdlaw.com
    jcaringal@rgrdlaw.com
9
    Class Counsel for Plaintiffs
10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          OAKLAND DIVISION

14
    THE APPLE IPOD ITUNES ANTITRUST          )   Lead Case No. C-05-00037-YGR
15  LITIGATION                               )
                                             )   CLASS ACTION
16  _____ )
                                             )   DECLARATION OF BONNY E. SWEENEY
17  This Document Relates To:                )   IN SUPPORT OF PLAINTIFFS' MOTIONS
                                             )   *IN LIMINE* NOS. 1-6, 8-9
18      ALL ACTIONS.                         )
    _____ )
                                                 Date:        October 29, 2014
19                                               Time:        9:30 a.m.
                                                 Courtroom:   1, 4th Floor
20                                               Judge:       Hon. Yvonne Gonzalez Rogers
21                                               Trial Date:  November 17, 2014
                                                 Time:        8:30 a.m.
22

23

24

25

26

27

28

1    I, BONNY E. SWEENEY, declare:

2        1.      I am an attorney duly licensed to practice before all of the courts of the State of

3    California.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP, Class Counsel

4    for the Class and for Plaintiffs Melanie Wilson (formerly Tucker) and Mariana Rosen (collectively,

5    "Plaintiffs") in this action.  I have personal knowledge of the matters stated herein, and, if called

6    upon, I could and would completely testify thereto.

7        2.      I submit this declaration in support of Plaintiffs' Motions *in Limine* Nos. 1-6, 8-9.

8        3.      Attached hereto are true and correct copies of the following documents:

9    | **Exhibit** | **Document Description** |
10   | Exhibit 1: | Relevant excerpts from the Transcript of Proceedings Before The Honorable James Ware United States District Judge, dated July 19, 2010; |
11   | Exhibit 2: | FBI Probes Possible Hacking Incident at J.P. Morgan, *The Wall Street Journal* (Aug. 28, 2014); |
12   | Exhibit 3: | Apple_AIIA01217427-28; |
13   | Exhibit 4: | Relevant excerpts from the Videotaped deposition of Kevin Murphy, Ph.D., taken November 12, 2013; |
14   | Exhibit 5: | Relevant excerpts from the Videotaped deposition of Robert Topel, Ph.D., taken November 8, 2013; |
15   | Exhibit 6: | Relevant excerpts from the Videotaped deposition of Robert Topel, Ph.D., taken January 8, 2014; |
16   | Exhibit 7: | Declaration of Alexandra S. Bernay in Support of Plaintiffs' Motion *in Limine* No. 4 – Declarations of Unavailable Declarants, dated October 14, 2014; |
17   | Exhibit 8: | Apple_AIIA00320482-84; |
18   | Exhibit 9: | Apple's Petition for Permission to Appeal Order Granting Class Certification Federal Rule of Civil Procedure 23(f), filed December 6, 2011 (ECF No. 1-2) in *In re Apple iPod iTunes Antitrust Litig.*, No. 11-80293 (9th Cir.) ("Apple 23(f) Appeal"); |
19   | Exhibit 10: | Order denying Apple's Petition for Permission to Appeal Order Granting Class Certification Federal Rule of Civil Procedure 23(f), filed March 13, 2012 (ECF No. 18) in Apple 23(f) Appeal; |
20   | Exhibit 11: | Apple's Reply Brief in Support of Petition for Permission to Appeal Order Granting Class Certification, filed December 22, 2011 (ECF No. 13-2) in Apple 23(f) Appeal; |

1

**Exhibit**      **Document Description**

2  Exhibit 12:   *In re TFT-LCD (Flat Panel) Antitrust Action*, No. 07-md-1827 SI, Final
                Pretrial Scheduling Order (N.D. Cal. May 4, 2012); and

3
   Exhibit 13:   *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-
4                1819 CW, Order on Motions *In Limine* and for Pre-Trial Preparation
                (N.D. Cal. Dec. 16, 2010).

5

        I declare under penalty of perjury under the laws of the United States of America that the

6
   foregoing is true and correct.  Executed this 14th day of October , 2014, at San Diego, California.

7

8                                                  s/ Bonny E. Sweeney
                                                   BONNY E. SWEENEY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF BONNY E. SWEENEY IN SUPPORT OF PLAINTIFFS' MOTIONS *IN LIMINE*
NOS. 1-6, 8-9 - C-05-00037-YGR                                                    - 2

EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

   THE APPLE IPOD ITUNES        )  C-05-00037 JW

6  ANTI-TRUST LITIGATION,       )
   _____  )  SAN JOSE, CALIFORNIA

7                               )
   THIS DOCUMENT RELATES TO:    )  JULY 19, 2010

8                               )
     ALL ACTIONS.             )  PAGES 1-35

9  _____  )
                                )

10 STACIE SOMERS, ON BEHALF     )
   OF HERSELF AND ALL OTHERS    )  C-07-06507 JW

11 SIMILARLY SITUATED,          )
                                )

12        PLAINTIFF,            )
                                )

13                              )
           VS.                  )

14                              )
   APPLE, INC., A CALIFORNIA    )

15 CORPORATION,                 )
                                )

16            DEFENDANT.        )
   _____  )

17

18            TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES WARE

19         UNITED STATES DISTRICT JUDGE

20

21            APPEARANCES ON NEXT PAGE

22

23

24 OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                   CERTIFICATE NUMBER 9595

25

                                                       1

1           THE COURT:  NOW, WHY WOULD -- IF THE

2    MONOPOLY'S IN BOTH MARKETS, WHY WOULD YOUR CLASS

3    NOT ALSO INCLUDE THOSE WHO PAID A SUPERCOMPETITIVE

4    PRICE FOR THEIR ITUNES MUSIC?

5           MS. SWEENEY:  THERE IS SOME DISPUTE IN

6    THE RECORD, YOUR HONOR, AS TO WHETHER APPLE

7    EMPLOYED ITS MONOPOLY TO TAKE SUPERCOMPETITIVE

8    PRICES OUT OF THE IPODS OR THE MUSIC, AND

9    PLAINTIFFS BELIEVE, YOUR HONOR, THAT THE

10   SUPERCOMPETITIVE PRICE WAS IMPOSED PRIMARILY, IF

11   NOT EXCLUSIVELY, ON THE IPODS AS OPPOSED TO THE

12   MUSIC.

13          THE COURT:  ALL RIGHT.  NOW,

14   MR. MITTELSTAEDT, ANYTHING YOU WANT TO ADD TO --

15   I'M JUST GETTING COUNSEL'S RECITATION OF THE CLAIM.

16         ANYTHING YOU WANT TO ADD OR TAKE AWAY

17   FROM THIS AS AN ADEQUATE RECITATION OF THE CLAIM?

18         MR. MITTELSTAEDT:  I WOULD CLARIFY JUST

19   ONE THING.  THE COMPLAINT SAYS THAT THE MONOPOLY

20   AND THE ATTEMPTED MONOPOLY FROM OCTOBER '04 THROUGH

21   MARCH '09 WAS BY USE OF SOFTWARE UPDATES, AND THEY

22   ALLEGE TWO TYPES OF SOFTWARE UPDATES.

23         THE ONE TYPE IS WHAT, AT THE PREVIOUS

24   HEARING, WE CALLED THE HACKS, AND THOSE WERE THE

25   ONES THAT STRIPPED DRM FROM THE MUSIC SOLD AT

1    ITUNES MUSIC STORE.

2              SO WE'VE GOT THE HACKS THAT JUST OUTRIGHT

3    STRIPPED THE DRM FROM APPLE'S MUSIC STORE.

4              AND THEN THE OTHER SOFTWARE UPDATES -- OR

5    THE OTHER ALLEGATION THEY MAKE IS THAT REAL

6    NETWORKS, WHICH HAD ITS OWN MUSIC STORE AND SOLD

7    DRM PROTECTED MUSIC, THAT THAT MUSIC COULD PLAY ON

8    AN IPOD UP UNTIL ONE OF THOSE SOFTWARE UPDATES THAT

9    WAS ADDRESSED TO THE HACKS.

10             SO I CLARIFY THAT BECAUSE THE PLAINTIFFS

11   SAY, IN THIS BRIEF RECITATION, THAT THE HACKS

12   PREVENTED -- OR THE SOFTWARE UPDATES PREVENTED

13   COMPETITORS FROM COMPETING.

14             OUR POSITION, AND WE'VE SAID IT OVER AND

15   OVER, IS THAT THE HACKS ARE NOT COMPETITORS AND THE

16   SOFTWARE UPDATES AT ISSUE IN THIS CASE WERE THE

17   ONES DIRECTED TO THE HACKS.

18             AND ONE OF THOSE SOFTWARE UPDATES THAT

19   WERE DIRECTED AT THE HACKS HAD THE SIDE EFFECT OF

20   BLOCKING HARMONY.

21             SO I THINK THAT'S WHAT THIS CASE IS

22   ABOUT.

23             ON THE -- I'VE GOT SOMETHING TO SAY ON

24   THEIR DAMAGE CLAIM BECAUSE -- AND I THINK IT GOES

25   TO ONE OF YOUR HONOR'S QUESTIONS:  THEIR DAMAGE

1    CLAIM HAS TO BE THAT IN OCTOBER OF '04 WHEN HARMONY

2    USERS COULD NO LONGER PLAY THEIR HARMONY MUSIC ON

3    AN IPOD, THAT THAT SOMEHOW HAD THE EFFECT OF

4    RAISING THE PRICE OF IPODS.

5            SO THEIR THEORY IS EVERYTHING IS OKAY,

6    THEY CALL IT A MONOPOLY, BUT THEY SAY IT'S LAWFUL

7    FOR APPLE TO HAVE A GREAT IPOD, LAWFUL FOR APPLE TO

8    HAVE A GREAT MUSIC STORE, LAWFUL TO CHARGE WHATEVER

9    PRICES IT'S CHARGING FOR BOTH PRODUCTS UP UNTIL

10   OCTOBER OF '04 WHEN HARMONY IS BLOCKED.

11           SO THE THEORY, AS I SAY, HAS TO BE THAT

12   BLOCKING HARMONY CAUSED IPOD PRICES TO GO UP.

13           IT'S A BIT COUNTERINTUITIVE THAT REDUCING

14   THE TYPE OF MUSIC THAT COULD BE PLAYED ON AN IPOD,

15   IN OTHER WORDS, HARMONY COULD NO LONGER BE PLAYED

16   ON AN IPOD, HAD THE EFFECT OF RAISING DEMAND FOR

17   IPOD AND RAISING THE PRICE.

18           I PREVIEW THAT ONLY BECAUSE WHEN WE GET

19   INTO CLASS CERTIFICATION AND WHETHER THEY CAN FIND

20   AN EXPERT WHO WILL COME UP AND SAY HE'S GOT A

21   CLASS-WIDE METHOD OF PROVING DAMAGES, IT GETS

22   PRETTY COMPLICATED PRETTY QUICKLY.

23           THE COURT:  WELL, IT SOUNDS AS THOUGH

24   PART OF WHAT I'M HEARING FROM MR. MITTELSTAEDT,

25   MS. SWEENEY, IS TRYING TO MAKE CERTAIN THAT AT SOME

11

EXHIBIT 2



1 of 2 DOCUMENTS

Copyright 2014 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.

The Wall Street Journal Online

August 28, 2014
WSJ.com Edition

**SECTION:** MARKETS

**LENGTH:** 852 words

**HEADLINE:** FBI Probes Possible Hacking Incident at J.P. Morgan;
 Attack Appears to Have Been Caused By Malicious Computer Code

**BYLINE:** By Danny Yadron, Emily Glazer and Devlin Barrett

**BODY:**

   The Federal Bureau of Investigation is probing a computer-hacking attack on J.P. Morgan Chase & Co. and as many as four other banks, in what people familiar with the probe described as a significant breach of corporate computer security.

   The timing and extent of the hacking attacks weren't immediately clear, though cybersecurity experts began probing the possible J.P. Morgan breach earlier this month, according to people familiar with the investigation.

   J.P. Morgan said Thursday morning it isn't seeing "unusual fraud" and it is working closely with law enforcement to determine the scope of the attack. The largest U.S. bank by assets added that it is taking "additional steps" to safeguard sensitive or confidential information and will contact relevant parties as it learns more about who may have been impacted.

   It stressed customers should contact the bank -- as always -- if any suspicious activity on their accounts is detected and they will not be liable for fraud.

   People familiar with the investigation said the evidence gathered so far suggested hackers were able to make a

FBI Probes Possible Hacking Incident at J.P. Morgan; Attack Appears to Have Been Caused By Malicious Computer
Code The Wall Street Journal Online August 28, 2014

significant foray into J.P. Morgan's computer system. People with knowledge of the probe said it appeared between two and five U.S. financial institutions may have been affected. The names of all targeted banks couldn't be immediately determined.

J.P. Morgan and federal cyber investigators are in discussions as they examine the apparent attack on the bank's computer system.

"Companies of our size unfortunately experience cyberattacks nearly every day," said Trish Wexler, a J.P. Morgan spokeswoman said Wednesday. "We have multiple layers of defense to counteract any threats and constantly monitor fraud levels."

The FBI said Wednesday it is "working with the United States Secret Service to determine the scope of recently reported cyber attacks against several American financial institutions."

The attack appears to have been caused by malicious computer code, known as malware, according to a person familiar with the matter.

Thefts of U.S. corporate data have in the past often come from hackers based in China, Russia or the former Soviet Union, though that doesn't mean the cyberattacks involve those governments. Just as in the U.S., hackers in those countries can act on their own and sell stolen data to other organizations.

The style of the attacks and the targets-large U.S. financial institutions-have led some people briefed on the investigation to suspect a possible Russian or Eastern European link. Russian organized crime often targets large financial institutions. But several people with knowledge of the investigation cautioned it is too early to tell who was behind the attacks.

Hackers appear to have originally breached J.P. Morgan's network via an employee's personal computer, a person close to the investigation said. From there, the intruders were able to move further into the bank's inner systems. Employees often use software to tap in to corporate networks from home through what are known as virtual private networks.

Such an attack would mark the latest instance in which a large corporate network was breached by a weak external link. When hackers stole 40 million payment-card numbers from Target Corp. last year, they originally infiltrated the retailer by stealing a ventilation contractor's password.

In mid-August, cybercriminals hacked in to nearly 1,000 grocery stores around the U.S. The common link: Supervalu Inc. of Eden Prairie, Minn., which managed the stores' technology services and had remote access to those locations, people familiar with that incident have said.

In recent weeks, J.P. Morgan called numerous security vendors with concerns it had a problem, people close to the investigation said. The bank in recent months hired a number of employees with Defense Department experience because the firm treats cybersecurity as a problem akin to military security, people familiar with the matter said.

Cybersecurity has been a chief concern-and cost-for large banks over the past few years.

J.P. Morgan, along with other banks, has been vulnerable to attacks in the past, particularly so-called distributed denial of service threats, known as DDoS. These attacks knock websites offline by flooding them with useless traffic. Iranian hackers aimed a DDoS attack at J.P. Morgan, U.S. Bancorp, PNC Financial Services Corp. and Wells Fargo & Co. in 2012, according to U.S. officials.

James Dimon, chairman and chief executive of J.P. Morgan, wrote in his annual shareholder letter this year that the bank will spend more than $250 million annually and have about 1,000 people focused on cybersecurity by the end of

FBI Probes Possible Hacking Incident at J.P. Morgan; Attack Appears to Have Been Caused By Malicious Computer Code The Wall Street Journal Online August 28, 2014

2014. That includes building and running three Cybersecurity Operations Centers in its regional headquarters to coordinate incoming information, identify threats, create response procedures and coordinate security of its buildings world-wide, he wrote.

