1    [*Counsel listed on signature page*]

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                        OAKLAND DIVISION

10   | THE APPLE iPOD iTUNES ANTI- | Lead Case No.  C 05-00037 YGR |
     | TRUST LITIGATION | [CLASS ACTION] |

11

12                                          **JOINT PRETRIAL CONFERENCE**
                                            **STATEMENT**

13   _____

14   This Document Relates To:          Judge:   Honorable Yvonne Gonzalez Rogers
                                        Date:    October 29, 2014
15   ALL ACTIONS                        Time:    9:30 AM
                                        Place:   Courtroom 1, 4th Floor
16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.     Substance of the Action ........................................................................................ 1
       Agreed Statement ................................................................................................. 1
       Relief Prayed ....................................................................................................... 1
       Summary of Apple's Defenses.............................................................................. 3
       Plaintiffs' Additional Statement ........................................................................... 5
II.    The Factual Basis of the Action............................................................................ 7
       A.    Undisputed Facts ................................................................................... 7
             iTunes ................................................................................................... 7
             iPods ..................................................................................................... 7
             iTunes Music Store ............................................................................... 8
             Digital Rights Management ................................................................... 8
       B.    Disputed Factual Issues ......................................................................... 9
             Monopolization ..................................................................................... 9
             Conduct ................................................................................................. 9
             Causation/Damages.............................................................................. 10
       C.    Agreed Statement ................................................................................. 11
       D.    Stipulations .......................................................................................... 11
III.   Disputed Legal Issues ......................................................................................... 13
       A.    Points of Law........................................................................................ 13
             The UCL Claim ..................................................................................... 13
             Class Issues .......................................................................................... 13
IV.    Further Discovery or Motions.............................................................................. 16
V.     Estimate of Trial Time ........................................................................................ 16
VI.    List of Motions in Limine .................................................................................... 16
       A.    Plaintiffs' Motions in Limine ............................................................... 16
       B.    Apple's Motions in Limine ................................................................... 17
VII.   Juror Questionnaire.............................................................................................. 17
VIII.  Trial Alternatives and Options ............................................................................ 17
       A.    Settlement Discussion. ......................................................................... 17
       B.    Consent to Trial Before a Magistrate Judge ......................................... 17
       C.    Amendments, Dismissals ..................................................................... 18
       D.    Bifurcation, Separate Trial of Issues .................................................... 18

i

1  **I.      Substance of the Action**

2                              <u>**Agreed Statement**</u>

3          This is an antitrust class action in which Plaintiffs allege that Defendant Apple Inc. engaged

4  in monopolization and attempted monopolization by introducing certain software and firmware

5  updates in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and California's Unfair

6  Competition Law ("UCL").  Plaintiff class representatives[1] are Mariana Rosen and Melanie Wilson

7  (formerly Tucker).  The class is defined as follows:

8          All persons or entities in the United States (excluding federal, state and local
           governmental entities, Apple, its directors, officers and members of their families)
9          who purchased an iPod directly from Apple between September 12, 2006 and
           March 31, 2009 ("Class Period")[2].
10

11  Order Granting Pls.' Mot. for Class Certification (Nov. 22, 2011) (Dkt. 694).   (Specific

12  models of iPods covered by the Court's Class Definition are included at Appendix A.)

13

14                              <u>**Relief Prayed**</u>

15          **Plaintiffs:** Plaintiffs seek money damages on behalf of the certified Class as well as

16  appropriate restitutionary relief.  Plaintiffs are claiming damages for the following models of iPods,

17  allegedly subject to overcharge during the class period:

18          iPod Classic (6th generation)
           iPod Classic (7th generation)
19          iPod nano (2nd generation)
           iPod nano (3nd generation)
20          iPod nano (4nd generation)
           iPod touch (1st generation)
21          iPod touch (2nd generation)

22  Rebuttal Decl. of Roger Noll, Exs. 5-6 (Nov. 25, 2013) (Dkt. 740-14).

23          Plaintiffs' damages have been calculated by Professor Roger G. Noll using a multiple-

24

25  _____

26  [1] Plaintiffs will seek to withdraw Somtai Charoensak as a class representative, as he did not
    purchase an iPod during the currently certified Class Period.  Plaintiffs will not seek to dismiss
    Mr. Charoensak as a plaintiff, however, to preserve his rights to appeal the Court's dismissal or
27  summary adjudication of his claims, including his Section 1, Sherman Act (15 U.S.C. §1) tying
    claim and his Section 2, Sherman Act (15 U.S.C. §2) claim based on iTunes 4.7.
28
    [2] The Class Notice details several models of iPods included in the class definition.

                                           1
    _____
    JOIN PRETRIAL CONFERENCE STATEMENT                    No. C 05-00037 YGR

variable regression analysis.  Comparing prices of iPods before and after the competitive events (when Harmony was operational, when Apple disabled Harmony, and when Apple and its competitors began selling DRM-free audio files), and using a hedonic model of iPod prices that accounts for different iPod models and their different features, Professor Noll quantified the competitive effects of the challenged conduct on iPod prices.  The regressions estimated an overcharge of 2.38% on iPods sold to resellers, and 7.45% on iPods sold to retail customers, for total damages of $351,631,153, before automatic trebling under antitrust law.

