# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| | ) | |
| THE APPLE IPOD ITUNES | ) | Case No. C 05 00037 YRG |
| ANTITRUST LITIGATION | ) | C 06 04457 YRG |
| | ) | |
| | ) | HIGHLY CONFIDENTIAL |
| _____ | ) | |

**EXPERT REPORT OF ROBERT H. TOPEL**
**August 19, 2013**
(Amended)

## TABLE OF CONTENTS

I.     INTRODUCTION AND BACKGROUND.................................................................- 1 -

   A.  Summary of Qualifications.........................................................................- 1 -

   B.  Assignment ...............................................................................................- 2 -

   C.  Summary of Opinions ...............................................................................- 3 -

II.    BACKGROUND: ITUNES, IPODS AND THE CHALLENGED CONDUCT ......- 6 -

   A.  The Development of the iTunes/iPod/iTMS Platform...................................- 6 -
      1.   iTunes .............................................................................................- 7 -
      2.   iPod ................................................................................................- 7 -
      3.   The iTunes Store ...........................................................................- 10 -

   B.  The Introduction and Use of DRM ..........................................................- 12 -

   C.  RealNetworks RealPlayer with Harmony.................................................- 13 -
      1.   RealNetworks (Real), Harmony and the Real Music Store ...................- 13 -

   D.  Challenged Conduct................................................................................- 15 -

   E.  The End of DRM .....................................................................................- 17 -

   F.  Quality Adjusted iPod Prices Rapidly Declined During the Period at Issue ...............- 18 -

III.   PLAINTIFFS' AND PROFESSOR NOLL'S THEORY OF IMPACT AND
      DAMAGES ....................................................................................................- 19 -

IV.    PROFESSOR NOLL'S HEDONIC PRICE REGRESSION AND
      INFERENCE OF DAMAGES ........................................................................- 21 -

   A.  Multiple Linear Regression......................................................................- 21 -

   B.  Hedonic Models of Prices for Products with Changing Quality.................- 24 -

V.     PROFESSOR NOLL'S HEDONIC DAMAGE MODEL .........................................- 24 -

   A.  How Professor Noll Constructs His Data .................................................- 25 -

   B.  What Professor Noll Claims to Find.........................................................- 27 -

VI.    PROFESSOR NOLL'S CLAIMS OF PRECISION AND STATISTICAL
      SIGNIFICANCE ARE INCORRECT ..............................................................- 28 -

   A.  Professor Noll's "Before and After" Experiment:  The Wrong But-For World...........- 37 -

   B.  Professor Noll's Confusion about the "Log of Time" .................................- 43 -

   C.  Additional Features and the "Quality" of Professor Noll's Regression .......................- 47 -

   D.  Professor Noll's Regression Produces Implausible Results That Are Inconsistent
      With The Basic Economics Of Plaintiffs' Theory.......................................................- 49 -

E. Professor Noll's Regression Improperly Estimates A Single Average Overcharge Across All Models .................................................................................................- 50 -

F. The Impact of DRM-Free Music on the Price of iPods ...............................................- 53 -

**VII.   PROFESSOR NOLL'S DAMAGE CALCULATIONS ...........................................- 54 -**

**VIII.  SOME FINAL POINTS:  PROFESSOR NOLL'S REGRESSION HAS NO CONNECTION TO THE CHALLENGED CONDUCT, PLAINTIFFS' THEORY, OR APPLE'S PRICING PRACTICES ...................................................- 55 -**

## LIST OF APPENDICES

**APPENDIX A:**       **Curriculum Vitae**

**APPENDIX B:**       **List of Materials Relied Upon**

**APPENDIX C:**       **Collection of iPod Characteristics**

**APPENDIX D:**       **Additional Regression Results**

## I.    INTRODUCTION AND BACKGROUND

1.    I am Robert H. Topel, Isidore Brown and Gladys J. Brown Distinguished Service Professor of Economics at The University of Chicago Booth School of Business.  I am also Director of the George J. Stigler Center for the Study of the Economy and State and Co-Director of the Energy Policy Institute at Chicago (EPIC), both at The University of Chicago.  In addition, I am a Senior Consultant at Charles River Associates (CRA), an economics consulting firm that specializes in the application of economic theory and statistics to legal and regulatory issues.

### A.  Summary of Qualifications

2.    I am an economist, and I specialize in (among other things) microeconomics, which is the study of markets, pricing, and firm and industry behavior.  I received a B.A. in economics from the University of California, Santa Barbara in 1974, and a Ph.D. in economics from the University of California, Los Angeles in 1981.  In addition to my position at the Booth School of Business at The University of Chicago, I have been a member of the faculties in the Department of Economics at The University of Chicago and the Department of Economics at the University of California, Los Angeles.  At these institutions, I have taught courses on Markets and Prices, Economic Theory, Labor Markets, Empirical Methods in Economics, Compensation and Personnel Policies, Industrial Organization and Antitrust, Business Strategy, and Law and Economics.

3.    From 1993 to 2003, I served as Editor of the *Journal of Political Economy*, and from 1991 to 1993 I was a member of the Editorial Board of the *American Economic Review*, two of the leading professional publications in economics and economic theory.  I am also a past founding editor of the *Journal of Labor Economics* (1982-92), and I currently am a member of the Editorial Advisory Board of the *International Journal of the Economics of Business* and the Advisory Board of the Economics Research Network.  I am a Research Associate of the National Bureau of Economic Research, an elected member of the Council on Income and Wealth, an elected Founding Member of the National Academy of Social Insurance, and a Fellow of the Stanford University Center for the Study of Poverty and Inequality.  In 2004, I was elected a Fellow of the Society of Labor Economists.  In 2005, I received the Eugene Garfield Award for

contributions to the economics of medical research, and, in 2007, I received the Kenneth Arrow Award from the International Health Economics Association.

4.    I have held various visiting and research positions with the Board of Governors of the Federal Reserve, the World Bank, the Economics Research Center of the National Opinion Research Center, the Brookings Panel on Economic Activity, the Rand Corporation, and the Center for the Study of the Economy and the State.  I have published numerous articles in the academic literature.  My curriculum vitae appears in Appendix A.

### B. Assignment

5.    This case involves allegations of anticompetitive harm and damages suffered by purchasers of certain models of Apple's iPod portable music player.  Plaintiffs allege that software and firmware updates included on certain generations of iPod models, beginning with the iPod Nano 2nd Generation introduced on September 12, 2006, caused prices of all iPods sold between September 12, 2006 and March 31, 2009 to be higher than they otherwise would have been had the updates not been released.[1]

6.    Plaintiffs offer the declaration of Professor Roger Noll, who addresses both liability claims and damage calculations.[2]  Professor Noll acknowledges that under Plaintiffs' "lock-in" theory, the challenged updates could potentially lower, leave unchanged, or raise the prices of affected iPods.  He asserts that determining which of these effects occurred "is an empirical issue."[3]  To resolve that issue, he relies on a "hedonic regression" analysis of iPod prices and product attributes from which he concludes that the challenged conduct raised iPod prices.  He estimates damages to allegedly affected iPod purchasers equal to $511 million.[4]

---

[1]    Order Granting Plaintiffs' Motion for Class Certification, November 22, 2011, pp. 5, 9.

[2]    Declaration of Roger G. Noll on Liabilities and Damages, April 3, 2013, hereinafter "Noll declaration."

[3]    Noll declaration, pp. 15-17.  See also Declaration of Roger G. Noll, January 18, 2011 (hereinafter, "Noll January 18, 2011 declaration"), in which he says that the introduction of Harmony initially made iPods more attractive to consumers because they were able to download music from vendors other than the iTMS (p. 54). The long run effect would be to increase competition, which presumably would have caused prices to fall. From an economic perspective, the opposite would also be true – the initial effect of disabling Harmony (if indeed there was any effect at all) would be to make iPods less, not more, attractive and thus prices would initially be lower, not higher.

[4]    Corrections to Declaration of Roger G. Noll on Liabilities and Damages, May 31, 2013, hereinafter "Noll corrections to declaration," pp. 1-2. In his initial declaration, Professor Noll reported estimated damages of $820.8 million.  Noll declaration, p. 6.  He later discovered that he had applied his estimated percentage

7.      I have been asked by counsel for Apple to examine whether Professor Noll's estimates of damages are scientifically valid, accurate and reliable.

8.      This report sets forth my opinions and describes the bases for those opinions as well as the data and analyses that underlie them.  My opinions are based upon my analysis of documents and data produced in this matter; discovery responses; deposition transcripts; declarations, pleadings, and other filings; declarations previously submitted by Professor Noll, Dr. Burtis, Dr. Martin, and Dr. Kelly; reports of Professor Noll, Dr. Martin, and Dr. Kelly and materials cited therein; data provided by both parties, and information from public sources.  My opinions are also based upon my general expertise in economics.  During the course of my work, I have had access to an electronic database that contains all the documents and data produced in this case.  The materials and information I considered in forming my opinions are listed in Appendix B to this report.

### C. Summary of Opinions

9.      Based on my economic and econometric analysis described in detail below, my overarching opinion is that Professor Noll's hedonic regression analysis of iPod prices is flawed, unreliable and highly misleading.  The model itself is inconsistent with the basic economics of Plaintiffs' and Professor Noll's theory of harm and is also inconsistent with the basic facts of this case.  Moreover, even ignoring these conceptual flaws, Professor Noll has miscalculated the precision of his claimed effects — in truth, even the "overcharges" he estimates are not statistically distinguishable from zero.

10.      My opinions include the following in addition to those expressed more fully herein:

- Opinion 1:  Professor Noll has vastly exaggerated the statistical precision of his model. He incorrectly assumes that the millions of price observations in his data are statistically independent of one another.  For example (using round numbers), suppose that reseller Best Buy paid $4 million for a delivery of 20,000 identical iPods.  Professor Noll calculates the average unit price of those iPods as ($4 million) ÷ 20,000 = $200.  He then

---

overcharge to sales beyond the end of the class period and thus his calculations were incorrect.  He has now issued corrections to his original declaration in which he applies the estimated percentage overcharge to sales within the class period - hence the new estimate of $511 million.

incorrectly treats the single price from that single transaction as 20,000 *independent* pricing observations, all coincidently with the same price, $200. But these observations are not independent; they are perfectly correlated — if one knows the price of one unit, one knows the price of all of them. By incorrectly treating millions of highly correlated observations as independent pricing decisions, Professor Noll has claimed to estimate his model with an absurd degree of precision. Correcting his error using standard econometric techniques that account for non-independence, I demonstrate that his estimates of alleged "overcharges" are indistinguishable from zero.

- Opinion 2:  Professor Noll's regression analysis produces implausible results that are inconsistent with the economics of Plaintiffs' theory. His results are based on unsupported assumptions that are inconsistent with the basic facts of this case.

  - His regression purports to show that the challenged conduct had an immediate and uniform impact on prices of all iPods sold from September 12, 2006 onward. This is contrary to his and Plaintiffs' theory in which the degree of "lock-in" would be proportional to the increase in iPod owners' accumulated stocks of FairPlay-protected music caused by the challenged update. This effect was zero in September of 2006, so even under Plaintiffs' theory the update could not have raised iPod prices at that time. Professor Noll's regressions are incapable of determining when an overcharge, if any, would have occurred.

  - The regression also produces "but-for" prices that are contrary to the way in which Apple actually sets prices. Apple consistently followed a specific pricing strategy for iPods, including changing prices infrequently (once or twice a year, and usually only when new generations or product lines were introduced) and changing prices in large increments based on aesthetic price points.

- Opinion 3:  Notwithstanding other flaws in Professor Noll's model, his overcharge estimates are based on an incorrect characterization of the "but-for" world that would have existed in the absence of the challenged update. The challenged conduct is the Keybag Verification Code (KVC) included in iTunes 7.0, which was introduced September 12, 2006. The DRM protection technology in versions of iTunes used prior to

that date — specifically in iTunes 4.7, 5 and 6 — has been found legal.  Thus the proper "before-and-after" estimate of the effect of the KVC would compare the level of iPod prices after the introduction of iTunes 7.0 to the "but-for" price level that existed under the legal DRM technology of iTunes 4.7 through 6.  Professor Noll incorrectly measures the but-for price level from a three-month period *before* the introduction of iTunes 4.7 in October 2004 — nearly two years before the introduction of iTunes 7.  This means that he does *not* measure the incremental effect on iPod prices of the KVC contained in iTunes 7; rather he includes the legal "effect" of iTunes 4.7 technology and functionality in his estimate of an alleged overcharge due to iTunes 7. This error alone doubles Professor Noll's estimated of "overcharge" among resellers, and it increases his estimated "overcharge" among direct purchasers by a factor of six.

- <u>Opinion 4</u>:  Professor Noll's regression model is incorrectly formulated.  Among other errors:

  - His model does not and cannot separate the impact of the challenged KVC feature from other factors that impact iPod prices and occurred at the same time the KVC feature was introduced.  Despite his claim to control for relevant product attributes and market forces, he omits many valuable attributes of iPods, iTunes, and iTMS that affect the prices of iPods.  He also fails to account for the fact that 80 percent of the iTMS music catalogue was DRM-free on January 6, 2009, nearly four months before he turns on his indicator variable.

  - Professor Noll also incorrectly constrains his model so that iTunes 7 must have the same percentage impact on the prices of all iPod models, even models that could not invoke the challenged KVC feature and so continued to be compatible with Harmony.  There is no economic or factual support for the assumption that any overcharge would be exactly the same for different products purchased by different class members, especially models that could not invoke the challenged KVC feature.  At deposition, Professor Noll suggested that he might attempt to fix this problem by estimating product-specific price effects of the iTunes 7 introduction.  But this is not a fix.  Even ignoring his model's other flaws, this

HIGHLY CONFIDENTIAL                                                                                      - 5 -

approach yields estimated "effects" of iTunes 7 that are inconsistent with Plaintiffs' theory. Moreover, this approach cannot provide an "overcharge" estimate for the iPod Touch because it did not exist prior to the introduction of iTunes 7.

- Professor Noll's attempt to account for technological progress ("Moore's Law") by using the "log of time" is, by his own testimony, incorrect and inconsistent with standard econometric practice. As in other instances, each of these errors and omissions increased Professor Noll's estimates of overcharges.

- Opinion 5: Correcting Professor Noll's errors in the context of his own model causes his estimates of "overcharge" and "damage" to vanish.

- Opinion 6: A necessary predicate for his theory of damages is that enough iPod owners were purchasing RMS music, and would have continued to do so, to have an impact on iPod prices. Professor Noll merely assumes that this was the case — i.e., that iPod owners were in fact purchasing RMS music and would have continued to do so in sufficient quantities to impact iPod demand. To the extent this is not the case, Professor Noll's damages theory fails as a threshold matter. Professor Noll has offered no evidence that anyone, let alone a material fraction of iPod owners, would have used Harmony and RMS, or ever did. Prior to the challenged update, RMS accounted for only about three percent of all digital downloads, a share that would have been substantially lower among iPod owners.

## II.    BACKGROUND: ITUNES, IPODS AND THE CHALLENGED CONDUCT

11.    This section presents a brief overview of the relevant products and technologies at issue and a timeline of relevant events.

### A. The Development of the iTunes/iPod/iTMS Platform

12.    Exhibit 1 is a timeline of key events in the evolution of the iTunes/iPod/iTMS platform.

### 1. iTunes

13.     iTunes is a "jukebox" software program that allows users to import, manage and play digital music files on the users' computers.  Apple introduced the first version of iTunes for its Mac line of computers in 2001 and iTunes for Windows in October 2003.  Since iTunes was first introduced, there have been ten major (version) updates, or just under one per year on average. The first of these version updates, iTunes 2.0, added integration with iPods along with improvements in CD burning capabilities and enhanced sound capabilities.[5]  In general, the new version updates enhanced the operation of the music player; added or supported new features in iPods, such as photo and/or video; and supported new content from the iTMS (e.g., movies, TV shows, and games).[6]  There have also been 78 smaller updates:  some added features or supported new iPods; others were released in order to "fix" particular technical issues.  For example, iTunes 4.7 was released to support the new photo feature added to the iPod Classic, improved FairPlay in response to hacks, and fixed other bugs.[7]  All told, there have been 88 different updates, the most recent of which (iTunes 11.0.4) was released on June 5, 2013.[8]  (See Exhibit 2 for a history of the various versions of iTunes and the major updates to those versions through March 2012.)

