ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
JOHN J. STOIA, JR. (141757)
BONNY E. SWEENEY (176174)
THOMAS R. MERRICK (177987)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)
johns@rgrdlaw.com
bonnys@rgrdlaw.com
tmerrick@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

THE KATRIEL LAW FIRM
ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
Washington, DC  20007
Telephone: 202/625-4342
202/330-5593 (fax)
rak@katriellaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) ) | Lead Case No. C-05-00037-JW(HRL) <br> <u>CLASS ACTION</u> |
|---|---|---|
| This Document Relates To: <br><br> ALL ACTIONS. | ) ) ) ) ) ) | PLAINTIFF SOMTAI TROY CHAROENSAK'S ADDITIONAL OBJECTIONS AND RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES |

<u>**CONFIDENTIAL**</u>

PROPOUNDING PARTY:  APPLE INC.

RESPONDING PARTY:  SOMTAI TROY CHAROENSAK

SET NUMBER:  ONE

611995_1

10.     To the extent Plaintiff provides a response to the Interrogatories, such response shall not constitute waiver of any objection to the Interrogatories. Plaintiff also expressly reserves his right to object to the introduction of any response to these Interrogatories or any portion thereof into evidence.

## III.     RESPONSES AND SPECIFIC OBJECTIONS TO INTERROGATORIES

In addition to the General Objections above, Plaintiff has set forth the following Specific Objections. By setting forth such Specific Objections, Plaintiff does not limit or restrict the General Objections. Plaintiff reserves his right to supplement his responses.

**INTERROGATORY NO. 1:**

Please identify all facts that YOU contend support your position that Apple has "used its dominant market position in the markets for Audio Downloads and Portable Digital Media Players to stifle competition and strengthen its monopoly in these markets," as alleged in paragraph 2 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff objects to this Interrogatory on grounds that it is overly broad and unduly burdensome and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects that this Interrogatory is premature and seeks information that is equally available to Apple or information that originated from Apple's possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff has not completed investigation or analysis of the facts relating to this case, has not completed discovery and has not completed preparation for trial.

Subject to and without waiver of any of the foregoing objections and General Objections, Plaintiff responds as follows:

**The Portable Digital Media Player and Digital Audio File Markets**

Apple sells products in both the portable digital media player market and the digital audio file market. The portable digital media player market is the market for portable consumer electronic

battery-powered devices that can store and play large numbers of digital audio files. *See* Declaration of Roger G. Noll, dated January 18, 2011 "Noll Decl."); AIIA00095818-48 (iPod presentation identifying "competition"); AIIA01308959-72 (Jupiter Research "Portable Media Players Beyond Music"); AIIA01295128-71 ("Market Focus: Portable Digital Audio Players, Worldwide, 2004-2010"); AIIA01294612-39 (Jupiter Research "Portable Media Devices"); AIIA01097260-74 ("US MP3 Player Price Band Analysis: Q2CY'02 through Q2CY'03"); AIIA00447191-97 ("NPD US MP3 Player Market: Monthly Trend Summary"); AIIA01385228-29 (discussing NPD's weekly results in "portable media device space"); AIIA01385218-19 (Apple helped push out publicity of Jupiter report on competition in "U.S. portable media device" market); Deposition of Arthur Rangel, taken December 17, 2010 ("Rangel Depo.") at 32:11-24, 34: 12-15, 51:10-52:19 (Apple relies on NPD for market info); *id.* at 48:11-17 (Apple relies on NPD and NPD does not track CD players, LPs).

The digital audio file market consists of legally purchased permanent downloads of digital music files and other audio files that are capable of being downloaded onto a portable digital media player. *See* AIIA00091094-121 ("iTMS Review" listing Wal-Mart, MSN Music, Napster, Real, Musicmatch, and BuyMusic as competitors); AIIA00105851-61 at 59 (chart of iTunes competitors); AIIA00166554-70 (Apple market analysis of digital music market); AIIA00028812-35 (IFPI Digital Music Report). Nielsen SoundScan, the entertainment industry's data information system that tracks point-of-purchase sales of music in a number of markets, including the compact disc ("CD") market and the Audio Download Market, announces sales figures each year. *See, e.g.*, Press Release, *U.S. Music Purchases up by 2.1% Over 2008, Exceed 1.5 Billion for Second Consecutive Year*, Nielsen (Jan. 6, 2010). Apple regularly relies on Nielsen's sales data. *See* Cue Depo. at 31:22-32:19. Digital audio files are sold on the internet through online stores both as single files or as music album. AIIA00105859.

