# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SMITHKLINE BEECHAM CORPORATION, doing
business as GLAXOSMITHKLINE,

      Plaintiff,

    v.

ABBOTT LABORATORIES,

      Defendant.

_____/

No. C 07-5702 CW

FINAL JURY
INSTRUCTIONS

### DUTY OF THE JURY

Members of the Jury: Now that you have heard all of the
evidence, it is my duty to instruct you as to the law of the case.
A copy of these instructions will be sent with you to the jury room
when you deliberate. You should discard the preliminary
instructions; the final instructions control and you should not
concern yourselves with any differences between them and the
preliminary instructions. You must not infer from these
instructions or from anything I may say or do that I have an
opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the
case. To those facts you will apply the law as I give it to you.
You must follow the law as I give it to you whether you agree with
it or not. And you must not be influenced by any personal likes or
dislikes, opinions, prejudices, or sympathy. That means that you
must decide the case solely on the evidence before you. You will
recall that you took an oath to do so.

In following my instructions, you must follow all of them and

not single out some and ignore others; they are all important.

**PARTIES**

Abbott Laboratories is the Defendant in this case.  It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection.

The Plaintiff in this case is SmithKline Beecham Corporation, which does business as GlaxoSmithKline, also known as GSK.  GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

**CORPORATIONS**

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

**SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES**

The drugs involved in this dispute are known as protease inhibitors, and also known as PIs.

Abbott's drug Norvir, a protease inhibitor, has the active ingredient called ritonavir.  When taken in small quantities with another PI, Norvir "boosts" the effectiveness of the other PI.  Because of this "boosting" property, Norvir is known as a booster.  The other PI is known as the "boosted" PI.

Abbott's drug Kaletra contains two active ingredients:

2

**United States District Court**
For the Northern District of California

1  lopinavir and ritonavir, which is the active ingredient in Norvir.

2  Ritonavir is used to boost the effects of lopinavir.  Kaletra is

3  known as a "boosted" PI.

4      GSK's drug is called Lexiva, a boosted PI that competes with

5  Abbott's Kaletra.  Before launching Lexiva, GSK signed a license

6  agreement with Abbott which allowed GSK to promote and market

7  Lexiva with Abbott's Norvir.

8      On December 3, 2003, Abbott raised the wholesale price of 100

9  milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-

10  percent increase.  Abbott maintained the cost of a daily regimen of

11  Kaletra at $18.78.

12      GSK alleges that Abbott's conduct violated federal antitrust

13  laws, causing damage.  Specifically, GSK claims that Abbott

14  monopolized or attempted to monopolize the market in which Kaletra

15  competes.  GSK also claims that Abbott breached the implied

16  covenant of good faith and fair dealing in their license agreement

17  and damaged GSK.

18      GSK has the burden of proving these claims.  Abbott denies all

19  of GSK's claims.  Abbott contends that it increased Norvir's price

20  for legitimate business reasons, with neither the purpose nor the

21  effect of harming competition.

22                      **BURDEN OF PROOF**

23      When a party has the burden of proof of any claim or

24  affirmative defense by a preponderance of the evidence, it means

25  you must be persuaded by the evidence that the claim or affirmative

26  defense is more probably true than not true.

27      You should base your decision on all of the evidence,

28                     3

1 regardless of which party presented it.

**WHAT IS EVIDENCE**

The evidence from which you are to decide what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits which have been received into evidence; and

(3) any facts to which the lawyers may agree.

**WHAT IS NOT EVIDENCE**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1) Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the Court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you were instructed to disregard, is not evidence and must not be considered.

(4) Anything you see or hear when the Court is not in session is not evidence.  You are to decide the case solely on the evidence

4

1 received at the trial.

2 **EVIDENCE FOR LIMITED PURPOSE**

3 Some evidence was admitted for a limited purpose only. When I
4 instructed you that an item of evidence was admitted for a limited
5 purpose, you must consider it only for that limited purpose and for
6 no other.

7 **DIRECT AND CIRCUMSTANTIAL EVIDENCE**

8 Evidence may be direct or circumstantial. Direct evidence is
9 direct proof of a fact, such as testimony by a witness about what
10 that witness personally saw or heard or did. Circumstantial
11 evidence is proof of one or more facts from which you could find
12 another fact. You should consider both kinds of evidence. The law
13 makes no distinction between the weight to be given to either
14 direct or circumstantial evidence. It is for you to decide how
15 much weight to give to any evidence.

