# Exhibit H

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

THE APPLE iPOD iTUNES          Lead Case No.
ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)
~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
STEVE JOBS
VOLUME I

April 12, 2011
10:03 a.m.

1 Infinite Loop
Cupertino, California

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Ana M. Dub, RMR, CRR, CSR 7445

**Page 2**

APPEARANCES OF COUNSEL

For the Direct Purchaser Plaintiffs:
  ROBBINS GELLER RUDMAN & DOWD LLP
  BONNY E. SWEENEY, ESQ.
  ALEXANDRA S. BERNAY, ESQ.
  CARMEN A. MEDICI, ESQ.
  655 West Broadway, Suite 1900
  San Diego, California  92101
  619.231.1058
  bsweeney@rgrdlaw.com
  xanb@rgrdlaw.com
  cmedici@rgrdlaw.com

For the Indirect Purchaser Plaintiffs:
  ZELDES & HAEGGQUIST, LLP
  AARON M. OLSEN, ESQ.
  625 Broadway, Suite 905
  San Diego, California  92101
  619.342.8000
  aaron@zhlaw.com

For the Defendant Apple, Inc., and the Deponent:
  O'MELVENY & MYERS LLP
  GEORGE A. RILEY, ESQ.
  Two Embarcadero Center, 28th Floor
  San Francisco, California  94111-3823
  415.984-8700
  griley@omm.com

Also Present:
  MATTHEW COPE, VIDEOGRAPHER

**Page 3**

INDEX OF EXAMINATION

WITNESS:  STEVE JOBS
EXAMINATION                         PAGE
By Ms. Sweeney                        7

**Page 4**

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | E-mail Chain, Top E-mail Dated July 23, 2004 to Jeff Robbin from Eddy Cue, Production Nos. Apple_AIIA 00090405-07 | 9 |
| Exhibit 2 | E-mail Dated July 24, 2004 to Eddy Cue, et al., from Katie Cotton, Production No. Apple_AIIA01384973 | 14 |
| Exhibit 3 | E-mail Chain, Top E-mail Dated July 25, 2004 to Philip Schiller from Eddy Cue, Production Nos. Apple_AIIA 00090429-31 | 14 |
| Exhibit 4 | E-mail Chain, Top E-mail Dated July 26, 2004 to Philip Schiller, et al., from Steve Jobs, Production Nos. Apple_AIIA 00093875-76 | 25 |
| Exhibit 5 | E-mail Chain, Top E-mail Dated July 26, 2004 to Steve Jobs from Zach Horowitz, Production Nos. Apple_AIIA 01384975-76 | 27 |
| Exhibit 6 | July 29, 2004 Press Release | 32 |
| Exhibit 7 | CNETNews.com Article | 28 |
| Exhibit 8 | The Wall Street Journal Article | 43 |
| Exhibit 9 | Chicago Tribune Binary Beat Column | 6 |
| Exhibit 10 | Redacted E-mail Chain, Top E-mail Dated August 17, 2004, Production Nos. Apple_AIIA 00920838-43 | 52 |



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Page 5

```
 1         INDEX TO EXHIBITS - CONTINUED
 2   Exhibit      Description              Page
 3   Exhibit 11   E-mail Dated April 9, 2004   22
                  to Steve Jobs from Rob Glaser,
 4                Production No. Apple_AIIA
                  01385106
 5
     Exhibit 12   E-mail Dated July 29, 2004   40
 6                to Katie Cotton, et al.,
                  from Steve Jobs, Production
 7                No. Apple_AIIA00090471
 8   Exhibit 13   E-mail Dated April 27, 2004  59
                  to Steve Jobs from Katie
 9                Cotton, Production
                  Nos. Apple_AIIA00098581-85
10
     Exhibit 14   E-mail Dated July 27, 2004,  62
11                to Steve Jobs, et al., from
                  Katie Cotton
12
13         (Original exhibits included with original
14          transcript.)
```

Page 6

```
 1              DEPOSITION OF STEVE JOBS
 2                   April 12, 2011
 3
 4              P R O C E E D I N G S
 5         (Whereupon, Deposition Exhibits 1
 6          through 10 were pre-marked for
 7          identification.)
 8         THE VIDEOGRAPHER: Good morning. This is
 9   Disk 1 in the videotaped deposition of Steve Jobs,
10   in the Apple iPod iTunes Antitrust Litigation.
11         This deposition is being held at Apple
12   headquarters, One Infinite Loop, Cupertino,
13   California. It's April 12th, 2011 at 10:03 A.M.
14         My name's Matt Cope. I'm the videographer
15   from Esquire in San Francisco. The court reporter
16   today is Ana Dub.
17         Counsel, will you please introduce
18   yourselves.
19         MS. SWEENEY: Bonny Sweeney, representing
20   the direct purchaser plaintiffs.
21         MS. BERNAY: Alexandra Bernay, also
22   representing the direct purchaser plaintiffs.
23         MR. MEDICI: Carmen Medici, also
24   representing the direct purchaser plaintiffs.
25         MR. OLSEN: Aaron Olsen representing the
```

Page 7

```
 1   indirect purchaser plaintiffs.
 2         MR. RILEY: George Riley representing
 3   Mr. Jobs and Apple.
 4         THE VIDEOGRAPHER: And will we now swear
 5   in the witness.
 6                   STEVE JOBS
 7         sworn by the Certified Shorthand Reporter,
 8              testified as follows:
 9                  EXAMINATION
10   BY MS. SWEENEY:
11     Q.  Good morning, Mr. Jobs. I introduced
12   myself before we got on the record. And as you
13   know, this is a short deposition, just two hours.
14   But at any time if you want to take a break, just
15   let me know and we'll break.
16     A.  Thanks.
17     Q.  What's your current position at Apple?
18     A.  I'm the CEO.
19     Q.  And were you CEO during the entire year of
20   2004?
21     A.  Yes.
22     Q.  Okay. And do you have any understanding
23   of what this lawsuit is about that we're here for
24   today?
25     A.  Not much.
```

Page 8

```
 1     Q.  What's your understanding of the claims in
 2   the case?
 3     A.  I don't know what the claims in the case
 4   are.
 5     Q.  Okay. Are you familiar with a company
 6   called RealNetworks?
 7     A.  Yeah.
 8     Q.  And do you recall in 2004 --
 9     A.  Do they still exist?
10     Q.  As far as I know.
11     A.  Okay.
12     Q.  In some form.
13         Do you recall in 2004 when RealNetworks
14   developed a product called Harmony?
15     A.  Not -- vaguely. I don't really remember
16   when it was, but I vaguely remember that they did,
17   yeah.
18     Q.  Okay. And do you recall that that product
19   enabled customers of RealNetworks to purchase songs
20   from the RealNetworks store and play them directly
21   on an iPod?
22     A.  I don't really remember that, but sure, it
23   might well have.
24     Q.  Okay. What can you tell me that you
25   recall about Harmony?
```



