# EXHIBIT 1

**From:** Eddy Cue
**Sent:** Sunday, July 25, 2004 12:46:58 PM
**To:** Philip Schiller
**CC:** Joswiak Greg; Robbin Jeff; Rubinstein Jon; Tony Fadell; Ng Stan; Jobs Steve
**Subject:** Re: RealNetworks Says Files Can Play on iPod

I didn't say they legally did it. Also they may have used the DVD John hack that has been out there. We will be actively working with legal to review this once we get our hands on it.

Lastly, remember that we are actively strengthening and changing our DRM so they will definitely break on our next release. We would have to work to not break them.

Eddy

On Jul 25, 2004, at 9:36 PM, Philip Schiller wrote:

> How can they put songs into FairPlay without reverse engineering our
> proprietary encryption algorithm?
>
>
> On Jul 25, 2004, at 9:29 PM, Eddy Cue wrote:
>
>> The labels are convinced that different formats are hurting their
>> growth. They want us to license our DRM to Real. Since Real has
>> assured them that they are putting the music in FairPlay, they are ok
>> with it (that is until there is a problem). Real is actually saying
>> they are playing a protected song on an authorized device for that
>> protection scheme.
>>
>> Also remember some labels at this point are also worried that we are
>> getting to be too dominant.
>>
>> Eddy
>>
>>
>> On Jul 25, 2004, at 9:13 PM, Philip Schiller wrote:
>>
>>> The music companies should take a fit about this!
>>> Real is advocating playing protected music on devices not designed
>>> or authorized for that protection scheme (thus undermining the whole



DEPOSITION
EXHIBIT
64

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090441

>>> idea of devices being designed to protect artists rights in that
>>> music)!

>>>

>>> http://story.news.yahoo.com/news?tmpl=story&u=/ap/20040726/

>>> ap_on_hi_te/realnetworks_ipod&cid=562&ncid=716

>>>

>>> RealNetworks Says Files Can Play on iPod

>>>

>>> 1 hour, 4 minutes ago

>>>

>>> By ALLISON LINN, AP Business Writer

>>>

>>> SEATTLE - RealNetworks Inc. says it has created technology that
>>> allows songs purchased through its online music services to be
>>> played on Apple Computer Inc.'s popular iPod player, just a few
>>> months after complaining that Apple was rebuffing attempts to form
>>> an alliance.

>>>

>>> In an interview Friday, RealNetworks chief executive Rob Glaser
>>> said he did not know how Apple would react to the new technology.
>>> Apple, based in Cupertino, Calif., did not return numerous phone
>>> calls from The Associated Press seeking comment.

>>>

>>> Glaser said the new system, called Harmony Technology, will let
>>> people securely transfer music bought using RealNetworks' music
>>> download services to an iPod or virtually any other portable music
>>> player.

>>>

>>> Previously, music purchased through RealNetworks' music download
>>> services could most easily be played on devices that supported its
>>> copyright protection technology. By the same token, the easiest way
>>> to get digital music onto the iPod player was through Apple's iTunes
>>> Music Store, which uses its own system. The same held true for
>>> devices that supported Microsoft's Windows Media Player anti-piracy
>>> technology.

>>>

>>> Microsoft said it could not immediately comment on the system.

>>>

>>> Glaser said the new system works by essentially translating the
>>> various anti-piracy technologies, to make the players' systems
>>> compatible with RealNetworks' system. RealNetworks said it was not
>>> concerned that the system would be illegal.

>>>

>>> "We are making it so that consumers can buy music once and play it
>>> anywhere," Glaser said.

>>>

>>> A test version of Harmony will be available Tuesday on Real's Web

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090442

>>> site.

>>>

>>> In April, Apple chairman Steve Jobs (news - web sites) rebuffed
>>> Glaser's request for a meeting to discuss an alliance between the
>>> companies, prompting complaints from RealNetworks representatives
>>> about why Apple didn't want to make its popular system more open.

>>>

>>> There is already a way to make songs from RealNetworks' online
>>> music services play on the iPod, but it is cumbersome. To do so, a
>>> user would have to burn the songs from a computer to a CD, download
>>> them back onto the computer in a different format and then put them
>>> on the player.

>>>

>>> Phil Leigh, an analyst with Inside Digital Media in Tampa, Fla.,
>>> said he was surprised to hear that Real had developed the
>>> technology, since Apple has been careful about guarding its popular
>>> — and proprietary — system.

>>>

>>> He said the new system could be a potential boon for RealNetworks,
>>> because customers would be able to buy whatever player they want
>>> without worrying about whether it would work with Real's service.
>>> But he said it would only be a success if it was easy and reliable.

>>>

>>> "The question is, 'How well does it work?'" he said.

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00090443

# EXHIBIT 2

Subject: Real Statement - #4
Date: Mon, 26 Jul 2004 08:42:47 -0700
From: "Steve Jobs" <sjobs@apple.com>
To: "Philip Schiller" <schiller@apple.com>, "Katie Cotton" <katiec@apple.com>
Cc: "Greg Jozwiak (Joz)" <joz@apple.com>, "Eddy Cue" <cue@apple.com>, "Steve Jobs"
<sjobs@apple.com>
Message-ID: <71856D53-DF1A-11D8-B49B-000A95AF9944@apple.com>

---

I think we can safely assume that they have succeeded. We will not be issuing any statement until
we know more - most likely later on today.

I propose going with this:

"We are stunned that Real has adopted the tactics and ethics of a hacker to break into the iPod, and
we are investigating the implications of their actions under the DMCA and other laws. We strongly
caution Real and their customers that when we update our iPod software from time to time it is
highly likely that Real's lock picking will cease to work on current and future iPods."

Steve

On Jul 26, 2004, at 7:42 AM, Philip Schiller wrote:

I like likening them to hackers.

Do we want to soften how successful they have been (seen we haven't used it ourselves) by
saying:

"We are stunned that Real has adopted the tactics and ethics of a hacker in their attempt to break
into the iPod, and we...."

On Jul 26, 2004, at 6:44 AM, Steve Jobs wrote:

How's this?
>
> "We are stunned that Real is adopting the tactics and ethics of a hacker and breaking into the
iPod, and we are investigating the implications of their actions under the DMCA and other laws.
We strongly caution Real and their customers that when we update our iPod software from time to
time it is highly likely that Real's lock picking will cease to work on current and future iPods."
>
> Steve
>
>
>
>



CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00093875

>
> Begin forwarded message:
>
> **From:** Katie Cotton <katiec@apple.com>
> **Date:** July 24, 2004 11:16:38 AM PDT
> **To:** Eddy Cue <cue@apple.com>, Greg Joswiak <joz@apple.com>
> **Cc:** Steve Jobs <sjobs@apple.com>
> **Subject: Revised Real Statement**
>
>
> Eddy/Joz:
>
> Here is a revised Real statement based on feedback from Steve:
>
> "Usually a thief breaks into your house and steals your stereo. In this case, it appears that Real has broken into our house and installed their stereo in our living room. ==Nonetheless, they have still broken into our house and we are investigating the implications of this under the DMCA and other laws.==
>
> In addition, we caution Real and their customers that as we update our iPod software from time to time, it is highly likely that Real's lock picking will cease to work on current and future iPods. The fact that Real would invest a significant amount of their limited engineering resources to create a hack to play songs purchased from their struggling music store on the iPod is a testament to how important the iPod has become in the digital music revolution."
>
> Like it?
>
> Katie
>
>

_____

------ end message ------

CONFIDENTIAL - ATTORNEYS EYES ONLY
Apple_AIIA00093876

# EXHIBIT 3

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | Shepard's® | More | | History | Alerts |
|---|---|---|---|---|---|---|

FOCUS™ Terms  Steve Jobs and RealNetworks      Search Within  Original Results (1 - 141)     View Tutorial
Advanced...

Source:  **News & Business > Combined Sources > Mega News, All (English, Full Text)** ⓘ
Terms:  **Steve Jobs and RealNetworks and date(geq (4/1/2004) and leq (8/1/2004))**  (Edit Search | Suggest Terms for My Search)

☞ Select for FOCUS™ or Delivery
☐

*RealNetworks breaks Apple's hold on iPod; Rob Glaser and Steve Jobs have feuded before. RealNetworks' iPod hack is likely to ruffle feathers again. CNETNews.com July 26, 2004*

Copyright 2004 Factiva, a Dow Jones and Reuters Company
All Rights Reserved.

### Dow Jones Factiva

(c) CNET Networks Inc. All Rights Reserved.



CNETNews.com

**July 26, 2004**

**LENGTH:** 996 words

**HEADLINE: RealNetworks breaks Apple's hold on iPod;**
Rob Glaser and Steve Jobs have feuded before. RealNetworks' iPod hack is likely to ruffle feathers again.

**BYLINE:** John Borland

**BODY:**

RealNetworks announced Monday that it has unlocked some of Apple Computer's most tightly held technology secrets, giving its music a way onto the popular iPod digital music player.

The announcement is part of a broader release of RealNetworks software, which will let songs sold from the company's online store play on a variety of portable devices, including the iPod and Microsoft-compatible rivals. RealNetworks has been selling songs from its digital song store since January, but the files could previously be played only on a few portable devices.

The new Harmony software, which RealNetworks said mimics the proprietary copy protection used in Apple's iTunes store, is sure to be controversial. Apple has previously refused to provide licenses to companies seeking iPod compatibility, and RealNetworks did not seek permission before releasing its own version of iPod-friendly software.

News.context

What's new:

DEPOSITION
EXHIBIT
JOBS 7
4/12/11  AD
PENGAD 800-631-6989

New software from **RealNetworks** will let songs sold from the company's store play on a variety of portable devices including Apple's iPod and Microsoft-compatible rivals.

Bottom line:

Apple has previously refused to provide licenses to companies seeking iPod compatibility, and **RealNetworks** did not seek permission before releasing the software. The move could trigger intense legal scrutiny.

More stories on this topic

"This is actually a natural extension to a decision we made two years ago with respect to different formats," said **RealNetworks** Chief Strategy Officer Richard Wolpert. "We think consumer choice is going to win out over proprietary formats."

**RealNetworks'** move marks a step away from what had been an increasingly confusing world of incompatible digital music formats and devices.

Record companies and consumer groups have been deeply critical of technology companies' decision to tie certain devices to specific music formats. Traditionally, CDs and DVDs have worked on any manufacturers' players, they note, while music downloads have been tied to specific brands of devices.

Indeed, several record company executives praised **RealNetworks'** independent steps to achieve compatibility with the iPod, even without Apple's consent.

"Up to now, the world of downloads has been far too close to a world where the CD you buy in one store wouldn't play on the CD player you bought in another," Larry Kenswil, president of Universal Music's eLabs division, said in a statement. "We applaud **RealNetworks'** efforts to help correct this situation and appeal to all people and companies in this area to work toward a world of universal interoperability."

Apple did not return requests for comment.

Apple maintains a dominant market share in the music download business, and **RealNetworks** hopes that the new compatibility with the iPod will help drive customers to its online store.

Dangerous ground? **RealNetworks** has previously thumbed its nose at rivals in a similar way. Its 2002 Helix server, which sends media files out over the Internet, included the ability to stream Microsoft-formatted files--a capability only Microsoft servers previously had.

Last January, **RealNetworks** also announced that it had figured out how to let its PC software play songs purchased from Apple's iTunes store and save them onto the iPod.

News.commentary

Getting on the same

sheet of music

The new Harmony digital music

technology from **RealNetworks**

challenges Apple and Microsoft

to play better together.

The new Harmony software's ability to work with Microsoft devices is fairly straightforward. When a customer buys a song from **RealNetworks'** online store, the software will check what kind of portable device is attached to the computer and change the song into Microsoft's format if necessary. Microsoft has provided licenses to its Windows Media technology to many companies.

Harmony also will automatically change songs into an iPod-compatible format. But because Apple has not licensed its FairPlay copy-protection software to anyone, **RealNetworks** executives said its engineers had to re-create their own version in their labs in order to make the device play them back.

Although the company said this action wasn't technically "reverse engineering," the software could trigger intense legal scrutiny.

The license accompanying Apple's iPod says purchasers cannot "copy, decompile, reverse engineer, disassemble, (or) attempt to derive the source code of" the software.

Boston patent attorney Bruce Sunstein said courts have issued mixed opinions on how much reverse engineering is allowed for purposes such as making compatible products.

"The law is unsettled," Sunstein said. "We might find some litigation if Apple wanted to be aggressive."

Indeed, lawsuits have been sparked by similar previous cases. In one famous example, Atari Games subsidiary Tengen created cartridges that worked with Nintendo's NES game machine in the late 1980s, when Nintendo was barring any other company from doing so.

Nintendo sued and won when it was discovered that Tengen had obtained part of Nintendo's software code from the U.S. Copyright Office and used it to make its games compatible.

**RealNetworks** has staunchly maintained that it has not illegally used any of Apple's copyrighted software code, however.

"We certainly feel we have all the licenses and rights to do what we've done or we wouldn't have done it," **RealNetworks'** Wolpert said.

Analysts welcomed the move as a good step for consumers, who would be able to buy music from **RealNetworks'** store and not worry about having to stay permanently with one brand of player to use music purchased online.

"Right now if you're a consumer, you have to pick sides," said Forrester Research analyst Josh Bernoff. "With every track you buy you're going further down the path of incompatibility...This is going to create some pressure on Microsoft and Apple to provide similar levels of interoperability."

The Harmony software will be available in test form on **RealNetworks'** site Tuesday, and will ultimately find its way into a variety of products, the company said.

**NOTES:**
PUBLISHER: CNET Networks Inc.

**LOAD-DATE:** January 28, 2005

Source: **News & Business > Combined Sources > Mega News, All (English, Full Text)** [i]
Terms: **Steve Jobs and RealNetworks and date(geq (4/1/2004) and leq (8/1/2004))** (Edit Search | Suggest Terms for My Search)

View:  Full
Date/Time:  Thursday, April 7, 2011 - 6:22 PM EDT

In

About LexisNexis   | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright © 2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 4

Subject: FW: Harmony Release
Date: Wed, 28 Jul 2004 22:13:55 -0700
From: "Horowitz, Zach" <zach.horowitz@umusic.com>
To: <sjobs@apple.com>
Message-ID:
<FEAE72A19B561846BC1DB4EE7995A45A05502C41@usintex02smo.amer.umusic.net>

fyi

-----Original Message-----
From: Lofrumento, Peter
Sent: Wednesday, July 28, 2004 7:11 PM
To: Horowitz, Zach
Subject: Harmony Release

Zach:

As requested, we have disseminated the attached press release regarding Harmony.

Please let us know if we may assist further.

Thank you.

Peace,

Peter

------ end message ------

CONFIDENTIAL
Apple_AIIA01384977



FOR IMMEDIATE RELEASE
Wednesday, July 28, 2004

STATEMENT OF UNIVERSAL MUSIC GROUP
REGARDING HARMONY TECHNOLOGY

"There are recent allegations questioning the legality of the Harmony application. To be clear, we will not support any service or system that doesn't respect the rights of all concerned. The rights of creators of technical systems are as important to us as the rights of copyright owners."

CONTACT: Peter LoFrumento    212.331.2585
         Maria Ho            212.331.2562

CONFIDENTIAL
Apple_AlIA01384978

# EXHIBIT 5

Search - 152 Results - newswire and apple and July 29
Case 4:05-cv-00037-YGR   Document 877-2   Filed 11/04/14   Page 17 of 177
Page 1 of 2

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | Shepard's® | More | | History | Alerts |
|---|---|---|---|---|---|---|

**FOCUS™** Terms  newswire and apple and July 29        Search Within  Original Results (1 - 152)    View Tutorial
Advanced...

Source: **News & Business > Combined Sources > Mega News, All (English, Full Text)** 🛈
Terms:  newswire and apple and July 29 and date(geq (6/29/04) and leq (7/30/2004))  (Edit Search | Suggest Terms for My Search)

☞Select for FOCUS™ or Delivery
☐

*Apple Statement PR Newswire July 29, 2004 Thursday*

Copyright 2004 PR **Newswire** Association, Inc.
PR **Newswire**

**July 29,** 2004 Thursday

**SECTION:** FINANCIAL NEWS

**DISTRIBUTION:** TO BUSINESS, ENTERTAINMENT AND TECHNOLOGY EDITORS

**LENGTH:** 120 words

**HEADLINE: Apple** Statement

**DATELINE:** CUPERTINO, Calif. **July 29**

**BODY:**

**Apple** today released the following statement:

We are stunned that RealNetworks has adopted the tactics and ethics of a hacker to break into the iPod(R), and we are investigating the implications of their actions under the DMCA and other laws.

We strongly caution Real and their customers that when we update our iPod software from time to time it is highly likely that Real's Harmony technology will cease to work with current and future iPods.

NOTE: **Apple, the Apple** logo, Macintosh, Mac, Mac OS and iPod are either registered trademarks or trademarks of **Apple.** Other company and product names may be trademarks of their respective owners.

SOURCE **Apple**

CONTACT: Natalie Kerris of **Apple,** +1-408-974-6877, or nat@**apple**.com

**URL:** http://www.prnewswire.com

**LOAD-DATE:** July 30, 2004

DEPOSITION
EXHIBIT
JOBS 6
4/12/11  AD

https://www.lexis.com/research/retrieve?cc=&pushme=1&tmpFBSel=all&totaldocs=&tag...   4/11/2011

Case 4:05-cv-00037-YGR     Document 877-2     Filed 11/04/14     Page 18 of 177

Source: **News & Business > Combined Sources > Mega News, All (English, Full Text)** ⓘ
Terms: **newswire and apple and July 29 and date(geq (6/29/04) and leq (7/30/2004))**
       (Edit Search | Suggest Terms for My Search)
 View: Full
Date/Time: Monday, April 11, 2011 - 11:04 PM EDT

About LexisNexis  | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright © 2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

https://www.lexis.com/research/retrieve?cc=&pushme=1&tmpFBSel=all&totaldocs=&tag...   4/11/2011

# EXHIBIT 6

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Melanie Tucker, | Case No. C 06-04457 JW |
| | Related Case No. C 05-00037 JW |
| Somtai Charoensak, et al. | |
| | **ORDER CONSOLIDATING RELATED** |
| Plaintiffs, | **CASES; APPOINTING CO-LEAD** |
| v. | **COUNSEL** |
| Apple Computer, Inc., | |
| Defendant. | |
| _____/ | |

On March 5, 2007, the Court conducted a hearing on its Order to Show Cause Why Cases Should Not Be Consolidated. Based on the papers submitted to date and the oral arguments of counsel, the Court orders as follows:

1. The Clerk shall consolidate these Related Cases such that the earlier filed action, C 05-00037 JW, is the lead case. All future filings shall be in C 05-00037 JW and shall bear the caption, "The Apple iPod iTunes Anti-Trust Litigation."

2. The Court appoints The Katriel Law Firm, P.L.L.C. and Lerach Coughlin Stoia Geller Rudman & Robbins LLP as Co-Lead Counsel.

3. The Court appoints Somtai Troy Charoensak, Mariana Rosen, and Melanie Tucker as Lead Plaintiffs.

4. Within thirty (30) days of the date of this Order, Lead Plaintiffs shall file a Consolidated Complaint.

5.   In light of this Order, Melanie Tucker's Motion to Appoint Interim Co-Lead Class

Counsel is denied as moot and the hearing presently scheduled for March 19, 2007 is

VACATED.

Dated:  March 20, 2007

_____

JAMES WARE
United States District Judge

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

**United States District Court**
For the Northern District of California

1  **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2  Adam Richard Sand arsand@JonesDay.com
   Andrew S. Friedman afriedman@bffb.com
3  Bonny E. Sweeney bsweeney@lerachlaw.com
   Christopher M. Burke chrisb@lerachlaw.com
4  John J. Stoia jstoia@lerachlaw.com
   Robert A. Mittelstaedt ramittelstaedt@jonesday.com
5  Tracy Strong tstrong@jonesday.com
   Brian P Murray bmurray@rabinlaw.com
6  Caroline N. Mitchell cnmitchell@jonesday.com
   Jacqueline Sailer jsailer@murrayfrank.com
7  Michael David Braun service@braunlawgroup.com
   Roy A. Katriel rak@katriellaw.com

8

9  **Dated: March 20, 2007**                      **Richard W. Wieking, Clerk**

10

11                                                **By:  /s/ JW Chambers**
                                                      **Elizabeth Garcia**
12                                                    **Courtroom Deputy**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

Case 4:05-cv-00037-YGR Document 11-3 Filed 04/19/07 Page 2 of 29

1  LERACH COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  BONNY E. SWEENEY (176174)
  GREGORY S. WESTON (239944)
3  655 West Broadway, Suite 1900
  San Diego, CA 92101
4  Telephone: 619/231-1058
  619/231-7423 (fax)
5  bonnys@lerachlaw.com
  gweston@lerachlaw.com
6
  THE KATRIEL LAW FIRM
7  ROY A. KATRIEL (*pro hac vice*)
  1101 30th Street, N.W., Suite 500
8  Washington, DC 20007
  Telephone: 202/625-4342
9  202/330-5593 (fax)
  rak@katriellaw.com
10
  Co-Lead Counsel for Plaintiffs
11
  [Additional counsel appear on signature page.]
12

               UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                 SAN JOSE DIVISION

15

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) Lead Case No. C-05-00037-JW |
| | ) |
| | ) CLASS ACTION |
| | ) |
| This Document Relates To: | ) CONSOLIDATED COMPLAINT FOR |
| | ) VIOLATIONS OF SHERMAN ANTITRUST |
| ALL ACTIONS. | ) ACT, CLAYTON ACT, CARTWRIGHT |
| | ) ACT, CALIFORNIA UNFAIR |
| | COMPETITION LAW, CONSUMER LEGAL |
| | REMEDIES ACT, AND CALIFORNIA |
| | COMMON LAW OF MONOPOLIZATION |
| | |
| | DEMAND FOR JURY TRIAL |

16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION AND MARKET DEFINITIONS**

1.      Plaintiffs Somtai Troy Charoensak, Mariana Rosen, and Melanie Tucker ("plaintiffs") on behalf of themselves and behalf of the Classes defined herein (the "Classes"), based on information and belief and investigation of counsel, except for information pertaining to the named plaintiffs, which is based on their personal knowledge, allege as follows:

2.      Apple, Inc. ("Apple" or "defendant") owns and operates iTunes Music Store ("Music Store"), an internet site that offers digital music and digital video computer files for online purchase and download ("Online Music" and "Online Video").  Unlike most internet sites, Music Store is accessed with proprietary Apple software rather than with a web browser.

3.      The "Online Music market" is defined as the market for digital music legally delivered to the consumer by way of internet download.  Online Music presents consumers enormous advantages over purchasing music in compact disk ("CD") form at retail stores.  Online Music stores offer for sale hundreds of thousands of songs at once, many times more than even the largest traditional music retailer.  Online Music is attractive to consumers because it allows them to purchase *a la carte* only the songs that they want rather than having to buy an entire CD album in order to get only one or two desirable songs.

4.      Online Music is also attractive because it is more convenient, reliable, and better for the environment.  Consumers do not have to drive to a store to make their purchase, trucks do not have to transport the CDs from factory to warehouse to retailer, and there is no material or packaging produced only to be thrown away.  Online Music also promises superior audio fidelity over time because unlike CDs Online Music lasts indefinitely and cannot wear out or break.

5.      Apple has an approximately 85% market share of the Online Music market.

6.      The "Online Video market" is defined as the market for digital video files that are purchased and downloaded via the internet that can be viewed both on a home computer and a video enabled Digital Music Player.  Popular examples of Online Video include commercial-free television shows, music videos, and short films.   Just as with Online Music, the variety, reliability, convenience, and environmental friendliness of Online Video make it superior to DVDs purchased from traditional retail outlets.

7. Apple's share of the Online Video market is 90%.

8. The "Digital Music Player market" is defined as the market for portable battery-powered devices that can store and play large numbers of digital music computer files. For technology savvy consumers, Digital Music Players are enormous improvements over portable CD players. While a traditional CD can hold no more than 15 to 25 songs, Digital Music Players, by playing music that has been compressed into small digital files, can store from 150 to more than 20,000 songs. Even larger Digital Music Players are now only a fraction of the size of a typical portable CD player, and by having few moving parts are more reliable and offer a much longer battery life. Digital Music Players also dispense with the need to carry around CDs and allow consumers to organize, categorize, and play their music in whatever manner or order they desire. Further advantages include superior skip protection and in many models the ability to play video games, play video files, and store digital photographs.

9. Apple sells Digital Music Players known as the iPod, iPod shuffle and iPod nano (collectively, the "iPod"). Apple designs some of the hardware and software of its iPod while manufacturing is outsourced to Asia.

10. Apple has an approximately 80% share of the Digital Music Player market.

11. The three relevant product markets are the markets for Online Video, Online Music, and Digital Music Players (collectively, the "Product Markets").

12. Consumers and merchants have come to recognize the Online Music market as a separate and distinct market from the market for music CDs.

13. Barriers to entry into the Online Music market are high. In addition the barriers to entry into the Online Music market imposed by Apple's illegal anticompetitive behavior, discussed in detail herein, other barriers to entry include the fact that: (1) the products are protected by copyrights that any new entrant would have to obtain a license for in order to legally sell; (2) the copyright holders are unlikely to license their copyrighted music files to any new entrant unless that entrant can credibly show that it will be able to sell these files to a large audience, which the ties effectively make impossible because most listeners of Online Music files are iPod owners; and

1    (3) any new entrant would have to offer an inventory of millions of music files, necessitating (in

2    addition to the copyright license requirement), an inordinate investment of capital and resources.

3            14.     The Online Music market offers a number of features not readily available at

4    traditional "brick and mortar" music stores, which help set it apart as a distinct market.  For example,

5    whereas shoppers at traditional "brick and mortar" music stores must typically purchase an entire

6    album of the artist or group selected, online sales of Digital Music files offer consumers the option to

7    purchase only individual songs or tracks of music separately.  This is borne out by sales statistics

8    showing that on iTunes, for every sale of a complete album online there are approximately 20 songs

9    purchased individually.  By contrast, according to statistics compiled by the Recording Industry

10   Association of America, in the CD market in 2005, sales of CD albums were 705.4 million compared

11   to sales of CD singles of 2.8 million units.

12           15.     Further, unlike brick and mortar music stores, the Online Music market offers

13   consumers the ability to create their own customized "playlists" wherein consumers can, in effect,

14   create their own customized collection of songs from different artists.  Thus, for example, a

15   consumer of Online Music stores that had a liking for the song "Help" from the Beatles and the song

16   "Goodbye Yellow Brick Road" from Elton John could create a customized playlist that would

17   comprise of just these two songs.  That consumer would only be charged for the particular songs

18   purchased (*i.e.* in this case, "Help" and "Goodbye Yellow Brick Road").  By contrast, if that same

19   consumer wished to avail himself of these same two songs by making purchases at a brick and

20   mortar music store, that consumer would have to purchase an entire Beatles album containing a

21   dozen songs or more, and an entire Elton John album, which also contains approximately a dozen

22   songs or tracks.  Thus, while the Online Music purchaser would only pay in $1.98 (99 cents each) in

23   total to obtain these two songs, the price paid by the same consumer at a traditional brick and mortar

24   store would likely be approximately $30 – *i.e.*, the price for two CDs.

25           16.     In addition, the music selection available in the Online Music market is not

26   coextensive with the music selection available at brick and mortar music stores.  Online Music stores

27   provide a ready outlet for independent and less popular artists whose music is not readily available at

28

CONSOLIDATED COMPLAINT - C-05-00037-JW                                                          - 3 -

1    brick and mortar music stores, which only have room to carry a small fraction of the inventory of

2    Online Music stores.

3         17.    In the eyes of consumers, the Online Music market and the brick and mortar market

4    are not in price-competition with one another.  The Online Music market focuses on selling

5    individual tracks or songs while the brick and mortar market is focused on selling whole albums or

6    CDs, thereby making price-comparison between these two distinct markets a *non sequitur*.  Further,

7    because of the ubiquitous nature of the internet, Online Music sales are available to a whole host of

8    consumers who do not have ready access to a nearby brick and mortar music store, let alone a nearby

9    brick and mortar store stocking the particular recording desired by these consumers at any given

10   time.  Similarly, because search costs on the internet are a fraction of search costs involved in the

11   brick and mortar market, consumers are not likely to and do not forego a purchase of a music

12   recording online even if they hypothetically would believe that the same recording could be obtained

13   somewhat less expensively at a traditional brick and mortar store.  The costs associated with

14   traveling to brick and mortar music stores, searching one or more such stores for a particular

15   recording, and comparison shopping between these brick and mortar music stores and online stores

16   dissuade consumers from foregoing a purchase made from the comfort of their own home or office

17   for the same piece of music, even if doing the foregoing tasks could hypothetically result in a

18   savings of a few cents per song.  Put differently, consumers are not likely to and do not travel miles

19   to their nearest brick and mortar music store in the hopes of saving a few cents off a song purchase

20   that they could make instantaneously on their home computer.

21        18.    For these and other reasons, the Online Music market is and has been recognized as a

22   separate relevant product market.

23        19.    For similar reasons, the Online Video market is distinct from the brick and mortar

24   market for DVDs.  Again online consumers do not have to endure the hassle and expense of going to

25   a brick and mortar store selling DVDs.  Furthermore, most Online Video sales are for television

26   shows, and typically sell for $1.99 per episode, with "Season Passes" allowing for the download of

27   an entire season of TV shows that sell for less than when broken down on a per-episode basis.  Most

28   DVD sales are for movies, and while some television shows are eventually available on DVD,

1    consumers are unable to purchase single episodes, and have to wait months or years for the DVD of

2    the show to arrive in stores.  By contrast, Online Video copies of TV shows are typically available

3    the same day the show is first broadcast.  Finally, while portable DVD players exist, they are

4    significantly larger, heavier, more cumbersome, and have fewer features than video-enabled Digital

5    Music Players.  Another segment of the Online Video market is the sale of short music videos,

6    typically two to five minutes long, for $1.99. Short music videos are rarely, if ever, available in

7    DVD form.

8          20.    The relevant geographic market for the three Product Markets is the United States.

9          21.    Apple has and is engaged in tying and monopolizing behavior, placing unneeded and

10    unjustifiable technological restrictions on its most popular products in an effort to restrict consumer

11    choice and restrain competition in the Product Markets.  Apple's CEO Steve Jobs has himself

12    compared Apple's digital music dominance in the Online Music market to Microsoft's personal

13    computer operating system dominance, calling Apple's Music Store "the Microsoft of music stores"

14    in a meeting with financial analysts.

15          22.    As alleged in further detail below, Apple deliberately makes Online Music purchased

16    at the Music Store inoperable with its competitor's Digital Music Players.  Thus, a consumer who

17    wishes to play music from Apple's Music Store, the dominant Online Music retailer, directly on a

18    Digital Music Player can do so only with an iPod.  Accordingly, Apple can and does sell the iPod at

19    prices far above those that would prevail in a competitive market for Digital Music Players.

20          23.    Conversely, as also alleged in detail below, Apple deliberately makes the iPod unable

21    to play music sold at rival Online Music stores.  Consumers with iPods can only buy Online Music

22    to play on them from Apple's Music Store, allowing Apple to further entrench its monopoly in both

23    of these Product Markets.

24          24.    In the past two years, as improved hard drive and video compression technology have

25    made playing video content such as television shows on Digital Music Players feasible, Apple has

26    begun using these same illegal tactics to block consumers from purchasing and playing Online Video

27    from its rivals' online stores and video-enabled Digital Music Players.

28

**PARTIES**

25.     Defendant Apple is a corporation organized under the laws of the State of California and has its principal place of business in Cupertino, California.  Though best known as a computer hardware and software company, the majority of Apple's revenues and profits now derive from its Online Video, Online Music, and Digital Music Player businesses.

26.     Plaintiff Somtai Troy Charoensak is a resident of California, plaintiff Mariana Rosen is a resident of New Jersey, and plaintiff Melanie Tucker is a resident of California.   During April 28, 2003 through the conclusion of the trial of this matter ("Class Period"), plaintiffs purchased iTunes music and iPods directly from Apple and plan to purchase and/or have purchased Online Videos from Apple.

**JURISDICTION AND VENUE**

27.     Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§15 and 26, and 28 U.S.C. §§1331 and 1337.

28.     Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391 because defendant transacts business in this district, defendant has its principle corporate office in this district, and because thousands of Class members are located in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district.  The acts complained of have had, and will have, substantial anticompetitive effects in this district.   A substantial number of putative plaintiffs reside in this district.

**TRADE AND COMMERCE**

29.     During the Class Period, Apple marketed, distributed, and sold Digital Music Players, Online Music, and Online Video in a continuous and uninterrupted flow of intrastate and interstate commerce throughout the United States.

**CLASS ACTION ALLEGATIONS**

30.     Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rules 23(b)(2)-(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following Classes:

**INJUNCTIVE RELIEF CLASS**
**(For injunctive relief under the Clayton Act, 15 U.S.C. §26)**

31.    All persons or entities in the United States (excluding federal, state and local governmental entities, Apple, its directors, officers and members of their families) who: (a) purchased an iPod from Apple or (b) purchased audio or video files from the Music Store during the Class Period.

**DAMAGES CLASS**
**(For damages under the Clayton Act, 15 U.S.C. §15)**

32.    All persons or entities in the United States (excluding federal, state and local governmental entities, Apple, its directors, officers and members of their families) who purchased an iPod directly from Apple during the Class Period.

33.    The Classes are so numerous that joinder of all members is impractical.  There are thousands of members in each Class who are geographically dispersed throughout the United States.

34.    Plaintiffs' claims are typical of the claims of the members of the Classes because plaintiffs and all Class members were damaged by the same wrongful conduct of the defendant alleged herein.

35.    There are questions of law and fact common to the Classes which predominate over any questions affecting only individual Class members.  Such common questions include:

(a)    the definition of the relevant markets;

(b)    Apple's market power within these markets;

(c)    whether Apple monopolized and continues to monopolize the relevant markets;

(d)    whether Apple attempted to monopolize and continues to attempt to monopolize the relevant markets;

(e)    whether the contractual conditions Apple imposes upon its customers are unconscionable;

(f)    whether Apple's conduct caused damage to the plaintiffs and members of the Classes, including the degree to which prices paid by the Classes are higher than the prices that would be paid in a market free from tying, monopolization, and other illegal conduct; and

1    (g)    the appropriateness of injunctive relief to restrain ongoing and future

2  violations of the law.

3    36.    The claims of the plaintiffs are typical of the claims of the Classes, and plaintiffs have

4  no interest adverse to the interest of other members of the Classes.

5    37.    Plaintiffs will fairly and adequately protect the interests of the Classes and have

6  retained counsel experienced and competent in the prosecution of complex class actions and antitrust

7  litigation.

8    38.    A class action is superior to other available methods for the fair and efficient

9  adjudication of the controversy.  Such treatment will permit a large number of similarly situated

10  persons to prosecute their common claims in a single forum simultaneously, efficiently, and without

11  duplication of effort and expense that numerous individual actions would engender.  Class treatment

12  will also permit the adjudication of relatively small claims by many Class members who could not

13  afford on their own to individually litigate an antitrust claim against a large corporate defendant.

14  There are no difficulties likely to be encountered in the management of this class action that would

15  preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient

16  adjudication of the controversy.

17    **APPLE ENGAGES IN ILLEGAL TYING CONDUCT**

18    39.    Online Music comes in both unprotected and protected digital file formats.  Unlike

19  unprotected formats, protected formats include technological encumbrances designed to prevent

20  consumers from making illegal unauthorized copies of the digital file.

21    40.    The protected music file format used by most Online Music stores is the WMA

22  format.  Online Music stores that sell their protected music files in WMA format include America

23  Online, Wal-Mart, Napster, MusicMatch, Best Buy, Yahoo! Music, FYE Download Zone, and

24  Virgin Digital.

25    41.    Online Music purchased from the Music Store, however, is in AAC format encoded

26  by Apple with DRM restrictions that Apple calls "FairPlay."

27    42.    Apple encodes Online Music purchased from the Music Store with FairPlay-DRM

28  even as to: (i) public domain material; and (ii) music that the music labels and/or artists themselves

CONSOLIDATED COMPLAINT - C-05-00037-JW    - 8 -

1   request be sold DRM-free, because doing so requires the consumer to use an iPod to transfer the

2   music directly to a Digital Music Player.

