# EXHIBIT 16

1 | COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
2 | JOHN J. STOIA, JR. (141757)
BONNY E. SWEENEY (176174)
3 | THOMAS R. MERRICK (177987)
PAULA M. ROACH (254142)
4 | 655 West Broadway, Suite 1900
San Diego, CA 92101
5 | Telephone: 619/231-1058
619/231-7423 (fax)
6 | johns@csgrr.com
bonnys@csgrr.com
7 | tmerrick@csgrr.com
proach@csgrr.com
8
THE KATRIEL LAW FIRM
9 | ROY A. KATRIEL (*pro hac vice*)
1101 30th Street, N.W., Suite 500
10 | Washington, DC 20007
Telephone: 202/625-4342
11 | 202/330-5593 (fax)
rak@katriellaw.com
12
Co-Lead Counsel for Plaintiffs
13
[Additional counsel appear on signature page.]
14

UNITED STATES DISTRICT COURT

15

NORTHERN DISTRICT OF CALIFORNIA

16

SAN JOSE DIVISION

17

| | | |
|---|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) | Lead Case No. C-05-00037-JW(HRL) |
| | ) | CLASS ACTION |
| This Document Relates To: | ) | AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF SHERMAN ANTITRUST ACT, CLAYTON ACT, CARTWRIGHT ACT, CALIFORNIA UNFAIR COMPETITION LAW, CONSUMERS LEGAL REMEDIES ACT, AND CALIFORNIA COMMON LAW OF MONOPOLIZATION |
| ALL ACTIONS. | ) | |

DEMAND FOR JURY TRIAL

479616_1

1

**NATURE OF THE ACTION**

2     1.     This action is brought as a class action pursuant to Rule 23 of the Federal Rules of
3 Civil Procedure on behalf of a Class of Plaintiffs, defined more fully below.

4     2.     Defendant Apple, Inc. ("Apple" or "Defendant") has used its dominant market
5 position in the markets for Audio Downloads and Portable Digital Media Players to stifle
6 competition and strengthen its monopoly in these markets. Apple engaged in systematic conduct to
7 shut out rivals' competing Audio Downloads and Portable Digital Media Players by cutting off their
8 access to the marketplace. In the process, Apple deprived consumers of choice and innovation in the
9 Audio Download Market and Portable Digital Media Player Market. Apple used unneeded
10 technological restrictions in conjunction with software updates to suppress new products that
11 threatened its monopoly power in the relevant product markets. This strategy succeeded in
12 maintaining Apple's monopolies at the expense of consumers who have been denied access to
13 potentially superior, non-Apple products and lower prices.

14     3.     As alleged in further detail below, Apple initially gained its monopoly power through
15 the use of proprietary software on Audio Downloads purchased from Apple's iTunes Store ("iTS")
16 and Apple's iPod, known as FairPlay. FairPlay prevented iPods from playing Audio Downloads
17 purchased from competitors of iTS and prevented Audio Downloads purchased through iTS from
18 playing on Portable Digital Media Players other than iPod. Thus, a purchaser who wished to play
19 Audio Downloads purchased from iTS on a Portable Digital Media Player had to purchase an iPod
20 and a purchaser of an iPod who wished to buy Audio Downloads for direct playback on the iPod had
21 to purchase them from iTS.

22     4.     When competitors attempted to enter either market by selling products compatible
23 with Apple's market-leading iPod or iTS files, Apple promptly issued software updates to end the
24 compatibility. This allowed Apple to further entrench its monopolization of both markets and
25 enabled it to sell the iPod at prices far above those that would prevail in a competitive market for
26 Portable Digital Media Players.

27

28

AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)     - 1 -

1      5.      Apple's use of software updates, intended to shut out competitors, constitutes a
2 violation of United States and California antitrust law. None of the anticompetitive conduct
3 described in this complaint had a legitimate business justification.

4 **PARTIES**

5      6.      Plaintiff Somtai Troy Charoensak is a resident of California. During the Class
6 Period, Mr. Charoensak purchased Audio Downloads and an iPod directly from Apple. The amount
7 paid to Apple for the iPod was supracompetitive; it was greater than he would have paid, but for the
8 antitrust violations alleged herein. Mr. Charoensak thereby suffered injury in his property, in the
9 form of overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

10      7.      Plaintiff Mariana Rosen is a resident of New Jersey. During the Class Period, Ms.
11 Rosen purchased Audio Downloads and an iPod directly from Apple. The amount paid to Apple for
12 the iPod was supracompetitive; it was greater than she would have paid, but for the antitrust
13 violations alleged herein. Ms. Rosen thereby suffered injury in her property, in the form of
14 overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

15      8.      Plaintiff Melanie Tucker is a resident of California. During the Class Period, Ms.
16 Tucker purchased Audio Downloads and iPods directly from Apple. The amount paid to Apple for
17 the iPods was supracompetitive; it was greater than she would have paid, but for the antitrust
18 violations alleged herein. Ms. Tucker thereby suffered injury in her property, in the form of
19 overcharges, injury that antitrust and consumer laws are intended to prevent and remedy.

20      9.      Defendant Apple is a corporation organized under the laws of the State of California
21 and has its principal place of business in Cupertino, California. Though best known as a computer
22 hardware and software company, the majority of Apple's revenues and profits now derive from its
23 Audio Downloads and Portable Digital Media Player businesses. At all times during the Class
24 Period, Apple owned and operated the iTS and sold iPods directly to Mariana Rose, Melanie Tucker,
25 and Somtai Troy Charoensak (collectively, "Plaintiffs") and members of the Class.

26 **JURISDICTION AND VENUE**

27      10.    Jurisdiction is conferred upon this judicial district pursuant to 15 U.S.C. §§15 and 26,
28 and 28 U.S.C. §§1331 and 1337.

479616_1    AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)      - 2 -

1    11.    Venue is proper in this district pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C.

2  §1391 because Defendant transacts business in this district, Defendant has its principle corporate

3  office in this district, and because thousands of Class members are located in this district.

4  Additionally, a substantial part of the interstate trade and commerce involved and affected by the

5  alleged violations of the antitrust laws was and is carried on in part within this district. The acts

6  complained of have had, and will have, substantial anticompetitive effects in this district. A

7  substantial number of putative plaintiffs reside in this district.

8                                         **TRADE AND COMMERCE**

9    12.    During the Class Period, Apple marketed, distributed, and sold Portable Digital

10  Media Players and Audio Downloads in a continuous and uninterrupted flow of intrastate and

11  interstate commerce throughout the United States.

12                                     **RELEVANT PRODUCT MARKETS**

13    13.    For the claims that may require market definition, the relevant product markets for

14  purposes of these allegations are as follows:

15  **Audio Download Market**

16    14.    The "Audio Download Market" is defined as the market for digital music, copies of

17  which can be legally purchased by the consumer by way of internet download. In contrast to

18  streaming audio services that sell temporary downloads that self-destruct after a predetermined time

19  period or when a consumer stops paying for the service, the Audio Download Market consists of

20  permanent downloads of digital music files. Audio Downloads present consumers enormous

21  advantages over purchasing music in compact disk ("CD") form at retail stores. Audio Download

22  stores offer for sale hundreds of thousands of songs at once, many times more than even the largest

23  traditional music retailer. Audio Downloads are attractive to consumers because they can be

24  purchased *a la carte* so that the purchaser gets only the songs that he/she wants rather than having to

25  buy an entire CD album in order to get only one or two desirable songs. Audio Downloads remain

26  portable because they can be easily downloaded onto a portable device capable of playing digital

27  files.

28

1      15.     Audio Downloads are also attractive because they are more convenient, reliable, and
2 better for the environment. Consumers do not have to drive to a store to make their purchase, trucks
3 do not have to transport the CDs from factory to warehouse to retailer, and there is no material or
4 packaging produced only to be thrown away. Audio Downloads also promise superior audio fidelity
5 over time because, unlike CDs, Audio Downloads last indefinitely and cannot wear out or break.
6 Additionally, another appealing feature of Audio Downloads is that they can be easily stored and
7 played in mass quantities on a Portable Digital Media Player.

