# EXHIBIT 20

# Robbins Geller
# Rudman & Dowd LLP

| Atlanta | Melville | Philadelphia | San Francisco |
| Boca Raton | New York | San Diego | Washington, DC |

Thomas R. Merrick
TMerrick@rgrdlaw.com

July 15, 2010

<u>VIA EMAIL AND U.S. MAIL</u>

David C. Kiernan
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104

      Re:    *The Apple iPod iTunes Anti-Trust Litigation*,
               No. C-05-00037-JW (N.D. Cal.)

Dear David:

      Now that the court has denied Apple's motions to dismiss and for summary judgment/adjudication, we will need to begin moving forward on discovery.

      As to the software update 30(b)(6) issues, please review my letters of April 19 (setting forth the issues), April 23 (regarding our meet and confer call of April 22), your two letters in response dated April 27 (neither of which we ever received via U.S. Mail) and my further correspondence of May 3.

      Please let me know whether Apple has any concerns after my explanation of "communications" in the context of the topics as set forth in my May 3 letter. Also, please advise when Apple will complete its production as to (1) – (5), (A), (C) and (D).

      Please also advise Apple's position on producing code related to iTunes 4.6 and 4.7 (E) and the "Specifications, design documents, and diagrams regarding those changes to FairPlay that broke Harmony. This would include any changes to iTunes software, iPod firmware, or QuickTime, to the extent these changes were made. For example, if the FairPlay change required updates to iTunes and the iTunes Store and iPod firmware and QuickTime, then we want documents that address all of those topics" (B).

      Apple preliminarily took the position that documents and code for disabling the so-called "hacks" (F) would not be produced because they were irrelevant. In light of Judge Ware's ruling, Apple should produce documents and code relating to those as well. Please advise whether Apple has changed its position or is still refusing to produce them.

      There is also a great deal of other pending discovery in addition to the 30(b)(6)-related topics and requests. Throughout this litigation, each time Apple has filed, or contemplated filing a motion, it has automatically granted itself a discovery stay as to all further discovery not related specifically to



**Robbins Geller
Rudman & Dowd** LLP

David Kiernan
July 15, 2010
Page 2


Apple's interpretation of the scope of the issues raised in its contemplated motion. Judge Ware has repeatedly stated that no such discovery stay is in place. From its submission in the joint case management statement, it appears that Apple is taking the position that discovery should be limited to only the specific information plaintiffs pointed to in their Rule 56(f) briefing. We strongly oppose this position and intend to raise it with the Court at the case management conference on Monday.

Very truly yours,

THOMAS R. MERRICK

TRM:hsb


cc:   Bonny Sweeney (via email)
      Paula Roach (via email)
      Robert A. Mittelstaedt (via email)
      Michael T. Scott (via email)

# EXHIBIT 21

# JONES DAY

555 CALIFORNIA STREET  •  26TH FLOOR  •  SAN FRANCISCO  CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939  •  FACSIMILE: 415-875-5700

Direct Number: (415) 875-5745
dkiernan@jonesday.com

825624-605002                         July 26, 2010

<u>VIA E-MAIL</u>

Thomas R. Merrick
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301

Re:    <u>The Apple iPod iTunes Anti-Trust Litigation No. C-05-00037-JW (N.D. Cal.)</u>

Dear Tom:

This letter confirms our discussion on July 23, 2010 regarding 30(b)(6) discovery and plaintiffs' document requests.

**1.     30(b)(6) Deposition**

Apple proposes scheduling the 30(b)(6) deposition for mid-October and will suggest some dates later this week. You said that, while you're willing to schedule the deposition for October, you don't want to take it until you receive all documents responsive to the 30(b)(6) and 56(f) requests.

**2.     30(b)(6) Requests and 56(f) Requests**

**(a)     Search Terms And Custodians**

I emphasized that the parties needed to finalize the search terms and custodians given the limited time for document production and depositions (discovery closes December 20, 2010) and the time and costs required to run additional search terms.[1] You confirmed that plaintiffs have no changes to the agreed-upon list of search terms and custodians for the 30(b)(6) requests and 56(f) requests, which I've attached.

Apple has already run the 30(b)(6) search terms and produced documents that were identified by such terms. It will start running the 56(f) terms this week and will produce responsive, non-privileged documents that are identified by such terms on a rolling basis. Because we have not yet run the new search terms, we are unable to estimate when production will be completed, but are aiming for the end of September.

---

[1] The parties previously agreed that Apple would run search terms against electronically stored information collected from an agreed list of custodians and would produce responsive, non-privileged documents that were identified by such terms.

ATLANTA  •  BEIJING  •  BRUSSELS  •  CHICAGO  •  CLEVELAND  •  COLUMBUS  •  DALLAS  •  FRANKFURT  •  HONG KONG  •  HOUSTON
IRVINE  •  LONDON  •  LOS ANGELES  •  MADRID  •  MENLO PARK  •  MILAN  •  MOSCOW  •  MUNICH  •  NEW DELHI  •  NEW YORK  •  PARIS
PITTSBURGH  •  SAN DIEGO  •  SAN FRANCISCO  •  SHANGHAI  •  SINGAPORE  •  SYDNEY  •  TAIPEI  •  TOKYO  •  WASHINGTON

JONES DAY

Thomas R. Merrick
July 26, 2010
Page 2

    (b)    <u>Agreements With Independent Labels</u>

    The parties agreed that Apple will produce a sample of each version of the agreements between Apple and the independent labels as it changed through time rather than producing all of the agreements. Plaintiffs, however, reserved the right to request additional agreements. As we discussed, there are thousands of agreements between Apple and independent labels, which are nearly identical. For the most part, the independent labels downloaded a Digital Music Download Sales Agreement from iTunes Connect portal to complete, execute, and send back to Apple. My understanding is that there may be several agreements where minor revisions were made, but no substantive revisions were made to provisions dealing with the "Security Solution," "Content Usage Rules" or data protection.

    (c)    <u>July 15, 2010 Letter</u>

    We also discussed the status of production of each category of documents listed in your July 15, 2010 letter.

        (i)    Category (1): notes, minutes or other memorializations of meetings attended by Apple concerning the relevant software updates.

