# EXHIBIT 28

1   Robert A. Mittelstaedt #60359
    ramittelstaedt@jonesday.com
2   Craig E. Stewart #129530
    cestewart@jonesday.com
3   David C. Kiernan #215335
    dkiernan@jonesday.com
4   Michael Scott #255282
5   michaelscott@jonesday.com
    555 California Street, 26th Floor
6   San Francisco, CA  94104
7   Telephone:    (415) 626-3939
    Facsimile:    (415) 875-5700
8
    Attorneys for Defendant
9   APPLE INC.

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12              SAN JOSE DIVISION

13

14
    THE APPLE iPOD iTUNES ANTI-          Lead Case No.      C 05-00037 JW (HRL)
15  TRUST LITIGATION                     [Class Action]
16                                       **APPLE'S MOTION FOR SUMMARY
                                         JUDGMENT**
17  _____
                                         Date:      April 18, 2011
18  This Document Relates To:            Time:      9:00 a.m.
                                         Courtroom: 8, 4th Floor
    ALL ACTIONS
19
20                                       **[REDACTED]**
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ................................................................................1

RELIEF SOUGHT ................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.   The Amended Consolidated Complaint.........................................................3

    B.   Apple's 2010 Rule 56 Motion. ......................................................................3

    C.   Subsequent Discovery Proceedings. ..............................................................4

UNDISPUTED FACTS .........................................................................................................4

    A.   Music Piracy. .................................................................................................4

    B.   Apple's Contracts with Record Labels. ........................................................5

    C.   Launch of iTunes Store, and Attacks by Hackers..........................................6

    D.   ███████████████████████████████████ .....................................................7

    E.   Harmony. .......................................................................................................8

    F.   Apple Continues To Improve FairPlay To Stop Hacks, Make It More Secure, And Protect The Operation Of The iPod ....................................................9

ARGUMENT .......................................................................................................................11

I.    STANDARD................................................................................................................11

    A.   Rule 56..........................................................................................................11

    B.   Section 2, Sherman Act ...............................................................................11

II.   SECTION 2 PERMITS APPLE TO IMPROVE ITS PRODUCTS REGARDLESS OF THE IMPACT ON COMPETITORS. .......................................................................12

    A.   The Antitrust Laws Do Not Prohibit Companies from Stopping Hackers. .................13

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1.      Preventing circumvention of anti-piracy software is not exclusionary conduct.............................................................................................13

2.      Stopping hacks to thwart music piracy and ensure continued operation of music store was a valid business justification ............................16

B.    Apple Also Had The Right To Improve the iPod By Ensuring that Its Operation Was Not Impaired by Third Party Programs and Content.........................18

C.    Apple Had a Right to Improve its Products Even If Harmony Music Could No Longer Play on iPods.............................................................................19

1.      *Tyco* holds that companies have no duty when improving their products to help competitors survive or expand.................................................19

2.      Plaintiffs' theory also violates *Trinko* because keeping Harmony in operation would have required that Apple engage in close, ongoing dealings with a competitor.........................................................................20

III.   PLAINTIFFS' STATE LAW UCL CLAIM FAILS FOR THE SAME REASONS. ...........24

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) .......................................................................15

*A&M Records, Inc. v. Napster, Inc.*,
   114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd* 239 F.3d 1004 (9th Cir. 2001) ..............................4

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LPP*,
   592 F.3d 991 (9th Cir. 2010) ..............................................................................passim

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) ....................................................................25

*Belton v. Comcast Cable Holdings, LLC*,
   151 Cal. App. 4th 1224 (2007) ..............................................................................25

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979) ..................................................................................11

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).............................................................................................11

*Chavez v. Whirlpool Corp.*,
   93 Cal. App. 4th 363 (2001) .................................................................................25

*Cont'l Paper Bag Co. v. E. Paper Bag Co.*,
   210 U.S. 405 (1908).............................................................................................22

*Covad Commc'ns Co. v. BellSouth Corp.*,
   374 F.3d 1044 (11th Cir. 2004) ..............................................................................23

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
   36 F.3d 1147 (1st Cir. 1994)..............................................................................16, 22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)..............................................................................................11

*Ethyl Gasoline Corp. v. United States*,
   309 U.S. 436 (1940)..............................................................................................22

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) .....................................................................11, 12, 15, 20

*Harrell v. 20th Century Ins. Co.*,
   934 F.2d 203 (9th Cir. 1991) .................................................................................25

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ...................................................................................... 23

*In re Canadian Import Antitrust Litig.*,
  470 F.3d 785 (8th Cir. 2006) ...................................................................................... 15

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ................................................................................... 23, 24

*Law v. Nat'l Collegiate Athletic Ass'n*,
  134 F.3d 1010 (10th Cir. 1998) .................................................................................. 15

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008) ............................................................................... 23

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ........................................................................ 22, 23, 24

*Miller Insituform, Inc. v. Insituform of N. A., Inc.*,
  830 F.2d 606 (6th Cir. 1987) ...................................................................................... 22

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
  309 F. Supp. 2d 1156 (N.D. Cal. 2004) ...................................................................... 15

*Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield*,
  883 F.2d 1101 (1st Cir. 1989) ..................................................................................... 17

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ...................................................................................... 16

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
  133 Cal. App. 4th 1277 (2005) ................................................................................... 25

*SC Manufactured Homes, Inc. v. Liebert*,
  162 Cal. App. 4th 68 (2008) ....................................................................................... 25

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  36 F.3d 958 (10th Cir. 1994) ...................................................................................... 17

*Schor v. Abbott Labs*,
  457 F.3d 608 (7th Cir. 2006) ...................................................................................... 22

*SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*,
  88 F.3d 780 (9th Cir. 1996) ................................................................................... 16, 23

*State of Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*
  935 F.2d 1469 (7th Cir. 1991) ..................................................................................... 16

*UMG Recordings, Inc. v. Doe*,
  2008 WL 4104214 (N.D. Cal. Sept. 3, 2008) ............................................................... 5

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

*Universal City Studios, Inc. v. Corley*
   273 F.3d 429 (2d Cir. 2001) ...........................................................................................7

*Universal City Studios, Inc. v. Reimerdes,*
   82 F. Supp. 2d 211 (S.D.N.Y. 2000) ...........................................................................15

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004).............................................................................................passim

Statutes

15 U.S.C. § 2......................................................................................................................passim

17 U.S.C. § 1201..........................................................................................................................15

Other Authorities

3B P. Areeda & H. Hovenkamp, *Antitrust Law* (3d ed. 2008) ......................................................17

H.R. Rep. No. 551 (Part 2), 105th Cong., 2d Sess. 43 (July 22, 1998) ........................................16

Rules

Federal Rules of Civil Procedure
   Rule 30(b)(6) ......................................................................................................................4
   Rule 56................................................................................................................1, 3, 11
   Rule 56(f).............................................................................................................................4

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1 **NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that on April 18, 2011 at 9 a.m., or as soon thereafter as the

3 matter may be heard, defendant Apple Inc. will bring on for hearing this motion for summary

4 judgment under Federal Rule of Civil Procedure 56.

