# EXHIBIT 32

1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  JOHN J. STOIA, JR. (141757)
   BONNY E. SWEENEY (176174)
3  THOMAS R. MERRICK (177987)
   ALEXANDRA S. BERNAY (211068)
4  CARMEN A. MEDICI (248417)
   655 West Broadway, Suite 1900
5  San Diego, CA  92101
   Telephone:  619/231-1058
6  619/231-7423 (fax)
   johns@rgrdlaw.com
7  bonnys@rgrdlaw.com
   tmerrick@rgrdlaw.com
8  xanb@rgrdlaw.com
   cmedici@rgrdlaw.com
9
   THE KATRIEL LAW FIRM
10 ROY A. KATRIEL (*pro hac vice*)
   1101 30th Street, N.W., Suite 500
11 Washington, DC  20007
   Telephone:  202/625-4342
12 202/330-5593 (fax)
   rak@katriellaw.com
13
   Co-Lead Counsel for Plaintiffs
14
   [Additional counsel appear on signature page.]
15
                    UNITED STATES DISTRICT COURT
16
                   NORTHERN DISTRICT OF CALIFORNIA
17
                          SAN JOSE DIVISION
18

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) | Lead Case No. C-05-00037-JW(HRL) |
| | | CLASS ACTION |
| This Document Relates To: | ) ) | PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES |
| ALL ACTIONS. | ) ) | |
| | | **CONFIDENTIAL** |

24  PROPOUNDING PARTY:     APPLE INC.

25  RESPONDING PARTY:      MARIANA ROSEN

26  SET NUMBER:            ONE

27

28

611994_1

1    Plaintiff Mariana Rosen ("Plaintiff"), by and through her attorneys and pursuant to the

2  Federal Rules of Civil Procedure, Rule 33, hereby submits the following additional objections and

3  responses to Defendant Apple, Inc.'s ("Apple") First Interrogatories ("Interrogatories") Nos. 1-16,

4  18, 19 and 22.

5  **I.    PRELIMINARY STATEMENT**

6    Plaintiff has not completed investigation or analysis of the facts relating to this case, has not

7  completed discovery and has not completed preparation for trial.  Plaintiff is still in the process of

8  reviewing the more than 1.5 million documents produced in the last two months of fact discovery

9  and expert discovery is ongoing.  Moreover, Plaintiff is still waiting to receive critical data from

10  Apple that has been promised for months.  Other important information, including prior depositions

11  of two of Apple's employees (David Heller and Augustin Farrugia) that plainly should have been

12  produced, have still not been received and the parties have not yet resolved issues surrounding a

13  deposition of CEO Steve Jobs.  Accordingly, the responses herein given are without prejudice to

14  Plaintiff's right to produce evidence of any subsequently discovered facts or interpretations thereof

15  and/or to add to, modify or to otherwise change or amend the responses herein.  Moreover, many of

16  the interrogatories seek information that is subject to expert opinion and analysis.  Contention

17  interrogatories, such as those propounded here, which "systematically track all of the allegations in

18  an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact

19  that supports the party's allegations, are an abuse of the discovery process because they are overly

20  broad and unduly burdensome." *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M. 2007); *see also*

21  *Olson v. City of Bainbridge Island*, No. C 08-5513 RJB, 2009 U.S. Dist. LEXIS 58171 (W.D. Wash.

22  June 18, 2009).

23    The information set forth below is true and correct to the best of Plaintiff's knowledge at this

24  particular time.  Plaintiff expressly reserves the right to supplement these responses as additional

25  information as Plaintiff becomes aware of it in the discovery process.  *Lucero,* 240 F.R.D. at

26  594 ("Contention interrogatories should not require a party to provide the equivalent of a narrative

27  account of its case, including every evidentiary fact, details of testimony of supporting witnesses,

28  and the contents of supporting documents."); *Tubbs v. Sacramento County Jail*, No. Civ. S-06-

1  280 LKK GGH P, 2008 WL 863974, *1 (E.D. Cal. Aug. 13, 2008) ("[P]laintiff is not required to

2  present his entire case in discovery responses.")

3  **II.    GENERAL OBJECTIONS**

4         Plaintiff asserts the following general objections and hereby incorporates them into each

5  individual response below.

6         1.      Plaintiff objects to the "Definitions," "Instructions" and each Interrogatory to the

7  extent that they purport to impose any obligations on Plaintiff that are not imposed by law, or that

8  are otherwise inconsistent with Rule 33 of the Federal Rules of Civil Procedure.

9         2.      Plaintiff objects to this discovery to the extent it calls for information that is protected

10  by the attorney-client privilege, the attorney work-product doctrine, or any other applicable

11  privilege.

12         3.      Plaintiff objects to the Interrogatories to the extent that they are overly broad and

13  unduly burdensome.

14         4.      Plaintiff objects to the "Definitions," "Instructions" and Interrogatories to the extent

15  that they are vague or ambiguous.

16         5.      Plaintiff objects to the Interrogatories to the extent the information requested is

17  neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

18         6.      Plaintiff objects to the Interrogatories to the extent they fail to state with sufficient

19  particularity the information sought.

20         7.      Plaintiff objects to the Interrogatories to the extent they seek information that is

21  improper or request that Plaintiff provides, under oath, information or contentions not within

22  Plaintiff's personal knowledge.

23         8.      Plaintiff objects to the Interrogatories to the extent they seek information equally

24  available to Apple or information that originated from Apple's possession, custody or control.

25         9.      Plaintiff also objects to the extent the Interrogatories seek information that is

26  ascertainable only through expert discovery, which is not completed, and/or calls for a legal

27  conclusion.

28

1    10.    To the extent Plaintiff provides a response to the Interrogatories, such response shall

2  not constitute waiver of any objection to the Interrogatories.  Plaintiff also expressly reserves her

3  right to object to the introduction of any response to these Interrogatories or any portion thereof into

4  evidence.

5  **III.    RESPONSES AND SPECIFIC OBJECTIONS TO INTERROGATORIES**

6    In addition to the General Objections above, Plaintiff has set forth the following Specific

7  Objections.  By setting forth such Specific Objections, Plaintiff does not limit or restrict the General

8  Objections.  Plaintiff reserves her right to supplement her responses.

9  INTERROGATORY NO. 1:

10    Please identify all facts that YOU contend support your position that Apple has "used its

11  dominant market position in the markets for Audio Downloads and Portable Digital Media Players to

12  stifle competition and strengthen its monopoly in these markets," as alleged in paragraph 2 of the

13  Complaint.

14  RESPONSE TO INTERROGATORY NO. 1:

15    Plaintiff objects to this Interrogatory on grounds that it is overly broad and unduly

16  burdensome and compound.  Plaintiff further objects on the grounds that this Interrogatory seeks the

17  discovery of expert opinions and is therefore premature, as no deadline for the exchange of merits

18  expert reports has yet been set in this case.  Plaintiff further objects to the extent this Interrogatory

19  calls for a legal conclusion and/or opinions and purports to seek expert opinions.  Plaintiff also

20  objects that this Interrogatory is premature and seeks information that is equally available to Apple

21  or information that originated from Apple's possession, custody or control.  This Interrogatory is

22  also objectionable on the grounds that Plaintiff has not completed investigation or analysis of the

23  facts relating to this case, has not completed discovery and has not completed preparation for trial.

24    Subject to and without waiver of any of the foregoing objections and General Objections,

25  Plaintiff responds as follows:

26  **The Portable Digital Media Player and Digital Audio File Markets**

27    Apple sells products in both the portable digital media player market and the digital audio file

28  market.  The portable digital media player market is the market for portable consumer electronic

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 3 -

1  battery-powered devices that can store and play large numbers of digital audio files. *See* Declaration
2  of Roger G. Noll, dated January 18, 2011 "Noll Decl."); AIIA00095818-48 (iPod presentation
3  identifying "competition"); AIIA01308959-72 (Jupiter Research "Portable Media Players Beyond
4  Music"); AIIA01295128-71 ("Market Focus: Portable Digital Audio Players, Worldwide, 2004-
5  2010"); AIIA01294612-39 (Jupiter Research "Portable Media Devices"); AIIA01097260-74 ("US
6  MP3 Player Price Band Analysis: Q2CY'02 through Q2CY'03"); AIIA00447191-97 ("NPD US
7  MP3 Player Market: Monthly Trend Summary"); AIIA01385228-29 (discussing NPD's weekly
8  results in "portable media device space"); AIIA01385218-19 (Apple helped push out publicity of
9  Jupiter report on competition in "U.S. portable media device" market); Deposition of Arthur Rangel,
10 taken December 17, 2010 ("Rangel Depo.") at 32:11-24, 34: 12-15, 51:10-52:19 (Apple relies on
11 NPD for market info); *id.* at 48:11-17 (Apple relies on NPD and NPD does not track CD players,
12 LPs).

13      The digital audio file market consists of legally purchased permanent downloads of digital
14 music files and other audio files that are capable of being downloaded onto a portable digital media
15 player. *See* AIIA00091094-121 ("iTMS Review" listing Wal-Mart, MSN Music, Napster, Real,
16 Musicmatch, and BuyMusic as competitors); AIIA00105851-61 at 59 (chart of iTunes competitors);
17 AIIA00166554-70 (Apple market analysis of digital music market); AIIA00028812-35 (IFPI Digital
18 Music Report). Nielsen SoundScan, the entertainment industry's data information system that tracks
19 point-of-purchase sales of music in a number of markets, including the compact disc ("CD") market
20 and the Audio Download Market, announces sales figures each year. *See, e.g.*, Press Release, *U.S.*
21 *Music Purchases up by 2.1% Over 2008, Exceed 1.5 Billion for Second Consecutive Year*, Nielsen
22 (Jan. 6, 2010).  Apple regularly relies on Nielsen's sales data. *See* Cue Depo. at 31:22-32:19.
23 Digital audio files are sold on the internet through online stores both as single files or as music
24 album. AIIA00105859.

