# EXHIBIT 35

Robert A. Mittelstaedt #60359
ramittelstaedt@jonesday.com
Craig E. Stewart #129530
cestewart@jonesday.com
David C. Kiernan #215335
dkiernan@jonesday.com
Michael Scott #255282
michaelscott@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. C 05-00037 JW (HRL)<br>[Class Action]<br><br>**APPLE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 18, 2011<br>Time: 9:00 a.m.<br>Courtroom: 8, 4th Floor<br><br><u>DOCUMENT FILED UNDER SEAL</u> |

Redacted

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

UNDISPUTED FACTS .......................................................................................................... 2

ARGUMENT .......................................................................................................................... 4

I. THE DISPOSITIVE ISSUE UNDER *TYCO* IS WHETHER THE UPDATES IMPROVED APPLE'S PRODUCTS. .............................................................................. 4

II. ITUNES 4.7 WAS A PRODUCT IMPROVEMENT. ................................................. 5

    A. iTunes 4.7 Blocked DRM-Stripping Hacks. ............................................... 5

    B. Plaintiffs' Intent Argument Fails. ................................................................ 6

III. ITUNES 7.0 WAS ALSO A PRODUCT IMPROVEMENT. ..................................... 9

IV. APPLE'S PRESS RELEASE IS NOT ACTIONABLE "DISPARAGEMENT" ........ 12

V. APPLE'S DECISION NOT TO LICENSE FAIRPLAY IS NOT ACTIONABLE. .... 13

VI. PLAINTIFFS' STATE LAW UCL CLAIM FAILS FOR THE SAME REASONS. ... 15

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

Page

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
   592 F.3d 991 (9th Cir. 2010) .................................................................................................. passim

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,*
   108 F.3d 1147 (9th Cir. 1997) ........................................................................................................ 12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
   472 U.S. 585 (1985) ................................................................................................................. 2, 13

*Bennett v. San Francisco Bay Area Rapid Transit,*
   2010 WL 3749415 (N.D. Cal. Sept. 23, 2010) ............................................................................... 2

*Cal. Computer Prods. Inc. v. IBM,*
   613 F.2d 727 (9th Cir. 1979) ......................................................................................................... 15

*Chavez v. Whirlpool Corp.,*
   93 Cal. App. 4th 363 (2001) .......................................................................................................... 15

*Coeur D'Alene Tribe v. Hammond,*
   384 F.3d 674 (9th Cir. 2004) ......................................................................................................... 13

*Image Tech. Serv., Inc. v. Eastman Kodak Co.,*
   903 F.2d 612 (9th Cir. 1990),
   aff'd, 504 U.S. 451 (1992) .............................................................................................................. 5

*Image Tech. Servs. Inc. v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997) ....................................................................................................... 13

*In re IBM Peripheral EDP Devices Antitrust Litig.,*
   481 F. Supp. 965 (N.D. Cal. 1979),
   aff'd, 698 F.2d 1377 (9th Cir. 1983) ................................................................................................ 5

*Larez v. City of Los Angeles,*
   946 F.2d 630 (9th Cir. 1991) .......................................................................................................... 9

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.,*
   838 F.2d 360 (9th Cir. 1998) .......................................................................................................... 9

*POURfect Prods. v. KitchenAid,*
   2010 WL 1769413 (D. Ariz. May 3, 2010) .................................................................................. 12

*SCM Corp. v. Xerox Corp.,*
   645 F.2d 1195 (2d Cir. 1981) ........................................................................................................ 14

*Twentieth Century Music Corp. v. Aiken,*
   422 U.S. 151 (1975) ......................................................................................................................... 6

Apple's Reply in Support of Its MSJ
Case No. C 05-0037 JW (HRL)

*U.S. v. Aluminum Co.*,
   148 F.2d 416 (2d Cir. 1945) ........................................................................................... 14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ......................................................................................... 2, 13, 14, 15

**Other Authorities**

IIIB P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶ 777 at 307 (3d ed. 2006) ........................ 4

**Rules**

Federal Rules of Civil Procedure
   Rule 56(e)(1) ............................................................................................................. 3, 9
   Rule 56(f) ..................................................................................................................... 9

Federal Rules of Evidence
   Rules 802 ..................................................................................................................... 3

**Statutes**

Title 28 United States Code Section 1746 ............................................................................. 3

# INTRODUCTION

After six years, Plaintiffs' case is reduced to a challenge to two updates to Apple's anti-piracy software, a single press release, and a decision not to license the software to one rival. [REDACTED] The Court deferred the motion so that a fuller record could be presented. Plaintiffs have now obtained voluminous documents from Apple, deposed Apple's technical expert and several Apple employees, and retained their own technical expert. [REDACTED]

Plaintiffs also concede that "stopping genuine hacks may be a salutary goal" and they no longer contest Apple's right to do so. Under *Tyco*, the controlling Ninth Circuit case, iTunes 4.7 was a product improvement and is not actionable under Section 2 of the Sherman Act.

