# EXHIBIT 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


THE APPLE iPOD iTUNES          Lead Case No.
ANTI-TRUST LITIGATION.         C-05-00037-JW (HRL)

~~~~~~~~~~~~~~~~~~~~~~




VIDEOTAPED DEPOSITION OF

STEVE JOBS

VOLUME I


April 12, 2011

10:03 a.m.


1 Infinite Loop
Cupertino, California


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Ana M. Dub, RMR, CRR, CSR 7445



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                    April 12, 2011
              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

1    page of Exhibit 2, Mr. Cue says:

2              "The labels are convinced

3              that different formats are

4              hurting their growth.  They want

5              us to license our DRM to Real.

6              Since Real has assured them that

7              they are putting the music in

8              FairPlay, they are ok with it

9              (that is until there is a

10             problem).  Real is actually

11             saying they are playing a

12             protected song on an authorized

13             device for that protection

14             scheme."

15             So does that refresh your recollection

16    that Real's Harmony product preserved the DRM and

17    that the labels were okay with Harmony and, in fact,

18    some of the labels issued public press releases

19    applauding the Harmony product?

20         A.   Yeah, I don't remember that.

21             And it doesn't say that the Real product

22    doesn't break the DRM.  It says that Real is saying

23    that.  It doesn't say that it's -- that we've tested

24    it or it's true.  But I'm sure we did and figured it

25    out.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

1      Q.    Did you ever -- did Apple ever conclude

2   that RealNetworks' Harmony product was stripping

3   DRM?

4      A.    I don't really remember.

5          Part of the issue, also, was that -- I

6   recall something to the effect that we are con- --

7   we were constantly upgrading iTunes and enhancing

8   its DRM.  And we -- you know, we assumed that future

9   enhancements would break the RealNetworks scheme,

10  whatever that was.  So that would be a real problem

11  for everybody.

12     Q.    Did Apple ever conclude that RealNetworks'

13  Harmony product was illegal?

14     A.    I don't know.

15     Q.    Did Apple ever send a cease and desist

16  letter to Real?

17     A.    I don't recall.  I don't know.

18     Q.    Now, Apple has, in the past, sent cease

19  and desist letters to persons who were known to have

20  developed programs that stripped DRM from iTunes

21  music; correct?

22          MR. RILEY:  Counsel, I think you're

23  getting beyond the topics that the judge permitted.

24          MS. SWEENEY:  I understand.  I'm not going

25  to go too far down this line.  Just get the answer



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                        April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17

1    to this question and --

2            MR. RILEY:  And I don't think it's tied to

3    the three topics that the judge permitted.  Cease

4    and desist letters to third parties?

5            MS. SWEENEY:  You've stated your

6    objection.  Thank you, Counsel.

7            MR. RILEY:  You don't have to answer that

8    question, Steve, if you don't want to.

9            THE WITNESS:  Okay.

10           MS. SWEENEY:  Respectfully, you can

11   object; and if I continue down roads that you think

12   are beyond the scope, you can seek an order from the

13   Court.  But the only basis for instructing a witness

14   not to answer is if there is an attorney-client

15   privilege issue.

16           MR. RILEY:  I'm aware of that, but this is

17   a different kind of deposition.  The Court limited

18   it to three narrow topics.  I don't see how cease

19   and desist letters to third parties fits into any of

20   those three topics.

21           MS. SWEENEY:  Because it fits into -- if

22   you'll recall, the judge said we're permitted to

23   inquire about Apple's decisions related to

24   RealNetworks' Harmony technology.

25           And Apple did issue cease and desist



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                     April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

1   letters against other companies, but not against

2   Real, and I want to establish that on the record.

3            MR. RILEY:  You've misstated what the

4   judge permitted.  Three topics.

5             "The deposition shall be

6             limited to the topics of (a) the

7             July 26, 2004 RealNetworks

8             announcement, (b) the July 29,

9             2004 Apple announcement in

10            response thereto, and (c)

11            Apple's software updates in

12            October 2004 that rendered the

13            RealNetworks digital music files

14            once again inoperable with

15            iPods."

16            Cease and desist orders -- letters to

17  third parties don't fit into any of those three

18  categories.

19            MS. SWEENEY:  We're using up a lot of the

20  two hours, a lot of time on this question.  It's

21  just a simple yes-or-no question.  Maybe Mr. Jobs

22  doesn't even recall.  Let him answer the question;

23  we'll move on.

24            MR. RILEY:  Okay.

25            THE WITNESS:  What was the question,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                    April 12, 2011
                HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                              19

1    again?

2    BY MS. SWEENEY:

3        Q.    Did Apple issue cease and desist letters

4    against companies that developed technology that

5    stripped DRM from iTunes songs?

6        A.    I don't -- in that time frame, I don't

7    remember.

8        Q.    Now, do you know who Rob Glaser is?

9        A.    Well, I don't know him, but I know he was

10   the CEO of RealNetworks for a while.

11       Q.    Did you ever meet Mr. Glaser?

12       A.    That's a good question.

13             I probably did once or twice.  I don't

14   remember.

15       Q.    Did you ever talk to him on the phone?

16       A.    I might have.  I just don't remember.

17       Q.    Now, looking at Exhibits 1, 2 --

18       A.    Do you want me to look at 2 now?

19       Q.    -- and 3, collectively, I think these are

20   all exhibits pertaining to --

21       A.    Do you want me to look at 2?  We haven't

22   looked at 2 yet.

23       Q.    Oh.  We haven't?

24       A.    No.

25             MR. RILEY:  No.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                        April 12, 2011
               HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                           33

1    documents?

2         A.    Yeah.

3         Q.    Okay.  And --

4         A.    That you just showed me?

5         Q.    That's correct.

6         A.    Yes.

7         Q.    And does this statement on Exhibit 6

8    represent the final version of those various draft

9    iterations of the press release?

10        A.    It would appear to.

11        Q.    Okay.  And looking at the text of the

12   statement, it says:

13              "We are stunned that

14              RealNetworks has adopted the

15              tactics and ethics of a hacker

16              to break into the iPod . . . ."

17              And then it goes on.  And my first

18   question is:  What did you mean by "the tactics and

19   ethics of a hacker"?

20        A.    I don't recall writing this, so I don't

21   know.  Maybe I wrote it, but -- I can guess at what

22   the person that wrote it meant, if you'd like.

23        Q.    Is it a pejorative description, the

24   tactics and ethics of a hacker?

25        A.    What do you mean by "pejorative"?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steve Jobs - Volume I                    April 12, 2011
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

34

1    Q.    Is it -- does it have negative

2   connotations, in your view?

3    A.    Yeah.

4    Q.    And then it says:

5         ". . . we are inves-" --

6    A.    But I'm sure some people would have the

7   opposite view.

8    Q.    And then I'm reading, again, the second

9   half of the first sentence.

10        ". . . we are investigating the

11        implications of their actions

12        under the DMCA and other laws."

13        And I already asked you some questions

14  about this, so I'm not going to reask all those

15  questions.  But did you ever come to an

16  understanding as to whether Real's release of

17  Harmony violated the DMCA?

18    A.    I don't remember.

19    Q.    Okay.  The second paragraph of the press

20  release, which is in Exhibit 6, says:

21        "We strongly caution Real and

22        their customers that when we

23        update our iPod software from

24        time to time, it is highly

25        likely that Real's Harmony



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

# EXHIBIT 37

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

The Apple iPod iTunes Antitrust Litigation          NO. C 05-00037 JW

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING AS PREMATURE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

_____/

## I.  INTRODUCTION

Plaintiffs[1] bring this class action against Defendant Apple Computer, Inc. ("Apple"), alleging violations of the Sherman Act, 15 U.S.C. § 2, and related state law claims.  Plaintiffs allege that Apple has committed unlawful acts in issuing software updates for its iPod, in violation of federal and state antitrust laws.

Presently before the Court are Defendant's Motion for Summary Judgment[2] and Plaintiffs' Motion for Class Certification.[3]  The Court conducted a hearing on April 18, 2011.  Based on the papers submitted to date and oral argument, the Court GRANTS in part and DENIES in part

---

[1]  Named Plaintiffs are Somtai Troy Charoensak, Mariana Rosen and Melanie Tucker.

[2]  (hereafter, "SJ Motion," Docket Item No. 473 (filed under seal).)

[3]  (Plaintiffs' Notice of Motion and Renewed Motion for Class Certification and Appointment of Lead Counsel, hereafter, "Class Certification Motion," Docket Item No. 477 (filed under seal).)

Case 4:05-cv-00037-YGR   Document 627   Filed 05/19/11   Page 2 of 16

1    Defendant's Motion for Summary Judgment and DENIES as premature Plaintiffs' Motion for Class

2    Certification.

3                                          **II.  BACKGROUND**

4    **A.      Undisputed Facts**[4]

5           In 2003, Apple launched its iTunes music store ("iTS").[5]  When Apple negotiated with

6    record labels about the terms under which Apple could sell digital music files online through the

7    iTS, most of the labels required that the digital music files be protected to guard against privacy.

8    (Id. at 5; Id. at 3.)  Apple implemented the required security solution through a proprietary system

9    called "FairPlay."  (Id. at 5-6; Id. at 3.)  The FairPlay system was used by Apple to encrypt the songs

10   offered on the iTS.  (Id. at 6; Id. at 4.)

11          In July 2004, RealNetworks announced its Harmony technology.  (SJ Motion at 8; SJ Opp'n

12   at 6.)  Using Harmony, RealNetworks was able to make music purchased from its online music store

13   playable on Apple's iPods.  (Id.; Id.)  In October 2004, Apple released an update of its iTunes

14   software called iTunes 4.7.  (Id.; Id. at 9.)  iTunes 4.7 featured a redesigned version of FairPlay.

15   (Id.; Id.)  The version of FairPlay used in iTunes 4.7 employed a new encryption method, which

16   ended the interoperability of the July 2004 version of Harmony with the iPod.  (Id. at 9; Id.)

17          In September 2006, Apple released an update of its iTunes software called iTunes 7.0.  (SJ

18   Motion at 9; SJ Opp'n at 10.)  iTunes 7.0 included a redesign of FairPlay.  (Id. at 10; Id.)  This

19   redesign prevented third-party applications like RealPlayer (the "jukebox" used by RealNetworks)

20   from placing music onto the iPod, which was accomplished by making it impossible for any source

21   other than iTunes itself to write on the iPod's database.  (Id.; Id.)

22

23

24          [4]  As a preliminary matter, although the Court had granted the parties' various Motions to
     seal the briefs and other documents in support of these Motions, the Court now finds its references
25   to these materials in this Order to be appropriate, as the referenced materials are not sealable under
     Civ. L.R. 79-5.
26

27          [5]  (SJ Motion at 6; Plaintiffs' Memorandum in Opposition to Apple's Motion for Summary
     Judgment at 4, hereafter, "SJ Opp'n," Docket Item No. 477 (filed under seal).)

28                                                  2

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

**B.     Procedural History**

A detailed account of the earlier procedural history in this case may be found in the Court's

December 20, 2006 Order Denying Defendant's Motion to Dismiss[6] and in the Court's December

22, 2008 Order Granting Plaintiffs' Motion for Class Certification.[7]  The Court reviews the

procedural history relevant to the present Motions.

This case is a consolidated putative class action.  The original cases were Charoensak v.

Apple Computer, Inc., No. C 05-00037 JW, and Tucker v. Apple Computer, Inc., No. C 06-04457

JW.[8]  On March 21, 2007, the Court ordered these cases consolidated, and renamed the consolidated

case The Apple iPod iTunes Antitrust Litigation.[9]  (Docket Item No. 106.)  The Court designated

The Katriel Law Firm, P.L.L.C. and Coughlin Stoia Geller Rudman & Robbins as Co-Lead Counsel,

and designated Somtai Troy Charoensak, Mariana Rosen and Melanie Tucker as Lead Plaintiffs.

(Id. at 1.)  On April 19, 2007, Plaintiffs filed a Consolidated Complaint for Violations of Sherman

Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumer Legal

Remedies Act, and California Common Law of Monopolization.  (Docket Item No. 107.)

On December 22, 2008, the Court granted Plaintiffs' Motion for Class Certification as to all

but one of Plaintiffs' counts.  (December 22 Order at 13-14.)  As to the remaining count, which

---

[6]  (hereafter, "December 20 Order.")  This Order may be found as Docket Item No. 27 in the docket for Tucker v. Apple Computer, Inc., No. C 06-04457 JW, which was one of the original cases now included in this consolidated action.  It may also be found as Tucker v. Apple Computer, Inc., 493 F. Supp. 2d 1090 (N.D. Cal. 2006).

[7]  (Order Granting Plaintiffs' Motion for Class Certification as to Counts Two, Three, Four, Five, Six, and Seven Only and Appointing Class Counsel; Sua Sponte Order Reconsidering Defendant's Motion to Dismiss Count One and Requiring Further Briefing, hereafter, "December 22 Order," Docket Item No. 196.)

[8]  There is a related case, the "Indirect Purchaser" action, Somers v. Apple Computer, Inc., No. C 07-06507.  Somers is a putative class action, which asserts the same causes of action against Apple based on the same alleged anticompetitive conduct.  The Plaintiffs in Somers, however, are iPod purchasers who did not purchase iPods directly from Apple.  (See Docket Item No. 1 in 07-06507.)

[9]  Prior to consolidation, the Court denied Apple's Motion to Dismiss the antitrust claims in Tucker case.  (See December 20 Order at 16.)  No other dispositive motions were filed in Tucker or in Charoensak prior to consolidation.

Case 4:09-cv-00037-YGR    Document 627    Filed 05/19/11    Page 4 of 16

United States District Court

For the Northern District of California

1    stated a claim for Unlawful Tying in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the

2    Court denied certification without prejudice pending further proceedings in the case. (Id. at 13.)  On

3    December 21, 2009, the Court *sua sponte* decertified the classes it had previously certified.[10]  In its

4    December 21 Order, the Court explained that the technological interoperability between iPods and

5    media sold through Apple's iTS did not constitute unlawful tying under the Sherman Act.  (Id. at 2.)

6    The Court stated that Plaintiffs' monopoly claims "interweave[d] allegations that there were

7    technological ties between Apple products when they were first introduced to the market," which by

8    itself does not constitute anticompetitive conduct, and "allegations that Apple made technological

9    modifications to its products for the express purpose of maintaining monopoly power," which could

10   support a monopoly claim.  (Id.)  The Court invited Plaintiffs to submit an Amended Consolidated

11   Complaint "that does not depend upon allegations of tying as the anticompetitive conduct upon

12   which they base their monopoly claims."  (Id. at 3.)

13       On January 26, 2010, Plaintiffs filed an Amended Consolidated Complaint[11] alleging six

14   causes of action: (1) Monopolization under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2;

15   (2) Attempted Monopolization under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2; (3)

16   Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16270, *et seq*.; (4) Violation of

17   California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (5) Violation of the

18   Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*.; (6) and Common Law

19   Monopolization Business Practices.[12]  (See ACC.)

20

21

---

22       [10]  (See Order Decertifying Classes Without Prejudice to Being Renewed; Inviting Further
     Motions at 2, hereafter, "December 21 Order," Docket Item No. 303.)

23

24       [11]  (Amended Consolidated Complaint for Violations of Sherman Antitrust Act, Clayton Act,
     Cartwright Act, California Unfair Competition Law, Consumers Legal Remedies Act, and California
     Common Law of Monopolization, hereafter, "ACC," Docket Item No. 322.)

25

26       [12]  On June 29, 2010, the Court dismissed Plaintiffs' Cartwright Act, CLRA and Common
     Law Monopolization claims with prejudice.  (See Order Granting in Part and Denying in Part
     Defendant's Motion to Dismiss; Denying as Premature Defendant's Motion for Summary Judgment;
27   Granting Indirect Purchaser Leave to File an Amended Complaint at 17, Docket Item No. 377.)

28

4

United States District Court

For the Northern District of California

1      Presently before the Court are Defendant's Motion for Summary Judgment and Plaintiffs'

2   Motion for Class Certification.

3                                    **III.  STANDARDS**

4   **A.      Summary Judgment**

5      Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

6   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

7   material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

8   56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims

9   or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).  The moving party "always bears the

10  initial responsibility of informing the district court of the basis for its motion . . . ." Id. at 323.  "The

11  judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file,

12  and any affidavits show that there is no genuine issue as to any material fact and that the movant is

13  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The non-moving party "may not

14  reply merely on allegations or denials in its own pleading; rather, its response must–by affidavits or

15  as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R.

16  Civ. P. 56(e).

17     When evaluating a motion for summary judgment, the court views the evidence through the

18  prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby

19  Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-

20  moving party, including questions of credibility and of the weight that particular evidence is

21  accorded. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court

22  determines whether the non-moving party's "specific facts," coupled with disputed background or

23  contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

24  T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987).   In such a case,

25  summary judgment is inappropriate. Anderson, 477 U.S. at 248.  However, where a rational trier of

26  fact could not find for the non-moving party based on the record as a whole, there is no "genuine

27  issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

28                                          5

**United States District Court**
For the Northern District of California

**B.** <u>**Class Certification**</u>

The decision to certify a class is committed to the discretion of the district court within the guidelines of Federal Rule of Civil Procedure 23. <u>See</u> Fed. R. Civ. P. 23; <u>Doninger v. Pacific Northwest Bell, Inc.</u>, 564 F.3d 1304, 1309 (9th Cir. 1977). The party seeking class certification bears the burden of establishing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. <u>Dukes v. Wal-Mart, Inc.</u>, 509 F.3d 1168, 1176 (9th Cir. 2007) (citing <u>Zinser v. Accufix Research Institute, Inc.</u>, 253 F.3d 1180, 1186 (9th Cir. 2001), amended, 273 F.3d 1266 (9th Cir. 2001)). A district court may certify a class only if, after "rigorous analysis," it determines that the party seeking certification has met its burden. <u>General Telephone Co. of the Southwest v. Falcon</u>, 457 U.S. 147, 158-61 (1982).

