EXHIBIT 1

William A. Isaacson (wisaacson@bsfllp.com)
(*Pro Hac Vice* application pending)
Karen L. Dunn (kdunn@bsfllp.com)
(*Pro Hac Vice* application pending)
Martha L. Goodman (mgoodman@bsfllp.com)
(*Pro Hac Vice* application pending)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

John F. Cove, Jr., SBN # 212213 (jcove@bsfllp.com)
Meredith R. Dearborn, SBN #268312 (mdearborn@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460

David C. Kiernan, SBN #215335 (dkiernan@jonesday.com)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     (415) 626-3939
Facsimile:     (415) 875-5700

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE APPLE iPOD iTUNES ANTITRUST LITIGATION | Lead Case No. C 05-00037 YGR [CLASS ACTION] |
| This Document Relates To: ALL ACTIONS | **APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT** |

# TABLE OF CONTENTS

I.      The Action ............................................................................................................... 1

        A.      Substance of the Action.................................................................................. 1

Apple's Statement ................................................................................................................ 1

                1.      Procedural History ............................................................................... 1

                2.      Development of iTunes, the iPod, and the iTunes Store.................................. 2

        B.      Named Plaintiffs and Class ............................................................................ 6

                1.      Summary of Apple's Defenses ............................................................. 7

Relief Prayed .................................................................................................................... 10

II.     The Factual Basis of the Action...................................................................... 11

        A.      Undisputed Facts ......................................................................................... 11

                iTunes 11

                iPods   11

                iTunes Music Store ....................................................................................... 12

                Digital Rights Management ........................................................................ 12

        B.      Disputed Factual Issues ............................................................................... 18

        C.      Agreed Statement ........................................................................................ 20

        D.      Stipulations .................................................................................................. 20

III.    Disputed Legal Issues ..................................................................................... 22

        A.      Points of Law................................................................................................ 22

IV.     Further Discovery or Motions........................................................................ 29

V.      Estimate of Trial Time .................................................................................... 29

VI.     List of Motions in Limine ............................................................................... 30

VII.    Juror Questionnaire ....................................................................................... 30

VIII.   Trial Alternatives and Options ..................................................................... 30

        A.      Settlement Discussion. ................................................................................. 30

        B.      Consent to Trial Before a Magistrate Judge ................................................ 30

        C.      Amendments, Dismissals ............................................................................. 31

        D.      Bifurcation, Separate Trial of Issues ........................................................... 31

i

1    **I.      The Action**

2         **A.      Substance of the Action**

3                        <u>**Apple's Statement**</u>

4         This is an antitrust class action in which Plaintiffs allege that Defendant Apple Inc. engaged

5    in illegal monopolization and attempted monopolization by introducing certain software updates in

6    violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and California's Unfair Competition Law

7    ("UCL").  The only remaining conduct at issue is the extent to which Apple's iTunes 7.0 update was

8    anticompetitive because it did not permit interoperability between the iPod and another third-party

9    music software program.  This Court has ruled that all the other conduct alleged as unlawful in the

10   complaint does not violate the antitrust laws, including Apple's design of an integrated iTunes/iPod

11   platform and its development and distribution of the iTunes 4.7 software update.  See Order Granting

12   In Part And Denying In Part Defendant's Motion For Summary Judgment; Denying As Premature

13   Plaintiffs' Motion For Class Certification (May 19, 2011) (Dkt. 627) ("2011 SJ Order"); Order

14   Decertifying Classes Without Prejudice to Being Renewed; Inviting Further Motions, at 9 (Dec. 21,

15   2009) (Dkt. No. 303) ("2009 Decertification Order").

16        **1.      Procedural History**

17        The first complaint in this matter was filed in January 2005.  In April 2007, Plaintiffs filed an

18   amended complaint, challenging Apple's use of its own proprietary digital rights management

19   software on music sold through iTS on the grounds that it constituted tying and monopolization in

20   violation of federal and state antitrust laws.  First Am. Compl. (Apr. 19, 2007) (Dkt. 107).  Plaintiffs'

21   theory was that, to promote interoperability among portable music players and online music stores,

22   Apple should have licensed Microsoft's or some other company's digital rights management

23   ("DRM") tool and designed Apple's products to interoperate with competitor products.  In two orders

24   entered in 2009, the Court dismissed Plaintiffs' tying claims.  Order Granting in Part Mot. for J. on

25   the Pleadings (May 15, 2009) (Dkt. 213) and Order Granting In Part Mot. for J. on the Pleadings

26   (Oct. 30, 2009) (Dkt. No. 274) ("Oct. 2009 Order").  In dismissing Plaintiffs' tying claims, Judge

27   Ware held that the "increased convenience of using the two products together due to technological

28   compatibility does not constitute anticompetitive conduct under either per se or rule of reason

                                1

analysis." Oct. 2009 Order, at 9 (Dkt. 274).  The Court's 2011 Decertification Order clarified that this ruling applied to Plaintiffs' monopolization claims, reasoning that the alleged technological tie between Apple products was, "without more, . . . not anticompetitive" and thus does not constitute exclusionary conduct for a monopoly claim.  2009 Decertification Order, at 2 (Dkt. 303).

On January 26, 2010, Plaintiffs amended their complaint, challenging software updates issued in October 2004 (referred to as iTunes 4.7) and software Apple introduced in iTunes 7.0 and in certain new iPods sold after September 12, 2006.  Am. Consolidated Compl. (Jan. 26, 2010) (Dkt. 322) ("ACC").  Plaintiffs alleged that the goal of the challenged software was to prevent iPods from playing songs purchased from competitors, which in turn decreased competition and allowed Apple to increase iPod prices to levels higher than they otherwise would have been.  On June 29, 2010, the Court granted Apple's motion to dismiss as to Plaintiffs' Cartwright Act, Consumer Legal Remedies Act, and common law monopolization claims.  Order Granting in Part and Denying in Part Def.'s Mot. to Dismiss (June 29, 2010) (Dkt. 377).  On May 19, 2011, the Court granted summary judgment on Plaintiffs' claim challenging the iTunes 4.7 update and denied summary judgment with respect to the iTunes 7.0 update introduced in September 2006.  2011 SJ Order (Dkt. 627).

Plaintiffs' remaining claims are (1) monopolization under Section 2 of the Sherman Act (Count I of the ACC (Dkt. 322)); (2) attempted monopolization under Section 2 of the Sherman Act (Count II of the ACC (Dkt. 322)); and (3) violation of the California UCL, Bus. & Prof. Code §§ 17200, et seq. (Count IV of the ACC (Dkt. 322)).

**2.      Development of iTunes, the iPod, and the iTunes Store**

In January 2001, Apple introduced iTunes, a software program designed to record, manage, and play digital music, sometimes referred to as a music jukebox.  At that point, iTunes worked only on Apple's Mac line of computers and, as Apple did not charge for it, its primary commercial purpose was to heighten Mac's appeal to consumers in an effort to stay afloat against the dominant Windows-based PC platform.  Later that year, Apple introduced the iPod.  Apple developed the iPod to work with iTunes, which Apple engineered to manage music on the iPod.  At that time, there were a number of competing portable devices and music jukebox programs, as well as a number of sources of digital music on the Internet, although none had generated strong momentum in the marketplace.

APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT

To compete with this diverse array of competitors, Apple designed iTunes and the iPod to work seamlessly together, with a special emphasis on ensuring that consumers without computer expertise could easily use iTunes to download music from CDs, the Internet and other sources, for playback on the iPod. Consumers responded favorably to this offering, and sales of iPods took off.

In 2003, Apple opened its iTunes Music Store, later known as the iTunes Store ("iTS"),[1] which offered digital downloads over the Internet. Apple designed the iTS to work seamlessly with the iTunes jukebox and iPod, allowing iTunes jukebox users to access and download music from the iTS directly and then use the iTunes jukebox to sync the music to an iPod. As a condition of making music available to consumers, the record labels required Apple to use DRM to enforce certain content usage rules to prevent piracy and the unauthorized copying and distribution of music. To comply with these contractual obligations, Apple developed its own proprietary DRM security tool known as FairPlay. FairPlay ensured that music purchased from the iTS could seamlessly be replayed on authorized devices and not on unauthorized devices. The iTunes/iPod platform competed (and continues to compete) against an array of different firms offering different options for downloads and devices, some integrated and some open.

Since the beginning, Apple has designed the iPod to work with the iTunes jukebox because it believes that an integrated solution provides the best consumer experience and makes the most business sense for Apple. Apple has adopted an integrated approach in designing other product systems and, with respect to the iTunes/iPod platform, clearly and repeatedly articulated its approach in the marketplace. Thus, consumers and competitors have been made aware of Apple's consistent and unwavering commitment to an integrated iTunes/iPod platform.

Nevertheless, over the years, numerous third parties have attempted to override Apple's design for a variety of purposes, including underground hackers who facilitated piracy by stripping DRM protection, and RealNetworks, which offered the "Harmony" translation program, by (in Plaintiffs' words) "discerning" the iTunes and FairPlay code so that RealPlayer with Harmony could trick the iPod into playing songs purchased from the RealPlayer Music Store ("RMS"). Third parties

---

[1] The parties refer to both the iTunes Music Store and iTunes Store as "iTS" throughout.

APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT

imposing interoperability by manipulating FairPlay posed security risks to Apple and provided an opening to illegal music sharing opposed by the record companies.

