# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

________________________________

THE APPLE IPOD ITUNES ANTITRUST LITIGATION )
) Lead Case No.
________________________________) C-05-00037-YGR
This Document Relates To: ) CLASS ACTION
)
ALL ACTIONS. )
)
________________________________)

VIDEOTAPED DEPOSITION OF KENNETH RIEGEL

South Lake Tahoe, California

Friday, November 7, 2014

Volume I

Reported by:
GINA GLANTZ
CSR No. 9795, RPR, RMR
JOB No. 1961798

PAGES 1 - 99

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

THE APPLE IPOD ITUNES ANTITRUST LITIGATION

Lead Case No. C-05-00037-YGR

This Document Relates To: ALL ACTIONS.

CLASS ACTION

Videotaped deposition of KENNETH RIEGEL, Volume I, taken on behalf of Defendants, at Lake Tahoe Resort Hotel, Niagara Room, 4130 Lake Tahoe Boulevard, South Lake Tahoe, California, beginning at 8:50 a.m. and ending at 11:11 a.m., on Friday, November 7, 2014, before GINA GLANTZ, Certified Shorthand Reporter No. 9795.

APPEARANCES:

For Plaintiffs:
ROBBINS GELLER RUDMAN & DOWD LLP
BY: ALEXANDRA S. BERNAY
Attorney at Law
655 West Broadway, Suite 1900
San Diego, California 92101
(619) 231-1058
xanb@rgrdlaw.com

For Defendant:
BOIES, SCHILLER & FLEXNER LLP
BY: KIERAN PAUL RINGGENBERG
BY: SUZANNE JAFFE
Attorneys at Law
1999 Harrison Street, Suite 900
Oakland, California 94612
(510) 874-1000
kringgenberg@bsfllp.com
sjaffe@bsfllp.com

Videographer:
JEFF WALDIE

INDEX

| WITNESS | EXAMINATION |
|---|---|
| KENNETH RIEGEL Volume I | |
| BY MR. RINGGENBERG | 8 |
| BY MS. BERNAY | 95 |

EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document titled "1120S U.S. Income Tax Return for an S Corporation," for 2005, for K & N Enterprises, Inc. (RIEGEL00001 - 37) | 19 |
| Exhibit 2 | Document titled "1120S U.S. Income Tax Return for an S Corporation," for 2006, for K & N Enterprises, Inc. (RIEGEL00038 -- 59) | 20 |

INDEX (Continued):

EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Document titled "1120S U.S. Income Tax Return for an S Corporation," for 2007, for K & N Enterprises, Inc. (RIEGEL00060 - 70) | 24 |
| Exhibit 4 | Document titled "1120S U.S. Income Tax Return for an S Corporation," for 2008, for K & N (RIEGEL00071 - 80) | 24 |
| Exhibit 5 | Document titled "Authorized Apple Reseller U.S. Sales Agreement (iPod Authorization)" (RIEGEL00093 - 98) | 27 |
| Exhibit 6 | Document titled "Invoice Line Item Export" (RIEGEL00110 - 132) | 34 |
| Exhibit 7 | Document titled "Invoice Line Item Export" (RIEGEL00133 - 166) | 38 |

INDEX (Continued):

EXHIBITS

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Document titled "BUSINESS PURCHASE AGREEMENT" (RIEGEL00081 - 86) | 39 |
| Exhibit 9 | Document titled "PLAINTIFF KENNETH RIEGEL'S RESPONSES TO DEFENDANT APPLE INC.'S FIRST INTERROGATORIES" | 62 |

INSTRUCTION NOT TO ANSWER

| Page | Line |
|---|---|
| 31 | 11 |

South Lake Tahoe, California; Friday, November 7, 2014

8:50 a.m.

THE VIDEOGRAPHER: Good morning. We are on the 08:50:17 record at 8:50 a.m. on November 7th, 2014. This is the 08:50:20 video-recorded deposition of Kenneth Riegel. My name is 08:50:27 Jeff Waldie, here with our court reporter, Gina Glantz. 08:50:32 We are here from Veritext Legal Solutions at the request 08:50:35 of counsel for defendant. 08:50:42

This deposition is being held at the Lake Tahoe 08:50:43 Resort Hotel in South Lake Tahoe, California. The caption 08:50:47 of the case is In Re the Apple iPod iTunes Antitrust 08:50:52 Litigation; Case No. C-05-00037-YGR. 08:50:59

Please note that audio and video recording will 08:51:10 take place unless all parties agree to go off the record. 08:51:16 Microphones are sensitive and may pick up whispers, 08:51:19 private conversations, and cellular interference. 08:51:23

I am not related to any party in this action, nor 08:51:27 am I financially interested in the outcome in any way. 08:51:31

If there are any objections to the proceeding, 08:51:36 please state them at the time of your appearance, 08:51:40 beginning with the noticing attorney. 08:51:42

Would you please introduce yourself. 08:51:44

MR. RINGGENBERG: Kieran Ringgenberg, Boies, 08:51:49 Schiller & Flexner, for Apple. 08:51:49

MS. JAFFE: Suzanne Jaffe, Boies, Schiller & 08:51:54 Flexner, on behalf of Apple. 08:51:55

MS. BERNAY: Alexandra Bernay from Robbins Geller 08:51:55 Rudman & Dowd on behalf of Mr. Riegel and the class. 08:51:58

THE VIDEOGRAPHER: Thank you. The witness will be 08:52:01 sworn in and counsel may begin the examination. 08:52:03

KENNETH RIEGEL,

having been administered an oath, was examined and testified as follows:

EXAMINATION 08:52:14

BY MR. RINGGENBERG: 08:52:14

Q Good morning, Mr. Riegel. We just met off the 08:52:15 record, but my name is Kieran Ringgenberg. I'm one of the 08:52:18 lawyers for Apple in this matter. Have you sat for a 08:52:20 deposition before? 08:52:24

A A long time ago. 08:52:24

Q Well, as you may recall, and Xan may have warned 08:52:25 you, how the process works is I'm going to ask questions 08:52:30 and the court reporter is going to try to write down what 08:52:33 your answers are, so a couple things that will make that 08:52:35 go a little smoother. It's important that we don't talk 08:52:38 over each other. So I'll do my best to wait until you 08:52:40 finish your answers before I ask my next question -- 08:52:40

(Interruption by the reporter.) 08:52:40

BY MR. RINGGENBERG: 08:52:40

Q It's also important that you wait until I finish 08:52:47 my questions before you begin your answer. Is that fair? 08:52:51

A It's fair. 08:52:53

Q The other thing is, people in normal conversation 08:52:54 often answer with nonverbals or sounds and not words, like 08:52:59 "uh-huh" and "huh-uh." Those are hard for the court 08:53:02 reporter to take down, so it's important that you answer 08:53:06 verbally with words; is that fair? 08:53:08

A That's fair. 08:53:10

Q Is there any reason why you can't give your best 08:53:11 and most accurate testimony today? 08:53:14

A No. 08:53:15

Q Is it correct that you were formally involved with 08:53:15 a business that, among other things, sold iPods? 08:53:20

A Yes. 08:53:26

Q And what was your involvement with that business? 08:53:26

A I was the owner. 08:53:28

Q And what was the name of the business? 08:53:30

A K & N Enterprises, Incorporated, doing business as 08:53:31 Delaware Computer Exchange. 08:53:37

Q And when did you -- when did K & N Enterprises -- 08:53:39 when was it formed? 08:53:43

A December of 1992, in Delaware. 08:53:44

Q And were you -- you were the owner from 1992; is 08:53:48
that correct? 08:53:53
A Yes. 08:53:53
Q And what kind of business was it in 1992? 08:53:54
A A computer reseller, retail computer reseller. 08:53:58
Q And what type of computers did you sell, starting 08:54:03
in 1992? 08:54:05
A Would have been IBM-compatible, Windows- 08:54:07
compatible, and Apple microcomputers. So mostly Macintosh 08:54:12
at that time. 08:54:18
Q And did you continue to sell mostly Apple 08:54:18
computers from 1992 until the mid-2000s? 08:54:22
A We actually ended up specializing in Apple 08:54:29
computers. 08:54:33
Q Do you recall when that was? 08:54:33
A It would have been soon after, so I would say '93 08:54:34
approximately. 08:54:38
Q So when you say you "specialize," does that mean 08:54:39
you ceased selling IBM-compatible computers? 08:54:41
A Initially we did not. All we sold was Apple 08:54:46
Macintosh. It had to do with capitalization. 08:54:49
Q So you made a business decision to focus your 08:54:51
efforts on Apple computers; is that right? 08:54:54
A That is correct, yes. 08:54:56
Q And why did you choose to do that? 08:54:57

A Capital, we did not have enough -- or I did not 08:54:58
have enough capital available to do everything well, so I 08:55:01
specialized in one thing, and did that quite well. 08:55:06
Q And why did you choose Apple as opposed to the 08:55:08
alternative? 08:55:11
A Like the -- like the products, it was also a 08:55:11
competitive decision. No one else in the area was 08:55:16
specializing. 08:55:19
Q And how long did K & N Enterprises operate? 08:55:20
A Well, we operated Delaware Computer Exchange until 08:55:27
the end of 2007. 08:55:30
Q And is it correct that you -- that K & N 08:55:33
Enterprises sold the retail computer business at that 08:55:36
time? 08:55:39
A We had one store at that time, and we sold the 08:55:39
operations of that store to another firm. 08:55:45
Q And was there any remaining business that K & N 08:55:47
Enterprises was involved in after the sale of the retail 08:55:51
computer store? 08:55:55
A Not specifically, no. I had kept the company 08:55:56
open, the corporation open for a while, thinking that I 08:56:01
would do something else, but I ended up not. 08:56:04
Q So what happened to the corporation? 08:56:08
A I just let it -- I'm not sure of the term, but if 08:56:09
you don't continue with the filings and the payment for -- 08:56:14

to the State of -- to the State of Corporations, then it 08:56:18
goes away. 08:56:21
Q And that's what happened; is that right? 08:56:23
A Correct. 08:56:23
Q And when did that occur? 08:56:24
A I'm not sure exactly, but it would have been at 08:56:26
least a year later. 2008, 2009 is my guess. 08:56:30
Q Thank you. 08:56:35
Did you personally use Macintosh computers for 08:56:36
your own uses? 08:56:44
A Yes. 08:56:46
Q And did you choose to use Macintosh computers 08:56:46
before you started the retail business? 08:56:50
A I probably was more Windows-oriented before 1992. 08:56:58
For my primary. I'll say primary. 08:57:07
Q And we don't need to get into a lot of detail, but 08:57:09
between 1992 and, say, the mid-2000s, how successful was 08:57:14
your retail operation as a business? 08:57:18
A Since we were a hundred percent dedicated to 08:57:20
Apple, we suffered at times when Apple suffered, and then 08:57:23
we benefited when Apple benefited. When Steve Jobs came 08:57:30
back around '98, introduced the small iMacs, we started to 08:57:35
build up some momentum again. 08:57:41
Q At some point is it correct that K & N -- strike 08:57:44
that. 08:57:50

