# EXHIBIT A

**Robbins Geller**
**Rudman & Dowd** LLP

| | | | | |
|---|---|---|---|---|
| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

Jennifer Caringal
jcaringal@rgrdlaw.com

November 13, 2014

<u>VIA ELECTRONIC MAIL ONLY</u>

Martha L. Goodman
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Ave. NW
Washington, DC 20015

Re: *The Apple iPod iTunes Antitrust Litigation*,
   No. C-05-00037-YGR

Dear Martha:

  I write to memorialize our November 12, 2014 meet and confer concerning Apple's proposed use of physical exhibits at trial, as set forth below.

**Overarching Issues**

  As a general matter, Plaintiffs object to Apple entering into evidence any physical exhibits that would go back to the jury room. The relevance of physical iPods to the key issues in the case – whether Apple's KVC and DVC were anticompetitive or whether there was a legitimate business justification for making the iPod worse – are not aided by sending back any physical devices. Plaintiffs also object to these items because giving devices to the jury will mislead and confuse them as to what the case is about.[1] In addition to the prejudice outweighing the marginal relevance (further explained below), Plaintiffs object on chain of custody/authentication grounds, foundation and because introducing them would require improper, late, expert testimony. Plaintiffs have these same objections to using physical items as demonstrative exhibits, but are willing to inspect the devices that Apple intends to use in order to alleviate these concerns and possibly come to an agreement about their use. In order to address foundational issues, Plaintiffs will also need to know how Apple plans to get each physical item into evidence, *i.e.,* which witness will be introducing which physical item, and how this is to be accomplished.

---

[1] If it is Apple's intent that jurors should be encouraged to experiment with these devices, that is plainly improper. *See, e.g., United States v. Navarro-Garcia*, 926 F.2d 818, 821-22 (9th Cir. 1991).

984144_1

655 West Broadway Suite 1900 San Diego, CA 92101 Tel 619 231 1058 Fax 619 231 7423 www.rgrdlaw.com

**Robbins Geller**
**Rudman & Dowd LLP**

Martha L. Goodman
November 13, 2014
Page 2

**Apple iPod Devices**

You stated that it is Apple's intention to send certain Apple iPod devices back to the jury room, including iPods that fall outside the scope of the certified Class Period. You further expressed your intention to have these devices fully charged, operable, and containing music. We objected to the sending of any Apple iPod devices to the jury room based on authentication, relevancy, and FRE 403 grounds.

First, during the parties' meet and confer discussion on October 31, 2014, you stated that several of the physical exhibits on your exhibit list – including Apple iPods – were in the process of being purchased online at www.eBay.com. We stated our concern then, which we reiterated during our call, that the authenticity of these physical exhibits could not be determined. You responded that Apple is in the process of attempting to authenticate the physical exhibits, which we objected to on various grounds including that such attempts at authentication would necessarily involve the untimely use of expert-style testimony for verifying such exhibits. Although the parties discussed the possibility of an Apple custodian of record verifying authenticity as to a device (that a given item appeared to be an authentic iPod, for example) we reiterated our concerns about such a process, particularly because the parameters of any verification could not be defined, including the authenticity of the software on the device, the history of the device and other concerns. We further objected on relevancy grounds to the introduction of unaffected iPod models, in addition to FRE 403 concerns.

Additionally, you discussed the introduction into evidence the iPods that Dr. Kelly directly conducted experiments on in support of his expert report. However, because Dr. Kelly failed to specify in his expert report where he obtained his iPods from, we reserved on our objections until further information could be provided.

**Non-iPod Portable Digital Media Players**

Included on your exhibit list are several non-iPod portable digital media players, like the Microsoft Zune or Creative Zen. Although you reserved at this time on discussing the manner in which Apple plans to introduce these devices into evidence at trial, you acknowledged that Apple would not be able to authenticate these devices. We objected to the introduction of any such devices on grounds that include, but are not limited to, relevancy, authentication, and FRE 403. Prior to any in-person inspection by Plaintiffs, we request that you provide in advance the model numbers, firmware, music, software programs, provenance and any other relevant information you have concerning these devices.

984144_1

**Robbins Geller
Rudman & Dowd LLP**

Martha L. Goodman
November 13, 2014
Page 3

**Software Programs**

You stated that Apple's use of any software programs would be limited to demonstrative purposes and would not be sent back to the jury room. You further stated that you will only be using computers from the Class Period for demonstrative purposes, thereby explaining why these items were not included on the exhibit list. Later in the call, you reiterated that you did not intend to send a computer back to the jury room. You said that you would, at a minimum, give Plaintiffs' forty-eight hours' notice to inspect any such equipment, but would endeavor to give notice much further in advance. We reserved on this issue, as this was the first time we had become aware of your intention for the use of these computers at trial.

**Other Hardware**

You reserved on the issue of discussing the introduction into evidence of other hardware devices, like CD burners, EarPods, writable CDs, etc. We have many of the same objections noted above to these items as well. While reserving on our objections, we reiterated our position that the introduction of any devices would necessarily need to contain the same exact technology as existed during the Class Period, which would need to be precisely identified.

**Plaintiffs' Inspection**

We expressed the necessity of an in-person inspection of any physical exhibits that Apple intends to use at trial. The parties have tentatively agreed to meet on either November 20th or 21st at Boies' Oakland office.

As we further stated, we reserve our rights to make any and all objections to the use of these items at trial as physical exhibits to be used with a witness, as exhibits used with a witness and sent back to the jury room and as demonstrative exhibits. We have made clear from the outset of discussing physical exhibits that our objections would depend on Apple's desired use of each exhibit. *See, e.g.*, Apple's Exhibit List and Plaintiffs' Objections at page 87 (where Plaintiffs' objections to the use of physical items "depend[s]… on the planned use of item.").

**Robbins Geller**
**Rudman & Dowd** LLP

Martha L. Goodman
November 13, 2014
Page 4

       Because of the shortness of time between now and trial, please let me know by the end of the day Friday in writing whether you disagree with any of the above.

                 Very truly yours,

                 JENNIFER CARINGAL

JC:sll

984144_1

# EXHIBIT B

# BOIES, SCHILLER & FLEXNER LLP

5301 Wisconsin Avenue N.W.  *  Washington, DC 20015-2015  *  PH 202.237.2727  *  FAX 202.237.6131

November 15, 2014

**Via Electronic Mail**

Jennifer Caringal
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Re:    *The Apple iPod iTunes Antitrust Litigation*, No. C-05-00037-YGR

Dear Jen:

I write in response to your November 13, 2014 letter concerning the parties' November 12, 2014 telephonic meet-and-confer regarding physical exhibits listed on Apple's exhibit list (Dkt. 844) (Oct. 21, 2014). As a general matter, I agree that you have accurately stated Plaintiffs' contentions and positions offered during the meet-and-confer.

Apple disagrees with Plaintiffs' belief that physical exhibits are not relevant to this case. Plaintiffs bring monopolization and attempted monopolization claims of the purported portable digital media player market. According to Plaintiffs, iPods and devices that compete with iPods are the products that comprise that market. These competitive devices—of which there are many; Apple's exhibit list contains just a sample—are relevant to whether Apple had monopoly power. Furthermore, Plaintiffs seek damages on behalf of purchasers of certain iPods—the very physical exhibits you seek to preclude Apple from introducing into evidence. iPods are also relevant to show features that Dr. Noll did not account for in his regression analysis, such as display size and resolution. Oct. 29, 2014 Pre-Trial Conf. Tr. at 54:15-20; TX 2669. A USB cable (TX 2721) and FireWire cable (TX 2713) are relevant for the same reason.

Software programs such as iTunes 7.0 (TX 2725) are relevant to this case because Plaintiffs challenge security updates issued with iTunes 7.0 as anticompetitive. RealPlayer 10.5 with Harmony technology (TX 2728) is the software Plaintiffs rely on to allege that Apple engaged in anticompetitive conduct. Virtual burner software (e.g., TX 2736-38) is relevant to switching costs. External CD burners (TX 2735) and writable CDs (TX 2788) are also relevant to switching costs.

Nor would admitting physical devices into evidence "mislead and confuse" the jury "as to what the case is about." As outlined above, the case is about devices that make up the purported portable digital media player market, which includes iPods and devices that compete with iPods. The case is also about software programs relating to Apple's alleged anticompetitive conduct. And the Court explained, "the jury will have to put themselves back into the era"; these physical exhibits will aid the jury in doing so. Oct. 29, 2014 Pre-Trial Conf. Tr. at 55:15-16.

Jennifer Caringal
November 15, 2014
Page 2

Second, Plaintiffs waived all but relevance and 403 objections to physical exhibits. The only objections Plaintiffs lodge as to all of the physical exhibits are "Relevance (FRE 402); FRE 403 Depending on whether Apple plans to send physical equipment to the jury and planned use of item." Dkt. 844 at 81-94, 99-101 (Oct. 21, 2014). The phrase "depending on whether Apple plans to send physical equipment to the jury and planned use of item" plainly qualifies only the stated objections; it does not, as you now suggest, cover unstated objections that you have since raised, including authentication, improper expert testimony, and "chain of custody." Nor does it cover any other undisclosed objections.

Moreover, at the October 29th pre-trial conference, counsel for Plaintiffs, Patrick Coughlin, did not raise authentication, improper expert testimony or chain of custody issues when discussing physical exhibits. *See* Oct. 29, 2014 Pre-Trial Conf. Tr. at 52-57. He only raised issues about whether the devices will be operable and whether they will be sourced from the time period relevant to this case. *Id.* at 53:18-24; 54:24-55:11. In fact, Patrick stated on the record that "if they're just the physical things and they're not going to be operating, we have no objection." *Id.* at 54:7-8. And as I stated during the meet-and-confer, Apple's physical exhibits are from the relevant time period.

Plaintiffs cannot reserve the right to add new, undisclosed objections past the deadlines set by the Court or mutually agreed to by the parties. Plaintiffs had the opportunity to object on Apple's exhibit list and at the pre-trial conference when Judge Gonzalez Rogers specifically raised this topic. Plaintiffs stated one set of objections on our October 31, 2014 telephonic meet-and-confer and then raised new objections on the November 12 meet-and-confer. Both sets of objections are untimely, as any other belated objections Plaintiffs may attempt to raise in the future.

