UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

THE APPLE IPOD ITUNES      )      NO. C 05-00037 YGR
ANTITRUST LITIGATION       )
                           )      PAGES 402 - 622
                           )
                           )      **JURY TRIAL VOLUME 3**
                           )
                           )
                           )      OAKLAND, CALIFORNIA
_____)      WEDNESDAY, DECEMBER 3, 2014

### REPORTERS' TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                  BY:  ALEXANDRA S. BERNAY,
                       JENNIFER N. CARINGAL,
                       PATRICK COUGHLIN,
                       STEVEN M. JODLOWSKI,
                       CHARLES MCCUE,
                       CARMEN A. MEDICI,
                       BONNY E. SWEENEY, ATTORNEYS AT LAW


                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                  BY:  FRANCIS J. BALINT, JR.
                       ATTORNEY AT LAW

                  (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                      DIANE E. SKILLMAN, CSR NO. 4909

     PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

## A P P E A R A N C E S (CONT'D.)

```
FOR DEFENDANT:          BOIES, SCHILLER & FLEXNER LLP
                        5301 WISCONSIN AVENUE NW
                        WASHINGTON, D.C.  20015
                   BY:  WILLIAM A. ISAACSON,
                        KAREN L. DUNN,
                        MARTHA L. GOODMAN, ATTORNEYS AT LAW


                        BOIES, SCHILLER & FLEXNER LLP
                        1999 HARRISON STREET, SUITE 900
                        OAKLAND, CALIFORNIA  94612
                   BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                        JONES DAY
                        555 CALIFORNIA STREET, 26TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94104-1500
                   BY:  DAVID C. KIERNAN, ATTORNEYS AT LAW


                        APPLE
                        1 INFINITE LOOP, MS 169-2NYJ
                        CUPERTINO, CALIFORNIA  95014
                   BY:  SCOTT B. MURRAY,
                          SENIOR LITIGATION COUNSEL


                        --OOO--
```

## <u>I N D E X</u>

| <u>PLAINTIFFS' WITNESSES</u> | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| MARTIN, DAVID | | |
| CROSS-EXAMINATION BY MR. ISAACSON | 411 | 3 |
| | | |
| FARRUGIA, AUGUSTIN | | |
| DIRECT EXAMINATION BY MR. COUGHLIN | 454 | 3 |
| CROSS-EXAMINATION BY MS. DUNN | 514 | 3 |
| REDIRECT EXAMINATION BY MR. COUGHLIN | 566 | 3 |
| | | |
| ROSEN, MARIANNA | | |
| DIRECT EXAMINATION BY MS. BERNAY | 581 | 3 |
| CROSS-EXAMINATION BY MR. ISAACSON | 593 | 3 |
| REDIRECT EXAMINATION BY MS. BERNAY | 611 | 3 |

--oOo--

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 269 | | | 576 | 3 |
| 271 | | | 576 | 3 |
| 316 | | | 577 | 3 |
| 327 | | | 575 | 3 |
| 371 | | | 577 | 3 |
| 820 | | | 576 | 3 |
| 871 | | | 577 | 3 |
| 927A | | | 576 | 2 |

| DEFENDANT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| 2239 | | | 575 | 3 |
| 2247 | | | 575 | 3 |
| 2265 | | | 575 | 3 |
| 2309 | | | 575 | 3 |
| 2329 | | | 578 | 3 |
| 2416 | | | 578 | 3 |
| 2446, 2446A | | | 485 | 3 |
| 2776 | | | 575 | 3 |
| 2784 | | | 619 | 3 |

--OOO--

```
 1   WEDNESDAY, DECEMBER 3, 2014                        8:05 A.M.
 2                    P R O C E E D I N G S
 3       (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE
 4   OF THE JURY:)
 5           THE COURT:  LET'S GO ON THE RECORD.
 6           THE CLERK:  CALLING CIVIL ACTION 05-037, THE APPLE
 7   IPOD ITUNES ANTITRUST LITIGATION.
 8       COUNSEL, PLEASE STATE YOUR APPEARANCES.
 9           MS. SWEENEY:  BONNY SWEENEY FOR THE PLAINTIFFS.
10       AND WITH ME IS MR. COUGHLIN AND MR. BALINT.
11           MR. ISAACSON:  BILL ISAACSON FOR THE DEFENDANT.  AT
12   COUNSEL TABLE IS MARTHA GOODMAN, KAREN DUNN, AND SCOTT MURRAY
13   FOR APPLE.
14           THE COURT:  OKAY.  GOOD MORNING.
15           MS. SWEENEY:  GOOD MORNING, YOUR HONOR.
16       YOUR HONOR, I -- PLAINTIFFS ARE RAISING THIS ISSUE.  WE
17   THOUGHT THAT APPLE WOULD RAISE IT, BUT THEY HAVEN'T SO WE --
18   WE THINK WE NEED TO ADDRESS IT NOW.
19       LAST NIGHT VERY LATE, MR. ISAACSON WANTED TO HAVE A CALL.
20   I SPOKE WITH MR. ISAACSON, AND HE SAID TO ME THAT HE DIDN'T
21   THINK THAT OUR CLASS REPRESENTATIVES HAD STANDING.  I TOLD HIM
22   THAT HE WAS WRONG.
23       NOW, THE BASIS FOR MR. ISAACSON'S ASSERTION IS -- I DON'T
24   KNOW IF YOUR HONOR RECALLS ALL THIS -- BUT THE AFFECTED MODELS
25   CHANGED LONG AFTER THE CLASS WAS CERTIFIED BECAUSE
```

1    MR. FARRUGIA CHANGED HIS TESTIMONY AS TO WHICH MODELS OF IPODS

2    SOLD AFTER SEPTEMBER 12TH, 2006, HAD KVC AND DVC, RIGHT?

3        SO -- SO THAT WAS THE SITUATION.  THE COURT CERTIFIED A

4    CLASS THAT WAS BROADER THAN THE AFFECTED MODELS, AND WE'VE

5    KNOWN THAT FOR MANY YEARS -- NOT FOR MANY YEARS BUT SINCE

6    MR. FARRUGIA SUBMITTED THAT DECLARATION.  WE ASKED APPLE IF

7    APPLE WANTED TO AMEND THE CLASS TO TAKE THAT INTO ACCOUNT.

8    APPLE SAID NO.

9        AND NOW WE HAVE MS. ROSEN WHO'S COMING TO TESTIFY THIS

10   MORNING.  SHE FLEW OUT FROM THE EAST COAST.  SHE ARRIVED THIS

11   MORNING AT 3:00 O'CLOCK, UNFORTUNATELY.

12       BUT ANYWAY, MS. ROSEN HAS PURCHASED AN AFFECTED IPOD.

13   MR. ISAACSON DIDN'T KNOW THAT BECAUSE HER DEPOSITION WAS TAKEN

14   IN 2007 BEFORE SHE PURCHASED THESE ADDITIONAL IPODS.  BUT I

15   JUST DON'T WANT THERE TO BE ANY ISSUE WHEN MS. ROSEN IS

16   TESTIFYING WHERE MR. ISAACSON IS GOING TO TRY TO PRECLUDE THAT

17   TESTIMONY ABOUT MS. ROSEN'S PURCHASE OF AFFECTED IPODS.

18       **MR. ISAACSON:**  I'M NOT -- I'M GOING TO ASK HER ABOUT

19   THESE ISSUES.  I'M NOT GOING TO SEEK TO PRECLUDE ANYTHING.

20       **THE COURT:**  OKAY.

21       **MS. SWEENEY:**  THANK YOU.

22       **THE COURT:**  THANKS FOR LETTING ME KNOW IN ADVANCE.

23   ALL RIGHT.  ANYTHING ELSE?

24       **MR. ISAACSON:**  NO, YOUR HONOR.

25       **MS. SWEENEY:**  NO, YOUR HONOR.

```
 1              THE COURT:  OKAY.  THERE -- THERE IS ONE THING THAT I
 2   AM CONSIDERING.  THE COURT YESTERDAY, AFTER WE CHATTED ON THE
 3   PHONE, WAS BARRAGED WITH REQUESTS FROM THE MEDIA FOR ACCESS TO
 4   ADMITTED EXHIBITS.  SO OUR PRESS -- THE COURT'S PRESS CONTACT
 5   IS GOING TO DO SOME CHECKING THIS MORNING AND PERHAPS REQUEST
 6   THAT THE COURT PROVIDE COPIES OF -- OR ASK THAT YOU PROVIDE
 7   COPIES OF ANYTHING THAT IS ADMITTED.  IT IS A PROCESS THAT
 8   WE'VE USED IN OTHER CASES IN THIS DISTRICT.
 9         SO YOU SHOULD BE AWARE THAT THAT REQUEST MAY BE COMING,
10   AND/OR ORDER.
11              MS. SWEENEY:  THANK YOU, YOUR HONOR.
12              THE COURT:  IF YOU HAVE ANY THOUGHTS, I SHOULD KNOW
13   ABOUT THEM NOW IN TERMS OF ANY PERSPECTIVES ON IT.
14              MS. SWEENEY:  PLAINTIFFS HAVE NO OBJECTION, YOUR
15   HONOR.
16              MR. ISAACSON:  I'LL DISCUSS IT WITH MY CLIENT AND
17   REPORT ANY THOUGHTS.
18              THE COURT:  OKAY.  THANK YOU.
19         ALL RIGHT.  WE'LL STAND IN RECESS, THEN, UNTIL -- UNLESS
20   MS. DUNN HAS MORE.
21                   (PAUSE IN THE PROCEEDINGS.)
22              THE COURT:  NO, SHE DOESN'T.
23              MS. DUNN:  THANK YOU, YOUR HONOR.
24              THE COURT:  ALL RIGHT.  THEN WE'LL STAND IN RECESS
25   UNTIL THE JURY IS ALL HERE.
```

```
 1        (RECESS TAKEN AT 8:09 A.M.; PROCEEDINGS RESUMED AT
 2    8:27 A.M.)
 3        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE
 4    OF THE JURY:)
 5            THE CLERK:  REMAIN SEATED.
 6        COURT IS IN SESSION.
 7            THE COURT:  OKAY.  LET'S GET STARTED.
 8        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF
 9    THE JURY:)
10            THE COURT:  OKAY.  YOU MAY BE SEATED.  WE ARE BACK ON
11    THE RECORD.
12        THE RECORD WILL REFLECT THAT THE JURY HAS NOW JOINED US.
13        WELCOME BACK, LADIES AND GENTLEMEN.  SEE, IT ONLY TOOK YOU
14    ONE DAY, JUROR NO. 1 AND NO. 5, TO COME IN LAST SO THAT PEOPLE
15    WEREN'T JUMPING OVER YOU.
16        ANY QUESTIONS?  EVERYBODY GOOD?  YOUR PENS ARE FRESH.
17    THUMBS UP?  EXCELLENT.  OKAY.
18        THEN LET'S CALL OUR WITNESS BACK TO THE STAND.
19    MR. MARTIN, IF YOU'LL PLEASE COME FORWARD.
20                        DAVID MARTIN,
21    CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN PREVIOUSLY
22    DULY SWORN, CONTINUED TESTIFYING AS FOLLOWS:
23            THE COURT:  SIR, YOU WILL RECALL THAT YOU ARE STILL
24    UNDER OATH.
25            THE WITNESS:  I DO.  THANK YOU.
```

1    **THE COURT:**  PLEASE BE SEATED.

2        MR. ISAACSON, GOOD MORNING.  YOU MAY PROCEED.

3        **MR. ISAACSON:**  THANK YOU, YOUR HONOR.

4                     **CROSS—EXAMINATION**

5    BY MR. ISAACSON:

6    **Q.**  GOOD MORNING, DR. MARTIN.  MY NAME IS BILL ISAACSON.

7    **A.**  GOOD MORNING.  NICE TO MEET YOU.

8    **Q.**  YESTERDAY I BELIEVE YOU SAID, "I'VE SEEN NO EVIDENCE THAT

9    THE IPOD KEYBAG WAS CRACKED."

10       DO I HAVE THAT RIGHT?

11   **A.**  THAT SOUNDS LIKE SOMETHING I SAID, YES.

12   **Q.**  RIGHT.  IT'S SOMETHING YOU SAID YESTERDAY AND SOMETHING

13   YOU SAID IN YOUR REPORT.

14   **A.**  CORRECT.  YES.

15   **Q.**  ALL RIGHT.  AND WHEN YOU SAY "THE IPOD KEYBAG," JUST TO BE

16   CLEAR, THERE WAS A KEYBAG ON THE ITUNES SOFTWARE ON THE

17   DESKTOP, AND THERE WAS A KEYBAG IN THE IPOD DEVICE, CORRECT?

18   **A.**  YES.  THERE WAS —— THERE WERE TWO SEPARATE KEYBAGS, ONE ON

19   THE DESKTOP, ALSO CALLED THE LOCAL KEYBAG, AND THE ONE ON THE

20   IPOD.  AND OF COURSE I WAS REFERRING TO THE IPOD FOLLOWING

21   THE —— THE EMBEDDED KEYBAG ——

22   **Q.**  AND THERE WAS ALSO ——

23   **A.**  —— TIME FRAME.

24   **Q.**  THERE WAS ALSO A KEYBAG IN THE ITUNES STORE, CORRECT?

25   **A.**  YES, THERE IS A KEYBAG THERE AS WELL.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **Q.**  RIGHT.  AND SO WHEN YOU SAID, "I'VE SEEN NO EVIDENCE THE

2    IPOD KEYBAG WAS CRACKED," YOU'RE REFERRING ONLY TO THE KEYBAG

3    ON THE IPOD, NOT THE ITUNES STORE AND NOT THE ITUNES SOFTWARE,

4    CORRECT?

5    **A.**  IT'S CORRECT.  I'M ONLY REFERRING TO THE IPOD KEYBAG

6    FOLLOWING THE EMBEDDED KEYBAG INTRODUCTION.

7    **Q.**  RIGHT.  AND BACK -- YOU SAID THAT YOU -- YOU SAW MANY

8    ATTACKS ON THE ITUNES KEYBAG, AND THERE YOU'RE REFERRING TO

9    THE ITUNES SOFTWARE, CORRECT?

10   **A.**  THAT'S CORRECT.  THAT WAS REFERRING TO THE DESKTOP KEYBAG

11   AT THAT POINT.

12   **Q.**  RIGHT.  AND YOU DON'T QUESTION THE NEED TO UPGRADE

13   SECURITY OF THE ITUNES KEYBAG, THE DESKTOP KEYBAG, IN LIGHT OF

14   THOSE MANY ATTACKS, CORRECT?

15   **A.**  GENERALLY SPEAKING, I AGREE THAT THERE WERE ATTACKS ON THE

16   DESKTOP KEYBAG FOR ITUNES, AND RESPONDING TO THOSE ATTACKS AND

17   PREVENTING THEM IS APPROPRIATE.

18   **Q.**  SO IS IT YOUR OPINION THAT THE IPOD KEYBAG SHOULD HAVE

19   DIFFERENT AND LESS SECURITY THAN THE ITUNES KEYBAG?

20   **A.**  I THINK APPLE'S USE OF DIFFERENT SECURITY FOR THE IPOD

21   KEYBAG, IN FACT, WHAT I WOULD CONSIDER STRONGER SECURITY, WAS

22   APPROPRIATE.

23   **Q.**  THAT'S NOT MY QUESTION, SIR.  MY QUESTION IS:  IS IT YOUR

24   OPINION THAT THE IPOD KEYBAG, THE DEVICE, SHOULD HAVE LESS

25   SECURITY THAN THE KEYBAG ON THE ITUNES DESKTOP?

1    **A.**   WELL, I WOULD SAY NO.  I COULD -- I COULD NOT PHRASE AN

2    OPINION THAT WAY BECAUSE IT DOESN'T REALLY MAKE SENSE TO ME.

3    THE -- THAT'S MY ANSWER.

4    **Q.**   IT DOESN'T MAKE SENSE TO ME EITHER.  BUT LET ME ASK YOU

5    ABOUT YOUR REPORT.  YOU SAID IN YOUR REPORT, "I'VE SEEN NO

6    EVIDENCE FROM ANY ATTACKER THAT WAS ABLE TO STRIP FAIRPLAY

7    ENCRYPTION FROM SONGS STORED ON AN IPOD WITH AN EMBEDDED

8    KEYBAG," WHICH IS WHAT YOU'VE SAID TODAY.

9         AND IF YOU LOOK AT PARAGRAPH -- I HAVE A BINDER THERE FOR

10   YOU.  I DON'T KNOW IF YOU ALREADY HAVE YOUR REPORTS IN FRONT

11   OF YOU?

12   **A.**   I DO NOT, NO.

13   **Q.**   OKAY.  THEY'RE IN THE BINDER.

14        AND YOU HAVE A 2013 REPORT.

15   **A.**   CORRECT.

16   **Q.**   AND YOUR STATEMENT IS FOUND AT PARAGRAPH 72.

17             (DEMONSTRATIVE PUBLISHED TO JURY.)

18   **BY MR. ISAACSON:**

19   **Q.**   AND THERE YOU SAY, AS YOU'VE SAID IN COURT, "I'VE SEEN NO

20   EVIDENCE THAT ANY ATTACKER WAS EVER ABLE TO STRIP FAIRPLAY

21   ENCRYPTION FROM SONGS STORED IN AN IPOD WITH AN EMBEDDED

22   KEYBAG."

23        AND THEN YOU CITE AN ONLINE CHAT FOR -- TO SUPPORT YOUR

24   OPINION; IS THAT CORRECT?

25   **A.**   YES, I DO CITE THAT CHAT BETWEEN APPLE EMPLOYEES.

1   Q.  ALL RIGHT.  THAT WAS JUST ONE CHAT YOU LOOKED AT?

2   A.  THAT'S ALL I CITED HERE, YES.

3   Q.  RIGHT.  YOU ONLY CITED ONE DOCUMENT TO SUPPORT YOUR

4   OPINION THAT YOU'VE SEEN NO EVIDENCE THAT THE IPOD KEYBAG WAS

5   CRACKED, CORRECT?

6   A.  THAT'S CORRECT.  I LOOKED FOR EVIDENCE, AND THIS WAS THE

7   SOLE PIECE OF EVIDENCE RELATED TO THAT THAT I COULD FIND.

8   Q.  OKAY.  LET'S LOOK AT THAT CHAT.  THIS WOULD BE TX243.

9              (EXHIBIT PUBLISHED TO JURY.)

10        MR. ISAACSON:  AND IF YOU COULD PULL THAT UP A

11  LITTLE, EASIER TO READ, AND THEN MOVE IT DOWN.

12  Q.  YOU SEE, "WE ALREADY HAVE.  THAT'S WHAT THE EMBEDDED

13  KEYBAG IS FOR, AND THAT HASN'T BEEN CRACKED."

14      THAT'S WHAT YOU WERE TALKING ABOUT THERE, RIGHT?

15  A.  THAT'S CORRECT, SIR.

16  Q.  OKAY.  AND SO IF WE MOVE TO THE TOP, THIS WAS AN IM,

17  INSTANT MESSAGE, IN JULY 5TH, 2005.  ALL RIGHT.  THAT'S THE

18  DOCUMENT THAT YOU RELIED ON FOR YOUR OPINION ABOUT HOW YOU'D

19  SEEN NO EVIDENCE OF CRACKING OF THE IPOD; IS THAT RIGHT?

20  A.  THIS IS THE DOCUMENT WE'VE BEEN DISCUSSING, YES.

21  Q.  AND THIS WAS AN INTERNAL DISCUSSION AT APPLE, RIGHT?

22  A.  THAT'S CORRECT.

23  Q.  RIGHT.  NOW, HOW DO YOU OR APPLE KNOW WHAT HACKERS ARE

24  GOING TO DO NEXT?

25  A.  SO JUST SO I UNDERSTAND, YOU'RE NOT ASKING ABOUT THIS CHAT

1    ANYMORE, RIGHT?

2    **Q.**  I'M NOT ASKING ABOUT THE CHAT ANYMORE.  I WANTED YOU TO

3    HAVE THAT BACKGROUND, OKAY.  YOU SAID THERE WAS AN IM WHERE

4    APPLE IS DISCUSSING THAT THEY HADN'T SEEN A CRACK, THAT THESE

5    TWO INDIVIDUALS HADN'T SEEN A CRACK AS OF THIS DATE IN 2005.

6    YOU'VE SEEN –– YOU HAVE THE OPINION THAT –– THAT THERE'S NO

7    EVIDENCE OF CRACKING OF THE IPOD KEYBAG.

8         WHAT I WANT TO KNOW FROM YOU IS:  HOW DO YOU KNOW OR HOW

9    IS APPLE SUPPOSED TO KNOW WHAT A HACKER IS SUPPOSED TO DO NEXT

10   AND WHETHER THEY'RE ABOUT TO CRACK THE IPOD KEYBAG?

11   **A.**  WELL, SIR, NO ONE CAN PREDICT THE FUTURE, RIGHT.

12   **Q.**  AND YOU CAN'T PREDICT WHAT HACKERS ARE GOING TO DO, RIGHT?

13   **A.**  NO, BUT YOU CAN PREDICT THE TECHNIQUES THAT THEY HAVE AT

14   THEIR DISPOSAL.

15   **Q.**  WHEN YOU SAY YOU CAN PREDICT THE TECHNIQUES THAT HACKERS

16   HAVE AT THEIR DISPOSAL, HAVE YOU INTERVIEWED ANY HACKERS?

17   **A.**  HAVE I INTERVIEWED ANY HACKERS?  I'VE TAUGHT MANY COMPUTER

18   SCIENCE STUDENTS REGARDING COMPUTER SECURITY, SOME OF WHOM I

19   THINK MIGHT FALL INTO THAT CATEGORY.

20   **Q.**  ALL RIGHT.  DID YOU INTERVIEW THEM ABOUT ANY OF THE

21   HACKING THEY DO?

22   **A.**  NOT FORMALLY, SIR.

23   **Q.**  DID YOU INTERVIEW ANY OF THE HACKING COMMUNITY THAT'S

24   INTERESTED IN HACKING INTO APPLE?

25   **A.**  INTERVIEW THEM?  NO.  I'VE STUDIED THEM.

MARTIN - CROSS / ISAACSON

```
 1   Q.  DID YOU REPORT ON ANY OF THOSE STUDIES IN YOUR REPORTS?

 2   A.  NO, NOT THAT I RECALL SPECIFICALLY.

 3   Q.  ALL RIGHT.  NOW, SUPPOSE I'M A HACKER AND I MANAGE TO HACK

 4   INTO IPODS.  HOW FAMOUS AM I GOING TO BE THAT DAY?

 5   A.  WELL, YOU HAVE TO TELL ME WHAT YOU MEAN BY "HACK INTO

 6   IPODS."

 7   Q.  SUPPOSE I HACK INTO THE IPOD KEYBAGS AND ALTER THE SONGS,

 8   I CHANGE THEIR NAMES, AND I ANNOUNCE ON HACKER FORUMS THAT I

 9   HAVE ALTERED IPOD USERS' SONG NAMES TO SOMETHING I THINK IS

10   FUNNY.  HOW FAMOUS AM I GOING TO BE THAT DAY?

11   A.  I DON'T THINK IT ACTUALLY WORKS THE WAY YOU DESCRIBED.

12   YOU CAN'T CHANGE SONG NAMES BY HACKING INTO A KEYBAG.

13   Q.  WHAT IF I PUT A PROGRAM INTO THE KEYBAG OR -- WHAT IF I

14   REVERSE-ENGINEERED THE KEYBAG, ALL RIGHT, AND I OVERWRITE THE

15   KEYBAG AND I CHANGE THE SONGS, I MAKE THEM PLAY SLOWER; HOW

16   FAMOUS AM I GOING TO BE THAT DAY?

17   A.  I DON'T REALLY UNDERSTAND ENOUGH ABOUT THE SCENARIO YOU'RE

18   DESCRIBING.

19   Q.  LET ME ASK YOU THIS, THEN:  WHAT DO YOU THINK IT DOES TO

20   APPLE'S REPUTATION IF ARTICLES COME OUT SAYING THAT IPOD HAS

21   BEEN HACKED?

22   A.  WHAT DO I THINK IT'S DONE TO APPLE'S REPUTATION?

23   Q.  WHAT DO YOU THINK IT WOULD DO TO APPLE'S REPUTATION IF

24   ARTICLES CAME OUT IN THE PRESS ANNOUNCING IPODS HAD BEEN

25   HACKED?
```

1    **A.**   THAT SOUNDS LIKE EXACTLY WHAT HAPPENED WITH HARMONY.

2    APPLE SAID THAT THEY WERE HACKED.  PRESS RELEASE CAME OUT.

3    AND SO WE CAN LOOK TO SEE WHAT HAPPENED TO APPLE'S REPUTATION.

4    BUT IT'S HARD FOR ME TO PREDICT IN A HYPOTHETICAL, THAT'S NOT

5    THAT, WHAT WOULD HAPPEN.

6    **Q.**   RIGHT.  YOU CAN'T PREDICT WHAT'S GOING TO HAPPEN TO

7    APPLE'S REPUTATION IF ARTICLES COME OUT SAYING THE HACKERS

8    WITH NAMES LIKE DVD JOHN OR ODD NAMES THAT YOU AND I HAVE

9    NEVER HEARD OF HACKED INTO THE IPOD; YOU DON'T KNOW WHAT

10   HAPPENS TO APPLE'S REPUTATION, THEN, DO YOU?

11   **A.**   WELL, YOU'RE MAKING IT SOUND LIKE, YOU KNOW, A VERY SEVERE

12   SECURITY BREACH ON AN IPOD.  AND CERTAINLY IF THERE'S A SEVERE

13   BREACH AND IT REFLECTED BADLY UPON APPLE, THEN I THINK THAT

14   APPLE WOULD SUFFER AS A RESULT.

15   **Q.**   OKAY.  AND NOW ARE YOU SAYING THAT IN YOUR OPINION THAT

16   APPLE SHOULD WAIT FOR THE IPOD KEYBAG TO BE CRACKED BEFORE IT

17   UPGRADES SECURITY?

18   **A.**   NO, I'VE SAID NOTHING ALONG THOSE LINES.

19   **Q.**   ALL RIGHT.  THAT DOESN'T MAKE ANY SENSE, DOES IT?  YOU

20   DON'T WAIT FOR YOUR SYSTEM TO BE CRACKED BEFORE YOU UPDATE

21   SECURITY, YOU STOP IT BEFORE IT HAPPENS, RIGHT?  THAT'S

22   ELEMENTARY SECURITY.

23   **A.**   IT'S ELEMENTARY SECURITY TO PREDICT THE WEAKNESSES IN YOUR

24   SYSTEM, CERTAINLY.

25   **Q.**   ALL RIGHT.  NOW, YOU TALKED ABOUT 4.7.  NOW THAT HAD --

MARTIN - CROSS / ISAACSON

1   WHICH CAME BEFORE 7.0.  THAT HAD AN RSA ENCRYPTION SCHEME; IS

2   THAT RIGHT?

3   **A.**  YES, IT DID.

4   **Q.**  AND YOU'VE AGREED THAT RSA CRYPTOSYSTEMS ARE VULNERABLE TO

5   ATTACK, CORRECT?

6   **A.**  YES.  NO SECURITY SYSTEM IS A HUNDRED PERCENT INVULNERABLE

7   TO ATTACK AND SO NEITHER IS RSA.

8   **Q.**  ALL RIGHT.  I WANT TO GO OVER YOUR BACKGROUND JUST TO MAKE

9   SURE I HAVE THIS CLEAR.

10      IN TERMS OF YOUR ACADEMIC EXPERIENCE, YOU WERE AN

11  ASSISTANT PROFESSOR AT THE UNIVERSITY OF MASSACHUSETTS AT

12  LOWELL, CORRECT?

13  **A.**  THAT'S CORRECT.

14  **Q.**  NEVER TENURED?

15  **A.**  I DID NOT APPLY FOR TENURE.

16  **Q.**  OKAY.  DIDN'T APPLY FOR TENURE.  AND AFTER THAT, YOU WENT

17  INTO BECOMING AN EXPERT IN LITIGATION, CORRECT?

18  **A.**  I CONTINUED MY CONSULTING WORK, YES, AS AN EXPERT IN

19  LITIGATION.

20  **Q.**  ONE HUNDRED PERCENT OF YOUR COMPENSATION -- AFTER YOU

21  DECIDED NOT TO APPLY FOR TENURE, 100 PERCENT OF YOUR

22  COMPENSATION SINCE THEN HAS BEEN FROM SERVING AS AN EXPERT

23  WITNESS IN LITIGATION; DO I HAVE THAT CORRECT?

24  **A.**  I'D SAY ROUGHLY A HUNDRED PERCENT, YES.  I HAVE

25  SPECIALIZED IN THAT AREA, IT'S TRUE.

1    **Q.**  OKAY.  AND AT THE UNIVERSITY OF MASSACHUSETTS LOWELL, YOU

2    NEVER TAUGHT A CLASS ON DRM?

3    **A.**  ON DRM?

4    **Q.**  YES.

5    **A.**  THERE WERE DRM TOPICS IN MY SECURITY CLASSES, BUT, NO, NOT

6    A CLASS ABOUT DRM EXCLUSIVELY.

7    **Q.**  NEVER PUBLISHED AN ARTICLE ON DRM?

8    **A.**  NOT ON DRM EXCLUSIVELY, NO.

9    **Q.**  ALL RIGHT.  AND PRIOR TO THIS CASE, WHEN YOU'RE DOING THIS

10   LITIGATION WORK, YOU'VE NEVER BEEN RETAINED TO PROVIDE AN

11   EXPERT OPINION ON DRM, CORRECT?

12   **A.**  THAT'S CORRECT.  NOT ON DRM.

13   **Q.**  AND YOU'VE NEVER DESIGNED A DRM SYSTEM?

14   **A.**  NOT FROM BEGINNING TO END, NO, SIR.

15   **Q.**  ALL RIGHT.  NOW, YOU LOOKED -- WELL, NOT EVEN IN THE

16   MIDDLE, RIGHT?  YOU'VE NEVER DESIGNED ANY PART OF A DRM

17   SYSTEM?

18   **A.**  DRM SYSTEMS CONSIST OF APPLICATIONS OF SECURITY

19   TECHNOLOGIES, AND I HAVE DESIGNED SECURITY TECHNOLOGIES SOME.

20   **Q.**  OKAY.  SIR, I'M ASKING YOU ABOUT DIGITAL RIGHTS

21   MANAGEMENT.  I THINK YOU KNOW WHAT THAT IS.  YOU'VE NEVER

22   DESIGNED ANY PART OF A DIGITAL RIGHTS MANAGEMENT SYSTEM, DID

23   YOU?

24   **A.**  I DID NOT INTEND TO DESIGN A DIGITAL RIGHTS MANAGEMENT

25   SYSTEM, BUT I DID WORK WITH COMPONENTS THAT ARE USED TO

1    CONSTRUCT THEM.  THAT'S ALL I'M SAYING.

2    **Q.**  ALL RIGHT.  WHEN YOU SAY -- I WANT TO GET THIS CRYSTAL

3    CLEAR HERE, SIR.  WHEN YOU SAY YOU WORKED WITH COMPONENTS THAT

4    ARE USED TO CONSTRUCT THEM, YOU DID NOT WORK WITH ANY

5    COMPONENTS THAT WERE ACTUALLY USED TO CONSTRUCT AN ACTUAL DRM

6    SYSTEM, DID YOU?

7    **A.**  WELL, I HAVE WORKED WITH THE RSA CRYPTOSYSTEM THAT IS

8    USED, FOR INSTANCE, IN THE EMBEDDED KEYBAG, BUT -- BUT I

9    THINK -- LET ME SAY IT THIS WAY.  I DID NOT WORK ON A

10   COMPONENT THAT THAT COMPONENT ITSELF WAS THEN USED TO

11   CONSTRUCT A DRM SYSTEM, THAT'S TRUE.

12   **Q.**  ALL RIGHT.  YOU'VE NEVER WORKED ON ANY SINGLE PIECE OF

13   CRYPTOGRAPHY OF SECURITY THAT WAS THEN USED IN A DRM SYSTEM;

14   DO I HAVE THAT RIGHT?

15   **A.**  IT DID NOT LEAVE MY HANDS AND THEN BECOME A DRM SYSTEM,

16   THAT'S CORRECT.

17   **Q.**  THANK YOU.

18      NOW, YOU DID LOOK AT HOW HARMONY WORKED IN THIS CASE.  YOU

19   DID THAT BASED ON THINGS YOU READ ABOUT HARMONY, RIGHT?

20   **A.**  THAT'S CORRECT.

21   **Q.**  YOU DID NOT -- YOU TALKED ABOUT LOOKING AT CODE.  YOU DID

22   NOT LOOK AT CODE OF HARMONY?

23   **A.**  I -- I DID BRIEFLY LOOK AT CODE BUT NOTHING -- NOTHING

24   SUBSTANTIAL.

25   **Q.**  ALL RIGHT.  AND I WANT TO ASK YOU ABOUT HOW HARMONY

1    WORKED.  IN THE BINDER IN FRONT OF YOU, THERE IS A TAB

2    HOPEFULLY THAT SAYS 2446.

3        AND I DON'T KNOW --

4    **A.**  YES, SIR.

5                    (OFF-THE-RECORD DISCUSSION.)

6            **MR. ISAACSON:**  DO YOU HAVE ANY OBJECTION TO PUTTING

7    THIS ON THE SCREEN?

8            **MR. COUGHLIN:**  NO.

9            **MR. ISAACSON:**  PUT THIS ON THE SCREEN.

10                   (EXHIBIT PUBLISHED TO JURY.)

11   **BY MR. ISAACSON:**

12   **Q.**  ALL RIGHT.  NOW, THIS IS FROM REALPLAYER TELLING YOU HOW

13   TO INSTALL THE IPOD TO WORK WITH REALPLAYER.  YOU'RE FAMILIAR

14   WITH THIS?

15   **A.**  IT LOOKS FAMILIAR, YES, SIR.

16   **Q.**  OKAY.  I WANT TO ASK -- SO IT GOES THROUGH ALL THE STEPS,

17   STEP 1, STEP 2.  I WANT TO ASK YOU ABOUT STEP 5 WHICH IS ON

18   PAGE 2.

19                   (EXHIBIT PUBLISHED TO JURY.)

20   **BY MR. ISAACSON:**

21   **Q.**  ALL RIGHT.  TURN OFF AUTOMATIC SONG UPDATING AND AUTOMATIC

22   PODCAST UPDATING IN ITUNES.  AND IT SAYS THE DEFAULT SETTING

23   OF ITUNES AUTOMATICALLY SYNCHRONIZES YOUR IPOD LIBRARY WITH

24   THE ITUNES LIBRARY.

25       WHAT IS AUTOMATIC SYNCING?

MARTIN – CROSS / ISAACSON

1   **A.**   AUTOMATIC SYNCING DESCRIBES THE SITUATION WHERE ONE —— AN

2   IPOD, ONCE CONNECTED TO —— TO THE COMPUTER, THE COMPUTER WILL

3   EFFECTIVELY REPLACE THE LIBRARY ON THE IPOD IN A RELATIVELY

4   EFFICIENT MANNER, IT'S AS EFFICIENT AS IT CAN, IN ORDER TO

5   HAVE THE TWO MUSIC LIBRARIES AGREE BETWEEN THE DESKTOP AND THE

6   IPOD.

7   **Q.**   RIGHT.  I'M HOLDING AN IPHONE, NOT AN IPOD, BY I SYNC

8   THIS —— WHAT WE'RE TALKING ABOUT IS I HOOK THIS UP TO THE

9   COMPUTER AND HIT "SYNC" AND IT JUST TAKES CARE OF IT FOR ME.

10  ALL THE —— ALL THE CHANGES, THE SONGS THAT HAVE BEEN DELETED

11  GO AWAY, THE NEW SONGS ARE ALL ADDED, INCLUDING —— AND THEN

12  THE SAME THING IS TRUE FOR PODCASTS AND ALL THAT.

13      DO I HAVE THAT BASICALLY RIGHT?

14  **A.**   THE OUTCOME IS SUPPOSED TO BE THAT BOTH LIBRARIES END UP

15  WITH THE SAME CONTENT, YES.

16  **Q.**   ALL RIGHT.  NOW, MANUAL SYNCING, WHAT IS THAT?

17  **A.**   I THINK OF THAT AS MANUALLY MANAGING, AND THIS IS A

18  DIFFERENT MODE IN WHICH THE DEVICE CAN BE SET UP SO THAT

19  INSTEAD OF MIRRORING, AUTOMATICALLY SYNCHRONIZING THE ENTIRE

20  LIBRARY, THE USER CAN, ON A SONG-BY-SONG BASIS OR

21  VIDEO-BY-VIDEO, DECIDE WHAT CONTENT SHOULD GO ON TO THE DEVICE

22  AND WHAT CONTENT SHOULDN'T.

23  **Q.**   ALL RIGHT.  SO I HAVE TO MANUALLY CLICK AND DRAG EACH SONG

24  OR GROUP OF SONGS OVER TO MY DEVICE IF I DECIDE TO DO THINGS

25  MANUALLY?

MARTIN - CROSS / ISAACSON

1    **A.**    THAT'S THE GENERAL IDEA, YEAH.

2    **Q.**    ALL RIGHT.  SO JUST BY WAY OF EXAMPLE, SUPPOSE I'VE GOT A

3    FAIRLY FULL IPOD WITH THOUSANDS OF SONGS.  I GO OUT AND I BUY

4    SOME -- SOME NEW MUSIC, WHETHER FROM A LIBRARY OR CD, AND I'M

5    PUTTING THEM IN -- I'M PUTTING THEM IN THERE.  AND THEY'RE AT

6    DIFFERENT POINTS IN THE ALPHABET, BONNIE RAITT, ELLIS

7    MARSALIS, TROMBONE SHORTY.  I HAVE TO SORT OF REMEMBER WHERE

8    THEY ARE IN MY SYSTEM, REMEMBER THAT I BOUGHT THEM, AND THEN

9    CLICK AND DRAG ALL OF THEM OVER IF I'M MANUALLY SYNCING,

10   RIGHT?

11   **A.**    IF YOU'RE MANUALLY SYNCING, YOU HAVE TO IDENTIFY THEM

12   SOMEHOW.  YOU HAVE TO SAY WHAT YOU WANT TO PUT ON YOUR IPOD.

13   YOU MADE THE CHOICE TO MANUALLY SYNC.

14   **Q.**    CORRECT.  AND IF HARMONY IS GOING TO WORK, I HAVE TO

15   MANUALLY SYNC.

16   **A.**    I'M NOT -- I'M NOT SURE ABOUT THAT.

17   **Q.**    ISN'T THAT WHAT THE STEP 5 INSTRUCTION SAYS?

18   **A.**    OH, STEP 5 SAYS -- IF YOU'RE USING ITUNES, YES.

19   **Q.**    YES.

20   **A.**    BUT IF YOU'RE A CUSTOMER WHO IS ONLY USING HARMONY TO

21   MANAGE YOUR IPOD, THE SETTING IN ITUNES IS IRRELEVANT.

22   **Q.**    SO IF I USE -- BUT IF I USE HARMONY WITH ITUNES, I'M GOING

23   TO HAVE TO MANUALLY CLICK AND DRAG, RIGHT?

24   **A.**    OH, YES, IF YOU'RE A CUSTOMER WHO'S DECIDED TO USE

25   HARMONY, THEN YOU HAVE TO USE ITUNES IN THAT MANNER AS WELL.

1    **Q.**   RIGHT.  AND SO FOR THOSE CUSTOMERS, I'M GOING TO BE

2    LIMITED TO THE MANUAL SYNC.

3        NOW, SUPPOSE I GET HARMONY, ALL RIGHT, AND I FIND I'M

4    MANUALLY SYNCING AND NOW I'M KIND OF TIRED OF THAT.  I WANT TO

5    GO BACK TO AUTOMATIC SYNCING.  WHAT HAPPENS TO MY SONGS WHEN I

6    GO BACK FROM MANUAL TO AUTOMATIC SYNCING?

7    **A.**   SO LET ME UNDERSTAND.  YOU'RE SAYING THAT YOU USE ITUNES

8    TO CHANGE YOUR IPOD BACK TO AN AUTOMATIC SYNCING MODE AND THE

9    ITUNES WILL THEN TELL YOU THAT THIS MEANS THAT I'M GOING TO

10   REPLACE THE ENTIRE CONTENTS OF THE IPOD WITH THE MUSIC THAT IS

11   IN THE ITUNES LIBRARY AND ONLY THAT MUSIC.  SO I THINK THAT'S

12   WHAT WILL HAPPEN.

13   **Q.**   WHAT -- IT WON'T -- ISN'T WHAT HAPPENS WHEN YOU SWITCH

14   FROM MANUAL BACK TO AUTOMATIC THAT IT WIPES THE SONGS AND YOU

15   HAVE TO HIT RESTORE TO GET THE SONGS BACK?

16   **A.**   A SYSTEM RETORE IS NOT REQUIRED AT THAT STEP, NO.

17   **Q.**   OKAY.  DO YOU HAVE TO RESYNC TO GET THE SONGS BACK?

18   **A.**   IF YOU SWITCH TO AUTOMATIC MODE, THEN YES, ITUNES WILL SAY

19   IF YOU WANT TO AUTOMATICALLY SYNC, THE EFFECT WILL BE THAT

20   WE'RE GOING TO REPLACE THE CONTENTS OF THE IPOD WITH THE

21   ITUNES LIBRARY.

22                      (SIMULTANEOUS COLLOQUY.)

23        **THE WITNESS:**  SO THE USER DECIDES WHETHER TO PROCEED

24   WITH THAT OR NOT.

25   / / /

1    BY MR. ISAACSON:

2    Q.  RIGHT.  IF I WANT TO GO BACK TO AUTOMATIC, I WILL LOSE

3    THOSE SONGS UNLESS I RESYNC, CORRECT?

4    A.  YOU CAN'T GO BACK TO AUTOMATIC WITHOUT RESYNCING.

5    Q.  CORRECT.  ALL RIGHT.  I'M GLAD WE AGREE ON THAT.

6        NOW, FROM YOUR INVESTIGATION, YOU FOUND NO EVIDENCE OF HOW

7    MANY IPOD USERS WERE POTENTIALLY USERS OF REALPLAYER, RIGHT?

8    A.  "POTENTIALLY" IS KIND OF A BIG WORD.  I MEAN, I WOULD SAY

9    THAT MANY IPOD USERS ARE POTENTIALLY USERS, BUT I DIDN'T

10   ATTEMPT TO MEASURE THAT.

11   Q.  OKAY.  WELL, LET ME PUT IT DIFFERENTLY.  YOU DIDN'T FIND

12   ANY EVIDENCE OF ANY IPOD USERS WHO WERE ACTUAL USERS OF

13   REALPLAYER, RIGHT?

14   A.  OH, I THINK I SAW SOME -- SOME POSTING IN FORUMS THAT

15   SEEMED TO BE FROM PEOPLE WHO -- WHO HAD USED REALPLAYER, BUT I

16   DIDN'T INVESTIGATE THAT ANY FURTHER.

17   Q.  TWO OR THREE PEOPLE?

18   A.  I WOULD SAY IT WAS MORE THAN TWO OR THREE.

19   Q.  FIVE OR SIX?

20   A.  I ACTUALLY WASN'T KEEPING COUNT.

21   Q.  OKAY.  LESS THAN TEN?

22   A.  I COULDN'T SAY.

23   Q.  NOW, I WANT TO ASK YOU:  WHEN VIDEO CAME OUT ON THE IPOD

24   WITH THE RELEASE OF ITUNES 6.0 FOR TV, YOU REMEMBER THAT,

25   RIGHT?

1    **A.**   WHEN VIDEO CAME OUT WITH ITUNES 6.0, YES, SIR.

2    **Q.**   AND THAT WAS FOR TELEVISION SHOWS?

3    **A.**   OKAY.

4    **Q.**   AND THEN FOR 7.0 IT CAME OUT FOR MOVIES, RIGHT?

5    **A.**   I'VE HEARD THAT, YES.

6    **Q.**   NOW, DID HARMONY WORK WITH VIDEO?

7    **A.**   CAN YOU ASK THAT A LITTLE MORE PRECISELY?

8                    (SIMULTANEOUS COLLOQUY.)

9    **BY MR. ISAACSON:**

10   **Q.**   YES, THAT'S A GOOD POINT.  IF I USED HARMONY TO SYNC TO

11   THE REALTUNES JUKEBOX TO AN IPOD, REALTUNES JUKEBOX DIDN'T

12   HAVE VIDEO, DID IT?

13   **A.**   NO.  REAL -- REALTUNES -- SORRY.  THE REALPLAYER SOFTWARE,

14   AS FAR AS I KNOW, DID NOT HAVE VIDEO CAPABILITY.

15   **Q.**   RIGHT.  NO TV, NO MOVIES.  IF I USE HARMONY WITH

16   REALPLAYER, I'M ONLY DOING MUSIC.  I'M GIVING UP THE TV AND

17   MOVIES, RIGHT?

18   **A.**   YEAH.  IF YOU DON'T -- IF YOU ONLY USE HARMONY FOR -- FOR

19   SONGS, THEN OF COURSE YOU ONLY HAVE SONGS.  AND I THINK

20   HARMONY NEVER ADVERTISED ITSELF AS SUPPORTING VIDEO.  SO IF A

21   USER DECIDED TO USE IT, THAT'S RIGHT, THEY WOULD NOT BE USING

22   VIDEO.

23   **Q.**   RIGHT.  SO IN TERMS OF THE CONSUMER EXPERIENCE, WHEN I'M

24   USING HARMONY, I'M SONGS ONLY, NO TV OR MOVIES; WE'RE IN

25   AGREEMENT ON THAT?

 1   **A.**  AS FAR AS I KNOW, YES.

 2   **Q.**  NOW --

 3                      (SIMULTANEOUS COLLOQUY.)

 4            **THE COURT:**  ONE AT A TIME.

 5            **THE WITNESS:**  I'D LIKE TO ACTUALLY FOLLOW UP ON THAT.

 6   HARMONY WON'T SUPPORT THE TRANSFER OF VIDEOS OR TV SHOWS AS

 7   FAR AS I KNOW.  BUT I THINK THE USER MAY STILL BE ABLE TO USE

 8   ITUNES FOR THOSE FUNCTIONS.

 9   **BY MR. ISAACSON:**

10   **Q.**  RIGHT.  YOU CAN USE ITUNES FOR TV AND MOVIES, YOU CAN'T

11   USE HARMONY.

12   **A.**  CORRECT, AS FAR AS I KNOW.

13   **Q.**  NOW, FAIRPLAY -- I'M GOING TO TALK TO YOU -- ASK YOU SOME

14   QUESTIONS ABOUT ENCRYPTION.

15       FAIRPLAY ENCRYPTS SONGS TO MAKE THEM UNPLAYABLE UNLESS YOU

16   HAVE THE RIGHT KEYS TO DECODE THE SONGS; IS THAT RIGHT?

17   **A.**  YES, SIR.

18   **Q.**  AND THAT -- AND BEGINNING IN 2003, FAIRPLAY APPLIED

19   ENCRYPTION TO ALL SONGS PURCHASED THROUGH THE ITUNES STORE.

20   **A.**  YES, SIR.

21   **Q.**  AND YOU COULDN'T PLAY AN ENCRYPTED SONG UNLESS YOU HAD THE

22   DECRYPTION KEYS.

23   **A.**  YES, SIR.

24   **Q.**  AND YOU'RE NOT DISPUTING OR GIVING ANY OPINIONS THAT IT

25   WAS SOMEHOW IMPROPER FOR APPLE TO HAVE ENCRYPTION ON THE

1    SONGS, CORRECT?

2    **A.**  THAT'S CORRECT.

3    **Q.**  OKAY.  AND YOU'RE NOT GIVING ANY OPINIONS THAT IT WAS

4    IMPROPER FOR APPLE TO HAVE ENCRYPTION ON ANY SOFTWARE OR

5    FIRMWARE IN THE IPOD DEVICE, CORRECT?

6    **A.**  I AGREE, I THINK, YES.

7    **Q.**  OKAY.  NOW, IN 2003, WAS IT THE CASE THAT REALNETWORKS DID

8    NOT HAVE THE DECRYPTION KEYS FOR ITUNES STORE MUSIC?

9    **A.**  CAN YOU REPEAT THE QUESTION, PLEASE?

10   **Q.**  SURE.  IN 2003, ALL RIGHT, SO WE'RE BACK BEFORE THE PERIOD

11   WHERE THERE WAS ANY ANNOUNCEMENT OF HARMONY WORKING, YOU WOULD

12   AGREE, WOULDN'T YOU, THAT REALNETWORKS DID NOT HAVE DECRYPTION

13   KEYS FOR ITUNES STORE MUSIC?

14   **A.**  I ACTUALLY WOULDN'T KNOW.  I FIND IT UNLIKELY, BUT THAT'S

15   NOT SOMETHING I INVESTIGATED.

16   **Q.**  WELL, LET ME ASK YOU TO LOOK AT YOUR REPORT, PARAGRAPH 17,

17   SEE IF I'VE MISREAD THIS.

18                (DEMONSTRATIVE PUBLISHED TO JURY.)

19   **BY MR. ISAACSON:**

20   **Q.**  NO.  ALL RIGHT.  I'LL PASS ON THAT.

21       SO BUT IN ORDER FOR HARMONY TO WORK AND REALNETWORKS --

22   REALNETWORKS' HARMONY TO WORK, IT HAD TO HAVE THE DECRYPTION

23   KEYS, RIGHT?

24   **A.**  AT WHAT STAGE ARE YOU TALKING ABOUT HAVING THE DECRYPTION

25   KEYS?  DO YOU MEAN DURING THE TRANSLATION FROM HELIX TO --

1    Q.   AT ANY POINT.  I MEAN, IN ORDER FOR IT TO WORK, DID IT

2    HAVE TO HAVE THE DECRYPTION KEYS?

3    A.   FOR THE PURPOSE OF TRANSLATING ENCRYPTION FROM THE

4    REALPLAYER FORMAT, THAT'S THE HELIX FORMAT, INTO FAIRPLAY,

5    YES, THERE IS A MOMENT WHEN HARMONY WOULD HAVE HAD THE

6    DECRYPTION KEY FOR THE SONG THAT IT HAD JUST SOLD THE USER.

7    Q.   RIGHT.  AND THAT MEANT IT HAD BROKEN THE CODE FOR THE

8    FAIRPLAY ENCRYPTION, RIGHT?

9    A.   NO, I DISAGREE.

10   Q.   OKAY.  IT HAD UNENCRYPTED IT.

11   A.   THE SONG WAS ORIGINALLY IN A REALPLAYER DRM FORMAT, THAT'S

12   THE HELIX FORMAT.  AND SO REALNETWORKS, THE COMPANY, APPLIED

13   FAIRPLAY TO THE SONG RATHER THAN REMOVING FAIRPLAY FROM A

14   SONG.

15   Q.   RIGHT.  AND IT -- IN ORDER TO DO THAT, IT FIGURED OUT WHAT

16   THE CODES WERE AND IT DECRYPTED THE SONGS, RIGHT?

17   A.   I DISAGREE.

18   Q.   ALL RIGHT.

19   A.   IT ENCRYPTED THE SONGS.

20   Q.   RIGHT.  BUT BEFORE THAT, OKAY, YOU HAD TO -- YOU HAD TO

21   LEARN WHAT THE CODES WERE FOR THE SONGS, RIGHT?

22   A.   NO.  IT KNEW HOW TO DEAL WITH HELIX DRM BECAUSE THAT

23   WAS --

24   Q.   -- TALKING ABOUT THE FAIRPLAY?

25           **THE COURT:**  ONE --

 1          **MR. ISAACSON:**  I'M SORRY.

 2          **THE COURT:**  MR. ISAACSON, LET HIM FINISH.

 3          **THE WITNESS:**  THE SONGS, WHEN PURCHASED THROUGH THE

 4   REAL STORE, COME WITH REALNETWORKS-BRANDED DRM ON THEM, NOT

 5   FAIRPLAY.

 6   **BY MR. ISAACSON:**

 7   **Q.**  I UNDERSTAND THAT.

 8   **A.**  AND -- AND SO THE TRANSITION TAKES THE -- THE HELIX DRM

 9   FROM REALNETWORKS AND ONLY APPLIES FAIRPLAY, IT ENCRYPTS THE

10   SONG USING FAIRPLAY, IT DOES NOT DECRYPT A FAIRPLAY SONG IN

11   ORDER TO DO THAT.

12   **Q.**  ALL RIGHT.  WELL, LET ME ASK YOU ABOUT THE DIFFERENT

13   SITUATION.  HARMONY WORKED -- WE'VE BEEN TALKING ABOUT THE

14   SITUATION WHERE HARMONY SYNCED BETWEEN REAL -- REALPLAYER AND

15   THE IPOD.

16          HARMONY ALSO ADVERTISED ITSELF THAT YOU COULD SYNC BETWEEN

17   ITUNES AND ANY MP3 PLAYER, CORRECT?

18   **A.**  I DON'T REMEMBER IT BEING PHRASED THAT WAY, NO.

19   **Q.**  ALL RIGHT.  DID -- HARMONY DID NOT ADVERTISE ITSELF AS

20   EXCLUSIVELY WORKING BETWEEN THE REAL JUKEBOX AND THE IPOD.  IT

21   SAID IT WOULD ALLOW YOU TO WORK WITH ANY JUKEBOX IN ANY -- ANY

22   MOBILE MUSIC PLAYER, CORRECT?

23   **A.**  IT CERTAINLY SAID THAT IT COULD WORK WITH A VARIETY OF

24   DIFFERENT MUSIC PLAYERS.

25   **Q.**  ALL RIGHT.  SO LET'S TAKE THE SITUATION WHERE YOU WORK

1    WITH ITUNES, USE HARMONY, TAKE THE ITUNES JUKEBOX, AND NOW

2    YOU'RE GOING TO SYNC TO AN ALTERNATIVE PLAYER, SOMETHING OTHER

3    THAN THE IPOD.  ALL RIGHT.

4        IN ORDER TO DO THAT, YOU'RE GOING TO HAVE THE STRIP THE --

5    IN ORDER TO PLAY ON THAT OTHER PLAYER, YOU'RE GOING TO HAVE TO

6    STRIP THE FAIRPLAY OFF, RIGHT?

7    **A.**  IF THAT WERE POSSIBLE, BUT I DON'T THINK HARMONY DID THAT.

8    I DON'T THINK HARMONY SAID THAT THEY DID THAT.

9    **Q.**  YOU DON'T THINK HARMONY SAID THAT THEY DID THAT?

10   **A.**  NO, SIR.

11   **Q.**  OKAY.

12       NOW, YOU'RE NOT DISPUTING THAT IT'S LEGITIMATE FOR A

13   COMPANY TO UPDATE OR CHANGE THE ENCRYPTION ON SONGS, CORRECT?

14   **A.**  I AGREE.

15   **Q.**  AND YOU AGREE WITH PLAINTIFFS' COUNSEL -- WELL, YOU WERE

16   HERE -- YOU WERE HERE FOR OPENING STATEMENT?

17   **A.**  YES, SIR, I WAS.

18   **Q.**  ALL RIGHT.  YOU AGREE WITH PLAINTIFF COUNSEL WHEN THEY

19   SAID THAT HARMONY AND REALNETWORK HAD REVERSE-ENGINEERED

20   FAIRPLAY?

21   **A.**  YES, SIR, AT THIS TIME IN THE 4.6, 4.7 TIME FRAME, IN

22   ORDER TO PUT SONGS ONTO IPODS.

23   **Q.**  OKAY.  NOW, YOU ALSO AGREE THE MOST SOFTWARE PROGRAMS HAVE

24   BUGS, RIGHT?

25   **A.**  OH, YES, SIR.

1    **Q.**   RIGHT.  THAT'S COMMON KNOWLEDGE.  THAT WOULD INCLUDE THE

2    HARMONY SOFTWARE?

3    **A.**   IT WOULD, YES.

4    **Q.**   IT WOULD INCLUDE OTHER SOFTWARE ATTEMPTING TO INTEROPERATE

5    WITH THE IPOD?

6    **A.**   YES, IT WOULD INCLUDE ITUNES AS WELL.

7    **Q.**   OKAY.  THIRD-PARTY JUKEBOXES WOULD BE NO EXCEPTION TO THE

8    RULE THAT MOST PROGRAMS HAVE BUGS.

9    **A.**   CERTAINLY.

10   **Q.**   ALL RIGHT.  IS IT YOUR OPINION THAT APPLE IS NOT PERMITTED

11   TO UPGRADE ITS SECURITY TO PREVENT IT -- TO -- TO INSULATE

12   ITSELF FROM THOSE PROGRAMS WITH THEIR BUGS?

13   **A.**   I'M -- I'M NOT SURE.  THAT SOUNDS LIKE A QUESTION OF LAW

14   TO ME.  AND I'M NOT SURE WHETHER THEY'RE PERMITTED TO OR NOT.

15   **Q.**   WELL, I'M ASKING YOU WITHIN YOUR -- WITHIN YOUR

16   PROFESSIONAL FIELD.  AND IF YOU DON'T HAVE AN OPINION ON THIS,

17   GO AHEAD AND TELL ME.

18       BUT WITHIN YOUR AREA OF EXPERTISE, IS IT YOUR OPINION THAT

19   APPLE SHOULD NOT UPGRADE ITS SECURITY TO PROTECT ITSELF FROM

20   THE BUGS THAT ARE IN THOSE PROGRAMS?

21   **A.**   I WOULD SAY THAT IF APPLE DOES UPGRADE ITS SECURITY TO

22   PROTECT ITSELF FROM BUGS IN PROGRAMS, IT SHOULD IMPROVE THE

23   EXPERIENCE WITH THOSE PROGRAMS RATHER THAN DEGRADE THE

24   EXPERIENCE WITH THOSE PROGRAMS.

25   **Q.**   DON'T YOU THINK -- IS IT YOUR OPINION THAT WHEN YOU

1    PROTECT USERS FROM HAVING BUGS IN THEIR SOFTWARE, THAT YOU

2    HAVE IMPROVED THE USER EXPERIENCE?

3    **A.**   YOU HAVE NOT IMPROVED THE USER EXPERIENCE IF BY PROTECTING

4    THEM FROM BUGS MEANS MAKING THE DEVICE UNABLE TO DO -- TO DO

5    THE THING IT'S DESIGNED FOR, NAMELY, PLAY SONGS.

6    **Q.**   ALL RIGHT.  LET ME BREAK THAT DOWN AND LET ME MAKE SURE I

7    UNDERSTAND YOUR TESTIMONY.

8        IF THE ONLY EFFECT OF THE UPGRADED SECURITY IS TO PROTECT

9    THE CONSUMER FROM THE RISK OF BUGS, WOULD YOU AGREE WITH ME

10   THAT YOU'VE IMPROVED THE CONSUMER EXPERIENCE?

11   **A.**   AS A HYPOTHETICAL --

12   **Q.**   YES, IT'S A HYPOTHETICAL.

13   **A.**   YES.  AS A HYPOTHETICAL, IF A USER IS PROTECTED FROM BUGS

14   AND THERE ARE NO OTHER CONSEQUENCES, THEN THIS SOUNDS LIKE

15   IT'S A BETTER EXPERIENCE FOR THE USER.  THIS DOES NOT SOUND

16   LIKE THE SITUATION IN THE TECHNOLOGIES THAT I INVESTIGATED.

17   **Q.**   RIGHT.  LET ME TAKE THE NEXT STEP.

18       IF -- ARE YOU SAYING THAT IF YOU UPGRADE SECURITY AND

19   PROTECT THE CONSUMER FROM BUGS, BUT YOU ALSO CAUSE SOMETHING

20   ELSE TO HAPPEN THAT DEGRADES THE CONSUMER EXPERIENCE, THAT IN

21   ORDER TO DECIDE WHETHER IT'S GOOD FOR THE CONSUMER, YOU HAVE

22   TO WEIGH THOSE TWO THINGS?

23   **A.**   NO, I'M NOT SAYING THAT.

24   **Q.**   OKAY.  DO YOU AGREE WITH ME THAT THE ASPECTS -- SO I

25   UNDERSTAND THAT YOU -- IT'S YOUR OPINION THAT THE

1   TECHNOLOGY -- THAT THE DVC AND THE KVC DID NOT IMPROVE THE

2   CONSUMER EXPERIENCE.  I DON'T QUESTION THAT THAT'S YOUR

3   OPINION.  I'M TRYING TO UNDERSTAND IT.  ALL RIGHT.

4       DO YOU ACCEPT THAT THE KVC AND THE DVC IN -- THAT WHEN

5   THEY STOPPED BUGS FROM COMING IN THE SYSTEM, THAT THAT PART

6   ALONE IMPROVED THE CONSUMER EXPERIENCE?

7   **A.**  NO, I DON'T.

8   **Q.**  OKAY.  SO IT'S YOUR OPINION THAT IF APPLE UPGRADED ITS

9   SECURITY TO WHAT YOU CALL THE KVC, WE CALL IT THE KEYBAG

10  INTEGRITY CHECK, OR THE DVC WHICH WE CALL THE DATABASE

11  INTEGRITY CHECK, THAT IF THOSE STOPPED BUGS FROM COMING INTO

12  THE SYSTEM, IT'S YOUR OPINION THAT THAT BY ITSELF DID NOT

13  IMPROVE THE CONSUMER EXPERIENCE?

14  **A.**  THAT'S CORRECT.  IT DID NOT IMPROVE THE CONSUMER

15  EXPERIENCE BECAUSE ALL THOSE TECHNOLOGIES DID WAS MAKE THE

16  DEVICES LESS ABLE TO PLAY SONGS.  IN ALL CIRCUMSTANCES THAT'S

17  THE ONLY EFFECT THEY COULD EXERT ON THE DEVICE.

18  **Q.**  RIGHT.  DIDN'T THEY ALSO HAVE THE EFFECT OF KEEPING

19  THIRD-PARTY SOFTWARE FROM OPERATING WITH THE IPOD?

20  **A.**  YES, SIR.

21  **Q.**  ALL RIGHT.  DIDN'T THEY -- DIDN'T THE KVC, AS YOU CALL IT,

22  AND THE DVC STOP THIRD-PARTY SOFTWARE WITH BUGS FROM OPERATING

23  WITH THE IPOD?  DON'T I HAVE THAT RIGHT?

24  **A.**  THE KVC AND THE DVC STOPPED THIRD-PARTY SOFTWARE FROM

25  INTEROPERATING WITH THE IPOD BY MAKING THE USER UNABLE TO PLAY

1    SONGS.  AND SO ALL ASPECTS OF THE THIRD-PARTY SOFTWARE, IF

2    THEY TOUCHED THOSE AREAS OF THE DEVICE, THE SONGS WOULD BE

3    UNPLAYABLE.

4    **Q.**  RIGHT.  BUT MORE THAN THAT, MORE -- I UNDERSTAND YOU SAY

5    THE SONGS WERE UNPLAYABLE.  THEY ALSO STOPPED THE THIRD-PARTY

6    SOFTWARE FROM WORKING, THE THIRD-PARTY SOFTWARE WITH BUGS.

7    THAT'S CORRECT, ISN'T IT?

8    **A.**  IT STOPPED THIRD-PARTY SOFTWARE THAT TOUCHED THOSE

9    PARTICULAR AREAS OF THE IPOD.  OF COURSE THERE ARE MANY OTHER

10   AREAS OF THE IPOD THAT WERE UNAFFECTED.

11   **Q.**  YES.  ALL RIGHT.

12       IN STOPPING -- I UNDERSTAND THAT YOU THINK AS A WHOLE THIS

13   DID NOT IMPROVE THE CONSUMER EXPERIENCE.  IN STOPPING

14   THIRD-PARTY SOFTWARE WHICH HAD BUGS FROM WORKING WITH THE

15   IPOD, WILL YOU ADMIT, SIR, THAT THAT ONE PIECE OF WHAT APPLE

16   WAS DOING IMPROVED THE CONSUMER EXPERIENCE?

17   **A.**  NO.  THAT SOUNDS WRONG TO ME.  THIS IS THE -- THE CURE

18   BEING WORSE THAN THE DISEASE.

19   **Q.**  EXACTLY.  ALL RIGHT.  YOUR OPINION IS THAT THE CURE HERE

20   WAS WORSE THAN THE DISEASE.  YOU'RE BALANCING WHAT YOU THINK

21   THE DISEASE WAS VERSUS WHAT THE CURE WAS, RIGHT?

22   **A.**  NO.  I WOULDN'T SAY I'M BALANCING.  I'M SAYING THAT NO

23   MATTER WHAT BUG THAT YOU'RE TALKING ABOUT, THE WORST POSSIBLE

24   OUTCOME THAT WE CAN IMAGINE ON AN IPOD IS THAT THE SONG

25   WOULDN'T PLAY, FOR THE USER'S EXPERIENCE.

1   **Q.** RIGHT. BUT YOU SAID THE CURE, SIR. OKAY? IT WAS A CURE

2   FOR THIRD-PARTY SOFTWARE WITH THE BUGS. YOU JUST THOUGHT THAT

3   THE CURE WAS WORSE THAN THE DISEASE.

4   **A.** I CERTAINLY SAID -- SAID IT THAT WAY BECAUSE WE'RE STILL

5   TALKING ABOUT THIS.

6   **Q.** YES. ALL RIGHT. SO THERE'S NO DOUBT IN YOUR MIND THAT

7   THE KVC AND THE DVC, AS YOU CALL THEM, CURED THE ISSUE OF

8   THIRD-PARTY SOFTWARES PUTTING BUGS POTENTIALLY INTO THE APPLE

9   IPOD, BUT THAT, ACCORDING TO YOU, WAS WORSE THAN THE DISEASE;

10  THAT'S YOUR OPINION, RIGHT?

11  **A.** I THINK THAT APPLE CONSIDERED IT A CURE. AND I UNDERSTAND

12  THAT THAT'S -- THAT'S THE DISCUSSION WE'RE HAVING -- WE'RE

13  HAVING, WHETHER IT'S LEGITIMATE FOR THAT TO BE CONSIDERED A

14  CURE OR NOT. AND I'M SAYING THAT EVEN IF YOU ACCEPT THAT AS

15  AN ASSUMPTION, THEN WHAT WE'RE DOING IS TAKING THE BUGS,

16  SHOULD THEY EXIST, AND AMPLIFYING THEM AND MAKING VERY SMALL

17  ERRORS INTO VERY LARGE ERRORS THAT PREVENT THE PLAYBACK OF

18  SONGS.

19  **Q.** RIGHT. BUT YOU ADMIT THEY CURED THE BUGS?

20  **A.** NO. THEY MADE THE BUGS WORSE.

21  **Q.** OKAY. WELL, THEY DID SOMETHING -- WHEN YOU SAY THEY MADE

22  THE BUGS WORSE, OKAY, THEY CURED THE BUGS IN THE THIRD-PARTY

23  SOFTWARE AND THEN DID SOMETHING ELSE YOU DON'T LIKE. THAT'S

24  WHAT'S HAPPENED HERE.

25  **A.** IF A BUG THAT WE'RE TALKING ABOUT IS SOMETHING LIKE THE

 1    NAME OF A SONG IS PERHAPS MISSPELLED OR SOMETHING LIKE THAT,

 2    AND THE SYSTEM IS DESIGNED IN ORDER TO SEE, "OH, HEY, THE NAME

 3    OF THAT SONG IS WRONG, LET'S JUST NOT PLAY ANY SONGS ON THE

 4    DEVICE ANYMORE," THEN THAT DOES NOT CURE THAT BUG, THAT MAKES

 5    THAT BUG WORSE.

 6    **Q.**  OKAY.  LET'S USE YOUR EXAMPLE.  IT'S A GREAT EXAMPLE.  ALL

 7    RIGHT.  IF THERE'S A BUG IN THE SYSTEM AND I'M USING

 8    THIRD-PARTY SOFTWARE, ALL OF A SUDDEN I COULD LOOK AT MY SONG

 9    LIST AND THE SONGS COULD ALL BE MISSPELLED, AND YOU DON'T

10    THINK THAT'S A BIG ISSUE, RIGHT?

11    **A.**  I'M SAYING IT'S A SMALLER ISSUE THAN WHETHER THE SONGS ARE

12    PLAYABLE ON THE DEVICE.

13    **Q.**  RIGHT.  AND WHEN YOU SAY "WHETHER THE SONGS ARE PLAYABLE

14    ON THE DEVICE," RIGHT -- SO WHEN -- IF THIRD-PARTY SOFTWARE

15    POSED THE RISKS OF PUTTING BUGS IN THE IPOD WHERE THE SONGS

16    GET MISSPELLED, OKAY, THE KVC AND THE DVC CURED THAT.  BUT TO

17    YOU, THE CURE WAS WORSE THAN THE DISEASE FOR THE REASONS YOU

18    HAVE SAID; DO I HAVE THAT RIGHT?

19    **A.**  NO.  I WOULD NOT EVEN CALL THAT A CURE.

20    **Q.**  ALL RIGHT.  WELL, THE THIRD-PARTY SOFTWARE THAT MISSPELLED

21    ALL THE SONG NAMES WAS NO LONGER GOING TO WORK WITH THE IPOD

22    AFTER THE KVC AND THE DVC; I HAVE THAT RIGHT, DON'T I?

23    **A.**  YES, SIR, YOU DO.

24    **Q.**  ALL RIGHT.  NOW, IF I DOWNLOAD SOFTWARE FROM THE INTERNET,

25    THAT SOFTWARE MIGHT HAVE A VIRUS OR MALWARE, RIGHT?  THAT'S A

1    BIG RISK.

2    **A.**  IT'S CONCEIVABLE, YES, SIR.

3    **Q.**  ALL RIGHT.  AND ONCE -- AND JUST USE THE EXAMPLE OF A

4    COMPUTER.  IF I DOWNLOAD SOFTWARE FROM THE COMPUTER AND I GET

5    MALWARE OR OTHER BAD SOFTWARE, THAT COULD BE USED TO STEAL MY

6    PERSONAL INFORMATION, RIGHT?

7    **A.**  IT'S POSSIBLE, YES.

8    **Q.**  ALL RIGHT.  AND IF I HAVE THIS RIGHT, WHEN I DOWNLOAD SOME

9    STRANGE SOFTWARE ONTO MY COMPUTER, THAT SOFTWARE MAY BE

10   TALKING TO SOMEBODY WHO I DON'T KNOW AND PROVIDING MY --

11   PROVIDING MY PERSONAL INFORMATION.  IS THAT -- DO I HAVE THAT

12   BASICALLY RIGHT?

13   **A.**  SOFTWARE COULD BE BUILT THAT DOES THAT, ABSOLUTELY.

14   **Q.**  RIGHT.  SO WHEN I DOWNLOAD THIRD-PARTY SOFTWARE TO WORK

15   BETWEEN A JUKEBOX AND THE IPOD, I HAVE NO WAY OF KNOWING

16   WHETHER THAT THIRD-PARTY SOFTWARE IS SECURE, DO I?

17   **A.**  I DON'T -- I GUESS I DON'T UNDERSTAND WHAT YOU MEAN BY

18   WORKING BETWEEN THE JUKEBOX AND THE IPOD.

19   **Q.**  TO SYNC FROM A JUKEBOX TO THE IPOD.  IF I DOWNLOAD

20   SOFTWARE THAT SAYS, "HEY, WE'LL HELP YOU DOWNLOAD FROM A

21   JUKEBOX OTHER THAN ITUNES TO THE IPOD," I HAVE NO WAY OF

22   KNOWING WHETHER THAT -- THAT'S SOFTWARE THAT I WOULD BE

23   PUTTING ON MY COMPUTER THAT COULD POTENTIALLY HAVE THE MALWARE

24   THAT WE'RE TALKING ABOUT, RIGHT?

25   **A.**  SO YOU'RE IMAGINING, FOR INSTANCE, THAT REALPLAYER, WHEN A

 1    USER DOWNLOADED IT, MIGHT HAVE MALWARE BUILT INTO IT?

 2    **Q.**  I'M NOT TALKING ABOUT REALPLAYER.  I'M TALKING ABOUT ANY

 3    THIRD-PARTY SOFTWARE.

 4    **A.**  YES.  WELL, ANY SOFTWARE YOU DOWNLOAD FROM THE INTERNET,

 5    INCLUDING ITUNES, MIGHT HAVE MALWARE ON IT IF IT -- IF IT

 6    COMES FROM THE WRONG PLACE AND HAS BEEN AFFECTED IN THAT WAY.

 7    **Q.**  AND YOU DIDN'T LOOK -- SO THERE'S A NUMBER -- FLOOLA,

 8    EPHOD, YOU HAVEN'T LOOKED AT ALL THE THIRD-PARTY SOFTWARE THAT

 9    SAID THAT IT WOULD WORK WITH ITUNES, HAVE YOU?

10    **A.**  NO, I HAVEN'T EXAMINED ALL OF THEM, NO, SIR.

11    **Q.**  AND YOU DIDN'T KNOW WHAT SOFTWARE MIGHT BE COMING UP IN

12    THE FUTURE THAT WOULD SAY "USE THIS TO SYNC WITH THE IPOD."

13    **A.**  NO, I DON'T KNOW WHAT PEOPLE MIGHT WRITE IN THE FUTURE.

14    **Q.**  RIGHT.  AND IN THEORY, ONE OF THOSE PROGRAMS, IF I

15    DOWNLOADED IT, COULD BE USED TO OBTAIN ACCESS TO MY ITUNES

16    ACCOUNT INFORMATION, RIGHT?

17    **A.**  YES, IT IS POSSIBLE THAT A VIRUS COULD TAKE OVER YOUR

18    COMPUTER AND GET TO YOUR ITUNES ACCOUNT INFORMATION, SURE.

19    **Q.**  ALL RIGHT.

20         **MR. ISAACSON:**  I WANT TO ASK MY COLLEAGUES FOR

21    SOMETHING.

22              (PAUSE IN THE PROCEEDINGS.)

23    **BY MR. ISAACSON:**

24    **Q.**  NOW, YOU WOULD AGREE THAT ENCRYPTING THE KEYBAG MAKES

25    SENSE BECAUSE IF THE KEYBAG IS FREELY ACCESSIBLE, IT WOULD BE

MARTIN - CROSS / ISAACSON

```
 1    EASIER -- EASY FOR SOMEONE FAMILIAR WITH ENCRYPTION TO DECRYPT

 2    THE SONGS, GRAB THE KEYS, AND USING THEM TO DECRYPT THE SONGS,

 3    RIGHT?

 4    A.  YES, I WOULD AGREE.  I THINK THAT'S RIGHT OUT OF MY

 5    REPORT.

 6    Q.  RIGHT.  AND YOU AGREE THAT THE KEYBAG IN IPOD AND THE

 7    ITUNES SHOULD NOT BE FREELY ACCESSIBLE TO THIRD PARTIES.

 8    A.  THE KEYBAG SHOULD NOT BE FREELY ACCESSIBLE?  ON -- YES,

 9    FREELY UNLOCKABLE, SURE, I WOULD AGREE.

10    Q.  IT'S OKAY TO LOCK THE KEYBAG?

11    A.  YES, I AGREE.

12    Q.  AND WHEN YOU CHANGE THE LOCKS, A REVERSE-ENGINEERED

13    PROGRAM IS NOT GOING TO WORK, CORRECT?

14    A.  IF YOU -- I THINK MAYBE WHAT YOU'RE GETTING AT IS IF YOU

15    CHANGE THE PROGRAM, THEN AN INTEROPERABLE PROGRAM THAT WAS

16    UNAWARE OF THE CHANGE MIGHT FAIL AT THAT POINT, AND I WOULD

17    AGREE WITH THAT.

18    Q.  ALL RIGHT.  WHEN YOU -- IF I KNOW HOW TO GET INTO AN

19    ENCRYPTED SYSTEM AND THAT SYSTEM CHANGES THE CODES, I'M NO

20    LONGER GOING TO BE ABLE TO GET INTO THAT SYSTEM, RIGHT?

21    A.  ALL OTHER THINGS BEING EQUAL, THAT'S RIGHT.

22    Q.  ALL RIGHT.  I WANT TO ASK YOU ABOUT PAGE 11 OF YOUR

23    REPORT.

24    A.  YES, SIR.

25         MR. ISAACSON:  CAN WE PUT THAT ON THE SCREEN.
```

```
 1              (EXHIBIT PUBLISHED TO JURY.)

 2         MR. ISAACSON:  AND CAN WE BLOW UP THE HELP PAGE

 3    THERE.

 4         THE COURT:  ARE WE STILL TALKING ABOUT THE LAST

 5    REPORT?

 6         MR. ISAACSON:  PARDON?

 7         THE COURT:  I SAID ARE WE STILL TALKING ABOUT HIS

 8    LAST REPORT?

 9         MR. ISAACSON:  YES.  I'M ONLY OPERATING OUT OF THAT

10    ONE.

11         THE COURT:  OKAY.  GO AHEAD.

12    BY MR. ISAACSON:

13    Q.  NOW, THIS WAS THE REAL HELP PAGE THAT YOU LOOKED AT TO

14    FORM YOUR OPINIONS ABOUT THE HARMONY TECHNOLOGY, CORRECT?

15    A.  CORRECT.

16    Q.  AND IT SAYS, "TAKE YOUR MUSIC WITH YOU."  DO YOU SEE THERE

17    AT THE BOTTOM?

18    A.  YES, A BIG SUBHEADING, YES.

19    Q.  AND IT SAYS, "NO MATTER WHAT FORMAT YOUR CONTENT IS IN OR

20    WHAT DIGITAL RIGHTS MANAGEMENT SOFTWARE IS USED, REALPLAYER

21    WITH HARMONY TECHNOLOGY CAN CONVERT AND SUPPORT THE TRANSFER

22    OF YOUR CONTENT TO YOUR PORTABLE DEVICE."

23         DO YOU SEE THAT?

24    A.  I DO.

25    Q.  ALL RIGHT.  DOES THAT HELP YOU REMEMBER THAT HARMONY
```

1    DIDN'T JUST WORK BETWEEN THE REAL JUKEBOX AND IPOD, IT WOULD

2    WORK BETWEEN ITUNES AND MANY OTHER DEVICES?

3    **A.**  I DON'T KNOW WHAT YOU MEAN BY "WORK BETWEEN ITUNES AND

4    OTHER DEVICES."  IT'S --

5              (SIMULTANEOUS COLLOQUY.)

6          **THE COURT:**  ONE AT A TIME.

7          **THE WITNESS:**  IT'S NOT --

8    **BY MR. ISAACSON:**

9    **Q.**  LET ME BE MORE SPECIFIC.  YOU'RE ABSOLUTELY RIGHT ABOUT MY

10   QUESTION.

11       THAT YOU UNDERSTOOD THAT HARMONY WAS PROMOTING ITSELF TO

12   SAYING YOU WOULD BE ABLE TO SYNC FROM ITUNES TO OTHER MOBILE

13   MUSIC PLAYERS SUCH AS MP3 PLAYERS?

14   **A.**  NO.  THAT'S NOT MY RECOLLECTION OF HARMONY.

15   **Q.**  ALL RIGHT.  WHAT DID YOU UNDERSTAND THAT TO MEAN WHEN THEY

16   SAY YOU CAN WORK -- NO MATTER WHAT FORMAT YOUR CONTENT IS IN,

17   YOU CAN CONVERT AND SUPPORT THE TRANSFER OF YOUR CONTENTS TO

18   YOUR PORTABLE DEVICE?

19   **A.**  THE USE OF THE WORD "FORMAT" HERE REFERS TO THE AUDIO

20   ENCODING TECHNOLOGY USED.

21   **Q.**  YES.

22   **A.**  SO THAT MEANS, FOR INSTANCE, IF YOU HAVE AN MP3, YOU MIGHT

23   BE ABLE TO TURN IT INTO AN AAC OR A WAV OR POSSIBLY AN AIFF.

24   I'M NOT SURE IF I HAVE THE LIST OF WHAT IT ACTUALLY SUPPORTED

25   CORRECT OR NOT.

 1   Q.  WELL, LOOK AT --

 2   A.  SO NO MATTER WHAT FORMAT, THAT IS, WHETHER YOU HAVE A WAV

 3   FILE AND YOU WANT TO TURN IT INTO AN MP3 OR NOT, HARMONY CAN

 4   SUPPORT THAT.

 5   Q.  ALL RIGHT.  SO, AND THE FIRST PARAGRAPH.  "NOW YOU CAN" --

 6   THE SECOND SENTENCE.  "NOW YOU CAN USE ANY ONLINE MUSIC STORE

 7   TO PURCHASE MUSIC FOR YOUR PORTABLE DEVICE."

 8       YOU COULD USE ITUNES MUSIC STORE TO PURCHASE MUSIC FOR ANY

 9   PORTABLE DEVICE USING HARMONY, ACCORDING TO THE HARMONY

10   PEOPLE, RIGHT?

11   A.  I DISAGREE.  THE REST OF THIS PARAGRAPH MAKES IT CLEAR

12   THAT THEY'RE TALKING ABOUT MUSIC DOWNLOADED FROM THE

13   REALPLAYER MUSIC STORE.

14   Q.  WHEN THEY SAY "ANY ONLINE MUSIC STORE"?

15   A.  WELL, WE DISCUSSED THIS EARLIER.  RECALL THAT YOU CAN USE

16   BOTH ITUNES AND HARMONY TO MANAGE THE SAME DEVICE.  YOU USE

17   ITUNES FOR SOME OF THE CONTENTS AND YOU CAN USE REALPLAYER

18   HARMONY FOR THE OTHER CONTENT.

19   Q.  SO YOU'RE SAYING WHEN IT SAYS, "YOU CAN USE ANY ONLINE

20   MUSIC STORE," THAT THEY'RE ONLY TALKING ABOUT THE REALPLAYER

21   MUSIC STORE; IS THAT YOUR -- IS THAT YOUR TESTIMONY?

22   A.  MY TESTIMONY IS THAT THIS PARAGRAPH AS A WHOLE DESCRIBES

23   WHAT YOU CAN DO WITH THE REALPLAYER MUSIC STORE, AND IT DOES

24   SAY THAT YOU CAN USE ANY ONLINE MUSIC STORE WITH YOUR DEVICE,

25   BUT IT DOESN'T SAY THAT HARMONY IS GOING TO BE THE PROGRAM

1  THAT ACTUALLY TAKES THE CONTENT FROM THAT OTHER ONLINE MUSIC

2  STORE AND PUTS IT ON YOUR DEVICE.

3  **Q.**  YOU'RE SUGGESTING THAT HARMONY IS PROMOTING OTHER

4  TECHNOLOGIES HERE?

5  **A.**  I'M SUGGESTING THAT HARMONY IS ADVERTISING ITS

6  INTEROPERABILITY WITH OTHER TECHNOLOGIES HERE.

7  **Q.**  ALL RIGHT.  AND TO UNDERSTAND HARMONY, HARMONY WAS A

8  PROGRAM THAT COULD TRANSFER SONGS TO THE IPOD.  WE'VE

9  DISCUSSED THAT, RIGHT?

10  **A.**  YES, SIR.

11  **Q.**  IN ORDER FOR A THIRD-PARTY PROGRAM TO DO THAT, THE PROGRAM

12  WOULD HAVE TO KNOW THE FORMAT OF THE KEYBAG, CORRECT?

13  **A.**  YES, SIR.

14  **Q.**  THE THIRD-PARTY PROGRAM WOULD HAVE TO BUILD AN APPROPRIATE

15  IPOD KEYBAG FILE ON THE IPOD; IS THAT CORRECT?

16  **A.**  FOR THE TRANSFER, YES, SIR.

17  **Q.**  OKAY.  AND THEN THE THIRD-PARTY PROGRAM WOULD HAVE TO

18  INSERT KEYS INTO THE IPOD KEYBAG.

19  **A.**  THAT'S CORRECT.

20  **Q.**  ALL RIGHT.  AND ANOTHER THING THE THIRD-PARTY PROGRAM HAS

21  TO DO -- HAVE IS SOME AWARENESS OF THE ENCRYPTION-DECRYPTION

22  METHOD THAT OCCURS ON THE IPOD, CORRECT?

23  **A.**  THAT'S CORRECT, YES, SIR.

24  **Q.**  ALL RIGHT.  AND THOSE ARE THE SAME THINGS A HACKER WOULD

25  NEED TO DO IN ORDER TO REVERSE-ENGINEER THE IPOD KEYBAG.  THE

1    HACKER WOULD HAVE TO KNOW THE FORMAT OF THE KEYBAG, HOW TO

2    BUILD AN APPROPRIATE IPOD KEYBAG FILE, TO INSERT KEYBAGS INTO

3    THE KEYBAG, AND SOME AWARENESS OF THE ENCRYPTION-DECRYPTION

4    METHOD; IS THAT CORRECT?

5    **A.**   HACKER WOULD HAVE TO KNOW A LOT MORE THAN THAT IN ORDER TO

6    STRIP DRM OFF A SONG.  THAT'S A MUCH HARDER PROPOSITION --

7    **Q.**   RIGHT.

8    **A.**   -- THAN SIMPLY ADDING DRM TO A SONG IN ORDER TO PUT IT ON

9    A DEVICE FOR PLAYBACK.

10   **Q.**   BUT THOSE ARE SOME OF THE THINGS A HACKER WOULD HAVE TO

11   KNOW, CORRECT?

12   **A.**   AGREED.  A HACKER WOULD ALSO HAVE TO HAVE BASIC

13   PROGRAMMING SKILLS.

14   **Q.**   RIGHT.  AND YOU WOULD AGREE WITH ME THAT REAL KNEW ALL OF

15   THOSE THINGS?  THEY KNEW THE FORMAT OF THE KEYBAG, HOW TO

16   BUILD AN APPROPRIATE IPOD KEYBAG -- ON THE IPOD, WHERE TO PUT

17   THE APPROPRIATE KEYS IN THE KEYBAG, AND THEY HAD SOME

18   AWARENESS OF THE ENCRYPTION-DECRYPTION METHOD.

19   **A.**   YES.  THOSE WOULD BE PREREQUISITES FOR HARMONY OPERATING

20   IN THE -- THE WAY IT DID.

21   **Q.**   ALL RIGHT.  AND YOU AGREE THAT IF THERE WERE APPLICATIONS

22   THAT DESTROYED THE DATABASE OR THE KEYBAG OR SONG FILES, THOSE

23   WOULD INTERFERE WITH THE ABILITY OF THE IPOD TO PLAY THOSE

24   SONGS, RIGHT?

25   **A.**   YES, SIR, I WOULD AGREE.

MARTIN – CROSS / ISAACSON

1   **Q.**  ALL RIGHT.  AND THE DATABASE.  THE DATABASE.  WE TALKED

2   SOME ABOUT THE KEYBAG.  THE DATABASE HAS SONG TITLES, RIGHT?

3   **A.**  YES, SIR.

4   **Q.**  THE LENGTH OF THE SONG, PLAY LIST INFORMATION, ALBUM ART,

5   ALBUM NAME, ARTIST, AND THE USER SEES ALL THOSE ON THE IPOD

6   SCREEN, RIGHT?

7   **A.**  THOSE ARE THE SORT OF THINGS YOU CAN SEE ON THE SCREEN,

8   YES, THAT'S RIGHT.

9   **Q.**  AND A THIRD PARTY WITH ACCESS TO THE DATABASE COULD INJECT

10  ANY DATA IT WANTED INTO THE DATABASE, CORRECT?

11  **A.**  PRIOR TO THE DVC, A THIRD PARTY COULD -- COULD EDIT THE

12  DATABASE, YES.

13  **Q.**  THEY COULD EDIT -- THE THIRD PARTY COULD EDIT THE DATABASE

14  WHICH MEANS THEY COULD CHANGE THE SONG NAMES, CHANGE THE PLAY

15  LIST INFORMATION, CHANGE THE ALBUM NAMES, CHANGE THE ARTIST

16  NAMES, CORRECT?

17  **A.**  THAT'S CORRECT.  AND A USER COULD DO THAT, TOO, SIMPLY BY

18  GOING INTO THAT FILE ON THEIR IPOD AND CHANGING IT.

19  **Q.**  RIGHT.  SO THE THIRD -- IF A THIRD PARTY WHO IS NOT A NICE

20  THIRD PARTY COULD GO IN AND WRITE THE -- REWRITE THE SONG

21  NAMES AND HAVE THEM SAY TERRIBLE THINGS.

22  **A.**  SURE.  A PROGRAM COULD BE WRITTEN THAT WOULD CHANGE THE

23  NAMES ON AN ITUNES DATABASE, AND THAT MIGHT BE A PROGRAM THE

24  USER WANTS TO RUN OR DOESN'T WANT TO RUN.  SO IT'S REALLY UP

25  TO THE OWNER OF THE IPOD WHETHER IT HAPPENS.

MARTIN – CROSS / ISAACSON

1   **Q.**  WELL, WHEN YOU SAY IT'S UP TO THE OWNER OF THE IPOD, ONCE

2   THE OWNER OF THE IPOD DOWNLOADS SOFTWARE THAT THEY DON'T KNOW

3   OR UNDERSTAND AND THAT SOFTWARE GOES INTO THE DATABASE, THE

4   USER IS NOT GOING TO BE CONTROLLING THAT EXPERIENCE ANYMORE,

5   RIGHT?

6   **A.**  I GUESS WHAT I'M SAYING IS THAT THE -- THE USER/OWNER IS

7   IN ULTIMATE CONTROL OVER THE PROGRAMS THAT RUN ON THEIR

8   COMPUTER AND THAT CONNECT TO THE IPOD.  AND SO IF THE USER HAS

9   DOWNLOADED A PROGRAM EITHER KNOWINGLY OR NOT KNOWINGLY THAT

10  CHANGES THE DATABASE, THAT'S BECAUSE THE USER RAN THAT

11  PROGRAM.

12  **Q.**  RIGHT.  SO IF THE USER DOWNLOADS SOFTWARE THAT TURNS OUT

13  TO BE MALWARE AND CHANGES ALL THE SONGS IN THEIR DATABASE TO

14  NAMES FROM PORNOGRAPHIC MOVIES, THAT'S ON THEM, RIGHT?

15  **A.**  NO.  I'M JUST TRACING IT BACK TO THE ACTION THAT INITIATED

16  IT.  I THINK IF THE USER IS VICTIMIZED BY SOME ONLINE

17  SOFTWARE, THEN, YEAH, THAT ONLINE SOFTWARE CAN DO BAD THINGS

18  TO THE USER'S COMPUTER AND THE DEVICES ATTACHED.

19  **Q.**  OKAY.  THE FIRST FOUR LETTERS OF THE IPOD DATABASE ARE

20  MBHD, RIGHT?  THOSE ARE FOUR BYTES?

21  **A.**  (REVIEWING DOCUMENT.)

22      I THINK OF IT AS DBHM IN REVERSE, SO, YEAH, THOSE ARE THE

23  RIGHT LETTERS.

24  **Q.**  THEY --

25  **A.**  JUST DO THEM IN REVERSE ORDER BECAUSE THE OTHER WAY IT

1    SPELLS --

2                    (SIMULTANEOUS COLLOQUY.)

3    **BY MR. ISAACSON:**

4    **Q.**   JUST SAY AGAIN FOR ME YOUR PREFERRED LETTERS.

5    **A.**   DBHM WHICH STANDS FOR "DATABASE HEADER MAGIC."

6    **Q.**   RIGHT.  AND IF YOU MODIFY ANY OF THOSE FOUR LETTERS IN THE

7    DATABASE, INCLUDING THE M, YOU'RE GOING TO DESTROY THE

8    DATABASE, RIGHT?

9    **A.**   THAT'S CORRECT.

10   **Q.**   ALL RIGHT.  SO IF A THIRD-PARTY PROGRAM MODIFIES ANY OF

11   THOSE LETTERS, THE DATABASE GETS DESTROYED?

12   **A.**   THAT'S CORRECT.  JUST AS THE DVC WOULD DESTROY THE

13   DATABASE IN OTHER CIRCUMSTANCES.

14   **Q.**   NOW, THIS DESTROYING THE DATABASE TESTIMONY THAT YOU JUST

15   GAVE, THAT WAS AS A RESULT OF WHAT YOU CALL THE DVC, THE

16   DATABASE -- THE DATABASE INTEGRITY CHECK, CORRECT?

17   **A.**   WELL, NO.  WE WERE JUST TALKING CHANGING THE HEADER MAGIC

18   PART OF IT SO THAT'S A LITTLE DIFFERENT.  I MENTIONED THE DVC.

19   **Q.**   RIGHT.  I WANT TO -- YOU'VE GIVEN THE OPINION THAT THE

20   DVC, THE DATABASE INTEGRITY CHECK, DELETES THE DATABASE,

21   CORRECT?

22   **A.**   I'VE GIVEN THE OPINION THAT THE DVC, WHEN IT SEES THAT THE

23   DATABASE WAS NOT PROVIDED BY ITUNES, TREATS THE DATABASE AS

24   BEING EMPTY.  IT PRETENDS THAT THERE'S NO DATA IN IT EVEN

25   THOUGH THERE ARE -- THERE ARE SONG DATA IN IT.

MARTIN - CROSS / ISAACSON

1   **Q.**   THAT'S AN EXCELLENT POINT, SIR.   IT'S IF I'M A HARMONY

2   USER AND I'VE GOT MUSIC FROM THE REAL STORE, AND THEN THE

3   DVC'S EFFECT ON ME WOULD BE TO DELETE THE DATABASE.   THAT'S

4   YOUR OPINION, RIGHT?

5   **A.**   I JUST WANT TO BE CAREFUL ABOUT SAYING "DELETE THE

6   DATABASE."   THE DATABASE IS IN A FILE ON THE IPOD.   THE EFFECT

7   OF THE DVC, WHEN IT DECIDES THAT SOMETHING IS NOT FROM ITUNES,

8   IS NOT TO REMOVE THE FILE FROM THE IPOD.   IT'S RATHER TO LOOK

9   AT THE FILE AND PRETEND THAT IT'S EMPTY, BUT THE FILE

10  PERSISTS.

11  **Q.**   RIGHT.   SO THE FILE PERSISTS -- THANK YOU -- AND THE IPOD

12  PRETENDS IT'S NOT THERE.   IS THAT YOUR PHRASE?

13  **A.**   YES.

14  **Q.**   ALL RIGHT.   SO THE CONSEQUENCE OF THE DVC, THE DATABASE

15  INTEGRITY CHECK, IF I'VE BEEN USING -- IF I'M A USER WHO'S

16  BEEN USING HARMONY AND I'VE GOT REALPLAYER MUSIC, IF I'M ONE

17  OF THESE PEOPLE AND I EXIST, THAT THE -- THE -- MY FILE WILL

18  CONTINUE TO EXIST, MY DATABASE FILE WILL CONTINUE TO EXIST,

19  BUT THE IPOD WILL PRETEND IT'S NOT THERE.   DO I HAVE THAT

20  RIGHT?

21  **A.**   THAT'S CORRECT.   YES.   IT'S ENGINEERED TO GIVE AN ERROR

22  MESSAGE TO THE USER BUT WITHOUT SPECIFIC INFORMATION AND --

23  AND BASICALLY PRETEND THAT IT'S -- IT'S EMPTY WHEN, IN FACT,

24  IT'S NOT.

25  **Q.**   SO THEN IT TRIGGERS THE ERROR MESSAGE, AND THEN I HAVE TO

1    HIT THE BUTTON TO RESTORE THE FACTORY SETTINGS, CORRECT?

2    **A.**  IF YOU THEN CONNECT THE IPOD TO ITUNES, CORRECT, YOU'LL

3    SEE AN ERROR MESSAGE THAT TELLS YOU YOU MUST RESTORE THIS

4    IPOD, AND THAT WOULD DELETE ALL THE FILES.

5    **Q.**  RIGHT.  AND THAT WAS A CONSEQUENCE OF THE DATABASE

6    INTEGRITY CHECK WHICH TOOK PLACE IN OCTOBER -- I'M SORRY --

7    SEPTEMBER 2007, RIGHT?

8    **A.**  THAT ROLLED OUT IN IPODS THAT WERE RELEASED IN SEPTEMBER

9    2007, RIGHT.

10   **Q.**  THE KEYBAG INTEGRITY CHECK DID NOT HAVE THE EFFECT OF

11   HAVING THE IPOD PRETEND THAT THE DATABASE FILE WASN'T THERE.

12   **A.**  NO, NOT THE DATABASE FILE.  THE KEYBAG FILE, RIGHT.  SO

13   IT -- UNDER SIMILAR CIRCUMSTANCES WHEN IT SAW THAT THE KEYBAG

14   FILED HAD NOT BEEN PUT THERE BY ITUNES, IT DELETED THE KEYBAG

15   FILE IN THAT CIRCUMSTANCE.

16   **Q.**  RIGHT.  AND THE CONSEQUENCE OF THAT, IT WOULDN'T RECOGNIZE

17   THE REALPLAYER SONGS?

18   **A.**  IT WOULDN'T EVEN RECOGNIZE THE ITUNES MUSIC STORE SONGS.

19   **Q.**  AND THEN --

20   **A.**  BUT -- CORRECT.

21   **Q.**  AND THEN I WOULD HAVE TO JUST HIT "SYNC."

22   **A.**  IN WHAT PROGRAM?

23   **Q.**  SO IF I WANT MY ITUNES SONG, ALL I HAVE TO DO IS SYNC UP

24   BETWEEN THE ITUNES AND THE IPOD, CORRECT?

25   **A.**  IF YOU THEN RESYNC WITH YOUR ITUNES PROGRAM, THEN YOU HAVE

1    TO MAKE SURE THAT YOUR PROGRAM IS AUTHORIZED AND IT HAS THE

2    KEYS, AND IT MIGHT HAVE TO CONNECT TO THE NETWORK TO DO THAT,

3    AND THEN THE SONGS THAT ARE AUTHORIZED ON THAT COMPUTER CAN BE

4    RESYNCED TO THE DEVICE.  IF YOU HAD SONGS THAT CAME FROM

5    HARMONY OR ANOTHER THIRD-PARTY PROGRAM, THEN YOU WOULD HAVE TO

6    DO SOME RESTORATION MECHANISM TO DEAL WITH THOSE AS WELL.

7    **Q.**  ALL RIGHT.  WHAT WOULD THAT RESTORATION MECHANISM BE?

8    **A.**  IT'S HARD TO SAY WITH THE KVC IN FORCE.

9    **Q.**  WELL, I COULD BURN AND RIP THE SONGS WITH THE REALPLAYER

10   JUKEBOX AND PUT THEM INTO MY ITUNES JUKEBOX, RIGHT?

11   **A.**  IF THE BURN AND RIP WERE SUPPORTED AND SUCCEEDED IN THE

12   THIRD-PARTY PROGRAM, THEN, YEAH, I THINK THE OUTCOME WOULD BE

13   FILES THAT YOU COULD THEN MOVE TO YOUR ITUNES COMPUTER AND

14   SYNC THAT WAY.  SOUNDS CORRECT.

15   **Q.**  ALL RIGHT.  SO TO BE CLEAR ABOUT WHAT'S HAPPENING HERE,

16   SEPTEMBER 2006, THE KEYBAG INTEGRITY CHECK, WHICH YOU CALL THE

17   KVC, AS A CONSEQUENCE OF THAT, IF I'VE BEEN USING HARMONY WITH

18   THE REALNETWORKS LIBRARY, I'M GOING TO GO LOSE MY REALNETWORKS

19   SONGS.  I'LL GET MY ITUNES SONGS ALL BACK WHEN I SYNC BETWEEN

20   THE ITUNES JUKEBOX AND MY IPOD.  AND IF I WANT MY REALPLAYER

21   SONGS, I'M GOING TO HAVE TO BURN AND RIP THEM OVER INTO

22   ITUNES.  IS THAT A FAIR SUMMARY?

23   **A.**  THAT'S A SERIES OF THINGS THAT MIGHT RESTORE THE

24   SITUATION.  THERE CAN BE OTHER COMPLICATIONS, BUT THAT MIGHT

25   WORK.

1   **Q.**  OKAY.  AND THEN -- AND I -- THAT'S A DIFFERENT SITUATION

2   FOR WHAT HAPPENED IN SEPTEMBER 2007.  THAT'S THE SITUATION

3   WHERE THE IPOD DOESN'T RECOGNIZE THE DATABASE FILE THAT'S

4   STILL THERE, AND THEN YOU HAVE TO HIT "RESTORE."

5   **A.**  YES, THE TECHNOLOGY IS DIFFERENT.  ALTHOUGH THE IPOD

6   MODELS THAT WE'RE TALKING ABOUT IN SEPTEMBER 2007 THAT HAD

7   THIS DVC REACTION CAUSING THEM TO PRETEND THE SONGS WEREN'T

8   THERE ALSO HAD THE KVC.  SO IT HAD THE 2006 REACTION AS -- AS

9   WELL UNDER THE SAME CIRCUMSTANCES.

10   **Q.**  OKAY.  NOW, YOU UNDERSTAND FROM YOUR INVESTIGATION OF

11   HARMONY AND REAL THAT REAL WARNED ITS CUSTOMERS THAT APPLE

12   UPDATES WOULD STOP HARMONY FROM WORKING, RIGHT?

13   **A.**  I HAVE SEEN THAT AT TIMES, YES.

14   **Q.**  ALL RIGHT.  AND YOU SAW -- SO YOU SAW THAT APPLE WARNED

15   ITS CUSTOMERS THAT UPDATES COULD AFFECT THIRD-PARTY SOFTWARE

16   LIKE HARMONY, RIGHT?

17   **A.**  YES, I CAN RECALL THINGS LIKE THAT.

18   **Q.**  RIGHT.  SO BOTH COMPANIES WERE TELLING THEIR CUSTOMERS OUT

19   IN THE MARKETPLACE, WARNING THEM ALL, "YOU'RE USING THIS

20   REVERSE-ENGINEERED SOFTWARE, THAT WHEN THERE'S UPDATES, IT MAY

21   STOP WORKING."  RIGHT?  BOTH COMPANIES TOLD CONSUMERS THAT.

22   **A.**  BOTH COMPANIES TOLD THE CONSUMERS IN DIFFERENT WAYS

23   THAT -- THAT -- WELL, APPLE SAID THAT IT'S LIKELY THAT HARMONY

24   WILL BREAK IN THE FUTURE.  AND REALNETWORKS ENCOURAGED ITS

25   CUSTOMERS TO -- TO CONTINUE USING THE REALPLAYER SOFTWARE IN

 1    ORDER TO ENSURE THAT IT WOULD KEEP WORKING.

 2    **Q.**  RIGHT.  IN FACT, REAL SAID TO CUSTOMERS, "STOP SYNCING

 3    WITH ITUNES AND STOP SYNCING WITH THE IPOD BECAUSE IT'S GOING

 4    TO STOP WORKING.  USE US WITH OTHER DEVICES."  RIGHT?

 5    **A.**  I DON'T RECALL THEM SAYING STOP SYNCING.  I THINK THEY MAY

 6    HAVE BEEN TALKING ABOUT ANOTHER ASPECT OF THE IPOD, BUT I

 7    DON'T THINK THEY SAID STOP SYNCING.

 8    **Q.**  WELL, THEY DID RECOMMEND THAT YOU STOP USING ITUNES WITH

 9    THE IPOD, RIGHT?

10    **A.**  I THINK THEY RECOMMENDED THAT YOU USE REALPLAYER INSTEAD

11    OF ITUNES, THAT'S CORRECT.

12         **MR. ISAACSON:**  ALL RIGHT.  I HAVE NO FURTHER

13    QUESTIONS, SIR.

14         **THE COURT:**  REDIRECT LIMITED TO THE SCOPE OF CROSS?

15         **MR. COUGHLIN:**  NO REDIRECT, YOUR HONOR.

16         **THE COURT:**  ALL RIGHT.  THEN, MR. MARTIN, YOU'RE

17    EXCUSED.

18         **THE WITNESS:**  THANK YOU, YOUR HONOR.

19         **THE COURT:**  NEXT WITNESS.

20         **MR. COUGHLIN:**  YOUR HONOR, WE WOULD CALL

21    MR. FARRUGIA.

22              (PAUSE IN THE PROCEEDINGS.)

23              **AUGUSTIN FARRUGIA,**

24    CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY

25    SWORN, TESTIFIED AS FOLLOWS:

1           THE WITNESS:  I DO.

2           THE CLERK:  PLEASE BE SEATED.

3           THE WITNESS:  THANK YOU.

4           THE CLERK:  AND THEN PLEASE STATE YOUR FULL NAME AND

5    SPELL YOUR LAST NAME.

6           THE WITNESS:  I'M AUGUSTIN FARRUGIA.  AND F-A DOUBLE

7    R-U-G-I-A.

8           THE COURT:  MR. FARRUGIA, DID YOU ANSWER "I DO" TO

9    THAT QUESTION?

10          THE WITNESS:  YES, I DO.

11          THE COURT:  THANK YOU.

12       GO AHEAD.  YOU MAY PROCEED.

13          MR. COUGHLIN:  THANK YOU, YOUR HONOR.

14                    **DIRECT EXAMINATION**

15   BY MR. COUGHLIN:

16   **Q.**  GOOD MORNING, MR. FARRUGIA.

17   **A.**  GOOD MORNING.

18   **Q.**  COULD YOU TELL THE JURY WHAT YOUR POSITION IS AT APPLE,

19   WHAT IT WAS ACTUALLY WHEN YOU STARTED IN APRIL OF 2005 AND

20   WHAT IT IS TODAY?

21   **A.**  I -- WHEN I STARTED AT APPLE IN APRIL 2005, I WAS A

22   DIRECTOR DRM TECHNOLOGIES.  AND I GOT PROMOTED SENIOR DIRECTOR

23   DRM TECHNOLOGY.

24       TODAY I EXPAND MY ROLE IN SECURITY AND INTERNET SERVICES

25   AND DRM TECHNOLOGIES AS A SENIOR DIRECTOR.

1    **Q.**   THANK YOU.

2        IN FRONT OF YOU, YOU HAVE A BINDER THERE WHICH IS JUST

3    MEANT TO HELP YOU.  YOU DON'T NEED TO USE IT OR LOOK AT IT IF

4    YOU DON'T NEED IT.  BUT WHAT IT HAS IS SOME OF THE DOCUMENTS

5    I'M GOING TO ASK YOU ABOUT.  AND SO IF YOU THINK YOU NEED TO

6    SEE MORE, BECAUSE THE JURY IS, FOR NOW -- THEY'LL GET THE

7    WHOLE DOCUMENT LATER -- BUT FOR NOW, THEY'RE JUST LOOKING AT

8    SOME PAGES.  IF YOU NEED TO SEE MORE, YOU CAN REFER TO THAT --

9    TO THAT DOCUMENT THAT'S IN FRONT OF -- THAT BINDER THAT'S IN

10   FRONT OF YOU THAT HAS THE DOCUMENTS.

11       SO I'LL START WITH JUST ASKING YOU SOME BACKGROUND

12   QUESTIONS.

13       DO YOU REMEMBER SUBMITTING A DECLARATION IN THIS CASE IN

14   JANUARY 2011?

15   **A.**   YES, I DO.

16   **Q.**   OKAY.  AND WITH THAT DECLARATION, YOU SUBMITTED A NUMBER

17   OF EXHIBITS; IS THAT CORRECT?

18       AND IF YOU WANT TO FLIP OPEN THAT BINDER, THE DECLARATION

19   IS IN THE FIRST -- IT'S MARKED AS EXHIBIT 927.

20       JUST SO YOU KNOW, YOU SUBMITTED AN ERRATA AND A

21   SUPPLEMENTAL DECLARATION WHICH ARE 928 AND 929.  THEY'RE ALSO

22   IN THAT BINDER.  SO I THINK IT'S ALL THERE.

23       YOU'RE FAMILIAR WITH THAT DECLARATION; IS THAT RIGHT?

24   **A.**   YES, CORRECT.

25   **Q.**   WHEN YOU SUBMITTED THAT DECLARATION, YOU SUBMITTED CERTAIN

1   EXHIBITS WITH IT THAT YOU WERE FAMILIAR WITH AND BELIEVED THAT

2   YOU COULD TESTIFY ABOUT; IS THAT CORRECT?

3   **A.**   THIS IS CORRECT.

4   **Q.**   OKAY.  IN FACT, YOU SAID YOU HAD PERSONAL KNOWLEDGE OF THE

5   EXHIBITS THAT YOU SUBMITTED AND THAT WERE ATTACHED TO THAT

6   DECLARATION; IS THAT RIGHT?

7   **A.**   YES, THAT'S RIGHT.

8   **Q.**   AND SO I'M GOING TO START TALKING TO YOU ABOUT SOME OF THE

9   DOCUMENTS YOU ATTACHED THERE AND GET THE BASIS OF THAT

10   OPINION.

11       IF WE LOOK AT EXHIBIT 2265, PLEASE.

12   **A.**   2265.

13                    (EXHIBIT PUBLISHED TO JURY.)

14   **BY MR. COUGHLIN:**

15   **Q.**   THAT IS -- 2265, IT'S IN YOUR BINDER, BUT IT'S ALSO,

16   MR. FARRUGIA, IT IS ALSO 3A, EXHIBIT 3A TO YOUR DECLARATION.

17   YOU DON'T NEED TO LOOK FOR IT NOW.  YOU CAN JUST LOOK AT THAT.

18       THIS WAS EXHIBIT 3A TO YOUR DECLARATION.  DO YOU RECOGNIZE

19   WHAT THIS IS?

20   **A.**   WHAT IS THE ONE WHICH IS ON THE SCREEN HERE?

21   **Q.**   THE ONE THAT'S ON THE SCREEN AND THE ONE THAT'S RIGHT IN

22   FRONT OF YOU IN THE BINDER.

23   **A.**   OKAY.  I NEED TO CHECK THAT.

24       YEAH.

25   **Q.**   CAN YOU TELL US WHAT THAT IS?

1    **A.**   THIS IS THE REPORT THAT A COMPANY CALLED CLOAKWARE DID

2    BEFORE MY TIME AT APPLE.

3    **Q.**   AND WHO IS CLOAKWARE?

4    **A.**   CLOAKWARE IS A SECURITY COMPANY IN CANADA.

5    **Q.**   OKAY.  AND DID THEY HAVE OFFICES HERE IN CALIFORNIA, OR --

6    OR DID THEY JUST COME AND VISIT APPLE AND GO BACK AND FORTH?

7    **A.**   TO MY KNOWLEDGE, THEY HAVE AN OFFICE IN CANADA.  AND THEY

8    COME HERE AND FORTH -- COME BACK AND FORTH HERE TO VISIT US.

9    **Q.**   OKAY.  AND YOU SUBMITTED THIS -- YOU SUBMITTED THIS REPORT

10   AND YOU SAID THAT WHEN YOU JOINED APPLE IN APRIL 2005 -- IS

11   THAT CORRECT, YOU JOINED APPLE IN APRIL 2005?

12   **A.**   I JOIN APPLE THE 11TH.

13   **Q.**   APRIL 11?

14   **A.**   2005, YES.

15   **Q.**   AND WHEN YOU JOINED, YOU SAID YOU FAMILIARIZED YOURSELF

16   WITH THE ARCHITECTURE OF FAIRPLAY, ITUNES' FAIRPLAY; IS THAT

17   CORRECT?

18   **A.**   NO, THIS IS INCORRECT.

19   **Q.**   OKAY.

20   **A.**   I'M NOT DOING MY JOB IN SECURITY BY -- BY BEING INFLUENCED

21   WHAT WE DID ON THE PAST.  WHAT I DID WHEN I COME, I DID THE

22   DUE DILIGENCE OF WHAT WAS THE SYSTEM TO UNDERSTAND WHAT WAS

23   DONE AND WHAT KIND OF SECURITY THEY HAVE.  AND THEN FROM THAT,

24   I'M -- WHEN I DID MY DUE DILIGENCE, I UNDERSTOOD WHERE ARE THE

25   FLAWS, WHERE NEEDS THINGS (SIC) TO BE IMPROVED AND STUFF LIKE

1    THIS.  BUT I NEVER GET ANY INFLUENCE OF ANYTHING ELSE.

2    **Q.**  WELL, I DIDN'T ASK YOU IF YOU HAD ANY INFLUENCE.  I WAS

3    JUST ASKING YOU, YOU FAMILIARIZED YOURSELF WITH THE

4    ARCHITECTURE OF FAIRPLAY SO YOU COULD POTENTIALLY UPGRADE IT

5    IF IT NEEDED IT; IS THAT RIGHT?

6    **A.**  THIS IS CORRECT.

7    **Q.**  AND WHEN YOU LOOKED AT THE FAIRPLAY ARCHITECTURE, YOU

8    THOUGHT IT'S LIKE WALKING WITH SHOES WITH HEELS ON THE FRONT;

9    IS THAT RIGHT?  IS THAT YOUR PHRASE?

10   **A.**  THIS IS A PHRASE I USE, YES, BECAUSE IT LOOKS TO ME THAT

11   THE DESIGN WOULD -- WAS DONE UPSIDE DOWN.

12   **Q.**  OKAY.  SO YOU -- YOU TOOK A LOOK AT THE ARCHITECTURE AND

13   YOU DECIDE TO REDESIGN IT; IS THAT RIGHT?

14   **A.**  THIS IS CORRECT.

15   **Q.**  OKAY.  AND WHEN YOU GOT THERE, YOU SAID THAT YOU

16   DISCOVERED -- WHEN YOU SUBMITTED THIS DECLARATION, YOU SAID

17   YOU DISCOVERED THAT CLOAKWARE HAD ALSO IDENTIFIED CERTAIN

18   VULNERABILITIES TO THE CURRENT DESIGN; IS THAT CORRECT?

19   **A.**  IT'S CORRECT.

20   **Q.**  OKAY.  AND THEY -- AND THEY -- AND YOU SAID THAT THEY

21   IDENTIFIED MANY OF THE SAME DESIGN FLAWS THAT YOU SAW; IS THAT

22   CORRECT?

23   **A.**  WE CAN SAY THAT.

24   **Q.**  OKAY.  IN FACT, YOU DID SAY THAT IN YOUR DECLARATION.

25   **A.**  YES, ABSOLUTELY.

1   Q.   THAT'S EXACTLY WHAT YOU SAID IN YOUR DECLARATION, RIGHT?

2   A.   YES.

3   Q.   AND YOU SUBMITTED THEIR REPORT TO IDENTIFY THE FLAWS THAT

4   YOU BOTH FOUND?

5   A.   CORRECT.

6   Q.   RIGHT.  YOU DIDN'T SUBMIT YOUR OWN REPORT AT THAT TIME IN

7   THAT DECLARATION, YOU SUBMITTED THEIR REPORTS; IS THAT RIGHT?

8   A.   THIS IS CORRECT.

9   Q.   OKAY.  BECAUSE THEY HAD IDENTIFIED THE SAME FLAWS THAT YOU

10   FOUND; IS THAT RIGHT?

11   A.   YES, CORRECT.

12   Q.   OKAY.  SO LET'S TAKE A LOOK AT THIS APRIL 5TH, 2005

13   CLOAKWARE REPORT.  IF WE COULD FLIP INTO THE FIRST PAGE, WHICH

14   IS PAGE 2.

15                  (EXHIBIT PUBLISHED TO JURY.)

16           THE WITNESS:   (REVIEWING DOCUMENT.)

17   BY MR. COUGHLIN:

18   Q.   IS IT TRUE THAT THIS REPORT HAD IDENTIFIED TWO CLASSES OF

19   ATTACKS ON ITUNES?

20   A.   PAGE 2 OF THE DOCUMENT?

21   Q.   I THINK IT IS PAGE 2.  IT'S ACTUALLY PAGE --

22   A.   PAGE 6 OR 2?

23   Q.   PAGE 6.

24   A.   OKAY.

25       (REVIEWING DOCUMENT.)

```
 1        OKAY.

 2   Q.  OKAY.  IF WE TAKE A LOOK AT WHAT'S UNDER HEADING 3,

 3   "MEDIUM TO LONG TERM RECOMMENDATIONS"?

 4   A.  UM-HMM.

 5   Q.  IN HERE, CLOAKWARE HAD IDENTIFIED TWO CLASSES OF ATTACK AT

 6   THIS TIME.

 7        CAN I ASK YOU WHAT WAS THE ITUNES -- WHAT VERSION OF

 8   ITUNES WAS -- WHEN YOU ARRIVED, WAS IT 4.7 THAT WAS THE

 9   VERSION OF ITUNES WHEN YOU GOT TO APPLE?

10   A.  THIS IS CORRECT.

11   Q.  OKAY.  AND THAT VERSION WAS THE VERSION THAT HAD THE RSA

12   TECHNOLOGY, THE PUBLIC KEYBAG AND THE PRIVATE KEYBAG; IS THAT

13   CORRECT?

14   A.  IT WAS ONE OF THE TECHNOLOGY THEY USE IN ENCRYPTION, YES,

15   CORRECT.

16   Q.  OKAY.  AND SO WHEN YOU GOT THERE, THERE WERE STILL ATTACKS

17   BEING -- OCCURRING; IS THAT CORRECT?

18   A.  THIS IS CORRECT.

19   Q.  OKAY.  AND IT -- AND HERE IT IDENTIFIES TWO TYPES OF

20   ATTACKS.  COULD WE TALK ABOUT -- IT SAYS THE FIRST CLASS OF

21   ATTACK IS AN AUTHORIZATION-BASED ATTACK.  PYMUSIQUE, IF I'M

22   PRONOUNCING THAT RIGHT, IS AN ATTACK OF THIS CLASS.  THE OTHER

23   CLASS OF ATTACK IS THE JHYMN CLASS.

24        TELL US WHAT THOSE TWO CLASSES OF ATTACKS ARE.

25   A.  THE -- I GOING TO START BY THE SECOND BECAUSE THE SECOND
```

 1    IS VERY IMPORTANT.  THE SECOND ATTACK WAS AN ATTACK WHERE WHEN

 2    YOU -- YOU EXPLAIN RSA, THE CRYPTOTECHNOLOGY WE HAVE, IT'S A

 3    TECHNOLOGY THAT BASICALLY IF YOU DON'T IMPLEMENT THAT

 4    PROPERLY, YOU CREATE A HUGE PROBLEM IN SECURITY.  THIS IS WHAT

 5    WE CALL THE MAN-IN-THE-MIDDLE ATTACK.  AND IT WAS IMPLEMENTED

 6    INCORRECTLY.  THAT WAS ONE OF THE FLAW JHYMN WAS USING, AND

 7    THE FLAW I DISCOVER ROUGHLY A WEEK AFTER I JOIN APPLE.

 8        AND THAT WAS A BAD DESIGN.  THAT WAS WHAT I SAY BASICALLY

 9    I SAW THAT THE SHOES WITH THE HEEL IN THE FRONT BECAUSE

10    BASICALLY A CORRECT IMPLEMENTATION OF CORRECT DESIGN WOULD NOT

11    DO THIS KIND OF FLAW.

12    Q.  I APPRECIATE THAT.  LET'S TALK ABOUT WHAT PYMUSIQUE DID

13    FIRST.  AND THEN WE'LL TALK ABOUT JHYMN AND YOU CAN TELL ME

14    WHAT KIND OF ATTACK THAT IS.

15    A.  THEN THE FIRST ATTACK WAS, AGAIN, A VERY BAD

16    IMPLEMENTATION OF A VERY BAD DESIGN OF SECURITY.  AND I GOING

17    TO USE AN EXAMPLE TO ILLUSTRATE THAT FOR THE JURY.

18        WHAT I DISCOVER IS, FOR EXAMPLE, YOU WANT TO TRY TO SEND A

19    MESSAGE TO SOMEONE.  AND YOU WANT TO SEND THIS -- A KEY, FOR

20    EXAMPLE.  AND YOU WANT TO HAVE THE KEY VERY, VERY SECURE.

21        WHAT ITUNES WAS DOING AT THE TIME, IT WAS PUTTING THE KEY

22    ON THE PAPER ENVELOPE, RIGHT?  SEND THE KEY OVER AND WRAP THE

23    KEY ON THE SAFE, ON THE VERY BIG SAFE ON THE CLIENT, ON THE

24    ITUNES.

25        AS YOU CAN IMAGINE, BUT IT'S PRETTY SIMPLE TO TEAR THE

 1   ENVELOPE OUT AND TO TAKE THE KEYS.  AND THEN BASICALLY YOU

 2   DON'T NEED TO PUT THE KEY IN THE ENVELOPE BECAUSE YOU GET THE

 3   SONG.  THAT WAS WHAT I DISCOVER.  THEY WERE USING A VERY WEAK

 4   MECHANISM TO SEND THE KEY TO THE CLIENT, AND THE CLIENT WAS

 5   THE ONE DOING THE PROTECTION.

 6   **Q.**  IN OTHER WORDS, THEY CAUGHT THE SONG AS IT WAS BEING -- AS

 7   IT WAS BEING ENCRYPTED ON THE DESKTOP; IS THAT RIGHT?  AND AS

 8   IT'S FREEING UP, THEY CAUGHT THE SONG?

 9   **A.**  THIS IS INCORRECT.  THE KEY WAS SENT WITHOUT A GOOD

10   PROTECTION.  THE SONG WAS ENCRYPTED, BUT THE KEY TO DECRYPT

11   THE SONG WAS SENT WITHOUT A VERY GOOD PROTECTION.  AND BECAUSE

12   THE PROTECTION WAS SO WEAK, IT'S PRETTY SIMPLE FOR A CLIENT TO

13   OPEN THE ENVELOPE, TAKE THE KEYS, AND DECRYPT THE SONG AND

14   THEN YOU HAVE THE SONG.  THAT WAS THE HACK ON THE NUMBER ONE,

15   RIGHT.

16       AND THAT'S WHAT I SAID IS THE DESIGN WAS UPSIDE DOWN

17   BECAUSE YOU DON'T DO SECURITY ON THE CLIENT WHICH IS BASICALLY

18   THE COMPONENT OF THE ECOSYSTEM WHERE YOU HAVE THE HACKERS.

19   WHAT YOU DO USUALLY IN SECURITY, YOU DO THE SECURITY ON THE

20   SERVER SIDE.

21   **Q.**  SO THIS IS WHAT YOU END UP DOING IN THE 6.0.  YOU END UP

22   MOVING THE SECURITY FROM THE DESKTOP OR THE ENCRYPTION OF THE

23   SONG UP TO THE SERVER; IS THAT RIGHT, THE TRANSFORMATION?

24   **A.**  THIS IS THE DESIGN I CHANGE WITH ITUNES 6.0.  WE MOVE THE

25   PROTECTION FROM THE CLIENT TO THE SERVER.  IN OTHER WORDS,

```
 1    WHAT WE DID IS INSTEAD OF SENDING THE KEY ON THE SMALL

 2    ENVELOPE, WE SEND THE KEY ON THE BIG VAULT, AND THE VAULT

 3    BASICALLY WAS NEVER OPEN ON THE CLIENT BECAUSE WE WERE PUTTING

 4    VAULT INSIDE VAULT.

 5    Q.  AND WE'RE GOING TO GET TO 6.

 6        AND WHAT DID JHYMN DO?

 7    A.  ON WHICH TIME FRAME?

 8    Q.  THE JHYMN -- JHYMN WAS IN THE CLASS OF STRIPPING OFF DRM;

 9    IS THAT CORRECT?

10    A.  YES, THIS IS CORRECT.

11    Q.  OKAY.  AND PYMUSIQUE WAS A KIND OF AN INTERCEPTOR TYPE OF

12    ATTACK, AND BOTH OF THOSE COULD BE STOPPED WITH YOUR NEW

13    DESIGN, YOUR 6.0; IS THAT RIGHT?

14    A.  BOTH COULD BE STOPPED WITH THE FULL REDESIGN I WAS

15    PLANNING TO DO, YES, CORRECT.  WITH THE FULL DESIGN I

16    PROPOSED.

17    Q.  AND THAT FULL DESIGN WAS IN 6.0; IS THAT RIGHT?

18    A.  NO.  THE FULL DESIGN WAS SOMETHING I PROPOSED, AND WE DID

19    THAT BY STEP.  6.0 WAS WHEN WE DID THE REINFORCEMENT ON THE

20    KEYBAG ON THE DESKTOP.

21    Q.  YOU TOOK IT TO THE SERVER?

22    A.  WE TOOK ON THE SERVER SIDE, FIRST STEP, BECAUSE TIME WAS

23    SOMETHING WE DIDN'T HAVE, RIGHT?  WE NEED TO DO A PRODUCT AND

24    WE HAVE LIMITED TIME.  WE DID THE DESKTOP FIRST BECAUSE IT WAS

25    VERY IMPORTANT TO REMOVE THIS HACK.
```

1          THEN WHAT WE DID IS, FOR 7.0, IS TO MOVE THE SAME SECURITY

2     WE DID IN THE DESKTOP TO THE IPOD.

3          AND THEN WE INTRODUCE ANOTHER KIND OF SECURITY FOR 7.4

4     WHERE BASICALLY WE TRY TO AVOID PEOPLE TO PLAY WITH THE GAME

5     AND DO INDIRECT ATTACK TO GET INFORMATION ON THE SYSTEM.

6     **Q.**  OKAY.  LET'S –– WE'RE GOING TO GO THROUGH A COUPLE OF

7     THOSE.

8     **A.**  WATERS?

9     **Q.**  YES, HAVE A LITTLE WATER.

10    **A.**  THANK YOU.

11    **Q.**  I'LL DO THE SAME.

12                    (PAUSE IN THE PROCEEDINGS.)

13    **BY MR. COUGHLIN:**

14    **Q.**  I WANT TO ASK YOU NOW TO FLIP TO EXHIBIT –– EXHIBIT –– GO

15    BACK TO THE FIRST –– GO BACK TO YOUR DECLARATION.

16    **A.**  (REVIEWING DOCUMENT.)

17    **Q.**  AND I WANT YOU TO FLIP TO WHERE IT'S MARKED WITH A BLUE

18    TAB.  AND THAT'S A –– IT APPEARS TO BE A CLOAKWARE JUNE 23RD,

19    2005 REPORT; IS THAT CORRECT?

20    **A.**  THIS IS CORRECT.

21    **Q.**  AND THAT YOU ALSO SUBMITTED WITH YOUR DECLARATION; IS THAT

22    CORRECT?

23    **A.**  THIS IS CORRECT.

24          **MR. COUGHLIN:**  OKAY.  THIS IS EXHIBIT 927.  AND IT'S

25    AT PAGE 39 OF HIS DECLARATION.  AND I WOULD LIKE TO JUST MOVE

1   THE REPORT –– NOT MOVE THE REPORT IN.  I WOULD JUST LIKE TO

2   SHOW THE REPORT.

3      ANY OBJECTION?

4           **MS. DUNN:**  NO OBJECTION.

5           **THE COURT:**  GO AHEAD.

6           **MR. COUGHLIN:**  927.

7                (EXHIBIT PUBLISHED TO JURY.)

8   **BY MR. COUGHLIN:**

9   **Q.**  SO THIS IS THE SECOND REPORT OF CLOAKWARE THAT YOU

10  INCLUDED IN YOUR DECLARATION; IS THAT CORRECT?

11  **A.**  THIS IS CORRECT.

12  **Q.**  OKAY.  AND IT'S DATED JUNE 23RD, 2005.  SO IT'S AFTER

13  YOU'RE WORKING AT APPLE; IS THAT RIGHT?

14  **A.**  THIS IS CORRECT, YES.

15  **Q.**  OKAY.  IF WE FLIP INTO PAGE 43.

16                (EXHIBIT PUBLISHED TO JURY.)

17  **BY MR. COUGHLIN:**

18  **Q.**  AND AT PAGE 43, IT SAYS THE DISCOVERY AND DESCRIPTION OF

19  THREATS.  DO YOU SEE THAT?

20  **A.**  YES.

21  **Q.**  OKAY.  AND IDENTIFIES FIVE, WHAT THEY SAY, YOU KNOW, WHAT

22  AN ATTACKER, THE MOST VALUABLE GOALS FOR AN ATTACKER, THEY ARE

23  THE FOLLOWING, AND IT IDENTIFIES FIVE THINGS; IS THAT CORRECT?

24  **A.**  YES, THIS IS CORRECT.

25  **Q.**  OKAY.  AND IF YOU –– LET'S GO THROUGH EACH ONE OF THOSE.

1    THE FIRST ONE, SAVE THE COMPRESSED AND UNENCRYPTED AAC

2    SONG; DO YOU SEE THAT?

3    **A.**   UH-HUH.

4    **Q.**   MY UNDERSTANDING OF THAT IS THIS FIRST ONE, THE NUMBER ONE

5    THING THAT ATTACKER WANTS IS TO STRIP THE DRM OFF THAT AND

6    SAVE THE SONG; IS THAT A CORRECT DESCRIPTION OF THAT?

7    **A.**   THIS IS THE GOAL OF THE HACKERS.  THEY WANT TO REMOVE THE

8    PROTECTION, IN A SENSE, AND THEY'RE GOING TO DO EVERYTHING

9    THEY CAN TO ACHIEVE THE FIRST TARGET, WHICH IS, YES, I WANT TO

10   REMOVE THE DRM, I WANT TO REMOVE THE PROTECTION.  AND TO

11   ACHIEVE THAT, THEY HAVE DIFFERENT TECHNIQUES.

12   **Q.**   OKAY, HOLD ON.  THAT'S WHAT THEY'RE DOING IN THE FIRST

13   ONE, RIGHT?  THEY WANT -- THE FIRST THING THEY WANT TO DO IS

14   STRIP THE DRM, AN ATTACKER, AND SET THAT SONG FREE; IS THAT

15   CORRECT?  IS THAT WHAT'S HAPPENING IN THE FIRST THAT THEY HAVE

16   IDENTIFIED?

17   **A.**   THIS IS WHAT THE REPORT SAYS.

18   **Q.**   AND YOU BOTH THOUGHT THAT, RIGHT?

19   **A.**   NO.  THIS IS WHERE WE HAVE A DISCREPANCY BETWEEN THIS

20   REPORT AND THE WAY I DID MY DUE DILIGENCE.

21   **Q.**   BUT YOU SUBMITTED THIS REPORT AND YOU SAID THIS WAS AN

22   EXAMPLE OF THE THINGS THAT YOU HAD BOTH IDENTIFIED.

23   **A.**   WE HAVE -- THIS IS CLOAKWARE REPORT.  THIS IS NOT MY

24   REPORT.  THEY HAVE IDENTIFIED.  BUT WE HAVE IDENTIFIED

25   DIFFERENT FLAWS WHERE WE ARE CONCERNED.  THE FIRST ONE WAS

1    BASICALLY THE FACT THAT PEOPLE THERE WERE ABLE TO REMOVE THE

2    DRM.  RIGHT.  THAT WAS THE FIRST HACK WE HAD.

3    **Q.**  OKAY.  STOP THERE.  THAT'S ALL WE'RE TALKING ABOUT RIGHT

4    NOW.

5    **A.**  OKAY.

6    **Q.**  IS THAT THE FIRST ONE THAT'S IDENTIFIED?

7    **A.**  CORRECT.

8    **Q.**  OKAY.  THE SECOND ONE IS SAVE -- SAVE THE PCM, THE PULSE

9    CODE MODULATION DATA; DO YOU SEE THAT?

10   **A.**  UM-HMM.

11   **Q.**  EXPLAIN WHAT THAT SECOND IS.  THAT -- IS THAT -- TELL US

12   WHAT'S GOING ON THERE.

13   **A.**  THE -- THE -- THE SONG USUALLY IS A SONG THAT FOR -- FOR A

14   BETTER USER EXPERIENCE, WHAT WE DO WITH SONG IS WE COMPRESS

15   THE SONG, WE MAKE IT SMALL, WITHOUT LOSING THE QUALITY OF THE

16   SONG.  THIS IS WHAT WE HAVE WITH AAC.  IT'S A COMPRESSED

17   TECHNIQUE.

18       THEN BEFORE WE PLAY THE SONG, WE NEED TO UNCOMPRESS THE

19   SONG, BUT THE VOLUME OF THE SONG THEN IS BIGGER, AND WE TRY TO

20   COMPRESS BECAUSE WHEN YOU DOWNLOAD FROM THE CLOUD, YOU DON'T

21   WANT TO SPEND ALL YOUR BIT RATE WITHIN THAT.  WE COMPRESS BUT

22   FOR -- WE DON'T WANT YOU -- WE DON'T WANT -- WE WANT TO USE

23   THE MINIMUM BITS WHEN YOU DOWNLOAD THAT YOU HAVE A FILE WHICH

24   IS A SMALLER ONE LIKE THIS, YOU CAN START VERY, VERY FAST.

25   AND WHEN YOU PLAY THE SONG, BEFORE WE PLAY, WE DECOMPRESS, WE

1    MAKE THE SONG THE WAY IT WAS BEFORE THE COMPRESSION, AND THAT

2    IS WHAT WE CALL PCM.

3    **Q.**   DID YOUR 6.0 IMPACT THIS NUMBER 2, YOUR DESIGN, YOUR

4    REDESIGN, YOUR 6.0 DESIGN?

5    **A.**   6.0, NO, IT DOESN'T.

6    **Q.**   IT DID NOT?

7    **A.**   IT DOESN'T.

8    **Q.**   THE NEXT TWO, THE BURN LIMIT?

9    **A.**   IT DOESN'T.  ALL THOSE POINT, THEY ARE NOT RELEVANT FOR

10   DRM.  THIS IS MY POINT BECAUSE I AM TRYING TO EXPLAIN IS DRM

11   IS A CONTENT PROTECTION.  WE ARE NOT DOING ANYTHING AT THE PCM

12   BECAUSE THIS IS AFTER THE -- THE SONG WAS DECRYPTED.  WE'RE

13   NOT DOING ANYTHING WITH THE CD BURNING BECAUSE THIS IS ITUNES.

14   IT'S NOTHING TO DO WITH THE DRM.

15   **Q.**   LET'S FLIP TO -- SO THESE -- THESE ARE THE THINGS THAT

16   THEY IDENTIFIED.  THESE ARE THE FIVE THINGS THAT THEY

17   IDENTIFIED AND YOU SUBMITTED IN YOUR REPORT; IS THAT CORRECT?

18   **A.**   THIS IS WHAT THEY IDENTIFY.  MY CONCERN AT THE TIME WAS

19   NOT THIS POINT.  MY CONCERN WAS DIFFERENT THREAT MODELS I

20   FOUND ON THE DESIGN, DIFFERENT THREAT MODELS I FOUND ON THE

21   DESIGN.  BUT I WAS MORE CONCERNED ABOUT THE THREAT MODEL I

22   FOUND THAN THIS REPORT.

23   **Q.**   OKAY.  BUT THESE ARE THE REPORTS YOU SUBMITTED WITH YOUR

24   DECLARATION IN THIS CASE IN 2011.

25   **A.**   ABSOLUTELY.  BUT YOU HAVE TO UNDERSTAND WE HAVE A FRAME OF

```
 1    TIME.  FOR EXAMPLE, IF --

 2    Q.  MR. FARRUGIA, WE'LL GET TO THAT.

 3    A.  OKAY.

 4    Q.  IF I COULD ASK YOU TO TAKE A LOOK AT THE NEXT EXHIBIT,

 5    2239.

 6    A.  2239.

 7    Q.  IT WILL COME UP ON THE SCREEN.

 8    A.  I SEE NOTHING.  I'M SORRY.

 9              (EXHIBIT PUBLISHED TO JURY.)

10        THE WITNESS:  OKAY.  THANK YOU.

11    BY MR. COUGHLIN:

12    Q.  I DIDN'T PUT THE ONE-PAGERS IN YOUR BINDER.

13        CAN YOU TELL ME WHAT THIS IS?

14    A.  I NEED TO SEE THE PAGE BECAUSE THIS IS --

15    Q.  OKAY.  THERE'S THE WHOLE PAGE.  IT LOOKS LIKE AN INSTANT

16    MESSAGE BETWEEN YOU AND MR. ROBBIN; IS THAT CORRECT?

17    A.  THIS IS CORRECT.

18    Q.  OKAY.  CAN YOU TELL US WHAT YOU'RE DISCUSSING THERE?

19    A.  (REVIEWING DOCUMENT.)

20        OKAY.

21        IT'S A DISCUSSION I HAD WITH JEFF ROBBIN ABOUT A

22    IMPLEMENTATION.

23    Q.  WHO IS JEFF ROBBIN?

24    A.  HE WAS MY -- MY BOSS AT THE TIME.

25    Q.  OKAY.  AND SO YOU'RE TALKING ABOUT HOW YOU CAN TRACK
```

1    PEOPLE USING PYMUSIQUE; IS THAT CORRECT?

2    **A.**   I THINK THE ABILITY TO TRACK HOW MANY PEOPLE, IT'S NOT TO

3    TRACK PEOPLE, HOW MANY PEOPLE.  DIFFERENT.

4            **MS. DUNN:**  OBJECTION, YOUR HONOR, FOUNDATION.

5            **THE COURT:**  OVERRULED.

6            **MS. DUNN:**  AND I'LL DIRECT --

7            **MR. COUGHLIN:**  WELL --

8            **THE COURT:**  HOLD ON.

9            **MS. DUNN:**  I'D LIKE TO FOCUS ATTENTION ON THE DATE OF

10   THIS DOCUMENT WHICH APPEARS TO BE BEFORE MR. FARRUGIA STARTED

11   WORK.

12           **THE WITNESS:**  AH, THIS IS WHAT -- IT'S NOT ME.  I WAS

13   NOT IN THE COMPANY.  THIS IS MARCH 2005.  I WAS NOT EVEN IN

14   THE COMPANY.

15   **BY MR. COUGHLIN:**

16   **Q.**   IT'S AN INSTANT MESSAGE BETWEEN YOU AND MR. ROBBIN; IS

17   THAT CORRECT?

18   **A.**   NOT ME.  I WAS NOT IN THE COMPANY AT THE DATE OF MARCH.

19   **Q.**   BUT YOU JUST SAID THIS WAS AN INSTANT MESSAGE BETWEEN YOU

20   AND MR. ROBBIN.

21   **A.**   I DON'T HAVE THE DOCUMENT IN FRONT OF ME.  WHAT I SEE IS A

22   MESSAGE FROM JEFF ROBBIN IN MARCH 2005.  I WAS NOT EVEN ON THE

23   COMPANY AND I DIDN'T KNOW JEFF ROBBIN AT THIS TIME.

24   **Q.**   I UNDERSTAND.  SO MAYBE THE DATE IS WRONG.  BUT IS THIS A

25   MESSAGE BETWEEN YOU AND JEFF ROBBIN?

**A.** I CANNOT SAY IT'S A MESSAGE BETWEEN ME AND JEFF ROBBIN.
**Q.** DO YOU REMEMBER, YOU JUST STARTED TO TALK WHAT THIS WAS ABOUT, THAT YOU WERE ABLE TO TRACK PEOPLE?
**A.** I DIDN'T SEE THE DATE. IF YOU SEE THE DATE, THIS IS AN INCONSISTENCE. THE DATE, I WAS NOT AT THE COMPANY, AND I DID NOT KNOW JEFF ROBBIN BEFORE I JOINED APPLE.

(SIMULTANEOUS COLLOQUY.)

**BY MR. COUGHLIN:**
**Q.** DID YOU WRITE THIS MESSAGE?
**A.** I CANNOT WRITE THIS MESSAGE. I --
**Q.** DID YOU WRITE IT, THOUGH?
**A.** NO.
**Q.** DID YOU WRITE IT? IS THE DATE WRONG AND YOU WROTE THIS MESSAGE?
**A.** I CANNOT WRITE THIS DOCUMENT.
**Q.** DID APPLE, AT THE TIME, HAVE THE ABILITY TO TRACK PEOPLE THAT WERE USING THE HACK PYMUSIQUE AFTER YOU STARTED WITH THE COMPANY?
**A.** I CANNOT ANSWER THIS QUESTION. I'M SORRY.
**Q.** YOU DON'T KNOW?
**A.** I -- COULD YOU REPEAT THE QUESTION?
**Q.** DID APPLE HAVE THE ABILITY TO TRACK HACKERS THAT HAD USED PYMUSIQUE?
**A.** NO. WE DON'T HAVE A WAY TO TRACK HACKERS.
**Q.** YOU HAD NO WAY?

1   **A.**   NO.   WHAT YOU WANT -- WE HAVE NO WAY TO USE THAT -- TO

2   HAVE -- I DON'T UNDERSTAND YOUR QUESTION.   SORRY.

3   **Q.**   LET'S TAKE A LOOK AT EXHIBIT 2247.

4   **A.**   2247.

5                        (EXHIBIT PUBLISHED TO JURY.)

6   **BY MR. COUGHLIN:**

7   **Q.**   IT'S UP ON THE SCREEN.

8   **A.**   YEAH, BUT I NEED TO HAVE THE DOCUMENT BECAUSE THE SCREEN

9   IS SOMETHING I DON'T --

10  **Q.**   WELL, WE'LL BLOW IT UP FOR YOU.

11       YOU ALREADY SAID YOU DIDN'T HAVE -- YOU DIDN'T KNOW A WAY

12  THAT THEY COULD USE THIS.

13               **MS. DUNN:**   OBJECTION.

14               **THE COURT:**   WHAT'S THE OBJECTION?

15               **MS. DUNN:**   SAME OBJECTION.

16               **THE COURT:**   WELL, LET'S -- WITH RESPECT TO THE LAST

17  EXHIBIT, HE DID INDICATE ON THE RECORD THAT IT WAS BETWEEN HE

18  AND MR. ROBBIN.   SO I'M GOING TO ALLOW THE EXAMINATION, AND IF

19  THERE ARE QUESTIONS, YOU HAVE TO ESTABLISH FOUNDATION.

20       GO AHEAD.

21  **BY MR. COUGHLIN:**

22  **Q.**   SO THIS IS DATED FOUR DAYS BEFORE -- SIX DAYS BEFORE YOU

23  SAY -- WELL, LET ME GET MY MATH RIGHT.   FOUR FROM 11, SEVEN

24  DAYS BEFORE YOU STARTED WITH THE COMPANY.

25       WHEN YOU STARTED WITH THE COMPANY, YOU HAD NO KNOWLEDGE

```
 1   THAT APPLE WAS ABLE TO TRACK THE HACKERS; IS THAT CORRECT?

 2   A.   THIS IS CORRECT.

 3   Q.   OKAY.

 4   A.   AND AS YOU CAN SEE ON THIS --

 5   Q.   IF WE COULD LOOK AT -- NO FURTHER QUESTIONS.

 6        IF WE COULD LOOK AT EXHIBIT 2309.

 7   A.   23 --

 8                    (EXHIBIT PUBLISHED TO JURY.)

 9   BY MR. COUGHLIN:

10   Q.   IT SHOULD BE IN YOUR BINDER.

11   A.   UM-HMM.

12        (REVIEWING DOCUMENT.)

13   Q.   CAN YOU TELL US WHAT THIS -- WHAT THIS EXHIBIT IS?

14   A.   THIS IS A PRESENTATION.  IT'S A PRESENTATION THAT I SENT

15   TO JEFF ROBBIN.

16   Q.   SO THIS IS A PRESENTATION THAT YOU PREPARED AND SENT TO

17   JEFF ROBBIN; IS THAT CORRECT?

18   A.   YES, THIS IS CORRECT.

19   Q.   CAN YOU GIVE US THE APPROXIMATE DATE OF THIS PRESENTATION?

20   A.   SEPTEMBER THE 8TH, 2005.

21   Q.   OKAY.  SO THIS IS SEVERAL MONTHS AFTER YOU STARTED WITH

22   THE COMPANY; IS THAT CORRECT?

23   A.   THIS IS CORRECT, YES.

24   Q.   AND THIS DOCUMENT DESCRIBES THE IMPLEMENTATION OF 6.0; IS

25   THAT CORRECT?
```

1   **A.**   NO, THIS IS INCORRECT.  THIS IS --

2   **Q.**   OKAY.  LET'S GO THROUGH THE DOCUMENT.

3                    (EXHIBIT PUBLISHED TO JURY.)

4   **BY MR. COUGHLIN:**

5   **Q.**   TELL US WHAT'S GOING ON HERE AT THE FIRST PAGE.

6   **A.**   THIS IS A -- IT'S A DESIGN -- IT'S A PROPOSED DESIGN I DID

7   TO JEFF TO EXPLAIN TO HIM WHAT IT IS WE NEED TO DO FOR ITUNES

8   AND FOR THE SYSTEM.

9   **Q.**   AND IT EXPLAINS THE PROCESS OF PLAYING A SONG; IS THAT

10  CORRECT?

11  **A.**   THAT IS, FOR EXAMPLE, A WAY OF THE SONGS SHOULD BE PLAYED

12  PROPERLY IF WE HAVE A CORRECT SITUATION.

13  **Q.**   OKAY.  LET'S TAKE A LOOK AT THE NEXT PAGE.

14                   (EXHIBIT PUBLISHED TO JURY.)

15  **BY MR. COUGHLIN:**

16  **Q.**   IT TALKS ABOUT FOUR LEVELS OF PROTECTION, RIGHT?  THERE'S

17  A LEVEL -- THERE'S -- WHEN IT SAYS THE CLOAK BOUNDARY, TELL US

18  WHAT THAT MEANS.

19  **A.**   OKAY.  THIS IS A VERY INTERESTING QUESTION.  WHEN YOU DO A

20  DRM AND YOU NEED TO DO THE SECURITY, YOU NEED TO MAKE SURE

21  THAT YOU REINFORCE THE PARAMETERS WHERE YOU DO YOUR CODE

22  PROCESSING.  YOU NEED TO MAKE SURE THAT THE CODE AND THE KEY

23  MANAGEMENT AND EVERYTHING YOU DO WITH THE KEY, THEY ARE REALLY

24  PROTECTED.  WHICH MEANS THAT THE WAY WE RUN THE CODE IS NOT

25  NATURALLY THE SAME WAY THAT AN APPLICATION RUN THE CODE.  WE

1    RUN THE CODE INSIDE WHAT WE CALL A CLOAK BOUNDARY WHERE, FOR A

2    HACKER, IS VERY, VERY DIFFICULT TO UNDERSTAND WHAT -- WHAT WE

3    ARE DOING.

4        AND WHAT WE DO USUALLY IS WE DO CODE PROTECTION, WE DO A

5    LOT OF OBFUSCATION THE CODE TO MAKE SURE THAT THE HACKER IS

6    NOT ABLE TO CHECK AND SEE WHAT THE CODE DOES.

7        AND, FOR EXAMPLE, WHEN WE EXTRACT THE KEY TO DECRYPT THE

8    SONG, WE DON'T EXPOSE THE KEY BECAUSE IN CRYPTOGRAPHY WE HAVE

9    A PROBLEM, WHAT WE CALL THE PROBLEM WITH THE CHICKEN AND AN

10   EGG.  WE DON'T EXPOSE THE KEY BECAUSE BASICALLY THE KEY IS

11   WHAT THE HACKER IS LOOKING FOR.

12       AND IN CRYPTO, WE HAVE THE PROBLEM OF WHAT WE CALL THE

13   CHICKEN AND EGG.  IF YOU HAVE A KEY TO DECRYPT THE SONG, WE

14   NEED TO PROTECT THE KEY.  OKAY.  TO PROTECT THIS KEY, YOU NEED

15   ANOTHER KEY.  TO PROTECT THE SECOND KEY, YOU NEED ANOTHER KEY.

16   AND THIS IS ENDLESS.  THIS IS WHAT WE CALL CHICKEN AND EGG.

17       BY DOING THE CLOAK BOUNDARY, WE HAVE THE FLEXIBILITY TO

18   USE THE KEY WITHOUT GIVING THE VALUE OF THE KEY TO THE HACKER,

19   AND THAT IS WHY WE HAVE WHAT WE CALL THE CLOAK BOUNDARY.  WE

20   RUN ALL THE CODE INSIDE A VERY OPAQUE PROCESS TO AVOID LET THE

21   HACKERS TO SEE WHAT WE HAVE INSIDE.

22   Q.  OKAY.  THANK YOU, MR. FARRUGIA.

23       IF WE FLIP TO THE NEXT PAGE, IT TALKS ABOUT BASICALLY THE

24   GP FUNCTION, THE ACCOUNT KEY, AND THAT'S THE PROTECTION.

25                 (EXHIBIT PUBLISHED TO JURY.)

1    BY MR. COUGHLIN:

2    **Q.** WHO IS -- WHAT DOES THAT MEAN, GP?  ARE THOSE THE INITIALS

3    OF AN EMPLOYEE AT APPLE?

4    **A.** NO, THIS IS A GLOBAL -- IT'S A JOB WE HAVE.  IT'S INITIAL

5    OF SOMEONE THAT IS A GLOBAL PROTECTION FUNCTION.

6    **Q.** OKAY.  AND THIS WAS -- THIS WAS TO PROTECT THE ACCOUNT

7    KEY; IS THAT RIGHT?  THIS IS THE DESIGN?

8    **A.** THIS IS ONE OF THE CRYPTO WE USE TO PROTECT THE KEYS

9    AND --

10    **Q.** OKAY.

11    **A.** -- WE RUN THESE COMPLEX FUNCTION.  AS YOU CAN SEE, IT'S

12    VERY COMPLICATED.  WE HAVE A LOT OF MATHEMATICAL FUNCTION

13    INSIDE.  AND WE RUN THAT IN THE WHAT WE CALL THE CLOAK

14    BOUNDARY, AND BECAUSE WE HAVE THAT, BASICALLY WE ARE ABLE TO

15    EXTRACT THE KEY TO DECRYPT THE SONG BUT WITHOUT EXPOSING THE

16    VALUE OF THE KEY.  RIGHT?

17    **Q.** OKAY.  MR. FARRUGIA, NOW TAKE A LOOK AT THE NEXT PAGE.

18    **A.** (REVIEWING DOCUMENT.)

19    **Q.** PAGE 6.

20                    (EXHIBIT PUBLISHED TO JURY.)

21            **THE WITNESS:** OKAY.

22    BY MR. COUGHLIN:

23    **Q.** IS THAT -- IS THAT YOUR DRAWING OF THE ARCHITECTURE OF

24    FAIRPLAY; IS THAT CORRECT?

25    **A.** THIS IS CORRECT.

1  Q.  TELL US AT WHAT THE AKAMAI SERVER IS.

2  A.  THE AKAMAI SERVER IS WHAT WE CALL A REPOSITORY.  AND BY

3  THE WAY, THIS IS THE REDESIGN WE DID.  RIGHT?  WITH -- WHEN

4  WE -- SORRY.  WHEN WE -- WHEN I DID MY DUE DILIGENCE, WE FOUND

5  FLAWS, AND I PROPOSED A NEW DESIGN THAT WE IMPLEMENTED.  AND

6  ONE THAT WAS IS THE MOVEMENT -- THE MOVEMENT FROM THE SECURITY

7  WE HAD ON THE CLIENT TO MOVE ON THE SERVER SIDE.

8  Q.  RIGHT.  THIS IS MOVING THE SECURITY FROM THE DESKTOP UP --

9  UP TO THE SERVER.

10  DO YOU NEED SOME MORE WATER?

11  A.  YES.

12  THIS IS EXACTLY THAT.  IT IS ONE OF THE IDEA WAS TO MOVE

13  THE PROTECTION WE HAD FROM THE CLIENT TO THE SERVER.

14  NOW, YOU HAVE TO UNDERSTAND THE CONCEPT OF THE DESIGN.

15  WHEN YOU HAVE A SONG, WHAT WE ARE LOOKING FOR IS REALLY THAT

16  THE SONG START VERY FAST.

17  Q.  MR. FARRUGIA, LET ME ASK YOU A QUESTION BEFORE YOU GO ON.

18  THIS IS WHAT YOU JUST SAID, IS THAT YOU'RE MOVING FROM THE

19  DESKTOP TO THE SERVER; IS THAT RIGHT?

20  IF WE FLIP THE PAGE TO THE NEXT PAGE.

21  (EXHIBIT PUBLISHED TO JURY.)

22  BY MR. COUGHLIN:

23  Q.  THIS IS WHERE YOU'RE TALKING ABOUT WHAT YOU'RE DOING.

24  THERE'S NO TRANSFORMATION WHATSOEVER WITH YOUR REDESIGN --

25  A.  CORRECT.

1   Q.  -- AT THE DESKTOP, RIGHT?

2   A.  THIS IS CORRECT.

3   Q.  IS THIS THE DESIGN THAT YOU IMPLEMENTED WITH THE 6.0?

4   A.  THIS IS THE DESIGN WE IMPLEMENTED ON THE 6.0, CORRECT.

5   Q.  OKAY.  THANK YOU.

6   A.  BUT YOU ASKED ME A QUESTION THAT --

7                    (SIMULTANEOUS COLLOQUY.)

8   BY MR. COUGHLIN:

9   Q.  THANK YOU, MR. FARRUGIA.  YOUR COUNSEL WILL GET PLENTY OF

10  OPPORTUNITY TO ASK YOU SOME QUESTIONS.

11      IF WE COULD TAKE A LOOK AT THE NEXT EXHIBIT, 269.

12  A.  26 --

13  Q.  IT'S NOT IN THERE.  IT'S A ONE-PAGER.

14                  (EXHIBIT PUBLISHED TO JURY.).

15           THE WITNESS:  OKAY.

16  BY MR. COUGHLIN:

17  Q.  CAN YOU TAKE A LOOK AT THIS AND IDENTIFY IT?  I'LL HAND

18  YOU A HARD COPY.

19      (HANDING DOCUMENT.)

20  A.  OKAY.  THIS IS A -- A CONVERSATION I HAD WITH JEFF ROBBIN

21  BECAUSE THE TIME IS ACCURATE.  IT'S PART OF WHEN I WAS AT

22  APPLE.

23  Q.  SO THIS -- THIS -- YOU SEEMED TO RECOGNIZE THE LAST ONE,

24  BUT YOU'RE SURE THAT YOU HAD THIS CONVERSATION WITH JEFF

25  ROBBIN; IS THAT RIGHT?

1    **A.**   THIS ONE MAKE MORE SENSE FOR ME.

2    **Q.**   OKAY.  AND THIS IS DATED NOVEMBER 18, 2005; IS THAT

3    CORRECT?

4    **A.**   THIS IS CORRECT.

5    **Q.**   OKAY.  AND IN THIS -- IN THIS CONVERSATION, MR. ROBBIN

6    SAYS THAT THIS HAS NOTHING TO DO --

7           **MR. COUGHLIN:**  IF YOU'D BLOW THE THIRD POINT UP, THAT

8    POINT.

9    **Q.**   IT SAYS NOTHING TO DO WITH THE DATABASE BUT LOCK DOWN THE

10   KEYBAG; IS THAT CORRECT?

11   **A.**   THIS IS WHAT HE SAYS.

12   **Q.**   OKAY.  AND HE WANTS TO MAKE THAT A PRIORITY; IS THAT

13   RIGHT?

14   **A.**   THIS IS WHAT HE SAYS.

15   **Q.**   OKAY.  AND YOU MOVE THAT TO THE TOP PRIORITY; IS THAT

16   RIGHT?

17   **A.**   THIS IS CORRECT.

18   **Q.**   OKAY.  AND IF YOU -- IF YOU LOOK DOWN AT THE BOTTOM, YOU

19   SAY IT'S A VERY SIMPLE MECHANISM; IS THAT CORRECT?

20   **A.**   UM-HMM.

21   **Q.**   OKAY.  NOW, HAD YOU HAD ANY KNOWLEDGE THAT JEFF ROBBIN HAD

22   JUST HAD A CONVERSATION WITH STEVE JOBS THAT THINGS MUST

23   CHANGE AROUND HERE --

24   **A.**   NOT --

25   **Q.**   -- JUST TWO DAYS BEFORE?

1    A.   NOT AT THIS TIME.

2    Q.   OKAY.  YOU HAD NO INFORMATION ABOUT NAVIO.

3         IF WE TAKE A LOOK AT EXHIBIT 267.  IT'S NOT IN THERE.

4    IT'S JUST A ONE-PAGER.  IT'S AN ARTICLE.

5         YOU HAD NO KNOWLEDGE OF THIS CONVERSATION BETWEEN JEFF AND

6    STEVE, WE MAY NEED TO CHANGE THINGS AROUND HERE IN REGARDS TO

7    NAVIO.

8    A.   NOT AT THIS TIME.

9    Q.   OKAY.  DID YOU EVEN KNOW -- DID YOU LOOK UP -- DID YOU GO

10   AND LOOK UP NAVIO AT THAT TIME TO SEE WHAT WAS GOING ON?

11   A.   NOT AT THIS TIME WHEN I HAVE THE EXCHANGE WITH JEFF

12   ROBBIN.  MAYBE LATER.

13   Q.   NOT ON THE 18TH?

14   A.   I DON'T HAVE ANY RECOLLECTION ON THE 18TH.

15   Q.   OKAY.  YOU DID WITHIN DAYS, THOUGH, RIGHT?

16   A.   I DID?  SORRY?

17   Q.   YEAH.  COULD WE LOOK AT 271.

18                    (EXHIBIT PUBLISHED TO JURY.)

19             MR. COUGHLIN:  (HANDING DOCUMENT.)

20             THE WITNESS:  OKAY.  THE DAY AFTER -- THE DAY --

21   COUPLE OF DAYS AFTER, THE 22ND.

22   BY MR. COUGHLIN:

23   Q.   COUPLE OF DAYS AFTER.

24        SO YOU'RE SAYING JEFF NEVER TOLD YOU THAT IT WAS STEVE

25   JOBS THAT WANTED TO DO SOMETHING DIFFERENT BECAUSE NAVIO

1    LOCKED DOWN THE KEYBAG?

2    **A.**   THIS IS CORRECT.

3    **Q.**   BUT YOU, JUST ON YOUR OWN WITHOUT ANY DIRECTION, YOU JUST

4    WENT AND LOOKED UP WHAT WAS GOING ON WITH NAVIO; IS THAT

5    CORRECT?  AND YOU WERE GOING TO QUALIFY IT?

6    **A.**   YES, ABSOLUTELY.

7    **Q.**   RIGHT.  AND WHEN YOU SAY "QUALIFY IT," WHAT DO YOU MEAN BY

8    THAT?

9    **A.**   WELL, IT'S VERY INTERESTING.  THE WORD "QUALIFY" FOR ME,

10   IF WHEN YOU'RE DOING SECURITY AND YOU SEE THAT SOMEONE IS

11   TRYING TO REVERSE-ENGINEER YOUR SOLUTION, YOU -- YOU WANT TO

12   QUALIFY WHAT IT IS.

13       AT THE TIME, WE HAVE ALREADY DEPLOYED 6.0, WE KNOW THAT

14   THE DESIGN WAS MUCH BETTER.  WE HAVE A PLAN TO DEVELOP 7.0 AND

15   ALL THE DESIGN WE -- WE -- WE PROPOSE.  AND FOR ME IT'S A

16   CONCERN.  I WANT TO QUALIFY BUT TO SEE IF WHAT WE HAVE HERE IS

17   SOMETHING THAT BASICALLY I NEED TO REINFORCE MY DESIGN OR I DO

18   SOMETHING ELSE.  QUALIFY MEANS I WANT TO KNOW WHAT IT IS WE

19   ARE TALKING ABOUT.

20   **Q.**   AND THIS IS AT A TIME WHEN REALNETWORKS' HARMONY IS

21   OPERATING -- IS OPERATING ON ITUNES; YOU KNOW THAT, RIGHT?

22   **A.**   YES, CORRECT.

23   **Q.**   OKAY.  AND THEN NAVIO IS ANOTHER COMPETITOR COMING UP; IS

24   THAT CORRECT?

25   **A.**   I DON'T SEE THAT AS A COMPETITOR.  I SEE THAT AS A PEOPLE

 1   TRYING TO REVERSE-ENGINEER THE THINGS YOU HAVE DONE.

 2   **Q.**  AND YOU DIDN'T SEE REALNETWORKS AS A COMPETITOR EITHER,

 3   DID YOU?

 4   **A.**  NO.

 5            **THE COURT:**  WE'RE ABOUT -- SO WHENEVER YOU'RE AT A

 6   BREAK.

 7            **MR. COUGHLIN:**  WE CAN TAKE A BREAK RIGHT NOW.

 8            **THE COURT:**  SO IT'S TEN OF.  I THOUGHT I HEARD A

 9   SLIGHT LULL.  MAYBE IT WAS JUST A SECOND.  BUT WHY DON'T WE GO

10   AHEAD AND TAKE OUR FIRST MORNING BREAK.

11       LADIES AND GENTLEMEN, CONSTANT REMINDER:  DO NOT TALK

12   ABOUT ANYTHING WITH EACH OTHER, OTHER THAN WHAT YOU MAY BE

13   DOING FOR THE HOLIDAYS.  GO AHEAD, STRETCH INSIDE THE JURY

14   ROOM.  WE WILL SEE YOU IN 15 MINUTES.

15       (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

16   OF THE JURY:)

17            **THE COURT:**  OKAY.  NOW YOU MAY STEP DOWN.

18            **THE WITNESS:**  OKAY.  THANK YOU.

19            **THE COURT:**  THE RECORD WILL REFLECT THE JURY IS GONE.

20       SO JUST ONE NOTE FOR FOLKS IN THE GALLERY.  YESTERDAY --

21   HAVE A SEAT.  AND THEN I'LL LET YOU GO.  I WON'T TAKE TIME

22   AWAY FROM YOUR 15 MINUTES.

23       YESTERDAY WE FOUND A WHOLE BUNCH OF STARBUCKS PACKAGES IN

24   THE GALLERY.  NOW, I KNOW WE HAVE A LOT OF REPORTERS HERE,

25   MAYBE SOME PEOPLE WHO ARE NOT USED TO BEING IN COURTROOMS.

 1   FOOD IS NOT ALLOWED IN THE COURTROOM.

 2        NOW I'M NOT GOING TO INSTRUCT THE COURT SECURITY OFFICERS

 3   TO CHECK YOUR BAGS DEEPLY, SO THAT YOU CAN BRING SNACKS IN AND

 4   HAVE THEM WHILE YOU'RE -- WHEN YOU HAVE YOUR 15 MINUTES.  BUT

 5   NO ONE EATS IN THE COURTROOM.

 6        SO IF I FIND WRAPPERS AGAIN, THEN I WILL ASK THE COURT

 7   SECURITY OFFICERS TO CHECK MORE DEEPLY INTO YOUR BAGS AND NOT

 8   LET ANYTHING INTO THE COURTHOUSE.  EVERYBODY GETS A SNACK AT

 9   THE SAME TIME, BUT IT'S NOT IN THE COURTROOM.  OKAY?

10        SO JUST A REMINDER:  NO EATING IN THE COURTROOM.

11        TAKE YOUR 15-MINUTE BREAK.  WE'LL GO BACK ON THE RECORD AT

12   10:15.  IF I CAN SEE THE LAWYERS REAL QUICK AT THE SIDEBAR.

13             **MR. ISAACSON:**  YOUR HONOR, CAN I JUST MOVE TWO

14   EXHIBITS ON THE RECORD.

15             **THE COURT:**  SURE.

16             **MR. ISAACSON:**  I SHOWED DR. MARTIN -- I SHOWED

17   DR. MARTIN TWO REALPLAYER PAGES.

18             **MR. COUGHLIN:**  NO OBJECTION.

19             **MR. ISAACSON:**  SO IT'S TX2446.  THE OTHER IS A

20   SCREENSHOT THAT'S ON PAGE 11.  IT WAS A REPORT.  WE'LL GIVE IT

21   A NUMBER.

22             **THE COURT:**  SO WHAT IS THE NUMBER ITSELF OF THAT

23   PARTICULAR EXHIBIT?

24             **MR. ISAACSON:**  THERE'S 2446.

25             **THE COURT:**  AND THEN THE SECOND ONE, WE'LL JUST GIVE

 1    IT THE NUMBER PLUS AN "A" DESIGNATION.

 2            MR. ISAACSON:  LET'S CALL IT 2446A.

 3            THE COURT:  I THOUGHT YOU SAID TWO EXHIBITS.

 4            MR. ISAACSON:  YES.  SO 2446.

 5            THE COURT:  THE WHOLE THING?

 6            MR. ISAACSON:  YES, IT'S ONE.  YES.  2446.  AND A

 7    SECOND EXHIBIT WHICH WOULD BE 2446A.

 8            THE COURT:  BUT IF 2446 IS ALREADY IN, WHY WOULD IT

 9    BE A SEPARATE EXHIBIT?

10            MR. ISAACSON:  I'M JUST GIVING IT A NEW NUMBER --

11    IT'S TWO DIFFERENT DOCUMENTS.

12            THE COURT:  MR. ISAACSON, WHAT IS THE -- OKAY, NO

13    TALKING YET.  WE'RE STILL ON THE RECORD.

14            MR. ISAACSON:  THE SECOND DOCUMENT DOES NOT HAVE A

15    NUMBER CURRENTLY.  IT WAS A -- IT WAS A SCREENSHOT ON A PAGE

16    OF HIS REPORT.  SO WE NEED TO GIVE IT A NEW NUMBER.

17            THE COURT:  I SEE.

18            MR. ISAACSON:  I WAS JUST SUGGESTING FOR CONVENIENCE

19    2446A.

20            THE COURT:  I SEE.

21         ANY OBJECTION?

22            MR. COUGHLIN:  I HAVE NO OBJECTION.

23            THE COURT:  OKAY.  SO ON THAT PARTICULAR PAGE,

24    THERE'S ALSO TEXT.

25            MR. COUGHLIN:  THAT COMES OFF.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1              **THE COURT:**  THAT TEXT NEEDS TO BE TAKEN OUT.

2              **MR. ISAACSON:**  CORRECT.

3              **THE COURT:**  OKAY.  ALL RIGHT.  THOSE ARE BOTH

4     ADMITTED.

5              (DEFENDANT'S EXHIBITS 2446 AND 2446A WERE RECEIVED IN

6     EVIDENCE.)

7              **THE COURT:**  ALL RIGHT.  NOW TAKE YOUR BREAK.

8                   (RECESS TAKEN AT 10:04 A.M.)

9

10                (CONTINUED NEXT PAGE; NOTHING OMITTED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FARRUGIA – DIRECT / COUGHLIN

```
1              (PROCEEDINGS RESUMED AT 10:15 A.M.)

2         THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

3   COME TO ORDER.

4      (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

5         THE COURT:  OKAY.  THE RECORD WILL REFLECT THAT THE

6   JURY IS BACK.

7      EVERYONE MAY BE SEATED.

8      WE ARE BACK ON THE RECORD.  LADIES AND GENTLEMEN, ANY

9   QUESTIONS?

10     NO?  ALL RIGHT.  THEN YOU MAY PROCEED.

11        MR. COUGHLIN:  THANK YOU.

12  BY MR. COUGHLIN:

13  Q.  MR. FARRUGIA, CAN YOU TAKE A LOOK AT THE NEXT

14  EXHIBIT 2776.

15              (EXHIBIT DISPLAYED TO JURY.)

16  A.  2776.

17  Q.  THAT'S A FOUR-PAGE DOCUMENT.  THE TOP DATE IS

18  NOVEMBER 27TH, 2005.  AND THEN THERE'S DATES DOWN BELOW,

19  NOVEMBER 24TH, 2005, WHERE YOU APPEAR TO BE WRITING.

20     DO YOU SEE THAT DOCUMENT?

21  A.  YES.

22  Q.  DID YOU WRITE THE EMAILS THAT ARE IN THIS DOCUMENT?

23  A.  YES, I DID.

24  Q.  DO YOU RECOGNIZE THIS DOCUMENT?

25  A.  YES, I DO.
```

FARRUGIA – DIRECT / COUGHLIN

1   **Q.**  IT WAS PART OF YOUR -- YOUR JOB AT APPLE TO WRITE

2   DOCUMENTS LIKE THIS DEALING WITH SECURITY MATTERS; IS THAT

3   RIGHT?

4   **A.**  ABSOLUTELY CORRECT.

5   **Q.**  IF WE CAN FLIP TO THE SECOND PAGE.

6       IT SAYS AT THE BOTTOM, YOU ARE IDENTIFYING SOME FLAWS AND

7   YOU ARE GOING TO GIVE A DESCRIPTION.

8       IS THAT CORRECT?

9   **A.**  THE LAST PARAGRAPH?

10  **Q.**  OF THE FIRST PAGE.

11      FIRST PAGE.

12  **A.**  SORRY.  OKAY.

13  **Q.**  SOME CONSIDERATION ABOUT THE KIND OF PROTECTION WE SHOULD

14  BE ABLE TO IMPLEMENT.  IS THAT CORRECT?

15  **A.**  THIS IS THE PROPOSAL AND THE ALTERNATIVES, YES.

16  **Q.**  THIS IS THE PROPOSAL IN RESPONSES TO LOCKING DOWN THE

17  KEYBAG THAT YOU HAD THE DISCUSSION -- THE INSTANT MESSAGE

18  DISCUSSION WITH JEFF ROBBIN, CORRECT?

19  **A.**  THIS IS INCORRECT.

20      THIS IS PART OF THE -- THE NEXT STEP ON THE DESIGN WE HAVE

21  ALREADY DISCUSS AND WE HAVE ALREADY STARTED.  WHEN YOU DO

22  SECURITY, YOU DO A PROCESS WHICH MEANS --

23  **Q.**  MR. FARRUGIA, LET ME JUST ASK YOU A QUESTION.

24      YOU ARE SAYING THIS HAD NOTHING TO DO WITH THE LOCKDOWN

25  THE KEYBAG DISCUSSION, INSTANT MESSAGE DISCUSSION YOU HAD WITH

FARRUGIA – DIRECT / COUGHLIN

```
 1    JEFF ROBBIN?

 2  A.  ABSOLUTELY CORRECT.

 3  Q.  OKAY.  LET'S TURN TO THE SECOND PAGE.

 4      LET'S START AT THE TOP, THE FIRST PARAGRAPH.  IT SAYS:

 5          "THE CURRENT SECURITY HAS SEVERAL FLAWS AND ONE OF

 6          THEM ALLOWS THE INJECTION INTO THE IPOD'S KEYBAG

 7          WITHOUT THE CONTROL OF THE IPOD ACCOUNT KEY MANAGER."

 8      OKAY?  YOU WROTE THAT; THAT'S RIGHT?

 9  A.  THAT'S CORRECT.

10  Q.  SO YOU ARE DEALING WITH THE IPOD KEYBAG; IS THAT CORRECT?

11  A.  THIS IS CORRECT.

12  Q.  AND THIS HAS TO DO WITH THE KEYBAG INTEGRITY, AS YOU CALL

13      IT, OR AS WE CALL IT, KEYBAG VERIFICATION, THE INJECTION OF

14      MATERIAL INTO THE KEYBAG, RIGHT?

15  A.  THIS IS INCORRECT.  THAT IS --

16  Q.  JUST ANSWER THE QUESTION.

17  A.  IT IS INCORRECT.

18  Q.  OKAY.

19      SO THAT IT SAYS, "THE INJECTION IS THEN USED TO ADD DRM

20      SONGS IN THE LIBRARY."

21      AND DRM SONGS ARE OTHER SONGS WITH DRM ON THEM THAT ARE

22      BEING INJECTED; IS THAT CORRECT?

23  A.  THIS IS CORRECT.

24  Q.  OKAY.  AND THAT'S BY SONGS -- YOU ARE SAYING THOSE ARE

25      SONGS FROM A THIRD PARTY; IS THAT CORRECT?
```

FARRUGIA – DIRECT / COUGHLIN

1    **A.**   THIS IS A SONG FROM A THIRD PARTY, YES.   CORRECT.

2    **Q.**   AND IT HAS DRM -- YOU SAY -- YOU CHARACTERIZE THEM AS DRM

3    SONGS; IS THAT CORRECT?

4    **A.**   THIS IS CORRECT.

5    **Q.**   YOU CALL IT THE MAN IN THE MIDDLE ATTACK; IS THAT CORRECT?

6    **A.**   THIS IS CORRECT.

7    **Q.**   AND YOU SAY "THE KEY MATERIAL IS THEN INJECTED IN THE

8    IPOD'S KEYBAG AND CAN NO LONGER BE IDENTIFIED OR REMOVED."

9       IS THAT CORRECT?

10   **A.**   IS CORRECT.

11   **Q.**   BECAUSE IT APPEARS TO THE IPOD AS GENUINE, RIGHT?

12   **A.**   NO.   THE APPEARANCE TO THE IPOD AS A CORRECT KEYS.

13   **Q.**   RIGHT.   AND IT CAN NO LONGER BE IDENTIFIED OR REMOVED,

14   RIGHT?

15   **A.**   IT CANNOT -- CORRECT.

16   **Q.**   BECAUSE IT'S NOT CORRUPT.

17   **A.**   IT'S NOT CORRUPT, YEAH, ABSOLUTELY.   IF IT WORKS --

18   **Q.**   MR. FARRUGIA --

19   **A.**   OKAY.

20   **Q.**   THEN YOU IDENTIFY SEVERAL CRYPTOGRAPHIC TECHNIQUES THAT

21   CAN STOP THE INJECTIONS BUT CANNOT ELIMINATE THE DRM

22   MATERIAL -- KEY MATERIAL OF THE CONTAMINATED KEYBAG.

23       IS THAT CORRECT?

24   **A.**   IS CORRECT.

25   **Q.**   THEN YOU WOULD ON TO DESCRIBE THE PROCESS; IS THAT

1    CORRECT?

2    **A.**   AND I DESCRIBE SOME OF THE PROCESS, CORRECT.

3    **Q.**   OKAY.

4         THE FIRST SOLUTION HERE, YOU SAY, "IT ADDS A SIGNATURE TO

5    AN ITEM NOT BEING PART OF THE DRM KEY MATERIAL".

6         EXPLAIN TO US WHAT THE FIRST SOLUTION WAS.

7    **A.**   EXCUSE ME?  WOULD YOU REPEAT THE QUESTION?

8    **Q.**   WHAT IS THE FIRST SOLUTION THAT YOU POINT OUT HERE?

9    **A.**   CRYPTOGRAPHY AND THIS IS ONE OF THE SOLUTION IS IF YOU TRY

10   TO SEND A MESSAGE AND IF YOU TRY TO MAKE SURE THAT WHAT YOU

11   READ WAS WHAT YOU THINK YOU ARE GOING TO ACCESS, WHAT WE DO IS

12   WE DO AN INTEGRITY VERIFICATION.

13           **THE COURT:**  YOU DO A WHAT?

14           **THE WITNESS:**  WE DO AN INTEGRITY VERIFICATION.

15           **MR. COUGHLIN:**  INTEGRITY.

16           **THE WITNESS:**  INTEGRITY.  SORRY FOR THE ACCENT.

17           **THE COURT:**  THAT'S OKAY.

18           **THE WITNESS:**  IT'S CALLED INTEGRITY VERIFICATION.

19   IT'S STANDARD PROCESS WE DO IN CRYPTOGRAPHY.  THAT PROVE THAT

20   WHAT WE ARE GOING TO INJECT IN THE CLOAK BOUNDARY IS

21   AUTHENTIC.  WHAT WE ARE GOING TO GET INSIDE THE CLOCK BOUNDARY

22   HAS NOT BEEN TAMPERED.

23        AND THE PROBLEM WITH THAT IS, IF YOU ALLOW THINGS TO GO IN

24   THE CLOAK BOUNDARY THAT WAS TAMPERED, YOU CREATE INDIRECT

25   ATTACK FOR THE HACKERS TO UNDERSTAND YOUR SYSTEM.

1        THIS IS WHY WE DO INTEGRITY VERIFICATION.  STANDARD

2    PROCESS WE DO IN CRYPTOGRAPHY TO PROTECT THE INFORMATION.

3    THAT WAS ONE OF THE SOLUTION I PROPOSE.

4    **BY MR. COUGHLIN:**

5    **Q.**  OKAY.  AND THE SECOND SOLUTION?  WHAT IS THE SECOND

6    SOLUTION THAT YOU PROPOSED?

7    **A.**  IN THE SECOND SOLUTION WE PROPOSE WAS AT THE TIME, WE HAVE

8    TESTED THE NEW KEYBAG ON THE DESKTOP WITH ITUNES 60, AND WE

9    WANTED TO USE THE SAME DESIGN WE DID ON ITUNES INSIDE THE

10   IPOD.

11       IT TURN OUT THAT BASICALLY WE DID BOTH OF THEM.  BECAUSE

12   BASICALLY IN SECURITY YOU LIKE TO HAVE THE SUSPENDER AND A

13   BELT.

14   **Q.**  OKAY.  IF WE GO OVER TO THE THIRD PAGE OF THAT DOCUMENT --

15   **A.**  SORRY.  WE NEED TO HAVE THE SUSPENDER AND THE BELT.

16   **Q.**  IF WE GO OVER TO THE THIRD PAGE OF THAT DOCUMENT, IF YOU

17   GO DOWN TO THE SECOND PARAGRAPH, RIGHT HERE (INDICATING), YOU

18   TALK ABOUT THE REMOVAL OF THE INJECTED DRM KEY MATERIAL IS

19   CRUCIAL BECAUSE THE ATTACKERS USE THE INJECTION TO FORGE

20   GENUINE FALSE CONTENTS.  IN OTHER WORDS, IT APPEARS TO THE

21   IPOD AS GENUINE, CORRECT?

22   **A.**  IT'S FORGED GENUINE FALSE CONTENT.  THIS MEANS THAT PEOPLE

23   ARE ABLE TO TREAT THE SYSTEM AND TO PUT SOMETHING IN THE CLOAK

24   BOUNDARY THAT IS GOING TO CREATE INDIRECT ATTACK FOR THE

25   HACKER.  THIS IS WHAT I MEANT.  YOU DON'T UNDERSTAND THE

FARRUGIA – DIRECT / COUGHLIN

1    SENTENCE OF THAT.

2        IS WE TRY TO PROTECT THE INFORMATION FROM THE OUTSIDE, THE

3    CLOAK BOUNDARY.  WHEN YOU MOVE INSIDE, WE DON'T WANT THE

4    HACKERS TO CREATE FAULTS INSIDE THE SYSTEM TO, FOR EXAMPLE,

5    CRASH THE SYSTEM OR TO FIND INFORMATION.

6    **Q.**  BUT HERE THEY ARE CREATING GENUINE MATERIAL, GENUINE DRMED

7    SONGS.  THAT'S WHAT YOU SAY IN THIS DOCUMENT.

8    **A.**  IF YOU -- IF YOU -- YOU HAVE A VISION WHICH IS NOT

9    CORRECT.

10       I'M NOT TRYING TO DO THAT.  I'M TRYING TO PROTECT THE

11   SYSTEM AGAINST INDIRECT ATTACK.  BY DOING THE INTEGRITY

12   VERIFICATION, ALL OF THE PIECE OF INFORMATION I HAVE FROM THE

13   OUTSIDE THAT I BRING INSIDE THE CLOAK BOUNDARY, I KNOW THEY

14   ARE CORRECT.  I KNOW THAT NO ONE HAS TAMPERED.

15       IF YOU TAMPER THE INFORMATION THAT YOU HAVE FROM THE

16   OUTSIDE AND I PUT THAT INSIDE THE INSIDE, I AM GIVING

17   INFORMATION TO THE HACKER.

18       AND BY THE WAY, AT THE END, THE HACKER, BASICALLY, THEY

19   COLLECT INFORMATION IF THEY HACK THE SYSTEM.  THIS IS WHY WE

20   HAVE A CLOAK BOUNDARY.  THE CLOAK BOUNDARY FOR US IS -- SORRY

21   I SPEAK TOO FAST.  THE CLOAK BOUNDARY FOR US IS A VERY CLOSED

22   SYSTEM WHERE NOTHING GETS OUT AND NOTHING GETS IN.

23   **Q.**  MR. FARRUGIA, LET ME ASK YOU A QUESTION.

24       SO THIS GENUINE FAULTS DRM SONG, AND IT PLAYS, BUT YOU ARE

25   TRYING TO STOP THAT SONG FROM PLAYING; IS THAT CORRECT?

1    **A.**  NO, I AM NOT TRYING TO STOP THE SONG TO PLAY.

2        WHAT I AM TRYING IS TO MAKE SURE THAT PEOPLE FROM THE

3    OUTSIDE THEY ARE NOT ALLOWED TO PUT THINGS ON MY WORLD TO BE

4    ABLE TO GET INFORMATION TO CRACK MY SYSTEM.

5    **Q.**  YOU DON'T OWN THEIR IPODS, DO YOU?

6    **A.**  WHAT DO YOU MEAN?  SORRY.

7    **Q.**  YOUR WORLD -- I MEAN, SOMEBODY BUYS AN IPOD.

8    **A.**  UH-HUH.

9    **Q.**  THEY WANT TO BUY A SONG FROM REALNETWORKS AND PLAY IT ON

10   THEIR IPOD.

11   **A.**  UH-HUH.

12   **Q.**  THAT'S NOT -- IT'S NOT A LICENSE AGREEMENT.  THEY BUY THE

13   IPOD, RIGHT?

14   **A.**  YES.

15   **Q.**  IT'S THEIR IPOD.

16   **A.**  YEAH, BUT IF THEY USE ITUNES, THEY CAN PUT THE SONG ON THE

17   IPOD.

18   **Q.**  WHAT IF THEY WANT TO USE REALNETWORKS, REAL PLAYER?  THEY

19   CAN DO THAT, RIGHT?  THAT'S THEIR CHOICE.

20   **A.**  NO.  IT'S A FLAW IN THE SYSTEM.  THE SYSTEM HAS A FLAW

21   THAT ALLOW PEOPLE TO PUT THINGS ON THE DRM TO BE ABLE TO HAVE

22   INDIRECT ATTACK.  AND THIS IS WHY THE FLAW HAS TO BE FIXED.

23       FOR EXAMPLE --

24   **Q.**  MR. FARRUGIA, YOU ANSWERED THE QUESTION.

25       THAT'S YOUR VIEW, RIGHT?

FARRUGIA – DIRECT / COUGHLIN

1   **A.** IT'S AS SECURITY VIEW. YOU HAVE A FLAW IN THE SYSTEM YOU

2   NEED TO FIX IT. IF YOU HAVE A CAR AND THE CAR IS RECALLED,

3   YOU BRING THE CAR TO THE GARAGE.

4   **Q.** DO YOU GET TO CHOOSE THE GARAGE YOU BRING THE CAR TO OR DO

5   YOU ALWAYS HAVE TO GO BACK TO THE FACTORY THAT YOU GOT THE CAR

6   FROM?

7   **A.** IF YOU HAVE A CAR AND YOU HAVE A RECALL FOR SECURITY, YOU

8   BRING THE CAR TO THE DEALER TO REPAIR IT.

9   **Q.** YOU ONLY BRING IT TO THE DEALER; IS THAT RIGHT? IS THAT

10  YOUR VIEW? ALWAYS TAKE THE CAR BACK TO THE DEALERS?

11  **A.** IF YOU HAVE A FLAW IN THE SECURITY SYSTEM, YOU NEED TO FIX

12  IT.

13      I HAD A FLAW IN THE SYSTEM THAT I DISCOVERED DURING MY DUE

14  DILIGENCE. THAT WAS A MAJOR FLAW BECAUSE THE MAN IN THE

15  MIDDLE. AND IF USED PROPERLY, WHAT YOU MENTIONED, YOU NEED TO

16  MAKE SURE THAT YOUR IMPLEMENTATION DOESN'T HAVE THE MEN IN THE

17  MIDDLE ATTACK.

18  **Q.** OKAY, MR. FARRUGIA.

19      SO IT'S YOUR VIEW THAT SOMEBODY DOESN'T HAVE A CHOICE OR

20  RIGHT TO BUY THEIR SONG FROM REALNETWORKS, USE HARMONY, AND

21  PUT IT ON THEIR IPOD.

22  **A.** THIS IS --

23          **MS. DUNN:** OBJECTION, YOUR HONOR.

24  **BY MR. COUGHLIN:**

25  **Q.** THAT YOU ARE GOING TO STOP THAT.

494
FARRUGIA – DIRECT / COUGHLIN

1            **THE COURT:**  WHAT'S THE OBJECTION?

2            **THE WITNESS:**  THIS IS NOT WHAT I MEANT.

3            **THE COURT:**  WHEN THERE'S AN OBJECTION, YOU NEED TO

4    STOP UNTIL I --

5            **THE WITNESS:**  SORRY.

6            **THE COURT:**  -- RESPOND.

7            **MS. DUNN:**  YOUR HONOR, COUNSEL IS ASKING --

8            **THE COURT:**  WHAT IS THE LEGAL OBJECTION, MS. DUNN?

9            **MS. DUNN:**  CALLING FOR IMPROPER OPINION TESTIMONY.

10            **THE COURT:**  OVERRULED.

11   BY MR. COUGHLIN:

12   **Q.**  SO, SOMEBODY BUYS A SONG FROM REALNETWORKS, MAYBE IT'S 49

13   CENTS, IT HAS A HIGHER BIT RATE SO IT HAS A HIGHER QUALITY

14   SOUND, YOU ARE SAYING YOU ARE GOING TO STOP THEIR RIGHT TO PUT

15   THAT ON THE IPOD; IS THAT RIGHT?

16   **A.**  THIS IS NOT WHAT I SAID.  LISTEN CAREFULLY TO WHAT I AM

17   GOING TO SAY.

18   **Q.**  WAIT A SECOND, MR. FARRUGIA.

19       YOU SAY NO, THAT'S NOT WHAT YOU SAID; IS THAT RIGHT?

20   **A.**  THIS IS NO -- YOUR ASSUMPTION IS INCORRECT.

21   **Q.**  YOU ARE STOPPING ALL INJECTION, THOUGH.  THAT'S WHAT YOU

22   MEANT HERE.  THAT'S WHAT YOU ARE TRYING TO DO WITH THIS

23   SUGGESTION, STOP ANY INJECTION OF ANOTHER SONG THAT'S NOT FROM

24   ITUNES ONTO THE IPOD, RIGHT?

25   **A.**  I'M FIXING THE VULNERABILITY -- I AM FIXING THE

FARRUGIA – DIRECT / COUGHLIN

```
 1   VULNERABILITY I HAVE ON MY SYSTEM.  THE SYSTEM WAS DEVELOPED
 2   INCORRECTLY.  I FIND THAT THERE IS A VULNERABILITY IN THE
 3   SYSTEM THAT INCREASE THE RISK FOR THE SECURITY OF THE SYSTEM.
 4   Q.  OF INJECTION.
 5       OF INJECTION, RIGHT?
 6   A.  IT'S -- IT'S THE MAN IN THE MIDDLE ATTACK.  IT'S THE MAN
 7   IN THE MIDDLE ATTACK.  THE MAN IN THE MIDDLE ATTACK AT THE END
 8   YOU ARE ABLE TO PRETEND WHO YOU ARE NOT.
 9   Q.  SO YOU -- SO YOU LOCK DOWN THE KEYBAG; THAT'S WHAT THESE
10   TWO SUGGESTIONS DO, RIGHT?
11   A.  NO.  WE DO NOT LOCK THE KEYBAG.
12       WHAT WE DID IS, ON THE IPOD, WE TRANSFER THE SAME DESIGN
13   WE DID ON THE DESKTOP, WHICH MEANS THAT BASICALLY FIXING THE
14   MAN IN THE MIDDLE ATTACK WE HAD BY A BETTER DESIGN, AND WE
15   TAKE THE CONCEPT WE DID ON THE DESKTOP WE FASHIONED 60 TO MOVE
16   THAT ON THE IPOD.
17   Q.  YOU PREVENT INJECTION ONTO THE IPOD; THAT'S WHAT THIS
18   DOES, RIGHT?
19   A.  WE FIX THE FLAW.  THE CONSEQUENCE WAS TO AVOID INJECTION.
20   THE INJECTION WILL BE DETECTED.
21       WE DON'T AVOID THE INJECTION.  WE GOING TO DETECT THE
22   INJECTION.
23   Q.  RIGHT.  AND THEN YOU DELETE THE KEYBAG.
24       WHEN YOU DETECT THE INJECTION, YOU DELETE THE KEYBAG,
25   RIGHT?
```

FARRUGIA – DIRECT / COUGHLIN

1    **A.**  WE DON'T DELETE THE KEYBAG.  WHAT WE DO, BASICALLY, IF YOU

2    HAVE INJECTED A SONG AND THE KEYBAG WAS INCORRECT, YOUR

3    LIBRARY DOES NOT EXIST.

4       IF YOU GO BACK TO ITUNE, AND YOU RECONNECT YOUR IPOD TO

5    ITUNES YOUR LIBRARY BY MAGIC COME BACK.  YOUR LIBRARY -- IF

6    YOU CONNECT YOUR IPOD TO ITUNES, AUTOMATICALLY YOUR MUSIC

7    COMES BACK.

8    **Q.**  JOHN KELLY, APPLE'S EXPERT, SAYS IT DELETES THE KEYBAG.

9    IS THAT NOT CORRECT?  IS HE WRONG?

10   **A.**  IT DELETED THE KEYBAG FOR SECURITY REASON.  BASICALLY THE

11   MUSIC IS NOT GONE.

12   **Q.**  STOP, MR. FARRUGIA.

13      DOES IT DELETE THE KEYBAG OR NOT?

14   **A.**  IT DOES DELETE THE KEYBAG FOR SECURITY --

15   **Q.**  THAT'S ALL --

16   **A.**  OKAY.

17   **Q.**  IF I ASK YOU TO TAKE A LOOK AT THIS NEXT EXHIBIT,

18   EXHIBIT 2.

19                (EXHIBIT DISPLAYED TO JURY.)

20      MR. FARRUGIA, CAN YOU TELL ME WHAT EXHIBIT 2 IS?

21   **A.**  CAN I SEE WHAT IT IS?

22   **Q.**  YES.  I WILL GET IT FOR YOU.

23   **A.**  THANK YOU.

24   **Q.**  MR. FARRUGIA, TAKE A SECOND AND TAKE A LOOK AT THIS

25   DOCUMENT SO WE BOTH KNOW WHAT WE ARE TALKING ABOUT HERE.

197
FARRUGIA – DIRECT / COUGHLIN

1   **A.**   THIS IS A DOCUMENT THAT EXPLAIN THE VISION WE SHOULD HAVE

2   FOR A CORRECT DRM, A VISION FOR A CORRECT SECURITY DRM.

3   **Q.**   THIS IS A DOCUMENT THAT YOU STARTED WORKING ON AS SOON AS

4   YOU GOT TO APPLE; IS THAT CORRECT?

5   **A.**   THIS IS CORRECT.  YES.

6   **Q.**   AND THEN YOU WOULD PERIODICALLY, AND THIS DOCUMENT HAS THE

7   VARIOUS DATES IN IT, YOU WOULD PERIODICALLY UPDATE IT WITH THE

8   LATEST UPDATE; IS THAT RIGHT?

9   **A.**   THIS IS CORRECT.  YES.

10  **Q.**   OKAY.  AND YOU DID THAT IN CONNECTION WITH THIS -- THE

11  THING WE JUST TALKED ABOUT, LOCKING DOWN THE KEYBAG TO STOP

12  INJECTION, YOU PUT THAT INTO THIS DOCUMENT; IS THAT CORRECT?

13  **A.**   THIS IS INCORRECT.

14  **Q.**   YOU DIDN'T TALK ABOUT IT IN THIS DOCUMENT?

15  **A.**   I WAS TALKING IN THIS DOCUMENT HOW TO FIX THE FLAWS AND

16  THE SECURITY VULNERABILITY I FOUND WHEN I DID MY DUE

17  DILIGENCE.

18  **Q.**   AND YOU VIEWED THIS INJECTION AS ONE OF THE FLAWS IN THE

19  SECURITY; IS THAT RIGHT?

20  **A.**   ABSOLUTELY.  YES.

21  **Q.**   AND YOU CREATED THIS DOCUMENT, CORRECT?

22  **A.**   I CREATED THIS DOCUMENT, YES.

23  **Q.**   WHILE YOU WERE WORKING AT APPLE, RIGHT?

24  **A.**   YES.  CORRECT.

25  **Q.**   LET'S TAKE A LOOK AT PAGE 33, IF WE MIGHT.

FARRUGIA – DIRECT / COUGHLIN

1    IT APPEARS HERE THAT YOU ARE TALKING ABOUT WHAT WE WERE

2    JUST TALKING ABOUT IMPROVING THE SECURITY BY STOPPING THE

3    INJECTION INTO THE IPOD'S KEYBAG; IS THAT CORRECT?

4    **A.**  IF YOU READ CORRECTLY THE SENTENCE IS, "INJECTION USED THE

5    MAN IN THE MIDDLE ATTACK.  I WAS FIXING THE MAN IN THE MIDDLE

6    ATTACK.

7    **Q.**  I GET IT.

8    WHAT YOU ARE DOING IS, THE INJECTION IS USED TO ADD DRM

9    SONGS TO THE LIBRARY.  THOSE ARE LEGALLY PROTECTED SONGS;

10   THAT'S CORRECT?

11   THE SENTENCE ABOVE THE MAN IN THE MIDDLE.

12   YOU WROTE THAT "INJECTION IS THEN USED TO ADD DRM SONGS IN

13   THE LIBRARY."  CORRECT?

14   **A.**  CORRECT.

15   **Q.**  THAT'S LEGALLY PURCHASED SONGS FROM ANOTHER SOURCE, A

16   THIRD PARTY, THAT'S WHAT YOU WERE DEALING WITH HERE, RIGHT?

17   **A.**  NO.  THIS IS INCORRECT.  I WAS NOT DEALING WITH THAT.

18   I WAS DEALING WITH A VULNERABILITY THAT HELP PEOPLE TO DO

19   INDIRECT ATTACK IN THE SECURITY SYSTEM.

20   **Q.**  BUT YOU KNEW YOU WERE DEALING WITH DRM SONGS IN THE

21   KEYBAG -- ONLY DRM SONGS GO INTO THE KEYBAG, RIGHT?

22   ARE PROTECTED BY THE KEYBAG; IS THAT CORRECT?

23   **A.**  IT'S ANY INDIRECT ATTACK.  ONE OF THEM IT WAS THAT.  ALL

24   INDIRECT ATTACKS, ONE OF THEM WAS THE INJECTION, AND ALL

25   INDIRECT ATTACK SHOULD BE REMOVED BECAUSE IT CREATE A

1    VULNERABILITY ON THE SYSTEM.

2    **Q.**  BUT WE ARE TALKING ABOUT HERE IS THE KEYBAG VERIFICATION.

3    OKAY?  AND THAT HAS TO DO ONLY WITH DRM SONGS, SONGS THAT ARE

4    PROTECTED BY DIGITAL RIGHTS MANAGEMENT; IS THAT CORRECT?

5    **A.**  THIS IS INCORRECT.  I'M EXPLAINING HERE ABOUT ONE

6    VULNERABILITY I HAVE ON THE SYSTEM WAS THAT THE PROBABILITY

7    FOR PEOPLE TO PUT SOMETHING INSIDE THE KEYBAG THAT WE CANNOT

8    DETECT.

9    **Q.**  OKAY.

10   **A.**  THIS IS WHY WE DO -- WE FIX THE MAN IN THE MIDDLE ATTACK.

11   **Q.**  LET'S TAKE A LOOK AT THE SECOND PARAGRAPH.

12       YOU IDENTIFY SEVERAL CRYPTOGRAPHIC TECHNIQUES THAT CAN

13   STOP THE INJECTIONS BUT CANNOT ELIMINATE THE INJECTED DRM KEY

14   MATERIAL OF THE CONTAMINATED KEYBAG.

15       YOU KEEP REFERRING TO DRM.  SO THAT'S ALL YOU WERE DEALING

16   WITH HERE, RIGHT?

17   **A.**  NO.  THIS IS INCORRECT.

18   **Q.**  WHY DON'T YOU SAY DRM AND NONDRM?  BECAUSE WHEN YOU DO THE

19   DATABASE, YOU ARE VERY SPECIFIC.  WHEN YOU DO THE DATABASE

20   BLOWUP, YOU TALK ABOUT DRM SONGS AND NONDRM SONGS.  BUT HERE,

21   WE HAVE ONLY SEEN YOU TALKING ABOUT DRM SONGS.

22       DID YOU NOT MEAN WHAT YOU SAID HERE?

23   **A.**  BUT DRM SONGS IS OF NO USE BECAUSE WE ARE SPEAKING ABOUT

24   KEYS.

25   **Q.**  THAT'S RIGHT.

1    **A.**   BUT THE POINT IS THE INJECTION IS ON THE KEYBAG.

2    **Q.**   THAT'S RIGHT.

3    **A.**   WE HAVE A MAN IN THE MIDDLE ATTACK IN THE SYSTEM THAT NEED

4    TO BE RESOLVED AT THE LEVEL OF THE KEY STORAGE.

5    **Q.**   IN THE NEXT SENTENCE YOU SAY:

6             "THE ERADICATION OF INJECTION CAN ONLY BE DONE WITH

7             CONSTRAINT FOR THE USER EXPERIENCE AND IT IS NOT A

8             DESCRIPTION AVAILABLE IN THIS PART OF THE DOCUMENT."

9         IS THAT CORRECT?

10   **A.**   WHAT I SAID HERE IS CORRECT.  THE FACT THAT WE HAVE THIS

11   FLAW, RIGHT, ON THE PAST, THE PAST PEOPLE THEY WERE USING THIS

12   FLAW TO DO SOMETHING ON THE SYSTEM.  THEY WERE USING THE MAN

13   IN THE MIDDLE ATTACK TO PUT SOMETHING IN THE SYSTEM.  BUT

14   EVERYBODY CAN USE EXACTLY THE SAME THING TO INJECT FAULTS

15   INSIDE THE SYSTEM TO CREATE INDIRECT ATTACK, WHICH MEANS THAT

16   WE CANNOT ERADICATE THAT BECAUSE IT'S THE PAST --

17   **Q.**   IT APPEARS --

18   **A.**   WE NEED TO FIX THAT BECAUSE BASICALLY IF I DON'T FIX THAT,

19   I AM GOING TO HAVE A HACKERS DOING INDIRECT ATTACK ON MY

20   SYSTEM.

21   **Q.**   BUT PEOPLE ARE PUTTING DRM SONGS THAT THEY PURCHASED FROM

22   SOMEWHERE ELSE, THEY ARE PUTTING IT ON THEIR IPOD.  AND THAT'S

23   WHAT YOU STOPPED HERE, RIGHT?

24   **A.**   NO.  THIS IS A CONCLUSION OF THE HACK AND THE

25   VULNERABILITY WE HAD.  WE HAVE EXACTLY THE SAME --

FARRUGIA – DIRECT / COUGHLIN

1    **Q.**  MR. FARRUGIA, LET ME ASK A QUESTION BEFORE YOU TALK.

2         LET'S FLIP TO THE NEXT PAGE, PAGE 34.

3    **A.**  OKAY.

4    **Q.**  HERE YOU SAY:

5              "STOPPING THE INJECTION WILL IMPLY UPGRADE TO THE

6              PROCESSES EITHER FOR ITUNES OR IPODS THAT

7              CONSEQUENTLY DOWNGRADE THE USER EXPERIENCE."

8         SO BY DELETING THE KEYBAG, YOU UNDERSTOOD YOU WERE

9    DOWNGRADING THE USER EXPERIENCE, RIGHT?

10   **A.**  NOT AT ALL.

11   **Q.**  NO?

12   **A.**  ON THE CONTRARY.  WE HAVE A VERY GOOD EXPERIENCE BECAUSE

13   WHEN PEOPLE HAVE HAD A BAD INJECTION, LIKE YOU SAID, THEY USE

14   THE --

15   **Q.**  STOP FOR A SECOND, MR. FARRUGIA.

16        IT'S NOT A BAD INJECTION IF THE SONG PLAYS THAT THEY

17   BOUGHT FROM REALNETWORKS AND PLAYS ON THEIR IPOD.  THAT'S NOT

18   A BAD INJECTION, RIGHT?

19   **A.**  I'M NOT -- I MEAN --

20   **Q.**  IT STOPS ALL INJECTION.

21   **A.**  YOU ARE NOT HEARING WHAT I SAID.

22        I'M NOT SPEAKING ABOUT GOOD SONG OR BAD SONG.  I AM

23   SPEAKING ABOUT THE SECURITY VULNERABILITY I HAVE ON MY SYSTEM.

24        THE SECURITY VULNERABILITY GOES TO THE FACT THAT PEOPLE

25   ARE ABLE TO FIND INFORMATION IN THE SYSTEM.  AND WE NEED TO

FARRUGIA – DIRECT / COUGHLIN

1    CLOSE THAT BECAUSE BASICALLY I CANNOT HAVE A SYSTEM WITH FLAWS

2    INSIDE.  BECAUSE HACKERS ALWAYS GO TO THE WEAKEST LINK OF THE

3    SECURITY.

4        IF I HAVE A VERY STRONG SECURITY ON THE DESKTOP, BUT I

5    DON'T HAVE THE SAME SECURITY ON THE IPOD, I CREATE THE WEAKEST

6    LINK WHERE HACKERS ARE GOING TO USE THAT.

7        AND THE NEW KEYBAG WE DESIGN FOR THE IPOD PROPOSE A BETTER

8    SECURITY TO AVOID TO HAVE INDIRECT AND DIRECT ATTACK ON THE

9    KEYBAG TO CREATE FLAWS IN MY SYSTEM.  BECAUSE AT THE END --

10   **Q.**  MR. FARRUGIA, LET ME ASK A QUESTION BEFORE YOU JUST TALK.

11   OKAY?

12       IF YOU FLIP TO PAGE 80, PLEASE.

13       HERE, AGAIN, WE ARE TALKING ABOUT THIS KEYBAG SOLUTION OR

14   KEYBAG VERIFICATION CODE.  YOU SAY:

15           "THIS KEY TRANSLATION CREATES A WELL-KNOWN FLAW

16           ALREADY EXPLOITED BY REAL TO DRM THEIR MUSIC TO BE

17           COMPATIBLE FOR THE IPOD IMPLEMENTATION OF THE

18           FAIRPLAY."

19       THAT'S WHAT YOU WERE TRYING TO STOP IS REAL?

20   **A.**  NO.

21   **Q.**  SELLING THEIR SONGS.  YOU SAID THAT HERE.

22   **A.**  WHAT I SAID IS THEY ARE USING A FLAW.  YOU HAVE TO READ

23   CAREFUL THE DOCUMENT.

24       YOU DON'T UNDERSTAND WHAT I WROTE --

25   **Q.**  MR. FARRUGIA, YOU TOLD ME I WAS INCORRECT.  I UNDERSTAND.

FARRUGIA – DIRECT / COUGHLIN

1    WE CAN BOTH INTERPRET THE DOCUMENT.

2         COULD I ASK YOU TO TAKE A LOOK AT EXHIBIT 327.

3    **A.**  327.

4                   (EXHIBIT DISPLAYED TO JURY.)

5    **Q.**  MR. FARRUGIA, YOU RECOGNIZE THIS DOCUMENT, CORRECT?

6    **A.**  YES, THIS IS CORRECT.

7    **Q.**  THIS IS A DOCUMENT THAT YOU HAD -- THIS CONTAINS

8    INFORMATION THAT YOU HAD MR. ROD SCHULTZ PREPARE FOR YOU; IS

9    THAT CORRECT?

10   **A.**  THAT'S CORRECT.

11   **Q.**  HE WORKED FOR YOU?

12   **A.**  HE WAS ONE OF THE UPPER EMPLOYEE WORKING ON MY

13   ORGANIZATION.

14   **Q.**  AND HE SENT THIS DOCUMENT TO YOU; IS THAT RIGHT?

15   **A.**  THIS IS CORRECT.

16   **Q.**  OKAY.

17        AND THIS HAS TO DO WITH THE -- WE WERE JUST TALKING ABOUT

18   THE KEYBAG VERIFICATION CODE.  AND NOW WE ARE TALKING ABOUT

19   THE DATABASE VERIFICATION CODE.  AND THIS DOCUMENT IS DATED, I

20   THINK, IN APRIL 2006 -- ACTUALLY MAY --

21   **A.**  MAY.

22   **Q.**  -- YOU -- YOU'RE GETTING IT IN MAY.  I THINK THE DOCUMENT

23   WAS ORIGINALLY DATED IN APRIL 2006.

24        YOU GOT IT IN MAY, RIGHT?

25   **A.**  I REPLIED IN MAY.

FARRUGIA – DIRECT / COUGHLIN

1   **Q.**   YOU ACTUALLY RECALL SEEING THIS, RIGHT?

2   **A.**   SORRY?

3   **Q.**   YOU RECALL READING THIS DOCUMENT, RIGHT?

4   **A.**   YES.  CORRECT.

5   **Q.**   LET'S TAKE A LOOK -- IF WE GO TO THE SECOND PAGE.

6        SO THIS IS A DIFFERENT INJECTION PREVENTION PROBLEM THAT

7   YOU ARE DEALING WITH.  NOW YOU ARE DEALING WITH DRM PROTECTED

8   OR NONDRM PROTECTED CONTENT; IS THAT CORRECT?

9   **A.**   ACTUALLY, NO, IT'S INCORRECT.

10  **Q.**   THAT'S WHAT IT SAYS HERE.

11       "TO PREVENT INJECTION OF CONTENT, AN IPOD DATABASES FROM

12  CLIENTS OTHER THAN ITUNES INTO THE IPOD DRM PROTECTED OR

13  NONDRM PROTECTED CONTENT, A METHOD FOR VERIFYING THE SOURCE OF

14  THE CONTENT NEEDS" --

15       IS THERE SOMETHING WRONG WITH THAT STATEMENT?

16  **A.**   YOUR STATEMENT WAS INCORRECT.

17       IT'S EXACTLY THE SAME THING WE DISCUSS ON THE KEYBAG.

18  THIS IS WHY IT'S NOT TWO THINGS DIFFERENT.  YOU SAY TWO THINGS

19  DIFFERENT.  IT'S TWO DIFFERENT THINGS.  IT'S NOT.  IT'S

20  EXACTLY THE SAME PROBLEM.

21       IF YOU DON'T DO AN INTEGRITY VERIFICATION IN YOUR SYSTEM,

22  WHEN YOU BRING SOMETHING FROM THE OUTSIDE THE CLOAK BOUNDARY,

23  OUTSIDE THE CLOAK BOUNDARY, PEOPLE INJECT FAULTS INSIDE AND WE

24  NEED TO DETECT THAT.  TO DETECT THAT, WE NEED TO DO INTEGRITY

25  VERIFICATION.

FARRUGIA – DIRECT / COUGHLIN

1    **Q.**   OKAY.  LET'S TALK ABOUT THE IPOD FOR A MINUTE.

2        IT'S A STORAGE DEVICE; IS THAT CORRECT?

3    **A.**   DEFINE "STORAGE DEVICE" FOR ME.

4    **Q.**   OKAY.  IT'S LIKE A DISK PLAYER.  IT'S LIKE PUTTING IN AN

5    EXTRA DISK.  YOU CAN PUT YOUR FILES ON IT, YOU CAN PUT YOUR

6    NEW BOOK ON IT.  YOU COULD PUT FREE SONGS, MP3 FREE SONGS.

7    YOU COULD PUT SONGS THAT YOU SHARE WITH OTHER PEOPLE.  YOU

8    COULD PUT BURN AND RIP SONGS.  IT'S NOT JUST SONGS YOU BOUGHT

9    FROM THE ITUNES MUSIC STORE, RIGHT?  YOU COULD PUT OTHER SONGS

10   ON IT.

11   **A.**   I AM CONFUSED BY YOUR STATEMENT.

12       WHAT DO YOU MEAN BY "SONG"?

13   **Q.**   SONGS?  YOU COULD PUT SONGS THAT DON'T HAVE ANY DRM ON

14   THEM, RIGHT?

15   **A.**   BUT YOU WANT TO PLAY THE SONGS OR YOU WANT TO USE AS A

16   STORAGE DEVICE?

17   **Q.**   WELL, BEFORE YOU BLEW UP THE DATABASE, YOU COULD PLAY

18   THOSE MP3 SONGS, RIGHT?  YOU COULD PLAY ANY SONGS THAT YOU

19   WANT --

20   **A.**   WE DON'T BLEW UP DATABASE.  IF YOU USE ITUNES AND YOU

21   CONNECT YOUR IPOD TO ITUNES, YOU CAN PLAY ANY SONG YOU WANT.

22   ALL YOUR MP3, EVERYTHING WORKS FINE.  IF YOU CONNECT --

23   **Q.**   HOLD ON.

24   **A.**   I REPHRASE FOR THE LADY HERE.  IF YOU CONNECT --

25   **Q.**   HOLD ON, MR. FARRUGIA.

306

FARRUGIA – DIRECT / COUGHLIN

1        **THE COURT:**  WHAT HE'S TRYING TO DO IS, HE SAW THE

2   COURT REPORTER SQUIRM BECAUSE SHE DIDN'T UNDERSTAND HIM --

3        **THE WITNESS:**  IT'S MY ACCENT.

4        **THE COURT:**  I KNOW IT'S YOUR ACCENT.  IT'S A VERY

5   HEAVY ACCENT.

6     GO AHEAD AND RESTATE WHAT YOU SAID SO WE CAN GET A CORRECT

7   TRANSCRIPT.

8        **THE WITNESS:**  IF YOU CONNECT YOUR IPOD TO YOUR

9   ITUNES, YOU HAVE YOUR MUSIC BACK.

10  **BY MR. COUGHLIN:**

11  **Q.**  LET'S TALK ABOUT THAT.  YOU DON'T HAVE ANY OF THE OTHER

12  MUSIC.

13     IF YOU DIDN'T PURCHASE IT FROM ITUNES, YOU LOSE ALL OF THE

14  SONGS THAT YOU BURNED AND RIPPED.  YOU LOSE ALL OF THE SONGS

15  THAT MAYBE YOUR FRIENDS GAVE YOU THAT WERE FREE.  YOU LOSE ALL

16  OF YOUR FILES, THE WHOLE DATABASE DISAPPEARS, AND WHEN YOU

17  RE-SYNC, THE ONLY THING YOU GET BACK ARE THE ITUNES SONGS; IS

18  THAT CORRECT?

19  **A.**  NO.  THIS IS INCORRECT.

20  **Q.**  YOU GET BACK YOUR FILES?

21  **A.**  YOU GET BACK THE FILES.  BASICALLY WE DON'T -- ITUNES

22  DOESN'T TOUCH THE FILE YOU HAD WITH WORDS AND STUFF LIKE THIS.

23  **Q.**  IF YOU LOST THE COMPUTER AND HAD PUT THAT FILE ONTO YOUR

24  IPOD, IT'S GONE.  THE DATABASE ON THE IPOD IS ERASED.

25  **A.**  NO.  THE DATABASE IS ONLY A DATABASE FOR MUSIC.

307

FARRUGIA – DIRECT / COUGHLIN

1  **Q.** IS IT YOUR TESTIMONY, BECAUSE IT'S NOT THE TESTIMONY OF

2  THE EXPERT, IS IT YOUR TESTIMONY THAT IT ONLY ERASES THE MUSIC

3  DATABASE AND NOT YOUR OTHER FILES ON YOUR IPOD?

4  **A.** MY UNDERSTANDING IS WE SIGNED ONLY DATABASE WITH THE

5  MUSIC.

6  **Q.** SO YOU DIDN'T KNOW THE WHOLE DATABASE WAS ERASED?

7  **A.** I AM DEALING WITH THE MUSIC. I'M NOT DEALING WITH OTHER

8  THINGS THAT IS NOT ON ITUNES.

9  **Q.** YOU ARE SAYING THAT YOU DIDN'T KNOW THAT THIS CLOAK THAT

10 YOU PUT AROUND THE WHOLE DATABASE ERASES EVERYTHING WITHIN

11 THAT CLOAK, THE SIGNATURE ON THE OUTSIDE OF THE DATABASE?

12 **A.** IT'S THE INTEGRITY VERIFICATION -- INTEGRITY VERIFICATION

13 WAS ONLY ON THE DATABASE ON THE MUSIC DATABASE.

14     AND IF YOU RECONNECT YOUR IPOD, BASICALLY YOU GET ALL YOUR

15 CONTENT. I'M SPEAKING ABOUT THE MUSIC.

16 **Q.** I UNDERSTAND WHAT YOU JUST SAID.

17     IF WE CAN TAKE A LOOK AT EXHIBIT 820.

18                 (EXHIBIT DISPLAYED TO JURY.)

19     THIS IS AN EXCHANGE OF EMAILS. IN PART, YOU ARE INVOLVED

20 IN THE MIDDLE OF IT. IN THIS ONE YOU ARE THE MAN IN THE

21 MIDDLE. OF STEVE BOLLINGER AND YOU. AND THIS IS ABOUT THE

22 DATABASE -- THIS IS ABOUT THE DATABASE DESIGN; IS THAT

23 CORRECT?

24 **A.** THIS IS CORRECT. YES.

25 **Q.** YOU ARE FAMILIAR WITH THIS DOCUMENT, RIGHT?

FARRUGIA – DIRECT / COUGHLIN

1   **A.**   LET ME READ THE DOCUMENT.

2        YES.  THIS IS CORRECT.

3   **Q.**   AND YOU WROTE THAT -- YOU WROTE THAT ON JUNE 20TH, 2006,

4   YOU WROTE TO THE TEAM, RIGHT, THAT:

5            ONE OF THE -- "ONE OF THE CONSEQUENCE OF SIGNING THE

6            WHOLE DATABASE IS THE LOST OF GRANULARITY IN THE IPOD

7            BEHAVIOR.  IN OTHER WORDS, IF THE IPOD DETECTS AN

8            ERROR IN THE DATABASE, WE WILL NEED TO REJECT THE

9            DATABASE INSTEAD OF REJECTING THE SINGLE TRACK."

10       YOU WERE TELLING THEM THAT THEY SHOULD UNDERSTAND THAT

11  YOU'RE ERASING THE WHOLE DATABASE, RIGHT?

12  **A.**   THIS IS CORRECT.  WE HAVE TWO --

13  **Q.**   MR. FARRUGIA.

14       AND WHEN YOU -- MR. BOLLINGER TELLS YOU THE ERS -- WHAT

15  DOES THAT STAND FOR "ERS"?

16  **A.**   I DON'T KNOW.

17  **Q.**   THAT THE ERS AND THE GOALS THAT HAVE BEEN COMMUNICATED TO

18  ME GO WELL WITH THE IDEA OF REJECTING THE DATABASE.  HE TOLD

19  YOU THAT THEY UNDERSTOOD THEY WERE GOING TO REJECT THE WHOLE

20  DATABASE; IS THAT RIGHT?

21  **A.**   WE MADE A DECISION TO NOT TO SIGN INDIVIDUAL ENTRY IN THE

22  DATABASE TO HAVE THE BEST USER EXPERIENCE.

23  **Q.**   RIGHT.

24       YOU MADE THE DECISION NOT TO LOOK FOR A CORRUPTION IN A

25  SINGLE PLACE, BUT TO DESTROY THE WHOLE DATABASE.  AND THAT WAS

FARRUGIA – DIRECT / COUGHLIN

```
1    YOUR DEFINITION OF A BETTER USER EXPERIENCE.

2    A.   NO.   ACTUALLY IT'S BETTER USER EXPERIENCE.

3         LET ME EXPLAIN THAT TO YOU.

4    Q.   NO.   YOUR COUNSEL CAN ASK YOU TO EXPLAIN.

5         YOU'RE SAYING NO?

6    A.   I'M SAYING NO TO YOUR QUESTION.   IT'S THE BEST USER

7    EXPERIENCE WE HAD.

8    Q.   OKAY.

9         IF WE GO BACK TO EXHIBIT 2 FOR A SECOND.

10                  (EXHIBIT DISPLAYED TO JURY.)

11   A.   OKAY.

12   Q.   IF WE TAKE A LOOK AT PAGE -- LET ME SEE WHAT PAGE IT IS.

13             MR. COUGHLIN:   LARRY, WHAT PAGE IS THAT NEXT PAGE?

14   BY MR. COUGHLIN:

15   Q.   IF WE TAKE A LOOK AT PAGE 49 AND 50.

16   A.   49?

17   Q.   YES.   AT THE BOTTOM.

18        THIS IS THE IPOD DATABASE INTEGRITY VALIDATION.   DO YOU

19   SEE THAT?

20   A.   UH-HUH.

21   Q.   AT THE BOTTOM, THE LAST SENTENCE, YOU SAY -- AND FOLLOW ME

22   OVER TO THE NEXT PAGE:

23            "THE RISK WITHOUT THE INTEGRITY VERIFICATION IS NOT

24            REALLY INJECTION OF NEW CONTENTS THAT CAN BE

25            CONTROLLED BY THE PLAY BACK VERIFICATION, BUT THE
```

1          CORRUPTION OF THE IPOD DATABASE THAT CREATES A VERY

2          BAD USER EXPERIENCE BY ERASING THE IPOD CONTENT

3          DURING THE BOOT SEQUENCE."

4      THEN YOU GO ON AND SAY:

5          "THE INTEGRITY WILL ALLOW DISCARDING THE COMPROMISED

6          CONTENT AND NOT THE WHOLE LIBRARY."

7      THAT'S NOT WHAT YOU IMPLEMENTED, RIGHT?

8  **A.**  ABSOLUTELY CORRECT.

9      THAT WAS A PROPOSAL.  AND THEN WE DISCUSSED THE PROPOSAL

10 WITH THE MANAGEMENT.  THAT WAS THE PROPOSAL.  THEN WE DISCUSS

11 THE PROPOSAL WITH THE MANAGEMENT.  THEN WE DO IMPLEMENTATION.

12 WE SEE THE USER EXPERIENCE WE HAVE.  AND LIKE I SAID, WE

13 IMPLEMENTED THE BEST USER EXPERIENCE BECAUSE THIS PROPOSAL

14 BASICALLY DURING THE INTEGRITY PROTRACT CREATED A VERY BAD

15 USER EXPERIENCE.

16 **Q.**  SO INSTEAD OF LOOKING FOR THE ACTUAL CORRUPTION, IF THERE

17 WAS CORRUPTION, YOU GUYS DECIDED TO GIVE THEM THE WORST

18 EXPERIENCE POSSIBLE AND BLOWUP THE DATABASE.

19 **A.**  THIS IS INCORRECT.

20      **MR. COUGHLIN:**  NO FURTHER QUESTIONS -- ACTUALLY I

21 HAVE ONE MORE QUESTION.  I SAID THAT, BUT NO LAWYER EVER HAS

22 JUST ONE.  I'LL BE VERY BRIEF.

23      **THE COURT:**  THEY ALWAYS SAY THAT.  AND IF I HELD THEM

24 TO IT, THEY WOULD BE VERY UNHAPPY WITH ME.

25      GO AHEAD.  IT'S YOUR TIME.

1          **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.

2                    (PAUSE IN THE PROCEEDINGS.)

3     **BY MR. COUGHLIN:**

4     **Q.**  MR. FARRUGIA, WHEN YOU SUBMITTED YOUR REPORT, YOUR

5     DECLARATION, YOU ATTACHED A NUMBER OF CONSUMER COMPLAINTS; IS

6     THAT CORRECT?

7     **A.**  YES, THIS IS CORRECT.

8     **Q.**  OKAY.

9          AND YOU SAY THAT YOU TOOK A LOOK AT THOSE COMPLAINTS AND

10    THAT'S -- IT WAS ON THE BASIS OF TAKING A LOOK AT THOSE

11    COMPLAINTS THAT YOU UNDERTOOK TO CHANGE THE ARCHITECTURE; IS

12    THAT CORRECT?

13    **A.**  THIS IS INCORRECT.

14         WE TOOK THE DOCUMENT, THE COMPLAINT COMING FROM APPLE

15    CARE, AND THEN FROM THAT WE DO AN INVESTIGATION.  AND THE

16    INVESTIGATION SHOW EXACTLY WHAT WE PLANNED.  IT WAS THAT WE

17    HAD THE MAN IN THE MIDDLE ATTACK AND WE HAD THE VULNERABILITY.

18    **Q.**  AND WHEN I GOT THOSE COMPLAINTS, WHEN I LOOKED AT THEM, I

19    DIDN'T SEE THAT YOU HAD ANY -- I DIDN'T SEE ANY DOCUMENTS HOW

20    YOU RECEIVED THOSE COMPLAINTS.

21         HOW DID YOU RECEIVE THEM?  THERE WAS NO DOCUMENTATION THAT

22    THOSE COMPLAINTS WERE SENT FROM APPLE CARE TO YOUR ENGINEERING

23    SECTION.

24    **A.**  ACTUALLY, THERE IS NO CLEAR PROCESS.  PEOPLE CALL APPLE

25    CARE AND APPLE CARE TRY TO DISPATCH DEPENDING ON WHAT IS THE

1    PROBLEM, AND THEN IT GOES TO ONE ORGANIZATION.  THE

2    ORGANIZATION SAYS, NO, IT'S NOT US, IT'S ANOTHER ORGANIZATION,

3    IT'S ANOTHER ORGANIZATION.

4        SOMETIMES YOU ARE THE FIRST ON THE LINE, SOMETIMES YOU ARE

5    THE SECOND ON THE LINE, BUT YOU ALWAYS GO TO SOMEONE WHO CARE.

6    **Q.**  OKAY.  AND THOSE ONES THAT YOU ATTACHED, THOSE ONES CAME

7    TO YOU?

8        IS THAT WHAT YOU ARE SAYING IS WHAT YOU ATTACHED TO THE

9    DECLARATION?

10   **A.**  IT COME TO ME, COME TO PEOPLE ON MY TEAM, IT COME TO

11   PEOPLE ON THE QUALITY CONTROL.  AND ALWAYS COME TO SOME

12   ORGANIZATION THAT CARE ABOUT THE USER.

13   **Q.**  OKAY.

14       I DIDN'T SEE A SINGLE NOTE FROM YOU, A SINGLE WRITING FROM

15   YOU ABOUT A SINGLE COMPLAINT.  DID YOU NOT WRITE ANYTHING DOWN

16   WHEN YOU VIEW THOSE COMPLAINTS?

17   **A.**  WHAT DO I NEED TO WRITE THIS DOWN?  IF I HAVE A COMPLAINT,

18   I'M GOING TO HAVE TO FIX IT.

19   **Q.**  SO WHEN YOU JUST GO FIX THE COMPLAINT, YOU DON'T WRITE

20   ANYTHING DOWN, WHAT THE COMPLAINT WAS AND HOW YOU FIXED IT?

21   **A.**  WE DON'T HAVE A LOT OF TIME AT APPLE.  WE WORK ON THE

22   PRODUCT, WHICH MEANS THAT WE DON'T SPEND TIME WRITING THINGS

23   TO FIX.  WE FIX IT.

24   **Q.**  YOU ARE AN ENGINEER.  YOU WROTE THIS WHOLE NEXT GENERATION

25   DOCUMENT, AND YOU WROTE IT VERY CAREFULLY AT EVERY STAGE,

1   CORRECT?

2   **A.**  BECAUSE THIS WAS A DESIGN.  THAT WAS THE ASSET OF THE

3   SECURITY WE'RE GOING TO BE FOR THE NEXT DECADE.  THAT IS

4   IMPORTANT.  WE NEED TO HAVE THE TIME FOR THAT BECAUSE WE HAVE

5   THE FOUNDATION OF IT.

6        FIXING SOMETHING THAT WE HAVE –– FROM A CUSTOMER, WE NEED

7   TO FIX IT BECAUSE IT IS CLEAR WE LOVE OUR CUSTOMERS.

8   **Q.**  ONE FINAL THING.

9        ROD SCHULTZ, WHEN HE CREATED THIS DOCUMENT, HE WROTE A

10  PAPER.  YOU HAVE SEEN IT OUT ON THE INTERNET ABOUT THE

11  CREATION OF THIS.

12       HAVE YOU EVER SEEN THE PAPER THAT HE WROTE?

13            **MS. DUNN:**  OBJECTION, YOUR HONOR.

14            **THE COURT:**  WHAT'S THE OBJECTION?

15            **MS. DUNN:**  HEARSAY.

16            **THE COURT:**  NOT TO THAT QUESTION.

17       YOU CAN ANSWER THAT QUESTION.

18            **THE WITNESS:**  I DON'T UNDERSTAND THE QUESTION.

19  SORRY.

20  **BY MR. COUGHLIN:**

21  **Q.**  HAVE YOU EVER SEEN A DOCUMENT THAT RON SCHULTZ WROTE ABOUT

22  CREATING THE DATABASE VERIFICATION, THE BLOWING UP OF THE

23  DATABASE?

24  **A.**  WHAT DOCUMENT ARE YOU TALKING ABOUT?  SORRY.

25  **Q.**  THE DOCUMENT –– YOU HAVE NEVER SEEN THE DOCUMENT HE

1    POSTED, THE WHITE PAPER HE POSTED ON THE INTERNET ABOUT

2    BLOWING UP THE DATABASE TO KEEP LYNX USERS AND OTHER

3    THIRD-PARTY PLAYERS OFF THE IPOD?  YOU NEVER SAW THAT?

4    **A.**  LOOKS LIKE I DIDN'T SEE THIS DOCUMENT.

5         **MR. COUGHLIN:**  OKAY.

6       NO FURTHER QUESTIONS, YOUR HONOR.

7         **THE COURT:**  YOUR EXAM.

8       MS. DUNN?

9         **MS. DUNN:**  THANK YOU.

10       WITH THE COURT'S PERMISSION, WE WOULD ALSO LIKE TO SET UP

11    A DEMONSTRATIVE ON THE EASEL.

12         **THE COURT:**  YOU MAY PROCEED.

13         **MR. COUGHLIN:**  YOUR HONOR, JUST SO I KEEP THE TIME,

14    BEFORE MR. FARRUGIA LEAVES, I WOULD LIKE TO MOVE FOR THE

15    ADMISSION OF THOSE EXHIBITS THAT I SHOWED HIM THAT HE

16    RECOGNIZED.

17         **THE WITNESS:**  COULD YOU EXCUSE ME?

18           (PAUSE IN THE PROCEEDINGS.)

19             **CROSS-EXAMINATION**

20    **BY MS. DUNN:**

21    **Q.**  WE CAN GET STARTED WHILE THEY DO THAT.

22       GOOD MORNING, MR. FARRUGIA.

23    **A.**  GOOD MORNING.

24    **Q.**  FIRST OF ALL, WHERE ARE YOU FROM?

25    **A.**  FRANCE.

FARRUGIA – CROSS / DUNN

1    **Q.**    AND WHEN DID YOU START WORKING AT APPLE?

2    **A.**    APRIL 11TH, 2005.

3    **Q.**    AND I THINK YOU SAID TO MR. COUGHLIN THAT YOUR POSITION

4    WAS SENIOR DIRECTOR OF DRM TECHNOLOGIES; IS THAT RIGHT?

5    **A.**    I AM SENIOR DIRECTOR INTERNET SECURITY AND DRM TECHNOLOGY

6    NOW.

7    **Q.**    AND IN THE TIME PERIOD THAT WE ARE TALKING ABOUT, WHAT

8    WERE YOUR RESPONSIBILITIES, GENERALLY SPEAKING?

9    **A.**    I WAS FOCUSING ON THE DRM TECHNOLOGIES.

10   **Q.**    WHAT DOES THAT MEAN "DRM TECHNOLOGIES"?

11   **A.**    TO BUILD A SECURE SYSTEM FOR APPLE TO MAKE SURE THAT WE

12   PROTECT THE CONTENT WE SELL FROM ITUNES.

13   **Q.**    AND WHEN YOU SAY "CONTENT", WHAT DO YOU MEAN?

14   **A.**    MUSIC, TV SHOWS, MOVIES, APPS, BOOKS.

15   **Q.**    AND I KNOW THAT YOU SAID TO MR. COUGHLIN THAT YOU WERE

16   CONCERNED WITH MUSIC WHEN HE WAS ASKING YOU QUESTIONS, SO YOU

17   MENTIONED THESE OTHER THINGS.

18       WERE THE OTHER THINGS AVAILABLE AT THE TIME THAT YOU

19   STARTED WORK?

20   **A.**    I STARTED WITH THE MUSIC.

21   **Q.**    OKAY.  AND YOU MENTIONED MOVIES.  WHEN WERE THOSE

22   INTRODUCED BY APPLE?

23   **A.**    LATER.  ITUNES 70, SOMETHING LIKE THIS.

24   **Q.**    AND DID YOU WORK IN SECURITY BEFORE APPLE?

25   **A.**    YES.  I DID TWO VERY IMPORTANT THINGS IN MY LIFE.  I AM

FARRUGIA – CROSS / DUNN

1    SURE THAT YOU ARE GOING TO UNDERSTAND.  IF YOU HAVE A CELL

2    PHONE, I DEVELOP THE SMALL CARD YOU HAVE IN THE CELL PHONE.  I

3    DEVELOPED THAT IN '91.

4        AND THEN I MOVED TO SINGAPORE.  AND IF YOU HAVE A CHANCE

5    TO GO TO SINGAPORE, THEY HAVE A NATIONAL SYSTEM FOR THE

6    BANKING WITH ACCOUNT IN THE CHIP.  I DESIGNED THE BANKING

7    SYSTEM IN SINGAPORE CALLED NETS, N-E-T-S.

8    **Q.**  YOU TESTIFIED JUST A FEW MOMENTS AGO THAT YOU HAD WORKED

9    ON A RE-DESIGN TO FAIRPLAY WHEN YOU GOT TO APPLE AND THAT

10   BEFORE YOU DID THAT YOU DID A DUE DILIGENCE; IS THAT RIGHT?

11   **A.**  YES.  THIS IS CORRECT.

12   **Q.**  OKAY.

13       AND JUST TO BE CLEAR, WHAT WAS THE -- WHAT WAS THE MAIN

14   ISSUE YOU FOUND WHEN YOU DID YOUR DUE DILIGENCE?

15   **A.**  THE FIRST THING, WHEN YOU COME TO SOMETHING AND YOU WANT

16   TO UNDERSTAND WHAT IT IS SECURITY, YOU NEED TO DO A DUE

17   DILIGENCE.  AND THE DUE DILIGENCE YOU NEED TO BE VERY OPEN TO

18   UNDERSTAND WHAT YOU HAVE.  YOU CANNOT BE INFLUENCED BY

19   ANYTHING.  YOU HAVE TO DO YOUR OWN HOMEWORK.

20       AND I DISCOVER THAT THE SYSTEM WAS NOT VERY GOOD.  I

21   DISCOVERED THAT THE SYSTEM HAS FLAWS EVERYWHERE.  THE FIRST

22   FLAWS IT WAS EASY TO STEAL THE CONTENT FROM THE ITUNES STORE.

23   VERY EASY.

24       LIKE I EXPLAIN, THE KEY WAS IN A SIMPLE ENVELOPE.  IT WAS

25   SIMPLE TO OPEN THE ENVELOPE AND TO GET THE KEYS.

FARRUGIA – CROSS / DUNN

1    THEN I UNDERSTAND THAT IT WAS SO EASY TO DO INDIRECT

2    ATTACK ON THE SYSTEM, LIKE WE DISCUSSED THE MAN IN THE MIDDLE

3    ATTACK.  THE DESIGN WAS NOT DONE BY SECURITY EXPERT.  IT WAS

4    DONE BY PEOPLE WHO NO CONCEPT OF SECURITY, BUT IT WAS NOT DONE

5    BY SECURITY EXPERT.

6    AND THEN WHAT I DID IS, I WROTE A SIMPLE DOCUMENT SAYING

7    THIS IS WHAT WE NEED TO DO.  AND IN SECURITY WE DON'T DO

8    PRODUCT.  WE DO A PROCESS.  RIGHT?

9    WE DO A FIRST STEP, A SECOND STEP, AND YOU NEVER STOP.

10   YOU NEVER STOP.  YOU NEVER STOP.  BECAUSE IF YOU STOP, THE

11   HACKER IS GOING TO HACK YOU.  IT'S NOT A QUESTION OF IF, IT'S

12   A QUESTION OF WHEN.  WE PLAY A CAT AND MOUSE GAME, RIGHT?  I

13   PREFER TO BE THE CAT RATHER THAN BE THE MOUSE.  RIGHT?

14   Q.  WHEN YOU STARTED AT APPLE, WAS THERE A PROBLEM WITH HACKS

15   TO THE SYSTEM?

16   A.  ABSOLUTELY.  THE SYSTEM WAS TOTALLY HACKED.

17   Q.  HOW DO YOU DEFINE A HACK?

18   A.  PEOPLE WERE ABLE TO TAKE THE KEYS, OPEN THE VAULT, WHICH

19   WAS THE MUSIC, STEAL THE MUSIC AND DISTRIBUTE THE MUSIC

20   EVERYWHERE WITHOUT ANY RESTRICTION.

21   Q.  AND DID ALL HACKERS STEAL KEYS?

22   A.  TODAY?

23   Q.  IN --

24   A.  THIS IS THE DREAM OF THE HACKER TO STEAL THE KEYS.

25   BASICALLY, IF YOU HAVE THE KEYS, YOU CAN GET THE CONTENT THE

FARRUGIA – CROSS / DUNN

1   WAY IT WAS INITIALLY PRODUCED, RIGHT?  BECAUSE, BASICALLY, THE

2   ENCRYPTION IS JUST A PROTECTION.

3       IF YOU HAVE A SAFE AT HOME, RIGHT, AND YOU OPEN THE SAFE,

4   YOU CAN ACCESS EVERYTHING INSIDE.  AND THE -- THE -- THE KEY

5   FACTOR FOR THE HACKER IS TO FIND THE COMBINATION IN THE VAULT

6   TO GET TO SEE WHAT IS INSIDE.  IT IS A KEY.

7   **Q.**  I'LL DIRECT YOU TO EXHIBIT 2253.

8                   (EXHIBIT DISPLAYED FOR JURY.)

9       DO YOU RECOGNIZE THIS -- I'LL WAIT UNTIL YOU GET THERE.

10      WE OWE YOU A BINDER, MR. FARRUGIA.  ONE SECOND.

11  **A.**  I DON'T HAVE IT.

12                  (PAUSE IN THE PROCEEDINGS.)

13                  (BINDER HANDED TO WITNESS.)

14      THANK YOU.

15  **Q.**  SO, WE ARE LOOKING AT 2253.

16  **A.**  I GET IT.

17  **Q.**  WHAT IS THIS?

18  **A.**  THIS IS A DOCUMENT I WROTE A WEEK AFTER I STARTED AT

19  APPLE.  A WEEK MEANS FIVE DAYS IF YOU ARE GOING TO INCLUDE THE

20  WEEKEND.

21      BUT IN VERY SHORT TIME, I WAS ABLE TO DO A DUE DILIGENCE

22  AND TO SEE ALL THE PROBLEM WE HAVE ON THE PROTECTION IN JUST A

23  WEEK, WHICH MEANS THAT FOR ME IT WAS A BREEZE, BUT THE DESIGN

24  WAS NOT DONE BY SECURITY EXPERT, IT WAS DONE BY PEOPLE WHO

25  KNOWS THE CONCEPT OF SECURITY.

FARRUGIA – CROSS / DUNN

1          IT'S LIKE YOU KNOW HOW TO DRIVE A CAR, RIGHT, BUT YOU

2     DON'T KNOW HOW TO RACE A CAR.  THAT'S BASICALLY WHAT WE HAD.

3     **Q.**  AND THE DATE ON THIS DOCUMENT THAT YOU WROTE?

4     **A.**  IT'S MAY 18TH -- APRIL 18TH, 2005, WHICH IS BASICALLY

5     SEVEN DAYS AFTER I STARTED.

6     **Q.**  AND IT SAYS IT'S VERY CONFIDENTIAL.

7          WAS THIS DOCUMENT CONFIDENTIAL EVEN WITHIN APPLE?

8     **A.**  YES.  ABSOLUTELY CORRECT.

9     **Q.**  WOULD APPLE EVER SHARE THIS SORT OF INFORMATION OUTSIDE OF

10    APPLE?

11    **A.**  NO, WE DON'T BECAUSE BASICALLY WE EXTEND THE CLOAK

12    BOUNDARY WITHIN MY TEAM TO MAKE SURE THAT WE DON'T LEAK

13    INFORMATION OUTSIDE.  WE ARE REALLY PARANOID ABOUT LEAKING

14    INFORMATION ABOUT THE DRM.  WE WANT TO MAKE SURE THAT WE

15    CONTROL THE INFORMATION BECAUSE LEAKS IS WHAT HACKERS THEY

16    WANT.

17    **Q.**  I'D ASK YOU TO TURN TO PAGE 2.

18            **MS. DUNN:**  IF WE CAN HIGHLIGHT FOR HIM THE MIDDLE

19    PARAGRAPH.

20    **BY MS. DUNN:**

21    **Q.**  SO, IN YOUR INTRODUCTION TO THIS DOCUMENT, IT SAYS:

22            "FOR DIGITAL CONTENT PROTECTION, THE PARADIGM HAS

23            SHIFTED.  SOME OF THE PLAYERS ARE NO LONGER TRUSTED

24            AND MAY ACTUALLY BE THE ATTACKER, E.G., THE END USERS

25            LEGALLY BUYING MUSIC FROM THE MUSIC STORE CAN BE THE

FARRUGIA – CROSS / DUNN

1           ATTACKER."

2      WHAT DID YOU MEAN BY THIS?

3  **A.**  WHAT -- WHEN YOU DEAL WITH SECURITY ON DRM, THE PARADIGM

4  IS TOTALLY DIFFERENT THAN THE PARADIGM YOU HAVE WITH YOUR

5  COMPUTER.

6      WHEN YOU HAVE A COMPUTER AND YOU HAVE A USER OF MAL-WARE

7  TRYING TO INSTALL ITSELF ON THE COMPUTER, YOU HAVE THE POP-UPS

8  AND THAT SAY, DO YOU WANT TO INSTALL THAT?  AND YOU SAY, NO,

9  RIGHT, BECAUSE YOU DON'T WANT TO INFECT YOUR COMPUTER.

10     IN THE DRM, THE HACKER IS THE USER OF THE MACHINE, WHICH

11  MEAN, HE CAN HAVE ALL OF THE PRIVILEGE HE WANTS ON THE MACHINE

12  TO DO THE HACK.  IF YOU WANT TO INSTALL SOFTWARE, YOU ARE

13  GOING TO INSTALL THAT.

14     IF YOU WANT TO DO EVERYTHING, HE HAS FULL CONTROL OF THE

15  MACHINE.  THIS IS WHY ON THE DRM THERE IS A PARADIGM SHIFT

16  BECAUSE YOU CANNOT EVEN TRUST THE USER.

17  **Q.**  AND DO YOU KNOW A PHRASE CALLED "KEEPING HONEST PEOPLE

18  HONEST"?

19  **A.**  YES, I DO.

20  **Q.**  IS THAT WHAT YOU'RE TALKING ABOUT HERE?

21  **A.**  TYPICALLY THIS IS A SHIFT WE HAVE.  WHEN YOU ARE ON THE

22  DRM, WE ARE NOT TALKING ABOUT KEEPING THE PEOPLE HONEST HONEST

23  (SIC) BECAUSE THE HACKER IS THE ONE WANTING TO DO SOMETHING.

24     BECAUSE BEFORE THEY WANT TO HAVE THE CONTENT, THERE IS A

25  VALUE OF THE CONTENT.  PEOPLE -- THE USER OF THE MACHINE WILL

FARRUGIA – CROSS / DUNN

```
 1   BE THE HACKER, WHICH MEANS THAT YOU CANNOT MAINTAIN THE

 2   PARADIGM SAYING, YEAH, WE NEED TO KEEP HONEST PEOPLE HONEST

 3   BECAUSE YOU ARE GOING TO HAVE TO DEAL WITH THE HACKERS NOW.

 4   Q.  LET'S LOOK AT PAGE 3 OF THIS DOCUMENT.  THERE'S A SECTION

 5   CALLED "KEY MANAGEMENT".

 6       AND HERE YOU WRITE:

 7           "THE KEYBAG IS ONE OF THE VULNERABLE PARTS OF APPLE'S

 8           DRM SOLUTION, AND IT IS PREDICTABLE THAT ATTACKS WILL

 9           BE PERPETRATED AGAINST THE KEYBAG.  BUT IT IS NOT THE

10           ONLY ONE."

11       WHAT DID YOU MEAN BY THAT?

12   A.  WHEN WE –– WHEN WE REDESIGNED FAIRPLAY, INSTEAD OF HAVING

13   THE PROTECTION EVERYWHERE ON THE CLIENT, WE TRIED TO LIMIT THE

14   DIMENSION WHERE WE KNOW THE HACKERS THEY ARE GOING TO HACK.

15   BASICALLY THIS IS THE KEYBAG.

16       YOU HAVE TO SEE THE KEYBAG AS A VAULT, VERY SECURE VAULT

17   WITH COMBINATION, CAMERAS, AND STUFF LIKE THIS TO MAKE SURE

18   THAT THE KEY ARE FULLY PROTECTED, RIGHT?

19       BY NATURE, THE HACKER WANTS TO GO INSIDE THE KEYBAG TO GET

20   WHAT'S INSIDE THE VAULT.  BECAUSE THAT IS THE GRAIL.  THIS IS

21   WHAT THEY NEED TO GET TO THE SONG.  AND THEY ARE GOING TO DO

22   EVERYTHING THEY CAN TO GO INSIDE THE VAULT.

23       AND TO DO THAT, THEY CAN PUT A BOMB IN THE DOOR.  THIS IS

24   WHAT WE CALL A DIRECT ATTACK.  BOOM, THEY BLOW UP AND SEE

25   WHAT'S GOING ON, OR THEY CAN TRY TO STEAL INFORMATION BY
```

1    INDIRECT ATTACK.

2         FOR EXAMPLE, THEY CAN SEE THE PRINT YOU HAVE, RIGHT?  THEY

3    CAN SEE A LOT OF THINGS THAT WE CALL INDIRECT ATTACK.  AND WE

4    NEED TO REMOVE ALL OF THE DIRECT AND INDIRECT ATTACKS TO HAVE

5    A VERY SECURE SOLUTION.

6    **Q.**  DID YOU TALK ABOUT INDIRECT ATTACKS IN THIS DOCUMENT?

7    **A.**  NOT NECESSARILY INDIRECT ATTACK PER SE, BUT YOU NEED TO

8    MAKE SURE THAT THE KEY IS SECURE.  IT COULD BE -- YOU NEED TO

9    BE SECURE DURING THE PROTOCOL, YOU NEED TO BE SECURE DURING

10   THE PROTOCOL.  YOU NEED TO BE SECURE WHEN YOU HANDLE THE KEYS.

11   YOU NEED TO PAY ATTENTION TO YOUR KEYS ALL INSIDE YOUR CLOAK

12   BOUNDARY.

13   **Q.**  I APOLOGIZE TO YOU MR. FARRUGIA.  I SHOULD HAVE SHOWN YOU

14   PAGE 4.

15         **MS. DUNN:**  IF WE CAN HIGHLIGHT "IT IS THEREFORE

16   IMPORTANT" UNDER "KEYBAG ARCHITECTURE" AT THE TOP.

17   **BY MS. DUNN:**

18   **Q.**  SO HERE YOU'RE TALKING ABOUT THE IMPORTANCE OF THE KEYBAG.

19   YOU SAY:

20         "IT IS IMPORTANT TO CREATE THE APPROPRIATE DEFENSES

21         TO AVOID DIRECT OR INDIRECT ATTACKS THAT COMPROMISE

22         THE CONTENT OF THE KEYBAG."

23   **A.**  CORRECT.

24   **Q.**  SO --

25   **A.**  YOU WANT TO SEE AN INDIRECT ATTACK, FOR EXAMPLE?

123

FARRUGIA – CROSS / DUNN

1       YOU ARE AT THE DEPARTMENT STORE.  YOU PUT YOUR PIN IN

2   THE -- ON THE PIN PAD, RIGHT?  AND YOU HAVE A CAMERA RIGHT

3   HERE (INDICATING).  THE GUY WHO IS ON THE OTHER SIDE OF THE

4   CAMERA SEE YOUR PIN.  THIS IS CALLED AN INDIRECT ATTACK.

5   RIGHT?

6   **Q.**  I JUST WANT -- WE'VE HEARD ABOUT INDIRECT ATTACKS AND

7   INJECTION ATTACKS, AND MAN THE MIDDLE ATTACKS.

8       IS AN INDIRECT ATTACK THE SAME THING AS AN INJECTION

9   ATTACK?

10  **A.**  IT IS.  THE INJECTION TAKES ADVANTAGE OF FLAWS THAT YOU

11  CREATE WITH INDIRECT ATTACK.  YES, CORRECT.

12  **Q.**  THEN A MAN IN THE MIDDLE OF THE ATTACK, IS THAT THE SAME

13  THING?

14  **A.**  YEAH, BECAUSE YOU CAN CREATE FLAWS INSIDE THE SYSTEM.  AND

15  YOU CAN INJECT THINGS INSIDE THE SYSTEM TO CREATE INDIRECT

16  ATTACKS.  CORRECT.

17  **Q.**  LET'S LOOK AT THE LAST PAGE OF THIS DOCUMENT YOU WROTE ON

18  APRIL 18, 2005.

19      SO, THIS HEADER SAYS "INTEGRITY OF THE KEYBAG".  IT SAYS:

20          "THE AUTHORIZED APPLICATION THAT CAN REMOVE THE

21          PROTECTION OF THE KEYBAG NEEDS TO VERIFY THE

22          INTEGRITY OF THE CONTENT.  IT IS PROPOSED TO INCLUDE

23          IN THE TRAILER A MD5 HASH OF THE WHOLE KEYBAG.  AND

24          THE MD5 -- KEYBAG MD5 SIGNATURE IN PART OF THE

25          PROTECTED DATA, THUS ANY CHANGE OF THE KEYBAG IS

124

FARRUGIA – CROSS / DUNN

```
 1                EXPOSED TO THE SIGNATURE."

 2    A.   TYPICALLY --

 3    Q.   WHAT ARE YOU TALKING ABOUT?

 4    A.   TYPICALLY HERE, THE KEYBAG IS SOMETHING THAT WE HAVE

 5    OUTSIDE THE CLOAK BOUNDARY I DESCRIBE, RIGHT?  WE NEED TO

 6    BRING THIS KEYBAG WITH ALL THE KEYS INSIDE THE CLOAK BOUNDARY,

 7    WHICH IS VERY SECURE.  RIGHT?

 8         NOW, IF I OPEN THE KEYBAG WITHOUT VERIFYING THAT IT WAS NO

 9    TAMPER, PEOPLE WOULD CREATE INDIRECT ATTACKS TO UNDERSTAND HOW

10    MY SYSTEM WORKS.

11         THE FIRST THING I DO WHEN I TAKE SOMETHING FROM THE

12    OUTSIDE, OUTSIDE THE CLOAK BOUNDARY, AND I PUT IT INSIDE THE

13    CLOAK BOUNDARY, I VERIFY THERE WAS NO TAMPER.  AND TAMPER

14    VERIFICATION IS WHAT I EXPLAIN HERE.

15         WE NEED TO MAKE SURE THAT WE HAVE AN INTEGRITY

16    VERIFICATION OF THE KEYBAG TO MAKE SURE THAT WHEN WE ARE GOING

17    TO ACCESS THE KEY, I KNOW THAT THE KEYBAG WAS NO TAMPERED.

18    Q.   IS THIS THE SAME KEYBAG INTEGRITY CHECK THAT WE HAVE BEEN

19    TALKING ABOUT IN THIS CASE?

20    A.   YES.  ABSOLUTELY CORRECT.

21    Q.   IS THE INTEGRITY CHECK PART OF THE KEYBAG ITSELF?

22    A.   YES.  CORRECT.

23    Q.   OKAY.  WHERE IS IT IN THE KEYBAG?

24    A.   IT IS IN THE TRAILER OF THE KEYBAG.  IT'S AT THE BOTTOM OF

25    THE KEYBAG USUALLY.
```

1    **Q.**  SWITCHING GEARS A LITTLE BIT.

2        HAVE YOU HEARD OF SOMETHING CALLED HARMONY?  I THINK

3    PLAINTIFFS' COUNSEL ASKED YOU ABOUT IT.

4    **A.**  YES, I DO.

5    **Q.**  IN APRIL OF 2005, WHEN YOU WORKED ON THIS DOCUMENT, WERE

6    YOU AWARE THAT HARMONY HAD LAUNCHED?

7    **A.**  WHEN I DID MY DUE DILIGENCE, NO, I WAS NOT AWARE.

8    **Q.**  DID YOU LATER BECOME AWARE?

9    **A.**  ABSOLUTELY CORRECT.

10   **Q.**  LET ME JUST ASK YOU TO LOOK AT THE TIME LINE FOR A SECOND

11   TO IDENTIFY WHAT DATE HARMONY DID LAUNCH.

12            **THE COURT:**  ALL OF YOU CAN SEE IT?

13       NO?

14       CAN WE HAVE SOMEONE GO UP THERE AND ADJUST IT SO THAT ALL

15   THE JURORS CAN SEE IT.

16            **THE CLERK:**  BRING IT FORWARD THIS WAY.

17                (PAUSE IN THE PROCEEDINGS.)

18            **MS. DUNN:**  MAYBE WE SHOULD HAVE MADE IT BIGGER.

19            **THE COURT:**  NO.  MR. ISAACSON, IF YOU WILL ROLL THAT

20   TABLE.  THERE'S A TABLE HERE ON THE SIDE.  I THINK IF WE GIVE

21   IT SOME HEIGHTH, EVERYBODY WILL BE ABLE TO SEE IT.

22       I HAVE IT HERE ON THE SCREEN.

23       IS THAT WIDE ENOUGH?

24                (PAUSE IN THE PROCEEDINGS.)

25                (POSTER DISPLAYED ON EASEL.)

FARRUGIA – CROSS / DUNN

1     **THE COURT:**  YOU CAN SHIFT IT.  I HAVE IT HERE ON MY

2     SCREEN.  I DON'T NEED TO SEE THAT.

3         IS IT HIGH ENOUGH?

4         JUROR EIGHT?

5         **JUROR:**  YES.

6         **THE COURT:**  SEVEN?

7         **JUROR:**  (JUROR NODS HEAD.)

8         **THE COURT:**  HOW ABOUT YOU, JUROR EIGHT, CAN YOU --

9         **JUROR:**  YES.

10        **THE COURT:**  YOU ALL HAVE NUMBERS.  I'M TRYING NOT TO

11    USE NAMES.

12        EVERYBODY CAN SEE IT?

13        **JURORS:**  (JURORS NOD.)

14        **THE COURT:**  YOU MAY PROCEED.

15    **BY MS. DUNN:**

16    **Q.**  MR. FARRUGIA, IF YOU CAN LOOK AT THAT CHART AND IDENTIFY

17    THE DATE WHEN HARMONY LAUNCHED.

18    **A.**  IT'S APRIL THE 26TH, 2005.

19    **Q.**  AND WAS THAT BEFORE OR AFTER THE DOCUMENT THAT WE JUST

20    DISCUSSED?

21    **A.**  IT WAS AFTER.

22    **Q.**  DID YOU KNOW HOW HARMONY WORKED?

23    **A.**  DEFINE WHEN.  DEFINE THE WHEN.

24    **Q.**  AFTER IT LAUNCHED, AT THE TIME YOU HEARD ABOUT IT, DID YOU

25    KNOW HOW IT WORKED?

FARRUGIA – CROSS / DUNN

1    **A.**  YES.

2    **Q.**  AND HOW DO YOU THINK IT WORKED?

3    **A.**  IT WAS EXPLOITING THE FLAWS WE HAVE IN OUR SYSTEM.

4    **Q.**  AND HOW COULD IT DO THAT?

5    **A.**  BECAUSE THE IMPLEMENTATION AT THE TIME WAS INCORRECT.  THE

6    IMPLEMENTATION OF THE RSA TECHNOLOGY WAS NOT IMPLEMENTED

7    CORRECTLY.  AND YOU OPEN THE VIEWS ATTACK THAT EVERYBODY KNOWS

8    IS CALLED THE MAN IN THE MIDDLE ATTACK.

9    **Q.**  HOW IS HARMONY ABLE TO DO THAT?

10   **A.**  SECURITY FLAWS IN OUR SYSTEM.

11   **Q.**  OKAY.

12        IF HARMONY HAD NEVER EXISTED, WOULD YOU STILL HAVE

13   IMPLEMENTED THAT INTEGRITY CHECK THAT WE JUST TALKED ABOUT?

14   **A.**  ABSOLUTELY CORRECT.

15   **Q.**  WHY IS THAT?

16   **A.**  BECAUSE IT WAS A FLAW IN THE SYSTEM.  WE NEED TO FIX THE

17   FLAWS.  BECAUSE IF THERE IS A FLAW IN YOUR SYSTEM, YOUR SYSTEM

18   IS WEAK.

19        HACKERS ALWAYS TO FIND WHAT IS THE WEAKEST LINK.  IN THE

20   PROCESS, WE NEED TO FIX EVERY TIME YOU SEE A WEAKEST LINK ON

21   YOUR SYSTEM, YOU NEED TO UPGRADE IT.  YOU NEED TO UPGRADE

22   BECAUSE YOU WANT TO BE THE CAT.  YOU DON'T WANT TO BE THE

23   MOUSE.

24   **Q.**  CAN YOU EXPLAIN THAT?  YOU DON'T WANT TO BE THE CAT --

25   **A.**  YOU DON'T WANT TO BE THE MOUSE, YOU WANT TO BE THE CAT.

FARRUGIA – CROSS / DUNN

1    THE SECURITY –– IT'S A CAT AND MOUSE GAME.  WHO GET THERE

2    FIRST.  THE GAME IS YOU WANT TO BE THE CAT.  YOU DON'T WANT TO

3    BE THE MOUSE.  RIGHT?  WHICH MEANS THAT YOU NEED TO RUN FASTER

4    THAN THE HACKER TO MAKE SURE THAT YOUR SYSTEM IS STILL SOLID.

5    IF YOU REACH THIS POINT, YOU HAVE A VERY SECURE SOLUTION.

6    **Q.**  I THINK YOU COVERED THIS A LITTLE WITH MR. COUGHLIN, BUT

7    THE FAIRPLAY REDESIGN INCLUDED 6.0, 7.0 AND 7.4; IS THAT

8    RIGHT?

9    **A.**  THIS IS CORRECT.  YES.

10   **Q.**  IF YOU CAN TELL FROM THAT CHART, WHEN DID 6.0 LAUNCH?

11   **A.**  6.0 WAS LAUNCHED OCTOBER 12TH, 2005.

12   **Q.**  AND?

13   **A.**  THAT WAS 6.0.

14   **Q.**  6.0.  AND WHAT CHANGES DID YOU MAKE IN 6.0?

15   **A.**  IN 6.0, WE REALLY FOCUS ON THE CHANGE ON THE DESKTOP.  WE

16   CHANGE THE KEYBAG FORMAT TO MAKE IT MORE SECURE AND WITH A

17   DESIGN WHICH WAS BASICALLY REMOVING ALL THE FLAWS WE HAD ON

18   THIS SYSTEM, AND MOVING THE SECURITY FROM THE CLIENT TO THE

19   SOFTWARE.  THAT WAS A MAJOR, MAJOR CHANGE.

20   **Q.**  YOU CHANGED THE KEYBAG IN 6.0?

21   **A.**  WE CHANGED THE FORMAT TO THE KEYBAG AS WELL.

22   **Q.**  DID THAT CHANGE STOP HACKERS LIKE HYMN THAT YOU BRIEFLY

23   DISCUSSED?

24   **A.**  ABSOLUTELY CORRECT.

25   **Q.**  LET'S TALK ABOUT 7.0 BECAUSE OBVIOUSLY WE ARE A LOT MORE

129

FARRUGIA – CROSS / DUNN

1    FOCUSED ON 7.0 RIGHT NOW.

2        IF YOU CAN TELL FROM THE TIME LINE, WHEN WAS 7.0?

3    **A.**  7.0 WAS SEPTEMBER THE 12TH, 2006.

4    **Q.**  AND I WOULD LIKE TO SHOW YOU IN YOUR BOOK 2273.

5                (EXHIBIT DISPLAYED TO JURY.)

6        IF WE CAN SHOW THAT EMAIL.

7    **A.**  OKAY.  I GOT IT.

8    **Q.**  WHAT IS THE DATE THERE?

9    **A.**  JUNE 2ND, 2005.

10   **Q.**  AND I BELIEVE THIS IS A DRAFT PRESENTATION SIMILAR TO THE

11   ONE THAT MR. COUGHLIN SENT YOU, BUT THIS IS AN EARLIER

12   VERSION; IS THAT RIGHT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  JUST FLIP THROUGH THE DOCUMENT A LITTLE BIT AND TELL ME

15   WHETHER THIS DOCUMENT IS ABOUT 6.0, 7.0, OR BOTH?

16   **A.**  IT WAS -- IT WAS FOR EVERYTHING.  IT WAS THE -- THE VISION

17   THAT I HAVE AT THE TIME PUT ON SLIDES TO BE ABLE TO HAVE A

18   SECURE SYSTEM, AND THEN WE DEVELOP THAT STEP BY STEP.

19   **Q.**  SO LET'S LOOK AT PAGE 9.

20       EVEN THOUGH THERE'S A LOT OF STUFF IN THIS PRESENTATION,

21   THIS SEEMS -- IT'S CALLED "KEYBAG FEATURES", IT MIGHT BE

22   RELEVANT TO WHAT WE ARE TALKING ABOUT.

23       WHICH OF THESE CHANGES, IF ANY, WERE IMPLEMENTED IN ITUNES

24   7.0?

25   **A.**  SINGLE ENTITY WAS IMPLEMENTED, GRANULARITY WAS

FARRUGIA – CROSS / DUNN

1    IMPLEMENTED, PROTECTION OF THE KEY WAS IMPLEMENTED, AND

2    INDEPENDENCE OF THE HARDWARE WAS IMPLEMENTED.  WE IMPLEMENTED

3    EVERYTHING.

4    **Q.**  OKAY.

5        VERY BRIEFLY CAN YOU DESCRIBE WHAT EACH OF THESE THINGS

6    WERE?

7    **A.**  THE FIRST BULLET POINT WAS TO MAKE SURE THAT WE REGROUP

8    ALL THE KEYS INSIDE THE VAULT I'M SPEAKING ABOUT, WHICH IS

9    CALLED A KEYBAG.  WE PUT EVERYTHING ON ONE SINGLE PLACE.

10       THE SECOND WAS ON THE FIRST VERSION OF THE KEYBAG, WHEN

11   YOU OPEN THE VAULT, WHICH WAS INSECURE, ALL THE KEY THEY WERE

12   EXPOSED.  IN OTHER WORDS, YOU WERE ABLE TO SEE EVERYTHING

13   INSIDE THE VAULT.  WHAT WE DID IS WE PUT VAULT INSIDE THE

14   VAULT.  IN OTHER WORDS, WHEN YOU OPEN THE FIRST DOOR, YOU SEE

15   INSIDE SMALL ONE, AND WHEN YOU OPEN ONE, YOU ONLY HAVE ONE

16   KEY.  YOU DON'T ACCESS THE REST OF THE KEYS.  RIGHT?  AGAIN,

17   TRY TO MAKE SURE WE DO A LOT OF SECURITY.

18       THEN THE THIRD BULLET POINT WAS TO INTRODUCE A LOT OF

19   COMPLEXITY ON -- WHEN WE DECRYPT THE SMALL VAULT WE HAVE

20   INSIDE THE VAULT TO MAKE SURE THAT WE DON'T RELY ON VERY

21   SIMPLE MATHEMATICAL FUNCTION, BUT WE RELY ON VERY COMPLEX

22   MATHEMATICAL FUNCTIONS.

23       AND THE FIRST ONE WAS, IN SECURITY, WHAT YOU WANT TO DO IS

24   TO DIVIDE.  IN OTHER WORDS, WHAT WE DID IS, THE SECURITY THAT

25   WAS GOOD FOR MAC, WAS NOT THE SAME SECURITY WE DID FOR

FARRUGIA – CROSS / DUNN

1    WINDOWS.  IT WAS NOT THE SAME WE DID FOR THE IPOD.  WE HAVE

2    DIFFERENT MATHEMATICAL FUNCTION.  I WILL EXPLAIN ON NUMBER

3    THREE FOR THE DIFFERENT PLATFORMS.

4         AS YOU CAN SAY, WE DO ALTOGETHER.  WE LIKE THE SUSPENDER,

5    THE BELT, THE HELMET, EVERYTHING.  WE NEED TO MAKE SURE WE ARE

6    VERY, VERY SECURE.

7    **Q.**  THIS IS PRETTY OBVIOUS, I THINK, BASED ON YOUR ANSWERS,

8    BUT DID YOU CONSIDER THIS TO BE A SECURITY IMPROVEMENT?

9    **A.**  ABSOLUTELY.  CORRECT.

10   **Q.**  AND I WOULD LIKE TO FOCUS YOU ON THE LAST ONE, WHICH SAYS,

11   "THE SAME KEYBAG FORMAT FOR ITUNES, IPOD, AND QUICKTIME."

12        WHAT -- WHAT IS THIS DOING WHEN YOU SAY "SAME KEYBAG

13   FORMAT"?

14   **A.**  IT'S EFFICIENCY IN THE SECURITY.  BECAUSE NOW WE HAVE ONLY

15   ONE TYPE OF THINGS WE NEED TO SECURE AND WE CAN PUT ALL THE

16   GUNS WE HAVE, ALL THE SECURITY WE HAVE IN ONE SINGLE ENTITY TO

17   PROTECT THIS ENTITY.

18        IF YOU HAVE 10 OR 20, YOU ARE GOING TO BE DIFFICULT

19   BECAUSE YOU ARE GOING TO HAVE TO PROTECT 20 ENTITIES.  HERE, I

20   HAVE ONLY ONE, WHICH MEANS THAT'S GOING TO BE MORE SECURE AND

21   MORE EFFICIENT FOR ME.

22   **Q.**  WHEN YOU SAY "SAME KEYBAG FORMAT FOR ITUNES AND IPOD", IS

23   THAT -- WAS THIS SOMETHING THAT YOU DID ON THE DESKTOP IN 6.0

24   FOR ITUNES AND THEN 7.0 FOR THE IPOD?

25        JUST EXPLAIN THAT TO THE JURY FOR A LITTLE BIT.

1    **A.**   THIS IS CORRECT.

2         WE TESTED THIS NEW FORMAT ON THE ITUNES WITH 60.  WE KNEW

3    IT WORKED BECAUSE WE HAD A VERY STRONG SECURITY.  AND THEN

4    WHAT WE DID IS, WE TAKE THE CONCEPT WE DID ON THE ITUNES 60

5    AND WE MOVE ON THE IPOD.

6         IF WE HAVE SOMETHING THAT WORKS, BASICALLY WE NEED TO

7    DUPLICATE BECAUSE IT WORKS.

8    **Q.**   AND DID THAT CHANGE BY ITSELF, MAKING THE SAME KEYBAG

9    FORMAT FOR ITUNES, IPOD, WOULD THAT BY ITSELF HAVE MEANT THAT

10   HARMONY NO LONGER WORKED?

11   **A.**   ABSOLUTELY BECAUSE WE CLOSE THE MAJOR FLAWS WITH THE

12   KEYBAG.

13   **Q.**   AND LET'S SAY YOU HAD IMPLEMENTED THIS ENTIRE DESIGN

14   WITHOUT THE INTEGRITY CHECKS THAT WE HAVE BEEN DISCUSSING,

15   WOULD THAT HAVE MEANT THAT HARMONY NO LONGER WORKED?

16   **A.**   ABSOLUTELY CORRECT.

17   **Q.**   WHY IS THAT?

18   **A.**   THE INTEGRITY IS JUST TO MAKE SURE THAT WE DON'T HAVE NEW

19   HACKERS COMING TO TRY TO DO INDIRECT ATTACK ON OUR SYSTEM.

20        WE FIX THE PROBLEM WITH THE NEW DESIGN, BUT WE WANT TO

21   PREVENT THAT NO MORE HACKERS THAT COME TO SEE WHAT WE HAVE

22   DESIGNED.

23   **Q.**   WAS HARMONY BASED ON THIS NEW KEYBAG?

24   **A.**   NO, IT WAS BASED ON THE PREVIOUS ONE.  THE FACT WE CHANGED

25   THE KEYBAG BASICALLY STOPPED THE FLAWS.

FARRUGIA – CROSS / DUNN

1    **Q.** DID IT MATTER THAT HARMONY WAS BASED ON THE OLD KEYBAG AND

2    NOT THIS NEW KEYBAG?

3    **A.** WHAT YOU MEAN BY?

4    **Q.** YOU TESTIFIED THAT HARMONY WOULD NO LONGER WORK AFTER THE

5    NEW KEYBAG.

6    **A.** CORRECT.

7    **Q.** MY QUESTION IS, IS THAT BECAUSE IT WAS BASED ON THE OLD

8    KEYBAG?

9    **A.** YEAH, IT WAS BASED ON THE OLD KEYBAG.  WITH THE NEW KEYBAG

10   WE DON'T HAVE THE FLAWS ANYMORE.

11   **Q.** DID YOU EVER LEARN THAT ANY HACKERS WERE TRYING TO COPY

12   HARMONY?

13   **A.** AT THE TIME WE HAVE A PERSON CALLED DVD JON.

14   **Q.** WHO IS DVD JON?

15       THAT'S A GREAT NAME, BY THE WAY.

16   **A.** IT IS A HACKER THAT HACKED THE DVD PLAYER IN THE '70S.

17   **Q.** LET'S LOOK AT EXHIBIT 371.

18                   (EXHIBIT DISPLAYED TO JURY.)

19       WE'LL COME BACK TO THE PRESENTATION IN A SECOND.  I WANT

20   TO TAKE A DETOUR TO THIS.

21   **A.** 371.

22   **Q.** SO, IS THIS AN EMAIL FROM YOU TO SINA TAMADDON ON OCTOBER

23   2ND, 2006?

24   **A.** YES.  THIS IS CORRECT.

25   **Q.** CAN YOU READ THE FIRST SENTENCE OF THIS?

1    **A.**  (READING)

2            "I THINK DVD JON WOULD LIKE TO COPYCAT REAL WITH THE

3            IPOD."

4    **Q.**  WHO IS SINA TAMADDON?

5    **A.**  SINA WAS JEFF BOSS AT THE TIME.

6    **Q.**  SO THIS DEVELOPMENT ABOUT DVD JON, WAS IT IMPORTANT?

7    **A.**  ABSOLUTELY EVERY SINGLE POTENTIAL HACKERS WILL COME TO OUR

8    AREA IS IMPORTANT BECAUSE IT IS BASICALLY A THREAT FOR US.

9    **Q.**  HOW MANY TIMES, IF YOU REMEMBER, HAD DVD JON ATTEMPT TO

10   HACK THE SYSTEM?

11   **A.**  SEVERAL TIMES.

12   **Q.**  I WOULD LIKE TO GO BACK TO EXHIBIT 2273, WHICH WAS THE

13   PRESENTATION WE WERE LOOKING AT BEFORE.

14                    (EXHIBIT DISPLAYED TO JURY.)

15      IF WE CAN TURN TO PAGE 11 OF THAT.

16      MR. FARRUGIA, YOU TESTIFIED JUST A SECOND AGO ABOUT ALL

17   THE SECURITY IMPROVEMENTS IN 7.0.  YOU DID NOT TESTIFY ABOUT

18   THIS, WHICH IS THE KEYBAG DESCRIPTION.

19   **A.**  SORRY.

20   **Q.**  NO PROBLEM.  DO YOU WANT SOME WATER?

21   **A.**  THAT'S OKAY.

22   **Q.**  AT THE BOTTOM RIGHT, WHAT DOES IT SAY THERE?

23   **A.**  ON PAGE 11?  WHAT DO YOU MEAN?

24   **Q.**  ON THE BOTTOM RIGHT, WHAT DOES IT SAY IN THE HIGHLIGHTED

25   PORTION?  IF YOU CAN SEE ON THE SCREEN.

FARRUGIA – CROSS / DUNN

1    **A.**  "KEYBAG INTEGRITY".

2    **Q.**  IS THAT THE SAME INTEGRITY CHECK THAT WE HAVE BEEN TALKING

3    ABOUT?

4    **A.**  YES.  IT'S AN INTEGRITY CHECK VERIFICATION.

5        IT'S THE INTEGRITY CHECK AS SEEN BY YOU EVERYWHERE.  IT

6    COULD BE ON A KEYBAG, DATABASE, COULD BE ANYWHERE.

7        IT IS THE WAY TO MAKE SURE THAT WHEN WE BRING SOMETHING

8    FROM THE OUTSIDE TO THE CLOAK BOUNDARY, WE DON'T HAVE PEOPLE

9    HAVE TAMPER WITH WHAT WE BROUGHT FROM THE OUTSIDE.

10   **Q.**  I JUST WANT TO BE CLEAR BECAUSE OBVIOUSLY THE TIME LINE IS

11   GOING TO BE IMPORTANT.

12       WAS THIS THE SAME INTEGRITY CHECK YOU WERE TALKING ABOUT

13   IN THE APRIL 18TH DOCUMENT THAT WE TALKED ABOUT?

14   **A.**  YES.  THIS IS CORRECT.

15   **Q.**  AND IS IT THE SAME INTEGRITY CHECK THAT WAS INTRODUCED IN

16   ITUNES 6.0 AS PART OF THE REDESIGNED KEYBAG ON THE DESKTOP?

17   **A.**  YES.  THIS IS CORRECT.

18   **Q.**  SAME INTEGRITY CHECK AS AN ITUNES 7.0 AS PART OF THE

19   REDESIGNED KEYBAG ON THE IPOD?

20   **A.**  YES.  THIS IS CORRECT.

21   **Q.**  OKAY.

22       SO, LET'S NOW TALK ABOUT ITUNES 7.4.  IF YOU CAN TELL FROM

23   THE CHART OVER THERE, WHEN 7.4 ISSUED.

24       I THINK YOU HAVE TO LOOK AT THE BOARD.

25   **A.**  OKAY.  7.4 WAS ISSUED IN SEPTEMBER 5TH, 2007.

136
FARRUGIA – CROSS / DUNN

1    **Q.**   AND WHAT WERE THE UPDATES CONTAINED IN 7.4 FROM A SECURITY

2    PERSPECTIVE?

3    **A.**   ONE OF THE UPGRADE WE DID WAS TO REINFORCE ALL THE

4    SECURITY WE DID ON THE 60, 70, BECAUSE, LIKE I SAID, WE WANT

5    TO MAKE SURE WE ARE AHEAD OF THE HACKERS.   AND WE HAVE

6    REDEFINED ALL THE CRYPTO, ALL THE MATHEMATICAL FUNCTION TO

7    MAKE SURE THAT WE ARE STRONG.

8        IN OTHER WORDS, WHEN WE ISSUE 74, ALL THE HACKER WHO

9    WORKED ON 70, THEY ARE GOING TO HAVE TO TAKE ALL OF THE

10   IMPLEMENTATION WE HAVE COLLECTED, ALL THE TIME THEY SPEND, AND

11   TO RESTART AGAIN, WHICH THIS GIVE US TIME.

12       THE SINGLE IMPROVEMENT WE DID WAS AT THIS TIME IS WE

13   ACTIVATED THE DB SIGNING ON THE IPOD.

14   **Q.**   BEFORE WE GET TO DB SIGNING, JUST BE CLEAR ABOUT WHY YOU

15   WANTED TO CHANGE THE CRYPTOGRAPHY?

16   **A.**   THE REASON IS EVERY SINGLE RELEASE OF ITUNES NEED TO

17   IMPLEMENT A NEW DEFINITION OF THE SECURITY, A NEW SYMMETRY OF

18   THE SECURITY.

19       AND LIKE THIS, IF YOU HAVE A HACKER WHO WORKED ON 70, AND

20   THE HACKER WORKS, FOR EXAMPLE, EIGHT MEN ON 70 AND DIDN'T FIND

21   OR SHE DIDN'T FIND A SOLUTION, BY UPDATING THE SYMMETRY WITH

22   74, NOW ALL THE WORKS HE OR SHE DID IS RESET BECAUSE WE HAVE

23   CHANGED EVERYTHING, WHICH MEANS THAT HE OR SHE HAS TO RESTART

24   FROM THE BEGINNING OF THE INVESTIGATION.

25       AND WE DO THAT ON A REGULAR BASIS BECAUSE, AGAIN, WE WANT

137

1    TO BE HEAD OF THE HACKERS.  WE WANT TO BE THE CAT, WHICH MEANS

2    THAT FOR EVERY RELEASE OF ITUNES, WE CHANGE THE SYMMETRY TO

3    MAKE SURE THAT EVERY HACKER WHO WORKED ON THE PREVIOUS VERSION

4    TO TAKE ALL THE DOCUMENT AND START AGAIN FROM ZERO.

5    **Q.**  AND TAKING JUST THAT CHANGE BY ITSELF WITHOUT THE DB

6    SIGNING, WOULD THAT CHANGE BY ITSELF HAVE MEANT THAT HARMONY

7    COULDN'T WORK?

8    **A.**  YES.  THAT IS CORRECT.

9    **Q.**  WHY WAS THAT?

10   **A.**  BECAUSE THE NEW CRYPTO, BECAUSE THE NEW FORMAT OF THE

11   KEYBAG WE DID BASICALLY STOPPED -- STOPPED ALL THE PROCESS

12   HARMONY WAS USING.

13   **Q.**  SO PUTTING THE KEYBAG ASIDE, WE ARE JUST TALKING ABOUT A

14   CHANGE TO DATABASE.  I APPRECIATE ALREADY AFTER 7.0 THE KEYBAG

15   CHANGES WERE ALREADY IMPLEMENTED.  SO --

16   **A.**  HARMONY WAS USING AN OLD VERSION OF THE KEYBAG.

17   **Q.**  AND JUST TO BE CLEAR, DID YOU CONSIDER THE CHANGE IN THE

18   CRYPTOGRAPHY AND THE DATABASE INTEGRITY CHECK TO BE SECURITY

19   IMPROVEMENTS?

20   **A.**  YES.  ABSOLUTELY CORRECT.

21   **Q.**  WHY DID YOU IMPLEMENT THE DATABASE INTEGRITY CHECK OR I

22   THINK YOU ALSO REFERRED TO IT AS DB SIGNING?

23   **A.**  THE REASON IS, AGAIN, WHEN YOU HAVE A SYSTEM THAT IS

24   SECURE, YOU WANT TO PROTECT THE SYSTEM AGAINST DIRECT AND

25   INDIRECT ATTACK.  IF YOU WERE ABLE TO PUT SOMETHING INSIDE THE

138
FARRUGIA – CROSS / DUNN

1    DATABASE, AND THE DATABASE IS SOMETHING WE ARE GOING TO BRING

2    INSIDE THE CLOAK BOUNDARY, WE NEED TO VERIFY THAT NO ONE HAS

3    TAMPERED WITH IT BECAUSE MOVING SOMETHING FROM A NONSECURE

4    ENVIRONMENT TO A SECURE ENVIRONMENT YOU CAN CREATE FAULTS

5    INSIDE THE SYSTEM, AND FAULTS CAN LEAVE A LOT OF INFORMATION

6    TO THE HACKER.

7         FOR EXAMPLE, WHAT THE HACKER, THEY WANT TO DO, THEY WANT

8    TO CRASH THE SYSTEM.  THEY WANT TO CRASH YOUR SYSTEM.  WHEN

9    YOU CRASH THE SYSTEM, YOU GET A LOT OF INFORMATION.  THIS IS

10   WHY BEFORE WE ACCESS THE KEY, BEFORE WE ACCESS THE INSIDE OF

11   THE INFORMATION, WE VERIFY THAT, YES, WHAT WE ARE GOING TO

12   BRING FROM THE OUTSIDE IN HAS NOT BEEN TAMPERED.  THAT IS THE

13   INTEGRITY VERIFICATION.

14   Q.   I WANT TO BE CLEAR FOR THE JURY.

15        ARE YOU SAYING IT INJECTED FAULTS?  IS THAT WHAT YOU MEAN,

16   FAULTS?

17   A.   FAULTS.  SORRY.

18   Q.   THAT'S OKAY.  I JUST WANT TO MAKE SURE WE ARE ON THE SAME

19   PAGE.

20        WHEN YOU SAY "INJECTED FAULTS", WHAT IS THAT?

21   A.   IF YOU INJECT FAULTS INSIDE SOMETHING, FOR EXAMPLE, DB,

22   WHEN I BRING THE DB INSIDE THE CLOAK BOUNDARY, FAULTS CAN

23   CREATE A PROBLEM ON THE CLOAK BOUNDARY AND I CAN CRASH.  IF I

24   CRASH, I CAN DISCLOSE A LOT OF INFORMATION I'M NOT SUPPOSED

25   TO.

139
FARRUGIA – CROSS / DUNN

```
 1        THIS IS WHY BEFORE WE ACCESS THE INFORMATION, WE WANT TO

 2   MAKE SURE THAT THE INFORMATION I'M GETTING IS CORRECT.  THE

 3   INFORMATION WAS NOT TAMPERED.  RIGHT?

 4   Q.  WHAT IS THE DANGER OF DISCLOSING THAT INFORMATION?

 5   A.  THAT HACKERS, THEY GET INFORMATION.  ANOTHER HACKER TALK

 6   TO ANOTHER HACKER, TALK TO ANOTHER HACKER.  AT THE END YOU

 7   HAVE A HACKED SYSTEM.  IT IS GIVING SECURITY INFORMATION TO

 8   THE COMMUNITY, TO THE HACKERS TO BE ABLE TO HACK YOUR SYSTEM.

 9   Q.  I WOULD LIKE TO SHOW YOU NOW AN EXHIBIT THAT PLAINTIFFS'

10   COUNSEL SHOWED YOU.  IT'S TRIAL EXHIBIT 316.

11        IF WE CAN JUST GO TO THE NEXT PAGE, FIRST PARAGRAPH WHERE

12   IT SAYS "PROBLEM".

13                   (EXHIBIT DISPLAYED TO JURY.)

14   A.  I DON'T HAVE IT.

15   Q.  IT WON'T BE IN THAT.  I THINK YOU HAVE TO LOOK ON THE

16   SCREEN FOR THAT.  IT'S IN THE OLD BINDER.

17   A.  OKAY.

18   Q.  THIS IS TALKING ABOUT INJECTION OF CONTENT AND DATABASES

19   FROM CLIENTS OTHER THAN ITUNES.  IT SAYS THAT'S A PROBLEM.

20        TO BE PERFECTLY CLEAR, WHY IS THAT A PROBLEM?

21   A.  IT IS A PROBLEM BECAUSE IF YOU ALLOW A HACKER TO PUT

22   THINGS INSIDE YOUR -- THE DATABASE, AND YOU BRING THE DATABASE

23   FROM AN INSECURE WORLD TO A SECURE WORLD, BASICALLY IT CAN

24   CREATE FAULTS INSIDE THE SYSTEM.  WE NEED TO HAVE THIS

25   INTEGRITY VERIFICATION TO MAKE SURE THAT WHEN WE ARE GOING TO
```

1    USE THE DATABASE, THE DATABASE WAS NO TAMPERED.

2    Q.  LET'S JUST GO BACK TO THE PAGE BEFORE THIS PAGE 1.  AND I

3    JUST WANT TO DIRECT YOU TO THE DATE ON THIS DOCUMENT.

4    A.  IT WAS --

5    Q.  I THINK YOU SHOULD LOOK AT THE DATE IT GOT TO

6    MR. FARRUGIA.  RIGHT UP THERE.

7         THAT SAYS APRIL 25TH, 2006.  HOW LONG AFTER HARMONY HAD

8    LAUNCHED IN APRIL OF 2005 WAS THIS DOCUMENT?

9    A.  HARMONY LAUNCHED IN 2005?  I DON'T HAVE THE TIMELINE IN

10   FRONT OF ME.

11   Q.  HARMONY LAUNCHED IN APRIL 2005.

12   A.  WHICH IS A YEAR AFTER.

13   Q.  WE TALKED A LITTLE BIT ABOUT HACKS TO THE SYSTEM.

14        DID YOU MONITOR THE INTERNET FOR HACKS WHEN YOU WORKED AT

15   APPLE?

16   A.  YES, WE DO.

17   Q.  LET'S LOOK AT EXHIBIT 2317.

18                    (EXHIBIT DISPLAYED TO JURY.)

19        IT'S VERY NOSTALGIC TO SEE THESE IM'S I THINK.

20        THIS LOOKS LIKE IT IS AN INSTANT MESSAGE.  IS THIS AN

21   INSTANT MESSAGE WITH YOU INVOLVED IN IT?

22   A.  YES.  THIS IS A DISCUSSION I HAD WITH JEFF AT THE TIME I

23   WAS AT APPLE.

24   Q.  IF YOU CAN LOOK AT THE CHART AND THEN LOOK AT THE SCREEN,

25   AND TELL ME HOW MANY DAYS AFTER ITUNES 6.0 THIS IM EXCHANGE

FARRUGIA – CROSS / DUNN

1    OCCURRED?

2    **A.**   A FEW DAYS AFTER.

3    **Q.**   AND IS THE RIGHT SIDE YOU?

4    **A.**   THE RIGHT SIDE IS ME.  YOU'RE CORRECT.  YES.

5    **Q.**   IT SAYS "HAVE YOU SEEN THE HYMN FORUM"?

6        WHAT IS HE HYMN FORUM?

7    **A.**   IT WAS A FORUM WHERE HACKERS WERE GATHERING TO EXCHANGE

8    INFORMATION.

9    **Q.**   JEFF SAYS, "NO."

10       AND YOU SAY "A LOT OF ATTACKS."

11       WHAT DO YOU MEAN?

12   **A.**   WE CHANGE THE KEYBAG FORMAT.  RIGHT?  WHICH MEANS THAT

13   EVERYTHING –– ALL THE FLAWS WE HAD IN THE PAST WOULD STOP

14   WORKING AND PEOPLE WERE TRYING TO FIGURE OUT WHAT WAS CHANGED.

15   NO MORE REACTION OF THE HACKER COMMUNITY.

16   **Q.**   AND WHAT DOES JEFF SAY TO YOU ON THE LEFT AFTER "NOT SINCE

17   FIRST THING THIS MORNING".

18   **A.**   HE WAS CONCERNED ABOUT IF IT WAS ALREADY BROKEN.  AND IT

19   WAS NOT.

20   **Q.**   LET'S NOW LOOK AT EXHIBIT 2329.

21                    (EXHIBIT DISPLAYED TO JURY.)

22       SO, MR. FARRUGIA, DO YOU HAVE THAT RIGHT IN FRONT OF YOU?

23   **A.**   YES, I DO.

24   **Q.**   CAN WE LOOK AT THE DATE ON THIS?

25   **A.**   NOVEMBER 22ND, 2005.

FARRUGIA – CROSS / DUNN

1    **Q.**  SO ABOUT A MONTH AFTER THE IM I JUST SHOWED YOU?

2    **A.**  YES.  CORRECT.

3    **Q.**  AND IT LOOKS LIKE JEFF IS FORWARDING A POST TO YOU FROM

4    SOMETHING CALLED HYMN PROJECT.ORG.

5        WHAT IS THAT?

6    **A.**  IT'S A FORUM WHERE ALL THE HACKERS, THEY WERE GATHERING TO

7    EXCHANGE INFORMATION ABOUT HOW TO HACK FAMILY.

8    **Q.**  I'M SORRY, IT'S WHERE THE HACKERS GATHER TO EXCHANGE

9    INFORMATION IS WHAT YOU SAID?

10   **A.**  THE HYMN FORUM, YES.  IT WAS A FORUM WHERE ALL THE

11   HACKERS, THEY WERE GATHERING TOGETHER TO EXCHANGE INFORMATION

12   ABOUT HOW TO HACK FAMILY.

13   **Q.**  SO JEFF SAYS, "THEY'RE MAKING PROGRESS", WHICH IT LOOKS

14   LIKE HE IS QUOTING FROM THE HYMN FORUM.

15       WHAT DID YOU TAKE IT TO MEAN?

16   **A.**  THEY ARE MAKING PROGRESS.  WE ARE INVESTIGATING.  THEY ARE

17   TRYING TO USE DIRECT AND INDIRECT ATTACK.  WE ARE TRYING TO

18   COLLECT INFORMATION.

19   **Q.**  AND THEN WHAT'S YOUR RESPONSE TO JEFF?

20   **A.**  WHAT I'M SAYING IS, IT'S OKAY, THEY CAN MAKE PROGRESS, BUT

21   TODAY THEY DIDN'T HACK THE SOLUTION WE PUT IN 60.  THE NEW

22   REDESIGN WORKS.

23   **Q.**  BUT YOU SAY "FOR THE TIME BEING."

24   **A.**  YEAH, BECAUSE IN THE DRM ON THE SECURITY, THE QUESTION IS

25   NOT IF, IT'S A QUESTION OF WHEN.  WHICH MEANS THAT WE NEED TO

FARRUGIA – CROSS / DUNN

1    MAKE SURE WE ARE AHEAD OF THE HACKERS BY IMPLEMENTING A

2    CORRECT PROCESS.

3        LIKE I SAID BEFORE, I'M NOT IMPLEMENTING A PRODUCT.  I'M

4    IMPLEMENTING A PROCESS.  AND THE PROCESS NEED TO MOVE FASTER

5    THAN THE HACKERS.

6    Q.  LET'S LOOK AT 2416.

7            (EXHIBIT DISPLAYED TO JURY.)

8    A.  COULD YOU GIVE ME A SECOND?

9    Q.  YES.

10   A.  COULD YOU REPEAT THE NUMBER PLEASE FOR ME?

11   Q.  2416.

12   A.  I GOT IT.

13   Q.  IS THIS AN EXCHANGE BETWEEN YOU AND PATRICE GAUTIER, WHO,

14   I THINK, WAS ONE OF YOUR SUPERIORS AT THE TIME?

15   A.  IT WAS NOT A SUPERIOR.  HE WAS WORKING ON ANOTHER

16   ORGANIZATION.

17   Q.  OKAY.  AND HE'S FORWARDING YOU SOMETHING THAT SAYS,

18   "ITUNES 6 DRM CRACKED".

19       IS THAT -- HAD ITUNES DRM 6 BEEN CRACKED?

20   A.  NO, IT WAS NOT.  THIS WAS AN INCORRECT SEMANTIC.  THE KEY

21   WAS TO PROTECT IT.  THE VAULT WHERE I PUT THE KEY THIS TIME

22   WAS PROTECTED.  PEOPLE WERE NOT ABLE TO ACCESS THE KEYS.

23       HOWEVER, THIS IS WHY I SAID "WHEN" AND NOT "IF".  PEOPLE

24   WILL FIND A WAY TO STEAL THE MUSIC JUST BEFORE WE PLAY ON THE

25   SPEAKER.  THEY WERE INSIDE THE SYSTEM TAKING FRAME AFTER FRAME

1    OF THE MUSIC TO BE ABLE TO RE-CREATE THE SONG.  RIGHT?

2        AND AT THIS TIME, WE HAD ALREADY A SOLUTION THAT WE WANTED

3    TO IMPLEMENT TO AVOID THAT BECAUSE WE WANTED TO BE AHEAD OF

4    THE HACKERS.  UNFORTUNATELY, WE DIDN'T HAVE THE TIME TO PUT

5    THAT IN THE PRODUCT BEFORE THEY FIND IT, BUT WE CLOSE THAT

6    AFTERWARD.

7        NOW, THE HACK WAS NOT ON THE KEY LIKE BEFORE, THE HACK WAS

8    BASICALLY PEOPLE THEY WERE IMPLEMENTING A SOFTWARE ON THE

9    MACHINE AND THEY WERE ABLE TO SEE A FRAME AFTER FRAME AFTER

10   FRAME DURING THE PLAYBACK, AND THEN THEY RE-CREATE THE SONG,

11   RIGHT?  BUT THE KEY WAS STILL INTACT.

12   **Q.**  SO THERE HAD BEEN A HACK TO THE SYSTEM BUT NOT TO THE

13   REDESIGNED KEYBAG?

14   **A.**  THIS IS CORRECT.

15   **Q.**  AND YOU TESTIFIED EARLIER THAT THAT'S THE SAME KEYBAG

16   REDESIGN THAT YOU HAD PUT INTO 7.0?

17   **A.**  CORRECT.

18   **Q.**  IS THAT RIGHT?

19       AND BY THE TIME YOU PUT IN 7.0, HAD IT BEEN HACKED BY THAT

20   TIME?

21   **A.**  NO.

22   **Q.**  WAS IT EVER HACKED?

23   **A.**  ON 7.0?  THE KEYBAG -- IT WAS HACKED IN FEBRUARY 2008 BY A

24   HACKER WE CALL REQUIEM.

25   **Q.**  REQUIEM?

FARRUGIA – CROSS / DUNN

1    **A.**  REQUIEM.

2              **THE COURT:**  REQUIEM?

3              **THE WITNESS:**  REQUIEM.  LIKE THE MUSIC.

4    **BY MS. DUNN:**

5    **Q.**  SO HOW LONG DID IT TAKE TO REDESIGN KEYBAG TO GET HACKED

6    BY REQUIEM?

7    **A.**  ROUGHLY 800 DAYS.

8    **Q.**  IS THAT A PRETTY GOOD RECORD?

9    **A.**  YES.

10   **Q.**  AND WHEN REQUIEM HACKED THE KEYBAG, DID REQUIEM HACK THE

11   IPOD OR THE DESKTOP OR BOTH?

12   **A.**  IT WAS ON THE DESKTOP.  THE HACK WAS ONLY ON THE DESKTOP

13   BECAUSE THE DESKTOP IS THE WEAKEST LINK INSIDE THE SYSTEM.

14   **Q.**  LET'S LOOK AT TRIAL EXHIBIT 2342.

15   **A.**  23?

16   **Q.**  2342.

17              (EXHIBIT DISPLAYED TO JURY.)

18   **A.**  OKAY.

19   **Q.**  AND IS THIS AN EMAIL FROM YOURSELF TO JEFF ROBBIN AND TWO

20   OTHER PEOPLE AT APPLE ON JANUARY 7, 2006?

21   **A.**  YES.  THIS IS CORRECT.

22   **Q.**  THE SUBJECT LINE SAYS "COMMENT FROM HYMN FORUM THIS

23   MORNING"?

24   **A.**  THAT'S CORRECT.

25   **Q.**  CAN YOU READ THE FIRST SENTENCE?

1    **A.**  (READING)

2             "MAYBE I'M MISSING SOMETHING, BUT WOULDN'T THE IPOD

3             BE THE OBVIOUS PLACE TO GET THE KEYS?"

4    PEOPLE, THEY WERE TRYING TO FIND THE KEYS ON THE DESKTOP.

5    THEY DIDN'T.  THEY SAY, MAYBE WE CAN GO ON THE IPOD TO SEE IF

6    WE CAN GET THE KEYS.

7    **Q.**  DID YOU CONSIDER THIS A DIRECT THREAT TO THE IPOD KEYBAG?

8    **A.**  ANY KIND OF COMMENT LIKE THIS IS A THREAT FOR ME.

9    **Q.**  HOW DID YOU ADDRESS THE THREAT TO THE IPOD KEYBAG?

10   **A.**  LIKE WE DO FOR EVERY SINGLE PLACE ON THE ECO SYSTEM.

11   RELEASE AFTER RELEASE AFTER RELEASE WE CHANGE THE SYMMETRY.

12   WE IMPROVE THE SECURITY.

13   **Q.**  JUST TO BE PERFECTLY CLEAR, DID THIS EMAIL HAPPEN BEFORE

14   OR AFTER ITUNE 7.0?

15   **A.**  THAT WAS BEFORE 7.0.

16   **Q.**  I WOULD LIKE TO NOW SHOW YOU AN EXHIBIT THAT PLAINTIFFS'

17   COUNSEL SHOWED YOU, EXHIBIT 271.  SO IT WILL BE IN YOUR OTHER

18   BINDER, BUT WE WILL ALSO PUT IT ON YOUR SCREEN FOR YOU.

19                   (EXHIBIT DISPLAYED TO JURY.)

20   PLAINTIFFS' COUNSEL FOCUSED ON THE PART WHERE YOU SAY "FOR

21   YOUR INFORMATION".  I'M TRYING TO QUALIFY IT.  BUT I THINK IT

22   WOULD BE HELPFUL TO LOOK AT THE ARTICLE ITSELF, TOO.

23   SO, THE HEADLINE OF THIS ARTICLE IS "DRM COMPANY VOWS TO

24   HACK ITUNES DRM".

25   IT SAYS THEY VOW TO CRACK THE ITUNES DRM.  AND IT SAYS, IN

FARRUGIA – CROSS / DUNN

1    THE LAST GRAPH ON THE SCREEN THAT "NAVIO SYSTEMS PROMISES TO

2    REVERSE ENGINEER THE ITUNES DRM FORMAT".

3        AT THIS TIME, YOU'RE DIRECTOR OF DRM SECURITY AT APPLE.

4    WOULD IT HAVE CONCERNED YOU THAT THIS ARTICLE SAYS IT IS GOING

5    TO HACK YOUR ITUNES DRM?

6    **A.**  YES.  ABSOLUTELY.

7    **Q.**  WOULD IT HAVE MATTERED TO YOU WHO THIS WAS ABOUT, WHETHER

8    IT WAS ABOUT A BUSINESS, OR A TEENAGER, OR SOME ANONYMOUS

9    BLOGGER?

10   **A.**  NO.  EVERY THREAT IS VERY IMPORTANT FOR US.

11   **Q.**  DID YOU TREAT THIS THREAT THE SAME WAY YOU WOULD TREAT ANY

12   THREAT?

13   **A.**  ABSOLUTELY CORRECT.  YES.

14   **Q.**  LET'S LOOK AT 267, WHICH IS ANOTHER EMAIL THAT PLAINTIFFS'

15   COUNSEL SHOWED YOU -- OR ANOTHER DOCUMENT.

16                   (EXHIBIT DISPLAYED TO JURY.)

17        **MS. DUNN:**  ACTUALLY, I DON'T EVEN KNOW IF --

18   MR. COUGHLIN, CAN CORRECT ME, I DON'T EVEN KNOW IF YOU SHOWED

19   HIM THIS EMAIL SO MUCH AS YOU REFERRED --

20        **MR. COUGHLIN:**  HE SAID HE HAD NO FAMILIARITY WITH

21   THIS.

22        **MS. DUNN:**  RIGHT.

23        SO -- AND YOU ARE NOT ON THIS EMAIL.  LET'S JUST LOOK AT

24   THE DATE.

25        **MR. COUGHLIN:**  I OBJECT TO IT.  HE SAID HE HAD NO

1    FAMILIARITY.  I ASKED HIM ABOUT IT, AND HE SAID HE HAD NO

2    FAMILIARITY.

3            THE COURT:  SO THE OBJECTION IS FOUNDATION?

4            MR. COUGHLIN:  FOUNDATION.

5            THE COURT:  THAT'S ALL I NEED TO HEAR.

6            MR. COUGHLIN:  THANK YOU.

7            THE COURT:  SUSTAINED.

8    BY MS. DUNN:

9    Q.  MR. FARRUGIA --

10            MS. DUNN:  ACTUALLY, I WOULD LIKE TO CONSULT WITH

11    COUNSEL TO CHECK THE TRANSCRIPT ON SOMETHING.

12                    (ALARM GOES OFF.)

13            THE COURT:  LET ME FIND OUT WHAT THAT IS.

14                    (PAUSE IN THE PROCEEDINGS.)

15            THE COURT:  WHILE WE ARE WAITING FOR THE

16    ANNOUNCEMENT, WHY DOESN'T EVERYBODY IN THE COURTROOM MAKE SURE

17    YOU HAVE YOUR PERSONAL BELONGINGS READY IN CASE WE NEED TO

18    EVACUATE.

19        THAT IS OUR FIRE ALARM.  I DON'T KNOW EXACTLY WHAT IS

20    GOING ON.  SO JUST IN CASE, MAKE SURE YOU ARE READY TO GO.

21        I AM GOING TO ASK MR. ISAACSON MAKE SURE THAT DOOR IS

22    AVAILABLE FOR US, PLEASE.

23        LADIES AND GENTLEMEN, IF REQUIRED, WE GO OUT THIS DOOR

24    HERE THAT SAYS "EXIT".  THERE IS A FIRE ESCAPE, EMERGENCY EXIT

25    THAT TAKES US DOWN TO THE FIRST FLOOR.

1      IF I'M CLEARING THIS COURTROOM, I AM USING BOTH DOORS.

2                (PAUSE IN THE PROCEEDINGS.)

3      THERE MAY BE SOMETHING GOING ON IN COURTROOM 5.  COURTROOM

4  5 IS ON OUR SECOND FLOOR.

5                (PAUSE IN THE PROCEEDINGS.)

6           THE COURT:  IT'S A FALSE ALARM.

7           THE CLERK:  IT IS A FALSE ALARM.  THEY ARE TRYING TO

8  FIGURE OUT HOW TO TURN IT OFF.

9           THE COURT:  SO WHY DON'T WE -- I WILL LET THE JURY GO

10  INTO THE JURY ROOM.  WE CAN'T HAVE -- I CAN'T HAVE ANYTHING

11  HAPPEN.  IT IS A FALSE ALARM, SO I DON'T HAVE TO EVACUATE THE

12  COURTROOM.  WE ARE NOT GOING TO GET STARTED UNTIL THE SOUND

13  STOPS.

14      LET ME SEE WHAT I CAN DO IN THE BACK.  ALL RIGHT?  SO WE

15  WILL STAND IN RECESS UNTIL THE MUSIC ENDS.

16        (RECESS TAKEN AT 11:48 A.M; RESUMED AT 11:57 A.M.)

17           THE COURT:  GET YOUR TEAM BACK.  LET'S GO.

18      MS. SWEENEY, GET YOUR TEAM BACK.

19           MS. DUNN:  WE SENT SOMEONE TO GET THE WITNESS.

20           THE COURT:  ALL RIGHT.  LET'S CALL THE JURY BACK IN.

21        (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

22           THE COURT:  OKAY.  HAVE A SEAT.  WE ARE BACK ON THE

23  RECORD.  THE RECORD WILL REFLECT THAT THE JURY IS BACK.

24      ALL I CAN TELL YOU IS THAT I'M TOLD THEY PUT A BRAND NEW

25  SYSTEM IN DOWN IN COURTROOM 5, IT TRIPPED ITSELF.  THE PEOPLE

FARRUGIA – CROSS / DUNN

1    WHO KNEW THE OLD SYSTEM WEREN'T HERE.  THE PEOPLE WHO KNEW THE

2    NEW SYSTEM WEREN'T HERE.  THEY DIDN'T KNOW HOW TO MAKE

3    ANNOUNCEMENTS.  ANYWAY, I GUESS WE WILL ALL FIGURE IT OUT.

4         IT'S NOON.  WE TYPICALLY TAKE OUR BREAK AT NOON.  I KIND

5    OF WOULD LIKE TO GET BACK ON THE RECORD.  EVERYBODY KIND OF

6    HAD A BREAK EXCEPT THE RINGING IS STILL HAPPENING IN MY EARS,

7    PROBABLY YOURS, TOO.

8         SO LET'S GO AND I WILL CHECK IN WITH EVERYBODY IN HALF AN

9    HOUR OR SO TO SEE IF WE NEED A BREAK, OR IF WE JUST KEEP

10   GOING.  OKAY?

11        OBVIOUSLY IT IS THE COURT'S TIME.  DOESN'T GET CHARGED

12   AGAINST ANYONE.

13             **MS. DUNN:**  WE APPRECIATE THAT, YOUR HONOR.

14             **THE COURT:**  OKAY.  MS. DUNN, YOU MAY CONTINUE.

15             **MS. DUNN:**  THANK YOU.

16   **BY MS. DUNN:**

17   **Q.**  LET'S LOOK AT EXHIBIT 269, WHICH, MR. FARRUGIA, IS ANOTHER

18   DOCUMENT THAT PLAINTIFFS' COUNSEL SHOWED YOU.

19             (EXHIBIT DISPLAYED TO JURY.)

20        WAS THIS INSTANT MESSAGE BETWEEN YOU AND JEFF ROBBIN?

21   **A.**  YES.  THIS IS CORRECT.

22   **Q.**  WAS IT ABOUT INTEGRITY CHECKS?

23   **A.**  HE DOESN'T SAY "INTEGRITY CHECK", BUT IT LOOKS LIKE.

24   **Q.**  WHEN YOU SAY -- WHEN JEFF ROBBIN SAYS, "I THINK WE NEED TO

25   TALK WITH GUY ABOUT DOING A SIMPLE AUTHENTICATION FOR 6.0",

```
1    WHAT IS THAT?

2    A.  AN AUTHENTICATION MECHANISM, WHAT JEFF REFERS HERE IS TO

3    MAKE SURE THAT THE IPOD WILL GET INFORMATION ONLY FROM ITUNES.

4    Q.  IS THAT THE SAME AS THE KEYBAG INTEGRITY CHECK?

5    A.  NO.  IT'S DIFFERENT THINGS.

6    Q.  OKAY.  AND DOWN AT THE BOTTOM IT SAYS, "IF SOMEONE INSERTS

7    KEYS THAT WE DIDN'T CREATE, REMOVE THEM".

8        DID THE KEYBAG INTEGRITY CHECK REMOVE ANY KEYS?

9    A.  WHERE?  THE IMPLEMENTATION WE HAVE DONE, WE HAVE TWO

10   POSSIBILITIES.  ONE WAS TO BE ABLE TO REMOVE THE KEY AND THE

11   SECOND ONE WAS TO DO THE INTEGRITY ON THE FULL KEYBAG.

12       WE CHOOSE THE SINGLE ONE FOR THE BETTER USER EXPERIENCE.

13   Q.  AND LOOKING TO THE DATE OF THIS ARE IM, NOVEMBER 18TH,

14   2005, WAS THIS BEFORE OR AFTER YOUR APRIL 2005 DOCUMENT WHERE

15   YOU TALK ABOUT THE KEYBAG INTEGRITY CHECK?

16   A.  THAT WAS AFTER.

17   Q.  HOW ABOUT BEFORE OR AFTER THE PRESENTATION WE SAW EARLIER

18   FROM JUNE OF 2005?

19   A.  IF IT WAS JUNE, IT WAS AFTER.

20   Q.  HOW ABOUT BEFORE OR AFTER THE PRESENTATION THAT

21   MR. COUGHLIN SHOWED YOU FROM SEPTEMBER OF 2005, WAS THIS AFTER

22   THAT?

23   A.  THIS IS AFTER.

24   Q.  SO DID YOU IMPLEMENT ANYTHING BASED ON THIS INSTANT

25   MESSAGE?
```

FARRUGIA – CROSS / DUNN

1    **A.**  NO, NOT AT ALL.  THAT WAS NOT IMPLEMENTED.

2    **Q.**  LET'S GO QUICKLY TO EXHIBIT 2776, WHICH IS ALSO AN EXHIBIT

3    THAT MR. COUGHLIN SHOWED YOU.

4                    (EXHIBIT DISPLAYED TO JURY.)

5        IF WE CAN LOOK AT THE DOCUMENT ITSELF ON THE NEXT PAGE.

6        I DON'T WANT TO GO BACK THROUGH THIS DOCUMENT BECAUSE

7    MR. COUGHLIN SPENT QUITE A LOT OF TIME ON IT.

8        I WILL JUST ASK YOU, IS THIS DOCUMENT TALKING ABOUT

9    INTEGRITY VERIFICATION OF THE KEYBAG?

10   **A.**  YES.  THIS IS CORRECT.  HE'S TALKING ABOUT THE INTEGRITY

11   VERIFICATION.

12   **Q.**  OF THE KEYBAG?

13   **A.**  NO -- LET ME READ IT.

14       THAT IS A FLAW WE HAD IN THE KEYBAG USING THE MAN IN THE

15   MIDDLE ATTACK THAT I REFER HERE.

16   **Q.**  RIGHT.

17   **A.**  IN THE KEYBAG.

18   **Q.**  AND THEN IF WE SCROLL DOWN WHERE IT SAYS "THE SECOND

19   SOLUTION", WHAT IS THAT TALKING ABOUT?

20   **A.**  IT'S JUST REFERRING THAT WE NEED TO DO ON THE IPOD THE

21   SAME KEYBAG WE DID ON THE DESKTOP.  WE NEED TO USE THE SAME

22   CONCEPT.  IT HAS BEEN VALIDATED ON ITUNES 6, WHICH MEANS THAT

23   WE SHOULD MOVE THAT ON THE IPOD.

24   **Q.**  AND ITUNE 6 LAUNCHED IN OCTOBER; IS THAT RIGHT?

25   **A.**  YES.

FARRUGIA - CROSS / DUNN

1    **Q.**  OF 2005.

2         IF WE CAN CHECK AGAIN THE DATE ON THIS DOCUMENT?

3    **A.**  YES.  THIS DOCUMENT IS NOVEMBER 27TH.  IT WAS AFTER ITUNES

4    6.0.

5    **Q.**  SO YOU ALREADY IMPLEMENTED YOUR REDESIGN IN 6.0 BY THE

6    TIME OF THIS EMAIL?

7    **A.**  THIS IS CORRECT.

8    **Q.**  LET'S ALSO LOOK AT TRIAL EXHIBIT 820.

9              (EXHIBIT DISPLAYED TO JURY.)

10        WHEN MR. COUGHLIN WAS ASKING YOU ABOUT THIS DOCUMENT, YOU

11   SAID THIS RESULTS IN A BETTER USER EXPERIENCE.  YOU WANTED TO

12   SAY MORE, AND MR. COUGHLIN SAID THAT I WOULD HAVE THE

13   OPPORTUNITY TO ASK YOU.

14        SO, I'M GOING TO ASK YOU NOW TO EXPLAIN WHAT YOU MEANT BY

15   THIS IS A BETTER USER EXPERIENCE.

16   **A.**  OKAY.  AT THE TIME WE HAD TO IMPLEMENT THAT, WE HAVE TWO

17   WAYS TO DO THE IMPLEMENTATION --

18              **THE COURT:**  YOU HAD WHAT?

19              **THE WITNESS:**  TWO WAYS TO DO THE IMPLEMENTATION.

20        THE DATABASE HAS EACH -- HAS SEVERAL ENTRIES.  ENTRIES

21   ONE, TWO, THREE, FOUR, AND FIVE.

22        THE FIRST WAY WAS TO MAKE SURE THAT WE DO THE INTEGRITY

23   VERIFICATION FOR EACH ENTRY.  ENTRY ONE AS THE INTEGRITY

24   VERIFICATION.  ENTRY TWO AS THE INTEGRITY VERIFICATION.  ENTRY

25   THREE INTEGRITY VERIFICATION, AND SO FORTH.

1          THE SECOND SOLUTION WAS WE TAKE ALL THE ENTRIES AND WE DO

2     THE INTEGRITY VERIFICATION ON ALL THE ENTRIES.  RIGHT?  NOW WE

3     HAVE EITHER INTEGRITY VERIFICATION PER ENTRIES OR THE

4     INTEGRITY VERIFICATION FOR ALL THE FILE.

5          WE DID BOTH IMPLEMENTATION, AND IT TURN OUT THAT IF YOU DO

6     THE INTEGRITY VERIFICATION PER ENTRY, THE TIME YOU LOAD THE

7     DATABASE INSIDE THE IPOD, WHICH MEANS THE TIME YOU PLAY THE

8     FIRST SONG WAS NOT ACCEPTABLE.  THE USER GOING TO WAIT THREE,

9     FOUR SECOND BEFORE THEY CAN PLAY A SONG.  THAT IS NOT

10    ACCEPTABLE.  YOU CANNOT WAIT THREE OR FOUR SECONDS BEFORE YOU

11    PLAY A SONG.

12         THEREFORE, WE SAID THE ONE WHERE WE DO THE INTEGRITY

13    VERIFICATION OF ALL DATABASE, BASICALLY SINCE WE DO ONLY ONE

14    VERIFICATION, WE MOVE VERY, VERY FAST.  THAT WAS THE REASON

15    THAT WE DO THE INTEGRITY VERIFICATION ON THE FILE ITSELF TO

16    MAKE IT FAST.

17         HOWEVER, THAT IS EVEN BETTER BECAUSE WHEN A USER WAS USING

18    ANOTHER TOOL TO PUT SOMETHING INSIDE THE DATABASE, ANOTHER

19    THIRD-PARTY SOFTWARE, AND THE DATABASE WAS CORRUPTED,

20    BASICALLY THE USER CALLED APPLE CARE AND HE SAYS, "MY LIBRARY

21    DISAPPEAR".  YOUR LIBRARY DISAPPEAR?  RECONNECT YOUR IPOD WITH

22    ITUNES AND YOU HAVE YOUR LIBRARY BACK.

23         IT TURNED OUT THAT BASICALLY IT WAS VERY PREDICTABLE,

24    WHICH MEANS THAT WE HELP THE USER ON THE SITUATION WHERE

25    BASICALLY IT WAS VERY, VERY WELL PREDICTABLE.  THIS IS WHAT I

155
FARRUGIA – CROSS / DUNN

1    SAID IS THE BEST USER EXPERIENCE BECAUSE IT'S THE BEST --

2              **THE COURT:**  SLOW DOWN.

3              **THE WITNESS:**  IT IS THE BEST USER EXPERIENCE BECAUSE

4    WE HAVE A RUNNING TIME WHICH WAS VERY FAST.  LIKE A USER CAN

5    PLAY THE SONG IMMEDIATELY.

6         AND, BY ANY CHANCE THE USER WAS NOT USING ITUNES, WE KNOW

7    AT APPLE CARE THAT THE SONG DISAPPEAR, VERY SIMPLE, RECONNECT

8    YOUR IPOD TO ITUNES AND YOU GET BACK YOUR MUSIC.

9         IT WAS VERY, VERY PREDICTABLE.  THIS IS WHAT I MEANT BY

10   BEST USER EXPERIENCE BECAUSE WE HELP THE USER EVEN IF THE USER

11   WAS IN A SITUATION WHICH WAS NOT GOOD, AND WE HELP THE USER ON

12   THE NORMAL CIRCUMSTANCES WHEN YOU NEED TO PLAY YOUR MUSIC AND

13   TO LOAD A LOT OF SONGS INSIDE YOUR IPOD.

14   **BY MS. DUNN:**

15   **Q.**  THANK YOU.

16        YOU MENTIONED -- I THINK YOU MENTIONED, ALTHOUGH IT WENT

17   VERY QUICKLY, APPLE CARE?

18   **A.**  APPLE CARE, YES.

19   **Q.**  MR. COUGHLIN ALSO ASKED YOU ABOUT THIS.

20        THE CONSUMER COMPLAINTS THAT COME THROUGH APPLE CARE.  SO,

21   I WOULD LIKE TO DIRECT YOU TO EXHIBIT 2089.

22                    (EXHIBIT DISPLAYED TO JURY.)

23   **A.**  DO I HAVE IT HERE?

24   **Q.**  I DON'T THINK YOU HAVE IT THERE, SO LET'S JUST LOOK ON THE

25   SCREEN.

 1          **MS. DUNN:**  SO IF WE CAN JUST ZOOM IN ON THE –– THAT

 2     WOULD BE GREAT.

 3     **BY MS. DUNN:**

 4     **Q.**  MR. FARRUGIA, DO YOU RECOGNIZE THIS AS AN APPLE CARE

 5     COMPLAINT?

 6     **A.**  THIS IS TYPICALLY WHAT WE RECEIVE COMING FROM APPLE CARE

 7     WHEN WE HAVE A USER CALLING APPLE CARE COMPLAINING THAT HE HAS

 8     A PROBLEM.

 9          **MR. COUGHLIN:**  OBJECT TO THE FOUNDATION ON THIS.

10          **THE COURT:**  SUSTAINED.

11       LAY FOUNDATION.

12     **BY MS. DUNN:**

13     **Q.**  MR. FARRUGIA, ARE YOU FAMILIAR WITH THIS TEMPLATE?  THIS

14     FORM?

15     **A.**  IT'S APPLE CARE FORM THAT WE RECEIVE, YEAH.

16     **Q.**  AND HOW ARE YOU FAMILIAR WITH THIS FORM?

17     **A.**  WHEN WE HAVE PEOPLE COMPLAINING, USUALLY WE HAVE A FORM

18     LIKE THIS COME IN FROM APPLE CARE OR FROM DIFFERENT

19     ORGANIZATION.

20          **MR. COUGHLIN:**  I OBJECT TO FOUNDATION, YOUR HONOR.

21     HE HAS NO FAMILIARITY WITH THIS DOCUMENT.

22     **BY MS. DUNN:**

23     **Q.**  MR. FARRUGIA, MR. COUGHLIN ASKED YOU SPECIFICALLY ABOUT

24     CUSTOMER COMPLAINTS APPENDED TO YOUR DECLARATION.  THIS IS A

25     COMPLAINT THAT WAS APPENDED TO YOUR DECLARATION.

FARRUGIA – CROSS / DUNN

1    DID YOU REVIEW THE COMPLAINTS THAT WERE APPENDED TO YOUR

2    DECLARATION?

3    **A.**  YES.  THIS IS CORRECT.

4         **MR. COUGHLIN:**  I STILL OBJECT, YOUR HONOR.  THERE IS

5    NO INDICATION THAT HE HAD THAT BEFORE HE SUBMITTED THEM WITH

6    HIS DECLARATION.

7         **THE COURT:**  MR. COUGHLIN, YOUR OBJECTION MAINTAINS

8    FOUNDATION?  IS THAT STILL YOUR OBJECTION?

9         **MR. COUGHLIN:**  YES.

10        **THE COURT:**  THAT'S ALL I NEED TO HEAR.  YOU ARE

11   OVERRULED.  YOU WILL HAVE AN OPPORTUNITY TO CROSS.

12        **MS. DUNN:**  THANK YOU, YOUR HONOR.

13   **BY MS. DUNN:**

14   **Q.**  FOCUSING YOUR ATTENTION, MR. FARRUGIA, THEN ON THIS

15   DOCUMENT.

16      THE CASE TITLE SAYS CUSTOMERS SONG SKIP WITHOUT PLAYING.

17   IF YOU GO TO -- HALFWAY THROUGH THAT BOX, WHERE IT SAYS

18   "TROUBLESHOOTING", CAN YOU JUST READ WHAT IT SAYS AFTER THE

19   WORD "TROUBLESHOOTING"?

20   **A.**  (READING)

21        "CUSTOMER SAYS HE/SHE BEEN TRYING TO SYNC WITH REAL

22        PLAYER."

23   **Q.**  AND THEN WHAT DOES IT SAY RIGHT AFTER THAT?

24   **A.**  (READING)

25        "LET HIM KNOW THAT WE DO NOT SUPPORT REAL PLAYER ON

FARRUGIA – CROSS / DUNN

1           ITUNES AND MUSIC MATCH."

2   **Q.**  TURNING NOW TO PAGE 13 OF 2089, PART OF THE SAME EXHIBIT.

3   IF WE CAN FOCUS IN ON THIS BOX.

4       YOU BEGIN READING IN THIS BOX?

5   **A.**  (READING)

6           "I RECENTLY HAD IMPORTED ALL MY MUSIC FILES INTO REAL

7           PLAYER.  AFTER I SAW THAT IT WAS NOT UP TO THE

8           STANDARDS OF ITUNES, I DELETED ALL THE FILES FROM

9           REAL PLAYER."

10  **Q.**  KEEP GOING.

11  **A.**  (READING)

12          "YET WHEN I DID THIS, IT ALSO DELETED ALL MY FILE IN

13          ITUNES AS WELL."

14  **Q.**  KEEP GOING.

15  **A.**  (READING)

16          "WHEN I WENT TO UPDATE MY IPOD, IT STARTED ACTING

17          STRANGELY.  IT WOULD TURN OFF WHEN IT STILL HAD

18          BATTERIES AND IT WOULD NOT PLAY THE SONG TO ITS FULL

19          LENGTH."

20  **Q.**  JUST THE NEXT SENTENCE.

21  **A.**  (READING)

22          "WHEN I TRIED TO UPLOAD NEW FILE INTO THE IPOD AFTER

23          I DELETED ALL THE SONGS FROM REAL PLAYER, IT JUST

24          DISPLAYED AN E REPRODUCE.  SO FAR I HAVE TRIED

25          RESTORING THE IPOD, BUT ALL THE PROGRAM WOULD JUST

1            SAY THAT THE IPOD COULDN'T BE LOADED."

2    **Q.**  OKAY.  LET'S THEN MOVE QUICKLY TO PAGE 32.

3            **MR. COUGHLIN:**  YOUR HONOR, I OBJECT.  THESE ARE

4    HEARSAY, UNLESS --

5            **THE COURT:**  SUSTAINED.

6            **MS. DUNN:**  THANK YOU, YOUR HONOR.

7        I THINK THE -- I THINK WE GET THE PICTURE, IN ANY EVENT.

8    **BY MS. DUNN:**

9    **Q.**  LET US MOVE ALONG THEN TO A TOTALLY DIFFERENT TOPIC,

10   MR. FARRUGIA.

11       I KNOW YOU DON'T WORK ON THE BUSINESS SIDE OF APPLE, BUT

12   HAVE YOU HEARD OF A COMPANY CALLED AMAZON?

13   **A.**  YES.

14   **Q.**  DO YOU HAVE ANY KNOWLEDGE ABOUT AMAZON'S MP3 STORE?

15   **A.**  IT IS JUST SELLING MP3 SONGS.

16   **Q.**  AND CAN MUSIC FROM AMAZON.COM BE PUT INTO ITUNES?

17   **A.**  ABSOLUTELY.  LIKE MUSIC YOU CAN READ FROM CD'S, YOU CAN

18   PUT IT ON ITUNES AND SYNC THAT TO YOUR IPOD.

19   **Q.**  SO, MUSIC FROM AMAZON CAN BE PUT INTO ITUNES.  I THINK

20   THAT'S WHAT YOU JUST SAID.  CAN THAT MUSIC FROM AMAZON THAT'S

21   PUT INTO ITUNES BE PUT ONTO THE IPOD?

22   **A.**  ABSOLUTELY CORRECT.

23   **Q.**  DID YOU EVER DO ANYTHING TO STOP THAT?

24   **A.**  NOT -- TO STOP THE FEATURE OF ITUNES IF YOU RIP A CD, IF

25   IT IS -- IT IS A FEATURE OF ITUNES IF YOU RIP A CD OR YOU TAKE

FARRUGIA – CROSS / DUNN

1    A MP3 FILE FROM SOMEBODY ELSE, YOU ARE ABLE TO PUT THAT INSIDE

2    YOUR LIBRARY, AND SYNC THAT TO THE IPOD.

3    **Q.**  DID ANYONE EVER ASK YOU TO DO ANYTHING TO STOP THAT?

4    **A.**  NO.

5    **Q.**  DID THE KEYBAG INTEGRITY CHECK STOP AMAZON MUSIC FROM

6    BEING ABLE TO PLAY ON AN IPOD?

7    **A.**  NO.

8    **Q.**  HOW ABOUT THE DATABASE INTEGRITY CHECK?

9    **A.**  NO.

10   **Q.**  HOW ABOUT ANYTHING IN ITUNES 7.0 OR 7.4 DID ANYTHING IN

11   YOUR FAIRPLAY REDESIGN PREVENT AMAZON SONGS FROM BEING PLAYED

12   ON AN IPOD?

13   **A.**  NO.

14   **Q.**  OKAY.

15       I WOULD LIKE TO SHOW YOU EXHIBIT 2265, WHICH WAS, AGAIN,

16   AN EXHIBIT THAT MR. COUGHLIN SHOWED YOU.  I WANT TO TRY TO

17   CLEAR UP SOME CONFUSION ABOUT CLOAKWARE.

18                    (EXHIBIT DISPLAYED TO JURY.)

19       IN YOUR DECLARATION, YOU SAID THAT CLOAKWARE HAD DEVELOPED

20   MANY OF THE SAME VULNERABILITIES AS YOU DID.

21       DID CLOAKWARE IDENTIFY ALL OF THE SAME VULNERABILITIES

22   THAT YOU DID?

23   **A.**  IT LOOKS LIKE WE WERE VERY CLOSE TO FIND THE SAME

24   VULNERABILITIES, YES.  CORRECT.

25   **Q.**  DID THEY IDENTIFY EVERY SINGLE VULNERABILITY THAT YOU

FARRUGIA – CROSS / DUNN

1    IDENTIFIED?

2    **A.**  NOT THE SAME PLACE, BUT YES.

3    **Q.**  OKAY.  AND WHAT IS CLOAKWARE?

4    **A.**  CLOAKWARE IS A SOFTWARE COMPANY -- A TOOL COMPANY THAT HAS

5    HEADQUARTER IN CANADA.  AND THEY SELL TOOL THAT PROTECT THE

6    CODE TO CREATE THIS CLOAK BOUNDARY.

7    **Q.**  IS THAT OBFUSCATION?

8    **A.**  IT'S WHAT WE CALL OBFUSCATION AS WELL.

9    **Q.**  AND DID YOU ALWAYS DO WHAT CLOAKWARE TOLD YOU TO DO?

10   **A.**  NO.

11   **Q.**  DID YOU SOMETIMES DO OTHER THINGS?

12   **A.**  YES.

13   **Q.**  DID YOU HAVE EXPERTISE THAT CLOAKWARE DID NOT HAVE?

14   **A.**  DO I HAVE EXPERTISE -- YES, I BELIEVE THAT.

15   **Q.**  LET'S LOOK AT PAGE 5 OF THIS DOCUMENT.

16       AND CAN YOU TELL, BECAUSE I KNOW THAT THERE'S NUMBERS IN

17   THE DOCUMENT, THIS IS THE RIGHT PAGE 5.

18       CAN YOU TELL FROM LOOKING AT THIS DOCUMENT WHETHER IT'S

19   TALKING ABOUT ITUNES OR THE IPOD?

20   **A.**  I CANNOT READ THE DOCUMENT.  IT'S --

21           **THE COURT:**  I'M SORRY, I DIDN'T HEAR YOU.

22           **THE WITNESS:**  OKAY.  THANK YOU.  I COULDN'T READ THE

23   DOCUMENT.

24           **THE COURT:**  ME EITHER.

25                   (EXHIBIT SCROLLING.)

FARRUGIA – CROSS / DUNN

1          **THE WITNESS:**  DON'T MOVE PLEASE.

2    **BY MS. DUNN:**

3    **Q.**  IF YOU STICK WITH "EXECUTIVE SUMMARY".

4    **A.**  OKAY.

5          HE WAS SPEAKING ABOUT EVERYTHING.  FAIRPLAY AS A WALL, HE

6    WAS NOT SPEAKING ABOUT ITUNES OR IPOD, HE WAS TALKING ABOUT

7    FAIRPLAY THAT APPLE WAS TRYING TO IMPLEMENT.

8    **Q.**  WHAT DOES THE LAST SENTENCE SAY?

9    **A.**  HE WAS TRYING TO SPEAK ABOUT THE FAIRPLAY, THE DRM APPLE

10   TRIED TO IMPLEMENT.

11   **Q.**  AND WHAT DOES IT SAY AT THE END OF THE FIRST –– OF THE

12   LAST SENTENCE OF THE FIRST PARAGRAPH?

13   **A.**  IT SAY THAT "IT IS FOR QUICKTIME AND ITUNES".

14   **Q.**  DOES IT SAY IPOD IN THAT SENTENCE?

15   **A.**  IT DOESN'T SAY IPOD IN THAT SENTENCE.

16   **Q.**  CAN YOU GO TO PAGE 6 OF THIS DOCUMENT?

17         AND THEN MR. COUGHLIN HAD JUST ASKED YOU ABOUT THAT

18   PARAGRAPH THAT SAYS "MEDIUM TO LONG TERM RECOMMENDATIONS".

19         HE DIDN'T FOCUS ON THIS PART, BUT IN THE PARENTHETICAL,

20   WHAT DOES IT SAY?

21   **A.**  SORRY?

22   **Q.**  IN THE PARENTHETICAL IN THE SECOND PARAGRAPH.

23   **A.**  TYPICALLY THIS IS A TECHNIQUES YOU NEED TO IMPLEMENT

24   INSIDE YOUR CLOAK BOUNDARY TO AVOID HACKERS VALUABLE TO

25   EXPLORE AND FIND WHAT IT IS THE CODE OR PROGRAM YOU HAVE

FARRUGIA – CROSS / DUNN

1    DEVELOPED IS DOING.  AND TO DEBUG IS WHAT A HACKER WILL DO,

2    FOR EXAMPLE, WHEN YOU RUN THE PROGRAM INSIDE THE CLOAK

3    BOUNDARY THEY STOP THE PROGRAM.  THEY STOP.

4        IF YOU RUN THE PROGRAM STEP BY STEP, NOT LIKE YOU DO

5    BECAUSE YOU RUN THROUGH IT VERY FAST, THEY DO IT STEP BY STEP.

6    AND FOR EVERY SINGLE STEP, THEY UNDERSTAND WHAT THE MACHINE IS

7    DOING.  AND THEY HAVE A LOT OF INFORMATION.  WHICH MEANS WE

8    HAVE IMPLEMENTED INSIDE THE CLOAK BOUNDARY THINGS THAT DOESN'T

9    ALLOW THE HACKERS TO DO THAT.

10       AND INTEGRITY VERIFICATION, EXACTLY THE SAME KIND OF

11   THINGS WE DO IS WHEN WE CREATE FAIRPLAY, FAIRPLAY, WHEN IT

12   RUNS INSIDE THE MACHINE, INSIDE OF YOUR COMPUTER, SELF-VERIFY.

13   WHICH MEANS THAT EVERY TIME YOU TRY TO EXECUTE FAIRPLAY, THERE

14   IS FAIRPLAY TRYING TO VERIFY IT, BUT IT WAS NOT VERIFIED.

15   IT'S SELF-VERIFY.

16       IF SOMEONE TRIED TO VERIFY SOMETHING, FAIRPLAY WOULD SAY

17   OH, YOU'RE TRAINED -- YOU VERIFY INTEGRITY VERIFICATION, YOU

18   VERIFY FAIRPLAY, I STOP.  INTEGRITY VERIFICATION IS A STANDARD

19   PRACTICE WE HAVE IN CRYPTO.

20       AND SECURE LOADER, THIS IS ANOTHER KIND OF THINGS WE DO ON

21   THE IPOD AND OTHER DEVICE WHERE THE FIRST THING YOU LOAD

22   BASICALLY VERIFY --

23           MR. COUGHLIN:  YOUR HONOR, I WOULD OBJECT.  HE'S

24   TESTIFYING AS AN EXPERT AND THEY NEVER DESIGNATED HIM AS ONE.

25   HE HAS QUALIFICATIONS, HE CAN TALK ABOUT WHAT HE DID, BUT HE

FARRUGIA – CROSS / DUNN

```
1    CANNOT JUST ESPOUSE ON TECHNICAL ISSUES.

2             THE WITNESS:  WE DID THAT.

3             THE COURT:  THERE IS AN OBJECTION.  DO YOU HAVE A

4    RESPONSE?

5             MS. DUNN:  THIS ACTUALLY IS PERMISSIBLE.  I CAN POINT

6    YOUR HONOR TO A NINTH CIRCUIT CASE UNITED STATES V. GADSON,

7    AND A CASE IN THIS COURT IF THAT WOULD BE HELPFUL.

8             THE COURT:  I AM GOING TO ALLOW IT IN THIS INSTANCE

9    BECAUSE, SPECIFICALLY BECAUSE THIS IS A PARAGRAPH ON WHICH YOU

10   SPENT SIGNIFICANT AMOUNT OF TIME ON DIRECT.

11            MR. COUGHLIN:  THAT'S FINE, YOUR HONOR.

12            MS. DUNN:  I CAN EVEN SIMPLIFY THIS FOR EVERYBODY IF

13   THAT WOULD HELP.

14   BY MS. DUNN:

15   Q.  DOES IT SAY "INTEGRITY VERIFICATION" IN THIS PARAGRAPH?

16   A.  YES, IT DOES.

17   Q.  IS INTEGRITY VERIFICATION SOMETHING THAT APPEARS IN

18   FAIRPLAY BEYOND THE KEYBAG INTEGRITY CHECK?

19   A.  YES.  THIS IS CORRECT.

20   Q.  CAN YOU EXPLAIN A LITTLE BIT ABOUT THAT?

21   A.  THE INTEGRITY VERIFICATION WE DID IN FAIRPLAY IS THE

22   INTEGRITY VERIFICATION OF THE PROGRAM ITSELF.  THE PROGRAM, IF

23   YOU TRY TO TAMPER WITH THE PROGRAM, WE PUT IN ITUNES, THE

24   PROGRAM VERIFY ITSELF.  AND IF YOU TRY TO CHANGE SOMETHING,

25   THE PROGRAM GOING TO -- THANKS TO THE INTEGRITY VERIFICATION,
```

FARRUGIA – CROSS / DUNN

1    YOU'RE GOING TO VERIFY THAT YOU CHANGED SOMETHING, AND

2    ACCORDINGLY, YOU ARE GOING TO STOP.  AND WE DO THAT BECAUSE WE

3    HAVE THE INTEGRITY VERIFICATION OF THE BINARY WE RUN ON NEW

4    MACHINE.

5    **Q.**  IS THERE INTEGRITY VERIFICATION OF KEYS INDIVIDUALLY OR IS

6    THAT NOT SOMETHING THAT YOU DO?

7    **A.**  THIS IS INTEGRITY VERIFICATION OF THE BINARY CODE WE

8    EXECUTE INSIDE THE COMPUTER OR INSIDE THE IPOD.

9    **Q.**  GOT IT.

10       HOW OFTEN DOES APPLE UNDATE FAIRPLAY?

11   **A.**  AS OFTEN AS WE CAN.  BECAUSE, LIKE I SAY FROM THE

12   BEGINNING, IT'S A PROCESS.  AS SOON AS WE HAVE AN OPPORTUNITY

13   TO UPDATE, WE UPDATE TO MAKE SURE THAT WE ARE ALWAYS AHEAD OF

14   THE HACKERS.

15   **Q.**  WE HAVE BEEN TALKING ABOUT ITUNES 7.0 AND 7.4 AND 6.0.

16   ARE UPDATES TO FAIRPLAY GENERALLY OR ALWAYS INCLUDED IN ITUNES

17   UPDATES?

18   **A.**  YES, THIS IS CORRECT.  EVERY TIME WE HAVE A NEW VERSION OF

19   ITUNES, WE HAVE AN UPDATE OF FAIRPLAY.

20   **Q.**  AND WE'VE DISCUSSED YOUR FAIRPLAY REDESIGN.

21       IS THAT -- IS YOUR REDESIGN TO FAIRPLAY STILL CONTAINED IN

22   FAIRPLAY TODAY?

23   **A.**  YES.  THIS IS CORRECT.

24   **Q.**  AND DOES THAT INCLUDE THE INTEGRITY CHECKS?

25   **A.**  YES.  THIS IS CORRECT.

1   **Q.**  SO THE DESIGN TODAY THAT INCLUDES THE INTEGRITY CHECKS,

2   WHAT -- YOU SAID IT PROTECTS CONTENT.  WHAT CONTENT IS IT

3   PROTECTING TODAY?

4   **A.**  IT PROTECT VIDEOS.  IT PROTECTS TV SHOWS.  IT PROTECT

5   APPS.  IT PROTECTS BOOKS.  EVERYTHING THAT WE SELL FROM ITUNES

6   WE HAVE INTEGRITY VERIFICATION FOR PROTECTION.

7   **Q.**  AND IF I HAVE AN IPHONE, IS IT IN MY IPHONE?

8   **A.**  YES, ABSOLUTELY.

9   **Q.**  IPAD?

10  **A.**  ABSOLUTELY.

11  **Q.**  IBOOKS?

12  **A.**  YEAH.

13  **Q.**  OKAY.

14  **A.**  EVERYWHERE.

15          **MS. DUNN:**  I PASS THE WITNESS, YOUR HONOR.

16          **THE COURT:**  REDIRECT LIMITED TO THE SCOPE OF CROSS?

17                  **REDIRECT EXAMINATION**

18  BY MR. COUGHLIN:

19  **Q.**  JUST BRIEFLY, MR. FARRUGIA.

20      SO AFTER YOU DID THE KEYBAG VERIFICATION OR KEYBAG

21  INTEGRITY CHECK, WAS THAT THE ONE THAT PREVENTED THIRD PARTIES

22  DRM SONGS FROM INJECTION?

23  **A.**  THAT WAS CLOSING THE MAN IN THE MIDDLE ATTACK.

24  **Q.**  RIGHT.  AFTER THAT, THE IPOD WOULD REJECT ANY THIRD

25  PARTIES' DRM SONGS; IS THAT CORRECT?

1  **A.**  THIS IS CORRECT.

2  **Q.**  OKAY.

3  AND AFTER THE DATA VERIFICATION CODE WAS PUT IN, APPLE

4  WOULD REJECT ANY THIRD-PARTY PLAYER, RIGHT?  ANY THIRD-PARTY

5  PLAYER.  IF IT DIDN'T COME FROM ITUNES, YOU COULDN'T USE IT IN

6  THE DATABASE.

7  **A.**  IT IS NOT A REJECTION.  THERE'S NO REJECTION.

8  **Q.**  IT NEVER GETS THERE?

9  **A.**  YOU CAN GET THERE, BUT BASICALLY IF YOU GET INSIDE, WE ARE

10  GOING TO DETECT THAT BECAUSE WE THINK THAT YOU ARE TRYING TO

11  HACK THE SYSTEM.

12  IT'S DIFFERENT.  THERE'S NO REJECTION.  YOU CAN TRY TO DO

13  IT.  YOU ARE GOING TO SUCCEED TO DO IT, BUT WE ARE GOING TO

14  VERIFY THAT YOU TAMPER AND WE WILL NOT CONTINUE THE PROCESS

15  BECAUSE WE THINK THAT YOU ARE TRYING TO ATTACK US.

16  **Q.**  EVEN IF YOU ARE JUST USING A THIRD-PARTY PLAYER THAT

17  YOU'VE USED FOR YEARS, YOU DESIGNED A SYSTEM WHERE YOU THINK

18  THAT THIRD-PARTY PLAYER --

19  **MS. DUNN:**  OBJECTION, YOUR HONOR.

20  **MR. COUGHLIN:**  -- IS ATTACKING; IS THAT CORRECT?

21  **THE COURT:**  NO, DON'T ANSWER THE QUESTION.  I HAVE AN

22  OBJECTION.

23  WHAT IS THE OBJECTION?

24  **MS. DUNN:**  OBJECTION AS TO SCOPE.  I DID NOT ASK

25  MR. FARRUGIA ABOUT THIRD-PARTY PLAYERS AND MR. COUGHLIN'S

1    QUESTION GOES TO ANY THIRD-PARTY PLAYER.

2            **THE COURT:**  OVERRULED.

3    **BY MR. COUGHLIN:**

4    **Q.**  NO THIRD-PARTY PLAYERS CAN PLAY; IS THAT CORRECT?

5    **A.**  THIS IS INCORRECT.

6        THEY CANNOT -- WE ARE NOT REJECTING.  WE ARE NOT STOPPING

7    THE PLAYBACK.

8        WHAT WE DO -- WE HAVE TO BE VERY, VERY ACCURATE WITH THE

9    WORD BECAUSE WHAT WE DO, IF YOU TRY TO PUT SOMETHING ON OUR

10   ECO SYSTEM, WE ARE GOING TO THINK THIS IS AN ATTACK FOR US.

11   IF WE THINK THIS IS AN ATTACK, WE WILL NOT PROCESS.  BECAUSE

12   WE DON'T WANT YOU TO GIVE INFORMATION TO THE HACKER TO HACK US

13   AFTERWARD.

14   **Q.**  SO THE ANSWER IS YES, NO THIRD-PARTY PLAYERS CAN PLAY ON

15   THE IPOD AFTER THE DATABASE VERIFICATION CODE WAS PUT ON?

16   **A.**  NO, THIS IS INCORRECT.

17       YOU ARE ALWAYS SAYING THE WORD "PLAY".  I'M NOT SAYING THE

18   WORD "PLAY".  I AM SAYING THAT YOU ARE STILL ABLE TO DO

19   WHATEVER IT IS, BUT BASICALLY WE ARE GOING TO STOP YOU BECAUSE

20   WE THINK IT IS ON THE ATTACK.

21   **Q.**  EVEN IF IT'S NOT?

22   **A.**  IT IS AN ATTACK BECAUSE BASICALLY IF YOU TRY TO PUT

23   SOMETHING ON THE SYSTEM WITH THE SECURITY I BUILD, IF YOU TRY

24   TO TAMPER WHAT I WROTE, MEANS FOR ME IS AN ATTACK.

25       I DON'T KNOW IF IT'S COMING FROM SOMETHING OR SOMEBODY.  I

1    DON'T UNDERSTAND WHERE IT'S COMING BECAUSE BASICALLY I DON'T

2    HAVE KNOWLEDGE OF THAT.

3    **Q.**  SO YOU ARE TELLING THE USER THAT YOU WANT TO DECIDE

4    WHAT –– WHAT THIRD-PARTY PLAYERS THEY CAN USE ON THE ITUNES.

5    NO OTHER THING BUT ITUNES ON THE IPOD, RIGHT?

6    **A.**  THIS IS AN INCORRECT STATEMENT.

7    **Q.**  YOU CAN'T USE AMAZON'S PLAYER ON YOUR IPOD.  YOU CAN BUY

8    THE SONGS AND PUT THEM ON ITUNES ––

9         **MS. DUNN:**  OBJECTION, YOUR HONOR.  RELEVANCE.  AMAZON

10    DOES NOT HAVE A PLAYER.

11    **BY MR. COUGHLIN:**

12    **Q.**  ANY PLAYER, ANY THIRD-PARTY PLAYER.  CAN YOU USE IT, REALS

13    PLAYER?  CAN YOU USE ––

14         **MS. DUNN:**  OBJECTION ASKED AND ANSWERED.

15         **THE COURT:**  OVERRULED.

16    **BY MR. COUGHLIN:**

17    **Q.**  CAN YOU USE REALS PLAYER ON YOUR IPOD AFTER YOU PUT IN THE

18    DATE OF VERIFICATION TO PLAY REAL SONGS?

19    **A.**  YOU HAVE TO BE VERY ACCURATE BECAUSE YOU ARE SAYING A LOT

20    OF THINGS HERE AND YOU ARE CONFUSING ME.

21    **Q.**  OKAY.

22    **A.**  IF YOU USE A THIRD-PARTY PLAYER, OR YOU USE SOMETHING

23    ELSE, WE DESIGN A SYSTEM WITH A SECURITY TO MAKE SURE THAT WE

24    DON'T GIVE INFORMATION TO THE HACKERS, TO AVOID TO GET HACKED.

25         AND ONE OF THE VULNERABILITY WE FIND WAS THE MAN IN THE

1    MIDDLE OR ANY INJECTION, ANY TAMPERING WITH THE ECO SYSTEM.

2    **Q.**  DID YOU TELL THE CUSTOMER WHAT THE ERROR WAS?  IN OTHER

3    WORDS, DID YOU TELL THE CUSTOMER THERE HAS BEEN A THIRD-PARTY

4    INVASION, A MAN IN THE MIDDLE ATTACK, YOU HAVE TO GO RE-SYNC

5    OR DID YOU GIVE THEM A FALSE MESSAGE AND JUST TELL THEM THE

6    ERROR -- LET'S PULL UP 871.  I WILL ASK YOU A QUESTION OFF THE

7    DOCUMENT.

8                    (EXHIBIT DISPLAYED TO JURY.)

9            **MR. COUGHLIN:**  IF WE CAN PULL THAT UP.  MAKE IT ANY

10   BIGGER?

11           **THE WITNESS:**  YES, PLEASE, BECAUSE I CANNOT READ.

12   **BY MR. COUGHLIN:**

13   **Q.**  THIS IS THE -- THIS DOCUMENT, 871, SAYS:

14           "THE AIR SCREEN DOES NOT RECOMMEND SINCE THIS REVEALS

15           SPECIFICS OF THE FAILURE, THE PREFERRED RESPONSE IS

16           FOR USER TO RE-SYNC WITH ITUNES FOR UNKNOWN REASONS

17           SHOULD NEVER HAPPEN TO A NONHACKER."

18   DO YOU SEE THAT?

19   **A.**  ABSOLUTELY CORRECT.

20   **Q.**  DID YOU DIRECT THE ERROR MESSAGE NOT TO TELL 'EM WHAT THE

21   REAL SITUATION WAS?

22   **A.**  WE WANT TO HELP OUR USER AND WE DON'T WANT TO CONFUSE THE

23   PEOPLE.  THAT WAS BASICALLY VERY PREDICTABLE FOR APPLE CARE,

24   WHICH MEAN THAT WHEN WE ARE IN THE SITUATION WHICH IS WE

25   EXPLAINED HERE, WE ASK OUR USER TO GO BACK TO A NORMAL

1    SITUATION BY CONNECTING THE IPOD TO AN ITUNE.  THIS IS EXACTLY

2    WHAT IT SAYS.

3        WE DON'T NEED TO GIVE TOO MUCH INFORMATION BECAUSE WE ARE

4    GOING TO CONFUSE THE USER.  WHAT A USER WANTS IS TO GO BACK TO

5    PLAY THE MUSIC.  WHAT WE SAID IS, SINCE THAT IS VERY, VERY

6    PREDICTABLE BECAUSE YOU DON'T HAVE MUSIC, WE SAID TO THE USER,

7    NOT A PROBLEM, DON'T WORRY, THE MUSIC IS STILL HERE.  IF YOU

8    RECONNECT YOUR IPOD WITH ITUNES, YOU GET YOUR MUSIC.

9    **Q.**  THAT'S NOT WHAT THE MESSAGE SHOWS UP FOR THE USER.  THE

10   MESSAGE SAYS "ERROR".  IT DOESN'T SAY YOU KNOW, ERROR, THEN IT

11   TELLS YOU TO GO BACK AND RE-SYNC, AND THEN IT ERASES YOUR

12   WHOLE DATABASE.

13          **MS. DUNN:**  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

14   THERE IS NO SCREEN THAT SAYS "ERROR" IN THE WAY THAT

15   MR. COUGHLIN DESCRIBED.

16   **BY MR. COUGHLIN:**

17   **Q.**  WHAT DOES THE SCREEN SAY WHEN THE USER USES ON THE IPOD --

18   WHEN THIS FAILURE OCCURS, WHAT DOES IT SAY?

19   **A.**  THIS IS NOT WHAT IT SAYS.  IT IS SPEAKING ABOUT APPLE

20   CARE.  THIS IS SPEAKING ABOUT APPLE CARE.

21       APPLE CARE MEANS THAT BECAUSE WE HAVE A SITUATION WHICH IS

22   VERY PREDICTABLE, BASICALLY THE SYSTEM SAYS -- THE APPLE CARE

23   PEOPLE SAY, YEAH, WE KNOW WHAT IT IS, RECONNECT YOUR IPOD TO

24   ITUNES AND THEN YOU HAVE YOUR MUSIC BACK.

25       WHEN HE SAYS IT SHOULDN'T HAPPEN BECAUSE -- FOR A

1   NONHACKER USER.

2   **Q.**  IT DOESN'T GIVE YOU THE SPECIFICS OF THE FAILURE.  IT

3   DOESN'T SAY THAT YOU WON'T ALLOW THEM TO PLAY BECAUSE THEY'RE

4   USING A THIRD-PARTY PLAYER, CORRECT?

5   **A.**  BECAUSE WE DON'T WANT TO CONFUSE THE USER.  WE WANT TO

6   HAVE THE USER TO PLAY THE MUSIC.  THIS IS HOW YOU HAVE THE

7   BEST USER EXPERIENCE.

8   **Q.**  TOO MUCH INFORMATION FOR THE USER?

9   **A.**  THE USER, WHAT HE WANTS IS HE WANTS TO PLAY THE MUSIC.

10  RIGHT?  MUSIC DISAPPEAR, FIRST THING, YOU DON'T NEED TO KNOW

11  FOR WHY AND FOR WHAT.  THE USER WANTS TO PLAY THE MUSIC.  AND

12  WE REDIRECT THE USER ON THE VERY SINGLE STEP, RECONNECT THE

13  IPOD TO ITUNES AND YOU GET YOUR MUSIC BACK.  HE DOES THAT, AND

14  BY MAGIC, EVERYTHING IS BACK.

15  **Q.**  NOT EVERYTHING.  YOU DON'T GET YOUR REAL PLAYER SONGS

16  BACK.  YOU DON'T GET ANYTHING YOU BOUGHT FROM REALNETWORKS.

17  YOU DON'T GET ANY THIRD-PARTY SONGS BACK THAT WERE PLAYED ON A

18  THIRD-PARTY PLAYER.

19  **A.**  BECAUSE YOU ARE SAYING THE OPPOSITE WAY I AM SAYING THAT.

20      I AM BUILDING A SECURITY SYSTEM.  AND YOU ARE TRYING --

21  AND IF YOU TRY TO COME ON MY SYSTEM, I DON'T KNOW WHAT YOU ARE

22  TRAINED TO DO.  THE ONLY THING I KNOW IS YOU ARE TRAINED TO

23  HACK MY SYSTEM.

24      WHEN YOU TRY TO HACK MY SYSTEM, I HAVE TO REHACK -- SAY, I

25  CANNOT ACCEPT THAT BECAUSE I HAVE A HACKER TRYING TO FIND

1    INFORMATION BY INDIRECT ATTACK.  THIS IS ALL I SEE ON MY

2    SYSTEM.

3        THIS IS WHY WE PUT THE INTEGRITY VERIFICATION.  IF WE HAVE

4    A HACKER COMING AND SAY I WANT TO TAMPER THAT TO GET

5    INFORMATION, WHAT WE SAY IS, SORRY, YOU HAVE TAMPERED IT.  WE

6    CANNOT GIVE YOU THE INFORMATION BECAUSE WE THINK IT IS THE

7    HACKER.

8    **Q.**  BUT YOU DON'T TELL THE USER THAT, FIRST OF ALL, RIGHT?

9    YOU DON'T TELL THE USER WHAT'S HAPPENED?

10   **A.**  IT DOESN'T NEED TO KNOW.  THE USER --

11   **Q.**  THAT'S ENOUGH.

12       YOU DON'T TELL THE USER THAT, RIGHT, WHAT HAPPENED?

13   **A.**  WE TELL THE USER TO --

14   **Q.**  WAIT A SECOND.

15       YOU DON'T TELL THE USER THE SPECIFICS OF THE FAILURE, DO

16   YOU?

17   **A.**  WHY DO YOU NEED TO KNOW THAT?

18   **Q.**  THANK YOU, MR. FARRUGIA.

19           **MR. COUGHLIN:**  I HAVE NO FURTHER QUESTIONS.

20           **THE COURT:**  RECROSS LIMITED TO THE SCOPE OF REDIRECT?

21           **MS. DUNN:**  NO FURTHER QUESTIONS, YOUR HONOR.

22           **THE COURT:**  OKAY.  YOU MAY STEP DOWN, BUT YOU MAY NOT

23   LEAVE UNTIL I DEAL WITH THE EXHIBITS WITH RESPECT TO YOUR

24   TESTIMONY.  OKAY?

25           **THE WITNESS:**  OKAY.

174

```
 1          THE COURT:  ALL RIGHT.

 2          MS. DUNN:  YOUR HONOR?

 3          THE COURT:  WHY DON'T WE GO AHEAD, LADIES AND

 4    GENTLEMEN.  WE WILL TAKE A SHORT BREAK NOW IN BETWEEN

 5    WITNESSES.  ABOUT 15, 20 MINUTES SO I CAN DEAL WITH THE

 6    EXHIBITS HERE, BUT YOU DON'T HAVE TO GO THROUGH THAT MONOTONY

 7    WITH US.

 8       ENJOY YOUR BREAK.

 9       YOU MAY STEP DOWN FOR A MOMENT AFTER THE JURY LEAVES.

10       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

11          THE COURT:  OKAY.  COUNSEL, THIS IS WHAT I HAVE.

12       COME UP TO THE MICS.

13          MS. DUNN:  YOUR HONOR, DO WE HAVE A STANDING ORDER

14    ABOUT WITNESSES BEING SUBJECT TO RECALL OR SHOULD WE ASK?

15          THE COURT:  I DO NOT HAVE A STANDING ORDER FOR THAT.

16    I EXCUSE THEM UNLESS I'M ADVISED THAT THEY MAY BE RECALLED.

17          MS. DUNN:  WE WOULD LIKE TO REQUEST THAT MR. FARRUGIA

18    BE POTENTIALLY SUBJECT TO RECALL.

19          THE COURT:  HE'S YOUR WITNESS.  DO YOU NEED ME TO

20    ORDER HIM TO COME BACK?

21          MS. DUNN:  NO.

22          THE COURT:  OKAY.  IF HE'S YOUR WITNESS, I DON'T NEED

23    TO ORDER HIM.

24          MS. DUNN:  THANK YOU.

25          THE COURT:  ALL RIGHT.  IN TERMS OF THE PLAINTIFFS'
```

```
 1    EXHIBIT, THESE ARE THE ONES THAT I HAVE WERE STIPULATED

 2    PREVIOUSLY TO ADMIT AND THAT WERE USED HERE.

 3        2265, 2239, 2247, 2309, 2776 AND 327.

 4        ARE ALL OF THOSE BEING REQUESTED FOR ADMISSION?

 5            MR. COUGHLIN:  ALL OF THOSE ARE BEING -- WE ARE

 6    ASKING FOR ADMISSION OF ALL OF THOSE.

 7            THE COURT:  GIVEN THE STIPULATION, THEY ARE ADMITTED.

 8            (PLAINTIFFS' EXHIBIT 327 RECEIVED IN EVIDENCE)

 9            (DEFENDANT'S EXHIBITS 2239, 2247, 2265, 2309 AND 2776

10    RECEIVED IN EVIDENCE)

11            THE COURT:  THE NEXT THAT I HAVE IN TERMS OF I DON'T

12    HAVE A STIPULATION, 927.

13        IS THERE AN OBJECTION?

14            MR. COUGHLIN:  THAT'S A JUNE 23RD, 2000 REPORT FROM

15    CLOAKWARE.

16            THE COURT:  YES OR NO?

17            MS. DUNN:  SORRY, YOUR HONOR.  927 IS MR. FARRUGIA'S

18    DECLARATION.  IF WE ARE ONLY SPEAKING ABOUT THE CLOAKWARE

19    EXHIBIT, THAT'S ONE THING.  IF WE ARE SPEAKING ABOUT THE

20    ENTIRETY --

21            MR. COUGHLIN:  JUST SPEAKING ABOUT THE CLOAKWARE

22    EXHIBIT THAT STARTS ON PAGE 39.

23            MS. DUNN:  NO OBJECTION TO THAT.

24            THE COURT:  WE WILL DESIGNATE THAT AS 927A.  IT IS

25    JUST A PORTION.  SO THOSE WILL BE PAGES 39 THROUGH WHATEVER
```

1    THE END OF THAT DOCUMENT IS.

2              (PLAINTIFFS' EXHIBIT 927A RECEIVED IN EVIDENCE)

3          **THE COURT:**  THE NEXT ONE I HAD IS 269.  YOU USED IT

4    IN THE EXAMINATION ON THE DEFENSE.  IS THERE AN OBJECTION?

5          **MS. DUNN:**  269 IS THE IM?

6          **THE COURT:**  I JUST HAVE THE NUMBER, MS. DUNN.  I'M

7    TRYING TO DECIDE WHETHER I'M --

8          **MS. DUNN:**  NO OBJECTION.

9          **THE COURT:**  OKAY.  269 IS ADMITTED.

10             (PLAINTIFFS' EXHIBIT 269 RECEIVED IN EVIDENCE)

11         **THE COURT:**  271.

12         **MS. DUNN:**  OUR ONLY OBJECTION TO 271 IS FOR -- IS AS

13   TO THE ARTICLE BEING OFFERED FOR THE TRUTH SO IT FALLS WITHIN

14   THE LIMITING INSTRUCTION.

15         **THE COURT:**  SO NO OBJECTION.  THEN IT IS ADMITTED

16   GIVEN THE LIMITING INSTRUCTION THE COURT WILL PROVIDE TO THE

17   JURY.

18             (PLAINTIFFS' EXHIBIT 271 RECEIVED IN EVIDENCE)

19         **THE COURT:**  OKAY.  820?

20      267 IS NOT ADMITTED.  LACKS FOUNDATION.

21      820 WAS THEN USED IN YOUR EXAMINATION AS WELL, MS. DUNN.

22         **MS. DUNN:**  NO OBJECTION.

23         **THE COURT:**  IT'S ADMITTED.

24             (PLAINTIFFS' EXHIBIT 820 RECEIVED IN EVIDENCE)

25         **THE COURT:**  316.  THAT WAS USED IN YOURS AS WELL.

177

```
 1              MS. DUNN:  NO OBJECTION.

 2              THE COURT:  316 IS ADMITTED.

 3         (PLAINTIFFS' EXHIBIT 316 RECEIVED IN EVIDENCE)

 4              THE COURT:  871.  THAT WAS USED ON REDIRECT.

 5              MS. DUNN:  NO OBJECTION.

 6         (PLAINTIFFS' EXHIBIT 871 RECEIVED IN EVIDENCE)

 7              THE COURT:  371?

 8        THAT WAS USED IN THE DEFENSE AS WELL.  I ACTUALLY DIDN'T

 9    HAVE A NOTE THAT IT WAS USED DURING THE PLAINTIFFS.

10              MR. COUGHLIN:  I DIDN'T USE IT, YOUR HONOR.

11              THE COURT:  DOES THAT MEAN -- SO THE REST I HAVE IS

12    FROM THE DEFENSE.  I DON'T KNOW IF THEY ARE BEING REQUESTED TO

13    BE ADMITTED OR NOT.

14        371 WAS USED -- IS THERE A REQUEST?  AND IF SO, IS THERE

15    AN OBJECTION?

16              MR. COUGHLIN:  371 IS THE ATTACHED -- LET ME SEE.

17              MS. DUNN:  371?

18              THE COURT:  YOU USED IT, MS. DUNN.

19              MS. DUNN:  OH, THIS ONE.  YES, WE WOULD MOVE TO

20    ADMIT.

21              MR. COUGHLIN:  NO OBJECTION.

22              THE COURT:  371 IS ADMITTED.

23         (PLAINTIFFS' EXHIBIT 371 RECEIVED IN EVIDENCE)

24              THE COURT:  2329 WAS USED.  IS THERE AN OBJECTION?

25    AND IS THERE A REQUEST?
```

178

```
1              MS. DUNN:  2329?

2              MR. COUGHLIN:  I HAVE NO OBJECTION, YOUR HONOR.

3              THE COURT:  IS THERE A REQUEST?

4              MS. DUNN:  YES.  WE MOVE TO ADMIT.

5              THE COURT:  THAT'S ADMITTED.

6         (DEFENDANT'S EXHIBIT 2329 RECEIVED IN EVIDENCE)

7              THE COURT:  2416.  IS THERE A REQUEST?

8              MS. DUNN:  ARE THESE -- I THINK WE CAN MOVE THAT IN,

9    ALTHOUGH I HAVE TO LOOK IT UP.

10             THE COURT:  THIS IS THE ONE WHERE IT SAYS DRM CRACKED

11   FROM AUGUST 29, 2006.

12             MS. DUNN:  YES.  MOVE TO ADMIT.

13             THE COURT:  IS THERE AN OBJECTION?

14             MR. COUGHLIN:  LET ME PULL IT UP, YOUR HONOR.

15        THAT'S 24?

16             THE COURT:  16.

17             MR. COUGHLIN:  I DON'T HAVE IT IN MY BINDER NOW.

18             MS. DUNN:  DO YOU WANT TO USE THIS?

19             MR. COUGHLIN:  I JUST WANT TO SEE IT.

20        NO OBJECTION.

21             THE COURT:  IT IS ADMITTED.

22        (DEFENDANT'S EXHIBIT 2416 RECEIVED IN EVIDENCE)

23             THE COURT:  820.

24             MR. COUGHLIN:  WE REQUEST ITS ADMISSION.  THIS IS --

25   WE PUT THIS ON FIRST, YOUR HONOR, THEN THEY USED IT.
```

1          **MS. DUNN:**  I THINK IT'S ADMITTED.

2          **THE COURT:**  YOU'RE RIGHT.  YEAH, I DID.

3     OKAY.  2265?  THIS IS THE CLOAK DOCUMENT.

4          **MR. COUGHLIN:**  NO OBJECTION.

5          **THE COURT:**  THAT'S ADMITTED.

6       (DEFENDANT'S EXHIBIT 2265 RECEIVED IN EVIDENCE)

7          **THE COURT:**  THEN THE ONLY OTHER ONE WAS THE 2089, AT

8     LEAST ACCORDING TO MY NOTES.  THIS IS -- THERE WAS A HEARSAY

9     OBJECTION.  I THINK THIS IS THE CUSTOMER COMPLAINT.

10         **MR. COUGHLIN:**  I STILL OBJECT.

11         **THE COURT:**  I THINK WE LACK FOUNDATION AT THIS POINT.

12    SO, IT'S NOT ADMITTED AT THIS POINT.

13     OKAY.  THOSE ARE ALL THE ONES I HAD.  I DON'T KNOW IF YOU

14    HAVE OTHERS, BUT IT DOESN'T SOUND LIKE I NEED THE WITNESS

15    BACK, SO HE'S EXCUSED.

16         **MS. DUNN:**  YOUR HONOR, YOU HAVE 2253?

17         **THE COURT:**  NO.

18     THAT WAS ADMITTED BECAUSE THERE'S A STIPULATION TO ADMIT.

19         **MS. DUNN:**  OKAY.  SHOULD WE GO OVER THE ONES --

20         **THE COURT:**  WE CAN DO THAT LATER.  OTHERWISE -- I'M

21    JUST TRYING TO MAKE SURE I CAN LET HIM GO.  HE CAN GO.

22     IT'S 12:38 AT THIS POINT.  SO TEN MINUTES.

23         **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.

24         **THE COURT:**  WHO'S NEXT, BY THE WAY?

25         **MR. COUGHLIN:**  MS. ROSEN.

180

```
1          THE COURT:  10 MINUTES.

2          MS. DUNN:  YOUR HONOR, SO IN TERMS OF RELEASING

3    WITNESSES, THAT MEANS NO JUROR QUESTIONS?

4          THE COURT:  THEY DIDN'T ASK -- USUALLY IF THEY WANT

5    TO ASK A QUESTION THEY WILL LET ME KNOW.

6          MS. DUNN:  OKAY.

7          THE COURT:  FRANCES, DO YOU WANT TO DOUBLE-CHECK WITH

8    THEM?  SEE IF THEY HAD ANY QUESTIONS?

9       ALL RIGHT.  WE WILL STAND IN RECESS.

10      GO AHEAD.

11         MS. DUNN:  THANK YOU.

12       (RECESS TAKEN AT 12:39 P.M.; RESUMED AT 12:48 P.M.)

13         THE CLERK:  COURT IS IN SESSION, COME TO ORDER.

14         THE COURT:  LET'S CALL THE JURY BACK IN.

15       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

16         THE COURT:  OKAY.  THE RECORD WILL REFLECT WE ARE

17   BACK IN SESSION.  THE JURY IS BACK.

18      READY?  EVERYBODY CAN SIT DOWN IN THE COURTROOM.

19   EVERYBODY READY?  THE LAST, THE FINAL STRETCH FOR THE DAY.

20   OKAY.

21      PLAINTIFFS CAN CALL THEIR NEXT WITNESS.  MS. BERNAY.

22         MS. BERNAY:  THANK YOU.  THE PLAINTIFFS CALL MARIANNA

23   ROSEN.

24      (MARIANNA ROSEN, CALLED AS A WITNESS FOR THE PLAINTIFFS,

25   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)
```

1          **THE WITNESS:**  YES.

2          **THE CLERK:**  ALL RIGHT.  PLEASE BE SEATED.

3      IF YOU SCOOT TO THE MICROPHONE AND PLEASE STATE YOUR FULL

4   NAME AND SPELL YOUR LAST NAME.

5          **THE WITNESS:**  MARIANNA ROSEN.  LAST NAME IS SPELLED

6   R-O-S-E-N.

7          **THE COURT:**  GOOD AFTERNOON.

8          **THE WITNESS:**  GOOD AFTERNOON.

9          **THE COURT:**  YOU MAY PROCEED.

10         **MS. BERNAY:**  THANK YOU, YOUR HONOR.

11                    **DIRECT EXAMINATION**

12  BY MS. BERNAY:

13  **Q.**  IT IS NOW AFTERNOON.  SO, GOOD AFTERNOON, MS. ROSEN.  HOW

14  ARE YOU TODAY?

15  **A.**  OKAY.  THANK YOU.

16  **Q.**  I KNOW THAT YOU TRAVELED QUITE AWAYS TO BE HERE AND YOU

17  HAD A NUMBER OF KIND OF TRAVEL NIGHTMARES GETTING HERE, SO WE

18  REALLY APPRECIATE YOUR TIME.

19      WHERE DO YOU CURRENTLY?

20  **A.**  I LIVE NEW JERSEY IN SOUTH ORANGE.

21  **Q.**  AND ABOUT HOW LONG --

22         **THE REPORTER:**  I'M SORRY?

23         **THE WITNESS:**  IN NEW JERSEY, SOUTH ORANGE.  I HAVE

24  BEEN LIVING THERE FOR 14 YEARS.  A LITTLE MORE THAN THAT.

25

ROSEN – DIRECT / BERNAY

1    **BY MS. BERNAY:**

2    **Q.**  WHERE ARE YOU FROM ORIGINALLY?

3    **A.**  I'M FROM RUSSIA, SOVIET UNION FORMERLY.  AND I CAME HERE

4    IN 1996, AND I BECAME A CITIZEN OF THE UNITED STATES IN 2003.

5    **Q.**  YOU TOOK THE CITIZENSHIP TEST AND ALL THAT?

6    **A.**  YES, OF COURSE.

7    **Q.**  WONDERFUL.

8         CAN YOU TELL ME A LITTLE BIT ABOUT YOUR EDUCATIONAL

9    BACKGROUND?

10   **A.**  RIGHT.  I HAVE A DEGREE FROM UNIVERSITY OF MOSCOW AND I

11   HAVE A GRADUATE DEGREE IN INTERNATIONAL FINANCIAL AND BANKING

12   FROM COLUMBIA UNIVERSITY IN NEW YORK.  I GRADUATED IN 2000.

13   **Q.**  TELL ME A LITTLE BIT ABOUT YOUR WORK HISTORY SINCE

14   GRADUATING FROM COLUMBIA?

15   **A.**  RIGHT AFTER MY GRADUATION IN 2000, I WENT TO WORK FOR AN

16   INVESTMENT BANK.  IT WAS CALLED SOLOMON, SMITH BARNEY AT THAT

17   TIME.  IT LATER BECAME CITIGROUP.  I WORKED THERE FOR FOUR AND

18   A HALF YEARS.

19        AND THEN RIGHT AFTER I LEFT THE BANKING, I WORKED FOR MY

20   HUSBAND'S LAW PRACTICE JUST DOING SOME BACK OFFICE STUFF.

21        AND I -- SINCE THEN, I AM NOT WORKING THERE ANY MORE SINCE

22   2012 AND I'M TAKING SOME CLASSES IN COLUMBIA UNIVERSITY TO

23   PREPARE MYSELF FOR PH.D. STUDIES IN COMPARATIVE LITERATURE.

24   **Q.**  AND YOU ALSO TAKE CARE OF YOUR CHILDREN AS WELL; IS THAT

25   RIGHT?

ROSEN – DIRECT / BERNAY

1    **A.**   RIGHT.  I HAVE TWO BOYS, 8 AND 15.

2    **Q.**   AND IS IT RIGHT THAT WHEN YOU WERE FIRST DEPOSED IN THIS

3    MATTER, YOUR YOUNGER SON WAS ONLY THREE MONTHS OLD; IS THAT

4    RIGHT, APPROXIMATELY?

5    **A.**   YES, I THINK SO.  HE WAS BORN IN OCTOBER 2006.

6    **Q.**   SO HOW OLD IS HE NOW?

7    **A.**   EIGHT AND CHANGE.

8    **Q.**   YOUR OLDEST SON IS HOW OLD?

9    **A.**   FIFTEEN.

10   **Q.**   AND YOU UNDERSTAND THAT YOU'RE HERE TODAY TO DISCUSS SOME

11   ISSUES RELATED TO YOUR PURCHASES OF IPODS; IS THAT RIGHT?

12   **A.**   RIGHT.

13   **Q.**   AND HAVE YOU EVER OWNED AN IPOD?

14   **A.**   YES.

15   **Q.**   HAVE YOU -- WHEN DID YOU PURCHASE YOUR FIRST IPOD?

16   **A.**   I BELIEVE THAT I PURCHASED MY FIRST IPOD IN FEBRUARY,

17   MARCH OF 2004.

18       AND I BOUGHT ANOTHER IPOD, IT WAS IPOD NANO FOR MY LITTLE

19   SISTER AS A GIFT FOR HER GRADUATION I THINK IN JULY OF THE

20   SAME YEAR.

21       THEN I BOUGHT, I GUESS IT'S NEXT GENERATION IPOD, A BLACK

22   IPOD IN SEPTEMBER 2006.

23       I BOUGHT AN IPOD NANO.  I THINK IT'S CALLED NANO, THE

24   GREEN KIND OF SLICK NARROW IPOD WHICH IS SMALLER THAN THE ONES

25   PRIOR, IN 2007, IN THE FALL OF 2007.

ROSEN – DIRECT / BERNAY

1       AND THE LAST IPOD I BOUGHT WAS THE IPOD TOUCH.  AND I

2   THINK I BOUGHT IT AS A HANUKKAH GIFT FOR MY SON IN DECEMBER OF

3   '08.

4   **Q.**  AND DID YOU PURCHASE ALL OF THOSE IPODS AT AN APPLE STORE?

5   **A.**  I THINK, YOU KNOW, I DON'T REMEMBER A HUNDRED PERCENT, BUT

6   I THINK IT'S A VERY GOOD ASSUMPTION THAT I BOUGHT IT AT THE

7   APPLE STORE IN SHORT HILLS MALL, WHICH IS NOT FAR FROM MY

8   HOUSE.  THAT'S WHERE I BOUGHT MOST OF MY APPLE PRODUCTS.

9   **Q.**  AND THE SHORT HILLS MALL IS IN NEW JERSEY?

10  **A.**  YES.  IT IS IN SHORT HILLS.

11  **Q.**  HAVE YOU EVER PURCHASED ANYTHING ELSE FROM APPLE?

12  **A.**  YES.  I HAVE A PHONE.  SO I HAVE A MAC BOOK AIR AND A

13  DESKTOP.

14  **Q.**  HAVE YOU EVER PURCHASED MUSIC FROM APPLE?

15  **A.**  AND THEN MUSIC FOR MY ITUNES LIBRARY AND VIDEOS, TOO.

16  **Q.**  THAT IS A NUMBER OF APPLE PRODUCTS; IS THAT RIGHT?

17  **A.**  IT'S QUITE A NUMBER, YES.

18  **Q.**  WHY HAVE YOU PURCHASED SO MANY APPLE PRODUCTS?

19  **A.**  WELL, YOU KNOW, I LIKE APPLE PRODUCTS.  I THINK THEY ARE

20  GOOD PRODUCTS.

21      I ALSO, AFTER I BOUGHT MY FIRST IPOD, WHICH WAS IN 2004, I

22  IMMEDIATELY PROCEEDED IN BUILDING THE LIBRARY WHICH CONSISTED

23  OF A GOOD PERCENTAGE OF SONGS THAT I BOUGHT FROM ITUNES STORE,

24  WHICH CAME TOGETHER WITH THE SOFTWARE.  AND ALSO COPYING MY CD

25  LIBRARY.

ROSEN – DIRECT / BERNAY

1    SO ONCE I BUILD THAT LIBRARY, I SORT OF HAD TO USE IPOD

2    PRODUCTS BECAUSE I COULDN'T USE ANY OTHERS, MP3 PLAYERS.  SO I

3    WAS JUST USING MY LIBRARY AND LOADING IT THERE.

4    **Q.**  YOU MENTIONED THAT YOU GOT MUSIC FROM CD'S AND ALSO FROM

5    THE ITUNES STORE.

6    WAS THERE ANY OTHER SOURCES OF MUSIC THAT YOU GOT TO PUT

7    ON YOUR IPOD?

8    **A.**  NO.  I DON'T THINK I COULD HAVE DONE IT.  I TRIED TO BUY

9    MUSIC FROM DIFFERENT WEBSITE, BUT IT DIDN'T -- I WAS UNABLE TO

10   SAVE IT ON MY -- IN MY ITUNES LIBRARY.  SO THE SOURCE OF MY

11   ITUNES LIBRARY IS PRIMARILY ITUNES PURCHASES AND THE SONGS

12   FROM MY CD COLLECTION.

13   **Q.**  YOU MENTIONED THAT YOU TRIED TO BUY MUSIC FROM A DIFFERENT

14   WEBSITE, BUT YOU WERE UNABLE TO SAVE IT IN YOUR ITUNES

15   LIBRARY.

16   CAN YOU TELL ME A LITTLE BIT MORE ABOUT THAT?

17   **A.**  I DON'T REMEMBER ALL THE DETAILS AND MECHANICS OF IT

18   PRECISELY.  IT WAS QUITE A BIT OF TIME AGO.  BUT I THINK WHAT

19   HAPPENED WAS I JUST RECEIVED AN EMAIL FROM A FRIEND OF MINE

20   THAT, YOU KNOW, I WAS INTO -- I PRIMARILY USED MY IPOD AT THAT

21   TIME FOR WORKING OUT.  SO I WAS INTO THIS MUSIC THAT WAS SORT

22   OF VERY FAST BUT ALSO IT WOULD GET BORING VERY FAST, SO I WAS

23   SEARCHING FOR DIFFERENT MUSIC.

24   AND ACTUALLY AT THE TIME ITUNES WASN'T THAT BIG, THE MUSIC

25   STORE, SO I WAS LOOKING FOR WHERE ELSE I COULD BUY THE MUSIC.

1    SOMEONE MENTIONED TO ME THAT THERE'S THIS RUSSIAN-BASED

2    WEBSITE WHERE YOU CAN UP -- DOWNLOAD AND BUY MUSIC THAT I

3    LIKED AT THE TIME.

4         AND I THINK I WENT THERE, I LISTENED.  I THINK THEY GIVE

5    YOU THE SMALL WINDOW, I DON'T REMEMBER, LESS THAN A MINUTE

6    JUST TO LISTEN TO THE SONG IF YOU LIKE IT, AND THEN YOU HAVE

7    TO PURCHASE IT.  AND I WAS NOT ABLE -- ONCE I CLICKED TO

8    PURCHASE, I THINK WHAT HAPPENED I WAITED A LITTLE BIT AND I

9    WENT AND CHECKED INTO MY ITUNES LIBRARY IF IT'S DOWNLOADED, IF

10   I COULD SEE IT AND I WAS NOT SEEING IT THERE.  I THINK I TRIED

11   SEVERAL TIMES.

12        AND THEN EITHER SOMEONE TOLD ME THAT OR I EVEN ASKED IF I

13   CAN BUY -- I'M NOT THE COMPUTER WHIZ, IF I CAN BUY MUSIC IN

14   DIFFERENT FORMATS, AND MY UNDERSTANDING WAS THAT IT'S ONLY THE

15   APPLE FORMAT THAT WORKS IN ITUNES.

16   **Q.**  YOU ALSO MENTIONED THAT YOU GOT MUSIC FROM CD'S.  HOW DID

17   YOU GET YOUR CD'S ONTO YOUR IPOD?

18   **A.**  WELL, IT'S -- I JUST -- WHATEVER -- DEPENDING ON THE

19   DEVICE I HAVE --

20                        (PHONE RINGS.)

21        **THE COURT:**  OKAY.  WHO HAS THE PHONE?  PLEASE GET UP

22   AND LEAVE.

23        **THE WITNESS:**  I HAD, YOU KNOW, JUST PUT THIS -- YOU

24   KNOW, MOST OF THE COMPUTERS COME WITH A CD PLAYER AND BUILT IN

25   SORT OF, AND YOU PUT A CD INTO THE CD PLAYER, EITHER IN THE

ROSEN – DIRECT / BERNAY

 1    DESKTOP AND I THINK ITUNES LIBRARY OPENS UP, AND IT ASK IF YOU

 2    WANT TO IMPORT THE CD.

 3        I USUALLY -- I THINK I NEVER IMPORTED THE FULL CD BECAUSE

 4    NOT ALL THE SONGS WOULD BE GREAT, AND THIS IS THE ADVANTAGE OF

 5    DIGITALIZING IT SORT OF.  SO I WOULD IMPORT CERTAIN SONGS.

 6        IT WILL TAKE SOME TIME, AND THEN I WOULD HEAR THIS MAGIC

 7    SOUND IT FINISHED, AND THEN IT WILL JUST -- I CREATE AN ALBUM.

 8    AND OFTENTIMES IF I LIKE THE ARTIST, I WOULD GO INTO ITUNES

 9    STORE AND BUY SOME MUSIC TO AUGMENT THAT ALBUM AND MAKE IT.

10    **BY MS. BERNAY:**

11    **Q.**  HOW LONG WOULD YOU SAY THE PROCESS OF ADDING A SINGLE CD

12    REGARDLESS OF -- OR, IF YOU CAN JUST TELL ME, ABOUT HOW LONG

13    IT WOULD TAKE TO IMPORT IT TO ITUNES?

14    **A.**  I DON'T KNOW.  I MEAN, I GUESS IT DEPENDS ON THE LENGTH OF

15    A SONG OR LENGTH OF THE CD, OR HOW MANY CD'S ARE IN THE ALBUM.

16    ANYWHERE FROM 15 TO 25 MINUTES I WOULD THINK.

17    **Q.**  AND DID YOU EVER HAVE ANY PROBLEMS WITH ANY OF THESE IPODS

18    THAT WE'VE TALKED ABOUT?

19    **A.**  WELL, I THINK THE FIRST IPOD THAT I HAD, THE VERY FIRST

20    ONE, THE WHITE ONE, AS I REMEMBER IT, IT'S -- IT USED TO

21    FREEZE A LOT.  IT EITHER WAS JUST FREEZING OUT OF THE BLUE OR

22    IT WOULD, YOU KNOW, SUDDENLY RUN OUT OF BATTERY.

23        IT WAS ACTUALLY FRUSTRATING BECAUSE I USED IT FOR WORKING

24    OUT.  AND I DON'T WORK OUT FOR THAT LONG UNFORTUNATELY SO IT

25    WOULD BE LIKE HALF AN HOUR AND A WORKOUT, BUT THEN 20 MINUTES

ROSEN – DIRECT / BERNAY

1    INTO IT, I WOULD HAVE NO MUSIC.  AND, YOU KNOW, IT'S –– IT'S

2    FRUSTRATING.  YOU CAN'T CONTINUE DOING ANYTHING.  AND IT WOULD

3    BE FULLY CHARGED BEFORE THAT.

4    **Q.**  AND OTHER THAN THAT BATTERY ISSUE, DID YOU HAVE OTHER

5    ISSUES?

6    **A.**  I THINK THE BATTERY ISSUE SORT OF, YOU KNOW, MADE ME LOOK

7    FOR OTHER OPPORTUNITY –– NOT OTHER OPPORTUNITIES, BUT OTHER

8    OPTIONS, I WOULD SAY, AND JUST RAISED AN ISSUE.

9        AND I –– I SAW SOME PEOPLE WORKING OUT WITH DIFFERENT

10   DEVICES.  AND THEN I NOTICED THAT IT WOULDN'T BE AN APPLE

11   DEVICE.  IPOD AT THAT TIME WAS ONLY AVAILABLE.  IT WAS SOME

12   OTHER MP3 PLAYER.  I THINK I DID LOOK INTO, YOU KNOW, I LOOKED

13   AT, I SHOULD SAY, THE DIFFERENT MP3 PLAYER IN THE STORE, MAYBE

14   BEST BUY, IT WAS ZOOM, IF I REMEMBER CORRECTLY, AND I ASKED, I

15   THINK, IF I COULD –– WHAT THE DEAL WAS, HOW IT WAS DIFFERENT.

16       THE DEAL WAS –– I DIDN'T BUY IT AT THE TIME MOSTLY BECAUSE

17   I DIDN'T –– I UNDERSTOOD THAT I CANNOT USE MY ITUNES LIBRARY

18   ON THAT DEVICE.  SO I WOULD HAVE TO –– MY UNDERSTANDING WAS

19   THAT I HAVE TO RE-CREATE THE LIBRARY, BUY MUSIC FROM OTHER

20   SOURCES, AND, YOU KNOW, CREATING ANOTHER CD BASE LIBRARY.  SO

21   DOING ALL THIS FROM SCRATCH.

22   **Q.**  THAT WASN'T SOMETHING THAT YOU WANTED TO DO, BUT ––

23   **A.**  I MEAN, I INVESTED SOME TIME AND MONEY INTO BUILDING MY

24   ITUNES LIBRARY.  AND, YOU KNOW, WHILE IT IS IMPORTANT, IT IS

25   NOT THE CRUX OF MY LIFE.  I DIDN'T WANT TO REDO THIS PROCESS,

ROSEN – DIRECT / BERNAY

1    OF COURSE, BECAUSE, YOU KNOW, I ALREADY SPENT SOME, AGAIN,

2    TIME AND MONEY ON BUILDING SOMETHING.  I JUST STUCK WITH IPOD.

3    **Q.**  AND WHEN APPROXIMATELY DID YOU BECOME A PLAINTIFF IN THIS

4    LAWSUIT?

5    **A.**  I THINK IT WAS SUMMER OF 2006.

6    **Q.**  HOW DID THAT COME TO BE THAT YOU BECAME A PLAINTIFF IN

7    THIS CASE?

8    **A.**  MY HUSBAND KNEW LAWYERS WHO WERE ON THE CASE, I THINK, AND

9    HE -- I DON'T REMEMBER WHAT CAME FIRST, EITHER HE MENTIONED --

10   THEY MIGHT HAVE ASKED HIM IF HE KNOWS ANYONE WHO OWNS IPOD.

11   AND HE TOLD THEM THAT HIS WIFE AT THE TIME OWNED IT, AND THEN

12   HE MENTIONED THAT TO ME.  AND THEY PROBABLY JUST CONTACT ME

13   AND WE MET, THEY EXPLAINED, YOU KNOW, TALKED TO ME ABOUT THE

14   CASE.

15   **Q.**  THEN YOU AGREED TO TAKE PART; IS THAT CORRECT?

16   **A.**  YES.

17   **Q.**  AND DO YOU KNOW WHETHER OR NOT YOUR HUSBAND HAD ANY

18   BUSINESS RELATIONSHIP WITH THOSE LAWYERS?

19   **A.**  I DON'T THINK SO.  HE PRACTICED DIFFERENT TYPE OF LAW.  HE

20   IS A CLASS ACTION SECURITY LITIGATOR.

21   **Q.**  AND DO YOU KNOW WHETHER THERE IS ANY FEE ARRANGEMENT OR

22   AGREEMENT BETWEEN YOUR HUSBAND AND THOSE OTHER LAWYERS?

23   **A.**  I DON'T THINK SO.  I THINK NOT.

24   **Q.**  AND WHY DID YOU BECOME A PLAINTIFF IN THIS CASE?

25   **A.**  WELL, AS I SAID, I WAS A LITTLE FRUSTRATED WITH THE ISSUE

190
ROSEN – DIRECT / BERNAY

1    NOT ENOUGH REALLY, YOU KNOW, TO MAKE A DIG DEAL OF IT.  WHEN I

2    LEARNED ABOUT THIS AND I UNDERSTOOD, I JUST -- I MAY SOUND A

3    LITTLE NAIVE, BUT I ACTUALLY THOUGHT THAT IF THIS BECOMES AN

4    ISSUE THAT PEOPLE WILL KNOW ABOUT AND MAYBE THINGS WILL CHANGE

5    BECAUSE I THINK IT WOULD BE BENEFICIAL FOR EVERYONE THAT

6    PEOPLE COULD USE MUSIC ON DIFFERENT DEVICES AND VICE VERSA.

7    **Q.**  AND DO YOU THINK THAT YOU HAVE BEEN DAMAGED OR INJURED BY

8    APPLE'S CONDUCT HERE?

9    **A.**  I THINK DAMAGE IS A VERY STRONG WORD.  I WOULDN'T SAY I

10   WAS REALLY, REALLY DAMAGED, BUT I THINK, YOU KNOW, IF I

11   COULD -- I JUST WANT TO MAKE -- EVEN IF IT'S A GOOD CHOICE, I

12   WANT TO MAKE IT FOR THE RIGHT REASON.

13        SO IN THAT, I WAS IN A WAY A LITTLE BIT FORCED TO BUY

14   CERTAIN PRODUCTS.  EVEN IF I WOULD HAVE CHOSEN APPLE AT THE

15   END, I WANTED TO BE MY FREE CHOICE NOT BECAUSE I ALREADY

16   INVESTED TIME AND MONEY IN THE LIBRARY.  I FELT LIKE I STUCK.

17        AND ALSO I THINK THAT -- YOU KNOW, I STUDIED ECONOMICS TO

18   UNDERSTAND THAT IF WE WOULD HAVE A FEE --

19             **MR. ISAACSON:**  OBJECTION, YOUR HONOR.  SHE'S NOW

20   ABOUT TO MAKE STATEMENTS BASED ON HER BACKGROUND OF ECONOMICS.

21             **THE COURT:**  OVERRULED.

22   **BY MS. BERNAY:**

23   **Q.**  YOU CAN GO AHEAD AND ANSWER THE QUESTION AS YOU WERE

24   GOING.

25   **A.**  I JUST THINK THAT IF WE HAVE -- IF PEOPLE, YOU KNOW,

ROSEN - DIRECT / BERNAY

1    PEOPLE CAN LIKE A CD, FOR INSTANCE.  IF YOU HAVE A CD, IT HAS

2    NOTHING TO DO WITH MY BACKGROUND IN ECONOMICS.  IF I'M A

3    SIMPLE CONSUMER BUYING A CD FROM A RECORD COMPANY, THE RECORD

4    COMPANY DOESN'T TELL ME OR DOESN'T MAKE A CD SO I CAN USE IT

5    ONLY ON BANG & OLUFSEN.  I CAN BUY A BANG & OLUFSEN OR ANY

6    OTHER CD PLAYER AND PLAY IT AND LISTEN TO MUSIC.  THERE'S NO

7    LIMITATIONS.  IT'S MY CHOICE WHAT KIND OF CD PLAYER TO BUY.

8        SO IF I BUY MUSIC FOR ITUNES, I THINK IT WOULD BE

9    BENEFICIAL FOR EVERYONE IF I COULD PUT THIS MUSIC IN ANY

10   DEVICE.  IF I CHOOSE TO BUY AN APPLE DEVICE, THAT'S FINE, BUT

11   I WANT TO MAKE THE FREE CHOICE.  I DON'T WANT ANYBODY TO MAKE

12   CHOICE FOR ME.

13   Q.  YOU UNDERSTAND YOU'RE A CLASS REPRESENTATIVE HERE?

14   A.  YES.

15   Q.  WHAT DOES THAT MEAN?

16   A.  WELL, I THINK I REPRESENT A LOT OF PEOPLE WHO HAVE SIMILAR

17   STORIES IN MY SITUATION, AND I JUST HAPPEN TO BE -- I'M HOPING

18   I'M ANSWERING, YOU KNOW, GIVING THE TESTIMONY BASED ON WHAT

19   THEY WOULD SAY.

20   Q.  AND DO YOU GET ANYTHING FOR BEING A CLASS REPRESENTATIVE?

21   A.  I DON'T THINK SO.  RATHER THAN, YOU KNOW, IF THERE'S GOING

22   TO BE ANY DAMAGES OR WHATEVER FOR THE CLASS OVERALL.  I DON'T

23   THINK I'M GETTING ANYTHING -- I HOPE MY EXPENSES FOR THE TRIP

24   HERE WOULD BE RETURNED.  THAT'S IT.

25   Q.  AND YOU MENTIONED THE TRIP HERE.  THAT'S ONE OF THE THINGS

1    THAT YOU'VE DONE IN THIS CASE.

2        WHAT ELSE HAVE YOU DONE AS A CLASS REPRESENTATIVE IN THIS

3    CASE?

4    **A.**  WELL, OTHER THAN MEETING FIRSTHAND WITH THE LAWYERS WHEN

5    THEY EXPLAIN TO ME, I THINK I WAS -- HAD ALL DAY DEPOSITION

6    BACK IN 2007 IN THE WINTER.  AND I THINK I HAVE BEEN ALSO

7    ASKED TO PROVIDE ACCESS TO MY COMPUTER THAT I HAD AT THAT

8    TIME, AND I REALLY DON'T KNOW WHAT THEY DID THERE.

9        AS I SAID, I DON'T KNOW, BUT THEY HAVE GOTTEN ACCESS TO

10   ALL MY RECORDS FROM MY COMPUTER, INCLUDING ITUNES LIBRARY AND

11   EVERYTHING ELSE.

12   **Q.**  DID YOU TURN OVER ANY DOCUMENTS OTHER THAN THOSE RECORDS,

13   DO YOU KNOW?

14   **A.**  IF I REMEMBER, I DON'T THINK SO.  I MIGHT HAVE ANSWERED

15   SOME EMAILS.  IT WAS A WHILE AGO.

16   **Q.**  AND DO YOU THINK BEING INVOLVED IN THIS CASE WAS THE RIGHT

17   THING TO DO?

18   **A.**  I THINK SO.  I HOPE I AM NOT HURTING ANYONE.  I REALLY

19   LIKE APPLE PRODUCTS.  I JUST THINK THAT, AGAIN, IT'S -- IF IT

20   HELPS IMPROVE EVEN APPLE AND MAKE IT EASIER TO USE AND MORE

21   TRANSFERABLE, I THINK IT'S A GOOD THING FOR EVERYONE.

22        **MS. BERNAY:**  I HAVE NO FURTHER QUESTIONS AT THIS

23   TIME, BUT MR. ISAACSON WILL BE ASKING YOU SOME.  THANK YOU.

24        **THE COURT:**  CROSS?

25            (BINDER HANDED TO WITNESS.)

ROSEN – CROSS / ISAACSON

1    ///

2    ///

3                    **CROSS-EXAMINATION**

4    **BY MR. ISAACSON:**

5    **Q.**  GOOD AFTERNOON, MS. ROSEN.  MY NAME IS BILL ISAACSON.

6    I'VE GOT A FEW QUESTIONS FOR YOU.

7        NOW, YOU SAID THAT YOU BECAME A PLAINTIFF IN THIS ACTION

8    IN 2006 -- IN THE SUMMER OF 2006.

9        DID YOU REVIEW COMPLAINTS THAT WERE FILED BY YOUR LAWYERS

10   AFTER THAT ON YOUR BEHALF?

11   **A.**  I THINK SO.  WE DISCUSSED IT.

12   **Q.**  ALL RIGHT.  CAN I ASK YOU TO LOOK AT -- WE HAVE GIVEN YOU

13   A BINDER.

14   **A.**  UH-HUH.

15   **Q.**  I WILL ASK YOU TO LOOK AT 2593.

16                    (EXHIBIT DISPLAYED TO JURY.)

17       JUST TAKE A LOOK AT THE FIRST PAGE.

18       DO YOU RECOGNIZE THIS IS A COMPLAINT THAT'S FILED IN 2010

19   AFTER YOU'RE A PLAINTIFF.  YOU WILL SEE THE NAMES OF YOUR

20   LAWYERS THERE.  IT'S THE AMENDED CONSOLIDATED COMPLAINT.  THIS

21   IS THE COMPLAINT THAT GOVERNS OUR ACTION.

22       DO YOU RECOGNIZE THIS AS A DOCUMENT YOU'VE READ BEFORE?

23   **A.**  ARE WE LOOKING AT THE FIRST PAGE, THE COVER PAGE?

24   **Q.**  IF YOU NEED -- WHATEVER YOU NEED TO DO TO FAMILIARIZE

25   YOURSELF TO ANSWER THE QUESTION WHETHER YOU'VE REVIEWED THIS

ROSEN - CROSS / ISAACSON

1    DOCUMENT BEFORE.

2    **A.**  YOU KNOW, IT WAS A WHILE AGO.  SO THEY ALL LOOK MORE OR

3    LESS THE SAME LEGAL DOCUMENTS TO ME.  I'M NOT A LAWYER.  I

4    HAVE NO BACKGROUND IN THAT.

5        IT LOOKS -- I MEAN I'VE DEFINITELY SEEN SOMETHING LIKE

6    THAT.  I DON'T KNOW IF IT IS EXACTLY THIS ONE.  I DON'T

7    REMEMBER THE DATES.  I DIDN'T MEMORIZE IT.

8    **Q.**  SURE.

9    **A.**  I DIDN'T HAVE AN STACK OF THESE PAPERS IN MY DESK.

10   **Q.**  ON PAGE 3 OF 29, PARAGRAPH 7, DO YOU SEE YOUR NAME THERE

11   AS A PLAINTIFF?

12       PARAGRAPH 7?

13   **A.**  YES, I SEE MY NAME.

14   **Q.**  IF WE CAN TURN TO PAGE 6 -- PARAGRAPH 66, WHICH IS PAGE 14

15   OF 29.

16   **A.**  OKAY.

17   **Q.**  THIS IS THE COMPLAINT THAT GOVERNS THIS ACTION RIGHT NOW.

18   **A.**  UH-HUH.

19   **Q.**  AND IT SAYS:

20       "IN SEPTEMBER 2006, APPLE RELEASED 7.0."

21       NOW, YOU UNDERSTAND THIS CASE IS ABOUT 7.0 AND 7.4.  DO

22   YOU UNDERSTAND THAT?

23   **A.**  RIGHT.  I MEAN, IT LOOK -- AS I SAY, I AM NOT A VERY

24   TECHNOLOGICAL GUY.  I JUST UNDERSTAND THE GIST OF IT.  TO

25   UNDERSTAND THE WHOLE NUMBERS BEHIND IT, I WOULDN'T GO THAT

1    FAR, BUT I UNDERSTAND WHAT THIS CASE IS ABOUT.

2    **Q.** AND IT SAYS THAT:

3        "APPLE RELEASED ITUNES 7.0 INTENDED TO PREVENT JHYMN

4        AND OTHER PROGRAMS FROM BEING USED TO CREATE

5        INTEROPERABILITY BETWEEN AUDIO DOWNLOADS PURCHASED

6        FROM THE ITUNES STORE AND NONAPPLE PORTABLE DIGITAL

7        MEDIA PLAYERS."

8    DID YOU UNDERSTAND WHEN THIS COMPLAINT WAS FILED, THAT

9    JHYMN WAS A KNOWN HACKER?

10   **A.** I DON'T KNOW.  YOU KNOW WHAT?  I'M BASICALLY –– IF I WERE

11   MORE TECHNOLOGICALLY INCLINED, I WOULD HAVE KNOWN ALL THOSE

12   DIFFERENT NAMES.  BUT BECAUSE I'M NOT, I GO STRAIGHT TO APPLE

13   ITUNES BUY STUFF AND I DON'T GO SURFING THE SET (SIC), SO I

14   DIDN'T KNOW WHAT AND WHO WAS A KNOWN HACKER.  I DON'T KNOW

15   WHAT IT IS.

16   **Q.** PARAGRAPH 66 GOES ON TO SAY:

17       "THROUGHOUT THE CLASS PERIOD, APPLE ISSUED SOFTWARE

18       UPDATES INTENDED TO PREVENT THE USE OF OTHER SIMILAR

19       PROGRAMS, INCLUDING QT FAIR USE AND PLAY FAIR."

20   DO YOU RECOGNIZE QT FAIRUSE AND PLAY FAIR AS KNOWN

21   HACKERS?

22   **A.** I WOULD GIVE YOU THE SAME ANSWER.  ACTUALLY I DON'T KNOW

23   WHAT IT IS AND WHAT THEY DO.  NEVER USED THIS.

24   **Q.** ALL RIGHT.

25       THIS COMPLAINT WAS FILED ON YOUR BEHALF.  IT'S THE MOST

ROSEN – CROSS / ISAACSON

1  RECENT COMPLAINT FILED BY YOUR LAWYERS.  DO YOU STAND BY THIS

2  DOCUMENT?

3  **A.**  OF COURSE.  I MEAN, IF WE DO UNDERSTAND -- IF I DO

4  UNDERSTAND CORRECTLY, I HOPE I DO, I STAND BY THIS DOCUMENT.

5  **Q.**  LET ME ASK YOU TO -- LET'S GO OVER YOUR PURCHASE HISTORY

6  OF IPODS.  IT WENT BY A LITTLE QUICKLY.

7     SO YOU BOUGHT TWO IPODS IN 2004, CORRECT?

8  **A.**  CORRECT.  BUT THE SECOND ONE WASN'T FOR ME.  I BOUGHT IT

9  AS A GIFT AND I DIDN'T USE IT.

10  **Q.**  ALL RIGHT.  AND YOU UNDERSTAND THAT THIS CLASS ACTION IS

11  FOR IPOD PURCHASERS BEGINNING IN SEPTEMBER 2006 RUNNING

12  THROUGH MARCH 2009.

13  **A.**  YEAH.  I UNDERSTAND THAT.

14  **Q.**  THEN YOU BOUGHT A NEXT GENERATION BLACK IPOD IN

15  DECEMBER 2006, CORRECT?

16  **A.**  NO.  I THINK I BOUGHT THE NEXT GENERATION BLACK IPOD IN

17  SEPTEMBER 2006.  YOU SEE --

18  **Q.**  THAT'S FINE.

19  **A.**  -- THIS IS -- AGAIN, IT'S LONG TIME AGO.

20     AND WHILE, YOU KNOW, I'M TRYING TO HAVE THE BEST

21  RECOLLECTION OF THIS EVENT, THE PURCHASE OF IPOD AND THAT

22  EVENT, MY LIFE GOES BY.  WHAT I TRY TO REMEMBER, I BOUGHT IT

23  FOR MY SON, FOR MY SISTER GRADUATION.  MY SON WAS BORN A MONTH

24  LATER.  THAT'S HOW I REMEMBER IT.

25  **Q.**  I'M SORRY.  I THINK YOU'RE ABSOLUTELY RIGHT ABOUT

ROSEN – CROSS / ISAACSON

```
1    SEPTEMBER.  I THOUGHT YOU SAID DECEMBER.

2        LET ME HELP YOU.  IN YOUR BINDER IS 2784.  THIS IS A

3    DOCUMENT YOUR LAWYERS GAVE US.

4                  (EXHIBIT DISPLAYED TO JURY.)

5        ITUNES INFORMATION FOR MS. ROSEN.  AND IF YOU TURN TO

6    PAGE 3 OF 23.  IT IS NOT ALWAYS TO READ HERE, BUT IF WE CAN

7    BLOW IT UP.

8        THAT IS A RECEIPT FROM THE APPLE STORE FROM SEPTEMBER OF

9    2006.  THAT WAS A RECEIPT YOU MUST HAVE GIVEN YOUR LAWYERS.

10   IT'S FOR A IPOD IS 30GIG BLACK IPOD.

11       THAT'S WHAT YOU PURCHASED IN SEPTEMBER 2006?

12   A.  RIGHT.

13   Q.  THAT WAS THE NEWEST GENERATION OF CLASSIC IPOD THAT WAS

14   AVAILABLE.  IT WAS A NEW IPOD?

15   A.  UH-HUH.

16   Q.  I'M SORRY, THE COURT REPORTER NEEDS YOU TO SAY YES OR NO.

17   A.  YES.  SORRY.

18   Q.  AND SO THAT WAS -- AT THAT TIME YOU UNDERSTAND THAT THAT

19   WAS A CLASSIC FIFTH GENERATION IPOD.  THAT'S WHAT WAS ON SALE

20   IN SEPTEMBER OF 2006?

21   A.  YES.

22   Q.  YOU UNDERSTAND THAT THE PLAINTIFFS IN THIS CASE ARE NOT

23   CLAIMING ANY DAMAGES FROM THE FIFTH GENERATION IPODS; YOU

24   UNDERSTAND THAT, DON'T YOU?

25   A.  I DON'T UNDERSTAND WHY THIS IS -- I MEAN, IT'S A LITTLE
```

ROSEN - CROSS / ISAACSON

1    BIT OF A LEGAL STAB THAT YOU ARE TRYING TO MAKE ME SAY "YES"

2    OR "NO" ABOUT.  I DON'T UNDERSTAND WHY IS THAT IMPORTANT.  I'M

3    TRYING TO TALK ABOUT MY OWN EXPERIENCE WITH THE IPODS.

4    **Q.**  I UNDERSTAND.  THERE MAY BE SOME THINGS I TALK ABOUT THAT

5    MAY NOT BE IMPORTANT TO YOU, BUT GIVE ME A LITTLE LEEWAY AND

6    WE WILL WORK THROUGH THEM.

7    **A.**  RIGHT.

8    **Q.**  DO YOU UNDERSTAND THAT YOUR FIFTH GENERATION IPOD THAT YOU

9    GOT IN SEPTEMBER 2006, THAT THE PLAINTIFFS AND THEIR EXPERT,

10   THE ECONOMIST, DR. NOLL, IS NOT SAYING THERE WAS ANY DAMAGES

11   ATTRIBUTABLE TO THAT IPOD.

12       DO YOU KNOW THAT?

13           **MS. BERNAY:**  OBJECTION.  IT'S CALLING FOR A LEGAL

14   CONCLUSION AT THIS POINT.  IT'S GETTING A LITTLE BIT FAR --

15           **THE COURT:**  OVERRULED.

16           **MR. ISAACSON:**  THIS IS A STIPULATED FACT IF THAT WILL

17   HELP YOU.

18           **THE COURT:**  THE QUESTION IS DOES SHE KNOW.

19           **MR. ISAACSON:**  YES.

20           **THE COURT:**  THAT IS THE QUESTION.

21   **BY MR. ISAACSON:**

22   **Q.**  DO YOU KNOW THAT FOR THAT IPOD THAT NO DAMAGES ARE BEING

23   CLAIMED BY THE PLAINTIFFS?

24   **A.**  OKAY.  I UNDERSTAND THAT, I THINK.

25   **Q.**  THEN YOU BOUGHT AN IPOD IN FALL OF 2007.  I THINK THAT'S

ROSEN – CROSS / ISAACSON

1    WHAT YOU SAID?

2    **A.**   RIGHT.

3        IT'S AN IPOD NANO.  IT IS THE NARROW VERSION OF IT.  THE

4    ONE THAT CAME IN COLORS.

5    **Q.**   AT THE TIME YOU BOUGHT THIS, YOU WERE A CLASS PLAINTIFF?

6    **A.**   UH-HUH.

7    **Q.**   I AM SORRY, YOU HAVE TO USE A WORD FOR THE COURT REPORTER.

8    **A.**   YES.

9    **Q.**   AND DO YOU HAVE THAT NANO TODAY?

10   **A.**   I NOT SURE.  I THINK I SHOULD HAVE IT BECAUSE -- I DON'T

11   HAVE IT TODAY WITH ME.  WAS THAT THE QUESTION?  OR DO I HAVE

12   IT IN MY HOUSE?

13   **Q.**   WELL, BOTH.

14   **A.**   I DON'T HAVE IT WITH ME.  THAT'S FOR SURE.

15       I -- BECAUSE I MOVED AND RIGHT NOW MY HOUSE IS UNDER

16   CONSTRUCTION AND I HAVE A LOT OF MY STUFF STORED.  I PRESUME

17   IT'S SOMEWHERE IN THE BOXES BECAUSE A LOT OF STUFF ARE IN

18   BOXES, BUT I DON'T HAVE IT, YOU KNOW, WITH ME IN THE APARTMENT

19   THAT I'M RENTING TEMPORARILY.

20   **Q.**   YOU THINK YOU BOUGHT IT AT AN APPLE STORE?

21   **A.**   I THINK I BOUGHT IT AT THE APPLE STORE.

22   **Q.**   DID YOU KEEP THE RECEIPTS?

23   **A.**   YOU KNOW, AGAIN, I TEND TO KEEP RECEIPTS FOR A COUPLE OF

24   YEARS, USUALLY, ESPECIALLY THE THINGS THAT I MIGHT RETURN

25   WHERE THERE IS A WARRANTY CONCERN, BUT ALL THE STUFF FROM

ROSEN – CROSS / ISAACSON

```
 1    2007, 2008, I DOUBT I HAVE IT.

 2        AND ANOTHER REASON IS A LOT OF STUFF I HAD TO THROW AWAY

 3    WHEN I WAS MOVING.  EVEN IF I HAD IT --

 4    Q.  AT THE TIME YOU WERE A CLASS PLAINTIFF, YOU BOUGHT AN IPOD

 5    AND YOU BELIEVE YOU THREW OUT THE RECEIPT AFTER A COUPLE OF

 6    YEARS; IS THAT RIGHT?

 7    A.  I MIGHT HAVE.  IF IT'S SO -- IF IT'S A CRUCIAL MATTER, ALL

 8    OF IT CAN BE -- ALL THE RECEIPTS AND ALL THE RECORDS COULD BE

 9    ON MY PURCHASES FROM APPLE ARE EASILY ACCESSIBLE.

10    Q.  DID YOU UNDERSTAND THAT AS A CLASS PLAINTIFF, YOU WERE

11    SUPPOSED TO KEEP YOUR RECORDS RELATED TO THIS CASE, SUCH AS

12    YOUR PURCHASES OF IPODS?

13    A.  I AM PRETTY SURE THAT ALL MY PURCHASES FROM APPLE WHICH

14    ARE IMPORTANT, CAN BE UPLOADED FROM MY HISTORY OF PURCHASES.

15    AND THEY SEND ME EMAILS, SO I DON'T THINK THE PHYSICAL PAPER

16    RECEIPT IS A CRUCIAL MATTER.  IF NECESSARY --

17    Q.  I --

18    A.  -- WE CAN ACCESS, ANYONE CAN ACCESS THE RECEIPT.

19    Q.  I APPRECIATE YOUR VIEWS ABOUT WHAT'S CRUCIAL AND NOT

20    CRUCIAL.

21        MY QUESTION IS, DID YOU UNDERSTAND YOU HAD AN OBLIGATION

22    AS A CLASS PLAINTIFF TO KEEP YOUR RECORDS RELATED TO THIS CASE

23    AND NOT THROW THEM OUT?

24    A.  I AM SORRY --

25            MS. BERNAY:  OBJECTION.
```

ROSEN – CROSS / ISAACSON

1          **THE WITNESS:**  –– I THINK THE QUESTION IS WHETHER I

2     UNDERSTOOD IT WAS CRUCIAL OR NOT.  MY VIEWS ON THAT ARE

3     IMPORTANT, RIGHT?

4          SO ARE YOU ASKING ME AS A PLAINTIFF, I UNDERSTOOD IT WAS

5     IMPORTANT.  I UNDERSTOOD THAT IN THIS DIGITAL DAY AND AGE, IF

6     NECESSARY, AND IF IT COME TO IT, ALL THOSE RECORDS CAN BE

7     EASILY ACCESSIBLE.

8     **BY MR. ISAACSON:**

9     **Q.**  HAVE YOU MADE ANY ATTEMPT TO ACCESS THOSE RECORDS?

10    **A.**  UNTIL I WAS ASKED TO.  ON MY OWN VOLITION, NO.  IF

11    SOMEBODY WOULD ASK ME, I CAN.

12    **Q.**  SO NO ONE –– NONE OF YOUR LAWYERS HAVE ASKED YOU TO HAND

13    OVER ANY OF THE RECORDS OF YOUR PURCHASES?

14    **A.**  NOT THAT I REMEMBER.  I THINK THEY JUST TOOK MY WORD FOR

15    IT.  I'M NOT LYING ABOUT MY PURCHASES.

16    **Q.**  OKAY.  AND YOU DON'T KNOW WHETHER YOU'VE THROWN OUT THE

17    RECEIPTS AND YOU DON'T KNOW WHETHER YOU STILL HAVE THAT IPOD

18    NANO; IS THAT RIGHT?

19          **MS. BERNAY:**  OBJECTION, ASKED AND ANSWERED.

20          **THE COURT:**  SUSTAINED.  COMPOUND.

21          **MR. ISAACSON:**  ALL RIGHT.

22    **BY MR. ISAACSON:**

23    **Q.**  YOU DON'T KNOW WHETHER –– YOU DON'T KNOW WHETHER YOU THREW

24    OUT YOUR RECEIPTS FROM THE –– FOR THE PURCHASE OF THE IPOD

25    NANO; IS THAT CORRECT?

1          **MS. BERNAY:** OBJECTION, ASKED AND ANSWERED.

2          **THE COURT:** OVERRULED.

3          **THE WITNESS:** I DON'T KNOW IF I THREW OUT THE

4    RECEIPT.

5    **BY MR. ISAACSON:**

6    **Q.** YOU DON'T KNOW WHETHER YOU KEPT THE IPOD AND WHETHER IT'S

7    AVAILABLE TO BE INSPECTED; IS THAT RIGHT?

8    **A.** I THINK IT IS THE SAME QUESTION.

9          I AM PRETTY SURE THE IPOD IS IN ONE OF THE BOXES WHERE ALL

10   OF THE TECHNOLOGY IS IN MY NEW HOUSE STORED.

11   **Q.** NOW, THE IPOD TOUCH, I BELIEVE YOU SAID YOU BOUGHT ONE OF

12   THOSE IN DECEMBER 2008; IS THAT RIGHT?

13   **A.** YES, IT IS RIGHT.

14   **Q.** ALL RIGHT. DID YOU KEEP ANY RECORDS OF THAT PURCHASE?

15   **A.** AGAIN, I THINK ALL THE RECEIPTS FOR MY PURCHASE FROM THE

16   APPLE STORE WERE EMAILED TO ME. SO TO THE EXTENT THEY ARE

17   AVAILABLE ON THE SERVER OF MY MAIL, IT'S THERE.

18         BUT I DO -- I HAVE -- YOU KNOW, AGAIN, IF SOMEONE ASKS AND

19   IT BECOMES IMPORTANT, I THINK IT'S VERY EASILY ACCESSIBLE.

20   **Q.** NO ONE HAS EVER ASKED YOU TO RETAIN YOUR RECORDS OF YOUR

21   PURCHASES OF IPODS AFTER THIS COMPLAINT WAS FILED; IS THAT

22   CORRECT?

23   **A.** I DON'T REMEMBER IF ANYONE ASKED ME TO.

24   **Q.** IS YOUR IPOD TOUCH -- DO YOU STILL HAVE THAT?

25   **A.** YES.

303

ROSEN – CROSS / ISAACSON

1    **Q.**  WHERE IS THAT?

2    **A.**  I HAVE IT.

3    **Q.**  YOU HAVE IT HERE WITH YOU IN CALIFORNIA?

4    **A.**  YES.

5    **Q.**  ALL RIGHT.

6        NOW, YOU MENTIONED YOUR HUSBAND.  YOU SAID YOUR HUSBAND

7    KNEW THE LAWYERS.  YOUR HUSBAND, I THINK YOU SAID, IS A

8    PLAINTIFFS' CLASS ACTION LAWYER, RIGHT?

9    **A.**  HE'S A SECURITIES LITIGATION --

10   **Q.**  YES.

11              **THE REPORTER:**  I'M SORRY.

12   **BY MR. ISAACSON:**

13   **Q.**  AND YOU WORKED SOME WITH HIS LAW FIRM, CORRECT?

14              **THE COURT:**  MR. ISAACSON, HOLD ON.

15       DID YOU GET THAT?

16              **THE REPORTER:**  NOT THE END OF IT.

17   **BY MR. ISAACSON:**

18   **Q.**  I NEED YOU TO REPEAT YOUR ANSWER.

19   **A.**  CLASS ACTION.

20   **Q.**  AND YOU'VE WORKED FOR YOUR HUSBAND'S LAW FIRM DOING

21   BOOKKEEPING, ACCOUNTING, GENERAL OFFICE MANAGER MATERIAL,

22   RIGHT?

23   **A.**  RIGHT.  PAYROLL PROCESSING, THINGS LIKE THAT.

24   **Q.**  YOU GOT INVOLVED IN THIS LAWSUIT BECAUSE YOUR HUSBAND

25   MENTIONED IT.  YES?

ROSEN – CROSS / ISAACSON

1    **A.**  I –– I WOULDN'T MAKE THAT CONJECTURE.  I DON'T THINK I GOT

2    INVOLVED IN THIS LAWSUIT BECAUSE MY HUSBAND MENTIONED IT.

3       IT IS A LITTLE BIT INCORRECT.  I THINK HE MENTIONED MY

4    NAME TO THE LAWYERS AND THEY CONTACTED ME.  I DIDN'T GET

5    INVOLVED BECAUSE HE MENTIONED IT.

6    **Q.**  ALL RIGHT.  NOW THAT SOUNDS MORE ACCURATE.

7       NOW, YOU KNOW THE LAWYERS FROM THE LAW FIRM HERE, ROBBINS

8    GELLER, A FINE LAW FIRM?

9    **A.**  YES.

10   **Q.**  AND YOUR HUSBAND WORKS WITH THIS LAW FIRM IN MANY CASES,

11   RIGHT?

12   **A.**  I HAVE NO IDEA.  MY UNDERSTANDING –– THAT THEY WOULD NOT

13   HAVE ANYTHING TO DO WITH EACH OTHER BECAUSE MY HUSBAND DOESN'T

14   DO CONSUMER FRAUD.  HE DOES SECURITIES FRAUD, WHICH IS

15   DIFFERENT.

16   **Q.**  ALL RIGHT.  DOES YOUR HUSBAND TALK ABOUT HIS CASES WITH

17   YOU?

18   **A.**  WE ACTUALLY –– I DON'T KNOW IF I'M SOLICITING MORE

19   INFORMATION RIGHT NOW.

20      I'M ACTUALLY DIVORCED AND WE HAVE NOT BEEN LIVING TOGETHER

21   AND DISCUSSING HIS CASES FOR OVER TWO YEARS.

22   **Q.**  ALL RIGHT.  I WILL CONFINE MYSELF TO PERIOD BEFORE THAT

23   HAPPENED.

24      SO FROM 2006 UNTIL ABOUT TWO YEARS AGO, DO YOU REMEMBER

25   TALKING FROM TIME TO TIME ABOUT SOME OF YOUR HUSBAND'S CASES,

1    THE CASE NAMES?

2    **A.**  I KNEW THE CASE NAMES VERY WELL, OF COURSE.  BUT I

3    DIDN'T -- I WOULDN'T DISCUSS THE DETAILS OF THE LITIGATION.

4    SOMETIMES IF THINGS GO BAD HE WOULD COME BACK FRUSTRATED AND

5    SAY THAT, YOU KNOW, SOMETHING WENT WRONG, THINGS LIKE THAT,

6    BUT WE DIDN'T GET INTO DETAILS.

7    **Q.**  DO YOU REMEMBER THE NAMES OF ANY OF THE CASES?

8    **A.**  I REMEMBER THE NAMES OF SOME OF THE CASES, I GUESS, BUT I

9    DON'T THINK IT'S -- THAT'S -- I WOULD PROBABLY BE FILING SOME

10   RECEIPTS AND THINGS LIKE THAT RELATED TO THE CASES.

11   **Q.**  LET ME SEE IF I CAN REFRESH YOUR MEMORY ON SOME NAMES.

12   **A.**  YES.

13   **Q.**  I'M GOING TO SHOW THIS TO HER.

14          (BINDER HANDED TO COUNSEL AND WITNESS.)

15   **BY MR. ISAACSON:**

16   **Q.**  I KNOW THIS LOOKS LARGE, I'M TRYING TO MAKE IT EASY FOR

17   YOU.

18       WE HAVE COLLECTED 18 CASES OVER THE LAST FIVE YEARS WHICH

19   YOUR HUSBAND HAS WORKED ON.  AND SO THERE'S 18 TABS AND WE

20   HAVE PUT POST-ITS WHERE WE CAN FIND YOUR HUSBAND'S NAME.

21       SO, FOR EXAMPLE, THE FIRST TAB, THERE'S A CASE CALLED *IN*

22   *RE:  GALENA BIOPHARMA SECURITIES LITIGATION*.  AND AT PAGE 8 OF

23   21, YOUR HUSBAND IS A LAWYER ON THAT CASE.  THAT'S YOUR FORMER

24   HUSBAND.

25       ISN'T THAT ON PAGE 8 OF 21?  WE HAVE HIGHLIGHTED IT FOR

1    YOU.

2    **A.**  YES.  CAN I ASK A QUESTION?  WHERE WOULD I SEE THE SAME OF

3    THE CASE?

4    **Q.**  IT IS ON THE FIRST PAGE AT THE TOP.

5    **A.**  I AM SORRY.  I AM NOT SURE I UNDERSTAND.  THIS IS PAGE 8,

6    RIGHT?

7            **MR. ISAACSON:**  MAY I APPROACH?

8            **THE COURT:**  YOU MAY.

9                (COUNSEL ASSISTS WITNESS.)

10   **BY MR. ISAACSON:**

11   **Q.**  ON PAGE 1 AT THE TOP, WOULD BE THE CASE NAME.  AND THEN ON

12   PAGE 8 --

13   **A.**  OKAY.  THIS IS THE BEGINNING.

14   **Q.**  THAT'S YOUR EX-HUSBAND?

15   **A.**  THAT'S MY EX-HUSBAND.  THE CASE WAS FILED, IF I READ IT

16   CORRECTLY, IN 2014.

17      ME AND MY HUSBAND WERE ACTIVELY PITTED AGAINST EACH OTHER

18   IN OUR DIVORCE, AND THE LAST THING I WOULD DISCUSS WITH HIM IS

19   HOW HE'S DOING IN HIS LAW PRACTICE.  AND YOU CAN UNDERSTAND

20   WHY.

21   **Q.**  ALL RIGHT.  I WAS UNAWARE OF THAT WHEN WE PUT TOGETHER THE

22   BINDER.

23      LET ME ASK YOU TO LOOK AT TAB 3.

24      THIS CASE, IS BACK IN 2011, FEBRUARY.  WERE YOU MARRIED AT

25   THIS TIME?

ROSEN – CROSS / ISAACSON

1    **A.**   WE -- IN JUNE 2011 THAT WAS THE TIME WHEN HE RETAINED HIS

2    LAWYER.  SO WE WERE MARRIED AT THE TIME TECHNICALLY,

3    TECHNICALLY STILL MARRIED BECAUSE THE JUDGMENT WILL BE ENTERED

4    ON THE 8TH OF DECEMBER.

5    **Q.**   THINGS WERE NOT GOING WELL?

6    **A.**   NO.

7    **Q.**   I WON'T INTRUDE INTO THAT.

8        ALL RIGHT.  LET'S TRY TAB 10.  *HUFNAGEL VERSUS RHINO*

9    *INTERNATIONAL CORPORATION* (PHONETIC).

10       NOVEMBER 2010.  YOUR HUSBAND IS HIGHLIGHTED ON THE FIRST

11   PAGE.  DO YOU SEE THAT?

12   **A.**   I SEE HIM BEING HIGHLIGHTED, YES.

13   **Q.**   THIS IS A CASE NAME YOU RECOGNIZE?

14   **A.**   I HEARD THE NAME NAGEL (PHONETIC) FROM HIM, I GUESS.

15   **Q.**   IF YOU LOOK ON PAGE 4, DO YOU SEE THAT ROBBINS GELLER WAS

16   CO-COUNSEL WITH YOUR HUSBAND IN THIS CASE?

17   **A.**   I SEE IT HIGHLIGHTED.  CAN -- AM I ALLOWED TO ASK

18   QUESTIONS, TOO?  NO?

19   **Q.**   I THINK IT WOULD GO QUICKER IF YOU LET ME ASK THE

20   QUESTIONS.  YOUR COUNSEL GETS TO ASK YOU QUESTIONS.

21   **A.**   I DON'T UNDERSTAND.  THERE'S A LOT OF LAWYERS ON THIS

22   CASE.  I WOULD NOT KNOW ALL OF THEM.

23   **Q.**   RIGHT.

24   **A.**   AND IF I UNDERSTAND CORRECTLY, THE WAY SECURITIES CLASS

25   ACTION LITIGATION WORKS, THERE'S A LOT OF PEOPLE FILING.

ROSEN – CROSS / ISAACSON

1    **Q.**  YES.

2    **A.**  AND THEY MAY NOT BE AWARE OF EACH OTHER EXISTENCE OR THEY

3    WILL, BUT THEY'RE NOT NECESSARILY WORKING TOGETHER.

4    **Q.**  OR --

5    **A.**  IT IS MY UNDERSTANDING.

6    **Q.**  OR THEY ARE WORKING TOGETHER IN A LOT OF CASES, AND NOT

7    MENTIONING IT TO THEIR WIFE.  THAT'S HOW THE CLASS ACTION

8    WORLD CAN WORK, RIGHT?

9    **A.**  THAT'S ENTIRELY POSSIBLE.  BECAUSE I HAVE NO IDEA HOW MANY

10   PEOPLE HE WORKS WITH.

11   **Q.**  YOUR HUSBAND HAS NEVER MENTIONED THE FACT -- YOUR

12   EX-HUSBAND NEVER MENTIONED THE FACT THAT HE WORKED WITH

13   ROBBINS GELLER FIRM IN MANY, MANY CASES, DID HE?

14   **A.**  NO.

15   **Q.**  OKAY.

16        **THE COURT:**  THREE MINUTES.  I DON'T KNOW IF THIS IS A

17   GOOD TIME TO BREAK, OR IF YOU HAVE GOT SOMETHING YOU CAN DO IN

18   THREE MINUTES.

19        **MR. ISAACSON:**  I CAN DO SOMETHING IN THREE MINUTES.

20   I MIGHT BE ABLE TO BE DONE IN FIVE ALTOGETHER WHICH WOULD BE

21   GOOD FOR THE WITNESS.

22        **THE COURT:**  THAT WOULD BE.

23   **BY MR. ISAACSON:**

24   **Q.**  YOU BASICALLY HAVE -- AT LEAST -- BACK IN 2007, YOU HAD NO

25   KNOWLEDGE OF COMPUTERS.  THAT WAS HOW YOU CHARACTERIZED

ROSEN – CROSS / ISAACSON

1    YOURSELF?

2    **A.**   I MEAN NO KNOWLEDGE IS PROBABLY A STRONG WORD.  I USED

3    COMPUTERS, BUT I DON'T KNOW HOW THEY WORK.  I STILL DON'T KNOW

4    HOW THEY WORK.

5    **Q.**   RIGHT, BUT YOU KNEW HOW TO BURN CD'S.

6    **A.**   YES.

7    **Q.**   YOU BURNED A LOT OF CD'S?

8    **A.**   I DID.

9    **Q.**   YOU HAD --

10   **A.**   WELL, IF YOU SAY "BURN", NO.  I COPIED A LOT OF CD'S.  I

11   THINK BURN IS THE OPPOSITE PROCESS, RIGHT?  IS WHEN YOU CREATE

12   A CD.

13   **Q.**   OR YOU -- YOU COPIED A LOT OF THEM, YOU RIPPED THEM INTO

14   YOUR ITUNES?

15   **A.**   I COPIED THEM INTO MY ITUNES.

16   **Q.**   ALL RIGHT.  AND YOU HAD A NANNY WHO WAS MUCH MORE COMPUTER

17   LITERATE THAN YOU; YOU HAD HER COPY MUSIC FILES FROM YOUR

18   COMPUTER, RIGHT?

19   **A.**   I'M SORRY, WHEN YOU SAY "COPY MUSIC FILES FROM MY

20   COMPUTER", TO WHERE?

21   **Q.**   WELL, YOU HAD HER HELP YOU WITH COPYING SOME MUSIC FILES

22   BECAUSE YOU HAD DIFFICULT WITH THAT.  YOUR NANNY WAS BETTER

23   WITH THAT, SO YOU HAD HER HELP YOU?

24   **A.**   MAYBE.  IT SOUNDS ENTIRELY POSSIBLE.

25   **Q.**   AND YOU NEVER ASKED YOUR NANNY, HOWEVER, TO HELP YOU BURN

ROSEN – CROSS / ISAACSON

1    ANY CD'S; THAT WAS EASY FOR YOU?

2    **A.**  WHEN YOU SAY "BURNING CD'S" YOU MEAN CREATING --

3    **Q.**  I'M SORRY, COPYING CD'S INTO THE ITUNES LIBRARY.  THAT WAS

4    EASY FOR YOU?

5    **A.**  IT IS RELATIVELY STRAIGHTFORWARD PROCESS.  YOU ARE

6    PROMPTED BY ITUNES PROGRAM WHAT TO DO.

7    **Q.**  NOW, IN THIS CASE, YOU'VE -- DO YOU UNDERSTAND THE CLASS

8    ALSO INCLUDES BUSINESSES LIKE WAL-MART AND BEST BUY?

9    **A.**  THAT'S WHAT IT SAYS ON THE COVER.  I UNDERSTOOD FROM

10   READING, YES.

11   **Q.**  YOU'VE NEVER SPOKEN TO ANY OF THOSE PEOPLE, HAVE YOU?

12   **A.**  FROM -- REGARDING THIS PARTICULAR LAWSUIT?

13   **Q.**  RIGHT.  AS PART OF YOUR WORK AS CLASS REPRESENTATIVE,

14   YOU'VE NEVER SPOKEN TO ANY OF THE BUSINESSES IN THE CLASS?

15   **A.**  NO.  I HAVEN'T SPOKEN TO THEM, NO, ABOUT THIS LAWSUIT.

16   NO.

17   **Q.**  RIGHT.  AND ONE FINAL THING THEN.

18       WHEN YOU BOUGHT YOUR FIRST IPOD IN 2004, YOU BELIEVED THAT

19   THE IPOD ONLY WORKED WITH ITUNES, CORRECT?

20   **A.**  I DIDN'T -- WHEN I ACTUALLY WAS BUYING THAT, I DIDN'T GO

21   THROUGH THE PROCESS OF BUYING MUSIC, ET CETERA.  I DIDN'T

22   REALLY THINK ONE WAY OR THE OTHER.

23       YOU KNOW, WHEN YOU DON'T ENCOUNTER THE PROBLEM, YOU DON'T

24   FORM ANY BELIEFS.  ONCE YOU HAVE AN ISSUE, YOU FORM BELIEFS.

25   SO I HAVEN'T HAD AN ISSUE AT THAT TIME.  I HAVE NOT HAD ANY

ROSEN – REDIRECT / BERNAY

```
 1   OPINION ON THE MATTER WHEN I WAS BUYING.

 2   Q.  WELL, AT SOME POINT BEFORE THE COMPLAINT WAS FILED, YOU

 3   FORMED THE BELIEF --

 4   A.  I FORMED THAT BELIEF, YES.

 5   Q.  THAT APPLE PRODUCTS WORK TOGETHER AND IPOD ONLY WORKED

 6   WITH ITUNES.  YOU HAD THAT BELIEF BEFORE THE COMPLAINT WAS

 7   FILED, RIGHT?

 8   A.  I BELIEVE SO, YES.

 9   Q.  AND WHEN YOU BOUGHT YOUR IPODS AFTER THE LAWSUIT WAS

10   FILED, YOU ALREADY BELIEVED THAT ITUNES AND IPOD ONLY WORKED

11   TOGETHER.  THAT WAS YOUR BELIEF?

12   A.  RIGHT.

13          MR. ISAACSON:  I HAVE NO FURTHER QUESTIONS.

14          THE COURT:  DO YOU HAVE ANY REDIRECT?

15          MS. BERNAY:  JUST VERY QUICK.

16                    REDIRECT EXAMINATION

17   BY MS. BERNAY:

18   Q.  MS. ROSEN, YOU MENTIONED THE IPOD TOUCH, AND MR. ISAACSON

19   ASKED YOU IF IT WAS HERE IN CALIFORNIA.  DO YOU REMEMBER THAT?

20   A.  UH-HUH.

21   Q.  DO YOU HAVE THAT IPOD TOUCH ACTUALLY WITH YOU TODAY IN

22   COURT?

23   A.  I DON'T HAVE -- I THINK I HAVE IT WITH ME IN MY BAG.

24   Q.  WOULD YOU BE WILLING TO SHOW THAT TO THE APPLE LAWYERS, IF

25   THEY ASKED?
```

212

1    **A.**  OF COURSE.  IF SOMEONE NEEDS IT TO LOOK AT IT, OF COURSE.

2              **MS. BERNAY:**  NOTHING FURTHER.  THANK YOU, YOUR HONOR.

3          **THE COURT:**  ANY QUESTIONS ON THAT TOPIC ONLY?

4          **MR. ISAACSON:**  NO, YOUR HONOR.  WE WILL RAISE THE

5    TOPIC AFTER THE WITNESS HAS BEEN EXCUSED.

6          **THE COURT:**  OKAY.  THEN YOU ARE EXCUSED.

7       I HEAR NO REQUEST FROM APPLE TO INSPECT THE IPOD, CORRECT?

8          **MR. ISAACSON:**  I WAS GOING TO WAIT FOR HER TO BE

9    EXCUSED.  YES, WE WOULD --

10         **THE COURT:**  IF I EXCUSE HER, I LOSE JURISDICTION.

11         **MR. ISAACSON:**  I WOULD TRUST THE PLAINTIFFS' LAWYERS

12   WOULD WORK WITH HER.

13         **THE COURT:**  I WILL TELL YOU WHAT.  YOU CAN STEP DOWN.

14   YOU ARE NOT EXCUSED QUITE YET.  BUT YOU CAN GO DOWN RIGHT HERE

15   NEXT TO YOUR LAWYERS.

16      I'M GOING TO LET THE JURY GO.  IT'S THE END OF OUR TRIAL

17   DAY.

18      LADIES AND GENTLEMEN, AGAIN, APOLOGIES FOR THAT FALSE

19   ALARM.  I GUESS IT'S GOOD TO KNOW THAT IT WORKS.

20      YOU'VE NOW HEARD A DAY AND A HALF OF REAL EVIDENCE.  SO

21   NOW HOPEFULLY MY INSTRUCTIONS ARE BEGINNING TO MAKE MORE SENSE

22   TO YOU ABOUT YOUR LACK OF ABILITY TO DO ANYTHING OUTSIDE THIS

23   COURTROOM.  SO NO RESEARCH, NO CONSULTING DICTIONARIES, NO

24   SEARCHING THE INTERNET.  DO NOT INVESTIGATE ANY OF THESE

25   ISSUES.  DO NOT INVESTIGATE ANY OF THE HISTORY.  DO NOT

213

1    INVESTIGATE ANY OF THESE ENTITIES.

2        ALL RIGHT?  DON'T DO ANY OF THAT.  YOU'VE HAD A FULL DAY

3    OF THIS CASE.  GO AND DO OTHER THINGS.  FINISH YOUR HOLIDAY

4    SHOPPING.  GET SOME WORK DONE.  TAKE A NAP, IF YOU NEED TO.

5        REMEMBER, DO NOT COMMUNICATE WITH ANYONE IN ANY WAY ABOUT

6    THIS CASE AND DO NOT LET ANYONE ELSE COMMUNICATE WITH YOU.

7        AS I MENTIONED TO YOU EARLIER, SOMETIMES WHEN COMPANIES

8    LIKE APPLE ARE IN LITIGATION, THERE'S A LOT OF PRESS, SO DO

9    NOT LOOK AT THE PRESS.  NO EMAILS, SOMEONE FORWARDS THEM TO

10   YOU, IF THEY HAPPEN TO SEE YOU WALK OUT OF THE COURTHOUSE AND

11   SAID, HEY, THAT PERSON HAS A JUROR TAG I KNOW THAT PERSON, AND

12   THIS MAY BE THE ONLY TRIAL GOING ON IN THIS COURTHOUSE, YOU

13   HAVE TO DELETE IT.  DON'T LOOK AT IT.  DON'T THINK ABOUT IT.

14   LISTEN TO MUSIC.  DON'T LISTEN TO THE NEWS, IF YOU CAN AVOID

15   IT.  CHANGE THE CHANNEL.

16       BUT, PLEASE, WE IMPRESS UPON YOU THE NEED TO TRY AND KEEP

17   YOURSELVES AS ISOLATED AS POSSIBLE FROM ANY OUTSIDE INFLUENCE

18   WITH RESPECT TO THIS CASE.  OKAY?

19       ANY QUESTIONS AT THIS POINT?  IS THAT REFRIGERATOR BIG

20   ENOUGH FOR SNACKS?

21       YES.  YOU DO HAVE SOMETHING?  I THINK I GOT A HIGHLIGHT ON

22   THIS ONE.  THIS IS ABOUT EVIDENCE PRESENTATION?

23            **JUROR:**  (NODS HEAD.)

24            **THE COURT:**  I WILL TALK TO THEM ABOUT THAT.

25       ANYTHING ELSE?  NO?

214

1          WELL, IF I CAN MAKE IT TO WHOLE FOODS OR SOME OTHER PLACE,

2     I WILL TRY TO PICK UP SOME SNACKS FOR TOMORROW.  I HEAR YOU'RE

3     OUT.  WE WILL SEE YOU TOMORROW.  YOU ARE EXCUSED FOR THE DAY.

4     WE WILL STAND IN RECESS WITH YOU UNTIL 8:30 TOMORROW MORNING.

5     THANK YOU.

6          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

7          **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

8     HAS LEFT THE COURTROOM.

9        MR. ISAACSON.

10         **MR. ISAACSON:**  YES.  SO, WITH REGARDS TO THE -- THE

11    ONLY REASON THIS PLAINTIFF IS CLAIMING STANDING IS TWO IPODS

12    THAT WERE PURCHASED AFTER HER DEPOSITION, AND ABOUT WHICH NO

13    DISCOVERY WAS PROVIDED.

14         **THE COURT:**  DID YOU ASK FOR IT?

15         **MR. ISAACSON:**  WE DIDN'T KNOW SHE PURCHASED -- THERE

16    IS A -- YES.  WE HAVE AN INTERROGATORY ABOUT APPLE PURCHASES,

17    WHICH I DON'T BELIEVE WAS UPDATED.

18         **MS. SWEENEY:**  YOUR HONOR, WE HAD A SPECIFIC AGREEMENT

19    THE PARTIES WOULD NOT HAVE TO SUPPLEMENT INTERROGATORY

20    ANSWERS.

21       MR. ISAACSON, THE DAY HE JOINED THE CASE, WE HAD A

22    TELEPHONE CONVERSATION.  WE HAD A LONG-STANDING REQUEST INTO

23    APPLE AS TO -- THIS WAS RIGHT AFTER YOUR HONOR SET A TRIAL

24    DATE AND WE HAD A TON OF WORK TO DO, SO WE REACHED THAT

25    AGREEMENT WHICH CERTAINLY WAS TO THE BENEFIT OF APPLE, WHICH

215

1    WOULD HAVE HAD MUCH MORE DISCOVERY RESPONSES TO UPDATE.

2        **MR. ISAACSON:** AN AGREEMENT WHICH WAS REACHED IN

3    SEPTEMBER, SO FROM 2007 TO SEPTEMBER OF THIS YEAR, NO

4    DOCUMENTS WERE PRODUCED AND DOCUMENTS MAY HAVE BEEN DESTROYED.

5        **MS. SWEENEY:** AND --

6        **THE COURT:** MR. ISAACSON, SO WHAT ARE YOU ASKING

7    AND -- SPECIFICALLY, AND WHAT IS THE PREJUDICE?

8        **MR. ISAACSON:** WE WANT TO CONFIRM THAT THIS IS A

9    CLASS -- QUALIFIED CLASS REPRESENTATIVE. SO, THERE'S TWO

10   IPODS AT ISSUE THAT POTENTIALLY MAKE HER A CLASS

11   REPRESENTATIVE. ONE SHE SAYS SHE HAS WITH HER. WE WOULD LIKE

12   TO INSPECT THAT. THE SERIAL NUMBER MAY ANSWER THAT QUESTION.

13   AND THE OTHER ONE WE HAVE NO RECORDS OF. WE -- I CAN'T TELL

14   FROM HER TESTIMONY WHETHER SHE HAS RECORDS OF IT. WE WOULD

15   LIKE WHATEVER RECORDS SHE HAS PRODUCED OR THE IPOD PRODUCED IF

16   SHE HAS IT. SHE SAID IT MIGHT BE IN A BOX.

17       **THE COURT:** WELL, MS. SWEENEY?

18       **MS. SWEENEY:** YES, YOUR HONOR. MS. ROSEN IS A MEMBER

19   OF THE CLASS CERTIFIED BY JUDGE WARE. JUDGE WARE IDENTIFIED

20   THE MODELS THAT AT THAT TIME APPLE HAD TOLD US AND TOLD THE

21   COURT WERE THE AFFECTED MODELS. IT WAS ONLY IN JULY OF 2013

22   AFTER DR. NOLL HAD SUBMITTED HIS FIRST REPORT THAT APPLE

23   CHANGED THE INFORMATION PROVIDED.

24       SO MS. ROSEN IS A MEMBER OF THE CERTIFIED CLASS, WHETHER

25   OR NOT SHE WAS INJURED. NOW, APPLE MADE A STRATEGIC DECISION.

216

1   WE ASKED APPLE AFTER THIS HAPPENED IF WE SHOULD MODIFY THE

2   CLASS DEFINITION AND APPLE SAID, NO.  THEY MADE A STRATEGIC

3   DECISION NOT TO MODIFY THE CLASS.

4       SO EVEN IF MS. ROSEN HADN'T PURCHASED A MODEL

5   SUBSEQUENTLY, WHICH SHE DID, WE ARE HAPPY TO PROVIDE THAT

6   INFORMATION, SHE IS A MEMBER OF THE CLASS.

7       SO ALL OF MR. ISAACSON'S OBJECTIONS ARE SIMPLY MOOT.

8           MR. ISAACSON:  MAY I SAY SOMETHING ABOUT THAT?

9   BECAUSE I THINK THERE'S A POINT THAT'S WORTH THE COURT

10  UNDERSTANDING.

11      SO COUNSEL IS DISCUSSING THAT SEPTEMBER 2006 PURCHASE,

12  WHICH WAS WITHIN THE CERTIFIED CLASS.  IT'S A FIFTH GENERATION

13  DEVICE WHICH DR. NOLL'S REPORT IN 2013 CONCLUDED HAD NO

14  DAMAGES BECAUSE THE INFORMATION CAME OUT THAT THAT DEVICE DID

15  NOT HAVE 7.0 ON IT EXCEPT FOR SOME GAMES.

16      SO, EVEN IF THIS PLAINTIFF IS A MEMBER OF THE CLASS BASED

17  ON THAT DEVICE, SHE WOULD HAVE NO DAMAGES, NO INJURY.  SHE

18  WOULD BE OUT.

19          MS. SWEENEY:  AND, YOUR HONOR, I WOULD JUST --

20          MR. ISAACSON:  I'M SORRY.

21          MS. SWEENEY:  I AM SORRY.

22          MR. ISAACSON:  CAN I SAY ONE MORE THING?

23          THE COURT:  MR. ISAACSON, STOP TALKING TO HER.  ARE

24  YOU DONE?

25          MR. ISAACSON:  I WANTED TO SAY ONE MORE THING.

217

```
1              THE COURT:  OKAY.

2              MR. ISAACSON:  ABOUT THIS POINT ABOUT THE CLASS.

3    THEY ASKED -- A PART OF THEIR CLASS HAS NO DAMAGES.  THEY

4    ASKED US TO VOLUNTARY DISMISS THEM.  WE DID NOT AGREE TO THAT.

5    WITH OUR RULE 50 MOTION, WE WILL BE MAKING A MOTION THAT THAT

6    PART OF THE CLASS' CLAIMS BE DISMISSED WITH PREJUDICE BECAUSE

7    THERE'S GOING TO BE NO SHOWING OF INJURY TO THAT CLASS.

8         I'M SORRY FOR INTERRUPTING.

9              MS. SWEENEY:  SO JUST QUICKLY.  IT WAS A STRATEGIC

10   DECISION BY APPLE BECAUSE THEY WANT TO MAKE THIS MOTION, AND

11   NOTICE WENT OUT TO ALL THESE MEMBERS OF THE CLASS.  MS. ROSEN

12   IS IN THE CERTIFIED CLASS.  SHE PURCHASED EFFECTED MODELS.

13             THE COURT:  SHE HAS ONE WITH HER.  THIS COULD ALL BE

14   MOOT.

15             MS. SWEENEY:  IT IS MOOT, YOUR HONOR.  I AGREE.

16             THE COURT:  UNTIL THERE'S A REAL CONTROVERSY, I'M NOT

17   GOING TO GIVE ANY PRELIMINARY INDICATION ABOUT ANYTHING.

18        IF THE FIFTH GENERATION IS STILL PART OF THE CLASS, THEN

19   IT'S STILL PART OF THE CLASS.  AND YOU HAVE CONCEDED THAT IT

20   IS.  YOU JUST THINK -- SOUNDS LIKE THERE'S NOT GOING TO BE ANY

21   OPPOSITION TO THE MOTION FOR JUDGMENT.

22             MR. ISAACSON:  CORRECT.

23             THE COURT:  WITH RESPECT TO THAT PARTICULAR

24   GENERATION.

25             MR. ISAACSON:  BUT --
```

218

```
1            THE COURT:  THOSE ARE TWO SEPARATE IPODS THAT WE'RE

2    DEALING WITH.  SO TAKE A LOOK AT THE ONE SHE HAS AND TELL ME

3    IF THERE'S AN ISSUE.  IT DOESN'T SOUND LIKE WE ARE THERE YET.

4            MR. ISAACSON:  WE WILL LOOK AT THEM AND FIND OUT.

5       I WILL SAY THIS:  COUNSEL HAS SAID THEY DID NOT UPDATE THE

6    INTERROGATORY BECAUSE OF WHAT I SAID.

7       IT'S BEEN POINTED OUT BY MY COLLEAGUES THAT THE

8    INTERROGATORY ANSWERS THAT SAID SHE BOUGHT THREE IPODS WAS

9    DATED 2010, AND SHE DID NOT PUT THE 2007 AND 2008 PURCHASES IN

10   THE INTERROGATORY ANSWERS.

11           THE COURT:  OKAY.  SO NOTED.

12      ANYTHING ELSE?

13      SO LET'S -- WHERE IS MS. ROSEN?

14      MS. ROSEN, IF YOU CAN GET THAT IPOD OUT SO THAT ONCE WE

15   BREAK, WE ARE NOT BREAKING QUITE YET, YOU CAN PROVIDE THAT TO

16   THEM, THEY CAN LOOK AT THE SERIAL NUMBER.

17      THERE WERE A FEW EXHIBITS MENTIONED.  IS THERE A REQUEST

18   ON THOSE EXHIBITS?

19           MR. ISAACSON:  YES.

20           THE COURT:  2590 -- 2784, THERE'S A STIPULATION.  SO

21   IS THERE A REQUEST ON 2784?

22           MS. BERNAY:  YOUR HONOR, ON THIS ONE EXHIBIT, WE DID,

23   WHEN MS. ROSEN REVIEWED IT AGAIN, SHE NOTED HER PASSWORD WAS

24   ON IT, SO WE JUST WOULD ASK THAT THAT BE REDACTED.

25           THE COURT:  2784?
```

1          MS. BERNAY:  CORRECT.

2          MR. ISAACSON:  THAT'S FINE.

3          THE COURT:  SO WITH THE -- YOU SAID THE PASSPORT

4     NUMBER?

5          MS. BERNAY:  PASSWORD NUMBER.  IT'S ON THE FIRST

6     PAGE.

7          THE COURT:  THE PASSWORD WILL BE REDACTED.  ADMITTED

8     IN THAT FORM.

9          (DEFENDANT'S EXHIBIT 2784 RECEIVED IN EVIDENCE)

10         THE COURT:  AND THEN 2593.

11         MR. ISAACSON:  I WOULD MOVE TO ADMIT THE FIRST PAGE

12    PARAGRAPH 66.  I GUESS PARAGRAPH 7, PARAGRAPH 66.

13         MS. BERNAY:  I THINK WE STIPULATED PREVIOUSLY.

14         THE COURT:  NO.  THERE WASN'T A STIPULATION ON THE --

15    ON 2593.

16         MS. BERNAY:  SO I WOULD JUST OBJECT UNDER RULE 106

17    UNDER THE RULE OF COMPLETENESS AND ASK IF IT WAS GOING TO BE

18    MOVED IN, TO HAVE THE ENTIRE COMPLAINT.

19         MR. ISAACSON:  SINCE THE REST OF THE COMPLAINT IS

20    ALLEGATIONS AND PARAGRAPH 66 IS A PARTY ADMISSION THAT WE WANT

21    TO USE THEY DON'T GET TO SIMPLY ADMIT ALL OF THEIR ALLEGATIONS

22    AS EVIDENCE.

23         MS. BERNAY:  IT IS NOT ALL ALLEGATIONS.  THAT'S

24    INCORRECT.  THERE'S A NUMBER OF OTHER PARAGRAPHS REGARDING --

25         THE COURT:  THERE MAY BE -- I WILL RESERVE ON 2593

1    UNTIL WE FIND OUT IF THERE ARE OTHER PORTIONS OF IT, IN WHICH

2    CASE I CAN DECIDE IF THE WHOLE THING IS COMING IN OR JUST

3    THOSE PORTIONS THAT YOU ARE REQUESTING.  LET'S WAIT ON THAT

4    ONE THEN.

5        OTHERS?

6            **MR. ISAACSON:**  NO.  THAT'S IT FOR EXHIBITS.  I WOULD

7    LIKE TO RAISE ONE ISSUE ABOUT SCHEDULE TOMORROW.

8        THE SCHEDULE IS CALLING FOR --

9            **THE COURT:**  SO LET'S HAVE THE WHOLE LIST.  YOU WANT

10   TO TALK ABOUT SCHEDULE.  ANYTHING ELSE YOU WANT TO TALK ABOUT?

11           **MR. COUGHLIN:**  NO.

12           **THE COURT:**  MR. ISAACSON?

13           **MR. ISAACSON:**  NO.

14           **THE COURT:**  ANYTHING ON THE PLAINTIFFS' SIDE?

15           **MR. COUGHLIN:**  NO.

16           **THE COURT:**  SO LET'S TALK ABOUT SCHEDULE.

17           **MR. ISAACSON:**  THIS IS JUST BY PREVIEW.  WE HAVE

18   THREE EXECUTIVES TOMORROW WHO ARE HOPING TO GET ALL THROUGH,

19   AND I BELIEVE WE CAN, BASED ON OUR MUTUAL ESTIMATES OF THE

20   SCHEDULES.

21       WE HAVE MR. CUE, MS. MARKS, AND MR. SCHILLER.  AND BASED

22   ON OUR PROJECTIONS, WE WILL GET THROUGH.

23       MR. SCHILLER IS THE LAST OF THEM AND IS NOT AVAILABLE ON

24   FRIDAY.  IF WE ARE RUNNING A LITTLE LATE AND WE NEED A FEW

25   EXTRA MINUTES AT THE END OF THE DAY, WE WILL ASK FOR SOME

1    LATITUDE AT THAT POINT AND HOPE SO THAT WE CAN -- EVEN IF WE

2    HAVE TO RUN A FEW MINUTES OVER TO GET HIM OFF THE STAND.

3         **THE COURT:**  THAT IS REALLY DEPENDENT ON THE JURY.  I

4    HAVE GIVEN THEM THE SCHEDULE.  IF YOU WANTED TO DO THAT, YOU

5    SHOULD HAVE LET ME KNOW.  I COULD HAVE ADVISED THEM BEFORE

6    THEY LEFT THAT IT MIGHT RUN LATE.

7         **MR. ISAACSON:**  OKAY.

8         **THE COURT:**  IF THEY HAVE APPOINTMENTS, THEN HE'S

9    GOING TO HAVE TO COME BACK.

10        SO I TAKE IT THEN THAT THE JOBS VIDEOTAPE IS NOT HAPPENING

11   TOMORROW SO ALL OF THESE CAN HAPPEN?

12        **MR. ISAACSON:**  IT WILL BE THE LAST PRIORITY.

13        **MR. COUGHLIN:**  IT IS NOT HAPPENING TOMORROW IN LIGHT

14   OF WHAT I LOOK AT AS THE SCHEDULE.

15        WE THOUGHT THAT MR. CUE WOULD BE ON PART OF TODAY, AND SO

16   JOBS WOULD GO ON TOMORROW.  THAT'S -- THAT DOES NOT LOOK LIKE

17   IT'S HAPPENING.

18        **THE COURT:**  ALL RIGHT.

19        I MENTION THAT BECAUSE THERE IS INTEREST.  SO NOW

20   EVERYBODY KNOWS AND THE COURTROOM WON'T BE FILLED TOMORROW.

21   AND THEN I HAVE DISAPPOINTED PEOPLE BECAUSE THEY WAITED AND

22   WAITED AND IT DIDN'T HAPPEN.

23        OKAY.  ANYTHING ELSE?

24        **MR. COUGHLIN:**  NO.

25        **MS. SWEENEY:**  NO, YOUR HONOR.

1          **MR. ISAACSON:**  NO, YOUR HONOR.

2          **THE COURT:**  STAND IN RECESS THEN UNTIL 8:00 A.M.

3    TOMORROW MORNING.

4          **MS. SWEENEY:**  THANK YOU.

5          (PROCEEDINGS CONCLUDED AT 1:45 P.M.)

6

7                    **CERTIFICATE OF REPORTER**

8

9

10         WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, CERTIFY

11   THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF

12   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.  WE FURTHER CERTIFY

13   THAT WE ARE NEITHER COUNSEL FOR, RELATED TO, NOR EMPLOYED BY

14   ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS

15   TAKEN, AND FURTHER THAT WE ARE NOT FINANCIALLY NOR OTHERWISE

16   INTERESTED IN THE OUTCOME OF THE ACTION.

17

18         _____

19         RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR

20

21         _____

22         DIANE E. SKILLMAN, CSR, RPR, FCRR

23

24         WEDNESDAY, DECEMBER 3, 2014

25