William A. Isaacson (wisaacson@bsfllp.com)
(Admitted *Pro Hac Vice*)
Karen L. Dunn (kdunn@bsfllp.com)
(Admitted *Pro Hac Vice*)
Martha L. Goodman (mgoodman@bsfllp.com)
(Admitted *Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, NW
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

John F. Cove, Jr. #212213
(jcove@bsfllp.com)
Kieran P. Ringgenberg #208600
(kringgenberg@bsfllp.com)
Meredith R. Dearborn #268312
(mdearborn@bsfllp.com)
Maxwell V. Pritt #253155
(mpritt@bsfllp.com)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, CA 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460

David C. Kiernan #215335
(dkiernan@jonesday.com)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. C 05-00037 YGR<br>[CLASS ACTION]<br><br>**NOTICE OF MOTION AND MOTION TO GRANT JUDGMENT AS A MATTER OF LAW IN FAVOR OF DEFENDANT APPLE INC.**<br><br>Date: TBD<br>Time: TBD<br>Place: Courtroom 1, 4th Floor<br>Judge: Honorable Yvonne Gonzalez Rogers |

B O I E S ,  S C H I L L E R  &  F L E X N E R  L L P
O A K L A N D ,  C A L I F O R N I A

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.  APPLE'S PRODUCT DESIGN CHANGES ARE IMMUNE FROM
    ANTITRUST SCRUTINY ABSENT A DUTY TO DEAL. ............................... 4

    A.  Apple Had No Duty To Deal With Real. ............................................... 5

    B.  There Was No Voluntary, Profitable Course of Dealing Between Apple and
        Real. ...................................................................................................... 9

II. PLAINTIFF HAS FAILED TO PROVIDE AN EVIDENTIARY BASIS FOR
    CAUSATION AND DAMAGES. ................................................................... 10

    A.  Dr. Noll's Regression Does Not Measure Injury or Damages From the
        Challenged Conduct and Thus He Can Offer Only Speculation............. 10

    B.  Dr. Noll's Regression Does Not Distinguish Between the Effects of
        Keybag and Database Verification............................................................ 12

    C.  Harmony Would Have Failed for Reasons Other Than the Integrity Checks...... 12

    D.  There Is No Evidence Apple Considered Real's Harmony a Competitive
        Threat In Making Pricing Decisions. ........................................................ 13

III. iTUNES 7.0 AND 7.4 WERE PRODUCT IMPROVEMENTS. ...................... 14

    A.  iTunes 7.0 and 7.4 Were Genuine Product Improvements. ................... 14

        1.  iTunes 7.0 and 7.4 Offered Unchallenged Product Improvements.......... 15

        2.  iTunes 7.0 and 7.4 Offered Unchallenged Security Improvements
            That Independently Would Have Prevented Real From Working. .......... 16

        3.  The Keybag and Database Verification Checks, Even Considered
            Separately, Are Product Improvements Because They Improved
            Security and Stability. ...................................................................... 19

        4.  Dr. Martin's Testimony Would Not Support a Jury Verdict. ................. 20

        5.  Apple's Integrated iPod+iTunes System Was a Product
            Improvement. ..................................................................................... 21

        6.  Noninteroperability Improved the Product and Competition.................. 22

    B.  Plaintiff's Evidence of Pretext Fails as a Matter of Law. ..................... 22

    C.  Apple Had Legitimate Business Justifications For Its Design Changes. ............. 24

IV. CLAIMS RELATING TO PURCHASES OF iPODS WITHOUT THE KEYBAG
    AND DATABASE VERIFICATION MUST BE DISMISSED. ...................... 25

CONCLUSION ............................................................................................................ 25

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

i

# TABLE OF AUTHORITIES

## CASES

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group*,
    592 F. 3d 991 (9th Cir. 2010)..................................................................................passim

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
    985 F. Supp. 2d 612 (S.D.N.Y. 2013)....................................................................8

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 US 209 (1993) ...............................................................................................10

*California Computer Products, Inc. v. International Business Machines Corp.*,
    613 F.2d 727 (9th Cir. 1979)......................................................................4, 7, 8, 14

*Comcast Corp. v. Behrend*,
    133 S.Ct. 1426 (2013).....................................................................................10, 11

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000)..........................................................................10, 11

*DSM Desotech, Inc. v. 3D Sys. Corp.*,
    2013 U.S. Dist. LEXIS 13017 (N.D. Ill. January 31, 2013) ...............................14

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983)...........................................................................4, 7, 22

*Image Technical Serv. v. Eastman Kodak Co.*,
    903 F.2d 612 (9th Cir. 1990).................................................................................15

*In re Apple iPod iTunes Antitrust Litig.*,
    796 F. Supp. 2d 1137 (N.D. Cal. 2011) ............................................................passim

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
    546 F.3d 981 (9th Cir. 2008)................................................................................10

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2008)...................................................................................22

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008)................................................................................25

*Jones v. City of Oakland*,
    No. 11–cv–4725 YGR, 2013 WL 1333933 (N.D. Cal. Mar. 29, 2013)................3

*Lakeside-Scott v. Multnomah County*,
    556 F.3d 797 (9th Cir. 2009).................................................................................3

*Law v. NCAA*,
    134 F.3d 1010 (10th Cir. 1998).............................................................................24

*LiveUniverse, Inc. v. MySpace, Inc.*,
    304 Fed. App'x 554 (9th Cir. 2008)...............................................................7, 8, 9

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
    No. 11–cv–5341 YGR, 2014 WL 4643947 (N.D. Cal. Sept. 17, 2014) ................3

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.*,
    371 F. Supp. 2d 578 (D. Del. 2005) .......................................................................8

*MiniFrame Ltd. v. Microsoft Corp.*,
    551 F. App'x 1 (2d Cir. 2013) ................................................................................8

BOIES,  SCHILLER  &  FLEXNER  LLP
OAKLAND,  CALIFORNIA

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

*MiniFrame Ltd. v. Microsoft Corp.,*
    No. 11 Civ. 7419 (RJS), 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013) ..............................8

*Novell Inc. v. Microsoft Corp.,*
    731 F.3d 1064 (10th Cir. 2013)...............................................................................1

*Novell Inc. v. Microsoft Corp.,*
    No. 2:04-cv-01045-JFM, 2012 WL2913234 (D. Utah July 16, 2012) ........................passim

*O'Bannon v. NCAA,*
    7 F. Supp. 3d 955 (N.D. Cal. 2014) .....................................................................24

*Oahu Gas Service, Inc. v. Pacific Resources, Inc.,*
    838 F.2d 360 (9th Cir. 1988)............................................................................3, 22

*Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1155, 1158—59 (9th Cir.
    2003).................................................................................................................24

*Rebel Oil Co. Inc. v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995).........................................................................10, 11

*Ritchie v. United States,*
    451 F.3d 1019 (9th Cir. 2006)............................................................................4

*United States v. Microsoft,*
    253 F.3d 34 (D.C. Cir. 2001) ...........................................................................22

*Univ. of Tex. Southwestern Med. Ctr v. Nasser,*
    133 S. Ct. 2517 (2013)....................................................................................13

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)...............................................................................passim

**STATUTES**

15 U.S.C. § 2 ...........................................................................................................3

Cal. Bus. & Prof.Code § 17200 .............................................................................4

**RULES**

Fᴇᴅ. R. Cɪᴠ. P. 50(a)................................................................................................3

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1

**NOTICE OF MOTION**

2        PLEASE TAKE NOTICE THAT on a date and time to be determined, Defendant Apple

3   Inc. ("Apple") will, in the United States District Court, Northern District of California, located at

4   1301 Clay St., Oakland, CA, Courtroom 1, 4th Floor, before the Honorable Yvonne Gonzalez

5   Rogers, move for an order granting Apple judgment as a matter of law pursuant to Federal Rules

6   of Civil Procedure 50 and 52.  This motion is based on this notice of motion and motion, the

7   accompanying memorandum of points and authorities, the trial record, and such other matters as

8   may be presented to the Court at the time of the hearing.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR JUDGMENT AS A MATTER OF LAW                No.  C 05-00037 YGR

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiff's case is that the success of Apple's breakthrough combination of iPods and iTunes required Apple to stand still and stop improving its products, including their security, so that competitors could reverse engineer their way back into Apple's ecosystem.  The case presented by Plaintiff flatly contravenes *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–09 (2004), and stands as a dangerous attack on competition and innovation.  No antitrust case making allegations similar to this case has ever survived to a jury verdict.  Plaintiff's evidence at trial has shown this should not be the first.

