EXHIBIT 1

UNITED STATES DISTRICT COURT

*CERTIFIED COPY*

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


| | | |
|---|---|---|
| THE APPLE IPOD ITUNES | ) | NO. C 05-00037 YGR |
| ANTITRUST LITIGATION | ) | |
| | ) | PAGES 1311 - 1529 |
| | ) | |
| | ) | **JURY TRIAL VOLUME 7** |
| | ) | |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| _____ | ) | TUESDAY, DECEMBER 9, 2014 |


<u>**REPORTERS' TRANSCRIPT OF PROCEEDINGS**</u>


APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                 BY:  ALEXANDRA S. BERNAY,
                      JENNIFER N. CARINGAL,
                      PATRICK COUGHLIN,
                      STEVEN M. JODLOWSKI,
                      CHARLES MCCUE,
                      CARMEN A. MEDICI,
                      BONNY E. SWEENEY, ATTORNEYS AT LAW

                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CHAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                 BY:  FRANCIS J. BALINT, JR.
                      ATTORNEY AT LAW

             (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258
                    DIANE E. SKILLMAN, CSR NO. 4909

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

## E X H I B I T S

| DEFENDANT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2428 | | | 1408 | 7 |
| 2874 | | 1410 | 1411 | 7 |
| 2874A | | | 1413 | 7 |

## EVIDENTIARY HEARING

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| BENNETT, BARBARA | | |
| DIRECT EXAMINATION BY MS. BERNAY | 1419 | 7 |
| CROSS-EXAMINATION BY MR. ISAACSON | 1433 | 7 |
| REDIRECT EXAMINATION BY MS. BERNAY | 1449 | 7 |
| RECROSS-EXAMINATION BY MR. ISAACSON | 1452 | 7 |

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 1 | | 1422 | | 7 |
| 2 | | 1432 | | 7 |
| 4, 5, 6 | | 1455 | | 7 |

--oOo--

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

BENNETT - DIRECT / BERNAY

1    Q.  -- BLOG ON THE INTERNET?

2    A.  RIGHT.

3    Q.  AND NOW, YOU UNDERSTAND THAT YOU'RE HERE TODAY TO DISCUSS

4    SOME ISSUES RELATED TO YOUR PURCHASES OF IPODS?

5    A.  SURE.

6    Q.  IS THAT RIGHT?

7        SO HAVE YOU EVER OWNED AN IPOD?

8    A.  I'VE HAD TWO.  I HAD THE IPOD CLASSIC THAT I BOUGHT, I

9    BELIEVE, IN 2005.  AND THEN THIS -- THE ONE, THE IPOD NANO.

10   Q.  OKAY.  AND SO YOU MENTIONED THAT YOU BOUGHT AN IPOD

11   CLASSIC IN ABOUT 2005.  DID YOU BUY THAT FROM THE APPLE STORE?

12   A.  YES.

13   Q.  AND DO YOU STILL HAVE THAT IPOD?

14   A.  YES.

15   Q.  OKAY.  AND THEN YOU MENTIONED THIS IPOD NANO.  ABOUT WHEN

16   DID YOU PURCHASE THAT?

17   A.  2006, I THINK IT WAS IN NOVEMBER.  YOU HAVE MY CREDIT

18   STATEMENT THERE.

19   Q.  AND NOW THAT YOU'VE MENTIONED YOUR CREDIT STATEMENT, I'M

20   ACTUALLY GOING TO --

21        MS. BERNAY:  AND, YOUR HONOR, I'M NOT SURE HOW YOU

22   WANT TO HANDLE, BUT I'D LIKE TO MARK WHAT IS TITLED A

23   DUPLICATE RECEIPT.  AND THERE'S ACTUALLY -- WELL, THERE'S A

24   LITTLE BIT OF IDENTIFYING INFORMATION ON HERE, I BELIEVE.

25        BUT IF I COULD APPROACH THE WITNESS, YOUR HONOR.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

BENNETT – DIRECT / BERNAY

1    **THE COURT:** YOU MAY. IT WILL BE MARKED AS --

2    **MS. BERNAY:** THANK YOU.

3    **THE COURT:** -- EXHIBIT 1.

4    **(PLAINTIFFS' EXHIBIT 1 MARKED FOR IDENTIFICATION)**

5    **BY MS. BERNAY:**

6    **Q.** MS. BENNETT, HAVE YOU HAD A MOMENT TO LOOK NOW AT WHAT

7    WE'VE MARKED AS EXHIBIT 1?

8    **A.** MM-HMM.

9    **Q.** WHAT IS THIS, IF YOU CAN TELL ME?

