1   William A. Isaacson (wisaacson@bsfllp.com)
    (Admitted *Pro Hac Vice*)
2   Karen L. Dunn (kdunn@bsfllp.com)
    (Admitted *Pro Hac Vice*)
3   Martha L. Goodman (mgoodman@bsfllp.com)
    (Admitted *Pro Hac Vice*)
4   BOIES, SCHILLER & FLEXNER LLP
    5301 Wisconsin Ave, NW
5   Washington, DC 20015
    Telephone:  (202) 237-2727
6   Facsimile:  (202) 237-6131

7   John F. Cove, Jr. #212213
    (jcove@bsfllp.com)
8   Kieran P. Ringgenberg #208600
    (kringgenberg@bsfllp.com)
9   Meredith R. Dearborn #268312
    (mdearborn@bsfllp.com)
10  Maxwell V. Pritt #253155
    (mpritt@bsfllp.com)
11  BOIES, SCHILLER & FLEXNER LLP
    1999 Harrison Street, Suite 900
12  Oakland, CA 94612
    Telephone:  (510) 874-1000
13  Facsimile:  (510) 874-1460

14  David C. Kiernan #215335
    (dkiernan@jonesday.com)
15  JONES DAY
    555 California Street, 26th Floor
16  San Francisco, CA  94104
    Telephone:  (415) 626-3939
17  Facsimile:  (415) 875-5700

18  *Attorneys for Defendant Apple Inc.*

19                  UNITED STATES DISTRICT COURT

20                  NORTHERN DISTRICT OF CALIFORNIA

21                        OAKLAND DIVISION

| | |
|---|---|
| 22 THE APPLE iPOD iTUNES ANTI-TRUST LITIGATION | Lead Case No.  C 05-00037 YGR [CLASS ACTION] |
| 23 _____ | **REPLY OF APPLE INC. IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| 24 This Document Relates To: | |
| 25 ALL ACTIONS | Date:    December 15, 2014 |
| 26 | Time:    8:00 a.m. |
| 27 | Place:   Courtroom 1, 4th Floor |
| 28 | Judge:   Honorable Yvonne Gonzalez Rogers |

(sidebar) BOIES, SCHILLER & FLEXNER LLP  OAKLAND, CALIFORNIA

**INTRODUCTION**

In an attempt to salvage her claim based on what she refers to as the database verification code, or "DVC," Plaintiff's opposition to Apple's motion for judgment as a matter of law asserts for the first time a new theory, entirely unsupported by the evidence at trial and flatly contrary to the opinion of her own expert, Dr. Noll.  This new theory is the database verification code harmed competition by preventing the emergence of a third-party jukebox player from Amazon that, Plaintiff says, was planned but never released and, specifically, that "Apple and Amazon had worked out an agreement and Amazon put Apple front and center in Amazon's new service." (Opp. at 12)

It is not strong enough to say that this assertion is based on speculation.  It is worse than that; Plaintiff has now ventured into invented conspiracy theory.

Apple respectfully submits that the Court should grant judgment as a matter of law on all of Plaintiff's claims for all the reasons set forth in its motion.  But given the shortness of time for the Court to consider this reply, Apple focuses solely here on Plaintiff's new theory.

The Court should further prohibit Plaintiff from arguing her new theory about a supposed deal with Amazon in closing argument.

**ARGUMENT**

Plaintiff must show that (1) any conduct on which she bases her claims must harm competition, and (2) any alleged damages must flow directly from the aspect of the conduct that makes it unlawful under the antitrust laws.  Final Jury Instructions, Third Element: Willful Maintenance of Monopoly Power Through Anticompetitive Conduct ("Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market.  Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition"); Final Jury Instructions, Fifth Element As To Both Claims Under the Sherman Act: Injury and Causation ("Any alleged injury that is caused by legal conduct, as opposed to anticompetitive conduct, cannot be considered"); Final Jury Instructions, Causation and Disaggregation ("Plaintiffs bear

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW          No.  C 05-00037 YGR

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

the burden of showing that their injuries were caused by Apple's alleged antitrust violation – as opposed to any other factors. If you find that the alleged injuries were caused by factors other than Apple's alleged antitrust violation, then you must return a verdict for Apple").

Here, Plaintiff's theory at trial regarding database verification has been that it "blow[s] up the iPod." (Coughlin, Tr. 1052:23-24) But Plaintiff has failed to offer evidence that database verification caused any harm to competition or had any role in the alleged overcharges that Dr. Noll claims.

