UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

THE APPLE IPOD ITUNES          )          NO. C 05-00037 YGR
ANTITRUST LITIGATION           )
                               )          PAGES 623 - 874
                               )
                               )          **JURY TRIAL VOLUME 4**
                               )
                               )
                               )          OAKLAND, CALIFORNIA
_____)          THURSDAY, DECEMBER 4, 2014


### REPORTERS' TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                    BY:  ALEXANDRA S. BERNAY,
                         JENNIFER N. CARINGAL,
                         PATRICK COUGHLIN,
                         STEVEN M. JODLOWSKI,
                         CHARLES MCCUE,
                         CARMEN A. MEDICI,
                         BONNY E. SWEENEY, ATTORNEYS AT LAW


                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                    BY:  FRANCIS J. BALINT, JR.
                         ATTORNEY AT LAW

                (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                      DIANE E. SKILLMAN, CSR NO. 4909

     PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.


*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

## **A P P E A R A N C E S (CONT'D.)**

```
FOR DEFENDANT:          BOIES, SCHILLER & FLEXNER LLP
                        5301 WISCONSIN AVENUE NW
                        WASHINGTON, D.C.  20015
                   BY:  WILLIAM A. ISAACSON,
                        KAREN L. DUNN,
                        MARTHA L. GOODMAN, ATTORNEYS AT LAW


                        BOIES, SCHILLER & FLEXNER LLP
                        1999 HARRISON STREET, SUITE 900
                        OAKLAND, CALIFORNIA  94612
                   BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                        JONES DAY
                        555 CALIFORNIA STREET, 26TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94104-1500
                   BY:  DAVID C. KIERNAN, ATTORNEYS AT LAW


                        APPLE
                        1 INFINITE LOOP, MS 169-2NYJ
                        CUPERTINO, CALIFORNIA  95014
                   BY:  SCOTT B. MURRAY,
                          SENIOR LITIGATION COUNSEL


                        --oOo--
```

# I N D E X

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| CUE, EDUARDO | | |
| DIRECT EXAMINATION BY MS. SWEENEY | 651 | 4 |
| CROSS-EXAMINATION BY MR. ISAACSON | 692 | 4 |
| REDIRECT EXAMINATION BY MS. SWEENEY | 754 | 4 |
| RECROSS-EXAMINATION BY MR. ISAACSON | 765 | 4 |
| FURTHER REDIRECT EXAMINATION BY MS. SWEENEY | 767 | 4 |
| | | |
| MARKS, AMANDA | | |
| DIRECT EXAMINATION BY MR. COUGHLIN | 769 | 4 |
| CROSS-EXAMINATION BY MR. ISAACSON | 806 | 4 |
| | | |
| SCHILLER, PHILLIP | | |
| DIRECT EXAMINATION BY MS. SWEENEY | 791 | 4 |
| CROSS-EXAMINATION BY MR. ISAACSON | 806 | 4 |
| REDIRECT EXAMINATION BY MS. SWEENEY | 841 | 4 |
| RECROSS-EXAMINATION BY MR. ISAACSON | 848 | 4 |

--O0O--

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2 | | | 647 | 4 |
| 55 | | | 866 | 4 |
| 83 | | | 866 | 4 |
| 118 | | | 855 | 4 |
| 121 | | | 855 | 4 |
| 124 | | | 854 | 4 |
| 125 | | | 855 | 4 |
| 128 | | | 854 | 4 |
| 130 | | | 855 | 4 |
| 147 | | | 856 | 4 |
| 193 | | | 866 | 4 |
| 222 | | | 856 | 4 |
| 319 | | | 860 | 4 |
| 383 | | | 864 | 4 |
| 461 | | | 857 | 4 |
| 816 | | | 857 | 4 |
| 880 | | | 869 | 4 |
| 940 | | | 865 | 4 |

**E X H I B I T S**

| DEFENDANT'S  EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2050 | | | 861 | 4 |
| 2082 | | | 869 | 4 |
| 2088 | | | 862 | 4 |
| 2098 | | | 856 | 4 |
| 2118 | | | 863 | 4 |
| 2119 | | | 860 | 4 |
| 2139 | | | 857 | 4 |
| 2140 | | | 855 | 4 |
| 2159 | | | 861 | 4 |
| 2171 | | | 862 | 4 |
| 2183 | | | 869 | 4 |
| 2184 | | | 867 | 4 |
| 2243 | | | 860 | 4 |
| 2337 | | | 859 | 4 |
| 2389 | | | 856 | 4 |
| 2394 | | | 857 | 4 |
| 2419 | | | 860 | 4 |
| 2423 | | | 857 | 4 |
| 2451 | | | 868 | 4 |
| 2458 | | | 863 | 4 |
| 2462 | | | 863 | 4 |
| 2495 | | | 860 | 4 |
| 2497 | | | 867 | 4 |

**E X H I B I T S**

| DEFENDANT'S   EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2741 | | | 867 | 4 |
| 2745 | | | 867 | 4 |
| 2767 | | | 863 | 4 |
| 2783 | | | 861 | 4 |
| 2805 | | | 861 | 4 |
| 2811 | | | 867 | 4 |

--OOO--

```
 1   THURSDAY, DECEMBER 4, 2014                         8:03 A.M.

 2                      P R O C E E D I N G S

 3       (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

 4   OF THE JURY:)

 5           THE COURT:  ALL RIGHT.  LET'S GO ON THE RECORD.  IT

 6   LOOKS LIKE WE HAVE A NUMBER OF THINGS TO DO THIS MORNING.

 7           THE CLERK:  CALLING CIVIL ACTION 05-037, APPLE IPOD

 8   ITUNES ANTITRUST LITIGATION.

 9       COUNSEL, PLEASE STATE YOUR APPEARANCES.

10           MR. ISAACSON:  BILL ISAACSON --

11           MS. SWEENEY:  GOOD MORNING, YOUR HONOR.

12       BONNY SWEENEY FOR THE PLAINTIFFS.  AND WITH ME AT COUNSEL

13   TABLE IS PATRICK COUGHLIN, ALEXANDRA BERNAY, AND JENNIFER

14   CARINGAL.

15           MR. ISAACSON:  BILL ISAACSON FOR APPLE, YOUR HONOR.

16   AT COUNSEL TABLE IS KAREN DUNN, MEREDITH DEARBORN, MARTHA

17   GOODMAN, AND SCOTT MURRAY ON BEHALF OF APPLE.

18           THE COURT:  GOOD MORNING, EVERYONE.

19       OKAY.  WELL, I DIDN'T GET TO FINISH MY COFFEE, GIVEN ALL

20   THE FILINGS THIS MORNING.  SO -- AND HERE WE HAVE NO LIGHTS.

21               (OFF-THE-RECORD DISCUSSION.)

22           THE COURT:  OKAY.  I JUST RECEIVED A COPY OF THE --

23   WHY DON'T WE START WITH A COPY OF THE LETTER THAT MR. ISAACSON

24   FILED.

25           MR. ISAACSON:  ALL RIGHT.  SO THERE'S SOME UPDATES TO
```

1    THIS IN THE LAST FEW MINUTES.

2             **THE COURT:**  OKAY.

3         **MR. ISAACSON:**  ALL RIGHT.

4             **THE COURT:**  EXCELLENT.  GO AHEAD.

5         **MR. ISAACSON:**  SO PLAINTIFFS, AS OF A FEW MINUTES

6    AGO, HAVE PRODUCED SOME RECORDS TO US SPECIFICALLY RELATED TO

7    THE, LET'S SEE, '09.  IT'S THE '08 PURCHASE THAT WE'RE LOOKING

8    AT RIGHT NOW OF WHAT THE WITNESS SAID WAS A NANO.

9        AND JUST BY WAY OF BACKGROUND, IN THE INTERROGATORY

10   RESPONSE IN 2010, AS WE'VE SAID IN THE LETTER, THE PLAINTIFF

11   SAID SHE HAD PURCHASED THREE IPODS.  NONE OF THOSE ARE IPODS

12   THAT ARE IN THE CLASS PERIOD OR HAVE DAMAGES ASSOCIATED WITH

13   THEM.  SO THE ISSUE NOW IS IPODS THAT SHE SAYS SHE PURCHASED,

14   TWO ADDITIONAL IPODS SHE SAYS SHE PURCHASED THAT SHE -- BEFORE

15   THE DATE OF INTERROGATORY, THAT SHE SAYS ARE WITHIN THE CLASS

16   PERIOD.

17       SHE GAVE ONE OF THEM TO US YESTERDAY.  AND WE TOOK THE

18   REGISTRATION NUMBER, THE SERIAL NUMBER, AND RAN IT, AND IT'S

19   OUTSIDE OF THE CLASS PERIOD.  IT'S AFTER THE CLASS PERIOD.  SO

20   WE'RE NOW DOWN TO THE ONE DEVICE THAT SHE SAID MIGHT BE IN A

21   BOX BACK IN NEW JERSEY.  AND THIS IS A DEVICE THAT THEY'VE

22   PRODUCED RECORDS ABOUT.

23       NOW, I WOULD ALSO POINT OUT THAT IN 2011, IN APPLYING FOR

24   CLASS CERTIFICATION, PLAINTIFFS SAID, QUOTE, ALL THREE

25   PROPOSED CLASS REPRESENTATIVES HAVE ALREADY GIVEN DAY-LONG

```
 1   DEPOSITIONS, HAVE SUBMITTED THEIR IPODS FOR A FORENSIC

 2   INSPECTION BY APPLE'S COUNSEL.  THESE IPODS THAT WE WERE

 3   TALKING ABOUT WERE NOT PREVIOUSLY SUBMITTED FOR INSPECTION OR

 4   IDENTIFIED.  THEY'RE ONLY -- THIS IS ONLY HAPPENING NOW.

 5       SO THEY PROVIDED US A RECORD FROM --

 6           THE COURT:  WHEN DID DISCOVERY CLOSE IN THIS CASE?

 7           MS. SWEENEY:  IN DECEMBER OF 2010.

 8               (OFF-THE-RECORD DISCUSSION.)

 9          MR. ISAACSON:  NOW, WE'VE BEEN GIVEN A RECORD FROM I

10   GUESS HER ITUNES ACCOUNT, SOMETHING LIKE THAT, THAT HAS A

11   SERIAL NUMBER ON IT FOR AN '08 PURCHASE.  WE'VE RUN -- APPLE

12   HAS RUN THE SERIAL NUMBER RIGHT NOW.  AND ON APPLE'S RECORDS,

13   IT'S A DEVICE PURCHASED BY A CUSTOMER NAMED THE ROSEN LAW

14   FIRM, WHICH OF COURSE IS THE LAW FIRM OF HER HUSBAND.

15       THIS RAISES ISSUES, AND SO I THINK THE ISSUE BEFORE US NOW

16   IS HOW WE TALK TO THIS WITNESS AND POSSIBLY RECALL THIS

17   WITNESS.  I UNDERSTAND SHE'S PROBABLY BACK IN NEW JERSEY.  BUT

18   WE'VE NOW GOT ONLY ONE DEVICE THAT HAS DAMAGES IN THIS CASE,

19   THAT'S ALLEGED TO HAVE DAMAGES IN THIS CASE, AND THE RECEIPT

20   SHOWS IT WAS PURCHASED BY HER HUSBAND'S LAW FIRM.

21           THE COURT:  AND WHY DIDN'T APPLE FIGURE THIS OUT?

22           MR. ISAACSON:  BECAUSE NONE OF THESE DEVICE --

23   BECAUSE THEY SAID IN THEIR INTERROGATORIES, "HERE ARE THE

24   IPODS WE ARE RELYING ON."  THEY DIDN'T IDENTIFY THIS IPOD.

25   THIS IPOD WAS IDENTIFIED FOR THE FIRST TIME AS THE BASIS FOR
```

1   AN INJURY CLAIM IN HER TESTIMONY.  AND THEY CERTIFIED IN THE

2   INTERROGATORY THAT SHE HAD BOUGHT THREE -- ONLY THREE, THAT

3   DIDN'T INCLUDE THIS, AND THEY SAID IN THEIR CLASS

4   CERTIFICATION PAPERS THAT THEY HAD TURNED OVER FOR INSPECTION

5   THEIR IPODS.  BOTH THE INTERROGATORY AND THE CLASS

6   CERTIFICATION MOTION CAME AFTER THIS ALLEGED PURCHASE.

7          **THE COURT:**  RESPONSE.

8          **MS. SWEENEY:**  YOUR HONOR, AS -- AS MR. ISAACSON

9   KNOWS, THE CLASS CERTIFICATION MOTION WAS LONG BEFORE APPLE

10  CHANGED THE IDENTIFICATION OF THE AFFECTED MODELS SO ALL

11  THIS --

12         **THE COURT:**  WAIT.  I DON'T -- I DON'T KNOW WHAT YOU

13  MEAN BY THAT.

14         **MS. SWEENEY:**  OH, SURE.  I'M SORRY.

15         **THE COURT:**  YOU MEAN APPLE CHANGED THE

16  IDENTIFICATION?

17         **MS. SWEENEY:**  WELL, LET ME BACK UP.  I'LL JUST START

18  WITH THE FACTS WITH RESPECT TO MS. ROSEN'S PURCHASES.

19     SO AFTER COURT YESTERDAY, WE -- WE RECEIVED AN EMAIL FROM

20  THE BOIES SCHILLER FIRM AND THEN LATER LAST NIGHT A LETTER TO

21  THE COURT.  AND SO MS. ROSEN CHECKED HER RECORDS.  SHE WENT

22  AND LOOKED UP HER ITUNES ACCOUNT.  AND IT TURNS OUT SHE HAD

23  BOUGHT TWO IPOD TOUCHES.  SO THE SERIAL NUMBER THAT WE GAVE

24  APPLE YESTERDAY WAS FOR AN IPOD THAT WAS PURCHASED OUTSIDE THE

25  CLASS PERIOD.  SHE ALSO PURCHASED AN IPOD TOUCH SECOND

1    GENERATION WHICH IS AN AFFECTED PRODUCT.  IT'S WELL WITHIN THE

2    DEFINITION OF THE CLASS, AND SHE PURCHASED THAT ON SEPTEMBER

3    11TH, 2008.

4        SHE CALLED APPLE THIS MORNING AND GOT THE RECEIPT

5    INFORMATION VIA EMAIL.  APPLE HAS HAD ACCESS TO THIS

6    INFORMATION ALL ALONG.  I DON'T KNOW THEY THOUGHT THAT THEY

7    SHOULD THROW THIS AT US LAST NIGHT AT MIDNIGHT.

8        AT THE SAME TIME, ON SEPTEMBER 11TH, 2008, SHE ALSO

9    PURCHASED AN IPOD NANO THIRD GENERATION.  SO THAT ALSO IS AN

10   AFFECTED PRODUCT WELL WITHIN THE CLASS PERIOD.

11       AND, YOU KNOW, I APOLOGIZE THAT MS. ROSEN'S INTERROGATORY

12   ANSWERS APPEAR TO BE INCORRECT, BUT I WOULD ALSO POINT OUT

13   THAT IT'S -- IT'S REALLY IRRELEVANT AT THE TIME.  BEFORE JULY

14   OF 2013, ALL IPODS PURCHASED -- THE -- THE -- THE CLASS PERIOD

15   IS STILL THE SAME, THAT IS, SEPTEMBER 12TH, 2006, THROUGH

16   MARCH 31ST, 2009.  BUT IT WASN'T UNTIL JULY OF 2013 THAT APPLE

17   INFORMED PLAINTIFFS THAT IT WASN'T ALL MODELS OF IPODS SOLD

18   AFTER THAT DATE THAT HAD KVC, DVC, IT WAS ONLY CERTAIN MODELS.

19           **THE COURT:**  SO HOW --

20           **MS. SWEENEY:**  SO IT WAS REALLY IRRELEVANT UNTIL AFTER

21   JULY 2013.

22           **THE COURT:**  WHEN DID APPLE DISCLOSE THE -- THAT

23   PARTICULAR -- THAT THOSE PARTICULAR -- THE -- THE ASSOCIATION

24   BETWEEN THE KVC AND DVC WITH THE MODEL NUMBERS?  WHAT --

25   HOW -- HOW WAS THAT DISCLOSED?  WHEN WAS THAT DISCLOSED?

1          **MS. SWEENEY:**  IT WAS -- IT WAS FIRST DISCLOSED, YOUR

2     HONOR, I BELIEVE IN A DECLARATION BY MR. FARRUGIA.  I THINK IT

3     WAS IN 2011 AT THE TIME WE WERE BRIEFING A CERTIFICATION AND

4     SUMMARY JUDGMENT.

5          AND THEN HE -- AFTER DR. NOLL SUBMITTED HIS LIABILITY AND

6     DAMAGES REPORT IN THE SPRING OF 2013, AFTER THAT TIME,

7     MR. FARRUGIA SUBMITTED WHAT HE CALLED A CORRECTED DECLARATION

8     WHICH CHANGED THE INFORMATION ABOUT WHICH IPODS HAD KVC AND

9     DVC.  AND I CAN GET THAT EXACT DATE, BUT I'M PRETTY SURE IT

10    WAS JULY OF 2013.

11         **MR. ISAACSON:**  MAY I SAYING SOMETHING, YOUR HONOR?

12         **MS. SWEENEY:**  IT WAS --

13         **THE COURT:**  FIRST OF ALL, ARE THE -- ARE THOSE

14    DISCLOSURE DATES BY APPLE ACCURATE?  DO YOU KNOW?

15         **MR. ISAACSON:**  THOSE SOUND ROUGHLY ACCURATE.  BUT IT

16    DOES NOT MATTER BECAUSE THE TWO IPODS THAT WE ARE TALKING

17    ABOUT WOULD HAVE HAD A DAMAGES CLAIM BOTH BEFORE AND AFTER

18    THOSE DISCLOSURES.  ALL RIGHT.  THESE ARE IPODS THAT, IF THEY

19    WERE PURCHASED BY THE PLAINTIFF UNDER THE PREVIOUS -- UNDER

20    THE PREVIOUS DAMAGE THEORY OR THE DAMAGE THEORY AFTER THE

21    FARRUGIA DECLARATION, WERE CLEARLY -- WERE IPODS WITHIN THE

22    CLASS DEFINITION.

23         AND BEFORE THE FARRUGIA DECLARATION AND BEFORE THE NOLL

24    REPORT, THESE WOULD HAVE BEEN IPODS BASED ON WHICH DAMAGES

25    WOULD BE CLAIMED.  AND THEN AFTERWARDS, THEY WOULD BE IPODS

1    WHICH DAMAGES WOULD BE CLAIMED.

2        THE -- THE CHANGE IN THE IPODS AFFECTED HAVE NOTHING TO DO

3    WITH THE FACT THAT THESE PLAINTIFFS ARE NOW DISCLOSING FOR THE

4    FIRST TIME IPODS FOR WHICH DAMAGES WOULD HAVE BEEN CLAIMED

5    FROM THE BEGINNING OF THE -- FROM THE BEGINNING OF THIS

6    COMPLAINT, THE -- THE BEGINNING OF THIS OPERATIVE COMPLAINT.

7        ALL RIGHT.  THIS -- THE CHANGE IN THE DAMAGE THEORY HAS

8    NOTHING --

9            **THE COURT:**  I UNDERSTAND THAT.  BUT WE'RE TEN YEARS

10   INTO THIS LITIGATION AND IT'S NOT CLEAR TO ME WHERE IN THE

11   DEPOSITION -- AND I -- I UNDERSTAND, MR. ISAACSON, THAT YOU

12   WERE NOT INVOLVED IN THIS CASE FROM THE BEGINNING.  BUT

13   TYPICALLY, THESE THINGS WOULD HAVE BEEN INVESTIGATED.  AND DO

14   I -- AND RESEARCHED AS PART OF THE DISCOVERY.

15           **MR. ISAACSON:**  AND THEY -- AND THEY WERE, YOUR HONOR.

16   SO LET ME -- SO THE DEPOSITION IS 2007.  ALL RIGHT?  SO WE ARE

17   TALKING ABOUT PURCHASES AFTER 2007.

18           **THE COURT:**  CAN I HAVE HER DEPOSITION, PLEASE?

19           **MR. ISAACSON:**  SURE.

20           **THE COURT:**  I'M TALKING TO MY COURTROOM DEPUTY.

21           **MR. ISAACSON:**  THE DEPOSITION IS IN 2007.  WE'RE

22   TALKING ABOUT 2008 PURCHASES, SO THIS WOULD NOT HAVE BEEN

23   DISCUSSED DURING THE DEPOSITION.

24       THE INTERROGATORY RESPONSE, WHICH IS 2010, COMES AFTER

25   THIS ALLEGED PURCHASE.  SO DISCOVERY WAS TAKEN ON IT.  AND THE

1    INTERROGATORY RESPONSE SAYS, "I BOUGHT THREE IPODS."  OKAY?

2    THESE ARE THE -- TWO OF THEM ARE BEFORE THE CLASS PERIOD AND

3    ONE IS -- ONE IS THE ONE THAT DR. NOLL SAYS WOULD HAVE NO

4    DAMAGES ASSOCIATED WITH IT.

5        THE TWO IPODS THAT ARE BEING DISCLOSED WERE PURCHASED

6    BEFORE THAT INTERROGATORY RESPONSE AND WERE NOT DISCLOSED IN

7    THE INTERROGATORY RESPONSE SO APPLE IS NOT PUT ON NOTICE THAT

8    THESE IPODS EXIST.

9        THEN IN THE CLASS CERTIFICATION MOTION, WHICH IS 2011,

10   PLAINTIFFS SAY, AS I SAID, THAT -- THAT THEIR THREE PROPOSED

11   PLAINTIFFS -- WE'RE DOWN TO TWO -- HAVE SUBMITTED THEIR IPODS

12   FOR FORENSIC INSPECTION BY APPLE COUNSEL SO --

13          **THE COURT:**  OKAY.  SO AT THAT TIME, YOU HAD SOME

14   INFORMATION ABOUT WHAT THE PLAINTIFFS APPARENTLY HAD OR DIDN'T

15   HAVE, AND YOU DIDN'T RAISE THE ISSUE THAT IT -- THAT THEY

16   WEREN'T -- IN 2011, YOU DIDN'T RAISE THE ISSUE THAT YOU

17   THOUGHT THAT THEY WEREN'T QUALIFIED BECAUSE THEY DIDN'T HAVE

18   AN IPOD?

19          **MR. ISAACSON:**  THAT -- THAT IS CORRECT.  BECAUSE WITH

20   THIS -- OBVIOUS -- TWO OF THEM ARE OBVIOUSLY OUTSIDE THE CLASS

21   PERIOD.  I DON'T THINK THE PLAINTIFFS HAVE EVER CLAIMED ANY

22   DAM -- THAT WAS SELF-EVIDENT.

23       THE THIRD IPOD, IN ORDER TO IDENTIFY THAT WAS FIFTH

24   GENERATION, TOOK SOME -- TOOK PUTTING PUZZLE PIECES TOGETHER

25   BECAUSE SHE SAID, "I BOUGHT AN IPOD ON THIS DATE IN SEPTEMBER

1    2006."

2              **THE COURT:**  SO WHAT WERE YOU DOING IN 2011, FOUR

3    YEARS AGO, THREE YEARS AGO, TO INVESTIGATE THIS PARTICULAR

4    ISSUE THAT YOU APPARENTLY RESOLVED IN LESS THAN 24 HOURS?

5              **MR. ISAACSON:**  I DON'T HAVE AN ANSWER FOR THAT, YOUR

6    HONOR.

7              **THE COURT:**  WELL, THAT'S A PROBLEM.

8              **MR. ISAACSON:**  I -- I UNDERSTAND THAT.  BUT AT THE

9    END OF THE DAY, THERE'S STILL -- WE'RE AT TRIAL AND A

10   PLAINTIFF HAS TO SHOW INJURY.

11             **THE COURT:**  WELL, AND I UNDERSTAND THAT, TOO, BUT I

12   DID EXCUSE HER.  AND IF YOU THOUGHT YOU HAD AN ISSUE, YOU

13   SHOULD HAVE ADVISED ME, AND I WOULDN'T HAVE EXCUSED HER.  AND

14   I SAID THAT TO YOU AT THE END OF THE COURT YESTERDAY.

15             **MR. ISAACSON:**  RIGHT.

16             **THE COURT:**  SO THAT CREATES ANOTHER PROBLEM.

17             **MR. ISAACSON:**  RIGHT.  I THINK IT COULD BE RESOLVED

18   BY -- BY PHONE OR VIDEO TESTIMONY.

19        THE -- BECAUSE WE ARE JUST -- THE ONLY ISSUE THAT HAS COME

20   UP IS THEY'RE NOW GIVING US A RECEIPT THAT SHE SAYS WAS HER

21   PURCHASE, AND THE RECEIPT FROM APPLE SHOWS THAT THE TWO -- THE

22   TWO DEVICES THAT COUNSEL JUST IDENTIFIED -- AND WE'LL HAVE

23   COPIES MADE FOR EVERYBODY -- ARE FROM THE ROSEN LAW FIRM.

24        AND WE WILL PUT ON A WITNESS TO CERTIFY THIS DOCUMENT.

25   AND THE JURY IS GOING TO BE TOLD THAT THIS WITNESS HAS NOT

1    PURCHASED A DEVICE AND THESE TWO DEVICES WERE PURCHASED BY THE

2    ROSEN LAW FIRM.

3        SO WE'RE -- I'M DELIVERING THE INFORMATION TO YOU AS I

4    HAVE IT.

5            **THE COURT:**  OKAY.  RESPONSE.

6            **MS. SWEENEY:**  YOUR HONOR, I -- WE -- OR MS. ROSEN

7    CALLED APPLE THIS MORNING AND IS GETTING THE RECEIPTS.  I

8    HAVEN'T SEEN THIS INFORMATION THAT MR. ISAACSON IS REFERRING

9    TO.  THEY HAVE A LOT OF INFORMATION ABOUT THE PURCHASES OF

10   PLAINTIFFS AND CLASS MEMBERS WHICH THEY HAVE WITHHELD, AND IT

11   SEEMS TO ME GROSSLY UNFAIR FOR APPLE TO RAISE IT NOW WHEN THEY

12   HAVE HAD THIS INFORMATION ALL ALONG AND CHOSE STRATEGICALLY TO

13   WAIT TO BRING IT UP NOW.

14           **MR. ISAACSON:**  WE HAD ABSOLUTELY NO REASON TO SEARCH

15   THE PURCHASES OF THE ROSEN LAW FIRM.

16           **THE COURT:**  SO YOU CAN -- YOU CAN SEARCH BY NAME?

17   AND IF SO, WHY DIDN'T YOU SEARCH BY NAME OF THE NAMED

18   PLAINTIFFS?

19           **MR. ISAACSON:**  YOU CAN SEARCH BY NAME.  IT'S NOT

20   NECESSARILY COMPLETE.  SO WHEN YOU SEARCH HER NAME, YOU DON'T

21   TURN THIS UP.  BUT I CAN'T HAND THAT TO YOU AND SAY THEREFORE

22   SHE DIDN'T HAVE A PURCHASE.  THE RECORDS ARE NOT PERFECT.

23       IF WE CAN -- WHEN WE GET A -- A SERIAL NUMBER, WE CAN THEN

24   PULL UP A RECEIPT MANY TIMES, INCLUDING THIS CASE.  BUT IF I

25   SEARCH MY NAME IN THE APPLE DEVICE, THERE'S MANY REASONS MY

1   NAME MIGHT NOT TURN UP.

2        SO I CAN'T HAND YOU A RECORD AND THEN SAY -- AND HAVE A

3   WITNESS GET ON THE STAND AND SAY THEREFORE THIS PER -- THEY'RE

4   NOT ON OUR LIST, THEREFORE THEY DID NOT PURCHASE A DEVICE.  I

5   CAN'T DO THAT.

6           **THE COURT:**  WELL, YOU CAN CERTAINLY EXAMINE ON THE

7   ABSENCE AND TRY TO FIGURE IT OUT, RIGHT?

8           **MR. ISAACSON:**  NO.  I CAN'T FORTHRIGHTLY DO THAT

9   BECAUSE THERE ARE REASONS WHY THAT ABSENCE IS NOT

10  DETERMINATIVE OF THE FACT THEY DIDN'T BUY AN IPOD.  ALL I CAN

11  SAY IS "IF YOU CHECK WITH US, WE DON'T HAVE THAT RECORD."

12       BUT THERE ARE REASONS WHY PLAINTIFFS MIGHT HAVE THAT

13  RECORD OR BE ABLE TO IDENTIFY, LIKE, FOR EXAMPLE, IF THEY

14  DIDN'T REGISTER THE DEVICE.

15          **MS. SWEENEY:**  YOUR HONOR, CAN I -- CAN I RESPOND

16  BRIEFLY TO THAT?

17       WHAT MR. ISAACSON HAS FAILED TO NOTE IS THAT APPLE HAS

18  ACCESS TO THE -- MS. ROSEN'S ITUNES RECORDS.  AND IT'S --

19  MS. ROSEN WENT TO HER ITUNES RECORDS YESTERDAY, AND UNDER AN

20  ENTRY CALLED "MS. ROSEN'S IPOD," SHE WAS ABLE TO PULL UP THE

21  SERIAL NUMBERS WHICH WE'VE NOW GIVEN TO APPLE WHICH APPLE HAS

22  NOW SEARCHED.  SO IT'S IN MS. ROSEN'S OWN ITUNES ACCOUNT.

23  APPLE HAD THIS INFORMATION AND NEGLECTED TO SEARCH IT.

24       AND IF YOUR HONOR WANTS TO SEE THIS, YOU CAN SEE THAT IT

25  SAYS MARIANNA ROSEN'S IPOD WITH THE SERIAL NUMBER.  IT DOESN'T

1    SAY ANYTHING ABOUT ROSEN LAW FIRM.

2         **THE COURT:**  WELL, IT'S A COMPLICATED SITUATION.  I

3    MEAN, YOU, AS THE PLAINTIFFS' LAWYERS, NEED TO ALSO MAKE SURE

4    THAT YOU HAVE PLAINTIFFS WHO HAVE PURCHASED IPODS WITHIN THE

5    RELEVANT CLASS PERIOD.

6         **MS. SWEENEY:**  AND -- I AGREE, YOUR HONOR, AND WE

7    HAVE.

8         **THE COURT:**  WELL, IF IT WAS THAT CLEAR-CUT,

9    MS. SWEENEY, WE WOULDN'T BE HAVING THIS CONVERSATION.

10        SO DOES ANYBODY KNOW THE ANSWER TO THE QUESTION ABOUT

11   WHETHER OR NOT SHE ACTUALLY PURCHASED IT?  PROBABLY NOT, GIVEN

12   THAT I JUST HEARD IT.

13        WE'LL HAVE TO RECONVENE ON THIS ISSUE LATER, ONCE I --

14   ONCE YOU'RE ABLE TO TALK TO HER, GIVEN WHAT APPLE'S RECORDS

15   INDICATE.

16        **MR. ISAACSON:**  AND I PROVIDED YOU A COPY OF THE

17   RECEIPT FOR THE ROSEN LAW FIRM.

18        **THE COURT:**  DO WE HAVE A SIMILAR ISSUE WITH THE OTHER

19   NAMED CLASS MEMBER?

20        **MR. ISAACSON:**  IF SHE STARTS IDENTIFYING NEW IPODS,

21   YES, BECAUSE SHE DOES NOT HAVE AN INJURED IPOD UNDER HER

22   CURRENT -- UNDER HER CURRENT PURCHASES.

23        **MS. SWEENEY:**  AND WE DON'T CLAIM THAT MS. TUCKER HAS

24   AN AFFECTED MODEL PURCHASE.  BUT SHE IS WITHIN THE CLASS AND

25   SHE WAS APPOINTED AS A CLASS REPRESENTATIVE SO SHE'S GOING TO

1    TALK ABOUT HER EXPERIENCES AS A -- A MEMBER OF THE CLASS.

2           **THE COURT:**  SO I POTENTIALLY HAVE NO PLAINTIFF THAT

3    HAS PURCHASED AN IPOD?

4                     (SIMULTANEOUS COLLOQUY.)

5           **MS. SWEENEY:**  NO, YOUR HONOR.  MS. ROSEN --

6    MS. TUCKER PURCHASED AN IPOD DURING THE CLASS PERIOD.  IT WAS

7    AFTER THE CLASS WAS CERTIFIED THAT APPLE NOTIFIED THE COURT

8    AND NOTIFIED THE PLAINTIFFS THAT THEY WERE WRONG WHEN THEY

9    TOLD US WHICH WERE THE AFFECTED MODELS.

10       AND MS. --

11          **THE COURT:**  SO -- SO TO BE CLEAR, MS. SWEENEY --

12          **MS. SWEENEY:**  YEAH.

13          **THE COURT:**  -- I UNDERSTAND THAT THEY'VE PURCHASED

14   IPODS.  THEY'VE NOT PURCHASED AN IPOD THAT HAS THE UPDATE THAT

15   IS AT ISSUE IN THIS CASE.  IS THAT RIGHT?

16          **MS. SWEENEY:**  WELL, THEY -- I MEAN, EVEN THE -- THE

17   SERIAL NUMBER THAT WE GAVE APPLE YESTERDAY FOR MS. ROSEN'S

18   IPOD HAS THE AFFECTED -- IS AN AFFECTED MODEL, BUT IT WAS

19   PURCHASED AFTER THE CLASS PERIOD.  BUT MS. TUCKER DOES NOT

20   HAVE A PURCHASE THAT -- THAT SHE -- SHE DOES NOT HAVE A

21   PURCHASE OF AN AFFECTED IPOD DURING THE CLASS PERIOD.

22          **THE COURT:**  AND WHY IS IT THAT YOU DIDN'T DO ANYTHING

23   ABOUT THIS?

24          **MS. SWEENEY:**  BECAUSE, YOUR HONOR, THE -- WELL, AS I

25   EXPLAINED, FIRST OF ALL, WE HAVE MS. ROSEN WHO DID PURCHASE AN

1    AFFECTED MODEL DURING THE CLASS PERIOD.  THAT'S THE MOST

2    IMPORTANT THING.

3        AND THEN SECONDLY, THE COURT CERTIFIED THE CLASS ON THE

4    BASIS OF A PARTICULAR DATE AND PARTICULAR MODELS PROVIDED BY

5    APPLE.  IT WAS ONLY IN JULY OF 2013 WHEN THE SUMMARY JUDGMENT

6    AND THE *DAUBERT* MOTIONS WERE UNDERWAY THAT APPLE NOTIFIED US,

7    AFTER HAVING ALLOWED US TO RELY UPON AND HAVING JUDGE WARE

8    RELY UPON THESE OTHER DATES.

9        SO MS. -- MS. TUCKER IS -- IS WELL WITHIN THAT CLASS,

10   AND -- AND APPLE HAS NEVER CHALLENGED THAT.  AND APPLE HAS HAD

11   THIS INFORMATION ABOUT PURCHASES FOR THE ENTIRE PERIOD AND HAS

12   NEVER QUESTIONED THEIR ABILITY TO REPRESENT THE CLASS ON THAT

13   BASIS.

14       AND MOREOVER, YOUR HONOR, AS I MENTIONED YESTERDAY,

15   WHEN -- AFTER WE LEARNED THIS INFORMATION ABOUT THE CHANGE

16   FROM APPLE IN THE AFFECTED MODELS, WE APPROACHED APPLE TO SEE

17   IF WE SHOULD MODIFY THE CLASS, RENOTIFY THE CLASS.  AND AT

18   THAT TIME, HAD APPLE WANTED TO DO THAT, WE WOULD HAVE

19   IMMEDIATELY RESEARCHED VERY CAREFULLY THE PURCHASES OF THE

20   CLASS REPRESENTATIVES AND, IF NECESSARY, WE WOULD HAVE

21   SUBSTITUTED IN CLASS REPRESENTATIVES.  BUT APPLE SAID "NO" FOR

22   THE STRATEGIC AND TACTICAL REASON OF DOING JUST WHAT THEY'RE

23   DOING NOW WHICH IS TO SANDBAG US WITH THIS 11:59 FILING

24   ATTACKING OUR CLASS REPRESENTATIVE.

25           **MR. ISAACSON:**  IT IS 100 PERCENT IRRELEVANT THAT IF

```
1    A -- THAT A PLAINTIFF IS A CLASS MEMBER IF THEY HAVE NO

2    INJURY.

3             MS. SWEENEY:  WELL, YOUR HONOR, I WOULD DISAGREE.

4                  (SIMULTANEOUS COLLOQUY.)

5             THE COURT:  YOU KNOW WHAT, MS. SWEENEY, YOU NEED TO

6    WAIT.

7             MR. ISAACSON:  MAY I FINISH?

8        ALL RIGHT.  IT IS ELEMENTARY LAW THAT A PLAINTIFF IN AN

9    ANTITRUST CASE HAS TO SUFFER ANTITRUST INJURY.  OTHERWISE THEY

10   ARE DISMISSED AS PLAINTIFFS.  IT DOESN'T MATTER IF THEY'RE IN

11   THE CLASS OR OUTSIDE THE CLASS.  THAT'S HORNBOOK LAW.  YOU

12   HAVE TO HAVE ANTITRUST INJURY.

13            THE COURT:  SO GIVEN THE ELEVENTH HOUR, IF THESE GUYS

14   BRING IN ANOTHER ELEVENTH-HOUR PLAINTIFF TO SUBSTITUTE, IS

15   THAT THE -- IS THAT THE REMEDY HERE?

16            MR. ISAACSON:  THEY -- THEY WOULD HAVE TO BE

17   QUALIFIED AS A CLASS REPRESENTATIVE WHICH MEANS THEY HAVE TO

18   BE DEPOSED AND WE HAVE TO HAVE THE ABILITY TO HAVE DUE PROCESS

19   TO LOOK AT THAT PERSON.

20            THE COURT:  HMM.  WELL --

21                  (PAUSE IN THE PROCEEDINGS.)

22            THE COURT:  WE'RE GOING TO NEED SOME BRIEFING,

23   AFTER -- AFTER ALL THE FACTS ARE --

24                  (OFF-THE-RECORD DISCUSSION.)

25            MS. SWEENEY:  CAN I RESPOND, YOUR HONOR?
```

1          **THE COURT:**  YOU MAY.

2          **MS. SWEENEY:**  YEAH.  I WAS -- JUST WANTED TO POINT,

3    YOUR HONOR, TO A SUPREME COURT CASE CALLED *SOSNA V. IOWA*,

4    419 U.S. 393, 1974, WHICH TALKS ABOUT WHETHER A PLAINTIFF WHO

5    HAS BEEN CERTIFIED AS A CLASS REPRESENTATIVE CAN CONTINUE TO

6    REPRESENT A CLASS AFTER CIRCUMSTANCES HAVE CHANGED SUCH THAT

7    THAT PARTICULAR PLAINTIFF NO LONGER HAS THE INJURY COMPLAINED

8    OF.

9          THAT'S A FAIRLY FREQUENT OCCURRENCE IN CLASS LITIGATION.

10   AND IN THIS CASE, WHERE THE LITIGATION HAS DRAGGED ON FOR TEN

11   YEARS, IT IS NOT SUCH A SURPRISING DEVELOPMENT, PARTICULARLY

12   WHEN IT IS APPLE, APPLE, WHO GAVE US THE INCORRECT INFORMATION

13   AND THEN REFUSED TO AMEND THE CLASS.

14         **MR. ISAACSON:**  WE'LL REVIEW THE CASE, YOUR HONOR, BUT

15   WE GET TO MAKE A RULE 50 MOTION.  ALL RIGHT.  PLAINTIFFS HAVE

16   TO PROVE INJURY.  IF THEY DON'T PROVE INJURY, THE PLAINTIFFS

17   ARE DISMISSED.  WE THEN HAVE A CASE WITH NO PLAINTIFFS.

18         **THE COURT:**  ALL RIGHT.  LET'S MOVE ON.

19         **MR. ISAACSON:**  OH --

20         **THE COURT:**  MR. ISAACSON.

21         **MR. ISAACSON:**  -- CAN I RAISE ONE ISSUE ABOUT TODAY?

22   WE MENTIONED THIS LAST NIGHT.  AND I REALIZE WE -- WE DIDN'T

23   ASK THE JURY LAST NIGHT.

24         BUT IF AN INQUIRY COULD BE MADE OF THE JURY THAT IF WE

25   NEED AN EXTRA 15, 20 MINUTES TODAY, WHETHER THAT -- WHETHER

```
 1    THEIR SCHEDULES CAN ACCOMMODATE THAT, WE WOULD APPRECIATE THAT

 2    INQUIRY BEING MADE OF THE JURY SO THAT WE KNOW.

 3            THE COURT:  ALL RIGHT.

 4            MS. SWEENEY:  AND I HAVE --

 5            THE COURT:  I MADE --

 6            MS. SWEENEY:  I'M SORRY.

 7            THE COURT:  I MADE AN ERROR ON THE TIME SHEET FIRST

 8    DAY.  SO THESE ONES ARE CORRECTED AND TAKE INTO ACCOUNT THE

 9    FIRE ALARM AND EVERYTHING ELSE.  SO HAVE YOUR FOLKS LOOK AT

10    THEM AGAIN AND LET ME KNOW.

11       WE HAVE -- YOU SHOULD HAVE RECEIVED, IF NOT -- WE DID GET

12    A QUESTION FROM A JUROR YESTERDAY.  DID YOU RECEIVE THE

13    QUESTION?

14            MS. SWEENEY:  NO, YOUR HONOR.

15            MR. ISAACSON:  NO.

16            THE COURT:  OKAY.  SO YOU'LL GET COPIES, BUT -- COULD

17    YOU -- FRANCES.

18            THE CLERK:  I HAVE.

19            THE COURT:  IT BASICALLY ASKS THE FOLLOWING:

20       "WOULD IT BE POSSIBLE WHEN DISPLAYING EXHIBITS OF INSTANT

21    MESSAGE COMMUNICATIONS TO CLARIFY WHOSE COMMUNICATION IS ON

22    THE LEFT AND WHO IS ON THE RIGHT, PLEASE."

23       SO I THINK IT'S A GOOD REQUEST, AND THE EVIDENCE IN THAT

24    REGARD WAS A BIT UNCLEAR WHICH PROBABLY, IN PART, LED TO SOME

25    OF THE TESTIMONY THAT WAS GIVEN.
```

1       I RECEIVED THIS MORNING AN UPDATED PLAINTIFFS' EXHIBIT

2    LIST.  I DO NOT WANT ANY MORE OF THESE BECAUSE -- UNLESS

3    YOU'RE ADDING TO THE BACK.  SO I'VE ALREADY STARTED MARKING UP

4    MY VERSION OF IT.  I'M NOT GOING TO GO AND REMARK A BRAND-NEW

5    VERSION.  WHAT IS THE POINT OF THIS NEW LIST?

6        **MS. SWEENEY:**  THERE ARE A COUPLE OF -- THE SUMMARY

7    EXHIBITS WERE REPLACED WITH SLIGHTLY MODIFIED SUMMARY

8    EXHIBITS, YOUR HONOR.  WE CAN JUST GIVE YOU AN UPDATE THAT

9    ANNOTATES IT AS OPPOSED TO GIVING YOU THE WHOLE NEW LIST.

10   WOULD THAT WORK BETTER?

11       **THE COURT:**  THAT WOULD BE -- THAT WOULD BE BETTER

12   BECAUSE MINE IS ALREADY IN USE.

13       **MS. SWEENEY:**  UNDERSTOOD, YOUR HONOR.

14       **THE COURT:**  SO HAVING A NEW ONE DOESN'T HELP.  OKAY.

15    LET'S SEE.  RECYCLE.  OKAY.

16    OKAY.  NEXT.

17       **MR. COUGHLIN:**  YOUR HONOR, I HAVE JUST ONE THING, A

18   HOUSEKEEPING.

19    WHEN I WENT THROUGH THE -- THE TRANSCRIPT YESTERDAY THAT

20   WE GOT, I SEE THAT THE MAIN DOCUMENT I TALKED WITH

21   MR. FARRUGIA ABOUT, THE FAIRPLAY NEXT GENERATION 0002, THAT

22   THAT -- THAT WAS NOT MOVED FOR ADMISSION.  SO I WOULD MOVE FOR

23   ADMISSION OF THAT NOW.

24       **THE COURT:**  ANY OBJECTION?

25       **MR. ISAACSON:**  MS. DUNN SAYS NO.

| | |
|---|---|
| 1 | **THE COURT:**  THEN THERE WILL BE NO OBJECTION.  NO. 2 |
| 2 | IS ADMITTED. |
| 3 | (PLAINTIFFS' EXHIBIT 2 WAS RECEIVED IN EVIDENCE.) |
| 4 | **THE COURT:**  OKAY. |
| 5 | OH, I WILL BE ISSUING AN ORDER LATER -- LATER THIS MORNING |
| 6 | OR -- TO ASK THAT THE PARTIES ACCOMMODATE THE PRESS.  SO FIVE |
| 7 | HARD -- ANY DOCUMENT THAT IS A HARD-COPY DOCUMENT -- I THINK |
| 8 | HERE WE HAVE -- I DON'T KNOW THAT ANYTHING HAS BEEN SUBMITTED |
| 9 | ON CD OR ANYTHING LIKE THAT.  SO FIVE COPIES WILL BE -- YOU |
| 10 | WILL BE ASKED TO PROVIDE THE PRESS WITH FIVE COPIES. |
| 11 | WE'RE TRYING TO FIGURE OUT A PLACE AND A LOCATION OUTSIDE |
| 12 | OF THE COURTROOM FOR THEM TO BE DEPOSITED.  SO SOMEONE ON YOUR |
| 13 | TEAM, WHOEVER REQUESTED ADMISSION OF THE DOCUMENT, WILL BE |
| 14 | RESPONSIBLE FOR PROVIDING THE FIVE HARD COPIES. |
| 15 | SO SOMEONE ON YOUR TEAM SHOULD BE WORKING ON THAT THIS |
| 16 | MORNING.  AND THEN THE ORDER WILL ISSUE, AND I'LL TELL YOU |
| 17 | SPECIFICALLY WHERE THEY WILL GO LATER ON.  OKAY?  SO THAT'S -- |
| 18 | THAT'S JUST ON THE HARD-COPY EXHIBITS. |
| 19 | WITH RESPECT TO THE JOBS TESTIMONY, THAT -- AS YOU KNOW, |
| 20 | UNDER MY PRIOR ORDER, WHEN WE DO DEPOSITIONS, THE DEPOSITION |
| 21 | TRANSCRIPT -- THE -- BY VIDEO, THE DEPOSITIONS ARE NOT |
| 22 | TRANSCRIBED BY THE COURT REPORTER.  SHE IS RELIEVED OF HER |
| 23 | OBLIGATIONS UNDER THE CODE.  YOU ARE REQUIRED, BECAUSE IT'S |
| 24 | ALREADY BEEN TRANSCRIBED, TO FILE THOSE PARTICULAR PORTIONS OF |
| 25 | THE TRANSCRIPT FROM THE DEPOSITION. |

```
 1        GIVEN THE INTEREST IN HIS, YOU NEED TO MAKE SURE THAT

 2   IT'S -- THAT IT GETS FILED AT THE SAME TIME AS THE TRANSCRIPT.

 3   SO THAT DOCUMENT --

 4                   (OFF-THE-RECORD DISCUSSION.)

 5        THE COURT:  SO IT HAS TO GET THEN -- I'M CORRECTED.

 6   SO YOU HAVE TO HAVE THAT AVAILABLE TO THE COURT REPORTER

 7   IMMEDIATELY SO THAT SHE CAN APPEND IT TO THE TRANSCRIPT AND

 8   FILE IT WITH THE TRANSCRIPT SO THAT IT IS ACCESSIBLE

 9   IMMEDIATELY.

10      OKAY?

11        MR. ISAACSON:  UNDERSTOOD, YOUR HONOR.

12        THE COURT:  THOSE ARE MY HOUSEKEEPING ISSUES.

13      I SEE MR. KIERNAN.  WHEN AM I GOING TO GET THAT LAST

14   FILING ON THE MOTIONS TO SEAL SO I CAN ISSUE AN ORDER?  I

15   THOUGHT YOU WERE GOING TO UPDATE.

16      DID YOU DO THAT LAST NIGHT?

17        MR. KIERNAN:  YOUR HONOR, I'LL CHECK ON THAT.  I

18   THOUGHT IT WAS DONE.  I'LL CHECK TODAY.  IF NOT, IT WILL BE

19   DONE THIS MORNING.

20        THE COURT:  OKAY.  SO IT WAS NOT DONE AT THE END OF

21   YESTERDAY'S TRIAL DAY BECAUSE I WENT AND TRIED TO FINISH THAT

22   ORDER.

23        MR. KIERNAN:  OKAY.

24        THE COURT:  AND WE DIDN'T HAVE THE UPDATED STATEMENT

25   THAT YOU SAID YOU WERE GOING TO FILE.
```

```
 1        MR. KIERNAN:  I DID FILE THE UPDATED STATEMENT.

 2                 (SIMULTANEOUS COLLOQUY.)

 3        THE COURT:  YES, BUT THEN YOU SAID YOU WERE GOING TO

 4   FILE SOMETHING ELSE.

 5        MR. KIERNAN:  UNDERSTOOD.  IT WILL BE DONE THIS

 6   MORNING.

 7        THE COURT:  OKAY.

 8        MR. KIERNAN:  IF IT WASN'T DONE ALREADY.

 9        THE COURT:  OKAY.  I THINK THAT'S ALL THAT I HAVE.

10   DO WE HAVE OUR JURY HERE?

11        THE CLERK:  YES.  THEY'RE ALL HERE.

12        THE COURT:  THEY'RE HERE?  OKAY.

13   ANYTHING ELSE?  IF NOT, WE'LL CALL THE JURY IN.

14        MS. SWEENEY:  NO, YOUR HONOR.

15        THE COURT:  OKAY.  LET'S CALL THE JURY.

16   (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

17   THE JURY:)

18        THE COURT:  GOOD MORNING, EVERYONE.  EVERYONE CAN BE

19   SEATED.

20   WE ARE BACK ON THE RECORD.  THE RECORD WILL REFLECT THAT

21   THE JURY IS BACK.

22   SO I WAS HEARING WITH THE LAWYERS, LET'S SEE, LAST NIGHT I

23   DIDN'T THINK ABOUT THIS CASE.  I WENT TO MY KID'S DANCE

24   RECITAL.  SO IT'S GOOD.  YOU KNOW, BREAKS THE MONOTONY.  IT

25   GETS YOU THINKING ABOUT SOMETHING ELSE USING A DIFFERENT SIDE
```

```
 1      OF THE BRAIN.  HOPEFULLY YOU ALL HAD A RELAXING EVENING.

 2          ARE YOU READY TO GO?

 3                          (JURORS NODDING.)

 4          THE COURT:  ANY QUESTIONS?  NO?  OKAY.

 5          NEXT WITNESS.

 6          OH, ONE -- I DO HAVE ONE QUESTION.  WE HAVE THREE

 7      EXECUTIVES COMING IN TODAY.

 8          MESSRS. CUE, MARKS, AND SCHILLER.  IF WE NEED TO GO OVER

 9      15 MINUTES OR SO TO MAKE SURE EVERYBODY GETS DONE, IS THAT A

10      PROBLEM OR DOES ANYBODY HAVE ANY APPOINTMENTS?

11                          (JURORS SHAKING HEADS.)

12          THE COURT:  NO?  THAT WORKS FOR EVERYBODY, IF NEEDED?

13      OKAY.  TERRIFIC.

14          ALL RIGHT.  NEXT WITNESS.

15          MS. SWEENEY:  YOUR HONOR, PLAINTIFFS CALLED EDUARDO

16      CUE.

17                      (PAUSE IN THE PROCEEDINGS.)

18          THE CLERK:  REMAIN STANDING.

19                          EDUARDO CUE,

20      CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY

21      SWORN, TESTIFIED AS FOLLOWS:

22          THE WITNESS:  I DO.

23          THE CLERK:  PLEASE BE SEATED.  AND THEN PLEASE STATE

24      YOUR FULL NAME AND SPELL YOUR LAST NAME.

25          THE WITNESS:  MY NAME IS EDUARDO BETO CUE.  I GO BY
```

1    EDDY CUE.  SO IF YOU WANT ME TO SPELL THE FULL NAME.

2              **THE COURT:**  JUST THE LAST NAME.

3              **THE WITNESS:**  LAST NAME IS C-U-E.

4              **THE COURT:**  GOOD MORNING.

5              **THE WITNESS:**  GOOD MORNING.

6              **THE COURT:**  YOU MAY PROCEED.

7                          **DIRECT EXAMINATION**

8    **BY MS. SWEENEY:**

9    **Q.**  GOOD MORNING, MR. CUE.

10       MY NAME IS BONNY SWEENEY.  I'M ONE OF THE LAWYERS FOR THE

11   PLAINTIFFS.

12       YOU SAID YOU GO BY EDDIE CUE.  IS THAT TRUE FOR YOUR

13   EMAILS AS WELL?

14   **A.**  THAT'S CORRECT.

15       LET ME FIRST APOLOGIZE.  I HAVE A COLD SO IF I BLOW MY

16   NOSE --

17              **THE COURT:**  AS LONG AS YOU'RE NOT SNEEZING ON ME,

18   WE'RE GOOD.

19              **THE WITNESS:**  WE'RE GOOD THEN, YOUR HONOR.

20   **BY MS. SWEENEY:**

21   **Q.**  SO, MR. CUE, AND -- ANYTIME YOU NEED TO TAKE A BREAK TO

22   BLOW YOUR NOSE OR HAVE A DRINK OF WATER, PLEASE FEEL FREE.

23       SO YOU'VE BEEN AT APPLE FOR SOME TIME; IS THAT RIGHT?

24   **A.**  THAT'S CORRECT.

25   **Q.**  WHEN DID YOU START THERE?

1   **A.**   I STARTED ON JANUARY 3RD, 1989.

2   **Q.**   AND WHAT'S YOUR CURRENT POSITION AT APPLE?

3   **A.**   I'M A SENIOR VICE-PRESIDENT OF INTERNET SOFTWARE AND

4   SERVICES.

5   **Q.**   AND ARE YOU A MEMBER OF THE EXECUTIVE TEAM AT APPLE?

6   **A.**   I AM.

7   **Q.**   AND WHAT DOES THAT MEAN?

8   **A.**   THERE'S THE CEO, TIM COOK, AND THERE ARE APPROXIMATELY

9   ABOUT TEN MEMBERS WHICH IS THE EXECUTIVE TEAM THAT IS

10   RESPONSIBLE FOR ALL OF THE DIFFERENT DIVISIONS AND GROUPS OF

11   APPLE.

12   **Q.**   IS IT FAIR TO SAY YOU'RE PRETTY HIGH UP IN THE APPLE

13   ORGANIZATION?

14   **A.**   THAT'S FAIR.

15   **Q.**   OKAY.   AND THEN IN -- CAN YOU TELL ME JUST BRIEFLY ABOUT

16   YOUR POSITIONS AT APPLE IN 2006?

17   **A.**   IN 2006 -- AND -- AND LET ME BE CLEAR, I'VE BEEN THERE

18   ALMOST 26 YEARS, SO THERE MAY BE SOME DISCREPANCIES IN

19   REMEMBERING EXACTLY WHAT YEAR IT WAS.   BUT I WAS RUNNING THE

20   ITUNES SOFTWARE, THE ITUNES MUSIC STORE.

21       AT CERTAIN TIMES, I HAD OTHER RESPONSIBILITIES ALONG WITH

22   ITUNES.   AND I DON'T REMEMBER EXACTLY IN 2006 THROUGHOUT THE

23   YEAR HOW THAT CHANGED, BUT I HAD ITUNES AND THE ITUNES MUSIC

24   STORE THROUGHOUT THAT TIME.

25   **Q.**   OKAY.   AND YOUR INVOLVEMENT WITH THE ITUNES STORE STARTED

1    IN 2001; IS THAT RIGHT?  OR 2003?

2    **A.**  WELL, THE STORE LAUNCHED IN 2003.  I WAS INVOLVED IN IT

3    BEFORE THE STORE LAUNCHED, SO IN 2002.

4    **Q.**  OKAY.  SO WHEN YOU WERE INVOLVED IN THE ITUNES STORE

5    BEFORE ITS LAUNCHING, WERE YOU -- THAT MEANS YOU WERE INVOLVED

6    IN THE NEGOTIATIONS WITH THE CONTRACT -- NEGOTIATION OF THE

7    CONTRACTS WITH THE MUSIC LABELS; IS THAT RIGHT?

8    **A.**  YES, THAT'S CORRECT.

9    **Q.**  OKAY.  AND THE STORE LAUNCHED IN APRIL OF 2003; IS THAT

10   RIGHT?

11   **A.**  THAT'S CORRECT.

12   **Q.**  OKAY.  AND YOU WERE -- YOU, ALONG WITH STEVE JOBS AND

13   JAMES HIGA, WERE THE ONES AT APPLE RESPONSIBLE FOR NEGOTIATING

14   THOSE CONTRACTS?

15   **A.**  I WAS RESPONSIBLE FOR NEGOTIATING THE CONTRACTS.  JAMES

16   HIGA AND KEVIN SAUL, WHO IS OUR COUNSEL, WERE WORKING WITH ME.

17   AND I REPORTED TO STEVE TO KEEP HIM UPDATED AND ASK HIM FOR

18   HELP OR ADVICE WHEN I NEEDED IT.

19   **Q.**  OKAY.  AND MR. HIGA, HE WAS SOMEONE WHO HAD EXPERIENCE

20   NEGOTIATING CONTRACTS IN THE MUSIC BUSINESS FROM HIS PRIOR

21   WORK AT REALNETWORKS; IS THAT RIGHT?

22   **A.**  HE HAD SOME EXPERIENCE.  NOT ANYTHING LIKE WHAT WE WERE

23   TRYING TO DO, BUT HE HAD SOME EXPERIENCE.

24   **Q.**  AND WHEN YOU NEGOTIATED THOSE CONTRACTS WITH THE LABELS,

25   THOSE WERE WHAT YOU CALL THE BIG FIVE, OR AT LEAST THEY WERE

1    THE BIG FIVE BACK THEN, RIGHT?

2    **A.**   THERE WERE FIVE MUSIC LABELS AT THAT TIME THAT ACCOUNTED

3    FOR 80 PERCENT OF THE -- OF THE MUSIC MARKET.

4    **Q.**   OKAY.  AND THEY'VE CONSOLIDATED TO, WHAT, THREE BIG LABELS

5    NOW?

6    **A.**   THAT'S CORRECT.

7    **Q.**   AND DURING THE TIME PERIOD 2006 THROUGH 2009, DID THOSE

8    BIG LABELS, WHETHER IT WAS FIVE, FOUR, OR THREE, DID THEY

9    CONTINUE TO COMPRISE ROUGHLY 70 TO 80 PERCENT OF THE MUSIC?

10   **A.**   THAT'S CORRECT.

11   **Q.**   OKAY.  NOW, WHEN YOU NEGOTIATED THE CONTRACTS WITH THE

12   LABELS THAT YOU NEEDED TO OPEN YOUR ITUNES STORE, DID YOU

13   CONSIDER THE CONTRACTS THAT YOU NEGOTIATED SUCCESSFUL IN THE

14   SENSE THAT THEY GRANTED APPLE LANDMARK USAGE RIGHTS?

15   **A.**   THEY WEREN'T -- YES, I -- I DO.  THEY WEREN'T EVERYTHING

16   WE WANTED, BUT THEY WERE ENOUGH OF WHAT WE WANTED THAT WE WERE

17   HAPPY TO HAVE THE DEALS DONE.

18   **Q.**   SO WHEN YOU OPENED THE ITUNES STORE IN APRIL OF 2003, YOU

19   STARTED OUT WITH MORE SONGS THAN ANY COMPETING ONLINE MUSIC

20   STORE; IS THAT CORRECT?

21   **A.**   I DON'T KNOW THAT.  I -- I -- I DON'T RECALL THAT.  WE --

22   WE MAY HAVE.  WE HAD 200,000 SONGS, BUT I DIDN'T -- I DIDN'T

23   GO AND MEASURE EVERY STORE AND COUNT THEIR SONGS.

24   **Q.**   BUT -- BUT YOU WANTED -- YOU WERE AWARE OF WHAT

25   COMPETITORS WERE OUT THERE IN THE MARKET WHEN YOU OPENED THE

1    ITUNES STORE, CORRECT?

2    **A.**   I WAS.

3    **Q.**   ALL RIGHT.  AND DID YOU CONSIDER ANY OF THOSE OTHER STORES

4    ANY KIND OF COMPETITIVE THREAT TO THE ITUNES STORE WHEN YOU

5    OPENED IT IN 2003?

6    **A.**   YES, THEY WERE COMPETITIVE, BUT I DIDN'T THINK THEY WERE

7    VERY GOOD SO I DIDN'T THINK THEY WOULD COMPETE SUCCESSFULLY

8    WITH US, SO --

9    **Q.**   AND WITHIN MONTHS, THE ITUNES STORE WAS SUCCESSFUL IN

10   SELLING SONGS; WOULD YOU -- IS THAT FAIR TO SAY?

11   **A.**   OH, I THINK IT WAS SUCCESSFUL WITHIN DAYS.

12   **Q.**   OKAY.  AND AT SOME POINT IN TIME, THE ITUNES STORE REACHED

13   A -- A MARKET SHARE LEVEL OF AROUND 70 PERCENT.  DO YOU RECALL

14   WHEN THAT WAS?

15   **A.**   I DON'T RECALL, BUT I -- WE REACHED 70 PERCENT WITHIN A

16   COUPLE YEARS OR A YEAR.  IT WAS VERY QUICK.  NOBODY HAD ANY

17   SUCCESS, AND WE WERE THE FIRST SUCCESSFUL ONES.

18   **Q.**   AT LEAST AS EARLY AS JANUARY 2004, THE ITUNES STORE HAD A

19   70 PERCENT MARKET SHARE; IS THAT RIGHT?

20   **A.**   AGAIN, I DON'T RECALL THE EXACT DATE, BUT IF -- THERE'S

21   PLENTY OF DATA TO LOOK AT THAT.

22   **Q.**   OKAY.  SO IF I SHOW YOU A DOCUMENT, THAT MIGHT HELP YOU

23   REMEMBER?

24   **A.**   SURE.

25   **Q.**   OKAY.  AND THEN THROUGHOUT THE PERIOD, THE FOLLOWING

1    PERIOD, DID THE ITUNES STORE CONTINUE TO HAVE A MARKET SHARE

2    70 PERCENT OR HIGHER UNTIL THE END OF MARCH OF 2009?

3            **MR. ISAACSON:**  OBJECTION TO FORM.  CAN WE TELL HIM

4    WHAT MARKET SHE'S REFERRING TO?

5            **THE COURT:**  SUSTAINED.

6    **BY MS. SWEENEY:**

7    **Q.**  MR. CUE, FROM THE PERIOD, LET'S SAY, 2006 TO 2009, DID

8    APPLE'S SHARE OF THE ONLINE DIGITAL MUSIC SALE MARKET COMPRISE

9    70 PERCENT OR MORE?

10   **A.**  I BELIEVE SO, YES.

11   **Q.**  OKAY.  AND AT TIMES, IT WAS UP TO 90 PERCENT?

12   **A.**  IT MAY HAVE.  I DON'T REMEMBER IT BEING AT 90 PERCENT VERY

13   OFTEN.  IF IT WAS, IT WOULD BE A VERY SHORT PERIOD OF TIME.

14   **Q.**  OKAY.  AND YOU'RE FAMILIAR WITH A COMPANY CALLED

15   REALNETWORKS, CORRECT?

16   **A.**  I AM.

17   **Q.**  AND IN FACT, YOU -- YOU USED TO USE THEIR REALPLAYER

18   JUKEBOX, CORRECT?

19   **A.**  I USED THEIR VIDEO PLAYER.

20   **Q.**  THEIR VIDEO PLAYER?

21   **A.**  NOT THEIR MUSIC JUKEBOX.

22   **Q.**  OKAY.

23   **A.**  BUT THEIR VIDEO PLAYER.

24   **Q.**  OKAY.  AND THEY WERE FAIRLY WELL-KNOWN FOR THEIR MEDIA

25   PLAYER; IS THAT RIGHT?

1    **A.**  I THINK THEY WERE VERY WELL-KNOWN FOR THEIR VIDEO PLAYER.

2    **Q.**  OKAY.  AND IN 2004, REALNETWORKS OPENED A COMPETING ONLINE

3    MUSIC STORE; IS THAT CORRECT?

4    **A.**  I DON'T REMEMBER THE EXACT DATE, BUT ROUGHLY, YES, I

5    BELIEVE THAT'S CORRECT.

6    **Q.**  OKAY.  AND WERE -- WERE YOU AWARE OF THAT OPENING OF THAT

7    STORE?

8    **A.**  I WAS.

9    **Q.**  AS MANAGER OF THE ITUNES STORE, YOU KEPT TRACK OF WHAT THE

10   COMPETITION WAS DOING?

11   **A.**  YES.  I KEPT TRACK OF ANYBODY THAT WAS GETTING INVOLVED AT

12   ALL IN THE MUSIC BUSINESS, DIGITALLY OR PHYSICALLY.

13   **Q.**  AND THEN IN JULY 2004, REALNETWORKS ANNOUNCED THAT IT HAD

14   DEVELOPED SOME DRM TRANSLATION SOFTWARE; IS THAT RIGHT?

15   **A.**  I DON'T RECALL IT AS DRM TRANSLATION SOFTWARE.  I REMEMBER

16   IT AS, I THINK IT WAS CALLED THE HARMONY, AND IT WAS BASICALLY

17   TO TAKE CONTENT BOUGHT OFF OF THE REAL MUSIC STORE TO THE

18   IPOD.

19   **Q.**  AND YOU -- BUT YOU'RE AWARE THAT THAT HAPPENED IN --

20   SOMETIME IN JULY OF 2004?

21   **A.**  I KNOW IT HAPPENED 2004.  I'LL ASSUME IT'S CORRECT OF

22   JULY.

23   **Q.**  OKAY.  ALL RIGHT.  SO LET'S LOOK AT A DOCUMENT.

24         **MS. SWEENEY:**  IF WE COULD PULL UP PLAINTIFFS' TRIAL

25   EXHIBIT 124.

```
 1          (EXHIBIT PUBLISHED TO WITNESS, COUNSEL AND THE COURT.)

 2     BY MS. SWEENEY:

 3     Q.   AND MR. CUE, DO YOU SEE THAT THERE ON YOUR SCREEN?

 4     A.   I DO.

 5     Q.   OKAY.  THIS IS AN EMAIL CHAIN.  AND IT'S -- THE TOP ONE,

 6     THE LATEST ONE IN THE SERIES, IS DATED JULY 26, 2004.

 7          THE COURT:  HOLD ON.

 8     MR. ISAACSON.

 9                    (OFF-THE-RECORD DISCUSSION.)

10          THE COURT:  DOES THE WITNESS HAVE A BINDER, IS THE

11     QUESTION.

12          MS. SWEENEY:  NO, HE DOES NOT HAVE A BINDER.

13          MR. ISAACSON:  IF YOU WOULD ADVISE HIM HE CAN SEE THE

14     REAL DOCUMENT IF YOU WANT.

15     BY MS. SWEENEY:

16     Q.   YEAH, THESE ARE ALL SHORT DOCUMENTS, MR. CUE, BUT IF AT

17     ANY POINT YOU THINK YOU NEED TO READ THROUGH THE WHOLE -- IF

18     YOU WANT TO READ THROUGH AN ENTIRE DOCUMENT, WE CAN HAND UP

19     THE DOCUMENT SO YOU CAN HAVE A LOOK AT IT.  JUST LET ME KNOW,

20     OKAY?

21     A.   OKAY.  THANK YOU.

22     Q.   ALL RIGHT.  SO LOOKING AT THE TOP OF THIS EXHIBIT 124,

23     IT'S FROM STEVE JOBS, RIGHT?

24                    (SIMULTANEOUS COLLOQUY.)

25
```

 1    BY MS. SWEENEY:

 2    **Q.**   AT LEAST THAT PART OF THE EMAIL IS, RIGHT?

 3    **A.**   THE TOP PART, YES.

 4    **Q.**   OKAY.  AND DURING THAT TIME PERIOD, THAT IS, IN 2004, WAS

 5    MR. JOBS CEO AT APPLE?

 6    **A.**   YES, HE WAS.

 7    **Q.**   OKAY.  AND DURING THE TIME PERIOD 2006 TO 2009, WAS

 8    MR. JOBS CEO AT APPLE?

 9    **A.**   YES, HE WAS.

10    **Q.**   AND YOU WORKED VERY CLOSELY WITH MR. JOBS; IS THAT RIGHT?

11    **A.**   I DID.

12    **Q.**   AND PARTICULARLY WITH RESPECT TO NEGOTIATING DEALS FOR

13    THE, WHAT YOU CALL THE CONTENT STORES; IS THAT RIGHT?

14    **A.**   AGAIN, YES.  I MEAN, I KEPT HIM UPDATED AND USED HIM FOR

15    ADVICE AND FEEDBACK AS TO HOW IT WAS DOING.

16    **Q.**   AND JUST LET ME PAUSE ON "CONTENT STORES" FOR A MOMENT.

17         DO YOU KNOW WHAT I MEAN WHEN I SAY "CONTENT STORES," OR IS

18    THERE ANOTHER WAY OF EXPRESSING THAT?

19    **A.**   THERE ARE OTHER -- MANY WAYS PEOPLE CAN REFER TO IT.  I

20    ASSUME WHEN YOU SAID "CONTENT STORES" THAT YOU WERE TALKING

21    ABOUT OUR DIGITAL STORES.  WE DID STORES FOR MUSIC, BOOKS, TV

22    SHOWS, MOVIES, APP STORES.  WE DID PODCASTS.  SO WE HAD A

23    LARGE NUMBER OF DIFFERENT STORES FOR MEDIA.

24    **Q.**   OKAY.  SO ITUNES WAS -- WAS ONE OF THOSE EARLY STORES; IS

25    THAT RIGHT?

CUE – DIRECT / SWEENEY

1    **A.**   WELL, ITUNES IS REPRESENTATIVE OF ALL OF THOSE –– MOST OF

2    THOSE STORES WITH THE EXCEPTION OF THE APP STORE.  BUT IN

3    THOSE DAYS, IT WAS MAINLY THE MUSIC STORE.

4    **Q.**   OKAY.  BUT AT SOME POINT, THEN YOU ADDED OTHER CONTENT TO

5    THE ITUNES STORE; IS THAT CORRECT?

6    **A.**   THAT'S CORRECT.

7    **Q.**   OKAY.  AND YOU WERE HEAVILY INVOLVED IN ALL THOSE

8    NEGOTIATIONS; IS THAT RIGHT?

9    **A.**   YEAH, I BELIEVE I LED ALL OF THEM.

10   **Q.**   OKAY.  ALL RIGHT.  SO IN –– IN –– AFTER REALNETWORKS

11   ANNOUNCED THE DEVELOPMENT OF THE HARMONY TRANSLATION –– LET'S

12   JUST CALL IT DEVELOPMENT OF HARMONY SO WE'RE TALKING ABOUT THE

13   SAME THING –– HOW DID YOU AND OTHERS AT APPLE RESPOND?

14   **A.**   WELL, VARIOUS WAYS.  NUMBER ONE, I WASN'T VERY HAPPY ABOUT

15   IT.  I THOUGHT IT WAS GOING TO HURT OUR PRODUCT.  AND SO THAT

16   WAS ONE CONCERN I HAD RIGHT OFF THE BAT.

17       TWO, I WAS CURIOUS AS TO HOW THEY DID IT BECAUSE ONE OF

18   THE PURPOSES OF A DRM IS TO KEEP HACKERS AND PEOPLE AWAY FROM

19   IT, AND IF THEY FOUND A BACKDOOR OR A REVERSE-ENGINEERED WAY

20   TO DO IT, THAT MEANS THAT OTHERS COULD FIND THE SAME WAY AND

21   DO IT.

22       THOSE WERE MY TWO PRIMARY CONCERNS THAT I HAD.

23   **Q.**   AND YOU MENTIONED SOMETHING ABOUT DRM.  DID YOU EVER GET

24   ANY COMPLAINTS FROM THE LABELS ABOUT HARMONY?

25   **A.**   NO.  NOT THAT I CAN RECALL.

1    **Q.**   OKAY.  AND RIGHT AFTER THE ANNOUNCEMENT WAS MADE THAT

2    REALNETWORKS HAD DEVELOPED HARMONY, YOU AND STEVE JOBS AND

3    OTHERS GOT TOGETHER TO WORK ON A PRESS RELEASE; IS THAT RIGHT?

4    **A.**   I THINK WE TRADED EMAILS.  I'M NOT SURE WHETHER WE GOT

5    TOGETHER IN A ROOM OR NOT.  BUT WE CERTAINLY TRADED EMAILS

6    ABOUT IT.

7    **Q.**   UNDERSTOOD.  OKAY.  SO HAVE A LOOK AT THIS EXHIBIT 124

8    WHICH IS IN FRONT OF YOU.

9        AND THE TOP PART OF THE EMAIL IS FROM MR. JOBS.  AND IT'S

10   TO YOU AND PHILIP SCHILLER AND OTHERS.

11       AND WHAT WAS MR. SCHILLER'S POSITION AT THIS TIME?

12   **A.**   HE WAS A SENIOR VICE-PRESIDENT -- I'M NOT SURE IF HE WAS A

13   SENIOR VICE-PRESIDENT, EITHER SENIOR VICE-PRESIDENT OR

14   VICE-PRESIDENT OF MARKETING.

15   **Q.**   AND WAS HE ON THE EXECUTIVE TEAM AT THAT TIME?

16   **A.**   HE WAS.

17   **Q.**   SO HE WAS A VERY HIGH-LEVEL EXECUTIVE IN 2004; IS THAT

18   CORRECT?

19   **A.**   YES, HE WAS.

20   **Q.**   OKAY.  AND MR. JOBS SAYS IN THIS EMAIL:

21       "I PROPOSE GOING WITH THIS:  'WE ARE STUNNED THAT REAL HAS

22   ADOPTED THE TACTICS AND ETHICS OF A HACKER TO BREAK INTO THE

23   IPOD.'"

24       AND HE GOES ON.

25       AND WAS THIS LANGUAGE EVENTUALLY ADOPTED BY APPLE AND PUT

```
 1    INTO A PRESS RELEASE?

 2    A.  I DON'T KNOW IF THIS WAS THE EXACT LANGUAGE, BUT SOMETHING

 3    SIMILAR TO THIS WAS CERTAINLY COMMUNICATED OUT.

 4    Q.  OKAY.  AND THEN AFTER YOU AND STEVE JOBS AND

 5    MR. SCHILLER --

 6            THE COURT:  HOLD ON A MINUTE.

 7                   (PAUSE IN THE PROCEEDINGS.)

 8            THE COURT:  YOU MAY PROCEED.

 9            MS. SWEENEY:  THANK YOU.

10    BY MS. SWEENEY:

11    Q.  SO AFTER YOU AND STEVE JOBS AND MR. SCHILLER --

12                   (OFF-THE-RECORD DISCUSSION.)

13            MS. SWEENEY:  I THINK IT'S BECAUSE WE'RE JUST

14    SWITCHING TO ANOTHER SLIDE.  SO IT'S PLANNED.

15            THE WITNESS:  I WAS HOPING IT WASN'T JUST WINDOWS.

16                   (LAUGHTER.)

17            THE COURT:  OKAY.  WE'LL LET THAT ONE GO.

18       LET'S GO.  NEXT QUESTION.

19    BY MS. SWEENEY:

20    Q.  MR. CUE, AFTER YOU --

21            THE COURT:  OKAY.  THE JURORS NEED TO STOP LAUGHING.

22                   (LAUGHTER.)

23            THE COURT:  ALL RIGHT.  GO AHEAD.

24    BY MS. SWEENEY:

25    Q.  AFTER YOU AND MR. SCHILLER AND MR. JOBS SENT OUT THAT
```

1    PRESS RELEASE THAT DESCRIBED REAL AS HAVING ADOPTED THE ETHICS

2    AND TACTICS OF A HACKER, DID YOU INVESTIGATE TO SEE WHETHER

3    REALNETWORKS' HARMONY SOFTWARE WORKED?

4    **A.**  WE INVESTIGATED TO SEE HOW THEY DID IT, IN TWO WAYS.

5    NUMBER ONE, I WENT AND LOOKED AT WHAT THEIR INSTRUCTIONS AND

6    DOCUMENTATION WAS AND WHAT THEY CLAIMED THAT THEY SAID THEY

7    DID FROM A USER POINT OF VIEW.  AND THEN I ASKED MY TECHNICAL

8    TEAM AND MY ENGINEERS TO GO FIGURE OUT HOW IT WORKED ALSO.

9    **Q.**  OKAY.  SO LET ME STOP RIGHT THERE.

10         **MS. SWEENEY:**  AND THEN LET'S PUT UP EXHIBIT 128 ON

11   THE SCREEN, PLEASE.

12                   (EXHIBIT PUBLISHED TO JURY.)

13   **BY MS. SWEENEY:**

14   **Q.**  AND THIS IS AN EMAIL FROM DAVE HELLER TO YOU AND JEFF

15   ROBBIN, TOM DOWDY.

16       THIS IS WHERE HE -- MR. HELLER SAYS THAT "TOM AND I TOOK A

17   LOOK AT HARMONY.  HERE'S WHAT WE FOUND."

18       AND THEN IF YOU GO DOWN TO 11 IN THAT FIRST PAGE, IT SAYS,

19   "IN A SIMPLE TEST, MERGING TRACKS FROM ITUNES AND HARMONY ONTO

20   THE IPOD SEEMED TO WORK."

21       AND THIS -- THIS IS WHAT YOU ASKED MR. HELLER TO DO; IS

22   THAT CORRECT, TO SEE IF HARMONY WORKED?

23   **A.**  WELL, I ASKED HIM TO FIGURE OUT IF IT WORKED, IN WHAT

24   CASES --

25   **Q.**  THANK YOU.

1    **A.**  -- IN WHAT --

2    **Q.**  AND THIS IS HIS RESPONSE TO YOUR QUESTION WHETHER IT

3    WORKED; IS THAT RIGHT?

4    **A.**  IF IT WORKED, HOW IT WORKED, AND IN WHAT CASES IT WORKED.

5           **MS. SWEENEY:**  AND CAN -- CAN WE HAVE EXHIBIT 130,

6    PLEASE.

7                    (EXHIBIT PUBLISHED TO JURY.)

8    **BY MS. SWEENEY:**

9    **Q.**  NOW, THIS IS ANOTHER EMAIL.  IT'S A LITTLE STRANGE

10   FORMATTING, BUT THIS IS THE WAY WE GOT THE DOCUMENT FROM

11   APPLE.  AND THIS IS ANOTHER EMAIL ABOUT HOW THE HARMONY

12   SOFTWARE WORKS.  AND YOU'RE ONE OF THE RECIPIENTS.

13        SO LOOKING AT THE SECOND PAGE, THIS IS AN EMAIL DESCRIBING

14   HOW HARMONY WORKS.  AND DO YOU SEE WHERE IT SAYS THERE "ENTIRE

15   PROCESS WAS VERY SEAMLESS"?

16   **A.**  I DO.

17   **Q.**  OKAY.  SO THIS IS WHAT YOUR ENGINEER REPORTED TO APPLE WAS

18   HOW HARMONY WORKED; ISN'T THAT RIGHT?

19   **A.**  I'M NOT SURE THAT'S THE CASE.  YOU'D HAVE TO SHOW ME.  CAN

20   WE GO BACK TO THE BEGINNING?  I DON'T KNOW WHERE THIS CAME

21   FROM.

22        SO THIS --

23   **Q.**  MR. CUE, IF YOU LOOK AT THE TOP.  AS I SAID, IT'S A

24   STRANGE FORMAT, BUT THIS IS HOW APPLE PRODUCED THE DOCUMENT TO

25   US.

1    **A.**  I CAN TELL YOU WHAT IT IS, I THINK.

2    **Q.**  IS IT AN EMAIL?

3    **A.**  IT'S AN EMAIL FROM KATIE COTTON, BUT SHE'S FORWARDING

4    SOMEBODY ELSE WHO WROTE THAT.  SO I DON'T KNOW WHO WROTE THAT.

5    IT WASN'T US.  I DON'T KNOW IF IT WAS US.  I DON'T KNOW WHERE

6    IT CAME FROM.

7    **Q.**  YOU'RE SAYING THIS WASN'T WRITTEN BY APPLE?

8    **A.**  I CAN'T TELL YOU THAT BY THE WAY IT'S WRITTEN BECAUSE IT

9    DOESN'T SHOW THAT.  IT SHOULD -- THIS LOOKS LIKE TO ME -- THIS

10   LOOKS LIKE TO ME IT'S SOMEBODY WHO WAS AT THE EVENT THAT WAS

11   TALKING ABOUT HOW IT WORKED.

12   **Q.**  AND DIDN'T YOU SEND SOME ENGINEERS TO THE EVENT?

13   **A.**  NOT THAT I'M AWARE OF, NO.

14   **Q.**  YOU DIDN'T SEND MR. HELLER TO THE EVENT?

15   **A.**  NO.

16   **Q.**  YOU DIDN'T SEND TOM DOWDY TO THE EVENT?

17   **A.**  NOT THAT I'M AWARE OF, NO.

18   **Q.**  BUT THEY MIGHT HAVE BEEN THERE?

19   **A.**  I DON'T KNOW, BUT I WOULD HIGHLY DOUBT IT.

20   **Q.**  ALL RIGHT.

21      SO DURING THIS TIME PERIOD WHEN HARMONY WAS RELEASED AND

22   YOU AND OTHERS AT APPLE WERE RESPONDING TO IT, DID YOU HAVE

23   ANY CONVERSATIONS WITH THE LABELS ABOUT HOW THEY FELT ABOUT

24   HARMONY?

25   **A.**  AGAIN, NOT -- NOT A PARTICULAR CONVERSATION JUST ABOUT

 1   HARMONY, BUT I RECALL HAVING SOME CONVERSATIONS ABOUT HARMONY

 2   WITH THEM.

 3   **Q.**  AND -- AND YOU TALKED TO UNIVERSAL, AND UNIVERSAL SAID

 4   THEY WERE OKAY WITH IT; ISN'T THAT RIGHT?

 5   **A.**  I BELIEVE THEY SAID THEY WERE OKAY WITH IT BUT THEY KNEW

 6   THAT IT WOULDN'T CONTINUE TO WORK.

 7           **MS. SWEENEY:**  AND CAN WE PUT ON THE SCREEN, PLEASE,

 8   EXHIBIT 118.

 9                   (EXHIBIT PUBLISHED TO JURY.)

10   **BY MS. SWEENEY:**

11   **Q.**  AND THIS IS AN EMAIL FROM YOU TO EDDY -- EXCUSE ME -- FROM

12   YOU, EDDY CUE, TO JEFF ROBBIN; IS THAT RIGHT?

13   **A.**  THAT'S RIGHT.

14   **Q.**  AND WHAT WAS JEFF ROBBIN'S ROLE AT THIS TIME?

15   **A.**  JEFF ROBBIN WAS THE HEAD OF ENGINEERING FOR THE ITUNES

16   CLIENT AND THE DRM AND REPORTED TO ME.

17   **Q.**  OKAY.

18       AND DO YOU SEE WHERE YOU SAY HERE, "I TALKED TO UNIVERSAL.

19   THEY WERE AWARE OF IT.  FROM THEIR VIEWPOINT, THEY ARE OKAY

20   WITH IT BECAUSE THEY WANT INTEROPERABILITY."

21       NOW, YOU KNEW THAT THE LABELS WANTED INTEROPERABILITY; IS

22   THAT RIGHT?

23   **A.**  THAT'S CORRECT.

24   **Q.**  AND THEY WANTED INTEROPERABILITY BECAUSE THEY WANTED TO

25   GROW THE PIE, RIGHT?

1    **A.**   THEY WANTED TO HAVE MORE MUSIC SALES.

2    **Q.**   AND -- AND IN YOUR WORDS, THEY WANTED TO GROW THE PIE.

3    THEY WANTED TO GROW THE MUSIC PIE, CORRECT?

4    **A.**   WHAT I MEAN BY THAT IS THAT THEY WEREN'T INTERESTED IN US

5    DECREASING OUR SALES, THEY WANTED OTHERS TO COME INTO THE

6    MARKET AND TRY TO BE SUCCESSFUL LIKE WE WERE.

7    **Q.**   THEY WANTED THE WHOLE -- THE WHOLE PIE TO INCREASE, MORE

8    SALES OF MORE MUSIC TO MORE PEOPLE; IS THAT RIGHT?

9    **A.**   THAT'S CORRECT.

10            **MS. SWEENEY:**   AND THEN IF WE COULD PULL UP

11   EXHIBIT 121, PLEASE.

12                    (EXHIBIT PUBLISHED TO JURY.)

13   **BY MS. SWEENEY:**

14   **Q.**   AND THIS IS AN EMAIL FROM YOU TO PHILIP SCHILLER AND CC

15   STEVE JOBS AND OTHERS.  AND HERE YOU'RE TALKING ABOUT HOW THE

16   LABELS WANT INTEROPERABILITY.  AND YOU SAY, "THE LABELS ARE

17   CONVINCED THAT DIFFERENT FORMATS ARE HURTING THEIR GROWTH."

18       AND HERE WHAT THEY'RE TALKING ABOUT IS THE INCOMPATIBILITY

19   BETWEEN ITUNES AND NON-APPLE PORTABLE DIGITAL MUSIC PLAYERS;

20   ISN'T THAT RIGHT?

21   **A.**   WELL, I THINK THEY'RE TALKING ABOUT MORE THAN THAT.

22   THEY'RE TALKING ABOUT ALL THE INCOMPATIBILITIES THAT EXIST,

23   NOT JUST OURS.

24   **Q.**   WELL, YOU HAD THE -- THE LARGEST SHARE OF THE DOWNLOAD

25   DIGITAL MUSIC MARKET; IS THAT RIGHT?

1    **A.**   THAT'S CORRECT.

2    **Q.**   AND AT -- DURING THE TIME PERIOD, 2004, IT WAS ROUGHLY

3    70 PERCENT; ISN'T THAT RIGHT?

4    **A.**   THAT'S CORRECT.

5    **Q.**   AND IN FACT, THE -- THE LABELS WANTED YOU TO LICENSE

6    FAIRPLAY TO REAL; ISN'T THAT RIGHT?

7    **A.**   THEY WANTED US TO LICENSE OUR DRM FROM -- TO ANYBODY THAT

8    WAS WILLING TO LICENSE IT.  AND I TOLD THEM THAT THAT WAS

9    IMPOSSIBLE.  SO, SURE, THEY CAN -- THEY WANTED THE IMPOSSIBLE,

10   SO, YES.

11   **Q.**   BUT THERE WERE TIMES WHERE YOU HAD CONSIDERED LICENSING

12   FAIRPLAY TO OTHERS; ISN'T THAT RIGHT?

13   **A.**   THAT'S CORRECT.  THAT'S HOW WE DISCOVERED IT WAS

14   IMPOSSIBLE TO DO AND DO IT WELL.

15   **Q.**   WELL, WHEN YOU SAY THAT, ARE YOU TALKING ABOUT THE TIME

16   PERIOD AFTER THIS -- THIS RELATION -- AFTER THIS EXCHANGE

17   ABOUT HARMONY IN 2004?

18   **A.**   NO.  WE -- WE THOUGHT ABOUT LICENSING THE DRM FROM THE --

19   THE BEGINNING.  IT WAS ONE OF THE THINGS THAT WE THOUGHT IS --

20   IS IT THE RIGHT MOVE TO DO THAT BECAUSE WE CAN EXPAND THE

21   MARKET AND -- AND GROW FASTER.  BUT WE COULDN'T FIND A WAY TO

22   DO THAT AND MAKE IT WORK RELIABLY.

23   **Q.**   ISN'T IT TRUE, MR. CUE, THAT YOU DECIDED YOU COULDN'T MAKE

24   IT WORK FOR APPLE ONCE APPLE HAD ACHIEVED SUCH A HIGH MARKET

25   SHARE IN BOTH THE MUSIC MARKET AND THE PORTABLE DIGITAL PLAYER

1   MARKET?

2   **A.**   THAT'S NOT CORRECT.

3   **Q.**   BUT THE TIMING OF WHEN YOU MADE THE DECISION TO NOT BECOME

4   INTEROPERABLE IS AROUND THE TIME WHEN YOU GAINED THESE HIGH

5   MARKET SHARES; ISN'T THAT FAIR?

6   **A.**   NO, THAT'S NOT CORRECT EITHER.

7   **Q.**   WELL, YOU'LL HAVE AN OPPORTUNITY TO -- TO SPEAK -- WHEN

8   YOUR COUNSEL ASKS YOU QUESTIONS TO GO INTO THAT FURTHER.

9            **MS. SWEENEY:**   BUT LET ME TURN NOW TO TRIAL

10   EXHIBIT 2140.

11                      (EXHIBIT PUBLISHED TO JURY.)

12   **BY MS. SWEENEY:**

13   **Q.**   NOW, AT THE TIME HARMONY WAS RELEASED, THE LABELS

14   EXPRESSED NOT ONLY THAT THEY WERE OKAY WITH IT, BUT THEY

15   ACTUALLY APPLAUDED IT BECAUSE IT INCREASED THE SALE OF MUSIC,

16   IT GREW THE PIE, AS YOU SAID.  AND THIS IS -- THIS PRESS

17   RELEASE PUTS IN A COUPLE OF QUOTES FROM THE LABELS.

18       AT -- AT THIS TIME IN 2004, IN JULY, YOU AND OTHERS AT

19   APPLE WERE AWARE THAT THE MUSIC LABELS HAD EXPRESSED SUPPORT

20   FOR HARMONY; IS THAT RIGHT?

21   **A.**   I DON'T RECALL WHAT THE EXACT DATE, BUT IT MAY BE.  I

22   DON'T REMEMBER WHEN I TALKED TO -- TO REAL AND THE JULY 26TH

23   DATE BUT --

24   **Q.**   BUT YOU KNEW ABOUT THESE COMMENTS IN THE REALNETWORKS

25   PRESS RELEASE, DIDN'T YOU?

1    **A.**   CAN YOU SHOW ME THE COMMENTS, PLEASE?

2    **Q.**   OH, SURE.  IF YOU GO DOWN TO THE ONE, TWO, THREE -- FOURTH

3    PARAGRAPH, THERE'S A COMMENT FROM AN EXECUTIVE AT BMG WHO

4    SAYS, "INTEROPERABILITY OF DEVICES AND JUKEBOX SOFTWARE IS ONE

5    OF THE BIGGEST CHALLENGES FOR TODAY'S MUSIC CONSUMER."

6        AND IF YOU GO DOWN TO THE NEXT PARAGRAPH, THERE'S A -- A

7    COMMENT FROM EMI MUSIC, "EMI'S GOAL IS TO ALLOW CONSUMERS TO

8    ACCESS OUR MUSIC ON AS MANY LEGITIMATE PLATFORMS AS POSSIBLE

9    AND SEAMLESSLY ACROSS A RANGE OF DEVICES."

10       SO THESE WERE THE KINDS OF COMMENTS THAT YOU WERE HEARING

11   FROM THE LABELS AT THE TIME HARMONY WAS RELEASED IN JULY 2004;

12   IS THAT CORRECT?

13   **A.**   WELL, THESE ARE THE COMMENTS I READ, YES.

14   **Q.**   OKAY.  AND THERE WERE ALSO COMMENTS FROM MUSICIANS WHO

15   WANTED THEIR MUSIC SOLD MORE WIDELY; ISN'T THAT FAIR?

16   **A.**   I WOULD -- I'M NOT -- I DON'T RECALL, BUT I WOULD ASSUME

17   THAT WOULD BE CORRECT.  I WOULD LIKE MY MUSIC TO BE SOLD AS

18   WIDELY AS POSSIBLE.

19   **Q.**   ALL RIGHT.  AND LET'S LOOK AT EXHIBIT 125.

20            (EXHIBIT PUBLISHED TO JURY.)

21   **BY MS. SWEENEY:**

22   **Q.**   ALL RIGHT.  THIS IS A JULY 26, 2004, EMAIL FROM STEVE JOBS

23   TO ZACH HOROWITZ.  WHO IS ZACH HOROWITZ?

24   **A.**   ZACH HOROWITZ WAS A PERSON WHO REPORTED TO THE CEO OF

25   UNIVERSAL MUSIC AND WAS RESPONSIBLE FOR THE DIGITAL COMPONENTS

1    OF DIGITAL MUSIC.

2    **Q.**  OKAY.  AND IN THIS EMAIL, MR. JOBS SAYS, "ZACH, A REACTIVE

3    STATEMENT ISN'T GOOD ENOUGH FOR US.  WE WANT A PRESS RELEASE

4    FROM UNIVERSAL CORRECTING THIS TERRIBLE STATEMENT FROM A

5    SENIOR EXEC.  WE ARE MIGHTY UPSET ABOUT THIS."

6        WHAT'S HE REFERRING TO IN THIS EMAIL?

7            **MR. ISAACSON:**  OBJECTION, FOUNDATION.

8            **THE COURT:**  SUSTAINED.

9    **BY MS. SWEENEY:**

10   **Q.**  MR. CUE, DURING THIS TIME PERIOD IN JULY -- AROUND --

11   AROUND JULY 26, 2004, DID YOU HAVE CONVERSATIONS WITH MR. JOBS

12   ABOUT HIS DISCUSSIONS WITH FOLKS AT UNIVERSAL ABOUT A

13   STATEMENT THAT ONE OF THEIR EXECUTIVES HAD MADE ABOUT HARMONY?

14   **A.**  I DID.

15   **Q.**  OKAY.

16                    (OFF-THE-RECORD DISCUSSION.)

17   **BY MS. SWEENEY:**

18   **Q.**  OKAY.  SO THIS EMAIL IS ABOUT THAT STATEMENT MADE BY THE

19   EXECUTIVE THAT YOU SPOKE WITH MR. JOBS ABOUT; IS THAT RIGHT?

20   **A.**  WELL, IF YOU SHOW ME THE STATEMENT I'M --

21   **Q.**  ABSOLUTELY.  LET'S GO TO TRIAL EXHIBIT 817.

22                    (EXHIBIT PUBLISHED TO JURY.)

23   **BY MS. SWEENEY:**

24   **Q.**  AND THIS IS AN ARTICLE FROM CNET NEWS DATED JULY 26, 2004.

25   THE HEADLINE IS "REALNETWORKS BREAKS APPLE'S HOLD ON IPOD."

```
 1        AND THEN IF YOU TURN TO THE SECOND PAGE, AND ABOUT ONE,

 2   TWO, THREE, FOUR, FIVE, SIX, SEVEN PARAGRAPHS DOWN, THE

 3   PARAGRAPH THAT STARTS "UP TO NOW."

 4                  (EXHIBIT PUBLISHED TO JURY.)

 5   BY MS. SWEENEY:

 6   Q.  AND IT SAYS, "UP TO NOW, THE WORLD" -- THIS IS A QUOTE.

 7             MR. ISAACSON:  OBJECTION, YOUR HONOR.  THERE ARE --

 8   OBJECTION TO THIS DOCUMENT.  IT'S HEARSAY SO PUTTING IT ON THE

 9   SCREEN AT THIS POINT IS INAPPROPRIATE.

10             THE COURT:  THE OBJECTION IS SUSTAINED.

11             MS. SWEENEY:  OKAY.  SO, WELL, MR. CUE ASKED TO SEE

12   THE STATEMENT, YOUR HONOR.  SO --

13             THE COURT:  YOU CAN HAND --

14             MS. SWEENEY:  -- DOES HE STILL HAVE IT IN FRONT OF

15   HIM?

16             THE COURT:  YOU --

17             MS. SWEENEY:  I'M SORRY.

18             THE COURT:  YOU CAN HAND HIM THE DOCUMENT, OR YOU CAN

19   SHOW IT TO HIM.  THE PROBLEM, THE WAY YOU'VE SITUATED IT BY

20   NOT GIVING HIM DOCUMENTS, IS THAT HIS SCREEN IS NOW FACING THE

21   JURORS.

22             MS. SWEENEY:  I SEE.  OKAY.  I'M SORRY.  THANK YOU.

23             THE COURT:  AND THAT MEANS I DON'T HAVE THE DOCUMENT.

24   SO NOW YOU HAVE TO WAIT.

25             THE WITNESS:  THANK YOU.
```

1          **THE COURT:**  THE NUMBER IS?

2          **MS. SWEENEY:**  817.

3                    (OFF-THE-RECORD DISCUSSION.)

4          **THE COURT:**  YOU MAY PROCEED.

5     BY MS. SWEENEY:

6     **Q.**  OKAY.  HAVE YOU HAD A CHANCE TO READ THAT PARAGRAPH,

7     MR. CUE?

8     **A.**  I DID.

9     **Q.**  OKAY.  AND THIS IS A -- A STATEMENT BY LARRY KENSWIL.  WAS

10    HE AN EXECUTIVE AT UNIVERSAL AT THE TIME?

11    **A.**  HE -- HE WASN'T REPORTING TO THE CEO OR A DIRECT EXECUTIVE

12    AS -- AS YOU REFERRED TO MYSELF OR TO ZACH HOROWITZ, BUT HE

13    WORKED AT -- HE WAS A MANAGER OF A TECHNICAL LAB TEAM THERE --

14    **Q.**  OKAY.

15    **A.**  -- AT UNIVERSAL MUSIC.

16    **Q.**  AND DID -- DID MR. KENSWIL SAY LAUDATORY THINGS ABOUT

17    REALNETWORKS' HARMONY?

18    **A.**  WELL, HE SAID THINGS THAT WE CERTAINLY DIDN'T AGREE WITH

19    AND WERE INCORRECT.

20    **Q.**  IS THIS THE STATEMENT THAT MR. JOBS WAS MIGHTY UPSET

21    ABOUT?

22    **A.**  I BELIEVE THAT'S THE CASE, YES.

23    **Q.**  AND WHAT DID REAL -- WHAT DID UNIVERSAL DO AFTER UNIVERSAL

24    GOT THAT EMAIL FROM MR. JOBS ABOUT HIM BEING UPSET ABOUT THIS

25    STATEMENT?

1   **A.**   WELL, I THINK NOT JUST UPSET ABOUT IT, BUT BEING WRONG.

2   AND I THINK STEVE SENT THEM -- SENT ZACH A NOTE ABOUT IT

3   TELLING HIM THAT HE WAS WRONG.  AND I THINK -- I BELIEVE ZACH

4   AGREED WITH HIM AND RESPONDED WITH THE FACT THAT -- I DON'T

5   REMEMBER THE EXACT WORDS BECAUSE IT GOES BACK, BUT HE AGREED

6   THAT IT WAS WRONG AND WAS WILLING TO CORRECT IT.

7   **Q.**   AND SO MR. JOBS GOT UNIVERSAL TO ISSUE A RETRACTIVE

8   STATEMENT; IS THAT RIGHT?  YES OR NO?

9   **A.**   NO.

10  **Q.**   NO?

11  **A.**   NO.  MR. JOBS DOESN'T HAVE THAT KIND OF POWER.  IT'S THEIR

12  COMPANY.  THEY CAN DECIDE.  THEY JUST KNEW THEY WERE WRONG AND

13  THEY CORRECTED IT.

14  **Q.**   ALL RIGHT.  LET'S GO BACK TO OTHER REACTIONS TO HARMONY.

15      SO NOW AFTER REALNETWORKS LAUNCHED HARMONY, THEY -- THEY

16  HAD A 49-CENT SALE; DO YOU REMEMBER THAT?

17  **A.**   I DO.

18  **Q.**   OKAY.  AND THEY SOLD A LOT OF SONGS DURING THAT SALE; IS

19  THAT RIGHT?

20  **A.**   FOR THEM, YES, THAT WAS A LOT OF SONGS.

21  **Q.**   OKAY.  AND --

22  **A.**   I BELIEVE.  I DON'T KNOW THE EXACT SALES NUMBERS FOR THEM,

23  BUT I WOULD ASSUME SINCE THEY SOLD -- SINCE THEY WERE LAUDING

24  THE FACT THAT THEY SOLD A LOT OF SONGS, I BELIEVED THEM.

25  **Q.**   AND SO YOU FOLLOWED THE SALES OF REALNETWORKS; IS THAT

1    RIGHT?

2    **A.**  WELL, I CAN'T FOLLOW THEIR DIRECT SALES BECAUSE I DON'T

3    HAVE ACCESS TO THEM, BUT I WOULD FOLLOW PRESS RELEASES OR

4    ANYTHING THEY WOULD SAY PUBLICLY.

5    **Q.**  SURE, THAT WAS YOUR JOB AS HEAD OF ITUNES TO SEE WHAT THE

6    COMPETITORS WERE DOING, RIGHT?

7    **A.**  IT'S CERTAINLY ONE OF MY JOBS.

8    **Q.**  OKAY.

9         **MS. SWEENEY:**  ALL RIGHT.  SO LET'S LOOK AT

10   EXHIBIT 147.

11               (EXHIBIT PUBLISHED TO JURY.)

12   **BY MS. SWEENEY:**

13   **Q.**  AND THIS IS AN EMAIL DATED AUGUST 23RD, 2004, FROM PATRICE

14   GAUTIER.  DID I PRONOUNCE THAT RIGHT?

15   **A.**  THAT'S CORRECT.

16   **Q.**  AND IT'S TO YOU AND OTHERS.  AND IT SAYS, "REALNETWORKS

17   SELLS ONE MILLION SONGS IN THE FIRST WEEK OF 49-CENT FIRE

18   SALE."

19       DOES THAT SOUND ACCURATE TO YOU?

20        **MR. ISAACSON:**  OBJECTION, YOUR HONOR, THE -- THERE'S

21   A HEARSAY OBJECTION TO THIS ARTICLE.

22        **THE COURT:**  SUSTAINED.

23        **MR. ISAACSON:**  IT SHOULD NOT BE SHOWN UP ON THE

24   SCREEN TO THE JURY.  THE UPPER PORTION OF THE EMAIL CAN BE

25   SHOWN.

1            **THE COURT:**  OBJECTION SUSTAINED.

2            **MS. SWEENEY:**  YOUR HONOR, WE'RE NOT SHOWING THIS

3    DOCUMENT FOR THE TRUTH.  IT'S JUST TO SHOW THE -- THAT IT

4    WAS -- THAT APPLE WAS ON NOTICE THAT THIS WAS THE PURPORTED

5    SALES BY REALNETWORKS AT THE TIME.

6        AND WE HAVE A STIPULATION THAT WE CAN SHOW THIS TO THE

7    JURY.

8            **THE COURT:**  LADIES AND GENTLEMEN, THERE ARE GOING TO

9    BE A SERIES OF EXHIBITS THAT ATTACH NEWS ARTICLES.  LET ME

10   GIVE YOU AN INSTRUCTION ABOUT THAT.

11       TO THE EXTENT ANY OF THESE EMAILS ARE ADMITTED, AND THAT

12   MEANS SENT TO YOU FOR YOUR CONSIDERATION DURING DELIBERATIONS,

13   THEY WILL BE ADMITTED ONLY FOR A LIMITED PURPOSE.  AS I

14   INSTRUCTED YOU BEFORE, WHEN THE COURT INSTRUCTS YOU THAT AN

15   ITEM OF EVIDENCE IS ADMITTED FOR A LIMITED PURPOSE, YOU MUST

16   CONSIDER IT ONLY FOR THAT LIMITED PURPOSE AND FOR NO OTHER.

17       WHEN YOU SEE DOCUMENTS AND HEAR TESTIMONY FROM WITNESSES

18   ABOUT OTHER DOCUMENTS THAT CONTAIN NEWS ARTICLES, BLOG POSTS,

19   OR STATEMENTS BY INDIVIDUALS WHO DO NOT WORK FOR APPLE, THE

20   STATEMENTS IN THE NEWS ARTICLES AND BLOG POSTS AND STATEMENTS

21   BY INDIVIDUALS WHO DO NOT WORK FOR APPLE MAY BE CONSIDERED

22   ONLY FOR THE LIMITED PURPOSE OF SHOWING THAT A WITNESS SENT OR

23   RECEIVED A STATEMENT FOR THE LIMITED PURPOSE OF EVALUATING THE

24   STATE OF MIND OF THE WITNESS WHO SENT OR RECEIVED THE

25   STATEMENT OR FOR PURPOSES OF NOTICE.

1        THE ACTUAL STATEMENTS IN THE EMBEDDED NEWS ARTICLES AND

2   BLOG STATEMENTS OR BLOG POSTS AND THE STATEMENTS BY

3   INDIVIDUALS WHO DO NOT WORK FOR APPLE AND WHO DO NOT TESTIFY

4   IN THIS TRIAL ARE HEARSAY AND MAY NOT BE CONSIDERED FOR THE

5   TRUTH OF THE MATTER ASSERTED IN THE STATEMENTS.

6        SO LET ME GIVE YOU AN EXAMPLE.

7        IF SOMEONE WROTE AN ARTICLE ABOUT ANY OF YOU, IT MAY OR

8   MAY NOT BE TRUE, RIGHT?  WE DON'T HAVE THAT PERSON HERE WHO

9   WROTE THE ACTUAL ARTICLE TO CROSS-EXAMINE, TO CHALLENGE THEM.

10  THAT'S WHY IT'S ONLY BEING SHOWED TO YOU FOR THAT LIMITED

11  PURPOSE, BECAUSE SOMEONE TOOK THAT ARTICLE AND MAY HAVE SENT

12  IT TO SOMEONE ELSE WITH A LITTLE STATEMENT IN THE EMAIL.  ALL

13  RIGHT?  SO YOU NEED TO KEEP THAT IN MIND.

14       WITH THAT INSTRUCTION, THE EMAIL CAN BE SHOWN.

15                (EXHIBIT PUBLISHED TO JURY.)

16  **BY MS. SWEENEY:**

17  **Q.**  ALL RIGHT.  SO YOU –– YOU HAD THIS REPORT IN AUGUST OF

18  2004 THAT REALNETWORKS SOLD ONE MILLION SONGS –– WHETHER IT

19  WAS TRUE OR NOT –– SOLD ONE MILLION SONGS IN THE FIRST WEEK OF

20  ITS SALE; IS THAT RIGHT?

21  **A.**  THAT'S CORRECT.

22  **Q.**  AND EVEN AFTER THE 49-CENT SALE ENDED, REALNETWORKS

23  CONTINUED TO SELL AT LEAST SOME SONGS BELOW APPLE'S PRICE OF

24  99 CENTS PER TRACK; IS THAT RIGHT?

25  **A.**  YEAH, A VERY LIMITED NUMBER.

1    **Q.**   THEY -- THEY SOLD SOME SONGS AT 79 CENTS; IS THAT RIGHT?

2    **A.**   I -- I DON'T RECALL THAT.

3                   (SIMULTANEOUS COLLOQUY.)

4         **THE WITNESS:**   LIKE I SAID, I DIDN'T MONITOR EVERY

5    SINGLE SONG THAT THEY SOLD.

6    **BY MS. SWEENEY:**

7    **Q.**   OKAY.  BUT YOU KNEW THAT THEY SOLD SOME SONGS AT PRICES

8    BELOW APPLE'S 99-CENT TRACKS?

9    **A.**   AGAIN, A VERY -- A VERY LIMITED NUMBER, YES.

10        **MS. SWEENEY:**   IF WE COULD LOOK AT EXHIBIT NO. 222.

11                  (EXHIBIT PUBLISHED TO JURY.)

12   **BY MS. SWEENEY:**

13   **Q.**   AND YOU -- YOU KEPT TRACK OF THE ITUNES MARKET SHARE; IS

14   THAT RIGHT?

15   **A.**   CAN I EXPLAIN HOW -- WE DID, BUT THERE'S AN EXPLANATION OF

16   HOW YOU CAN DO THAT.  BECAUSE OTHERWISE WE DON'T -- WE DON'T

17   HAVE THE DATA FOR OTHERS AND EVERYBODY ELSE.  SO I CAN EXPLAIN

18   HOW WE KEPT TRACK OF MARKET SHARE.

19   **Q.**   SO, WELL -- WELL, LET ME INTERRUPT YOU THERE.

20        SO YOU GOT DATA FROM INDUSTRY SOURCES SUCH AS SOUNDSCAN,

21   THEN YOU TOOK YOUR OWN NUMBER OUT OF THAT; IS THAT HOW YOU

22   FIGURE OUT YOUR MARKET SHARE?

23   **A.**   NOT FROM INDUSTRY SOURCES.  WE GOT DATA FROM SOUNDSCAN

24   THAT WE REPORTED OUR SALES TO, AND THEN THEY GAVE US THE TOTAL

25   SALES OF DIGITAL SALES AND THE TOTAL SALES OF PHYSICAL SALES.

CUE – DIRECT / SWEENEY

1    AND SO THEN I COULD USE OUR SALES TO CALCULATE THE PERCENTAGE

2    OF THE OVERALL SALES OF MUSIC.

3    **Q.**   OKAY.  SO LET'S LOOK AT EXHIBIT 222.

4        AND THIS IS AN EMAIL FROM YOU DATED MAY 31ST, 2005, TO

5    STEVE JOBS.  AND THE TITLE IS "ITMS MARKET SHARE."

6        AND WHAT DOES ITMS STAND FOR?

7    **A.**   THE ITUNES MUSIC STORE.

8    **Q.**   AND EVENTUALLY YOU CHANGED THAT TO THE ITUNES STORE, JUST

9    ITS; IS THAT RIGHT?

10   **A.**   THAT'S CORRECT.

11   **Q.**   AND YOU SAY, "HERE ARE THE U.S. MONTHLY MARKETSHARE

12   NUMBERS."

13       AND THESE ARE APPLE'S SHARES OF THE U.S. MONTHLY MARKET

14   SHARE NUMBERS OF THE DIGITAL MARKET, DIGITAL ONLINE MUSIC

15   MARKET; IS THAT RIGHT?

16   **A.**   YES, THIS IS THE DIGITAL MARKET.

17   **Q.**   OKAY.

18   **A.**   SURE.

19   **Q.**   AND THAT'S ALL YOU'RE REPORTING HERE TO MR. JOBS IS THE

20   ITMS MARKET SHARE AS IT RELATES TO ONLINE STORES, CORRECT?

21   **A.**   LEGAL ONLINE STORES, YES.

22   **Q.**   OKAY.  AND THEN IF YOU LOOK DOWN, SORT OF THE HALFWAY DOWN

23   THIS LIST, IT HAS AUGUST '04 AND IT SAYS 68 PERCENT.

24       DO YOU SEE THAT?

25   **A.**   I DO.

1   Q.   AND THAT WAS APPLE'S ITUNES MARKET SHARE DURING THE MONTH

2   OF AUGUST 2004?

3   A.   THAT'S CORRECT.

4   Q.   OKAY.   AND THESE OTHER DATES AND PERCENTAGES HERE ARE

5   THE -- ALL OF THE OTHER MONTHS IN 2004, RIGHT?

6   A.   AND SOME IN 2005.

7   Q.   OH, YOU'RE RIGHT.   THANK YOU.

8        AND THEN BELOW THE LIST THERE, YOU SAY, "WE FELL BELOW

9   70 PERCENT IN AUGUST WHEN REAL RAN THEIR PROMOTION OF HALF

10  OFF."

11       THAT'S -- THAT'S WHAT YOU SAID; IS THAT RIGHT?

12  A.   THAT'S CORRECT.

13  Q.   OKAY.

14       NOW, WHEN WE WERE TALKING A MOMENT AGO ABOUT JULY 2004,

15  AND YOU AND MR. JOBS AND MR. SCHILLER RESPONDED TO

16  REALNETWORKS' HARMONY, YOU ISSUED THAT PRESS RELEASE JUST A

17  FEW DAYS AFTER YOU LEARNED ABOUT HARMONY; IS THAT CORRECT?

18  A.   I DON'T REMEMBER THE EXACT DATES, BUT I'M SURE IT WAS VERY

19  QUICKLY --

20  Q.   OKAY.

21  A.   -- THEREAFTER.

22  Q.   I'M SORRY TO INTERRUPT YOU.

23       SO IT WAS VERY QUICK AND IT INVOLVED EXECUTIVES AT THE

24  HIGHEST LEVEL OF APPLE; IS THAT RIGHT?

25  A.   WELL, IT WAS STEVE, PHIL, AND MYSELF.   I DON'T KNOW WHO

1    ELSE THERE COULD BE BUT -- AND KATIE COTTON, SORRY, WHO WAS

2    OUR PR -- HEAD OF PR.

3    **Q.**  ALL RIGHT.  AND WHEN THERE WERE HACKS WHO GOT INTO DRM

4    THAT STRIPPED THE DRM OFF SONGS, THE RESPONSE WASN'T QUITE

5    THAT RAPID, WAS IT?

6    **A.**  NO.  THE RESPONSE WAS ALREADY UP ON THE WEB BY ARTICLES

7    BEING WRITTEN ABOUT IT.  SO WE DIDN'T HAVE TO RESPOND.

8    **Q.**  AND IT -- RESPONSES TO HACKS THAT STRIPPED OFF DRM ALSO

9    DIDN'T INVOLVE THE KIND OF EXECUTIVE FIRE POWER THAT WERE

10   INVOLVED IN THE RESPONSE TO HARMONY; ISN'T THAT RIGHT?

11   **A.**  NO, THAT'S NOT TRUE.  STEVE WAS MIGHTY UPSET WITH ME AND

12   WITH JEFF AND THE TEAM WHENEVER WE GOT HACKED.

13   **Q.**  SO, BUT MR. JOBS WOULD HAVE WRITTEN EMAILS ABOUT THAT; IS

14   THAT RIGHT?

15   **A.**  WOULDN'T --

16   **Q.**  DID MR. JOBS WRITE ANY EMAILS ABOUT OTHER HACKS?

17   **A.**  I DON'T KNOW.  HE MAY HAVE.  I MEAN, WE CERTAINLY TALKED A

18   LOT ABOUT THEM.

19   **Q.**  ALL RIGHT.

20       LET'S LOOK AT EXHIBIT 2098.

21              (EXHIBIT PUBLISHED TO JURY.)

22   **BY MS. SWEENEY:**

23   **Q.**  OKAY.  THIS IS AN EMAIL EXCHANGE BETWEEN YOU AND BARNEY

24   WRAGG.  AND THIS IS ABOUT A HACK DVD JON; IS THAT RIGHT?

25   **A.**  THAT'S CORRECT.

1   Q.   OKAY.  AND HERE IN YOUR EMAIL, YOU'RE ASSURING

2   MR. WRAGG -- WHO WAS AT UNIVERSAL?

3   A.   I BELIEVE HE WAS AT BMG.

4   Q.   OKAY.  AT BMG.  YOU'RE ASSURING MR. WRAGG THAT YOU'RE

5   GOING TO CLOSE THIS HACK IN A -- IN A RELEASE THAT'S GOING OUT

6   AT THE END OF THE MONTH; IS THAT RIGHT?

7   A.   (REVIEWING DOCUMENT.)

8        THAT'S CORRECT.

9   Q.   OKAY.  AND THEN LET'S LOOK AT TRIAL EXHIBIT 2389.

10                  (EXHIBIT PUBLISHED TO JURY.)

11  BY MS. SWEENEY:

12  Q.   AND THIS IS AN EMAIL FROM JEFF ROBBIN TO YOU, AND IT'S

13  FORWARDING AN EMAIL FROM AMANDA MARKS.

14       AMANDA MARKS IS SOMEONE WHO WAS AT UNIVERSAL; IS THAT

15  RIGHT?

16  A.   THAT'S CORRECT.

17  Q.   OKAY.  AND THIS IS ALSO ABOUT A -- A HACK, AND MS. MARKS

18  SAYS, "GENTS, IT'S BEEN A GOOD LONG WHILE SINCE WE HEARD

19  ANYTHING ON THIS SUBJECT."

20       AND SHE'S TALKING ABOUT THE MYTUNES HACK; IS THAT CORRECT?

21  A.   I THINK THIS IS MORE THAN THAT.  THIS IS TALKING ABOUT THE

22  FACT THAT AT THIS POINT WE HAD A DRM TEAM AND WE HAD COMMITTED

23  TO THE LABELS THAT WE WERE GOING TO TAKE THESE HACKS VERY

24  SERIOUSLY AND TRY TO CLOSE THEM, AND WE WERE COMMITTING

25  RESOURCES, DOLLARS, AND ENERGY TO FORM A DRM TEAM.

1    SHE HAD HEARD ABOUT THAT, AND SO SHE WANTED TO SEE HOW OUR

2    NEW, SORT OF, DRM TEAM WAS COMING ALONG WITH -- WITH THE

3    SOLUTION FOR THIS.

4            **MS. SWEENEY:**  LET'S TURN TO EXHIBIT 816.

5                    (EXHIBIT PUBLISHED TO JURY.)

6    **BY MS. SWEENEY:**

7    **Q.**  THIS IS AN EMAIL THAT YOU WROTE TO PATRICE GAUTIER AND

8    JEFF ROBBIN ON OCTOBER 11, 2005.  AND IT FORWARDS AN ARTICLE,

9    AND WE'RE NOT ASKING THAT THE ARTICLE BE ADMITTED FOR ITS

10   TRUTH.  BUT THIS IS AN ARTICLE BY TIM LEE.  AND IT'S CALLED

11   "THE RECORDING INDUSTRY'S NEW CLOTHES."

12        AND IN YOUR EMAIL, YOU SAY, "THIS IS DEAD ON.  FORTUNATELY

13   OR UNFORTUNATELY, THE LABELS WILL NEVER GET THIS."

14        AND YOU WROTE THIS IN OCTOBER OF 2005.

15        AND THE FIRST PARAGRAPH OF THE -- OF THE ARTICLE --

16            **MS. SWEENEY:**  AND THIS HAS BEEN STIPULATED TO THAT WE

17   CAN SHOW IT, YOUR HONOR.

18   **Q.**  IT SAYS, "DEAR RECORDING INDUSTRY, YOU'RE BEING HAD."

19        AND THEN THE SECOND -- THE FIRST PARAGRAPH, THE THIRD

20   SENTENCE SAYS, "IF YOU DON'T CHANGE YOUR STRATEGY, YOU'RE

21   GOING TO GIVE THE STORE AWAY TO APPLE CEO STEVE JOBS.  HIS

22   ITUNES MUSIC STORE IS THE INDUSTRY LEADER, AND THANKS TO

23   DIGITAL RIGHTS MANAGEMENT TECHNOLOGY, EVERY CUSTOMER WHO BUYS

24   YOUR PRODUCTS FROM THE ITUNES MUSIC STORE BECOMES LOCKED INTO

25   APPLE'S PRODUCTS.  IF THAT'S NOT CHANGED, THAT WILL SOON MAKE

CUE – DIRECT / SWEENEY

 1    STEVE JOBS THE MOST POWERFUL MAN IN YOUR INDUSTRY."

 2        SO IS THAT WHAT YOU WERE REFERRING TO WHEN YOU SAID THIS

 3    IS DEAD ON?

 4    **A.**  NO.

 5            **MR. ISAACSON:**  OBJECTION, YOUR HONOR.  IT IS

 6    INCORRECT THAT WE STIPULATED TO THIS TO BE SHOWN ON THE

 7    SCREEN, BUT WE -- THAT'S FINE, GIVEN THE JUDGE'S -- YOUR

 8    INSTRUCTION.  BUT THIS IS A THREE-PAGE ARTICLE.  I DON'T THINK

 9    IT'S FAIR TO QUESTION HIM ABOUT IT WITHOUT GIVING HIM THE

10    ARTICLE.

11            **THE COURT:**  DO YOU HAVE A COPY FOR THE WITNESS?

12            **MS. SWEENEY:**  YES, I DO, YOUR HONOR.

13                    (PAUSE IN THE PROCEEDINGS.)

14                    (OFF-THE-RECORD DISCUSSION.)

15            **THE COURT:**  I HAVE MY OWN COPY.  I DON'T -- I'VE GOT

16    A COPY HERE.  THE BINDER IS NOT THERE.

17        DO YOU NOT HAVE ANOTHER COPY?

18            **MR. COUGHLIN:**  WE'VE GOT IT HERE.

19            **THE COURT:**  OKAY.

20                    (PAUSE IN THE PROCEEDINGS.)

21            **MR. COUGHLIN:**  (HANDING DOCUMENT.)

22            **THE WITNESS:**  THANK YOU.

23                    (OFF-THE-RECORD DISCUSSION.)

24            **MR. COUGHLIN:**  NEXT BINDER.

25            **THE WITNESS:**  NO PROBLEM.

1    **MS. SWEENEY:**  WELL, WE CAN JUST MOVE ON.  I'M SORRY.

2    **Q.**  ALL RIGHT.  MR. CUE, LET'S TALK A LITTLE BIT ABOUT THE

3    ITUNES STORE PRICING.

4        WHEN YOU OPENED THE STORE, SINGLE TRACKS WERE ALL SOLD AT

5    99 CENTS, RIGHT?

6    **A.**  THAT'S CORRECT.

7    **Q.**  AND THAT REMAINED UNCHANGED UNTIL APPLE LAUNCHED ITUNES

8    PLUS IN APRIL OF 2007; IS THAT CORRECT?

9    **A.**  THAT'S CORRECT.

10   **Q.**  AND THEN IN APRIL OF 2007, YOU LAUNCHED ITUNES PLUS WHICH

11   ALLOWED CUSTOMERS TO BUY SONGS, SINGLE SONGS, FOR $1.29 THAT

12   HAD NO DRM PROTECTION AND WERE AT A HIGHER BIT RATE; IS THAT

13   RIGHT?

14   **A.**  A HIGHER AUDIO QUALITY, THAT'S CORRECT.

15   **Q.**  HIGHER AUDIO QUALITY.  THANK YOU.

16       SO, AND ALSO BECAUSE THEY WERE DRM-FREE, THOSE SONGS COULD

17   BE PLAYED BY THE BUYER ON ANY PORTABLE DIGITAL DEVICE; IS THAT

18   RIGHT?

19   **A.**  THAT'S CORRECT.

20   **Q.**  NOT JUST ON THE IPOD, RIGHT?

21   **A.**  THAT'S CORRECT.

22   **Q.**  OKAY.  AND OTHER THAN THE ITUNES PLUS SONGS, ALL ITUNES

23   SONGS COULD ONLY BE PLAYED DIRECTLY ON AN IPOD; IS THAT RIGHT?

24   **A.**  THAT'S NOT CORRECT.

25   **Q.**  OH, I'M SORRY.  I MISSTATED THAT.  LET ME REPHRASE.

1    THEY COULD ONLY BE PLAYED -- THE ONLY PORTABLE DIGITAL

2    MEDIA PLAYER THEY COULD BE PLAYED ON WAS AN IPOD; IS THAT

3    RIGHT?

4    **A.**  THAT'S NOT CORRECT.

5    **Q.**  DIRECTLY?

6    **A.**  I DON'T KNOW WHAT YOU MEAN BY "DIRECTLY."  BUT, YES, I

7    MEAN, YOU COULD -- YOU COULD TAKE THE SONGS THAT YOU BOUGHT IN

8    ANOTHER STORE, BURN THEM TO A CD WHICH UNPROTECTED THEM, AND

9    THEN YOU COULD RIP THEM BACK INTO ANY DEVICE OR ANY OTHER

10   MUSIC PLAYER THAT YOU WANTED.

11   **Q.**  OKAY.  SO -- SO THE IPOD WAS THE ONLY DEVICE, THE ONLY

12   PORTABLE DEVICE YOU COULD PLAY AN ITUNES SONG ON IF YOU DIDN'T

13   BURN AND RIP, RIGHT?

14   **A.**  THAT'S CORRECT.

15   **Q.**  OKAY.  AND SO WITH ITUNES PLUS, THAT RESTRICTION WAS

16   ELIMINATED, RIGHT?

17   **A.**  THAT'S CORRECT.

18   **Q.**  AND THEN AFTER ITUNES PLUS CAME OUT IN APRIL OF 2007, WHEN

19   WAS THE NEXT TIME THAT APPLE CHANGED ITS PRICING FOR SINGLES?

20   **A.**  I DON'T RECALL THE EXACT DATE.

21   **Q.**  WAS IT OCTOBER 2007?  DOES THAT SOUND RIGHT TO YOU?

22   **A.**  I DON'T RECALL THE EXACT DATE, BUT I'M SURE WE CAN GET

23   DOCUMENTS THAT SHOW ME THE EXACT DATE WE CHANGED SONG PRICES,

24   SO --

25   **Q.**  AT SOME POINT IN TIME, APPLE TOOK OFF THE ADDITIONAL

1    30-CENT CHARGE FOR ITUNES PLUS; IS THAT CORRECT?

2    **A.** WE DIDN'T TAKE IT OFF.  THE LABELS TOOK IT OFF.

3    **Q.** DOES THE LABEL DICTATE YOUR PRICING TO THE CONSUMERS,

4    MR. CUE?

5    **A.** INDIRECTLY.

6    **Q.** THE -- MY QUESTION WAS:  DO THE LABELS DIRECT APPLE'S

7    PRICING TO THE CONSUMER?

8    **A.** THEY DO NOT.  BUT -- BUT THEY DO BY THE FACT OF WHAT THEY

9    SELL IT TO US AT.

10   **Q.** MR. CUE, DO THE -- THE LABELS DO NOT DIRECT APPLE'S

11   PRICING TO THE CONSUMER, RIGHT?

12   **A.** AGAIN, NO, THEY DON'T.

13   **Q.** THANK YOU.

14       SO AT SOME POINT IN TIME, AROUND OCTOBER 2007, APPLE

15   REDUCED THE PRICES FOR ITUNES PLUS SONGS TO 99 CENTS, RIGHT?

16   **A.** WHEN THE LABELS REDUCED THE PRICE TO US, WE THEN IN TURN

17   REDUCED THE PRICE TO THE CONSUMER.

18   **Q.** AND UP TILL THAT POINT IN TIME, YOU HAD NOT REDUCED ANY

19   ITUNES SINGLE TRACK PRICES, RIGHT?

20   **A.** ALL SONGS WERE 99 CENTS.  SO, NO, WE NEVER CHANGED THE

21   PRICE OF 99 CENTS.

22   **Q.** AND BEFORE OCTOBER OF 2007, SOME OF YOUR COMPETITORS IN

23   THE ONLINE MUSIC BUSINESS HAD SOLD SONGS AT PRICES LOWER THAN

24   99 CENTS, RIGHT?

25   **A.** PRIOR TO WHEN?  SORRY.

1   **Q.**   PRIOR TO OCTOBER 2007.

2   **A.**   YEAH, THEY SOLD THEM AT LOWER PRICES AND HIGHER PRICES.

3   **Q.**   BUT APPLE NEVER LOWERED ITS ITUNES PRICES UNTIL OCTOBER OF

4   2007, RIGHT?

5   **A.**   NO.  WE -- ALL OF OUR SONGS WERE 99 CENTS ALL THE TIME

6   UNTIL WE DID ITUNES PLUS.  THEN THEY WERE $1.29.  AND THEN

7   WHEN THE LABELS -- WHEN THE LABEL AGREED TO LOWER THE PRICE

8   AND, AGAIN, WE IN TURN LOWERED THE PRICE TO 99 CENTS.

9   **Q.**   NOW, IN -- IN THE SPRING OF 2007, APPLE LEARNED THAT

10   AMAZON WAS GOING TO OPEN A DRM-FREE STORE; IS THAT RIGHT?

11   **A.**   THAT'S CORRECT.

12   **Q.**   OKAY.  AND THIS IS SOMETHING THAT -- THAT YOU AND YOUR

13   GROUP FOLLOWED WITH SOME INTEREST, CORRECT?

14   **A.**   THAT'S CORRECT.

15   **Q.**   BECAUSE AMAZON HAD THE ABILITY, YOU THOUGHT, TO BE A REAL

16   COMPETITIVE THREAT, CORRECT?

17   **A.**   WELL, FIRST OF ALL, BECAUSE IT MEANT THAT THE LABELS --

18   **Q.**   YES OR NO, MR. CUE?

19   **A.**   NO.

20   **Q.**   YOU DIDN'T THINK AMAZON WAS A COMPETITIVE THREAT?

21   **A.**   I DID THINK OF AMAZON AS A COMPETITIVE THREAT.  BUT YOU

22   ASKED ME WHAT WAS MY FIRST -- MY CONCERN.  AND SO MY FIRST

23   CONCERN WASN'T THAT.  MY FIRST CONCERN WAS THE FACT THAT THE

24   LABELS MUST HAVE LICENSED THE -- THE MUSIC TO AMAZON DRM-FREE

25   AND THEY WERE NOT LICENSING IT TO US DRM-FREE, AND THAT WAS OF

1   GRAVE CONCERN TO ME.

2   **Q.**  AND IN FACT --

3   **A.**  BECAUSE IT'S SOMETHING --

4                     (SIMULTANEOUS COLLOQUY.)

5   **Q.**  I'M SORRY.  I DIDN'T MEAN TO INTERRUPT.

6       AT SOME POINT, IN FACT, THE LABELS DID LICENSE DRM-FREE

7   MUSIC TO AMAZON BEFORE APPLE; IS THAT RIGHT?

8   **A.**  THAT'S CORRECT.

9   **Q.**  OKAY.

10          **MS. SWEENEY:**  SO I'D LIKE TO SHOW EXHIBIT 461.

11                  (OFF-THE-RECORD DISCUSSION.)

12                  (EXHIBIT PUBLISHED TO JURY.)

13  **BY MS. SWEENEY:**

14  **Q.**  AND THIS IS AN EMAIL FROM CHRIS BELL TO YOU AND OTHERS

15  DATED AUGUST 22ND, 2007.  AND THIS IS AN EMAIL ABOUT

16  ANNOUNCEMENTS ABOUT DRM-FREE CONTENT BEING MADE AVAILABLE TO

17  YOUR COMPETITORS, RIGHT?

18  **A.**  THAT'S CORRECT.  EXACTLY MY CONCERN.

19  **Q.**  OKAY.  AND SO YOUR COMPETITORS WHO ARE GETTING DRM (SIC)

20  MUSIC, OR AT LEAST YOU LEARNED ABOUT IT AT THIS POINT IN TIME

21  OR BEFORE THIS, SOME OF THEM INCLUDED AMAZON, WAL-MART, AND

22  OTHERS; IS THAT RIGHT?

23  **A.**  THAT'S CORRECT.

24                  (PAUSE IN THE PROCEEDINGS.)

25

CUE – DIRECT / SWEENEY

1   **BY MS. SWEENEY:**

2   **Q.** NOW, IN NOVEMBER 2004, YOU ASKED SONY WHETHER THEY WERE

3   INTERESTED IN A PARTNERSHIP WITH -- THAT INVOLVED USING

4   FAIRPLAY; IS THAT RIGHT?

5   **A.** THAT'S CORRECT.

6   **Q.** OKAY.  AND YOU NEVER ENDED UP DOING THAT; IS THAT RIGHT?

7   **A.** NO, WE DID NOT.

8   **Q.** AND IN -- SOMETIME IN 2005, YOU LEARNED THAT REALNETWORKS'

9   HARMONY WAS WORKING AGAIN; IS THAT RIGHT?

10  **A.** I READ ABOUT IT.

11  **Q.** OKAY.  AND UNLIKE WHAT HAPPENED IN -- IN JULY OF 2004, YOU

12  AND OTHERS AT APPLE DIDN'T ISSUE A CRITICAL PRESS RELEASE,

13  CORRECT?

14  **A.** I DON'T RECALL ONE.

15  **Q.** OKAY.

16      NOW, MR. CUE, YOU'VE BEEN EMPLOYED AT APPLE FOR A LONG

17  TIME, AS YOU SAID, RIGHT?

18  **A.** THAT'S CORRECT.

19  **Q.** AND IS PART OF YOUR COMPENSATION AN EQUITY IN APPLE?

20  **A.** IT IS.

21  **Q.** OKAY.  AND SO YOU HAVE EQUITY SHARE IN APPLE RIGHT NOW?

22  **A.** I DO.

23  **Q.** AND WHAT IS THAT EQUITY SHARE?

24          **MR. ISAACSON:**  OBJECTION, YOUR HONOR.

25          **THE COURT:**  A RANGE IS APPROPRIATE.  IT GOES TO BIAS.

1    OVERRULED.

2           THE WITNESS:  I HAVE A COUPLE OF -- PROBABLY TWO TO

3    THREE MILLION DOLLARS' WORTH OF APPLE SHARES.

4    BY MS. SWEENEY:

5    Q.  AND THAT'S ALL YOU HAVE RIGHT NOW; IS THAT RIGHT?

6    A.  YES.

7    Q.  AND THEN IN OCTOBER, QUITE RECENTLY, YOU SOLD A LARGE

8    SHARE; IS THAT RIGHT?

9           MR. ISAACSON:  OBJECTION, YOUR HONOR.  IT WOULD NOT

10   GO TO BIAS.  PAST OWNERSHIP IS IRRELEVANT.

11          THE COURT:  SUSTAINED.

12          MS. SWEENEY:  I HAVE NO FURTHER QUESTIONS AT THIS

13   TIME, YOUR HONOR.  THANK YOU.

14          THE WITNESS:  THANK YOU, MS. SWEENEY.

15          THE COURT:  MR. ISAACSON, YOUR WITNESS.

16               (PAUSE IN THE PROCEEDINGS.)

17          THE COURT:  WE DIDN'T HAVE GREAT SUCCESS WITH THAT

18   CHART YESTERDAY.

19               (OFF-THE-RECORD DISCUSSION.)

20          THE COURT:  PROBABLY IT'S FINE IF SOMEBODY -- DOES

21   SOMEBODY HAVE A HARD COPY?  IF I JUST HAVE A HARD COPY,

22   MR. ISAACSON, THEN IT DOESN'T MATTER SO MUCH IF I CAN'T SEE

23   IT.

24          MR. ISAACSON:  WE'LL GET YOU A HARD COPY.

25          THE COURT:  OKAY.  GO AHEAD.  YOU MAY PROCEED.

1                   **<u>CROSS-EXAMINATION</u>**

2   **BY MR. ISAACSON:**

3   **Q.**  ALL RIGHT.  MR. CUE, LET ME JUST START WITH SOMETHING YOU

4   WERE ASKED ABOUT.  YOU WERE SHOWN PLAINTIFFS' EXHIBIT -- OR

5   TX121.  I WANT TO SHOW YOU TX2139.

6         **MR. ISAACSON:**  MATT, CAN YOU PULL THAT UP.

7             (EXHIBIT PUBLISHED TO JURY.)

8   **BY MR. ISAACSON:**

9   **Q.**  ALL RIGHT.  THIS IS AN EMAIL CHAIN AT THE BOTTOM THAT WAS

10   PART OF AN EXHIBIT YOU SAW.  BUT THIS EXHIBIT INCLUDES YOUR

11   STATEMENT AT THE TOP, ON TOP OF THE CHAIN, THAT YOU WERE NOT

12   SHOWN.  SO IF WE CAN LOOK AT THAT.

13             (EXHIBIT PUBLISHED TO JURY.)

14   **BY MR. ISAACSON:**

15   **Q.**  THIS IS FROM YOU IN JULY 25TH, 2004, AND THIS WAS

16   DISCUSSING THE -- THE ISSUE OF REAL.  AND YOU WERE SHOWN THE

17   DISCUSSIONS BELOW ABOUT REAL.  AND THEN YOU SAY, "I DIDN'T SAY

18   THEY LEGALLY DID IT.  ALSO THEY MAY HAVE USED THE DVD JON HACK

19   THAT HAS BEEN OUT THERE.  WE'LL BE ACTIVELY WORKING WITH LEGAL

20   TO REVIEW THIS ONCE WE GET OUR HANDS ON IT.  LASTLY, REMEMBER

21   WE ARE ACTIVELY STRENGTHENING AND CHANGING OUR DRM SO THEY

22   WILL DEFINITELY BREAK ON OUR NEXT RELEASE.  WE WOULD HAVE TO

23   WORK TO NOT BREAK THEM."

24     ALL RIGHT.  WOULD YOU EXPLAIN WHAT YOU MEANT BY "THEY MAY

25   HAVE USED THE DVD JON HACK.

1    **A.**   WELL, BECAUSE -- THE DRM IS TO PROTECT THE CONTENT FROM

2    ANYBODY OTHER THAN THE PEOPLE THAT BOUGHT IT TO PLAY IT.   IF

3    SOMEBODY HAD FIGURED OUT A WAY TO PUT THAT DRM ON OR TAKE IT

4    OFF, IT HAD TO BE REVERSE ENGINEERED, IT HAD TO BE HACKED,

5    SOMEBODY HAD TO FIGURE OUT A WAY TO DO THAT.

6        AND SO DVD JON HAD FIGURED OUT A WAY TO DO THAT.   AND WE

7    WERE NOT SURE WHAT EXACTLY REAL HAD USED TO DO THE SAME KIND

8    OF THING.   AND SO WE KNEW, BASED ON THE FACT THAT WE WERE --

9    HAD A DRM TEAM THAT WE WERE HARDENING, THAT WE WERE GOING TO

10   MAKE HACKING INTO OUR SYSTEM MUCH, MUCH HARDER TO DO.

11       AND SO I KNEW FOR A FACT THAT NO MATTER WHAT THEY DID OR

12   HOW THEY USED IT, WHEN WE INTRODUCED THE NEW UPDATE TO THE

13   DRM, IT WAS GOING TO BREAK IT.   AND SO MY POINT WAS I DON'T

14   KNOW IF THEY WERE USING DVD JON OR THEY HAD DEVELOPED

15   SOMETHING ELSE, BUT EITHER WAY I KNOW IT'S GOING TO BREAK

16   WHENEVER WE UPDATE.

17   **Q.**   RIGHT.   AND ISN'T THAT WHY YOU ALSO SAID, "REMEMBER WE ARE

18   ACTIVELY STRENGTHENING AND CHANGING OUR DRM SO THAT THEY WILL

19   DEFINITELY BREAK ON OUR NEXT RELEASE"?

20   **A.**   THAT'S CORRECT.   I MEAN, AT THIS POINT, WE HAD A DRM TEAM

21   THAT WAS -- SOLE PURPOSE IN LIFE WAS TO PROTECT THE CONTENT

22   AND MAKE SURE THAT NO ONE COULD HACK IT OR NO ONE COULD REMOVE

23   IT OR CHANGE IT.

24   **Q.**   AND WHEN YOU SAID, "WE WOULD HAVE TO WORK TO NOT BREAK" --

25   THEN YOU SAID, "WE WOULD HAVE TO WORK NOT TO BREAK THEM."

1    SO LET ME MOVE ON.  YOU WERE ALSO ASKED ABOUT WHETHER YOUR

2    DECISIONS ABOUT INTEROPERABILITY WERE MADE WHEN YOU HAD A HIGH

3    MARKET SHARE, AND YOU SAID THEY WERE NOT.  AND COUNSEL SAID

4    YOU WOULD HAVE THE OPPORTUNITY WHEN WE SPOKE TO EXPLAIN YOUR

5    ANSWER.  SO WOULD YOU EXPLAIN YOUR ANSWER.

6    **A.**  WELL, BACK IN –– IN 2002 WHEN THIS WHOLE ITUNES MUSIC

7    STORE IDEA CAME ABOUT FROM OUR –– FROM OUR SIDE AND WE WENT TO

8    THE LABELS, IN OUR VISION WHEN HE WENT TO THEM, WE DIDN'T EVEN

9    THINK OF THE CONCEPT OF THE DRM OR PROTECTING THE CONTENT.

10   AND YOU'D SAY, WELL, WHY WOULDN'T YOU THINK OF THAT?

11   WELL, BECAUSE WHEN THEY SOLD THEIR CD'S, AUDIO CD'S, THEY

12   DIDN'T HAVE ANY PROTECTION ON THEM AT ALL.  THEY WEREN'T

13   PROTECTED WHICH IS WHAT ALLOWED YOU TO RIP THEM AND PUT THEM

14   ON A COMPUTER.

15   SO OUR EXPECTATION WAS WHEN WE WENT TO THEM IS THAT WE

16   WOULD GET A LICENSE FROM THEM TO SELL MUSIC EXACTLY THE SAME

17   WAY IT WAS SOLD ON THE CD'S IN AN UNPROTECTED FASHION.

18   NOW, THE LABELS AT THAT TIME HAD ALREADY DECIDED THAT THEY

19   WERE GOING TO DRM MUSIC.  AND HOW DID THEY DECIDE THAT?

20   BEFORE WE WENT TO MARKET, THERE WERE TWO MUSIC STORES THAT

21   WERE IN –– IN THE MARKET.  ONE WAS CALLED PRESSPLAY AND ONE

22   WAS CALLED MUSICNET.  AND THOSE WERE OWNED BY THE ACTUAL

23   LABELS.  SO THREE OF THE LABELS COMBINED OWNERSHIP TO ONE OF

24   THEM.  AND THE OTHER TWO LABELS OWNED THE OTHER TWO.  AND THEY

25   ONLY SOLD MUSIC WITH DRM.  VERY COMPLICATED DRM.  NOTHING LIKE

1   THE ONE WE DID.  BUT THEY ONLY SOLD MUSIC THROUGH DRM.

2       WHEN WE WENT TO THEM AND STARTED NEGOTIATING WITH THEM, WE

3   SAID, LOOK, YOUR CONTENT IS ALREADY FREELY AVAILABLE OUT

4   THERE, IT'S AVAILABLE ON PIRATED SITES, IT'S AVAILABLE ON CD'S

5   IN AN UNPROTECTED FASHION.  TRYING TO CREATE A STORE WITH THE

6   DRM IS NOT A GOOD IDEA.  IT'S GOING TO HINDER SALES.  WE'RE

7   NOT GOING TO GROW AS FAST AS IF IT WERE DRM-FREE.

8       BUT THEY WERE ADAMANT.  AND AS A MATTER OF FACT, NOT JUST

9   ADAMANT ON THE FACT THAT MUSIC HAD TO HAVE DRM DIGITALLY, BUT

10  THEY SAID, "WE'RE WORKING ON CLOSING THE CD.  WE'RE GOING TO

11  PUT DRM ONTO THE CD AND EVEN CLOSE THE CD'S AS THEY COME OUT."

12      AND IF YOU GO THROUGH HISTORY, YOU'LL SEE THEY ATTEMPTED

13  TO DO THAT.  FAILED MISERABLY BECAUSE THEY DID IT IN A VERY

14  POOR WAY AND IT DIDN'T WORK RELIABLY.  BUT THEY ACTUALLY TRIED

15  TO CLOSE THE CD.  AND SO THEY REQUIRED IT FROM US.

16      AT THAT POINT IS WHEN WE REALIZED -- AND I REMEMBER IT WAS

17  STEVE AND MYSELF IN PARTICULAR AND THERE WERE PEOPLE AT APPLE,

18  I EVEN THINK PHIL WAS ONE OF THOSE, THAT ACTUALLY DIDN'T LIKE

19  THE IDEA BECAUSE IT WAS LIKE THIS THING SHOULD BE DRM-FREE.

20  AND I SAID, "LOOK, IF WE'RE GOING TO DO THIS STORE, THE ONLY

21  WAY WE'RE GOING TO DO IT IS WITH A DRM."

22      AND THEN WE DECIDED TO -- HOW CAN WE DO A DRM THAT, TO THE

23  CONSUMER WHO'S BUYING IT, LEGITIMATELY BUYING IT, THEY DON'T

24  ACTUALLY EXPERIENCE OR SEE THE DRM, AND THAT'S HOW THE

25  EVOLVEMENT CAME OUT.

1    BUT FROM DAY ONE, APPLE WAS NEVER -- WE'D NEVER BEEN IN

2    THE DRM BUSINESS, WE HAD NEVER DEVELOPED A DRM.  AND HONESTLY,

3    WE WERE NAIVE BECAUSE WHEN WE DID THE FIRST DRM, IT WASN'T

4    VERY STRONG, IT GOT HACKED REALLY EASILY, WHICH IS WHY I THEN

5    TASKED JEFF ROBBIN WHO THEN HIRED AUGUSTIN TO FORM A DRM TEAM

6    TO REALLY HARDEN IT.  BECAUSE WE WERE PRETTY NAIVE IN IT AND

7    THOUGHT WE HAD DONE ALL THE RIGHT THINGS TO MAKE IT EASY BUT

8    WE DIDN'T PROTECT IT FROM HACKERS IN THAT STANDPOINT.  AND SO

9    WE NEEDED TO FORM A TEAM TO DO THAT.

10   **Q.**  JUST GOING BACK TO THAT -- THAT EARLY HISTORY.  IF THE

11   RECORD LABELS HAD THEIR OWN MUSIC STORES SELLING DIGITAL

12   MUSIC, HOW DID YOU CONVINCE THEM TO GIVE YOU THEIR MUSIC AND

13   COMPETE AGAINST THEM?

14   **A.**  WELL, GOING BACK TO 2001 --

15   **Q.**  YES.

16   **A.**  -- WAS THE FIRST TIME WE EVER WENT TO THE RECORD LABELS.

17   THIS IS TWO YEARS BEFORE WE LAUNCHED.  SO TWO YEARS BEFORE, WE

18   GO TO THE RECORD LABELS AND SAY WE WANT TO DO A MUSIC STORE.

19   THEY WERE LIKE, "WE'RE NOT INTERESTED.  WE'RE DOING OUR OWN

20   THING."

21       AND WE ASKED THEM, "WELL, WHAT ARE YOU DOING?"

22       AND THEY EXPLAINED TO US WHAT WE (SIC) WERE DOING.  AND I

23   SAID -- I REMEMBER, YOU KNOW, WHEN I HEARD ABOUT IT, IT WAS

24   CLEAR IT WASN'T GOING TO WORK.  IT WAS CRAZY WHAT THEY WERE

25   TRYING TO DO.  BUT THEY SAID, "LOOK, WE'RE -- WE'RE GOING TO

 1   MAKE THIS.  IT'S OUR MUSIC.  WE'LL BUILD OUR STORES AND PEOPLE

 2   WILL BUY FROM US."

 3       BY THE TIME WE CAME BACK TO THEM IN 2002, A YEAR BEFORE WE

 4   LAUNCHED, THEY'D BEEN OUT IN THE MARKET NOW, AND IT'S A

 5   MISERABLE SYSTEM.  IT WAS TERRIBLE TO WORK WITH.  IT HAD

 6   DIFFERENT RESTRICTIONS BY SONG, DIFFERENT PRICING BY SONG.  IT

 7   WAS JUST TERRIBLE FROM A CONSUMER POINT OF VIEW.  AND GUESS

 8   WHAT?  NO CONSUMERS HAD BOUGHT ANYTHING FROM THEM.

 9       AND SO WE WENT TO THEM AND SAID LICENSE US THE CONTENT.

10   THEY WERE LIKE, "FINE, WE'LL LICENSE YOU THE CONTENT NOW, BUT

11   WE'LL LICENSE IT TO YOU UNDER THE SAME EXACT TERMS" AS WHAT

12   THEIR STORES WERE DOING.

13       AND WE WERE LIKE, "THERE'S NO WAY WE'RE GOING TO DO THIS.

14   IT'S NOT GOING TO WORK.  IT'S NOT INTERESTING."

15       AND SO THAT GOT INTO A BATTLE BACK AND FORTH.

16       THE -- THE KEY AT THE END OF DAY THAT GOT -- WE -- WE WERE

17   ABLE TO CONVINCE THEM IS WE WERE GOING TO PUT A LOT OF

18   DEVELOPMENT WORK INTO THIS.  WE DECIDED LET'S BOX THIS IN, IN

19   A VERY SMALL BOX SO THEY CAN'T SAY NO.  AND WHAT THAT BOX WAS,

20   WAS WE SAID, LET'S MAKE IT ONLY WORK ON THE MAC.

21       IN THOSE DAYS -- THE MAC HAS A MUCH HIGHER MARKET SHARE

22   TODAY, AND OBVIOUSLY IT'S MUCH MORE SUCCESSFUL.  BUT IN THOSE

23   DAYS, THE MAC WAS TWO TO THREE PERCENT OF THE MARKET.  98, 97

24   PERCENT OF THE MARKET WAS WINDOWS.  SO WE SAID WE'RE NOT GOING

25   TO DO ANYTHING ON WINDOWS.  WE'LL ONLY DO IT ON THE MAC.

1          SECOND OF ALL, WE'LL ONLY DO IT IN THE U.S.  SO WE'LL TRY

2     THIS IN THE U.S. AND SEE IF IT WORKS.  AND SO WE'RE NOT GOING

3     TO GO ANYWHERE GLOBALLY.

4          AND THEN THIRDLY, WE SAID WE'LL ONLY DO IT FOR A YEAR.

5          SO MAC, U.S., AND ONLY FOR A YEAR.

6          AND WE SAID, "LOOK, IF WE SCREW IT UP AND YOU'RE RIGHT AND

7     WE'RE WRONG, THEN YOU'VE LOST NOTHING BECAUSE IT'S ONLY A

8     YEAR, IT'S ONLY FOR THAT 2 PERCENT AUDIENCE, AND IT'S NOT

9     GOING TO MATTER AT ALL."  AND THAT'S REALLY HOW WE GOT THE

10    FIRST LABEL TO AGREE TO DOING THIS.

11         NOW, EVEN AFTER THAT, WE STILL HAD A LOT OF BATTLES ON

12    WHAT THE RESTRICTIONS AND WHAT THE DRM WAS.  BUT AT LEAST NOW

13    THEY WERE REALLY WILLING TO CONSIDER LICENSING IT TO US BY

14    HAVING THAT SMALL BOX AND RESTRICTION.

15    **Q.**  AND LATER IN TIME, YOU SAID YOU TOLD THE LABELS THAT

16    INTEROPERABILITY WAS IMPOSSIBLE.  WHAT DID -- WHAT DID YOU

17    TELL THE LABEL -- WHAT EXPLANATION DID YOU GIVE THE LABELS FOR

18    THAT?

19    **A.**  WELL, AT FIRST THEY -- WHEN -- I MEAN, IT'S INTERESTING

20    BECAUSE AT THE BEGINNING OF THE DEAL AND WHEN WE'RE DOING THE

21    DEAL, THAT'S NOT THE TIME THAT THEY'RE ASKING FOR

22    INTEROPERABILITY.  AT THAT TIME, THEY'RE ACTUALLY ASKING FOR A

23    BUNCH OF RESTRICTIONS.  IT'S THE REVERSE OF INTEROPERABILITY.

24         THEY WANTED US TO NAME EVERY SINGLE DEVICE THAT IT WOULD

25    WORK ON.  AND SO ONE OF THE PROBLEMS, WE SAID, WELL, WHEN WE

1    DESIGN A NEW DEVICE, WE'D HAVE TO GO BACK AND NEGOTIATE WITH

2    THEM TO GET US PERMISSION, WHICH WE DIDN'T WANT TO DO.  SO

3    THEY WERE BEING VERY, VERY RESTRICTIVE.

4        AS WE STARTED HAVING SUCCESS, THEY WANTED

5    INTEROPERABILITY.  AND I UNDERSTOOD WHY.  AND WE BELIEVED IN

6    INTEROPERABILITY.  INTEROPERABILITY WAS DRM-FREE, WHICH IS

7    WHAT WE TOLD THEM THEY WANTED TO DO.  BUT THEY WANTED TO HAVE

8    SORT OF THEIR CAKE AND EAT IT, TOO.

9        AND WHAT I MEAN BY THAT IS THEY WANTED TO HAVE ALL THE

10   INTEROPERABILITIES OF DRM-FREE BUT WITH ALL THE PROTECTIONS OF

11   A DRM.  AND THOSE THINGS JUST DON'T ACTUALLY WORK.  AND SO THE

12   DRM IS ALL ABOUT RESTRICTIONS AND THINGS YOU CAN'T DO.  AND --

13   AND SO WHAT I TOLD THEM IS IF YOU WANT INTEROPERABILITY, YOU

14   NEED TO GO DRM-FREE.

15       OUR DRM AND THE WAY THAT IT WORKS IS NOT SOMETHING THAT'S

16   GOING TO WORK ACROSS ALL THE DEVICES, ALL THE COMPUTERS THEN.

17   AS A MATTER OF FACT, OTHER PARTIES TRIED TO DO THIS AND FAILED

18   MISERABLY.

19       AND ONE OF THE PARTIES THAT TRIED TO DO THIS WAS

20   MICROSOFT, WHICH AT THE TIME WAS THE LARGEST COMPANY, MANY,

21   MANY MORE RESOURCES THAN US.  THEY TRIED TO BUILD A DRM THAT

22   YOU COULD LICENSE.  AND WHAT ENDED UP HAPPENING IS IT WOULD

23   SOMETIMES WORK WHEN YOU BOUGHT A NEW DEVICE, SOMETIMES IT

24   DIDN'T.

25       AND SO THE -- THE -- THE SECRET TO OUR SUCCESS IN THE

1  MUSIC SPACE WAS THAT WE BUILT EVERYTHING FROM THE ITUNES

2  CLIENT TO THE ITUNES STORE TO THE -- TO THE IPOD, AND WE MADE

3  THAT WORK SEAMLESSLY AND EASILY A HUNDRED PERCENT OF THE TIME.

4       AND SO IF WE DID INTEROPERABILITY, I TOLD THE LABELS THAT

5  THAT'S WHAT'S GOING TO BREAK AND YOU'RE GOING TO RUIN THE

6  WHOLE THING.  AND NOT ONLY WOULD -- YOU'RE NOT GOING TO GET

7  MORE SALES, BUT YOU'RE ACTUALLY GOING TO DECREASE OUR SALES AS

8  PART OF THAT.

9  **Q.**  AND THAT INTEGRATED SYSTEM INCLUDED YOUR FAIRPLAY DRM?

10  **A.**  IT DID.

11  **Q.**  ALL RIGHT.  LET'S TAKE A STEP BACK.

12       YOU'VE BEEN AT APPLE FOR OVER 25 YEARS?

13  **A.**  IT'S GOING TO BE 26 YEARS IN JANUARY.

14  **Q.**  ALL RIGHT.  AND WHAT WAS YOUR FIRST POSITION AT APPLE?

15  **A.**  OH, I WORKED IN A -- IT WAS CALLED THE MCSG, IT WAS THE

16  MICROCOMPUTER SUPPORT GROUP.  AND I WAS ASSIGNED TO SUPPORT

17  JOHN SCULLEY, WHO WAS THEN THE CEO, AS HIS TECH GUY.

18  **Q.**  YOU WERE A TECH GUY AND CUSTOMER SUPPORT?

19  **A.**  I STARTED -- I HAVE A COMPUTER SCIENCE DEGREE SO I --

20  UNDERSTOOD THE TECHNICAL SIDE OF IT.  BUT I COMMUNICATED WELL

21  ALSO, AND SO THEY THOUGHT I WOULD BE GOOD TO HELP JOHN IN

22  SUPPORTING HIS NEEDS AND WHEN HE HAD ISSUES OR QUESTIONS OR

23  ANYTHING, THAT I WOULD BE A GOOD PERSON TO DO THAT.

24  **Q.**  ALL RIGHT.  YOU MENTIONED YOUR -- YOUR DEGREE.  WHAT'S

25  YOUR EDUCATIONAL BACKGROUND?

1    **A.**   I WENT TO DUKE UNIVERSITY, AND I HAVE A COMPUTER SCIENCE

2    AND ECONOMICS DEGREE.

3    **Q.**   ALL RIGHT.   AND THEN SO AFTER YOUR FIRST POSITION, CAN YOU

4    JUST SUMMARIZE HOW YOUR CAREER GREW AT APPLE AFTER THAT.

5    **A.**   YOU KNOW, ONE OF THE GREAT THINGS THAT APPLE GAVE ME AN

6    OPPORTUNITY OF IS DOING MANY, MANY DIFFERENT THINGS.   SO I'VE

7    WORKED FROM RUNNING A 24 BY 7 HELP LINE AND UNDERSTANDING WHAT

8    IT TAKES TO RUN A HELP LINE AND ALL OF THE ISSUES ASSOCIATED

9    WITH IT, TO WORKING IN IS&T WHICH IS THE IT DEPARTMENT.

10   I WORKED ON THE FIRST ONLINE STORE, THE APPLE ONLINE

11   STORE, WHICH EXISTS TODAY.   I WORKED ON THINGS FROM IMOVIE TO

12   IPHOTO TO IWORK PAGES, KEYNOTE NUMBERS, TO TODAY IT'S A MUCH

13   BROADER SELECTION.

14   SO I -- I GOT TO DO JUST ABOUT EVERY FUNCTION AT APPLE

15   OUTSIDE OF HR AND FINANCE.

16   **Q.**   OKAY.   ALL RIGHT.   THIS CASE IS ABOUT SOMETHING CALLED

17   ITUNES 7.0 AND 7.4.   I'M NOT SURE YOU'VE BEEN ASKED ABOUT THAT

18   YET.

19   WHAT'S YOUR ROLE WITH ITUNES UPDATES?

20   **A.**   ALL THE RELEASES OF ITUNES, AS -- AS THE HEAD PERSON OF

21   THE GROUP, I WORK WITH THE TEAM TO HELP DEFINE WHAT THE

22   FEATURE LISTS ARE AND WHAT ARE THE -- WHAT ARE WE GOING TO

23   ADD, HOW ARE WE GOING TO CHANGE IT, HOW ARE WE GOING TO MAKE

24   IT BETTER.   THOSE ARE THE BIG THINGS, AND I WORK WITH THE TEAM

25   TO DEVELOP THAT.

1    Q.  ALL RIGHT.  NOW, WE'RE GOING TO PUT SOME DOCUMENTS ON THE

2    SCREEN FOR YOU.  YOU ALSO HAVE A BINDER IN FRONT OF YOU THAT

3    HAS THE DOCUMENTS IF YOU NEED THEM.

4              MR. ISAACSON:  CAN WE LOOK AT 2394.

5                   (EXHIBIT PUBLISHED TO JURY.)

6    BY MR. ISAACSON:

7    Q.  THIS SAYS THAT AT THE TOP IT'S AN ITUNES PPR FOR 7.0 DATED

8    JULY 13TH, 19 -- SORRY -- 2006.

9        AND MOVING ON DOWN, IT SAYS "PPR FOR ITUNES 7.0 DECISION

10   MAKERS."

11             MR. ISAACSON:  A LITTLE LOWER, MATT.

12   Q.  "FOR THE DECISION MAKERS."

13                  (EXHIBIT PUBLISHED TO JURY.)

14             MR. ISAACSON:  THERE WE GO.

15       "DECISION MAKERS."

16                  (EXHIBIT PUBLISHED TO JURY.)

17   BY MR. ISAACSON:

18   Q.  AND THERE WE SEE YOUR NAME.

19       WHAT IS A PPR?

20   A.  IT'S A DOC -- ONCE OUR TEAM HAS COME UP WITH ALL OF THE

21   FEATURES AND THE LIST OF NEW OR UPDATES THAT WE'RE GOING TO DO

22   TO -- TO A SOFTWARE ITEM, IN THIS CASE ITUNES, WE PUT THIS

23   TOGETHER TO PUBLISH, IN A SENSE, ALL OF THE NEW THINGS THAT

24   WE'RE GOING TO DO, WHAT THE IMPACT OF THOSE ARE, SORT OF

25   WHAT'S THE LANDSCAPE.  AND WE PUBLISH THAT OUT FOR APPROVAL TO

1   MAKE SURE THAT EVERYBODY'S IN SYNC.

2       SO EVEN THOUGH WE'VE HAD THESE COMMUNICATIONS AND WE'VE

3   ALL TALKED ABOUT IT, THIS IS SORT OF A HAND -- YOU KNOW, THE

4   WRITTEN VERSION TO MAKE SURE THERE'S NOTHING ELSE THAT MAY BE

5   MISSING.

6       AND SO IT'S ASKED FOR MY APPROVAL AND JEFF ROBBIN'S

7   APPROVAL, WHO WAS THE HEAD OF ENGINEERING FOR ME, ALONG WITH

8   TOM LAFOLLETTE, WHO'S OUR FINANCE PERSON, TO MAKE SURE THAT

9   THE THREE OF US AGREE THIS IS THE LIST OF ALL OF THE FEATURES,

10  THE MAIN FEATURES AND FUNCTIONS THAT WE'RE ADDING IN THIS

11  RELEASE OF ITUNES.

12  **Q.**  ALL RIGHT.  SO THAT'S THE PPR FOR 7.0.

13      CAN WE LOOK AT 2423.

14      THIS IS DATED SEPTEMBER 12TH, 2006.

15              (EXHIBIT PUBLISHED TO JURY.)

16  **BY MR. ISAACSON:**

17  **Q.**  IS THIS THE PRESS RELEASE THAT WENT ALONG WITH THE

18  ANNOUNCEMENT OF 7.0?

19  **A.**  YES.  WHEN ITUNES 7 WAS ANNOUNCED, WE PUT OUT A PRESS

20  RELEASE THAT DAY TO TALK ABOUT ALL OF THE AMAZING NEW

21  FEATURES.

22  **Q.**  ALL RIGHT.  WAS 7.0 A MAJOR UPDATE?

23  **A.**  IT WAS A HUGE UPDATE.  I THINK IT'S -- WE CERTAINLY LOOKED

24  AT IT AS THE BIGGEST UPDATE SINCE WE HAD LAUNCHED THE STORE.

25  **Q.**  ALL RIGHT.  WHY WOULD -- TELL US ABOUT THAT UPDATE.  TELL

 1    US ABOUT SOME OF THE TOP FEATURES THAT 7.0 OFFERED.

 2        AND I'LL -- WHEN YOU NAME SOMETHING, I'LL PROBABLY

 3    INTERRUPT YOU AND FOLLOW UP ON IT, AND THEN WE CAN GO BACK TO

 4    THE -- WHAT IT OFFERED.

 5    **A.**  WELL, IT HAD A LOT OF FEATURES SO I'LL START WITH THE ONES

 6    I REMEMBER.  AND THEN IF I DON'T RECALL ANYTHING, WE CAN GO

 7    THROUGH THIS PRESS RELEASE.

 8        BUT ONE OF THE BIGGEST FEATURES, LIKE WE HAD DONE WITH

 9    MUSIC, ITUNES 7 WAS THE FIRST TIME WE INTRODUCED DIGITAL

10    MOVIES.  AND SO THIS GAVE YOU THE OPPORTUNITY OF BUYING A

11    MOVIE LIKE *PIRATES OF THE CARIBBEAN* ONLINE FOR THE FIRST TIME.

12        TODAY YOU'D SAY, WELL, WHOOPTY DOO, WHAT'S THE BIG DEAL?

13    BUT THE BIG DEAL WAS THAT IN THOSE DAYS THE ONLY WAY YOU COULD

14    BUY *PIRATES OF THE CARIBBEAN* WAS ON A CD -- SORRY -- ON A DVD.

15    SO YOU HAD TO GO TO THE STORE.

16        SO THIS WAS THE EQUIVALENT OF WHAT WE HAD DONE FOR MUSIC

17    FOR MOVIES.  AND SO WE INTRODUCED DISNEY AS PART OF THIS

18    INTRODUCTION WITH 75 NEW MOVIES THAT WERE NOW AVAILABLE FOR

19    THE FIRST TIME TO BUY DIGITALLY.  AND THEN GREW IT FROM THERE.

20        SO THAT'S CERTAINLY ONE OF THE BIG FEATURES THAT WE HAD.

21    **Q.**  AND THAT WAS THE FULL RANGE OF DISNEY STUDIOS, PIXAR AND

22    OTHERS?

23    **A.**  YEAH.  DISNEY HAS MULTIPLE STUDIOS, PIXAR, MIRAMAX, WALT

24    DISNEY STUDIO.  AND SO WE STARTED WITH THEM, AND OVER THE YEAR

25    WE ADDED ALL OF THE OTHER STUDIOS AND MANY, MANY, MANY MORE

1    MOVIES.

2    Q.   AND YOU HAD PREVIOUSLY INTRODUCED TELEVISION SHOWS?

3    A.   THE YEAR BEFORE, WE HAD DONE SOMETHING SIMILAR TO THE SAME

4    THING WE HAD DONE WITH MUSIC AND NOW WITH MOVIES, WE ALSO DID

5    WITH TV SHOWS.  SO AT THE TIME I REMEMBER VERY WELL *LOST* AND

6    *DESPERATE HOUSEWIVES* WERE THE NUMBER ONE AND NUMBER TWO RATED

7    SHOWS ON TELEVISION.  AND FOR THE FIRST TIME EVER, RATHER THAN

8    HAVING TO WATCH IT LIVE, YOU COULD ACTUALLY BUY IT FROM ITUNES

9    AND WATCH IT, AND NOT JUST WATCH IT ON YOUR COMPUTER BUT ALSO

10   WATCH IT ON YOUR IPOD.  SO BOTH MOVIES AND TV SHOWS WERE

11   AVAILABLE TO WATCH RIGHT ON YOUR IPOD.

12   Q.   ALL RIGHT.  AND THEN WHAT SORT OF RESOLUTION DID YOU

13   ACHIEVE WITH 7.0 FOR THOSE MOVIES AND TELEVISION SHOWS?

14   A.   WE DOUBLED THE RESOLUTION.  THE YEAR BEFORE, I BELIEVE WE

15   HAD DONE 320 BY 240.  LOOK -- NOT TO TRY TO EXPLAIN THE NUMBER

16   OF PIXELS OR WHATEVER, BUT WE BASICALLY MADE IT TWICE AS -- AS

17   BIG.  THE REASON -- SO WHAT'S THE IMPORTANCE OF MAKING IT

18   TWICE AS BIG IS THAT IT LOOKS A LOT BETTER, THE RESOLUTION WAS

19   HIGHER, AND SO IT WAS CLEARER FOR THE CUSTOMER.

20        SO WHEN 7.0 CAME OUT, WE WENT BACK TO THE TV STUDIOS AND

21   NEGOTIATED TO UP THE RESOLUTION.  AND WITH THE MOVIE STUDIOS,

22   WE ASKED THEM FOR THE HIGHER RESOLUTION RIGHT FROM THE

23   BEGINNING.

24   Q.   AND WHAT DID YOU DO TO PROMOTE THE NEW MOVIE FEATURES OF

25   7.0?

1    **A.**   WELL, WE DID MANY THINGS.  OBVIOUSLY, THE PRESS RELEASE

2    WAS ONE.  IF YOU WENT TO OUR WEBSITE, YOU WOULD SEE MOVIES AS

3    A BIG FEATURE ON APPLE.COM.  IF YOU WENT TO THE ITUNES STORE,

4    YOU WOULD SEE MOVIES RIGHT ON THE FRONT PAGE OF THE ITUNES

5    STORE.  WE ACTUALLY DID SOME TV ADS ON IT.

6        ON THE BOX OF THE IPOD, THE IPOD WAS A –– THE BOX WAS KIND

7    OF A SQUARE-SHAPED BOX.  AND ON THE OUTSIDE OF THE BOX, THERE

8    WAS A PICTURE OF WHAT AN IPOD LOOKED LIKE, AND IT HAD THE

9    SCREEN.  AND SO WE ACTUALLY WENT AHEAD AND ACTUALLY –– I

10   BELIEVE IT WAS *PIRATES OF THE CARIBBEAN*, IF I REMEMBER

11   CORRECT, WE LICENSED FROM DISNEY THE ABILITY OF USING THAT

12   IMAGE ON THE BOX SO THAT WHEN THE CUSTOMER SAW THE IPOD ON THE

13   SHELF, THEY COULD SEE IT PLAYING A MOVIE RIGHT ON THE –– ON

14   THE –– ON THE BOX.

15   **Q.**   ALL RIGHT.  AND THEN YOU HAD AN EVENT WHERE STEVE JOBS

16   ANNOUNCED 7.0 AND DISCUSSED IT?

17   **A.**   AS –– AS IS PRETTY TYPICAL WITH APPLE, WHEN WE HAVE A

18   NEW –– MAJOR NEW PRODUCT, WE HAVE AN EVENT WHERE WE INVITE

19   PRESS AND SOME CUSTOMERS.  AND WE GENERALLY EVEN STREAM THEM

20   OR MAKE THEM AVAILABLE ONLINE FOR PEOPLE TO WATCH, WHERE WE

21   HAVE THE ANNOUNCEMENT AND –– AND –– AND STEVE GETS ON THE

22   STAGE AND INTRODUCES THE PRODUCTS.

23   **Q.**   ALL RIGHT.  AND YOU ATTENDED THAT EVENT?

24   **A.**   I DID.

25   **Q.**   WHAT DO YOU CALL THAT TYPE OF EVENT?

1   **A.**  WELL, THERE'S -- THEY'RE LIVE EVENTS AND -- IT DEPENDS.

2   IT'S A KEYNOTE EVENT, IS THE TERM THAT WE USE INTERNALLY.  AND

3   WE CALL IT A KEYNOTE.  AND SO IT'S -- IT'S GOTTEN THAT NAME, I

4   THINK, FOR MANY OTHER EVENTS SINCE THEREAFTER.

5   **Q.**  ALL RIGHT.  DURING THIS WEEK, DID WE ASK YOU TO WATCH A

6   VIDEO OF THE KEYNOTE EVENT FOR 7.0?

7   **A.**  YES, YOU DID.

8   **Q.**  ALL RIGHT.  AND YOU --

9            **MR. ISAACSON:**  IF I MAY APPROACH.

10  **Q.**  YOU WATCHED IT -- THIS IS TX2847.

11   YOU WATCHED THAT VIDEO ON THAT THUMB DRIVE?

12  **A.**  WELL, I WATCHED IT ON MY COMPUTER.  I ATTACHED THE THUMB

13  DRIVE TO MY COMPUTER.

14  **Q.**  YES.  THANK YOU.

15   AND WAS THAT A TRUE AND ACCURATE COPY OF WHAT YOU

16  WITNESSED OF THE 7.0 KEYNOTE EVENT?

17  **A.**  YES.  IT ACTUALLY BROUGHT BACK SOME GREAT MEMORIES.

18  **Q.**  ALL RIGHT.  I'LL JUST TAKE THAT BACK.

19   WHAT WAS THE CONSUMER RESPONSE TO THE MOVIE FEATURE OF

20  7.0?

21  **A.**  IT WAS HUGE.  IT WAS -- AGAIN, NOT SURPRISINGLY, PEOPLE

22  WANTED TO WATCH MOVIES ON THEIR LAPTOPS WITH WINDOWS AND ON

23  THEIR MACS AND ON THEIR IPODS BECAUSE IT WAS THE FIRST TIME

24  YOU HAD A DEVICE ON THE GO THAT WAS SMALL ENOUGH TO FIT IN

25  YOUR POCKET AND ACTUALLY WATCH A MOVIE ON.  AND SO THE --

1    THE -- IT WAS AN OVERWHELMINGLY POSITIVE RESPONSE, WHICH LED

2    US TO GET MORE STUDIOS AND MORE -- MORE MOVIES.

3    **Q.**  ALL RIGHT.  I'LL ASK YOU TO LOOK IN YOUR BINDER AT 2781.

4            **MR. ISAACSON:**  AND I WILL ASK YOU IF YOU HAVE ANY

5    OBJECTION TO SHOWING THIS ON THE SCREEN WITH THE ADMONITION

6    THAT THIS IS ANOTHER NEWSPAPER ARTICLE --

7            **MR. COUGHLIN:**  NO.

8            **MR. ISAACSON:**  -- AND SHOULD NOT BE TAKEN FOR THE

9    TRUTH.

10           ALL RIGHT.  WE CAN SHOW THIS ON THE SCREEN.

11                   (EXHIBIT PUBLISHED TO JURY.)

12   **BY MR. ISAACSON:**

13   **Q.**  THIS WAS AN EMAIL THAT'S INTERNAL TO APPLE, BUT IT HAS A

14   ARTICLE FROM *FORTUNE* THAT SAYS IN THE FIRST PARAGRAPH, "IN THE

15   FIRST SIX DAYS AFTER THE LAUNCH OF ITS NEW ITUNES MOVIE

16   DOWNLOAD SERVICE, APPLE SOLD A MILLION DOLLARS' WORTH OF

17   DISNEY FILMS OR 125,000 DOWNLOADS, ACCORDING TO DISNEY CEO

18   ROBERT IGER.  BEFORE THE YEAR IS OUT, IGER ADDED, DISNEY

19   EXPECTS TO REAP $50 MILLION FROM ITUNES MOVIE SALES."

20           DOES THAT SQUARE WITH YOUR RECOLLECTION OF WHAT HAPPENED?

21   **A.**  IT DOES.

22   **Q.**  NOW, PEOPLE COULD THEN, YOU SAID, COULD WATCH THESE MOVIES

23   ON THE SMALL SCREEN ON THE IPOD.  TODAY IN RECENT YEARS, ARE

24   YOU ABLE TO TRACK CONSUMER RESPONSES TO WATCHING MOVIES AND TV

25   OR HOW OFTEN THEY WATCH MOVIES AND TV ON SMALL SCREENS?

1    **A.**   WELL, WE DON'T -- APPLE'S ALWAYS BEEN ABOUT PRIVACY SO WE

2    DON'T MONITOR WHAT PEOPLE DO ON THEIR IPODS OR THEIR IPHONES

3    OR -- BUT WHAT WE DO KNOW IS AS -- IN THE TIME WHEN THE IPOD

4    CAME ABOUT, YOU BUY YOUR MOVIE ON ITUNES AND THEN YOU WOULD

5    TRANSFER IT OVER TO YOUR IPOD.

6       TODAY, IT'S -- IT'S MUCH BETTER.  ON AN IPOD TOUCH OR AN

7    IPHONE, YOU CAN JUST BUY YOUR MOVIE DIRECTLY.  AND SO WHAT

8    WE'VE SEEN IS THE NUMBER OF MOVIES THAT WE SELL ON IPHONE

9    DIRECTLY OR IPAD DIRECTLY IS MUCH GREATER THAN WHAT WE SEE ON

10   ITUNES.  AND NOT SURPRISINGLY, BECAUSE PEOPLE HAVE THESE

11   DEVICES IN THEIR POCKETS AND CARRY THEM WITH THEM.

12      SO IT CERTAINLY TELLS US THAT PEOPLE ARE ENJOYING THEIR

13   MOVIES ON THEIR DEVICES ON THE GO.

14   **Q.**   ALL RIGHT.  NOW, ANOTHER FEATURE OF 7.0 HAD TO DO WITH

15   ALBUM ART.  CAN YOU EXPLAIN THAT?

16   **A.**   YOU HAVE TO REMEMBER, EVEN THOUGH THE ITUNES MUSIC STORE

17   WAS HIGHLY SUCCESSFUL, AS HAS BEEN TALKED ABOUT, THE VAST

18   MAJORITY OF THE MUSIC THAT PEOPLE HAD WAS MUSIC THEY HAD

19   ACQUIRED PRIOR TO THE ITUNES MUSIC STORE.

20      AND SO MOST PEOPLE LIKE MYSELF HAD A CD COLLECTION, FOR

21   EXAMPLE, AND THE FIRST THING THAT YOU DID WHEN YOU WENT TO

22   ITUNES OR ANY KIND OF DIGITAL, IS YOU RIPPED THOSE CD'S INTO A

23   FORMAT THAT WORKED DIGITALLY AND SO NOW YOU HAD ALL YOUR MUSIC

24   COLLECTION DIGITALLY.

25      THE PROBLEM WAS THINGS LIKE THE COVER ARTWORK FOR THE

1   ALBUM, YOU DIDN'T HAVE.  RIGHT?  IT EXISTED IN THE PHYSICAL

2   CD, BUT YOU DIDN'T HAVE IT DIGITALLY.  WHEN YOU BOUGHT A SONG

3   FROM ITUNES, WE PROVIDED YOU WITH THE COVER, BUT THOSE SONGS

4   THAT YOU RIPPED DIDN'T HAVE A COVER.

5       AS WE WERE DOING THINGS ON THE USER INTERFACE, WE WANTED

6   THINGS TO BE MORE VISUAL.  ONE OF THE PROBLEMS THAT YOU HAD IS

7   THE VAST MAJORITY OF YOUR MUSIC DIDN'T HAVE COVERS, THEN

8   CREATING A VISUAL UI WAS GOING TO LOOK VERY, VERY UGLY.  IT

9   WASN'T GOING TO LOOK GOOD BECAUSE EVERYTHING WOULD BE BLANK,

10  AND THEN EVERY SONG YOU BOUGHT FROM ITUNES WOULD HAVE THE

11  COVER.

12      SO WE WORKED WITH THE LABELS TO ALLOW US TO -- FOR

13  CUSTOMERS OF ITUNES TO GIVE THEM THE COVER FOR THOSE SONGS

14  THAT HAD BEEN RIPPED FROM CD'S.  AND SO ALL OF A SUDDEN NOW

15  YOUR LIBRARY ALL LIT UP VISUALLY BECAUSE EVERY SONG HAD ITS

16  ALBUM COVER.

17  **Q.**  ALL RIGHT.  NOW YOU ALSO INTRODUCED A GAMES FEATURES WITH

18  7.0.  CAN YOU EXPLAIN THAT?

19  **A.**  AGAIN, GOING BACK TO THAT TIME IN 2006, THE MOST POPULAR

20  GAME CONSOLE DEVICE, EVERYTHING WAS A NINTENDO GAMEBOY, WHICH

21  WAS A PORTABLE PLAYER THAT -- THAT YOU GOT TO TAKE WITH YOU.

22  YOU PUT IT IN YOUR POCKET.

23      WE WEREN'T TRYING TO COMPETE DIRECTLY WITH THE GAMEBOY

24  BECAUSE WE WEREN'T GOING TO BE JUST A GAME MACHINE AND HAVE

25  ALL OF THE BUTTONS AND EVERYTHING ELSE.  BUT WE THOUGHT WITH

1    THE IPOD AND THE SCREEN THAT WE HAD, MANY OF THE GAMES THAT

2    PEOPLE WERE PLAYING ON GAMEBOYS, ONE OF THE MOST POPULAR ONES,

3    FOR EXAMPLE, TETRIS, AT THE TIME WAS SOMETHING THAT WOULD WORK

4    REALLY, REALLY WELL ON AN IPOD.

5        AND SO AT THIS TIME, WE DECIDED WHY DON'T WE OPEN IT UP

6    FOR DEVELOPERS TO BE ABLE TO TAKE THE SAME KIND OF GAMES THAT

7    THEY'RE MAKING AVAILABLE FOR GAMEBOY AND OTHERS AND MAKE THEM

8    AVAILABLE FOR THE IPOD, AND NOW CUSTOMERS COULD BUY THOSE

9    GAMES.

10       AND ALL OF A SUDDEN, THE IPOD BECAME EVEN THAT MUCH MORE

11   VALUABLE.  SO NOW YOU COULD LISTEN, YOU COULD HAVE, YOU KNOW,

12   IN YOUR POCKET ALL YOUR MUSIC WITH YOU, YOU COULD HAVE MOVIES,

13   YOU COULD HAVE TV SHOWS, YOU HAVE PODCASTS, AND NOW YOU COULD

14   EVEN HAVE GAMES AND YOU COULD PLAY THOSE ON THE IPOD.

15   Q.  ALL RIGHT.  WHAT WAS THE CONSUMER REACTION TO THE ADDITION

16   OF GAMES AFTER 7.0?

17   A.  AGAIN, IT WAS GREAT.  IT WAS ANOTHER GREAT NEW FEATURE.

18   PEOPLE LIKED CASUAL GAMING, WHICH IS WHAT IT WAS CALLED.

19   THESE WERE GAMES THAT YOU COULD PLAY WHILE YOU WERE IN

20   DOCTOR'S OFFICE, YOU KNOW, IN A SENSE WAITING.  AND SO IT WAS

21   FUN.  IT WAS, YOU KNOW, VERY, VERY SUCCESSFUL.

22   Q.  ALL RIGHT.  THE 7.0 DOCUMENTS TALK ABOUT SOMETHING CALLED

23   GAPLESS PLAYBACK.  CAN YOU EXPLAIN THAT?

24   A.  ANOTHER FEATURE OF 7.0, ONE OF THE THINGS THAT WE

25   DISCOVERED WITH SONGS IS THAT WHEN A SONG ENDS IT GOES SILENT

1    AND WHEN A SONG STARTS IT STARTS WITH SILENCE.  THE PROBLEM

2    WAS THERE WAS NO STANDARD FOR THAT.  AND SO YOU'D FIND ONE

3    SONG WHERE IT WAS SILENT FOR A SECOND AT THE BEGINNING.

4    ANOTHER SONG MIGHT TAKE LIKE THREE OR FOUR SECONDS OF SILENCE.

5    AND SO WHEN YOU WERE LISTENING -- YOU HAD YOUR IPOD AND YOU

6    WERE LISTENING TO MUSIC AND IT WAS ONE SONG AFTER ANOTHER,

7    SOMETIMES THERE'D BE A SECOND OF SILENCE AND SOMETIMES THERE'D

8    BE FIVE OR SIX SECONDS OF SILENCE, AND YOU DIDN'T REALIZE WHY

9    THAT WAS.  IT WAS ALMOST LIKE, WAIT, WHAT HAPPENED, DID MY

10   IPOD TURN OFF?

11       SO WE WANTED TO INTRODUCE THIS CONCEPT OF GAPLESS PLAYBACK

12   WHICH MEANT THAT WE WOULD ANALYZE THE SONG AND UNDERSTAND WHEN

13   IT WAS ACTUALLY PLAYING SO THAT AS THE SONG STOPPED PLAYING,

14   THE NEW SONG WOULD START AND SO THERE WASN'T ANY SILENCE.

15       AND SO ALL OF A SUDDEN, THE EXPERIENCE OF LISTENING TO

16   MUSIC, I THINK, WAS ENHANCED IN A -- IN A GREAT WAY.

17   **Q.**  OKAY.  ANOTHER FEATURE HAD THE NAME "IMPROVED IPOD

18   SYNCING" OR "SYNCING WITH A SINGLE CLICK."  CAN YOU EXPLAIN

19   THAT.

20   **A.**  ONE OF THE BENEFITS WHICH -- WE CAN TALK ABOUT IT IN

21   GREATER DEPTH, WHICH IS AUTO SYNC, BUT I'LL LEAVE THAT FOR A

22   SECOND AND JUST TALK ABOUT THE INTERFACE.

23       WHEN YOU PLUG IN AN IPOD INTO ITUNES OR INTO YOUR MAC, YOU

24   HAD -- YOU HAD TO LAUNCH ITUNES AND YOU HAD TO GO TO A

25   PREFERENCE AREA AND THEN YOU HAD TO SAY "I WANT TO SYNC."  AND

1    SO THERE WERE MULTIPLE STEPS IN DOING THAT.

2         AND WITH ITUNES 7, WHAT WE WANTED TO DO IS ELIMINATE

3    ALL -- SORRY -- ALL OF THOSE STEPS.  AND SO WHAT WE DID IS

4    WHEN YOU PLUGGED IN YOUR -- YOUR IPOD, WE WOULD SENSE THAT,

5    AND WE WOULD LAUNCH ITUNES AND WE WOULD BRING YOU RIGHT TO A

6    SCREEN WHERE ALL OF THE SETTINGS AND ALL OF YOUR CONTENT THAT

7    WAS ON ITUNES WAS VISIBLE.  SO WE -- WE ELIMINATED ALL OF

8    THESE STEPS.  AND NOW ALL YOU HAD TO DO WAS HIT "SYNC" AND IT

9    STARTED GOING.

10        SO WE MADE IT MUCH, MUCH EASIER FOR IPOD CUSTOMERS NOT TO

11   HAVE TO HAVE MULTIPLE STEPS TO HAVE TO SYNC THEIR CONTENT.

12   Q.  ALL RIGHT.  WELL, WHILE WE'RE ON THIS TOPIC OF AUTO

13   SYNCING, DURING YOUR -- WHEN YOU WERE TALKING TO MS. SWEENEY,

14   YOU SAID YOU LOOKED AT THE HARMONY HELP PAGE OR THE HARMONY

15   PAGE FOR HOW IT WORKED.  AND WHAT DID YOU LEARN THERE ABOUT

16   AUTO SYNCING WITH RESPECT TO HARMONY?

17   A.  WELL, LET ME DESCRIBE WHAT AUTO SYNCING AND MANUAL SYNCING

18   IS FIRST.  AND THEN I'LL DESCRIBE HOW -- HOW IT IS.

19        BY DEFAULT, MEANING WHEN YOU BUY YOUR IPOD, ONE OF THE, I

20   THINK, REALLY COOL IDEAS THAT MADE US SUCCESSFUL WAS THAT

21   BEFORE THE IPOD -- AND WE HAD DEVICES -- I HAD DEVICES THAT --

22   THAT DID THIS -- WHENEVER I WANTED TO MOVE A SONG ONTO THE

23   DEVICE, I HAD TO DRAG IT.  YOU'D HAVE TO SELECT IT ON THE

24   SCREEN AND THEN DRAG IT OVER.  AND IF I WANTED TO TAKE AN

25   ALBUM, I HAD TO DRAG THE ALBUM OVER.  IF I WANTED TO TAKE A

1    PLAYLIST, I HAD TO DRAG THE PLAYLIST OVER.  SO EVERYTHING WAS

2    MANUAL.

3        WITH IPOD, WE CAME UP WITH THIS IDEA OF AUTO SYNC FROM THE

4    VERY BEGINNING AND THE IDEA OF IT WAS WHY ARE WE ASKING

5    CUSTOMERS TO MANUALLY HAVE TO MANAGE THIS WHEN REALLY WHAT

6    THEY WANT IS THEY WANT ALL THEIR MUSIC THE SAME WAY THEY HAVE

7    IT ON THEIR COMPUTER ON THE GO ON THEIR IPOD AND SO WHAT WE

8    DID IS SO THAT AS YOU WERE -- LET'S SAY YOU RIPPED A CD ONTO

9    YOUR MAC AND ITUNES, OR YOU BOUGHT A SONG FROM THE STORE AND

10   YOU CREATED A PLAYLIST, THE NEXT TIME YOU PLUGGED IN YOUR

11   IPOD, RATHER THAN HAVING TO REMEMBER THAT YOU BOUGHT THAT SONG

12   AND YOU WANT TO DRAG IT OVER OR THAT YOU CREATED THIS NEW

13   PLAYLIST AND YOU HAD TO DRAG IT OVER, WE WOULD AUTOMATICALLY

14   SENSE THAT THE IPOD DIDN'T HAVE THOSE THINGS AND WE'D MOVE IT

15   AUTOMATICALLY THERE.

16       SO WE MADE IT SO THAT THE MANAGEMENT OF YOUR PORTABLE

17   DEVICE WAS IRRELEVANT.  YOU DIDN'T HAVE TO THINK ABOUT IT.

18       ONE OF THE PROBLEMS THAT REAL, AND ONE OF THE REASONS I

19   WAS VERY UNHAPPY WHEN HARMONY CAME OUT, BESIDES THE HACKING

20   AND THE OTHER THINGS I'VE TALKED ABOUT, IS THAT IN ORDER FOR

21   REAL'S HARMONY TO WORK, YOU HAD TO SET YOUR IPOD TO MANUAL

22   MODE.  WHICH MEANS THAT ALL OF THESE AUTO SYNCING FEATURES I

23   JUST DESCRIBED WENT AWAY.

24       AND SO WHAT HAPPENS IS A REAL CUSTOMER, FOR EXAMPLE, WOULD

25   HAVE TO GO IN TO SETTINGS, SET THE IPOD INTO MANUAL MODE, AND

1    THEN THEY WOULD HAVE TO START DRAGGING THOSE SONGS FROM REAL

2    ONTO THE PLAYER.

3        IF I WAS A CUSTOMER ON ITUNES THAT WAS AUTO SYNCING NOW,

4    THE NEXT TIME AFTER I DID THAT ON THE REAL SIDE, WHEN I CAME

5    BACK TO MY ITUNES SIDE --

6    **Q.**  LET ME STOP YOU THERE, JUST TO MAKE THIS CLEAR.  SO

7    SUPPOSE I'M A CUSTOMER WHO'S ON MANUAL.  I'M TIRED OF -- I'M

8    TIRED OF CLICKING AND DRAGGING.  AND I SWITCH TO -- I GO BACK

9    TO AUTO SYNC.  WHAT HAPPENS?

10   **A.**  WELL, IF YOU'RE IN MANUAL MODE AND YOU GO BACK TO AUTO

11   SYNC, REMEMBER AUTO SYNC IS ABOUT HAVING THE EXACT COPY ON

12   YOUR COMPUTER AND ON YOUR IPOD.  SO THEY'RE A MIRROR OF EACH

13   OTHER.  AND THERE'S ALWAYS -- ANYTIME YOU CONNECT THEM,

14   THEY'RE EXACT MIRRORS.

15       SO IF YOU SAY YOU WANT TO BE IN AUTO SYNC MODE, THE FIRST

16   THING WE DO IS WE ERASE EVERYTHING FROM THE IPOD, AND WE PUT

17   EVERYTHING FROM THAT COMPUTER ONTO THAT IPOD SO THAT THEREFORE

18   FROM NOW ON EVERYTHING IS ALWAYS THE SAME.

19           **THE COURT:**  ALL RIGHT -- I'M SORRY.  FINISH.

20           **THE WITNESS:**  SO IN THE CASE OF IF YOU'RE IN MANUAL

21   MODE, IF YOU EVER WANT TO GO TO AUTO SYNC MODE, IT JUST ERASES

22   EVERYTHING.

23           **THE COURT:**  IT'S TIME FOR OUR BREAK?

24       **MR. ISAACSON:**  ABSOLUTELY, YOUR HONOR.

25           **THE COURT:**  OKAY.  LADIES AND GENTLEMEN, WE'LL GO

 1    AHEAD AND TAKE OUR MORNING BREAK.

 2         I HAVE TO TELL YOU.  I DID GO TO THE STORE YESTERDAY.  I

 3    DID BUY YOU SNACKS.  AND THEN I PROCEEDED TO LEAVE THEM IN

 4    MY -- THAT, ALONG WITH MY LUNCH.  SO ANYWAY, I DON'T HAVE THEM

 5    FOR YOU TODAY.  I WILL REMEMBER TO BRING THEM TOMORROW.  BUT

 6    HOPEFULLY YOU GUYS BROUGHT SOME SNACKS YOURSELVES.

 7         SO WE WILL STAND IN RECESS FOR 15 MINUTES.  I'LL CALL YOU

 8    BACK THEN.

 9         (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

10    OF THE JURY:)

11         **THE COURT:**  THE RECORD WILL REFLECT THAT THE JURY HAS

12    LEFT.

13         COUNSEL, STAND IN RECESS FOR 15 MINUTES.

14         IS THERE SOMETHING?  MR. ISAACSON IS TAKING A DEEP BREATH.

15         **MR. ISAACSON:**  IF YOU --

16         **THE COURT:**  EVERYONE CAN SIT DOWN.

17         **MR. ISAACSON:**  WITHOUT DISCLOSING THAT IT CAME FROM

18    THE LAWYERS, IF YOU WANT TO SAY YOU FOUND SOME SNACKS FOR

19    THEM, WE COULD DELIVER THEM SOME SNACKS.

20         **THE COURT:**  YOU KNOW, IN STATE COURT THAT WORKS.  IN

21    FEDERAL COURT, IT DOESN'T.

22         **MR. ISAACSON:**  OKAY.

23         (RECESS TAKEN AT 10:02 A.M.; PROCEEDINGS RESUMED AT

24    10:17 A.M.)

25         (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

1    OF THE JURY:)

2           **THE COURT:**  ONE QUICK HOUSEKEEPING ISSUE BEFORE WE

3    CALL THE JURY BACK IN.

4       WITH RESPECT TO THESE COURTESY COPIES OF EXHIBITS, DO YOU

5    FOLKS WANT TO GIVE HARD COPIES OR JUST PUT OUT THUMB DRIVES

6    FOR PEOPLE TO DOWNLOAD THINGS?

7           **MR. ISAACSON:**  I DON'T KNOW.  I'LL HAVE TO BE

8    SPEAKING TO THE PEOPLE WHO --

9           **MS. SWEENEY:**  I'VE HEARD FROM OUR PEOPLE, YOUR HONOR.

10   THEY WOULD PREFER TO DO THUMB DRIVES.

11          **THE COURT:**  I WAS JUST THINKING IT MIGHT BE A LOT

12   EASIER THAN HARD COPIES.  WE'D KILL FEWER TREES.

13          **MR. ISAACSON:**  ANY OPINIONS FROM OVER THERE?

14                 (OFF-THE-RECORD DISCUSSION.)

15          **THE COURT:**  OKAY.  SO YOU PUT OUT COPIES SO IF YOU

16   WANT.  I'LL JUST GIVE YOU THE OPTION OF DOING THAT VERSUS HARD

17   DRIVES -- I MEAN THUMB DRIVES.

18      AND I WOULD ASK MEMBERS OF THE PRESS THAT YOU'RE ON THE

19   HONOR SYSTEM HERE, RIGHT?  SO SHARE.  DON'T BE TAKING THEM.

20   JUST DOWNLOAD AND LEAVE THE THUMB DRIVE THERE FOR SOMEONE

21   ELSE.

22      OKAY.  LET'S CALL THE JURY OUT.

23                 (PAUSE IN THE PROCEEDINGS.)

24      (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

25   THE JURY:)

 1          **THE COURT:**  YOU MAY BE SEATED.

 2       YOU NOW ARE ALL PERFECTLY ALIGNED IN YOUR REENTRY INTO THE

 3    COURTROOM.  EXCELLENT.

 4       OKAY.  MR. ISAACSON, YOU MAY PROCEED.

 5    **BY MR. ISAACSON:**

 6    **Q.**  BACK TO 7.0, MR. CUE.  THERE WAS A FEATURE WITH THE

 7    ITUNES 7. UPDATE CALLED "COPY PURCHASES FROM IPOD" WHERE YOU

 8    COULD COPY PURCHASES FROM YOUR IPOD TO YOUR COMPUTER.

 9       COULD YOU EXPLAIN WHAT THAT WAS?

10    **A.**  WELL, ONE OF THE THINGS THAT WAS HAPPENING SOMETIMES IS

11    THAT THE IPOD -- YOU -- YOU HAD A COMPUTER AT WORK, AS AN

12    EXAMPLE, AND A COMPUTER AT HOME.  AND YOU WOULD BUY, LET'S

13    SAY, ALL OF YOUR MUSIC AT WORK, BUT YOU WANTED TO LISTEN TO IT

14    AT HOME.

15       BEFORE THIS FEATURE OF 7.0, WHAT YOU HAD TO DO IS YOU HAD

16    TO GET A PORTABLE DRIVE.  IN THOSE DAYS THERE WEREN'T EVEN

17    THINGS LIKE THUMB DRIVES THAT MUCH, SO YOU HAD TO HAVE

18    PORTABLE HARD DRIVE TO KIND OF MOVE THE CONTENT BETWEEN YOUR

19    WORK AND YOUR HOME.

20       SO ONE OF THE IDEAS THAT WE CAME UP WITH IS WHAT IF WE

21    TAKE THE IPOD AND WHEN YOU CONNECTED TO YOUR COMPUTER AT HOME,

22    IT WOULD SENSE THAT THERE'S NEW SONGS THAT YOU PURCHASED.  AND

23    SINCE WE KNEW THAT THAT COMPUTER AT HOME WAS CONNECTED UNDER

24    THE SAME ACCOUNT FOR THE DRM PURPOSES, IT WOULD COPY THE

25    CONTENT FROM THE IPOD TO THAT COMPUTER.

1    THE KEY THERE IS THAT WE KNOW THAT DRM PIECE BECAUSE

2    OTHERWISE YOU COULD TAKE THAT IPOD AND MOVE IT FROM COMPUTER

3    TO COMPUTER OF ALL YOUR FRIENDS OR ANYBODY ELSE, OR SELL IT ON

4    EBAY AND THEY WOULD BE ABLE TO COPY IT FROM THERE.  AND SO IT

5    ONLY COPIED TO A COMPUTER THAT WAS WITH THE SAME DRM.

6    **Q.**  ALL RIGHT.  AND THERE WERE IMPROVED ACCESSIBILITY FEATURES

7    FOR ITUNES AND SOMETHING CALLED VOICEOVER.  WOULD YOU EXPLAIN

8    THAT?

9    **A.**  WELL, ONE OF THE THINGS THAT GOES BACK TO THE VERY

10   EARLIEST DAYS OF APPLE EVEN -- EVEN PRIOR TO MYSELF BEING

11   THERE IS WE CARED A LOT ABOUT MAKING OUR PRODUCT ACCESSIBLE TO

12   THE DISABLED.  AND SO WE WERE ALWAYS LOOKING FOR FEATURES

13   AND -- AND EVEN TODAY I THINK WE'RE A LEADER IN THAT.  AND ONE

14   OF THE THINGS THAT WE WANTED, FOR EXAMPLE, IS FOR A BLIND

15   PERSON TO BE ABLE TO ENJOY THEIR IPOD AND THEIR MUSIC.

16   OBVIOUSLY THEY COULDN'T SEE THE SCREEN, AND SO A FEATURE LIKE

17   VOICE TO BE ABLE TO TELL YOU WHAT THE SONG IS AND WHERE YOU

18   ARE IN THE MENUS AND ALL OF THOSE THINGS WERE CRITICAL TO

19   THAT.  AND SO WE INTRODUCED THAT AS PART OF ITUNES 7 AND THE

20   NEW IPODS.

21   **Q.**  AND ON A MORE MUNDANE TOPIC, THERE WAS A FEATURE RELATING

22   TO THE NFL?

23   **A.**  THERE WAS.  AS -- AS MOST OF YOU KNOW, THE NFL'S WAS THE

24   MOST WATCHED SPORTS IN THE UNITED STATES.  AND WE HAD DONE A

25   DEAL WITH THEM FOR THE NFL NETWORK SUCH THAT IF YOU WANTED TO

1   WATCH HIGHLIGHTS OF THE GAME, YOU COULD GET THEM RIGHT ONTO

2   YOUR IPOD AND WE WOULD SELL THEM THROUGH ITUNES.

3       AND SO IT WAS A BRAND -- IT WAS THE FIRST TIME THE NFL

4   AGAIN HAD MADE THEIR STUFF AVAILABLE DIGITALLY IN ANY WAY

5   OTHER THAN BROADCASTING ON TELEVISION.

6   **Q.**  ALL RIGHT.  AND DID ITUNES 7.0 ALSO INCLUDE NEW

7   ARCHITECTURE FOR THE FAIRPLAY SOFTWARE?

8   **A.**  IT DID.  IT INCLUDED, AS PRETTY MUCH EVERY RELEASE THAT WE

9   HAD, INCLUDED CHANGES TO THE DRM.

10  **Q.**  ALL RIGHT.  AND WHAT DID -- FROM YOUR PERSPECTIVE, WHAT

11  DID FAIRPLAY ACCOMPLISH?

12  **A.**  HERE'S THE WAY THAT WE -- EXCUSE ME -- THE WAY WE STARTED

13  AND THE WAY WE LOOKED AT IT.  IT WAS ABOUT KEEPING HONEST

14  PEOPLE HONEST.  WHAT DOES THAT MEAN?

15      AS YOU RECALL, A DRM IS ABOUT NOT ALLOWING YOU TO DO

16  THINGS.  IT HAS RESTRICTIONS LIKE HOW MANY TIMES YOU COULD

17  BURN THE SONG ONTO A CD.  YOU HAD TO USE IT ON A NUMBER OF

18  COMPUTERS SO YOU COULD HAVE A COMPUTER AT WORK AND AT HOME,

19  BUT ONLY A CERTAIN NUMBER.  THERE WERE A LOT OF RESTRICTIONS

20  THAT THE DRM HAD NOW.

21      WE NEGOTIATED VERY HARD WITH THE LABELS AND GOT THOSE

22  RESTRICTIONS SO WHAT WE THOUGHT WAS A MANAGEABLE LIST THAT THE

23  AVERAGE CONSUMER, AS THEY WERE USING THIS, WAS NOT GOING TO

24  HIT ANY OF THOSE LIMITS, RIGHT?  SO THE LAST THING YOU WOULD

25  WANT IS, IF YOU WERE A LEGITIMATE USER, YOU BOUGHT A SONG FROM

```
 1    ITUNES, AND NOW YOU WANTED TO PLAY IT ON YOUR IPOD AND SOMEHOW

 2    IT DIDN'T PLAY.  NOBODY WOULD EVER BUY ANOTHER SONG.  NOBODY

 3    WOULD EVER BUY ANOTHER IPOD.  THAT'S WHY THIS WAS REALLY

 4    CRITICAL TO US, TO MAKE SURE THAT IT ALWAYS WORKED.

 5        AND SO WHEN WE WERE DOING THIS, THE LABELS, AGAIN, WANTED

 6    THE DRM, WANTED THESE PROTECTIONS.  AND SO WE SAID, WELL,

 7    WE'VE GOT TO MAKE THESE PROTECTIONS AS EASY AND AS SEAMLESS

 8    FOR THE USER TO NEVER RUN INTO THEM.

 9        AND SO WE WORKED REALLY, REALLY HARD IN DESIGNING THE DRM

10    BOTH IN THE IPOD, THE ITUNES, AND IN THE STORE SO THAT IT

11    WORKED SEAMLESSLY.  AND YOU NEVER REALLY RAN INTO IT UNLESS

12    YOU WERE TRYING TO DO SOMETHING THAT WAS GIVE AWAY THE SONG TO

13    SOMEBODY.

14        OR UNFORTUNATELY IF YOU HAD SIX COMPUTERS, FOR EXAMPLE,

15    BECAUSE YOU HAD A LOT OF COMPUTERS IN YOUR HOUSE, YOU WOULD

16    RUN INTO THE LIMIT.  BUT IN GENERAL, MOST USERS NEVER RAN INTO

17    IT, AND SO IT FELT LIKE IT WAS ALMOST DRM-FREE IN A SENSE

18    BECAUSE THEY WEREN'T HITTING ANY LIMITS IN TRYING TO DO

19    ANYTHING.

20    Q.  OKAY.  WHAT RELEVANCE DID YOU BELIEVE THIS HAD TO ARTISTS,

21    THE FAIRPLAY DRM?

22    A.  WELL, IF YOU GO BACK TO WHEN WE STARTED, MUSIC WAS ALL

23    BOUGHT ON CD'S.  BUT THE REALITY OF WHAT HAPPENED WHEN WE

24    LAUNCHED IN 2003 IS THAT PIRACY WAS RAMPANT.  THERE WERE

25    SERVICES LIKE NAPSTER, BITTORRENT, ALL OF THESE THINGS.  AND
```

1    PEOPLE WERE ACTUALLY JUST ACQUIRING MUSIC THROUGH THESE SITES

2    AND WERE PAYING NOTHING FOR IT.  AND SO THERE WAS RAMPANT

3    PIRACY IN THE MARKET.

4        AND THAT CONTINUED.  AND EVEN TO THIS DAY, THERE'S PIRACY,

5    BUT NOWHERE NEAR AS MUCH AS THERE WAS OVER THOSE FIRST FOUR OR

6    FIVE YEARS THAT WE WERE IN THE BUSINESS OF.

7        AND SO WE LOOKED AT OURSELVES.  OUR NUMBER ONE OBJECTIVE

8    WHEN WE STARTED, AND I THINK IF YOU LOOK AT OUR LAUNCH EVENT,

9    WE SAID OUR NUMBER ONE COMPETITOR IN LIFE IS PIRACY.  BECAUSE

10   WE'RE TRYING TO CONVINCE PEOPLE THAT ARE GETTING THEIR MUSIC

11   FOR FREE TO NOW PAY FOR IT AGAIN.  AND SO HOW ARE WE GOING TO

12   DO THAT?

13       AND THE WAY WE WERE GOING TO DO THAT IS WE WERE GOING TO

14   DESIGN SOMETHING THAT WORKED SO SEAMLESSLY AND WORKED SO WELL

15   THAT IT WAS BETTER THAN ACTUALLY GOING OUT AND PIRATING.

16       AND YOU SAY, WELL, HOW COULD IT BE BETTER?  WELL, IT WAS

17   BETTER BECAUSE THE QUALITY OF THE SONGS WERE CONSISTENT.  YOU

18   COULD PREVIEW EVERY SONG SO YOU KNEW WHEN YOU WANTED TO

19   DOWNLOAD SOMETHING THAT IT WAS THE RIGHT SONG.  THE SERVERS WE

20   RAN SO IT WAS ALWAYS FAST.  ONE OF THE THINGS THAT WOULD

21   HAPPEN WHEN YOU WERE PIRATING, THINGS WOULD TAKE A REALLY LONG

22   TIME TO DOWNLOAD.  SOMETIMES IT WOULD AND YOU WOULDN'T

23   UNDERSTAND WHAT IT WAS.

24       SO WE DID A BUNCH OF THINGS THAT REALLY COMPETED WITH

25   PIRACY TO TRY TO CONVINCE PEOPLE TO MOVE OVER.  AND OVER TIME

1    WE WERE VERY SUCCESSFUL AT DOING THAT AND GETTING MORE AND

2    MORE CUSTOMERS TO NOT PIRATE.

3    **Q.**  LET ME PAUSE ON THAT TOPIC.  YOU WERE SHOWN DOCUMENTS

4    SHOWING 70 PERCENT OR 80 PERCENT MARKET SHARE FOR LEGAL

5    DIGITAL DOWNLOADS.  WHAT ABOUT YOUR SHARE OF ALL DIGITAL

6    DOWNLOADS?  HOW DID THAT COMPARE?

7    **A.**  WELL, OUR SHARE OF OVERALL DIGITAL DOWNLOADS, IT'S HARD TO

8    REPORT BECAUSE OBVIOUSLY IF YOU'RE PIRATING, YOU'RE NOT

9    STANDING UP AND BROADCASTING HOW MUCH YOU'RE STEALING.  AND SO

10   THERE WASN'T ANY KNOWN ENTITY THAT YOU COULD DO EXACTLY LIKE

11   WE DID SALES.  BUT THERE WERE A LOT OF SURVEYS AND -- AND

12   ORGANIZATIONS THAT DID SURVEYS OF PEOPLE AND TO TRY TO

13   DETERMINE WHAT PIRACY.  AND PIRACY WAS MUCH, MUCH GREATER THAN

14   WHAT WE WERE SELLING.

15       SO WE WERE, YOU KNOW, NOWHERE NEAR WHAT THE PIRACY OF

16   MUSIC WAS.

17       ALONG WITH THE FACT THAT WE HAVE TO REMEMBER THAT DURING

18   THOSE TIMES, THE MAJORITY OF LEGITIMATE MUSIC THAT WAS BEING

19   BOUGHT WAS STILL PHYSICAL.  SO PEOPLE BUYING CD'S.

20       AND SO WHEN WE HAD 70 PERCENT MARKET SHARE OF DIGITAL

21   MUSIC, IT WAS OF THE LEGAL PART.  AND WHEN YOU COMPARED IT TO

22   THE OVERALL EVEN LEGAL MUSIC DOWNLOAD -- MUSIC SALES INCLUDING

23   CD'S AND DOWNLOADS, OUR MARKET SHARE WAS IN THE HIGH SINGLE

24   DIGITS.  SO IT WAS LIKE IN THE SEVEN, EIGHT, NINE, TEN PERCENT

25   RANGE.  SO WE STILL HAD A LONG WAY TO GO IN CONVERTING PEOPLE

1    TO LEGALLY BUYING DIGITAL MUSIC WHICH WAS, YOU KNOW, AN

2    OBJECTIVE WE HAD.

3    **Q.**  ALL RIGHT.  LET'S TAKE A QUICK LOOK WHILE WE'RE ON THIS

4    SUBJECT AT 2337.  IT'S IN YOUR BINDER.

5                    (EXHIBIT PUBLISHED TO JURY.)

6    **BY MR. ISAACSON:**

7    **Q.**  IS THIS AN ITUNES MUSIC STORE REVIEW THAT YOU PREPARED?

8    **A.**  YES, IT IS.

9            **MR. ISAACSON:**  ALL RIGHT.  AND, MATT, IF WE CAN SHOW

10   THE JURY THE FIRST PAGE AND THEN MOVE TO PAGE 9.

11                   (EXHIBIT PUBLISHED TO JURY.)

12   **BY MR. ISAACSON:**

13   **Q.**  THIS IS -- THERE'S SEVERAL PAGES ABOUT COMPETING WITH

14   PIRACY HER THAT BEGIN WITH THIS EMBLEM.  AND IN THIS -- IN

15   THIS PRESENTATION, ARE YOU SUMMARIZING WHAT YOU JUST TOLD THE

16   JURY ABOUT YOUR COMPETITION WITH PIRATED MUSIC?

17   **A.**  THAT'S CORRECT.

18           **MR. ISAACSON:**  OKAY.  AND IF YOU BACK UP ONE PAGE,

19   MATT.

20                   (EXHIBIT PUBLISHED TO JURY.)

21   **BY MR. ISAACSON:**

22   **Q.**  PAGE 8, TOTAL U.S. MARKET.  THIS IS 2004.

23      WOULD YOU EXPLAIN THIS CHART?

24   **A.**  WELL, THIS -- THIS IS IN 2004.  AND -- AND THIS WAS TO THE

25   POINT OF I WAS TRYING TO MAKE OF CD SALES VERSUS DIGITAL

1    DOWNLOADS.  SO IF YOU LOOK AT THE OVERALL SALES OF MUSIC

2    INCLUDING CD'S AND ALL OF DIGITAL OURSELVES AND OTHER DIGITAL

3    PROVIDERS, THE DIGITAL PROVIDERS WERE 1.8 PERCENT OF WHICH WE

4    WERE, DEPENDING ON WHAT MONTH, LET'S CALL IT 70 PERCENT OF

5    THAT.

6        SO IN THIS PARTICULAR TIME FRAME, WE WERE LESS THAN, YOU

7    KNOW, 2 PERCENT.  WE WERE PROBABLY IN THE 1.5 PERCENT.  OVER

8    THE YEARS EVEN AS IT GREW, IT WAS STILL IN THE SINGLE DIGITS

9    FOR MANY, MANY YEARS.

10   **Q.**  BY 2006, 2007, THERE'S A PERCENTAGE OF ALL MUSIC SALES.

11   HOW -- WHERE DID THE ITUNES STORE FIT?

12   **A.**  AGAIN, I KNOW I REMEMBER IT GROWING TO ABOUT THE

13   10 PERCENT RANGE, AND I DON'T EXACTLY REMEMBER THE YEAR, BUT

14   IT TOOK MANY YEARS FOR US TO GET TO THAT POINT.

15   **Q.**  ALL RIGHT.  ALL RIGHT.  SO GOING BACK TO -- TO 7.0.

16       IN 7.0, WAS THERE FAIRPLAY SECURITY -- THERE WAS FAIRPLAY

17   SECURITY FOR MUSIC.  WHAT ABOUT TV AND MOVIES?

18   **A.**  ONE OF THE THINGS THAT WAS VERY, VERY DIFFERENT ABOUT TV

19   AND MOVIES --

20   **Q.**  BEFORE YOU EXPLAIN, DID YOU HAVE FAIRPLAY SECURITY FOR TV

21   AND MOVIES?

22   **A.**  YES, WE DID.

23   **Q.**  OKAY.  AND NOW EXPLAIN WHY.

24   **A.**  UNLIKE MUSIC WHERE IT WAS SOLD WITHOUT DRM -- REMEMBER I

25   MENTIONED ON AN AUDIO CD, THERE WAS NO DRM ON IT.  IT WAS --

```
 1    IT WAS EVEN LATER ON WHEN THEY TRIED, THEY FAILED.  ON DVD'S
 2    THERE WAS A DRM.  AND SO YOU ACTUALLY COULDN'T COPY A DVD LIKE
 3    YOU COULD AN AUDIO CD.
 4        SO NOT SURPRISINGLY, WHEN WE WENT TO DO THE DEALS WITH THE
 5    TV STUDIOS AND THE MOVIE STUDIOS, THEY REQUIRED US TO HAVE A
 6    DRM.
 7        OBVIOUSLY, WHAT WE THEN DID IS TAKE THE DRM THAT WE HAD
 8    AND WE EXTENDED IT TO SUPPORT VIDEO AND A FEW OTHER
 9    REQUIREMENTS THAT THEY HAD AS PART OF IT.
10    Q.  DOES FAIRPLAY SECURITY STILL EXIST TODAY FOR TV AND
11    MOVIES?
12    A.  IT EXISTS FOR TV, MOVIES.  IT STILL EXISTS FOR MUSIC.
13    EVEN THOUGH IT'S AVAILABLE DRM-FREE, IT EXISTS FOR THE APP
14    STORE FOR APPS.  IT EXISTS FOR MANY THINGS, BOOKS.
15    Q.  DO YOU STILL HAVE A LARGE TEAM OF PEOPLE WORKING ON DRM
16    EVERY DAY?
17    A.  UNFORTUNATELY, YES.
18    Q.  AND YOU SAID IT STILL EXISTS FOR MUSIC.  WOULD YOU EXPLAIN
19    THE ITUNES STORE AND WHY YOU WOULD -- I CAN BUY MUSIC FROM THE
20    ITUNES STORE DRM-FREE, RIGHT?
21    A.  THAT'S CORRECT.  THE --
22    Q.  SO EXPLAIN WHY THERE'S STILL DRM IN THE ITUNES STORE.
23    A.  THE MUSIC THAT YOU GET IS DRM-FREE, BUT OBVIOUSLY WE HAVE
24    TO STORE IT ON SERVERS WITH DRM.  AND -- WELL, WHY DO YOU HAVE
25    TO DO THAT?  THE REASON IS WE DON'T WANT ANYBODY TO GET ACCESS
```

1   TO THOSE SERVERS AND STEAL ALL THE MUSIC FROM US.

2       AND SO WE HAVE, I THINK, NOW OVER 30 MILLION SONGS IN THAT

3   DATABASE.  AND SO ALL OF THOSE SONGS ARE ENCRYPTED AND SECURED

4   WITH THE DRM AND IS UPDATED WITH THAT DRM AS WE DO THAT.  AND

5   THEN WHEN WE'RE GOING TO SEND A COPY TO YOU AS AN INDIVIDUAL,

6   WE TAKE THAT, WE UNLOCK IT AND SEND YOU THE UNLOCKED COPY.

7   BUT EVERYTHING ON THE SERVER IS STILL MAINTAINED WITH

8   FAIRPLAY.

9   **Q.**  ALL RIGHT.  CAN I ASK YOU TO LOOK AT 2495, TX2495.

10        **MR. ISAACSON:**  AND JUST HIGHLIGHT THE TOP, MATT.

11            (EXHIBIT PUBLISHED TO JURY.)

12  **BY MR. ISAACSON:**

13  **Q.**  YOU TOLD US WHAT A PPR WAS BEFORE.  IS THIS THE PPR FOR

14  7.4?

15  **A.**  YES.  THIS IS THE RESPONSE, MY APPROVAL OF THE -- OF THE

16  PPR.

17  **Q.**  ALL RIGHT.  AND CAN YOU COMPARE THE IMPORTANCE OF THE

18  RELEASE OF 7.4 TO 7.0?

19  **A.**  IT'S SLIGHTLY SMALLER.  IF -- THE EASIEST WAY FOR YOU TO

20  UNDERSTAND WHEN YOU LOOK AT OUR RELEASES IS IF THE NUMBER --

21  THE BIG NUMBER CHANGES, LIKE 7, ITUNES 6, ITUNES 7, ITUNES 8,

22  THEN THAT IMPLIES A MAJOR RELEASE.  THAT MEANS THERE'S A LOT

23  MORE FEATURES, A LOT MORE FUNCTIONS.

24      THE SECOND NUMBER, IN THIS CASE LET'S CALL IT THE 4 IN

25  7.4, IMPLIES THAT THIS IS SORT OF A MIDDLE-TYPE RELEASE.  IT'S

 1    NOT A MINOR RELEASE, BUT IT'S NOT QUITE UP TO A FULL-FEATURED,

 2    BIG RELEASE.

 3        WE ALSO DO RELEASES LIKE 7.4.1.  THOSE ARE USUALLY MEANT

 4    FOR BUG FIXES.  SO 7.4 WAS A MEDIUM RELEASE THAT WE WERE

 5    DOING.

 6    **Q.**  ALL RIGHT.  AND DO YOU RECALL SOME OF THE FEATURES OF 7.4?

 7    **A.**  THERE WERE.  AT THIS TIME, WE HAD INTRODUCED THE IPHONE

 8    AND IPOD TOUCH.  AND ONE OF THE FEATURES OF ITUNES 7.4 WAS TO

 9    SUPPORT THOSE DEVICES.  SO WE NEEDED TO DO CHANGES TO ITUNES

10    TO SUPPORT THOSE DEVICES.

11        AND -- AND ONE NEW FEATURE WE ADDED WHICH WAS BRAND-NEW

12    WAS CALLED RING TONES.  AND ON -- ON THE -- THE IPHONE, ONE OF

13    THE CAPABILITIES THAT YOU WANTED TO HAVE WAS WHEN THE PHONE

14    RANG, TO NOT JUST HAVE THE RING TONES THAT WE PROVIDED, BUT

15    HAVE MUSIC PLAYBACK.  AND SO WE WANTED TO BE ABLE TO SELL RING

16    TONES AND CREATE RING TONES, AND SO WE ADDED THAT TO ITUNES.

17        IF YOU RECALL WHEN YOU -- WHEN I SAID THAT YOU PLUG IN AN

18    IPOD, FOR EXAMPLE, WE WOULD POP UP THAT SCREEN AND WE WOULD DO

19    THE AUTO SYNC.  ONE OF THE THINGS WE NEVER HAD THE CAPABILITY

20    TO TELL YOU IS HOW MUCH BATTERY LIFE WAS LEFT ON YOUR IPOD, SO

21    WE INCLUDED THAT IN THAT RELEASE.

22        WE ALSO INCLUDED THE CAPABILITY FOR GAMES TO PLAY ACROSS

23    MULTIPLE IPODS.  AT THIS POINT, WE HAD IPODS WITH DIFFERENT

24    SCREEN SIZES.  SO WE HAD NANOS THAT WERE -- OR MINIS, I DON'T

25    REMEMBER THE -- THE ONES AT THIS TIME.  BUT WE HAD ONES THAT

1   WERE SMALLER SCREEN, ONES THAT WERE LARGER SCREEN.  AND WE

2   WANTED A GAME DEVELOPER TO BE ABLE TO CREATE THE GAME ONCE AND

3   IT WOULD WORK ACROSS BOTH DEVICES.

4        AGAIN, IN OUR CONTINUATION FOR ACCESSIBILITY AND THE

5   DISABLED, WE ADDED CLOSED CAPTIONING FOR BOTH MOVIES AND TV

6   SHOWS AS PART OF THAT.  AND -- AND A FEW OTHER MINOR THINGS

7   ONTO THAT RELEASE.

8   **Q.**  ALL RIGHT.  AND FROM YOUR WORK AT APPLE, WHAT WAS YOUR

9   UNDERSTANDING OF HOW FAIRPLAY GENERALLY PROTECTED CONTENT FROM

10  BEING STOLEN?

11  **A.**  WELL, OUR GOAL, AS I SAID, IS TO KEEP HONEST PEOPLE HONEST

12  WHICH MEANT THAT WE WANTED FAIRPLAY TO WORK FOR THE LEGITIMATE

13  USER, THE CUSTOMER THAT WAS BUYING SONGS FROM THE STORE, WAS

14  USING ITUNES, AND HAD AN IPOD.

15       WHAT WE WERE TRYING TO PREVENT IS SONGS FROM GOING ONTO

16  THE PIRATED SITES FOR PEOPLE TO REMOVE THE DRM.

17       WE WERE ALSO TRYING TO MAKE SURE THAT THAT ECOSYSTEM THAT

18  I TALKED ABOUT THAT YOU BUY A SONG, YOU HAVE ITUNES, YOU HAVE

19  IPOD, AND THAT IT ALWAYS WORKS, THAT AUTO SYNC AND OTHER

20  THINGS THAT WE HAD THAT ALWAYS, YOU KNOW, WORKED WAS CRITICAL

21  TO US.

22       AND THAT -- THAT WAS PART OF THE CONCEPT WHEN WE WERE

23  DOING THE DRM WAS THE DRM CAN'T GET IN THE WAY, IT CAN'T BE

24  SOMETHING THAT CAUSES ISSUES.  IT CAN'T CAUSE PROBLEMS.  IT

25  CAN'T CAUSE INCOMPATIBILITY.  IT CAN'T BE THAT I UPGRADE AND

1    NOW ALL OF A SUDDEN I BUY A NEW IPOD AND SOMEHOW THE SONG THAT

2    I WAS USED TO PLAYING WITH WOULD ALWAYS CONTINUOUSLY WORK, AS

3    WE WERE MAKING THINGS LIKE ADDING MOVIES, TV SHOWS, GAMES AND

4    OTHER THINGS.

5    **Q.**  WHAT ABOUT, OTHER THAN THE HONEST PEOPLE BEING HONEST,

6    WHAT ABOUT HACKERS?  WHAT CONCERNS DID YOU HAVE ABOUT THEM?

7    **A.**  WELL, WE HAD TWO CONCERNS WITH HACKERS.  ONE CONCERN WE

8    HAD WITH HACKERS WAS PEOPLE REMOVING THE DRM.  WE HAD A

9    CONTRACTUAL OBLIGATION WITH THE LABELS WHICH THEY ENFORCED

10   READILY BY NOTIFYING US OF HACKS.  AND WHAT THAT CONTRACT

11   POSITION THAT THEY HAD WAS, IF A HACK HAPPENED, WE HAD TO

12   REMEDY THAT HACK WITHIN A CERTAIN TIME PERIOD OR THEY COULD

13   REMOVE ALL THE CONTENT FROM THE STORE.  IN OTHER WORDS, WE HAD

14   A TIME TO FIX THE PROBLEM, AND IF WE DIDN'T FIX IT, THEY COULD

15   TAKE ALL THEIR MUSIC OFF THE STORE.

16       AND SO WHENEVER THERE WAS A HACK, WE'D HAVE COMMUNICATIONS

17   WITH THE LABELS ABOUT THIS.  SO WE HAD TO CLOSE THOSE HACKS

18   RELATIVELY QUICKLY SO WE HAD TO KIND OF DROP WHATEVER WE WERE

19   DOING AND GO WORK ON THOSE.

20       THE SECOND PROBLEM THAT WE HAD WITH HACKS, AND -- AND, YOU

21   KNOW, THE MOST CRITICAL ONE, IN MY VIEW, WITH REAL AND -- AND

22   HARMONY, IS WHAT I TALKED ABOUT WHICH IS NOT ONLY ARE THEY

23   HACKING AND IT MAY BE AN ISSUE WITH THE WAY THEY'VE DONE IT

24   CAN REMOVE THE DRM AND SOMEBODY ELSE COULD USE IT THAT WAY,

25   BUT A MUCH MORE IMPORTANT ISSUE FOR US WAS BREAKING THAT

1    ECOSYSTEM THAT WE HAD.

2         SO THAT CONCEPT THAT I KEEP HARPING ON, THE FACT THAT YOU

3    HAD AN IPOD, YOU HAD ITUNES, AND YOU HAD THE MUSIC STORE AND

4    IT JUST ALL WORKED, SOUNDS EASY, BUT IT WAS ACTUALLY QUITE

5    HARD, AND NONE OF OUR COMPETITORS ACHIEVED THAT.  YOU KNOW,

6    MICROSOFT TRIED, OTHERS TRIED, REAL TRIED, AND THEY WERE

7    UNSUCCESSFUL AT DOING THAT.

8         AND SO WE DID NOT WANT ANYTHING THAT WOULD ACTUALLY

9    JEOPARDIZE THAT AND WOULD BREAK THAT AND WOULD CAUSE CUSTOMERS

10   TO HAVE ISSUES BECAUSE WE THINK IT WOULD HURT OUR IPOD SALES

11   AND OUR ITUNES SALES, AND ALSO THE LABELS.

12   **Q.**  AND OTHER THAN HURTING YOUR SALES WHEN YOU HAD CUSTOMER

13   ISSUES, WHAT HAPPENED TO YOUR CALL CENTERS?

14   **A.**  WHENEVER WE HAVE ISSUES, OUR CALL CENTERS LIGHT UP.  AND

15   THEY'RE EXPENSIVE TO RUN.  I'VE RUN ONE.  AND SO, YOU KNOW,

16   BUT THAT DOESN'T EVEN MATTER HONESTLY BECAUSE YOU CAN ALWAYS

17   AFFORD, AND MAYBE YOU LOSE MONEY OR WHATEVER, YOU'RE TRYING TO

18   DEAL WITH YOUR CUSTOMERS.

19        THE MOST IMPORTANT THING IS NOW YOUR CUSTOMERS ARE UNHAPPY

20   AND DON'T LIKE YOUR PRODUCTS.  AND THAT'S ONE THING THAT WE

21   LOVED.  WE LOVED OUR CUSTOMERS AND WHAT WE WERE TRYING TO DO,

22   AND WE DIDN'T WANT OUR CUSTOMERS TO HAVE ISSUES.

23   **Q.**  WELL, JUST IN CASE THAT IT MATTERS TO SOMEONE IN

24   ACCOUNTING AT APPLE, I WANT TO SHOW YOU EXHIBIT 319.

25              (EXHIBIT PUBLISHED TO JURY.)

 1   BY MR. ISAACSON:

 2   Q.  THIS IS A -- IF YOU CAN LOOK AT PAGE 2, THIS IS THE IPOD

 3   SOFTWARE RELEASES SEPTEMBER 2006, A PRESENTATION.

 4   A.  YES.

 5   Q.  AND THEN IF I CAN ASK YOU TO LOOK AT PAGE 18 OF 24.

 6                    (EXHIBIT PUBLISHED TO JURY.)

 7   BY MR. ISAACSON:

 8   Q.  SO IN 2006, WERE YOU FAMILIAR, BASED ON YOUR WORK, WITH

 9   THE ISSUES AS TO CALL VOLUMES AND HOW THAT RELATED TO YOUR

10   COSTS?

11   A.  YES.  ONE OF THE THINGS THAT WE TRIED TO DO --

12   Q.  LET ME -- LET ME -- I JUST NEED TO KNOW IF YOU'RE

13   FAMILIAR.

14   A.  YES.

15   Q.  BECAUSE I WANT TO ASK YOU ABOUT A STATEMENT THERE.

16   REDUCING AVERAGE CALL HANDLE TIME BY 10 PERCENT CAN SAVE APPLE

17   $12 TO $15 MILLION PER YEAR.

18       WAS THAT STATEMENT CONSISTENT WITH YOUR UNDERSTANDING OF

19   THE SITUATION IN 2006?

20   A.  YES, IT WAS.

21   Q.  OKAY.  NOW, ABOUT THIS ISSUE ABOUT COMPLAINTS.  ONE OF THE

22   ALLEGATIONS IN THIS CASE, SIR, IS THAT AT SOME POINT THAT

23   THERE WAS SOMETHING CALLED A DVC THAT WOULD CAUSE DATABASES TO

24   BE DESTROYED OR EXPLODE, PEOPLE WOULD LOSE THEIR NOVELS.  WHAT

25   HAPPENS TO YOU WHEN THERE IS AN ISSUE THAT RESULTS IN CUSTOMER

1    COMPLAINTS?  WHAT -- TELL ME ABOUT YOUR LIFE.

2    **A.**  WELL, ONE OF THE WAYS THAT I CAN GAUGE HOW WE ARE DOING ON

3    A PRODUCT IS BY MY EMAIL.  MY EMAIL IS PUBLICLY AVAILABLE,

4    ALONG WITH STEVE'S AT THE TIME.  AND WHENEVER THERE'S

5    SOMETHING THAT IS OF SIGNIFICANCE, OUR EMAIL STARTS -- NOT

6    ONLY ARE THEY GOING DIRECTLY TO APPLE CARE AND SUPPORT, BUT

7    OUR EMAILS, WE GET CUSTOMERS WRITING TO US RIGHT AWAY.

8        AND SO I CAN GAUGE -- AND I THINK IT'S ONE OF THE THINGS

9    THAT TIM DOES ALSO.  STEVE -- I REMEMBER WHEN STEVE -- WHEN

10   TIM WAS TAKING OVER AS CEO, STEVE TOLD HIM ONE OF THE THINGS

11   TO DO IS READ ALL YOUR EMAILS.  DON'T HAVE SOMEBODY READ THEM

12   FOR YOU.  BECAUSE IT KEEPS YOU -- IT GIVES YOU A GREAT GAUGE

13   OF HOW YOUR CUSTOMERS ARE FEELING ABOUT YOU AND WHAT THEIR

14   ISSUES ARE.

15       AND SO WHEN WE DID SOMETHING THAT WE HAD A BUG OR AN

16   ISSUE, WE COULD SEE OUR EMAIL LIGHT UP ENOUGH.  AND THAT

17   CERTAINLY WAS NEVER THE CASE WITH 7.0 OR 7.4 THAT WE GOT

18   EMAILS COMING INTO US DIRECTLY.  AND SO IF THERE WERE ANY

19   ISSUES, THEY WERE CERTAINLY VERY FEW.

20   **Q.**  AND WHAT LEVEL OF ISSUES WOULD YOU PAY ATTENTION TO

21   WHEN -- NOT -- NOT THIS DVD ISSUE, BUT JUST WHEN THERE WAS AN

22   ISSUE RESULTING IN COMPLAINTS.  WHEN DID YOU -- WHAT LEVEL OF

23   ISSUE GOT YOU INVOLVED?

24   **A.**  WELL, TO BE FAIR, EVERY EMAIL THAT I GOT, I WAS

25   INVOLVED -- I GOT INVOLVED IN AND I HAD SOMEBODY GO BACK TO

CUE – CROSS / ISAACSON

1    THE CUSTOMER SO TO MAKE SURE THAT IT WAS RESOLVED.

2        BUT I COULD GAUGE BY LOOKING AT THE EMAIL AND UNDERSTAND

3    WHETHER IT'S A TECHNICAL PROBLEM OR MAYBE A USAGE PROBLEM OR

4    INSTRUCTION PROBLEM.  AND SO IF IT WAS A TECHNICAL PROBLEM, I

5    WOULD ENGAGE OUR ENGINEERING TEAM TO GO LOOK AT IT AND SEE

6    WHAT THE ISSUES WERE.

7    **Q.**  AND WHAT IF YOU DIDN'T GET AN EMAIL BUT YOU HEARD THAT

8    THERE WERE -- YOU HAVE A NEW DEVELOPMENT AND THERE'S A PROBLEM

9    WITH THE PRODUCT, AT WHAT POINT DO YOU GET INVOLVED?

10   **A.**  ANY -- ANYTIME THAT THERE WAS A SIGNIFICANT NUMBER OF

11   CALLS GOING TO APPLE CARE OR IF ANYBODY AT APPLE KNEW THAT

12   THERE WERE ANY BIG ISSUES, WE WOULD GET -- I WOULD GET

13   NOTIFIED TO SAY HERE'S SOME ISSUE THAT WE'RE HAVING.

14       IT'S A STANDARD PROCESS ANYWAY THAT OUR ENGINEERING TEAM

15   WOULD GET WHAT THE TOP TEN CALL DRIVERS WERE, WHAT THE TOP TEN

16   EMAIL DRIVERS WERE SO THAT WE COULD SEE WHAT ARE THINGS THAT

17   WE POTENTIALLY COULD FIX.  OR IN SOME CASES NOT JUST FIX, BUT

18   ACTUALLY MAKE THEM EASIER TO USE.  SO SOME OF THEM MAY BE

19   PROBLEMS JUST IN THE FACT THAT THEY WEREN'T AS EASY TO USE AND

20   PEOPLE GOT CONFUSED, AND SO THAT WOULD TEACH US THAT THAT'S AN

21   AREA WE HAD TO FOCUS ON.

22   **Q.**  AND BEFORE YOU -- YOU BECAME -- BEFORE YOU WERE A

23   WITNESS -- BECAME A WITNESS IN THIS CASE, HAD LEARNED ABOUT

24   THE ISSUES IN THIS CASE, HAD YOU HEARD ABOUT DATABASE -- THE

25   DATABASE INTEGRITY CHECK, OR DVC, EXPLODING DATABASES?

1    **A.**  NO, I HAD NOT.

2    **Q.**  BY THE WAY, ONE OF THE OTHER THINGS THAT'S BEEN --

3    QUESTIONS THAT PEOPLE HAD IN THIS CASE IS SO WHY NOT CONNECT

4    THE IPOD TO OTHER MUSIC STORES OTHER THAN ITUNES, OTHER THAN

5    THROUGH BURNING AND RIPPING?  WOULDN'T YOU SELL MORE IPODS?

6    WHY NOT DO THAT?

7    **A.**  SO IF YOU THINK ABOUT THIS WITHOUT THE DETAILS, THE ANSWER

8    IS SURE, LET'S DO IT, WE'D SELL A LOT MORE IPODS.  IF THERE

9    WERE MORE STORES POINTING TO IPODS, THEN BY ITS SHEER NATURE,

10   WE WOULD HAVE MORE IPOD SALES.

11       AND IN A WAY, THAT'S EXACTLY WHAT THE LABELS VIEWED THE

12   WORLD AS.  CREATE INTEROPERABILITY, YOU KNOW, MORE STORES

13   WOULD COME, YOU'D SELL MORE IPODS SO YOU SHOULD BE IN FAVOR OF

14   IT.

15       WELL, WHY WEREN'T WE IN FAVOR OF IT?  AND THE REASON WE

16   WEREN'T IN FAVOR OF IT IS BECAUSE IT'S NOT TRUE.  IT WOULDN'T

17   WORK.  THAT INTEGRATION THAT WE CREATED BETWEEN THE THREE

18   PRODUCTS WOULD START FAILING AND IT WOULD START HAVING ISSUES.

19       AND IT'S NOT THAT I BELIEVE THAT TO BE THE CASE.  THAT'S

20   EXACTLY WHAT THE OTHER GUYS HAD DONE.  THAT'S WHAT MICROSOFT

21   DID WITH WMA AND THEN PLAYSFORSURE.  IT'S EXACTLY WHAT DOUBLE

22   HELIX HAD WITH THEIR SYSTEM.  SO ALL OF THESE OTHER GUYS THAT

23   TRIED THE APPROACH OF TRYING TO BE OPEN AND HAVE MULTIPLE

24   STORES AND ALL THAT FAILED BECAUSE IT BROKE.

25       AND YOU SAY, WELL, GEE, YOU GUYS ARE SMART.  WHY CAN'T YOU

 1  MAKE IT WORK?  THE REASON IS IT'S REALLY IMPOSSIBLE TO KEEP

 2  THINGS WORKING WHEN YOU HAVE MULTIPLE ENGINEERING TEAMS THAT

 3  ARE NOT REALLY WORKING CLOSELY TOGETHER ON THESE THINGS AND

 4  KNOWING THE INTIMATE DETAILS, AND SO THEY COULD DO SOMETHING

 5  WITHOUT REALIZING THAT THEY'RE BREAKING SOMETHING BECAUSE

 6  THERE'S NO WAY TO DO THAT.

 7  **Q.**  OKAY.

 8  **A.**  AND SO IT'S REALLY, REALLY HARD.  AND SO THERE'S NO -- NO

 9  WAY FOR US TO HAVE DONE THAT AND HAD THE SUCCESS THAT WE HAVE.

10  **Q.**  ALL RIGHT.  YOU WERE ASKED SOME QUESTIONS ABOUT STEVE JOBS

11  EMAILING YOU ABOUT HACKING.

12           **MR. ISAACSON:**  CAN WE LOOK AT 2119.

13              (EXHIBIT PUBLISHED TO JURY.)

14  **BY MR. ISAACSON:**

15  **Q.**  ALL RIGHT.  THIS IS AN EMAIL FROM STEVE JOBS DATED

16  MAY 19TH, 2004, TO MR. ROBBIN AND TO YOU.  AND MR. ROBBIN, AT

17  THE BOTTOM OF THE EMAIL IN THE FIRST PARAGRAPH, SAYS, "HI,

18  STEVE.  AS YOU MAY KNOW, THE ITUNES 4.5'S DRM ENHANCEMENTS

19  HAVE ALREADY BEEN CIRCUMVENTED BY THE PLAYFAIR PROJECT, NOW

20  CALLED HYMN."

21      WAS THAT A HACKER THAT WAS KNOWN TO YOU?

22  **A.**  YES, IT WAS.

23  **Q.**  ALL RIGHT.  AND MR. JOBS RESPONDED, "WE NEED TO TAKE A

24  BRIGHT HARD LINE ON THEFT.  THERE'S NO GRAY AREA ON THEFT.  SO

25  WE SHOULD NOT PLAY THESE SONGS NOR TRANSFER THEM TO ANY IPOD."

1      WAS THAT CONSISTENT WITH THE TYPE OF DISCUSSIONS HE HAD

2   WITH YOU?

3   **A.**   YES.  I THINK AS I STATED EARLIER, WHEN WE WERE HACKED,

4   MR. JOBS WAS VERY ADAMANT ABOUT IT AND WAS NOT PLEASED WITH

5   IT.

6   **Q.**   THIS IS IN MAY OF 2004, AND IT'S TALKING ABOUT A HACKER.

7   HOW DID -- HOW DID THE HACKING SITUATION EVOLVE OVER THE YEARS

8   AFTER THAT?

9   **A.**   UNFORTUNATELY IT CONTINUED AND GOT EVEN WORSE.  THERE WERE

10  MORE ELABORATE HACKS AND -- AND AS WE GOT INTO OTHER PRODUCTS

11  LIKE MOVIES AND TV SHOWS, IT WAS EVEN MORE, YOU KNOW, AS

12  CRITICAL OR MORE CRITICAL TO MAKE SURE THAT WE KEPT THOSE.

13  AND SO IT JUST -- IT WAS A NEVER-ENDING BATTLE THAT WE HAVE

14  WITH HACKERS.

15  **Q.**   HOW OFTEN DID YOU PERSONALLY HEAR FROM RECORD COMPANIES

16  ABOUT HACKS FROM 2004 THROUGH 2007, 2008?

17  **A.**   YOU KNOW, IT WAS -- IT WAS PRETTY MUCH A CONSTANT

18  DISCUSSION WITH THEM.  SO EVERY TIME WE HAD MEETINGS WITH THEM

19  OR ANY KIND OF DISCUSSION, IT WOULD ALWAYS GENERALLY COME UP

20  IN A MEETING:  HOW ARE WE DOING WITH THIS?  HOW ARE YOU GUYS

21  PROTECTING THIS IN THE FUTURE?  WHAT ARE YOU DOING ABOUT IT?

22  HOW ARE YOU PREVENTING IT FROM HAPPENING AGAIN?  THOSE TYPES

23  OF DISCUSSIONS.

24  **Q.**   WHAT ABOUT THE MOVIES AND TELEVISION STUDIOS WHOSE CONTENT

25  YOU WERE OFFERING AFTER 7.0?

1   **A.**   THEY HAD THE SAME ISSUES ANYTIME THERE WAS A HACK.   AND IN

2   MANY WAYS, AS I SAID, THEY WERE -- THEIR TECHNICAL TEAMS WERE

3   EVEN SMARTER THAN THE MUSIC GUYS BECAUSE THEY HAD BEEN DOING

4   DRM FOR A LONG TIME.   AND SO THEY WERE ALL OVER US ANYTIME

5   THERE WAS ANYTHING MINOR OR OTHERWISE AROUND -- AROUND

6   HACKING.

7   **Q.**   ALL RIGHT.   YOU'LL SEE OVER ON OUR TIME LINE ON

8   APRIL 11TH, 2005, MR. FARRUGIA HAD HIS FIRST DAY AT APPLE.

9       WOULD YOU TELL ME ABOUT HOW MR. FARRUGIA CAME TO WORK AT

10   APPLE AND WHAT YOU DID TO INCREASE THE SECURITY TEAM FOR

11   FAIRPLAY?

12           (DEMONSTRATIVE PUBLISHED TO JURY.)

13       **THE WITNESS:**   WELL, BACK IN 2004, AS WE WERE GETTING

14   HACKED -- AND I THINK I TESTIFIED A LITTLE EARLIER THAT WE

15   WERE A LITTLE NAIVE IN THAT WE THOUGHT THAT THE WAY WE HAD

16   IMPLEMENTED WAS GOING TO WORK.   WE STARTED GETTING HACKED.

17   AND WHAT WOULD HAPPEN IS WE WOULD FIX THE HACK, AND LITERALLY

18   WE WOULD RELEASE THE SOFTWARE, AND WITHIN A FEW DAYS OR A

19   WEEK, IT WOULD BE HACKED AGAIN.

20       NUMBER ONE, IT WAS EMBARRASSING TO US AS TECHNOLOGISTS.

21       NUMBER TWO, IT WAS GETTING A LOT OF PRESS, AND YOU CAN

22   CERTAINLY UNDERSTAND THIS TODAY.   IT WOULD ALWAYS LEAD WITH

23   "APPLE GOT HACKED."   YOU KNOW, IT WAS VERY NEGATIVE FROM THE

24   VIEWPOINT OF APPLE'S SYSTEM WASN'T SECURE.

25       AND THEN, NUMBER THREE, WE HAD ALL OF THE PRESSURE OF THE

1    LABELS COMPLAINING ABOUT THE HACKING.

2        AND SO JEFF ROBBIN, WHO WAS THE LEAD ENGINEER, AND MYSELF

3    STARTED DISCUSSING ABOUT THIS AND SAID, LOOK, WE CAN'T DO THIS

4    AS A SIDE THING, AS A NICE-TO-HAVE THING.  WE'RE GOING TO HAVE

5    TO REALLY GET INTO THE DRM BUSINESS, MEANING WE REALLY HAVE TO

6    UNDERSTAND AND -- AND TRY TO PROTECT THIS WITH ALL OF THE

7    RESOURCES AND TECHNICAL --

8        **THE COURT:**  WAIT.  JUST WHEN SHE STARTS COUGHING, IF

9    YOU COULD JUST PAUSE.

10       **THE WITNESS:**  SORRY.

11       **THE COURT:**  NO, IT'S NOT YOUR FAULT.  I JUST WANT TO

12   MAKE SURE WE HAVE A FULL TRANSCRIPT.

13       **THE WITNESS:**  OKAY.

14       **THE COURT:**  GO AHEAD.

15       **THE WITNESS:**  SORRY.  CAN YOU TELL ME THE LAST THING

16   I SAID JUST SO --

17                        (RECORD READ.)

18       **THE WITNESS:**  SO JEFF AND I REALIZED THAT OUR ATTEMPT

19   AT DOING IT AS PEOPLE AS A SIDE PROJECT AND NOT PEOPLE THAT

20   WERE DEDICATED TO DRM WAS NOT GOING TO WORK.  WE WERE GETTING

21   TROUNCED, IN A SENSE, BY THIS CONSTANT HACKING.

22       AND SO WE SAID, LOOK, WE'VE -- WE'VE GOT TO PUT DEDICATED

23   RESOURCES, MONEY, ALL THE EFFORTS OF APPLE TO TRULY DEVELOP A

24   HACK-PROOF DRM.  OR AS MUCH HACK-PROOF AS WE CAN EVER GET TO.

25       AND SO WE DECIDED WE NEEDED TO HIRE SOMEBODY WITH

```
 1    INCREDIBLE EXPERIENCE IN THIS AREA OF SECURITY AND HACKING AND

 2    HAVE HIM FORM A TEAM.  AND HONESTLY I GAVE JEFF AND SAID,

 3    IT'S -- IT'S LITERALLY A BLANK CHECK.  HIRE AS MANY PEOPLE AS

 4    YOU NEED.  HIRE THE BEST PEOPLE THAT WE CAN FIND OUT THERE

 5    BECAUSE WE'VE GOT TO MAKE THIS STOP.

 6    BY MR. ISAACSON:

 7    Q.  ALL RIGHT.  LET ME SEE IF I CAN GET THROUGH A FEW

 8    DOCUMENTS WITH YOU.

 9          MR. ISAACSON:  CAN WE LOOK AT 2419.

10              (EXHIBIT PUBLISHED TO JURY.)

11    BY MR. ISAACSON:

12    Q.  ALL RIGHT.  IS THIS AN EMAIL DISCUSSION BETWEEN MR. ROBBIN

13    AND MR. JOBS COPIED TO YOU AFTER MR. JOBS --

14          MR. ISAACSON:  SHOW THE WHOLE THING.

15    Q.  -- AFTER MR. JOBS FORWARDED INFORMATION ABOUT A HACK ON --

16    ON YOUR ITUNES DRM?

17    A.  THAT'S CORRECT.  THIS IS ANOTHER EXAMPLE OF THE

18    PUBLIC'S -- THE PUBLICITY OF SOMEBODY WRITING ABOUT ITUNES

19    GETTING HACKED.

20    Q.  ALL RIGHT.  THIS IS -- AND THAT'S IN SEPTEMBER 2006.

21          MR. ISAACSON:  CAN WE LOOK AT NOW -- I WANT TO MOVE

22    TO A NEW -- OH, I'M SORRY, ONE MORE.  2243.

23          THE COURT:  WHAT NUMBER?

24          MR. ISAACSON:  2243.

25       ALL RIGHT.  AND CAN YOU BLOW UP THE BOTTOM PART.
```

 1              (EXHIBIT PUBLISHED TO JURY.)

 2    **BY MR. ISAACSON:**

 3    **Q.**  IS THIS SOMEONE FROM -- WHO IS THE GENTLEMAN WRITING THIS

 4    EMAIL?

 5    **A.**  THIS IS ONE OF THE LABELS, FOR THE BMG MUSIC LABEL.

 6    **Q.**  AND HE'S FOLLOWING UP WITH REGARDS TO HACKS BY JHYMN AND

 7    PYMUSIQUE; IS THAT RIGHT?

 8    **A.**  THAT'S CORRECT.  HE HAD REACHED OUT TO JEFF ROBBIN AND

 9    WANTED TO FIND OUT WHAT WE WERE DOING TO ELIMINATE THESE TWO

10    HACKS.

11    **Q.**  AND AT THE TOP OF THE EMAIL, MR. ROBBIN THEN FORWARDED

12    THAT TO YOU; IS THAT RIGHT?

13    **A.**  THAT'S CORRECT.

14    **Q.**  ALL RIGHT.

15              **MR. ISAACSON:**  IF WE CAN LOOK AT 2805.

16        JUST THE TOP PART.

17                  (EXHIBIT PUBLISHED TO JURY.)

18    **BY MR. ISAACSON:**

19    **Q.**  THIS IS OCTOBER 2006, A *FORTUNE* -- REFERENCING A *FORTUNE*

20    ARTICLE UNLOCKING THE IPOD.  IT'S BEEN FORWARDED TO YOU.  AND

21    IT TALKS -- THE ARTICLE INCLUDES A STORY ON DVD JON AND HIS

22    NEW COMPANY THAT SEEKS TO LICENSE A FAIRPLAY CLONE.

23        WHAT ISSUES DID DVD JON RAISE FOR YOUR COMPANY?

24    **A.**  WELL, DVD JON WAS ONE OF THOSE HACKERS THAT HAD BEEN

25    ATTACKING US FOR YEARS.  AND, YOU KNOW, HE HAD CREATED

1    PROGRAMS TO REMOVE THE -- THE DRM.

2        YOU COULD WONDER WHY HIS NAME WAS DVD JON.  THE REASON WHY

3    HIS NAME WAS DVD JON WAS BECAUSE HE HAD DEVELOPED A WAY TO

4    HACK INTO THE DVD DRM.  AND SO HE HAD GOTTEN NICKNAMED DVD

5    JON.

6        SO THIS WAS THE FACT THAT HE WAS A HACKER AND NOW HE WAS

7    GOING TO TRY TO FORM A COMPANY TO SELL HIS HACK.  IT WAS

8    CRAZY, IN MY EYES.

9            **MR. ISAACSON:**  LET'S LOOK AT TX2783.

10       THIS IS JUST THE TOP -- LET'S GET THE TOP AND JUST THE

11   TITLE OF THE ARTICLE.

12                   (EXHIBIT PUBLISHED TO JURY.)

13   **BY MR. ISAACSON:**

14   **Q.**  THIS IS AN EMAIL FROM STEVE JOBS TO YOU IN OCTOBER 2006,

15   AS WELL AS MR. ROBBIN, ABOUT AN ARTICLE ABOUT HOW DVD JON WAS

16   REVERSE ENGINEERING THE APPLE'S FAIRPLAY DRM AND WANTS TO

17   LICENSE IT?

18   **A.**  THAT'S CORRECT.

19   **Q.**  ALL RIGHT.  THIS IS ANOTHER EXAMPLE OF MR. JOBS'

20   FORWARDING YOU INFORMATION ABOUT -- ABOUT HACKERS?

21   **A.**  WELL, AS I SAID, THERE WERE MANY EMAILS AND EVEN MORE

22   CONVERSATIONS ABOUT HACKING, WITH STEVE.

23   **Q.**  ALL RIGHT.  YOU WERE ASKED QUESTIONS ABOUT OPENING UP YOUR

24   DRM AND LICENSING IT.  YOU TALKED SOME ABOUT THAT.

25            **MR. ISAACSON:**  CAN WE LOOK AT 2050?

1          **THE CLERK:** 2050?

2          **MR. ISAACSON:** YES.

3     NOW, IF WE CAN JUST SHOW THE TOP.

4               (EXHIBIT PUBLISHED TO JURY.)

5   BY MR. ISAACSON:

6   **Q.** THIS IS PATRICE GAUTIER WRITING TO YOU, SOMEONE ELSE SEES

7   IT, AND IT'S SOME SORT OF BLOG POST OR SOMETHING ON MAC DAILY

8   NEWS, "WHY IT'S CRITICAL WE OPEN OUR DRM."

9     AND SO HE'S FORWARDING SOME COMMENTARY, AND HE WAS

10  ACTUALLY, AT LEAST AT SOME POINT OF THE TIME, AN ADVOCATE

11  WITHIN YOUR COMPANY FOR LICENSING YOUR DRM, RIGHT?

12  **A.** THAT'S CORRECT. AS I SAID BEFORE, THIS IS BACK IN 2003 SO

13  RIGHT AT THE TIME AFTER WE HAD LAUNCHED THE STORE. SO WE WERE

14  ALWAYS -- WE HAD LOOKED AT THIS. IT MADE SENSE AT CERTAIN

15  TIMES, IF WE LICENSED DRM, WE'RE GOING TO SELL MORE IPODS, AS

16  I SAID.

17    AND THEN WE REALLY CAME TO THE REALIZATION AS WE LOOKED AT

18  IT THAT IT COULDN'T REALLY BE DONE AND ULTIMATELY WE WERE

19  GOING TO HURT OURSELVES. AND SO WE HAD SPENT TIME THINKING

20  ABOUT THIS. AND -- AND THIS CONTINUED, HONESTLY, BEYOND 2003.

21  **Q.** WELL, LET ME SHOW YOU ONE OF THE WARNINGS IN HERE.

22          **MR. ISAACSON:** IF WE CAN GO TO THE BOTTOM OF PAGE 2

23  OF 3.

24               (EXHIBIT PUBLISHED TO JURY.)

25

1    **BY MR. ISAACSON:**

2    **Q.** NOW, THIS IS JUST SOME COMMENTATOR WHO'S TALKING ABOUT,

3    THE PARAGRAPH ABOVE, IT'S PRETTY CLEAR THAT APPLE HAS DECIDED

4    NOT TO LICENSE FAIRPLAY.

5        AND THEN IN THIS PARAGRAPH TALKS ABOUT HOW IF YOU LOSE THE

6    PORTABLE MUSIC PLAYER MARKET, THE ITUNES MUSIC STORE WILL BE

7    KNOWN AS THE NEWTON OF ONLINE MUSIC STORES.

8        WHAT WAS THE NEWTON?

9    **A.** THE NEWTON WAS A DEVICE THAT APPLE BUILT MANY, MANY YEARS

10   AGO THAT WAS CALLED A PERSONAL DIGITAL ASSISTANT.  THINK OF IT

11   AS -- IT WAS KIND OF LIKE AN IPHONE WITH THE TOUCH INTERFACE.

12   BUT AS YOU CAN IMAGINE, MANY, MANY YEARS AGO, IT WASN'T

13   ANYWHERE NEAR AS GOOD AND ACTUALLY FAILED PRETTY MISERABLY IN

14   THE MARKET.

15   **Q.** ALL RIGHT.  AND THIS PERSON ALSO SAYS APPLE WILL HAVE

16   REPEATED THE SAME MISTAKE IT MADE WITH THE MAC, THE MAC OS.

17   AND I THINK YOU TALKED ABOUT YOUR VERY SMALL MARKET SHARE WITH

18   THE MAC.

19       THERE WERE PEOPLE GIVING YOU THESE WARNINGS, BUT YOU

20   DECIDED TO STICK TO YOUR BUSINESS PHILOSOPHY, RIGHT?

21   **A.** AGAIN, WE CONSIDERED THIS BECAUSE THESE ARE ALL VALID

22   POINTS, BUT WE KNEW THAT WHAT WE WERE DOING WAS BETTER AND THE

23   ONLY WAY THAT WE COULD ACTUALLY BE SUCCESSFUL.

24       **MR. ISAACSON:**  ALL RIGHT, LET'S LOOK AT 2159.

25           (EXHIBIT PUBLISHED TO JURY.)

 1   **BY MR. ISAACSON:**

 2   **Q.**  THIS IS MR. GAUTIER AGAIN WRITING TO YOU, MR. ROBBIN, IN

 3   2004.  AT THE TOP, ANOTHER "WHY WE SHOULD LICENSE FAIRPLAY"

 4   ARTICLE.  THIS IS JUST SOME COMMENTATOR THAT MR. GAUTIER IS

 5   SENDING ON TO YOU, WHO SAYS UP IN THE BOTTOM PARAGRAPH --

 6                   (EXHIBIT PUBLISHED TO JURY.)

 7   **BY MR. ISAACSON:**

 8   **Q.**  THIS IS JUST -- NOW IT'S A THIRD-PARTY COMMENTATOR.  OPEN

 9   UP FAIRPLAY IS A WINNING STRATEGY FOR APPLE AND COULD GO A

10   LONG WAY TOWARDS ENSURING APPLE'S CONTINUED DOMINANCE IN THE

11   DRM, NOT JUST ONLINE MUSIC MARKET.

12       I MEAN, THIS COMMENTATOR IS SAYING IF YOU WANT TO

13   DOMINATE, YOU SHOULD LICENSE FAIRPLAY.  MR. GAUTIER IS

14   POINTING THIS OUT TO YOU.  AND WHAT DECISION DID YOU MAKE?

15   **A.**  AGAIN, THIS WAS A YEAR LATER.  AND AS I SAID, THROUGHOUT

16   THE WHOLE TIME, WE ALWAYS CONSIDERED IT.  BUT IT JUST DOESN'T

17   WORK.  IT WOULDN'T WORK.  AND ALL WE WOULD DO IS NOT BE AS

18   SUCCESSFUL AS WE WOULD.  WE WOULD HAVE SOLD A LOT LESS IPODS

19   AND SOLD A LOT LESS SONGS, AND ITUNES WOULD HAVE FAILED.

20   **Q.**  ALL RIGHT.  AND THEN MICROSOFT WAS COMPETING WITH YOU

21   DURING THIS PERIOD WITH ITS OWN DRM.  YOU TALKED ABOUT THAT,

22   RIGHT?

23   **A.**  THAT'S CORRECT.

24   **Q.**  AND DID IT HAVE -- DO YOU KNOW THE TERM "IPOD KILLER"?

25   **A.**  YEAH, IT WAS USED MANY TIMES BY MICROSOFT.

1   **Q.**   OKAY.  AND ALSO OUTSIDE COMMENTATORS?

2   **A.**   AND ALSO OUTSIDE COMMENTATORS.

3   **Q.**   ALL RIGHT.  AND WHAT DID "IPOD KILLER" REFER TO?

4   **A.**   IT REFERRED TO, AT DIFFERENT TIMES, PLAYERS THAT WERE

5   COMING OUT INTO THE MARKET THAT WERE VIEWED AS, BY SOME

6   PEOPLE, AS BETTER THAN THE IPOD.  AND SO IT WAS VIEWED AS

7   HERE'S THIS DEVICE THAT'S GOING TO ERASE ALL THE SUCCESS OF

8   THE IPOD AND IS GOING TO, YOU KNOW, KILL THE IPOD.

9                **MR. ISAACSON:**  ALL RIGHT.  2208 (SIC).

10                   (EXHIBIT PUBLISHED TO JURY.)

11  **BY MR. ISAACSON:**

12  **Q.**   THIS IS AN EMAIL FROM STEVE JOBS TO YOU AND OTHER PEOPLE

13  IN 2004 ABOUT THE MICROSOFT IPOD KILLER.

14       IS THIS AN EXAMPLE OF THE THIRD-PARTY COMMENTARY OUT THERE

15  ABOUT MICROSOFT'S IPOD KILLER PRODUCTS?

16  **A.**   THAT'S CORRECT.

17  **Q.**   ALL RIGHT.  AND MR. JOBS SAID, "I AM MORE CONVINCED THAN

18  EVER, THIS ROAD LEADS TO A CLIFF."

19       AND I DO TAKE FROM THAT HE MEANT THAT YOU UNDERSTOOD THAT

20  APPLE WAS GOING TO STICK TO ITS PHILOSOPHY ABOUT HOW TO

21  PRODUCE THE BEST PRODUCTS POSSIBLE?

22  **A.**   RIGHT.  MICROSOFT WAS TAKING THE EXACT APPROACH OF

23  INTEROPERABILITY AND TRYING TO MAKE THE STORES ALL WORK WITH

24  EACH OTHER.  AND WE KNEW THAT THAT WASN'T GOING TO WORK.

25  AND -- AND SO WE FELT AND STEVE FELT LIKE THIS WAS GOING TO BE

1  A CLIFF, AND IT WASN'T A POSITIVE CLIFF, IT WAS A CLIFF THAT

2  YOU WERE GOING TO FALL OFF BECAUSE THERE WAS JUST NO WAY TO

3  MAKE THAT RELIABLY AND SUCCESSFULLY COMPETE WITH WHAT WE WERE

4  DOING.

5  **Q.**  SO MICROSOFT HAD ITS OWN DRM.  WERE THEY PUBLICLY MAKING

6  PUBLIC COMMENTS ABOUT APPLE'S DRM?

7  **A.**  THEY WERE.  THEY WERE TRYING TO SAY THAT THEIRS WAS

8  BETTER, IT WAS MORE SECURE, THAT IT WAS EASIER TO USE.

9  **Q.**  DO YOU REMEMBER COMMENTS BY MR. BALLMER OF MICROSOFT ABOUT

10  THAT?

11  **A.**  YES.  MR. BALLMER HAS A WAY OF BEING VERY VOCAL, BEING

12  VERY ANTI-APPLE IN A VOCAL WAY, AND HE DID THAT BACK THEN,

13  TOO.

14  **Q.**  ALL RIGHT.  DO YOU REMEMBER HIS EXACT WORDS?

15  **A.**  I KNOW HE -- HE HAS A HABIT OF REPEATING HIMSELF.  I

16  REMEMBER -- IN THIS CASE, I REMEMBER HE'S LIKE EASIER, EASIER,

17  EASIER TO USE, AND WE WERE --

18  **Q.**  WELL, LET ME SEE --

19  **A.**  -- CALLED THE IPOD AND ITUNES WAS FOR PIRATES AND STEALING

20  MUSIC, AND SO HE HAD A LOT OF MANY NEGATIVE THINGS TO SAY

21  ABOUT US.

22  **Q.**  ALL RIGHT.  WELL, LET ME SHOW YOU 2171.

23                  (EXHIBIT PUBLISHED TO JURY.)

24  **BY MR. ISAACSON:**

25  **Q.**  WHICH HAS AT PAGE 3 -- THIS IS JUST A NEWSPAPER -- JUST AN

1   ARTICLE IN *DIGITAL MUSIC NEWS*, SO THIS IS JUST A PRESS ARTICLE

2   TITLED "BALLMER CALLS OUT IPOD THIEVES."

3        AND IN THE FIRST PARAGRAPH, IT SAYS THE MOST --

4   MR. BALLMER IS QUOTED AS SAYING THE MOST COMMON FORMAT OF

5   MUSIC ON AN IPOD IS STOLEN.  AND TO SOLVE THE PROBLEM BALLMER

6   POINTED TO NEXT GENERATION MICROSOFT DRM SYSTEMS THAT WOULD

7   BE, QUOTE, HARDER TO CRACK AND EASIER, EASIER, EASIER, EASIER

8   TO USE.

9        IS THIS THE TYPE OF COMMENTARY THAT YOU REMEMBER THAT WAS

10  BEING SAID IN THE MARKETPLACE?

11  **A.**  YES.  AND THIS WAS A -- ONE OF THE PRIMARY REASONS WHY

12  THIS WOULD GET SAID IS BECAUSE WE WERE GETTING HACKED LEFT AND

13  RIGHT, AND SO ALL OF A SUDDEN IT APPEARED THAT OUR DRM WAS NOT

14  VERY GOOD.

15  **Q.**  THIS IS OCTOBER 2004.  MR. FARRUGIA STARTED WORK IN APRIL

16  2005.  HOW LONG OR -- CAN YOU TELL US, IN THIS -- BETWEEN

17  OCTOBER 2004 AND THAT APRIL 2005 TIME PERIOD, WHEN YOU MADE

18  THE DECISION TO UPGRADE YOUR DRM SECURITY TEAM?

19  **A.**  THE DISCUSSIONS HAD ALREADY STARTED PRIOR TO THE NEW YEAR,

20  AND SO WE -- JEFF AND I HAD ALREADY STARTED DISCUSSIONS ABOUT

21  WHAT ARE WE GOING TO DO DIFFERENTLY, WE CAN'T KEEP GOING DOWN

22  THE PATH THAT WE'RE GOING, WE'RE FAILING, AND WE NEED TO DO

23  SOMETHING DIFFERENT.

24       AND SO WE STARTED THE RECRUITING PROCESS AT THAT POINT.

25  AND THESE ARE EXTREMELY DIFFICULT SKILLS AND TALENTS TO FIND.

1    AS YOU CAN IMAGINE, THERE'S NOT A LOT OF PEOPLE DOING THINGS

2    IN THIS SPACE.  AND SO IT TOOK US A WHILE TO ACTUALLY BUILD A

3    TEAM AND GET TO WHERE WE WANTED.

4    **Q.**  ALL RIGHT.  NOW, AFTER NAPSTER, YOU MENTIONED NAPSTER

5    BEFORE.  DID NAPSTER EVENTUALLY SWITCH TO A STREAMING

6    SERVICE -- A SUBSCRIPTION SERVICE?

7    **A.**  YES.  NAPSTER, THE ILLEGAL DOWNLOADS BECAME A LEGAL

8    SUBSCRIPTION SERVICES --

9    **Q.**  ALL RIGHT.

10   **A.**  -- LATER ON.

11   **Q.**  AND THEY WERE A COMPETITOR OF YOURS AT THAT POINT?

12   **A.**  THEY WERE.

13          **MR. ISAACSON:**  ALL RIGHT.  LET'S LOOK AT 2767.

14       JUST THE FIRST PAGE AT THE TOP.

15              (EXHIBIT PUBLISHED TO JURY.)

16   **BY MR. ISAACSON:**

17   **Q.**  THIS IS AN INTERVIEW WITH NAPSTER'S CHRIS GOROG, IF I'M

18   SAYING THAT RIGHT, THAT'S BEING FORWARDED TO YOU AND OTHER

19   EXECUTIVES AND -- IN MARCH 2005.

20       AND THEN IF WE CAN LOOK AT PAGE 8 OF 10, THIS IS THE

21   INTERVIEW WITH THE GENTLEMAN FROM NAPSTER, MR. GOROG.

22              (EXHIBIT PUBLISHED TO JURY.)

23   **BY MR. ISAACSON:**

24   **Q.**  AND YOU'LL SEE A BOLDED QUESTION.  THE SAME AFTERNOON YOU

25   SHOT OFF YOUR OWN EMAIL TO THE SAME EXECUTIVES DEFENDING

1    NAPSTER SECURITY AND POINTING OUT HOW TRIVIAL IT WAS TO UNLOCK

2    A LARGE COLLECTION OF ITUNES MUSIC IN SECONDS.  WAS NAPSTER

3    ALSO OUT THERE CRITICIZING YOUR DRM SECURITY?

4    **A.**  YES, THEY WERE.

5    **Q.**  OKAY.  AND HE GOES ON AFTER THE NEXT QUESTION IN THE

6    SECOND PARAGRAPH TO SAY, "I THINK THIS IS A WINDOWS MEDIA

7    AUDIO WORLD.  I DON'T THINK THERE'S ANY QUESTION ABOUT THAT.

8    WMA ALREADY DOMINATES MP3 PLAYERS GLOBALLY."

9        WOULD YOU EXPLAIN WHAT HE'S -- WHAT THE -- WHAT WMA IS IN

10   TERMS OF COMPETITION HERE AND HOW HIS OPINION COMPARES TO

11   YOURS.

12   **A.**  WELL, WINDOWS MEDIA WAS JUST THE ANSWER TO FAIRPLAY AND TO

13   AAC, WHICH WERE THE FORMATS THAT WE USED FOR DIGITAL MUSIC,

14   AND THEY WERE MICROSOFT'S.  AND THEY MADE THEIRS WIDELY

15   AVAILABLE.  AS YOU CAN IMAGINE, THEY MADE THEIRS WIDELY

16   AVAILABLE.  AND AGAIN, REMEMBER THE TIME, MICROSOFT WAS HUGE

17   IN THOSE DAYS, 97 PERCENT MARKET SHARE, 98 PERCENT MARKET

18   SHARE, DESKTOPS, ET CETERA.  SO THEY HAD EVERY STORE AND EVERY

19   MUSIC PLAYER USE WINDOWS MEDIA.

20       AND HONESTLY, I LOST A LOT OF SLEEP OVER IT BECAUSE YOU

21   START THINKING IN THE WORLD YOU'RE COMPETING AGAINST

22   EVERYBODY, AND HERE WE ARE A VERY SMALL COMPANY WITH ITUNES,

23   IPOD, AND THE MUSIC STORE, WE'RE GOING TO GET KILLED BECAUSE

24   IT'S EVERYBODY.

25       WHICH IS WHY WE CONSIDERED LICENSING THE DRM.  BUT WE

 1   ALWAYS CAME BACK TO THE -- THE PIECE THAT WE THOUGHT YOU CAN'T

 2   DO THIS, I DON'T KNOW HOW THEY'RE GOING TO DO IT.  AND SO WE

 3   WERE LIKE WE DON'T KNOW HOW TO DO IT, THEREFORE WE DON'T THINK

 4   THEY KNOW HOW TO DO IT, AND IT'S GOING TO BREAK.

 5       BUT EVERYBODY ELSE IN THE WORLD THOUGHT, INCLUDING CHRIS,

 6   AT THIS POINT WAS, HEY, WITH EVERY OTHER PLAYER, EVERY PLAYER

 7   THAT WAS BEING SHIPPED WAS WITH WINDOWS, IT'S GOING TO WIN.

 8           **MR. ISAACSON:**  ALL RIGHT.  LET'S LOOK AT 2118.

 9               (EXHIBIT PUBLISHED TO JURY.)

10   **BY MR. ISAACSON:**

11   **Q.**  THIS IS MR. GAUTIER AGAIN BACK IN 2004.  HE'S QUOTING AN

12   ARTICLE, AND HE SAYS IN THE SECOND PARAGRAPH -- SO THIS IS

13   MR. GAUTIER QUOTING AN ARTICLE, AND THIS IS AGAIN TALKING

14   ABOUT LICENSING OF FAIRPLAY.

15       "APPLE IS GOING TO HAVE TO START LICENSING FAIRPLAY.  IT'S

16   EASY TO SUCCEED WHEN YOU'RE BETTER THAN ALL YOUR COMPETITORS

17   AS INDIVIDUALS.  BUT WHEN THEY ALL START SELLING MUSIC FILES

18   THAT COULD BE PLAYED ON ANY JUKEBOX APP OR PORTABLE DEVICE,

19   YOU CAN'T BRING A KNIFE TO A GUNFIGHT."

20       AFTER THIS, WHAT DID YOU DECIDE TO BRING TO THE GUNFIGHT?

21   **A.**  AGAIN, WE -- ONE, LUCKILY WE DIDN'T HAVE A GUNFIGHT, BUT

22   WE STAYED OUR COURSE.  WE DECIDED AGAIN THAT WHAT WE WERE

23   DOING WAS BETTER.  IT WAS THE CONSUMERS WERE GOING TO

24   EXPERIENCE WHAT WE WERE DOING WITH ITUNES, THE MUSIC STORE,

25   AND IPOD, AND THERE WAS NO WAY THAT MICROSOFT OR ANYBODY ELSE

 1   THAT WAS LICENSING THE DRM WAS GOING TO BE ABLE TO REPLICATE

 2   THAT.

 3          **MR. ISAACSON:**  ALL RIGHT.  LET'S LOOK AT 2458.

 4              (EXHIBIT PUBLISHED TO JURY.)

 5   **BY MR. ISAACSON:**

 6   **Q.**  MOVING TOPICS HERE.  THIS IS TITLED "THOUGHTS ON MUSIC,"

 7   STEVE JOBS, FEBRUARY 6, 2007.

 8       WHAT IS THIS?

 9   **A.**  STEVE AND I DECIDED BY 2007 -- THIS WAS AN EMAIL THAT

10   STEVE PUT OUT, PUBLISHED ON THE WEB, THAT WAS THE LABELS

11   NEEDED TO MOVE TO DRM-FREE.

12       YOU COULD SAY, WELL, WHY DID HE DO IT THEN?  WHAT WAS THE

13   IMPETUS FOR THIS?  AS I SAID, FROM THE VERY BEGINNING WE

14   WANTED TO BE DRM-FREE.  BY 2007, WE HAD HAD A LOT OF SUCCESS.

15       SO AT THIS POINT, MICROSOFTS (SIC) AND ALL OF THESE OTHER

16   GUYS HAD KIND OF FAILED MISERABLY, AS WE HAD SUSPECTED, AND

17   ITUNES, IPOD, AND THE MUSIC STORE WERE HUGE SUCCESSES.  PEOPLE

18   LOVED THE PRODUCT.

19       THE COMPETITORS GOT SOME GOVERNMENT OFFICIALS LIKE IN

20   EUROPE AND COMPETITORS STARTED WRITING ARTICLES AND TELLING

21   THE PRESS THAT APPLE WAS THIS CLOSED PROPRIETARY SYSTEM AND

22   THAT WE WANTED THIS CLOSED ENVIRONMENT.

23       AND HONESTLY WE GOT FED UP WITH IT BECAUSE IT WASN'T TRUE.

24   WE HAD BEEN DEMANDING DRM-FREE FROM DAY ONE.  AND WE DECIDED,

25   YOU KNOW -- AND PARTICULARLY STEVE DECIDED, I'M GOING TO

1    PUBLISH EXACTLY HOW I FEEL AND HOW THIS CAME ABOUT AND WHEN WE

2    STARTED, THE FACT THAT WE'VE ALWAYS WANTED DRM-FREE BECAUSE WE

3    FELT IF WE HAD DRM-FREE, WE HAD THE BEST JUKEBOX, WE HAD THE

4    BEST STORE, AND WE HAD THE BEST PLAYER, WE'D SELL EVEN MORE.

5    **Q.**  WELL, LET ME SHOW YOU 2462.  I WANT TO DISCUSS WITH YOU

6    THE RECORD LABELS' IMMEDIATE RESPONSE.

7                      (EXHIBIT PUBLISHED TO JURY.)

8    **BY MR. ISAACSON:**

9    **Q.**  THIS IS A FEBRUARY 8TH, 2007, EMAIL FROM MR. FARRUGIA THAT

10   GOES TO SEVERAL PEOPLE INCLUDING YOU.  IT QUOTES WARNER

11   MUSIC'S CHIEF.  IT HAS AN ARTICLE, JUST AN ARTICLE.  WARNER

12   MUSIC CHIEF EXECUTIVE EDGAR BRONFMAN SAID IN A CALL WITH

13   ANALYSTS "THAT ARGUMENT IS WITHOUT LOGIC AND MERIT.  WE WILL

14   NOT ABANDON DRM."

15       WHAT WAS THE RECORD COMPANIES' RESPONSES TO THOUGHTS ON

16   MUSIC?

17   **A.**  AGAIN, YOU KNOW, AT THIS POINT, I BELIEVE THERE WERE FOUR

18   MAJORS.  THREE OF THE MAJORS, OF WHICH WARNER IS ONE OF THEM,

19   WERE EXACTLY THE SAME:  THERE'S NO WAY WE'RE GOING TO LICENSE

20   THIS WITHOUT DRM.

21       EMI WAS NOT SURE.  THEY WERE STARTING TO -- TO FEEL LIKE

22   THERE WAS A POTENTIAL FOR POSSIBLY GOING DRM-FREE.  EMI HAD

23   HAD A SIGNIFICANT CHANGE IN THEIR EXECUTIVE TEAM.  EVERYBODY

24   HAD GOT BLOWN OUT.  A NEW PERSON HAD BOUGHT IT.  AND SO THIS

25   NEW GUY CAME IN AND REALLY WANTED TO CHANGE THINGS.  AND SO

```
 1    THEY WERE UNSURE ABOUT WHAT THEY WANTED TO DO.

 2        BUT THE OTHER THREE LABELS WERE ADAMANT AS THEY HAD ALWAYS

 3    BEEN THAT THEY WANTED TO CONTINUE WITH DRM.

 4            MR. ISAACSON:  THANK YOU, MR. CUE.  I HAVE NO MORE

 5    QUESTIONS.

 6            THE COURT:  REDIRECT?

 7                       REDIRECT EXAMINATION

 8    BY MS. SWEENEY:

 9    Q.  SO MR. ISAACSON ASKED YOU SOME QUESTIONS ABOUT YOUR

10    COMPETITORS WHO DID HAVE INTEROPERABLE DRM; IS THAT RIGHT?

11    A.  THAT'S CORRECT.

12    Q.  AND LET'S GO BACK TO THE TIME PERIOD WHEN APPLE OPENED ITS

13    ITUNES STORE.  AND DO YOU REMEMBER YOU TESTIFIED IN RESPONSE

14    TO MR. ISAACSON'S QUESTIONS ABOUT PRESSPLAY AND MUSICNET?

15    A.  THAT'S CORRECT.

16    Q.  AND ISN'T IT TRUE THAT THOSE TWO STORES WERE NOT AT ALL

17    SUCCESSFUL, AND IN ADDITION, THEY HAD BEEN -- WERE IN THE

18    PROCESS OF BEING INVESTIGATED BY THE DEPARTMENT OF JUSTICE,

19    AND SO THE MUSIC COMPANIES WITHDREW THEIR INVESTMENTS FROM

20    THOSE BUSINESSES BEFORE THE ITUNES STORE OPENED?

21    A.  BEFORE IT OPENED -- HONESTLY, I DON'T KNOW ABOUT THE DOJ.

22    THE FACT THAT THEY WERE A FAILURE, ABSOLUTELY.  THEY WERE

23    BEYOND AN ABYSMAL FAILURE.

24    Q.  AND SO AT THE TIME THAT APPLE, THAT IS, YOU -- YOU SAID

25    YOU WERE THE PRIMARY NEGOTIATOR -- WHEN YOU WERE NEGOTIATING
```

1    THOSE CONTRACT RIGHTS WITH THE LABELS, THE LABELS WANTED APPLE

2    TO SERVE AS A TEST; IS THAT RIGHT?  BECAUSE IT HAD A SMALLER

3    MARKET THAN SOME OTHERS?

4    **A.**  WELL, THAT'S HOW WE WERE ABLE TO CONVINCE THEM.  AT FIRST

5    THEY DIDN'T WANT US TO PLAY AT ALL.

6    **Q.**  AND SO YOU WERE ABLE TO NEGOTIATE WHAT YOU DESCRIBED AS

7    LANDMARK USAGE RIGHTS, CORRECT?

8    **A.**  THAT'S CORRECT.

9    **Q.**  AND SO THE OTHER BUSINESSES THAT ENTERED THAT MARKET

10   DIDN'T DO SO FOR APPROXIMATELY SIX MONTHS AFTER THE ITUNES

11   STORE WAS OPENED -- OR LET ME REPHRASE THAT.

12       ISN'T IT TRUE THAT OTHER COMPETING ONLINE MUSIC STORES

13   DIDN'T GET ACCESS TO THE SAME USAGE RIGHTS UNTIL THE ITUNES

14   STORE HAD BEEN OPERATING FOR ABOUT SIX MONTHS, ABOUT THE TIME

15   WHEN APPLE ALSO OPENED UP ITUNES FOR WINDOWS MACHINES?

16   **A.**  I WOULDN'T KNOW THAT SO --

17   **Q.**  YOU DIDN'T KEEP TRACK OF THAT IN YOUR JOB AS HEAD OF

18   ITUNES AT APPLE?

19   **A.**  WELL, I DON'T -- I DON'T KNOW WHAT THE LABELS ARE

20   NEGOTIATING AND GIVING TO A CERTAIN PARTY UNTIL THAT PARTY

21   LAUNCHES.  SO I HAVE NO IDEA WHETHER THEY GAVE THOSE RIGHTS TO

22   SOMEBODY AND THEY WERE WORKING ON IT AND HADN'T LAUNCHED.  I

23   DON'T KNOW.

24   **Q.**  BUT WEREN'T YOU MONITORING WHAT YOUR COMPETITORS WERE

25   DOING IN TERMS OF HOW MANY SONGS THEY HAD AND WHAT THEIR BURN

1   AND RIP RESTRICTIONS WERE?

2   **A.**   IF THEY WERE LIVE, YES, BUT IF THEY WERE NEGOTIATING OR

3   BUILDING THEIR STORE OR ANY OF THOSE THINGS, I WOULDN'T KNOW.

4   **Q.**   OKAY.   WELL, IN THE SIX-MONTH TIME PERIOD BETWEEN WHEN

5   APPLE OPENS ITS ITUNES STORE AND IT WENT TO WINDOWS, ARE YOU

6   AWARE OF ANY COMPETING MUSIC STORE THAT HAD THE SAME NUMBER OF

7   SONGS AND THE SAME USAGE RIGHTS AS APPLE HAD?

8   **A.**   I DON'T RECALL, BUT I WOULD BE SURPRISED IF THERE WERE

9   ANY, GIVEN THE FACT THAT IT TOOK US MORE THAN NINE MONTHS TO

10  DEVELOP.   SO IN SIX MONTHS, UNLESS THEY WERE A LOT SMARTER

11  THAN US, THERE'S NO WAY THEY COULD HAVE BUILT A STORE IN THAT

12  TIME.

13  **Q.**   NOW, MR. ISAACSON ASKED YOU SOME QUESTIONS ABOUT 7.0; DO

14  YOU RECALL THAT?

15  **A.**   YES, I DO.

16  **Q.**   AND YOU KNOW THAT 7.0 HAS A -- HAS SOME CODE IN IT CALLED

17  KEY -- WELL, WE CALL IT KEYBAG VERIFICATION CODE.   AND I THINK

18  THAT APPLE CALLS IT KEYBAG INTEGRITY CODE.   YOU'RE AWARE OF

19  THAT, RIGHT?

20  **A.**   I'M AWARE OF IT AT A HIGH LEVEL.

21  **Q.**   OKAY.   AND YOU WENT THROUGH THE PRESS RELEASE FOR THAT 7.0

22  RELEASE, CORRECT?

23  **A.**   THAT'S CORRECT.

24  **Q.**   AND NOTHING IN THAT PRESS RELEASE DESCRIBES THESE SECURITY

25  CHANGES TO THE SOFTWARE; IS THAT RIGHT?

1   **A.**   THAT'S CORRECT.  WE WOULD NEVER COMMUNICATE THAT.

2   **Q.**   AND THE 7.0, WAS THAT -- COULD THAT WORK WITH ALL OF THE

3   IPODS THAT WERE IN EXISTENCE AT THE TIME OR JUST CERTAIN

4   IPODS?  I MEAN -- LET ME MAKE THAT A LITTLE MORE CLEAR.

5      SO ON SEPTEMBER 12, 2006, WHEN APPLE ISSUED 7.0, WHAT

6   IPODS WERE ISSUED THE SAME TIME THAT COULD BE USED WITH 7.0?

7   **A.**   CERTAINLY ALL THE -- IPODS THAT WE HAD WERE COMPATIBLE,

8   BUT I DON'T KNOW, I DON'T REMEMBER THE EXACT COMPATIBILITY OF

9   EACH RELEASE.

10  **Q.**   IS IT YOUR UNDERSTANDING, THOUGH, THAT THE DIFFERENT

11  IPODS, IT'S REFLECTED IN THE IPOD WHICH VERSION OF THE

12  SOFTWARE IT WORKS WITH?  IS THERE A WAY TO FIND THAT OUT?

13  **A.**   THERE IS.

14  **Q.**   YEAH.

15     YOU ALSO SAID THAT -- THAT APPLE CAN MONITOR WHAT IPOD

16  OWNERS ARE DOING WITH THEIR IPODS CURRENTLY BECAUSE YOU CAN

17  SEE WHO'S BUYING SONGS OR MOVIES, DIRECTLY FROM THEIR IPOD,

18  BUT THEY DIDN'T HAVE THAT ABILITY IN 2006, CORRECT?

19  **A.**   THAT'S CORRECT.  AND AGAIN, I WANT TO BE CLEAR, WE DON'T

20  MONITOR WHAT OUR USERS ARE DOING.  WE ONLY MONITOR WHAT

21  THEY --

22  **Q.**   THANK YOU, MR. CUE.

23  **A.**   -- BOUGHT FROM THE STORE.

24  **Q.**   AND YOU TALKED ABOUT THE AUTO SYNCING FUNCTION.  AND --

25  DID -- DID YOU SAY THAT IF A PERSON PLAYED A SONG, THAT THAT

1    PERSON WHO OWNED AN IPOD HAD LEGALLY PURCHASED FROM HARMONY

2    AND THEN TRIED TO PLAY IT ON THE IPOD AND THEN IT DELETES --

3    DELETED IT, AND YOU THOUGHT THAT WAS A BAD THING, RIGHT?

4    **A.**  SURE, I DID.

5    **Q.**  BUT IT WAS BECAUSE OF APPLE'S SOFTWARE IN KVC THAT THE --

6    THAT THE USER COULDN'T PLAY THAT SONG; ISN'T THAT RIGHT?

7    **A.**  NO.  IT WAS BECAUSE HARMONY REVERSE-ENGINEERED AND IT

8    WASN'T GOING TO WORK.

9    **Q.**  YOU TALKED ABOUT BURNING AND RIPPING, AND YOU SAID THE

10   BURNING AND RIPPING LIMITS, AND YOU TALKED ABOUT HOW IT WAS

11   GOOD TO HAVE A NUMBER OF DEVICES THAT YOU COULD PLAY YOUR

12   SONGS ON.  SO A USER HAD PURCHASED A SONG LEGALLY FROM THE

13   ITUNES STORE AND WANTED TO PLAY THAT SONG, AND IF THE -- IF

14   THE USER HAD REACHED THE LIMIT, THE SONG WOULDN'T PLAY; DO YOU

15   RECALL THAT TESTIMONY?

16   **A.**  SORRY.  THE -- THE LIMIT WASN'T PLAY THE SONGS ON ITUNES

17   OR WHATEVER.  THE LIMIT WAS ON THE NUMBER OF BURNS THAT YOU

18   COULD DO ON A CD.  YOU COULD LISTEN TO THE SONGS AS MANY

19   TIMES --

20   **Q.**  RIGHT.

21   **A.**  -- AS YOU WANTED --

22                    (SIMULTANEOUS COLLOQUY.)

23           **THE WITNESS:**  IT WAS UNLIMITED LISTENING.

24   **BY MS. SWEENEY:**

25   **Q.**  OKAY, RIGHT, RIGHT.

1    SO IF YOU REACHED THAT LIMIT, YOU COULDN'T PLAY THE SONG

2    ANYMORE, RIGHT?

3    **A.**  NO.  AGAIN, IF YOU REACHED THE LIMIT, YOU COULDN'T BURN

4    ANOTHER CD.

5    **Q.**  OKAY.  OKAY.  WELL, WHAT YOU SAID -- I'M JUST TRYING TO

6    RECALL YOUR TESTIMONY AS BEST I CAN.  YOU SAID SUDDENLY IT

7    WOULDN'T PLAY, REFERRING TO THE SONG.  IF SUDDENLY THE SONG

8    WOULDN'T PLAY, NO ONE WOULD EVER BUY ANOTHER IPOD.

9    SO YOU AGREE THAT IF A PERSON BUYS A SONG LEGALLY AND

10   SUDDENLY THAT SONG WON'T PLAY, THAT'S A VERY BAD OUTCOME?

11   **A.**  NO.  I THINK WHEN YOU'RE REFERRING TO MY TESTIMONY, WHAT I

12   WAS REFERRING TO --

13   **Q.**  CAN YOU ANSWER MY QUESTION, THOUGH?

14   **A.**  REPEAT YOUR QUESTION.  SORRY.

15   **Q.**  DO YOU AGREE THAT IF YOU PURCHASE A SONG LEGALLY AND IT NO

16   LONGER PLAYS ON YOUR IPOD, THAT THAT'S A VERY BAD OUTCOME?

17   **A.**  NO.  IF IT WAS FROM OUR STORE, I DO.  WE WERE VERY CLEAR

18   THAT OUR STORES WOULD ALWAYS WORK.  IF YOU WERE DOING IT FROM

19   ANOTHER STORE, THAT'S EXACTLY WHAT I WAS WORRIED ABOUT.  WHICH

20   IS WHY I DID NOT LIKE WHAT HARMONY DID BECAUSE I KNEW IT WAS

21   GOING TO BREAK.  IT WAS GOING TO CAUSE US THE EFFECT THAT YOU

22   JUST MENTIONED.  AND NOW WE HAVE A CUSTOMER WHO WAS A HAPPY

23   ITUNES AND IPOD CUSTOMER INTO AN UNHAPPY CUSTOMER BECAUSE

24   SOMETHING DIDN'T WORK, THANKS TO REAL AND HARMONY.

25   **Q.**  WELL, BUT, SO A CUSTOMER WHO HAD PURCHASED A SONG FROM

1   REALNETWORKS AND COULD NO LONGER PLAY IT ON HER IPOD AFTER 7.0

2   COULDN'T PLAY THAT SONG BECAUSE THE 7.0 KVC BLOCKED THE

3   PLAYABILITY; ISN'T THAT RIGHT?

4   **A.**   IT'S NOT THE WAY I SEE IT.   AGAIN, IT WAS BLOCKED BECAUSE

5   HARMONY REVERSE-ENGINEERED.   AND GUESS WHAT?   WHEN A NEW

6   VERSION CAME OUT, IT DIDN'T WORK.

7   **Q.**   NOW, YOU TALKED A LOT ABOUT SOME HACKS INCLUDING DVD JON;

8   DO YOU REMEMBER THAT TESTIMONY?

9   **A.**   I DO.

10  **Q.**   OKAY.   AND THE DVD JON HACK THAT YOU WERE TALKING ABOUT

11  INVOLVED DVD JON REMOVING THE DRM, CORRECT?

12  **A.**   THAT'S CORRECT.

13  **Q.**   OKAY.   AND HARMONY DID NOT REMOVE DRM; ISN'T THAT CORRECT?

14  **A.**   HARMONY REMOVED ITS OWN DRM AND THEN ADDED OUR DRM TO IT.

15  **Q.**   BUT THE SONG CONTINUED TO BE DRM-PROTECTED, RIGHT?

16  **A.**   THAT'S CORRECT.

17  **Q.**   SO THAT THE USER COULDN'T SHARE IT FREELY ON THE INTERNET

18  IN THE WAY THAT THE MUSIC LABELS WERE CONCERNED, CORRECT?

19  **A.**   THAT'S CORRECT.

20  **Q.**   NOW, YOU TALKED ABOUT MR. JOBS' PIECE, "THOUGHTS ON

21  MUSIC."   DO YOU RECALL THAT TESTIMONY?

22  **A.**   I DO.

23  **Q.**   AND HE ISSUED THAT PUBLICATION, I THINK, ON FEBRUARY 7,

24  2007; DOES THAT SOUND CORRECT?

25  **A.**   I BELIEVE THAT'S CORRECT.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **Q.**   OKAY.  I'D LIKE TO SHOW YOU A COUPLE OF DOCUMENTS.  THE

2    FIRST ONE IS –– BEAR WITH ME ONE MOMENT.

3                    (PAUSE IN THE PROCEEDINGS.)

4    **BY MS. SWEENEY:**

5    **Q.**   –– DATED DECEMBER –– EXCUSE ME.  THIS IS EXHIBIT 383.

6    **A.**   IS IT IN THIS BINDER?  NO, IT'S NOT IN THIS BINDER, SORRY.

7                    (EXHIBIT PUBLISHED TO JURY.)

8    **BY MS. SWEENEY:**

9    **Q.**   OKAY.  SO THIS IS AN EMAIL DATED DECEMBER 5TH, 2006, FROM

10   STEVE JOBS, AND IT'S A FORWARDING OF AN ARTICLE CALLED "IN A

11   TURNABOUT RECORD INDUSTRY RELEASES MP3'S."  AND THE ARTICLE IS

12   ABOUT HOW THE EMI GROUP HAS RELEASED SOME DRM–FREE VERSIONS OF

13   POPULAR SONGS, A SERIES OF SONGS BY POPULAR ARTISTS.

14       AND MR. JOBS SAYS, "I HAVE BEEN EXPECTING SOMETHING LIKE

15   THIS FOR A FEW MONTHS NOW."

16       SO WHEN MR. JOBS ISSUED THAT PIECE, "THOUGHTS ON MUSIC,"

17   IN FEBRUARY 2007, HE –– HE WAS ALREADY AWARE THAT THE LABELS

18   WERE GOING IN THE DIRECTION OF DRM–FREE; ISN'T THAT RIGHT?

19             **MR. ISAACSON:**  I'M SORRY.  DOES THE WITNESS HAVE THE

20   ENTIRE ARTICLE?

21   **BY MS. SWEENEY:**

22   **Q.**   WOULD YOU LIKE TO SEE IT?  WE CAN GET IT FOR YOU, MR. CUE.

23   **A.**   I THINK I'M FINE.

24             **THE COURT:**  OKAY.

25             **THE WITNESS:**  NO.  THE ANSWER IS NOT CORRECT.  WHAT

 1    THE LABEL -- ONE LABEL OUT OF THE FOUR -- WAS DOING WAS

 2    TESTING A FEW SONGS.  AND MR. JOBS THOUGHT THAT, YOU KNOW,

 3    THAT SOME OF THE LABELS, IN THIS PARTICULAR CASE EMI, MIGHT

 4    TEST IT.  BUT THAT'S A BIG DIFFERENCE FROM RELEASING ALL OF

 5    YOUR SONGS DRM-FREE.

 6    **BY MS. SWEENEY:**

 7    **Q.**  BUT ISN'T IT TRUE THAT AT THIS TIME, MR. JOBS HAD HEARD

 8    FROM A NUMBER OF SOURCES THAT SOME OF THE LABELS WERE GOING TO

 9    EXPERIMENT WITH DRM-FREE MUSIC?

10    **A.**  I -- I DON'T RECALL.  I CERTAINLY -- I MEAN, A NUMBER OF

11    SOURCES I -- AGAIN, "EXPERIMENT WITH," I DON'T KNOW WHAT

12    "EXPERIMENT" MEANS.  ALL I KNOW IS THAT I WAS TALKING TO THE

13    LABELS, AND THEY WERE NOT GIVING US DRM-FREE UNDER ANY

14    CONDITIONS.  AND -- AND AS I MENTIONED, EMI WAS TESTING IN

15    THIS CASE BUT WAS UNSURE ABOUT WHAT THEY WANTED TO DO.

16    **Q.**  AND WERE THERE COMPLAINTS ABOUT THE LACK OF

17    INTEROPERABILITY BETWEEN -- BETWEEN APPLE'S DRM FAIRPLAY AND

18    OTHER MUSIC PLAYERS?

19    **A.**  YES, THERE WERE.

20         **MS. SWEENEY:**  SIDEBAR, YOUR HONOR?

21         **THE COURT:**  OKAY.

22         (SIDEBAR CONFERENCE OFF THE RECORD.)

23         **MS. SWEENEY:**  I HAVE NO FURTHER QUESTIONS.  THANK

24    YOU, MR. CUE.

25       OH, ACTUALLY, THERE'S -- I WANTED TO FINISH THE DOCUMENT,

1     THOUGH, THAT I DIDN'T HAVE AN OPPORTUNITY TO FINISH BEFORE.

2              **MR. ISAACSON:**  OBJECTION, OUTSIDE THE SCOPE.

3              **MS. SWEENEY:**  I THINK IT IS IN THE SCOPE, AND I ONLY

4     DIDN'T FINISH IT BECAUSE I DIDN'T HAVE THE HARD COPY.

5              **THE COURT:**  WHAT'S THE DOCUMENT NUMBER?

6              **MS. SWEENEY:**  I'M SORRY?

7              **THE COURT:**  WHAT'S THE DOCUMENT NUMBER AGAIN?

8              **MS. SWEENEY:**  THIS IS TRIAL EXHIBIT 816.

9              **MR. ISAACSON:**  I DID NOT EXAMINE THE WITNESS ON THIS

10    DOCUMENT.

11             **MS. SWEENEY:**  THE WITNESS HAD ALREADY STATED THAT

12    HE --

13             **THE COURT:**  I'M GOING TO LET HER REOPEN ON THE ONE

14    DOCUMENT, MR. ISAACSON.

15             **MS. SWEENEY:**  THANK YOU, YOUR HONOR.  MAY I APPROACH?

16             **THE WITNESS:**  SURE.

17             **THE COURT:**  SHE'S ASKING ME.

18             **THE WITNESS:**  OH, SORRY, I APOLOGIZE.  I APOLOGIZE,

19    YOUR HONOR.

20             **THE COURT:**  IT'S MY COURTROOM.  I GET TO DECIDE IF

21    SHE APPROACHES YOU OR NOT.

22             **THE WITNESS:**  YES, I APPRECIATE THAT.

23                        (LAUGHTER.)

24    **BY MS. SWEENEY:**

25    **Q.**  ALL RIGHT.  THIS IS A DOCUMENT THAT WE LOOKED AT BRIEFLY

1    EARLIER.

2                    (EXHIBIT PUBLISHED TO JURY.)

3    **BY MS. SWEENEY:**

4    **Q.**  THIS IS AN EMAIL FROM YOU DATED OCTOBER 11TH, 2005.  AND

5    THE SUBJECT IS "THE RECORDING INDUSTRY'S NEW CLOTHES."

6         AND YOU SAY, "THIS IS DEAD ON.  FORTUNATELY OR

7    UNFORTUNATELY, THE LABELS WILL NEVER GET THIS."

8         AND YOU'RE RESPONDING TO AN ARTICLE THAT MR. GAUTIER SENT

9    YOU BY TIM LEE.  AND IF WE CAN LOOK AT THE MIDDLE OF THE FIRST

10   PARAGRAPH, THIS ARTICLE IS TALKING ABOUT MUSIC AND IT'S

11   TALKING ABOUT APPLE'S DOMINANCE.

12        AND THE ARTICLE SAYS, "THERE'S JUST ONE PROBLEM.  IF YOU

13   DON'T CHANGE YOUR STRATEGY, YOU'RE GOING TO GIVE THE STORE

14   AWAY TO APPLE CEO STEVE JOBS.  HIS ITUNES MUSIC STORE IS THE

15   INDUSTRY LEADER, AND THANKS TO DIGITAL RIGHTS MANAGEMENT

16   TECHNOLOGY, EVERY CUSTOMER WHO BUYS YOUR PRODUCTS FROM THE

17   ITUNES MUSIC STORE BECOMES LOCKED INTO APPLE PRODUCTS.  IF

18   THAT'S NOT CHANGED, THAT WILL SOON MAKE STEVE JOBS THE MOST

19   POWERFUL MAN IN YOUR INDUSTRY."

20        AND THIS IS WHAT YOU WERE RESPONDING TO WHEN YOU SAID THIS

21   IS DEAD ON; ISN'T THAT RIGHT?

22   **A.**  NO.  I WAS RESPONDING TO THE WHOLE ARTICLE.  AND THE WHOLE

23   ARTICLE WAS ABOUT GOING DRM-FREE WHICH I BELIEVED WAS DEAD ON.

24             **MS. SWEENEY:**  I HAVE NO FURTHER QUESTIONS.  THANK

25   YOU.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1           THE WITNESS:  THANK YOU, MS. SWEENEY.

 2           THE COURT:  RECROSS LIMITED TO THE SCOPE OF REDIRECT.

 3                       RECROSS-EXAMINATION

 4    BY MR. ISAACSON:

 5    Q.  ONE QUESTION, MR. CUE.

 6        YOU MENTIONED YOU WOULDN'T PUT SECURE -- SECURITY UPDATES

 7    IN A PRESS RELEASE.  WOULD YOU EXPLAIN YOUR ANSWER.

 8    A.  WELL, SECURITY UPDATES WERE ABOUT PREVENTING HACKERS.

 9    TALKING IN A PRESS RELEASE THAT WE WERE DOING THINGS FROM A

10    HACKER POINT OF VIEW WOULD JUST HIGHLIGHT THE FACT THAT THOSE

11    HACKERS WERE OUT THERE.  IT WAS NOT MEANINGFUL FROM A CUSTOMER

12    POINT OF VIEW AND WOULD ACTUALLY JUST CAUSE MORE CONFUSION AND

13    POTENTIALLY OUR SALES TO GO DOWN BECAUSE PEOPLE WOULD VIEW OUR

14    SOFTWARE AS BEING HACKED.  SO IT'S NOT SOMETHING WE WOULD EVER

15    DO IN A -- IN A PRESS RELEASE.

16           MR. ISAACSON:  NO FURTHER QUESTIONS.  THANK YOU.

17           THE COURT:  REDIRECT ON THAT ONE QUESTION?

18           MS. SWEENEY:  NO REDIRECT, YOUR HONOR.

19           THE COURT:  ALL RIGHT, THEN, MR. CUE, YOU'RE EXCUSED.

20           THE WITNESS:  THANK YOU, YOUR HONOR.

21           THE COURT:  YOU'RE WELCOME.

22        NEXT WITNESS.

23                  (OFF-THE-RECORD DISCUSSION.)

24           THE COURT:  OH, HOLD ON A MINUTE.  I'LL TALK TO YOU

25    AT SIDEBAR.  HAVE A SEAT.
```

```
 1                (SIDEBAR CONFERENCE OFF THE RECORD.)

 2          THE COURT:  OKAY.  THANK YOU.

 3      LADIES AND GENTLEMEN OF THE JURY, ANY QUESTIONS FROM YOU

 4  ALL?  AND I DID RECEIVE ONE QUESTION AT THE BREAK.  IS

 5  EVERYBODY -- OR IS THE PERSON COMFORTABLE THAT THAT QUESTION

 6  WAS ANSWERED?

 7      WOULD YOU LIKE ME TO ASK IT?

 8          A JUROR:  YES.

 9          THE COURT:  OKAY.

10      SO, MR. CUE, THE QUESTION IS:  WHY EXACTLY IS

11  INTEROPERABILITY NOT POSSIBLE OR RELIABLE WHEN WORKING WITH

12  DRM-PROTECTED MUSIC?

13          THE WITNESS:  IT'S A GREAT QUESTION, BY THE WAY,

14  BECAUSE I THINK MANY PEOPLE ASK THAT QUESTION.

15      AND THE CHALLENGE WITH IT IS OUR DRM IS ABOUT SECRETS.  IN

16  A WAY, YOU'RE TRYING TO PROTECT THESE FILES IN A WAY THAT

17  NOBODY ELSE CAN FIGURE OUT BECAUSE IF THEY FIGURE OUT, THEY

18  CAN REMOVE IT.  SO IT'S ALL ABOUT THESE SECRETS AND THESE --

19  YOU HAVE TO FIGURE OUT TECHNICALLY HOW TO MAKE THINGS

20  DIFFICULT TO REVERSE-ENGINEER OR TO -- TO STRIP.  SO YOU'RE,

21  IN A WAY, HIDING THINGS AND DOING THINGS THAT ARE UNUSUAL.

22      WHAT HAPPENS IS IF YOU WANT TO MAKE IT INTEROPERABLE, THAT

23  MEANS YOU HAVE TO TURN OVER THOSE SECRETS TO SOMEBODY ELSE IF

24  YOU WANT IT TO WORK REALLY RELIABLY.  WHAT PEOPLE HAVE TRIED

25  TO DO -- AND OBVIOUSLY, IF YOU TURN OVER THE SECRETS, WHAT
```

1    HAPPENS IS -- YOU KNOW, THERE'S A GOOD SAYING, "IF YOU WANT TO

2    KEEP A SECRET, DON'T TELL ANYONE."

3           **MR. ISAACSON:**  YOUR HONOR, CAN I INTERRUPT AT THIS

4    POINT?

5           **THE COURT:**  YOU MAY.

6           **MR. ISAACSON:**  I DON'T WANT HIM TO GO DOWN THIS ROAD.

7           **THE COURT:**  ALL RIGHT.  SO YOUR LAWYER IS SAYING THAT

8    YOUR ANSWER IS DONE.

9           **MR. ISAACSON:**  OKAY.  BECAUSE OF SOME LEGAL RULINGS

10   IN THE CASE.

11          **THE COURT:**  ALL RIGHT.  ANY FOLLOW-UP QUESTIONS FROM

12   YOU?

13          **MR. ISAACSON:**  NO.

14          **THE COURT:**  ANY FOLLOW-UP QUESTIONS FROM YOU?

15                    **FURTHER REDIRECT EXAMINATION**

16   **BY MS. SWEENEY:**

17   **Q.**  IT'S TRUE, MR. CUE, ISN'T IT, THAT OTHER COMPANIES MADE

18   THEIR DRM INTEROPERABLE SO THAT YOU COULD USE ONE DRM FROM --

19   AND USE IT ON MANY DIFFERENT PORTABLE PLAYERS; ISN'T THAT

20   RIGHT?

21   **A.**  NO, THAT'S NOT CORRECT.  IT DID NOT WORK RELIABLY WHICH IS

22   WHY THEY FAILED.

23   **Q.**  THAT'S YOUR OPINION, ISN'T IT, MR. CUE?  ISN'T IT POSSIBLE

24   THAT THEY FAILED BECAUSE APPLE ALREADY HAD DOMINANCE IN BOTH

25   THE PLAYER MARKET AND THE MUSIC MARKET?

1    **A.**   THAT OBVIOUSLY WASN'T TRUE WHEN WE LAUNCHED AND WE WERE

2    COMPETING AGAINST SOMEBODY WHO WAS SIGNIFICANTLY BIGGER THAN

3    US IN MICROSOFT WITH MANY MORE ENGINEERS AND CAPABILITIES THAN

4    WE EVER HAD, AND –– AND THEY FAILED.  SO I CERTAINLY DON'T

5    BELIEVE IT'S TRUE.  I DON'T THINK IT'S AN OPINION.  I THINK

6    IT'S A FACT.

7            **THE COURT:**  MR. ISAACSON, ANYTHING ELSE?

8            **MR. ISAACSON:**  NO FURTHER QUESTIONS.

9            **THE COURT:**  OKAY.  NOW YOU MAY STEP DOWN, MR. CUE.

10           **THE WITNESS:**  THANK YOU, YOUR HONOR.

11           **THE COURT:**  ALL RIGHT.  NEXT WITNESS.

12           **MR. COUGHLIN:**  YOUR HONOR, WE WOULD CALL AMANDA

13   MARKS.

14           **THE COURT:**  OKAY.  AND IT'S 11:26.  WE'LL TAKE OUR

15   NEXT BREAK AT 11:45.

16                   (PAUSE IN THE PROCEEDINGS.)

17           **THE CLERK:**  IF THE WITNESS WILL –– IF YOU'LL STAND,

18   PLEASE, TO BE SWORN.  THANK YOU.

19                       **AMANDA MARKS**,

20   CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY

21   SWORN, TESTIFIED AS FOLLOWS:

22           **THE WITNESS:**  I DO.

23           **THE CLERK:**  ALL RIGHT.  PLEASE BE SEATED.  AND THEN

24   WOULD YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

25   NAME.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **THE WITNESS:**  AMANDA MARKS, M-A-R-K-S.

2        **THE COURT:**  GOOD MORNING.

3    YOU MAY PROCEED.

4                    **DIRECT EXAMINATION**

5    BY MR. COUGHLIN:

6    **Q.**  IT IS STILL MORNING.  GOOD MORNING, MS. MARKS.

7        WE'D NEVER MET BEFORE, BEFORE WE JUST MET OUT IN THE

8    HALLWAY; IS THAT CORRECT?

9    **A.**  YES.

10   **Q.**  OKAY.  AND YET YOU HAD SUBMITTED A DECLARATION IN THIS

11   CASE SOME TIME AGO; IS THAT CORRECT?

12   **A.**  YES.

13   **Q.**  I THINK THAT DECLARATION WHICH IS MARKED AS EXHIBIT 719 IS

14   IN FRONT OF YOU.  DO YOU SEE IT THERE?

15   **A.**  YES.

16   **Q.**  IS THAT THE DECLARATION YOU SUBMITTED?

17   **A.**  YES.

18   **Q.**  CAN YOU TELL US WHERE -- WHERE YOU CURRENTLY WORK?

19   **A.**  I WORK FOR UNIVERSAL MUSIC GROUP.

20   **Q.**  OKAY.  AND IS THAT DIFFERENT, SOMEHOW SPLIT OFF FROM

21   ANOTHER PART OF UNIVERSAL?

22   **A.**  WE ARE SEPARATE COMPANIES FROM UNIVERSAL STUDIOS.

23   **Q.**  OKAY.  AND BACK IN THE TIME FRAME OF 2003 TO 2000 -- WELL,

24   I GUESS IF YOU STILL WORK THERE TODAY, IN 2003 DID YOU WORK

25   FOR UNIVERSAL -- I'LL JUST CALL IT UNIVERSAL.  DID YOU WORK

1    FOR UNIVERSAL THEN?

2    **A.**   YES.

3    **Q.**   OKAY.  WHAT WAS YOUR POSITION WITH UNIVERSAL?

4    **A.**   IN 2003?

5    **Q.**   IN 2003, 2004.

6    **A.**   I WAS EXECUTIVE VICE-PRESIDENT OF ELABS WHICH WAS THE NEW

7    TECHNOLOGY DIVISION OF UNIVERSAL.

8    **Q.**   SO THE -- FOR DISTRIBUTING THE DIGITAL CONTENT OF YOUR

9    RECORD OR LABEL CONNECTION?

10   **A.**   YES.  DISTRIBUTING -- DIGITALLY DISTRIBUTING AND OTHERWISE

11   INVESTIGATING ALL ASPECTS OF NEW TECHNOLOGY, WHETHER IT WAS

12   NEW PHYSICAL FORMATS OR DIGITAL FORMATS.

13   **Q.**   AND WERE YOU INVOLVED IN THE NEGOTIATIONS TO LICENSE

14   COMPANIES LIKE APPLE AND REALNETWORKS TO SELL YOUR SONGS?

15   **A.**   YES.  I MANAGED THE TEAMS THAT DID THAT.

16   **Q.**   OKAY.

17   **A.**   AND IN SOME CASES DID IT MYSELF.

18   **Q.**   WHAT WAS DIFFERENT ABOUT THE -- YOU HAD ACTUALLY

19   NEGOTIATED WITH REALNETWORKS TO SELL YOUR COLLECTION OVER

20   THEIR SYSTEM ACTUALLY PRIOR TO APPLE; IS THAT RIGHT?

21   **A.**   YES.

22   **Q.**   OKAY.  AND WHAT WAS DIFFERENT ABOUT YOUR NEGOTIATIONS WITH

23   APPLE OR WHAT RIGHTS YOU GRANTED THEM THAT WAS DIFFERENT FROM

24   THE RIGHTS THAT YOU HAD GRANTED REALNETWORKS?

25   **A.**   WELL, REALNETWORKS HAD A SUBSCRIPTION SERVICE IN ADDITION

1   TO SELLING A LA CARTE.

2   **Q.**  OKAY.  AND DID THEY SELL A LA CARTE AT THAT TIME?

3   **A.**  I BELIEVE THEY DID, ALTHOUGH I'M NOT TOTALLY CLEAR ON

4   DATES.

5   **Q.**  ON THE EXACT DATE THAT THEY STARTED SELLING A LA CARTE?

6   **A.**  OR WHEN THEY STOPPED.

7   **Q.**  OKAY.  AND I ASK YOU TO TAKE A LOOK.  IN 2003 WHEN YOU

8   FIRST WENT TO -- WAS IT 2003 WHEN YOU FIRST TALKED TO APPLE

9   ABOUT LICENSING?

10  **A.**  2002.

11  **Q.**  2002.  AT THE END OF 2002?

12  **A.**  YES.

13  **Q.**  OKAY.

14  **A.**  FALL.

15  **Q.**  AND DID YOU -- WHEN YOU TALKED TO THEM AT THAT TIME, DID

16  YOU TALK TO THEM ABOUT WHAT TYPE OF SYSTEM -- WHAT TYPE OF DRM

17  SYSTEM -- THEY'VE HEARD A LOT ABOUT DRM -- WHAT TYPE OF DRM

18  SYSTEM THAT THEY WOULD PUT TO PROTECT YOUR SONGS?

19  **A.**  WE HAVE REQUIREMENTS IN OUR CONTRACTS THAT MANDATE THE

20  KIND OF SECURITY BUT NOT NECESSARILY HOW IT'S ACHIEVED.

21  **Q.**  OKAY.  AND SO YOU -- YOU NEGOTIATED THE, YOU KNOW, LET'S

22  SAY HOW MANY TIMES SOMEBODY COULD DOWNLOAD A SONG, HOW MANY

23  TIMES THEY COULD BURN A SONG OR RIP A SONG?

24  **A.**  RIGHT.

25  **Q.**  THINGS LIKE THAT, YES?

MARKS - DIRECT / COUGHLIN

1    **A.**   USAGE -- USAGE RULES.

2    **Q.**   AND AT THE TIME WHEN YOU FIRST NEGOTIATED THAT AND

3    APPLE -- THE APPLE STORE, MUSIC STORE, OPENED UP IN APRIL OF

4    2003, AT THE TIME THAT YOU WERE NEGOTIATING THOSE FIRST

5    CONTRACTS, WERE YOU -- DID YOU DISCUSS AT ALL WITH APPLE ABOUT

6    HAVING THEIR DRM BE INTEROPERABLE?

7    **A.**   I DON'T SPECIFICALLY REMEMBER.

8    **Q.**   OKAY.  IN YOUR DECLARATION, YOU SAY THAT YOU TALKED TO

9    THEM IN 2004 REQUESTING THAT THEY MAKE -- TO ALLOW

10   INTEROPERABILITY.  DO YOU RECALL THAT?

11   **A.**   YES --

12   **Q.**   AT WHAT POINT --

13   **A.**   -- GENERALLY.

14   **Q.**   WHAT DID YOU GO AND ASK THEM?  YOU WERE THE PERSON IN

15   CHARGE, RIGHT?

16   **A.**   WELL, I REPORTED TO SOMEONE WHO WAS THE PRESIDENT OF

17   ELABS, AND I MANAGED THE BUSINESS DEVELOPMENT AND BUSINESS

18   AFFAIRS TEAMS.

19   **Q.**   OKAY.

20   **A.**   SO --

21   **Q.**   SO YOU DID TALK -- YOU WERE THE ONE -- YOU WERE THE PERSON

22   TALKING TO -- WERE YOU TALKING TO EDDY CUE?

23   **A.**   YES.  SPENT A LOT OF TIME TALKING TO EDDY CUE.

24   **Q.**   WAS HE THE PERSON THAT MAINLY YOU TALKED -- DISCUSSED

25   THESE ISSUES WITH?

1    **A.**   AND I THINK I REMEMBER THAT THE ORIGINAL CONTRACT WE DID

2    WITH EDDY AND SOMEONE NAMED JAMES HIGA --

3    **Q.**   OKAY.

4    **A.**   -- WHO WAS ANOTHER APPLE EMPLOYEE.

5    **Q.**   RIGHT.

6         AND WHEN WAS THE FIRST TIME THAT YOU RECALL REQUESTING

7    THAT THEY MAKE THEIR -- THEIR -- THEIR SYSTEM INTEROPERABLE?

8    **A.**   I DON'T RECALL EXACTLY.

9    **Q.**   OKAY.  YOU SAY IN YOUR DECLARATION THAT YOU APPROACHED

10   THEM IN 2004.

11   **A.**   AND I'M -- I'M SURE -- I'M SURE THAT WE DID.  I JUST DON'T

12   KNOW --

13   **Q.**   I UNDERSTAND.

14   **A.**   -- SPECIFICALLY WHEN.

15   **Q.**   GOT IT.

16        IS THERE -- AND WHAT WAS THEIR RESPONSE?

17   **A.**   WELL, IT WAS A -- IT'S A COMPLICATED QUESTION BECAUSE THE

18   TWO PRIMARY DRM SYSTEMS WERE WINDOWS AND APPLE.  SO IT'S SORT

19   OF LIKE GETTING TWO PORCUPINES TO DANCE TOGETHER.

20   **Q.**   AND THEY SAID NO?

21   **A.**   THEY -- THEY DIDN'T, IN FACT, DO IT, BUT WE KEPT TRYING TO

22   GET THE PARTIES TO THE TABLE.

23   **Q.**   YOU KEPT TRYING TO CRACK THAT ISSUE; IS THAT RIGHT?

24   **A.**   YES.

25   **Q.**   OKAY.  AND -- AND YOU COULDN'T GET THAT DONE; IS THAT

1    RIGHT?  APPLE SAID, "NO, WE'RE NOT GOING TO DO IT"?

2    **A.**  I DON'T REMEMBER EITHER PARTY BEING PARTICULARLY HELPFUL.

3    **Q.**  OKAY.  THAT'S FAIR.

4       DID -- NOW YOU WERE ALREADY LICENSING YOUR MUSIC TO

5    REALNETWORKS IN THIS TIME FRAME, 2004, 2005; IS THAT RIGHT?

6    **A.**  YES.

7    **Q.**  AND THEY HAD A DRM PROTECTION SYSTEM; IS THAT CORRECT?

8    **A.**  YES.

9    **Q.**  YOU WOULDN'T HAVE DONE IT WITHOUT THEM HAVING SUCH A

10   SYSTEM, RIGHT?

11   **A.**  THAT'S CORRECT.

12   **Q.**  OKAY.  AND AT THAT TIME, THEY HAD -- THEY DEVELOPED A

13   SYSTEM -- HARMONY, THEY DEVELOPED -- THEY DEVELOPED HARMONY.

14   DO YOU REMEMBER WHEN HARMONY WAS DEVELOPED?

15   **A.**  GENERALLY, YES.

16   **Q.**  RIGHT.  AND WHAT HARMONY DID IS IT ALLOWED FOR

17   INTEROPERABILITY; DO YOU REMEMBER THAT?

18   **A.**  YES.

19   **Q.**  OKAY.  AND YOU LIKED THAT; IS THAT CORRECT?

20   **A.**  I DON'T THINK THAT I WOULD CHARACTERIZE IT THAT WAY.

21   **Q.**  YOU --

22   **A.**  I --

23   **Q.**  YOU WANTED APPLE TO ACCEPT --

24   **A.**  I CAN SAY THAT WE WANTED INTEROPERABILITY.  I CAN'T

25   COMMENT ON HOW REAL ACHIEVED IT AND WHETHER WE WOULD BE HAPPY

1  WITH THAT.

2  **Q.** OKAY. YEAH, I WASN'T ASKING YOU HOW. I WAS JUST ASKING

3  YOU WERE YOU HAPPY THAT THEY HAD ACHIEVED INTEROPERABILITY?

4  **A.** I THINK AS I REMEMBER, IT WAS SOMEWHAT CONTROVERSIAL --

5  **Q.** OKAY.

6  **A.** -- HOW THEY HAD ACHIEVED IT.

7  **Q.** OKAY. LET ME SHOW YOU WHAT'S MARKED EXHIBIT 314.

8               (EXHIBIT PUBLISHED TO JURY.)

9  **BY MR. COUGHLIN:**

10  **Q.** MANY OF THESE DOCUMENTS THAT WE'RE GOING TO TALK ABOUT

11  DEAL -- THAT ARE FROM APPLE, THEY'RE NOT OF COURSE FROM

12  UNIVERSAL -- AND THEY TALK ABOUT, I THINK -- I BELIEVE THAT

13  THEY TALK ABOUT CONVERSATIONS THAT APPLE PEOPLE MAY HAVE HAD

14  WITH YOU.

15      THIS CONVERSATION THAT TAKES PLACE IN APRIL 2003, IT SAYS

16  THAT ZACH HAS ASKED AMANDA TO DETAIL THE REQUESTED CHANGES.

17      DO YOU SEE THAT?

18  **A.** YES.

19  **Q.** AND THE FIRST CHANGE, IT SAYS THAT YOU WOULD LIKE THE IPOD

20  PLAYER DEFINITION IN THE CONTRACT TO SPELL OUT THAT -- OUT THE

21  ROACH MOTEL APPROACH, SONGS GO INTO THE IPOD -- DIDN'T SAY

22  THAT -- SONGS GO IN BUT DO NOT COME OUT. THEY UNDERSTAND THAT

23  THIS IS THE WAY IPOD WORKS BUT WANTED IT IN THE CONTRACT.

24      CAN YOU TELL US WHAT YOU WERE ASKING FOR THERE?

25  **A.** I THINK MY MEMORY IS THAT WE DID NOT WANT PEOPLE TO BE

1    ABLE TO TAKE THEIR IPOD AND THEN TRANSFER ALL OF THEIR MUSIC

2    OUT TO SOME THIRD PARTY'S COMPUTER.

3    **Q.**  AND YOU UNDERSTOOD, THOUGH, THAT -- YOU UNDERSTOOD THE

4    IPOD -- IT SAYS HERE THAT YOU UNDERSTOOD AT THAT TIME THAT IT

5    WAS NOT SUCH A TRANSFER DEVICE, THAT THINGS WENT IN BUT THEY

6    DIDN'T COME OUT; YOU KNEW THAT?

7    **A.**  IT SAYS THAT.  YES.

8    **Q.**  OKAY.  SO YOU UNDERSTOOD THAT AT THAT TIME, RIGHT?

9    **A.**  (REVIEWING DOCUMENT.)

10    I THINK SO.

11    **Q.**  OKAY.

12    COULD WE TAKE A LOOK AT EXHIBIT 92.

13                    (EXHIBIT PUBLISHED TO JURY.)

14    **BY MR. COUGHLIN:**

15    **Q.**  YOU CAN SEE IT ON THE SCREEN THERE.  WE'RE JUST GOING TO

16    TALK ABOUT THE ONE PAGE.  BUT I THOUGHT I'D -- I'LL GIVE YOU A

17    COPY OF IT.  I DON'T WANT AN OBJECTION YOU'RE NOT SEEING THE

18    WHOLE EXHIBIT.

19            **THE COURT:**  YOU CAN APPROACH.

20            **THE WITNESS:**  THANK YOU.

21            **MR. COUGHLIN:**  THANK YOU, JUDGE.

22                    (PAUSE IN THE PROCEEDINGS.)

23            **MR. ISAACSON:**  YOUR HONOR, I DON'T THINK IT'S

24    APPROPRIATE TO SHOW THIS DOCUMENT TO THE JURY AT THIS POINT.

25    THE WITNESS HAS NOT -- ON THIS DOCUMENT --

1           THE COURT:  TAKE IT OFF THE SCREEN.

2           MR. COUGHLIN:  YOUR HONOR, I HAVE TO DISAGREE WITH

3    THAT.  WE HAVE A –– A STIPULATION THAT WE CAN SHOW THESE

4    DOCUMENTS.

5           THE COURT:  NOT ON THIS ONE.  NOT ON THIS ONE.

6           MR. COUGHLIN:  NOT ON THIS ONE?

7           THE COURT:  I'M LOOKING AT MY CHART.

8           MR. COUGHLIN:  IT'S THE HEARSAY.  OKAY.

9    BY MR. COUGHLIN:

10   Q.  NOW, WHEN YOU WERE TALKING ABOUT INTEROPERABILITY, WHAT

11   YOU WERE TALKING ABOUT IS THAT YOU WANTED EVERYBODY'S

12   SYSTEMS –– YOU WANTED YOUR MUSIC TO BE AS FREE AS POSSIBLE,

13   PROTECTED WITH DRM BUT BE ABLE TO BE SOLD TO ALL DIFFERENT

14   TYPES OF SYSTEMS TO PLAY ON, TO PLAY ON ANY PORTABLE DIGITAL

15   PLAYER; IS THAT CORRECT?

16   A.  YES.

17   Q.  OKAY.  AND YOU WERE AGAINST THE BALKANIZATION OF THE –– OF

18   THE INDUSTRY; IS THAT RIGHT?

19   A.  WE WERE IN FAVOR OF INTEROPERABILITY, YES.

20   Q.  RIGHT.

21       AND DID YOU TALK TO MICROSOFT ABOUT INTEROPERABILITY?

22   A.  ABSOLUTELY.

23   Q.  OKAY.  AND THEY WERE LICENSING THEIR DRM; IS THAT CORRECT?

24   A.  YES.

25   Q.  OKAY.  AND YOU SUPPORTED THAT, RIGHT?

```
 1    A.   I'M SORRY.  SUPPORTED THEM LICENSING THEIR DRM?

 2    Q.   YOU KNEW THAT THEY WERE LICENSING THEIR DRM THAT -- THAT

 3    PROTECTED YOUR SONGS TO OTHER PEOPLE AND YOU WERE GOOD WITH

 4    THAT, RIGHT?

 5    A.   WE WERE FINE WITH THAT, YES.

 6    Q.   YOU THOUGHT IT PROTECTED YOUR SONGS AND MUSIC WELL ENOUGH

 7    TO DO THAT, CORRECT?

 8    A.   YES.  IT WAS SATISFACTORY.

 9    Q.   OKAY.  LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 817.

10               (EXHIBIT PUBLISHED TO JURY.)

11          MR. ISAACSON:  YOUR HONOR, IT'S A HEARSAY DOCUMENT,

12    SHOULDN'T BE SHOWN TO THE JURY.

13          MR. COUGHLIN:  THAT'S NOT CORRECT, YOUR HONOR.  WE

14    HAVE --

15          MR. ISAACSON:  STIPULATED --

16          MR. COUGHLIN:  THIS IS NOT ONE OF THE STIPULATED

17    ONES.  OKAY.

18    Q.   LET ME ASK YOU TO FLIP TO THE SECOND PAGE OF THAT

19    DOCUMENT.

20       CAN YOU TELL US WHO LARRY KENSWIL IS?  IN THE MIDDLE OF

21    PAGE.

22    A.   HE WAS MY BOSS.

23    Q.   OKAY.  AND AT THE TIME THAT REALNETWORKS CAME OUT WITH

24    HARMONY, HE GAVE A STATEMENT TO CNET; DO YOU REMEMBER THAT?

25    A.   YES.
```

1    **Q.**  OKAY.  AND CAN YOU TELL US WHAT HE SAID ABOUT HARMONY TO

2    CNET?

3    **A.**  DO YOU WANT ME THE READ HIS QUOTE IN THIS --

4    **Q.**  NO.

5    **A.**  -- DOCUMENT?

6    **Q.**  TELL US WHAT YOU REMEMBER OF IT.

7    **A.**  (REVIEWING DOCUMENT.)

8        I REMEMBER THAT HE MADE A STATEMENT THAT WAS POSITIVE

9    ABOUT HARMONY.

10   **Q.**  RIGHT.  HE WAS YOUR BOSS AT THE TIME, RIGHT?

11   **A.**  YES.

12   **Q.**  AND HE WANTED INTEROPERABILITY, TOO; IS THAT CORRECT?

13   **A.**  YES.

14   **Q.**  AND SO HE SUPPORTED THE FACT THAT REALNETWORKS CAME OUT

15   WITH HARMONY AND IT TRANSLATED REALNETWORKS' DRM OVER TO

16   FAIRPLAY'S DRM?

17           **MR. ISAACSON:**  OBJECTION, LEADING.

18           **THE COURT:**  SUSTAINED.

19   **BY MR. COUGHLIN:**

20   **Q.**  DID HE SUPPORT THE TRANSLATION OF THE DRM?

21   **A.**  I THINK THAT HE MADE A -- I THINK HE MADE AN INITIAL

22   STATEMENT THAT WAS SUPPORTIVE OF IT, YES.

23           **MR. COUGHLIN:**  LET'S TAKE A LOOK AT EXHIBIT 121.

24               (EXHIBIT PUBLISHED TO THE JURY.)

25

1    BY MR. COUGHLIN:

2    Q.  I DIRECT YOUR ATTENTION UP TO THE TOP OF THE -- DO YOU

3    REMEMBER TALKING TO EDDY CUE ABOUT THE FACT OF HARMONY -- DID

4    YOU HAVE DISCUSSIONS -- YOU, YOURSELF, HAVE DISCUSSIONS WITH

5    EDDY CUE ABOUT THE SUPPORT THAT YOU FELT THAT YOUR BOSS AND

6    YOU HAD FOR INTEROPERABILITY WHEN REALNETWORKS CAME OUT WITH

7    HARMONY?

8    A.  SORRY.  I WAS READING.  COULD YOU SAY THE QUESTION AGAIN?

9    Q.  DID YOU HAVE ANY CONVERSATIONS WITH EDDY CUE ABOUT

10   UNIVERSAL'S SUPPORT FOR REALNETWORKS' HARMONY?

11   A.  I -- I DON'T REMEMBER SAYING THAT UNIVERSAL SUPPORTED

12   HARMONY, BUT WE WERE GENERALLY OKAY WITH -- WE HAD

13   REQUIREMENTS FOR SECURITY, AND WE DID NOT DICTATE HOW THOSE

14   SECURITY REQUIREMENTS WERE MET.

15   Q.  SO YOU WERE GENERALLY OKAY WITH WHAT REALNETWORKS HAD

16   DONE; IS THAT YOUR STATEMENT?

17   A.  I WOULD SAY THAT TO THE EXTENT THERE WAS NOT A PROBLEM

18   WITH THE WAY THAT THEY CREATED THE SOLUTION, WE WERE OKAY WITH

19   THE SECURITY THAT WAS ACHIEVED.

20   Q.  DID YOU TALK TO THE OTHER NETWORKS ABOUT YOUR VIEWS ON

21   INTEROPERABILITY?

22   A.  THE OTHER LABELS, YOU MEAN?

23   Q.  YES.

24   A.  NO.

25   Q.  NO?  YOU JUST TALKED TO THE PEOPLE THAT WERE LICENSING

1   YOUR MUSIC ABOUT THOSE ISSUES?

2   **A.**  YES, ALTHOUGH -- YES.

3   **Q.**  AT SOME TIME -- AT SOME POINT, DID YOU KNOW THAT -- DID

4   YOU UNDERSTAND THAT HARMONY HAD RECEIVED A BILLBOARD AWARD FOR

5   THEIR TECHNOLOGY?

6   **A.**  I DO NOT REMEMBER THAT.

7   **Q.**  YOU DIDN'T?

8       DID YOU HAVE ANY -- DID YOU DO A LICENSING AGREEMENT WITH

9   NAVIO?

10  **A.**  I DON'T HAVE A SPECIFIC RECOLLECTION ABOUT THAT.  I MEAN,

11  THE NAME IS FAMILIAR, BUT --

12  **Q.**  DID YOU DO AN AGREEMENT WITH THEM ABOUT THE GBOX; DO YOU

13  REMEMBER THAT?

14  **A.**  NO.

15          **MR. COUGHLIN:**  CAN WE LOOK AT EXHIBIT 940.

16              (EXHIBIT PUBLISHED TO JURY.)

17          **MR. COUGHLIN:**  CAN WE GO TO THE -- DOWN TO THE PART

18  WHERE MS. MARKS SENDS AN EMAIL.

19  **Q.**  IF YOU COULD READ THAT PART TO YOURSELF FIRST.

20  **A.**  (REVIEWING DOCUMENT.)

21  **Q.**  CAN YOU REMEMBER WHAT THIS EMAIL EXCHANGE WAS ABOUT?

22  **A.**  IT -- IT APPEARS TO BE ABOUT CONTRACTUAL LANGUAGE

23  REGARDING WHAT WOULD BE A SECURITY BREACH AND THE -- THE

24  ACTIONS THAT WOULD FOLLOW THEREFROM.

25  **Q.**  AND WHAT WAS YOUR POSITION ON THAT?  IF THERE WAS A

1    SECURITY BREACH, WHAT DID YOU WANT TO BE ABLE TO DO -- WHAT

2    DID UNIVERSAL WANT TO BE ABLE TO DO?

3    **A.**  WE WANTED THEM TO FIX IT, OR WE WOULD HAVE THE OPPORTUNITY

4    TO TAKE OUR CONTENT DOWN.

5    **Q.**  OKAY.  AND DID YOU ACHIEVE THAT IN YOUR CONTRACT

6    NEGOTIATIONS?

7    **A.**  I BELIEVE SO.

8    **Q.**  OKAY.  TAKE A LOOK AT EXHIBIT --

9              **THE COURT:**  LET'S GO AHEAD AND TAKE OUR BREAK AT THAT

10   POINT BEFORE YOU GET INTO THIS WHOLE NEXT SERIES.

11             **MR. COUGHLIN:**  OKAY.

12             **THE COURT:**  SO LADIES AND GENTLEMEN, WE'LL TAKE OUR

13   SECOND BREAK FOR THE DAY, 15 MINUTES.  OKAY?

14      WE'LL CALL YOU BACK IN THEN.

15      (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

16   OF THE JURY:)

17             **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

18   IS GONE.

19      ANYTHING?  IF NOT, LET YOU GO AHEAD AND TAKE YOUR BREAK.

20   WE STAND IN RECESS FOR 15 MINUTES.

21             (RECESS TAKEN AT 11:48 A.M.)

22

23

24             (CONTINUED NEXT PAGE; NOTHING OMITTED.)

25

1          (PROCEEDINGS RESUMED AFTER RECESS AT 12:01 P.M.)

2          **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

3     COME TO ORDER.

4          **THE COURT:**  ALL RIGHT.  LET'S CALL THE JURY IN.

5          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

6          **THE CLERK:**  WITNESS?

7          **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THAT THE

8     JURY IS BACK.  WHERE IS MY WITNESS?

9        MS. MARKS, IF YOU WILL TAKE YOUR SEAT.  YOU UNDERSTAND YOU

10    ARE STILL UNDER OATH?

11          **THE WITNESS:**  YES, MA'AM.

12          **THE COURT:**  MR. COUGHLIN, YOU MAY PROCEED.

13          **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.

14    **BY MR. COUGHLIN:**

15    **Q.**  MS. MARKS, LET ME DIRECT YOUR ATTENTION TO EXHIBIT 40,

16    WHICH THEY'LL WILL PULL UP ON THE SCREEN IN A SECOND.

17                    (EXHIBIT DISPLAYED TO JURY.)

18        MS. MARKS, THIS IS AN EMAIL THAT DEALS WITH A DISCUSSION

19    AT APPLE AFTER SUPPOSEDLY A UNIVERSAL CALL.  AND THE QUESTION

20    IS -- IS ABOUT DRM.  IN THE MIDDLE PARAGRAPH, IT SAYS:

21              "THEIR POINT WAS THAT IF 70 PERCENT, OR WHATEVER, OF

22              OUR BASIS DOWNLOADING APPS TO BREAK THE STORE, THEY

23              WOULD BOTH ACKNOWLEDGE THAT THERE'S A PROBLEM; THAT

24              THEY'D LIKE US TO AT LEAST DO SOMETHING IN THE NEXT

25              RELEASE OF ITUNES."

1      THAT'S WHAT APPLE SAID IN SEPTEMBER 2002.  WAS THAT YOUR

2  UNDERSTANDING IS THAT IF A MAJORITY OF THEIR CUSTOMERS WERE

3  SOMEHOW USING A HACK OR AN APP TO STRIP THE DRM, THAT YOU

4  WOULD DO SOMETHING, OR DID YOU HAVE A DIFFERENT PERCENTAGE IN

5  MIND?

6      WAS THERE SOMETHING COMMUNICATED TO APPLE?  DID THEY GET

7  IT WRONG?  OR WAS THAT YOUR VIEW WHEN THEY FIRST STARTED?

8          **MR. ISAACSON:**  OBJECTION, FOUNDATION, COMPOUND,

9  LEADING.

10          **THE COURT:**  SUSTAINED.

11  **BY MR. COUGHLIN:**

12  **Q.**  WHAT WAS YOUR UNDERSTANDING OF HOW BIG A HACK WOULD HAVE

13  TO BE BEFORE YOU WOULD DO SOMETHING?

14          **MR. ISAACSON:**  CAN WE TAKE THE EXHIBIT DOWN?  IT

15  DOESN'T RELATE TO THE QUESTION, AND THE WITNESS ISN'T COPIED

16  ON IT.

17          **THE COURT:**  OBJECTION SUSTAINED.  IT'S DOWN.

18      GO AHEAD.

19  **BY MR. COUGHLIN:**

20  **Q.**  DID YOU HAVE A DISCUSSION WITH APPLE ABOUT HOW BIG A HACK

21  HAD TO BE BEFORE YOU WOULD TAKE ACTION?

22  **A.**  I THINK THAT WE WOULD HAVE USED SOMETHING LIKE MATERIAL

23  AND NOT A PERCENTAGE.

24  **Q.**  DID YOU HAVE --

25  **A.**  AS A DEFINITIONAL TERM.

1    **Q.**  OKAY.

2        AND DID YOU HAVE A -- WHAT WOULD YOU CONSIDER A MATERIAL

3    HACK?

4    **A.**  WELL, IT WOULD BE LESS THAN -- LESS THAN THE 70 PERCENT OF

5    THEIR CUSTOMER BASE FOR SURE.

6    **Q.**  WOULD IT BE 25 PERCENT?

7    **A.**  I DON'T KNOW.

8    **Q.**  OKAY.

9        NOW YOU -- YOU LICENSED YOUR MUSIC TO REAL.  IS THAT --

10   REALNETWORKS; IS THAT RIGHT?

11   **A.**  YES.

12   **Q.**  AND YOU DID NOT CONSIDER THEM HACKERS, DID YOU?

13   **A.**  AT THE TIME WHEN WE LICENSED THEM WE DID NOT.

14   **Q.**  DID YOU EVER CONSIDER THEM A HACKER?

15   **A.**  I DON'T KNOW.  I'M NOT -- I DON'T REALLY -- NOT CONVERSANT

16   WITH HOW THEY ACHIEVE WHAT THEY ACHIEVE WITH HARMONY.

17   **Q.**  DO YOU BELIEVE THEY WERE STRIPPING SOMEBODY'S DRM OFF?

18       WERE THEY FREEING MUSIC OUT INTO THE INTERNET?

19            **MR. ISAACSON:**  OBJECTION, COMPOUND.

20            **THE COURT:**  SUSTAINED.

21            **THE WITNESS:**  I DON'T THINK --

22            **THE COURT:**  HOLD ON.

23            **THE WITNESS:**  -- I'M COMPETENT TO DESCRIBE --

24            **THE COURT:**  MS. MARKS, WHEN I SAY "HOLD ON", I MEAN

25   STOP TALKING.

1      WHEN THERE'S AN OBJECTION, IF I SAY "SUSTAINED", YOU CAN'T

2  ANSWER THE QUESTION.

3      HE ASKED YOU TWO QUESTIONS.  THE OBJECTION WAS SUSTAINED.

4      START OVER, MR. COUGHLIN.

5          **MR. COUGHLIN:**  I WILL, YOUR HONOR.

6  **BY MR. COUGHLIN:**

7  **Q.**  NEITHER OF THOSE WERE GOOD QUESTIONS, SO I WILL MOVE ON TO

8  EXHIBIT 941.

9      IF YOU CAN TAKE A LOOK AT THIS EXHIBIT.

10                  (EXHIBIT DISPLAYED TO JURY.)

11      941.  AND IT HAS TO DO WITH AN OFFER THAT MR. JOBS MADE TO

12  UNIVERSAL.  WERE YOU FAMILIAR WITH THIS OFFER TO SELL DRM FREE

13  SONGS, YOUR -- YOUR MUSIC DRM FREE FOR 30 PERCENT MORE

14  REVENUES PER SONG?

15  **A.**  YES.

16  **Q.**  OKAY.  WERE YOU INVOLVED IN THE NEGOTIATIONS -- DID YOU

17  TAKE MR. JOBS UP ON HIS OFFER?

18      IN THAT TIME FRAME?

19  **A.**  I WAS -- I WAS NOT INVOLVED IN THE DISCUSSION AT THIS

20  POINT BECAUSE I WAS IN A DIFFERENT POSITION.

21  **Q.**  OKAY.  BUT YOU KNOW UNIVERSAL DID NOT TAKE MR. JOBS UP ON

22  HIS OFFER; IS THAT CORRECT?

23  **A.**  I BELIEVE THAT WE WENT DRM FREE WITH APPLE LATER.

24  **Q.**  IN FACT, YOU WENT DRM FREE WITH A NUMBER OF MUSIC --

25  DIGITAL MUSIC SELLERS BEFORE YOU WENT DRM FREE WITH APPLE; IS

1   THAT CORRECT?

2   **A.**   I BELIEVE SO.

3   **Q.**   WITH AMAZON.COM, WAL-MART, GOOGLE, BEST BUY, RHAPSODY,

4   REALNETWORKS, TRANSWORLD ENTERTAINMENT, PASS-ALONG NETWORKS,

5   AND PURE TRACKS?

6   **A.**   YES.

7   **Q.**   BUT YOU WOULDN'T DO THAT WITH APPLE AT THAT TIME; IS THAT

8   RIGHT?

9   **A.**   FOR WHATEVER -- I DON'T REMEMBER EXACTLY THE REASONS, BUT

10  I DO BELIEVE THAT WE AGREED WITH THEM TO GO DRM FREE LATER.

11  **Q.**   LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 446.

12                    (EXHIBIT HANDED TO WITNESS.)

13              **MR. ISAACSON:**   OBJECTION, YOUR HONOR.

14              **THE COURT:**   THERE IS AN OBJECTION.

15              **MR. COUGHLIN:**   I'M NOT GOING TO SHOW THIS, YOUR

16  HONOR.   I'M NOT GOING TO SHOW IT TO THE JURY.   IT'S OBJECTED

17  TO.   BUT I CAN CERTAINLY SHOW IT TO THE WITNESS.

18              **MR. ISAACSON:**   SHE'S NOT ON THIS DOCUMENT.   AND --

19              **THE COURT:**   SO, THERE'S NO QUESTION.   SO THERE'S NO

20  OBJECTION AT THIS POINT.

21              **MR. ISAACSON:**   THERE'S ALSO A 403 OBJECTION TO THIS

22  DOCUMENT.   I WOULD APPRECIATE IT IF YOU WOULD REVIEW IT.

23              **THE COURT:**   HOLD ON, MR. ISAACSON.   IT'S NOT BEING

24  SHOWN TO THE JURY.

25       WHAT'S THE QUESTION?

**BY MR. COUGHLIN:**

**Q.** THE QUESTION IS, MS. MARKS, ISN'T THE REASON THAT YOU WOULDN'T GO DRM FREE WITH APPLE IS BECAUSE THEY WEREN'T GOING INTEROPERABILITY WITH ANYBODY ELSE?  AT THIS TIME IN 2007?

**A.** YOUR QUESTION IS –– COULD YOU REPEAT THE QUESTION?

**Q.** OKAY.

YOU DIDN'T LICENSE APPLE AT THIS TIME TO ALLOW YOUR MUSIC TO BE SOLD DRM FREE; IS THAT CORRECT?

**A.** YES.

**Q.** AND YET YOU LICENSED IT TO THAT LARGE GROUP WE JUST TALKED ABOUT, AMAZON, WAL-MART, GOOGLE, CORRECT?

**A.** YES.

**Q.** AND MR. JOBS HAD ASKED YOU TO DO THAT WITH APPLE, CORRECT?

**A.** YES.

**Q.** AND YOU REFUSED TO DO THAT, RIGHT?

**A.** YES.

**Q.** AND YOU REFUSED TO DO THAT BECAUSE OF THEIR DOMINANT MARKET SHARE; IS THAT CORRECT?

**A.** NO.

**Q.** YOU REFUSED TO DO THAT BECAUSE THEY WOULD NOT ALLOW INTEROPERABLE WITH OTHER DIGITAL PLAYERS; IS THAT CORRECT?

**A.** NO.

**Q.** YOU REFUSED TO DO THAT BECAUSE –– WHY DID YOU REFUSE TO DO THAT?

**A.** I THINK THAT THE DISCUSSIONS ARE –– WERE COMPLICATED.  I

```
 1    WAS NOT INVOLVED DIRECTLY WITH THEM, BUT WHATEVER THE GIVE AND

 2    TAKE, WE DID NOT REACH AGREEMENT WITH THEM INITIALLY TO GO DRM

 3    FREE.

 4            THE COURT:  YOU CAN TURN 446 OVER.  MS. MARKS, JUST

 5    TURN IT OVER.

 6    BY MR. COUGHLIN:

 7    Q.  AND, IN FACT, YOU DIDN'T RELEASE APPLE FROM THE DRM FOR A

 8    COUPLE OF YEARS; IS THAT CORRECT?

 9    A.  THAT IS CORRECT.

10            MR. COUGHLIN:  NO FURTHER QUESTIONS, YOUR HONOR.

11            THE COURT:  CROSS?

12                        CROSS-EXAMINATION

13    BY MR. ISAACSON:

14    Q.  GOOD AFTERNOON, MS. MARKS.  MY NAME IS BILL ISAACSON.

15        TO YOUR KNOWLEDGE, UNIVERSAL WAS NOT IN FAVOR OF

16    INTEROPERABILITY IF IT ALLOWED HACKERS INTO THE ITUNES OR THE

17    IPOD; IS THAT CORRECT?

18    A.  YES.

19    Q.  TO YOUR KNOWLEDGE, UNIVERSAL WAS NOT IN FAVOR OF

20    INTEROPERABILITY IF IT NEGATIVELY AFFECTED THE SECURITY OF

21    APPLE'S DRM; IS THAT CORRECT?

22    A.  YES.

23    Q.  YOU DON'T KNOW AS A TECHNICAL MATTER WHAT HOLES IN

24    FAIRPLAY SECURITY WERE BEING EXPLOITED BY THE HARMONY

25    TECHNOLOGY, CORRECT?
```

1    **A.**  YES.

2    **Q.**  IF HARMONY WAS USING A HOLE IN THE FAIRPLAY SECURITY,

3    UNIVERSAL WOULD NOT WANT PEOPLE LIKE DVD JON EXPLOITING THOSE

4    SAME HOLES; IS THAT CORRECT?

5    **A.**  YES.

6          **MR. ISAACSON:**  I'VE GOT NO FURTHER QUESTIONS.  THANK

7    YOU VERY MUCH.

8          **THE COURT:**  ANY REDIRECT?

9          **MR. COUGHLIN:**  NO, YOUR HONOR.

10         **THE COURT:**  ALL RIGHT.  MS. MARKS, YOU MAY STEP DOWN.

11         **THE WITNESS:**  THANK YOU.

12         **THE COURT:**  THANK YOU.

13      NEXT WITNESS.

14         **MS. SWEENEY:**  PLAINTIFFS CALL PHILIP SCHILLER.

15         **THE COURT:**  MR. COUGHLIN, PLEASE GET YOUR EXHIBITS

16   OFF THE WITNESS STAND.  THANK YOU.

17      IS MR. SCHILLER NOT STANDING OUTSIDE?

18         **MR. ISAACSON:**  HE IS DOWN THE HALL.  I DON'T THINK

19   THEY WERE ANTICIPATING I ONLY HAD FOUR QUESTIONS, BUT THEY ARE

20   COMING DOWN THE HALL.

21      (**PHILIP SCHILLER,** CALLED AS A WITNESS FOR THE PLAINTIFFS,

22   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

23         **THE WITNESS:**  I DO.

24         **THE CLERK:**  PLEASE BE SEATED.  THEN WILL YOU PLEASE

25   STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

1          **THE WITNESS:**  PHILIP WILLIAM SCHILLER,

2     S-C-H-I-L-L-E-R.

3          **THE COURT:**  GOOD AFTERNOON.

4          **THE WITNESS:**  HELLO.

5          **THE COURT:**  YOU MAY PROCEED.

6          **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

7                    **DIRECT EXAMINATION**

8     **BY MS. SWEENEY:**

9     **Q.**  GOOD AFTERNOON, MR. SCHILLER.

10         MY NAME IS BONNIE SWEENEY.  I'M ONE OF THE LAWYERS FOR THE

11    PLAINTIFFS.

12         YOU WORK AT APPLE, CORRECT?

13    **A.**  YES.

14    **Q.**  WHAT IS YOUR POSITION?

15    **A.**  I'M THE SENIOR VICE PRESIDENT OF WORLDWIDE MARKETING.

16    **Q.**  HOW LONG HAVE YOU BEEN WITH APPLE?

17    **A.**  OVER 20 YEARS.

18    **Q.**  ARE YOU A MEMBER OF THE EXECUTIVE TEAM AT APPLE?

19    **A.**  YES.

20    **Q.**  HOW LONG HAVE YOU BEEN ON THE EXECUTIVE TEAM?

21    **A.**  OVER TEN YEARS.

22    **Q.**  ARE YOU -- IF THERE WERE AN ORGANIZATIONAL CHART, WOULD

23    YOU FIGURE HIGH UP IN THE ORGANIZATIONAL CHART?

24    **A.**  YES.

25    **Q.**  WHO DO YOU REPORT TO?

SCHILLER – DIRECT SWEENEY

1   **A.**   OUR CEO TIMOTHY COOK.

2   **Q.**   BEFORE MR. COOK WHO DID YOU REPORT TO?

3   **A.**   STEVE JOBS.

4   **Q.**   ARE YOU A MEMBER OF THE PRICE COMMITTEE AT APPLE?

5   **A.**   YES.

6   **Q.**   HOW LONG HAVE YOU BEEN A MEMBER OF THE PRICE COMMITTEE?

7   **A.**   ALMOST 20 YEARS NOW.

8   **Q.**   CAN YOU TELL ME A LITTLE BIT ABOUT THE PRICE COMMITTEE?

9        FIRST OF ALL, WHO -- WHO -- WHO WERE THE MEMBERS OF THE

10   PRICE COMMITTEE IN 2006?

11   **A.**   MYSELF, THE HEAD OF OUR PRODUCT FINANCE GROUP, MARK

12   DONNELLY, TIMOTHY COOK, OUR CFO PETER OPPENHEIMER, AND THERE

13   WERE SOME OTHER SUPPORT STAFF THAT WOULD BE THERE TO HELP US

14   WITH IT, BUT THOSE ARE THE PRIMARY MEMBERS.

15   **Q.**   AND WAS THE ROLE -- WAS THE EXECUTIVE TEAM PART OF THE

16   PRICE COMMITTEE?

17   **A.**   YES.

18   **Q.**   SO MR. JOBS WAS ALSO ON THE PRICE COMMITTEE IN 2006?

19   **A.**   I'M SORRY, NOT ALL MEMBERS OF THE EXECUTIVE TEAM, JUST

20   THOSE THAT I MENTIONED.  AS WELL AS, YES, MR. JOBS WOULD

21   ATTEND MANY AS WELL.

22   **Q.**   OKAY.

23        AND FOR -- DURING THE TIME WHEN MR. JOBS WAS CEO AT APPLE,

24   WAS HE, TO YOUR KNOWLEDGE, ALWAYS ON THE PRICE COMMITTEE?

25   **A.**   MOST OF THE TIME.  NOT EVERY TIME.

SCHILLER – DIRECT SWEENEY

1   **Q.**  BUT HE WAS ON THE PRICE COMMITTEE IN 2006?

2   **A.**  AGAIN, MOST OF THE TIME, NOT ALL OF THE TIME IN 2006.

3   **Q.**  HOW OFTEN DOES THE PRICE COMMITTEE MEET -- HOW OFTEN DID

4   THE PRICE COMMITTEE MEET IN 2006?

5   **A.**  I CAN'T TELL YOU AN EXACT NUMBER.  WE WOULD MEET TO PRICE

6   EVERY PRODUCT THAT APPLE MADE.

7       AND WE HAD TWO PARTS OF IT.  WE HAD A U.S. PRICE COMMITTEE

8   THAT SET THE STANDARD U.S. PRICES.  THEN WE HAD THE SECOND

9   PART OF THE PRICE COMMITTEE THAT WAS THE INTERNATIONAL

10  PRICING.  SO THERE WERE MULTIPLE MEETINGS FOR EACH PRODUCT.

11  **Q.**  OKAY.  AND SOMETIMES YOU PRICE PRODUCTS WITHOUT ACTUALLY

12  ATTENDING A MEETING IN PERSON; IS THAT RIGHT?

13  **A.**  ON A FEW INSTANCES.  THEY WERE CERTAINLY THE EXCEPTION.

14  WE WOULD DO THEM VIA EMAIL RATHER THAN IN PERSON.

15  **Q.**  MR. JOBS WAS INVOLVED AS WELL IN THOSE EMAIL DECISIONS ON

16  PRICING?

17  **A.**  ON THE U.S. PRICING OF THE PRODUCTS, HE WOULD BE.  NOT ON

18  THE INTERNATIONAL PRICING OF THE PRODUCTS.

19  **Q.**  OKAY.

20      SO FOR THE ENTIRE PERIOD, SEPTEMBER 12TH, 2006 THROUGH

21  MARCH 31, 2009, WAS MR. JOBS ON THE PRICE COMMITTEE FOR U.S.

22  PRODUCTS?

23  **A.**  HE MAY HAVE BEEN.  I WOULD HAVE TO LOOK BACK AT EACH ONE

24  TO BE CERTAIN.  I CAN'T SAY A HUNDRED PERCENT FOR SURE.

25  **Q.**  BUT YOU THINK HE WAS?

SCHILLER – DIRECT SWEENEY

1   **A.**  HE MAY HAVE BEEN.  I CAN'T BE CERTAIN.

2   **Q.**  AND WITH RESPECT TO IPODS, HOW OFTEN WOULD THE PRICE

3   COMMITTEE MEET TO CHANGE PRICES FOR IPODS?

4   **A.**  WE WOULD MEET WITH THE INTRODUCTION OF EVERY NEW IPOD.

5   AND IT WOULD BE POSSIBLE THAT WE MIGHT HAVE HAD A MEETING OR

6   TWO IN TEN YEARS FOR A PRICING ON SOME INTERNATIONAL PRICES IF

7   THERE WAS SOME LARGE FLUCTUATION IN EXCHANGE RATES, BUT THAT

8   WAS RARE.

9       SO USUALLY WHEN WE HAD A BRAND NEW GENERATION OF IPOD.

10  **Q.**  SO WHEN -- WHEN THE PRICE COMMITTEE MADE A DECISION ON AN

11  IPOD, LET'S JUST FOCUS ON THE PERIOD 2006 THROUGH 2009, DID

12  THE PRICE THAT WAS AGREED TO, WAS THAT THE PRICE THAT WAS USED

13  IN THE KEYNOTE SPEECH, FOR EXAMPLE, TO ANNOUNCE A NEW PRODUCT?

14  **A.**  YES, I BELIEVE IT WAS.

15  **Q.**  OKAY.  SO IT'S THE LIST PRICE; IS THAT RIGHT?

16  **A.**  YES.

17  **Q.**  OKAY.

18      AND THAT'S DIFFERENT FROM THE -- FROM THE PRICE THAT WAS

19  USED TO SELL IPODS TO RESELLERS DURING THAT TIME PERIOD,

20  CORRECT?

21  **A.**  YES.  WE WOULD CALL THAT THE WHOLESALE PRICE.

22  **Q.**  OKAY.

23      AND WAS THE SETTING THE WHOLESALE PRICE ONE OF THE

24  FUNCTIONS OF THE PRICE COMMITTEE OR DID SOMEBODY ELSE DO THAT?

25  **A.**  IT -- IT'S A LITTLE COMPLICATED TO ANSWER THAT SIMPLY.

1    IT'S -- THERE'S A DIRECT RELATIONSHIP BETWEEN THE RETAIL

2    PRICE AND THE WHOLESALE PRICE BASED ON SOME COMPLEX FORMULAS.

3    AND SO THE PRICE OF THE RETAIL PRICE HAS A RELATIONSHIP WITH

4    THE WHOLESALE PRICE, BUT IT ISN'T ALWAYS SET DIRECTLY.

5    SO IT'S NOT QUITE THAT SIMPLE.

6    **Q.** OKAY.  DURING THE PERIOD 2006 THROUGH 2009, ISN'T IT TRUE

7    THAT THE -- THE WHOLESALE AND RESELLER PRICE WAS 13 PERCENT

8    DISCOUNT FROM THE RETAIL PRICE FOR IPODS IN THE U.S.?

9    **A.** I DON'T RECALL SPECIFICALLY.

10   **Q.** OKAY.  ALL RIGHT.

11   NOW, AS PART OF THE PRICE COMMITTEE DECISION MAKING, YOU

12   AND OTHER MEMBERS OF THE PRICE COMMITTEE WOULD REVIEW SLIDES,

13   CORRECT?

14   **A.** YES.

15   **Q.** AND THOSE SLIDES HAD INFORMATION ABOUT COMPETITIVE

16   CONDITIONS, CORRECT?

17   **A.** WE WOULD LIST SOME COMPETITIVE SAMPLE PRODUCTS IN THE

18   SLIDE DECK, YES.

19   **Q.** OKAY.  IT ALSO HAD INFORMATION ABOUT MARGINS; IS THAT

20   RIGHT?

21   **A.** YES.

22   **Q.** AND WHAT ELSE WAS CONTAINED IN THE SLIDE DECK, AS YOU PUT

23   IT?

24   **A.** WE WOULD HAVE THE PRODUCT ITSELF, WHAT ITS FEATURES WERE,

25   SOME OF THE KEY FEATURES THAT WE THOUGHT CUSTOMERS WOULD BE

1   LOOKING AT.  WE WOULD LIST THE RETAIL PRICE, THE GROSS MARGIN,

2   THE LINE MARGIN, THE MARGIN TARGETS, THE END-OF-LIFE PLANNING,

3   IN OTHER WORDS, THE PRICE OF THE PREVIOUS PRODUCT AND HOW IT

4   WOULD BE HANDLED BASED ON THE NEW PRODUCT'S PRICE.  OFTEN WE

5   WOULD LIST THE INVENTORY LEVELS THAT WERE IMPACTED BY THOSE

6   PRICES.

7        THAT'S SOME OF THE INFORMATION THAT WOULD BE IN THE SLIDES

8   THAT WE WOULD PROVIDE FOR THE PRICE COMMITTEE.

9   **Q.**  AND AFTER THE PRICE -- EXCUSE ME.  WHEN THE PRICE

10  COMMITTEE WAS DISCUSSING A PRICE FOR, LET'S SAY, FOR EXAMPLE,

11  A NEW IPOD, WERE THERE EXTENSIVE MINUTES OF THOSE MEETINGS?

12  **A.**  NO.

13  **Q.**  WERE THERE OCCASIONS WHEN THERE WERE NO MINUTES OF THE

14  MEETINGS AT ALL?

15  **A.**  I DON'T RECALL US EVER TAKING MINUTES.

16       WE TOOK DOWN EXACTLY WHAT THE PRICING DECISIONS WERE,

17  BECAUSE THAT WAS THE POINT OF THE MEETING, BUT WE DIDN'T TAKE

18  MINUTES OF THE DIALOGUE DURING THE MEETING.

19  **Q.**  OKAY.  I'M JUST GOING TO SHOW YOU A FEW DOCUMENTS THAT

20  WERE USED IN THE PRICE COMMITTEE.  BEAR WITH ME A MOMENT.

21           **MS. SWEENEY:**  MAY I APPROACH THE WITNESS, YOUR HONOR?

22           **THE COURT:**  YOU MAY.

23           **MS. SWEENEY:**  THANK YOU.

24                (BINDERS HANDED TO WITNESS.)

25           **THE COURT:**  DO YOU HAVE A BINDER SET?

1          **MS. SWEENEY:**  RIGHT THERE.

2          **MR. ISAACSON:**  THANKS.

3     BY MS. SWEENEY:

4     **Q.**  SO, MR. SCHILLER, THAT BINDER IN FRONT OF YOU IN THAT RED

5     WELL, IT'S A LOT OF PAPER BUT WE ARE NOT GOING TO GO THROUGH

6     IT ALL TODAY.

7     **A.**  THANK YOU.

8     **Q.**  IF YOU CAN LOOK AT THE DOCUMENT IN THE BINDER THAT HAS THE

9     TAB FOR TRIAL EXHIBIT 193.

10    **A.**  I SEE 194.  I'M NOT SEEING 193.

11         **THE COURT:**  IT CAN GO UP ON THE SCREEN AS WELL.

12         **MS. SWEENEY:**  I'M ONLY GOING TO POINT TO ONE OR TWO

13    PAGES IN IT, SO LET'S GO TO THE SCREEN.

14       MR. SCHILLER, I AM SORRY, YOU CAN LOOK AT THE SCREEN.

15         **THE WITNESS:**  ALL RIGHT.  THANK YOU.

16              (EXHIBIT DISPLAYED TO JURY.)

17    BY MS. SWEENEY:

18    **Q.**  OKAY.  SO LOOKING AT THIS FRONT PAGE, DO YOU RECOGNIZE

19    THIS DOCUMENT OR DOCUMENTS LIKE THIS ONE?

20    **A.**  YES.  IT APPEARS TO BE A REPORT FROM A THIRD PARTY OF

21    MONTHLY TRENDS ON MP3 PLAYER SALES IN THE U.S.

22    **Q.**  AND IS THIS A KIND OF REPORT THAT THE PRICE COMMITTEE

23    WOULD USE IN ITS DELIBERATIONS ABOUT SETTING PRICES FOR IPODS?

24    **A.**  NO.

25    **Q.**  IS IT -- WHAT WAS THE REPORT USED FOR?

1    **A.**  IT'S ONE OF THE SECONDARY SOURCES OF DATA THAT OUR

2    CUSTOMER RESEARCH TEAM HAS AND TRACKS AND PROVIDES TO ANYONE

3    OF INTEREST, BUT I DON'T RECALL THIS EVER BEING PROVIDED TO

4    ANY PRICE COMMITTEE MEETING.

5    **Q.**  BUT YOU RECEIVED IT, CORRECT?

6    **A.**  I MAY HAVE.

7    **Q.**  OKAY.  DID YOU -- DID YOU USUALLY RECEIVE THE NPD REPORTS

8    AND REVIEW THEM?

9    **A.**  I WOULD RECEIVE THEM AS A MATTER OF COURSE.  SOMEBODY

10   WOULD COPY ME OR SEND THEM IN AN EMAIL.  YES.

11   **Q.**  IF YOU COULD TURN TO TRIAL EXHIBIT 55.

12        AND WE CAN JUST USE THE SCREEN AGAIN.

13                    (EXHIBIT DISPLAYED TO JURY.)

14   **A.**  I HAVE THIS.

15   **Q.**  WHAT IS THIS DOCUMENT?  ARE YOU FAMILIAR WITH THIS

16   DOCUMENT?

17   **A.**  IT APPEARS TO BE A PRICE COMMITTEE SET OF SLIDES FROM

18   MARCH OF 2003.

19   **Q.**  OKAY.  AND IS THIS THE KIND OF DOCUMENT THAT THE PRICE

20   COMMITTEE USED WHEN IT WAS MAKING ITS PRICING DECISIONS ON

21   IPODS?

22   **A.**  YES.

23   **Q.**  AND IF YOU COULD TURN TO THE FOURTH PAGE IN, WHERE IT SAYS

24   "IPOD COMPETITION"?

25   **A.**  OKAY.

SCHILLER – DIRECT SWEENEY

1    **Q.**  AND THESE ARE THE COMPETING PRODUCTS THAT THE PRICE

2    COMMITTEE TOOK INTO ACCOUNT WHEN IT WAS DETERMINING THE PRICE

3    OF IPODS -- WELL, I WILL MAKE THIS MORE SPECIFIC.

4        FOR THIS PARTICULAR PRICE COMMITTEE MEETING, WHICH WAS

5    MARCH 17TH, 2003, AND THE DECISION WAS A PARTICULAR IPOD

6    AVAILABLE THEN CALLED Q14, THAT WAS THE CODE NAME, WERE THESE

7    THE COMPETING PRODUCTS THE PRICE COMMITTEE TOOK INTO ACCOUNT?

8    **A.**  THESE ARE COMPARISONS.

9        WHAT WE WOULD DO IS WE WOULD LOOK AT THE PRICING WE WANT

10   TO SET A PRODUCT AT AND ITS GROSS MARGINS, AND THEN AFTER WE

11   LOOKED AT THAT, WE WOULD THEN PICK A COUPLE OF SAMPLES FROM

12   THE INDUSTRY AND SEE HOW OUR PRICES LOOKED COMPARED TO THAT.

13       I WOULDN'T SAY WE USED THEM TO DETERMINE THE PRICE.  WE

14   WOULD JUST DO THEM FOR COMPARISON TO SEE HOW THEY LOOKED.

15   **Q.**  OKAY.

16       AND THE -- THE THREE SAMPLES HERE ARE PORTABLE DIGITAL

17   MUSIC PLAYERS, CORRECT?

18   **A.**  YES.  ONE OF THEM IS APPLE'S AND TWO OTHER PORTABLE MUSIC

19   PLAYERS.

20   **Q.**  OKAY.  AND IS THIS REPRESENTATIVE -- THIS -- THIS -- THIS

21   KIND OF INFORMATION -- IF YOU COULD GO TO THE PAGE, THE VERY

22   NEXT PAGE, WHICH IS PAGE 5 OF THIS DOCUMENT.

23   **A.**  YES.

24   **Q.**  SO THIS IS SOME OF THE MARGIN INFORMATION THAT YOU

25   MENTIONED BEFORE THAT THE PRICE COMMITTEE CONSIDERED?

1    **A.**  NO.  THIS IS -- THIS PAGE IS ABOUT THE LIFE CYCLE

2    PLANNING.

3        WHAT YOU SEE IS, ON THE LEFT, THE CURRENT PRODUCTS' PRICE.

4    AND THEN IN THE QUARTER WHERE WE INTRODUCED A NEW PRODUCT,

5    WHAT WOULD HAPPEN TO THE CURRENT PRICE.  WHAT PRICE, FOR

6    EXAMPLE, THE TOP ONE P97 WOULD HAVE TO DROP TO STILL MAKE

7    SENSE ONCE THE NEW PRODUCTS CAME OUT.  SO THIS IS ABOUT LIFE

8    CYCLE MANAGEMENT OF THE PRODUCT LINE.

9    **Q.**  THAT IS WHAT HAS TO DO WITH END-OF-LIFE PRICING, CORRECT?

10   **A.**  YES.

11   **Q.**  TURN TO PAGE 11 OF THIS DOCUMENT.

12   **A.**  OKAY.

13   **Q.**  AND THIS IS AN EXAMPLE OF THE GROSS MARGIN INFORMATION

14   THAT THE PRICE COMMITTEE LOOKED AT WHEN IT WAS SETTING IPOD

15   PRICES?

16   **A.**  NOT EXACTLY.  THIS IS IN A SECTION CALLED "BACKUP".

17       SO THE TEAM PROVIDED THIS KIND OF CHARTS JUST IN CASE A

18   QUESTION WOULD COME UP IN THE MEETING AND WOULD HAVE SOME

19   BACKUP SLIDES TO GO LOOK UP SOME OF THAT INFORMATION.

20       I CAN'T SAY WHETHER THIS CHART WAS LOOKED AT AT ALL IN THE

21   PRICING OF THESE PRODUCTS AT THE TIME.  THEY WERE SIMPLY

22   BACKUP SLIDES.

23   **Q.**  SO IT WAS AVAILABLE FOR THE PRICE COMMITTEE IF THEY WANTED

24   TO LOOK AT IT?

25   **A.**  YES, IT WAS.

1    **Q.**   OKAY.  COULD WE LOOK, PLEASE, AT TRIAL EXHIBIT 83?

2                    (EXHIBIT DISPLAYED TO JURY.)

3        AND THIS IS AN EMAIL -- AN EMAIL EXCHANGE BETWEEN YOU AND

4    MR. JOBS FROM SEPTEMBER 30TH, 2003.

5        YOU CAN JUST LOOK AT THE SCREEN IF IT IS EASIER,

6    MR. SCHILLER.

7    **A.**   I JUST FOUND IT.  SORRY, THEY'RE NOT SEQUENTIAL, THERE'S

8    SECTIONS.  I WAS TRYING TO FIND IT.

9        YES, IT IS.

10   **Q.**   AND YOU'RE FORWARDING AN ARTICLE.  AND THEN YOU SAY TO

11   MR. JOBS:

12              "I THINK A NUMBER OF US AGREE THAT AS SOON AS WE ARE

13              ABLE, WE HAVE TO GET ITUNES FOR WINDOWS DONE" --

14              EXCUSE ME.

15       AND THEN I'M GOING TO SKIP SOME.

16              "WE SHOULD HAVE AN SDK FOR FAIRPLAY SUCH THAT OTHER

17              MUSIC PLAYERS CAN ALSO WORK WITH ITUNES."

18       DO YOU REMEMBER HAVING THAT KIND OF CONVERSATION WITH

19   MR. JOBS?

20   **A.**   YES.

21   **Q.**   OKAY.  SO AT CERTAIN TIMES YOU WERE AN ADVOCATE OF

22   INTEROPERABILITY; IS THAT RIGHT?

23   **A.**   I DIDN'T USE THAT TERM, BUT I CERTAINLY WAS AN ADVOCATE OF

24   CREATING AN SDK AND API'S SO THAT THERE MIGHT BE OTHER

25   PRODUCTS IN THE MARKET THAT WORKED WITH IT.  I DON'T RECALL

```
 1    TALKING ABOUT INTEROPERABILITY SPECIFICALLY.
 2    Q.  AND WHAT -- MR. JOBS' RESPONSE WAS FOR NO --
 3             "FOR NONCOMPETITIVE DEVICES, MAYBE.  FOR COMPETITIVE
 4             DEVICES IPOD IT'S TOO SOON TO DECIDE THIS."
 5    IS THAT RIGHT?
 6    A.  YES, THAT'S WHAT HE WROTE.
 7    Q.  OKAY.
 8       IN OTHER CONTEXT -- SO WHEN I SAY "INTEROPERABILITY", DO
 9    YOU KNOW WHAT I MEAN?
10    A.  I BELIEVE SO.
11    Q.  AND DURING THE TIME PERIOD 2006 TO 2009, APPLE'S ITUNES
12    DRM-PROTECTED SONGS WERE NOT COMPATIBLE WITH ANY PLAYER OTHER
13    THAN THE IPOD; IS THAT CORRECT?
14    A.  I BELIEVE THAT'S CORRECT, YES.
15    Q.  OKAY.
16       AND IN OTHER ARENAS, YOU WERE AN ADVOCATE OF MAKING APPLE
17    PRODUCTS INTEROPERATE WITH OTHER VENDORS' PRODUCTS; IS THAT
18    RIGHT?
19    A.  I THINK THERE ARE MANY TIMES WHEN THAT HAS BEEN OF
20    INTEREST TO ME, YES.
21    Q.  SO, FOR EXAMPLE, WITH A PRODUCT CALLED QUICKTIME, YOU --
22    YOU WANTED APPLE'S QUICKTIME PRODUCT TO BE A WIDELY AVAILABLE
23    AND USED BY HOST OF OTHER DIFFERENT VENDORS, CORRECT?
24    A.  IN CERTAIN SITUATIONS.  I WOULDN'T USE IT THAT BROADLY,
25    BUT THERE WERE CERTAINLY WORK WE DID TO MAKE QUICKTIME
```

1    AVAILABLE AND USEFUL TO OTHER PARTIES.

2        ULTIMATELY ALWAYS FOR THE CUSTOMERS AND WHAT WOULD MAKE

3    SENSE FOR THEM.

4    **Q.**  IN THE QUICKTIME MARKET -- IN THE MARKET IN WHICH

5    QUICKTIME WAS SOLD, ISN'T IT TRUE THAT YOU -- YOU FACED SOME

6    SERIOUS COMPETITION FROM MICROSOFT?

7    **A.**  I WOULDN'T CALL IT A MARKET WHERE IT WAS SOLD.  QUICKTIME

8    WAS A MEDIA ARCHITECTURE LAYER THAT CAME WITH OS8 AND 9 AND

9    WAS MADE AVAILABLE FOR WINDOWS DOWNLOAD, AND WE COMPETED WITH

10   MICROSOFT ON THAT.

11   **Q.**  SO ISN'T IT FAIR TO SAY THAT YOU WERE CONCERNED CERTAINLY

12   IN THE LATE -- DURING A PERIOD MAYBE 20 YEARS AGO, ABOUT

13   MICROSOFT'S DOMINATION OF THAT MARKET AND YOUR INABILITY TO

14   BREAK INTO THAT MARKET WITH THE QUICKTIME?

15   **A.**  I DON'T RECALL THINKING ABOUT IT QUITE THAT WAY.  WE

16   CERTAINLY WERE COMPETING WITH MICROSOFT.

17   **Q.**  AND WERE YOU CONCERNED THAT MICROSOFT WAS ENGINEERING

18   INCOMPATIBILITY WITH YOUR QUICKTIME PRODUCT?

19   **A.**  I DON'T RECALL SPECIFICALLY THAT.  IT WAS A LONG TIME AGO,

20   BUT I DON'T RECALL THAT SPECIFICALLY.

21   **Q.**  DO YOU RECALL THAT GENERALLY?

22   **A.**  I RECALL THAT WE BOTH HAD MEDIA ARCHITECTURES.  IT WAS THE

23   BEGINNING OF TRYING TO MAKE MEDIA AVAILABLE ON THE INTERNET.

24   AND FIRST ON THE COMPUTER AND EVENTUALLY ON THE INTERNET.

25       AND WE WERE DOING THAT WITH QUICKTIME AND MICROSOFT WAS

1    DOING THAT WITH THEIR WINDOWS MEDIA ARCHITECTURE, AND WE WERE

2    COMPETITORS IN THAT SPACE.

3    **Q.**  AND IT WAS IMPORTANT TO APPLE AT THE TIME THAT THERE BE A

4    MARKET OF OPEN SERVERS FOR THIS KIND OF MEDIA SO THAT YOU

5    COULD HAVE A LARGE VARIETY OF BOTH CUSTOMERS AND VENDORS,

6    CORRECT?

7    **A.**  WE CARED THAT THE PEOPLE WHO WERE CREATING THE CONTENT

8    WOULD HAVE A METHOD OF DELIVERING THAT TO END USERS.  AND OVER

9    THE INTERNET THEY WOULD USE A SERVER, AND THERE WERE MANY

10   DIFFERENT TYPES OF SERVERS FOR DELIVERING THAT.  AND WE WERE

11   ALWAYS TRYING TO MAKE SURE THAT THOSE SERVERS WERE AVAILABLE

12   TO OUR CUSTOMERS TO GET THE CONTENT THEY NEEDED.

13   **Q.**  THAT WAS GOOD FOR THE CUSTOMERS, RIGHT?

14   **A.**  IN THE INSTANCE OF QUICKTIME STREAMING, YES.

15   **Q.**  AND -- AND YOU COMPLAINED, DIDN'T YOU, ABOUT SOME

16   INCOMPATIBILITY THAT WAS ENGINEERED THAT -- BY MICROSOFT THAT

17   HAD THE EFFECT OF WHEN YOUR QUICKTIME PROGRAM CAME UP, AN

18   ERROR MESSAGE CAME ON THAT DIDN'T TELL THE USER WHAT WAS GOING

19   ON; WEREN'T YOU COMPLAINING ABOUT THAT?

20   **A.**  THANK YOU.  YOU ARE BRINGING BACK MEMORIES OF SOMETHING I

21   HADN'T THOUGHT -- HEARD ABOUT IN DECADES.

22      THERE WAS SOMETHING BACK THEN ABOUT QUICKTIME RUNNING ON

23   WINDOWS EXPLORER, ON WINDOWS PCS WHERE THEY MADE A CHANGE AND

24   IT WOULD BRING UP A DIALOGUE THAT WAS CONFUSING TO THE USER.

25   AND -- AND I DON'T RECALL SPECIFICS AROUND THAT, BUT THERE WAS

1    SOMETHING THAT HAPPENED AT THAT TIME.

2    **Q.**  AND ISN'T IT TRUE, MR. SCHILLER, THAT WHETHER YOU ARE IN

3    FAVOR OF INTEROPERABILITY DEPENDS ON WHERE YOU SIT IN THE

4    MARKETPLACE?

5        ISN'T IT TRUE THAT DEPENDING ON WHERE YOU SIT IN THE

6    INDUSTRY, YOU WILL HAVE A DIFFERENT POINT OF VIEW?

7    **A.**  I DON'T KNOW ABOUT THAT.  I -- I ALWAYS THINK FIRST ABOUT

8    THE CUSTOMER, WHAT MAKES A GREAT CUSTOMER PRODUCT AND HOW DO

9    WE DO THAT.

10       SOMETIMES INTEROPERABILITY HELPS YOU TO MAKE A GREAT

11   PRODUCT.  SOMETIMES IT GETS IN THE WAY OF MAKING A GREAT

12   PRODUCT.  I THINK ABOUT IT FROM THAT PERSPECTIVE.

13   **Q.**  IF YOU HAVE A DOMINANT SHARE IN THE INDUSTRY, YOU ARE MORE

14   LIKELY TO DO BETTER IF YOU KEEP YOUR WALLED GARDEN AND KEEP

15   OTHERS OUT OF YOUR WALLED GARDEN?

16   **A.**  I DON'T THINK THAT'S A FAIR CHARACTERIZATION.  I THINK

17   THAT IF YOU PUT THE CUSTOMER FIRST, YOU CAN ALWAYS MAKE THE

18   RIGHT DECISION OF WHAT TO DO BASED ON WHAT THEY NEED.

19       THAT'S HOW I ALWAYS APPROACH IT.

20   **Q.**  AND DO YOU THINK IF YOU PUT THE CUSTOMER FIRST, THAT MEANS

21   MAKING IT SO SONGS THAT THEY LEGALLY PURCHASED FROM OTHER

22   VENDORS DON'T PLAY?

23   **A.**  AGAIN, I DON'T THINK ABOUT IT THAT WAY.  I THINK ABOUT

24   WHAT WE ARE TRYING TO MAKE FOR THE CUSTOMER.  THAT'S WHAT WE

25   ARE RESPONSIBLE FOR.  AND HOW DO WE MAKE IT THE BEST PRODUCT

1    POSSIBLE FOR THEM, AND WHAT ARE THE TECHNOLOGIES AND SOLUTION

2    THAT MAKE THAT GREAT FOR THEM.  THAT'S WHAT I THINK ABOUT.

3              **MS. SWEENEY:**  NO FURTHER QUESTIONS.  THANK YOU.

4              **THE COURT:**  CROSS?

5                   (BINDER HANDED TO WITNESS.)

6                        **CROSS-EXAMINATION**

7    **BY MR. ISAACSON:**

8    **Q.**  I'LL MAKE YOUR LIFE EASIER.

9    **A.**  THANK YOU VERY MUCH.

10   **Q.**  GOOD AFTERNOON, MR. SCHILLER.

11        WE HEARD A LITTLE BIT ABOUT YOUR BACKGROUND.  HOW LONG

12   HAVE YOU WORKED AT APPLE?

13   **A.**  I STARTED IN 1998 AND TOOK A COUPLE OF YEARS OFF.  SO IT

14   HAS BEEN SOMEWHERE IN THE ORDER OF JUST SHY OF 25 YEARS OF

15   ACTUAL WORK TIME THERE, I BELIEVE.

16   **Q.**  WHAT WAS YOUR STARTING POSITION AT APPLE?

17   **A.**  I STARTED IN OUR FIELD IN THE EAST COAST, MASSACHUSETTS,

18   AS A FIELD MARKETING REPRESENTATIVE.

19   **Q.**  AND CAN YOU TELL US, GIVE US A SUMMARY OF HOW YOU WORKED

20   YOUR WAY UP IN APPLE FROM THERE?

21   **A.**  BY TRYING TO DO EVERY MARKETING JOB THEY WOULD LET ME.

22        I WORKED IN THE FIELD, AS I SAID, DOING MARKETING,

23   VISITING CUSTOMER ACCOUNTS, HELPING THEM USE TECHNOLOGY.  I

24   WORKED IN CUPERTINO, IN THE HEADQUARTERS DOING COMP PROGRAMS

25   FOR THE SALES TEAMS.  I WORKED ON NEW EMERGING OPPORTUNITIES

1    THAT WERE BEING INVENTED LIKE MULTIMEDIA MARKETING.  I BECAME

2    A PRODUCT MANAGER FOR EVERY LITTLE THING I COULD FROM MEMORY

3    STICKS TO CD DRIVES, AND EVENTUALLY NOTEBOOKS, AND WORKED MY

4    WAY UP AND TRIED TO LEARN EVERY PART OF THE BUSINESS I COULD.

5    **Q.**  NOW YOU ARE THE SENIOR VICE PRESIDENT OF WORLDWIDE

6    MARKETING?

7    **A.**  YES.

8    **Q.**  AND WOULD THAT POSITION -- ACTUALLY, DURING 2006 AND 2009,

9    WHAT WAS YOUR TITLE THEN?

10   **A.**  I WAS THE SENIOR VICE PRESIDENT OF PRODUCT MARKETING.

11   **Q.**  AS THE SENIOR VICE PRESIDENT OF PRODUCT MARKETING, WHAT

12   WOULD YOU DO TO FAMILIARIZE YOURSELF WITH APPLE PRODUCTS?

13   **A.**  EVERYTHING I COULD.  I LOVE APPLE PRODUCTS.

14       I WOULD SPEND ALL MY TIME USING EACH AND EVERY ONE OF THEM

15   CONSTANTLY TO FAMILIARIZE MYSELF WITH THEM.  WORK CLOSELY WITH

16   THE ENGINEERING TEAM AS CONCEPTS WERE CREATED AND IDEAS WERE

17   DEVELOPED.  AND THEN ON THE OTHER SIDE OF IT, WORKING WITH

18   CUSTOMERS AS MUCH AS POSSIBLE AT TRADE SHOWS AND EVENTS TO

19   HEAR ALL THE FEEDBACK I CAN OF HOW WE CAN MAKE THINGS BETTER.

20   THAT'S HOW I SPENT MY TIME.

21   **Q.**  ARE YOU MARRIED, SIR?

22   **A.**  YES, I AM.

23   **Q.**  HOW LONG?

24   **A.**  TWENTY-EIGHT YEARS.

25   **Q.**  CHILDREN?

1    **A.**   YES.

2    **Q.**   YOUR CHILDREN IPOD USERS?

3    **A.**   YEAH.   THIS IS I THINK ONE OF THE FUN THINGS.

4         I HAVE TWO SONS, AND I THINK OF IT AS THIS ISN'T A

5    BUSINESS, THIS MIRRORS THEIR LIFE.   MY SONS WERE TEN AND EIGHT

6    WHEN THE FIRST IPOD CAME OUT.   AND THEIR -- MOST OF THEIR

7    YOUNG ADULT LIVES THEY'VE HAD EVERY IPOD WE'VE EVER MADE AND

8    USED ITUNES.

9         THAT'S WHAT THEY KNOW ABOUT ME FROM MY JOB.   THEY DON'T

10   KNOW WHAT MARKETING IS.   THEY KNOW I WORKED ON THE IPOD FROM

11   THE BEGINNING AND CARED DEEPLY ABOUT SOMETHING THEY CARE

12   ABOUT.

13   **Q.**   IN THIS CASE WE'RE TALKING ABOUT ITUNES 7.0 AND ITUNES

14   UPDATES.

15        WHAT'S A HIGH LEVEL EXECUTIVE AT APPLE, WHAT ROLE DO YOU

16   PLAY IN UPDATES?

17   **A.**   MY TEAM AND I WILL WORK WITH THE ENGINEERING TEAM ON

18   UNDERSTANDING THE FEATURES AND THE THINGS THAT ARE ENGINEERING

19   INTO IT.   AND OUR JOB IS TO REPRESENT THE CUSTOMER, TO MAKE

20   SURE THEY ARE MAKING GOOD CHOICES FOR WHAT PEOPLE WILL WANT

21   AND USE, AND THAT CUSTOMERS CAN UNDERSTAND WHAT THE PRODUCT IS

22   AND -- AND WHAT HAS BEEN PUT THERE FOR THEM AND HOW THEY CAN

23   GET THE MOST OUT OF IT.

24        WE ARE VERY DEEPLY INVOLVED WITH IT.

25   **Q.**   AND THE ITUNES 7.0 UPDATE, CAN YOU SUMMARIZE WHAT THAT WAS

1    AND WHAT ITS IMPORTANCE WAS?

2    **A.**   ITUNES 7.0 WAS A MAJOR RELEASE, WE WOULD CALL IT.  IT CAME

3    OUT IN SEPTEMBER OF, I BELIEVE, IT WAS 2006.

4         AND THIS IS NO COINCIDENCE THAT ITUNES MAJOR UPDATES WOULD

5    COME OUT IN SEPTEMBER BECAUSE IN SEPTEMBER WE WOULD INTRODUCE

6    NEW LINES OF IPODS.  SO WITH EACH NEW LINE OF IPOD WOULD COME

7    A NEW RELEASE OF ITUNES.  THEY WORK HAND IN HAND.

8         AND SO IT WAS A MAJOR RELEASE FIRST AND FOREMOST TO WORK

9    WITH NEW IPODS THAT WERE ANNOUNCED THAT YEAR, BUT IT ALSO

10   BROUGHT MANY VERY INNOVATIVE NEW FEATURES TO CUSTOMERS.

11        IT BROUGHT THE ABILITY FOR THE FIRST TIME TO PURCHASE

12   MOVIES.  THAT WAS A BIG DEAL.  WE HAD ADDED TV SHOWS THE YEAR

13   BEFORE AND NOW WE ADDED MOVIES.  IT ALSO INCREASED THE SIZE OF

14   THE FILES FOR TV SHOWS AND MOVIES, FOUR TIMES LARGER, SO YOU

15   CAN HAVE A BETTER EXPERIENCE.

16        IT HAD SOME GREAT MUSIC FEATURES.  WE, FOR THE FIRST TIME,

17   SHOWED ALBUM ART AND USER INTERFACE FOR HOW YOU MANAGE YOUR

18   MUSIC.

19        AND WE WORKED REALLY HARD ON A FEATURE CALLED COVER FLOW,

20   SO THAT YOU COULD FLIP THROUGH YOUR ALBUMS OF MUSIC THE SAME

21   WAY WE USED TO FLIP THROUGH THE OLD LP ALBUMS IN THE DAY.  AND

22   SO IT HAD THAT.

23        SOME OF THE OTHER THINGS, IT HAD A -- FOR THE FIRST GAMES

24   THAT YOU COULD DOWNLOAD AND PUT ON YOUR IPOD.  SO THERE WERE

25   MANY FEATURES THAT WERE PART OF ITUNES 7 THAT WE INTRODUCED IN

SCHILLER – DIRECT SWEENEY

1    7.0.

2    **Q.**   THE JURY HAS HEARD ABOUT APPLE'S FAIRPLAY DRM SOFTWARE.

3         WHY DID APPLE DEVELOP ITS OWN DRM SOFTWARE?

4    **A.**   WE NEEDED TO HAVE A WAY TO PROVIDE FOR CUSTOMERS A LEGAL,

5    FAIR WAY TO BUY MUSIC DIGITALLY.   THERE WAS A LOT OF PIRACY ON

6    THE INTERNET.   PEOPLE WERE DOWNLOADING FREE SONGS.

7         AND WE WANTED TO FIND A SOLUTION WHERE THE MUSIC COMPANIES

8    AND THE ARTISTS COULD GET PAID FOR SELLING MUSIC AND THE

9    CUSTOMER COULD LEGALLY BUY FROM A LARGE LIBRARY OF MUSIC WITH

10   RIGHTS THE CUSTOMER LIKED THAT THEY COULD PUT IT ON ALL THEIR

11   IPODS.   THEY COULD OWN IT FOREVER, LISTEN TO IT, AND USE IT.

12        SO IN ORDER TO PROVIDE A SYSTEM FOR DOWNLOADING THOSE

13   SONGS AND MAKING SURE THOSE RIGHTS ARE PROPERLY GIVEN TO YOU,

14   THE USER, AND HONORED, NEEDED SOME KIND OF MANAGEMENT SYSTEM.

15   THAT'S A DRM, DIGITAL RIGHTS MANAGEMENT.

16   **Q.**   ALL RIGHT.   AND SO WHY DID YOU -- WHY DID APPLE DEVELOP

17   ITS OWN DRM SOFTWARE AS OPPOSED TO USING SOMEBODY ELSE'S?

18   **A.**   WELL, I'M NOT AN ENGINEER, SO I CAN'T TELL YOU ALL THE

19   ENGINEERING REASONS FOR IT, BUT WE -- FROM MY SIDE, WE NEEDED

20   A SOLUTION THAT WAS SIMPLE TO USE.   EVERYBODY CAN USE IT.

21        WE WANTED THIS TO BE WILDLY POPULAR WITH PEOPLE OF ALL

22   AGES AND ALL WALKS OF LIFE.   IT HAD TO BE SOMETHING THAT GAVE

23   YOU ALL OF THE RIGHTS THAT WE HAD WORKED -- MUSIC COMPANIES

24   TO -- TO GET FOR YOU, BUT TRANSPARENT THAT YOU DIDN'T KNOW

25   THAT THAT'S WHAT MADE IT ALL HAPPEN.

1     YOU DIDN'T HAVE TO KNOW WHAT DRM MEANT.  YOU DIDN'T HAVE

2  TO KNOW HOW IT WOULD WORK, IF IT MOVED FROM ONE PLACE TO

3  ANOTHER.  IT WOULD DO ALL OF THAT.  AND AS FAR AS I KNOW,

4  THERE WAS NO SYSTEM AVAILABLE TO US THAT DID WHAT WE WANTED,

5  THE WAY WE WANTED RELIABLY, DEPENDABLY, SIMPLY, AND WE CREATED

6  THAT.

7  **Q.**  DO YOU KNOW THE TERM "END-TO-END SOLUTION"?

8  **A.**  SURE.

9  **Q.**  WHAT'S THAT?

10  **A.**  ONE THING -- ONE OF THE THINGS WE THINK ABOUT ALL THE TIME

11  AT APPLE IS THAT WE WANT SOMETHING THAT FROM ONE END TO THE

12  OTHER WE TAKE RESPONSIBILITY FOR THE WHOLE PRODUCT EXPERIENCE

13  FOR THE CUSTOMER SO THAT IT ALL WORKS TO THE LEVEL THAT YOU

14  EXPECT.  FROM, IN THIS CASE, FROM GOING TO THE STORE,

15  DISCOVERING MUSIC, BUYING IT, DOWNLOADING IT, USING IT IN

16  ITUNES, USING IT ON YOUR MUSIC PLAYER, EVERY STEP OF THAT

17  CHAIN WE NEED TO MAKE SURE WORKS WELL BECAUSE IF THERE'S A

18  WEAK LINK IT WILL BREAK AND NOT DO A GOOD JOB FOR YOU, AND THE

19  WHOLE SYSTEM DOESN'T MAKE SENSE.

20  **Q.**  HOW DOES THAT PHILOSOPHY RELATE TO INTEGRATING ITUNES,

21  FAIRPLAY, THE IPOD?

22  **A.**  WELL, THE IPOD WAS ALWAYS ENVISIONED AS A DEVICE THAT

23  WORKED WITH ITUNES.  IT WAS FROM DAY ONE HOW WE ENGINEERED IT,

24  SO THAT ALL THE COMPLICATED STUFF COULD HAPPEN IN ITUNES.

25     YOU COULD SET UP WHAT YOUR PLAYLISTS WERE FOR YOUR MUSIC,

1    YOU CAN DECIDE WHAT CONTENT YOU WANTED, AND THEN YOU COULD PUT

2    IT ALL ON THE IPOD.  AND THE IPOD HAD THE EASY JOB OF JUST

3    BEING THE DEVICE YOU PLAYED IT ON OR EXPERIENCED IT ON.

4         SO WE NEEDED A SYSTEM THAT BALANCED THE -- THE EFFORT FOR

5    THE USER BETWEEN WHAT WAS BETTER DONE IN ITUNES AND WHAT WAS

6    BETTER HANDLED IN IPOD.

7         AND FAIRPLAY WAS THE DIGITAL RIGHTS PART OF THAT THAT

8    CONNECTED THE TWO AND MADE SURE THE MUSIC YOU BOUGHT IN ITUNES

9    WOULD ALSO PLAY ON ALL THE IPODS YOU OWNED UNDER YOUR ACCOUNT.

10   **Q.**  MS. SWEENEY ASKED YOU ABOUT INTEROPERABILITY.  WHY HAVE

11   AN -- WHY HAVE THAT INTEGRATED SYSTEM YOU DESCRIBED?  WHY NOT

12   HAVING SOMETHING THAT INTEROPERATED WITH ALL THE DIGITAL

13   PLAYERS AND ALL THE MUSIC SOURCES IN THE WORLD?

14   **A.**  BECAUSE IF WE ARE TAKING RESPONSIBILITY TO MAKE THAT WHOLE

15   THING WORK AND THEN WE ENGINEER A SOLUTION FOR SOMEONE ELSE'S

16   PRODUCTS IN SOMEONE ELSE'S DEVICE, YOU INCREASE THE LIKELIHOOD

17   THAT THAT STARTS TO BREAK DOWN AND THERE'D BE PROBLEMS, AND

18   PROBLEMS WE CAN'T FIX BECAUSE THEY ARE NOT OUR PRODUCTS.  AND

19   NOW YOU START TO HAVE A SYSTEM THAT ISN'T WORKING.

20        AND APPLE MADE PROMISES TO THE MUSIC COMPANIES THAT WE

21   WOULD MAKE SURE IT WORKED.  AND IF IT'S NOT ON OUR PRODUCT AND

22   NOT ON OUR SOFTWARE, ALL OF A SUDDEN THE RISK GOES UP THAT IT

23   DOESN'T WORK AND THERE'S NOT A LOT YOU CAN DO ABOUT IT BECAUSE

24   IT'S OUTSIDE OF YOUR SCOPE OF CONTROL.

25   **Q.**  IS THE IPOD A COMPUTER?

1    **A.**  THERE IS COMPUTER TECHNOLOGY IN THE IPOD, BUT WE WORKED

2    EXTREMELY HARD TO MAKE SURE IT WASN'T A COMPUTER.

3        YOU HAVE YOUR MAC OR PC, THAT'S YOUR COMPUTER, BUT WE

4    WANTED A DEVICE THAT WAS A MUSIC PLAYER, THAT, IN FACT,

5    REPLACED THE CD PLAYER THAT WE ALL HAD HAD BEFORE SOMETHING

6    LIKE AN IPOD.  AND IT HAD TO BE THAT SIMPLE AND THAT EASY TO

7    USE.  SO IT COULDN'T BE LIKE A COMPUTER IN ANY SUBSTANTIAL

8    WAY.

9    **Q.**  TALKING ABOUT MY PORTABLE DISK PLAYER FROM YEARS AGO?

10   **A.**  THAT WAS THE MOST PORTABLE MUSIC PLAYER BEFORE IPOD.

11   **Q.**  SO WHAT SORT OF EXPERIENCE DID YOU WANT CONSUMERS TO HAVE

12   WITH THE IPOD RELATIVE TO THE EXPERIENCE THEY WOULD HAVE WITH

13   A COMPUTER?

14   **A.**  YOU HAVE TO REMEMBER BACK IN THIS TIME, IN 2001, '2, '3,

15   THE INTERNET WAS JUST STARTING TO TAKE OFF.  AND THE INTERNET

16   WAS -- IS A WONDERFUL THING, BUT IT BRINGS WITH IT THINGS WE

17   HAVE NEVER REALLY EXPERIENCED EN MASS BEFORE, PROBLEMS WITH

18   SECURITY, VIRUSES AND --

19   **Q.**  RATHER THAN 2001 AND 2003, RELATE THIS TO 2006 BECAUSE

20   THAT'S CLOSER TO THE TIME PERIOD IN THIS CASE.

21   **A.**  WELL, IN 2006, PC'S WERE HAVING TREMENDOUS PROBLEMS WITH

22   SECURITY AND RELIABILITY BECAUSE OF THINGS THAT WERE COMING

23   DOWN TO COMPUTER OVER THE INTERNET, INFECTING COMPUTERS,

24   CAUSING COMPUTERS TO CRASH AND HAVE TO HAVE SOFTWARE

25   RE-LOADED.

1    THE COMPUTER WORLD WAS LIVING WITH THIS VERY MESSY

2    SITUATION, SO WE DIDN'T WANT THE IPOD TO BE LIKE THAT.  WE

3    WANTED TO MAKE SURE IT WAS MUCH MORE DEPENDABLE, MUCH MORE

4    RELIABLE.  IT'S AN ELECTRONIC DEVICE.

5    IT NEEDS TO BE AS EASY TO USE AS YOUR REFRIGERATOR.  YOU

6    DON'T WORRY EVERY DAY WHETHER SOMEBODY'S INFECTED YOUR

7    REFRIGERATOR AND YOU HAVE TO RE-LOAD THE OPERATING SYSTEM OR

8    YOUR FOOD GOES BAD.  THAT'S WHAT A CONSUMER ELECTRONIC DEVICE

9    NEEDS TO BE ABOUT.

10   **Q.**  SO WHAT SECURITY ISSUES DO COMPUTERS -- I AM SORRY.  YOU

11   WERE FAMILIAR WITH SECURITY ISSUES WITH DESKTOP COMPUTERS IN

12   2006?

13   **A.**  I THINK WE ALL WERE, YES.

14   **Q.**  WHAT SECURITY ISSUES DID COMPUTERS HAVE DURING THAT

15   PERIOD.

16   **A.**  THERE WERE THINGS LIKE VIRUSES, WORMS, JUST ENDLESS

17   THREATS TO YOUR COMPUTER.  AND ESPECIALLY AT THAT TIME,

18   WINDOWS, WHICH GROWING WITH THE IPOD BASE WERE MANY WINDOWS

19   USERS WERE EXPERIENCING THE PROBLEMS WHERE THE COMPUTERS WOULD

20   JUST GET SLOWER, STOP WORKING CORRECTLY.  THAT'S THE WORLD WE

21   LIVED IN.

22   **Q.**  THIS INTEGRATED APPROACH OF ITUNES AND IPOD AND FAIRPLAY,

23   HOW DID THAT AFFECT THE QUALITY OF THE IPOD?

24   **A.**  WELL, I BELIEVE THAT TAKING RESPONSIBILITY FOR THOSE

25   COMPONENTS AND MAKING THEM WORK TOGETHER SEEMLESSLY IS WHAT

```
 1    CREATED AN EASY-TO-USE DEVICE THAT CUSTOMERS LOVED.
 2    Q.  YOU USED THE TERM "SEEMLESSLY".  CAN YOU TELL ME HOW THAT
 3    RELATES TO THE CONSUMER EXPERIENCE WITH SOMETHING LIKE A
 4    PLAYLIST?
 5    A.  THE PLAYLIST IS REALLY IMPORTANT.  IT'S PROBABLY ONE OF
 6    THE MOST INTERESTING THINGS THAT GAVE RISE TO THE WHOLE IPOD
 7    AND ITUNES FROM THE BEGINNING.
 8       WE HAD CD'S.  WE PUT THEM INTO OUR COMPUTERS, AND NOW WE
 9    CAN MAKE PLAYLISTS OF ANY SONGS IN ANY ORDER WE WANTED TO
10    LISTEN TO.
11       NOW THAT YOU HAVE YOUR PLAYLIST, YOU CREATE THAT IN
12    ITUNES, IF YOU WANT THAT PLAYLIST ON YOUR IPOD SO WHEN YOU USE
13    IT FOR A WORKOUT AT THE GYM OR YOU GO ON A TRIP, USE IT AT A
14    PARTY, YOU'VE CREATED A PLAYLIST YOU WANT.  SO YOU WANT THE
15    ABILITY TO ORGANIZE YOUR SONGS AND TRANSFER PLAYLISTS OVER TO
16    YOUR IPOD.
17       INCREASINGLY WE CREATED TOOLS SO ON THE IPOD YOU CAN
18    CHANGE THE PLAYLIST IF YOU WANT AND SEND THAT INFORMATION BACK
19    TO THE COMPUTER SO THESE THINGS KNEW ABOUT WHAT WAS GOING ON
20    AND WORKED TOGETHER.
21    Q.  YOU TALKED ABOUT THE ITUNES ON THE DESKTOP BEING THE
22    MANAGEMENT SOFTWARE FOR THE IPOD.
23       CAN YOU EXPLAIN THAT?
24    A.  YES.  THE -- THERE'S A LOT OF POWERFUL FUNCTIONS THAT
25    CUSTOMERS WANTED IN ITUNES, AND THE PLACE TO DEAL WITH THAT
```

1    WAS ON THE COMPUTER WHERE YOU HAD THE BIGGER SCREEN, AND THE

2    KEYBOARD AND YOU WOULD SPEND TIME DECIDING HOW YOU WANT TO

3    ORGANIZE YOUR MUSIC AND MANAGE IT.

4        IN ORDER TO KEEP THE IPOD SIMPLE AND INTUITIVE AND

5    RELIABLE, IT HAD TO MAKE SURE THAT SOME OF THAT STUFF IS

6    HANDLED ON THE COMPUTER, NOT ON THE IPOD.

7    **Q.**  ALL RIGHT.  AND IS AN INTEGRATED SYSTEM ONE OF THE WAYS

8    THAT APPLE MARKETED THE IPOD?

9    **A.**  ABSOLUTELY.  WE MARKETED IPOD QUITE OFTEN AS IPOD PLUS

10   ITUNES SO PEOPLE UNDERSTOOD THAT THIS IS A SOLUTION THAT WORKS

11   TOGETHER, AND ONE REQUIRES THE OTHER.

12   **Q.**  I'M GOING TO SHOW YOU AN OLD FRIEND OF YOURS,

13   EXHIBIT 2710.

14            (EXHIBIT HANDED TO WITNESS.)

15       IF YOU CAN HOLD THAT UP AND EXPLAIN WHAT THAT IS.

16   **A.**  I LOVE THIS.  THIS IS THE VERY FIRST GENERATION IPOD.

17   IT'S -- WE'VE MOVED ALONG IN THE DECADE PLUS SINCE NOW, BUT

18   IT'S STILL PRETTY SPECIAL, WONDERFUL DEVICE.

19   **Q.**  THIS IS THE IPOD WITH A THOUSAND SONGS IN YOUR POCKET?

20   **A.**  YES.  THAT'S HOW WE MARKETED THE VERY FIRST IPOD.

21   **Q.**  WHAT WAS THE -- WHEN YOU LAUNCH A NEW PRODUCT, YOU HAVE

22   MEETINGS WITH -- TO INTRODUCE IT TO PEOPLE TO GET THEIR

23   REACTION; IS THAT RIGHT?

24   **A.**  YES, WE DO.

25   **Q.**  WHAT WAS THE REACTION TO THE LAUNCH OF THE FIRST IPOD?

SCHILLER – DIRECT SWEENEY

1    **A.**  SURPRISINGLY NOT ALL VERY POSITIVE.  WE LAUNCHED IT AT

2    APPLE IN A SMALL AUDITORIUM, NOT MUCH BIGGER THAN THIS ROOM,

3    CALLED TOWN HALL.  AND THE MAJORITY OF THE PRESS REACTION WAS,

4    WHAT?  YOU INVITED US OUT HERE FOR A MUSIC PLAYER JUST TO SEE

5    THAT?  YOU ARE CRAZY.  THIS WON'T TAKE OFF.  YOU'RE APPLE

6    COMPUTER, WHAT ARE YOU DOING MAKING A MUSIC PLAYER?

7    **Q.**  WHAT HAPPENED AFTER THE LAUNCH WITH -- AND WHEN IT BECAME

8    AVAILABLE TO THE PUBLIC?

9    **A.**  CUSTOMERS LOVED IT AND IT DID VERY WALL.

10   **Q.**  DID YOU WORK ON ANY ASPECTS OF THE PRODUCT DESIGN FOR THE

11   IPOD?

12   **A.**  YES, I DID.

13   **Q.**  TELL US WHAT YOU DID.

14   **A.**  MY IDEA FOR THIS, I HAVE ACTUALLY THE PATENT ON THE WHEEL.

15   I CAME UP WITH THE IDEA OF USING THE WHEEL FOR PERUSING YOUR

16   SONGS.

17       WE KNEW WE WANTED A THOUSAND SONGS, A SMALL HARD DRIVE IS

18   IN HERE.  AND WE NEEDED A WAY TO SCROLL THROUGH A THOUSAND

19   SONGS.  AND AT THE TIME, THE OTHER FIRST GENERATION DIGITAL

20   MUSIC PLAYERS ALL HAD A BUTTON TO MOVE UP OR DOWN ON IT.  I

21   THOUGHT, YOU ARE NOT GOING TO SIT THERE AND PRESS IT A

22   THOUSAND TIMES TO MOVE DOWN YOUR SONG LIST.  YOU NEEDED A WAY

23   TO VERY QUICKLY SCROLL.

24       AND IT HAD TO BE A ONE-HANDED WAY BECAUSE WE WANTED PEOPLE

25   TO GO TO THE GYM AND RUN WITH IT, ALL THESE THE FUN

```
 1    ACTIVITIES, SO IT HAD TO BE SOMETHING YOU CAN CONTROL.  AND I
 2    CAME UP WITH THE IDEA OF USING THE WHEEL FOR SCROLLING THROUGH
 3    YOUR MUSIC.
 4    Q.  CAN YOU LOOK IN YOUR BINDER AT EXHIBIT 2745.
 5         MR. ISAACSON:  NOT ON THE SCREEN YET.
 6         THE WITNESS:  OKAY.
 7    BY MR. ISAACSON:
 8    Q.  ALL RIGHT.  THERE'S TWO PAGES HERE.  AND YOU SEE THAT --
 9    DO YOU RECOGNIZE THESE PHOTOS AND THE DESCRIPTIONS?
10    A.  YES, I DO.
11    Q.  OKAY.  YOU'VE -- THE -- THESE -- CAN YOU EXPLAIN WHAT
12    YOU'RE LOOKING AT HERE?
13    A.  THESE ARE EACH OF THE GENERATIONS OF THE IPOD THAT GREW
14    FROM THIS FIRST GENERATION.  WE -- AS THE LINE GREW, WE CALL
15    THESE THE IPOD CLASSIC.
16         SO EACH GENERATION OF THE IPOD CLASSIC FROM FIRST UP UNTIL
17    THE 7TH -- 6TH GENERATION.
18    Q.  IS THIS AN ACCURATE SUMMARY OF INFORMATION ABOUT THE IPOD
19    CLASSIC FROM THE 1ST GENERATION TO THE 6TH GENERATION?
20    A.  YES, IT IS.
21         MR. ISAACSON:  I WOULD ASK TO PUT THIS ON THE SCREEN?
22         THE COURT:  THAT'S FINE.  IT IS ACTUALLY STIPULATED
23    FOR ADMISSION.
24         MR. ISAACSON:  ALL RIGHT.
25              (EXHIBIT DISPLAYED TO JURY.)
```

1    **BY MR. ISAACSON:**

2    **Q.**  ALL RIGHT.  TELL US -- GIVE US A BRIEF LOOK AT THIS --

3    BRIEF SUMMARY OF THIS HISTORY, SIR.

4    **A.**  WELL, AS YOU SEE, THE FIRST PAGE SHOWS GENERATIONS 1

5    THROUGH 4, AND THEN THE SECOND PAGE WILL SHOW 4 THROUGH 6TH.

6        AND IT'S A LITTLE HARD TO TELL IN JUST THESE IMAGES, BUT

7    THEY GOT THINNER AND THINNER AS TIME WENT ON.  THE SCREENS

8    WENT FROM BLACK AND WHITE TO COLOR.  THE CLICK WHEEL WENT FROM

9    A MECHANICAL CLICK WHEEL TO A TOUCH WHEEL.  AND IT GOT BOTH

10   SIMPLER, IT HAD FEWER BUTTONS ON IT AND MORE POWERFUL, AND

11   THINNER AND LIGHTER.

12       AND YOU ALSO CAN'T SEE, BUT IT'S IN THE DATA THERE, THE

13   CAPACITIES GREW LARGER AND LARGER AS TIME WENT ON AS WELL.

14   **Q.**  LET ME ASK YOU ABOUT THE 5TH GENERATION.

15       WHAT DISTINGUISHED THE 5TH GENERATION?

16   **A.**  IT WAS A LOT THINNER.  IT HAD -- WHOLE IDEA OF ALBUM

17   ARTWORK WE TALKED ABOUT.  IT HAD A VERY LARGE COLOR SCREEN,

18   MUCH LARGER THAN THE PREVIOUS GENERATION.  AND, AGAIN, LARGER

19   CAPACITIES.  UP TO 80 GIGABYTES.  IT GOT LESS EXPENSIVE.

20   DRAMATICALLY LESS --

21   **Q.**  THE 4TH GENERATION WAS KNOWN AS PHOTO?

22       SORRY.

23           **THE COURT:**  ONE AT A TIME.

24   **BY MR. ISAACSON:**

25   **Q.**  THE 4TH GENERATION WAS KNOWN AS PHOTO BECAUSE IT HAD

1    PHOTOS AVAILABLE?

2    **A.**  IT WAS THE FIRST TIME WE ALLOWED YOU TO PUT YOUR PHOTOS ON

3    IT AND SEE THEM AS WELL.

4    **Q.**  WHAT WAS THE 5TH GENERATION CALLED?

5    **A.**  WE ALL REFERRED IT TO THE VIDEO IPOD INTERNALLY.

6    **Q.**  NOW IF I CAN ASK YOU TO LOOK AT 2421.  WE CAN PUT THAT ON

7    THE SCREEN.

8                    (EXHIBIT DISPLAYED TO JURY.)

9        IS THIS A PRESS RELEASE INTRODUCING THE NEW IPOD NANO IN

10   SEPTEMBER OF 2006?

11   **A.**  YES, IT IS.

12   **Q.**  WHAT WAS THE IPOD NANO?

13   **A.**  IT WAS A NEW GENERATION, SMALLER VERSION OF THE IPOD.

14   **Q.**  2745.

15       2715.  I'M GOING TO SHOW YOU 2715.

16                    (EXHIBIT HANDED TO WITNESS.)

17       CAN YOU TELL THE JURY WHAT THAT IS AND EXPLAIN ITS

18   FEATURES?

19   **A.**  SO THIS IS THE IPOD NANO.  AS YOU CAN SEE, IT'S

20   DRAMATICALLY SMALLER.  IT ACTUALLY HELD AS MANY SONGS AS THIS

21   FIRST GENERATION IPOD CLASSIC.  AND WE WERE ABLE TO MAKE A

22   MUCH SMALLER, MORE BEAUTIFUL DEVICE.  PEOPLE REALLY LOVED IT

23   BECAUSE YOU COULD CARRY IT EVEN MORE PLACES WITHOUT EVEN

24   FEELING IT WAS ON YOU.

25       IT HAS A SMALL SCREEN.  IT STILL HAS THE SAME GENERAL

1   THINGS YOU KNOW ABOUT IN IPOD, A CLICK WHEEL AND THE SCREEN.

2   AND IT COULD ALSO PLAY A THOUSAND SONGS IN YOUR POCKET AND BE

3   MORE AFFORDABLE AND BEAUTIFUL.

4       IT CAME IN COLORS, WHICH THE IPOD LINE HADN'T DONE BEFORE.

5   AND IT'S MADE OUT OF AN EXTRUDED ALUMINUM DESIGN WHICH IS A

6   LOT MORE DURABLE AND BEAUTIFUL.

7   **Q.**  WHAT DID IT HAVE -- DID IT HAVE ANY IMPROVEMENTS IN

8   BATTERY LIFE?

9   **A.**  OH, YES.  WE WORKED REALLY HARD ON DELIVERING GREAT

10  BATTERY LIFE IN IT AS WELL.

11  **Q.**  WHAT IS THE IPOD SHUFFLE?  PLEASE TELL THE JURY WHAT THAT

12  IS.

13  **A.**  THE IPOD SHUFFLE WAS ANOTHER LINE OF IPOD WE INTRODUCED.

14  WE WERE CONSTANTLY TRYING TO FIND WAYS TO BRING IPOD TO MORE

15  PEOPLE AT LOWER PRICES.

16      AND WHEN WE LOOKED AT HOW TO GET REALLY LOW, TRY TO GET

17  BELOW A HUNDRED DOLLARS, WE REALIZED SOME OF THE TECHNOLOGIES

18  WERE GOING TO MAKE THAT HARD TO DO.  LIKE A SCREEN AND CLICK

19  WHEEL.

20      SO IF WE CAN REMOVE THOSE, WE COULD MAKE SOMETHING

21  INCREDIBLY LOW COST, BUT THE FUNCTIONALITY WOULD HAVE TO

22  CHANGE BECAUSE WE ARE ALL SO USED TO SCROLLING AROUND THE

23  SCREEN.

24      WE DISCOVERED THAT WHEN WE INTERVIEWED CUSTOMERS, SO MANY

25  OF THEM LISTENED TO THEIR MUSIC BY JUST PUTTING ON SHUFFLE AS

SCHILLER – DIRECT SWEENEY

1   A FEATURE ON THE IPOD.  THEY JUST SHUFFLED AND LET THEIR

2   PLAYLIST PLAY ALL DAY LONG WHILE THEY DID WHATEVER THEY DID.

3       SO WE CAME UP WITH THE IDEA, WELL, LET'S MAKE AN IPOD

4   WITHOUT A SCREEN, WITHOUT A CLICK WHEEL THAT JUST SHUFFLED ALL

5   YOUR MUSIC, AND THAT WOULD LET US MAKE IT EVEN MORE

6   AFFORDABLE.

7   **Q.**  LET ME ASK YOU TO LOOK AT 2497.  WE WILL PUT THAT ON THE

8   SCREEN FOR YOU.

9                    (EXHIBIT DISPLAYED TO JURY.)

10      THIS IS A PRESS RELEASE, "APPLE UNVEILS THE IPOD TOUCH".

11      WOULD YOU EXPLAIN WHAT THE IPOD TOUCH WAS AND WHAT IT

12   OFFERED?

13  **A.**  THIS WAS ANOTHER LINE OF IPOD, A WHOLE NEW GENERATION IN

14   2007.

15      IN EARLY 2007, WE BROUGHT TO MARKET IPHONE.  THAT WAS A

16   PRETTY BIG BREAKTHROUGH.  IT HAD A FULL MULTI-TOUCH USER

17   EXPERIENCE.  IT RAN AN OPERATING SYSTEM CALLED IOS THAT IS

18   INCREDIBLY POWERFUL.

19      WE WANTED TO BRING THAT CAPABILITY AND POWER FROM IPHONE

20   ALSO TO IPOD USERS.  SO WE CAME UP WITH THIS PRODUCT WE CALLED

21   IPOD TOUCH.  IT'S LIKE AN IPHONE BUT ALL ABOUT YOUR MUSIC AND

22   ENTERTAINMENT EXPERIENCE.

23  **Q.**  SHOW YOU, I THINK, IT'S 2720 --

24          **THE CLERK:**  CAN YOU SAY THAT AGAIN, EXHIBIT NUMBER?

25          **MR. ISAACSON:**  2720.

SCHILLER – DIRECT SWEENEY

1              (EXHIBIT HANDED TO WITNESS.)

2              **THE WITNESS:**  SO THIS WAS THE FIRST GENERATION IPOD

3    TOUCH.

4    **BY MR. ISAACSON:**

5    **Q.**  AND WHAT –– HOW DID THIS DEVICE RELATE TO THE ITUNES

6    WIRELESS –– WI-FI STORE?

7    **A.**  ONE OF THE THINGS WE WANTED TO DO WITH A PRODUCT LIKE THIS

8    WAS TO MAKE IT SO CUSTOMERS COULD PURCHASE MUSIC DIRECTLY ON

9    THE DEVICE WITHOUT HAVING TO ALWAYS GO BACK TO ITUNES ON THE

10   COMPUTER AND SYNC IT ACROSS DIRECTLY.

11        SO WE CREATED A WI-FI VERSION OF THE ITUNES STORE AND MADE

12   IT SO YOU CAN GET TO YOUR MUSIC WIRELESSLY AND PURCHASE MUSIC

13   OVER YOUR WI-FI NETWORK DIRECTLY ON THE DEVICE, BUT ALSO MAKE

14   SURE THAT IT WOULD SYNC BACK WITH YOUR ITUNES LIBRARY SO

15   THINGS WOULD STAY ALWAYS ORGANIZED AND UP TO DATE.

16   **Q.**  AND WHAT WAS AVAILABLE ON THE SCREEN ON THE IPOD TOUCH?

17   **A.**  WELL, FOR THE FIRST TIME NOW YOUR IPOD HAD APPLICATIONS ON

18   THE SCREEN.

19        SO YOU HAD APPLICATIONS LIKE A SAFARI WEB BROWSER.  YOU

20   COULD SURF THE INTERNET ON AN IPOD FOR THE FIRST TIME.  YOU

21   HAD YOUR CALENDAR, YOUR EMAIL.  YOU CAN READ YOUR EMAIL HERE

22   WIRELESSLY.

23        SO THE CAPABILITIES OF IPOD STARTED TO GROW AND ENABLE YOU

24   TO DO OTHER THINGS IN ADDITION TO LISTEN TO MUSIC, AND WATCH

25   TV SHOWS AND MOVIES.

1    **Q.**  WE HAVE BEEN TALKING ABOUT HARMONY AND REALNETWORKS IN

2    THIS CASE, SIR.

3         DID APPLE EVER HAVE ANY BUSINESS RELATIONSHIP WITH

4    REALNETWORKS RELATING TO ITUNES OR THE IPOD OR ANYTHING ELSE

5    YOU CAN THINK OF?

6    **A.**  NO.

7    **Q.**  CAN WE LOOK AT EXHIBIT 2139?

8         THIS IS AN EMAIL FROM EDDY CUE AT THE TOP TO YOU IN JULY

9    OF 2004.

10        AND IF YOU SCROLL DOWN, THERE'S A DISCUSSION ABOUT

11   REALNETWORKS AND HARMONY.

12        AND YOU ASK IN THE MIDDLE OF THE PAGE, "HOW CAN THEY PUT

13   SONGS INTO FAIRPLAY WITHOUT REVERSE ENGINEERING OUR

14   PROPRIETARY ENCRYPTION ALGORITHM?"

15        WHY WERE YOU CONCERNED ABOUT REVERSE ENGINEERING?

16   **A.**  I WAS CONCERNED BECAUSE WE HAD BUILT A SYSTEM FROM THE

17   ITUNES STORE THROUGH AIRPLAY TO THE IPOD THAT DELIVERED USERS

18   ALL THE FEATURES THEY WANTED AND PROTECTED THE MUSIC THE WAY

19   THE MUSIC COMPANIES REQUIRED.

20        AND IF THAT SYSTEM WAS BROKEN INTO OR ACCESSED IN

21   INAPPROPRIATE WAYS, THEN THE MUSIC COMPANIES MIGHT GET UPSET

22   AND BE UNHAPPY WITH THE DISTRIBUTION OF THE MUSIC, AND

23   QUESTION WHETHER WE CAN EVEN KEEP DISTRIBUTING THEIR MUSIC AND

24   THUS CUSTOMERS WOULD LOSE THE VERY STORE WE ARE BUILDING.

25   **Q.**  DID YOU HAVE USER AGREEMENTS WITH YOUR ITUNES CUSTOMERS AT

1    THIS TIME?

2    **A.** YES, WE DID.

3    **Q.** WHAT DID THOSE USER AGREEMENTS SAY ABOUT REVERSE

4    ENGINEERING?

5    **A.** THAT CUSTOMERS COULD NOT HELP OR DO WORK TO REVERSE

6    ENGINEER AND WORK AROUND OUR DIGITAL RIGHTS MANAGEMENT SYSTEM.

7    **Q.** ALL RIGHT.

8        MR. CUE THEN MENTIONS IN RESPONSE TO YOU, DVD JON.  IF YOU

9    GO UP TO THE TOP.

10   **A.** YES.

11   **Q.** WHAT IS YOUR RECOLLECTIONS OF DVD JON?

12   **A.** I JUST HAVE A LITTLE BIT OF RECOLLECTION OF HIM AS A

13   GENTLEMAN WHO HAD WORKED TO BREAK CONTENT MANAGEMENT SYSTEMS

14   AND BREAK INTO THEM FOR, FIRST FOR DVD FOR MOVIE PROTECTION,

15   THAT'S WHY THE NICKNAME DVD JON WAS GIVEN HIM, AND THEN LATER

16   ALSO INTO MUSIC SYSTEMS.

17   **Q.** ALL RIGHT.  IF WE CAN LOOK AT 2811.

18                 (EXHIBIT DISPLAYED TO JURY.)

19       THIS IS AN EMAIL FROM MR. JOBS TO YOU AND OTHER EXECUTIVES

20   WITH AN ARTICLE SAYING "DVD JON IS HIRING".

21       WHAT CONCERNS DID YOU HAVE -- THIS IS IN APRIL OF 2007.

22   WHAT CONCERNS DID YOU HAVE ABOUT DVD JON DURING THIS PERIOD?

23   **A.** IT APPEARED FROM NEWS STORIES THAT THIS GENTLEMAN WAS

24   BUILDING A TEAM TO, AMONG OTHER THINGS, TRY TO HACK INTO,

25   BREAK INTO OUR PROTECTION SCHEMES THAT OUR SYSTEM WAS BUILT

1    ON.

2    **Q.**  ALL RIGHT.  AND WHAT CONCERNS DID YOU HAVE ONCE YOU

3    LEARNED ABOUT HARMONY, ABOUT HARMONY OR ANY OTHER THIRD-PARTY

4    SOFTWARE OPERATING ON ITUNES OR THE IPOD?

5    **A.**  WELL, THE FIRST AND MAIN CONCERN WAS SIMPLY THAT THEY WERE

6    EXPOSING POTENTIALLY SOME SECURITY PROBLEM; THAT IF A COMPANY

7    CAN GET INTO A SYSTEM LIKE FAIRPLAY AND DO THINGS WITH IT IT

8    WASN'T DESIGNED TO DO, THAT THAT MAY BE DONE VIA A METHOD THAT

9    WASN'T SUPPOSED TO BE THERE, AND THAT MEANS THAT THAT METHOD

10   CAN BE USED BY MANY THINGS THAT WOULD BE INAPPROPRIATE AND

11   DANGEROUS.

12   **Q.**  AND WHAT EFFECT WOULD THAT HAVE ON THE QUALITY OF YOUR

13   PRODUCTS?

14   **A.**  ABSOLUTELY COULD DAMAGE THE QUALITY OF THE PRODUCT.  THE

15   CUSTOMER COULD HAVE EXPERIENCES OF THINGS THAT DON'T WORK THE

16   WAY THEY ARE SUPPOSED TO BECAUSE THERE'S NOW SOFTWARE AND

17   CONTENT LOADED THAT DIDN'T GET IN THERE THE APPROPRIATE WAY

18   AND DIDN'T WORK AS DESIGNED.

19   **Q.**  ONCE YOU SAW THAT THERE WAS HARMONY, DID YOU HAVE CONCERNS

20   ABOUT OTHERS USING -- OTHERS ACTING THE SAME WAY OTHER THAN

21   HARMONY?

22   **A.**  ABSOLUTELY.

23   **Q.**  PLEASE EXPLAIN WHY.

24   **A.**  IT'S -- IT'S -- THE OLD SAYING THAT ONE KEY CAN OPEN ANY

25   LOCK, THAT ONCE SOMEBODY SHOWS A KEY TO UNLOCK SOMETHING,

1  EVERYBODY WHO'S TRIED TO BREAK INTO THAT THING IS FOLLOWING

2  THAT AND INTERESTED IN IT, AND GOING TO LEARN FROM THAT, AND

3  OTHERS WILL TRY AS WELL.

4      SO YOU DON'T WANT TO EXPOSE PUBLICLY SECURITY ISSUES AND

5  THEN LEAVE THEM THAT WAY FOR A LONG TIME FOR ANYONE TO DO

6  THINGS THAT YOU CAN'T IMAGINE.

7  **Q.**  WHY NOT JUST HAVE HOLES IN YOUR SYSTEM?

8  **A.**  WELL, FIRST OF ALL, ULTIMATELY THAT'S THE KIND OF THING

9  THAT WE TALKED ABOUT IN THE BEGINNING WITH THE INTERNET AND

10  PERSONAL COMPUTERS AND WHY THINGS GOT SO UNSTABLE AND

11  DIFFICULT TO MANAGE.  WE DIDN'T WANT THAT FOR THE USERS

12  EXPERIENCE.

13      BUT, SECONDLY, WE HAD A RESPONSIBILITY IN THE AGREEMENTS

14  WE HAD FOR THE MUSIC COMPANIES TO PROTECT THE SYSTEM AND KEEP

15  IT WORKING AS DESIGNED.

16  **Q.**  ALL RIGHT.

17      AND IF I'M SYNCING MY IPOD TO MULTIPLE DATABASES, ITUNES

18  AND OTHER DATABASES, WHAT ISSUES DOES THAT RAISE?

19  **A.**  I BELIEVE THAT CAN CREATE A NUMBER OF ISSUES.  IPOD WAS

20  DESIGNED TO WORK WITH ONE MANAGEMENT PIECE OF SOFTWARE.  AND

21  IF THERE ARE MULTIPLE MANAGEMENT PIECES OF SOFTWARE TRYING TO

22  DO THE SAME THING -- I DON'T KNOW, IT'S LIKE HAVING TWO

23  STEERING WHEELS IN A CAR.  YOU CAN'T HAVE TWO PEOPLE TRYING TO

24  DRIVE IT AT THE SAME TIME.  YOU CAN CRASH UP.

25      SO, IF YOU HAVE ONE, FOR EXAMPLE, MY IPOD, I MIGHT BE

1    USING MY ITUNES TO CREATE A PLAYLIST.  I PUT THAT PLAYLIST ON

2    MY IPOD.  IF I HAVE A DIFFERENT SYSTEM TRYING TO PUT DIFFERENT

3    SONGS IN THE PLAYLIST, NOW THEY ARE NOT IN SYNC AND I DON'T

4    KNOW WHETHER IT'S PROPERLY BACKED UP.  I DON'T KNOW IF IT'S

5    PROPERLY MANAGING THE SONGS.  IT GETS VERY MESSED UP QUICKLY.

6    **Q.**  ALL RIGHT.

7        NOW WHEN 7.0 WAS IMPLEMENTED IN SEPTEMBER OF 2006, DID YOU

8    CARE ABOUT REALNETWORKS AND HARMONY?

9    **A.**  CARE ONLY IN THE SENSE, AGAIN, THAT WE DON'T WANT ANY

10   SECURITY PROBLEMS.  BUT OTHER THAN THAT, TO ME, YOU KNOW,

11   THERE WERE SO MANY OTHER BIGGER THINGS GOING ON AT THE TIME AT

12   APPLE WITH ALL WE WERE DOING, I DON'T WANT TO OVERSTATE THE

13   CARE PART.  THEY WERE A SMALL COMPANY THAT WASN'T ON MY LIST

14   OF IMPORTANT THINGS GOING ON.

15   **Q.**  ALL RIGHT.

16       AND HOW DOES YOUR IPOD -- YOUR PHILOSOPHY THAT YOU DIDN'T

17   WANT THE IPOD TO OFFER A COMPUTER EXPERIENCE, HOW DID IT

18   RELATE TO THIS CONCERN ABOUT HARMONY?

19   **A.**  AGAIN, IF THERE'S MULTIPLE MANAGEMENT SOFTWARE, THERE'S

20   SECURITY THINGS EXPOSING PROBLEMS IN THE SOFTWARE, IT ALL GETS

21   DOWN TO SIMPLY EASE OF USE AND RELIABILITY.

22       WE CREATED A SYSTEM THAT'S ALL ABOUT BUYING MUSIC AND

23   MANAGING IT ON YOUR DEVICE, AND MAKING THAT SO SIMPLE THAT YOU

24   DON'T HAVE TO THINK ABOUT IT.  YOU DON'T HAVE TO WORRY ABOUT

25   WHETHER IT'S STABLE.  IT'S JUST A JOY TO USE.

1        AND SOFTWARE APPLICATIONS TRYING TO USE UNDOCUMENTED

2    METHODS TO GET INTO A PRODUCT DESTABILIZES ALL OF THAT AND

3    MAKES FOR A BAD CUSTOMER EXPERIENCE IN MY VIEW.

4    **Q.**   ALL RIGHT.  COULD YOU JUST TAKE A QUICK LOOK AT 2481?

5                    (EXHIBIT DISPLAYED TO JURY.)

6        YOU TALKED ABOUT THE USER AGREEMENT.  IS THIS A COPY OF

7    THE USER AGREEMENT THAT WOULD HAVE BEEN IN EXISTENCE IN

8    MAY 30TH, 2007, WHICH IS WHAT IS INDICATED ON THE LAST PAGE?

9    **A.**   YES, IT IS.

10   **Q.**   ALL RIGHT.

11       NOW, COUNSEL ASKED YOU ABOUT THE PRICE COMMITTEE.

12       WOULD YOU SUMMARIZE THE FACTORS THAT APPLE DID CONSIDER

13   WHEN PRICING IPODS?

14   **A.**   SURE.

15   **Q.**   THIS IS IN THE 2006 THROUGH 2009 TIME FRAME.

16   **A.**   OKAY.

17       WHAT WE CONSIDERED WAS, FIRST, THE VALUE OF WHAT WE WERE

18   CREATING FOR THE CUSTOMER.  WHAT DOES IT DO, HOW MUCH DO WE

19   THINK CUSTOMERS' WILLING TO PAY FOR THAT CAPABILITY, AND WHAT

20   OUR PRODUCT LINE LOOKED LIKE.  WE WANTED THINGS TO BE THE

21   APPROPRIATE PRICE RELATIVE TO EACH OTHER, AND WHAT GROSS

22   MARGIN CAN WE MAKE BASED ON HOW MUCH IT COST TO DELIVER ALL

23   THOSE FEATURES.  THOSE ARE THE THINGS WE THOUGHT ABOUT.

24   **Q.**   AND THE TERM "LOCK-IN" HAS BEEN USED IN THIS CASE.

25       DID APPLE HAVE A STRATEGY LOCKING IN CUSTOMERS TO THE

1    IPODS USING ITUNES FOR PURPOSES OF PRICING?

2    **A.**   NO, NOT AT ALL.

3    **Q.**   TELL ME ABOUT WHAT YOUR -- WHAT YOUR VIEW WOULD BE OF A

4    LOCK-IN STRATEGY FOR PRICING?

5    **A.**   IF -- FIRST OF ALL, IF YOU WANT TO LOCK SOMETHING IN, THE

6    BEST WAY TO DO IT IN PRICING IS TO MAKE IT AS CHEAP AS

7    POSSIBLE AND HAVE A LOT OF THEM OUT THERE.  SO I DON'T THINK

8    IT HAS ANY RELATIONSHIP TO PRICING WHATSOEVER.

9        WE BUILT A SYSTEM THAT WE HOPE CUSTOMERS LOVED AND WANTED

10   TO USE.  THAT'S HOW WE ATTRACT CUSTOMERS TO OUR PRODUCT.  AND

11   THEN WE PRICE IT AT A PRICE WE THINK IS FAIR AND PEOPLE ARE

12   WILLING TO SPEND FOR IT SO THAT WE CAN SELL A LOT.  AND THEY

13   ARE HAPPY AND WE ARE HAPPY.  AND THAT'S IT.

14       THERE'S NO IDEA OF USING ONE TECHNOLOGY TO LOCK YOU INTO

15   SOMETHING.  IT'S ABOUT OFFERING A GREAT PRODUCT AT A PRICE WE

16   THINK PEOPLE ARE WILLING TO PAY FOR IT.

17   **Q.**   AT ANY PRICE COMMITTEE MEETINGS, DID YOU TALK ABOUT

18   LOCK-IN?

19   **A.**   NEVER CAME UP.

20   **Q.**   WHAT WAS YOUR OVERARCHING STRATEGY WITH REGARDS TO PRICING

21   THE IPOD DURING 2006?

22   **A.**   WE WERE TRYING TO MAKE THE IPOD MORE AFFORDABLE AND

23   AVAILABLE TO MORE PEOPLE, WHICH IS WHY WE KEPT BRINGING OUT

24   MORE LINES LIKE IPOD SHUFFLE AND IPAD NANO TO MAKE THINGS MORE

25   AFFORDABLE.

1   **Q.**  NOW, IN 2006, WERE YOU RECEIVING THE INFORMATION ABOUT HOW

2   MANY IPOD PURCHASERS WERE BUYING THEIR FIRST IPOD?

3   **A.**  YES.

4   **Q.**  DURING THIS PERIOD, 2006 TO 2009, CAN YOU TELL US OVERALL,

5   HOW MANY IPODS OVERALL WERE GIFTS OR FIRST-TIME PURCHASES?

6   **A.**  WE -- WE ALWAYS LOOKED CLOSELY AT THIS.  WE THOUGHT ONE OF

7   THE MOST IMPORTANT THINGS IPOD DID FOR APPLE WAS TO INVITE

8   MORE PEOPLE TO TRY OUT OUR PRODUCTS AND EXPERIENCE THE

9   HARDWARE AND SOFTWARE THAT APPLE MADE.

10      AND ONE OF THE GREAT WAYS TO UNDERSTAND THAT IS TO ASK

11  THEM IN SURVEYS WHETHER THIS WAS A GIFT TO YOU OR WHETHER

12  YOU'RE A FIRST-TIME BUYER FOR YOURSELF.  AND THROUGHOUT THAT

13  PERIOD OF TIME, WE WERE TYPICALLY IN THE RANGE OF 50 PERCENT

14  OR HIGHER WERE NEW CUSTOMERS TO APPLE BECAUSE IT WAS A GIFT OR

15  THEY BOUGHT IT FOR A FIRST PRODUCT FOR THEMSELVES.

16  **Q.**  LET ME -- HOW MANY -- DURING THE SAME PERIOD OF TIME, HOW

17  MANY ITUNE SONGS ON AVERAGE WERE IPOD USERS BUYING?

18  **A.**  BUYING WAS A LOW NUMBER.  CUSTOMERS DIDN'T BUY A LOT PER

19  USER FOR THEIR ITUNES AND IPODS.

20  **Q.**  ALL RIGHT.  WOULD YOU LOOK IN YOUR BINDER AT 2241.

21          **MR. ISAACSON:**  NOT ON THE SCREEN YET, MATT.

22      UNLESS YOU HAVE NO OBJECTION TO SHOWING IT ON THE SCREEN.

23          **MS. SWEENEY:**  I'M SORRY?

24          **MR. ISAACSON:**  2241.  IT'S IN THE BINDER.

25

1   **BY MR. ISAACSON:**

2   **Q.**  IS THIS AN EMAIL YOU RECEIVED IN MARCH -- THAT YOU SENT IN

3   MARCH OF 2005 TALKING ABOUT SOME INFORMATION ABOUT SALES AND

4   WHAT -- AND WHAT WAS ON IT -- WHAT YOU WERE FINDING WAS ON

5   IPODS?

6   **A.**  YES.  THIS IS AN EMAIL I WROTE EXPLAINING THE RESULTS OF

7   SOME RESEARCH WE HAD DONE ON THE ITUNES MUSIC STORE.

8   **Q.**  WHAT DID YOU FIND OUT ABOUT HOW MUCH MUSIC WAS ON IPODS

9   FROM CD'S, FROM RIPPING CD'S?

10  **A.**  A VAST MAJORITY.  WE FOUND THAT --

11          **THE COURT:**  DO YOU HAVE AN OBJECTION ON THIS?

12          **MS. SWEENEY:**  WE OBJECT.

13          **THE COURT:**  I UNDERSTAND THAT.  IS THERE AN OBJECTION

14  TO SHOWING IT?  IS THERE AN OBJECTION TO SHOWING THE DOCUMENT?

15  I SEE YOUR OBJECTION HERE, BUT THAT DOESN'T NECESSARILY RELATE

16  TO THIS PARTICULAR --

17          **MS. SWEENEY:**  NO, WE HAVE NO OBJECTION TO SHOWING IT.

18          **MR. ISAACSON:**  THANK YOU.

19          **THE COURT:**  GO AHEAD.  SHOW THE DOCUMENT.

20              (EXHIBIT DISPLAYED TO JURY.)

21  **BY MR. ISAACSON:**

22  **Q.**  SAYS ABOUT 65 TO 75 PERCENT OF THEIR MUSIC CAME FROM

23  RIPPING CD'S AT THE BOTTOM?

24  **A.**  YES.

25  **Q.**  TELL US -- I THINK WE INTERRUPTED YOU WHEN YOU WERE

SCHILLER – DIRECT SWEENEY

1    EXPLAINING THAT.

2    **A.**   YES.  I WAS EXPLAINING THAT WE LOOKED AT HOW MUCH MUSIC

3    CUSTOMERS HAD IN THEIR ITUNES MUSIC LIBRARY AND ON THEIR

4    IPODS, AND HOW MUCH OF THAT CAME FROM PURCHASES IN THE STORE

5    TO MAKE A CORRELATION BETWEEN THE TWO.

6    **Q.**   ALL RIGHT.  AND LISTENING TO THE MUSIC AT THE GYM IS QUITE

7    SMALL FOR THE FRENCH.

8         THAT WASN'T A REFERENCE TO MR. FARRUGIA, WAS IT?

9    **A.**   NO, SIR, IT WASN'T.

10   **Q.**   NOW, FROM 2000 -- YOU MENTIONED RIPPING.  FROM 2006 TO

11   2009, DID COMPUTERS HAVE CD BURNERS BUILT IN?

12   **A.**   YES.

13   **Q.**   DID YOU BURN AND RIP YOURSELF?

14   **A.**   YES.  OF COURSE.

15   **Q.**   ALL RIGHT.  PLEASE EXPLAIN THE PROCESS AT THAT PERIOD WHEN

16   YOU HAVE IT BUILT INTO YOUR COMPUTER.

17   **A.**   THE WAY THAT THINGS -- MAYBE EVERYONE WILL REMEMBER BACK

18   THEN HOW WE ALL USED TO DO IT.

19        WE HAD CD'S THAT WE LISTENED TO IN OUR CD PLAYERS AND OUR

20   CARS, AND THEN ONCE WE STARTED TO BE ABLE TO PUT MUSIC ON OUR

21   COMPUTERS IN APPLICATIONS LIKE ITUNES, YOU WOULD TAKE YOUR CD,

22   PUT IT IN THE CD DRIVE, AND ITUNES HAD TECHNOLOGY BUILT RIGHT

23   IN TO READ THE INFORMATION OF THE SONGS OFF THE CD INTO YOUR

24   COMPUTER.  THAT'S CALLED RIPPING.  SO NOW YOU HAVE BROUGHT

25   YOUR MUSIC INTO YOUR LIBRARY.

1        YOU CAN THEN REARRANGE IT AND MAKE PLAYLISTS OR HOWEVER

2   YOU WANT TO LISTEN TO YOUR MUSIC.  AND THEN YOU CAN PUT A

3   BLANK NEW CD IN YOUR DRIVE AND BURN THAT PLAYLIST ONTO YOUR CD

4   AND LISTEN TO IT AGAIN IN YOUR CAR OR WHEREVER YOU ARE GOING.

5   AND THAT'S RIP, MIXING, AND BURNING AS WE CALLED IT.

6   **Q.**  IN THIS PERIOD OF 2006, 2009 WHAT COMPETITOR DEVICES TO

7   THE IPOD WERE THERE FOR PORTABLE MUSIC PLAYERS?

8   **A.**  THERE WERE MANY.

9   **Q.**  PORTABLE DIGITAL MUSIC PLAYERS.

10  **A.**  THERE WERE MANY MP3 PLAYERS, PORTABLE DIGITAL MUSIC

11  PLAYERS IN THE MARKETPLACE.

12  **Q.**  CAN YOU NAME SOME OF THEM?

13  **A.**  SONY HAD SOME PLAYERS OUT THERE.  MICROSOFT HAD PLAYERS.

14  CREATIVE LABS HAD PLAYERS.  THERE WERE MANY.

15  **Q.**  HOW OFTEN WERE NEW ONES CROPPING UP?

16  **A.**  IT SEEMED EVERY DAY.

17  **Q.**  LET ME ASK YOU IF YOU RECOGNIZE ONE DEVICE.

18          **THE COURT:**  ASK HIM IF RECOGNIZES WHAT?

19          **MR. ISAACSON:**  A DEVICE.

20          **MS. SWEENEY:**  OBJECT.

21          **THE COURT:**  WHAT NUMBER DO YOU HAVE AFFILIATED WITH

22  THAT?

23          **MR. ISAACSON:**  I AM SORRY.  THIS IS 2440.

24          **THE COURT:**  HOLD ON.

25          **MS. SWEENEY:**  NO, IT'S NOT.

1          **THE COURT:**  I'VE GOT AN OBJECTION.

2          **MR. ISAACSON:**  I THINK THE OBJECTION IS FOUNDATION,

3     WHICH I NEED TO LAY.

4          **THE COURT:**  I DON'T KNOW WHAT THE OBJECTION IS.

5     PERHAPS YOU ARE RIGHT, MR. ISAACSON.

6          **MS. SWEENEY:**  WHAT IS THE EXHIBIT NUMBER?

7          **THE COURT:**  2440.

8          **MS. SWEENEY:**  IT SAYS "EMAIL".

9          **MR. ISAACSON:**  I AM SORRY.  I SAID THE WRONG NUMBER.

10    2705.  I APOLOGIZE.

11         **THE COURT:**  WHAT IS THE OBJECTION?

12         **MS. SWEENEY:**  IT'S FOUNDATION AND IT'S ALSO -- I

13    THINK THIS IS ONE OF THE DEVICES WE DON'T KNOW WHERE IT CAME

14    FROM, AND IT'S NOT ONE OF THE DEVICES INVOLVED IN THE ACTION.

15         **THE COURT:**  THE OBJECTION IS OVERRULED AT THIS POINT.

16    WE HAVE NO QUESTIONS PENDING, SO I CAN'T EVALUATE IT.

17              (EXHIBIT HANDED TO WITNESS.)

18    **BY MR. ISAACSON:**

19    **Q.**  DO YOU RECOGNIZE THAT DEVICE?

20    **A.**  YES, I DO.

21    **Q.**  WHY DO YOU RECOGNIZE THAT DEVICE?

22    **A.**  IT WAS QUITE -- QUITE NEWSWORTHY AT THE TIME.  BACK THEN

23    IT WAS MICROSOFT'S FORAY INTO MAKING A DIGITAL MUSIC PLAYER AS

24    WELL.  IT'S CALLED THE MICROSOFT ZUNE.

25    **Q.**  DID YOU LOOK AT ZUNES DURING THAT PERIOD OF TIME?

1  **A.**  YES.

2          **MR. ISAACSON:**  ALL RIGHT.  I WOULD LIKE TO USE IT.

3  THIS IS A DEMONSTRATIVE EXHIBIT AT THIS POINT.

4          **THE COURT:**  YOU CAN USE IT AS A DEMONSTRATIVE.

5  BY MR. ISAACSON:

6  **Q.**  ALL RIGHT.

7     YOU WEREN'T FOND OF THE ZUNE AS A PRODUCT, WERE YOU?

8  **A.**  NO, SIR.

9  **Q.**  BUT YOU SAW A LOT OF THEM?

10  **A.**  I SAW THEM BECAUSE WE LOOKED AT THEM.  I DON'T THINK I SAW

11  A LOT SOLD IN THE MARKETPLACE.

12  **Q.**  DID ZUNE ENTER THE MARKETPLACE AROUND 2006 TO COMPETE WITH

13  YOU?

14  **A.**  YES, IT DID.

15  **Q.**  WHO WAS MAKING THE ZUNE?

16  **A.**  MICROSOFT.

17  **Q.**  WHAT WAS THE IMPORTANCE TO APPLE THAT MICROSOFT WAS

18  INTRODUCING IN 2006 A DIGITAL MUSIC PLAYER?

19  **A.**  IT WAS FASCINATING BECAUSE THIS WAS A MAJOR SHIFT IN

20  STRATEGY FOR MICROSOFT.

21     MICROSOFT HAD AT FIRST ATTACKED OUR BUSINESS MODEL

22  PUBLICLY SAYING THAT WE WERE DOING THE WRONG THING WITH IPOD

23  AND ITUNES, THAT THEY HAD A DIFFERENT STRATEGY CALLED PLAYS

24  FOR SURE, WHERE THEIR SOFTWARE WOULD RUN ON MANY COMPANIES'

25  PRODUCTS AND THAT THAT'S A BETTER BUSINESS MODEL THAN APPLE'S

1  MODEL TO DO IT OURSELVES, AND THAT THAT WAS LIKE WINDOWS

2  VERSUS MAC.

3      THEN THEY FOLLOW IT UP WHEN THAT DIDN'T WORK FOR THEM WITH

4  DOING A SIMILAR MODEL TO APPLE; THEIR OWN MUSIC PLAYER, WITH

5  THEIR OWN MUSIC STORE, THEIR OWN MUSIC SOFTWARE, THEIR OWN

6  MEDIA ARCHITECTURE.

7  **Q.**  SO THEY SHIFTED FROM THEIR LICENSING STRATEGY TO AN

8  INTEGRATED SYSTEM AND OFFERED A PORTABLE DIGITAL MUSIC PLAYER

9  IN 2006; IS THAT WHAT HAPPENED?

10  **A.**  YES.  I SAW THIS AS VALIDATION FROM MICROSOFT THAT WE WERE

11  DOING IT THE RIGHT WAY FOR CUSTOMERS.

12  **Q.**  LET ME ASK YOU TO LOOK AT 2451.

13      **MR. ISAACSON:**  CAN WE PUT THIS ON THE SCREEN?

14          (EXHIBIT DISPLAYED TO JURY.)

15  **BY MR. ISAACSON:**

16  **Q.**  THIS IS AT THE TOP.  THIS IS JANUARY 2007.  THIS IS AN

17  EMAIL TO MR. JOBS AS WELL AS YOU AND OTHER INDIVIDUALS.  AND

18  IT TALKS ABOUT ZUNE NUMBERS BEING RELEASED.

19      WHAT WAS HAPPENING WITH THE ZUNE DURING THIS PERIOD?

20  **A.**  YES.  THIS IS AN EMAIL WHERE WE WERE WATCHING TO SEE HOW

21  PEOPLE WOULD RESPOND TO IT AND ACCEPT IT.  AND THERE WERE --

22  THEY JUMPED TO NUMBER 2 IN THE CATEGORY, AS THE EMAIL STATES,

23  DURING THIS PERIOD OF TIME.

24  **Q.**  LET'S GO TO THAT EARLIER MICROSOFT HISTORY THEN THAT YOU

25  WERE TALKING ABOUT.

1           CAN WE LOOK AT 2183?

2                     (EXHIBIT DISPLAYED TO JURY.)

3    **A.**   OKAY.

4    **Q.**   NOW THIS IS -- THIS SHOWS THE TOP, NOT THE ARTICLE AT THIS

5    POINT.

6           NOW, THIS 2183 IS AN EMAIL FROM MR. JOBS TO YOU IN

7    NOVEMBER 14TH, 2004.  SO WE HAVE GONE BACK A COUPLE OF YEARS.

8           AND IN THE MIDDLE, YOU HAVE WRITTEN AN EMAIL AFTER THERE

9    WAS A *NEW YORK TIMES* STORY.  THERE WAS A *NEW YORK TIMES* STORY

10   CALLED "GATES V. JOBS, THE RE-MATCH."

11          THIS WAS AN ARTICLE ABOUT APPLE'S STRATEGY WITH THE IPOD

12   AND MICROSOFT'S STRATEGY WITH PLAYS FOR SURE, IT'S DRM

13   SOFTWARE.

14          IS THAT AN ACCURATE SUMMARY?

15   **A.**   YES.

16   **Q.**   THIS WAS -- IT WAS PRINTED IN CNET.  AND SO YOU SAY,

17   "INTERESTING CNET.  LOTS OF THE SAME REFRAINS AND MISTAKES."

18          THERE'S SOME QUOTES FROM MR. GATES.  AND WAS MR. GATES

19   BULLISH ABOUT THEIR PROSPECTS OF DEFEATING YOU IN COMPETITION?

20   **A.**   YES, VERY MUCH SO.

21   **Q.**   I THINK AT THE CONCLUSION ON PAGE 8 OF 8, MR. GATES IS

22   QUOTED A SAYING:

23               "APPLE'S ALWAYS BEEN A HARDWARE COMPANY.  I THINK

24               APPLE WILL DO THINGS THE APPLE WAY AND MICROSOFT WILL

25               DO THINGS THE MICROSOFT WAY.  I'D SAY THE LONG-TERM

1          FACTORS ALL FAVOR OUR APPROACH."

2     YOU UNDERSTOOD THAT MICROSOFT WAS GOING TO BE COMPETING

3   WITH YOU IN THIS MARKET, RIGHT?

4   **A.**  YES.

5   **Q.**  AND MR. JOBS SAYS, IN RESPONSE TO YOUR EMAIL:

6          "THEY CAN'T BEAT US ON PRODUCT, SO THEY ARE TRYING TO

7          SHIFT THE BATTLEGROUND TO STRATEGY."

8     CAN YOU PLEASE EXPLAIN WHAT YOU UNDERSTOOD MR. JOBS TO

9   MEAN?

10  **A.**  YES.  THAT THERE WASN'T A GOOD OFFERING IN THE MARKET, IN

11  OUR OPINION, COMBINING THIS PLAY FOR SURE SOFTWARE AND OTHER

12  PEOPLE'S MUSIC PLAYER HARDWARE.  AND SO RATHER THAN ARGUE

13  ABOUT WHO HAS THE BEST PRODUCT, THEY WERE ON A PRESS TOUR

14  TRYING TO CONVINCE PEOPLE THAT THEY HAD A BETTER LONG-TERM

15  STRATEGY BECAUSE THEY COULDN'T REALLY CONVINCE PEOPLE THEY HAD

16  A BETTER PRODUCT.

17  **Q.**  HOW DOES THIS RELATE TO THE CONVERSATION WE HAD ABOUT

18  WHETHER THE IPOD SHOULD OFFER A COMPUTER EXPERIENCE?

19  **A.**  IT RELATES COMPLETELY.  THEY WERE CREATING A MORE

20  COMPLICATED SOFTWARE EXPERIENCE WITH -- WITH OPERATING SYSTEMS

21  AND API'S FOR DEVELOPMENT THAT IN THE END MADE PRODUCTS THAT

22  DIDN'T WORK AS WELL.  WE WERE FOCUSED ON A MUCH MORE CONSUMER

23  ELECTRONIC PRODUCT THAT WAS COMPLETELY INTEGRATED AND WE

24  THOUGHT DELIVERED A BETTER EXPERIENCE FOR CUSTOMERS.

25  **Q.**  ALL RIGHT.

1          AND LET ME ASK YOU TO LOOK AT 2082.

2                    (EXHIBIT DISPLAYED TO JURY.)

3          THIS IS AN EMAIL YOU WROTE, AGAIN, IN THIS 2004 PERIOD.

4     THIS IS TO MR. JOBS AND OTHERS.  AND HERE YOU ARE DISCUSSING

5     THE MICROSOFT DRM AND APPLE'S DRM AND INTEGRATED SYSTEM; IS

6     THAT CORRECT?

7     **A.**  YES.

8     **Q.**  ALL RIGHT.

9          AND YOU TITLE THE EMAIL "ACHILLES HEEL"?

10         IN THE FOURTH PARAGRAPH YOU SAY:

11              "SINCE ONLY APPLE HAD TO WORRY ABOUT GETTING

12              EVERYTHING RIGHT FROM THE START, WE HAVE OUR OWN

13              ONLINE STORE, JUKEBOX APPLICATION, COMPUTER SYSTEMS,

14              PORTABLE PLAYERS, ET CETERA.  WE TOOK THE TIME TO

15              DEVISE THE RIGHT SCHEME, ONE THAT WORKS NOW AND INTO

16              THE FUTURE."

17         WOULD YOU EXPLAIN WHAT YOU MEANT BY THAT?

18    **A.**  YES.

19         BECAUSE WE HAD TO MAKE THE WHOLE SOLUTION WORK END TO END,

20    WE TOOK THE TIME TO CRAFT IT SO THAT IT WOULD DO WHAT WE

21    THOUGHT CUSTOMERS WOULD WANT FOR MANY, MANY YEARS.

22         FOR EXAMPLE, ONE OF THE THINGS I CARE DEEPLY ABOUT IS IF

23    THIS IS OUR FUTURE FOR HOW WE WILL GET MUSIC, INSTEAD OF CD'S,

24    WE ARE NOT GOING TO GET THEM DIGITALLY, IS THAT YOU WANT THE

25    MUSIC TO PLAY ON YOUR DEVICE FOR YEARS, AND YEARS, AND YEARS

1    TO COME, YOU WANT TO COUNT ON IT AS BEING WELL-THOUGHT OUT.

2    EVEN IF YOUR COMPUTER CHANGES, YOU GET A NEW IPOD, IT SHOULD

3    ALWAYS CONTINUE TO WORK.  AND WE THOUGHT THAT THROUGH AND

4    DEVISED AN ARCHITECTURE THAT ACTUALLY DELIVERED THAT.

5         AND AS I WAS EXPRESSING IN THIS EMAIL, AS I LEARNED MORE

6    ABOUT HOW MICROSOFT'S STRATEGY WORKED WITH THEIR TECHNOLOGY,

7    IT ACTUALLY DIDN'T DO THAT.  THE ENCODING AND ENCRYPTION IN

8    THE SONGS WOULDN'T PLAY ON A FUTURE DEVICE YOU BOUGHT.

9         SO I THOUGHT THEY HAD APPROACHED IT WRONG, AND OUR

10   INTEGRATED APPROACH WAS DEEPLY THOUGHT ABOUT AND WOULD WORK

11   FOR A LONG TIME.

12             **MR. ISAACSON:**  JUST ONE SECOND.

13        THANK YOU, MR. SCHILLER.  I HAVE NO MORE QUESTIONS.

14             **THE WITNESS:**  THANK YOU.

15             **THE COURT:**  ALL RIGHT.  REDIRECT?

16                     **REDIRECT EXAMINATION**

17   **BY MS. SWEENEY:**

18   **Q.**  MR. SCHILLER, YOU TALKED ABOUT HOW IPOD OWNERS USE THEIR

19   IPODS, AND YOU SAID THAT THE NUMBER OF ITUNE SONGS PER IPOD

20   WAS NOT THAT HIGH.

21        NOW, IT'S TRUE, ISN'T IT, THAT SOME IPOD USERS PUT A LOT

22   OF CD'S ONTO THEIR IPODS WHEREAS OTHERS MAY PUT A LOT OF

23   ITUNES ONTO THEIR IPODS; ISN'T THAT RIGHT?

24   **A.**  I DON'T KNOW THAT THAT WAS THE CASE AT THE TIME.

25        AS YOU SAW FROM THAT EMAIL, WE SUMMARIZED WHAT WE HAD

1   LEARNED FROM THE RESEARCH.  AND THE RESEARCH LOOKED ACROSS A

2   LARGE NUMBER OF PEOPLE AND REPORTED BACK WHAT WE SAW, WHICH

3   WAS A SMALL NUMBER OF SONGS FROM THE ITUNES STORE PER USER.

4       WE DIDN'T HAVE RESEARCH THAT SAID CONVERSELY WHAT YOU WERE

5   JUST SAYING, THAT THERE WERE A LOT OF ITUNE SONGS ON AN

6   INDIVIDUAL USER'S SYSTEM.  THAT WASN'T WHAT THE RESEARCH

7   SHOWED US.

8   **Q.**  SO YOU COULDN'T TELL FROM THE KIND OF DATA THAT YOU HAD;

9   IS THAT RIGHT?

10  **A.**  THAT'S NOT WHAT THIS RESEARCH SHOWED.

11  **Q.**  OKAY.

12      AND YOU TALKED ABOUT DVD JON.  AND YOU'RE AWARE, AREN'T

13  YOU, THAT THE DVD JON HACK HAD TO DO WITH STRIPPING DRM FROM

14  THE SONG; IS THAT RIGHT?

15  **A.**  I DON'T KNOW THE SPECIFICS ABOUT WHAT DVD JON'S HACK WAS.

16  **Q.**  YOU KNOW THAT HARMONY DID NOT STRIP DRM FROM SONGS, RIGHT?

17  **A.**  I DON'T KNOW THAT IT DID NOT DO THAT IN THE PROCESS OF

18  CREATING ITS FAIRPLAY WRAPPER ON IT.  IT MAY HAVE STRIPPED

19  DRM.  I DON'T KNOW.

20  **Q.**  WELL, YOU KNOW THAT THE SONG -- THAT THE BUYER LEGALLY

21  PURCHASED FROM REALNETWORKS AND THEN WHEN IT PLAYED ON THE

22  IPOD WAS DRM PROTECTED.

23  **A.**  I DON'T KNOW THAT.  I DIDN'T USE REAL SOFTWARE OR STUDIED

24  HOW IT WORKED.

25  **Q.**  YOU TALKED ABOUT THE KINDS OF FACTORS THAT THE PRICE

SCHILLER – REDIRECT / SWEENEY

1   COMMITTEE TAKES INTO ACCOUNT.  AND WE WERE GOING THROUGH SOME

2   OF THOSE DOCUMENTS YOU -- YOU -- YOU AGREED THAT SOME OF THE

3   INFORMATION THAT WAS IN THOSE IS TAKEN INTO ACCOUNT, FOR

4   EXAMPLE, THE COMPETING PRODUCTS, RIGHT?

5   **A.**  YES.  AS I EXPLAINED, WE WOULD SELECT OUR PRICES AND THEN

6   COMPARE THAT TO SAMPLE PRODUCTS IN THE MARKET TO UNDERSTAND

7   WHAT THE PRICES WE WERE PICKING LOOKED LIKE AGAINST OTHER

8   PRODUCTS.

9   **Q.**  OKAY.

10      AND THOSE SAMPLE PRODUCTS FROM THE MARKET THAT YOU LOOKED

11  AT DURING THE PERIOD 2006, 2009 WHEN YOU WERE PRICING IPODS,

12  WERE ALL PORTABLE DIGITAL MEDIA PLAYERS, CORRECT?

13  **A.**  YES.

14  **Q.**  OKAY.

15      AND YOU SAID THAT DURING THE PERIOD 2006, 2009, THAT

16  50 PERCENT OR MORE OF THE IPODS SOLD WERE FIRST-TIME PURCHASES

17  OR GIFTS.

18      NOW, ARE YOU FAMILIAR WITH THE STATISTIC THAT THE

19  REPLACEMENT RATE FOR IPODS AND SIMILAR PORTABLE DIGITAL

20  PLAYERS IS ON AVERAGE AROUND 18 TO 24 MONTHS?

21  **A.**  NO, I AM NOT FAMILIAR WITH THAT STATISTIC.

22  **Q.**  AND YOU ALSO TALKED ABOUT BURNING AND RIPPING.  DO YOU

23  RECALL THAT TESTIMONY?

24  **A.**  YES.

25  **Q.**  AND YOU ALSO TALKED ABOUT THE EARLY DAYS OF THE IPOD.

1   DO YOU REMEMBER A CAMPAIGN THAT APPLE LAUNCHED IN 2002

2   CALLED RIP, MIX, AND BURN?

3   **A.**   ABSOLUTELY.

4   **Q.**   DO YOU REMEMBER THAT EISNER FROM DISNEY CRITICIZED THAT

5   CAMPAIGN SAYING THAT APPLE WAS ENCOURAGING THEFT?

6   **A.**   I BELIEVE THERE WERE SOME STATEMENT MADE AND I BELIEVE WE

7   ALSO CLARIFIED THAT THAT'S NOT THE CASE AT ALL.

8   **Q.**   IN FACT, MR. JOBS IN RESPONSE SAID, THAT IF YOU BUY YOUR

9   OWN MUSIC LEGALLY, YOU SHOULD BE ABLE TO PLAY IT ON ANY DEVICE

10  YOU WANT, RIGHT?

11  **A.**   I DON'T RECALL THE STATEMENTS MADE AT THAT TIME.

12  **Q.**   DON'T YOU THINK THAT IF YOU BUY YOUR MUSIC LEGALLY, YOU

13  SHOULD BE ABLE TO PLAY IT ON ANY DEVICE YOU WANT?

14  **A.**   I THINK THAT'S AN OVERLY GENERAL STATEMENT.

15      I THINK YOU BUY SOMETHING AND IF IT HAS RIGHTS WITH IT, IT

16  TELLS YOU WHAT YOU CAN DO WITH IT.  AND THOSE ARE THE THINGS

17  YOU CAN DO WITH IT.  AND SOMETIMES IT ALLOWS YOU TO USE THINGS

18  ON MANY TECHNOLOGIES AND SOMETIMES IT DOESN'T.

19      FOR EXAMPLE, WHEN I BUY A VHS MOVIE, I EXPECT I CAN PLAY

20  IT WITHIN A VHS PLAYER.  I DON'T EXPECT I CAN PLAY WITH IT IN

21  A DVD PLAYER.  I HAVE HAD TO BUY THE SAME MOVIE OVER AND OVER

22  FOR DIFFERENT FORMATS.

23      SO I THINK IT'S NORMAL TO EXPECT THAT YOU BUY SOME CONTENT

24  WITH THE RIGHTS TO USE IT ON WHAT YOU PLANNED ON USING IT ON,

25  AND THAT'S WHAT YOU -- THAT'S WHAT YOU CAN DO.

SCHILLER – REDIRECT / SWEENEY

1   **Q.**  WELL, YOU -- YOU TALKED ABOUT THE IPOD AND THE ITUNES AND

2   THE ITUNES STORE BEING AN INTEGRATED SYSTEM.

3       NOW, ISN'T IT TRUE THAT YOU COULD HAVE MADE THAT

4   INTEGRATED SYSTEM WHERE USERS COULD STAY WITHIN THAT SYSTEM IF

5   THEY CHOSE, BUT YOU COULD ALSO HAVE A SYSTEM WHERE APPLE COULD

6   DESIGN THOSE THREE COMPONENTS TO WORK TOGETHER, TO WORK

7   SEEMLESSLY TOGETHER, AS YOU SAY, AND YET GIVE CONSUMERS THE

8   CHOICE TO PURCHASE COMPONENTS OF THAT SYSTEM FROM OTHER

9   VENDORS.  THAT WOULD BE POSSIBLE, WOULDN'T IT?

10  **A.**  NOT TO MY KNOWLEDGE.  AGAIN, IT WAS A QUESTION WE

11  DISCUSSED.  I THINK THERE'S AN EMAIL ALREADY SHOWN WHERE I

12  ASKED ABOUT THAT.  BUT IN THE EXPERIENCE OF THE TEAM, THAT

13  WOULDN'T BE FEASIBLE OR WORK WELL.

14  **Q.**  WELL, YOU, AT APPLE, DECIDED YOU DIDN'T WANT TO DO IT, BUT

15  IT WAS POSSIBLE; ISN'T THAT RIGHT?

16  **A.**  I DON'T KNOW THAT'S THE CASE.  THE OTHER EXAMPLES I'VE

17  SEEN IN THE INDUSTRY THAT ATTEMPTED TO DO THAT DID NOT WORK

18  WELL.

19  **Q.**  AND YOU SAID THAT WE'RE TAKING RESPONSIBILITY, I THINK

20  THOSE WERE THE WORDS YOU USED WHEN YOU WERE TALKING ABOUT WHY

21  APPLE DECIDED NOT TO MAKE ITS PRODUCTS INTEROPERABLE.

22      AND THE CONSUMER WHO HAS LEGALLY PURCHASED SONGS FROM

23  REALNETWORKS OR ANOTHER COMPANY THAT HAS FIGURED OUT A WAY TO

24  KEEP THE SONGS DRMED AND PUT THEM ON THE IPOD, YOU'RE TAKING

25  RESPONSIBILITY FROM THAT CONSUMER SO THAT THAT CONSUMER CAN'T

1  MAKE THE CHOICE; ISN'T THAT RIGHT?

2  **A.**  NO.  NOT -- THAT'S NOT HOW I LOOK AT IT AT ALL.

3  **Q.**  OKAY.  SO THE CONSUMER THEN CAN'T PLAY THOSE SONGS ON THE

4  IPOD, AND THAT'S JUST THE CONSUMER'S MISTAKE; IS THAT RIGHT?

5  IS THAT YOUR POSITION?

6  **A.**  NO.  MINE IS THAT REAL KNOWINGLY CREATED A METHOD TO WORK

7  AROUND APPLE'S RIGHTS MANAGEMENT SYSTEM.  REAL SOLD MUSIC TO

8  CUSTOMERS KNOWING THAT THEY HAD DONE THAT WITHOUT PROGRAMMING

9  INTERFACES, ANY SDK, ANY DOCUMENTATION, ANY LICENSE, AND THEN

10  THEY DID THAT KNOWING THAT IT MAY NOT KEEP WORKING FOR THE

11  CUSTOMER.

12      SO, ULTIMATELY, IT'S REAL WHO SHOULD HAVE TAKEN

13  RESPONSIBILITY TO BUILD A SYSTEM THAT THE CUSTOMER COULD USE

14  THAT WOULD BE EASY TO USE AND RELIABLE, AND DESIGNED FOR THE

15  LONG TERM.  AND I THINK THEY KNOWINGLY DIDN'T DO THAT, WHICH

16  IS HOW I DESCRIBED HOW WE CREATED OUR PRODUCTS.

17      SO I REALLY THINK IF YOU WANT TO TALK ABOUT

18  RESPONSIBILITY, THE RESPONSIBILITY TO DEVELOP A SYSTEM THAT

19  WORKS AS THE CUSTOMER EXPECTS, SHOULD BE ON THE COMPANY WHO

20  CREATES THAT PRODUCT.  IN THIS CASE, IT'S REAL, NOT APPLE.

21  **Q.**  LET ME ASK YOU ABOUT THE -- YOU DESCRIBED A BAD CUSTOMER

22  EXPERIENCE.  BUT ISN'T IT A BAD CUSTOMER EXPERIENCE FOR

23  SOMEONE WHO HAS LEGALLY PURCHASED A SONG AND USED TO BE ABLE

24  TO PLAY THAT SONG ON HER IPOD AND NO LONGER CAN BECAUSE APPLE

25  HAS IMPLEMENTED CODE IN THE SOFTWARE CALLED KVC?

1      ISN'T THAT A BAD EXPERIENCE NOT TO BE ABLE TO PLAY A SONG

2   THAT YOU PURCHASED?

3   **A.**  FIRST OF ALL, I DON'T KNOW WHAT KVC IS, SO I DON'T WHAT

4   THAT TECHNOLOGY IS.

5   **Q.**  I'M SORRY.  LET ME EXPLAIN.

6      IT'S KEYBAG VERIFICATION CODE.  IT'S THE CODE IN THE 7.0

7   THAT PREVENTED PLAYBACK, DIRECT PLAYBACK OF SONGS PURCHASED

8   FROM THE REALNETWORKS STORE ON IPODS.

9   **A.**  SO, AGAIN, AS I SAID BEFORE, IF REAL FOUND A WAY TO

10   REVERSE ENGINEER OR GET AROUND A SYSTEM AND SOLD PRODUCTS

11   WITHOUT PROPER SUPPORT ON THAT SYSTEM, I ULTIMATELY THINK

12   THEY'RE (SIC) RESPONSIBILITY FOR THAT ACTION.  OUR JOB AT

13   APPLE IS TO DELIVER A PRODUCT THAT WORKED AS WE PROMISED

14   CUSTOMERS, THAT WORKED RELIABLY, THAT -- THAT DID WHAT THE

15   CUSTOMER WAS PROMISED, AND WOULD CONTINUE TO DO THAT, AND WE

16   DID THAT.

17      WE HAD NO RESPONSIBILITY OF WHAT REAL WAS DOING.  THEY DID

18   THAT ON THEIR OWN.  AND THEY ARE THE ONES THAT, I THINK,

19   ULTIMATELY LET CUSTOMERS DOWN WITH THE PRODUCT THEY CREATED.

20   **Q.**  NOW YOU TALKED ABOUT THE INITIAL RESPONSE TO THE IPOD, THE

21   FIRST IPOD.

22      NOW, ARE YOU -- DO YOU KNOW WHAT THE MARKET SHARE WAS AT

23   THE END OF THE FIRST YEAR OF THE IPOD BEFORE THE ITUNES STORE

24   WAS LAUNCHED?

25   **A.**  I DON'T RECALL SPECIFICALLY, BUT THE MARKET WAS JUST

1  BEGINNING.  SO I -- I DON'T THINK MARKET SHARES IS A REALLY

2  GOOD METRIC AT THE BEGINNING OF A MARKET THAT DIDN'T EXIST.

3  **Q.**  AND YOUR TESTIMONY ABOUT REALNETWORKS, YOU SAID THAT THE

4  MUSIC COMPANIES MIGHT GET UPSET AND MIGHT CUT OFF APPLE'S

5  SUPPLY OF MUSIC.

6     WERE YOU AWARE THAT THE MUSIC COMPANIES THEMSELVES SAID

7  THEY WERE OKAY WITH HARMONY AND THAT MANY OF THEM ACTUALLY

8  ENDORSED HARMONY PUBLICLY?

9  **A.**  I DIDN'T WORK AT ALL WITH THE MUSIC COMPANIES.  I HAD NO

10  COMMUNICATION WITH THEM.  I DON'T KNOW WHAT THEY THOUGHT AND

11  HOW THEY APPROACHED IT.

12  **Q.**  AND WERE YOU FAMILIAR WITH THE COMPANY CALLED NAVIO THAT

13  ALSO DEVELOPED A PROGRAM SIMILAR TO HARMONY?

14  **A.**  NO, I DON'T RECALL THAT COMPANY.

15         **MS. SWEENEY:**  NO FURTHER QUESTIONS.

16         **THE COURT:**  REDIRECT (SIC) LIMITED TO THE SCOPE OF

17  RECROSS (SIC)?

18         **MR. ISAACSON:**  I'M DELIGHTED TO SAY WE HAD LEEWAY FOR

19  ANOTHER 15 OR 20 MINUTES, BUT I THINK I ONLY NEED THREE, IF

20  THAT'S OKAY.

21                    **RECROSS-EXAMINATION**

22  BY MR. ISAACSON:

23  **Q.**  YOU WERE ASKED ABOUT ADVERTISING RELATING TO RIP, MIX, AND

24  BURN.  I WOULD LIKE TO CLARIFY WHAT THAT WAS.

25     AND WE HAVE A PLAINTIFFS' EXHIBIT THAT I CAN SHOW YOU THAT

1   EXPLAINS, AND MAYBE THIS WILL CLARIFY IT FOR THE JURY.

2          **MR. ISAACSON:**  MATT, WOULD YOU PLAY TX880.

3      (EXHIBIT (VIDEO) PLAYED ON SCREEN AND NOT REPORTED.)

4   **BY MR. ISAACSON:**

5   **Q.**  WHAT WAS RIP, MIX, AND BURN IN THAT ADVERTISEMENT?

6   **A.**  IT WAS AN AD TO EDUCATE PEOPLE ABOUT THE IDEA THAT THEY

7   CAN TAKE THEIR CD'S, IF YOU LOOK CLOSELY, THE YOUNG MAN IN THE

8   AUDIENCE IS ACTUALLY HOLDING HIS OWN CD CASES OF ORIGINAL CD'S

9   HE BOUGHT, AND YOU COULD PUT THEM ON YOUR COMPUTER, MIX THEM

10  IN WHATEVER WAY YOU WANTED, AND RE-BURN THEM TO A CD TO LISTEN

11  TO.  AND YOU EVEN HEARD AN ARTIST SAY, "IT'S YOUR MUSIC."

12      SO -- AND IT SHOWED THAT WE HAD THE SUPPORT OF THE MUSIC

13  COMMUNITY THERE BECAUSE SO MANY OF THEM JOINED US IN TALKING

14  ABOUT THAT.

15         **MR. ISAACSON:**  THANK YOU VERY MUCH, SIR.

16         **THE COURT:**  THANK YOU.

17         **THE WITNESS:**  THANK YOU.

18         **THE COURT:**  ANY REDIRECT ON THAT ONE TOPIC?

19         **MS. SWEENEY:**  NO, YOUR HONOR.

20         **THE COURT:**  ALL RIGHT.  MR. SCHILLER, THEN YOU ARE

21  EXCUSED.

22         **THE WITNESS:**  THANK YOU.

23         **THE COURT:**  YOU'RE WELCOME.

24      OKAY.  LADIES AND GENTLEMEN, THAT'S -- ACTUALLY, BEFORE

25  YOU LEAVE, DID YOU HAVE ANY QUESTIONS BEFORE HE WALKS OUT THE

1    DOOR?

2        NO?  OKAY.  I DIDN'T THINK SO.  OTHERWISE I WOULD HAVE

3    SEEN A HAND WAVING.

4        THAT'S FINE.  NO QUESTIONS.

5        OKAY.  ARE YOU READY TO GO HOME?

6            **JURORS:**  (NOD)

7            **THE COURT:**  THEY'RE LONG DAYS.  LONGER THAN YOU

8    THINK.  I DON'T GIVE YOU A LONG BREAK.  THE ONLY GOOD THING

9    ABOUT THAT IS WHEN I WAS IN STATE COURT AND WE WOULD GO ALL

10   DAY, I WOULD HAVE TO TAKE, BECAUSE THE WORK RULES WERE

11   DIFFERENT IN STATE COURT, WE HAD TO TAKE THESE HOUR AND A HALF

12   LUNCHES.  THE PROBLEM WAS, THE JURORS, THEY ALL GET TO KNOW

13   EACH OTHER, RIGHT BY CHINATOWN, AND THEY WOULD GO EAT THESE

14   HUGE LUNCHES.  SO AT ABOUT 2:00 O'CLOCK, ALL MY JURORS WERE

15   TAKING NAPS BECAUSE THEY HAD THESE HUGE LUNCHES.  WITH YOU

16   GUYS, THAT DOESN'T HAPPEN.  YOU BARELY HAVE ANY TIME TO EAT.

17       REMEMBER, DO NOT COMMUNICATE ABOUT THIS CASE WITH ANYONE

18   ABOUT ANY TOPIC.  DO NOT DO ANY RESEARCH.  DO NOT DO ANY

19   INVESTIGATION.  ENJOY YOUR AFTERNOON.  AND WE WILL SEE YOU

20   AGAIN TOMORROW.  WE WILL START AS SOON AS YOU GET HERE ABOUT

21   8:30.  THANK YOU.

22       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

23           **THE COURT:**  THE RECORD WILL REFLECT THAT THE JURY HAS

24   LEFT THE COURTROOM.  I AM GOING TO NEED, MR. ISAACSON, A

25   TRANSCRIPT OF THAT VIDEO THAT WAS PLAYED SO THAT IT CAN BE

```
 1    DELIVERED TO THE COURT REPORTER.

 2        I WAS NOT ANTICIPATING THAT.

 3            MR. ISAACSON:  I WAS NOT ANTICIPATING IT EITHER.

 4            THE COURT:  SO WHAT WILL HAVE TO HAPPEN IS, I WILL

 5    NEED A TRANSCRIPT.  YOU WILL HAVE TO GIVE IT TO THE OTHER SIDE

 6    TO REVIEW FOR ACCURACY, AND THEN IT HAS TO BE SUBMITTED TO THE

 7    COURT REPORTER SO THAT IT CAN BE INCLUDED WITH THE TRANSCRIPT

 8    HERE.  I DON'T THINK I SAW HER QUICKLY --

 9            THE REPORTER:  I DIDN'T.

10            THE COURT:  I DIDN'T ANTICIPATE THAT YOU WOULD BE.

11        SO WHEN CAN I HAVE THAT?

12            MR. ISAACSON:  IF YOU DON'T MIND IF WE HAVE SOMEONE

13    TYPE IT UP AND SEND IT TO YOU, THEN --

14            MR. COUGHLIN:  THERE IS NO PROBLEM WITH THAT, YOUR

15    HONOR.

16            MR. ISAACSON:  CERTIFIED COPY WOULD TAKE LONGER.

17            THE COURT:  THAT'S FINE.  AS LONG AS YOU BOTH AGREE.

18            MR. COUGHLIN:  I DON'T THINK WE CAN GET BARRY WHITE

19    JUST RIGHT.

20                    (LAUGHTER).

21            THE COURT:  OKAY.  WE HAVE A NUMBER OF THINGS TO TAKE

22    CARE OF.

23        I HAVE TO TELL YOU, I AM CONCERNED ABOUT THE ISSUES THAT

24    WERE RAISED THIS MORNING.  AND THE CASE THAT WAS CITED TO ME

25    BY THE PLAINTIFFS, I'VE TAKEN A LOOK AT DURING ONE OF THE
```

```
 1   BREAKS, AND I DON'T THINK THAT IT IS APPLICABLE HERE.

 2        NOW, I UNDERSTAND THAT YOU RECEIVED MR. ISAACSON'S LETTER

 3   AT MIDNIGHT LAST NIGHT, AND THAT'S NOT QUITE AN OPPORTUNITY TO

 4   DO RESEARCH AND ANALYSIS.  BUT THE EVIDENCE WITH RESPECT TO

 5   THE CLASS MEMBERS AT THIS POINT IS IN.  AND THERE WILL BE NO

 6   MORE.

 7        YOU ALL CAN BE SEATED.  THANK YOU.

 8        THERE WILL BE NO MORE ON THAT JUNCTURE.  SO EVEN THOUGH WE

 9   TYPICALLY HAVE MOTIONS FOR JUDGMENT COME AT THE CONCLUSION OF

10   EVIDENCE, FRANKLY, I'M NOT INTERESTED IN WAITING TO GET THE

11   LEGAL BRIEFING ON THIS.

12        YOU'RE ALL WORKING VERY HARD, BUT IT'S -- IT IS SOMETHING

13   THAT I THINK I'M GOING TO END UP HAVING TO DO INDEPENDENT

14   RESEARCH ON AS WELL.

15        ONE, IF IT IS A GOOD MOTION, WHICH I'M NOT SAYING THAT IT

16   IS YET, BUT IF IT IS A GOOD MOTION, THEN I HAVE TO ALSO FIGURE

17   OUT WHAT THE OPTIONS ARE.  EQUITABLE TOLLING.  WHAT AM I

18   SUPPOSED TO DO IF I DON'T HAVE A PLAINTIFF?  THERE ARE

19   OBVIOUSLY MANY, MANY PEOPLE WHO HAVE PURCHASED THESE DEVICES.

20        HOW MANY?

21             MS. SWEENEY:  THERE ARE MORE THAN 8 MILLION CONSUMER

22   CLASS REPRESENTATIVES AND ALMOST A THOUSAND --

23             THE COURT:  NOT CLASS REPRESENTATIVES.

24             MS. SWEENEY:  EXCUSE ME, CLASS MEMBERS.  YES.

25             THE COURT:  AND IT'S -- IT COULD BE POTENTIALLY AN
```

1    ISSUE.  SO I'M NOT INTERESTED IN WAITING.

2       I WANT, IF YOU'RE GOING TO BRING A MOTION, THEN I WANT THE

3    MOTION BROUGHT.  AND THEN I WANT A RESPONSE SO THAT I HAVE AN

4    OPPORTUNITY TO ANALYZE IT.  AND IF THIS TRIAL IS GOING TO GO

5    FORWARD, NOT TO DELAY IT.

6           **MR. ISAACSON:**  TWO ISSUES WITH RESPECT TO THE

7    EVIDENCE.  ONE IS, THE OTHER PLAINTIFF IS TESTIFYING

8    TOMORROW --

9           **THE COURT:**  RIGHT.  BUT I THINK THAT THERE WAS A

10   CONCESSION THAT SHE'S NOT -- THAT SHE DID NOT PURCHASE A

11   DEVICE THAT IS AT ISSUE DURING THE RELEVANT PERIOD.

12          **MR. ISAACSON:**  I BELIEVE THAT'S CORRECT, BUT I NEEDED

13   TO CONFIRM THAT BEFORE --

14          **THE COURT:**  MS. SWEENEY SAID THAT THIS MORNING.  AM I

15   WRONG?

16          **MS. SWEENEY:**  YOU ARE CORRECT, YOUR HONOR.

17          **MR. ISAACSON:**  AND THEN THE ONLY OTHER ISSUE WOULD BE

18   WE PRODUCED A RECEIPT THIS MORNING AND LAST NIGHT.  WE WOULD

19   CALL A WITNESS IN OUR CASE, IF IT WAS NECESSARY, TO

20   AUTHENTICATE THOSE RECEIPTS, WHICH I DON'T THINK SHOULD BE

21   NECESSARY, BUT THEY ARE NOT PART OF THE RECORD RIGHT NOW.

22      THIS WOULD BE THE RECEIPT THAT SHOWS -- I THINK YOU AGREED

23   THAT THE ONE IPOD SHE SAID WAS PURCHASED IN 2009 WAS PURCHASED

24   AFTER THE CLASS PERIOD, SO I DON'T THINK THAT'S AN ISSUE.

25      SO I THINK THE ONLY RECEIPTS THAT ARE AT ISSUE ARE THE

```
 1    ONES THAT WE PRODUCED THIS MORNING THAT SHOWED THE ROSEN LAW

 2    FIRM PURCHASED THE OTHER IPODS.

 3         MS. SWEENEY:  YOUR HONOR, WE HAVEN'T FINISHED

 4    ACQUIRING THE RECEIPTS YET, SO WE WOULD OBJECT TO THEM --

 5    FIRST OF ALL, I DON'T AGREE WITH WHAT MR. ISAACSON SAID THAT

 6    WE CONCEDED THAT WAS THE CORRECT RECEIPT.  WE HAVEN'T HAD A

 7    CHANCE YET TO REVIEW.  WE GOT IT LATE LAST NIGHT.

 8         THE COURT:  WE HAVE BEEN IN SESSION ALL DAY.  ALL I'M

 9    SAYING IS THAT I'M NOT -- I WANT YOU TO INVESTIGATE IT AND TO

10    BE PREPARED, IF NOTHING ELSE, TO CITE ME SOME AUTHORITY

11    BECAUSE I'M CONCERNED THAT I DON'T HAVE A PLAINTIFF.  THAT'S A

12    PROBLEM.

13         MS. SWEENEY:  UNDERSTOOD, YOUR HONOR.  WE WILL BE

14    PREPARED.

15         THE COURT:  OKAY.  IN TERMS OF EXHIBITS, THIS IS WHAT

16    I HAVE.  AND I WILL REVIEW THESE IN THE ORDER IN WHICH THEY

17    WERE RAISED IN TODAY'S PROCEEDINGS.

18       LET ME KNOW IF YOU ARE NOT -- I'M GOING TO ASSUME THAT

19    THEY ARE BEING REQUESTED FOR ADMISSION UNLESS YOU TELL ME

20    OTHERWISE.

21       FIRST WITH MR. CUE.  124 WAS STIPULATED.  IT'S ADMITTED.

22         (PLAINTIFFS' EXHIBIT 124 RECEIVED IN EVIDENCE)

23         THE COURT:  128 WAS STIPULATED.  IT'S ADMITTED.

24         (PLAINTIFFS' EXHIBIT 128 RECEIVED IN EVIDENCE)

25         THE COURT:  130 STIPULATED.  IT'S ADMITTED.
```

```
 1            (PLAINTIFFS' EXHIBIT 130 RECEIVED IN EVIDENCE)

 2            THE COURT:  118 STIPULATED.  IT'S ADMITTED.

 3            (PLAINTIFFS' EXHIBIT 118 RECEIVED IN EVIDENCE)

 4            THE COURT:  121.

 5            MR. ISAACSON:  THIS IS -- NO OBJECTION.  THIS JUST

 6    HAS THE -- THIS IS SUBJECT TO THE EMBEDDED HEARSAY

 7    INSTRUCTION.

 8            THE COURT:  IT'S ADMITTED.

 9            (PLAINTIFFS' EXHIBIT 121 RECEIVED IN EVIDENCE)

10            THE COURT:  2140, IT'S STIPULATED.  IT'S ADMITTED.

11            (DEFENDANT'S EXHIBIT 2140 RECEIVED IN EVIDENCE)

12            THE COURT:  125?

13            MR. ISAACSON:  ACCORDING TO MY NOTES, THE FOUNDATION

14    WASN'T LAID.

15            MS. SWEENEY:  THIS IS -- I BELIEVE THAT MR. -- THIS

16    IS THE ONE I WENT BACK AFTERWARDS, YOUR HONOR, AND MR. CUE

17    ALREADY SAID THAT HE WAS FAMILIAR WITH THE EXCHANGE EVEN

18    THOUGH HE WASN'T THE RECIPIENT OF THE EMAILS --

19            MR. ISAACSON:  WE WILL AGREE TO ADMIT.

20            THE COURT:  IT'S ADMITTED.

21            (PLAINTIFFS' EXHIBIT 125 RECEIVED IN EVIDENCE)

22            THE COURT:  817, I THINK THAT'S THE ONE WE ARE

23    STILL -- THAT THERE'S A HEARSAY OBJECTION ON THIS ONE.  817 IS

24    THE ARTICLE THAT YOU ALSO USED WITH MARKS.

25            MR. COUGHLIN:  WITH SCHILLER?
```

1           **THE COURT:**  THIS IS THE CNET NEWS ARTICLE.

2           **MR. COUGHLIN:**  THERE'S ONE THAT --

3           **THE COURT:**  I'M TALKING ABOUT 817.

4           **MR. ISAACSON:**  THIS IS JUST THE --

5           **MS. SWEENEY:**  THIS IS THE ONE THAT HAS THE LARRY

6    KENSWIL QUOTE IN IT.

7           **MR. ISAACSON:**  IT'S A NEWS ARTICLE --

8           **THE COURT:**  IT'S NOT AN EMAIL OR ANYTHING.

9           **MR. ISAACSON:**  RIGHT.

10          **MR. COUGHLIN:**  THERE'S A DUPLICATE EXHIBIT OF THE

11   SAME THING, BUT THAT'S NOT -- THAT'S NOT FROM APPLE.  I

12   UNDERSTAND.

13          **THE COURT:**  ALL RIGHT.  147?

14          **MR. ISAACSON:**  THIS IS -- NO OBJECTION SUBJECT TO THE

15   EMBEDDED HEARSAY.

16          **THE COURT:**  THAT'S ADMITTED.

17          (PLAINTIFFS' EXHIBIT 147 RECEIVED IN EVIDENCE)

18          **THE COURT:**  222 IS STIPULATED.  IT'S ADMITTED.

19          (PLAINTIFFS' EXHIBIT 222 RECEIVED IN EVIDENCE)

20          **THE COURT:**  2098, STIPULATED.  IT'S ADMITTED.

21          (DEFENDANT'S EXHIBIT 2098 RECEIVED IN EVIDENCE)

22          **THE COURT:**  2389, STIPULATED.  IT'S ADMITTED.

23          (DEFENDANT'S EXHIBIT 2389 RECEIVED IN EVIDENCE)

24          **THE COURT:**  816.

25          **MR. ISAACSON:**  IT CAN BE ADMITTED SUBJECT TO THE

```
1    OBJECTION ABOUT EMBEDDED HEARSAY.

2              THE COURT:  OKAY.  IT'S ADMITTED.

3          (PLAINTIFFS' EXHIBIT 816 RECEIVED IN EVIDENCE)

4              THE COURT:  461, STIPULATED.  IT'S ADMITTED.

5          (PLAINTIFFS' EXHIBIT 461 RECEIVED IN EVIDENCE)

6              THE COURT:  2139, STIPULATED.  IT'S ADMITTED.

7          (DEFENDANT'S EXHIBIT 2139 RECEIVED IN EVIDENCE)

8              THE COURT:  2394, STIPULATED.  IT'S ADMITTED.

9          (DEFENDANT'S EXHIBIT 2394 RECEIVED IN EVIDENCE)

10             THE COURT:  2423, STIPULATED.  IT'S ADMITTED.

11         (DEFENDANT'S EXHIBIT 2423 RECEIVED IN EVIDENCE)

12             THE COURT:  2847.

13          MR. ISAACSON:  THAT'S THE THUMB DRIVE.

14          MS. SWEENEY:  SO THIS -- THIS IS THE THUMB DRIVE OF

15   WHAT?

16          MR. ISAACSON:  THE KEYNOTE VIDEO OF THE PRESENTATION

17   THAT THE -- KEYNOTE PRESENTATION THAT MR. CUE SAID --

18             THE COURT:  OH, BUT HE'S NOT -- THE JURY HASN'T SEEN

19   IT.

20             MR. COUGHLIN:  IT'S HEARSAY.

21             MR. ISAACSON:  THEY HAVE NOT SEEN IT.

22          MS. SWEENEY:  WE OBJECT, YOUR HONOR.

23          MR. ISAACSON:  WE WANT TO BE ABLE TO BE FREE TO USE

24   THIS, AND HE INDICATED IT WAS A TRUE AND CORRECT COPY OF THAT

25   VIDEO.
```

858

```
 1              THE COURT:  OKAY.  I'LL RESERVE ON THIS ONE.  BUT I

 2   WILL --

 3              MR. ISAACSON:  CAN I USE CLIPS OF THIS IN EXAMINATION

 4   OF WITNESSES?

 5              MR. COUGHLIN:  WE OBJECT, YOUR HONOR.  IT'S HEARSAY.

 6   IT'S MR. JOBS GIVING A PRESENTATION.  IT'S AN OUT-OF-COURT

 7   STATEMENT.  WE OBJECT.  IT'S NOT A BUSINESS RECORD.

 8              MR. ISAACSON:  I WOULD NOT BE SEEKING TO USE IT FOR

 9   THE TRUTH.  IT'S THE SAME THING AS A PRESS RELEASE.  THIS

10   WOULD SHOW HOW WE PROMOTE THE PRODUCT AND PROMOTE THE FEATURES

11   OF 7.0.

12              MR. COUGHLIN:  THAT'S NOT TRUE.

13              THE COURT:  I AM RESERVING.  SO I'LL WAIT UNTIL I

14   FIGURE OUT HOW YOU ARE GOING TO USE IT, MR. ISAACSON, AND I

15   WOULD LIKE TO HAVE A COPY OF IT.

16              MR. ISAACSON:  OKAY.

17     WE CAN ALSO GIVE YOU A TRANSCRIPT IF YOU WANT TO SAVE YOU

18   SOME TIME.

19              THE COURT:  2781.

20              MS. SWEENEY:  WELL, IT'S HEARSAY, AND I THINK THEY

21   WERE OFFERING IT FOR THE TRUTH, YOUR HONOR.

22              MR. ISAACSON:  NO.  WE ARE NOT OFFERING IT FOR THE

23   TRUTH.

24              THE COURT:  SO FOR WHAT PURPOSE WERE YOU OFFERING IT?

25   AND IF YOU WEREN'T OFFERING IT FOR ITS TRUTH, WHY DOES IT HAVE
```

```
 1    TO BE ADMITTED?

 2         MR. ISAACSON:  IT IS PUBLIC STATEMENTS THAT ITUNES

 3    7.0 WAS -- THAT THE FILM PRODUCT WAS SUCCESSFUL.  SO IT SHOWS

 4    THAT THE -- THAT FEATURE WAS BEING PROMOTED IN THE

 5    MARKETPLACE.

 6         MR. COUGHLIN:  THAT IS FOR THE TRUTH OF THE MATTER

 7    ASSERTED.

 8         THE COURT:  THAT'S WHAT IT SOUNDED LIKE.

 9         MR. ISAACSON:  NO.  YOU CAN PROMOTE THINGS,

10    ADVERTISEMENT --

11         THE COURT:  LIE ABOUT THEM?  MR. ISAACSON, THAT'S WHY

12    I'M ASKING THE QUESTION.  I DON'T HAVE IT IN FRONT OF ME.  I

13    NEED TO GET IT.

14         MR. ISAACSON:  SURE.

15         THE COURT:  CAN SOMEONE HAND ME -- FRANCES, CAN YOU

16    HAND ME 2781?

17         MR. ISAACSON:  I CAN GIVE YOU MY COPY AND THEN --

18         THE COURT:  I'VE GOT A BINDER.

19              (PAUSE IN THE PROCEEDINGS.)

20         MR. ISAACSON:  I WILL MAKE YOUR LIFE EASIER, YOUR

21    HONOR.  I WILL WITHDRAW IT.

22         THE COURT:  ALL RIGHT.  WITHDRAWN.

23      2337 WAS STIPULATED.  IT'S ADMITTED.

24       (DEFENDANT'S EXHIBIT 2337 RECEIVED IN EVIDENCE)

25         THE COURT:  2495, STIPULATED.  IT'S ADMITTED.
```

1          (DEFENDANT'S EXHIBIT 2495 RECEIVED IN EVIDENCE)

2              **THE COURT:**  319.  HAVE WE SEEN 319 BEFORE?

3      NO.

4              **MR. ISAACSON:**  BUT THAT WAS ME USING A PLAINTIFFS'

5      EXHIBIT, SO THERE SHOULDN'T BE AN ISSUE.

6              **THE COURT:**  ARE YOU --

7              **MR. ISAACSON:**  I USED IT IN CUE, SO I AM THE ONE

8      OFFERING IT.

9              **THE COURT:**  OKAY.  AND THERE'S NO OBJECTION.  IT'S

10     ADMITTED.

11          (PLAINTIFFS' EXHIBIT 319 RECEIVED IN EVIDENCE)

12             **THE COURT:**  2119, STIPULATED.  IT'S ADMITTED.

13          (DEFENDANT'S EXHIBIT 2119 RECEIVED IN EVIDENCE)

14             **THE COURT:**  2419.  THIS IS AN EMAIL.

15     ANY OBJECTION?

16             **MS. SWEENEY:**  I THINK THEY ARE NOT OFFERING IT FOR

17     THE TRUTH.

18             **MR. ISAACSON:**  NOT THE ARTICLE PART.  THAT'S RIGHT.

19             **THE COURT:**  ALL RIGHT.  IT'S ADMITTED.

20          (DEFENDANT'S EXHIBIT 2419 RECEIVED IN EVIDENCE)

21             **THE COURT:**  2243, STIPULATED.  IT'S ADMITTED.

22          (DEFENDANT'S EXHIBIT 2243 RECEIVED IN EVIDENCE)

23             **THE COURT:**  2805.  THIS IS ANOTHER EMAIL TO CUE.

24             **MS. SWEENEY:**  SO LONG AS THEY ARE NOT OFFERING IT FOR

25     THE TRUTH.

```
1              MR. ISAACSON:  THERE'S AN EMBEDDED ARTICLE THAT WE
2    ARE NOT OFFERING FOR THE TRUTH.
3              THE COURT:  2805 IS ADMITTED.
4         (DEFENDANT'S EXHIBIT 2805 RECEIVED IN EVIDENCE)
5              THE COURT:  2783.
6              MR. ISAACSON:  SAME SITUATION.
7              MS. SWEENEY:  YES.
8              THE COURT:  NO OBJECTION?
9              MS. SWEENEY:  NO OBJECTION, YOUR HONOR.
10             THE COURT:  ALL RIGHT.  IT'S ADMITTED.
11        (DEFENDANT'S EXHIBIT 2783 RECEIVED IN EVIDENCE)
12             THE COURT:  2050, STIPULATED.  THAT'S ADMITTED.
13        (DEFENDANT'S EXHIBIT 2050 RECEIVED IN EVIDENCE)
14             THE COURT:  2159.  THIS IS AN EMAIL.
15             MR. ISAACSON:  THIS IS THE EMBEDDED HEARSAY ISSUE.
16   AGAIN, WE ARE NOT OFFERING THE EMBEDDED HEARSAY WITHIN IT FOR
17   THE TRUTH.
18             MS. SWEENEY:  NO OBJECTION.
19             THE COURT:  IT IS ADMITTED.
20        (DEFENDANT'S EXHIBIT 2159 RECEIVED IN EVIDENCE)
21             THE COURT:  2171.  ANOTHER EMAIL.
22             MR. ISAACSON:  YOUR HONOR, I THINK WE, UNLESS YOU
23   HAVE IT LATER, IN OUR ORDER WE HAD 2088 AS WELL, WHICH I KNOW
24   I SHOWED THE WITNESS.  TWO ZERO EIGHT EIGHT.
25             THE COURT:  I HAD -- OKAY.  ACTUALLY I DIDN'T WRITE
```

```
1    IT HERE.  2208?

2             THE CLERK:  2208.

3             MR. ISAACSON:  I'M INFORMED THAT I SAID THE EXHIBIT

4    NUMBER INCORRECTLY ON THE RECORD.  SO IT SHOULD BE 2088.

5         THIS IS, AGAIN, WHERE THE ARTICLE IS NOT BEING OFFERED FOR

6    THE TRUTH.

7             THE COURT:  ANY OBJECTION?

8             MS. SWEENEY:  NO, YOUR HONOR.

9             THE COURT:  THAT'S ADMITTED.

10        THE RECORD WILL REFLECT THE CORRECTION.

11         (DEFENDANT'S EXHIBIT 2088 RECEIVED IN EVIDENCE)

12            THE COURT:  2171.

13            MR. ISAACSON:  SAME ISSUE.  THERE'S AN ARTICLE.  IT

14   IS NOT BEING OFFERED FOR THE TRUTH.

15            THE COURT:  ANY OBJECTION?

16            MS. SWEENEY:  NO, YOUR HONOR.

17            THE COURT:  IT'S ADMITTED.

18         (DEFENDANT'S EXHIBIT 2171 RECEIVED IN EVIDENCE)

19            THE COURT:  2767.  ANOTHER EMAIL.

20            MR. ISAACSON:  SAME SITUATION.  THIS HAS THE

21   INTERVIEW, EMBEDDED INTERVIEW, WHICH IS NOT BEING OFFERED FOR

22   THE TRUTH.

23            THE COURT:  MS. SWEENEY?

24            MS. SWEENEY:  NO, YOUR HONOR.

25            THE COURT:  IT'S ADMITTED.
```

```
1            (DEFENDANT'S EXHIBIT 2767 RECEIVED IN EVIDENCE)

2            THE COURT:  2118, STIPULATED.  THAT'S ADMITTED.

3            (DEFENDANT'S EXHIBIT 2118 RECEIVED IN EVIDENCE)

4            THE COURT:  2458, STIPULATED.  THAT'S ADMITTED.

5            (DEFENDANT'S EXHIBIT 2458 RECEIVED IN EVIDENCE)

6            THE COURT:  2462.  AGAIN, AN EMAIL, BUT THE OBJECTION

7    IS RELATIVE TO THE ARTICLE.

8            MR. ISAACSON:  YES.

9            THE COURT:  SAME POSITIONS?

10           MR. ISAACSON:  SAME POSITION ON OUR PART.

11           MS. SWEENEY:  YES, YOUR HONOR.

12           THE COURT:  THAT'S ADMITTED.

13           (DEFENDANT'S EXHIBIT 2462 RECEIVED IN EVIDENCE)

14           THE COURT:  THEN I JUMP BACK TO REDIRECT.  THEY WERE

15   383.

16      I WOULD ASK COUNSEL TO START CLEANING UP.  I HAVE A VERY

17   LONG CRIMINAL CALENDAR.  SO IF YOU CAN START CLEANING THOSE

18   DESKS, PLEASE, QUIETLY.

19      383?

20           MR. ISAACSON:  SAME -- SUBJECT TO THE EMBEDDED

21   HEARSAY.  AS LONG AS THAT'S NOT BEING OFFERED FOR THE TRUTH,

22   THAT CAN BE ADMITTED.

23           MR. COUGHLIN:  NO OBJECTION.

24           THE COURT:  ALL RIGHT.  THAT'S ADMITTED.

25
```

```
 1            (PLAINTIFFS' EXHIBIT 383 RECEIVED IN EVIDENCE)

 2            MR. ISAACSON:  AND THE SAME IS TRUE FOR --

 3            THE COURT:  THEN I HAVE, IS IT 318 OR 816?

 4            MR. ISAACSON:  816 IS WHAT WE HAVE WRITTEN DOWN.

 5            THE COURT:  ALL RIGHT.  AND I ALLOWED YOU TO REOPEN

 6      ON THIS ONE.

 7         ANY OBJECTION FROM DEFENSE?

 8            MR. ISAACSON:  ONLY TO THE EMBEDDED HEARSAY.

 9            THE COURT:  NOT OFFERED FOR THE TRUTH?

10         MR. COUGHLIN:  YES.

11            THE COURT:  THAT'S CORRECT, SO IT'S ADMITTED ON A

12      LIMITED BASIS.

13            (PLAINTIFFS' EXHIBIT 816 RECEIVED IN EVIDENCE)

14            THE COURT:  OKAY.  THEN WE MOVE TO MARKS.

15         719 WAS THE FIRST ONE.

16            MR. COUGHLIN:  YOUR HONOR, NONE OF THOSE EXHIBITS I

17      USED WITH MS. MARKS REALLY HAD -- THERE ARE ONLY A COUPLE THAT

18      I WOULD MOVE IN.

19            THE CLERK:  STAY NEAR A MIC, PLEASE.

20            THE COURT:  ESPECIALLY BECAUSE WE HAVE PEOPLE

21      CLEANING UP.

22         WHICH ARE THE ONES -- I ONLY HAD A FEW.  WHICH OF THE

23      MARKS ARE YOU REQUESTING ADMISSION?

24         719 WAS THE FIRST.  314, I DON'T THINK THERE WAS ENOUGH

25      FOUNDATION.
```

```
1            MR. COUGHLIN:  YOUR HONOR, I AM NOT REALLY MOVING ANY
2    OF THOSE.  NO.
3            THE COURT:  OKAY.
4        THEN SCHILLER.
5            MR. ISAACSON:  YOUR HONOR, WE WOULD MOVE TO ADMIT
6    EXHIBIT 940, WHICH HE USED IN HIS EXAMINATION.  IT WAS AN
7    EMAIL BETWEEN AMANDA MARKS AND EDDY CUE.
8            MR. COUGHLIN:  NO OBJECTION, YOUR HONOR.
9            MR. ISAACSON:  THEN WHAT'S --
10           THE COURT:  THAT'S ADMITTED.
11       (PLAINTIFFS' EXHIBIT 940 RECEIVED IN EVIDENCE)
12           THE COURT:  THEN I HAVE --
13           MR. ISAACSON:  I HAVE ONE MORE.  IF I CAN HAVE A
14   MOMENT.
15           THE COURT:  40, 941 AND 446.
16           MR. ISAACSON:  2389, I BELIEVE WAS --
17           MS. GOODMAN:  IT'S ALREADY ADMITTED.
18           MR. ISAACSON:  ARE YOU SURE?
19       IT WAS USED WITH CUE.
20           THE COURT:  I DON'T HAVE 2389.
21           MR. ISAACSON:  IT WAS USED WITH CUE I'M TOLD.  IT'S
22   ALREADY ADMITTED.
23           THE COURT:  WITH RESPECT TO SCHILLER, THE VERY FIRST
24   ONE HE HAD VERY LITTLE TO SAY ABOUT IT.  193.
25       193 BEING OFFERED?
```

```
 1              MS. SWEENEY:  YES, YOUR HONOR.

 2              THE COURT:  IS THERE AN OBJECTION?  THIS IS THE --

 3              MR. ISAACSON:  HE WAS ON THIS?

 4              THE COURT:  YES.  THIS WAS --

 5              MR. ISAACSON:  NO OBJECTION.

 6              THE COURT:  193 IS ADMITTED.

 7          (PLAINTIFFS' EXHIBIT 193 RECEIVED IN EVIDENCE)

 8              THE COURT:  55, STIPULATED.  IT'S ADMITTED.

 9          (PLAINTIFFS' EXHIBIT 55 RECEIVED IN EVIDENCE)

10              THE COURT:  83.  ONE OF HIS EMAILS.

11       ANY OBJECTION?

12              MR. ISAACSON:  SUBJECT -- IF THERE'S -- THIS IS

13    ANOTHER ONE WITH AN ARTICLE.  SO IT WOULD BE THE EMBEDDED

14    HEARSAY ISSUE.  SUBJECT TO THAT OBJECTION, IT MAY BE ADMITTED.

15              MS. SWEENEY:  NO OBJECTION.

16              THE COURT:  ALL RIGHT.  SO THAT'S ADMITTED.

17          (PLAINTIFFS' EXHIBIT 83 RECEIVED IN EVIDENCE)

18              THE COURT:  2710.

19              MS. SWEENEY:  WE OBJECT TO THIS BEING ADMITTED, YOUR

20    HONOR.

21              THE COURT:  THIS IS THE --

22                      (SIMULTANEOUS COLLOQUY.)

23              MS. SWEENEY:  PHYSICAL EXHIBITS.

24              THE COURT:  SO LET'S DEAL WITH THOSE LATER.

25          2745 IS STIPULATED.  THAT'S ADMITTED.
```

```
 1            (DEFENDANT'S EXHIBIT 2745 RECEIVED IN EVIDENCE)

 2              THE COURT:  2741, STIPULATED.  IT'S ADMITTED.

 3            (DEFENDANT'S EXHIBIT 2741 RECEIVED IN EVIDENCE)

 4              THE COURT:  2715, IS THAT PHYSICAL?

 5              MR. ISAACSON:  '14, 2714.  THAT'S THE NANO.

 6              MS. SWEENEY:  2715 IS THE NANO.

 7              MR. ISAACSON:  YOU ARE CORRECT.  2715.  SORRY.

 8              THE COURT:  WE WILL PASS ON THAT ONE.

 9         2497 WAS STIPULATED.  THAT'S ADMITTED.

10            (DEFENDANT'S EXHIBIT 2497 RECEIVED IN EVIDENCE)

11              THE COURT:  2720 IS THE PHYSICAL.  PASS ON THAT.

12         2139, I THINK, MAY HAVE BEEN PREVIOUSLY ADMITTED.

13              MR. ISAACSON:  THAT'S CORRECT.

14              THE COURT:  2811 FROM 2007.

15              MR. ISAACSON:  WE ARE OFFERING THIS.  THERE IS AN

16     ARTICLE IN HERE THAT WE ARE NOT OFFERING FOR THE TRUTH.

17              MS. SWEENEY:  NO OBJECTION.

18              THE COURT:  ALL RIGHT.  ADMITTED FOR A LIMITED

19     PURPOSE.

20            (DEFENDANT'S EXHIBIT 2811 RECEIVED IN EVIDENCE)

21              THE COURT:  2184, STIPULATED.  THAT'S ADMITTED.

22            (DEFENDANT'S EXHIBIT 2184 RECEIVED IN EVIDENCE)

23              THE COURT:  2241.

24              MS. SWEENEY:  WE MAINTAIN OUR OBJECTION, YOUR HONOR,

25     THAT THE STUDY TO WHICH THIS EMAIL REFERS IS NOT ATTACHED.
```

868

```
1          THE COURT:  LET'S GO --

2          MS. SWEENEY:  I'M SORRY?

3          THE COURT:  WE WILL GO BACK TO THAT.

4       2705.

5          MS. SWEENEY:  THAT'S ANOTHER PHYSICAL EXHIBIT, WHICH

6    WE OBJECT TO.

7          THE COURT:  I WILL WAIT ON THAT.

8       2451.

9          MR. ISAACSON:  2705 IS THE ZUNE.  IT'S ONLY OFFERED

10   AS A DEMONSTRATIVE.  SO IT'S NOT --

11         THE COURT:  YOU ARE NOT OFFERING IT?

12         MR. ISAACSON:  I THINK YOU PERMITTED THAT.

13         THE COURT:  ALL RIGHT.  2451.  THIS IS A JANUARY 20,

14   2007 EMAIL.  MAYBE?  IT'S ABOUT ZUNE.

15         MS. SWEENEY:  NO OBJECTION AS LONG AS IT IS NOT

16   OFFERED FOR THE TRUTH OF THE ATTACHED ARTICLE.

17         MR. ISAACSON:  AGREED, YOUR HONOR.

18         THE COURT:  THAT'S ADMITTED.

19      (DEFENDANT'S EXHIBIT 2451 RECEIVED IN EVIDENCE)

20         THE COURT:  2183.

21         MR. ISAACSON:  THIS HAS AN EMBEDDED ARTICLE THAT'S

22   NOT OFFERED FOR THE TRUTH, AND OTHERWISE WE OFFER IT.

23         MS. SWEENEY:  NO OBJECTION.

24         THE COURT:  IT'S ADMITTED ON THAT BASIS.

25
```

```
1            (DEFENDANT'S EXHIBIT 2183 RECEIVED IN EVIDENCE)

2            THE COURT:  AND THEN TWO MORE.  2082 IS STIPULATED.

3   SO IT'S ADMITTED.

4            (DEFENDANT'S EXHIBIT 2082 RECEIVED IN EVIDENCE)

5            THE COURT:  880 IS STIPULATED.  SO IT'S ADMITTED.

6            (PLAINTIFFS' EXHIBIT 880 RECEIVED IN EVIDENCE)

7            THE COURT:  OKAY.  I DON'T KNOW IF MY COURTROOM

8   DEPUTY HAS HAD A CHANCE TO POST THAT ORDER.

9            THE CLERK:  YES.

10           THE COURT:  PER THE ORDER, MAKE SURE YOU HAVE COPIES

11  AVAILABLE OF THOSE DOCUMENTS ADMITTED TODAY FOR THE PRESS.

12      WHO IS IT WE EXPECT TO HEAR FROM TOMORROW?

13           MR. COUGHLIN:  WE EXPECT TO HEAR FROM MR. ROBBIN.

14           THE COURT:  OKAY.

15      ROBBIN.  WHO ELSE?

16           MS. SWEENEY:  PROFESSOR NOLL AND WE'LL PROBABLY PLAY

17  THE JOBS' DEPOSITION.

18           MR. COUGHLIN:  AND THEN WE ALSO HAVE MELANIE --

19           THE COURT:  MS. TUCKER?

20           MS. SWEENEY:  TUCKER WILSON.

21           MR. COUGHLIN:  YOUR HONOR, CAN I ASK A QUESTION

22  ABOUT, JUST AT THE RISK OF REVISITING SOMETHING, BUT BRIEFLY?

23      WE THINK THAT MS. ROSEN DID PURCHASE TWO IN THE TIME

24  PERIOD AND WE WILL KEEP WORKING WITH THEM TO SOLVE -- YOU

25  KNOW, FIGURE THAT OUT.
```

```
1        WE'RE CONCERNED, AS YOU'RE CONCERNED, YOU KNOW, ABOUT A

2   CLASS THAT WAS CERTIFIED AND IS MOVING FORWARD AND NOTICE HAS

3   GONE OUT WITH SO MANY INDIVIDUALS INVOLVED.

4        SO ONE -- WE ALSO THINK THAT MR. RIEGEL DOES HAVE THE

5   RIGHT AND YOUR HONOR HAS RULED THAT HE COULDN'T BE AT THE

6   BEGINNING OF THIS TRIAL, HIS COMPANY COULD NOT BE INTERVENED.

7        I DIDN'T WANT MR. RIEGEL -- MR. RIEGEL HAD CALLED ON HIS

8   OWN AND CHECKED WITH THE DELAWARE, I GUESS, CORPORATION'S

9   OFFICE TO FIND OUT HOW MUCH IT WOULD COST HIM TO REINSTATE.  I

10  CAN SAY THAT HE HASN'T DONE ANYTHING BECAUSE HE'S -- I WAS

11  CONCERNED ABOUT HAVING HIM DO SOMETHING IN THE MIDST OF THIS

12  TRIAL.

13       SO, ESSENTIALLY HE'S INDICATED, YOU KNOW, A WILLINGNESS,

14  IF NEED BE, IF THE COURT STILL THOUGHT HE WAS NOT QUALIFIED,

15  TO GO AHEAD AND REACTIVATE.  IT IS RETROACTIVE.  BUT I DON'T

16  WANT SOMEBODY DOING SOMETHING --

17            THE COURT:  I UNDERSTAND.

18            MR. COUGHLIN:  OKAY.

19            THE COURT:  WELL, LET'S SEE IF WE HAVE TO CROSS THAT

20  BRIDGE.  I DON'T CROSS BRIDGES I DON'T HAVE TO.

21       AFTER -- WHAT ELSE DO YOU HAVE?  SO AFTER TUCKER, AFTER

22  THE FOUR YOU'VE IDENTIFIED, WHO ELSE DO YOU HAVE?

23            MR. COUGHLIN:  YOUR HONOR, ON THE TUCKER?  SO WE ARE

24  GOING TO FIGURE THIS OUT TONIGHT MORE ABOUT THE PURCHASES.

25  AND I DON'T KNOW IF WE NEED MS. TUCKER TO TESTIFY IF -- IF
```

871

```
1   SHE'S -- IF SHE'S NOT GOING TO BE CONSIDERED TO BE A CLASS

2   MEMBER.  THAT'S WHERE YOUR HONOR SEEMS TO BE GOING WITH SOME

3   OF THE RULINGS.

4       WE ALREADY HAVE MS. ROSEN, WHO CERTAINLY BOUGHT WITHIN THE

5   CLASS PERIOD, BUT BOUGHT AN UNEFFECTED ONE.  SO WE WILL MAKE

6   THAT DECISION.  WE'LL TALK TO THEM TONIGHT ABOUT THAT OR NOT.

7       WE HAVE DESIGNATED -- BOTH SIDES HAVE DESIGNATED TESTIMONY

8   FROM HER, AND THAT MIGHT BE QUICKER.  SHE IS OUT HERE.  SHE

9   IS -- SHE IS CONCERNED AND SCARED TO TESTIFY.  SO I DON'T

10  KNOW -- BECAUSE OF THE MOONDOGGIES EXPERIENCE.  SO WE WILL

11  TALK TO HER TONIGHT MORE.  SHE'S NERVOUS.  AND SHE WAS WILLING

12  TO DO IT IF IT WAS NECESSARY.  BUT IF IT IS NOT NECESSARY,

13  THEN WE WILL NOTIFY THEM AS SOON AS WE CAN --

14          MS. DUNN:  YOUR HONOR -- SORRY.  ARE YOU DONE WITH

15  THAT POINT?

16          THE COURT:  HE'S NOT DONE.

17          MS. DUNN:  OKAY.

18          MR. COUGHLIN:  SO THEN WE HAVE I WAS JUST TALKING

19  ABOUT WITNESSES.

20      SO, I THINK THAT WE HAVE -- CERTAINLY WE HAVE MR. ROBBIN

21  WHO IS GOING TO TAKE UP A BIG PORTION OF THE MORNING, AND THEN

22  WE WOULD GO INTO ROGER NOLL.

23      WE STILL EXPECT MS. TUCKER TO TESTIFY.  I HAVEN'T HAD A

24  CHANCE TO TALK TO HER TONIGHT.

25          THE COURT:  THAT'S FINE.  AFTER YOUR FOUR WITNESSES,
```

```
1    DO YOU HAVE ANY OTHER ONES LINED UP OR ARE YOU PREPARED AT

2    THAT JUNCTURE TO REST?

3          MS. SWEENEY:  WE EXPECT -- WE WON'T FINISH WITH

4    PROFESSOR NOLL TOMORROW, YOUR HONOR.

5          MR. COUGHLIN:  YES --

6          MS. SWEENEY:  OH, I'M SORRY THAT WASN'T YOUR

7    QUESTION.

8          MR. COUGHLIN:  THE ANSWER TO YOUR QUESTION IS YES, WE

9    WOULD EXPECT TO REST.  AND THE ONLY THING WE WOULD HAVE IS

10   SOME REBUTTAL WITNESSES, AND THAT'S A POTENTIAL.

11         THE COURT:  THAT'S WHAT I NEEDED TO KNOW.

12    APPLE FILED A NUMBER OF THINGS INCORRECTLY LAST NIGHT.

13   THE LAST FILING STILL DID NOT FIX THE PROBLEM.  SO SOMEBODY

14   NEEDS TO TAKE SOME CARE AND LOOK AT IT AND GET ANOTHER REQUEST

15   WITH A PROPOSED ORDER.

16    I HAVE LOCKED THOSE DOCUMENTS.  BUT I NEED IT DONE RIGHT.

17   SO GET SOMEONE WHO'S NOT FOCUSED ON WITNESSES TO DO IT RIGHT,

18   TO FILE SOMETHING THAT I CAN -- WITH A PROPOSED ORDER SO I CAN

19   ISSUE AND CLEAN UP THE DOCKET.

20         MS. DUNN:  WE WILL DO THAT, YOUR HONOR.

21         THE COURT:  ALL RIGHT.  DID YOU WANT TO SAY SOMETHING

22   ELSE?

23         MS. DUNN:  I DO HAVE A COUPLE OF QUICK THINGS, AND I

24   AM COGNIZANT OF YOUR CALENDAR.

25    FIRST, WE WOULD NOT AGREE TO STIPULATE TO THE TESTIMONY IN
```

873

1    LIEU OF LIVE WITNESS TESTIMONY, AND BELIEVE THAT WE ARE

2    ENTITLED TO CROSS-EXAMINE AND ARE HAPPY TO DISCUSS WITH

3    MR. COUGHLIN SPECIFICALLY WITH REGARD TO MS. WILSON.

4        HOWEVER, WE WANT TO RAISE AN ISSUE WITH THE COURT.  WE'VE

5    RAISED IT WITH MS. BERNAY, AND I THINK WE ARE IN AGREEMENT.

6        THE COURT, WHEN WE HAD SUBMITTED DEPOSITION DESIGNATIONS,

7    HAD SAID A PARTICULAR DESIGNATION WAS IN, ACTUALLY THREE OF

8    THEM, WAS IN WHEN YOU'VE RULED ON THE RECORD, AND THEN THE

9    WRITTEN ORDER SAID THAT THEY WERE OUT.

10       IF IT'S LIVE WITNESS TESTIMONY, IT MAYBE DOESN'T MATTER,

11   BUT IT SPECIFICALLY PERTAINS TO THE ISSUE OF MS. WILSON HAVING

12   DATED PLAINTIFF'S COUNSEL.  SO --

13           **THE COURT:**  IT'S OUT.

14           **MS. DUNN:**  SO WE BELIEVE THAT THIS GOES TO

15   CREDIBILITY AND BIAS, AND ARE HAPPY TO BRIEF IT.

16           **THE COURT:**  NO.  YOU ARE NOT ALLOWED TO BRIEF IT.

17   I'M NOT GOING TO RECONSIDER IT.  IT'S OUT.  ALL RIGHT?

18       NEXT?

19           **MS. DUNN:**  WELL, FINALLY WE WOULD -- WE APPRECIATE

20   PLAINTIFFS' COUNSEL GAVE MR. FARRUGIA A BINDER YESTERDAY.  WE

21   WOULD LIKE THE SAME FOR MR. ROBBIN TOMORROW BECAUSE THERE ARE

22   A LOT OF DOCUMENTS, OBVIOUSLY, AND IT WILL CUT DOWN ON

23   THINGS --

24           **THE COURT:**  IT'S THEIR TIME.  I AGREE IT IS MORE

25   EFFICIENT TO DO IT THAT WAY.  THEY ARE ON THE CLOCK.

874

1          **MS. DUNN:**  PART OF THE PROBLEM, THOUGH, YOUR HONOR,

2    AS YOU POINTED OUT, THE EXHIBITS ARE BEING SHOWN TO THE JURY

3    BECAUSE THE WITNESS CAN'T LOOK AT THEM BY HIMSELF.

4          **THE COURT:**  WELL, I HAVE PLENTY OF TIMES TODAY SAID

5    THAT THEY GO OFF THE SCREEN, AND THEY ARE WASTING TIME BY NOT

6    HAVING A BINDER UP THERE.

7          **MS. DUNN:**  OKAY.  WE APPRECIATE THAT.

8          **THE COURT:**  IT'S ON THEM.  I HAVE A FULL CALENDAR.

9       ANYTHING ELSE?

10          **MS. DUNN:**  THAT'S IT.  THANK YOU.

11          **THE COURT:**  WE WILL STAND IN RECESS UNTIL 8:00 A.M.

12   TOMORROW.

13          **THE CLERK:**  JUST REMEMBER THE PHYSICAL EXHIBITS ON

14   THE STAND.

15              (PROCEEDINGS CONCLUDED AT 2:09 P.M.)

16

17

18

19

20

21

22

23

24

25

1

2

3                          **CERTIFICATE OF REPORTERS**

4              WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, OFFICIAL

5      REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6      CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

7      TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

8      ABOVE-ENTITLED MATTER.

9

10             _____

11             RAYNEE H. MERCADO, CSR 8258, RMR, CRR, FCRR

12

13

14

15             DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

16                   THURSDAY, DECEMBER 4, 2014

17

18

19

20

21

22

23

24

25

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  OAKLAND DIVISION

 4


 5


 6   THE APPLE iPOD iTUNES ANTI-TRUST      )   LEAD CASE NO.

     LITIGATION,                          )   C05-00037YGR

 7   _____)

 8


 9


10


11


12


13        STENOGRAPHIC TRANSCRIPTION OF COMMERCIAL

14              THURSDAY, DECEMBER 4, 2014

15


16


17


18


19   REPORTED BY:  AMANDA KALLAS, C.S.R. NO. 13901

20   ASSIGNMENT: 1977936

21   PAGES 1 - 4

22


23


24


25        (Start of Commercial Transcription.)
```

Page 1

```
 1                    MAIN GUY:  Hi.

 2                    THE GROUP:  Hi.

 3                    MAIN GUY:  Hey.  Um, for this CD I'd like to

 4          start off with Liz, "Polyester bride."

 5                    LIZ:  Sure ,for you.

 6                    MAIN GUY:  And, George, I'd love to hear "Hey,

 7          good lookin."

 8                    GEORGE:  Ima drop the funk bomb on you.

 9                    THE GROUP:  Definitely the funk bomb.  Oh, yeah.

10                    MAIN GUY:  Then track three, De La Soul doing

11          "Oooh."

12                    DE LA SOUL:  You must mean "The land of oooh,

13          oooh, oooh, oooh."

14                    MAIN GUY:  That's right.  Then, Ziggy, how about

15          "We are one."

16                    ZIGGY:  Everything cool.

17                    MAIN GUY:  Irie.

18                    ZIGGY:  Yeah, man.

19                    MAIN GUY:  Then, Iggy, with "Search and destroy."

20                    IGGY:  With or without jumper cables.

21                    MAIN GUY:  Okay.  Lil' Kim, how about "Notorious

22          K.I.M."

23                    LIL' KIM:  You sure you're ready for that?

24                    MAIN GUY:  Smashmouth.

25                    SMASHMOUTH:  What do you want to hear?
```

Page 2

```
 1              MAIN GUY:  Can you do "Allstar" after that?

 2              SMASHMOUTH:  I don't think so.  Okay; I'm just

 3     kidding.

 4              MAIN GUY:  And, Deep Dish, can you do that song

 5     that's like, uh, M.T.M.T.M.T.M.T (phonetic) --

 6              DEEP DISH:  Yeah, we can do that.

 7              MAIN GUY:  -- M.T.

 8              GEORGE:  Ima drop the funk bomb on ya.

 9              THE GROUP:  Good one, George.

10              MAIN GUY:  Let's slow it down with Aimee Mann

11     doing "Red vines."

12              AIMEE MANN:  You got it.

13              MAIN GUY:  And Wilco with "Misunderstood."

14              WILCO:  All right.

15              MAIN GUY:  And, uh, Mr. White.

16              BARRY WHITE:  You can call me "Barry."

17              MAIN GUY:  How about something for, you know, the

18     ladies.

19              BARRY WHITE:  Now you're speaking my language.

20              NARRATOR:  It's your music, burn it on a Mac.

21              GEORGE:  Dig.

22                      (End of commercial.)

23

24

25

                                                    Page 3
```

```
1                  C E R T I F I C A T I O N

2

3         I, Amanda Kallas, hereby certify that the

4    foregoing is a true and correct transcription, to the

5    best of my ability, of the sound recorded proceedings

6    submitted for transcription.

7

8         I further certify that I am not employed by nor

9    related to any party to this action.

10

11        In witness whereof, I hereby sign this date:

12   December 14, 2014.

13

14        _____

15        Amanda Kallas, CSR No. 13901

16

17

18

19

20

21

22

23

24

25

                                              Page 4
```

**[1 - trust]**

**1**

**1**  1:21
**13901**  1:19 4:15
**14**  4:12
**1977936**  1:20

**2**

**2014**  1:14 4:12

**4**

**4**  1:14,21

**a**

**ability**  4:5
**action**  4:9
**aimee**  3:10,12
**allstar**  3:1
**amanda**  1:19 4:3,15
**anti**  1:6
**apple**  1:6
**assignment**  1:20

**b**

**barry**  3:16,16,19
**best**  4:5
**bomb**  2:8,9 3:8
**bride**  2:4
**burn**  3:20

**c**

**c**  4:1,1
**c.s.r.**  1:19
**c05-00037ygr**  1:6
**cables**  2:20
**california**  1:2
**call**  3:16
**case**  1:6
**cd**  2:3
**certify**  4:3,8
**commercial**  1:13,25
   3:22
**cool**  2:16
**correct**  4:4
**court**  1:1
**csr**  4:15

**d**

**date**  4:11
**de**  2:10,12
**december**  1:14 4:12
**deep**  3:4,6
**definitely**  2:9
**destroy**  2:19
**dig**  3:21
**dish**  3:4,6
**district**  1:1,2
**division**  1:3
**doing**  2:10 3:11
**drop**  2:8 3:8

**e**

**e**  4:1
**employed**  4:8

**f**

**f**  4:1
**foregoing**  4:4
**funk**  2:8,9 3:8
**further**  4:8

**g**

**george**  2:6,8 3:8,9
   3:21
**good**  2:7 3:9
**group**  2:2,9 3:9
**guy**  2:1,3,6,10,14,17
   2:19,21,24 3:1,4,7
   3:10,13,15,17

**h**

**hear**  2:6,25
**hey**  2:3,6
**hi**  2:1,2

**i**

**iggy**  2:19,20
**ima**  2:8 3:8
**ipod**  1:6
**irie**  2:17
**itunes**  1:6

**j**

**jumper**  2:20

**k**

**k.i.m.**  2:22
**kallas**  1:19 4:3,15
**kidding**  3:3
**kim**  2:21,23
**know**  3:17

**l**

**la**  2:10,12
**ladies**  3:18
**land**  2:12
**language**  3:19
**lead**  1:6
**lil**  2:21,23
**litigation**  1:6
**liz**  2:4,5
**lookin**  2:7
**love**  2:6

**m**

**m.t.**  3:7
**m.t.m.t.m.t.m.t**  3:5
**mac**  3:20
**main**  2:1,3,6,10,14
   2:17,19,21,24 3:1,4
   3:7,10,13,15,17
**man**  2:18
**mann**  3:10,12
**mean**  2:12
**misunderstood**  3:13
**music**  3:20

**n**

**n**  4:1
**narrator**  3:20
**northern**  1:2
**notorious**  2:21

**o**

**o**  4:1
**oakland**  1:3
**oh**  2:9
**okay**  2:21 3:2

**oooh**  2:11,12,13,13
   2:13

**p**

**pages**  1:21
**party**  4:9
**phonetic**  3:5
**polyester**  2:4
**proceedings**  4:5

**r**

**r**  4:1
**ready**  2:23
**recorded**  4:5
**red**  3:11
**related**  4:9
**reported**  1:19
**right**  2:14 3:14

**s**

**search**  2:19
**sign**  4:11
**slow**  3:10
**smashmouth**  2:24
   2:25 3:2
**song**  3:4
**soul**  2:10,12
**sound**  4:5
**speaking**  3:19
**start**  1:25 2:4
**states**  1:1
**stenographic**  1:13
**submitted**  4:6
**sure**  2:5,23

**t**

**t**  4:1,1
**think**  3:2
**three**  2:10
**thursday**  1:14
**track**  2:10
**transcription**  1:13
   1:25 4:4,6
**true**  4:4
**trust**  1:6

Page 1

[uh - ziggy]

| u |
|---|
| **uh**   3:5,15 |
| **um**   2:3 |
| **united**   1:1 |

| v |
|---|
| **vines**   3:11 |

| w |
|---|
| **want**   2:25 |
| **whereof**   4:11 |
| **white**   3:15,16,19 |
| **wilco**   3:13,14 |
| **witness**   4:11 |

| y |
|---|
| **ya**   3:8 |
| **yeah**   2:9,18 3:6 |

| z |
|---|
| **ziggy**   2:14,16,18 |

Page 2