"Cyberattacks are growing every day in strength and velocity across the globe," he wrote. "It is going to be a continual and likely never-ending battle to stay ahead of it-and, unfortunately, not every battle will be won."

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** August 28, 2014

EXHIBIT 3

Subject: Re: Real Shady - RealPlayer Screenshot
Date: Wed, 17 Jan 2007 14:38:48 -0800
From: Steve Gedikian <ssg@apple.com>
To: Grace Kvamme <kvamme@apple.com>, Eddy Cue <cue@apple.com>, Chris Bell
<chrisbell@apple.com>
CC: John Brown <john_brown@apple.com>, Camille Hearst <chearst@apple.com>, Zeene Chang
Ni <zchang@apple.com>, Eric Oliver <eoliver@apple.com>
Message-ID: <BF2DFA94-610A-450F-956D-CF929F8F26E6@apple.com>

Real has become much more aggressive over the past few years.

Fortunately, Real's own support website states that iPod with video and iPod nano do not work with
Real Player due to changes we've made in the iPod software. Real Player customers will only be
able to use legacy iPods with that software. New generations of our products will not be vulnerable
to Real's hacking of our software.

I think we should consider adding a provision to our EULAs stating that customers who use third
party software to sync music, movies, etc. with their iPod will void their warranty. We do not
authorize third parties to interface with the iPod for these use cases. It is unreasonable for Apple to
support customers who use unauthorized software that may damage their hardware.

Thoughts?

-s

On Jan 17, 2007, at 2:05 PM, Grace Kvamme wrote:

 I think this would be the technological form of hijacking...

 On Jan 17, 2007, at 1:41 PM, John Brown wrote:

  Hey guys NPD sent this over as an FYI. Didn't know if you have seen this or not but thought I
  would pass it along.

  John

  Begin forwarded message:

   **From:** David Aronson <David_Aronson@npd.com>
   **Date:** January 17, 2007 1:37:04 PM PST
   **To:** John Brown <john_brown@apple.com>
   **Subject: Real Shady - RealPlayer Screenshot**

   John,

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01217427

Are you guys aware of what RealPlayer is doing?  See the below screenshot...

DA


&lt;unknown.jpg&gt;



**"That which does not kill me makes me stronger."**

**- Anonymous**




--
Steve Gedikian - ssg@apple.com
Product Manager - iTunes
----------------------------------------------
http://www.iTunes.com




------ end message ------

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA01217428

EXHIBIT 4

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                 OAKLAND DIVISION

4

THE APPLE iPOD iTUNES          Lead Case No. C 05-00037
5 ANTI-TRUST LITIGATION

6

7 _____

8 This Document Relates To:

9 ALL ACTIONS

10

11 _____

12

13

14

15         CONFIDENTIAL - ATTORNEYS' EYES ONLY

16     VIDEOTAPED DEPOSITION OF KEVIN M. MURPHY, PH.D.

17             Tuesday, November 12, 2013

18             San Francisco, California

19

20

21

22 Reported By:

23 Darcy J. Brokaw

24 RPR, CRR, CSR No. 12584

25 Job No. 10008261

**Confidential - Attorneys' Eyes Only**

Kevin Murphy, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 30

1  amended expert report?
2        A.  I believe they are, yes.
3        Q.  Okay.  And then you say in your report
4  that all the materials that you -- all the materials
5  and information upon which you specifically rely in
6  forming your opinions are listed in Appendix B to
7  your report.
8            Since you submitted your report, is
9  there -- are there any additional materials that you
10  reviewed which you specifically rely upon in forming
11  your opinions?
12        A.  I don't believe so, no.
13        Q.  Do you specifically rely upon the opinions
14  of Professor Topel in reaching your own opinions in
15  this case?
16        A.  No, I do not.
17        Q.  Do you specifically rely upon the opinions
18  of Dr. Kelly in reaching your own opinions in this
19  case?
20        A.  I'd say I considered what Dr. Kelly said,
21  and I think I cite him a couple of times.  So it's
22  something that I don't think is central to my
23  opinions; I think my opinions are developed largely
24  on my own economic analysis, but there are a couple
25  of instances I know where I do cite Mr. Kelly's

Page 31

1  analysis.
2        Q.  Now, did you and Professor Topel
3  collaborate in putting together your respective
4  expert reports in this case?
5        MR. KIERNAN:  Object to the form.
6        THE WITNESS:  I think we collaborated on
7  the project as a whole.  I think from the beginning,
8  we both talked about the economics of the issues at
9  hand.  We thought about the marketplace, thought
10  about the economics of the product offerings.
11            And we also evaluated Professor Noll's
12  analysis and talked that over.  Examined his
13  regression analyses and the flaws and issues with
14  that.
15            So I'd say yeah, I mean -- I would say it
16  was more in the analytical part.  I think when we
17  got time to work on the reports, there was some,
18  obviously, coordination, because we were both really
19  trying to get the answers to some of the same
20  questions.
21            So we conferred with one another about
22  what our thoughts were.  I think there was a great
23  deal of agreement.  I can't -- I can't recall a
24  place where there was any substantive disagreement
25  in how we saw things.

Page 32

1            But we worked on that.  And he worked on
2  his report, and I worked on mine.  But there was a
3  back and forth of discussions, yes.
4  BY MS. SWEENEY:
5        Q.  Did you review Professor Topel's report
6  before it was submitted?
7        A.  I never reviewed it in its entirety.  I
8  think I saw pieces of it and talked to him about
9  pieces of it.  Particularly areas where we had some
10  overlap, we had some discussions.
11            I'd been putting together some stuff, he'd
12  been putting together stuff.  It was always very
13  similar because it had been based on the same
14  meetings and discussions that we both were at.
15  So...
16            But yeah, there was a back and forth.  I
17  never -- I don't think I ever, like, went through
18  and made comments and gave him edits or anything
19  like that.  I just talked to him about things based
20  on portions that I had seen.
21        Q.  Did you have staff at -- do you call it
22  CRA or Charles River Associates?  Does it matter?
23        A.  I call it CRA.
24        Q.  Okay.  Did you have staff at CRA help you
25  in putting together your expert report?

Page 33

1        A.  Yes, I did.
2        Q.  And who were the staff that assisted you?
3        A.  I would say the main people would be Anita
4  Garten and Ricardo Cossa.  They were the two main
5  people I worked with.
6        Q.  Were there other people that you may not
7  have worked with directly who participated in, for
8  example, putting together the exhibits or
9  appendices?
10        A.  Oh, there definitely would have been, but
11  I can't recall all the names of the people who
12  worked on that.  But the main people I worked
13  directly with were Anita and Ricardo.  And of course
14  I also worked with Bob Topel.
15        Q.  Did staff at CRA, other than -- well,
16  strike that.
17            Did any of the staff that assisted you in
18  putting together your report write parts of the
19  report?
20        A.  Yeah, they helped -- they helped draft
21  parts of it, yes.
22        Q.  Which parts of the report did staff at CRA
23  help draft?
24        A.  I would say they helped with --
25        MR. KIERNAN:  Let me -- is this covered by

**Confidential - Attorneys' Eyes Only**

Kevin Murphy, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 34

1 the stipulation?
2         MS. SWEENEY:  No.
3         MR. KIERNAN:  Do you have a copy?
4         Can we just come back to this?  I don't
5 have a copy with me.
6         MS. SWEENEY:  Well, it doesn't --
7         MR. KIERNAN:  If it's not covered, then
8 you can come back to the questions and ask about it.
9 I just don't have a copy with me.
10         I just want to make sure we're doing the
11 same thing that we did with Professor Noll, because
12 I know that you shut down a number of questions on
13 drafting.
14         So I just want to make sure that, if it's
15 not covered -- maybe if we can get a copy and look
16 at it right now.
17         See if I can pull it up here.
18         MS. SWEENEY:  We'll keep going, and then
19 when that document comes in, then we'll revert back
20 to this line of questioning.
21 BY MS. SWEENEY:
22     Q.  Now, you know, Professor Murphy, that many
23 of your exhibits to your report are identical to the
24 exhibits to Professor Topel's report, correct?
25     A.  I believe that's correct.

Page 35

1     Q.  Can you identify which ones, which of your
2 exhibits are identical to Professor Topel's?
3     A.  No, because I haven't studied his report
4 in that great detail.  But I know, for example, when
5 it came to regression models and things like that,
6 we were using the same data and same specifications,
7 so the results should be the same if you're using
8 the same data and the same specifications, for
9 example.
10     Q.  So you said that you and Professor Topel
11 used the same data and same specifications to run
12 the regressions.  Is that a fair characterization of
13 what you said?
14     A.  I believe it is, yes.
15     Q.  Okay.  But did you actually run the
16 regressions yourself that are reflected in the
17 exhibits to your report?
18     A.  You mean like did I push the button on the
19 computer?
20     Q.  Let's start with that.
21     A.  No, I did not push the button on the
22 computer.
23         I think I discussed the regressions
24 with -- I believe in a meeting, several meetings,
25 actually -- with Bob Topel, myself and staff, about

Page 36

1 what we thought was the appropriate analysis to do.
2 And the people working on the project, staff people,
3 actually went then and got the data and put the data
4 together and ran the regressions per those
5 instructions.
6     Q.  And did the staff put together the
7 exhibits that you used that reflect the regressions?
8     A.  I think I kind of helped design the
9 exhibits in terms of how we wanted them laid out and
10 things like that.  I think they actually created the
11 exhibit themselves.  I think they were mostly
12 created in Excel.  So they actually put the numbers
13 into the tables and did the final formatting and
14 things like that.
15     Q.  So they created the same exhibits in terms
16 of formatting for both you and Professor Topel,
17 correct?
18     A.  I believe so, but I don't know that for
19 sure.  It makes a lot of sense that they would have
20 done it that way.  I mean, the content would be the
21 same, because like I said, we had the same
22 specifications and data.
23         I would assume they just formatted them
24 once and wouldn't have formatted them separately for
25 him, other than they probably have different

Page 37

1 numbers, so they probably had to change that part.
2         Different exhibit numbers, I mean, not
3 result numbers.
4     Q.  Now, one of your criticisms of Professor
5 Noll's regression is that the -- according to you
6 and Professor Topel, the observations are not
7 independent and there's a clustering problem.
8         And you say in your report, and I'm
9 looking at page 50, paragraph 97, that to test this,
10 quote, "I disaggregated the observations used," and
11 then you split the units into two halves and
12 calculated the average residual.  And I was
13 paraphrasing there from paragraph 97.
14         So my question really is just:  So was it
15 you who disaggregated the observations, or was it
16 your staff that did that work?
17     A.  It was the staff who actually did the
18 disaggregation.  I discussed with them how to do it
19 and the methodology that one would use to do that.
20         They actually carried out -- or more
21 accurately, the computer carried out that
22 disaggregation.  There was lots of observations to
23 be allocated, so it wouldn't be something you'd want
24 to do by hand.  So the computer actually did the
25 allocations.

EXHIBIT 5

**Confidential - Attorneys' Eyes Only**

**Robert Topel, Ph.D.**                     **The Apple iPod iTunes Anti-Trust Litigation**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

   THE APPLE iPOD iTUNES           Lead Case No. C 05-00037
 5 ANTI-TRUST LITIGATION

 6 _____

 7 This Document Relates To:

 8 ALL ACTIONS

 9

10 _____

11

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15      VIDEOTAPED DEPOSITION OF ROBERT H. TOPEL, Ph.D.

16               Friday, November 8, 2013

17               San Francisco, California

18

19

20

21

22 Reported By:

23 Darcy J. Brokaw

24 RPR, CRR, CSR No. 12584

25 Job No. 10008160
```

**Confidential - Attorneys' Eyes Only**

Robert Topel, Ph.D.                    The Apple iPod iTunes Anti-Trust Litigation

Page 14

1  ago.  So it could be 2007, '8, '9.  I can't
2  remember.
3       Q.  Now, you said -- you made a distinction
4  between discussing your report with Kevin Murphy and
5  others and writing it.  Who wrote your report?
6       A.  I did.
7       Q.  Did you write every word?
8       A.  Well, there's a boilerplate at the front
9  about who I am and where I work, things like that.
10  Sometimes people take elements of that for my
11  biography.
12          The substance, I wrote it.  Now, some
13  editor might have gone through and said, you should
14  use the present tense here, or something like that,
15  but I wrote the report.
16       Q.  So you say the substance, you wrote it.
17  What was the process?  Did you send drafts, for
18  example, to Professor Murphy?
19       A.  I don't recall sending drafts to
20  Professor Murphy.  We would -- I'd work on the
21  report.  I'd give them to Anita, who was managing
22  the case, and she'd put them in the proper
23  formatting and things like that.  She'd make
24  comments, suggestions.
25          I'm sure Kevin had some elements of my

Page 15

1  report because we were discussing both his report
2  and mine.
3       Q.  So Anita worked with you and with
4  Professor Murphy?
5       A.  Yes.
6       Q.  So she had interactions with
7  Professor Murphy that you were not involved in that
8  may have included providing him with drafts of your
9  report?
10       A.  I wouldn't be surprised if we saw drafts
11  of each other's reports.  So that's not unusual at
12  all.  We work together a lot.
13       Q.  Did you see drafts of Professor Murphy's
14  report?
15       A.  Yes.
16       Q.  How many drafts did you see?
17       A.  Oh, I don't know.  It also depends on the
18  definition of a draft.  I think if I got a document
19  and then somebody would change a little bit of it,
20  like the boilerplate I was referring to before, and
21  said, here's the current copy, what do you think, I
22  couldn't give you a number.
23       Q.  Did you see more than five drafts?
24       A.  Probably.
25       Q.  Did you see more than ten drafts?

Page 16

1       A.  I don't know.
2       Q.  Now, you said that you often work closely
3  with Professor Murphy.  Did you collaborate closely
4  with respect to this project?
5       A.  Sure.  We had a lot of meetings where
6  everybody was there, so there was a lot of
7  interaction.  And, you know, our offices are next to
8  each other at the university, so we talk.
9       Q.  How did you and Professor Murphy decide
10  who was going to take on which tasks in preparing
11  your expert reports in this case?
12       A.  You mean like who would do liability and
13  who would do damages?  Is that what you're asking?
14       Q.  Well, your reports are not identical; is
15  that correct?
16       A.  That's correct.
17       Q.  There are some matters that are covered in
18  Professor Murphy's report that are not covered in
19  yours; is that correct?
20       A.  That's correct.
21       Q.  So how was that decision made?
22       A.  Well, he's the liability expert; I'm the
23  damages expert.  So there's certain things that I
24  don't have to address.
25       Q.  So in your report that you submitted in

Page 17

1  this case, what are the matters that you did not
2  have to address because you are not the liability
3  expert?
4       A.  I don't think I'd do anything on market
5  definition or market power.
6       Q.  Anything else?
7       A.  I think he spends a lot more time or ink
8  on analysis of the plaintiffs' theory of impact,
9  although impact is clearly relevant for me as a
10  damage expert.
11       Q.  Anything else?
12       A.  As I sit here, I don't think of anything,
13  but I'm sure there's something.
14       Q.  Did you rely on Professor Murphy's
15  opinions in arriving at your own opinions?
16       A.  No, no.  I mean, in the sense of reading
17  them and taking them as given?  No, there's nothing
18  in my analysis that says I have to rely on Professor
19  Murphy.
20       Q.  Now, who put the footnotes in your report?
21          THE WITNESS:  Is this mine?
22          MR. MITTELSTAEDT:  Yes.
23          THE WITNESS:  Staff and me.
24  BY MS. SWEENEY:
25       Q.  Did staff put in most of the footnotes?

**Page 14..17**

EXHIBIT 6

**Volume II**
Robert Topel, Ph.D.

**Confidential - Attorneys' Eyes Only**

The Apple iPod iTunes Anti-Trust Litigation

---

**Page 194**