To support their damages claim, Plaintiffs expect to call Professor Noll as a witness. Plaintiffs may additionally support their damages claim with any witnesses on its witness list as well as any of its deposition designations and counter-designations, cross examination of any witnesses Apple calls at trial, rebuttal witnesses, demonstrative exhibits to be presented at trial as well as exhibits on Plaintiffs' proposed list of trial exhibits, Apple's proposed list of trial exhibits, and/or the parties' joint list of trial exhibits, including transactional records produced in the litigation by Apple.

Plaintiffs also seek pre- and post-judgment interest, and costs of suit, including attorneys' fees and any other relief the Court deems appropriate.

Damages under the UCL are unavailable, but Plaintiffs seek restitution from Apple based on the overpayment for iPods as calculated by Professor Noll for both resellers and consumers of $351,631,153.

Plaintiffs object to Apple's request for "costs and reasonable attorneys' fees" in the event that judgment is entered in Apple's favor.  Apple provides no basis for its "loser pays" model and such a request is contrary to established law.

**Apple**: Apple denies liability, and asserts that even if its actions in issuing the challenged product updates were to be considered anticompetitive, no relief or damages is available under settled principles of antitrust laws.  Apple respectfully requests that this Court dismiss Plaintiffs' claims with prejudice, enter judgment against Plaintiffs and in favor of Apple, decline to award Plaintiffs' requested relief, and award Apple its costs and reasonable attorneys' fees.

///

JOINT PRETRIAL CONFERENCE STATEMENT                                   No. C 05-00037 YGR

1

**Summary of Apple's Defenses**

2        **No Anticompetitive Conduct**.  The only remaining allegation of anticompetitive conduct

3 at issue is the extent to which Apple's iTunes 7.0 and 7.4 updates were anticompetitive because

4 certain elements of those updates did not permit interoperability between certain iPods and another

5 third-party music software program.  This Court has ruled that all the other conduct alleged as

6 unlawful in the complaint does not violate the antitrust laws, including Apple's design of an

7 integrated iTunes/iPod platform and its development and distribution of the iTunes 4.7 software

8 update.  *See* Order Granting In Part And Denying In Part Defendant's Motion For Summary

9 Judgment; Denying As Premature Plaintiffs' Motion For Class Certification (May 19, 2011) (Dkt.

10 627) ("2011 SJ Order"); Order Decertifying Classes Without Prejudice to Being Renewed; Inviting

11 Further Motions, at 9 (Dec. 21, 2009) (Dkt. No. 303) ("2009 Decertification Order").

12        Apple designed the iPod to work with the iTunes jukebox because it believes that an

13 integrated solution provides the best consumer experience and makes the most business sense for

14 Apple, and has repeatedly articulated its approach in the marketplace.  Nevertheless, numerous

15 third parties attempted to override Apple's design for a variety of purposes, including underground

16 hackers who facilitated piracy by stripping DRM protection, and RealNetworks, which offered the

17 "Harmony" translation program, which in RealNetworks's words, "translated" the DRM on songs

18 purchased from the RMS to a form of DRM that approximated FairPlay.  Third parties imposing

19 interoperability by manipulating FairPlay posed security risks to Apple and iPod users, caused

20 corruption within the system, and also provided an opening to illegal copying.[3]  Apple regularly

21 issued iTunes updates to add features, fix bugs, address and anticipate threats to stability and

22 security of the platform, and comply with its contracts with the record companies, which required

23 continuous efforts to ensure that its DRM provided adequate security for their copyrighted music in

24 the face of the inevitable hacks.  Some updates caused third-party programs, including Harmony, to

25 no longer operate as the third party intended because those programs were based on the third-

26 _____

27 [3] Plaintiffs make a number of factual allegations in their separate statement with which Apple
disagrees, including but not limited to statements about the conduct of third parties as to whom
28 Plaintiffs never conducted any discovery.  This joint pre-trial statement, however, is not the proper
vehicle for responding to these statements.

3

1   parties' decoding of a previous version of FairPlay.

2          One of the legitimate business justifications for Apple's enhancement of its security

3   architecture was the likelihood that RealNetworks and others violated Apple's copyrights under the

4   Digital Millennium Copyright Act and its User Agreements. The iTunes 7.0 update, released on

5   September 12, 2006, was a significant product improvement in any number of ways, including but

6   not limited to security. The new generation of FairPlay found in 7.0 enhanced security to eliminate

7   known vulnerabilities, streamlined the structure of FairPlay's protection scheme, which made it

8   easier for Apple to make changes and fix problems, and maintained the integrated iTunes/iPod

9   platform for new iPod models to protect against inadvertent and malicious corruption.  All of these,

10  among others, constituted legitimate business justifications. In September 2007, Apple enabled

11  additional security and stability measures in iTunes 7.4 and certain new iPod models that, among

12  other things, further secured the internal music database on those models.