### 2. iPod

14.     Apple introduced the first iPod in October 2001.  The iPod could play music from a variety of sources, including a CD collection copied or ripped to the user's computer and then synced or loaded to an iPod using iTunes; music obtained online without DRM protection, including from music stores that offered music without DRM; music that originally had DRM protection but had been copied to a CD and then copied back to a computer (burned and ripped);

---

[5]     Apple Press Release, "Apple Announces iTunes 2; Best Digital Music Software Gets Even Better," October 23, 2001 (Apple_AIIA00974863-5).

[6]     Apple Press Release, "Apple Introduces iPod shuffle; First iPod Under $100," January 11, 2005 (Apple_AIIA00974708).

[7]     "iTunes version history," Wikipedia, The Free Enclyclopedia, http://en.wikipedia.org/wiki/ITunes_version_history (accessed June 25, 2013); Declaration of Dr. John P. J. Kelly in Support of Defendant's Renewed Motion for Summary Judgment, April 18, 2011 (hereinafter, "Kelly declaration in support of MSJ"), ¶22.

[8]     This number includes 10 versions after version 1, 26 sub-version updates, and 52 more minor updates.  iTunes 4.7 is not counted as a separate version, but rather as one of the sub-version updates.  See "iTunes version history," Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/ITunes_version_history (accessed June 25, 2013 and verified July 17, 2013).

HIGHLY CONFIDENTIAL                                                                      - 7 -

and later, music purchased from iTMS.  From the time the iPod was first introduced, Apple released new generations that added features to the first model, which it later called the "classic," and introduced new iPod models that had significantly different features.  (For a description of the evolution of iPod features over time, see Exhibit 3.)  The following paragraphs offer a brief overview of these product introductions and enhancements.

15.     iPod Classic.  The first iPod (iPod Classic 1st Generation) was smaller and lighter than other devices then on the market, had only 5GB memory, and was touted for its ability to put "a thousand songs in your pocket."[9]  Five months later, Apple introduced a second-generation iPod with twice the memory, and four months after that Apple introduced their next update with twice again the memory.  In just nine months, the capacity of the iPod had quadrupled from 5GB to 20GB.  Over the years, Apple continued to add memory to the iPod Classic:  by September 2006 the iPod Classic 5th Generation was available with 80GB memory and a year later, the iPod Classic 6th Generation was available with 160GB.  (See Exhibit 4 for a summary of enhancements to iPod memory.)   At the same time, Apple continued to add features.   In April 2003, Apple began to offer iPods with USB connectivity in addition to the FireWire cable that they had offered initially.[10]  Over time, successive generations of the iPod Classic became smaller and lighter, had more memory and longer battery life, and were generally sold at prices lower than the models they replaced.  Later, when photo and video were introduced, the iPod began to feature high-resolution color screens that improved with each new generation.  (For a summary of the history of the iPod Classic, see Exhibit 5a.)

16.     iPod Mini.  The iPod Mini was introduced in January 2004.  It was half the size of the original iPod.  With 4GB of memory the Mini held 1000 songs – the smallest portable digital music player to do so at the time.  According to Apple's press release, it could also transfer music at the rate of a song per second, and it could be conveniently charged using either the

---

[9]    Apple Press Release, "Apple Presents iPod; Ultra-Portable MP3 Music Player Puts 1,000 Songs in Your Pocket," October 23, 2001 (Apple_AIIA00974636). See also  http://www.vaughanpl.info/vortex/?p=5261.

[10]    Although FireWire was faster at the time the iPod was introduced, it was also limited by the fact that it was not usually standard on personal computers.  See, e.g., http://www.qimaging.com/support/pdfs/firewire_usb_technote.pdf.

HIGHLY CONFIDENTIAL

included FireWire or USB cable.[11]  The 2nd Generation Mini was introduced a year later.  It was smaller, lighter, held 50 percent more music and featured increased battery life of up to 18 hours, and it sold for the same price as the previous model. While it was in production, the Mini was one of the most popular electronic products on the market.[12]  (See Exhibit 5b.)

17.    <u>iPod Shuffle</u>.  On January 11, 2005, Apple introduced the iPod Shuffle, a digital music player based on iTunes' shuffle feature, which randomly selected songs from the user's library for placement on the iPod.  In replaying the music, the Shuffle "shuffled" the music so that users got a new combination of music every time they listened.  The Shuffle was smaller and lighter than a pack of gum and was available for less than $100.[13] (See Exhibit 5c.)

18.    <u>iPod Nano</u>.  In September 2005, Apple introduced the iPod Nano as a replacement model for the Mini.  The Nano was a full-featured iPod that was smaller and lighter than anything then on the market and featured a redesigned color screen.[14]  Industry commentators praised the Nano for its innovative design.[15]  PC World named it one of five ground-breaking products in the audio category in its 2006 World Innovations Awards.[16]  The 1st Generation Nano was 1.6 inches wide, 3.5 inches long, .27 inches thick and weighed 1.5 oz.; it had a stated battery life of up to 14 hours; and the screen was a 1.5-inch (diagonal) liquid crystal display panel at $176 \times 132$ resolution.  The Nano could also hold and display between 15,000 and 25,000 photos.[17]  The following year, Apple introduced a completely redesigned 2[nd] Generation Nano with twice the

---

[11]    Apple Press Release, "Apple Introduces iPod mini; Smallest 1,000 Song Music Player Ever Comes in Five Colors," January 6, 2004 (Apple_AIIA00974840).

[12]    "iPod Mini," Wikipedia, The Free Encyclopedia, https://en.wikipedia.org/wiki/IPod_Mini (accessed July 16, 2013).

[13]    Apple Press Release, "Apple Introduces iPod shuffle; First iPod Under $100," January 11, 2005 (Apple_AIIA00974708).

[14]    Apple Press Release, "Apple Introduces iPod nano," September 7, 2005 (Apple_AIIA00974603).

[15]    The Nano turned out to be very popular – more than a million were sold in the 17 days following its introduction.  Drew Turner, Daniel, "Apple hits $1 Billion in Profit for 2005," eWeek, October 10, 2011, http://www.eweek.com/c/a/Apple/Apple-Hits-1-Billion-in-Profit-for-2005/ (accessed July 16, 2013).  PC World named it one five ground-breaking products in the audio category in its 2006 World Innovations Awards.  "2006 PC World Innovations Awards," PR Newswire, January 4, 2006, http://www.prnewswire.com/news-releases/2006-pc-world-innovations-awards-winners-unveiled-53127872.html (accessed July 16, 2013).

[16]    "2006 PC World Innovations Awards," PR Newswire, January 4, 2006, http://www.prnewswire.com/news-releases/2006-pc-world-innovations-awards-winners-unveiled-53127872.html (accessed July 16, 2013).

[17]    http://support.apple.com/kb/sp42.

HIGHLY CONFIDENTIAL                                                                                    - 9 -

storage capacity and 24 hours of battery life for the same price as the previous generation.[18] Apple continued to introduce new generations of Nanos with additional innovative features. In September 2009, for example, it introduced the first Nano with a built-in video camera. (See Exhibit 5d.)

19.    iPod Touch. The most recent addition to the iPod product line is the iPod Touch. Introduced in September 2007, the Touch featured a multi-touch interface, together with widescreen display and built-in Wi-Fi wireless networking, which allowed browsing and wireless viewing of internet videos. In addition, users could browse, preview, and buy and download songs from iTMS.[19] A year later, Apple introduced the 2nd Generation Touch. Smaller and lighter than the original, it featured a thin metal design and a 3.5-inch widescreen glass display. With the new Touch, users could "listen to millions of songs, watch thousands of Hollywood movies and now, thanks to the App Store [which opened at about the same time], download and play hundreds of great games on their iPods."[20] (For a summary of the history of the iPod Touch, see Exhibit 5e.)

### 3. The iTunes Store

20.    Apple opened its online music store ("iTMS") in April 2003, which allowed users to purchase DRM-protected music files that could be played on an Apple personal computer or, after syncing with iTunes, on an iPod. The only way to access the iTMS was and is through iTunes. In October 2003, Apple introduced iTunes for Windows, which allowed owners of personal computers using the Windows operating system to use iTunes to purchase content from iTMS and to sync that content on iPods. When the iTMS opened in April 2003, it offered 200,000 songs.[21] By March 2004, there were more than 500,000 songs available, and in August 2004 Apple announced that its catalogue topped one million songs.[22] On February 23, 2006,

---

[18]    Apple Press Release, "Apple Introduces the New iPod nano; World's Most Popular Digital Music Player Features New Aluminum Design in Five Colors & 24 Hour Battery Life," September 12, 2006 (Apple_AIIA00974838).

[19]    Apple Press Release, "Apple Unveils iPod Touch," September 5, 2007 (Apple_AIIA00974641).

[20]    Apple Press Release, "Apple Introduces New iPod touch," September 9, 2008 (Apple_AIIA00974932).

[21]    Apple Press Release, "Apple Launches the iTunes Music Store," April 28, 2003 (Apple_AIIA00974776).

[22]    Apple Press Releases, "iTunes Music Store Downloads Top 50 Million Songs," March 15, 2004 (Apple_AIIA00974577); "iTunes Music Store Catalog Tops One Million Songs," August 10, 2004 (Apple_AIIA00974782).

Apple announced that one of its users had purchased and downloaded the one-billionth song from iTMS. At the time, there were two million songs available.[23] By January 2009, iTMS offered approximately ten million songs, approximately eight million without DRM; and by September 2012, it offered 26 million songs.[24] The competition lagged far behind. When the Real Music Store (RMS) opened in January 2004, it had a catalogue of 300,000 songs, which was about half the size of the iTMS catalogue at the time.[25] By the time the Amazon.com music store debuted in September 2007 with approximately two million songs,[26] iTMS had a catalogue with more than five million songs.[27]

21.    Music is not the only thing available from the iTMS.[28] On October 12, 2005, the iTMS began to offer music videos, Pixar short films, and hit TV shows for $1.99.[29] At the same time,

---

[23]    Apple Press Releases, "iTunes Music Store Downloads Top One Billion Songs; Scholarship at Juilliard School of Music to be Created February 23, 2006 (Apple_AIIA00974735); Levy, Steven, *The Perfect Thing: How the iPod Shuffles Commerce, Culture, and Coolness*, hereinafter "The Perfect Thing," pp. 135-136.

[24]    Apple Press Release, "Changes Coming to the iTunes Store," January 6, 2009, http://www.apple.com/pr/library/2009/01/06Changes-Coming-to-the-iTunes-Store.html (accessed July 16, 2013); "Apple Unveils New iTunes; Featuring Dramatically Simplified Design & Seamless iCloud Integration," September 12, 2012, http://www.apple.com/pr/library/2012/09/12Apple-Unveils-New-iTunes.html (accessed July 16, 2013).

[25]    CNET News, "Real offers new tech, song store," January 7, 2004, http://news.cnet.com/2100-1027-5136275.html (accessed July 16, 2013).

[26]    Amazon.com began to offer digital downloads in a public beta test in September 2007. However, music from two of the major labels, Warner and Sony, was not available until January 2008. At that time Amazon's music catalogue reached over 3.1 million songs. See, e.g., ArsTechnica, "Amazon's MP3 store brings more DRM-free music at lower prices than iTunes Store," September 25, 2007, http://arstechnica.com/uncategorized/2007/09/amazon-launches-public-beta-of-mp3-music-store/ (accessed May 28, 2013); NY Times, "Amazon to Sell Warner Music Minus Copy Protection," December 28, 2007, http://www.nytimes.com/2007/12/28/technology/28music.html?_r=0 (accessed May 28, 2013); NY Times, "Sony Joins Other Labels on Amazon MP3 Store," January 11, 2008, http://www.nytimes.com/2008/01/11/technology/11sony.html (accessed May 28, 2013); Antone Gonsalves, "Amazon Adds Fourth Major Record Label To DRM-Free Music Store," Information Week, January 10, 2008, http://www.informationweek.com/amazon-adds-fourth-major-record-label-to/205602334 (accessed May 28, 2013).

[27]    Apple Press Release, "Apple Announces iTunes U on the iTunes Store; Free Content From Top Universities Now Available." May 30, 2007 (Apple_AIIA00974843).

[28]    With the release of iTunes 4.9 on June 28, 2005, Apple began to offer users the ability to discover, manage and subscribe and listen to podcasts right on their computers. In just the first two days, iTunes customers subscribed to more than one million Podcasts. Apple Press Release, "Apple Takes Podcasting Mainstream; Discover, Subscribe, Manage & Listen to Podcasts Right in iTunes 4.9," June 28, 2005 (Apple_AIIA00974620); Apple Press Release, "iTunes Podcast Subscriptions Top One Million in First Two Days," June 30, 2005 (Apple_AIIA00974799).

Apple introduced the iPod Classic 5th Generation (video) so that consumers could take advantage of the additional content. Over the first three weeks video was available, iTMS customers purchased more than one million videos.[30] The following September, Apple announced that the iTMS would start selling movies. When the service first became available, the iTMS offered 75 movies from Walt Disney Pictures, Pixar, Touchstone Pictures and Miramax Films that customers could download to watch on their computers and iPods.[31] By January 2007, the iTMS offered 250 feature films and 350 television shows.[32] By the end of May, there were more than 500 movies.[33] Also in September 2006, the iTMS began to offer downloads of popular video games for fifth generation Classic iPods, all available for $4.99.[34]

### B. The Introduction and Use of DRM

22.    From April 2003 until various times in 2007 and 2009, as a condition for operating online digital music stores, the record labels that owned the music rights required that the stores encrypt their music with DRM technology that would allow the stores to enforce certain usage limits. Apple complied with this contractual requirement by developing and using its own proprietary DRM called FairPlay. Other music stores used different proprietary DRM such as RealNetworks' Helix and Microsoft's WMA DRM. The result was that DRM-protected music files purchased from a vendor using one of these methods could only be loaded and played on devices that supported that DRM technology. This meant that digital music downloads obtained from online music stores that used Microsoft's WMA DRM or downloads from the RMS could

---

[29]    Apple Press Release, "Apple Announces iTunes 6 With 2,000 Music Videos, Pixar Short Films & Hit TV Shows," October 12, 2005 (Apple_AIIA00974906). At the time, the Chairman of record label Interscope Geffen A&M said: "Apple is giving music fans a great way to own their favorite music videos."

[30]    Apple Press Release, "iTunes Music Store Sells One Million Videos in Less Than 20 Days," October 31, 2005 (Apple_AIIA00974894).

[31]    Apple Press Release, "Apple Announces iTunes 7 with Amazing New Features," September 12, 2006 (Apple_AIIA00974982). Sometime between June and September, the name of the iTunes Music Store was changed to the iTunes Store. Nonetheless, I continue to refer to the store as the iTMS.

[32]    Apple Press Release, "iTunes Store Tops Two Billion Songs; 50 Million TV Shows & Over 1.3 Million Movies Sold." January 9, 2007 (Apple_AIIA00974561).

[33]    Apple Press Release, "Apple Announces iTunes U on the iTunes Store; Free Content From Top Universities Now Available," May 30, 2007 (Apple_AIIA00974843).

[34]    Apple Press Release, "Apple Announces iTunes 7 with Amazing New Features." September 12, 2006 (Apple_AIIA00974982).

HIGHLY CONFIDENTIAL                                                                                    - 12 -

not be played on iPods.  Similarly, music obtained from the iTMS could not be played on devices that used other (non-FairPlay) DRM technology.

### C. RealNetworks RealPlayer with Harmony

#### 1. RealNetworks (Real), Harmony and the Real Music Store

23.    RealNetworks operated the RMS.  Like the iTMS, the RMS was an online store that sold downloadable digital media files that could be played on personal computers and portable devices.  Similar to iTunes, RealPlayer was Real's proprietary program for acquiring purchased downloads from the RMS, managing digital files, and loading those files on a portable music player.