**Apple Gained Monopolies in the Relevant Markets Through Its Use of FairPlay**

In October 2001, Apple began selling portable digital media players, known as iPods. Deposition of Jeffrey L. Robbin, taken December 3, 2010 ("Robbin Depo.") at 27:14-17; AIIA01305533-34 (Forrester research report "iPod: Sounds Great But Won't Change the Tune").

iPods were intended to play back music downloaded from CDs and digital audio files in MP3 format. The first iPod was "an MP3 player" that had the "ability to play MP3 songs that were put on to it from a Macintosh computer." Robbin Depo. at 27:21-24. In order to get music on to the first generation iPods, the desktop iTunes application would be used. Robbin Depo. at 28:11. Prior to the launch of the iTunes Store, users could use iTunes to transfer music from a compact disc into iTunes where it would be encoded into an MP3. "The songs had no DRM." Robbin Depo. at 29:11-25; *see also* AIIA01045450-55. At the time Apple launched the iPod, the market for portable digital media players was highly competitive, with no one company dominating the market. *See* AIIA01305533-34 (Forrester research report); AIIA01045458-66 (Forrester research reports comparing iPod and other players); AIIA01335531-32. Between October 2001 and April 28, 2003, Apple's share of the portable digital media player market was consistently under 20%. AIIA01278671-74. Prior to the launch of the iTunes Store, the iTunes interface supported other portable digital media players, including the Rio One. *See* Robbin Depo. Ex. 4; *see also* Robbin Depo. at 30:20-31:17. Before the iTunes Store for Windows-based computers was developed, a program known as MusicMatch was the desktop application used to manage digital audio libraries on what Apple called "Windows iPod." *See* AIIA00174684-707 at 86. The first iPod for Windows was made available on July 17, 2002. Apple Press Release, *Apple Unveils New iPods* (July 17, 2002).

On April 28, 2003, Apple launched the iTunes Music Store, now known as the iTunes Store, through which it sold digital audio files. Deposition of Eddy Cue, taken December 17, 2010 ("Cue Depo.") at 161:22. These digital audio files contained music licensed from the major record labels, Sony, BMG, Universal, Warner, and EMI. Cue Depo. at 16:2-17:5. The store was the first store of its kind, instantly giving Apple an overwhelming share of the market for legally purchased digital audio files. Cue Depo. at 23:25-24:9 (70-80% of online market within first 6 months). At the time of its launch, the iTunes Store could be only used on Mac computers. Deposition of David K. Heller, taken December 15, 2010 ("Heller Depo.") at 49:6-8 ("Apple did not offer iTunes on the Windows platform.") Importantly, those digital music players that had previously worked with iTunes could not play music purchased from the iTunes Store. Only iPods could play music from

the iTunes Store as of April 2003. *See* Robbin Depo. at 31:6-16 *see also* Heller Depo. at 48:16-18 ("[T]he Rio One did not support our protected format and that content would not play."); *see* AIIA00166723-777 (marketing plan for going to Windows). Apple quickly realized that in order to capture the majority of the market for portable digital media players, Apple would have to make iTunes available on Windows. *See* AIIA00166554-70 at 59. Accordingly, on October 16, 2003, Apple launched the iTunes Store for Windows. Robbin Depo. Ex. 4.

From the beginning of the iTunes Store, all the digital audio downloads purchased through the Store were protected by Apple's proprietary digital rights management technology ("DRM"), known as FairPlay. Heller Depo. at 41:5-7. During negotiations with the record labels over the licensing of digital audio files for sale through the iTunes Store, the record labels required that Apple protect the music so that it could not be illegally copied and distributed. Cue Depo. at 33:4-7. Despite this concern over illegal copying, the record labels always maintained an interest in having their music widely distributed; there was never a demand from the labels to keep the music they sold through iTunes locked into the iPod. "In or around 2004 Universal had discussions with Apple, in which Universal expressed to Apple that while Universal continued to require content protection, Universal wanted interoperability between its music sold through online stores and portable digital music players. Universal has always had an interest in having its music sold in the widest manner possible, through as many channels as possible." *See* Declaration of Amanda Marks, Executive Vice President and General Manager of Universal Music Distribution ("Marks Decl."), ¶4; Declaration of Howie Singer, Senior Vice President, Strategic Technology and Chief Technology Officer for Warner Music Inc. ("Singer Decl.") ("In 2003, Apple and WARNER entered into negotiations concerning the launch of iTunes for Windows. During these negotiations, WARNER proposed that WARNER's music sold through the iTunes Store be playable on an unlimited number of iPods and on competing digital players owned by the purchaser of the music. Apple did not agree to this proposal. And instead insisted that the music sold through the iTunes Store, including WARNER's sound recordings, only be compatible with iPods."); Declaration of Lawrence Kanusher, Senior Vice President, Business & Legal Affairs for the Global Digital Business Group of Sony Music Entertainment ("Kanusher Decl."). ("SONY required that SONY's digital products available for re-