16 **RULING ON OBJECTIONS**

17 There are rules of evidence that control what can be received
18 into evidence. When a lawyer asked a question or offered an
19 exhibit into evidence and a lawyer on the other side thought that
20 it was not permitted by the rules of evidence, that lawyer may have
21 objected. If I overruled the objection, the witness was permitted
22 to answer the question. If I sustained the objection, the witness
23 was not permitted to answer the question. If I sustained an
24 objection to a question, you must ignore the question and must not
25 guess what the answer might have been.

26 **CREDIBILITY OF WITNESSES**

27 In deciding the facts in this case, you may have to decide

28 5

United States District Court
For the Northern District of California

which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)   the opportunity and ability of the witness to see or hear or know the things testified to;

(2)   the witness's memory;

(3)   the witness's manner while testifying;

(4)   the witness's interest in the outcome of the case and any bias or prejudice;

(5)   whether other evidence contradicts the witness's testimony;

(6)   the reasonableness of the witness's testimony in light of all the evidence; and

(7)   any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

## EXPERT OPINION

Some witnesses, because of education or experience, were permitted to state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony.

You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

6

**CHARTS AND SUMMARIES**

Certain charts and summaries were received into evidence to illustrate information brought out in the trial.  Charts and summaries are only as good as the underlying evidence that supports them.  You should, therefore, give them only such weight as you think the underlying evidence deserves.

Certain graphics not received in evidence were shown to you in order to help explain the contents of books, records, documents or other evidence in the case.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these graphics and determine the facts from the underlying evidence.

**TESTIMONY THROUGH DEPOSITIONS**

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  You should consider deposition testimony, presented to you in court instead of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

**THE FOOD AND DRUG ADMINISTRATION**

You have heard mention of the Food and Drug Administration, and I said I would provide an instruction about the role of that federal agency, which is also known as the FDA.  The FDA oversees the drug approval process and claims regarding a drug's safety and efficacy.  The FDA does not regulate pricing.

**United States District Court**
For the Northern District of California

7

**United States District Court**
For the Northern District of California

**I.    ANTITRUST CLAIMS - PURPOSE OF ANTITRUST LAWS**

I will now discuss GSK's claims.  GSK first alleges that Abbott violated the United States antitrust laws by willfully maintaining a monopoly or attempting to acquire a monopoly.  The purpose of the antitrust laws is to preserve free and unfettered competition in the marketplace.  The antitrust laws rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

A.    ACTUAL MONOPOLIZATION CLAIM - ELEMENTS

The first claim GSK brings under the antitrust laws is that Abbott unlawfully actually monopolized the market in which Kaletra competes.  To prevail on this claim, GSK must prove each of the following elements by a preponderance of the evidence:

First, that the market that it alleges Abbott monopolized is a validly defined economic market;

Second, that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;

Third, that Abbott willfully maintained monopoly power in that market by engaging in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property because of Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

**United States District Court**
For the Northern District of California

1    1.    ACTUAL MONOPOLIZATION CLAIM - ELEMENT ONE: RELEVANT MARKET

2         The first element of its actual monopolization claim that GSK

3    must prove by a preponderance of the evidence is that the market

4    that it alleges Abbott monopolized is a validly defined, relevant

5    economic market.  GSK defines this relevant market as the market

6    for all boosted protease inhibitors or as the market for a subset

7    of such drugs: all highly effective protease inhibitors, including

8    only boosted Reyataz, boosted Lexiva and Kaletra, at the time of

9    the Norvir price increase.  Abbott asserts that the relevant market

10   also includes unboosted protease inhibitors and NNRTI drugs, and

11   that GSK's reasons for defining the market as it has are invalid.

12        Defining the relevant market is essential because you are

13   required to make a judgment about whether Abbott had monopoly power

14   in a properly defined economic market.  To decide the relevant

15   market, you must be able to determine what, if any, economic forces

16   restrained Abbott's freedom to set prices for or restrict the

17   output of Kaletra.  The most likely and most important restraining

18   force is actual and potential competition from other firms and

19   their products.  This includes all firms and products that acted as

20   restraints on Abbott's power to set prices as it pleased.  All the

21   firms and products that exerted this restraining force are within

22   what is called the relevant market.