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Page 9

1  A. I don't really have much of a recollection
2  of Harmony.
3       MS. SWEENEY: Okay. Well, we can show you
4  some documents that might help refresh your
5  recollection. In fact, why don't we do that right
6  now.
7       And, in fact, George, we've premarked some
8  exhibits. Should we just pass them all out now?
9  Whatever's easiest for you.
10      MR. RILEY: Sure. Whatever works --
11      MS. SWEENEY: Okay.
12      MR. RILEY: -- for you.
13      MS. SWEENEY: And we may not get through
14 all these, but I thought it was easier to just
15 pre-mark them.
16 BY MS. SWEENEY:
17  Q. Mr. Jobs, do you have all those exhibits
18 in front of you?
19  A. I have the ones you just gave me.
20  Q. Okay. Can you turn, please, to the one
21 that we have marked Jobs Exhibit 1.
22  A. Jobs Exhibit 1. Yeah, I was reading that
23 right now.
24  Q. Okay. Do you need to take another minute
25 to look through it?

Page 10

1  A. No.
2  Q. Okay. And this is a document that was
3  produced by Apple, and it's a series of e-mails.
4  The last e-mail, the one on the top left of the
5  first page, is from Eddy Cue to Jeff Robbin, and
6  it's discussing a draft press release by Apple
7  responding to the Harmony product.
8       Do you recall the discussions that took
9  place at Apple between July 23rd and July 26th, 2004
10 regarding Harmony?
11  A. I don't, no.
12  Q. Can you turn to the last page of
13 Exhibit 1.
14  A. Sure.
15  Q. And the top of that page reads:
16      "Describe the situation using
17      Steve's analogy. 'Normally
18      you're concerned that someone is
19      going to break [into] your house
20      to steal your stereo. In this
21      case, it appears that someone is
22      breaking into our house and
23      setting up their own stereo --
24      but they're still breaking in.'"
25      Did you make that analogy to describe the

Page 11

1  RealNetworks' Harmony product?
2   A. I don't remember. Sounds like I might
3  have, based on this e-mail.
4   Q. Okay. And at the bottom of that last
5  page, again, of Exhibit 1, it says:
6      "Eddy -- any word from the
7      labels?"
8      Eddy Cue is one of the persons at Apple
9  who has been involved since the beginning of the
10 contracts with the labels in the negotiations
11 between Apple and the labels; is that correct?
12  A. I don't know if he was involved at the
13 very beginning, but he's been involved for a long
14 time.
15  Q. Okay. And you also have been very
16 involved with those discussions; correct?
17  A. Sure.
18  Q. And do you recall in July of 2004
19 discussing with Mr. Cue or anyone else at Apple the
20 labels' reaction to RealNetworks' Harmony product?
21  A. I don't remember any specific discussions,
22 no.
23  Q. Do you remember some general discussions?
24  A. Not really. I mean, I -- I just don't
25 have much of a memory of that whole time frame.

Page 12

1   Q. If you could look at the first page of
2  Exhibit 1. And, again, this is an e-mail from
3  Mr. Cue, and he says:
4      "I talked to Universal. They
5      were aware of it. From their
6      viewpoint, they are ok with it
7      because they want
8      interoperability."
9      In 2004, were the labels pressing Apple to
10 open up the iPod so that there was greater
11 interoperability between the iPod and competing
12 digital music stores?
13  A. Well, I think from their point of view,
14 they wanted everything to interoperate with
15 everything else, but there were other points of view
16 in the marketplace.
17      It depended on what your point of view
18 was. Depending on where you sat in the industry,
19 you'd have a different point of view.
20  Q. And what was your point of view as CEO of
21 Apple?
22  A. Well, I think, as best as I can recall, my
23 point of view and I'd say Apple's point of view was,
24 you know, we were the only big company involved in
25 this stuff at that time, the one with the deepest



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                        April 12, 2011
                HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13

1  pockets.
2       And we had pretty much black-and-white
3  contracts with the labels that if people violated
4  the digital rights management system on iTunes or on
5  the iPod and they allowed music to be taken off of
6  the iPod, as an example, and put on somebody else's
7  computer, that that would be in clear violation of
8  the licenses that we had with the labels, and they
9  could cease giving us music at any time because of
10 that.
11      So I remember we were very concerned about
12 that.  And we went to great pains to make sure that
13 people couldn't hack into our digital rights
14 management system because if they could, we would
15 get nasty e-mails from the labels threatening us
16 to -- you know, that they were going to yank the
17 license.
18      Q.  But because RealNetworks' Harmony product
19 didn't strip DRM, the labels were okay with it;
20 isn't that right?
21      A.  No, I don't remember that at all, no.  I
22 don't know whether it stripped the DRM off or not.
23 I think it must have had to have stripped the DRM
24 off.  Not strip it off, but break it.
25      Q.  Let's --

14

1       A.  I don't think there's any other way that
2  something like that could work.
3       Q.  Well, let's take a look at Exhibit 3.
4       A.  Not 2?
5       Q.  We'll come back to 2.
6       A.  Okay.
7          MR. RILEY:  What is Exhibit 3?
8          MS. SWEENEY:  It's a series of e-mails.
9  The most -- the last one in the string is from Eddy
10 Cue to Philip Schiller and others, including
11 Mr. Jobs, and it's dated July 25th, 2004.
12 BY MS. SWEENEY:
13      Q.  Have you had a chance to look through
14 that, Mr. Jobs?
15      A.  No, I'm just reading it now.
16         (Witness reviews document.)
17         THE WITNESS:  Okay.  I've read it.
18 BY MS. SWEENEY:
19      Q.  And did you receive this e-mail from
20 Mr. Cue on or about July 25th, 2004?
21      A.  I have no recollection of it, no.
22      Q.  Do you have any reason you didn't believe
23 it -- you didn't receive it?
24      A.  No.
25      Q.  Okay.  And in the top left of the first

15

1  page of Exhibit 2, Mr. Cue says:
2          "The labels are convinced
3          that different formats are
4          hurting their growth.  They want
5          us to license our DRM to Real.
6          Since Real has assured them that
7          they are putting the music in
8          FairPlay, they are ok with it
9          (that is until there is a
10         problem).  Real is actually
11         saying they are playing a
12         protected song on an authorized
13         device for that protection
14         scheme."
15      So does that refresh your recollection
16 that Real's Harmony product preserved the DRM and
17 that the labels were okay with Harmony and, in fact,
18 some of the labels issued public press releases
19 applauding the Harmony product?
20      A.  Yeah, I don't remember that.
21         And it doesn't say that the Real product
22 doesn't break the DRM.  It says that Real is saying
23 that.  It doesn't say that it's -- that we've tested
24 it or it's true.  But I'm sure we did and figured it
25 out.