3        43.    For the purposes of this Consolidated Complaint, the tied product is the iPod, and the

4   tying product is FairPlay-DRM Online Music purchased from the Music Store.  Apple deliberately

5   makes the FairPlay-DRM music files purchased from the Music Store incapable of being played by

6   other Digital Music Players.  Thus, consumers who have purchased Online Music from Apple will

7   have no choice but to buy an iPod if they want to play their music directly on a Digital Music Player.

8        44.    After purchasing their Digital Music library from the Music Store, consumers are

9   locked into making all future Digital Music Player purchases from Apple.  They might want to buy a

10  non-Apple Digital Music Player for a family member or to replace their original iPod, but to do so

11  would mean they could not utilize any of the songs they purchased from the Music Store in their new

12  Digital Music Player.  As Josh Bernoff, principle analyst with Forrester Research stated, Apple's

13  "overwhelming market share is based in large part on its ability to lock people into that device."

14       45.    Apple could license its FairPlay-DRM format to other manufacturers of Digital Music

15  Players, so that music purchased from the Music Store could be transferred directly to Digital Music

16  Players other than the iPod.

17       46.    There are no technological limitations preventing the iPod from supporting WMA

18  playback.  Apple outsources most of the production of the iPod to third party manufacturers in Asia.

19  One third party part used in the iPod is its "core processor," the Portal Player System-On-A-Chip.

20  The System-On-A-Chip by default supports the WMA format.  Apple, however, deliberately

21  designed the iPod's software so that it would only play a single protected digital format, Apple's

22  FairPlay-modified AAC format.  Deliberately disabling a desirable feature of a computer product is

23  known as "crippling" a product, and software that does this is known as "crippleware."

24       47.    The software Apple has designed for the iPod, which disables the iPod's inherent

25  ability to play WMA format files, is a classic example of crippleware.  By preventing the iPod from

26  playing WMA or any other protected music format besides FairPlay-DRM format, iPod owners only

27  option to purchase Online Music is to purchase from the Music Store.  This conduct reinforces the

28  illegal tie-in violation of the federal and state antitrust laws.

48.     In place of the Portal Player System-On-A-Chip, Apple uses the SigmaTel STMP3550 in its low end iPod shuffles.  Like the Portal Player System-On-A-Chip, the SigmaTel STMP3550 was designed to decode and play WMA files and does indeed play them on every Digital Music Player that contains the STMP3550 chip except the iPod.  As in its higher end models, Apple's crippleware operating system software prevents the iPod shuffle from playing WMA files.

49.     The cost to Apple of licensing the WMA format would likely not exceed $800,000 per year or less than two cents per iPod sold in 2006.

50.     Apple has not licensed or given access to its FairPlay-DRM format to any other Digital Music Player manufacturer, thereby ensuring two results – both of which are anticompetitive.  First, through the foregoing, Apple has ensured that the iPod is the only Digital Music Player that can directly play songs purchased from the Music Store.  Second, through the foregoing, Apple has managed to ensure that owners of iPods wishing to purchase music files online to be directly played on their iPod can only do so by purchasing these files at the Music Store.

51.     Despite this anticompetitive restriction, RealNetworks, a rival seller of online digital music recordings through its RealNetworks music store, managed to independently analyze the firmware within the Apple iPod.  As a result of this analysis, RealNetworks was able to discern the necessary extra software code added by Apple to make downloaded songs playable on the iPod.  Armed with this knowledge, RealNetworks was able to insert a corresponding code of its own into song files sold through its RealNetworks music store so that they too would be playable on the Apple iPod.

52.     Thus, on July 26, 2004, RealNetworks announced publicly that songs sold through its online RealNetworks music store would now be playable on the Apple iPod, thereby giving iPod owners a competitive outlet for their purchases of Online Music files.  This announcement was significant not only because it represented the first alternative to the stronghold that Apple's Music Store had heretofore exerted as the sole supplier of downloaded digital music files that could be played on the iPod, but also because RealNetworks began selling its digital online songs for as low as 49 cents per track, well below the 99 cents per track charged by Apple's Music Store.

53.   Rather than embracing this competitive offering to iPod owners, Apple immediately threatened RealNetworks and iPod users.  On Thursday, July 29, 2004, merely four days after RealNetworks' announcement, Apple issued its own public statement warning RealNetworks and iPod users that "[w]e are stunned that RealNetworks has adopted the tactics and ethics of a hacker to break into the iPod, and we are investigating the implications of their actions under the DMCA and other laws.  We strongly caution Real and their customers that when we update our iPod software from time to time it is highly likely that Real's Harmony technology will cease to work with current and future iPods."

54.   True to its threat, by December 2004, Apple updated its iPod software to prevent songs downloaded from RealNetworks music store (or any other Online Music store) from being played on iPods.  Thus, Apple continues to impede competition, and forces iPod users who wish to buy music online to do so exclusively from Apple's Music Store.

55.   In addition to the software change used to block music iPod owners from listening to Online Music purchased from RealNetworks, at least twice Apple has changed iPod and Music Store software, under the guise of "updating" it, to add new restrictions to music that customers previously purchased from Apple.  Consumers, locked into Apple's monopoly in the Online Music market, are subject to such unannounced, unilateral, and one-sided changes to their rights to listen to the music they purchased from Apple by Apple's enormous market power.

56.   Apple's tying of the iPod to Online Music and Online Video constitutes a *per se* violation of United States and California antitrust law.  None of the anticompetitive conduct described in this complaint has a legitimate business justification, and all of it is in violation of antitrust law under the rule of reason.

57.   Apple applies its FairPlay-DRM to Online Music sold through the Music Store even though it admits that doing so serves no genuine antipiracy purpose.  In a web-posting dated February 6, 2007, Apple's CEO Steve Jobs conceded that "DRM's haven't worked, and may never work, to halt music piracy."

58.   These ongoing injuries can be halted and abated by an injunction that would compel Apple to: (a) make Online Music and Online Video sold through the Music Store compatible with

1   Digital Music Players other than the iPod; and (b) make the iPod compatible with Online Music and

2   Online Video purchased on stores other than Music Store.

3        59.     Apple has acted on grounds generally applicable to the Injunctive Relief Class,

4   thereby making final injunctive relief appropriate with respect to the Class as a whole.  Such an

5   injunction would be of immense benefit to the plaintiffs, the Classes, and the general public while

6   imposing only a trifling burden upon Apple.

7   **IN EUROPE, APPLE'S MONOPOLY PRICING AND TYING CONDUCT HAS BEEN**
    **THE TARGET OF FORMAL GOVERNMENT INVESTIGATIONS, PRIVATE**
8   **LAWSUITS, AND LEGISLATION SPECIFICALLY DESIGNED TO COUNTER**
    **APPLE'S ANTICOMPETITIVE CONDUCT**

9        60.     In France, a consumer rights organization has filed suit against Apple for deliberately

10  making the iPod and Online Music purchased from Music Store incompatible with competing

11  products.

12       61.     Also in France, the nation's Parliament has approved a law that specifically was

13  designed to force Apple to allow other companies to sell protected music files on the iPod, and to

14  force Apple to make music purchased on its Music Store compatible with competing Digital Music

15  Players.  In an interview, a French official explained that his government believes that "[s]omeone

16  who buys a song has to be able to listen to it, no matter which device or the software of choice" and

17  that Apple is designing its products to prevent consumers from using other companies' products is

18  "not in the interest of the consumer, nor the interest of the creator.  It only benefits the company and

19  we're there to defend the consumer, our citizens."  Apple unsuccessfully lobbied against the law,

20  calling it "state sponsored piracy."

21       62.     Denmark's Minister of Culture plans on introducing in 2007 legislation similar to the

22  French law.

23       63.     The Office of the Norwegian Consumer Ombudsman on July 6, 2006 ruled that Apple

24  violates Norwegian law by tying purchases of music from its Music Store to the purchase of an

25  Apple iPod, stating that "[t]he way Apple uses DRM is illegal."  Using language that echoes the

26  American common law standard of an unconscionable contract, Ombudsman Bjørn Erik Thon ruled:

27            [Apple] goes to great lengths to ensure that its standard customer contract
           protects the company's own interest. . . .  "The contracts are both vague and hard to

28

CONSOLIDATED COMPLAINT - C-05-00037-JW                                              - 12 -

understand for the customers, and they're clearly unbalanced to disfavor the customer. The consumers are clearly the inferior partner in the contract, and this in itself is illegal . . . ." "[Apple's restrictive] technology renders the customers without rights in dealing with a company which on a whim can dictate what kind of access customers will have to products they have already paid for . . . ."

64.    Norway may begin levying fines or shut down Apple's Norway iTunes store if it does not cease violating Norwegian law by a September 30, 2007 deadline.

65.    In the Netherlands, the Consumer Ombudsman has also filed suit against what it calls Apple's "illegal practices" and "abuse of dominant market position" noting that "[w]hat we want from Apple is that they remove the limitations that prevent you from playing a song you download from iTunes on any player other than an iPod . . . .  When you buy a music CD it doesn't play only on players made by Panasonic.  People who download a song from iTunes shouldn't be bound to an iPod for the rest of their lives."

66.    Similar investigations of Apple's anticompetitive practices in tying the iPod to Music Store downloads are underway in Finland, Sweden, Denmark, and Germany.

67.    The European Union Consumer Affairs Commissioner criticized Apple on March 12, 2007, saying "Do you think it's fine that a CD plays in all CD players but that a song purchased from iTunes only plays in an iPod?  I don't."

68.    Several of the above European governments issued a joint statement saying "[w]e believe consumers have a right to play material purchased online on a portable device of their own choice.  Contract clauses that make this impossible or too inconvenient are unfair and should be revoked."

69.    European and British antitrust authorities are currently investigating Apple's pricing practices in the European Union.  Leveraging its worldwide monopoly power in the Online Music market, Apple has set the price of music downloads in the United Kingdom higher than countries that use the Euro as their currency, which in turn are priced higher than downloads in the United States, and maintains these higher prices by placing technological restrictions preventing European residents from purchasing music from Apple's non-EU Music Store sites.

70.    On April 3, 2007 the European Commission issued a press release announcing it had sent Apple a "Statement of Objections" regarding its anticompetitive price-discrimination policies.

1   The press release noted that "Statements of Objections are a formal step in European antitrust

2   investigations."

3       71.    Following these governmental investigations and public denunciations, and after

4   Apple's repeated motions to dismiss the antitrust claims brought by plaintiffs were denied by this

5   Court, Apple announced on April 2, 2007, that it would begin selling a limited number of songs

6   without the FairPlay-DRM restrictions, but for the higher price of $1.29, while continuing to sell the

7   same songs with the FairPlay-DRM for 99 cents.  Apple also offered to remove FairPlay DRM on

8   songs consumers had already purchased, but only if the consumer paid the 30 cents difference in

9   price for each song, and only for the limited number of songs it sells without FairPlay DRM.

10   **ANTITRUST INJURY TO CONSUMERS**

11       72.    Through the unlawful acts and practices described above Apple has harmed

12   competition, consumers and innovation by causing consumers to pay supracompetitive prices for

13   iPods.  Those practices, described herein, have also allowed Apple to obtain and maintain illegal

14   monopolies in the three Product Markets.

15       73.    By preventing consumers who have purchased music files from Music Store from

16   playing their music on its competitors' Digital Music Players, Apple has been able to charge

17   purchasers of the iPod a supracompetitive price.

18       74.    Likewise, by preventing owners of iPods from buying music from any Online Music

19   retailer other than Music Store, Apple deters consumers from even considering doing business with

20   its competitors' music and video stores, allowing it to monopolize these markets, and further exclude

21   competing Digital Music Players from the market, lock consumers into iPod and iTunes, and charge

22   supracompetitive prices for the iPod.

23       75.    Consumers have been further injured as innovative companies such as Dell, Olympus,

24   and Rio have begun to withdraw from the Digital Music Player markets.  These companies had little

25   choice but to give up and exit the market because Apple's anticompetitive conduct excluded them

26   from reaching the majority of their potential customers no matter how much cheaper or how much

27   better their products were.  There can be no real competition in the Online Music, Online Video, and

28

1    Digital Music Player markets as long as Apple's conduct forecloses even the possibility of its

2    competitors reaching most potential customers.

3         76.    Apple's anticompetitive conduct has deterred the development of competing

4    products, damaging consumers by depriving them of a choice of products with different and possibly

5    superior sets of features.

6         77.    Normally markets for consumer electronic goods such as Digital Music Players are

7    characterized by intense competition and narrow profit margins.  Apple's pricing in the Digital

8    Music Player market, by contrast, is exactly that of a monopolist, excessive and arbitrary.  For

9    example, in June 2006 the only difference between the 1GB and 4GB models of the iPod nano was

10   the capacity of their NAND flash memory parts.  At spot prices in the NAND flash memory market

11   at the time, the 1GB part cost approximately $4.15, while the 4GB part cost approximately $9.67.

12   Nonetheless, Apple charged an additional one hundred dollars for the 4GB model.

13        78.    Plaintiffs and the Classes have been injured by this anticompetitive conduct and will

14   continue to suffer injury unless the relief prayed for herein is granted.

15                              **COUNT I: TYING**

16        **(For Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1)**

17                 **Violations Resulting from Unlawful Tying of the Apple**
                   **iPod to Online Video and FairPlay Protected Music Files**
18

19        79.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth

     above on behalf of the Classes.
20

21        80.    Apple has substantial market power in the Online Music and Online Video markets.

22        81.    All of these markets are for goods and not services.

23        82.    There is no appropriate or legitimate business justification for Apple's use of

24   technological restrictions to force those who purchase Online Music and Online Video from Music

25   Store to also purchase only Apple's Digital Music Players that would counterbalance the clear

26   anticompetitive effects of its tying conduct, including the foreclosure of competition in the Digital

27   Music Player market.

28

83.     This unlawful conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple.  Prices in the Digital Music Player market are higher than they would have been in a competitive market; the supply and selection of products available is lower than it would be in a competitive market; and the number and effectiveness of competitors have been diminished by unlawful means.

84.     The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §1.

## COUNT II: MONOPOLIZATION

### (For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)

#### Violations Resulting from the Unlawful Acquisition or Maintenance of Monopoly Power in the Digital Music Player Market

85.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

86.     Through the actions described herein, Apple has willfully acquired and maintained monopoly power in the Digital Music Player market.  This conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple.  Prices in the Digital Music Player market are higher than they would be in a competitive market; the supply and selection of products available is lower than it would be in a competitive market; and the number and effectiveness of competitors have been diminished by unlawful means.

87.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Digital Music Player market.

88.     The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

#### Violations Resulting from the Unlawful Acquisition or Maintenance of Monopoly Power in the Online Music Market

89.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

90.     Through the actions described herein, Apple has willfully acquired and maintained monopoly power in the Online Music market.  This conduct has harmed competition in that market, making the supply and selection of products available lower in the Online Music market than they would be in a competitive market.  The number and effectiveness of competitors have also been diminished by Apple's unlawful conduct.

91.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Online Music market.

92.     The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

<b>Violations Resulting from the Unlawful Acquisition<br>or Maintenance of Monopoly Power in the Online Video Market</b>

93.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

94.     Through the actions described herein, Apple has willfully acquired and maintained monopoly power in the Online Video market.  This conduct has harmed competition in that market, making the supply and selection of products available lower than they would be in a competitive market.  The number and effectiveness of competitors have also been diminished by Apple's conduct.

95.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Online Video market.

96.     The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

<b>COUNT III: ATTEMPTED MONOPOLIZATION</b>

<b>(For Violation of Section of the Sherman Antitrust Act, 15 U.S.C. §2)</b>

<b>Violations Resulting from Unlawful Attempted<br>Monopolization of the Digital Music Player Market</b>

97.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

98.     Apple has acted with specific intent to monopolize the Digital Music Player market.

99.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Digital Music Player market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Digital Music Player market will allow Apple to obtain an illegal monopoly over the Digital Music Player market.

100.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Digital Music Player market and forced consumers to pay higher prices in the Digital Music Player market than they would in a competitive market.

101.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Digital Music Player market.

102.     The anticompetitive conduct described herein, if not halted and abated, will damage plaintiffs and the alleged Classes, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Attempted**
**Monopolization of the Online Music Market**

103.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

104.     Apple has acted with specific intent to monopolize the Online Music market.

105.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Online Music market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Online Music market will allow Apple to obtain an illegal monopoly over the Online Music market.

106.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market.  Apple's unlawful attempted

monopolization has also reduced the number and effectiveness of competitors in the Online Music market.

107.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Online Music market.

108.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

## Violations Resulting from the Unlawful
## Attempted Monopolization of the Online Video Market

109.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

110.    Apple has acted with specific intent to monopolize the Online Video market.

111.    There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Online Video market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products.  Further success in excluding competitors from the Online Video market will allow Apple to obtain an illegal monopoly over the Online Video market.

112.    This conduct has harmed competition of the Online Video market, making the supply and selection of products available lower than they would be in a competitive market.  Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Online Video market.

113.    There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Online Video market.

114.    The anticompetitive conduct described herein, if not halted and abated, will damage plaintiffs and the alleged classes, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

## COUNT IV

### (For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq.*)

115.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

116.    Apple's actions as described above constituted an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act, §§16270, *et seq.* of the California Business and Professions Code.

117.    The Classes have been injured in their business and property as a result of Apple's illegal conduct, for which they seek damages (trebled where appropriate) including pre-judgment interest.

118.    Apple's conduct is continuing and unless equitable relief is granted, artificially inflated prices for Portable Music Players will continue unabated.

**COUNT V**

**(For Violation of California Unfair Competition Law, Bus. & Prof. Code §§17200, *et seq.*)**

119.    Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

120.    The conduct alleged in this Consolidated Complaint constitutes unlawful, unfair, and fraudulent business acts and practices within the meaning of the California Unfair Competition Law, §§17200, *et seq.* of the California Business and Professions Code.  Plaintiffs and the Classes have suffered injury in fact and lost money or property as a result of Apple's violations of law and wrongful conduct.

121.    Apple's actions are unlawful and unfair because it has violated, *inter alia*, the Sherman Antitrust Act, the Cartwright Act, the Consumers Legal Remedies Act and because it has monopolized the markets for Online Music, Online Video, and Digital Music Players in violation of California common law.

122.    Apple's actions are unfair because in its pursuit of monopoly pricing it has made its products less useful to consumers and prevented them from choosing which companies to do business within the relevant markets based on the merits of each company's products.  Moreover, there is no legitimate business justification for Apple's conduct, and any business justification is further outweighed by the harm Apple's conduct has caused to consumers and competitors.

123.     Apple's actions are fraudulent and unfair because it does not inform the purchasers of its products that it has deliberately made them incompatible with the products of its competitors. Apple has deceived consumers who reasonably believed that the Online Video and Online Music they could purchase from Music Store are compatible with any standard Portable Music Player and that they could purchase Online Music and Online Video from any store to play on Apple's Digital Music Player products.  These beliefs are reasonable under the circumstances given that consumers when purchasing media products are accustomed to the fact that the CDs, DVDs, audio cassettes, and VHS cassettes they purchase from any American store are compatible with any standard CD, DVD, audio cassette, and VHS cassette player.

124.     Accordingly, Apple has violated the Unfair Competition Law proscription against engaging in unlawful, unfair, and fraudulent business practices.

125.     As a result of this unlawful, unfair, and fraudulent conduct, Apple has been unjustly enriched at the expense of plaintiffs, other members of the Classes, and the general public.

126.     Apple's conduct is continuing and unless equitable relief is granted, artificially inflated prices for Digital Music Players will continue unabated.

**COUNT VI**

**(For Violation of the Consumer Legal Remedies Act,
Cal. Civil Code §§1750, *et seq.*)**

127.     Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

128.     Plaintiffs and each member of the Class are "consumers" within the meaning of Consumer Legal Remedies Act, California Civil Code §1761(d) ("CLRA").

129.     On July 7, 2006, plaintiff Melanie Tucker sent a letter to Apple's general counsel demanding Apple cease its conduct in violation of the CLRA.

130.     The CLRA applies to Apple's actions and conduct, described herein, because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

131.     Apple is a monopolist with market shares of 75% or more in each of the relevant markets and a stock market capitalization of more than fifty billion dollars.  The unnecessary technological restrictions it places on its products offer no benefit to consumers while preventing them from using any Apple product they have already bought from being used with a competitor's Digital Music Player or online store.

132.     Apple's size, completely dominant market share, and unreasonable and unfair technological restrictions, place it in a greatly unequal bargaining position relative to consumers in each of the relevant markets.

133.     Apple unconscionably exploits this unequal bargaining power by imposing prices, contractual terms, and one sided technological restrictions into contracts with consumers in the digital music markets.  This behavior has violated and continues to violate the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*.

**COUNT VII**

**(For Common Law Monopolization Business Practices)**

134.     Plaintiffs re-alleges and incorporate by reference each of the allegations set forth above on behalf of the Classes.

135.     The conduct described in this Consolidated Complaint is in violation of California common law prohibiting monopolization.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs, on their own behalf and on behalf of the putative classes pray that the Court declare, adjudge and decree the following:

A.     That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs' claims for injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief, and declaring plaintiffs as representatives of the Classes and their counsel as counsel for the Classes;

B.       That the conduct alleged herein constitutes unlawful tying, monopolization, and attempted monopolization in violation of the Cartwright Act, California common law, and Sections 1 and 2 of the Sherman Antitrust Act;

C.       That the conduct alleged herein is in violation of the California Unfair Competition Law and appropriate restitutionary and other injunctive relief be granted pursuant to this law;

D.       That the conduct alleged herein is in violation of the Consumer Legal Remedies Act; and appropriate damages and injunctive relief be granted pursuant to this law;

E.       For an order permanently restraining and enjoining Apple from continuing the unfair and anticompetitive activities alleged herein;

F.       That plaintiffs and the Classes are entitled to damages, penalties and other monetary relief provided by applicable law, including treble damages;

G.       That plaintiffs and the Classes recover their costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest;

H.       For an order requiring full restitution of all funds acquired from Apple's unfair business practices, including disgorgement of revenues and/or profits;

I.       Awarding plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law; and

J.       That plaintiffs and the Classes are granted such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

1     **JURY DEMAND**

2         Plaintiffs respectfully demand a trial by jury on all issues so triable.

3     DATED:  April 19, 2007                    LERACH COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
4                                              BONNY E. SWEENEY
                                               GREGORY S. WESTON
5

6
                                                       s/BONNY E. SWEENEY
7                                                   BONNY E. SWEENEY

8                                              655 West Broadway, Suite 1900
                                               San Diego, CA  92101
9                                              Telephone:  619/231-1058
                                               619/231-7423 (fax)
10
                                               THE KATRIEL LAW FIRM
11                                             ROY A. KATRIEL
                                               1101 30th Street, N.W., Suite 500
12                                             Washington, DC  20007
                                               Telephone:  202/625-4342
13                                             202/330-5593 (fax)

14                                             Co-Lead Counsel for Plaintiffs

15                                             BONNETT, FAIRBOURN, FRIEDMAN
                                                  & BALINT, P.C.
16                                             ANDREW S. FRIEDMAN
                                               FRANCIS J. BALINT, JR.
17                                             ELAINE A. RYAN
                                               TODD D. CARPENTER
18                                             2901 N. Central Avenue, Suite 1000
                                               Phoenix, AZ  85012
19                                             Telephone:  602/274-1100
                                               602/274-1199 (fax)
20
                                               BRAUN LAW GROUP, P.C.
21                                             MICHAEL D. BRAUN
                                               12400 Wilshire Blvd., Suite 920
22                                             Los Angeles, CA  90025
                                               Telephone:  310/442-7755
23                                             310/442-7756 (fax)

24                                             MURRAY, FRANK & SAILER LLP
                                               BRIAN P. MURRAY
25                                             JACQUELINE SAILER
                                               275 Madison Avenue, Suite 801
26                                             New York, NY  10016
                                               Telephone:  212/682-1818
27                                             212/682-1892 (fax)

28

CONSOLIDATED COMPLAINT - C-05-00037-JW                                        - 24 -

1

2       GLANCY BINKOW & GOLDBERG LLP
        MICHAEL GOLDBERG
3       1801 Avenue of the Stars, Suite 311
        Los Angeles, CA  90067
        Telephone:  310/201-9150
4       310/201-9160 (fax)

5       Additional Counsel for Plaintiffs

6   S:\CasesSD\Apple Tying\CPT00041079-AMD.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 19, 2007.

<pre>
                              s/ BONNY E. SWEENEY
                              BONNY E. SWEENEY

                              LERACH COUGHLIN STOIA GELLER
                                  RUDMAN & ROBBINS LLP
                              655 West Broadway, Suite 1900
                              San Diego, CA  92101-3301
                              Telephone:  619/231-1058
                              619/231-7423 (fax)

                              E-mail:BonnyS@LerachLaw.com
</pre>

CAND-ECF                                                                    Page 1 of 1

Case 4:05-cv-00037-YGR   Document 877-2   Filed 11/04/14   Page 51 of 177
Case 5:05-cv-00037-YGR   Document 704   Filed 04/19/07   Page 29 of 29

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael David Braun**
  service@braunlawgroup.com

- **Roy A. Katriel**
  rak@katriellaw.com rk618@aol.com

- **Caroline N. Mitchell**
  cnmitchell@jonesday.com mlandsborough@jonesday.com;ybennett@jonesday.com

- **Robert A. Mittelstaedt**
  ramittelstaedt@jonesday.com ybennett@jonesday.com

- **Brian P Murray**
  bmurray@rabinlaw.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Adam Richard Sand, Esq**
  arsand@JonesDay.com mlandsborough@jonesday.com

- **John J. Stoia, Jr**
  jstoia@lerachlaw.com

- **Tracy Strong**
  tstrong@jonesday.com dharmon@jonesday.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT 8

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
BONNY E. SWEENEY (176174)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bonnys@csgrr.com

THE KATRIEL LAW FIRM
ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
Washington, DC 20007
Telephone: 202/625-4342
202/330-5593 (fax)
rak@katriellaw.com

Co-Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | Lead Case No. C-05-00037-JW(RS) |

THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION )
)
)
This Document Relates To: )
)
ALL ACTIONS. )
)

Lead Case No. C-05-00037-JW(RS)

CLASS ACTION

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

JUDGE: Hon. James Ware
DATE: November 10, 2008
TIME: 9:00 a.m.
CTRM: 8-4th Floor

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. PLAINTIFFS' FEDERAL ANTITRUST CLAIMS.................................................3

    A.    The Elements of Plaintiffs' Tying Claim ....................................................3

    B.    The Elements of Plaintiffs' Monopolization Claims ..................................4

III. THE REQUIREMENTS OF RULE 23 ARE READILY SATISFIED IN THIS CASE .....................................................................................................................5

    A.    Rule 23(a) Is Satisfied.................................................................................6

           1.    Numerosity.......................................................................................6

           2.    Commonality.....................................................................................6

           3.    Typicality .........................................................................................7

           4.    Adequacy ..........................................................................................8

    B.    Rule 23(b) Is Satisfied. ...............................................................................9

           1.    Injunctive Relief under Rule 23(b)(2)..............................................9

           2.    Monetary Relief under Rule 23(b)(3) ............................................11

                 a.    Predominance.......................................................................11

                 b.    Superiority...........................................................................22

    C.    There Exists Readily Definable Classes of Apple Customers ..............................23

    D.    Appointment of Class Counsel ..................................................................24

IV. PLAINTIFFS' STATE LAW CLAIMS .................................................................24

V. CONCLUSION......................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ....................................1, 11, 23

5

*Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.*,
    475 F. Supp. 973 (D. Mass. 1979) ...............................................................................16

6

7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985) .............................................19

8

*Bafus v. Aspen Realty, Inc.*,
    236 F.R.D. 652 (D. Idaho 2006) ........................................................................ *passim*

9

10

*Behrend v. Comcast Corp.*,
    No. 03-6604, 2007 WL 2972601 (E.D. Pa. Oct. 10, 2007) .............................................5

11

*Betaseed, Inc. v. U&I, Inc.*,
    681 F.2d 1203 (9th Cir. 1982) ....................................................................................14

12

13

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ....................................................................................6, 8

14

*Bogosian v. Gulf Oil Corp.*,
    561 F. 2d 434 (3rd Cir. 1977) ....................................................................................16

15

16

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) .............................................................................3, 4, 19

17

*Collins v. Int'l Dairy Queen, Inc.*,
    168 F.R.D. 668 (M.D. Ga. 1996) ...................................................................... *passim*

18

19

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*,
    99 F.3d 937 (9th Cir. 1996) .........................................................................................5

20

*Datagate, Inc. v. Hewlett-Packard Co.*,
    60 F.3d 1421 (9th Cir. 1995) ...................................................................................3, 13

21

22

*Digidyne Corp. v. Data Gen. Corp.*,
    734 F.2d 1336 (9th Cir. 1984) .......................................................................... *passim*

23

*Dukes v. Wal-Mart, Inc.*,
    509 F.3d 1168 (9th Cir. 2007) ...........................................................................5, 8, 22

24

25

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 3d........................................................ *passim*

26

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974).................................................5

27

28

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)

**Page**

*Estate of Garrison v. Warner Bros., Inc.,*
  No. CV 95-8328 RMT, 1996 WL 407849
  (C.D. Cal. June 25, 1996) ...........................................................................7, 20

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
  703 F.2d 534 (9th Cir 1983) .......................................................................17, 20

*Fortner Enters., Inc. v. United States Steel Corp.,*
  394 U.S. 495, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969).................................3, 12

*George Lussier Enters., Inc. v. Subaru of New England, Inc.,*
  No. CIV 99-109-B, 2001 WL 920060
  (D.N.H. Aug. 3, 2001) ........................................................................11, 13, 23

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) .....................................................................6, 7, 8

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ...............................................................................7

*Hardy v. City Optical, Inc.,*
  39 F.3d 765 (7th Cir. 1994) ...............................................................................17

*Hawaii v. Standard Oil Co. of Cal.,*
  405 U.S. 251, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972) ........................................2

*Hill v. A-T-O, Inc.,*
  535 F.2d 1349 (2d Cir. 1976).............................................................................17

*Hill v. A-T-O, Inc.,*
  80 F.R.D. 68 (E.D.N.Y. 1978) ......................................................................16, 21

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  No. C 87-1686 BAC, 1994 WL 508735
  (N.D. Cal. Sept. 2, 1994) ......................................................................... *passim*

*In re Catfish Antitrust Litig.,*
  826 F. Supp. 1019 (N.D. Miss. 1993)..................................................................9

*In re Corrugated Container Antitrust Litig.*
  No. 310, 1979 WL 1751
  (S.D. Tex. Dec. 21, 1979) ..................................................................................22

*In re Domestic Air. Transp. Antitrust Litig.,*
  137 F.R.D. 677 (N.D. Ga. 1991).....................................................................9, 22

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  No. M 02-1486 PJH, 2006 WL 1530166
  (N.D. Cal. June 5, 2006) .......................................................................... *passim*

Page

*In re Indus. Silicon Antitrust Litig.,*
    No. 95-1131, 1998 WL 1031507
    (W.D. Pa. Oct. 13, 1998) ...................................................................................22

*In re Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007)............................................................... *passim*

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    202 F.R.D. 12 (D.D.C. 2001)..................................................................................5

*In re NASDAQ Market Makers Antitrust Litig.,*
    169 F.R.D 493 (S.D.N.Y. 1996) ..........................................................................22

*In re Playmobil Antitrust Litig.,*
    35 F. Supp 2d 231 (E.D.N.Y. 1998) ...................................................................1, 6

*In re Relafen Antitrust Litig.,*
    221 F.R.D. 260 (D. Mass. 2004)..........................................................................24

*In re Rubber Chems. Antitrust Litig.,*
    232 F.R.D. 346 (N.D. Cal. 2005)............................................................. *passim*

*In re Sugar Indus. Antitrust Litig.,*
    No. MDL 201, 1976 WL 1374
    (N.D. Cal. May 21, 1976) ....................................................................................21

*In re Tableware Antitrust Litig.,*
    241 F.R.D. 644 (N.D. Cal. 2007) ............................................................. *passim*

*In re Visa Check/Mastermoney Antitrust Litig.,*
    192 F.R.D. 68 (E.D.N.Y. 2000),
    *aff'd*, 280 F.3d 124 (2d Cir. 2001).......................................................... *passim*

*Jefferson Parish Dist. No. 2 v. Hyde,*
    466 U.S. 2117, 104 S. Ct. 1551, 80 L. Ed. 2d 2......................................................12

*Krehl v. Baskin-Robbins Ice Cream Co.,*
    78 F.R.D. 108 (C.D. Cal. 1978)..............................................................................6

*Linney v. Cellular Alaska P'ship.,*
    151 F.3d 1234 (9th Cir. 1998) .............................................................................10

*Little Caesar Enters., Inc. v. Smith,*
    172 F.R.D. 236 (E.D. Mich. 1997) ............................................................ *passim*

*Mailand v. Burckle,*
    20 Cal. 3d 367, 143 Cal. Rptr. 1 (1978)...............................................................24

*Martino v. McDonald's System, Inc.,*
    81 F.R.D. 81 (N.D. Ill. 1979)...............................................................................18

|  |  | **Page** |

*Milonas v. Amerada Hess Corp.*,
    No. 73 CIV 4263 (JMC), 1976 WL 1312
    (S.D.N.Y. Aug. 19, 1976) ........................................................................13, 17

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ..................................................................10

*Moore v. Jas. H. Matthews & Co.*,
    550 F.2d 1207 (9th Cir. 1977) .......................................................... *passim*

*Moore v. Jas. H. Matthews & Co.*,
    682 F.2d 830 (9th Cir. 1982) ..................................................................21

*Northern Pac. Ry. Co. v. United States*,
    356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958).........................................3, 16

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ..................................................................24

*O'Connor v. Boeing North Am., Inc.*,
    184 F.R.D. 311 (C.D. Cal. 1998) .................................................................23

*Paladin Assocs., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ..................................................................17

*Probe v. State Teachers' Ret. Sys.*,
    780 F.2d 776 (9th Cir. 1986) ..................................................................10

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ..................................................................5, 18

*Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,
    ___ F.3d ___, 2008 WL 2697793 (9th Cir. July 11, 2008)................................3, 4

*Slattery v. Apple Comp., Inc.*,
    No. C 05-00037 JW, 2005 WL 2204981
    (N.D. Cal. Sept. 9, 2005) ....................................................................1, 4, 5

*Slaven v. BP Am., Inc.*,
    190 F.R.D. 649 (C.D. Cal. 2000)...............................................................23

*Spectrum Sports v. McQuillan*,
    506 U.S. 447, 113 S.Ct. 884, 122 L. Ed. 2d 247 (1993)....................................5

*Tele Atlas N.V. v. Navteq Corp.*,
    397 F. Supp. 2d 1184 (N.D. Cal. 2005) .......................................................4

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
    209 F.R.D. 159 (C.D. Cal. 2002) ..............................................................7

**Page**

*Tucker v. Apple Comp., Inc.*,
   493 F. Supp. 2d 1090 (N.D. Cal., 2006) ................................................ *passim*

*Tuolumne v. Sonora Cmty. Hosp.*,
   236 F.3d 1148 (9th Cir. 2001) ..............................................................4, 15, 24

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
   512 F.2d 1264 (9th Cir. 1975) ........................................................................20

*United States Steel Corp. v. Fortner Enters., Inc.*,
   429 U.S. 610, 97 S. Ct. 861, 51 L. Ed. 2d 80 (1977).......................................12

*United States v. Loew's, Inc.*,
   371 U.S. 38 (1962).........................................................................................14

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) .........................................................................22

*Westways World Travel, Inc. v. AMR Corp.*,
   218 F.R.D. 223 (C.D. Cal. 2003) .....................................................................9

*Xiufang Situ v. Leavitt*,
   No. C 06-2841 TEH, 2007 WL 127993
   (N.D. Cal. Jan. 12, 2007) .................................................................................9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969).....................................20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §1............................................................................................................ *passim*
   §2............................................................................................................ *passim*

California Business & Professions Code
   §16700 *et seq.* ................................................................................................24

Federal Rules of Civil Procedure
   Rule 23................................................................................................... *passim*
   Rule 23(a)...................................................................................................6, 7, 8
   Rule 23(a)(1)......................................................................................................6
   Rule 23(a)(2)......................................................................................................6
   Rule 23(a)(3)......................................................................................................7
   Rule 23(a)(4)................................................................................................8, 24
   Rule 23(b)...........................................................................................................9
   Rule 23(b)(2)................................................................................................9, 10
   Rule 23(b)(3)................................................................................................6, 11
   Rule 23(g)(1)....................................................................................................24

**Page**

**SECONDARY AUTHORITIES**

6 A. Conte & H. Newberg, *Newberg on Class Actions*, §18:1 (4th ed. 2002) ..............................2
        §4:32 ...............................................................................................................................23
        §18.8..................................................................................................................................7
        §18.14................................................................................................................................8
        §18:24................................................................................................................................9
        §18:26..............................................................................................................................11
        §18:27..............................................................................................................................21
        §18:30..............................................................................................................................15
        §18:5..................................................................................................................................6

Press Release, Apple, *Apple launches iTune Plus Higher Quality DRM-Free Tracks
    Now Available on the iTunes Store Worldwide* May 30, 2007 ..........................................10

Press Release, Apple, *iTunes Music Store Catalog Tops One Million Songs*
    Aug. 10, 2004..........................................................................................................................12

S. Jobs, *Thoughts on Music* Feb. 6, 2007........................................................................10, 13, 16

1    TO:     ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2          PLEASE TAKE NOTICE that on November 10, 2008 at 9:00 a.m., in Courtroom 8, 4th

3 Floor of the above-entitled Court, located at 280 South 1st Street, San Jose, California, Plaintiffs

4 Melanie Tucker, Mariana Rosen, and Somtai Troy Charoensak (collectively, "Plaintiffs"), will, and

5 hereby do, respectfully move the Court for class certification and to appoint the law firms of

6 Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") and The Katriel Law Firm as Co-

7 Lead Class Counsel.

8 **I.**     **INTRODUCTION**

9          Plaintiffs respectfully seek certification of their claims that Defendant Apple, Inc. ("Apple"

10 or "AAPL") violated antitrust laws when, beginning in April 2003, Apple encrypted online audio

11 and video recording files purchased from its online music store ("the iTunes Store") so that they

12 could only be played on portable digital media players manufactured by Apple (collectively,

13 "iPods"). ==Given Apple's overwhelming market power in the online recordings markets, Plaintiffs==

14 ==allege that Apple's unremitting policy of incompatibility constitutes an unlawful tying arrangement==

15 ==in violation of Section 1 of the Sherman Act.== Apple furthermore allegedly obtained, maintained

16 and/or attempted to obtain a monopoly of the online audio and video recordings and portable digital

17 media player markets through a series of anticompetitive actions beyond the initial tie, precluding

18 competition from other portable player makers in violation of Section 2 of the Sherman Act.