8      16.     Apple owns and operates iTS, formally known as the iTunes Music Store, an internet
9 site that offers digital music and digital video computer files for online purchase and download.
10 Unlike most internet sites, iTS is accessed with proprietary Apple software, known as iTunes, rather
11 than with a web browser.

12      17.     At all relevant times, Apple has been a competitor in the Audio Download Market.
13 Throughout the Class Period, Apple has maintained a market share of the United States Audio
14 Download Market of 70% or more.

15      18.     Barriers to entry into the Audio Download Market are high. In addition to the
16 barriers to entry into the Audio Download Market imposed by Apple's illegal monopolistic
17 anticompetitive behavior, discussed in detail herein, other barriers to entry include: (a) Audio
18 Downloads are protected by copyrights that any new entrant would have to obtain a license for or
19 purchase at wholesale in order to legally sell; (b) the copyright holders are unlikely to license their
20 copyrighted Audio Downloads to any new entrant unless that entrant can credibly show that it will
21 be able to sell these files to a large audience; (c) any new entrant would have to offer an inventory of
22 Audio Downloads comparable to that of existing music stores which would necessitate an inordinate
23 investment of capital and resources; (d) purchasers are unlikely to switch to a new online Audio
24 Download store because switching means learning a new software; (e) technological costs for things
25 such as network fees are high; and (f) any new entrant would have to offer Audio Downloads that
26 were operable on the most popular media players.

27      19.     Consumers and merchants have come to recognize the Audio Download Market as a
28 separate and distinct market from the market for music CDs.

479616_1     AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)        - 4 -

1    20.    The Audio Download Market offers a number of features not readily available at
2  traditional "brick and mortar" music stores, which help set it apart as a distinct market. For example,
3  whereas shoppers at traditional "brick and mortar" music stores must typically purchase an entire
4  album of the artist or group selected, online sales of Audio Downloads offer consumers the option to
5  purchase only individual songs or tracks of music separately. This is borne out by sales statistics
6  showing that on iTS, for every sale of a complete album online there are approximately 20 songs
7  purchased individually. By contrast, according to statistics compiled by the Recording Industry
8  Association of America, in the CD market in 2005, sales of CD albums were 705.4 million compared
9  to sales of CD singles of 2.8 million units.

10    21.    Further, unlike "brick and mortar" music stores, the Audio Download Market offers
11  consumers the ability to create their own customized "playlists" wherein consumers can, in effect,
12  create their own customized collection of songs from different artists.

13    22.    In addition, the music selection available in the Audio Download Market is not
14  coextensive with the music selection available at "brick and mortar" music stores. Audio Download
15  sites provide a ready outlet for independent and less popular artists whose music is not readily
16  available at "brick and mortar" music stores, which only have room to carry a small fraction of the
17  inventory of Audio Download stores.

18    23.    In the eyes of consumers, the Audio Download Market and the "brick and mortar"
19  market are not in price-competition with one another. The Audio Download Market focuses on
20  selling individual tracks or songs while the "brick and mortar" market is focused on selling whole
21  albums or CDs, thereby making price-comparison between these two distinct markets a *non sequitur*.
22  Further, because of the ubiquitous nature of the internet, Audio Download sales are available to a
23  whole host of consumers who do not have ready access to nearby "brick and mortar" music stores,
24  let alone a nearby "brick and mortar" store stocking the particular recording desired by these
25  consumers at any given time. Similarly, because search costs on the internet are a fraction of search
26  costs involved in the "brick and mortar" market, consumers are not likely to and do not forego a
27  purchase of a music recording online even if they hypothetically would believe that the same
28  recording could be obtained somewhat less expensively at a traditional "brick and mortar" store.

1  The costs associated with traveling to "brick and mortar" music stores, searching one or more such
2  stores for a particular recording, and comparison shopping between these "brick and mortar" music
3  stores and online stores dissuade consumers from foregoing a purchase made from the comfort of
4  their own home or office for the same piece of music, even if doing the foregoing tasks could
5  hypothetically result in a savings of a few cents per song. Put differently, consumers are not likely
6  to and do not travel miles to their nearest "brick and mortar" music stores in the hopes of saving a
7  few cents off a song purchase that they could make instantaneously on their home computer.

8       24.    For these and other reasons, the Audio Download Market is and has been recognized
9  as a separate relevant product market.

10  **Portable Digital Media Player Market**

11       25.    The "Portable Digital Media Player Market" is defined as the market for portable
12  consumer electronic battery-powered devices that can store and play large numbers of digital media
13  files. Portable Digital Media Players are enormous improvements over portable CD players. While
14  a traditional CD can hold no more than 15 to 25 songs, Portable Digital Media Players can store up
15  to 40,000 songs. Even the largest Portable Digital Media Players are only a fraction of the size of a
16  typical portable CD player. Portable Digital Media Players also dispense with the need to carry
17  around CDs and allow consumers to organize, categorize, and play their digital media files in
18  whatever manner or order they desire. Further advantages include superior skip protection and in
19  many models the ability to play video games, video files, and store digital photographs.

20       26.    At all relevant times, Apple has sold Portable Digital Media Players known as iPods.
21  These include all generations of the iPod Classic, iPod Shuffle, iPod Nano, iPod Mini and iPod
22  Touch (collectively, the "iPod").

23       27.    During the Class Period, Apple has maintained a market share of the Portable Digital
24  Media Player Market of 60% or more.

25       28.    Barriers to entry in the Portable Digital Media Player Market are high. In addition to
26  the barriers to entry into the Portable Digital Media Player Market imposed by Apple's illegal,
27  anticompetitive conduct, discussed in detail herein, other barriers to entry include: (a) high fixed
28  costs related to product development, production, manufacturing and marketing; (b) purchasers are

479616_1    AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)    - 6 -

1    unlikely to switch to a new Portable Digital Media Player unless it is compatible with their existing
2    libraries of Audio Downloads; (c) new entrants were required to license Digital Rights Management
3    software ("DRM") so that their Portable Digital Media Players were capable of playing DRM-
4    encrypted Audio Downloads purchased from online stores; and (d) certain DRM's, including
5    FairPlay, were proprietary and not available to license.

6          29.      The relevant geographic market for the relevant product markets is the United States.

7                                **CLASS ACTION ALLEGATIONS**

8          30.      Plaintiffs seek to represent the following Class:

9          31.      All persons or entities in the United States (excluding federal, state and local
10   governmental entities, Apple, its directors, officers and members of their families) who purchased an
11   iPod directly from Apple between October 1, 2004 and March 31, 2009 ("Class Period").

12         32.      The membership of the Class is so numerous that joinder of all members is
13   impractical. There are millions of Class members who are geographically dispersed throughout the
14   United States.

15         33.      Plaintiffs' claims are typical of the claims of the members of the Class because
16   Plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendant
17   alleged herein.

18         34.      There are questions of law and fact common to the Class which predominate over any
19   questions affecting only individual Class members. Such common questions include:

20               (a)      The definition of the relevant product markets;

21               (b)      Apple's market power within the relevant product markets;

22               (c)      Whether Apple monopolized and continues to monopolize the relevant
23   product markets;

24               (d)      Whether Apple attempted to monopolize and continues to attempt to
25   monopolize the relevant product markets;

26               (e)      Whether the contractual conditions Apple imposes upon its customers are
27   unconscionable; and

28

(f)     Whether Apple's conduct caused damage to Plaintiffs and members of the Class, including the degree to which prices paid by the Class are higher than the prices that would have been paid in a market free from monopolization and other illegal conduct.

35.     The claims of Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interest adverse to the interest of other members of the Class.

36.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

37.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford on their own to individually litigate an antitrust claim against a large corporate defendant. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

**APPLE'S USE OF FAIRPLAY TO MAINTAIN MONOPOLY POWER**

38.     On January 9, 2001, Apple released a digital media player application known as iTunes that is used for playing and organizing digital media files on a personal computer. iTunes allows the user to, *inter alia*, organize music, record CDs, and download the files onto a Portable Digital Media Player.