    As noted in my April 27, 2010 letter, Apple has produced non-privileged notes, minutes or other memorializations of meetings attended by Apple concerning the relevant software updates, if any, that were identified by the search terms for the agreed-upon custodians. It also has produced any paper documents to the extent such documents exist for the agreed-upon custodians. As we discussed, Apple will run the 30(b)(6) search terms against data collected from Suki Lee and Jill Surdzial, who were project managers for the DRM team.

        (ii)    Category (2): notes, instructions, memoranda or other communications provided by management to developers or other persons responsible for creating and implementing the software updates.

    As noted in my April 27, 2010 letter, Apple has produced responsive, non-privileged documents that were identified by the search terms for the agreed-upon custodians, which include the custodians who were involved with decisions related to updates to FairPlay. It also has produced any paper documents to the extent such documents exist for the agreed-upon custodians. As noted above, Apple will run the 30(b)(6) search terms against data collected from Suki Lee and Jill Surdzial.

        (iii)    Category (3): documents related to relevant iPod firmware updates

    As noted in my April 27, 2010 letter, Apple has produced non-privileged documents related to relevant iPod firmware updates that were identified by the agreed-upon search terms for the agreed-upon custodians. Apple will also produce a change history log for iPod firmware updates to the extent that such a log exists.

JONES DAY

Thomas R. Merrick
July 26, 2010
Page 3

      (iv)    Category (4): Versions of several documents by one of Apple's vendor

We're not aware of other versions of the documents that haven't been produced.

      (v)    Category (5): Communication between Mr. Glaser and Mr. Jobs

We are checking to see if a copy of the communication exists.

      (vi)    Categories (5)(A) & (D): Documents relating to how Harmony works

As noted in my April 27, 2010 letter, Apple has produced non-privileged documents relating to Harmony that were identified by the agreed-upon search terms for the agreed-upon custodians, including documents relating to the observation of how Harmony's use of user IDs affected the FairPlay redesign.

      (vii)    Category 5(B): Specifications, design documents, and diagrams regarding changes to FairPlay that broke Harmony, including updates to iTunes, iPod, and Quicktime.

Apple will produce non-privileged, sufficient to show the specifications, design documents, and diagrams regarding changes to FairPlay that broke Harmony, including updates to iTunes, iPod, and Quicktime, to the extent they exist.

      (viii)    Category 5(C): Documents that describe the relationship between iTunes software updates and iPod firmware updates.

Apple will produce non-privileged documents sufficient to describe the relationship between iTunes software updates and iPod firmware updates, if any.

      (ix)    Categories 5(E) & (F): Code related to iTunes software updates 4.6 and 4.7 and code related to iTunes software updates and iPod firmware updates that addressed "hacks."

Apple is considering plaintiffs' request for source code. In lieu of producing the actual source code, I proposed producing a document reflecting FairPlay specifications that, among other things, describes each of the incremental changes to FairPlay. You accepted the proposal, but reserved the right to seek code in the event that plaintiffs' expert needs additional information regarding the changes to FairPlay. If that turns out to be the case, the parties will discuss further. Later this week, I'll send a proposed amendment to the Protective Order to govern the use of the FairPlay Specifications document and source code.

3.    **First Amended Requests For Production**

In light of the amended complaint and their current theory of recovery, plaintiffs will review the proposed search terms and custodians for the First Amended Requests for Production

JONES DAY

Thomas R. Merrick
July 26, 2010
Page 4

and suggest revisions.  For example, given plaintiffs' theory and the shortened class period (October 2004 – March 2009), document request Nos. 5, 8, and 21-22 are no longer pertinent— Apple's decision to develop its own DRM in 2003 rather than using another company's is no longer part of the case.  Thus, the search terms for these requests should be dropped to reduce the volume of documents to be reviewed and produced.

**4.     Second Set of Requests For Production**

Apple will propose search terms and custodians.  I am traveling Monday and Tuesday, so it may be Wednesday before I'm able to send them.

Very truly yours,

David Kiernan /LN

David C. Kiernan

# EXHIBIT 22

1   Robert A. Mittelstaedt  #60359
    ramittelstaedt@jonesday.com
2   Craig E. Stewart  #129530
    cestewart@jonesday.com
3   David C. Kiernan #215335
    dkiernan@jonesday.com
4   Michael T. Scott #255282
    michaelscott@jonesday.com
5   JONES DAY
    555 California Street, 26th Floor
6   San Francisco, CA  94104
    Telephone:     (415) 626-3939
7   Facsimile:      (415) 875-5700

8

9   Attorneys for Defendant
    APPLE INC.

10                    UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

12

13
    **THE APPLE iPOD iTUNES ANTI-TRUST**      **Case No. C 05 00037 JW**
14  **LITIGATION**
                                              **CLASS ACTION**
15
                                              **DEFENDANT APPLE INC.'S FIRST**
16                                            **AMENDED ANSWER AND**
                                              **DEFENSES TO PLAINTIFFS'**
17                                            **AMENDED CONSOLIDATED**
                                              **COMPLAINT**
18

19

20

21

22

23

24

25

26

27

28

**ANSWER AND AFFIRMATIVE DEFENSES**

Now comes defendant Apple Inc. ("Apple"), by its undersigned counsel, and in answer to the Amended Complaint, and with the understanding that the allegations relate to activities within the United States, states as follows:

1.  Answering the allegations in Paragraph 1, Apple admits that plaintiffs purport to bring this action on behalf of themselves and others. Apple denies that plaintiffs have established or can establish the prerequisites to certification or maintenance of the alleged classes pursuant to Rule 23 of the Federal Rules of Civil Procedure.

2.  The allegations in Paragraph 2 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations.

3.  The allegations in Paragraph 3 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations, except that Apple admits that Apple previously sold music on the iTunes Store (formerly known as the iTunes Music Store) that was protected by Apple's proprietary digital rights management ("DRM") technology named FairPlay.

4.  The allegations in Paragraph 4 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations.

5.  The allegations in Paragraph 5 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations.

6.  Answering the allegations of the first two sentences of Paragraph 6, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them, except that Apple admits that Somtai Troy Charoensak has purchased an iPod and audio downloads from Apple. Apple denies the remaining allegations in Paragraph 6.