5 **RELIEF SOUGHT**

6 Summary judgment in defendant's favor on all claims.

7 **MEMORANDUM OF POINTS AND AUTHORITIES**

8 **INTRODUCTION**

9      Four undisputed facts establish that summary judgment should be granted.

10      First, to combat piracy and theft, the major record labels required that Apple protect

11 music with digital rights management technology (DRM) and, if the DRM became compromised

12 or ineffective, that Apple promptly repair the breach and restore the DRM's security.  Plaintiffs

13 have conceded this fact.

14      Second, from the launch of the iTunes Store (iTS) in 2003, various individuals hacked

15 Apple's DRM and distributed software programs designed to strip DRM from iTS songs.  The

16 software programs allowed iTS songs to be distributed for free over the Internet and played on an

17 unlimited number of unauthorized computers around the world in violation of the labels' content

18 usage rules and copyrights.  As one hacker's web site proclaimed, its software was written to

19 "remove DRM restrictions":

20      You buy some new music through iTunes, you run JHymn — hopefully do no
        more than click one or two buttons — and when you quit JHymn and go back to
21      iTunes, all of your DRM-protected music has been seamlessly replaced by
        unlocked, DRM-free music . . . .
22

23 Robbin Decl., Ex. 2A.  Another hacker told users to keep a file-sharing program open "to

24 allow others to download as well."  *Id.*, Ex. 3A.  These hackers promoted the very piracy

25 and theft that the major record labels were seeking to avoid by requiring DRM.

26      Third, consistent with its contractual obligations to the labels, Apple improved its DRM

27 by closing the holes exploited by hacks and improving the overall architecture of the system to

28 make it more secure and stay a step ahead of future hackers.  ▮▮▮▮▮▮▮▮▮▮

Fourth, a consequence of these product improvements was that they would render incompatible RealNetworks' Harmony or any other technology that tried to mimic Apple's DRM or inject content into Apple's iPod.

The legal issue presented by these facts is whether Section 2 of the Sherman Act prohibits a company from maintaining and improving the functionality of its product when a competitor's product becomes incompatible in the process.  The Ninth Circuit's decision last year in *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LPP*, 592 F.3d 991 (9th Cir. 2010), shows that this conduct does not violate Section 2.

Under *Tyco*, an alleged monopolist is entitled to make even a "seemingly minor technological improvement" notwithstanding any resulting incompatibility and regardless of intent.  Because a small change might lead to "much greater advances in the future," the Ninth Circuit rejected as "unwise" and "unadministrable" the notion that a jury should weigh "as-yet-unknown benefits against current competitive injuries." *Id.* at 1000.  In short, no Section 2 liability can be imposed based on product improvement alone.

The record here, which has been significantly expanded since Apple's Rule 56 motion last year, shows that the software updates at issue meet the *Tyco* standard.  Closing security vulnerabilities in software that is designed to be secure obviously improves the software.  It would defy logic—and the antitrust laws—to say that a company can use anti-piracy software but cannot repair or improve it when a hacker finds a way to defeat its fundamental purpose.  This is particularly true here because the record labels could have closed down iTS if Apple did not repair the DRM.

Last year, this Court ruled that Apple's Rule 56 motion was premature because Plaintiffs wanted more discovery and Apple's supporting declaration provided "little detail as to the nature of the hacks and how they worked, or the manner in which Defendant's software updates addressed the threat posed by the hacks." Doc. 377, p. 12.  Plaintiffs have now taken the

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1   discovery they requested, and Apple files herewith expanded declarations that provide the details

2   referred to by the Court. This additional information confirms that summary judgment is

3   appropriate on the independent grounds in Apple's original motion. Apple's conduct was not

4   exclusionary within the meaning of Section 2; it was supported by valid business reasons; it was a

5   product improvement protected by *Tyco*; and, under *Verizon Commc'ns Inc. v. Law Offices of*

6   *Curtis V. Trinko, LLP,* 540 U.S. 398 (2004), Apple had no duty to ensure that competitors'

7   products would continue to work with Apple's.

8                              **BACKGROUND**

9       **A.     The Amended Consolidated Complaint.**

10      Plaintiffs no longer challenge the legality of Apple's decision to use its own proprietary

11  DRM—FairPlay—rather than Microsoft's DRM or Apple's decision not to license FairPlay to

12  competitors. Instead, Plaintiffs allege that, to maintain its lawfully obtained "monopoly power,"

13  Apple used software updates to exclude competitors. Doc. 322, ¶ 52. Specifically, Plaintiffs

14  allege that, starting in October 2004, Apple updated its iPod and iTunes software to prevent songs

15  downloaded from RealNetworks' store from being played on iPods (*id.*, ¶ 60) and that, in October

16  2005 and September 2006, Apple updated its software to block JHymn and other "similar

17  software programs" that permitted iTS music to play on non-iPods. *Id.*, ¶¶ 63-67.

18      **B.     Apple's 2010 Rule 56 Motion.**

19      In February 2010, Apple moved for summary judgment. Apple showed that the software

20  updates challenged by Plaintiffs were aimed at closing holes in its anti-piracy software that

21  hackers were exploiting to promote piracy. These hacks defeated the very purpose of the DRM

22  that the labels required Apple to use in the first place, and jeopardized Apple's continuing ability

23  to operate its music store. The contracts with the major record labels required Apple not only to

24  use DRM but to repair it when breached.

25      In response to the Rule 56 motion, Plaintiffs asserted that they needed discovery on how

26  JHymn and other hacks operated and whether the challenged software updates, including the one

27  that blocked Harmony, were in fact aimed at the hacks. At the May 2010 hearing, Plaintiffs

28  conceded in response to the Court's questioning that the labels' contracts "required Apple to have

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

security measures, limit copying and to repair breaches of those protections." Doc. 376, p. 18.
Although Plaintiffs had alleged that Apple's software updates "served no genuine anti-piracy
purpose," they admitted at the hearing that they could not say that stopping hacks like JHymn was
improper. *Id.* at 25-26. They could only argue that "we're just not in a position to know that yet
not having received sufficient discovery from Apple." *Id.* at 26.

In June 2010, the Court ruled that Apple's Rule 56 motion was premature. Granting
Plaintiffs' request for discovery under Rule 56(f), the Court noted that Plaintiffs sought discovery
in several areas including the hacks and technical aspects of the updates that disabled Harmony.
Doc. 377, p. 14. The Court set December 20, 2010, as the deadline for fact discovery.