25 **Apple Gained Monopolies in the Relevant Markets Through Its Use of FairPlay**

26      In October 2001, Apple began selling portable digital media players, known as iPods.
27 Deposition of Jeffrey L. Robbin, taken December 3, 2010 ("Robbin Depo.") at 27:14-17;
28 AIIA01305533-34 (Forrester research report "iPod: Sounds Great But Won't Change the Tune").

1  iPods were intended to play back music downloaded from CDs and digital audio files in MP3

2  format. The first iPod was "an MP3 player" that had the "ability to play MP3 songs that were put on

3  to it from a Macintosh computer." Robbin Depo. at 27:21-24. In order to get music on to the first

4  generation iPods, the desktop iTunes application would be used. Robbin Depo. at 28:11. Prior to

5  the launch of the iTunes Store, users could use iTunes to transfer music from a compact disc into

6  iTunes where it would be encoded into an MP3. "The songs had no DRM." Robbin Depo. at 29:11-

7  25; *see also* AIIA01045450-55. At the time Apple launched the iPod, the market for portable digital

8  media players was highly competitive, with no one company dominating the market. *See*

9  AIIA01305533-34 (Forrester research report); AIIA01045458-66 (Forrester research reports

10  comparing iPod and other players); AIIA01335531-32. Between October 2001 and April 28, 2003,

11  Apple's share of the portable digital media player market was consistently under 20%.

12  AIIA01278671-74. Prior to the launch of the iTunes Store, the iTunes interface supported other

13  portable digital media players, including the Rio One. *See* Robbin Depo. Ex. 4; *see also* Robbin

14  Depo. at 30:20-31:17. Before the iTunes Store for Windows-based computers was developed, a

15  program known as MusicMatch was the desktop application used to manage digital audio libraries

16  on what Apple called "Windows iPod." *See* AIIA00174684-707 at 86. The first iPod for Windows

17  was made available on July 17, 2002. Apple Press Release, *Apple Unveils New iPods*

18  (July 17, 2002).

19        On April 28, 2003, Apple launched the iTunes Music Store, now known as the iTunes Store,

20  through which it sold digital audio files. Deposition of Eddy Cue, taken December 17, 2010 ("Cue

21  Depo.") at 161:22. These digital audio files contained music licensed from the major record labels,

22  Sony, BMG, Universal, Warner, and EMI. Cue Depo. at 16:2-17:5. The store was the first store of

23  its kind, instantly giving Apple an overwhelming share of the market for legally purchased digital

24  audio files. Cue Depo. at 23:25-24:9 (70-80% of online market within first 6 months). At the time

25  of its launch, the iTunes Store could be only used on Mac computers. Deposition of David K.

26  Heller, taken December 15, 2010 ("Heller Depo.") at 49:6-8 ("Apple did not offer iTunes on the

27  Windows platform.") Importantly, those digital music players that had previously worked with

28  iTunes could not play music purchased from the iTunes Store. Only iPods could play music from

1  the iTunes Store as of April 2003. *See* Robbin Depo. at 31:6-16 *see also* Heller Depo. at 48:16-18

2  ("[T]he Rio One did not support our protected format and that content would not play."); *see*

3  AIIA00166723-777 (marketing plan for going to Windows). Apple quickly realized that in order to

4  capture the majority of the market for portable digital media players, Apple would have to make

5  iTunes available on Windows. *See* AIIA00166554-70 at 59. Accordingly, on October 16, 2003,

6  Apple launched the iTunes Store for Windows. Robbin Depo. Ex. 4.

7         From the beginning of the iTunes Store, all the digital audio downloads purchased through

8  the Store were protected by Apple's proprietary digital rights management technology ("DRM"),

9  known as FairPlay. Heller Depo. at 41:5-7. During negotiations with the record labels over the

10  licensing of digital audio files for sale through the iTunes Store, the record labels required that Apple

11  protect the music so that it could not be illegally copied and distributed. Cue Depo. at 33:4-7.

12  Despite this concern over illegal copying, the record labels always maintained an interest in having

13  their music widely distributed; there was never a demand from the labels to keep the music they sold

14  through iTunes locked into the iPod. "In or around 2004 Universal had discussions with Apple, in

15  which Universal expressed to Apple that while Universal continued to require content protection,

16  Universal wanted interoperability between its music sold through online stores and portable digital

17  music players. Universal has always had an interest in having its music sold in the widest manner

18  possible, through as many channels as possible." *See* Declaration of Amanda Marks, Executive Vice

19  President and General Manager of Universal Music Distribution ("Marks Decl."), ¶4; Declaration of

20  Howie Singer, Senior Vice President, Strategic Technology and Chief Technology Officer for

21  Warner Music Inc. ("Singer Decl.") ("In 2003, Apple and WARNER entered into negotiations

22  concerning the launch of iTunes for Windows. During these negotiations, WARNER proposed that

23  WARNER's music sold through the iTunes Store be playable on an unlimited number of iPods and

24  on competing digital players owned by the purchaser of the music. Apple did not agree to this

25  proposal. And instead insisted that the music sold through the iTunes Store, including WARNER's

26  sound recordings, only be compatible with iPods."); Declaration of Lawrence Kanusher, Senior Vice

27  President, Business & Legal Affairs for the Global Digital Business Group of Sony Music

28  Entertainment ("Kanusher Decl."). ("SONY required that SONY's digital products available for re-

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 6 -

1   sale by Apple through the iTunes Store have content protection to mitigate against piracy.  In

2   particular, SONY was concerned with consumers' ability to make an unrestricted number of copies.

3   In 2003, Apple and SONY entered into negotiations concerning the launch of iTunes for Windows.

4   During ongoing negotiations, SONY and Apple discussed whether SONY digital product files

5   protected by DRM could be playable on music players in addition to the iPod without compromising

6   the security solution.  Apple did not accommodate Sony's request for a solution that would both

7   protect the content as well as be interoperable with other devices.")

8          Even in the earliest discussions with the record labels and Apple, illegal copying is the

9   primary concern expressed. AIIA00099928-29. As Apple's rapid dominance in the market became

10  quickly apparent, the record labels pressed Apple to make its content interoperable.  Cue Depo. at

11  40:15-18. ("[P]ost the launch and through some of the renewals, as we started getting some success,

12  one of the things the labels had asked us about was whether we could make our content

13  interoperable.")  Apple sought to retain its chokehold by claiming that it wouldn't be technically

14  feasible to make the iTunes Store interoperable. Cue Depo. at 41:6-12; Singer Decl.

15         Instead of using an already-developed third party DRM, Apple created and used FairPlay to

16  address the copyright concerns of the major music labels. *See* AIIA00094578-84 (Digital Rights

17  Management ("DRM") Overview); AIIA00094571-77 (DRM Details).  However, in addition to

18  addressing the labels' copyright concerns, Apple also developed FairPlay so that music sold through

19  the iTunes Store could only be played on an iPod. *See* AIIA00094578-84 at 84 (stating that only

20  iPod will be supported); AIIA01278697; Cue Depo. at 41:24-42:7 (music could only be put on an

21  iPod or burned to CD). All music sold through the iTunes Store, including that licensed by the non-

22  major music labels, was protected by FairPlay. Cue Depo. at 45:2-46:16; 56:6-57:16 (all music had

23  same restrictions).  All music sold through the iTunes Store was restricted through FairPlay,

24  including music recorded by labels that did not require DRM. Robbin Depo. at 50:10-16. Indeed,

25  the same music from certain artists was available DRM-free on online sites, such as eMusic, but was

26  sold with FairPlay attached on the iTunes Store. *See* Cue Depo. at 56:6-57:3. Apple's insistence on

27  the use of its proprietary DRM scheme prevented manufacturers of competing portable digital media

28  players from effectively competing in the market because their products were not compatible with

1 │ the digital audio files sold through the iTunes Store. *See* Declaration of Lee Morris, dated

2 │ January 19, 2007, ¶8.

3 │      At the same time Apple launched its iTunes Store, it also released a new model of iPod that

4 │ was compatible with the FairPlay-encrypted files sold through the Store. Apple made certain that

5 │ the new iPods were not compatible with files sold through other online stores. AIIA00098417. This

6 │ was not necessary to maintain the security of the audio files sold through the iTunes Store.

7 │ However, Apple knew that if it maintained the link between iTunes Store digital audio downloads

8 │ and iPods, it could take significant profits in the portable digital media player market with the sale of

9 │ iPods. *See* Cue Depo. at 209:21-210:11 (margin for the iTunes store "runs in the single digits" while

10 │ iPod margins have "been in the high 20s, low 30s range"). Apple thus created a closed system that

11 │ locked iTunes Store customers into using the iPod for direct playback of their digital audio files.

12 │ Cue Depo. at 41:24-43:9; Robbin Depo. at 36:25-37:23; Heller Depo. at 48:12-18.

13 │      Apple jealously guarded the technological link between the iPod and iTunes Store audio files

14 │ and rejected several requests to license FairPlay. *See* AIIA001344648-49 (9/3/05 Tony Fadell email

15 │ stating that Sandisk CEO "desperately wanted to license FairPlay"); AIIA00098511. Just weeks

16 │ before Apple's launch of the iTunes Store, Apple's own Director of Product and Music Marketing

17 │ recognized that "from a marketing perspective," the more portable digital media players that were

18 │ compatible with audio files purchased from the iTunes Store the better, but iPod was the priority.