Plaintiffs still argue, however, that iTunes 4.7 was unlawful because it was supposedly designed to block a competitor, RealNetworks. That argument is unavailing. [REDACTED] Moreover, a product improvement is protected under *Tyco* even if, contrary to the facts here, it intentionally causes incompatibility with a rival's product. The defendant in *Tyco* designed its product intentionally to exclude competitors and "hoped its new technology would constitute a barrier to entry." 592 F.3d at 1001. The Ninth Circuit nonetheless affirmed summary judgment, holding that an intent to harm competitors does not make a product improvement actionable.

With no legitimate basis to challenge iTunes 4.7, Plaintiffs now challenge another software update, iTunes 7.0, and assert unpled claims for product "disparagement" and refusal to deal. The undisputed facts material to these new claims, and controlling Ninth Circuit law, show

1 that summary judgment should be granted in Apple's favor.



The two other allegedly exclusionary acts (not pled in the operative complaint) are likewise without merit. Apple's July 2004 statement about RealNetworks falls far short of the Ninth Circuit's standard for actionable "disparagement"—it was not "clearly false," it was a one-time event, and it could be offset by a response by the rival. Likewise, the unpled claim that Apple's decision not to license its DRM to RealNetworks constitutes a refusal to deal in violation of Section 2 is wrong under *Aspen Skiing* and *Trinko*. Apple did not have any pre-existing course of dealing with RealNetworks and was under no duty to ensure that its music would play on iPods.

### UNDISPUTED FACTS

When Plaintiffs' diversionary and unsupported assertions are set aside, it is clear that Plaintiffs do not dispute most of the material facts and have no evidence to dispute the remainder.

**Hacks and iTunes 4.7:** Plaintiffs do not dispute that music piracy was a rampant problem; that Apple's music store (iTS) provided an innovative, procompetitive and legal alternative; that the record labels insisted on usage rules to guard against piracy; and that, to enforce those rules, the labels required that Apple use and maintain an encryption-based "security solution" or DRM. Mot., pp. 4-7.[1] They also concede that hackers "cracked" or "attacked" (as

---

[1] Plaintiffs' assertion (pp. 2-3) ▓▓▓▓▓▓▓▓▓▓ immaterial because this Court has ruled that Apple's decision to use its own anti-piracy software was lawful. Doc. 274, p. 10. Moreover, the labels' declarations (Sweeney Exs. 1-4) are inadmissible hearsay and lack foundation. Three declarations do not attest to personal knowledge (Exs. 1, 2 and 4); one explicitly states the information is based on undisclosed "information in EMI's records" rather than personal knowledge (Ex. 4); and two are not signed under penalty of perjury. Exs. 2 and 4. *Bennett v. San Francisco Bay Area Rapid Transit*, 2010 WL 3749415 at *3 (N.D. Cal. Sept. 23, 2010) (declaration not signed under penalty of perjury is inadmissible);
(continued)

Plaintiffs' expert put it, Martin Decl., ¶ 39) FairPlay to learn its secrets and published programs on the Internet that facilitated free, unlimited distribution of the music.

[Redacted]

---

28 U.S.C. § 1746 (declaration must be signed under penalty of perjury); Fed. R. Civ. P. 56(e)(1) (declaration must be based on personal knowledge); Fed. R. Evid. 802.

[2] Plaintiffs drop their challenge to iTunes 6.0 released in October 2005, [redacted]

(continued)

[redacted]

## ARGUMENT

### I. THE DISPOSITIVE ISSUE UNDER *TYCO* IS WHETHER THE UPDATES IMPROVED APPLE'S PRODUCTS.

*Tyco* held that a "product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." 592 F.3d at 999-1000. This is because "[a]n antitrust rule prohibiting a firm from improving its own invention simply because the improvement turns out *ex post* not to be much of an improvement at all and when it makes rivals' complementary products obsolete would chill innovation unnecessarily." IIIB P. Areeda & H. Hovenkamp, *Antitrust Law*, ¶ 777 at 307 (3d ed. 2006).