In reviewing a motion for class certification, the court generally is bound to take the substantive allegations of the complaint as true. <u>In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.</u>, 691 F.2d 1335, 1342 (9th Cir. 1982) (citing <u>Blackie v. Barrack</u>, 524 F.2d 891, 901 (9th Cir. 1975)). However, the court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met. <u>Hanon v. Dataproducts Corp.</u>, 976 F.2d 497, 509 (9th Cir. 1992) (citation omitted). In fact, "courts are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case." <u>Dukes</u>, 509 F.3d at 1178 n.2 (internal quotations and citation omitted).

## IV. DISCUSSION

**A.** <u>**Summary Judgment**</u>

Defendant moves for summary judgment as to all of Plaintiffs' claims on the grounds that: (1) Section 2 of the Sherman Act permits Defendant to improve its products regardless of the impact on competitors; and (2) because Plaintiffs' claim under Section 2 of the Sherman Act fails, its state law UCL claim necessarily fails as well. (SJ Motion at 12-24.)

6

United States District Court

For the Northern District of California

**1.      Section 2 of the Sherman Act**

Section 2 of the Sherman Act prohibits monopolization or attempted monopolization. 15 U.S.C. § 2. "There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal 'antitrust' injury." Allied Orthopedic Appliances, Inc., v. Tyco Health Care Group LP, 592 F.3d 991, 998 (9th Cir. 2010).

In this case, Defendant does not contest the sufficiency of Plaintiffs' Amended Consolidated Complaint as to the first and third elements. Thus, the Court's analysis will focus on the second element, namely, whether Defendant "willfully acquired or maintained" monopoly power.

If a design change is a product improvement, that design change "by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result." Tyco Health Care Group, 592 F.3d at 998-1000. "If a monopolist's design change is an improvement," then courts may not "balanc[e] the benefits or worth of [the] product improvement against its anticompetitive effects." Id. at 1000. "There is no violation of Section 2 unless [a] plaintiff proves that some conduct of the monopolist associated with its introduction of a new and improved product design 'constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market.'" Id. (quoting Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 545-46 (9th Cir. 1983)).

Here, two of Defendant's design changes to its software are at issue: (1) its introduction of iTunes 4.7 in 2004; and (2) its introduction of iTunes 7.0 in 2006. The Court considers each design change in turn.

**a.      iTunes 4.7**

At issue is whether Defendant's introduction of iTunes 4.7 constituted a genuine improvement. Defendant contends that iTunes 4.7 was introduced in response to hackers who had circumvented Defendant's previous anti-piracy software, and that the redesigned version of FairPlay in iTunes 4.7 made files more difficult for hackers to crack, which constituted a genuine improvement. (SJ Motion at 4-8.) Plaintiffs respond that the software updates in iTunes 4.7 were in

7

fact designed to make it impossible for RealNetworks' Harmony technology to play RealNetworks

songs on an iPod, and that Defendant's real aim was to end RealNetworks' interoperability with the

iPod, rather than to prevent hacks.  (SJ Opp'n at 6-9.)

Defendant presents evidence that iTunes 4.7 was designed to prevent hacks as follows:

(1)     The earlier versions of Defendant's anti-piracy software had been successfully hacked.[13]

(2)     In late 2003 and early 2004, attacks by hackers on Defendant's software increased in frequency, leading the record labels whose music was sold on iTS to demand that Defendant take steps to prevent the hacking.[14]

(3)     In accord with its contractual obligations with the record labels, Defendant improved its FairPlay security system by fundamentally changing the way its encryption technology worked, thereby making the system more difficult for hackers to crack.[15]

Plaintiffs do not contend that earlier versions of Defendant's software had not been hacked.

Further, Plaintiffs concede that record labels required Defendant to have "content protection to

guard against piracy."  (SJ Opp'n at 3.)  Finally, Plaintiffs' expert presents testimony that iTunes 4.7

"introduced a radically different" encryption technology which was "much more resistant to attack"

than previous versions of the software.[16]  Based on this evidence, the Court finds that it is not

disputed that iTunes 4.7 constituted a genuine improvement.

Because iTunes 4.7 was a genuine improvement, the Court may not balance the benefits or

worth of iTunes 4.7 against its anticompetitive effects.  Tyco Health Care Group, 592 F.3d at 1000.

Therefore, Defendant's introduction of iTunes 4.7 could only be a violation of Section 2 if Plaintiffs

can prove that some conduct of Defendant associated with its introduction of iTunes 4.7 constituted

"an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of

---

[13] (Declaration of Jeffrey Robbin in Support of Defendant's Renewed Motion for Summary Judgment ¶¶ 21-23, hereafter, "Robbin Decl.," Docket Item No. 468 (filed under seal).)

[14] (Robbin Decl. ¶¶ 23-29; Id., Exs. 10-13.)

[15] (Robbin Decl. ¶¶ 35-40; Declaration of Dr. John P.J. Kelly in Support of Defendant's Renewed Motion for Summary Judgment ¶¶ 17-31, hereafter, "Kelly Decl.," Docket Item No. 536 (filed under seal).)

[16] (Declaration of David F. Martin in Support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment ¶¶ 31-39, hereafter, "Martin Decl.," Docket Item No. 540 (filed under seal).)

United States District Court
For the Northern District of California

8

Case 4:09-cv-00037-YGR   Document 1627   Filed 05/19/14   Page 9 of 18

<div style="text-align:left"><strong>United States District Court</strong><br/>For the Northern District of California</div>

attempting to monopolize the relevant market." Id.  Plaintiffs offer the following evidence to show that Defendant engaged in such conduct:

> (1)  Defendant began its redesign of FairPlay, which would be released in iTunes 4.7, in May 2004, a month after Defendant refused to license FairPlay to its competitor RealNetworks.[17]
>
> (2)  A number of record labels approved of RealNetworks' technology, and several labels entered into agreements with RealNetworks to have RealNetworks sell their music in its online store.[18]
>
> (3)  Defendant released a public statement stating that it was "investigating the [legal] implications" of RealNetworks' actions, and cautioning customers that "when [Defendant] update[s its] iPod software from time to time it is highly likely that [the] Harmony technology will cease to work with current and future iPods."[19]
>
> (4)  After it launched Harmony, RealNetworks saw an "immediate and dramatic increase" in its share of the audio digital file market, while Defendant's share of that market "fell below 70%" for the first time since the launch of iTS.[20]

The Court considers those pieces of evidence relevant to proving that Defendant engaged in conduct constituting an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market.[21]

### I.  RealNetworks's Proposal to License FairPlay

At issue is whether Defendant's refusal to license FairPlay to RealNetworks was anticompetitive conduct.

In general, under antitrust law "there is no duty to aid competitors." Verizon Comm., Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004).  An exception to this rule may arise if there is a "unilateral termination of a voluntary (*and thus presumably profitable*) course of

---

[17] (SJ Opp'n at 5; Declaration of Bonny E. Sweeney in Support of Plaintiffs' Memorandum in Opposition to Apple's Motion for Summary Judgment, Ex. 21, hereafter, "Sweeney Decl.," Docket Item No. 515 (filed under seal).)

[18] (SJ Opp'n at 6-7; Sweeney Decl., Exs. 1-4.)

[19] (SJ Opp'n at 7; Sweeney Decl., Ex. 29.)

[20] (SJ Opp'n at 7; Sweeney Decl., Exs. 11, 55.)

[21] Because the second and fourth pieces of evidence produced by Plaintiffs–namely, that record labels entered into agreements with RealNetworks and that Defendant lost market share–do not relate to any *conduct* of Defendant, they are irrelevant to the Court's analysis. See Tyco Health Care Group, 592 F.3d at 1000 (stating that a plaintiff must prove that "some *conduct* of the monopolist" was an abuse or leverage of monopoly power or a means of attempting to monopolize the relevant market) (emphasis added).

Case 4:05-cv-00037-YGR Document 621 Filed 09/19/14 Page 20 of 26

United States District Court

For the Northern District of California

1   dealing" between two parties. <u>Id.</u> at 409 (emphasis in original).  Liability under Section 2 on the

2   basis of a duty to aid a competitor "can arise when a defendant voluntarily alters a course of dealing

3   and 'anticompetitive malice' motivates the defendant's conduct."  <u>Safeway, Inc. v. Abbott Lab.</u>,

4   Nos. C 07-05470 CW, C 07-5985 CW, C 07-6120 CW, C 07-5702 CW, 2010 WL 147988, at *6

5   (N.D. Cal. Jan. 12, 2010).

6        Here, Plaintiffs present no evidence that Defendant had a prior course of dealing with

7   RealNetworks.  Instead, Plaintiffs contend that under Ninth Circuit law, Defendant's unilateral

8   refusal to license its intellectual property to RealNetworks was an antitrust violation even in the

9   absence of a prior course of dealing.  (SJ Opp'n at 18-20.)  However, Plaintiffs' reliance on <u>Image</u>

10  <u>Technical Services, Inc. v. Eastman Kodak Co.</u>[22] in support of their contention is misplaced.  In

11  <u>Image Technical Services</u>, the Court was addressing "a situation in which a monopolist made a

12  conscious choice to change an established pattern of distribution to the detriment of competitors."

13  <u>Id.</u> at 1211.  Thus, its holding does not apply where, as here, there is no evidence of a prior course of

14  dealing.

15       Plaintiffs' reliance on this Court's December 20 Order is also misguided.  In its December

16  20, 2006 Order, the Court read <u>Trinko</u> as not confining a refusal-to-deal claim to "cases in which a

17  prior course of dealing exists."  (<u>See</u> December 20 Order at 13.)  However, the Ninth Circuit has

18  since clarified that a refusal-to-deal claim, under <u>Trinko</u>, requires the "unilateral termination of a

19  voluntary and profitable course of dealing" between competitors.  <u>See</u> <u>LiveUniverse, Inc. v.</u>

20  <u>MySpace, Inc.</u>, 304 Fed. Appx. 554, 556 (9th Cir. 2008) (observing that the Ninth Circuit now

21  recognizes "the narrow scope of the refusal to deal exception").

22       Accordingly, the Court finds that Defendant's refusal to license FairPlay to RealNetworks

23  was not anticompetitive conduct that would give rise to Section 2 liability.

24

25

26

_____

27       [22]  125 F.3d 1195 (9th Cir. 1997).

28                                             10

Case 4:05-cv-00037-YGR Document 627 Filed 05/19/14 Page 10 of 16

**United States District Court**
For the Northern District of California

### ii.    Defendant's Public Statement

At issue is whether Defendant's public statement was anticompetitive conduct.

To rise to the level of an antitrust violation, a competitor's disparaging statement "must overcome a presumption that the effect on competition" of the statement "was de minimis." Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc., 108 F.3d 1147, 1152 (9th Cir. 1997). A plaintiff may overcome this de minimis presumption by proving that the representations were: "(1) clearly false; (2) clearly material; (3) clearly likely to induce reasonable reliance; (4) made to buyers without knowledge of the subject matter; (5) continued for prolonged periods; and (6) not readily susceptible of neutralization or other offset by rivals." Id. A plaintiff "must satisfy *all* six elements to overcome [the] de minimis presumption." Id. (emphasis in original).

Here, Plaintiffs present no evidence to overcome the de minimis presumption. In particular, Plaintiffs' evidence indicates that Defendant's public statement was a single event, and was not "continued for prolonged periods." Accordingly, the Court finds that Defendant's public statement was not anticompetitive conduct that would give rise to Section 2 liability.

In sum, the Court finds that the undisputed evidence shows that iTunes 4.7 was a genuine improvement. Further, Plaintiffs present no evidence that Defendant engaged in conduct associated with its introduction of iTunes 4.7 that would give rise to Section 2 liability. Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiffs' Section 2 claim as to Defendant's introduction of iTunes 4.7.

### b.    iTunes 7.0

At issue is whether Defendant's introduction of iTunes 7.0 constituted a genuine improvement. Defendant contends that iTunes 7.0 included improvements to FairPlay that prevented third-party applications from corrupting the iPod by "injecting" content onto its internal

11

Case 4:05-cv-00037-YGR   Document 821   Filed 08/13/14   Page 22 of 26

United States District Court

For the Northern District of California

database.[23]  (SJ Motion at 9-10.)  Plaintiffs respond that iTunes 7.0 did not prevent corruption of the iPod, but instead made the software worse by magnifying small errors into enormous errors which treated the database as being devoid of data.  (SJ Opp'n at 10-12.)

Here, Defendant presents evidence that iTunes 7.0 was designed to prevent iPod corruption as follows:

(1)  Third-party applications like RealPlayer could corrupt the iPod by modifying the iPod's internal database and adding foreign files to it.[24]

(2)  To guard against the risk of corruption, the new code included in iTunes 7.0 ensured that only iTunes could write to the iPod's internal database.[25]

In response, Plaintiffs provide the following evidence, based on the testimony of Plaintiffs' expert, David Martin:[26]

(1)  Adding foreign files to the iPod's internal database would not corrupt the iPod, because one of the intended functions of the iPod is to act as an external disk, and for RealNetworks to treat the iPod as an external disk would introduce no more risk of corruption than would already exist when an iPod user treats the iPod as an external disk.[27]

(2)  The new code included in iTunes 7.0 did not guard against the risk of corruption, but actually made the software worse, because it transformed small errors in the database that did not meaningfully interfere with the user experience into enormous errors that treated the database as devoid of all data.[28]

In light of the parties' conflicting evidence, the Court finds that it is unable to determine, as a matter of law, that iTunes 7.0 was introduced to guard against the risk of corruption and was

---

[23]  (SJ Motion at 9-10; Apple's Reply in Support of its Motion for Summary Judgment at 9-12, hereafter, "SJ Reply," Docket Item No. 546 (filed under seal).)

[24]  (SJ Reply at 9-10; Kelly Decl. ¶¶ 37-38; Declaration of Augustin Farrugia in Support of Defendant's Renewed Motion for Summary Judgment ¶¶ 20, 24, hereafter, "Farrugia Decl.," Docket Item No. 472 (filed under seal).)

[25]  (SJ Reply at 10-11; Farrugia Decl. ¶¶ 20-24, 29-32; Declaration of Michael T. Scott in Support of Apple's Reply in Support of its Motion for Summary Judgment, Ex. 2 at 163-70, Docket Item No. 564 (filed under seal).)

[26]  Martin is a professor of computer science whose research is in the areas of computer security and privacy.  (See Martin Decl. ¶¶ 1-8; Id., Ex. A.)

[27]  (SJ Opp'n at 11; Martin Decl. ¶¶ 56-63.)

[28]  (SJ Opp'n at 11-12; Martin Decl. ¶¶ 70-76.)

12

Case 4:05-cv-00037-YGR   Document 621   Filed 06/19/14   Page 18 of 16

United States District Court

For the Northern District of California

1   therefore a genuine product improvement.  Thus, the Court finds that Defendant is not entitled to

2   summary judgment on Plaintiffs' Section 2 claim as to iTunes 7.0.

3         Accordingly, the Court DENIES Defendant's Motion for Summary Judgment on Plaintiffs'

4   Section 2 claim as to iTunes 7.0.

5         **2.    The UCL**

6         Defendant contends that Plaintiffs' UCL claim only survives if Plaintiffs' Sherman Act claim

7   survives, and that without a valid Sherman Act claim there is no "unlawful" conduct to support

8   Plaintiffs' UCL claim.  (SJ Motion at 24.)  Plaintiffs respond that because California courts have

9   recognized that an unfair business act or practice need not violate antitrust law to be actionable

10  under the UCL, Plaintiffs' UCL claim survives whether or not its Sherman Act claim survives.  (SJ

11  Opp'n at 24-25.)

12        Under California law, if the "same conduct is alleged to be both an antitrust violation and an

13  'unfair' business act or practice for the same reason," then the "determination that the conduct is not

14  an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward

15  consumers."  Apple, Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008) (quoting

16  Chavez v. Whirlpool Corp., 93 Cal. App. 4th 963, 975 (Cal. Ct. App. 2001)).

17        Here, in its June 29 Order, the Court stated that Plaintiffs could state a UCL claim under the

18  "unlawfulness" prong of the UCL if Plaintiffs adequately stated a Section 2 claim.  (June 29 Order at

19  8.)  As discussed previously, the Court has found that Defendant is entitled to summary judgment on

20  its Section 2 claim as to iTunes 4.7, but not as to iTunes 7.0.  Thus, Defendant is also entitled to

21  summary judgment on its UCL claim as to iTunes 4.7, but not as to iTunes 7.0.  See Psystar, 586 F.

22  Supp. 2d at 1204.

23        Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiffs'

24  UCL claim as to iTunes 4.7.  The Court DENIES Defendant's Motion for Summary Judgment on

25  Plaintiffs' UCL claim as to iTunes 7.0.

26

27

28

13

**B.      Class Certification**

Plaintiffs seek to certify a damages class under Rule 23(b)(3), seeking damages for the supracompetitive price paid for iPods as a result of Defendant's alleged anticompetitive conduct. (Class Certification Motion at 1, 16.)  Defendant contends that: (1) Plaintiffs fail to demonstrate a class-wide method of proving impact and damages; and (2) Plaintiffs have also failed to carry their burden to show that resellers may properly be included in the Class.[29]

As discussed previously, the Court earlier certified classes in this case under both Rule 23(b)(2) and Rule 23(b)(3).  (See December 22 Order.)  The Court later *sua sponte* decertified those classes without prejudice.  (See December 21 Order.)  However, the Court only decertified the classes in order to reexamine Plaintiffs' Sherman Act claims.  (December 21 Order at 2-3, 10-11.) Because the Court finds that there is a genuine issue of fact as to whether Plaintiffs can state a claim under the Sherman Act for iTunes 7.0, the Court's earlier findings that Plaintiffs' proposed class satisfies the requirements of Rule 23(a) and 23(b)(3) still stand.  (See December 22 Order at 4-13.)