There was, and is, a serious question regarding whether the hackers' and RealNetworks' conduct was unlawful.  No RealNetworks or hacker witness will testify in this case, and RealNetworks produced no documents or code in this litigation, but their purpose in circumventing Apple's DRM was nonetheless clear.  Under the Digital Millennium Copyright Act, it is unlawful to use or to offer to the public any technology designed to "circumvent a technological measure that effectively controls access" to a copyrighted work.  17 U.S.C. §§ 1201(a)(1)(A), 1201(a)(2)(A).  To "circumvent a technological measure" means to "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."  Id. § 1201(a)(3)(A).  The hacks, in stripping DRM and thus enabling users to make unlimited copies of songs available over the Internet, undeniably violated the DMCA.  And according to RealNetworks' own public statements, it is highly likely that the company had to remove its DRM protection from the music file before "translating" RealNetworks' DRM to one that the iPod would falsely believe was Apple's.  It is also possible that Harmony achieved its ends by studying or copying one of the available DRM-stripping hacks, such as PlayFair or Hymn.

RealNetworks' and the hackers' actions also may have constituted copyright infringement, and may have violated Apple's applicable Terms of Service, which prevented "circumvent[ing], reverse-engineer[ing], decompil[ing], disassembl[ing], or otherwise tamper[ing] with any of the security components related to [Apple's] Usage Rules for any reason whatsoever."  End users agreed "not to modify the software in any manner or form, or to use modified versions of the software, for any purposes including obtaining unauthorized access to the Service [iTunes]."

From 2001 through the present, Apple has regularly issued iTunes software updates to add features, fix bugs, address and anticipate threats to stability and security of the platform, and comply with its contracts with the record companies, which required continuous efforts to ensure that its DRM provided adequate security for their copyrighted music in the face of the inevitable hacks.  Some of these updates caused third-party programs, including Harmony, to no longer operate as the

4

1    third party intended, a consequence that third parties must have understood when they released their

2    programs.  For example, if a software update made changes to FairPlay, iTunes, or the iPod, and a

3    third-party program had been developed to interoperate with the previous version of FairPlay, iTunes,

4    or the iPod, that third-party program would no longer function for the obvious reason that it was not

5    designed to interoperate with the updated version.

6         As noted above, this Court has already ruled Apple's design of its integrated system,

7    including its updates, are all lawful as a matter of law, with a single exception:  the Court found that a

8    material issue of fact remains as to the software introduced in September 2006.  The challenged

9    software was a component of iTunes 7.0 and a new generation of FairPlay.  Security updates to

10   FairPlay were one type of competition between Apple and other companies offering digital media

11   players, some of whom criticized the security offered by FairPlay.  The iTunes 7.0 update, released

12   on September 12, 2006, introduced movies and Apple's unique "Cover Flow" design, which enabled

13   consumers to quickly browse through their libraries.  With iTunes 7.0, iPods would work with

14   multiple computers and videos would play in near-DVD quality.  The new generation of FairPlay

15   found in 7.0, among other things, enhanced security to eliminate known vulnerabilities, streamlined

16   the structure of FairPlay's protection scheme, which made it easier for Apple to make changes and fix

17   problems, and maintained the integrated iTunes/iPod platform for new iPod models to protect against

18   inadvertent and malicious corruption.  In September 2006, the new generation of FairPlay was

19   included only in the iPod nano 2nd generation.  One year later, Apple included the new generation of

20   FairPlay on new iPod classic model, the new iPod nano model, and the new iPod touch.  The new

21   generation of FairPlay was never included on iPod shuffles or on any legacy iPods.

22        In addition, in September 2007, Apple introduced complementary software in iTunes 7.4 and

23   certain new iPod models that further secured the internal music database on those models by ensuring

24   that only the iTunes jukebox created that database.  As with iTunes 7.0, iTunes 7.4 also included

25   many features unrelated to the security and stability of the platform, such as custom ringtones, closed

26   captioning for movies, a rating system for movies, and the ability to watch movies in a larger size in

27   the iTunes window.  The new software was included on new iPod classic, nano and touch models, but

28   was never included on iPod shuffles or on any legacy iPods.

5

Plaintiffs' challenge rests upon their belief that, once RealNetworks decoded iTunes and Apple's anti-piracy software, Apple was obligated to allow and support interoperability with the RMS. Plaintiffs' current theory of liability is that the new software that rendered Harmony incompatible with a subset of iPods reduced competition in the sale of players because, although there were a number of other players on the market and a number of other sites offering digital downloads, the inability of consumers to play songs from the RMS on the affected models of iPods allegedly "locked in" those consumers who already had a supply of downloads from the iTS into using only the iTunes jukebox and made them reluctant to purchase a player other than an iPod. This "lock-in" effect allegedly allowed Apple to raise prices for iPods to an anticompetitive level, thereby allegedly injuring Plaintiffs when they purchased iPods. Plaintiffs also allege that consumers with large digital music collections purchased from the RMS were immediately locked out of purchasing an iPod on September 12, 2006 because the iPod would not play their RMS music collection.

## B. Named Plaintiffs and Class

Plaintiffs are Somtai Troy Charoensak, Mariana Rosen, and Melanie Tucker, who collectively represent a damages class that was certified by Judge Ware in November 2011. Order Granting Pls.' Mot. for Class Certification (Nov. 22, 2011) (Dkt. 694). The class is defined as follows:

> All persons or entities in the United States (excluding federal, state and local governmental entities, Apple, its directors, officers and members of their families) who purchased an iPod directly from Apple between September 12, 2006 and March 31, 2009 ("Class Period").

The specific models of iPods covered by the Class Definition are as follows:

I.  iPod Standard, Classic, Special Models

    iPod (5th generation) 30 GB
    iPod (5th generation) 80 GB
    iPod U2 Special Edition 30 GB
    iPod Classic 120 GB
    iPod Classic 80 GB
    iPod Classic 160 GB
    iPod (5th generation) 60 GB

II.  iPod shuffle Models

    iPod shuffle (2nd generation) 1 GB
    iPod shuffle (2nd generation) 2 GB

iPod shuffle (3rd generation) 4 GB
iPod shuffle (1st generation) 1 GB
iPod shuffle 512 MB

III.   iPod touch Models

iPod touch 8 GB
iPod touch 16 GB
iPod touch 32 GB
iPod touch (2nd generation) 8 GB
iPod touch (2nd generation) 16 GB
iPod touch (2nd generation) 32 GB

IV.   iPod nano Models

iPod nano (2nd generation) 2 GB
iPod nano (2nd generation) 4 GB
iPod nano (2nd generation) 8 GB
iPod nano (3rd generation) 4 GB
iPod nano (3rd generation) 8 GB
iPod nano (4th generation) 4 GB (Apple retail sales only during the class period.)
iPod nano (4th generation) 8 GB
iPod nano (4th generation) 16 GB
iPod nano (1st generation) 1 GB
iPod nano (1st generation) 2 GB
iPod nano (1st generation) 4GB

Id. at 9-10.  However, Plaintiffs' economist has claimed damages for only the following models:

iPod Classic (6th generation)
iPod Classic (7th generation)
iPod nano (2nd generation)
iPod nano (3nd generation)
iPod nano (4nd generation)
iPod touch (1st generation)
iPod touch (2nd generation)

Rebuttal Decl. of Roger Noll, Exs. 5-6 (Nov. 25, 2013) (Dkt. 740-14).  Therefore, Apple is entitled to judgment on all other models.

**1.   Summary of Apple's Defenses**

**No Anticompetitive Conduct**.  Apple had no duty to aid its competitors or to create and maintain an interoperable system.  This is a complete defense to liability under Section 2.  It was lawful for Apple to create its own proprietary DRM, refuse to license that DRM, withhold from third

7

parties information about how the DRM worked to encrypt music, and issue software updates containing security and stability upgrades that had the effect of frustrating those who had decoded a previous version of its DRM.  Apple had the right to compete with an integrated system; integrated systems have many benefits related to ease of use, security and stability, protection against inadvertent and malicious corruption, product performance, and efficiency in resolving consumer complaints; and Apple's intention to create and maintain an integrated system was well known to competitors and consumers.  The challenged updates improved Apple's products by, among other things, maintaining the integrated iTunes/iPod platform, ensuring an improved and seamless customer experience in using Apple products, stopping corruption of iPods caused by the use of third-party applications and hacks, improving FairPlay through both enhanced security and improved software architecture, assisting Apple in complying with its contracts with digital rights holders, and providing a competitive feature to other digital media players.  This is also a complete defense to liability under Section 2.

**Market Definition**.  Plaintiffs cannot establish that the two markets that they have alleged are relevant antitrust markets for the purposes of analyzing Apple's conduct.

The first market they allege, the purported Audio Download Market, is unduly narrow. Plaintiffs' own expert admitted that the relevant question is the fractional share of iTS music compared to all other sources of music that could play on iPods.  Consumers obtain recorded music from a number of different sources, including not only digital downloads, but CDs, Internet streaming services, and file-sharing services.  CDs, in particular, are highly relevant to the analysis of the issues in this case because the vast majority of content found on portable players during the class period was imported from CDs.  Also, to the extent Plaintiffs allege that the iTS competes only with equivalent large stores making available millions of songs, they are wrong; many smaller scale sites, for example sites associated with an artist or an independent record label, offer digital downloads or links to sites that do.

The second market Plaintiffs allege, the purported Portable Digital Media Player Market, is also unduly narrow.  The relevant market also includes, at the very least, smart phones and other handheld devices capable of playing music, as well as a variety of sub-PC devices such as tablets that

APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT

are highly portable and also play music.