I'm just going to start calling it K & N -- 08:57:50
A That's fine. 08:57:53
Q -- because K & N Enterprises is long; is that 08:57:53
okay? 08:57:56
A That's fine. 08:57:56
Q At some point, did K & N begin selling iPods? 08:57:57
A Yes. 08:58:00
Q And why is that? 08:58:01
A We were known in the community to be the Apple 08:58:02
specialists, and whatever -- whenever Apple introduced the 08:58:05
product, they made it available to us, and our clients 08:58:11
expected us to have them available and to be knowledgeable 08:58:14
and expert. 08:58:18
Q Did -- in your experience, were the buyers of 08:58:25
iPods from K & N Mac users or were there also PC users? 08:58:28
A Initially they were Mac users, because they only 08:58:35
worked with Mac, and then they ended up being available 08:58:39
for Windows-based, and people came into our stores, and 08:58:42
they -- again, it became a mix, but it also -- we ended up 08:58:51
selling more computers because of the iPod. 08:58:55
Q And why is that? 08:58:57
A People got comfortable with the Apple product and 08:58:58
liked it, and so they were open to trying their computers. 08:59:02
Q In your experience, were consumers satisfied with 08:59:07
how the iPods worked and -- 08:59:12

employees at the store about -- well, strike that. 09:04:29
You had to make decisions about what products to 09:04:32
buy -- 09:04:34
A Yes. 09:04:34
Q -- for resale; is that right? 09:04:35
And what information did you use to make that 09:04:37
decision? 09:04:40
A You take a look at the previous sales. Like I 09:04:40
would go back, I would analyze my inventory and my sales. 09:04:44
That was one thing I was pretty good at. And so I would 09:04:49
take a look at previous -- past sales, take a look at the 09:04:52
models, when they're released, the price points, and make 09:04:57
determinations. A lot of times it was a supply issue, and 09:05:01
so I would buy everything I could get. 09:05:04
Q Were there -- you had difficulty getting as many 09:05:07
iPods to sell as you'd like to have? 09:05:13
A Yes. Apple specifically put in their contracts 09:05:15
that they would allocate product to their stores first and 09:05:18
their website, their educational customers and anyone else 09:05:22
they wanted to allocate it to before the dealers. 09:05:27
Q And so is it correct that at times, you didn't 09:05:29
have enough iPods to sell to meet all the demand that you 09:05:32
thought you could meet? 09:05:36
A There were many times that we did not have a 09:05:36
product in stock when the person wanted to buy it. 09:05:39

Q I'm going to offer you what we call Riegel Exhibit 09:06:04
1. 09:06:11
(Exhibit 1 was marked for identification.) 09:06:11
MR. RINGGENBERG: So for the record, Riegel 09:06:22
Exhibit 1 bears Bates number RIEGEL00001 through 37. 09:06:23
Q Do you recognize Riegel Exhibit 1? 09:06:30
A Yes. 09:06:32
Q Is this the income tax returns for K & N 09:06:34
Enterprises for 2005? 09:06:37
A Yes. 09:06:38
Q Did you prepare these? 09:06:39
A Yes. 09:06:40
Q And they were accurate to the best of your 09:06:40
understanding and ability? 09:06:42
A Yes. 09:06:47
Q What year did the second retail store close? 09:06:48
A At the end of 2005. 09:06:52
Q So in 2005, you had two retail stores operating; 09:06:54
is that right? 09:06:57
A Yes. 09:06:57
Q And it looks like you did about $2.1 million in 09:07:02
revenue that year; is that right? 09:07:05
A Yes. 09:07:06
Q Do you have any just general view about what 09:07:06
portion of that revenue came from iPod sales? 09:07:11

A Not specifically, that I could tell you today. Do 09:07:15
you want a guess or do you want -- 09:07:22
MS. BERNAY: No. 09:07:24
BY MR. RINGGENBERG: 09:07:24
Q No. What was the largest revenue item for K & N 09:07:25
Enterprises in 2005? 09:07:31
A Largest revenue item for K & N would have been Mac 09:07:32
CPU sales. 09:07:37
Q Let me offer you what will be Riegel Exhibit 2. 09:07:40
MS. BERNAY: So you can put that to the side. 09:07:57
(Exhibit 2 was marked for identification.) 09:07:57
MR. RINGGENBERG: For the record, Riegel Exhibit 2 09:08:14
bears Bates numbers RIEGEL00038 through 59. 09:08:17
Q Is Riegel Exhibit 2 K & N Enterprises' tax return 09:08:23
for 2006? 09:08:28
A Yes. 09:08:28
Q And was that also accurate to the best of your 09:08:28
ability and understanding at the time? 09:08:31
A Yes. 09:08:32
Q So in 2006, it looks like you did about $900,000 09:08:33
in revenue; is that right? 09:08:40
A Yes. 09:08:41
Q And do you attribute the drop-off primarily to 09:08:41
closing the second retail location? 09:08:45
A Most of it. 09:08:47

Q Are there other reasons for the decline in revenue 09:08:50
between 2005 and 2006? 09:08:52
A If I recall correctly, my sales at my Dover store, 09:08:54
which was the one that was still in existence, had 09:09:02
decreased a little bit. 09:09:05
Q Do you have any view as to why that was? 09:09:06
A I don't. I mean, I can't tell you why today. 09:09:08
Q Why did you -- where was the other location? 09:09:13
There's a Dover store that maintained -- that stayed open. 09:09:16
Where was the location that closed? 09:09:19
A Delaware is a long, skinny state. We were at the 09:09:22
very top of the state, within a mile and a half of the 09:09:24
Pennsylvania border. 09:09:26
Q I see. That's the location that closed or that's 09:09:28
the location that's open? 09:09:31
A That was the location that closed. 09:09:32
Q And what's the name of the town? 09:09:33
A It would be Wilmington, Delaware, is the -- 09:09:35
Q Why did you -- so in 2005, there was a Wilmington 09:09:39
store and a Dover store; is that right? 09:09:44
A Yes. 09:09:46
Q And at the end of 2005, you decided to close the 09:09:47
Wilmington store? 09:09:50
A Yes. 09:09:52
Q Why did you decide to close the Wilmington store 09:09:52

resolve such dispute or controversy within sixty days 09:23:08
after the complaining party's written notice (a 'Dispute 09:23:10
Notice') to the other party of such dispute or 09:23:14
controversy, the parties shall further seek to resolve the 09:23:17
dispute or controversy pursuant to non-binding mediation 09:23:20
conducted in either Santa Clara County or San Francisco, 09:23:24
California"? 09:23:27
Do you see that language? 09:23:27
A I see that language. 09:23:28
Q Have you ever invoked this provision, that is, 09:23:29
attempted to resolve a dispute with a member of Apple 09:23:33
management? 09:23:37
A No. 09:23:37
Q And did you ever participate in any mediation with 09:23:37
any -- with Apple pursuant to this agreement? 09:23:42
A No. 09:23:44
Q Do you have a dispute with Apple? 09:23:44
MS. BERNAY: Objection. Vague. Also calls for a 09:23:50
legal conclusion. 09:23:53
You can answer if you understand the question. 09:24:00
THE WITNESS: I mean, I understand the question. 09:24:02
I'm not sure, the answer. 09:24:04
BY MR. RINGGENBERG: 09:24:06
Q How did you -- so you're sitting here in a 09:24:10
deposition. I'm sure you have other things you'd rather 09:24:14

be doing. 09:24:16
A Sure. 09:24:17
Q How did you come to be here? 09:24:20
A I was contacted by the plaintiff law firm back in 09:24:20
September. 09:24:23
Q And what did they tell you? 09:24:24
MS. BERNAY: Objection. Calls for attorney-client 09:24:26
privilege. 09:24:29
I'm going to instruct you not to answer that 09:24:29
question. 09:24:31
(Instruction not to answer.) 09:24:31
BY MR. RINGGENBERG: 09:24:32
Q At what point, to your understanding, did the 09:24:32
attorney or any attorney for the plaintiffs in this 09:24:38
lawsuit become to represent you -- become your lawyer? 09:24:41
MS. BERNAY: Objection. Calls for attorney-client 09:24:44
privileged information. 09:24:48
I'm going to instruct you not to answer, unless 09:24:48
you can answer that without involving discussions that you 09:24:50
and I have had or that you've had with other members of my 09:24:55
law firm. 09:24:58
BY MR. RINGGENBERG: 09:24:58
Q My question is, on what date, to your 09:24:59
understanding, she became your lawyer. 09:25:01
MS. BERNAY: If you can answer just by giving him 09:25:02

a specific date. If you don't know the answer to that -- 09:25:04
THE WITNESS: I don't have the specific date. 09:25:07
BY MR. RINGGENBERG: 09:25:08
Q Did you believe, in this conversation in September 09:25:09
that you referenced, that at that point, Xan's law firm 09:25:11
was representing you as your lawyers? 09:25:16
MS. BERNAY: Objection. Calls for potentially 09:25:18
attorney-client privileged information. 09:25:21
You can answer if you can do that without 09:25:23
involving discussions that we've had or that you've had 09:25:25
with anyone in my law firm. 09:25:28
THE WITNESS: They were not representing me in the 09:25:30
first conversation. 09:25:32
BY MR. RINGGENBERG: 09:25:33
Q What do you remember about that conversation? 09:25:36
A Just being made aware of the lawsuit, and that I 09:25:38
was a party to it, as being a dealer of iPods during the 09:25:48
time period. 09:25:56
Q And at some point, did you make a decision that 09:25:56
you wanted to become personally involved in a lawsuit? 09:26:00
A Yes. 09:26:04
Q Why did you -- why did you want to do that? 09:26:05
A Number one, I thought it would be interesting; 09:26:08
number two, the -- a little bit of nostalgia. This was my 09:26:13
life for 25 years, and so there was some nostalgia. And 09:26:21

then number three is I'm a huge believer of right and 09:26:28
wrong, and I believe there was some wrong here. 09:26:31
Q Setting aside the issues that are specific to this 09:26:38
case, and we'll talk about those, setting those aside for 09:26:41
the moment, you had a long business relationship with 09:26:43
Apple. How did you -- and then you sold your business and 09:26:45
walked away. What was your feeling about Apple at that 09:26:48
time when you sold your business? 09:26:52
A Oh, my feeling about Apple? Very blessed. It was 09:26:53
a huge -- it was my life. Very blessed. I am -- you 09:27:03
know, although the relationship was not perfect, there 09:27:06
were, you know, a lot of things that I considered unfair, 09:27:12
but the positives were bigger than the negatives. It got 09:27:17
my family to Lake Tahoe, which is an incredible place, and 09:27:25
I would not have been able to do it without Steve Jobs, 09:27:29
first of all, opening stores. And then it provided us the 09:27:32
income to transition to other careers here. And it's 09:27:34
been -- I mean, I'm super blessed. And I'm very, very 09:27:39
grateful for my relationship with Apple, because again, I 09:27:43
would not be here. 09:27:47
Q Referring back to paragraph 14.A, there's two 09:27:51
sentences at the end that are in bold. Do you see those? 09:28:01
A Um-hmm. 09:28:04
Q Or, I'm sorry, at least all caps. And the first 09:28:04
one says, "EACH PARTY HERETO...IRREVOCABLY WAIVES ALL 09:28:06