In any event, Apple is working diligently to provide Plaintiffs with further information regarding the physical devices' serial numbers, model numbers, and firmware, software, or operating system information, as applicable. In so doing, Apple is going far beyond what is required to authenticate evidence. Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Apple has already listed these exhibits on the exhibit list with potential sponsoring witnesses. Thus, we are confused by your request to further explain how "Apple plans to get each physical item into evidence, *i.e.*, which witness will be introducing which physical item, and how this is to be accomplished," a request that was not raised in the meet-and-confer and which we believe that Apple's exhibit list with sponsoring witnesses already fulfills.

Finally, through the meet-and-confer, Apple has notified Plaintiffs that Apple also may use these physical exhibits, including software programs and the computers that will necessarily run those programs, as demonstrative aids during trial. By inviting Plaintiffs to inspect the physical exhibits, including the software programs and the computers used to run those programs, Apple is providing Plaintiffs general notice well in advance of the time required under the parties' trial stipulations for use of demonstratives at trial. Dkt. 838 ¶ 14 (Oct. 21, 2014). Apple will also provide subsequent notice regarding the use of specific physical exhibits pursuant to the parties' stipulation.

Jennifer Caringal
November 15, 2014
Page 3

The balance of this letter responds to specific issues raised in your letter.

**Apple iPod devices**

With respect to iPods that Apple's expert, Dr. John Kelly, relied on in preparing his expert report, you did not raise authenticity issues during the October 31, 2014 meet and confer but instead represented that you would have "fewer concerns" about Apple using those iPods at trial and admitting them into evidence. Also, Plaintiffs did not object to the authenticity of iPods that Dr. Kelly used in preparing his reports during the pendency of this case.

**Non-iPod Portable Digital Media Players**

I disagree with your statement that I "acknowledged that Apple would not be able to authenticate these devices." I merely acknowledged that there might be issues associated with authenticating certain non-iPod portable digital media players. I also indicated that Apple may use these devices either as demonstrative aids or exhibits to be introduced into evidence.

**Software Programs**

During the meet-and-confer, I understood Plaintiffs' position regarding software programs to relate only to Apple's Trial Exhibit Nos. 2723-2725, 2728, and 2736-2742.

**Plaintiffs' Inspection**

Plaintiffs also offered November 22, 2014, as a date to inspect the physical exhibits. I indicated, and I will, confirm a date and time for Plaintiffs to inspect physical exhibits as soon as I am able to do so.

Sincerely,

*/s/ Martha L. Goodman*

Martha L. Goodman

EXHIBIT C

**Robbins Geller
Rudman & Dowd** LLP

| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

Jennifer Caringal
jcaringal@rgrdlaw.com

November 17, 2014

<u>VIA ELECTRONIC MAIL ONLY</u>

Martha L. Goodman
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015

> Re:   *The Apple iPod iTunes Antitrust Litigation,*
>       No. C-05-00037-YGR

Dear Martha:

I write in response to your November 15, 2014 letter to clarify some inaccuracies as you have described them.

First, you misstate the characterization of the relevance argument concerning the physical exhibits by stating that it is "Plaintiffs' belief that physical exhibits are not relevant to this case." As I stated in my letter, we do not believe that the relevance of physical iPods are aided by allowing them into the jury room. Any marginal relevance that these physical exhibits may have is outweighed by the unfair prejudice Plaintiffs will suffer due to the confusion of issues that these physical exhibits present.

Next, your claim of waiver is baseless. Both parties plainly have the right to make whatever objections they wish at trial. Is it now Apple's position that it has waived the right to make any objections not listed on its exhibit list at trial? If so, please let us know.

Further, we have made it clear from the outset, starting with our October 16, 2014 telephonic meet-and-confer that we have relevance, authentication, chain of custody, and FRE 403 objections with the introduction of any such physical exhibit. It was also not until the October 31, 2014 telephonic meet-and-confer discussion that you disclosed, for the first time, that you intended to purchase many of these physical exhibits through eBay or elsewhere. We immediately objected to this upon learning of this fact during that discussion. It was clear that we, and the Court, were under the impression that these physical exhibits would be coming directly from Apple (*see* Oct. 29, 2014 Pre-Trial Conf. Tr. at 173:21-23: "I mean, are you getting them from Apple? Can someone drive down there? It's not like it's across the United States."). We still do not understand how you intend to authenticate items with an unknown provenance. How, for example, can Mr. Cue serve as

**Robbins Geller**
**Rudman & Dowd** LLP

Martha L. Goodman
November 17, 2014
Page 2

a sponsoring witness for Trial Exhibit 2722 (iRiver)?  While he might have a general knowledge of other devices in the marketplace, how is he in a position to testify that a device purchased off of eBay, is a genuine iRiver, with its factory settings in place, etc.?  Issues such as this are why we continue to question how Apple plans to get these physical exhibits into evidence.

On the morning of November 17, you sent us a reference to *ACCO Brands, Inc. v. PC Guardian Anti-Theft Products, Inc.*, 592 F. Supp. 2d 1208, 1219 (N.D. Cal. 2008), a summary judgment ruling in a patent case.  The case is distinguishable on the merits, because the core issue in that case was the physical product, not its source code.  The case is also inapplicable because of its procedural posture: there is no balancing prejudice against relevance at the summary judgment stage.  *See* October 3, 2014 Hrg. Tr. at 13:5-7; 17-22 (MR. ISSACSON: "It's an entirely different set of issues in terms of what the Court sees and hears, because if the Court sees and hears something that's absolutely irrelevant, we can -- we can say in papers or in summary judgment proceedings, that's irrelevant.  That's not the case with the jury.")

In your November 10, 2014 email to Mr. Coughlin you state that "There are many documents to which we have not offered an objection but would object to their admission if they were not used with a witness with knowledge."  To now argue that these physical exhibits should be treated differently from document exhibits and should be admitted even though you clearly do not have a "witness with knowledge" of them is clearly disingenuous.

We would like to inspect the exhibits on the 20th or 21st – those would be the ideal dates.  Please let us know by the 19th what date is available. With respect to inspections, Plaintiffs request Apple have ready forensic images of all software and firmware that it plans to use in any device, including the computers, iPods, other portable digital media players, CD burners, etc.  If Apple cannot have this or something similar ready, then Plaintiffs request that they be permitted to make forensic images of all equipment that Apple intends to use, with all precautions taken that the original devices/software will not be altered in any way.  Further, while we do not anticipate needing it, we would like to schedule a second inspection day for any follow-up issues we may have.

Regards,

JENNIFER CARINGAL

# EXHIBIT D

Physical Exhibits Meet and Confer
11/20/14

| TX | Device | Model | Serial | Source | Firmware | Copyright or Date Listed | Music | Charged |
|---|---|---|---|---|---|---|---|---|
| 2706 | Creative Nomad Jukebox | DAP6G01 | | Jones Day | | © 2000 | No | No |
| 2788 | Writeable CDs | | | Boies, Schiller & Flexner | | | | |
| 2843 | RCA Lyra Jukebox 40 GB | RD2840A | QA003E013QBMLF | Boies, Schiller & Flexner personal device | | | | No |
| 2705-E | Microsoft Zune 30 GB | 1089 | 145211764610 | ebay.com | 3.30 (39) | © 2006 | No | Yes |
| 2709-E | Creative Zen V | DAP-FL0036 | C6PF1922634M00956U | ebay.com | 1.32.01 | © 2006 | Yes | Yes |
| 2726-E | Microsoft Zune 8 GB | 1125 | 20462774515 | ebay.com | 3.30 (39) | © 2009 | Yes | Yes |
| 2727-E | mobiBLU cube | DAH-1500i | PCMDAH1500i | ebay.com | | | Yes | Yes |
| 2729-E | Samsung YP-Z5 | YP-Z5AB XAA | 1ULL700219x | amazon.com | 2.47 US | 2006/07 | Yes | Yes |
| 2731-E | Sandisk Sansa e280a | e280a | e200RB0611472046 | ebay.com | 1.0.1.47 | © 2006 | No | Yes |
| 2732-E | Sansa Clip | Clip+ | BH1408CKGK-4GB | ebay.com | V01.02.17A | © 2009 | Yes | Yes |
| 2733-E | Sandisk Sansa Fuze | Fuze | BH806AVK | ebay.com | V01.02.31A | © 2008 | Yes | Yes |