First, *Trinko* and courts since *Trinko* have repeatedly recognized that a claim such as the one here is, in sum and substance, a duty to deal claim.  Judge Ware correctly held that such a claim must fail unless Apple was previously engaged in a voluntary and profitable course of dealing.  And here, as the Court has recognized, Apple never did so.  Unsupported and unauthorized—and involuntary—attempts at interoperation are the opposite of a voluntary course of dealing.  Accordingly, this Court should grant the Rule 50 motion, as Judge Motz did in *Novell Inc. v. Microsoft Corp.*, No. 2:04-cv-01045-JFM, 2012 WL 2913234, at *3, *8–9 (D. Utah July 16, 2012), *aff'd* 731 F.3d 1064 (10th Cir. 2013).

Second, following the testimony of Plaintiff's expert, Dr. Noll—in which he made admissions fatal to both the Plaintiff's claims and the class claims—there is no basis for the jury to conclude that iTunes 7.0 and 7.4 caused any injury to Plaintiff or the entire class.  Dr. Noll's effort to measure the impact of iTunes 7.0 with a regression fails because the regression cannot distinguish between the impact of keybag verification and the numerous other (legal and valuable) aspects of iTunes 7.0, such as the ability to download and watch full length movies.  As he admitted, "if there were five [features] put on simultaneously and one is in the model, you cannot separate the effects of all five.  You'll pick up all the effects in a single variable."  (Noll Tr. 1334:13-16.)  Dr. Noll was left with only speculation to say that *any* price effect his regression identified was caused by keybag integrity, let alone all of it.  And Dr. Noll failed to

measure any injury supposedly attributable to database verification, as his regression failed to control for the release of iTunes 7.4.

Undisputed evidence also shows that, whatever semblance of interoperability RealNetworks' Harmony (or anyone else) did or could have achieved with reverse engineering, it would have been rendered inoperable by numerous other security and other changes implemented by Apple in iTunes 7.0 and 7.4, as well as other changes to iTunes and iPods over time. Plaintiff has not even attempted to challenge these changes as anticompetitive. Dr. Noll was entirely unaware of them and Plaintiff's other expert, Dr. Martin, conceded they were legitimate. Thus, whatever "lock in" effect Plaintiff may hypothesize, it would not have been any different had Apple not adopted keybag or database integrity checks.

Third, Plaintiff has failed to offer evidence sufficient to permit a jury to find that iTunes 7.0 and 7.4 were not product improvements. iTunes 7.0 and 7.4 added numerous valuable features, such as full length movies, downloadable games for iPods, and the ability to transfer songs from iPods to one's desktop computer (known as reverse syncing). iTunes 7.0 and 7.4 also contained a complete redesign of FairPlay, the entirety of which, and not just pieces such as the integrity checks, prevented the reverse-engineered product Harmony from working with the iPod. Plaintiff has presented no evidence at all to dispute that the FairPlay redesign, which included numerous security upgrades including a universal keybag, individually encrypted keys, and a locked keybag, were not product improvements. Plaintiff challenges only one feature of FairPlay redesign, keybag verification, which indisputably increased the security of Apple's system by reducing the risk that an iPod could be tricked into processing keys or other code from untrusted sources, the possibility of which exposed a security flaw. And the database signing feature added in iTunes 7.4 similarly protected the iPod from untrusted code and content, which otherwise could place DRM protections at risk or create opportunities for corruption of the iPod.

Plaintiff's efforts at trial focused on purported *motives* for these changes, but so long as the changes—as here—were improvements, the motive for adopting them is irrelevant. Plaintiff's other evidence relied on Dr. Martin's opinion that the integrity checks damaged the keybag and database. Even if this testimony were true (and it is not), Plaintiff showed no

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

consumer who was affected by this and Dr. Martin's admissions at trial, like those of Dr. Noll, were fatal to Plaintiff's claims.

## **ARGUMENT**

After "a party has been fully heard on an issue during a jury trial," a court "may . . . grant a motion for judgment as a matter of law against the party" if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a).  "A party is entitled to judgment as a matter of law if, under the governing law, there can be but one reasonable conclusion as to the verdict, and that is a finding in favor of the moving party."  *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11–cv–5341 YGR, 2014 WL 4643947, at *1 (N.D. Cal. Sept. 17, 2014) (citation omitted).  "Judgment as a matter of law should be granted when the evidence contains no proof beyond speculation to support a verdict." *Jones v. City of Oakland*, No. 11-cv-4725 YGR, 2013 WL 1333933, at *2 (N.D. Cal. Mar. 29, 2013); *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802–03 (9th Cir. 2009) ("reasonable" inference "cannot be supported by only threadbare conclusory statements instead of significant probative evidence, and the jury cannot rely "only on speculation to reach its verdict").

Courts applying the Rule 50 standard have not hesitated to grant judgment as a matter of law where plaintiffs asserting Section 2 claims have failed to present sufficient evidence of an element of their claims.  *E.g.*, *Oahu Gas Service, Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 368-69 (9th Cir. 1988) (reversing denial of judgment notwithstanding the verdict when undisputed evidence established a legitimate business justification); *Novell*, 2012 WL 2913234, at *3, *9–10 (granting judgment as a matter of law to defendant for insufficient evidence it owed a duty to deal with competitor).

Plaintiff's jury claims are under Section 2 of the Sherman Act, 15 U.S.C. § 2.  Her monopolization claim requires proof of (1) "the possession of monopoly power in the relevant market," (2) "willful acts directed at establishing or retaining its monopoly, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident," and (3) "causal 'antitrust' injury," meaning "injury . . . caused by a reduction, rather than an increase, in competition flowing from the defendant's acts."  *Cal. Comp. Prods., Inc.*

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1   *v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 732, 735 (9th Cir. 1979) [hereinafter *CalComp*]

2   (quotation marks omitted).  Plaintiff's attempted monopolization claim requires proof (1) that the

3   defendant had "specific intent to control prices or destroy competition with respect to a part of

4   commerce," (2) "predatory or anticompetitive conduct directed to accomplishing the unlawful

5   purpose," (3) "a dangerous probability of success" and (4) "causal 'antitrust' injury."  *Id.* at 736.

6   　　Because Rule 50 should be granted on Plaintiff's Sherman Act claims, it necessarily

7   follows that judgment should be also granted on Plaintiff's claim under the California's Unfair

8   Competition Law ("UCL"), which is tried to the Court, not the jury.[1]

9   **I.   APPLE'S PRODUCT DESIGN CHANGES ARE IMMUNE FROM ANTITRUST
         SCRUTINY ABSENT A DUTY TO DEAL.**

10

11   　　It is the law of this case that Apple's decision to design the iPod to work exclusively with

12   iTunes instead of interoperating with other software was lawful, and that Apple had no duty to

13   assist RealNetworks, Inc. ("Real") or others in enabling or maintaining interoperability with the

14   iPod.  (Tr. 212:15-25 (Apple has "no general legal duty to assist its competitors including by

15   making its products interoperable, licensing to competitors, or sharing information with

16   competitors"; "the court has previously held that conduct to be legal").); *see also Trinko*, 540 U.S.

17   at 408–09; *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983).

18   　　In an effort to avoid this settled law, Plaintiff casts her claims as challenges to Apple's

19   product design, not its refusal to deal with Real.  But in light of the case that Plaintiff has tried—

20   plainly aimed at trying to convince the jury that Apple should have permitted third parties to

21   interoperate with Apple's iPods—this Court should do exactly what Judge Motz did in *Novell*:

22   grant the Rule 50 motion because Plaintiff's claims, in substance, are premised on a duty to deal

23

24   　　[1] The UCL prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent
     business act or practice."  Cal. Bus. & Prof. Code § 17200.  "Under California law, if the same

25   conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the
     same reason, then the determination that the conduct is not an unreasonable restraint of trade

26   necessarily implies that the conduct is not 'unfair' toward consumers."  *In re Apple iPod iTunes
     Antitrust Litig.*, 796 F. Supp. 2d 1137, 1147 (N.D. Cal. 2011) [hereinafter *In re AIIA*] (quotation

27   marks omitted).  Here, because Plaintiff has failed to satisfy the Rule 50 standard, she necessarily
     also has failed to satisfy the Rule 52 standard.  *See Ritchie v. United States*, 451 F.3d 1019, 1022-

28   24 (9th Cir. 2006).