10   **A.** IT'S A RECEIPT FROM THE DERBY STREET APPLE STORE IN

11   HINGHAM, MASSACHUSETTS WHERE I BOUGHT THE IPOD NANO. IT'S

12   LISTING THE IPOD NANO AS A RED SPECIAL EDITION NANO. PRICE

13   POINT WAS $199. AND THEN I PICKED UP A TECH SUPPORT APP FOR

14   THE IPOD FOR $59 AT THE SAME TIME. SO THE AMOUNT PAID BY MY

15   CREDIT CARD WAS 267.95, AND THE -- I'M TRYING TO FIND THE DATE

16   ON HERE. NOVEMBER 5, 2006.

17   **Q.** AND YOU'LL NOTICE THAT IT SAYS AMOUNT PAID VIA VISA; DO

18   YOU SEE THAT?

19   **A.** YES.

20   **Q.** AND IS THAT YOUR -- DO YOU RECOGNIZE THOSE LAST FOUR

21   DIGITS?

22   **A.** YEAH, THAT'S MY CREDIT CARD.

23   **Q.** AND TELL ME WHAT YOU REMEMBER ABOUT BUYING THIS -- THIS

24   PARTICULAR IPOD NANO?

25   **A.** WELL, I LOVE THE APPLE STORES. I MEAN, THEIR CUSTOMER

BENNETT – CROSS / ISAACSON

```
1    SHOULD BE ABLE TO -- IF MR. ISAACSON WANTS TO GO ONLINE AND

2    GET A CLEANER COPY, BUT I DID WANT TO AT LEAST HAVE THIS

3    BEFORE THE COURT.

4    BY MS. BERNAY:

5    Q.  MS. BENNETT, CAN YOU IDENTIFY WHAT WE'VE MARKED AS

6    EXHIBIT 2?

7    A.  YES.

8    Q.  WHAT IS IT?

9    A.  IT IS MY CREDIT -- MY VISA CREDIT CARD WITH THE CHARGES

10   INCLUDING THE APPLE STORE CHARGE FOR 267.95.

11   Q.  AND DO YOU SEE THAT ABOUT THREE-QUARTERS OF THE WAY

12   THROUGH ON THE TRANSACTIONS?

13   A.  YES.

14   Q.  OKAY.  AND AGAIN, THIS IS YOUR PERSONAL CREDIT CARD, AND

15   YOU PAY THE BALANCE, YOUR NAME IS ON THE CARD?

16   A.  YES.

17         MS. BERNAY:  I HAVE NOTHING FURTHER AT THIS TIME.

18   THANK YOU, MS. BENNETT.

19         THE COURT:  MR. ISAACSON?

20         MR. ISAACSON:  ONE MOMENT, YOUR HONOR.

21              (PAUSE IN THE PROCEEDINGS.)

22                   CROSS-EXAMINATION

23   BY MR. ISAACSON:

24   Q.  GOOD MORNING, MS. BENNETT.

25       MY NAME --
```

BENNETT - CROSS / ISAACSON

1   **A.**   I THINK IT -- THIS IS MY OPINION.  I THINK THIS CASE IS

2   ABOUT RESTRICTED USE BASED ON PROPRIETARY FILE FORMATS.

3   **Q.**   OKAY.  MEANING DRM?

4   **A.**   DRM AND YOUR -- THE VARIOUS AUTHENTICATION VERIFICATION

5   FORMATTING THAT WERE USED ON THESE FILES SO THAT ONLY AN IPOD

6   COULD ACCESS MUSIC OR USE MUSIC FROM ITUNES DATABASES.

7   **Q.**   ALL RIGHT.  AND THAT WAS -- SO WHEN YOU FIRST CONTACTED

8   THE COURT AND THE LAWYERS, YOU THOUGHT THIS WAS A CLASS ACTION

9   THAT SAID APPLE SHOULD NOT BE PUTTING DRM ON ITS MUSIC DURING

10  THIS PERIOD OF TIME THAT'S AT ISSUE; IS THAT CORRECT?

11  **A.**   THE MANNER IN WHICH APPLE HAS CHOSEN TO RESTRICT THE USE

12  OF MUSIC PURCHASED BY ITUNES IN THIS WINDOW -- AND THEY'VE

13  CHANGED OVER THE YEARS -- WAS PROBLEMATIC FOR ME.  IT COSTS ME

14  MONEY, IT RESTRICTED ACCESS TO CERTAIN KINDS OF MUSIC THAT I

15  COULDN'T GET.

16  **Q.**   ALL RIGHT.

17  **A.**   AND COULD NOT PUT ON MY MACHINE TO TAKE TO THE RINK.