I.  **THE ONLY EVIDENCE PLAINTIFF HAS OFFERED IN SUPPORT OF THEIR THEORY OF HARM TO COMPETITION OR ALLEGED OVERCHARGE IS DR. NOLL'S TESTIMONY ABOUT LOCK-IN FROM THE SALE OF DRM-PROTECTED MUSIC BY REALNETWORKS FROM HARMONY.**

Plaintiff's case at trial seeks damages for alleged overcharges on iPods. The only proof for alleged overcharges came from Dr. Noll, who opined that iTunes 7.0 made it harder for RealNetworks to sell DRM music to customers with iPods, which enhanced supposed lock-in, which supposedly allowed Apple to raise its prices on iPods over what they otherwise would have been. That theory, flawed as a matter of law, economics, and evidence, is the only one Plaintiff has presented a trial.

Plaintiff's opposition brief expressly says that their theory of competitive injury and damages is based exclusively on lock-in:

> Based on his analysis, Dr. Noll reached an opinion that the conduct identified as anticompetitive did harm consumers by increasing the degree to which they were locked-in to using iPods, resulting in the elevation of iPod prices to supracompetitive levels between September 2006 and January 2009.

(Opp. at 5)

Dr. Noll's lock-in theory is exclusively based on customers having purchased DRM-protected music. As he explained his theory, "If you have this library of sound recordings that you've downloaded in a particular DRM format, you pretty much have to stick with the portable digital media players that use that because if you don't, you face a significant cost of switching." (Noll, Tr. 1158:10-14)

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW          No.  C 05-00037 YGR

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

The following slide, used both in Plaintiff's opening and with Dr. Noll, further confirms this theory:

## How do consumers become locked in to iPods?

- Consumers buy iPod
- Consumers download recordings from the Apple iTunes Store that are protected by Apple's proprietary DRM system (FairPlay)
- Consumer wants to replace iPod with new portable digital media player with new features
- Only new iPod allows them to play old DRM-protected files from iTunes

(Plaintiff's Demonstrative056)

Dr. Noll also explained he understood the "crucial issue" to be the alleged lock-in created when RealNetworks's Harmony no longer worked on some iPods:

> And then the last step is iTunes 7.0, 7.4, which is a similar story. **Harmony had been upgraded over a year earlier so that people could buy songs in the -- in the RealNetworks digital rights management format and play it on an iPod. But the 7.0 and 7.4 upgrades include components of the software that disabled harmony and did so permanently.** And the test – I'm not the person testifying about the differences between 7.0 and 4.7. The issue there is: was there anything about that component of the software that produced value other than just disabling Harmony? And like Dr. Martin testified about that and some Apple witnesses have testified about that. **That is the crucial issue.**

(Noll, Tr. 1166:13-24) (emphasis added)

And Dr. Noll again confirmed that his theory of lock-in was based on (supposed) reduced sales of DRM-protected music by RealNetworks due to Harmony's failure:

> Q. The lock-in effect happens, in your view, because harmony stops working, people have iPods, and because Harmony is no longer working, instead of -- when they -- when it comes time to buy a new device, instead of thinking about another device, they are locked in so they buy another iPod; is that a fair summary of lock-in?
> A. That's what lock-in means, is that the switching costs going to another brand are higher because more of your music is incompatible with the new brand.

(Noll, Tr. 1237:7-15)

///
///

3

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW                    No.  C 05-00037 YGR

**II.     PLAINTIFF HAS CONCEDED THAT HER CLAIMS BASED ON DATABASE VERIFICATION HAVE NOTHING TO DO WITH DRM-PROTECTED MUSIC OR HARMONY, AND OFFERS A NEW THEORY WITH NO BASIS IN FACT OR DR. NOLL'S OPINION.**

In her opposition brief, Plaintiff makes a stunning confession that database verification had nothing to do with Harmony, RealNetworks, DRM-protected music, or Dr. Noll's lock-in theory.  She writes:

> KVC and DVC each served its intended purpose.  KVC knocked out competitors selling DRM-protected songs to be played on the iPod.  DVC knocked out third party players managing DRM-free songs on the iPod.

(Opp. at 12)

Plaintiff also asserts that keybag integrity, implemented in September 2006, "knocked Real's Harmony out for good."  (Opp. at 14)  This confirms that Apple's implementation of database verification a year later cannot have *any* relationship with Dr. Noll's theory of competitive harm or lock-in.