```
1            UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3                 OAKLAND DIVISION
4
   THE APPLE iPOD iTUNES      )    Lead Case No. C 05-00037
5   ANTI-TRUST LITIGATION     )
6                             )
7   _____)
8   This Document Relates To: )
9   ALL ACTIONS               )
10                            )
11  _____)
12
13
14       CONFIDENTIAL - ATTORNEYS' EYES ONLY
15   VIDEOTAPED DEPOSITION OF ROBERT H. TOPEL, Ph.D.
16                  VOLUME II
17              January 08, 2014
18              Phoenix, Arizona
19
20
21
22  Reported By:
23  Cathy A. Miccolis
24  RPR, CRR, CSR No. 50068
25  Job No. 10009199
```

**Page 195**

```
1              A P P E A R A N C E S
2
3  For the Plaintiffs:   Bonny Sweeney, Esq.
                         ROBBINS GELLER RUDMAN & DOWD, LLP
4                        655 West Broadway
                         Suite 1900
5                        San Diego, CA  92101
                         619.231.1058
6                        bonnys@rgrdlaw.com
7
8
9
   For the Defendant Apple, Inc.:
10                       David C. Kiernan, Esq.
                         JONES DAY
11                       555 California Street
                         26th Floor
12                       San Francisco, CA  94104
                         415.626.3939
13                       dkiernan@jonesday.com
14
15
16  Also Present:        Thomas C. Tracy, videographer
17
18
19
20
21
22
23
24
25
```

**Page 196**

```
1              I N D E X
2  Witness                              Page
3     ROBERT TOPEL, Ph.D.
4
        EXAMINATION BY MS. SWEENEY       198
5
6
7
8              E X H I B I T S
9  Exhibit    Description               Page
10     (No newly marked exhibits.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 197**

```
1            THE VIDEOTAPED DEPOSITION OF ROBERT TOPEL,
2  Ph.D., VOLUME II, was continued on January 8, 2014,
3  commencing at 12:56 p.m. at the offices of BONNETT,
4  FAIRBOURN, FRIEDMAN & BALINT, P.C., 2325 East Camelback
5  Road, Suite 300, Phoenix, Arizona, before CATHY MICCOLIS,
6  a Certified Reporter in the State of Arizona.
7
8            THE VIDEOGRAPHER:  We are now on the record.
9  The time is approximately 12:56 p.m.  Today's date is
10  January 8, 2014.  My name is Tom Tracy of Aptus Court
11  Reporting.  The court reporter is Cathy Miccolis of Aptus
12  Court Reporting, located at 600 West Broadway, Suite 300,
13  San Diego, California 92101.
14            This begins the videotaped deposition of Robert
15  Topel, Volume II, testifying in the matter of the Apple
16  iPod iTunes Antitrust Litigation pending in the District
17  Court of California, Division of Oakland, Case Number C
18  05-00037 YGR, taken at 2325 East Camelback, Suite 300,
19  Phoenix, Arizona 85016.
20            Counsel, will you please identify yourself and
21  whom you represent for the record at this time, starting
22  with the plaintiffs' counsel.
23            MS. SWEENEY:  Bonny Sweeney for the plaintiffs.
24            MR. KIERNAN:  David Kiernan for Apple.
25            THE VIDEOGRAPHER:  Thank you, Counsel.  The
```

**Page 194..197**

**Page 198**

1 court reporter may swear in the witness so we can proceed.

2

3                    ROBERT TOPEL, Ph.D.,

4 having been first duly sworn to tell the truth, the whole

5 truth, and nothing but the truth, was examined and

6 testified as follows:

7

8                    EXAMINATION

9 BY MS. SWEENEY:

10        Q.    Good afternoon, Professor Topel.

11        A.    Good afternoon.

12        Q.    I don't know if you remember, but we met I

13 think two months ago when I deposed you in San Francisco.

14 Do you recall that?

15        A.    I do.  I do remember.

16        Q.    I'm going to have the court reporter hand you

17 what was marked as Murphy Exhibit 6 in the deposition we

18 took this morning.

19        A.    Okay.

20        Q.    Professor Topel, is this a copy of the

21 supplemental report that you and Professor Murphy

22 submitted in this case recently?

23        A.    It is.

24        Q.    Do you want to take a minute to make sure all

25 the exhibits and things are there?

**Page 199**

1        A.    Well, I can't tell you that every exhibit is

2 there, but I'm going to take your word for it.

3        Q.    Okay.  And is this a report that you wrote

4 together with Professor Murphy?

5        A.    It is.

6        Q.    And with the assistance of staff at Charles

7 River Associates?

8        A.    That's correct.

9        Q.    Is there anything in that report that you would

10 like to change or correct?

11        A.    Not that I recall.  I think there is a column

12 number that's incorrect in one of the tables.  It's

13 mentioned or referenced in one of the tables.  If I had to

14 sit here and find it for you, I wouldn't be able to do it.

15        Q.    Other than that, you can't think of anything

16 you want to change?

17        A.    No.

18        Q.    And did you work collaboratively with Professor

19 Murphy on this report?

20        A.    Yes, I did.

21        Q.    How is it that in the prior reports you each

22 submitted a separate report and this time you just

23 submitted one report?

24        A.    Because the issues seemed to be things that

25 applied to both of our prior reports.

**Page 200**

1        Q.    Did one of you contribute more than the other

2 to this supplemental report?

3        A.    I don't think so.

4        Q.    Did you write portions of the supplemental

5 report?

6        A.    I did.

7        Q.    Did Professor Murphy write portions of the

8 supplemental report?

9        A.    Yes.

10        Q.    Roughly how many hours did you spend personally

11 in preparing the supplemental report and reviewing various

12 drafts?

13        A.    Oh, I don't know.  12, 13.  I'm guessing.

14        Q.    And since you submitted this supplemental

15 report -- is it okay if I use the expression supplemental

16 report as shorthand?  You'll know what I'm talking about?

17        A.    Sure.

18        Q.    In the time period since you submitted the

19 supplemental report, have you done any additional work on

20 this matter?

21        A.    Yes.

22        Q.    And what have you done?

23        A.    I have reviewed the -- is it declaration?  Is

24 that the right -- by Professor Wooldridge.  I read his

25 deposition and looked back over my report or what you're

**Page 201**

1 calling the supplemental report, and you know, things

2 associated with that.

3        Q.    Anything else?

4        A.    Not that I recall.

5        Q.    Did you do anything to prepare for today's

6 deposition?

7        A.    Yes.

8        Q.    What did you do?

9        A.    I went over this report, what you're calling

10 the supplemental report.  I went over Professor

11 Wooldridge's testimony, looked back at some literature,

12 that sort of thing.  Looked back at the models we

13 estimated.

14        Q.    And did you -- when you say you went back and

15 looked at the models that you estimated, did you make --

16 did you run any additional -- strike that.

17              Did you tinker at all with the models and

18 conduct any additional statistical analysis?

19              MR. KIERNAN:  Object to form.

20              THE WITNESS:  Did I tinker with them?  No, I

21 didn't do any tinkering.

22 BY MS. SWEENEY:

23        Q.    Did you do anything with them?

24        A.    I mean, I don't know what you have in mind, but

25 I didn't do anything to change the models in any way.

# EXHIBIT 7

1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  BONNY E. SWEENEY (176174)
   ALEXANDRA S. BERNAY (211068)
3  CARMEN A. MEDICI (248417)
   JENNIFER N. CARINGAL (286197)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  bonnys@rgrdlaw.com
   xanb@rgrdlaw.com
7  cmedici@rgrdlaw.com
   jcaringal@rgrdlaw.com
8
   Class Counsel for Plaintiffs
9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13
   THE APPLE IPOD ITUNES ANTITRUST        )   Lead Case No. C-05-00037-YGR
14 LITIGATION                             )
                                          )   CLASS ACTION
15 ─────────────────────────────────      )
                                          )   DECLARATION OF ALEXANDRA S.
16 This Document Relates To:              )   BERNAY IN SUPPORT OF PLAINTIFFS'
                                          )   MOTION IN LIMINE NO. 4 –
17      ALL ACTIONS.                       )   DECLARATIONS OF UNAVAILABLE
   ─────────────────────────────────      )   DECLARANTS
18
                                              Date:        October 29, 2014
19                                            Time:        9:30 a.m.
                                              Courtroom:   1, 4th Floor
20                                            Judge:       Hon. Yvonne Gonzalez Rogers
21                                            Trial Date:  November 17, 2014
                                              Time:        8:30 a.m.
22

23

24

25

26

27

28

973448_1

1    I, ALEXANDRA S. BERNAY, hereby declare as follows:

2    1.    I am an attorney duly licensed to practice before all of the courts of the State of

3    California.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP, Counsel for the

4    Class and for Plaintiffs Melanie Wilson (formerly Tucker) and Mariana Rosen (collectively,

5    "Plaintiffs") in this action.  I have personal knowledge of the matters stated herein, and, if called

6    upon, I could and would competently testify thereto.

7    2.    I submit this declaration in support of Plaintiffs' Motion *in Limine* No. 4 –

8    Declarations of Unavailable Declarants.

9    3.    Plaintiffs pursued fact discovery from a number of entities in this action.

10   4.    I have reviewed hard copy and email correspondence between counsel regarding

11   discovery sought from a number of third parties, including Sony Music Entertainment, Universal

12   Music Group, Warner Music Inc., and EMI Music (the "Record Labels") during late 2010.

13   5.    Counsel for the Record Labels objected to providing discovery on a number of

14   grounds, including their status as third parties.

15   6.    I am also familiar with the discussions between counsel and the Record Labels and I

16   understand it was agreed that based on the approaching December 20, 2010 fact discovery cut-off

17   that declarations would be accepted in lieu of production of documents and depositions.

18   7.    I am also familiar with the document production by Defendant Apple in this case.  I

19   asked that a search be run to determine when document productions were received by Plaintiffs.  As

20   a result of that search, it was determined that approximately 90% of the pages of documents

21   produced in discovery in the entire case were produced in the last month of the discovery period, at a

22   time when all of the depositions in this matter, other than the deposition of Steve Jobs, were

23   scheduled.

24

25

26

27

28

DECLARATION OF ALEXANDRA S. BERNAY IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* NO. 4 – DECLARATIONS OF UNAVAILABLE DECLARANTS - C-05-00037-YGR        - 1 -

1        8.     The late production of documents by Defendant Apple also affected Plaintiffs' ability

2 to prepare for any depositions with Record Label executives.

3       I declare under penalty of perjury under the laws of the United States of America that the

4 foregoing is true and correct.  Executed this 14th day of October, 2014, at San Diego, California.

ALEXANDRA S. BERNAY

DECLARATION OF ALEXANDRA S. BERNAY IN SUPPORT OF PLAINTIFFS' MOTION *IN
LIMINE* NO. 4 – DECLARATIONS OF UNAVAILABLE DECLARANTS - C-05-00037-YGR      - 2 -

EXHIBIT 8

Subject: In a Turnabout, Record Industry Releases MP3s
Date: Tue, 05 Dec 2006 20:19:19 -0800
From: Steve Jobs <sjobs@apple.com>
To: ET <et@group.apple.com>, Eddy Cue <cue@apple.com>, Jeff Robbin <jrobbin@apple.com>,
Scott Forstall <forstall@apple.com>
Message-ID: <B3A193A4-B779-46DA-AB76-F7F281AEA37E@apple.com>

---

I have been expecting something like this for a few months now. The motivation is a bit
convoluted - companies feel they need access to the iPod but don't want to be tied to the iTunes
store, so they are willing to forgo any content protection to get access to the iPod. I don't expect
Hollywood to go this route, but the entire music industry could begin to move in this direction over
the coming year or two. Not sure, but its a distinct possibility. I'm not entirely sure if this is good
or bad for us. I can argue both views...

Steve



# In a Turnabout, Record Industry Releases MP3s

By ETHAN SMITH and NICK WINGFIELD
*December 6, 2006*

The music industry has long resisted selling music in the MP3 format, which lacks the copy
protections that prevent songs from being duplicated endlessly. But now, Blue Note Records and its
marquee artist, jazz-pop singer Norah Jones, are selling her latest single through Yahoo Inc. as an
MP3 -- despite the risk that it may add to piracy problems.

The move represents a small but significant retreat from one of the central tenets of the music
industry's digital strategy. EMI Group PLC's Blue Note and other music companies are beginning to
think they will have to sell some MP3-formatted music both to satisfy customer demand and to
provide access to Apple Computer Inc.'s iPod for songs that are sold by online stores other than
Apple's iTunes Store.



Blue Note yesterday began letting Yahoo sell MP3s of Ms. Jones's latest single, "Thinking About
You." Another EMI act, Christian rock band Relient K, also released two MP3s through Yahoo
yesterday. All of the songs will come without any of the software that normally keeps users from
making unlimited copies of songs they buy online.

The releases come as some high-tech and music-industry executives are becoming increasingly
concerned about Apple's growing clout in the music business. Only online music files purchased
from iTunes, ripped from users' own CDs or downloaded from pirate services can be played on the
popular iPod. Copy-protected songs purchased from Yahoo and other legitimate sources don't work
on it. By selling music in the MP3 format without copy-protection software, Yahoo can offer music
that works easily on iPods.

Blue Note General Manager Zach Hochkeppel called the initiative "an experiment," adding that he



CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00320482

doesn't believe it will cut into sales of Ms. Jones's forthcoming album, also called "Thinking About You," which is due out Jan. 30. That's because even if early copies of the song end up widely copied among friends or online, Ms. Jones's mostly adult fan base is thought to be less likely than teenage pop fans to be satisfied with just one song from the album and thus willing to buy the entire album even if they have gotten one song free.

"Nobody gets hurt -- we think," Mr. Hochkeppel said.



The MP3 releases are coming as digital-music sales have stalled for the first time since Apple launched its iTunes Store in 2003. Digital track sales held steady at 137 million songs in the second and third quarters of this year, according to Nielsen SoundScan. That's a slight drop from the 144 million sold in the first quarter.

The MP3 announcements highlight a growing internal debate at EMI and other music companies over the correct approach to maximizing the impact of digital sales. Throughout the music industry, executives at record labels who suggested using MP3s for promotions spent years butting heads with their corporate superiors.

Ted Cohen, an independent digital-media consultant who used to be EMI's senior vice president for digital development, called yesterday's announcement "a nice first step," but said the company hadn't gone far enough. "We need to see some albums available as MP3," he said.

Mr. Hochkeppel confirms that he and other Blue Note executives had to overcome what he called "general resistance" on the part of senior EMI executives. He says they were ultimately persuaded there was a need to try fresh approaches to digital sales.

Since the rise of the original Napster in 1999, the music industry has largely blamed the free online trading of MP3 files for a 20% decline in its sales. As a result, it has insisted that when music is sold online by iTunes and others, it be delivered in formats that use special software called digital rights management, or DRM, to prevent copying and redistribution.