13         Apple had the right to compete with an integrated system; integrated systems have many

14  benefits related to functionality, ease of use, security and stability, protection against inadvertent

15  and malicious corruption, product performance, and efficiency in resolving consumer complaints;

16  and Apple's intention to create and maintain an integrated system was well known to competitors

17  and consumers.  Further, Apple had no duty to aid its competitors or to create and maintain an

18  interoperable system or to permit compatibility with other systems.  Thus, it was lawful for Apple

19  to issue software updates containing security and stability upgrades that had the effect of frustrating

20  third parties who had decoded a previous version of its DRM.  This would be the case even where

21  the third-parties' programs did not interfere with the functioning of the integrated system and

22  create security risks and corruption, but is even more clearly the case here, where they did.

23         **Market Definition**.  Plaintiffs cannot establish that the two markets that they have alleged

24  are relevant antitrust markets for the purposes of analyzing Apple's conduct.

25         The first market they allege, the purported Permanent Audio Download Market, is unduly

26  narrow and is not a relevant market in any event because the relevant issue under Plaintiffs' lock-

27  in/lock-out theories is not reasonable interchangeability with regard to the sale of downloads, but

28  all sources of music that consumers use to play on their digital players.

JOINT PRETRIAL CONFERENCE STATEMENT                              No. C 05-00037 YGR

The second market Plaintiffs allege, the purported Portable Digital Media Player Market, is also unduly narrow.  The relevant market also included for a substantial portion of the class period, at the very least, smart phones and other handheld devices capable of playing music.

**Monopoly Power**.  Apple does not possess monopoly power in either alleged market.  Its competitors in the sale of digital downloads include some of the largest companies in the world, such as Microsoft, WalMart, Amazon, Sony, and Best Buy.  All of them have tremendous bargaining power with rights holders and/or are rights holders themselves; all of them have the financial and technical resources to develop the infrastructure and marketing associated with offering downloads over the Internet, to operate efficiently, and to price competitively.

Similarly, competition in the sale of devices is intense.  During the class period, a number of highly successful high-tech firms, including Microsoft, Sony, Dell, Rio, Sandisk, RCA, and many others offered portable devices, competing on price, style, function and features, ease of use, security, the availability and quality of complementary software jukeboxes, and other metrics.

**Causation/Injury/Damages**.  Plaintiffs cannot demonstrate causal antitrust injury or damages.  Plaintiffs' theory is entirely dependent on showing that the allegedly anticompetitive incompatibility between Harmony and certain iPod models inhibited consumer demand for other players to such an extent that this incompatibility, rather than the slew of improvements and the well-recognized consumer appeal of iPods, caused Apple to charge several dollars more per iPod than it would have otherwise charged for every iPod sold during the class period.

Plaintiffs' regression model offered by Dr. Noll does not establish causal antitrust injury or damages, nor does it demonstrate impact or damages on a class-wide basis.

Plaintiffs' class must be decertified because Dr. Noll improperly conflates concededly lawful and allegedly unlawful conduct in his regression analysis.

Plaintiffs are not typical of or adequate representatives for resellers—retailers who purchased iPods from Apple for resale in their stores.

### Plaintiffs' Additional Statement

Plaintiffs contend this Court's Pre-Trial Order No. 1 limited and clarified the matters appropriate for inclusion in this required joint pretrial statement and have notified Apple of their

1 position.  Because Apple has refused to remove the "additional statement,"  Plaintiffs include this

2 additional statement to counter Apple's one-sided view of the case and note certain fundamental

3 disagreements with Apple's statement.

4 　　　When Apple and the record labels originally negotiated the terms under which Apple could

5 sell digital music files through its online music store, iTS, most of the labels required that the

6 recordings "have content protection to guard against piracy."  Apple implemented this requirement

7 through a proprietary DRM system called FairPlay.  All music sold through iTS during the class

8 period was restricted through FairPlay, including music recorded by labels that did not require

9 DRM.  The major music labels would have preferred a system that would have allowed their music

10 to be played on multiple competing devices because the labels wanted their music to be sold in the

11 widest manner possible.  In fact, Sony requested a security solution that would have protected

12 content and allowed for interoperability, but Apple refused.  Apple quickly leveraged this closed

13 system and almost immediately achieved dominance in the portable digital media player market

14 soon after the introduction of the iTunes Store.  The first real threat to this dominance came in

15 January 2004, when RealNetworks launched an online music store that competed directly with

16 iTunes. It sold digital audio files licensed from the major record labels and protected by DRM.

17 Recognizing that unless iPod users could play RealNetworks' songs on the iPod, RealNetworks

18 could not successfully compete in the digital audio file market, RealNetworks developed a new

19 technology called Harmony that enabled iPod users to play DRM-encrypted songs legally

20 purchased from Real directly on the iPod and many other portable players.  There is no evidence

21 Harmony was ever intended or able to remove FairPlay encryption from any songs purchased from

22 the iTunes Store.  And Plaintiffs' expert has opined that Harmony only added encryption to songs;

23 it did not strip FairPlay from songs sold through the iTunes Store.