24.    In July 2004, RealNetworks announced that version 10.5 of its RealPlayer jukebox would include a new feature, which it called Harmony.[35]  Harmony apparently mimicked or cloned other methods of DRM protection, so that an owner of (say) a WMA-based device could purchase Helix-protected music from the RMS and play it on a WMA-compatible MP3 player.[36] The same was true for an iPod owner using Harmony — Harmony made Helix-protected music appear to be protected by FairPlay, so that an iPod would recognize, decrypt, and play the file. To load RMS music so that it would work on an iPod, the user had to use RealPlayer with Harmony.[37]

25.    The ability of the original version of Harmony to convert files so that they would play on iPods ended roughly three months later with the release of the enhanced version of FairPlay — referred to as the "embedded keybag" — introduced with iTunes 4.7 in October 2004.  Because the new version of FairPlay changed the way that FairPlay protected files, Harmony no longer mimicked FairPlay.  Thus, Harmony could no longer convert files from RMS into a format that

---

[35]    Cohen, Peter, "RealNetworks' Harmony Promises iPod Compatibility," PCWorld, July 26, 2004, http://www.macworld.com/article/1035237/harmony.html (accessed May 28, 2013).

[36]    See Expert Report of David M. Martin Jr., PH.D., April 8, 2013 (hereinafter, "Martin report"), ¶27; Robbin declaration in support of MSJ, ¶9; Kelly declaration in support of MSJ, ¶¶32-33.

[37]    Apple_AIIA00093860, pp. 3-5. See also Cohen, Peter, "RealNetworks' Harmony Promises iPod Compatibility," PCWorld, July 26, 2004, http://www.macworld.com/article/1035237/harmony.html (accessed May 28, 2013); Declaration of David F. Martin in Support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment, February 28, 2011, ¶¶26-27.

HIGHLY CONFIDENTIAL

could be played on iPods that had been updated with the new version of FairPlay.[38]  Importantly, the court has ruled that the improved version of FairPlay included in iTunes 4.7 was not anticompetitive.

26.    On April 26, 2005, Real announced that it had updated Harmony and restored its ability to mimic the current FairPlay encryption technology and thus interoperate with iPods.[39]  I understand that Harmony remained operational with all iPod models and generations of iPod models — old and new — through September 11, 2006.

27.    Although Harmony was able to interoperate with all iPods from April 2005 until September 12, 2006 and with all but the iPod Nano 2nd Generation until September 5, 2007, it was never a major factor in the marketplace.  Available evidence from NPD suggests, except for the period during its half-price sale, RMS's share of digital downloads was around three percent, and for the period beginning in July 2006 — immediately prior to the introduction of iTunes 7 — it was generally less than that.[40]  Moreover, these are sales to all consumers, not just to iPod owners, and thus even these figures overstate that significance of Harmony to the issues in this case.  Professor Noll himself testified in his deposition of April 7, 2011 that he doubted customers would have taken advantage of the ability to buy music from the RMS and use Harmony after it was re-launched to load it onto their iPods "because the consumers had already experienced the prior disabling."[41]  In other words, according to Professor Noll, there weren't many RMS sales for iTunes 7 to "block" because the legal technology contained in iTunes 4.7

---

[38]    Note, when iTunes 4.7 was first released, users had the option of whether to upgrade, i.e., users could continue to purchase and download from the iTMS whether they had upgraded or not.  Following the introduction of a particular hack of the iTunes system that stripped the FairPlay DRM from music prior to its download and subsequent complaints from the record labels, Apple began to require any user who wished to purchase and download from the iTMS to upgrade to 4.7 first. See, e.g., Mook, Nate, "Apple Blocks iTunes DRM Hack," BetaNews, March 21, 2005, http://betanews.com/2005/03/21/apple-blocks-itunes-drm-hack/ (accessed May 28, 2013); Borland, John, "iTunes hack disabled by Apple," CNET News, March 21, 2005, http://news.cnet.com/Apple-disables-iTunes-hack/2100-1027_3-5628616.html (accessed May 28, 2013); Smith, Tony, "Apple plugs PyMusique iTunes 'hole,'" The Register, March 22, 2005, http://www.theregister.co.uk/2005/03/22/apple_blocks_pymusique/ (accessed May 28, 2013).

[39]    Borland, John, "RealNetworks rekindles iPod tech tussle," April 26, 2005, http://news.cnet.com/2100-1027_3-5685286.html (accessed June 26, 2013).

[40]    There were only two months (August 2006 and June 2007) in which it was over three percent.  In all other months, it was less than three percent, and sometimes much less.  By January 2009, it was no longer present in the NPD data.  NPD_DigitalOnlyJuly06_Dec11.XLSX

[41]    Videotaped Deposition of Roger G. Noll, April 7, 2011 (hereinafter, "Noll April 7, 2011 deposition"), p. 144:22-23

had already dissuaded iPod owners from purchasing RMS music and using Harmony. This is clearly a major problem for Plaintiffs' theory, which requires that in the absence of iTunes 7 iPod owners would avail the RMS in substantial numbers. Yet, in the absence of iTunes 7, Professor Noll doesn't believe that iPod owners were using Harmony or RMS, an opinion that accords with the evidence on RMS sales.

28.     Ignoring all of this, Professor Noll refers to RealNetworks' claim that it sold 3 million downloads during its three-week promotional sale when it launched Harmony in August 2004.[42] But the relevant question is not what Harmony was doing in 2004, but rather what its sales were at the time it was blocked in 2006.

### D. Challenged Conduct

29.     On September 12, 2006, Apple introduced iTunes 7, which included many enhancements and upgrades to iTunes functionality (see Exhibit 6). iTunes 7 also supported an updated version of FairPlay that included code (the Keybag Verification Code, or KVC) that was used by the iPod to verify that the keybag had been written by iTunes and not by a third-party program.[43] The keybag is used by the iPod firmware to store and manage "keys" and other information necessary to decrypt protected music. One effect of this was that iPods with the FairPlay keybag with KVC would not be able to play music purchased from RMS because RealPlayer with Harmony no longer mimicked FairPlay.

30.     Two new iPod models were introduced at the same time as iTunes 7: the iPod Shuffle 2nd Generation and the iPod Nano 2nd Generation. In addition, Apple added some features to the iPod Classic 5th Generation (a.k.a. iPod video), which had been introduced the previous year, but did not introduce a new generation of the Classic. The new FairPlay keybag with KVC was included and enabled only on the iPod Nano 2nd Generation. Although iTunes 7.0 supported the iPod Classic 5th Generation and iPod Shuffle 2nd Generation, FairPlay keybag with KVC was not included and enabled on those models. RealPlayer with Harmony thus could continue to load music on the iPod Classic 5th Generation and iPod Shuffle 2nd Generation, as well as to all iPods that had been sold prior to September 12, 2006. The new FairPlay keybag with KVC was

---

[42]   Noll declaration, p. 53, note 93.

[43]   See Martin report, ¶¶98-99.

included on all later generations of the Nano (e.g., the Nano 3rd Generation introduced in September 2007), the iPod Classic 6th Generation, and iPod Touch 1st Generation introduced in September 2007 and later generations of Classics and Touches.  No model of the Shuffle ever included the new FairPlay keybag with KVC challenged by Plaintiffs.  In other words, Harmony continued to work on all iPod Shuffles.[44]

31.    In September 2007, Apple released iTunes 7.4, which included a number of new features. Among others things, it added a feature called the database verification code (DVC) to iTunes and to certain versions of iPod firmware.  The DVC ensured that only iTunes managed the music that was placed on iPods.  Before playing music, iPods with DVC would verify that iTunes had written the music and video database on the iPod.[45]  As a result, iPods with DVC could not be managed by third-party applications (e.g., Winamp, Anapod, RealPlayer, etc.) and thus could not play music that had been loaded using one of those applications.  DVC was included in the iPod Classic 6th Generation, the iPod Nano 3rd Generation, and the iPod Touch 1st Generation, all introduced in September 2007, as well as on all later models of iPod Classic, iPod Nano, and iPod Touch.[46]  It was never included on any Shuffle or any previous generations of Classic or Nano.  Customers were able to use third-party applications to load and manage music to any model or generation of a model that did not include the DVC.

32.    I understand that, as of the date of his April 3, 2013 report, Professor Noll did not know which iPod models included the new FairPlay keybag with KVC and DVC, and which did not. He relied on the declaration of Augustin Farrugia filed in support of Apple's motion for summary judgment, which said that "[t]he iPod database verification protocol was included in the firmware for only new iPods starting with iPod nano second generation shipped in October 2006.  Users with legacy iPods could and can continue to use third-party jukebox applications to download and manage music on their iPods."  And also stated that "…the new version of FairPlay added an improved architecture for iPod keybag more secure against attacks.  This change had the effect of preventing the injection of foreign material, including DRM keys, into the keybag.  As with the iPod database verification protocol, the new architecture was included

---

[44]    Supplemental Declaration of Augustin Farrugia, July 3, 2013, ¶3; Martin report, ¶84.

[45]    Martin report, ¶¶21-22.

[46]    Martin report, ¶84; Supplemental Declaration of Augustin Farrugia, July 3, 2013, ¶¶2-3.

HIGHLY CONFIDENTIAL                                                                - 16 -

only in new iPods starting with the iPod nano second generation shipped in October 2006.  Users with older iPods could continue to use third-party application to inject foreign material, including DRM key, into the iPod keybag."[47]  Based on this declaration, he assumed that the KVC and DVC were included on all new iPod models introduced on September 12, 2006 — the iPod Nano 2nd Generation and the iPod Shuffle 2nd Generation.  He also assumes that the KVC and DVC were included on the iPod Classic 5th Generation even though it was not a new model — it was introduced in September 2005 and was never affected by either technology.[48]

### E.  The End of DRM

33.    As early as 1998, there was at least one paid service (eMusic) that offered paid downloads of music without DRM protection.[49]  By September 2006, there were at least 24 sites that offered DRM-free music, all but four of which offered fully or partially paid service.[50]  (See Exhibit 7.)  On February 6, 2007 — less than five months after the introduction of iTunes 7 — Apple CEO Steve Jobs published an open letter called "Thoughts on Music."  In it, he called on the major labels to allow Apple to sell their music without DRM protection:  "This is clearly the best alternative for consumers, and Apple would embrace it in a heartbeat.  If the big four music companies would license Apple their music without the requirement that it be protected with a DRM, we would switch to selling only DRM-free music on our iTunes store."[51]

34.    Two months after Jobs' open letter, on April 2, 2007, EMI announced it was launching new premium download service and that, effectively immediately, all of its digital catalog would

---

[47]    Declaration of Agustin Farrugia in Support of Defendant's Renewed Motion for Summary Judgement, ¶¶31-32.

[48]    Noll deposition, p. 200:9-19; Exhibits 15.1, 15.2.

[49]    eMusic was a subscription service that primarily sold music from independent labels. See "eMusic," Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Emusic (accessed May 28, 2013).

[50]    Three of these – Kazaa, Morpheus and Limewire – were peer-to-peer file sharing sites, and all three were sued by the record industry.  Kazaa converted to a "legal" site in 2006; Morpheus filed for bankruptcy in 2008; and Limewire was shut down by a judge in 2010.  "Kazaa site becomes legal service," BBC News, http://newsvote.bbc.co.uk/mpapps/pagetools/print/news.bbc.co.uk/2/hi/technology/5220406.stm (accessed May 28, 2013); "Encyclopedia: Kazaa," PCMag.com, http://www.pcmag.com/encyclopedia/term/45734/kazaa (accessed May 28, 2013); "LimeWire," Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Limewire (accessed May 28, 2013); "Morpheus (software)," Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Morpheus_(software) (accessed May 28, 2013); "National Geographic unveils World Music downloads service," PC Pro.co.uk, http://www.pcpro.co.uk/news/90308/national-geographic-unveils-world-music-downloads-service (accessed May 28, 2013).

[51]    Jobs, Steve, "Thoughts on Music," February 6, 2007 (AIIA00093477).

be available with higher sound quality and without DRM restrictions through the iTMS.[52]

Amazon.com launched a public beta test of its own online music store on September 25, 2007 with approximately two million DRM-free songs from EMI, Universal, and a number of leading independent labels.[53] At that point, iPod owners could purchase music from Amazon and load it on their iPods, or use it on some other brand of player. In January 2008, Amazon became the first music store to sell music without DRM from all of the four major music labels (EMI, Universal, Warner Music, and Sony BMG).[54] (See Exhibit 8.)

35.    A year later, on January 6, 2009, Apple announced that all four of the major labels as well as thousands of independent labels would begin to offer their music through the iTMS in DRM-free format with higher quality encoding. Approximately eight million of Apple's ten million songs would be available immediately—the rest were to be available by the end of March 2009.[55]

### F. Quality Adjusted iPod Prices Rapidly Declined During the Period at Issue

36.    Exhibit 9 provides a summary of the impact of these product introductions and enhancements on quality-adjusted iPod prices. The exhibit indicates that real (quality adjusted) iPod prices declined dramatically between October 2001 when the iPod was first introduced and December 2010, the latest period for which I have data.[56] In fact, real prices fell by nearly 80

---

[52]    Apple Press Release, "Apple Unveils Higher Quality DRM-Free Music on the iTunes Store," April 2, 2007 (Apple_AIIA00974869).

[53]    Amazon Press Release, "Amazon.com Launches Public Beta of Amazon MP3, a Digital Music Store Offering Customers Earth's Biggest Selection of a la Carte DRM-Free MP3 Music Downloads," citing Business Wire, "Amazon MP3 Offers Over 2 Million Songs From More Than 180,000 Artists and Over 20,000 Labels, Including EMI Music and Universal Music Group," September 25, 2007. Available at http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle_pf&ID=1055053, last accessed 5/28/2013.

[54]    See, e.g., "Amazon MP3," Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Amazon_MP3 (accessed May 28, 2013); Jeff Leeds, "Amazon to Sell Warner Music Minus Copy Protection," The New York Times, December 28, 2007; Antone Gonsalves, "Amazon Adds Fourth Major Record Label To DRM-Free Music Store," Information Week, January 10, 2008.

[55]    Apple Press Release, "Changes Coming to the iTunes Store," January 6, 2009, http://www.apple.com/pr/library/2009/01/06Changes-Coming-to-the-iTunes-Store.html (accessed May 28, 2013).

[56]    To create a hedonic price index of quality-adjusted iPod prices, I have taken the product characteristics that Professor Noll used in his regressions as well as the additional characteristics listed in Exhibit 10 (obviously this list does not include all characteristics or factors that influence iPod prices), excluded time variables and added monthly dummies. I then rerun his reseller sales and direct sales regressions. I have then used the coefficients from those regressions to create two price indices: one for prices to resellers and one for prices to

percent over the period.  In addition, real prices fell by approximately 45 percent for resellers and nearly 50 percent for direct sales between October 2001 and July 2004 when Harmony was introduced and by an additional 30 percent between July 2004 and September 2006 when iTunes 7 was released.[57]  As we will see below, the basis of Professor Noll's damage calculation is that he claims to find that real prices should have fallen even faster.

## III.  PLAINTIFFS' AND PROFESSOR NOLL'S THEORY OF IMPACT AND DAMAGES

37.    Plaintiffs claim that the challenged update created a form of "lock-in" that made it more difficult for buyers of downloaded digital music to switch from iPods to other brands of music players.  Before the introduction of RealPlayer with Harmony, iPods could play directly DRM-protected music from only iTMS unless they removed the DRM protection by burning and ripping, using a virtual burner or other means.  According to Professor Noll, because an iPod owner's accumulated stock of iTMS music could not be easily transferred without incurring significant switching costs, as iPod owners accumulated iTMS music they become locked-in to purchasing an iPod as a replacement player.  Putting it differently, the increase in the size of their iTMS libraries reduced the incentive or opportunity to purchase a non-iPod device.  RealPlayer with Harmony allegedly reduced this lock-in effect by offering users an alternative source of DRM-protected music that could play on competing devices.

38.    According to Professor Noll, the initial effect of Harmony would be to make iPods relatively more attractive—iPods could play music from two sources rather than one—which

---

direct purchasers.  There are some price data available for periods after December 2010, but other information is missing.  As a result, the hedonic price index does not extend past this period.  Note that this exhibit reports calculated prices as the log of prices.