sale by Apple through the iTunes Store have content protection to mitigate against piracy. In particular, SONY was concerned with consumers' ability to make an unrestricted number of copies. In 2003, Apple and SONY entered into negotiations concerning the launch of iTunes for Windows. During ongoing negotiations, SONY and Apple discussed whether SONY digital product files protected by DRM could be playable on music players in addition to the iPod without compromising the security solution. Apple did not accommodate Sony's request for a solution that would both protect the content as well as be interoperable with other devices.")

Even in the earliest discussions with the record labels and Apple, illegal copying is the primary concern expressed. AIIA00099928-29. As Apple's rapid dominance in the market became quickly apparent, the record labels pressed Apple to make its content interoperable. Cue Depo. at 40:15-18. ("[P]ost the launch and through some of the renewals, as we started getting some success, one of the things the labels had asked us about was whether we could make our content interoperable.") Apple sought to retain its chokehold by claiming that it wouldn't be technically feasible to make the iTunes Store interoperable. Cue Depo. at 41:6-12; Singer Decl.

Instead of using an already-developed third party DRM, Apple created and used FairPlay to address the copyright concerns of the major music labels. *See* AIIA00094578-84 (Digital Rights Management ("DRM") Overview); AIIA00094571-77 (DRM Details). However, in addition to addressing the labels' copyright concerns, Apple also developed FairPlay so that music sold through the iTunes Store could only be played on an iPod. *See* AIIA00094578-84 at 84 (stating that only iPod will be supported); AIIA01278697; Cue Depo. at 41:24-42:7 (music could only be put on an iPod or burned to CD). All music sold through the iTunes Store, including that licensed by the non-major music labels, was protected by FairPlay. Cue Depo. at 45:2-46:16; 56:6-57:16 (all music had same restrictions). All music sold through the iTunes Store was restricted through FairPlay, including music recorded by labels that did not require DRM. Robbin Depo. at 50:10-16. Indeed, the same music from certain artists was available DRM-free on online sites, such as eMusic, but was sold with FairPlay attached on the iTunes Store. *See* Cue Depo. at 56:6-57:3. Apple's insistence on the use of its proprietary DRM scheme prevented manufacturers of competing portable digital media players from effectively competing in the market because their products were not compatible with

1  the digital audio files sold through the iTunes Store. *See* Declaration of Lee Morris, dated
2  January 19, 2007, ¶8.
3      At the same time Apple launched its iTunes Store, it also released a new model of iPod that
4  was compatible with the FairPlay-encrypted files sold through the Store. Apple made certain that
5  the new iPods were not compatible with files sold through other online stores. AIIA00098417. This
6  was not necessary to maintain the security of the audio files sold through the iTunes Store.
7  However, Apple knew that if it maintained the link between iTunes Store digital audio downloads
8  and iPods, it could take significant profits in the portable digital media player market with the sale of
9  iPods. *See* Cue Depo. at 209:21-210:11 (margin for the iTunes store "runs in the single digits" while
10 iPod margins have "been in the high 20s, low 30s range"). Apple thus created a closed system that
11 locked iTunes Store customers into using the iPod for direct playback of their digital audio files.
12 Cue Depo. at 41:24-43:9; Robbin Depo. at 36:25-37:23; Heller Depo. at 48:12-18.
13     Apple jealously guarded the technological link between the iPod and iTunes Store audio files
14 and rejected several requests to license FairPlay. *See* AIIA001344648-49 (9/3/05 Tony Fadell email
15 stating that Sandisk CEO "desperately wanted to license FairPlay"); AIIA00098511. Just weeks
16 before Apple's launch of the iTunes Store, Apple's own Director of Product and Music Marketing
17 recognized that "from a marketing perspective," the more portable digital media players that were
18 compatible with audio files purchased from the iTunes Store the better, but iPod was the priority.
19 AIIA01278697. Apple's CEO, Steve Jobs, made clear that Apple would not be licensing FairPlay to
20 competitors, despite the opinions of upper-level management at Apple that licensing FairPlay to
21 other portable digital media players would be good for the success of the iTunes Store.
22 AIIA00098491-93. Further, Mr. Jobs made clear that Apple would do what it took to make sure
23 iPods could not play digital audio files purchased from competing online stores. AIIA00098417
24 (5/08/03 MusicMatch Jobs email). Apple did not, however, express similar concerns about licensing
25 FairPlay to non-competitors, and entered into an agreement with Motorola for ringtone use. Heller
26 Depo. at 154:4-155:24; Cue Depo at 43:11-23; AIIA00094370-82; Press Release, *Apple, Motorola*
27 *& Cingular Launch World's First Mobile Phone with iTunes* (Sept. 7, 2005).
28