23        The basic idea of a relevant market is that the products

24   within it are reasonable substitutes for each other from the

25   buyer's point of view; that is, the products compete with each

26   other.  In other words, the relevant market includes the products

27   that consumers believe are reasonably interchangeable or reasonable

28                                   9

**United States District Court**
For the Northern District of California

1  substitutes for each other.  This is a practical test with
2  reference to actual behavior of buyers and marketing efforts of
3  sellers.  Products need not be identical or precisely
4  interchangeable as long as they are reasonable substitutes.  Thus,
5  for example, if consumers seeking to cover leftover food for
6  storage considered certain types of flexible wrapping material --
7  such as aluminum foil, cellophane, or even plastic containers -- to
8  be reasonable alternatives, then all those products would be in the
9  same relevant market.

10  To determine whether products are reasonably interchangeable
11  substitutes for each other, you may consider whether a small but
12  significant permanent increase in the price of one product would
13  result in a substantial number of consumers switching from that
14  product to another.  Generally speaking, a small but significant
15  permanent increase in price is approximately a five percent
16  increase in price not due to external cost factors, but you may
17  conclude in this case that some other percentage is more applicable
18  to the product at issue.  If you find that such switching would
19  occur, then you may conclude that the products are in the same
20  relevant market.

21  In evaluating whether various products are reasonably
22  interchangeable or are reasonable substitutes for each other, you
23  may also consider: (1) consumers' views on whether the products are
24  interchangeable; (2) the relationship between the price of one
25  product and sales of another; (3) the perceptions of either the
26  industry or the public as to whether the products are in separate
27  markets; (4) the views of the producers in the market about who

28

1  their respective competitors are; and (5) the existence or absence

2  of different customer groups or distribution channels.

3       The parties agree that, for the purposes of this case, the

4  relevant geographic market is the United States.

5       2.    ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER

6       The second element of its actual monopolization claim that GSK

7  must prove by a preponderance of the evidence is that Abbott

8  possessed monopoly power in the relevant market during the time

9  period in which Abbott allegedly violated the antitrust laws.

10 Monopoly power is the power to control prices and exclude or

11 handicap competition in a relevant market.  The power to handicap

12 competition is the power to limit competition on the merits.  A

13 firm is a monopolist if it can profitably raise or maintain prices

14 substantially above the competitive level for a significant period

15 of time.  Monopoly power, in and of itself, is not unlawful.

16      GSK may show that Abbott had monopoly power through indirect

17 evidence.  Factors you may consider are: (a) Abbott's market share,

18 (b) market share trends, (c) barriers to entry or expansion and

19 (d) the number and size of Abbott's competitors.  If this evidence

20 establishes that Abbott had the power to control prices and exclude

21 or handicap competition in the relevant antitrust market, then you

22 may conclude that Abbott had monopoly power in the market.  I will

23 explain each of these factors.

24               a.  MARKET SHARE

25      The first factor that you may consider as evidence of monopoly

26 power is Abbott's market share.  You heard evidence about Abbott's

27 market share, and you should determine Abbott's market share as a

28                        11

**United States District Court**
For the Northern District of California

1   percentage of total industry sales by prescription.

2       A market share above fifty percent may be sufficient to

3   support an inference that Abbott had monopoly power.  The

4   likelihood that a company has monopoly power is stronger the higher

5   that company's share is above fifty percent.

6       A market share below fifty percent is ordinarily not

7   sufficient to support a conclusion that a company has monopoly

8   power.  However, if you find that the other evidence demonstrates

9   that Abbott, in fact, had monopoly power despite having a market

10  share below fifty percent, you may conclude that Abbott had

11  monopoly power.

12                    b.   MARKET SHARE TRENDS

13      The second factor that you may consider as evidence of

14  monopoly power is the trend in Abbott's market share.  An

15  increasing market share may strengthen an inference that Abbott had

16  monopoly power, particularly if Abbott had a high market share,

17  while a decreasing share might show that Abbott did not have

18  monopoly power.

19                  c.   BARRIERS TO ENTRY OR EXPANSION

20      The third factor you may consider as evidence of monopoly

21  power is the extent to which there were barriers to entry or

22  barriers to expansion in the relevant market.

23      Barriers to entry make it difficult for new competitors to

24  enter the relevant market in a meaningful and timely way.  Barriers

25  to entry might include intellectual property rights (such as

26  patents), specialized marketing practices, and the reputation of

27  the companies already participating in the market or the brand name

28                              12

1   recognition of their products.

2       Barriers to expansion prevent other companies who are already

3   in the market from increasing their output and selling more of

4   their product.