16

1       Q.  Did you ever -- did Apple ever conclude
2  that RealNetworks' Harmony product was stripping
3  DRM?
4       A.  I don't really remember.
5          Part of the issue, also, was that -- I
6  recall something to the effect that we are con- --
7  we were constantly upgrading iTunes and enhancing
8  its DRM.  And we -- you know, we assumed that future
9  enhancements would break the RealNetworks scheme,
10 whatever that was.  So that would be a real problem
11 for everybody.
12      Q.  Did Apple ever conclude that RealNetworks'
13 Harmony product was illegal?
14      A.  I don't know.
15      Q.  Did Apple ever send a cease and desist
16 letter to Real?
17      A.  I don't recall.  I don't know.
18      Q.  Now, Apple has, in the past, sent cease
19 and desist letters to persons who were known to have
20 developed programs that stripped DRM from iTunes
21 music; correct?
22         MR. RILEY:  Counsel, I think you're
23 getting beyond the topics that the judge permitted.
24         MS. SWEENEY:  I understand.  I'm not going
25 to go too far down this line.  Just get the answer



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                    April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                                    17
 1   to this question and --
 2         MR. RILEY:  And I don't think it's tied to
 3   the three topics that the judge permitted.  Cease
 4   and desist letters to third parties?
 5         MS. SWEENEY:  You've stated your
 6   objection.  Thank you, Counsel.
 7         MR. RILEY:  You don't have to answer that
 8   question, Steve, if you don't want to.
 9         THE WITNESS:  Okay.
10         MS. SWEENEY:  Respectfully, you can
11   object; and if I continue down roads that you think
12   are beyond the scope, you can seek an order from the
13   Court.  But the only basis for instructing a witness
14   not to answer is if there is an attorney-client
15   privilege issue.
16         MR. RILEY:  I'm aware of that, but this is
17   a different kind of deposition.  The Court limited
18   it to three narrow topics.  I don't see how cease
19   and desist letters to third parties fits into any of
20   those three topics.
21         MS. SWEENEY:  Because it fits into -- if
22   you'll recall, the judge said we're permitted to
23   inquire about Apple's decisions related to
24   RealNetworks' Harmony technology.
25         And Apple did issue cease and desist
```

```
                                    18
 1   letters against other companies, but not against
 2   Real, and I want to establish that on the record.
 3         MR. RILEY:  You've misstated what the
 4   judge permitted.  Three topics.
 5            "The deposition shall be
 6         limited to the topics of (a) the
 7         July 26, 2004 RealNetworks
 8         announcement, (b) the July 29,
 9         2004 Apple announcement in
10         response thereto, and (c)
11         Apple's software updates in
12         October 2004 that rendered the
13         RealNetworks digital music files
14         once again inoperable with
15         iPods."
16         Cease and desist orders -- letters to
17   third parties don't fit into any of those three
18   categories.
19         MS. SWEENEY:  We're using up a lot of the
20   two hours, a lot of time on this question.  It's
21   just a simple yes-or-no question.  Maybe Mr. Jobs
22   doesn't even recall.  Let him answer the question;
23   we'll move on.
24         MR. RILEY:  Okay.
25         THE WITNESS:  What was the question,
```

```
                                    19
 1   again?
 2   BY MS. SWEENEY:
 3      Q.  Did Apple issue cease and desist letters
 4   against companies that developed technology that
 5   stripped DRM from iTunes songs?
 6      A.  I don't -- in that time frame, I don't
 7   remember.
 8      Q.  Now, do you know who Rob Glaser is?
 9      A.  Well, I don't know him, but I know he was
10   the CEO of RealNetworks for a while.
11      Q.  Did you ever meet Mr. Glaser?
12      A.  That's a good question.
13         I probably did once or twice.  I don't
14   remember.
15      Q.  Did you ever talk to him on the phone?
16      A.  I might have.  I just don't remember.
17      Q.  Now, looking at Exhibits 1, 2 --
18      A.  Do you want me to look at 2 now?
19      Q.  -- and 3, collectively, I think these are
20   all exhibits pertaining to --
21      A.  Do you want me to look at 2?  We haven't
22   looked at 2 yet.
23      Q.  Oh.  We haven't?
24      A.  No.
25         MR. RILEY:  No.
```

```
                                    20
 1   BY MS. SWEENEY:
 2      Q.  I'm sorry.
 3      A.  You skipped over it.  Do you want me to
 4   read it?
 5      Q.  No, that's okay.  I'm sorry.  Let me ask a
 6   different question.
 7      A.  Okay.
 8      Q.  Okay.  I'm sorry.  Going back to
 9   Exhibit 3, now Mr. Cue says in the top of the
10   left-hand side of the first page:
11            "Also remember some labels at
12         this point are also worried that
13         we are getting to be too
14         dominant."
15         And is this something that you discussed
16   at Apple around this time frame, that is, the
17   labels' concern that Apple was becoming too
18   dominant?
19      A.  I don't really remember.  I mean, I
20   remember there was such a time.  I don't really know
21   when it was.  Probably spanned many years, but I
22   don't really remember when.
23      Q.  But you do recall that at some time the
24   labels expressed a concern that Apple was becoming
25   too dominant?
```



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 21

```
 1     A.  I don't remember -- I remember maybe
 2  reading some press articles where they might say
 3  that.  They never said that to us.
 4     Q.  If you could turn to the second page of
 5  Exhibit 3, about two-thirds of the way down the page
 6  it says:
 7        "In April, Apple chairman
 8        Steve Jobs" --
 9     A.  I'm sorry.  Exhibit 3?
10     Q.  Yeah.
11     A.  Okay.  On page what?
12     Q.  Page 2.
13     A.  Okay.  Sorry.  Yeah.  Yeah.
14     Q.  It's about two-thirds of the way down the
15  page.  It says:
16        "In April, Apple chairman
17        Steve Jobs rebuffed Glaser's
18        request for a meeting to discuss
19        an alliance between the
20        companies . . . ."
21        Do you see that?
22     A.  Mm-hmm.
23     Q.  Did you rebuff a request from Mr. Glaser
24  in April of 2004 to license FairPlay to
25  RealNetworks?
```

Page 22