19 Plaintiffs seek injunctive relief requiring Apple to remedy the "lock-in" predicament it has created

20 for iPod purchasers, and damages for the supracompetitive price paid for iPods. The Court has

21 already ruled that Plaintiffs have alleged viable federal antitrust claims. *See Slattery v. Apple Comp.,*

22 *Inc.*, No. C 05-00037 JW, 2005 WL 2204981, at *3 (N.D. Cal. Sept. 9, 2005); *Tucker v. Apple*

23 *Comp., Inc.*, 493 F. Supp. 2d 1090 (N.D. Cal., 2006); *see generally*, *Eastman Kodak Co. v. Image*

24 *Tech. Servs., Inc.*, 504 U.S. 451, 462, 112 S. Ct. 2072, 119 L. Ed. 3d 265 (1992).

25          As the Supreme Court and numerous other courts have recognized, few cases are better

26 candidates for class-wide resolution than antitrust actions. *Amchem Products, Inc. v. Windsor*, 521

27 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("Predominance is a test readily met in

28 certain cases alleging . . . violations of the antitrust laws."); *In re Playmobil Antitrust Litig.*, 35 F.

1    Supp 2d 231, 238 (E.D.N.Y. 1998) ("Antitrust claims are well suited for class actions.").  And, in

2    turn, class actions "play a particularly vital role in the private enforcement of antitrust [laws]." *In re*

3    *Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007); *accord In re Dynamic Random*

4    *Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *3 (N.D. Cal.

5    June 5, 2006) ("DRAM") (same); *see generally* 6 A. Conte & H. Newberg, *Newberg on Class*

6    *Actions*, §18:1, at 3-6 (4th ed. 2002) ("*Newberg*").  In the words of the Supreme Court:

7              Every violation of the antitrust laws is a blow to the free-enterprise system
         envisaged by Congress.  This system depends on strong competition for its health
8        and vigor, and strong competition depends, in turn, on compliance with antitrust
         legislation.  In enacting these laws, Congress had many means at its disposal to
9        penalize violators.  It could have, for example, required violators to compensate
         federal, state, and local governments for the estimated damage to their respective
10       economies caused by the violations.  But, this remedy was not selected.  Instead,
         Congress chose to permit all persons to sue to recover three times their actual
11       damages every time they were injured in their business or property by an antitrust
         violation.  By offering potential litigants the prospect of a recovery in three times the
12       amount of their damages, Congress encouraged these persons to serve as "private
         attorneys general."

13                                          *       *       *

14
              Congress has given private citizens rights of action for injunctive relief and
15       damages for antitrust violations without regard to the amount in controversy.  28
         U.S.C. §1337; 15 U.S.C. §15.  Rule 23 of the Federal Rules of Civil Procedure
16       provides for class actions that may enhance the efficacy of private actions by
         permitting citizens to combine their limited resources to achieve a more powerful
17       litigation posture.[1]

18   *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972).

19   Given the salutary role of the class mechanism in private antitrust actions, any doubt under Rule 23

20   is to be resolved in favor of certification.  *Tableware*, 241 F.R.D. at 648; *In re Rubber Chems.*

21   *Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005).

22           Plaintiffs' claims against Apple are ideally suited for class treatment because, as shown

23   below, ***every*** element of those claims can and will be established by evidence and economic analysis

24   common to all iPod purchasers.  Indeed, as confirmed in the declaration of esteemed Stanford

25   economist, Professor *Emeritus* Roger G. Noll ("Noll Decl."), based on his expertise, preliminary

26   _____

27   [1]      Unless otherwise noted, citations are omitted and emphasis is added, here and throughout.

28

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                          - 2 -

1  research and the exemplar data provided by Apple as the prelude to full discovery, there are

2  established and reliable econometric methodologies available to prove liability, antitrust impact and

3  damages caused by Apple's alleged anticompetitive conduct on a class-wide basis.  Sweeney Decl.,

4  Ex. 1 (Declaration of Roger G. Noll, dated July 15, 2008).[2]

5      Accordingly, Plaintiffs respectfully seek certification of the following class:

6      "All persons or entities in the United States (excluding federal, state and local
        governmental entities, Apple, its directors, officers and members of their families)
7      who since April 28, 2003 purchased an iPod directly from Apple."

8  **II.   PLAINTIFFS' FEDERAL ANTITRUST CLAIMS**

9      **A.   The Elements of Plaintiffs' Tying Claim**

10     "A tying arrangement is a device used by a competitor with market power in one market (for

11  the 'tying' product) to extend its market power into an entirely distinct market (for the 'tied'

12  product)."  *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1423 (9th Cir. 1995); *see generally*

13  *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958);

14  *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 499, 89 S. Ct. 1252, 22 L. Ed. 2d

15  495 (1969).  Ties are prohibited where a seller "exploits," "controls," "forces," or "coerces" a buyer

16  of a tying product into purchasing a tied product.  *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*,

17  ___ F.3d ___, 2008 WL 2697793, at *6 (9th Cir. July 11, 2008); *Cascade Health Solutions v.*

18  *PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008)).  Here, Plaintiffs will prove that Apple engaged in

19  just such conduct when it intentionally encrypted recordings purchased from the iTunes Store with

20  Apple's proprietary FairPlay/DRM so as to restrict portable play-back to Apple's own iPods.

21     The tying arrangement "is one of the few practices that the Supreme Court has determined to

22  be illegal *per se* under the Sherman Act, §1."  *Datagate*, 60 F.3d at 1423; *see also Eastman Kodak*,

23  504 U.S. at 461-62 (reaffirming theory of *per se* liability).  Indeed, "[a] *per se* tying violation is

24  proscribed without examining the actual market conditions, when the seller has such power in the

25  _____

26  [2]   All "Ex." and "Exs." references are to the Declaration of Bonny E. Sweeney ("Sweeney
      Decl.") in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Counsel,
27  filed concurrently herewith.

28

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                    - 3 -

1    tying product or service market that the existence of forcing is probable, . . . and there is a substantial

2    potential for impact on competition." *Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th

3    Cir. 2001) (internal quotes omitted).

4           As this Court has already held, to establish a *per se* illegal tying arrangement, Plaintiffs need

5    to show but three elements:

6           1.      A tie between two separate products or services sold in relevant markets;

7           2.      Sufficient economic power in the tying products market to affect the tied market; and

8           3.      An effect on a not-insubstantial volume of commerce in the tied product market.

9    *Slattery*, 2005 WL 2204981, at *3; *Tucker*, 493 F. Supp. 2d at 1096; *see also Tele Atlas N.V. v.*

10   *Navteq Corp.*, 397 F. Supp. 2d 1184, 1191 (N.D. Cal. 2005) (citing *Slattery*, 2005 WL 2204981);

11   *Rick-Mik Enters.*, 2008 WL 2697793, at *5-*6 (recently reiterating the same three elements for *per*

12   *se* tying claim); *PeaceHealth*, 515 F.3d at 913 (same).  Some courts consider a fourth element of a

13   *per se* claim: that the defendant has an economic interest in the tied product.  *Tuolumne*, 236 F.3d at

14   1158.  If a *per se* analysis does not apply, to establish a Section 1 tying claim Plaintiffs would in

15   addition have to show "an unreasonable restraint on competition in the relevant market."  *Tuolumne*,

16   236 F. 3d at 1157.

17          Because none of the elements of a Section 1 tying claim turns on the individual

18   circumstances of a particular product purchaser, courts both within and outside of the Ninth Circuit

19   have consistently certified tying claims for class-wide resolution.  *See, e.g.*, *Bafus v. Aspen Realty,*

20   *Inc.*, 236 F.R.D. 652 (D. Idaho 2006) (certifying tying claims); *see generally Image Tech. Servs.,*

21   *Inc. v. Eastman Kodak Co.*, No. C 87-1686 BAC, 1994 WL 508735 (N.D. Cal. Sept. 2, 1994)

22   (same); *In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280

23   F.3d 124 (2d Cir. 2001) (same); *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236 (E.D. Mich.

24   1997) (same); *Collins v. Int'l Dairy Queen, Inc.*, 168 F.R.D. 668 (M.D. Ga. 1996) (same).

25          **B.      The Elements of Plaintiffs' Monopolization Claims**

26          To prove their Section 2 monopolization claims, Plaintiffs must show:

27          1.      That Apple possesses monopoly power in the relevant market;

28          2.      That Apple willfully acquired or maintained that power; and

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                      - 4 -

3.     That Apple's conduct has caused antitrust injury.

*Slattery*, 2005 WL 2204981, at \*4; *Tucker*, 493 F. Supp. 2d at 1099; *see generally Eastman Kodak*, 504 U.S. at 481; *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977).  To establish their Section 2 ***attempted*** monopolization claim, Plaintiffs must show:

1.     A specific intent by Apple to monopolize the relevant market;

2.     Predatory or anticompetitive conduct by Apple designed to control prices or destroy competition;

3.     A dangerous probability of success; and

4.     Causal antitrust injury.

*Slattery*, 2005 WL 2204981, at \*4; *Tucker*, 493 F. Supp. 2d at 1102; *see generally Rebel Oil Co., Inc.  v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995);  *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L. Ed. 2d 247 (1993).

Because, once again, none of these elements turns on the individual circumstances of any particular product purchaser, courts likewise have long certified Section 2 monopolization and attempted monopolization claims for class-wide resolution.  *See, e.g.*, *Behrend v. Comcast Corp.*, No. 03-6604, 2007 WL 2972601, at \*12-\*14 (E.D. Pa. Oct. 10, 2007); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29-30 (D.D.C. 2001); *Eastman Kodak*, 1994 WL 508735, at \*4.

## III.   THE REQUIREMENTS OF RULE 23 ARE READILY SATISFIED IN THIS CASE

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974) (internal quotes omitted).  Arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage. *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1177 (9th Cir. 2007).  Nor may a court weigh the merits of conflicting expert evidence. *Dukes*, 509 F.3d. at 1179-80; *see In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 135 (C.D. Cal.

1    2007) (challenges to expert opinions constitute merits determinations not properly resolved at the

2    class certification stage).  And the Court is, of course, "bound to take the substantive allegations of

3    the complaint as true."  *Tableware*, 241 F.R.D. at 648 (quoting *Blackie v. Barrack*, 524 F.2d 891,

4    901 n.17 (9th Cir. 1975)).

5         **A.    Rule 23(a) Is Satisfied.**

6              **1.    Numerosity**

7         The numerosity requirement is met if "the class is so numerous that joinder of all members is

8    impracticable."  Fed. R. Civ. P. 23(a)(1).  "A finding of numerosity may be supported by common

9    sense assumptions, and it is especially appropriate in antitrust actions brought under Rule 23(b)(3)."

10   *Tableware*, 241 F.R.D. at 648 (quoting *In re Playmobil*, 35 F. Supp 2d at 239); *accord In re Rubber*

11   *Chemicals*, 232 F.R.D. at 350.  "A potential class of 1,700 members is, *a fortiori*, sufficiently

12   numerous to preclude joinder."  *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 114 (C.D.

13   Cal. 1978).  The fact that a class is geographically dispersed supports class certification.  *DRAM*,

14   2006 WL 1530166, at *3.

15        Here, Apple itself reports that it sold over 51,000,000 iPods during the fiscal year 2007 alone.

16   Sweeney Decl. Ex. 2 (Apple Inc., Annual Report (Form 10-K), at 42 (Sept. 29, 2007)); *see generally*

17   Sweeney Decl., Ex. 1 (Noll Decl. at 46) (there are "estimated to be over 110 million [iPod] users").

18   Because the number of direct iPod purchasers in the United States is unquestionably in the millions,

19   numerosity is easily satisfied.  Compare *Tableware*, 241 F.R.D. at 648-49 (numerosity satisfied with

20   lesser numbers); *Bafus*, 236 F.R.D. at 655 (same); *Little Caesar*, 172 F.R.D. at 242 (same); *Collins*,

21   168 F.R.D. at 673 (same); *Eastman Kodak*, 1994 WL 508735, at *1 (same).

22              **2.    Commonality**

23        Commonality is satisfied where ***"there are questions of law or fact common to the class."***

24   Fed. R. Civ. P. 23(a)(2).  The commonality requirement is permissively construed, such that "[t]he

25   existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of

26   salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150

27   F.3d 1011, 1019 (9th Cir. 1998).  In the antitrust context, "[a]n allegation of . . . tying [or]

28   monopolization . . . will establish a common question."  *Newberg*, §18:5, at 16-20.

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                                    - 6 -

1    Here, the legal issues common to all class members include virtually every element of the

2  federal antitrust claims alleged against Apple:  Are the markets for online digital recordings and

3  portable players separate?  What are Apple's respective market shares?  Does Apple enjoy market

4  power in these markets?  Does Apple have an unremitting policy of applying its encryption

5  ("FairPlay") restrictions? Has Apple used those restrictions to obtain, maintain or attempt to obtain

6  monopoly power in the portable player market?  If Apple is liable, how are damages to be

7  calculated?  These and many other common issues focusing on the alleged common conduct of

8  Apple are squarely raised in this action, amply satisfying commonality.  Compare *Tableware*, 241

9  F.R.D. at 649 (commonality satisfied based on alleged common practice by defendant); *Bafus*, 236

10  F.R.D. at 656 (same); *Little Caesar*, 172 F.R.D. at 242 (same); *Collins*, 168 F.R.D. at 673-74 (same);

11  *Eastman Kodak*, 1994 WL 508735, at *1 (same).

12              **3.      Typicality**

13    The third Rule 23(a) requirement, typicality, is met where "the claims . . . of the

14  representative parties are typical of the claims . . . of the class."  Fed. R. Civ. P. 23(a)(3).  Under

15  Rule 23(a)(3), "representative claims are 'typical' if they are reasonably co-extensive with those of

16  absent class members; they need not be substantially identical."  *Hanlon*, 150 F.3d at 1020; *accord*

17  *Eastman Kodak*, 1994 WL 508735, at *2.  "The test of typicality is whether other members have the

18  same or similar injury, whether the action is based on conduct which is not unique to the named

19  plaintiffs, and whether other class members have been injured by the same course of conduct."

20  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  In the antitrust context, typicality

21  "will be established by plaintiffs and all class members alleging the same antitrust violation by the

22  defendants."  *Estate of Garrison v. Warner Bros., Inc.*, No. CV 95-8328 RMT, 1996 WL 407849, at

23  *2 (C.D. Cal. June 25, 1996); *accord Newberg*, §18.8, at 29.  The typicality requirement is to be

24  "liberally construed."  *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites,*

25  *Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002).

26    Here, Plaintiffs all purchased iPods directly from Apple, allege precisely the same antitrust

27  claims on behalf of themselves and every other member of the proposed class of iPod purchasers,

28  and seek relief for the same alleged injury.  Consolidated Complaint for Violations of Sherman

1    Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumer Legal

2    Remedies Act and California Common Law of Monopolization, filed April 14, 2007, ("CCAC"),

3    ¶¶26, 72-78.  Typicality is established.  Compare *Tableware*, 241 F.R.D. at 653 (typicality

4    requirement satisfied); *Bafus*, 236 F.R.D. at 656 (same); *Little Caesar*, 172 F.R.D. at 242-3 (same);

5    *Collins*, 168 F.R.D. at 674 (same); *Eastman Kodak*, 1994 WL 508735, at *2 (same).

6                        **4.    Adequacy**

7            The fourth requirement of Rule 23(a) is that "the representative parties will fairly and

8    adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy under Rule

9    23(a)(4) turns on two basic questions: "(1) do the named plaintiffs and their counsel have any

10   conflicts of interest with other class members and (2) will the named plaintiffs and their counsel

11   prosecute the action vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020; *accord Dukes*,

12   509 F.3d at 1185.  To disqualify class representatives or class counsel, perceived conflicts of interest

13   "must go to the heart of the litigation, relating to the subject matter of the suit."  *Newberg*, §18.14, at

14   40-41; *accord Blackie*, 524 F.2d at 909.

15           Here, the interests of the Plaintiffs and the rest of the proposed class are entirely aligned: as

16   direct purchasers of iPod players from Apple, all share the same interest in determining whether

17   Apple's use of FairPlay violated antitrust law, whether competition was thereby stifled, whether

18   Plaintiffs and class members were unlawfully "locked-in" to iPods as portable players and/or

19   whether they paid supracompetitive prices for those iPods.  *DRAM*, 2006 WL 1530166, at *6

20   (adequacy of representation met because "the named plaintiffs allege that all members of the

21   proposed class paid artificially inflated prices as a result of defendants' [antitrust violation] during

22   the relevant class period, that all suffered similar injury as a consequence of the conspiracy, and that

23   all seek the same relief.").  There are simply no conflicts precluding class certification.  Compare

24   *Tableware*, 241 F.R.D. at 649 (no conflict precluding certification of antitrust claims); *Bafus*, 236

25   F.R.D. at 657 (same); *Little Caesar*, 172 F.R.D. at 244 (same); *Collins*, 168 F.R.D. at 674-5 (same).

26           Nor is there any basis to doubt that Mr. Charoensak, Ms. Rosen, and Ms. Tucker are highly

27   motivated advocates for the proposed class.  They have retained legal counsel with considerable

28   experience in the prosecution of major class and antitrust litigation.  Sweeney Decl., Exs. 3-4 (Firm

1   Resumes of Coughlin Stoia Geller Rudman & Robbins LLP and The Katriel Law Firm,

2   respectively); *see also* Order Consolidating Related Cases; Appointing Co-Lead Counsel, dated

3   March 21, 2007 ("March 21, 2007 Order").  Furthermore, all three proposed class representatives

4   have already given day-long depositions, have submitted their iPods for a forensic inspection by

5   Apple's counsel, and have produced voluminous (and needlessly intrusive) documentation to Apple

6   as part of the discovery process, including: copies of all music files stored on their personal

7   computers; copies of their iTunes Purchase history; iTunes account names and passwords; copies of

8   receipts documenting their iPod purchases from Apple; and lists of every Compact Disc they

9   currently own.  Sweeney Decl., ¶¶3-4.  Mr. Charoensak, Ms. Rosen, and Ms. Tucker are assuredly

10  committed proposed class representatives.  *See* March 21, 2007 Order.

11          **B.      Rule 23(b) Is Satisfied.**

12                  **1.      Injunctive Relief under Rule 23(b)(2)**

13          Under Rule 23(b)(2), a class is appropriately certified where defendants have acted or refused

14  to act in a manner generally applicable to the class, rendering injunctive relief or declaratory relief

15  appropriate to the class as a whole.  *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223,

16  240 (C.D. Cal. 2003).  It is sufficient if class members complain of a company pattern or practice

17  that is generally applicable to the class as a whole, even if not all class members have been injured

18  by the challenged practice.  *Xiufang Situ v. Leavitt*, No. C 06-2841 TEH, 2007 WL 127993, at *10

19  (N.D. Cal. Jan. 12, 2007).  Antitrust claims may be certified under Rule 23(b)(2) when injunctive

20  relief is sought.  *Newberg*, §18:24, at 79 (and cases cited therein); *See, e.g.*, *In re Visa

21  Check/Mastermoney*, 192 F.R.D. at 87 (certifying Rule 23 (b)(2) class); *In re Catfish Antitrust Litig.*,

22  826 F. Supp. 1019, 1046 (N.D. Miss. 1993) (same); *In re Domestic Air. Transp. Antitrust Litig.*, 137

23  F.R.D. 677, 696 (N.D. Ga. 1991) (same).

24          Plaintiffs' first and foremost goal is to enjoin Apple from continuing to obstruct

25  interoperability between online audio and video recordings sold through the iTunes Store and

26  competing portable digital media players.  Without question, Apple has in this regard acted in a

27  consistent and unwavering manner toward all proposed class members:  Steve Jobs, Apple's own

28  CEO, confirmed that "music purchased from Apple's iTunes Store will only play on iPods."

1    Sweeney Decl., Ex. 5 (S. Jobs, *Thoughts on Music*, Feb. 6, 2007 *available at*

2    www.apple.com/hotnews/thoughtsonmusic/) ("[Apple] envelopes [sic] each song purchased from the

3    iTunes Store in special and secret software so that it cannot be played on unauthorized devices.").

4    Compare *Little Caesar*, 172 F.R.D. at 268.  If Apple's deliberate incompatibility is determined by

5    the factfinder to have been unlawful, then declaratory or injunctive relief precluding Apple's

6    alteration of the digital entertainment files and "unlocking" the recordings would certainly be

7    "appropriate . . . to the class as a whole." *In re Visa Check/MasterMoney*, 192 F.R.D. at 88-89.

8    Plaintiffs here seek to enjoin Apple:  (a) from rendering online digital audio and video recordings

9    sold through the iTunes Store inoperable with portable digital media players other than the iPod; and

10   (b) to "unlock" the iTunes Store recordings previously purchased so that they may be played on

11   portable digital media players other than iPods (a feat which is known to be technically

12   accomplishable because Apple currently does this for some recordings).[3]

13       Plaintiffs' additional prayer for money damages does not preclude Rule 23(b)(2)

14   certification.  The Ninth Circuit has repeatedly held that "'class actions certified under Rule 23(b)(2)

15   are not limited to actions requesting only injunctive or declaratory relief, but may include cases that

16   also seek monetary damages.'" *Linney v. Cellular Alaska P'ship.*, 151 F.3d 1234, 1240 (9th Cir.

17   1998) (quoting *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986)); *see also*

18   *Molski v. Gleich*, 318 F.3d 937, 949-50 (9th Cir. 2003) (facts and circumstances of each case

19   determine the plaintiffs' fundamental intent in bringing the suit).  If this Court deems it appropriate,

20   notice and the opportunity to opt-out can be given in a Rule 23(b)(2) certification. *Molski*, 318 F.3d

21   at 951 n.16; *but see In re Visa Check/MasterMoney*, 192 F.R.D. at 88-89 (notice to injunctive class

22   not required by the Court).

23

24

25

_____

26   [3]      Sweeney Decl., Ex. 6 (Press Release, Apple, *Apple launches iTune Plus Higher Quality
         DRM-Free Tracks Now Available on the iTunes Store Worldwide*, May 30, 2007 *available at*

27   http://www.apple.com/pr/library/2007/05/30itunesplus.html).

28

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                        - 10 -

## 2.      Monetary Relief under Rule 23(b)(3)

Under Rule 23(b)(3), the Court may certify a class if it determines:  (1) that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The "predominance" and "superiority" factors are closely related: when common issues predominate, class actions achieve Rule 23's objectives of economy and efficiency by minimizing costs and avoiding the confusion that would result from inconsistent outcomes. *Tableware*, 241 F.R.D. at 651.

### a.      Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products*, 521 U.S. at 623.  To predominate, common questions "need not be dispositive of the litigation." *Tableware*, 241 F.R.D. at 651.  In antitrust cases, issues of tying, monopolization and attempted monopolization have been viewed as central issues which satisfy the predominance requirement. *Newberg*, §18:26, at 86-89. Indeed, as shown below and confirmed by Professor Noll, each element of Plaintiffs' Section 1 tying and Section 2 monopolization claims can and will be proved in this case through evidence common to every member of the proposed classes.

### (i)      Section 1 Tying Claims

An element-by-element analysis confirms that Plaintiffs' Section 1 tying claim is comparable to the tying claims certified for class resolution in *Bafus* and *Eastman Kodak*, because each element squarely raises issues that can and will be proved by common evidence.

***Separate Tying and Tied Products***.   The tied products must not be simply integral components of some larger product. *Eastman Kodak*, 504 U.S. at 462.  The question of distinctness between product markets is certainly one "readily amenable to common proof." *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, No. CIV 99-109-B, 2001 WL 920060, at *8 (D.N.H. Aug. 3, 2001); *accord In re Visa Check/Mastermoney*, 192 F.R.D. at 87 (and authorities cited therein).  Plaintiffs can, if need be, show through common evidence that the two products offered by Apple could be offered separately.  *See, e.g.*, *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336,

1339 (9th Cir. 1984); *see also Eastman Kodak*, 504 U.S. at 462-63 (where items have been sold
separately, distinct product markets exist).

   ***Sufficient Power in the Tying Product Market***.  The next element involves proof that the
defendant had "sufficient economic power in the tying product market to restrain appreciably
competition in the tied product market." *Moore*, 550 F.2d at 1214; *see generally United States Steel
Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620, 97 S. Ct. 861, 51 L. Ed. 2d 80 (1977) ("the
question is whether the seller has some advantage not shared by his competitors in the market for the
tying product").  "Possession by the seller of . . . monopoly power [in the tying product market] is
sufficient to establish *per se* illegality, . . . ." (*Digidyne*, 734 F.2d at 1339-40) and "[t]he existence of
[market] power ordinarily is inferred from the seller's possession of a predominate share of the
market." *Eastman Kodak*, 504 U.S. at 464; *Jefferson Parish Dist. No. 2 v. Hyde*, 466 U.S. 2117, 104
S. Ct. 1551, 80 L. Ed. 2d 2 (same).[4]

   Here, Plaintiff will establish Apple's domination of the online audio and video recordings
markets through common (and likely undisputed) evidence of Apple's market share during the
pertinent time period.  In August 2004, Apple announced it had "more than [a] 70 percent market
share of the legal downloads for singles and albums."  Sweeney Decl., Ex. 7 (Press Release, Apple,
*iTunes Music Store Catalog Tops One Million Songs*, (Aug. 10, 2004) *available at*
www.apple.com/pr/library/2004/aug/10itms.html).  During virtually every quarter of the class
period, Apple has publicly stated its market share of the online digital recordings markets. *See, e.g.*,
Sweeney Decl., Exs. 8-11 (AAPL – Q4 2004 Earnings Conference Call (Oct. 13, 2004); AAPL – Q3
2005 Earnings Conference Call (July 13, 2005); AAPL – Q2 2006 Earnings Conference Call (Apr.
19, 2006); APPL – Q1 2007 Earnings Conference Call (Jan. 17, 2007), respectively).  And,
according to Jobs, through the end of 2006 alone, Apple sold some 2 billion songs encrypted with

---

[4]     On the other hand, it is important to note that " [t]he standard of 'sufficient economic power'
does not, . . . require that the defendant have a monopoly or even a dominant position throughout the
market for the tying product.  Our tie-in cases have made unmistakably clear that the economic
power over the tying product can be sufficient even though the power falls far short of dominance
and even though the power exists only with respect to some of the buyers in the market." *Fortner*,
394 U.S. at 502-03; *accord Digidyne*, 734 F.2d at 1339-40.

1   FairPlay.  Sweeney Decl., Ex. 5 (*see supra*, Jobs, *Thoughts on Music*).  Apple's dominance in the

2   tying product market – if disputed at all – will plainly be proved through common evidence.  *See,*

3   *e.g.*, *In re Visa Check/MasterMoney*, 192 F.R.D. at 87 ("Class-wide determination of defendants'

4   market power is warranted."); *Milonas v. Amerada Hess Corp.*, No. 73 CIV 4263 (JMC), 1976 WL

5   1312, at *4 (S.D.N.Y. Aug. 19, 1976) (sufficiency of market power given alleged unremitting policy

6   was a common question for class-wide resolution); *see generally* Sweeney Decl., Ex. 1 (Noll Decl.,

7   at 10-12, 29-47).

8       ***Effect on Commerce in the Tied Product***.  Showing a "non-insubstantial effect on the

9   volume of commerce in the tied product" is another element of Plaintiffs' tying claim that is "readily

10  amenable" to common proof.  *George Lussier*, 2001 WL 920060, at *8 (citing *Little Caesar*, 172

11  F.R.D. at 266).  In particular, Plaintiffs need only show that the total net revenue derived from tied

12  product sales is "not *de minimis*."  *Moore*, 550 F.2d at 1216; *Digidyne*, 734 F.2d at 1341 & 1347.

13  Far from *de minimis*, Apple's revenue from the direct sales of iPods have easily exceeded $1 billion.

14  *See, e.g.*, Sweeney Decl., Ex. 2, Apple, Inc. Annual Report 2007 (Form 10-K), at 42; Sweeney Decl.,

15  Ex. 12 (Defendant Apple, Inc.'s Answer and Defenses to Plaintiffs' Consolidated Complaint, filed

16  June 6, 2007 ("Answer")), ¶25 (admitting that "Apple's publicly disclosed revenue and profit data

17  speak for themselves . . . .").  *Cf. Datagate*, 60 F.3d at 1425-26 (test met by $100,000 in annual

18  sales); *Moore*, 550 F.2d at 1216 (test met $60,800 in dollar volume).  To the extent Apple attempts

19  to dispute this rather obviously satisfied element, it will be resolved by common evidence.

20       ***Apple's Interest in the Tied Product***.  All proposed class members by definition purchased

21  their iPods directly from Apple, and Apple can hardly deny that it sells the iPods.[5]  Sweeney Decl.,

22  Ex. 12 (Answer, ¶9).  Again, should Apple somehow contest its interest in iPod sales, it would only

23  raise an additional question of fact common to the class as a whole.

24

25

---

26  [5]   *See also* Sweeney Decl., Ex. 13 (Reply in Support of Motion to Dismiss Antitrust Claims,

27  filed November 11, 2006) ("Apple MTD Reply") at 11 n.9 (admitting that Apple digital music files and iPods are priced on Apple's website).

28

1    ***Potential Affirmative Defenses***.  The business justification defenses asserted by Apple in its

2    Motion to Dismiss the *Tucker* complaint – *e.g.*, that Apple was "required" by music labels to use

3    FairPlay, that without FairPlay Apple's online music store "would not exist" – only serve to

4    ***reinforce*** predominance, by raising additional issues that are indisputably common in character to

5    the class.  Sweeney Decl., Ex. 14 (Defendant's Notice of Motion and Motion to Dismiss Antitrust

6    Claims, filed August 21, 2006) ("Apple MTD")) at 1.  Plaintiff in response will demonstrate by

7    further common evidence that these defenses are purely "pretextual." *Eastman Kodak*, 504 U.S. at

8    484; *see, e.g.*, Sweeney Decl., Ex. 15 (Warner Music Group F1Q07 Earnings Call Feb. 8, 2007

9    *available at* http://seekingalpha.com/article/26496-warner-music-group-f1q07-qtr-end-12-31-06-

10   earnings-call-transcript) (Warner Music Group Chairman and CEO advocating label support for

11   interoperability while preserving DRM); *see generally* Sweeney Decl., Ex. 1 (Noll Decl. at 15-16,

12   49-51).[6]  In its Answer Apple also asserts additional, undeniably common defenses.  For example,

13   Apple contends that its actions purportedly did not result in any adverse effects on competition, that

14   any such effects were supposedly outweighed by pro-competitive benefits, and that Apple allegedly

15   did not act with the purpose or intent to suppress or restrain competition.  *See* Sweeney Decl., Ex. 12

16   (Answer at 15).   Plaintiffs will in response demonstrate the availability of less restrictive

17   alternatives.  *Moore*, 550 F.2d at 1217; *Betaseed*, 681 F.2d at 1228; *see also* Sweeney Decl., Ex. 1

18   (Noll Decl., at 13-14, 49-51).  For present purposes, though, it suffices that none of the purported

19   business justifications offered by Apple would require consideration of the individual circumstances

20   of the particular iPod purchase.[7]

21       ***Rule of Reason Analysis***.  If for some reason a *per se* analysis is not applied, Plaintiffs will

22   through common evidence prove that Apple's tie-in policy unreasonably suppresses competition in

23   

24   [6]     Plaintiffs note, however, that Apple cannot insulate itself from liability by claiming that it

25   was forced into illegal conduct by another party.  *United States v. Loew's, Inc.*, 371 U.S. 38, 51-52
     (1962) (fact that guarantor of loan required defendant to obtain tie-in did not constitute a defense);

26   *Betaseed, Inc. v. U&I, Inc.*, 681 F.2d 1203, 1225 (9th Cir. 1982) (citing *Loew's*, 371 U.S. 38).

27   [7]     Yet another common issue, Apple also bears the burden of showing that the tie-in was
     reasonable for the entire time it was in effect.  *Betaseed*, 681 F.2d at 1215.

28   

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                      - 14 -

1    the tied product market for portable digital media players.  *Tuolumne*, 236 F.3d at 1158.  Under the

2    rule of reason's burden-shifting scheme, Plaintiffs must first "'delineate a relevant market and show

3    that the defendant plays enough of a role in that market to impair competition significantly.'"  *Id.* at

4    1159.  Plaintiffs would make that showing here through common evidence of Apple's dominance in

5    both the online recordings and portable digital media player markets.  *See, e.g.*,  Sweeney Decl., Exs.

6    8-11 (APPL – Q4 2004 Earnings Conference Call (Oct. 13, 2004); APPL – Q3 2005 Earnings

7    Conference Call (July 13, 2005); APPL – Q2 2006 Earnings Conference Call (Apr. 19, 2006);

8    APPL – Q1 2007 Earnings Conference Call (Jan. 17, 2007), respectively) Sweeney Decl., Ex. 16

9    (AAPL – Q4 2005 Earnings Conference Call (Oct. 11, 2005)).

10           ***Coercion***.  Defendants sometimes challenge predominance on the theory that "coercion" is

11   an element of a Section 1 tying claim that must be established as to each individual member of the

12   class.  *Newberg*, §18:30, at 112-13; *see generally Little Caesar*, 172 F.R.D. at 253-58 (explaining

13   courts' shorthand use of "coercion" terminology).  Such an argument is unavailing here for at least

14   three reasons.

15           First, "[t]he Ninth Circuit … does not require any showing of such actual coercion in tying

16   claims."  *Bafus*, 236 F.R.D. at 657.  As explained in *Moore*:

17           Although some cases in other circuits have required a showing of actual coercion, . .
             . our reading of the Supreme Court's opinions supports the view that coercion may
18           be implied from a showing that an appreciable number of buyers have accepted
             burdensome terms, such as a tie-in, and there exists sufficient economic power in the
19           tying product market . . . .