39.     On October 23, 2001, Apple released the iPod, its first Portable Digital Media Player. At the time, iPod was capable of playing only unprotected Audio Downloads in MP3 format either downloaded from the internet or transferred from a user's CD ("burned").

40.     On April 28, 2003, Apple opened iTS, known at the time as the iTunes Music Store. iTS offered over 200,000 songs from the major record labels for sale for 99 cents each. This was the largest online music store of its time. iTS now offers more than 11,00,000 songs. iTS is accessible

1  only through iTunes. At the same time as the release of iTS, Apple also released a new generation of

2  iPod and updated the iTunes software so that iTunes and iPod software was compatible with

3  FairPlay.

4      41.    Traditionally, Audio Downloads have come in both unprotected and protected digital

5  file formats. Unlike unprotected formats, protected formats include technological encumbrances,

6  commonly known as DRM, designed to restrict a consumer's use of the file and illegal unauthorized

7  copies of the digital file.

8      42.    From the inception of Apple's iTS, the major record labels, Sony, Universal, EMI,

9  Warner, and BMG, all required Audio Downloads to be sold in protected format. Apple elected to

10  encode the Audio Downloads sold through the iTS with its own proprietary software, FairPlay.

11      43.    Because FairPlay was not licensed to any other manufacturers of Portable Digital

12  Media Players or sellers of Audio Downloads, songs purchased from iTS that were encoded with

13  FairPlay were incapable of being played by Portable Digital Media Players other than iPods. Thus,

14  consumers who purchased Audio Downloads from Apple had no choice but to buy an iPod if they

15  wanted to play those songs directly on a Portable Digital Media Player. Conversely, iPods were

16  unable to play any files encrypted with a DRM format other than FairPlay that were sold on

17  competing Audio Download stores.

18      44.    Apple encoded all Audio Downloads sold through the iTS with FairPlay even as to:

19  (a) public domain material; and (b) music that certain music labels and/or artists themselves

20  requested be sold DRM-free.

21      45.    Apple used its proprietary DRM to gain an overwhelming market share in the Audio

22  Download and Portable Digital Media Player markets.

23      46.    After purchasing their Audio Download library from the iTS, purchasers were locked

24  into making all future Portable Digital Media Player purchases from Apple. They may have wanted

25  to buy a non-Apple Portable Digital Media Player to replace their iPod, but to do so would mean

26  they could not utilize any of the FairPlay-protected songs they purchased from the iTS on their new

27  Portable Digital Media Player.

28

Trial Ex. 2593, Page 10 of 29

1     47.    This quickly increased Apple's market share in both the Portable Digital Media

2 Player and Audio Download Markets. After the release of iTS in April 2003, Apple steadily

3 maintained a 70% or more market share of the Audio Download Market. Additionally, prior to

4 release of iTS, Apple's iPod maintained about 11% of the market compared to up to 92% after the

5 release of iTS. As Josh Bernoff, principle analyst with Forrester Research stated, Apple's

6 "overwhelming market share is based in large part on its ability to lock people into that device."

7     48.    Apple could have licensed its FairPlay software to other manufacturers of Portable

8 Digital Media Players, so that music purchased from the iTS could be transferred directly to Portable

9 Digital Media Players other than the iPod. Additionally, Apple could have licensed its FairPlay to

10 other Audio Download stores so that music files purchased from those stores could be played

11 directly on iPods.

12     49.    However, Apple did not license or give access to FairPlay to any other Portable

13 Digital Media Player manufacturer, thereby ensuring two results. First, Apple ensured that the iPod

14 was the only Portable Digital Media Player that could directly play songs purchased from the iTS.

15 Second, Apple ensured that owners of iPods who wanted to purchase Audio Downloads to be

16 directly played on their iPod could only do so by purchasing these files at the iTS.

17     50.    But for Apple's anticompetitive intent, it would have been rational and profitable for

18 Apple to license FairPlay to competing manufacturers of Portable Digital Media Players because it

19 would have expanded the consumer base for iTS. The more Portable Digital Media Players on the

20 market that were interoperable with files purchased from iTS, the more profitable iTS would have

21 been.

22     51.    Instead, Apple used its dominant position obtained as a result of FairPlay, to obtain

23 monopoly power in the relevant product markets and to make substantial profits in the sale of iPods.

24 Indeed, Apple claims that it has operated the iTS at just above cost, instead taking its monopoly

25 profits in the sale of iPods. In the first quarter of 2008, Apple reported $9.6 billion in revenue, 42%

26 of which came from the sale of iPods. Instead, Apple took its anticompetitive profits from the sale

27 of iPods.

28

479616_1    AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)    - 10 -

1             **APPLE'S ANTICOMPETITIVE USE OF SOFTWARE UPDATES**

2         52.     In order to maintain its monopoly power in the market for Audio Downloads and the

3 market for Portable Digital Media Players, Apple has used software updates to shut out competitors

4 and cut off their access to the marketplace. Apple's anticompetitive tactics were intended to, and

5 had the effect of, preventing and/or delaying entry of competitive products that threatened Apple's

6 monopolies in the relevant product markets.

7         53.     On July 26, 2004, RealNetworks, a rival seller of Audio Downloads, announced that

8 songs sold through its online store could be played on the iPod in addition to other competing

9 Portable Digital Media Players. This gave iPod owners a competitive alternative to the iTS for their

10 purchases of Audio Downloads. RealNetworks had independently analyzed the firmware within the

11 iPod and was able to discern the required extra software code added by Apple to make downloaded

12 songs playable on the iPod. Armed with this knowledge, RealNetworks was able to convert their

13 Helix DRM into the necessary DRM so that Audio Downloads sold through RealNetworks' online

14 store could be playable on Apple's iPod. This technology was known as Harmony. RealNetworks

15 maintained that its conduct was legal.

16         54.     RealNetworks' Harmony was significant not only because it represented the first

17 alternative to Apple's monopolistic stronghold of Audio Downloads for playback on the iPod, but

18 also because RealNetworks began selling its Audio Downloads for as low as 49 cents per track, well

19 below the 99 cents per track charged by Apple's iTS.

20         55.     At the time of RealNetworks' announcement, although there were several Portable

21 Digital Media Players in the marketplace, the iPod was the number one seller and controlled 60%

22 market share. Thus, in order to compete with Apple's iTS, which had 70% market share and was the

23 only Audio Download store that sold downloads compatible with iPod, RealNetworks had to make

24 its products compatible with iPods.

25         56.     Moreover, RealNetworks' announcement was met with approval from the major

26 record labels. This was because RealNetworks sold its Audio Downloads with DRM protection that

27 ensured the files could not be improperly copied but also allowed for compatibility with over 100

28 Portable Digital Media Players, including Apple's iPod.

AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)        - 11 -

1       57.    Indeed, in its first three weeks of selling iPod-compatible music files, RealNetworks

2 sold three million music files. RealNetworks alleged that with Harmony RealNetworks increased its

3 market share in the Audio Download Market to 20% from 10% and decreased Apple's market share

4 from 60% to 70%.

5       58.    As Forrester Research pointed out about RealNetworks' actions at the time, "more

6 compatibility means more competition."

7       59.    Rather than embracing this competitive offering to iPod owners, Apple immediately

8 threatened RealNetworks and iPod users. On July 29, 2004, merely four days after RealNetworks'

9 announcement, Apple issued its own public statement warning RealNetworks and iPod users: "We

10 strongly caution Real and their customers that *when we update our iPod software from time to time*

11 *it is highly likely that Real's Harmony technology will cease to work with current and future*

12 *iPods*." (emphasis added).

13       60.    True to its threat, beginning in October 2004, Apple updated its iPod and iTunes

14 software to prevent songs downloaded from RealNetworks' music store from being played on iPods.