7.      Answering the allegations of the first two sentences of Paragraph 7, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them, except that Apple admits that Mariana Rosen has purchased an iPod and audio downloads from Apple.  Apple denies the remaining allegations in Paragraph 7.

8.      Answering the allegations of the first two sentences of Paragraph 8, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them, except that Apple admits that Melanie Tucker has purchased an iPod and audio downloads from Apple.  Apple denies the remaining allegations in Paragraph 8.

9.      Answering the allegations in Paragraph 9, Apple admits the allegations in the first sentence.  The remaining allegations in Paragraph 9 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple's  publicly disclosed revenue and profit data speak for themselves, and no further disclosure is appropriate for this answer.  On that basis, Apple denies the remaining allegations.

10.     Answering the allegations in Paragraph 10, Apple admits that plaintiffs purport to invoke jurisdiction of this Court under 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

11.     Answering the allegations of Paragraph 11, Apple admits that it is headquartered in Cupertino, California and that it transacts business in this judicial district, but Apple denies that it has engaged in any conduct giving rise to this Amended Complaint in this, or any other, judicial district.  Apple denies the remaining allegations in Paragraph 11.

12.     The allegations in Paragraph 12 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

13.     The allegations in Paragraph 13 state conclusions of law to which no answer is necessary.  To the extent an answer is deemed necessary, Apple denies the allegations.

14.     Answering the allegations in Paragraph 14, Apple believes that many aspects of its iTunes Store offerings make it attractive to consumers.  The allegations in the first two sentences of Paragraph 14 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05-00037 JW

deemed necessary, Apple denies the allegations in the first sentence of Paragraph 14. Apple is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14 and therefore denies them, except that Apple admits that consumers may buy individual songs from its iTunes Store and that the iTunes Store currently offers over 13 million songs.

15. Answering the allegations in Paragraph 15, Apple believes that many aspects of its iTunes Store offerings make it attractive to consumers. Apple is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 15 and therefore denies them.

16. The allegations in Paragraph 16 are not susceptible to being answered because of their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations, except that Apple admits that it operates the iTunes Store (f/k/a the iTunes Music Store), that the iTunes Store can be accessed through the iTunes application, and that users may purchase and download digital music and digital video files from the iTunes Store.

17. The allegations in Paragraph 17 state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations, except that Apple admits that Apple's iTunes Store offers digital music files.

18. Answering the allegations in Paragraph 18, Apple denies the first sentence and that it has engaged in any illegal anticompetitive behavior. Apple is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 18, and therefore denies them.

19. Apple is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, which relate principally to allegations regarding consumers and merchants, and therefore denies them.

20. The allegations in Paragraph 20 are not susceptible to being answered because of their ambiguity. To the extent that an answer is deemed necessary, Apple is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them, except that Apple admits that consumers may purchase individuals songs from the iTunes

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

1    Store and that the Recording Industry Association of America's website stated that manufacturers

2    shipped 705.4 million CD album units and 2.8 million CD single units in 2005.

3         21.    The allegations in Paragraph 21 are not susceptible to being answered because of

4    their ambiguity.  To the extent that an answer is deemed necessary, Apple is without knowledge

5    or information sufficient to form a belief as to the truth of the allegations and therefore denies

6    them, except that Apple admits that consumers may purchase individual songs from the iTunes

7    Store and that they can create customized playlists.

8         22.    Apple is without knowledge or information sufficient to form a belief as to the

9    truth of the allegations in Paragraph 22 and therefore denies them, except that Apple admits that

10   its online music service provides an outlet for independent artists and music labels.

11        23.    Apple is without knowledge or information sufficient to form a belief as to the

12   truth of the allegations in Paragraph 23 and therefore denies them.

13        24.    Apple denies the allegations in Paragraph 24.

14        25.    Answering the allegations in Paragraph 25, Apple believes that many aspects of its

15   iPod products make them attractive to consumers.  The allegations in the first sentence of

16   Paragraph 25 are not susceptible to being answered because of their ambiguity and because they

17   state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed

18   necessary, Apple denies the allegations in the first sentence of Paragraph 25.  Apple is without

19   knowledge or information sufficient to form a belief as to the truth of the remaining allegations in

20   Paragraph 25 which relate principally to allegations regarding consumers, and therefore denies

21   them.

22        26.    Answering the allegations in Paragraph 26, Apple admits that it sold various

23   generations of the iPod Classic, iPod shuffle, iPod nano, iPod mini, and iPod touch.  The

24   remaining allegations are not susceptible to being answered because of their ambiguity and

25   because they state conclusions of law to which no answer is necessary.  To the extent that an

26   answer is deemed necessary, Apple denies the remaining allegations.

27        27.    The allegations in Paragraph 27 state conclusions of law to which no answer is

28   necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

28.     Answering the allegations in Paragraph 28, Apple denies the first sentence and that it has engaged in any illegal anticompetitive behavior.  Apple is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28, and therefore denies them.

29.     The allegations in Paragraph 29 state conclusions of law to which no answer is necessary.  To the extent that an answer is necessary, Apple denies the allegations.

30.     Answering the allegations in Paragraph 30, Apple admits that plaintiffs purport to bring this action on behalf of themselves and others.  Apple denies that plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged classes pursuant to Rule 23 of the Federal Rules of Civil Procedure.

31.     Answering the allegations in Paragraph 31, Apple denies that plaintiffs have established or can establish the prerequisites to certification or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure.

32.     Apple denies the allegations in Paragraph 32.

33.     Apple denies the allegations in Paragraph 33.

34.     Apple denies the allegations in Paragraph 34.

35.     Apple denies the allegations in Paragraph 35.

36.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, and therefore denies them.

37.     The allegations in Paragraph 37 state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary Apple denies the allegations.

38.     Answering the allegations in Paragraph 38, Apple admits that it introduced the iTunes Software application on January 9, 2001 and that iTunes may be used, among other things, to play and organize digital media files on a user's computer, import content from audio CDs, and transfer content onto blank audio CDs or portable digital devices.  Apple denies the remaining allegations in Paragraph 38.

39.     Answering the allegations in Paragraph 39, Apple denies the first sentence, except that Apple admits that it announced the iPod on October 23, 2001.  The remaining allegations in

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

Paragraph 39 are not susceptible to being answered because of their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations.