C.    **Subsequent Discovery Proceedings.**

Apple has completed its production of documents in response to Plaintiffs' broad requests.
Plaintiffs have taken two Rule 30(b)(6) depositions and five individual depositions of Apple
employees.

## UNDISPUTED FACTS

A.    **Music Piracy.**

Apple conceived its online digital music store as a legal alternative to "peer-to-peer file
sharing" services like the original Napster. In the early 2000's, music piracy was rampant with
individuals using those services to download music for free, without paying the artists or the
record companies that owned the copyrights. *See generally A&M Records, Inc. v. Napster, Inc.,*
114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd* 239 F.3d 1004 (9th Cir. 2001). Napster allowed its
users to "make MP3 music files stored on individual computer hard drives available for copying
by other Napster users" and to "transfer exact copies of the contents of other users' MP3 files
from one computer to another via the Internet." 239 F.3d at 1011. The scale of this piracy was
enormous. "Approximately 10,000 music files are shared per second using Napster, and every
second more than 100 users attempt to connect to the system." 114 F. Supp. 2d at 902. This
"propagation of illegal digital copies over the Internet significantly harms copyright owners, and
has had a particularly devastating impact on the music industry. . . . The [recording] com-
panies . . . lose significant revenues on an annual basis due to the millions of unauthorized down-

1 loads and uploads of well-known recordings distributed on P2P networks." *UMG Recordings,*

2 *Inc. v. Doe*, 2008 WL 4104214, at \*2 (N.D. Cal. Sept. 3, 2008).

3       It is against this backdrop that Apple sought to persuade the major record labels to permit

4 Apple to distribute their music over the Internet. Apple's challenge was to create a store so

5 attractive to consumers and so easy to use that it could compete with free music services. To

6 make the store a reality, Apple had to satisfy the recording industry's concerns that licensed

7 online distribution would lead to more piracy and theft and further erode the labels' sales. Robbin

8 Decl., ¶¶ 3-5; Kiernan Decl., Ex. 3, 33:20-22.

9       **B.     Apple's Contracts with Record Labels.**

10       Between November 2002 and April 2003, Apple and the major record labels (Sony, BMG,

11 EMI, Warner, and Universal) entered into digital music distribution agreements that permitted

12 Apple to distribute music through iTS. Robbin Decl., ¶ 5. As a condition of making music

13 available to Apple, the record labels insisted on certain usage rules to guard against the kind of

14 piracy and theft that Napster and similar services promoted.[1]

15

16                                                                                         The usage

17 rules limited copying and distribution of the music files, such as limiting the number of

18 computers authorized to play a protected song. Robbin Decl., ¶ 5, Ex. 1.

19

20                                       The labels also required that, should the DRM become

21 compromised or ineffective, Apple promptly repair the breach and restore the DRM's security.

22 Robbin Decl., ¶ 5, Ex. 1.

23 ────────────────────────

24 [1] Doc. 322, ¶ 42 ("From the inception of Apple's iTS, the major record labels, Sony, Universal, EMI, Warner and BMG, all required Audio Downloads to be sold in protected format."); Robbin

25 Decl., ¶ 4, Ex. 1. As Plaintiffs' expert admitted, the labels sought to protect their "intellectual property" and gave Apple (and other online sellers) "no choice" but to agree to adopt a security

26 solution. Kiernan Decl., Ex. 1, 102:4-105:7, 168:17-21, 225:4-12. The indirect Plaintiff's economist likewise admitted that the labels have a "legitimate business concern" in requiring

27 DRM to prevent "their copyrighted products [from] being given away." Kiernan Decl., Ex. 2,

28 126:3-127:7.

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1     As noted (pp. 3-4), Plaintiffs admitted that Apple was required to use DRM and to repair

2    it when breached.



11          **C.    Launch of iTunes Store, and Attacks by Hackers.**

12     In April 2003, Apple launched iTS. As Plaintiffs and their expert admitted, iTS was

13    "procompetitive" and a "huge benefit" to consumers. Doc. 176, Ex. 21 at 105:8-20. It provided

14    "enormous advantages" for consumers, expanding the number of available songs and allowing

15    consumers to purchase individual songs rather than albums. Doc. 322, ¶¶ 14-15, 40.

16     Almost from iTS's inception, hackers cracked FairPlay to learn its secrets and then

17    published programs on the Internet that facilitated piracy and theft. In some cases, the hackers

18    devised a way to unlock the keybags on the computer and iPod and obtain the keys to decrypt the

19    songs. In others, the hackers wrote programs to intercept and copy the songs before FairPlay

20    protection was applied. Robbin Decl., ¶¶ 21-22. Either way, by circumventing FairPlay, these

21    hacks permitted users to distribute the music over the Internet so that others could obtain the

22    music for free and play it on an unlimited number of computers, all in violation of the labels'

23    copyrights. The result was that the hackers made possible the very piracy and theft that occurred

24    with Napster and the other peer-to-peer sites and that the record labels sought to avoid by

25    insisting on usage restrictions enforced by DRM. *Id.*

26     In the fall of 2003 and the spring of 2004, hackers' attacks on FairPlay increased in

27    frequency. For example, an individual known as "DVD Jon" published QTFairUse in the fall of

28

1   2003 and additional hacks in 2004 (DeDRMS and FairKeys).[2]  Other hackers introduced PlayFair

2   and Hymn (predecessors of JHymn) and FairTunes.  *Id.*  ¶¶ 23-25, 30.  As before, these hacks

3   stripped off the content protection, facilitating free, unlimited distribution of the music.  *Id.*



26  [2]  DVD Jon, whose real name is Jon Lech Johansen, first gained notoriety for creating and
27  distributing DeCSS, a program that removed DRM protection from DVDs.  In 2001, the Second
    Circuit affirmed a permanent injunction against distributing that program because it violated the
28  DMCA.  *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

                                                                        Mot. for Sum. Jgmt.
                                    - 7 -                                C 05-00037 JW (HRL)



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17      **E.      Harmony.**

18          In late July 2004, two months **after** Apple had begun its redesign of FairPlay,

19      RealNetworks announced its Harmony technology. Doc. 322, ¶ 53. As Plaintiffs explain it,

20      RealNetworks managed to "analyze[] the firmware within the iPod" and "discern[ed]" Apple's

21      "software code." *Id.*, ¶ 53. By cracking FairPlay code, RealNetworks devised a way to make

22      music purchased from its website mimic Apple's then-existing encryption scheme and make it

23      falsely appear to the iPod that the RealNetworks-protected music was actually iTS music