19 │ AIIA01278697. Apple's CEO, Steve Jobs, made clear that Apple would not be licensing FairPlay to

20 │ competitors, despite the opinions of upper-level management at Apple that licensing FairPlay to

21 │ other portable digital media players would be good for the success of the iTunes Store.

22 │ AIIA00098491-93. Further, Mr. Jobs made clear that Apple would do what it took to make sure

23 │ iPods could not play digital audio files purchased from competing online stores. AIIA00098417

24 │ (5/08/03 MusicMatch Jobs email). Apple did not, however, express similar concerns about licensing

25 │ FairPlay to non-competitors, and entered into an agreement with Motorola for ringtone use. Heller

26 │ Depo. at 154:4-155:24; Cue Depo at 43:11-23; AIIA00094370-82; Press Release, *Apple, Motorola*

27 │ *& Cingular Launch World's First Mobile Phone with iTunes* (Sept. 7, 2005).

28 │

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)       - 8 -

1    Apple also rejected requests from the major music labels to make the digital audio files sold
2  through the iTunes Store interoperable with other portable digital media players. For example, in
3  September 16, 2003 email from John Rose of EMI to Eddy Cue and others, Mr. Rose stated that
4  "Portable Devices" as defined in the contract with Apple should include "iPODS and WMA 1000-
5  compliant devices owned by the Purchaser." AIIA00098220-22. Mr. Cue forwarded the email to
6  Steve Jobs who responded, "This is bad – they are trusting all 'WMA 1000-compliant
7  devices'. . . . This is an immediate problem." AIIA00098373-75; Cue Depo. at 65:22-66:2 (There
8  was no provision for WMA-complaint devices in the finalized agreement). Mr. Cue assured Mr.
9  Jobs that Apple could use its disagreement over the burn limit to negotiate interoperability with
10  iPods only: "I don't think they would have a problem with 'Apple DRM devices' if we agreed to
11  burns in the future." AIIA00098373-75.

12    The technology link between the iPod and the iTunes Store due to FairPlay enabled Apple to
13  increase its market share in both the portable digital media player market and online music market.
14  AIIA01293667-74 at 67. (Needham & Company report "Apple tightly linked the iTunes Music Store
15  and its iPod music player through FairPlay, its digital rights management software. In doing so,
16  Apple effectively locked iPod owners into its Music Store and shoppers at the Store into the iPod.
17  No other music player could access the Music Store nor could iPod owners access rival stores.")
18  Apple was able to leverage this market share to increase its market share in portable digital media
19  players. In the sixteen months after the launch of the iTunes Store, Apple had at most an 11% share
20  of the portable digital media player market. When the Store was launched with FairPlay, Apple's
21  market share in the media digital player market more than steadily increased to 70% by the end of
22  2005. AIIA1083490. Similarly, the exclusive link between the iTunes Store and iPods has enabled
23  Apple to maintain a 70% or more market share in the online music market. *See*
24  AIIA00712163; AIIA00099408-09. The only time Apple's market share in the online music market
25  dropped below 70% was in August 2004, when RealNetworks, a competing online music retailer,
26  sold digital audio files that were compatible with the iPod. *Id.* By end of 2004, iPods sales made up
27  14.3% of Apple's overall revenue. AIIA00095840.

28

**Apple Used Unnecessary and Non-Improving Software and Firmware Updates to Exclude Competition in the Relevant Markets and to Maintain Its Monopolies**

In January 2004, one of Apple's competitors in the digital audio file market, RealNetworks, launched an online music store through which it sold digital audio files licensed from the major record labels. AIIA01278810; *see also* Marks Decl., ¶5 ("Universal entered into agreements with other companies, including RealNetworks."); Declaration of Mark Piibe, Executive Vice President, Global Business Development of EMI Music ("Piibe Decl.") ("EMI . . . had agreements with other companies including RealNetworks . . . to sell downloads of EMI sound recordings . . . ."); Singer Decl. ("WARNER entered into agreements with other companies, including Real Networks, which also set forth the terms and conditions under which Warner's sound recordings were sold through online stores other than the iTunes Store."); Kanusher Decl. ("SONY entered into agreements with other companies, including Real Networks which also set forth the terms and conditions under which the downloads embodying SONY's digital products were sold."). Apple kept a close eye on this competitive effort. *See* AIIA01278810. On January 5, 2004, Apple's CEO, Steve Jobs, forwarded an article to several people in upper-level management at Apple that described RealNetworks' impending online store and RealNetworks' use of DRM other than FairPlay. *Id.* Mr. Jobs enthusiastically recognized that this was "great" for Apple because Apple's FairPlay was the "largest." *Id.* He excitedly announced, "Let's leverage this position now!!!!" *Id.* Apple also continued to monitor the efforts of other competitors in an effort to keep Apple's iPod and iTunes Store a closed system. *See* AIIA00113706 (1/29/04 email from James Higa to Warner confirming that Warner's license to subscription services does not allow transfer to portable devices).

Realizing the need to have access to Apple's iPod in order to successfully compete in the digital audio file market, RealNetworks' CEO, Rob Glaser, contacted Steve Jobs, on April 9, 2004, concerning the licensing of FairPlay. AIIA01385106. Mr. Glaser proposed to Mr. Jobs that Apple license FairPlay so that RealNetworks could sell music that was interoperable with the iPod and RealNetworks would make the iPod its preferred device for its online store. *Id.* Apple's document production includes no response to Mr. Glaser's email and it is unknown whether any discussions took place between Mr. Jobs and Mr. Glaser.

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 10 -

1    Just months later, in July 2004, RealNetworks took matters into their hands and with the

2    approval of the major record labels began legally selling digital audio files that could be directly

3    played on an iPod. Marks Decl., ¶5 (noting that Universal and RealNetworks had a contract to sell

4    music); Piibe Decl. (EMI had agreements with RealNetworks to sell downloads; EMI "became

5    aware of RealNetworks' Harmony DRM technology at some time in or after 2004. RealNetworks'

6    predecessor Listen.com, represented that Harmony guarded against violations of the usage

7    limitations and restrictions applicable to downloads of EMI recordings. I have found no indication

8    that EMI made any objection to the Harmony DRM technology."); Kanusher Decl. ("SONY was

9    aware of RealNetworks' Harmony technology introduced in July, 2004, which allowed music

10   purchased though Real Networks' online store to be transferred to an iPod. Because music

11   purchased though Real Networks' online store contained a security solution that guarded against

12   unauthorized duplication and distribution of SONY's digital products, Sony did not object to the

13   Harmony technology"); Singer Decl. ("WARNER was aware of RealNetworks' Harmony

14   technology introduced in July, 2004, which purported to allow music purchased through

15   RealNetworks' online store to be directly downloaded onto an iPod. Warner entered into a download

16   deal with RealNetworks because music purchased through RealNetworks' online store contained a

17   security solution that guarded against unauthorized duplication and distribution of WARNER's

18   sound recordings.")

19   According to RealNetworks, the Harmony technology followed "in a well-established

20   tradition of fully legal, independently developed paths to achieve compatibility . . . . Harmony

21   creates a way to lock content from Real's music store in a way that is compatible with the iPod,

22   Windows Media DRM devices and Helix DRM devices. Harmony technology does not remove or

23   disable any digital rights management system." AIIA00090471. *See* Declaration of David Martin in

24   Support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment ("Martin Decl."),

25   at ¶28. Apple executives admitted that Harmony made it so that music purchased through the

26   RealNetworks site was interoperable with the iPod. Robbin Depo. at 96:21-24.

27   Instead of embracing the increased access to iPod owners of different sources of music,

28   Apple took swift action to exclude RealNetworks. Even prior to RealNetworks' release of Harmony,

1  Apple began crafting its public attack on RealNetworks' efforts. *See* AIIA00090405-07 (7/23/04

2  email string); AIIA00090498. Indeed, Steve Jobs and his top lieutenants worked feverishly to craft

3  the company's threatening response to Harmony, drafting a statement that Apple's software updates

4  would end interoperability between the iPod and RealNetworks' music. This process occurred

5  ***before*** Apple engineers even had an opportunity to examine the RealNetworks product.

6  AIIA00093875 ("Do we want to soften how successful they have been (seen [sic] we haven't used it

7  ourselvbes [sic].")) Apple issued a public statement, crafted by Mr. Jobs, threatening RealNetworks

8  and other competitors that Apple would be updating its software so that the iPod would no longer be

9  compatible with RealNetworks music. AIIA00090405-07. Apple acted aggressively toward

10  RealNetworks even though the record labels approved of RealNetworks' actions. *See* Kanusher

11  Decl.; Piibe Decl.; Robbin Depo. Ex. 14; Cue Depo. Ex. 64. A Universal Music executive lauded

12  RealNetworks' announcement: "We applaud RealNetworks' efforts to help correct this situation and

13  appeal to all people and companies in this area to work toward a world of universal interoperability."

14  Press Release, *RealNetworks breaks Apple's hold on iPod* (July 26, 2004). This support did not sit

15  well with Steve Jobs, who went as far as to personally demand Universal change its public

16  statements made in support of RealNetworks. *See* AIIA01384975-76; AIIA01384977-78;

17  AIIA00090441.

18    Top technical executives also went into overdrive, performing a detailed technical analysis as

19  soon as the program was available to be downloaded. AIIA00090427; AIIA00090428; Heller Depo.