Plaintiffs suggest (p. 22) that the value of a product improvement should be weighed against its negative impact on rivals. But *Tyco* prohibited balancing the "benefits or worth of a product improvement against its anticompetitive effects." 592 F.3d at 1000. Balancing is "not just unwise, it is unadministrable" because "[t]here are no criteria that courts could use to calculate the 'right' amount of innovation, which would maximize social gains and minimize competitive injury." *Id.* Plaintiffs' related argument (p. 24) that *Tyco* prohibits balancing only in cases "lacking any evidence of exclusionary conduct" is illogical and contrary to *Tyco*. That case involved evidence of exclusionary intent and impact, and the Court still barred balancing. Indeed,

absent anticompetitive effects, the issue would not arise at all.[3]

Although *Tyco*'s holding applies to any product improvement, it makes particular sense where the conduct at issue is simply repairing software that has been hacked. Plaintiffs still have not identified any authority supporting the radical notion that, even though it is lawful to use anti-piracy software, it is somehow unlawful to repair the software when a hacker defeats its fundamental purpose.

The result is the same when analyzed under the rubric of valid business justifications. As shown in Apple's motion (pp. 16-19), ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Tyco* forecloses Plaintiffs' related argument (p. 22) that even if iTunes 7.0 improved iPod performance in one respect, it impaired its functioning in another respect.

Plaintiffs incorrectly argue (p. 20) that *Image Tech.*, 903 F.2d at 620 & n.10, holds that the sufficiency of a proffered justification always requires a trial. That case simply held that triable issues existed on that record. Courts regularly grant summary judgment on this issue based on undisputed facts. *See e.g.*, Doc. 325, p. 7.

## II. ITUNES 4.7 WAS A PRODUCT IMPROVEMENT.

### A. iTunes 4.7 Blocked DRM-Stripping Hacks.

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Nonetheless, Plaintiffs argue (p. 1) that iTunes 4.7 did not provide "any benefit to consumers." That is incorrect. Plaintiffs do not

---

[3] Contrary to Plaintiffs' related argument (p. 24), "there is no least restrictive alternative requirement in the context of a Section 2 claim." *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990), *aff'd*, 504 U.S. 451 (1992). *See also In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1021 (N.D. Cal. 1979) (stating that it would be a "novel theory with serious and far reaching anticompetitive effects" if a monopolist could not alter the design of a product "if any alternative was open to them which would have less impact on competitors"), *aff'd*, 698 F.2d 1377 (9th Cir. 1983); *Tyco*, 592 F.3d at 1000.

dispute that iTS was "procompetitive" and a "huge benefit" to consumers that "solved the problem [of] how to create a consumer-friendly, yet legal and profitable, system for downloading music." Mot., pp. 6, 14-15. Until 2009, the labels required the use of DRM, and blocking hacks helped ensure that the labels would continue to permit Apple to offer music to consumers.

[redacted]

Plaintiffs' argument (p. 22) that iTunes 4.7 "did not improve the performance" of **iPods** is too narrow.

[redacted]

### B. Plaintiffs' Intent Argument Fails.

Faced with the stubborn, dispositive fact that iTunes 4.7 improved Apple's DRM, Plaintiffs seek to divert attention by attempting to show that the update was aimed at Harmony. That approach fails for two reasons. First, Apple's motive for issuing iTunes 4.7 is irrelevant

---

[4] Blocking hacks also benefitted consumers because, as Plaintiffs concede, the hacks violated the DMCA. *See* Mot., p. 15. Although Plaintiffs acknowledge (p. 17) that stopping the hacks from "violat[ing] copyright law may be salutary," they incorrectly argue that it does not benefit consumers. In fact, copyrights "stimulate [the creation of useful works] for the general public good" (*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)) and thereby increase the music available to consumers.

[5] [redacted] Opp., p. 21. The issue instead is simply whether that update improved the efficacy of the DRM that the labels required, which the undisputed evidence shows it did. Similarly misguided is Plaintiffs' argument (p. 4) that use of a proprietary DRM was the cause of Apple's success. Not only is it immaterial but nothing in the cited evidence suggests that Apple's success came from anything other than the superiority of its innovative products.