However, at this time, the Court finds that it lacks information necessary to certify the class. Accordingly, the Court DENIES as premature Plaintiffs' Motion for Class Certification, and sets a hearing to address the issues of how the class should be defined and the length of the class period, in light of the Court's disposition of the Motion for Summary Judgment.

**V.  CONCLUSION**

The Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment as follows:

(1)      The Court GRANTS Defendant's Motion for Summary Judgment on all of Plaintiffs' claims as to iTunes 4.7; and

---

[29]  (Apple's Opposition to Renewed Motion for Class Certification at 8-21, hereafter, "Class Certification Opp'n," Docket Item No. 512 (filed under seal).)

(2)     The Court DENIES Defendant's Motion for Summary Judgment on all of Plaintiffs'

claims as to iTunes 7.0.[30]

The Court DENIES as premature Plaintiffs' Motion for Class Certification and orders as

follows:

(1)     The Court sets **June 27, 2011 at 9 a.m.**, as a further hearing on Plaintiffs' Motion for

Class Certification;

(2)     On or before **June 6, 2011**, the parties shall file simultaneous Supplemental Briefs

addressing the issues of how the class should be defined and the length of the class

period in light of the Court's ruling on Defendant's Motion for Summary Judgment.

Dated: May 19, 2011

_____
JAMES WARE
United States District Chief Judge

---

[30]  In light of the Court's disposition of Defendant's Motion for Summary Judgment, the Court DENIES as moot Plaintiffs' Notice of Motion and Motion to File Under Seal Plaintiffs' Submission of Supplemental Evidence from the Deposition of Steve Jobs in Support of Plaintiffs' Opposition to Summary Judgment and Exhibits 1-3, 5 to the Declaration of Alexandra S. Bernay Pursuant to Local Rule 79-5(b)-(c), Docket Item No. 598, and Plaintiffs' Motion for Leave to File Supplemental Evidence from the Deposition of Steve Jobs in Support of Plaintiffs' Opposition to Apple's Motion for Summary Judgment, Docket Item No. 599.

15

United States District Court

For the Northern District of California

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alexandra Senya Bernay xanb@rgrdlaw.com
Alreen Haeggquist alreenh@zhlaw.com
Andrew S. Friedman afriedman@bffb.com
Bonny E. Sweeney bonnys@rgrdlaw.com
Brian P Murray bmurray@murrayfrank.com
Carmen Anthony Medici cmedici@rgrdlaw.com
Caroline Nason Mitchell cnmitchell@jonesday.com
Craig Ellsworth Stewart cestewart@jonesday.com
David Craig Kiernan dkiernan@jonesday.com
Elaine A. Ryan eryan@bffb.com
Francis Joseph Balint fbalint@bffb.com
George A. Riley griley@omm.com
Helen I. Zeldes helenz@zhlaw.com
Jacqueline Sailer jsailer@murrayfrank.com
John J. Stoia jstoia@rgrdlaw.com
Michael D Braun service@braunlawgroup.com
Michael D. Braun service@braunlawgroup.com
Michael Tedder Scott michaelscott@jonesday.com
Robert Allan Mittelstaedt ramittelstaedt@jonesday.com
Roy Arie Katriel rak@katriellaw.com
Thomas J. Kennedy tkennedy@murrayfrank.com
Thomas Robert Merrick tmerrick@rgrdlaw.com
Todd David Carpenter tcarpenter@bffb.com

**Dated:  May 19, 2011**                    **Richard W. Wieking, Clerk**


                                            **By:     /s/ JW Chambers**
                                                **Sue Imbriani**
                                                **Courtroom Deputy**

# EXHIBIT 38

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE APPLE IPOD ITUNES ANTI-TRUST LITIGATION | ) ) ) | Case No.: 05-CV-00037 YGR |
| _____ | ) ) | EXPERT REPORT OF DAVID M. MARTIN JR., PH.D. |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |
| _____ | ) | |

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 29 of 90
Case 4:05-cv-00037-YGR   Document 761-2   Filed 10/04/14   Page 2 of 94

2                                                          Expert Report of David Martin, Ph.D.

# Table of Contents

I.      Engagement ........................................................................................................ 4

II.     Methodology ..................................................................................................... 6

III.    Background........................................................................................................ 6

IV.     iTunes and Related Products ............................................................................ 6

    IV.A.    FairPlay Encryption and Keys ................................................................... 7

        IV.A.1.    Keybags ......................................................................................... 8

    IV.B.    Transferring Songs to an iPod ................................................................ 8

V.      Timeline of Software and Events ..................................................................... 9

    V.A.    iTunes 4.6 ................................................................................................ 9

    V.B.    Harmony ................................................................................................ 10

    V.C.    iTunes 4.7 .............................................................................................. 13

    V.D.    iTunes 4.7 and Harmony......................................................................... 16

    V.E.    Harmony Update.................................................................................... 30

    V.F.    iTunes 6.0 .............................................................................................. 31

    V.G.    iTunes 7.0.0 and the iPod Database Verification Code ......................... 31

        V.G.1.    Apple's March 2013 Correction to Database Verification Activation Dates ..................... 34

        V.G.2.    Database Verification in Apple's March 2013 Code Production ........................................ 35

        V.G.3.    Consequences of a Database That Does Not Verify ....................................................... 37

    V.H.    iTunes 7.0.0 and the iPod Keybag Verification Code ............................. 38

VI.     Database and Keybag Verification Make iPod Failure and Customer Service Calls More Likely.... 39

VII.    Possible Alternatives to Detecting and Blocking Third-Party Software Using Database and Keybag Verification Code................................................................................................ 41

VIII.   Summary of Main Opinions................................................................................ 42

IX.     Additional Topics ............................................................................................ 44

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 913-2   Filed 10/10/14   Page 30 of 90

Expert Report of David Martin, Ph.D.                                                                                 3

X.    Documents Relied upon and Considered ........................................................................... 44

XI.    Signature ........................................................................................................................... 56

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## I.    Engagement

1. I receive compensation of $450 per hour for my time working on this matter plus reasonable expenses.  My compensation is in no way related to the outcome of this litigation.

2. The statements made in this report are made of my own personal knowledge and experience.

3. A curriculum vitae detailing my educational background and professional experience is attached as Exhibit A.

4. I have received the following honors throughout my academic and professional career: Teaching Excellence Award for U. Mass Lowell Computer Science Department (2007); Teaching Excellence Award for U. Mass Lowell Computer Science Department (2004); one of four nominees for Outstanding Research in Privacy Enhancing Technology Award  (2003); Outstanding Teaching Fellow, Department of Computer Science, Boston University (1996); University Graduate Fellowship, Boston University (1993-1994); Top Graduating Senior in Mathematics, Iowa State University, Spring (1993); Top Graduating Senior in Computer Science, Iowa State University, Spring (1993); Honorable Mention, National Science Foundation Graduate Fellowship (1993); Honorable Mention, Department of Defense Graduate Fellowship (1993); Phi Beta Kappa membership (liberal arts honor society) (1990); Phi Kappa Phi membership (engineering honor society) (1990); Pi Mu Epsilon (mathematics honor society) (1990); Upsilon Pi Epsilon (computer science honor society) (1990); Arthur Collins Foundation Scholarship, Spring (1992); Dio L. Holl Award for Outstanding Senior, Spring (1992); Shell Oil Foundation Scholarship, Spring (1991); Barry Goldwater Scholarship (1989-1990).

5. I have been a member in the following professional societies:  the Association for Computing Machinery and the Institute for Electrical and Electronics Engineers.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                              5

6.  I earned a Ph.D. in 1999 from Boston University in Computer Science.  I earned a Bachelor of

Science, with distinction, in 1993 from Iowa State University in Computer Science and Mathematics.  My

Ph.D. research was in the area of Internet security and privacy.

7.  Since obtaining my Ph.D., I have worked at University of Denver as an Assistant Professor, Boston

University as a Research Assistant Professor, and University of Massachusetts Lowell as an Assistant

Professor.  In these positions, I performed research in the areas of computer security and privacy.

8.  My experience also includes teaching courses in Introduction to Object Oriented Programming

(C++); Foundations of (Theoretical) Computer Science; Computer Security I: Principles of Cryptography

and Network Security; Computer Security II: Applied Computer Security; Unix Software Tools; Computer

Networking; Introduction to Computer Science II (C++); Introduction to Computer Science I (C++); Special

Topics in Systems: Computer Security; Advanced Unix Programming; Formal Languages and Automata;

Introduction to Computer Science (C).

9.  A complete list of my publications and my experience testifying at trial and in depositions during

the previous four years can be found in my curriculum vitae, attached as Exhibit A.

10.  If called as a witness, I would testify as to the statements and opinions contained in this report.

11.  Significant portions of this report were previously submitted in my February 28, 2011 report

titled Declaration of David M. Martin In Support of Plaintiffs' Opposition to Apple's Motion for Summary

Judgment. Since then, the Court has granted Defendant's Motion for Summary Judgment on all of

Plaintiff's claims as to iTunes 4.7 and has denied Defendant's Motion for Summary Judgment on all of

Plaintiff's claims as to iTunes 7.0.[1]  In this report, I reprise my explanation and findings regarding iTunes

and iPods prior to iTunes 7.0 in order to explain the underlying technology and the context in which the

iTunes 7.0 changes were made.  I have also considered additional material, including documents

produced by Apple, publicly available documents and source code provided by Apple.

---

[1] See May 19, 2011 Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment;
Denying as Premature Plaintiffs' Motion for Class Certification.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

6                                                    Expert Report of David Martin, Ph.D.

## II.      Methodology

12. In determining my conclusions, I considered evidence including produced source code, produced

documents, publicly available information, and my own experiments.  I have cited these and other

sources of evidence throughout the report.  Although I do not necessarily cite my own use of the

products at issue in every instance, I have found my experience with the products to be consistent with

the evidence.

## III.     Background

13. iPods are portable digital music players.[2]  In order to play songs on an iPod, a user must first

connect it to a desktop computer (typically a PC or a laptop) and use appropriate software to transfer

the songs to the iPod.   iTunes is software designed to perform this function.  iTunes can also play songs

on a desktop computer, in addition to other functions.

14. Certain third-party programs, such as RealPlayer, Winamp, and Anapod, are also designed to be

able to transfer songs to an iPod.  Like iTunes, these players have other functions as well.

## IV.     iTunes and Related Products

15. iPod and iTunes are part of Apple's suite of products and services involving music.  These related

products include:

- iPods: the physical devices that are responsible for the storage and playback of music.
- iPod firmware: software specific to an iPod model that controls how the iPod behaves.
  Firmware runs on individual iPod devices.  Each iPod comes with firmware.  The firmware may
  also be updated, using standalone programs released by Apple, or by the iTunes program.
- iTunes: a program that manages music collections and transfers music and firmware updates to
  an iPod.  iTunes runs on the desktop (typically a PC or laptop computer).
- iTunes Store: an online store where users can buy music.  The iTunes Store is typically accessed
  through the iTunes program.

---

[2] Late iPod models have additional features such as video and games.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D. 7

- QuickTime: a desktop technology for playing media files, including those bought through the iTunes Store.
- FairPlay: Apple's Digital Rights Management (DRM) software. This is not a standalone program that a user runs, but rather a technology used by Apple that restricts the ways in which iTunes-Store content may be used.

16. Versions of these elements have changed over time. The version numbers for compatible elements are not identical, however. For example, I understand that an iPod Nano (2nd generation) from 2006[3] has the Apple codename of N36,[4] uses iPod firmware 1.1.3,[5] was supported by iTunes 7.0.0,[6] and uses version 3_2-024 of the FairPlay software.[7]

## IV.A. FairPlay Encryption and Keys

17. FairPlay encrypts songs in a way that makes them unplayable unless appropriate keys are used to decode the songs. Beginning on April 28, 2003,[8] Apple, through iTunes, began applying FairPlay encryption to all songs purchased through the iTunes Store.[9] iTunes only applies FairPlay encryption to songs purchased through the iTunes Store. FairPlay-encrypted songs typically have the .m4p extension. In order to play FairPlay-encrypted songs on any device—computer, iPod or otherwise—the decryption keys are necessary.

---

[3] See http://support.apple.com/kb/HT1353#ipodnano, accessed 2/14/11.
[4] See Apple_AIIA_B_001706.
[5] Version number 1.1.3 is reported by iTunes 10.0.0.68 when an iPod Nano (2nd generation) is attached.
[6] See Apple_AIIA00106006.
[7] See Apple Inc.'s Objections and Answers to Plaintiffs' Third Set of Interrogatories, p.5, later corrected by counsel.
[8] See Exhibit 4 at Apple_AIIA_00330728 (iTunes Store opened on April 28, 2003).
[9] See Robbin depo. 50:10-16 ("All songs that we sold when the iTunes Music Store first opened were protected with FairPlay"). This lasted until May 2007, when Apple began selling recordings from EMI in an unprotected format through the iTunes Store. See Apple news release http://www.apple.com/pr/library/2007/04/02itunes.html, fetched February 2011. In January 2009, Apple announced that it would begin selling most music without DRM. See http://www.bbc.co.uk/2/hi/technology/7813527.stm, fetched February 2011.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

## IV.A.1.      **Keybags**

18. iTunes uses a data structure called a *keybag* to store the FairPlay keys needed to play FairPlay-encrypted songs on the desktop or an iPod.[10]  In order to enable such songs to be played both on computers and iPods, iTunes puts keybags in both places so that iTunes or the iPod firmware can later find these keys when needed.  Although the keybag contains keys for decrypting songs, the keybag itself is also locked using yet another key.  The precise form of the keybag depends on a number of factors including where the file is stored by the relevant iTunes software and iPod firmware versions.  The keybag form changed dramatically over time.  I explore some of the important differences in the sections below.

19. For songs not purchased from the iTunes Store, iTunes organizes the songs, allows for playback on the desktop, and supports the transfer of the songs to iPods.    For songs that aren't purchased from the iTunes Store, iTunes does not transfer FairPlay keys for these songs to the iPod.  Songs stored in files with names ending in .mp3 are usually songs that are not FairPlay-encrypted.  These songs can be played by many other media playback programs, including RealPlayer, Winamp, and Windows Media Player, in addition to iTunes and QuickTime.  Unencrypted files such as these can also be played on the iPod and many other competing digital music players.


## IV.B.  **Transferring Songs to an iPod**

20. When an iPod is attached to a compatible computer, it appears to be another disk drive on that computer.[11]  For example, it may appear as the E: drive on a Windows computer.

21. iTunes and comparable third-party programs transfer songs to the iPod by performing each of these steps:

---

[10] The keys contained in a keybag are called "account keys."
[11] Even iPods that do not contain physical disk drives may be accessed as if they were disk drives when connected to a computer.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                    9

1) It copies the song files to appropriate locations on the iPod's disk drive, such as within
   E:\iPod_Control\Music.

2) It constructs an appropriate database file on the iPod's disk drive, such as
   E:\iPod_Control\iTunes\iTunesDB.  This is necessary because iPod firmware looks for a
   database file like this describing the songs that have been loaded on the device.  The
   database is the source of the iPod menus that allow a user to choose what songs to play.  A
   song on the iPod without an appropriate entry in the iPod database is not playable on the
   iPod.

3) ████████████████████████████████████████████
   ██████████████████████████████  As described above, the keybag stores the keys needed to
   play FairPlay-encrypted songs stored on the iPod.[12]  If a FairPlay-encrypted song is present
   on the iPod, and has an appropriate database entry, but does not have an applicable key in
   the iPod keybag, then that song will not play on the iPod.

22. Thus, a third-party program can add songs to an iPod only if it knows how to perform the first

two of these functions (copying music files and updating the database).  For a third-party program to

transfer FairPlay songs that will playback on the iPod, it must know how to perform the third step

(inserting keys into the keybag) as well.  The first requirement, copying files to the iPod device, is very

easy.  The difficulty of the remaining two requirements — adding to the iPod database and adding to the

iPod keybag — has changed over time, as I describe below.


## V.      Timeline of Software and Events

23. The rest of my report is arranged chronologically according to Apple's software releases.

24. To show how the Harmony interoperability software was affected by the changes Apple made in

iTunes 4.7, I begin by describing the behavior of iTunes 4.6.


## V.A.   iTunes 4.6

25. iTunes 4.6 was released on June 9, 2004.[13]  In the iTunes 4.6 method, the desktop keybag was

locked using a method very similar to the one used on the iPod keybag.  In order to add keys to either

---

[12] The keybag omits entries for songs that are not FairPlay encrypted, since these songs don't require keys to play.
[13] See Apple_AIIA00106004.

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 37 of 90
Case 4:05-cv-00037-YGR   Document 819-2   Filed 10/10/14   Page 40 of 64

10                                                           Expert Report of David Martin, Ph.D.

keybag, a program needed to first determine the key used to unlock both keybags. This applied both to iTunes 4.6 and any other program that wanted to add keys to the keybag. Having the key to unlock the keybag gave the program the ability to add, remove, and inspect keys within the keybag.

26. This is illustrated in Figure 1 below. Note that the keybag contains keys ultimately used to encrypt (and decrypt) songs, but the keybag itself is also locked. This makes sense because if the keybag were freely accessible, then it would be easy for someone familiar with encryption to decrypt corresponding songs by simply reaching inside, grabbing the key, and using it to decrypt them. As suggested by the diagram, the same key is used to lock and unlock the keybag, and the keybags on the desktop and the iPod are the same type of container.