Further, in an arena where competitors offer integrated end-to-end solutions, such as Apple's iTunes/iPod platform, Microsoft's Zune platform, and Sony's download/player platform,  it is error to analyze the product market solely by the components of the system without considering the importance of system competition.

**Monopoly Power**.  Even if one accepts the markets Plaintiffs allege, Apple does not possess monopoly power in either market.  Its competitors in the sale of digital downloads include some of the largest companies in the world, such as Microsoft, WalMart, Amazon, Sony, and Best Buy.  All of them have tremendous bargaining power with rights holders and/or are rights holders themselves; all of them have the financial and technical resources to develop the infrastructure and marketing associated with offering downloads over the Internet, to operate efficiently, and to price competitively.  Moreover, as noted above, there are many smaller sites that do not carry the huge selection of the biggest players but are a perfectly effective means of selling downloads to their target audiences.

Similarly, competition in the sale of devices is intense.  During the class period, a number of highly successful high-tech firms, including Microsoft, Sony, Dell, Rio, Sandisk, RCA, and many others offered portable devices, competing on price, style, function and features, ease of use, security, and other metrics, including competition about which devices were supported by the many jukeboxes.  The evidence will show that Apple continually monitored the offerings, technical capabilities, consumer appeal and pricing of these competitors in establishing its iPod pricing.  Moreover, on a quality-adjusted basis, prices dropped throughout the class period, while the output not only of Apple, but also its competitors, increased.  And toward the end of the class period, competition from smart phones, which offered all the functionality of a portable music player and a lot more, caused player sales to drop.  That Apple was more successful than these firms does not mean that it attained monopoly power.

**Causation/Injury**.  Plaintiffs cannot demonstrate causal antitrust injury.  Plaintiffs' theory is entirely dependent on showing that the incompatibility between Harmony and certain iPod models inhibited consumer demand for other players to such an extent that this incompatibility, rather than

9

the slew of improvements and the well-recognized consumer appeal of iPods, caused Apple to charge several dollars more per iPod than it would have otherwise charged to everyone who purchased an iPod during the class period.  Plaintiffs will present no evidence to show that the RMS was a significant competitor to the iTS in 2006, when the challenged iTunes 7.0 FairPlay update was released.  Plaintiffs will present no evidence showing what portion of RMS sales was made by iPod owners.  Plaintiffs will present no evidence showing the number of consumers locked into or locked out of iPods.  The actual "switching costs" to import music from the RealPlayer music library to the iPod were low.  Plaintiffs will present no evidence showing that Apple took the RMS into account when pricing iPods.  Plaintiffs will present no real-world evidence showing that Apple raised iPod prices during the class period as a result of the challenged updates, or that any price increases were attributable to the exclusion of competitors rather than increased demand for Apple's products.

**Damages.**  There are no damages.  Plaintiffs have not and cannot establish a reliable guide for determining damages, or that any Plaintiff incurred any damages.

Plaintiffs' regression model offered by their expert Dr. Noll does not establish causal antitrust injury or damages.  Dr. Noll's flawed regression does not demonstrate impact or damages on a class-wide basis.

Because Plaintiffs cannot prevail on their Section 2 claims, their UCL claim fails.

Plaintiffs' class must be decertified because Dr. Noll improperly conflates concededly lawful and allegedly unlawful conduct in his regression analysis.

Plaintiffs are not typical of or adequate representatives for resellers—retailers who purchased iPods from Apple for resale in their stores.

### **Relief Prayed**

Plaintiffs seek damages reflecting the difference in price between what customers actually paid and what they would have paid but for the release of the challenged software updates.

Apple denies liability, and asserts that even if its actions in issuing the challenged software updates were to be considered anticompetitive, no relief or damages is available under settled principles of antitrust laws.  Apple respectfully requests that this Court dismiss Plaintiffs' claims with prejudice, enter judgment against Plaintiffs and in favor of Apple, decline to award Plaintiffs'

10

requested relief, and award Apple its costs and reasonable attorneys' fees.

**II.    The Factual Basis of the Action**

    **A.    Undisputed Facts**

    1.    Apple is a company headquartered in Cupertino, California.

    2.    Apple makes consumer electronic and computing products, such as iMac, MacBook, iPhone, iPad, and iPod.

    3.    Apple's products include both hardware and software components, which are often integrated.  For example, Apple's personal computers are integrated with its operating system, iOS.

<strong>iTunes</strong>

    4.    In January 2001, Apple introduced the iTunes software, a "jukebox" that provides a way for users to organize, store and play their music collections on Mac computers.  iTunes was preinstalled on Macs and available for download for free; Apple did not charge separately for it.

<strong>iPods</strong>

    5.    Apple introduced the iPod, a portable digital music player, on October 23, 2001. Apple designed the iPod and iTunes to work together, with iTunes functioning as the software tool for users to transfer music from their computers to their iPods, a process known as "syncing," and to organize and manage that music.

    6.    A customer could use iTunes to transfer music from the iTS and other sources to an iPod.

    7.    To sync music to an iPod, the user had to physically connect the iPod to the computer.

    8.    As of 2001, there were other electronic music players on the market, including the Sony Network Walkman (introduced in 1999); the Creative Technology Nomad (1999); devices by iRiver (~2000); the Archos Jukebox (2000); and others.

    9.    From 2001 to 2009, electronic music players continued to be introduced and sold by competitors such as Microsoft (which introduced the Zune in 2006), iRiver, Rio, Creative Technologies, Nokia, Sandisk (which introduced the Sansa e100 series in 2005), and Dell.

    10.    Apple monitored these competitive products, including pricing, features, consumer appeal and other relevant competitive variables and took these competitors into consideration in

1    pricing its products.

2    **iTunes Music Store**

3    11.    Apple launched the iTS, an online music store, on April 28, 2003.  The iTS is accessed

4    through the iTunes software.

5    12.    When a consumer purchased a song through the iTS at any time between 2003 and

6    2009, the consumer could play that song on his or her computer directly or on an iPod; burn that

7    music to a CD and play it anywhere a CD was playable; or burn that music to a CD, rip it back to the

8    computer, and play on any portable media device.

9    13.    iTunes music downloads and iPods are always sold separately and without any

10    requirement that purchasers of one product also purchase the other.

11    14.    The introduction of the iTS was procompetitive and benefitted consumers.

12    15.    As of 2003, there were a number of other electronic music stores, including eMusic,

13    MusicNet, and PressPlay, and other sites where music could be downloaded.

14    16.    From 2003 to 2009, electronic music stores continued to be introduced and sell digital

15    music to consumers, including Napster (which was re-introduced as a music store in 2003); Wal-

16    Mart's digital music store (2004), MTV's URGE (2006), Microsoft's Zune Marketplace (2006),

17    Amazon.com's digital music store (2007), and SpiralFrog (2007).  Each of these examples sold music

18    by the major music labels.

19    **Digital Rights Management**

20    17.    Before Apple launched the iTS, in the early 2000's, many individuals used online

21    digital music services, such as Napster, to download music for free, without paying the artists or the

22    record companies that owned the copyrights.

23    18.    As a condition of making music available to Apple, the major record labels—

24    including Sony, Universal, EMI, Warner, and BMG—entered into contracts with Apple that required

25    that Apple implement usage rules and sell music in a protected format.

26    19.    The contracts with the music labels required Apple to limit copying and distribution of

27    the music files, through the use of an encryption-based "security solution" known as digital rights

28    management, or DRM.  The purpose of DRM was to enforce the usage rules and prevent music

piracy including the unauthorized copying and distribution of music.

20.    The labels also required that, should the DRM become compromised or ineffective, Apple promptly repair the breach and restore the DRM's security.

21.    One of the aspects of the security solution that the labels required was that on the iPod, or a comparable device, an "Apple-owned application will store an end user's keys in a key file that is encrypted using AES-128 encryption, and the key to decrypt this key file will be known to Apple-owned applications and Apple's QuickTime software."

22.    Apple implemented the security solution that the record labels required through a proprietary system it developed called FairPlay.  FairPlay used encryption and other tools to enforce the usage rules on songs offered on the iTS.

23.    Pursuant to the contractual usage rules, FairPlay limited the number and identity of devices that a given song could be played on.  Thus, when a user purchased a song on the iTS, he or she had to authorize the song to play on a limited number of specifically identified devices.

24.    In general, FairPlay encrypted each song offered on the iTS and provided the user's authorized computer and iPod with the keys needed to decrypt the song.  Some of the keys necessary to decrypt the song were stored in an encrypted database known as a "keybag" on a user's authorized computer (the "local keybag") or iPod (the "iPod keybag").

25.    To sync FairPlay-protected music to an iPod, iTunes (1) would "write" or "create" a "database" or lookup table that stores information about the music, information about where the songs are stored, and information about how the songs can be accessed, and (2) would "write" or create the keybag to store the keys necessary to decrypt the music.  Each time iTunes added songs from the iTS to an iPod, it would rewrite the database and keybag.

26.    From time to time, Apple updated FairPlay.

27.    Apple provided FairPlay, along with all updates Apple issued for iTunes and iPod firmware, to its users for free.

28.    A user could remove FairPlay from a song purchased from the iTS by burning that song to a CD and then uploading the song back to his or her computer, a process called "burning and ripping."

APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT

29.    "Virtual burners," or software that emulated the process of burning and ripping, were also available during the class period.