And so the remainder of Riegel Exhibit 6 is the weekly reports that you still happen to have in your file? 09:32:59 09:33:03
A Yeah, one or two were missing for 2007, but most of them were there. 09:33:06 09:33:08
Q And the third column, it's "BNAME," the information is redacted. Is that the identity of the purchaser? 09:33:09 09:33:13 09:33:16
A It -- yes, and I'm -- business name. I don't -- since this is redacted, I don't recall -- we had a code for the customer, and then we also had a name, and I'm not sure which one was populated for this since it was taken out. 09:33:16 09:33:21 09:33:25 09:33:30 09:33:33
Q But it's either the name or a code number for the -- 09:33:33 09:33:39
A For the customer. 09:33:39
Q -- for the customer? 09:33:40
Let me offer you -- it's the other one of these, so this will be Riegel Exhibit 8. 09:33:41 09:33:52
THE REPORTER: 7. 09:34:06
MR. RINGGENBERG: 7, thank you. 09:34:06
(Exhibit 7 was marked for identification.) 09:34:06
MR. RINGGENBERG: So Riegel Exhibit 7 is RIEGEL00133 through 166. 09:34:07 09:34:10
Q Is Riegel Exhibit 7 a compilation of further weekly reports that came from your file? 09:34:15 09:34:18

A Yes. 09:34:20
Q And the columns in Riegel Exhibit 7 mean the same things as the column in Riegel Exhibit 6 that we already covered; is that right? 09:34:20 09:34:23 09:34:26
A Yes. 09:34:26
Q Do you have any other records other than Riegel 6 or 7 of what K & N purchased from Apple or sold between 2005 and 2007? 09:34:33 09:34:36 09:34:42
A Sold, no. Purchased, you have another thing which was a couple invoices. That's the only thing that I had. 09:34:44 09:34:49
Q I appreciate that. Let me offer you what will be Riegel Exhibit 8. 09:34:52 09:35:00
(Exhibit 8 was marked for identification.) 09:35:00
MR. RINGGENBERG: Riegel Exhibit 8 bears Bates labels RIEGEL00081 through 86. 09:35:11 09:35:13
Q Do you recognize Riegel Exhibit 8? 09:35:17
A Yes. 09:35:19
Q What is it? 09:35:20
A This was the agreement that we used to sell the assets or the operations, I guess assets primarily, of K & N Enterprises to Apple Sauce, Inc. 09:35:20 09:35:27 09:35:31
Q Why did you decide to sell the retail operation? 09:35:34
A Why did I decide to sell? Similar reason as to closing the other store. It was difficult to reenter into a new lease when the uncertainty was too negative in 09:35:39 09:35:47 09:35:53

predictions as opposed to positive, and I was also 3,000 miles away, and I had a manager who wanted to buy it. 09:36:01 09:36:06
Q So Apple Sauce, Inc., was the buyer of the retail store; is that right? 09:36:10 09:36:18
A Yes, that was the name of the corporation that they set up and it was two individuals. 09:36:19 09:36:21
Q And that was the manager of your store and someone else? 09:36:23 09:36:26
A Yes. Francis Mott was the manager. And looking at the document, he became the president of Apple Sauce, Inc. 09:36:26 09:36:31 09:36:34
Q And did you know Mr. Timothy O'Connor as well? 09:36:34
A I personally did not know him prior to the purchase. He was a client for many years; okay? But I did not know him. 09:36:36 09:36:39 09:36:44
Q He was the client, meaning he bought -- 09:36:45
A Apple products. 09:36:48
Q From K & N? 09:36:49
A Um-hmm. 09:36:50
Q So just to kind of dot our i's and cross our t's, on page 4, bearing Bates label RIEGEL00084, is that your signature above "Kenneth A. Riegel, President"? 09:36:51 09:36:58 09:37:02
A Yes. 09:37:06
Q Were there any other officers of K & N other than yourself? 09:37:06 09:37:13

A My wife probably was secretary at the time. 09:37:13
Q And Riegel Exhibit 8 sets out, to the best of your understanding, the terms under which K & N sold the assets of the retail store known as Delaware Computer Exchange to Apple Sauce, Inc.; is that right? 09:37:16 09:37:19 09:37:22 09:37:27
A Yes. 09:37:28
Q And is it correct that the purchase price you received was $78,500 in inventory and $20,000 for the remaining value of the company? 09:37:29 09:37:33 09:37:42
A 78,000 was for the inventory, and then the other 20,000 was for the other assets purchased. 09:37:43 09:37:48
Q Oh, I see. And what other -- other than inventory, what other assets were there? 09:37:51 09:37:53
A Customer lists, service, there was -- we had some service tools, some furniture, fixtures, things. 09:37:55 09:38:00
Q What about the right to use the name Delaware Computer Exchange, who had that after the transaction, to your understanding? 09:38:03 09:38:07 09:38:09
A I would -- I don't know if they continued as Delaware Computer Exchange. So I was comfortable having them have the rights to the name Delaware Computer Exchange. 09:38:10 09:38:16 09:38:19 09:38:22
Q Do you know what happened to the business after you sold it? 09:38:22 09:38:25
A They -- I think they only lasted a year, and it 09:38:26

back to Apple? 09:43:46
A How do I know? Because they reported everything 09:43:50
back to Apple. I mean -- 09:43:52
Q Fair enough. You haven't seen -- let me put it 09:43:53
this way. 09:43:56
You don't recall receiving specific information 09:43:56
that showed Apple had your volume of sales from Ingram of 09:43:59
iPods, but you believe that to be the case because it was 09:44:07
true for other products; is that fair? 09:44:09
A That's fair. That's a fair summary. 09:44:11
Q In order to maintain inventory in the most -- in 09:44:23
the optimal way, did you keep track of Apple's products 09:44:27
and the various iterations over time? 09:44:34
MS. BERNAY: Objection. Vague. 09:44:36
BY MR. RINGGENBERG: 09:44:37
Q Strike that. 09:44:38
Apple sold various models of iPods; correct? 09:44:38
A Yes. 09:44:41
Q And they came out with new versions that had 09:44:41
different features regularly; is that right? 09:44:43
A Yes. 09:44:45
Q And one of the things you did is manage your 09:44:45
inventories to keep track of that; is that right? 09:44:47
A Absolutely, yes. 09:44:48
Q You wanted to make sure you had the latest iPod, 09:44:49

at least if you thought it would sell I assume; is that 09:44:52
right? 09:44:54
A Yes. 09:44:54
Q And what's your recollection of how different iPod 09:44:54
models changed over time, as a general matter? 09:45:01
MS. BERNAY: Objection. Vague. 09:45:03
You can answer. 09:45:04
THE WITNESS: There were -- and this is a vague 09:45:05
summary. There were certain times of the year that Apple 09:45:10
would make model changes; okay? Originally, it was tied 09:45:13
into Macworld, okay, which in most cases was in January. 09:45:18
That was a big time that they came out with product 09:45:23
announcements. There was also the Worldwide 09:45:26
Development -- Developers Conference, which is in 09:45:30
San Francisco, most of the time, I think. That was 09:45:32
another time that they came out with models. When they 09:45:35
shifted to a large consumer iPod slide, September was a 09:45:39
big, big time that they changed models. 09:45:45
BY MR. RINGGENBERG: 09:45:49
Q In anticipation for the holiday season presumably? 09:45:49
A Absolutely. 09:45:52
Q And was the holiday season significant for your 09:45:53
retail store too? 09:45:56
A Yes. 09:45:57
Q A lot of people buy iPods for gifts? 09:45:57

A Yes. 09:46:02
Q So there are different iPod models in the sense of 09:46:02
there's a nano and a shuffle and classic and a mini; you 09:46:12
understand that? 09:46:16
A Um-hmm. 09:46:17
Q And then within each of those categories, they 09:46:17
came out with iterations with improvements over time; is 09:46:20
that right? 09:46:22
A Yes. 09:46:22
Q What's your recollection of some of the types of 09:46:23
improvements that occurred within a given iPod category, 09:46:25
so, for example, for an iPod nano? 09:46:30
MS. BERNAY: Objection. Vague. 09:46:32
You can answer. 09:46:34
THE WITNESS: I think one of the biggest changes, 09:46:34
they went to a color screen. They had the ability to add 09:46:39
some photos, I guess, some little videos and things, but 09:46:46
that was probably one of the biggest changes. It made it 09:46:50
a little bit more user-friendly for the person using them. 09:46:54
BY MR. RINGGENBERG: 09:46:58
Q And were iPod buyers, to your understanding, from 09:46:58
K & N, typically first-time iPod buyers or did you have 09:47:03
people who were getting new models to replace prior 09:47:08
versions? 09:47:13
MS. BERNAY: Objection. Vague, also compound. 09:47:13

BY MR. RINGGENBERG: 09:47:19
Q Do you understand the question? 09:47:19
A I understand the question, and it was a 09:47:20
combination. With -- Apple has a huge following of people 09:47:21
that would buy every product that Apple came out with. It 09:47:30
didn't matter if it was three months later, they would do 09:47:33
that, and then they would have -- we'd have new people 09:47:36
coming in to buy stuff. 09:47:39
Q But as first-time iPod buyers? 09:47:40
A Yes. 09:47:45
Q Did you use an iPod personally? 09:47:45
A I -- yes, I used an iPod. 09:47:48
Q Do you remember when you first had an iPod for 09:47:52
your personal use? 09:47:55
A I don't remember when. I wasn't a big user of an 09:47:56
iPod. Kids, yes. Wife, yes. 09:48:02
Q Your kids and wife had iPods, but -- 09:48:05
A They had iPods. 09:48:09
Q Do you -- are you a music fan? Do you have a 09:48:13
music collection? 09:48:15
A Yes. 09:48:16
Q And what forms -- for the period, say, from 2000 09:48:17
to 2007, what form did your music collection take? Did 09:48:21
you have albums, did you have CDs? What did you have? 09:48:26
A Oh, I have some albums still in storage. I think 09:48:29

right? 09:53:51
A Correct. 09:53:51
Q And you didn't bother to reload all those songs 09:53:52 onto your computer, from CD -- 09:53:55
A Right. 09:53:57
Q -- your new computer? 09:53:58
A Too much work. 09:53:59
Q Do you recall when that was when you replaced your 09:54:00 computer? 09:54:05
A Three years ago, two years -- two to three years 09:54:05 ago. A few years, I think. 09:54:07
Q Would it have been helpful to you to be able to 09:54:10 take the songs that were on your iPod, that you had 09:54:14 already spent all that time getting digital format to load 09:54:16 them back onto your new computer? 09:54:20
A Yes, yes. 09:54:22
Q It saved you the trouble of getting them off CD 09:54:23 again; right? 09:54:26
A Right. 09:54:27
MS. BERNAY: When you're done with this line, can 09:54:27 we take a quick break? 09:54:29
MR. RINGGENBERG: Sure. Why don't we take a break 09:54:30 now. 09:54:32
THE VIDEOGRAPHER: We're off the record at 09:54:32 approximately 9:54 a.m. 09:54:34