Physical Exhibits Meet and Confer
11/20/14

| TX | Model | Serial No. | Model No. | Model Release Date | Current Firmware/software/OSX version | Firmware/Software/OSX release date | Source | Music | Charged |
|---|---|---|---|---|---|---|---|---|---|
| 2710-BSF | iPod scroll wheel (classic 1st generation) | U2149GXXLG6 | M8541 (EMC 1910) | 10/23/01 | | | Boies, Schiller & Flexner personal device | No | No |
| 2711-K | iPod video (classic 5th generation) | 4J545EPQSZA | MA003LL | 10/12/05 | 1.3.0 | 3/10/2008 | Dr. Kelly | Yes | Yes |
| 2712-K | iPod classic 6th generation | 8N748R68YMV | MB147LL | 9/5/07 | 1.1.2 | 4/27/2008 | Dr. Kelly | Yes | Yes |
| 2713-A | Apple iPod firewire cable | | | | | | Apple | | |
| 2715-K | iPod nano 2nd generation | 5U726014V8T | MA426LL | 9/12/06 | 1.1.3 | 4/23/2007 | Dr. Kelly | Yes | Yes |
| 2715-A | iPod nano 2nd generation | 5K309001V8T | MA426LL | 9/12/06 | 1.1.3 | 4/23/2007 | Apple | Yes | Yes |
| 2716-K | iPod nano 3rd generation | 7J748VLWY0P | MA978LL | 9/5/07 | 1.1.3 | 7/28/2008 | Dr. Kelly | No | Yes |
| 2716-A | iPod nano 3rd generation | 5K34202GY0P | MA978LL | 9/5/07 | 1.1.3 | 7/28/2008 | Apple | Yes | Yes |
| 2717-K | iPod shuffle 1st generation | 5C505H84RSA | M9725LL/A | 1/11/05 | 1.1.5 | 12/11/2006 | Dr. Kelly | No | No |
| 2718-K | iPod shuffle 2nd generation | 5M648U35VTE | MA565LL | 9/12/06 | 1.0.4 | 2/25/2008 | Dr. Kelly | No | No |
| 2718-A | iPod shuffle 2nd generation | 2Y222048YX6 | | 3/11/09 | | | Apple | No | No |
| 2719-K | iPod shuffle 3rd generation | 4H945RYSA78 | MC323LL/A | 3/11/09 | 1.1.0 | 3/9/2009 | Dr. Kelly | No | No |
| 2719-A | iPod shuffle 3rd generation | 4H0080NM4NZ | | 3/11/09 | | | Apple | No | No |
| 2720-A | iPod touch 1st generation | EC90603214P | MA627LL | 9/5/07 | 1.1.5 (4B1) | | Apple | Yes | Yes |
| 2721-A | Apple iPod USB cable | | | | | | Apple | | |
| 2723-E | iTunes 4.7 loaded on iBook G4 | UV4190ELQHU | M9165LL/A | 10/22/03 | iTunes 4.7 OSX 10.4.11 | OSX 10.4.11 - 11/14/07 iTunes 4.7 - 10/26/04 | powermac.com | Yes | Yes |
| 2725-E | iTunes 7.0 loaded on MacBook 2,1 | W8726DBHYA2 | MB061LL/A | 5/15/07 | iTunes 7.0 OSX 10.4.11 | OSX 10.4.11 - 11/14/07 iTunes 7.0 - 9/12/06 | powermac.com | Yes | Yes |
| 2743-K(1) | iPod photo (iPod classic 4th generation) | JQ4513JZR5R | M9586LL | 10/26/04 | 1.2.1 | 9/1/2006 | Dr. Kelly | Yes | Yes |
| 2787 | Apple EarPods | | | | | | | | |
| 2790-E | iPod dock connector (classic 3rd generation) | JQ424063PQ5 | A1040 (EMC 1961) | 4/28/03 | | | ebay | only when plugged in | only when plugged in |
| 2791-E | iPod click wheel (classic 4th generation) | JQ4495T3PQ7 | M9282LL/A* | 7/19/04 | | | ebay | No | Yes |

Physical Exhibits Meet and Confer
11/20/14

| 2792-A | iPod nano 4th generation | 5K43300T3R0 | MB754LL | 9/5/07 | 1.0.4 | | Apple | Yes | Yes |
|---|---|---|---|---|---|---|---|---|---|
| TBD-A(T2) | iPod touch 2nd generation | 9e42700D201 | MB528LL | 9/9/08 | 2.2.1 | | Apple | Yes | Yes |
| TBD-A(Cl7) | iPod classic 7th generation | 2Z4390S49ZU | MC297LL | 9/9/08 | 2.0.5 | | Apple | Yes | Yes |
| TBD | iTunes 7.4 loaded on MacBook 2,1 | W87316RRZ5V | MB061LL/A | 5/15/07 | iTunes 7.4 OSX 10.4.11 | OSX 10.4.11 - 11/14/07 iTunes 7.4 - 9/5/07 | powermac.com | Yes | Yes |

# EXHIBIT E

The only song present on iPods that were made available for inspection and could be turned on is "I'll Be There" by the Jackson 5. The song is byte-for-byte identical across all imaged ipods. Metadata in the .m4a file shows that it was purchased by Suzanne Jaffe with email address sjaffe@bsfllp.com on 2014-11-19 at 1:11:13 pm.



# EXHIBIT F





# Mastered for iTunes:
# Music as the Artist and
# Sound Engineer Intended

Whether you're a major label or a small indie, you provide the most important ingredient for iTunes—the music itself. It's our job to faithfully and accurately deliver your songs and albums to fans around the world exactly as you intend them to be heard. We've designed our tools to facilitate the best possible results, ones that live up to your highest standards for music available on the iTunes Store. To achieve this transparency, you need tools and technologies from us to ensure delivery of the highest quality master recordings possible into our ecosystem. With over 315 million iOS devices capable of playing your music, there's never been a better time than now for us to communicate, codify, and distribute updated information to you about the best tools and processes used to produce the millions of AAC files delivered daily to our mutual customers in over 50 countries around the world.

## Innovation and Excellence in Sound

Apple celebrates a rich history and tradition of innovation and excellence in sound for computing as well as content creation. The original Mac was engineered fully capable of supporting audio without additional hardware or software, making it one of the first personal computers ever to ship with sound. In 2002, even before the launch of the iTunes Store, Apple received a GRAMMY Award® for technical excellence in music, the first and only such award ever given to a personal computing company. When iTunes launched, the decision was made to standardize on AAC instead of the more popular MP3 format simply because AAC clearly provides superior audio quality compared to other codecs at similar bit rates. In working with Dolby and Fraunhofer, there have since been further improvements to AAC to get it to the level of excellence experienced on iTunes today. If you follow the guidelines outlined in this document and audition sample AAC encodes on Apple devices, you can achieve dynamic range that's superior to red book audio and a final product that's virtually indistinguishable from the original recording.

## Mastering for Digital Delivery

Digital distribution is no longer an afterthought. It is today's dominant medium for consuming music and as such needs to be treated with utmost care and attention. For decades, the standard for consumer digital audio has been the compact disc, and most mastering has been done with CDs in mind.

In recent years the quality of digital music delivery has vastly increased, as has the number of digital music sales, with iTunes being a key driver of those sales. With more than 16 billion downloads encoded as AAC to date worldwide, AAC is the new standard for digital music. It only makes sense to create masters specifically for this format.

## What is AAC and iTunes Plus?

AAC (Advanced Audio Coding) is a format for compressing and encoding digital audio. AAC achieves the portability and convenience of compressed and encoded digital audio while retaining audio quality that's indistinguishable from larger digital files, such as audio from CDs.

The iTunes catalog was initially offered in 2003 as 128 kbps AAC files, many of which were encoded from the original CD masters. They sounded great—in fact, these downloads led the industry in sound quality. More than 100 million songs were sold in this format in a little over a year, changing the landscape of legal digital music forever.

But innovation didn't stop there. Recently, using the most advanced AAC encoder, the iTunes catalog was upgraded to iTunes Plus: a variable bit rate (VBR) 256 kbps AAC encoding format. iTunes AAC encoders are now able to transparently encode high definition audio, creating files that retain the small footprint, portability, and ease of use iTunes is known for. And they sound amazing.

## High Resolution Digital Recording

Digital audio, such as that on a CD, generally uses Linear Pulse Code Modulation (LPCM, often referred to simply as PCM) to represent audio signals. LPCM works by taking snapshots of the analog audio signal and assigning each a numerical value.

The resolution of an LPCM recording is determined by the sample rate (how many times per second samples are taken) and the bit depth (how many bits are used to represent each sample). Higher sample rates can capture higher frequencies, and higher bit depths can accurately represent a greater dynamic range.

The standard for CDs is 16-bit 44.1 kHz resolution, meaning that the analog signal is sampled 44,100 times per second and each sample is given a value between -32,768 and 32,767. This resolution is often referred to as 44/16.

The Nyquist sampling theorem states that to accurately represent a signal one must use a sampling rate double that of the highest frequency being represented. The highest frequency audible to humans is around 20kHz; therefore a sampling rate of over 40kHz is required to accurately capture the audible range of frequencies. Compact discs' 44.1 kHz rate is adequate for this need.

Even so, many experts feel that using higher resolution PCM files during production provides better-quality audio and a superior listening experience in the end product. For this reason, 96/24 resolution is quickly becoming a standard format in the industry, and it's also common to see higher resolution files, such as 192/24.

### Challenges with Encoding Higher Resolution Recording

An inherent challenge of working with high resolution audio has been that both the sample rate and the bit depth must be reduced to match the specifications used in mainstream distribution, such as CD or AAC. This can be done either with software ("in the box") or by running the mix through an additional analog stage and resampling. There are pros and cons with each technique, but both can add noise and/or distortion.

Downsampling, as the word implies, is the process of using Sample Rate Conversion (SRC) to lower the sample rate (for example, from 96kHz to 44.1 kHz). This process commonly creates aliasing, an undesired effect.

Dithering (or dithering down) is a technique used when reducing a file's bit depth (for example, from 24-bit to 16-bit). It's an attempt to reduce the distortion inherent in this process. Dithering is a tradeoff—the distortion is reduced at the cost of added noise. (Another bit depth reduction option is called "truncating," where the additional bits are

**Frequency** is the number of vibrations per second and is measured in Hertz (Hz). Human hearing spans a range from roughly 20Hz to 20kHz.

**Bit** *rate* is different than **bit** *depth*. Bit rate indicates how much data is being used per second and is calculated using the sample rate and bit depth. An iTunes Plus AAC file uses a sample rate of 44.1 kHz and is encoded with a target bit rate of 256 kilobits/second. It utilizes Variable Bit Rate (VBR) encoding, which uses each bit strategically, dynamically allocating less data for simple sections and more data for complex passages.

**Dynamic Range**, when used as a general audio term, refers to the range of possible volumes—the difference between the softest and the loudest parts.

In digital audio, **aliasing** refers to audible artifacts created when higher frequencies are sampled at an insufficient rate. The result is distortion. A visual metaphor for aliasing can be found in the "wagon wheel effect"—a rapidly spinning wagon wheel filmed at a low frame rate can appear to be moving backward.

simply removed. This can cause quantization distortion.)

### Improved Conversion and Encoding for AAC

Apple's latest encoding methodology is a two-step process. The first step in the encoding path is to use state-of-the-art, mastering-quality Sample Rate Conversion (SRC) to resample the master file to a sample rate of 44.1kHz.

Because this SRC outputs a 32-bit floating-point file, it can preserve values that might otherwise fall outside of the permitted amplitude range. This critical intermediary step prevents any aliasing or clipping that could otherwise occur in SRC. It is this 32-bit floating file that's used as the input to the encoder and is one key reason for such stunning results.