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

B O I E S ,  S C H I L L E R  &  F L E X N E R  L L P
O A K L A N D ,  C A L I F O R N I A

1    requiring elements of proof that—as the Court has already held—they cannot prove and have not

2    proved.  *Novell,* 2012 WL 2913234, at *3, *8–10.

3         In that case, Novell alleged that Microsoft made a technical change to Windows, namely,

4    withdrawing support for namespace extension APIs, which made it harder for competitors to

5    interoperate with Windows.  *Id.* at *3.  Specifically, Novell argued, the change protected

6    Microsoft from competitors, such as Novell, which offered WordPerfect software in competition

7    with Microsoft's Office software containing the Word application.  *Id.* at *2–4.  The court noted

8    that CEO Bill Gates, who made the namespace decision, wrote an email indicating the change

9    would "give Office a real advantage" over WordPerfect.  *Id.* at *3.  After an eight-week jury trial,

10   following the Supreme Court's decision in *Trinko*, Judge Motz held that Novell's claim was

11   barred because Microsoft had no duty to deal with Novell, and Novell had failed to prove the

12   single, narrow exception for a duty to deal case, viz., "that Microsoft purposely destroyed a

13   preexisting profitable business relationship."  *Id.* at *10.  Thus, the court granted the Rule 50

14   motion, and was affirmed by the Tenth Circuit.  731 F.3d at 1066, 1070-74, 1080-81 (discussing

15   the "general rule of firm independence" and the "rare" situations in which the antitrust laws

16   "impose on firms—even dominant firms—a duty to deal with their rivals"; affirming that Novell

17   failed to thread "the narrow-eyed needle of refusal to deal doctrine").

18        Plaintiff, like Novell, presented to the jury a case that a technical change made it harder

19   for a competitor (Real) to interoperate with iPods.  Plaintiff, like Novell, claimed the reduced

20   interoperability was unlawful because it harmed a competitor (Real) and was motivated by ill

21   intent (though the evidence proves otherwise).  And Plaintiff, like Novell, presented no evidence

22   to satisfy the narrow *Trinko* exception to the rule that firms have no duty to deal.  Accordingly,

23   Plaintiff, like Novell, presented a fatally flawed claim and, like Novell, should have judgment

24   entered against the class under Rule 50.

25        **A.    Apple Had No Duty To Deal With Real.**

26        The Supreme Court has clearly stated that Apple, like all firms, enjoys "the long

27   recognized right of a trader or manufacturer engaged in an entirely private business, freely to

28   exercise its own independent discretion as to parties with whom he will deal."  *Trinko,* 540 U.S.

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

1    at 408 (quotation marks and alteration omitted).  As the Supreme Court explained in *Trinko*, a

2    contrary rule would facilitate collusion among competitors, stifle investment in new products and

3    innovation, and would be unadministrable, requiring courts to act as "central planners" for the

4    economy, setting the price and terms of compelled sharing.  *Id.* at 407–08, 415; *see also Novell*,

5    731 F.3d at 1073 ("Experience teaches that independent firms competing against one another is

6    almost always good for the consumer and thus warrants a strong presumption of legality").  As

7    the Supreme Court has warned, Plaintiff's case, if accepted, rather than fostering competition,

8    would impose dangerous constraints on competition and innovation.  *Trinko*, 540 U.S. at 407–08.

9         Plaintiff's approach at trial was to convey to the jury that Apple was required to permit, if

10   not affirmatively help, competitors to interoperate with Apple's iPods.  At opening, Plaintiff

11   noted the "important" feature of Apple's FairPlay DRM, which was that, "[y]ou couldn't take a

12   song that you had bought from the iTunes Store and play it directly on any other portable digital

13   media player.  There was a lock—a link between those two products." (Tr. 220:16-23.)  Due to

14   the popularity of iPods, they argued, competitive music stores "had access essentially to one out

15   of four consumers" because "they couldn't purchase songs from other stores and play them on

16   their iPod." (Tr. 221:16-23.)  As to Real, Plaintiff argued, it asked Apple, "can we make it

17   interoperable with you, our technology" and "Apple refuses." (Tr. 248:21-25.)  Real's reverse-

18   engineered Harmony was laudable, Plaintiff said, because "interoperability of devices and

19   jukebox software is one of the biggest challenges for today's music consumer." (Tr. 222:23-25.)

20   "[T]he labels wanted Apple to allow this to happen, to allow interoperability.  And Apple said no,

21   take a hike." (Tr. 257:19-20.)  "Apple certainly didn't want" interoperability. (Tr. 246:12.)

22        In support of forced interoperability, Plaintiff has repeatedly argued with witnesses, for

23   example, "[s]o it's your view that somebody doesn't have a choice or right to buy their song from

24   RealNetworks, use Harmony, and put it on their iPod." (Tr. 493:19-21.)  "[T]hat consumer can't

25   make the choice; isn't that right?" (Tr. 845:25-846:1.)  At the core of Plaintiff's case is the

26   assertion that once a third-party application—through reverse engineering—had managed, despite

27   Apple's design, to put material on an iPod, it was somehow improper for Apple to bring to market

28   new products that were incompatible with the reverse engineering.  Plaintiff's case, in sum and

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

6

1    substance, is an argument that Apple was required to deal with Real (and others) by supporting

2    interoperability with Real (and others) by act or omission.

3        No post-*Trinko* case has permitted such a claim to go to the jury.  Instead, courts routinely

4    dismiss actions alleging an anticompetitive product redesign on the ground that the innovator had

5    no duty to deal with the competitor.  Having found that the plaintiffs failed to establish the

6    threshold duty to deal, these courts have not continued to assess whether the challenged product

7    redesign was a genuine improvement.  This Court must do the same, particularly in light of the

8    irreconcilable conflict in this case between *Trinko* and Plaintiff's liability theory.

9        The Ninth Circuit has consistently applied *Trinko* and recognized that claims alleging an

10   anticompetitive product design must be dismissed if the innovator had no threshold duty to deal

11   with the competitor, expressly rejecting claims alleging an anticompetitive product redesign on

12   duty to deal grounds.  *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556–57 (9th Cir.

13   2008) (challenge to product redesign under Section 2 must involve a prior "affirmative decision

14   or agreement to cooperate" between the innovator and the complaining competitor, citing *Trinko*);

15   *CalComp*, 613 F.2d at 744 ("IBM, assuming it was a monopolist. . . . was under no duty to help

16   CalComp or other peripheral equipment manufacturers survive or expand").  Similarly, in

17   *Foremost Pro*, monopolization claims based on the introduction by a monopolist of products

18   incompatible with those of its rivals were dismissed on duty to deal grounds.  703 F.2d at 545

19   ("The antitrust laws did not impose a duty on Kodak to assist . . . manufacturers of competing

20   cameras, film, paper or chemicals to survive or expand" (quotation marks and citation omitted)).

21   In these cases, the Ninth Circuit did not continue on to consider whether any anticompetitive

22   effects of the design were outweighed by any procompetitive benefits, or whether the defendant

23   had a non-pretextual business justification.  The absence of a duty to deal brought those cases to

24   an end; so too here.  *See Allied Orthopedic*, 592 F.3d at 1002 ("Our precedents make clear that a

25   monopolist has no duty to help its competitors survive or expand when introducing an improved

26   product design").

27       It is of no moment that Plaintiff has attempted to dress up her duty to deal claim as turning

28   on product design.  No court has ever found that reverse engineered interoperability can oblige an

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

7

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

innovator to accommodate a competitor's business model when redesigning the innovator's own products. The distinction drawn by Plaintiff is illusory, and is precisely the gambit rejected by the Tenth Circuit in *Novell* under identical circumstances:

> Unable to travel the hard road of refusal to deal doctrine, Novell seeks an escape route, trying to recast Microsoft's conduct as an "affirmative" act of interference with a rival rather than a "unilateral" refusal to deal. . . . Essentially Novell asks us to toy with the act-omission distinction, seeking to have us describe Microsoft's conduct as an "affirmative" act of interference rather than an "omission" of assistance. . . . Traditional refusal to deal doctrine is not so easily evaded . . . . Whether one chooses to call a monopolist's refusal to deal with a rival an act or omission, interference or withdrawal of assistance, the substance is the same . . . .