18  **Q.**   ALL RIGHT.  LET ME UNDERSTAND THAT.  THE --

19      AND, AGAIN, I'M JUST FOCUSING ON WHEN -- BEFORE YOU TALKED

20  TO THE LAWYERS.  DID YOU -- WAS IT YOUR BELIEF THAT THIS CASE

21  WAS ABOUT THE FACT THAT APPLE HAD DRM ON ITS SYSTEM AND IT

22  SHOULDN'T HAVE DRM?

23  **A.**   IT'S THE IMPLEMENTATION OF A DIGITAL RIGHTS MANAGEMENT

24  PROTOCOL --

25  **Q.**   OKAY.

BENNETT – CROSS / ISAACSON

1    Q.  OKAY.  THAT WAS A VERY LONG ANSWER BEFORE WE GOT TO YES.

2        JUST TO BE CLEAR, BY THE TIME YOU CALLED INTO THE -- YOU

3    WROTE INTO THE COURT, YOU THOUGHT THIS CASE WAS ABOUT THE FACT

4    THAT CONSUMERS WERE BEING DENIED MUSIC AND MAYBE MUSIC PRICES

5    WERE HIGHER BECAUSE OF THAT?

6           MR. COUGHLIN:  I OBJECT.

7                 (SIMULTANEOUS COLLOQUY.)

8           THE WITNESS:  I NEVER -- I NEVER SAID ANYTHING ABOUT

9    PRICES.

10          THE COURT:  I HAVE AN OBJECTION.

11   BY MR. ISAACSON:

12   Q.  I'M JUST ASKING --

13          THE COURT:  SO HOLD ON.

14       SHE ANSWERED THE QUESTION.  THE OBJECTION IS MOOT.

15          MR. ISAACSON:  RIGHT.

16   Q.  SO DID YOU THINK WHAT THIS CASE WAS ABOUT WAS THE FACT

17   THAT PEOPLE WERE -- THAT CONSUMERS WERE BEING DENIED ACCESS TO

18   MUSIC, THAT THAT'S WHAT THE CASE WAS ABOUT?

19          MS. BERNAY:  OBJECTION, AGAIN MISSTATES THE PRIOR

20   TESTIMONY.

21          THE COURT:  OVERRULED.

22          THE WITNESS:  SHALL I ANSWER?

23          THE COURT:  YOU MAY.

24          THE WITNESS:  I THINK THE CASE IS ABOUT THE

25   RESTRICTION OF WHAT CONSUMERS CAN ACCESS AND LISTEN TO, MUSIC

1   THAT IS OUT AND AVAILABLE BUT NOT USABLE ON AN IPOD IN THE

2   FILE FORMAT THAT APPLE HAS RESTRICTED THE IPOD TO.  SO, YES, I

3   GUESS THE ANSWER TO THAT QUESTION IS A YES.

4   **BY MR. ISAACSON:**

5   **Q.**  OKAY.

6       THE -- SO THEN YOU TALKED TO THE LAWYERS BY PHONE?

7   **A.**  EMAIL.

8   **Q.**  EMAIL.  AND THEN WHEN -- WHEN DID YOU FIRST MEET WITH

9   THE -- WHEN DID YOU FIRST HAVE SUBSTANTIVE CONVERSATIONS WITH

10  THE PLAINTIFF LAWYERS?  VERBAL CONVERSATIONS, NOT EMAIL.

11  **A.**  I THINK YESTERDAY.  WE MAY HAVE HAD ONE QUICK QUESTION THE

12  DAY BEFORE, CAN I COME OUT HERE.

13  **Q.**  UM-HMM.

14  **A.**  BUT THE -- THE MOST CONVERSATIONS WE'VE HAD WERE

15  YESTERDAY, AND IT WAS MOSTLY ABOUT ARRANGING TRAVEL PLANS.

16  **Q.**  OKAY.  SO TWO DAYS AGO, YOU TALKED WITH THE PLAINTIFFS'

17  LAWYERS ABOUT COMING OUT HERE.  AND YESTERDAY YOU HAD

18  NONSUBSTANTIVE CONVERSATIONS, YOU TALKED ABOUT GETTING OUT

19  HERE; IS THAT A FAIR --

20  **A.**  YES.

21  **Q.**  ALL RIGHT.  SO TODAY WOULD HAVE BEEN YOUR FIRST

22  SUBSTANTIVE CONVERSATIONS ABOUT THE CASE WITH THE LAWYERS.

23          **MS. BERNAY:**  OBJECTION, MISSTATES HER PRIOR

24  TESTIMONY.  SHE TESTIFIED THAT SHE HAD EMAIL CONVERSATION.

25          **THE COURT:**  OVERRULED.  NO COACHING.  SHE CAN ANSWER.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