Having given up any connection between database verification and the theory of competitive harm and damages to which her economist testified, Plaintiff then goes on to make up from whole cloth a story that Amazon intended to offer jukebox software that would control the iPod.  Plaintiff then asserts, without any citation to the record, that:  "Because Apple dominated this market with 80% of the portable digital player market, Amazon's new service would suffer greatly if Apple rolled out the DVC."  (Opp. at 12)

Finally, Plaintiff asserts that the database verification's launch in September 2007 "coincides with Amazon going live with its own music services but without a portable digital player and with a lightweight music manager," and concludes from this that "Apparently Apple and Amazon had worked out an agreement and Amazon put Apple front and center in Amazon's new service."  (Opp. at 12)

This new theory is fatally flawed in at least two respects.  First, this new assertion about a deal with Amazon is entirely unsupported by any evidence in the record.  Second, there is nothing in the record from which the jury could conclude that preventing Amazon (or anyone else) from

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW                No.  C 05-00037 YGR

offering jukebox software would have harmed competition, "locked in" consumers, or raised iPod prices.

### A.    Plaintiff's New Theory About a Deal With Amazon Has No Support in the Record.

Plaintiff's theory that Amazon planned to offer jukebox software and was stopped by database verification and a deal with Apple is pure fiction.  The assertion of a conspiracy with no evidence of *any* communications with Amazon is clearly intended to prejudice.  Plaintiff relies on three documents referring to Amazon and one snippet of testimony.  (Opp. at 11-12)  None supports Plaintiff's theory.

First, Plaintiff cites an internal Apple document that, in half of a page discussing Amazon, refers to a WALL STREET JOURNAL report.  It summarizes that report to state that Amazon would offer an "Amazon branded digital music player at a discount or for free with a subscription contract," "similar to how mobile phone carries use free phones tied to service contracts." (TX2354 at 9).  That is, on its face, a reference a rumor about Amazon's possible sale of an Amazon-branded *hardware device* for audio, which was never released.  It is speculation, at best, to suggest from this document that Amazon was planning jukebox software for PCs, and to further suggest from the document that Apple and Amazon reached some deal to stop jukebox software is a desperation tactic.[1]

Second, Plaintiff cites another internal Apple document from July 13, 2006, which contains the same rumor and sources it to the same WALL STREET JOURNAL article.  (TX2394 at 4-5)  It adds nothing.

Third, Plaintiff cites to 433:21-434:3 in the trial transcript, which is testimony of Augustin Farrugia.  Mr. Farrugia explained that keybag and database verification prevented "third-party software from interoperating with the iPod."  It says nothing about Amazon and nothing about a

---

[1] Plaintiff also ignores the testimony from Jeff Robbin, who explained that Amazon took advantage of "programming interfaces" that Apple made available to permit software to interact with the iTunes desktop client (as opposed to the iPod), which meant that Amazon "didn't hack the DRM.  They were just using the iTunes/iPod experience the way we wanted.  I mean, we wanted that end to end great experience for our customers, and this worked just fine with iTunes. . . . No corruption, no unintended consequences, no weird behaviors, no AppleCare support calls. We're fine."  (Robbin, Tr. 1047:16-1049:23)

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

supposed Amazon jukebox, let alone any deal with Amazon. What Mr. Farrugia said about Amazon, uncontradicted by Plaintiff, is as follows:

> Q. And can music from Amazon.com be put into iTunes?
> A. Absolutely. Like music you can read from CD's, you can put it on iTunes and sync that to your iPod.
> Q. So, music from Amazon can be put into iTunes. I think that's what you just said. Can that music from Amazon that's put into iTunes be put onto the iPod?
> A. Absolutely correct.

(Farrugia, Tr. at 559:16-22; *see also* 560:3-560:13)

Fourth, Plaintiff cites an email from Chris Bell at Apple analyzing the threat from Amazon's unblocked music service ***after it launched***. (TX2505) There is no suggestion in that email that Amazon had considered releasing jukebox software or of any deal with Apple to prevent it.

There is simply no evidentiary basis for Plaintiff's new theory, let alone an adequate basis for a jury verdict.

### B. There Is No Evidence of Lock-In from DRM-Free Music and Dr. Noll Himself Testified to the Opposite.

There is also no evidence in the record that would permit the jury to conclude that preventing a third-party jukebox (from Amazon or anyone else) from putting DRM-free music on iPods caused any harm to competition, caused "lock-in," or had any impact on iPod prices. Dr. Noll himself testified to the contrary.