But music companies have grown increasingly troubled by Apple's unwillingness to allow music it sells to play on devices from other manufacturers, or to allow music sold on other mainstream sites to work with the market-leading iPod. Music companies worry that those hurdles are holding back legitimate sales of music on the Internet. For instance, cellphone companies this season are rolling out numerous handsets that can play music, but most of them won't play songs purchased from iTunes, cutting off a potentially major new market.

Apple spokesman Steve Dowling declined to comment.

For Yahoo, the deal with EMI represents another step in a long-running effort by David Goldberg, the vice president and general manager of Yahoo Music, to persuade recording companies to abandon their insistence on antipiracy software. Mr. Goldberg publicly floated the proposal at a music industry conference in February, but initially found few takers.

His reasoning: Antipiracy software on music isn't helping the industry because the same music is already available without copy protection on CDs and through Internet file-sharing programs. What's more, many consumers don't like the limitations that copy protection imposes on how and on which devices they can listen to their music. If DRM benefits anyone, Mr. Goldberg argued, it's technology companies like Apple, because it makes it trickier for consumers that have made hefty purchases of digital music through iTunes to switch to non-Apple music devices in the future.

CONFIDENTIAL - ATTORNEYS EYES ONLY

Apple_AIIA00320483

"It just isn't working," he said. "It's not solving piracy. It's not helping consumers: They view it as a tax."

For music executives, allowing Apple to gain increasing control over digital music sales -- iTunes accounts for more than 90% of the tracks sold online some weeks, according to people who work in the music industry -- is shaping up as the latest in a long series of strategic blunders that have helped create powerful new gatekeepers between them and their customers. (Past middlemen have included radio broadcasters, MTV and big retailers like Best Buy Co. and Wal-Mart Stores Inc.

Even as digital sales have stalled, peer-to-peer networks that traffic in pirated music -- virtually all of it MP3s that can be played on iPods and other devices -- have much more traffic than all the legitimate retailers put together.

Eric Garland, chief executive of BigChampagne LLC, which tracks peer-to-peer traffic, says more than one billion songs are traded over those networks every month. "It took iTunes several years to reach that particular mile marker," he notes. "The pirate market -- if we considered that a market -- would command better than 90% of the online marketplace."

One online retailer has, in fact, made a healthy business of selling MP3s. Dimensional Associates Inc.'s eMusic has made itself the No. 2 digital music retailer, by units sold, by selling all of its music as unprotected MP3 files. The catch: The company offers only music sold by independent labels, which don't generally have the same stringent policies requiring copy-protection software that major labels do.

Sony BMG, Warner Music Group Corp. and Walt Disney Co.'s Hollywood Records have also made a handful of selections from their catalogs available as MP3s. Sony BMG, a joint venture of Sony Corp. and Bertelsmann AG, sold MP3s of a Jessica Simpson song earlier this year, as Hollywood did for Jesse McCartney.

Yahoo, which promoted the sale of MP3 tracks by Ms. Simpson and Mr. McCartney, didn't see "massive, massive" sales of the music, but the results were satisfying, says Mr. Goldberg. He adds that Yahoo is also talking to independent labels about getting their music in the MP3 format and hopes to have a significant catalog of songs by next year.

**Write to** Ethan Smith at ethan.smith@wsj.com and Nick Wingfield at nick.wingfield@wsj.com

color ff2f2c flags 9160559745 original-mailbox imap://cue@mail.apple.com/Temp remote-id 45026

------ end message ------

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00320484

EXHIBIT 9

No. 11-_____

_____

**In The United States Court Of Appeals**

**For The Ninth Circuit**

_____

**IN RE APPLE iPOD iTUNES ANTITRUST LITIGATION**

_____

On Petition for Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, No. 05-00037 JW

_____

**PETITION FOR PERMISSION TO APPEAL
ORDER GRANTING CLASS CERTIFICATION
Federal Rule Of Civil Procedure 23(f)**

_____

Robert A. Mittelstaedt (60359)
Craig E. Stewart (129530)
David C. Kiernan (215335)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone: (415) 626-3939
Facsimile:  (415) 875-5700

Attorneys for Defendant-Petitioner
APPLE INC.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Apple Inc. (Apple) has no parent corporation and no publicly held corporation owns 10% of more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .........................................................i

INTRODUCTION ...............................................................................................1

BACKGROUND ................................................................................................3

    A.   Plaintiffs' Original and Amended Theories. ..............................................4

    B.   Renewed Motion for Class Certification and Plaintiffs' Initial Expert Submissions. ..............................................................................5

    C.   Plaintiffs' Revised Expert Submissions. ..................................................7

    D.   Order Granting Class Certification..........................................................9

STANDARD OF REVIEW ...................................................................................10

RELIEF SOUGHT ............................................................................................10

REASONS FOR GRANTING THE PETITION....................................................11

I.    THE PETITION SHOULD BE GRANTED TO CLARIFY THE PROPER STANDARDS FOR EVALUATING EXPERT TESTIMONY AND PROVING RULE 23 ELEMENTS, AND TO CORRECT THE MANIFESTLY INCORRECT CERTIFICATION ORDER. ........................................................................................11

II.   THIS COURT SHOULD ALSO RESOLVE THE PROPRIETY OF INDIVIDUAL END-USER CONSUMERS REPRESENTING LARGE RETAILER ENTITIES SUCH AS WAL-MART AND TARGET. ...............17

CONCLUSION .................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group*,
    247 F.R.D. 156 (C.D. Cal. 2007) ........................................................................19

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group*,
    592 F.3d 991 (9th Cir. 2010).................................................................................8

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir. 2011) ...............................................................................14

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ..............................................................................12

*Caridad v. Metro-North Commuter R.R.*,
    191 F.3d 283 (2d Cir. 1999) ...............................................................................14

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005)......................................................................... 2, 10

*Connecticut Ret. Plans v. Amgen*,
    660 F.3d 1170 (9th Cir. 2011)................................................................. 1, 11, 12

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) .................................................................................15

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011)...............................................................................16

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983)................................................................................5

*Gariety v. Grant Thornton, LLP*,
    368 F.3d 356 (4th Cir. 2004)...............................................................................16

*Hanover Shoe v. United Shoe Machinery Corp.*,
    392 U.S. 481 (1968) ...........................................................................................20

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    2006 WL 1530166 (N.D. Cal. June 5, 2006) ................................................ 9, 14

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) ...............................................................14

*In re Initial Public Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) .................................................................15

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) ...................................................................16

*In re Online DVD Rental Antitrust Litig.*,
   2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ......................................9

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995) ........................................................13

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) ...............................................................14

*Kline v. Coldwell, Banker & Co.*,
   508 F.2d 226 (9th Cir. 1974)...............................................................12

*Meijer v. Abbott Labs*,
   251 F.R.D. 431 (N.D. Cal. 2008) ........................................................20

*Sher v. Raytheon Co.*,
   419 Fed.Appx. 887 (11th Cir. 2011) ...................................................15

*United Steel Workers v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010)...............................................................16

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003).................................................... 19, 20

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) .................................................... 1, 11, 12, 17

*West v. Prudential Secs., Inc.*,
   282 F.3d 935 (7th Cir. 2002)...............................................................15

## Other Authorities

7A C. Wright & A. Miller, *Federal Practice and Procedure*
   § 1768 (3d. ed. 2010)............................................................................19

II P. Areeda, H. Hovenkamp & R. Blair, *Antitrust Law*,
¶ 331d (2d ed. 2000) ..............................................................................................13

# INTRODUCTION

By this Rule 23(f) petition, Apple asks this Court to decide the oft-recurring question of the appropriate standard for showing at the class certification stage whether antitrust impact and damages are provable on a class-wide basis. Relatedly, where antitrust plaintiffs rely on disputed expert testimony to make that showing, what does it mean for courts to engage in "rigorous analysis" as required by Rule 23? These questions are unsettled in this Circuit after *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). They are of critical importance because, if plaintiffs are not held to a sufficiently high standard, classes will be certified in cases that will devolve into unmanageable mini-trials. Last month, this Court reserved decision on the standard of proof issue in the securities fraud context. *See Connecticut Ret. Plans v. Amgen*, 660 F.3d 1170, 1175 (9th Cir. 2011). This antitrust case presents these issues, and underscores the need for clear guidance from this Court.

The court below certified a nationwide class of direct purchasers and resellers of 75 million iPods. Relying on a pre-*Dukes'* district court opinion, the court held that plaintiffs' burden was simply to propose a class-wide method of proving antitrust injury and damages that was not "so insubstantial as to amount to no method at all." Citing another pre-*Dukes* district court opinion, the court also held that, in determining whether plaintiffs had met that minimal burden, it could not "weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony." As a result, although the court acknowledged the need for "rigorous analysis," the court did not address the

admission by plaintiffs' expert that his regression model for showing impact and damages was unreliable. Nor did the court address the testimony by Apple's expert that, in light of the nature of the alleged antitrust violation and Apple's pricing strategy, plaintiffs "will never be able to establish anticompetitive impact or the amount of damages on a class-wide basis."

The district court's lenient standard is contrary to *Dukes*. *Dukes* requires "convincing proof" to support class certification and admonishes parties seeking class certification to "affirmatively demonstrate [their] compliance" with Rule 23 on all issues—even those that must be proved again at trial. 131 S. Ct. at 2556, 2551. In antitrust cases, class certification often turns on whether a common method exists to establish that the alleged violation caused injury. If no such method exists, the trial will turn into a series of disputes over whether individual class members have been injured. The result will be particularly unwieldy where, as here, the complaint alleges various types of antitrust injury, each of which (if viable) would vary from individual to individual.

Thus, clarifying the standards for evaluating expert testimony and determining whether antitrust impact and damages are provable with common evidence will not only advance the fair and efficient adjudication of this case, but will aid in the many future cases that inevitably raise the same issues. This discretionary appeal is the proper vehicle to decide these important issues that otherwise may evade appellate review. *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005).

The other key issue raised by the order below is whether an individual consumer who buys a product for personal use can represent not just other similarly-situated consumers, but also differently-situated resellers like Wal-Mart and Costco that buy and resell large quantities of the product. In ruling that they could, the court below addressed only the sub-issue of whether the fact that resellers, unlike consumers, benefit from higher retail prices affected its class certification decision. The court did not address the basic issues of whether consumers are adequate representatives of resellers or whether a consumer class action is the superior method for large resellers.

## BACKGROUND

The named plaintiffs are three individuals who challenge an Apple software update in 2006 that required iPod users to use Apple's free iTunes software application (rather than third party applications) to "sync" or load their iPods with music from their computers. Plaintiffs allege that the software update constituted unlawful monopolization and harmed them in various ways, including higher iPod prices. Plaintiffs conceded that economic theory provided no basis to conclude that the challenged conduct necessarily had any impact on iPod prices. Plaintiffs further conceded that, even though the case has been pending since 2005 and fact discovery has been closed for nearly a year, their expert had been unable, despite three attempts, to construct a reliable regression analysis that could establish impact on a common basis. Indeed, plaintiffs' expert admitted at his deposition that he could not rely on his regression analyses for anything, and certainly not to

conclude that the challenged conduct affected iPod prices, much less caused them to increase.

Nonetheless, the district court certified a class of iPod consumers and resellers, holding, as noted, that plaintiffs' burden was only to offer a method of proving impact that was more than "no method at all" and that the court "must not engage in a battle of expert testimony."

This is the essence of the case as it now stands although, as summarized below, the case has been through various twists and turns.

### A.     Plaintiffs' Original and Amended Theories.

As filed in 2005, this case alleged that Apple's use of proprietary anti-piracy software ("digital rights management" or DRM) on music sold by its on-line iTunes Store ("iTS") constituted tying and monopolization in violation of the Sherman Act. Plaintiffs acknowledged that the record labels required Apple and other on-line music sellers to use DRM, but they claimed that Apple should have used Microsoft's DRM instead of its own or should have licensed its DRM to competitors, so that all on-line music would be directly compatible with iPods and other portable music devices.

In December 2008, the district court certified a class on this original claim. Doc. 196. Soon thereafter, however, the court ruled that the antitrust laws do not require that Apple use another company's DRM or license its DRM to other companies. Doc. 274, p. 10 ("'[T]he introduction of technologically-related products, even if incompatible with the products offered by competitors, is alone neither a predatory nor anticompetitive act.'") (quoting *Foremost Pro Color, Inc. v.*

*Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir. 1983)).  In light of this ruling, the court decertified the class.  Doc. 303.

Plaintiffs then amended their complaint to challenge Apple's later software updates (one in 2004, one in 2006), which allegedly prevented iPods from playing music sold by competing on-line music stores.  Doc. 321.  This, they assert, raised demand for iPods and increased their price.  In addition to the alleged iPod price increase, plaintiffs advanced several other theories of supposed harm to consumers: (1) a "dead-weight . . . loss of welfare" from a reduction in output, (2) higher prices for competing digital players, (3) extra costs for consumers with iTS music who wished to purchase a competing player, and (4) reduced technological innovation.  Doc. 479, pp. 64-65, Doc. 321, ¶¶ 85-86, 91, 103.

The parties engaged in extensive fact discovery, which was completed in January 2011.  At that point, defendants moved for summary judgment and plaintiffs moved for class certification.

**B.**    **Renewed Motion for Class Certification and Plaintiffs' Initial Expert Submissions.**

To support their certification motion, plaintiffs submitted a declaration from an economist, Dr. Roger Noll.  Noll asserted that three methods—the "before-after," "yardstick," and "mark-up" methods—are "available" to prove one of the multiple alleged harms, an iPod overcharge.  Doc. 479, pp. 72-84.  He described these methods, however, only in generic fashion and admitted that he had not attempted to employ any of them in this case.  He further admitted that there are "complicating factors" to using his proposed methods, without identifying how he would attempt to overcome those factors.  *Id.* at 73.

Noll did not assert that his proposed methods could be used to show the other injuries plaintiffs alleged.  *Id.* at 64-65.  Nor did plaintiffs otherwise attempt to show that these alleged harms could be proved on a common basis.  It is clear that none of them could be.  *See* Doc. 511, ¶ 44.  That left plaintiffs' motion to stand or fall on Noll's assertion that a viable common method exists for proving that class members were overcharged for their iPods.  Without such class-wide proof, plaintiffs and class members would be relegated to trying to show that they had been individually damaged in the other alleged ways.

Apple submitted a declaration from Dr. Michelle Burtis, which set out the reasons why Noll's proposed methods would not work.  Doc. 511.  Among other things, Burtis demonstrated that Noll had not identified any viable benchmark against which any overcharge attributable to Apple's software updates could be measured.  She also demonstrated that Noll had not shown that he could control for the numerous variables that affected iPod pricing or that he could obtain the data necessary to carry out his proposed methods.

Plaintiffs submitted a reply declaration in which Noll presented a regression model for the first time.  Doc. 551.  That model used only a purported "before-after" analysis.  Noll presented no model for his other two proposed  methods.  Plaintiffs described this as a "working regression analysis" that "demonstrates that impact and damages can be proven by relying on common proof."  Doc. 550, pp. 2, 8.  At his deposition, however, Noll admitted that his regression model did not work, was not reliable and that he could not draw any "causal inferences from that regression," including whether the software update caused any change in iPod

prices.  Doc. 582, p. 2.  Indeed, he admitted that "I'm not relying on it for anything."  *Id.*[1]

Noll also admitted at deposition that economic theory provided no basis to conclude that the challenged software updates necessarily affected iPod prices. Doc. 692, p. 2 n.1.  As he explained, the 2004 update allegedly reduced the sources of music that could be played on iPods, so that if it affected iPod prices at all it would have tended at least in the short run to decrease demand and thus prices.  He added that, to the extent that iPod owners bought more music from Apple, it could eventually increase iPod demand and prices.  But he admitted that only an empirical study could show whether there was any effect and, if so, what it was. Doc. 551, pp. 8-9.  As to the 2006 update, Noll's view was that it probably had no impact on iPod prices for reasons that he explained.  Doc. 633, pp. 4-5.