24 　　　Apple now, for the first time in this nine-year litigation, claims that Real's conduct was

25 "unlawful" and alleges that Real's actions "may have constituted copyright infringement."  Neither

26 of these unsupported claims has merit or has any bearing on the issues presented.  In fact, the

27 evidence Plaintiffs will present at trial will show that Apple did not actually believe Real was

28 violating the law, but instead publicly threatened Real in order to deter other potential competitors.

Besides having waived both the illegality and copyright infringement defenses,  neither of these claims has merit.  *See, e.g.*,, Apple's Motion to Dismiss or, Alternatively, for Summary Judgment dated February 22, 2010 (nowhere claiming Harmony was illegal, but arguing that various programs such as JHymm violated  the Digital Millennium Copyright Act).

Apple further claims "third parties imposing interoperability by manipulating FairPlay posed security risks to Apple and iPod users and also provided an opening to illegal music sharing opposed by the record companies" but as Plaintiffs' expert has explained, Apple's implementation of KVC and DVC was "intended to prevent third-party applications like RealPlayer . . . from directly transferring songs to an iPod, whether they were encrypted or not." Expert Report of David Martin at ¶76. The database verification code in 7.0 "did not make it more difficult for attackers to strip FairPlay encryption from songs." *Id.*, ¶78. Instead of making it harder to read the database in the iPod, database verification made it harder to write onto the databases. *Id.* Thus, 7.0 was not aimed at hacks that stripped content protection from music and so were required by Apple's contracts with the labels. It was aimed, instead, at competing online music sources.  Rather than a legitimate product improvement, KVC and DVC were solely directed at competitors and made customers' experiences worse, not better.  Apple's post-hoc "justifications" are pretextual and litigation-driven.

## II.     The Factual Basis of the Action

### A.     Undisputed Facts

1.     Apple is a company headquartered in Cupertino, California.

2.     Class representatives are Mariana Rosen, a resident of New York, and Melanie Wilson (formerly Tucker), a resident of Charleston, South Carolina.

### iTunes

3.     In January 2001, Apple introduced the iTunes software, a "jukebox" that provided a way for users to organize, store and play their digital media audio files, including music, on Mac computers.  iTunes was preinstalled on Macs; Apple did not charge separately for it.

### iPods

4.     Apple introduced the iPod, a portable digital music player, on October 23, 2001.

7

5.      In order to play songs on the iPod, a user would first connect the iPod to a computer and then use iTunes software to transfer the songs to the iPod and to perform other functions, such as creating playlists for the iPod.  iTunes can also be used to play music and other audio files on a computer.

**iTunes Music Store**

6.      Apple launched the iTunes Music Store (later called the iTunes Store or iTS), an online music store, on April 28, 2003.  The iTunes software program enables users to select, purchase and download audio content from the iTunes Store and is the only software program designed for and allowed to access the iTunes Store.

7.      A customer could use iTunes to transfer music from the iTunes Store and other sources, such as CDs, to an iPod.

8.      On October 16, 2003, Apple introduced iTunes and the iTunes Store for Windows-based computers.

**Digital Rights Management**

9.      Prior to the launch of the iTunes Store, Apple entered into contracts with the major record labels to offer digital audio files via the iTunes Store.  The contracts between the major record labels and Apple that allowed Apple to offer their copyrighted music through the iTunes Store required that Apple implement usage rules and sell music in a protected format.

10.     Pursuant to these contracts, Apple agreed to limit copying and distribution of the music files, through the use of an encryption-based "security solution" known as digital rights management, or DRM.  Apple's security solution was called FairPlay.

11.     Elements of FairPlay are (1) used for Apple's iTunes Store, (2) incorporated in iTunes and the iTunes Store software on the user's computer, and (3) incorporated in the firmware (the preinstalled software) on iPods.

12.     In October 2004, Apple released iTunes 4.7, which contained, among other things, an updated version of FairPlay. Updated FairPlay technology was also preinstalled in the firmware for new iPods.

13.     On September 12, 2006, Apple released an update of its iTunes software called

8

JOINT PRETRIAL CONFERENCE STATEMENT                    No. C 05-00037 YGR

iTunes 7.0, which contained updated FairPlay technology.  Updated FairPlay firmware was also preinstalled in the iPod nano 2nd generation, iPod nano 3rd generation, iPod classic 6th generation, and iPod touch 1st generation models sold after September 12, 2006.