[57]    The latter number is the percentage change in price over the period.  The exhibit also illustrates an important feature of the way in which Apple prices its iPods.  As I mention above, Apple determines the price of each iPod at the time it is introduced, and that price will remain in effect until that particular iPod is replaced by a new model, at which point it will be discounted in order to sell the remaining inventory.  See Internal Apple Presentations from the Price Committee, March 2001 to February 2009.  There has only been one exception to this general approach.  Until 2006, Apple introduced iPod products at various times during the year, but starting in September 2006, Apple began to release all of its new products in the fall of each year.  Exhibit 9 shows the effect of this.  As the exhibit shows, quality adjusted prices fall with the introduction of new models with better features at prices that are the same as (or lower than) the prices of the models they replace.  Following the product introductions, prices remain relatively flat until new products are introduced the following year.  (See also Exhibits 5a through 5e.)

HIGHLY CONFIDENTIAL

would increase demand and ultimately prices for iPods.[58]  As he recently explained at deposition, the amount of lock-in depends on the amount of iTMS music relative to other types of music (e.g., RMS music, DRM-free music) in an owner's library.  Over the long run, according to Professor Noll, Harmony would have reduced the lock-in as iPod owners accumulated more RMS music than iTMS music.[59]  His theory is that some of those iPod owners would have purchased competing players, reducing the demand for iPods and thus iPod prices.

39.    According to Professor Noll, the introduction of iTunes 4.7 in October 2004 arrested the chain of events that would have led to lower iPod prices.  Because the update disabled Harmony, over time iPod owners were allegedly more likely to purchase music downloads from iTMS, and less likely to purchase from RMS.  Though blocking Harmony would initially have made iPods less attractive according to Plaintiffs' theory, at some future point the accumulating stock of iTMS-purchased music would make some iPod owners less likely to purchase a competing digital player.  This is the "lock-in" that allegedly allowed Apple to charge higher prices.

40.    Central to Professor Noll's and Plaintiffs' theory, in April 2005 Real introduced a new version of Harmony that worked around iTunes 4.7.  For roughly the next 18 months, iPod users could acquire and play DRM-protected music purchased from RMS, which would allegedly reduce the "lock-in" of some iPod owners—the ones who chose to purchase from the RMS.  The introduction of iTunes 7 in September 2006 disabled Harmony on certain iPod models.  Going forward, according to their theory, owners of affected iPod models who would otherwise have purchased music downloads from the RMS would no longer do so.  At some future date, after they built iTMS libraries and increased their switching costs, the incremental lock-in of iPod owners who would otherwise have used Harmony made them less likely to switch to other brands of music players.  The incremental lock-in caused by iTunes 7 allegedly allowed Apple to

---

[58]  Noll January 18, 2011 declaration, p. 54.

[59]  Citing evidence from August 2004, Plaintiffs have contended that Apple's share of online music sales "dropped below 70% only during the brief period when competitor RealNetworks sold music compatible with the iPod" (July 2004 through October 2004 when iTunes 4.7 was introduced).  Plaintiffs' theory was that the alleged drop in iTMS sales and corresponding increase in Real sales showed that Harmony allowed Real to capture iTMS sales and that ultimately fewer iPod owners would be locked into buying an iPod for the next purchase.  The evidence suggests that if Real's or iTMS's sales were impacted by Real's three-week, half-price music sale in July 2004, it was a temporary effect due to the temporary discount offered to introduce Harmony to the market. See Plaintiffs' Notice of Motion and Renewed Motion for Class Certification and Appointment of Lead Class Counsel, p. 7, and Noll declaration, pp. 53, 60.

HIGHLY CONFIDENTIAL

overcharge for all iPod models sold between September 12, 2006 (when iTunes 7 was introduced on the iPod Nano 2nd Generation) and March 31, 2009 (when all music on the iTMS was available without DRM).

## IV.    PROFESSOR NOLL'S HEDONIC PRICE REGRESSION AND INFERENCE OF DAMAGES

41.    Professor Noll uses a hedonic multiple linear regression in an attempt to estimate damages by comparing iPod prices during the proposed class period to prices during a "before" period that, he assumes, represents what would have occurred "but-for" the challenged conduct, while at the same time attempting to control for factors such as product features and functionality that would also affect iPod prices.[60]  Using his regressions, he claims to show that the KVC caused an anticompetitive increase in the price of all iPod models.  His regression predicts that the effect was immediate and constant, beginning on September 12, 2006 when the KVC was introduced and lasting until March 31, 2009, the end of the class period.  He also claims that the percentage overcharge was exactly the same for each iPod model, even models that could not invoke the KVC.

42.    I begin with a brief overview of regressions.  Next I discuss the concept of "hedonic" models of prices and how regressions have been used to estimate such models.  With these elements as background, I then turn to a description of Professor Noll's regressions.

### A.  Multiple Linear Regression

43.    A multiple linear regression is a statistical technique for estimating the empirical relationship between one measureable variable, call it $P$, and "multiple" other variables, $X = \{X^1, X^2, X^3, ....., X^K\}$, which are often called "explanatory variables."  In the current context, $P$ might measure the price of a particular model ($m$) of MP3 player at a particular date ($t$), which we could denote $P_{mt}$.  For example, the retail price ($P$) of an iPod Touch with 8 GB of storage capacity ($m$) in September 2007 ($t$) was $299, so $P_{mt} = \$299$.  $X^1$ might be a continuous variable that measures some valuable characteristic of the Touch, such as the megapixel resolution of its screen, and so on.

---

[60]    Noll declaration, p. 71.

44.    An indicator variable (or "dummy variable") is used to indicate that a particular condition is true or false. It takes the value 1.0 if the condition is true, and zero otherwise. For example, let $X_{mt}$ be an indicator for whether model $m$ had a touch screen at date $t$. Then this indicator would take the value $X_{mt} = 1$ if the model had a touch screen and $X_{mt} = 0$ otherwise. (The iPod Touch in fact had a touch screen in September 2007, so $X_{mt} = 1$ for that model and date. On the same date, the iPod Shuffle did not have a touch screen, so $X_{mt} = 0$ for the Shuffle.) Similarly, an indicator variable for time periods where music downloads were DRM-free would take the value 1 during such periods, and zero otherwise.

45.    The adjective "linear" refers to the maintained assumption that in a given dataset that records values of $P$ and $X$, the relationship between $P$ and the multiple $X$'s is linear. Then $P_{mt}$ may be expressed as a linear combination of the $X$'s:

(1)        $P_{mt} = X^1_{mt}B^1 + X^2_{mt}B^2 + X^3_{mt}B^3 + \ldots + X^K_{mt}B^K + U_{mt}$

In equation (1) the parameters $B^j j=1,2,\ldots,K$ are unknown constants that represent how much $P$ changes when a particular $X^j$ increases by one unit, holding constant all the other $X^i$ for $i \neq j$. For example, if "all else equal" the addition of a touch screen ($X^1_{mt}$ increases from $X^1_{mt} = 0$ to $X^1_{mt} = 1$) was associated with a \$50 increase in price, then $B^1 = \$50$. And so on.

46.    In addition to the linear combination of observed and measurable variables $X^j$, the right side of equation (1) includes a "residual" quantity $U_{mt}$, which represents the portion of $P_{mt}$ that cannot be represented by the linear combination of $X$s that are included in the model. In general, the most useful way to think about $U_{mt}$ is that it represents all of the "left out" factors that affect $P$ but were not included in the model, either because the person constructing the model chose not to include them or because they are "unobserved" (i.e., not recorded in the available data).

47.    Given the model (1) for the relation between $X$ and $P$, there are well-known regression techniques available to estimate the unknown parameters $B^j j=1,\ldots K$. The most basic of these techniques is called "ordinary least squares" (OLS), and that is the technique Professor Noll used in the hedonic regression model reported in Exhibits 13.1 and 13.2 of his report.[61] Under very

---

[61]    In his deposition, Professor Noll appears to be confused about the technique he used to produce the estimates in Exhibits 13.1 and 13.2. He claims that these exhibits show "generalized least squares" estimates with "robust" standard errors that have been adjusted for heteroskedasticity. This is incorrect. His Exhibits 13.1 and 13.2

specific assumptions, the OLS estimator $b^j$ of the unknown parameter $B^j$ has certain "nice" properties. One is that $b^j$ is "unbiased," which means that while $b^j$ is itself a random variable that will vary from one random sample to another, the expected value of $b^j$ is equal to the unknown value of the parameter $B^j$. Put differently, if the OLS estimator is unbiased, then repeated samples from the same population will generate a number of OLS estimates, but these estimates will tend to cluster around the true value $B^j$.

48.    When will the OLS estimator $b^j$ of $B^j$ have this "nice" property of being unbiased? The key assumption is that the elements of $U$—the "excluded" variables—are not correlated with the "included" variables $X$. The idea is quite simple and can be illustrated in the context of Professor Noll's regression. Suppose that iPod models that use the updated iTunes 7 also have higher resolution displays compared to earlier models, but resolution is not included among the explanatory variables, $X$. This means that display resolution is an omitted variable—in other words, it's in $U$. Then the estimated coefficient on iTunes 7 will "pick up" the effect of resolution on price, because the indicator for iTunes 7 and the omitted factors in $U$ are correlated with one another. As a result, if the impact on price of higher resolution is positive and the impact of the KVC on price is zero, the estimated coefficient on the iTunes 7 indicator variable would be positive because it is "picking up" the effects of higher resolution. This is called "omitted variables bias," and it is, in fact, one of the many fatal flaws in Professor Noll's regression analysis.

49.    I mentioned above that the least squares estimator $b^j$ of the unknown parameter $B^j$ is itself a random variable, with a mean and a standard deviation, which in the case of regression estimators is called the "standard error" of the estimator. The standard error $SE^j$ of $b^j$ is a measure of the precision of the estimator—the confidence we can have that the true value $B^j$ is near the estimated value. $SE^j$ can also be estimated from the data under appropriate assumptions. As explained below, Professor Noll's implicit assumptions in this regard are wildly at odds with the facts, which causes him to vastly overstate the precision and statistical significance of his results.

---

report OLS results. Videotaped Deposition of Roger G. Noll, May 16, 2013, hereinafter "Noll deposition," p. 196:4-22. The Appendix to his report contains other exhibits in which standard errors have been adjusted for heteroskedasticity.

### B. Hedonic Models of Prices for Products with Changing Quality

50.     Economists have long recognized the difficulty of comparing prices over time for products with changing attributes.  Computers provide a good illustration.  In 2004, a personal computer with about 1 gigabyte (GB) of system memory, a 60 GB hard drive and a 15-inch cathode ray monitor could be had for about $1200.  By 2010, the same $1200 expenditure would get a computer with 8 GB of memory, a 700 GB hard drive and 21-inch LCD monitor.  The nominal price of a standard computer system had not changed, but technical progress in storage, memory and production made the 2010 model vastly superior.  The "real" price of a standard computer had fallen dramatically, even though the nominal price had not changed.

51.     Now consider iPods.  In 2001, an original iPod Classic with 5 GB of storage capacity sold for $399.  By 2005 the same $399 nominal price fetched a Classic with photo and video capabilities and 60 GB of storage, among other features.  And by 2009, for a $249 nominal price a consumer could purchase a 160 GB iPod Classic with further product enhancements.  Like computers, "real" prices of iPods were falling dramatically.

52.     As these examples illustrate, an analysis of product pricing that ignores the evolution of product quality and features can be highly misleading.  One way of dealing with this issue is to employ "hedonic" models of product pricing, in which products are explicitly viewed as bundles of changing attributes or characteristics.[62]  A hedonic regression model is in the (basic) form of equation (1), above, where the $X^j$ represent measures of product characteristics and the $B^j$ represent the "relative valuation" of such characteristics or qualities.

## V.    PROFESSOR NOLL'S HEDONIC DAMAGE MODEL

53.     Professor Noll's damages model is built on a hedonic regression model of iPod prices and certain product attributes.[63]  The basic framework of this regression follows the form of equation (1) above:  a particular measure of iPod prices (the natural logarithm of price, $\ln(P)$) is regressed on a chosen set of product characteristics, $X,$ and the estimated coefficients $b$ are interpreted as

---

[62]   Griliches, Zvi, "Hedonic Price Indexes and the Measurement of Capital and Productivity: Some Historical Perspectives."  *NBER Working Paper 2634* (June 1988).

[63]   Noll declaration, pp. 71-72.

measuring "the relative valuation of such qualities."[64]  Putting it differently, Professor Noll starts with the hedonic regression model described above and adds a set of indicators for the occurrence of certain events that, in his view, affected the nature of competition between Apple and other unspecified sellers of MP3 players.  This set of "event" indicators is the centerpiece of Professor Noll's claim that he has measured the impact of Apple's challenged conduct.

54.    Specifically, his model includes an indicator variable for the introduction of iTMS, which is meant to measure the impact of iTMS on iPod prices (the iTMS coefficient), an indicator variable for Harmony's introduction to measure its impact on iPod prices (Harmony coefficient), an indicator variable for iTunes 4.7 (Harmony blocked coefficient), an indicator variable for iTunes 7 (iTunes 7.0 coefficient), as well as indicator variables for when competing online music stores went DRM-free (competitors DRM free coefficient) and when iTMS went completely DRM-free (iTMS all DRM free coefficient).  Professor Noll constrains his model so that the iTunes 7 variable estimates a single percentage overcharge on all iPod models sold after September 12, 2006, whether the iPod model included KVC or not.  The regression makes no attempt to measure any impact of the reintroduction of Harmony, changes to iTunes or iTMS or the introduction of the DVC.

55.    Using his regression, Professor Noll claims to find that Apple's challenged conduct allowed it to raise prices to members of the reseller class by 3.2 percent, and to raise prices to members of the direct purchaser class by 6.1 percent.  As I explain below, it is improper and invalid to interpret these unreliable empirical "results" as evidence of overcharge or damage from Apple's challenged conduct.  Professor Noll's conclusions are unreliable and highly misleading.

### A.  How Professor Noll Constructs His Data

56.    Professor Noll implements his pricing regression using a measure of the unit price of individual iPod models and some of their characteristics.  His price measure is constructed from Apple's transactional databases for resellers and direct purchasers, for which he estimates separate damage models.  For resellers, the data he uses for his regression encompass 2.14

---

[64]    Griliches, Zvi, "Hedonic Price Indexes and the Measurement of Capital and Productivity: Some Historical Perspectives," *NBER Working Paper 2634* (June 1988), p. 1.

million multi-unit transactions that occurred between November 2001 and December 2010. (By multi-unit, I mean the sale of more than one iPod in a single purchase/sale transaction.) For direct purchasers the data he uses for his regression include 36.9 million transactions — many of which are multi-unit — that occurred between November 2001 and December 2010.[65]

57.　"Price" is not directly reported in either of these databases; instead the data report the total number of units purchased and the amount paid in each individual transaction between Apple and the buyer. Exhibit 11 shows some particularly large transactions from the reseller data. For example, column 2 of the exhibit shows that in September 2009 Best Buy paid $4,852,650 for 28,050 identical units of the 3rd Generation iPod Touch, N72B Good. To obtain a unit price for this transaction, Professor Noll divides the total amount Best Buy paid by the number of units they received. Thus his measure of unit price for this *single* transaction is $4,853,650/28,050 = $173. In his regression model, he treats this single transaction with a single buyer as 28,050 *independent* price observations of $173 each. He does this for every such transaction, for both resellers and direct purchasers. His reseller regression data are made up of 2.14 million actual multiunit transactions, but by counting each transaction hundreds or even thousands of times, he effectively pretends that his regression model is using 113 million *independent* price observations. This is a serious error. As I discuss below, by ignoring the fact that his observations are not independent, Professor Noll exaggerates the precision of his regression estimates and their statistical significance.

58.　It is important to understand how to interpret the regression estimates when this is done. The dependent variable in his regression is the natural logarithm of the calculated price. A basic mathematical "fact" about natural logarithms is that a change in the natural logarithm of some quantity is approximately the percentage change in that quantity. So, for example, suppose the average unit price of the iPod Touch models purchased by Best Buy rises from $173 to $182, an increase of about five percent. One may use a calculator to verify that the increase in the natural logarithm of price is ln(182) - ln(173) = .05, or about five percent. This fact is useful in interpreting Professor Noll's regression results — if a variable in his regression has a coefficient

---

[65]　Noll declaration, Exhibits 13.1 and 13.2.