1   Apple also rejected requests from the major music labels to make the digital audio files sold
2   through the iTunes Store interoperable with other portable digital media players. For example, in
3   September 16, 2003 email from John Rose of EMI to Eddy Cue and others, Mr. Rose stated that
4   "Portable Devices" as defined in the contract with Apple should include "iPODS and WMA 1000-
5   compliant devices owned by the Purchaser." AIIA00098220-22. Mr. Cue forwarded the email to
6   Steve Jobs who responded, "This is bad – they are trusting all 'WMA 1000-compliant
7   devices'. . . . This is an immediate problem." AIIA00098373-75; Cue Depo. at 65:22-66:2 (There
8   was no provision for WMA-complaint devices in the finalized agreement). Mr. Cue assured Mr.
9   Jobs that Apple could use its disagreement over the burn limit to negotiate interoperability with
10  iPods only: "I don't think they would have a problem with 'Apple DRM devices' if we agreed to
11  burns in the future." AIIA00098373-75.

12  The technology link between the iPod and the iTunes Store due to FairPlay enabled Apple to
13  increase its market share in both the portable digital media player market and online music market.
14  AIIA01293667-74 at 67. (Needham & Company report "Apple tightly linked the iTunes Music Store
15  and its iPod music player through FairPlay, its digital rights management software. In doing so,
16  Apple effectively locked iPod owners into its Music Store and shoppers at the Store into the iPod.
17  No other music player could access the Music Store nor could iPod owners access rival stores.")
18  Apple was able to leverage this market share to increase its market share in portable digital media
19  players. In the sixteen months after the launch of the iTunes Store, Apple had at most an 11% share
20  of the portable digital media player market. When the Store was launched with FairPlay, Apple's
21  market share in the media digital player market more than steadily increased to 70% by the end of
22  2005. AIIA1083490. Similarly, the exclusive link between the iTunes Store and iPods has enabled
23  Apple to maintain a 70% or more market share in the online music market. *See*
24  AIIA00712163; AIIA00099408-09. The only time Apple's market share in the online music market
25  dropped below 70% was in August 2004, when RealNetworks, a competing online music retailer,
26  sold digital audio files that were compatible with the iPod. *Id.* By end of 2004, iPods sales made up
27  14.3% of Apple's overall revenue. AIIA00095840.

28

**Apple Used Unnecessary and Non-Improving Software and Firmware Updates to Exclude Competition in the Relevant Markets and to Maintain Its Monopolies**

In January 2004, one of Apple's competitors in the digital audio file market, RealNetworks, launched an online music store through which it sold digital audio files licensed from the major record labels. AIIA01278810; *see also* Marks Decl., ¶5 ("Universal entered into agreements with other companies, including RealNetworks."); Declaration of Mark Piibe, Executive Vice President, Global Business Development of EMI Music ("Piibe Decl.") ("EMI . . . had agreements with other companies including RealNetworks . . . to sell downloads of EMI sound recordings . . . ."); Singer Decl. ("WARNER entered into agreements with other companies, including Real Networks, which also set forth the terms and conditions under which Warner's sound recordings were sold through online stores other than the iTunes Store."); Kanusher Decl. ("SONY entered into agreements with other companies, including Real Networks which also set forth the terms and conditions under which the downloads embodying SONY's digital products were sold."). Apple kept a close eye on this competitive effort. *See* AIIA01278810. On January 5, 2004, Apple's CEO, Steve Jobs, forwarded an article to several people in upper-level management at Apple that described RealNetworks' impending online store and RealNetworks' use of DRM other than FairPlay. *Id.* Mr. Jobs enthusiastically recognized that this was "great" for Apple because Apple's FairPlay was the "largest." *Id.* He excitedly announced, "Let's leverage this position now!!!!" *Id.* Apple also continued to monitor the efforts of other competitors in an effort to keep Apple's iPod and iTunes Store a closed system. *See* AIIA00113706 (1/29/04 email from James Higa to Warner confirming that Warner's license to subscription services does not allow transfer to portable devices).