5       Evidence of low or no barriers to entry or expansion during

6   the relevant period would be evidence that Abbott did not have

7   monopoly power, regardless of Abbott's market share, because new

8   competitors could enter the market or existing competitors could

9   expand their sales if Abbott attempted to raise the price of its

10  drug Kaletra substantially above competitive levels for a

11  substantial period of time.  By contrast, evidence of high barriers

12  to entry and high barriers to expansion along with high market

13  share, during the relevant period, may support an inference that

14  Abbott had monopoly power.

15      The history of entry and exit of competitors in the relevant

16  market may be helpful to consider.  Entry of new competitors or

17  expansion of existing competitors may be evidence that Abbott

18  lacked monopoly power.  On the other hand, departures of

19  competitors from the market, or the failure of competitors to enter

20  the market, particularly if prices and profit margins are

21  relatively high, may support an inference that Abbott had monopoly

22  power.

23              d.   NUMBER AND SIZE OF COMPETITORS

24      The fourth factor you may consider as evidence of monopoly

25  power is whether Abbott's competitors were capable of effectively

26  competing.  In other words, you should consider whether the

27  financial strength, market shares and number of competitors acted

28                              13

as a check on Abbott's ability to price Kaletra.  If Abbott's competitors were vigorous or had large or increasing market shares, this may be evidence that Abbott lacked monopoly power.  On the other hand, if you determine that Abbott's competitors were weak or had small or declining market shares, this may support an inference that Abbott had monopoly power.

3.  ACTUAL MONOPOLIZATION CLAIM - ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott willfully maintained monopoly power in the relevant market by engaging in anticompetitive conduct.

In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other.  Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way.  Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

Here, in support of its claim that Abbott unlawfully monopolized the market in which Kaletra competes, GSK argues that Abbott engaged in two types of anticompetitive conduct: (a) a

14

1  practical refusal to deal with its competitors; and (b) unlawful

2  bundled discounting.  Abbott denies that it engaged in either type

3  of anticompetitive conduct, and contends that it increased Norvir's

4  price for legitimate business reasons, including obtaining a fair

5  value for its patented invention, with neither the purpose nor the

6  effect of harming competition.

7          a.  PRACTICAL REFUSAL TO DEAL WITH COMPETITORS

8          The first type of anticompetitive conduct that GSK alleges to

9  prove the third element of its actual monopolization claim is that

10  Abbott effectively refused to deal with its competitors, and did so

11  with anticompetitive intent.  You may recall in my preliminary

12  instructions that I referred to this conduct as a "refusal to

13  deal."  A refusal to deal does not need to be absolute to violate

14  the antitrust laws.  A company's practical, or effective, refusal

15  to deal with its competitors can constitute anticompetitive

16  conduct.

17          A company that possesses monopoly power generally does not

18  have a duty to deal with its competitors.  However, a practical

19  refusal to deal with competitors may constitute anticompetitive

20  conduct if the practical refusal was contrary to Abbott's short-run

21  best interest, but made sense for Abbott because it harmed

22  competitors and helped Abbott maintain monopoly power in the long

23  run.  An important change in a pattern of conduct, in a competitive

24  market, that had persisted for several years can constitute a

25  practical refusal to deal.

26          In deciding whether Abbott acted with anticompetitive intent,

27  you may consider: (1) whether Abbott unilaterally terminated a

28                                      15

**United States District Court**
For the Northern District of California

1    voluntary and profitable course of dealing with its competitors;

2    (2) whether Abbott offered to deal with its competitors only on

3    unreasonable terms and conditions; and (3) whether Abbott refused

4    to provide its competitors' customers with products, that were sold

5    in a retail market, on the same terms it provided the products to

6    its own customers.

7                    b.   BUNDLED DISCOUNTING

8         The second type of anticompetitive conduct that GSK alleges to

9    prove the third element of its actual monopolization claim is

10   unlawful bundled discounting.  Sometimes a company will offer a

11   lower price if a buyer purchases two different products together

12   for a single price, in a bundle, rather than buying them

13   separately.  Bundling is generally not anticompetitive because

14   bundled discounts can benefit buyers.

15        However, bundling may be anticompetitive if a business that

16   has monopoly power over part of the bundle charges a substantial

17   penalty to buyers who purchase the products separately.  Penalizing

18   buyers purchasing from competitors can have the effect of causing

19   buyers to purchase the entire bundle from the monopolist even if

20   those buyers would rather buy one product from the bundler and one

21   product from the competitor.  In this way, monopoly bundling can

22   harm or exclude equally efficient competitors that sell only one of

23   the bundled products.  This could reduce competition and lead to

24   higher prices.