```
 1     A.  I don't remember that.  I might have.  I
 2  don't really remember.
 3     Q.  Do you recall discussions with Mr. Glaser
 4  at any time during 2004?
 5     A.  I don't recall any specific discussions.
 6        I'm sorry I don't remember more of this
 7  for you, but there's been a lot of water under that
 8  bridge in seven years.  So . . .
 9        MS. SWEENEY:  I understand.  I've been
10  reading these documents, so it's different.
11        (Whereupon, Deposition Exhibit 11 was
12         marked for identification.)
13  BY MS. SWEENEY:
14     Q.  Okay.  I'm going to ask the court reporter
15  to hand you what's been marked as Jobs Exhibit 11.
16     A.  Are you done with 3?
17     Q.  Yes.
18     A.  Thank you.
19        (Witness reviews document.)
20        THE WITNESS:  Okay.  I've read it.
21  BY MS. SWEENEY:
22     Q.  Okay.  Mr. Jobs, this is an e-mail from
23  Rob Glaser to you dated April 9th, 2004.  Did you
24  receive this e-mail?
25        MR. RILEY:  Hold on.
```

Page 23

```
 1        I object to this.  This was a document
 2  that was in front of Judge Lloyd.  He said you could
 3  not question about this issue.  It's outside the
 4  three topics.
 5        MS. SWEENEY:  Well, I disagree because it
 6  goes to Apple's response to the July 26 announcement
 7  by RealNetworks.
 8        MR. RILEY:  It's hard to see that.  This
 9  isn't part of a response.  This is a letter that
10  occurred a couple of months before that time.
11        MS. SWEENEY:  Yes, but it establishes the
12  background for the events that occurred between June
13  and October of 2004.
14        MR. RILEY:  I will let you ask some
15  background about this as it relates to the previous
16  document, but I think this is clearly outside the
17  scope.
18        MS. SWEENEY:  Your objection is noted.
19  BY MS. SWEENEY:
20     Q.  Mr. Jobs, do you recall the question?  Did
21  you receive this e-mail from Mr. Glaser?
22     A.  I don't remember receiving it, but I might
23  have.
24     Q.  Is that the e-mail that you use at Apple?
25     A.  Yes, it is.
```

Page 24

```
 1     Q.  Is there any reason to believe you didn't
 2  receive this e-mail?
 3     A.  I don't know.  I just don't remember
 4  receiving it.
 5     Q.  Did you respond to Mr. Glaser's request
 6  that Apple license RealNetworks' access to FairPlay
 7  on the iPod?
 8     A.  I don't remember doing so, no, because I
 9  don't even remember this e-mail.
10     Q.  Is it possible that you spoke with
11  Mr. Glaser about his proposal after he sent you this
12  e-mail on April 9, 2004?
13     A.  It's possible.  I don't remember doing so,
14  but it's possible.
15     Q.  Do you recall Mr. Glaser telling you that
16  RealNetworks was working on a product that could
17  make its music interoperable with iPods?
18     A.  I don't recall that, no.
19     Q.  Is it possible that you had that
20  discussion?
21        MR. RILEY:  Object to the form.
22        THE WITNESS:  It's possible I had any
23  discussion.  I just don't remember.
24  BY MS. SWEENEY:
25     Q.  If you could look at the next to last
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**29**

1  Q. Yes, please.
2  A. Okay.
3     (Witness reviews document.)
4  BY MS. SWEENEY:
5  Q. Have you had a chance to read that,
6  Mr. Jobs?
7  A. No. I'm still reading it.
8     (Witness reviews document.)
9     THE WITNESS: Okay.
10 BY MS. SWEENEY:
11 Q. All right. So first of all, the headline
12 of Exhibit 7 says:
13    "RealNetworks breaks Apple's
14    hold on iPod."
15 And then it says:
16    "Rob Glaser and Steve Jobs
17    have feuded before."
18 Do you know what that's referring to, that
19 you and Mr. Glaser feuded before?
20 A. I don't, no.
21 Q. And then you recall in a previous exhibit
22 we were looking at, which is the e-mail
23 correspondence between you and Mr. Horowitz, you
24 were complaining about Larry's quote in a CNET
25 article.

**30**

1  And halfway down the page -- excuse me.
2  The second page of Exhibit 7, there is a quote from
3  Larry Kenswil, president of Universal Music's eLabs
4  division.
5     Is that the Larry that you're referring to
6  in the e-mail that's Exhibit 5?
7  A. I don't know, but it might very well be.
8  Q. Was Larry Kenswil someone that you dealt
9  with at Universal in that time frame?
10 A. Not really, no.
11 Q. And in this statement attributed to
12 Mr. Kenswil, he says:
13    "Up to now, the world of
14    downloads has been far too close
15    to a world where the CD you buy
16    in one store wouldn't play on
17    the CD player you bought in
18    another."
19 And then he goes on to say:
20    "We applaud RealNetworks'
21    efforts to help correct this
22    situation and appeal to all
23    people and companies in this
24    area to work toward a world of
25    universal interoperability."

**31**

1     Is this the statement that you described
2  in your July 26 e-mail as terrible and in need of
3  correction?
4  A. I don't really remember. Could be. You
5  mean the whole paragraph there?
6  Q. Yes.
7  A. Might be. I just don't remember.
8  Q. Is there anything in that statement, that
9  quote that I just read into the record, is there
10 anything in that that's inaccurate?
11 A. I have -- in which statement? Larry's
12 statement?
13 Q. Yes.
14 A. Well, you have to ask him. It's his
15 statement. I don't know if it's inaccurate or not.
16 I don't know what he meant to say.
17 Q. Can you look at the bottom of the second
18 page of Exhibit 7. And it says:
19    "Last January, RealNetworks
20    also announced that it had
21    figured out how to let its PC
22    software play songs purchased
23    from Apple's iTunes store and
24    save them onto the iPod."
25 Do you see that?