20   550 F. 2d at 1217; *accord Tucker*, 493 F. Supp. 2d at 1097 ("there is no requirement that individual

21   purchaser plaintiffs must allege coercion at the individual level, rather than at the market level").  To

22   the extent coercion need be shown at all, therefore, Plaintiffs need only show that "an appreciable

23   number of buyers" have been coerced – a market-level showing made on a class-wide basis.  *See,*

24   *e.g.*, *Bafus*, 236 F.R.D. at 657 (following Moore); *Eastman Kodak*, 1994 WL 508735, at *3 (same);

25   *see also Collins*, 168 F.R.D. at 675-76 (rejecting argument that coercion must be proved

26   individually, so as to preclude class certification).  Therefore, proof of market coercion – *i.e.*, that

27   "an appreciable number of buyers have accepted" the tie-in, and that Apple holds "sufficient

28   economic power in the tying product market" does not require individual "state-of-mind"

1    determinations from every class member so as to preclude class certification.  *Moore*, 550 F. 2d at

2    1217; *accord Bogosian v. Gulf Oil Corp.*, 561 F. 2d 434, 449-50 (3rd Cir. 1977) ("It has never been

3    an element of a plaintiff's case to disprove, nor even a permitted defense, that the tied product is

4    superior to others available on the market, or that even without the tie requirement plaintiff would

5    have purchased the tied product. . . .  The issue is whether the seller acted in a certain way, not what

6    the buyer's state of mind would have been absent the seller's action."); *Anderson Foreign Motors,*

7    *Inc. v. New England Toyota Distrib., Inc.*, 475 F. Supp. 973, 988 (D. Mass. 1979) ("The Supreme

8    Court's *per se* test is designed to eliminate detailed evidentiary inquiries of the type that would be

9    required to prove individual buyer coercion. . . .  It is the nature of the test that it focuses not on the

10   buyer's state of mind but rather on the seller's actions.").

11          Second,  Apple's announced "unremitting policy" of limiting portable play-back of the online

12   digital audio and video recordings to iPods obviates any need to show coercion.  *See Bogosian*, 561

13   F.2d at 450 ("once a plaintiff proves that a defendant has conditioned the sale of one product upon

14   the purchase of another there is no requirement that he prove that his purchase was coerced by the

15   seller's requirement"); *Hill v. A-T-O, Inc.*, 80 F.R.D. 68, 69 (E.D.N.Y. 1978) (in case of "unremitting

16   policy of tie-in," further evidence of coercion is unnecessary).  There is no question here that under

17   Apple's "unremitting policy" of applying FairPlay to the online recordings, buyers may not exercise

18   free choice in choosing a portable digital media player on which to play those recordings – a classic

19   indicia of a tie proscribed under the Sherman Act.  *Northern Pacific Ry.*, 356 U.S. at 6.  Indeed,

20   Apple has unabashedly announced and defended its unequivocal policy of applying FairPlay to the

21   online recordings it sells, such that "music purchased from Apple's iTunes store will only play on

22   iPods." *See, e.g.*, Sweeney Decl., Ex. 5 (*see supra*, Jobs, *Thoughts on Music*) ("[Apple] envelopes

23   each song purchased from the iTunes store in special and secret software so that it cannot be played

24   on unauthorized devices."); Sweeney Decl., Ex. 12 (Answer, ¶50) (admitting that Apple has not

25

26

27

28

1   licensed FairPlay to other portable player manufacturers).[8] Common evidence of this sort shows that

2   Apple's position went far beyond mere persuasion, and in fact amounted to an "unremitting policy"

3   of tie-in between the iTunes Store's online digital audio and video recordings and the iPod.

4   Compare *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976) (noting that "defendants admit to a

5   policy of never offering the [tying product] separately from the [tied product]"); *see also Eastman*

6   *Kodak*, 504 U.S. at 463 (conditioning established through evidence of defendant's policy to sell parts

7   to third parties only if they agreed not to buy services from independent service organizations). At a

8   minimum, the existence of Apple's "unremitting policy" is itself a common question, to be resolved

9   on a class-wide basis. *See, e.g.*, *Milonas*, 1976 WL 1312, at *4 (the existence vel non of defendants'

10   "unremitting policy" certified for class-wide resolution).

11        Finally, even if evidence of some general "modicum" of involuntariness or coercion were

12   still required here, *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir

13   1983), certification remains appropriate because that modicum could be established generally by

14   circumstantial evidence common to the putative class as a whole rather than on a purchaser-by-

15   purchaser basis, such as evidence that Apple's actions "locked-in" a large number of (even if not

16   necessarily all) Apple customers to the use of iPods. Sweeney Decl., Ex. 1 (Noll Decl. at 14, 48-49);

17   *See, e.g.*, *Digidyne*, 734 F.2d at 1342 (considering both direct and circumstantial evidence of

18   forcing); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1161 (9th Cir. 2003)

19   (suggesting that evidence of tie-in requirement sent to customers at large would allow inference of

20   coercion); *Hardy v. City Optical, Inc.*, 39 F.3d 765, 770-71 (7th Cir. 1994) (coercion may be proved

21   on a classwide basis with evidence of a "blanket policy"), *Moore*, 550 F.2d at 1217 ("coercion may

22   be implied from a showing that an appreciable number of buyers have accepted burdensome

23   terms. . . . [In *Siegel*] we refused to accept appellant's individual coercion theory and we were not

24   troubled by the fact there was no evidence to show that each [class member] had been required to

25

26   [8]   *See also* Sweeney Decl., Ex. 14 (Apple MTD at 3 n.4); Sweeney Decl., Ex. 13 (Apple MTD

27   Reply at 15) (arguing that Apple should not be required to license Fairplay or otherwise take steps to allow the online recordings it sells to be played on non-iPod portable digital players).

28

1   purchase the equipment, mixes, and packaging"); *Collins*, 168 F.R.D. at 675-76 (certifying tying

2   claim where proof of coercion focused on the defendants' conduct common to the putative class).

3   Once again, to the extent Apple asserts any such purported defense, doing so would only raise more

4   common issues that adds to predominance. *Martino v. McDonald's System, Inc.*, 81 F.R.D. 81, 93

5   (N.D. Ill. 1979) ("Because the issues of coercion, market power, and fact of damage will be

6   classwide, we hold that common questions of law and fact predominate.").

7                        **(ii)        Section 2 Monopolization Claims**

8          Every element of Plaintiffs' Section 2 claim likewise raises common issues to be proved by

9   common evidence, so as to warrant class certification.  Compare *Live Concert*, 247 F.R.D. at 149.

10         ***Market Power***.  Although the requisite degree of market power may differ somewhat from

11  that applicable to a tying claim, *Digidyne*, 734 F.2d at 1345, Plaintiffs will similarly rely on common

12  evidence to prove Apple's market power in their Section 2 monopolization and attempted

13  monopolization claims.  *See, e.g.*, *In re Visa Check/MasterMoney*, 192 F.R.D. at 88 (each element of

14  attempt to monopolize claim focuses on conduct of the defendants and its effects in the relevant

15  markets, factors that will not vary from plaintiff to plaintiff).  In *Rebel Oil Co., Inc.*, the Ninth

16  Circuit reiterated that market power in a Section 2 claim may be demonstrated by either of two types

17  of proof: (1) direct evidence of injurious exercise of market power, such as evidence of restricted

18  output and supracompetitive prices, or (2) circumstantial evidence of dominance in the relevant and

19  significant barriers to entry and competitor expansion of output.  *Rebel Oil*, 51 F.3d at 1434.  Neither

20  of these alternative approaches turns on proof of the idiosyncratic circumstances of the individual

21  iPod purchaser.  Sweeney Decl., Ex. 1 (Noll Decl. at 12, 35); *See, e.g.*, *Rebel Oil*, 51 F.3d at 1432-43

22  (reviewing evidence submitted in support of and in opposition to motion for summary judgment on

23  attempt to monopolize claim); *Live Concert*, 247 F.R.D. at 147 (same; concluding that whatever the

24  respective merits of the parties' positions, the issue of market definition and market power were

25  predominate common issues supporting class certification).

26         Plaintiffs here can most easily demonstrate Apple's market power in the portable digital

27  media player market through evidence of Apple's market share, including Apple's own admissions

28  of its high market share.  *Eastman Kodak*, 504 U.S. at 464 ("The existence of such power ordinarily

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                        - 18 -

1    is inferred from the seller's possession of a predominant share of the market."); *see, e.g.*, Sweeney

2    Decl., Ex. 17.  (APPL – Apple Computer, Inc. at JP Morgan Technology & Telecom Conference, at

3    3 (May 4, 2004)); Sweeney Decl., Exs. 7, 18 (AAPL-Q4 2004 Earnings Conference Call (Oct. 13,

4    2004); AAPL-Q2 2005 Earnings Conference Call (April 13, 2005), respectively).   Apple's

5    admissions do not of course implicate individual issues.  Moreover, Plaintiffs can also show market

6    power through common economic evidence of concentration in the market and the presence of

7    barriers to entry.  Sweeney Decl., Ex. 1 (Noll Decl. at 32-35).

8         ***Anticompetitive Conduct***.  Similarly, all of the evidence used to prove that Apple "willfully"

9    has obtained, maintained and/or attempted to monopolize the relevant markets (*i.e.*, evidence that

10   Apple obtained or maintained its monopoly through exclusionary, anticompetitive conduct) will

11   come from Apple or its competitors and would-be competitors, not class members. "Anticompetitive

12   conduct is behavior that tends to impair the opportunities of rivals and either does not further

13   competition on the merits or does so in an unnecessarily restrictive way."  *PeaceHealth*, 515 F.3d at

14   894 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32, 105 S. Ct.

15   2847, 86 L. Ed. 2d 467 (1985)).  For example, when in July 2004 RealNetworks began selling digital

16   music files that were compatible with the iPod, Apple publicly threatened legal action against its

17   would-be competitor, immediately told the public that it would be modify iPod software to once

18   again make it inoperable with Real Networks' music store, and then promptly did exactly that.  *See*

19   CCAC, ¶¶51-56.

20        ***Specific Intent to Monopolize***.  This element of the attempted monopolization claim can be

21   inferred from "'either specific intent coupled with monopoly power *or* from ''proof of specific intent

22   to . . . exclude competition . . . accompanied by predatory conduct directed to accomplishing the

23   unlawful purpose.'"  *Moore*, 550 F.2d at 1219.  Plaintiffs will present evidence that Apple took

24   exclusionary actions (like the *RealNetworks* incident just mentioned) to maintain and/or strengthen

25   its monopolies in the online digital entertainment file market and portable digital player market.  The

26   burden will then shift to Apple to demonstrate "valid business reasons" for its actions.  *Eastman*

27   *Kodak*, 504 U.S. at 483.  Plainly any and all such proof will focus on the conduct of Apple, and not

28   on the circumstances of any individual consumer.  Sweeney Decl., Ex. 1, (Noll Decl. at 49-51).

1      ***Dangerous Probability of Success***.  In the Ninth Circuit a dangerous probability of success

2 may be inferred from the existence of predatory or anticompetitive conduct.  *Foremost*, 703 F.2d at

3 544.  Once again, therefore, the evidence presented will be of Apple's own company-wide actions,

4 not the actions of any individual iPod purchaser.

5                **(iii)**          **Antitrust Impact**

6      One tactic in opposing class certification in antitrust cases is to isolate and focus on the

7 question of antitrust impact, hoping to convince the court that such impact can only be proven on an

8 individual basis.  To demonstrate antitrust impact at trial, though, Plaintiffs will need only show

9 ***some*** injury suffered as a consequence of the alleged anti-competitive behavior.  *See Zenith Radio*

10 *Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)

11 (noting the "burden of proving the fact of damage . . . is satisfied by . . . proof of ***some*** damage

12 flowing from the unlawful [conduct]; inquiry beyond this minimum point goes only to the amount

13 and not the fact of damage" (emphasis in original)).[9]  At the class certification stage, therefore,

14 Plaintiffs "need only advance a plausible methodology to demonstrate that antitrust injury can be

15 proven on a class-wide basis."  *DRAM*, 2006 WL 1530166, at *9.

16      Antitrust impact is typically established for class certification purposes through expert

17 testimony that generally accepted economic methodologies are available to demonstrate such impact

18 and to reasonably calculate such damages on a class-wide basis.  *Live Concert*, 247 F.R.D. at 144;

19 *DRAM*, 2006 WL 1530166, at *8; *Estate of Garrison*, 1996 WL 407849, at *4; *See, e.g.*, *Bafus*, 236

20 F.R.D. at 658 (expert declaration described what appeared to the court to be a viable method for

21 determining economic effect on a class basis).

22      Plaintiffs have done just that here.  Professor Noll explains in summary (Sweeney Decl.,

23 Ex. 1 (Noll Decl. at 14-15)) and in depth (Sweeney Decl., Ex. 1 at 47-49) the different ways Apple's

24 alleged anticompetitive actions have harmed competition in the relevant markets, including

25

26     [9]     Indeed, an even lesser showing is needed under the Clayton Act (applicable here because two
tangible products are involved): the plaintiff need only show that the challenged conduct "may tend"

27 to substantially lessen competition.  *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
512 F.2d 1264, 1275 (9th Cir. 1975).

28

1   specifically not only supracompetitive pricing for iPods (specifically addressed below in the context

2   of ways to calculate antitrust damages), but also (a) "dead-weight loss" that occurs when prices

3   exceed the incremental cost of production,  (b) reduced intensity of competition among other firms

4   in the respective markets, and (c) the adverse effects of "lock-in" due to technological

5   incompatibility, which extends not only to reduced choice for consumers but also to reduced

6   incentive to innovate by competitors.  Professor Noll confirms that the economic evidence to

7   establish these harms, involving product features and market outcomes, is common to all class

8   members.  Sweeney Decl., Ex. 1, (Noll Decl., at 48-49).

9         One illustration of the type of common evidence that will be used to prove antitrust impact

10   on competition in the tied products market is the Declaration of Lee Morse, Director of Emerging

11   Technology for Creative Labs, Inc., a portable digital player competitor of Apple, who confirms

12   Creative's belief that Apple's encryption of online recordings purchased from the iTunes Store has

13   had a negative impact on Creative's sale of portable digital media players.  Sweeney Decl., Ex. 19

14   (Declaration of Lee Morse, filed Jan. 22, 2007).

15                              **(iv)      Antitrust Damages**

16         Once antitrust injury is established, the overall burden of proving damages is eased

17   significantly under both Section 1 and Section 2 of the Sherman Act.  *Moore v. Jas. H. Matthews &*

18   *Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *See, e.g.*, *DRAM*, 2006 WL 1530166, at *10.  Individual

19   damages issues are thus generally no bar to certification of antitrust claims.  *Live Concert*, 2007 WL

20   4291967, at * 37-*39, *51, *In re Rubber Chemicals*, 232 F.R.D. at 354, *A-T-O*, 80 F.R.D. at 70; *see*

21   *generally Newberg*, §18:27.

22         Here again the quantification of damages only **reinforces** predominance because Plaintiffs

23   will calculate damages on a class-wide basis, based upon one or more of three well-established and

24   reliable damages methodologies.  Compare *Little Caesar*, 172 F.R.D. at 267; *DRAM*, 2006 WL

25   1530166, at *10; *In re Sugar Indus. Antitrust Litig.*, No. MDL 201, 1976 WL 1374, at *27 (N.D.

26   Cal. May 21, 1976).  Specifically, Professor Noll confirms that antitrust damages can be calculated

27   under the "before and after" method, the "yardstick" method or the "mark-up" method – all

28   recognized methodologies that, in Professor Noll's opinion, are suitable for use in this case based

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                                    - 21 -

upon the exemplars supplied by Apple and upon information available to and reasonably relied upon by experts in the field of econometrics. Sweeney Decl., Ex. 1 (Noll Decl. at 51-59); *accord Live Concert*, 247 F.R.D. at 144 ("Plaintiffs have demonstrated that several generally accepted methodologies can be used to prove class-wide impact through the use of common evidence.").

Courts have repeatedly acknowledged these methodologies as accepted means of calculating class-wide damages in the antitrust context. *See, e.g.*, *In re NASDAQ Market Makers Antitrust Litig.*, 169 F.R.D 493, 521 (S.D.N.Y. 1996) (holding the "'yardstick'" method for calculating damages, which "compares profits earned or prices paid by the plaintiff with the corresponding data for a . . . market unaffected by the violation . . . is an accepted means of measuring damages in an antitrust action."); *In re Indus. Silicon Antitrust Litig.*, No. 95-1131, 1998 WL 1031507, at *3 (W.D. Pa. Oct. 13, 1998) (finding expert's before-and-after comparison proper model for showing antitrust damages); *In re Corrugated Container Antitrust Litig.*, MDL No. 310, 1979 WL 1751, at *2 (S.D. Tex. Dec. 21, 1979) (approving, over objection, damages amount in antitrust settlement because expert's damages "estimate was based on a before-and-after model, using the four years within the statute of limitations as 'before' and the years 1977 and 1978, after the grand jury investigation was underway, as 'after.'").

Apple may attempt to attack Professor Noll's application of these accepted models for calculating class-wide damages, but once again this is not the time or place to resolve any battle of the experts; "It is not necessary that plaintiffs show that their expert's methods will work with certainty at this time. Rather, plaintiffs' burden is to present the court with a likely method for determining class damages." *Tableware*, 241 F.R.D. at 652 (quoting *In re Domestic Air Transp.*, 137 F.R.D. at 693); *accord Dukes*, 509 F.3d at 1192-93; *Live Concert*, 247 F.R.D. at 110 ("a district court is not permitted to discount the testimony of a plaintiff expert merely because the defendant has challenged some aspect of the expert's opinion"); *In re Rubber Chemicals*, 232 F.R.D. at 353 (same).

### b. Superiority

Superiority is demonstrated where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227,

1234 (9th Cir. 1996). Apple cannot seriously question the superiority of the class mechanism in

resolving the antitrust claims asserted against it here. *See, e.g.*, *Bafus*, 236 F.R.D. at 658 (tying

claim satisfied superiority requirement); *George Lussier*, 2001 WL 920060, at *6-*7 (same); *Little

Caesar*, 172 F.R.D. at 267 (same); *Collins*, 168 F.R.D. at 677 (same); *Eastman Kodak*, 1994 WL

508735, at *3. Litigation of the tying and monopolization claims of each iPod purchaser on an

individual basis is plainly not the preferable alternative. *Live Concert*, 247 F.R.D. at 148 (holding

class mechanism clearly superior way to resolve antitrust claims, even if individualized damages

analysis were assumed *arguendo* to be required); *DRAM*, 2006 WL 1530166, at *11 ("it would be

unnecessarily duplicative, and judicially inefficient, for the court to mandate individual trials as to

each class member"); *see generally Newberg*, §4:32 at 269 ("It is only when such difficulties make a

class action less fair and efficient than some other method, such as individual interventions or

consolidation of individual lawsuits, that a class action is improper.").

Indeed, class certification is nothing less than essential if the private antitrust enforcement

mechanism is to function at all. As stated in *Tableware*: "The modest amount at stake for individual

plaintiffs . . . renders individual prosecution impractical; class treatment not only promotes judicial

economy, it represents plaintiffs' **only** chance for adjudication." *Tableware*, 241 F.R.D. at 652

(citing *Amchem Prods.*, 521 U.S. at 616).

### C.    There Exists Readily Definable Classes of Apple Customers

A Rule 23 class must be defined with reasonable specificity. *O'Connor v. Boeing North Am.,*

*Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). A class definition is "definite enough" to satisfy Rule

23 if it "is administratively feasible for the court to ascertain whether an individual is a member."

*Tableware*, 241 F.R.D. at 650 (quoting *O'Connor*). The class definition proposed by Plaintiffs

here – all persons who purchased specified products directly from Apple during a specified time

period – unquestionably constitutes an "ascertainable class" within the meaning of Rule 23. *See,*

*e.g.*, *Live Concert*, 247 F.R.D. at 155 (certifying class, for example, of "All persons who purchased

tickets to any live rock concert in the Chicago Region directly from any of the Defendants or their

affiliates or predecessors or agents during the period from June 19, 1998 to the present."). This

Court has certified far less precisely defined classes. *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D.

649, 650-51 (C.D. Cal. 2000) (certifying class defined as persons who have suffered or will suffer economic damage as a result of an oil spill and/or the ensuing clean-up effort).

### D.  Appointment of Class Counsel

Rule 23 requires the Court to appoint counsel to represent the interests of the class.  Fed. R. Civ. P. 23(g)(1).  *In re Rubber Chemicals*, 232 F.R.D. at 355.  For the reasons stated above in connection with the adequacy requirements of Rule 23(a)(4), and as has hopefully been demonstrated thus far in this litigation, the law firms retained by Plaintiffs to prosecute this class action are "well equipped" to vigorously represent the proposed classes.  *See* Exs. 3, 4 (Coughlin Stoia Geller Rudman & Robbins LLP and The Katriel Law Firm Resumes).  The Court should accordingly appoint Coughlin Stoia Geller Rudman & Robbins LLP and The Katriel Law Firm as co-counsel for the class.

### IV.  PLAINTIFFS' STATE LAW CLAIMS

The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof.Code §16700 *et seq.*, was modeled after the Sherman Act. *Tuolumne*, 236 F.3d at 1160; *Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088, 1091 (9th Cir. 2000); *Mailand v. Burckle*, 20 Cal. 3d 367, 375, 143 Cal. Rptr. 1 (1978).  Accordingly, the same Rule 23 analysis applies to Plaintiffs' Cartwright Act claims.  *See, e.g.*, *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 283 (D. Mass. 2004) (certifying Cartwright Act claims).

## V.    CONCLUSION

All of Rule 23's requirements for the certification of Plaintiffs' antitrust claims against Apple have been satisfied.  Plaintiffs' Motion for class certification is therefore well-taken, and should be granted.  For the reasons stated above, the Court should also appoint Coughlin Stoia Geller Rudman & Robbins, LLP, and The Katriel Law Firm as Co-Lead Counsel for the Class.

DATED:  July 21, 2008                              Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
BONNY E. SWEENEY


                                        s/ BONNY E. SWEENEY
                                        BONNY E. SWEENEY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

THE KATRIEL LAW FIRM
ROY A. KATRIEL
1101 30th Street, N.W., Suite 500
Washington, DC  20007
Telephone:  202/625-4342
202/330-5593 (fax)

Co-Lead Counsel for Plaintiffs

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
ELAINE A. RYAN
TODD D. CARPENTER
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

BRAUN LAW GROUP, P.C.
MICHAEL D. BRAUN
12304 Santa Monica Blvd., Suite 109
Los Angeles, CA  90025
Telephone:  310/442-7755
310/442-7756 (fax)

MURRAY, FRANK & SAILER LLP
BRIAN P. MURRAY

1   JACQUELINE SAILER
    275 Madison Avenue, Suite 801
2   New York, NY  10016
    Telephone:  212/682-1818
3   212/682-1892 (fax)

4   GLANCY BINKOW & GOLDBERG LLP
    MICHAEL GOLDBERG
5   1801 Avenue of the Stars, Suite 311
    Los Angeles, CA  90067
6   Telephone:  310/201-9150
    310/201-9160 (fax)

7
    Additional Counsel for Plaintiffs
8
    S:\CasesSD\Apple Tying\BRF00052711_Certification Mot.doc
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL - C-05-00037-JW(RS)                                          - 26 -

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on July 21, 2008, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7        I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct. Executed on July 21, 2008.

9

10                                          s/ BONNY E. SWEENEY
                                          BONNY E. SWEENEY

11                                          COUGHLIN STOIA GELLER

12                                              RUDMAN & ROBBINS LLP
                                          655 West Broadway, Suite 1900

13                                          San Diego, CA 92101-3301
                                          Telephone: 619/231-1058

14                                          619/231-7423 (fax)

15                                          E-mail:Bonnys@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

CAND-ECF                                                                Page 1 of 2

Case 4:05-cv-00037-YGR   Document 877-2   Filed 11/04/14   Page 88 of
Case 4:05-cv-00037-YGR   Document 763   Filed 7/21/08   Page 90 of 177

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael David Braun**
  service@braunlawgroup.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Adam Richard Sand , Esq**
  invalidaddress@invalidaddress.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Tracy Strong**
  tstrong@jonesday.com,dharmon@jonesday.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,tturner@csgrr.com,E_file_sd@csgrr.com

- **Helen I. Zeldes**
  helenz@zeldeslaw.com,hzeldes@yahoo.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Todd David Carpenter**
Bonnett, Fairbourn, Friedman, & Balint
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

**Elaine A. Ryan**
Bonnett Fairbourn Friedman & Balint, P.C
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

# EXHIBIT 9

1 COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2 BONNY E. SWEENEY (176174)
655 West Broadway, Suite 1900
3 San Diego, CA 92101
Telephone: 619/231-1058
4 619/231-7423 (fax)
bonnys@csgrr.com
5
THE KATRIEL LAW FIRM
6 ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
7 Washington, DC 20007
Telephone: 202/625-4342
8 202/330-5593 (fax)
rak@katriellaw.com
9
Co-Lead Counsel for Plaintiffs
10
[Additional counsel appear on signature page.]
11
UNITED STATES DISTRICT COURT
12
NORTHERN DISTRICT OF CALIFORNIA
13
SAN JOSE DIVISION
14
| | | |
|---|---|---|
| 15 THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) | Lead Case No. C-05-00037-JW(RS) |
| 16 _____ | ) | CLASS ACTION |
| 17 This Document Relates To: | ) ) ) | PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR |
| 18 ALL ACTIONS. | ) ) ) | JUDGMENT ON THE PLEADINGS AS TO PLAINTIFFS' TYING CLAIMS |
| _____ | ) | |

19
                              JUDGE:    Hon. James Ware
                              DATE:     March 23, 2009
20
                              TIME:     9:00 a.m.
                              CTRM:   8-4th Floor
21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3   I.    INTRODUCTION ........................................................................................1

4   II.   SUMMARY OF PLAINTIFFS' TYING CLAIMS.......................................2

5   III.  APPLICABLE LEGAL STANDARDS ......................................................2

6   IV.  LEGAL ARGUMENT................................................................................3

7         A.    Issues Raised by the Court.......................................................3

8               1.     There Is No Requirement Under Section 1 that the Tying and Tied Products Be Purchased Together ...........................................3

9

10               2.     Plaintiffs Need Not Allege Coercion on an Individual Basis to State a Viable Section 1 Tying Claim.........................................9

11         B.    Issues Raised by Apple .........................................................14

12               1.     Plaintiffs Allege Actionable Federal Law Claims ....................14

13               2.     Plaintiffs Allege Actionable State Law Claims ........................15

14   V.   CONCLUSION.........................................................................................16

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Adv. Bus. Sys. & Supply Co. v. SCM Corp.*,
    415 F.2d 55 (4th Cir. 1969) ...............................................................................7

5

*Amerinet, Inc. v. Xerox Corp.*,
    972 F.2d 1483 (8th Cir. 1992) ...........................................................................8

6

*Ariz. v. Maricopa County Med. Soc.*,
    457 U.S. 332, 102 S. Ct. 2466 (1982)...............................................................15

7

8

*B.H. Goodrich v. Betkoski*,
    99 F.3d 505 (2d Cir. 1996)...............................................................................3

9

*Betaseed, Inc. v. U&I, Inc.*,
    681 F.2d 1203 (9th Cir. 1982) .........................................................................10

10

11

*Bogosian v. Gulf Oil Corp.*,
    561 F.2d 434 (3d Cir. 1977).............................................................................7

12

*Cascade Health Solutions v. Peacehealth*,
    515 F.3d 883 (9th Cir. 2008).......................................................................10, 13

13

14

*Chase Parkway Garage Inc. v. Subaru, Inc.*,
    94 F.R.D. 330 (D. Mass. 1982)........................................................................13

15

*Colburn v. Roto-Rooter Corp.*,
    78 F.R.D. 679 (N.D. Cal. 1978).......................................................................13

16

17

*Compuware Corp. v. IBM*,
    259 F. Supp. 2d 597 (E.D. Mich. 2002)............................................................7

18

*Daniels v. Amerco*,
    No. 81 CIV 3801 (RLC),
    1983 WL 1794 (W.D.N.Y. Mar. 10, 1983).......................................................13

19

20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451, 112 S. Ct. 2072 (1992).................................................... *passim*

21

22

*Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*,
    132 F.3d 526 (9th Cir. 1997) ........................................................................3, 13

23

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ....................................................................5, 6, 9, 10

24

25

*Fortner Enters., Inc. v. United States Steel Corp.*,
    394 U.S. 495 89 S. Ct. 1252 (1969)..................................................................9

26

*Freeland v. AT & T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) .....................................................................13

27

28

**Page**

*Hill v. A-T-O, Inc.,*
    535 F.2d 1349 (2d Cir. 1976)..................................................................................12, 14

*In re Data Gen. Corp. Antitrust Litig.,*
    490 F. Supp. 1089 (N.D. Cal. 1980) .................................................................4

*In re Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007) ........................................................................2

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2, 104 S. Ct. 1551 (1984).....................................................................8

*Little Caesar Enters., Inc. v. Smith,*
    895 F. Supp. 884 (E.D. Mich. 1995)..................................................................13

*Moore v. Jas H. Matthews & Co.,*
    550 F.2d 1207 (9th Cir. 1977) .................................................................. *passim*

*Murphy v. Bus. Cards Tomorrow, Inc.,*
    854 F.2d 1202 (9th Cir. 1988) .................................................................9, 13

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1, 78 S. Ct. 514 (1958)................................................................. *passim*

*Nobel Scientific Indus. v. Beckham Instruments,*
    670 F. Supp. 1313 (D. Md. 1986)......................................................................7, 14

*Olmstead v. Amoco Oil Co.,*
    No. 76-247-Orl-Civ-Y,
    1977 WL 1416 (M.D. Fla. June 16, 1977).......................................................13

*Paladin Assocs.  v. Montana Power Co.,*
    328 F.3d 1145 (9th Cir. 2003) .................................................................10

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.,*
    No. C93 20613 RMW,
    1995 WL 853037 (N.D. Cal. Sept. 7, 1995) .....................................................8

*Schor v. Abbott Labs.,*
    457 F.3d 608 (7th Cir. 2006) ........................................................................7

*Sheridan v. Marathon Petroleum Co., LLC,*
    530 F.3d 590 (7th Cir. 2008) ........................................................................4

*Siegel v. Chicken Delight, Inc.,*
    448 F.2d 45 (9th Cir. 1971) ........................................................................12

*Slattery v. Apple Comp., Inc.,*
    No. C 05-00037 JW,
    2005 WL 2204981 (N.D. Cal. Sept. 9, 2005) ....................................................9

**Page**

*Smith v. Denny's Rests., Inc.*,
        62 F.R.D. 459 (N.D. Cal. 1974) ........................................................................13

*Toulumne v. Sonora Cmty. Hosp.*,
        236 F.3d 1148 (9th Cir. 2001) ....................................................................14, 15

*Tucker v. Apple Comp., Inc.*,
        493 F. Supp. 2d 1090 (N.D. Cal. 2006) ......................................................9, 13

*Ungar v. Dunkin' Donuts of Am., Inc.*,
        531 F.2d 1211 (3d Cir. 1976)............................................................................13

*United States v. Microsoft Corp.*,
        253 F.3d 34 (D.C. Cir. 2001) ......................................................................4, 14

*Waldo v. N. Am. Van Lines, Inc.*,
        102 F.R.D. 807 (W.D. Pa. 1984) ......................................................................13

*Ways & Means, Inc. v. IVAC Corp.*,
        506 F. Supp. 697 (N.D. Cal. 1979),
        *aff'd* 638 F.2d 143 (9th Cir. 1981)..............................................................8, 14

**STATUTES, RULES AND REGULATIONS**

15. U.S.C.
        §1.................................................................................................... *passim*

Federal Rule of Civil Procedure
        Rule 12(b) ..........................................................................................................1
        Rule 12(c) ...............................................................................................1, 2, 13

California Business & Professional Code
        §16700 *et seq.* ................................................................................................15
        §17200 *et seq.* ................................................................................................15

California Civil Code
        §1750 *et seq.* ..................................................................................................15

**SECONDARY AUTHORITIES**

10 Phillip E. Areeda, Herbert Hovenkamp & Einer Elhauge, *Antitrust Law:
        An Analysis of Antitrust Principles and Their Application*,
        ¶1752e (2d ed. 2004) ..........................................................................................3

Press Release, *Changes Coming to the iTunes Store*
        available at www.apple.com/pr/library/2009/01/06itunes.html
        (Jan. 6, 2009)......................................................................................................2

1        Plaintiffs Melanie Tucker, Somtai Charoensak, and Mariana Rosen (collectively, "Plaintiffs")

2  respectfully submit this memorandum in opposition to Defendant Apple, Inc.'s ("Apple") Motion for

3  Judgment on the Pleadings as to Plaintiffs' Tying Claims, filed February 13, 2009 ("Apple's

4  Motion").

5  **I.    INTRODUCTION**

6        On December 22, 2008, the Court certified Plaintiffs' monopolization, attempted

7  monopolization, and state law claims.  Docket No. 196 at 1-2. The Court opted to defer, however,

8  ruling on certification of Plaintiffs' Section 1 tying claims, and invited a Rule 12(b) or Rule 12(c)

9  motion on two specific issues:

10       (1)    Can coercion sufficient to support a Section 1 tying claim exist where there is
   no requirement that the tying product and tied product be purchased together?

11

12       (2)    Must such coercion be proved on an individual basis, such that each
   individual consumer of the tied product must prove that he or she was forced to
   purchase the tied product?

13

14 Docket No. 196 at 6-7.

15       Apple in its Rule 12(c) motion impermissibly and futilely strays far beyond these two

16 designated questions.  As to the two specified issues of concern, both were correctly decided by the

17 Court when it denied Apple's earlier motions to dismiss.  Supreme Court and Ninth Circuit

18 precedent squarely support the propositions that:  (1) separate availability of the tying and tied

19 products is not fatal to a Section 1 claim and (2) proof of coercion on an individual basis is not

20 required.  *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462, 112 S. Ct.

21 2072 (1992); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6, 78 S. Ct. 514 (1958); *Moore v. Jas H.*

22 *Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977).  No matter how innovative Apple's products,

23 Apple's conduct remains constrained by Section 1 of the Sherman Act; though Apple's products

24 may involve modern technology, Plaintiffs' claims are soundly premised on existing and controlling

25 antitrust precedent.  Despite Apple's claim to the contrary, sustaining the Section 1 claims does not

26 require any "expansion" of tying law.

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO PLAINTIFFS' TYING CLAIMS - C-05-00037-JW(RS)          - 1 -

## II.    SUMMARY OF PLAINTIFFS' TYING CLAIMS

Plaintiffs allege that Apple, through iTunes, holds market power in the sale of digital audio and video files (collectively, "iTunes files"), which it exploited by tying the sale of iTunes files and the sale of iPods, Apple's portable digital media players capable of playing such files.  Complaint, ¶21.[1]  Apple achieved this technological tie by encrypting the iTunes files with digital rights management ("DRM") technology called "FairPlay," so that the iTunes files could be portably played only on the portable digital media players manufactured by Apple (collectively, "iPod").  Complaint, ¶¶41-44.  Plaintiffs contend that Apple thereby necessarily constrained the iTunes customer's choice of portable digital media players.[2]  Id.  For the same reason, the only replacement for a broken iPod that can play an iTunes customer's existing library of iTunes files would be another iPod.  Complaint, ¶44.  Plaintiffs allege that Apple's conduct deterred competition in the portable player market and allowed it to charge supracompetitive prices to *all* purchasers of iPods, including those who never purchased any iTunes files.  Complaint, ¶¶22, 72, 73.

## III.    APPLICABLE LEGAL STANDARDS

Apple chose to file its motion under Rule 12(c), which provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  As with a motion to dismiss, the court must accept the allegations as true and must otherwise construe the complaint in the light most favorable to the plaintiff.  *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 150 (C.D. Cal. 2007).  "Judgment 'may only be granted when the pleadings show that it is beyond doubt that the plaintiff can prove no set of facts in support

---

[1]    *See* Consolidated Complaint for Violations of the Sherman Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumer Legal Remedies Act, and California Common Law of Monopolization, filed April 19, 2007 ("Complaint").