15 Unlike other software updates previously issued by Apple, purchasers were required to update the

16 iTunes software in order to use iTS. This sent a clear message to other Apple competitors, that

17 Apple was not willing to allow genuine competition in the relevant product markets and would take

18 aggressive steps to prevent competition.

19       61.    In the wake of this episode, RealNetworks and other companies were reluctant to

20 invest the necessary capital to develop music stores that would allow them to adequately compete

21 with Apple by selling Audio Downloads compatible with iPods. As RealNetworks stated in an SEC

22 filing in August 2005: "There are other risks associated with our Harmony technology, including the

23 risk that Apple will continue to modify its technology to 'break' the interoperability that Harmony

24 provides to consumers, which Apple has done in connection with the release of certain new products.

25 If Apple chooses to continue this course of action, Harmony may no longer work with Apple's

26 products, which could harm our business and reputation, or we may be forced to incur additional

27 development costs to refine Harmony to make it interoperate again."

28

1  62.    Because Apple was able to maintain its monopoly power in the Audio Download

2  Market, competing manufacturers of Portable Digital Media Players were unable to compete with

3  Apple's iPod because any media player they created would not be compatible with iTS. Consumers

4  who purchased Audio Downloads from iTS would not purchase a Portable Digital Media Player

5  unless those iTS files could be played on their Portable Digital Media Player. Because iTS

6  maintained 70% or more of the Audio Download Market, interoperability with files purchased from

7  iTS was critical. However, because Apple would not license FairPlay and issued software updates

8  intended to prevent interoperability when achieved, competitors were unable to genuinely compete.

9  Accordingly, Apple willfully maintained its monopoly of both the Audio Download Market and

10  Portable Digital Media Player Market.

11  63.    Apple also issued several software updates intended to prevent Audio Downloads

12  purchased from iTS from being played on competing Portable Digital Media Players.

13  64.    For example, in or about the beginning of 2005, a software program known as JHymn

14  was developed so that Audio Downloads purchased from iTS could be played on any AAC-

15  compatible music player, including Apple's iPod or any non-Apple device. This gave consumers a

16  clear choice of using an iPod for playback of their iTS purchases or an alternative Portable Digital

17  Media Player.

18  65.    Apple immediately began issuing software updates to prevent iTS files that were

19  made interoperable with other Portable Digital Media Players using JHymn software from being

20  played. In October 2005, iTunes 6.0 was released and included changes specifically intended to stop

21  JHymn and other similar software programs.

22  66.    Again in September 2006, Apple released iTunes 7.0 intended to prevent JHymn and

23  other programs from being used to create interoperability between Audio Downloads purchased

24  from iTS and non-Apple Portable Digital Media Players. Throughout the Class Period, Apple issued

25  software updates intended to prevent the use of other similar programs including QTFairUse and

26  PlayFair.

27  67.    Apple continually redesigned its software even though it admitted that doing so

28  served no genuine antipiracy purpose. In a web-posting dated February 6, 2007, Apple's CEO Steve

479616_1    AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                    - 13 -

1   Jobs conceded that "DRMs haven't worked, and may never work, to halt music piracy." Moreover,

2   the record companies that contractually required DRM did not require all of the anticompetitive

3   software updates issued by Apple.

4   **Removal of FairPlay**

5        68.     On April 2, 2007, EMI began selling its entire catalog of music on iTS without DRM

6   restrictions and hence no FairPlay. As Eric Nicoli, CEO of EMI Group stated, "[b]y providing

7   DRM-free downloads, we aim to address the lack of interoperability which is frustrating for many

8   music fans. We believe that offering consumers the opportunity to buy higher quality tracks and

9   listen to them on the device or platform of their choice will boost sales of digital music." This

10   represented only a fraction of the entire catalog available on iTS at the time.

11        69.     In January 2008, Amazon.com became the first music store to sell all Audio

12   Downloads without DRM restrictions. Its initial catalog contained over 2 million songs. The current

13   catalog now offers over 10 million songs.

14        70.     In January 2009, Apple announced that it would begin selling most Audio Downloads

15   through iTS without FairPlay restrictions. Purchasers that previously bought Audio Downloads

16   from iTS in the past could also upgrade these files to a FairPlay-free format for an additional cost of

17   30 cents per file or 30% of the original album price. By the end of March 2009, all Audio

18   Downloads sold through iTS were FairPlay-free.

19        71.     This presented the first time when all iPod owners could freely purchase Audio

20   Downloads from any online store for playback on their iPods. This also presented the first time

21   when Apple could no longer re-design FairPlay software through software updates to control

22   competition in the relevant product markets and restrict consumer choice. Indeed, in 2009, Apple's

23   market share in the Audio Download Market began to slip for the first time since its creation.

24   Apple's share in the Audio Download Market slipped from 68.3% to 67.1%, whereas, by

25   comparison Amazon's MP3 Store jumped from 6.2% to 9.1%.

26        72.     Despite Apple's decision to sell Audio Downloads unencumbered by FairPlay on a

27   going-forward basis, the impact of Apple's prior conduct did not end. The billions of songs already

28   downloaded by consumers that remain locked by FairPlay continued to allow Apple to charge

1  monopoly prices for its iPod because it is the only Portable Digital Media Player that can play those

2  files.

3  ## APPLE'S CONDUCT HAS BEEN THE TARGET OF FORMAL GOVERNMENT
   ## INVESTIGATIONS AND LEGISLATION IN EUROPE

4

5       73.     In August 2006, France's government approved a law that was specifically designed

6  to force Apple to allow other companies to sell protected music files on the iPod, and to force Apple

7  to make music purchased on its iTS compatible with competing Portable Digital Media Players. In

8  an interview, a French official explained that his government believes that "[s]omeone who buys a

9  song has to be able to listen to it, no matter which device or the software of choice" and that Apple is

10 designing its products to prevent consumers from using other companies' products is "not in the

11 interest of the consumer, nor the interest of the creator. It only benefits the company and we're there

12 to defend the consumer, our citizens." Apple unsuccessfully lobbied against the law, calling it "state

13 sponsored piracy."

14      74.     In 2006, the consumer ombudsmen in Norway, the Netherlands, Finland, Sweden,

15 Denmark, and Germany began investigating Apple's use of FairPlay.

16      75.     On July 6, 2006, the Office of the Norwegian Consumer Ombudsman found "[t]he

17 way Apple uses DRM is illegal." Using language that echoes the American common law standard of

18 an unconscionable contract, Ombudsman Bjørn Erik Thon ruled:

19       [Apple] goes to great lengths to ensure that its standard customer contract
         protects the company's own interest. . . . "The contracts are both vague and hard to
20       understand for the customers, and they're clearly unbalanced to disfavor the
         customer. The consumers are clearly the inferior partner in the contract, and this in
21       itself is illegal . . . ." "[Apple's restrictive] technology renders the customers without
         rights in dealing with a company which on a whim can dictate what kind of access
22       customers will have to products they have already paid for . . . ."

      76.     Similarly, in the Netherlands, the Consumer Ombudsman filed suit against what it
23
   called Apple's "illegal practices" "abuse of dominant market position" noting that "[w]hat we want
24
   from Apple is that they remove the limitations that prevent you from playing a song you download
25
   from iTunes on any player other than an iPod . . . . When you buy a music CD it doesn't play only
26
   on players made by Panasonic. People who download a song from iTunes shouldn't be bound to an
27
   iPod for the rest of their lives."
28

479616_1    AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                               - 15 -

1    77.    The European Union Consumer Affairs Commissioner criticized Apple on March 12,
2    2007, saying: "[d]o you think it's fine that a CD plays in all CD players but that an iTunes song only
3    plays in an iPod? I don't."

4    78.    Several of the above European governments issued a joint statement saying "[w]e
5    believe consumers have a right to play material purchased online on a portable device of their own
6    choice. Contract clauses that make this impossible or too inconvenient are unfair and should be
7    revoked."