40. Answering the allegations of Paragraph 40, Apple admits that Apple introduced the iTunes Music Store (now the iTunes Store) on April 28, 2003, which at that time offered over 200,000 songs at $0.99 per song, and now offers over 13,000,000 songs. The iTunes Store can be accessed only through the iTunes Software application. Apple also introduced the third generation iPod and released a new version of the iTunes Software application on April 28, 2003. Apple denies the remaining allegations.

41. The allegations in Paragraph 41 are not susceptible to being answered because of their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations.

42. Answering the allegations of Paragraph 42, Apple admits that the major record labels (Sony, BMG, EMI, Warner, and Universal) required that Apple use an encryption-based "security solution" approved by the labels to enforce content usage rules that limited copying and transfer of the music files distributed through Apple's iTunes Store. To comply with this requirement, Apple developed its FairPlay digital rights management (DRM) technology. The remaining allegations in Paragraph 42 are not susceptible to being answered because of their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations.

43. The allegations in Paragraph 43 are not susceptible to being answered because of their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations in Paragraph 43, except that Apple admits that Apple has not licensed FairPlay.

44. Apple denies the allegations in Paragraph 44.

45. The allegations in Paragraph 45 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations.

46. The allegations in Paragraph 46 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary. To the extent that an answer is deemed necessary, Apple denies the allegations.

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

47.     The allegations in Paragraph 47 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations, except that Apple admits that the quoted language was attributed to Josh Bernoff in a January 31, 2007 *Business Week* article.

48.     The allegations in Paragraph 48 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations.

49.     The allegations in Paragraph 49 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations in Paragraph 49, except that Apple admits that it has not licensed FairPlay.

50.     The allegations in Paragraph 50 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

51.     The allegations in Paragraph 51 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations in Paragraph 51 except that Apple states that its publicly disclosed revenue and profit data speak for themselves.

52.     Apple denies the allegations in Paragraph 52.

53.     The allegations in the first two sentences in Paragraph 53 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations in the first two sentences in Paragraph 53, except that Apple admits that, on or about July 26, 2004, RealNetworks announced its Harmony technology, claiming that Harmony would allow users to buy music from RealNetworks' online store and play it on an iPod.   Apple is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 53 and therefore denies them.

54.     The allegations in Paragraph 54 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

the extent that an answer is deemed necessary, Apple denies the allegations in Paragraph 54 based on information and belief, except that Apple admits that RealNetworks sold audio downloads for as low as 49 cents per track for a limited time.

55.    The allegations in Paragraph 55 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

56.    The allegations in Paragraph 56 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore denies them.

57.    The allegations in Paragraph 57 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore denies them.

58.    The allegations in Paragraph 58 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations, except that Apple admits that the quoted language was attributed to Forrester Research.

59.    Apple denies the allegations in Paragraph 59, except that Apple admits that it made a public statement on July 29, 2004 that included the words quoted in Paragraph 59.

60.    The allegations in Paragraph 60 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is necessary, Apple denies the allegations in Paragraph 60.

61.    The allegations in Paragraph 61 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 61,

1  and therefore denies them, except that Apple admits that the quoted language appears in an

2  August 2005 RealNetworks SEC filing.

3      62.    The allegations in Paragraph 62 are not susceptible to being answered because of

4  their ambiguity and because they state conclusions of law to which no answer is necessary.  To

5  the extent that an answer is deemed necessary, Apple denies the allegations.

6      63.    The allegations in Paragraph 63 are not susceptible to being answered because of

7  their ambiguity.  To the extent that an answer is necessary, Apple denies the allegations in

8  Paragraph 63.

9      64.    The allegations in Paragraph 64 are not susceptible to being answered because of

10  their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations,

11  except that Apple admits that, in 2005, JHymn was released, which stripped the content

12  protection from songs purchased from the iTunes Store, allowing users to copy songs and give

13  those copies to others without restriction.

14      65.    The allegations in Paragraph 65 are not susceptible to being answered because of

15  their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations,

16  except that Apple admits that it released updates to its FairPlay technology to, among other

17  things, stop JHymn and other hacks that circumvented the content protection required by the

18  labels on music purchased from the iTunes Store and further admits that, in October 2005, Apple

19  released iTunes 6.0, which included, among other things, updates to FairPlay technology

20  designed to stop such hacks.

21      66.    The allegations in Paragraph 66 are not susceptible to being answered because of

22  their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations,

23  except that Apple admits that, in September 2006, it released iTunes 7.0, which among other

24  things included updates to FairPlay technology designed to stop hacks that circumvented the

25  content protection required by the labels on music purchased from the iTunes Store.

26      67.    The allegations in Paragraph 67 are not susceptible to being answered because of

27  their ambiguity.  To the extent that an answer is necessary, Apple denies the allegations in

28  Paragraph 67, except that Apple admits that Steve Jobs' "Thoughts on Music" web posting

1   contained the quoted language in answer to the question "Why would the big four music

2   companies agree to let Apple and others distribute their music without using DRM systems to

3   protect it? The simplest answer is because DRMs haven't worked, and may never work, to halt

4   music piracy. Though the big four music companies require that all their music sold online be

5   protected with DRMs, these same music companies continue to sell billions of CDs a year which

6   contain completely unprotected music. That's right! No DRM system was ever developed for

7   the CD, so all the music distributed on CDs can be easily uploaded to the Internet, then (illegally)

8   downloaded and played on any computer or player."

9       68.    The allegations in Paragraph 68 are not susceptible to being answered because of

10  their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations,

11  except that Apple admits that, starting on April 2, 2007, Apple distributed EMI's music without

12  DRM and that the quoted text was attributed to Eric Nicoli, CEO of EMI Group.

13      69.    The allegations in Paragraph 69 are not susceptible to being answered because of

14  their ambiguity. To the extent that an answer is deemed necessary, Apple is without knowledge

15  or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and

16  therefore denies them.

17      70.    The allegations in Paragraph 70 are not susceptible to being answered because of

18  their ambiguity. To the extent that an answer is deemed necessary, Apple denies the allegations,

19  except that Apple admits that, on January 6, 2009, Apple announced that it would begin selling

20  music from the major labels and thousands of independent labels in Apple's higher quality,

21  DRM-free iTunes Plus format, that customers could upgrade their previously purchased music to

22  the iTunes Plus format for 30 cents per song or 30 percent of the album price, and that since April

23  2009, all iTunes Store music has been in iTunes Plus format.