24      _____

25      [3] Plaintiffs' assertion (Doc. 322, ¶ 60) that iTunes 4.7 was the first time Apple required users
        who wished to use iTS to upgrade to the new version of iTunes and FairPlay is wrong on two
26      counts. Apple had also required such users to upgrade to earlier versions of iTunes. Robbin
        Decl., ¶ 66. And Apple did not require users who wished to use iTS to upgrade to iTunes 4.7
27      until March 2005, five months after iTunes 4.7 was released. Apple did so to stop the PyMusique
        hack. *Id.* iPod owners could avoid the upgrade by choosing not to use iTS.
28

1    protected by FairPlay. Robbin Decl., ¶¶ 50-54; Kelly Decl., ¶¶ 32-35. Because the redesigned

2    FairPlay changed the encryption method on the iPod to stop Hymn and other DRM-stripping

3    hacks discussed above, Harmony no longer worked on iPods that were updated with the

4    redesigned FairPlay. Harmony mimicked only the previous encryption method. *Id.*

5        For Harmony to work after the FairPlay redesign, Apple and RealNetworks would have

6    had to work together well in advance of the redesign, sharing highly confidential and proprietary

7    information (likely including Apple's source code). Robbin Decl., ¶¶ 55-57; Kelly Decl., ¶¶ 36-

8    40. RealNetworks would have needed to know precisely how FairPlay was being redesigned and

9    how the iPod played music. *Id.* The parties would have had to continue dealing with each other,

10   indefinitely and at significant ongoing expense to Apple, so that future updates to FairPlay or the

11   iPod would not interfere with Harmony, and *vice versa*. *Id.*

12

13

14

15       Supporting both FairPlay and Harmony on iPods would have made FairPlay substantially

16   less secure. Robbin Decl, ¶ 59.

17                                      . Cooperating with RealNetworks would have greatly

18   escalated the risks of information leaks by giving non-Apple employees access to that information.

19

20

21

22

23

24       **F.    Apple Continues To Improve FairPlay To Stop Hacks, Make It More Secure,**

25            **And Protect The Operation Of The iPod**

26       In addition to challenging iTunes 4.7 released in October 2004, Plaintiffs also allege that

27   updates in October 2005 (iTunes 6.0) and September 2006 (iTunes 7.0) were unlawful because

28   they thwarted programs such as JHymn and QTFairUse. Doc. 322, ¶ 65-66. Plaintiffs describe

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1  those programs as "creat[ing] interoperability" between iTS music and competing players, thus

2  giving consumers a "clear choice." Doc. 322, ¶¶ 64, 66. But, like the earlier hacks, these

3  programs did so by stripping DRM protection from the music, thus permitting and facilitating

4  unlimited, free-of-charge transfer of the music files in violation of the usage rules required by the

5  labels. Robbin Decl., ¶ 41. As noted, JHymn's website proclaimed that it was written to "remove

6  DRM restrictions." *Id.*, Ex. 2A.



Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1                              **ARGUMENT**

2   **I.**     **STANDARD**

3       **A.**    **Rule 56**

4       This Court's July 2010 Order summarizes the standard for summary judgment under Rule

5 56. In short, the purpose is to "dispose of factually unsupported claims." The moving party bears

6 the burden of informing the court of the basis for its motion, and the opposing party must respond

7 with "specific facts" showing a "genuine issue for trial." Doc. 377, p. 4.

8       **B.**    **Section 2, Sherman Act**

9       A claim for monopolization requires that the plaintiff prove that, first, the defendant has

10 monopoly power in relevant markets; second, it "willfully acquired or maintained" that power;

11 and third, it caused antitrust injury. *See* Doc. 35, p. 6. This motion focuses on Plaintiffs' failure

12 on the second prong.[4] Given the term "willful acquisition or maintenance," the courts require

13 allegations of specific anticompetitive conduct such as predatory pricing (*e.g.*, *Brooke Group Ltd.*

14 *v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)); refusals-to-deal (*e.g.*, *Trinko,* 540

15 U.S. 398); or some other cognizable unlawful exclusionary conduct (*e.g.*, *Berkey Photo, Inc. v.*

16 *Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (product disparagement)). Even where conduct

17 is "exclusionary," Section 2 liability is not proper if the conduct is supported by "valid business

18 reasons." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992).

19       The Ninth Circuit held in *Tyco*, 592 F.3d at 999-1000, "that product improvement by itself

20 does not violate Section 2, even if it is performed by a monopolist and harms competitors as a

21 result." The Court relied in part on *Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d

22 534 (9th Cir. 1983), where the plaintiff alleged that Kodak maintained its monopoly "by

23

---

24   [4] If necessary, future motions will show that Plaintiffs' definition of the relevant product markets

25 and their assertion that Apple has monopoly power in any such market are incorrect. No
company can monopolize the distribution of music owned by the major record labels, and the

26 market for devices that play digital music is much broader than as defined by Plaintiffs. Both
markets are in the developing stage which further cuts against any claim of monopoly power.

27 Moreover, Plaintiffs cannot show that Apple's improvement to its products causes any cognizable

28 antitrust injury.

1 | continually researching and developing new photographic products . . . that are incompatible with

2 | then existing photographic products." *Id.* at 999 (quoting *Foremost Pro*, 703 F.2d at 543). Such

3 | allegations of "technological predation" do not state a Section 2 claim, because even monopolists

4 | are "permitted and indeed encouraged to compete aggressively on the merits" *Id.* at 998-99

5 | (quoting *Foremost Pro*, 703 F.2d at 544-45).[5] Even "seemingly minor technological improve-

6 | ments" are protected because they "can lead to much greater advances in the future" and because

7 | courts are ill-equipped to "balance[e] the benefits or worth of a product improvement against its

8 | anticompetitive effects." *Id.* at 1000. Applying these principles, the Ninth Circuit affirmed

9 | summary judgment against a claim that Tyco violated Section 2 by introducing, after gaining

10 | monopoly power, a product change that made Tyco's products incompatible with the plaintiffs'

11 | existing complementary products.

12 | Applying this law to the undisputed facts shows that summary judgment should be

13 | granted.

14 | **II.    SECTION 2 PERMITS APPLE TO IMPROVE ITS PRODUCTS REGARDLESS**

15 | **OF THE IMPACT ON COMPETITORS.**

16 | As noted, Plaintiffs allege that, starting in October 2004, Apple updated its iPod and

17 | iTunes software to prevent songs downloaded from RealNetworks from being played on iPods.