20  at 128:1-5; 130:14-22. Rather than finding a program that stripped DRM from the music, the

21  engineers found that the program appeared to be "encrypting the files the same way that FairPlay

22  does." Heller Depo. at 87:3-4. David Heller testified that during his analysis of the Harmony

23  software, he found that "what Harmony was doing at the time was writing a v3, a Version 3,

24  encrypted keybag." This meant, he testified, "that as far as the iPod was concerned, it met enough

25  criteria so that the iPod would actually play the song." Heller Depo. at 135:20-136:8. Apple

26  executives admitted, that unlike a "hack," RealNetworks' Harmony technology did not strip DRM

27  protection from music. Cue Depo. at 123:3-6. One Apple engineer who witnessed a product

28

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 12 -

1 | demonstration described Harmony's translation and playback of a DRM-protected song on an iPod
2 | as "very quick" and "very seamless." AIIA00329373.[1]

3 |     RealNetworks' sale of digital audio files that were interoperable with iPods was successful.
4 | In August 2004, Apple's market share in the digital audio file market fell and RealNetworks' market
5 | share increased for the first time. *See* AIIA00090447-49; AIIA00099408-09; AIIA00090467-68. In
6 | fact, shortly after it launched Harmony, RealNetworks saw an immediate and dramatic increase in its
7 | share of the audio digital file market, which went from 10% to 20% in three weeks. AIIA00090447-
8 | 49.

9 |     True to its word and in an effort to end RealNetworks' successful competitive efforts,
10 | beginning October 2004, Apple began issuing iTunes software and iPod firmware updates to
11 | FairPlay that ensured that music legally purchased from RealNetworks could not be played on an
12 | iPod.  Each iPod model that was released on or after October 26, 2004, contained the updated
13 | version of FairPlay and thus was not compatible with music purchased from RealNetworks' online
14 | store. Robbin Depo. Ex. 4; Heller Depo. at 240:10-19.

15 |     In an effort to further ramp up their efforts to exclude competition from the markets through
16 | updates to FairPlay, in April 2005, Apple hired Augustin Farrugia to head up the DRM department.
17 | Deposition of Augustin J. Farrugia, taken December 8, 2010, ("Farrugia Depo.") at 12:24-13:2;
18 | Robbin Depo. at 56:8-10. Mr. Farrugia immediately began work on a new FairPlay system known
19 | as "FairPlay 1.0." Farrugia Depo. at 46:1-6. Mr. Farrugia and his team monitored competitor
20 | actions, including that of RealNetworks, and determined what changes to FairPlay could be made to
21 | make interoperability with iPods impossible. Farrugia Depo. at 164:9-24; AIIA00094569.

---

[1]     Apple's immediate and high-level response to RealNetworks' Harmony was a far cry from Apple's typical response to news of hacks that stripped DRM from iTunes Store-purchased songs. Rather than immediately attack, Apple would wait until the record labels complained about hacks to take action. AIIA00092388. In response to a concern about a breach of FairPlay, Eddy Cue told an executive from Universal to wait for a hack to be closed "at the end of the month." Cue Depo. Ex. 7. When RealNetwork's Harmony, in contrast, threatened Apple's market dominance, Apple executives and engineers at the highest level – including Mr. Jobs – launched an immediate investigation and responded within hours.

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)     

1    In conducting an analysis of FairPlay, Mr. Farrugia found that it was a "flaw" in the FairPlay

2  system that Real was able to make its music playable on an iPod. Apple_AIIA_B_000001-103 at 80

3  ("This key translation creates a well known flaw already exploited by Real to DRM their music to be

4  compatible for iPod implementation of FairPlay.") Farrugia Depo. at 195:10-196:13.[2] In April 2005,

5  RealNetworks' music began working again with iPods. *See* AIIA00090485-88. Apple quickly

6  drafted another threatening press release warning RealNetworks and other competitors that updates

7  to "iPod software" would break the compatibility between iPods and RealNetworks' digital audio

8  files. *Id.* Similarly, on May 11, 2005, Apple became aware of the fact that Yahoo's new Music

9  Engine application allowed consumers to download music onto iPods. *See* AIIA01341443. As

10  Apple's Director of iPod Marketing, Stan Ng, reported directly to Steve Jobs and other upper-level

11  management, "[Yahoo Music Engine] puts all the synced music into a viewable Music folder on the

12  iPod. Music transferred by iTunes, which is still hidden, can co-exist with the music transferred by

13  Yahoo Music Engine." *Id.*

14    Interoperability between the iPod and digital audio files purchased from competing online

15  stores was the focus of Apple's updates to FairPlay. In October 2005, Apple's Senior Director of

16  DRM, Augustin Farrugia, identified RealNetworks' ability to sell music that was compatible with

17  iPods as a "flaw" in the FairPlay system. Apple_AIIA_B_000001-103, at 80 ("This key translation

18  creates a well known flaw already exploited by Real to DRM their music to be compatible for iPod

19  implementation of FairPlay."); Farrugia Depo. at 195:10-196:13. Instead, the "problem" identified

20  by Apple was that consumers were able to purchase music from sources other than the iTunes Store

21  and download that music directly onto their iPods. Farrugia Depo. at 164:10-24 (Farrugia admits

22  that this "problem" has nothing to do with the security of the digital audio files sold through the

23  iTunes Store); AIIA_B_000001-103; Farrugia Depo. at 191:13-18.

24    Apple kept a close eye on RealNetworks' and other competitors' efforts at interoperability.

25  In March 2006, Apple again became aware that RealNetworks' music was compatible with the iPod.

26

27  [2]    To correct this "flaw," Apple redesigned FairPlay so that Apple could monitor the sources of
music on consumers' iPods and prevent rivals' music from working. AIIA00094563-69.

28

1   *See* AIIA00093859-60. Realizing that RealNetworks' music, and music sold by other competitors,

2   would continue to become compatible with iPods, Apple aggressively redesigned FairPlay so that

3   Apple could monitor purchasers' sources of music that were on their iPods and prevent that music

4   from working. *See* AIIA00094563-69. Beginning sometime in April 2006, Augustin Farrugia,

5   Apple's Senior Director of DRM, directed Rod Schultz, an Apple software engineer, to address a

6   certain "problem" identified as: "To prevent injection of content and iPod databases from clients

7   other than iTunes into the iPod (DRM protected or non-DRM protected content), a method for

8   verifying the course of the content needs to be implemented." AIIA00094563-69 at 64; Farrugia

9   Depo. at 164:4-24. The "problem" identified by Apple was that consumers were able to purchase

10   music from sources other than the iTunes Store and download that music directly onto their iPods.

11   Farrugia Depo. at 164:10-24. Apple admitted that this "problem" had nothing to do with the security

12   of the digital audio files sold through the iTunes Store. Farrugia Depo. at 191:13-18. This code was

13   incorporated into FairPlay in September or October 2006[3] and in fact prevented music purchased

14   from competing online stores from being directly downloaded onto an iPod. Farrugia Depo. at

15   167:13-15, 183:14-23.

16        Indeed, on October 23, 2006, Augustin Farrugia, Apple's Senior Director of DRM, went to

17   RealNetworks' website and confirmed that digital audio files purchased from RealNetworks could

18   no longer be directly downloaded onto an iPod. AIIA00802966-67; Farrugia Depo. at 202:22-

19   205:21. Apple confirmed again in January 2007, that RealNetworks was no longer interoperable

20   with new iPods. *See* AIIA00807080-81 ("Fortunately, Real's own support website states that iPod

21   with video and iPod nano do not work with Real Player due to changes we've made in the iPod

22   software."). *See* Martin Decl., ¶¶70-76.

23        In early 2007, EMI approached several online stores that competed with Apple in an attempt

24   to sell its music DRM-free. *See* AIIA00093504. Subsequently, Steve Jobs issued a self-serving

25   public statement on DRM. However, this public statement was merely pretextual so as to disguise

26

27   [3]   *See* Errata to Declaration of Augustin Farrigua in Support of Defendant's Renewed Motion
    for Summary Judgment.

28

1  Apple's intent all along to use FairPlay to shut-out competition in the relevant markets.  As Steve

2  Jobs admitted, the reasoning behind his public statement on DRM was not his desire to create

3  interoperability, but rather the pressure Apple was receiving from European competition authorities

4  concerning Apple's use of FairPlay.  AIIA01385373-74.  As is clear by Apple's continued rejection

5  of the record labels' request for interoperability with music from the iTunes Store and non-Apple

6  portable digital media players, Apple was not genuinely interested in opening the closed system of

7  the iTunes Store and iPods.  *See, e.g.*, AIIA01385473-74.  Other evidence conflicts with Apple's

8  depiction of itself as zealous defender of DRM.  Apple's customer service representatives, for

9  example, frequently advised customers to strip DRM from songs purchased from sources other than

10  the iTunes Store in order to play them on their iPods.  *See, e.g.*, AIIA00001978, AIIA00001964,

11  AIIA00001948, AIIA00001945, AIIA00001944, AIIA00001936, AIIA00001899, AIIA00001827,

12  AIIA00001790, AIIA00001759, AIIA00001756, AIIA00001519, AIIA00001518, AIIA00001516,

13  AIIA00001492, AIIA00001491, AIIA00001486, AIIA00001478, AIIA00001461, AIIA00001440,

14  AIIA00001439, AIIA00001433, AIIA00001366, AIIA00001362, AIIA00001342, AIIA00001310,

15  AIIA00001305, AIIA00001288, AIIA00001263, AIIA00001244, AIIA00001242, AIIA00001206,

16  AIIA00001187, AIIA00001154, AIIA00001145, AIIA00001118, AIIA00001111, AIIA00001108,

17  AIIA00001051, AIIA00000994, AIIA00000906, AIIA00000905, AIIA00000885, AIIA00000861,

18  AIIA00000860, AIIA00000852, AIIA00000844, AIIA00000831, AIIA00000830, AIIA00000818,

19  AIIA00000805, AIIA00000796, AIIA00000789, AIIA00000771, AIIA00000759, AIIA00000726,

20  AIIA00000716, AIIA00000710, AIIA00000697, AIIA00000658, AIIA00000569, AIIA00000478,

21  AIIA00000475, AIIA00000438, AIIA00000431, AIIA00000412.  In some instances, Apple

22  instructed   customers   to   delete   RealPlayer.      AIIA_C_00204897;   AIIA_C_00205403;