1 given the indisputable showing that it stopped DRM-stripping hacks—an admittedly "salutary
2 goal." As noted, the Ninth Circuit affirmed summary judgment in *Tyco* even though the
3 defendant designed its new product to exclude rivals and hoped that it would create an entry
4 barrier. 592 F.3d at 1001. That holding is consistent with Section 2 case law generally, which
5 adopts an objective test out of recognition that every competitor wants to gain an advantage over
6 rivals. *See* Mot., p. 16, n.9.

[REDACTED]

15     Instead of refuting any of this, Plaintiffs argue (pp. 9, 16) that several items supposedly
16 imply that iTunes 4.7 was intended to block Harmony.
17     ***Timing***: Plaintiffs imply (p. 5) that RealNetworks' April 9, 2004 email (Sweeney Ex. 21),
18 which requested that Apple license FairPlay, led Apple to believe that, if Apple declined,
19 RealNetworks would develop a software program to mimic FairPlay. Quite to the contrary, the e-
20 mail states that, if Apple declined, RealNetworks would switch to Microsoft's technology: "the
21 emerging consensus at our company is that we should switch [to Microsoft]." It added that
22 "[b]efore we switch," RealNetworks wanted to see if Apple wanted to enter into "a smart
23 technical deal." Ex. 21. [REDACTED]
24
25     ***Labels' reaction to Harmony***: Plaintiffs assert (p. 6) that Harmony was legal and
26 received the labels' "full endorsement." If that were true, it would be irrelevant. At best, it
27 would mean only that Apple was not contractually obligated to stop Harmony. It would not mean
28 that Apple was free to ignore the DRM-stripping hacks – let alone that it was acting to stop

Harmony rather than those hacks. Nor does it mean that Apple could only improve its DRM when it received a complaint from a music label. Beyond that, Plaintiffs' exhibits say nothing about whether Harmony was legal. And the labels' declarations, which are inadmissible in any event (*supra*, fn. 1), simply say that some of them did not object to Harmony.[6]

*"Differential response to DRM-stripping hacks as compared to Harmony:"*

The "response" to Harmony, however, was a press release, not an update. The update that blocked Harmony did not come until October 2004, three months later.

***Apple's market share***: Plaintiffs rely (p. 7) on an inadmissible press article that says that RealNetworks' share of online sales doubled during the three weeks in August 2004 when it sold

---

[6] Universal, in particular, stopped short of endorsing Harmony, stating: "There are recent allegations questioning the legality of the Harmony application. To be clear, we will not support any service or system that doesn't respect the rights of all concerned. The rights of creators of technical systems are as important to us as the rights of copyright owners." Sweeney Ex. 31.

[7]

1  music below its wholesale cost, losing $2 million as a result. Sweeney Ex. 55; *Larez v. City of*
2  *Los Angeles*, 946 F.2d 630, 643 (9th Cir. 1991) (newspaper article is inadmissible hearsay).
3  Neither that article nor any admissible evidence shows that the temporary change in relative sales
4  of RealNetworks and Apple had anything to do with Harmony rather than RealNetworks' half-
5  price promotion.

[redacted] [8]

\* \* \* \* \*

13  In short, despite the full discovery allowed under Rule 56(f), Plaintiffs have no evidence
14  to refute Apple's showing that this update was directed at stopping unlawful hacks. And this case
15  illustrates why the purpose of a new product design is irrelevant as long as the new design is an
16  improvement. Even if Plaintiffs could show that the update was aimed in part at disabling
17  Harmony, they do not and cannot dispute that it was also aimed at stopping hacks. They point to
18  no case that outlaws a product improvement simply because of an alleged mixed motive, and
19  *Tyco* rules out any such result.[9]

### III. ITUNES 7.0 WAS ALSO A PRODUCT IMPROVEMENT.

21  As Apple's motion and supporting declarations demonstrate (p. 18), third-party

---

[8] [redacted]

[9] 592 F.3d at 1001 (describing issue as whether the innovator "introduced the design solely to eliminate competition" and citing *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368-69 (9th Cir. 1998) for proposition that "[w]here a monopolist's refusal to aid a competitor is based partially on a desire to restrict competition, we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct").

applications like Winamp and RealPlayer could corrupt the iPod, causing it to skip or not play iTS or other songs.