Lockable des

**Figure 1: The iTunes 4.6 Keybag**

# V.B.   Harmony

27. On July 26, 2004, RealNetworks Inc. released RealPlayer 10.5, which included technology they called Harmony. Harmony enabled RealNetworks to sell songs through its own store and that were playable on iPods. To do this, Harmony only *added* encryption to songs; it did not strip FairPlay

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.            11

encryption from songs sold through the iTunes Store. The help feature included with RealPlayer 10.5 explains:



<div align="center">Figure 2: Harmony Help</div>

28. This was a significant innovation for RealNetworks. RealNetworks sold songs encrypted by a digital rights management (DRM) scheme called Helix that, like FairPlay, encrypted songs in order to restrict the way that the songs could be played.[14] However, Helix was incompatible with both FairPlay and iPods. Before Harmony, customers who purchased Helix-encrypted songs from RealNetworks could not play them on an iPod.

---

[14] See http://www.drmwatch.com/drmtech/article.php/3094921 ("RealNetworks announces Helix DRM. NO Windows Media support."), fetched February 2011.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 39 of 90
Case 4:05-cv-00037-YGR   Document 819-1   Filed 11/04/14   Page 39 of 64

12                                                                    Expert Report of David Martin, Ph.D.

29. To address this problem, RealNetworks determined how to create the keybag that the iPod needed to play encrypted songs, and they used this knowledge to write a Helix-to-FairPlay encryption translator.  They put the translator into the RealPlayer program and called the technology Harmony.  Now RealNetworks could sell Helix-encrypted songs to customers, and Harmony would translate the Helix encryption into FairPlay encryption to allow their customers to play these songs on an iPod.[15]

30. Thus, Harmony only *added* FairPlay encryption to songs, namely, those songs sold by RealNetworks.  I have seen no evidence that RealPlayer and Harmony were ever intended or able to strip FairPlay encryption from any songs purchased through the iTunes Store.

31. In ¶¶32-33 of his January 18, 2011 declaration, Apple's expert Dr. Kelly transfers an unencrypted .mp3 file from "RealPlayer 10.5 (with Harmony)" to an iPod.  Although his description of the transfer process appears to be accurate, his example does not illustrate Harmony's stated purpose of "translating the DRM"[16] to FairPlay.  Dr. Kelly does not actually state that Harmony was invoked in his example, nor was Harmony invoked in his example, despite calling the product "RealPlayer 10.5 (with Harmony)" in this section.  Since Dr. Kelly only illustrated using RealPlayer to transfer an *unencrypted .mp3 file* to his iPod, Harmony technology was simply not part of his demonstration.  Harmony is an encryption translator; to invoke Harmony, one must start with a Helix-encrypted file, such as a song purchased from RealNetworks.  Because Dr. Kelly did not use Harmony, his discussion in ¶¶34-35 is potentially misleading as it does not address what Harmony does, but rather what RealPlayer 10.5 does.[17]

---

[15] See Apple_AIIA_00090427 (email from Dave Heller reporting on use of Harmony).
[16] See Figure 2.
[17] Dr. Kelly confirmed in his deposition that he did not use Harmony to transfer a Helix-protected song purchased from RealNetworks to an iPod.  Kelly depo. 101:12-15.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D. 13

## V.C.   iTunes 4.7

32. iTunes 4.7 was released on October 26, 2004.[18]  In iTunes 4.7, the keybags changed, both on the

desktop and on the iPod.

33. iTunes 4.7 introduced a radically different keybag format for the iPod.[19]  This keybag scheme is

called the "embedded keybag."  This keybag format is different than the previous one because while it is

relatively easy to add keys to the embedded keybag, it is a very difficult and an entirely different process

to inspect or remove keys from it.  This is shown in Figure 3, where I have depicted the iPod's embedded

keybag as a parking meter.  In a parking meter, it is very easy to add things (i.e. coins) to the meter, but

inspecting or removing the coins inside is much more difficult.

---

[18] See Apple_AIIA00106002-3, excerpt from "DRM Version Info."
[19] In order to use a particular keybag format on an iPod, the iPod firmware must know that keybag format, and
iTunes (and any other programs that will transfer keys to the iPod) must know that keybag format as well.  In the
case of iTunes 4.7, the first iPod that understood and required the embedded keybag format was the P98 iPod
Photo released in September 2004 (Heller depo. 121:1-16).  When iTunes 4.7 communicated with iPods that did
not know about the embedded keybag format, it used the old format.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

Lockable

Figure 3: The iTunes 4.7 Embedded Keybag

34. Apple includes the following documentation in their FairPlay source code directory:[20]

EMBEDDED KEYBAG
A new keybag mechanism has been created for embedded devices (such as the iPod) that makes use of an RSA public/private keypair.  This keybag has no relationship to the PC based keybag in any way. […]

35. Elsewhere the iTunes source code states, in a comment:

Embedded devices use a keybag format that uses public/private key encryption ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ This means that the PC side can write the keys, but has no way to read them. […][21]

36. The basic mechanism that provides this easy-to-write, hard-to-read iTunes 4.7 embedded keybag

is called the RSA cryptosystem.  RSA is an example of *public-key* or *asymmetric* cryptography.  In public-

---

[20] See DRM Version Info at Apple_AIIA_B_015552-3.
[21] See iTunes FP 4.7.0 DulcimerUtilities.c:1550-1554, Apple_AIIA_B_015708.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                          15

key cryptography, instead of there being a single key to operate a lock (i.e., both encrypt and decrypt),

two keys are forged simultaneously when the lock is constructed. The public key is used to lock it, and

the private key is used to unlock it. Given an RSA lock, the public key simply won't unlock it; it can only

be used to put things into the bag protected by the lock. To unlock an RSA lock, its private key is

needed.

    37. Furthermore, a very important property of the RSA cryptosystem when properly deployed is that

it is considered nearly impossible for an attacker to use an RSA public key in order to find a matching

RSA private key. This is why they are called "public" and "private" rather than more neutral terms such

as "left" and "right": the public key can be made public essentially without harm, while the private key

must be kept private. As stated in the paper that introduced the RSA cryptosystem, written by its

inventors, "An encryption method is presented with the novel property that publicly revealing an

encryption key does not thereby reveal the corresponding decryption key."[22]

    38. Using the RSA scheme, iTunes 4.7 possessed the *public* key allowing it to create entries in an iPod

keybag, but iTunes did not have the *private* key used by the iPod to extract the desired keys from the

iPod keybag for song playback. As Dr. Kelly states in ¶30, "the RSA private key used by the iPod to

decrypt the ▮▮▮▮▮▮▮ was not stored on the customer's computer and could not be derived from

properties of the customer's computer."[23]

    39. Although RSA private keys for the embedded keybag were indeed stored on iPods so that the

iPods could decrypt and play their songs, the RSA private keys were stored in a manner that made them

extremely difficult to extract. As I previously explained in ¶20, programs like iTunes communicate with

the iPod by accessing it like a disk drive. However, the iPod's private RSA keys used to extract keys from

---

[22] See *A Method for Obtaining Digital Signatures and Public-Key Cryptosystems* by Ronald L. Rivest, Adi Shamir, and Leonard M. Adleman, *Communications of the ACM* 21,2 (Feb. 1978), 120-126, available online at http://people.csail.mit.edu/rivest/Rsapaper.pdf.
[23] See also Apple_AIIA_B_000048, from the "FairPlay Next Generation" document.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

the embedded keybag for playback are not visible in the disk drive view of the iPod. They are buried

deeper within the iPod firmware than the disk drive interface exposes.

40. The iTunes 4.7 desktop keybag was also built differently than the iTunes 4.6 desktop keybag,

however, the same key was still used to lock and unlock the iTunes 4.7 desktop keybag. This made it

possible for iTunes 4.7 to store songs securely, yet still be able to unlock the keybag in order to play

those songs on the desktop computer.

41. I understand that in his declaration, Mr. Robbin reports that iTunes 4.7 FairPlay was cracked by

attackers "within weeks" of its release.[24] These cracks appear to have attacked the iTunes Store and the

iTunes 4.7 *desktop* keybag. The *embedded* iPod keybag, however, was much more resistant to attack.[25]

I have seen no evidence that any attacker was ever able to strip FairPlay encryption from songs stored

on an iPod with an embedded keybag.


## V.D.   iTunes 4.7 and Harmony

42. The version of Harmony existing when iTunes 4.7 was released in October 2004 did not know

how to read or use the embedded keybag format that iTunes 4.7 used with compatible iPods.[26]

Therefore, this version of Harmony could not successfully transfer songs to such iPods.[27]

43. On pp. 15-17 of his January 18, 2011 declaration, Mr. Robbin discusses the possibility that Apple

could have shared technical information with RealNetworks to permit their RealPlayer/Harmony

product to work with iTunes 4.7 embedded keybag. Under the heading "Harmony Would Make FairPlay

Less Secure" on p. 16, Mr. Robbin argues that if Apple were to have shared its confidential technical

information with RealNetworks, then this "would have made FairPlay substantially less secure" because

---

[24] See Mr. Robbin's 2011-01-18 declaration at ¶45.
[25] See Apple_AIIA00798326 "That's what the embedded keybag is for, and that hasn't been cracked," chat from 2005-07-05.
[26] See Apple_AIIA0090427 (2004-07-27 email from Dave Heller, "Switching to the new embedded keybag will slow them down, but if they get the public key in iTunes, they can continue to do this.")
[27] Robbin Decl., ¶¶3, Kelly Decl., ¶¶34-35.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D. 17

of the possibility of attacks against RealNetworks and RealPlayer/Harmony in addition to the possibility

of attacks against Apple and its products:

> Had Apple worked directly with RealNetworks and shared information about FairPlay
> technology, it would have greatly escalated the risk of leaks by giving non-Apple employees
> access to that information. In the end, Apple's ability to protect FairPlay's security would have
> been dependent on RealNetworks and the measures it may (or may not) have taken to protect
> Apple's information. Harmony also would have provided hackers yet another point of attack on
> FairPlay. Because Harmony mimicked FairPlay, <u>if hackers were able to reverse engineer
> Harmony, they could have learned how FairPlay operates-e.g., how songs are decrypted.</u> They
> could have then used that information to hack FairPlay. (Robbin decl. ¶59, emphasis added)

44. However, the evidence does not support Mr. Robbin's position. My review of the embedded-

keybag architecture leads me to conclude that disclosing sufficient technical information to

RealNetworks in order to update Harmony for iTunes 4.7 should have been possible with *little or no*

threat to the security of FairPlay-encrypted songs sold through the iTunes Store. This is directly due to

the architecture of embedded keybag architecture adopted in iTunes 4.7. Recalling the steps used to

transfer music to an iPod as stated in ¶21 above:

1) RealPlayer 10.5 was able to copy the relevant song files to the appropriate locations on the
   iPod's disk drive before iTunes 4.7, so it would not have required significant, if any, engineering
   effort to preserve this functionality in order to make Harmony compatible with iTunes 4.7.

2) RealPlayer 10.5 was able to construct an appropriate database file on the iPod's disk drive
   before iTunes 4.7, so it would not have required significant, if any, engineering effort to
   preserve this functionality in order to make Harmony compatible with iTunes 4.7.

3) Although RealPlayer 10.5 was able to create an appropriate keybag file on the iPod's disk drive
   that was compatible with iTune 4.6, as discussed above, the iPod embedded keybag format
   introduced in iTunes 4.7 was different, and therefore some engineering effort would have been
   required to make Harmony compatible with iTunes 4.7. However, in order to transfer songs to
   an iPod, Harmony only needed to *add* to a keybag. Thus Harmony needed to know the RSA
   *public* keys for adding to embedded keybags, and the relevant algorithms, but it did not need to
   know the RSA *private* keys needed to play songs associated with keys in the embedded keybag.

45. In other words, if Apple had given the relevant RSA public keys and algorithms to RealNetworks,

then RealNetworks could have improved Harmony to be able to transfer songs to iPods using the iTunes

4.7 embedded keybag. But RealNetworks would have been completely unable to use this knowledge to

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 45 of 90
Case 4:05-cv-00037-YGR   Document 879-2   Filed 11/04/14   Page 46 of 64

18                                                      Expert Report of David Martin, Ph.D.

strip FairPlay encryption from songs purchased from the iTunes Store and stored on an iPod with an

iTunes 4.7 embedded keybag.  This is due to the asymmetric nature of RSA keys: it is not considered

possible to use a public RSA key to find its matching private key.[28]  So Mr. Robbin's claim that "if hackers

were able to reverse engineer Harmony, they could have learned how FairPlay operates-e.g., how songs

are decrypted" does not make sense.  Apple's expert Dr. Kelly declined to endorse or address Mr.

Robbin's claim in his declaration.

46. Dr. Kelly also confirmed that keys present on the desktop in iTunes 4.7 could not be used to strip

DRM content from iPods:

> Q. Well, then how does this asymmetric encryption that you're talking about improve the
> security of 4.7 -- or improve the security of FairPlay through 4.7?
>
> A. Well, there are a number of things that it does, and I've laid those out in detail. But one of the
> significant things it does is it -- it prevents you from using a key that you may have retrieved
> from the desktop to go in and retrieve -- to strip the DRM content from the iPod itself.
>
>
> ***
>
>
> Q. Well, are the -- all right. So I'm trying to get at this private/public key distinction. And so the
> public key, at least as I understand the use of the public -- the expression "public key," that,
> beginning with 4.7, is in 18 iTunes; correct? And the private key with 4.7 is in the iPod; correct?
>
> A. That's correct.
>
> Q. Okay. And you say that this improves the security of the DRM-protected music; correct?
>
> A. Correct.
>
> Q. All right. And so I'm trying to figure out how it does that if part of the encryption is still on the
> desktop.
>
> A. Well, there -- there are a number of things that -- that happen between 4.5, 4.6, and 4.7, and
> those all improved the DRM technology. Specifically, the RSA asymmetric encryption, that -- the
> idea there is that even if you have the public key, that's not going to help you with respect to
> the iPod because the iPod -- even if you've managed to retrieve that public key, it's not going to
> help you in the operation of the iPod, to decrypt or to strip content from the iPod.[29]

---

[28] Apple's expert Dr. Kelly agreed with this basic fact about RSA in deposition.  Kelly depo. 90:7-21.
[29] See Kelly depo. 92:19-93:4, 93:13-94:11.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

47. Dr. Kelly discusses this version of Harmony in his January 18, 2011 declaration. In ¶37, Dr. Kelly

states that Harmony and other third-party applications presented a "significant risk to the proper

functioning of the iPod," because they "did not have perfect knowledge regarding how FairPlay worked"

and if they created errors in the iPod keybag or in the iPod database, these would have led to some or

all songs being unplayable. I agree that applications that destroy the database or keybag or song files

would interfere with the ability of the iPod to play those songs, but I am not sure how this constitutes a

"significant risk" as this would never be the intent or function of a program designed to play music on an

iPod. Dr. Kelly presents absolutely no evidence that there were a "significant" number of problems with

third-party applications relative to the problems encountered with iPods where no third-party

applications were present. In his deposition, Dr. Kelly stated that he did not know how many iPod users

were potential users of RealPlayer, nor how many complaints Apple received from all customers.[30]

48. In any case, Apple could have provided appropriate technical documentation if it were concerned

about the quality of programs like Harmony and Winamp. For example, Apple sells hundreds of

thousands of third-party applications through its App Store for the iPhone.[31] To make this possible,

Apple publishes technical documents at its developer website.[32] Security measures prevent third-party

applications from searching the entire iPhone and harvesting private data, and the technical documents

provided to aid in development do not give developers enough information to overcome these security

measures. This is similar to the situation created by the embedded keybag in iTunes 4.7, because using

the iTunes 4.7 technique that allows content contributors (such as iTunes and Harmony) to add

encrypted content to the iPod, effective security measures (namely, the RSA cryptosystem in the

embedded keybag) prevented content contributors (such as iTunes and Harmony) from searching the

entire iPod and harvesting private data (namely, stripping DRM from songs sold through the iTunes

---

[30] See Kelly depo. 121:10-18.
[31] See http://www.apple.com/iphone/apps-for-iphone/.
[32] See https://developer.apple.com/devcenter/ios/index.action.

Case 4:05-cv-00037-YGR Document 877-15 Filed 11/04/14 Page 47 of 90
Case 4:05-cv-00037-YGR Document 619 Filed 11/04/14 Page 20 of 64

20                                                     Expert Report of David Martin, Ph.D.

Store).  Apple could have created technical documents that specified the iPod database format and all of

the RSA public keys needed to transfer encrypted songs to the iPod, but which would not have provided

enough information to overcome the RSA security measures that prevent stripping the DRM from songs

sold through the iTunes Store.  In fact, Apple already dealt with this issue at some level, because the

iTunes and iPod development teams were separate, yet somehow they had to agree on how files could

be transferred to the iPods.[33]

49.  In ¶38, Dr. Kelly turns his attention to the iTunes database.  Dr. Kelly first states that "Apple

received complaints from its customers that RealPlayer and other jukebox applications…corrupted those

iPods."  Going on, Dr. Kelly states that "In the case of RealPlayer, this corruption likely occurred because

RealPlayer modified the iPod internal database and added foreign files, interfering with the operation of

the iPod."

50.  The cited customer incident reports contain nowhere enough detail to support this sweeping,

aggregate conclusion.  I see little evidence that customers even made such complaints; rather, it appears

that Apple employees and Dr. Kelly simply interpreted any iTunes/iPod problem in the presence of

RealPlayer or another third-party application to be an instance of that application corrupting the iPod.

These complaints are far too ambiguous to warrant Dr. Kelly's conclusion as to the "likely cause" of the

customer incidents.[34]  Nor do the incident reports establish that the *customers* had assigned blame to

the third-party applications.

51.  For example, the first problem report that Dr. Kelly cites, Apple_AIIA_C_00205226, shows Apple

agents concluding that a customer's difficulty with iTunes must be due to the presence of Anapod on

the caller's computer, apparently because the agents found something similar described on the Anapod

---

[33] See Heller depo. 24:5-21.

[34] In fact, Apple employee Dave Heller wrote in an email that "Harmony will transfer to iPod, writing a valid v3 keybag and iPod DB."  Apple_AIIA_00090427.  In deposition, Mr. Heller explained that a "valid v3 keybag and iPod DB" meant "as far as the iPod was concerned, it met enough criteria so that the iPod would actually play the song."  Heller depo. 136:4-8.