30.    Other entities also developed proprietary DRM technology to enforce usage rules required by their contracts with the record labels.  For example, Microsoft developed its own DRM called Janus or Windows Media DRM for Portable Devices, which it licensed to be used in portable media devices that competed with the iPod, including devices offered by Microsoft, Toshiba, Cowon, Dell, iriver, Samsung, Sandisk, and Archos.  RealNetworks also developed its own proprietary DRM called Helix.  In 2006, RealNetworks licensed Helix to Sandisk.

31.    From 2003 to 2009, numerous hackers released and updated programs that circumvented FairPlay in order to evade the labels' usage restrictions.  They used various techniques, which became more sophisticated as Apple updated FairPlay in response to their attacks.  For example, PlayFair cracked the iPod keybag, obtained the account key, and then used it to decrypt songs for playback by unauthorized users.

32.    The hackers published the programs on the Internet, which allowed users to strip or circumvent the content protection required by the labels and facilitated unauthorized sharing copies of songs over the Internet.

33.    Some of these "hacks" included QTFairUse, DeDRMS, and FairKeys, which were all introduced by an individual named Jon Lech Johansen, otherwise known as "DVD Jon," in 2003 and 2004.

34.    Other "hacks" included PlayFair, Hymn, JHymn, FairTunes, and Requiem.

35.    Pursuant to the contracts and in response to hacks, the record labels demanded that Apple take action to stop the hackers.  For example, in response to PlayFair, Universal stated that it was "increasingly concerned about [PlayFair's] breach of Fairplay security system" and asked "what steps [Apple was] taking to mitigate the spread of the attach [sic] and also close the hole it has exposed."

36.    The music labels, through their contracts with Apple, required Apple to repair breaches and restore the FairPlay security caused by hacks like QTFairUse, DeDRMS, FairKeys, PlayFair, JHymn, Hymn, and FairTunes.

37.     In accord with its contractual obligations, Apple issued software updates to stop hacks, restore content protection, and stay ahead of other potential hacks.

**RealNetworks' Harmony**

38.     In July 2004, RealNetworks announced the introduction of RealPlayer 10.5, RealNetworks' jukebox.  RealPlayer 10.5 allowed users to purchase music from the RealNetworks Music Store, which was protected by RealNetworks' Helix DRM.  RealPlayer 10.5 included RealNetworks' Harmony DRM translation technology.

39.     RealNetworks claimed that Harmony technology would allow users to buy music from the RMS and play it on "over 100 devices including devices from Apple, Rio, Panasonic, PalmOne and more."

40.     RealPlayer with Harmony tried to replicate the way the iTunes jukebox synced iTS music to the iPod.  Among other things, RealPlayer with Harmony (1) would "write" or create the iPod music database and (2) would "write" or create the iPod keybag to store the keys necessary to decrypt the music.  Harmony also made songs from the RMS appear to the iPod that they were actually iTS music protected by FairPlay.  Thus, if Apple changed the way the iTunes jukebox wrote the iPod music database or keybag or otherwise changed the FairPlay security scheme, RealPlayer with Harmony would no longer work.

41.     RealNetworks also claimed that, by using Harmony, "RealPlayer 10.5 [with Harmony] will convert [music] files to a format supported by [the user's] device automatically, translating the DRM to one supported by [the user's] device at the same time."  Thus, by using RealPlayer 10.5 with Harmony, a user "can use any online music store to purchase music for [the user's] portable device … No matter what format [the user's] content is in, or what digital rights management (DRM) software is used, RealPlayer with Harmony Technology can convert and support the transfer of [the user's] content to [the user's] portable device."

42.     In other words, RealNetworks claimed that Harmony would allow users to transfer and play iTS FairPlay-protected music to non-iPod devices and to transfer and play music protected by any other DRM-protected scheme (e.g., Microsoft Windows DRM) to other devices that did not support that DRM (e.g., iPods).

43.    As of 2006, various third parties published applications, including WinAmp, to add and manage songs on iPods.  These applications were not reviewed or supported by Apple.  Thus, if Apple changed the way the iTunes jukebox wrote the iPod music database, the third-party programs would no longer work.

44.    RealNetworks is not, and has never been, a party to this lawsuit.

45.    In 2009, RealNetworks was sued by the DVD Copy Control Association, Inc. for removing DRM technology from DVDs.

46.    iTunes 4.7 and the embedded keybag

47.    In May 2004, Apple started a redesign of FairPlay to respond to existing hacks, like Hymn, and in anticipation of future hacks.  Apple had received inquiries from the record companies asking what they were doing to confront the hacks.  The redesign included changes to the DRM scheme in both iTunes and iPods.

48.    Among other changes, the redesign changed the way FairPlay encrypted and decrypted the iPod keybag.  It referred to the new iPod keybag as the "embedded keybag."

49.    The redesign changed the way FairPlay encrypted and decrypted files, making it more difficult for hackers to crack.

50.    According to Hymn's authors, they had reverse engineered the encryption scheme for the keybag.  Hymn's manual admitted that "according to the DMCA [Hymn was] in the wrong."

51.    Apple started work on source code for the embedded keybag in June 2004.

52.    In October 2004, Apple released the redesigned FairPlay with iTunes 4.7 and in the firmware for new iPods.  iTunes 4.7 included other new features including iPod preference integration, the ability to show duplicates in the iTunes library, a floating mini player task bar, and automated reminders to consumers to back up their purchased music.

53.    iTunes 4.7 also updated the firmware of legacy iPods to include the embedded keybag.  If a user updated to iTunes 4.7, iTunes 4.7 would add the embedded keybag to the user's iPod.

54.    For iPods updated with iTunes 4.7, the redesigned version of FairPlay ended the interoperability of the July 2004 version of Harmony because Harmony's functioning was based on a previous version of FairPlay with a different encryption and decryption system.

APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT

55.   iTunes 4.7 was a genuine product improvement.

56.   The Court has ruled that 4.7 did not violate the antitrust laws.

57.   Hackers released programs, like JHymn and PyMusique, that circumvented the redesigned FairPlay.

58.   Apple continued to release new versions of FairPlay to address existing hacks and to make FairPlay more resistant to potential hacks.

59.   Apple continued to release new versions of iTunes, including iTunes 6.0, which in addition to adding features like music videos, personalized music recommendations, and expanded online gift options, also made changes to FairPlay.

60.   RealNetworks announced in April 2005 that it again had enabled its Harmony technology to play music purchased from the RMS on "all shipping iPods, including iPod Photo."

61.   On September 12, 2006, Apple released an update of its iTunes software called iTunes 7.0.

62.   iTunes 7.0 included new features such as (1) for the first time, movies from major studios such as Pixar and Disney; (2) higher resolution television shows; (3) the ability for the iPod to push music back to the computer, enabling synchronization with more than one computer; (4) a new management interface for the iPod; and (5) a distinctive new way to flip through music on the computer, called Cover Flow.

63.   iTunes 7.0 also included a redesign of FairPlay.

64.   The redesigned FairPlay introduced a new keybag for the iPod called the "universal keybag." The universal keybag included a security feature that required the iPod to verify the integrity of the keybag before accessing it. When enabled, before accessing and using the music database, the iPod verified the integrity of the keybag by confirming that it had been written and signed by iTunes. If the integrity check failed because the keybag was not signed or was not signed by iTunes, the iPod would not access the keybag. The keybag verification code ensured that the keybag was written by iTunes. This is called the keybag verification code, or "KVC."

65.   iTunes 7.0 also contained "dormant" code that, when enabled, would cause iTunes to add an iTunes signature to the iPod music database. This is called the database verification or

integrity code.  Apple included the database verification code to certain models of iPods.  If database verification code was enabled in the iPod, before accessing and using the music database, the iPod verified the integrity of the database by confirming that the database had been written and signed by iTunes.  If the integrity check failed because the database was not signed or was not signed by iTunes, the iPod would not access the database.  The database verification code ensured that the music database was written by iTunes.

66.    The universal keybag with keybag verification code was first included in the iPod nano 2nd generation when that device was released on September 12, 2006.  The universal keybag with keybag verification code was also enabled on the iPod nano 3rd generation and iPod classic 6th generation, when those devices were released on September 5, 2007.  The universal keybag with keybag verification code was not enabled on the iPod classic 5th generation or any earlier iPod classic models, nor on any earlier generations of the iPod nano.  The universal keybag with keybag verification code was never present on any iPod shuffle or iPod mini model.

67.    The database verification code was first enabled on the iPod nano 3rd generation, iPod Classic 6th generation, and iPod touch when these devices were first released on September 5, 2007.  The database verification code was never enabled on any iPod shuffle, iPod mini, or any earlier generations of the iPod classic or iPod nano.

68.    At the time iTunes 7.0 was released, there was no preexisting voluntary course of dealing between Apple and RealNetworks.

69.    In March 2007, EMI permitted its music to be sold in the iTS without DRM.

70.    The contracts with other labels continued to require Apple to maintain its DRM protection but as time went on, the other labels released Apple of this obligation.

71.    As of January 2009, 80% of music (approximately 8 million titles) available in the iTS was DRM-free.

72.    As of March 31, 2009, all new purchases on the iTS were DRM-free.

**B.    Disputed Factual Issues**

1.    Whether the purported market for Portable Digital Music Players is a relevant antitrust market.

2.      Whether Apple possessed monopoly power in the purported relevant market for Portable Digital Music Players.

3.      Whether there were barriers to entry or expansion in the purported relevant market for Portable Digital Music Players.

4.      Whether the purported market for Permanent Audio Downloads is a relevant antitrust market.

5.      Whether Apple possessed monopoly power in the purported market for Permanent Audio Downloads.

6.      Whether there were barriers to entry or expansion in the purported market for Permanent Audio Downloads.

7.      Whether Apple intended to monopolize the purported Portable Digital Music Player market.

8.      Whether there was a dangerous probability that Apple would monopolize the purported Portable Digital Music Player market.