(Recess.) 10:05:01
THE VIDEOGRAPHER: We're back on the record at 10:06:15 approximately 10:06 a.m. 10:06:26
BY MR. RINGGENBERG: 10:06:28
Q Mr. Riegel, when you were doing purchasing for 10:06:30 K & N and -- how did you learn about what new products or 10:06:32 new versions of products Apple would be offering? 10:06:43
A Apple would give us product notices, for lack of a 10:06:45 better word, of when they were introducing new products. 10:06:53 And they probably distributed in a combination of e-mail, 10:06:58 overnight packages. They got us the information pretty 10:07:06 quickly. 10:07:10
Q And based on that, you would decide how many and 10:07:11 of what type of iPods and other products -- 10:07:16
A Yes. 10:07:19
Q -- to purchase; is that right? 10:07:19
A Yes. 10:07:20
Q You also sold iPod accessories; is that correct? 10:07:21
A Yes. 10:07:26
Q And is it correct that those were relatively 10:07:26 high-margin products? 10:07:29
A Compared to an iPod, yes. 10:07:30
Q So we're talking about things like headphones and 10:07:32 cases; is that right? 10:07:35
A Cases, yes, speakers. 10:07:35

Q And is it correct that the more sales of iPods you 10:07:40 had, the more sales of ancillary products like those you 10:07:44 had? 10:07:47
A You would hope, yes. 10:07:47
Q And that was your belief and understanding? 10:07:49
A Yes. 10:07:50
Q And when you received notices from Apple about 10:07:51 either new products or new versions of products, you'd 10:08:04 look at the features that they offered and try to figure 10:08:08 out which ones would be good sellers for you; is that 10:08:10 correct? 10:08:13
A Features, yes. Price point, more important. 10:08:13
Q And how did you decide what price you would charge 10:08:19 for the products you bought from Apple or the Apple 10:08:22 products you bought from other sources? 10:08:26
A Okay. Apple had a suggested retail price or a 10:08:28 minimum advertised price. And the margins were so small 10:08:30 that you really could not vary off of that price, if you 10:08:36 wanted to make any profit. 10:08:41
Q Is it correct that from time to time, you offered 10:08:42 some discounts off the list price? 10:08:45
A Yes. 10:08:48
Q And why would you decide to do that in a 10:08:48 particular case? 10:08:51
A One reason would be if I bought too much inventory 10:08:52

of a particular model and I needed to sell it, so I had to 10:08:56 entice. Another reason would be if a person -- I'm sorry, 10:09:00 if a product was changed or a new model came out, we 10:09:08 would, you know, sell off the older products. Then there 10:09:12 could be other customer reasons. If they were buying 10:09:16 multiple products or buying even multiple iPods or with a 10:09:20 computer, we -- you know, we would consider doing that. 10:09:25 If we were competing with the Apple store for -- 10:09:30 especially the education store, then we might offer a 10:09:33 discount to try to have them buy from us instead of Apple 10:09:36 direct. 10:09:40
Q If a new version of an iPod came on the market, 10:09:40 and you had an older version, is it correct that you 10:09:54 needed to offer a discount on the old version to clear 10:09:59 your inventory because consumers, given the choice, at the 10:10:03 same price point, they want the new version? 10:10:06
MS. BERNAY: Objection. Misstates prior 10:10:09 testimony, also compound and vague. 10:10:11
BY MR. RINGGENBERG: 10:10:12
Q Let me ask it this way. Why would you need to 10:10:13 offer a discount on existing inventory if there was a new 10:10:15 version of that product on the market? 10:10:18
A If there was a new version that had capabilities 10:10:20 that people wanted, that was priced at or below the 10:10:25 existing inventory, we had to offer a discount. 10:10:30

dealer or the consumer, and that's, you know, general. If 10:42:23
you want specifics, I can get into some specifics. 10:42:26
BY MR. RINGGENBERG: 10:42:29
Q I'm interested in hearing more specifically about 10:42:29
what you think Apple did wrong in this -- that's at issue 10:42:33
in this case -- 10:42:36
A Okay. 10:42:37
Q -- to your understanding, that led you to think 10:42:37
that there was a wrong, that you wanted to get involved to 10:42:40
deal with. 10:42:42
A Okay. 10:42:42
MS. BERNAY: Again, objection. Vague. Again, 10:42:43
I -- 10:42:46
THE WITNESS: I think I've answered it. 10:42:46
MS. BERNAY: -- urge you not to answer with 10:42:48
attorney-client privileged information. 10:42:50
BY MR. RINGGENBERG: 10:42:50
Q You say you think you've answered that already? 10:42:53
A Yeah. 10:42:56
Q So I understand you feel it's not fair for 10:42:56
consumers to be tied to any one service because they made 10:42:58
purchases to it. Do I understand that correctly? 10:43:03
MS. BERNAY: Objection. Misstates prior 10:43:05
testimony. 10:43:07
Go ahead. 10:43:07

THE WITNESS: Go ahead and ask that again, please. 10:43:08
BY MR. RINGGENBERG: 10:43:12
Q Sure. I think I didn't understand before. 10:43:12
A Okay, that's fine. 10:43:14
Q You may have said it. So try me again. Help me 10:43:15
understand, please -- 10:43:18
A Okay. 10:43:19
Q -- what you think Apple did wrong that led you to 10:43:19
get involved in this lawsuit. 10:43:22
MS. BERNAY: Again, asked and answered. 10:43:23
THE WITNESS: My -- 10:43:26
MS. BERNAY: Go ahead. 10:43:26
THE WITNESS: Can I answer specifics of what I've 10:43:27
learned or no? 10:43:29
MS. BERNAY: If you've only learned them through 10:43:30
conversations with your attorneys, then no. But if you've 10:43:33
learned it from, you know, looking at materials or -- 10:43:35
THE WITNESS: Okay. 10:43:37
MS. BERNAY: -- go ahead. 10:43:37
THE WITNESS: Okay. You know, if you have -- and 10:43:38
this was from materials that I did a little bit of reading 10:43:42
on; okay? 10:43:45
BY MR. RINGGENBERG: 10:43:46
Q Okay. 10:43:47
A If you have a product, let's say an Apple iPod 10:43:47

that you had downloaded music from another service, and 10:43:53
you also may have downloaded some music from iTunes store, 10:43:59
okay, and -- a new model comes out, and a new Apple iPod 10:44:03
model comes out, and your library of music that you 10:44:09
downloaded from other sources that was previously able to 10:44:13
be listened to on an iPod is not going to be compatible 10:44:15
with the new iPod, then you're taking a loss on that, 10:44:20
where it was perfectly acceptable before, and now it's not 10:44:23
capable. That, to me, is a wrong. 10:44:28
Q So do I understand correctly that your view is 10:44:32
that what Apple did wrong is they made changes to its 10:44:41
system so that music that was bought from other digital 10:44:43
music stores wouldn't play on iPods anymore? 10:44:46
A That would sum it up, yes. 10:44:49
Q And you understand that Apple never did anything 10:44:50
affirmatively to help anyone make music from other digital 10:45:00
music stores play on iPods -- 10:45:07
MS. BERNAY: Objection. 10:45:10
BY MR. RINGGENBERG: 10:45:10
Q -- correct? 10:45:10
MS. BERNAY: Vague, assumes facts not in evidence. 10:45:10
THE WITNESS: I'm not knowledgeable on what Apple 10:45:13
did in their systems or not prior. 10:45:14
BY MR. RINGGENBERG: 10:45:16
Q Do you feel that Apple had to go out of its way to 10:45:16

help digital music stores with which it was competing play 10:45:19
their music on iPods? 10:45:24
MS. BERNAY: Objection. Vague. Misstates -- 10:45:25
THE WITNESS: No, Apple does not have to go out of 10:45:27
their way to enable somebody to play something on the -- 10:45:30
make it compatible. But that also answers the other side, 10:45:35
is did Apple have to go out of their way to prevent other 10:45:39
products. 10:45:42
BY MR. RINGGENBERG: 10:45:43
Q You understand among the things that Apple updates 10:45:44
from time to time relates to its security? 10:45:46
A Yeah, they say that, yeah. 10:45:49
Q Do you believe that's not true, that they say it's 10:45:50
security and it's really not? 10:45:55
A I'm not technical enough to answer that. 10:45:56
Q You agree that there are legitimate security 10:45:59
issues with computer software that need to be addressed 10:46:04
regularly, yeah? 10:46:07
MS. BERNAY: Objection. Vague. 10:46:08
THE WITNESS: There are lots of people out there 10:46:10
that want to steal people's information and so yes, Apple 10:46:15
is known, or at least on their computers, to be less prone 10:46:20
to hacking and viruses and things, and part of that was 10:46:26
market share, though. If you're going to be a crook, you 10:46:31
go after 90 percent of the market instead of 10. 10:46:35

BY MR. RINGGENBERG: 10:46:38
Q And did you -- have you ever learned that there were individuals who were trying to hack Apple's FairPlay digital rights management software for the purpose of removing digital rights management and illegally sharing music? 10:46:38 10:46:43 10:46:49 10:46:52 10:46:55
MS. BERNAY: Objection. Vague, compound, calling for a legal conclusion, as well as an expert opinion. 10:46:55 10:46:59
THE WITNESS: I'm not aware. 10:47:04
BY MR. RINGGENBERG: 10:47:05
Q Would it surprise you to learn that there were individuals who were trying to hack Apple's DRM so that they could take songs that were supposed to only play on -- for one customer and share them with others? 10:47:06 10:47:08 10:47:11 10:47:14
MS. BERNAY: Objection. Vague. 10:47:17
THE WITNESS: It wouldn't surprise me that there's people out there with a lot of time. 10:47:17 10:47:19
BY MR. RINGGENBERG: 10:47:21
Q Right. And do you think there's anything wrong with Apple trying to address that by updating its security and make that harder to do? 10:47:21 10:47:23 10:47:26
MS. BERNAY: Objection. Vague, assumes facts not in evidence, also misstates his prior understanding. 10:47:28 10:47:29
THE WITNESS: You know, other materials that I read is that the music industry was less concerned about 10:47:33 10:47:35

the protection than Apple was during that time period. 10:47:39
BY MR. RINGGENBERG: 10:47:39
Q But my question remains. Do you think there's anything illegitimate with Apple updating its security to make it harder to hack its DRM software so that songs and other materials it sold couldn't be used by people other than those who bought it? 10:47:44 10:47:47 10:47:50 10:47:54 10:47:57
MS. BERNAY: Same objections, and asked and answered. 10:47:58 10:47:59
THE WITNESS: The only thing I'll say to that is I don't think it's unreasonable for Apple to protect their systems. I'm not going to -- I don't know the specifics on the thing. 10:47:59 10:48:04 10:48:07 10:48:09
BY MR. RINGGENBERG: 10:48:11
Q So let me just tell you something and ask your view on it. 10:48:11 10:48:16
A Okay. 10:48:17
Q A big issue in this case is -- 10:48:17
A Okay. 10:48:20
Q -- who gets -- is -- Apple did some updates to its software and the plaintiffs have one view of what those were, and Apple has another view. Who do you think ought to decide what software updates Apple can do and can't do? Who do you think ought to make that decision? 10:48:20 10:48:23 10:48:26 10:48:29 10:48:34
MS. BERNAY: Objection. Vague. 10:48:36