Our encoders then use every bit of resolution available, preserving all the dynamic range of a 24-bit source file and eliminating the need for dithering. The advantage of this is twofold. Not only does it obviate the need of adding dither noise, it also lets the encoders work more efficiently as they don't need to waste resources encoding this unwanted and unnecessary noise.

By using this highly accurate file directly from our SRC and taking advantage of its clean signal, our encoder can deliver the final product exactly as the artist and sound engineers intended it to sound.

## Best Practices for Mastering for iTunes

Our latest high resolution encoding process ensures that your music is transparently and faithfully distributed in the way you intended it to be heard. However, before you submit songs to iTunes for encoding, there are some best practices you can follow to ensure that your audio is optimized for iTunes.

### Provide High Resolution Masters

To take best advantage of our latest encoders send us the highest resolution master file possible, appropriate to the medium and the project.

An ideal master will have 24-bit 96kHz resolution. These files contain more detail from which our encoders can create more accurate encodes. However, any resolution above 16-bit 44.1kHz, including sample rates of 48kHz, 88.2kHz, 96kHz, and 192kHz, will benefit from our encoding process.

Don't upsample files to a higher resolution than their original format. Upsampling won't recover or add information to an audio file. Don't provide files that have been downsampled and dithered for a CD. This degrades the file's audio quality.

As technology advances and bandwidth, storage, battery life, and processor power increase, keeping the highest quality masters available in our systems allows for full advantage of future improvements to your music. Also, though it may not be apparent because there may not always be a physical, tangible master created in LP or CD format, the iTunes catalog forms an important part of the world's historical and cultural record. These masters matter—especially given the move into the cloud on post-PC devices.

### Master for iTunes Plus

When creating a master, mastering engineers take into account the limitations and characteristics of the medium or destination format, as well as the listening environment of their audience. For example, a master created for vinyl is unlikely to be listened to in an airplane or car, and therefore is often mastered for a listening environment where a listener can hear and appreciate a wider dynamic range. Similarly, a master created for a club environment might take into account the noisiness of the intended listening environment.

**Clipping** is a form of audio distortion and can be caused in many ways. In general, it is the result of the amplitude of a signal becoming too great to be accurately represented by a system. In an amplifier this can occur if one attempts too much amplification—the top of the signal is cut off, or "clipped." In digital audio this can occur when a signal falls outside of an allowed bit-depth range.

Because iTunes Plus is a highly portable format, its files have the potential to be listened to in a wide range of different settings. So while one listener may be using white earbuds while riding in a loud subway car, another may wind up listening intently to a Bach cantata on AirPlay–equipped Bowers and Wilkins speakers or on a similarly equipped Denon receiver in a home media room. Just as likely, a college student may be deep into Miles Davis' *Sketches of Spain* while sporting Dre Beats headphones in the campus library. Keep in mind that Apple has sold more than 250 million iOS devices, and that many, many people around the world are listening to music on their iPods, iPhones, or iPads.

You're being provided with all the tools you'll need to encode your masters precisely the same way the iTunes Store does so that you can audition exactly what they'll sound like as iTunes Plus AAC files.

Further, to ensure that your audience is hearing your intended sound, Apple recommends listening to your masters on the devices your audience will be using. While this doesn't have to be done in real time, you should be confident that the sound will hold up when heard on its intended listening device and in its intended environment.

### Be Aware of Dynamic Range and Clipping

Whether you're mastering a whisper-quiet zen flute tone poem or a heavy metal guitar fest, volume is a key issue. The main tools used in mastering—equalization, compression, limiting, or combinations of these—are all different ways of controlling aspects of volume. Making decisions about gain levels, dynamic range, and frequency response is what mastering is all about.

**Equalization (EQ)** controls the volume of specific frequencies—such as bass and treble. There are many types of EQ, all of which control the volume of specific frequencies.

**Compression** automatically controls volume over time. A compressor decreases dynamic range by decreasing loud signals, increasing lower signals, or by doing both. (Audio compression shouldn't be confused with data compression, which is used to reduce digital file sizes.)

**Limiting** is a fast-acting form of audio compression with a high ratio—it's often used to attenuate peak levels of a signal that could otherwise result in distortion. By raising the total volume and limiting the peaks, the total dynamic range is compressed, increasing loudness. An extreme form of limiting is "brick wall limiting."

**Multi-band Compression** is a combination of EQ and compression where a signal is divided into bands of frequencies which can then be isolated and compressed without affecting the other frequencies. For example, one can compress the bass without affecting the vocal.

Many artists and producers feel that louder is better. The trend for louder music has resulted in both ardent fans of high volumes and backlash from audiophiles, a controversy known as "the loudness wars." This is solely an issue with music. Movies, for example, have very detailed standards for the final mastering volume of a film's soundtrack. The music world doesn't have any such standard, and in recent years the de facto process has been to make masters as loud as possible. While some feel that overly loud mastering ruins music by not giving it room to breathe, others feel that the aesthetic of loudness can be an appropriate artistic choice for particular songs or albums.

Analog masters traditionally have volume levels set as high as possible, just shy of oversaturation, to improve the signal-to-noise ratio (SNR). With digital masters, the goal is to achieve the highest gain possible without losing information about the original file due to clipping.

With digital files, there's a limit to how loud you can make a track: 0dBFS. Trying to increase a track's overall loudness beyond this point results in distortion caused by clipping and a loss in dynamic range. The quietest parts of a song increase in volume, yet the louder parts don't gain loudness due to the upper limits of the digital format.

Although iTunes doesn't reject files for a specific number of clips, tracks which have audible clipping will not be badged or marketed as Mastered for iTunes.

A less obvious issue when setting gain for digital masters can occur on playback. Whether it's a compressed file like an AAC file or an uncompressed file such as a CD, digital data goes through several processes to be converted to an analog signal for playback.

One common process is called oversampling. This upsamples the digital data at four times the original sample rate to improve the quality of the digital audio signal being converted to analog. If the original digital audio data is at 0dBFS, oversampling can result in undesirable clipping. And if the original was already clipped, oversampling can

make it worse. A growing consensus is emerging that digital masters should have a small amount of headroom (roughly 1dB) in order to avoid such clipping.

In both digital and analog, the highest possible level will vary from track to track, depending on the material being mastered. Your decision about the volume and loudness of your tracks is a technical and creative choice. You might decide to take the listener on a dynamic journey through an album as a complete work, raising and lowering the volume level across the sequence of tracks to increase the music's emotional impact. Alternately, you might pursue the loudest possible signal at all times.

Whatever you decide—exquisitely overdriven and loud, or exquisitely nuanced and tasteful—we will be sure to encode it and reproduce it accurately. We only ask that you avoid clipping the signal.

**0dBFS**, or "Zero Decibels relative to Full Scale," refers to the maximum possible values that can be represented by a digital signal. Values that are beyond the maximum value cause clipping. For example, in a 16-bit file the highest value that can be represented is 32,767 and the lowest value that can be represented is -32,768. If you attempt to represent a series of values above 32,767, they will all be clipped at 32,767 and will create artifacts that sound unpleasant and dissonant when played back.

## Master for Sound Check and Other Volume Controlling Technology

Sound Check is a feature in iTunes and all iOS devices that lets listeners hear all their songs at approximately the same volume. It first determines the loudness of a track and then stores that information in the file's metadata. (Songs downloaded from the iTunes Store already contain this information.) The metadata is then used to raise or lower the volume of each track to prevent jarring volume changes while a device is shuffling songs.

Radio uses technology similar to Sound Check to control changes in volume when playing songs on the air. MP3s have a similar technology to control volume changes, called Replay Gain. The International Telecommunication Union (ITU) is taking a similar approach in its standardization of the characterization of volume in its broadcasting standards (specifically BS. 1770).

(Sound Check can also correctly set the volume per album, rather than per song, allowing albums that rely on volume differences between tracks, such as *The Dark Side of the Moon* by Pink Floyd, to maintain their intended volumes.)

The effect of Sound Check, as well as other volume-controlling technologies, is that songs that have been mastered to be too loud will be played back at a lower volume, letting listeners more easily notice any artifacts or unintentional distortion.

Because many such technologies are available to listeners, you should always mix and master your tracks in a way that captures your intended sound regardless of playback volume.

## Remastering for iTunes

When the CD was first becoming a popular format, many older recordings were rushed to market. To make these recordings available as soon as possible, corners were sometimes cut. In several instances, the wrong master tapes were used or the CD was mastered poorly. Many of these mistakes have since been identified and corrected, but even so, a number of record labels are remastering older material for rerelease in high resolution formats like DVD-A or SACD.

The recent advances in encoding files for iTunes Plus provides an opportunity for anyone maintaining a catalog of older content to create a digital archive or improve an existing one. In the last five years, there have also been advances in digital mastering tools and techniques. In addition to higher resolutions, other technologies (such as noise reduction and pop and click removal) have undergone significant improvements. Now that there's a clear distribution path that can take full advantage of high resolution masters, an older recording may merit being given new life. Delicate and artful remastering can let works of genius be experienced as they were meant to be and haven't been for years.

Materials already being remastered in high resolution formats, such as DVD-A or SACD, are excellent candidates for being remastered for iTunes. Projects that can benefit from remastering include CDs that were poorly mastered or mastered from the wrong tapes, projects that could benefit from cutting-edge noise reduction or similar modern technologies, and cases where the physical media is in danger of deteriorating.

Unlike physical media, digital archiving offers the advantage of exact, bit-for-bit copies that can be made with no signal degradation. As masters start making their way into the cloud, it's important that the best possible high resolution copies be archived.

When remastering for iTunes, procedures and best practices similar to mastering for new releases should be followed. You should always work from the best available master, carefully monitor gain to avoid clipping, and audition the encoding process and finished files on an iOS device.

Although it's possible to remaster from a previously mastered CD source with positive results, in order to qualify as Mastered for iTunes remastered content must begin with a high resolution digitization of the original analog source and must sound noticeably superior to the previously released version. Songs and albums submitted to the iTunes Store as remastered content will be reviewed to ensure that the sound quality shows discernible improvement.