*Novell*, 731 F.3d at 1078–79. As in *Novell*, the Ninth Circuit in *LiveUniverse* and *CalComp* reviewed the affirmative replacement of compatible products with incompatible ones, and found no duty to deal. *See LiveUniverse*, 304 F. App'x at 557; *CalComp*, 613 F.2d at 744. Other courts likewise have routinely recognized that, absent a duty to deal, a monopolist cannot be held liable for a product design or redesign that renders its products incompatible with a competitor's products. *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 617, 623 (S.D.N.Y. 2013) (dismissing, on duty to deal grounds, monopolization claim premised on Amazon's decision to use proprietary digital rights management such that only books downloaded from Amazon could be read on a Kindle device); *MiniFrame Ltd. v. Microsoft Corp.*, No. 11 Civ. 7419 (RJS), 2013 WL 1385704, at *3–5 (S.D.N.Y. Mar. 28, 2013) (dismissing, on duty to deal grounds, claim based on Microsoft's change to Windows license agreement that rendered a competitor's previously interoperable product incompatible with Windows), *aff'd* 551 F. App'x 1 (2d Cir. 2013) (affirming on duty to deal grounds); *Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 371 F. Supp. 2d 578, 588–89 (D. Del. 2005) (dismissing product design claim on duty to deal grounds).

Plaintiff's theory unfairly asks the jury to play the role prohibited by *Trinko* and the Ninth Circuit. Without even an assertion of a duty to deal, Plaintiff would nonetheless demand the jury oversee innovation by technology companies and, as a central planner, determine whether interoperability should have been permitted.

MOTION FOR JUDGMENT AS A MATTER OF LAW   No.  C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

### B. There Was No Voluntary, Profitable Course of Dealing Between Apple and Real.

The only narrow circumstance in which a unilateral refusal to deal with competitors might give rise to an antitrust claim is when a firm "terminate[s] . . . a voluntary (*and thus presumably profitable*) course of dealing" with a competitor in a way that "suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (emphasis in original); *LiveUniverse*, 304 F. App'x at 556 (characterizing the scope of this exception as "narrow").

The Court has already ruled that discovery revealed "no evidence that [Apple] had a prior course of dealing with RealNetworks." *In re AIIA,* 796 F. Supp. 2d at 1145.[2] After Plaintiff's case at trial, nothing has changed. It remains undisputed that Apple never voluntarily dealt with Real or any other party seeking to interoperate with iPods. The reverse-engineered relationship between iPods and some third-party software occurred without Apple's cooperation or permission. And, among other things, Apple expressed its firm position against dealing with Real to the public when it issued a press release immediately after Harmony's release making clear that any interoperability between the iPod and Harmony was unauthorized, possibly unlawful, and merely temporary. (TX 124; Cue Tr. 661:20-23.) Real also warned Harmony customers of the product's inevitable demise from Apple's updates. (Martin Tr. 451:10-452:11.)

Nor has Plaintiff met her separate, independent burden of producing evidence sufficient to show that Apple profited from Real's or others' unauthorized "hacking" into Apple's system. *See LiveUniverse*, 304 F. App'x at 556. Plaintiff has supplied nothing to show that Apple profited from Real's (or anyone else's) forced reverse engineered interoperability with the iPod.

Allowing the claim to go to the jury in light of the undisputed evidence that Apple never dealt with Real, profitably or otherwise, would flout the Supreme Court's directive in *Trinko* that claims based on unilateral refusals to deal must fit within the "limited exception" for discontinuing a voluntary, profitable course of dealing. *Trinko*, 540 U.S. at 409. Permitting other

---

[2] Judge Ware's summary judgment order followed *LiveUniverse* in rejecting Plaintiff's refusal-to-license claim, but did not address its application to Plaintiff's claims regarding iTunes 7.0. *In re AIIA*, 796 F. Supp. 2d at 1145, 1146–47.

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No. C 05-00037 YGR

duty-to-deal claims would be in "tension with the underlying purpose of antitrust law," and punish "risk taking that produces innovation and economic growth." *Id.* at 407.

## II.   PLAINTIFF HAS FAILED TO PROVIDE AN EVIDENTIARY BASIS FOR CAUSATION AND DAMAGES.

Plaintiff must establish "a direct causal link between the anticompetitive practice and plaintiff[s'] damages." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 988 (9th Cir. 2008). "[S]ince it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition," the requirement of "causal antitrust injury" requires that damages specifically "flow from an *anticompetitive aspect or effect* of the defendant's behavior." *Rebel Oil Co. Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (emphasis added) ("If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal per se").

To carry her burden to show causation and damages, Plaintiff has relied exclusively on the testimony of Dr. Noll. Dr. Noll's testimony is inadequate to show causation and damages in the face of the evidence submitted at trial. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Id.* In particular, an expert's opinion cannot support an antitrust verdict if it does "not incorporate all aspects of the economic reality of the [relevant] market" and does "not separate lawful from unlawful conduct." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000). Plaintiff must also show that injury and damages were suffered classwide, and in a manner consistent with her theory of liability. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).

### A.   Dr. Noll's Regression Does Not Measure Injury or Damages From the Challenged Conduct and Thus He Can Offer Only Speculation.

Because the "undisputed facts about the structure of the market . . . render the inference [to be drawn from Dr. Noll's opinion] economically unreasonable" it is "insufficient to support a

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No. C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1   jury verdict." *Rebel Oil*, 51 F.3d at 1435–36; *see also Comcast*, 133 S.Ct. at 1433 (damages

2   model improper where it "failed to measure damages resulting from the particular antitrust

3   injury" alleged by the plaintiff); *Concord Boat,* 207 F.3d at 1057 (opinion must "separate lawful

4   from unlawful conduct").

5   The only empirical support for Dr. Noll's liability, injury, and damages opinions is his

6   regression.  Plaintiff offers it as evidence of the impact of the keybag integrity check included in

7   iTunes 7.0, but that is not what it measures.  It is, as Dr. Noll admitted, a "before-and-after" price

8   analysis linked to the date of iTunes 7.0's release in September 2006.  Dr. Noll's admissions at

9   trial that it was impossible for his regression to distinguish legal from allegedly illegal conduct

10   (Noll Tr. 1334:12-16; 1397:4-8) was one of several junctures of this trial that require dismissal of

11   Plaintiff's claims.  His regression cannot distinguish between price impacts of other aspects of

12   iTunes 7.0 and the price impact of keybag integrity (if there was one).  "You can't assign a

13   specific number to the price effect of multiple components that were all put on the machine

14   together."  (Noll Tr. 1334:3-4.)  "If it's true that there's something that is perfectly correlated with

15   7.0 and is not in the regression, it will be included in the coefficient for 7.0."  (Noll Tr. 1293:12-

16   14.)  "[I]t's difficult when things happen simultaneously, . . . [it] ranges from difficult to

17   impossible to separate their effects."  (Noll Tr. 1341:17-19.)  It is therefore undisputed that Dr.

18   Noll's damages model cannot isolate the effect of the allegedly anticompetitive conduct (keybag

19   integrity) from the undisputedly legal conduct (including the overall redesign of the FairPlay

20   architecture).  (Noll Tr. 1396:18-1397:8 (acknowledging he has "not segregated" out the alleged

21   impact from the KVC and DVC from other source code changes released with iTunes 7.0

22   redesign)); (Noll Tr. 1293:5-19, 1296:11-1297:15, 1394:6-9.)

23   The undisputed evidence at trial shows that the features of iTunes 7.0 other than keybag

24   integrity were significant.  Apple introduced iTunes 7.0 as "the most significant enhancement to

25   the world's most popular music jukebox and online music and video store since it debuted in

26   2001," and it included for the first time the ability to download full-length feature films and play

27   them on iPods.  (TX 2423 at 1.)  Since that feature was introduced, consumers have downloaded

28   millions of dollars' worth of movies from iTunes and played them on a range of devices.

11

1   (Schiller Tr. 707:19-708:2; 708:13-21.)  iTunes 7.0 also introduced the sale of downloadable

2   games for the iPod, browsing music by album ("Cover Flow"), reverse-syncing and other

3   features.  (Cue Tr. 704:5-20, 705:12-18, 709:14-19, 710:17-22; TX 2423 at 1-2.)