BENNETT – CROSS / ISAACSON

1    THE COURT:  IS THAT A "YES"?

2    THE WITNESS:  YES.

3  BY MR. ISAACSON:

4  Q.  AFTER YOU READ THAT MEMO, YOUR UNDERSTANDING OF THIS CASE

5  THAT IT WAS ABOUT DENYING CONSUMERS ACCESS TO MUSIC.

6  A.  NO.  THAT SIMPLIFIES IT DRAMATICALLY.  IT HAS TO DO WITH

7  DRM.  IT HAS TO DO WITH -- WITH VERIFICATION OR VALIDATION, I

8  FORGET THE -- THE KEYBAG AND THE DATABASE PROTOCOLS THAT --

9  THAT WERE IN SOME UPGRADES THAT WERE CHANGES THAT WERE MADE TO

10  THE ITUNES FUNCTIONALITY.  THE QUESTION OF SHERMAN ANTITRUST

11  AND WHAT CONSTITUTES MONOPOLY BEHAVIOR AND WHAT DOESN'T.

12  IT -- I MEAN, AS I SAY, IT'S ALL VERY HIGH -- HIGH LEVEL, AND

13  I HAVEN'T HAD ACCESS OR RECEIVED ANY OF THE BACKUP

14  DOCUMENTATION OR ANY OF THE COURT FILINGS, WHICH, IF I

15  CONTINUE, I WOULD TAKE A LOOK AT.

16  Q.  RIGHT.  YOU WILL BE -- YOU WILL ACTUALLY BE REVIEWING WHAT

17  THIS CASE IS ABOUT PRETTY MUCH FOR THE FIRST TIME AFTER --

18  AFTER THIS TESTIMONY IF YOU'RE PERMITTED TO CONTINUE; IS THAT

19  A FAIR STATEMENT?

20    MS. BERNAY:  OBJECTION.

21    THE WITNESS:  NO.

22    MS. BERNAY:  MISSTATES --

23    GO AHEAD.

24    THE COURT:  IT CAN'T MISSTATE TESTIMONY.  THE

25  QUESTION WAS NEVER ASKED.  SHE SAID NO.

1   MR. ISAACSON, YOU SAID ON THE RECORD YOU WANTED THE DEPOSITION

2   WITH RESPECT TO THE TRIAL TESTIMONY.

3      AND THAT'S WHY I RECOMMENDED NOT ISSUING SOME KIND OF

4   ORDER WITH RESPECT TO A PERSON, WITH RESPECT TO A PURCHASE,

5   AND NOT HAVING TRIAL TESTIMONY, TO ALLEVIATE THAT ADDITIONAL

6   TIME AND EFFORT.

7      YOU NOW HAVE INDICATED TODAY JUST A FEW MINUTES AGO THAT

8   YOU WANT THAT DEPOSITION TESTIMONY SO THAT YOU CAN, IT SOUNDS

9   TO ME, BRIEF THE ISSUE OF ADEQUACY, WHICH IS DIFFERENT THAN

10  WHAT YOU SAID YESTERDAY.  AND I'M PREPARED TO ALLOW YOU TO DO

11  THAT IN LIGHT OF THE CIRCUMSTANCES.

12      **MR. ISAACSON:**  RIGHT.

13      **THE COURT:**  BUT AT LEAST I THINK YOU'VE GOT AT LEAST

14  A PRIMA FACIE SHOWING THAT I'VE GOT SOMEONE HERE WHO'S MADE A

15  PURCHASE DURING THE RELEVANT TIME PERIOD WITH HER OWN FUNDS,

16  HAS SOME EXPERIENCE, AT LEAST FROM WHAT I CAN TELL, IS

17  INTELLIGENT AND CONCERNED AND NOT -- AND DOESN'T HAVE ANY

18  RELATIONSHIP TO THE LAWYERS AND REACHED OUT ON HER OWN ACCORD.

19     SO IN LIGHT OF THAT, I'M HAPPY TO HAVE YOU GO AND

20  INVESTIGATE FURTHER, BUT I'M PREPARED TO ALLOW YOU FOLKS TO GO

21  AND DO THAT AND WORK ON OTHER ISSUES.

22      **MR. ISAACSON:**  RIGHT.  SO I AGREE WITH THAT

23  DESCRIPTION OF WHAT'S GOING ON HERE THAT THE COURT IS

24  BASICALLY LOOKING AT WHETHER THIS PROPOSED PLAINTIFF HAS MADE

25  A PRIMA FACIE SHOWING.

# EXHIBIT 2

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               OAKLAND DIVISION

4

    _____
5                                 )
    THE APPLE IPOD ITUNES ANTITRUST )
6   LITIGATION                    )
    _____)
7   This Document Relates To:     )    No. C-05-00037-YGR
                                  )
8            ALL ACTIONS.         )
    _____)
9

10

11

12      VIDEOTAPED DEPOSITION OF BARBARA BENNETT

13               VOLUME I

14          Oakland, California

15         Tuesday, December 9, 2014

16

17

18

19

20  Reported by:
    Angelica R. Gutierrez
21  CSR No. 13292
22  Job No. 1980395
23

24  PAGES 1 - 76

25

                                        Page 1

1   has been ever since the beginning, to play unDRMed MP3s

2   on an iPod player and you can blow them up in iTunes,

3   and there's easy tools for that, and there has been

4   since the iPods were launched in 2001.