First, it bears emphasizing that Plaintiff's Rule 50 opposition cites absolutely nothing in support of her assertion that database verification had some impact on Amazon's ability to compete (or anyone else's). TX2505, cited by Plaintiff in her brief, shows that, despite database verification, Amazon was able to offer consumers the easy ability to download music into the iTunes desktop software and easily play it on their iPods. As Chris Bell of Apple wrote in his competitive assessment of the unblocked Amazon, "Threat level: Higher than previous entrants. Why? Their established customer base and better execution on basic inter-operability with the iTunes + iPod eco-system than others." (TX2505 at 2) Mr. Bell explained that "Amazon clearly highlights the fact that their downloads are DRM-free and work with iPods, iTunes, and virtually

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW      No. C 05-00037 YGR

1   all other digital music hardware and software available today." (*Id.* at 1)  And Mr. Bell included

2   in that assessment screen shots of Amazon's web site touting their ability to easily play Amazon-

3   sold music on iPods by loading the songs into the iTunes desktop software. (*Id.* at 8)  Jeff Robbin

4   walked through this screenshot at trial and explained how it worked. (Robbin, Tr. 1047:2-1048:1)

5   Second, there is no dispute that DRM-free music was always easy to play on iPods using

6   iTunes, regardless of where the music was obtained.  In Plaintiff's opening, Ms. Sweeney stated

7   that DRM-free music "could play on an iPod directly without having to rip and burn." (Tr.

8   234:10-14).  Dr. Martin likewise admitted that users "absolutely" could put MP3 files on their

9   iPods. (Martin, Tr. 375:1-3)  Dr. Noll admitted that "two-thirds" of music on iPods during the

10  class period "came from either CD's or DRM-free downloads." (Noll, Tr. 1228:21-24; *see also*

11  1229:14-16)  And Plaintiff made no effort to contradict Dr. Murphy's testimony that, "Apple

12  always allowed people to put DRM-free, regardless of where you got it, on the iPod." (Murphy,

13  Tr. at 1769:2-5)

14  Third, Dr. Noll offered no opinion that the ability to use a third-party jukebox, from

15  Amazon or anyone else, to load DRM-free music onto an iPod had any effect on lock-in or was

16  otherwise competitively significant.  Dr. Noll's lock-in theory was based on DRM-protected

17  music, on which database verification (by Plaintiff's own admission) had no impact.

18  Rather than supporting the notion that DRM-free music led to lock-in, Dr. Noll testified to

19  the opposite.  He said that Apple was originally able to achieve a large market share because <u>there</u>

20  <u>was no lock-in effect from DRM-free music</u>:

21  Q. All right.  Let's turn to your third opinion which is that apple maintained and
    enhanced monopoly power by including 7.0 and 7.4, disabling Harmony.  And
22  before we get there, can you talk a little bit about how apple acquired the
    monopoly power and then --
23  A. Yes.
24  Q. -- how it maintained it?
         (demonstrative published to jury.)
25  The Witness: Okay.  This is basically the big event in the history of portable
    digital media players and iPods in particular.  Step one, Apple introduces the iPod
26  and very quickly gets a 30 percent market share.  And indeed, that's not monopoly
    power.  But had it been 50 percent, that would have been fine because obtaining
27  that high of a market -- a high market share quickly means you have a good
    product.  **There wasn't any lock-in going on at the time because the only way**

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW          No.  C 05-00037 YGR

1

**to put music on a portable digital media player at that time was to either --
was to obtain it in some digital rights management-free formats, like a CD or
the subset of sound recording you could obtain over the internet at that time
which was very small in a DRM-free form.**

(Noll, Tr. 1162:12-1163:8) (emphasis added)

Similarly, Dr. Noll stopped his calculation of damages when DRM-free music was
available from Apple because, at that point, there <u>could be no lock-in because the music was</u>
<u>DRM-free</u>:

So we're just taking that as the date that the iTunes store is selling DRM-free
music.  **And of course at -- at that point, there's no longer a lock-in effect from
buying music from the iTunes store.**

(Noll, Tr. 1183:18-21 (emphasis added); *see also* 1182:14-19 ("but we're using January 1st as
approximately the date that DRM-free music -- a complete catalog of DRM-free music was
available from Apple's competitors.  Now, that means **at that point you can buy music from
one of Apple's competing digital download sources and play it on an iPod**" (emphasis added))

Plaintiff has offered the jury no basis to conclude that database verification harmed
competition in any way or caused any of the damages she claims.  Database verification cannot
support a verdict on any antitrust claim.

## <u>CONCLUSION</u>

The Court should dismiss Plaintiff's claims based on database verification and bar
Plaintiff from arguing it to the jury at closing.

Date:  December 13, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: *<u>/s/ William A. Isaacson</u>*
    William A. Isaacson

*Attorney for Defendant Apple Inc.*

REPLY ISO MOTION JUDGMENT AS A MATTER OF LAW        No.  C 05-00037 YGR