### C.    Plaintiffs' Revised Expert Submissions.

In May 2011, the district court granted summary judgment against plaintiffs' challenge to the 2004 software update.  Doc. 627.[2]  That ruling reduced plaintiffs'

---

[1] He was forced to this concession after admitting that he did not know whether his model contained specification errors—*i.e.*, errors in constructing the model that could bias the results.  He conceded that his model is "not proof that this is the right specification."  *Id.*  When asked whether there is a "factor that's been excluded from this regression that leads to the wrong answer," he admitted "I don't know that.  That's why I wouldn't offer this as a damages model."  *Id.* at 1.  He furthered admitted that his model does not account for such things as Apple's pricing strategy.  *Id.* ("Q.  Does your current regression in your reply report account for the fact that Apple changed its retail prices and wholesale prices, list prices infrequently?  A.  No, that's why it's not a damage model.").

[2] The court held that, because the 2004 software update indisputably blocked hackers' attacks on Apple's DRM, it was a genuine product improvement under

(continued)

claim to the 2006 software update—the one that Noll doubted had any impact on iPod prices. Nonetheless, Noll submitted a new report asserting that he could show class-wide impact from the 2006 update using the same regression model that he previously admitted he could not rely upon "for anything." Doc. 660. He did not, however, attempt to address the basic problems that he had previously stated made that model unreliable. Other than fixing a few data errors, he simply added a "dummy" variable for the challenged 2006 software update. Noll later submitted a second regression model addressed to the retail prices Apple charged to its end-user purchasers (Noll's previous model was addressed to Apple's prices to resellers such Target and Best Buy). Doc. 679. Again, that model was the same one that he had previously used, without any attempt to address the problems that he had identified as making it unreliable.

Confirming that he had not rectified those problems, Noll admitted when deposed that, based on his regression analysis, he was not willing to reach a conclusion on "whether the conduct had any impact on iPod pricing." Doc. 692, ¶ 6. He said that he has not "formed an opinion as to whether that conduct caused the retail iPod prices charged by Apple to be any different than they would have been without that conduct." *Id.* Rather than defending his models as reliable, Noll asserted that he was not required to do so at this juncture and would correct the

---

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group*, 592 F.3d 991 (9th Cir. 2010). Doc. 627, pp. 7-8. But the court found that the evidence was conflicting as to whether the 2006 software update was a genuine product improvement. *Id.*, pp. 11-13.

defects later.  But he did not present any such adjusted models demonstrating that it would be possible to remedy the flaws in his approach.

In response to Noll's new reports, Apple submitted another expert declaration by Burtis, describing in detail the defects in Noll's model and the reasons why it was not reliable.  Importantly, she concluded that "[a]fter a careful review of Professor Noll's most recent declaration, I am even more firmly of the opinion that Plaintiffs will never be able to establish anticompetitive impact or the amount of damages on a class-wide basis."  Doc. 692, ¶ 3.  The remainder of her declaration explained the basis for that conclusion.  *Id.*, ¶¶ 4-51.

### D.    <u>Order Granting Class Certification.</u>

On November 22, 2011, the district court granted plaintiffs' renewed motion for class certification.  Although the court stated that a "rigorous analysis" was needed (Doc. 694, p. 5), it held that plaintiffs' burden was "simply [to] offer a proposed method for determining damages that is not 'so insubstantial as to amount to no method at all.'"  Doc. 694, p. 6 (quoting *In re Online DVD Rental Antitrust Litig.,* 2010 WL 5396064, at *11 (N.D. Cal. Dec. 23, 2010).  The court added that it "cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony."  *Id.* (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006)).

Applying this standard, the court stated that plaintiffs had met their burden by proposing "three specific methodologies which, upon review, are sufficient to establish their method for determining damages at this stage."  Doc. 694, pp. 6-7.

This was a reference to the three generic methods plaintiffs originally suggested in 2008 even though, after the case was narrowed, Noll relied only on one of the three methodologies.  Although the court stated that plaintiffs have "demonstrated it can be done," citing Noll's supplemental declaration, the court did not discuss Noll's deposition admissions that his regressions were unreliable or Burtis' extensive showing that, not only were Noll's regressions fatally flawed in numerous critical respects, but that Noll would never be able to show class-wide impact.  The court made no finding that Burtis' criticisms were incorrect or that Noll had adequately rebutted them.[3]

## STANDARD OF REVIEW

Review under Rule 23(f) is proper when a district court's class certification decision is manifestly erroneous or presents unsettled and fundamental questions of law related to class actions.  *Chamberlan*, 402 F.3d at 959.

## RELIEF SOUGHT

Apple requests that this petition be granted and the class certification order be reversed.

---

[3] The court stated that it had "previously found" that plaintiffs' proposed methods were adequate.  Doc. 694, p. 6.  But the court's original class certification order did not advert to Noll's testimony.  Doc. 196.  And the court's later order denying decertification of that original class stated simply, without explanation, that Apple's challenges to Noll's testimony were "reject[ed]."  Doc. 303, p. 2, n.6.

## REASONS FOR GRANTING THE PETITION

**I.   THE PETITION SHOULD BE GRANTED TO CLARIFY THE PROPER STANDARDS FOR EVALUATING EXPERT TESTIMONY AND PROVING RULE 23 ELEMENTS, AND TO CORRECT THE MANIFESTLY INCORRECT CERTIFICATION ORDER.**

The overarching principle established in *Dukes* is that a party seeking class certification must prove, not merely allege, the existence of elements of its claim that, if unproven, will prevent the case from being tried on a class-wide basis. *Dukes* required Title VII plaintiffs to present, at the class certification stage, "convincing proof of a companywide discriminatory pay and promotion policy" because without such proof the trial would devolve into individual issues. 131 S. Ct. at 2556-57.  This was true even though plaintiffs "will surely have to prove [the same thing] *again* at trial." *Id.* at 2552 n.6 (the Court's emphasis). Using the same principle, *Dukes* approved of the requirement in securities fraud cases that "plaintiffs seeking 23(b)(3) certification must prove that their shares were traded on an efficient market." *Id.*  Without that proof, the case would devolve into individualized proof of reliance by individual investors.  *Id.*

In *Amgen*, this Court agreed that the "efficient market" method of avoiding individual reliance proof must be proved at the class certification stage.  Because the defendant did not contest that element, the Court expressly reserved deciding "the applicable standard of proof for proving those elements at the class certification stage."  660 F.3d at 1175.  The only element the defendant challenged was the materiality of its statements.  As to that element, the Court held that the plaintiffs need not prove it at class certification because failure to prove it at trial would not

cause the trial to devolve into individual issues; rather plaintiffs and the class would simply lose the case—their case would be "dead on arrival." *Id.*

*Dukes* also addressed the use of expert testimony at the class certification stage, holding that district courts must conduct a "rigorous analysis" of such testimony to show common issues. 131 S. Ct. at 2551. Applying that rigorous analysis, the Court "disregard[ed]" the testimony of the plaintiffs' sociology expert, finding it insufficient because the expert admitted that he could not "determine with any specificity" the degree to which bias played a role in Wal-Mart's employment decisions. *Id.* at 2553-54. The Court also rejected the plaintiffs' reliance on statistical regression analyses that addressed pay and promotion disparities only at the national and regional levels, and thus did not show whether disparities existed at individual stores, let alone that they were the product of unlawful discrimination. *Id.* at 2555.

This case presents the question of how these principles apply in the antitrust context. In antitrust cases, the propriety of class certification often turns on whether plaintiffs have shown a common, class-wide means of establishing injury. "Proof of injury is an essential substantive element" of an antitrust claim. *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 233 (9th Cir. 1974). Accordingly, where injury "cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003). As the leading antitrust treatise recognizes:

> [T]he fact that some class members have not been damaged at all generally defeats certification, because the fact of injury, or "impact" must be established by common proof.

II P. Areeda, H. Hovenkamp & R. Blair, *Antitrust Law*, ¶ 331d, at 282 (2d ed. 2000).

As here, antitrust class action plaintiffs often try to avoid individual injury issues by alleging that the conduct at issue resulted in an increased price charged to all purchasers. To support that assertion, they typically submit (as here) expert testimony proposing to do a regression analysis that purports to control for all the other factors that might have affected price, with any unexplained price effect being attributed to the challenged conduct. The validity and reliability of that proposed method goes to the core of Rule 23's requirements. Without a workable method to show a common overcharge incurred by all class members, the case devolves into a series of individual claims over other types of alleged harm, such as plaintiffs' claims here of inability to buy competing products or to obtain desired features.

Before *Dukes*, many courts in this circuit and elsewhere concluded that, because of the preliminary stage at which class certification motions are typically decided, district courts are required to accept such expert testimony, even in the face of contradictory evidence. Some (like the court below) concluded that they must accept the expert's proposed methods unless they "are so insubstantial as to amount to no method at all." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D. Minn. 1995). Others said the testimony must be accepted unless it is "fatally flawed." *E.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135

(2d Cir. 2001). Many of these decisions stated that courts were barred from "engaging in a battle of expert testimony," *DRAM*, 2006 WL 1530166, at *9, and proclaimed that "statistical dueling" between experts is "not relevant to the certification determination." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir. 1999).

The district court here followed these decisions. Rather than rigorously analyzing Noll's proposed methods as *Dukes* requires, the court concluded that it was obligated to find those methods sufficient so long as they were more than nothing at all. And rather than analyzing and making findings regarding the validity of Burtis' expert testimony challenging Noll's conclusion, the court concluded it was barred from resolving a battle of the experts.

Cases in other circuits have expressly repudiated the lenient approach the district court used here. For example, the Third Circuit recently ruled that plaintiffs must "demonstrate[] by a preponderance of the evidence that they will be able to measure damages on a class-wide basis using common proof" and that district courts must "examine critically expert testimony on both sides . . . . Indeed, '[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands.'" *Behrend v. Comcast Corp.*, 655 F.3d 182, 204, 190 (3d Cir. 2011) (citation omitted).[4]

---

[4] *See also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 324 (3d Cir. 2008) ("Resolving expert disputes in order to determine whether a class certification requirement has been met is always a task for the court—no matter

(continued)

-14-

The Second Circuit has similarly ruled that "an expert's testimony may [not] establish a component of a Rule 23 requirement simply by being not fatally flawed." *In re Initial Public Offerings Sec. Litig.,* 471 F.3d 24, 42 (2d Cir. 2006). The court rejected the notion that "a district judge may not weigh conflicting evidence and determine the existence of a Rule 23 requirement." *Id.* Rather, "[a] district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." *Id.*[5]

Other circuits are in accord. *E.g., West v. Prudential Secs., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (a plaintiff may not "obtain class certification just by hiring a competent expert"); *Sher v. Raytheon Co.*, 419 Fed.Appx. 887, 888 (11th Cir. 2011) (holding that "the district court erred as matter of law by not sufficiently evaluating and weighing conflicting expert testimony presented by the parties at the class certification stage;" vacating order certifying class).

Other circuits have likewise made clear that, at least in a case involving disputed and conflicting testimony, the required "rigorous analysis" obligates the district court to explain the basis for its conclusion that the testimony is sufficient.

---

whether a dispute might appear to implicate the 'credibility' of one or more experts[.]").

[5] *See also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106-07 (2d Cir. 2007) (directing the district court to "determine which expert is correct" where the parties' experts disagreed as to whether injury was susceptible to common proof).

*E.g., In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) (district courts should give a "thorough explanation of *how* the pivotal evidence behind plaintiff's theory can be established") (emphasis in original); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004) (vacating certification order with respect to predominance finding where "the district court did not explain why it could find the predominance requirement satisfied").[6]

This Court should grant this petition to make clear that these standards apply in this circuit. In *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983-84 (9th Cir. 2011), another employment discrimination case, this Court held that crediting the plaintiffs' expert testimony on commonality simply because it was admissible is not a sufficiently "rigorous analysis" of the competing expert testimony. 657 F.3d at 983-84. *Ellis*, however, did not provide district courts with concrete guidance as to what such an analysis entails or how should it be applied to expert testimony offered to prove antitrust injury. Applying the correct standard is particularly important in a case like this where there are obvious reasons to reject the plaintiffs' proposed methodology, including the plaintiffs' expert's admission that his model is incomplete, potentially biased, and unreliable. Absent guidance from this Court,

---

[6] In *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 807-09 (9th Cir. 2010), this Court ruled that it was improper for the district court, after ruling that plaintiffs' meal break claim could be established by common proof, to nonetheless deny certification because there was "no assurance" plaintiffs would ultimately prevail on the merits. The issue here, by contrast, is whether plaintiffs' claim can be established by common proof at all.

-16-

district courts in this circuit will, as here, continue to certify classes where no proper basis for doing so has been shown.

This case presents an ideal vehicle for resolving these issues. The facts here—an expert economist proffering a regression model as a supposed "available" method to show class-wide injury—is a common one. Indeed, it is the typical scenario in the broad run of antitrust cases. A ruling in this case would thus have broad applicability to antitrust cases generally.

Further, the district court's application of the wrong standard was pivotal to the outcome here—and requires that the district court's order be reversed. In *Dukes*, the Court said it could "disregard" the expert's testimony because he could not say what percentage of employment decisions might be discriminatory, let alone offer "significant proof" that Wal-Mart 'operated under a general policy of discrimination." 131 S. Ct. at 2554. Even more so here, Noll's testimony that he is "not relying" on his regression analysis "for anything" fails to carry Plaintiffs' burden of showing that a workable class-wide method exists to determine impact and damages. Contrary to Noll's argument, the task at class certification is not to show that an expert can create an ***unreliable*** method; it is to show that a method exists for actually proving class-wide impact.

## II. THIS COURT SHOULD ALSO RESOLVE THE PROPRIETY OF INDIVIDUAL END-USER CONSUMERS REPRESENTING LARGE RETAILER ENTITIES SUCH AS WAL-MART AND TARGET.

The named plaintiffs each purchased one or more iPods for personal use from an Apple retail store. Instead of limiting their certification motion to consumers like themselves, plaintiffs sought to include large reseller entities, such

as Best Buy, Target, Wal-Mart and Costco, each of which purchased at wholesale prices different from the retail prices plaintiffs paid.

The district court's ruling that these resellers may be included in a class with individual end-user plaintiffs independently merits review. The sole basis offered by the district for including the resellers was that they supposedly have the same incentive to prove and collect an overcharge. But even if that were correct (*see infra*), it is not an adequate basis for including them in the class. Because the resellers paid different prices from the end-users in separate transactions, litigating their claims will necessarily involve separate proof from the end-users, as evidenced by Noll's proposed separate regression for resellers and his admission that the transaction data is different and requires different treatment. *See* Doc. 679. As end-users, the named plaintiffs have no personal interest (and no relevant personal knowledge) in litigating these issues. Similarly, because resellers generally have ongoing business relationships with Apple and purchase iPods for economic profit, their litigation and settlement incentives may differ from end-users.