14.     On September 5, 2007 Apple released iTunes 7.4 which contained updated FairPlay technology.

**B.     Disputed Factual Issues[4]**

**Monopolization**

1.     Whether Portable Digital Media Players is a relevant antitrust market for the purposes of this case. (joint)

2.     Whether Apple possessed monopoly power in the proposed relevant market for Portable Digital Media Players. (joint)

3.     Whether there were barriers to entry or expansion in the proposed relevant market for Portable Digital Media Players. (Apple)

4.     Whether the proposed market for websites that offer permanent downloads of audio recordings distributed by the major record companies (Permanent Audio Downloads) is a relevant antitrust market for the purposes of this case. (Plaintiffs)

5.     Whether Apple possessed monopoly power in the proposed market for Permanent Audio Downloads.  (joint)

6.     Whether there were barriers to entry or expansion in the proposed market for Permanent Audio Downloads.  (Apple)

7.     Whether Apple intended to monopolize the proposed Portable Digital Music Player market. (joint)

8.     Whether there was a dangerous probability that Apple would monopolize the proposed Portable Digital Music Player market. (joint)

**Conduct**

9.     Whether KVC was a genuine product improvement. (Plaintiffs)

_____

[4] The parties do not agree that each of the disputed factual issues herein are relevant to this case. The party offering the disputed factual statement is noted in parentheses.

9

10.     Whether DVC was a genuine product improvement. (Plaintiffs)

11.     Whether KVC provided a new benefit to consumers (Plaintiffs)

12.     Whether iTunes 7.0, 7.4, and related technologies and updates were product improvements. (Apple)

13.     Whether Apple had a valid business justification for releasing iTunes 7.0, 7.4, and related technologies and updates. (joint)

14.     Whether Apple's justifications for implementing KVC and DVC were pretextual. (Plaintiffs)

15.     Whether RealNetworks violated the Digital Millennium Copyright Act, committed copyright infringement, or violated Apple's applicable Terms of Service. (Apple)

16.     Whether DRM-stripping hacks violated the Digital Millennium Copyright Act, committed copyright infringement, or violated Apple's applicable Terms of Service. (Apple)

**Causation/Damages**

17.     Whether Plaintiffs and the Class suffered damages as a result of Apple's conduct during the relevant period. (Plaintiffs)

18.     Whether the release of iTunes 7.0 caused any anticompetitive consumer "lock in." (Apple)

19.     Whether the release of iTunes 7.0 caused any anticompetitive consumer "lock out." (Apple)

20.     Whether any anticompetitive conduct caused Apple to charge prices higher than it otherwise would have charged. (Apple)

21.     Whether Apple took into account any alleged anticompetitive "lock in" or "lock out" when pricing its iPods. (Apple)

22.     Whether the RMS was a significant competitor to the iTS in 2006. (Apple)

23.     Whether actual "switching costs" to import music from the RealPlayer Music Library to the iPod were low. (Apple)

24.     Whether Apple took the RMS into account when pricing iPods.  (Apple)

25.     Whether the named Plaintiffs suffered any harm remediable by the antitrust laws.

10

1    (Apple)

2          26.     Whether any members of the class suffered any harm remediable by the antitrust

3    laws. (Apple)

4         **C.**    **Agreed Statement**

5          Plaintiffs and Apple agree that the facts set forth above in Section II.A may be presented in

6    an agreed statement of facts to the jury.

7          Apple is also presenting a proposed jury instruction that will instruct the jury with regard to

8    issues that have already been resolved in this case.  Plaintiffs object to this proposed instruction as

9    unduly prejudicial and wholly improper.  Additionally, the issues are the basis of one of Apple's

10   pending motions in limine and to strike, which Plaintiffs oppose.

11        **D.**    **Stipulations**

12        27.     Apple and Plaintiffs stipulate to the authenticity of any document created and

13   produced by a party in this case. This stipulation shall not be deemed or interpreted to be a

14   stipulation that any document is admissible in evidence.

15        28.     Apple and Plaintiffs stipulate that copies of documents may be used at trial in lieu of

16   originals and shall not be deemed inadmissible solely on the basis that they are copies.

17        29.     Apple and Plaintiffs stipulate that by offering jury instructions they are not waiving

18   the right to appeal any pretrial legal ruling by the Court.

19        30.     Apple and Plaintiffs stipulate that venue is proper in this Court.

20        31.     Apple and Plaintiffs stipulate that, only for purposes of this action, Apple does not

21   contest that this Court has personal jurisdiction over Apple.

22        32.     Apple and Plaintiffs stipulate that the activities that are the subject of the lawsuit

23   affected interstate commerce.

24        33.     Apple and Plaintiffs stipulate that the relevant geographic market for the purpose of

25   this case is the United States.

26        34.     Apple and Plaintiffs stipulate that Plaintiffs will provide Apple with no less than 48

27   hours advance notice of when they expect to call their last witness.

28        35.     Apple and Plaintiffs stipulate that Apple will provide Plaintiffs with no less than 48

JOINT PRETRIAL CONFERENCE STATEMENT          No. C 05-00037 YGR

hours advance notice of when they expect to call their last witness.

36.     Apple and Plaintiffs stipulate that neither will object to the presence of their respective expert witnesses' presence in the courtroom during trial.

37.     Apple and Plaintiffs stipulate that any witness called to testify shall be disclosed to the opposing party 48 hours in advance of the witness's testimony, as required by the Court's Pretrial Order No. 1.