HIGHLY CONFIDENTIAL

of .05, for example, this means that a unit (1.0) change in that variable is associated with (not "caused") a price that is about five percent higher.

59.     Professor Noll's regression estimates are displayed in two of his exhibits—Exhibit 13.1 of his report shows his estimates for resellers, and Exhibit 13.2 shows his results for direct purchasers.  For completeness, I include Professor Noll's Exhibits 13.1 and 13.2 as Exhibits 12a and 12b.  The main results from my review of his regressions will also be summarized in two exhibits, Exhibit 13a for resellers and Exhibit 13b for direct purchasers.  Unlike Professor Noll's tables, each of which reported results from only one regression, Exhibits 13a and 13b report results from many regressions that correct Professor Noll's errors.  Because of this, for each regression model shown in Exhibits 13a and 13b, I report the estimates for only the most relevant variables in Professor Noll's model.  Complete results for all the variables in every regression in my review are reported in Appendix D. (See Exhibits D1a and D1b].

60.     For clarity of exposition, I will focus much of my discussion on Professor Noll's reseller regression results.  Nearly identical arguments apply to his direct purchaser regression, which I will note along the way.

### B.  What Professor Noll Claims to Find

61.     Exhibit 12a (Noll Exhibit 13.1) shows Professor Noll's reseller sales regression results.  His estimate of "overcharge" is based on the coefficient on the "itunes7_0" indicator.  Professor Noll reports a coefficient of 0.032, which he interprets to mean that the challenged KVC feature raised the price of all iPod models sold during the class period by approximately 3.2 percent— "the percentage increase in price due to the iTunes 7.0 update."[66]  This is the overcharge percentage that Professor Noll uses in his Exhibit 14 to calculate damages on all reseller transactions.

62.     Along with each coefficient estimate, Professor Noll also reports the standard error he calculates for that estimate.  In general, the standard error (standard deviation) of a coefficient measures the precision with which the coefficient in question is estimated.  When the standard error is very small, the estimate is correspondingly very precise.  Economists are also typically

---

[66]     Noll declaration, p. 81.

interested in expressing the degree of confidence they have that the estimated value of the coefficient did not arise by chance when the true effect of the variable in question is actually zero. This can be measured by taking the ratio of a coefficient estimate to its standard error, which is called the "t-ratio" or "t-statistic" for that estimate. Intuitively, the t-statistic measures the distance between the estimated value of the parameter in question and zero, measured in standard deviations. When the t-statistic is large, the estimated coefficient is "far" from (many standard deviations away from) zero, which increases our confidence that the true effect of that variable is not zero.

63.    When sample sizes are sufficiently large, as they are in this case, a common benchmark for saying that an estimated coefficient is "statistically significant" is that it has a t-statistic that is 2.0 or larger ($t \geq 2.0$) so that the estimated coefficient is at least twice its standard error. A t-statistic of 2.0 corresponds to approximately a five percent ($p = .05$) probability that a coefficient estimate as large as the one obtained could have arisen by chance if the true value of that coefficient is zero. This would sometimes be referred to as "statistical significance at the five percent level." Larger values of the t-statistic correspond to rapidly declining probabilities that the true effect of the variable in question is zero. For example, a t-statistic of $t = 2.58$ corresponds to a 1-in-100 ($p=.01$) probability of arising by chance—"statistical significance at the 1 percent level." A t-statistic of $t = 4.9$ corresponds to a one-in-one million chance ($p = .000001$).

## VI.    PROFESSOR NOLL'S CLAIMS OF PRECISION AND STATISTICAL SIGNIFICANCE ARE INCORRECT

64.    In his Exhibits 13.1 and 13.2, Professor Noll places three stars (***) next to each of his estimated coefficients, which he points out "Denotes statistical significance at the 1% level."[67] This means that all of his estimated t-statistics are greater than 2.58 in absolute value. As Professor Noll puts it:  "The coefficients on indicators of market conditions all are highly significant."[68] They are so significant, in fact, that Professor Noll should have noticed that something is seriously wrong with his model—his claims of precision and statistical significance

---

[67]    Noll declaration, Exhibits 13.1, 13.2.

[68]    Noll declaration, p. 90.

HIGHLY CONFIDENTIAL                                                                          - 28 -

cannot possibly be true in data such as these. In fact his claims are caused by a major error, as I now explain.

65.    My point can be illustrated by Professor Noll's claimed precision in estimating his "overcharge," which is the coefficient on his itunes7_0 indicator. As shown in his Exhibit 13.1 (my Exhibit 12a), this coefficient is 3.2 percent (0.032) with a vanishingly small standard error of 0.00009. The t-statistic for his estimate is then t = (0.032/.00009) = 355.6. If this estimate of the standard error was accurate (and it clearly is not), it would be inconceivable that this small overcharge amount could have arisen by chance. In fact, with the degree of precision claimed by Professor Noll it would not even be conceivable that the true effect could be just slightly smaller than his estimate—say 3.15 percent (0.0315). The hypothetical true value of 0.0315 is 5.6 standard errors away from 0.0320 ([.0320-.0315]/.00009 = 5.6). Consulting the t-distribution, Professor Noll's estimate is allegedly so precise that there is only one chance in 72 million that the true effect could be as small as 3.15 percent (or as large as 3.25 percent).[69] In effect, Professor Noll has absolute confidence in the exact numeric value of his estimated "overcharge." But he should not — his claims of extreme precision and statistical significance are the result of grossly inaccurate assumptions regarding the statistical independence of the price observations he constructs.

66.    The most obvious manifestation of Professor Noll's error is illustrated by the way he treats the multi-unit transactions that account for the large majority of his data. As I noted above, Professor Noll's measure of "price" is derived from these multi-unit transactions with purchasers. In the example above, in September 2009 Best Buy paid $4.85 million for 28,050 identical iPod Touches, and Professor Noll measures the price of the iPods in that transaction as ($4.85 million)/(28,050) = $173. But in his regression model he did not treat this single transaction with single price as a single observation. He treated it as 28,050 independent observations on price, all of which coincidently had exactly the same price.

---

[69]    This calculation itself illustrates the absurdity of Professor Noll's standard errors. In his report, Professor Noll presents his results rounded to three significant figures. However, when I examine this particular coefficient carried out to four significant figures, I find that the actual coefficient is 0.0316. This is 4.44 standard deviations away from the rounded value (0.032) that Professor Noll reports and uses. With a point estimate of .0316 and Professor Noll's claimed precision, this means that there is less than a 1-in-200,000 chance that the true effect could be as large as .032. In other words, his estimates are allegedly so precise that even the rounded value he uses has virtually no chance of being true.

67.    In Exhibit 13.1 of his report (my Exhibit 12a), Professor Noll reports that his Reseller Sales regression is based on 2.14 million "observations," but this is highly misleading.  An accurate statement is that his data contained 2.14 million multi-unit ***transactions***, each of which allowed him to calculate a single price, as in the example above.  When he ran his regression, he "frequency weighted" each of these 2.14 million transactions by the number of identical iPods represented in each transaction.  This is equivalent to treating a single transaction involving $N$ iPods for which he calculated a single average price $P$ as $N$ ***independent*** observations, each of which coincidently had the same price $P$.  Thus in the example of a single transaction with Best Buy, above, Professor Noll's regression procedure acted as if the data included 28,050 independent iPod price observations, each with an identical price of $173.  But of course there are not 28,050 independent observations; Professor Noll has simply counted the one piece of information from this single transaction 28,050 times.  The result is that the regression procedure "thinks" it is dealing with far more than 2.14 million observations— in fact, Professor Noll's Reseller Sales regression output is calculated as if he had 113 million ***independent*** price observations, though he does not report that number in his declaration.[70]

68.    In his deposition, Professor Noll was asked whether the 2.14 million observations reported in his Exhibit 13.1 was the number of observations used for his standard error calculations.

> Q: When you do the log regression, Exhibit 13.1, you report that you had 2.1 million observations.
>
> A:  Yes.
>
> Q: Is that the number that you used for the denominator of your standard errors—for your standard error calculations?
>
> A: Probably, I mean, yes.
>
> Q: Is that an appropriate number to use?
>
> A: I mean, remember, it's not quite that simple, because the quantity went into regression, but yes, you know.  These are heteroskedastic robust standard error estimates.
>
> Q:  So what formula did you use?

---

[70]    The numbers above refer to Professor Noll's reseller regression.  He took a similar approach in calculating the standard errors in his regression of direct sales.  In that case, Professor Noll had data on 36.9 million transactions.  However, after frequency weighting, he calculated his standard errors as if he had 42.4 million independent observations.  See Noll declaration, Exhibits 13.1 and 13.2; and Exhibits 13a and 13b to this report ("Den DF" line, column 1).

A: It's a quantity weighted - it's - the observations are quantity weighted, so it doesn't - it's not 2.1 million. It's a quantity weighting of all the observations.[71]

69.  This "quantity weighting" (or as it is more generally called, "frequency weighting") is a serious error. The user's guide for SAS, the statistical software package that Professor Noll used for his regression analysis, clearly explains the meaning of frequency weighting and its consequence for the assumed number of observations on which the model is based:

> When a FREQ statement appears, each observation in the input data set is assumed to represent $n$ observations, where $n$ is the value of the FREQ variable. The analysis produced when you use a FREQ statement is the same as an analysis produced by using a data set that contains $n$ observations in place of each observation in the input data set. When the procedure determines degrees of freedom for significance tests, the total number of observations is considered to be equal to the sum of the values of the FREQ variable.[72]

An online Stata tutorial on "Choosing the Correct Weight Syntax" posted by the Carolina Population Center at the University of North Carolina at Chapel Hill contains a specific warning about the consequences of frequency weighting.[73] Referring to frequency weights, or "fweights," this tutorial specifically states:

> Do not use fweights to specify sampling weights. Your variance of estimates, p-values and standard errors will be computed incorrectly.[74]

70.  My inspection of Professor Noll's computer code confirms that he did, indeed, use frequency weights as sampling weights in his regression analysis. This is a major error when, as here, the data consist of multi-unit aggregates in which each unit is an exact replica of the others. Then each of these price "observations" from a particular transaction is (by construction) perfectly correlated with the others. This matters because Professor Noll assumed exactly the

---

[71]  Noll deposition, p. 197:6-9. Professor Noll is also confused about what types of standard errors he actually reported in Exhibits 13.1 and 13.2. They are not "heteroskedastic robust standard errors." They are ordinary least squares standard errors, calculated under the assumption that the 113 million observations are independent and that their residuals have common variance. The footnotes to his report indicate that he also ran these regressions allowing for robust standard errors, but those are not the results reported in Exhibit 13.1. (See Noll declaration, notes 127 and 133.)

[72]  SAS/STAT(R) 9.2 User's Guide, Second Edition, "FREQ Statement." Available at http://support.sas.com/documentation/cdl/en/statug/63033/HTML/default/viewer.htm#statug_reg_sect011.htm.

[73]  Stata is another one of the most prominent statistics and econometrics software packages.

[74]  "Choosing the Correct Weight Syntax," Carolina Population Center at the University of North Carolina at Chapel Hill, http://www.cpc.unc.edu/research/tools/data_analysis/statatutorial/sample_surveys/weight_syntax (accessed June 20, 2013).

opposite in calculating "the variance of estimates, p-values and standard errors" for his model —
he assumed that literally millions of identical price "observations" are statistically independent,
when they clearly are not.

71.    The fundamental problem is that Professor Noll assumes his "113 million" observations
are statistically independent of one another, but they are not.  Professor Noll appears to be
confused about the concept of "independence" that is required to run his regression in the way
that he did.  He appears to believe that the independence of his *price* observations depends on
whether buyers of iPods are making independent purchase decisions.  Asked whether two
consumers purchasing the same product from the same store at the same price on the same day
provide independent observations on price, he responded: "The two consumers made their
decisions independently whether to buy the iPod.  The price they were charged were [sic] the
same, but it doesn't mean the observation of the transaction is not independent." (Noll deposition
pp. 211:7-10).  This is the wrong concept.  The question isn't whether the individuals made
independent decisions about whether to purchase their iPods; it's whether Apple set the prices of
those two iPods independently.  This analysis is about the determination of prices.  The recorded
prices are the outcome of Apple's decision of how to price its products, and it is obvious that the
single price that applies to all 28,050 iPod Touches purchased by Best Buy were the outcome of
a single decision by Apple, not 28,050 independent decisions.  Professor Noll's answer reveals
that he has it backwards — he's thinking of the wrong decision-maker.

72.    This erroneous assumption that the prices of 113 million iPods (in his reseller regression)
are statistically independent causes Professor Noll to vastly exaggerate what the data can show
and to totally misrepresent the accuracy and statistical significance of his results.  In order to
understand the issue, one must first understand the strict assumptions of the "ordinary least
squares" (OLS) procedure he used to estimate his model.  Estimates of standard errors in
regression models depend critically on what one assumes about the "covariance structure" of the
residuals, *U,* across observations—that is, what one assumes about how the residuals are
correlated with each other.  The key but unstated assumption made by Professor Noll is that the
residuals in his data are independent of one another (uncorrelated), which in layman's terms
means that if I knew that the residual (the portion of the price that cannot be represented by the
explanatory variables) for one iPod was, say, five percent, that information would not help me

predict the residual for *any* other iPod in the data — my best guess would be zero, because that is the expected value and Professor Noll *assumes* the residuals are independent.

73.     Our example of Best Buy demonstrates that this assumption is clearly untrue.  Each of the 28,050 observations associated with the reported transaction is exactly the same, and, therefore, if I know that the residual for one of them is five percent, then I know that the residual for each of the 28,049 other ones is also five percent.  They are *not* independent as Professor Noll assumed; they are perfectly correlated.  As the saying goes: "If you've seen one, you've seen them all."  The consequence is that Professor Noll is pretending to have much more information than he actually does.  The technical consequence of this exaggeration is that his standard errors will be underestimated or, put the other way around, his claims about the precision and statistical significance of his results will be greatly overstated.

74.     In the data analyzed by Professor Noll, the problem is deeper than the obvious (but ignored) fact that all the iPods in a single transaction have the same price.  Apple set its iPod prices so that virtually all the iPods of a given model with given characteristics sold at roughly the same time would have the same price, no matter who the buyer was.  So if I know what Best Buy paid for a particular iPod model in January 2005, I can be quite confident that in other transactions with Best Buy and with other buyers who purchased around that date, the price would be exactly or nearly the same.  For example, using Exhibit 11 I showed how Professor Noll counted a single September 2009 iPod Touch price observation for Best Buy 28,050 times.  But notice as well (in column 5) that Best Buy purchased another 22,700 units of the iPod Touch two months later — in November 2009.  As in the earlier transaction, the price in this latter transaction was also $173.  Also in November 2009, Toys R Us purchased 19,000 units of the same Touch model, again with the identical price of $173 (see column 7).  The same pattern is true for purchases of the Nano shown in the exhibit.  Apple's price for a given model and generation was virtually identical for everyone.  By construction, the residuals will be highly correlated across transactions for a given buyer, but also across buyers.  In the jargon of econometrics, this means that the price observations for an iPod model at a given point in time form a "cluster" within which the residuals are (highly) positively correlated both within and across transactions.