Realizing the need to have access to Apple's iPod in order to successfully compete in the digital audio file market, RealNetworks' CEO, Rob Glaser, contacted Steve Jobs, on April 9, 2004, concerning the licensing of FairPlay. AIIA01385106. Mr. Glaser proposed to Mr. Jobs that Apple license FairPlay so that RealNetworks could sell music that was interoperable with the iPod and RealNetworks would make the iPod its preferred device for its online store. *Id.* Apple's document production includes no response to Mr. Glaser's email and it is unknown whether any discussions took place between Mr. Jobs and Mr. Glaser.

611995_1

PLAINTIFF SOMTAI TROY CHAROENSAK'S ADDITIONAL OBJECTIONS AND RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)   - 10 -

Just months later, in July 2004, RealNetworks took matters into their hands and with the approval of the major record labels began legally selling digital audio files that could be directly played on an iPod. Marks Decl., ¶5 (noting that Universal and RealNetworks had a contract to sell music); Piibe Decl. (EMI had agreements with RealNetworks to sell downloads; EMI "became aware of RealNetworks' Harmony DRM technology at some time in or after 2004. RealNetworks' predecessor Listen.com, represented that Harmony guarded against violations of the usage limitations and restrictions applicable to downloads of EMI recordings. I have found no indication that EMI made any objection to the Harmony DRM technology."); Kanusher Decl. ("SONY was aware of RealNetworks' Harmony technology introduced in July, 2004, which allowed music purchased though Real Networks' online store to be transferred to an iPod.  Because music purchased though Real Networks' online store contained a security solution that guarded against unauthorized duplication and distribution of SONY's digital products, Sony did not object to the Harmony technology"); Singer Decl. ("WARNER was aware of RealNetworks' Harmony technology introduced in July, 2004, which purported to allow music purchased through RealNetworks' online store to be directly downloaded onto an iPod. Warner entered into a download deal with RealNetworks because music purchased through RealNetworks' online store contained a security solution that guarded against unauthorized duplication and distribution of WARNER's sound recordings.")

According to RealNetworks, the Harmony technology followed "in a well-established tradition of fully legal, independently developed paths to achieve compatibility . . . . Harmony creates a way to lock content from Real's music store in a way that is compatible with the iPod, Windows Media DRM devices and Helix DRM devices. Harmony technology does not remove or disable any digital rights management system." AIIA00090471. See Declaration of David Martin in Support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment ("Martin Decl."), at ¶28. Apple executives admitted that Harmony made it so that music purchased through the RealNetworks site was interoperable with the iPod. Robbin Depo. at 96:21-24.

Instead of embracing the increased access to iPod owners of different sources of music, Apple took swift action to exclude RealNetworks. Even prior to RealNetworks' release of Harmony,

611995_1

PLAINTIFF SOMTAI TROY CHAROENSAK'S ADDITIONAL OBJECTIONS AND RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL) - 11 -

Apple began crafting its public attack on RealNetworks' efforts. *See* AIIA00090405-07 (7/23/04 email string); AIIA00090498. Indeed, Steve Jobs and his top lieutenants worked feverishly to craft the company's threatening response to Harmony, drafting a statement that Apple's software updates would end interoperability between the iPod and RealNetworks' music. This process occurred ***before*** Apple engineers even had an opportunity to examine the RealNetworks product. AIIA00093875 ("Do we want to soften how successful they have been (seen [sic] we haven't used it ourselvbes [sic].")) Apple issued a public statement, crafted by Mr. Jobs, threatening RealNetworks and other competitors that Apple would be updating its software so that the iPod would no longer be compatible with RealNetworks music. AIIA00090405-07. Apple acted aggressively toward RealNetworks even though the record labels approved of RealNetworks' actions. *See* Kanusher Decl.; Piibe Decl.; Robbin Depo. Ex. 14; Cue Depo. Ex. 64. A Universal Music executive lauded RealNetworks' announcement: "We applaud RealNetworks' efforts to help correct this situation and appeal to all people and companies in this area to work toward a world of universal interoperability." Press Release, *RealNetworks breaks Apple's hold on iPod* (July 26, 2004). This support did not sit well with Steve Jobs, who went as far as to personally demand Universal change its public statements made in support of RealNetworks. *See* AIIA01384975-76; AIIA01384977-78; AIIA00090441.