25        In order to prove that Abbott engaged in unlawful bundled

26   discounting in this case, GSK must prove that:

27        (i) Kaletra is a bundle; and (ii) Abbott's Norvir price

28                                16

Case4:07-cv-05702-CW   Document485   Filed03/24/14   Page20 of 30

1   increase constituted an improper penalty on buyers who wanted to

2   purchase a boosted PI other than lopinavir, the active ingredient

3   in Kaletra.

i.   BUNDLED DISCOUNTING - IS KALETRA A BUNDLE?

5   The first element that GSK must prove to show that Abbott

6   engaged in unlawful bundled discounting is that Kaletra is a bundle

7   of products. GSK contends that Kaletra is a bundle of the active

8   ingredients lopinavir and ritonavir, the active ingredient in

9   Norvir. Abbott contends that Kaletra is a single integrated

10  product, that lopinavir and ritonavir are active ingredients rather

11  than separate products, that Norvir is not a bundled component of

12  Kaletra and that Kaletra is not a bundle.

ii.   BUNDLED DISCOUNTING - IMPROPER PENALTY

14  The second element that GSK must prove to show that Abbott

15  engaged in unlawful bundled discounting is that Abbott's Norvir

16  price increase constituted an improper penalty such that it could

17  exclude a hypothetical competitor, who is equally efficient at

18  producing a boosted PI, because the competitor does not sell

19  Norvir. GSK argues that the Norvir price increase imposed a

20  penalty on buyers who wanted to purchase a boosted PI other than

21  lopinavir. To explain what is an improper penalty, I must first

22  define for you some terms related to Abbott's costs.

23  Abbott's costs in making and selling Kaletra are divided into

24  two categories.

25  The first kind of cost is referred to as a fixed cost -- a

26  cost that Abbott would bear regardless of how much of a product it

27  sells. An example of a fixed cost might be the rent on a seller's

28                                  17

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   plant or store.  This rent probably will be the same whether the

2   firm sells one unit or one thousand units of its product.  This

3   type of cost is not to be considered in deciding whether Abbott's

4   pricing conduct was improper.

5       The second kind of cost is referred to as "variable cost."

6   Variable costs, as the name suggests, are those costs that increase

7   with the production of each additional unit of the product.

8   Variable costs typically include such things as the materials that

9   go into the product, fuel needed to produce the product, and wages

10  paid to the workers who make the product.  "Average variable cost"

11  is the sum of all variable costs, divided by the total number of

12  units expected to be produced and sold.

13      To determine whether Abbott imposed an improper penalty and

14  excluded hypothetical equally efficient competitors, you must

15  consider whether Abbott was, in effect, selling the lopinavir

16  component of Kaletra at a price below the lopinavir component's

17  average variable cost.  The effective price of the lopinavir

18  component of Kaletra is the price of Kaletra minus the price of

19  Norvir.  An effective price of the lopinavir component of Kaletra

20  below its average variable cost is improper because it would make

21  it impossible for a hypothetical equally efficient competitor,

22  which was legally allowed to sell lopinavir, and which had the same

23  costs as Abbott, to sell lopinavir at a profit.

24  C.   ABBOTT'S AFFIRMATIVE DEFENSE - LEGITIMATE BUSINESS REASON

25      If you find that GSK has proved that Abbott engaged in

26  anticompetitive conduct, you should then consider whether Abbott

27  has proved its affirmative defense that Abbott had a legitimate

28                              18

United States District Court
For the Northern District of California

1   business reason for the Norvir price increase.  A legitimate
2   business reason is one that demonstrates that Abbott did not intend
3   to exclude its competitors from the market in which Kaletra
4   competes.  To prevail on its affirmative defense, Abbott has the
5   burden of proving that it had a legitimate business reason for its
6   alleged anticompetitive conduct.  It is for you to decide whether
7   this reason is legitimate.

8        Conduct that is designed to protect or further Abbott's
9   legitimate business purposes is not anticompetitive, even if that
10  conduct injures competitors.  A legitimate business purpose is one
11  that benefits Abbott, regardless of any harmful effect on
12  competitors, such as a purpose to promote efficiency or quality,
13  offer a better product or service, or increase short-run profits.
14  In general, the desire to maintain monopoly power or to block entry
15  of competitors is not a legitimate business purpose.

16       As you have heard during trial, Abbott has patents on Norvir
17  and on Norvir's use as a booster.  Abbott's patents on Norvir and
18  on Norvir's use as a booster provide Abbott with a legal monopoly
19  over Norvir and Norvir's use as a booster.  This fact does not
20  establish whether Abbott violated the antitrust laws through
21  anticompetitive conduct.  It is for you to decide whether Abbott
22  engaged in anticompetitive conduct that violates the antitrust
23  laws.