**32**

1  A. Mm-hmm.
2  Q. Okay. And do you recall that
3  announcement?
4  A. I don't, no.
5  Q. All right. Let's have a look at
6  Exhibit 6. And I apologize for skipping around.
7  A. That's okay.
8  Q. That's the press release.
9     (Witness reviews document.)
10    THE WITNESS: Okay.
11 BY MS. SWEENEY:
12 Q. All right.
13 A. Excuse me.
14 Q. Exhibit 6 is -- appears to be a press
15 release by Apple dated July 29th.
16    Is that a press release that Apple issued
17 on July 29th, 2004?
18 A. I don't know. Looks like it, but I don't
19 know.
20 Q. Do you have any reason to believe it's not
21 a press release that was issued by Apple?
22 A. No.
23 Q. Some of the other exhibits we were looking
24 at discussed drafts of a press release pertaining to
25 RealNetworks' Harmony product. Do you recall those


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**33**
1  documents?
2      A.  Yeah.
3      Q.  Okay.  And --
4      A.  That you just showed me?
5      Q.  That's correct.
6      A.  Yes.
7      Q.  And does this statement on Exhibit 6
8  represent the final version of those various draft
9  iterations of the press release?
10     A.  It would appear to.
11     Q.  Okay.  And looking at the text of the
12 statement, it says:
13         "We are stunned that
14         RealNetworks has adopted the
15         tactics and ethics of a hacker
16         to break into the iPod . . . ."
17         And then it goes on.  And my first
18 question is:  What did you mean by "the tactics and
19 ethics of a hacker"?
20     A.  I don't recall writing this, so I don't
21 know.  Maybe I wrote it, but -- I can guess at what
22 the person that wrote it meant, if you'd like.
23     Q.  Is it a pejorative description, the
24 tactics and ethics of a hacker?
25     A.  What do you mean by "pejorative"?

**34**
1      Q.  Is it -- does it have negative
2  connotations, in your view?
3      A.  Yeah.
4      Q.  And then it says:
5          ". . . we are inves-" --
6      A.  But I'm sure some people would have the
7  opposite view.
8      Q.  And then I'm reading, again, the second
9  half of the first sentence.
10         ". . . we are investigating the
11         implications of their actions
12         under the DMCA and other laws."
13         And I already asked you some questions
14 about this, so I'm not going to reask all those
15 questions.  But did you ever come to an
16 understanding as to whether Real's release of
17 Harmony violated the DMCA?
18     A.  I don't remember.
19     Q.  Okay.  The second paragraph of the press
20 release, which is in Exhibit 6, says:
21         "We strongly caution Real and
22         their customers that when we
23         update our iPod software from
24         time to time, it is highly
25         likely that Real's Harmony

**35**
1  technology will cease to work
2  with current and future iPods."
3  Do you see that?
4      A.  Uh-huh.
5      Q.  And in fact, when Apple released its 4.7
6  update in October of 2004, Harmony ceased working
7  with at least some iPods; correct?
8      A.  I -- I think so, but I don't recall
9  specifically.
10     Q.  And at the time that this press release
11 was issued, that is, July 29, 2004, were you certain
12 that updates to iPod software would cause Real's
13 Harmony technology to cease to work with iPods?
14     A.  Well, I'm not an engineer, so I -- I
15 probably wasn't qualified to make such a judgment.
16     Q.  Were engineers at Apple involved in the
17 drafting of the press release?
18     A.  I don't remember.
19     Q.  Do you want to take a minute to go back
20 and look at a couple of the exhibits we looked at
21 before and see who some of the people were involved
22 in the drafting?  That would be Exhibit 3,
23 Exhibit 1.
24     A.  So you want me to go back to these?
25     Q.  Yeah, just briefly.  Just look at the

**36**
1  names in the e-mails.
2      A.  So which ones?
3      Q.  How about Exhibit 3 and Exhibit 4?
4         MR. RILEY:  I think she's asking you to
5  look at the recipients copied, the people copied to
6  determine whether they include engineers.
7         THE WITNESS:  Yeah.  I'm trying to find 3
8  here.  3 and 4?
9  BY MS. SWEENEY:
10     Q.  Yes, please.
11        (Witness reviews document.)
12        THE WITNESS:  Well, I'm sorry.  I read
13 Exhibit 3 as not having much to do with the press
14 release.  So I don't know how that can illuminate
15 this.
16 BY MS. SWEENEY:
17     Q.  Okay.  That's a good point.  How about
18 Exhibit 1?
19     A.  You said Exhibit 4 or 1?
20     Q.  How about Exhibits 1 and 4?  And then, if
21 you could just look at the to's and the cc's,
22 et cetera.
23     A.  Okay.  Exhibit 1 and 4.
24        (Witness reviews documents.)
25        THE WITNESS:  Okay.  Exhibit 1 doesn't



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                              April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                37
 1  really have any engineers on it.  And --
 2       MR. RILEY:  I think she is referring to
 3  the entire list of recipients.
 4       THE WITNESS:  Oh, I see.  From Jeff
 5  Robbin.  Huh?  Yeah, Jeff's an engineer.
 6  BY MS. SWEENEY:
 7    Q.  Okay.
 8    A.  And I don't see any engineers copied on 4
 9  either.  So I guess Jeff sent this out to people,
10  and Eddy had sent it out.
11       MR. RILEY:  Greg Joswiak.
12       THE WITNESS:  Greg's not an engineer.
13       MR. RILEY:  Right.  But he's copied on
14  this.
15       THE WITNESS:  But he's not an engineer.
16  BY MS. SWEENEY:
17    Q.  All right.  So Mr. Robbin, who is an
18  engineer, was involved in at least some of the
19  discussions at Apple regarding the drafting of the
20  press release; correct?
21    A.  Mm-hmm.
22    Q.  Okay.  And the press release says that it
23  is highly likely that Harmony will cease to work.
24       If it was certain that Harmony would cease
25  to work with iPods, wouldn't Apple have said that in

                                                38
 1  its press release?
 2    A.  Well, "highly likely" is pretty strong.
 3    Q.  But it's not certain?
 4    A.  I don't know why certain words were chosen
 5  and others weren't.  But "highly likely" is pretty
 6  strong.
 7    Q.  Now, when we looked at the e-mails
 8  regarding the drafting of the press release
 9  pertaining to RealNetworks' Harmony product, there's
10  a lot of e-mails going around over the weekend.
11  July 26 was a Monday.  And there's e-mails from, I
12  think, July 24th and 25th.
13       Is it common for you and others at Apple
14  to work on press releases over the weekend?
15    A.  Well, Apple's a 24-by-7 company.  So a lot
16  of us work on things on the weekend.
17    Q.  Was there an unusual amount of activity
18  surrounding the RealNetworks' Harmony announcement
19  at Apple?
20    A.  Not that I recall, but I don't know all
21  these press releases that were flying around.  I
22  probably wasn't copied on most of them, so I don't
23  know, but I don't recall that being the case.
24    Q.  Now, after you -- after Apple issued its
25  press release on July 29th about RealNetworks'