[2]    Despite the fact that Apple now offers FairPlay DRM free audio files for sale on iTunes, purchasers with existing libraries of iTunes audio files remain locked in.  The previously purchased audio files remain encrypted with Apple's FairPlay unless the purchaser pays an additional $0.30 per audio file to remove the existing DRM and "unlock" the file.  *See* Press Release, *Changes Coming to the iTunes Store* (Jan. 6, 2009), available at  www.apple.com/pr/library/2009/01/06itunes.html (explaining that Apple charges $0.30 per audio file or 30% of the album price to remove its FairPlay DRM from previously purchased files).

1    of his claims which would entitle him to relief.'" *Enron Oil Trading & Transp. Co. v. Walbrook Ins.*

2    *Co.*, 132 F.3d 526, 529 (9th Cir. 1997) (quoting *B.H. Goodrich v. Betkoski*, 99 F.3d 505, 529 (2d Cir.

3    1996)).

4    **IV.    LEGAL ARGUMENT**

5        **A.    Issues Raised by the Court**

6            **1.    There Is No Requirement Under Section 1 that the Tying and Tied Products Be Purchased Together**

7

8        A tying arrangement is "an agreement by a party to sell one product but only on the condition

9    that the buyer also purchases a different (or tied) product, ***or at least agrees that he will not***

10    ***purchase that product from any other supplier***."[3] *Northern Pacific*, 356 U.S. at 5-6; *see also*

11    *Eastman Kodak Co.*, 504 U.S. at 462-63 (finding evidence of a tie where purchasers of Kodak parts

12    were forced to agree not to purchase service from a Kodak competitor); 10 Phillip E. Areeda,

13    Herbert Hovenkamp & Einer Elhauge, *Antitrust Law: An Analysis of Antitrust Principles and Their*

14    *Application*, ¶1752e (2d ed. 2004) ("[A] tying 'agreement' or 'condition' is present when the

15    defendant has utilized customers' desire for its product A to constrain improperly their choice

16    between its product B and that of its rivals.").

17        The Supreme Court in *Northern Pacific* made clear that there is no requirement that the tying

18    and tied products be purchased together. There, the government alleged defendant had illegally tied

19    the lease of land and the shipping of commodities by inserting a "preferential routing clause" in its

20    lease agreements. *Id.* at 3-4. The "preferential routing clause" required the lessee to use Northern

21    Pacific to ship certain commodities, so long as Northern Pacific's rates were not greater than those

22    offered by competing carriers. *Id.* at 3.

23        Importantly, this "preferential routing clause" did not obligate the lessee to ship anything at

24    all; nor, were Northern Pacific's shipping customers required to lease land. *See id.* at 7. Indeed, the

25    lessee of land might never require shipping services, and vice versa. Moreover, it was entirely

26    possible that lessees would use the shipping services of a railroad carrier other than defendant.

27    [3]    Unless otherwise noted, emphasis is added and citations are omitted.

28

1    Nonetheless, the Supreme Court held that the "preferential routing clause" was *per se* illegal because

2    it forced buyers to "forgo their free choice" of a competing commodities shipper. *Id.* at 6.

3           Following *Northern Pacific*, the Ninth Circuit and other courts have found tying

4    arrangements unlawful under Section 1 despite the lack of an explicit refusal by the defendant to sell

5    the tying product unless the buyer also agreed to buy the tied product. *See, e.g.*, *Moore*, 550 F.2d at

6    1217 (finding a tie where "each purchaser of a cemetery lot was not absolutely required to buy a

7    marker"); *In re Data Gen. Corp. Antitrust Litig.*, 490 F. Supp. 1089, 1110-11 (N.D. Cal. 1980)

8    (existence of the option to purchase the tying product separately did not defeat plaintiff's tying claim

9    because this "option is more theoretical than real").

10          As in *Northern Pacific*, Apple has restrained competition in the market for portable digital

11   media players by imposing a preferential restraint that forces iTunes customers to "forego their free

12   choice" of portable digital media players. Complaint, ¶¶41-44. Regardless of the cost or features of

13   competing portable digital media players, consumers who want to play their iTunes files directly on

14   a portable device must purchase an iPod. *Id.* Like the land lessees in *Northern Pacific*, they are

15   deprived of free choice even though, at least initially, they do not buy an iPod. Complaint, ¶¶41-44,

16   50. Apple's repeated refrain that the iPod works without iTunes files, and vice versa, completely

17   misses the point of Plaintiffs' tying claim: an iPod is the ***only*** portable digital media player that can

18   directly play iTunes files encrypted with FairPlay DRM.[4]

19          The same point was made by the Supreme Court in *Eastman Kodak*, in which independent

20   copy servicer providers alleged that Kodak's policy of selling Kodak copy machine parts (tying

21   product) only to customers who agreed not to purchase copy repair and maintenance services (tied

22   product) from anyone other than Kodak constituted an unlawful tie. 504 U.S. at 459. As a result of

---

[4]       Moreover, tying law has never required that the defendant make the tied product usable ***only
with*** the tying product. *See Sheridan v. Marathon Petroleum Co., LLC*, 530 F.3d 590, 592 (7th Cir.
2008) (explaining that the concerns underlying a tying claim arise "if the tied product is used mainly
with the tying product"); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 45 (D.C. Cir. 2001)
(tying liability recognized where defendant sold computer operating system for purposes other than
internet access for which the tied product was created). Here, even Apple is forced to concede that
the overwhelming majority of iPod owners use the device to play iTunes files. *See* Docket No. 181
at 5.

1   the tie, the independent copy servicer providers were not able to obtain parts and thus were not able

2   to service Kodak copiers.  *Id.* at 458.  In deciding whether parts and service were separate products

3   for purposes of a tying claim, the Supreme Court noted that "service and parts have been sold

4   separately in the past and still are sold separately to self-service equipment owners."  *Id.* at 462.  The

5   Supreme Court found that a Section 1 tie existed, despite the fact that self-service equipment owners

6   could purchase parts without service, because all purchasers of parts, including the self-service

7   equipment owners, were forced to agree not to buy service from anyone other than Kodak.   *Id.* at

8   463.

9         In an attempt to distinguish *Eastman Kodak*, Apple completely distorts its facts, arguing that

10  only the purchasers of both parts and service had a tying claim.  Apple's Motion at 5-6.  However, as

11  discussed above, self-service equipment owners also had a tying claim because they were forced to

12  agree not to purchase the tied product from anyone other than Kodak.  Like in *Eastman Kodak* and

13  *Northern Pacific*, a tie exists here because although purchasers can buy iTunes files separately, they

14  are forced to agree not to purchase a portable digital media player other than an iPod for direct

15  playback of their iTunes files.

16        Rather than meaningfully distinguish *Northern Pacific* and *Eastman Kodak*, Apple relies on

17  *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir. 1983), a case which

18  addressed only the question whether the complaint sufficiently pleaded a *per se* tying claim under

19  Section 1.  In *Foremost Pro*, the plaintiff alleged that Kodak illegally tied the sale of its new camera

20  (tying product) to accompanying products (tied products) because the new camera technology

21  required the use of new Kodak film, and that film could only be processed using Kodak's new

22  chemicals and paper.  *Id.* at 538.  The Ninth Circuit declined to hold that "such technological ties"

23  were *per se* unlawful under Section 1.[5]  *Id.* at 542.

24

25

---

26  [5]      The Ninth Circuit left undecided the question whether the plaintiff's allegation could state a
    tying claim under the "rule of reason" approach to antitrust law.  *Id.*  at 543.  Unlike the plaintiff in
27  *Foremost Pro*, however, Plaintiffs in this action have asserted their tying claim against Apple under
    both the *per se* theory of liability and under the antitrust rule of reason.  Complaint, ¶56.
28

1    However, the court suggested that plaintiff's *per se* tying claim would have survived had

2    plaintiff alleged that the "dominant purpose motivating Kodak's design and introduction of the 110

3    system was to compel purchase of the entire system as a package, rather than to achieve the

4    legitimate goal of marketing new, technologically superior products designed to satisfy consumer

5    demand for smaller, pocket-sized cameras." *Id.* at 543; *see also* Areeda, *et al.*, *supra*, ¶1757a n.7

6    (citing *Foremost Pro* and stating that plaintiff may have adequately plead a tying claim under these

7    facts).

8    Unlike plaintiff in *Foremost Pro*, Plaintiffs here allege that Apple's dominant purpose in

9    tying its iPod and iTunes files was to compel customers to purchase both iTunes files and a portable

10   digital media player from Apple.  Complaint, ¶¶21, 22.  Plaintiffs allege that Apple's decision to use

11   its own proprietary DRM format was to leverage its market power in the market for audio and video

12   digital files to foreclose competition in the market for portable digital media players by ensuring that

13   purchasers of iTunes files would have to also purchase a portable digital media player from Apple.

14   Complaint, ¶¶41-44, 50.

15   Thus, as Professor Areeda acknowledges, *Foremost Pro* does not foreclose Plaintiffs' tying

16   claim as Apple would like the Court to believe.  Areeda, *et al.*, *supra*, ¶1757a n.7.  Instead, *Foremost*

17   *Pro* specifically contemplates such a claim where, as here, a defendant uses technology as a highly

18   effective "preferential routing" technique to compel purchase of both the tying and tied products

19   from defendant.  *See also Northern Pacific*, 356 U.S. at 5-6 (tying arrangement is one where plaintiff

20   agreed to limit choice if and when it needed the tied product).

21   The court in *Foremost Pro* also noted that plaintiff was unable to establish implied coercion

22   under *Moore* because plaintiff in *Foremost Pro* did not allege that purchasers were "forced to 'accept

23   the tied item and forego possibly desirable substitutes.'"  703 F.3d at 542 n.4.  Because, plaintiff

24   alleged that "no competing manufacturers produced chemicals and papers compatible with

25   Kodacolor II film, there could have been no substitutes that Foremost or other photofinishing

26   customers were foreclosed from purchasing." *Id.*  By contrast, Plaintiffs here allege that when other

27   competing online vendors such as RealNetworks managed to sell files that could be played on

28   Apple's iPod, Apple promptly issued a software update that ensured that the only files compatible

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO PLAINTIFFS' TYING CLAIMS - C-05-00037-JW(RS)                                - 6 -

1  with an iPod were those purchased from Apple.  Complaint, ¶¶52-54.  Plaintiffs allege further that

2  Apple repeatedly issued software changes through iTunes to ensure that competition remained

3  foreclosed.  Complaint, ¶55.

4       Apple's assertion that "where products are separately available, tying law does not apply"

5  (Apple's Motion at 5), is thus sorely misguided.  *See, e.g.*, *Compuware Corp. v. IBM*, 259 F. Supp.

6  2d 597, 601 (E.D. Mich. 2002) (permitting plaintiffs to amend their tying claim to allege that despite

7  separate availability, "reasonable customers are forced to purchase the package . . . because of the

8  various tactics used by IBM"); *Nobel Scientific Indus. v. Beckham Instruments*, 670 F. Supp. 1313,

9  1324 (D. Md. 1986) (establishing that as long as the option provided by the seller to purchase

10  products separately is "not feasible," "[t]here need not be an explicit condition that the buyer of the

11  tying product buy the tied product"); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 450 (3d Cir. 1977)

12  (recognizing that "an illegal tie-in may exist even when the seller has not expressly conditioned the

13  sale of one product upon purchase of another, if the existence of a tie-in can otherwise be established

14  from business conduct"); *Adv. Bus. Sys. & Supply Co. v. SCM Corp.*, 415 F.2d 55, 60 (4th Cir. 1969)

15  (finding that lease agreement was not "reasonable alternative" to tie arrangement).[6]

16       Alternatively, a cognizable Section 1 tying claim is stated despite the separate availability of

17  the allegedly tied products "where a defendant has established its pricing policy in such a way that

18  the only viable economic option is to purchase the tying and tied product in a single package."

19  ─────────────────────────────

20  [6]     Apple is incorrect in its assertion that separate availability is permitted only in "package
    pricing" cases, where the price of the package is less than purchase of the products separately.  *See,*

21  *e.g.*, *Eastman Kodak*, 504 U.S. at 463 (no allegation that price of parts and services together was less
    expensive than when purchased individually); *Moore*, 550 F.2d at 1217 (no allegation that cost of

22  cemetery plot and marker were less expensive when purchased together); *Bogosian*, 561 F.2d at 450
    (discussing perceived threat of termination by franchisor as evidence that plaintiff was forced to

23  accept the tie).  The other case Apple cites fares no better in supporting Apple's contention that
    separate availability defeats Plaintiffs' tying claim.  In *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th

24  Cir. 2006), plaintiff alleged that defendant violated the antitrust laws by selling its patented ritonavir
    drug, Norvir, at a discounted price when it was purchased in combination with defendant's protease

25  inhibitor drug.  *Id.*  Plaintiff contended that defendant illegally used its monopoly power in the
    ritonavir drug market to foreclose the market on protease inhibitors.  *Id.*  The court stated that this

26  could not be a tie because Norvir, the tying product, was separately available for those who wished
    to use it in combination with a competing protease inhibitor.  *Id.*  By contrast, Plaintiffs here allege

27  they could not purchase iTunes files for direct playback on competing portable digital media players
    because Apple restricts them from doing so.  Complaint, ¶¶41-44, 50.

28

1    *Ways & Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D. Cal. 1979), *aff'd* 638 F.2d 143 (9th

2    Cir. 1981); *see also Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C93 20613 RMW,

3    1995 WL 853037, at *13 (N.D. Cal. Sept. 7, 1995) (discussing whether purchase of tied product

4    from competitor was "unfeasible or was not seriously contemplated"); *Amerinet, Inc. v. Xerox Corp.*,

5    972 F.2d 1483, 1500 (8th Cir. 1992) ("In cases where there is no explicit agreement which

6    conditions the purchase of the tying product upon the purchase of the tied product, an illegal

7    arrangement may still be shown if the defendant's policy makes the purchasing of the tying and tied

8    products together 'the only viable economic option. . . .'").

9         Apple itself relies on *Ways & Means*, citing the decision for the proposition that "where the

10   products are separately available, tying law does not apply." Apple's Motion at 5. But Apple leaves

11   out a critical proviso. Apple quotes: "there must in fact exist a tie scheme by which purchasers are

12   required to buy one commodity or service in order to obtain a second, distinct commodity or

13   service." *Id.* (quoting *Ways & Means*, 506 F. Supp. at 700). However, Apple fails to read on. In

14   fact, the court in *Ways & Means* went on to state: "This does not end the analysis, however, for

15   plaintiffs are correct in their assertion that separate availability will not preclude antitrust liability

16   where a defendant has established its pricing policy in such a way that the only viable economic

17   option is to purchase the tying and tied products in a single package." 506 F. Supp. at 701. Thus,

18   *Ways & Means* cannot possibly hold that tying law does not apply where the products are separately

19   available.

20        Nothing in Plaintiffs' Section 1 tying claims, therefore, "violate[s] basic antitrust principals."

21   *See* Apple's Motion at 7. Instead, Plaintiffs' claims stand on solid foundation of Supreme Court and

22   Ninth Circuit Section 1 tying precedent. Indeed, "the essential characteristic of an invalid tying

23   arrangement lies in the ***seller's exploitation*** of its control over the tying product to force the buyer

24   into the purchase of a tied product that the buyer either did not want at all, or ***might have preferred***

25   ***to purchase elsewhere on different terms***." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2,

26   12, 104 S. Ct. 1551  (1984); *see also* Areeda, *et al.*, *supra*, ¶1753c . As Professor Areeda concludes,

27   "the language of 'coercion,' 'forcing,' and 'voluntariness' should  be understood as inviting a

28   specific factual inquiry about whether the defendant has illegitimately constrained buyer choices."

Areeda, *et al.*, *supra*, ¶1752e. Constrained choice in the tied market imposed by a seller with market power in the tying product market is precisely what Plaintiffs allege here. Apple exploited its market power in digital audio and video files to force consumers to buy Apple's iPods, regardless of their desire to purchase a portable digital media player from a competitor on different terms. Complaint, ¶22.

No matter how innovative its products, Apple is not permitted to perpetuate illegal tie-ins that restrict consumers' choices and impede the development of competing products. As discussed above, and as the Ninth Circuit recognized in *Foremost Pro*, innovation does not amount to immunity from antitrust laws. 703 F.2d at 542-43.

> **2.**   **Plaintiffs Need Not Allege Coercion on an Individual Basis to State a Viable Section 1 Tying Claim**

Completely ignoring controlling Ninth Circuit law, Apple attempts to convince the Court that it somehow stepped outside the box when it recognized that market level coercion is sufficient to sustain a Section 1 tying claim. *See Tucker v. Apple Comp., Inc.*, 493 F. Supp. 2d 1090, 1091 (N.D. Cal. 2006); *Slattery v. Apple Comp., Inc.*, No. C 05-00037 JW, 2005 WL 2204981, at *3 (N.D. Cal. Sept. 9, 2005). Ninth Circuit authority could not be more clear: Plaintiffs need not prove coercion on an individual basis.

It is true that "some modicum of involuntariness or coercion is . . . essential to the existence" of an illegal tie-in. *Foremost Pro*, 703 F.2d at 540. In *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 504, 89 S. Ct. 1252 (1969), the Supreme Court explained that "the proper focus of concern is whether the seller has the power to . . . impose other burdensome terms such as a tie-in, with respect to ***any appreciable number of buyers within the market***." *See also Murphy v. Bus. Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 (9th Cir. 1988) ("The essence of an antitrust tying violation is not the seller's unilateral refusal to deal with a buyer who refuses to buy the tied product, but the use by the seller of its 'leverage' to force a purchaser to do something that he would not do in a competitive market."); Areeda, *et al.*, *supra*, ¶1752c ("[w]hile earlier cases suggested that the practical effect must be to prevent the buyer from purchasing ***any*** of the tied product from others,

1   subsequent cases were clearly satisfied with the practical effect of preventing **some** purchases from

2   defendant's rivals that might have otherwise been made.") (emphasis in original).

3        This is precisely the holding espoused by the Ninth Circuit in *Moore*, when it wrote that,

4   although a "modicum" of coercion was required, "the Supreme Court's opinions support[] the view

5   that ***coercion may be implied from a showing that an appreciable number of buyers have accepted***

6   ***burdensome terms, such as a tie-in***, and there exists sufficient economic power in the tying market."

7   550 F.2d at 1217.  In *Moore*, it made no difference that each purchaser of the tying product (the

8   cemetery lot) was not absolutely required to buy the tied product (a marker), because there was no

9   need to prove individual coercion in the purchase of the tied product.  *Id.*  The Ninth Circuit could

10  hardly have stated the point more bluntly: "A showing of an onerous effect on an appreciable

11  number of buyers coupled with a demonstration of sufficient economic power in the tying market is

12  sufficient to demonstrate coercion."  *Id.*

13       The Ninth Circuit has not retreated from its holding in *Moore*.  *See, e.g.*, *Cascade Health*

14  *Solutions v. Peacehealth*, 515 F.3d 883, 914 (9th Cir. 2008) (citing *Moore* for the proposition that

15  "coercion may be implied from a showing that an appreciable number of buyers have accepted

16  burdensome terms, such as a tie-in"); *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1161

17  (9th Cir. 2003) (same); *Foremost Pro*, 703 F.2d at 542 n.4 (citing *Moore* for the proposition that

18  coercion may be implied); *Betaseed, Inc. v. U&I, Inc.*, 681 F.2d 1203, 1221-22, 1222 n.35 (9th Cir.

19  1982) (addressing *Moore* and *Northern Pacific* at length).

20       Nevertheless, Apple argues that the Court's previous holdings are improper because

21  Plaintiffs themselves have not been individually coerced.  Apple's Motion at 12.  Apple states, "[n]o

22  case, however, has ever ruled that a non-coerced customer may assert a tying claim on the ground

23  that someone else might have been coerced."  *Id.*  Besides being factually incorrect, this contention

24  again completely misses the point.  Plaintiffs may establish the necessary modicum of coercion

25  where some appreciable number of the class members have been coerced.  *Cascade Health*, 515 F.3d

26  at 914 (holding that summary judgment for defendant on plaintiff's tying claim was improper where

27  there was sufficient evidence that defendant's practice "may have coerced *some* insurers" to accept

28  the tie).  This is because under the concept of market level coercion, where a sufficient number of

1   buyers of the tying product have been forced to accept the tied item instead of a possibly desirable

2   substitute, injury results for all buyers of the tied product. *See Moore*, 550 F.2d at 1212 ("the public

3   is harmed by the adverse effect on the market for the tied product").

4          This is exactly what Plaintiffs allege here; ***all*** purchasers of iPods were injured because an

5   appreciable number of iTunes customers accepted Apple's tie-in, resulting in supracompetitive

6   prices for all iPods. Complaint, ¶¶22, 72, 73. As Plaintiffs' own testimony reveals, Plaintiffs

7   themselves have been forced by Apple's technological tie-in policy to purchase an iPod over a

8   possibly more desirable substitute.[7] *See* Bonny Decl., Ex. 1, Deposition of Melanie Tucker, taken

9   October 26, 2007 at 12:20-13:5 (explaining that she purchased a second iPod after her first iPod

10  broke because her existing iTunes files were not compatible with other MP3 players); Bonny Decl.,

11  Ex. 2, Deposition of Mariana Rosen, taken January 24, 2007 at 89:8-90:5 (explaining that she did not

12  purchase something other than an iPod because she already had an existing iTunes library); *see also*

13  Complaint, ¶43 ("[C]onsumers who have purchased Online Music from Apple will have no choice

14  but to buy an iPod if they want to play their music directly on a Digital Music Player.").

15         Plaintiffs' argument for market level coercion is also supported by the unrebutted testimony

16  of an actual competitor in the portable digital media player market. As the Declaration of Lee

17  Morse, the Director for Emerging Technologies at Creative Labs, Inc., a competing manufacturer of

18  portable digital music player's, makes clear: "songs purchased from the iTunes Store cannot be

19  directly recorded onto or played back on Creative's line of portable digital music players, which

20  Creative believes has a negative impact on its sale of digital music players." Docket No. 96, ¶8; *see*

21  *also* Complaint, ¶75 (alleging competitors in the portable digital media player market were

22  foreclosed by Apple's anticompetitive conduct). Thus, whether viewed from the perspective of

23  consumers or competitors, Plaintiffs have alleged sufficient facts (and introduced sufficient

24  evidence) to properly state a Section 1 claim based on a theory of market level coercion.

25

26  [7]     *See* Declaration of Bonny E. Sweeney in Support of Plaintiffs' Opposition to Defendant's
27  Motion for Judgment on the Pleadings as to Plaintiffs' Tying Claims, filed concurrently ("Bonny Decl.").

28

1    Apple's attempts to distinguish *Moore* are unavailing. Apple's Motion at 14-15. With little

2    explanation, Apple asserts that unlike here, an "actual tie and actual coercion" existed in *Moore*. *Id.*

3    at 14. But, it can hardly be said that the alleged tie in *Moore* was anymore of an "actual tie" than

4    that alleged here. In *Moore* plaintiff alleged a tie between the purchase of cemetery lots (tying

5    product) and memorial markers (tied product) and the purchase of cemetery lots (tying product) and

6    installation service of the cemetery (tied product). 550 F.2d at 1212. However, not all purchasers of

7    cemetery lots were required to purchase memorial markers. *Id.* Nonetheless, the *Moore* court held

8    that plaintiff had established the existence of a tie. *Id.* at 1217. The same is true here. An actual tie

9    exists because Apple has imposed the same technological restraints on all class members regardless

10   of whether some purchasers of iTunes files have not purchased an iPod and vice versa.[8] Complaint,

11   ¶¶41-44. Additionally, the Ninth Circuit in *Moore* explicitly held that "actual coercion" was not

12   required and in fact found that plaintiff was able to satisfy the coercion requirement by proof that "an

13   appreciable number of buyers" forewent desirable substitutes and accepted the tie. 550 F.2d at 1216-

14   17. As stated above, Plaintiffs allege at least the same level of coercion here. Complaint, ¶22, 72,

15   73.

16       Moreover, Apple completely misunderstands *Moore's* significance and argues that *Moore*

17   "cannot mean that coercion can be inferred from the mere fact that consumers buy the two products

18   at issue." Apple's Motion at 14. Plaintiffs have not asked for any such inference. Plaintiffs instead

19   cite *Moore* for its clear holding that coercion can be established at the market level by proof that "an

20   appreciable number" of purchasers of the tying product accepted the terms of the tie-in and thus also

21   purchased the tied product. *Moore*, 550 F.2d at 1217. Apple itself concedes that a significant

22   _____

23   [8]    Similarly, Apple's citations to *Hill v. A-T-O, Inc.*, 535 F.2d 1349 (2d Cir. 1976) and *Siegel v.*
     *Chicken Delight, Inc.*, 448 F.2d 45 (9th Cir. 1971) do not demonstrate any more of a tie than what
24   Plaintiffs allege here. In *Hill*, plaintiffs alleged a tie between the purchase of a vacuum cleaner and
     membership services. 535 F.2d at 1354. The *Hill* court found the existence of a tie despite the facts
25   that not all purchasers of the vacuum were coerced. *Id.* at 1355. In *Siegel*, franchisees alleged a tie
     between franchise lease agreements and cooking equipment, food items, and packaging. 448 F.2d at
26   46. As recognized by the court in *Moore*, the fact that plaintiffs did not establish that each of the
     franchisees was required to purchased the cooking equipment, food items and packaging as a
27   condition of the agreement was not fatal to their tying claims. 550 F.2d at 1217.

28

number of iPod purchasers use iTunes. *See* Docket No. 181 at 6. Nevertheless, whether, after

discovery, Plaintiffs can prove that an "appreciable number" of iTunes purchasers also purchased an

iPod is a matter that cannot be resolved on this Rule 12(c) motion. *See Enron Oil Trading &*

*Transp. Co.*, 132 F.3d at 529. Here, Plaintiffs allege the existence of a technological tie and, in

accordance with *Moore*, coercion on a market level. They have also demonstrated through expert

testimony submitted in support of class certification, how market level coercion can be established.

Docket No. 166-2 (Declaration of Roger G. Noll) at 38, 42.

The Court properly relied on Murphy as support for the suitability of market level coercion.

*Tucker*, 492 F. Supp. 2d at 1099. In *Murphy*, plaintiff franchisees alleged that they were required by

defendant franchisor to purchase equipment as a condition of the franchise lease. 854 F.2d at 1204.

The Ninth Circuit held that plaintiffs did not establish the necessary level of coercion because it was

not alleged "that ***any*** person, let alone plaintiffs were persuaded by [defendant]" to accept the

conditions of the tie. *Id.* While *Murphy* is factually distinguishable, the Ninth Circuit's reasoning is

in accord with *Moore* where the court found coercion is satisfied where some but not all consumers

accepted the tie. *See Moore*, 550 F.2d at 1217; *Cascade Health*, 515 F.3d at 914.

Further, Apple argues that market level coercion in a class action is improper because "in the

absence of an express contractual tie that applies to all purchasers, class certification is improper

because of the need for each individual customer to prove that he or she was coerced." Apple's

Motion at 12. All of the cases cited by Apple involve challenges to contractual ties that were not

uniformly imposed and enforced across the class.[9] But here, Plaintiffs' tying claim is based on a

---

[9]    *See Freeland v. AT & T Corp.*, 238 F.R.D. 130, 155 (S.D.N.Y. 2006) (no provision in class members' cell phone service plans requiring purchase of handset); *Little Caesar Enters., Inc. v. Smith*, 895 F. Supp. 884, 904 (E.D. Mich. 1995) (no express contractual tie existed in franchise contract); *Colburn v. Roto-Rooter Corp.*, 78 F.R.D. 679, 681-82 (N.D. Cal. 1978) (no evidence tying provision in plaintiff's contract was enforced throughout the class); *Smith v. Denny's Rests., Inc.*, 62 F.R.D. 459, 461 (N.D. Cal. 1974) (franchise agreement did not expressly create tie-in policy); *Chase Parkway Garage Inc. v. Subaru, Inc.*, 94 F.R.D. 330, 332 (D. Mass. 1982) (because no express tying provision existed, proof defendants enforced such a policy would require individual proof); *Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1216 (3d Cir. 1976) (no existence of express contractual tie); *Daniels v. Amerco*, No. 81 CIV 3801 (RLC), 1983 WL 1794, at *1 (W.D.N.Y. Mar. 10, 1983) (alleged tie based on verbal orders or "indirect strategems" not contractual provisions); *Waldo v. N. Am. Van Lines, Inc.*, 102 F.R.D. 807, 814 (W.D. Pa. 1984) (no express contractual tie-in

1    technological restriction ("FairPlay") that was allegedly imposed on all iTunes file purchasers,

2    requiring them to purchase an iPod for direct playback on a portable digital media player.

3    Complaint, ¶¶41-44, 50.  No further allegation of coercion is required.  *See Moore*, 550 F.2d at 1217;

4    *Hill*, 535 F.2d at 1355 (an "unremitting policy of tie-in" and sufficient market power constitutes

5    requisite coercion).

6          Alternatively, as explained above, even absent an express contractual provision, a plaintiff

7    can prove a Section 1 tie by demonstrating that purchase of the tying and tied products together is

8    the only "viable economic option."  *See, e.g.*, *Ways & Means*, 506 F. Supp. at 701 (finding that

9    although an express tying arrangement did not exist because the tying product was available outside

10   the tie, a tie could be established by proof that purchase of the tying and tied products together was

11   the "only viable economic option").  In fact in *Moore*, the Ninth Circuit implied coercion even

12   though all purchasers were not contractually obligated to purchase the tied product.  550 F.2d at

13   1217 (only five out of eight cemeteries contractually required the sale of markers and cemetery lots).

14   **B.     Issues Raised by Apple**

15         Although the Court explicitly identified the two narrow issues to be addressed in Apple's

16   motion, Apple raises additional substantive challenges to Plaintiffs' federal and state tying claims.

17   Even were the Court is willing to consider such arguments, they are substantively meritless.

18   **1.     Plaintiffs Allege Actionable Federal Law Claims**

19         Apple argues that Plaintiffs' tying claim is improper under Section 1 for lack of "concerted

20   action."  *See* Apple's Motion at 4.  Section 1 liability for unilateral tying arrangements is, however,

21   hardly a novel concept.  *See, e.g.*, *Toulumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157-58 (9th

22   Cir. 2001) (affirming Section 1 tying claim where hospital tied the purchase of C-section services

23   and obstetrical services); *Microsoft Corp.*, 253 F.3d at 84 (recognizing Section 1 liability for

24   Microsoft's tie of Windows and Internet Explorer); *Nobel Scientific Indus., Inc.*, 670 F. Supp. at

25   _____

26   provision existed in franchise contract); *Olmstead v. Amoco Oil Co.*, No. 76-247-Orl-Civ-Y, 1977
     WL 1416, at *3 (M.D. Fla. June 16, 1977) (absent express tie-in in lease agreement, proof based on
27   operation of the relevant program and pressure by defendant on class members was insufficient).

28

1  1324 (holding that unilateral conduct may constitute a tying arrangement under Section 1).  Such

2  arrangements can unquestionably constitute an unreasonable restraint on trade actionable under

3  Section 1.  *Ariz. v. Maricopa County Med. Soc.*, 457 U.S. 332, 344 n.15, 102 S. Ct. 2466 (1982)

4  (recognizing that a tying arrangement may be an unreasonable restraint on trade under Section 1).

5       In particular, Section 1 encompasses unilateral tying arrangements where defendant agrees

6  "'to sell one product but only on the condition that the buyer also purchasers a different (or tied)

7  product, or at least agrees that he will not purchase that product from any other supplier.'"  *Eastman*

8  *Kodak Co.*, 504 U.S. at 461 (quoting *Northern Pacific*, 356 U.S. at 5-6).  That is precisely what is

9  alleged here; through deliberate technological impediments Apple effectively forced purchasers of

10 iTunes files to agree not to purchase a portable digital media player from a competing manufacturer.

11 Complaint, ¶¶41-44, 50.  Accordingly, Plaintiffs' tying claim is appropriately pled under Section 1.

12            **2.       Plaintiffs Allege Actionable State Law Claims**

13       Apple also contends that Plaintiffs' state law claims under the Cartwright Act (Cal. Bus. &

14 Prof. Code. §16700 *et seq*.), California Unfair Competition Law (Cal. Bus. & Prof. Code §17200 *et*

15 *seq*.), and California Civil Legal Remedies Act (Cal Civ. Code. §1750 *et seq*.) fail for the same

16 reasons as Plaintiffs' Section 1 tying claim.  Plaintiffs incorporate the same allegations as alleged

17 under Section 1 and 2 of the Sherman Act as the basis for these claims.  Complaint, ¶¶115, 119, 127.

18       Apple correctly notes that the analysis under California's antitrust law mirrors the analysis

19 under federal law because the Cartwright Act was modeled on the Sherman Act.  *Tuolumne*, 236

20 F.3d at 1160.  Thus, for the same reasons as stated above, Plaintiffs' Cartwright Act tying claim

21 survives because proof of individual coercion is not required and the separate availability of the

22 tying and tied products is not fatal.  *See Moore*, 550 F.2d at 1217.

23       Additionally, Plaintiffs' §17200 and §1750 claims are premised on the alleged antitrust

24 violations and have been properly certified.  Complaint, ¶121 ("Apple's actions are unlawful and

25 unfair because it has violated, *inter alia*, the Sherman Antitrust Act. . . .");  Complaint ¶131 ("Apple

26 is a monopolist [and] [t]he unnecessary technological restrictions it places on its products offer no

27 benefit to consumers while preventing them from us[ing] a competitor's Digital Music Player or

28 online store.").

1  **V.    CONCLUSION**

2        For each and all of the foregoing reasons, the Court should deny Apple's Motion.

3  DATED:  March 2, 2009                    Respectfully submitted,

4                                           COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
5                                           BONNY E. SWEENEY

6

7                                                   s/ Bonny E. Sweeney
                                               BONNY E. SWEENEY
8
                                           655 West Broadway, Suite 1900
9                                          San Diego, CA  92101
                                           Telephone:  619/231-1058
10                                         619/231-7423 (fax)

11                                         THE KATRIEL LAW FIRM
                                           ROY A. KATRIEL
12                                         1101 30th Street, N.W., Suite 500
                                           Washington, DC  20007
13                                         Telephone:  202/625-4342
                                           202/330-5593 (fax)
14
                                           Co-Lead Counsel for Plaintiffs
15
                                           BONNETT, FAIRBOURN, FRIEDMAN
16                                            & BALINT, P.C.
                                           ANDREW S. FRIEDMAN
17                                         FRANCIS J. BALINT, JR.
                                           ELAINE A. RYAN
18                                         TODD D. CARPENTER
                                           2901 N. Central Avenue, Suite 1000
19                                         Phoenix, AZ  85012
                                           Telephone:  602/274-1100
20                                         602/274-1199 (fax)

21                                         BRAUN LAW GROUP, P.C.
                                           MICHAEL D. BRAUN
22                                         12304 Santa Monica Blvd., Suite 109
                                           Los Angeles, CA  90025
23                                         Telephone:  310/442-7755
                                           310/442-7756 (fax)
24
                                           MURRAY, FRANK & SAILER LLP
25                                         BRIAN P. MURRAY
                                           JACQUELINE SAILER
26                                         275 Madison Avenue, Suite 801
                                           New York, NY  10016
27                                         Telephone:  212/682-1818
                                           212/682-1892 (fax)
28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO PLAINTIFFS' TYING CLAIMS - C-05-00037-JW(RS)                          - 16 -

1

2    GLANCY BINKOW & GOLDBERG LLP
     MICHAEL GOLDBERG
3    1801 Avenue of the Stars, Suite 311
     Los Angeles, CA  90067
4    Telephone:  310/201-9150
     310/201-9160 (fax)
5
     Additional Counsel for Plaintiffs
6    S:\CasesSD\Apple Tying\BRF00057838.doc

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO PLAINTIFFS' TYING CLAIMS - C-05-00037-JW(RS)                         - 17 -

1

<u>CERTIFICATE OF SERVICE</u>

2       I hereby certify that on March 2, 2009, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7       I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct. Executed on March 2, 2009.