8    79.    In 2008, with the support of other European countries, Norway brought a formal
9    action against Apple. In September 2008, Norway's Consumer Ombudsman, Bjørn Erik Thon,
10   referred Apple to the Norwegian Market Council. Bjørn Erick Thon indicated that since his last
11   meeting with Apple in February 2008, when Apple stated that it shared the goal of complete
12   interoperability, Apple had done nothing to advance that goal.

13   80.    Norway dropped its action against Apple in early 2009, when Apple announced that it
14   would begin selling Audio Downloads through iTS without FairPlay so that they could be played on
15   Portable Digital Media Players other than iPods.

16                    **ANTITRUST INJURY TO CONSUMERS**

17   81.    Through the unlawful acts and practices described above, Apple has harmed
18   competition and innovation by forcing out competitors in the relevant product markets and harmed
19   consumers by causing them to pay supracompetitive prices for iPods. Those practices, described
20   herein, have also allowed Apple to obtain and maintain illegal monopolies in the relevant product
21   markets.

22   82.    Apple engaged in willful anticompetitive conduct to maintain its monopoly in both
23   the Audio Download Market and Portable Digital Media Player Market through the use of software
24   updates intended to prevent competitors from selling Audio Downloads that were compatible with
25   iPods. As a result of this conduct and the technological link created by FairPlay, Apple was able to
26   preserve its monopoly in both markets and charge purchasers of iPods a supracompetitive price.

27   83.    Likewise, by preventing owners of iPods from buying music from any Audio
28   Downloads retailer other than iTS, Apple deterred consumers from even considering doing business

479616_1    AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                                    - 16 -

1   with its competitors' music stores, allowing it to monopolize the Audio Download Market, and
2   further exclude competing Portable Digital Media Players from the market, lock consumers into iPod
3   and iTunes, and charge supracompetitive prices for the iPod.

4         84.    Moreover, through the use of software updates intended to prevent interoperability
5   between Audio Downloads purchased through the iTS and competing Portable Digital Media
6   Players, Apple was able to discourage the purchase of competitors products, allowing it to
7   monopolize the Portable Digital Player Market and charge supracompetitive prices for iPods.

8         85.    Consumers have been further injured as innovative companies such as Dell, Olympus,
9   and Rio have withdrawn from the Portable Digital Media Player Market. These companies had little
10   choice but to give up and exit the market because Apple's anticompetitive conduct excluded them
11   from reaching the majority of their potential customers no matter how much cheaper or how much
12   better their products were from iPods. There could be no real competition in the Audio Download
13   and Portable Digital Media Player Market as long as Apple's conduct foreclosed even the possibility
14   of its competitors reaching most potential customers.

15         86.    Apple's anticompetitive conduct has deterred the development of competing
16   products, damaging consumers by depriving them of a choice of products with potentially different
17   and innovative features.

18         87.    Normally markets for consumer electronic goods such as Portable Digital Media
19   Players are characterized by intense competition and narrow profit margins. Apple's pricing in the
20   Portable Digital Media Player Market, by contrast, is exactly that of a monopolist, excessive and
21   arbitrary. For example, in June 2006 the only difference between the 1GB and 4GB models of the
22   iPod nano was the capacity of their NAND flash memory parts. At spot prices in the NAND flash
23   memory market at the time, the 1GB part cost approximately $4.15, while the 4GB part cost
24   approximately $9.67. Nonetheless, Apple charged an additional one hundred dollars for the 4GB
25   model.

26         88.    Plaintiffs and the Class have been injured by this anticompetitive conduct. As a direct
27   result of Apple's anticompetitive use of software updates, Plaintiffs and members of the Class paid
28   supracompetitive prices for iPods.

# COUNT I: MONOPOLIZATION

## (For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)

### Violations Resulting from the Unlawful Maintenance of Monopoly Power in the Portable Digital Media Player Market

89. Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

90. Apple has monopoly power in the Portable Digital Player Market.

91. Through the anticompetitive use of software updates described herein, Apple has willfully maintained its monopoly of the Portable Digital Media Player Market. This conduct has harmed competition in that market, and has caused injury to every buyer of an iPod from Apple during the Class Period. Prices in the Portable Digital Media Player Market were higher than they would have been in a competitive market; the supply and selection of products available was lower than it would have been in a competitive market; innovation has been stifled; and the number and effectiveness of competitors have been diminished by unlawful means.

92. As a result of this violation of law, Apple's prices for iPods paid by the Class and Plaintiffs were higher than they otherwise would have been.

93. There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's monopolization of the Portable Digital Media Player Market.

94. The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

### Violations Resulting from the Unlawful Maintenance of Monopoly Power in the Audio Download Market

95. Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

96. Apple has monopoly power in the Audio Download Market.

97. Through Apple's anticompetitive use of software updates described herein, Apple has willfully maintained monopoly power in the Audio Download Market. This conduct has harmed competition in that market, making the supply and selection of products available lower in the Audio

1 | Download Market than they would be in a competitive market. The number and effectiveness of

2 | competitors have also been diminished by Apple's unlawful conduct.

3 | 98. There is no appropriate or legitimate business justification for the actions and conduct

4 | which have facilitated Apple's monopolization of the Audio Download Market.

5 | 99. The anticompetitive conduct described herein has damaged Plaintiffs and the alleged

6 | Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

7 | **COUNT II: ATTEMPTED MONOPOLIZATION**

8 | **(For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2)**

9 | **Violations Resulting from Unlawful Attempted
Monopolization of the Portable Digital Media Player Market**

10

11 | 100. Plaintiffs re-allege and incorporate by reference each of the allegations, set forth
above, on behalf of the Class.

12

13 | 101. Apple has acted with specific intent to monopolize the Portable Digital Media Player
Market by using software updates intended to stifle competition and restrict consumer choice.

14

15 | 102. There was and is a dangerous possibility that Apple will succeed in its attempt to
monopolize the Portable Digital Media Player Market because Apple controls a large percentage of

16

17 | that market and has the ability, and actually does, exclude its competitors through use of
anticompetitive technological restrictions on its products. Further success in excluding competitors

18

19 | from the Portable Digital Media Player Market will allow Apple to obtain an illegal monopoly over
the Portable Digital Media Player Market.

20

21 | 103. This conduct has harmed competition in that market, making the supply and selection
of products available lower than it would be in a competitive market. Apple's unlawful attempted

22

23 | monopolization has also reduced the number and effectiveness of competitors in the Portable Digital
Media Player Market and forced consumers to pay higher prices in the Portable Digital Media Player

24

25 | Market than they would in a competitive market.

26 | 104. There is no appropriate or legitimate business justification for the actions and conduct
which have facilitated Apple's attempted monopolization of the Portable Digital Media Player

27 | Market.

28

105.     The anticompetitive conduct described herein, if not halted and abated, will damage Plaintiffs and the alleged Class, and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**Violations Resulting from the Unlawful Attempted
Monopolization of the Audio Download Market**

106.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

107.     Apple has acted with specific intent to monopolize the Audio Download Market by issuing software updates intended to stifle competition and restrict consumer choice.

108.     There was and is a dangerous possibility that Apple will succeed in its attempt to monopolize the Audio Download Market because Apple controls a large percentage of that market and has the ability and actually does exclude its competitors through use of anticompetitive technological restrictions on its products. Further success in excluding competitors from the Audio Download Market will allow Apple to obtain an illegal monopoly over the Audio Download Market.

109.     This conduct has harmed competition in that market, making the supply and selection of products available lower than it would be in a competitive market. Apple's unlawful attempted monopolization has also reduced the number and effectiveness of competitors in the Audio Download Market.

110.     There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Apple's attempted monopolization of the Audio Download Market.

111.     The anticompetitive conduct described herein has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §2.

**COUNT III**

**(For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq.*)**

112.     Plaintiffs re-allege and incorporate by reference each of the allegations, set forth above, on behalf of the Class.

113.     Apple's actions as described above constituted an unreasonable restraint of trade or commerce throughout California and the rest of the United States in violation of the Cartwright Act, §§16270, *et seq.* of the California Business and Professions Code.