24      71.    The allegations in Paragraph 71 are not susceptible to being answered because of

25  their ambiguity and because they state conclusions of law to which no answer is necessary. To

26  the extent that an answer is deemed necessary, Apple denies the allegations.

27

28

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

72.     The allegations in Paragraph 72 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is necessary, Apple denies the allegations in Paragraph 72.

73.     Answering the allegations in the first sentence of Paragraph 73, Apple denies the allegations except that Apple admits that the French Parliament approved a law affording legal protection to DRM (Digital Rights Management).  Answering the allegations in the second and third sentences of Paragraph 73, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.  Answering the allegations in the fourth sentence of Paragraph 73, Apple admits that it made a comment about "state sponsored piracy" in relation to one of the earlier versions of the law.  Apple denies the remaining allegations in Paragraph 73.

74.     The allegations in Paragraph 74 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is necessary, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 and therefore denies them.

75.     The allegations in Paragraph 75 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations, except that Apple admits that the Office of the Norwegian Consumer Ombudsman sent a letter to Apple asking questions about the use of DRM.

76.     Answering the allegations in Paragraph 76, Apple admits that the quoted language was attributed to Dutch Consumer Ombudsman Ewald van Kouwen in news articles.  Apple denies the remaining allegations.

77.     Answering the allegations in Paragraph 77, Apple admits that the quoted language was attributed to European Union Consumer Affairs Commissioner Kuneva in news articles.  Apple denies the remaining allegations.

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

78.     Apple denies the allegations in the first two sentences of Paragraph 78.  Answering the allegations in the third sentence of Paragraph 78, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

79.     Answering the allegations in Paragraph 79, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

80.     Answering the allegations in Paragraph 80, Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

81.     The allegations in Paragraph 81 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

82.     The allegations in Paragraph 82 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

83.     The allegations in Paragraph 83 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

84.     The allegations in Paragraph 84 are not susceptible to being answered because of their ambiguity and because they state conclusions of law to which no answer is necessary.  To the extent that an answer is deemed necessary, Apple denies the allegations.

85.     The allegations in Paragraph 85 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations in Paragraph 85.

86.     The allegations in Paragraph 86 are not susceptible to being answered because of their ambiguity.  To the extent that an answer is deemed necessary, Apple denies the allegations in Paragraph 86.

87.     The allegations in Paragraph 87 are not susceptible to being answered because they state conclusions of law to which no answer is necessary.  As to the allegations of the NAND spot market, Apple lacks knowledge or information sufficient to form a belief as to the truth of

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

the allegations and therefore denies them. To the extent that an answer is deemed necessary to any additional portions of the paragraph, Apple denies the allegations. The current retail prices at which Apple sells its products are stated on the Apple website located at www.apple.com.

88. Apple denies the allegations in Paragraph 88.

**COUNT I**

89. Paragraph 89, which purports to incorporate by reference all of the allegations of the Complaint, requires neither admission nor denial.

90. Apple denies the allegations in Paragraph 90.

91. Apple denies the allegations in Paragraph 91.

92. Apple denies the allegations in Paragraph 92.

93. Apple denies the allegations in Paragraph 93.

94. Apple denies the allegations in Paragraph 94.

95. Paragraph 95, which purports to incorporate by reference all of the allegations of the Complaint, requires neither admission nor denial.

96. Apple denies the allegations in Paragraph 96.

97. Apple denies the allegations in Paragraph 97.

98. Apple denies the allegations in Paragraph 98.

99. Apple denies the allegations in Paragraph 99.

**COUNT II**

100. Paragraph 100, which purports to incorporate by reference all of the allegations of the Complaint, requires neither admission nor denial.

101. Apple denies the allegations in Paragraph 101.

102. Apple denies the allegations in Paragraph 102.

103. Apple denies the allegations in Paragraph 103.

104. Apple denies the allegations in Paragraph 104.

105. Apple denies the allegations in Paragraph 105.

106. Paragraph 106, which purports to incorporate by reference all of the allegations of the Complaint, requires neither admission nor denial.

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05-00037 JW

107.    Apple denies the allegations in Paragraph 107.

108.    Apple denies the allegations in Paragraph 108.

109.    Apple denies the allegations in Paragraph 109.

110.    Apple denies the allegations in Paragraph 110.

111.    Apple denies the allegations in Paragraph 111.

**COUNT III**

112.    In its June 29, 2010 Order, the Court dismissed the claims in Count III, and for that reason Paragraph 112 requires neither dismissal nor denial.

113.    In its June 29, 2010 Order, the Court dismissed the claims in Count III, and for that reason Paragraph 113 requires neither dismissal nor denial.

114.    In its June 29, 2010 Order, the Court dismissed the claims in Count III, and for that reason Paragraph 114 requires neither dismissal nor denial.

**COUNT IV**

115.    Paragraph 115, which purports to incorporate by reference all of the allegations of the Complaint, requires neither admission nor denial.

116.    Apple denies the allegations in Paragraph 116.

117.    Apple denies the allegations in Paragraph 117.

118.    Apple denies the allegations in Paragraph 118.

119.    Apple denies the allegations in Paragraph 119.

120.    Apple denies the allegations in Paragraph 120.

**COUNT V**

121.    In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 121 requires neither dismissal nor denial.

122.    In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 122 requires neither dismissal nor denial.

123.    In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 123 requires neither dismissal nor denial.

124.     In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 124 requires neither dismissal nor denial.

125.     In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 125 requires neither dismissal nor denial.

126.     In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 126 requires neither dismissal nor denial.

127.     In its June 29, 2010 Order, the Court dismissed the claims in Count V, and for that reason Paragraph 127 requires neither dismissal nor denial.

## COUNT VI

128.     In its June 29, 2010 Order, the Court dismissed the claims in Count VI, and for that reason Paragraph 128 requires neither dismissal nor denial.

129.     In its June 29, 2010 Order, the Court dismissed the claims in Count VI, and for that reason Paragraph 129 requires neither dismissal nor denial.