18 | Doc. 322, ¶ 60. In fact, although the October 2004 update blocked Harmony, it was aimed at

19 | hacks that stripped the DRM protection from iTS music. As discussed above, it is absurd to

20 | assert that blocking DRM-stripping hacks violates Section 2. Stripping DRM protection meant

21 | that unlimited copies of the music could be made and distributed for free through file-sharing

22 | sites and other means and played on any computer. It was to guard against piracy like this that

23 | the labels required usage limits enforced by DRM in the first place. And the labels had the

24 | contractual right to withhold their music from Apple if Apple failed to remedy this kind of

25 |

26 | [5] As this Court quoted from *Foremost Pro*, 703 F.2d at 544, in dismissing certain claims earlier
in this action: "the introduction of technologically related products, even if incompatible with the
27 | products offered by competitors, is alone neither a predatory nor anticompetitive act." Doc. 274,
28 | p. 10.

1  security breach. No basis exists for Plaintiffs to allege that issuing updates to block these hacks

2  may be condemned under Section 2 as exclusionary or that the updates were not justified by valid

3  business reasons. That the hacks could be used to "create interoperability" once the DRM was

4  stripped does not mean that the antitrust laws render Apple powerless to block them.

5      The same is true of Plaintiffs' allegation that Apple updated its software in October 2005

6  and September 2006 to block JHymn and other "similar software programs" that permitted iTS

7  music to play on non-iPods. *Id.*, ¶¶ 63-67. Like the hacks at which the October 2004 revision to

8  FairPlay was aimed, these programs also stripped the anti-piracy software required by the labels.

9  Apple was entitled to block these hacks just like the earlier ones.



17      None of these conclusions is altered by the fact that Apple's updates had the effect of

18  blocking Harmony. *Tyco* holds that, when improving a product, a company is not required to

19  ensure that its competitors' products continue to work with the redesigned product. It is lawful to

20  improve a product even if competitors' products are rendered incompatible. And *Trinko*

21  independently mandates that conclusion here because ensuring that Harmony music could play on

22  iPods without impairing the iPods' operation would have required close, ongoing cooperation

23  between Apple and RealNetworks.

24      **A.**    **The Antitrust Laws Do Not Prohibit Companies from Stopping Hackers.**

25          **1.**    **Preventing circumvention of anti-piracy software is not exclusionary**

26              **conduct.**

27      Plaintiffs have not identified any authority holding that it is exclusionary conduct,

28  prohibited by Section 2, for a company that has adopted anti-piracy software to repair that

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1    software when it is hacked. No such holding would make sense. As this Court's rulings

2    recognize, it was lawful for the record labels to demand that Apple encrypt copyrighted music to

3    protect against the kind of rampant theft of music that occurred with illegal peer-to-peer sites.

4    And it was lawful for Apple to comply with that demand by adopting FairPlay. Doc. 274, pp. 9-

5    10. *A fortiori,* it was lawful for the labels and Apple to stop hackers when they tried to thwart

6    that lawful protection by stripping the DRM and making possible the very kind of music piracy

7    and theft that led to adopting the DRM security in the first place.

8        A homeowner whose home security system is broken into and disabled is not required to

9    leave the system unrepaired. Security systems are lawful, whether they protect real estate,

10    personal property or, as here, copyrighted music. And it is lawful to fix those systems when they

11    are breached. Nothing in the antitrust laws requires otherwise. The antitrust laws exist to protect

12    competition on the merits, not to provide a safe haven for hackers. Saying that a burglar has

13    altruistic motives or that a hacker is "creating interoperability" does not change the analysis—the

14    victim is still permitted to repair its security system.

15        Although the lawfulness of the security system is sufficient by itself to defeat Plaintiffs'

16    claim, the claim is also invalid under *Tyco*. As discussed, *Tyco* holds that companies do not

17    engage in exclusionary conduct when they modify a product to improve it. Updating a security

18    system to eliminate a vulnerability and close a hole that a hacker has exploited (or may exploit) is

19    indisputably a product improvement. Such updates make the security system effective and ensure

20    that it is able to serve the lawful function for which it was originally developed.

21        That is particularly true here, where the purposes served by the security system are not

22    only lawful, but procompetitive. Apple's agreement to the labels' demand for anti-piracy

23    measures made possible the indisputably "pro-competitive" launch of iTS which provided a

24    "huge benefit" to consumers." *Supra,* p. 6. By offering a legal alternative to Napster and other

25    unlicensed and illegal peer-to-peer sites, iTS expanded the lawful avenues for sale of music to

26    consumers and produced "enormous advantages" for consumers. This creation of innovative new

27    products is precisely the pro-competitive, pro-consumer outcome the antitrust laws were enacted

28

1   to foster.[6] As a recent head of the U.S. Department of Justice Antitrust Division observed, Apple

2   "solved a problem that some observers, less than five years ago, predicted might never be solved:

3   how to create a consumer-friendly, yet legal and profitable, system for downloading music and

4   other entertainment from the Internet." Kiernan Decl., Ex. 5.

5         In addition, stopping the hackers was permissible because the hacks were themselves

6   illegal under DMCA. The DMCA prohibits any technology designed to "circumvent a

7   technological measure that effectively controls access" to a copyrighted work or otherwise

8   protects rights of copyrights owners. 17 U.S.C. § 1201(a)(1)(A) & 1201(b)(1)(A). These

9   prohibitions include software written "to decrypt an encrypted work, or otherwise to . . .

10   bypass . . . a technological measure, without the authority of the copyright owner." *Id.*

11   § 1201(a)(3)(A) & 1201(b)(2)(A); *see 321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F.

12   Supp. 2d 1085 (N.D. Cal. 2004) (granting permanent injunction under the DMCA against

13   program that circumvented copy protection on DVDs).

14         The hacks cited in the amended complaint fall squarely within these prohibitions. Apple

15   thus had no obligation to keep them in business. The Sherman Act does not impose liability for

16   combating conduct illegal under other laws. *See, e.g.*, *In re Canadian Import Antitrust Litig.*, 470

17   F.3d 785, 790-92 (8th Cir. 2006) (no antitrust liability for conspiring to prevent unlawful import

18   of drugs); *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169-70 (N.D.

19   Cal. 2004) ("an action under the antitrust laws will not lie where the business conducted by the

20   plaintiff, and alleged to have been restrained by the defendant, was itself unlawful").[7]

21

---

22   [6] *See Foremost Pro*, 703 F.2d at 546 ("creat[ing] demand for new products is perfectly consistent
with the competitive forces the Sherman Act was intended to foster"); *Law v. Nat'l Collegiate

23   Athletic Ass'n*, 134 F.3d 1010, 1023 (10th Cir. 1998) (antitrust laws favor "increasing output,
creating operating efficiencies, making a new product available, enhancing product or service

24   quality, and widening consumer choice").