23  AIIA_C_00205532. Consumers continually complained to Apple about the lack of interoperability,

24  voicing extreme displeasure at Apple's anticompetitive behavior.  *See, e.g.*, AIIA00006477,

25  AIIA00007040, AIIA00007064, AIIA00007549, AIIA00007575, AIIA00008481, AIIA00008499,

26  AIIA00067464, AIIA00067479, AIIA00067605, AIIA00067632, AIIA00067979, AIIA00069598,

27  AIIA00005573, AIIA00005584, AIIA00005595,  AIIA00005615, AIIA00006175, AIIA00059009,

28  AIIA00059088 (a sampling of thousands of customer complaints).

1    Through this conduct, Apple forewent the short-term profits that come with increased

2  demand for iPods, in order to maintain its monopolies in both the portable digital media player and

3  digital audio file markets. *See* AIIA00799692 (10/02/06 Email from Apple's VP, iPod Product

4  Marketing, stating, "I don't think that anything that breaks iPod+iTunes is a good thing in the long

5  run."); AIIA01278697.  Apple was able to maintain its 70% or more market share in the online

6  music market and steadily increase its share of the portable digital media market.

7  **Apple's Anticompetitive Conduct Resulted in Supracompetitive Prices for iPods**

8    The software and firmware updates enabled Apple to shut out genuine competition in the

9  portable digital media player market and the legally purchased audio download market.  By shutting

10  out competition, Apple was able to continue to increase its market share in the portable digital media

11  player market and charge consumers supracompetitive prices.  In July 2004, when RealNetworks

12  began selling digital audio files that were interoperable with iPods, the desirability of iPods

13  increased.  When Apple updated FairPlay so that iPods were no longer compatible with digital audio

14  files purchased from RealNetworks, the value of iPods decreased.  Had Apple not prevented other

15  products from being compatible with the iPod and the iTunes Store, the market for portable digital

16  media players would have been more competitive and prices of iPods would have reflected the

17  competition.  Instead, Apple was able to raise the price of iPods to supracompetitive levels.

18  INTERROGATORY NO. 2:

19    Please identify all facts that YOU contend support your position that "Apple engaged in

20  systematic conduct to shut out rivals' competing Audio Downloads and Portable Digital Media

21  Players by cutting off access to the marketplace," as alleged in paragraph 2 of the Complaint.

22  RESPONSE TO INTERROGATORY NO. 2:

23    Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

24  and compound.  Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

25  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

26  has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

27  conclusion and/or opinions and purports to seek expert opinions.  Plaintiff also objects to this

28  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

1  respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

2  information that is equally available to Apple or information that originated from Apple's

3  possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

4  has not completed investigation or analysis of the facts relating to this case, has not completed

5  discovery and has not completed preparation for trial.

6       Subject to and without waiver of any of the foregoing objections and General Objections,

7  Plaintiff responds as follows:

8       *See* Response to Interrogatory No. 1, above.

9  INTERROGATORY NO. 3:

10      Please identify all facts that YOU contend support your position that "In the process, Apple

11  deprived consumers of choice and innovation in the Audio Download Market and Portable Digital

12  Media Player Market," as alleged in paragraph 2 of the Complaint.

13  RESPONSE TO INTERROGATORY NO. 3:

14      Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

15  and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

16  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

17  has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

18  conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

19  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

20  respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

21  information that is equally available to Apple or information that originated from Apple's

22  possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

23  has not completed investigation or analysis of the facts relating to this case, has not completed

24  discovery and has not completed preparation for trial.

25      Subject to and without waiver of any of the foregoing objections and General Objections,

26  Plaintiff responds as follows:

27      *See* Response to Interrogatory No. 1, above.

28

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 18 -

1    INTERROGATORY NO. 4:

2        Please identify all facts that YOU contend support your position that "Apple used unneeded

3    technological restrictions in conjunction with software updates to suppress new products that

4    threatened its monopoly power in the relevant product markets," as alleged in paragraph 2 of the

5    Complaint.

6    RESPONSE TO INTERROGATORY NO. 4:

7        Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

8    and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

9    expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

10   has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

11   conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

12   Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

13   respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

14   information that is equally available to Apple or information that originated from Apple's

15   possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

16   has not completed investigation or analysis of the facts relating to this case, has not completed

17   discovery and has not completed preparation for trial.

18       Subject to and without waiver of any of the foregoing objections and General Objections,

19   Plaintiff responds as follows:

20       *See* Response to Interrogatory No. 1, above.

21   INTERROGATORY NO. 5:

22       Please identify all facts that YOU contend support your position that "Apple initially gained

23   its monopoly power through the use of proprietary software on Audio Downloads purchased from

24   Apple's iTunes Store ("iTS") and Apple's iPod, known as FairPlay," as alleged in paragraph 3 of the

25   Complaint.

26   RESPONSE TO INTERROGATORY NO. 5:

27       Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

28   and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

1  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

2  has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

3  conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

4  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

5  respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

6  information that is equally available to Apple or information that originated from Apple's

7  possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

8  has not completed investigation or analysis of the facts relating to this case, has not completed

9  discovery and has not completed preparation for trial.

10      Subject to and without waiver of any of the foregoing objections and General Objections,

11  Plaintiff responds as follows:

12      *See* Response to Interrogatory No. 1, above.

13  INTERROGATORY NO. 6:

14      Please identify all facts that YOU contend support your position that "When competitors

15  attempted to enter either market by selling products compatible with Apple's market-leading iPod or

16  iTS files, Apple promptly issued software updates to end the compatibility," as alleged in paragraph

17  4 of the Complaint.

18  RESPONSE TO INTERROGATORY NO. 6:

19      Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

20  and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

21  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

22  has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

23  conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

24  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

25  respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

26  information that is equally available to Apple or information that originated from Apple's

27  possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

28

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 20 -

1  has not completed investigation or analysis of the facts relating to this case, has not completed

2  discovery and has not completed preparation for trial.

3          Subject to and without waiver of any of the foregoing objections and General Objections,

4  Plaintiff responds as follows:

5          *See* Response to Interrogatory No. 1, above.

6  INTERROGATORY NO. 7:

7          Please identify all facts that YOU contend support your position that "Consumers and

8  merchants have come to recognize the Audio Download Market as a separate and distinct market

9  from the market for music CDs," as alleged in paragraph 19 of the Complaint.

10  RESPONSE TO INTERROGATORY NO. 7:

11          Plaintiff objects to this Interrogatory on grounds that it is overly broad and unduly

12  burdensome, and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the

13  discovery of expert opinions and is therefore premature, as no deadline for the exchange of merits

14  expert reports has yet been set in this case. Plaintiff further objects to the extent this Interrogatory

15  calls for a legal conclusion and/or opinions and purports to seek expert opinions. Plaintiff also

16  objects to this Interrogatory to the extent Apple has not yet fully complied with its duties and

17  obligations to respond to requested discovery. Plaintiff also objects that this Interrogatory is

18  premature and seeks information that is equally available to Apple or information that originated

19  from Apple's possession, custody or control. This Interrogatory is also objectionable on the grounds

20  that Plaintiff has not completed investigation or analysis of the facts relating to this case, has not

21  completed discovery and has not completed preparation for trial.

22          Subject to and without waiver of any of the foregoing objections and General Objections,

23  Plaintiff responds as follows:

24          The Audio Download Market presents consumers significant advantages over purchasing

25  music in CD form. These advantages have been embraced by consumers and the markets for the two

26  products that are separate and distinct. In contrast to the market for CDs, the audio download market

27  tends to focus on single tracks – an *a la carte* model where the purchaser buys only the songs that

28  he/she wants rather than buying an entire CD album. "Downloaders' behaviors truly reveal that they

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 21 -

1  care for tracks, not albums." AIIA00002905-12 (The Digital Music Consumer: 2003 Forrester

2  Research, Inc.) Eddy Cue, in celebrating iTunes' revenue numbers in 2006, recognized the track-

3  based nature of the Audio Download market. "We have built a billion dollar business in 3 years 99

4  cents at time!" AIIA00099494. "A digitally downloaded album or song is a significantly different

5  product from a compact disc (CD) bought at a record store." Ali Matin, *Digital Rights Management*

6  *(DRM) in Online Music Stores: DRM-Encumbered Music Downloads' Inevitable Demise as a*

7  *Result of the Negative Effects of Heavy-Handed Copyright Law*, 28 Loy L.A.. Ent.

8  L. Rev. 265 (2007/2008). Audio Downloads are also attractive because they are more convenient,

9  reliable, and better for the environment. *See, e.g.*, AIIA00175538 -93 at 58 (Apple Presentation

10 touting the convenience of one-click downloads) ; *see also* United States Environmental Protection

11 Agency, *The    Life    Cycle    of    a    CD    or    DVD*, available    at

12 www.epa.gov/osw/education/pdfs/finalposter.pdf (demonstrating environmental impact of CDs).