[10]

Plaintiffs' expert does not dispute that third-party applications could interfere with iPods. Instead, he argues that the customer complaints cited by Apple do not show that third-party applications created a "significant risk" of corrupting iPods or that RealPlayer was the cause. Martin Decl., ¶ 55. This argument is insufficient.

[11]

Third, regardless how he characterizes the risk's magnitude, *Tyco* protects even a "seemingly minor technological improvement."

[12] Neither Plaintiffs nor their expert addresses or refutes this other

---

[10]

[11]

[12]

(continued)

Apple's Reply in Support of Its MSJ
Case No. C 05-0037 JW (HRL)

evidence.[13]

[black redaction covering lines 2–19]

[black redaction on lines 21–22]

[13] [black redaction on lines 23–25]

[14] [black redaction on lines 26–28]

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ [15]

## IV. APPLE'S PRESS RELEASE IS NOT ACTIONABLE "DISPARAGEMENT"

Plaintiffs misstate the evidence and law in arguing that Apple's statements about Harmony are actionable exclusionary acts under Section 2. Apple stated that RealNetworks adopted "tactics and ethics of a hacker to break into the iPod;" that Apple was investigating the DMCA implications; and that it was highly likely that when the iPod software is updated from time to time Harmony "will cease to work" with iPods. Sweeney Ex. 29. (Plaintiffs quote a draft (Ex. 28) instead of the final version which dropped the reference to "Real's lock picking.")

This statement does not come close to "product disparagement" actionable under Section 2. The Ninth Circuit presumes that a competitor's statements have only a *de minimus* effect on competition and are therefore not actionable. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). To overcome this presumption, a plaintiff must prove that "that the representations: (1) were clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Id.* The plaintiff "must satisfy *all* six elements to overcome [the] presumption." *Id.* (emphasis in original).

Plaintiffs do not even describe this test, much less assert that they can meet it. The press release is not "clearly false" in any respect. It was a one-time event.[16] RealNetworks not only had an opportunity to respond but did so with its own press release. Sweeney Ex. 29. Plaintiffs

---

[15] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[16] Plaintiffs' claim (p. 9) that Apple issued "another threatening press release" in April 2005 when Harmony was reactivated is unsupported. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ it still would not constitute a "prolonged period." *See POURfect Prods. v. KitchenAid*, 2010 WL 1769413 at *5 (D. Ariz. May 3, 2010) (statements made to trade customers during one-month period insufficient to support disparagement claim). Nor is there any showing that a second release, if one existed, was clearly false or that RealNetworks was unable to respond.

1 offer no evidence that this statement affected competition.

2 Nor does Apple's statement constitute an actionable threat of sham legal proceedings. Apple simply stated that it was investigating the DMCA implications of RealNetworks' conduct. The cases cited by Plaintiffs (p. 18) require much more. They involved claims that defendants attempted to enforce fraudulently-obtained patents, including through litigation. Plaintiffs here make no such allegation.

## V. APPLE'S DECISION NOT TO LICENSE FAIRPLAY IS NOT ACTIONABLE.

Plaintiffs' argument (pp. 18-20) that Apple's decision not to license FairPlay to RealNetworks is actionable under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is incorrect for two main reasons. First, if the *Aspen Skiing* "sacrificing short-term profits" test were the appropriate standard, Plaintiffs have not offered any evidence that licensing FairPlay would have been more profitable in the short-term (or, for that matter, the long-term). Second, the subsequent decision in *Trinko* made clear that a refusal-to-deal is not actionable absent, as a threshold matter, a voluntary prior course of dealing. Mot., pp. 22-23. Plaintiffs assert (p. 19) that "binding Ninth Circuit authority" holds to the contrary. But the case they cite, *Image Tech. Servs. Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997), was expressly predicated on the existence of just such a course of dealing. As the court stated, "Like the Supreme Court in *Aspen Skiing*, we are faced with a situation in which a monopolist made a conscious choice to change an established pattern of distribution . . . ." *Id.* at 1211. But if *Image Tech.* had dispensed with that requirement, it would obviously not control over the Supreme Court's later decision in *Trinko*.