Case 4:05-cv-00037-YGR Document 877-15 Filed 11/04/14 Page 48 of 90
Case 4:05-cv-00037-YGR Document 831-5 Filed 10/10/14 Page 22 of 64

Expert Report of David Martin, Ph.D.                                                                21

website.  The customer was then referred to the Anapod website.  The incident report is completely

silent on whether the iPod was corrupted or not; the issue was the behavior of the *iTunes application* on

a desktop computer where Anapod was also installed and possibly attempting to simultaneously access

the iPod.  And nowhere does the customer say that Anapod corrupted the iPod.

52. In Dr. Kelly's second problem report, Apple_AIIA_C_0020520, an Apple agent surmises that the

caller's RealOne Player had "apparently" synced with an iPod and erased its contents.  The Apple agent

then told the customer to reconfigure, disable, or uninstall RealPlayer.  Nowhere does the customer say

that RealOne Player corrupted the iPod.  Syncing with RealPlayer in a manner that ends up deleting the

files may not be what the customer wanted or thought would happen, but that does *not* mean that the

"likely cause" of the missing files was that RealPlayer modified the iPod database incorrectly.

53. In another of Dr. Kelly's examples, Apple_AIIA_C_00205493, the customer reports using Winamp,

which "worked great until recently." The customer reports a number of problems on the iPod such as

freezing, not playing songs, and changing tracks randomly.  But near the top of the complaint report, the

customer tellingly states that the iPod *won't hold a charge* and *won't charge through the computer's

USB port.*  In my opinion, the most plausible explanation for this is a battery or other hardware problem.

Failure to charge through the USB port is unlikely to have been a result of anything that Winamp did.  In

deposition, Dr. Kelly suggested a possible relationship between Winamp and this charging problem by

stating "it may well be that Winamp is using a whole bunch of processor cycles and that's what's

depleting the charge."[35]  This speculation does not warrant a characterization of this incident as being

one of the "complaints from [Apple's] customers that [RealPlayer and] other jukebox applications that

attempted to transfer content onto iPods corrupted those iPods."

54. Dr. Kelly also cites Apple_AIIA_C_00205677 as an instance of a customer complaining that a non-

iTunes application corrupted an iPod.  This incident report is extremely brief:

---

[35] See Kelly depo. 148:19-149:19.

Case 4:05-cv-00037-YGR Document 877-15   Filed 11/04/14   Page 49 of 90
Case 4:05-cv-00037-YGR Document 837-5   Filed 11/04/14   Page 48 of 64

22                                                        Expert Report of David Martin, Ph.D.

Case_ID:    63810570

| AP_Fiscal_Pd: | FY2006P08 | Date: | 2006-06-01 00:17:10 |
|---|---|---|---|
| Issue: | (PC) iPod update fails | | |
| Case_Title: | Case Created From Retail | | |
| Serial_Num: | YM60165UTK2 | | |
| Problem_Product: | IPOD NANO,4GB,BLACK | | |

**Case Notes:**

ISSUE: not syncing with pc  ACTION RESULTING IN FAILURE: undt. possible cause of conflict use of winamp plus itunes on same ipod.  POSSIBLE LIQUID DAMAGE: N ACCIDENTAL OR COSMETIC DAMAGE: minor scuffs  CONFIGURATION: ipod nano 4gb black  ACTION: restored. test/  RESOURCES CONSULTED:  RESOLUTION: ntf  PHOTOS ON FILE:  IPOD SOFTWARE VERSION: up tod ate    CRENNE - R103  /  Apple Store Rockaway -

55. In this case, the Apple agent actually in contact with the customer apparently considered the cause of the failure to be undetermined ("undt.") with a *possible* cause being the use of Winamp and iTunes on the same iPod.  Again, the customer was completely silent on the issue of whether Winamp corrupted anything at all.  There is no indication that the Apple agent actually witnessed any problem. The phrase "RESOLUTION: ntf" may in fact mean "no trouble found."[36]  There are myriad possible explanations for this problem having nothing to do with a third-party player.

56. Dr. Kelly also cites Apple_AIIA_C_00205614, where a customer complains about "no songs playing on iPod."  Yet the report shows no evidence that a third-party jukebox program was *ever* used with the iPod.  The sequence of events described are:

a)   Agent determines that the iPod is broken for some reason and needs to be restored.

b)   Agent asks the customer to uninstall old software and then download and install new versions.

c)   Agent determines that customer was installing each program *twice simultaneously*, which was interfering with the installation.

---

[36] See, for example, http://forums.ilounge.com/ipod-classic-ipod-5g-video/186039-what-does-no-trouble-found-mean.html (fetched February, 2011).

d)    Agent learns that customer had been downloading by using Netscape with a RealPlayer

"enhanced downloader."

e)    Agent has customer instead use Internet Explorer to download iTunes, QuickTime, and iPod

Updater and eventually reports success restoring the iPod.

57. The "Netscape with a RealPlayer enhanced downloader" in step d) does not at all sound like a

program that transfers songs to iPods.  At deposition, Apple's expert Dr. Kelly seemed unsure about

what it was:

> Q. Is Netscape a program that transfers songs to the iPod?
>
> A. No, it's not. It's a browser.
>
> Q. Okay. And Netscape with a RealPlayer enhanced downloader, is that a third-party jukebox?
>
> A. I don't recall as I sit here. The RealPlayer enhanced downloader, I don't recall.[37]

58. As an alternative to using Netscape with the RealPlayer enhanced downloader, the agent told the

customer to use Internet Explorer.  Internet Explorer is not a program that transfers songs to iPods.

Again, the customer never reported that third-party software corrupted the iPod, nor does any of the

contemporaneous evidence indicate that was the case. Dr. Kelly nonetheless cited this incident report as

one of the "complaints from [Apple's] customers that RealPlayer and other jukebox applications that

attempted to transfer content onto iPods corrupted those iPods" in his declaration.

59. Dr. Kelly also cites Apple_AIIA_C_00205261,[38] where a customer complains of an "iPod library

corrupted after battery ran out during an update" that was being done "via RealPlayer."  Here, it

appears the transfer was interrupted by a battery failure at an inopportune moment.  The customer may

have understood this perfectly and simply required assistance in recovering the iPod.  In any case, this

incident report does not indicate that the customer blamed RealPlayer for the problem.  Nor do the

facts indicate that RealPlayer was the problem; it appears that the problem was battery failure.

---

[37] See Kelly depo. 157:7-13.
[38] Dr. Kelly also reviewed the customer complaints attached to the Farrugia and Robbin declarations.  Kelly depo.
at 120:8-121:9.  This complaint is from Farrugia decl. Ex. 5.

Expert Report of David Martin, Ph.D.

Obviously, battery failure can happen during iTunes transfers too.  For example, see

http://discussions.apple.com/thread.jspa?threadID=1325146 (fetched February 2011), where an iPod

user explains, "I recently added around 6GB of music to my iTunes and, stupidly, tried to sync my iPod

video without having it fully charged. The result was that my iPod died mid-sync. I fixed the initial

problem by syncing it later while it was fully charged, but now I believe that all the music that had

synced previously before it died are now somewhere on my iPod and are taking up space under the

'Other' categorie in the iTunes Summary page of the iPod."

   60.  Although the details vary tremendously in the remaining problem reports that Dr. Kelly cites, the

overall lack of detail in the reports is constant.    No evidence has been presented by Apple or Dr. Kelly

as to the methodology used by Apple customer agents when generating these incident reports.  Dr. Kelly

did not speak to anyone at Apple about them,[39] nor did he "read any training material or any other

material provided to Apple Help Desk employees in how to address customer complaints,"[40] nor did he

make any attempt to determine whether Apple employees had even examined the customer's iPod

when writing the incident report.[41]  The Apple agents who created the incident reports did not appear to

be tasked with discovering underlying causes of failure, but rather, appeared to be working towards a

conclusion of the incident.  Dr. Kelly testified that "they are – they are focused on describing the

problem and a solution.  And that's – that's what their focus is."[42]  Therefore, in my opinion, the

customer incident reports cited in the declarations of Dr. Kelly, Mr. Robbin, and Mr. Farrugia do not

constitute a sufficient basis for the conclusion that the iPod customers complained that their iPods were

corrupted by third-party programs, or a conclusion that the "likely cause" of any alleged corruption was

that "RealPlayer modified the iPod internal database," or a conclusion that third-party programs

constituted a "significant risk" to the proper functioning of the iPod.

---

[39] See Kelly depo. 123:11-20.
[40] See Kelly depo. 125:11-15.
[41] See Kelly depo. 134:13-135:15.
[42] See Kelly depo. 162:18-163:9.

61. Additionally, I am aware of no evidence that supports Dr. Kelly's proposition in ¶38 that RealPlayer "adding foreign files" along the lines of his illustration in Table 1 (p. 16) would *ever* corrupt an iPod. In my opinion, corruption due to "adding foreign files" is very unlikely. In fact, Apple provides instructions to its iPod owners on how to use the iPod as an external disk.[43] It is difficult to see how RealPlayer treating the iPod as an external disk would be any more hazardous to the iPod than the iPod's owner using the iPod as an external disk.

62. In their declarations, Mr. Farrugia, Mr. Robbin, and Dr. Kelly each claimed that RealNetworks' and other third parties' lack of proper technical documentation also constituted a risk to the proper functioning of the iPod.[44] This was obviously due to Apple's own refusal to provide technical information to RealNetworks and the other third parties.

63. Mr. Robbin also claimed that "third party jukeboxes could make FairPlay less secure."[45] The only evidence cited for this claim is an internal Apple email indicating that Winamp plugin #138888 was removed "because [it] includes support for HYMN, in order to strip FairPlay off music copied to and from iPod." The Winamp plugin directory identifies plugin #138888 as the "iPod Support Plug-in" authored by Will Fisher.[46] As explained by the internal Apple email, "The plug-in itself doesn't bundle Hymn, but it allows users to specify a path to the Hymn executable, which it uses to perform the DRM circumvention."[47] The Hymn Forum, an online bulletin board for topics related to the Hymn program, contains a statement from a poster identifying himself as Will Fisher that characterized this similarly, saying "We don't include any binarys for hymn, the user must specify the path of the windows binarys. I

---

[43] For example, see http://manuals.info.apple.com/en_US/iPod_nano_2nd_Gen_Features_Guide.pdf at p. 36, "You can use iPod nano as an external disk to store data files."

[44] See Farrugia decl. ¶24, Robbin decl. ¶¶61-62, Kelly decl. ¶¶37-38.

[45] See Robbin footnote 6 and exhibit 42. Mr. Farrugia made essentially the same claim with the same evidence in his declaration at ¶21 and exhibit 6.

[46] See http://web.archive.org/web/20050427081409/http://www.winamp.com/plugins/details.php?id=138888, archived April 27, 2005.

[47] See Robbin decl. exhibit 42.

Case 4:05-cv-00037-YGR Document 877-15 Filed 11/04/14 Page 53 of 90
Case 4:05-cv-00037-YGR Document 819-1 Filed 10/10/14 Page 27 of 64

26                                                          Expert Report of David Martin, Ph.D.

hope this will protect me from a lawsuit from apple."[48] The fact that a user could add this plugin to *Winamp*, independently locate and install Hymn, and configure the plugin to rely upon Hymn to attack FairPlay DRM, certainly does not logically imply that *RealPlayer* made "make FairPlay less secure." RealPlayer and Winamp were independent products, and no evidence has been presented to suggest that RealPlayer supported this Winamp plugin.  Nor was any evidence presented that the effect of this particular combination of three separate programs was in any way representative of "third party jukeboxes" generally.

64. In ¶39, Dr. Kelly describes how he proceeded to "analyze the effect of a third-party modifying the internal database."  Dr. Kelly reports that he changed an unspecified lowercase 'm' character somewhere within the iPod database into an uppercase 'M' character, resulting in songs going missing on the iPod.

65. Dr. Kelly testified that this 'm' he found in the iPod database and changed to an 'M' was actually the first 'm' character visible in the database.[49]  To determine which 'm' character this could have been, I consulted the iTunes 4.6.0 source code.  The source code requires that a valid iPod database begin with the letters 'mhbd.'[50]  Therefore, the 'm' character that Dr. Kelly changed was actually the very first character in the iPod database.  Due to the encoding used in the iPod database,[51] the characters 'mhbd' that appear in the database actually correspond to places in the source code where those characters are stated in reversed order, namely, 'dbhm.'  The source code directly associates these characters 'dbhm' with the identifier name "kD<u>DB</u>File<u>H</u>eader<u>M</u>agic" (underlining added).[52]  Thus these characters 'dbhm' appear to be an abbreviation for "<u>d</u>ata<u>b</u>ase <u>h</u>eader <u>m</u>agic".[53]  In other words, the 'm' character in

---

[48] See http://www.hymn-project.org/forums/viewtopic.php?t=88, fetched February 2011.
[49] See Kelly depo. 174:18-175:11.
[50] See iTunes 4.6.0 DulcimerDatabase.c:3823; DulcimerDBFileFormat.h:276,459.
[51] This encoding is implemented in iTunes 4.6.0 DulcimerDatabase.c:410-696.
[52] See iTunes 4.6.0 DulcimerDBFileFormat.h:276.
[53] Subsequent lines of the file suggest further obvious associations: 'dshm' with database section header magic, 'tlhm' with track list header magic, 'tihm' with track info header magic, etc.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

'dbhm' is part of the "magic number" for the database header.  In deposition, Dr. Kelly explained the concept of a magic number:

> Q. And what is a magic number?
>
> A. Well, it has different meanings; but in this context, it is a -- it is something basically that identifies the type of entry that's present in this struct.
>
> Q. And can you predict what the likely effect is of changing a magic number in a file like this one?
>
> A. Well, there are a number of possibilities, and you'd have to know what the change was to be sure. But there are a number of possibilities, and you could certainly predict what some of those possibilities would be.
>
> Q. Can you give me some examples?
>
> A. Sure. The -- the struct would be misinterpreted. It would be interpreted as some other type of struct because the magic number got changed, or it could cause an internal fault. I mean, those are possibilities. And it could cause the program not to be able to understand the contents at all. There are various possibilities.[54]

66. Dr. Kelly's experiment amounted to changing the magic number that identifies the database as a whole, and he then characterized this as "analyz[ing] the effect of a third party modifying the internal database."  But this experiment bears no similarity to a third-party modifying the iPod's database.  If the 'mhbd' characters in the database header are modified, the database is absolutely guaranteed to be destroyed.  These four characters must always be present in the first four characters of any iPod database compatible with iTunes 4.6.0, and thus, putting them in the database is practically the easiest thing for a third-party to do correctly.[55]  This experiment, exhibiting the failure to write these characters correctly, could not possibly be considered representative of the actual behavior of RealPlayer, Winamp, or any other third-party program that was able to transfer songs to iPods.

---

[54] See Kelly depo. 185:1-22.
[55] While Mr. Farrugia notes that official documentation for the iPod was not publicly available (Farrugia decl. ¶24), the WikiPodLinux description of the iTunes database, a third-party reverse engineering effort, also indicates that the first four characters of the iTunes database are always 'mhbd'.  See http://web.archive.org/web/20050206174417/http://ipodlinux.org/ITunesDB from 2005 and http://web.archive.org/web/20071214010257/http://ipodlinux.org/ITunesDB from 2007.

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 55 of 90
Case 4:05-cv-00037-YGR   Document 819-1   Filed 10/14/14   Page 29 of 64

28                                              Expert Report of David Martin, Ph.D.

67. In deposition, Dr. Kelly was shown a copy of DulcimerDBFileFormat.h[56] and asked whether the 'm' character that he changed *could have* come from one of the magic numbers listed there, including 'mhbd', 'mhsd', and so on.  He was not familiar enough with the magic numbers defined in the file to answer:

> Q. Okay. So just to make sure that the record's clear, I'll ask my question again because now I'm a little confused. So is it possible that the M that you changed in the iTunes database from a lowercase M to a capital M came from one of the M characters listed within the 4_character_code constructs on the lines on page 15641?
>
> A. Without a further analysis, I can't say one way or the other.
>
> Q. So it's possible, but you're just not sure?
>
> A. Well, no. It's more than I'm not sure. I mean, I would have to trace through this to determine if it's even possible. I don't know if it's even possible. I would have to trace through the code to see if this ends up in an appropriate place on the iPod. If it does, then I would agree that it's possible. But if it doesn't, then I would have to say it's impossible. And I just don't have enough information, as I sit here, to call it one way or the other.[57]

68. Earlier in the day, when Dr. Kelly was asked what analysis he had conducted to determine whether iPod databases were, in fact, corrupted in the ways he identified as risks in his declaration, among his answers he cited this 'm'-and-'M' experiment and his "detailed understanding of how – how the database is constructed and built based on review of the source code."[58]  But Dr. Kelly's review of the source code must not have covered the code that actually reads or writes an iPod database, for within 20 lines of code after iTunes begins reading an iPod database, the iTunes code rejects the database if its first bytes do not match the 'mhbd' magic number.[59]  Additionally, within 20 lines of creating the iPod database file, the iTunes code deposits the 'mhbd' characters at the very beginning of the file.[60]  It appears that Dr. Kelly did not actually correlate his "experiment to analyze the effect of a third-party modifying the internal database" with his "detailed understanding of how the database is

---

[56] Although Dr. Kelly was shown the iTunes 4.7.0 version of this file rather than the iTunes 4.6.0 version, the block of source code Dr. Kelly was asked to examine is virtually identical in these two versions.
[57] See Kelly depo. 183:20-184:17.
[58] See Kelly depo. 68:22-69:17.
[59] See iTunes 4.6.0 DulcimerDatabase.c:3810-3823.
[60] See iTunes 4.6.0 DulcimerDatabase.c:2289-2306.

constructed and built based on review of the source code." It would be immediately obvious that

modifying any of the first four bytes in the iPod database, including 'm,' would destroy the database

under even a cursory examination of the source code by an expert.