9.      Whether Apple intended to monopolize the purported Permanent Audio Download market.

10.     Whether there was a dangerous probability that Apple would monopolize the purported Permanent Audio Download market.

11.     Whether iTunes 7.0 and related technologies and updates were product improvements.

12.     Whether Apple had a valid business justification for releasing iTunes 7.0 and related technologies and updates.

13.     Whether RealNetworks violated the Digital Millennium Copyright Act, committed copyright infringement, or violated Apple's applicable Terms of Service.

14.     Whether DRM-stripping hacks violated the Digital Millennium Copyright Act, committed copyright infringement, or violated Apple's applicable Terms of Service.

15.     Whether the release of iTunes 7.0 caused any anticompetitive consumer "lock in."

16.     Whether the release of iTunes 7.0 caused any anticompetitive consumer "lock out."

17.     Whether any anticompetitive conduct caused Apple to charge prices higher than it

19

otherwise would have charged.

18.     Whether Apple took into account any alleged anticompetitive "lock in" or "lock out" when pricing its iPods.

19.     Whether the RMS was a significant competitor to the iTS in 2006.

20.     Whether actual "switching costs" to import music from the RealPlayer Music Library to the iPod were low.

21.     Whether Apple took the RMS into account when pricing iPods.

22.     Whether the named Plaintiffs suffered any harm remediable by the antitrust laws.

23.     Whether any members of the class suffered any harm remediable by the antitrust laws.

**C.     Agreed Statement**

Apple does not believe that this action may be presented in whole to the jury upon an agreed statement of facts at this time.  Apple does, however, believe that pursuant to the Court's 2009 Decertification Order, and the 2011 SJ Order, the court should instruct the jury that there is no conduct at issue other than Apple's release of iTunes 7.0 in September 2006.  Thus the jury may not consider as potentially illegal conduct Apple's statements regarding RealNetworks; Apple's decision not to license FairPlay to any party, including RealNetworks; Apple's decision not to license Microsoft's or another party's DRM; and Apple's release of iTunes 4.7, which also resulted in incompatibility between Harmony and the iTunes/iPod/iTS integrated system.  Furthermore, Apple agrees that the facts set forth above in Section II.A may be presented in an agreed statement of facts to the jury.

**D.     Stipulations**

1.     Apple [and Plaintiffs] stipulate to the authenticity of any document created and produced by a party in this case. This stipulation shall not be deemed or interpreted to be a stipulation that any document is admissible in evidence.

2.     Apple [and Plaintiffs] stipulate that copies of documents may be used at trial in lieu of originals and shall not be deemed inadmissible solely on the basis that they are copies.

3.     Apple [and Plaintiffs] stipulate that by offering jury instructions they are not waiving the right to appeal any pretrial legal ruling by the Court.

4.      Apple [and Plaintiffs] stipulate that venue is proper in this Court.

5.      Apple [and Plaintiffs] stipulate that, only for purposes of this action, Apple does not contest that this Court has personal jurisdiction over Apple.

6.      Apple [and Plaintiffs] stipulate that they will disclose demonstrative aids to be used during each's case in chief at trial and during opening and closing statements no less than 48 hours in advance of their anticipated use.

7.      Apple [and Plaintiffs] stipulate that Apple will conduct its direct examination of any former and current employee of Apple that Plaintiffs call in their case in chief before Plaintiffs conduct their examination of that witness.  Further, Apple [and Plaintiffs] stipulate that Plaintiffs will be permitted to go beyond the scope of Apple's direct examination of that witness.

8.      Apple [and Plaintiffs] stipulate that Apple will examine its technical expert, Dr. John Kelly, out of turn during Plaintiffs' case in chief.  Apple [and Plaintiffs] stipulate that Dr. Kelly will be called to testify immediately after Plaintiffs and Apple conclude their respective examinations of Plaintiffs' technical expert, Dr. David Martin.

9.      Apple [and Plaintiffs] stipulate that Apple will examine its economic experts, Drs. Kevin Murphy and Robert Topel, out of turn during Plaintiffs' case in chief.  Apple [and Plaintiffs] stipulate that Drs. Murphy and Topel will be called to testify immediately after Plaintiffs and Apple conclude their respective examinations of Plaintiffs' economic experts, Dr. Roger Noll and Dr. Jeffrey Woolridge (as applicable).

10.     Apple [and Plaintiffs] stipulate that Plaintiffs will provide Apple with no less than three business days advance notice of when they expect to call their last witness.

11.     Apple [and Plaintiffs] stipulate that Apple will provide Plaintiffs with no less than three business days advance notice of when they expect to call their last witness.

12.     Apple [and Plaintiffs] stipulate that any witness called to testify shall be disclosed to the opposing party 72 hours in advance of the witness's testimony.

13.     Apple [and Plaintiffs] stipulate that both parties' technical and economic experts may testify based on previously produced confidential source code documents and voluminous data sets that were relied upon and cited by the experts in their reports without those documents being

admitted into evidence. Neither party waives any objection to expert testimony that is outside the scope of the expert report; based upon undisclosed documents, source code or data; or otherwise inadmissible for any reason, including without limitation because it is based on insufficient or incorrect facts or data.

14.    Apple [and Plaintiffs] stipulate that the date to exchange each's charts, schedules, summaries, diagrams and other similar documentary materials to be used in its case in chief at trial (collectively, "summary exhibits") is and has been extended until October 13, 2014. The parties stipulate that they will meet and confer regarding the admissibility of summary exhibits on or about October 17, 2014 and agree that all stipulations and/or objections regarding summary exhibits will be incorporated into the parties' respective exhibit lists to be provided to the Court in the Joint Pretrial Readiness Binder, as due to the Court on October 21, 2014.

15.    The parties make these stipulations for the limited purpose of simplifying the issues for trial. *See* FED. R. CIV. P. 16(c)(2)(A).

16.    The parties will continue to meet and confer regarding additional stipulations that may be requested or proposed to streamline the trial of this matter. In particular, the parties will continue to discuss potential stipulations regarding: (1) authenticity of exhibits not already the subject of a stipulation, (2) admissibility of exhibits, and (3) procedures for confidential documents.

## III.    Disputed Legal Issues

### A.    Points of Law

1.    As the Court already held, whether it had monopoly power or not, Apple had an unconditional right to design its products as it chose, had no duty to assist competitors or third parties in interoperating with its products, no duty to share information with competitors about its DRM security program, and had no duty to maintain its products so that third-party products that had been engineered to interoperate could continue to operate.

- 2011 SJ Order, at 9 (Dkt. 627) ("[U]nder antitrust law 'there is no duty to aid competitors.'") (quoting Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, 540 U.S. 398, 411 (2004) ("Trinko"));

- *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.") (citations omitted);

- *Trinko,* 540 U.S. at 407–08 ("Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing-a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion. Thus, as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' …. We have been very cautious in recognizing … exceptions [to this rule], because of the uncertain benefits of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm") (internal citations omitted);[2]

- *Novell, Inc. v. Microsoft Corp.,* 731 F.3d 1064, 1073 (10th Cir. 2013), cert. denied, 134 S. Ct. 1947 (2014) ("If the law were to make a habit of forcing monopolists to help competitors by keeping prices high, sharing their property, or declining to expand their own operations, courts would paradoxically risk encouraging collusion between rivals and dampened price competition—themselves paradigmatic antitrust wrongs, injuries to consumers and the competitive process alike. Forcing firms to help one another would also risk reducing the incentive both sides have to innovate, invest, and expand—again results inconsistent with the goals of antitrust. The monopolist might be deterred from investing, innovating, or expanding (or even entering a market in the first place) with the knowledge anything it creates it could be forced to share; the smaller company might be deterred, too, knowing it could just demand the right to piggyback on its larger rival.") (citing secondary sources);

- *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 268 (2d Cir. 1979) ("any firm, even a monopolist, may generally bring its products to market whenever and however it chooses").

2.    Apple never licensed iTunes or FairPlay, or otherwise voluntarily facilitated interoperability between iPods and RealPlayer or RealPlayer with Harmony, or any other competing online digital music service. RealNetworks's manipulation of Apple's code and products to allow its offerings to work with the iPod was unauthorized and Apple made clear statements to this effect. In the absence of any voluntary course of dealing between Apple and RealNetworks, a jury could not reasonably find that Apple's introduction of iTunes 7.0 was exclusionary conduct within the ambit of Section 2 of the Sherman Act.

---

[2] Apple does not concede that it is a monopolist.

23

- *Trinko*, 540 U.S. at 409 (concluding that in the absence of a voluntary and presumably profitable prior course of dealing, there is no basis to infer an anticompetitive motivation in refusing to deal);

- *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) (holding that a manufacturer "engaged in an entirely private business" is free "to exercise his own independent discretion as to parties with whom he will deal" and that the "narrow scope" of any exception to this rule requires the "unilateral termination of a voluntary and profitable course of dealing" with the third party; also holding that previous ability of a rival's products to interoperate is not an "agreement, or even an implicit understanding" between the parties) (citing Trinko).

3.    Apple had legitimate and competitive business reasons to release iTunes 7.0.  iTunes 7.0 was a product improvement and product improvements alone do not violate Section 2, even if competitors are harmed or the actor intended to exclude a competitor.