THE WITNESS: Who do I think -- if there's a valid, legitimate reason for something, then, you know, certainly the company could make that -- could make that decision. 10:48:38 10:48:44 10:48:50 10:48:53
BY MR. RINGGENBERG: 10:48:54
Q Are you comfortable with the government or a jury deciding what software updates Apple could issue and which ones it can't? 10:48:54 10:48:59 10:49:03
MS. BERNAY: Objection. Vague, assumes facts not in evidence, also compound. 10:49:04 10:49:06
THE WITNESS: I don't know how to answer that. I mean, I don't -- I certainly -- government I'm not. Yeah, government or a jury, I mean, this is after the fact, taking a look at things. And certainly the updates and changes had more to do with just the protection on the music. 10:49:08 10:49:13 10:49:17 10:49:21 10:49:25 10:49:31
BY MR. RINGGENBERG: 10:49:33
Q You believe that -- you don't have firsthand knowledge about that; you believe that based on things that you've learned from materials provided by lawyers; is that right? 10:49:34 10:49:37 10:49:39 10:49:42
A That these materials were general public materials out there. They were all articles off the Internet, is what I read. 10:49:42 10:49:45 10:49:49
Q It wouldn't surprise you to learn that Apple has a 10:49:49

different view, I assume? 10:49:51
A Oh, Apple has a different view on anything they do. 10:49:53 10:49:55
Q And someone has to decide -- 10:49:56
A Right. 10:49:57
Q -- who is right and who is wrong about this point; right? 10:49:58 10:50:00
A Yeah. 10:50:01
MS. BERNAY: Objection. Vague, and asked and answered. 10:50:01 10:50:01
Go ahead. 10:50:03
BY MR. RINGGENBERG: 10:50:03
Q And here's my question: Are you comfortable with the system where Apple can make a business decision about what software to update, and some years later, someone could ask them for a billion dollars because they disagree with Apple's software update? 10:50:03 10:50:05 10:50:09 10:50:12 10:50:14
MS. BERNAY: Objection. It's vague. 10:50:16
THE WITNESS: It doesn't make -- it doesn't -- any decision Apple makes doesn't mean it's right, or right decision, it doesn't mean it was fair. And Apple can make those decisions, but they also are accountable to whatever decisions they make, just like you and I are. 10:50:18 10:50:19 10:50:22 10:50:26 10:50:29
BY MR. RINGGENBERG: 10:50:32
Q Fair. Do you agree that if Apple had a legitimate 10:50:32

security concern or a legitimate concern about protecting how well its system worked, that they should be permitted to make whatever software updates they feel they should make to address those concerns? 10:50:37 10:50:42 10:50:45 10:50:50

MS. BERNAY: Objection. Vague. It's calling for a legal conclusion, and it's assuming facts not in evidence. 10:50:51 10:50:53 10:50:58

Go ahead. 10:50:58

THE WITNESS: You know, you had words in there for "how well a system works." I don't know if that's applicable or not for this. 10:50:59 10:51:01 10:51:03

BY MR. RINGGENBERG: 10:51:05

Q I understand. Let me just -- let me put it this way. Would you agree that if Apple believed that it needed to protect the consumer experience by making sure that iTunes and iPods worked well together so that consumers could use them easily and seamlessly, that that is a legitimate interest, and that they should have the right to update their software to protect that? 10:51:06 10:51:08 10:51:12 10:51:16 10:51:19 10:51:22 10:51:24

A Yeah. 10:51:27

MS. BERNAY: Objection. Vague, asked and answered. It's also compound and it's calling for a legal conclusion. 10:51:27 10:51:29 10:51:32

THE WITNESS: If Apple believed -- I mean, how do I answer that one? Restate that one more time, because 10:51:33 10:51:38

I -- something went through my mind. 10:51:44

BY MR. RINGGENBERG: 10:51:48

Q Sure. Would you agree that if Apple legitimately believed that it needed to issue software updates to ensure that iPods and iTunes continue to work well together seamlessly for the benefit of the consumer experience, that that's a legitimate reason for Apple to want to issue software updates? 10:51:48 10:51:51 10:51:56 10:51:59 10:52:03 10:52:06

MS. BERNAY: Objection. Vague, asked and answered, compound. Again, calling for a legal conclusion. 10:52:09 10:52:11 10:52:14

THE WITNESS: It is legitimate if Apple believed that; okay? I don't believe they believed that. 10:52:15 10:52:17

MR. RINGGENBERG: We need to change the videotape, so why don't we take a short break. 10:52:19 10:52:21

MS. BERNAY: Okay. 10:52:23

THE VIDEOGRAPHER: This is the end of Tape No. 1 of the video-recorded deposition of Kenneth Riegel. The time is approximately 10:52 a.m. Thank you. 10:52:24 10:52:26 10:52:28

(Recess.) 11:02:50

THE VIDEOGRAPHER: This is the beginning of Tape No. 2 of the video-recorded deposition of Kenneth Riegel. The time is approximately 11:02 a.m. 11:02:50 11:02:59 11:03:03

BY MR. RINGGENBERG: 11:03:06

Q Welcome back, sir. Did you ever hear of a company 11:03:06

called RealNetworks? 11:03:09

A Because of reading documents, I am a little familiar with the RealNetworks. 11:03:11 11:03:17

Q Do you think you knew of them in the 2005 to 2009 time frame? 11:03:19 11:03:24

A Vaguely. 11:03:24

Q What's your recollection of what you knew about them in that time period? 11:03:26 11:03:30

A I can't say specifically, other than had to do with the music, music side. 11:03:32 11:03:36

Q Did you learn that there were document requests that were sent to your lawyers that requested certain documents from you? 11:03:38 11:03:47 11:03:52

A The interrogatories or -- 11:03:52

Q No, there's a separate document which I can put in front of you, if you'd like, but -- 11:03:57 11:04:01

A There were two. 11:04:02

Q Yes. We asked your lawyers to give us certain documents from your files. Did you hear -- 11:04:03 11:04:05

A Yes, I'm aware. 11:04:06

Q And you worked with your lawyers to identify whatever materials you had that were responsive and provide them; is that right? 11:04:08 11:04:10 11:04:12

A They just gave me the list of your requests, and so I went through multiple storage boxes that I had at my 11:04:13 11:04:16

house, which were the last records that I have from -- 11:04:23

Q Are there any other sources of information that you can think of that would have documents that would be responsive to those requests? 11:04:26 11:04:30 11:04:33

A Not any longer, other than documents that Apple could provide. 11:04:34 11:04:41

Q As far as documents that you have or that you're aware of, there's not anything else? 11:04:42 11:04:46

A No. 11:04:51

Q You referred to some materials that you reviewed, some public materials that you reviewed, kind of leading up to this deposition. What materials were you thinking of? 11:04:51 11:05:00 11:05:07 11:05:09

A To refresh memory, I reviewed the -- glanced at the history of iPods, the -- just so I could -- again, the nostalgic part I could remember, you know, the various things, because over a long time period. And then I read a couple documents in reference to the music industry's viewpoint of the protection, and then some -- I guess there was another document in reference to Apple on the FairPlay and things, interesting name, but -- 11:05:09 11:05:13 11:05:21 11:05:24 11:05:28 11:05:34 11:05:40 11:05:44

Q And were those materials that your lawyers put together? 11:05:49 11:05:52

A At my request, they put them together. 11:05:52

MR. RINGGENBERG: Anything else? I don't have 11:06:09

anything else. 11:06:14
Q Oh, did you review any nonpublic materials provided to you by your lawyers, like anything written by lawyers or anything else, other than like press reports or public materials, leading up to this deposition? 11:06:14 11:06:20 11:06:22 11:06:28
MS. BERNAY: And I'm going to object to the extent that the -- that revealing that is going to reveal attorney work product. But if you can answer without doing that, you can give him a yes or a no. So you can give him a yes or a no. 11:06:31 11:06:34 11:06:38 11:06:40 11:06:44
THE WITNESS: Yes. 11:06:45
BY MR. RINGGENBERG: 11:06:47
Q And did any of those things refresh your recollection? 11:06:48 11:06:50
A No. 11:06:50
Q Do you recall whether you reviewed anything written by Dr. Roger Noll? 11:06:52 11:07:01
A Yes. I've read about ten pages of his very long document. 11:07:05 11:07:15
Q Well, in the interest of keeping this efficient, since we all have a great deal of work to do, I'm going to stop now. So thank you for your time, sir. 11:07:21 11:07:24 11:07:27
MS. BERNAY: I'm going to have just a couple questions. I don't think we need to change -- 11:07:28 11:07:30
MR. RINGGENBERG: That's fine. 11:07:30

MS. BERNAY: -- sides; is that okay? 11:07:31
EXAMINATION 11:07:31
BY MS. BERNAY: 11:07:39
Q So you mentioned Macworld and attending the Macworld conventions. Do you recall that testimony? 11:07:39 11:07:42
A Yes. 11:07:44
Q And when you would attend those, did you meet with other resellers at that -- 11:07:44 11:07:47
A Yes. 11:07:48
Q -- time? 11:07:49
And would you talk with other resellers about Apple products and things like that? 11:07:50 11:07:53
MR. RINGGENBERG: Objection. Leading. 11:07:55
THE WITNESS: We had -- as part of being an Apple specialist, we were required to attend meetings for Apple specialists, and only Apple specialists. They didn't let other people into them. And so that would be a few-hour meeting, usually within Macworld, same time as Macworld. And then some of the Apple executives would come and talk to us, and we would also have receptions where, you know, we'd have a drink and hors d'oeuvres or we'd go out to dinner and things, and so it was a time for sharing our good things and bad things, and we all had similar interests. It was a good group. 11:07:56 11:08:03 11:08:08 11:08:12 11:08:16 11:08:21 11:08:24 11:08:30 11:08:34 11:08:38 11:08:42
BY MS. BERNAY: 11:08:43