## Mastering Tools

Mastering is a series of creative choices. As a professional you can be confident that the work you put in to mixing and mastering your material will be treated just as carefully by Apple. Our role is to faithfully and transparently reproduce the audio you deliver for iTunes—and to make your job easier, you're being provided access to the same world-class tools used to encode the entire catalog for the iTunes Library. Whether you opt to use an automated droplet or a command-line utility, the following tools will help you create the intended sound for your masters:

- **Master for iTunes Droplet**. The Master for iTunes Droplet is a simple, standalone drag-and-drop tool that can be used to quickly and easily encode your masters in iTunes Plus format.
- **afconvert**. The afconvert command-line utility can be used to encode your masters in iTunes Plus format.
- **afclip.** The afclip command-line utility can be used to check any audio file for clipping.
- **AURoundTripAAC Audio Unit**. The AURoundTripAAC Audio Unit can be used to compare an iTunes Plus file to the original source audio file to check for clipping.
- **Audio to WAVE Droplet**. The Audio to WAVE Droplet automates the creation of audio files, in WAVE (Waveform Audio File) format, from any audio file (such as MPEG or CAF files) natively supported on Mac OS X.

The following sections include instructions for using some of these tools to convert audio to iTunes Plus AAC and checking audio for clipping. Both tools utilize afconvert, which is a part of the Core Audio frameworks in Mac OS X. Changes made to these tools are incorporated into Mac OS X by means of Software Update. Software Update is the best way to keep your systems up-to-date so that the system you're using for audio encoding is the same one used by the iTunes Store.

At the time this document was written, Mac OS X 10.6.8 or later is required to have access to the most current version of the AAC encoder.

## Master for iTunes Droplet

You can use the Master for iTunes Droplet to automate the creation of iTunes Plus format masters. The Droplet creates an AAC audio file from an AIFF or WAVE source file by first generating a CAF (Core Audio File) rendered with an iTunes sound check profile applied to the file. If the sample rate of the source file is greater than 44.1 kHz, it's downsampled to 44.1 kHz using our mastering-quality SRC. Next, it uses this newly rendered CAF to render a high quality AAC audio file. Once the final AAC audio file is generated, the intermediary CAF is deleted.

To use the Master for iTunes Droplet, drag and drop AIFF or WAVE format source audio files, or folders containing those files, onto the droplet. This droplet works by automating the use of the afconvert command-line tool shown below.

For more information about the Master for iTunes Droplet, see the Master for iTunes Droplet Read Me file included in the Master for iTunes Installer.

### afconvert

The afconvert utility is command-line tool that will let you encode your masters using precisely the same technology used to encode files for the iTunes Store. The afconvert utility is built into Mac OS X and can be accessed using the Terminal application.

For more information about afconvert, type afconvert -h on the command line in the Terminal application on Mac OS X. For more information on the formats that afconvert can convert to, type afconvert -hf.

### Using afconvert to Convert Audio from LPCM to iTunes Plus AAC

Use the following steps to convert your audio file from LPCM to iTunes Plus AAC using the command-line interface. The items in italics are placeholders for filenames. The input file is assumed to be called source.wav, and any intermediate files are carried through from the output of one command to be the input of the next. The final output file is called final.m4a. These steps assume that your current directory is the same directory as your input file.

If starting with WAV LPCM file at 44.1kHz sample rate:

1.  To convert to a .caf file and add Sound Check information, in Terminal, type on one line:

    ```
    afconvert source.wav intermediate.caf -d 0 -f caff --
    soundcheck-generate
    ```

Or if starting with WAV LPCM file at 48kHz or 96kHz sample rate:

1.  To downsample to 44.1kHz LPCM using optimal sample rate conversion and add Sound Check information, in Terminal, type on one line:

    ```
    afconvert source.wav -d LEF32@44100 -f caff --
    soundcheck-generate --src-complexity bats -r 127
    intermediate.caf
    ```

Then, encode to AAC:

2.  To convert to iTunes Plus AAC, type on one line:

    ```
    afconvert intermediate.caf -d aac -f m4af -u pgcm 2 --
    soundcheck-read -b 256000 -q 127 -s 2 final.m4a
    ```

### Previewing the Converted Audio File

The AAC-encoded M4A file (final.m4a) created by afconvert can be previewed in iTunes or another application that plays M4A files (such as QuickTime Player). However, if you want to do a more detailed examination (such as loop sections, compare sections with the original, and so forth), you need to decode the AAC-encoded data to uncompressed LPCM data, just as it's decoded during playback. You can use afconvert to decode the AAC data to uncompressed LPCM and store it to a WAV file.

This WAV file should only be used for making a more detailed comparison or evaluation beyond what you can do by just previewing the file in iTunes. It should not be submitted to the iTunes Store as an audio source.

Use afconvert to decode the AAC-encoded data, as it will correctly decode the AAC file, taking care of some details that other applications don't do correctly. For example, the resulting decode.wav file will have the same number of audio samples as the original source.wav file that you started with, and thus it can be exactly aligned with your source file for critical listening, comparison, and evaluation.

Regardless of the bit depth of the original source file (16- or 24-bit), you should generate a 24-bit file to preserve maximum fidelity resulting from the AAC coding process.

### Using afconvert to Decode Your AAC-Encoded M4A File

Use the following command to decode your AAC-encoded M4A file. (Note that you can also use the Audio to WAVE Droplet to automate the process of decoding one or more of your AAC-encoded M4A files.) In this command, the M4A file with AAC-encoded data that was originally generated using afconvert is assumed to be called *final.m4a*; the WAV file generated from decoding the AAC-encoded data is called *decode.wav*.

1. In Terminal, type on one line:

```
afconvert final.m4a decode.wav -d LEI24 -f WAVE
```

### afclip

You can use another simple command-line tool, afclip, to check any file for clipping. This tool works by examining an audio file and identifying areas where clipping has occurred.

It accepts audio files as input and outputs a stereo sound file containing the left channel of the original file and a right channel with graphically represented impulses corresponding to each clipped sample in the original. This sound file can then be loaded into a digital audio workstation (DAW), such as Logic, providing a visual map to locate any clipping that may have occurred.

The following image is an example of an audio file that has been loaded into a DAW to help visually locate clipping.



iTunes won't reject a master file based on the number of clips the file contains. This tool is provided so you can make an informed decision about whether to submit an audio file or go back to the drawing board and make adjustments. It's a creative decision—one that's entirely up to you.

For more information about afclip, type afclip -h on the command line in the Terminal application on Mac OS X.

### Using afclip to Check for Clipping

To check an audio file for clipping with afclip:

1.  Open a Terminal window.

2.  In the Terminal window, type the following on one line, followed by a space:

    ```
    afclip
    ```

3.  Drag and drop the audio file you wish to check onto the Terminal window.

4.  Press Return to run afclip.

By default, afclip will give a readout of any clipping found. If there's clipping, it will also output a .wav file in the original audio file's directory.

### Reading the afclip Readout

If any clipping is found, a readout will be printed to the terminal window with details for each instance of clipping.

```
SECONDS            SAMPLE      CHAN    VALUE         DECIBELS
14.595941          643681.00     0    -1.002716      0.023562
14.595964          643682.00     0    -1.016706      0.143904
14.595986          643683.00     0    -1.031721      0.271245
14.596009          643684.00     0    -1.027497      0.235609
14.642409          645730.25     1     1.000831      0.007211
14.642511          645734.75     1     1.003081      0.026721
14.642517          645735.00     1     1.008520      0.073693
```

The readout will contain the following information for each instance of clipping:

-   **Seconds.** The time, in seconds, where the clipping occurs.

-   **Sample.** The sample number that was clipped.

-   **Channel.** The channel of the clipped sample. A value of 0 means the clipping occurred on the left channel, while a value of 1 means the clipping occurred on the right channel.

-   **Value.** The raw value of the clipped sample. Since clipping happens when a value exceeds the range of -1 through 1, these values will be below -1 or above 1.

-   **Decibels.** The number of decibels by which the sample exceeds the clipping point.

The readout will end with a summary of how many total clipped samples the audio file contains for the left channel and the right channel.

```
186.064853     8205460.00     0     -1.062570     0.527150
186.064875     8205461.00     0     -1.003081     0.026723
186.312120     8216364.50     1     -1.009396     0.081235
186.312132     8216365.00     1     -1.034017     0.290550
186.312154     8216366.00     1     -1.037741     0.321770
188.297455     8303917.75     1      1.000005     0.000041
188.297460     8303918.00     1      1.008717     0.075380
188.297483     8303919.00     1      1.025134     0.215617
     total clipped samples    Left  on-sample: 10661    inter-sample: 2876
     total clipped samples    Right on-sample: 9690     inter-sample: 2487
```

Some readouts will show sample values with decimals, such as 8216364.50 in the table above. This indicates that the waveform will clip between two samples of the original audio data. This is called inter-sample clipping. Most DACs will upsample audio while converting the digital signal to an analog signal, which is known as the reconstruction process. This process can result in clipped values that aren't actually clipped in the original material, causing an uncompressed digital signal to cause clipping in playback even if all the values in the waveform don't show on-sample clipping. For this reason, it's important to check for inter-sample clipping. By default, afclip does inter-sample clip detection and includes the total number of inter-sample clipping at the bottom of the readout, next to the total number of on-sample clipping.

## AURoundTripAAC Audio Unit

The AURoundTripAAC Audio Unit lets you compare audio encoded using iTunes Plus AAC against a source audio file. It also includes clip and peak detection, as well as a simple listening test environment. The audio unit can be used in any audio unit host application, such as Logic or AU Lab. AU Lab is available as a free download at apple.com/iTunes/Mastered for iTunes. For more information on using the AURoundTripAAC Audio Unit, see the AURoundTripAAC ReadMe file included in the Mastered for iTunes Installer.

## Audio to WAVE Droplet

The Audio to WAVE Droplet lets you automate the creation of WAVE audio files, in WAVE (Waveform Audio File) format, from any audio file (such as MPEG or CAF files) natively supported on Mac OS X. For example, the Droplet can be used to decode AAC files to 24-bit WAVE files, automating the decoding process used by the Mastered for iTunes command line utility, afconvert, and allowing you to decode multiple files at once.