4   These new features made iPods more valuable to consumers.  Dr. Noll conceded that he

5   has no basis to distinguish the impact of keybag integrity (if any) from the impact of Cover Flow,

6   NFL season pass, improved screen resolution, reverse syncing, gapless playback, the ability to

7   transfer content from your iPod to a computer, or other new iTunes 7.0 features.  (Noll Tr.

8   1333:12-1341:19.)  Thus, Dr. Noll has offered no basis for the jury to conclude that *any* of the

9   price impact from iTunes 7.0 identified by his regression resulted from reduced competition from

10  Harmony as opposed to these significant new features in iTunes 7.0, let alone that *all* of it arises

11  from keybag integrity, as his damages figures assume.  (Noll Tr. 1333:6-1334:15.)

**B.    Dr. Noll's Regression Does Not Distinguish Between the Effects of Keybag and Database Verification.**

12
13  Dr. Noll's regression also does not separate any alleged effects from keybag verification

14  (launched with iTunes 7.0) apart from the effects of database verification (launched a year later

15  with iTunes 7.4).  His damages analysis conflates them.  (Noll Tr. 1209:21-1210:2; TX 893.)  His

16  before-and-after September 2006 regression has no ability to isolate damages from the September

17  2007 iTunes 7.4 update.  (Noll Tr. 1365:19-21.)  Plaintiff has shown no injury from the iTunes

18  7.4 update and those claims must be dismissed.

**C.    Harmony Would Have Failed for Reasons Other Than the Integrity Checks.**

19
20  The only feature of the iTunes 7.0 update challenged by Plaintiff at trial as anticompetitive

21  is the keybag integrity check.  (Martin Tr. 379:3-25.)  As the undisputed evidence shows, keybag

22  integrity was only one part of a total redesign of Apple's Fairplay security architecture that

23  occurred in the 7.0 update.  (Farrugia Tr. 462:11-463:5, 528:6-9, 529:23-530:3.)  It was not even

24  a free-standing element; it was part of the new, redesigned FairPlay architecture and, specifically,

25  the keybag.  Uncontroverted evidence establishes that, even without the integrity checks, the 7.0

26  update and related firmware would have rendered Real's Harmony incompatible with the new

27  iPods with that technology.  (Farrugia Tr. 532:8-16; TX 118 (record labels "told Real it wasn't

28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1   worth doing because they know it would not work in the future"); TX 2139 ("we are actively

2   strengthening and changing our DRM so they will definitely break on our next release.  We

3   would have to work not to break them"); Cue Tr. 692:15-693:16; Martin Tr. 451:10-452:1; Jobs

4   16:01-11.)  This is because Harmony was based on a reverse engineered, previous version of

5   FairPlay and anytime Apple rolled out changes to FairPlay it would break the link between any

6   third-party software based on a previous version.  (Farrugia Tr. 537:2-8 (Apple "change[d] the

7   symmetry to make sure that every hacker who worked on the previous version . . . [had] to start

8   again from zero").)  Apple "couldn't have" updated its DRM without breaking interoperability

9   with Harmony "because any change we made to the DRM was going to break them.  To make the

10  DRM more secure, there's no way it was going to keep working."  (Robbin Tr. 1043:15-1044:4.)

11  Among the other changes to Fairplay that would have prevented Harmony from playing songs on

12  iPods were encryption of each key and encryption of the keybag as a whole.  (Farrugia Tr. 461:9-

13  20.)

14         Because the alleged harm (Harmony's inability to load songs onto the iPod) would have

15  occurred even absent the challenged conduct (keybag integrity), Plaintiff has failed to meet her

16  burden of showing causal antitrust injury.  *Univ. of Tex. Southwestern Med. Ctr v. Nasser*, 133

17  S.Ct. 2517, 2525 (2013) ("an action is not regarded as a cause of an event if the particular event

18  would have occurred without it" (quotation marks omitted)).

19         **D.    There Is No Evidence Apple Considered Real's Harmony a Competitive
               Threat In Making Pricing Decisions.**

20

21         At summary judgment, the Court rejected Apple's argument that Dr. Noll's opinion did

22  not fit the facts because Apple's pricing committee did not take into account the factors that Dr.

23  Noll says would underlie the price increase predicted by his theory, particularly the purported

24  threat from Real's Harmony and the lock-in effect Harmony would supposedly reduce.  In doing

25  so, the Court specifically rested on the premise that there was "evidence sufficient to support an

26  inference that the Apple executives on the pricing committee knew of and were concerned by

27  Harmony."  (Dkt. 788 at ECF 10.)  At trial, Plaintiff has failed to come forward with any

28  evidence that the pricing committee considered Real or any supposed "lock-in" attributable to 7.0

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

1   and 7.4 when making its pricing decisions.  Plaintiff presented no evidence that Harmony was a

2   competitive threat to iPods in that period, or that anyone at Apple saw it as one.  (*See* Farrugia Tr.

3   481:2-4 (Apple did not consider Real a competitive threat); Schiller Tr. 828:7-14; Noll Tr.

4   1227:14-1228:2.)

5   **III.    iTUNES 7.0 AND 7.4 WERE PRODUCT IMPROVEMENTS.**

6           As the Court instructed the jury, "a change to a company's product cannot be considered

7   anticompetitive regardless of its effect on competitors if the change was a genuine product

8   improvement."  (Tr. 212:11-14); *accord Allied Orthopedic*, 592 F.3d at 999–1000 (a "product

9   improvement by itself does not violate Section 2, even if it is performed by a monopolist and

10  harms competitors as a result").

11          Plaintiff has failed to produce evidence that iTunes 7.0 and 7.4 were not genuine product

12  improvements.  Uncontroverted evidence demonstrates that the those versions added important

13  new features and functions as well as an entire security redesign including multiple elements, and

14  that even the challenged aspects of iTunes 7.0 and 7.4 improved the quality, security, and

15  reliability of the iPods containing that technology, benefitting consumers and enhancing Apple's

16  competitive position vis-à-vis its rivals.  Thus, *even assuming* Plaintiff's theories about what the

17  integrity verification did to the keybag and database were true, Apple is entitled to judgment as a

18  matter of law.

19          **A.    iTunes 7.0 and 7.4 Were Genuine Product Improvements.**

20          Courts have recognized a wide range of cognizable product improvements that under

21  *Allied Orthopedic* immunize product designs from antitrust scrutiny.  *Allied Orthopedic*, 592 F.3d

22  at 1001 (incorporation of new functionality was a product improvement); *CalComp*, 613 F.2d at

23  744 (lower costs were a product improvement); *DSM Desotech, Inc. v. 3D Sys. Corp.*, 2013WL

24  389003, at *14–15 (N.D. Ill. Jan. 31, 2013) (inclusion of technology in printers that "locked out"

25  unapproved resins justified as enhancing operation of defendant's printers and approved resins);

26  *In re AIIA*, 796 F. Supp. 2d at 1143–44 (enhancement of security and stability of iTunes was a

27  legitimate product improvement).

28

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    Product improvements do not need to be substantial or even fully realized to render design

2    changes immune from antitrust scrutiny. *Allied Orthopedic*, 592 F.3d at 1001 (design change an

3    improvement even in the face of evidence that redesigned products were "no more accurate than

4    previous" versions and consumers had "not found the [new features] very useful"). The

5    possibility of consumer benefits in the future is sufficient to bring the antitrust analysis to an end.

6    *Id.* (a product design is an improvement when it "facilitates the introduction" of new features "in

7    the long run"). Judicial deference to plausible product improvements is required because courts

8    are unable to "to calculate the 'right' amount of innovation," as a "seemingly minor technological

9    improvement today can lead to much greater advances in the future." *Id.* at 1000.

10    At trial, Plaintiff's expert, Dr. Martin, proffered an unheard definition of product quality

11    limited to whether the device can play more songs than the previous version. (Martin Tr. 379:14-

12    25.) No court has ever suggested that a product improvement would or could be so restricted.