5          MS. BERNAY:  Is that a question?

6          MR. RINGGENBERG:  Q.  I'm telling her that and

7   I'm asking --

8      A.   Can you tell me what those tools are?

9      Q.   ITunes.  You load up iTunes, you point it to a

10  folder, it will import for you any MP3 you can find on

11  your system as well as at least four or five other

12  files, including every major file format you can find.

13  And you don't have to take my opinion on that, you can

14  go back and confirm with anyone that uses iTunes

15  regularly.

16          What I'm asking you is, if you found out that

17  was accurate would you consider withdrawing as a class

18  represent --

19          MS. BERNAY:  -- objection --

20          MR. RINGGENBERG:  -- rather than continuing in

21  this case --

22          THE WITNESS:  -- number one, it's

23  argumentative and number two, you're not giving me

24  dates because I know for a fact, because I work with

25  it, that that's what you're saying is not true and

Page 29

1    there are date ranges that you're saying oh, it's a big

2    picture.  Let's say in 1945 we could do this.

3        Q.  Okay.  Here's the facts:  ITunes launched in

4    2001, that's a fact.  You can confirm that with someone

5    else.  Okay.  On that day, was only available for the

6    Mac then because that's what it was, on that day you

7    could load MP3 file.  ITunes music store hadn't even

8    launched yet.

9             So here's my question to you, and I'm not

10   asking you to make any commitments today other than to

11   answer my question which is:  If you confirmed after

12   this deposition that, in fact, from the very beginning,

13   you could load DRM free music into iTunes and onto

14   iPods would you consider changing your mind and getting

15   out of this lawsuit?

16       A.  No, because the range is not 2001.  You have a

17   narrow window in which you are addressing issues in

18   this trial.  And I know for a fact that when those

19   operating systems change and those versions change and

20   the upgrading change, so no; the answer is no.

21            MS. BERNAY:  And you're kind of bullying the

22   witness at this point.  You're raising your voice in a

23   way that I don't think is necessary, so I'm just going

24   to ask you to take a step back.

25            MR. RINGGENBERG:  Q.  I'm sorry, ma'am.  Do

                                              Page 30

```
1    you feel that I'm being to aggressive?

2       A.   Yeah, because you're misleading questions

3    without substantive facts and I'm not going to

4    hypothesize on anything.

5       Q.   I'm certainly not trying to mislead you, in

6    fact everything I'm telling you is 100 percent truth.

7            MS. BERNAY:  Objection.  You're testifying

8    now.

9            MR. RINGGENBERG:  Well, she's --

10           MS. BERNAY:  Go ahead.

11           MR. RINGGENBERG:  Q.  And so I'm sorry if I

12   made you uncomfortable with my questions, if I did, as

13   Ms. Bernay suggested, I don't mean to do that.  I'm

14   asking you to think about what you're doing in this

15   case and decide whether it's really the right thing for

16   you.  That's really for you to decide.  And I'm asking

17   if you're willing to reconsider, if you learn the

18   facts -- not for me, but for some third party source

19   that you trust, if I'm worried about the facts would

20   you consider it?

21           MS. BERNAY:  Objection.  You're bullying the

22   witness.  You're --

23           MR. RINGGENBERG:  That is not bullying.

24           THE WITNESS:  It's a hypothesis.  We don't

25   answer hypotheses.
```

Page 31

1          MR. RINGGENBERG:  Q.  I'm asking if you would

2     consider it.

3          A.    No.

4          Q.    You wouldn't consider it at all?

5          A.    No.  Because from my point of view I don't

6     think those facts are accurate and it's an if, I know

7     from experience in having worked with some very high

8     level technology people and music people, and people

9     that were high level music executives at the very

10    studios you're talking about, I happen to know some of

11    what was going on at that point.

12          Q.    Is there --

13          MS. BERNAY:  You're also misstating her

14    testimony earlier today where she made it very clear

15    that she was here not just because of, you know, the

16    form --

17          MR. RINGGENBERG:  This is an absurd couching

18    objection, which I will not allow you to do.

19          MR. RINGGENBERG:  Q.  Ma'am, is there someone

20    you trust who's very familiar with iTunes, someone you

21    know personally who's opinion -- if they told you the

22    facts you would believe them?  I'm not asking you who

23    they are, just is there someone in mind you can think

24    of?

25          A.    Well, you're talking what window of time and

Veritext National Deposition & Litigation Services
866 299-5127

1    which iTunes and systems and who's got the source code?