Resellers are also differently situated with respect to plaintiffs' other theories of harm. Whether any reseller was harmed by such things as higher prices for competing products, inability to purchase competing products or lack of technological innovation would not only vary from reseller to reseller, but would turn on an entirely different set of facts from those relevant to any consumer claim.

Even aside from these fundamental differences, the district court's ruling that the resellers possess the same economic interest as end users was itself in

conflict with decisions from other courts.  Plaintiffs say that, as consumers, they want lower retail prices for iPods.  Resellers, however, benefit from higher retail prices for iPods.[7]  Thus, the resellers' interests are aligned with Apple, not with consumers.

A putative class representative "cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented."  7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1768 (3d. ed. 2010).  "A fundamental conflict exists where some … members [of a class] claim to have been harmed by the same conduct that benefited other members of the class."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).  For that reason, the Eleventh Circuit held that plaintiffs could not adequately represent the interests of resellers that "appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off" as a result of the conduct.  *Id.* at 1191.  *See also Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group*, 247 F.R.D. 156, 177 (C.D. Cal. 2007) ( "[T]o [the court's] knowledge, no circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class.").

---

[7] To illustrate, a reseller that purchases iPods at, hypothetically, a 10% discount from Apple's retail prices will pay $90 for an iPod with a $100 retail price.  If the reseller charges the same retail price as Apple, the reseller will earn $10 on that iPod.  If the retail price drops to $90, however, the same reseller would earn only $9 on that same iPod.

The district court relied for its contrary ruling on *Meijer v. Abbott Labs*, 251 F.R.D. 431, 433 (N.D. Cal. 2008), which concluded that the Eleventh Circuit's decision was contrary to the holding in *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), that direct purchasers may sue even if they passed the alleged overcharge along to their purchasers. As the Eleventh Circuit explained, however, *Hanover Shoe* addressed only the question of a direct purchasers' standing to sue. It did not address the "distinctly separate question . . . whether class certification is appropriate where a fundamental conflict exists among the named and unnamed members of a class." 350 F.3d at 1192.

Like the questions regarding the governing standard of proof and use of expert testimony, this question of the propriety of end-user purchasers representing large commercial resellers in antitrust cases is a common one. It arises whenever the defendant sells both at the wholesale and retail levels. The Court should grant this petition to clarify the law and provide guidance to the district courts on this important issue.

## <u>CONCLUSION</u>

For the foregoing reasons, this petition to appeal should be granted.

Dated:  December 6, 2011                    Respectfully submitted,

                                            JONES DAY

                                            By:/s/ Robert A. Mittelstaedt

                                            Attorneys for Defendant-Petitioner
                                            APPLE INC.

EXHIBIT 10

FILED

MAR 13 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| MELANIE TUCKER; et al., | No. 11-80293 |
| Plaintiffs - Respondents, | D.C. No. 5:05-cv-00037-JW |
| v. | Northern District of California, San Jose |
| APPLE INC., | |
| Defendant - Petitioner. | ORDER |

Before: GRABER and N.R. SMITH, Circuit Judges.

The parties' motions to file appendices under seal are granted.

Petitioner's opposed motion for leave to file a reply brief in support of this petition for permission to appeal is granted.

The court, in its discretion, denies the petition for permission to appeal the district court's November 22, 2011 order granting class action certification. *See* Fed. R. Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005) (per curiam).

AS/MOATT

EXHIBIT 11

No. 11-80293

-----------------------------------

**In The United States Court Of Appeals**

**For The Ninth Circuit**

-----------------------------------

**IN RE APPLE iPOD iTUNES ANTITRUST LITIGATION**

-----------------------------------

On Petition for Appeal from the United States District Court
for the Northern District of California
James Ware, District Judge, No. 05-00037 JW

-----------------------------------

**REPLY BRIEF IN SUPPORT OF PETITION FOR PERMISSION
TO APPEAL ORDER GRANTING CLASS CERTIFICATION**

-----------------------------------

Robert A. Mittelstaedt (60359)
Craig E. Stewart (129530)
David C. Kiernan (215335)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant-Petitioner
APPLE INC.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.   THE DISTRICT COURT APPLIED A LEGALLY ERRONEOUS
     STANDARD. ...............................................................................................2

II.  PLAINTIFFS' FACTUAL ARGUMENT IS IRRELEVANT AND
     UNFOUNDED. ...........................................................................................6

III. THE DISTRICT COURT ALSO ERRED IN DECIDING THAT
     PLAINTIFFS COULD REPRESENT RESELLERS. ..................................11

CONCLUSION ....................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

Cases

*Behrend v. Comcast Corp.*,
    264 F.R.D. 150 (E.D. Pa. 2010) .............................................................................5

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir. 2011) ............................................................................4, 5

*Connecticut Ret. Plans v. Amgen*,
    660 F.3d 1170 (9th Cir. 2011) .........................................................................1, 5

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .................................................................................1

*McGrath v. County of Nevada*,
    67 F.3d 248 (9th Cir. 1995) ...............................................................................11

*Solis v. County of Los Angeles*,
    514 F.3d 946 (9th Cir. 2008) .............................................................................11

*United Nat. Ins. Co. v. R & D Latex Corp.*,
    141 F.3d 916 (9th Cir. 1998) .............................................................................11

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ..............................................................................3

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .........................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................................... 1, 3, 4

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010) ........................................................................2, 6

Rules

Federal Rules of Civil Procedure
    Rule 23......................................................................................... passim

Federal Rules of Civil Procedure
    Rule 23(a) .........................................................................................................12

Federal Rules of Civil Procedure
    Rule 23(a)(3).....................................................................................................12

Federal Rules of Civil Procedure
    Rule 23(a)(4).....................................................................................................12

Federal Rules of Civil Procedure
    Rule 23(f)........................................................................................................3, 6

## INTRODUCTION

Plaintiffs' answer confirms the pressing need for this Court to decide the appropriate legal standard for evaluating purported common methods of proving impact in antitrust cases. Plaintiffs assert that the district court "considered" the "voluminous record" and found that plaintiffs had demonstrated that a valid common method exists. But the district court's orders show that the court did not apply the correct standard. The court stated that it was precluded from resolving a "battle of the experts" at this stage and that it was required to accept plaintiffs' expert's proposed method so long as it was not "so insubstantial as to amount to no method at all."

Plaintiffs do not attempt to defend these statements as reflecting the proper standard under Rule 23. Nor could they. As *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), makes clear, and as other circuits have held, district courts must resolve conflicts in the evidence that go to the requirements of Rule 23—and plaintiffs must demonstrate as a factual matter that their claims are subject to common proof, not merely that their methods amount to something more than no method at all.

But this Court has not squarely addressed these issues, leaving the district courts without the guidance they need to properly evaluate disputed expert testimony at the class certification stage. In *Connecticut Ret. Plans v. Amgen*, 660 F.3d 1170, 1175 (9th Cir. 2011), this Court reserved the question of the appropriate standard of proof. And while *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011), held that it is not enough merely that the plaintiffs' evidence be

admissible, the Court did not elaborate on what is required beyond that. This petition presents the opportunity to resolve these issues, in the commonly recurring circumstance of proving a common method for showing impact in an antitrust case.

Plaintiffs try to divert attention from this pivotal legal issue by devoting most of their brief to arguing their factual position—and accusing Apple of mischaracterizing the record. As shown below, these arguments are unfounded. More fundamentally, they highlight the need for this Court's review. Because the district court did not apply the correct legal standard, it did not address the factual arguments plaintiffs raise in this Court. The court did not address Noll's admissions that his models were unreliable or Burtis' extensive testimony that Noll's defective models were not a viable common method to determine impact.

This Court should grant this appeal to make clear that district courts must confront and resolve these important issues going to the core of Rule 23's requirements.

## ARGUMENT

### I. THE DISTRICT COURT APPLIED A LEGALLY ERRONEOUS STANDARD.

Plaintiffs cite *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir. 2010), as holding that district courts have "significant discretion" in resolving class certification motions. They ignore, however, the pertinent holding of that case—that this Court "accord[s] the decisions of district courts no deference when reviewing their determinations of questions of law" and that "an error of law *is* an abuse of discretion." *Id.* at 1091 (emphasis in original). That is the circumstance here—and one of the reasons Apple's petition satisfies the

requirements of Rule 23(f) and should be granted. The proper standard under Rule 23 is a question of law, and one the district court did not correctly resolve.[1]

As noted, plaintiffs do not attempt to defend the district court's articulation of the governing standard. Instead, they try to create the impression, by citing the court's earlier orders and the hearing transcript, that the district court actually engaged in a more searching review. The record, however, belies that assertion. In the court's initial December 2008 order, the court did not discuss plaintiffs' purported common methods for proving impact. It simply referred to plaintiffs' allegation that consumers had been "uniformly" overcharged, without analyzing whether a common method exists to prove that allegation. Doc. 196, p. 8. When Apple moved to reconsider on the ground that Noll's methods were not adequate to prove common impact, the district court simply stated in a footnote that it "rejects" Apple's contention. Doc. 303, p. 2 n.6. Again, the court did not explain the basis for that rejection or discuss any of the evidence. And neither order pertained to the 2006 software update that is the only remaining claim in this case.

Nor do the hearing transcripts reflect the required analysis. If anything, they show that the court lacked the needed guidance from this Court. In the passages plaintiffs quote, the district court (1) suggested that *Dukes* was inapplicable because it did not involve a regression to prove economic damages (APP 715); (2) suggested that it was enough that plaintiff alleged that all iPods were uniformly

---

[1] *United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009), does not assist plaintiffs. That was a criminal case, not a class certification case, and it had nothing to do with interlocutory review.

affected (APP 717); (3) expressed its reluctance to engage in a "trial" at the class certification stage (APP 716); and (4) relied on the fact that Noll did not expressly admit that a common method was "impossible" (APP 714). Of course, district court judges are not expected or required to articulate their final reasoning in the give-and-take of a hearing. But contrary to plaintiffs' suggestion that these comments show that the court applied the right standard, the comments reinforce the opposite conclusion. Granting this appeal would permit this Court to make clear that *Dukes* applies equally in antitrust cases, that allegations do not substitute for proof, that district courts must resolve disputed factual issues pertinent to Rule 23's requirements at the class certification stage, and that courts must examine not only the plaintiffs' expert's testimony but the evidence refuting that testimony as well.

Nor is it relevant that the district court referred to the need to conduct a "rigorous analysis." Ans. at 1. The basis for this petition to appeal is that the district court—like other district courts in this Circuit—did not properly interpret what such an analysis requires, particularly in light of *Dukes*.

Lacking support in the district court's own analysis, plaintiffs resort to describing the supposedly "voluminous" evidence and briefing the court received. The issue, however, is not the quantity of the plaintiffs' submissions but whether the district court applied the proper standard in evaluating them under Rule 23. The record here shows that the district court did not.

The Third Circuit's decision in *Behrend v. Comcast Corp.*, 655 F.3d 182, 197 (3d Cir. 2011), does not "strongly support[]" plaintiffs. Ans. at 15. The trial

court in *Behrend* held a four-day evidentiary hearing on whether antitrust impact and damages were capable of common proof, followed by a second hearing at which the court heard argument. *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 154 (E.D. Pa. 2010); 655 F.3d at 188. The district court then issued an 81-page opinion analyzing the evidence before it. *Id*. The district court discussed the plaintiffs' four theories of class-wide impact and, "[a]fter detailing the evidence put forth by both sides," gave reasons for rejecting three and accepting one. *Id*. at 195. Far from refusing to engage in a battle of the experts, the trial court explained which experts it found to be persuasive and credited them. 264 F.R.D. at 174–75. As the Third Circuit found, "[t]he [d]istrict [c]ourt examined the methodology, conclusions, and criticisms of the experts on both sides, before providing its conclusions" (655 F.3d at 200), thereby fulfilling its "task … [of] weigh[ing] expert testimony [to] make a determination" as to whether class-wide antitrust impact was susceptible to common proof. *Id*. at 199. The district court's exhaustive analysis in *Behrend* demonstrates the inadequacy of the district court's discussion of impact and damages here.

As shown in Apple's petition, applying the correct standard is critical here because, absent a common method of proving an iPod overcharge, plaintiffs' case will devolve into a series of individual mini-trials over plaintiffs' other theories of injury. Plaintiffs do not dispute this key point. They argue that this case is not like *Amgen* and other securities fraud cases because individual reliance is not an issue in antitrust cases. Ans. at 17 n.15. But they do not dispute that (like reliance) their

other theories of injury—including inability to buy competing products or obtain desired features—are not susceptible to common proof.

## II.    PLAINTIFFS' FACTUAL ARGUMENT IS IRRELEVANT AND UNFOUNDED.

Because the district court applied the incorrect legal standard, plaintiffs' argument that Noll's testimony was sufficient would be irrelevant even if that argument were correct.  As plaintiffs' authority holds, "[i]f the district court's determination was premised on a legal error, we will find a *per se* abuse of discretion." *Yokoyama,* 594 F.3d at 1091.  It is only when "no legal error occurred [that the Court] will proceed to review the district court's class certification decision for abuse of discretion." *Id.*  Thus, Apple is not asking this Court to "second-guess" the district court's evaluation of the "factual record."  Ans. at 4. Rather, it is invoking this Court's authority to correct a legal error—and to do so under Rule 23(f) because of the broad importance of clarifying in this Circuit the proper standard for evaluating expert testimony on the issue of common proof of impact.

But if it were relevant, plaintiffs' argument about the factual record—and their accusation that Apple has mischaracterized it—is not correct.  Plaintiffs deny that Noll admitted that his models were not reliable, asserting that Apple "cherry picked" that testimony and took it out of context.  Ans. at 6.  Importantly, however, plaintiffs do not provide any supposedly missing context that supports a different reading of Noll's testimony.  To the contrary, as the following deposition testimony shows, Noll repeatedly admitted that he had not constructed a model that accounted for the relevant variables and showed causal injury on a class-wide

basis—and his effort to characterize the problem as going merely to the existence
or amount of damages rather than the existence of a common method for proving
impact ignored that his proposed regression model was the only method he offered
for establishing a common iPod overcharge.  Thus, the fact that his model is
unreliable means that plaintiffs have not shown that any viable common method
exists to prove an overcharge.   And because the overcharge theory is the only
theory of impact plaintiffs claim can be proved by common evidence, the
unreliability of Noll's method means plaintiffs have not met their Rule 23 burden
of showing that antitrust impact is capable of proof through common evidence:[2]

> Q.  When you say in your report that the coefficients indicate
> Apple dropped wholesale prices of iPods $30 during the Harmony
> period, are you intending to imply there a causal relationship, namely
> that the prices dropped because of the introduction of Harmony?
>
> A.  I drew no causal inferences from that regression.  I
> explicitly said several times that I don't regard this as a damage
> model.

RA 33.[3]

> Q.  Can you rule out that the price effect of the launch of the U2
> edition was attributed in part to the iTunes update?

---

[2]  Plaintiffs assert that it is "telling" that Apple cited to its briefs in the court below,
or to its expert report, rather than directly to Noll's deposition pages.  But, as the
cited materials show, the relevant deposition pages containing Noll's key admis-
sions were submitted to the court below—and Apple is now submitting them to
this Court with this brief.  As those pages show, Noll testified in the manner Apple
has quoted him as testifying.

[3]  All references to "RA" are to the Reply Appendices in Support of Apple's
Petition for Permission to Appeal Order Granting Class Certification, filed
concurrently.