38.     Apple and Plaintiffs stipulate that both parties' technical and economic experts may testify based on previously produced confidential source code documents and voluminous data sets that were relied upon and cited by the experts in their reports without those documents being admitted into evidence.  Neither party waives any objection to expert testimony that is outside the scope of the expert report; based upon undisclosed documents, source code or data; or otherwise.

39.     Apple and Plaintiffs stipulate that the date to exchange each's charts, schedules, summaries, diagrams and other similar documentary materials to be used in its case in chief at trial (collectively, "summary exhibits") is and has been extended until October 13, 2014.  The parties stipulate that they will meet and confer regarding the admissibility of summary exhibits on or about October 17, 2014 and agree that all stipulations and/or objections regarding summary exhibits will be incorporated into the parties' respective exhibit lists to be provided to the Court in the Joint Pretrial Readiness Binder, as due to the Court on October 21, 2014.

40.     Apple and Plaintiffs stipulate that they will disclose demonstrative aids to be used during each's case in chief at trial and during closing statements no less than 48 hours in advance of their anticipated use.  Apple and Plaintiffs stipulate that they will disclose demonstrative aids to be used during opening statements by 3:00 P.M. Pacific time on November 14, 2014.

41.     The parties make these stipulations for the limited purpose of simplifying the issues for trial.  *See* Fed. R. Civ. P. 16(c)(2)(A).

42.     The parties will continue to meet and confer regarding additional stipulations that may be requested or proposed to streamline the trial of this matter. In particular, the parties will continue to discuss potential stipulations regarding: (1) authenticity of exhibits not already the subject of a stipulation, (2) admissibility of exhibits, and (3) procedures for confidential

1   documents. If the parties are unable to reach agreement regarding the procedures for closing the

2   courtroom, if necessary, due to confidentiality concerns, they intend to raise this issue at the

3   Pretrial Conference on October 29, 2014.

4   **III.**     **Disputed Legal Issues**

5       **A.**     **Points of Law**

6       Per the Court's Pretrial Order No. 1, this section discusses only disputed points of law that

7   are not likely to be the subject of jury instructions.

8   <u>**The UCL Claim**</u>

9       1.     **Apple's position**: As the UCL is an equitable claim for restitution, it will be

10  resolved by the Court.   The only basis for the Plaintiffs' allegation that Apple engaged in unfair or

11  unlawful conduct is its monopolization and attempted monopolization allegations.  Since those

12  claims fail, its UCL claim fails as well.

13

14

15

16
- 2011 SJ Order, at 13 (Dkt. 627) ("Under California law, if the 'same conduct is alleged to be both an antitrust violation and an unfair business act for the same reason,' then the 'determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers.'") (citing Apple, Inc. v. Pystar Corp., 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008));

17

18
- 2011 SJ Order, at 13 (Dkt. 627) (granting summary judgment on Plaintiffs' UCL claim as to iTunes 4.7 because Plaintiffs' Section 2 claim based on iTunes 4.7 failed as a matter of law).

19

20       **Plaintiffs' Position**: Plaintiffs' UCL claim will be resolved by the Court following the

21  jury's verdict on Plaintiffs' Section 2 claim.  If the jury finds for Plaintiffs on the Section 2 claim,

22  liability under the UCL will be established.

23

24
- 2011 SJ Order, at 13 (Dkt. 627) (Upholding UCL claim as to 7.0 and noting "Plaintiffs could state a UCL claim under the "unlawfulness" prong of the UCL if Plaintiffs adequately stated a Section 2 claim").

25  <u>**Class Issues**</u>

26

27       2.     **Apple's Position**: A class may be decertified at any time during or after trial if

28  requirements of Rule 23 have not been met.  Thus, the following legal issues are in dispute:

JOINT PRETRIAL CONFERENCE STATEMENT        No. C 05-00037 YGR

3.    **Apple's Position**: Plaintiffs are not typical of or adequate representatives for resellers who purchased iPods from Apple for resale in their stores.

- Fed. R. Civ. P. 23;

- *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489 (N.D. Cal. 2008) (finding representative plaintiffs who were individual purchasers of GPUs were not typical representatives for wholesale customers who bought in substantially different quantities and under different bargaining terms);

- *Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006) (representative plaintiffs who were individual purchasers of Microsoft operating system software were inadequate to represent Enterprise customers who had purchased at least 250 licenses because the claims were not typical).

**Plaintiffs' Position**: Plaintiffs are proper class representatives for all direct purchasers.

- *Apple iPod iTunes Antitrust Litig.*, 2011 U.S. Dist. LEXIS 134836, 15-16 (N.D. Cal. Nov. 22, 2011) (the Court finds that Defendant's contention that resellers are differently situated from end-users insofar as they "benefit from higher retail prices" is misguided. (Opp'n at 22.) As a matter of antitrust law, "when a seller overcharges a buyer . . . the fact that the buyer raises the price for its own product, thereby passing on the overcharge to its customers and avoiding a loss in profit, has no bearing on the issue of whether the buyer has suffered an injury and thus has the right to recover damages from the seller." *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433 (N.D. Cal. 2008) (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489-92, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968)). Thus, because "all class members have the right to pursue overcharge damages, they have the same incentive to do so, and there is no conflict among class members  allegedly harmed by the same antitrust violation." *Id.* at 435 (citation omitted).Accordingly, the Court finds that Plaintiffs can represent all direct purchasers, including resellers

4.    **Apple's Position**: Plaintiffs cannot show a class-wide method of proving impact and damages.