75.      An econometrician who neglects to account for this clustering will underestimate the true standard errors of his results. That is what Professor Noll did when he ignored these facts and falsely assumed that the price observations he created were independent of one another.  As Professors Joshua Angrist and Jorn-Steffen Pischke (2009) put it in their useful survey of modern econometric methods:

> A pillar of traditional cross section inference ….is the assumption that the data are independent.  Each observation is treated as a random draw from the population, uncorrelated with the observation before or after.  We understand today that this sampling model is unrealistic and potentially even foolhardy.  …We call this correlation the clustering problem.[75]

76.      The same warning appears in the most recent edition of the American Bar Association's reference volume *Proving Antitrust Damages:  Legal and Economic Issues* (2010):

> There can be substantial consequences from estimating the standard errors for the coefficient estimates as if the errors were uncorrelated when they are in fact correlated. With positive correlation between the error terms, the incorrectly estimated standard errors generally will be biased downward, making the regression coefficients seem to be more precisely estimated than they really are.  As a result, a statistical test on the coefficients may yield what appears to be a statistically significant result but is not.[76]

77.      In his deposition Professor Noll was adamant that clustering is not an issue for his model, and he expressed some annoyance when he was asked about it:

> Q: Did you cluster standard errors?
>
> A: This is not something that requires a cluster analysis.  Again, you're perpetuating an econometric mistake you've been making for two years.  This is not a problem of clustering.
>
> …
>
> Q:  Did you cluster standard errors?
>
> A: That would have been inappropriate.  This is not a clustering problem.
>
> …

---

[75]   Angrist, Joshua and Jorn-Steffan Pischke, Mostly Harmless Econometrics: An Empiricist's Companion, Princeton University Press, Princeton, New Jersey, 2009, pp. 293-294.  Professor Noll cites Chapter 8 of this book as one of the documents he considered in preparing his report, and Chapter 8 is the chapter from which this quotation was taken.  Noll declaration, Documents Considered #944.

[76]   ABA Section of Antitrust Law, *Proving Antitrust Damages:  Legal and Economic Issues*, ABA Publishing, Second Edition, 2010, pp. 145-6.  The citation notes that standard methods of allowing for clustering "produce consistent estimates of the standard errors even when there is no correlation among the error terms.  In other words, they work well in both situations." (p. 147).

A: I also didn't fly to the moon because it's not a fly-to-the-moon problem.  It's inappropriate to do any cluster analysis on this data set, because it's not a clustering problem.

…

Q: So you didn't do a cluster analysis?

A: There aren't any clusters to do the analysis of.  How can you do an analysis of something that isn't there?[77]

78.    Unfortunately, it is Professor Noll who is "perpetuating an econometric mistake."  If it is in fact true that "there aren't any clusters to do the analysis of," he could easily have offered evidence to prove his point:  He could simply have shown that the residuals generated by his model are uncorrelated and that clustering by, say, product family would not affect his standard errors.  Indeed, the American Bar Association volume cited above notes that standard econometric methods of allowing for clustering, which are "used generally in practice" and available in the software package used by Professor Noll, "produce consistent estimates of the standard errors even when there is no correlation among the error terms.  In other words, they work well in both situations."[78]  But he would not have been able to show this.  As the examples above illustrate, his assumption that the residuals in his model are independently distributed is untrue in the extreme:  the existence of clusters is obvious.  However, one need not take my word for it.  One can demonstrate the existence of clusters directly from Professor Noll's regression.

79.    I used the parameter estimates in Professor Noll's reseller regression reported in Exhibit 13.1 of his report (my Exhibit 12a) to calculate the estimated residual for each of the 113 million iPods in his reseller data.  Then, within each product family and quarter, I divided the observations randomly into two equally-sized groups and calculated the average residual within each group.  If Professor Noll's assumption that his observations are independent is correct, then these family-by-quarter clusters would be meaningless.  In particular, the average residuals in each family-quarter-group would satisfy the assumptions Professor Noll used in estimating his model and standard errors.  First, because the model assumes that the expected value of the residuals is zero, the average value of the residual in each group should be very close to zero.

---

[77]    Noll deposition, pp. 186:6-187:22.

[78]    ABA Section of Antitrust Law, *Proving Antitrust Damages:  Legal and Economic Issues*, ABA Publishing, Second Edition, 2010, p. 147.

Second, the Group-1 and Group-2 average residuals should be uncorrelated with one another —
in other words, knowing the Group-1 average residual for iPod Classics in the first quarter of
2005 should not help me predict the Group-2 residual for that same model sold in that same
quarter.

80.     The results of this exercise are shown in Exhibit 14a, which graphs each value of a
Group-1 average residual for a family-quarter cluster, measured on the horizontal axis, against
the corresponding Group-2 average residual measured on the vertical axis.  The exhibit
demonstrates two important facts.  First, the average within-cluster residuals are not closely
distributed around zero — they range from -0.45 to more than 0.30.  With regard to within-
cluster correlation, if Professor Noll was correct we should find that the average residual for
Group 1 of each cluster does not help to predict the value for Group 2.  In other words, the
relationship between them should have a slope of zero.  But the exhibit shows exactly the
opposite — the within-cluster average residuals for Group 1 and Group 2 lie very close to a 45-
degree line.  Put differently, if I know the Group-1 average residual within a family-quarter
cluster, I can almost exactly predict the Group-2 average residual within that cluster.  These facts
are completely at odds with Professor Noll's assertion that "there aren't any clusters."[79]  There
are clusters, and he ignored them.  The existence of these clusters explains why Professor Noll's
implausible claims of statistical significance, and his corresponding claim that clustering is not
appropriate in these data, are simply wrong.

81.     The consequences of Professor Noll's mistake in calculating standard errors are shown in
column (2) of Exhibits 13a and 13b.  Consider the reseller sales regression in Exhibit 13a.  Using
standard and well-accepted econometric methods that are part of the regression package used by
Professor Noll, I calculated the standard errors of his model allowing for "clusters" of non-
independent price observations within product family and quarter.  Because I have changed
nothing about Professor Noll's regression or the variables in it, the coefficient estimates are
exactly the same as in his model.  Thus, for example, column (2) still shows his 3.2 percent
(0.032) coefficient on his iTunes 7.0 indicator.  The only thing that changes here is the claim one
can make about the precision of these estimates.  The previous discussion indicates there is very

---

[79]  Repeating this exercise for Professor Noll's direct sales regression leads to the same conclusions.  (See Exhibit
14b.)

high correlation of residuals within product family and quarter as a consequence of Apple's pricing practices and the construction of the data. Once I correct for this clustering, the standard errors of his estimates are much larger than what Professor Noll claims and much more reasonable as estimates of precision.

82.     This point is demonstrated by looking at the t-statistics associated with each of Professor Noll's coefficients.   Recall that the t-statistic is the ratio of a coefficient to its standard error. Hence, for his itunes7_0 coefficient, Professor Noll claimed a standard error of .00009 and a corresponding t-statistic of .032/.00009 = 355.6.  But the correct estimated standard error that accounts for non-independence is 0.04216, which is *468 times* greater than the standard error Professor Noll claims.  In fact, this standard error is actually larger than the coefficient estimate of 0.032 and thus yields the t-statistic of 0.749 shown in the exhibit.  This means that Professor Noll's estimated 3.2 percent "overcharge" is not statistically significant by any standard.  That is, it is not statistically distinguishable from zero, and thus there is no material or reliable evidence of an "overcharge," even in Professor Noll's otherwise incorrect model.

83.     The same is true of Professor Noll's direct sales regression.  By properly recognizing that the observations in Professor Noll's data are *not* statistically independent, I find that his claimed 6.1 percent (0.061) coefficient on his iTunes 7.0 indicator is not statistically significant by any meaningful standard—it has a t-statistic of 1.253, well below the most lenient threshold for significance.  (See Exhibit 13b.)  Again, Professor Noll's estimate of an "overcharge" is not statistically distinguishable from zero.

84.     The bottom line is this:  Professor Noll's standard error calculations, and hence his claims of "statistical significance," are indisputably wrong.  This conclusion alone is enough to undermine his claims to have identified a meaningful "overcharge" associated with the challenged conduct.  But this failure to correctly represent the precision of his estimates is only one of many mistakes that materially affect his results and claims.

   **A. Professor Noll's "Before and After" Experiment:  The Wrong But-For World**

85.     The measured product characteristics in Professor Noll's regression, such as the storage capacity of a device or functionalities such as the ability to store and display photo or video files, are used to control for "other factors" that affect the price of iPods.  His real interest centers on a

set of "event" variables that are meant to identify "market conditions" and the impact of Apple's challenged conduct on iPod prices. Specifically, Professor Noll views these variables as representing a "before and after" comparison of iPod prices. As he describes it: "The 'before-after' method compares the prices of the reference products (here, iPods) before and/or after the occurrence of the anticompetitive acts with prices in the damage period."[80] He goes on to explain that "[t]he initial period before iTS was created and the period after the launch of the iTS establish the 'before' period for measuring Apple's market power prior to the events surrounding the release of Harmony, the attempts to disable Harmony, and the movement to DRM-free files."[81] Though this explanation is a bit confusing, the specification of his model demonstrates that what Professor Noll is trying to say is that his "before" period — his "but-for" world benchmark — is a three-month period between the launch of Harmony in July 2004 and the release of iTunes 4.7 in late October of 2004.

86.     I understand the court has determined that the relevant FairPlay technology contained in iTunes version 4.7 — which initially "blocked" Harmony for several months — is not anticompetitive. This means that Professor Noll's "before" but-for benchmark for measuring the impact of the allegedly anticompetitive introduction of the KVC in September 2006 is incorrect. Other flaws aside, the logic of Professor Noll's "before and after method" implies that the "before" period should be the period before September 2006, when the KVC did not exist, FairPlay technology was legal, and Harmony was capable of interoperating with all iPod models.

87.     Professor Noll's reseller sales regression is a good template for illustrating how he claims to find an anticompetitive increase in iPod prices. Exhibit 15a is a timeline that shows the periods when each of his six "event" indicators is "on" — that is, when the relevant indicator takes a value of 1 instead of zero. On each line that indicates an event I also show Professor Noll's estimate of the impact that event had on iPod prices. The "omitted" time period is the period before the opening of the iTMS in April 2003.[82]

---

[80]    Noll declaration, p. 71.

[81]    Noll declaration, p. 73.

[82]    Exhibit 15b contains a similar timeline for the direct sales regression.

88.    For example, the exhibit shows that the indicator for the existence of the iTMS is "on" (equal to 1) beginning in April 2003 and continues to be "on" until the end of the data period. The coefficient on this indicator is -0.051, which Professor Noll interprets to mean that (after controlling for the other variables in his regression) the new iTMS caused the average prices of all iPod models to be about five percent *lower* than they were before the iTMS was opened. The next variable to "turn on" is an indicator for the existence of Harmony, which Professor Noll turns on in July 2004 and leaves on until the end of the data period.  This indicator has an estimated coefficient of -0.056, which he interprets to mean that the introduction of Harmony caused all iPod prices to be about 5.6 percent lower than before Harmony existed.  Because ***both*** the iTMS indicator and the Harmony indicator are "on" from July 2004 onward, their cumulative effect relative to the omitted period before the iTMS opened is -0.051 - 0.056 = -0.107.  That is, Professor Noll "finds" that the existence of iTMS and Harmony together caused iPod prices to be about 11 percent lower than in the period before the iTMS opened.[83]

89.    These "effects" of the iTMS and Harmony may be used to illustrate an important feature of the way in which Professor Noll constructed his indicators for "market conditions."  Suppose that Professor Noll had turned off (set to zero) his indicator for the iTMS on the same day he turned on (set to 1) his indicator for the existence of Harmony.  Then he would still estimate that the effect of the iTMS is -0.051.  In fact, nothing in his regression would change except the coefficient on Harmony.  Specifically, he would estimate that the effect of Harmony is -0.107 = -0.051 - 0.056.  By "turning off" the iTMS indicator on the day the Harmony indicator is turned on, however, the Harmony indicator would be forced to capture the "effects" of *both* Harmony *and* the iTMS, not the (hypothetically) true effect of Harmony alone.  Compared to its "true" value, the estimated effect of the Harmony indicator is too large (in absolute value) because it is picking up the effect of the iTMS, which was improperly turned off.  In the language of econometrics, the estimated impact of Harmony is "biased."

---

[83]    It is difficult to take these estimates seriously in the context of Plaintiffs' theory.  Take the "finding" that iTMS and Harmony combined *reduced* iPod prices to resellers by 11 percent.  The corresponding estimate for direct purchasers, shown in Exhibit 15b, is .053 - .007 = .046, or 4.6 percent.  That is, Professor Noll estimates that the combined impact of iTMS and Harmony *increased* direct sales prices by 4.6 percent.  Professor Noll does not comment on the inconsistency of these estimated effects, or how they reflect on Plaintiffs' claims.

90.    The third indicator in the sequence of Professor Noll's "events" is the introduction of iTunes 4.7 in October 2004, which included FairPlay technology with which Harmony could not initially interoperate.   Professor Noll refers to this event as "harmony_blocked," and in his deposition he refers to it as "4.7."   He turns this indicator on in October 2004 and turns it off on September 12, 2006, the day iTunes 7 was introduced.   This choice is conspicuous because, as shown in Exhibit 15a, "harmony_blocked/4.7" is the only one of his event indicators that is ever turned off—once turned on, all the others remain on until the end of the data.   The estimated coefficient on the "harmony_blocked/4.7" indicator is 0.016, indicating that iPod prices during those 23 months were about 1.6 percent higher than the rest of Professor Noll's model would predict.   He interprets this to mean that iTunes 4.7 caused all iPod prices in this period to be 1.6 percent higher than if iTunes 4.7 had not been introduced ("[Apple] raised prices 1.6 percent after Harmony was disabled by iTunes 4.7…").[84]   In other words, according to Professor Noll's interpretation, had Apple not introduced iTunes 4.7, average prices on iPod models would have been 1.6 percent lower.

91.    Exhibit 15a shows that the next indicator to turn on is for iTunes 7, on September 12, 2006.   *On exactly the same day*, Professor Noll turns off his indicator for iTunes 4.7.   The iTunes 7 indicator has an estimated coefficient of .032, which Professor Noll interprets to mean "[Apple] raised prices by 3.2 percent after update 7.0 disabled Harmony."   Importantly, *this 3.2 percent is Professor Noll's estimate of the "overcharge" attributed to the KVC feature of iTunes 7*, so it is his "before/after" estimate of how much Apple "raised prices" compared to the but-for world in which the KVC would not have existed.   He uses this value to calculate damages for the reseller class, claiming that prices would have been 3.2 percent lower were it not for the challenged KVC technology contained in iTunes 7.

92.    Professor Noll's decision to turn off his "harmony_blocked/4.7" indicator when he turns on his iTunes 7 indicator is very important.   Recall the example above, where I examined what Professor Noll's regression would show if we hypothetically turned off the iTMS indicator on the same day that the Harmony indicator turned on.   In the example, by omitting the impact of the iTMS during the Harmony period, the Harmony indicator was forced to "pick up" the

---

[84]    Noll declaration, p. 80.

omitted effect of the iTMS. This biased the estimated effect of Harmony, and as a result, its coefficient roughly doubled.

93.    Precisely the same thing happens here: by turning off the iTunes 4.7 indicator during the period where the iTunes 7 indicator is on, Professor Noll forces the iTunes 7 indicator to pick up the omitted "effect" of iTunes 4.7. In terms of pure arithmetic, to find the *incremental* coefficient on iTunes 7 had Professor Noll left the iTunes 4.7 indicator on — as he did for each of his other indicators — we merely have to subtract the 1.6 percent effect of iTunes 4.7 from the 3.2 percent estimate that Professor Noll reports for iTunes 7. This yields an incremental "effect" of iTunes 7 compared to the legal environment immediately before it of 0.032 - 0.016 = 0.016, or 1.6 percent, which is only half as large. In other words, Professor Noll's decision to turn off his indicator for the existence of iTunes 4.7 technology has the effect of doubling his estimate of impact and, therefore, damages, for the reseller class. Note that nothing else in his regression changes — the coefficient on every other variable would have been exactly the same had he left "on" the iTunes 4.7 indicator.

94.    The exercise in the previous paragraph is not just arithmetic. Professor Noll's decision to turn off the iTunes 4.7 indicator on September 12, 2006 precisely defines the "but-for" world that he assumes would have existed in the absence of the challenged conduct. Specifically, by turning off the iTunes 4.7 indicator he assumes that the FairPlay technology included in iTunes 4.7 through iTunes 6 would not exist in the but-for world, even though this was the legal technology in use immediately prior to the introduction of iTunes 7. Instead, Professor Noll's but-for world is a very brief period immediately *before* the release of iTunes 4.7, i.e., it is the 3-month period between July 26, 2004, when Harmony was first announced, and October 26, 2004, when iTunes 4.7 was introduced. He does not explain why this is the appropriate but-for world for measuring the incremental effect of the challenged KVC, or iTunes 7, or for anything else relevant to this case. But this choice doubles his estimated impact of the KVC feature of iTunes 7 on resellers.