    Top technical executives also went into overdrive, performing a detailed technical analysis as soon as the program was available to be downloaded. AIIA00090427; AIIA00090428; Heller Depo. at 128:1-5; 130:14-22. Rather than finding a program that stripped DRM from the music, the engineers found that the program appeared to be "encrypting the files the same way that FairPlay does." Heller Depo. at 87:3-4. David Heller testified that during his analysis of the Harmony software, he found that "what Harmony was doing at the time was writing a v3, a Version 3, encrypted keybag." This meant, he testified, "that as far as the iPod was concerned, it met enough criteria so that the iPod would actually play the song." Heller Depo. at 135:20-136:8. Apple executives admitted, that unlike a "hack," RealNetworks' Harmony technology did not strip DRM protection from music. Cue Depo. at 123:3-6. One Apple engineer who witnessed a product

demonstration described Harmony's translation and playback of a DRM-protected song on an iPod as "very quick" and "very seamless." AIIA00329373.[1]

RealNetworks' sale of digital audio files that were interoperable with iPods was successful. In August 2004, Apple's market share in the digital audio file market fell and RealNetworks' market share increased for the first time. *See* AIIA00090447-49; AIIA00099408-09; AIIA00090467-68. In fact, shortly after it launched Harmony, RealNetworks saw an immediate and dramatic increase in its share of the audio digital file market, which went from 10% to 20% in three weeks. AIIA00090447-49.

True to its word and in an effort to end RealNetworks' successful competitive efforts, beginning October 2004, Apple began issuing iTunes software and iPod firmware updates to FairPlay that ensured that music legally purchased from RealNetworks could not be played on an iPod. Each iPod model that was released on or after October 26, 2004, contained the updated version of FairPlay and thus was not compatible with music purchased from RealNetworks' online store. Robbin Depo. Ex. 4; Heller Depo. at 240:10-19.

In an effort to further ramp up their efforts to exclude competition from the markets through updates to FairPlay, in April 2005, Apple hired Augustin Farrugia to head up the DRM department. Deposition of Augustin J. Farrugia, taken December 8, 2010, ("Farrugia Depo.") at 12:24-13:2; Robbin Depo. at 56:8-10. Mr. Farrugia immediately began work on a new FairPlay system known as "FairPlay 1.0." Farrugia Depo. at 46:1-6. Mr. Farrugia and his team monitored competitor actions, including that of RealNetworks, and determined what changes to FairPlay could be made to make interoperability with iPods impossible. Farrugia Depo. at 164:9-24; AIIA00094569.

---

[1] Apple's immediate and high-level response to RealNetworks' Harmony was a far cry from Apple's typical response to news of hacks that stripped DRM from iTunes Store-purchased songs. Rather than immediately attack, Apple would wait until the record labels complained about hacks to take action. AIIA00092388. In response to a concern about a breach of FairPlay, Eddy Cue told an executive from Universal to wait for a hack to be closed "at the end of the month." Cue Depo. Ex. 7. When RealNetwork's Harmony, in contrast, threatened Apple's market dominance, Apple executives and engineers at the highest level – including Mr. Jobs – launched an immediate investigation and responded within hours.

In conducting an analysis of FairPlay, Mr. Farrugia found that it was a "flaw" in the FairPlay system that Real was able to make its music playable on an iPod. Apple_AIIA_B_000001-103 at 80 ("This key translation creates a well known flaw already exploited by Real to DRM their music to be compatible for iPod implementation of FairPlay.") Farrugia Depo. at 195:10-196:13.[2] In April 2005, RealNetworks' music began working again with iPods. *See* AIIA00090485-88. Apple quickly drafted another threatening press release warning RealNetworks and other competitors that updates to "iPod software" would break the compatibility between iPods and RealNetworks' digital audio files. *Id.* Similarly, on May 11, 2005, Apple became aware of the fact that Yahoo's new Music Engine application allowed consumers to download music onto iPods. *See* AIIA01341443. As Apple's Director of iPod Marketing, Stan Ng, reported directly to Steve Jobs and other upper-level management, "[Yahoo Music Engine] puts all the synced music into a viewable Music folder on the iPod. Music transferred by iTunes, which is still hidden, can co-exist with the music transferred by Yahoo Music Engine." *Id.*