24       If you find that GSK has proved that Abbott engaged in
25  anticompetitive conduct, through an effective refusal to deal with
26  its competitors or bundled discounting or both, and that Abbott has
27  not proved that it had a legitimate business reason for its

28                                   19

conduct, you may find that GSK has proved the third element of its actual monopolization claim.

### 4.  ACTUAL MONOPOLIZATION CLAIM – ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an actual monopolization claim that GSK must prove by a preponderance of the evidence is that it suffered injury to its business or property.  GSK can satisfy this element if it can prove the following:

First, that GSK was in fact injured as a result of Abbott's alleged violation of the antitrust laws;

Second, that Abbott's alleged illegal conduct was a material cause of GSK's injury; and

Third, that GSK's injury is an injury of the type that the antitrust laws were intended to prevent.

The first part of this element requires GSK to establish that it was injured as a result of Abbott's alleged violation of the antitrust laws.  Proving the fact of injury does not require GSK to prove the dollar value of its injury.  It requires only that GSK prove that it was in fact injured by Abbott's alleged antitrust violation.  If you find that GSK has established that it was in fact injured by an antitrust violation by Abbott, you will later consider the amount of GSK's antitrust damages.  The fact of injury and the amount of damages are different concepts.  You will not be asked to consider the amount of antitrust damages unless and until you have concluded that GSK has established all of the elements of a violation of the antitrust laws.

As to the second part of this element, GSK must prove that

United States District Court
For the Northern District of California

1   Abbott's alleged illegal conduct was a material cause of GSK's

2   injury.  This means that GSK must prove that it was injured as a

3   result of Abbott's alleged antitrust violation, and not some other

4   cause.  GSK is not required to prove that Abbott's alleged

5   antitrust violation was the sole cause of its injury; nor does GSK

6   need to eliminate all other possible causes of injury.  It is

7   enough if GSK has proved that the alleged antitrust violation was a

8   material cause of its injury.  However, if you find that GSK's

9   injury was caused primarily by something other than the alleged

10  antitrust violation, then you must find that GSK has failed to

11  prove the injury element of its antitrust claim.

12      To prove the third part of this element, GSK must establish

13  that its injury is the type of injury that the antitrust laws are

14  intended to prevent.  If GSK's injury was caused by a reduction in

15  competition, acts that would lead to a reduction in competition, or

16  acts that would otherwise harm consumers, then GSK's injury is an

17  antitrust injury.  On the other hand, if GSK's injuries were caused

18  by heightened competition, the competitive process itself, or by

19  acts that would benefit consumers, then GSK's injuries are not

20  antitrust injuries and GSK may not recover damages for those

21  injuries under the antitrust laws.  You should bear in mind that

22  businesses may incur losses for many reasons that the antitrust

23  laws are not designed to prohibit or protect against -- such as

24  where a competitor offers better products or services or where a

25  competitor is more efficient and can charge lower prices and still

26  earn a profit.

27

28                                  21

**United States District Court**
For the Northern District of California

B.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS

The second claim GSK brings under the antitrust laws is that Abbott unlawfully attempted to monopolize the market in which Kaletra competes.

To prevail on its claim of attempted monopolization, GSK must prove each of the following elements by a preponderance of the evidence:

First, that Abbott had a specific intent to achieve monopoly power in a relevant market;

Second, that there was a dangerous probability that Abbott would achieve its goal of acquiring monopoly power in the relevant market;

Third, that Abbott engaged in anticompetitive conduct; and

Fourth, that GSK was injured in its business or property by Abbott's anticompetitive conduct.

If you find that GSK has failed to prove any of these elements, then you must find for Abbott and against GSK on this claim.  If you find that GSK has proved each of these elements by a preponderance of the evidence, then you must find for GSK and against Abbott on this claim.

1.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT ONE:
SPECIFIC INTENT TO MONOPOLIZE A RELEVANT MARKET

The first element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott had a specific intent to monopolize the market in which GSK alleges that Kaletra competes.  This is the same market as the market relevant to GSK's claim of actual monopolization, about which I

22

**United States District Court**
For the Northern District of California

1    instructed you earlier.  You must determine whether GSK has proved

2    that Abbott acted with the conscious aim of obtaining the power to

3    control prices and to exclude or handicap competition in this

4    alleged market.