                                                39
 1  Harmony product, RealNetworks responded with its own
 2  press release.
 3       Do you recall that public dialogue, as it
 4  were, between Apple and RealNetworks?
 5    A.  I don't.
 6    Q.  Okay.  Did you speak with Mr. Glaser at
 7  any time after Apple issued its press release in
 8  July of 2004?
 9    A.  I don't recall speaking to him.
10    Q.  Did you have discussions with engineers
11  and others at Apple about closing the holes in
12  software that enabled -- or that permitted
13  RealNetworks to create interoperability through
14  Harmony?
15       MR. RILEY:  Object to the form of the
16  question.
17       THE WITNESS:  Well, if you're asking me
18  did I have -- did I talk with engineers about the
19  RealNetworks situation, I'm sure I probably did.
20  BY MS. SWEENEY:
21    Q.  And what did -- what was the substance of
22  those communications?
23    A.  I have no recollection of them.
24    Q.  Did you have any discussions -- did you
25  make any public statements about the RealNetworks

                                                40
 1  Harmony product in or after July of 2004?
 2    A.  I might have.  I don't remember doing so,
 3  but -- I just don't remember.
 4    Q.  Now, do you recall that Mr. Glaser
 5  telephoned you the week before the RealNetworks
 6  announcement of Harmony to let you know it was
 7  coming?
 8    A.  I don't remember that, no.
 9    Q.  Is -- do you recall ever speaking with
10  Mr. Glaser by telephone?
11    A.  I don't.
12       (Whereupon, Deposition Exhibit 12 was
13        marked for identification.)
14       THE WITNESS:  Do you want me to read this?
15       MS. SWEENEY:  Yes, please.
16       And for the record, this is an Apple
17  document.  It's an e-mail from Mr. Jobs to Katie
18  Cotton, Jeff Robbin, and others regarding
19  RealNetworks' statement, and it's dated July 29,
20  2004.
21       (Witness reviews document.)
22       THE WITNESS:  Okay.  I've read it.
23  BY MS. SWEENEY:
24    Q.  Okay.  And this is the statement that
25  RealNetworks issued in response to Apple's statement



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                            April 12, 2011
                HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                    45
 1         concerned, if it gets legal
 2         music into consumers' hands and
 3         makes it more flexible, we
 4         welcome it,' says Ted Cohen,
 5         senior vice president of digital
 6         development and distribution at
 7         EMI Music . . . ."
 8       Did you talk to Mr. Cohen of EMI Music
 9   about the RealNetworks announcement in 2004?
10       A.  No, not that I recall, no.
11       Q.  Okay.  Do you know who Mr. Cohen is?
12       A.  I don't.
13       Q.  And then at the bottom of the page and
14   carrying over to the top of page 3, the article
15   says:
16         "Even if RealNetworks is
17         successful, it's unclear if the
18         effort would harm or help Apple.
19         The move could boost iPod sales
20         by allowing users to buy songs
21         from more sites."
22       Do you agree with that?
23       A.  I don't know.  We've never run that
24   experiment.
25       Q.  Did you discuss that possibility at the

                                    46
 1   time, that is, back in 2004?
 2       A.  Not that I recall.  Might have.
 3       Q.  And then the second paragraph says:
 4         "'The more iPods they sell,
 5         the better off Apple will
 6         be . . . .'"
 7       And you would agree with that; right?
 8       A.  Sure.
 9       The thing that you have to keep in mind,
10   though, is there are lots of hackers trying to hack
11   into these things so that they can do things that
12   would put us in non-compliance with the contracts we
13   have with the music companies.
14       And we were very scared of that.  So we
15   would constantly be revving iTunes and iPod
16   software, closing any -- any holes that might be in
17   it or any problems it might have.  And so this was a
18   moving target; and, you know, anybody trying to keep
19   up with that moving target would probably have a
20   hard time doing it.
21       And so we were very concerned with, you
22   know, somebody like Real promising customers that
23   they would have compatibility when, in the future,
24   they might not.
25       And that's not something we could

                                    47
 1   guarantee.  So we could get sued by all these
 2   people, you know?
 3       Q.  By Real customers?
 4       A.  Yeah.
 5       Q.  You said that you were very concerned
 6   about non-compliance with music companies.  In fact,
 7   you said, ". . . we were very scared of that."
 8       Did any of the labels ever threaten to
 9   withhold music because of the RealNetworks Harmony
10   technology?
11       A.  Well, we got -- we got letters from time
12   to time.  I don't remember any specific ones.  But
13   we got letters from time to time from the music
14   companies about a particular hack that had existed
15   out there that just popped up, and they were very
16   clear that they wanted it closed or they would
17   revoke the license.
18       Q.  But that wasn't the labels' response to
19   Harmony; correct?
20       A.  I don't know.  I don't know if we got them
21   on Harmony or not.
22       The labels -- there's a lot of people at
23   the labels, and they -- sometimes some of the people
24   working there don't speak for the whole label, you
25   know.  You've got to be careful about that too.

                                    48
 1       Q.  Well, you recall the exhibits we looked at
 2   earlier today where there was an exchange between
 3   you and Mr. Horowitz at Universal.  Do you recall
 4   that?
 5       A.  Mm-hmm.
 6       Q.  And you were upset because an executive at
 7   Universal had actually applauded Harmony; right?
 8   Mr. Larry Kenswil.
 9       A.  Okay.
10       Q.  So you can't think of any instances, can
11   you, where a label complained to Apple about
12   RealNetworks' Harmony product?
13       A.  But it doesn't really matter because in
14   fixing holes for DRM hacks, it might screw up the
15   Real technology anyway, as collateral damage.
16       Q.  Did --
17       A.  One would have to be very careful about
18   that.  And since we didn't own the Real technology
19   and probably didn't have access to it, that's not a
20   burden we would want to take on.
21       Q.  And from time to time, there were DRM
22   hacks.  And that's the phrase that you used.  And
23   these are hacks that stripped DRM from iTunes music;
24   correct?
25       A.  No.  They would just find ways to get at



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 49**

1  stuff that would put us in non-compliance with the
2  agreements.
3      Q.  And did any of the labels ever withhold
4  music because of a DRM hack?
5      A.  No, because we were very responsive in
6  fixing them.
7      Q.  Did any of the labels ever threaten to
8  withhold music from Apple because of a DRM hack?
9      A.  Yes.
10     Q.  Who?
11     A.  I don't know.  I remember we would get
12 letters from time to time.
13     Q.  You would get letters asking you to fix
14 the holes or actually threatening to withhold music
15 from Apple?
16     A.  Well, they would say both.  Fix the holes
17 or else.  So . . .
18     Q.  But you can't remember which labels --
19     A.  I don't remember any --
20     Q.  -- sent such a letter?
21     A.  No.
22     Q.  And those would have been letters to you
23 or to Mr. Cue at Apple?
24     A.  I don't know who they would have sent them
25 to.  There might have been some legal department