9

                                         s/ Bonny E. Sweeney
10                                       BONNY E. SWEENEY

11                                       COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
12                                       655 West Broadway, Suite 1900
                                         San Diego, CA 92101-3301
13                                       Telephone: 619/231-1058
                                         619/231-7423 (fax)
14

15                                       E-mail:bonnys@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

CAND-ECF                                                                                Page 1 of 2

Case 4:05-cv-00037-YGR   Document 877-3    Filed 11/04/14   Page 114 of 177
Case 4:05-cv-00037-YGR   Document 209    Filed 03/02/09   Page 1 of 25

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Adam Richard Sand , Esq**
  invalidaddress@invalidaddress.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Tracy Strong**
  tstrong@jonesday.com,dharmon@jonesday.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,E_file_sd@csgrr.com,christinas@csgrr.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Todd David Carpenter**
Bonnett, Fairbourn, Friedman, & Balint
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

**Elaine A. Ryan**
Bonnett Fairbourn Friedman & Balint, P.C
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

# EXHIBIT 10

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| The Apple iPod iTunes Antitrust Litigation | NO. C 05-00037 JW |
| | **ORDER GRANTING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS; ORDERING SUPPLEMENTAL BRIEFING** |

_____/

## I. INTRODUCTION

Plaintiffs[1] bring this class action against Defendant Apple Computer, Inc. ("Apple"), alleging violations of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, and related state law claims.  Plaintiffs allege that Apple has committed unlawful acts in the sale of its iPod portable digital music player and online digital music files sold through its iTunes Music Store ("iTMS"), in violation of federal and state antitrust laws.

Presently before the Court is Defendant's Motion for Judgment on the Pleadings as to Plaintiffs' Tying Claims.  (hereafter, "Motion," Docket Item No. 200.)  The Court found it appropriate to take the matter under submission without oral argument.  See Civ. L.R. 7-1(b).  Based on the papers submitted to date, the Court GRANTS in part Defendant's Motion for Judgment on the Pleadings as to Plaintiffs' tying claims.

---

[1]  Named Plaintiffs are Melanie Tucker, Mariana Rosen, and Somtai Troy Charoensak.

**United States District Court**
For the Northern District of California

**II.  BACKGROUND**

1

2    A detailed outline of the factual allegations and procedural history in this case may be found

3    in the Court's December 20, 2006 Order Denying Defendant's Motion to Dismiss (hereafter,

4    "December 20 Order," Docket Item No. 27)[2] and in the Court's December 22, 2008 Order Granting

5    Plaintiffs' Motion for Class Certification as to Counts Two, Three, Four, Five, Six, and Seven Only

6    and Appointing Class Counsel; *Sua Sponte* Order Reconsidering Defendant's Motion to Dismiss

7    Count One and Requiring Further Briefing (hereafter, "December 22 Order," Docket Item No. 196).

8    The Court reviews the relevant procedural history to the extent it implicates the present Motion.

9    In the Court's December 22, 2008 Order, the Court granted in part Plaintiffs' Motion for

10   Class Certification.  (Decmeber 22 Order at 1.)  In doing so, the Court permitted Plaintiffs' Sherman

11   Act § 2 claims and related state law claims to proceed as a class action.  (See id.)  The Court,

12   however, declined to certify a class as to Plaintiffs' claim for unlawful tying under Sherman Act § 1.

13   Instead, the Court made a *sua sponte* determination to reconsider its December 20, 2006 finding that

14   Plaintiffs' Complaint had stated a tying claim under settled antitrust law.  (See Decmeber 20 Order

15   at 6-9; December 22 Order at 6-7.)  Accordingly, the Court denied without prejudice Plaintiffs'

16   Motion for Class Certification, with respect to the tying claim only, subject to renewal after

17   reconsideration of whether Plaintiffs have, as a predicate matter, stated a cognizable tying claim.

18   The Court invited Defendant to move pursuant to Federal Rules of Civil Procedure 12(b) or 12(c),

19   and instructed Defendant to brief the following issues:

20        (1)    Whether "market-level coercion" can be the basis of a cognizable tying claim under

21               Section 1 of the Sherman Act; and

22        (2)    Whether, as a matter of law, coercion can be found where there is no requirement that

23               the tying and tied product be purchased together.

24   (December 22 Order at 7.)

25

26   ─────────────

27        [2]  This Order may be found in the docket for Tucker v. Apple Computer, Inc., Case No. C 06-
     04457 JW, which was one of the original cases now included in this consolidated action.

28                                          2

Presently before the Court is Defendant's Motion for Judgment on the Pleadings.

### III. STANDARDS

Under Federal Rule of Civil Procedure 12(c), any party may move for judgment on the pleadings at any time after the pleadings are closed but within such time as not to delay the trial. Fed. R. Civ. P. 12(c). "For the purposes of the motion, the allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false." Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990). Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." Id. When brought by the defendant, a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is a "means to challenge the sufficiency of the complaint after an answer has been filed." New. Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1115 (C.D. Cal. 2004). A motion for judgment on the pleadings is therefore similar to a motion to dismiss. Id. When the district court must go beyond the pleadings to resolve an issue on a motion for judgment on the pleadings, the proceeding is properly treated as a motion for summary judgment. Fed. R. Civ. P. 12(c); Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1301 (9th Cir. 1982).

### IV. DISCUSSION

Defendant contends, *inter alia*, that (1) no unlawful tie can exist where products are separately available and have separate uses and (2) Plaintiffs in this case have not alleged coercion sufficient to support a tying claim. (Motion at 5, 11.) The Court considers each issue in turn.

**A.** **Separate Availability of Tying and Tied Products**

Defendant contends that there can be no Section 1 tying liability in this case, as a matter of law, because the tying and tied products undisputedly have separate uses and are sold on a separate basis. (Motion at 5.) In support of this position, Defendant relies on the premise that tying law requires that a seller condition purchase of the tying product on the buyer's agreement to also

3

United States District Court

For the Northern District of California

1  purchase the tied product.[3]  In response, Plaintiffs contend that Section 1 liability does not require

2  that the tying and tied products be purchased together.  The Court first reviews applicable tying law,

3  and then considers whether the tie alleged by Plaintiffs is cognizable under Section 1, as a matter of

4  law.

5       **1.       Tying Claims Under Sherman Act § 1**

6       In the Court's December 20, 2006 Order, the Court summarized the basic framework for

7  Section 1 tying liability, as follows:

8           Section 1 of the Sherman Act provides that "[e]very contract, combination in the
            form of trust or otherwise, or conspiracy, in restraint of trade or commerce among
9           the several states, or with foreign nations, is declared to be illegal. . . ." 15 U.S.C.
            § 1.  Tying in violation of Section 1 can either be a per se violation or a violation
10          of the rule of reason.  County of Tuolumne v. Sonora Community Hosp., 236 F.3d
            1148, 1157-58 (9th Cir. 2001).  To establish that a tying arrangement is per se
11          illegal, a plaintiff must prove (1) a tie between two separate products or services
            sold in separate markets; (2) sufficient economic power in the tying product
12          market to affect the tied market; and (3) an effect on a substantial volume of
            commerce in the tied product market.  Id.  Implicit in these elements is the need
13          of the seller of the tying product "to force the buyer into the purchase of the tied
            product that the buyer did not want at all, or might have preferred to purchase
14          elsewhere on different terms."  Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466
            U.S. 2, 12 (1984); Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145,
15          1159 (9th Cir. 2003).

16  (December 20 Order at 6.)

17       In this case, the dispute concerns whether Plaintiffs have adequately alleged the first prong of

18  the Jefferson Parish standard for tying liability.  In particular, the parties contest whether Plaintiffs

19  have alleged a "tie" within the meaning of established Sherman Act jurisprudence.  To resolve this

20  dispute, the Court considers what types of product sales relationships constitute "tying

21  arrangements" under Sherman Act Section 1.

22       "[A] tying arrangement may be defined as an agreement by a party to sell one product but

23  only on the condition that the buyer also purchases a different (or tied) product, or at least agrees

24  that he will not purchase that product from any other supplier."  N. Pac. Ry. Co. v. United States,

25  _____

26       [3]  In this case, purchases from the iTMS are alleged to be the "tying" product and the iPod is
     alleged to be the "tied" product.  (See Consolidated Complaint ¶¶ 79-84, hereafter, "Complaint,"
27   Docket Item No. 107.)

28                                          4

United States District Court

For the Northern District of California

1    356 U.S. 1, 5-6 (1958).  The "essence of an antitrust tying violation" is the use of a seller's market

2    power-based "leverage to force a purchaser to do something that he would not do in a competitive

3    market."  Murphy v. Bus. Cards Tomorrow, Inc., 854 F.2d 1202, 1204 (9th Cir. 1988) (quoting

4    Jefferson Parish, 466 U.S. at 14 n.20).  "[W]here the buyer is free to take either [the tying or the tied]

5    product by itself there is no tying problem. . . ."  Northern Pacific, 356 U.S. at 6 n.4.

6        The paradigmatic unlawful tying relationship exists where a seller expressly conditions the

7    sale of the tying product on the buyer's additional purchase of the tied product.  For example, in

8    Northern Pacific, the defendant sold and leased tracts of land that it owned throughout the United

9    States.  In the majority of the relevant sales contracts and lease agreements, the defendant inserted

10   "preferential routing" clauses, "which compelled the grantee or lessee to ship over its lines all

11   commodities produced or manufactured on the land provided that its rates . . . were equal to those of

12   competing carriers."  356 U.S. at 3.  After an antitrust challenge to the "preferential routing" practice

13   by the United States, the Supreme Court affirmed a lower court judgment of tying liability against

14   the defendant railway company.

15       In United States v. Loew's, 371 U.S. 38, 39-40 (1962), the Supreme Court upheld tying

16   liability against motion picture distributors where the distributors "conditioned the license or sale of

17   one or more feature films upon the acceptance by [television stations] of a package or block

18   containing one or more unwanted or inferior films."  Similarly, in Eastman Kodak Co. v. Image

19   Technical Servs., Inc., 504 U.S. 451, 463 (1992), the Court permitted tying claims against Kodak to

20   go forward where there was evidence that Kodak sold replacement parts for its copiers only where

21   the purchasers agreed not to buy repair services from independent service providers.

22       Tying liability, however, has not been limited to situations in which sellers engaged in

23   express conditioning with respect to the sale of the tying product.  For example, "separate

24   availability will not preclude antitrust liability where a defendant has established its pricing policy in

25   such a way that the only viable economic option is to purchase the tying and tied products in a single

26   package."  Ways & Means, Inc. v. IVAC Corp., 506 F. Supp. 697, 701 (N.D. Cal. 1979); see also

27

28                                                5

United States District Court

For the Northern District of California

1    Bogosian v. Gulf Oil Corp., 561 F.2d 434, 450 (3d Cir. 1977) ("an illegal tie-in may exist even when

2    the seller has not expressly conditioned the sale of one product upon purchase of another, if the

3    existence of a tie-in can otherwise be established from business conduct"); Am. Mfrs. Mut. Ins. Co.

4    v. Am. Broad.-Paramount Theaters, Inc., 388 F.2d 272, 283 (2d Cir. 1967); Advance Bus. Sys. &

5    Supply Co. v. SCM Corp., 415 F.2d 55, 62 (4th Cir. 1969).  Liability in such cases, however, is

6    limited where separate purchase of the allegedly tying and tied products is a "reasonable alternative"

7    to buying the seller's packaged product.  Ways & Means, 506 F. Supp. at 702.  In Ways & Means,

8    the court granted summary judgment to the defendant where 25% of purchases of the allegedly tied

9    product were made separately from purchase of the package of tying and tied products.  Id.

10          Finally, several cases acknowledge the potential for liability based on a so-called

11   "technological tie," where a technological relationship between a seller's products compels a buyer

12   to purchase both products.  Such compulsion results when one product is ineffective or is less

13   effective without concomitant purchase of the second technologically interrelated product.  The

14   primary case addressing technological tying is Foremost Pro Color, Inc. v. Eastman Kodak Co., 703

15   F.2d 534 (9th Cir. 1983).  See also Innovation Data Processing, Inc. v. Int'l Bus. Machines, Corp.,

16   585 F. Supp. 1470, 1475-76 (D.N.J. 1984) (following Foremost Pro in granting summary judgment

17   to the defendant on a Section 1 tying claim where, despite a technical interrelationship between

18   products, customers were free to purchase either product alone).  In Foremost Pro, the Ninth Circuit

19   considered tying claims against Kodak, which were based on Kodak's introduction of a new type of

20   film that was incapable of being processed with the types of processing materials that otherwise

21   existed at the time.  The result of this alleged technological interrelationship was that purchase of

22   Kodak's processing materials was a necessary incident of purchasing Kodak's new film.  Id. at 542.

23   The purchaser plaintiff asserted a Section 1 claim, contending that the technological connection

24   created an implied condition that "whenever [the plaintiff] purchased one Kodak product, it

25   necessarily had to purchase additional Kodak commodities."  Id. at 540.

26

27

28                                                    6

1      In upholding the district court's granting of Kodak's motion to dismiss, the Ninth Circuit

2   "decline[d] to place such technological ties in the category of economic restrictions deemed *per se*

3   unlawful by <u>Northern Pacific</u> and its progeny." <u>Id.</u> at 542.  The Court held that "the development

4   and introduction of a system of technologically interrelated products is not sufficient alone to

5   establish a *per se* unlawful tying arrangement even if the new products are incompatible with the

6   products then offered by the competition and effective use of any one of the new products

7   necessitates purchase of some or all of the others." <u>Id.</u> at 542-43.  The basis for this conclusion was

8   the Ninth Circuit's concern with impeding technological development by imposing overly onerous

9   antitrust duties on innovative firms.  In dictum, the Court did suggest, however, that a technological

10  tie could still be found unlawful if the "dominant purpose motivating [the seller's] design and

11  introduction" of the system of related products "was to compel purchase of the entire system as a

12  package, rather than to achieve the legitimate goal of marketing new, technologically superior

13  products. . . ." <u>Id.</u> at 543.

14      **2.      Application to the Alleged iTMS - iPod Tie**

15      In this case, Plaintiffs allege in relevant part:

16          Online music purchased from the iTMS is encoded by Apple with Digital Rights
            Management ("DRM") restrictions called "FairPlay." (Complaint ¶ 41.)  Use of
17          FairPlay requires iTMS consumes to use Apple's iPod to transfer the music
            directly to a Digital Music Player. (<u>Id.</u> ¶ 43.)  The tied product is the iPod and the
18          tying product is FairPlay-DRM Online Music purchased from the iTMS.  Apple
            deliberately makes the music filed purchased from the iTMS incapable of being
19          played by other Digital Music Players.  Thus, consumers who have purchased
            Online Music from Apple will have no choice but to buy an iPod if they want to
20          play their music directly on a Digital Media Player. (<u>Id.</u> ¶ 43.)  After purchasing
            Digital Music from the iTMS, consumers are locked into making all future Digital
21          Music Player purchases from Apple, because consumers with libraries of iTMS
            music could not utilize any of the songs they purchased from the iTMS with any
22          non-iPod Digital Music Player. (<u>Id.</u> ¶ 44.)  As a result of this activity, Apple has
            been able to charge supracompetitive prices to all purchasers of iPods. (<u>Id.</u> ¶ 73.)

23
24      Critically, for purposes of the Court's present tying inquiry, there is no allegation that iTunes

25  music and iPods are not available on a separate basis.  <mark>It appears that there is, in fact, no dispute that</mark>

    <mark>iTunes music and iPods are always separately available.  Rather, the gravamen of the Complaint is</mark>

26  <mark>that by creating the DRM-mediated link between iTunes music and iPods, Apple has forced "iTunes</mark>

27

28                                              7

United States District Court

For the Northern District of California

1    customers to forego their free choice of portable digital media players." (Opposition at 4.)

2    According to Plaintiffs, "a tie exists here because although purchasers can buy iTunes files

3    separately, they are forced to agree not to purchase a portable digital media player other than an iPod

4    for direct playback of their iTunes files." (Id. at 5.)

5            Despite Plaintiffs' contentions that the technological interrelationship between iTunes music

6    and iPods constitute an unlawful tie, the Court is not persuaded that this is the type of relationship

7    that is condemned by federal antitrust law. First, the allegations in this case are far from the

8    paradigmatic cases of express conditioning proscribed by the Supreme Court in cases like Northern

9    Pacific and Lowe's. That is, there is no allegation that there was any form of express conditioning in

10   connection with Apple's sale of either iTunes music or iPods. Second, there is no allegation of a

11   package pricing policy that could constitute an unlawful tie, of the type recognized in Ways &

12   Means. Even in Ways & Means, the court refused to find an unlawful tie, where, despite package

13   pricing, there appeared to be a reasonable alternative that allowed consumers to purchase the tied

14   product on a separate basis. See 506 F. Supp. at 702. As in that case, Plaintiffs' allegations suggest

15   that there are reasonable alternatives in that consumers are free to take either product separately.

16   Indeed, nothing in the allegations suggests that purchasing an iPod is a necessary incident of

17   purchasing iTunes music, or vice versa. Furthermore, there is no allegation that iPods and iTunes

18   music are ever even sold on a packaged basis.

19           Finally, the Court recognizes that the most relevant model for liability is that of the

20   technological tie, as recognized by the Ninth Circuit in Foremost Pro. See 703 F.2d at 542. The

21   Ninth Circuit in that case identified the technological tie as a species of tying arrangement, but

22   expressly declined to find that allegations of technological ties, without more, could provide the

23   basis for per se Section 1 liability. Although Ninth Circuit suggested that the existence of an

24   anticompetitive purpose behind a technological tie might lead to a different outcome, the Court was

25   not actually confronted with any such allegations. Ultimately, this Court is not aware of any case

26   where per se tying liability was found on the basis of a technological tie.

27

28                                                      8

**United States District Court**
For the Northern District of California

1    In sum, the Court is not persuaded that the allegations in this case are sufficient to give rise

2    to a cognizable claim for *per se* tying under Sherman Act § 1.  The Court finds that, although

3    Plaintiffs are alleging conduct that may have anticompetitive effects, existing antitrust doctrine does

4    not allow such conduct to be remedied through a *per se* tying action.[4]  That is, current antitrust

5    jurisprudence does not, as a *per se* matter, prohibit conduct that merely limits consumers' "free

6    choice" in their purchase of complimentary products.

7    Accordingly, the Court GRANTS Defendant's Motion for Judgment on the Pleadings as to

8    Count 1 for *per se* unlawful tying.[5]

9        **3.    Rule of Reason**

10   The Court recognizes, however, that Plaintiffs alternatively seek to proceed with a § 1 claim

11   on the basis of a "rule of reason" theory of liability.  (Complaint ¶ 56.)

12   "Conduct which does not meet the per se requirements may still constitute a violation of the

13   Sherman Act Section 1 rule of reason."  Betaseed, Inc. v. U&I, Inc., 681 F.2d 1203, 1228 (9th Cir.

14   1983).  The rule of reason "focuses directly on the challenged restraint's impact on competitive

15   conditions."  Id.  The inquiry under the rule of reason examines "whether the challenged agreement

16   is one that promotes competition or one that suppresses competition."  Id.  In such a case, the

17   plaintiff has the burden of demonstrating to the factfinder, upon review of the totality of the

18   circumstances, that the intent of the restraint is anticompetitive and that the restraint has significant

19   anticompetitive effects.  Id.  The reasonableness of a restrictive practice "is a paradigm fact

20   question."  Id.

21   In this case, neither party's briefs address whether, assuming Plaintiffs' *per se* tying claim is

22   dismissed, Plaintiffs should be permitted to proceed on a rule of reason theory.  Accordingly, to the

---

24   [4]  The Court does not comment on whether this conduct, despite being unactionable under a

25   tying framework, may still provide the basis for a finding of willfulness in Plaintiffs' Section 2
     monopolization and attempted monopolization claims.

26   [5]  The Court also GRANTS Defendant's Motion with respect to Plaintiffs' state law claims,

27   to the extent those claims are based on unlawful tying under federal antitrust law.

28                                               9

1  extent Plaintiffs seek to proceed on the rule of reason theory,  the Court invites Defendant to file

2  another Rule 12(c) motion so that the parties will have an opportunity to fully brief the issue.

3  **B.**      **Absence of Individual Coercion**

4         In light of the Court's finding that the technological tie alleged in this case does not provide

5  the basis for a cognizable tying claim under Section 1 of the Sherman Act, the Court declines to

6  speculate on whether Plaintiffs have alleged coercion sufficient to support a tying claim.

7                                          **V.  CONCLUSION**

8         The Court GRANTS in part Defendant's Motion for Judgment on the Pleadings as to

9  Plaintiffs' claim for unlawful tying under the Sherman Act and related state law claims.  The Court

10  invites Defendant to file another Rule 12(c) motion regrading whether Plaintiffs' antitrust claim

11  under the rule of reason may still proceed.

12         The parties shall appear for a Case Management Conference on **June 1, 2009 at 10 a.m.**  The

13  parties shall meet and confer and file a Joint Case Management Statement on or before **May 22,**

14  **2009.**  The Statement shall include, among other things, the parties' proposed schedule to advance

15  this case.

16

17  Dated:  May 15, 2009                    _____

18                                          JAMES WARE
                                            United States District Judge

19

20

21

22

23

24

25

26

27

28                                          10

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

1

2   Adam Richard Sand invalidaddress@invalidaddress.com
    Alreen Haeggquist alreenh@zhlaw.com
3   Andrew S. Friedman afriedman@bffb.com
    Bonny E. Sweeney bonnys@csgrr.com
4   Brian P Murray bmurray@murrayfrank.com
    Caroline Nason Mitchell cnmitchell@jonesday.com
5   Craig Ellsworth Stewart cestewart@jonesday.com
    Francis Joseph Balint fbalint@bffb.com
6   Helen I. Zeldes helenz@zhlaw.com
    Jacqueline Sailer jsailer@murrayfrank.com
7   John J. Stoia jstoia@csgrr.com
    Michael D Braun service@braunlawgroup.com
8   Michael D. Braun service@braunlawgroup.com
    Robert Allan Mittelstaedt ramittelstaedt@jonesday.com
9   Roy A. Katriel rak@katriellaw.com
    Thomas J. Kennedy tkennedy@murrayfrank.com
10  Tracy Strong tstrong@jonesday.com

11

12

13  **Dated:  May 15, 2009**                    **Richard W. Wieking, Clerk**

14                                              **By:   /s/ JW Chambers                    **
                                                    **Elizabeth Garcia**
15                                                  **Courtroom Deputy**

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

# EXHIBIT 11

1   Robert A. Mittelstaedt #060359
    David C. Kiernan #215335
2   Michael T. Scott #255282
    JONES DAY
3   555 California Street, 26th Floor
    San Francisco, CA 94104
4   Telephone:    (415) 626-3939
    Facsimile:    (415) 875-5700
5   ramittelstaedt@jonesday.com
    dkiernan@jonesday.com
6

7

8   Attorneys for Defendant
    APPLE INC.

9
                      UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11

12
    **THE APPLE iPOD iTUNES ANTI-TRUST**          **Case No. C 05-0037 JW(RS)**
13  **LITIGATION**

14                                                **CLASS ACTION:**

15
    This Document Relates to:                     **DEFENDANT APPLE INC.'S**
16                                                **RESPONSE TO PLAINTIFFS'**
                                                  **AMENDED FIRST SET OF**
17        ALL ACTIONS.                            **REQUESTS FOR PRODUCTION OF**
                                                  **DOCUMENTS**
18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Federal Rule of Civil Procedure 34, Apple Inc. ("Apple") hereby responds and

2    objects to Plaintiffs' Amended First Set of Requests for Production of Documents ("Document

3    Requests") served May 22, 2009.  Pursuant to the agreement reached by the parties, this response

4    is timely.  The parties are continuing to negotiate the appropriate scope of the Document Requests,

5    and Apple is hopeful that an acceptable compromise will be reached.  Depending on the course of

6    continuing negotiations, Apple reserves the right to revise or supplement these responses.

7                                   **GENERAL OBJECTIONS**

8    Apple asserts the following general objections.  Each individual response is subject to, and

9    is limited in accordance with, the following General Objections.

10    1.    Apple will conduct a diligent search of its files that is reasonable under the

11    circumstances, and it will produce non-privileged documents in its possession, custody and

12    control, if any, in accordance with its Responses to each individually numbered Request.

13    2.    Apple reserves the right to object on any ground, including authenticity and

14    admissibility, to the use of these responses or any documents produced pursuant to these

15    responses for any purpose in this action, including at trial.

16    3.    No admission of any kind is to be implied or inferred from these responses.  The

17    fact that any Document Request has been responded to is not an admission or concession of the

18    existence of any facts set forth or assumed by such Document Request or that the response

19    constitutes evidence of any fact set forth or assumed.  Moreover, any agreement to produce

20    documents responsive to a particular Document Request does not imply that responsive

21    documents exist.

22    4.    Apple objects to the "Definitions," "Instructions," and each Document Request to

23    the extent that they seek to impose obligations beyond those imposed by the Federal Rules of

24    Civil Procedure, Local Rules of this Court or any order entered by the Court in this action.

25    5.    Apple objects to each Document Request to the extent that it calls for the

26    production of documents or information protected by the attorney-client privilege, the attorney

27    work product doctrine, the joint defense privilege, the common interest doctrine or any other

28    applicable privilege or doctrine.  No such documents or information will be produced, and any

1    inadvertent production shall not be deemed a waiver of any privilege or protection.  For purposes

2    of responding to plaintiffs' Document Requests, Apple will refer to this objection as the

3    "Privilege Objection."

4        6.        Apple objects to this discovery to the extent it purports to require Apple to disclose

5    trade secrets, proprietary information, other confidential commercial information or sensitive

6    information.  This objection will hereafter be referred to as the "Confidential Information

7    Objection."

8        7.        Apple objects to this discovery to the extent that the terms used are so amorphous

9    and overbroad that they either make the request if literally read so overbroad and burdensome as

10   to be unreasonable and beyond the bounds of relevance and/or make it difficult for Apple to

11   ascertain, with specificity sufficient to allow defendant to conduct a search, what materials

12   plaintiff is seeking.  This objection will hereafter be referred to as the "Vague and Ambiguous

13   Objection."

14       8.        Apple objects to this discovery to the extent the scope of the requests is overbroad

15   and burdensome.  This occurs when the discovery seeks information that is not reasonably

16   calculated to lead to the discovery of admissible evidence or where the burden of producing the

17   requested material far outweighs its relevance to the claims or defenses or the benefit to plaintiffs.

18   Apple further objects to each Document Request to the extent that it requests "all" documents

19   ever created, sent to, received or used by Apple regardless of their materiality and relevance, as

20   such requests are overbroad and unduly burdensome.  Apple will produce non-privileged

21   documents located after searching custodian files mostly likely to contain a substantial number of

22   relevant documents.  This objection will hereafter be referred to as the "Burden Objection."

23       9.        Apple objects to the burden associated with producing "all" documents when in

24   many instances documents "sufficient to show" representative, responsive information will

25   mitigate any undue burden and costs a request would otherwise impose on Apple.  Apple is

26   prepared to meet-and-confer to agree on the aspects of these requests that can be satisfied by a

27   "sufficient to show" production.  Apple will refer to this objection as the "'Sufficient to Show'

28   Objection."  Apple's production will be on a "Sufficient to Show" basis wherever this objection is

1   made, unless the parties agree otherwise.

2       10.    Apple objects to this discovery to the extent it imposes on Apple an obligation to

3   search for and produce materials unrelated to the geographic scope at issue in this case. For

4   example, Apple will not produce information or documents discussing any geographic regions

5   outside the United States. This objection will hereafter be referred to as the "Geographic

6   Location Objection."

7       11.    Apple objects to the extent that this discovery violates the applicable procedural

8   statutes or rules to the extent that it is compound, conjunctive or disjunctive, resulting in

9   plaintiff's disguising the true amount of discovery they are taking and makes the call of the

10  request for production misleading or impossible to ascertain. This objection will hereafter be

11  referred to as the "Compound Objection."

12      12.    By responding to a Document Request with a defined term, Apple is not by

13  implication agreeing with any such definition.

14      13.    Apple objects to the definition of "Apple" as overbroad and ambiguous.

15  Defendants will interpret "Apple" to be a reference to Apple Inc. and its relevant U.S. activities.

16      14.    Apple objects to the definition of "Communications" as overbroad and

17  burdensome, especially to the extent it seeks to incorporate communications in which neither

18  Apple nor its agents participated and that are available to plaintiffs through other means.

19      15.    Apple objects to the definition of "Concerning" as overbroad and burdensome.

20  Apple will interpret "concerning" to have its ordinary, common sense meaning.

21      16.    Apple objects to the definition of "Digital audio file" as overbroad, unduly

22  burdensome, and oppressive. Apple further objects to the definition to the extent it seeks

23  documents that are not relevant to the claims or defenses in this action or not reasonably

24  calculated to lead to the discovery of admissible evidence. Apple will interpret "Digital audio

25  file" to mean digital music files.

26      17.    Apple objects to the definition of "Documents" and "Electronic Data" as

27  overbroad and burdensome. Subject to its objections, Apple will interpret "Documents" and

28  "Electronic Data" to have the same meaning as the reference to "documents" and "electronically

1    stored information," respectively, set forth in Federal Rule of Civil Procedure 34.

2        18.    Apple objects to each Document Request to the extent "Documents" is defined to

3    include electronically stored information or "Electronic Data" without a reasonable limitation as

4    to scope of custodians, location of data, date, file type, and search terms.  Apple will meet and

5    confer with plaintiffs regarding a cost-effective method of identifying and producing

6    electronically stored information, including without limitation the use of search terms and

7    deduplication and reasonable limitations as to custodians, location of data, date, and file type.

8    Apple will produce electronically stored information pursuant to the terms of the Stipulation and

9    Order Governing Electronic Discovery Formats entered in this action.  Consistent with Federal

10   Rule of Civil Procedure 34(b)(2)(E)(iii), the electronically stored information will only be

11   produced in one form.  Apple will refer to this as the "E-Discovery Objection."

12       19.    Apple objects to the definition of "Financial statements" as overbroad, unduly

13   burdensome, vague, and ambiguous.  Apple will interpret "Financial statements" to include

14   audited or unaudited balance sheets, income statements, and cash flow statements.

15       20.    Apple objects to the definition of "iPod" to the extent that it includes iPhone as

16   overbroad and unduly burdensome, as any relevancy is clearly outweighed by the undue burden

17   involved in identifying, reviewing, and producing the detailed discovery requested.  Apple will

18   interpret "iPod" to exclude the iPhone.

19       21.    Apple objects to the definition of "Labels" as overbroad, burdensome, vague, and

20   ambiguous to the extent it purports to include entities that may not be known or readily

21   identifiable by Apple.

22       22.    Apple objects to the definition of "Online music store" as overbroad, burdensome,

23   vague, and ambiguous to the extent it purports to include stores that may not be known or readily

24   identifiable by Apple.

25       23.    Apple objects to the definition of "Portable digital media player" as overbroad,

26   burdensome, vague, and ambiguous to the extent it purports to include players that may not be

27   known or readily identifiable by Apple.

28       24.    Apple objects to the definitions that are not incorporated into the Document

1   Requests as vague and ambiguous.  Apple is not relying upon them in its responses.

2       25.   Apple objects to the third and fifth instructions to the extent they purport to impose

3   on Apple a greater obligation than Federal Rule of Civil Procedure 34.  Apple will comply with

4   Rule 34.  In response to these Document Requests, Apple will produce copies of documents in its

5   possession, custody or control.  In addition, Apple will produce electronically stored information

6   pursuant to the terms of the Stipulation and Order Governing Electronic Discovery Formats

7   entered in this action.

8       26.   Apple objects to the sixth and eighth instructions to the extent they purport to

9   impose on Apple a greater obligation than the Federal Rules of Civil Procedure.  Apple will

10  comply with Rule 26(b)(5).  Apple will not include on the privilege log documents prepared by

11  in-house counsel or outside counsel for Apple during the course of this litigation and asserts

12  privilege and work product as to all such documents that have not been communicated to anyone

13  outside of Apple or Jones Day or that were created as part of attorney work product.

14      27.   Apple objects to the seventh and ninth instructions to the extent they purport to

15  impose on Apple a greater obligation than Federal Rule of Civil Procedure 34.  Apple will

16  comply with Rule 34.

17      28.   Apple objects to the eighth instruction to the extent it purports to impose on Apple

18  a greater obligation than Federal Rule of Civil Procedure 34.  Subject to the objections set forth

19  regarding the privilege log, Apple will comply with Rule 34.

20      29.   Apple objects to the tenth instruction to the extent it purports to impose on Apple a

21  greater obligation than Federal Rule of Civil Procedure Rule 26(e).  Apple will comply with Rule

22  26(e).

23      30.   Apple objects to the instruction that responsive documents be made available for

24  inspection at the office of Coughlin Stoia Geller Rudman & Robbins LLP, 655 West Broadway,

25  Suite 1900, San Diego, California 92101.  Apple will make documents available for inspection at

26  Jones Day's offices in San Francisco, California after the scope of these requests is established by

27  agreement of the parties or order of the Court so that Apple does not need to make duplicative

28  searches.  Apple is willing to meet-and-confer about the logistics for transport of responsive

1    documents to Coughlin Stoia, at plaintiffs' expense.

2                            **RELEVANT TIME PERIOD**

3         Apple objects to the "Relevant Time Period" defined by plaintiffs as overbroad, unduly

4    burdensome, and oppressive, and seeking information that is not relevant to the claims or

5    defenses in this action or not reasonably calculated to lead to the discovery of admissible

6    evidence.  Apple will treat the relevant time period as April 28, 2003 through March 31, 2009.

7    Apple will produce responsive documents created or dated on or after April 1, 2002 to account for

8    activity relating to the launch of the iTunes Music Store.

9                   **SPECIFIC RESPONSES TO DOCUMENT REQUESTS**

10   **DOCUMENT REQUEST NO. 1:**

11        All documents concerning or discussing the market for Apple's iPods in the United States.

12   **RESPONSE TO DOCUMENT REQUEST NO. 1:**

13        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

14   Sufficient to Show, and E-Discovery objections.  Apple objects to the term "concerning" as vague,

15   ambiguous, overbroad, and unduly burdensome.  Apple further objects to the term "market" as

16   undefined, vague, ambiguous, overbroad, and unduly burdensome.  Apple further objects to the

17   term "market" to the extent that it is intended to refer to a legal or expert opinion or conclusion

18   relating to the relevant antitrust product market.  Such a request is premature, as the scope of the

19   relevant market will be the subject of expert discovery.

20        Subject to and without waiving these objections and the General Objections, Apple will

21   produce non-privileged documents that contain substantial discussion of competition for iPods in

22   the United States, if any, located after searching custodian files mostly likely to contain a

23   substantial number of relevant documents.

24   **DOCUMENT REQUEST NO. 2:**

25        All documents concerning or discussing the market for digital video files purchased from

26   Apple's iTunes store in the United States.

27   **RESPONSE TO DOCUMENT REQUEST NO. 2:**

28        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

1  Sufficient to Show, and E-Discovery objections.  Apple objects to the term "concerning" as vague,

2  ambiguous, overbroad, and unduly burdensome.  Apple objects to the term "market" as undefined,

3  vague, ambiguous, overbroad, and unduly burdensome.  Apple further objects to the term

4  "market" to the extent that it is intended to refer to a legal or expert opinion or conclusion relating

5  to the relevant antitrust product market.  Such a request is premature, as the scope of the relevant

6  market will be the subject of expert discovery.

7         Subject to and without waiving these objections and the General Objections, Apple will

8  produce non-privileged documents that contain substantial discussion of competition for digital

9  video files purchased from Apple's iTunes Store in the United States, if any, located after

10  searching custodian files mostly likely to contain a substantial number of relevant documents.

11  **DOCUMENT REQUEST NO. 3:**

12         All documents concerning or discussing the market for digital audio files purchased from

13  Apple's iTunes store in the United States.

14  **RESPONSE TO DOCUMENT REQUEST NO. 3:**

15         Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

16  Sufficient to Show, and E-Discovery objections.  Apple objects the to term "concerning" as vague,

17  ambiguous, overbroad, and unduly burdensome.  Apple objects to the term "market" as undefined,

18  vague, ambiguous, overbroad, and unduly burdensome.  Apple further objects to the term

19  "market" to the extent that it is intended to refer to a legal or expert opinion or conclusion relating

20  to the relevant antitrust product market.  Such a request is premature, as the scope of the relevant

21  market will be the subject of expert discovery.

22         Subject to and without waiving these objections and the General Objections, Apple will

23  produce non-privileged documents that contain substantial discussion of competition for digital

24  music files purchased from Apple's iTunes Store in the United States, if any, located after

25  searching custodian files mostly likely to contain a substantial number of relevant documents.