479616_1     AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                         - 20 -

1     114.    The Class has been injured in their business and property as a result of Apple's illegal

2  conduct, for which they seek damages (treble damages where appropriate) including pre-judgment

3  interest.

4                         **COUNT IV**

5            **(For Violation of California Unfair Competition Law,**

6            **Bus. & Prof. Code §§17200, *et seq*.)**

7     115.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth

above, on behalf of the Class.

8

9     116.    The conduct alleged herein constitutes unlawful and unfair business acts and practices

10  within the meaning of the California Unfair Competition Law, §§17200, *et seq*. of the California

11  Business and Professions Code ("UCL"). Plaintiffs have suffered injury in fact and lost money or

property as a result of Apple's violations of law and wrongful conduct.

12

13     117.    Apple's actions are unlawful under the UCL because they violate, *inter alia*, the

14  Sherman Antitrust Act, the Cartwright Act, the Consumers Legal Remedies Act and because Apple

15  has monopolized the markets for Audio Downloads and Portable Digital Media Players in violation

of California common law.

16

17     118.    Apple's actions are unfair under the UCL because, in its pursuit of monopoly pricing,

18  it has shut out competitors who attempted to enter the relevant product markets thus preventing

19  consumers from choosing which companies to do business with in the relevant product markets

20  based on the merits of each company's products. Such conduct is immoral, unethical, oppressive

21  and/or unscrupulous and causes injury to consumers. Moreover, there is no legitimate business

22  justification for Apple's conduct, and any business justification is further outweighed by the harm

Apple's conduct has caused to consumers and competitors.

23

24     119.    Accordingly, Apple has violated the UCL by engaging in unlawful and unfair

business practices.

25

26     120.    As a result of this unlawful and unfair conduct, Apple has been unjustly enriched at

the expense of Plaintiffs, other members of the Class, and the general public.

27

28

1

**COUNT V**

2

**(For Violation of the Consumers Legal Remedies Act,
Cal. Civil Code §§1750, *et seq.*)**

3

4

121.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth
above, on behalf of the Class.

5

6

122.    Plaintiffs and each member of the Class are "consumers" within the meaning of
Consumers Legal Remedies Act, California Civil Code §1761(d) ("CLRA").

7

8

123.    On July 7, 2006, Plaintiff Melanie Tucker sent a letter to Apple's general counsel
demanding Apple cease its conduct in violation of the CLRA.

9

10

124.    The CLRA applies to Apple's actions and conduct, described herein, because it
extends to transactions that are intended to result, or which have resulted, in the sale or lease of
goods or services to consumers.

11

12

125.    Apple is a monopolist with market shares of 70% or more in each of the relevant
product markets and a stock market capitalization of more than fifty billion dollars. Through the use
of FairPlay, Apple has continued to shut out competitors at no benefit to consumers while preventing
them from using any Apple product they have already bought from being used with a competitor's
Portable Digital Media Player or iTS.

13

14

15

16

17

126.    Apple's size, completely dominates market share, and unreasonable and unfair
technological restrictions along with its use of software updates, place it in a greatly unequal
bargaining position relative to consumers in each of the relevant product markets.

18

19

20

127.    Apple unconscionably exploits this unequal bargaining power by imposing prices,
contractual terms, and one sided technological restrictions into contracts with consumers in the
Audio Download Market and Portable Digital Media Player Markets. This behavior has violated and
continues to violate the CLRA.

21

22

23

24

**COUNT VI**

25

**(For Common Law Monopolization Business Practices)**

26

128.    Plaintiffs re-allege and incorporate by reference each of the allegations, set forth
above, on behalf of the Class.

27

28

479616_1    AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)                                    - 22 -

1    129.    The conduct described herein is in violation of California common law prohibiting
2 monopolization.

3                              **PRESERVATION OF CLAIMS FOR APPEAL**

4    130.    Plaintiffs expressly incorporate by reference from the April 19, 2007 Consolidated
5 Complaint all allegations in support of: Count 1 Tying (for violation of Section 1 of the Sherman
6 Antitrust Act, 15 U.S.C. §1) under both a *per se* and rule of reason analysis.  Plaintiffs likewise
7 incorporate Count II Monopolization and Count III Attempted Monopolization (for violations of
8 Section 2 of the Sherman Antitrust Act, 15 U.S.C. §2) arising solely from the existence of a
9 technological tie between iTS and iPods prior to October 1, 2004.  Plaintiffs incorporate these
10 allegations out of an abundance of caution, solely for the purpose of preserving such claims for
11 appeal.  *See London v. Coopers & Lybrand*, 644 F.2d 811, 814 (9th Cir. 1981) and *USS-POSCO*
12 *Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 812 (9th
13 Cir. 1994).

14                              **PRAYER FOR RELIEF**

15    WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the putative Class, pray
16 that the Court declare, adjudge and decree the following:

17    A.    That this action may be maintained as a class action pursuant to Rule 23(b)(3) of the
18 Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief,
19 and declaring Plaintiffs as representatives of the Class and their counsel as counsel for the Class;

20    B.    That the conduct alleged herein constitutes unlawful monopolization and attempted
21 monopolization in violation of the Cartwright Act, California common law, and Section 2 of the
22 Sherman Antitrust Act;

23    C.    That the conduct alleged herein is in violation of the UCL and appropriate
24 restitutionary relief be granted pursuant thereto;

25    D.    That the conduct alleged herein is in violation of the CLRA; and appropriate damages
26 be granted thereto;

27    E.    That Plaintiffs and the Class are entitled to damages, penalties and other monetary
28 relief provided by applicable law, including treble damages;

479616_1    AMENDED CONSOLIDATED COMPLAINT  - C-05-00037-JW(HRL)          - 23 -

1    F.    That Plaintiffs and the Class recover their costs of suit, including reasonable pre- and

2  post-judgment interest;

3    G.    For an order requiring full restitution of all funds acquired from Apple's unfair

4  business practices, including disgorgement of revenues and/or profits;

5    H.    Awarding Plaintiffs and the Class their expenses and costs of suit, including

6  reasonable attorneys' fees, to the extent provided by law; and

7    I.    That Plaintiffs and the Class are granted such other, further, and different relief as the

8  nature of the case may require or as may be determined to be just, equitable, and proper by this

9  Court.

10                              **JURY DEMAND**

11    Plaintiffs respectfully demand a trial by jury on all issues so triable.

12  DATED: January 25, 2010                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
13                                            JOHN J. STOIA, JR.
                                              BONNY E. SWEENEY
14                                            THOMAS R. MERRICK
                                              PAULA M. ROACH
15

16
                                                    s/ Bonny E. Sweeney
17                                                BONNY E. SWEENEY

18                                            655 West Broadway, Suite 1900
                                              San Diego, CA 92101
19                                            Telephone: 619/231-1058
                                              619/231-7423 (fax)
20
                                              THE KATRIEL LAW FIRM
21                                            ROY A. KATRIEL
                                              1101 30th Street, N.W., Suite 500
22                                            Washington, DC 20007
                                              Telephone: 202/625-4342
23                                            202/330-5593 (fax)

24                                            Co-Lead Counsel for Plaintiffs

25                                            BONNETT, FAIRBOURN, FRIEDMAN
                                              & BALINT, P.C.
26                                            ANDREW S. FRIEDMAN
                                              FRANCIS J. BALINT, JR.
27                                            ELAINE A. RYAN
                                              TODD D. CARPENTER
28                                            2901 N. Central Avenue, Suite 1000

479616_1    AMENDED CONSOLIDATED COMPLAINT - C-05-00037-JW(HRL)                                - 24 -

1                                             Phoenix, AZ 85012
                                                  Telephone: 602/274-1100

2                                             602/274-1199 (fax)

3                                             BRAUN LAW GROUP, P.C.
                                            MICHAEL D. BRAUN

4                                             12304 Santa Monica Blvd., Suite 109
                                            Los Angeles, CA 90025

5                                             Telephone: 310/442-7755
                                            310/442-7756 (fax)

6

7                                             MURRAY, FRANK & SAILER LLP
                                            BRIAN P. MURRAY

8                                             JACQUELINE SAILER
                                            275 Madison Avenue, Suite 801

9                                             New York, NY 10016
                                            Telephone: 212/682-1818

10                                            212/682-1892 (fax)

11                                             GLANCY BINKOW & GOLDBERG LLP
                                            MICHAEL GOLDBERG

12                                             1801 Avenue of the Stars, Suite 311
                                            Los Angeles, CA 90067

13                                             Telephone: 310/201-9150
                                            310/201-9160 (fax)

14                                             Additional Counsel for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                                  <u>CERTIFICATE OF SERVICE</u>

2           I hereby certify that on January 26, 2010, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7           I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct. Executed on January 26, 2010.