## PRESERVATION OF CLAIMS FOR APPEAL

130.     Paragraph 130, which purports to incorporate by reference all of the allegations of the April 19, 2007 Consolidated Complaint, requires neither admission nor denial.

## AFFIRMATIVE DEFENSES

Apple sets forth below its affirmative defenses.  Each defense is asserted as to all claims against Apple.  By setting forth these affirmative defenses, Apple does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to the plaintiffs.  Moreover, nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the plaintiffs' allegations.

Apple reserves the right to amend or supplement its affirmative defenses and raise counterclaims as additional facts concerning its defenses become known to it.

As separate and distinct affirmative defenses, Apple alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

The Complaint, in whole or in part, fails to state a claim upon which relief may be granted.  Apple incorporates by reference its Motion to Dismiss or, Alternatively, for Summary

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05-00037 JW

1  Judgment (Dkt. 325) and Reply in Support Thereof (Dkt. 354). The updates and other conduct

2  that plaintiffs challenge do not violate federal or California antitrust laws for a number of reasons.

3  For example, the Court (Dkt. 377) has already dismissed Count III (Cartwright Act, Cal. Bus. &

4  Prof. Code §§16270, et seq.), Count V (Consumers Legal Remedies Act, Cal. Civil Code §§1750,

5  et seq.), Count VI (California Common Law Monopolization). In addition, the Complaint does

6  not state a claim under Section 2 of the Sherman Act. The Court has ruled that Apple's adoption

7  and use of its own anti-piracy technology does not violate the antitrust laws. Dkt. 274, pp. 9-10;

8  *see also* Dkt. 213. Just as it was lawful for Apple to adopt its own technology, it was also lawful

9  for Apple to update, repair, and improve that technology. And because Apple's conduct was

10 lawful under the Sherman Act, it does not give rise to a claim under California Unfair

11 Competition Law, Bus. & Prof. Code §§17200, et seq.

12                          **SECOND AFFIRMATIVE DEFENSE**

13         The activities of Apple alleged in the Complaint do not give rise to antitrust liability

14 because they did not result in adverse effects on competition or, if there were any such effects

15 (which Apple denies), they were outweighed by the pro-competitive benefits of the activities.

16 Apple incorporates by reference its Motion to Dismiss or, Alternatively, for Summary Judgment

17 (Dkt. 325) and Reply in Support Thereof (Dkt. 354). Apple also realleges and incorporates by

18 reference each of its allegations, denials, and defenses set forth above.

19         The software updates and any other conduct that plaintiffs challenge were pro-consumer

20 and pro-competitive. This Court has ruled that Apple had a right to choose to use its own anti-

21 piracy technology when it introduced the iTunes Store in April 2003. Dkt. 274, pp. 9-10 ("The

22 increased convenience of using the two products together due to technological compatibility does

23 not constitute anticompetitive conduct under either *per se* or rule of reason analysis."); *see also*

24 Dkt. 303, p. 2 (directing plaintiffs to file an amended complaint to identify "what actions they

25 allege Apple took to maintain monopoly power beyond initial technological relationships between

26 its products."). Forcing Apple to use Microsoft's or any other company's technology would have

27 stymied innovation and prevented consumers from enjoying the benefits of Apple's technology.

28 As the Ninth Circuit ruled in *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544

1  (9th Cir. 1983), "the introduction of technologically related products, even if incompatible with

2  the products offered by competitors," is not an "anticompetitive act." The "creation of

3  technological incompatibilities" actually "increases competition" in two ways: it provides

4  consumers "with a choice among differing technologies," and it provides "competing

5  manufacturers the incentive to enter the new product market by developing similar products of

6  advanced technology." *Id.* at 542. Condemning such decisions "would unjustifiably deter the

7  development and introduction of those new technologies so essential to the continued progress of

8  our economy." *Id.* at 543. As plaintiffs' economist has acknowledged, prohibiting a company

9  from developing its own software "would be stupid" because it would freeze technology and

10  "prohibit innovation." Dkt. 176, Ex. 21 at 169-170.

11      Apple provided consumers with an innovative, legal way to access digital music online,

12  and a device that seamlessly played that and other music. Both the iPod and iTunes Store were

13  widely recognized as superior products. CNET named the iPod the best product in ten years.

14  Tom Merrit, *Top 10 products*, available at http://www.cnet.com/1990-11136_1-6312246-1.html.

15  Fortune Magazine named the iTunes Music Store its 2003 "Product of the Year." Peter Lewis,

16  Product of the Year Apple iTunes Music Store, Fortune Magazine, December 22, 2003, available

17  at http://money.cnn.com/magazines/fortune/fortune_archive/2003/12/22/356108/. As admitted by

18  plaintiffs' economist, the iTunes Store was "procompetitive" and a "huge benefit" to consumers.

19  Dkt. 176, Ex. 21 at 105:8-20. It provided "enormous advantages" for consumers, expanding the

20  number of available songs and allowing consumers to purchase individual songs rather than

21  albums. Dkt. 322, ¶¶ 14-15, 40.

22      The fact that large numbers of consumers preferred Apple's products over competitors'

23  products was the result of Apple's innovation and competition. Plaintiffs' attempt to translate

24  success in the marketplace into anticompetitive conduct reflects a serious misunderstanding of the

25  antitrust laws. Apple continued to improve and expand its products, as evidenced by the

26  successive introduction of the iPod Classic, iPod mini, iPod shuffle, iPod nano, and iPod touch.

27  Successive models had increased capacities and added features, including video playback,

28

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

camera, a multi-touch interface, the ability to play video games and wirelessly access the internet, and the ability to select from the hundreds of thousands of applications on Apple's App Store.

Contrary to plaintiffs allegations, Apple's conduct did not deter competition. In fact, throughout the class period, numerous companies introduced a wide range of portable products that could play digital audio files with a variety of features, including Microsoft, Creative, SanDisk, Dell, Cowon, Sony, Archos, Toshiba, iRiver, Coby, Philips, Samsung, and others. Similarly, numerous companies offered music (including digital music downloads), including Amazon, Wal-Mart, Napster, RealNetworks, Microsoft, BestBuy, Target, and Borders.

As discussed in more detail below (incorporated by reference), the specific updates challenged in the Complaint blocked illegal hacks that threatened the security of Apple's anti-piracy technology. This conduct aided consumers because, without the updates, Apple's ability to continue offering music from the major record labels would have been in jeopardy.