25   [7] In opposing Apple's previous motion, Plaintiffs suggested that the hacks might have fallen
within the DMCA's "reverse engineering" exceptions. Those exceptions, however, apply only to

26   circumventing access control measures for certain "computer programs" under limited circum-
stances, not copyrighted digital works like music. *See Universal City Studios, Inc. v. Reimerdes*,

27   82 F. Supp. 2d 211, 218 (S.D.N.Y. 2000) (holding that "Section 1201(f) permits reverse engi-
neering of copyrighted computer programs only and does not authorize circumvention of techno-

28   (continued)

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

2.   **Stopping hacks to thwart music piracy and ensure continued operation of music store was a valid business justification**

The foregoing shows that Plaintiffs' challenge to the updates that stopped DRM-stripping hacks fails because Plaintiffs have not alleged any exclusionary conduct. The result is the same even if the matter is analyzed as a valid business justification, rather than the absence of exclusionary conduct in the first place. Preventing piracy of copyrighted music and thereby ensuring the continued operation of an admittedly pro-competitive music store are valid reasons under the antitrust laws.[8]  Plaintiffs do not seriously contend otherwise.

Instead, Plaintiffs argue that the Court should reject these legitimate business reasons as "pretextual" because Apple's actual purpose was supposedly to harm competitors and maintain its alleged monopoly. This argument fails both legally and factually. As a legal matter, *Tyco* holds that an alleged anticompetitive intent does not make an otherwise valid business justification illegitimate. The *Tyco* plaintiffs pointed to evidence that Tyco "hoped its new technology would constitute a barrier to entry" by its competitors. *Tyco,* 592 F.3d at 1001. But the Ninth Circuit held that "[s]tatements of an innovator's intent to harm a competitor through genuine product improvement are insufficient by themselves to create jury question under Section 2" because "even legitimate product improvement can have the effect of harming or even destroying competitors." *Id.*[9]

logical systems that control access to other copyrighted works, such as movies"); *see also* H.R. Rep. No. 551 (Part 2), 105th Cong., 2d Sess. 43 (July 22, 1998) ("Section [1201](f) applies to computer programs as such, . . . and not to works generally, such as music or audiovisual works").

[8] *See, e.g., SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (dental insurer had valid business reason for stopping competing insurer from covering patient co-payments in circumvention of defendant's contracts with patients); *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1484 (7th Cir. 1991) (pipeline company had valid business reason for refusing to release customers from contracts where such a release would result in defendant incurring huge contractual liability); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1183 (1st Cir. 1994) (recognizing that "pursuit of efficiency and quality control" likely qualify as legitimate business reasons).

[9] This holding is consistent with Section 2 case law generally, which adopts an objective test out of recognition that every competitor wants to harm its competitors and gain an advantage. *E.g., Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is

(continued)

1    As a factual matter, Plaintiffs' pretext argument fails because, as shown above, the record

2    is indisputable that (1) beginning in 2003 and continuing thereafter Apple's FairPlay was attacked

3    by hacks (including JHymn, QTFairUse, PlayFair and others) that stripped the DRM from the

4    music and allowed unlimited transfer and distribution of the label's copyrighted music, (2) Apple

5    was required by its agreements with the labels not only to adopt a security solution such as DRM

6    but to repair it when it was breached, (3)

7    ████████████████████████████████████████████████████ and (4) Apple's

8    software updates addressed the hacks and protected against circumvention of the lawful DRM

9    security that Apple was legally entitled and contractually obligated to adopt. These facts show

10    that Apple had a valid business reason to stop the hacks, that it issued the updates to do so and

11    that the updates served that purpose. No claim of pretext can be sustained in these circumstances.

12    Seeking to divert attention from these dispositive facts, Plaintiffs argue that DRM was

13    never particularly effective in stopping piracy and that the labels did not require that Apple use its

14    own proprietary DRM. Neither assertion is relevant. Whether or not DRM was effective or a

15    good idea, the labels required it as a condition of selling music to Apple—a requirement the

16    labels were entitled to impose as copyright holders and that Apple was entitled to accept. And

17    this Court has ruled that it was lawful for Apple to adopt a proprietary DRM, rather than licensing

18    DRM to or from other companies such as Microsoft. Doc. 274, pp. 9-10.

19    In short, it was not exclusionary conduct for Apple to protect its security system from

20    being circumvented by hackers, and Apple in any event had valid business reasons to stop the

21    hackers. Doing so protected against piracy and ensured that Apple complied with its contractual

22

23    irrelevant"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 969-70 (10th Cir. 1994) (same);
     *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield*, 883 F.2d 1101, 1113 (1st
24    Cir. 1989) ("[T]he desire to crush a competitor, standing alone, is insufficient to make out a
     violation of the antitrust laws.").
25
         As the leading antitrust treatise puts it, making liability in product design cases turn on
26    intent is "the worst way for handling claims that innovation violates the antitrust laws." 3B
     P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 775c, p. 284 (3d ed. 2008). "An antitrust rule
27    permitting juries to sift through records pertaining to a firm's intent cannot help but chill perfectly
28    appropriate behavior that the antitrust laws are intended to encourage." *Id.*

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1    obligations to the labels and retained the ability to sell music.  Plaintiffs' arguments to the

2    contrary are without merit.

3        **B.**     **Apple Also Had The Right To Improve the iPod By Ensuring that Its**

4            **Operation Was Not Impaired by Third Party Programs and Content.**



Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

1      **C.      Apple Had a Right to Improve its Products Even If Harmony Music Could**
2              **No Longer Play on iPods.**

3          Apple's updates to improve its products did not become unlawful because they disabled

4    RealNetworks' Harmony.  Section 2 did not require that Apple work with RealNetworks to

5    ensure that its product continued to work after each update and improvement to Apple's product.

6    Just as Apple had no antitrust duty to license FairPlay to RealNetworks, Apple was not required

7    to permit RealNetworks to continue exploiting flaws in Apple's DRM.  This conclusion is

8    established by *Tyco* and, independently, by *Trinko*.

9              **1.      *Tyco* holds that companies have no duty when improving their**
10                      **products to help competitors survive or expand.**

11         *Tyco* makes clear that product improvements are lawful under the antitrust laws, even if

12   they make a competitor's product incompatible with the defendant's redesigned product.  This is

13   true whether the defendant designed the product when it first entered a new market or (as

14   Plaintiffs allege occurred here) the defendant modifies the product after the product has proven

15   successful and the defendant has obtained market power.  As the Ninth Circuit ruled, "product

16   improvement by itself does not violate Section 2, even if it is performed by a monopolist and

17   harms competitors as a result." *Tyco*, 592 F.3d at 999-1000.  Apple had the right to protect its

18   security system from being thwarted and to protect the iPod's operation from being impaired.  In

19   exercising that right, it had no duty to ensure that RealNetworks' Harmony—or any other

20   software or device that operated with the superseded versions of FairPlay—remained in operation.