13 Consumers do not have to drive to a store to make their purchase, trucks do not have to transport the

14 CDs from factory to warehouse to retailer, and there is no material or packaging produced only to be

15 thrown away. Audio Downloads also promise superior audio fidelity over time because, unlike CDs,

16 Audio Downloads last indefinitely and cannot wear out, get scratched or break. The Audio

17 Download Market offers a number of features not readily available at traditional "brick and mortar"

18 music stores, which help set it apart as a distinct market. For example, whereas shoppers at

19 traditional "brick and mortar" music stores must typically purchase an entire album of the artist or

20 group selected, online sales of Audio Downloads offer consumers the option to purchase only

21 individual songs or tracks of music separately. This is borne out by sales statistics showing that on

22 the iTunes Store, for every sale of a complete album online there are approximately 20 songs

23 purchased individually. By contrast, according to statistics compiled by the Recording Industry

24 Association of America ("RIAA"), in the CD market in 2009, sales of CD albums were 292.9

25 million compared to sales of CD singles of 900,000 units. *See* RIAA 2009 Year-End Shipment

26 Statistics, available at http://76.74.24.142/A200B8A7-6BBF-EF15-3038-582014919F78.pdf.

27 Another distinguishing feature of the Audio Download Market is that it offers consumers the ability

28 to create their own customized "playlists" wherein consumers can, in effect, create their own

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)          - 22 -

1  customized collection of songs from different artists. *See* iTunes A to Z regarding playlists,

2  available at http://www.apple.com/itunes/features/#playlists. In addition, the music selection

3  available in the Audio Download Market is not coextensive with the music selection available at

4  "brick and mortar" music stores. Audio Download sites provide a ready outlet for independent and

5  less popular artists whose music is not as likely to be available at "brick and mortar" music stores,

6  which only have room to carry a small fraction of the inventory of Audio Download stores. In 2008

7  Apple boasted the "world's largest music catalog" of more than six million songs. *See* Press

8  Release, *iTunes Now Number Two Music Retailer in the U.S.* (February 26, 2008), available at

9  http://www.apple.com/pr/library/2008/02/26itunes.html.

10  Government regulators also consider the digital audio market to be distinct. "Generally

11  speaking, companies with 75-percent market share of any business, in this case, the digital download

12  market, need to step up to the plate when it comes to testifying on policy issues that impact their

13  industry. Failure to do so is a mistake." Statement of Honorable Lamar Smith Chairman of

14  Subcommittee on Courts, the Internet and Intellectual Property at hearing titled Digital Music

15  Interoperability and Availability, April 6, 2005 regarding Apple's failure to attend Congressional

16  hearing          despite          its          dominant          market          position.

17  http://commdocs.house.gov/committees/judiciary/hju20389.000/hju20389_0.HTM.

18  Consumers, merchants and the industry all recognize that the digital download market is a

19  distinct market. "The digital download market is growing geometrically." AIIA00028812 at 14

20  (IFPI Digital Music Report); "Apple has an estimated 80 percent share of the digital download

21  market." Ryan Nakashima, *Music Labels Cheer iTunes Price Changes* (January 14, 2009), available

22  at http://www.msnbc.msn.com/id/28661059/ns/technology_and_science-tech_and_gadgets/; Press

23  Release, *Digital Music Increases Share of Overall Music Sales Volume in the*

24  *U.S.* (August 18, 2009), available at http://www.npd.com/press/releases/press_090818.html ("iTunes

25  comprised 69 percent of the digital music market in the first half of 2009.").

26  Numerous reports examining the industry as a distinct market are published by a variety of

27  firms. *See* AIIA00697930 -56 (report by research firm Understanding & Solutions detailing "online

28  delivered music markets worldwide"); AIIA00325547-70 (IFPI Digital Music Report 2006 detailing

1  state of the digital market); AIIA00823708-31 (IFPI Digital Music Report 2007, detailing state of the

2  digital market); AIIA00975139-66 (IFPI Digital Music Report 2008, reporting key facts and figures

3  of digital music market); AIIA00975107-38 (IFPI Digital Music Report 2009, reporting key facts

4  and figures of digital music market); AIIA00975191-222 (IFPI Digital Music Report 2010, reporting

5  key facts and figures of digital music market); AIIA01359289-379 (NPD Digital Music Monitor, 1st

6  Quarter 2008 Findings, reporting on digital music market.)

7       Apple documents reveal that Apple itself considers the Audio Download market to be a

8  separate and distinct market.  *See* AIIA01201670 at 74. ("iTunes Has Created a New Market - The

9  digital download market is growing") AIIA00098663-64 at 64. ("One of the reasons that iTunes has

10  been so successful in leading the legal music download market is that we give customers the choice

11  of buying either singles or albums.") *Id.* ( "iTunes and iPod are driving the explosion in the digital

12  music market. . . ."); AIIA00979025-71 at 29   (slide presentation title heading "The Music

13  Download Market Leader"); AIIA01216692 ("I'd love to get the Forrester or Jupiter data to add a

14  slide about how we have created a music download market and create a slide from it.").  In a

15  presentation by Eddy Cue, a slide titled "Who Does iTunes Compete With?" refers to six online

16  sellers of music. *See* Cue Depo. Ex. 69. AIIA00099378-79 (In a press statement regarding iTunes

17  downloads topping 150 million songs, Steve Jobs is quoted as saying, "As the world's leader in the

18  digital music market we'd like to thank the artists, labels and our customers for making the iTunes

19  Music Store the world's number one online music service." AIIA00097013-33 at 16. ("iTunes has

20  actually increased our market share in the music download space from 70% to about 80% in the US

21  and UK, . . . .")

22  INTERROGATORY NO. 8:

23       Please identify all facts that YOU contend support your position that "Barriers to entry in the

24  Audio Download Market are high," as alleged in paragraph 18 of the Complaint.

25  RESPONSE TO INTERROGATORY NO. 8:

26       Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

27  and compound.  Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

28  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

1  has yet been set in this case.  Plaintiff further objects to the extent this Interrogatory calls for a legal

2  conclusion and/or opinions and purports to seek expert opinions.  Plaintiff also objects to this

3  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

4  respond to requested discovery and is therefore premature.  Plaintiff also objects that this

5  Interrogatory seeks information that is equally available to Apple or information that originated from

6  Apple's possession, custody or control.  This Interrogatory is also objectionable on the grounds that

7  Plaintiff has not completed investigation or analysis of the facts relating to this case, has not

8  completed discovery, has not completed expert analysis, and has not completed preparation for trial.

9       Subject to and without waiver of any of the foregoing objections and General Objections,

10  Plaintiff responds as follows:

11      Entry barriers in the Audio Download Market are high. In addition to the facts provided in

12  response to Interrogatory No. 1, detailing Apple's illegal, anticompetitive conduct in the Audio

13  Download Market, Plaintiff also responds that other barriers to entry include: high fixed costs of

14  securing licensing rights in order to purchase content to legally sell to consumers, high costs of set-

15  up, including advertising, marketing and technological costs related to operating a business that

16  provides audio downloads through the internet.  There are also high entry barriers related to the

17  ability to attract and maintain customers.

18      The costs of securing licensing rights are high.  *See* RealNetworks, Inc., Quarterly Report

19  (Form 10-Q) at 22, 27-28, 33, 35 (Nov. 9, 2005) (detailing licensing costs and noting, "[t]he cost of

20  third party content, in particular, is a substantial percentage of the net revenue we receive from

21  subscribers and end-users and is unlikely to decrease significantly over time as a percentage of net

22  revenue"); Napster, Inc., Quarterly Report (Form 10-Q) at 18, 23 (Dec. 31, 2005) (describing

23  licensing costs); Cue Depo. Ex. 69 (detailing royalty costs); Cue Depo. at 79:22-80:9 (Cost of

24  royalties and credit card assessments make up 75% to 80% of costs of providing music to

25  customers). Market analyst group IDC states: "Licensing agreements with music copyright holders

26  are a requirement for any paid MSP [music service provider] to do business and the factor that

27  distinguishes legitimate services from illegitimate ones. But acquiring copyright licenses can be

28  challenging for several reasons. U.S. music copyright law, . . . has been incompletely revised to take

1   into account current music distribution technology, including online and wireless music

2   distribution." IDC Report 2005 at 2. "The fact that an audio codec and a DRM must both be

3   supported by a device and/or PC media software in order for a music file to be played complicates

4   the issue of hardware and software compatibility, and can add cost to vendors who must pay to

5   license both those technologies, especially if they come from different sources." IDC Report 2005 at

6   3. Nick Wingfield and Ethan Smith, *Jobs's New Tune Raises Pressure on Music Firms – Apple*

7   *Chief Now Favors Making Downloads of Songs Freely Tradable*, W.S.J., February 7, 2007 ("Some

8   executives in the technology and music industries have argued that sales of digital music are being

9   held back by the lack of compatibility between hardware devices and music services. These people

10   believe the market could grow more strongly if iTunes competitors can sell music that can be played

11   on iPods.")

12       In October 2004 Yahoo, Inc. purchased Musicmatch for $158 million, further demonstrating

13   the high costs of entry into the Audio Download market. Yahoo!, Inc., Annual Report (Form 10-K)

14   at 47, 74 (Mar. 3, 2006). *See also* AIIA00944321 (In an email between Grace Kvamme and Chris

15   Bell, Ms. Kvamme states: "I do think that Steve [Jobs] underplays the iTunes business not only

16   because it is smaller than the Mac and iPod business but because he wants to dissuade future

17   competitors from entering the market.")