Plaintiffs assert that *Trinko's* pivotal ruling was dictum, citing the personal views of an FTC commissioner. Opp., p. 19, Sweeney Ex. 49. If it were dictum, it would still be persuasive. *See, e.g., Coeur D'Alene Tribe v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004) (stating that Supreme Court dicta is entitled to "great weight"). But it is not dictum, at least not to the Second, Ninth and Eleventh Circuits and the leading antitrust treatise—all of which recognize the requirement of a prior course of dealing. *See* Mot., pp. 23-24. Indeed, the FTC itself (in a statement joined by the commissioner Plaintiffs cite) has recognized that *Trinko* means that

refusal-to-deal claims should be limited to the narrow "circumstances paralleling those presented in *Aspen*."[17] Plaintiffs do not cite any post-*Trinko* decision from any appellate court that adopts a contrary view.[18]

Plaintiffs also argue (p. 23) that, even if Apple wasn't required to license FairPlay, it was required to deal with RealNetworks to ensure indefinitely that no update to FairPlay would ever interfere with Harmony. For the same reasons Apple had no duty to license, it had no duty to invest in the cooperation contemplated by Plaintiffs. Although Plaintiffs' expert tries to minimize the degree of cooperation, neither he nor Plaintiffs dispute that cooperation would have been required for Harmony to continue to work and to ensure that it did not interfere with iPods. Robbin Decl., ¶¶ 60-62; Farrugia Decl., ¶ 24; Kelly Decl. ¶¶ 36-40.

[REDACTED]

Martin Decl., ¶¶ 42-43, 84. Plaintiffs also ignore that Apple would need to invest engineering time to determine whether any part of a particular proposed update would interfere with Harmony. Robbin Decl., ¶¶ 55-58. And this cooperation would have to continue indefinitely to ensure that future versions of FairPlay would not inadvertently interfere with Harmony. *Id.*; Kelly Decl., ¶ 40; Martin Decl., ¶ 64.[19]

At bottom, Plaintiffs' argument is that because Apple and RealNetworks could have

---

[17] http://ftc.gov/reports/innovation/P040101PromotingInnovationandCompetitionrpt0704.pdf, p. 28.

[18] Plaintiffs' licensing argument is also at odds with this Court's ruling that Apple was entitled to adopt a proprietary DRM, and had no obligation to license it to others. Doc. 274, pp. 9-10. The iPod's later success did not deprive Apple of the right to continue using that proprietary DRM. "The successful competitor, having been urged to compete, must not be turned upon when he wins." *U.S. v. Aluminum Co.*, 148 F.2d 416, 430 (2d Cir. 1945); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981) (holding that a company that has lawfully acquired a patent may continue to exercise the exclusionary power of that patent even after the patented product becomes a commercial success and results in an economic monopoly).

[19] In designing future updates and new products, Apple would incur increasing costs to investigate whether any part of those updates would impact Harmony and then incur yet more costs to redesign the updates in a way that did not impact Harmony.

cooperated to integrate their products, Apple had a duty to do so. *Trinko* forecloses that argument. Requiring Apple to design and redesign its updates and products to ensure interoperability with RealNetworks' products would thwart innovation and competition. *Cf. Trinko*, 542 U.S. at 407-08; *Cal. Computer Prods. Inc. v. IBM*, 613 F.2d 727, 744 (9th Cir. 1979) (stating that a monopolist has no obligation to provide its rivals with its new products for reverse-engineering and copying purposes).[20]

## VI. PLAINTIFFS' STATE LAW UCL CLAIM FAILS FOR THE SAME REASONS.

Plaintiffs do not dispute that the UCL claim should be decided, one way or the other, rather than remanded to state court. Plaintiffs' argument (pp. 24-25) about their UCL "unfairness" claim is refuted by *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) and the other California cases cited in Apple's motion (p. 25). Those cases demonstrate that, where the federal antitrust claim fails, so does the UCL "unfairness" claim based on the same conduct.

## CONCLUSION

For these reasons, Apple's motion for summary judgment should be granted.

Dated: March 28, 2011

JONES DAY

By: /s/ Robert A. Mittelstaedt
Robert A. Mittelstaedt

Counsel for Defendant APPLE INC.

SFI-666585v1

---

[20] Plaintiffs point (p. 5) to Apple's agreement with Motorola that Motorola could sell phones that could play music from iTS. The Motorola deal, however, is not analogous to licensing FairPlay to RealNetworks. It did not involve trying to make another company's DRM-protected music play on iPods, with all the complexities that would entail. Sweeney Ex. 10, pp. 154-55 (explaining that Motorola deal allowed phones to play iTS music).