69. Finally, Dr. Kelly states in ¶40 that "To avoid blocking Harmony and at the same time ensuring the

intended operation of the iPod, Apple would have had to share confidential information (including

specifications, design information, and perhaps source code) with RealNetworks prior to updating

products containing FairPlay." As I explained, when the ▮▮▮▮▮▮▮▮▮ is applied as intended, as I

believe it was in the embedded keybag, there is no need to keep the ▮▮▮▮▮▮▮▮▮

Furthermore, Dr. Kelly sets the goal too high when addressing the burden involved "to avoid blocking

Harmony," resulting in supposed "limits to the changes that Apple could make to address hackers and

also limits on new product features since all changes would have to be compatible with Harmony."[61] As

discussed above in ¶¶45-46, instead of "promising to avoid blocking Harmony," Apple could have

provided technical specifications to RealNetworks for the purpose of interoperability without

guaranteeing that the specifications would be set in stone for all time. Then if Apple needed to make

changes to the iPod database or keybag, it could simply tell RealNetworks what was changing so that

they would have an opportunity to update Harmony appropriately and provide continuity in service to

their own customers.

70. By comparison, Apple does not promise that it will never change its iPhone software. Instead, it

gives its app developers advance notice and documentation to help them make required changes once

Apple rolls out the new software. For example, see the iOS 4 Readiness Checklist at

http://developer.apple.com/devcenter/ios/checklist/ (fetched February 10, 2011) and a list of

differences between iOS 3.2 and iOS 4.0 at

---

[61] Mr. Robbin stated this issue similarly; see Robbin decl. ¶¶55-58, ¶65.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 57 of 90
Case 4:05-cv-00037-YGR   Document 819-2   Filed 10/10/14   Page 58 of 64

30                                                    Expert Report of David Martin, Ph.D.

http://developer.apple.com/library/ios/#releasenotes/General/iPhone40APIDiffs/index.html#//apple_ref/doc/uid/TP40009698 (fetched February 10, 2011).

## V.E.   Harmony Update

71. RealNetworks reportedly announced an update to Harmony on or about April 26, 2005, saying that Harmony was now compatible with "all shipping iPods, including iPod Photo."[62]  Apple's internal emails confirm that Harmony did regain compatibility.[63]  This suggests that RealNetworks determined the algorithms introduced by iTunes 4.7, discovered the appropriate ▆▆▆▆▆▆, and updated their software accordingly.

72. As I previously stated, I have seen no evidence that any attacker was ever able to strip FairPlay encryption from songs stored on an iPod with an embedded keybag.  This includes those attackers who may have attempted to reverse engineer an updated version of Harmony from April 2005 containing the ▆▆▆▆▆▆ associated with the embedded keybags.  In an online chat between Apple employees Dave Heller and Augustin Farrugia on July 5, 2005, Mr. Heller stated that the embedded keybag "hasn't been cracked"[64] as of that date.

73. The iTunes 4.7 embedded keybag resisted attack so well because of the appropriate use of ▆▆ ▆▆▆▆ in its design.  It is misleading to suggest that the iTunes embedded keybag would have crumbled before attackers if Apple had given RealNetworks that technical documentation that specified how to add keys to a keybag.

---

[62] See http://news.cnet.com/RealNetworks-rekindles-iPod-tech-tussle/2100-1027_3-5685286.html.
[63] See Apple_AIIA00093862-63, where an Apple employee describes the "Real & iPod current situation": "I just confirmed. It still works. I was able to connect a 5G iPod, buy a song from Real's store, sync it, and play it right on the iPod." (March, 2006)
[64] See Apple_AIIA00798326.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                    31

## V.F.    iTunes 6.0

74. iTunes 6.0 was released in October 2005.[65]  Although iTunes 6.0 introduced a variety of changes

to FairPlay, it does not appear to have interfered with Harmony.[66]

## V.G.    iTunes 7.0.0 and the iPod Database Verification Code

75. In April 2006, leading up to the release of iTunes 7.0.0, Mr. Rod Schultz prepared a proposal for

iPod Database Verification at the direction of Mr. Augustin Farrugia, the Senior Director for DRM

Technologies at Apple.[67]  The proposal is at Apple_AIIA00094564-94569.  It begins:



76. The problem statement above clearly indicates that the modification is intended to prevent third-

party applications like RealPlayer and Winamp ("clients other than iTunes") from directly transferring

songs to an iPod, whether they were encrypted or not. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

---

[65] See Apple_AIIA00106005.

[66] See footnote 63.

[67] See Farrugia depo. 8:8-10.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 59 of 90
Case 4:05-cv-00037-YGR   Document 819-2   Filed 10/10/14   Page 60 of 64

32                                                                Expert Report of David Martin, Ph.D.

According to Mr. Farrugia, this proposal was implemented through iTunes and in new iPods when iTunes 7.0.0 was released in September 2006.[68]

77.   As described below in paragraph 83, Apple later revised its assessment of the activation date of the database verification proposal to 2007.

78.   The database verification code does not make it more difficult for attackers to strip FairPlay encryption from songs.  In particular, as Mr. Farrugia stated in deposition, database verification did not make it any harder to *read* data from the database or the keybag.[69]  ███████████████████

███████████ is to make it harder to *write* onto the database.

79.   In support of its Renewed Motion for Summary Judgment, Apple pointed to the concern that third-party applications might degrade an iPod user's experience.  Specifically, Mr. Farrugia described how third-party software was thought to "corrupt the iPod music database and thus interfere with the user experience," such as "iPods not playing music after using third-party jukeboxes like Winamp" and describes these problems as motivators for the database verification code.[70]  Mr. Robbin warned that Harmony might contain bugs that "could corrupt the iPod, preventing users from playing music or performing other functions on the iPod correctly."[71]  And Dr. Kelly warned, based on the highly questionable conclusions derived from customer complaints above, that "If RealPlayer wrote the internal database incorrectly, the iPod may not have been able to locate some or all songs in its database,"[72] and warned that very small errors, such as changing a single byte, "have the potential to prevent the iPod from functioning as intended and expected"[73] and attempted to illustrate this with his 'm'-and-'M' experiment as I described above.

---

[68] See Farrugia depo. 109:21-110:8; Farrugia decl. ¶29; February 8, 2011 Errata to Declaration of Augustin Farrugia in Support of Defendant's Renewed Motion for Summary Judgment; and Apple_AIIA_00106003.
[69] See Farrugia depo. 174:15-23.
[70] See Farrugia decl. at ¶20 and ¶29.
[71] See Robbin decl. at ¶60 and a similar statement at ¶64.
[72] See Kelly decl. at ¶37.
[73] See Kelly decl. at ¶39.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D. 33

80. However, the *specified purpose* of the database verification code was to transform small errors in the database, such as changing a composer's name from "Bach, J.S." to "bach, J.S.," into very serious errors. The specification reads:



81. In other words, if the database content was not last edited by a program (such as iTunes) that knows the secret database generation key, then "the database or song is invalid and cannot be used or played." In effect, the database verification code transforms small errors that do not meaningfully interfere with the user experience into enormous ones that treat the database as being devoid of all data. A consequence is that a third-party application that does not know the secret database generation key cannot change iPod database entries without destroying the entire database and effectively making all songs on the iPod unplayable. I have verified that the iTunes 7.0.0 source code contains the ability to treat iPod databases in this manner.[75]

82. In deposition, Mr. Farrugia testified that preventing the playback of non-iTunes digital audio files on an iPod was not an intended effect of the FairPlay updates at this time, and that he could not remember whether he suspected or believed that it might have that effect as a consequence.[76] This statement is inconsistent with the clear specification for rejecting non-iTunes databases, made at his own direction.

---

[74] See Apple_AIIA00094565. It follows that a third-party application adding or removing songs from the database would similarly be treated as a very serious error, with the result that the database is invalid and the songs cannot be played.
[75] See, e.g., DulcimerDatabase.c:5216, 3870, 3889, 798, 758.
[76] See Farrugia depo. 120:17-122:1.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 61 of 90
Case 4:05-cv-00037-YGR   Document 819-1   Filed 10/10/14   Page 61 of 64
34                                                              Expert Report of David Martin, Ph.D.

## V.G.1. **Apple's March 2013 Correction to Database Verification Activation Dates**

83.  Counsel for Apple has indicated that a declaration it submitted at summary judgment was incorrect.  A portion of my declaration in support of plaintiffs' opposition to Apple's summary judgment motion relied on that information for activation dates and versions of the database verification protocol.  Counsel for Apple has provided additional information correcting the inaccuracies in that declaration.  None of this new information—the revised activation dates of the keybag verification code and database verification—changes any of the conclusions in my prior declaration, as I describe in paragraph 92.

84.  In his January 2011 declaration, his February 2011 Errata thereof, and his December 2010 deposition, Mr. Farrugia indicated that the database verification protocol was present in new iPods starting with the iPod Nano 2$^{nd}$ generation (N36) and iTunes 7.0 in September 2006.  I understand that counsel for Apple have stated that a further correction is forthcoming that will be consistent with the following:[77]

---

Keybag verification code:

   It was was first enabled in 2nd gen nano (aka N36) introduced in September 2006 by the iPod firmware (Minos iPod SW) and iTunes 7.0.  It was not included on 5th gen classic (aka M25) for songs or videos.
   It was later enabled in 3rd gen nano (aka N46) introduced in September 2007 by the iPod firmware (Imos iPod SW) and iTunes 7.4 and enabled in 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.
   It was never included on any iPod shuffle models.

Database verification code:

   It was first enabled in 3rd gen nano (aka N46) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4 and the 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.
   It was never included on iPod shuffle models.

---

**Figure 4: Apple's Statement of Activation Versions and Dates**

---

[77] Source: April 1, 2013 email from Apple counsel with subject "Timing of updates."

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                          35

## V.G.2. **Database Verification in Apple's March 2013 Code Production**

85.  In order to see if this new information affected any of my original conclusions, I reviewed

additional documents and source code from Apple engineers over a 3-day period in March 2013 at the

Jones Day offices in San Francisco.  Taking this new material into account, I maintain the opinions stated

in my previous declaration.  I have not observed any inconsistencies between the revised activation

dates and versions and the newly produced materials.

86.  The remaining paragraphs in this section detail some of the statements by Apple engineers

concerning the activation version and dates.

87.  The HAVE_IPOD_DATABASE_MAC was changed to 1 according to AIIA_SC_001091-93 in the

source code directory called CL84714.  The changelist entry is identified as being submitted by

"rwormley@projects on 2007/08/18"[78] and further states:

> This source is the source that turned on Candy (database validation) for the N46 (4G Mini) and
> N25 (6G Classic) project.  The code was shipped in the 1.0 release (first release) of software for
> those iPods (i.e. day 1 of sales in September 2007).
>
> …
>
> Risk details: this mod invalidates prior iPod databases; you'll need to resync w/iTunes >=7.4a11

88.  Along with this changelist log entry, Apple produced two other files in the directory named

CL84714.  These two files are in the list of the eight "affected files" associated with the changelist; Apple

did not produce the remaining six files for inspection.  The iTunesToGoPrefix.h file shows the definition

of HAVE_IPOD_DATABASE_MAC as 1 and BUILDING_IPOD as 1.  The other file DulcimerDatabase.c

contains code that reads, writes, and updates the database.

89.  The  document AIIA_SC_001000 associates Imos DulcimerDatabase.c with the explanation "Calls

to the Candy API wrapped by the HAVE_IPOD_DATABASE_MAC macro" and associates Imos

iTunesToGoPrefix.h with the explanation "Definition of the macro HAVE_IPOD_DATABASE_MAC to 1

when building the firmware."

---

[78] According to Apple_AIIA00256090, rwormley is Brett Wormley.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

90. These documents and source code indicate that the keybag verification code was first enabled in the iPod model N36 introduced in September 2006 by the iPod firmware (Minos iPod SW) and iTunes 7.0.  It was later enabled in 3rd gen nano (aka N46) introduced in September 2007 by the iPod firmware (Imos iPod SW) and iTunes 7.4 and enabled in 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.

91.  These documents and source code also indicate that the database verification code was first enabled in 3rd gen nano (aka N46) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4 and the 6th gen classic (aka N25) introduced in September 2007 by the firmware (Imos iPod SW) and iTunes 7.4.

92. This information does not contradict the conclusions I stated in my prior declaration, because:

    a.    Apple has not changed its assessment of the activation dates and versions of the keybag verification protocol; it just added more detail.

    b.    I did not offer or reach an independent conclusion regarding the activation date or version of the database verification protocol; I instead relied on Mr. Farrugia's testimony regarding this as I stated above in paragraph 76.

93. Despite the difference in dates now provided by Apple, the Harmony user experience going back to 2006 would be the same as I previously described it: namely, the keybag verification protocol "had the effect of preventing the injection of foreign material, including DRM keys, into the keybag."  As a result, Harmony would not have been able to add DRM-protected songs to the iPod without causing the keybag to be considered invalid.  An invalid keybag would have made all FairPlay-encrypted songs unplayable, even those that weren't add by Harmony.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

## V.G.3. **Consequences of a Database That Does Not Verify**

94. In order to determine how iTunes and iPods would behave when a database failed to verify (as would be expected when a user tried to use a third-party program to manage the iPod), I reviewed Apple source code and documents and conducted experiments with various iPods, including the N46 iPod nano (3$^{rd}$ generation) and N25 iPod Classic (6$^{th}$ generation).  My conclusion is that Apple designed the system to detect whether the database verifies or not, but when it detected a failure, to be vague about the nature of the problem and offer the user no recovery option other than erasing the entire device.

95. For example, in AIIA_SC_001001 dated July 8 2007, Brett Wormley states that "DB load time should be negligible since the plan of record now is to hash the entire header/index, using master mode SHA1. […]  Error screen is not recommended, since this reveals the specifics of failure.  The preferred response is for user to resync with iTunes for unknown reason -- should never happen for a non-hacker user."  In Apple_AIIA00304445, Brett Wormley also states "A reminder: if you update/restore to changelist 84174 or later, your older iPod database will seem to be empty."

96. My review of the source code and my experiments concerning iPods with databases that fail to verify are consistent with a database that seems to be empty, with the lack of a descriptive error screen on the iPod, and with the requirement for user to resync "for unknown reason."  iPods with databases that fail to verify simply report "No Music."[79]  The iTunes 7.4.0 source code explains this situation using the error message "iTunes cannot read the contents of the iPod "*[iPod name]*".  Go to the Summary tab

---

[79] To make an iPod database fail to verify, I started from a iTunesDB created by iTunes (i.e., one with a database that does verify correctly) and then transposed two unequal bytes within the file's fileMAC field.  The result is a database that fails to verify but otherwise has identical content.  Alternatively, I also induced verification failure by changing a song's title within iTunesDB without updating the corresponding fileMAC, as a third-party application without the database verification protocol might do.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 65 of 90
Case 4:05-cv-00037-YGR   Document 819-2   Filed 10/01/14   Page 65 of 64

38                                                              Expert Report of David Martin, Ph.D.

in iPod preferences and click Restore to restore this iPod to factory settings."[80]  For example, the

following screenshot shows iTunes 7.4.0.28 responding to an iPod with a database that fails to verify:



97. The user is not told the reason that the error message appears and iTunes offers no option to the

user other than to restore, which "erases the iPod's disk and restores iPod to its original factory

condition."[81]  A user who restores the iPod would therefore lose all content on the iPod, including all

music content purchased or obtained from third parties.


## V.H.   iTunes 7.0.0 and the iPod Keybag Verification Code

98. On November 18, 2005, Mr. Robbin told Mr. Farrugia that he wanted to "lock down the keybag"

so that if "[iTunes] 6.0.2 touches the keybag, the iPod will only recognize it if it comes from us."[82]  iTunes

7.0.0 also contains keybag verification code that is similar in concept to the database verification code.

In ¶32 of his declaration, Mr. Farrugia stated that this change "had the effect of preventing the injection

of foreign material, including DRM keys, into the keybag."  In other words, the change made it harder for

programs other than iTunes to add entries to the keybag.

99. My analysis of the iTunes 7.0.0 and relevant FairPlay source code indicates that the effect of the

keybag verification code was to ensure that a change anywhere within the keybag would be easily

detectable by iTunes and the iPod, unless it is done by a party (such as iTunes) that knows the secret

"integrity key" associated with the iPod.  When reading an iPod keybag, the iTunes 7.0.0 code will reject

---

[80] See DulcimerDatabase.cpp:6911, DulcimerHandler.cpp:15183,15200, and iPodStrings.h:31.
[81] See http://support.apple.com/kb/HT1339, fetched March 2013.
[82] See Apple_AIIA00798303.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

it and consider it devoid of contents if the keybag verification code indicates it has been changed by a party that did not possess the integrity key.[83]  An iPod cannot play a FairPlay-encrypted song if it cannot locate a matching key in its keybag.

100.  The keybag verification code appears to have little or no relationship to security measures that resist attempts to strip FairPlay encryption from songs. The only apparent function of the keybag verification code is to prevent content from being placed on an iPod.

101.  In order to determine how iPods would behave when a keybag failed to verify (as would be expected when user tried to use a third-party program to manage FairPlay-protected songs on the iPod), I reviewed Apple source code and documents and conducted experiments with the N36 iPod nano (2nd generation).  As expected, an N36 with a keybag that failed to verify made all of its FairPlay-protected songs unable to play.[84]  Although the affected songs were still visible through the iPod user interface, they stopped playing immediately after attempting to play them, and the iPod tried to play the next song in the playlist.

## VI.    Database and Keybag Verification Make iPod Failure and Customer Service Calls More Likely

102.  Enabling the database and keybag verification protocols didn't make the affected iPods able to play any music they couldn't play before, nor did it make them any faster, smaller, lighter, more brightly colored, nor cheaper to manufacture, nor faster to synchronize, nor able to store more songs, nor easier for a user to manage.  The only "feature" added is that of increased incompatibility.  The affected iPods became *more likely to fail* than before.  This is not hard to see: when verification was turned on, the

---

[83] See, *e.g.,* AuthorizationDB.c:828, 836, from iTunes 7.0.0 and FairPlayPublic.c:358, KeybagAccounts.c:1342, Safe.c:334, 344 from FairPlay-3_2-024.