- 2011 SJ Order, at 7 (Dkt. 627) ("If a design change is a product improvement, that design change 'by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result.'") (quoting Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp., 592 F.3d 991, 999–1000 (9th Cir. 2010) ("Tyco"));

- *California Computer Prods., Inc. v. Century Data Systems, Inc.*, 613 F.2d 727, 744 (9th Cir. 1979) ("CalComp") ("IBM, assuming it was a monopolist, had the right to redesign its products [by introducing integration that precluded interoperability] to make them more attractive to buyers … It was under no duty to help CalComp or other peripheral equipment manufacturers survive or expand.  IBM need not have provided its rivals with disk products to examine and copy [to facilitate interoperability] … nor have constricted its product development so as to facilitate sales of rival products.  The reasonableness of IBM's conduct in this regard did not present a jury issue") (citing IIIB Areeda & Turner, Antitrust Law ¶ 738, at 285–86 (3d ed. 2006));

- *Tyco*, 592 F.3d at 999–1000 ("*CalComp* and [*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), *overruled on other grounds by Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034 (9th Cir. 1987) ("*Foremost Pro*")] therefore stand for the uncontroversial proposition that product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result) (citing IIIB Areeda & Hovenkamp, Antitrust Law ¶ 776(a) at 285–86 (3d ed. 2006) ("At the very least, as all courts recognize, product improvement without more is protected and beyond antitrust challenge")); Novell, 731 F.3d at 1075 ("Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect.") (citing, among others, Aspen Skiing Co. v. Aspen Highlands Skiing Corp. , 472 U.S. 586, 597 (1985) and IIIB Areeda & Hovenkamp, Antitrust Law ¶ 772, at 223 (the refusal must be "irrational" but for its anticompetitive tendencies).

APPLE'S PROPOSED PRETRIAL CONFERENCE STATEMENT

4.    Apple had a legitimate business purpose in preventing, through technological means, conduct that violated the Digital Millennium Copyright Act, constituted copyright infringement of its software, caused Apple to violates its contracts with the record labels, or violated its Terms of Service.

- *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 790–92 (8th Cir. 2006) (no antitrust liability for allegedly conspiring to prevent unlawful import of drugs);

- *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169–70 (N.D. Cal. 2004) ("an action under the antitrust laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful.") (quoting Jenkins v. Greyhound Lines, Inc., 1971 WL 529, *1 (N.D.Cal.1971)).

5.    Plaintiffs' Permanent Audio Download market is not a properly defined relevant market.  Plaintiffs' Portable Digital Media Player market is not a properly defined relevant market.

- *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("[A] 'market' is the group of sellers or producers who have the 'actual or potential ability to deprive each other of significant levels of business.'");

- *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) ("The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand.");

- *Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 737 (W.D. Va. 2000) (excluding testimony of expert who failed to "thoroughly consider the substitutability of other products" in assessing the relevant market).

6.    Apple did not have monopoly power in any relevant market.  Apple did not have the ability to charge supracompetitive prices or exclude competition for an extended period of time at any point during the class period.  There were no significant barriers to entry or expansion by competitors in either market proposed by the Plaintiffs.

- *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run.") (citing cases);

- *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425–27 (9th Cir. 1993) ("The definition of monopoly power is clearly established in the case law: 'Monopoly power is the

25

power to control prices or exclude competition.' … We note that in order to prove Brunswick's possession of monopoly power, it was incumbent on L.A. Land to show that Brunswick had the power to exclude competition from the relevant market generally, not just to exclude a particular competitor.  Courts have consistently confirmed that the goal of the antitrust laws is to protect competition rather than competitors.") (emphasis in original; citations omitted).

7.     The integration of iTunes and iPod had no connection with the acquisition or maintenance of monopoly power.  The benefits that flowed to consumers, and to Apple, from this integration could have been realized by any firm, with or without monopoly power, and as this Court held, were per se lawful under Section 2 of the Sherman Act.  Apple introduced these products as an integrated platform as a new entrant into the relevant markets, when it could not possibly have had monopoly power.  Integrated systems were similarly introduced by competitors, including Microsoft and Sony, who the Plaintiffs concede had no monopoly power in the relevant markets.  The integration of iTunes and iPod was not exclusionary conduct within the ambit of Section 2 of the Sherman Act.

- *Foremost*, 703 F.2d at 544-45 (integrated system of film and camera was "lawful whether or not the defendant enjoys monopoly power in the relevant market" because "[t]he introduction of technologically related products, even if incompatible with the products offered by competitors, is alone neither a predatory nor anticompetitive act.").

8.     Plaintiffs cannot demonstrate that iTunes 7.0 caused injury to competition, rather than to RealNetworks alone, in the relevant market.  Plaintiffs' regression model offered by their expert Dr. Noll does not establish antitrust impact or damages.

- *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion deficient where it does not "incorporate all aspects of the economic reality" of the relevant markets and does not "separate lawful from [allegedly] unlawful conduct");

- *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1078–79 (D.D.C. 1982) ("A damage claim which fails to account adequately for the effect of other competitors on the plaintiff's market share is insufficient as a matter of law"; also holding that "failure to establish the reasonableness of its critical assumptions about competition and market share" renders the damages model insufficient; and "'but for' damage model is thus left with no foundation" where it is based on, among other things, an "obvious inconsistency between real world competitive conditions and [plaintiff's] assumptions about competition in the imaginary 'but for' world");

26

- *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041–42 (N.D. Cal. 2001) (damages model "contains entirely too many assumptions and simplifications that are not supported by real-world evidence. As a result, its conclusions that the discounts defendants received caused actual injury to the individual plaintiffs, and the amount of damages caused by that injury, are entirely too speculative to support a jury verdict").

9.      Plaintiffs' regression model offered by their expert Dr. Noll improperly conflates lawful and allegedly unlawful conduct.

- *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013) ("We start with an unremarkable premise. If respondents prevail on their claims, they would be entitled only to damages resulting from … the only theory of antitrust impact accepted for class-action treatment by the District Court.  It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class … [A]t the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'") (citing sources).

10.      There was no "lock-in" of consumers caused by iTunes 7.0 within the meaning of the antitrust laws.  Apple's longstanding policy of integrating iTunes and iPod was widely known and understood by consumers and competitors alike.  After learning that RealNetworks had discerned the code to FairPlay so that it could mimic the security program and trick the iPod, Apple publicized its intention to continue to update its products as it saw fit, specifically explaining that such updates were likely to be incompatible with third-party add-ons.  Reminding consumers that it intended to follow its traditional integrated approach clearly falls with the scope of a manufacturer's right to independently design products without regard to their effect on competitors.  Moreover, consumers who purchased an iPod were always on notice that updates would be integrated with iTunes, and that third-party programs would not be supported and may not work.

- *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1048–49 (9th Cir. 2008) (exclusion of complementary products is not actionable as an exercise of market power when consumers knowingly and voluntarily purchase the relevant product with knowledge that complements provided by rivals will not be available);

27

11.     The jury may not consider allegedly less restrictive alternatives to Apple's method of carrying out the product improvement.

- 2011 SJ Order, at 7 (Dkt. 627) ("'If a monopolist's design change is an improvement,' then the courts may not 'balanc[e] the benefits or worth of [the] product improvement against its anticompetitive effects.'") (quoting *Tyco*, 592 F.3d at 1000);

- *Tyco*, 592 F.3d at 1000 ("To weigh the benefits of an improved product design against the resulting injuries to competitors is not just unwise, it is unadministrable.  There are no criteria that courts can use to calculate the 'right' amount of innovation, which would maximize social gains and minimize competitive injury.  A seemingly minor technological improvement today can lead to much greater advances in the future.  The balancing test proposed by plaintiffs would therefore require courts to weigh as-yet-unknown benefits against current competitive injuries. Our precedents and the precedents we have relied upon strongly counsel against such a test.");

- *Trinko*, 540 U.S. at 408 ("Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited");

- *Image Tech. Serv. Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir. 1990) ("there is no least restrictive alternative requirement in the context of a Section 2 claim"); aff'd sub nom. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992));

- *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1022 (N.D. Cal. 1979) ("Where a monopolist chooses an alternative that does not unreasonably restrict competition, the law is not offended.  It is the choice of an unreasonable alternative, not the failure to choose the least restrictive alternative, that leads to liability."), *aff'd sub nom. Transamerica Comp. Co. v. Int'l Business Machines Corp.*, 698 F.2d 1377 (9th Cir. 1983).


12.     Apple did not attempt to monopolize the purported Permanent Audio Download market.  Apple did not attempt to monopolize the purported Portable Digital Media Player market.

- *CalComp*, 613 F.2d at 736–37 ("[A] a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt" and "specific intent is difficult to prove").


13.     Apple did not violate the UCL.  The only basis for the Plaintiffs' allegation that Apple engaged in unfair or unlawful conduct is its monopolization and attempted monopolization allegations.  Since those claims fail, its UCL claim fails as well.

- 2011 SJ Order, at 13 (Dkt. 627) ("Under California law, if the 'same conduct is alleged to be both an antitrust violation and an unfair business act for the same reason,' then the 'determination that the conduct is not an unreasonable restraint of trade necessarily implies

28

that the conduct is not "unfair" toward consumers.'") (citing *Apple, Inc. v. Pystar Corp.*, 586 F. Supp. 2d 1190, 1204 (N.D. Cal. 2008));

- 2011 SJ Order, at 13 (Dkt. 627) (granting summary judgment on Plaintiffs' UCL claim as to iTunes 4.7 because Plaintiffs' Section 2 claim based on iTunes 4.7 failed as a matter of law).

14.    Plaintiffs are not typical of or adequate representatives for retailers who purchased iPods from Apple for resale in their stores.