Q And did you ever discuss pricing or terms that Apple imposed? 11:08:43 11:08:48
A It was -- the pricing was dictated to us, so there was nothing we could talk about on pricing that wouldn't -- it was just wasting air. 11:08:49 11:08:53 11:08:55
Q Is it your view that Apple's list prices were not negotiable with the resellers? 11:08:58 11:09:01
A Well, the list prices were list prices, suggested retail prices, so we were free to sell things at a loss if we so desired. The only thing that was dictated specifically was a thing called minimum advertised price, so we could not advertise in a publication that we were selling something below that price. 11:09:04 11:09:08 11:09:12 11:09:19 11:09:23 11:09:27
Q And why -- you mentioned a couple of the reasons that -- earlier today about why you were involved in this suit, and one of them was that you felt strongly about right and wrong and then you also mentioned nostalgia. Are there any other reasons that you have? 11:09:29 11:09:36 11:09:40 11:09:44 11:09:49
A I mean, those are -- I mean, the only other reason is that I am available timewise right now. I mean, if I was super busy in my other -- I'm in between businesses, so -- 11:09:51 11:09:54 11:09:58 11:10:02
Q I'd like to draw your attention back to Exhibit 5, if you could pull that out. And is it accurate that if you wanted to be an authorized Apple reseller for iPods, 11:10:03 11:10:06 11:10:14

that you had to sign this contract? 11:10:19
A Yes. 11:10:22
MR. RINGGENBERG: Objection. Foundation, leading. 11:10:23
BY MS. BERNAY: 11:10:25
Q Did you ever negotiate any of the terms of the Apple reseller sales agreement? Were you able to strike anything out -- 11:10:25 11:10:30 11:10:34
A Never. 11:10:35
Q -- or make changes? 11:10:36
A No, it was take it or leave it. 11:10:37
MS. BERNAY: Okay. I have no further questions. 11:10:40
MR. RINGGENBERG: I don't have anything further. 11:10:46
THE REPORTER: Are you ordering a copy? 11:10:52
MS. BERNAY: I need a copy as soon as possible. 11:10:54
THE VIDEOGRAPHER: We are off the record at approximately 11:10 a.m., and this concludes today's testimony given by Kenneth Riegel. The total number of media used was two tapes and will be retained by Veritext Legal Solutions. Thank you. 11:10:56 11:10:58 11:11:03 11:11:07 11:11:12
(TIME NOTED: 11:11 a.m.)

I, KENNETH RIEGEL, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of ___________, 2014, at _________________________, ____________.
(City) (State)

______________________________
KENNETH RIEGEL
Volume I

Page 98

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 11/10/14

______________________________
GINA GLANTZ
CSR No. 9795, RPR, RMR

99

Page 99

# EXHIBIT 2

RECEIVED
ACI COMPUTER INC
OCT 18 2006
SALES CONTRACTS MGMT.

# Authorized Apple Reseller U.S. Sales Agreement (Apple CPU Products Authorization)

This Authorized Apple Reseller U.S. Sales Agreement ("Agreement") is made between Apple Computer, Inc., a California corporation located at 1 Infinite Loop, Cupertino, CA 95014 ("Apple") and:

Customer Name ("Reseller"): K + N Enterprises, Inc dba Delaware Computer Exchange

Address: 1030 Forest Ave Ste 100

City, ST, Zip: Dover DE 19904

**1. Definitions.**
When used in this Agreement, the following terms have the meanings specified below:

A. "Agreement" means collectively this Authorized Apple Reseller U.S. Sales Agreement, any amendments or additions, and any documents or materials incorporated by reference, and the Practices and Procedures.

B. "Apple Marks" means trademarks, service marks, logos and product names owned by or licensed to Apple, and used on and in connection with Authorized Apple Price Lists, and the designation "Authorized Apple Reseller."

C. "Authorized Apple Price Lists" means the then-current lists of prices for Reseller's purchase of Products from Apple.

D. "Authorized Apple Products Lists" means the then-current lists of Products that Reseller is authorized by Apple to resell.

E. "Authorized Apple Reseller" means a reseller of Apple Products, as defined below, with which Apple has an Authorized Apple Reseller U.S. Sales Agreement in effect.

F. "Authorized Apple Wholesaler" means an entity authorized by Apple to resell Products to Reseller in the United States.

G. "Authorized Locations" means locations where Reseller is authorized by Apple to resell Products.

H. "Confidential Information" means confidential information disclosed by either party to the other, including but not limited to the terms and conditions of this Agreement, any non-public information relating to the other party's research, development, proprietary technology, product and marketing plans, finances, personnel, business opportunities, and pricing, but not including information that becomes public knowledge except to the extent made public in violation of this Agreement.

I. "Configure-to-Order Products" means Products available to Reseller only by special order.

J. "Customers" means (i) end users, whether or not the end users are the actual purchasers; and (ii) purchasers not purchasing the Products for resale.

K. "Modifications" means changes in hardware Products that significantly alter the functionality or capabilities of those Products, whether accomplished by cutting, soldering, disassembling or other means, but not including enhancements made by utilizing unmodified components or mass-produced software from the Authorized Apple Products Lists or third parties.

L. "Practices and Procedures" means any of Apple's policies, practices and programs that (i) govern Reseller's performance under this Agreement and its use of or activities under or with respect to any other Apple-provided resources and systems, (ii) are posted on the Apple sales web or other Apple web sites or otherwise provided to Reseller, and (iii) may be updated periodically by Apple at Apple's sole discretion.

M. "Products" means Apple-branded CPU products, including Apple-branded laptops, desktops, servers, storage products, software and hardware accessories (such as keyboards, mice, displays and wireless products) now or previously on the Authorized Apple Products Lists and Configure-to-Order Products that Reseller is authorized by Apple to resell to Customers, including factory refurbished, reseller-reconditioned and used products. iPod and iPod accessories are excluded from this definition.

**2. Appointment.** Apple appoints Reseller as a limited and nonexclusive Authorized Apple Reseller for the resale of Products from Authorized Locations to Customers for use within the United States in compliance with the terms of this Agreement; and Reseller accepts this appointment.

**3. Scope of Authorization.**
A. Reseller will purchase Products only from an Authorized Apple Wholesaler, on terms decided between the Reseller and the Authorized Apple Wholesaler, and if qualified, directly from Apple, except where Apple authorizes other purchases. Apple will not in any way be responsible or liable to Reseller for any act or omission by any Authorized Apple Wholesaler. Reseller will sell Products to Customers from Authorized Locations at prices determined solely by Reseller. Apple reserves the right to remove or add Products from the Authorized Apple Products Lists, restrict or otherwise limit Configure-to-Order Products, and change the Practices and Procedures and scope of Reseller's authorization at any time and without notice. Reseller will have a commercially reasonable period of time to implement such changes by Apple, not to exceed thirty (30) days.

B. Reseller will not sell, rent or lease Products: (i) for resale; (ii) for export outside the United States, either directly or indirectly; (iii) for use by public or private nonprofit educational institutions; (iv) either through the Internet or direct mail order, or telephone sales, (v) in response to a Federal Government Contracting Officer's Notice of Intent to place a delivery order against the General Services Administration (GSA) Automatic Data Processing (ADP) Schedule as published in the Commerce Business Daily; or (vi) to certain Apple customers participating in special programs and identified by Apple.

**4. Reseller's Obligations.**
A. Reseller shall act at all times and conduct its activities in a professional and competent manner. Reseller will actively promote and sell Products to Customers and maintain a high level of Customer satisfaction. Without limitation, Reseller will: (i) comply with all Practices and Procedures; (ii) promote the Products in a manner that maintains the good name and reputation of both Apple and the Products; (iii) upon Customers' request, provide to Customers a copy of (a) Apple's standard hardware Limited Warranty, (b) any warranties provided by vendors of products bundled with the Products, and (c) an end-user software license for software

2992
Delaware Computer Exchange
ACI, E



accompanying the Products; and (iv) not engage in any illegal, false or deceptive acts or practices with respect to Reseller's business activities.

B. Reseller will provide knowledgeable assistance to Customers and potential Customers in connection with the Products, including: (i) assisting to determine appropriate Product configurations that fit the needs of Customers and (ii) providing information and advice in the general use of Products. Reseller will provide each Customer with: (a) a bill of sale or other receipt that states the Customer's name and address, date of sale, the Products' serial numbers, and the address of the Authorized Location where the Products are sold; and (b) Apple's then-current limited warranty for the Products.

C. Reseller will promptly notify Apple in writing of any suspected Product defect or safety issue.

D. Reseller will not make Modifications without written authorization from Apple.

E. Reseller will not make any representations, warranties, or guarantees to Customers or to the trade with respect to the specifications, features, or capabilities of any Apple Products that are inconsistent with Apple's literature, including all warranties and disclaimers contained in such literature.

F. Reseller will maintain an Internet email address, which it will provide to Apple, and have Internet access at all times. Reseller will access Apple's channel web sites at least weekly to ascertain whether Apple has modified the Practices and Procedures.

G. Reseller will pay any applicable sales or use taxes, duties and other imposts due on account of purchases under this Agreement. Reseller will be responsible for the collection of all applicable sales tax and use taxes associated with the resale of Products.

**5. Purchases Directly from Apple.**
A. In order to qualify to purchase Products directly from Apple, Reseller must satisfy all requirements and perform all obligations of the Practices and Procedures applicable to or governing direct Reseller purchases of Products. Any order placed with Apple is subject to acceptance by Apple, and Apple may decline any order, in whole or in part, for any reason. Apple may cancel any accepted order prior to shipment. Unless Reseller notifies Apple otherwise, Apple may make partial shipments of Reseller's orders. Apple will not be liable for any failure to ship complete orders. Apple will allocate its available inventory and make deliveries (including partial shipments) in its sole discretion and without liability to Reseller. Reseller acknowledges that Apple may choose to allocate available inventory to or among Apple's own retail and web-based stores, education customers, sales territories, other resellers, or otherwise, before Reseller, and that there may be delays in Apple's fulfillment of Reseller orders. Reseller will be invoiced separately for each partial shipment and will pay each invoice when due, without regard to subsequent deliveries.

B. The price for Products purchased directly from Apple will be the price on the applicable Authorized Apple Price List on the date that Apple ships the Products. Prices include standard freight and insurance using an Apple-selected carrier. Reseller will be invoiced upon shipment of Product and, provided Reseller is qualified for credit from Apple, such invoice will be due no later than thirty (30) days from the date of invoice. Apple reserves the right to change the Authorized Apple Price Lists and Reseller's credit terms at any time.

C. Reseller acknowledges that Apple has set its prices and entered into this Agreement in reliance upon the provisions of this Agreement, particularly including (but not limited to) Sections 12 and 14A, and that the provisions of this Agreement form an essential basis of the bargain between the parties.