To use the Audio to WAVE Droplet, drag and drop source audio files, or folders containing those files, onto the droplet. The droplet will then convert those files to WAVE format files. The created WAVE files will be titled using the names of their corresponding source files, and will be placed in the same folder as the source files.

For more information about the Audio to WAVE Droplet, see the Audio to WAVE Droplet Read Me file included in the Master for iTunes Installer.

© 2012 Apple Computer, Inc. All rights reserved. Apple, the Apple logo, iPod, iTunes, Mac, Macintosh, and Mac OS are trademarks of Apple Computer, Inc., registered in the U.S. and other countries. iTunes Music Store is a service mark of Apple Computer, Inc., registered in the U.S. and other countries. Other product and company names mentioned herein may be trademarks of their respective companies. Product specifications are subject to change without notice. This material is provided for information purposes only; Apple assumes no liability related to its use.
January 2012

# EXHIBIT G

# Robbins Geller
# Rudman & Dowd LLP

| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

Carmen A. Medici
cmedici@rgrdlaw.com

November 20, 2014

<u>VIA ELECTRONIC MAIL ONLY</u>

Martha L. Goodman
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW
Washington, DC 20015

     Re:    *The Apple iPod iTunes Antitrust Litigation*,
           No. C-05-00037-YGR

Dear Martha:

    I write to continue the dialog that we have had about physical exhibits following our in-person inspection of the devices that are on Apple's exhibit list.

    You withdrew all exhibits that were not present for us to physically inspect. Specifically, you withdrew TX 2707, TX 2708, TX, 2709, TX 2714, TX 2722, TX 2726, TX 2730, TX 2734, TX 2735. In addition, you withdrew exhibit TX 2726-E (Microsoft Zune 8GB), which was present. You also said that there would be no new physical exhibits (demonstrative or otherwise) that you would seek to introduce at trial, with the potential exception of a PC to run the programs that were already on the exhibit list, and then only as a demonstrative.

    You again confirmed that you were not seeking to introduce any computers to the jury room. The only physical exhibits that Apple seeks to introduce into the jury room are fully charged portable digital media players—without chargers—and a single set of "ear pods" that belong to Dr. Kelly. The rest of the physical exhibits on your list are meant to be exhibits that Apple plans to use as demonstratives.

    You replaced some exhibits that were on the exhibit list with new iPods purportedly from Apple. You said that they were the same model iPods as were previously listed on the exhibit lists, but that you believed they were officially refurbished iPods from Apple. Please provide us with as much detail as you can about the process that Apple uses to restore iPods, especially any information that you have about how the iPod is refurbished, including any quality checking, firmware updates or anything else that might tend to show the device is what you contend it is and acts how it would have during the class period. To establish the authenticity of those exhibits, you said that you would provide Plaintiffs with a declaration from someone at Apple. Plaintiffs are willing to review those declarations and revisit their authenticity objections to the iPods. Of course, even with this information, without knowing how Apple plans to use these devices, it is impossible

**Robbins Geller
Rudman & Dowd** LLP

Martha L. Goodman
BOIES, SCHILLER & FLEXNER LLP
November 20, 2014
Page 2

to resolve all objections. Plaintiffs reserve their objections depending on how Apple intends to use the devices.

We also requested, and you agreed to consider, providing us the sales listings for the products purchased that did not come directly from Apple or Dr. Kelly. We also requested receipts of such purchases.

You said that you would provide us with the executable files that you downloaded from the internet and were planning to use as part of demonstrations. Please provide us with all of the information that you have about where these programs came from and where they've been.

With respect to the PC, you said that you only need give us 48 hours' notice for inspection of any demonstratives. While we don't contend that is a misstatement of the parties' agreement, we indicated that an inspection of a computer or any device where code is at issue would take longer to authenticate, by its nature, than that of a regular demonstrative. It would be easier for us to resolve our objections, especially authenticity objections, if Plaintiffs had more time to inspect the devices. You agreed, and said that you would endeavor to provide us with those devices before the 48-hour window.

We said that we would take under advisement whether we would provide you with the forensic images that our experts took of the devices today. As long as it is not overly burdensome, we will get you those images as soon as is practicable.

While we appreciate the efforts that you have gone through in order to address some of our evidentiary concerns about the physical exhibits, we believe that some exhibits have no possible cure and are not appropriate demonstrative exhibits, let alone appropriate evidence to be put in "the box." Thus, we continue to object to the use of any physical exhibits for all of the reasons outlined in the Caringal letters of November 13 and November 17, with a few small exceptions.

We agree that it is proper for Dr. Kelly to use at trial the exact physical exhibits that he used in his report, provided that you can establish the chain of custody of how the iPod has been used and where it has been in the interim period since Dr. Kelly ran his report. Without this, Apple will not be able to establish the appropriate foundation for the exhibit. In that respect, we reserve our evidentiary objection. We also agree that Dr. Kelly can run the exact same demonstrations that he ran in his report, provided that a) again, he can establish the foundation for the devices that he is using (computer, software and iPod); and b) that we are able to inspect any devices that he will be using in advance of their use.

**Robbins Geller**
**Rudman & Dowd** LLP

Martha L. Goodman
BOIES, SCHILLER & FLEXNER LLP
November 20, 2014
Page 3

Finally, because we are at impasse regarding the introduction of any physical exhibits beyond the above limited uses, we suggested that we may move the Court for relief soon (but that we would give you notice in advance of filing), so that any evidentiary issues could be resolved before trial. We discussed a briefing schedule, but were unable to come up with anything that seemed workable considering the upcoming Thanksgiving holiday. You said that you would confer with your colleagues and attempt to narrow your exhibit list so that both sides could focus their arguments and objections. You also said that you would propose a briefing schedule. Plaintiffs propose that they file their opening motion on Sunday, that Apple oppose it on Monday and Plaintiffs reply on Tuesday.

Plaintiffs do not believe that any physical devices belong in the jury room, but in an effort to hopefully aid you in narrowing your physical exhibit list, Plaintiffs suggest you withdraw all iPods that were not used by Dr. Kelly in his reports and seek to introduce no others into evidence. Plaintiffs also suggest that no devices are used as demonstratives except turned off, "affected" iPods on which plaintiffs claim damages. The remainder of the exhibits are clearly not appropriate demonstrative exhibits and are certainly not appropriate to go to the jury room. In addition to being irrelevant and prejudicial, there can be no sponsoring witness and the chain of custody raises alarming issues with attorneys being responsible for certain links in the chain. The purpose of testimony concerning chain of custody is to prove that evidence has not been altered or changed from the time it was collected through production in court. *Gallego v. United States of America*, 276 F.2d 914 (9th Cir. 1960) (citing *United States v. S.B. Panicky & Co.*, 136 F.2d 413, 415 (2d Cir. 1943)). There is no way of establishing that these devices are what they purport to be: devices that are functioning as they functioned at the time in which the alleged wrongful conduct occurred.

Thank you for your time today. We look forward to your email.

Very truly yours,

CARMEN A. MEDICI

CAM:adc



# EXHIBIT H

**Xan Bernay**

| | |
|---|---|
| **From:** | Carmen Medici |
| **Sent:** | Friday, November 21, 2014 7:44 PM |
| **To:** | Martha Goodman; Suzanne Jaffe |
| **Cc:** | Xan Bernay; Jennifer Caringal; Maxwell Pritt; John Cove |
| **Subject:** | RE: Apple - Physical Exhibits |

Martha-

We're checking into both whether we produced every ipod image we took (I believe we did) and whether we have the technical capability to take an image this weekend. I suspect we do. I'll get back to you once I know. Have a good night.

Thanks,
Carmen

-------- Original message --------
From: Martha Goodman <MGoodman@BSFLLP.com>
Date:11/21/2014 7:08 PM (GMT-08:00)
To: Carmen Medici <cmedici@rgrdlaw.com>, Suzanne Jaffe <sjaffe@BSFLLP.com>
Cc: Xan Bernay <XanB@rgrdlaw.com>, Jennifer Caringal <JCaringal@rgrdlaw.com>, Maxwell Pritt <mpritt@BSFLLP.com>, John Cove <jcove@BSFLLP.com>
Subject: RE: Apple - Physical Exhibits

Carmen,

Thanks for the images. I noticed that the zip file appears to be incomplete, as it contains images for only what appears to be nine iPods. Can you please send me the additional images that you took?

Also, the image you took of TX 2743 (an iPod classic 4th gen. photo) was meant to be an image of the precise iPod 4th gen. Dr. Kelly relied on in preparing his expert report, but I just realized we inadvertently placed a different iPod—with serial number JQ52597TSAZ—in the bag. We have the proper model—with serial number JQ4513JZR5R—available for you to image. I am happy to bring it to Robbins Geller this weekend for that purpose. I can also send you photos of it. Please let me know what you prefer.

Martha

**From:** Carmen Medici [mailto:cmedici@rgrdlaw.com]
**Sent:** Friday, November 21, 2014 12:05 PM
**To:** Martha Goodman; Suzanne Jaffe

**Cc:** Xan Bernay; Jennifer Caringal; Maxwell Pritt; John Cove
**Subject:** RE: Apple - Physical Exhibits

Martha:

I write concerning the images of the iPods that we took yesterday, which we are providing separately via secure file transfer. The images were taken using the "partimage" program, www.partimage.org. Images were only taken of the used blocks on each iPod's storage. There is a separate folder for each iPod that we took an image of. Each folder is named with the exhibit number, then the iPod's serial number as recorded on the device. The image is named: "image.000." On some devices, because of unknown problems (perhaps errors in the hard drive, errors with the iPod or some other error), only partial images were taken. You can see which of those did not take a complete image of the used blocks because the folder will have a ".tmp" file in it. It is for these reasons that we requested a potential follow-up inspection. We do not currently believe we need that now, but reserve our right to request one.

In each folder, there is subfolder called "iPod_Control." That subfolder has selected folders from the iPod's hard drive directly copied from the iPod.

Recall that we did not take any images of any device which Apple said was not going to be turned on.

Please let me know if you have any questions.