13    **1.    iTunes 7.0 and 7.4 Offered Unchallenged Product Improvements.**

14    iTunes 7.0 and 7.4 contained a number of new features unchallenged by Plaintiff. Among

15    other things, iTunes 7.0 allowed consumers to download and play feature films (including on

16    iPods), browse music collections by album cover art, download games for iPods, and transfer

17    songs from iPods to computers.. (TX 2423 at 1-2; Cue Tr. 703:22-704:11, 710:12-712:17-22,

18    718:6-25-720:5.) iTunes 7.4 also added new features, including the ability to determine an iPod's

19    battery charge from within iTunes, customizable ringtones, and  closed captioning for movies and

20    TV. (Cue Tr. 728:11-729:7.)

21    Plaintiff's claims focus myopically on one aspect of iTunes 7.0 (keybag integrity) and one

22    aspect of iTunes 7.4 (database signing). But *Allied Orthopedic* prohibits the jury from

23    considering one piece of a complex software product in isolation from the product as a whole. To

24    hold otherwise would be to invite the jury to weigh the undisputed procompetitive and allegedly

25    anticompetitive effects of iTunes, precisely the balancing test prohibited by *Allied Orthopedic*, or

26    to inquire as to whether Apple could have achieved the procompetitive benefits of iTunes 7.0 and

27    7.4 through less restrictive means. 592 F.3d at 1000; *Image Technical Serv. v. Eastman Kodak

28    Co.*, 903 F.2d 612, 620 (9th Cir. 1990) ("there is no least restrictive alternative requirement in the

15

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1  context of a Section 2 claim"); Tr. 213:9-12.  For example, in *Allied Orthopedic*, the court

2  considered whether OxiMax, the "patented pulse oximetry system," was a product improvement,

3  not the particular features that made OxiMax incompatible with generic components.  592 F.3d at

4  994, 1001–04.  And in this case the Court has already ruled that the relevant products for

5  purposes of the trial are iTunes 7.0 and 7.4.  *In re AIIA*, 796 F. Supp. 2d at 1146–47 ("At issue is

6  whether [Apple's] introduction of iTunes 7.0 constituted a genuine product improvement.").

7  Both iTunes 7.0 and 7.4 contained new and improved features, and that is the end of the inquiry.

8  *See Allied Orthopedic*, 592 F.3d at 1001.

9    **2.**  **iTunes 7.0 and 7.4 Offered Unchallenged Security Improvements That**
     **Independently Would Have Prevented Real From Working.**

10

11    The evidence presented at trial establishes that iTunes 7.0 and 7.4 were product

12  improvements because they enhanced the security and reliability of iTunes.  Those security

13  features, not limited to the integrity checks, prevented the reverse engineered Harmony from

14  interoperating with the iPod.  (Farrugia Tr. 529:23-531:9 (security features), 532:13-16

15  (incompatibility with Harmony).)  The Court has already ruled that iTunes security upgrades were

16  genuine product improvements to the extent they made the system more resistant to breaches of

17  Apple's Fairplay DRM, in compliance with Apple's obligations to the record labels.  *In re AIIA*,

18  796 F. Supp. 2d at 1143–44.  The Court concluded at summary judgment that iTunes 4.7 was a

19  product improvement under this standard, relying on evidence of hacking before 4.7, pressure

20  from record labels on Apple to fix the hacks, and subsequent changes to Apple's encryption

21  technology to make it more resistant to attacks.  *Id.*  The Court set for trial the question whether

22  the iTunes 7.0 and 7.4 updates were product improvements under the same standard based on

23  disputed issues of fact raised by Dr. Martin.  *Id.* at 1146–47.  The evidence at trial, including Dr.

24  Martin's testimony, has revealed that the 7.0 and 7.4 updates were improvements, just as iTunes

25  4.7 was.

26    The undisputed evidence shows that iTunes remained subject to persistent hacking and

27  threats of hacking after iTunes 4.7 was released.  (Farrugia Tr. 517: 14-20 ("The system was

28  totally hacked. . . . People were able to take the keys, open the vault . . . steal the music and

MOTION FOR JUDGMENT AS A MATTER OF LAW    No.  C 05-00037 YGR

distribute the music everywhere without any restriction").)  Apple employees were aware of critical vulnerabilities in the iPod's security infrastructure that hackers were continually seeking to exploit.  (Farrugia Tr. 516:8-25, 517:14-20, 534:9-11; TX 2342 (Hymn forum:  "wouldn't the iPod be the obvious place to get the keys"), TX 371 (discussing DVD Jon's intent to "copycat Real" to hack FairPlay), TX 2850 (DVD Jon "hacks FairPlay, the Apple iTunes closed system.")

After the release of iTunes 4.7, the record labels continued to complain to Apple about iTunes hacks and demand that they be closed.  (Cue Tr. 738: 25-739:1 ("And then . . . we had all of the pressure of the labels complaining about the hacking."); TX 2205, TX 2185, TX 2222, TX 2243; TX 2330 (emails from record label executives to Apple expressing concern about various hacks, after iTunes 4.7).)  Apple took these complaints seriously because its contracts with the record labels provided the labels with a termination option if Apple did not fix hacks to iTunes. "We had . . . to fix the problem, and if we didn't fix it, they could take all their music off the store."  (Cue Tr. 730:5-15.)  Given the importance of maintaining security, Apple tried to stay a step ahead of the ever-improving hackers, rather than a reactive step behind.  (Farrugia Tr. 528:1-4 (security is "a cat and mouse game," where "you need to run faster than the hacker to make sure that your system is still solid").)  Dr. Martin, Plaintiff's expert, admitted that the desktop keybag was under attack and "responding to those attacks and preventing them is appropriate."  (Martin Tr. 411:12-17.)

When Augustin Farrugia was hired, he redesigned FairPlay, and paid close attention to the keybag because, as he wrote at the time, it was "one of the vulnerable parts of Apple's DRM solution, and it is predictable that attacks will be perpetrated against the keybag."  (TX 2253 at 3; Farrugia Tr. 521:4-522:5.)  iTunes 6.0 included a complete redesign of the FairPlay architecture for iTunes on the customer's desktop and the servers, including fundamental changes to how the keybag was created, organized, and stored, and it was a fundamental improvement to the security of the system.  (Farrugia Tr. 528:6-531:9; TX 2273 at 5-8.)  A central component was creating the new, redesigned keybag on Apple's secure servers, instead of creating it on the customer's desktop computer.  (Farrugia Tr. 462:17-463:5, 476:8-477:4.)  From the outset, the design of the new keybag included integrity checks because it is "important to create the appropriate defenses

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

to avoid direct or indirect attacks that compromise the content of the keybag."  (TX 2253 at 4; *see* Farrugia Tr. 534:12-535:20; TX 2273 at 8, 11.)  That is a standard cryptographic technique to prevent indirect attacks by confirming that the keybag is authentic, i.e., from a trusted source, before processing its contents.  (Farrugia Tr. 522:18-524:25; TX 2253 at 6.)

iTunes 7.0, in turn, implemented Mr. Farrugia's FairPlay redesign on the iPod, including a version of the keybag structure that had been introduced in iTunes 6.0 on the desktop.  (Farrugia Tr. 462:14-20, 531:22-532:7.)  Using the same format of keybag in both locations (and elsewhere on Apple's systems) improved security and efficiency by focusing efforts instead of maintaining multiple formats.  (Farrugia Tr. 531:10-532:7.)  This changed the format, structure, and protections of the keybag on the iPod entirely independent of the keybag integrity check, and thus made reverse-engineered programs like Harmony no longer work because they were made to be compatible with the prior versions.  (Farrugia Tr. 532:8-532:25; Jobs Tr. 16:1-11.)  iTunes 7.4 rolled out additional pieces of the FairPlay redesign, including further changes to the encryption functions, so that "all the hacker[s] who worked on 7.0" would have to "restart again" after "all the time they spen[t]" attempting to hack the prior version.  (Farrugia Tr. 536:1-13.)

The new redesign of FairPlay, rolled out in iTunes 6.0, 7.0, and 7.4, was a major success, and prevented any successful hack of the keybag for approximately 800 days before a hack called Requiem succeeded.  (Farrugia Tr. 544:15-545:9.)  That redesign, including the integrity checks, is the basis for all of Apple's FairPlay DRM in use today, and it protects a wide array of popular content (such as movies and apps) on a wide array of popular devices (including iPhones and iPads).  (Farrugia Tr. 565:20-565:14.)  Apple needed secure DRM to obtain and maintain rights to sell additional content, including the movies that were launched with iTunes 7.0.  (Robbin Tr. 1013:5-15.)

Plaintiff presented no evidence at trial that the FairPlay redesign generally, or that its implementation on iPods in iTunes 7.0 and 7.4 specifically, did not increase the security of Apple's FairPlay DRM, nor any evidence to rebut the undisputed fact that secure DRM was important to adding new content to the iTunes store.  The only reasonable conclusion is that the

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

redesign increased security, and that alone shows that iTunes 7.0 and 7.4 were genuine product improvements.  *In re AIIA*, 796 F. Supp. 2d at 1143-44.