2        Q.   No, in general, I'm asking, oh, you know, I

3    have my friend, Bob, and he actually is a big music guy

4    and he's been using iPods for ten years.  If he told me

5    this I would believe him.  Is there someone you can

6    think of in your mind?

7        A.   No.  Because they're amateur users and end

8    users.  I'm talking the technology issues, so no.

9        Q.   I understand.  But --

10       A.   I can find a ten year-old kid that uses iPods.

11       Q.   If it were the case, just assume with me that

12   I'm right, that you could take a DRM free protected

13   song, this is with no protections on it, and put it on

14   iTunes and load it on an iPod in 2001, in 2002, in

15   2003, in 2004, in 2005, in 2006, in 2007, in 2008, in

16   2009, in 2010, all the way until today; assume with me

17   that that's true, if that were true and I could

18   convince you of that, or some other person in the world

19   who you trust and like could convince you that those

20   facts were true, would you consider not -- getting out

21   of this lawsuit and trying to sue Apple for something

22   they didn't do?

23            MS. BERNAY:  Objection.  Compound.  Objections

24   misstates the facts.  Vague.  Argumentative.

25            Go ahead.

```
 1              THE WITNESS:  And I have had firsthand
 2    experience where I know that's not true?  That answer
 3    is --
 4              MS. BERNAY:  It's really a yes or no question
 5    he's asking you.
 6              MR. RINGGENBERG:  San.
 7              MS. BERNAY:  Your questions are getting just
 8    completely outrageous.
 9              Go ahead.
10              MR. RINGGENBERG:  It's outrageous to asker her
11    if she'd consider changing her mind?
12              THE WITNESS:  I've said -- three times I've
13    said no, so how many more times do you want to ask it
14    and how many different ways?
```

```
15              MR. RINGGENBERG:  Q.  So you understand you're
16    the client in this relationship?
17         A.   Yeah.
18         Q.   And San is your lawyer, which means she's
19    supposed to answer to you; do you understand that,
20    right?
21              MS. BERNAY:  He's asking you.
22              THE WITNESS:  I'm not answering that.  It
23    doesn't deserve an answer.
24              MS. BERNAY:  You can go ahead and answer if
25    you can.
```

Page 34

1    were being asked, and unfair, for a guy who all he did

2    was pull a couple of receipts off his computer, because

3    that's his job.  And he's asked if he's on drugs and if

4    he's been arrested.

5        A.    What's the point?

6        Q.    Here's my question:  Do you understand that

7    the lawyers who are appearing in your name answer to

8    you, and that you have an obligation, or at least you

9    could if you chose to, to help them behave and conduct

10   themselves in a professional manner?

11       A.    Why would you imply that I have any reason to

12   think they're not acting in a professional manner?

13       Q.    I didn't -- well, other than what we just --

14   you can make your own judgment about that, I guess

15   we'll put it that way.

16           MS. BERNAY:  Is that a question or --

17           MR. RINGGENBERG:  Yeah.

18           MR. RINGGENBERG:  Q.  The question is:  Do you

19   understand that, as the client, you can exercise some

20   control over how the lawyers behave?

21       A.    Of course I do.

22       Q.    You said at deposition today, or in your

23   testimony earlier today, that you grew up with lawyers.

24   I thought that's what you said.

25       A.    Yes.

 1    tomorrow and Thursday.  If they want me back on Friday

 2    that's up to my lawyer.

 3         Q.   It's actually up to you, but --

 4         A.   No.  It's a scheduling thing, so --

 5         Q.   But right now, at least, you're not planning

 6    on it; is that right?

 7         A.   I wasn't planning on being here today either,

 8    until last night.

 9         Q.   Okay.  And what's your understanding of what

10    your role will be from here on out, since we're in the

11    middle of trial.  It's a little unusual situation.

12         A.   Yes.  I understand.

13         Q.   So what's your understanding of what your role

14    is going to be?

15         A.   I may be asked to perform certain activities

16    representing a group of people who are being

17    represented by the law firm sitting next to me in a

18    case, apparently has enough merit to go to trial.

19         Q.   And what are the activities that you think you

20    might have to do?  What is it that you think might have

21    to do?