A.  I cannot rule out anything based on the regression I have because I'm not relying on it for anything.

RA 38.

Q. . . . Does your current regression in your reply report account for the fact that Apple changed its retail prices and wholesale prices, list prices infrequently?

A.  No, that's why it's not a damage model.  Remember, this is in response to the claim I can't estimate this regression. And I can, but to go from there to a damage model, you would take this stuff into account.

RA 40.

Q:  Have you performed a regression analysis that shows damages on a class-wide basis that you're satisfied with and you believe it's reliable?

A.  Of course not.  That's not what the purpose of this was, to produce a reliable damages model.  That's not its purpose.  I say that about five times in that report.

RA 99.

As to whether "[f]rom all the work you've done in this case so far, can you tell us when, if ever, the disabling of Harmony had an impact on iPod prices," Noll responded: "I have not even attempted to answer that question."  RA 101.

Similarly unfounded is plaintiffs' assertion (Ans. at 10) that it is "false" to say that Noll admitted that economic theory provides no basis for concluding that Apple's software updates necessarily affected prices.  Noll's testimony on that point was unequivocal:

Q:  So let me see if I've got it right.  Unless you do this empirically with the regression analysis that actually works, there's no theoretical way to tell if the net effect of Harmony on iPod prices is positive or negative in the initial time period; is that right?

-8-

A.  Yes, it's an empirical issue to be answered by the data.

Q.  And is it also true that if that initial – if the net effect of the initial period is to increase iPod prices, it's solely an empirical question when, if ever, there's a tipping effect and the effect goes the other way?

A.  Yes, it's purely an empirical question.  It's not a theoretical question.

Q.  And is there any theoretical way to say how long that initial period would last?

A.  No.

RA 100-101; *see also* APP 283 ("Whether Apple did set iPod prices above the level that otherwise would have been the case is an empirical matter to be determined by econometric analysis.").

Unable to deny these admissions, plaintiffs rely on Noll's assertions in his declarations (*see* Ans. at  8-9)—assertions that, as shown above, he was forced to retreat from when cross-examined at deposition.  Plaintiffs point to Noll's testimony that, even though the only model he had produced was not reliable, he believed it showed that a working, reliable model could be formulated.  But Noll never presented any such model, despite having been retained in this case over three years ago and despite fact discovery having been completed nine months before he submitted his latest report.  Moreover, one of his principal bases for asserting that a reliable model was possible was the model he presented.  APP 260 ("This is proof they can be done.").  Recognizing as much, plaintiffs seek to bolster the validity of the model by describing it as a "working regression analysis."  Ans. at 6.  But Noll admitted that that very model was one that he could not rely upon

for anything.  The issue on plaintiffs' class certification motion was not whether their expert could construct an ***unreliable*** model, but whether he had shown (not merely asserted) that he could show common impact with a valid, ***reliable*** model.

Contrary to plaintiffs' suggestion (Ans. at 8), the issue with Noll's model was not simply that he lacked some of the necessary data to accurately make a final determination of damages.  Rather, Noll admitted that he did not know whether his model contained the proper variables and whether it properly accounted for such things as the fact that Apple only infrequently changed its prices.  See RA 85, RA 40.  As explained by Apple's expert, Michelle Burtis, these were not minor details for which readily available answers existed.  Instead, those problems—and others described in Burtis' reports—went directly to whether a valid regression model is possible at all in the particular circumstances of this case.  *See* RA 110, ¶ 3; RA 115-138, ¶¶ 10-49; RA 3-18, ¶¶ 7-42; RA 169-175, ¶¶ 2-15.  As Burtis concluded, Noll's various reports showed that Noll "will never be able to establish anticompetitive impact or the amount of damages on a class-wide basis."  RA 110, ¶ 3.

At the very least, Noll's deposition testimony—taken together with Burtis' detailed reports demonstrating that Noll's proposals are unworkable—demanded that the district court critically evaluate all of the evidence before it and explain the basis for concluding that plaintiffs' claim is susceptible to common proof.  While plaintiffs assert in their brief that Noll "addressed various criticisms" of his proposed method and "provided a detailed refutation of each of the supposed inconsistencies" (Ans. at 14), the district court did not address any of this in its

order and made no specific findings to that effect. In other circumstances in which district courts are required to resolve disputes, this Court's cases are clear that the court must explain the basis for its resolution.[4] Factual disputes related to Rule 23's requirements should be treated no differently. Plaintiffs do not contest that other circuits have required such an explanation. *See* Pet. at 14-16 (citing cases). This Court should make clear that the same requirement for a reasoned decision exists in this Circuit.

## III. THE DISTRICT COURT ALSO ERRED IN DECIDING THAT PLAINTIFFS COULD REPRESENT RESELLERS.

Plaintiffs' argument regarding resellers suffers the same problem as the district court's order. Plaintiffs assume that it is enough that consumers and resellers supposedly share a "common interest" in recovering an overcharge. But even if their interests were aligned in that manner,[5] plaintiffs have no answer to the

---

[4] *See McGrath v. County of Nevada*, 67 F.3d 248, 253-54 (9th Cir. 1995) (in determining attorney's fees under § 1988(b), a district court must "provide a clear indication of how it exercised its discretion, [or] we will remand the fee award for the court to provide an explanation"); *Solis v. County of Los Angeles*, 514 F.3d 946, 958 (9th Cir. 2008) (where the district court denied plaintiff's request for appointment of counsel without explanation, reversing because the court could not "determine on appellate review whether [the district court's] denial constituted an abuse of discretion"); *United Nat. Ins. Co. v. R & D Latex Corp.*, 141 F.3d 916, 919 (9th Cir. 1998) (reversing a decision to entertain a declaratory judgment action because "the lack of any reasoning or explanation whatsoever by the district court in support of its decision forecloses any meaningful appellate review for abuse of discretion") (citation omitted).

[5] Plaintiffs do not dispute that, if prices were elevated as plaintiffs claim, resellers would have benefited from those higher prices, thus aligning their interests with Apple rather than plaintiffs. Nor do they deny that resellers generally have ongoing business relationships with Apple that affect their litigation and settlement

(continued)

-11-

point that the resellers' claim turns on separate proof that is irrelevant to the consumers' claims because resellers purchased in separate transactions from consumers and paid different prices. Thus, even if the consumers could prove impact and damages to themselves, that proof would not establish the resellers' claim—as evidenced by Noll's admission that the resellers' claim requires a separate regression model. APP 372-377. And plaintiffs as consumers have no stake whatsoever (nor personal knowledge) in adducing that separate proof or defending its validity.

Plaintiffs attempt to dismiss this problem by suggesting that the resellers can opt out if they believe their interests are not being adequately represented. But that argument renders Rules 23(a)(3) and 23(a)(4) meaningless: every typicality and adequacy of representation problem could be disregarded by putting the onus on the inadequately represented class members to figure out the problem and opt out. Rule 23 requires that *plaintiffs* show that Rule 23(a)'s requirements are satisfied; it does not permit them to shift the responsibility for evaluating such issues to absent class members.

This is an important issue properly reviewable under Rule 23(a). Plaintiffs do not dispute that it is commonly recurring question—and it has not been definitively settled by this Court. The Court should grant this appeal to decide it.

---

incentives. As the Eleventh Circuit recognized in *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003), these differing interests create a conflict that is not eliminated by the resellers' standing to sue under *Hanover Shoe*.

## <u>CONCLUSION</u>

For the foregoing reasons, this petition to appeal should be granted.

Dated: December 22, 2011        Respectfully submitted,

JONES DAY

By:<u>/s/ Robert A. Mittelstaedt</u>

Attorneys for Defendant-Petitioner
APPLE INC.

SFI-720317v1

EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: TFT-LCD (FLAT PANEL) ANTITRUST
LITIGATION

_____/

This Order Relates To:

     All Direct-Purchaser Plaintiff Class
     Actions

_____/

No. M 07-1827 SI
MDL No. 1827

**FINAL PRETRIAL SCHEDULING
ORDER**

     On April 25, 2012, the Court held a Pretrial Conference on this matter, which is scheduled for

jury selection on May 14, 2012, with jury trial commencing on May 21, 2012.  All parties were

represented by counsel.  Based on that conference, and on the hearing held May 20, 2012 concerning

trial structure, the following matters have been resolved:

     1.     **Parties:** At the time of the Pretrial Conference, this trial was anticipated to include the

remaining claims of both the Direct- and the Indirect-Purchaser Plaintiff Class Actions.  Since that date,

however, the Indirect-Purchaser Plaintiff ("IPP") Class Action counsel informed the Court that they

have tentatively resolved their remaining claims (against defendants LG and AUO).  Thus the jury trial

to commence on May 21, 2012 will include only the claims of the Direct-Purchaser Plaintiff Class

Actions ("DPPs") against their only remaining defendant, Toshiba.[1]

2.    **Number of jurors and challenges**:  There shall be a jury of 10 members.  Each side shall have up to four peremptory challenges.

3.    **Voir dire**: The Jury Commissioner will distribute the approved jury questionnaire to potential jurors on May 9, 2012, and counsel will obtain and copy the completed questionnaires thereafter.  Voir dire will be conducted on Monday, May 14, 2012.  The Court anticipates that counsel will have reviewed and considered the completed questionnaires in advance of voir dire.  The Court will conduct general voir dire, and counsel for each side shall have up to 30 minutes total to question the panel.

4.    **Jury instructions**:  Certain joint proposed jury instructions have been submitted, but given the altered scope of the trial (DPPs/Toshiba only) those must be revised.  No later than **Tuesday, May 15, 2012**, counsel shall submit one complete set of proposed instructions, containing both agreed upon instructions (which shall be so noted), and contested instructions, all in the order in which they should be read to the jury.  Where contested instructions are included, they should be annotated both with the proponent's authority for seeking the instruction and the opponent's reason for opposition.  Where feasible, competing instructions addressing the same point shall be included together in the single set of proposed instructions.  The final submission shall be filed in hard copy and also submitted to the court in digital format suitable for reading by WordPerfect (*wpd file) by May 15, 2012.

5.    **Trial exhibits**: Counsel may set up the courtroom for trial during the week of May 8, 2012.  No later than May 17, 2012, the parties shall submit their trial exhibits, in binders with numbered tabs separating and identifying each exhibit.  The court shall be provided with three sets (for the court,

---

[1] The Toshiba defendants include Toshiba Corporation; Toshiba Mobile Display Co., Ltd.; Toshiba America Electronic Components, Inc.; and Toshiba America Information Systems, Inc.  Unless otherwise specified, all will be referred to collectively as "Toshiba."

United States District Court
For the Northern District of California

2

United States District Court
For the Northern District of California

the file and the witness) and each side shall provide one set for the other side. To the extent that original documents are to be used as exhibits in the case, they should be included in the set of exhibits for the court.

6. **Timing of trial**:  The parties originally had identified hundreds of potential witnesses in this case and estimated that the trial would take many weeks, noting that the parallel criminal trial had taken about seven weeks. Since then, however, major portions of the case have been carved off and the case involves only one set of plaintiffs (the DPPs) and one defendant (Toshiba). Revised witness lists have been submitted, which now include somewhere between 17 and 31 witnesses for plaintiffs, and 25 witnesses for defendant, with some overlap. Plaintiffs estimate 14 court days for their direct examination; defendant does not provide an estimate. The Court has reviewed the witnesses listed and the issues to be tried, and believes that the matter can easily be tried in six court weeks, or 24 days.[2] Based on this estimate, each side shall have 60 minutes for opening statements; each side shall have 50 hours total for presentation of evidence, which includes direct and cross-examination and presentation of all exhibits; and each side shall have up to 2 hours for closing argument.

6. **Trial schedule**:  Jury trials are generally conducted Monday through Thursday; jury trials are generally not conducted on Fridays, although deliberating juries are free to deliberate on Fridays. The trial day runs from 8:30 a.m. until 3:30 p.m., with a 15 minute break at 10:00 a.m., a 45 minute break at 12:00 noon and a 15 minute break at 2:00 p.m., all times approximate. The Court will be unavailable on Thursday, June 7, 2012.

7. **Motions in limine**:  The parties filed approximately 51 motions in limine. All were discussed at the Pretrial Conference. Some have been mooted by the IPPs' tentative settlements; the balance are resolved as follows (any motions not mentioned are DISMISSED as moot):

---

[2] This time estimate may be over-generous. Both sides now agree that some or all of the prior guilty pleas may be admitted as substantive evidence of conspiracy in this civil action. This should considerably compress the time needed to prove major parts of the case.

**DPP Motions**:

No. 1: To exclude references to treble damages: GRANTED.

Nos. 2/3: To exclude references to DPP and IPP settlements: GRANTED as to the amount or terms of any settlement; DENIED as to fact of settlement by testifying witness or by corporate employer of testifying witness.

No. 4: To exclude evidence of settling defendants' obligations to cooperate: DENIED.

No. 5: To exclude evidence of cooperating witnesses' payments while in prison: DENIED.

No. 6: To exclude references to plaintiffs' financial condition: GRANTED, absent further Court order on offer of proof of relevance.

No. 7: To exclude references to plaintiffs' other lawsuits: GRANTED, absent further Court order on offer of proof of relevance.

No. 8: To exclude references to relationship between named plaintiff and counsel: GRANTED, absent further Court order on offer of proof of relevance.

No. 9: To exclude references to separate cases brought by opt-outs, state AGs and IPPs: DENIED, without prejudice to specific objection to specific testimony at trial.

No. 10: IPP motion only - moot.

No. 11: To exclude references to statements made by AUSA regarding multiple conspiracies: GRANT.

No. 12: To exclude references to fact that Toshiba was not indicted: DENIED. Upon request, and if necessary, the Court will give a limiting instruction.

No. 13: To exclude reference to DOJ Rule 12/4 disclosures in criminal actions: GRANTED.

No. 14: To exclude reference to Samsung as amnesty applicant: DENIED.

No. 15: To exclude argument that plaintiffs' claims are barred because they arise from foreign commerce: GRANTED as to any such argument. If/to the extent that factual predicates must be established at trial re FTAIA issues, those will simply be submitted to the jury for

4

determination.

No. 16: To exclude evidence/argument re plaintiffs' ability to pass on overcharges: GRANTED.

No. 17: To exclude evidence re failure to mitigate damages: GRANTED, absent further Court order on offer of proof.

No. 18: To exclude witnesses who refuse to describe their trial testimony: DENIED, without prejudice to specific objection at time of trial.

No. 19: To exclude all undisclosed evidence: DENIED, without prejudice to specific objection at time of trial.

No. 20: To exclude witnesses not previously disclosed by defendants: GRANTED, absent further Court order on offer of proof.

No. 21: To exclude live witnesses not made available to plaintiffs: GRANTED. Any witnesses being brought to trial by defendant for live testimony must be made available for testimony in plaintiffs' case in chief. However, the defense examination of any such witness will not be limited by the scope of plaintiffs' direct. See Toshiba No. 1.

No. 22: To exclude evidence regarding effect of large damage award: DENIED, as overbroad and premature; without prejudice to specific objections at time of trial.

No. 23: To exclude non-expert, percipient witnesses during trial: GRANTED, except as to that party's designated representative.

No. 24: To exclude expert testimony that there was no conspiracy: DENIED, as vague, overbroad and premature; without prejudice to specific objections at time of trial. No expert may offer improper legal conclusions.

No. 25: To exclude duplicative, cumulative, prejudicial, time-wasting and confusing experts: DENIED without prejudice to actual objection at time of trial. Any witness' testimony which is genuinely duplicative, cumulative, unfairly prejudicial, time-wasting or confusing will be excluded.