- *Comcast*, 133 S. Ct. at 1433 (at trial, "any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010));

- *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("We have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class

14

members defeats Rule 23(b)(3) predominance.");

- IIA P. Areeda, H. Hovenkamp & R. Blair, Antitrust Law, ¶ 331d, at 57 (3d ed. 2007) ("[T]he fact that some class members have not been damaged at all generally defeats certification, because the fact of injury, or 'impact' must be established by common proof.").

**Plaintiffs' Position**: Plaintiffs can demonstrate classwide impact and damages

- *In re Static Random Access Memory Antitrust Litig.*, No. 07-md-01819, 2010 U.S. Dist. LEXIS 141670, at *41-42 (N.D. Cal. 2010)(Expert's regression analysis determined to be reliable method of determining overcharges)

- *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 312-13 (N.D. Cal. 2010)(Using a regression analysis, "[t]he Court concludes that plaintiffs have advanced a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis.")

- *In re High-Tech Emple. Antitrust Litig.*, No. 11-CV-02509, 2014 U.S. Dist. LEXIS 47181, at*58 (N.D. Cal. April 4, 2014) ("[N]umerous courts have held that regression analysis is generally a reliable method for determining damages in antitrust cases and is 'a mainstream tool in economic study.'")

- *In re Urethane Antitrust Litig.*, No. 13-3215, 2014 U.S. App. LEXIS 18553 (10th Cir. Sept. 29, 2014)

5.      **Apple's position**: Plaintiffs' regression model offered by their expert Dr. Noll improperly conflates lawful and allegedly unlawful conduct.

- *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013) ("We start with an unremarkable premise. If respondents prevail on their claims, they would be entitled only to damages resulting from … the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class … [A]t the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'") (citing sources).

**Plaintiffs' Position:** Plaintiffs' Professor Noll's model can establish the fact and amount of damages.

- Sum. J  Order at 17.

- *See, e.g., In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-00318, 2013 U.S. Dist. LEXIS 62394, at *55-*58 (D. Md. May 1, 2013

JOINT PRETRIAL CONFERENCE STATEMENT                    No. C 05-00037 YGR

- *Hemmings v. Tidyman's Inc*., 285 F.3d 1174, 1188 (9th Cir. 2002)

- *In re Urethane Antitrust Litig*., No. 13-3215, 2014 U.S. App. LEXIS 18553 (10th Cir. Sept. 29, 2014)

**IV.     Further Discovery or Motions**

No further discovery is outstanding, ongoing, or contemplated.

Apple's motions *in limine* and motions to strike expert testimony Nos. 1–3, 7 & 8 were filed on October 7, 2014 pursuant to the Court's Pre-trial Order No. 1 (Dkt. 801).  Plaintiffs' oppositions are due October 14, 2014.  Apple's motions in limine 7 & 8 were stricken as untimely on October 9, 2014.  Each party is also filing additional Motions *in Limine* as discussed below.  No other motions are pending.

Apple anticipates moving the Court, formally or informally, to issue an order under Federal Rule of Evidence 611 that permits parties to go beyond the scope of direct examination on cross-examination in order to reduce inconvenience for the witnesses and avoid confusion for the jury. Plaintiffs will oppose such a motion.

**V.     Estimate of Trial Time**

The Court has ordered that each side shall have 20 hours in total to present their case.

**VI.     List of Motions in Limine**

**A.     Plaintiffs' Motions in Limine**

Plaintiffs' motions in limine are:

1.     Plaintiffs' Motion in Limine #1:  References to Hacking.

2.     Plaintiffs' Motion in Limine #2:  Cumulative Expert Testimony.

3.     Plaintiffs' Motion in Limine #3:  Unchallenged Aspects.

4.     Plaintiffs' Motion in Limine #4:  Declarations of Unavailable Declarants.

5.     Plaintiffs' Motion in Limine #5:  Class Certification.

6.     Plaintiffs' Motion in Limine #6:  No Suit by RealNetworks.

7.     Plaintiffs' Motion in Limine #7:  Pass-on Charges. (Apple has agreed not to contest)

8.     Plaintiffs' Motion in Limine #8:  Treble Damages and Attorneys' Fees and Costs.

(Apple has agreed not to contest, but will seek a cautionary jury instruction on this issue)

16

9.      Plaintiffs' Motion in Limine #9:  Dismissed Claims.

**B.      Apple's Motions in Limine**

Apple's motions in limine are:

1.      Apple's Motion in Limine #1:  To Exclude Evidence or Argument Contrary to the Court's 2011 Summary Judgment Order. (includes a motion to strike related portions of expert reports)

2.      Apple's Motion in Limine #2:  To Exclude Evidence or Argument that Apple Could Have or Should Have Aided Third-Party Products' Interoperability with iPods. (includes a motion to strike related portions of expert reports)

3.      Apple's Motion in Limine #3:  To Exclude References to Purported Less Restrictive Alternatives. (includes a motion to strike related portions of expert reports)

4.      Apple's Motion in Limine #4:  To Exclude Evidence of Defendant's Financial Resources & References to Any Purported Supracompetitive Profits.