95.    In his Second Supplemental Declaration on Class Certification Professor Noll attempted to explain his decision to turn off his iTunes 4.7 indicator upon the release of iTunes 7.[85] He

---

[85]    Second Supplemental Declaration of Roger G. Noll on Class Certification, September 23, 2011, p. 10,

said: "The iTunes 7.0 release replaced the prior version of iTunes software and contained new code for disabling Harmony. If the iTunes 4.7 release was not anticompetitive, but the iTunes 7.0 release was anticompetitive, as plaintiffs allege, then the appropriate specification is for the indicator variable for iTunes 4.7 to be reset to zero when it is replaced by iTunes 7.0." While this is nothing more than an assertion, the assertion itself is incorrect. Putting aside the other problems with his model, the logically correct "before-and-after" experiment would compare the level of iPod prices during the period of challenged conduct to the level of prices prior to that conduct, when Apple's practices were legal. This is the period prior to September 12, 2006, when iTunes 4.7 through 6 were operative. Technically, in a regression this *incremental* effect on prices is found by leaving on the iTunes 4.7 indicator, which then captures the level of prices before September 2006, in which case the coefficient on the iTunes 7.0 indicator will measure the difference between average prices before and after the introduction of iTunes 7. As I explained above, Professor Noll's incorrect procedure compares prices after the introduction of iTunes 7 to those in a three-month window *in 2004*, which was two years earlier. But 2004 (or any earlier period) cannot be the but-for world of Plaintiffs' theory if technology and prices in 2005 and 2006 were legal.

96.    The same arguments apply to the effects that Professor Noll reports for his direct sales regression, but here the bias is even larger. (See Exhibit 15b.) In that regression, the reported coefficient on his iTunes 7 indicator variable is 0.061, or 6.1 percent. He interprets this to mean that direct purchasers paid 6.1 percent more for iPods because of the introduction of iTunes 7. The coefficient on "harmony_blocked/4.7" is 0.051. Taking this into account, his model implies an ***incremental*** impact of iTunes 7 over iTunes 4.7 of 0.061 - 0.051 = 0.01, or only one percent. In other words, by turning off the "harmony_blocked/4.7" indicator in his direct sales regression, Professor Noll overstates the claimed incremental effect of the KVC feature of iTunes 7 by a factor of more than six. And of course his reported damages are overstated by this factor as well.

97.    The points just discussed are formally presented in column (3) of Exhibits 13a (for resellers) and 13b (for direct purchasers). As indicated, the incremental effect of iTunes 7 in Professor Noll's model can be found by leaving "on" the indictor for "harmony_blocked/4.7," just as other indicators are left on. The incremental effect of iTunes 7 in the reseller regression is now 1.6 percent (0.016) with a t-statistic of only 0.643, which is not statistically significant. For

the direct sales regression, the incremental effect is 1.0 percent (0.010) with a t-statistic of 0.445 – also not statistically significant.

### B. Professor Noll's Confusion about the "Log of Time"

98.     As described by Professor Noll, "Moore's Law" is an empirical regularity regarding technical progress: "the amount of functionality that can be placed on a semiconductor of a given size doubles every 18 months."[86]  This is one of the reasons "prices for consumer electronics generally fall through time."[87]  To capture this effect in his model, Professor Noll includes a variable he refers to as "the log of time" in his log price regressions.  Professor Noll also offers the negative estimated coefficient on "the log of time" in his regression as a test of his model's validity.

99.     Based on his discussions of this "log of time" variable in his report and in his deposition, one can only conclude that Professor Noll is confused both about the use and meaning of logarithmic variables in regression analyses and about their connection to economic theory. While it is quite common in empirical research to control for the impact of technical progress and other time-related factors by including a time trend, in nearly 40 years as an empirical researcher and journal editor I have ***never*** seen an economist use the "log of time" in any regression.  Not even once.  There is good reason for this:  the "log of time" makes absolutely no sense as an economic control variable.  And as it turns out, had Professor Noll used more conventional and widely accepted methods to control for technical progress, his results would have been quite different and his "damage" estimates much smaller.  These points require some technical explanation.

100.     Consider Moore's Law — as Professor Noll describes it in his report this "law" says the functionality that can be placed on a given size semiconductor doubles every 18 months.  Turned into a prediction for prices of electronic goods, this means that each increment of time of a given size — say a month or a year — should reduce costs and prices of an electronic device with given functionality by a constant percentage amount.  For example, if between 2002 and 2003 prices fall by 20 percent due to this form technical progress, then the constant pace of such

---

[86]     Noll declaration, p. 18.

[87]     Noll declaration, p. 80.

progress implies that prices should fall by 20 percent between 2003 and 2004 or between 2007 and 2008. ***Each additional year reduces price by a constant percentage amount.*** Recalling that the change in the logarithm of a given quantity is approximately the percentage change in that quantity, this constant-percentage-change relationship between price and the passage of time may be represented mathematically as $\ln(P) = C + At$. In this equation, "*t*" is a measure of time such as the number of months from a given starting point—$t = 1, 2, 3, \ldots$ — and "A" is the constant percentage amount by which price changes between one month and the next. For example, if A = -0.02 then price falls at a rate of 2 percent per month. In other words, the proper representation of technical progress that causes prices to fall at roughly a constant rate — as implied by Moore's Law — is a ***linear*** relationship between the logarithm of price and ***time*** counted in integer units, not "the log of time".

101.    What would be the meaning of using the "log of time" — as advocated by Professor Noll — rather than simply "time" to describe technical progress? The mathematical relationship would be $\ln(P) = C + B\ln(t)$, which would mean that each ***percentage*** increment of "time" causes the same (B) percentage change in price. So suppose we start time at *t=1* in November of 2001 as Professor Noll does in his data set. The change in ln(t) between month 1 (November) and month 2 (December) of 2001 is ln(2) - ln(1) = .693. Using Professor Noll's regression coefficient on "the log of time" in his reseller regression we have B = -.026, so his model predicts a technical progress effect of (-.026) x (.693) = -.018, or a price decline of 1.8 percent between November and December of 2001.

102.    Now advance the calendar a few years to November of 2008, where *t=85*. The identical November-to-December advance of one calendar month now changes "the log of time" by ln(86) - ln(85) = .012. Now the predicted one-month percentage change in price is (-.026)  x (0.012) = -0.0003, or a decline of three one-hundredths of one percent between November and December of 2008. Professor Noll's approach forces the rate of price decline due to technical change to be ***59 times*** larger in 2001 than in 2008.   In other words, Professor Noll's use of "the log of time" to represent unmeasured technical progress actually constrains his model so that the effect of such progress is effectively zero during most of the period of interest, and particularly during the period in which iTunes 7 is relevant.

HIGHLY CONFIDENTIAL

103.    In his deposition Professor Noll was asked about this odd choice to use "the log of time" in his regression.  His explanation was exactly backwards — there is no other way to put it.  Apparently thinking that he is offering a technical defense for why the "log of time" is an appropriate explanatory variable, he actually explains why it is not appropriate.  Here is his answer, with emphasis added:

> Q:  And why did you decide to use the log of time rather than time in levels?
>
> A: Because the — if you — there's no reason to believe that you have an exponentially increasing price in time.  That the — if you, if you, you know if you think about if you use level, if the dependent variable's a log of price, and you're measuring time by, you know, the first - the first month is month one and the second month is month two.  When you go from one to two you're doubling it.  That's a hundred percent increase, all right. **When you're going from the hundredth month to the hundred-and-first month that's a one percent increase.**
>
> **One would not expect that the – the effect of time would be such that going from 100 to 101 was one percent of going from one to two.  The only – the way you get that to be a constant rate of increase is to take the logarithm of time.**[88]

104.    As I explained above, I completely agree that one would not expect "the effect of time would be such that going from 100 to 101 was one percent of going from one to two."  But that is precisely what Professor Noll forces his model to do when he uses the "log of time" as a control for technical progress.  His statement "The only way you get that to be a constant rate of increase is to take the logarithm of time" is flatly wrong.  He has it backwards.  Using the logarithm of time forces a non-constant rate of change, which, as I showed above, rapidly approaches zero.  The mathematical truth is that "the only way you get that to be a constant rate" is to measure time in levels, not in logarithms.  In response to further questions about "the log of time" Professor Noll demonstrates complete confusion, cogently explaining why what he did is exactly wrong.

> Q:  Why do you say that the choice of the starting time period is arbitrary?
>
> A:  Well, I could - I could start my – my first period could be 1842, and I could measure time by every month since January 1842, all right.  **And in principle, that shouldn't affect anything**.  **I mean what I pick as the starting date shouldn't matter,** because what I'm interested in is the effect of technological change during the period of the data.[89]

---

[88]    Noll deposition, pp. 24:17-25:9, emphasis added.

[89]    Noll deposition, p. 27:4-12, emphasis added.

105.    Professor Noll's reasoning is correct—choosing January of 1842 as the starting date from which time is measured "shouldn't affect anything."  And it wouldn't if he had measured time in levels instead of logs.  To be precise, had he chosen January 1842 as the starting date, then November 2001 (the first month in his data) would be month 1919 instead of month 1, and December 2001 would be month 1920.  The *level* of time would change by one month between November and December, and this would be true no matter what starting year was used.  In contrast, if time is measured from January of 1842 the passage of one calendar month between November and December of 2001 changes "the log of time" by ln(1920) - ln(1919) = 0.0005, which is vanishingly small.  However, if time is measured from November of 2001 the exact same passage of one calendar month changes "the log of time" by ln(2) - ln(1) = 0.693, which is 1330 times larger.

106.    Professor Noll correctly offers that "what I pick as a starting date shouldn't matter."  If time is measured in levels, the arbitrary choice of starting date will *not* matter.  However, if one uses his "log of time" variable the arbitrary choice of a starting date matters enormously.  In other words, Professor Noll's deposition testimony is a clear acknowledgement that his reliance on "the log of time" is indisputably wrong.  At another point in this exchange Professor Noll offers "that's why you – you always use the log of time in a logarithmic equation."[90]  As I noted earlier, in nearly 40 years as a professional economist I have never seen a research paper that uses "the log of time in a logarithmic equation," because it would be wrong.  Professor Noll's remark would have been correct had he said "never" instead of "always."

107.    Correcting this error in Professor Noll's reasoning and model is easy — all one needs to do is use time measured in levels (months) instead of the "log of time" in his regression.  The effect of doing so is shown in column (4) of Exhibits 13a and 13b.  In the reseller sales regression (Exhibit 13a) the coefficient of iTunes 7 declines further, from 0.016 in column (3) to 1.0 percent (0.010) in column (4), with a t-statistic of 0.415.  In the direct sales regression (Exhibit 13b) the coefficient of iTunes 7 declines from 0.010 to 0.007, with a t-statistic of 0.297.  Neither of these estimates is even remotely significant.

---

[90]    Noll deposition, p. 26:15-17.

### C.  Additional Features and the "Quality" of Professor Noll's Regression

108.    At page 80 of his report Professor Noll offers a way to "test" the quality of a regression: "Another test of the quality of a regression is whether the estimated coefficients are consistent with expectations derived from economic theory."  He then offers an example:  "For example, prices for consumer electronics generally fall through time due to the presence of ubiquitous learning by doing and Moore's Law.  The positive coefficient on the logarithm of time bears out this expectation."  The term "positive" appears to be a simple mistake in writing that sentence: the actual coefficient is negative (-0.026 in his reseller sales regression and -0.217 in his direct sales regression), and at least a negative sign would be consistent with prices that decline over time.  In any case, we have already established that the "logarithm of time" is a meaningless construct for measuring Moore's Law and technical progress, or for any other purpose.

109.    Professor Noll neglects to mention other, equally important estimates from his regression that are **not** "consistent with expectations derived from economic theory."  For example, as shown in Exhibits 12a and 12b (Noll Exhibits 13.1 and 13.2) his model indicates that photo capability **reduces** the price of iPods by about half a percentage point (-.005) for resellers and about 2.7 percent (-0.027) for direct purchasers.  He also estimates that combined photo and video capability **reduces** the price of iPods with this functionality by 7.7 percent (-0.077) for resellers, and an even larger 8.4 percent (-0.084) for direct purchasers.  Further, if Professor Noll's standard errors are to be believed (and they are not — see discussion above), then these estimates are highly statistically significant.  For example, the negative effect of video and photo capability has a t-statistic of 1467(!) in his reseller sales regression and 829 in his direct sales regression.  But there can be little doubt that these features are valuable to users, which is why Apple puts them in iPods.  He similarly "finds" that the number of downloads available from the iTMS reduces iPod prices.  According to Professor Noll's view of economic theory these effects should be positive, not negative as Professor Noll confidently estimates.  If consistency with theory is a test of a model's quality, then these results indicate that Professor Noll's regressions fail multiple tests, and by a very wide margin.

110.    These "tests" reject the conceptual foundation of Professor Noll's model, which is that it should be consistent with theory — especially the Plaintiffs' theory.  But the conceptual foundation of Professor Noll's "before-and-after" experiment is incorrect in other ways as well.

Most prominently, he fails to recognize that the challenged conduct is not the introduction of iTunes 7 itself, but rather the introduction of a specific feature of iTunes 7. iTunes 7 had many additions and enhancements that were unrelated to the challenged conduct.[91] (See Exhibit 6.) In addition, iTunes 7 was introduced at the same time as new iPod models that were upgrades to previous versions, with enhanced functionalities.[92] At best, his iTunes_7 indicator is a catch-all for any and all things relevant to iPod pricing that are correlated with the time period in which iTunes 7 or later versions existed, but that are not among the (very) limited product characteristics he chose to include in his regression. Professor Noll does not explain why an indicator for the mere existence of iTunes 7 would measure and identify the impact of the allegedly anticompetitive KVC as opposed to the array of other features and functionalities of both the iTunes 7 software itself and the hardware devices with which it operated.

111.    This raises the obvious question of why Professor Noll chose to include some product attributes in his model and to exclude others. Beyond the short list of attributes that Professor Noll included, Apple's data contain information on many other measurable attributes of iPod models that an economist would reasonably expect to affect pricing. For example, as indicated in Exhibit 10, the data indicate whether a particular model and generation of iPod could be attached by FireWire or USB, its weight, its battery life, the size of its display, its display resolution, and the number of hours required to charge its battery. To the extent that any or all of these measurable features are valuable — and why would they not be? — they should have been included in Professor Noll's model of iPod pricing. But they were not.[93]

112.    Column (5) of Exhibits 13a and 13b takes this step, adding additional controls for measurable (and presumably valuable) features of iPods that Professor Noll chose to omit.[94] In

---

[91]    See Exhibit 2 for a list of iTunes features included in each version and Exhibit 6 for a list of those in iTunes 7.

[92]    See Exhibit 3 for a description of the evolution of iPod features in successive models.

[93]    Professor Noll apparently was aware of the fact that he had failed to consider a number of characteristics – See Expert Report of Dr. Michelle M. Burtis in Apple Inc.'s Opposition to Plaintiffs' Motion to Exclude, May 2, 2011, ¶¶16-17; Noll January 18, 2011 declaration, pp. 39, 76-78, 81-82, and Exhibits 1-6; Noll April 7, 2011 deposition, pp. 87:18-88:1.

[94]    In choosing these characteristics, I used the following approach. I asked my staff to create a list of all iPod models (classified by MPN) that Apple had introduced between 2001 and December 2010 (the latest date for which I have usable price data). (Note: MPN stands for "Marketing Part Number" and is the most detailed level at which information on iPod characteristics is available. "Marketing Part Number," Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Marketing_part_number (accessed June 14, 2013).) I then asked my

both cases the data indicate these features should not have been excluded from the model – tests of their joint significance solidly reject excluding these features from the regressions for both resellers and direct purchasers.  Just as importantly, including these features leads to results that completely undermine any notion that iTunes 7 caused or allowed Apple to raise prices.  For example, in the resellers regression the the estimated "effect" of iTunes 7 is negative (-.043 with a t-statistic of 1.865), not positive as required by Plaintiffs' damage claim.  The same is true in the direct sales regression, where the "effect" of iTunes 7 is also negative (-.038 with a t-statistic of 1.457).