Interoperability between the iPod and digital audio files purchased from competing online stores was the focus of Apple's updates to FairPlay. In October 2005, Apple's Senior Director of DRM, Augustin Farrugia, identified RealNetworks' ability to sell music that was compatible with iPods as a "flaw" in the FairPlay system. Apple_AIIA_B_000001-103, at 80 ("This key translation creates a well known flaw already exploited by Real to DRM their music to be compatible for iPod implementation of FairPlay."); Farrugia Depo. at 195:10-196:13. Instead, the "problem" identified by Apple was that consumers were able to purchase music from sources other than the iTunes Store and download that music directly onto their iPods. Farrugia Depo. at 164:10-24 (Farrugia admits that this "problem" has nothing to do with the security of the digital audio files sold through the iTunes Store); AIIA_B_000001-103; Farrugia Depo. at 191:13-18.

Apple kept a close eye on RealNetworks' and other competitors' efforts at interoperability. In March 2006, Apple again became aware that RealNetworks' music was compatible with the iPod.

---

[2] To correct this "flaw," Apple redesigned FairPlay so that Apple could monitor the sources of music on consumers' iPods and prevent rivals' music from working. AIIA00094563-69.

See AIIA00093859-60. Realizing that RealNetworks' music, and music sold by other competitors, would continue to become compatible with iPods, Apple aggressively redesigned FairPlay so that Apple could monitor purchasers' sources of music that were on their iPods and prevent that music from working. See AIIA00094563-69. Beginning sometime in April 2006, Augustin Farrugia, Apple's Senior Director of DRM, directed Rod Schultz, an Apple software engineer, to address a certain "problem" identified as: "To prevent injection of content and iPod databases from clients other than iTunes into the iPod (DRM protected or non-DRM protected content), a method for verifying the course of the content needs to be implemented." AIIA00094563-69 at 64; Farrugia Depo. at 164:4-24. The "problem" identified by Apple was that consumers were able to purchase music from sources other than the iTunes Store and download that music directly onto their iPods. Farrugia Depo. at 164:10-24. Apple admitted that this "problem" had nothing to do with the security of the digital audio files sold through the iTunes Store. Farrugia Depo. at 191:13-18. This code was incorporated into FairPlay in September or October 2006[3] and in fact prevented music purchased from competing online stores from being directly downloaded onto an iPod. Farrugia Depo. at 167:13-15, 183:14-23.

Indeed, on October 23, 2006, Augustin Farrugia, Apple's Senior Director of DRM, went to RealNetworks' website and confirmed that digital audio files purchased from RealNetworks could no longer be directly downloaded onto an iPod. AIIA00802966-67; Farrugia Depo. at 202:22-205:21. Apple confirmed again in January 2007, that RealNetworks was no longer interoperable with new iPods. See AIIA00807080-81 ("Fortunately, Real's own support website states that iPod with video and iPod nano do not work with Real Player due to changes we've made in the iPod software."). See Martin Decl., ¶¶70-76.

In early 2007, EMI approached several online stores that competed with Apple in an attempt to sell its music DRM-free. See AIIA00093504. Subsequently, Steve Jobs issued a self-serving public statement on DRM. However, this public statement was merely pretextual so as to disguise

---

[3] See Errata to Declaration of Augustin Farrigua in Support of Defendant's Renewed Motion for Summary Judgment.