5        There are two ways GSK may prove that Abbott had the specific

6    intent to monopolize.  First, GSK may present evidence of direct

7    statements of Abbott's intent to obtain a monopoly in the relevant

8    market.  Such proof of specific intent may be established by

9    documents prepared by responsible officers or employees of Abbott

10   at or about the time of the conduct in question or by testimony

11   concerning statements made by responsible officers or employees of

12   Abbott.  You must be careful, however, to distinguish between

13   Abbott's intent to compete aggressively (which is lawful), which

14   may be accompanied by aggressive language, and a true intent to

15   acquire monopoly power by using anticompetitive means.

16       Second, even if you decide that the evidence does not prove

17   directly that Abbott specifically intended to obtain a monopoly,

18   specific intent may be inferred from what Abbott did.  For example,

19   if the evidence shows that the natural and probable consequence of

20   Abbott's conduct in the relevant market was to give Abbott control

21   over prices and to exclude or handicap competition, and that this

22   was plainly foreseeable by Abbott, then you may (but are not

23   required to) infer that Abbott specifically intended to acquire

24   monopoly power.

25           2.  ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT TWO:
                   DANGEROUS PROBABILITY OF SUCCESS
26

27       The second element of an attempted monopolization claim that

28                                      23

GSK must prove by a preponderance of the evidence is that there was a dangerous probability that Abbott would succeed in acquiring monopoly power in the market in which Kaletra competes if Abbott continued to engage in anticompetitive conduct.  As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider the factors included in Instruction "A.2.  ACTUAL MONOPOLIZATION CLAIM - ELEMENT TWO: MONOPOLY POWER" which I gave earlier.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

### 3.   ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT THREE: ANTICOMPETITIVE CONDUCT

The third element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that Abbott engaged in anticompetitive conduct.  GSK alleges that, to attempt to monopolize the market in which Kaletra competes, Abbott engaged in (a) a practical refusal to deal with its competitors and (b) unlawful bundled discounting.  This is the same anticompetitive conduct that GSK alleges with respect to its actual monopolization claim, about which I instructed you earlier.

### 4.   ATTEMPTED MONOPOLIZATION CLAIM - ELEMENT FOUR: REQUIREMENT OF INJURY

The fourth element of an attempted monopolization claim that GSK must prove by a preponderance of the evidence is that it

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

suffered injury to its business or property.  This is the same type of injury as the injury required for GSK's actual monopolization claim, about which I instructed you earlier.

## II.   BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – INTRODUCTION

Implied in every contract is a covenant, or agreement, of good faith and fair dealing.  The implied covenant of good faith and fair dealing between parties to a contract is a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.  The implied covenant is part of the contract, even though the contract contains a provision that states that the written contract is the "entire agreement."  A breach of the implied covenant is a breach of the contract itself, the covenant being part and parcel of the contract.  The covenant encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding were included. However, the covenant cannot be construed so broadly as to create independent contractual rights that were not bargained for by the parties.

## A.   BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – ELEMENTS

GSK alleges that Abbott breached the implied covenant of good faith and fair dealing with respect to the licensing agreement that they executed on December 13, 2002.  In order to demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has the burden to prove three elements by the preponderance of the evidence:

25

1     First, Abbott's conduct directly destroyed or injured GSK's

2   alleged right to receive benefits under the license agreement that

3   a reasonable party in GSK's position would have understood the

4   license agreement to have included;

5     Second, Abbott engaged in grossly negligent conduct; and

6     Third, Abbott's conduct constituting a breach of the implied

7   covenant of good faith and fair dealing was a proximate cause of

8   the injury to GSK's business.

9   1.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING –
              ELEMENT ONE: BAD FAITH OR UNFAIR CONDUCT

10

11    The first element of its implied covenant claim that GSK must

12  prove by a preponderance of the evidence is that Abbott committed

13  an act that showed a lack of good faith and fair dealing, injuring

14  GSK's right to receive the benefits that a reasonable party would

15  have been justified in understanding were included in the license

16  agreement.

17  2.   BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
              - ELEMENT TWO: GROSS NEGLIGENCE

18    The second element of its implied covenant claim that GSK must

19  prove by a preponderance of the evidence is that Abbott's breach of

20  the implied covenant constituted grossly negligent conduct.  Such

21  conduct involves intentional wrongdoing or a reckless indifference

22  to the rights of others.

23  3.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING –
              ELEMENT THREE : CAUSE OF INJURY

24

25    The third element of its implied covenant claim that GSK must

26  prove by a preponderance of the evidence is that Abbott's breach of

27  the implied covenant was a proximate cause of the injury to GSK's

28                                    26

1  business.