**Page 50**

1  or -- I don't -- they wouldn't have been to me,
2  but . . .
3      Usually, there's contact people in the
4  contracts.
5      Q.  Do you know who Josh Bernoff is?
6      A.  I don't.
7      Q.  If you look at the third page of
8  Exhibit 8, this is still that article.
9      A.  Okay.
10     Q.  And it's the paragraph that starts
11 "RealNetworks' technology . . . ."  Do you see that?
12     A.  Yes.
13     Q.  Okay.  And it says:
14        "RealNetworks' technology,
15         though, could undermine the hold
16         Apple has on its music
17         customers.  Customers who
18         purchase music through the Real
19         Music Store -- which offers a
20         similar selection of songs at
21         nearly identical prices -- will
22         be able to switch tunes to other
23         devices, RealNetworks says."
24        And then it quotes Josh Bernoff, and it
25 says:

**Page 51**

1        "'Now that people know you
2         can do this,' says Forrester
3         Research analyst Josh Bernoff,
4         'a lot more people may try.'"
5      Now, were you, at Apple, concerned that
6  others might try to copy what RealNetworks had done
7  with Harmony to make their digitally -- their
8  digital music songs directly playable on an iPod?
9      A.  I don't remember being concerned about
10 that, no.
11     Q.  After the RealNetworks episode with
12 Harmony in July of 2004, was there ever an instance
13 in which a company other than RealNetworks
14 successfully created interoperability between its
15 digital music store and Apple's iPods?
16        MR. RILEY:  Objection to the form of the
17 question.
18        THE WITNESS:  What should I do?
19        MR. RILEY:  You can answer the question.
20        THE WITNESS:  Oh, okay.
21        I don't recall, but I would imagine so.
22 People have tried to hack iTunes for a long time,
23 and they're still trying.
24 BY MS. SWEENEY:
25     Q.  Would you describe Apple's response to the

**Page 52**

1  RealNetworks Harmony announcement as strong or
2  vehement?
3      A.  No.
4      Q.  What about the early drafts of the press
5  release that you were involved in?  Were those --
6  many of those statements were ultimately edited out
7  of the final version of the press release.  Was that
8  because they were too -- too angry-sounding?
9      A.  I don't remember, but they don't sound too
10 angry to me when I read them.
11        Usually, a vehement -- I don't know about
12 the word "vehement," but a strong response from
13 Apple would be a lawsuit, as an example.
14     Q.  But Apple never sued RealNetworks?
15     A.  Not to my knowledge.  I don't know if we
16 ever have.  I don't think so.
17        Are we done with this?
18     Q.  Yes, please.  Can you have a look at
19 Exhibit 10.
20     A.  Sure.
21        MS. SWEENEY:  Exhibit 10, for the record,
22 is a multipage document produced by Apple with Bates
23 numbers ending in 920838.  There's a lot of redacted
24 material, but part of it is an article by John
25 Borland of CNETNews.com.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                       April 12, 2011
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                    53
1      (Witness reviews document.)
2      THE WITNESS:  Okay.
3  BY MS. SWEENEY:
4     Q.  You've had a chance to read through
5  Exhibit 10?
6     A.  Yeah.
7     Q.  Okay.  Did you ever see this article
8  before?
9     A.  I don't recall seeing it.
10    Q.  And --
11    A.  Might have.
12    Q.  I can't tell whether you were a recipient
13 of this e-mail or not because all the information is
14 redacted.  But if you could turn to the second page
15 of the Exhibit 10, and it's an interview of
16 Mr. Glaser about the Harmony project.
17         And do you see there's a set of Q&As sort
18 of halfway down the page?  Do you see that?
19    A.  I do.
20    Q.  Okay.  And the question is:
21        "Has the Harmony project met
22     your expectations?"
23        And the answer is:
24        "No, it has blown it away.
25        We took the decision at the

                                    54
1      beginning of the year to
2      implement Harmony.  It really
3      went back to some things we were
4      working on before, where we've
5      had good experience with
6      creating technology with
7      interoperability in the past."
8         So when Mr. Glaser sent that e-mail to you
9  in April of 2004, that was several months after
10 RealNetworks had decided to implement Harmony.  Is
11 that how you read that?
12    MR. RILEY:  I'm going to object to this --
13    THE WITNESS:  Well, you'll have to go ask
14 him.
15    MR. RILEY:  Hold on.
16    THE WITNESS:  I don't know.
17    MR. RILEY:  Hold on just a minute, Steve.
18    I'm going to object.  This is completely
19 outside the three topics that were permitted by the
20 court order.
21 BY MS. SWEENEY:
22    Q.  Did -- does this refresh your recollection
23 about whether you and Mr. Glaser discussed the
24 Harmony project sometime after he contacted you in
25 April of 2004?

                                    55
1     A.  It doesn't, no.
2     Q.  And then the interviewer asks, continuing
3  on:
4        "That was with the Microsoft
5     technology and the streaming
6     media servers?"
7     He says:
8        "Exactly."
9        Do you recall the development by
10 RealNetworks of the Microsoft -- the streaming media
11 server work that it did?
12    A.  I don't, no.
13    Q.  Okay.  In the middle of the next page --
14    A.  Okay.
15    Q.  -- it's questions and answers about the
16 e-mail that Mr. Glaser sent to you in April of 2004.
17 And the interviewer asks:
18       "Can you explain, Mr. Glaser, why you sent
19 that message to Mr. Jobs?"
20       And then it goes on and he says:
21       "And (we were asked), 'Now
22    that he's told you . . . he
23    won't do that, what will you
24    do?'"
25       Does that refresh your recollection about

                                    56
1  speaking with Mr. Glaser about his April 2004
2  proposal?
3     A.  I'm sorry.  It doesn't.
4     Q.  Did you leak that e-mail of April 2004
5  from Mr. Glaser to The New York Times?
6     A.  I don't even remember the e-mail of 2004.
7  I don't remember leaking any e-mail to The New York
8  Times.
9     Q.  Okay.
10    A.  Ever in my life.
11    Q.  Okay.
12    A.  So . . .
13    Q.  It just says here:
14       "In that exchange, Jobs
15    leaked your request to the
16    press."
17       But you don't recall doing that?
18    A.  No.  It's not what I generally do.
19    MS. SWEENEY:  Can we take a short break?
20    MR. RILEY:  Sure.
21    THE VIDEOGRAPHER:  Going off the record at
22 11:27 A.M.
23    (Recess taken.)
24    THE VIDEOGRAPHER:  This marks the start of
25 Disk 2.  Going back on the record at 11:45 A.M.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                                    April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