26  **DOCUMENT REQUEST NO. 4:**

27         All documents discussing the Digital Millennium Copyright Act.

28  **RESPONSE TO DOCUMENT REQUEST NO. 4:**

1    Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

2    and E-Discovery objections.  Apple further objects that documents discussing the Digital

3    Millennium Copyright Act are not relevant to the claims or defenses in this action and thus are

4    beyond the scope of permissible discovery.

5    **DOCUMENT REQUEST NO. 5:**

6         All documents concerning, analyzing or discussing Apple's use of a DRM other than

7    FairPlay.

8    **RESPONSE TO DOCUMENT REQUEST NO. 5:**

9         Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

10   Geographic Location Objection, and E-Discovery objections.  Apple objects to the term

11   "concerning" as vague, ambiguous, overbroad, and unduly burdensome.  Apple further objects to

12   this request to the extent that it requests documents relating to Apple's use of DRM that is not

13   relevant to the claims or defenses in this action as such documents are beyond the scope of

14   permissible discovery.

15        Subject to and without waiving these objections and the General Objections, Apple will

16   produce non-privileged documents that analyze Apple's use of a DRM other than FairPlay for

17   digital music or video files on iPods or sold on Apple's iTunes Store in the United States, if any,

18   located after searching custodian files mostly likely to contain a substantial number of relevant

19   documents.

20   **DOCUMENT REQUEST NO. 6:**

21        All communications between you and Microsoft concerning or discussing licensing or

22   royalty agreements and/or payments concerning media formats, including audio, image, and

23   video file formats, and all communications with Microsoft concerning digital music players

24   and/or DRM.

25   **RESPONSE TO DOCUMENT REQUEST NO. 6:**

26        Apple asserts the Vague and Ambiguous, Confidential Information, Burden, Geographic

27   Location, and E-Discovery objections.  Apple objects to the term "concerning" as vague,

28   ambiguous, overbroad, and unduly burdensome.  Apple further objects to this request to the

1    extent that it requests communications with Microsoft that are not relevant to the claims or

2    defenses in this action as such communications are beyond the scope of permissible discovery

3        Subject to and without waiving these objections and the General Objections, Apple will

4    produce communications between Apple and Microsoft that discuss digital music players, digital

5    music stores or DRM for digital music or video files, if any, located after searching custodian

6    files mostly likely to contain a substantial number of relevant documents.

7    **DOCUMENT REQUEST NO. 7:**

8        All communications between you and RealNetworks, Inc.; Archos S.A.; the companies

9    over the class period that have controlled Rio (including D&H Holdings U.S., Inc.); and Creative

10    Technologies Ltd., concerning the interoperability of music purchased from online music stores

11    other than iTunes store with the iPod and/or the interoperability of portable digital media players

12    other than iPods and audio and video files purchased from iTunes Store and documents

13    concerning, analyzing, or discussing these communications.

14    **RESPONSE TO DOCUMENT REQUEST NO. 7:**

15        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

16    Geographic Location, and E-Discovery objections.  Apple objects to the term "the companies

17    over the class period that have controlled Rio" as overbroad, burdensome, vague, and ambiguous,

18    as it purports to include entities that may not be known or readily identifiable by Apple.  Apple

19    further objects to the term "concerning" as vague, ambiguous, overbroad, and unduly burdensome.

20        Subject to and without waiving these objections and the General Objections, Apple will

21    produce communications with RealNetworks, Inc., Archos S.A., D&H Holdings U.S., Inc., or

22    Creative Technologies Ltd. that discuss the interoperability of music purchased from online music

23    stores with the iPod or the interoperability of portable digital media players other than iPods and

24    digital music or video files purchased from Apple's iTunes Store and documents analyzing these

25    communications, if any, located after searching custodian files mostly likely to contain a

26    substantial number of relevant documents.

27    **DOCUMENT REQUEST NO. 8:**

28        All documents and communications concerning Apple's request to license or agreement to

1  license DRM software, including the agreements themselves, and any request by any company to

2  license Apple's FairPlay DRM.

3  **RESPONSE TO DOCUMENT REQUEST NO. 8:**

4          Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

5  Geographic Location, and E-Discovery objections. Apple objects to the term "concerning" as

6  vague, ambiguous, overbroad, and burdensome.

7          Subject to and without waiving these objection and the General Objections, Apple will

8  produce non-privileged (i) documents or communications that discuss Apple's request to license

9  DRM or agreement to license DRM software, (ii) agreements to license DRM, and (iii) requests

10  by a company to license FairPlay, if any, located after searching custodian files mostly likely to

11  contain a substantial number of relevant documents.

12  **DOCUMENT REQUEST NO. 9:**

13          All documents concerning exporting, copying, burning, transferring, converting or

14  "ripping" of digital audio files from one audio format to another.  For example, the conversion of

15  AAC files to MP3 files.

16  **RESPONSE TO DOCUMENT REQUEST NO. 9:**

17          Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

18  and E-Discovery objections.  Apple objects to the term "concerning" as vague, ambiguous,

19  overbroad, and unduly burdensome.  Apple further objects to the terms "copying" or

20  "transferring" as vague and ambiguous and will interpret such terms to mean converting, burning

21  or ripping.  Apple objects to this request to the extent that it is duplicative of Document Request

22  No. 24 and incorporates by reference the objections set forth in response to that request.

23          Subject to and without waiving these objections and the General Objections, Apple will

24  produce non-privileged documents that discuss exporting, burning, converting or ripping digital

25  music files from one format to another format, if any, located after searching custodian files

26  mostly likely to contain a substantial number of relevant documents.

27  **DOCUMENT REQUEST NO. 10:**

28          Full copies of the spreadsheets for which excerpts were produced to Somtai Troy

1    Charoensak and marked APPLE CHAR 00059 TO APPLE CHAR 00066 and all documents used

2    in the production of these documents, including but not limited to all profit and loss statements

3    for all iPod models.

4    **RESPONSE TO DOCUMENT REQUEST NO. 10:**

5          Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

6    Geographic Location Objection, and E-Discovery objections.  Apple objects to the request to

7    produce "all documents used in the production of these documents" as vague, ambiguous,

8    overbroad, and unduly burdensome.

9          Subject to and without waiving these objections and the General Objections, Apple will

10   produce unredacted copies of the spreadsheets for which excerpts were produced to Somtai Troy

11   Charoensak and marked APPLE CHAR 00059 TO APPLE CHAR 00066.

12   **DOCUMENT REQUEST NO. 11:**

13         All documents and answers Apple produced, and all transcripts of depositions taken in

14   litigation or investigations involving iPod, iTunes and/or iTunes store brought by the

15   governments of France, Germany, Norway, Sweden, Finland, Denmark, the United Kingdom, the

16   European Union/European Commission, and the French consumer rights organization Union

17   Federale des Consommateurs Que Choisir.

18   **RESPONSE TO DOCUMENT REQUEST NO. 11:**

19         Apple asserts the Vague and Ambiguous, Confidential Information, and Burden

20   objections.  Moreover, Apple objects on the ground that Apple has already produced documents

21   responsive to this request subject to the objections set forth in Apple's Supplemental Response to

22   Request For Production No. 11 served August 17, 2007.  Apple incorporates by reference its

23   Supplemental Response to Request For Production No. 11 served August 17, 2007, and refers

24   Plaintiffs to letters dated August 17, 2007 and January 19, 2008, and to documents with bates

25   numbers AIIA 000012 - AIIA 000345 and AIIA 028761 - AIIA 029018.

26   **DOCUMENT REQUEST NO. 12:**

27         All documents that identify, describe or refer to any actual, prior or potential competitor

28   of Apple's iPod and digital audio and video files sold by iTunes store.

**RESPONSE TO DOCUMENT REQUEST NO. 12:**

Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Sufficient To Show, Burden, Geographic Location, and E-Discovery objections.  Apple objects to the terms "describe" and "refer" as vague, ambiguous, overbroad, and unduly burdensome.

Subject to and without waiving these objections and the General Objections, Apple will produce non-privileged documents sufficient to identify competitors of Apple's iPod or iTunes Store in the United States as competitors, if any, located after searching custodian files mostly likely to contain a substantial number of relevant documents.

**DOCUMENT REQUEST NO. 13:**

All documents analyzing, describing, estimating or projecting the past, present, future or projected market share of:

        (a)     iPod;

        (b)     online music files; and

        (c)     online video files.

**RESPONSE TO DOCUMENT REQUEST NO. 13:**

Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden, Geographic Location, and E-Discovery objections.  Apple objects to the term "describing" as vague, ambiguous, overbroad, and unduly burdensome.  Apple objects to the term "market share" as undefined, vague, ambiguous, overbroad, and unduly burdensome.  Apple further objects to the term "market share" to the extent that it is intended to refer to a legal or expert opinion or conclusion relating to the relevant antitrust product market.  Such a request is premature, as the scope of the relevant market will be the subject of expert discovery.

Subject to and without waiving these objections and the General Objections, Apple will produce non-privileged documents that analyze, estimate or project sales of iPods and online digital music and video files from Apple's iTunes Store in the United States compared to sales of other products in the United States, if any, located after searching custodian files mostly likely to contain a substantial number of relevant documents.

DEFENDANTS' RESPONSE TO
PLAINTIFFS' Am. RFPs  C 05-0037 JW(RS)

**DOCUMENT REQUEST NO. 14:**

All documents analyzing, describing, estimating or projecting your sales in the United States of:

        (a)    iPod;

        (b)    online music files; and

        (c)    online video files.

**RESPONSE TO DOCUMENT REQUEST NO. 14:**

Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden, and E-Discovery objections. Apple objects to the term "describing" as vague, ambiguous, overbroad, and unduly burdensome.

Subject to and without waiving these objections and the General Objections, Apple will produce non-privileged documents that analyze, estimate or project sales of iPods and online digital music and video files from Apple's iTunes Store in the United States, if any, located after searching custodian files mostly likely to contain a substantial number of relevant documents.

**DOCUMENT REQUEST NO. 15:**

All documents concerning the actual or potential impact on your iPod and/or iTunes audio and video market shares, sales or profits in the United States resulting from the introduction, modification, changes to the terms of use for, changes to the pricing, employment or maintenance of FairPlay DRM.

**RESPONSE TO DOCUMENT REQUEST NO. 15:**

Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden, and E-Discovery objections. Apple objects to the term "concerning" as vague, ambiguous, overbroad, and unduly burdensome. Apple objects to the term "market share" as undefined, vague, ambiguous, overbroad, and unduly burdensome. Apple further objects to the term "market share" to the extent that it is intended to refer to a legal or expert opinion or conclusion relating to the relevant antitrust product market. Such a request is premature, as the scope of the relevant market will be the subject of expert discovery.

Subject to and without waiving these objections and the General Objections, Apple will

1   produce non-privileged documents that analyze the impact of FairPlay DRM on (1) the sales of

2   iPods or digital music and video files from Apple's iTunes Store in the United States, (2) profits,

3   or (3) the sales of iPods and digital music and video files from Apple's iTunes Store in the United

4   States compared to sales of competitors of iPods and other products in the United States, if any,

5   located after searching custodian files mostly likely to contain a substantial number of relevant

6   documents.

7   **DOCUMENT REQUEST NO. 16:**

8        All documents concerning the actual or potential impact on your market share, sales or

9   profits in the United States resulting from any restriction or limitation on the compatibility of

10  audio files or video files protected by Apple's FairPlay DRM with any portable digital media

11  player other than iPod.

12  **RESPONSE TO DOCUMENT REQUEST NO. 16:**

13       Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

14  and E-Discovery objections. Apple objects to the term "concerning" as vague, ambiguous,

15  overbroad, and unduly burdensome. Apple objects to the term "market share" as undefined,

16  vague, ambiguous, overbroad, and unduly burdensome. Apple further objects to the term "market

17  share" to the extent that it is intended to refer to a legal or expert opinion or conclusion relating to

18  the relevant antitrust product market. Such a request is premature, as the scope of the relevant

19  market will be the subject of expert discovery.

20       Subject to and without waiving these objections and the General Objections, Apple will

21  produce non-privileged documents that analyze the impact of FairPlay DRM on (1) the sales of

22  iPods or digital music and video files from Apple's iTunes Store in the United States, (2) profits,

23  or (3) the sales of iPods and digital music and video files from Apple's iTunes Store in the United

24  States compared to sales of competitors of iPods and other products in the United States, if any,

25  located after searching custodian files mostly likely to contain a substantial number of relevant

26  documents.

27  **DOCUMENT REQUEST NO. 17:**

28       All documents reflecting or constituting any internal communications concerning the

1    licensing or sharing of FairPlay DRM.

2    **RESPONSE TO DOCUMENT REQUEST NO. 17:**

3         Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

4    and E-Discovery objections.  Apple objects to the terms "reflecting," "concerning," and "sharing"

5    as vague, ambiguous, overbroad, and unduly burdensome.

6         Subject to and without waiving these objections and the General Objections, Apple will

7    produce non-privileged communications between or among Apple personnel that analyze

8    licensing of FairPlay DRM, if any, located after searching custodian files mostly likely to contain

9    a substantial number of relevant documents.

10    **DOCUMENT REQUEST NO. 18:**

11         All documents reflecting or constituting any internal communications concerning the

12    compatibility (or lack thereof) of files protected by Apple's FairPlay DRM with other file formats

13    or any portable digital media player other than iPod.

14    **RESPONSE TO DOCUMENT REQUEST NO. 18:**

15         Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

16    and E-Discovery objections.  Apple objects to the terms "reflecting" and "concerning" as vague,

17    ambiguous, overbroad, and unduly burdensome.

18         Subject to and without waiving these objections and the General Objections, Apple will

19    produce non-privileged communications between or among Apple personnel that analyze the

20    compatibility of digital music or video files protected by Apple's FairPlay DRM with any

21    portable digital media player other than iPod, if any, located after searching custodian files mostly

22    likely to contain a substantial number of relevant documents.

23    **DOCUMENT REQUEST NO. 19:**

24         All documents reflecting or constituting any internal communications concerning the

25    actual, anticipated or potential actions of any actual or potential competitor of the iPod or iTunes

26    store.

27    **RESPONSE TO DOCUMENT REQUEST NO. 19:**

28         Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

1   Geographic Location, and E-Discovery objections. Apple objects to the terms "reflecting" and

2   "concerning" as vague, ambiguous, overbroad, and unduly burdensome. Apple further objects to

3   producing all communications relating to actions of competitors to the extent it requests

4   communications that are not relevant to the claims or defenses in this action and thus are beyond

5   the scope of permissible discovery.

6        Subject to and without waiving these objections and the General Objections, Apple will

7   produce non-privileged communications between or among Apple personnel that analyze a

8   United States competitor's actual, anticipated or potential actions relating to DRM in response to

9   the iPod or Apple's iTunes Store, if any, located after searching custodian files mostly likely to

10   contain a substantial number of relevant documents.

11   **DOCUMENT REQUEST NO. 20:**

12        All documents analyzing, describing, estimating or projecting the impact on your market

13   share or sales in the United States resulting from the licensing of Apple's FairPlay DRM to third

14   parties.

15   **RESPONSE TO DOCUMENT REQUEST NO. 20:**

16        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

17   and E-Discovery objections. Apple objects to the term "describing" as vague, ambiguous,

18   overbroad, and unduly burdensome. Apple objects to the term "market share" as undefined,

19   vague, ambiguous, overbroad, and unduly burdensome. Apple further objects to the term "market

20   share" to the extent that it is intended to refer to a legal or expert opinion or conclusion relating to

21   the relevant antitrust product market. Such a request is premature, as the scope of the relevant

22   market will be the subject of expert discovery.

23        Subject to and without waiving these objections and the General Objections, Apple will

24   produce non-privileged documents that analyze, estimate or project the impact of licensing

25   FairPlay DRM to third parties on (1) the sales of iPods or digital music and video files from

26   Apple's iTunes Store in the United States or (2) the sales of iPods and digital music and video

27   files from Apple's iTunes Store in the United States compared to sales of competitors of iPods

28   and other products in the United States, if any, located after searching custodian files mostly

1    likely to contain a substantial number of relevant documents.

2    **DOCUMENT REQUEST NO. 21:**

3        All documents analyzing, describing, estimating or projecting the impact on your market

4    share or sales in the United States resulting from any measures that would make iPods

5    interoperable with digital audio files protected by means other than Apple's FairPlay DRM.

6    **RESPONSE TO DOCUMENT REQUEST NO. 21:**

7        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

8    and E-Discovery objections. Apple objects to the term "describing" and "measures" as vague,

9    ambiguous, overbroad, and unduly burdensome. Apple objects to the term "market share" as

10   undefined, vague, ambiguous, overbroad, and unduly burdensome. Apple further objects to the

11   term "market share" to the extent that it is intended to refer to a legal or expert opinion or

12   conclusion relating to the relevant antitrust product market. Such a request is premature, as the

13   scope of the relevant market will be the subject of expert discovery.

14       Subject to and without waiving these objections and the General Objections, Apple will

15   produce non-privileged documents that analyze, estimate or project the impact of iPod

16   interoperability with digital audio files protected by means other than FairPlay DRM on (1) the

17   sales of iPods or (2) the sales of iPods compared to sales of competitors of iPods in the United

18   States, if any, located after searching custodian files mostly likely to contain a substantial number

19   of relevant documents.

20   **DOCUMENT REQUEST NO. 22:**

21       All documents analyzing, describing, estimating or projecting the impact on your market

22   share or sales in the United States resulting from any measures that would make digital audio files

23   purchased from iTunes Store interoperable with any portable digital media player other than iPod.

24   **RESPONSE TO DOCUMENT REQUEST NO. 22:**

25       Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

26   and E-Discovery objections. Apple objects to the term "describing" and "measures" as vague,

27   ambiguous, overbroad, and unduly burdensome. Apple objects to the term "market share" as

28   undefined, vague, ambiguous, overbroad, and unduly burdensome. Apple further objects to the

1   term "market share" to the extent that it is intended to refer to a legal or expert opinion or

2   conclusion relating to the relevant antitrust product market.  Such a request is premature, as the

3   scope of the relevant market will be the subject of expert discovery.

4          Subject to and without waiving these objections and the General Objections, Apple will

5   produce non-privileged documents that analyze, estimate or project the impact of using a DRM

6   other than FairPlay DRM on (1) the sales of digital music files from Apple's iTunes Store in the

7   United States or (2) the sales of digital music files from Apple's iTunes Store in the United States

8   compared to sales of other products in the United States, if any, located after searching custodian

9   files mostly likely to contain a substantial number of relevant documents.

10  **DOCUMENT REQUEST NO. 23:**

11         Documents sufficient to allow the calculation for each quarter since the introduction of the

12  iPod for each model of iPod that Apple has sold in the United States, the number of iPods that

13  have been purchased, Apple's total revenue from sales of each iPod model, and Apple's cost of

14  manufacturing and cost of sales for each model of iPod.

15  **RESPONSE TO DOCUMENT REQUEST NO. 23:**

16         Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

17  and E-Discovery objections.  Apple objects to the term "cost of sales" as undefined, vague,

18  ambiguous, overbroad, and unduly burdensome.  Apple further objects to this request to the

19  extent that it seeks information produced in response to Plaintiffs' Interrogatories.

20         Subject to and without waiving these objections and the General Objections, Apple will

21  produce non-privileged documents sufficient to allow the calculation for each quarter since

22  January 1, 2003 for each model of iPod (i) the number of iPods sold, (ii) Apple's total revenue

23  from those sales, and (iii) Apple's "cost of manufacturing" for each model of iPod sold, if any,

24  located after searching custodian files mostly likely to contain a substantial number of relevant

25  documents.

26  **DOCUMENT REQUEST NO. 24:**

27         All complaints and other correspondence from individuals Apple has received regarding

28  the lack of interoperability of iTunes audio and video files with non-Apple digital media players,

SFI-613397v1

- 19 -

DEFENDANTS' RESPONSE TO
PLAINTIFFS' Am. RFPs C 05-0037 JW(RS)

1  the iPod and non-Apple audio and video file formats concerning FairPlay DRM and any

2  summaries or analysis of such complaints.

3  **RESPONSE TO DOCUMENT REQUEST NO. 24:**

4        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

5  and E-Discovery objections.  Apple objects to the term "regarding" and "concerning" as vague,

6  ambiguous, overbroad, and unduly burdensome.  Apple further objects that, after meeting and

7  conferring with Plaintiffs' counsel, Apple produced over 86,000 pages of documents responsive

8  to this request.  The burden of collecting, reviewing, and producing additional responsive

9  documents, if any, far outweighs the benefit, if any, to plaintiffs of further production.

10  **DOCUMENT REQUEST NO. 25:**

11        All documents concerning RealNetworks Harmony Technology, which according to

12  RealNetworks "enables consumers to securely transfer purchased music to every popular secure

13  music device" and "frees consumers from the limitation of being locked into a specific portable

14  device when they buy digital music."

15  **RESPONSE TO DOCUMENT REQUEST NO. 25:**

16        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

17  and E-Discovery objections.  Apple objects to the term "concerning" as vague, ambiguous,

18  overbroad, and unduly burdensome.

19        Subject to and without waiving these objections and the General Objections, Apple will

20  produce non-privileged documents that contain substantial discussion of or analyze Apple's

21  response to RealNetworks Harmony Technology, if any, located after searching custodian files

22  mostly likely to contain a substantial number of relevant documents.

23  **DOCUMENT REQUEST NO. 26:**

24        All personnel charts, related personnel listing, indices or directories, organizational charts

25  and documents retention policies produced, compiled or dated after January 1, 2000.

26  **RESPONSE TO DOCUMENT REQUEST NO. 26:**

27        Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

28  and E-Discovery objections.  Moreover, Apple objects to the request on the ground that the

1    parties agreed previously to limit this request to certain organization charts and document

2    retention policies (*see, e.g.*, B. Sweeney 5/24/2007 letter to B. Mittlestaedt). Subject to those

3    agreements and Apple's objections set forth in Apple's Supplemental Response to Request For

4    Production No. 20 served August 17, 2007, Apple produced documents responsive to this request.

5    Apple incorporates by references its Supplemental Response to Request For Production No. 22

6    served August 17, 2007 and refers Plaintiffs to those productions with bates numbers AIIA

7    0000012 – AIIA 0000086.

8    **DOCUMENT REQUEST NO. 27:**

9        All versions of the iTunes Store Terms of Service Agreements that were in effect during

10   any portion of the time period from April 28, 2003 to the present, as well as all versions of any

11   documents setting forth policies, practices, licenses and/or agreements applicable to the use of the

12   iTunes store by consumers in the United States during the period April 28, 2003 to the present.

13   **RESPONSE TO DOCUMENT REQUEST NO. 27:**

14       Apple asserts the Vague and Ambiguous, Privilege, Confidential Information, Burden,

15   Geographic Location, and E-Discovery objections. Apple objects to this request on the ground

16   that it has already produced to Plaintiffs' counsel documents responsive to this request. Apple

17   refers Plaintiffs to CHAR 000001 – CHAR 000058 and Apple SOM0007607 – Apple

18   SOM0007756.

19   **DOCUMENT REQUEST NO. 28:**

20       Documents sufficient to show the number of digital audio files sold by iTunes store in the

21   United States during the period April 28, 2003 to the present.

22   **RESPONSE TO DOCUMENT REQUEST NO. 28:**

23       Apple asserts the Confidential Information and Burden objections. Apple objects on the

24   ground that it has already produced information responsive to this request. Apple further objects

25   to this request to the extent that it seeks information that has been provided in response to other

26   discovery, including interrogatories.

27       Subject to and without waiving these objections and the General Objections, Apple will

28   produce non-privileged documents sufficient show the number of digital music files sold by

1    Apple's iTunes Store in the United States during the period April 28, 2003 to the present, if any,

2    located after searching custodian files mostly likely to contain a substantial number of relevant

3    documents.

4    **DOCUMENT REQUEST NO. 29:**

5        For each different model of iPod sold by Apple, documents sufficient to show the number

6    of iPod units sold directly by Apple in the United States during the period April 28, 2003 to the

7    present.

8    **RESPONSE TO DOCUMENT REQUEST NO. 29:**

9        Apple asserts the Vague and Ambiguous, Confidential Information, and Burden

10   objections. Apple objects on the ground that it has already produced information responsive to

11   this request. Apple objects to the phrase "sold directly" as undefined, vague, and ambiguous.

12   Apple further objects to this request to the extent that it seeks information that has been provided

13   in response to other discovery, including interrogatories.

14       Subject to and without waiving these objections and the General Objections, for each

15   model of iPod sold by Apple, Apple will produce non-privileged documents sufficient to show

16   the number of iPods sold by Apple's retail and online stores in the United States from April 28,

17   2003 to the present, if any, located after searching custodian files mostly likely to contain a

18   substantial number of relevant documents.

19   **DOCUMENT REQUEST NO. 30:**

20       Documents sufficient to show the number of consumers in the United States who have

21   purchased one or more digital audio or video files from iTunes store and downloaded the file(s)

22   onto an iPod during the period April 28, 2003 to the present.

23   //

24   //

25   //

26   //

27   //

28   //

1  **RESPONSE TO DOCUMENT REQUEST NO. 30:**

2       Apple asserts the Confidential Information and Burden objections.

3       Subject to and without waiving these objections and the General Objections, Apple

4  responds that it is unaware of any such documents.

5

6

7  Dated: July 20, 2009                JONES DAY

8

9  By: Michael T. Scott

               Michael T. Scott

10                 Attorneys for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Robert A. Mittelstaedt #060359
    Craig E. Stewart #129530
2   JONES DAY
    555 California Street, 26th Floor
3   San Francisco, CA 94104
    Telephone:    (415) 626-3939
4   Facsimile:    (415) 875-5700
    ramittelstaedt@jonesday.com
5   cestewart@jonesday.com

6   Attorneys for Defendant
    APPLE INC.
7

8                UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                    SAN JOSE DIVISION

11

12  **THE APPLE iPOD iTUNES ANTI-**        **Case Nos. C 05 00037 JW**
    **TRUST LITIGATION**                             **C 06-04457 JW**
13
                                          **CERTIFICATE OF SERVICE**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          PROOF OF SERVICE
                                          Case No. C-07-6507 JW

## PROOF OF SERVICE

I, Elizabeth Evans, declare:

I am a citizen of the United States and employed in San Francisco County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 555 California Street, 26th Floor, San Francisco, California 94104. On _____, I served a copy of the within document(s):

**DEFENDANT APPLE INC.'S RESPONSE TO PLAINTIFFS' AMENDED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☐    by placing the document(s) listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a agent for delivery.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒    by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

SEE ATTACHED SERVICE LIST

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 20, 2009, at San Francisco, California.

_Elizabeth Evans_
Elizabeth Evans

PROOF OF SERVICE
Case No. C-07-6507 JW

1

## SERVICE LIST

2    **Attorneys for Plaintiffs:**

3    Bonny E. Sweeney                             Roy A. Katriel
     Thomas R. Merrick                            The Katriel Law Firm, P.C.
     Coughlin Stoia Geller Rudman & Robbins LLP   1101 30th Street, NW, Suite 500
4    655 West Broadway, Suite 1900                Washington, DC 20007
     San Diego, CA 92101                          rak@katriellaw.com
5    bonnys@csgrr.com

6    Andrew S. Friedman                           Michael D. Braun
     Francis J. Balint, Jr.                       Braun Law Group
7    Elaine A. Ryan                               10680 West Pico Boulevard, Suite 280
     Todd D. Carpenter                            Los Angeles, CA 90064
8    Bonnett Fairbourn Friedman & Balint PC       mdb@braunlawgroup.com
     2901 North Central Avenue, Suite 1000
9    Phoenix, AZ 85012
     afriedman@bffb.com
10   fbalint@bffb.com
     eryan@bffb.com
11   tcarpenter@bffb.com

12   Brian P. Murray                              Marc Godino
     Jacqueline Sailer                            Glancy Binkow & Goldberg LLP
13   Murray Frank & Sailer LLP                    1801 Avenue of the Stars, Suite 311
     275 Madison Avenue, Suite 801                Los Angeles, CA 90067
14   New York, NY 10016                           mgodino@glancylaw.com
15   bmurray@murrayfrank.com
     jsailer@murrayfrank.com
16

17

18   **Attorneys for Plaintiff Stacie Somers:**
     Helen I. Zeldes                              Steven A. Skalet
19   Alreen Haeggquist                            Craig L. Briskin
     Zeldes & Haeggquist LLP                      Mehri & Skalet PLLC
20   625 Broadway, Suite 906                      1250 Connecticut Ave., NW, Suite 300
     San Diego, CA 92101                          Washington, DC 20036
21   helenz@zhlaw.com                             sskalet@findjustice.com
     alreenh@zhlaw.com                            cbriskin@findjustice.com
22

23
     SFI-591125v2
24

25

26

27

28

                                          PROOF OF SERVICE
                                          Case No. C-07-6507 JW

# EXHIBIT 12

1  COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  JOHN J. STOIA, JR. (141757)
   BONNY E. SWEENEY (176174)
3  THOMAS R. MERRICK (177987)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   johns@csgrr.com
6  bonnys@csgrr.com
   tmerrick@csgrr.com
7
   THE KATRIEL LAW FIRM
8  ROY A. KATRIEL (*pro hac vice*)
   1101 30th Street, N.W., Suite 500
9  Washington, DC  20007
   Telephone:  202/625-4342
10 202/330-5593 (fax)
   rak@katriellaw.com
11
   Co-Lead Counsel for Plaintiffs
12
   [Additional counsel appear on signature page.]
13
                    UNITED STATES DISTRICT COURT
14
                   NORTHERN DISTRICT OF CALIFORNIA
15
                          SAN JOSE DIVISION
16

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | Lead Case No. C-05-00037-JW(RS) |
| | CLASS ACTION |
| This Document Relates To: | PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PLAINTIFFS' RULE OF REASON TYING CLAIM |
| ALL ACTIONS. | |
| | Judge: Hon. James Ware |
| | Date:  October 5, 2009 |
| | Time:  9:00 a.m. |
| | Ctrm:  8 – 4th Floor |

1    Plaintiffs Somtai Troy Charoensak, Mariana Rosen, and Melanie Tucker (collectively

2    "Plaintiffs") respectfully submit this memorandum in opposition to Defendant Apple, Inc.'s

3    ("Apple" or "Defendant") Motion for Judgment on the Pleadings as to Plaintiffs' Rule of Reason

4    Tying Claim ("Def's Motion").

5    **I.    INTRODUCTION**

6    While Apple would like to rely on the Court's dismissal of Plaintiffs' *per se* tying claim, it

7    glosses over the critical distinctions between the standards and policies underlying *per se*

8    prohibitions of anticompetitive conduct and those evaluated under the rule of reason. *Per se*

9    illegality is limited to those situations where the anticompetitive conduct is so obvious and

10   pernicious that the court is not required to undertake a specific analysis of the nature of the industry,

11   the markets and the pro- and anti competitive effects of the defendant's conduct. The rule of reason,

12   by contrast, allows for, and in fact requires, this type of fact-specific analysis. It is therefore

13   appropriately applicable to situations, such as this, where Plaintiffs allege a "technological tie," and a

14   more extensive analysis of the relevant markets and effects of the tie is necessary to determine

15   whether Defendant has acted anticompetitively to unreasonably restrain trade. The fact-specific

16   analysis required by the rule of reason can only be conducted after sufficient discovery and is thus

17   particularly inappropriate for a motion for judgment on the pleadings.

18   Plaintiffs have adequately pleaded a technological tie between Apple's iPod and iTMS audio

19   and video files that is well-suited for the rule of reason analysis. Plaintiffs have also sufficiently

20   pleaded both concerted action under settled Section 1 jurisprudence and the level of coercion

21   necessary to sustain a rule of reason tying claim. Despite Apple's attempt to immunize itself from

22   the antitrust laws, Plaintiffs have demonstrated that antitrust enforcement is crucially important in

23   cases such as this, to ensure that dominant companies do not abuse their market power to squelch

24   competition and innovation and ultimately harm consumers.

25

26

27

28

## II.    SUMMARY OF PLAINTIFFS' TYING CLAIMS

Plaintiffs allege that Apple, through its iTunes Music Store ("iTMS"), holds market power in the sale of digital audio and video files (collectively, "iTMS files"), which it exploited by tying the sale of iTMS files and the sale of iPods.  Complaint, ¶21.[1]  Apple achieved this technological tie by encrypting the iTMS files with digital rights management ("DRM") technology called "FairPlay," so that the iTMS files could be directly played only on the portable digital media players manufactured by Apple (collectively, "iPod").  *Id.*, ¶¶41-44.  Plaintiffs contend that Apple thereby necessarily constrained the iTMS customer's choice of portable digital media players.[2]  *Id.*  For the same reason, the only replacement for a broken iPod that can play an existing library of iTMS files is another iPod.  *Id.*, ¶44.  Apple acted to maintain the tie by issuing software updates designed specifically to destroy any possibility that competing manufacturers could sell a portable digital media player that was interoperable with iTMS files.  *Id.*, ¶¶51-55.  Plaintiffs allege that Apple's conduct deterred competition in the portable player market and allowed it to charge supracompetitive prices to *all* purchasers of iPods, including those who never purchased any iTMS files.  *Id.*, ¶¶22, 72, 73.

## III.    LEGAL STANDARD

Motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure "are functionally identical" to motions to dismiss under Rule 12(b)(6) and the standard for deciding them is the same.  *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989).  Judgment under Rule 12(c) "may only be granted when the pleadings show that it is 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"

---

[1]    *See* Consolidated Complaint for Violations of the Sherman Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumer Legal Remedies Act, and California Common Law of Monopolization, filed April 19, 2007 ("Complaint").

[2]    Despite the fact that Apple now offers FairPlay DRM free music files for sale on iTMS, purchasers with existing libraries of iTMS music files remain locked in.  The previously purchased music files remain encrypted with Apple's FairPlay unless the purchaser pays an additional $0.30 per music file to remove the existing DRM and "unlock" the file.  *See* Press Release, *Changes Coming    to    the    iTunes    Store* (Jan.  6,  2009),  available  at www.apple.com/pr/library/2009/01/06itunes.html (explaining that Apple charges $0.30 per audio file or 30% of the album price to remove its FairPlay DRM from previously purchased files).

1   *Enron Oil Trading & Transp. v. Walbrook Ins. Co.*, 132 F.3d 526, 529 (9th Cir. 1997) (quoting *B.F.*

2   *Goodrich v. Betkoski*, 99 F.3d 505, 529 (2d Cir. 1996)).  All allegations of material fact are taken as

3   true and construed in the light most favorable to the plaintiff.  *U.S. Philips Corp. v. Infodisc Tech.*

4   *USA, Inc.*, No. CV 04-10017 SVW (JTLx), 2005 WL 6141291, at *3 (C.D. Cal. June 28, 2005).

5   **IV.    PLAINTIFFS' TYING CLAIM CONSTITUTES A VIOLATION OF
        SECTION 1 UNDER THE RULE OF REASON ANALYSIS**

6

7        **A.    Plaintiffs' Tying Allegations Are Appropriately Evaluated Under the
                Rule of Reason**

8        Apple argues that the Court's order dismissing Plaintiffs' *per se* tying claim and the holding

9   of *Foremost Pro* require dismissal of Plaintiffs' rule of reason tying claim.  *See* Def's Motion at 4.

10  Both decisions were expressly limited to *per se* liability, and neither dealt with whether the type of

11  conduct alleged here could be addressed under a Section 1 rule of reason analysis.  Dkt. No. 213 at

12  9-10; *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 541 (9th Cir. 1983).

13       Tying arrangements that are not suitable for *per se* prohibition may still be addressed under a

14  rule of reason test.  *See Phonetele, Inc. v. Am. Tel. & Tel. Co.*, 664 F.2d 716, 738 (9th Cir. 1981)

15  ("Conduct that does not meet the requirements of [the] *per se* rule . . . may still constitute a violation

16  of the section 1 rule of reason.").  The *per se* analysis is applied only to a subset of antitrust claims.