9                                         <u>s/ Bonny E. Sweeney</u>
                                          BONNY E. SWEENEY

10

11                                  COUGHLIN STOIA GELLER
                                   RUDMAN & ROBBINS LLP

12                                655 West Broadway, Suite 1900
                               San Diego, CA 92101-3301

13                                Telephone: 619/231-1058
                               619/231-7423 (fax)

14                                E-mail:BonnyS@csgrr.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

479616_1

# Mailing Information for a Case 5:05-cv-00037-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Francis Joseph Balint , Jr**
  fbalint@bffb.com

- **Michael D Braun**
  service@braunlawgroup.com

- **Michael D. Braun**
  service@braunlawgroup.com,clc@braunlawgroup.com

- **Todd David Carpenter**
  tcarpenter@bffb.com

- **Andrew S. Friedman**
  rcreech@bffb.com,afriedman@bffb.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,judyj@zhlaw.com

- **Roy A. Katriel**
  rak@katriellaw.com,rk618@aol.com

- **Thomas J. Kennedy**
  tkennedy@murrayfrank.com

- **David Craig Kiernan**
  dkiernan@jonesday.com,lwong@jonesday.com,valdajani@jonesday.com

- **Thomas Robert Merrick**
  tmerrick@csgrr.com

- **Caroline Nason Mitchell**
  cnmitchell@jonesday.com,mlandsborough@jonesday.com,ewallace@jonesday.com

- **Robert Allan Mittelstaedt**
  ramittelstaedt@jonesday.com,ybennett@jonesday.com

- **Brian P Murray**
  bmurray@murrayfrank.com

- **Paula Michelle Roach**
  proach@csgrr.com

- **Elaine A. Ryan**

eryan@bffb.com,pjohnson@bffb.com

- **Jacqueline Sailer**
  jsailer@murrayfrank.com

- **Michael Tedder Scott**
  michaelscott@jonesday.com,gwayte@jonesday.com

- **Craig Ellsworth Stewart**
  cestewart@jonesday.com,mlandsborough@jonesday.com

- **John J. Stoia , Jr**
  jstoia@csgrr.com

- **Bonny E. Sweeney**
  bonnys@csgrr.com,proach@csgrr.com,E_file_sd@csgrr.com,christinas@csgrr.com

- **Helen I. Zeldes**
  helenz@zhlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Trial Ex. 2593, Page 29 of 29

# EXHIBIT 17

# Robbins Geller
## Rudman & Dowd LLP

Atlanta
Boca Raton

Melville
New York

Philadelphia
San Diego

San Francisco
Washington, DC

Thomas R. Merrick
TMerrick@rgrdlaw.com

April 23, 2010

VIA EMAIL AND U.S. MAIL

David C. Kiernan
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104

    Re:    *The Apple iPod iTunes Anti-Trust Litigation,*
            No. C-05-00037-JW (N.D. Cal.)

Dear David:

    I write to confirm our telephonic meet and confer held yesterday concerning the subject matter of the upcoming Rule 30(b)(6) deposition currently scheduled for May 6, 2010, and the related documents Plaintiffs requested through my letter to you dated April 19, 2010.

## Deposition Subject Matter

    Apple agrees to prepare its witness on the following topics: (1) the redesign of FairPlay included in iTunes 4.7; (2) in general, the other functions or purposes of iTunes 4.7, apart from the redesign of FairPlay; (3) knowledge of how exactly Harmony was disabled by the FairPlay redesign; (4) all other updates that prevented the playback of non-iTS files on iPods, to the extent that there are any; (5) an overview of how Apple responded to "hackers" generally and how the responsive software updates were distributed; (6) policies and procedures concerning the relevant software updates to the extent that there are any; (7) the relationship between iPod firmware and iTunes software; and (8) communications regarding the software updates. Also, while we did not discuss it yesterday, the documents already produced indicate that other updates may have affected later versions of Harmony. *See, e.g.,* AIIA00093860, 862. The witness should be prepared to discuss this topic as well.

    Plaintiffs have agreed to all of these topics except for (5) which addresses software updates to stop what Apple refers to as "hacks." Depending on Plaintiffs' expert's evaluation of the source code regarding "hacks," discussed below, the scope of limitations you suggest may or may not be sufficient.

    Additionally, please confirm who you will be proffering as Apple's person most knowledgeable to testify regarding these topics.



**Robbins Geller**
**Rudman & Dowd** LLP

David Kiernan
April 23, 2010
Page 2

**Related Document Requests**

The parties also discussed the related document requests identified in my letter to you dated April 19, 2010. You advised Plaintiffs of the following:

(1)     You advised that Apple was looking into this further but that it was your belief that Apple is not aware of any notes, minutes or other memorializations of meetings attended by Apple concerning the relevant software updates. This includes any internal meetings or meetings with third parties.

(2)     Apple is unaware of any notes, instructions, memoranda or other communications provided to developers or other persons responsible for creating and implementing the software updates. You advised Plaintiffs that Apple does not communicate in this fashion. Rather, management only communicates orally with the software engineers concerning the software updates.

(3)     Apple is not withholding any documents concerning iPod firmware updates. You advised that all relevant documents pulled using the agreed upon search terms and custodians, including those concerning any iPod firmware updates, were produced.

After review of Apple's production, Plaintiffs still believe that there is information concerning iPod firmware updates that was not produced. This may be a function of the search terms. Still, Plaintiffs request that Apple produce a change log for iPod firmware updates related to FairPlay, similar to those produced on May 27, 2009 concerning the iTunes software updates.

(4)     Apple is looking to see if other versions of the documents referenced in (4) of my April 19 letter exist. Apple is also looking to see if the paper referenced in AIIA00090771 exists.

(5)     Apple is unable to locate the communication between Rob Glaser, the former CEO of RealNetworks, and Steve Jobs.

(A)     Please advise whether Apple will be producing documents concerning its understanding of how Harmony works, including memos, emails, instructions, notes, and documents concerning Harmony's code.

(B) & (E)     Apple will consider producing source code for the FairPlay redesign in iTunes 4.7, the source code of FairPlay before iTunes 4.7, and the source code of FairPlay after iTunes 4.7. Apple will not produce the source code for the portions of the updates that concerned functions other than FairPlay, e.g. support for iPod Photo.

520572_2

**Robbins Geller**
**Rudman & Dowd LLP**

David Kiernan
April 23, 2010
Page 3

Plaintiffs have considered this and agree that subject to Plaintiffs' expert's review of the code for sufficiency, Apple may produce the portions of the source code that relate to FairPlay. Plaintiffs reserve their rights to request additional source code if their expert requires such code for a complete analysis.

(C)     Apple is looking for documents concerning the relationship between iTunes software updates and iPod firmware updates.

(D)     Apple is unaware of any documents being withheld that indicate how the observation of how Harmony's use of user IDs affected the FairPlay redesign.

(F)     Apple will not produce source code related to other iTunes software and iPod firmware redesigns that addressed "hacks." Apple does not believe that this is needed because the fact of redesign is not contested.

Plaintiffs have considered this and still request that Apple produce the source code related to the updates that addressed so-called "hacks." While the parties do not contest the fact that Apple issued the software updates to address "hacks," this information is still relevant to determine how they worked technically. One of Apple's primary defenses is that the so-called "hacks" violated the DMCA. In order to evaluate Apple's defense, Plaintiffs are entitled to discovery to show how the software worked and how Apple responded.