**THIRD AFFIRMATIVE DEFENSE**

Defendant Apple has at all times and in all relevant manners acted reasonably, as necessary to serve legitimate business purposes, in furtherance of trade, in good faith, and with the purpose and effect of promoting, encouraging, or increasing competition. Apple has not acted with the purpose or intent to suppress or restrain competition. Apple incorporates by reference its Motion to Dismiss or, Alternatively, for Summary Judgment (Dkt. 325) and Reply in Support Thereof (Dkt. 354). Apple also realleges and incorporates by reference each of its allegations, denials, and defenses set forth above.

The updates challenged by plaintiffs stopped illegal hacks that circumvented Apple's anti-piracy technology, restored the level of content protection required by the labels, and attempted to stay ahead of other potential hacks. Apple also issued updates to improve its products and maintain or improve the customer experience.

Before the April, 2003 launch of the iTunes Store, Apple and the major record labels (Sony, BMG, EMI, Warner, and Universal) entered into agreements to permit Apple to distribute music through iTunes Store. To protect their copyrights, the labels required that Apple use an encryption-based security to enforce content usage rules that limited copying and transfer of the

FIRST AMENDED ANSWER &
AFFIRMATIVE DEFENSES
Case No. C05 00037 JW

1 music files.  The agreements provide that, if the security solution is compromised, Apple must

2 promptly restore the security solution or the labels can withdraw their music catalogs from the

3 iTunes Store.  To comply with these contractual requirements, Apple developed and maintained

4 its FairPlay digital rights management (DRM) technology.

5   Almost from inception, hackers attacked FairPlay seeking to circumvent it and evade the

6 Labels' usage restrictions.  The hackers published programs on the Internet that allowed users to

7 strip or otherwise circumvent the content protection.  By circumventing FairPlay, these hackers

8 violated the federal Digital Millennium Copyright Act.  *See, e.g.*, 17 U.S.C. § 1201(a)(2)(A) &

9 1201(b)(1)(A) (prohibiting any technology designed "to circumvent[] a technological measure

10 that effectively controls access" to a copyrighted work or otherwise protects rights of copyrights

11 owners).

12   Apple released updates to stop such illegal hacks.  Had it not done so, its ability to

13 continue offering music to consumers would be jeopardized, depriving consumers of what

14 plaintiffs concede is the "huge benefit" of obtaining music on the iTunes Store.  As noted above,

15 Apple's conduct not only benefited consumers, but also promoted competition.  Indeed,

16 throughout the class period, numerous companies introduced a variety of portable media players

17 and offered music including digital music downloads.

18      **FOURTH AFFIRMATIVE DEFENSE**

19   The claims of the plaintiffs and/or others alleged to be members of the putative class are

20 barred, in whole or in part, by the applicable statutes of limitations.  In their amended

21 consolidated complaint filed on January 26, 2010, plaintiffs for the first time challenge Apple's

22 updates to its DRM technology that stopped hackers from circumventing the level of content

23 protection required by the labels.  Plaintiffs are barred from challenging such updates that Apple

24 released before January 26, 2006. 15 U.S.C. §15b; Cal. Bus. & Prof. Code §17208.

25   WHEREFORE, defendant Apple respectfully requests that this Court:

26   1. Enter judgment against the plaintiffs and in favor of Apple;

27   2. Dismiss the Complaint in its entirety, with prejudice;

28   3. Decline to award the requested relief;

1        4.     Award Apple its costs and reasonable attorneys' fees incurred in this action; and

2        5.     Grant such other and further relief as the Court may deem just and proper.

Dated: September 24, 2010             Respectfully submitted,

Jones Day

By: /s/ David Kiernan
      David Kiernan

Counsel for Defendant
APPLE INC.