21   Even an alleged monopolist "has no duty to help its competitors survive or expand when

22   introducing an improved product design." *Id.* at 1002.  Indeed, the antitrust laws are designed to

23   encourage innovators to develop products that are "uniquely suited" for their customers without

24   sharing "the source of their advantage" with rivals. *See Trinko*, 540 U.S. at 407-08.

25         *Tyco*'s rationale of protecting and encouraging product improvement applies with

26   particular force here, because Harmony was not simply a complementary product but was itself

27   an unauthorized program that posed risks to Apple.  RealNetworks created Harmony by

28   "discerning" and then mimicking Apple's proprietary encryption code.



*Tyco* also rejected the argument that the legality of a product design change should be determined by balancing the "benefits or worth of a product improvement against its anticompetitive effects." *Tyco*, 592 F.3d at 1000. So long as the change improves the product, the change is "necessarily tolerated by the antitrust laws." *Id.* (quoting *Foremost Pro,* 703 F.2d at 545). This is true even for a "seemingly minor technological improvement." *Id.* As the Court explained,

> To weigh the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable. There are no criteria that courts could use to calculate the 'right' amount of innovation, which would maximize social gains and minimize competitive injury . . . The balancing test proposed by plaintiffs would therefore require courts to weigh as-yet-unknown benefits against current competitive injury. Our precedents and the other precedents we have relied upon strongly counsel against such a test.

*Id.* The only exception is if the defendant engaged in improper conduct beyond the product change. *Id.* Plaintiffs do not and could not allege any such conduct here. Their claim is predicated solely on software updates. These updates, which stopped hacks and restored or enhanced FairPlay's security, are indisputably product improvements. Indeed, the "huge" benefit that iTS offered to consumers would never have occurred but for Apple's use of DRM and efforts to maintain its integrity, as required by the labels. Plaintiffs do not allege otherwise. Their claim therefore fails for the same reasons as the claim in *Tyco*.

        **2.**    **Plaintiffs' theory also violates *Trinko* because keeping Harmony in operation would have required that Apple engage in close, ongoing dealings with a competitor.**

Plaintiffs' claim also fails for the independent reason that any attempt to prevent the updates from disabling Harmony would have required extensive, close cooperation between

1     Apple and RealNetworks. *See* Robbin Decl., ¶¶ 55-58; Kelly Decl., ¶¶ 36-40.[10] Apple and

2     RealNetworks (competitors in music distribution) would have had to exchange highly

3     confidential, proprietary information regarding their respective technologies, likely including

4     Apple's source code, so that RealNetworks could try to mimic the latest version of FairPlay.

5     Apple would have had to disclose to RealNetworks how FairPlay was being modified, including

6     the modified encryption method, so that RealNetworks could modify Harmony to match the

7     updated FairPlay. RealNetworks would likewise have had to disclose to Apple how Harmony

8     worked and then cooperate with Apple to attempt to prevent Harmony from interfering with the

9     iPods' and FairPlay's operation. This cooperation and exchange of confidential information

10     would have had to continue indefinitely, at substantial cost to Apple, so that future updates

11     responding to other hacks or otherwise improving FairPlay would not interfere with Harmony.

12     Robbin Decl., ¶¶ 57-58; Kelly Decl., ¶¶ 36-40.[11]

13        The antitrust laws, however, do not impose a duty to cooperate with competitors in this

14     manner. In *Trinko*, the plaintiff sought to impose such a duty, alleging that Verizon had refused

15     to give competing carriers access to its network, thereby preventing them interoperating their

16     systems with Verizon's. The Supreme Court rejected that claim at the pleading stage, holding

17     that, as a general rule, "there is no duty [under the antitrust laws] to aid competitors." 540 U.S. at

18     411. As noted above, the antitrust laws permit, indeed encourage, companies to establish "an

19     infrastructure that renders them uniquely suited to serve their customers." *Id.* at 407. Compelling

20     companies to "share the source of their advantage" would be in "tension with the underlying

21

22     [10] *See also* Doc. 278, Ex. 1 ("We would have to engineer and work with [RealNetworks] not to
23     break [Harmony].").

24     [11] This close, ongoing cooperation between two competitors would carry its own risks. Even
with significant expenditure of time and money, there would be no assurance that undiscovered
25     bugs or glitches in trying to meld two different DRM technologies would not adversely affect
iPod customers. Similarly, as noted, dealing with RealNetworks would have made FairPlay less
26     secure because it would (1) increase the number of people with knowledge of Apple's highly
confidential, proprietary encryption methods and (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮

27

28

1    purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to

2    invest in those economically beneficial facilities." *Id.* at 407-08. It would also require courts to

3    "act as central planners, identifying the proper price, quantity, and other terms of dealing—a role

4    for which they are ill-suited." *Id.* at 408. As the Ninth Circuit amplified, "'[a]n antitrust court is

5    unlikely to be an effective day-to-day enforcer of these detailed sharing obligations.'" *MetroNet*

6    *Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004) (quoting *Trinko*, 540 U.S. at

7    415). And "compelling negotiation between competitors may facilitate the supreme evil of

8    antitrust: collusion." *Trinko,* 540 U.S. at 408.[12]

9           Consistent with these concerns, courts have held for over a century that unilateral refusal

10    to license intellectual property is not an antitrust violation. *See Cont'l Paper Bag Co. v. E. Paper*

11    *Bag Co.*, 210 U.S. 405, 429 (1908) (exclusion of competitor's use of patented improvement of

12    paper bag machines is the "very essence of the right conferred by the patent"); *Ethyl Gasoline*

13    *Corp. v. U.S.*, 309 U.S. 436, 457 (1940) (patentee has the "right to refuse to sell or to permit his

14    license to sell the patented products"); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir.

15    1981) (no liability under Sherman or Clayton act for refusal to license patents for copying

16    process); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1157 (1st Cir. 1994).

17           The analysis of these cases applies fully here. Plaintiffs are seeking to require Apple to

18    engage in an ongoing course of dealing with a competitor to share in the success of Apple's

19    groundbreaking innovative products. This claim raises each concern that led *Trinko* to reject a

20    forced interoperability claim. Forced dealing could chill the incentive to invest in developing

21    innovative products. It would thrust the court into the role of overseeing Apple's forced efforts to

22    ensure that Harmony stayed in operation while guarding against significant incremental risks to

23    iPod operations and the security of Apple's DRM. And it would force two competitors into a

24    close, cooperative relationship with the sharing of highly confidential, proprietary commercial

25    information. Indeed, due to the complexity and difficulty of court oversight of forced dealings

26

27    _____

     [12] *See also Schor v. Abbott Labs*, 457 F.3d 608, 610 (7th Cir. 2006) (citing *Trinko* for proposition
28    that "Cooperation is a *problem* in antitrust, not one of its obligations.") (emphasis in original).