18   <u>INTERROGATORY NO. 9</u>:

19       Please identify all facts that YOU contend support your position that "Barriers to entry in the

20   Portable Digital Media Player Market are high," as alleged in paragraph 28 of the Complaint.

21   <u>RESPONSE TO INTERROGATORY NO. 9</u>:

22       Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

23   and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

24   expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

25   has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

26   conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

27   Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

28   respond to requested discovery and is therefore premature. Plaintiff also objects that this

1 Interrogatory seeks information that is equally available to Apple or information that originated from
2 Apple's possession, custody or control. This Interrogatory is also objectionable on the grounds that
3 Plaintiff has not completed investigation or analysis of the facts relating to this case, has not
4 completed discovery and has not completed preparation for trial.

5       Subject to and without waiver of any of the foregoing objections and General Objections,
6 Plaintiff responds as follows: Entry barriers in the Digital Media Player Market are high. In
7 addition to the facts provided in Response to Interrogatory No. 1, detailing Apple's illegal,
8 anticompetitive conduct in the digital media player market, Plaintiff also responds that other barriers
9 to entry include: (a) high fixed costs related to product development, production, manufacturing and
10 marketing; (b) purchasers are unlikely to switch to a new portable digital media player unless it is
11 compatible with their existing libraries of audio downloads; (c) new entrants were required to license
12 DRM so that their portable digital media players were capable of playing DRM-encrypted audio
13 downloads purchased from online stores; and (d) certain DRM's, including FairPlay, were
14 proprietary and not available to license. AIIA01341736-835 at 42 ("Making iTunes songs only
15 compatible with iPod allows for the generation of noticeable entry barriers in the market of portable
16 players and some barriers in the market of music downloading services (iTunes
17 competitors)."); ("How Copyright, Contract, and Technology Shape the Business of Digital Media-
18 A Case Study"); Anjali Athavaley and Robert A. Goth, *How the Zune Is Faring So Far With*
19 *Consumers Microsoft's Music Player Faces Tough Odds in Battle Against iPod Early Buyers Report*
20 *Lonliness*, W.S.J., December 12, 2006 at D1. ("[T]he lack of compatibility with the iPod is
21 discouraging others from giving the Zune a try . . . . Switching brands can be a pain."). *See* The
22 Future of Portable Music, Informa Media Group ("Protected downloads purchased through the
23 iTunes Music Store can only be played on an iPod. Although the iPod is compatible with other non-
24 secure formats, any consumer that buys music through iTunes and wishes to use a portable player is
25 likely to opt for an iPod. As another differentiation to rival players, the lack of compatibility with the
26 WMA format will further tie the iPod to iTunes."); Digital Consumer Electronic and Home
27 Entertainment Watch, Understanding & Solutions, July 2006 ("Product and service compatibility,

28

1    DRM issues and lack of content has seriously hindered the development of Apple's ODM

2    competitors.").

3         Refusal to license - Apple refused multiple requests to license FairPlay. Olympus executives

4    sought to license FairPlay DRM for use in the company's device, but no such deal was ever

5    consummated. AIIA00100925-27. Apple rejected other requests to license FairPlay as well. *See*

6    AIIA001344648-49 (Tony Fadell email stating that Sandisk CEO "desperately wanted to license

7    FairPlay"); AIIA01385106 (Email from Rob Glaser of RealNetworks to Steve Jobs);

8    AIIA00098511.

9         High costs of marketing - Samsung announced plans to "spend $40 million on overseas

10    marketing for its MP3 players in an effort to unseat the iPod." George Anthunes, *Samsung Vows to*

11    *Take a Bite of Apple's Sales*, Financial Times (April 11, 2005), available at http://www.mail-

12    archive.com/medianews@twiar.org/msg00912.html. The digital player market is one product area in

13    which Samsung, "the world's largest producer of memory chips and flat screens, is struggling

14    despite its technological edge in digital consumer goods. The South Korean company can't even

15    keep up with domestic rivals in the fast-growing market for portable digital music players, let alone

16    Apple Computer Inc., whose hugely popular iPod dominates the market." *Id.* Competitors to Apple

17    in the Digital Player Market "face significant challenges," according to analysts.  In-Stat, 2006

18    Portable Audio Players Forecast.  In fact, analysts rightly predicted other competitors would likely

19    "exit the market altogether" In-Stat, *Portable Digital Audio Players: Market Growth Exceeds*

20    *Expectations* at 22 (April 5, 2006).  Barriers also exist because "the majority of peripheral devices

21    and third-party applications work with the Apple iPod and not with competing players." Jupiter

22    Research, *Portable Media Players, Competing in an Evolving Marketplace* (2005).

23    INTERROGATORY NO. 10:

24         Please identify all facts that YOU contend support your position that "But for Apple's

25    anticompetitive intent, it would have been rational and profitable for Apple to license FairPlay to

26    competing manufacturers of Portable Digital Media Players because it would have expanded the

27    consumer base for iTS," as alleged in paragraph 50 of the Complaint.

28

1 | RESPONSE TO INTERROGATORY NO. 10:

2 |     Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

3 | and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

4 | expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

5 | has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

6 | conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

7 | Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

8 | respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

9 | information that is equally available to Apple or information that originated from Apple's

10 | possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

11 | has not completed investigation or analysis of the facts relating to this case, has not completed

12 | discovery and has not completed preparation for trial.

13 |     Subject to and without waiver of any of the foregoing objections and General Objections,

14 | Plaintiff responds as follows:

15 |     *See* Response to Interrogatory No. 1, above.

16 | INTERROGATORY NO. 11:

17 |     Please identify all facts that YOU contend support your position that "Apple also issued

18 | several software updates intended to prevent Audio Downloads purchased from iTS from being

19 | played on competing Portable Digital Media Players," as alleged in paragraph 63 of the Complaint.

20 | RESPONSE TO INTERROGATORY NO. 11:

21 |     Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

22 | and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

23 | expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

24 | has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

25 | conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

26 | Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

27 | respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

28 | information that is equally available to Apple or information that originated from Apple's

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)    - 29 -

1  possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

2  has not completed investigation or analysis of the facts relating to this case, has not completed

3  discovery and has not completed preparation for trial.

4        Subject to and without waiver of any of the foregoing objections and General Objections,

5  Plaintiff responds as follows:

6        *See* Response to Interrogatory No. 1, above.

7  INTERROGATORY NO. 12:

8        Please identify all facts that YOU contend support the position that cellular telephones that

9  store and play digital music files – including but not limited to "smartphones" – do or do not

10  compete with Portable Digital Media Players.

11  RESPONSE TO INTERROGATORY NO. 12:

12        Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

13  and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

14  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

15  has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

16  conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

17  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

18  respond to requested discovery. Plaintiff also objects that this Interrogatory is premature and seeks

19  information that is equally available to Apple or information that originated from Apple's

20  possession, custody or control. This Interrogatory is also objectionable on the grounds that Plaintiff

21  has not completed investigation or analysis of the facts relating to this case, has not completed

22  discovery and has not completed preparation for trial.

23        Subject to and without waiver of any of the foregoing objections and General Objections,

24  Plaintiff responds as follows:

25        Financial analysts have concluded that iPhones and iPods are substitutes. *See* "AAPL: The

26  Reason for the iPhone's Reported Woes Is Closer than You Think: It's the iPod touch," Needham &

27  Company, January 28, 2008, and "Apple's Negative Guidance Tone at the FQ1 Call Means a Lower

28  Valuation of Multiple: Hold," Kintisheff Research, January 23, 2008. Because the price of a smart

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)        - 30 -

1   phone is roughly equal to the sum of the prices of a digital media player and an ordinary mobile

2   telephone, a smart phone plausibly is a close substitute for the separate purchase of a portable digital

3   audio          player          and          a          mobile telephone. *See*

4   http://www.pcmag.com/products/?action=defaultadvancedquery&cid=1612&sid=1612&gridtitle=Re

5   cent%20Product%20Reviews (providing detailing price guide to digital audio players). *See also*

6   http://www.verizonwireless.com/b2c/store/controller?item=phoneFirst&action=viewPhoneOverview

7   ByDevice&deviceCategoryId=(Verizon price list for "feature phones")

8            Mobile telephone penetration in the United States is at more than 90 percent of the total

9   United States population. *See* CTIA, *Wireless Quick Facts Mid-Year Figures*, available at

10  http://www.ctia.org/media/industry_info/index.cfm/AID/10323. A very large fraction of consumers

11  who want a portable digital audio player also are likely to want a mobile telephone. Thus, for the

12  vast majority of consumers, smart phones are likely to be a reasonable alternative to a portable

13  digital audio player.

14  INTERROGATORY NO. 13:

15           Please identify all facts that YOU contend support the position that "As a direct result of

16  Apple's anticompetitive use software updates, Plaintiffs and members of the Class paid

17  supracompetitive prices for iPods," as alleged in paragraph 88 of the Complaint.

18  RESPONSE TO INTERROGATORY NO. 13:

19           Plaintiff objects to this Interrogatory on grounds that it is overly broad and unduly

20  burdensome, and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the

21  discovery of expert opinions and is therefore premature, as no deadline for the exchange of merits

22  expert reports has yet been set in this case. Plaintiff further objects to the extent this Interrogatory

23  calls for a legal conclusion and/or opinions and purports to seek expert opinions. Plaintiff also

24  objects to this Interrogatory to the extent Apple has not yet fully complied with its duties and

25  obligations to respond to requested discovery. Plaintiff also objects that this Interrogatory is

26  premature and seeks information that is equally available to Apple or information that originated

27  from Apple's possession, custody or control. This Interrogatory is also objectionable on the grounds

28  that Plaintiff has not completed investigation or analysis of the facts relating to this case, has not

1  completed discovery and has not completed preparation for trial.  Plaintiff further objects to this

2  Interrogatory to the extent it misstates the law and imposes an improper burden on Plaintiff.  *See*

3  *Ziemack v. Centel Corp.*, No. 92 C 3551, 1995 U.S. Dist. LEXIS 18192, at *8(N.D. Ill. Dec. 6, 1995)

4  (noting inappropriateness of premature damage theory interrogatories where damage issues "will be

5  more appropriately dealt with by experts at a later date."); *id.* at *2.  "[M]any damage related

6  questions are more appropriately dealt with during expert discovery than through contention

7  interrogatories." *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 230 F.R.D. 538, 543 (N.D. Ill.