[84] To create a keybag that failed to verify but was otherwise intact, I started from an N36 IC-Info.sidb keybag produced by iTunes and transposed two unequal bytes of its "integrity value" field as described in FairPlay-3_2-024 Safe.c:340.  The result was a keybag that failed to verify.

essential change was that iPods got a new reason to refuse to play songs – namely, when the database or keybag doesn't verify.

103. Furthermore, the database verification protocol didn't simply make the iPod just *somewhat* more likely to fail to play songs.  Apple's design documents and source code show that the point is to *ensure*, to the greatest possible extent, that if a third-party application changed even the smallest portion of the database that can affect the songs that an iPod could play,[85] then *all* of the songs would be unplayable.  The entire collection of songs would be treated as the appropriate collateral damage for a user who let a third-party application manage their iPod. Similarly, an iPod keybag that fails to verify renders all of the keys within it useless, and none of the DRM-protected songs will play.

104. I would expect that breaking the capability of the iPod to interact with third-party software and adding new ways to corrupt the iPod database would cause increased service calls from customers compared to the previous situation where the iPod was permitted to interact with third-party software.

105. Additionally, by programming in a lack of a descriptive error screen on iPods that had the database verification enabled, and with the requirement for user to resync "for unknown reason," when third-party music or content was detected, Apple further increased the likelihood that iPod users would call Apple to complain about their user experience.

106. The source code evidence and documents from Apple engineers previously cited indicate that N25s and N46s could have been built with database verification disabled.  One approach would have been to ███████████████████████████ In addition, Chris Wysocki indicates another technique for building N25s and N46s without database verification: "It would be interesting to disable database integrity on N25 ██████████████████████████…"[86]

---

[85] This follows from the security properties of the message authentication code (MAC) that Apple used.
[86] See Apple_AIIA00294222.

# VII.   Possible Alternatives to Detecting and Blocking Third-Party Software Using Database and Keybag Verification Code

107. The database verification code and keybag verification code in iTunes 7.0.0 interrupted access to songs when third-party application changes to the iPod database or iPod keybag were detected. Apple points to possible bugs in third-party applications as a justification for taking these steps, as I described in ¶79 above.

108. Another possibility would have been for Apple to code for robustness rather than rapid failure due to the detection of third-party software.  Whenever designing software, it is a good practice to anticipate errors and to respond gracefully if possible.  For example, Web browsers such as Apple Safari, Microsoft Internet Explorer, Google Chrome, and Firefox compete with each other in part through their ability to usefully display imperfectly specified web pages.

109. In fact, the iTunes code already shows this sort of robustness in some of its behavior.  For example, the function SetDulcimerName in iTunes 4.7.0 includes special code when setting the name of an iPod: if the operating system reports that the desired name is too long, then the function repeatedly tries to use shorter names.  The explanation given in the source code is that Japanese names are particularly likely to cause this behavior.[87]

110. Further examples of Apple's software accommodating problems between programs can be seen in its source code.[88]

111. In addition, an effective way to help minimize incompatibilities or bugs in third-party applications is to publish technical documents that accurately reflect the requirements for interoperability.

---

[87] See iTunes 4.7.0 DulcimerUtilities.c:1448-1512.
[88] See, e.g., N36 iTunesDataEngine.c:5000, iTunesDataEngine.c:5757, iTunesDataEngine.c:6076, CodeDrops/DulcimerDatabase.c:303, CodeDrops/DulcimerDatabase.c:1501, IapIncomingProcess.cpp:621-647, and iTunes 7.4.0/iTunes/iPod/DulcimerDatabase.cpp:709.

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 69 of 90
Case4:05-cv-00037-YGR   Document819-2   Filed10/04/14   Page69 of 84

42                                                          Expert Report of David Martin, Ph.D.

## VIII.   Summary of Main Opinions

112.  In this section I summarize my main opinions, which are described in detail above.

1)  RealPlayer Harmony allowed FairPlay-encrypted songs to be transferred to and played on iPods during the period corresponding to iTunes 4.6.

2)  RealPlayer Harmony did not strip FairPlay encryption from songs sold through the iTunes Store.

3)  The initial release of RealPlayer Harmony was incompatible with the iTunes 4.7 embedded keybag for the iPod.

4)  Songs stored on an iPod and encrypted using the embedded keybag method, including those sold through the iTunes Store, could not be decrypted for playback or stripped of FairPlay encryption without using the iPod's ███████████

5)   RealPlayer Harmony did not need to use any of the iPod's ███████ ███ in order to add FairPlay-encrypted songs to an iPod using the embedded keybag method.

6)  Technical documentation could have been provided to RealNetworks that would have enabled RealPlayer Harmony to achieve compatibility with embedded keybag iPods, but which would not have meaningfully assisted an attacker who sought to strip FairPlay encryption from iTunes songs stored using the embedded keybag method.

7)  Assuming that an updated version of Harmony would then have been constructed on the basis of this technical documentation with functionality comparable to the original release of Harmony, the updated version of Harmony would not have meaningfully assisted an attacker who sought to strip FairPlay encryption from iTunes songs stored using the embedded keybag method.

8)  The customer incident reports cited in the declarations of Dr. Kelly, Mr. Farrugia, and Mr. Robbin do not justify a conclusion that there was a "significant risk to the proper functioning of the iPod" due to Harmony and other third-party applications.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

9) The 'm'-and-'M' experiment described in Dr. Kelly's declaration is highly misleading, cannot possibly be considered representative behavior of third-party programs that transferred songs to iPods, and adds no support to the claim that there was a "significant risk to the proper functioning of the iPod" due to Harmony and other third-party applications.

10) The other primary suggested cause of the alleged risk to the proper operation of the iPod described in the Apple declarations, namely, that RealNetworks and other third parties did not possess official technical documentation for the iPod database and keybag, was an immediate consequence of Apple not releasing this very same official technical documentation.

11) The purpose and effect of the iPod Database Verification Code of iTunes 7.0.0 is to prevent third-party applications from transferring songs to or otherwise managing content on iPods.

12) When the database verification protocol rejects a database on an iPod, the iPod appears to have no playable content, but does not otherwise communicate to the iPod user that anything is wrong.

13) When the database verification protocol rejects a database in iTunes, then iTunes treats the iPod as corrupt and prompts the user to restore the iPod to factory settings, which if done, would erase all of the iPod's contents, including music from third-party sources.

14) The purpose and effect of the iPod Keybag Verification Code of iTunes 7.0.0 is to prevent third-party applications from transferring songs to iPods.

15) The database verification protocol and the keybag verification protocol did not make it more difficult for third-party software to read iPod contents.

16) The database and keybag verification protocols increase the chances that an iPod will fail to play songs, and consequently, the verification protocols can be expected to increase customer service calls.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

## IX.    Additional Topics

113. I reserve the right to supplement or amend this report as necessary or appropriate to take into account additional information obtained through discovery or otherwise.  Furthermore, in support of the discussion and the opinions given above, I would expect at trial to rely upon demonstratives or exhibits that may consist of copies of the documents referenced or portions thereof (or of documents cited or relied upon by other experts in this case), and may also rely upon charts, graphics, animations or slides designed to summarize or illustrate the background of the technology and the basis for my opinions.

114. If called as a witness, I would testify as to the statements and opinions contained in this report. I may demonstrate some of the relevant functionality at trial. I may also create or assist in the creation of certain demonstrative exhibits that rely on analogies between the products at issue in this case and other consumer products.  I may also rely upon graphics or an animation in presenting a tutorial to the jury.  Finally, I expect that certain documents used as exhibits may be enlarged, highlighted or otherwise emphasized for use as exhibits during trial.  I have not yet selected or created the particular exhibits that might be used.

## X.    Documents Relied upon and Considered

In some cases below I have cited only the Bates number of the first page of a multipage document, intending it to be understood as encompassing the entire document.

**Documents relied upon in preparing this declaration:**

1. All documents, depositions, declarations, exhibits, and web pages specifically cited above

2. Depositions and exhibits thereto of Jeffrey Robbin, Augustin Farrugia, Dave Heller, John Kelly

3. Declarations and exhibits thereto of Jeffrey Robbin, Augustin Farrugia, John Kelly

4. 2010-12-20 Defendant Apple Inc.'s Objections and Answers to Plaintiffs' Third Set of Interrogatories, subsequently corrected by counsel for Apple (FairPlay version "3_2-023" was corrected to "3_2-024")

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                                45

5. Source code provided on Apple's source code computer on December 20, 2010; January 27-28, 2011, February 3, 2011, and March 20-22 at the Jones Day offices in San Francisco

6. Source code produced by Apple in this case

7. iTunes 4.6, 4.7 (executable program)

8. RealPlayer 10.5 (executable program)

9. http://support.apple.com/kb/HT1378 "iPod iconology or what does this picture on my iPod mean?"

10. http://support.apple.com/kb/TS1405 "iPod displays a folder icon with an exclamation point"

11. http://support.apple.com/kb/HT1353 "Identifying iPod models"

12. Apple_AIIA_B_000001 FairPlay Next Generation

13. iTunes and iPod firmware versions produced by Apple in March-April 2013

**Documents considered in preparing this declaration:**

1. All documents relied upon and listed above

2. iTunes 6.4, 7.0, 7.4, 7.5, 7.7, 8.2, 10.1 (executable program)

3. RealOne Player v2, RealPlayer 11 (executable program)

4. All documents marked Restricted Source Code

5. Amended Consolidated Complaint for Violations of Sherman Antitrust Act, Clayton Act, Cartwright Act, California Unfair Competition Law, Consumers Legal Remedies Act, and California Common Law of Monopolization

6. Apple's Motion to Dismiss or, Alternatively, for Summary Judgment; Declaration of Michael Scott in Support of Apple's Motion to Dismiss or, Alternatively, for Summary Judgment; and Declaration of Jeffrey Robbin in Support of Apple's Motion to Dismiss or, Alternatively, for Summary Judgment

7. Apple's Motion for Summary Judgment; Declaration of David C. Kiernan in Support of Apple's Renewed Motion for Summary Judgment; Declaration of Augustin Farrugia in Support of Defendant's Renewed Motion for Summary Judgment; Declaration of Dr. John P. J. Kelly in Support of Defendant's Renewed Motion for Summary Judgment; and Declaration of Jeffrey Robbin in Support of Defendant's Renewed Motion for Summary Judgment

8. http://www.ilounge.com/index.php/news/comments/apple-disables-realnetworks-music-on-ipod-photo/

9. http://www.ilounge.com/index.php/news/comments/realnetworks-restores-ipod-compatibility/

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Case 4:05-cv-00037-YGR   Document 877-15   Filed 11/04/14   Page 73 of 90
Case 4:05-cv-00037-YGR   Document 819-1   Filed 10/04/14   Page 40 of 64
46                                                    Expert Report of David Martin, Ph.D.

10. http://hymn-project.org/forums/viewtopic.php?p=5952 "Real Networks apparently knew the mystery of the iPod's iEKInfo file"

11. http://news.cnet.com/RealNetworks-rekindles-iPod-tech-tussle/2100-1027_3-5685286.html

12. http://mlipod.sourceforge.net/index.php?page=home&show=all

13. http://en.wikipedia.org/wiki/Magic_number_%28programming%29

14. Alfred Menezes, Paul van Oorschot, and Scott Vanstone, *Handbook of Applied Cryptography,* CRC Press 1997.

15. Bates-numbered documents:

Apple_AIIA00088845 iTunes Software updates list
Apple_AIIA00090405
Apple_AIIA00090426
Apple_AIIA00090427
Apple_AIIA00090428
Apple_AIIA00090453
Apple_AIIA00090498
Apple_AIIA00090527
Apple_AIIA00090666
Apple_AIIA00090769
Apple_AIIA00090771
Apple_AIIA00090937
Apple_AIIA00090960-62
Apple_AIIA00091693
Apple_AIIA00091720
Apple_AIIA00091748
Apple_AIIA00091765
Apple_AIIA00091784
Apple_AIIA00091785-86
Apple_AIIA00091825
Apple_AIIA00091906
Apple_AIIA00091967
Apple_AIIA00091978
Apple_AIIA00092237-38
Apple_AIIA00092282
Apple_AIIA00092282-83
Apple_AIIA00092311-12
Apple_AIIA00092315-16
Apple_AIIA00092317-19
Apple_AIIA00092338-40
Apple_AIIA00092345-87
Apple_AIIA00092389-90
Apple_AIIA00092393-94
Apple_AIIA00092413-14

Expert Report of David Martin, Ph.D.                                                    47

Apple_AIIA00092431
Apple_AIIA00092453
Apple_AIIA00092595-96
Apple_AIIA00092599
Apple_AIIA00092673
Apple_AIIA00092698
Apple_AIIA00092909
Apple_AIIA00092914
Apple_AIIA00093265
Apple_AIIA00093316-19
Apple_AIIA00093441
Apple_AIIA00093560-66
Apple_AIIA00093567-78
Apple_AIIA00093579-87
Apple_AIIA00093711
Apple_AIIA00093729-35
Apple_AIIA00093860
Apple_AIIA00093862-63
Apple_AIIA00093869-70
Apple_AIIA00093877
Apple_AIIA00094064
Apple_AIIA00094118-20
Apple_AIIA00094498
Apple_AIIA00094532-600
Apple_AIIA00094564
Apple_AIIA00094564
Apple_AIIA00094571
Apple_AIIA00094571 DRM Detail 2002 v1.0
Apple_AIIA00094578 DRM Overview 2002 v.04
Apple_AIIA00094585
Apple_AIIA00094872
Apple_AIIA00097104
Apple_AIIA00097106
Apple_AIIA00097107
Apple_AIIA00097110
Apple_AIIA00097121
Apple_AIIA00097211
Apple_AIIA00097222
Apple_AIIA00098387
Apple_AIIA00098417
Apple_AIIA00098435
Apple_AIIA00098491
Apple_AIIA00098510
Apple_AIIA00098524
Apple_AIIA00098568
Apple_AIIA00098796
Apple_AIIA00099034
Apple_AIIA00099169

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Apple_AIIA00099178
Apple_AIIA00099192
Apple_AIIA00099814
Apple_AIIA00103972
Apple_AIIA00106003
Apple_AIIA00116631 DRM Overview 2005 v.04 redlined
Apple_AIIA00116646 DRM Overview 2005 v.2
Apple_AIIA00116673
Apple_AIIA00116674
Apple_AIIA00116729 DRM Overview 2005 v.3 redlined
Apple_AIIA00293651
Apple_AIIA00294038
Apple_AIIA00330735
Apple_AIIA00797459
Apple_AIIA00797486
Apple_AIIA00797631
Apple_AIIA00797862
Apple_AIIA00797947
Apple_AIIA00798303
Apple_AIIA00798326
Apple_AIIA00816907
Apple_AIIA00974463
Apple_AIIA01288177 FairPlay Public Key Infrastructure Version 1.0
Apple_AIIA01288181
Apple_AIIA01288272 iPod Database Signing Verification API
Apple_AIIA01288280 eApp DRM Testing Workflow
Apple_AIIA01288284 FairPlay Extension M53
Apple_AIIA01288294 FairPlay White Paper 2.1
Apple_AIIA01288309 Rod Schultz FairPlay Overview
Apple_AIIA01288312 FairPlay Security Access Protocol
Apple_AIIA01288475 Key Rotation
Apple_AIIA01288511 Use of Smart Cards with Apple FairPlay
Apple_AIIA01288540 iPod Database Verification 4.2006 version
Apple_AIIA01288580 FairPlay 3.2 presentation
Apple_AIIA01288692
Apple_AIIA01288702
Apple_AIIA01288713
Apple_AIIA01288715
Apple_AIIA01288723
Apple_AIIA01288739
Apple_AIIA01288815
Apple_AIIA01288852
Apple_AIIA01288886
Apple_AIIA01288887
Apple_AIIA01288897
Apple_AIIA01288913
Apple_AIIA01288922
Apple_AIIA01289072

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                49

Apple_AIIA01289079
Apple_AIIA01289081
Apple_AIIA01289092
Apple_AIIA01289122
Apple_AIIA01289143
Apple_AIIA01289146
Apple_AIIA01289161
Apple_AIIA01289333
Apple_AIIA01289341
Apple_AIIA01289367
Apple_AIIA01289397
Apple_AIIA01289403
Apple_AIIA01289404
Apple_AIIA01289465
Apple_AIIA01289527
Apple_AIIA01289529
Apple_AIIA01289549
Apple_AIIA01349812
Apple_AIIA01371986
Apple_AIIA01372011
Apple_AIIA_B-000001
Apple_AIIA_B_001706-54
Apple_AIIA_B_001755-57
Apple_AIIA_B_001758-63

Apple_AIIA00019916
Apple_AIIA00042247
Apple_AIIA00042401
Apple_AIIA00042418
Apple_AIIA00042838
Apple_AIIA00042905
Apple_AIIA00049006
Apple_AIIA00049400
Apple_AIIA00057978
Apple_AIIA00062113
Apple_AIIA00089936
Apple_AIIA00089937
Apple_AIIA00089938
Apple_AIIA00089939
Apple_AIIA00090334
Apple_AIIA00090350
Apple_AIIA00090472
Apple_AIIA00092158
Apple_AIIA00092454
Apple_AIIA00093711
Apple_AIIA00093729
Apple_AIIA00093858
Apple_AIIA00093859

Apple_AIIA00093895
Apple_AIIA00094086
Apple_AIIA00095142
Apple_AIIA00095169
Apple_AIIA00095170
Apple_AIIA00096956
Apple_AIIA00097184
Apple_AIIA00097185
Apple_AIIA00097188
Apple_AIIA00097194
Apple_AIIA00099084
Apple_AIIA00101375
Apple_AIIA00102445
Apple_AIIA00102487
Apple_AIIA00105655
Apple_AIIA00105931
Apple_AIIA00105959
Apple_AIIA00106003
Apple_AIIA00106024
Apple_AIIA00113574
Apple_AIIA00115922
Apple_AIIA00116092
Apple_AIIA00116382
Apple_AIIA00116422
Apple_AIIA00122467
Apple_AIIA00142141
Apple_AIIA00164871
Apple_AIIA00165562
Apple_AIIA00165759
Apple_AIIA00182671
Apple_AIIA00185670
Apple_AIIA00187610
Apple_AIIA00187793
Apple_AIIA00230354
Apple_AIIA00231292
Apple_AIIA00231314
Apple_AIIA00231314
Apple_AIIA00231322
Apple_AIIA00231333
Apple_AIIA00231465
Apple_AIIA00232273
Apple_AIIA00233512
Apple_AIIA00234674
Apple_AIIA00256090
Apple_AIIA00256090
Apple_AIIA00256113
Apple_AIIA00256119
Apple_AIIA00256728

Apple_AIIA00289151
Apple_AIIA00289375
Apple_AIIA00289709
Apple_AIIA00290330
Apple_AIIA00290330
Apple_AIIA00290624
Apple_AIIA00291320
Apple_AIIA00291509
Apple_AIIA00291806
Apple_AIIA00292063
Apple_AIIA00292063
Apple_AIIA00292784
Apple_AIIA00293801
Apple_AIIA00293999
Apple_AIIA00294002
Apple_AIIA00294055
Apple_AIIA00294056
Apple_AIIA00294222
Apple_AIIA00294222
Apple_AIIA00294880
Apple_AIIA00294880
Apple_AIIA00294909
Apple_AIIA00294911
Apple_AIIA00294914
Apple_AIIA00294970
Apple_AIIA00294970
Apple_AIIA00294978
Apple_AIIA00294979
Apple_AIIA00294985
Apple_AIIA00295538
Apple_AIIA00295668
Apple_AIIA00296193
Apple_AIIA00296202
Apple_AIIA00297255
Apple_AIIA00297255
Apple_AIIA00300193
Apple_AIIA00300195
Apple_AIIA00300199
Apple_AIIA00300204
Apple_AIIA00302118
Apple_AIIA00302239
Apple_AIIA00303635
Apple_AIIA00303635
Apple_AIIA00303708
Apple_AIIA00303708
Apple_AIIA00303709
Apple_AIIA00303710
Apple_AIIA00303712

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.