- FED. R. CIV. P. 23;

- *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489 (N.D. Cal. 2008) (finding representative plaintiffs who were individual purchasers of GPUs were not typical representatives for wholesale customers who bought in substantially different quantities and under different bargaining terms);

- *Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006) (representative plaintiffs who were individual purchasers of Microsoft operating system software were inadequate to represent Enterprise customers who had purchased at least 250 licenses because the claims were not typical).

15.    Plaintiffs cannot show a class-wide method of proving impact and damages.

- *Comcast*, 133 S. Ct. at 1433 (at trial, "any model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010));

- *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("We have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.");

- IIA P. Areeda, H. Hovenkamp & R. Blair, Antitrust Law, ¶ 331d, at 57 (3d ed. 2007) ("[T]he fact that some class members have not been damaged at all generally defeats certification, because the fact of injury, or 'impact' must be established by common proof.").

## IV.    Further Discovery or Motions

No further discovery is outstanding or ongoing.  No motions are pending.

## V.    Estimate of Trial Time

29

Apple estimates that six court days will be needed for the presentation of each party's case, and thus a total of twelve court days will be needed for trial.

The parties will continue to meet and confer regarding additional stipulations that may be requested or proposed to streamline the trial of this matter. In particular, the parties will continue to discuss potential stipulations regarding: (1) authenticity of exhibits not already the subject of a stipulation; (2) admissibility of exhibits; and (3) the factual and legal issues in dispute.

**VI.   List of Motions in Limine**

Apple's motions in limine include:

1.     Apple's Motion in Limine #1:  To Exclude Evidence or Argument Contrary to the Court's 2011 Summary Judgment Order.

2.     Apple's Motion in Limine #2: To Exclude Evidence or Argument that Apple Could Have or Should Have Aided Third-Party Products' Interoperability with iPods.

3.     Apple's Motion in Limine #3: To Exclude References to Purported Less Restrictive Alternatives.

4.     Apple's Motion in Limine #4: To Exclude Evidence of Defendant's Financial Resources & References to Any Purported Supracompetitive Profits.

5.     Apple's Motion in Limine #5: To Exclude Evidence or Argument Concerning Other Litigations.

6.     Apple's Motion in Limine # 6: To Exclude Argument or Evidence Concerning Steve Jobs's Character.

**VII.   Juror Questionnaire**

Apple intends to file proposed additional questions for jury selection, in the form of a draft juror questionnaire and proposed voir dire.

**VIII.   Trial Alternatives and Options**

**A.     Settlement Discussion.**

To be determined.

**B.     Consent to Trial Before a Magistrate Judge**

Apple [and Plaintiffs] do not consent to trial before a magistrate judge.

### C.    Amendments, Dismissals

All claims under Section 1 of the Sherman Act, all of Plaintiffs' state-law claims save for one under the UCL, and all claims regarding Apple's conduct concerning any software update or conduct other than iTunes 7.0, have been dismissed from the case before trial.

### D.    Bifurcation, Separate Trial of Issues

Apple [and Plaintiffs] state that bifurcation is neither feasible nor desirable in this case.

Dated: September __, 2014                    BOIES, SCHILLER & FLEXNER LLP



By: _____
            William A. Isaacson

*Counsel for Defendant* APPLE INC.

EXHIBIT 2

ROBBINS GELLER RUDMAN
  & DOWD LLP
BONNY E. SWEENEY (176174)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
JENNIFER N. CARINGAL (286197)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
bonnys@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
jcaringal@rgrdlaw.com
        – and –
PATRICK J. COUGHLIN (111070)
STEVEN M. JODLOWSKI (239074)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
patc@rgrdlaw.com
sjodlowski@rgrdlaw.com

Class Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE APPLE IPOD ITUNES ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) |  Lead Case No. C-05-00037-YGR |
| This Document Relates To:<br><br>    ALL ACTIONS. | | CLASS ACTION<br><br>DECLARATION OF PAULA M. ROACH IN SUPPORT OF PLAINTIFFS' RESPONSE TO APPLE'S BRIEF AND INDEX RELATING TO ILLEGALITY AND CHANGING CASE THEORIES |

Date:         November 18, 2014
Time:         1:00 p.m.
Courtroom:    1, 4th Floor
Judge:        Hon. Yvonne Gonzalez Rogers

982150_1

I, PAULA M. ROACH, declare as follows:

1.     I am an attorney duly licensed to practice before all of the courts of the courts of the State of California.  I am currently an associate at Blood Hurst & O'Reardon LLP.  Prior to joining Blood Hurst & O'Reardon, I worked at Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and its predecessor firm, lead counsel for Plaintiffs Melanie (Wilson) Tucker and Marianna Rosen.  I have personal knowledge of the matters stated herein, and, if called upon, I could and would competently testify thereto.

2.     I submit this declaration in support of Plaintiffs' Response to Apple's Brief and Index Relating to Illegality and Changing Case Theories.

3.     During my time at Robbins Geller, I, along with Thomas R. Merrick (formerly a partner at Robbins Geller) were primarily responsible for negotiating discovery with Apple.

4.     Where documents are referred to below, Carmen A. Medici, currently an associate with Robbins Geller, provided me with those documents.  I reviewed each document referred to in this declaration on November 6, 2014.

5.     On August 21, 2009, I sent a memorandum to the file detailing the contents of a meet and confer between Mr. Merrick, myself, and counsel for Apple, David Kiernan.  That memorandum said, in part: "RFP 4: [Apple is] not producing info related to DCMA [sic]."  Reading that memorandum refreshed my recollection that at the time Apple refused to produce documents relating to the DMCA.

6.     On and before December 1, 2009, I created a discovery chart detailing the history of discovery negotiations that our firm had with Apple and the current status of each discovery request, and sent it to other counsel for Plaintiffs.  In that chart, Discovery Request No. 4 is listed as: "All documents discussing the Digital Millennium Copyright Act."  The corresponding column under "Production Status" states: "Refused to produce responsive documents."  Reading this discovery chart refreshed my recollection that at the time, Apple still refused to produce any documents relating to the DMCA document request.

7.     On April 23, 2010, I helped Mr. Merrick prepare a letter.  That letter was sent to Apple and is included in the November 4, 2014 Declaration of David C. Kiernan Regarding Apple

1  Inc.'s Index of Documents ("Kiernan Decl.", ECF 877-1) relating to the Digital Millennium

2  Copyright Act. The excerpt included in the "Document Title and Description" (ECF 877 at 11)

3  describing this letter is incomplete and misleading. Reading the full paragraph of the April 23, 2010

4  letter (ECF 877-4 at 34) together with Mr. Kiernan's responsive letter dated April 27, 2010 (ECF

5  877-4 at 37), reveals that: (1) this paragraph is about source code; and (2) Apple continued to refuse

6  to provide any information responsive to the DMCA document request to Plaintiffs.

7       8. On July 18, 2010, I updated the discovery chart. In that chart, Discovery Request

8  No. 4 is described as "All documents discussing the Digital Millennium Copyright Act." The

9  corresponding column under "Production Status" states: "Refused to produce responsive

10  documents." Reading this discovery chart refreshed my recollection that at the time, Apple still

11  refused to produce any documents responsive to the DMCA document request.

12       9. On or before August 2, 2010, I updated the discovery chart. In that chart, Discovery

13  Request No. 4 is listed as: "All documents discussing the Digital Millennium Copyright Act." The

14  corresponding column under "Production Status" states: "Refused to produce responsive

15  documents." The next corresponding column under "MEET/CONFER STATUS" states: "Plaintiffs

16  withdrew request." Reading this discovery chart refreshed my recollection that at the time, Apple

17  still refused to produce any documents responsive to the DMCA document request.

18       10. I reviewed the Kiernan Decl. and the contemporaneous correspondence cited in the

19  Kiernan Decl. at exhibits 17-21 (ECF 877-4 at 32-40; ECF 877-5 at 1-8). Those exhibits refreshed

20  my recollection that there was a dispute between Plaintiffs and Apple regarding the DMCA and

21  Apple continually refused to produce documents relating to the DMCA. Because Plaintiffs' goal

22  was to see the changes that Apple made to FairPlay in response to perceived hackers and

23  competitors, Plaintiffs agreed that Apple would produce information related to the changes that

24  Apple made to FairPlay in lieu of documents related to the DMCA document request. *See* Kiernan

25  Decl., ¶24 (ECF No. 877-1 at 4).

26       11. Reviewing the Kiernan Decl. and the contemporaneous correspondence cited in the

27  Kiernan Decl. at exhibits 17-21 (ECF 877-4 at 32-40; ECF 877-5 at 1-8) refreshed my recollection

28

1  that Apple never expressed that RealNeworks' Harmony was illegal; rather Apple always treated

2  Harmony and RealNetworks separately from the other so-called "hacks" like JHymn.

3         I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct. Executed this 6th day of November, 2014, at San Diego, California.

5

                                                    PAULA M. ROACH

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECL OF PAULA M. ROACH ISO PLAINTIFFS' RESPONSE TO APPLE'S BRIEF AND INDEX
RELATING TO ILLEGALITY AND CHANGING CASE THEORIES - C-05-00037-YGR                    - 3 -

# EXHIBIT 3



**The Register of Copyrights**
United States Copyright Office • Library of Congress • 101 Independence Avenue SE • Washington, DC 20559-6000

TO:         James H. Billington                    DATE:   June 11, 2010
            The Librarian of Congress

FROM:       Marybeth Peters
            Register of Copyrights

SUBJECT:    Recommendation of the Register of Copyrights in RM 2008-8; Rulemaking
            on Exemptions from Prohibition on Circumvention of Copyright Protection
            Systems for Access Control Technologies

      I am pleased to present my recommendation relating to the rulemaking on exemptions from the prohibition on circumvention of technological measures that control access to copyrighted works.  This document constitutes my formal recommendation, as required pursuant to 17 U.S.C. § 1201(a)(1)(C).