D. Title and risk of loss to all Product will pass to Reseller upon shipment from Apple's shipping location. For Products shipped pursuant to Apple's standard practices in all but the last week of every Apple fiscal quarter during the term of this Agreement, Apple will issue credits or replace Products returned due to damage in transit or that are lost in transit. For Products shipped pursuant to Apple's standard practices in the last week of every Apple fiscal quarter during the term of this Agreement, Apple will not issue credits or replace Products returned due to damage in transit or that are lost in transit. Instead, Apple will provide third-party insurance for damaged or lost Products with Reseller named as the loss payee. When not shipping Products pursuant to Apple's standard practices but instead shipping via a carrier selected by Reseller, Apple will not issue credits or replace Products returned due to damage in transit or that are lost in transit.

**6. Confidentiality.** Neither party will use the other's Confidential Information except as required to achieve the objectives of this Agreement, or will disclose such Confidential Information except to employees, agents or contractors who have a need to know or as required by law. Neither party will make any disclosure or statement of Confidential Information in connection with this Agreement or its subject matter without the other's prior written consent or as required by law.

**7. Limited Warranty to Reseller.**
A. Apple warrants that any Products purchased directly from Apple for resale to Customers according to this Agreement will conform to their general descriptions on the Authorized Apple Price Lists. Reseller's sole and exclusive remedy for any breach of this warranty will be a credit to Reseller's account for such nonconforming Products that are returned to Apple.

B. When Apple has given Reseller written authorization to modify Product, Reseller will remove Product warranty cards and other Apple warranty documents for modified Products prior to providing modified Products to Customers and, on Apple's behalf, will prominently disclaim, in written material provided to Customers at the time of sale, all Apple liability for any modified Product.

C. APPLE MAKES NO OTHER WARRANTY TO RESELLER, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS. APPLE SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**8. Records, Inspections, and Reporting.**
A. Reseller will provide to Apple a list of all Authorized Locations and any other information that Apple may reasonably request, including sales and inventory reports, in formats prescribed by Apple. During the term of this Agreement and for five (5) years after its expiration or termination, Apple will have the right to inspect Reseller's Authorized Locations and other related facilities at any time during regular business hours for purposes of verifying Reseller's compliance with the terms of this Agreement and Practices and Procedures.

B. Reseller will maintain, at the applicable Authorized Location, its records, contracts and accounts relating to the sale of Products for at least five (5) years. Upon Apple's reasonable request, during the term of this Agreement and for five (5) years after its expiration or termination, Reseller will promptly provide copies of any requested records, financial statements and documents to Apple.



C. Reseller will provide Apple with resale certificate numbers and any other documentation requested by taxing authorities to substantiate any claim of exemption from taxes, duties, or imposts.

**9. Proprietary Rights.**

**A. Apple Marks**

Subject to Reseller's compliance with the terms of this Agreement and Apple's policies and guidelines (including but not limited to Apple's trademark guidelines at http://www.apple.com/legal/trademark/guidelinesfor3rdparties.html), as updated from time to time, Apple grants Reseller a privilege and limited license to use the Apple Marks solely for the promotion and sale of Products under Reseller's appointment, except that Reseller shall not use or allow others to use any of the Apple Marks on any promotional merchandise such as key chains, mugs, or T-shirts unless such use is pursuant to Apple's written merchandising policies. No other rights to any Apple property or right is granted. Reseller agrees that Apple owns all rights in the Apple Marks, and that any use by Reseller shall inure to the benefit of Apple. Except as expressly permitted hereunder, Reseller agrees not to use any Apple trademark, service mark, logo, trade dress, design, "look and feel" (e.g., the design and layout of Apple's retail stores or websites, or the name under which Reseller does business), in any manner whatsoever, or act in any manner that implies an endorsement of Reseller by Apple. Reseller will not remove, obfuscate or add any mark to any materials provided by Apple or packaging for products on Authorized Apple Products Lists.

**B. Software Rights**

Reseller will not separate any software that is packaged with other Product, or such software's end-user license, from the Product. Reseller may distribute software that is incorporated in or packaged with other Product solely in connection with the authorized sale of such Product, and will have no other rights with respect to such software. Reseller will pass on to Customers any end-user software licenses. Reseller will not disassemble, de-compile, reverse engineer, copy, modify, create derivative works, or otherwise change any software or its form.

**C. Apple Proprietary Customer Information**

Reseller acknowledges that (i) Apple maintains customer information independently derived from numerous sources other than Reseller, including product registration and use of Apple's websites by customers and prospective customers; (ii) such customer information may be identical to information that Reseller has developed or maintains; and (iii) Apple has a proprietary interest in such customer information when derived from sources other than Reseller, whether or not Reseller has derived or maintains identical information. Reseller disclaims any interest whatsoever in Apple's proprietary customer information.

**10. Insurance.** For each Authorized Location, Reseller will have a general liability insurance policy, including coverage for premises liability, products, and completed operations. This policy will have limits of not less than one million dollars ($1,000,000) per incident for bodily, personal injury or property damage, or one million dollars ($1,000,000) in a combined single limit, and a Certificate of Insurance will be made available to Apple at its request.

**11. Indemnity.**

A. If Reseller promptly notifies Apple in writing and gives Apple sole control over the defense and all related settlement negotiations, Apple will defend, hold harmless and indemnify Reseller against any damages finally awarded or amounts paid in settlement as a result of any claim or threat of claim brought by a third party against Reseller to the extent based on an allegation that: (i) the marketing or licensed use of any Apple-branded Products sold by Reseller or software licensed by Apple that a Customer has paid to acquire infringes any U.S. patent, copyright, trademark, trade secret or other proprietary right of a third party, or (ii) a defective Product directly caused death or personal injury or tangible property damage; provided that Reseller did not alter, modify, or otherwise change the Product or software that gave rise to such claim.

B. Reseller will defend, hold harmless and indemnify Apple against any claim or threat of claim brought by a third party against Apple arising out of the acts or omissions of Reseller, its employees or agents, excluding acts or omissions expressly required or proscribed by this Agreement.

C. If either party seeks indemnification provided for in this section, each party seeking indemnification will cooperate with and provide reasonable assistance in the defense or settlement of any claim or legal proceeding. Reseller and Apple will not make public any terms, or the mere existence, of any settlements.

**12. Limitation of Liability and Remedies.** The total liability of either party to the other on all claims of any kind under or related to this Agreement, whether in contract, warranty, tort, strict liability, statute, or otherwise, shall be limited to the total amounts paid by Reseller to Apple in the twelve (12) months prior to the date the initial claim is made against either party by the other or one hundred thousand dollars ($100,000), whichever is greater; provided that in no event shall all recoveries exceed three hundred thousand dollars ($300,000). IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT, WARRANTY, TORT, STRICT LIABILITY, STATUTE OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL OR INDIRECT DAMAGES (INCLUDING LOST BUSINESS PROFITS, LOSS OF DATA, INTERRUPTION IN USE, OR UNAVAILABILITY OF DATA) OR FOR PUNITIVE OR EXEMPLARY DAMAGES. The limitation in the preceding two sentences shall not apply to (i) indemnity claims under Section 11 with respect to defective Products that directly cause death, personal injury or tangible property damage, (ii) any claims by Apple against Reseller for violation of intellectual property rights, including claims under Section 9, or (iii) the amount due from Reseller to Apple for products or services purchased from Apple. The remedies set forth in this Agreement will be Reseller's sole and exclusive remedies for any claim against Apple under or related to this Agreement. Reseller waives and relinquishes any rights or claims under franchise, dealership, or other statutes, or at common law that would or might arise out of Apple's termination of this Agreement, Apple's refusal to accept Reseller's order, or Apple's refusal to renew or extend the term of this Agreement.

**13. Term and Termination.**

**A. Term**

Unless terminated earlier as provided in this Agreement, the initial term of this Agreement will be from its effective date until April 30, 2008.

**B. Termination**

This Agreement may be terminated as follows: (i) either party may terminate this Agreement at any time, with or without cause, on thirty (30) days' written notice of termination to the other party; and (ii) Apple may terminate this Agreement and any other active agreement with Reseller immediately and without any period to remedy if: (a) Reseller fails to fully perform any obligation under this Agreement or violates any Practice and Procedure, (b) Reseller commits a felony or engages in any unlawful or unfair business practice, (c) there is a material change in or transfer of Reseller's management, ownership, control or business operations, or Reseller becomes affiliated, through common management, ownership, or

control, with any person or entity that is unacceptable to Apple, (d) Reseller's actions expose or threaten to expose Apple to any liability, obligation, or violation of law, (e) Reseller fails to maintain sufficient net worth and working capital to meet its obligations, has a receiver or trustee appointed for its property, becomes insolvent or makes an assignment for the benefit of creditors, (f) Reseller closes its last Authorized Location, or (g) Reseller abandons this Agreement.

**C. Effect of Notice of Termination**
If either party gives notice of termination of this Agreement according to Section 13B(i): (i) all unpaid Apple invoices will become due on the effective date of termination; (ii) Apple may refuse all or part of Reseller's orders received by Apple after the date of notice of termination; (iii) Reseller will cease placing new orders for Products from any Authorized Apple Wholesaler; and (iv) Apple may restrict Reseller's use of any available promotional allowances. Reseller may continue to use the designation "Authorized Apple Reseller" until the effective date of termination. In addition, if termination is in accordance with Section 13B(ii), all unpaid Apple invoices will become due on the effective date of termination.

**D. Effect of Expiration or Termination**
Within ten (10) days after expiration or termination, Reseller will provide a list of all Products remaining in Reseller's inventory to Apple, and Apple reserves the first right to purchase such Products. If Apple purchases Products from Reseller, the price will be determined by the parties. If Apple purchases Products from Reseller, upon Apple's acceptance of such Products, Apple will issue a credit to Reseller in the amount of Apple's purchase to offset any amount due Apple by Reseller or, if there is no amount due Apple by Reseller, Apple will pay Reseller forty-five (45) days from Apple's acceptance of Products. If Apple does not purchase Products remaining in Reseller's inventory, Reseller may sell the Products solely to an Authorized Apple Reseller, to an Authorized Apple Wholesaler, or to a Customer. Furthermore, upon expiration or termination of this Agreement: (i) Reseller will immediately cease use of the Apple Marks and the designation "Authorized Apple Reseller"; (ii) Apple will cancel all unshipped Product orders; (iii) Reseller will no longer accrue any promotional allowances or other available funds; and (iv) Reseller will return promptly to Apple all Apple property in Reseller's possession, such as loaned equipment and all material containing Confidential Information. If Reseller fails to comply with any provisions of Sections 13.C or 13.D, Apple is not obligated to refund amounts due Reseller, if any, until forty-five (45) days after Reseller has complied fully with Sections 13.C and 13.D.

**E. Survivorship**
Those sections that by their nature survive expiration or termination of this Agreement will survive expiration or termination.