Thanks,

Carmen

**From:** Martha Goodman [mailto:MGoodman@BSFLLP.com]
**Sent:** Friday, November 21, 2014 9:57 AM
**To:** Carmen Medici; Suzanne Jaffe
**Cc:** Xan Bernay; Jennifer Caringal; Maxwell Pritt; John Cove
**Subject:** RE: Apple - Physical Exhibits

Carmen,

Thanks for your letter. A few items in response:

1) Briefing schedule: We cannot accept your Sunday-Monday-Tuesday (November 23-24-25) briefing schedule. Plaintiffs are filing a motion in limine, and, under Judge Gonzalez Rogers' rules, no reply briefs are permitted. Pretrial Setting Instructions ¶ 4(b). Apple proposes that Plaintiffs file their motion in limine on Sunday, November 22 and Apple oppose on Wednesday, November 26, and, in an effort to afford Plaintiffs a fuller briefing opportunity, that both parties' papers be limited to five pages, instead of the maximum four pages otherwise permitted for motions in limine under the Court's rules.

2) Issues to be briefed: In order to narrow the scope of issues to be briefed and in light of some of Plaintiffs' objections, Apple will seek to admit into evidence only Apple iPods and other devices received from Apple or Dr. Kelly, i.e., those with an "-A" or "-K" appended to the trial exhibit number, as provided in the list to you yesterday. Apple reserves its right to use any other Apple iPod or competitive portable digital media player as a demonstrative aid, as well as the software programs (and necessary computers) identified on Apple's exhibit list, some of which you inspected yesterday.

3) Specific objections: We asked during the meet and confer that you provide us with specific objections to specific physical exhibits if your investigation through the forensic images leads you to any specific objections, whether to their use as demonstrative aids or as evidence to be sent back to the jury. You said that you would do so. Please provide us with those objections, if any, before you file your motion.

4) Withdrawn exhibits: We withdraw the following trial exhibits: TX 2704, TX 2707, TX 2708, TX 2714, TX 2722, TX 2726, TX 2730, TX 2734, TX 2735. You incorrectly listed in your letter that Apple withdrew TX 2709, a Creative Zen V, which was made available to you for inspection.

Finally, thank you for agreeing to provide us copies of the forensic images. We trust that it will not any more overly burdensome than it was to provide you the opportunity to make the images. I look forward to receiving the copies as soon as possible.

Martha L. Goodman

BOIES, SCHILLER & FLEXNER LLP

(202) 237-9616

mgoodman@bsfllp.com

**From:** Carmen Medici [mailto:cmedici@rgrdlaw.com]
**Sent:** Thursday, November 20, 2014 10:12 PM
**To:** Martha Goodman; Suzanne Jaffe
**Cc:** Xan Bernay; Jennifer Caringal; Maxwell Pritt; John Cove
**Subject:** RE: Apple - Physical Exhibits


Martha, Suzanne,


Nice seeing you today.  Please see the attached letter.


Thanks,

Carmen


**From:** Jennifer Caringal
**Sent:** Monday, November 17, 2014 11:10 AM
**To:** 'Martha Goodman'
**Cc:** Xan Bernay; Carmen Medici; Maxwell Pritt
**Subject:** RE: Apple - Physical Exhibits


Martha,


Please see the attached.


Regards,
Jen


**From:** Martha Goodman [mailto:MGoodman@BSFLLP.com]
**Sent:** Saturday, November 15, 2014 3:27 PM

**To:** Jennifer Caringal
**Cc:** Xan Bernay; Carmen Medici; Maxwell Pritt
**Subject:** RE: Apple - Physical Exhibits

Jen:

Please see the attached correspondence.


Martha L. Goodman

BOIES, SCHILLER & FLEXNER LLP

(202) 237-9616

mgoodman@bsfllp.com



**From:** Jennifer Caringal [mailto:JCaringal@rgrdlaw.com]
**Sent:** Thursday, November 13, 2014 3:09 PM
**To:** Martha Goodman
**Cc:** Xan Bernay; Carmen Medici; Maxwell Pritt
**Subject:** Apple - Physical Exhibits


Martha,

Please see the attached correspondence concerning yesterday's meet and confer.


Regards,
Jen


**Jennifer N. Caringal**

Robbins Geller
Rudman & Dowd LLP

655 West Broadway, Suite 1900
San Diego, CA 92101
Tel 619 231 1058 | Fax 619 231 7423

5



NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information
that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this
electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in
error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information
that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this
electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in
error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information
that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this
electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any
dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in
error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# EXHIBIT I

*In re Apple iPod iTunes Antitrust Litigation - Jury Trial Volume 1 - November 19, 2014*

— Sheet 1 —

```
                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

    BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


    THE APPLE IPOD ITUNES          )      NO. C 05-00037 YGR
    ANTITRUST LITIGATION           )
                                   )      PAGES 1 - 197
                                   )
                                   )      JURY TRIAL - VOLUME 1
                                   )
                                   )      OAKLAND, CALIFORNIA
    _____)          WEDNESDAY, NOVEMBER 19, 2014


                    REPORTERS' TRANSCRIPT OF PROCEEDINGS


    APPEARANCES:

    FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                             655 WEST BROADWAY, SUITE 1900
                             SAN DIEGO, CALIFORNIA  92101
                        BY:  ALEXANDRA S. BERNAY,
                             JENNIFER N. CARINGAL,
                             PATRICK COUGHLIN,
                             STEVEN M. JODLOWSKI
                             CARMEN A. MEDICI,
                             BONNY E. SWEENEY, ATTORNEYS AT LAW

                             BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                             4023 CAIN BRIDGE ROAD
                             FAIRFAX, VIRGINIA 22030
                        BY:  FRANCIS J. BALINT, JR.
                             ATTORNEY AT LAW


              (APPEARANCES CONTINUED NEXT PAGE)

    REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                          DIANE E. SKILLMAN, CSR NO. 4909

       PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
    TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

       RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530
```

```
                 A P P E A R A N C E S (CONT'D.)



    FOR DEFENDANT:           BOIES, SCHILLER & FLEXNER LLP
                             5301 WISCONSIN AVENUE NW
                             WASHINGTON, D.C.  20015
                        BY:  WILLIAM A. ISAACSON,
                             KAREN L. DUNN,
                             MARTHA L. GOODMAN, ATTORNEYS AT LAW

                             BOIES, SCHILLER & FLEXNER LLP
                             1999 HARRISON STREET, SUITE 900
                             OAKLAND, CALIFORNIA  94612
                        BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                             --oOo--










       RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530
```

3

1  WEDNESDAY, NOVEMBER 19, 2014            8:42 A.M.
2           P R O C E E D I N G S
3     (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE
4  OF THE JURY:)
5     THE CLERK:  CALLING CIVIL ACTION 05-0037, THE APPLE
6  IPOD ITUNES ANTITRUST LITIGATION.
7     COUNSEL, PLEASE STATE YOUR APPEARANCES.
8     MS. SWEENEY:  GOOD MORNING, YOUR HONOR.  BONNY
9  SWEENEY.  WITH ME TODAY ARE PATRICK COUGHLIN, FRANK BALINT,
10  ALEXANDRA BERNAY.
11     THE COURT:  OKAY.
12     MR. ISAACSON:  BILL ISAACSON FOR DEFENDANT APPLE.
13  I'M HERE WITH MEREDITH DEARBORN, MARTHA GOODMAN, KAREN DUNN,
14  AND THEN SCOTT MURRAY OF APPLE.
15     THE COURT:  OKAY.
16     OKAY.  LET'S TALK ABOUT THESE PROPOSALS YOU FILED.
17     FOR PURPOSES OF THE RECORD, THE COURT REFERS TO DOCKET
18  NOS. 914, WHICH IS PLAINTIFFS' PROPOSED JURY INSTRUCTIONS,
19  NO. 17 AND 31, AND DEFENDANT'S FILING DOCKET NO. 913.
20     ALL RIGHT.  A COUPLE OF QUESTIONS.
21     THESE ARE HELPFUL.  I'M NOT GOING TO ACCEPT EITHER WITHOUT
22  CHANGES, PROBABLY A LITTLE OF BOTH.  BUT I DO WANT TO MAKE
23  SURE WE ARE ALL ON THE SAME PAGE ABOUT SOME OF THE BASICS.
24     AND THAT IS, LET'S START WITH, IN LIGHT OF WHAT YOU'VE
25  GIVEN ME, WHAT A JURY VERDICT FORM IS GOING TO LOOK LIKE.
       RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

4

1  PLAINTIFFS DON'T DIRECTLY ADDRESS IT.  APPLE DOES.  AND THAT
2  IS THE NOTION THAT IF THE JURY FINDS THAT THE SOFTWARE AND
3  FIRMWARE CHANGES IN ITUNES 7.0 AND 7.4 WERE NOT GENUINE
4  PRODUCT IMPROVEMENTS, WE'RE GOING TO -- I'M GOING TO GET TO
5  LEGITIMATE BUSINESS JUSTIFICATION IN A MINUTE -- BUT THE CASE
6  IS OVER.  THAT IS, THE JURY CAN CHECK THE BOX, IF THEY SAY
7  "NO," THEY GO AND THEY SIGN THE FORM, IT'S DONE.
8     MS. SWEENEY:  CAN I RESPOND, YOUR HONOR?
9     THE COURT:  YOU CAN.
10     MS. SWEENEY:  WE HAVE IN OUR PROPOSED JURY
11  INSTRUCTIONS A PROPOSED INSTRUCTION AS TO MONOPOLY LEVERAGING.
12  IT'S OUR POSITION THAT EVEN IF THE JURY FINDS THAT THERE WAS
13  NO GENUINE PRODUCT IMPROVEMENT, THE JURY CAN NONETHELESS FIND
14  THAT APPLE ENGAGED IN ANTICOMPETITIVE CONDUCT THROUGH MONOPOLY
15  LEVERAGING.
16     MR. ISAACSON:  YOUR HONOR, MONOPOLY LEVERAGING
17  REQUIRES AN ANTICOMPETITIVE ACT.  A GENUINE PRODUCT
18  IMPROVEMENT CANNOT BE AN ANTICOMPETITIVE ACT.  IT WOULD END
19  ANY CLAIM FOR MONOPOLY LEVERAGING.  THE CLAIM FOR MONOPOLY
20  LEVERAGING IS COMPLETELY REDUNDANT OF A CLAIM FOR ENHANCING
21  MONOPOLY POWER UNDER SECTION 2.
22     THE COURT:  WHAT EVIDENCE OTHER THAN -- WELL,
23  RESPOND.
24     MS. SWEENEY:  YOUR HONOR, WE -- WE'VE CITED SOME
25  CASES IN OUR PROPOSED JURY INSTRUCTIONS.  AND THEN THE --
       RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