### 3.  The Keybag and Database Verification Checks, Even Considered Separately, Are Product Improvements Because They Improved Security and Stability.

Even if one incorrectly limits the evaluation to the challenged aspects of iTunes 7.0 and 7.4 alone, they were product improvements.

*Keybag Integrity*.  The iPod's keybag contained the cryptographic keys that allowed DRM-protected songs to be played.  (Martin Tr. 351:15-21.)  As a result, it was an obvious target of attack for hackers.  (Farrugia Tr. 461:9-20.)  After the keybag on the desktop was made more secure with iTunes 6.0, but before iTunes 7.0, Apple engineers saw, for example, a hacker comment that, "wouldn't the iPod by the obvious place to get the keys?  iTunes may be able to [download] them on the fly, but the iPod sure as hell can't."  (TX 2342; Robbin Tr. 1019:5-1020:16; Farrugia Tr. 545:16-546:15.)  Keybag integrity allowed iPods to determine whether the keybag had been tampered with by an untrusted source, which made it the first line of defense that would stop a hacker trying to reverse engineer the FairPlay system.  (Farrugia Tr. 535:4-20.)  Even in cases where it does not itself harm the system, such reverse engineering allows hackers to learn about the system and build an attack vector.  (Robbin Tr. 995:2-13.)  It is for this reason that within a week of starting at Apple, Farrugia's proposed redesign of Fairplay included keybag integrity.  (Farrugia Tr. 489:18-490:3, 518:15-20; TX 2253 at 6.)

*Database Signing*.  The iPod's database contained information that the iPod used to control its operation.  (Martin Tr. 380:20-23.)  Because content in the database was processed by the iPod during its operation, it was a point of vulnerability that hackers could use to reverse engineer aspects of iPod operations, including Fairplay DRM.  (Farrugia Tr. 567:8-15.)  Like keybag integrity, database signing was a way to determine whether the database was tampered with by an untrusted source, which prevents inadvertent corruption of the database, and prevents hackers from gaining information they need to maliciously attack the system.  (Farrugia Tr. 537:17-539:8.)  Moreover, Apple received complaints from some users about their iPods no longer working properly after attempting to use third-party applications that, through some

MOTION FOR JUDGMENT AS A MATTER OF LAW                          No.  C 05-00037 YGR

1   reverse-engineered process, attempted to place content on iPods and failed: "Especially with the
2   numbers of customers that we have when people are doing stuff like this, the support calls, they
3   all come to us.  When people say, 'my iPod doesn't work,' and we field that call and we're trying
4   to figure out why, we don't know that they were using software like this."  (Robbin Tr. 996:6-23.)

### 4.   Dr. Martin's Testimony Would Not Support a Jury Verdict.

5
6        The testimony of Plaintiff's expert, Dr. Martin, was the sole basis for denying Apple
7   summary judgment on the 7.0 issues.  Dr. Martin's testimony was so rife with admissions that the
8   issue of security may not go to the jury.  He admitted it was "elementary security" to upgrade
9   before keybag hacks, not after.  (Martin Tr. 416:15-24.)  He agreed iTunes 4.7 RSA security was
10  vulnerable to attack.  (Martin Tr. 417:6), that Apple was entitled to encrypt songs, firmware, and
11  the keybag (426:24-427:6, 438:24-439:11), and to update the encryption (430:11-14).  He
12  admitted database signing would stop third party software that would misspell song names
13  (Martin Tr. 436:20-23), contain malware (438:4-18), and edit iPod database to change song
14  names to "terrible things" or the names of pornographic movies (444:21-445:25; 446:12-18).  Dr.
15  Martin's testimony that the keybag or database could be damaged was also entirely theoretical.
16  There is no evidence of a single customer suffering these consequences:  not one customer.  Even
17  if it were assumed a scattered few suffered these consequences, no reasonable jury could find
18  based on this evidence that the upgrade of security was not a product improvement.
19       In light of the undisputed evidence of security benefits of the FairPlay redesign generally,
20  and of keybag integrity and database signing in particular, as a matter of law, Dr. Martin's
21  testimony cannot support a jury verdict that a design change was anticompetitive.  To allow the
22  jury to weigh the undisputed benefits of security against the potential effect on an uninvited third
23  party would be exactly the balancing of "an improved product design against the resulting injuries
24  to competitors" that the Ninth Circuit said "is not just unwise, it is unadministrable."  *Allied*
25  *Orthopedic*, 592 F.3d at 1000; Tr. 213:9-12.  "A seemingly minor technological improvement
26  today can lead to much greater advances in the future."  *Id.*  Accordingly, the evidence before the
27  jury cannot support a verdict for Plaintiff.
28

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

**5.        Apple's Integrated iPod+iTunes System Was a Product Improvement.**

"The iPod was always envisioned as a device that worked with iTunes," exclusively. (Schiller Tr. 811:7-812:3; *see also* Cue Tr. 744:15-23, 746:17-747:4; TX 2088.)  Trying to "engineer a solution for someone else's products" risked "problems we can't fix because they are not our products."  (Schiller Tr. 812:14-19.)  Instead, Apple's integrated approach permitted iTunes and iPods to "work together seamlessly" and "created an easy-to-use device that customers loved."  (Schiller Tr. 814: 22-815:1.)  Apple pursued a competitive business strategy of designing and preserving closed, integrated systems based on its belief that a seamless user experience led to superior products and provided "the best customer experience."  (Robbin Tr. 1058:2-10.)

This philosophy extended to the tight and exclusive interoperability of the iPod and its management software, iTunes.  (Schiller Tr. 811:20-812:6; TX 2183 at 1.)  The iPod was designed to be a simple, easy-to-use product focused on performing one task—playing music—exceptionally well.  (Schiller Tr. 814:5-9 (iPod was "as easy to use as your refrigerator. . . .That's what a consumer electronic device needs to be about").)  To enable this simplicity on the iPod, however, complex functions needed to be performed by iTunes.  (Schiller Tr. 815:21-816:6.)  iTunes and iPod were therefore complementary parts of a single, complete system.  (Schiller Tr. 811:22-812:6.)  Only by controlling both parts of the system could Apple ensure a quality user experience.  (Schiller Tr. 811:10-19.)  This integrated system allowed Apple to streamline its customer service operations, which reduced costs and enhanced the user experience in a variety of ways.  (Cue Tr.  731:14-18, 732:15-20 (Apple saved 12-15 million dollars each year in reduced customer support costs because of iPod+iTunes integration); Robbin Tr. 996:9-23 (hacks to FairPlay increased Apple's customer support costs and degraded the user experience).)  Apple marketed the iPod based on its tight, seamless interoperability with iTunes, as well as on the iPod's simple, intuitive design that was only possible because of that interoperability.  (Schiller Tr. 816:7-11.)

The evidence showed all of these benefits were compromised if a user used a third-party jukebox software to manage the iPod.  Most importantly, Apple's ability to offer users a simple

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

and standardized way of resolving problems with their iPods—fixing bugs, enhancing security, and restoring a user's content if problems could not be fixed—was dependent on customers using iTunes as the iPod's management software.  (Robbin Tr. 1038:2-25 (using third-party management software instead of iTunes left iPods "stuck in time"); TX 2449.)

### 6.    Noninteroperability Improved the Product and Competition.

Plaintiff contends that Apple created incompatibility with Harmony.  As a matter of law, creating incompatibility enhances competition and is therefore a product improvement.  In affirming the dismissal of antitrust claims premised on a monopolist's introduction of a system of integrated products incompatible with competing products, the Ninth Circuit held that incompatible product designs enhance competition by increasing consumer choice:

> The creation of technological incompatibilities, without more, does not foreclose competition; rather, it increases competition by providing consumers with a choice among differing technologies, advanced and standard, and by providing competing manufacturers the incentive to enter the new product market by developing similar products of advanced technology.

*Foremost Pro,* 703 F.2d at 542.  Increased product quality is also a recognized legitimate business justification for product incompatibility.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 53 (2d Cir. 2008) (integrated elevator system can promote competition by "upholding the product's reputation for reliability and safety").