22         A.   I'm going to look at all the documents that we

23    have.  I certainly will do some background research and

24    I will look historically at what I can find on the

25    iTunes and the various iPod models.  I can certainly

                                                    Page 68

```
 1   talk to engineers that I know that are familiar, in

 2   some cases more than I, with certain aspects of how

 3   Apple has operated in the past.

 4       Q.    So I have one last question for you --

 5       A.    Uh-hum.

 6       Q.    -- which is will you please find someone you

 7   trust, other than your lawyers, and ask them whether or

 8   not it was true that iPods can play DRM free music

 9   every day since 2001?  Would you do that for me,

10   please?

11       A.    If we can find some qualified expert who has

12   been around that long and can testify to file formats.

13       Q.    I mean find someone you trust, who is

14   knowledgeable, and ask them.  Would you do that?

15       A.    I certainly can ask.  I don't know that I'll

16   find anyone that is sort of going to MIT or Solaris,

17   that's a qualified engineer.  I don't know that some

18   techie that listens to music while he codes is going to

19   be able to give me the answer about the history of a 14

20   year comment about file formats available online.

21       Q.    I understand that you may not believe them,

22   but would you please find someone whose opinion you

23   trust and ask them if it's true, who's knowledgeable,

24   and see what they say; would you do that?

25       A.    And if they say I don't know?
```

Page 69

1          A.    Yes.

2          Q.    And do you recall that the court indicated

3    that she found -- while you were sitting there she made

4    a statement regarding that you had made a prima fascia

5    showing that you're a proper class representative, that

6    you have standing; do you remember that?

7          A.    Yes.

8          Q.    Now, are you willing to continue, you know, to

9    work with us and to take part in this litigation and do

10   whatever is necessary in the best interests of the

11   class?

12         A.    Yes.

13              MS. BERNAY:  I have nothing further.

14                          EXAMINATION

15              MR. RINGGENBERG:  Q.  I have two really quick

16   questions.  I just -- very quick.

17              When you worked at Sun what was the name that

18   you used on your employment records?

19         A.    Barbara Bennett.

20         Q.    And in testimony today you talked about

21   signing an engagement letter, which you looked at on

22   the stand.  You talked about receiving a memo from the

23   lawyers.  In what order did that sequence happen?

24         A.    The letter that I signed came first, and then

25   I believe it was several hours later when the memo --

Veritext National Deposition & Litigation Services
866 299-5127

# EXHIBIT 3

**Confidential - Attorneys' Eyes Only**

Timothy O'Neil                                    The Apple iPod iTunes Anti-Trust Litigation

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     OAKLAND DIVISION

 4

 5   THE APPLE iPOD iTUNES      ) Lead Case No. C 05-00037
     ANTI-TRUST LITIGATION      )
 6                              )
                                )
 7   _____      )
                                )
 8   This Document Relates To:  )
                                )
 9   ALL ACTIONS                )
     _____      )
10

11

12

13

14

15          CONFIDENTIAL - ATTORNEYS' EYES ONLY

16     VIDEOTAPED DEPOSITION OF TIMOTHY PATRICK O'NEIL

17              Friday, December 5, 2014

18                 Oakland, California

19

20

21

22

23   Reported By:

24   Hanna Kim, CLR, CSR No. 13083

25   Job No.: 10013785
```

**Confidential - Attorneys' Eyes Only**

**Timothy O'Neil**                                    **The Apple iPod iTunes Anti-Trust Litigation**

1       A.   At approximately 1:30 in the morning this

2   morning.

3       **Q.   And did you sign it or did you give permission**

4   **to someone to sign it?**

5       A.   I signed it.

6       **Q.   Who wrote the first draft of this declaration?**

7       A.   I was -- explained to counsel how I went

8   through the pulling of the records, and they provided

9   the first draft.  I reviewed it and provided my edits

10  for, you know, factual statements.

11      **Q.   So you -- you explained it to them in the**

12  **first instance, how you pulled the records?**

13      A.   Yes.

14      **Q.   And who originally asked you to pull the**

15  **records?**

16      A.   I believe it was one of our counsel.  I

17  believe it was in-house provided the -- the instruction

18  to do so.

19      **Q.   And who is that?**

20      A.   Scott Murray.

21      **Q.   And when did that happen?**

22      A.   The first instance was Wednesday of -- during

23  testimony; and then the second time was yesterday

24  morning, just as the trial began, before any witnesses

25  or jury came in.

**Confidential - Attorneys' Eyes Only**

Timothy O'Neil                          The Apple iPod iTunes Anti-Trust Litigation

```
 1        Q.  And when -- it was the first -- let's focus on
 2   Wednesday during testimony.  Did you receive that
 3   assignment from Scott and then leave the courtroom?
 4        A.  I wasn't in the courtroom at the time.
 5        Q.  But you received it during the trial day?
 6        A.  Yeah.  During the trial day, yeah.
 7        Q.  And then what did you do after you received
 8   those instructions?
 9        A.  I looked the serial number up in our records.
10        Q.  How did you go about doing that?
11        A.  I'm not sure I understand the question.
12        Q.  How do you look a serial number up in the
13   records?
14        A.  So we have various databases, customer
15   relationship management databases specifically.  So the
16   serial number is available in there, and then -- excuse
17   me.  And then you can find the product information and
18   associate it with the -- the actual customer
19   information.  And then, based on that, you can go and
20   look for the actual purchase record in our
21   point-of-sale database.
22        Q.  Okay.  We'll get into that more in a second.
23            And then Thursday, about what time did you say
24   that you did another search for records?
25        A.  That was within the first few minutes, I
```

EXHIBIT 4

UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


THE APPLE IPOD ITUNES        )        NO. C 05-00037 YGR
ANTITRUST LITIGATION         )
                             )        PAGES 1101 - 1310
                             )
                             )        **JURY TRIAL VOLUME 6**
                             )
                             )
                             )        OAKLAND, CALIFORNIA
_____)        MONDAY, DECEMBER 8, 2014


### REPORTERS' TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                   BY:   ALEXANDRA S. BERNAY,
                         JENNIFER N. CARINGAL,
                         PATRICK COUGHLIN,
                         STEVEN M. JODLOWSKI,
                         CHARLES MCCUE,
                         CARMEN A. MEDICI,
                         BONNY E. SWEENEY, ATTORNEYS AT LAW

                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                   BY:   FRANCIS J. BALINT, JR.
                         ATTORNEY AT LAW

            (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                      DIANE E. SKILLMAN, CSR NO. 4909

   PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

## A P P E A R A N C E S (CONT'D.)

```
FOR DEFENDANT:              BOIES, SCHILLER & FLEXNER LLP
                           5301 WISCONSIN AVENUE NW
                           WASHINGTON, D.C.  20015
                    BY:    WILLIAM A. ISAACSON,
                           KAREN L. DUNN,
                           MARTHA L. GOODMAN, ATTORNEYS AT LAW


                           BOIES, SCHILLER & FLEXNER LLP
                           1999 HARRISON STREET, SUITE 900
                           OAKLAND, CALIFORNIA  94612
                    BY:    MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                           JONES DAY
                           555 CALIFORNIA STREET, 26TH FLOOR
                           SAN FRANCISCO, CALIFORNIA  94104-1500
                    BY:    DAVID C. KIERNAN, ATTORNEYS AT LAW

                           APPLE
                           1 INFINITE LOOP, MS 169-2NYJ
                           CUPERTINO, CALIFORNIA  95014
                    BY:    SCOTT B. MURRAY,
                             SENIOR LITIGATION COUNSEL


                           --O0O--
```

1       BETWEEN THE NAMED DEFENDANT AND A MEMBER OF THE CERTIFIED

2       CLASS.  IT'S A PARAPHRASED QUOTE.

3           IN A 2007 DECISION IN *BATES VERSUS UPS*, THE NINTH CIRCUIT

4       ALSO CITED THE SUPREME COURT FOR THE PROPOSITION THAT IF THE

5       INITIAL CERTIFICATION WAS PROPER AND DECERTIFICATION NOT

6       APPROPRIATE, THE CLAIMS OF THE CLASS MEMBERS WOULD NOT NEED TO

7       BE MOOTED OR DESTROYED BECAUSE OF SUBSEQUENT EVENTS OR THE

8       PROOF AT TRIAL HAS UNDERMINED THE NAMED PLAINTIFFS' INDIVIDUAL

9       CLAIMS.  IT'S FOUND AT 511 F. 3D 974, 987.

10          HERE, THE COURT FINDS THE CLAIMS OF THE UNNAMED CLASS

11      MEMBERS REMAIN A LIVE CONTROVERSY FOR PURPOSES OF STANDING.

12      ONCE A CLASS HAS BEEN CERTIFIED, THE CLASS OF UNNAMED PERSONS

13      DESCRIBED IN THE CERTIFICATION ACQUIRED A LEGAL STATUS

14      SEPARATE FROM THE INTEREST ASSERTED BY THE NAMED PLAINTIFF SO

15      THAT AN ARTICLE III CONTROVERSY STILL EXISTS BETWEEN THE NAMED

16      DEFENDANT AND A MEMBER OF THE CERTIFIED CLASS.  THE COURT

17      CITES TO *SOSNA VERSUS IOWA*, 419 UNITED STATES 393 AT 399, A

18      1975 CASE.

19          BASED UPON THE RECORD BEFORE THE COURT AT THE TIME, ROSEN

20      WAS A MEMBER OF THE CLASS AT THE TIME CLASS CERTIFICATION

21      HAPPENED, WHICH IS A SNAPSHOT IN TIME FOR DETERMINING INITIAL

22      STANDING BASED ON THE AUTHORITY OF *BATES*.  STANDING IN THE

23      FIRST INSTANCE DOES NOT DEPEND UPON THE MERITS OF ROSEN'S

24      CLAIMS, BUT ON A DETERMINATION THAT SHE MADE ALLEGATIONS OF

25      DEMONSTRABLE PARTICULARIZED INJURY.  THE COURT REFERENCES