No. 26: To exclude expert testimony on incomplete pass-on of overcharges through affiliates: GRANTED, absent further Court order on offer of proof demonstrating ownership and

United States District Court
For the Northern District of California

control.

No. 27: To admit evidence that witnesses have invoked the Fifth Amendment: DENIED, absent further order of Court.

No. 28: To issue finding pretrial that foundation exists to admit co-conspirator statements: DENIED, without prejudice to renewal at trial.

**Toshiba Motions:**

No. 1: To allow full defense examination of Toshiba witnesses during plaintiffs' case in chief: GRANTED; see DPP No. 21.

No. 2: To exclude evidence of anticompetitive conduct unrelated to plaintiffs' claims: DENIED, without prejudice to specific objection to specific evidence at time of trial.

No. 3: To exclude evidence of prior invocations of Fifth Amendment: GRANTED, without prejudice to reconsideration based on showing of good cause.

No. 4: To exclude use of discovery responses by other civil defendants: DENIED, without prejudice to case-by-case evaluation.

No. 5: To exclude testimony by expert Kenneth Flamm re non-index panels: DENIED, without prejudice to specific objection to specific questions/testimony at time of trial.

No. 6 – re video - withdrawn.- moot.

No. 7: To exclude evidence of guilty pleas by Japanese manufacturers: DENIED, without prejudice to specific objection at trial.

No. 8: To exclude adverse inferences from the Fifth Amendment deposition of Christina Caperton Clark: GRANTED; FRE 403.

No. 9 – re IPPs only – moot.

No. 10 - re IPPs only – moot.

**LG Motions joined in by Toshiba:**

No. 1: To exclude purported expert testimony: DENIED, without prejudice to specific objections to specific questions at time of trial.

No. 2 - re IPPs only - moot.

No. 3: To exclude miscellaneous things:

–Inflammatory rhetoric - GRANTED.

–Products/territories not at issue - DENIED without prejudice.

–Employment issues - DENIED.

–Investigations and indictments - DENIED without prejudice.

–"Gross gains" from criminal AUO trial - GRANTED; FRE 403.

**IT IS SO ORDERED.**

Dated: May 4, 2012

SUSAN ILLSTON
United States District Judge

7

EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE STATIC RANDOM ACCESS MEMORY (SRAM) ANTITRUST LITIGATION | No. 07-md-01819 CW |
| | ORDER ON MOTIONS IN LIMINE AND FOR PRE-TRIAL PREPARATION |

_____/

As discussed at the pre-trial conference, the Court issues the following orders, and rules on the parties' motions in limine:

I. Settlement Conference with Judge Weinstein

Lead counsel for all parties are ordered to participate in a joint conference call with Judge Weinstein by December 24, 2010, or as soon thereafter as is convenient to Judge Winstein's schedule, to schedule a settlement negotiation process.

II. Bifurcation

The case will be tried in phases. The first phase of the first trial will determine for both the Direct Purchaser (DP) and Indirect Purchaser (IP) classes whether Samsung or Cypress or both participated in an antitrust conspiracy, and if so its length, and

United States District Court
For the Northern District of California

the statute of limitations issues.  Following any verdict for Plaintiffs on that point, the same jury will proceed to consider DP Plaintiffs' injury and damages.  Thereafter, a second trial with a second jury will be scheduled to consider some or all of the IP classes' state law claims against Cypress, and their injury and damages.  At that time, the parties may move for remand of some of these cases to the district courts from which they were transferred.

III. Jury Instructions

The parties are to revise and resubmit their proposed jury instructions, in accordance with the Court's guidance at the pre-trial conference, for the conspiracy and Direct Purchaser damages phases of the trial.  (Indirect Purchaser instructions need not submitted at this time.)  Where available, the Ninth Circuit model jury instructions should be used.  The American Bar Association model jury instructions for civil antitrust cases should be used where an appropriate model instruction from the Ninth Circuit is unavailable.  Custom instructions may be submitted where no model instruction is available.  If the parties propose edited versions of the Ninth Circuit and ABA instructions, they must clearly indicate their line edits with highlight and strike-through marks. These instructions should be submitted on January 4, 2011.

IV. Special Verdict Forms

The parties are to revise and resubmit their proposed joint or separate special verdict forms, for the conspiracy and Direct Purchaser damages phases of the trial only, on January 4, 2011.

V. Differentiation of Entities

The parties are to attempt to stipulate so that the Samsung entities, Samsung Electronics Company, Ltd. (SEC) and Samsung Semiconductor, Inc. (SSI) may be referred to throughout the trial as Samsung, and related former co-Defendant entities may be similarly combined. If a stipulation cannot be reached, this issue shall be addressed in the parties' briefing, scheduled below.

VI. Order of Witnesses

Absent unusual circumstances, each witness should be called to testify only once in the conspiracy phase of the first trial. The parties are to devise a plan for presenting witnesses in an order that is efficient and assists the jury in understanding the facts of the case. It may be necessary for experts to testify in both phases.

VII. Jury Questionnaire

A jury questionnaire will be given to the venire to inquire into hardship, generic information and case-specific information. The generic jury questions are attached to this Court's standing order for civil pretrial preparation. A previously used hardship questionnaire and sample case-specific questionnaires will be

United States District Court

For the Northern District of California

posted on the website with the Court's standing orders.  The parties' Joint Proposed Voir Dire Questionnaire shall be submitted on January 4, 2011, as previously stipulated.

VIII. Allocation of Any Damages Award

The parties are to attempt to stipulate as to the process for allocating any damages awards among DP and IP Plaintiff class members, and any cy pres fund, taking into account the settlement amounts.  If there is disagreement as to the process, the parties shall include this issue in their briefing, scheduled below.

IX. Exhibits

Exhibit lists and Objections and pre-marked exhibits, and designations of depositions and discovery responses and objections thereto, for the conspiracy and Direct Purchaser damages phases of the trial, will be submitted by January 4, 2011, as previously stipulated.

X. Further Briefs

Plaintiffs' joint brief on damages allocations and differentiation of Defendant entities, if necessary, of not more than ten pages, shall be submitted on December 28, 2010. Defendants' joint response of the same length shall be submitted on January 4, 2011, and Plaintiffs' reply of not more than four pages on January 7, 2011.

XI. Co-conspirator Statements

These will be proposed by Plaintiffs not less than a week before they are proffered, along with an offer of proof as to the

4

co-conspirator's participation in the conspiracy, the dates
thereof, and the relevance of the statement to the conspiracy.

X.  Time limits

     The trial will be allotted not more than six weeks, five days
per week except in a holiday week, approximately 8:30 to 1:30 each
day without side-bar conferences, and including jury selection,
argument and instructions.  Half of that time will be allotted to
each side, and half of each side's time to each party.

XI. Motions in Limine

   A.  Plaintiffs' Motions in Limine

        1.  DP Plaintiffs' Motion in Limine #1 (IP Plaintiffs'
            Motion in Limine #1) to exclude reference to or
            evidence of the Department of Justice's closing of its
            SRAM investigation: GRANTED.

        2.  DP Plaintiffs' Motion in Limine #2 to exclude
            reference to or evidence of Westell's lack of damages:
            GRANTED in part, DENIED in part.  The evidence is
            admissible as to damages, but not to argue Westell's
            lack of standing or inadequacy as a class
            representative.

        3.  DP Plaintiffs' Motion in Limine #3 (IP Plaintiffs'
            Motion in Limine #4) to exclude arguments or evidence
            that Plaintiffs failed to mitigate damages: GRANTED as
            unopposed.

4.  DP Plaintiffs' Motion in Limine #4 (IP Plaintiffs' Motion in Limine #5) to exclude reference to treble damages and attorneys' fees: GRANTED.  The Court may instruct the jury not to consider trebling of damages.

5.  DP Plaintiffs' Motion in Limine #5 to exclude reference to or evidence of DP Plaintiffs' ability to pass-on overcharges: GRANTED for the conspiracy and Direct Purchaser damages phases of the trial.  However, such evidence will be necessary to apportion damages.

6.  DP Plaintiffs' Motion in Limine #6 (IP Plaintiffs' Motion in Limine #6) to exclude reference to or evidence of the DP class representative's financial condition, fee arrangements or other litigation: GRANTED.  Such evidence does not appear relevant.  If there is a development that suggests a need for such evidence, counsel are to make a request to the Court before proffering the evidence.

7.  DP Plaintiffs' Motion in Limine #7 (IP Plaintiffs' Motion in Limine #7) to exclude reference to or evidence of other class members' financial condition: GRANTED, except Defendants may proffer evidence of class members' financial condition to the extent that it is relevant to their bargaining power.

8.  DP Plaintiffs' Motion in Limine #8 (IP Plaintiffs'

Motion in Limine #9) to exclude reference to or
evidence of settlements with other Defendants: GRANTED
in part.  References to settlements are excluded.  The
settlement amounts are excluded.  However, evidence of
the cooperation clauses may be relevant to impeach a
witness's credibility.

9.  DP Plaintiffs' Motion in Limine #9 to exclude evidence
of class members who opted out of the action or
settled separately: GRANTED.

10.  DP Plaintiffs' Motion in Limine #10 (IP Plaintiffs'
Motion in Limine #10) to exclude expert opinion that
Defendants did not conspire: GRANTED.  No experts may
testify as to their opinions on whether Defendants did
or did not in fact conspire.

11. IP Plaintiffs' Motion in Limine #2 to exclude
reference to any IP class representative being
inadequate because the representative did not purchase
SRAM during one of the damages subperiods identified
by Dr. Dwyer: GRANTED in part.  The adequacy of a
class representative is not a matter for the jury, but
such evidence may go to the issue of damages at a
later trial.

12. IP Plaintiffs' Motion in Limine #3 to exclude
reference to any IP class representative not producing
a product for inspection: GRANTED in part.  The

United States District Court
For the Northern District of California

adequacy of the class representatives is not a jury question, and evidence of failure to produce the products pre-trial will be excluded, but lack of evidence of purchase of Defendants' products will be relevant to IP Plaintiffs' damages.

12. IP Plaintiffs' Motion in Limine #8 to exclude reference to or evidence of any IP class representative's alleged inadequacy as a class representative due to relationships with counsel: GRANTED.  Such evidence does not appear relevant.  If there is a development that suggests a need for such evidence, counsel are to make a request to the Court before proffering the evidence.

B. Defendants' Motions in Limine

1. Samsung's Motion in Limine #1 to exclude evidence of guilty pleas in the DRAM price-fixing case: DENIED. The Court will give a limiting instruction.

2. Samsung's Motion in Limine #2 to exclude evidence of Samsung's leniency agreement with the Department of Justice in connection with the Department's antitrust investigation of the SRAM industry: GRANTED.  However, the Court will review the agreement in camera.  It shall be lodged along with a proposed sealing order by January 4, 2011.  If it appears relevant to impeachment, the Court may reconsider.

3.    Samsung's Motion in Limine #3 to exclude evidence of
      any of its conduct related to DRAM: DENIED, but the
      amount of such evidence will be limited.

 4.   Samsung's Motion in Limine #4 to preclude evidence of
      government investigations of non-SRAM industries:
      GRANTED.

5.    Samsung's Motion in Limine #5 to exclude evidence of
      impact or damages that is inconsistent with the
      opinions in expert reports of Dr. Levy:  GRANTED.

6.    Samsung's Motion in Limine #6 to exclude evidence of
      foreign conduct: DENIED.  However, foreign
      transactions found to be barred by the FTAIA will not
      be included in any damages calculation.

7.    Samsung's Motion in Limine #7 to exclude evidence of
      compensation, discipline or employment status of any
      of its employees who plead guilty, was indicted or
      cooperated with the government in the DRAM criminal
      proceedings: DENIED, except that the fact that Samsung
      may have paid its employees' attorneys' fees may be
      excluded.

8.    Samsung's Motion in Limine #8 to exclude uncertified
      translations of foreign-language documents: DENIED, as
      long as certified translations are also available, and
      any difference is relevant.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

9.  Samsung's Motion in Limine #9 to strike inadmissible
evidence from Plaintiffs' complaints: DENIED as moot.
The complaints will not be presented to the jury.

10. Cypress' Motion in Limine #1 to exclude guilty pleas
and evidence regarding the DRAM criminal proceedings:
DENIED.  However, the Court will give an effective
limiting instruction, and will limit the amount of
such evidence.

11. Cypress' Motion in Limine #2 to exclude discovery
excerpts from Samsung and Defendants who settled:
DENIED, except that discovery excerpts that are
hearsay as to Cypress but admissible as to Samsung
will be subject to an effective limiting instruction.

12. Cypress' Motion in Limine #3 to disallow allocation of
damages attributable to Samsung: DENIED, but damages
attributable to Cypress will also be allocated.

13. Cypress' Motion in Limine #4 to exclude expert
testimony that price inflation is evidence of
conspiracy: DENIED.

14. Cypress' Motion in Limine #5 to exclude evidence of
the relationships between customers and vendors:
DENIED.

IT IS SO ORDERED.

Dated: 12/16/2010

_____
CLAUDIA WILKEN
United States District Judge

10

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 14, 2014.

                                    s/ Bonny E. Sweeney
                                    BONNY E. SWEENEY

                                    ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101-8498
                                    Telephone:  619/231-1058
                                    619/231-7423 (fax)

                                    E-mail:        bonnys@rgrdlaw.com

# Mailing Information for a Case 4:05-cv-00037-YGR The Apple iPod iTunes Anti-Trust Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amir Q Amiri**
  aamiri@jonesday.com,ttualaulelei@jonesday.com

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Alexandra Senya Bernay**
  xanb@rgrdlaw.com,LMix@rgrdlaw.com,TJohnson@rgrdlaw.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com

- **Jennifer N. Caringal**
  JCaringal@rgrdlaw.com

- **Todd David Carpenter**
  Todd@Carpenterlawyers.com

- **Patrick J. Coughlin**
  PatC@rgrdlaw.com,SusanM@rgrdlaw.com,e_file_sd@rgrdlaw.com,SJodlowski@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **John F. Cove , Jr**
  jcove@bsfllp.com,kmurphy@bsfllp.com,dnasca@bsfllp.com,sphan@bsfllp.com

- **Meredith Richardson Dearborn**
  mdearborn@bsfllp.com,cseki@bsfllp.com

- **Karen Leah Dunn**
  kdunn@bsfllp.com

- **Andrew S. Friedman**
  khonecker@bffb.com,rcreech@bffb.com,afriedman@bffb.com

- **Martha Lea Goodman**
  mgoodman@bsfllp.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com,winkyc@zhlaw.com

- **William A. Isaacson**
  wisaacson@bsfllp.com,jmilici@bsfllp.com

- **Roy Arie Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com

- **Carmen Anthony Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,mlandsborough@jonesday.com,pwalter@jonesday.com

- **Brian P. Murray**
  bmurray@glancylaw.com

- **George A. Riley**
  griley@omm.com,lperez@omm.com,cchiu@omm.com

- **Elaine A. Ryan**
  eryan@bffb.com,nserden@bffb.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Michael Tedder Scott**
  mike.scott@dlapiper.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **Bonny E. Sweeney**
  bonnys@rgrdlaw.com,slandry@rgrdlaw.com,E_file_sd@rgrdlaw.com,ckopko@rgrdlaw.com

- **Helen I. Zeldes**
  helenz@zhlaw.com,winkyc@zhlaw.com,aarono@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)