5.      Apple's Motion in Limine #5:  To Exclude Evidence or Argument Concerning Other Litigations.

6.      Apple's Motion in Limine #6:  To Exclude Argument or Evidence Concerning Steve Jobs's Character.

**VII.   Juror Questionnaire**

The parties intend to file proposed additional questions for jury selection, in the form of a draft juror questionnaire.

**VIII.  Trial Alternatives and Options**

**A.      Settlement Discussion.**

The parties have engaged in settlement discussions over the course of the litigation, including through mediation with a JAMS mediator, settlement discussions among counsel, and a settlement conference before the Honorable Judge James Ware on May 1 and 2, 2012.  Settlement discussions have not been successful.

**B.      Consent to Trial Before a Magistrate Judge**

The parties do not consent to trial before a magistrate judge.

**C.     Amendments, Dismissals**

Plaintiffs will seek to withdraw Somtai Charoensak as a class representative, as he did not purchase an iPod during the currently certified Class Period.  Plaintiffs will not seek to dismiss Mr. Charoensak as a plaintiff, however, to preserve his rights to appeal the Court's dismissal or summary adjudication of his claims, including his Section 1, Sherman Act (15 U.S.C. §1) tying claim and his Section 2, Sherman Act (15 U.S.C. §2) claim based on iTunes 4.7.

**D.     Bifurcation, Separate Trial of Issues**

The parties agree that bifurcation is neither feasible nor desirable in this case.

As noted above, the UCL claim will not be tried to the jury and will be resolved by the Court.  The parties do not anticipate any presentation of evidence to the Court on the UCL claim beyond that presented to the jury on the Sherman Act claim.

/ / /

/ / /

/ / /

JOINT PRETRIAL CONFERENCE STATEMENT                    No. C 05-00037 YGR

| | |
|---|---|
| 1 | Dated: October 14, 2014 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |

Dated: October 14, 2014 — ROBBINS GELLER RUDMAN & DOWD LLP
BONNY E. SWEENEY
ALEXANDRA S. BERNAY
PATRICK J. COUGHLIN
CARMEN A. MEDICI
JENNIFER N. CARINGAL

By: /s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
*Class Counsel for Plaintiffs*

Dated: October 14, 2014 — BOIES, SCHILLER & FLEXNER LLP
WILLIAM A. ISAACSON
KAREN L. DUNN
JOHN F. COVE, JR.
MEREDITH R. DEARBORN
MARTHA L. GOODMAN

By: /s/ William A. Isaacson
WILLIAM A. ISAACSON
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
*Counsel for Defendant* APPLE INC.

## ATTESTATION OF FILER

I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this efiled document.

/s/ William A. Isaacson
William A. Isaacson

| | |
|---|---|
| JOINT PRETRIAL CONFERENCE STATEMENT | No. C 05-00037 YGR |

1

# APPENDIX A

2

3          The specific models of iPods covered by the Class Definition are as follows:

4          I.   <u>iPod Standard, Classic, Special Models</u>
5                iPod (5th generation) 30 GB
                 iPod (5th generation) 80 GB
6                iPod U2 Special Edition 30 GB
                 iPod Classic 120 GB
7                iPod Classic 80 GB
                 iPod Classic 160 GB
8                iPod (5th generation) 60 GB

9          II.  <u>iPod shuffle Models</u>
10               iPod shuffle (2nd generation) 1 GB
                 iPod shuffle (2nd generation) 2 GB
11               iPod shuffle (3rd generation) 4 GB
                 iPod shuffle (1st generation) 1 GB
12               iPod shuffle 512 MB

13         III. <u>iPod touch Models</u>
14               iPod touch 8 GB
                 iPod touch 16 GB
15               iPod touch 32 GB
                 iPod touch (2nd generation) 8 GB
16               iPod touch (2nd generation) 16 GB
                 iPod touch (2nd generation) 32 GB
17

18         IV.  <u>iPod nano Models</u>
                 iPod nano (2nd generation) 2 GB
19               iPod nano (2nd generation) 4 GB
                 iPod nano (2nd generation) 8 GB
20               iPod nano (3rd generation) 4 GB
                 iPod nano (3rd generation) 8 GB
21               iPod nano (4th generation) 4 GB (Apple retail sales only during the class period.)
22               iPod nano (4th generation) 8 GB
                 iPod nano (4th generation) 16 GB
23               iPod nano (1st generation) 1 GB
                 iPod nano (1st generation) 2 GB
24               iPod nano (1st generation) 4GB

25         (Dkt. 694 at 9-10.)

26

27

28

JOINT PRETRIAL CONFERENCE STATEMENT                    No. C 05-00037 YGR