### D.  Professor Noll's Regression Produces Implausible Results That Are Inconsistent With The Basic Economics Of Plaintiffs' Theory.

113.    The issue for damages is how and *when* the keybag with KVC might have affected consumers' willingness to pay for new iPods and ultimately the prices that Apple would have charged for them.  Exhibit 16 shows the way in which the keybag with KVC affected the interoperability of each new iPod model as of September 12, 2006 when the keybag with KVC was introduced.  Professor Noll forces his regression to find that the challenged update would have had an immediate impact on prices of all iPods on the same date the update was introduced.  This is contrary to his and Plaintiffs' theory, in which the update would cause the incremental degree of "lock-in" would rise over time as iPod owners accumulated more iTMS music relative to RMS.

114.    Any "lock in" created by the KVC would play out over time.  For example, consider an individual who purchased an iPod Nano 2nd Generation on September 12, 2006.  The effect of the KVC was zero on September 12, 2006, because the owner's accumulated stock of iTMS music had not changed.  When this owner goes to **replace** that Nano at some **future** date and assuming that that same owner had more iTMS music relative other music on her Nano, her

---

staff to compile available information on the characteristics of each of these models.  In doing this search, they reviewed information from Apple.com and Everymac.com.  They also reviewed Apple press releases and Apple price committee documents that were produced as part of the discovery in this case.  When information was not available or needed corroboration, they searched a variety of other websites.  (For a list of the websites used and a description of the process by which the search was conducted, see Appendix C.)  Ultimately they collected information on 39 different characteristics from which I selected for the regression those that logically appear to be relevant for the explanation of prices and would not generate perfect collinearity with other variables already included in the model.

HIGHLY CONFIDENTIAL

stock of DRM-protected music would be less portable than it otherwise would have been, which might increase the likelihood of purchasing a new iPod instead of some other MP3 player. But notice how distant in time this effect would be — the "lock-in" of some new owners of a KVC-affected device affects their ***next*** purchase of an MP3 player.

115.    So even under Professor Noll's theory, the September 2006 update would not have raised iPod prices at that time. Indeed, Professor Noll notes that MP3 players are replaced roughly every 18 months to two years, on average.[95]  It is therefore implausible that there would be a material effect of KVC-induced "lock-in" on or soon after the introduction of iTunes 7 and the KVC. And even in a vaguely defined "long run," if the incremental "lock-in" is to increase the prices that Apple charges, then it must offset the reduced demand for iPods by other buyers who, in Plaintiffs' theory, would have preferred the option of purchasing music from RMS.

### E.  Professor Noll's Regression Improperly Estimates A Single Average Overcharge Across All Models

116.    Professor Noll improperly constrains his model by using a single variable for iTunes 7 that he has "on" for each model. Consequently, his model is forced to estimate a single average percentage overcharge across all iPod models and generations of models, including models and generations that never included the challenged update. His regression thus assumes that the KVC included on the Nano 2nd Generation would not only cause overcharges on all other models, but also that the percentage overcharge would be exactly the same regardless of their feature sets or customer bases or ability to interoperate with Harmony. Estimating a single average percentage overcharge will mask the fact that certain models might have been impacted while others were not. It also hides the fact that his model does not include products that were sold before and after iTunes 7. The iPod Touch, for example, was not sold in the "before" period. This means that his regression cannot estimate the impact of iTunes 7 on the Touch by comparing its prices before and after the introduction of iTunes 7, for the simple reason that the Touch did not exist before iTunes 7. To overcome this, Professor Noll's assumes that the iPod Touch must have been impacted by the exact same percentage "overcharge" as models that were sold before and after the introduction of iTunes 7, including models that were and were not

---

[95]    Noll declaration, pp. 4, 18.

affected by the KVC.  For example, he assumes that the iPod Touch was impacted by the same percentage overcharge as the Nano (which could invoke the KVC) or Shuffle (which could not), two models that existed (in different generations and with changing functionalities) before and after iTunes 7.  There is no reason to believe that a putative impact would be exactly the same for all models, especially given their vastly different functionalities, competitive conditions and pricing strategies.[96]  This issue was recognized by Professor Noll at the time of class certification, but he has done nothing to address it.[97]

117.    The challenged update was included on only one iPod model (the Nano) in September 2006 and was never included on iPod Shuffles.  As noted above, Harmony continued to interoperate with the Classic 5th Generation and the Shuffle 2nd Generation and with all existing iPod models.  Only in September 2007 could the *next* (6th) generation of the Classic invoke the KVC, as could the newly introduced iPod Touch.  This fact alone should have indicated to Professor Noll that his "one coefficient fits all" regression cannot reliably estimate damages.[98]

118.    Consider for example the impact of the KVC on the new version of the Nano.  Among owners of iPods and other MP3 players who had music libraries purchased from RMS, under Professor Noll's theory the fact that those libraries could no longer be played on the Nano should make that player less valuable, which would reduce demand.  For example, under Professor Noll's theory, an owner of another brand of MP3 player who had purchased substantial music from RMS in the past and who might otherwise have purchased the new Nano would be less likely to do so because her DRM-protected music could not be ported to it.  Further, because the Nano could not be used with new purchases from RMS, any potential buyer who would otherwise have valued that option would also have lower willingness to purchase a Nano.  So,

---

[96]    Internal Apple Presentations from the Price Committee, March 2001 to February 2009.

[97]    Noll April 7, 2011 deposition, pp. 125:7-126:9.

[98]    Dr. Martin was aware of these facts at the time he filed his April 3, 2013, report. Martin report, p. 34. However, Professor Noll seems to have had only a partial understanding by the time of his deposition on May 16, 2013. From his testimony, it appears that he understood that the Shuffle could never invoke the KVC, but he did not understand that new iPod Classics did not support this feature until the Classic 6th Generation was introduced in September 2007.  The Classic 5th Generation was not a new model at that time iTunes 7, and, like the Shuffle, it could not invoke the KVC feature of iTunes 7.  There were roughly 7.7 million 5th Generation Classic iPods sold after September 2006, and the owners of all of them could use Harmony and load RMS music, just as could the owners of all previous iPod models. Noll corrections to declaration Exhibits 15.1, 15.2; Supplemental Declaration of Augustin Farrugia, July 2, 2013, p. 2.

under Plaintiffs' theory in which the KVC does not enhance value in any way but merely removes the allegedly valuable option of purchasing from the RMS, the introduction of the KVC would be expected to reduce the demand for the Nano 2nd Generation. Apple would sell *fewer* Nanos than in the but-for-world. Regarding price, if there was any impact it would be to lower the price that Apple charged, which is the opposite of Plaintiffs' damage claim.

119. Now consider the Classic 5th Generation and all Shuffles. These models did not contain the firmware necessary to invoke the KVC, and thus, after the introduction of iTunes 7, they continued to be able to play RMS music loaded with Harmony in exactly the same way they had before. Because these models were substitutes for the now-restricted new Nano, one effect under Plaintiffs' theory is that the Classic and Shuffle became *more* valuable than they would have been in the absence of the KVC — people with RMS music would gravitate to the Classic and Shuffle. In that case, it is conceivable that the prices of the Classic and Shuffle would be higher than otherwise.

120. At deposition, Professor Noll suggested that he may change his regression to fix this problem by interacting the iTunes 7.0 variable with product-specific dummy variables, which would allow for separate "effects" on each model. He also evidently instructed his staff to re-run his damage regressions with the iTunes 7 variable turned off for the Shuffle, in recognition that the Shuffle could not invoke the KVC.[99] He claimed that this regression yielded even larger "damages" for purchasers of Classics (which also could not invoke the KVC) and Nanos, and later for purchasers of the Touch. But this is not a solution to the fundamental problem. First, and fatally, it fails to recognize that Classic 5th Generation models sold after September 2006 could not invoke the KVC, and thus it assumes that buyers of this Classic were harmed by a technology that, in fact, did not prevent them from using Harmony.

121. Second, it assumes that other features of iTunes 7 could not possibly affect the price of the Shuffle — or, for that matter, the prices of Nanos and Classics. Third, even in the context of Plaintiffs' theory, it assumes that the demand for new models that do not invoke the KVC would be unaffected. As explained above, if Plaintiffs are correct that use of Harmony and the RMS were valuable to prospective iPod buyers, then models that maintained interoperability would

---

[99] Noll deposition, pp. 85:12-87:24.

become relatively more valuable because they were substitutes for the affected Nano. Fourth, it fails to recognize that, according to Plaintiffs' theory, at the outset and for some substantial period thereafter, the effect of the KVC on the demand for Nanos would be negative. Finally, a model with product specific effects of iTunes 7 cannot estimate an effect on the price of the iPod Touch, because the Touch did not exist prior to the introduction of iTunes 7.

122.    These flaws aside, and to demonstrate the extreme sensitivity of Professor Noll's model, column (6) of Exhibits 13a and 13b take the additional step of allowing for separate effects of iTunes 7 on each iPod model other than the Touch, for which no such estimate is possible. Notice that in the resellers regression (Exhibit 13a) the coefficient on iTunes 7 is negative for all iPod models, and it is statistically significant for the iPod Classic (-.067 with a t-statistic of 3.822). This is exactly the opposite of Plaintiffs' damage claim. For direct purchasers (Exhibit 13b) the estimated impact of iTunes 7 on the Nano — which was the only model that could invoke the KVC in September 2006 — is effectively zero, while the coefficients for the Classic and the Shuffle are negative. Again, this pattern is the opposite of Plaintiffs' damage claim.

### F. The Impact of DRM-Free Music on the Price of iPods

123.    Throughout this case, Professor Noll has made much of the fact that the widespread availability of DRM-free music would dramatically limit Apple's ability to lock in its iPod customers.[100]    And, of course, once the iTMS began to offer DRM-free music, there could be no additional lock in. Earlier, in the class certification portion of this case, he recognized that Apple announced on January 6, 2009 that effectively immediately, eight million of the ten million songs in the iTMS would be available without DRM protection and that "by April 1, 2009, all digital audio files sold through iTMS could be purchased without FairPlay DRM."[101]    In deposition Professor Noll was asked: "Do you think that as of the time Apple was selling 80

---

[100]  See, e.g., Declaration of Roger Noll, July 15, 2008, p. 41; Reply Declaration of Roger Noll, October 19, 2009, p. 44; Noll January 18, 2011 declaration, p. 59.

[101]  Noll January 18, 2011 declaration, p. 13; see also Reply Declaration of Roger Noll, October 19, 2009, p. 44 (citing Apple Press Release, "Changes Coming to iTunes Store," January 6, 2009, http://www.apple.com/pr/library/2009/01/06Changes-Coming-to-the-iTunes-Store.html (accessed July 19, 2013)).

HIGHLY CONFIDENTIAL

percent of its music from its music store DRM-Free, that that had any impact on iPod demand?" he answered: "Of course."[102] When asked where that impact would show up, he said:

> It won't show up. It won't show up. What it will do is just reduce the magnitude to the pre DRM-Free effect of 7.0, because the 7.0 effect would be less in the last few days of the period, and so the overall effect on the coefficient would be to reduce it to reduce the magnitude of the damages.

> So – you have – because the 7.0 period is really long compared to the DRM-Free, it's not going to have much of an effect, but the effect will be to suppress the coefficient on – on 7.0.[103]

124. Professor Noll's conjecture is wrong—notwithstanding the many other flaws of his regression and its interpretation, corrections to his "competitive market conditions" indicators for the availability of DRM-free music have a large impact on his estimated "overcharges." To show this, I have reproduced the analyses in 13a and 13b, but instead of setting the indicator variable for the iTMS being DRM-free to equal 1 as of April 1, 2009, I have set it to equal 1 three months earlier, as of January 6, 2009, when 80 percent of iTMS music went DRM-free.[104] The results of these sensitivity tests are reported in Appendix D. [See Exhibits D2a through D2c and D3a through D3c.] The key finding is that, again, these corrections uniformly reduce the estimated "effect" of iTunes 7.

## VII.   PROFESSOR NOLL'S DAMAGE CALCULATIONS

125. Each of the changes above has an effect on Professor Noll's estimate of the coefficient on his iTunes 7 indicator and thus on his estimate of damages. Although none of the estimated effects from Professor Noll's model are statistically significant, I have nonetheless used these coefficients to re-estimate "damages" in order to show the sensitivity of his damage estimates. The results of this exercise are shown in Exhibit 13c. As the exhibit shows, Professor Noll's damage estimates quickly vanish once his errors and omissions are corrected — and, in the end, "damages" are negative because the estimated "effect" of iTunes 7 is negative. This is further

---

[102]   Noll deposition, p. 117:7-10.

[103]   Noll deposition, pp. 118:17-119:1.

[104]   To make sure that these results are robust, I tested these changes individually, and I find that each of them has the effect of lowering Professor Noll's coefficients across the board. See Appendix D, Exhibits D4a1 through D4c3.

evidence that Professor Noll's approach to estimating impact and damages in this case is not scientifically valid, accurate or reliable.

## VIII.  SOME FINAL POINTS:  PROFESSOR NOLL'S REGRESSION HAS NO CONNECTION TO THE CHALLENGED CONDUCT, PLAINTIFFS' THEORY, OR APPLE'S PRICING PRACTICES

126.    The fact remains that for all of these alternative specifications of Professor Noll's model, and for any others one can imagine, the entire exercise is futile.  As explained above, any connection between the keybag with KVC and Plaintiffs' theory of "lock-in" depends on owners of affected iPods purchasing less music from the RMS after the introduction of the KVC than they would have had the KVC not been introduced, an effect that (if it exists at all) would accumulate slowly over time and might affect future purchase decisions.  But Plaintiffs have provided no evidence that iPod owners ever purchased enough music from RMS to have a material impact on iPod prices, and have certainly provided no evidence that the KVC had a material incremental impact on whatever purchases there might have been.  Prior to the introduction of the KVC the RMS accounted for only about three percent of protected music downloads overall, and this proportion would have been lower among iPod owners.  With the introduction of the KVC, the Plaintiffs' theory suggests that the most intense users of Harmony would be "locked out" from playing their music on new iPod models affected by the KVC and thus would be unlikely to purchase an affected new iPod.  Thus Plaintiffs' entire case rests on a small and unobserved population of iPod owners who had not used Harmony much in the past, but allegedly would in the future.  It is implausible that this unobserved and unmeasured group had a material impact on the price of iPods, even in the long run.

127.    Professor Noll's method for estimating damages is also inconsistent with the way in which Apple set its prices.  Apple has consistently followed a specific pricing strategy for iPods and its other products.  It changes prices infrequently (usually only once or twice a year and usually only when new models are introduced).[105]  In general, a particular generation iPod model will have two prices during the time it is for sale: the initial price and the end of life price.  With a few exceptions, the initial price remains unchanged until either the product is discontinued or

---

[105]    Videotaped Deposition  of Mark Donnelly, December 20, 2010 ("Donnelly deposition"), pp. 46:1-47:2.

Apple introduces a new iPod generation of that model.[106]  The period frequently lasts up to a year, at which time Apple introduces a new generation of the model and reduces the price of the previous generation.[107] In addition, Apple typically sets and changes its prices in relatively large increments, based on "aesthetic" price points such as $149, $299, or $399. [108]  (See Exhibits 5a to 5e).  Professor Noll's damage models, however, predict that Apple would have changed its policy and set lower prices that are different than these "aesthetic" values.   For example, for an allegedly impacted model that sold to direct purchasers for $149, Professor Noll assumes that the but-for price would be 6.1 percent lower, or $139.91.  Professor Noll has provided no evidence that Apple would abandon its long-established pricing policy in this way.

128.    As a result of the above analysis, my opinion is that there is no credible evidence that class members were damaged by Apple's challenged conduct.


_____

Robert H. Topel


---

[106]    Donnelly deposition, p. 20:5-23.

[107]    Donnelly deposition, pp. 46:5-47:21, 49:21-50:12.

[108]    Donnelly deposition, pp. 72:2-74:7.


HIGHLY CONFIDENTIAL