Apple's intent all along to use FairPlay to shut-out competition in the relevant markets. As Steve Jobs admitted, the reasoning behind his public statement on DRM was not his desire to create interoperability, but rather the pressure Apple was receiving from European competition authorities concerning Apple's use of FairPlay. AIIA01385373-74. As is clear by Apple's continued rejection of the record labels' request for interoperability with music from the iTunes Store and non-Apple portable digital media players, Apple was not genuinely interested in opening the closed system of the iTunes Store and iPods. *See, e.g.*, AIIA01385473-74. Other evidence conflicts with Apple's depiction of itself as zealous defender of DRM. Apple's customer service representatives, for example, frequently advised customers to strip DRM from songs purchased from sources other than the iTunes Store in order to play them on their iPods. *See, e.g.*, AIIA00001978, AIIA00001964, AIIA00001948, AIIA00001945, AIIA00001944, AIIA00001936, AIIA00001899, AIIA00001827, AIIA00001790, AIIA00001759, AIIA00001756, AIIA00001519, AIIA00001518, AIIA00001516, AIIA00001492, AIIA00001491, AIIA00001486, AIIA00001478, AIIA00001461, AIIA00001440, AIIA00001439, AIIA00001433, AIIA00001366, AIIA00001362, AIIA00001342, AIIA00001310, AIIA00001305, AIIA00001288, AIIA00001263, AIIA00001244, AIIA00001242, AIIA00001206, AIIA00001187, AIIA00001154, AIIA00001145, AIIA00001118, AIIA00001111, AIIA00001108, AIIA00001051, AIIA00000994, AIIA00000906, AIIA00000905, AIIA00000885, AIIA00000861, AIIA00000860, AIIA00000852, AIIA00000844, AIIA00000831, AIIA00000830, AIIA00000818, AIIA00000805, AIIA00000796, AIIA00000789, AIIA00000771, AIIA00000759, AIIA00000726, AIIA00000716, AIIA00000710, AIIA00000697, AIIA00000658, AIIA00000569, AIIA00000478, AIIA00000475, AIIA00000438, AIIA00000431, AIIA00000412. In some instances, Apple instructed customers to delete RealPlayer. AIIA_C_00204897; AIIA_C_00205403; AIIA_C_00205532. Consumers continually complained to Apple about the lack of interoperability, voicing extreme displeasure at Apple's anticompetitive behavior. *See, e.g.*, AIIA00006477, AIIA00007040, AIIA00007064, AIIA00007549, AIIA00007575, AIIA00008481, AIIA00008499, AIIA00067464, AIIA00067479, AIIA00067605, AIIA00067632, AIIA00067979, AIIA00069598, AIIA00005573, AIIA00005584, AIIA00005595, AIIA00005615, AIIA00006175, AIIA00059009, AIIA00059088 (a sampling of thousands of customer complaints).

Through this conduct, Apple forewent the short-term profits that come with increased demand for iPods, in order to maintain its monopolies in both the portable digital media player and digital audio file markets. *See* AIIA00799692 (10/02/06 Email from Apple's VP, iPod Product Marketing, stating, "I don't think that anything that breaks iPod+iTunes is a good thing in the long run."); AIIA01278697. Apple was able to maintain its 70% or more market share in the online music market and steadily increase its share of the portable digital media market.

**Apple's Anticompetitive Conduct Resulted in Supracompetitive Prices for iPods**

The software and firmware updates enabled Apple to shut out genuine competition in the portable digital media player market and the legally purchased audio download market. By shutting out competition, Apple was able to continue to increase its market share in the portable digital media player market and charge consumers supracompetitive prices. In July 2004, when RealNetworks began selling digital audio files that were interoperable with iPods, the desirability of iPods increased. When Apple updated FairPlay so that iPods were no longer compatible with digital audio files purchased from RealNetworks, the value of iPods decreased. Had Apple not prevented other products from being compatible with the iPod and the iTunes Store, the market for portable digital media players would have been more competitive and prices of iPods would have reflected the competition. Instead, Apple was able to raise the price of iPods to supracompetitive levels.

INTERROGATORY NO. 2:

Please identify all facts that YOU contend support your position that "Apple engaged in systematic conduct to shut out rivals' competing Audio Downloads and Portable Digital Media Players by cutting off access to the marketplace," as alleged in paragraph 2 of the Complaint.

RESPONSE TO INTERROGATORY NO. 2:

Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome, and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

| | |
|---|---|
| 1 | **INTERROGATORY NO. 22:** |
| 2 | Please identify all facts that YOU contend support your position that the software programs |
| 3 | referred to in paragraphs 64-66 of the Complaint made iTS files interoperable with Portable Digital |
| 4 | Media Players other than the iPod. |
| 5 | **RESPONSE TO INTERROGATORY NO. 22:** |
| 6 | Plaintiff no longer relies on these allegations. |

DATED: March 7, 2011

ROBBINS GELLER RUDMAN
   & DOWD LLP
JOHN J. STOIA, JR.
BONNY E. SWEENEY
THOMAS R. MERRICK
ALEXANDRA S. BERNAY
CARMEN A. MEDICI

*/s/ Alexandra S. Bernay*

ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

THE KATRIEL LAW FIRM
ROY A. KATRIEL
1101 30th Street, N.W., Suite 500
Washington, DC 20007
Telephone: 202/625-4342
202/330-5593 (fax)

Co-Lead Counsel for Plaintiffs

BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
ELAINE A. RYAN
TODD D. CARPENTER
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

BRAUN LAW GROUP, P.C.
MICHAEL D. BRAUN
10680 West Pico Blvd., Suite 280
Los Angeles, CA 90064
Telephone: 310/836-6000