2      Proximate cause is a cause which in a natural and continuous

3  sequence produces the injury, and is a cause which a reasonable and

4  prudent person could have foreseen would probably produce such

5  injury or some similar injurious result.

6      There may be more than one proximate cause of an injury.

7  Therefore, GSK need not prove that Abbott's conduct was the sole

8  proximate cause of the injury to GSK's business.  However, GSK must

9  prove by a preponderance of the evidence that its injury is

10 directly traceable to Abbott's alleged breach of the implied

11 covenant.

12                    **III.    ADDITIONAL QUESTIONS**

13     Certain issues in this case must be decided by the Court,

14 based on decisions you make on certain factual questions.  You will

15 be asked to decide whether the following statements are true:

16     1.    During the negotiation of the Norvir Boosting License,

17           Abbott was considering how to use its control over Norvir

18           to limit competition with its drug Kaletra from

19           competitors' drugs and deliberately withheld its plans

20           from GSK.

21     2.    Abbott inequitably asserted its power over Norvir by

22           increasing Norvir's price by 400 percent to undermine and

23           disrupt GSK's launch of its drug, Lexiva, and future

24           sales of that drug.

25     3.    Abbott timed the 400 percent Norvir price increase in

26           order to disrupt Lexiva's launch and undermine Lexiva's

27           future sales.

28                                  27

1    You will also be asked to determine whether any of this

2 conduct proximately caused injury to GSK.

3                          **IV.  DAMAGES**

4    It is the duty of the Court to instruct you about the measure

5 of damages.  By instructing you on damages, the Court does not mean

6 to suggest for which party your verdict should be rendered.

7    If you find for GSK on any of its claims, you must determine

8 its damages.  GSK has the burden of proving damages by a

9 preponderance of the evidence.  Damages means the amount of money

10 that will reasonably and fairly compensate GSK for any injury you

11 find was caused by Abbott.

12    GSK seeks an award of damages on each of its claims based on

13 profits it alleges that it lost as a result of Abbott's

14 anticompetitive conduct and Abbott's breach of the implied

15 covenant.  If you find that GSK proved one or both of its antitrust

16 claims, or its breach of the implied covenant claim, or that Abbott

17 engaged in the specific conduct I described above in Instruction

18 III, you must consider the evidence of GSK's damages.

19    GSK has offered evidence to calculate the profits it would

20 have earned if Abbott had not engaged in its alleged misconduct.

21 You may award GSK the amount it has proved its profits would have

22 been in the absence of this alleged misconduct.

23    You must determine the amount of GSK's damages for all of the

24 claims on which it prevails, if any.  However, GSK is not entitled

25 to recover its damages more than once.  On the verdict form, if you

26 find that an award of damages is appropriate for more than one of

27 GSK's claims, you will be asked questions that ensure that GSK does

28                                28

1    not recover its damages more than once.

2    It is for you to determine what damages, if any, have been

3    proved.  So long as there is a reasonable basis for a damages

4    award, GSK should not be denied a right to be fairly compensated

5    just because damages cannot be determined with absolute

6    mathematical precision.  However, your award must be based upon

7    evidence and not upon speculation, guesswork or conjecture.

8                              **USE OF NOTES**

9    Some of you have taken notes during the trial.  Whether or not

10   you took notes, you should rely on your own memory of what was

11   said.  Notes are only to assist your memory.  You should not be

12   overly influenced by the notes.

13                        **NO TRANSCRIPT AVAILABLE**

14   You will have to make your decision based on what you recall

15   of the testimony.  You will not have a written transcript of the

16   trial.  Although a few portions of the trial have been transcribed,

17   the trial as a whole has not.  Portions of it could be read back to

18   you, if necessary, if you can identify particular portions you want

19   to hear.  However, read-back is time-consuming.

20                         **DUTY TO DELIBERATE**

21   When you begin your deliberations, you should elect one member

22   of the jury as your presiding juror.  That person will preside over

23   the deliberations and speak for you here in court.

24   You will then discuss the case with your fellow jurors to

25   reach agreement if you can do so.  Your verdict must be unanimous.

26                      **COMMUNICATION WITH COURT**

27   If it becomes necessary during your deliberations to

28                                    29

communicate with me, you may send a note through the Court security officer, signed by your presiding juror or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the parties before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone -- including me -- how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

### RETURN OF VERDICT

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the Court that you are ready to return to the courtroom.

Dated: March 24, 2011

_____
CLAUDIA WILKEN
United States District Judge