57
1  BY MS. SWEENEY:
2      Q.  Can you go back to Exhibit 4, please.
3      A.  Yeah.
4      Q.  And again, this is an e-mail from you to
5  others at Apple dated July 26, 2004 regarding the
6  draft press release about RealNetworks' Harmony.
7      A.  Mm-hmm.
8      Q.  And then we already discussed the first
9  sentence in that e-mail.  And the second one says:
10         "I propose going with this:"
11     And then below that in quotes you say:
12         "We are stunned that Real has
13         adopted the tactics and ethics
14         of a hacker to break into the
15         iPod, and we are investigating
16         the implications of their
17         actions under the DMCA and other
18         laws."
19     And it goes on.  And is that the language
20  that you proposed for the press release regarding
21  Harmony?
22     A.  Well, I think it's a conglomeration of
23  what I and other people have proposed or did
24  propose, would be my guess.  I mean, somebody might
25  have -- else might have proposed it and I might have

58
1  been the one to just edit it.  I don't know who
2  proposed it.  It's hard to --
3      Q.  But you did --
4      A.  -- hard to say.
5      Q.  -- agree that this was a possible press
6  release that you could issue; correct?
7      A.  Well, I said I -- I say in this e-mail:
8         "I propose going with this:"
9      Q.  Now, when did you first learn that --
10     A.  Are we done with this?
11     Q.  Yes.
12         When did you learn -- when did you first
13  learn that the redesign of FairPlay that culminated
14  in iTunes 4.7 would disable Harmony?
15     A.  I don't recall.
16     Q.  Can you give me your best estimate.
17     A.  I don't have a clue.
18     Q.  Did you --
19     A.  I mean, just about every release of iTunes
20  enhanced the DRM.  So I probably would have just
21  assumed that the next release would.  But I don't
22  remember at all.
23     Q.  Do you know all of the -- or strike that.
24         What did 4.7 do?
25     A.  I have no idea.  I don't remember.

59
1      Q.  Do you remember discussions at Apple about
2  whether 4.7 would disable Harmony?
3      A.  I'm sure they occurred, but I don't
4  remember them.
5      Q.  Did you have discussions with -- or do you
6  recall having any discussions with the press about
7  the disabling by Harmony -- disabling by 4.7 of
8  Harmony after it occurred in October 2004?
9      A.  I don't.  Your -- one of the exhibits you
10  handed me said that we were warning customers not to
11  assume that -- you know, not to assume that it would
12  continue to be compatible.  That's all I really
13  remember.
14         MS. SWEENEY:  Let's mark this one.
15         (Whereupon, Deposition Exhibit 13 was
16          marked for identification.)
17         MS. SWEENEY:  For the record, the court
18  reporter just handed you Exhibit 13, which is an
19  e-mail from Katie Cotton to you and others at Apple
20  dated April 7 -- excuse me -- April 27, 2004
21  regarding "Final iTunes Speaking Points and Q&A."
22         (Witness reviews document.)
23         THE WITNESS:  Okay.  I finished reading
24  it.
25

60
1  BY MS. SWEENEY:
2      Q.  All right.  And this is -- it says at the
3  top of this e-mail:
4         "Here are the final speaking
5         points and Q&A for tomorrow."
6         Do you recall some kind of speech that you
7  gave on or about April 28, 2004 about iTunes?
8         MR. RILEY:  I'm going to -- hold on just a
9  moment.
10         I'm going to object.  This is completely
11  outside the scope.  It's a document dated April 27,
12  2004.  It is in no way related to the three topics
13  that Judge Lloyd permitted this deposition to
14  inquire into.
15  BY MS. SWEENEY:
16     Q.  Can you turn to the third page of this
17  exhibit, please.  At the top of that page, it's
18  asking you about the proposal made by Mr. Glaser of
19  RealNetworks to you; correct?
20         MR. RILEY:  Which page are we on, Bates
21  stamp?
22         MS. SWEENEY:  The third page of
23  Exhibit 13.
24         MR. RILEY:  Bates stamp 584?
25         MS. SWEENEY:  I'm sorry.  Page 4.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Page 65

```
 1         CERTIFICATE OF REPORTER
 2       I, ANA M. DUB, a Certified Shorthand
 3  Reporter, hereby certify that the witness in the
 4  foregoing deposition was by me duly sworn to tell
 5  the truth, the whole truth, and nothing but the
 6  truth in the within-entitled cause;
 7       That said deposition was taken down in
 8  shorthand by me, a disinterested person, at the time
 9  and place therein stated, and that the testimony of
10  the said witness was thereafter reduced to
11  typewriting, by computer, under my direction and
12  supervision;
13       That before completion of the deposition,
14  review of the transcript [X] was [ ] was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18       I further certify that I am not of counsel
19  or attorney for either or any of the parties to the
20  said deposition, nor in any way interested in the
21  event of this cause, and that I am not related to
22  any of the parties thereto.
23       DATED:  April 14, 2011.
24       _____
25         ANA M. DUB, RMR, CRR, CSR No. 7445
```

Page 66

```
 1         DEPOSITION ERRATA SHEET
 2
 3
 4  Our Assignment No. 385054
 5  Case Caption:THE APPLE iPOD iTUNES
 6  ANTI-TRUST LITIGATION.
 7
 8    DECLARATION UNDER PENALTY OF PERJURY
 9    I declare under penalty of perjury
10  that I have read the entire transcript of
11  my Deposition taken in the captioned matter
12  or the same has been read to me, and
13  the same is true and accurate, save and
14  except for changes and/or corrections, if
15  any, as indicated by me on the DEPOSITION
16  ERRATA SHEET hereof, with the understanding
17  that I offer these changes as if still under
18  oath.
19    Signed on the _____ day of
20  _____, 20___.
21
22  _____
23       STEVE JOBS
24
25
```

Page 67

```
 1        DEPOSITION ERRATA SHEET
 2  Page No._____Line No._____Change to:_____
 3  _____
 4  Reason for change:_____
 5  Page No._____Line No._____Change to:_____
 6  _____
 7  Reason for change:_____
 8  Page No._____Line No._____Change to:_____
 9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25       STEVE JOBS
```

Page 68

```
 1        DEPOSITION ERRATA SHEET
 2  Page No._____Line No._____Change to:_____
 3  _____
 4  Reason for change:_____
 5  Page No._____Line No._____Change to:_____
 6  _____
 7  Reason for change:_____
 8  Page No._____Line No._____Change to:_____
 9  _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Page No._____Line No._____Change to:_____
20  _____
21  Reason for change:_____
22
23  SIGNATURE:_____DATE:_____
24       STEVE JOBS
25
```



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com