17  The Supreme Court has cautioned that "'[it] is only after considerable experience with certain

18  business relationships that courts classify them as *per se* violations . . . .'"  *Broad. Music, Inc. v.*

19  *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9, 99 S. Ct. 1551 (1979); *see also White Motor Co. v. United*

20  *States*, 372 U.S. 253, 263, 83 S. Ct. 696 (1963) ("We need to know more than we do about the actual

21  impact of these arrangements on competition to decide whether they have such a 'pernicious effect

22  on competition and lack . . . any redeeming virtue' and therefore should be classified as *per se*

23  violations of the Sherman Act.") (internal citations omitted).  *Per se* treatment is appropriate in those

24  situations where the anticompetitive conduct is so obvious that analysis of market conditions is not

25  justified.  *See, e.g.*, *Arizona v. Maricopa Cty Med. Soc'y*, 457 U.S. 332, 350-51, 102 S. Ct. 2466

26  (1982) (elaborate market analysis not necessary in price fixing case); *Catalano, Inc. v. Target Sales,*

27  *Inc.*, 446 U.S. 643, 647, 100 S. Ct. 1925 (1980) (agreement among competitors to fix prices is *per se*

28  unlawful).

1    However, where judicial expertise in a particular industry is missing, or the nature of the

2    anticompetitive conduct is not of the kind that has historically been subject to *per se* condemnation,

3    the rule of reason analysis is proper because it allows "consider[ation] [of] facts peculiar to the

4    industry, the nature of the restraint and its effect to determine whether that restraint promotes or

5    restrains competition." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d

6    1381, 1387 (9th Cir. 1984); *see also In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 202 n.13

7    (2d Cir. 2006) (holding assessment of several factors is necessary including, "specific information

8    about the relevant business, its condition before and after the restraint was imposed, and the

9    restraint's history, nature and effect").

10   To state a claim for tying under the rule of reason, Plaintiffs must allege that the tying

11   arrangement was intended to harm competition and in fact caused injury to competition. *See Oltz v.*

12   *St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1445 (9th Cir. 1988); *Datagate, Inc. v. Hewlett-Packard*

13   *Co.*, 941 F.2d 864, 870 (9th Cir. 1991) ("must allege an injury to competition"). Once this is shown,

14   "the factfinder must analyze the anti-competitive effects along with any pro-competitive effects to

15   determine whether the [arrangement] is unreasonable on balance." *Bahn v. NME Hosps., Inc.*, 929

16   F.2d 1404, 1413 (9th Cir. 1991); *see also Maricopa Cty Med. Soc'y*, 457 U.S. at 343 ("[T]he rule of

17   reason requires the factfinder to decide whether under all the circumstances of the case the restrictive

18   practice imposes an unreasonable restraint on competition."). This requires inquiry into all the

19   relevant facts. *Oltz*, 861 F.2d at 1445. Such an inquiry is, however, not appropriate for a Rule 12

20   motion. *See Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 389 (S.D.N.Y. 2007).

21   Here, Plaintiffs' tying claim is appropriately pleaded under Section 1 rule of reason,

22   permitting the factfinder to more fully understand and evaluate the actual impact of the technological

23   tie on competition in the relevant markets by considering and balancing the tie's benefits against the

24   costs to consumer choice and competition. *United States v. Microsoft*, 253 F.3d 34, 94 (D.C. Cir.

25   2001); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 25 n.41, 104 S. Ct. 1551

26   (1984) (noting that the *per se* rule does not permit consideration of procompetitive justifications).

27   Plaintiffs allege that Apple's use of FairPlay and software updates to block interoperability created

28   technological impediments that were intended to restrict consumer choice and restrain competition.

1    Complaint, ¶¶21, 41-44. Plaintiffs allege further that Apple's conduct in fact caused injury to

2    competition by deterring consumers from doing business with Apple's competitors and discouraging

3    entrance into the market for portable digital media players. *Id.*, ¶¶72, 74-77. These allegations, if

4    proven, are adequate to show a Section 1 violation under the rule of reason and are therefore

5    sufficient to defeat Apple's 12(c) motion.

6          Apple suggests that the rule of reason analysis is reserved for those tying cases where the

7    defendant lacks market power. Def's Motion at 5-6. However, as the Supreme Court has stated "the

8    purpose of tying law has been to identify and control those tie-ins that have a demonstrable

9    exclusionary impact in the tied product market, or that abet the ***harmful exercise of market power***

10    ***that the seller possesses*** in the tying product market."[3] *Jefferson Parish*, 466 U.S. at 35 (O'Connor,

11    J., concurring). The rule of reason only condemns tying arrangements in these circumstances. *See*

12    *id.*; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731

13    (1984) ("[S]uch combinations are judged under a rule of reason, an inquiry into market power and

14    market structure designed to assess the combination's actual effect."); *William O. Gilley Enters., Inc.*

15    *v. Atlantic Richfield Co.*, 561 F.3d 1004, 1010 (9th Cir. 2009) ("To make [a] showing [of

16    anticompetitive effect] under the rule of reason analysis, a plaintiff must generally establish market

17    power.").

18          Indeed, even where a defendant has market power in the relevant market, the court may still

19    find that analysis under the rule of reason is more appropriate given the facts of the case. For

20    example, in *Microsoft*, the court found that the company had market power in the tying product

21    market, operating systems. *Microsoft*, 253 F.3d at 54. The court still held that the rule of reason,

22    rather than *per se* analysis, was appropriate because the alleged technological tie represented a

23    "novel categor[y] of dealing[]." *Id.* at 84. Similarly, here, despite the Court's prior finding that the

24    alleged technological tie cannot be remedied through a *per se* action, the Court should still find, as in

25

26

27    [3]          Unless otherwise noted, citations are omitted and emphasis is added.

28

1   *Microsoft*, that Plaintiffs have alleged a set of facts that if proven would entitle them to relief under

2   the rule of reason.

3          **B.     Plaintiffs Have Alleged a Tie Between Apple's iPod and iTMS Audio
                     and Video Files**

4          Apple contends that in its order on Plaintiffs' *per se* claim, the Court held that Plaintiffs

5   failed to meet the "threshold requirement" that the "seller refused to sell the products at issue

6   separately." Def's Motion at 1. This is a complete misreading of the Court's prior order and an

7   incorrect statement of the law.

8          First, the Court did not find that Plaintiffs failed to allege a tie. To the contrary, the Court

9   expressly held that Plaintiffs alleged a "technological tie" like that recognized by the Ninth Circuit in

10  *Foremost Pro*. Dkt. No. 213 at 8 ("[T]he Court recognizes that the most relevant model for liability

11  is that of the technological tie, as recognized by the Ninth Circuit in *Foremost Pro*."). In *Foremost

12  Pro* the court considered only whether plaintiff had stated a *per se* tying claim. *Foremost Pro*, 703

13  F.2d at 541. Plaintiff alleged that defendant Kodak illegally tied the sale of film and processing

14  materials to the sale of its new camera. Because the new camera could only use the new film, which

15  could not be processed without the new processing materials, it was necessary to purchase the entire

16  package of camera, film and processing materials from Kodak. *Id.* at 542. The Ninth Circuit held

17  that such a "technological interrelationship among complementary products" was essentially that of

18  a "technological tie" but, standing alone, not sufficient to establish a *per se* tying arrangement *Id.*

19  Stated another way, "[t]he Ninth Circuit . . . identified the technological tie as a species of tying

20  arrangement, but expressly declined to find that allegations of technological ties, without more,

21  could provide the basis for *per se* Section 1 liability." Dkt. No. 213 at 8.

22         As the Court recognized, a "technological tie" exists where "a technological relationship

23  between a seller's products compels a buyer to purchase both products. Such compulsion results

24  when one product is ***ineffective or is less effective*** without concomitant purchase of the second

25  technologically interrelated product." *Id.* at 6. Here, Plaintiffs allege exactly this. Plaintiffs contend

26  that Apple tied purchase of its iPods to purchase of iTMS files encrypted with FairPlay technology.

27  Complaint, ¶¶42-44. Customers who purchased FairPlay-encrypted iTMS files were required to also

28

1  purchase an iPod from Apple for direct playback of the files on a portable digital media player

2  because Apple's proprietary encryption technology prevented direct playback of the files on

3  competing players. *Id.*, ¶44. Plaintiffs contend that although consumers could purchase iTMS files

4  without purchasing an iPod, they were still locked into purchasing an iPod if they wished to play the

5  files directly on a portable digital media player. *Id.*, ¶¶43, 44. Since a large part of the appeal in

6  purchasing digital downloads is that they can be easily transferred to a portable player, use of the

7  files "is ineffective or less effective" without the purchase of an iPod. Dkt. No. 213 at 6; Complaint,

8  ¶8.

9  　　　Like the camera, film and processing materials in *Foremost Pro*, the "technological

10  interrelationship" created by Apple between iTMS files and iPods resulted in a tie which required

11  consumers to purchase the entire package, iTMS files and an iPod, for direct playback of the iTMS

12  files on a portable player. *See id.*, ¶¶42-44. The Court here found Plaintiffs' allegations analogous

13  to *Foremost Pro* and held that while Plaintiffs alleged a technological tie, "existing antitrust doctrine

14  does not allow such conduct to be remedied through a *per se* tying action." Dkt. No. 213 at 9. Other

15  courts have recognized the existence of similar ties. *See, e.g.*, *Microsoft*, 253 F.3d at 84-85; *see also*

16  10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Laws*, ¶1757c at 320-23 (2d ed. 2006).

17  　　　Notably, plaintiff in *Foremost Pro* did not allege that Kodak's conduct foreclosed

18  competition in the relevant market. Instead, plaintiff merely contended that when the new Kodak

19  camera was introduced, no competing chemicals and film on the market at the time were compatible

20  with the camera. *Foremost Pro*, 703 F.2d at 542 n.4. By contrast, Plaintiffs here allege that Apple

21  deliberately used FairPlay to prevent competing manufacturers from creating portable digital media

22  players that are compatible with FairPlay-encrypted iTMS files. Complaint, ¶¶45, 50. Moreover,

23  Plaintiffs allege that Apple acted to maintain the tie by issuing software updates designed

24  specifically to destroy any possibility that competing manufacturers could sell a portable digital

25  media player that was interoperable with iTMS files. *Id.*, ¶¶51-55. This type of exclusionary

26  conduct violates antitrust law. *See, e.g.*, *Xerox Corp.*, 511 F. Supp. 2d at 388 (finding plaintiff

27  alleged anticompetitive conduct where it was alleged that defendant's patented redesign prevented

28  competitors from selling compatible complimentary products); *In re IBM Peripheral EDP Devices*

1   *Antitrust Litig.*, 481 F. Supp. 965, 1002-03 (N.D. Cal. 1979) (explaining that a market-dominating

2   producer who kept "changing [its products] with such frequency that [competing complementary

3   products] would have been unable to attach and unable to economically adapt their [products] to the

4   ever-changing . . . designs" and used this "as a vehicle for tying" would be acting illegally).

5         Moreover, Plaintiffs are not required to allege that the purchase of the tied and tying products

6   occurred at the same time or on a "package" basis.  *See* Def's Motion at 2.  Indeed, a tying

7   arrangement exists where the seller agrees "to sell one product but only on the condition that the

8   buyer also purchases a different (or tied product), or at least ***agrees that he will not purchase that***

9   ***product from any other supplier*** ."  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461,

10  112 S. Ct. 2072 (1992) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6, 78 S. Ct. 514

11  (1958)).  Here, Plaintiffs have alleged that Apple's use of FairPlay forced consumers who wished to

12  purchase FairPlay-encrypted iTunes files to implicitly agree not to purchase a portable digital media

13  player from "any other supplier."  *Id.*; *see* Complaint, ¶¶43-45.  While consumers were not required

14  to purchase both products at the same time, purchasers were forced to forgo the possibility of

15  purchasing a competing portable digital media player for use with their iTMS files.  *Id.*, ¶44.

16        *Advanced Computer Services of Michigan, Inc. v. MAI Systems Corp.*, 845 F. Supp. 356

17  (E.D. Va. 1994), cited by Apple, is not to the contrary.  *See* Def's Motion at 4-5.  There, plaintiffs,

18  independent service organizations, alleged that defendant tied the purchase of its copyrighted

19  computer operating systems and diagnostic software to the purchase of maintenance and repair

20  services.  *MAI Sys. Corp.*, 845 F. Supp. at 360.  Plaintiffs claimed that defendant's enforcement of its

21  copyrights of the operating system and diagnostic software precluded competition in the

22  maintenance and repair market because plaintiffs were unable to adequately service the computers

23  without using the copyrighted programs.  *Id.*  The court found that no tie existed because: (1)

24  independent servicers could and did develop their own diagnostic software to service the computers;

25  (2) consumers were free to and did choose to have their computers serviced by these servicers; and

26  (3) defendant's selective licensing of its diagnostic software and operating systems was within its

27  discretion.  *Id.* at 368-69.  Thus, competition in the tied product market, maintenance and repair, was

28  not foreclosed and consumers were free to choose alternative maintenance and repair services.  *See*

1    Areeda, *supra*, ¶1757a at 318 ("No tying problem arises when the defendant sufficiently prediscloses

2    its primary product design so that efficient rivals can offer a compatible complimentary product.").

3           By contrast here, Plaintiffs have alleged that competing manufacturers of the tied product,

4    portable digital media players, are unable to create and sell products that are compatible with iTMS

5    files because of the use of FairPlay and Apple's continued foreclosure of the market through

6    software updates. Complaint, ¶¶44-45, 50-55. Unlike in *Advanced Computer Services of Michigan,*

7    *Inc.* where consumers of the tying product had alternatives to the purchase of the tied product from

8    defendant, here, purchasers of iTMS files are genuinely limited in their choice of a portable digital

9    media player because no compatible products exist. *See id.*

10          Still, Apple claims that Plaintiffs have not alleged the level of coercion necessary to

11   demonstrate a tie. Def's Motion at 4. Apple asserts that the decision in *Foremost Pro* "rested on

12   the Ninth Circuit's conclusion that plaintiff had not alleged the required coercion because the

13   defendant had not conditioned the sale of the tying product on the purchase of the tied product." *Id.*

14   Apple contends this "analysis applies to a rule of reason claim." *Id.* This is simply not the law.

15          The coercion necessary to prove that a tie is unlawful *per se* is not the same as that required

16   to demonstrate a tie is unlawful under the rule of reason. As the court in *Foremost Pro* explicitly

17   stated, "Foremost's complaint failed to plead the ***coercion essential to a per se unlawful tying***

18   ***arrangement***." *Foremost Pro*, 703 F.2d at 542. The rationale of a *per se* claim is that competition

19   in the tied product market is necessarily restrained, not because the tied product is better, but because

20   the defendant is able to leverage its power in the tying product market into that of the tied product by

21   forcing purchasers to purchase both the tying and tied products. *See Betaseed, Inc. v. U & I Inc.*, 681

22   F.2d 1203, 1215 (9th Cir. 1982). Thus, "'[s]ome modicum of involuntariness or coercion is . . .

23   essential to the existence of a *per se* illegal tie-in. When these requirements are met, tying

24   arrangements are illegal in and of themselves without any requirement that the plaintiff make a

25   showing of unreasonable competitive effect." *Foremost Pro*, 703 F.2d at 540 (internal citations

26   omitted).

27          Where coercion is not demonstrated in the usual way – the express condition that plaintiff

28   purchase the tied product with the tying product – it may still be appropriate to analyze the tie under

1   the rule of reason standard with proof that the conduct had an anticompetitive effect.  *Id.* at 542; *see*

2   *also Webb v. Primo's Inc.*, 706 F. Supp. 863, 867 (N.D. Ga. 1988) (citing *Jefferson Parish*, 466 U.S.

3   at 15-16) ("Proof of coercion would make the tying arrangement illegal *per se* and eliminate the

4   necessity of establishing the actual anticompetitive effects in the tied market.").

5         **C.    "Technological Ties" Are Not Exempt From the Antitrust Laws**

6         Apple would like the Court to find that the alleged technological tie between the iPod and

7   iTMS files is exempt from antitrust liability on purported public policy grounds.  Def's Motion at 7.

8   Apple argues that antitrust law is not applicable because: (1) courts are not equipped to deal with

9   such claims; (2) Apple would not have a "safe harbor" to avoid liability since it already offers its

10   products separately; (3) Apple is not required to deal with its competitors; and (4) application of

11   antitrust law to this case would "chill . . . innovation."  *Id.* at 7-8.

12         There is no basis in case authority or sound antitrust policy to grant Apple the immunity it

13   seeks.  Although courts may give some deference to product innovation, that does not mean that

14   every technological tie is lawful.  *Microsoft*, 253 F.3d at 65.  Questions concerning technological

15   design can be complex, but they are certainly not beyond the competence of the court when applying

16   antitrust doctrine to determine what is lawful and what is not.  *See* Richard A. Posner, *Antitrust in*

17   *the New Economy*, 68 Antitrust L.J. 925, 925 (2001) ("[A]ntitrust doctrine is supple enough . . . to

18   take in stride the competitive issues presented by the new economy.").

19         The Court is also aided by the flexibility of the rule of reason analysis to determine whether

20   Apple's conduct does in fact unreasonably restrain competition in the tied product market.  *See Nat'l*

21   *Football League*, 726 F.2d at 1387 (rule of reason permits the court to consider facts peculiar to the

22   industry, the nature of the tie, and its effects); *see also In re Tamoxifen Citrate Antitrust Litig.*, 466

23   F.3d at 201 n.3 (rule of reason permits consideration of several factors).  While antitrust laws seek to

24   encourage innovation, "[j]udicial deference to product innovation . . . does not mean that a

25   monopolist's product design changes are *per se* lawful."  *See Microsoft*, 253 F.3d at 65; *see also*

26   *Xerox Corp.*, 511 F. Supp. 2d at 388 ("[S]everal courts have found that product redesign, when it

27   suppresses competition and is without other justification, can be violative of the antitrust laws.").

28   Accordingly, any concerns about "chilling innovation" can be addressed under a rule of reason

1    analysis and weighed against the anticompetitive effects of Apple's conduct.  *See, e.g.*, *Microsoft*,

2    253 F.3d at 92 ("Rule of reason analysis, [] affords the first mover an opportunity to demonstrate that

3    an efficiency gain from its 'tie' adequately offsets any distortion of consumer choice.").

4         Applying the rule of reason analysis here would, in fact, advance the public policies that

5    undergird antitrust law.  The purpose of tying law is to identify and control those tie-ins that have a

6    demonstrable exclusionary impact in the tied product market by restricting consumer choice and

7    foreclosing competition on the merits.  *See Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 404

8    n.26, 98 S. Ct. 1123 (1978) ("[T]he protection against injury to the buyer is only one purpose of the

9    rule against tying arrangements.  Equally important is the need to protect competing sellers from

10   competition unrelated to the merits of the product involved, and, concomitantly, to protect the

11   market from distortion.").[4]  Where, as alleged here, purchasers are restricted in their choice of a

12   portable digital media player for direct playback of their iTMS files and competition in the market

13   for portable digital media players has been significantly stifled, application of the antitrust laws is

14   perfectly appropriate.

15        Nor is Apple entitled to the "safe harbor" it seeks.  Def's Motion at 7.  *Cf.* Ex. 1[5] at 7-8

16   (explaining the Department of Justice's move away from "the adoption of a number of safe harbors"

17   and "extreme hesitancy in the face of potential abuses by monopoly firms").  In support, Apple relies

18   on *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, __ U.S. __, 129 S. Ct. 1109 (2009).  There,

19   plaintiffs asserted a "price-squeeze" claim that was outside "existing antitrust doctrine."  *Id*. at 1120;

20

21   [4]      *See also Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605, 73 S. Ct. 872
     (1953) ("Any intrinsic superiority of the 'tied' product would convince freely choosing buyers to

22   select it over others, anyway.  Thus '(i)n the usual case only the prospect of reducing competition
     would persuade a seller to adopt such a contract and only his control of the supply of the tying

23   device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter
     one.'"); *Rick-Mik Enters., Inv. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (The injury

24   caused by an unlawful tying arrangement is "reduced competition in the market for the tied
     product."); *Ungar v. Dunkin' Donuts of Am., Inc.*, 531 F.2d 1211, 1226 (3d Cir. 1976) ("The purpose

25   of the antitrust laws is to stimulate economic competition, the essence of which is the presence of
     many competing sellers.").

26   [5]      All references to "Ex." are to the Exhibit attached to the Declaration of Thomas R. Merrick

27   in Support of Plaintiffs' Opposition to Defendant's Motion for Judgment on the Pleadings as to
     Plaintiffs' Rule of Reason Claims, filed concurrently.

28

1  *see also id*. at 1122 ("To the extent [defendant] violates [antitrust] doctrines, the plaintiffs have a

2  remedy under existing law.  We do not need to endorse a new theory of liability to prevent such

3  harm.")  Here, Plaintiffs' claim is well within existing Section 1 jurisprudence.  *See generally*

4  *Microsoft*, 253 F.3d at 89-94.  Apple's asserted interest in promoting innovation is sufficiently

5  advanced by application of existing rule of reason analysis, which, unlike the *per se* rule, permits

6  consideration of the tie's purported benefits and pro-competitive justifications.  *See id.* at 94.[6]

7          Moreover, application of the antitrust laws to this case would not require Apple to "deal with

8  [its] competitors."  *See* Def's Motion at 7-8 (citing *Verizon Commc'ns, Inc. v. Law Offices of Curtis*

9  *v. Trinko, LLP*, 540 U.S. 398, 407-08, 124 S. Ct. 872 (2004)).  As the Court found in its Order

10 Denying Defendant's Motion to Dismiss,[7] Plaintiffs' tying claims, like their monopoly claims, are

11 not reducible to the contention that Apple should "do[] whatever was necessary to ensure that

12 competitors' products interoperate with Apple's products as well as Apple's products interoperate

13 with each other."  Def's Motion at 8.  *See Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1099,

14 1099 (N.D. Cal. 2006).  Rather, Plaintiffs have alleged that Apple took several anticompetitive steps

15 to tie iTMS files and iPods: (1) using technological restrictions for the purpose of preventing music

16 purchased from iTMS from playing on competing portable digital media players; (2) using

17 technological restrictions for the purpose of preventing video files purchased on iTMS from playing

18 on competing portable digital media players; (3) issuing software updates that prevent any attempt

19 by a competitor to enable interoperability with a competing portable digital media player; and (4)

20 refusing to license FairPlay to competitors of portable digital media players.  Complaint, ¶¶22, 41-

21 45, 55.  Of these, only the fourth can be characterized as a refusal to deal.  The remaining allegations

22 are affirmative steps to exclude competitors for which there is no conceivable pro-competitive

23  _____

24 [6]     As discussed in §IV.D., *infra*, technology companies do not get special treatment under

25 Section 1.

26 [7]     The MTD Order related to Apple's Motion to Dismiss plaintiff Tucker's complaint, filed July
   21, 2006 in *Tucker v. Apple Co., Inc.*, No. c-06-4457 (N.D. Cal.).  This was decided prior to

27 consolidation.  However, the allegations and claims in the Tucker complaint and the Consolidated
   Complaint are essentially identical.

28

1    justification.  Moreover, the right of a firm to not deal with competitors is not "unqualified."  *Aspen*

2    *Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601, 105 S. Ct. 2847 (1985).

3            *Trinko*, relied on by Apple, is inapposite.  Def's Motion at 7-8.  There, plaintiff alleged

4    defendant acted anticompetitively to prevent rival local telephone service carriers from competing

5    effectively.  *Trinko*, 540 U.S. at 404-05.  Important to the Court's finding that defendant's refusal to

6    cooperate with rivals was not anticompetitive was that the telephone service industry was highly

7    regulated such that "the additional benefit to competition provided by antitrust enforcement [was]

8    small."  *Id.* at 412.  By contrast here, there is no "regulatory scheme which performs the antitrust

9    function."  *See id.*  Thus, the benefits of applying antitrust law to determine whether Apple's conduct

10   as alleged by Plaintiffs is indeed anticompetitive are considerable.

11           **D.     Section 1 Applies to Plaintiffs' Tying Claim**

12           Apple also reasserts its argument that Plaintiffs' tying claim is improper under Section 1

13   because it does not involve a "'contract combination . . . or conspiracy between separate entities."

14   Def's Motion at 3 (quoting *Copperweld Corp.*, 467 U.S. at 768).  Without any real support, Apple is

15   inviting this Court to overturn settled antitrust jurisprudence recognized by the Supreme Court, the

16   Ninth Circuit, and other courts.

17           It is well-settled that a tying claim can be based on a company's unilateral action in which a

18   customer acquiesces by purchasing the tied product.  The Supreme Court's classic definition of tying

19   presupposes that it may be unilaterally imposed by a single firm: "a tying arrangement may be

20   defined as an agreement ***by a party*** to sell one product but only on the condition that the buyer also

21   purchases a different (or tied) product, or at least agrees that he will not purchase that product from

22   any other supplier."  *Northern Pac. Ry. Co.*, 356 U.S. at 5-6.  "[T]he essential characteristic of an

23   invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force

24   the buyer into the purchase of a tied product that the buyer either did not want at all, or might have

25   preferred to purchase elsewhere on different terms."  *Jefferson Parish*, 466 U.S. at 12.[8]

26   _____

27   [8]    Subsequent case law is in accord.  *See, e.g.*, *Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d

28   1148, 1157-58 (9th Cir. 2001) (affirming Section 1 tying claim where hospital tied the purchase of

1    Plaintiffs allege that through deliberate technical impediments, Apple essentially forced

2  iTMS purchasers to agree not to purchase a portable digital media player from anyone other than

3  Apple.  Complaint, ¶¶41-44, 50.  Plaintiffs' tying claim is thus appropriately pleaded under settled

4  Section 1 standards.

5    Apple provides no real authority to the contrary.  First, the *Copperweld* language that Apple

6  relies on is inapposite. Dkt. No. 229 at 7.  *Copperweld* was not a tying case.  There, the Court solely

7  addressed a separate Section 1 issue – whether a parent and subsidiary could conspire with each

8  other in restraint of trade.  *Copperweld Corp.*, 467 U.S. at 777.  The Supreme Court specifically

9  narrowed its analysis to that issue alone: "We limit our inquiry to the narrow issue squarely

10  presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of

11  §1 of the Sherman Act."  *Id.* at 767.; *see also Systemcare*, 117 F.3d at 1145 (rejecting defendant's

12  *Copperweld* argument).  Apple cites no case law addressing tying claims – under either the *per se* or

13  rule of reason test – in support of its attempt to redefine Section 1 jurisprudence.

14    Apple likewise cites no case support for its bald assertion that technological companies

15  should get special treatment under Section 1.  In fact, courts and commentators agree that there is no

16  sound rationale for treating technological ties differently.  *See, e.g.*, *Microsoft.*, 253 F.3d at 84-97

17  (analyzing how a technological tying claim may be brought under a Section 1 rule of reason

18  analysis); Antitrust Modernization Commission, Report and Recommendations (April 2007) at 38

19  (Recommendations and Findings No. 1: "There is no need to revise the antitrust laws to apply

20  different rules to industries in which innovation, intellectual property, and technological change are

21  central features."); Richard A. Posner, *Antitrust Law* 256 (2d ed. 2001) ("antitrust doctrine is

22  sufficiently supple, and sufficiently informed by economic theory, to cope effectively with the

23  _____

24  C-section services and obstetrical services); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421,
25  1427 (9th Cir. 1995) (coerced sales contract satisfied concerted action requirement); *see also Systemcare, Inc. v. Wang Laboratories Corp.*, 117 F. 3d 1137, 1142 (10th Cir. 1997) ("We hold that
26  a contract between a buyer and seller satisfies the concerted action element of section 1 of the Sherman Act where the seller coerces a buyer's acquiescence in a tying arrangement."); *Nobel
27  Scientific Indus., Inc. v. Beckman Instruments*, 670 F. Supp. 1313, 1324 (D. Md. 1986) ("There need not be an explicit condition that the buyer of the tying product buy the tied product.").

28

1    distinctive-seeming antitrust problems that the new economy presents."). In fact, as the head of

2    antitrust enforcement for the Justice Department recently pointed out, "high-tech and internet-based

3    markets" are especially crucial for antitrust enforcement. *See* Ex. 1 at 16 ("Increasingly, Americans

4    are relying on high-tech solutions in the home and the workplace and enjoying the fruits of

5    innovation in those markets that have been spurred on by competition between rival firms. We thus

6    plan to devote attention to understanding the unique competition-related issues posed by these

7    markets.").[9]

8            Plaintiffs have adequately pleaded the level of concerted action required under Section 1.

9    Apple has provided no support for this Court to reject well-settled antitrust jurisprudence.

10           **E.    Plaintiffs Have Alleged Coercion Under Applicable Ninth Circuit Law**

11           Finally, Apple incorporates by reference its earlier argument that this Court erred in

12   following Ninth Circuit authority that Plaintiffs need not allege individual coercion in order to

13   maintain a Section 1 tying claim. *See Tucker*, 493 F. Supp. 2d at 1097-99.[10] Apple cites no changes

14   in Ninth Circuit law on individual coercion in either its briefing on the *per se* claim nor in the current

15   motion. In fact, as Plaintiffs' earlier briefing points out, subsequent case law and the facts developed

16   in this case both support the Court's initial decision. *See* Dkt. No. 209 at 9-14.

17           Applied to a rule of reason analysis, moreover, Apple's individual coercion argument carries

18   even less weight.[11] Apple argues repeatedly that its lock on consumers' iTMS purchases so that they

19   _____

20   [9]       Apple cites the Areeda treatise purportedly in support of its argument that technological ties
     should be immune from Section 1 liability generally. Dkt. No. 228 at 3. The authors do not address
21   how they square this conclusion with the settled case law interpreting concerted action discussed
     above, and in fact, the treatise goes on to analyze in detail how technological ties should be treated
22   by the courts under Section 1 under a rule of reason analysis. Areeda, *supra*, ¶1757 at 317-23. The
     quote clearly does not support Apple's argument that technological ties are immune from Section 1
23   liability.

24   [10]      Apple incorporates its earlier briefing. Def's Motion at 9 (incorporating Dkt. No. 200 at 11-
     16 and Dkt. No. 211 at 8-12). In the event the Court believes it is appropriate to revisit its holding
25   regarding market level coercion, Plaintiffs respectfully incorporate their opposition memorandum.
     Dkt. No. 209 at 9-14.
26

27   [11]      *See also* discussion at 9, *supra*, explaining that the level of coercion necessary to demonstrate
     a *per se* claim is not that required to prove a claim under the rule of reason.

28

1   can only be directly played on an iPod – tying iTMS purchasers into Apple's player – is actually an

2   "enhanced utility" to the consumer.  Dkt. No. 211 at 8-10.  Plaintiffs allege, in contrast, that this

3   "lock-in" is a "burdensome term" that demonstrates market level coercion and anticompetitive

4   effects.  *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977) ("the Supreme

5   Court's opinions support[] the view that coercion may be implied from a showing that an appreciable

6   number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient

7   economic power in the tying product market.").[12]  While plaintiffs believe that their characterization

8   is the more reasonable one, at the very least, the issue presents a question of fact under the rule of

9   reason analysis and would therefore preclude, not support, judgment under Rule 12(c).  *See Newcal*

10  *Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1051 (9th Cir. 2008), *cert. denied*, 129 S. Ct.

11  2788 (2009) (question of fact precludes Rule 12 dismissal); *Tucker*, 493 F. Supp. at 1101 ("existence

12  of valid business reasons in antitrust cases is generally a question of fact not appropriate for

13  resolution at the motion to dismiss stage").

14  **V.    FOR THE SAME REASONS, PLAINTIFFS HAVE PLEADED STATE
        LAW TYING CLAIMS**

15

16          For the same reasons as stated above, Plaintiffs have also adequately pleaded a tying claim

    under the Cartwright Act and violations of the California Unfair Competition Law ("UCL") and

17  Consumer Legal Remedies Act ("CLRA") based on Apple's illegal tie.  *Hamro v. Shell Oil Co.*, 674

18  F.2d 784, 786-87 (9th Cir. 1982) (federal decisions under the Sherman act are applicable to the

19  Cartwright Act).

20

21

22

23

24  _____

25  [12]    In its reply brief in support of its Rule 12(c) motion on the *per se* claim, Apple attempts to
    distinguish *Moore* by arguing that there is a distinction between the level of coercion that must be
26  shown for a tying claim brought by consumer rather than a competitor.  Dkt. No. 211 at 8-10.  Ninth
    Circuit authority is clear that there is no such distinction.  *Cascade Health Solutions v. Peacehealth*,
27  515 F.3d 883, 913 (9th Cir. 2008) ("Supreme Court discussions about the existence of a tie have not
    varied according to the status of the plaintiff.") (quoting Areeda, *supra,* ¶1752d at 264.

28

1  **VI.    CONCLUSION**

2      For the reasons set forth above, Apple's Motion for Judgment on the Pleadings as to

3  Plaintiffs Rule of Reason Tying Claims should be denied in its entirety.

4  DATED:  August 27, 2009              Respectfully submitted,

5                                       COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
6                                       JOHN J. STOIA, JR.
                                        BONNY E. SWEENEY
7                                       THOMAS R. MERRICK

8

9                                              s/ Thomas R. Merrick
                                        _____
10                                            THOMAS R. MERRICK

11                                      655 West Broadway, Suite 1900
                                        San Diego, CA  92101
12                                      Telephone:  619/231-1058
                                        619/231-7423 (fax)

13                                      THE KATRIEL LAW FIRM
                                        ROY A. KATRIEL
14                                      1101 30th Street, N.W., Suite 500
                                        Washington, DC  20007
15                                      Telephone:  202/625-4342
                                        202/330-5593 (fax)

16
                                        Co-Lead Counsel for Plaintiffs
17
                                        BONNETT, FAIRBOURN, FRIEDMAN
18                                         & BALINT, P.C.
                                        ANDREW S. FRIEDMAN
19                                      FRANCIS J. BALINT, JR.
                                        ELAINE A. RYAN
20                                      TODD D. CARPENTER
                                        2901 N. Central Avenue, Suite 1000
21                                      Phoenix, AZ  85012
                                        Telephone:  602/274-1100
22                                      602/274-1199 (fax)

23                                      BRAUN LAW GROUP, P.C.
                                        MICHAEL D. BRAUN
24                                      12304 Santa Monica Blvd., Suite 109
                                        Los Angeles, CA  90025
25                                      Telephone:  310/442-7755
                                        310/442-7756 (fax)

26
                                        MURRAY, FRANK & SAILER LLP
27                                      BRIAN P. MURRAY
                                        JACQUELINE SAILER
28                                      275 Madison Avenue, Suite 801

1     New York, NY  10016
      Telephone:  212/682-1818
2     212/682-1892 (fax)

3     GLANCY BINKOW & GOLDBERG LLP
      MICHAEL GOLDBERG
4     1801 Avenue of the Stars, Suite 311
      Los Angeles, CA  90067
5     Telephone:  310/201-9150
      310/201-9160 (fax)

6
      Additional Counsel for Plaintiffs
7
      S:\CasesSD\Apple Tying\BRF 00061149.doc
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO PLAINTIFFS' RULE OF REASON TYING CLAIM - C-05-00037-JW(RS)          - 18 -

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on August 27, 2009, I electronically filed the foregoing with the Clerk of

3  the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7        I certify under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on August 27, 2009.

9

10                            s/ Thomas R. Merrick
                              THOMAS R. MERRICK

11                              COUGHLIN STOIA GELLER

12                                  RUDMAN & ROBBINS LLP
                              655 West Broadway, Suite 1900

13                              San Diego, CA  92101-3301
                              Telephone:  619/231-1058

14                              619/231-7423 (fax)

15                              E-mail:  tmerrick@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

CAND-ECF-                                                                  Page 1 of 2

Case 4:05-cv-00037-YGR   Document 877-2   Filed 11/04/14   Page 176 of 177
Case4:05-cv-00037-YGR   Document230   Filed03/27/09   Page91 of 92

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com,valdajani@jonesday.com

- **Thomas Robert Merrick**
  tmerrick@csgrr.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Adam Richard Sand , Esq**
  invalidaddress@invalidaddress.com

- **Michael Tedder Scott**

michaelscott@jonesday.com,gwayte@jonesday.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Tracy Strong**
  tstrong@jonesday.com,dharmon@jonesday.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,E_file_sd@csgrr.com,christinas@csgrr.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Todd David Carpenter**
Bonnett, Fairbourn, Friedman, & Balint
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012

**Elaine A. Ryan**
Bonnett Fairbourn Friedman & Balint, P.C
2901 N. Central Avenue
Suite 1000
Phoenix, AZ 85012