Please get back to Plaintiffs as soon as possible concerning the open issues above. If Plaintiffs need to seek court intervention on any of these issues they will need to do so immediately. Feel free to contact me if you have any questions.

Very truly yours,

THOMAS R. MERRICK

TRM:hsb

cc:     Bonny Sweeney (via email)
        Paula Roach (via email)
        Robert A. Mittelstaedt (via email)
        Michael T. Scott (via email)

520572_2



# EXHIBIT 18

# JONES DAY

555 CALIFORNIA STREET · 26TH FLOOR · SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 · FACSIMILE: 415-875-5700

Direct Number:  (415) 875-5745
dkiernan@jonesday.com

825624-605002

April 27, 2010

VIA E-MAIL

Thomas R. Merrick
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301

Re:    The Apple iPod iTunes Anti-Trust Litigation No. C-05-00037-JW (N.D. Cal.)

Dear Tom:

This letter responds to your letter to me dated April 23, 2010 regarding the certain categories of documents.

(1) Apple has produced non-privileged notes, minutes or other memorializations of meetings attended by Apple concerning the relevant software updates, if any, that were identified by the search terms for the agreed upon custodians.

We are in the process of producing documents, including emails, regarding the technical aspects of updates to FairPlay that were identified by the search terms for the agreed upon custodians. Up until now, plaintiffs had agreed that Apple did not need to produce the technical aspects of the software updates.

(2) Your April 19th letter complained that plaintiffs had only received emails with developers or other persons relating to the updates and that plaintiffs also wanted notes, instructions, memoranda or other communications provided to developers or other persons responsible for creating and implementing the software updates. Apple has produced responsive, non-privileged documents that were identified by the search terms for the agreed upon custodians. As noted above, we are in the process of producing documents, including emails, regarding the technical aspects of updates to FairPlay that were identified by the search terms for the custodians.

There appears to be some misunderstanding regarding this category, what we discussed or both. I did not say that "management only communicates orally with the software engineers concerning the software updates." During our call, you asked why there were no documents responsive to this category (i.e., notes, instructions, memoranda or other communications (i.e., non-emails) from management to the software engineers telling them what specific changes to make to the source code. I told you that I did not know how they communicated aside from email, but that I understood that communications about changes to the actual source code were oral. Moreover, as your April 19th letter acknowledges and we discussed during our call, Apple has produced emails (i.e., written communications) regarding creating and implementing the software updates.

(3) Apple has produced non-privileged documents relating to relevant iPod firmware updates that were identified by the agreed upon search terms for the agreed upon custodians. Apple is the process of

SFI-640026v1

ATLANTA · BEIJING · BRUSSELS · CHICAGO · CLEVELAND · COLUMBUS · DALLAS · FRANKFURT · HONG KONG · HOUSTON
IRVINE · LONDON · LOS ANGELES · MADRID · MILAN · MOSCOW · MUNICH · NEW DELHI · NEW YORK · PARIS · PITTSBURGH
SAN DIEGO · SAN FRANCISCO · SHANGHAI · SILICON VALLEY · SINGAPORE · SYDNEY · TAIPEI · TOKYO · WASHINGTON

**JONES DAY**

Thomas R. Merrick
April 27, 2010
Page 2

producing documents, including emails, regarding the technical aspects of updates to FairPlay that are identified by the search terms for the agreed upon custodians.

I am determining whether a change log for iPod firmware updates related to FairPlay exists.

(5)  We are checking to see if a copy of the communication exists.

(A) & (D) Apple has produced non-privileged documents relating to Harmony that were identified by the agreed upon search terms for the agreed upon custodians, including documents relating to the observation of how Harmony's use of user IDs affected the FairPlay redesign.

(B) & (E) Apple is considering plaintiffs' request for source code of updates to FairPlay included in iTunes 4.6 and 4.7. I will try to get back to you this week on this issue. Your letter also states that Apple will consider source code of FairPlay after iTunes 4.7. Which updates to FairPlay are you referring to?

(F)  As I explained during our call, Apple objects to producing source code of updates to FairPlay that were issued after the FairPlay redesign included in 4.7. There is no dispute that Apple issued updates to FairPlay to stop hacker programs. Nevertheless, you contend that plaintiffs need the code to determine how the hacker programs worked so that plaintiffs can evaluate whether they violated the DMCA. But there is also no dispute that the hacker programs at issue circumvented FairPlay. Thus, those programs violated the DMCA. How they circumvented FairPlay is irrelevant to whether they violated the DMCA. If you disagree, please explain why the operation of the hacker programs is relevant to whether they violated the DMCA so that we can consider your request further. We would like to avoid motion practice on this issue and would be happy to discuss this further at your convenience.

Very truly yours,

David C. Kiernan

# EXHIBIT 19

# Robbins Geller
# Rudman & Dowd LLP

| Atlanta | Melville | Philadelphia | San Francisco |
|---------|----------|--------------|---------------|
| Boca Raton | New York | San Diego | Washington, DC |

Thomas R. Merrick
TMerrick@rgrdlaw.com

May 3, 2010

<u>VIA EMAIL AND U.S. MAIL</u>

David C. Kiernan
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104

> Re:     *The Apple iPod iTunes Anti-Trust Litigation*,
>         No. C-05-00037-JW (N.D. Cal.)

Dear David:

This letter is in response to your letters purportedly dated April 27, 2010,[1] and your email of April 30 regarding the scope and timing of the software updates 30(b)(6) deposition and related document requests.

Our recent conversations and correspondence clearly shows that, while the parties are making some progress regarding the scope of the deposition and document requests, there are still some significant areas of disagreement. Plaintiffs have therefore taken the May 6 date off calendar until those disagreements are settled, either between the parties, or with the assistance of the magistrate judge. Plaintiffs strongly disagree with your position that the deposition should go forward with these issues left unresolved. Plaintiffs are entitled to full information to adequately prepare to depose Apple on the software updates.

For example, in the letters we received April 30, you indicated that Apple was "considering" whether to produce source code for FairPlay, and was "in the process" of producing documents on other technical aspects of FairPlay updates. As we have discussed in the past, in order to question the witness on the FairPlay redesign and other technical issues, it will be necessary to have our expert review the code and other documents and assist us in evaluating the changes. Plaintiffs are not required to take the deposition "blind."

Please advise when you anticipate Apple completing production with regard to (1) and (3).

---

[1]     You represented to me in your email of April 30 that the letters were sent via U.S. mail. Neither has been received via U.S. mail. In fact, both were marked "VIA EMAIL" and neither was sent via email until April 30.

521483_1

655 West Broadway, Suite 1900     San Diego, CA 92101     Tel 619 231 1058     Fax 619 231 7423     rgrdlaw.com

**Robbins Geller**
**Rudman & Dowd** LLP

David Kiernan
May 3, 2010
Page 2

Please also advise us on Apple's final position on producing source code to show the before and after affects of the FairPlay redesign that disabled Harmony. As to the source code that disabled the "hacks," and the scope of the deposition on that subject, plaintiffs disagree with Apple's cursory and universal position that each one violated the DMCA and therefore Apple was always justified in shutting them down. Plaintiffs' position is set forth in their Opposition to Apple's MTD/MSJ at 16-19. Some may have violated the DMCA, some may not have, but plaintiffs are clearly entitled to discovery on this issue. We also would like to avoid motion practice, but are prepared to seek the assistance the court if necessary.

As to the topic of "communications," as we discussed in our meet and confer call on April 22, the scope of the topic was intended to cover documents that Apple produced on these issues, so that the witness would be prepared to discuss them at the deposition. Plaintiffs are not required to give Apple a list of the documents they intend to question the witness on.

Very truly yours,

THOMAS R. MERRICK

TRM:hsb

cc:   Bonny Sweeney (via email)
      Paula Roach (via email)
      Robert A. Mittelstaedt (via email)
      Michael T. Scott (via email)

521483_1