SFI-650319v5

# EXHIBIT 23

Jeffrey Robbin                                    December 3, 2010

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


THE APPLE IPOD ITUNES            Lead Case No.
ANTI-TRUST LITIGATION.           C-05-00037-JW (HRL)

~~~~~~~~~~~~~~~~~~~~~~~



VIDEOTAPED 30(B)(6) DEPOSITION OF

APPLE COMPUTER, INC.

BY DESIGNEE:  JEFFREY L. ROBBIN

VOLUME I


December 3, 2010

9:23 a.m.



1755 Embarcadero Road
Palo Alto, California



Ana M. Dub, RMR, CRR, CSR 7445



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                    December 3, 2010

45

1    from the songs, but I don't -- I'm not positive.

2         Q.   Okay.  And do you know how, in general

3    terms, it was able to accomplish that?

4         A.   No.

5         Q.   Do you know who at Apple would be a good

6    person to answer that type of question regarding how

7    a specific hack took off the DRM protection of a

8    song?

9         A.   Augustin Farrugia.

10         Q.   Another hack that we've seen in the

11    documents is -- and I may pronounce this wrong --

12    Pimusique.  Is that one that you're familiar with?

13         A.   I remember the name.  I don't remember

14    what the hack did.

15         Q.   Okay.  What other hacks, during this early

16    time period soon after the launch of the iTunes

17    Store in April 2003, are you personally aware of?

18         A.   I remember MyTunes.  I remember there was

19    a DVD Jon-based hack.  That might have been him.

20         Q.   Okay.

21         A.   There were a variety of different hacks.

22    I mean . . .

23         Q.   Okay.  And do you generally recall what

24    MyTunes did?

25         A.   MyTunes was not the same kind of hack.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                    December 3, 2010

46

1    MyTunes allowed people to transfer songs from one

2    iTunes library to another machine.

3         Q.    Okay.  Did MyTunes remove the DRM

4    protection of a song?

5         A.    I don't remember.  I don't think so.

6         Q.    Okay.  And then you mentioned DVD Jon, but

7    we're not sure necessarily if that's a person's name

8    or -- right, or he may have been part of this JHymn.

9    Is that correct?

10        A.    Yeah, I don't remember which hack he did.

11        Q.    Did Apple have a general policy or

12   procedure regarding how they would respond to these

13   types of hacks?  You know, some sort of guidelines

14   that were followed when they became aware of them?

15        A.    Not in a written-down formal kind of way.

16        Q.    What about in a general, just, practice

17   sort of way?

18        A.    Yes.

19        Q.    And what was that general practice?

20        A.    We would take a look at the hack to see

21   what it was doing and if there was an easy way to

22   prevent it.

23             We would discuss it with the music label

24   partners, figure out when we'd be able to close it,

25   shut it down.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                    December 3, 2010

47

1          We'd notify our legal department so that

2     they could start issuing cease-and-desist type

3     notifications to try to get the content -- try to

4     get the hacks taken down.

5          Q.    Were there any other steps that you're

6     aware of that Apple would take, in general?

7          A.    That's usually what we did.

8          Q.    Okay.  You mentioned "take a look at the

9     hack."  What do you mean by that?

10          A.    Well, in order to stop the hack from doing

11     whatever it's doing, we needed to understand how it

12     worked.  So we would run it, make sure that -- a lot

13     of hacks, you know, they'd come out; they wouldn't

14     even necessarily work correctly.  We wanted to see

15     if it even worked.

16          Q.    And would people, like software engineers,

17     be responsible for that kind of taking a look at how

18     the hacks worked?

19          A.    Yes.

20          Q.    And would those engineers then report to

21     you or someone regarding what they found?

22          A.    Yes.

23          Q.    And you also mentioned that you would

24     discuss this with your music label partners.  Is

25     that accurate?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                    December 3, 2010

94

1    five-minute break?   Is that okay?

2                MR. MITTELSTAEDT:   Sure.

3                THE VIDEOGRAPHER:   This is the end of Disk

4    No. 1 in the deposition of Mr. Jeff Robbin.   The

5    time is 11:12 A.M., and we are now going off the

6    record.

7                (Recess taken.)

8                THE VIDEOGRAPHER:   This is the beginning

9    of Disk No. 2 in the deposition of Mr. Jeff Robbin.

10   The time is 11:27 A.M., and we are now going back on

11   the record.

12   BY MS. BERNAY:

13       Q.   Before we broke, I was asking a little bit

14   about a thing called a VLC music player.

15            Do you know if music purchased on the

16   iTunes Store could play through that VLC music

17   player?

18       A.   I don't know.

19       Q.   Okay.  Do you know whether -- so you'd

20   mentioned something about Apple, when you had notice

21   of hacks, various people -- there were various steps

22   that you took.  You said you would look at the hack,

23   you'd discuss it with the music label, and sometimes

24   legal would be involved to send, like,

25   cease-and-desist letters.  Do you remember that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                    December 3, 2010

95

1   testimony?

2        A.   Yes.

3        Q.   And do you know whether Apple took any of

4   those steps when it became aware of the Harmony

5   technology?

6        A.   I don't -- I don't know.  I don't think

7   so, but I don't know.

8        Q.   You'd mentioned earlier that you believed

9   it was a hack.  So I was just trying to find out

10  whether or not you treated the hack of Harmony in

11  the same manner as you treated these other hacks

12  where you would look at it, discuss it with the

13  music labels, and then --

14       A.   Well, it was a different --

15            MR. MITTELSTAEDT:  Just a second.

16            Object; argumentative and compound.

17            Go ahead.

18            THE WITNESS:  Okay.  The steps that we

19  took for each hack were different.  I said we didn't

20  always do --

21  BY MS. BERNAY:

22       Q.   Right.

23       A.   -- the same thing.  We didn't have a

24  normal -- other than, you know, the first thing was

25  we look at it, and then we decide what we're going



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                December 3, 2010

96

1   to do about it.

2        Q.   Okay.

3        A.   So in this case, we didn't feel it was

4   necessary to talk to them about it.

5        Q.   And when you say "to talk to them," you

6   mean --

7        A.   The music --

8        Q.   -- the record labels?

9        A.   Yeah.

10       Q.   Okay.  Are you familiar with the term

11  "interoperability"?

12       A.   Yes.

13       Q.   What does that mean?

14       A.   To have things interoperate with each

15  other.

16       Q.   Was that something that you've heard used

17  in connection with music purchased and its ability

18  to play on the iPod or other digital music players?

19  Have you heard that term used in that context?

20       A.   Yes.

21       Q.   Is it right that Harmony made it so that

22  music purchased through that RealNetworks site was

23  interoperable with an iPod?

24       A.   It was one way that you could do that.

25       Q.   Okay.  Did the labels, during the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                    December 3, 2010

175

1       Q.   Okay.  Maybe from the press?

2       A.   I don't know.

3       Q.   Okay.  And here, if you look at the very

4   last page, there's a note that says:

5            "Apple did not authorize

6            RealNetworks to do this hack.

7            Further, we'll have to investigate

8            the possible implications of what

9            they" -- "what they've done with the

10           DMCA."

11           Do you see that?

12      A.   I see it.

13      Q.   And it goes on:

14           "Additionally, there may be

15           violations of Apple's intellectual

16           property and copyrights."

17           Do you see that?

18      A.   I do.

19      Q.   And do you know what the DMCA is there?

20           (Mr. Carpenter leaves the proceedings.)

21           THE WITNESS:  I believe it stands for the

22   Digital Millennium Copyright Act.

23   BY MS. BERNAY:

24      Q.   And do you know whether at any time Apple

25   sent, for example, a cease-and-desist letter to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Jeffrey Robbin                                December 3, 2010

176

1    RealNetworks?

2        A.    I don't know.

3        Q.    Somebody in legal would probably be the

4    best person to ask?

5            MR. MITTELSTAEDT:    Object; argumentative.

6    BY MS. BERNAY:

7        Q.    There's a message on the second page.

8            No.  I'm sorry.  I apologize.  It's on the

9    first page.  And Eddy Cue is writing to a couple of

10   people.  It says:

11            "I talked to Universal.  They were

12            aware of it.  From their viewpoint,

13            they are okay with it because they

14            want interoperability."

15           Do you see that?

16       A.    I see that.

17       Q.    And do you know -- did you ever talk to

18   Universal regarding Harmony?

19       A.    No.

20       Q.    Did you ever talk to Universal regarding

21   issues related to interoperability?

22       A.    Not that I recall.

23       Q.    Okay.  Do you know whether Mr. Cue talked

24   to other record labels regarding Harmony?

25       A.    I don't know.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com