1    between Apple and RealNetworks, and the type of information that they would need to share, this

2    case shows even more pointedly than *Trinko* and *MetroNet* why the antitrust laws do not force

3    companies to deal with each other to achieve interoperability.

4        Plaintiffs cannot escape *Trinko*. "[T]he sole exception to the broad right of a firm to

5    refuse to deal with its competitors" arises when a company has voluntarily entered into—and then

6    unilaterally terminated—a prior course of dealing with competitors. *In re Elevator Antitrust*

7    *Litig.*, 502 F.3d 47, 52 (2d Cir. 2007). Applying that rule, the Second Circuit affirmed the

8    dismissal of a claim that the defendant elevator manufacturers had violated Section 2 by

9    designing their elevators to require "proprietary maintenance tools which are not made available

10    to competing service companies (*e.g.*, embedded computer systems that can only be interfaced

11    with defendant-controlled handheld units)." *Id.* at 49. The Second Circuit held that no valid

12    claim was stated because "the complaint does not allege that defendants terminated a prior

13    relationship with elevator service providers." *Id.* at 54. The Eleventh Circuit has likewise ruled

14    that "*Trinko* now effectively makes the unilateral termination of a voluntary course of dealing a

15    requirement for a valid refusal-to-deal claim." *Covad Commc'ns Co. v. BellSouth Corp.*, 374

16    F.3d 1044, 1049 (11th Cir. 2004). These rulings are consistent with Ninth Circuit rulings that,

17    even before *Trinko*, refused to impose a duty to deal absent a prior voluntary course of dealing.[13]

18        Plaintiffs cannot satisfy that exception here because they do not and cannot allege that

19    Apple ever entered into any course of dealing with RealNetworks, voluntary or otherwise.

20    Moreover, just as Verizon was not in the business of selling access to its network in *Trinko*,

---

[13] *E.g., Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211 (9th Cir. 1997) ("Like the Supreme Court in *Aspen Skiing*, we are faced with a situation in which a monopolist made a conscious choice to change an established pattern of distribution...."); *SmileCare*, 88 F.3d at 786 ("Unlike the defendant skiing company in *Aspen*, Delta Dental did not discontinue a market arrangement with SmileCare."). *See also LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) ("LiveUniverse contends a refusal-to-deal claim does not require 'an affirmative decision or agreements to cooperate' between competitors. LiveUniverse is mistaken."). The Areeda treatise, relied on extensively in *Trinko*, similarly recognizes that the critical basis for imposing refusal-to-deal liability is the "defendant's abandonment of a joint venture initially entered into voluntarily. The Court did not impose a prospective duty to deal where no such dealing had occurred previously, and there is no reason for thinking that it would have done so." 3B *Antitrust Law* ¶ 772e, p. 229.

1   Apple is not in the business of licensing its DRM software to others and thus had not "refused to

2   provide to its competitor . . . a product that it already sold at retail." *Trinko,* 540 U.S. at 410.

3   Thus, just as in *Trinko*, dealing with RealNetworks would require Apple to develop licensing

4   systems and procedures that do not already exist. *Id.*

5   As noted (p. 16), Plaintiffs' allegations of bad intent do not give rise to a duty to deal.

6   The Supreme Court rejected liability in *Trinko*, at the pleading stage, despite allegations that the

7   defendant had refused to deal "as part of an anticompetitive scheme" and "in order to limit entry"

8   by competitors. *Id.* at 404, 407. The Ninth Circuit reached a similar result in *MetroNet*. Qwest

9   had adopted a volume discount plan for customers with 20 or more phone lines. MetroNet sought

10  to avoid the volume requirement by aggregating the phone orders of numerous small businesses

11  with less than 20 lines into a single purchase order and then reselling the purchased lines to the

12  individual businesses. In response, Qwest revised its discount plan to require that the twenty or

13  more lines be at a single location. Even though this change in the plan was specifically to prevent

14  MetroNet from continuing to obtain the volume discount, the Ninth Circuit held that the change

15  did not violate Section 2 because Qwest was simply seeking to maintain the business strategy it

16  had originally adopted. *MetroNet,* 383 F.3d at 1133. The same is true here. *Accord Elevator*

17  *Antitrust Litig.*, 502 F.3d at 49 (rejecting refusal to deal liability even though the defendants

18  allegedly "intentionally design[ed]" their product to be incompatible).

19  **III.   PLAINTIFFS' STATE LAW UCL CLAIM FAILS FOR THE SAME REASONS.**

20  In ruling on Apple's earlier summary judgment motion, the Court dismissed on the merits

21  Plaintiffs' state law claims, except the UCL claim which was premised on the Sherman Act claim.

22  The Court ruled that the UCL claim would survive if Plaintiffs' Sherman Act claim did. The

23  Court should now dismiss the UCL along with the Sherman Act claim. Without a valid Sherman

24  Act claim (and without the other claims the Court earlier dismissed), there is no "unlawful"

25  conduct (Doc. 322, ¶ 117) to support a UCL claim.

26  Plaintiffs' "unfairness" allegation (*Id.* ¶ 118) likewise falls with Plaintiffs' antitrust claim.

27  Plaintiffs assert that Apple's conduct was unfair because Apple engaged in "monopoly pricing"

28  that impaired competition and harmed consumers without any business justification. *Id.* But

- 24 -

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)

California courts have rejected such attempts to repackage an invalid antitrust claim into a UCL "unfairness" claim. *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).[14]

As the Court recognized in dismissing Plaintiffs' other state law claims on the merits, the interests of economy and comity dictate the UCL claim be dismissed on the merits as well, rather than remanding that claim to state court.[15]

## CONCLUSION

For these reasons, Apple's motion for summary judgment should be granted.

Dated: January 18, 2011                    JONES DAY

                                           By:/s/ Robert A. Mittelstaedt
                                              Robert A. Mittelstaedt

                                           Counsel for Defendant APPLE INC.

---

[14] *Accord Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008) (dismissing UCL unfairness claim after concluding no antitrust claim existed); *SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 92-93 (2008) (same); *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1286 (2005) (same); *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1240 (2007) (same).

[15] *See, e.g., Harrell v. 20th Century Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) (affirming dismissal of plaintiffs' federal and state law claims, reasoning that retaining jurisdiction over the state law claims furthered the interests of economy, convenience, fairness, and comity).

Mot. for Sum. Jgmt.
C 05-00037 JW (HRL)