8  2005).

9  INTERROGATORY NO. 14:

10  Please state the amount that Plaintiffs and members of the Class would have paid but for

11  Apple's anticompetitive conduct as alleged in paragraph 88 of the Complaint.

12  RESPONSE TO INTERROGATORY NO. 14:

13  Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

14  compound, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.

15  Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of expert opinions

16  and is therefore premature, as no deadline for the exchange of merits expert reports has yet been set

17  in this case.  Plaintiff further objects to the extent this Interrogatory calls for a legal conclusion

18  and/or opinions and purports to seek expert opinions that are not full formed.  Plaintiff also objects

19  to this Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

20  respond to requested discovery and it is therefore premature. This Interrogatory is also objectionable

21  on the grounds that Plaintiff has not completed investigation or analysis of the facts relating to this

22  case, has not completed discovery and has not completed preparation for trial.  Plaintiff further

23  objects to this Interrogatory to the extent it misstates the law and imposes an improper burden on

24  Plaintiff. *See Ziemack*, 1995 U.S. Dist. LEXIS 18192, at *8 (noting inappropriateness of premature

25  damage theory interrogatories where damage issues "will be more appropriately dealt with by

26  experts at a later date."); *id.* at *2.  "[M]any damage related questions are more appropriately dealt

27  with during expert discovery than through contention interrogatories." *Amerigroup Ill., Inc.*, 230

28  F.R.D. at 543.

1   INTERROGATORY NO. 15:

2          Please identify all facts that YOU contend support your position that "Apple's prices for

3   iPods paid by the Class and Plaintiffs were higher than they otherwise would have been," as alleged

4   in paragraph 92 of the Complaint.

5   RESPONSE TO INTERROGATORY NO. 15:

6          Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

7   and compound. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

8   expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

9   has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

10  conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

11  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

12  respond to requested discovery and is therefore premature. This Interrogatory is also objectionable

13  on the grounds that Plaintiff has not completed investigation or analysis of the facts relating to this

14  case, has not completed discovery and has not completed preparation for trial. Plaintiff further

15  objects to this Interrogatory to the extent it misstates the law and imposes an improper burden on

16  Plaintiff. *See Ziemack*, 1995 U.S. Dist. LEXIS 18192 at *8 (noting inappropriateness of premature

17  damage theory interrogatories where damage issues "will be more appropriately dealt with by

18  experts at a later date."); *id.* at *2. "[M]any damage related questions are more appropriately dealt

19  with during expert discovery than through contention interrogatories." *Amerigroup Ill., Inc.*, 230

20  F.R.D. at 543.

21  INTERROGATORY NO. 16:

22         Please state the amount that Plaintiffs and members of the Class would have paid but for

23  Apple's anticompetitive conduct as alleged in paragraph 92 of the Complaint.

24  RESPONSE TO INTERROGATORY NO. 16:

25         Plaintiff objects to this Interrogatory on grounds that it is overly broad, unduly burdensome,

26  compound, irrelevant and not reasonably calculated to the lead to the discovery of admissible

27  evidence. Plaintiff further objects on the grounds that this Interrogatory seeks the discovery of

28  expert opinions and is therefore premature, as no deadline for the exchange of merits expert reports

1  has yet been set in this case. Plaintiff further objects to the extent this Interrogatory calls for a legal

2  conclusion and/or opinions and purports to seek expert opinions. Plaintiff also objects to this

3  Interrogatory to the extent Apple has not yet fully complied with its duties and obligations to

4  respond to requested discovery and is therefore premature. This Interrogatory is also objectionable

5  on the grounds that Plaintiff has not completed investigation or analysis of the facts relating to this

6  case, has not completed discovery, has not completed preparation for trial, and has not completed

7  expert analysis of the discovery. Plaintiff further objects to this Interrogatory to the extent it

8  misstates the law and imposes an improper burden on Plaintiff. *See Ziemack*, 1995 U.S. Dist.

9  LEXIS 18192 at *8 (noting inappropriateness of premature damage theory interrogatories where

10  damage issues "will be more appropriately dealt with by experts at a later date."); *id.* at *2. "[M]any

11  damage related questions are more appropriately dealt with during expert discovery than through

12  contention interrogatories." *Amerigroup Ill., Inc.*, 230 F.R.D. at 543.

13  INTERROGATORY NO. 18:

14      If your response to Request for Admission No. 7 was anything other than an unqualified

15  admission, please identify all facts that YOU contend support YOUR response to Request for

16  Admission No. 7.

17  RESPONSE TO INTERROGATORY NO. 18:

18      Plaintiff has amended her response to Request for Admission No. 7.

19  INTERROGATORY NO. 19:

20      If your response to Request for Admission No. 7 was anything other than an unqualified

21  admission, please identify all facts that YOU contend support YOUR response to Request for

22  Admission No. 7.

23  RESPONSE TO INTERROGATORY NO. 19:

24      This interrogatory is redundant of Interrogatory No. 18. Plaintiff therefore incorporates her

25  Response to Interrogatory No. 18, above.

26

27

28

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)                - 34 -

1 | INTERROGATORY NO. 22:

2 |     Please identify all facts that YOU contend support your position that the software programs

3 | referred to in paragraphs 64-66 of the Complaint made iTS files interoperable with Portable Digital

4 | Media Players other than the iPod.

5 | RESPONSE TO INTERROGATORY NO. 22:

6 |     Plaintiff no longer relies on these allegations.

7 | DATED: March 7, 2011

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOHN J. STOIA, JR.
BONNY E. SWEENEY
THOMAS R. MERRICK
ALEXANDRA S. BERNAY
CARMEN A. MEDICI


_____
      ALEXANDRA S. BERNAY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

THE KATRIEL LAW FIRM
ROY A. KATRIEL
1101 30th Street, N.W., Suite 500
Washington, DC 20007
Telephone: 202/625-4342
202/330-5593 (fax)

Co-Lead Counsel for Plaintiffs

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
FRANCIS J. BALINT, JR.
ELAINE A. RYAN
TODD D. CARPENTER
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

BRAUN LAW GROUP, P.C.
MICHAEL D. BRAUN
10680 West Pico Blvd., Suite 280
Los Angeles, CA 90064
Telephone: 310/836-6000

611994_1

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)                - 35 -

1    310/836-6010 (fax)

2    MURRAY, FRANK & SAILER LLP
     BRIAN P. MURRAY
3    JACQUELINE SAILER
     275 Madison Avenue, Suite 801
4    New York, NY 10016
     Telephone: 212/682-1818
5    212/682-1892 (fax)

6    GLANCY BINKOW & GOLDBERG LLP
     MICHAEL GOLDBERG
7    1801 Avenue of the Stars, Suite 311
     Los Angeles, CA 90067
8    Telephone: 310/201-9150
     310/201-9160 (fax)

9
     Additional Counsel for Plaintiffs
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO
DEFENDANT APPLE INC.'S FIRST INTERROGATORIES - C-05-00037-JW(HRL)

DECLARATION OF SERVICE BY MAIL AND E-MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.     That on March 7, 2011, declarant served PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

4.     Also on March 7, 2011, I served the attached PLAINTIFF MARIANA ROSEN'S ADDITIONAL OBJECTIONS AND RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES on the parties in the within action by e-mail addressed as follows:

**COUNSEL FOR DEFENDANTS:**

| NAME | FIRM | EMAIL |
| --- | --- | --- |
| Robert Mittelstaedt | Jones Day | ramittelstaedt@jonesday.com |
| David Kiernan | Jones Day | dkiernan@jonesday.com |
| Michael Scott | Jones Day | michaelscott@jonesday.com |

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 7, 2011, at San Diego, California.

SHONDA L. LANDRY

611994_1

APPLE TYING

Service List - 3/7/2011    (06-0171)

Page 1 of 1

**Counsel For Defendant(s)**

Robert A. Mittelstaedt
Craig E. Stewart
David Craig Kiernan
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
  415/626-3939
  415/875-5700 (Fax)

**Counsel For Plaintiff(s)**

Andrew S. Friedman
Elaine A. Ryan
Todd D. Carpenter
Bonnett, Fairbourn, Friedman & Balint, P.C.
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
  602/274-1100
  602/274-1199 (Fax)

Michael D. Braun
Marc L. Godino
Braun Law Group, P.C.
10680 West Pico Blvd., Suite 280
Los Angeles, CA 90064
  310/836-6000
  310/836-6010 (Fax)

Eric J. Belfi
Labaton Sucharow LLP
140 Broadway, 34th Floor
New York, NY 10005
  212/907-0700
  212/818-0477 (Fax)

Jacqueline Sailer
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
  212/682-1818
  212/682-1892 (Fax)

John J. Stoia, Jr.
Bonny E. Sweeney
Thomas R. Merrick
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)

Roy A. Katriel
The Katriel Law Firm
101 30th Street, N.W., Suite 500
Washington, DC 20007
  202/625-4342
  866/373-4023 (Fax)