Apple_AIIA00303714
Apple_AIIA00303720
Apple_AIIA00303723
Apple_AIIA00303726
Apple_AIIA00303729
Apple_AIIA00303733
Apple_AIIA00304033
Apple_AIIA00304038
Apple_AIIA00304054
Apple_AIIA00304351
Apple_AIIA00304366
Apple_AIIA00304444
Apple_AIIA00305359
Apple_AIIA00305360
Apple_AIIA00305362
Apple_AIIA00305363
Apple_AIIA00305364
Apple_AIIA00305373
Apple_AIIA00305374
Apple_AIIA00305375
Apple_AIIA00305377
Apple_AIIA00305379
Apple_AIIA00305384
Apple_AIIA00305393
Apple_AIIA00305434
Apple_AIIA00305438
Apple_AIIA00305440
Apple_AIIA00305511
Apple_AIIA00305545
Apple_AIIA00305561
Apple_AIIA00305562
Apple_AIIA00305564
Apple_AIIA00305566
Apple_AIIA00305568
Apple_AIIA00305570
Apple_AIIA00305573
Apple_AIIA00305577
Apple_AIIA00305579
Apple_AIIA00305586
Apple_AIIA00305587
Apple_AIIA00306827
Apple_AIIA00306957
Apple_AIIA00307078
Apple_AIIA00307205
Apple_AIIA00307342
Apple_AIIA00307482
Apple_AIIA00307928
Apple_AIIA00307929

Apple_AIIA00307942
Apple_AIIA00307943
Apple_AIIA00307944
Apple_AIIA00307946
Apple_AIIA00307948
Apple_AIIA00307950
Apple_AIIA00307960
Apple_AIIA00307963
Apple_AIIA00307966
Apple_AIIA00307969
Apple_AIIA00307972
Apple_AIIA00307975
Apple_AIIA00307979
Apple_AIIA00307983
Apple_AIIA00308174
Apple_AIIA00308901
Apple_AIIA00308904
Apple_AIIA00308907
Apple_AIIA00308914
Apple_AIIA00308918
Apple_AIIA00308923
Apple_AIIA00308929
Apple_AIIA00308935
Apple_AIIA00308942
Apple_AIIA00308949
Apple_AIIA00308956
Apple_AIIA00308978
Apple_AIIA00308980
Apple_AIIA00308988
Apple_AIIA00308989
Apple_AIIA00309174
Apple_AIIA00309175
Apple_AIIA00318740
Apple_AIIA00322727
Apple_AIIA00325894
Apple_AIIA00330298
Apple_AIIA00797947
Apple_AIIA00798033
Apple_AIIA00798119
Apple_AIIA00798119
Apple_AIIA00798211
Apple_AIIA00798211
Apple_AIIA00799628
Apple_AIIA00799672
Apple_AIIA00801467
Apple_AIIA00801597
Apple_AIIA00801753
Apple_AIIA00801909

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Apple_AIIA00803347
Apple_AIIA00803378
Apple_AIIA00803472
Apple_AIIA00803474
Apple_AIIA00803476
Apple_AIIA00803719
Apple_AIIA00803855
Apple_AIIA00804003
Apple_AIIA00804170
Apple_AIIA00804326
Apple_AIIA00804496
Apple_AIIA00807085
Apple_AIIA00812423
Apple_AIIA00816952
Apple_AIIA00817263
Apple_AIIA00817408
Apple_AIIA00924813
Apple_AIIA00924823
Apple_AIIA00924825
Apple_AIIA00925323
Apple_AIIA00928375
Apple_AIIA00928486
Apple_AIIA00928878
Apple_AIIA00940807
Apple_AIIA00942002
Apple_AIIA00960350
Apple_AIIA00974519
Apple_AIIA00974838
Apple_AIIA00974904
Apple_AIIA00976211
Apple_AIIA00983892
Apple_AIIA01025117
Apple_AIIA01026210
Apple_AIIA01026473
Apple_AIIA01026480
Apple_AIIA01026485
Apple_AIIA01026488
Apple_AIIA01026495
Apple_AIIA01026503
Apple_AIIA01026512
Apple_AIIA01026521
Apple_AIIA01026526
Apple_AIIA01026531
Apple_AIIA01026536
Apple_AIIA01026542
Apple_AIIA01026548
Apple_AIIA01044664
Apple_AIIA01044830

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

Expert Report of David Martin, Ph.D.                                                      55

Apple_AIIA01055551
Apple_AIIA01056176
Apple_AIIA01071045
Apple_AIIA01071222
Apple_AIIA01072060
Apple_AIIA01072123
Apple_AIIA01072452
Apple_AIIA01115498
Apple_AIIA01203889
Apple_AIIA01205270
Apple_AIIA01209939
Apple_AIIA01213489
Apple_AIIA01230360
Apple_AIIA01232836
Apple_AIIA01234400
Apple_AIIA01234663
Apple_AIIA01234670
Apple_AIIA01234675
Apple_AIIA01234678
Apple_AIIA01234685
Apple_AIIA01234693
Apple_AIIA01234702
Apple_AIIA01234711
Apple_AIIA01234716
Apple_AIIA01234721
Apple_AIIA01234726
Apple_AIIA01234732
Apple_AIIA01234738
Apple_AIIA01245226
Apple_AIIA01288873
Apple_AIIA01288977
Apple_AIIA01289350
Apple_AIIA01289351
Apple_AIIA01333263
Apple_AIIA01333268
Apple_AIIA01333274
Apple_AIIA01333622
Apple_AIIA01349710
Apple_AIIA01373607
Apple_AIIA01373827
Apple_AIIA01373945
Apple_AIIA01373953
Apple_AIIA01375042
Apple_AIIA01375094
Apple_AIIA01376058
Apple_AIIA01376059
Apple_AIIA01376060
Apple_AIIA01377907

Case 4:05-cv-00037-YGR   Document 875-12   Filed 11/04/14   Page 83 of 84

56                                                    Expert Report of David Martin, Ph.D.

    Apple_AIIA01377909
    Apple_AIIA01377918
    Apple_AIIA01378991
    Apple_AIIA01379134
    Apple_AIIA01385473
    Apple_AIIA_C_00000411
    Apple_AIIA_C_00003450

## XI.   Signature

Signed April 8, 2013 in Des Plaines, Illinois

_____

David M. Martin Jr., Ph.D.

*Attorneys' Eyes Only Confidential Information Subject to Protective Order*

# APPENDIX A

**David Martin, Ph.D.**
1153 Lee St. #251
Des Plaines, IL   60016-6516
224 633 9802 voice
dmartin@acm.org

April 8, 2013

# CURRICULUM VITAE

---

## A. SUMMARY

I have been working in the computer software field for over 30 years, in the roles of developer, designer, professor, and expert consultant.  I hold a Ph.D. in computer science and a B.S. in mathematics and computer science.

## B. EDUCATION AND ACADEMIC QUALIFICATIONS

### 1. Education

| | | |
|---|---|---|
| 1999 | Ph.D. | Department of Computer Science, Boston University |
| 1993 | B.S. | Iowa State University, awarded "with distinction" |
| | | Major: Mathematics |
| | | Major: Computer Science |
| | | Minor: German |

### 2. Academic Experience

| | |
|---|---|
| 2002-2007 | Assistant Professor |
| | Department of Computer Science |
| | University of Massachusetts Lowell |
| | (On leave of absence during 2005-2006) |
| 2001-2002 | Research Assistant Professor |
| | Department of Computer Science |
| | Boston University |
| 1998-2001 | Assistant Professor |
| | Department of Mathematics and Computer Science |
| | University of Denver |

### 3. Teaching

Introduction to Object Oriented Programming (C++), Foundations of (Theoretical) Computer Science, Computer Security I: Principles of Cryptography and Network Security, Computer Security II: Applied Computer Security, Unix Software Tools, Computer Networking, Introduction to Computer Science I (C++), Introduction to Computer Science II (C++), Special Topics in Systems: Computer Security, Advanced Unix Programming, Formal Languages and Automata, Introduction to Computer Science (C)

David Martin                                                                                    2

## C. PROFESSIONAL ACTIVITIES

### 1. Testifying expert experience

| | |
|---|---|
| 2011 | Global Sessions LP v. Travelocity et al. (report) |
| 2010 | The Apple iPod iTunes Anti-trust Litigation (report, deposition) |
| 2009 | University of California and Eolas Technologies Inc. v. Adobe Systems Inc. et al. (report, trial, deposition) |
| 2008 | Northeastern University and Jarg Corporation v. Google, Inc. (report, deposition) |
| 2007 | i4i Limited Partnership v. Microsoft Corporation (report, trial, deposition) |
| 2006 | Computer Acceleration Corporation v. Microsoft Corporation (report, trial, deposition) |
| 2006 | Comes et al. (Iowa consumer class) v. Microsoft Corporation (report, deposition) |
| 2003 | Gordon et al. (Minnesota Consumer Class) v. Microsoft Corporation (report, deposition) |
| 2004 | Lingo et al. (California Consumer Class) v. Microsoft Corporation (report, deposition) |
| 2000 | Rich Media v. LaGarde (hearing) |

### 2. Consulting expert experience

| | |
|---|---|
| 2013 | Lodsys Group, LLC |
| 2013 | Unwired Planet, LLC |
| 2012 | VirnetX, Inc. |
| 2012 | Droplets, Inc. v. E*TRADE Fin. Corp. et al., Droplets, Inc. v. Amazon.com, Inc. et al., and Droplets, Inc. v. eBay, Inc. et al. |
| 2011 | Robocast Inc. v. Microsoft and Robocast Inc. v. Apple |
| 2010 | In the Matter of Certain Authentication Systems, Including Software and Handheld Electronic Devices, Investigation No. 337-TA-697, on behalf of Research in Motion, Ltd. |
| 2010 | TiVo, Inc. v. EchoStar et al. |
| 2009 | Prism Technologies LLC v. Research in Motion, Ltd. and Microsoft Corporation |

David Martin                                                                                                3

| 2009 | Bedrock Computer Technologies, LLC v. Softlayer Technologies Inc. et al. |
| 2009 | Nelson Bumgardner Casto, P.C. |
| 2008 | Peer Communications, LLC v. Skype Technologies SA et al. |
| 2008 | Sun Microsystems v. Versata Enterprises |
| 2006 | Comes et al. (Iowa consumer class) v. Microsoft Corporation |
| 2005 | PlusFunds v. OTC, Inc. |

**3. Other Work Experience**

2005-2008    **Cofounder,** Boston Software Forensics.  Developed software analysis and protective tools for software publishers and OEMs and provided software forensics consulting services.

1997    **E-mail survey programmer and administrator**, Boston University School of Management, Summer

1996    **Student researcher**, Bellcore Inc., Summer
Conducted research in firewall technology, Java security, and cryptography.

1995    **Contract programmer**, BitFlow Inc., Summer
Ported device drivers for a digital camera interface board to Windows NT and Windows 95.

1995    **Database and statistical consultant** for Boston University expert witness, Spring

1987-1993    **System programmer and administrator**, Iowa State University.
Wrote administration and support code for ISU's distributed network of hundreds of Unix systems.  Provided programming and system administration support to Computer Science faculty.

1989    **Student intern programmer**, Hewlett-Packard Germany, Spring
Designed and implemented a hypertext help system based on a precursor of Motif for the X Window System under HP Unix while participating in a foreign exchange program.

1986    **Contract programmer**, Lucasfilm Ltd., Fall
Designed and implemented a sound sequencer for a computer game in 6502 assembler; arranged music and sound effects for the soundtrack.

1985-1986    **Lead programmer**, Sensor Scan Inc.
Designed and implemented object-oriented system and application software for a custom microcomputer-based security control device in 6303 assembler.

1984-1985    **Programmer**, Waveform Corp.

David Martin                                                                                         4

Developed software infrastructure for home computer music products in 6502 assembler.

1979-1983     **Part-time programmer**, Cyberia, Inc.
Contributed to development of microcomputer software products in BASIC and 6502 assembler, including peripheral-sharing technologies, farm management software, and games.

## 4. Professional Memberships

Association for Computing Machinery (ACM)

## 5. Honors and Awards

2007, 2004    Teaching Excellence Award for U. Mass Lowell Computer Science Department

1996          Outstanding Teaching Fellow, Department of Computer Science, Boston University

1993-1994     University Graduate Fellowship, Boston University

1993          Top Graduating Senior in Mathematics, Iowa State University, Spring

1993          Top Graduating Senior in Computer Science, Iowa State University, Spring

1990          Phi Beta Kappa membership (liberal arts honor society)

1990          Phi Kappa Phi membership (engineering honor society)

1990          Pi Mu Epsilon (mathematics honor society)

1990          Upsilon Pi Epsilon (computer science honor society)

1989-1990     Barry Goldwater Scholarship

1988-1989     Participated in Congress-Bundestag Youth Exchange to Germany

## 6. Academic and Professional Publications

### Refereed Publications

2008          Stanley J. Barr, Samuel J. Cardman, and David M. Martin Jr., *A Boosting Ensemble for the Recognition of Code Sharing in Malware*. Journal of Virology 4:4, 2008.

2005          Jesse M. Heines and David M. Martin Jr., *Development and Deployment of a Web-based Course Evaluation System*. In Proceedings of the 2005 International Conference on Web Information Systems and Technologies.

David Martin                                                                                                     5

| 2003 | D. Martin, H. Wu, A. Alsaid, *Hidden Surveillance by Web Sites: Web Bugs in Contemporary Use*, Communications of the ACM 46:12ve, December 2003. |

2002        D. Martin and A. Schulman, *Deanonymizing Users of the SafeWeb Anonymizing Service*.  In Proceedings of the 11th USENIX Security Symposium, August 2002.

2002        A. Alsaid and D. Martin, *Detecting Web Bugs With Bugnosis: Privacy Advocacy Through Education*.  In Privacy Enhancing Technologies, Springer Lecture Notes in Computer Science volume 2482, 2002.

2001        J. Burns, P. Gurung, D. Martin, S. Rajagopalan, P. Rao, D. Rosenbluth, and A.V. Surendran, *Automatic Management of Network Security Policy by Self-securing Networks*, Proceedings of DISCEX II, 2001.

2000        D. Martin, R. Smith, M. Brittain, I. Fetch, and H. Wu, *The Privacy Practices of Web Browser Extensions*, Communications of the ACM, February 2001. Extended version available from Privacy Foundation, December 2000.

1998        A. Bestavros, M. Crovella, J. Liu, and D. Martin, *Distributed Packet Rewriting and its Application to Scalable Server Architectures*, Proceedings of the 1998 International Conference on Network Protocols, October 1998.

1997        D. Martin, S. Rajagopalan, and A. Rubin, *Blocking Java Applets at the Firewall*, Proceedings of the Internet Society Symposium on Network and Distributed System Security, January 1997.

1995        R. Book, J. Lutz, and D. Martin, *The Global Power of Additional Queries to Random Oracles*, Information and Computation 120:1, July 1995.

## Book Chapters

2004        D. Martin, "Privacy Analysis for the Casual User with Bugnosis", in *Designing Security Systems That People Can Use*, O'Reilly and Associates, 2005.

## Book Editor

2005        Privacy Enhancing Technologies, 4th International Workshop, David Martin and Andrei Serjantov (eds.), Lecture Notes in Computer Science 3424, Springer-Verlag 2005.

2006        Privacy Enhancing Technologies, 5th International Workshop, George Danezis and David Martin (eds.), Lecture Notes in Computer Science 3856, Springer-Verlag 2006.

## Software distributions

2001        A. Alsaid, J. Boak, and D. Martin, The Bugnosis Web Bug Detector (Web site and downloadable software), *www.bugnosis.org*, June 2001.

David Martin                                                                                          6

**Magazine and Web site articles**

2001            D. Martin, "TiVo's Data Collection and Privacy Practices", *Privacy Foundation*, March 2001.

2001            R. Smith and D. Martin, "E-Mail Wiretapping", *Privacy Foundation*, February 2001.

1998            D. Martin, "Internet Anonymizing Techniques", *;login:* Magazine, May 1998.

**Technical reports**

2007            S. Barr, S. Cardman, and D. Martin, Matching Global Data References in Related Executables.  Computer Science Department Technical Report No. 2007-003.

1999            D. Martin, *Local Anonymity in the Internet*, Ph.D. thesis, May 1999.