**Outline of the Recommendation**

**I.      BACKGROUND**

      **A.      Legislative Requirements for Rulemaking Proceeding**

      **B.      Responsibilities of Register of Copyrights and Librarian of Congress**

      **C.      The Purpose and Focus of the Rulemaking**

            1.      *Purpose of the Rulemaking*

            2.      *The Necessary Showing*

            3.      *Determination of "Class of Works"*

      **D.      Consultation with the Assistant Secretary for Communications and Information**

**II.     SOLICITATION OF PUBLIC COMMENTS AND HEARINGS**

**III.    THE DESIGNATED CLASSES**

      **A.      Motion pictures on DVDs that are lawfully made and acquired and that are protected by the Content Scrambling System when circumvention is accomplished solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use in the following instances:**

necessary to make such a determination here, or delve into the essential step analysis that is required under Section 117, because (as discussed below) the Register has concluded that fair use provides an alternative legal basis for designating a class of works.[308]  As a result, the Register declines to base her recommendation on a finding centered on the question of whether "jailbreaking" involves non-infringing activity under Section 117.

              **b.**       Fair use

    As an additional basis for finding a non-infringing use that would justify designating the proposed class, proponents asserted that "even if any reproduction and modification of firmware incident to jailbreaking were to fall outside the scope of both authorization and § 117(a), it would nevertheless constitute a non-infringing fair use."[309]  The Register agrees that the activity of an iPhone owner who modifies his or her iPhone's firmware/operating system in order to make it interoperable with an application that Apple has not approved, but that the iPhone owner wishes to run on the iPhone, fits comfortably within the four corners of fair use.

    Fair use has traditionally been defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent."[310]  In evaluating whether a particular use is being made in such a reasonable manner,  it is helpful to look at the judgments Congress has made as to what kinds of uses of copyrighted material are reasonable and should be considered non-infringing.

    In this case, one does not have to look far.  In fact, Section 1201 itself offers strong evidence that the conduct at issue here is conduct that, at the time Congress enacted the prohibition on circumvention, it anticipated and considered to be reasonable and lawful.  The proposed exemption would make it lawful for iPhone users to circumvent technological measures in the iPhone firmware in order to install and run independently created software applications designed to run on the iPhone, albeit without Apple's approval.

    In Section 1201(f), Congress provided a statutory exemption that permits circumvention in

---

[308]  *Accord Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 600 n.1 (9th Cir. 2000) ("Connectix contends that its copying is within the protection of section 117, but our disposition of the fair use issue makes it unnecessary for us to address that contention").

[309]  C5A (EFF) at 9.

[310]  *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. at 549.

order to identify and analyze the elements of a computer program that are necessary to achieve interoperabilitiy of an independently created computer program.  The exemption also permits the development and employment of technological means to circumvent a technological measure in order to enable such identification and analysis, as well as to enable interoperability of an independently created computer program with other programs.  Finally, the exemption permits the making available to others of such information and of the means to circumvent, solely for the purpose of enabling interoperability of independently created computer programs.

In the legislative history associated with that provision, Congress expressed a commitment to permit and encourage interoperability between independently created computer programs and existing programs. Endorsing the holding of *Sega Enters. Ltd.  v. Accolade, Inc.,*[311] Congress stated in the legislative history that the purpose of the reverse engineering exemption, an exemption that it described as permitting "the circumvention of access control technologies for the sole purpose of achieving software interoperability," was to "avoid hindering competition and innovation in the computer and software industry."[312]  In enacting Section 1201(f), Congress provided that one who created a circumvention tool (a "means") to enable an independently created computer program to interoperate with a computer program (including a bootloader or an operating system) would be permitted to provide that circumvention tool to others so that they may use the tool to enable an independently created computer program to interoperate with another computer program when such activity is non-infringing.  Since Congress determined that it is lawful to make such tools and provide them to others for such purposes, it is difficult to imagine why Congress would nevertheless have wished to make it unlawful for others to use the tools for the purposes for which they were lawfully provided.[313]

A review of the four factors enumerated in Section 107 leads to the conclusion that making minor alterations in the firmware of an iPhone (or any smartphone) in order to permit

---

[311]     *Sega Enters. Ltd.  v. Accolade, Inc.* 977 F.2d 1510 (9th Cir. 1992); s*ee also, Sony Computer Entertainment, Inc. v. Connectix Corp.,* 203 F.3d 59; *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1540 (11th Cir. 1996); *Assessment Technologies of WI, LLC v. WIREdata, Inc.*350 F.3d 640, 644-45 (7th Cir. 2003).

[312]     House Manager's Report at 14.

[313]     The Register takes no position on the factual question of whether any particular person or entity has met the statutory requirements of Section 1201(f) for exempted reverse engineering or dissemination of the information and means discovered. The point of this discussion is to highlight the fact that Congress specifically provided that subject to certain requirements, Congress provided that it would not be a violation of Section 1201(a)(1) to circumvent an access control in order to achieve interoperability between computer programs and that it would not be a violation of Section 1201(a)(2) or 1201(b) to provide others with the means to enable interoperability.

independently created software applications to run on the iPhone is a fair use.  In making its case that the first fair use factor, "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes,"[314] favors a finding of fair use, EFF simply states that "[t]he first factor favors fair use because jailbreaking a phone in order to use lawfully obtained computer programs is a purely noncommercial, private use."[315]  That is accurate as far as it goes, but at the very least requires elaboration.  The fact that the use is noncommercial and private does not necessarily make it a fair use, nor does it even mean that the nature and purpose of the use is necessarily favored under the first fair use factor.[316]  In this case, it appears fair to say that the purpose and character of the modification of the operating system is to engage in a private, noncommercial use intended to add functionality to a device owned by the person making the modification, albeit beyond what Apple has determined to be acceptable. The user is not engaging in any commercial exploitation of the firmware, at least not when the jailbreaking is done for the user's own private use of the device, in the situation under consideration by the Register.

The fact that the person engaging in jailbreaking is doing so in order to use Apple's firmware on the device that it was designed to operate, which the jailbreaking user owns, and to use it in precisely the purpose for which it was designed (but for the fact that it has been modified to run applications not approved by Apple) favors a finding that the purpose and character of the use is innocuous at worst and beneficial at best.  As discussed below,[317] Apple's objections to the installation and use of "unapproved" applications appears to have nothing to do with its interests as the owner of copyrights in the computer programs embodied in the iPhone, and running the unapproved applications has no adverse effect on those interests.   Rather, its objections relate to its interests as a manufacturer and distributor of a device, the iPhone.

Moreover, as noted above, Congress has determined that reverse engineering for the purpose of making computer programs interoperable is desirable when certain conditions are met, and has crafted a specific exemption from Section 1201(a)'s prohibition on circumvention in such cases.  While an iPhone owner who "jailbreaks" does not fall within the four corners of the

---

[314]   17 U.S.C. § 107(1).

[315]   C5A (EFF) at 9.

[316]   *See BMG Music v. Gonzalez,* 430 F.3d 888, 889-90 (7th Cir. 2005).

[317]   *See* discussion of fourth fair use factor, *infra.*

statutory exemption in Section 1201(f),[318] the fact that he or she is engaging in jailbreaking in order to make the iPhone's firmware interoperable with an application specially created for the iPhone suggests that the purpose and character of the use are favored.

Further support for that conclusion can be found in case law relating to reverse engineering and fair use. In *Sega,* the case the legislative history of Section 1201(f) relied on, the court of appeals found that the first factor favored a finding of fair use when Accolade reverse engineered object code in a Sega video game console in order to learn how to make its own video games compatible with, and therefore run on, the Sega console. While much of the court's analysis of the first factor focused on the fact that Accolade needed "to discover the functional requirements for compatibility" with the Sega console in order to create games that were compatible for the console,[319] the court concluded that "Accolade copied Sega's code for a legitimate, essentially non-exploitative purpose, and that the commercial aspect of its use can best be described as of minimal significance."[320] Similarly, iPhone users who jailbreak the iPhone firmware in order to install and operate compatible applications do so for a legitimate, non-exploitative purpose which, as noted above, has no commercial aspects.

The Sega court also expressly considered the "public benefit" from Accolade's activity, which "has led to an increase in the number of independently designed video game programs offered for use with the Genesis console."[321] Similarly, the whole point of jailbreaking is to permit the use of independently designed applications on the iPhone, and the activity of jailbreaking encourages the creation of such applications.

Whether the use is "transformative" is a more difficult question. The user may be altering the firmware in a way that creates a derivative work, but such a work is not always, and not commonly, a transformative work. In this context, questions arise as to whether the alterations to the firmware are transformative in the sense described by the Supreme Court; that is, do they "adds something new, with a further purpose or different character, altering the first with new

---

[318]    The iPhone owner is not the person who has "identif[ied] and analyz[ed] those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs." *See* Section 1201(f)(1). Rather, the iPhone owner will be the beneficiary of that person's efforts and will be using the means provided by that person to install and run the independently created application on his or her iPhone.

[319]    *See* 977 F.2d at 1522.

[320]    *Id.* at 1522-23.

[321]    *Id.* at 1523.