**14. General Terms.**
**A. Governing Law; Venue; Limitation of Claims**
This Agreement will be governed and interpreted under the laws of California, USA, without regard to its conflict of laws provisions. In the event of any dispute or controversy between the parties to this Agreement, the parties shall try to resolve the dispute in a fair and reasonable way. To that end, the parties shall first attempt to resolve such dispute or controversy through one senior management member of each party. If the parties' senior management members are unable to resolve such dispute or controversy within sixty (60) days after the complaining party's written notice (a "Dispute Notice") to the other party of such dispute or controversy, the parties shall further seek to resolve the dispute or controversy pursuant to non-binding mediation conducted in either Santa Clara County or San Francisco, California. Each party shall bear its own expenses in connection with the mediation, except that Apple shall pay the fees and expenses of the mediator. If the parties are unable to resolve the dispute or controversy within sixty (60) days after commencing mediation, either party may commence litigation in the state or federal courts in Santa Clara County, California (but only such courts). Notwithstanding the foregoing, each party shall have the right to seek equitable relief in order to protect any rights to confidentiality or intellectual property. The parties hereby waive any bond requirements for obtaining equitable relief. To the extent permitted by law, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER OR NOT RELATING TO OR ARISING OUT OF THIS AGREEMENT). ANY LITIGATION ARISING OUT OF ANY DISPUTE OR CONTROVERSY BETWEEN THE PARTIES TO THIS AGREEMENT MUST BE BROUGHT WITHIN ONE (1) YEAR FROM THE FIRST DATE SUCH ACTION COULD HAVE BEEN BROUGHT. IF A LONGER PERIOD IS PROVIDED BY STATUTE, THE PARTIES HEREBY EXPRESSLY WAIVE IT.

**B. Notice**
Any notice under this Agreement, except notices of changes in Practices and Procedures as provided below, must be in writing and will be deemed given upon the earlier of actual receipt or ten (10) days after being sent by first class mail, return receipt requested, to the address set forth below for Apple and to the address designated on page one (1) of this Agreement by Reseller for receipt of notices, or as may be provided by the parties.

Apple Computer, Inc.
Sales Contracts Management
1 Infinite Loop, M/S 38-2CM
Cupertino, CA 95014

Either party may give notice of its change of address for receipt of notices by giving notice in accordance with this section. Notices of changes in the Practices and Procedures that are posted on the Apple channel web sites will be given by Apple by posting to the Apple channel web sites and will be deemed given when posted.

**C. Severability**
If a court of competent jurisdiction holds that any provision of this Agreement is invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect, and the parties will replace the invalid or unenforceable provision with a valid and enforceable provision that achieves the original intent of the parties and economic effect of the Agreement.

**D. Headings and Construction**
Paragraph headings are for reference only and will not be considered as parts of this Agreement. Wherever the singular is used, it includes the plural, and wherever the plural is used, it includes the singular.

**E. Waivers**
A party's waiver of any breach by the other party or failure to enforce a remedy will not be considered a waiver of subsequent breaches of the same or of a different kind.

**F. Assignments and Other Material Business Changes**
Reseller will notify Apple promptly if there is a material change in Reseller's ownership, management, or control; or Reseller acquires an ownership, managerial or controlling interest in a third party that sells or services Products. Reseller may not assign, in whole or in part, this Agreement without Apple's prior written approval.

**G. Relationship of Parties**
Reseller is an independent contractor, has no power or authority to bind Apple, and is contracting for certain goods



and services. Nothing in this Agreement will be construed as creating any relationship such as employer-employee, principal-agent or franchisor-franchisee. Reseller acknowledges that Apple can sell Products directly to any person, including Customers.

**H. Entire Agreement**
Apple and Reseller acknowledge that this Agreement supersedes and extinguishes all previous agreements and representations of, between or on behalf of the parties with respect to its subject matter. This Agreement contains all of Apple's and Reseller's agreements, warranties, understandings, conditions, covenants, and representations with respect to its subject matter. Neither Apple nor Reseller will be liable for any agreements, warranties, understandings, conditions, covenants, or representations not expressly set forth or referenced in this Agreement. Apple is deemed to have refused any different or additional provisions in purchase orders, invoices or similar documents, unless Apple affirmatively accepts such provision in writing, and such refused provisions will be unenforceable.

**I. Modifications**
Except as otherwise provided in this Agreement, no modification to this Agreement will be binding unless in writing and signed by an authorized representative of each party.

**J. Counterparts**
This Agreement may be executed in one or more counterparts (including by facsimile), each of which when so executed shall be deemed to be an original and shall have the same force and effect as an original but such counterparts together shall constitute one and the same instrument.

The duly authorized representatives of the parties execute this Agreement as of the dates set forth below.

| Reseller | | Apple Computer, Inc. | |
|---|---|---|---|
| SIGNATURE: | [signature] | SIGNATURE: | [signature] |
| PRINT NAME: | Kenneth A. Riegel | PRINT NAME: | Sarah Beams |
| TITLE: | President | TITLE: | Contracts Specialist |
| DATE: | 10/16/06 | DEPT: | Sales Contracts Management |
| | | EFFECTIVE DATE: | 10/19/06 |



Dear Reseller,

Following is a summary of the terms that have changed between your current Agreement and the enclosed Agreement. If a section of the Agreement is not referenced below, it **HAS NOT** changed from the previous Agreement.

**Authorized Apple Reseller U.S. Sales Agreement (iPod Authorization)**

**Section 1A.** "Agreement" means collectively this Authorized Apple Reseller U.S. Sales Agreement, any amendments or additions, and any documents or materials incorporated by reference, and the ~~Practices and Procedures~~iPod Practices and Procedures. (NOTE: See Section 1J below - all subsequent references to "Practices and Procedures" have been updated to "iPod Practices and Procedures" throughout the rest of the Agreement.)

**Section 1I.** ~~I. "Configure to Order Products" means Products available to Reseller only by special order.~~

**Section 1K.** ~~K. "Modifications" means changes in hardware Products that significantly alter the functionality or capabilities of those Products, whether accomplished by cutting, soldering, disassembling or other means, but not including enhancements made by utilizing unmodified components or mass produced software from the Authorized Apple Products Lists or third parties.~~

**Section 1J.** ~~L~~J. "~~Practices and Procedures~~iPod Practices and Procedures" means any of Apple's policies, practices and programs that (i) govern Reseller's performance under this Agreement and its use of or activities under or with respect to any other Apple-provided resources and systems, (ii) are posted on the Apple sales web or other Apple web sites or otherwise provided to Reseller, and (iii) may be updated periodically by Apple at Apple's sole discretion.

**Section 1K.** ~~M~~K. "Products" means ~~products now or previously on the Authorized Apple Products Lists and Configure to Order Products~~ iPod and iPod accessories that Reseller is authorized by Apple to resell to Customers~~, including factory refurbished, reseller reconditioned and used products~~. Apple-branded CPU products, including Apple-branded laptops, desktops, servers, storage products, software and hardware accessories (such as keyboards, mice, displays and wireless products) are excluded from this definition.

**Section 2. Appointment.** Apple appoints Reseller as a limited and nonexclusive Authorized Apple Reseller for the resale of ~~Products~~ iPod and iPod accessories from Authorized Locations to Customers for use within the United States in compliance with the terms of this Agreement; and Reseller accepts this appointment.

**Section 3A, Scope of Authorization, fourth sentence.** Apple reserves the right to remove or add Products from the Authorized Apple Products Lists, ~~restrict or otherwise limit Configure to Order Products,~~ and change the ~~Practices and Procedures~~iPod Practices and Procedures and scope of Reseller's authorization at any time and without notice.

**Section 3B, Scope of Authorization.** Reseller will not sell, rent or lease Products: (i) for resale; (ii) for export outside the United States, either directly or indirectly; (iii) for use by public or private nonprofit educational institutions; (iv) either through the Internet or direct mail order, or telephone sales, (v) in response to a Federal Government Contracting Officer's Notice of Intent to place a delivery order against the General Services Administration (GSA) Automatic Data Processing (ADP) Schedule as published in the Commerce Business Daily; or (vi) to certain Apple customers participating in special programs and identified by Apple.

**Section 4A(i), Reseller's Obligations, second sentence.** Reseller will actively promote and sell Products to Customers and maintain a high level of Customer satisfaction. Without limitation, Reseller will: (i) comply with all ~~Practices and Procedures~~iPod Practices and Procedures;

**Section 4D, Reseller's Obligations.** ~~D. Reseller will not make Modifications without written authorization from Apple.~~

**Section 4E, Reseller's Obligations, second sentence.** Reseller will access Apple's channel web sites at least weekly to ascertain whether Apple has modified the ~~Practices and Procedures~~iPod Practices and Procedures.

**Section 5A, Purchases Directly from Apple, first sentence.** In order to qualify to purchase Products directly from Apple, Reseller must satisfy all requirements and perform all obligations of the ~~Practices and Procedures~~iPod Practices and Procedures applicable to or governing direct Reseller purchases of Products.

**Section 5D, Purchases Directly from Apple, first sentence.** Title and risk of loss to all Products will pass to Reseller upon shipment from Apple's shipping location.

**Section 7B, Limited Warranty to Reseller.** ~~B. When Apple has given Reseller written authorization to modify Product, Reseller will remove Product warranty cards and other Apple warranty documents for modified Products prior to providing modified Products to Customers and, on Apple's behalf, will prominently disclaim, in written material provided to Customers at the time of sale, all Apple liability for any modified Product.~~

**8. Records, Inspections, and Reporting.**
**Section 8A, Records, Inspections, and Reporting, second sentence.** During the term of this Agreement and for five (5) years after its expiration or termination, Apple will have the right to inspect Reseller's Authorized Locations and other related facilities at any time during regular business hours for purposes of verifying Reseller's compliance with the terms of this Agreement and ~~Practices and Procedures~~iPod Practices and Procedures.

**9. Proprietary Rights.**
**Section 9A, Apple Marks, first sentence.** Subject to Reseller's compliance with the terms of this Agreement and Apple's policies and guidelines (including but not limited to Apple's trademark guidelines at http://www.apple.com/legal/ trademark/guidelinesfor3rdparties.html), as updated from time to time, Apple grants Reseller a privilege and limited license to use the Apple Marks solely for the promotion and sale of Products under Reseller's appointment, except that Reseller shall not use or allow others to use any of the Apple Marks on any promotional merchandise such as key chains, mugs, or T-shirts unless such use is pursuant to Apple's written merchandising policies.

**Section 13A, Term.** Unless terminated earlier as provided in this Agreement, the initial term of this Agreement will be from its effective date until ~~October 31, 2006~~April 30, 2008.

**Section 14B, Notice.** Any notice under this Agreement, except notices of changes in ~~Practices and Procedures~~iPod Practices and Procedures as provided below, must be in writing and will be deemed given upon the earlier of actual receipt or ten (10) days after being sent by first class mail, return receipt requested, to the address set forth below for Apple and to the address designated on page one (1) of this Agreement by Reseller for receipt of notices, or as may be provided by the parties.

Either party may give notice of its change of address for receipt of notices by giving notice in accordance with this section. Notices of changes in the ~~Practices and Procedures~~iPod Practices and Procedures that are posted on the Apple channel web sites will be given by Apple by posting to the Apple channel web sites and will be deemed given when posted.