*In re Apple iPod iTunes Antitrust Litigation - Jury Trial Volume 1 - November 19, 2014*

### 9

1  MS. SWEENEY:  AND WE HAVE FOUND NO CASE, YOUR HONOR,
2  WHERE THE DEFENDANT WAS PERMITTED TO PRESENT BOTH OF THOSE
3  DEFENSES.  AND THE CASES THAT WE HAVE SEEN ARE LEGITIMATE
4  BUSINESS JUSTIFICATION CASES.
5  THE COURT:  WELL, WHAT IS THE JUSTIFICATION OTHER
6  THAN -- I MEAN, HOW ARE THESE ANY DIFFERENT, GIVEN YOUR THEORY
7  OF THE CASE?  IT SOUNDS AS IF THEY'RE THE EXACT SAME.
8  MR. ISAACSON:  NO.  IT ACCEPTS -- WITH THE GENUINE
9  BUSINESS JUSTIFICATION, IT ACCEPTS THAT THERE WAS NO OTHER
10  ACTION TAKEN HERE OTHER THAN WHAT THEY SAY.  AND THAT THAT
11  IS --
12  THE COURT:  ALL OF THE -- ALL OF THE EVIDENCE --
13  MR. ISAACSON:  -- A LEGITIMATE METHOD OF COMPETING.
14  THE COURT:  IT'S MY UNDERSTANDING THAT ALL OF THE
15  EVIDENCE THAT YOU ARE PRESENTING IN TERMS OF THE CHANGES BEING
16  MADE TO 7.0 AND 7.4 WERE, IN FACT, THE JUSTIFICATIONS THAT
17  THEY WERE GENUINE PRODUCT IMPROVEMENTS.  THEY'RE NOT SEPARATE
18  AND APART.
19  I DON'T UNDERSTAND HOW YOU CAN MAKE THE ARGUMENT THAT A
20  COMPANY SUCH AS APPLE, THAT THEIR LEGITIMATE BUSINESS
21  JUSTIFICATION IS ANYTHING OTHER THAN INTEGRAL TO THE PRODUCT
22  IMPROVEMENT.
23  MR. ISAACSON:  I DISAGREE WITH YOUR HONOR BECAUSE
24  APPLE MARKETS ITSELF, PROMOTES ITSELF, IT COMPETES AND SAYS,
25  "WE ARE DIFFERENT ON THE SPACES."  AND SOMEONE COULD SAY, AND
RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

### 10

1  THE PLAINTIFFS ARE GOING TO SAY, THAT IS ILLEGITIMATE, DOESN'T
2  RESULT IN ANY PRODUCT QUALITY.  PROFESSOR NOLL SAYS IT HURTS
3  PRODUCT QUALITY, THAT OUR WHOLE SYSTEM DOES THAT.  AND WE SAY
4  WE COMPETE ON THAT BASIS AND PROVIDE CONSUMER CHOICE ON THAT
5  BASIS.  AND THAT IS AN ACCEPTED BUSINESS JUSTIFICATION FOR
6  WHAT APPLE DOES.  AND THEY WILL --
7  THE COURT:  WELL, BUT THE JURY IS ALREADY BEING
8  ADVISED THAT THE INTEGRATED PLATFORM HAS BEEN FOUND TO BE
9  LEGAL.  SO WE'RE NOT -- THAT'S NOT THE DISPUTE.  SO THAT
10  JUSTIFICATION IS NOT -- IN SOME WAYS NOT EVEN REALLY RELEVANT
11  BECAUSE I'M ALREADY INSTRUCTING THEM AS A MATTER OF LAW THAT
12  THAT'S THE CASE.  THE ISSUE HERE IS SOLELY 7.0 AND 7.4 AND THE
13  CIRCUMSTANCES SURROUNDING IT.
14  MR. ISAACSON:  I -- I --
15  THE COURT:  AND SO THE JUSTIFICATION FOR 7.0 AND 7.4
16  IS -- YOU AREN'T GOING TO BE ALLOWED TO DOVETAIL THAT BACK
17  INTO RULINGS THAT HAVE ALREADY BEEN MADE.  THAT'S NOT WHY
18  WE'RE HERE.
19  MR. ISAACSON:  WELL, YOUR HONOR, PLAINTIFFS INTEND TO
20  SAY AND PUT ON EXPERTS TO SAY AND -- TO CROSS-EXAMINE OUR
21  WITNESSES TO SAY THAT CREATING INCOMPATIBILITY IS
22  ANTICOMPETITIVE AND BAD.
23  THE COURT:  AND THE JURY IS GOING TO BE INSTRUCTED
24  THAT AS A MATTER OF LAW, WITHOUT MORE, IT'S LEGAL.
25  MR. ISAACSON:  IT -- BUT WE ARE ENTITLED TO MORE THAN
RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

### 11

1  THAT BECAUSE IT IS NOT JUST THAT IT IS LEGAL.  IT IS -- WE ARE
2  ALLOWED TO ARGUE THAT THAT -- WE ENHANCE CONSUMER CHOICE AND
3  WE -- AND WE BOLSTER COMPETITION BY DOING THAT.
4  IT'S NOT SIMPLY A MATTER OF BEING LEGAL, YOUR HONOR.
5  OKAY?  THEY ARE GOING TO BE SAYING -- THEY'RE GOING TO BE
6  ATTACKING IT.  WE ARE ALLOWED TO DEFEND IT.  AND THAT DEFENSE
7  IS CONSISTENT WITH THE LAW, THAT IT'S NOT SIMPLY THAT IT'S
8  LEGAL, IT'S NOT SIMPLY THAT IT'S NOT ANTICOMPETITIVE, IT'S
9  THAT IT IMPROVES CONSUMER CHOICE.  AND THE CASES SAY THAT.
10  THE COURT:  WELL, THEN, WHAT -- HOW DO YOU TIE THAT
11  BACK TO 7.0 AND 7.4?
12  MR. ISAACSON:  BECAUSE 7.0 AND 7.4, ACCORDING TO
13  THEIR OWN CASE, KEEPS PEOPLE OUT OF OUR SYSTEM.  AND WE
14  MAINTAIN OUR ECOSYSTEM.  AND THAT'S HOW WE MARKET AND COMPETE
15  AND SAY HERE'S THE CHOICE -- SORRY -- HERE'S THE CHOICE THAT
16  YOU HAVE, CONSUMER.
17  NOW, THEY MAY --
18  THE COURT:  WELL, I MEAN --
19  MR. ISAACSON:  -- ARGUE THAT DOESN'T IMPROVE PRODUCT
20  QUALITY, BUT THAT'S A CHOICE THAT WE ARE ALLOWED TO ARGUE
21  SHOULD BE IN THE MARKETPLACE.
22  AND I WOULD JUST SAY SECONDARILY, YOU'RE ALSO GOING TO
23  CROSS THIS BRIDGE WHEN YOU DECIDE WHETHER THERE'S A SUFFICIENT
24  EVIDENTIARY FOUNDATION FOR THE DMCA ISSUE AND THOSE ISSUES.
25  BECAUSE THOSE -- THOSE CROSS OVER INTO THE AREA OF LEGITIMATE
RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

### 12

1  BUSINESS JUSTIFICATION.
2  (PAUSE IN THE PROCEEDINGS.)
3  MR. ISAACSON:  SO MY COLLEAGUE IS REMINDING ME THAT
4  TYCO OR ALLIED ORTHOPEDIC TALKS ABOUT THAT PRODUCT
5  IMPROVEMENTS CAN HAVE THE EFFECT OF HARMING OR EVEN DESTROYING
6  COMPETITORS, AND THEN CITES ANOTHER NINTH CIRCUIT CASE THAT
7  REFUSING TO AID A COMPETITOR -- WHERE -- WHERE A MONOPOLIST'S
8  REFUSAL TO AID A COMPETITOR IS BASED PARTIALLY ON A DESIRE TO
9  RESTRICT COMPETITION, WE DETERMINE ANTITRUST LIABILITY BY
10  ASKING WHETHER THERE WAS A LEGITIMATE BUSINESS JUSTIFICATION
11  FOR THE MONOPOLIST'S CONDUCT.
12  WE FEEL THAT UNDER THE LAW, WE ARE ALLOWED TO PRESENT
13  OTHER LEGITIMATE REASONS FOR OUR CONDUCT OTHER THAN THE FACT
14  THAT THIS ACTUALLY IMPROVED THE PRODUCT.
15  MS. SWEENEY:  AND, YOUR HONOR, I WOULD -- I WOULD
16  JUST REAFFIRM WHAT I SAID BEFORE, WHICH IS I DON'T HEAR
17  MR. ISAACSON SAYING -- WE'VE CERTAINLY NOT SEEN IN THE
18  EVIDENCE THAT WE EXPECT APPLE TO PUT FORWARD ANY LEGITIMATE
19  BUSINESS JUSTIFICATION OTHER THAN THESE PRODUCT CHANGES WERE
20  PRODUCT IMPROVEMENTS.  AS MR. ISAACSON JUST SAID, WHAT THEY DO
21  ENHANCES CONSUMER CHOICE.  WELL, THAT GOES DIRECTLY TO THE
22  QUESTION THAT TYCO SAYS THE JURY MUST ANSWER, WHICH IS:  DID
23  THE PRODUCT CHANGE PROVIDE A NEW CONSUMER BENEFIT?
24  SO, AGAIN, WE THINK THAT APPLE IS JUST TRYING TO GET TWO
25  OPPORTUNITIES TO PRESENT THE SAME DEFENSE, AND THAT'S NOT FAIR
RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530