### B.    Plaintiff's Evidence of Pretext Fails as a Matter of Law.

Plaintiff's case is premised on their theory that Apple's introduction of iTunes 7.0 and 7.4 was pretext for closing forced interoperability between the iPod and third-party jukeboxes like Real.  (Tr. 214:22-215:4.)  What this misses is that if a design change is objectively determined to be a genuine product improvement, then the innovator's intent is irrelevant.[3]

---

[3] *See Allied Orthopedic*, 592 F.3d at 1001 ("Statements of an innovator's intent to harm a competitor through genuine product improvement are insufficient by themselves to create a jury question under Section 2"); *Oahu Gas*, 838 F.2d at 370 ("a finding of anticompetitive intent will not sustain a Section 2 claim in the face of evidence of procompetitive effects"); *In re AIIA*, 796 F. Supp. 2d at 1144–45 (relying on objective evidence).  At most, in ambiguous or close cases, an innovator's subjective motivation for making a design change may be relevant to the extent it sheds circumstantial light on whether the design change is, in fact, a product improvement.  *See United States v. Microsoft*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("considering whether the

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1   Even assuming intent is relevant to their claims, Plaintiff has adduced insufficient

2   evidence to establish that Apple's undisputed product improvements in iTunes 7.0 and 7.4 were a

3   pretext for engaging in anticompetitive conduct.  First, it is undisputed that Apple took no action

4   to block much more significant competitors than Real.  For example, when Amazon launched a

5   digital music store in September 2007 that sold DRM-free music at lower prices than Apple,

6   Apple did nothing to prevent users from placing songs purchased from Amazon onto their iPods.

7   (Robbin Tr. 1048:24-1049:23; Schiller Tr. 826:2-828:5; TX 2505 at 2 (Amazon "Threat level:

8   higher than previous entrants.  Why?  Their established customer base and better execution with

9   basic inter-operability with the iTunes + iPod eco-system than others")).)  Similarly, the majority

10  of music placed on iPods throughout the class period was from CDs, yet iTunes actually

11  facilitated this competition to iTunes by attempting to make the process of "ripping" songs from

12  CDs onto iPods quick and easy.  (Schiller Tr. 832:8-10, 833:15-25.)

13  Second, there is no evidence from which a reasonable jury could infer that Apple's

14  adoption of the keybag and database integrity checks had any connection with Real's introduction

15  of Harmony.  Apple decided to hire Augustin Farrugia to identify and fix security vulnerabilities

16  in Apple's DRM system prior to April 2005—before Real even announced its hack of iTunes 4.7

17  in late April.  (Farrugia Tr. 456:9-14.)  Farrugia also diagnosed the security flaws that were closed

18  by 7.0 before the Real announcement, specifically mentioning the need for keybag integrity on

19  April 18, 2005.  (Farrugia Tr. 462:8-20; 525:5-7; 526:16-21; TX 2253 at 1, 6.)  An outside

20  security firm also highlighted the specific vulnerability to Apple.  (TX 2265 at 7; Farrugia Tr.

21  560:19-563:19.)

22  Third, the undisputed evidence shows that the keybag and database integrity checks were

23  small parts of Apple's complete and ongoing overhaul of its security infrastructure.  (Farrugia Tr.

---

24  monopolist's conduct on balance harms competition and is therefore condemned as exclusionary
    for purposes of § 2, our focus is upon the effect of that conduct, not upon the intent behind it.
25  Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us
    understand the likely effect of the monopolist's conduct"); *Allied Orthopedic*, 592 F.3d at 1001
26  ("Evidence of an innovator's initial intent may be helpful to the extent that it shows that the
    innovator knew all along that the new design was no better than the old design, and thus
27  introduced the design solely to eliminate competition").

28

MOTION FOR JUDGMENT AS A MATTER OF LAW                        No.  C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

528-31; 532:13-22.)  In uncontroverted testimony, Farrugia testified that, if it specifically desired to do so, Apple could have blocked Harmony simply by implementing the keybag integrity check for iTunes on iPods, but instead Apple waited over a year to implement the integrity checks as part of a methodical and comprehensive security upgrade to iPod, iTunes, and QuickTime.  (Farrugia Tr. 532:13-16; Robbin Tr. 926:5-9, 927:21-23.)

Fourth, any possible inference that Apple's introduction of the integrity checks is pretextual is belied by the fact that even today—long after Real's music store closed—keybag and database integrity checks continue to be used on a wide range of Apple products.  (Farrugia Tr. 566:1-8; Cue Tr. 726:10-727:8; Robbin Tr. 991:11-25.)  No reasonable factfinder could conclude that these security upgrades would continue to operate today if their sole purpose was to block a long-defunct, minor competitive threat.   Again, the fact that a challenged technology is being used 10 years later is dispositive evidence.

**C.      Apple Had Legitimate Business Justifications For Its Design Changes.**

Apple's integration of iTunes + iPod into a system incompatible with competing products was central to Apple's business strategy of offering distinctive, high quality products to consumers.  The Ninth Circuit has held that conduct that facilitates the provision of new or distinctive products has a legitimate business justification in a Section 2 case.  *See Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1155, 1158–59 (9th Cir. 2003).  "Improving customer choice is procompetitive."  *Id.* at 1157; *see also O'Bannon v. NCAA*, 7 F. Supp. 3d 955, 1003 (N.D. Cal. 2014) ("'increasing output, creating operating efficiencies, making a new product available, enhancing service or quality, and widening consumer choice' may be procompetitive justifications") (*quoting Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998)).

The undisputed evidence also shows that the iTunes 7.0 and 7.4 security upgrades facilitated Apple's effort to compete with its rivals on the strength of its DRM technology.  Major competitors of Apple, including Microsoft, publicly criticized the security of Apple's DRM.  (Schiller Tr. 838:18-839:16; TX 2183.)  Apple was free to respond to such criticism from competitors by upgrading its DRM security.  *See Paladin Assocs.*, 328 F.3d at 1157 (competitive

MOTION FOR JUDGMENT AS A MATTER OF LAW                      No.  C 05-00037 YGR

1   pressure is a legitimate business justification for product innovation; a contrary ruling "would

2   restrict an important form of non-price competition").

3         Apple also had a legitimate interest in protecting its reputation of its DRM technology

4   FairPlay, including because for Apple "to get additional content rights for things like movies, and

5   TV shows, and books" Apple needed to be able to explain "we have a really secure DRM."

6   (Robbin Tr. 1013:3-15.)

7         Finally, Apple was subject to contractual obligations that required it to protect the record

8   labels' content from being hacked.  (Robbin Tr. 911:7-8)  Creating and maintaining a secure

9   DRM also was critical for Apple to obtain the rights to sell additional content, such as the movies

10   that were launched with iTunes 7.0.  (Robbin Tr. at 1012:10-1013:15, 1016:23-1017:4; TX 2234.)

11   Apple had legitimate business interests in complying with its current contractual obligations.

12   **IV.    CLAIMS RELATING TO PURCHASES OF iPODS WITHOUT THE KEYBAG AND DATABASE VERIFICATION MUST BE DISMISSED.**

13

14         As the Court is well aware, the certified class includes purchasers of a number of iPods

15   that did not contain the keybag and database integrity checks that are the sole remaining conduct

16   challenged by Plaintiff in this litigation.  Apple's Reply ISO Mot. to Dismiss, Dkt. 972 at 11-

17   12.  Plaintiff does not claim damages for these iPod models.  Joint Pre-Trial Conf. Stmt., Dkt. 823

18   at 1.  Plaintiff's expert, Dr. Noll, testified that his damages calculation does not include iPod

19   models unaffected by the integrity checks.  (Noll Tr. 1184:9-22.)  Accordingly, Apple is entitled

20   to judgment as a matter of law dismissing claims relating to purchases of unaffected iPods, for

21   which no damages have been claimed.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 524

22   (6th Cir. 2008) (district court "directed a verdict against Plaintiffs for all claims relating to non-

23   ferrous scrap-metal sales on the ground that Plaintiffs failed to establish any proof of injury or

24   damages relating to such transactions").

25                          <u>**CONCLUSION**</u>

26         Apple respectfully requests that the Court enter judgment as a matter of law in its favor.

27

28

MOTION FOR JUDGMENT AS A MATTER OF LAW          No.  C 05-00037 YGR

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

Date:  December 10, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: */s/ William A. Isaacson*
     William A. Isaacson

*Attorney for Defendant Apple Inc.*

MOTION FOR JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR