UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA   *ORIGINAL*

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


| | | |
|---|---|---|
| THE APPLE IPOD ITUNES | ) | NO. C 05-00037 YGR |
| ANTITRUST LITIGATION | ) | |
| | ) | PAGES 875 - 1100 |
| | ) | |
| | ) | **JURY TRIAL VOLUME 5** |
| | ) | |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| _____) | | FRIDAY, DECEMBER 5, 2014 |


### REPORTERS' TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                  BY:  ALEXANDRA S. BERNAY,
                       JENNIFER N. CARINGAL,
                       PATRICK COUGHLIN,
                       STEVEN M. JODLOWSKI,
                       CHARLES MCCUE,
                       CARMEN A. MEDICI,
                       BONNY E. SWEENEY, ATTORNEYS AT LAW

                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                  BY:  FRANCIS J. BALINT, JR.
                       ATTORNEY AT LAW

             (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:       RAYNEE H. MERCADO, CSR NO. 8258
                   DIANE E. SKILLMAN, CSR NO. 4909

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.


*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

## A P P E A R A N C E S (CONT'D.)

FOR DEFENDANT:          BOIES, SCHILLER & FLEXNER LLP
                          5301 WISCONSIN AVENUE NW
                          WASHINGTON, D.C.  20015
                BY:  WILLIAM A. ISAACSON,
                     KAREN L. DUNN,
                     MARTHA L. GOODMAN, ATTORNEYS AT LAW


                          BOIES, SCHILLER & FLEXNER LLP
                          1999 HARRISON STREET, SUITE 900
                          OAKLAND, CALIFORNIA  94612
                BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                          JONES DAY
                          555 CALIFORNIA STREET, 26TH FLOOR
                          SAN FRANCISCO, CALIFORNIA  94104-1500
                BY:  DAVID C. KIERNAN, ATTORNEYS AT LAW


                          APPLE
                          1 INFINITE LOOP, MS 169-2NYJ
                          CUPERTINO, CALIFORNIA  95014
                BY:  SCOTT B. MURRAY,
                        SENIOR LITIGATION COUNSEL


                            --OOO--

<u>**I N D E X**</u>

| <u>**PLAINTIFFS' WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| JEFFREY, ROBBIN | | |
| DIRECT EXAMINATION BY MR. COUGHLIN | 895 | 5 |
| CROSS-EXAMINATION BY MS. DUNN | 983 | 5 |
| REDIRECT EXAMINATION BY MR. COUGHLIN | 1050 | 5 |
| RECROSS-EXAMINATION BY MS. DUNN | 1057 | 5 |
| | | |
| VIDEOTAPED DEPOSITION OF STEVE JOBS | 1059 | 5 |
| | | |
| NOLL, ROGER | | |
| DIRECT EXAMINATION BY MS. SWEENEY | 1060 | 5 |

--OOO--

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 69 | | | 1085 | 5 |
| 92 | | | 1086 | 5 |
| 102 | | | 1094 | 5 |
| 133 | | | 1086 | 5 |
| 136 | | | 1086 | 5 |
| 153 | | | 1087 | 5 |
| 172 | | | 1093 | 5 |
| 176 | | | 1087 | 5 |
| 218 | | | 1088 | 5 |
| 267 | | | 1088 | 5 |
| 312 | | | 1088 | 5 |
| 333 | | | 1089 | 5 |
| 465 | | | 1088 | 5 |
| 880A | | | 1085 | 5 |
| 908 | | | 1096 | 5 |

--OOO--

**E X H I B I T S**

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2015 | | | 1085 | 5 |
| 2021 | | | 1085 | 5 |
| 2107 | | | 1091 | 5 |
| 2185 | | | 1090 | 5 |
| 2205 | | | 1090 | 5 |
| 2222 | | | 1090 | 5 |
| 2228 | | | 1091 | 5 |
| 2234 | | | 1090 | 5 |
| 2247 | | | 1088 | 5 |
| 2252 | | | 1090 | 5 |
| 2272 | | | 1092 | 5 |
| 2273 | | | 890 | 5 |
| 2317 | | | 890 | 5 |
| 2330 | | | 1091 | 5 |
| 2342 | | | 890 | 5 |
| 2354 | | | 1088 | 5 |
| 2449 | | | 1092 | 5 |
| 2481 | | | 1092 | 5 |
| 2505 | | | 1093 | 5 |
| 2780 | | | 1092 | 5 |
| 2850 | | | 1092 | 5 |

```
 1   FRIDAY, DECEMBER 5, 2014                        8:00 A.M.

 2                     P R O C E E D I N G S

 3       (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

 4   OF THE JURY:)

 5           THE CLERK:  CALLING CIVIL ACTION 05-0037, APPLE IPOD

 6   ITUNES ANTITRUST LITIGATION.

 7       COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 8           MS. SWEENEY:  GOOD MORNING, YOUR HONOR.

 9       BONNIE SWEENEY FOR THE PLAINTIFFS.  AND WITH ME AT COUNSEL

10   TABLE ARE PATRICK COUGHLIN, ALEXANDRA BERNAY, STEVE JODLOWSKI,

11   FRANK BALINT.

12           THE COURT:  GOOD MORNING.

13           MR. ISAACSON:  BILL ISAACSON FOR DEFENDANT, APPLE,

14   YOUR HONOR, HERE WITH KAREN DUNN, MEREDITH DEARBORN, MARTHA

15   GOODMAN, AND SCOTT MURRAY OF APPLE.

16           THE COURT:  GOOD MORNING.

17               (OFF-THE-RECORD DISCUSSION.)

18           THE COURT:  HOW DO YOU SPELL YOUR LAST NAME?

19           MR. JODLOWSKI:  IT'S NOT THE FIRST TIME I'VE BEEN

20   ASKED THAT.  IT'S J-O-D-L-O-W-S-K-I.

21           THE COURT:  WELL, MY ROOMMATE WAS CZERNYKOWSKI.  SO I

22   KIND OF HAD PART OF IT BUT WANTED TO MAKE SURE.  THANK YOU.

23       OKAY.  LOTS TO DO THIS MORNING.

24       I RECEIVED THE MOTION FROM APPLE.  I APPRECIATE YOU DOING

25   THIS EARLY.  LIKE I SAID, I WANT TO MAKE SURE THAT I HAVE
```

1   SUFFICIENT TIME TO CONSIDER IT AND TO DO CASE RESEARCH,

2   ET CETERA.

3       I'M EXPECTING I'LL GET A WRITTEN RESPONSE FROM THE

4   PLAINTIFFS ON THIS.

5           **MS. SWEENEY:**  YES, YOUR HONOR.  WE ONLY RECEIVED IT

6   AT 3:30 THIS MORNING, THOUGH, SO WE DON'T HAVE A RESPONSE

7   PREPARED YET.

8           **THE COURT:**  I DID NOT EXPECT THAT.

9       WHEN CAN YOU GET A RESPONSE ON FILE?

10          **MS. SWEENEY:**  WHEN WOULD YOU LIKE IT, YOUR HONOR?  WE

11  COULD PROBABLY HAVE ONE TOMORROW OR --

12          **THE COURT:**  TOMORROW IS FINE.

13          **MS. SWEENEY:**  -- LATE TODAY.

14          **THE COURT:**  NO.  TOMORROW IS FINE.  AND THEN THAT

15  WILL GIVE US AN OPPORTUNITY TO LOOK AT IT AND TALK ABOUT IT ON

16  MONDAY.

17          **MR. ISAACSON:**  IF IT'S OF ASSISTANCE, YOUR HONOR, WE

18  HAVE A COURTESY COPY OF THE CASES CITED --

19          **THE COURT:**  EXCELLENT.  THAT JUST SAVED MY LAW CLERK

20  TIME.  THANK YOU.

21      OKAY.  ON THE NEXT ISSUE -- WELL, LET ME -- ACTUALLY, I

22  DID LOOK AT IT THIS MORNING.  I HAVE JUST A COUPLE QUICK

23  QUESTIONS.  I WANT TO MAKE SURE.

24      THE REVELATION THAT THE FIFTH GENERATION DID NOT INCLUDE

25  KVC AND DVC, WHEN WAS THAT REVEALED BY APPLE?

1            **MR. ISAACSON:**  THAT WAS REVEALED BACK IN THE FARRUGIA

2    AFFIDAVIT, WHICH IS 2000 AND --

3            **MS. SWEENEY:**  JULY 2013.

4                    (PAUSE IN THE PROCEEDINGS.)

5            **THE COURT:**  OKAY.  AND WHAT WAS THE CONTEXT IN WHICH

6    APPLE REVEALED THAT THE FIFTH GENERATION DID NOT INCLUDE THE

7    KVC AND DVC?

8            **MR. ISAACSON:**  AS I UNDERSTAND IT, THE DECLARATION

9    EXPLAINED THAT THERE HAD -- THAT PEOPLE HAD GONE BACK AND

10   LOOKED AT THE UNDERLYING CODE AGAIN AND COME TO THE

11   UNDERSTANDING AS TO WHICH DEVICES HAD 7.0 AND WHICH DEVICES

12   DID NOT.

13           **THE COURT:**  OKAY.  SO I WANT TO -- IT DIDN'T HAVE 7.0

14   AT ALL?  OR IT HAD 7.0 BUT NOT KVC AND DVC?  THOSE ARE --

15           **MR. ISAACSON:**  YES.  SO IT HAD THE -- TO BE MORE

16   SPECIFIC, IT HAD IT FOR ONLY THE GAMES IN THIS

17   FIFTH-GENERATION DEVICE SO IT WOULDN'T HAVE -- WOULDN'T HAVE

18   HAD A KVC OR DVC THAT WOULD HAVE BLOCKED HARMONY.

19      AND BOTH SIDES HAD THE CODE AND BOTH SIDES' TECHNICAL

20   EXPERTS AGREED THAT THIS WAS BEING DONE -- THIS WAS THE

21   CORRECT -- THIS WAS UNDISPUTED.  DR. MARTIN REVIEWED THIS.

22           **THE COURT:**  ON THE FIFTH GENERATION ONLY?

23           **MR. ISAACSON:**  YES.  WELL, ON -- ONLY THE FIFTH

24   GENERATION IS AT ISSUE, BUT OTHER DEVICES WERE SORTED OUT IN

25   THIS AFFIDAVIT.

```
 1                    (OFF-THE-RECORD DISCUSSION.)

 2          THE COURT:  IT'S NOT JUST THE FIFTH GENERATION AT

 3   ISSUE.  I MEAN, THERE ARE -- THERE ARE DAMAGES BEING SOUGHT ON

 4   NUMEROUS VERSIONS.

 5          MR. ISAACSON:  RIGHT.  BUT IN TERMS OF THE PLAINTIFF,

 6   THERE'S ONLY ONE IPOD LEFT IN THE CASE.

 7          THE COURT:  I'M JUST TRYING TO UNDERSTAND,

 8   MR. ISAACSON, WHEN THE REVELATION OCCURRED AND WHAT

 9   SPECIFICALLY IT WAS.

10          MR. ISAACSON:  RIGHT.  AND I GUESS PREVIOUS TO THE

11   DECLARATION, THERE WAS AN APRIL 1ST, 2013, EMAIL FROM APPLE

12   COUNSEL THAT'S REFERENCED IN THE MARTIN REPORT.

13          THE COURT:  THAT SAYS WHAT?

14          MR. ISAACSON:  I DON'T HAVE IT WITH ME.  I'M JUST --

15   MR. MARTIN -- OH, IT'S -- OH, THIS IS QUOTED.

16      SO IT IS AT PAGE 34 OF DR. MARTIN'S EXPERT REPORT.

17          THE COURT:  THAT SAYS?

18          MR. ISAACSON:  IT SAYS -- WELL, I'M GOING TO HAVE TO

19   READ THE NAME OF A NUMBER OF DEVICES OUT LOUD.

20          THE COURT:  ALL RIGHT.  WELL, HOLD ON.  JUST LET ME

21   GET IT THEN.

22      HE HAS THREE REPORTS.  WHICH ONE AM I LOOKING AT?

23          MR. ISAACSON:  THIS IS THE EXPERT REPORT IS THE TITLE

24   AND SO -- AND IT IS DATED APRIL 8TH, 2013.

25          THE COURT:  AND WHAT PARAGRAPH ARE YOU LOOKING AT?
```

```
 1              MR. ISAACSON:  PARAGRAPH 84, AND YOU CAN SEE BLOCK

 2      TEXT THERE.

 3                     (PAUSE IN THE PROCEEDINGS.)

 4              MR. ISAACSON:  AND THAT'S --

 5              THE COURT:  HOLD ON.

 6              MR. ISAACSON:  -- FROM THE EMAIL.

 7                     (PAUSE IN THE PROCEEDINGS.)

 8              THE COURT:  OKAY.

 9         NOW, THE OTHER --

10              MR. ISAACSON:  I HAVE BEEN GIVEN A FULL COPY OF THE

11      EMAIL, TOO, IF YOU WOULD LIKE THAT.

12              THE COURT:  NO, THAT'S FINE.  I HAVE ENOUGH.

13         THE THREE NEWLY DISCLOSED -- OR THE TWO NEWLY DISCLOSED

14      IPODS THAT MS. ROSEN TESTIFIED TO A FEW DAYS AGO, THE SERIAL

15      NUMBERS THAT WERE GIVEN YESTERDAY, WERE THOSE FOR BOTH OF

16      THOSE NEWLY DISCLOSED IPODS?

17              MS. SWEENEY:  I -- I BELIEVE SO, YOUR HONOR.

18              MR. ISAACSON:  NO, I DON'T --

19              THE COURT:  AND --

20              MR. ISAACSON:  I DON'T THINK THAT'S QUITE CORRECT.

21      WE WERE GIVEN ONE SERIAL NUMBER TWO DAYS AGO FOR -- WELL, SO

22      THERE'S THE DEVICE THAT SHE HAD WITH HER HERE IN CALIFORNIA.

23              MS. SWEENEY:  HERE.  I CAN ANSWER, MR. ISAACSON.  I

24      HAVE THE DOCUMENT IN FRONT OF ME NOW.

25         SO THERE WERE TWO SEPARATE PURCHASES.  SO ONE OF THE
```

```
 1   PURCHASES, THE ONE THAT WAS ON SEPTEMBER 11TH, 2008, HAD TWO

 2   IPODS.  AND -- BUT THE SERIAL NUMBER THAT WE GAVE TO APPLE

 3   YESTERDAY ONLY REFERENCED THE IPOD TOUCH THAT WAS PURCHASED ON

 4   THAT DATE BECAUSE THAT WAS THE SERIAL NUMBER IN HER ITUNES

 5   ACCOUNT.

 6          THE COURT:  I'M TRYING TO MAKE SURE I UNDERSTAND THE

 7   FACTUAL PRESENTATION IN APPLE'S BRIEF.

 8      SO ON PAGE 6 OF THE BRIEF, THEY TALK ABOUT THE TWO

 9   ADDITIONAL IPODS, THE NANO FROM THE FALL OF 2007 AND THE TOUCH

10   FROM 2008.

11      AS I UNDERSTAND IT, THE TOUCH WAS THE ONE SHE HAD WITH

12   HER; IS THAT CORRECT?

13          MS. SWEENEY:  SHE HAD A TOUCH WITH HER, YOUR HONOR.

14   IT TURNS OUT THAT THE TOUCH THAT SHE HAD WITH HER WAS A LATER

15   PURCHASED TOUCH.  IT'S NOT THE ONE THAT SHE PURCHASED IN 2008.

16   SO APPLE HAS THE SERIAL NUMBERS FOR BOTH TOUCHES, THAT IS, THE

17   ONE THAT WAS PURCHASED IN 2009 AND THE ONE THAT WAS PURCHASED

18   IN 2008.

19          THE COURT:  ALL RIGHT.  SO WE STILL DON'T HAVE

20   INFORMATION ON THE NANO; IS THAT CORRECT?

21          MS. SWEENEY:  WE HAVE -- WE HAVE HER RECEIPT FROM THE

22   APPLE STORE FOR BOTH THE NANO AND THE TOUCH ON SEPTEMBER 11,

23   2008.

24          MR. ISAACSON:  AND THAT'S THE RECEIPT THAT SAYS THE

25   ROSEN LAW FIRM.
```

1        **MS. SWEENEY:**  YOUR HONOR, MS. ROSEN GOT A COPY OF THE

2   RECEIPT FROM THE APPLE STORE.  IT DOESN'T SAY THE ROSEN LAW

3   FIRM.  WE DON'T KNOW WHERE APPLE'S RECORDS CAME FROM.  IT'S

4   CERTAINLY NOTHING THAT WAS GIVEN TO MS. ROSEN.

5        **THE COURT:**  OKAY.

6        **MR. ISAACSON:**  JUST TO BE CLEAR, WHEN IT SAYS -- THE

7   RECEIPT SAYS THE ROSEN LAW FIRM, THE ROSEN LAW FIRM, TWICE,

8   THAT'S BECAUSE OF THE -- THAT MEANS IT'S THE CREDIT CARD THAT

9   WAS USED.  AND SO THE REASON IT'S REPEATED IS IT'S FIRST NAME

10  AND LAST NAME.  SO IF I HAD DONE IT, IT WOULD HAVE SAID -- MY

11  CREDIT CARD WOULD HAVE SAID WILLIAM ISAACSON.  WHEN IT'S THIS

12  BUSINESS, IT SAYS THE ROSEN LAW FIRM, THE ROSEN LAW FIRM.  SO

13  THAT'S A CREDIT CARD THAT WAS USED FOR THE PURCHASE.

14       **THE COURT:**  WELL, BUT THAT'S NOT IN EVIDENCE RIGHT

15  NOW.  I JUST WANT TO UNDERSTAND WHAT THE PARTIES' POSITIONS

16  ARE.

17     SO THERE IS -- THERE'S INFORMATION THAT HAS BEEN PROVIDED

18  TO THE COURT, BUT THE ACTUAL EVIDENCE IN THE CASE IS LIMITED.

19  SO I'M JUST TRYING TO UNDERSTAND WHERE EVERYBODY IS AT THIS

20  POINT.

21       **MR. ISAACSON:**  RIGHT.  AS WE'VE EXPLAINED IN THE

22  PAPER BECAUSE -- IN OUR PAPERS WITH RESPECT TO SUBJECT MATTER

23  JURISDICTION, THE EVIDENTIARY RECORD --

24       **THE COURT:**  I UNDERSTAND.

25       **MR. ISAACSON:**  -- IS BEFORE THE COURT.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1           **THE COURT:**  I UNDERSTAND.

2           **MR. ISAACSON:**  AND IF THERE IS AN ADDITIONAL RECEIPT

3    THAT'S BEING REFERENCED, WE'RE NOT AWARE OF WHAT THAT IS.

4           **THE COURT:**  OKAY.  WELL, MAKE SURE YOU GIVE THEM A

5    COPY.

6           **MS. SWEENEY:**  WELL, WE'LL GIVE THEM A COPY, YOUR

7    HONOR.

8       AND MS. ROSEN -- WE'LL ALSO SUBMIT A DECLARATION FROM

9    MS. ROSEN IN -- IN OUR RESPONSE TO APPLE'S MOTION.  AMONG

10   OTHERS THINGS, SHE -- SHE WAS AN AUTHORIZED USER OF THE CREDIT

11   CARD.  SHE PURCHASED THE IPOD WITH HER FUNDS.  SHE USED THE

12   IPOD.  SHE USED IT, SHE CONNECTED IT TO ITUNES.  APPLE HAS

13   RECORDS OF THAT CONNECTION.  SHE USED IT FOR HER OWN PERSONAL

14   USE.

15      SO WE -- WE'LL RESPOND IN FULL ON SATURDAY, YOUR HONOR.

16          **THE COURT:**  OKAY.

17          **MR. ISAACSON:**  ALL RIGHT.  SEPARATE FROM THE ISSUE OF

18   SUBJECT MATTER JURISDICTION, WE WOULD ALSO SEEK TO ADD AS A

19   WITNESS MR. O'NEIL AS PART OF OUR CASE JUST TO TESTIFY TO

20   THESE RECEIPTS.

21      IF MR. O'NEIL IS NOT ADDED, WE WILL HAVE -- WE HAVE

22   EXECUTIVES WHO ARE ON OUR WITNESS LIST.  WE'LL TEACH THEM THE

23   SYSTEM AND HAVE THEM TESTIFY TO THE SAME THING AS MR. O'NEIL.

24   IT WILL BE MORE EXPEDITIOUS TO JUST HAVE MR. O'NEIL DO IT.

25          **THE COURT:**  I AGREE, IT WOULD.  I WILL ALLOW HIM TO

1  TESTIFY IF YOU GIVE HIM -- GIVE THE PLAINTIFFS ACCESS TO HIM

2  FOR ABOUT AN HOUR SO THAT THEY CAN GO OVER THAT TESTIMONY AND

3  WE'RE NOT WASTING TIME IN COURT.

4          **MR. ISAACSON:**  YES, YOUR HONOR.

5          **THE COURT:**  ALL RIGHT.

6      WITH RESPECT TO THE OTHER LETTER THAT WAS SENT WITH

7  PROFESSOR NOLL AND HIS ANTICIPATED TESTIMONY, ARE THERE

8  CERTAIN -- I SHOULD GET MY ORDER.  THIS WAS RESERVED, I TAKE

9  IT?

10         **MS. SWEENEY:**  YOUR HONOR, MAY I SPEAK TO THAT?

11     WE -- WE -- WE GOT THIS LETTER.  WE'RE NOT SURE WHY APPLE

12  SENT IT.  IT DOESN'T SEEM LIKE ANY KIND OF ISSUE THAT WE'RE

13  AWARE OF.  WE DID A WORD SEARCH OF PROFESSOR NOLL'S MANY

14  REPORTS.  HE'S BEEN DEPOSED SIX TIMES, AND HE'S GIVEN TEN

15  REPORTS AND DECLARATIONS.  AND I DON'T SEE HIM TESTIFYING

16  ANYWHERE IN THERE ABOUT APPLE'S INTENT.

17     SO I'M NOT SURE WHY MR. ISAACSON FELT THE NEED TO SUBMIT

18  THAT LETTER LAST NIGHT.

19         **THE COURT:**  WELL, BECAUSE APPARENTLY I OVERRULED AN

20  OBJECTION.  THAT'S WHY HE FELT THE NEED.  AND I DON'T ACTUALLY

21  REMEMBER THE OBJECTION REFERENCING ANY TESTIMONY OF INTENT,

22  BUT PERHAPS IT'S BECAUSE I CUT YOU OFF, MR. ISAACSON.

23     I WAS CONCERNED, GIVEN SOME OF THE IMMEDIATE OBJECTIONS IN

24  LIGHT OF THE FLEXIBILITY THAT THE COURT HAD AFFORDED TO THE

25  PARTIES, AND THAT'S CERTAINLY WHAT I WAS REACTING TO.

 1          NOW, IF WE DON'T HAVE ANY EVIDENCE BEING PROFFERED OF

 2    INTENT, THEN THIS ISN'T AN ISSUE.  BUT IN GENERAL, IF IT'S NOT

 3    IN THE RECORD, THE EXPERTS CAN'T RELY ON IT.

 4          SO ANYTHING TO DISCUSS AT THIS POINT?

 5               **MR. ISAACSON:**  I DON'T THINK SO.

 6               **THE COURT:**  OKAY.

 7               **MR. ISAACSON:**  NOT ON THAT ISSUE ANYWAY.  WE --

 8               **THE COURT:**  ALL RIGHT.  OTHER ISSUES?  MS. DUNN?

 9          GOOD MORNING.

10               **MS. DUNN:**  YEAH, ONE SMALL ISSUE, YOUR HONOR.

11          IT SEEMS LIKE ON DAY TWO OF TRIAL, WE MAY NOT HAVE

12    ADMITTED INTO EVIDENCE THREE STIP-TO-ADMIT EXHIBITS.

13               **THE COURT:**  OKAY.  HOLD ON.

14               **MS. DUNN:**  WE ALERTED PLAINTIFFS LAST NIGHT.

15               **THE COURT:**  HOLD ON.

16          THERE WERE -- I REMEMBER ONE DAY THERE WERE A NUMBER OF

17    EXHIBITS THAT MR. COUGHLIN DID NOT OFFER EVEN THOUGH THAT THEY

18    WERE USED.  SO WHO -- WITH WHICH WITNESS?

19               **MS. DUNN:**  THESE WERE APPLE EXHIBITS WITH

20    MR. FARRUGIA.  AND THE NUMBERS -- I'M SHOWING THEM TO

21    MR. COUGHLIN.  LAST NIGHT WE SENT THEM -- OR RIGHT NOW.  WE

22    SENT THE NUMBERS OVER LAST NIGHT.

23               **THE COURT:**  OKAY.  GIVE ME THE NUMBERS.

24               **MR. COUGHLIN:**  EXHIBIT 234.

25               **THE CLERK:**  CAN YOU GO TO THE --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1          **MS. DUNN:**  I CAN DO IT ALSO.

2          **THE COURT:**  OKAY.  GO AHEAD.

3          **MS. DUNN:**  TX2342, TX2273, AND TX2317.

4          **THE COURT:**  ARE THERE OBJECTIONS TO THOSE THREE?

5          **MR. COUGHLIN:**  WELL, YOUR HONOR, ONE IS EXHIBIT 2342

6     IS HEARSAY.  I DON'T KNOW IF THERE'S AN OBJECTION.  ARE THEY

7     ALL STIPULATE-TO-ADMIT WITHOUT THIS BEING OBJECTION TO

8     HEARSAY?

9          **MS. DUNN:**  THEY'RE ALL STIPULATE-TO-ADMIT.

10         **MR. COUGHLIN:**  THEN I HAVE NO OBJECTION, YOUR HONOR.

11         **THE COURT:**  OKAY.  SO 2342 IS ADMITTED.

12     (DEFENDANT'S EXHIBIT 2342 WAS RECEIVED IN EVIDENCE.)

13         **THE COURT:**  2273 IS ADMITTED.

14     (DEFENDANT'S EXHIBIT 2273 WAS RECEIVED IN EVIDENCE.)

15         **THE COURT:**  2317 IS ADMITTED.

16     (DEFENDANT'S EXHIBIT 2317 WAS RECEIVED IN EVIDENCE.)

17         **MS. DUNN:**  THANK YOU, YOUR HONOR.

18              (PAUSE IN THE PROCEEDINGS.)

19         **THE COURT:**  OKAY.  OTHER ISSUES?

20              (OFF-THE-RECORD DISCUSSION.)

21         **MR. COUGHLIN:**  YOUR HONOR, WE REACHED A -- AN

22     AGREEMENT LAST NIGHT BETWEEN THE PARTIES THAT MELANIE TUCKER

23     IS GOING TO BE WITHDRAWN AS A PLAINTIFF.  SHE WILL NOT BE

24     TESTIFYING TODAY.  AND THE INSTRUCTION TO THE JURY THAT THE

25     PARTIES AGREED UPON IS THAT PLAINTIFFS WITHDREW MELANIE TUCKER

```
 1    AS A PLAINTIFF.

 2            THE COURT:  HAVE THEY BEEN -- I'M TRYING TO REMEMBER

 3    IF THEY'VE EVEN BEEN ADVISED THAT SHE WAS A PLAINTIFF.

 4            MR. COUGHLIN:  SHE -- THEY MIGHT HAVE SEEN HER

 5    PICTURE IN THE OPENING.

 6            MR. ISAACSON:  THEY WERE TOLD ABOUT HER IN OPENING

 7    AND -- BY BOTH SIDES, BOTH SIDES, TWO PLAINTIFFS, TOLD HER

 8    NAME.  SO I THINK THEY'RE EXPECTING TWO PLAINTIFFS EVEN IF

 9    THEY'VE FORGOTTEN THE NAME.

10            THE COURT:  OKAY.  WHEN DO YOU WANT ME TO INSTRUCT

11    THEM ON THAT ISSUE?

12            MR. COUGHLIN:  I DON'T THINK IT'S -- THERE'S A RUSH

13    TO IT.

14            THE COURT:  DO YOU WANT ME TO JUST DO IT AS --

15            MR. COUGHLIN:  YEAH, JUST PART OF YOUR OPENING

16    INSTRUCTIONS, MAYBE THIS MORNING YOU COULD DO IT AS WE START.

17    SHE WAS GOING TO TESTIFY TODAY.  WE REACHED THAT AGREEMENT

18    LAST NIGHT.

19            THE COURT:  OKAY.

20            MR. COUGHLIN:  YOU COULD ALSO DO IT AT THE END OF THE

21    CASE, AT THE END OF OUR CASE, SO IT'S --

22            THE COURT:  OKAY.  ANYTHING ELSE?

23            MR. ISAACSON:  WE TALKED TO THE PLAINTIFFS ABOUT

24    THIS, THE TIME CALCULATIONS.

25            THE COURT:  WRONG AGAIN, HUH?
```

```
 1           MR. ISAACSON:  IT'S JUST THE MATH.  IT'S NOT HOW MUCH

 2   SIDE -- EACH --

 3           THE COURT:  SO IN THERE --

 4           MR. ISAACSON:  -- HOW MUCH TIME EACH SIDE -- IT'S THE

 5   SUBTOTALS HAVE TWO MATH ERRORS.

 6           THE COURT:  IN THERE, ARE YOU TAKING INTO ACCOUNT

 7   THAT I DON'T -- I DON'T ADDRESS THE -- THE 15-MINUTE -- OR

 8   THOSE THINGS HAVE 15-MINUTE ALLOCATIONS FOR YOUR BREAKS THAT

 9   YOU DON'T GET.

10           MR. ISAACSON:  WELL, ONE OF THEM IS A ONE-MINUTE

11   ADDITION ERROR SO -- ALL I KNOW IS --

12           THE COURT:  LET ME JUST HAVE THEM.

13           MR. ISAACSON:  RIGHT.  SO DR. DAVID MARTIN START --

14   AND THIS IS -- START 12:24 END 1:24, SUBTOTAL 45 MINUTES.

15           THE COURT:  YES, BECAUSE IN THAT ONE-HOUR PERIOD, YOU

16   GET A 15-MINUTE BREAK.

17           MR. ISAACSON:  OKAY.

18           THE COURT:  SO ONLY 45 MINUTES IS COUNTED AGAINST

19   YOU.

20           MR. ISAACSON:  ALL RIGHT.  THAT'S FINE.  AND THEN THE

21   OTHER ONE IS JUST -- WHICH ONE IS IT?  IT'S THE REDIRECT OF

22   ROSEN.  OH, IT'S -- IS IT JUST MISSING ONE MINUTE; IS THAT

23   WHAT WE'RE SAYING?  I'LL --

24                 (OFF-THE-RECORD DISCUSSION.)

25           MR. ISAACSON:  I'M NOT GOING TO SPEND YOUR TIME ABOUT
```

1    ONE MINUTE.

2         **THE COURT:**  SO I DIDN'T WANT TO SPEND THE TIME ABOUT

3    ONE MINUTE EITHER.  OKAY?

4       SO THIS IS -- LOOK, IF WE'RE GOING OVER FIVE MINUTES ON

5    EACH SIDE, TEN MINUTES ON EACH SIDE, I DON'T REALLY CARE.

6         **MR. ISAACSON:**  YEAH, NEITHER DO WE.

7         **THE COURT:**  BUT THESE ARE ROUGH ESTIMATES.

8         **MR. ISAACSON:**  YES.

9         **THE COURT:**  OKAY.  SO NOT SO BAD IN FRONT OF THE

10   NATIONAL PRESS THAT I DIDN'T GET MY MATH RIGHT.  I ACTUALLY

11   DID.

12        **MR. ISAACSON:**  RIGHT.

13        **THE COURT:**  IT'S JUST -- IT'S JUST HIT -- IT'S THE

14   NEW MATH.

15        **MR. ISAACSON:**  IT'S THE EMBEDDED CODES.

16        **THE COURT:**  IT'S THE EMBEDDED CODES.  THERE WE GO.

17   IT'S MY OWN SOURCE CODE.

18      OKAY.  OTHER ISSUES?

19        **MR. COUGHLIN:**  I DON'T THINK SO, YOUR HONOR.

20        **THE COURT:**  ALL RIGHT.  LET'S SEE, WE'LL STAND IN

21   RECESS THEN TILL I HAVE -- MAKE SURE THAT THE JURY IS BACK.

22      GO AHEAD.

23      (RECESS TAKEN AT 8:20 A.M.; PROCEEDINGS RESUMED AT 8:28

24   A.M.)

25        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

1    THE JURY:)

2            **THE COURT:**  YOU MAY BE SEATED.  WE ARE BACK ON THE

3    RECORD.

4        THE RECORD WILL REFLECT THAT THE JURY IS BACK WITH US.

5    GOOD MORNING.

6            **JURORS:**  GOOD MORNING.

7            **THE COURT:**  THANK GOD IT'S FRIDAY, AS THEY SAY.

8        HOPE EVERYBODY HAD A GOOD EVENING.  SO HIGH SCHOOL ON

9    WEDNESDAY NIGHT.  THURSDAY NIGHT WAS THE MIDDLE SCHOOL

10   ANIMATION AND FILM PRESENTATIONS TO THE PARENTS.  SO THAT'S

11   WHAT I DID LAST NIGHT AFTER BEING ON THE RECORD ALL AFTERNOON

12   WITH MY CRIMINAL CALENDAR.

13       SO AS I HAVE EXPLAINED TO YOU, WE ARE ALL BUSY, BUSY,

14   BUSY.  BUT HOPEFULLY, YOU WERE AGAIN ABLE TO GET SOME REST AND

15   FRESH AND READY TO GO AGAIN.

16       TODAY WE WILL HAVE, IT LOOKS LIKE ANOTHER EXECUTIVE, AN

17   EXPERT, AND THEN PERHAPS SOME VIDEO DEPOSITION TESTIMONY.

18       YOU SHOULD KNOW THAT THE PLAINTIFFS ARE WITHDRAWING ONE OF

19   THEIR NAMED PLAINTIFFS, MELANIE TUCKER, WHO WAS INTRODUCED TO

20   YOU DURING THEIR OPENING.  SO YOU WILL NOT BE HEARING FROM

21   HER.  OKAY?

22       NEXT WITNESS, PLAINTIFFS.

23            **MR. COUGHLIN:**  JEFFREY ROBBIN, YOUR HONOR.

24                (PAUSE IN THE PROCEEDINGS.)

25            **THE CLERK:**  OKAY.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1   **JEFFREY ROBBIN**,

2   CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY

3   SWORN, TESTIFIED AS FOLLOWS:

4           **THE WITNESS:**  I DO.

5           **THE CLERK:**  PLEASE BE SEATED.  AND THEN YOU HAVE TO

6   SCOOT UP TO THE MIC.  AND THEN PLEASE STATE YOUR FULL NAME AND

7   SPELL YOUR LAST NAME.

8           **THE WITNESS:**  JEFFREY LOWELL ROBBIN, R-O-B-B-I-N.

9           **THE COURT:**  GOOD MORNING, MR. ROBBIN.

10          **THE WITNESS:**  GOOD MORNING.

11          **THE COURT:**  YOU MAY PROCEED.

12                  **DIRECT EXAMINATION**

13  **BY MR. COUGHLIN:**

14  **Q.**  GOOD MORNING, MR. ROBBIN.

15      MR. ROBBIN, WHAT YOU HAVE IN FRONT OF YOU –– WELL, YOU

16  HAVE A FEW THINGS IN FRONT OF YOU, BUT YOU HAVE A BINDER.  SO

17  IF YOU COULD OPEN THAT BINDER AND TURN TO EXHIBIT 819.  AND

18  WHAT THEY –– THEY JUST FOLLOW –– WELL, NUMERICAL ORDER.

19      BUT, SO, AND YOU ALSO HAVE SOME WATER, SO YOU MIGHT POUR

20  YOURSELF A GLASS NOW, NOT THAT YOU'RE GOING TO BE UP THERE

21  FOREVER, BUT JUST TO BE READY.

22                  (PAUSE IN THE PROCEEDINGS.)

23  **BY MR. COUGHLIN:**

24  **Q.**  MR. ROBBIN, YOU WORK AT APPLE TODAY; IS THAT CORRECT?

25  **A.**  YES.

1   Q.   AND WHAT IS YOUR POSITION THERE?

2   A.   I'M THE VICE PRESIDENT OF ITUNES ENGINEERING.

3   Q.   AND WHAT WAS YOUR POSITION THERE IN 2003?

4   A.   I DON'T REMEMBER MY EXACT TITLE BACK THEN.

5   Q.   WERE YOU STILL --

6   A.   I WOULD HAVE BEEN RUNNING -- I WOULD HAVE BEEN RUNNING

7   ITUNES ENGINEERING FOR THE DESKTOP SOFTWARE.

8   Q.   WHEN DID YOU GO BACK TO APPLE?

9   A.   SEPTEMBER OF 2000.

10   Q.   OKAY.  AND YOU'VE BEEN WORKING THERE EVER SINCE WITH

11   ITUNES; IS THAT RIGHT?

12   A.   YES.

13   Q.   OKAY.

14       AND YOU'RE FAMILIAR WITH THE -- WHEN DID ITUNES COME

15   ONLINE?  WHEN WAS IT ACTIVATED?

16   A.   CAN YOU BE MORE SPECIFIC?

17   Q.   ITUNES CAME OUT IN 2001; IS THAT CORRECT?

18   A.   THE ITUNES DESKTOP CLIENT ON THE MAC FIRST LAUNCHED IN

19   JANUARY OF 2001.

20   Q.   OKAY.  AND THEN THE IPOD, WHEN DID IT COME OUT FIRST, IN

21   OCTOBER 2001, THE FALL?

22   A.   I BELIEVE THAT'S CORRECT.

23   Q.   OKAY.  AND THE MUSIC STORE HADN'T COME ONLINE UNTIL 2003;

24   IS THAT CORRECT?

25   A.   YES, IT WAS APRIL 2003.

1  Q.   OKAY.  AND SO IN BETWEEN 2001 WHEN YOU HAD THE ITUNES OUT

2  FOR THE DESKTOP AND YOU HAD THE IPOD OUT, YOU WENT ALL THE WAY

3  FROM THERE TO 2003 BEFORE THE MUSIC STORE BECAME ACTIVE; IS

4  THAT RIGHT?

5  A.   THE MUSIC -- THE ITUNES MUSIC STORE LAUNCHED IN APRIL OF

6  2003.

7  Q.   OKAY.  AND SO BEFORE THAT, WHAT WAS -- WHAT WERE PEOPLE

8  PUTTING ON THEIR IPODS IN THE 2002 TIME PERIOD?

9  A.   WHATEVER THE IPOD SUPPORTED, MUSIC.  THEY COULD PUT ANY

10 FILE ON IT IF THEY WANTED TO.

11 Q.   YOU COULD PUT SPREADSHEETS ON IT?

12 A.   IT COULD BE USED AS A HARD DRIVE, AND SO YOU COULD PUT

13 DOCUMENTS AND STORE THEM KIND OF LIKE A FLASH DRIVE.

14 Q.   OKAY.  AND YOU COULD PUT ANY KIND OF MP3 MUSIC ON IT; IS

15 THAT TRUE?

16 A.   YES.

17 Q.   OKAY.  AND YOU HAD A NUMBER OF THIRD-PARTY PLAYERS THAT

18 YOU COULD USE WITH THE -- WITH THE IPOD; IS THAT RIGHT?

19 A.   I DON'T KNOW.  WHAT THIRD-PARTY PLAYERS ARE YOU REFERRING

20 TO?

21 Q.   WELL, IN OTHER WORDS, YOUR COUNSEL SHOWED ABOUT 16 IN THE

22 OPENING STATEMENT.  SO THERE WERE A NUMBER OF JUKEBOXES THAT

23 COULD ORGANIZE YOUR SONGS ON YOUR IPOD.  YOU WERE AWARE OF

24 THAT, RIGHT?

25 A.   YES.

1    **Q.**  OKAY.  DOES 16 SOUND ABOUT RIGHT THAT WERE OUT ABOUT THAT

2    TIME PERIOD?

3              **MS. DUNN:**  OBJECTION, YOUR HONOR, FOUNDATION.

4              **THE COURT:**  OVERRULED.

5              **THE WITNESS:**  I DON'T REMEMBER ALL THE DIFFERENT

6    SOFTWARE PROGRAMS THAT TRIED TO WORK WITH THE IPOD.  THE IPOD

7    WAS DESIGNED TO WORK WITH ITUNES END TO END ON THE MAC.

8    **BY MR. COUGHLIN:**

9    **Q.**  OKAY.

10   **A.**  SO THAT WAS ITS MAIN FOCUS.

11   **Q.**  BUT FOR A NUMBER OF YEARS FROM WHEN THE IPOD CAME OUT, A

12   NUMBER OF PLAYERS COULD PLAY ON THE IPOD AND DID PLAY ON THE

13   IPOD FOR SOMETHING LIKE FIVE OR SIX YEARS, THEY COULD PLAY MP3

14   MUSIC, ORGANIZE IT ON THE IPOD; IS THAT RIGHT?

15   **A.**  PLAYERS DIDN'T PLAY ON THE IPOD.  SO THE IPOD -- YOU COULD

16   PUT MUSIC ONTO THE IPOD, AND THEN THE IPOD WOULD PLAY IT.

17   **Q.**  RIGHT.  AND IT WAS -- YOU COULD ORGANIZE -- YOU COULD USE

18   A THIRD-PARTY PLAYER TO ORGANIZE THAT MUSIC; IS THAT CORRECT?

19   ON YOUR DESKTOP OR THE IPOD?

20   **A.**  THERE WERE THIRD-PARTY PLAYERS -- THIRD-PARTY SOFTWARE

21   PROGRAMS THAT WOULD LET YOU ORGANIZE SOFTWARE -- ORGANIZE

22   MUSIC ON THE IPOD OR PUT MUSIC ONTO THE IPOD.

23   **Q.**  RIGHT.  SO IT COULD PLAY.  SO IT WOULD REWRITE THE

24   DATABASE ON THE IPOD SO IT COULD PLAY THAT MUSIC IF YOU CHOSE

25   TO USE A, LET'S SAY, A REALPLAYER FROM REALNETWORKS; IS THAT

1    RIGHT?

2    **A.**  I DON'T KNOW IF BACK THEN THERE WAS A REALPLAYER --

3    ANYTHING THAT COULD WORK WITH THE IPOD.

4    **Q.**  HOW ABOUT JRIVER, DOES THAT RING A BELL?

5    **A.**  NO.

6    **Q.**  HOW ABOUT WINAMP, DOES THAT RING A BELL?

7    **A.**  I REMEMBER THE WINAMP PROGRAM.  I DON'T REMEMBER IF THEY

8    HAD AN IPOD -- IF THEY WERE ABLE TO MANAGE THE IPOD AT ALL.

9    **Q.**  HOW ABOUT AMAROK?

10   **A.**  I VAGUELY REMEMBER THAT ONE.

11   **Q.**  OKAY.  ANAPOD EXPLORER?

12   **A.**  I'VE HEARD THAT NAME BEFORE, BUT I'M NOT POSITIVE.

13   **Q.**  OKAY.  MEDIA CENTER?

14   **A.**  I DON'T KNOW THAT ONE.

15   **Q.**  MEDIAMONKEY?

16   **A.**  THE NAME IS FAMILIAR, BUT I DON'T REMEMBER THE PROGRAM.

17   **Q.**  OKAY.  JRIVER?

18   **A.**  I DON'T REMEMBER JRIVER.

19   **Q.**  NO?

20      THEY DIDN'T -- AND YOUR COUNSEL DIDN'T LIST JRIVER ON

21   THE -- THEY GAVE 16 NAMES OF THIRD-PARTY --

22          **MS. DUNN:**  OBJECTION, YOUR HONOR, COUNSEL IS ASKING

23   THE WITNESS ABOUT A SLIDE IN OPENING AND ASKING QUESTIONS

24   ABOUT OPENING.

25          **THE COURT:**  SO WHAT'S THE OBJECTION?

1          **MS. DUNN:**  FOUNDATION.

2          **THE COURT:**  LET HIM ASK THE QUESTION.  WE'LL SEE

3     WHAT -- THERE IS NO OBJECTION UNTIL I CAN HAVE AN ACTUAL

4     QUESTION --

5          **MS. DUNN:**  UNDERSTOOD.

6          **THE COURT:**  -- MS. DUNN.

7       SO WHAT'S THE QUESTION?

8          **MR. COUGHLIN:**  LET'S PUT UP OPENING SLIDE NO. 35, IF

9     WE COULD.

10         **THE COURT:**  JUST TO THE WITNESS, NOT TO THE JURY.

11         **MR. COUGHLIN:**  ALL RIGHT.

12      THIS WAS SHOWN IN OPENING, YOUR HONOR.

13         **THE COURT:**  JUST TO THE WITNESS.

14         **MR. COUGHLIN:**  (HANDING DOCUMENT.)

15         **THE COURT:**  AND YOU CAN APPROACH, MR. COUGHLIN.

16         **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.  SORRY.

17         **THE COURT:**  NOW WHAT'S YOUR QUESTION?

18    **BY MR. COUGHLIN:**

19    **Q.**  DO YOU RECOGNIZE THE NAMES THAT ARE LISTED ON THAT SHEET?

20    **A.**  (REVIEWING DOCUMENT.)

21      I RECOGNIZE SOME OF THE NAMES ON THE SHEET.

22    **Q.**  NOW, NOT ON THAT SHEET IS JRIVER, WHICH IS MY HANDWRITING

23    ON THE BOTTOM; DO YOU SEE THAT?

24    **A.**  I SEE WHERE YOU WROTE THE WORD JRIVER.

25    **Q.**  AND THEY HAD ABOUT 500,000 CUSTOMERS; DO YOU REMEMBER

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    THAT?

2    **A.**  I DON'T KNOW WHO JRIVER IS.

3    **Q.**  OKAY.  DO YOU REMEMBER THE RIP, MIX, AND BURN CAMPAIGN?

4    **A.**  YES.

5    **Q.**  OKAY.  AND WHEN DID IT COME OUT?

6    **A.**  I DON'T REMEMBER THE EXACT DATE.  I REMEMBER THE CAMPAIGN.

7    **Q.**  OKAY.  DOES 2002 SOUND ABOUT RIGHT?

8    **A.**  I DON'T REMEMBER WHEN IT CAME OUT.  IT WAS DEFINITELY IN

9    THE EARLY DAYS.

10   **Q.**  OKAY.  BUT YOU DON'T REMEMBER WHAT YEAR IT CAME OUT?

11   **A.**  NO, I DON'T REMEMBER THAT FAR BACK VERY EASILY.

12   **Q.**  WE ENDED YESTERDAY WITH THE RIP, MIX, AND BURN COMMERCIAL

13   SO MAYBE THIS WILL REFRESH YOUR RECOLLECTION ABOUT WHEN THIS

14   CAME OUT.

15          **MR. COUGHLIN:**  IF WE COULD -- IF WE COULD SHOW 888.

16                  (VIDEO PLAYING.)

17   **BY MR. COUGHLIN:**

18   **Q.**  THIS CAMPAIGN SPARKED A LITTLE CONTROVERSY; IS THAT

19   CORRECT?

20   **A.**  I DON'T REMEMBER THE CONTROVERSY.

21   **Q.**  DO YOU REMEMBER THAT MR. EISNER AT DISNEY ACCUSED APPLE OF

22   ENCOURAGING PIRACY WITH THIS CAMPAIGN; DO YOU REMEMBER THAT?

23   **A.**  NO, I DON'T REMEMBER THAT.

24   **Q.**  OKAY.  DO YOU REMEMBER MR. JOBS RESPONDED THAT IF YOU

25   PURCHASED YOUR MUSIC LEGALLY, IF YOU LEGALLY ACQUIRE MUSIC,

1    YOU NEED TO HAVE THE RIGHT TO MANAGE IT ON ALL OTHER DEVICES

2    THAT YOU OWN.  DO YOU REMEMBER THAT?

3    **A.**  I DON'T REMEMBER THE ACCUSATION SO I DON'T REMEMBER THAT

4    EITHER.

5    **Q.**  YOU DON'T REMEMBER THAT STATEMENT FROM HIM?

6    **A.**  I DON'T REMEMBER THAT STATEMENT.

7    **Q.**  OKAY.  DO YOU BELIEVE IN THAT STATEMENT, THAT IF YOU

8    PURCHASE YOUR MUSIC LEGALLY, IF YOU ACQUIRE -- I'LL USE HIS

9    WORDS -- YOU ACQUIRE MUSIC, YOU MAY -- YOU NEED TO HAVE THE

10   RIGHT TO MANAGE IT ON ALL OTHER DEVICES THAT YOU OWN?

11       DO YOU AGREE WITH THAT STATEMENT?

12   **A.**  I DON'T KNOW IF I AGREE OR DISAGREE WITH THAT.  I THINK

13   THAT YOU BUY MUSIC, YOU SHOULD BE ABLE TO DO THE RIGHTS THAT

14   YOU GOT WHEN YOU BOUGHT THE MUSIC.

15   **Q.**  THAT'S NOT WHAT I ASKED YOU.  I ASKED YOU IF YOU AGREED

16   WITH THAT STATEMENT.

17   **A.**  YES.

18   **Q.**  OKAY.  NOW, AT THE SAME TIME THAT MR. JOBS MADE THAT

19   STATEMENT, HE SAID THAT MOST PEOPLE -- AND HE BELIEVED IT WAS

20   AT LEAST GREATER THAN 80 PERCENT -- WOULD LEGALLY PURCHASE

21   THEIR MUSIC IF THEY HAD THE ABILITY TO DO THAT VERSUS PIRATE

22   THEIR MUSIC; DO YOU REMEMBER THAT?

23   **A.**  NO.

24   **Q.**  IS IT YOUR BELIEF THAT MOST PEOPLE WOULD, IF GIVEN THE

25   OPPORTUNITY, LEGALLY PURCHASE THEIR MUSIC VERSUS USING PIRATED

1   MUSIC OR FILE-SHARING STOLEN MUSIC?

2   **A.**  I THINK THAT'S A COMPLEX QUESTION.  I THINK THAT WHEN WE

3   WERE DOING THE ITUNES MUSIC STORE AND WE WERE STARTING THAT

4   UP, PIRACY WAS RAMPANT, AND SO TRYING TO GET PEOPLE TO BUY IT

5   LEGALLY WAS A CHALLENGE.  FREE IS VERY, VERY HARD TO COMPETE

6   WITH.

7       AND SO YOU HAVE TO HAVE A REALLY GREAT ECOSYSTEM THAT

8   WORKS WELL IN ORDER TO GET PEOPLE TO DO IT.  IT'S NOT JUST

9   ABOUT MAKING IT AVAILABLE DIGITALLY.  YOU'VE GOT TO HAVE A

10  GOOD SYSTEM.

11  **Q.**  OKAY.  AND APPLE HAD A GOOD SYSTEM, RIGHT?

12  **A.**  WE CREATED ONE.

13  **Q.**  RIGHT.  AND WITHIN THE FIRST WEEK OF YOUR MUSIC STORE

14  OPENING, YOU SOLD MORE THAN A MILLION SONGS; IS THAT RIGHT?

15  **A.**  YES.

16  **Q.**  OKAY.  PRIOR TO THE MUSIC STORE, DO YOU REMEMBER WHAT

17  PERCENTAGE OF THE MARKET THAT APPLE HAD IN THE DIGITAL

18  PORTABLE PLAYER?

19  **A.**  NO, I DON'T REMEMBER.

20  **Q.**  OKAY.  DOES UNDER 30 PERCENT SOUND ABOUT RIGHT?

21  **A.**  I DON'T REMEMBER WHAT THE MARKET SHARE WAS.

22  **Q.**  OKAY.  YOU DON'T RECALL WHAT IT WAS DURING THE YEARS

23  BEFORE THE MUSIC STORE OPENED UP?

24  **A.**  NO, I DON'T.

25  **Q.**  OKAY.  DOES 30 PERCENT SOUND ABOUT RIGHT?

1    **A.**  I DON'T REMEMBER WHAT THE MARKET SHARE WAS.

2    **Q.**  NOW, YOU USED TO GET REPORTS AROUND THAT TIME IN 2005,

3    2006.  IN FACT IN 2006, YOU GOT A REPORT ABOUT APPLE THEN

4    HAVING ABOUT 90 PERCENT OF THAT MARKET.  DO YOU REMEMBER THAT?

5    **A.**  NO.  I GET LOTS OF EMAILS, LOTS OF REPORTS.

6    **Q.**  OKAY.  WELL, WE'LL GET -- WE'LL GET TO THAT IN A LITTLE

7    BIT THEN.

8        COULD YOU TURN TO EXHIBIT 2015 IN YOUR BINDER.  IT'S AN

9    EMAIL FROM YOU TO MR. JAMES HIGA, SEPTEMBER 2002.

10            **MR. COUGHLIN:**  IF WE CAN GO AHEAD AND SHOW THAT EMAIL

11   TO THE JURY.

12                   (EXHIBIT PUBLISHED TO JURY.)

13   **BY MR. COUGHLIN:**

14   **Q.**  WERE YOU INVOLVED IN THE NEGOTIATIONS WITH THE MUSIC

15   LABELS?

16   **A.**  YES, I WAS.

17   **Q.**  OKAY.  AND DID YOU DISCUSS WITH THEM ISSUES DEALING WITH

18   THE DIGITAL RIGHTS MANAGEMENT THAT THEY WANTED INCLUDED IN THE

19   CONTRACTS?

20   **A.**  YES, I DID.

21   **Q.**  OKAY.  AND HERE, IT SEEMS TO BE -- CAN YOU TELL US WHAT

22   THIS EMAIL IS ABOUT?

23   **A.**  WELL, WOULD YOU LIKE ME TO READ IT?

24   **Q.**  NO.  I'D LIKE YOU TO -- YOU CAN READ IT IF YOU WANT.  CAN

25   YOU JUST TELL US THE CONTEXT THAT YOU WROTE IT?

1    **A.**   OKAY.  GIVE ME ONE MINUTE.

2         (REVIEWING DOCUMENT.)

3         OKAY.

4    **Q.**   OKAY.  YOU ASKED IF DRM CAME UP IN A MEETING WITH

5    UNIVERSAL; IS THAT CORRECT?

6    **A.**   YES.

7    **Q.**   OKAY.  AND THEN ON THE SECOND POINT THERE, THE RESPONSE

8    FROM MR. HIGA IS THAT THEIR KEY POINT WAS THAT IF 70 PERCENT

9    OR WHATEVER OF OUR BASE IS DOWNLOADING APPS TO BREAK THE

10   STORE, I GUESS THAT WOULD BE STEALING MUSIC; IS THAT RIGHT?

11   **A.**   NO, THAT WOULD BE ANYTHING THAT IS HACKING THE DRM.  IT

12   MIGHT ALSO INCLUDE STEALING MUSIC.

13   **Q.**   OKAY.  AND THAT IF IT WAS THE MAJORITY, THEN, OF YOUR

14   BASE -- AND YOU UNDERSTAND YOUR BASE TO BE YOUR CUSTOMERS; IS

15   THAT RIGHT?

16        (REVIEWING DOCUMENT.)

17        YES.

18   **Q.**   OKAY.  IF THE MAJORITY OF YOUR BASE WAS "DOWNLOADING APPS

19   TO BREAK THE STORE, THEN WE BOTH ACKNOWLEDGE THAT THERE IS A

20   PROBLEM AND THEY'D LIKE FOR US TO AT LEAST DO SOMETHING IN THE

21   NEXT RELEASE OF ITUNES, ET CETERA."

22        THAT'S WHAT YOU WERE TOLD BACK THEN?

23   **A.**   THAT'S WHAT JAMES WROTE TO ME IN THE EMAIL.

24   **Q.**   OKAY.  SO THAT WAS YOUR UNDERSTANDING AT THE TIME?

25   **A.**   WELL, AT THE TIME WHEN WE NEGOTIATED THOSE RIGHTS, WE HAD

1    TO WORK REALLY HARD TO CONVINCE THEM TO ALLOW US TO SELL MUSIC

2    ELECTRONICALLY AT ALL.  AND WHEN WE WERE DOING THE DRM, WE

3    KNEW IT WAS GOING TO GET HACKED, AND SO THE QUESTION WAS WHAT

4    WAS THE THRESHOLD FOR US HAVING TO DO SOMETHING ABOUT IT.  AND

5    THE TERM WE GENERALLY GOT BACK TO WAS "WIDESPREAD USE."  AND

6    IN THE ACTUAL CONTRACTS, I THINK THAT'S WHAT WE SAID WAS

7    "WIDESPREAD USE."  SO IT WAS SUBJECT TO INTERPRETATION, AND IT

8    MEANT THAT WE COULD HAVE A DISCUSSION WITH THEM ABOUT IT.

9    **Q.**  BUT WHEN YOU --

10   **A.**  THAT'S WHAT IT EVOLVED TO.

11   **Q.**  WHEN YOU ASKED MR. HIGA AT THIS TIME, HE TOLD YOU IF MORE

12   THAN 70 PERCENT OR AROUND 70 PERCENT WERE BREAKING THE STORE,

13   THEN YOU MIGHT BOTH, YOU AND THE LABELS, MIGHT HAVE TO DO

14   SOMETHING; IS THAT RIGHT?

15   **A.**  WELL, THAT WAS WHAT THE POINT WAS IN SEPTEMBER OF 2002.

16   BUT THAT'S LONG BEFORE WE ACTUALLY LAUNCHED THE STORE, AND SO

17   THE NEGOTIATIONS KEPT GOING.

18   **Q.**  MR. ROBBIN, WE'LL GET TO A LATER TIME.  AT THIS TIME, THEY

19   TOLD YOU -- OR YOU BELIEVED MR. HIGA, RIGHT?

20   **A.**  YES.

21   **Q.**  OKAY.  HE'S -- HE'S A LAWYER, RIGHT?

22   **A.**  I DON'T THINK -- I DON'T KNOW IF JAMES WAS A LAWYER.

23   **Q.**  OKAY.  AND HE PASSED ON THE INFORMATION FROM THE MEETING

24   THAT IT WAS A 70 PERCENT NUMBER, CORRECT?

25   **A.**  YES.

1    **Q.** AND THAT'S THE ONLY UNDERSTANDING YOU HAD AT THIS TIME

2    BECAUSE YOU DIDN'T GO TO THAT MEETING OR WEREN'T IN THAT

3    MEETING; IS THAT CORRECT?

4    **A.** I DON'T REMEMBER AT THAT TIME IF I HAD OTHER CONVERSATIONS

5    OF MY OWN WITH OTHER RECORD LABELS OR WITH OTHER PEOPLE AT

6    UNIVERSAL. FROM THAT MEETING, THE RESPONSE HE GOT AS PART OF

7    HIS BUSINESS NEGOTIATIONS, THIS EMAIL SAYS THAT IT WAS

8    70 PERCENT.

9    **Q.** LET'S TAKE A LOOK AT EXHIBIT 2021 IN YOUR BOOK,

10   MR. ROBBIN.

11          **MR. COUGHLIN:** AND YOU CAN PUBLISH THIS DOCUMENT TO

12   THE JURY.

13                (EXHIBIT PUBLISHED TO JURY.)

14   **BY MR. COUGHLIN:**

15   **Q.** THIS IS A DECEMBER 2002 EMAIL FROM YOU TO A GROUP OF APPLE

16   EMPLOYEES, IT APPEARS, AND IT HAS TO DO WITH DIGITAL RIGHTS

17   MANAGEMENT, A DRM OVERVIEW. IT HAS TO DO WITH SETTING UP A

18   MEETING FOR THAT.

19       DID YOU WRITE THIS EMAIL?

20   **A.** YES, I DID.

21   **Q.** OKAY. AND DID YOU SET UP THIS MEETING?

22   **A.** I ASSUME IT GOT SET UP. I DON'T REMEMBER.

23   **Q.** OKAY. IF WE FLIP IN TO THE FIRST PAGE, IT APPEARS THAT

24   YOU'RE ONE OF THE AUTHORS OF THE "DIGITAL RIGHTS MANAGEMENT

25   (DRM) OVERVIEW"? NEXT PAGE.

ROBBIN – DIRECT / COUGHLIN

1    A.   YES.

2    Q.   OKAY.  SO YOU HELPED PREPARE THIS DOCUMENT; IS THAT

3    CORRECT?

4    A.   YES, I DID.

5    Q.   OKAY.  LET'S FLIP TO THE NEXT PAGE, PAGE 3, TO THE

6    OVERVIEW.

7                     (EXHIBIT PUBLISHED TO JURY.)

8    BY MR. COUGHLIN:

9    Q.   IT SAYS, "THUS THE GOAL OF THIS CONTROL SYSTEM IS TO KEEP

10   HONEST PEOPLE HONEST."  IS THAT -- IS THAT WHAT YOUR STATED

11   GOAL WAS?

12   A.   IN THE BEGINNING, OUR GOAL WAS TO KEEP HONEST PEOPLE

13   HONEST --

14   Q.   MR. ROBBIN, IF I WANT TO ASK YOU ABOUT LATER TIME, I'LL

15   ASK YOU ABOUT IT.  I'M ASKING ABOUT THIS TIME.  YOUR GOAL AT

16   THE BEGINNING WAS TO KEEP HONEST PEOPLE HONEST; IS THAT

17   CORRECT?

18   A.   YES.  THE GOAL AT THE BEGINNING WAS TO KEEP THE HONEST

19   PEOPLE HONEST.

20   Q.   AND WHAT DOES THAT MEAN, "HONEST PEOPLE HONEST"?  DID YOU

21   BELIEVE HONEST PEOPLE WEREN'T HONEST?

22   A.   IT MEANT THAT -- "KEEPING HONEST PEOPLE HONEST" MEANT THAT

23   IF YOU GAVE PEOPLE THAT LEGAL ALTERNATIVE AND YOU MADE IT SO

24   THAT THERE WAS A SPEED BUMP IN TERMS OF TRYING TO SHARE MUSIC

25   ILLEGALLY, THAT THEY WOULDN'T TRY TO CIRCUMVENT IT.  THAT WAS

ROBBIN – DIRECT / COUGHLIN

1    OUR BELIEF.

2    Q.  DID YOU BELIEVE YOU HAD TO THROW A SPEED BUMP IN AGAINST

3    HONEST PEOPLE?

4    A.  YES.

5    Q.  STILL?  OR BACK AT THAT TIME?

6    A.  BACK AT THAT TIME.

7    Q.  OKAY.  NOW YOU KNOW YOU DON'T HAVE TO; IS THAT CORRECT?

8    A.  WELL, SINCE THEN, ALL THE MUSIC HAS GONE DRM-FREE AND SO

9    MUSIC IS BEING SOLD WITHOUT ANY PROTECTIONS.

10   Q.  AND HONEST PEOPLE ARE STILL HONEST; IS THAT CORRECT?

11   A.  YES, THEY ARE.

12   Q.  OKAY.

13       AND THE NEXT LINE YOU SAY, "IT IS EXPLICITLY NOT INTENDED

14   TO PREVENT A DILIGENT THIEF FROM STEALING MUSIC."  IS THAT

15   CORRECT?

16   A.  YES, IT SAYS THAT.

17   Q.  OKAY.  WELL, YOU -- DID YOU WRITE IT?

18   A.  TOM OR I DID.

19   Q.  OKAY.  DID YOU BELIEVE IT?

20   A.  YES.

21   Q.  OKAY.

22       TAKE A LOOK AT THE BOTTOM.  IF YOU TAKE A LOOK AT THE

23   THIRD PARAGRAPH AT THE BOTTOM, IT SAYS, "WITH THIS APPROACH,

24   THE USER WOULD NOT BE ABLE TO GET AROUND THESE BARRIERS

25   WITHOUT BEING A PROGRAMMER AND DOING SOME REVERSE ENGINEERING,

1    RUNNING A NON-STANDARD APPLICATION..., OR RUNNING A PROGRAM

2    SUPPORTED BY A THIRD PARTY DESIGNED...TO THWART THE PROTECTION

3    MECHANISM."

4        DID YOU WRITE THOSE THREE THINGS?

5    **A.**  YES, WE DID.

6    **Q.**  OKAY.  AND SO AT THAT TIME, YOU THOUGHT MAYBE A PROGRAMMER

7    COULD DO SOME REVERSE ENGINEERING AND EASILY CRACK YOUR DRM;

8    IS THAT RIGHT?

9    **A.**  WHEN WE FIRST DID OUR DRM, WE WERE A LITTLE NAIVE IN TERMS

10   OF HOW EASY IT WAS GOING TO BE TO KEEP IT SECURE, AND SO WE

11   JUST PUT IN A SYSTEM THAT WAS GOING TO IMPLEMENT THE USAGE

12   RULES THAT WE WERE REQUIRED TO DO.  AND IT HAD A LITTLE BIT OF

13   PROTECTION BUT NOT A LOT, SO WE KNEW THAT SOMEBODY TRYING TO

14   CIRCUMVENT THE SYSTEM WOULD BE ABLE TO, BUT A USER WOULDN'T BE

15   ABLE TO DO THAT WITH JUST USING OUR SOFTWARE, YOU'D HAVE TO

16   USE SOME OTHER PIECE OF SOFTWARE.

17   **Q.**  THE HONEST PEOPLE WOULDN'T BE ABLE TO DO THAT, RIGHT?

18   **A.**  IT WOULD BE ANY PEOPLE.

19   **Q.**  WELL, MOST OF YOUR CUSTOMERS YOU BELIEVED WERE HONEST,

20   RIGHT?

21   **A.**  SURE.

22   **Q.**  OKAY.  SO YOU DIDN'T THINK THAT THEY WOULD BE

23   CIRCUMVENTING EVEN IF SOMEBODY HAD HACKED OR CRACKED YOUR

24   SYSTEM; IS THAT CORRECT?

25   **A.**  THAT'S CORRECT.

1    Q.  AND THAT THEY WOULD HAVE STILL BOUGHT MUSIC FROM APPLE; IS

2    THAT CORRECT?

3    A.  YES.

4    Q.  OKAY.  AND IN FACT, IN THE FIRST WEEK WHEN YOU OPENED THE

5    ITUNES MUSIC STORE, YOU SOLD OVER A MILLION SONGS; IS THAT

6    RIGHT?

7    A.  YES.  BUT WE WERE REQUIRED TO DO THE DRM BY THE MUSIC

8    LABELS.

9    Q.  WELL, I UNDERSTAND THAT.  AND YOU DID THAT, RIGHT?

10   A.  YES.

11   Q.  AND HONEST PEOPLE WERE HONEST AND THEY ABIDED BY THAT,

12   RIGHT?

13   A.  THE SYSTEM WORKED VERY WELL.

14   Q.  OKAY.

15        LET'S TAKE A LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT 69,

16   PLEASE.

17        THIS IS AN EMAIL FROM STEVE JOBS TO YOU AND MR. SCHILLER.

18   THERE'S SOME OTHER PEOPLE INVOLVED IN IT.

19             MR. COUGHLIN:  WE CAN PUBLISH IT TO THE JURY.

20                  (EXHIBIT PUBLISHED TO JURY.)

21   BY MR. COUGHLIN:

22   Q.  THIS EMAIL IS DATED MAY 8, 2003.  DO YOU SEE THAT?

23   A.  YES.

24   Q.  OKAY.  AND IF WE TAKE A LOOK DOWN TO A LITTLE BELOW THERE,

25   "WE NEED TO MAKE SURE THAT WHEN MUSICMATCH LAUNCHES THEIR

1    DOWNLOAD MUSIC STORE, THEY CANNOT USE IPOD.  IS THIS GOING TO

2    BE AN ISSUE?  DO THEY HAVE THE RIGHTS TO USE IPOD WITH THEIR

3    OWN SERVICE?"

4        DO YOU SEE THAT?

5    **A.**  (REVIEWING DOCUMENT.)

6        YES, I SEE THAT.

7    **Q.**  WHO WAS MUSICMATCH?

8    **A.**  MUSICMATCH WAS A COMPANY THAT DID A MUSIC PLAYER FOR THE

9    PC.

10   **Q.**  AND DID YOU HAVE DISCUSSIONS ABOUT THIS ISSUE ABOUT

11   KEEPING THEM OFF OR NOT LETTING THEM ON USING THE IPOD?

12   **A.**  I DON'T REMEMBER HAVING THOSE DISCUSSIONS.

13   **Q.**  OKAY.  UP ABOVE THAT, MR. SCHILLER RESPONDS, "THERE IS

14   NOTHING IN OUR AGREEMENT THAT DENIES THEM THE RIGHT TO PUT ANY

15   CLASS OF CONTENT ON AN IPOD."

16       DO YOU SEE THAT?

17   **A.**  YES.

18   **Q.**  WAS THAT THE CASE AT THAT TIME?

19   **A.**  I DON'T KNOW WHAT THE AGREEMENT WAS BETWEEN MUSICMATCH AND

20   APPLE.

21   **Q.**  OKAY.  DID YOU KNOW IF MUSICMATCH WAS USING DRM MATERIALS?

22   **A.**  I DON'T REMEMBER.

23   **Q.**  OKAY.  FINALLY UP ABOVE, "RIGHT.  THEY WILL NEED A DRM IN

24   ANY PORTABLE DEVICE TO SATISFY THE MUSIC COMPANIES, AND WE CAN

25   SIMPLY DENY ANY REQUEST TO PUT THEIR DRM IN OUR IPOD."

1    DO YOU SEE THAT?

2    **A.**  YES.

3    **Q.**  OKAY.  DO YOU KNOW IF YOU DID THAT AND THAT HAPPENED?

4    **A.**  I DON'T KNOW THAT THEY EVER EVEN ASKED.

5    **Q.**  SO YOU DON'T KNOW IF THEY DID THAT OR NOT?

6    **A.**  I DON'T EVER REMEMBER GETTING A REQUEST TO DO ANYTHING

7    WITH MUSICMATCH AND A DRM FOR ANYTHING FROM THEM.

8    **Q.**  DID YOU EVER TALK TO ANYBODY ABOUT THIS STATEMENT?

9    **A.**  NOT THAT I REMEMBER.

10   **Q.**  OKAY.  DID YOU EVER TALK TO ANYBODY ABOUT THE FACT THAT

11   THERE WERE AT LEAST 16, MAYBE 17 THIRD-PARTY APPLICATIONS THAT

12   COULD PLAY ON THE IPOD THEN?  DID YOU EVER TALK TO ANYBODY

13   ABOUT THAT AT THIS TIME, 2003?

14   **A.**  NOT THAT I REMEMBER.

15   **Q.**  OKAY.

16   **A.**  I MIGHT HAVE.

17   **Q.**  YOU DIDN'T TALK TO ANYBODY BECAUSE IT WASN'T A CONCERN OF

18   YOURS; IS THAT RIGHT?

19   **A.**  THE FACT THAT PEOPLE WERE PUTTING STUFF ONTO THE IPOD WAS

20   A CONCERN ONLY IN THAT THEY WERE MANIPULATING THE DATABASE AND

21   SO WE WERE WORRIED ABOUT WHAT THAT WOULD DO TO THE DEVICE.

22   BUT IT WASN'T SOMETHING THAT WE ACTIVELY DISCUSSED AT THAT

23   TIME.

24   **Q.**  YOU DIDN'T GET A LOT OF COMPLAINTS ABOUT THESE THIRD-PARTY

25   APPLICATIONS CORRUPTING THE DEVICE; IS THAT CORRECT?

1  **A.**  I DON'T KNOW WHETHER WE GOT COMPLAINTS ABOUT THAT BECAUSE

2  WE CAN'T DISTINGUISH WHY THE DEVICE WOULD HAVE HAD A PROBLEM

3  FROM THAT OR ANY OTHER REASON.

4  **Q.**  WELL, YOU WOULD HAVE INVESTIGATED IT -- IF THESE

5  THIRD-PARTY APPLICATIONS WERE CAUSING A PROBLEM, YOU WOULD

6  HAVE INVESTIGATED, RIGHT?  THERE WOULD BE A MEMO FROM YOU TO

7  SOMEBODY ELSE ABOUT THIRD-PARTY APPS CAUSING A CORRUPTION

8  PROBLEM, RIGHT?

9  **A.**  I DON'T KNOW IF THERE WOULD HAVE BEEN A MEMO OR NOT.  WE

10  MIGHT HAVE TALKED ABOUT SOMETHING IN THE HALL.  WHO KNOWS?

11  **Q.**  DID YOU TALK ABOUT THIRD-PARTY APP CORRUPTION IN THE FIVE

12  YEARS LEADING UP TO THE DATABASE VERIFICATION IMPLEMENTATION

13  ABOUT THESE APPS RUNNING ON THE IPOD?  DID YOU TALK ABOUT THAT

14  AT ANY TIME DURING THAT TIME?

15  **A.**  I'M SURE WE DID.

16  **Q.**  AND DID YOU WRITE ABOUT IT?

17  **A.**  I DON'T REMEMBER.

18       **MR. COUGHLIN:**  IF WE COULD TAKE A LOOK AT EXHIBIT 83.

19            (EXHIBIT PUBLISHED TO JURY.)

20  **BY MR. COUGHLIN:**

21  **Q.**  THIS IS A SEPTEMBER 20TH, 2003, EMAIL FROM STEVE JOBS IN

22  WHICH YOU'RE COPIED, MR. ROBBIN.  YOU CAN FLIP TO IT IN YOUR

23  BOOK OR YOU CAN LOOK AT IT ON THE SCREEN.

24  **A.**  (REVIEWING DOCUMENT.)

25  **Q.**  DOWN HERE, MR. SCHILLER WROTE ON SEPTEMBER 30, 2003, "I

```
 1    THINK A NUMBER OF US AGREE THAT AS SOON AS WE ARE ABLE TO

 2    (WHICH IS NOT THIS WEEK, WE HAVE TO GET ITUNES FOR WINDOWS

 3    DONE AND OUT...) WE SHOULD HAVE AN SDK...."

 4        WHAT'S AN SDK?

 5    A.  SDK STANDS FOR SOFTWARE DEVELOPMENT KIT.

 6    Q.  OKAY.  "FOR FAIRPLAY SUCH THAT OTHER MUSIC PLAYERS CAN

 7    ALSO WORK WITH ITUNES AND AAC...."

 8        WHAT'S AAC?

 9    A.  ADVANCED AUDIO CODEC.

10    Q.  AND THAT'S A CODEC THAT APPLE USED, RIGHT?

11    A.  IT'S THE AUDIO DECODER AND ENCODER.

12    Q.  OKAY.  "PLUS FAIRPLAY IN ADDITION TO OUR BELOVED IPOD."

13        DO YOU SEE THAT?

14    A.  YES.

15    Q.  OKAY.  AND STEVE JOBS WRITES BACK, "FOR NON-COMPETITIVE

16    DEVICES, MAYBE."

17        DO YOU SEE THAT?

18    A.  YES, I SEE THAT.

19    Q.  SO IT APPEARS THAT APPLE WAS WILLING TO DO THAT FOR

20    NON-COMPETITIVE DEVICES.

21        AND THEN IT GOES ON, "FOR COMPETITIVE DEVICES WITH IPOD,

22    ITS (SIC) TOO SOON TO DECIDE THIS."

23        DO YOU SEE THAT?

24    A.  YES.

25    Q.  OKAY.
```

1      SO FOR COMPETITIVE DEVICES AND COMPETITIVE REASONS, APPLE

2   WAS UNWILLING TO DO THIS AT THIS TIME FOR IPOD; IS THAT RIGHT?

3   **A.**  NO.  AT THAT TIME, WE WERE HAVING A HEALTHY DISCUSSION

4   BACK AND FORTH ABOUT WHETHER WE SHOULD OR SHOULDN'T DO THAT,

5   BUT I DON'T THINK AT THIS TIME WE HAD MADE A DECISION.

6   **Q.**  WELL, THERE'S NO -- THERE'S NO DISCUSSION IN THIS DOCUMENT

7   THAT DOING THIS WOULD CAUSE A SECURITY BREACH; IS THAT

8   CORRECT?

9   **A.**  IN THIS -- I DON'T KNOW IF THERE'S ANYTHING IN THE REST OF

10  THIS DOCUMENT ABOUT THAT, BUT I'M SURE WE HAD LOTS OF OTHER

11  DISCUSSIONS AROUND WHAT IT WOULD TAKE TO DO SOMETHING LIKE

12  THAT.

13  **Q.**  THERE'S NO DISCUSSION IN HERE ABOUT CORRUPTION THAT --

14  THAT IF YOU DID THIS, IF YOU OPENED UP FAIRPLAY, THAT YOU'D BE

15  OPENING UP APPLE TO CORRUPTION OR THE IPOD TO CORRUPTION, IS

16  THERE?

17  **A.**  THERE MAY NOT BE IN THIS DOCUMENT, BUT I'M SURE WE TALKED

18  ABOUT IT OUTSIDE THIS DOCUMENT.

19  **Q.**  NO.  MR. JOBS IS PRETTY EXPLICIT.

20      "FOR NON-COMPETITIVE DEVICES, MAYBE."  BUT "FOR

21  COMPETITIVE DEVICES WITH IPOD, ITS (SIC) TOO SOON TO DECIDE

22  THIS."

23      HE DOESN'T TALK ABOUT SECURITY OR CORRUPTION PROBLEMS; IS

24  THAT CORRECT?

25  **A.**  IN THIS EMAIL, HE DOESN'T TALK ABOUT THAT.  BUT I'M SURE

1    WE TALKED ABOUT THAT OUTSIDE THE SCOPE OF THIS DOCUMENT.

2    **Q.**   OKAY.  DID YOU RESPOND AND TALK ABOUT SECURITY OR

3    CORRUPTION TO THIS, TO YOUR KNOWLEDGE?

4    **A.**   I DON'T KNOW IF I RESPONDED IN EMAIL TO THAT, BUT I'M SURE

5    WE TALKED ABOUT IT.

6    **Q.**   AND YOU WOULD HAVE RAISED THOSE ISSUES IF YOU HAD THEM,

7    CORRUPTION AND SECURITY ISSUES; IS THAT CORRECT?

8    **A.**   WE HAD LOTS OF CONVERSATIONS ABOUT CORRUPTION AND SECURITY

9    ISSUES.

10   **Q.**   OKAY.  BUT NOT AT THAT TIME IN THAT DOCUMENT ABOUT OPENING

11   IT UP TO NON-COMPETITIVE DEVICES; IS THAT RIGHT?

12   **A.**   THAT DOCUMENT MAY NOT TALK ABOUT THAT, BUT WE HAD LOTS OF

13   CONVERSATIONS ABOUT IT AT THE TIME.

14   **Q.**   LET'S TAKE A LOOK AT EXHIBIT NO. 92.  YOU CAN FLIP TO THAT

15   IN YOUR BINDER.

16                  (EXHIBIT PUBLISHED TO JURY.)

17   **BY MR. COUGHLIN:**

18   **Q.**   IT'S AN EMAIL FROM STEVE JOBS TO YOU DATED JANUARY 5TH,

19   2004.  IF YOU COULD TAKE A LOOK AND READ THAT FIRST PARAGRAPH

20   SO WE'RE GOING TO TALK A LITTLE BIT ABOUT THAT.

21   **A.**   "THIS IS GREAT!  BENEFITS TO US:

22       "1.  POSITIONS AAC AS AN OPEN STANDARD AND MICROSOFT'S WMA

23   AS PROPRIETARY.

24       "2.  POSITIONS REAL ADOPTING AAC AS ADDING 'MOMENTUM TO A

25   STANDARD THAT MANY SEE AS THE LOGICAL COMPETITOR TO

1    MICROSOFT'S PROPRIETARY WINDOWS MEDIA TECHNOLOGY.'

2        "3.   PORTRAYS A BALKANIZED WORLD OF STANDARDS, AND

3    PORTRAYS THIS BALKANIZATION OF STANDARDS AS AN INDUSTRY

4    PROBLEM, NOT AN APPLE PROBLEM.   WE ARE NOT ALONE.   NOBODY'S

5    STUFF IS GOING TO WORK WITH THE OTHER GUY'S STUFF.

6        "'ALONG WITH REAL'" --

7        AND THEN A QUOTE:

8        "'ALONG WITH REAL, APPLE, MICROSOFT AND SONY ALL OFFER

9    OR PLAN TO OFFER MUSIC WRAPPED IN THEIR OWN PROPRIETARY

10   ANTICOPYING TECHNOLOGIES.   MOST OF THE OTHER SONG STORES

11   PROLIFERATING ONLINE, INCLUDING NAPSTER, MUSICNOW AND

12   MUSICMATCH, USE MICROSOFT'S DIGITAL AUDIO FORMAT.'"

13       IT LOOKS LIKE IT'S A QUOTE FROM AN ARTICLE.

14       "IN THIS BALKANIZED WORLD, THE SAFEST BET IS THE LARGEST,

15   MOST SUCCESSFUL STANDARD, AND TODAY WE'RE IT.   LET'S LEVERAGE

16   THIS POSITION NOW.

17       "STEVE."

18   Q.   YOU RECEIVED THAT EMAIL FROM HIM ON OR ABOUT JANUARY 5TH,

19   2004; IS THAT RIGHT?

20   A.   YES.

21   Q.   AND AT THAT TIME, THE MUSIC STORE HAD A 70 PERCENT MARKET

22   SHARE IN DOWNLOAD DIGITAL MUSIC; IS THAT ABOUT RIGHT?   DOES

23   THAT COINCIDE WITH YOUR RECOLLECTION?

24   A.   I DON'T REMEMBER WHAT THE MARKET SHARE OF THE ITUNES STORE

25   WAS AT THE TIME.

1    **Q.**   OKAY.  AND THE MARKET SHARE OF THE IPOD WAS ABOUT 70

2    PERCENT FOR PORTABLE DIGITAL DEVICES; DO YOU REMEMBER THAT?

3    **A.**   I DON'T REMEMBER THE MARKET SHARE OF THE IPOD AT THE TIME.

4    **Q.**   OKAY.  WAS IT ABOUT 70 PERCENT?  YOU HAD A MONOPOLY; IS

5    THAT CORRECT?

6    **A.**   I DON'T REMEMBER THE MARKET SHARE OF THE IPOD AT THE TIME.

7    **Q.**   DID YOU HAVE A MONOPOLY IN THE -- THE ITUNES, THE DOWNLOAD

8    MUSIC, THE ITUNES STORE AS FAR AS DIGITAL MUSIC DOWNLOADS AT

9    THAT TIME?

10   **A.**   I WOULDN'T KNOW HOW YOU WOULD DEFINE SOMETHING AS A

11   MONOPOLY OR NOT.

12   **Q.**   OKAY.  WOULD YOU THINK THAT 70, 80 PERCENT, OR 90 PERCENT

13   OF A MARKET IS A MONOPOLY?

14   **A.**   I THINK OF THAT AS A SUCCESSFUL PRODUCT.

15   **Q.**   OKAY.  HOW -- THAT'S A FAIR ANSWER.

16       DID YOU BELIEVE THAT YOU SHOULD LEVERAGE THIS BALKANIZED

17   WORLD?

18   **A.**   I DON'T KNOW THAT I --

19   **Q.**   DID YOU DISAGREE WITH HIM?

20   **A.**   (REVIEWING DOCUMENT.)

21       LET ME READ AND UNDERSTAND WHAT HE WAS ACTUALLY SAYING

22   HERE BECAUSE I'M NOT SURE THAT THE WAY THAT YOU'RE STATING IT

23   MAKES SENSE TO ME.

24   **Q.**   OKAY.

25   **A.**   HE'S TALKING ABOUT AAC AS AN OPEN STANDARD VERSUS

1   MICROSOFT'S WMA WHICH IS A DIFFERENT AUDIO CODEC AT THE TIME,

2   AND AAC IS OPEN AND WA IS NOT.  AND I THINK HE'S TALKING ABOUT

3   THE DIFFERENT ECOSYSTEMS THAT WERE BEING CREATED BY THE

4   DIFFERENT COMPANIES.  AND FOR APPLE TO CREATE AN END-TO-END

5   ECOSYSTEM THAT WORKED REALLY WELL, WHICH IS WHAT ITUNES AND

6   IPOD WAS, IT REQUIRED US TO WORK REALLY CLOSELY TOGETHER, AND

7   I THINK THAT THAT'S WHAT HE'S TALKING ABOUT.

8       SO THIS, TO ME, IS JUST ABOUT HIM SAYING, "HEY, THIS IS

9   GREAT, WE'VE GOT THE BEST PRODUCT, AND THE BEST PRODUCT IS THE

10  ONE THAT PEOPLE ARE GOING TO WANT."

11  **Q.**  WELL, HE ALSO SAYS THAT YOU'RE THE LARGEST, YOU'RE THE

12  SAFEST BET, AND SO HE WANTS A BALKANIZED WORLD.  ISN'T IT TRUE

13  THAT THAT MEANS THAT HE DIDN'T WANT INTEROPERABILITY?

14  **A.**  I DON'T THINK HE SAID HE WANTED A BALKANIZED WORLD.  I

15  THINK HE JUST SAID THAT THAT WAS THE WORLD WE WERE IN.  AND

16  HE'S SAYING THAT THE SAFEST BET IS THE LARGEST, MOST

17  SUCCESSFUL STANDARD, AND OUR PRODUCT WAS VERY SUCCESSFUL.

18  PEOPLE LIKED WHAT WE BUILT.

19  **Q.**  AND HE WANTED TO LEVERAGE THAT, RIGHT?

20  **A.**  I THINK WE WANTED TO BE MORE SUCCESSFUL AND KEEP SHIPPING

21  MORE IPODS AND MAKE A GREAT PRODUCT.  WE WANTED SOMETHING

22  PEOPLE LOVED.

23  **Q.**  AND YOU WANTED TO KEEP OTHER PEOPLE OUT, RIGHT?

24  **A.**  IT WASN'T ABOUT KEEPING OTHER PEOPLE OUT.  IT WAS ABOUT

25  BUILDING THE BEST PRODUCT.

1   **Q.**  OKAY.  LET'S TAKE A LOOK AT EXHIBIT -- ACTUALLY, WE DON'T

2   NEED TO TAKE A LOOK AT EXHIBIT -- WELL, YOU CAN TAKE A LOOK AT

3   IT.  IT'S IN YOUR BOOK.  EXHIBIT 102.

4       IN APRIL OF 2004, WERE YOU AWARE THAT REALNETWORKS -- CEO

5   OF REALNETWORKS REACHED OUT TO APPLE SO THAT THEY COULD

6   LICENSE FAIRPLAY AND THE IPOD?

7   **A.**  (REVIEWING DOCUMENT.)

8       NO, I WAS NOT.

9   **Q.**  YOU KNOW WHO REALNETWORKS IS, RIGHT?

10  **A.**  I DO.

11  **Q.**  AND YOU MONITORED THEIR ACTIVITIES AS FAR AS THEM BEING

12  ABLE TO PUT THE SONGS INTO FAIRPLAY, TAKE THEIR HELIX DRM OFF,

13  PUT FAIRPLAY ON, AND PUT THEIR SONGS ON YOUR IPOD IN 2004; IS

14  THAT CORRECT?

15  **A.**  WE MONITOR ALL THE HACKS THAT WE CAN FIND AND SEE WHERE

16  THEY'RE MODIFYING OUR DRM OR TRYING TO CIRCUMVENT IT.  SO WHEN

17  WE HEARD ABOUT THE HARMONY DRM, WE CERTAINLY FOLLOWED IT.  BUT

18  THAT WAS THE EXTENT.

19  **Q.**  AND YOU UNDERSTOOD WHAT THEY WERE -- LET ME ASK YOU A

20  QUESTION.  LET'S TAKE A LOOK AT EXHIBIT 912 IN YOUR BOOK.

21  **A.**  (REVIEWING DOCUMENT.)

22  **Q.**  CAN YOU TELL ME WHO GUY BAR-NAHUM IS?

23  **A.**  GUY WAS AN ENGINEER --

24       **MR. COUGHLIN:**  DON'T SHOW THIS YET.

25       **THE WITNESS:**  GUY WAS AN ENGINEER ON THE IPOD TEAM

1    FOR THE SOFTWARE.

2    **BY MR. COUGHLIN:**

3    **Q.**  OKAY.

4    AND IT SAYS THAT HE'S GOING TO -- "BELOW IS MY TAKE ON WHY

5    THE IPOD IS THE LAST PLACE SOMEONE WILL PLAN TO ATTACK THE AAC

6    DRM.  PLEASE REVIEW, COMMENT AND ADD.  WE WILL TRY AND

7    CONVINCE JEFF TOMORROW."

8    IS THAT YOU?  IS HE GOING TO TRY TO CONVINCE YOU TOMORROW?

9    **A.**  I'M SURE I'M THE JEFF HE'S REFERRING TO.

10   **Q.**  OKAY.  DID HE TRY TO CONVINCE YOU THAT THE IPOD WAS THE

11   LAST PLACE A HACK WOULD ATTACK?

12   **A.**  I DON'T REMEMBER IF WE HAD A MEETING AFTER THIS PARTICULAR

13   EMAIL WAS SENT.  I'M SURE WE'VE TALKED ABOUT THE DRM AND WHAT

14   WE WOULD BE DOING ON THE IPOD, AND HE MAY HAVE TRIED TO

15   CONVINCE ME TO -- TO DO SOMETHING LIKE THIS.

16   **Q.**  OKAY.  HE SENT -- YOU SAW THIS EMAIL THEN?

17   **A.**  (REVIEWING DOCUMENT.)

18   I DIDN'T SEE THIS EMAIL UNTIL THIS COURT CASE.

19   **Q.**  OKAY.  SO YOU'VE SEEN IT BEFORE YOU CAME IN TO TESTIFY?

20   **A.**  I SAW IT DURING --

21   **Q.**  YOUR PREP?

22   **A.**  YEAH.

23   **Q.**  OKAY.  AND DO YOU REMEMBER SEEING IT BEFORE?

24   **A.**  NO.

25   **Q.**  OKAY.  DID YOU TAKE A LOOK AT WHAT HE SAID?  HE SAID THAT

1    IT WOULD BE THE LAST PLACE TO ATTACK BECAUSE OF THE

2    PROPRIETARY DATA LAYOUT; DO YOU REMEMBER THAT?

3    **A.**   IT DOESN'T SAY THAT.  IT SAYS THIS IS THE LAST PLACE -- IT

4    SAYS IN THE VERY BEGINNING THIS IS THE LAST PLACE IT WILL BE

5    TO ATTACK THE DRM.  AND THEN HE GOES IN TO DISCUSS THE VARIOUS

6    THINGS THAT SUPPORT HIS OPINION.

7         THIS IS ACTUALLY, I THINK, A DOCUMENT TALKING ABOUT THE

8    PIECE OF FAIRPLAY THAT'S IN THE DECODER THAT RUNS ON THE IPOD

9    ITSELF.  WHEN WE DID FAIRPLAY, WE PUT SOME OF THE PROTECTION

10   IN THE ACTUAL SONG AUDIO DATA THAT THE DECODER COULD REMOVE,

11   AND I THINK HE'S TRYING TO MAKE THE ARGUMENT THAT WE SHOULDN'T

12   DO TOO MUCH EXTRA WORK TO TRY TO OBFUSCATE THE DRM ON THE

13   IPOD.  IT MIGHT HAVE A NEGATIVE PERFORMANCE IMPACT.  THERE

14   WERE A BUNCH OF REASONS WHY HE WANTED US TO NOT DO THAT.  FOR

15   HIM, THAT'S HIS JOB.  MY JOB IS TO SECURE THE DRM.  SO IT

16   WOULD HAVE BEEN AN INTERESTING DISCUSSION.

17   **Q.**   SO YOU WENT THROUGH -- DID YOU GO THROUGH THESE THINGS --

18   DID YOU DISAGREE WITH THESE POINTS WHEN YOU DID YOUR PREP?

19   **A.**   I DON'T KNOW THAT I -- I DON'T THINK I WENT THROUGH THE

20   INDIVIDUAL POINTS.

21   **Q.**   OKAY.

22        LET'S TAKE A LOOK AT EXHIBIT 118.

23             **MR. COUGHLIN:**  AND THIS YOU CAN PUBLISH TO THE JURY.

24                  (EXHIBIT PUBLISHED TO JURY.)

25

1    BY MR. COUGHLIN:

2    **Q.**  THIS IS PART OF AN EMAIL STRING, JULY 23RD, 2004 FROM EDDY

3    CUE TO YOU.  DO YOU SEE THAT?

4    **A.**  AND IT LOOKS LIKE A FORWARD FROM EDDY TO ME.

5    **Q.**  RIGHT.  AND HE ASKED YOU ANYTHING ELSE -- "JEFF, ANYTHING

6    ELSE...?"  RIGHT?

7    **A.**  YEAH.  ANYTHING ELSE I CAN THINK OF.

8    **Q.**  OKAY.  AND HE TELLS YOU THAT HE'S TALKED TO UNIVERSAL.

9    THEY'RE AWARE OF IT.

10        YOU KNOW THIS HAS TO DO -- YOU -- IN YOUR PREP, YOU KNOW

11   THIS HAS TO DO WITH THE REALNETWORKS, RIGHT?

12   **A.**  (REVIEWING DOCUMENT.)

13        YES.

14   **Q.**  OKAY.  AND SO HE MADE YOU AWARE THAT HE HAD TALKED TO

15   UNIVERSAL, THAT THEY WERE AWARE OF IT.  AND FROM THEIR

16   VIEWPOINT, THEY WERE OKAY WITH IT.  AND WHEN HE'S TALKING

17   ABOUT "IT," THEY'RE OKAY WITH REALNETWORKS PUTTING FAIRPLAY

18   DRM ONTO THEIR SONGS AND HAVING THEM PLAY ON THE IPOD.

19        DO YOU SEE THAT?

20   **A.**  THIS DOESN'T SAY ANYTHING ABOUT PUTTING FAIRPLAY DRM ON

21   THEIR SONGS.  IT DOES TALK ABOUT INTEROPERABILITY IN A

22   CONVERSATION HE HAD WITH UNIVERSAL.  BUT I NEVER HAD ANY

23   CONVERSATIONS WITH UNIVERSAL ABOUT IT.

24   **Q.**  OKAY.  DO YOU KNOW THAT'S HOW -- YOU KNOW THAT'S WHAT REAL

25   DID, IS THEY PUT FAIRPLAY DRM ON THEIR SONGS SO THEY COULD

1   PLAY ON THE IPOD, RIGHT?

2   **A.**  NO.  THEY TRIED TO PUT FAIRPLAY ON.  THEY DID -- THEY

3   IMITATED FAIRPLAY, BUT THEY DIDN'T ACTUALLY DO FAIRPLAY.

4   **Q.**  WELL, YOU HAD MR. HELLER HACK INTO IT AND FIGURE OUT IF IT

5   WORKED, AND HE SAID IT WORKED.  HE WROTE YOU A MEMO.  HE WENT

6   THROUGH 13 -- 11 TO 13 THINGS.  AND HE SAID -- IN THE END, HE

7   SAID IT WORKED.

8   **A.**  I NEVER ASKED DAVE HELLER, NOR DID HE EVER HACK INTO

9   HARMONY.

10  **Q.**  HE DOESN'T -- HE DIDN'T SEND YOU AN EMAIL TO THAT EFFECT?

11  **A.**  NO.

12  **Q.**  OKAY.  WE'LL TALK ABOUT THAT.

13      LET'S FLIP OVER TO PAGE 2 OF 3 THERE.  ACTUALLY LET'S GO

14  TO THE THIRD PAGE.

15                  (EXHIBIT PUBLISHED TO JURY.)

16  **BY MR. COUGHLIN:**

17  **Q.**  DID YOU EVER HEAR STEVE JOBS DESCRIBING THIS ANALOGY?

18      "NORMALLY YOU'RE CONCERNED THAT SOMEONE IS GOING TO BREAK

19  YOUR HOUSE (SIC) TO STEAL YOUR STEREO.  IN THIS CASE, IT

20  APPEARS THAT SOMEONE IS BREAKING INTO OUR HOUSE AND SETTING UP

21  THEIR OWN STEREO, BUT THEY'RE STILL BREAKING IN."

22      DO YOU SEE THAT?

23  **A.**  I SEE WHERE IT SAYS THAT.  I DON'T KNOW IF STEVE EVER SAID

24  THAT.

25  **Q.**  YOU'RE NOT AWARE THAT HE EVER SAID THAT, THAT THAT WAS HIS

1    SENTIMENT?

2    **A.**   I'M NOT.

3    **Q.**   OKAY.  DID YOU THINK THAT REAL WAS BREAKING INTO YOUR

4    HOUSE?

5    **A.**   I THINK THAT REAL WAS EXPLOITING A -- THEY'D

6    REVERSE-ENGINEERED OUR DRM AND THEY WERE TRYING TO FIGURE OUT

7    HOW TO CIRCUMVENT THE WAY THAT IT WORKED, AND IT JUST SHOWED

8    ME THAT THERE WERE WEAKNESSES TO THE DRM THAT WE NEEDED TO FIX

9    ANYWAY.

10   **Q.**   OKAY.  BUT YOU DIDN'T BELIEVE THEY WERE BREAKING INTO YOUR

11   HOUSE?

12   **A.**   NO.  I -- I DON'T KNOW -- I DON'T KNOW ABOUT THE ANALOGY

13   OF BREAKING INTO YOUR HOUSE.  I BELIEVE THAT REAL WAS

14   VIOLATING FAIRPLAY.  I THINK REAL WAS MAKING IT LOOK LIKE

15   FAIRPLAY WASN'T SECURE.

16      WE TAKE THE FAIRPLAY BRAND VERY SERIOUSLY.  WE NEEDED

17   FAIRPLAY TO BE A GOLD STANDARD.  AND WHAT REAL DID WAS MAKING

18   IT LOOK LIKE FAIRPLAY WAS NOT SECURE.

19   **Q.**   BECAUSE THEY WERE ABLE TO PLAY THEIR SONGS ON THE IPOD?

20   **A.**   BECAUSE THEY REVERSE-ENGINEERED FAIRPLAY AND WERE ABLE TO

21   MANIPULATE IT TO MODIFY WHAT IT WAS DOING.  THEY WERE

22   VIOLATING THE DRM.

23   **Q.**   OKAY.  BECAUSE YOU FEEL THAT THE IPOD THAT YOU SOLD TO

24   PEOPLE IS STILL YOUR HOUSE, IT'S NOT THEIR IPOD, IT'S STILL

25   YOUR IPOD; IS THAT RIGHT?

1  **A.**  I BELIEVE THAT WE'RE ABOUT CREATING THAT GREAT EXPERIENCE

2  WITH ITUNES AND IPOD WORKING TOGETHER.  AND IN ORDER TO DO

3  THAT, IN ORDER TO HAVE A MUSIC STORE, WE HAD TO HAVE A DRM AND

4  THE DRM HAD TO BE SECURE.

5      AND WHAT REAL DID, REAL WAS BREAKING OUR DRM.  THEY WERE

6  REVERSE ENGINEERING IT, AND THAT WAS A PROBLEM FOR US.

7  **Q.**  SO YOU BELIEVED THAT YOU STILL COULD -- EVEN THOUGH YOU'VE

8  SOLD THIS IPOD TO SOMEBODY, IT'S NOT A LICENSE AGREEMENT; IS

9  THAT CORRECT?  YOU'RE NOT LICENSING AN IPOD TO PEOPLE, RIGHT?

10  **A.**  NO.  WE SELL IPODS.

11  **Q.**  THAT'S RIGHT.  SO IF SOMEBODY DECIDES THEY WANT TO USE

12  REAL'S MUSIC STORE AND USE THEIR IPOD TO PUT THEIR MUSIC FROM

13  REAL ONTO THE IPOD, YOU DIDN'T WANT THEM TO DO THAT, RIGHT?

14  **A.**  IF A CUSTOMER BUYS AN IPOD AND USES IT WITH ANOTHER PIECE

15  OF SOFTWARE, THEY'RE ABLE TO DO THAT, IF THAT PIECE OF

16  SOFTWARE WORKS.  THAT'S FINE.  WE DIDN'T HAVE A PROBLEM WITH

17  THAT.

18      FOR US, OUR PROBLEM WAS WHAT REAL HAD DONE TO FAIRPLAY.

19  AND IT WASN'T A PROBLEM WITH REAL PER SE.  IT WAS JUST A

20  PROBLEM WITH FAIRPLAY.  WE NEEDED TO KEEP MAKING FAIRPLAY

21  SECURE.  WE WERE MAKING FAIRPLAY MORE AND MORE SECURE ALL THE

22  TIME.  IT WOULD HAVE BEEN IMPOSSIBLE TO FIGURE OUT HOW HARMONY

23  WOULD HAVE KEPT WORKING ANYWAY.

24      SO FOR US, THIS WAS JUST ABOUT THE DRM.

25  **Q.**  OKAY.  LET'S STOP YOU THERE.

1    WHAT YOU JUST SAID IS YOU DIDN'T HAVE A PROBLEM WITH A

2    THIRD PARTY -- WITH A CUSTOMER USING A THIRD PARTY TO PUT THE

3    MUSIC THAT THEY LEGALLY PURCHASE FROM THAT PARTY INTO THE IPOD

4    IF THEY CHOSE TO DO THAT?

5    **A.**  YOU COULD EASILY DO THAT.  IF YOU BURN A CD AND USE IT

6    WITH ITUNES, YOU CAN PUT MUSIC INTO AN IPOD.  THERE WERE LOTS

7    OF WAYS TO PUT MUSIC INTO AN IPOD FROM A THIRD PARTY.  PEOPLE

8    WERE DOING THAT ALL THE TIME, AND THAT WAS FINE.

9    **Q.**  AND THAT WAS FINE WITH YOU IF THEY HAD USED ITUNES.  BUT

10   YOU SHUT OUT THIRD-PARTY MUSIC STORES AND YOU SHUT OUT

11   THIRD-PARTY PLAYERS IN 7.0 AND 7.4 WITH THE KVC AND DVC.

12        **MS. DUNN:**  OBJECTION, YOUR HONOR.  COMPOUND.

13        **THE COURT:**  SUSTAINED.

14   **BY MR. COUGHLIN:**

15   **Q.**  IN 7.0, USING -- WHEN I SAY KEY "KEYBAG VERIFICATION

16   CODE," DO YOU UNDERSTAND WHAT I'M TALKING ABOUT?

17   **A.**  I THINK I KNOW WHAT YOU MEAN.

18   **Q.**  YEAH.  YOU CALL IT SOMETIMES "KEYBAG INTEGRITY CODE"; IS

19   THAT RIGHT?

20   **A.**  I THINK IT'S THE KEYBAG INTEGRITY VERIFICATION.

21   **Q.**  OKAY.  AND SO I'M GOING TO STILL USE "KVC" BECAUSE SOME OF

22   THE ENGINEERS THAT WROTE ON THE DOCUMENTS USED THAT FIRST, AND

23   SO THAT'S WHERE I PICKED UP THAT.

24        **MS. DUNN:**  OBJECTION, YOUR HONOR, ASSERTS FACTS NOT

25   IN EVIDENCE.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    BY MR. COUGHLIN:

2    **Q.**  SO WHEN I SAY "KVC" --

3          **THE COURT:**  OVERRULED AT THIS TIME.  LET HIM ASK HIS

4    QUESTION.

5    BY MR. COUGHLIN:

6    **Q.**  WHEN I SAY "KVC," YOU UNDERSTAND WHAT I'M TALKING ABOUT,

7    RIGHT?

8    **A.**  I'VE NEVER HEARD THE TERM "KVC" BEFORE.

9    **Q.**  OKAY.  WHAT TERM DO YOU WANT ME TO USE WHEN WE TALK ABOUT

10   THE KEYBAG INTEGRITY, KEYBAG INTEGRITY VERIFICATION?

11   **A.**  THAT WOULD WORK.

12   **Q.**  OKAY.  IN 7.0, YOU HAD THE KEYBAG VERIFICATION INTEGRITY

13   (SIC), RIGHT?

14   **A.**  YES.

15   **Q.**  IF SOMEBODY TRIED TO PUT -- IF SOMEBODY TRIED TO REWRAP A

16   DRM SONG TO MIMIC FAIRPLAY AND PUT IT ON THE IPOD, THAT CODE

17   DELETED THE KEYBAG; IS THAT CORRECT?

18   **A.**  NO.

19   **Q.**  YOU'RE SAYING THAT DIDN'T HAPPEN?

20   **A.**  IF I REMEMBER THE TIME LINE RIGHT, AND -- AND I'M NOT A

21   HUNDRED PERCENT SURE, BUT IF I REMEMBER IT RIGHT, ITUNES 4.7

22   FIRST MADE SO IT THAT WE UPGRADED THE DRM, AND HARMONY STOPPED

23   WORKING.

24        WE HAD ANOTHER VERSION OF ITUNES, ITUNES 6, WHICH ADDED

25   VERIFICATION TO THE KEYBAG TO THE DESKTOP.  SO WE'D ALREADY

1  DONE KEYBAG VERIFICATION THEN.

2  Q.  WELL, THAT ALSO MOVED IT TO THE SERVER, RIGHT?  YOU MOVED

3  THE ENCRYPTION UP TO THE SERVER, 6.0?

4  A.  I DON'T REMEMBER IF THAT WAS 4.7 OR 6.0.  I THINK IT MIGHT

5  HAVE BEEN 4.7 WHERE WE FIRST MOVED STUFF, BUT I'M NOT

6  POSITIVE.

7      IN ITUNES 7 WE TOOK THE IMPLEMENTATION OF --

8          THE COURT:  SLOW DOWN, SLOW DOWN.

9          THE WITNESS:  SORRY.

10          THE COURT:  WE'RE TRYING TO MAKE A TRANSCRIPT.  SO --

11  ALL RIGHT.

12                  (RECORD READ.)

13          THE WITNESS:  IN ITUNES 7 WE TOOK THE IMPLEMENTATION

14  OF THE KEYBAG VERIFICATION THAT WAS ON THE DESKTOP AND WE

15  MOVED IT TO THE IPOD AS WELL.

16  BY MR. COUGHLIN:

17  Q.  SO THE EFFECT OF THAT WAS IF SOMEBODY -- IF A THIRD

18  PARTY -- IF A CUSTOMER DECIDED TO USE A THIRD PARTY TO

19  PURCHASE SONGS THAT HAD DRM PROTECTION AND THEY MIMICKED

20  FAIRPLAY AND PUT IT IN THE IPOD AND THE IPOD DETECTED THAT,

21  THE IPOD FIRMWARE, SOFTWARE DETECTED THAT, IT WOULD -- IT

22  WOULD SAY THAT YOU COULDN'T PLAY THAT, RIGHT?  YOU'D GET AN

23  ERROR MESSAGE, RIGHT?

24  A.  WHEN THE -- WHEN AN IPOD FOUND A KEYBAG -- ACTUALLY, I

25  DON'T EVEN THINK IT WAS THE KEYBAG THAT PUT THE ERROR MESSAGE.

1    ACTUALLY, I'M NOT SURE IF IT WAS THE KEYBAG OR THE DATABASE.

2    WHEN THE DATABASE WAS --

3    **Q.**  WE'LL TALK ABOUT THE DATABASE IN A MINUTE.  WE'RE STILL ON

4    THE KEYBAG.  BECAUSE THERE'S THE KEYBAG VERIFICATION, 7.0, AND

5    THEN THERE'S THE DATABASE VERIFICATION, 7.4.  SO LET'S TALK

6    ABOUT THE FIRST ONE FIRST.

7        BECAUSE THE KEYBAG ONLY DEALS WITH DIGITAL RIGHTS

8    MANAGEMENT PROTECTED SONGS, RIGHT?

9    **A.**  CORRECT.

10   **Q.**  OKAY.  SO WHEN A THIRD PARTY -- OKAY, WHEN A CUSTOMER USES

11   A THIRD PARTY TO PUT A DRM-MIMICKED FAIRPLAY SONG ON THE IPOD,

12   AND THE IPOD DETECTED THAT, THE KEYBAG, BECAUSE IT WOULD HAVE

13   GONE INTO THE KEYBAG BECAUSE IT WAS DRM'D, IT SHOWED AN ERROR

14   AND DIDN'T PLAY ANY OF THOSE SONGS, CORRECT?

15   **A.**  I DON'T REMEMBER IF IT SHOWED AN ERROR FOR THAT ONE.  I

16   KNOW IT DID FOR THE DATABASE INTEGRITY.  I DON'T REMEMBER IF

17   THE KEYBAG VERIFICATION SHOWED AN ERROR MESSAGE --

18                     (SIMULTANEOUS COLLOQUY.)

19           **THE COURT:**  MR. COUGHLIN, YOU'VE GOT TO LET HIM

20   FINISH.

21   **BY MR. COUGHLIN:**

22   **Q.**  YOU COULDN'T PLAY ANY SONGS WHETHER THEY'RE FROM ITUNES OR

23   FROM THE THIRD PARTY; IS THAT CORRECT?

24   **A.**  IF WE DETECTED CORRUPTION IN THE KEYBAG, THEN THE IPOD

25   WOULD HAVE SAID, "WE FOUND SOMETHING WRONG."  AND THAT COULD

1   HAVE BEEN BECAUSE OF THIRD-PARTY APPLICATION MESSING WITH IT.

2   IT COULD HAVE BEEN BECAUSE OF DISK CORRUPTION ON THE IPOD.

3   BUT ANYTHING THAT MADE THAT KEYBAG LOOK LIKE IT WAS BROKEN,

4   WHICH ALL SORTS OF THINGS CAN MAKE THAT HAPPEN, THEN, YES, THE

5   IPOD WOULD SAY, "OKAY, YOU NEED TO GO AND CONNECT THIS TO

6   ITUNES TO FIX IT."

7   **Q.**  IT WASN'T CORRUPTION.  IF ANYBODY TOUCHED THE KEYBAG,

8   THAT'S WHAT HAPPENED, RIGHT?  IT NEVER GOT INTO THE KEYBAG,

9   RIGHT?  THIS WAS A WRAP AROUND THE KEYBAG?

10        **MS. DUNN:**  OBJECTION, YOUR HONOR, COMPOUND QUESTION.

11        **THE COURT:**  SUSTAINED.

12  **BY MR. COUGHLIN:**

13  **Q.**  THIS WAS A WRAP AROUND THE KEYBAG, THE KEYBAG VERIFICATION

14  WAS A WRAP WITH A TAG AROUND THE KEYBAG, RIGHT?

15        **MS. DUNN:**  OBJECTION, YOUR HONOR.  COMPOUND QUESTION.

16        **THE COURT:**  OVERRULED.

17        **THE WITNESS:**  KEYBAG VERIFICATION WAS -- WAS A

18  TECHNIQUE, AND I DON'T KNOW EXACTLY HOW IT WAS IMPLEMENTED.  I

19  DIDN'T DO THAT.  YOU'D HAVE TO ASK AUGUSTIN.  BUT THE KEYBAG

20  VERIFICATION WAS TO MAKE SURE THAT THE KEYBAG ITSELF HAD NOT

21  BEEN CORRUPTED OR TAMPERED WITH.

22  **BY MR. COUGHLIN:**

23  **Q.**  OR TOUCHED, RIGHT?

24  **A.**  NO.  YOU COULD READ IT JUST FINE.  YOU JUST COULDN'T --

25  **Q.**  YOU COULDN'T INSERT ANYTHING INTO IT.  A THIRD PARTY COULD

 1   NOT INSERT A DRM SONG INTO IT, RIGHT?

 2   **A.**   THAT'S CORRECT.  IF THEY DID, IT WOULD LOOK LIKE IT WAS

 3   CORRUPTED.

 4   **Q.**   RIGHT.  AND IT WOULD DELETE ALL THOSE SONGS FROM THE THIRD

 5   PARTY, RIGHT?

 6   **A.**   NO.  IT WOULDN'T DELETE THE SONGS.  THE SONGS WOULD STILL

 7   BE ON THE IPOD.

 8   **Q.**   WHEN YOU RESYNCED, IT WOULD DELETE THE WHOLE KEYBAG,

 9   RIGHT?

10   **A.**   I DON'T REMEMBER IF IT DELETED THE KEYBAG WHEN IT FOUND IT

11   WAS CORRUPTED.  I THINK IT WOULD REPAIR IT AS PART OF SYNCING.

12   **Q.**   DID YOU READ YOUR EXPERT'S REPORT IN THIS CASE?  HE SAID

13   IT DELETED THE KEYBAG.  DID YOU READ IT?

14   **A.**   NO.

15   **Q.**   OKAY.

16       LET'S TAKE A LOOK AT EXHIBIT 121.

17       DO YOU HAVE 121?

18   **A.**   I DO.

19           **MR. COUGHLIN:**  WE CAN SHOW THIS, PUBLISH THIS TO THE

20   JURY.

21                   (EXHIBIT PUBLISHED TO JURY.)

22   **BY MR. COUGHLIN:**

23   **Q.**   IF WE TAKE A LOOK AT THE FIRST PARAGRAPH UP THERE, THIS IS

24   AN EMAIL FROM EDDY CUE TO PHIL SCHILLER, AND YOU'RE COPIED.

25   DO YOU SEE THAT?

1    **A.**   YEAH.   IT ALSO HAS GREG JOSWIAK, JON RUBINSTEIN, AND A FEW

2    OTHERS.

3    **Q.**   A NUMBER OF PEOPLE, STEVE JOBS.   JULY 25TH, 2004.

4        THIS IS AT THE TIME WHEN REAL HAS -- HAS BASICALLY MADE

5    THEIR PRODUCT INTEROPERABLE WITH APPLE'S IPOD; DO YOU REMEMBER

6    THAT?

7    **A.**   I DON'T KNOW IF THIS IS WHEN THAT HAPPENED OR IF IT WAS

8    BEFORE IT HAPPENED.   I'M NOT SURE OF THE TIME FRAME.

9    **Q.**   WELL, WE JUST LOOKED AT A MEMO THAT WAS TWO DAYS BEFORE

10   THIS, AND YOU SAID YOU UNDERSTOOD THAT WAS THE TIME FRAME THAT

11   REAL DID THIS.

12   **A.**   (REVIEWING DOCUMENT.)

13   **Q.**   THE UNIVERSAL EMAIL THAT WE JUST LOOKED AT.

14   **A.**   THAT WAS THE DISCUSSION BETWEEN EDDY AND THE LABELS ABOUT

15   WHAT THEY MIGHT OR MIGHT NOT WANT TO DO.   I DON'T REMEMBER

16   WHEN HARMONY ACTUALLY SHIPPED.

17   **Q.**   OKAY.   AND IT TALKS ABOUT HERE THAT "THE LABELS ARE

18   CONVINCED THAT DIFFERENT FORMATS ARE HURTING THEIR GROWTH.

19   THEY WANT US TO LICENSE OUR DRM TO REAL."

20       DO YOU SEE THAT?

21   **A.**   YES.

22   **Q.**   OKAY.

23       "SINCE REAL HAS ASSURED THEM THAT THEY ARE PUTTING THE

24   MUSIC IN FAIRPLAY, THEY ARE OKAY WITH IT (THAT IS UNTIL THERE

25   IS A PROBLEM).   REAL IS ACTUALLY SAYING THEY ARE PLAYING A

1   PROTECTED SONG ON AN AUTHORIZED DEVICE FOR THAT PROTECTION

2   SCHEME."

3       DO YOU SEE THAT?

4   **A.**  YES.

5   **Q.**  OKAY.  SO YOU UNDERSTOOD THAT'S WHAT THE LABELS THOUGHT

6   AND THAT'S WHAT REAL WAS SAYING, AND YOU GOT THAT INFORMATION

7   FROM EDDY CUE; IS THAT RIGHT?

8   **A.**  YES.

9   **Q.**  OKAY.  AND IT ALSO SAYS THAT THE LABELS -- SOME OF THE

10  LABELS -- "ALSO REMEMBER SOME LABELS AT THIS POINT ARE ALSO

11  WORRIED THAT WE ARE GETTING TOO DOMINANT."

12      DO YOU SEE THAT?

13  **A.**  YES.

14  **Q.**  OKAY.  SO THEY HAD ASKED -- THEY HAD COME TO -- DID YOU

15  KNOW THAT UNIVERSAL HAD COME TO APPLE AND ASKED THEM TO ALLOW

16  INTEROPERABILITY?

17  **A.**  NO.

18  **Q.**  YOU DIDN'T TALK TO THE LABELS ABOUT THAT?

19  **A.**  NO.

20  **Q.**  I MEAN, YOU WERE THE ONE NEGOTIATING THE DRM RIGHTS,

21  RIGHT?

22  **A.**  DRM RIGHTS, BUT I WASN'T DOING THOSE BUSINESS PARTS OF THE

23  TERMS, SO I WAS NOT INVOLVED IN THE DISCUSSION --

24  **Q.**  NONE -- NO DISCUSSIONS ABOUT THAT, HUH?  OKAY.

25      LET'S TAKE A LOOK -- YOU SAID MR. HELLER -- THAT YOU'D

1   NEVER ASKED MR. HELLER TO EXAMINE HARMONY?  LET'S TAKE A LOOK

2   AT --

3   **A.**  THAT'S NOT WHAT I SAID.

4                      (SIMULTANEOUS COLLOQUY.)

5              **THE COURT:**  OKAY.

6   **BY MR. COUGHLIN:**

7   **Q.**  LET'S TAKE A LOOK AT EXHIBIT 128.

8              **MR. COUGHLIN:**  AND YOU CAN PUBLISH THIS TO THE JURY.

9                   (EXHIBIT PUBLISHED TO JURY.)

10  **BY MR. COUGHLIN:**

11  **Q.**  THIS IS A DAVE HELLER EMAIL TO YOU, JULY 27TH, 2004.

12      THIS -- IT SAYS "HARMONY AVAILABLE."  THIS IS AN EMAIL TO

13  YOU FROM MR. HELLER.  I THINK MR. DOWDY WAS ALSO INVOLVED WITH

14  MR. HELLER IN DOING THIS TASK; IS THAT CORRECT?

15  **A.**  YES.

16  **Q.**  OKAY.  SO HERE, THEY TOOK A LOOK AT HARMONY.  THEY

17  DOWNLOADED A SONG, IT'S 192K.  WHAT IS 192K?  WHAT DOES THAT

18  MEAN?

19  **A.**  IT'S ACTUALLY 192 KBPS, WHICH IS KILOBITS PER SECOND.

20  IT'S THE BIT RATE OF THE SONG.

21  **Q.**  AND AT THE TIME, APPLE WAS 128 KBPS; IS THAT RIGHT?

22  **A.**  YES.

23  **Q.**  SO THIS WAS A HIGHER QUALITY; IS THAT CORRECT?

24  **A.**  IT WAS A HIGHER BIT RATE.  I DON'T KNOW WHAT THE QUALITY

25  OF THEIR ENCODER WAS.

1   **Q.**   OKAY.   BUT USUALLY A HIGHER BIT RATE MEANS A HIGHER

2   QUALITY?

3   **A.**   IT'S A MUCH MORE COMPLICATED CONVERSATION.   THE BIT RATE

4   DEPENDS ON THE ACTUAL IMPLEMENTATION.   A 128 MP3 FROM ONE

5   ENCODER COMPARED TO A 128 MP3 FROM ANOTHER ENCODER, ONE COULD

6   EASILY BE A LOT WORSE THAN THE OTHER.   SO I DON'T KNOW IF

7   THEIR 192 AAC WAS BETTER QUALITY THAN OUR 128 AAC.

8   **Q.**   ALL CODING -- IF ALL THE OTHER SYSTEMS ARE THE SAME, A

9   HIGHER BIT RATE MEANS HIGHER QUALITY; IS THAT CORRECT?

10  **A.**   IF YOU'RE USING THE SAME ENCODER, USUALLY THE HIGHER BIT

11  RATE ONE IS GOING TO BE A HIGHER QUALITY, YES.

12  **Q.**   OKAY.   IT SAYS, "HARMONY WILL TRANSFER TO HAVE IPOD,

13  WRITING A VALID VERSION 3 KEYBAG AND THE IPOD DATABASE."

14      DO YOU SEE THAT?

15  **A.**   YES.   BUT WHAT HE'S REFERRING THERE IS THIS WAS AN

16  ANALYSIS HE DID TO LOOK AT WHAT HARMONY APPEARED TO DO SINCE

17  HE DIDN'T REVERSE ENGINEER IT OR SEE ANYTHING OR KNOW WHAT IT

18  WAS ACTUALLY WRITING.   SO HIS FIRST COMMENT HERE IS THAT IT'S

19  WRITING A VALID V3 KEYBAG MEANS IT'S A KEYBAG THAT WE'RE ABLE

20  TO ACTUALLY LOAD.

21  **Q.**   OKAY.

22  **A.**   BUT WE DON'T KNOW IF IT'S AN ACCURATE KEYBAG.

23  **Q.**   BUT YOU'RE ABLE TO LOAD AND IT'S ABLE TO PLAY, RIGHT?

24  **A.**   IT WAS ABLE TO PLAY SOME OF THE SONGS, YEAH.

25  **Q.**   OKAY.

1    AND HARMONY WILL TRANSFER AUTHORIZED ITUNES SONGS TO THE

2    IPOD.  DO YOU SEE THAT?

3    **A.**  YES.

4    **Q.**  OKAY.  SO YOU UNDERSTOOD THAT HARMONY COULD ALSO TRANS- --

5    TRANSFER AUTHORIZED SONGS TO THE IPOD, RIGHT?

6    **A.**  YES.

7    **Q.**  OKAY.

8        NOW IT'S THE NEXT ONE I'M PARTICULARLY INTERESTED.

9    HARMONY WILL NOT LET YOU BURN AUTHORIZED ITUNES SONGS.  DO YOU

10   SEE THAT?

11   **A.**  YES.

12   **Q.**  OKAY.  WHAT'S YOUR UNDERSTANDING OF THAT?

13   **A.**  WELL, KIND OF LIKE WITH THE LINE BEFORE WHERE IT SAYS IT

14   WILL ALSO TRANSFER AUTHORIZED SONGS TO THE IPOD, DOING THAT

15   WORRIED US BECAUSE THAT MEANS THAT THEY'RE NOT NECESSARILY

16   OBEYING THE SAME CONTENT USAGE RULES THAT WE HAVE IN PLACE IN

17   ITUNES.  SO NOT LETTING YOU BURN AUTHORIZED ITMS SONGS JUST

18   MEANS THAT HARMONY DIDN'T LET YOU EXERCISE ONE OF THE RIGHTS

19   YOU HAVE FROM AN ITUNES SONG, THE NOT -- THE ALLOWING YOU TO

20   TRANSFER AUTHORIZED ITUNES --

21                    (OFF-THE-RECORD DISCUSSION.)

22           **THE WITNESS:**  -- SONGS MIGHT CIRCUMVENT THE CONTENT

23   USAGE RULES WE HAD.

24   **BY MR. COUGHLIN:**

25   **Q.**  THAT'S RIGHT.  DOESN'T IT SAY JUST THE OPPOSITE?  IT SAYS

1    THEY'RE NOT ALLOWING YOU TO BURN AUTHORIZED ITUNES SONGS.  SO

2    THERE'S NO WAY THEY COULD, YOU KNOW -- THEY'RE CIRCUMVENTING

3    WHAT ITUNES MUSIC STORE DID; ISN'T THAT RIGHT?  THEY'RE NOT

4    LETTING YOU BURN THOSE.  THEY'RE NOT LETTING YOU VIOLATE THE

5    RIGHTS THAT YOU PUT ON AS TO YOUR SONGS; ISN'T THAT RIGHT?

6    **A.**  FOR NO. 4, YES.  NOT FOR NO. 3.

7    **Q.**  OKAY.  LET'S TAKE A LOOK AT NO. 12.

8        WELL, LET'S TAKE A LOOK AT NO. 6 FIRST, OR 7.

9        SORRY.  SORRY.

10        **THE COURT:**  THAT'S ALL RIGHT.  IT'S FRIDAY.

11   **BY MR. COUGHLIN:**

12   **Q.**  OKAY.

13        LET'S GO DOWN TO 12.

14        "WE HACKED ITUNES TO USE THE KEYBAG ON THE POD FOR

15   PLAYBACK AND FILE PURCHASED FROM THE REAL STORE PLAYED IN

16   ITUNES, ALBEIT WITH SOME ASSERTS IN THE AAC HANDLER.  I

17   BELIEVE THESE ARE FOR INFORMATIONAL ASSERTS ONLY."

18        DO YOU SEE THAT?

19   **A.**  YES.

20   **Q.**  OKAY.  SO THEN THEY HACK INTO ITUNES TO TAKE A LOOK AT

21   WHAT HARMONY WAS DOING?

22   **A.**  WHEN THEY SAY THEY HACKED ITUNES, IT'S JUST A SHORTCUT FOR

23   THEM SAYING THEY MODIFIED IT.  SINCE THEY HAVE ITUNES, ALL THE

24   SOURCE CODE, THEY CAN BUILD IT AND DO WHAT THEY WANT TO IT.

25   IT'S NOT HACKING.

1    Q.   HE CALLED IT HACKING.

2    A.   HE USED THE WORD "HACKED."

3    Q.   YEAH.  AND THE -- AND THE ONE ABOVE THAT, IN 11:

4         "IN A SIMPLE TEST, MERGING TRACKS FROM ITUNES AND HARMONY

5    ONTO THE IPOD SEEMED TO WORK."

6         DO YOU SEE THAT?

7    A.   YES.

8    Q.   NOW, LET'S TALK ABOUT NO. 1, "OTHER THOUGHTS."

9         "SWITCHING TO THE NEW EMBEDDED KEYBAG WILL SLOW THEM DOWN,

10   BUT IF THEY GET THE PUBLIC KEY IN ITUNES, THEY CAN CONTINUE TO

11   DO THIS.  NOT CLEAR HOW HARD THIS WILL BE TO REVERSE

12   ENGINEER."

13        SO YOU UNDERSTAND HE'S TALKING ABOUT -- REFERRING TO

14   WHAT'S GOING TO HAPPEN IN 4.7 WITH THE PUBLIC AND PRIVATE KEY

15   AND THE RSA TECHNOLOGY, RIGHT?

16   A.   YES.

17   Q.   OKAY.  AND SO HE THOUGHT BECAUSE THERE'S STILL A PUBLIC

18   KEY ON THE ITUNES DESKTOP, THAT THEY COULD PROBABLY GET THAT

19   AND REVERSE ENGINEER AND BE BACK ON; IS THAT RIGHT?

20   A.   (REVIEWING DOCUMENT.)

21        I THINK THAT HE'S SAYING THAT SWITCHING THE NEW EMBEDDED

22   KEYBAG IS GOING TO SLOW THEM DOWN, BUT IF THEY CAN GET THAT

23   PUBLIC KEY, THEY CAN CONTINUE TO DO IT.

24   Q.   IN FACT, THEY DID GET THAT PUBLIC KEY AND WERE BACK UP AND

25   RUNNING IN APRIL 2005, RIGHT?

1    A.   YEAH.   IT TOOK THEM A WHILE.

2    Q.   IF WE TAKE A LOOK AT EXHIBIT 133.

3         MR. COUGHLIN:   AND YOU CAN PUBLISH THAT.

4              (EXHIBIT PUBLISHED TO JURY.)

5    BY MR. COUGHLIN:

6    Q.   DID YOU ASK HELLER TO CHECK OUT AND SEE IF THE ID, IF THE

7    USER ID, WAS WITHIN THE RANGE THAT APPLE WAS USING?

8    A.   NO.

9    Q.   HE JUST DID THAT ON HIS OWN AND THEN SENT YOU THIS

10   INFORMATION?

11   A.   YES.

12   Q.   OKAY.

13        "MAX TELLS ME THAT THE USER ID USED BY HARMONY IS WELL

14   OUTSIDE THE CURRENT VALID DSID RANGE."

15        WHAT DOES DSID MEAN?

16   A.   IT'S THE ID NUMBER FOR THE USER FROM THE ITUNES STORE.

17   Q.   SO THEY WEREN'T USING A -- A USER NUMBER WITHIN APPLE'S

18   RANGE; IS THAT CORRECT?

19   A.   NO.   THEY WEREN'T USING ONE THAT'S -- THAT'S IN CURRENT

20   USE.   BUT AS WE ADD ACCOUNTS, AND WE'VE GOT QUITE A FEW AT

21   THIS POINT, WE WOULD EVENTUALLY RUN INTO THE ID THAT THEY WERE

22   USING.

23   Q.   LET'S TAKE A LOOK AT EXHIBIT 136, AND NOT FOR THE TRUTH OF

24   MATTER OF THE ARTICLE, BUT IT'S AN EMAIL FROM STEVE JOBS TO

25   YOU DATED JULY 29TH, 2004.

1          **MR. COUGHLIN:**  AND WE CAN PUBLISH THIS TO THE JURY.

2              (EXHIBIT PUBLISHED TO JURY.)

3     **BY MR. COUGHLIN:**

4     **Q.**  YOU'VE SEEN THIS DOCUMENT BEFORE, RIGHT, IN YOUR PREP?

5     **A.**  I DON'T REMEMBER SEEING THIS ONE, BUT I MIGHT HAVE.

6     **Q.**  OKAY.  LET'S JUST TAKE A LOOK AT THE -- IN THE MIDDLE

7     THERE.

8          SO ABOUT THIS TIME, JULY 29TH, 2004, YOU GOT NOTICE AT

9     LEAST THAT REAL THOUGHT THAT HARMONY TECHNOLOGY DOES NOT

10    REMOVE OR DISABLE ANY DIGITAL RIGHTS MANAGEMENT SYSTEM.

11         DO YOU SEE THAT?

12    **A.**  NO.  WHERE DOES IT SAY THAT?

13    **Q.**  IN THE MIDDLE.  HE'S GOING TO HIGHLIGHT IT FOR YOU.

14         **MR. COUGHLIN:**  RIGHT THERE.  CAN YOU BRING THAT UP.

15             (EXHIBIT PUBLISHED TO JURY.)

16         **THE WITNESS:**  YEAH.

17    (REVIEWING DOCUMENT.)

18    I SEE WHERE THEY SAY THAT.

19    **BY MR. COUGHLIN:**

20    **Q.**  OKAY.  SO YOU GOT NOTICE OF THAT IN 2009.  IS THAT

21    CONSISTENT WITH WHAT THE LABELS WERE TELLING YOU THAT THEY

22    WEREN'T CONCERNED ABOUT THIS?

23    **A.**  I NEVER TALKED TO THE LABELS ABOUT IT.

24    **Q.**  OKAY.  LET'S TAKE A LOOK AT SEPTEMBER 8, 2004 EMAIL ON

25    WHICH YOU WERE COPIED, EXHIBIT 153.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1        **MR. COUGHLIN:**  AND NOT FOR THE TRUTH OF MATTER OF ANY

2    OF THE ARTICLES, BUT WE CAN SHOW IT TO THE JURY AS FAR AS FOR

3    THE EMAIL.

4              (EXHIBIT PUBLISHED TO JURY.)

5        **THE WITNESS:**  I DON'T HAVE 153.

6    BY MR. COUGHLIN:

7    **Q.**  OH, IT'S NOT IN YOUR BINDER?

8    **A.**  NO.

9    **Q.**  OKAY.  YOU CAN LOOK AT THE SCREEN THEN.

10   **A.**  I CAN -- IT'S VERY FUZZY.

11   **Q.**  OKAY.  WE'RE GOING TO BRING UP THE FIRST PARAGRAPH A

12   LITTLE BETTER.

13             (EXHIBIT PUBLISHED TO JURY.)

14   BY MR. COUGHLIN:

15   **Q.**  OKAY?  THIS IS AN EMAIL REPORTING THAT "APPLE REPORTED

16   60 PERCENT (AFFECTED FOR THE LAST THREE WEEKS BY RHAPSODY'S

17   49-CENT TRACKS)."

18       DO YOU SEE THAT?

19   **A.**  YES.

20   **Q.**  IS THAT THE TYPE OF INFORMATION THAT YOU GOT IN THE NORMAL

21   COURSE OF YOUR BUSINESS?  WERE THEY SENDING YOU WHAT WAS GOING

22   ON WITH THE MARKET SHARE?

23   **A.**  I CAN'T SEE THE WHOLE EMAIL, BUT THIS LOOKS LIKE A QUOTED

24   PART FROM SOME OTHER PART OF THE EMAIL, AND I DON'T KNOW IF

25   THAT'S FROM AN ARTICLE OR -- OR WHAT.

1   Q.   OKAY.  LET ME HAND YOU THE WHOLE EMAIL.  I DON'T WANT YOU

2   TO --

3        (HANDING DOCUMENT.)

4   A.   THANKS.

5        (REVIEWING DOCUMENT.)

6        YEAH.  SO THIS IS A QUOTED SECTION FROM THE ARTICLE THAT

7   WAS BEING FORWARD.

8   Q.   OKAY.  DID YOU HAVE AN UNDERSTANDING THAT THAT'S WHAT

9   HAPPENED TO APPLE AT THAT TIME?

10  A.   I DON'T KNOW IF THAT'S WHAT HAPPENED TO APPLE.  ARTICLES

11  LIKE THAT ARE OFTEN INCORRECT.

12  Q.   OKAY.  DID YOU CHECK WHEN YOU GOT THIS INFORMATION WHETHER

13  THAT HAD HAPPENED, WHETHER APPLE HAD DROPPED 10 PERCENT?

14  A.   NO.

15       MR. COUGHLIN:  MAY I APPROACH THE WITNESS, YOUR

16  HONOR?

17       THE COURT:  YOU MAY.

18  BY MR. COUGHLIN:

19  Q.   IF YOU COULD FLIP TO 176.

20       MR. COUGHLIN:  AND NOT FOR THE TRUTH OF THE MATTER

21  ASSERTED IN THE ARTICLE, BUT YOU CAN PUBLISH THIS TO THE JURY.

22            (EXHIBIT PUBLISHED TO JURY.)

23  BY MR. COUGHLIN:

24  Q.   ON NOVEMBER 9TH, 2004, YOU RECEIVED AN EMAIL FROM TONY

25  FADELL ABOUT HARMONY TECHNOLOGY RECEIVING A BILLBOARD AWARD.

 1    DO YOU REMEMBER THAT?

 2    **A.**  I DON'T REMEMBER THIS.

 3    **Q.**  OKAY.  YOU DON'T RECALL THAT THEY RECEIVED A BILLBOARD

 4    AWARD?

 5    **A.**  NO.

 6    **Q.**  LET'S TAKE A LOOK AT EXHIBIT 2239.

 7    **A.**  (REVIEWING DOCUMENTS.)

 8    **Q.**  THIS APPEARS TO BE AN INSTANT MESSAGE BETWEEN YOU AND

 9    SOMEBODY ELSE.  CAN YOU TELL US WHO IT'S WITH?

10    **A.**  (REVIEWING DOCUMENT.)

11        NO, I CAN'T.

12    **Q.**  CAN YOU TELL US WHICH SIDE OF THE INSTANT MESSAGE YOU'RE

13    ON, THE RIGHT OR LEFT?

14    **A.**  (REVIEWING DOCUMENT.)

15        I THINK I'D BE ON THE LEFT.

16    **Q.**  SO SOMEBODY IS TELLING YOU, "WE'VE DECIDED NOT TO PUSH A

17    BUILD TO MESS WITH PYMUSIQUE IN THE WAY WE TALKED ABOUT

18    YESTERDAY."  SOMEBODY'S TELLING YOU THAT?

19    **A.**  ACTUALLY, I'M NOT SURE WHICH SIDE I'M ON.

20    **Q.**  YEAH.  YOU'RE ON THE RIGHT, I THINK.

21    **A.**  (REVIEWING DOCUMENT.)

22        SO I WAS TELLING SOMEBODY ELSE.

23    **Q.**  RIGHT.  BECAUSE THAT WAS YOUR JOB.

24        YOU SAY, "I THINK THE ABILITY TO TRACK HOW MANY PEOPLE ARE

25    USING THE HACK (WHICH WE HAVE RIGHT NOW) IS MORE VALUABLE THAN

```
1    SLOWING THEM DOWN FOR A FEW HOURS."

2         DO YOU SEE THAT?

3    A.   I DO.

4    Q.   OKAY.

5         "THAT'LL GIVE US SOME AMMO WHEN THE LABELS COME KNOCKING."

6         AND WHAT YOU MEANT BY THAT IS YOU DIDN'T THINK THERE WOULD

7    BE A LOT OF HACKS, YOU WERE SELLING MILLIONS AND MILLIONS OF

8    SONGS, YOU DIDN'T THINK THERE WOULD BE A LOT OF HACKS AND

9    YOU'D BE ABLE TO TELL THE LABELS THAT IT WASN'T A SIGNIFICANT

10   HACK; IS THAT CORRECT?

11   A.   I THINK I DIDN'T KNOW HOW MANY PEOPLE WERE USING THE HACK,

12   AND SO THIS WAS ABOUT TRYING TO FIND OUT.

13   Q.   LET'S TAKE A LOOK AT WHAT YOU LEARNED.

14        THE COURT:  DO YOU WANT THE JURY TO SEE THIS?  IT'S

15   ADMITTED.

16        MR. COUGHLIN:  YES, I WOULD LIKE TO SHOW THE JURY.  I

17   THOUGHT THEY WERE --

18        MS. DUNN:  WELL, OBJECTION TO FOUNDATION.  I -- AS

19   FAR AS I COULD TELL, COUNSEL HAS TOLD THE WITNESS --

20        THE COURT:  PREVIOUSLY ADMITTED.

21        MS. DUNN:  OKAY.

22   BY MR. COUGHLIN:

23   Q.   AND IT IS YOU ON THE RIGHT SIDE, RIGHT?

24        (REVIEWING DOCUMENT.)

25                  (EXHIBIT PUBLISHED TO JURY.)
```

1    BY MR. COUGHLIN:

2    **Q.**   NOBODY WOULD BE TELLING YOU THAT, YOU'D BE TELLING

3    SOMEBODY ELSE THAT?

4    **A.**   NO.   I COULD HAVE BEEN BEING TOLD THAT, TOO.

5    **Q.**   WHO WOULD HAVE BEEN TELLING YOU THAT?

6    **A.**   WELL, I DON'T KNOW.   AT THE TIME, IT COULD HAVE BEEN DAVE

7    HELLER, TOM DOWDY.   IT COULD HAVE BEEN -- WELL, I DON'T KNOW

8    IF AUGUSTIN WAS HIRED AT THIS POINT.

9    **Q.**   WOULDN'T YOU HAVE BEEN THE ONE DECIDING WHETHER TO PUSH A

10   BUILD?

11   **A.**   THIS IS JUST UPDATING WHETHER THAT WE HAVE DECIDED.   SO

12   THE COLLECTIVE WE DECIDED, AND THIS IS SOMEBODY TELLING

13   SOMEBODY ELSE WHETHER WE DECIDED.

14   **Q.**   WELL, YOU'RE IN THAT -- YOU'RE IN THE INSTANT MESSAGE,

15   YOUR NAME IS AT THE TOP.   SO YOU --

16   **A.**   YES.   I'M ON ONE OF THESE SIDES.

17   **Q.**   -- YOU CAN'T TELL WHICH SIDE YOU'RE ON?

18   **A.**   I DON'T REMEMBER WHICH SIDE IN THIS VERSION THAT THE

19   TYPING GOES.   I THINK -- I THINK IT MIGHT BE THE RIGHT, BUT

20   I'M NOT POSITIVE.

21   **Q.**   OKAY.   LET ME ASK YOU -- LET'S TAKE A LOOK AT 2247.

22        **MR. COUGHLIN:**   AND YOU CAN PUBLISH THAT TO THE JURY.

23             (EXHIBIT PUBLISHED TO JURY.)

24   BY MR. COUGHLIN:

25   **Q.**   WHO IS PATRICE -- IS IT GAUTIER?

1    **A.**  GAUTIER.

2    **Q.**  GAUTIER.  FRENCH.  THE DATE IS APRIL 4, 2005.

3         AND YOU LEARNED THERE WAS ONLY 259 USERS; IS THAT RIGHT?

4    **A.**  YES.  THAT'S WHAT HE TOLD ME.  I DON'T KNOW HOW LONG IT

5    WAS FROM WHEN PYMUSIQUE LAUNCHED BUT --

6    **Q.**  BUT THAT WAS A SMALL NUMBER THAT YOU WERE GOING TO USE

7    AGAINST THE LABELS; IS THAT RIGHT?

8    **A.**  IT WAS NOT AGAINST THE LABELS.  IT WAS JUST TO SHOW THEM

9    THAT THIS WASN'T WIDESPREAD USE.

10   **Q.**  OKAY.  LET'S TAKE A LOOK AT EXHIBIT 218.

11         **MR. COUGHLIN:**  AND I BELIEVE THIS IS A

12   STIPULATED-TO-ADMIT EXHIBIT.  IS THAT CORRECT?

13         **THE COURT:**  WHAT'S THE NUMBER AGAIN?

14         **MR. COUGHLIN:**  218.

15         **THE WITNESS:**  (REVIEWING DOCUMENT.)

16         **THE COURT:**  YES, IT CAN BE SHOWN.

17         **MR. COUGHLIN:**  IF WE CAN SHOW THE JURY THIS.

18         **THE COURT:**  YES.

19              (EXHIBIT PUBLISHED TO JURY.)

20   **BY MR. COUGHLIN:**

21   **Q.**  YOU'RE COPIED ON THIS EMAIL.  SO IS STEVE JOBS.  FROM STAN

22   NG.  AND IT SEEMS TO BE GIVING YOU NOTICE ABOUT THAT YAHOO'S

23   NEW MUSIC ENGINE APPLICATION (BETA) RECOGNIZES THE IPOD AND

24   THEREFORE CAN PLAY SONGS, NON-DRM SONGS, ON THE IPOD; IS THAT

25   RIGHT?

```
 1       A.   (REVIEWING DOCUMENT.)

 2            YES.

 3       Q.   OKAY.  NOW LET'S TALK ABOUT THE IPOD FOR A SECOND.

 4            SO YOU HAVE THE DRM SONG SECTION WHICH IS IN THE KEYBAG,

 5       RIGHT?  THE DRM SONGS ARE CONTROLLED BY THE KEYS IN THE

 6       KEYBAG, RIGHT?

 7       A.   THE KEYBAG CONTAINS THE KEYS FOR DECRYPTING THE DRM SONGS.

 8       Q.   OKAY.  AND IN THE DATABASE, YOU CAN HAVE, AS YOU SAY, YOU

 9       COULD RIP A LOT OF CD'S AND PLAY THAT MUSIC IN THE DATABASE;

10       IS THAT RIGHT?  THEY'RE NOT CONTROLLED BY THE KEYBAG, RIGHT?

11       THEY'RE CONTROLLED BY ITUNES?

12       A.   I MEAN, WHAT YOU'RE SAYING DOESN'T MAKE SENSE TO ME.

13       Q.   OKAY.  SAY IT SO THAT IT MAKES SENSE TO YOU.

14       A.   THE -- THE DATABASE IS THE DIRECTORY OF ALL OF THE MUSIC

15       FILES THAT ARE ON THE IPOD, WHETHER DRM'D OR NOT DRM'D.

16       Q.   RIGHT.  MUSIC FILES THAT YOU MAY HAVE RIPPED CD'S,

17       CORRECT?

18       A.   IT COULD BE ANY MUSIC FILE.

19       Q.   BECAUSE YOU CAN PUT -- YOU CAN PUT ANY MP3 FILE INTO THE

20       DATABASE; IS THAT CORRECT?

21       A.   YEAH.  ITUNES CAN -- CAN DO THAT, YES.

22       Q.   AND A LOT OF THIRD-PARTY PLAYERS, AT LEAST 17 THAT WE

23       LOOKED AT, COULD DO THAT, RIGHT?

24       A.   YES.

25       Q.   OKAY.  AND YOU CAN PLAY THOSE SONGS.
```

```
1      WERE YOU CONCERNED ABOUT CORRUPTION WHEN YOU SAW THAT

2    YAHOO WAS ABLE TO DO THIS?

3    A.  YES.

4    Q.  DID YOU NOTIFY YAHOO?

5    A.  I DOUBT IT.

6    Q.  LET'S TAKE A LOOK AT EXHIBIT 267, IF WE MIGHT.

7           MR. COUGHLIN:  AND NOT FOR THE TRUTH OF THE MATTER OF

8    THE ARTICLE ASSERTED, BUT YOU CAN SHOW THE WITNESS 267.

9              (EXHIBIT PUBLISHED TO JURY.)

10   BY MR. COUGHLIN:

11   Q.  IT'S A NOVEMBER 16TH, 2005 EMAIL.

12   A.  (REVIEWING DOCUMENT.)

13   Q.  YOU'VE SEEN THIS EMAIL WHEN YOU WERE GETTING PREPPED; IS

14   THAT CORRECT?

15   A.  YES.

16   Q.  SO YOU UNDERSTAND THIS IS AN EMAIL ABOUT NAVIO GETTING

17   LICENSES WITH SONY, BMG, AND FOX AND OTHERS, AND THEN USING

18   THE SAME TECHNOLOGY OR TYPE OF TECHNOLOGY THAT REALNETWORKS

19   WAS GOING TO USE TO MIMIC FAIRPLAY SO TO DELIVER

20   COPY-PROTECTED SONGS IN A FORMAT THAT WILL PLAY THEM ON THE

21   IPOD.  YOU KNEW THAT, RIGHT?

22   A.  THAT'S A -- THAT'S A LOT OF STATEMENTS ABOUT WHAT THIS

23   ARTICLE IS.

24      MY UNDERSTANDING IS THAT THIS ARTICLE IS ABOUT A PRODUCT

25   CALLED NAVIO THAT REVERSE-ENGINEERED FAIRPLAY, BUT I DON'T
```

1    KNOW THAT NAVIO EVER ACTUALLY EVEN SHIPPED.

2    **Q.**  OKAY.  WE'LL –– WE'LL GET TO THAT IN A MINUTE.

3        UP AT THE TOP, STEVE IS TELLING YOU, WHEN NAVIO'S COMING

4    OUT.  AT THIS TIME YOU SAID YOU UNDERSTOOD THAT REALPLAYER IS

5    BACK –– THAT REALPLAYERS' HARMONY IS BACK WORKING ON THE IPOD,

6    RIGHT, IN NOVEMBER 2005?  THEY CAME BACK IN APRIL?

7    **A.**  THEY –– THEY DID COME BACK.  I DON'T REMEMBER THE EXACT

8    DATES.

9    **Q.**  OKAY.  SO NOW ANOTHER COMPANY IS COMING UP TO BE ABLE TO

10   PUT THEIR SONGS OR TO LICENSE THEIR DRM SO THEY CAN MIMIC

11   FAIRPLAY.  AND STEVE JOBS WRITES YOU; IS THAT CORRECT?

12   **A.**  WELL, STEVE JOBS WOULD SEND ME EMAILS ABOUT THINGS THAT

13   WERE MODIFYING THE DRM ALL THE TIME.  THIS IS JUST ANOTHER ONE

14   OF THOSE.

15   **Q.**  OKAY.  AND HE SAID THINGS "MAY NEED TO CHANGE AROUND

16   HERE"; IS THAT RIGHT?

17   **A.**  HE SAID, "WE MAY NEED TO CHANGE THINGS HERE."

18   **Q.**  LET'S TAKE A LOOK AT EXHIBIT 269.

19                (EXHIBIT PUBLISHED TO JURY.)

20   **BY MR. COUGHLIN:**

21   **Q.**  THIS IS ANOTHER INSTANT MESSAGE.  DO YOU RECOGNIZE WHICH

22   SIDE OF THIS INSTANT MESSAGE YOU ARE ON?

23   **A.**  FROM THIS, I CAN TELL THAT I'M ON THE LEFT SIDE.  SO I

24   WOULD HAVE BEEN ON THE LEFT SIDE ON THAT PREVIOUS ONE, TOO.

25   **Q.**  OKAY.  AND YOU WERE TALKING TO AUGUSTIN; IS THAT CORRECT?

 1    **A.**  (REVIEWING DOCUMENT.)

 2        YES.

 3    **Q.**  OKAY.  AND SO YOU'RE ON THE LEFT SIDE.

 4        AND IT SAYS HERE -- HELP ME READ THIS, GO AHEAD, YOU READ

 5    YOUR WORDS.

 6            **THE COURT:**  WHAT'S THE QUESTION?

 7            **MR. COUGHLIN:**  I JUST WANT TO BE ABLE TO READ IT.

 8    **Q.**  "I THINK WE NEED TO TALK WITH GUY," AND THAT'S THE

 9    GENTLEMAN WE LOOKED AT EARLIER, "ABOUT DOING A SIMPLE

10    AUTHORIZATION (SIC) IN 6.0.2 FOR THE IPOD."

11        IS THAT RIGHT?

12    **A.**  IT SAYS "SIMPLE AUTHENTICATION."

13    **Q.**  AUTHENTICATION.  OKAY.

14        NOTHING WITH THE DATABASE.  IS THAT WHAT "DB" MEANS?

15    **A.**  YES.

16    **Q.**  OKAY.  "BUT LOCK DOWN THE KEYBAG."

17        IS THAT CORRECT?

18    **A.**  YES.

19    **Q.**  OKAY.  AND AUGUSTIN REPLIES TO YOU THAT THAT'S A GOOD IDEA

20    AS WE DISCUSSED YESTERDAY; IS THAT RIGHT?

21    **A.**  IT DOESN'T SAY YESTERDAY.  IT JUST SAYS WE HAVE DISCUSSED

22    A SOLUTION.

23    **Q.**  OH, I THOUGHT IT -- "WE DISCUSSED THAT YESTERDAY."

24        DID I READ THAT WRONG?

25    **A.**  IT DOESN'T SAY YESTERDAY.

1    **Q.**  IT DOESN'T SAY "WE DISCUSSED THAT YESTERDAY"?

2    **A.**  NO.  IT SAYS, "THIS IS A GOOD IDEA AND WE HAVE ALREADY

3    DISCUSSED A SOLUTION."  ACTUALLY IT SAYS "AN SOLUTION" BUT I'M

4    CHALKING THAT UP TO --

5                    (SIMULTANEOUS COLLOQUY.)

6    **BY MR. COUGHLIN:**

7    **Q.**  OH, FURTHER DOWN, I'M SORRY.  THE THIRD LINE DOWN.

8    **A.**  OH, SORRY.

9         HE -- HE MOVED TO THE TOP PRIORITY "SINCE SD IS NOT ONE OF

10   THE TOP.  WE DISCUSSED THAT YESTERDAY."  NOT THE SOLUTION.

11   **Q.**  OKAY.  WHAT IS SD?

12   **A.**  I HAVE HAD NO IDEA.

13   **Q.**  OKAY.

14        NOW, IF WE GO DOWN FURTHER TO THE LAST TWO LINES, YOU SAY,

15   "AND IF SOMEONE INSERTS KEYS THAT WE DIDN'T CREATE, REMOVE

16   THEM."

17        DO YOU SEE THAT?

18   **A.**  YEAH, I SEE WHERE I MENTION THAT.

19   **Q.**  OKAY.

20   **A.**  WE DIDN'T ACTUALLY DO IT.

21   **Q.**  THAT HAS TO DO WITH REALNETWORKS AND NAVIO, RIGHT?

22   THEY'RE INSERTING KEYS THAT YOU DIDN'T CORRECT (SIC)?

23   **A.**  IT WOULD BE ANY KEYS THAT WERE INSERTED, BUT LIKE I SAID,

24   WE NEVER ACTUALLY DID IT.

25   **Q.**  OKAY.  YOU DIDN'T LOCK DOWN THE KEYBAG?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **A.**   WE DID LOCK DOWN THE KEYBAG WHICH IS SOMETHING WE'D

2    ALREADY BEEN WORKING ON FOR A WHILE, BUT WE DIDN'T ACTUALLY DO

3    THE THING ABOUT REMOVING KEYS.

4    **Q.**   OKAY.  BECAUSE BY THE WAY YOU LOCKED DOWN THE KEYBAG IS

5    YOU DELETED IT IF SOMEBODY INTRUDED; IS THAT RIGHT?

6    **A.**   NO, I DON'T THINK WE DELETED THE KEYBAG.  I THINK IT JUST

7    WOULDN'T LOAD.

8    **Q.**   YOU'RE -- YOU DIDN'T READ KELLER'S REPORT WHERE HE SAYS

9    THAT YOU ACTUALLY DELETED THE KEYBAG?

10   **A.**   NO.

11   **Q.**   OKAY.  IS HE INCORRECT IN THAT?

12   **A.**   I DON'T KNOW.  MY BELIEF WAS THAT WE DIDN'T DELETE IT, BUT

13   I COULD BE WRONG.

14   **Q.**   OKAY.  SO YOU DON'T KNOW.

15   **A.**   I DON'T KNOW WHETHER WE DELETED THE KEYBAG.  I DIDN'T

16   THINK THAT WE DID.

17   **Q.**   OKAY.

18        LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 2776.

19                   (EXHIBIT PUBLISHED TO JURY.)

20   **BY MR. COUGHLIN:**

21   **Q.**   A FEW DAYS LATER, NOVEMBER 24TH, 2005, AUGUSTIN WRITES

22   YOU, JEFF AND DAVID, "SOME CONSIDERATION ABOUT THE KIND OF

23   PROTECTION WE SHOULD BE ABLE TO IMPLEMENT."

24        DO YOU SEE THAT DOWN AT THE BOTTOM OF THAT EMAIL STRING?

25   **A.**   (REVIEWING DOCUMENT.)

1        YES.

2   **Q.**   OKAY.  AND THEN HE SAYS "DESCRIPTION," AND THEN WE GO OVER

3   TO THE NEXT PAGE.  HE IDENTIFIES THE CURRENT SECURITY HAS

4   SEVERAL FLAWS, AND ONE OF THEM ALLOWS THE INJECTION IN THE

5   IPOD'S KEYBAG WITHOUT THE CONTROL OF THE IPOD ACCOUNT KEY

6   MANAGER.

7        DO YOU SEE THAT?

8   **A.**   YES.

9   **Q.**   OKAY.  HE SAYS THE INJECTION IS THEN USED TO ADD DRM'D

10  SONGS IN THE LIBRARY.  DRM SONGS ARE SONGS THAT ARE

11  DIGITALLY -- DIGITAL RIGHTS MANAGEMENT-PROTECTED; IS THAT

12  RIGHT?

13  **A.**   YES.

14  **Q.**   OKAY.

15       "THE INJECTION USES THE MAN IN THE MIDDLE ATTACK."

16       DO YOU HAVE AN OPINION WHETHER IT'S ACTUALLY A MAN IN THE

17  MIDDLE ATTACK OR NOT?

18  **A.**   I WOULDN'T BEGIN TO DOUBT AUGUSTIN ON THAT.

19  **Q.**   OKAY.

20       "MAN IN THE MIDDLE ATTACK THAT CREATES GENUINE DRM KEY

21  MATERIAL."

22       DO YOU SEE THAT?

23  **A.**   I SEE WHERE IT SAYS THAT.

24  **Q.**   OKAY.

25       AND HE SAYS, "THE ACCOUNT KEY AND THE KEY PROTECTION KEY,

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    THE KEY MATERIAL IS THEN INJECTED IN THE IPOD'S KEYBAG AND IT

2    CAN NO LONGER BE IDENTIFIED OR REMOVED."

3        DO YOU SEE THAT?

4    **A.**  YES.

5    **Q.**  IT DOESN'T SAY IT'S CORRUPTED, DOES HE?

6    **A.**  THAT PART DOESN'T CALL IT CORRUPTED.

7    **Q.**  NO.  AND HE GIVES TWO SOLUTIONS.  DO YOU KNOW IF EITHER OF

8    THESE SOLUTIONS BECOMES WHAT ULTIMATELY IS THE, IN YOUR WORDS,

9    KEYBAG INTEGRITY VERIFICATION?

10   **A.**  YOU'D HAVE TO ASK AUGUSTIN.

11   **Q.**  OKAY.  BUT HE MADE THIS PROPOSAL TO YOU.  YOU CERTAINLY

12   UNDERSTOOD WHAT HE WAS TALKING ABOUT HERE, RIGHT?

13   **A.**  SURE.

14   **Q.**  YOU UNDERSTOOD THAT HE WAS TALKING ABOUT WHAT REAL AND

15   WHAT NAVIO WAS PROPOSING, RIGHT?

16   **A.**  NO.  THIS WAS JUST TALKING ABOUT IMPROVEMENTS TO THE DRM

17   IN GENERAL.  THIS WASN'T SPECIFIC TO ANYBODY -- ANY PARTICULAR

18   PARTY.  THIS WAS JUST LIKE THE NORMAL COURSE OF BUSINESS, WE

19   WERE IMPROVING THE DRM.

20   **Q.**  JUST A COINCIDENCE THAT STEVE JOBS HAD SENT YOU THAT EMAIL

21   ABOUT NAVIO A COUPLE DAYS BEFORE, RIGHT?

22   **A.**  STEVE JOBS SENDING ME EMAIL LIKE THAT MIGHT HAVE JUST

23   PUSHED ME TO SAY, HEY, WHERE ARE WE WITH THE PROTECTIONS WE'VE

24   BEEN WORKING ON.  BUT IT WASN'T THAT THE PROTECTIONS WERE JUST

25   THOUGHT OF BECAUSE OF THAT.

```
 1    Q.   LET'S TAKE A LOOK AT EXHIBIT 312.

 2                      (EXHIBIT PUBLISHED TO JURY.)

 3    BY MR. COUGHLIN:

 4    Q.   IF WE TAKE A LOOK AT THE THIRD PAGE IN ON EXHIBIT 312,

 5    IT'S 3 PAGES OF 85 PAGES.

 6         YOU RECOGNIZE THIS AS AUGUSTIN'S FAIRPLAY TM NEXT

 7    GENERATION; IS THAT CORRECT?

 8    A.   (REVIEWING DOCUMENT.)

 9         IT'S A FAIRPLAY NEXT GENERATION DOCUMENT, YES.

10    Q.   YOU'RE LISTED AS A CONTRIBUTOR ON THE THIRD PAGE.  DO YOU

11    SEE THAT?

12         (REVIEWING DOCUMENT.)

13         YES.

14    Q.   OKAY.  IF YOU TAKE A LOOK AT PAGE 26 OF THAT DOCUMENT, IF

15    YOU WOULD, FOR ME.

16    A.   (REVIEWING DOCUMENT.)

17    Q.   LET'S START WITH THE DIAGRAM UP ABOVE.

18                      (EXHIBIT PUBLISHED TO JURY.)

19    BY MR. COUGHLIN:

20    Q.   DO YOU KNOW IF THAT'S THE --

21              THE COURT:  JUST A SECOND.

22                      (OFF-THE-RECORD DISCUSSION.)

23              THE COURT:  WE'LL TAKE A BREAK IN 15 MINUTES.

24              MR. COUGHLIN:  YOUR HONOR, WE'VE COVERED SOME STUFF

25    BUT IF WE TOOK A BREAK NOW, I COULD SHORTEN IT UP.
```

1    **THE COURT:**  NO.  OTHERWISE THEN THE NEXT PIECE WILL

2    BE EXTRA LONG.  BUT --

3            **MR. COUGHLIN:**  I PROMISE --

4        **THE COURT:**  THERE IS A METHOD TO MY MADNESS.

5        **MR. COUGHLIN:**  I UNDERSTAND.

6        **THE COURT:**  GO AHEAD.

7    **BY MR. COUGHLIN:**

8    **Q.**  LET'S TAKE A LOOK AT THAT KEYBAG UP THERE.  IS THAT THE

9    NEW KEYBAG; DO YOU KNOW?

10   **A.**  (REVIEWING DOCUMENT.)

11       I DON'T KNOW IF THAT'S WHAT ACTUALLY GOT IMPLEMENTED.

12   IT'S WHAT THIS DOCUMENT HAS AS A DIAGRAM FOR IT.

13   **Q.**  OKAY.

14       IN FACT, IT'S NOT WHAT ACTUALLY GOT IMPLEMENTED; IS THAT

15   RIGHT?

16   **A.**  I DON'T KNOW.

17   **Q.**  YOU DON'T KNOW AT ALL?  YOU CAN READ -- YOU UNDERSTAND

18   THAT DIAGRAM, RIGHT?  YOU'RE A CONTRIBUTOR TO THIS DOCUMENT.

19   **A.**  I'M A CONTRIBUTOR TO A VERY LARGE DOCUMENT THAT TALKS

20   ABOUT THE DRM, BUT I DON'T KNOW WHO DREW THIS PARTICULAR

21   IMAGE.  I DID NOT.  AND I DON'T KNOW WHAT THE RELATIONSHIP OF

22   THAT IS TO WHAT THE KEYBAG ACTUALLY ENDED UP BEING.

23   **Q.**  OKAY.

24   **A.**  WE HAVE DOCUMENTS THAT EVOLVE ALL THE TIME.

25   **Q.**  DO YOU KNOW THAT -- DO YOU KNOW WHETHER EACH KEY VALUE IN

1    THE KEYBAG THAT WAS IMPLEMENTED HAD A KEY INTEGRITY FIELD?

2    **A.**  I DON'T KNOW.

3    **Q.**  OKAY.  LET'S TAKE A LOOK -- LET'S TAKE A LOOK AT DOWN INTO

4    THE DOCUMENT THEN.  IT'S TALKING ABOUT IMPROVEMENT OF THE

5    CURRENT SECURITY.  THE INTERNAL VALIDATION PROCESS -- I'M

6    READING THE FIRST PARAGRAPH THERE -- "PROCESS OF THE CURRENT

7    IPOD SECURITY SHOWS THAT THE SECURITY ARCHITECTURE HAS SEVERAL

8    FLAWS AND ONE OF THEM ALLOWS THE INJECTION IN THE IPOD'S

9    KEYBAG WITHOUT THE CONTROL OF THE IPOD...KEY MANAGER."

10        NOW THAT'S WHAT WE WERE TALKING ABOUT EARLIER IN THAT

11   NOVEMBER DOCUMENT; IS THAT RIGHT?

12   **A.**  (REVIEWING DOCUMENT.)

13        WHICH NOVEMBER DOCUMENT?

14   **Q.**  THE ONE WE JUST TURNED OVER WHERE HE PROPOSED TWO

15   DIFFERENT SOLUTIONS TO YOU TO THE INJECTION ISSUE WITH THE

16   KEYBAG.

17   **A.**  I'D HAVE TO GO --

18   **Q.**  JUST THE PREVIOUS DOCUMENT.

19   **A.**  I UNDERSTAND IT'S THE PREVIOUS DOCUMENT.  I'D HAVE TO GO

20   BACK AND LOOK AT WHAT EXACTLY WAS SAYING TO SEE IF THAT'S THE

21   SAME AS THIS.

22   **Q.**  ACTUALLY LET'S JUST STAY WITH THIS, THEN.  WE WON'T HOOK

23   IT UP TO THE PREVIOUS DOCUMENT YET.

24        IT SAYS, "THE INJECTION IS THEN USED TO ADD DRM'ED SONGS

25   IN THE LIBRARY."

1          IS THAT CORRECT?

2    **A.**  YES, IT SAYS THAT.

3    **Q.**  IT SOUNDS LIKE WHAT WE WERE TALKING ABOUT IN THE PREVIOUS

4    DOCUMENT, RIGHT?

5    **A.**  I'D HAVE TO GO BACK AND LOOK AT THE PREVIOUS DOCUMENT.

6    **Q.**  OKAY.  "THE INJECTION USES THE MAN IN THE MIDDLE ATTACK

7    THAT CREATES GENUINE DRM KEY MATERIAL."

8          YOU MADE THE JOKE ABOUT AUGUSTIN -- YOU WOULDN'T DOUBT

9    AUGUSTIN ABOUT THE MAN IN THE MIDDLE ATTACK, RIGHT?

10   **A.**  I DON'T THINK IT WAS A JOKE.  I WOULDN'T DOUBT AUGUSTIN

11   ABOUT WHETHER IT'S A MAN IN THE MIDDLE ATTACK.

12   **Q.**  IT SAYS -- LET'S MOVE DOWN TO THE NEXT PARAGRAPH.

13         "SEVERAL CRYPTOGRAPHY TECHNIQUES CAN STOP THE INJECTION

14   BUT CANNOT ELIMINATE THE INJECTED DRM KEY MATERIAL OF A

15   CONTAMINATED KEYBAG."

16         DO YOU SEE THAT?

17   **A.**  YES.

18   **Q.**  "THE ERADICATION OF INJECTION CAN ONLY BE DONE WITH

19   CONSTRAINT FOR THE USER EXPERIENCE AND IT IS NOT A DESCRIPTION

20   IN THIS DOCUMENT."

21         DO YOU SEE THAT?

22   **A.**  YES.

23   **Q.**  OKAY.  IF WE FLIP TO THE NEXT PAGE.

24   **A.**  THIS PART OF THE DOCUMENT SAYS THAT.

25   **Q.**  THIS PART OF THE DOCUMENT.

1           IF WE FLIP TO 312 -- I MEAN PAGE 27.  AND WE'RE LOOKING AT

2    THE IPOD KEY PROTECTION, AT THE BOTTOM, THE LAST PARAGRAPH.

3           IT SAYS, "STOPPING THE INJECTION WILL IMPLY UPGRADE

4    PROCESSES EITHER FOR ITUNES OR THE IPODS THAT CONSEQUENTLY

5    DOWNGRADE THE USER EXPERIENCE."

6           DO YOU SEE THAT?

7    **A.**   UH-HUH.

8    **Q.**   SO YOU UNDERSTOOD THAT IF YOU UNDERTOOK THIS UPGRADE OF

9    PROCESSES, IT WOULD DOWNGRADE THE USER EXPERIENCE, RIGHT?

10   **A.**   THAT'S WHAT THIS DOCUMENT SAYS.  I DON'T KNOW IF I

11   UNDERSTOOD THAT AT THE TIME OR IF WE EVEN TALKED ABOUT THIS AT

12   THE TIME.

13          THIS WAS AUGUSTIN'S DOCUMENT.  WE HAD CONVERSATIONS ABOUT

14   THE DRM ALL THE TIME.  BUT I DON'T KNOW WHAT THAT PARTICULAR

15   SENTENCE MEANS IN THE SCOPE OF THE DRM'S OVERALL

16   IMPLEMENTATION.

17   **Q.**   WELL, YOU'RE A CONTRIBUTOR TO THIS DOCUMENT, RIGHT?

18   **A.**   I'M A CONTRIBUTOR IN CONCEPT TO THE DOCUMENT, BUT I DIDN'T

19   ACTUALLY WRITE THE DOCUMENT.

20   **Q.**   IF YOU DIDN'T UNDERSTAND SOMETHING, YOU WOULD HAVE ASKED,

21   RIGHT?

22   **A.**   I CAN'T REMEMBER WAY BACK WHEN WHAT THIS WOULD HAVE MEANT,

23   SO I'M JUST NOT SURE.

24   **Q.**   OKAY.

25          IF YOU THOUGHT SOMETHING WAS GOING TO DOWNGRADE THE USER

1    EXPERIENCE, YOU WOULD HAVE ASKED SOMEBODY, RIGHT?

2    **A.**  IF WE WERE GOING TO DO SOMETHING THAT MADE A BAD

3    EXPERIENCE, WE WOULD HAVE BEEN THINKING LONG AND HARD ABOUT

4    THAT.

5    **Q.**  OKAY.  BUT YOU DID IT ANYWAY, RIGHT?  YOU IMPLEMENTED

6    THAT --

7               **THE COURT:**  OKAY.  SORRY.

8                     (OFF-THE-RECORD DISCUSSION.)

9                     (PAUSE IN THE PROCEEDINGS.)

10              **THE COURT:**  THERE WE GO.  GO AHEAD.

11   **BY MR. COUGHLIN:**

12   **Q.**  YOU IMPLEMENTED THAT SCHEME; IS THAT CORRECT?

13   **A.**  WHAT -- WHAT MECHANISM?

14                     (SIMULTANEOUS COLLOQUY.)

15              **THE WITNESS:**  THE KEYBAG VERIFICATION SYSTEM?

16   **BY MR. COUGHLIN:**

17   **Q.**  YES.

18   **A.**  YES, WE IMPLEMENTED THE KEYBAG VERIFICATION SYSTEM.

19   **Q.**  AND THAT -- YOU DON'T -- YOU'RE NOT SURE IF IT DELETED THE

20   KEYBAG, BUT THAT'S WHAT YOUR EXPERT SAYS, IT DELETED THE

21   KEYBAG.  THAT DOWNGRADED THE USER EXPERIENCE, RIGHT?

22   **A.**  THAT'S NOT A DOWNGRADE OF THE USER EXPERIENCE.  IF -- IF

23   THE KEYBAG GOT CORRUPTED, THEN THERE WAS A SIMPLE WAY TO FIX

24   IT AND JUST CONNECT IT BACK UP TO ITUNES.

25   **Q.**  IF YOU CONNECTED --

1   **A.**   SO THAT WASN'T DEGRADING THE EXPERIENCE.

2   **Q.**   IF YOU CONNECTED IT BACK UP TO ITUNES, THOUGH, YOU LOST

3   THE SONGS FROM THE THIRD PARTIES LIKE REAL, RIGHT?   THOSE DRM

4   SONGS WERE DELETED WHEN YOUR KEYBAG WAS DELETED.

5   **A.**   THOSE SONGS WOULD HAVE STILL BEEN IN THE REALPLAYER SO THE

6   USER DIDN'T ACTUALLY LOSE THE SONGS THEMSELVES.

7   **Q.**   IF THEY HAD THE SAME COMPUTER, MAYBE.   BUT IF THEY DIDN'T,

8   IF THEY DIDN'T HAVE THE COMPUTER FOR THAT -- THAT THEY HAD

9   BEFORE WHERE THEY HAD THAT FILE, THEY WOULD LOSE THOSE

10  FOREVER?

11  **A.**   THE WHOLE WAY THAT IPOD WORKED WAS IT WAS DESIGNED TO SYNC

12  WITH ITUNES.   AND SO WHEN YOU CONNECTED IT UP TO A COMPUTER,

13  IT'S GOING TO TRY TO LAUNCH ITUNES.   ITUNES IS GOING TO TRY TO

14  AUTOMATICALLY SYNC AND MAKE EVERYTHING LOOK LIKE THE ITUNES

15  LIBRARY.   THAT WAS HOW IT WAS SUPPOSED TO WORK.   THAT WAS WHAT

16  MADE IT SUCH A GREAT EXPERIENCE.   SO --

17  **Q.**   AND YOU DIDN'T WANT THIRD-PARTY PLAYERS TO PLAY ON IT.

18  **A.**   WE DIDN'T WANT -- WE DIDN'T WANT THE DRM COMPROMISED.   THE

19  BIG ISSUE HERE WAS AROUND DRM BEING COMPROMISED.   WE WERE

20  REQUIRED BY THE RECORD LABELS TO -- TO HAVE FAIRPLAY BE

21  PROTECTED.   AND WE HAD HACK AFTER HACK AFTER HACK THAT BROKE

22  THAT.   AND SO FOR US, WE WERE JUST EVOLVING THE DRM.

23  **Q.**   FOR THE RECORD LABELS, RIGHT?

24  **A.**   IN ORDER TO HAVE AN ITUNES MUSIC STORE AT ALL.

25  **Q.**   OKAY.   BUT THEY TOLD YOU THEY HAD NO CONCERNS OVER THIS

1    TYPE OF MIMIC, RIGHT?  THEY WANTED INTEROPERABILITY?

2    **A.**  THEY DIDN'T TELL ME THAT.  AND ALL THE CONVERSATIONS I HAD

3    WITH THE RECORD LABELS WERE "YOU HAVE THIS HACK.  WHAT ARE YOU

4    DOING ABOUT IT?"  OVER AND OVER AGAIN.

5    **Q.**  LET'S TAKE A LOOK AT EXHIBIT 2354, PLEASE.

6                (EXHIBIT PUBLISHED TO JURY.)

7    **BY MR. COUGHLIN:**

8    **Q.**  I'M NOT GOING TO GET THESE NAMES RIGHT.  SO COULD YOU

9    PRONOUNCE THAT, STEVE GEDIKIAN?

10   **A.**  GEDIKIAN.

11   **Q.**  GEDIKIAN.  TO ERIC OLIVER DATED FEBRUARY 21ST, 2006.

12       DO YOU SEE THAT?

13   **A.**  YES.

14   **Q.**  AND IT SAYS THAT THIS IS A DRAFT BEFORE THEY CIRCULATE IT.

15       THAT JEFF WOULD HAVE BEEN YOU, RIGHT?

16   **A.**  I'M SURE.

17   **Q.**  OKAY.  YOU'VE SEEN THIS -- YOU UNDERSTAND WHAT

18   "ALEXANDRIA" REFERS TO, IT'S 7.0, RIGHT?

19   **A.**  THAT'S WHAT IT SAYS HERE.

20   **Q.**  OKAY.  AND YOU WOULD HAVE GOTTEN A DOCUMENT LIKE THIS; IS

21   THAT RIGHT?  OR DID YOU GET THIS DOCUMENT?

22   **A.**  (REVIEWING DOCUMENT.)

23       I DON'T REMEMBER IF I GOT THIS DOCUMENT OR NOT.

24   **Q.**  OKAY.  YOU WOULD HAVE GOTTEN A DOCUMENT LIKE THIS EITHER

25   THEN OR THE VERY NEXT DAY, RIGHT?

1    **A.**   AGAIN, I DON'T REMEMBER IF I GOT THIS DOCUMENT.

2    **Q.**   WELL, LET'S SEE IF YOU RECOGNIZE THINGS WITHIN IT.  AND

3    I'LL JUST ASK YOU TO FLIP TO ONE PAGE AND SEE IF YOU

4    RECOGNIZE, AND IF YOU DON'T, WE'LL MOVE ON.

5        IF YOU COULD FLIP TO PAGE 9.

6    **A.**   (REVIEWING DOCUMENT.)

7                   (EXHIBIT PUBLISHED TO JURY.)

8    **BY MR. COUGHLIN:**

9    **Q.**   AT THE BOTTOM.  RIGHT THERE ON "AMAZON'S MUSIC PLAY."

10       YOU UNDERSTOOD THAT IN FEBRUARY 2006 THAT THERE HAD BEEN

11   AN ARTICLE IN THE *WALL STREET JOURNAL* ABOUT AMAZON'S MUSIC

12   PLAY; IS THAT CORRECT?

13   **A.**   I -- I DON'T REMEMBER THAT.

14   **Q.**   OKAY.  WELL, YOU WOULD HAVE GOTTEN A DOCUMENT LIKE THIS

15   THAT SAID AT THE BOTTOM, "THIS SERVICE POSES A SIGNIFICANT

16   THREAT TO IPOD AND ITUNES WHEN COMPARING OUR CUSTOMER BASE TO

17   AMAZON'S 55 MILLION ACTIVE CUSTOMERS."

18       DO YOU SEE THAT?

19   **A.**   YOU'VE ASKED ME TWO QUESTIONS.  I DIDN'T RECEIVE THIS -- I

20   DON'T REMEMBER RECEIVING THIS DOCUMENT.  BUT I DO SEE WHERE IT

21   SAYS THAT IN THIS DOCUMENT.

22   **Q.**   OKAY.  WELL, YOU WERE AWARE AT THAT TIME -- THIS WOULD

23   HAVE BEEN BIG NEWS AT APPLE.  THIS WAS A SIGNIFICANT THREAT,

24   OR THEY IDENTIFIED IT HERE AS A SIGNIFICANT THREAT.  THESE

25   PEOPLE THAT WERE COMING TO TALK TO YOU LATER WOULD HAVE TOLD

1   YOU ABOUT IT, RIGHT?

2   **A.**   WE ABSOLUTELY LOOKED AT THE --

3           **MS. DUNN:**   OBJECTION, COMPOUND QUESTION.

4           **THE COURT:**   SUSTAINED.

5   BY MR. COUGHLIN:

6   **Q.**   THE PEOPLE INVESTIGATING AND COMPILING THIS DOCUMENT WOULD

7   HAVE DISCUSSED THIS IMPORTANT ISSUE WITH YOU ABOUT AMAZON,

8   CORRECT?

9   **A.**   THIS IS A DOCUMENT FROM THE MARKETING GUYS ABOUT ITUNES 7

10  AND INCLUDED IN IT LOOKS LIKE A COMPETITIVE DISCUSSION.  AND

11  THEY ARE TALKING ABOUT AMAZON WHICH WE ABSOLUTELY VIEWED AS A

12  SERIOUS COMPETITOR.

13  **Q.**   OKAY.  AND THIS IS IN FEBRUARY 2006, RIGHT?

14  **A.**   (REVIEWING DOCUMENT.)

15      YES.

16  **Q.**   OKAY.  AND DOWN, IT SAYS "DIGITAL JUKEBOXES."

17      DO YOU SEE THAT?

18  **A.**   YES.

19  **Q.**   AND SO DO YOU -- DOES THAT COMPORT WITH YOUR RECOLLECTION

20  THAT THE ITUNES JUKEBOX VERSUS THE ITUNES MUSIC STORE VERSUS

21  THE IPOD, THAT THE ITUNES JUKEBOX WAS ONLY 17 PERCENT OF THE

22  MARKET; IS THAT CORRECT?

23  **A.**   THAT'S WHAT THIS LOOKS LIKE.

24  **Q.**   DOES THAT SEEM LIKE IT -- THE NUMBERS THAT YOU REMEMBER

25  ABOUT THAT TIME?

1    **A.**   I CAN NEVER REMEMBER THE MARKET SHARE NUMBERS FROM THEN.

2    **Q.**   OKAY.  HOW ABOUT REALPLAYER AT 13 PERCENT?

3    **A.**   I WOULDN'T HAVE KNOWN THAT EITHER.

4    **Q.**   OKAY.

5        LET'S TAKE A LOOK AT EXHIBIT 316.

6            **MR. COUGHLIN:**  I THINK THIS DOCUMENT HAS ALREADY BEEN

7    ADMITTED, YOUR HONOR.

8            **THE COURT:**  IT HAS BEEN.  IT CAN BE SHOWED TO THE

9    JURY.

10            (EXHIBIT PUBLISHED TO JURY.)

11    **BY MR. COUGHLIN:**

12    **Q.**   THIS IS DOCUMENT 316.  IT'S FROM CHRIS WOZNIAK (SIC),

13    DATED APRIL 25TH, 2006, TO DAVE HELLER.

14        AND THIS IS ABOUT DATABASE VERIFICATION.  NOW SOMEBODY IS

15    USING THE WORDS THAT I USE.  IT'S ABOUT THE DATA -- DATABASE

16    VERIFICATION.

17        DO YOU SEE THAT?

18    **A.**   IT WAS FROM CHRIS WYSOCKI TO DAVE HELLER.  AND, YES, IT

19    TALKS ABOUT DATABASE VERIFICATION API.

20    **Q.**   OKAY.  LET'S FLIP OVER TO THE SECOND PAGE.  AND WE'RE JUST

21    GOING TO FOCUS ON THE TOP TWO THERE.

22            (EXHIBIT PUBLISHED TO JURY.)

23    **BY MR. COUGHLIN:**

24    **Q.**   AND OF COURSE YOU CAN LOOK AT ANY OTHER PART OF THE

25    DOCUMENT YOU WANT.

1     AND HE IDENTIFIES THE PROBLEM:  "TO PREVENT INJECTION OF

2   CONTENT IN IPOD DATABASES FROM CLIENTS OTHER THAN ITUNES INTO

3   THE IPOD (DRM PROTECTED OR NON-DRM PROTECTED CONTENT), A

4   METHOD FOR VERIFYING THE SOURCE OF THE CONTENT NEEDS TO BE

5   IMPLEMENTED."

6     DO YOU SEE THAT?

7   **A.**  YES.

8   **Q.**  OKAY.  SO YOU UNDERSTOOD THERE THAT WHILE WE WERE JUST

9   DEALING WITH THE DRM-PROTECTED SONGS WITH KEYBAG, NOW WE'VE

10  MOVED TO DRM AND NON-DRM SONGS WITH THE DATABASE VERIFICATION;

11  IS THAT CORRECT?

12  **A.**  I'D NEVER SEEN THIS DOCUMENT BEFORE.

13  **Q.**  THIS IS THE FIRST TIME YOU'VE EVER SEEN THIS?

14  **A.**  WELL, I SAW IT DURING PREP, BUT I NEVER SAW IT BEFORE

15  THEN.

16  **Q.**  OKAY.  YOU UNDERSTAND WHAT THE DATABASE VERIFICATION IS

17  AND WHAT IT DOES, RIGHT?

18  **A.**  I DO UNDERSTAND WHAT DATABASE VERIFICATION IS.

19  **Q.**  OKAY.  AND WHEN -- WELL, PUT IT IN YOUR OWN WORDS.  WHAT

20  DOES THE DATABASE VERIFICATION DO?  WHAT IS THE END RESULT OF

21  WHAT HAPPENED HERE?

22  **A.**  DATABASE VERIFICATION IS ABOUT MAKING SURE THAT THE

23  DATABASE HASN'T BEEN TAMPERED WITH OR CORRUPTED.

24  **Q.**  AND IT PUTS A -- LET'S SAY A BOUNDARY AROUND THE OUTSIDE

25  OF THE DATABASE, RIGHT?

1    **A.**   I DON'T KNOW WHAT YOU MEAN BY A BOUNDARY AROUND IT.

2    **Q.**   HOW WOULD YOU DESCRIBE THE PROTECTION AROUND THE ENTIRE

3    DATABASE?

4    **A.**   I WOULD DESCRIBE IT AS MAKING IT SO THAT DATABASE ITSELF

5    CAN'T BE TAMPERED WITH OR CORRUPTED.

6    **Q.**   THAT NOBODY CAN GET INTO THE DATABASE, RIGHT?

7    **A.**   YOU CAN READ THE DATABASE.  YOU JUST CAN'T MODIFY THE

8    DATABASE.  AND IF IT'S DAMAGED, THEN WE CAN DETECT THAT IT WAS

9    DAMAGED.

10   **Q.**   OKAY.  AND WHEN YOU SAY "DAMAGED," IF -- IF A THIRD-PARTY

11   PLAYER, ONE OF THE 17 THAT WE'VE BEEN TALKING ABOUT EARLIER,

12   WAS TRYING TO PLAY SONGS ON YOUR IPOD, THAT YOU WOULD CONSIDER

13   THAT DAMAGED, RIGHT?

14   **A.**   IF THE THIRD-PARTY PLAYER MODIFIED THE DATABASE FILE

15   DIRECTLY ITSELF, THAT WOULD LOOK LIKE DAMAGE TO ITUNES.  IF A

16   THIRD-PARTY PLAYER PUT THEIR SONGS IN SOME UNPROTECTED FORM

17   THROUGH ITUNES ONTO THE DEVICE, IT WOULD WORK FINE.

18   **Q.**   RIGHT.  SO IT WAS ONLY IF A THIRD-PARTY PLAYER WAS BEING

19   USED TO MODIFIED THE DATABASE?

20   **A.**   OR A HACK OR DISK CORRUPTION OR ANYTHING ELSE THAT WOULD

21   HAVE MODIFIED THAT FILE.

22   **Q.**   OKAY.  THESE DATA -- THESE THIRD-PARTY PLAYERS HAVE NOW

23   BEEN PLAYING ON THE IPOD OR ABLE TO PLAY ON THE IPOD FOR YEARS

24   AND YEARS NOW WITHOUT YOU PUTTING THIS DATABASE VERIFICATION

25   ON; ISN'T THAT CORRECT?

1    **A.**   THIRD-PARTY PLAYERS DON'T PLAY ON AN IPOD.  SO THIRD-PARTY

2    PLAYERS EXISTED THAT PUT SONGS ONTO AN IPOD OR MODIFIED THE

3    IPOD DATABASE, THAT'S TRUE.

4    **Q.**   OKAY.  AND IF A THIRD-PARTY PLAYER PUT SONGS ON THE IPOD

5    OR MODIFIED THE IPOD DATABASE, YOU DELETED THE DATABASE.

6    **A.**   NO.

7    **Q.**   WHAT HAPPENED TO THE DATABASE?

8    **A.**   THE DATABASE WAS LEFT ALONE, BUT THE DATABASE WASN'T GOING

9    TO WORK WITH THE IPOD.

10                      (SIMULTANEOUS COLLOQUY.)

11   **BY MR. COUGHLIN:**

12   **Q.**   RIGHT.  IT DIDN'T WORK AT ALL, YOU COULDN'T PLAY ANY

13   SONGS.

14   **A.**   YOU WOULD HAVE TO GO AND CONNECT IT BACK TO ITUNES TO FIX

15   IT.

16   **Q.**   AND WHEN YOU CONNECTED IT BACK TO ITUNES TO FIX IT, IT

17   ERASED THE WHOLE MUSIC DATABASE, CORRECT?

18   **A.**   NO.  WHEN YOU -- FIRST WHEN YOU CONNECTED IT TO THE

19   COMPUTER, IT WOULD MOUNT AS A HARD DRIVE, SO YOU COULD GET OFF

20   ANY DOCUMENTS THAT WERE ON IT.  SO ON THE MASS STORAGE SIDE OF

21   IT.  YOU COULD COPY THE FILES OFF OF IT.  THE ONLY THING THAT

22   WASN'T VALID WAS THE DATABASE ITSELF.

23   **Q.**   ALL RIGHT.

24   **A.**   SO THEN ITUNES WOULD OFFER TO FIX IT.

25   **Q.**   AND DID THE ERROR MESSAGE TELL THE CUSTOMER "YOU BETTER

1    GET YOUR FILES OFF THIS"?  DID THE ERROR MESSAGE THAT APPLE

2    DECIDED TO PUT IN TELL CUSTOMERS THEY HAD BETTER GET THEIR

3    FILES ONTO THEIR COMPUTER, OTHERWISE THEY'RE ABOUT TO BE

4    DELETED?

5    **A.**  THE ERROR MESSAGE, WHEN YOU WOULD RESTORE ANY IPOD, WOULD

6    ALWAYS TELL YOU THIS IS GOING TO ERASE ALL THE CONTENT.  IT'S

7    A VERY CLEAR WARNING.

8    **Q.**  NOT THE ERROR THAT YOU GOT ON THE IPOD, THOUGH.  THAT'S

9    NOT WHAT THAT ERROR SAID.  WHAT DID THAT ERROR SAY?

10    **A.**  I DON'T REMEMBER IF THERE WAS EVEN AN ERROR MESSAGE VERSUS

11    JUST AN ICON.  USUALLY WHEN THE IPOD ENCOUNTERS A PROBLEM, WE

12    PUT UP A MESSAGE THAT'S REALLY SIMPLE BECAUSE WE WANT A VERY

13    CLEAR WAY FOR ITUNES TO BE ABLE TO FIX IT.  SO IF IT'S ICON,

14    IT SAYS, "CONNECT THIS TO ITUNES."

15    **Q.**  SO YOU DON'T KNOW WHAT THE ERROR MESSAGE SAID?

16    **A.**  I DON'T THINK THERE WAS AN ERROR MESSAGE.  I THINK IT WAS

17    JUST THE ICON.

18    **Q.**  OKAY.  AND DID THAT ERROR MESSAGE, THAT ICON, TELL YOU

19    THAT BEFORE YOU GO AND RESTORE, YOU'RE GOING TO LOSE ALL YOUR

20    FILES AND ALL THE MUSIC IF IT'S FROM A THIRD-PARTY PLAYER IN

21    YOUR DATABASE AND ALL THE FILES ON YOUR IPOD?

22    **A.**  ITUNES, WHEN YOU GO TO RESTORE, IT TELLS YOU THAT IT'S

23    GOING TO ERASE YOUR DEVICE.  IT'S GOING TO RESTORE IT BACK TO

24    FACTORY SETTINGS.  IT LOOKS LIKE IT WAS A BRAND-NEW IPOD.  AND

25    THEN ITUNES WILL AUTOMATICALLY SYNC OVER EVERY CONTENT YOU

1    HAVE IN YOUR ITUNES LIBRARY ONTO THE DEVICE.

2    **Q.**  OKAY.  BUT YOU'VE LOST POTENTIALLY, IF YOU DIDN'T GET YOUR

3    FILES OFF, YOU'VE LOST ALL YOUR FILES.  IF YOU DIDN'T GET YOUR

4    FILES OFF THAT IPOD BEFORE YOU RESTORED TO FACTORY SETTINGS,

5    YOU'VE LOST THEM, RIGHT?

6    **A.**  IF YOU IGNORE THE WARNING THAT TELLS YOU VERY CLEARLY THAT

7    IT'S GOING TO ERASE THE DEVICE AND YOU DON'T BACK UP WHAT YOU

8    NEED TO BACK UP, THEN, YES, YOU WOULD LOSE SOMETHING.  THAT

9    WOULD HAPPEN WITH ANYTHING THAT YOU ERASE.

10    **Q.**  WELL, WHAT IT DOES IS YOU CAN'T USE YOUR IPOD ANYMORE AT

11    ALL TO PLAY MUSIC, RIGHT?  WHEN THE DATABASE VERIFICATION,

12    LET'S SAY FINDS AN INTRUDER, A THIRD PARTY, YOU CAN'T PLAY ANY

13    SONGS, IT'S JUST STOPS PLAYING.

14    **A.**  ONCE YOU'VE MODIFIED THE IPOD OR IT GETS CORRUPTED --

15    WHICH DID HAPPEN, IPODS HAD MOVING DISKS AND WE HAD CORRUPTION

16    ALL THE TIME -- WHEN SOMETHING GETS MODIFIED AND IT GETS

17    DAMAGED, THE IPOD CAN'T FIX IT ITSELF.  SO ALL IT CAN DO IS

18    TELL YOU TO CONNECT TO A COMPUTER TO FIX IT.

19        THE SOFTWARE THAT WE MADE AS PART OF THE ITUNES-IPOD

20    ECOSYSTEM WAS ITUNES.  AND SO ITUNES DID THE BEST THING IT

21    COULD IN ORDER TO REPAIR THAT.  THAT WOULD INVOLVE WARNING THE

22    USER THAT IT WAS GOING TO DO SOMETHING LIKE THAT.  THE USER

23    HAD THE CHOICE TO DO IT OR NOT DO IT.  AND UNTIL THEY ACTUALLY

24    DID THAT, IT WASN'T ACTUALLY ERASED.

25        AND THEN ONCE THE ERASE HAPPENED, WE COULD RESTORE FROM

1    BACKUP WHICH WOULD PUT EVERYTHING BACK ONTO THE IPOD.  OR YOU

2    COULD START A NEW SYNC AND IT WOULD SYNC ALL YOUR SONGS OVER.

3             **MR. COUGHLIN:**  YOUR HONOR.

4             **THE COURT:**  IS THIS A GOOD TIME FOR A BREAK?

5             **MR. COUGHLIN:**  YES.

6             **THE COURT:**  OKAY.  LADIES AND GENTLEMEN, AGAIN, A

7    REMINDER NOT TO TALK ABOUT ANY OF THE MATTERS YOU'VE HEARD

8    AMONGST YOURSELVES.

9        I DID REMEMBER THE BAG SO THERE ARE SOME SNACKS IN THERE

10   FOR YOU.  ENJOY THEM.  WE'LL SEE YOU IN 15 MINUTES.

11       (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

12   OF THE JURY:)

13            **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

14   IS GONE.

15       I'M SHOWING 10:03.  BACK ON THE RECORD AT 10:18.  THANK

16   YOU.

17                (RECESS TAKEN AT 10:03 A.M.)

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS RESUMED AFTER RECESS AT 10:16 A.M.)

 2              THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

 3     COME TO ORDER.

 4              THE COURT:  OKAY.  FRANCES, GO AHEAD.

 5              (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

 6              THE COURT:  OKAY.  WE ARE BACK ON THE RECORD.  THE

 7     RECORD WILL REFLECT THAT THE JURY IS HERE.  EVERYONE MAY BE

 8     SEATED.

 9          SO I WAS REALIZING I GAVE YOU SUGAR.  I PROBABLY SHOULD

10     HAVE BROUGHT YOU IN SOME TREATS THAT WERE PROTEIN.  BUT

11     HOPEFULLY IT WORKED.  AT LEAST YOU HAVE A LITTLE BIT OF ENERGY

12     TO GET TO THE NEXT BREAK.

13          MR. COUGHLIN, YOU MAY PROCEED.

14              MR. COUGHLIN:  THANK YOU, YOUR HONOR.

15     BY MR. COUGHLIN:

16     Q.  IF YOU COULD FLIP TO EXHIBIT 465.

17          THIS IS AN EMAIL DATED SEPTEMBER 16TH, 2007.  AND YOU ARE

18     COPIED ON IT.

19                   (EXHIBIT DISPLAYED TO JURY.)

20          AND IT LOOKS LIKE STEVE JOBS STARTS IT OFF ON THE BOTTOM,

21     SEPTEMBER 15TH, 2007, AND HE ATTACHES AN ARTICLE.

22          AND JUST FOR NOTICE, THAT ARTICLE, IF WE GO TO THE SECOND

23     PAGE, GO TO THE TOP TWO PARAGRAPHS.

24          THAT ARTICLE -- "THIS IS NOTHING ACTIONABLE, JUST THOUGHT

25     YOU MAY APPRECIATE A CONSUMER'S FEEDBACK."
```

ROBBIN – DIRECT / COUGHLIN

```
 1        COULD YOU READ THAT TO YOURSELF?
 2            THE COURT:  ONCE AGAIN, THIS ISN'T FOR THE TRUTH
 3    CORRECT?
 4        MR. COUGHLIN?  THIS ISN'T FOR THE TRUTH?
 5            MR. COUGHLIN:  NO, IT'S NOT FOR THE TRUTH.  I JUST
 6    WANT IT JUST FOR NOTICE.
 7    BY MR. COUGHLIN:
 8    Q.  WE CAN GO BACK TO THE FIRST.  I WANTED YOU TO SEE WHAT THE
 9    ARTICLE WAS ABOUT.
10        WE CAN GO BACK TO THE FIRST PAGE.
11        IF WE TAKE A LOOK AT THE BOTTOM, LINE ITEM ARTICLE APPEARS
12    TO HAVE BEEN SENT BY STEVE JOBS AT THE BOTTOM.
13        AND THEN SOMEBODY ASKED:  "ARE WE GETTING ANY NEGATIVE
14    PRESS ON DB SIGNING YET?"
15        YOU UNDERSTAND THAT'S THE DATABASE VERIFICATION WE TALKED
16    ABOUT EARLIER, RIGHT?
17    A.  I DON'T THINK THIS IS AN ARTICLE.  THIS LOOKS LIKE A
18    FORWARD OF AN EMAIL FROM SOMEBODY THAT EMAILED STEVE.
19    Q.  THAT'S CORRECT.
20        YOU RECOGNIZE IT'S ABOUT THE DATABASE VERIFICATION, RIGHT?
21    A.  DB SIGNING IS THE DATABASE VERIFICATION.
22    Q.  YES.
23        AND THEN THERE IS A, ACCORDING TO THE BLOG -- WHO WROTE
24    THAT?
25        IS THAT AN EXCERPT FROM AN ARTICLE OR IS THAT FROM A BLOG
```

1    POST, OR DO YOU KNOW?

2    **A.**   I THINK IT'S A COPY OF A BLOG POST.

3    **Q.**   AND IT SAYS:

4            "THE TWEAK TO THE NEW IPOD DATABASE FILES DOES NOT

5            APPEAR INCIDENTAL."

6        DO YOU SEE THAT?

7        THAT WAS TRUE, RIGHT?  IT WASN'T INCIDENTAL THAT YOU PUT

8    IN THE DATABASE VERIFICATION.

9    **A.**   I'M SORRY, I'M STILL LOOKING AT THE POSTING --

10           **MS. DUNN:**  OBJECTION, YOUR HONOR.  THE QUESTION IS

11   WHETHER THAT WAS TRUE.  THIS IS NOT OFFERED FOR THE TRUTH.

12           **THE COURT:**  I THINK THE QUESTION IS WHETHER THE

13   STATEMENT IS ACCURATE.

14       BUT YOU CAN REPHRASE.

15   **BY MR. COUGHLIN:**

16   **Q.**   IS THAT STATEMENT ACCURATE?

17   **A.**   SORRY.  WHICH STATEMENT?  I WAS STILL LOOKING AT WHETHER

18   IT WAS A BLOG POST.

19   **Q.**   OKAY.  SORRY.  TAKE YOUR TIME.

20   **A.**   WHAT WAS YOUR QUESTION?

21   **Q.**   THE IMPLEMENTATION OF THE DATABASE VERIFICATION, THAT

22   WASN'T INCIDENTAL, RIGHT?  THAT WAS INTENTIONAL.

23   **A.**   YEAH.  THE DATABASE VERIFICATION WAS PART OF US MAKING THE

24   DRM STRONGER.

25   **Q.**   AND ON THE VERY TOP IT SAYS, "IT LOOKS LIKE IT'S

ROBBIN – DIRECT / COUGHLIN

1    STARTING".

2        DO YOU SEE THAT?

3    **A.**  YES.

4    **Q.**  YOU RECEIVED THIS DOCUMENT, RIGHT?

5    **A.**  IT WAS EMAILED TO ME BY TONY.

6    **Q.**  LET'S TAKE A LOOK AT EXHIBIT 333.

7        THIS IS AN EMAIL FROM YOU, MAY 23RD, TO STEVE JOBS FROM

8    JEFF ROBBIN.  LET'S GO DOWN TO THE ARTICLE FIRST.

9        IT APPEARS THAT YOU'RE SENDING THIS ARTICLE:  NAVIO MAKES

10   GOOD ON ITS PROMISE TO UNLOCK THE IPOD, TO STEVE JOBS; IS THAT

11   RIGHT?

12   **A.**  IT WAS SENT TO STEVE AND CC'G EDDY CUE.

13   **Q.**  AND THEN YOU TELL THEM UP ABOVE:  WE'VE SEEN THESE REPORTS

14   OF THE LAST FEW DAYS, BUT NOTHING CONCRETE FOR US TO LOOK AT.

15   REGARDLESS, THIS WILL NOT WORK WITH THE NEW NANOS.

16       WHEN YOU SAY THAT, YOU ARE REFERRING TO THE NEW NANOS

17   BECAUSE THEY HAVE THE KEYBAG VERIFICATION IN IT, RIGHT?

18   **A.**  THE TIME LINE OF THIS IS MAY OF 2006.  I'M TRYING TO

19   REMEMBER WHICH VERSION WAS SHIPPED WHEN, AND I'M NOT

20   REMEMBERING.

21   **Q.**  6.0 IN THE FALL.

22   **A.**  OF?

23   **Q.**  2005.

24   **A.**  '5.

25   **Q.**  7.0 IN THE FALL OF 2006.

1    **A.**  OKAY.

2         SO 7.0 HAD THE KEYBAG VERIFICATION NOT THE DB

3    VERIFICATION.

4    **Q.**  THAT'S RIGHT.

5    **A.**  SO, YEAH.  THIS WOULD HAVE BEEN BECAUSE WHEN WE WENT WITH

6    THE NEW NANOS FOR THE NEXT ROUND WHERE THAT HAD THE NEW

7    FIRMWARE, WHICH WOULD HAVE HAD THE NEW VERIFICATION, IT

8    WOULDN'T HAVE WORKED.

9    **Q.**  THAT WAS THE NANO 2; IS THAT RIGHT?

10   **A.**  I DON'T REMEMBER THE VERSION NUMBER.

11   **Q.**  OKAY.

12        LET'S LOOK A LOOK AT EXHIBIT 2505.

13        THIS IS A -- I DON'T KNOW IF IT'S AN EMAIL OR DOCUMENT

14   DATED SEPTEMBER 25TH, 2007, FROM CHRIS BELL TO YOU, STEVE

15   JOBS, AND OTHERS, EDDY CUE.

16        DO YOU SEE THAT?

17   **A.**  YES.

18   **Q.**  AND SO YOU RECEIVED THIS EMAIL ABOUT AMAZON IN SEPTEMBER

19   OF 2007?

20   **A.**  YES.

21   **Q.**  AND IT TALKS ABOUT THE THREAT AND AMAZON'S STRENGTHS; IS

22   THAT RIGHT?

23        WHY DON'T YOU TELL ME WHAT THE DOCUMENT DOES SINCE YOU ARE

24   THE ONE WHO RECEIVED IT.

25        WHERE DOES CHRIS BELL WORK?

ROBBIN – DIRECT / COUGHLIN

1    **A.**  CHRIS BELL AT THE TIME WOULD HAVE BEEN IN THE ITUNES

2    MARKETING TEAM.

3    **Q.**  AND THIS DOCUMENT APPEARS TO GO THROUGH THE STRENGTHS AND

4    WEAKNESSES OF AMAZON'S LAUNCH; IS THAT RIGHT?

5    **A.**  THERE ARE TWO SECTIONS IN THIS DOCUMENT ON THEIR STRENGTHS

6    AND WEAKNESSES.

7    **Q.**  OKAY.

8    **A.**  I THINK IT HAS OTHER THINGS IN HERE.

9    **Q.**  AND ONE OF THEIR STRENGTHS, IF WE LOOK AT THE SECOND PAGE,

10   IS THE DIGITAL DOWNLOADS OFFERED BY AMAZON ARE 256K MP3 AND

11   LOWER PRICED THAN WHAT'S CURRENTLY OFFERED ON ITUNES.

12       DO YOU SEE THAT?

13   **A.**  YES, ALTHOUGH I WOULD PROBABLY DISAGREE ABOUT THE 256K MP3

14   BEING -- IF YOU'RE TALKING ABOUT THE BIT RATE, I WOULD BE

15   CONCERNED ABOUT THAT.

16   **Q.**  BECAUSE MP3 YOU DON'T THINK IS AS GOOD AS AC?

17   **A.**  NOT AT THE SAME BIT RATE.

18   **Q.**  OKAY.  SO AT THIS TIME, THIS IS DRM FREE SONG; IS THAT

19   CORRECT?

20   **A.**  YES.

21   **Q.**  WHAT WAS THE BIT RATE AT APPLE AT THIS TIME?

22   **A.**  I DON'T REMEMBER WHEN WE --

23   **Q.**  126?

24   **A.**  NO, NO, NO.  IT WOULD HAVE BEEN EITHER 128 OR 256, AND I

25   DON'T REMEMBER WHEN WE WENT TO 256.

ROBBIN – DIRECT / COUGHLIN

1  **Q.**  SO YOU CAN'T RECALL THE EXACT BIT RATE; IS THAT RIGHT?

2      DID YOU GO TO A NEW BIT RATE FOR EMI AT SOME POINT AND

3  OFFERING THEM A HIGHER BIT RATE FOR ANOTHER 30 CENTS?

4  **A.**  NO.

5  **Q.**  NO?

6  **A.**  NO.

7  **Q.**  ITUNES PLUS NO?

8  **A.**  WHEN WE DID ITUNES PLUS, IT WASN'T JUST FOR EMI.

9  **Q.**  IT WAS FOR ALL THE LABELS IN 2009?

10  **A.**  WE TOOK THE WHOLE STORE AND MADE IT AVAILABLE AT 256 WHERE

11  WE COULD GET THE MUSIC.

12  **Q.**  PRIOR TO THAT TIME, WERE ANY SONGS AVAILABLE AT 256?

13  **A.**  NO.

14  **Q.**  SO FROM 2007 TO 2009 YOU WERE AT A LOWER BIT RATE?

15  **A.**  SEE, I DON'T REMEMBER WHEN WE DID THE ITUNES PLUS.  I

16  DON'T REMEMBER THE DATE.

17  **Q.**  EXACT DATE?

18      THE ITUNES PLUS WAS THE 256, THOUGH, RIGHT?

19  **A.**  256 AEC.  AND IT WASN'T JUST ABOUT THE AEC BIT RATE.  FOR

20  ITUNES PLUS, ONE OF THE THINGS WE DID IS WE WENT AND STARTED

21  GOING AFTER BETTER QUALITY SOURCE.

22      SO IT MATTERED NOT JUST THE ENCODER, BUT THE ENTIRE

23  PIPELINE FROM THE RECORD LABEL ALL THE WAY THROUGH TO THE

24  CUSTOMER.  AND WE WERE TRYING FOR A BETTER QUALITY ACROSS THE

25  BOARD.  SO IT WASN'T JUST BIT RATE.

1    **Q.**  THAT'S WHEN YOU TOOK THE DRM OFF AT APPLE; IS THAT RIGHT?

2    **A.**  ITUNES PLUS WENT DRM FREE.

3    **Q.**  DID YOU EXPERIENCE A LOT OF THEFT IMMEDIATELY FROM ALL THE

4    HONEST PEOPLE?

5    **A.**  I HIGHLY DOUBT IT.

6    **Q.**  IT DIDN'T HAPPEN AT ALL, DID IT?

7    **A.**  WE ARE SUPPORTIVE OF DRM FREE.

8    **Q.**  CAN YOU -- WE TALKED EARLIER ABOUT THE -- I'M GOING TO

9    SHOW IT TO YOU, THE ERROR THAT COUNSEL PUT UP IN HIS OPENING.

10        I WON'T SHOW IT TO THE JURY.

11                    (DOCUMENT HANDED TO WITNESS.)

12        IS THAT CONSISTENT WITH WHAT YOU THOUGHT THE ERROR WOULD

13    BE -- WOULD SHOW UP ON YOUR IPOD?

14    **A.**  THIS ERROR DOESN'T SHOW UP ON THE IPOD.  THIS ERROR SHOWS

15    UP ON ITUNES.

16    **Q.**  THAT SHOWS UP ON YOUR DESKTOP?

17    **A.**  CORRECT.  IN ITUNES.

18    **Q.**  OKAY.  LET ME SHOW YOU EXHIBIT 871.

19            **MR. COUGHLIN:**  THAT HAS ALREADY BEEN ADMITTED, YOUR

20    HONOR?

21            **THE COURT:**  IT HAS BEEN.  CORRECT.

22            **THE WITNESS:**  871.

23                    (EXHIBIT DISPLAYED TO JURY.)

24    **BY MR. COUGHLIN:**

25    **Q.**  I DON'T THINK 871 IS IN THERE.

ROBBIN – DIRECT / COUGHLIN

1    **A.** OKAY.

2    **Q.** I DIDN'T KNOW WE WERE GOING TO HAVE THIS QUESTION ABOUT

3    THE ERROR.

4        IF YOU LOOK VERY CLOSELY AT THE SCREEN, AND I UNDERSTAND

5    IT'S HARD.  MR. FARRUGIA TALKED ABOUT THIS.  I BELIEVE IT

6    IS -- IT'S NOT SOURCE CODE, BUT IT IS FROM THE SOURCE CODE.

7        AND THIS HAS BEEN ADMITTED AS AN EXHIBIT.

8        IT SAYS:

9            "ERROR SCREEN IS NOT RECOMMENDED SINCE THIS REVEALS

10           SPECIFICS OF FAILURE.  THE PREFERRED RESPONSE IS FOR

11           THE USER TO RE-SYNC WITH ITUNES FOR UNKNOWN REASONS.

12           SHOULD NEVER HAPPEN FOR A NONHACKER."

13       DO YOU SEE THAT?

14   **A.** YES.

15   **Q.** SO YOU DIDN'T TELL THE CONSUMER WHAT ACTUALLY HAD HAPPENED

16   TO THEIR IPOD; IS THAT RIGHT?

17   **A.** THAT'S NOT WHAT THIS SAYS.

18       THIS IS -- I THINK THIS IS FROM A BUG REPORT, WHICH WAS

19   TALKING ABOUT IMPLEMENTING THIS PART OF THE FEATURE OR THE

20   CODE.  AND THIS ENGINEER IS SAYING THAT THE ERROR SCREEN IS

21   NOT RECOMMENDED BECAUSE IT REVEALS THE SPECIFICS OF THE

22   FAILURE, WHICH I THINK IS THAT WE DON'T WANT TO ADVERTISE TO

23   PEOPLE WHO ARE HACKING IT WHAT IS CAUSING WHAT FAILURE.

24       FOR THE CUSTOMER, WE WANTED A CLEAN MESSAGE THAT WAS ABOUT

25   WHAT YOU NEEDED TO DO TO FIX IT.  AND THE THING YOU NEEDED TO

1    DO TO FIX IT WAS CONNECT TO ITUNES.

2        SO I THINK ON THE DEVICE, IT TOLD YOU TO CONNECT TO

3    ITUNES, AND THEN ITUNES WOULD TELL YOU SUBSEQUENTLY WHAT YOU

4    NEEDED TO ACTUALLY DO IN ORDER TO FIX IT.

5    **Q.** SO YOU DIDN'T REALLY WANT TO TELL THE CUSTOMER WHAT HAD

6    HAPPENED.

7    **A.** NO, WE WANTED TO TELL THE CUSTOMER WHAT HAPPENED.  WE'RE

8    TELLING THE CUSTOMER THAT SOMETHING'S WRONG AND YOU NEED TO

9    CONNECT TO ITUNES TO FIX IT.  IN FACT, PRETTY MUCH EVERY ERROR

10   CASE THAT YOU RUN INTO ON THE IPOD DOES IT, NOT JUST THESE

11   TYPES OF ERRORS.

12           **MR. COUGHLIN:**  NO FURTHER QUESTIONS, YOUR HONOR.

13           **THE COURT:**  CROSS?

14                   (BINDERS DISTRIBUTED.)

15                   **CROSS-EXAMINATION**

16   **BY MS. DUNN:**

17   **Q.** GOOD MORNING, MR. ROBBIN.

18   **A.** GOOD MORNING.

19   **Q.** SO YOU ARE THE VICE PRESIDENT OF ITUNES.  I THINK WE HEARD

20   THAT; IS THAT RIGHT?

21   **A.** YES.

22   **Q.** AND I WOULD LIKE YOU TO INTRODUCE YOURSELF FOR THE JURY A

23   LITTLE BIT, AND TELL THEM WHEN YOU STARTED WORKING AT APPLE.

24   **A.** I STARTED WORKING AT APPLE BACK IN 1992 AS AN INTERN.  I

25   WORKED OVER THE SUMMER ON THE OPERATING SYSTEM TEAM.  AND I

ROBBIN – CROSS / DUNN

1    CAME BACK FULL TIME IN 1993.  MOVED TO CALIFORNIA.  AND I WAS

2    THERE WORKING ON AN OPERATING SYSTEM CALLED COPLAND, AND

3    QUICKTIME, AND SOUND, AND A FEW OTHER THINGS THROUGH '97.

4        AND I LEFT IN 1997, NOT TO DO ANYTHING IN PARTICULAR, I

5    JUST WANTED SOMETHING ELSE TO DO.  AND I STARTED A COMPANY

6    CALLED SOUND STEP, WHICH CREATED A PROGRAM CALLED SOUNDJAM,

7    WHICH WAS AN MP3 PLAYER FOR THE MAC.

8        AND I DID THAT WITH TWO OTHER PEOPLE WHO I HAD MET AT

9    APPLE.  DAVE HELLER -- ACTUALLY, I MET DAVE BEFORE APPLE.

10   DAVE HELLER AND BILL KINCAID.  AND WE DID THE SOUNDJAM

11   PROGRAM.  WE PUBLISHED IT.  WE SOLD IT OUTSIDE TO END USERS

12   DIRECTLY.  AND THEN IN SEPTEMBER OF 2000, APPLE ACQUIRED MY

13   COMPANY, BROUGHT ME BACK, AND IN FOUR MONTHS FROM

14   SEPTEMBER 2000 TO JANUARY OF 2001, WE ACTUALLY TURNED SOUNDJAM

15   INTO ITUNES.

16       AND SO WE LAUNCHED THE FIRST VERSION OF ITUNES JUST FOUR

17   MONTHS AFTER WE HAD COME BACK TO APPLE.

18   **Q.**  AND WHAT YEAR DID YOU CREATE SOUNDJAM?

19   **A.**  I THINK IT WAS '98.  IT WAS '98, '99.

20   **Q.**  AND HAD ANYONE EVER DONE ANYTHING LIKE THAT BEFORE OR WERE

21   YOU GUYS THE FIRST?

22   **A.**  NO, THERE WERE OTHER MP3 PLAYERS.  MOSTLY ON THE WINDOWS

23   PC.  I THINK WE WERE -- WE WEREN'T THE FIRST, BUT WE WERE

24   DEFINITELY THE BEST.

25   **Q.**  AND YOU SAY YOU TURNED SOUNDJAM INTO ITUNES.

ROBBIN – CROSS / DUNN

1        WHAT WAS DIFFERENT ABOUT ITUNES FROM SOUNDJAM?

2        WAS THERE ANY -- DID YOU CONTINUE TO INNOVATE ONCE YOU GOT

3    TO APPLE?

4    **A.**   OH, YES.  IT WAS ACTUALLY PRETTY COOL.

5        WE TOOK SOUNDJAM, WHICH HAD A LOT OF THE GREAT GUTS; IT

6    HAD A DECODER AND AN ENCODE, ALL OF THE PIECES YOU NEEDED TO

7    MAKE AN MP3 PLAYER WORK WELL, BUT THE USER INTERFACE ON TOP OF

8    IT WAS MORE ENGINEERING INTERFACE THAN APPLE CONSUMER LEVEL.

9        AND WORKING CLOSELY WITH STEVE JOBS AND A COUPLE OF THE UI

10   DESIGNERS AND OURSELVES, WE CAME UP WITH A WHOLE NEW MODEL FOR

11   HOW TO DO MUSIC ON THE DESKTOP WITH A LIBRARY WHERE YOU COULD

12   ORGANIZE YOUR MUSIC, WHERE YOU COULD MAKE PLAYLISTS.  AND THE

13   USER INTERFACE YOU SAW FOR ITUNES 1 WAS THAT.

14       SO WE TOOK THE -- KIND OF THE GUTS OF SOUNDJAM, AND PUT A

15   WHOLE NEW UI ON TOP OF IT TO MAKE ITUNES.

16   **Q.**   AND YOU'RE NOT THE FIRST TO HAVE DONE THIS IN THIS TRIAL,

17   AND I KNOW SOME OF THE JURORS ARE ENGINEERS BUT SOME AREN'T,

18   SO WHAT'S UI?

19   **A.**   USER INTERFACE.

20   **Q.**   AND DO YOU KNOW THE PHRASE "END-TO-END SOLUTION"?

21   **A.**   YES.

22   **Q.**   CAN YOU EXPLAIN WHAT THAT IS?

23   **A.**   WELL, FOR US, END TO END IS YOU NEED TO HAVE ALL THE

24   COMPONENTS OF THE SYSTEM THAT IS REQUIRED TO MAKE IT WORK

25   WELL.

ROBBIN – CROSS / DUNN

1    SO END TO END WOULD BE THE ITUNES STORE, ITUNES, IPOD, AN

2    END TO END EXPERIENCE WHERE YOU BUY FROM THE STORE, DOWNLOAD

3    TO ITUNES, IT GOES ONTO AN IPOD.  THAT'S END TO END TO ME.

4    **Q.**  WE ARE GOING TO DO A LOT OF DATES IN THIS PRESENTATION AS

5    YOU DID WITH MR. COUGHLIN.

6        **MS. DUNN:**  AND SO WITH THE COURT'S PERMISSION, I WILL

7    ASK MY COLLEAGUES IF THEY CAN SET UP THE TIME LINE THAT WE

8    USED PREVIOUSLY.

9        **THE COURT:**  THEY CAN.  LET'S DO IT IN THE SAME WAY WE

10   DID IT YESTERDAY.

11        (BLOWUP DISPLAYED ON EASEL.)

12        **MS. DUNN:**  THANK YOU.

13   **BY MS. DUNN:**

14   **Q.**  SO AT THIS POINT YOU'VE REJOINED APPLE AND CREATED THE

15   IPOD.

16     WHAT YEAR WAS THAT?  I THINK YOU TOLD MR. COUGHLIN IT

17   MIGHT HAVE BEEN 2001?

18   **A.**  WELL -- YEAH.  WE CREATED ITUNES IN 2001.  IN JANUARY IS

19   WHEN WE FIRST SHIPPED IT.  THEN I THINK IT WAS OCTOBER OF 2001

20   WHEN WE DID THE FIRST IPOD.

21   **Q.**  AT THIS POINT THERE'S NO ITUNES MUSIC STORE, I THINK YOU

22   TESTIFIED.

23     AND JUST BRIEFLY EXPLAIN, BECAUSE WE COVERED THIS A LITTLE

24   BIT, HOW PEOPLE GOT MUSIC THAT THEY HAD INTO ITUNES WITHOUT A

25   MUSIC STORE TO BUY IT ON.

ROBBIN – CROSS / DUNN

1    **A.**  WELL, AT THAT TIME, MOST PEOPLE WERE EITHER –– THEY HAD

2    CD'S AND SO YOU COULD PUT A CD INTO THE COMPUTER, AND YOU

3    COULD IMPORT THAT CD WHICH WOULD ENCODE IT INTO MP3, AND THEN

4    YOU COULD TAKE THAT –– THOSE MP3'S AND SYNC THEM ONTO YOUR

5    IPOD.

6    **Q.**  WHEN YOU ALL INTRODUCED IPOD, ITUNES, DID IT WORK FOR PC'S

7    OR JUST MAC'S?

8    **A.**  JUST MAC'S.

9    **Q.**  DID IT EVER WORK FOR PC'S?

10   **A.**  WE FIRST LAUNCHED ITUNES FOR WINDOWS WITH THE APPROPRIATE

11   SLOGAN "HELL FROZE OVER" IN OCTOBER OF 2003, AT THE SAME TIME

12   WE DID THE MUSIC STORE.

13   **Q.**  OKAY.

14       AND THERE'S ALSO BEEN A LOT OF DISCUSSION ABOUT HOW

15   SUCCESSFUL IPOD PLUS ITUNES WAS, THAT YOU SOLD A LOT OF SONGS.

16   AND ONE QUESTION THAT I HAVE IS WHETHER AT THE TIME YOU

17   THOUGHT IT WOULD BE A BIG SUCCESS AS IT WAS.

18   **A.**  THERE'S NO WAY ANYBODY COULD HAVE PREDICTED WHAT HAPPENED

19   WITH THE ITUNES MUSIC STORE.  WE SOLD, I THINK IT WAS A

20   MILLION SONGS IN THE FIRST WEEK, AND NONE OF OUR ESTIMATES

21   WERE EVEN CLOSE TO THAT.

22   **Q.**  SO WHY DID YOU CREATE THIS THING IF YOU DID NOT KNOW IT

23   WAS GOING TO BE HUGELY SUCCESSFUL?

24   **A.**  WE –– AT APPLE, WE TEND TO BUILD PRODUCTS FOR OURSELVES.

25   WE ARE CONSUMERS, AND WE KIND OF THINK THAT WE KNOW WHAT WE

ROBBIN – CROSS / DUNN

1    WOULD LIKE.

2        SO AS WE WERE USING IPODS, AS WE WERE USING ITUNES, IT

3    SEEMED VERY NATURAL FOR US TO FIND MUSIC OVER THE INTERNET

4    WOULD BE A REALLY COOL WAY TO GET THE MUSIC.

5        AT THE TIME, THE BIGGEST COMPETITOR TO THE MUSIC STORE WAS

6    ACTUALLY ILLEGAL MUSIC BEING SHARED OVER THE INTERNET.  THERE

7    WAS A LOT OF ILLEGAL SHARING GOING ON.

8        SO OUR COMPETITION WAS ACTUALLY FREE MUSIC.  SO COMING UP

9    WITH A MUSIC STORE THAT CAN ACTUALLY SELL YOU MUSIC WHEN YOU

10   CAN EASILY GET THAT MUSIC OVER THE INTERNET FOR FREE WAS A

11   CHALLENGE.

12   **Q.**  AND HOW DO YOU RESPOND TO THAT CHALLENGE TO GET PEOPLE TO

13   PAY FOR SOMETHING THAT THEY CAN GET FOR FREE SOMEWHERE ELSE?

14   **A.**  IT HAD TO BE A REALLY GREAT PRODUCT WITH REAL EASE OF USE

15   AND VERY CONVENIENCE.

16       IT WAS ALL ABOUT THE END TO END, ONE CLICK DOWNLOAD,

17   TRANSFERS AUTOMATICALLY TO THE IPOD.  IT WAS THE WHOLE THING

18   IS WHAT MADE IT VERY ATTRACTIVE.  IT WAS SOMETHING THAT WAS

19   APPROACHABLE BY EVERYBODY.

20   **Q.**  SO, I ALSO WANT TO BRING SOME CLARITY.  I KNOW PLAINTIFFS'

21   COUNSEL HAD ASKED YOU A LOT OF QUESTIONS ABOUT MARKET RESEARCH

22   AND SORT OF COMPETITIVE ANALYSIS.

23       CAN YOU DESCRIBE WHAT YOU DO AND WHAT YOU DO NOT DO AT

24   APPLE?

25   **A.**  I'M INVOLVED IN PRODUCT.  I'M INVOLVED IN DESIGNING

ROBBIN – CROSS / DUNN

1    PRODUCT, WHETHER IT'S USER INTERFACE, WHETHER IT'S ENGINEERING

2    AND CODE.

3        AND MY ROLE HAS CHANGED OVER THE YEARS.  I STARTED AS AN

4    INTERN.  AND, YOU KNOW, NOW I'M KIND OF RUNNING ITUNES

5    ENGINEERING.  SO THAT WENT FROM THREE PEOPLE, YOU KNOW,

6    WORKING TOGETHER TO, YOU KNOW, A TEAM OF HUNDREDS.

7        AND UNFORTUNATELY THAT MEANS THAT MY -- I HAVE

8    TRANSITIONED FROM WRITING CODE TO MORE MANAGEMENT, BUT IT'S

9    BEEN AN EVOLUTION.

10   Q.  VERY BRIEFLY, I WOULD LIKE TO PUT EXHIBIT 83 ON THE

11   SCREEN.  THIS WAS SOMETHING PLAINTIFFS' COUNSEL ASKED YOU

12   ABOUT EARLY IN THE EXAMINATION.

13                   (EXHIBIT DISPLAYED TO JURY.)

14       CAN YOU JUST LOOK -- IT SHOULD BE UP ON YOUR SCREEN.

15       CAN YOU JUST LOOK AT THE DATE OF THAT EMAIL?

16   A.  IT'S SEPTEMBER 30TH, 2003.

17   Q.  OKAY.  DOES THIS EMAIL HAVE ANYTHING TO DO WITH ITUNES 7.0

18   OR 7.4?

19   A.  NO.  THIS IS LONG BEFORE THAT.

20           MS. DUNN:  CAN WE PUT ON EXHIBIT 92?

21                   (EXHIBIT DISPLAYED TO JURY.)

22       IF WE CAN JUST FOCUS ON THE TOP.

23   BY MS. DUNN:

24   Q.  MR. ROBBIN, JUST TELL US WHAT THE DATE IS ON THIS EMAIL,

25   BUT I THINK FOR THE JURY, THEY NEED TO SEE WHAT THE REST OF

1    THE EMAIL IS.

2    **A.**  IT'S JANUARY 5TH, 2004.

3    **Q.**  OKAY.

4        AND SO I KNOW PLAINTIFFS' COUNSEL READ YOU A LOT OF EMAILS

5    FROM STEVE JOBS.  THIS IS ANOTHER ONE.

6        DOES THIS EMAIL HAVE ANYTHING DO WITH ITUNES 7.0 OR 7.4?

7    **A.**  NO.  THIS IS ALSO LONG BEFORE THEN.

8    **Q.**  OKAY.  SO --

9          **MS. DUNN:**  THANKS, MR. SPAULDING.

10   **BY MS. DUNN:**

11   **Q.**  SO WE HAVE BEEN TALKING IN THIS TRIAL A LOT ABOUT 7.0 AND

12   7.4, SO I WOULD LIKE TO ASK YOU SOME QUESTIONS ABOUT THOSE

13   UPDATES.

14       TO BEGIN, WE ARE TALKING ABOUT UPDATES TO FAIRPLAY IN

15   THOSE ADDITIONS.  WERE -- DID ALL UPDATES INCLUDE UPDATES TO

16   FAIRPLAY, SOME OF THEM, GIVE US A SENSE?

17   **A.**  AS MOST PEOPLE PROBABLY KNOW, WE UPDATE ITUNES A LOT.  AND

18   WE WOULD CERTAINLY TAKE THE OPPORTUNITY WHENEVER WE SHIPPED A

19   NEW UPDATE TO ITUNES TO UPDATE THE DRM.

20   **Q.**  SO WHENEVER YOU SHIPPED A NEW VERSION, THERE WERE UPDATES

21   TO FAIRPLAY; IS THAT CORRECT?

22   **A.**  WHENEVER WE SHIPPED A NEW VERSION, WE WOULD TAKE THE

23   OPPORTUNITY TO UPDATE FAIRPLAY.  CERTAINLY IN THE EARLIER

24   YEARS WHEN WE WERE GETTING HACKED ALL THE TIME, ANY

25   OPPORTUNITY WE HAD TO SHIP A NEW UPDATE, WE WOULD.  WE WOULD

ROBBIN – CROSS / DUNN

1    ACTUALLY --

2             **THE COURT:**  SLOW DOWN, MR. ROBBIN.  TAKE A BREATH.

3    IT'S OKAY.  YOU CAN BREATHE IN HERE.

4        OKAY.  LET'S CONTINUE.

5             **THE WITNESS:**  WE WOULD UPDATE ITUNES, WE WOULD UPDATE

6    FAIRPLAY, AND WE WOULD BE TRYING TO GET AHEAD OF THE HACKS.

7        SO WE WOULD ACTUALLY SHIP UPDATES TO FAIRPLAY THAT MIGHT

8    CLOSE PROBLEMS THAT HADN'T YET BEEN DISCOVERED BECAUSE WE ARE

9    MONITORING WHAT THE HACKERS ARE TRYING TO DO.

10   **BY MS. DUNN:**

11   **Q.**  TAKING A SLIGHT STEP BACK, WHAT IS FAIRPLAY INTENDED TO

12   PROTECT?

13   **A.**  THE CONTENT USAGE RULES THAT WE HAD IN THE AGREEMENTS WITH

14   THE RECORD LABELS.

15   **Q.**  WHEN YOU SAY "CONTENT", WHAT DO YOU MEAN BY "CONTENT"?

16   **A.**  THE MUSIC.  OR -- I MEAN, FOR FAIRPLAY, IT EVOLVED INTO

17   NOT JUST MUSIC, BUT IT WAS ALSO MOVIES, TV SHOWS, BOOKS, APPS.

18   **Q.**  AND WHERE DOES FAIRPLAY EXIST?

19   **A.**  FAIRPLAY IS IN THE ITUNES STORE, IT'S IN THE IPODS, IT'S

20   IN THE DESKTOP SOFTWARE ON THE MAC, IN ITUNES, IN QUICKTIME.

21   WHEREVER WE NEED TO BE ABLE TO ACCESS THE CONTENT, YOU NEED TO

22   HAVE FAIRPLAY.

23        BUT IT'S ALSO WHAT'S PROTECTING THE SONGS THAT ARE STORED

24   ON THE SERVERS.  EVEN WITH THE DRM-FREE WORLD, WE STILL HAVE

25   FAIRPLAY ON THE SERVERS.  AND WHEN YOU DOWNLOAD A SONG, WE

ROBBIN – CROSS / DUNN

1    HAVE TO REMOVE THE DRM IN ORDER TO MAKE IT A DRM-FREE SONG.

2    **Q.**   WHAT SONGS ARE PROTECTED ON THE SERVERS?  IF YOU KNOW.

3    **A.**   I MEAN ALL THE SONGS.

4    **Q.**   SO ALL THE SONGS ON ITUNES --

5    **A.**   SORRY.  ALL THE SONGS IN THE CATALOG OF CONTENT THAT WE

6    HAVE AVAILABLE FOR SALE.

7    **Q.**   AND MR. COUGHLIN ASKED YOU A LITTLE BIT ABOUT THE INITIAL

8    ROLE OF FAIRPLAY KEEPING HONEST PEOPLE HONEST.

9        HOW DID THAT WORK OUT FOR YOU?

10   **A.**   A LOT OF EMAILS AND PHONE CALLS.

11       OUR INITIAL IDEA OF KEEPING HONEST PEOPLE HONEST WAS STILL

12   THE RIGHT GOAL, BUT IT WAS -- IT WAS NAIVE TO ASSUME THAT WE

13   WOULD BE ABLE TO KIND OF IGNORE THE HACKS THAT WE THOUGHT

14   WOULD COME.  WE THOUGHT THERE MIGHT BE HACKS.  WE THOUGHT THEY

15   WOULDN'T BE WIDESPREAD, AND WE THOUGHT IT WOULDN'T BE AS BIG A

16   DEAL AS IT CLEARLY TURNED INTO FAIRLY QUICKLY.

17   **Q.**   I KNOW MR. COUGHLIN SHOWED YOU A DOCUMENT FROM 2002 ABOUT

18   HONEST PEOPLE HONEST, AND I WANT TO FAST FORWARD A LITTLE BIT

19   UNTIL 2005, IN APRIL, WHEN YOU HIRED AUGUSTIN FARRUGIA.

20       WHY DID YOU HIRE AUGUSTIN?

21   **A.**   TOM, DAVE, AND I, WHILE WE ARE VERY GOOD ENGINEERS, WE ARE

22   NOT EXPERTS IN THE FIELD OF SECURITY.  WE HAVE LEARNED A LOT,

23   BUT WE'RE NOT EXPERTS.

24       AND SO WE WERE LOOKING FOR SOMEBODY WHO COULD BUILD A TEAM

25   WHO COULD SOLVE THIS PROBLEM -- I WON'T SAY ONCE AND FOR

ROBBIN – CROSS / DUNN

1    ALL -- BUT WHO WOULD BE ABLE TO GO AFTER IT AND MAKE IT BE HIS

2    MISSION.  AUGUSTIN HAS DONE THAT.

3    **Q.**  DID YOU OVERSEE AUGUSTIN?

4    **A.**  YES.  HE REPORTED TO ME.

5    **Q.**  AND WHEN AUGUSTIN GOT THERE TO APPLE, WHAT DID YOU TELL

6    HIM TO DO?

7    **A.**  THE FIRST THING HE NEEDED TO DO IS HE NEEDED TO GO FIGURE

8    OUT HOW OUR SYSTEM WORKED.  IT'S NOT ENOUGH TO JUST GO START

9    FROM SCRATCH.  YOU'VE GOT TO FIGURE OUT HOW WHAT WE DID WORKS

10   BECAUSE WE NEED TO BE ABLE TO EVOLVE IT.  SO THERE WAS A LOT

11   OF EDUCATION HE HAD TO DO.  IT DIDN'T TAKE HIM VERY LONG TO

12   FIND THAT WE HAD JUST A TON OF WEAK POINTS IN WHAT WAS THEN

13   FAIRPLAY.

14       SO HIS FIRST TASK WAS TO COME UP WITH A ROADMAP AND A PLAN

15   FOR HOW HE WAS GOING TO START ATTACKING THEM ONE AT A TIME.

16   **Q.**  HOW INVOLVED WERE YOU WITH AUGUSTIN'S WORK?

17   **A.**  I WAS INVOLVED IN -- IN THE ARCHITECTURE, SORT OF THE HIGH

18   LEVEL, THIS IS THE TYPES OF THINGS THAT WE WANTED TO SOLVE,

19   THIS IS HOW WE WANT TO DO IT, BUT I LEFT IT TO HIM TO

20   IMPLEMENT.

21   **Q.**  IN -- IN YOUR PREVIOUS TESTIMONY YOU TALKED A LITTLE BIT

22   ABOUT HACKS.  AND I'M WONDERING, DO YOU HAVE A PERSONAL

23   DEFINITION OF WHAT YOU CONSIDER TO BE A HACK?

24   **A.**  THAT TERM MEANS A LOT OF THINGS TO A LOT OF PEOPLE.  I

25   THINK THAT A HACK IS SOMETHING THAT'S MODIFYING SOFTWARE OR

ROBBIN – CROSS / DUNN

1    SYSTEMS TO DO SOMETHING THAT IT WASN'T INTENDED TO DO.

2    **Q.**   DO HACKS STRIP DRM?

3    **A.**   SOMETHING WOULD STRIP DRM WOULD DEFINITELY BE A HACK.

4    **Q.**   DO ALL HACKS STRIP DRM?

5    **A.**   NO.

6    **Q.**   AND CAN YOU JUST GIVE THE JURY SOME EXAMPLES OF HACKS THAT

7    DO NOT STRIP DRM?

8    **A.**   WE HAD A FEATURE IN ITUNES THAT LET YOU SHARE MUSIC WITHIN

9    YOUR OWN HOME.  IT WAS CALLED HOME SHARING.  BEFORE THAT IT

10   WAS JUST SHARING.

11       AND SO YOU COULD SEE YOUR LIBRARY FROM ONE ITUNES ON

12   ANOTHER COMPUTER, AND YOU COULD PLAY IT.  AND WE THOUGHT THAT

13   WAS REALLY COOL.  AND THIS WAS FOR DRM-FREE MUSIC AS WELL AS

14   DRMED MUSIC.

15       AND VERY QUICKLY SOFTWARE CAME OUT THAT STUDENTS IN THE

16   DORMS LOVED, WHICH WAS, LET'S GO BROWSE ALL OF YOUR ITUNES

17   LIBRARIES AND DOWNLOAD ANY SONG THAT WE SEE.

18       SO THAT WAS KIND OF LOOKED -- FROWNED UPON BY THE RECORD

19   LABELS, AND IT BECAME A BIG DEAL FOR US TO TRY TO SHUT DOWN

20   EVEN THOUGH IT WASN'T TECHNICALLY A HACK OF OUR DRM, IT WAS

21   VIOLATING WHAT WAS CONSIDERED FAIR USE.

22   **Q.**   AND YOU WERE ASKED SOME QUESTIONS ABOUT INJECTION OF

23   FOREIGN MATERIAL.

24       WOULD YOU HAVE CONSIDERED THAT TO BE A HACK?

25   **A.**   ABSOLUTELY.

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

1    Q.  WHY?

2    A.  IF YOU'RE INJECTING FOREIGN MATERIAL, YOU CAN USE THAT TO

3    FIGURE OUT HOW THE DRM WORKS.  THE INJECTION COULD MODIFY IT.

4    IT COULD DO UNINTENDED THINGS.  BECAUSE SOMEBODY WHO'S DOING

5    THAT DOESN'T KNOW THE STRUCTURE OF THE THINGS THEY ARE

6    MODIFYING.  THEY'VE REVERSE ENGINEERED IT.  THEY'VE TRIED TO

7    FIGURE IT OUT.  THEY DON'T NECESSARILY KNOW.  AND IT'S ALMOST

8    IMPOSSIBLE FOR THEM TO DO IT PERFECTLY.

9        SO IT'S GOING TO HAVE UNINTENDED CONSEQUENCES.  AND IT'S

10   GOING TO BE SOMETHING THAT OTHER PEOPLE CAN MAYBE EVEN STAND

11   ON THE SHOULDERS OF THEM TO FIGURE OUT MORE ABOUT HOW THE DRM

12   WORKS.  SO THEY'RE KIND OF BLAZING A TRAIL FOR OTHER PEOPLE

13   WHO MIGHT DO EVEN MORE, YOU KNOW, BAD THINGS.

14   Q.  IF YOU CAN JUST TAKE A LOOK AT SLIDE 33 THAT MR. ISAACSON

15   USED IN OPENING AND THAT MR. COUGHLIN ASKED YOU ABOUT.

16                   (DOCUMENT DISPLAYED TO JURY.)

17           THE COURT:  SO I HAVE NOT ALLOWED THIS TO BE SHOWN TO

18   THE JURY.

19        MR. COUGHLIN, TAKE IT OFF.

20           MS. DUNN:  LET'S TAKE IT DOWN.

21           THE COURT:  JURORS ARE REMINDED THAT OPENING

22   STATEMENTS AREN'T EVIDENCE.  SO UNTIL WE HAVE EVIDENCE, THEY

23   DON'T GO ONTO THE SCREEN.

24   BY MS. DUNN:

25   Q.  IF YOU CAN JUST PUT THAT ON MY SCREEN OR THE WITNESS'

ROBBIN - CROSS / DUNN

1    SCREEN.

2                    (DOCUMENT DISPLAYED.)

3        DO YOU REMEMBER ANY OF THE FOLKS THAT YOU SEE HERE?

4    **A.**  I REMEMBER SOME OF THEM.

5    **Q.**  WHO DO YOU REMEMBER?

6    **A.**  I REMEMBER WINAMP.  I REMEMBER REALPLAYER WITH HARMONY.  I

7    REMEMBER EPHPOD.  I REMEMBER XPLAY.  AND I THINK I REMEMBER

8    MYPOD.  AND I'VE HEARD THE NAME MEDIAMONKEY, I THINK.

9    **Q.**  WHAT, IF ANY, CONCERNS DID YOU HAVE ABOUT THESE KINDS OF

10   PROGRAMS?

11   **A.**  ALL OF THESE PROGRAMS MODIFY THE DATABASE ON THE IPOD FROM

12   REVERSE ENGINEERING IT, FROM TRYING TO FIGURE OUT HOW IT

13   WORKS.  WE HAVE NEVER GIVEN ANYBODY ANY TECHNICAL

14   DOCUMENTATION THAT SAYS HOW TO DO THIS CORRECTLY OR DONE

15   ANYTHING TO GUARANTEE THAT WE WOULD WORK CORRECTLY WITH IT IN

16   THE FUTURE.  SO ALL OF THESE GUYS ARE MAKING IT SO THAT THEY

17   ARE GOING TO DO IT WRONG TO A VARYING DEGREE.

18       ESPECIALLY WITH THE NUMBERS OF CUSTOMERS THAT WE HAVE WHEN

19   PEOPLE ARE DOING STUFF LIKE THIS, THE SUPPORT CALLS, THEY ALL

20   COME TO US.  WHEN PEOPLE SAY, "MY IPOD DOESN'T WORK", AND WE

21   FIELD THAT CALL AND WE'RE TRYING TO FIGURE OUT WHY, WE DON'T

22   KNOW THAT THEY WERE USING SOFTWARE LIKE THIS.  SO IT JUST

23   CREATES A MUDDIED CUSTOMER EXPERIENCE.

24   **Q.**  LET'S FOCUS NOW ON MR. FARRUGIA'S REDESIGN.

25       YOU TALKED A LITTLE BIT ON YOUR PREVIOUS EXAMINATION BY

ROBBIN − CROSS / DUNN

1    THE KEYBAG INTEGRITY CHECK AND DATABASE INTEGRITY CHECK.

2        WERE THOSE ELEMENTS OF THE REDESIGN?

3    **A.**  YES.

4    **Q.**  WERE THEY THE WHOLE REDESIGN?

5    **A.**  NO.

6    **Q.**  CAN YOU EXPLAIN GENERALLY TO THE JURY WHAT AN INTEGRITY

7    CHECK IS?

8    **A.**  AN INTEGRITY CHECK IS SOMETHING THAT'S GOING TO GO AHEAD

9    AND MAKE SURE THAT THE FILE IS WHAT IT'S SUPPOSED TO BE; THAT

10   IT WASN'T CORRUPTED, DAMAGED, MODIFIED.  IT DOESN'T PREVENT

11   YOU FROM ACTUALLY LOOKING AT THE FILE, IT JUST MAKES SURE THAT

12   THE FILE WASN'T CHANGED.

13   **Q.**  AND WHY HAVE AN INTEGRITY CHECK ON THE KEYBAG?

14   **A.**  FOR THE REASONS THAT WE WERE JUST TALKING ABOUT.  IF

15   SOMEBODY IS MODIFYING THAT KEYBAG, THEY ARE GOING TO

16   INEVITABLY DO IT WRONG.

17       AND THERE'S A BUNCH OF DIFFERENT REASONS.  WE WOULD

18   IMPLEMENT USAGE RULES.  WE WOULD IMPLEMENT THE DRM WITH

19   INFORMATION THAT WE WERE STORING IN THE KEYBAG OR THE

20   DATABASE, FOR THAT MATTER.  AND IF SOMEBODY WAS MODIFYING THAT

21   AND CHANGING THAT INFORMATION, THEY DIDN'T UNDERSTAND HOW OUR

22   SYSTEM WORKED CORRECTLY, THEY COULD MAKE THAT WORK INCORRECTLY

23   AND EITHER VIOLATE THE RESTRICTIONS THAT THE LABELS WERE

24   MAKING US DO OR JUST SIMPLY CAUSE IT TO FAIL.

25   **Q.**  AND WHY WOULD YOU WANT AN INTEGRITY CHECK FOR THE

ROBBIN – CROSS / DUNN

1   DATABASE?

2   **A.**  IT'S THE SAME THING.  THE DATABASE HAS NOT JUST THE

3   METADATA ABOUT THE SONGS, BUT IT MIGHT HAVE OTHER INFORMATION.

4   IT COULD BE PLAY COUNTS.  IT COULD BE PLAYLIST BURN LIMITS.

5   IT COULD BE A BUNCH OF DIFFERENT THINGS.

6      THE KEYBAG IS JUST ONE COMPONENT OF THE SYSTEM.  THE

7   DATABASE IS ANOTHER COMPONENT OF THE SYSTEM, BUT THEY ALL WORK

8   TOGETHER TO CREATE THAT SEAMLESS END-TO-END EXPERIENCE.

9   **Q.**  SO, PLAINTIFFS HAVE ASSERTED THAT THE PURPOSE OF THESE

10  INTEGRITY CHECKS WERE TO BLOCK REAL HARMONY AND OTHERS.  AFTER

11  REAL NO LONGER WORKED, DID THE INTEGRITY CHECKS CONTINUE?

12  **A.**  YES.

13  **Q.**  CAN YOU EXPLAIN THAT?

14  **A.**  WHEN -- WHEN WE WERE IMPLEMENTING THE DRM IMPROVEMENTS, WE

15  DID THOSE CHANGES OVER A LONG PERIOD OF TIME.  AND WE WOULD

16  SORT OF ROLL THEM OUT THROUGH THE ECOSYSTEM.  SO SOME CHANGES

17  WOULD HAPPEN ON THE SERVER.  SOME WOULD HAPPEN ON THE ITUNES

18  DESKTOP, AND SOME WOULD HAPPEN ON THE IPOD.

19      AND SO WE OFTEN WOULD DO THINGS FIRST ON ITUNES BECAUSE WE

20  UPDATED IT THE MOST OFTEN.  AND THEN EVENTUALLY WE WOULD PUT

21  THAT UNDER THE FIRMWARE OF THE IPOD OFTEN ONLY IN NEW IPODS AS

22  THEY WERE SHIPPING, NOT EVEN NECESSARILY ON OLD IPODS THAT

23  ALREADY EXISTED.

24  **Q.**  AND WHAT ABOUT TODAY, THE CURRENT DAY, DOES THIS STUFF

25  STILL EXIST?

1    **A.**  YES.

2    **Q.**  CAN YOU EXPLAIN TO THE JURY WHERE IT EXISTS?

3    **A.**  IT'S ON YOUR IPHONE.  IT'S ON YOUR IPOD TOUCHES.  IT'S ON

4    YOUR IPOD NANOS.  IT'S PRETTY MUCH IN ALL THE PRODUCTS THAT WE

5    SELL THAT PLAY ANY OF THIS CONTENT.

6         AND WE STILL USE -- YOU KNOW, FAIRPLAY IS STILL WIDELY

7    USED FOR APPLICATIONS, FOR BOOKS, FOR MOVIES AND TV SHOWS.

8    AND EVEN DRM SONGS THAT WE SOLD A LONG TIME AGO STILL HAVE TO

9    WORK, SO THE FAIRPLAY SYSTEM IS ACTUALLY STILL IN PLACE FOR

10   THOSE, TOO.

11   **Q.**  WITH THE COURT'S PERMISSION, I WOULD LIKE TO SHOW YOU --

12   MR. COUGHLIN HAD ASKED YOU ABOUT A STATEMENT BY STEVE JOBS AND

13   HE JUST READ YOU THAT STATEMENT AND DID NOT SHOW YOU THE

14   ARTICLE IN WHICH IT'S CONTAINED.  I HAVE THE ARTICLE.

15          **MS. DUNN:**  IF I MAY, I WOULD LIKE TO APPROACH THE

16   WITNESS?

17          **THE COURT:**  IT'S YOUR WITNESS.  YOU MAY I APPROACH.

18          **MS. DUNN:**  THANK YOU.

19          **THE COURT:**  WHAT IS THE EXHIBIT NUMBER?

20          **MS. DUNN:**  IT IS NOT A MARKED EXHIBIT.  MR. COUGHLIN

21   READ THE STATEMENT DURING HIS EXAMINATION AND WE HAVE THE

22   ARTICLE.

23        WOULD THE COURT LIKE TO SEE IT?

24          **THE COURT:**  IF YOU HAVE AN EXTRA COPY.

25          **MS. DUNN:**  ABSOLUTELY.

```
 1                    (DOCUMENT HANDED TO COURT.)

 2              MR. COUGHLIN:  I THINK THE ARTICLE HAS AN EXHIBIT

 3    NUMBER.

 4              THE COURT:  I DON'T REMEMBER ANYTHING BEING SHOWN

 5    THAT DIDN'T HAVE AN EXHIBIT NUMBER.  THAT'S WHY I ASKED.

 6              MR. COUGHLIN:  THE ARTICLE HAS EXHIBIT NUMBER 822 IF

 7    YOU WANT TO USE THAT AS THE NUMBER.

 8              THE COURT:  822?

 9              MS. DUNN:  THAT'S FUNNY.  BECAUSE I LOOKED UP THIS

10    QUOTE, AND IT IS IN A DIFFERENT ARTICLE.

11                    (PAUSE IN THE PROCEEDINGS.)

12              THE COURT:  SO WHAT ARE YOU GOING TO DO?

13              MS. DUNN:  SO --

14              THE COURT:  ARE YOU --

15              MS. DUNN:  IT DEPENDS ON YOUR PREFERENCE, REALLY.

16              THE COURT:  NOT MY PREFERENCE.  HE SHOWED HIM ONE

17    FROM -- HE READ SOMETHING FROM 822.

18              MS. DUNN:  I WOULD BE HAPPY TO SHOW HIM BOTH

19    ARTICLES, ACTUALLY, IF THAT IS --

20              THE COURT:  GO AHEAD.

21              MS. DUNN:  -- OKAY WITH YOUR HONOR.

22              MR. COUGHLIN:  COULD I HAVE A COPY OF THE ARTICLE?

23              MS. DUNN:  SURE.

24                    (DOCUMENT HANDED TO COUNSEL.)

25              THE COURT:  FOR PURPOSES OF THE RECORD, THE OTHER ONE
```

1    WILL BE IDENTIFIED AS 2854.

2        (DEFENDANT'S EXHIBIT 2854 MARKED FOR IDENTIFICATION)

3        **MS. DUNN:**  THANK YOU, YOUR HONOR.

4    **BY MS. DUNN:**

5    **Q.**  MR. ROBBIN, MR. COUGHLIN READ YOU A QUOTE FROM THESE

6    ARTICLES BY STEVE JOBS WHICH SAYS:

7        "IF YOU LEGALLY ACQUIRE MUSIC, YOU NEED TO HAVE THE

8        RIGHT TO MANAGE IT ON ALL OTHER DEVICES THAT YOU

9        OWN."

10   AND HE ASKED YOU IF YOU AGREED WITH THIS.

11   CAN YOU EXPLAIN TO THE JURY WHAT THESE ARTICLES ARE ABOUT?

12   **A.**  THIS IS AN ARTICLE FROM --

13       **THE COURT:**  WHICH IS "THIS", 822?

14       **THE WITNESS:**  I'M SORRY.

15       **MS. DUNN:**  IF WE'RE LOOKING AT 822, WE CAN PUT IT UP

16   ON THE SCREEN BECAUSE THAT'S MARKED, PROVIDED THERE'S NO

17   OBJECTION FROM COUNSEL.

18       **MR. COUGHLIN:**  AS LONG AS WE ADMIT IT.  IF WE ARE

19   GOING TO PUT IT UP ON THE SCREEN.

20       **MS. DUNN:**  THIS IS NOT AN EXHIBIT THAT WE NEED TO

21   ADMIT.  SO I'M HAPPY TO HAVE THE WITNESS JUST TESTIFY.

22       **THE WITNESS:**  OKAY.

23   **BY MS. DUNN:**

24   **Q.**  MR. ROBBIN, WHAT IS 822 ABOUT?

25   **A.**  WELL, THIS --

```
 1         THE COURT:  WILL SOMEBODY PUT IT ON THE SCREEN FOR
 2   ME, PLEASE?
 3                    (EXHIBIT DISPLAYED.)
 4      GO AHEAD.
 5         THE WITNESS:  THE TITLE -- THIS SAYS 802 AND 402.  IS
 6   THAT 822?
 7         MR. COUGHLIN:  THOSE ARE EVIDENCE OBJECTIONS.
 8         THE WITNESS:  SORRY.  THANK YOU.
 9      THIS ONE IS "APPLE RECEIVES GRAMMY AWARD BUT CALLS FOR
10   BETTER DISTRIBUTION".  AND IT HAS THAT QUOTE FROM STEVE.  AND
11   THIS IS ABOUT OUR SUPPORT FOR DRM-FREE MUSIC.
12   BY MS. DUNN:
13   Q.  AND HOW DO YOU KNOW THAT'S WHAT IT'S ABOUT?
14   A.  WELL, WHEN WE FIRST STARTED THE MUSIC STORE, WE WERE
15   PERFECTLY HAPPY TO DO DRM-FREE MUSIC.  THE RECORD LABELS
16   REALLY WANTED THE PROTECTION.  FOR US, CD'S HAD BEEN SOLD FOR
17   YEARS AND YEARS AND YEARS WITHOUT PROTECTIONS, SO WE WERE
18   HAPPY TO HAVE DRM FREE, SO WE WOULD BE HAPPY WITH THAT
19   WORKING.
20      AND BOTH OF THESE DOCUMENTS ARE IN THE SAME TONE.
21   Q.  AND THERE'S ANOTHER QUOTE BY STEVE JOBS IN THIS ARTICLE.
22      IN THE -- IF YOU READ TWO PARAGRAPHS DOWN FROM WHERE YOU
23   ARE, CAN YOU READ THE LAST PART OF HIS SENTENCE THERE?
24   A.  IS THIS "BUT THERE IS NO ONE OFFERING YOU A CHOICE"?
25   Q.  YES.
```

1    SO WHEN HE SAYS "BUT THERE IS NO ONE OFFERING YOU A

2    CHOICE", WHAT'S HE TALKING ABOUT?

3         **MR. COUGHLIN:**  I OBJECT.  THIS IS HEARSAY.  THAT'S

4    WHY IT IS NOT IN.

5         **MS. DUNN:**  WHAT DO YOU TAKE --

6         **THE COURT:**  THE OBJECTION IS SUSTAINED.

7    **BY MS. DUNN:**

8    **Q.**  WHAT DO YOU TAKE HIM TO BE TALKING ABOUT?

9    **A.**  I BELIEVE THAT HE'S REFERRING TO THE FACT THAT AT THIS

10   TIME, ALL THE MUSIC IS BEING SHARED ILLEGALLY.  IT'S ON

11   NAPSTER, IT'S ON A BUNCH OF THOSE SERVICES, AND THERE'S REALLY

12   NO GOOD LEGAL ALTERNATIVE.

13        SO THIS IS ABOUT SAYING THAT PEOPLE WOULD BE WILLING TO

14   PAY IF YOU GIVE THEM A GREAT PRODUCT AND A LEGAL ALTERNATIVE.

15   **Q.**  AND THEN IF YOU COULD LOOK AT THE ARTICLE THAT I'VE HANDED

16   YOU.

17        **THE COURT:**  AGAIN, THAT DOESN'T GO UP.  JUST FOR ME.

18             (EXHIBIT DISPLAYED.)

19   **BY MS. DUNN:**

20   **Q.**  WHAT IS THE HEADLINE ON THAT ARTICLE?

21   **A.**  "JOBS:  RECORD COMPANIES SHOULD LOOSEN THEIR GRIP."

22   **Q.**  WHAT DO YOU TAKE THAT TO BE ABOUT?

23   **A.**  I THINK IT'S A SIMILAR CONCEPT.

24        IN ORDER TO BE SUCCESSFUL AT SELLING MUSIC IN THE FACE OF

25   ALL THE MUSIC THAT'S BEING STOLEN, WE NEED TO HAVE SOMETHING

1    THAT'S GOING TO GIVE CONSUMERS THE RIGHTS THAT THEY NEED FOR

2    THEIR MUSIC.  THE MUSIC THAT WAS BEING -- THAT THEY WERE

3    TRYING TO DO DIGITALLY AT THE TIME HAD THESE DRACONIAN USAGE

4    RIGHTS.

5         THE STUFF THAT ITUNES WAS ABLE TO DO IN THE FIRST MUSIC

6    STORE WAS UNPRECEDENTED.  NOBODY HAD EVER BEEN ABLE TO DO A

7    MUSIC STORE THAT ALLOWED YOU TO USE YOUR MUSIC ON UP TO THREE

8    COMPUTERS, AND ALLOWED YOU TO BURN CD'S WITH THEM, YOU KNOW,

9    IN AN EASY WAY.  WE EVEN MADE IT SO THAT IF YOU WENT TO A

10   SECOND COMPUTER, YOU CAN AUTHORIZE THAT, AND ALL YOUR MUSIC

11   WOULD WORK WITH JUST ONE -- ONE SIGN-IN.  AND ALL OF THE

12   EXISTING SYSTEMS THAT WERE OUT THERE WERE SO COMPLICATED AND

13   FRAGILE THAT CUSTOMERS DIDN'T WANT TO USE THEM.

14   **Q.**  WOULD YOU JUST READ THE LAST SENTENCE OF THE FIRST

15   PARAGRAPH?

16   **A.**  (READING)

17        "JOBS SUGGESTED THAT RECORDING LABELS NEED TO MAKE IT

18        EASIER FOR CONSUMERS TO USE THEIR OWN MUSIC HOWEVER

19        THEY WANT."

20   **Q.**  THANK YOU.

21        SO YOU JUST TESTIFIED THAT APPLE WANTED DRM FREE, BUT YOU

22   DIDN'T END UP BEING DRM FREE.  SO LET'S TALK ABOUT APPLE'S

23   CONVERSATION WITH THE LABELS.

24        WHAT, GENERALLY SPEAKING, DID THE LABELS WANT?

25   **A.**  THE LABELS THOUGHT THEY COULD PUT THE GENIE BACK IN THE

ROBBIN – CROSS / DUNN

1    BOTTLE.  THEY WERE LOOKING AT PIRACY AND THEY WANTED TO STOP

2    PIRACY.

3        AND SO THE SOLUTION TO PIRACY, THEY FELT, WASN'T JUST A

4    LEGAL ALTERNATIVE, IT WAS BEING RESTRICTIVE OF WHAT YOU COULD

5    DO WITH IT, STOP PEOPLE FROM SHARING THAT MUSIC.  SO THAT'S

6    WHAT THEY WANTED.

7        SO THEIR USAGE RIGHTS STARTED OUT AS VERY, VERY

8    CONSTRAINED.  IN FACT, WE WEREN'T EVEN WILLING TO LAUNCH THE

9    MUSIC STORE AT FIRST BECAUSE THEY WOULDN'T GIVE US THE RIGHTS

10   WE THOUGHT WOULD BE NECESSARY TO HAVE A GOOD CUSTOMER

11   EXPERIENCE.  SO WE HELD OFF FOR A WHILE DOING THE STORE.

12   **Q.**  WHEN YOU SAY YOU HELD OFF, CAN YOU JUST DESCRIBE THAT

13   PERIOD OF TIME?

14   **A.**  I DON'T REMEMBER HOW LONG.  IT WAS LIKE MAYBE YEAR AND A

15   HALF.

16   **Q.**  DURING THAT TIME, WERE YOU NEGOTIATING WITH THE LABELS?

17   **A.**  YEAH, WE KEPT HAVING CONVERSATIONS WITH THEM.  DIDN'T MAKE

18   A WHOLE LOT OF PROGRESS AT FIRST.

19   **Q.**  SO AT THE TIME THAT APPLE ENTERED THE MARKET, WAS THERE

20   ANY OTHER DRM THAT YOU WERE ABLE TO LOOK AT?

21   **A.**  WINDOWS MEDIA.

22   **Q.**  AND CAN YOU DESCRIBE YOUR EVALUATION OF WINDOWS MEDIA DRM?

23   **A.**  IT WAS A DRM THAT DIDN'T WORK VERY WELL.  SO PEOPLE WOULD

24   BUY THEIR SONGS, THEY'D TRY TO USE IT ON DEVICES, AND THE

25   SONGS JUST WOULDN'T PLAY.  OR THE SONG THAT YOU LEGALLY

ROBBIN – CROSS / DUNN

1    DOWNLOADED TO YOUR COMPUTER WOULDN'T EVEN PLAY ON YOUR

2    COMPUTER AFTER A WHILE.  IF YOU HAD PROBLEMS WITH YOUR

3    COMPUTER, LIKE A BAD INTERNET CARD AND YOU REPLACED IT, THEN

4    THAT MIGHT CAUSE YOUR MUSIC TO STOP PLAYING.

5        SO IT WAS VERY FRAGILE.  AND SO WE LOOKED AT IT AND SAID

6    THAT WASN'T GOING TO BE SOMETHING THAT MADE ANY SENSE.

7    **Q.**  DO YOU REMEMBER WHAT IT WAS CALLED?

8    **A.**  I THINK IT WAS CALLED PLAYS FOR SURE.  IT WENT THROUGH A

9    FEW NAME CHANGES.

10   **Q.**  DID IT, IN FACT, PLAY FOR SURE?

11   **A.**  NO.  IT DEFINITELY WAS NOT PLAYS FOR SURE.

12   **Q.**  WHAT WOULD HAVE HAPPENED IF YOU HAD STUCK WITH YOUR

13   ORIGINAL VIEW OF NOT WANTING DRM?

14   **A.**  WELL, IF THERE WAS NO DRM, WE WEREN'T GOING TO HAVE AN

15   ITUNES STORE.

16   **Q.**  AND IF YOU WERE TO AGREE TO HAVE DRM, WHAT DID APPLE WANT?

17   **A.**  DO YOU MEAN THE USAGE RULES FOR THE ACTUAL MUSIC ITSELF?

18   **Q.**  THEORETICALLY WHAT DID YOU WANT?  WHAT WERE YOUR GOALS?

19   **A.**  OUR GOALS WERE TO CREATE A GREAT EXPERIENCE.  WE WANTED

20   THAT -- THAT EASE OF USE.  WE WANTED THAT FAIR USE FOR THE

21   CONTENT.  WE WANTED CUSTOMERS TO NEVER RUN INTO THE BOUNDARIES

22   OF DRM.  IT HAD TO BEHAVE AS IF IT WAS DRM FREE FOR MOST

23   PEOPLE MOST OF THE TIME.

24       SO ALL THE RULES THAT WE WENT AFTER WHEN WE NEGOTIATED

25   WITH THEM WERE ABOUT TRYING TO OBTAIN THAT EXPERIENCE.

ROBBIN – CROSS / DUNN

1    **Q.**  AND WAS IT EASY TO CONVINCE THE LABELS THAT THAT'S WHAT

2    SHOULD HAPPEN?

3    **A.**  NO.  IT ACTUALLY TURNED OUT THAT WE COULDN'T GET THOSE

4    DEALS JUST BY TALKING WITH THE LABELS.  WE HAD TO ACTUALLY GO

5    AND VISIT THE ARTISTS, AND GET THE ARTISTS TO TELL THE LABELS

6    THAT, HEY, YOU SHOULD GO DO THIS BECAUSE THIS IS SO COOL.

7    **Q.**  DID YOU MEET WITH THE ARTISTS?

8    **A.**  WE DEFINITELY MET WITH ARTISTS.

9        I ACTUALLY PREPARED A DEMONSTRATION VERSION OF THE ITUNES

10   STORE AND ITUNES THAT RAN ON A LAPTOP.  AND STEVE JOBS AND I

11   WOULD GO AND MEET WITH SOME OF THE ARTISTS AND SHOW THEM THE

12   DEMO AND TRY TO CONVINCE THEM THAT DOING A MUSIC STORE WAS A

13   GREAT IDEA AND THEY SHOULD TALK TO THE LABELS.

14       I REMEMBER ONE TIME, HE AND I WENT AND VISITED THE ROLLING

15   STONES AND SHOWED THEM THE LAPTOP AND THE DEMO.  IT WAS PRETTY

16   COOL BECAUSE STEVE COULD DO ALL THE TALKING AND I JUST SHOWED

17   THE DEMO.  IT WAS FUN.

18   **Q.**  DID THE LABELS REQUIRE YOU TO HAVE YOUR OWN DRM SYSTEM AS

19   OPPOSED TO LICENSING FROM SOMEWHERE ELSE?

20   **A.**  YES.  THEY WERE -- THERE WERE A FEW DIFFERENT REQUIREMENTS

21   IN ORDER TO GET THE DEALS DONE.

22       ONE, THEY VIEWED THE MAC MARKET, BECAUSE THIS WAS

23   MACINTOSH ONLY TO START WITH.  THEY VIEWED THAT AS

24   SUFFICIENTLY SMALL THAT THEY WERE WILLING TO TAKE THE RISK

25   WITH THE MUSIC STORE.

1008
ROBBIN – CROSS / DUNN

1    AND SO IF, YOU KNOW, IF IT DIDN'T WORK OUT WELL, WELL, IT

2    WAS JUST A SMALLER MARKET.  THEY STARTED OUT AT THAT -- WITH

3    THAT KIND OF A LIMITATION.

4       AND THE -- I THINK THAT GETTING THEM TO AGREE TO DO IT

5    REQUIRED DRM JUST -- WELL, LIKE WE ALREADY TALKED ABOUT.

6    **Q.**  SO AFTER YOU ESTABLISHED FAIRPLAY DRM, DID YOU END UP

7    PUTTING RESOURCES BEHIND IT IN THE BEGINNING?

8    **A.**  WELL, WE USED THE CORE ENGINEERING TEAM FOR ITUNES TO WORK

9    ON THE DRM.

10      TO CALL IT A DRM, IT'S A SLIGHT EXAGGERATION I THINK

11   BECAUSE IT WAS THE KEEP HONEST PEOPLE HONEST, AND SO IT WASN'T

12   VERY SECURE.

13   **Q.**  SO LET'S TALK ABOUT THAT.

14      DO YOU REMEMBER -- WHEN YOU SAY IT WASN'T SECURE, I ASSUME

15   YOU ARE TALKING ABOUT HACKS TO THE DRM.  DO YOU REMEMBER SOME

16   HACKS THAT HAPPENED?

17      AND I THINK WHAT WE WILL DO IS FOCUS -- BECAUSE I KNOW

18   THIS IS SORT OF A LONG TIME PERIOD.  SO IF WE CAN FOCUS AROUND

19   THE TIME OF ITUNES 4.7.

20   **A.**  LET'S SEE.  THERE WERE SO MANY OF THEM.  WE HAD HYMN, WE

21   HAD JHYMN, WE HAD PYMUSIQUE.  THERE WAS PLAY FAIR.  EVENTUALLY

22   THERE WAS REQUIEM.  THEY KIND OF KEPT COMING.

23      AND THEN THERE WERE THINGS LIKE MYTUNES, WHICH DID THAT --

24   THE SHARING HACK.  THAT WAS ANOTHER ONE.

25   **Q.**  AND DID THE TEAM THAT YOU HIRED MONITOR THE HACKS?

ROBBIN – CROSS / DUNN

1   **A.**   YES.  ONE OF THE THINGS THAT AUGUSTIN STARTED DOING WAS

2   MONITORING ALL THE PLACES WHERE HACKS WERE POSTED.  SO HE

3   WOULD GO LOOKING AT THE DISCUSSION BOARDS AND ALL SORTS OF

4   INTERESTING PLACES ON THE INTERNET WHERE THESE PEOPLE WOULD

5   TALK ABOUT WHAT THEY WERE TRYING DO TO TO HACK US AGAIN WHEN

6   IT WOULD GET BROKEN, BOTH FROM A CUSTOMER OF THE HACK

7   PERSPECTIVE AS WELL AS AN ACTUAL HACKER PERSPECTIVE.

8   **Q.**   WHAT WAS ITUNES 4.7?

9   **A.**   IT WAS A SOFTWARE UPDATE TO ITUNES.

10  **Q.**   DO YOU RECALL WHAT IT DID?

11  **A.**   I DON'T REMEMBER THE FEATURES THAT WERE IN THAT RELEASE.

12  THERE WERE, I'M SURE, QUITE A FEW OF THEM.

13        ONE OF THE THINGS IT DID, THOUGH, IT HAD ANOTHER UPDATE TO

14  THE DRM.

15  **Q.**   WHAT WAS THAT UPDATE, IF YOU REMEMBER?

16  **A.**   WELL, ON THE ITUNES SIDE OF IT, THAT UPDATE WOULD HAVE HAD

17  THE KEYBAG CHECK.

18  **Q.**   DID -- WAS ITUNES 4.7 SUCCESSFUL IN BLOCKING SOME HACKS?

19  **A.**   IT WAS.

20  **Q.**   WAS IT SUCCESSFUL IN BLOCKING ALL HACKS?

21  **A.**   ABSOLUTELY NOT.

22  **Q.**   SO LET'S TALK ABOUT THAT.

23        ARE YOU FAMILIAR WITH HOW THE LABELS RESPONDED TO THE

24  HACKS?

25  **A.**   THE LABELS WOULD LOVE TO GIVE ME A PHONE CALL OR SEND ME

ROBBIN – CROSS / DUNN

1    AN EMAIL KIND OF POKING ME ABOUT THE HACKS THAT WERE GOING ON

2    AND HOW THEY VIEWED IT AS, YOU KNOW, VERY WIDESPREAD AND WHEN

3    ARE YOU GOING TO DO SOMETHING ABOUT THIS.

4        THEY WOULD LIKE TO PUSH US TO, YOU KNOW, HAVE AN UPDATE

5    THAT WOULD GO OUT REALLY QUICKLY.  WE KIND OF WANTED TO WAIT A

6    LITTLE BIT BECAUSE WE DIDN'T WANT TO UPDATE ANY MORE

7    FREQUENTLY THAN WE ALREADY WERE.

8    **Q.**  LET'S LOOK AT TRIAL EXHIBIT 2205.

9                    (EXHIBIT DISPLAYED TO JURY.)

10       AND IF WE CAN START FURTHER DOWN THE PAGE WITH THE FIRST

11   EMAIL IN THIS CHAIN.

12       SO, THIS IS AN EMAIL FROM JANIS NIXON TO VARIOUS PEOPLE

13   AND THEN IT GETS FORWARDED TO YOU.

14       WHO IS JANIS NIXON?

15   **A.**  SHE'S SOMEONE AT UNIVERSAL MUSIC.

16   **Q.**  AND SHE SAYS:

17           "ARE YOU AWARE OF THIS?  IF NOT, I AM SURE IT IS OF

18            GREAT INTEREST AND CONCERN TO APPLE."

19       THEN THERE'S A LINK.  WHAT IS THAT LINK?

20   **A.**  THE LINK IS TO THE HYMN PROJECT.  AND IT LOOKS LIKE A LINK

21   TO THE DOCUMENTATION ON JHYMN.

22   **Q.**  THE SUBJECT LINE SAYS "AAC DRM HACK".  WHAT DOES THAT

23   MEAN?

24   **A.**  IT'S A HACK TO THE AC FILES TO REMOVE THE COPY PROTECTION.

25   **Q.**  SO, ITUNES 4.7 WAS RELEASED IN OCTOBER 2004.  IS THIS

1    EMAIL BEFORE OR AFTER 4.7?

2    **A.**  THIS IS AFTER 4.7.

3    **Q.**  OKAY.

4        LET'S GO TO 2185.

5                    (EXHIBIT DISPLAYED TO JURY.)

6        SO THIS IS AN EMAIL, IT LOOKS LIKE, FROM EDDY CUE TO YOU

7    SAYING "FYI FROM SONY".

8        WHAT IS EDDY CUE FORWARDING TO YOU FROM SONY?

9    **A.**  IT'S AN EMAIL FROM MARK EISENBERG OF SONY MUSIC TALKING

10   ABOUT THE MYTUNES HACK, NEED HELP HERE, AND ITUNES PROFILER.

11   **Q.**  WHAT IS THE MYTUNES HACK?

12   **A.**  YET ANOTHER -- THIS IS THE FILE SHARING ONE.

13   **Q.**  WHAT'S THE DATE ON THIS EMAIL?

14   **A.**  THIS IS NOVEMBER 2004.

15   **Q.**  SO, AGAIN, AFTER 4.7?

16   **A.**  UH-HUH.

17   **Q.**  ALL RIGHT.  LET'S GO TO 2222.

18                   (EXHIBIT DISPLAYED TO JURY.)

19       SO THIS LOOKS LIKE ANOTHER EMAIL FROM MARK EISENBERG TO

20   YOU AND TO EDDY CUE.  AND THE DATE IS MARCH 2005.

21       AGAIN, IS THIS AFTER 4.7?

22   **A.**  YES.

23   **Q.**  WHAT IS THE SUBJECT OF THIS EMAIL?

24   **A.**  ITUNES HACKS.

25   **Q.**  SO LET'S LOOK AT THE END OF THE SECOND PARAGRAPH.

ROBBIN – CROSS / DUNN

1    MR. EISENBERG WRITES:

2            "WHAT IS BEING DONE ABOUT THE HACKS, LIKE MYTUNES,

3            OUR TUNES, ACCESS TUNES, AND JHYMN?"  WE NEED A REAL

4            PLAN OF ATTACK HERE.

5    WHAT WAS YOUR RESPONSE TO THIS?

6    **A.**  THANK YOU AGAIN FOR TELLING ME ABOUT THE HACKS THAT WE'RE

7    FOLLOWING.  WE'LL DO SOMETHING ABOUT IT SOON.

8    **Q.**  WAS THIS TYPICAL OF THE EMAILS YOU WOULD GET?

9    **A.**  YES.

10   **Q.**  LET'S GO TO 2234.

11                (EXHIBIT DISPLAYED TO JURY.)

12       SO, THIS IS A WHOLE EMAIL CHAIN.  AND YOU ARE AT THE TOP

13   OF IT.  LET'S START AT THE BOTTOM.

14       SO THIS IS AN EMAIL FROM SOMEONE NAMED JOHN BORLAND AT

15   CNET.  MARCH OF 2005.

16       WHO IS JOHN BORLAND?

17   **A.**  I THINK HE'S A WRITER FOR CNET.

18   **Q.**  SO -- AND HE'S WRITING TO NATALIE KERRIS AT APPLE.  WHO IS

19   NATALIE?

20   **A.**  NATALIE IS IN PR AT APPLE.

21   **Q.**  AND HIS QUESTION SEEMS TO BE WHETHER DVD JON HAS ALREADY

22   BROKEN 4.7.

23   **A.**  YES.  HE'S TALKING ABOUT THE ITUNES PYMUSIQUE THING

24   TARGETING 4.7.

25   **Q.**  SO, IT SEEMS LIKE THE HACKS ARE NOW IN THE MEDIA.  WHAT'S

ROBBIN – CROSS / DUNN

1    YOUR REACTION TO THAT?

2    **A.**  THAT JUST PUTS MORE PRESSURE ON US TO CLOSE IT DOWN AGAIN.

3    **Q.**  IF THE HACKS ARE PUBLICIZED IN THE MEDIA, WHAT, IF ANY,

4    RISK DOES THAT POSE TO APPLE?

5    **A.**  SO THE PROBLEM WAS NOT JUST THE WIDESPREAD USE OF A HACK.

6    THE PROBLEM WAS ALSO THE REPUTATION OF FAIRPLAY.  BECAUSE FOR

7    US TO GET THE ADDITIONAL CONTENT RIGHTS FOR THINGS LIKE

8    MOVIES, AND TV SHOWS, AND BOOKS, WE HAD TO BE ABLE TO GO TO

9    THE CONTENT PROVIDERS AND SAY, HEY, YOU KNOW, WE HAVE A REALLY

10   SECURE DRM.

11       SO THE REPUTATION OF FAIRPLAY WAS REALLY IMPORTANT TO US.

12   AND SO THE MORE ARTICLES THERE WERE ABOUT PEOPLE HACKING

13   FAIRPLAY, THE HARDER THAT MADE OUR LIVES WHEN WE WERE GOING

14   AND TRYING TO NEGOTIATE USAGE RULES OR DRM RIGHTS FOR THAT

15   CONTENT.

16   **Q.**  AND IF WE CAN GO TO THE NEXT EMAIL UP IN THE CHAIN.

17       NATALIE SAYS:  "ANY TRUTH TO THIS?"  AND CC'D SOME OTHER

18   PEOPLE INCLUDING CHRIS BELL.

19       WHAT DOES CHRIS BELL SAY?

20   **A.**  (READING)

21          "HE COULDN'T HAVE DONE IT THAT FAST, RIGHT?"

22   **Q.**  AND HE'S SPEAKING THERE ABOUT WHO?

23   **A.**  THIS IS ABOUT THE DVD JON HACK, AND WHETHER OR NOT BETWEEN

24   FOUR SEVEN AND THIS TIME FRAME, WHETHER HE COULD HAVE HACKED

25   IT THAT QUICKLY.

ROBBIN – CROSS / DUNN

1    Q.   AND WHAT'S THE LAST EMAIL IN THIS CHAIN?

2    A.   STEVE GEDIKIAN SAYING THAT HE CLAIMS HE HAS.  AND IT'S

3    POINTED TO LINKS TO HIS BLOG TALKING ABOUT IT.

4    Q.   LET'S MOVE TO 2243.

5                   (EXHIBIT DISPLAYED TO JURY.)

6         THIS ALSO LOOKS LIKE AN EMAIL CHAIN WHERE DAVID SEKLIR

7    FROM BMG HAS SENT AN EMAIL TO YOU AND THEN YOU HAVE FORWARDED

8    IT ALONG.

9         BMG IS ONE OF THE LABELS?

10   A.   YES.

11   Q.   HE SAYS TO YOU:

12            "THOMAS HESSE" OR HESSEY (PHONETIC), I DON'T KNOW HOW

13            TO PRONOUNCE THAT, "ASKED THAT I FOLLOW UP WITH YOU

14            REGARDING JHYMN AND PYMUSIQUE.  IT SEEMS THAT JHYMN

15            IS STILL ABLE TO REMOVE THE FAIRPLAY INFORMATION FROM

16            TRACKS AND THAT THERE IS A NEW VERSION OF PYMUSIQUE.

17            PLEASE LET US KNOW AS SOON AS POSSIBLE WHAT STEPS ARE

18            BEING TAKEN WITH RESPECT TO THESE TWO SITUATIONS."

19   Q.   FIRST OF ALL, WHAT IS THE DATE ON THIS EMAIL?

20   A.   MARCH 23, 2005.

21   Q.   IS THAT ALSO AFTER 4.7?

22   A.   YES.

23   Q.   SO WHAT DID YOU DO WITH THIS EMAIL?

24   A.   THIS EMAIL I SENT IT ON TO EDDY CUE SO HE KNEW ABOUT IT

25   SINCE HE WOULD BE TALKING TO THE LABELS.

ROBBIN – CROSS / DUNN

1    **Q.**   OKAY.  LET'S LOOK NOW AT 2252.

2                   (EXHIBIT DISPLAYED TO JURY.)

3        SO THE EMAILS WE JUST TALKED ABOUT, WE ESTABLISHED ARE

4    AFTER 4.7.  CAN YOU TELL JUST BY LOOKING AT THAT CHART WHEN

5    AUGUSTIN IS HIRED?

6    **A.**   APRIL 11TH, 2005.

7    **Q.**   OKAY.  AND THE DATE OF THIS EMAIL IS WHAT?

8    **A.**   APRIL 14TH, 2005.

9    **Q.**   AND CAN YOU TELL THE JURY WHAT THIS EMAIL IS?

10   **A.**   THIS IS AN EMAIL THAT I FORWARDED ON FROM A COMPANY CALLED

11   CLOAKWARE, WHICH WE HAD BEEN WORKING WITH TO TRY TO IMPROVE

12   THE TECHNOLOGY OF OUR DRM.

13       DRM IS MADE UP OF A BUNCH OF DIFFERENT SECRETS AND

14   TECHNOLOGY, AND ONE IS CODE OBFUSCATION, WHICH IS ALLOWING YOU

15   TO HIDE SECRETS INSIDE THE CODE.

16       AND THIS COMPANY WAS ONE THAT WE HAD BEEN WORKING WITH TO

17   TRY TO LICENSE TECHNOLOGY TO MAKE IT BETTER.  AS IT TURNS OUT,

18   YOU CAN'T JUST LICENSE YOUR WAY OUT OF A PROBLEM LIKE THIS.

19   SO....

20   **Q.**   AND IF YOU CAN TURN -- ACTUALLY, LET'S SCROLL DOWN IN THIS

21   EMAIL.  SEE WHAT THEY ARE TALKING ABOUT.

22       SO, IT LOOKS LIKE HE'S TALKING ABOUT DVD JON.  AND

23   GENERALLY SPEAKING, WHAT ARE THEY SAYING?

24   **A.**   WELL -- THEY ARE TRYING TO SELL THEIR SERVICES TO US,

25   RIGHT?  SO THEY ARE TRYING TO DEFEND WHY, EVEN THOUGH WE WERE

ROBBIN – CROSS / DUNN

1    USING THEIR TECHNOLOGY AND WHAT THEY HAD PROPOSED, THAT HE WAS

2    STILL ABLE TO HACK SOMETHING THAT WE THOUGHT WASN'T ACTUALLY

3    GOING TO BE HACKABLE IN THE SYSTEM.

4    **Q.**  DOES HE MENTION ANY OTHER HACKS IN THIS DOCUMENT OTHER

5    THAN DVD JON?

6    **A.**  HE MENTIONS PYMUSIQUE.  HE MENTIONS DEDRMS.

7    **Q.**  WHAT DOES HE SAY ABOUT DEDRMS?

8    **A.**  IT USES THE SAME WHITE BOX AES TABLE APPROACH AS THE

9    ORIGINAL PYMUSIQUE HACK BUT WITH A DIFFERENT TABLE.

10   **Q.**  WHAT DOES HE SAY ABOUT THE DEDRMS ATTACK IN THE MIDDLE OF

11   THE SECOND PAGE OF THIS EXHIBIT?

12   **A.**  (READING)

13        "THE DEDRMS ATTACK IS MORE POWERFUL THAN PYMUSIQUE

14        BECAUSE IT FREES ALL YOUR PURCHASED CONTENT, INSTEAD

15        OF JUST THE NEW CONTENT BEING PURCHASED.  WHY DID HE

16        BOTHER TO REMOVE THE TRANSFORM?"

17   **Q.**  THIS DOCUMENT FROM APRIL 14TH, 2005, WAS THAT BEFORE OR

18   AFTER THE LAUNCH OF HARMONY?

19        YOU CAN USE THAT CHART FOR REFERENCE IF YOU DON'T

20   REMEMBER.

21   **A.**  THIS IS BEFORE -- THIS IS AFTER THE FIRST HARMONY AND

22   BEFORE THE SECOND HARMONY.

23   **Q.**  LET'S TALK A LITTLE BIT MORE ABOUT THE FAIRPLAY REDESIGN.

24        JUMPING FORWARD, YOU LAUNCHED ITUNES 6.0 ON OCTOBER 12TH

25   OF 2005.

ROBBIN – CROSS / DUNN

1      DO YOU REMEMBER WHAT WAS GOING ON AROUND THAT TIME?

2      **A.**   I THINK THAT WAS WHEN WE STARTED DOING VIDEO IN ITUNES.

3      SO WE WERE ADDING SOME MORE FEATURES TO THE STORE.  AND THAT

4      WOULD HAVE BEEN ANOTHER DRM IMPROVEMENT TO ITUNES.

5             **MS. DUNN:**   IF WE CAN PUT UP 2317.

6                   (EXHIBIT DISPLAYED TO JURY.)

7      **BY MS. DUNN:**

8      **Q.**   SO THIS IS AN INSTANT MESSAGE THAT HAS YOUR NAME ON THE

9      TOP.

10        LET'S BE CLEAR WHO IS ON THE RIGHT AND WHO IS ON THE LEFT.

11     **A.**   IT LOOKS LIKE I'M ON THE LEFT AND AUGUSTIN IS ON THE

12     RIGHT.

13     **Q.**   SO AUGUSTIN SAYS TO YOU:  "HAVE YOU SEEN THE HYMN FORUM?"

14        THEN WHAT DOES HE SAY?

15     **A.**   I SAY "NO".

16        AND THEN HE SAYS "A LOT OF ATTACKS."

17        AND I ASK HIM IF HE -- IF THEY BROKE IT YET.  HE SAYS,

18     "NOT YET AND THEY ARE GOING IN THE OPPOSITE DIRECTION."

19        THAT'S GREAT.

20        AND THEN HE TALKS ABOUT AN INTERESTING POINT FOR IMOVIE,

21     BUT THAT'S A DIFFERENT KIND OF ATTACK.

22     **Q.**   WHAT'S THE DATE ON THIS EMAIL?

23     **A.**   OCTOBER 15TH, '05.

24     **Q.**   AND WHEN IS THIS EMAIL RELATIVE TO WHEN ITUNES 6.0

25     LAUNCHED?

ROBBIN – CROSS / DUNN

1    **A.**    THIS IS AFTER ITUNES 6.

2    **Q.**    HOW MANY DAYS AFTER ITUNES 6?

3    **A.**    THREE.

4    **Q.**    AND IF YOU SCROLL DOWN A LITTLE BIT IN THIS IM EXCHANGE,

5    MR. FARRUGIA SAYS, "WE SHOULD DO THE SAME WITH THE IPOD".

6         WHAT DO YOU TAKE THAT TO MEAN?

7    **A.**    HE THINKS WE SHOULD BE TAKING THE SAME TECHNIQUES THAT WE

8    APPLY TO ITUNES 6 AND MOVING THEM TO THE IPOD.

9    **Q.**    SO IN OCTOBER OF 2005, AFTER YOU INSTITUTED THE

10   IMPROVEMENTS ON THE DESKTOP, YOU'RE DISCUSSING WITH AUGUSTIN

11   PUTTING THE SAME SECURITY ON THE IPOD; IS THAT RIGHT?

12   **A.**    YES.

13   **Q.**    LET'S LOOK BRIEFLY AT TX267.

14        THIS IS AN EMAIL THAT PLAINTIFFS' COUNSEL SHOWED YOU.

15   **A.**    I DON'T THINK I HAVE 267.

16   **Q.**    MR. SPAULDING WILL PUT IT ON THE SCREEN FOR YOU.

17                  (EXHIBIT DISPLAYED TO JURY.)

18        WHAT IS THE DATE ON THIS EMAIL?

19   **A.**    NOVEMBER 16TH, 2005.

20   **Q.**    WAS THAT BEFORE OR AFTER THE OCTOBER 2005 EXCHANGE WE JUST

21   DISCUSSED WHERE AUGUSTIN IS TALKING ABOUT PUTTING THE SAME

22   SECURITY ON THE IPOD AS ON THE DESKTOP?

23   **A.**    SORRY, I LOST MY PLACE IN THE OTHER ONE.

24   **Q.**    THE LAST EMAIL WE DISCUSSED WAS IN OCTOBER OF 2005.  THIS

25   ONE IS IN NOVEMBER.

1          IS IT BEFORE OR AFTER THE IM EXCHANGE WHERE AUGUSTIN

2    FARRUGIA SAYS WE SHOULD DO THE SAME THING ON THE IPOD?

3    **A.**  THIS IS AFTER.

4    **Q.**  THANK YOU.

5          **MS. DUNN:**  CAN WE MOVE TO 2342?

6               (EXHIBIT DISPLAYED TO JURY.)

7    **BY MS. DUNN:**

8    **Q.**  SO THIS IS AN EMAIL FROM AUGUSTIN FARRUGIA TO YOU AND A

9    COUPLE OF OTHER PEOPLE.

10         CAN YOU TELL THE JURY WHO THESE PEOPLE ARE?  WHAT THE DATE

11   IS ON THE EMAIL?

12   **A.**  THIS IS FROM JANUARY 7TH, 2006.  IT'S FROM AUGUSTIN TO

13   JEAN-FRANCOIS AND GIANPAOLO, AND MYSELF.

14         THEY'RE ENGINEERS ON THE DRM TEAM.

15   **Q.**  AND WHAT'S THE SUBJECT LINE OF THIS EMAIL?

16   **A.**  "COMMENT FROM HYMN FORUM THIS MORNING".

17   **Q.**  AND WHAT'S IN THE BODY OF THE EMAIL?

18   **A.**  THIS IS A QUOTE --

19         **MR. COUGHLIN:**  OBJECTION, YOUR HONOR, IT'S HEARSAY.

20         **MS. DUNN:**  YOUR HONOR, I'M ASKING HIM WHAT HE TAKES

21   TO BE -- WHAT IS -- NOT -- I MEAN, WE WILL DISCUSS WHAT'S IN

22   IT, BUT AT THIS POINT I'M JUST ASKING HIM WHAT IT IS.

23         **THE COURT:**  OKAY.  YOU ARE NOT OFFERING IT FOR ITS

24   TRUTH?

25         **MS. DUNN:**  NO, I AM NOT.

1      **THE COURT:**  GO AHEAD AND ANSWER THE QUESTION.

2         OBJECTION OVERRULED.

3      **THE WITNESS:**  IT'S A COMMENT FROM THE HYMN FORUM

4    POSTED BY AUGUSTIN THAT SAYS:

5              "MAYBE I'M MISSING SOMETHING, BUT WOULDN'T THE IPOD

6              BE THE OBVIOUS PLACE TO GET THE KEYS?  ITUNES MAY BE

7              ABLE TO DOWNLOAD THEM ON THE FLY, BUT THE IPOD SURE

8              AS HELL CAN'T.  ANY WAY TO GET SOME OLD SAMPLE KEYS

9              TO FIGURE OUT HOW THE NEW ONES ARE ENCRYPTED?"

10   **BY MS. DUNN:**

11   **Q.**  WHAT DOES THAT MEAN TO YOU, "OLD SAMPLE KEYS TO FIGURE OUT

12   HOW THE NEW ONES ARE ENCRYPTED"?

13   **A.**  THIS IS BASICALLY SOMEBODY SAYING THAT THE IPODS THE NEXT

14   PLACE TO GO AND ATTACK THE DRM, AND THEY SHOULD DO THAT BY

15   COMPARING THE OLD WAY THINGS WE'RE DOING TO THE NEW WAY THINGS

16   ARE BEING DONE.

17        **MR. COUGHLIN:**  I OBJECT TO HIM INTERPRETING A HEARSAY

18   DOCUMENT.

19        **MS. DUNN:**  I ASKED THE WITNESS WHAT IT MEANT TO HIM.

20        **THE COURT:**  OVERRULED.

21   **BY MS. DUNN:**

22   **Q.**  MR. ROBBIN, WAS THIS PUBLIC?

23   **A.**  YES.

24        **THE COURT:**  I DON'T UNDERSTAND THAT QUESTION.  WAS

25   WHAT PUBLIC?

ROBBIN – CROSS / DUNN

1    **BY MS. DUNN:**

2    **Q.**   WAS THIS COMMENT FROM THE HYMN FORUM PUBLIC.

3         AND PERHAPS I SHOULD BE MORE SPECIFIC.

4         IF YOU KNOW, WAS IT ON THE INTERNET?

5    **A.**   THE HYMN FORUM IS A PUBLICLY AVAILABLE WEBSITE ON THE

6    INTERNET WHERE THIS COMMENT WOULD HAVE BEEN POSTED.

7    **Q.**   WHAT'S YOUR REACTION TO THIS?

8    **A.**   THIS JUST REINFORCES THE FACT THAT WE NEED TO KEEP

9    EVOLVING THE DRM AND THE IPOD'S ANOTHER WEAK POINT TO GO

10   AFTER.

11        AND WHAT THIS WORRIES ME ABOUT IS THAT THE HYMN FORUM IS

12   WHERE THEY'RE TALKING ABOUT HOW TO HACK THE DRM NEXT.

13        AND SO THIS IS JUST SAYING THAT IF THEY ARE POSTING THIS

14   KIND OF COMMENT, THEN THAT'S ANOTHER PLACE THEY ARE GOING TO

15   GO.  SO ONE OF THE NEXT THINGS WE NEED TO GO AFTER IS TO MAKE

16   SURE THE IPOD IS MORE SECURE.

17   **Q.**   DID YOU ULTIMATELY MAKE THE IPOD MORE SECURE?

18   **A.**   YES, WE DID.

19   **Q.**   AT THIS POINT, WHICH IS AFTER ITUNES 6.0 AND BEFORE 7.0,

20   ARE YOU STILL HEARING FROM THE LABELS ABOUT HACKS?

21   **A.**   YES.

22             **MS. DUNN:**  CAN WE LOOK AT 2330.

23                  (EXHIBIT DISPLAYED TO JURY.)

24   **BY MS. DUNN:**

25   **Q.**   SO THIS IS AN EMAIL FROM MARK EISENBERG, WHO TURNS OUT TO

1    HAVE BEEN SOMEONE WHO SENT YOU NUMEROUS EMAILS, TO EDDY CUE

2    AND CC'D TWO OTHER PEOPLE.  AND THEN IT LOOKS LIKE EDDY

3    FORWARDS THIS TO YOU.

4        CAN YOU READ THE FIRST TWO PARAGRAPHS OF THIS EMAIL?

5    **A.**  (READING)

6            "EDDY, HERE'S ANOTHER ONE OF THOSE GOPHERS THAT'S

7            POPPED OUT OF THE GROUND.  IT'S A REAL SERIOUS ONE

8            FOR BOTH OF US.  FOR US, THEY ARE USING APPLE AS A

9            CONDUIT FOR STEALING MUSIC AND FOR YOU IT'S EXTREMELY

10           DENIGRATING TO THE APPLE TRADEMARK AMONG OTHER

11           THINGS.  NOT ONLY IS DOT-TUNES TRADING OFF YOUR

12           MARKS, THEY ARE ALSO ASSOCIATING THE MARK WITH PORN

13           MUSIC.  SEE SCREEN GRAB BELOW."

14   **Q.**  WHAT, IF I MAY ASK, IS PORN MUSIC?

15   **A.**  I HAVE NO PERSONAL KNOWLEDGE OF PORN MUSIC.

16   **Q.**  ALL RIGHT.  LET'S GO TO THE SCREEN GRAB.

17       SO I'LL SPARE YOU HAVING TO READ THIS.  IT SAYS, "PORNO

18   MUSIC" WITH A PICTURE.

19       WHY MIGHT THIS BE BAD FOR APPLE?

20   **A.**  THIS IS ASSOCIATING OUR LOGO, OUR TRADEMARKS, AND OUR

21   BRAND WITH STOLEN MUSIC AND PORN MUSIC.

22   **Q.**  WHY MIGHT IT BE BAD FOR SONY?

23   **A.**  I THINK FOR THE SAME REASONS.

24   **Q.**  AND IF YOU COULD JUST RETURN TO THE FIRST PAGE OF THE

25   EMAIL.

1    AND, MR. ROBBIN, IF YOU COULD READ THE SECOND PARAGRAPH

2  THAT MR. EISENBERG WRITES?

3  **A.**  SORRY, WHICH PARAGRAPHS?

4  **Q.**  THE SECOND PARAGRAPH THAT HE WRITES.

5  **A.**  (READING)

6        "WE NEED TO ATTACK THIS ONE SWIFTLY.  LET ME KNOW

7        WHAT YOUR PLANS ARE FOR DISABLING/CLOSING UP THE HOLE

8        AND THE TIMETABLE FOR SUCH.  WE CAN'T WAIT MONTHS FOR

9        THE SECURITY PLUG TO BE IMPLEMENTED HERE."

10  **Q.**  MR. ROBBIN, IN ADDITION TO HEARING FROM THE LABELS, DID

11  YOU ALSO HEAR FROM SENIOR PEOPLE AT APPLE?

12  **A.**  YES, I DID.

13  **Q.**  AND DID THOSE SENIOR PEOPLE INCLUDE STEVE JOBS?

14  **A.**  YES, I DID.

15  **Q.**  LET'S GO TO 2107.

16        (EXHIBIT DISPLAYED TO JURY.)

17    SO WHAT IS THIS EMAIL?

18  **A.**  THIS IS AN EMAIL FROM STEVE TO EDDY AND ME, A FORWARD OF

19  NEW ITUNES DRM REMOVER.  SO ASKING ME I'VE SEEN IT.

20  **Q.**  WHAT'S YOUR UNDERSTANDING OF WHY MR. JOBS IS SENDING YOU

21  THIS EMAIL?

22  **A.**  STEVE WOULD SEND ME EMAILS ON A REGULAR BASIS ABOUT ALL

23  THE DRM HACKS HE HEARD ABOUT.

24  **Q.**  WHY WOULD MR. JOBS CARE IF THE DRM WAS HACKED, IN YOUR

25  VIEW?

1024

ROBBIN - CROSS / DUNN

1    **A.**   FOR THE SAME REASON THAT I WOULD HAVE.  IT'S OUR JOB TO

2    MAKE THE DRM SECURE.  IF WE DON'T HAVE A DRM THAT WORKS, THEN

3    WE ARE NOT GOING TO HAVE CONTENT.

4    **Q.**   WHEN YOU SAY, "IF WE DON'T HAVE A DRM THAT WORKS, WE ARE

5    NOT GOING TO HAVE CONTENT", WHY IS THAT?

6    **A.**   THE RECORD LABELS AND THE CONTENT PROVIDERS ARE NOT GOING

7    TO GIVE US THE LICENSES TO SELL MUSIC UNLESS WE HAVE A SECURE

8    DRM.

9    **Q.**   LET'S GO TO 2228.

10                   (EXHIBIT DISPLAYED TO JURY.)

11        WHAT IS THIS EMAIL?

12   **A.**   THIS IS AN EMAIL FROM STEVE TO MYSELF REGARDING THE ITUNES

13   MUSIC STORE NOW REQUIRING ITUNES 4.7.

14   **Q.**   AND TELL THE JURY WHAT STEVE IS SAYING TO YOU.

15   **A.**   STEVE IS ASKING WHY NOT PUSH A CHANGE OF CONTENT KEYS NOW?

16   **Q.**   AND WHAT DOES THAT MEAN?

17   **A.**   WHEN WE EVOLVED THE DRM, WE HAD THE ABILITY TO CONTROL

18   SOME OF THE PARAMETERS ON THE STORE.  SO THE STORE CAN DECIDE

19   WHERE THE SONGS THAT ARE BEING SOLD WILL WORK THROUGHOUT OUR

20   ECOSYSTEM, WHETHER IT REQUIRES A VERSION UPDATE OR NOT.

21        AND WE USUALLY LIKE TO SHIP AN UPDATE TO THE DRM THAT IS

22   BACKWARD COMPATIBLE FOR A WHILE, AND THEN EVENTUALLY AFTER

23   PEOPLE HAVE ALREADY UPDATED, WE MIGHT MAKE THE SONGS COMING

24   FROM THE SERVER REQUIRE THOSE SO THAT IT MINIMIZES THE

25   DISRUPTION TO CUSTOMERS THAT WOULD REQUIRE AN UPDATE.

ROBBIN – CROSS / DUNN

1    AND SO THERE'S A PROCESS WE KIND OF TEND TO DO.  IT IS NOT

2  ALWAYS THE SAME.  IT DEPENDS ON THE SEVERITY OF THE HACKS.

3  AND IN THIS EMAIL, HE'S ASKING ABOUT TRYING TO ACCELERATE

4  THINGS, WHICH IS NOT UNCOMMON.

5  **Q.**  AND IN THE MIDDLE OF THE PAGE -- ACTUALLY, LET'S START

6  FROM YOUR EMAIL TO HIM.

7    MARCH 19TH, 2005, YOU ARE TALKING ABOUT SOMETHING THAT

8  DISABLES THE EARLIER SERVER-SIDE HACKS.  AND THEN HE RESPONDS

9  TO YOU.

10  **A.**  HE SAYS:

11    "WILL THE CURRENT HACK WORK UNTIL WE ISSUE NEW KEYS?

12    WHEN WILL WE ISSUE NEW KEYS?"

13  **Q.**  AND WHAT DID -- WHY DID HE ASK YOU THAT, IN YOUR OPINION?

14  **A.**  WELL, HE'S TRYING TO FIGURE OUT WHAT THE SCOPE OF THE HACK

15  IS AND HOW QUICKLY THE HACK WILL BE RENDERED, YOU KNOW,

16  NEUTRALIZED FOR THE LABELS.

17  **Q.**  WHAT'S THE DATE OF THIS EMAIL?

18  **A.**  THAT WAS -- HIS WAS ON 3/19/05.  SO MARCH 19TH.

19  **Q.**  LET'S LOOK AT 2780.

20    (EXHIBIT DISPLAYED TO JURY.)

21    DO YOU RECOGNIZE THIS?

22  **A.**  HANG ON.

23    THIS IS ANOTHER EMAIL FROM STEVE TO ME AND GREG JOZWIAK,

24  WHO'S IN MARKETING, ABOUT MYTUNES, THE SIMPLIFIED ITUNES DRM

25  STRIPPER FOR WINDOWS.

1    **Q.**  WHAT IS MR. JOBS ASKING YOU ABOUT IN THIS EMAIL?

2    **A.**  HE DIDN'T ASK ME ANYTHING.  THIS WAS JUST A FORWARD

3    TELLING ME ABOUT THIS HACK, REMINDER OF SOMETHING I NEED TO GO

4    LOOK AT.

5    **Q.**  WHAT'S THE DATE ON THIS EMAIL?

6    **A.**  SEPTEMBER 1ST, 2006.

7    **Q.**  LET'S LOOK AT 2419.

8              (EXHIBIT DISPLAYED TO JURY.)

9         **MS. DUNN:**  IF WE CAN SHOW THE JURY THE WHOLE THING.

10   AND THE BOTTOM.

11   THANK YOU.

12   **BY MS. DUNN:**

13   **Q.**  SO THIS LOOKS LIKE IT'S AN EMAIL EXCHANGE BETWEEN YOU AND

14   MR. JOBS CC'D TO EDDY CUE.

15   PLEASE EXPLAIN TO THE JURY WHAT'S GOING ON IN THIS EMAIL?

16   **A.**  SO THIS SAYS THIS IS THE SAME HACK WE TALKED ABOUT BEFORE.

17   SO HE HAD FORWARDED ME AN EMAIL, AN ARTICLE HE MUST HAVE

18   SEEN OR A POST, TALKED ABOUT MYTUNES, WHICH HAS NOW BEEN

19   RENAMED MYFAIRTUNES6 WITH TONS OF NEW FEATURES ADDED, KIND OF

20   MAKES THE HACKS BETTER.

21   AND SO THAT'S AN IMPLIED QUESTION OF, HEY, I HOPE YOU ARE

22   DOING SOMETHING ABOUT THIS.  AND SO I'M RESPONDING TO HIM

23   ABOUT THE CURRENT STATUS.

24   **Q.**  LET'S GO TO 2419.

25   **A.**  THAT WAS --

1    **THE COURT:**  WEREN'T YOU --

2         **MS. DUNN:**  I AM SORRY, 2850.

3              (EXHIBIT DISPLAYED TO JURY.)

4    BY MS. DUNN:

5    **Q.**  SO THIS EMAIL IS AN EMAIL FROM YOU TO MR. JOBS, MR. CUE,

6    SINA TAMADDON, AND AUGUSTIN FARRUGIA.  THE SUBJECT SAYS, "JON

7    JOHANSEN HACKS FAIRPLAY, THE APPLE ITUNES CLOSED SYSTEM".

8         IT SAYS IT'S AN ARTICLE ABOUT DVD JON AND HIS NEW COMPANY

9    DOUBLETWIST.  WHAT WAS DOUBLETWIST?

10   **A.**  IT WAS ANOTHER HACK THAT LET PEOPLE PUT COPIED-PROTECTED

11   SONGS ON THE IPOD, BUT IT WOULD ALSO LET OTHER DEVICES PLAY

12   ITUNES SONGS.

13   **Q.**  DID REALNETWORKS HARMONY ALSO CLAIM TO LET OTHER DEVICES

14   PLAY ITUNES SONGS -- OR TO LET THE IPOD PLAY SONGS FROM OTHER

15   DEVICES?

16   **A.**  LET IPOD PLAY SONGS FROM OTHER DEVICES, YEAH.

17   **Q.**  SORRY.  LET ME BE MORE SPECIFIC.

18        YOU DISCUSSED WITH PLAINTIFFS' COUNSEL THAT HARMONY

19   ASSERTED IT COULD PLAY SONGS FROM REALNETWORKS ONTO THE IPOD.

20   **A.**  UH-HUH.

21   **Q.**  DOES DOUBLETWIST SAY THEY CAN DO THAT AS WELL?

22   **A.**  YES.

23   **Q.**  PLAINTIFFS' COUNSEL ALSO ASKED YOU ABOUT AN EMAIL FROM

24   STEVE JOBS ABOUT SOMETHING CALLED NAVIO.

25        WOULD IT HAVE MATTERED WHETHER AN EMAIL YOU GOT FROM STEVE

ROBBIN – CROSS / DUNN

1   JOBS WAS ABOUT DVD JON, NAVIO, OR A HACK LIKE JHYMN OR

2   PYMUSIQUE?

3   **A.**  THEY WERE ALL THE SAME TO US.  IF SOMETHING WAS

4   THREATENING THE DRM, IF SOMETHING WAS HACKING IT, OR BYPASSING

5   IT, OR SHOWING SOME KIND OF WEAKNESS, WE WOULD HAVE DEALT WITH

6   THEM ALL THE SAME.

7       WE WOULD HAVE, IF IT WAS AVAILABLE, TAKEN A LOOK AT IT,

8   TRIED TO SEE WHAT IT DID, TRIED TO FIGURE OUT WHAT WE NEED TO

9   DO TO MAKE OUR SYSTEM BETTER.  WE WERE REQUIRED TO DO THAT.

10  **Q.**  WAS ITUNES HACKED AFTER ITUNES 7.0 AND 7.4?

11  **A.**  UNFORTUNATELY.

12  **Q.**  TELL THE JURY WHAT HAPPENED.

13  **A.**  WELL, HACKS HAVE BEEN KIND OF AN ONGOING PROBLEM ALL THE

14  WAY THROUGH, YOU KNOW, ALMOST TO NOW.

15      THERE'S A COMPANY CALLED -- NOT A COMPANY, A HACK CALLED

16  REQUIEM THAT WAS -- THAT KEPT GOING AFTER A BUNCH OF THESE

17  HACKS SORT OF FELL BY THE WAYSIDE.  AS WE GOT BETTER, AS THE

18  DRM GOT BETTER, THE HACKS HAD TO GET MORE AND MORE

19  SOPHISTICATED.

20      SO WE DID MAKE IT BETTER, AND IT DID MAKE IT TEND TO GO A

21  LITTLE BIT LONGER IN TIME, LONGER IN TIME, LONGER IN TIME, BUT

22  WE KEPT GETTING HACKED.

23  **Q.**  LET'S SWITCH GEARS AND TALK ABOUT HARMONY.

24      DO YOU KNOW HOW HARMONY WORKED?

25  **A.**  I KNOW WHAT THEY PURPORTED TO DO.  I NEVER ACTUALLY USED

ROBBIN - CROSS / DUNN

1    IT MYSELF.

2    **Q.**  DO YOU KNOW WHETHER REALNETWORKS HAD ANY ACCESS TO APPLE

3    SOURCE CODE?

4    **A.**  THEY DID NOT.

5    **Q.**  FOR REALNETWORKS TO DO WHAT IT DID WITH HARMONY, WOULD IT

6    HAVE BEEN EASY OR DIFFICULT?

7    **A.**  DIFFICULT.

8    **Q.**  WHY IS THAT?

9    **A.**  THE DRM IS A VERY COMPLICATED SYSTEM.  THEY HAD TO FIGURE

10   OUT ENOUGH OF IT TO MAKE IT WORK TO THE LEVEL IT DID WHERE

11   WHAT THEY SHIPPED OPERATED.

12       THEY ALSO HAD TO KNOW, BY THE WAY, THAT IT WOULD HAVE

13   BROKEN VERY QUICKLY.  WHEN YOU IMPLEMENT SOMETHING THAT'S THAT

14   FRAGILE, THEY HAD TO HAVE KNOWN IT WAS GOING TO BREAK.

15   **Q.**  WHY DO YOU SAY THAT?

16   **A.**  BECAUSE IT IS THAT COMPLICATED.  AND ANY ENGINEER WOULD

17   KNOW THAT IF YOU ARE GOING TO REVERSE ENGINEER SOMETHING

18   THAT'S THAT COMPLICATED AND YOU TRY TO DO IT, THAT ANY CHANGES

19   THAT WE WOULD HAVE HAD TO HAVE MADE WERE GOING TO BREAK IT

20   ANYWAY.

21   **Q.**  LET'S LOOK AT 2481.

22                (EXHIBIT DISPLAYED TO JURY.)

23       DO YOU RECOGNIZE THIS DOCUMENT?

24   **A.**  YES.

25   **Q.**  WHAT IS IT?

1030
ROBBIN – CROSS / DUNN

1    **A.**   IT'S THE ITUNES TERMS OF SERVICE.

2    **Q.**   AND WHO HAS TO EXECUTE THE ITUNES TERMS OF SERVICE?

3    **A.**   ANYBODY WHO TRIES TO USE ITUNES.

4    **Q.**   AND CAN YOU EXPLAIN HOW USERS EXECUTE THIS AGREEMENT?

5    **A.**   WITH ITUNES, WHEN YOU RUN THE APPLICATION, IT PUTS UP A

6    WINDOW THAT SHOWS YOU THE TERMS OF SERVICE, AND IT HAS AN

7    "AGREE" AND "CANCEL" BUTTON.

8    **Q.**   LET'S LOOK AT SECTION 8B.

9        THIS IS SORT OF A LONG PARAGRAPH.  SO DO YOU SEE THE PART

10   WHERE IT SAYS:

11           "YOU AGREE NOT TO ATTEMPT TO OR ASSIST ANOTHER PERSON

12            TO CIRCUMVENT, REVERSE ENGINEER, DECOMPILE,

13            DISASSEMBLE, OR OTHERWISE TAMPER WITH ANY OF THE

14            SECURITY COMPONENTS RELATED TO SUCH USAGE RULES FOR

15            ANY REASON WHATSOEVER."

16   **A.**   YES.

17   **Q.**   DO YOU SEE THAT?

18       WOULD THERE HAVE BEEN ANY WAY FOR REALNETWORKS TO GET

19   ACCESS TO ITUNES WITHOUT SIGNING THIS USER AGREEMENT?

20   **A.**   NO.

21   **Q.**   LET'S GO TO EXHIBIT 136.

22               (EXHIBIT DISPLAYED TO JURY.)

23       PLAINTIFFS' COUNSEL SHOWED YOU THIS EXHIBIT.

24   **A.**   I DON'T HAVE IT.

25   **Q.**   IS IT ON THE SCREEN?  CAN YOU SEE IT?

ROBBIN – CROSS / DUNN

1    **A.**  VERY FUZZY.

2    **Q.**  LET'S BLOW IT UP.

3    **A.**  OKAY.

4    **Q.**  SO, PLAINTIFFS' COUNSEL POINTED YOU TO THIS DOCUMENT, AND

5    SAID THAT THIS DOCUMENT SAID THAT HARMONY TECHNOLOGY DOESN'T

6    REMOVE OR DISABLE ANY DIGITAL RIGHTS MANAGEMENT SYSTEM.

7         IS THIS DOCUMENT A PRESS RELEASE FROM REALNETWORKS?

8    **A.**  YES.

9    **Q.**  LET'S GO TO EXHIBIT 128.

10                    (EXHIBIT DISPLAYED TO JURY.)

11        PLAINTIFFS' COUNSEL ALSO SHOWED YOU THIS EMAIL, WHICH IS

12   AN EMAIL FROM DAVE HELLER TO YOU, TOM DOWDY, AND EDDY CUE

13   ABOUT HARMONY FROM 2004.

14        AND PLAINTIFFS' COUNSEL POINTED YOU TO 1 THROUGH 4 OF THIS

15   EMAIL.  THEN I BELIEVE HE PICKED IT UP WITH 11.

16        SO, IF YOU CAN EXPLAIN TO THE JURY NUMBERS 5, 6, 7, 8, 9

17   AND 10, THAT WOULD BE GREAT.

18   **A.**  SO 5 SAYS:

19             "HARMONY APPEARS TO BE USING A RANDOM USER I.D. IN

20             THE KEYBAG/SINF."

21        SO THAT MEANS THEY ARE JUST INJECTING A NUMBER THAT THEY

22   DON'T KNOW WHAT IT'S GOING TO DO.  AND SINCE OUR SYSTEM

23   ACTUALLY DOES CARE ABOUT WHAT THOSE USER I.D.'S ARE, THAT'S

24   GOING TO MAKE A DIFFERENCE.

25        NUMBER 6 SAYS:

ROBBIN – CROSS / DUNN

1          "HARMONY IS ALSO FILLING IN THE VENDOR I.D. FIELD

2          WITH SOME LARGE NUMBER."

3     THAT'S GOING TO MAKE THINGS NOT WORK CORRECTLY.

4  **Q.**  WHY IS THAT?

5  **A.**  WELL, THE VENDOR I.D. IS HOW WE CHOOSE TO LINK BACK INTO

6  THE STORE WHEN YOU CLICK ON THE ARROW NEXT TO THE SONG TO GET

7  TO THE RIGHT ARTIST AND STUFF.  SO IT'S PART --

8  **Q.**  I THINK YOU MIGHT NEED TO SLOW DOWN A LITTLE BIT FOR THE

9  COURT REPORTER.

10 **A.**  WHEN YOU CLICK THE LINK ARROW, IT TAKES YOU TO THAT ARTIST

11 IN THE STORE.

12     NUMBER 7 SAYS:

13          "THERE ARE NO SONG I.D., ARTIST I.D., OR ALBUM I.D.

14          FIELDS PRESENT.  THESE ARE IN THE METADATA, NOT THE

15          SINF."

16     AND THIS IS JUST MISSING INFORMATION ABOUT THE SONGS

17 BECAUSE THEY PROBABLY DIDN'T KNOW WHAT THOSE I.D.'S WERE.

18     NUMBER 8 SAYS:

19          "THERE IS NO TUPLE IN THE FILE.  IT SHOWS AS FAIRPLAY

20          VIEW 1 IN ITUNES."

21     SO THEIR SONGS EXPRESS THEMSELVES AS A CERTAIN VERSION OF

22 FAIRPLAY THAT WAS THE VERY FIRST VERSION OF FAIRPLAY.  IT'S

23 JUST A STATEMENT ABOUT HOW THEY HAD DONE IT.  I THINK THEY

24 WOULD HAVE HAD NO IDEA WHAT THAT FIELD WAS ANYWAY.  SO NO REAL

25 WAY TO UNDERSTAND IT.

1    I DON'T SEE A NUMBER 9.

2    **Q.**   IT'S A FAIR POINT.

3    **A.**   WHAT WAS THE OTHER ONE YOU ASKED?

4    **Q.**   10.

5    BUT BEFORE YOU DO 10, YOU SAID THAT THEY COULDN'T HAVE

6    KNOWN WHAT THE I.D. FIELDS WERE IN NUMBER 7.

7    CAN YOU JUST EXPLAIN THAT A LITTLE BIT MORE FOR THE JURY?

8    **A.**   WELL, THEY ARE GOING TO JUST LOOK LIKE NUMBERS IF YOU ARE

9    REVERSE ENGINEERING IT.  WITHOUT ANY CONTEXT FOR WHAT THOSE

10   NUMBERS DO, HOW WOULD YOU KNOW?

11   SO, WE HAVE A FILE WITH A LIST OF SONGS.  AND NEXT TO EACH

12   SONG THERE MIGHT BE NUMBERS.  IN THIS CASE, THESE ARE I.D.'S,

13   WHICH ARE THE IDEA OF THE SONG AND THE CATALOG, THE ARTIST IN

14   THE CATALOG, THE ALBUM IN THE CATALOG, AND THAT ALLOWS US TO

15   HAVE A USER INTERFACE WHERE WE KNOW WHERE THOSE SONGS CAME

16   FROM.

17   AND YOU CAN MAKE IT SO YOU CAN LINK BACK INTO THE STORE

18   AND DO OTHER THINGS.  SO HOW WOULD THEY EVER KNOW WHAT THOSE

19   WERE.

20   **Q.**   SORRY.  IF YOU CAN NOW EXPLAIN 10.

21   **A.**   (READING)

22   "THE SIMPLE CHECKSUM I ADDED TO THE IPOD DB HEADER IN

23   ITUNES 3.0 DOESN'T VERIFY.  THIS IS SOMEWHAT EXPECTED

24   AS NEITHER EPHPOD OR XPLAY DO THIS RIGHT EITHER AND

25   I'VE NEVER SEEN THIS MENTIONED PUBLICLY BEFORE."

1    SO THAT'S -- WHEN WE HAD DONE THIS EARLY ON, THEY HAD

2    ADDED A VERY SIMPLE -- ALMOST LIKE A SIMPLE VERIFICATION

3    PROCESS ALREADY, WHICH CHECKS TO SEE WHETHER OR NOT THE FILE

4    HAS INTEGRITY.  WE JUST WEREN'T CHECKING IT TO DECIDE TO DO

5    ANYTHING DIFFERENT BASED ON IT, BUT WE KNEW WHETHER OR NOT THE

6    FILE WAS TOUCHED FOR SOME PART OF IT.

7    Q.  YOU JUST TESTIFIED THAT THERE'S SOME INTEGRITY

8    VERIFICATION ALREADY IN THE SYSTEM.  WHAT ARE YOU TALKING

9    ABOUT WHEN YOU SAY THAT?

10   A.  WELL, IT'S NOT NECESSARILY VERIFICATION, IT'S THE SIMPLE

11   CHECKSUM.  A CHECKSUM IS -- YOU MIGHT JUST RUN THROUGH THE

12   BYTES IN THE FILE, ADD THEM ALL UP, AND THEN YOU GET A NUMBER.

13   AND IT'S UNLIKELY THAT YOU WILL GET TWO FILES THAT WOULD HAVE

14   THE SAME CHECKSUM.  POSSIBLE, BUT UNLIKELY.  SO IT'S KIND OF A

15   SIMPLE WAY FOR US TO LOOK AT AND SEE HAS THERE BEEN ANY

16   CORRUPTION TO THE FILE.

17       SO WE DID THAT SO THAT WE COULD, WHEN WE WERE DEBUGGING

18   THINGS, SEE WHETHER SOMETHING HAD GONE WRONG, WHETHER IT HAD

19   BEEN TAMPERED WITH, SO THAT WE COULD KNOW THAT WHEN LOOKING AT

20   OUR SYSTEM.  BUT WE DIDN'T EVER PUT A CHECK THAT SAID, IF THIS

21   VALUE DIDN'T MATCH WHAT WE EXPECTED IT TO BE THAT WE WOULD DO

22   ANYTHING DIFFERENT.

23   Q.  WHAT ARE EPHPOD AND XPLAY?

24   A.  THOSE WERE PROGRAMS THAT TRIED TO MANAGE THE IPOD SONGS, I

25   BELIEVE.

1    **Q.**  AND LET'S JUST BRIEFLY REVISIT NUMBER 4, WHICH YOU DID

2    TALK ABOUT WITH PLAINTIFFS' COUNSEL.

3    **A.**  (READING)

4         "HARMONY WILL NOT LET YOU BURN AUTHORIZED ITMS

5         SONGS."

6    **Q.**  WHAT DOES THAT MEAN?

7    **A.**  IT MEANS THAT IN THE HARMONY APPLICATION, I THINK THAT

8    THEY DON'T LET YOU BURN SONGS FROM THE ITUNES MUSIC STORE.

9    **Q.**  MR. ROBBIN, HOW, IF AT ALL, DID THE HARMONY PROGRAM AFFECT

10   THE ITUNES/IPOD SYSTEM?

11   **A.**  I DIDN'T EVEN KNOW HOW MANY PEOPLE WOULD HAVE ACTUALLY

12   USED IT.  BUT IF YOU HAD USED IT, THEN THOSE PEOPLE WOULD HAVE

13   HAD POTENTIALLY UNEXPLAINED BEHAVIORS.  RIGHT?

14       YOU JUST DON'T KNOW WHAT WAS GOING TO HAPPEN BECAUSE I

15   DON'T KNOW HOW THEIR SYSTEM REVERSE ENGINEERED IT, TO WHAT

16   LEVEL OF QUALITY, OR WHAT BUGS THEY INTRODUCED.  WE JUST DON'T

17   KNOW.

18   **Q.**  AND YOU TESTIFIED EARLIER ABOUT INJECTION OF FOREIGN

19   MATERIAL.  DID HARMONY DO THAT?

20   **A.**  YES.

21   **Q.**  WHAT DID IT INJECT?

22   **A.**  I BELIEVE IT INJECTED SONGS INTO THE DATABASE.  IT

23   INJECTED KEYS INTO THE KEYBAG.

24   **Q.**  AND WHY, IF AT ALL, WAS THAT A CONCERN?

25   **A.**  BECAUSE THAT SHOWED THAT THE DRM HAD A SECURITY HOLE.  IT

1    SHOWED THAT THERE WAS A HACK MODIFYING IT, AND IT COULD PAVE

2    THE WAY FOR OTHER PEOPLE TO FIGURE OUT HOW THOSE THINGS

3    HAPPENED OR CAUSE OTHER PROBLEMS.

4    **Q.**  LET'S LOOK AT TRIAL EXHIBIT 2272.

5                    (EXHIBIT DISPLAYED TO JURY.)

6        AND THIS LOOKS LIKE AN EMAIL FROM STEVE GEDIKIAN TO CHRIS

7    BELL, YOU, DAVE HELLER, AND CC GRACE KVAMME.

8        WHAT WAS THE SUBJECT?

9    **A.**  "FYI:  WINAMP IPOD PLUG-IN PLUS HYMN".

10   **Q.**  WHAT IS THIS EMAIL TALKING ABOUT?

11   **A.**  STEVE GEDIKIAN, WHO USED TO WORK ON WINAMP, HAD GOTTEN A

12   CALL FROM HIS FORMER BOSS THAT THEY WERE GOING TO PULL A

13   POPULAR IPOD PLUG-IN FROM WINAMP.COM ON THEIR OWN, AND THEY

14   ARE PULLING IT BECAUSE THE PLUG-IN HAD ADDED SUPPORT FOR HYMN

15   TO REMOVE THE DRM.

16   **Q.**  ALL RIGHT.  LET'S LOOK AT 2449.

17                    (EXHIBIT DISPLAYED TO JURY.)

18   **A.**  I DON'T HAVE THAT ONE.

19   **Q.**  SO YOU'RE NOT COPIED ON THIS EMAIL.  SO THE ONLY QUESTION

20   I WILL ASK YOU IS WHETHER YOU RECOGNIZE THE SCREEN SHOT THAT'S

21   ON THE NEXT PAGE.

22   **A.**  THIS LOOKS LIKE THE SCREEN SHOT FOR REALPLAYER WHEN YOU

23   CONNECT AN IPOD TO IT.

24          **MS. DUNN:**  AND IF WE CAN BLOW UP JUST THE SCREEN

25   SHOT, WHICH IS REALLY SMALL.

1    **BY MS. DUNN:**

2    **Q.**   COULD YOU READ WHAT IT SAYS IN THIS DIALOGUE BOX?

3    **A.**   (READING)

4              "REALPLAYER IS NOT CURRENTLY THE DEFAULT APPLICATION

5              TO MANAGE YOUR IPOD.

6              AS YOUR DEFAULT APPLICATION, REALPLAYER CAN HELP

7              PREVENT CHANGES TO YOUR IPOD SOFTWARE THAT MIGHT

8              LIMIT YOUR ABILITY TO PLAY OR STORE REALMUSIC STORE

9              CONTENT ON YOUR IPOD.  IN ADDITION, CHOOSING

10             REALPLAYER AS YOUR DEFAULT WILL ALSO HELP PRESERVE

11             YOUR ABILITY TO USE YOUR MUSIC LIBRARY WITH OTHER

12             PORTABLE DEVICES THAT YOU MAY CHOOSE IN THE FUTURE.

13             WOULD YOU LIKE REALPLAYER TO BE THE DEFAULT

14             APPLICATION TO MANAGER YOUR IPOD?  RECOMMENDED."

15   **Q.**   WHAT WAS YOUR REACTION TO THIS?

16   **A.**   THEY ARE TRYING TO HIGHJACK THE IPOD.

17   **Q.**   WHY DO YOU SAY THAT?

18   **A.**   BY DEFAULT, WHEN YOU CONNECT AN IPOD TO A COMPUTER, ITUNES

19   AUTOMATICALLY LAUNCHES AND DOES ITS AUTOMATIC SYNCING.  THAT'S

20   THE BEHAVIOR THAT OUR ECOSYSTEM WAS TRYING FOR -- WAS INTENDED

21   WITH THE IPOD/ITUNES ECOSYSTEM.

22   **BY MS. DUNN:**

23   **Q.**   SO, WHEN REALPLAYER SAYS IT'S GOING TO BE THE DEFAULT

24   APPLICATION TO MANAGE YOUR IPOD, WHAT DOES THAT MEAN?

25   **A.**   IT MEANS THAT WHEN YOU CONNECT THE IPOD, IT WILL LAUNCH

1    REALPLAYER INSTEAD OF ITUNES.

2    **Q.**  AND FROM AN ENGINEERING PERSPECTIVE, WHAT, IF ANYTHING, IS

3    THE IMPORTANCE OF HAVING ITUNES BE THE MANAGEMENT SOFTWARE FOR

4    THE IPOD?

5    **A.**  WELL, BY HAVING ITUNES MANAGE THE IPOD, WHEN THERE'S A

6    FIRMWARE UPDATE OR SECURITY UPDATE, WE ARE GOING TO MAKE THAT

7    AVAILABLE THROUGH ITUNES.

8         WITH THIS, YOU WOULDN'T BE ABLE TO EVER UPDATE YOUR IPOD.

9    SO YOUR IPOD WOULD BE SORT OF FROZEN IN TIME.

10        IT ALSO MEANS THAT THE IPOD, AS IT WAS, WOULD CONTINUE TO

11   WORK WITH REAL, HOWEVER -- TO WHATEVER LEVEL IT HAD ALREADY

12   BEEN WORKING WITH REAL.  SO ONCE YOU DID THIS, IF YOU DID

13   THIS, THEN ITUNES WOULDN'T EVEN SEE THE IPOD ANYMORE, IT

14   WOULD, BY DEFAULT, GO TO REAL.

15   **Q.**  AND IF --

16        **THE COURT:**  GO AHEAD.

17   **BY MS. DUNN:**

18   **Q.**  AND IF A THIRD PARTY TAKES OVER FOR ITUNES AS THE

19   MANAGEMENT SOFTWARE, AS REAL RECOMMENDS HERE, WHAT DOES THAT

20   MEAN FOR THE CONSUMER?

21   **A.**  IT MEANS THAT -- THAT REAL IS GOING TO BE TAKING OVER THE

22   IPOD.  IT MEANS THAT THE IPOD IS STUCK IN TIME.  I MEAN --

23   **Q.**  WHAT DOES THAT MEAN "STUCK IN TIME"?

24   **A.**  IT'S NO LONGER GOING TO BE UPDATED.  IT'S GOING TO

25   CONTINUE TO WORK THE WAY IT WORKED AT THAT MOMENT.

1    Q.  LET'S GO TO 2258.

2           THE COURT:  LET'S GO AHEAD AND TAKE A BREAK.  THAT'S

3    WHY I WAS ALMOST GOING TO INTERRUPT WHEN I THOUGHT YOU HAD

4    FINISHED, BUT YOU HAD NOT QUITE.

5       LADIES AND GENTLEMEN, OUR SECOND BREAK FOR THE DAY, OUR

6    LAST BREAK FOR THE WEEK. ENJOY YOUR 15 MINUTES.  WE WILL SEE

7    YOU BACK HERE PROMPTLY AT NOON.  THANK YOU.

8          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

9           THE COURT:  OKAY.  THE RECORD WILL REFLECT THAT THE

10   JURY IS OUT.

11      SAME WITH EVERYBODY ELSE, SECOND BREAK FOR THE DAY.

12           MS. DUNN:  THANK YOU.

13           MR. ISAACSON:  THANK YOU, YOUR HONOR.

14           THE COURT:  PERHAPS NOT THE LAST BREAK FOR THE WEEK.

15   WE WILL SEE.  SEE YOU IN 15 MINUTES.

16          (RECESS TAKEN AT 11:45 A.M.; RESUMED AT     .M.)

17           THE COURT:  OKAY.  LET'S BRING IN THE JURY.

18           THE CLERK:  PLEASE BE SEATED.  COURT IS IN SESSION.

19   COME TO ORDER.

20          (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

21           THE COURT:  OKAY.  WE ARE BACK ON THE RECORD.

22   EVERYONE CAN BE SEATED.  THE RECORD WILL REFLECT THAT THE JURY

23   IS BACK.

24      YOU MAY CONTINUE.

25           MS. DUNN:  THANK YOU, YOUR HONOR.

1    **BY MS. DUNN:**

2    **Q.**  SO THE FIRST THING I WOULD LIKE TO DO IS RETURN TO

3    EXHIBIT 128.

4        DURING THE BREAK MY COLLEAGUES INFORMED ME THAT THERE IS

5    SOMETHING HERE THAT NONE OF THEM UNDERSTOOD.  SO, IN CASE THAT

6    ALSO PERTAINS TO THE JURORS, LET'S JUST REVISIT NUMBER 10.

7        SO, MR. ROBBIN, THIS IS IN THAT SAME EMAIL FROM DAVE

8    HELLER TO YOU ABOUT HARMONY.  CAN YOU EXPLAIN NUMBER 10 AGAIN?

9    **A.**  IT SAYS:

10            "THE SIMPLE CHECKSUM I ADDED TO THE IPOD DB HEADER IN

11            ITUNES 3.0 DOESN'T VERIFY.  THIS IS SOMEWHAT EXPECTED

12            AS NEITHER EPHPOD OR XPLAY DO THIS RIGHT EITHER AND

13            I'VE NEVER SEEN THIS MENTIONED PUBLICLY BEFORE."

14   **Q.**  DOES THIS HAVE -- THIS SAYS "DB".  DOES THIS HAVE TO DO

15   ABOUT THE DATABASE?

16   **A.**  YES.  IT HAS TO DO WITH THE IPOD DATABASE.

17   **Q.**  WHAT IS IT SAYING ABOUT THE DATABASE?

18   **A.**  IT'S SAYING THAT WE CAN TELL THAT THE IPOD DATABASE HAS

19   BEEN MODIFIED OR CORRUPTED IF THE CHECKSUM DOESN'T MATCH WHAT

20   WE EXPECT IT TO BE.

21   **Q.**  AND WHAT DOES THAT MEAN?

22   **A.**  THERE'S A FIELD IN THE HEADER OF THE IPOD DATA

23   STRUCTURE -- LET ME THINK ABOUT HOW TO MAKE THIS EASIER.

24       IT'S BASICALLY THAT NUMBER THAT I TALKED ABOUT WHEN YOU

25   ARE ADDING UP ALL THE BYTES IN A FILE AND SAYING THIS IS WHAT

ROBBIN – CROSS / DUNN

1    THAT NUMBER IS, WHICH IS GOING TO BE GENERALLY UNIQUE IN EVERY

2    FILE.

3        THAT NUMBER WE THEN PUT AT THE BEGINNING OF THE FILE SO

4    THAT WE CAN KNOW THAT THE FILE IS THE WAY IT WAS WRITTEN.

5    IT'S NOT A SECURITY THING OR ANYTHING LIKE THAT, BUT YOU CAN

6    THEN TELL WHETHER OR NOT ANY OF THE BYTES IN THE FILE HAVE

7    BEEN CHANGED, BUT YOU CAN'T TELL WHICH BYTES HAVE BEEN

8    CHANGED.  YOU JUST KNOW THAT SOMETHING WAS NOT WHAT YOU

9    EXPECTED.

10       AND IT COULD HAVE BEEN FROM CORRUPTION OR IT COULD HAVE

11   BEEN FROM SOMEBODY INSERTING SOMETHING.  BUT IT'S JUST

12   DIFFERENT THAN HOW WE WROTE IT OUT IN THE FIRST PLACE.

13       WHAT THIS IS SAYING IS THAT THAT NUMBER DOESN'T VERIFY

14   BECAUSE NOBODY FIGURED OUT WHAT THAT NUMBER WAS SUPPOSED TO

15   BE.

16   **Q.**  AND WHAT'S THE EFFECT OF THAT, IF YOU KNOW?

17   **A.**  IN THIS PARTICULAR CASE, IT DOESN'T HAVE A REAL EFFECT.

18   IT'S JUST SOMETHING THAT WE DID SO THAT WE COULD, WHEN WE WERE

19   DEBUGGING, FIGURE OUT THAT IT HAD BEEN VERIFIED.

20   **Q.**  OKAY.  AND IF IT DOESN'T VERIFY, WHAT'S THE EFFECT OF

21   THAT, IF YOU KNOW?

22   **A.**  I DON'T THINK THERE'S ANY EFFECT.

23   **Q.**  OKAY.

24       AND THEN LET'S LOOK AT "THERE IS NO TUPLE IN THE FILE."

25   WHAT IS A TUPLE?

1042

1    **A.**  WHEN WE DID FAIRPLAY, WE WANTED TO BE ABLE TO UPDATE THE

2    IPOD, ITUNES, AND QUICKTIME INDEPENDENTLY WITH DIFFERENT

3    VERSIONS OF THE DRM.

4        AND SO, INSIDE EVERY SONG THAT YOU BUY, THERE'S THREE

5    NUMBERS, WHICH WE CALLED THE TUPLE, WHICH IS THE VERSION

6    NUMBER, THAT IS THE MINIMUM REQUIREMENT IN ORDER FOR THE SONG

7    TO PLAY IN THE DRM FOR ITUNES, FOR QUICKTIME, AND FOR THE

8    IPOD.  AND SO THAT'S WHAT THOSE THREE NUMBERS ARE.

9        AND WE DIDN'T HAVE THAT IN THE VERY FIRST VERSION OF

10   FAIRPLAY.  WE ADDED THAT AT SOME POINT.  SO IN THE VERY

11   BEGINNING, ALL THOSE NUMBERS WERE ZERO, AND THEY LOOK LIKE

12   THEY'RE JUST NOT SET.

13       AND THIS IS SAYING THAT THEY ARE NOT BEING SET BY HARMONY.

14   **Q.**  WHAT HAPPENS IF THERE IS NO TUPLE IN THE FILE?

15   **A.**  IT MEANS THAT IT HAS -- IT MEANS IT WILL ONLY WORK IN A

16   DEVICE THAT SUPPORTS THE VERSION OF FAIRPLAY THAT DOESN'T HAVE

17   ANY OF THAT INFORMATION.

18   **Q.**  WHAT DOES THAT MEAN?

19   **A.**  HOW TO EXPLAIN THIS.

20       IF THERE IS NO TUPLE IN THE FILE AT ALL, IT MAKES THESE

21   SONGS LOOK LIKE FAIRPLAY VIEW 1, I GUESS IS THE CLEANEST WAY

22   TO SAY IT.

23   **Q.**  THEN DOES THAT PLAY WITH LATER FAIRPLAY VIEWS?

24   **A.**  YES, IT WOULD, IF WE SUPPORTED -- YOU KNOW, WE SUPPORTED

25   THE OLDER SONGS ON NEWER DEVICES.  SO WE STILL SUPPORTED OLDER

1    SONGS.  WHAT IT MEANT WAS THAT NEWER SONGS THAT HAD THAT

2    INFORMATION MIGHT NOT PLAY.

3    **Q.**  OKAY.

4        SO, LOOKING AT THAT CHART, HARMONY LAUNCHED IN APRIL 26,

5    2005.  WHEN DID YOU LAUNCH ITUNES 7.0?

6    **A.**  SEPTEMBER 12TH, 2006.

7    **Q.**  SO THAT'S 18 MONTHS AFTER REAL'S ANNOUNCEMENT?

8    **A.**  YES.

9    **Q.**  AND DID YOU SPECIFICALLY DO ANYTHING IN RESPONSE TO REAL'S

10   APRIL 26TH, 2005 ANNOUNCEMENT?

11   **A.**  NO.

12   **Q.**  IF YOUR PRIMARY GOAL WAS TO BLOCK HARMONY, HOW LONG WOULD

13   IT HAVE TAKEN?

14   **A.**  WE COULD HAVE DONE THAT IN DAYS IF WE WANTED TO.

15   **Q.**  AND SIMPLY PUT, WHY DID ITUNES 7.0 MEAN THAT HARMONY

16   DIDN'T WORK?

17   **A.**  BECAUSE WHEN WE EVOLVED THE DRM AND ADDED THE SECURITY

18   SOLUTION THAT WE HAD ON ITUNES 6 ON THE DESKTOP ONTO IPODS AT

19   THE TIME WE DID ITUNES 7, THEN THAT CAUSED THEM TO NOT WORK.

20   **Q.**  WOULD THAT HAVE BEEN TRUE OF ANY THIRD PARTY THAT WAS

21   USING A PREVIOUS VERSION OF ITUNES?

22   **A.**  YES.

23   **Q.**  AND HOW, IF AT ALL, COULD YOU HAVE AVOIDED MAKING IT SO

24   HARMONY DIDN'T WORK?

25   **A.**  WE COULDN'T HAVE.

1   **Q.** WHY?

2   **A.** BECAUSE ANY CHANGE WE MADE TO THE DRM WAS GOING TO BREAK

3   THEM.  TO MAKE THE DRM MORE SECURE, THERE'S NO WAY IT WAS

4   GOING TO KEEP WORKING.

5   **Q.** PLAINTIFFS' COUNSEL HAS SPOKEN ABOUT, IN THIS TRIAL, ABOUT

6   BLOWING UP THE DATABASE.  CAN YOU EXPLAIN TO THE JURY

7   PRECISELY WHAT HAPPENS TO THE DATABASE IF THE DATABASE

8   INTEGRITY CHECK DOES NOT VERIFY?

9   **A.** NOTHING HAPPENS TO THE DATABASE.  THE DATABASE JUST FAILS

10  TO LOAD ON THE IPOD.

11  **Q.** WHAT HAPPENS TO THE CONTENT?

12  **A.** IT'S LEFT ALONE.

13  **Q.** SO JUST WALK THE JURY THROUGH THE STEPS.

14  **A.** SO, IF YOU WERE TO MODIFY THE DATABASE, THEN WHEN YOU TRY

15  TO -- WHEN YOU TRY TO USE THE IPOD AFTER HAVING DONE THAT

16  MODIFICATION, IT'S GOING TO NOT LOAD THE DATABASE.

17      BUT ALL THE CONTENTS ON THE DRIVE ARE IDENTICAL.  WE

18  HAVEN'T TOUCHED ANYTHING.  IT'S JUST THAT THE FIRMWARE OF THE

19  IPOD SAYS, I DON'T UNDERSTAND THIS FILE, I DON'T KNOW WHAT TO

20  DO, AND IT PUTS UP THE MESSAGE THAT SAYS CONNECT TO ITUNES,

21  ITUNES WILL FIX ANYTHING.  AND SO THAT'S WHAT HAPPENS.

22  **Q.** AND WHAT HAPPENS IF YOU WROTE A NOVEL, AND FOR SOME REASON

23  PUT IT ON YOUR IPOD?

24  **A.** IT WOULD STILL BE ON THE IPOD.

25  **Q.** OKAY.

1    SO, THEN WE'VE TALKED ABOUT THE USER GETS THE SCREEN

2  THAT -- SOME SORT OF MESSAGE TALKING ABOUT RESTORING; IS THAT

3  RIGHT?

4  **A.**  THAT'S IN ITUNES WHEN YOU CONNECT THE IPOD THAT'S IN THAT

5  STATE.

6  **Q.**  OKAY.  AND WHAT HAPPENS THEN?

7  **A.**  WE WILL OFFER TO REPAIR YOUR IPOD AND TO RESTORE IT TO

8  FACTORY DEFAULTS.  AND IT'S GOING TO WARN THE USER THAT

9  ANYTHING THAT'S ON THE IPOD IS GOING TO BE ERASED.

10  **Q.**  IS THERE ANOTHER STEP BEYOND THAT SCREEN THAT MR. COUGHLIN

11  SHOWED YOU?

12  **A.**  YEAH.  OF COURSE.

13  **Q.**  WHAT IS IT?

14  **A.**  AFTER IT DOES THE RESTORE, IT'S GOING TO GO AHEAD AND

15  CONFIRM.  AND AFTER YOU CONFIRM, THEN IT'S GOING TO GO AHEAD

16  AND ERASE THE IPOD.  THEN IT'S GOING TO LOOK LIKE A NEW IPOD.

17    AND WHEN THAT COMES UP, IT'S GOING TO OFFER TO RESTORE A

18  BACKUP, IF YOU HAD A BACKUP FROM THE LAST TIME YOU CONNECTED

19  YOUR IPOD.

20    IF YOU CHOOSE NOT TO DO THAT EVEN, THEN IT'S GOING TO GO

21  AHEAD AND TAKE YOU THROUGH THE OUT-OF-BOX EXPERIENCE FOR A

22  BRAND NEW IPOD, WHICH WILL, BY DEFAULT, PUT ALL OF YOUR MUSIC

23  FROM YOUR ITUNES LIBRARY ONTO THE IPOD.

24  **Q.**  AND SO IS THERE A SECOND DIALOGUE BOX AFTER THE ONE

25  MR. COUGHLIN SHOWED YOU WHICH ASKS THE CONSUMER WHETHER OR NOT

1    THEY WANT TO DO THIS?

2    **A.**   YEAH.   IT'S A CONFIRMATION DIALOGUE, WE CALL IT.

3    **Q.**   OKAY.   DOES THAT MEAN IT'S THE CONSUMER'S CHOICE TO DO IT?

4    **A.**   ABSOLUTELY.

5    **Q.**   OKAY.   LET'S LOOK AT EXHIBIT 2505.

6                      (EXHIBIT DISPLAYED TO JURY.)

7         SO THIS IS AN EMAIL FROM CHRIS BELL ABOUT AMAZON.   I THINK

8    YOU'VE SEEN THIS EMAIL WHEN MR. COUGHLIN SHOWED IT TO YOU.

9         SO IF YOU LOOK AT THE SECOND PARAGRAPH FROM THE BOTTOM ON

10   PAGE 1, WHAT DOES THAT SAY?

11   **A.**   IT SAYS:

12              "AMAZON MP3 IS WEB-BASED AND OFFERS A LIGHTWEIGHT

13              DOWNLOAD MANAGER APPLICATION THAT ROUTES PURCHASES

14              DIRECTLY TO THE ITUNES LIBRARY OR WINDOWS MEDIA

15              PLAYER.   AMAZON CLEARLY HIGHLIGHTS THE FACT THAT

16              THEIR DOWNLOADS ARE DRM FREE AND WORK WITH IPOD,

17              ITUNES, AND VIRTUALLY ALL OTHER DIGITAL MUSIC

18              HARDWARE AND SOFTWARE AVAILABLE TODAY."

19   **Q.**   AND I THINK YOU TESTIFIED EARLIER THAT AMAZON WAS A

20   CONSIDERABLE COMPETITOR TO APPLE; IS THAT TRUE?

21   **A.**   YES.

22   **Q.**   AND COULD AMAZON MUSIC BE SYNCED FROM ITUNES ONTO THE

23   IPOD?

24   **A.**   YES.

25   **Q.**   SO PEOPLE COULD PLAY AMAZON MUSIC ON AN IPOD?

ROBBIN – CROSS / DUNN

1    **A.**  YES.

2    **Q.**  LET'S TURN TO PAGE 8.

3        SO THIS IS A SCREEN SHOT FROM AMAZON.

4        AND WHAT ARE YOU SEEING HERE?  IF YOU CAN EXPLAIN.

5    **A.**  THIS IS A SCREEN SHOT OF THE MP3 DOWNLOADS TAB THAT SHOWS

6    AN IPOD AT THE FRONT OF A LONG LIST OF DEVICES THAT WORK WITH

7    AMAZON MP3.

8    **Q.**  AND RIGHT NEXT DOOR IT SAYS, "AMAZON MP3".  IS THAT A

9    PICTURE OF AN IPOD?

10   **A.**  IT IS.

11   **Q.**  AND THEN OVER THERE ON THE RIGHT, WHAT DOES IT SAY?

12   **A.**  "ALL SONGS COMPATIBLE WITH ITUNES AND WINDOWS MEDIA

13   PLAYER".

14   **Q.**  ITUNES IS APPLE'S ITUNES, RIGHT?

15   **A.**  YES.

16   **Q.**  LET'S TURN TO PAGE 10.

17       IF YOU CAN EXPLAIN TO THE JURY WHAT WE ARE SEEING HERE.

18   **A.**  THIS IS A WINDOWS SCREEN SHOT OF THE AMAZON MP3 DOWNLOADED

19   APP WHICH SHOWS THE AMY WINEHOUSE BACK TO BLACK ALBUM,

20   EXPLICIT VERSION, HAVING BEEN PURCHASED AND DOWNLOADED.  AND

21   THE DOWNLOADER HAS DOWNLOADED FOUR SONGS, WHICH YOU CAN SEE IN

22   THE BACKGROUND HAVE BEEN AUTOMATICALLY ADDED TO THE ITUNES

23   PLAYER.

24       I'M SURE THAT THEY DID THAT USING THE PROGRAMMING

25   INTERFACES THAT WE GAVE APPLICATIONS ON MAC AND WINDOWS FOR

ROBBIN — CROSS / DUNN

1    THIRD-PARTY APPS TO MANIPULATE THE ITUNES DATABASE.

2    **Q.**   AND HOW DOES THIS WORK?

3    **A.**   YOU CAN BUY AN ALBUM ON AMAZON'S WEBSITE, AND THEN THEY

4    AUTOMATICALLY TRIGGER A DOWNLOAD USING THEIR DOWNLOADER APP TO

5    PUT IT INTO ITUNES.  AND THEN THAT'S GOING TO AUTOMATICALLY

6    SYNC TO YOUR IPOD WHEN YOU CONNECT YOUR IPOD.

7    **Q.**   LET'S TURN TO PAGE 12.

8         AND IF YOU CAN JUST READ TO THE JURY WHAT THIS SAYS.

9         AND WE ARE GOING TO NOT PLAY BACK TO BLACK, THE EXPLICIT

10   VERSION, BY AMY WINEHOUSE.

11   **A.**   WHAT DID YOU ASK?

12   **Q.**   READ TO THE JURY WHAT IT SAYS IN THAT SCREEN SHOT RIGHT

13   UNDER WHERE IT SAYS "THANKS STEVE GEDIKIAN".

14   **A.**   (READING)

15              "YOU HAVE PURCHASED THE ALBUM BLACK TO BLACK

16              (EXPLICIT) BY AMY WINEHOUSE.  THE AMAZON MP3

17              DOWNLOADER WILL DOWNLOAD YOUR PURCHASE MOMENTARILY.

18              IF YOU ARE PROMPTED TO OPEN OR SAVE A .AMZ FILE, BE

19              SURE TO CLICK OPEN.

20              THE AMAZON MP3 DOWNLOADER WILL ADD YOUR DOWNLOADS TO

21              ITUNES OR WINDOWS MEDIA PLAYER.  ONCE YOUR DOWNLOAD

22              IS COMPLETE, GO TO YOUR ITUNES OR WINDOWS MEDIA

23              PLAYER LIBRARY TO FIND AND PLAY YOUR AMAZON MP3'S."

24   **Q.**   DID APPLE EVER DO ANYTHING TO STOP AMAZON MUSIC FROM BEING

25   PLAYED ON AN IPOD?

1    **A.**  OF COURSE NOT.

2    **Q.**  DID ANYONE EVER TELL YOU TO STOP IT FROM HAPPENING?

3    **A.**  NO.

4    **Q.**  DID YOU EVER TELL ANYONE TO TOP IT FROM HAPPENING?

5    **A.**  NO.

6    **Q.**  DID THE INTEGRITY CHECKS THAT WE TALKED ABOUT STOP IT FROM

7    HAPPENING?

8    **A.**  NO.

9    **Q.**  ANYTHING IN ITUNES 7.0 OR 7.4 STOP IT FROM HAPPENING?

10   **A.**  NO.

11   **Q.**  WHY NOT?

12   **A.**  WE DIDN'T HAVE A PROBLEM WITH IT.  IT'S FINE THAT IT

13   WORKS.  WE THINK IT'S GREAT.

14   **Q.**  WHAT IS THE DIFFERENCE BETWEEN WHAT AMAZON WAS DOING AND

15   WHAT WE'VE TALKED ABOUT, REALNETWORKS, HARMONY, OR OTHER THIRD

16   PARTY?

17   **A.**  THEY DIDN'T HACK THE DRM.  THEY WERE JUST USING THE

18   ITUNES/IPOD EXPERIENCE THE WAY WE WANTED.  I MEAN, WE WANTED

19   THAT END TO END GREAT EXPERIENCE FOR OUR CUSTOMERS, AND THIS

20   WORKED JUST FINE WITH ITUNES.

21   **Q.**  SO NO CORRUPTION FROM WHAT AMAZON WAS DOING?

22   **A.**  NO CORRUPTION, NO UNINTENDED CONSEQUENCES, NO WEIRD

23   BEHAVIORS, NO APPLECARE SUPPORT CALLS.  WE'RE FINE.

24   **Q.**  THANK YOU.

25          **MS. DUNN:**  YOUR HONOR, LET ME JUST MAKE SURE -- I

1    PASS THE WITNESS.  THANK YOU.

2           **THE COURT:**  ANY QUESTIONS THUS FAR FROM THE JURY?

3           **MR. COUGHLIN:**  JUST BRIEFLY, YOUR HONOR.

4           **THE COURT:**  NO JUROR QUESTIONS?

5      OKAY.  MR. COUGHLIN.

6                   **REDIRECT EXAMINATION**

7    **BY MR. COUGHLIN:**

8    **Q.**  MR. ROBBIN, YOU TALKED ABOUT CONSUMER CHOICE.  YOU SAID

9    THAT THE CONSUMER HAS A CHOICE TO EITHER HAVE EVERYTHING

10   ERASED OR NOT.

11     IS THAT WHAT YOU SAID?

12   **A.**  I SAID THAT WHEN YOU CONNECT AN IPOD THAT'S HAD CORRUPTION

13   OR DRM COMPROMISED, OR WHATEVER, THAT THEN THE USER HAS THE

14   OPTION TO CLICK TO RESTORE OR NOT.

15   **Q.**  THERE'S NO OTHER OPTION.  YOU CAN'T PLAY ANY MUSIC ONCE IT

16   DETECTS THE QUOTE "TOUCH" FROM A THIRD-PARTY PLAYER, RIGHT?

17   **A.**  WELL, YOU CAN RECOVER ANY OF THE DATA THAT WAS ON THE

18   DEVICE THAT YOU WANTED TO RECOVER, AND THEN YOU WOULD HAVE TO

19   RESTORE IT WITH ITUNES TO GET IT BACK TO WORKING BEHAVIOR.

20   **Q.**  IF YOU DON'T RESTORE -- IF YOU DON'T TAKE ALL YOUR FILES

21   OFF AND PUT THEM ON YOUR COMPUTER, IF YOU HAD A DIFFERENT

22   COMPUTER OR SOMETHING, IF YOU DON'T DO THAT, ALL OF THOSE

23   FILES ARE DELETED, RIGHT, WHEN YOU RESTORE?

24           **MS. DUNN:**  OBJECTION, YOUR HONOR, COMPOUND.

25           **THE COURT:**  OVERRULED.

1          **THE WITNESS:**  I AM SORRY, CAN YOU REPEAT THE

2     QUESTION?

3     **BY MR. COUGHLIN:**

4     **Q.**  ALL OF THOSE FILES ARE DELETED THAT WERE ON YOUR IPOD,

5     RIGHT?

6     **A.**  WHEN YOU RESTORE AN IPOD, ANYTHING THAT'S ON IT AFTER

7     YOU'VE CONFIRMED IS DELETED.

8     **Q.**  ANYTHING EXCEPT ITUNES MUSIC IS DELETED, RIGHT?

9     **A.**  WELL, ANYTHING THAT WASN'T ALREADY BACKED UP IN YOUR

10    BACKUP IN ITUNES THAT CAN THEN BE RESTORED IS REMOVED WHEN YOU

11    ERASE THE IPOD.

12    **Q.**  IT'S DELETED, RIGHT?

13    **A.**  IT'S REMOVED -- I THINK I --

14    **Q.**  HOW DO YOU SAY "REMOVED"?  WHAT'S THE DIFFERENCE BETWEEN

15    YOUR MIND (SIC) REMOVED AND DELETED?

16    **A.**  THE DIFFERENCE IS THAT WHEN WE DO IT WE BASICALLY RESTORE

17    THE DEVICE BACK TO FACTORY SETTINGS, AND IT BASICALLY LAYS

18    DOWN AN ENTIRE DISK IMAGE OVER THE WHOLE IPOD.

19         SO, THE EFFECT MIGHT BE THE SAME, AND THAT'S FINE.  BUT AT

20    THE END OF THE DAY, YOU CAN GET YOUR STUFF OFF FIRST.  AND

21    THEN AFTER YOU'VE DONE THAT, YOU CAN RESTORE YOUR IPOD, AND

22    THEN IT WORKS JUST LIKE IT DID WHEN YOU FIRST BOUGHT IT.

23    **Q.**  AND THERE'S NO GHOST FILES ON THERE OR ANYTHING; NOTHING

24    IS LEFT, RIGHT?

25    **A.**  NO.

1    **Q.**  NOW, WHEN APPLE FIRST LEARNED AMAZON STORE WAS COMING OUT,

2    AND WE LOOKED AT SOME OF THOSE EARLY ANNOUNCEMENTS IN

3    FEBRUARY, YOU DIDN'T KNOW WHETHER THEY WOULD HAVE A DOWNLOAD

4    MANAGER OR NOT; IS THAT CORRECT?

5    **A.**  NO.

6    **Q.**  OKAY.

7        AND WHAT THE DATABASE VERIFICATION DOES, IS IT PREVENTS

8    LET'S SAY THOSE 16 THIRD PLAYER -- THIRD-PARTY PLAYERS THAT WE

9    SAW, IT PREVENTS THOSE FROM PLAYING ANY OF THE AMAZON SONGS ON

10   THE IPOD, RIGHT?

11   **A.**  WELL, THOSE DON'T PLAY SONGS ON IPOD ANYWAY.  SO IF YOU'RE

12   GOING TO DOWNLOAD IT FROM AMAZON, I DON'T KNOW SEE WHY A

13   CUSTOMER WOULDN'T JUST USE THE ITUNES THAT THEY BOUGHT WITH

14   THEIR IPOD, I MEAN, TO DO THAT.

15       SO, IF YOU DIDN'T HAVE AN MP3 DOWNLOADER FROM AMAZON, THEN

16   WHAT USED TO HAPPEN IS PEOPLE WOULD DOWNLOAD THE MP3 FILES,

17   JUST LIKE THEY DID WHEN THEY WERE STEALING THEM FROM THE

18   INTERNET, AND YOU CAN JUST DRAG THOSE INTO ITUNES, AND THEN

19   SYNC ONTO YOUR IPOD AND PLAY.

20   **Q.**  OR YOU COULD USE A THIRD-PARTY PLAYER THAT HAD BEEN

21   WORKING ON YOUR IPOD FOR FIVE, SIX YEARS, AND YOU COULD BUY

22   SONGS FROM AMAZON AND USE THE THIRD-PARTY PLAYER TO ORGANIZE

23   THEM ON THE IPOD PRIOR TO THE DATABASE VERIFICATION BLOWING UP

24   THE IPOD.

25            **MS. DUNN:**  OBJECTION, COMPOUND.

1          **THE COURT:**  OVERRULED.

2          **THE WITNESS:**  WELL, THE DATABASE VERIFICATION DIDN'T

3    BLOW UP IPODS.

4        SO -- BUT IT'S TRUE THAT AFTER THE DATABASE VERIFICATION

5    WAS ENACTED, THAT THE THIRD-PARTY PLAYERS COULD NO LONGER

6    MANIPULATE THOSE DATABASES.

7    **BY MR. COUGHLIN:**

8    **Q.**  YOU TALKED ABOUT HYMN, JHYMN, PYMUSIQUE, MYTUNES, AND YOU

9    TALKED ABOUT PROBABLY ABOUT FIVE OR SIX OTHERS THAT THE RECORD

10   LABELS OR THE MUSIC LABELS ASKED YOU TO PLUG THE HOLES AND

11   STOP THEM; IS THAT RIGHT?

12   **A.**  THEY ASKED ME TO PLUG THE HOLES OF ANYTHING THAT HACKED

13   THE DRM.

14   **Q.**  THEY DIDN'T ASK YOU TO PLUG THE HOLES OF NAVIO OR

15   REALNETWORKS, RIGHT?

16   **A.**  I DON'T EVEN KNOW IF NAVIO EVER SHIPPED.  SO WHY WOULD

17   THEY ASK ME TO PLUG A HOLE IF IT'S JUST A MYTHICAL THING THAT

18   WASN'T BEING DONE.  AND THEN --

19   **Q.**  WELL, YOU ARE ON A NUMBER OF EMAILS, YOU KNOW, WATCHING

20   NAVIO TO SEE WHEN IT SHIPS, TO SEE IF IT'S ACTIVATED.  YOU

21   KNOW, YOU TALKED ABOUT IT.  WE LOOKED AT THOSE EARLIER.

22       YOU ARE MONITORING WHAT NAVIO IS DOING.

23   **A.**  WE'RE MONITORING A RUMOR ABOUT NAVIO THAT WAS IN A PRESS

24   ARTICLE.  WE NEVER ACTUALLY SAW ANY NAVIO SOFTWARE.

25   **Q.**  BUT YOU KNEW EXACTLY WHAT REAL DID, RIGHT?

1    **A.**  WE KNEW WHAT WE COULD OBSERVE REAL TO DO AND WE LOOKED AT
2    WHAT REAL DID WHEN WE RAN IT.
3    **Q.**  AND YOU KNEW THE RECORD LABELS ASKED YOU NOT TO DISABLE IT
4    AND ACTUALLY LICENSE YOUR DRM, RIGHT?
5    **A.**  NO.
6    **Q.**  YOU DIDN'T KNOW THAT?
7    **A.**  NO.
8    **Q.**  I THOUGHT WE LOOKED AT AN EMAIL THAT YOU'RE COPIED ON
9    WHERE EDDY CUE TOLD YOU THAT.
10   **A.**  EDDY CUE TOLD ME WHAT HIS CONVERSATIONS WITH THE RECORD
11   LABELS WERE.  SO I KNEW THAT THE LABELS WANTED
12   INTEROPERABILITY.
13       MY CONVERSATIONS WITH THE TECHNICAL PEOPLE AT THE LABELS
14   WERE, WHEN ARE YOU GOING TO FIX YOUR DRM?  SO WE HAD TO FIX
15   THE DRM, AND THE SIDE EFFECT OF FIXING THE DRM WAS GOING TO
16   MEAN THAT HARMONY WAS GOING TO NOT WORK.
17   **Q.**  STOP FOR A SECOND.
18       YOU SAID YOU DIDN'T KNOW THAT THE RECORD LABELS WANTED YOU
19   TO ALLOW REAL TO CONTINUE ON; IS THAT RIGHT?
20   **A.**  I DID NOT HAVE CONVERSATIONS WITH THE RECORD LABELS ABOUT
21   HAVING HARMONY CONTINUE TO WORK.  I HAD CONVERSATIONS WITH THE
22   RECORD LABELS ABOUT THE DRM NOT WORKING.
23   **Q.**  DID YOU BELIEVE THAT EDDY CUE WAS GIVING YOU BAD
24   INFORMATION WHEN HE TOLD YOU THAT?  HE HAD TALKED TO THE
25   RECORD LABELS AND THEY TOLD HIM THAT; DID YOU THINK IT WAS

1    INACCURATE?

2    **A.**   NO.   I JUST THINK THAT THE INFORMATION THAT THEY WERE

3    GIVING ME FROM THAT WAS IN CONFLICT WITH WHAT THEY WERE ALSO

4    ASKING ME TO DO WITH THE DRM.

5    **Q.**   DID YOU TELL EDDY CUE THAT?   AND YOU DIDN'T RESPOND TO

6    THAT, THAT IT SEEMED TO BE IN CONFLICT.

7        NO, YOU DIDN'T RESPOND.

8    **A.**   I DID NOT RESPOND TO THAT EMAIL.   I'M SURE I HAD OTHER

9    CONVERSATIONS WITH EDDY ABOUT THE DRM ALL THE TIME.

10   **Q.**   YOU COULDN'T REMEMBER ANY OF THE CONVERSATIONS WHEN WE

11   TALKED THIS MORNING ABOUT THAT -- THOSE CONVERSATIONS ABOUT

12   CORRUPTION.

13       AFTER 4.7 CAME OUT, DID ANYBODY EVER STRIP DRM OFF OF

14   SOMETHING FROM THE IPOD?

15   **A.**   I DON'T THINK SO.   I'M NOT SURE.

16   **Q.**   LET ME HAND YOU WHAT HAS BEEN MARKED AS EXHIBIT 172.

17          **MR. COUGHLIN:**   AND WE CAN PULL THAT UP ON THE

18   MONITOR.   I BELIEVE THAT'S STIPULATED TO ADMIT.

19   **BY MR. COUGHLIN:**

20   **Q.**   CAN YOU TELL US WHAT THAT IS?

21              (EXHIBIT DISPLAYED TO JURY.)

22   **A.**   IT IS AN EMAIL FROM JENNIFER CAVALIERE TO MYSELF AND DAVE

23   HELLER, TITLED "FORWARD STOP RE HOT COMPLETE FEATURE LIST 4.2

24   TO 4.7."

25       AND IT'S A FORWARD OF A MESSAGE FROM CHRIS BELL TO GRACE

1    KVAMME CC'G LIZ EINBINDER, JEN CAVALIERE WITH THE SAME

2    SUBJECT.

3    **Q.**   AND HERE IT SAYS:

4        "EDDY WANTS ANY REQUESTS" --

5            **MR. COUGHLIN:**   IF WE CAN HIGHLIGHT THAT.

6    **BY MR. COUGHLIN:**

7    **Q.**   (READING)

8            "EDDY WANTS ANY REQUEST TO DISCUSS DISABLED FEATURES,

9            HOLES PLUGGED, ET CETERA"... "NO INFORMATION TO BE

10           GATHERED ON THIS TOPIC."

11   DO YOU KNOW WHAT THAT MEANS?

12   **A.**   ONE SECOND PLEASE.

13       SO THIS IS AN EMAIL ABOUT AN INTERVIEW WITH A REPORTER WHO

14   IS ASKING ABOUT WHAT WE HAVE CHANGED IN THE PRODUCT.

15       SO I THINK THIS IS JUST EDDY SAYING WE DON'T WANT TO BE

16   TALKING ABOUT CHANGES THAT WE'VE MADE TO THE SECURITY AS PART

17   OF THAT INTERVIEW.  SO THAT'S WHY THIS HAS BEEN SENT.

18   **Q.**   WHY DOES HE SAY "NO INFORMATION TO BE GATHERED."  WHY

19   DIDN'T HE JUST SAY, DON'T TALK ABOUT THIS TOPIC?

20   **A.**   I THINK IT'S ANOTHER WAY OF SAYING THAT HE DOESN'T WANT

21   THIS BROUGHT AS PART OF THIS.

22   **Q.**   THOSE TWO THINGS ARE THE SAME?  DON'T GATHER ANY

23   INFORMATION ON THIS TOPIC AND DON'T TALK ABOUT THIS?

24   **A.**   HE DIDN'T WRITE THAT.  CHRIS BELL WROTE THAT.  I DON'T

25   KNOW WHAT HE MEANT.

1    **Q.**  FINALLY, YOU SAID THAT THE -- WHEN SOMEBODY HAD USED A

2    THIRD-PARTY PLAYER, THAT THEIR IPOD WAS HIJACKED.

3         HIJACKED FROM WHO?

4    **A.**  WHAT I SAID WAS, WHEN YOU CONNECT AN IPOD AND REAL OFFERS

5    TO CHANGE WHAT DEFAULT APPLICATION IS GOING TO BE LAUNCHED

6    WHEN YOU CONNECT AN IPOD, THAT THAT IS -- WE CALL IT

7    HIJACKING, WHERE BASICALLY YOU ARE CHANGING THE FACT THAT THE

8    DEFAULT IS TO RUN ITUNES TO MAKE IT RUN REAL INSTEAD.

9    **Q.**  RIGHT.  A CONSUMER WHO OWNS THE IPOD HAS CHOSEN TO HIJACK

10   THEIR OWN IPOD?

11   **A.**  AND THEY CAN.  THAT'S JUST WHAT WE CALLED IT.

12   **Q.**  OKAY.  BECAUSE YOU STILL THOUGHT IT WAS YOUR IPOD, RIGHT?

13   **A.**  WE THINK IT'S THE CONSUMER'S IPOD, BUT THEY ARE USING THE

14   IPOD/ITUNES ECOSYSTEM.

15        LOOK, WE WERE ALL ABOUT --

16             **MR. COUGHLIN:**  THAT'S ALL.  THANK YOU.

17             **THE COURT:**  ANY RECROSS LIMITED TO THE SCOPE OF

18   REDIRECT?

19             **MS. DUNN:**  JUST ONE QUESTION, YOUR HONOR.

20             **THE COURT:**  COME TO THE MIC.

21                        **RECROSS-EXAMINATION**

22   BY MS. DUNN:

23   **Q.**  MR. ROBBIN, PLAINTIFFS' COUNSEL JUST CUT YOU OFF WHEN IT

24   LOOKED LIKE YOU WANTED TO SAY SOMETHING.

25        DO YOU HAVE ANYTHING YOU WANT TO SAY IN RESPONSE TO HIS

1    QUESTION?

2    **A.**   WE WERE ALWAYS ABOUT TRYING TO CREATE THE BEST CUSTOMER

3    EXPERIENCE, THE BEST USER EXPERIENCE.  IT WAS ALWAYS ABOUT THE

4    PRODUCT FOR US.

5       SO FOR US, HAVING ITUNES, IPOD, THE ITUNES STORE, BE THIS

6    INTEGRATED EXPERIENCE THAT HAD THIS GREAT UI THE CUSTOMERS

7    LOVED, THAT'S WHAT DROVE US.

8       AND IN ORDER TO DO THAT, WE NEEDED TO HAVE DRM TO

9    IMPLEMENT THE CONTENT USAGE RULES THAT THE RECORD LABELS

10   REQUIRED US.  THAT'S HOW WE FELT ABOUT IT.

11   **Q.**   THANK YOU.

12          **MS. DUNN:**  NO FURTHER QUESTIONS.

13          **THE COURT:**  ANYTHING ON THAT ONE RESPONSE?

14          **MR. COUGHLIN:**  NO, YOUR HONOR.

15          **THE COURT:**  OKAY.  MR. ROBBIN, YOU MAY STEP DOWN.

16          **THE WITNESS:**  THANK YOU.

17          **THE COURT:**  NEXT WITNESS?

18          **MS. SWEENEY:**  YOUR HONOR, PLAINTIFFS ARE GOING TO

19   PLAY THE DEPOSITION OF MR. JOBS.

20          **THE COURT:**  ALL RIGHT.

21      LADIES AND GENTLEMEN, A COUPLE OF INSTRUCTIONS ON THIS

22   FRONT.  FIRST, THE RECORD WILL REFLECT THAT ONCE THE RECORDING

23   STARTS, THE COURT REPORTER IS RELIEVED OF HER DUTIES UNDER THE

24   CODE TO TRANSCRIBE THIS.  THE PARTIES ARE ORDERED TO PRODUCE

25   THE TRANSCRIPT ITSELF, WHICH, I BELIEVE, THEY HAVE ALREADY

1059

1    DONE.

2        OKAY.  THIS IS THE FIRST VIDEO YOU WILL HAVE BEEN SHOWN IN

3    TERMS OF A DEPOSITION.  SO LET ME JUST GIVE YOU SOME

4    EXPLANATION.

5        A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

6    BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE

7    TRUTH, AND LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.

8        THE QUESTIONS AND ANSWERS ARE RECORDED.  WHEN A PERSON IS

9    UNAVAILABLE TO TESTIFY AT TRIAL, THE DEPOSITION OF THAT PERSON

10   MAY BE USED AT TRIAL.

11       YOU SHOULD CONSIDER DEPOSITION TESTIMONY PRESENTED TO YOU

12   IN COURT IN LIEU OF LIVE TESTIMONY INSOFAR AS IS POSSIBLE IN

13   THE SAME WAY AS IF THE WITNESS HAD BEEN HERE PRESENT TO

14   TESTIFY.

15       YOU WILL NOW BE PLAYED A VIDEO RECORDING OF THE DEPOSITION

16   OF STEVE JOBS, THE FORMER CEO OF APPLE.  MR. JOBS' DEPOSITION

17   WAS TAKEN ON APRIL 12TH, 2011.  AT THAT TIME, MR. JOBS WAS ON

18   MEDICAL LEAVE FROM APPLE.  HE'S NOT HERE TO TESTIFY IN PERSON

19   BECAUSE HE HAS PASSED AWAY.

20       YOU MAY PROCEED.

21               (DEPOSITION OF STEVE JOBS PLAYED.)

22           **THE COURT:**  IS THAT ALL?  OKAY.  NEXT WITNESS.

23           **MS. SWEENEY:**  PLAINTIFFS CALL DR. ROGER NOLL.

24           **THE CLERK:**  MR. NOLL, IF YOU WOULD STAND AND I WILL

25   SWEAR YOU IN.

NOLL – DIRECT / SWEENEY

1    (**ROGER NOLL**, CALLED AS A WITNESS FOR THE PLAINTIFFS,

2    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

3            **THE WITNESS:**  I DO.

4            **THE CLERK:**  PLEASE BE SEATED, AND THEN PLEASE STATE

5    YOUR FULL NAME AND SPELL YOUR LAST NAME.

6            **THE WITNESS:**  MY NAME IS ROGER G. NOLL.  MY LAST NAME

7    IS SPELLED N-O-L-L.

8        DO YOU WANT MR. ROBBIN'S STUFF BACK?

9            **MS. SWEENEY:**  THANK YOU.

10           **THE COURT:**  GOOD AFTERNOON.  YOU MAY PROCEED.

11                    **DIRECT EXAMINATION**

12   BY MS. SWEENEY:

13   **Q.**  GOOD AFTERNOON, DR. NOLL.

14   **A.**  GOOD AFTERNOON.

15       IT IS AFTERNOON.

16   **Q.**  YES.

17       CAN YOU PLEASE TELL THE JURY WHAT YOUR PROFESSION IS?

18   **A.**  I'M AN ECONOMIST.

19   **Q.**  AND HOW LONG HAVE YOU BEEN AN ECONOMIST?

20   **A.**  I RECEIVED MY PH.D. IN ECONOMICS IN 1967, AND I HAVE BEEN

21   ASSOCIATED WITH UNIVERSITIES OR THINK TANKS EVER SINCE.

22   **Q.**  AND WHERE ARE YOU CURRENTLY?

23   **A.**  I'M CURRENTLY PROFESSOR EMERITUS, WHICH MEANS RETIRED, AT

24   STANFORD.  I STILL DIRECT THE PROGRAM AND REGULATORY POLICY IN

25   THE STANFORD INSTITUTE FOR ECONOMIC POLICY RESEARCH AND I'M

NOLL – DIRECT / SWEENEY

1    STILL A SENIOR FELLOW AT –– IN SIEPR AT STANFORD.  AND I'M

2    BASICALLY STILL THERE ALL THE TIME.

3    **Q.**  ARE YOU STILL TEACHING?

4    **A.**  YES.

5           **MS. SWEENEY:**  CAN WE PUT THE FIRST SLIDE ON, PLEASE?

6                (SLIDE DISPLAYED TO JURY.)

7    **BY MS. SWEENEY:**

8    **Q.**  SO, THIS SLIDE HAS YOUR EDUCATION AND YOUR ACADEMIC

9    POSITIONS.

10       SO, CAN YOU TELL THE JURY A LITTLE BIT ABOUT THE COURSES

11   THAT YOU HAVE TAUGHT OVER THE LAST COUPLE OF DECADES AT

12   STANFORD?

13   **A.**  YES.

14       MY PRINCIPAL FIELD OF TEACHING HAS BEEN INDUSTRIAL

15   ORGANIZATION, WHICH IS –– INCLUDES THE ECONOMICS OF ANTITRUST

16   AND REGULATION.

17       IT ALSO INCLUDES TECHNOLOGY POLICY AND THE ECONOMICS OF

18   RESEARCH AND DEVELOPMENT.

19       AND SO THAT'S MOSTLY WHAT I HAVE TAUGHT, BUT I'VE ALSO

20   TAUGHT A LARGE NUMBER OF OTHER COURSES AS WELL, MICROECONOMIC

21   THEORY, ECONOMETRICS, POLITICAL ECONOMY, WHICH IS THE ECONOMIC

22   APPROACH TO STUDYING POLITICS, AND THE POLITICAL ECONOMY OF

23   LAW, WHICH IS AN INTERSECTION AMONG ECONOMICS, POLITICAL

24   SCIENCE, AND LAW.  AND THEN A BUNCH OF OTHER THINGS THAT YOU

25   SHOULDN'T REALLY CARE ABOUT LIKE MEDIEVAL ECONOMIC HISTORY.

1    **Q.**  SO YOU MENTIONED "ECONOMETRICS".

2        WHAT IS ECONOMETRICS?

3    **A.**  ECONOMETRICS IS THE DEVELOPMENT OF METHODS FOR ANALYZING

4    DATA FOR -- AND SOLVING PROBLEMS THAT ARISE IN DATA IN ORDER

5    TO BE ABLE TO EXTRACT INFORMATION FROM DATA.

6    **Q.**  AND YOU'VE TAUGHT ECONOMETRICS COURSES OVER MANY YEARS?

7    **A.**  I'VE TAUGHT ECONOMETRICS IN TWO WAYS.

8        FIRST OF ALL, I'VE TAUGHT THE UNDERGRADUATE INTRODUCTION

9    TO ECONOMETRICS COURSE.  AND THEN IN ADDITION TO THAT, IN MY

10   GRADUATE COURSES IN INDUSTRIAL ORGANIZATION, WE TEACH THE

11   ELEMENTS OF ECONOMETRICS THAT ARE COMMONLY USED IN THE STUDY

12   OF INDUSTRIAL ORGANIZATION.  THOSE STUDENTS ALREADY HAVE A

13   BACKGROUND IN THE PURE ECONOMETRICS COURSE, BUT WE ALSO HAVE

14   TO TEACH THEM ADDITIONAL THINGS THAT PERTAIN TO THE TOOLS THAT

15   WE USE IN INDUSTRIAL ORGANIZATION.

16   **Q.**  SO, YOU MENTIONED YOUR AREAS OF SPECIALIZATION.

17       DO YOU ALSO HAVE PUBLICATIONS?

18   **A.**  YES.

19   **Q.**  WHAT KIND OF PUBLICATIONS DO YOU HAVE?

20   **A.**  WELL, THERE IS A VERY LONG -- IT IS A VARIED LIST.  I

21   HAVE -- I'M THE AUTHOR OR CO-AUTHOR OF 15 BOOKS, AND -- ON A

22   VARIETY OF TOPICS.

23       I HAVE APPROXIMATELY 180 ARTICLES THAT ARE PUBLISHED IN

24   SCHOLARLY JOURNALS.  SOME OF THEM -- MOST OF THEM IN

25   ECONOMICS, A SIGNIFICANT NUMBER IN LAW REVIEWS, AND THEN A FEW

```
1    IN POLITICAL SCIENCE, AND EVEN A COUPLE IN SOCIOLOGY.

2        IN ADDITION TO THAT, I HAVE A LARGE NUMBER OF OTHER KINDS

3    OF -- OF PUBLICATIONS THAT YOU WOULDN'T REALLY CALL MAINLINE

4    SCHOLARLY PUBLICATIONS.  AND THERE'S OVER 150 OF THOSE,

5    INCLUDING SOME BOOK REVIEWS AND REVIEW ARTICLES OF RESEARCH IN

6    THE FIELD.

7    Q.  AND YOU SAID SOME OF YOUR BOOKS ARE ABOUT ECONOMICS?

8    A.  ALL OF THEM ARE ABOUT ECONOMICS.

9    Q.  AND YOU'VE ALSO DONE SOME CONSULTING WORK OVER THE YEARS,

10   DR. NOLL?

11   A.  YES.  I HAVE BEEN INVOLVED IN CONSULTING BOTH WITH RESPECT

12   TO LITIGATION AND NOT FOR ALMOST MY ENTIRE PROFESSIONAL

13   CAREER, BACK INTO THE EARLY 1970'S.

14   Q.  SO WHAT ARE SOME OF THE CONSULTING POSITIONS THAT YOU HAVE

15   HELD THAT ARE NOT RELATED TO LITIGATION?

16   A.  I HAVE CONSULTED FOR -- WELL, NOT RELATED TO LITIGATION, I

17   HAVE CONSULTED FOR THE SENATE SUBCOMMITTEE ON ANTITRUST AND

18   MONOPOLY.

19       I HAVE CONSULTED WITH BASEBALL TEAMS IN TERMS OF

20   NEGOTIATING THEIR BROADCASTING AGREEMENTS.  AND I HAVE

21   CONSULTED FOR SOME HOLLYWOOD COMPANIES, SOME ENTERTAINMENT

22   COMPANIES ABOUT THEIR BUSINESS STRATEGIES.  AND I'VE CONSULTED

23   FOR HEWLETT-PACKARD ON SOME BUSINESS STRATEGY ISSUES.

24   Q.  AND YOU MENTIONED LITIGATION WORK THAT YOU'VE DONE.

25       HAVE YOU TESTIFIED AS AN EXPERT IN LITIGATION?
```

NOLL – DIRECT / SWEENEY

1    **A.** YES, I HAVE.

2    **Q.** HOW MANY TIMES APPROXIMATELY?

3    **A.** OH, ONE, TWO, OR THREE TIMES A YEAR SINCE THE MID '70S.

4    **Q.** OKAY.

5       AND HAS -- WHEN YOU'VE DONE THAT KIND OF CONSULTING WORK

6    IN LITIGATION, HAVE YOU ALWAYS BEEN --

7    **A.** ACTUALLY, LET ME CORRECT THAT.  YOU SAID "TESTIFY", AND

8    THAT'S AN OVERSTATEMENT.

9       TESTIFY IS LESS FREQUENT THAN THAT.  IF YOU INCLUDE

10   WRITING EXPERT REPORTS AND BEING DEPOSED, THEN IT'S TWO OR

11   THREE TIMES A YEAR.

12   **Q.** AND IN THOSE CASES WHERE YOU'VE BEEN RETAINED IN

13   LITIGATION, HAVE YOU ALWAYS BEEN RETAINED BY THE PLAINTIFF?

14   **A.** NO.

15   **Q.** ARE THERE ANY KINDS OF LITIGATION IN WHICH YOU HAVE BEEN

16   RETAINED THAT ARE PARTICULARLY PERTINENT TO THE WORK THAT

17   YOU'VE DONE IN THIS CASE?

18   **A.** YES.  SOME OF MY CONSULTING WORK HAS BEEN IN INFORMATION

19   TECHNOLOGY AND ISSUES THAT ARE SIMILAR TO OR RELATED TO THE

20   ISSUES HERE.

21   **Q.** HOW ABOUT WITH RESPECT TO THE MUSIC INDUSTRY OR

22   ENTERTAINMENT?

23   **A.** YES.  I HAVE HAD SEVERAL -- DO YOU WANT ME TO LIST THEM?

24   **Q.** JUST DESCRIBE ONE OR TWO, IF YOU COULD.

25   **A.** WELL, I WAS INVOLVED TOWARDS THE END OF THE NAPSTER

NOLL – DIRECT / SWEENEY

1    LITIGATION ON BEHALF OF NAPSTER.  THE ISSUE THERE WAS WHETHER

2    THE RECORD COMPANIES, IN CREATING THEIR JOINT VENTURES, MUSIC

3    NET AND PRESS PLAY, WHICH HAD EXCLUSIVE CONTROL OVER DIGITAL

4    DOWNLOADS AT THE TIME, WHETHER THEY ENGAGED IN MISUSE OF THEIR

5    COPYRIGHTS, WHICH IS BASICALLY LIKE AN ANTITRUST ISSUE.  IT'S

6    NOT QUITE THE SAME, BUT IT IS SIMILAR.

7        AND SO I WAS INVOLVED IN THE VERY END PHASE OF THE NAPSTER

8    LITIGATION WHEN THE ISSUE OF COPYRIGHT MISUSE WAS INVOLVED.

9        I ALSO HAVE BEEN INVOLVED IN SEVERAL MUSIC LICENSING

10   PROCEEDINGS.  FIRST OF ALL, MANY YEARS AGO THE TWO LEADING

11   COOPERATIVES OF COMPOSURES, NAMELY, ASCAP AND BMI, LOST

12   ANTITRUST CASES, AND RATHER THAN -- AND THE RELIEF IN THOSE

13   CASES WAS A SETTLEMENT TO CREATE A REVIEW OF THE LICENSE

14   ROYALTIES THAT ARE PAID TO COMPOSURES OF MUSIC WHEN THEIR

15   MUSIC IS PLAYED ON VARIOUS OUTLETS.

16       AND SO I HAVE SERVED AS A CONSULTANT FOR MOBITV AND

17   PANDORA ON RATE HEARINGS.  MOBITV IS A COMPANY THAT MAKES

18   VIDEO ENTERTAINMENT FOR DISTRIBUTION BY WIRELESS CARRIERS.

19   AND PANDORA IS THE LEADING NONINTERACTIVE MUSIC STREAMING

20   SERVICE.  IT NOW ACCOUNTS FOR SOMETHING LIKE 8 PERCENT OF THE

21   TOTAL RADIO AUDIENCE IN THE UNITED STATES.  AND SO I WAS

22   INVOLVED IN THOSE RATE HEARINGS.

23       I WAS ALSO INVOLVED -- THERE'S ANOTHER SET OF LICENSING

24   ISSUES PERTAINING TO THE SOUND RECORDING ITSELF.  YOU NEED A

25   LICENSE TO PLAY A SOUND RECORDING IF YOU'RE A DIGITAL

1    DISTRIBUTION OF ANY KIND.

2         AND THERE'S A COMPULSORY LICENSE THAT IS REGULATED BY THE

3    COPYRIGHT ROYALTY BOARD IN WASHINGTON, D.C.  AND TWICE I HAVE

4    SERVED AS AN EXPERT FOR SIRIUS AND XM SATELLITE BROADCASTING

5    COMPANIES, WHICH BASICALLY ARE LIKE RADIO STATIONS EXCEPT THEY

6    HAVE A HUNDRED CHANNELS, A LITTLE MORE THAN HALF OF WHICH ARE

7    MUSIC, AND THEY HAVE TO PAY A ROYALTY TO BE ABLE TO PLAY MUSIC

8    OVER SATELLITE BROADCASTING.

9    Q.  AND THEN LET'S TURN TO THE NEXT SLIDE.

10                    (SLIDE DISPLAYED TO JURY.)

11        HERE'S A LIST OF SOME OF THE AWARDS THAT YOU'VE ACHIEVED

12   OVER YOUR CAREER.  I JUST WANT TO ASK YOU ABOUT A COUPLE OF

13   THEM.

14        WHAT IS THIS NAEB ANNUAL BOOK AWARD AT THE BOTTOM OF THE

15   LIST?

16   A.  THAT IS AN ORGANIZATION THAT DISAPPEARED IN THE EARLY

17   1980'S AND BASICALLY HAS BEEN REPLACED BY THE PUBLIC

18   BROADCASTING SERVICE.  IT WAS ESSENTIALLY A TRADE ASSOCIATION

19   OF PUBLIC TELEVISION STATIONS AND PUBLIC RADIO STATIONS.

20        AND THEY HAD AN ANNUAL BOOK AWARD FOR THE BEST BOOK IN

21   TELECOMMUNICATIONS POLICY.  AND A BOOK THAT I PUBLISHED IN

22   LATE '73 WON THE '74-'75 BOOK AWARD FROM THE NATIONAL

23   ASSOCIATION OF EDUCATIONAL BROADCASTERS AS THE BEST BOOK IN

24   TELECOMMUNICATIONS POLICY.

25   Q.  AND IS THIS JUST A PARTIAL LIST OF THE AWARDS THAT YOU'VE

1   BEEN HONORED WITH OVER THE COURSE OF YOUR CAREER?

2   **A.**  YES.  THESE ARE MOSTLY THE RECENT ONES AND A COUPLE OF

3   OLDER ONES.

4   **Q.**  ALL RIGHT.

5       SO LET'S GET TO YOUR WORK IN THIS CASE.  WHAT WERE YOU

6   ASKED TO DO?

7       WHAT WAS YOUR ASSIGNMENT IN THIS CASE?

8   **A.**  MY ASSIGNMENT IN THIS CASE WAS TO UNDERTAKE THE -- THE

9   TASK THAT AN ECONOMIST IS NORMALLY ASKED TO DO IN A RULE OF

10  REASON ANTITRUST CASE, WHICH ULTIMATELY ENDS IN DETERMINING

11  WHETHER ANTICOMPETITIVE CONDUCT BY THE DEFENDANT CAUSED HARM

12  TO CONSUMERS AND, IF SO, TO QUANTIFY THAT HARM IN TERMS OF

13  DAMAGES.

14          **MS. SWEENEY:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

15  TO PROFFER DR. NOLL AS AN EXPERT IN INDUSTRIAL ORGANIZATION

16  AND ANTITRUST AND REGULATION ECONOMICS OF THE INFORMATION

17  SECTOR AND THE ECONOMICS OF SPORT AND ENTERTAINMENT.

18          **MR. ISAACSON:**  NO OBJECTION.

19          **THE COURT:**  HE'S ADMITTED AS AN EXPERT.  I WILL

20  INSTRUCT THE JURY LATER WHAT THAT MEANS, BUT HE'S ADMITTED AS

21  AN EXPERT.

22      YOU MAY PROCEED.

23  **BY MR. COUGHLIN:**

24  **Q.**  WITHOUT GOING INTO A LOT OF DETAIL AT THIS TIME, WE WILL

25  GO BACK TO THIS, WHAT SORT OF WORK -- HOW DID YOU GO ABOUT

1    CARRYING OUT YOUR ASSIGNMENTS IN THIS CASE?

2    **A.**  I REVIEWED AS MUCH OF THE PUBLISHED MATERIAL AS I COULD

3    FIND ON THE BUSINESS OF PORTABLE DIGITAL MEDIA PLAYERS AND

4    DIGITAL DOWNLOADS.  A LOT OF IT I HAD ALREADY KNOWN BEFORE

5    FROM MY INVOLVEMENT IN THE NAPSTER CASE, BUT I HAD TO UPDATE

6    IT TO THE END OF THE CLASS PERIOD HERE.  THIS CONSISTS OF

7    TRADE PUBLICATIONS.

8         THERE ARE FIRMS OUT THERE THAT WRITE STUDIES OF THE -- OF

9    THE COMPANIES THAT -- IN THE ELECTRONIC -- CONSUMER

10   ELECTRONICS AREA, AND SOMETIMES THOSE REPORTS DISCUSS WHAT

11   THEY ARE DOING IN THIS SPACE OF MUSIC DOWNLOADS AND MEDIA

12   PLAYERS.

13        AND THEN IN ADDITION TO THAT, THERE WAS A GREAT DEAL OF --

14   YOU KNOW, MILLIONS OF PAGES OF MATERIAL PRODUCED IN DISCOVERY

15   IN THIS CASE.  AND ALONG WITH A TEAM OF ECONOMISTS AT AN

16   ECONOMICS CONSULTING FIRM, WE WENT THROUGH ALL THOSE -- ALL

17   THE DOCUMENTS THAT WE COULD FIND THAT WERE PERTINENT TO THE

18   ECONOMIC ISSUES IN THE CASE.  SO I READ THOSE.

19        IN ADDITION TO THAT, APPLE PRODUCED DETAILED FINANCIAL

20   INFORMATION ABOUT THEIR PARTICIPATION IN THE PORTABLE DIGITAL

21   PLAYERS' MARKET, THE FINANCIAL INFORMATION PERTAINING TO

22   IPODS, AND THEY PRODUCED A FILE OF THE -- OF THEIR OWN

23   TRANSACTION RECORDS FOR PORTABLE DIGITAL MEDIA PLAYERS THAT

24   WENT ON FOR LIKE NINE OR TEN YEARS THAT HAD OVER 50 MILLION

25   TRANSACTION DATA RECORDINGS IN IT.  WE DIDN'T USE THAT MANY

1    BECAUSE SOME WERE DUPLICATIVE AND SOME OF THEM HAD ERRORS, AND

2    SOME OF THEM WERE RETURNS AND REFUNDS.  BUT IN THE END, WE

3    PERFORMED AN ECONOMETRIC ANALYSIS ON APPROXIMATELY 30

4    MILLION -- 39 MILLION TRANSACTIONS FROM THE APPLE DATABASE.

5    Q.  AND -- SO YOU PUT A FAIR AMOUNT OF TIME INTO THE WORK THAT

6    YOU'VE DONE IN THIS CASE; IS THAT FAIR?

7    A.  THAT'S CERTAINLY FAIR.  A LOT OF TIME -- IN THE TIME OF

8    THREE, FOUR -- YOU KNOW, THREE, FOUR -- TWO, THREE, FOUR YEARS

9    AGO, IT WAS -- A LOT OF EFFORT WAS PUT INTO READING ALL THIS

10   MATERIAL AND DIGESTING IT AND DOING THE DATA.

11       THE DATA ANALYSIS IN PARTICULAR TOOK AN ENORMOUS AMOUNT OF

12   TIME BECAUSE WHEN WE FIRST STARTED OUT, SIMPLY RUNNING A

13   SINGLE REGRESSION ON THE APPLE TRANSACTION RECORDS WOULD TAKE

14   A DAY.  SO WE HAD TO UPGRADE OUR COMPUTER SYSTEM, AND FIND

15   WAYS TO SHORTEN -- SHORT CIRCUIT THE TIME IN ORDER TO BE ABLE

16   TO DO THE ECONOMETRIC ANALYSIS.

17   Q.  ALL RIGHT.  AFTER CONDUCTING ALL OF THAT INVESTIGATION AND

18   ANALYSIS, DID YOU REACH SOME CONCLUSIONS?

19   A.  YES, I DID.

20   Q.  AND -- AND WHAT ARE THOSE?  I THINK WE HAVE A SLIDE THAT

21   SUMMARIZES --

22                  (SLIDE DISPLAYED TO JURY.)

23   A.  YES.  THERE IS A LIST OF THEM.

24       THESE ARE THE -- THESE ARE THE CONCLUSIONS PERTAINING TO

25   THE STANDARD TRADITIONAL QUESTIONS THAT ARE ASKED OF AN

1    ECONOMIST IN A RULE OF REASON ANTITRUST CASE.

2        THE FIRST ONE IS DEFINING THE RELEVANT MARKET.  AND THE

3    CONCLUSION THERE IS THAT PORTABLE DIGITAL MEDIA PLAYERS SOLD

4    IN THE UNITED STATES ARE A RELEVANT ANTITRUST MARKET DURING

5    THE CLASS PERIOD.

6        THE SECOND CONCLUSION PERTAINS TO THE POSSESSION OF

7    MONOPOLY POWER OR MARKET -- ECONOMISTS TEND TO PREFER THE WORD

8    "MARKET POWER", BUT MONOPOLY POWER MEANS A LOT OF MARKET

9    POWER.  AND THE CONCLUSION PERTAINING TO THAT IS THAT APPLE

10   ENJOYED MONOPOLY POWER IN THE RELEVANT MARKET DURING THE CLASS

11   PERIOD.

12       THAT -- IT'S IMPORTANT TO SAY THAT DETERMINING WHETHER A

13   FIRM HAS MARKET POWER DOESN'T SAY ANYTHING ABOUT WHETHER THEY

14   ACHIEVED IT IN A BENEFICIAL OR HARMFUL WAY.  IT'S JUST A FACT.

15   DO THEY OR DO THEY NOT POSSESS IT.

16       THEN THE THIRD ISSUE IS THE SORT OF SOURCES OF THE

17   MONOPOLY POWER.  AND IN PARTICULAR, DID THEY ACHIEVE THEIR

18   MONOPOLY POWER SOLELY BY PROCOMPETITIVE MEANS, SUPERIOR

19   EFFICIENCY AND FORESIGHT, OR DID SOME OF THAT MONOPOLY POWER

20   ARISE FROM ANTICOMPETITIVE CONDUCT.  MY CONCLUSION HERE IS

21   THAT APPLE MAINTAINED AND ENHANCED ITS MONOPOLY POWER IN A

22   RELEVANT MARKET BY INTRODUCING ITUNES 7.0 AND 7.4.

23       THE FOURTH ISSUE IS TO DEMONSTRATE THAT THE CONDUCT

24   IDENTIFIED AS ANTICOMPETITIVE ACTUALLY HARMED CONSUMERS.  AND

25   THE CONCLUSION THERE IS, YES, IT DID HARM CONSUMERS BY

NOLL – DIRECT / SWEENEY

1    INCREASING THE DEGREE TO WHICH THEY WERE LOCKED IN TO WHAT IS

2    CALLED THE APPLE WALLED GARDEN USING THE ITUNES STORE FOR

3    DOWNLOADS, THE ITUNES SOFTWARE FOR THEIR FILING SYSTEM,

4    BASICALLY, AND THE IPODS.

5         AND THEN FINALLY, PART OF THE COURSE OF THAT

6    ANTICOMPETITIVE HARM IS THE ELEVATION IN PRICES IN IPODS DUE

7    TO THE ANTICOMPETITIVE CONDUCT.

8         SO THE LAST TASK IS TO MEASURE THE DAMAGES.  AND MY

9    CONCLUSION THERE IS THAT, INDEED, MEMBERS OF THE CLASS WERE

10   DAMAGED BY THE INTRODUCTION OF 7.0 AND 7.4.

11   **Q.**  NOW THAT YOU HAVE SUMMARIZED YOUR OPINIONS IN THIS CASE,

12   LET'S TAKE THEM ONE BY ONE.

13        AND STARTING WITH YOUR FIRST OPINION, THAT IS, THAT THE

14   MARKET FOR PORTABLE DIGITAL MEDIA PLAYERS IS A RELEVANT

15   ANTITRUST MARKET, WHAT IS A RELEVANT MARKET?

16   **A.**  A RELEVANT MARKET IS A CONFUSING TERM BECAUSE

17   ECONOMISTS -- YOU'RE GOING TO SEE SEVERAL TIMES, ECONOMISTS

18   USE WORDS THAT ARE DIFFERENT THAN THE WAY ORDINARY MORTALS USE

19   THEM.

20        A MARKET IN ANTITRUST IS A VERY SPECIFIC -- ANTITRUST

21   ECONOMICS DEFINES MARKETS IN A VERY PARTICULARISTIC WAY.  AND

22   IT'S NOT SOMETHING LIKE THE STOCK MARKET, FOR EXAMPLE.

23        A RELEVANT MARKET IN ANTITRUST ECONOMICS IS THE -- THE

24   PRODUCTS IN A PARTICULAR GEOGRAPHIC LOCATION THAT ARE CLOSE

25   COMPETITIVE SUBSTITUTES FOR THE PRODUCT AT ISSUE IN THE

1    ANTITRUST CASE.

2         SO WHAT WE DO IS, WE -- IT IS THE REFERENCED PRODUCT AND

3    THE SMALLEST NUMBER OF OTHER PRODUCTS THAT IF THEY WERE OWNED

4    BY THE SAME FIRM TO PROFITABLY INCREASE THEIR PRICE.

5         NOW WHAT THAT -- THAT, FOR EXAMPLE, IT DOES EXCLUDE SOME

6    OF THE PRODUCTS THAT YOU WOULD THINK WOULD BE IN THE MARKET.

7    BECAUSE ALL YOU NEED TO DEFINE THE MARKET IS THAT NUMBER OF

8    PRODUCTS THAT IF THEY WERE CONTROLLED BY THE SAME FIRM, COULD

9    PROFITABLY INCREASE THEIR PRICE.

10        SO THE TECHNICAL DEFINITION OF A RELEVANT MARKET HERE IS

11   THE SMALLEST NUMBER OF PORTABLE DIGITAL MEDIA PLAYERS, THAT IF

12   SOLD BY APPLE AS WELL AS THE APPLE IPOD COULD PROFITABLY

13   INCREASE THEIR PRICE.

14   **Q.**  IS DEFINING A RELEVANT MARKET SOMETHING THAT ECONOMISTS DO

15   A LOT?

16   **A.**  WE ARE FORCED TO, YES, BECAUSE WE DON'T DO IT IN OUR

17   ORDINARY LIVES BECAUSE WE HAVE GONE WAY BEYOND THAT IN TERMS

18   OF THE RESEARCH THAT IS DONE IN ECONOMICS, THE WAY ECONOMISTS

19   APPROACH THINGS.

20        BUT IN THE LITIGATION ENVIRONMENT, IT IS FREQUENTLY HELD

21   TO BE A NECESSARY THING YOU HAVE TO DO IN THE CONTEXT OF

22   LITIGATION.

23   **Q.**  OKAY.

24   **A.**  SO IT'S DONE ALL THE TIME IN THE CONTEXT OF LITIGATION.

25   **Q.**  HOW -- WHAT DO ECONOMISTS DO TO DEFINE THE RELEVANT

1    MARKET?

2    **A.**  WHAT YOU DO IS YOU -- THE FIRST THING YOU DO IS IDENTIFY

3    THE REFERENCED PRODUCT, HERE, AN APPLE IPOD, WHICH IS THE --

4    THE SUB -- THE PRODUCT AT ISSUE IN THE DISPUTE.

5         IF IT WERE A COLLUSION CASE, IT COULD BE PRODUCTS FROM

6    SEVERAL COMPANIES IF THEY WERE COLLUDING TO SET PRICES

7    JOINTLY.  BUT IN THIS CASE IT'S THE APPLE IPOD.

8         THE SECOND THING YOU DO IS ONCE YOU'VE GOT THE REFERENCED

9    PRODUCT, YOU IDENTIFY THE OTHER PRODUCTS THAT PERFORM SIMILAR

10   FUNCTIONS AND HAVE SIMILAR ATTRIBUTES THAT LOGICALLY YOU WOULD

11   THINK OF AS BEING FUNCTIONAL SUBSTITUTES FOR THE REFERENCED

12   PRODUCT.

13        AND THEN ONCE YOU HAVE DONE THAT, YOU THEN SEE HOW MANY OF

14   THESE THINGS YOU'VE IDENTIFIED AS FUNCTIONALLY SIMILAR, IT

15   ACTUALLY TAKES TO FORM THE RELEVANT MARKET.

16        THAT IS, THE COLLECTIVITY OF PRODUCTS, THAT IF OFFERED BY

17   A SINGLE FIRM WOULD BE MONOPOLIZED AND RAISE ITS PRICE.

18   **Q.**  AND DID YOU CONDUCT THAT KIND OF ANALYSIS IN THIS CASE?

19   **A.**  YES.

20   **Q.**  WHAT DID YOU DO TO DETERMINE WHAT IS THE RELEVANT

21   MARKET --

22   **A.**  THERE IS A SLIDE ABOUT THIS, TOO.

23        **MS. SWEENEY:**  CAN WE GO TO THE NEXT SLIDE, PLEASE?

24             (EXHIBIT DISPLAYED TO JURY.)

25        THANK YOU.

1          **THE WITNESS:**  SO THIS IS -- THIS IS HOW WE DO IT AND

2    HOW WE DO IT IN THIS CASE.

3          SO WHAT IS -- AS I SAID BEFORE, WE START WITH THE

4    REFERENCE PRODUCT.  WHAT ARE ITS KEY FUNCTIONAL ATTRIBUTES?

5    AND ITS KEY FUNCTIONAL ATTRIBUTES, FIRST OF ALL, IT'S

6    PORTABLE.  AND, SECONDLY, IT HAS A HUGE STORAGE CAPACITY.  YOU

7    CAN PLAY A VERY LARGE NUMBER OF SONGS ON IT.

8          AND, OF COURSE, IN ORDER TO BE USEFUL AS A DEVICE THAT'S

9    (A) PORTABLE, AND HAS (B) A LARGE NUMBER OF SONGS ON IT, IT'S

10   GOT TO HAVE OTHER THINGS AS WELL, LIKE A LONG BATTERY LIFE.  A

11   BATTERY LIFE THAT'S LONG ENOUGH THAT HAVING ALL THOSE SONGS ON

12   IT ACTUALLY IS A BENEFIT.  IF IT ONLY HAD A BATTERY LIFE OF 15

13   MINUTES, THEN HAVING THOUSANDS OF SONGS ON IT WOULDN'T BE VERY

14   VALUABLE.

15         SO THAT'S THE KEY CHARACTERISTIC OF A PORTABLE DIGITAL

16   MEDIA PLAYER FROM THE POINT OF VIEW OF SELLING SOUND

17   RECORDINGS, DIGITAL DOWNLOADS OF SOUND RECORDINGS OR OTHER

18   WAYS THAT SOUND RECORDINGS CAN BE PUT ON AN IPOD.

19         NOW, WHAT WE DO NEXT IN THEORY, IT WOULD BE NICE, IF WE

20   CAN GO STRAIGHT TO THE CHASE AND SEE HOW MUCH A CHANGE IN THE

21   PRICE OF SOME POTENTIAL SUBSTITUTE FOR AN IPOD, LIKE A

22   PORTABLE DIGITAL MEDIA PLAYER PRODUCED BY SANDISK OR SAMSUNG

23   OR ARCOS OR ANY ONE OF THE DOZEN OR SO COMPANIES THAT MAKE

24   THESE THINGS.

25         IN REALITY, ECONOMETRIC METHODOLOGY IS NOT SUFFICIENTLY

1    ROBUST THAT YOU CAN ACTUALLY MEASURE THE EFFECT OF THE PRICE

2    OF ONE PRODUCT ON ANOTHER IN A MARKET THAT'S HIGHLY

3    DIFFERENTIATED, WHERE THE PRODUCTS THEMSELVES HAS LOTS AND

4    LOTS AND LOTS OF DIFFERENT CHARACTERISTICS.

5        BECAUSE WHAT YOU ARE REALLY IMPLICITLY DOING IS EVALUATING

6    ALL OF THESE CHARACTERISTICS.  AND YOU RARELY HAVE ENOUGH DATA

7    TO BE ABLE TO SUSTAIN AN ESTIMATE.

8        YOU KNOW, WE HAVE A MARKET HERE WITH A DOZEN PRODUCTS IN

9    IT.  WHAT, IN PRINCIPLE, WE WOULD LIKE TO DO IS MEASURE THE

10   CROSS-ELASTICITY OF DEMAND, THAT IS TO SAY, THE EFFECT OF IPOD

11   SALES OR THE CHANGE IN PRICE OF ALL 12 OTHER PRODUCTS, IN

12   PRACTICE WE DON'T HAVE POWERFUL ENOUGH METHODS TO DO THAT.

13       IF YOU CAN'T DO THAT, THEN WHAT IS THE NEXT BEST THING YOU

14   DO?  THE NEXT BEST THING YOU DO IS YOU LOOK AT THE RECORD OF

15   INFORMATION, BOTH PUBLIC AND THROUGH DISCOVERY, OF WHAT PEOPLE

16   WHO ARE INVOLVED IN THE INDUSTRY AND WHO STUDY THE INDUSTRY

17   THINK ARE THE CLOSE COMPETITIVE SUBSTITUTES.

18       AND AMONG THE THINGS LOOKED AT HERE WOULD BE APPLE'S OWN

19   INTERNAL ASSESSMENTS OF WHO THEY BELIEVE THEIR COMPETITORS ARE

20   IN THE MARKET FOR PORTABLE DIGITAL MEDIA PLAYERS.  WHO ARE THE

21   BEST -- WHO ARE THE CLOSEST COMPETITIVE SUBSTITUTES FOR IPODS.

22       IN ADDITION, THERE'S ALL KINDS OF TRADE PUBLICATIONS THAT

23   EXAMINE CONSUMER ELECTRONICS AND RATE THEM.  THEY DO PRODUCT

24   RATINGS, LIKE PROBABLY THE MOST INFLUENTIAL IS CNET WHICH IS

25   PERIODICALLY RATING PRODUCTS IN THE CONSUMER ELECTRONICS

NOLL − DIRECT / SWEENEY

```
 1   SPACE, AND THEY SPECIFICALLY CONTAIN -- PERIODICALLY HAD

 2   PRODUCED, DURING THE CLASS PERIOD AND BEFORE IT, REVIEWS OF

 3   THE PORTABLE DIGITAL MEDIA PLAYERS.

 4       AND, OF COURSE, THE IMPORTANT THING ABOUT THOSE REVIEWS IS

 5   THEY REALLY DON'T REVIEW ANYTHING ELSE WITH THEM.  THEY DON'T

 6   REVIEW A TABLET COMPUTER OR A PERSONAL COMPUTER OR ANY OTHER

 7   KIND OF CONSUMER ELECTRONICS WITH THE PORTABLE DIGITAL MEDIA

 8   PLAYERS.

 9       IN ADDITION TO THAT, THERE'S DATA PRODUCED ON PRICE

10   MOVEMENTS AND SALES QUANTITIES THAT ARE USEFUL IN THIS

11   EXERCISE.

12       AND, FINALLY, THERE'S AN ANALYST (SIC) BY FINANCIAL

13   INSTITUTIONS OF THE COMPANIES INVOLVED IN THE -- THAT PRODUCE,

14   AMONG OTHER THINGS, PORTABLE DIGITAL MEDIA PLAYERS.  NOT

15   ALWAYS, BUT SOMETIMES IN THEIR ASSESSMENT OF A COMPANY LIKE

16   APPLE, OR LIKE SANDISK OR LIKE SAMSUNG, THEY'LL DISCUSS WHAT

17   THEY THINK IS GOING ON IN PORTABLE DIGITAL MEDIA PLAYERS.

18       AND, INDEED, NEAR THE END OF THE CLASS PERIOD, THERE WAS A

19   LOT OF INFORMATION THAT APPEARED IN LATE 2008, A LOT OF

20   INFORMATION STARTED APPEARING IN THIS INFORMATION ABOUT

21   WHETHER SMART PHONES WERE GOING TO PUT AN END TO PORTABLE

22   DIGITAL MEDIA PLAYERS BECAUSE SMART PHONES BASICALLY HAVE THE

23   CAPABILITY OF BEING A PORTABLE DIGITAL MEDIA PLAYER.

24       SO INFORMATION ABOUT THE DEGREE OF COMPETITION BETWEEN

25   SMART PHONES AND PORTABLE DIGITAL MEDIA PLAYERS IS PRESENT IN
```

1    THESE FINANCIAL ANALYST REPORTS.

2         FINALLY, THE LAST SOURCE OF INFORMATION IS RESEARCH BY

3    PEOPLE LIKE ME, ECONOMISTS, ACADEMIC ECONOMISTS, OR ECONOMISTS

4    IN THINK TANKS WHO, YOU KNOW, AS YOU CAN WELL IMAGINE, THE

5    CONSUMER ELECTRONICS INDUSTRY GETS A LOT OF SCHOLARLY

6    ATTENTION.  NOT SO MUCH PORTABLE DIGITAL MEDIA PLAYERS, BUT

7    THE DIGITAL DOWNLOADS.

8         AND THE -- THE EFFECT OF ILLEGAL FILE SHARING ON THE SALE

9    OF CD'S AND DIGITAL DOWNLOADS WAS AN EXTRAORDINARILY HOT TOPIC

10   FOR STUDY AMONG ACADEMIC ECONOMISTS FROM ROUGHLY 2000 TO 2006

11   OR '7.  LOTS OF PAPERS WERE WRITTEN ON THAT TOPIC.  THAT STILL

12   GIVES YOU MORE RELEVANT INFORMATION ABOUT HOW THE INDUSTRY

13   OPERATES AND WHAT THE RELEVANT MARKETS ARE.

14   Q.  AFTER REVIEWING THIS KIND OF INFORMATION ABOUT THE IPOD,

15   DID YOU COME TO A CONCLUSION ABOUT WHAT PRODUCTS ARE INCLUDED

16   IN THE MARKET?

17   A.  YES, I DID.

18        AND THE -- THE -- OBVIOUSLY IT'S PORTABLE DIGITAL MEDIA

19   PLAYERS.  WE INCLUDED THEM ALL, EVEN THOUGH SOME WITH VERY

20   TINY MARKET SHARES THAT CAME AND WENT, WEREN'T SUCCESSFUL,

21   PROBABLY WEREN'T COMPETITIVE SUBSTITUTES FOR APPLE'S PRODUCTS,

22   BUT NONETHELESS, THE BIGGER YOU DEFINE THE MARKET, THE LOWER

23   IS APPLE'S MARKET SHARE, AND SO THE LESS LIKELY YOU ARE TO

24   FIND IT HAD MARKET POWER.

25        SO FOR OVER INCLUSION REASONS, WE BASICALLY INCLUDED ALL

1    PORTABLE DIGITAL MEDIA PLAYERS.  BUT THEN WE ALSO CONSIDERED

2    OTHERS, CD PLAYERS IN PARTICULAR, AND SMART PHONES.

3    **Q.**  AND WHAT WAS YOUR CONCLUSION ABOUT WHETHER CD PLAYERS

4    OUGHT TO BE INCLUDED IN THE RELEVANT MARKET?

5    **A.**  WE DECIDED THAT CD PLAYERS WERE NOT RELEVANT DURING THE

6    CLASS PERIOD BECAUSE THEY HAD BECOME OBSOLETE AND VIRTUALLY

7    DISAPPEARED FROM THE MARKET BY THE TIME THE CLASS PERIOD

8    BEGAN.

9        CD PLAYERS HAVE SEVERAL OBVIOUS DISADVANTAGES.  FIRST OF

10    ALL, A SINGLE CD.  SECONDLY, THEY'RE BIG AND HEAVY AND CLUNKY.

11        AND, INDEED, THE REVIEWING ENTITIES, LIKE CNET AND

12    CONSUMERS REPORT AND OTHERS, EVEN STOPPED REVIEWING THEM

13    BEFORE THE CLASS PERIOD STARTED.

14        SO THEY HAD -- ESSENTIALLY, THEY WERE PROBABLY RELEVANT TO

15    APPLE IN ITS DECISIONS WHEN IT FIRST ENTERED THE PORTABLE

16    DIGITAL PLAYER MARKET, BECAUSE THE SONY WALK-MAN, WHICH WAS

17    THE ICONIC PORTABLE CD PLAYER, WAS VERY POPULAR IN THE LATE

18    1990'S.  AND THAT WOULD HAVE BEEN THE PRODUCT TO BEAT WHEN YOU

19    CAME INTO THE PORTABLE DIGITAL MEDIA BUSINESS.  BUT BY THE

20    TIME WE GET TO THE CLASS PERIOD, THEY ARE NO LONGER IMPORTANT.

21        THE OTHER ONE IS SMART PHONES.  AND AS I SAID EARLIER,

22    SMART PHONES CAN BE USED AS PORTABLE DIGITAL MEDIA PLAYERS.

23    THE -- THE REASON THAT SMART PHONES -- SMART PHONES TODAY

24    WOULD BE CONSIDERED IN THE RELEVANT MARKET THAT INCLUDES

25    PORTABLE DIGITAL MEDIA PLAYERS, BUT THEY WOULDN'T BE IN 2008

1    AND THE FIRST MONTH OR SO OF 2009, WHICH IS WHERE THE DAMAGES

2    IN THIS CASE OCCUR.

3        THE REASON FOR THAT IS THAT THEY WEREN'T YET -- NEITHER

4    THE NETWORK THAT SUPPORTS SMART PHONES, NOR THE SMART PHONES

5    THEMSELVES, HAD YET EVOLVED TO THE POINT WHERE THEY WERE AS

6    USEFUL AS PORTABLE DIGITAL MEDIA PLAYERS AS DEVICES FOR

7    PLAYING MUSIC.

8        INDEED, AS LATE AS 2010, 2011 FEWER THAN A QUARTER OF ALL

9    PEOPLE WHO OWNED A SMART PHONE SAID THAT THEY EVER USED THEM

10   TO LISTEN TO MUSIC AT ALL.

11       NOW, YOU CAN LISTEN TO MUSIC IN MANY WAYS.  YOU CAN USE IT

12   AS A PORTABLE DIGITAL MEDIA PLAYER, YOU CAN LISTEN TO MUSIC

13   STREAMING OVER THE INTERNET, SO THERE'S ALL KINDS OF THINGS

14   YOU CAN DO TO LISTEN TO MUSIC, BUT THE VAST MAJORITY OF PEOPLE

15   WHO OWN SMART PHONES LONG AFTER THE END OF THE CLASS PERIOD,

16   DID NOT, IN FACT, OWN -- DID NOT, IN FACT, USE THEM FOR MUSIC.

17   SO WE DECIDED TO EXCLUDE THEM.

18       THERE'S ACTUALLY --

19           **THE COURT:**  HOLD ON.

20   **BY MS. SWEENEY:**

21   **Q.**  LET ME INTERRUPT YOU FOR A SECOND, DR. NOLL.

22   **A.**  OKAY.

23   **Q.**  LET'S TURN TO EXHIBIT 731.

24       YOU MENTIONED EARLIER THE DIFFERENT KINDS OF INFORMATION

25   THAT YOU LOOKED AT IN DETERMINING WHAT PRODUCTS SHOULD BE

1080

NOLL - DIRECT / SWEENEY

```
1    INCLUDED IN THE RELEVANT MARKET.

2        IS EXHIBIT 731 SOMETHING THAT YOU PREPARED?

3    A.  YES.  THERE'S ACTUALLY A SEQUENCE OF THESE EXHIBITS THAT

4    LOOK AT THE DOCUMENTS THAT I FOUND IN APPLE'S DISCOVERY THAT

5    WERE DOCUMENTS THAT WERE PREPARED FOR THE PRICE COMMITTEE

6    OF -- FOR APPLE IPODS IN SORT OF INFORMING THEM IN MAKING

7    THEIR DECISIONS ABOUT PRICING.

8        SO, THERE'S A LONG SERIES OF THESE EXHIBITS THAT SHOW WHAT

9    THE CHARACTERISTICS OF THE RELEVANT APPLE IPOD MODEL ARE AND

10   COMPARE IT WITH WHAT THEY REGARD AS THE MAIN COMPETITORS FOR

11   THAT PRODUCT.

12   Q.  AND LOOKING JUST AT THIS FIRST ONE OF THESE SERIES OF

13   EXHIBITS --

14       THE COURT:  MS. SWEENEY, I'M GOING TO ASK YOU A

15   QUESTION.

16       THE WITNESS:  YES.

17       THE COURT:  THIS IS 731.  HE SAID THAT THERE'S A LONG

18   SERIES.  YOU HAVE THREE MINUTES LEFT.

19       WOULD YOU LIKE TO STOP NOW?

20       MS. SWEENEY:  YES, THAT'S A GOOD IDEA.

21       THE COURT:  RATHER THAN --

22       MS. SWEENEY:  OKAY.

23       THE COURT:  -- DO ONE PAGE AND THEN STOP.

24       MS. SWEENEY:  SURE.  THAT MAKES SENSE.  THANK YOU,

25   YOUR HONOR.
```

1081

1           **THE COURT:**  LADIES AND GENTLEMEN, THEN WE HAVE

2     CONCLUDED THE PROCEEDINGS FOR THE WEEK.  WE WILL START AGAIN

3     BRIGHT AND EARLY ON MONDAY MORNING.

4        GIVEN THAT I HAVE SUNDAY, PERHAPS I'LL GET SOMETHING

5     BAKED.  I DON'T KNOW.  WE'LL SEE HOW MY SON, WHO LOVES TO

6     BAKE, IS FEELING THAT DAY.

7        BUT, GIVEN THAT YOU'VE GOT THE WEEKEND AHEAD OF YOU, LET

8     ME GIVE YOU, AGAIN, THE LONG ADMONISHMENT.

9        DO NOT COMMUNICATE WITH ANYONE IN ANY WAY.  DO NOT LET

10    ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS

11    OF THIS CASE, OR ANYTHING TO DO WITH IT.

12        THIS INCLUDES DISCUSSING THE CASE IN PERSON, IN WRITING,

13    BY PHONE, OR ANY OTHER ELECTRONIC MEANS, VIA EMAIL, TEXT

14    MESSAGING, OR ANY INTERNET CHAT ROOM, BLOG, WEBSITE OR ANY

15    OTHER FEATURE.

16        THIS APPLIES TO COMMUNICATING WITH ANYONE, INCLUDING YOUR

17    FELLOW JURORS, FAMILY MEMBERS, EMPLOYERS, FRIENDS, RELATIVES.

18    IF YOU ARE ASKED OR APPROACHED IN ANY WAY ABOUT YOUR JURY

19    SERVICE OR ANYTHING TO -- ABOUT THIS CASE, YOU MUST RESPOND

20    THAT YOU HAVE BEEN ORDERED BY THE COURT NOT TO DISCUSS THE

21    MATTER.

22        BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND THE LEGAL

23    INSTRUCTIONS THAT YOU MAY PROPERLY CONSIDER BEFORE YOU MAY

24    REACH A VERDICT, YOU ARE ORDERED NOT TO READ, WATCH, OR LISTEN

25    TO ANY NEWS OR MEDIA ACCOUNTS OR COMMENTARY ABOUT THE CASE OR

1    ANYTHING TO DO WITH IT.

2        REMEMBER WE HAVE OUR BOX.  WE ARE PUTTING EVIDENCE IN THAT

3    BOX.  YOU ALL HAVE TO SEE AND CONSIDER THE EXACT SAME THING

4    UNDER THE EXACT SAME CIRCUMSTANCES.

5        DO NOT DO ANY RESEARCH, CONSULT DICTIONARIES, SEARCH THE

6    INTERNET, OR ANY REFERENCE MATERIALS.  DO NOT MAKE ANY

7    INVESTIGATION ON YOUR OWN OR TRY TO LEARN ABOUT THIS CASE ON

8    YOUR OWN.

9        IN FACT, GO OFF, HAVE A WONDERFUL WEEKEND.  ENJOY WHATEVER

10   HOLIDAY THINGS YOU ARE STARTING TO ENJOY IN DECEMBER, CATCH UP

11   ON YOUR WORK, CATCH UP ON YOUR SLEEP, CATCH UP ON YOUR EATING,

12   AND WE'LL SEE YOU ON MONDAY MORNING.

13       WE WILL STAND IN RECESS WITH YOU UNTIL MONDAY MORNING AT

14   8:30.  THANK YOU.

15       (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

16            **THE COURT:**  ALL RIGHT.  THE RECORD WILL REFLECT THAT

17   THE JURY IS GONE.  PROFESSOR NOLL, YOU MAY STEP DOWN.

18            **THE WITNESS:**  GOOD.

19            **THE COURT:**  LET' TAKE CARE OF A FEW HOUSEKEEPING

20   THINGS.

21       FIRST OF ALL, MS. SWEENEY, DO YOU -- I TAKE IT YOU HAVE

22   EXCHANGED THESE SLIDES.

23            **MS. SWEENEY:**  YES, YOUR HONOR.  THERE'S NO OBJECTION

24   TO THE DEMONSTRATIVES.

25            **THE COURT:**  DO YOU HAVE A COPY FOR ME?  HE SEEMS TO

```
1   BE FOLLOWING CLOSELY ALONG.  IT MEANS I HAVE TO TAKE FEWER

2   NOTES.

3            MS. SWEENEY:  YES.

4            THE COURT:  TERRIFIC.

5       LET'S GO THROUGH EXHIBITS.

6       DO YOU HAVE SOMETHING ELSE?

7            MR. ISAACSON:  YEAH.  I WANTED TO NOTIFY THE COURT OF

8   SOMETHING.  MS. DUNN WILL OBVIOUSLY TAKE OVER THE EXHIBITS.

9   IT'S HER WITNESS.

10      WE RECEIVED A FAX, SO YOU MAY BE RECEIVING THIS FAX.  IT'S

11  NOT ON THE DOCKET SHEET.  IT IS A MOTION FOR LEAVE TO

12  INTERVENE AS PLAINTIFF BY WHAT APPEARS TO BE A PRO SE

13  PLAINTIFF NAMED JEFFREY KOWALSKI OF HEMLOCK, MICHIGAN, WITH A

14  POST OFFICE BOX ADDRESS, REQUESTING THE COURT GRANT

15  MR. JEFFREY KOWALSKI LEAVE TO INTERVENE AS A PLAINTIFF

16  PURSUANT TO RULE 24.

17      HE'S A MEMBER OF THE CLASS, IT SAYS.  THE MOTION IS TIMELY

18  SUBMITTED AND ADEQUATE PARTIES NO LONGER EXIST TO PROTECT

19  MR. KOWALSKI'S INTEREST.

20      WE HAVE JUST LOOKED HIM UP ON PUBLIC DOCKET SHEETS.  HE

21  FILED A PRO SE ACTION ALSO IN MICHIGAN, WHERE HE RESIDES,

22  AGAINST THE ATTORNEY GENERAL OF MISSOURI BECAUSE HE OPERATES A

23  WEBSITE WHERE HE PUBLISHES A LIST OF PUBLIC OFFICIALS AND

24  USES, SAYS THE SITE, AND MAY POST INFORMATION ABOUT THE

25  OFFICIALS AND HE BELIEVES HE HAS BEEN THREATENED BY MISSOURI
```

1084

1    ATTORNEY GENERAL.

2        SO YOU MAY BE RECEIVING PAPERS FROM THIS GENTLEMAN.  AND

3    THERE'S NO REFLECTION OF PLAINTIFFS' COUNSEL HAVING ANY

4    CONNECTION TO THIS.

5            **MS. SWEENEY:**  IT'S THE FIRST I LEARNED OF IT, YOUR

6    HONOR.

7            **MR. COUGHLIN:**  NO, YOUR HONOR.  WE DON'T HAVE ANY

8    CONNECTION WITH MR. KOWALSKI.

9            **THE COURT:**  ALL RIGHT.  LET'S GO THROUGH THE

10   EXHIBITS.

11       AGAIN, I'M GOING TO DO THESE IN THE ORDER IN WHICH THEY

12   WERE DISCUSSED DURING THE TRIAL.

13       WE'LL START WITH ROBBIN.  THE VERY FIRST ONE THERE WAS NO

14   STIPULATION.  IT'S 819.

15       THIS IS THE -- THIS IS JUST THE -- IS THIS BEING REQUESTED

16   FOR ADMISSION?

17           **MR. COUGHLIN:**  NO, YOUR HONOR.  THE FIRST EXHIBIT --

18           **THE COURT:**  IT'S --

19           **MR. COUGHLIN:**  -- IT'S NOT CLEAR IS 880A.  THAT WAS

20   THE CLIP, AND IT'S NOT OBJECTED TO ON RIP, MIX AND BURN.

21           **THE COURT:**  THEY PLAYED IT AS WELL.

22           **MS. DUNN:**  WE PLAYED 880.

23           **MR. COUGHLIN:**  IT'S JUST A SHORTER --

24           **MS. DUNN:**  IT'S AN EXCERPT.  880A EXCERPT.

25           **THE COURT:**  OKAY.  WELL, I THOUGHT -- 880A, NO

1085

```
 1    OBJECTION?
 2              MS. DUNN:  NO OBJECTION.  I AM JUST CLARIFYING.  880
 3    IS THE FULL COMMERCIAL.  PLAINTIFFS MADE 880A, WHICH IS, I
 4    THINK -- I'M ACTUALLY NOT SURE IT IS AN EXCERPT.  I THINK IT
 5    MAY HAVE BEEN EDITED, LIKE PART OF IT TAKEN OUT AND GONE TO
 6    THE NEXT PART?
 7              MR. COUGHLIN:  NO, IT'S AN APPLE --
 8              THE COURT:  STOP.  ONE AT A TIME.
 9              MR. COUGHLIN:  IT'S AN APPLE COMMERCIAL.  THEY CUT IT
10    DOWN.  APPLE DID, AND WE JUST TOOK IT.  AND IT WAS SHORTER
11    BECAUSE HE HAD PLAYED THE WHOLE 880.  I THOUGHT IT WAS QUICKER
12    TO GO THROUGH A SHORTER VERSION.
13              THE COURT:  SO IT'S ADMITTED AS A SUBSET OF 880.
14         (PLAINTIFFS' EXHIBIT 880A RECEIVED IN EVIDENCE)
15              MS. DUNN:  NO OBJECTION.
16         THE COURT:  2015 WAS STIPULATED.  THAT'S ADMITTED.
17         (DEFENDANT'S EXHIBIT 2015 RECEIVED IN EVIDENCE)
18         THE COURT:  2021, STIPULATED.  THAT'S ADMITTED.
19         (DEFENDANT'S EXHIBIT 2021 RECEIVED IN EVIDENCE)
20         THE COURT:  69 WAS STIPULATED.  THAT'S ADMITTED.
21         (PLAINTIFFS' EXHIBIT 69 RECEIVED IN EVIDENCE)
22         THE COURT:  83 WAS PREVIOUSLY ADMITTED.
23      92.  IS THAT BEING OFFERED?
24         MR. COUGHLIN:  YES, IT IS, YOUR HONOR.
25         THE COURT:  IS THERE AN OBJECTION?
```

1      **MS. DUNN:**  CONTROLLED BY THE LIMITING INSTRUCTION, NO

2   OTHER OBJECTION.

3          **THE COURT:**  OKAY.  THAT'S ADMITTED.

4          (PLAINTIFFS' EXHIBIT 92 RECEIVED IN EVIDENCE)

5          **THE COURT:**  102.  I DIDN'T -- THERE -- IT WAS USED,

6   BUT THERE WAS NO SPECIFIC QUESTION.

7      IS THAT BEING OFFERED?

8          **MR. COUGHLIN:**  NO, YOUR HONOR.

9          **THE COURT:**  912.  THIS IS THE -- THIS IS AN EMAIL,

10  BUT THE WITNESS WAS NOT --

11         **MR. COUGHLIN:**  IT WAS NOT SHOWN, YOUR HONOR.

12         **THE COURT:**  OKAY.

13     118, PREVIOUSLY ADMITTED.

14     121, PREVIOUSLY ADMITTED.

15     128, PREVIOUSLY ADMITTED.

16     133 WAS STIPULATED.  THAT'S ADMITTED.

17         (PLAINTIFFS' EXHIBIT 133 RECEIVED IN EVIDENCE)

18         **THE COURT:**  136 THAT WAS AN ARTICLE?

19         **MR. COUGHLIN:**  THAT'S -- THAT'S A STIPULATED -- WITH

20  THE LIMITING INSTRUCTION, YOUR HONOR, THAT COMES IN.

21         **MS. DUNN:**  AGREED.

22         **THE COURT:**  OKAY.  THAT'S ADMITTED.

23         (PLAINTIFFS' EXHIBIT 136 RECEIVED IN EVIDENCE)

24         **THE COURT:**  153?

25         **MR. COUGHLIN:**  SAME THING, YOUR HONOR.  LIMITING

1087

```
1    INSTRUCTION.

2            THE COURT:  MS. DUNN, AGREED?

3            MS. DUNN:  AGREED.

4            THE COURT:  THAT COMES IN.

5        (PLAINTIFFS' EXHIBIT 153 RECEIVED IN EVIDENCE)

6            THE COURT:  ALL RIGHT.  176, IT WAS NOT CLEAR THERE

7    WAS FOUNDATION.

8            MR. COUGHLIN:  I BELIEVE THAT HE WAS ON THAT.

9        I BELIEVE THAT HE WAS ON THAT EMAIL.  I ASKED HIM ABOUT

10   IT.  HE SAID THAT HE HAD NO REASON TO BELIEVE HE DIDN'T

11   RECEIVE IT, I BELIEVE.

12           THE COURT:  I'M NOT SURE YOU ASKED HIM THAT QUESTION.

13   THERE WAS ANOTHER ONE WHERE YOU ASKED THAT QUESTION.  ON 176

14   YOU DIDN'T.

15           MR. COUGHLIN:  I WOULD MOVE FOR IT'S ADMISSION.  IF

16   THERE'S AN OBJECTION, THERE'S AN OBJECTION.

17           MS. DUNN:  MY RECOLLECTION IS THE SAME AS YOUR

18   HONOR'S, BUT I ALSO HAVE NOT LOOKED BACK AT THE TRANSCRIPT.

19           THE COURT:  DO YOU OBJECT?

20           MS. DUNN:  NO, YOUR HONOR.  SUBJECT TO THE LIMITING

21   INSTRUCTION, WE DO NOT OBJECT.

22           THE COURT:  IT IS ADMITTED.

23       (PLAINTIFFS' EXHIBIT 176 RECEIVED IN EVIDENCE)

24           THE COURT:  2239 WAS PREVIOUSLY ADMITTED.

25       2247, THERE IS A STIPULATION.  IT IS ADMITTED.
```

1088

```
1           (DEFENDANT'S EXHIBIT 2247 RECEIVED IN EVIDENCE)
2           THE COURT:  218, STIPULATION.  IT'S ADMITTED.
3           (PLAINTIFFS' EXHIBIT 218 RECEIVED IN EVIDENCE)
4           THE COURT:  267.  THAT WAS AN ARTICLE OR HAD AN
5    ARTICLE?
6           MR. COUGHLIN:  THOSE ARE -- THOSE ARE SUBJECT --
7    THAT'S SUBJECT TO THE STIPULATION.
8           MS. DUNN:  AGREED.
9           THE COURT:  ALL RIGHT.  THEN IT'S ADMITTED.
10          (PLAINTIFFS' EXHIBIT 267 RECEIVED IN EVIDENCE)
11          THE COURT:  269 AND 2776 WERE PREVIOUSLY ADMITTED.
12    312.  THAT'S STIPULATED, SO IT'S ADMITTED.
13          (PLAINTIFFS' EXHIBIT 312 RECEIVED IN EVIDENCE)
14          THE COURT:  2354, THERE'S A STIPULATION ON THAT.
15    THAT'S ADMITTED.
16          (DEFENDANT'S EXHIBIT 2354 RECEIVED IN EVIDENCE)
17          THE COURT:  316, PREVIOUSLY ADMITTED.
18    465 INCLUDED AN ARTICLE.  NO OBJECTION WITH THE
19    INSTRUCTION?
20          MS. DUNN:  CORRECT.
21          THE COURT:  ALL RIGHT.  THEN THAT'S ADMITTED.
22          (PLAINTIFFS' EXHIBIT 465 RECEIVED IN EVIDENCE)
23          THE COURT:  333.
24          MR. COUGHLIN:  SAME, YOUR HONOR.
25          MS. DUNN:  SAME.
```

```
1            MR. COUGHLIN:  WITH THE LIMITING INSTRUCTION.

2            THE COURT:  THEN IT'S ADMITTED.

3         (PLAINTIFFS' EXHIBIT 333 RECEIVED IN EVIDENCE)

4            THE COURT:  THEN WE GO TO 822, 2854.

5            MR. COUGHLIN:  I HAD THE NEXT ONE GOING TO 2505, YOUR

6     HONOR.  LET ME LOOK BACK.

7            THE COURT:  THESE WERE THE ONES THAT -- I THINK

8     YOU -- THESE WERE THE TWO ARTICLES THAT YOU READ -- SO YOU ARE

9     NOT -- THOSE WEREN'T YOURS.  YOU ARE NOT OFFERING THOSE, ARE

10    YOU?

11           MS. DUNN:  2505 IS NOT ONE OF THE TWO ARTICLES.

12           THE COURT:  NO, NO.  822, 2854.  ARE YOU REQUESTING

13    THEY BE ADMITTED?  THOSE ARE THE TWO NEWS ARTICLES.

14           MS. DUNN:  NO, YOUR HONOR.

15           THE COURT:  OKAY.

16        THEN 2205, I NOTE, INCOMPLETE WAS THE OBJECTION?

17           MR. COUGHLIN:  I THINK -- WAS THAT THE EXHIBIT THAT

18    HAD THE LINK TO THE HYMN SITE?  IT HAS A LINK IN IT, BUT IT

19    DOESN'T ACTUALLY HAVE THE ARTICLE.  IT DOESN'T HAVE THE

20    EMBEDDED ARTICLE, SO I MAINTAIN THE OBJECTION.  IT WAS A CITE

21    TO THE HYMN SITE, I THINK.

22           MS. DUNN:  COURT'S INDULGENCE.

23        YOUR HONOR, WE ARE MOVING TO ADMIT THIS.

24           THE COURT:  WELL, I WILL HAVE TO TAKE A LOOK TO SEE

25    IF IT IS COMPLETE ENOUGH.
```

1090

```
1        MR. COUGHLIN:  I HAVE NO OBJECTION, YOUR HONOR.

2        MS. DUNN:  IT'S A -- IT JUST HAS A NAME OF A LINK.

3        THE COURT:  OKAY.  SO IT'S ADMITTED THEN.

4      (DEFENDANT'S EXHIBIT 2205 RECEIVED IN EVIDENCE)

5        THE COURT:  2185 STIPULATED.  THAT'S ADMITTED.

6      (DEFENDANT'S EXHIBIT 2185 RECEIVED IN EVIDENCE)

7        THE COURT:  2222 STIPULATED.  THAT'S ADMITTED.

8      (DEFENDANT'S EXHIBIT 2222 RECEIVED IN EVIDENCE)

9        THE COURT:  2234?

10       MS. DUNN:  THIS IS THE SAME ISSUE.  IT JUST CITES WWW

11   SOMETHING DOT NET.

12       MR. COUGHLIN:  NO OBJECTION.

13       THE COURT:  THAT'S ADMITTED.

14     (DEFENDANT'S EXHIBIT 2234 RECEIVED IN EVIDENCE)

15       THE COURT:  2243 WAS PREVIOUSLY ADMITTED.

16   2252 IS ADMITTED PER STIPULATION.

17     (DEFENDANT'S EXHIBIT 2252 RECEIVED IN EVIDENCE)

18       THE COURT:  2317 ADMITTED PER STIPULATION.

19     (DEFENDANT'S EXHIBIT 2317 RECEIVED IN EVIDENCE)

20       THE COURT:  THE NEXT NEW ONE WAS 2342.  ADMITTED PER

21   STIPULATION.

22     (DEFENDANT'S EXHIBIT 2342 RECEIVED IN EVIDENCE)

23       THE COURT:  2330.

24       MR. COUGHLIN:  WHICH ONE IS THAT, YOUR HONOR?  I AM

25   SORRY.
```

1091

```
 1          THE COURT:  I JUST WRITE DOWN NUMBERS.

 2          MS. DUNN:  THAT IS THE EMAIL THAT DISCUSSES PORN

 3     MUSIC.

 4          THE COURT:  THAT WAS GOOD PREP FOR THAT WITNESS.

 5          MS. DUNN:  HARD TO FORGET.

 6          MR. COUGHLIN:  NO OBJECTION, YOUR HONOR.

 7          THE COURT:  THAT'S ADMITTED.

 8       (DEFENDANT'S EXHIBIT 2330 RECEIVED IN EVIDENCE)

 9          THE COURT:  2107?  MR. COUGHLIN?

10          MR. COUGHLIN:  I GUESS THEY ARE MOVING TO ADMIT THAT.

11          MS. DUNN:  WE ARE.

12          MR. COUGHLIN:  NO OBJECTION.

13          THE COURT:  THAT'S ADMITTED.

14       (DEFENDANT'S EXHIBIT 2107 RECEIVED IN EVIDENCE)

15          THE COURT:  2228 ADMITTED PER STIPULATION.

16       (DEFENDANT'S EXHIBIT 2228 RECEIVED IN EVIDENCE)

17          THE COURT:  2780 IS THE NEXT ONE.  MR. COUGHLIN, IS

18     THAT BEING REQUESTED FOR ADMISSION?

19          MS. DUNN:  YES, IT IS.

20          MR. COUGHLIN:  2780, YOUR HONOR?

21          THE COURT:  CORRECT.

22          MS. DUNN:  THIS IS MR. JOBS' EMAIL TO MR. ROBBIN

23     ABOUT THE MYTUNES HACK.

24          MR. COUGHLIN:  NO OBJECTION, YOUR HONOR.

25          THE COURT:  THAT'S ADMITTED.
```

1092

```
1          (DEFENDANT'S EXHIBIT 2780 RECEIVED IN EVIDENCE)

2          THE COURT:  2419 WAS PREVIOUSLY ADMITTED.

3       2850, IS THAT BEING REQUESTED FOR ADMISSION?

4          MS. DUNN:  YES, IT IS.

5          THE COURT:  MR. COUGHLIN?

6          MR. COUGHLIN:  WITH THE LIMITING INSTRUCTION, NO

7    OBJECTION, YOUR HONOR.

8          THE COURT:  OKAY.  THAT'S ADMITTED.

9          (DEFENDANT'S EXHIBIT 2850 RECEIVED IN EVIDENCE)

10         THE COURT:  2481 IS ADMITTED PER STIPULATION.

11         (DEFENDANT'S EXHIBIT 2481 RECEIVED IN EVIDENCE)

12         THE COURT:  THE NEXT NEW ONE I HAVE IS 2272 SHOWING

13   AS INCOMPLETE.

14           MR. COUGHLIN:  NO OBJECTION, YOUR HONOR.

15         THE COURT:  THAT'S ADMITTED.

16         (DEFENDANT'S EXHIBIT 2272 RECEIVED IN EVIDENCE)

17         THE COURT:  2449, YOU ONLY USED PAGE 2 OF THAT, BUT

18   THERE IS A STIPULATION.  ANY OBJECTION TO --

19           MR. COUGHLIN:  NO OBJECTION.

20         THE COURT:  THAT'S ADMITTED.

21         (DEFENDANT'S EXHIBIT 2449 RECEIVED IN EVIDENCE)

22         THE COURT:  172 IS THE NEXT NEW ONE.  THAT IS

23   ADMITTED PER STIPULATION.

24         (PLAINTIFFS' EXHIBIT 172 RECEIVED IN EVIDENCE)

25         THE COURT:  NOW WITH RESPECT TO MR. JOBS' DEPOSITION
```

TRANSCRIPT --

**MS. DUNN:** YOUR HONOR, I HAVE A COUPLE OF EXHIBITS, IF YOU WANT TO DO THOSE NOW OR WAIT UNTIL AFTER THE DEPOSITION, THAT ARE ON MY LIST.

**THE COURT:** FROM ROBBIN?

**MS. DUNN:** FROM ROBBIN.

**THE COURT:** THAT WERE NOT ALREADY ADMITTED? WHAT DO YOU SHOW?

**MS. DUNN:** LET ME ASK.

I SHOW 2505, WHICH FIRST PLAINTIFFS' COUNSEL SHOWED, BUT I DON'T THINK THAT WE WENT OVER IT WHEN WE WENT OVER HIS EXHIBITS, AND THEN I SHOWED --

**THE COURT:** OKAY. I NOTED THAT THIS WAS A DUPLICATE. HOLD ON.

ANY OBJECTION TO 2505?

**MR. COUGHLIN:** NONE, YOUR HONOR.

**THE COURT:** THAT'S ADMITTED.

(DEFENDANT'S EXHIBIT 2505 RECEIVED IN EVIDENCE)

**MS. DUNN:** I HAVE A QUESTION AS TO 128, WHICH WAS USED BY BOTH PLAINTIFFS' COUNSEL AND ME, BUT I DON'T KNOW IF IT HAS ALREADY BEEN ADMITTED.

**THE COURT:** IT MAY HAVE BEEN PREVIOUSLY ADMITTED. HOLD ON.

I'M SHOWING THAT IT WAS ALREADY ADMITTED.

**MS. DUNN:** THANK YOU.

1094

```
1          THE COURT:  OKAY.  NOW FOR JOBS.

2       THE ONES THAT WERE USED, 118 WAS PREVIOUSLY ADMITTED.  121

3    WAS PREVIOUSLY ADMITTED.

4       102 WAS USED, BUT I DID NOT SHOW SUFFICIENT FOUNDATION.

5          MS. SWEENEY:  WE MOVE ITS ADMISSION.  I'M NOT SURE

6    WHETHER APPLE IS GOING TO OBJECT.  THEY DIDN'T --

7          MS. DUNN:  WE JUST NEED TO LOOK AT WHAT 102 IS.

8          MS. SWEENEY:  IT'S THE EMAIL FROM ROB GLASER.

9          MS. DUNN:  WE DO NOT OBJECT.

10         THE COURT:  ALL RIGHT.  102 IS ADMITTED.

11         (PLAINTIFFS' EXHIBIT 102 RECEIVED IN EVIDENCE)

12         THE COURT:  124 WAS PREVIOUSLY ADMITTED, AS WAS 125.

13   THEN THE NEXT ONE I HAVE IS 908.

14         MS. SWEENEY:  I DON'T THINK WE ARE MOVING TO ADMIT

15   THAT ONE, YOUR HONOR.

16         THE COURT:  OKAY.  136 I JUST ADMITTED.  ALL RIGHT.

17     WHY DON'T WE DO NOLL ALL AT ONCE.

18         MS. SWEENEY:  THERE'S ONE MORE, YOUR HONOR, THAT --

19   IT'S EXHIBIT 124, WHICH WAS -- I'M SORRY, NOT 124,

20   EXHIBIT 933, WHICH WAS IN THE TESTIMONY DESIGNATED BY APPLE.

21   AND WE'D ONLY BE OBJECTING -- I'M SORRY, WE WOULD MOVE TO

22   ADMIT BUT NOT FOR THE TRUTH.  IT'S AN ARTICLE.

23         MS. DUNN:  I DON'T -- WHICH NUMBER ARE YOU SPEAKING

24   OF?

25         MS. SWEENEY:  ACTUALLY, MR. JOBS ADOPTED THE
```

1095

```
1    STATEMENT IN HIS TESTIMONY.  IT'S AT -- IT'S THE WALL STREET

2    JOURNAL ARTICLE, AND MR. JOBS WAS ASKED IF HE WOULD AGREE WITH

3    THE STATEMENT IN THE ARTICLE.  AND HE SAID --

4            THE COURT:  THE TESTIMONY, IF HE AGREES -- HE DIDN'T

5    AGREE TO THE ENTIRE ARTICLE.

6            MS. SWEENEY:  THAT'S CORRECT, YOUR HONOR.

7            THE COURT:  SO WHAT IS THE -- WHAT IS THE EXHIBIT

8    NUMBER?

9            MS. SWEENEY:  933.

10        SO WE ARE MOVING IN JUST MR. JOBS' STATEMENT ADOPTING THAT

11   PART OF THE ARTICLE, AND THE REST OF THE ARTICLE IS MOVED --

12   IS NOT MOVED FOR ADMISSION FOR THE TRUTH OF THE MATTER

13   ASSERTED.

14           THE COURT:  BUT YOU HAVE HIS STATEMENT.

15        ALL RIGHT.  IS THERE AN OBJECTION ON 933?  I DIDN'T EVEN

16   NOTE IT.

17           MS. DUNN:  I JUST NEED TO TAKE A LOOK AT 933.

18           THE COURT:  WHAT'S THE EXHIBIT NUMBER TO HIS

19   DEPOSITION?

20           MS. DUNN:  8.

21           THE COURT:  8?

22        WHERE IS IT IN THE TRANSCRIPT?

23           MS. SWEENEY:  IT'S AT PAGE 46 TO 47 IN THE

24   TRANSCRIPT.

25           THE COURT:  ALL RIGHT.  HOLD ON.
```

1096

```
1              (PAUSE IN THE PROCEEDINGS.)

2      SO I SEE THE REFERENCE TO EXHIBIT 12.  WHAT LINE?

3          MS. SWEENEY:  MS. DUNN?

4          MS. DUNN:  I'M SORRY.  IT STARTS 46:03 TO 47:25, THAT

5   SECTION, LINE 3, 4, 5, 6, 7.

6          THE COURT:  OKAY.  SO THERE ISN'T -- THAT'S WHY.

7   THERE'S NO -- EXHIBIT 12 IS NOT 933, CORRECT?  THAT WAS THE

8   CLIP RIGHT BEFORE?  SO THERE WAS NO REFERENCE IN THE

9   TRANSCRIPT ITSELF TO AN EXHIBIT.

10         MS. DUNN:  THAT'S CORRECT.

11         THE COURT:  AND I TAKE IT THAT -- I DON'T REMEMBER

12  THE EXHIBIT BEING SHOWN ON THE SCREEN AS I WAS MAKING NOTES;

13  IS THAT CORRECT?  SO THE JURY NEVER SAW IT.

14         MS. SWEENEY:  I THINK YOU'RE RIGHT, YOUR HONOR.  WE

15  WILL WITHDRAW.

16         THE COURT:  ALL RIGHT.

17         MS. DUNN:  YOUR HONOR, APPLE WOULD LIKE TO MOVE

18  EXHIBIT 908.

19         THE COURT:  SO THAT WAS SHOWN.  ANY OBJECTION?

20         MS. SWEENEY:  NO OBJECTION, YOUR HONOR.

21         THE COURT:  THAT'S ADMITTED THEN.

22      (PLAINTIFFS' EXHIBIT 908 RECEIVED IN EVIDENCE)

23         THE COURT:  933 IS NOT.

24      THAT'S ALL I HAVE ON EXHIBITS.

25      DO YOU HAVE ANYTHING ELSE?
```

1097

1      MR. ISAACSON?

2              **MR. ISAACSON:**  YES, YOUR HONOR.

3      PLAINTIFFS WILL REST, I GUESS, ON MONDAY.  WE WOULD JUST

4      LIKE AN INSTRUCTION OR AN EXPLANATION TO THE JURY, IF WE ARE

5      GOING TO SAY THINGS LIKE "THE PLAINTIFFS' CASE IS OVER AND NOW

6      IT'S THE DEFENDANT'S CASE," THAT ACTUALLY OUR CASE WAS

7      INCLUDED IN THE PLAINTIFF'S CASE, THAT SO THAT THEY ARE NOT

8      EXPECTING A RAFT OF NEW APPLE WITNESSES.  AND SO THEY

9      UNDERSTAND WE HAVE BEEN PRESENTING OUR CASE IN OUR REDIRECT,

10     JUST TO AVOID ANY CONFUSION ON THEIR PART.

11             **THE COURT:**  WHO DO YOU ANTICIPATE -- MR. ISAACSON?

12             **MR. ISAACSON:**  YES.

13             **THE COURT:**  -- AFTER THE PLAINTIFFS REST?

14             **MR. ISAACSON:**  WE HAVE THREE EXPERT WITNESSES.

15     TOPEL, MURPHY, AND KELLY.

16     WE HAVE MR. DONNELLY FROM APPLE.  WE HAVE MR. O'NEIL,

17     SHORT WITNESS WITH THE RECEIPTS.  WE ARE CONSIDERING WHAT TO

18     DO WITH TWO OTHER APPLE WITNESSES, AND WE WILL INFORM

19     PLAINTIFFS OVER THE WEEKEND WHAT WE ARE GOING TO DO WITH THEM.

20     WE ARE GOING TO EVALUATE WHETHER THEY ARE NECESSARY AFTER THIS

21     WEEK'S TESTIMONY.

22             **THE COURT:**  OKAY.

23             **MR. COUGHLIN:**  THOSE WITNESSES, WOULD THAT BE -- I

24     HAVE THREE:  FASOLI, BELL, AND GRACE KVAMME.

25             **MR. ISAACSON:**  IT WOULD BE BELL AND FASOLI.  GRACE

1    KVAMME IS DEFINITELY NOT BEING CALLED.

2                **THE COURT:**  HOW DO YOU TELL THAT?

3                **MR. ISAACSON:**  K-V-A-M-M-E.

4                **THE COURT:**  OKAY.

5                **MR. ISAACSON:**  AS SOON AS SHE MET US, SHE LEFT THE

6    COMPANY.

7                **THE COURT:**  ALL RIGHT.  I EXPECT THAT YOU WILL BE

8    FILING YOUR RULE 50 MOTIONS AS SOON AS THE PLAINTIFFS REST?

9                **MR. ISAACSON:**  YES.

10                **THE COURT:**  OKAY.

11        ARE YOU GOING TO WANT EXTENDED TIME FOR ARGUMENT OR ARE

12    WE -- IT IS NOT UNCOMMON FOR COURTS TO DEFER JUDGMENT ON THESE

13    KINDS OF MOTIONS UNTIL AFTER THE CLOSE OF EVIDENCE.

14        AND ARE YOU PLANNING TO HAVE YOUR EXPERTS HERE ON MONDAY?

15    I MEAN, I HAVEN'T SEEN THE MOTIONS, SO I'M NOT GIVING ANY

16    JUDGMENTS, BUT --

17                **MR. ISAACSON:**  WE WILL BE READY TO PROCEED ON MONDAY.

18    YES.

19                **THE COURT:**  OKAY.

20                **MR. ISAACSON:**  AND I THINK WE WOULD LIKE SOME

21    ARGUMENT ON THEM, YOUR HONOR.  I DON'T THINK WE WANT TO GO

22    OVER WITH THE COURT ISSUES THAT WE'VE GONE OVER BEFORE WITH

23    YOU, BUT WE DO FEEL THAT THERE'S SOME ISSUES IN THE MOTION

24    THAT WE HAVE NOT DISCUSSED.

25                **THE COURT:**  OKAY.

1099

1          **MR. ISAACSON:**  SO WE WOULD LIKE TO JUST HAVE THE

2    CHANCE TO ANSWER ANY QUESTIONS YOU HAVE AND TO BASICALLY SET

3    OUT OUR POSITION.

4          **THE COURT:**  ALL RIGHT.  OKAY.  OTHER ISSUES?

5          **MR. ISAACSON:**  I THINK WE -- ARE WE DOING JURY

6    INSTRUCTIONS ON -- AND ARGUMENT ON MONDAY OR TUESDAY?  WE

7    HEARD TWO DIFFERENT THINGS.

8          **THE COURT:**  I THINK I ONLY SAID MONDAY.

9          **MR. ISAACSON:**  OKAY.

10          **THE CLERK:**  I THINK YOU SAID A LONG DAY MONDAY.

11          **THE COURT:**  YES.  LONG DAY MONDAY.

12     OKAY.

13          **MS. SWEENEY:**  I HAVE A QUESTION, YOUR HONOR.

14      FOR THE BRIEF THAT PLAINTIFFS ARE SUBMITTING TOMORROW, ON

15    SATURDAY, IF WE BUMP UP TO THE MIDNIGHT ECF FILING DEADLINE,

16    YOUR HONOR'S COURTESY COPIES, SHOULD WE DELIVER THAT THE NEXT

17    MORNING --

18          **THE COURT:**  DON'T, DON'T DELIVER --

19          **MS. SWEENEY:**  I FIGURED AS MUCH.

20          **THE COURT:**  HOLD ON.  BECAUSE WE ALSO -- LET ME

21    DOUBLE-CHECK SOMETHING.

22      I THINK THEY ARE DOING MAINTENANCE ON OUR ECF SYSTEM.  I

23    HAVE THIS VAGUE MEMORY.  I DON'T ALWAYS READ EMAILS DURING

24    TRIAL.

25                    (PAUSE IN THE PROCEEDINGS.)

1100

```
 1        SO ECF WILL BE DOWN FOR ABOUT FOUR HOURS.  HOLD ON.

 2   CHECKING.  SATURDAY FROM EIGHT A.M. TO NOON.  SO I TAKE IT

 3   YOU'RE NOT GOING TO BE FILING BETWEEN EIGHT A.M. AND NOON.

 4             MR. COUGHLIN:  NO, YOUR HONOR.

 5             THE COURT:  OKAY.  JUST BY NINE A.M. IS FINE.

 6             MS. SWEENEY:  THANK YOU, YOUR HONOR.

 7             THE COURT:  OKAY.  OTHER ISSUES?

 8        NO?  WELL, TRY TO GET SOME REST.  HAVE A GOOD WEEKEND.

 9             MR. COUGHLIN:  THANK YOU, YOUR HONOR.

10             MR. ISAACSON:  THANK YOU, YOUR HONOR.

11             THE COURT:  WE'LL STAND IN RECESS UNTIL EIGHT A.M. ON

12   MONDAY MORNING.

13        THANK YOU.

14             MS. SWEENEY:  THANK YOU.

15

16             (PROCEEDINGS CONCLUDED AT 1:53 P.M.)

17

18

19

20

21

22

23

24

25
```

1

2                      **CERTIFICATE OF REPORTERS**

3        WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, OFFICIAL

4    REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

5    CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

6    TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

7    ABOVE-ENTITLED MATTER.

8

9        _____

10           RAYNEE H. MERCADO, CSR 8258, RMR, CRR, FCRR

11

12

13

14           DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

15              SATURDAY, DECEMBER 6, 2014

16

17

18

19

20

21

22

23

24

25

**Case Clip(s) Detailed Report**
**Thursday, December 04, 2014, 5:39:09 PM**

## Apple Tying

---

 **Jobs, Steve (Vol. 01) - 04/12/2011 [Jobs, Steve]**          1 CLIP  (RUNNING 00:27:13.143)

 Jobs Trial



**SJ-0412-0000805**                    **42 SEGMENTS  (RUNNING 00:27:13.143)**

**1. PAGE 7:11 TO 7:21  (RUNNING 00:00:25.778)**

```
11      Q.   Good morning, Mr. Jobs.  I introduced
12 myself before we got on the record.  And as you
13 know, this is a short deposition, just two hours.
14 But at any time if you want to take a break, just
15 let me know and we'll break.
16      A.   Thanks.
17      Q.   What's your current position at Apple?
18      A.   I'm the CEO.
19      Q.   And were you CEO during the entire year of
20 2004?
21      A.   Yes.
```

**2. PAGE 8:05 TO 8:17  (RUNNING 00:00:30.460)**

```
05      Q.   Okay.  Are you familiar with a company
06 called RealNetworks?
07      A.   Yeah.
08      Q.   And do you recall in 2004 --
09      A.   Do they still exist?
10      Q.   As far as I know.
11      A.   Okay.
12      Q.   In some form.
13           Do you recall in 2004 when RealNetworks
14 developed a product called Harmony?
15      A.   Not -- vaguely.  I don't really remember
16 when it was, but I vaguely remember that they did,
17 yeah.
```

**3. PAGE 8:24 TO 8:25  (RUNNING 00:00:03.682)**

```
24      Q.   Okay.  What can you tell me that you
25 recall about Harmony?
```

**4. PAGE 9:01 TO 9:02  (RUNNING 00:00:03.282)**

```
00009:01      A.   I don't really have much of a recollection
     02 of Harmony.
```

**5. PAGE 9:20 TO 10:11  (RUNNING 00:00:57.662)**

```
20      Q.   Okay.  Can you turn, please, to the one
21 that we have marked Jobs Exhibit 1.
22      A.   Jobs Exhibit 1.  Yeah, I was reading that
23 right now.
24      Q.   Okay.  Do you need to take another minute
25 to look through it?
00010:01      A.   No.
     02      Q.   Okay.  And this is a document that was
     03 produced by Apple, and it's a series of e-mails.
     04 The last e-mail, the one on the top left of the
     05 first page, is from Eddy Cue to Jeff Robbin, and
     06 it's discussing a draft press release by Apple
     07 responding to the Harmony product.
     08           Do you recall the discussions that took
     09 place at Apple between July 23rd and July 26th, 2004
     10 regarding Harmony?
     11      A.   I don't, no.
```

## Apple Tying

**6. PAGE 10:12 TO 12:19 (RUNNING 00:02:33.399)**

```
12        Q.   Can you turn to the last page of
13   Exhibit 1.
14        A.   Sure.
15        Q.   And the top of that page reads:
16             "Describe the situation using
17             Steve's analogy.  'Normally
18             you're concerned that someone is
19             going to break [into] your house
20             to steal your stereo.  In this
21             case, it appears that someone is
22             breaking into our house and
23             setting up their own stereo --
24             but they're still breaking in.'"
25             Did you make that analogy to describe the
00011:01   RealNetworks' Harmony product?
02        A.   I don't remember.  Sounds like I might
03   have, based on this e-mail.
04        Q.   Okay.  And at the bottom of that last
05   page, again, of Exhibit 1, it says:
06             "Eddy -- any word from the
07             labels?"
08             Eddy Cue is one of the persons at Apple
09   who has been involved since the beginning of the
10   contracts with the labels in the negotiations
11   between Apple and the labels; is that correct?
12        A.   I don't know if he was involved at the
13   very beginning, but he's been involved for a long
14   time.
15        Q.   Okay.  And you also have been very
16   involved with those discussions; correct?
17        A.   Sure.
18        Q.   And do you recall in July of 2004
19   discussing with Mr. Cue or anyone else at Apple the
20   labels' reaction to RealNetworks' Harmony product?
21        A.   I don't remember any specific discussions,
22   no.
23        Q.   Do you remember some general discussions?
24        A.   Not really.  I mean, I -- I just don't
25   have much of a memory of that whole time frame.
00012:01        Q.   If you could look at the first page of
02   Exhibit 1.  And, again, this is an e-mail from
03   Mr. Cue, and he says:
04             "I talked to Universal.  They
05             were aware of it.  From their
06             viewpoint, they are ok with it
07             because they want
08             interoperability."
09             In 2004, were the labels pressing Apple to
10   open up the iPod so that there was greater
11   interoperability between the iPod and competing
12   digital music stores?
13        A.   Well, I think from their point of view,
14   they wanted everything to interoperate with
15   everything else, but there were other points of view
16   in the marketplace.
17             It depended on what your point of view
18   was.  Depending on where you sat in the industry,
19   you'd have a different point of view.
```

**7. PAGE 12:20 TO 14:02 (RUNNING 00:02:00.799)**

```
20        Q.   And what was your point of view as CEO of
21   Apple?
22        A.   Well, I think, as best as I can recall, my
23   point of view and I'd say Apple's point of view was,
```

**Case Clip(s) Detailed Report**
**Thursday, December 04, 2014, 5:39:09 PM**

## Apple Tying

```
        24   you know, we were the only big company involved in
        25   this stuff at that time, the one with the deepest
00013:01   pockets.
        02          And we had pretty much black-and-white
        03   contracts with the labels that if people violated
        04   the digital rights management system on iTunes or on
        05   the iPod and they allowed music to be taken off of
        06   the iPod, as an example, and put on somebody else's
        07   computer, that that would be in clear violation of
        08   the licenses that we had with the labels, and they
        09   could cease giving us music at any time because of
        10   that.
        11          So I remember we were very concerned about
        12   that.  And we went to great pains to make sure that
        13   people couldn't hack into our digital rights
        14   management system because if they could, we would
        15   get nasty e-mails from the labels threatening us
        16   to -- you know, that they were going to yank the
        17   license.
        18      Q.   But because RealNetworks' Harmony product
        19   didn't strip DRM, the labels were okay with it;
        20   isn't that right?
        21      A.   No, I don't remember that at all, no.  I
        22   don't know whether it stripped the DRM off or not.
        23   I think it must have had to have stripped the DRM
        24   off.  Not strip it off, but break it.
        25      Q.   Let's --
00014:01      A.   I don't think there's any other way that
        02   something like that could work.
```

**8. PAGE 14:19 TO 14:24  (RUNNING 00:00:14.016)**

```
        19      Q.   And did you receive this e-mail from
        20   Mr. Cue on or about July 25th, 2004?
        21      A.   I have no recollection of it, no.
        22      Q.   Do you have any reason you didn't believe
        23   it -- you didn't receive it?
        24      A.   No.
```

**9. PAGE 16:01 TO 16:11  (RUNNING 00:00:46.307)**

```
00016:01      Q.   Did you ever -- did Apple ever conclude
        02   that RealNetworks' Harmony product was stripping
        03   DRM?
        04      A.   I don't really remember.
        05          Part of the issue, also, was that -- I
        06   recall something to the effect that we are con- --
        07   we were constantly upgrading iTunes and enhancing
        08   its DRM.  And we -- you know, we assumed that future
        09   enhancements would break the RealNetworks scheme,
        10   whatever that was.  So that would be a real problem
        11   for everybody.
```

**10.  PAGE 16:12 TO 16:17  (RUNNING 00:00:21.184)**

```
        12      Q.   Did Apple ever conclude that RealNetworks'
        13   Harmony product was illegal?
        14      A.   I don't know.
        15      Q.   Did Apple ever send a cease and desist
        16   letter to Real?
        17      A.   I don't recall.  I don't know.
```

**11.  PAGE 19:08 TO 19:16  (RUNNING 00:00:30.500)**

```
        08      Q.   Now, do you know who Rob Glaser is?
        09      A.   Well, I don't know him, but I know he was
        10   the CEO of RealNetworks for a while.
        11      Q.   Did you ever meet Mr. Glaser?
        12      A.   That's a good question.
```

## Apple Tying

```
         13              I probably did once or twice.  I don't
         14   remember.
         15       Q.   Did you ever talk to him on the phone?
         16       A.   I might have.  I just don't remember.
```

**12. PAGE 20:08 TO 21:03 (RUNNING 00:00:58.627)**

```
         08       Q.   Okay.  I'm sorry.  Going back to
         09   Exhibit 3, now Mr. Cue says in the top of the
         10   left-hand side of the first page:
         11              "Also remember some labels at
         12              this point are also worried that
         13              we are getting to be too
         14              dominant."
         15              And is this something that you discussed
         16   at Apple around this time frame, that is, the
         17   labels' concern that Apple was becoming too
         18   dominant?
         19       A.   I don't really remember.  I mean, I
         20   remember there was such a time.  I don't really know
         21   when it was.  Probably spanned many years, but I
         22   don't really remember when.
         23       Q.   But you do recall that at some time the
         24   labels expressed a concern that Apple was becoming
         25   too dominant?
     00021:01       A.   I don't remember -- I remember maybe
         02   reading some press articles where they might say
         03   that.  They never said that to us.
```

**13. PAGE 22:03 TO 22:05 (RUNNING 00:00:11.137)**

```
         03       Q.   Do you recall discussions with Mr. Glaser
         04   at any time during 2004?
         05       A.   I don't recall any specific discussions.
```

**14. PAGE 22:06 TO 22:08 (RUNNING 00:00:06.663)**

```
         06              I'm sorry I don't remember more of this
         07   for you, but there's been a lot of water under that
         08   bridge in seven years.  So . . .
```

**15. PAGE 22:14 TO 22:18 (RUNNING 00:00:14.412)**

```
         14       Q.   Okay.  I'm going to ask the court reporter
         15   to hand you what's been marked as Jobs Exhibit 11.
         16       A.   Are you done with 3?
         17       Q.   Yes.
         18       A.   Thank you.
```

**16. PAGE 22:20 TO 22:20 (RUNNING 00:00:02.223)**

```
         20              THE WITNESS:  Okay.  I've read it.
```

**17. PAGE 23:20 TO 24:04 (RUNNING 00:00:20.837)**

```
         20       Q.   Mr. Jobs, do you recall the question?  Did
         21   you receive this e-mail from Mr. Glaser?
         22       A.   I don't remember receiving it, but I might
         23   have.
         24       Q.   Is that the e-mail that you use at Apple?
         25       A.   Yes, it is.
     00024:01       Q.   Is there any reason to believe you didn't
         02   receive this e-mail?
         03       A.   I don't know.  I just don't remember
         04   receiving it.
```

**18. PAGE 25:19 TO 26:05 (RUNNING 00:00:38.335)**

```
         19       Q.   I don't think I've asked you any questions
         20   yet about Exhibit 4.  Can you look at Exhibit 4.
```

**Case Clip(s) Detailed Report**
**Thursday, December 04, 2014, 5:39:09 PM**

## Apple Tying

```
        21      A.   Sure.  Are we going to look at Exhibit 2
        22 ever or not?
        23      Q.   Probably not, depending on how much time
        24 we have.
        25      A.   Okay.
00026:01           MR. RILEY:  What is Exhibit 4?
        02           MS. SWEENEY:  I'm sorry.  It's an e-mail
        03 dated July 26, 2004 from Mr. Jobs to Philip Schiller
        04 and others.  And the subject is "Real Statement -
        05 #4."
```

**19. PAGE 26:07 TO 26:22  (RUNNING 00:00:44.934)**

```
        07           THE WITNESS:  Okay.  I finished reading
        08 it.
        09 BY MS. SWEENEY:
        10      Q.   Okay.  Is this an e-mail that you sent to
        11 Philip Schiller and others at Apple on or about
        12 July 26, 2004?
        13      A.   I would assume so.  I don't remember it,
        14 but that's what I would assume.
        15      Q.   Okay.  At the top of the e-mail you say:
        16           "I think we can safely assume
        17           that they have succeeded."
        18           And my question is:  Why did you write
        19 that at this point in early July -- excuse me -- at
        20 the beginning of the week of July 26, 2004?
        21      A.   I have no idea.  I don't even know what it
        22 means.
```

**20. PAGE 26:23 TO 27:08  (RUNNING 00:00:37.360)**

```
        23      Q.   Were you familiar with RealNetworks' prior
        24 work to make products interoperable?
        25      A.   I don't think I've ever used any of their
00027:01 products.  I don't think I was very familiar with
        02 them, no.
        03      Q.   But had you heard that RealNetworks had
        04 done other work in the past, that is, prior to
        05 July 26, to make products manufactured by different
        06 competitors compatible with one another?
        07      A.   I don't recall.  I might have.  I just
        08 don't remember.
```

**21. PAGE 27:09 TO 27:09  (RUNNING 00:00:03.000)**

```
        09      Q.   Okay.  Can you turn to Exhibit 5.
```

**22. PAGE 27:11 TO 27:11  (RUNNING 00:00:01.985)**

```
        11           THE WITNESS:  Okay.
```

**23. PAGE 27:12 TO 28:07  (RUNNING 00:00:58.595)**

```
        12 BY MS. SWEENEY:
        13      Q.   And this is an e-mail from Zach Horowitz
        14 to you dated July 26, 2004.
        15           Did you receive this e-mail?
        16      A.   I assume I did.  I don't recall.
        17      Q.   Who's Zach Horowitz?
        18      A.   He works at Universal Music, I think.
        19      Q.   And was he one of your contacts at
        20 Universal in terms of negotiating the contracts
        21 between Apple and the labels?
        22      A.   I didn't negotiate with Zach, no, but
        23 others may have.
        24      Q.   Did you contact Mr. Horowitz or someone
        25 else at Universal around the time of the Harmony
00028:01 announcement in July of 2004?
```

## Apple Tying

```
02        A.   I don't recall doing so.  But here's an
03   e-mail that's supposedly from me to him, so maybe I
04   did.
05        Q.   Do you have any reason to think you didn't
06   contact Universal around this time frame?
07        A.   I just don't remember.
```

**24. PAGE 28:08 TO 28:17  (RUNNING 00:00:27.750)**

```
08        Q.   Now, in the middle of this Exhibit 5, this
09   is your e-mail to Zach Horowitz, and you say:
10               "A reactive statement isn't
11               good enough for us.  We want a
12               press release from Universal
13               correcting this terrible
14               statement from a senior exec.
15               We are mighty upset about this."
16        Q.   What were you upset about?
17        A.   I don't remember.
```

**25. PAGE 32:14 TO 32:19  (RUNNING 00:00:18.544)**

```
14        Q.   Exhibit 6 is -- appears to be a press
15   release by Apple dated July 29th.
16             Is that a press release that Apple issued
17   on July 29th, 2004?
18        A.   I don't know.  Looks like it, but I don't
19   know.
```

**26. PAGE 32:20 TO 35:18  (RUNNING 00:03:37.629)**

```
20        Q.   Do you have any reason to believe it's not
21   a press release that was issued by Apple?
22        A.   No.
23        Q.   Some of the other exhibits we were looking
24   at discussed drafts of a press release pertaining to
25   RealNetworks' Harmony product.  Do you recall those
00033:01 documents?
02        A.   Yeah.
03        Q.   Okay.  And --
04        A.   That you just showed me?
05        Q.   That's correct.
06        A.   Yes.
07        Q.   And does this statement on Exhibit 6
08   represent the final version of those various draft
09   iterations of the press release?
10        A.   It would appear to.
11        Q.   Okay.  And looking at the text of the
12   statement, it says:
13               "We are stunned that
14               RealNetworks has adopted the
15               tactics and ethics of a hacker
16               to break into the iPod . . . ."
17             And then it goes on.  And my first
18   question is:  What did you mean by "the tactics and
19   ethics of a hacker"?
20        A.   I don't recall writing this, so I don't
21   know.  Maybe I wrote it, but -- I can guess at what
22   the person that wrote it meant, if you'd like.
23        Q.   Is it a pejorative description, the
24   tactics and ethics of a hacker?
25        A.   What do you mean by "pejorative"?
00034:01  Q.   Is it -- does it have negative
02   connotations, in your view?
03        A.   Yeah.
04        Q.   And then it says:
05               ". . . we are inves-" --
06        A.   But I'm sure some people would have the
```

## Apple Tying

```
07  opposite view.
08      Q.   And then I'm reading, again, the second
09  half of the first sentence.
10           ". . . we are investigating the
11           implications of their actions
12           under the DMCA and other laws."
13           And I already asked you some questions
14  about this, so I'm not going to reask all those
15  questions.  But did you ever come to an
16  understanding as to whether Real's release of
17  Harmony violated the DMCA?
18      A.   I don't remember.
19      Q.   Okay.  The second paragraph of the press
20  release, which is in Exhibit 6, says:
21           "We strongly caution Real and
22           their customers that when we
23           update our iPod software from
24           time to time, it is highly
25           likely that Real's Harmony
00035:01         technology will cease to work
02           with current and future iPods."
03           Do you see that?
04      A.   Uh-huh.
05      Q.   And in fact, when Apple released its 4.7
06  update in October of 2004, Harmony ceased working
07  with at least some iPods; correct?
08      A.   I -- I think so, but I don't recall
09  specifically.
10      Q.   And at the time that this press release
11  was issued, that is, July 29, 2004, were you certain
12  that updates to iPod software would cause Real's
13  Harmony technology to cease to work with iPods?
14      A.   Well, I'm not an engineer, so I -- I
15  probably wasn't qualified to make such a judgment.
16      Q.   Were engineers at Apple involved in the
17  drafting of the press release?
18      A.   I don't remember.
```

**27.  PAGE 37:17 TO 37:21  (RUNNING 00:00:09.800)**

```
17      Q.   All right.  So Mr. Robbin, who is an
18  engineer, was involved in at least some of the
19  discussions at Apple regarding the drafting of the
20  press release; correct?
21      A.   Mm-hmm.
```

**28.  PAGE 37:22 TO 38:06  (RUNNING 00:00:42.000)**

```
22      Q.   Okay.  And the press release says that it
23  is highly likely that Harmony will cease to work.
24           If it was certain that Harmony would cease
25  to work with iPods, wouldn't Apple have said that in
00038:01  its press release?
02      A.   Well, "highly likely" is pretty strong.
03      Q.   But it's not certain?
04      A.   I don't know why certain words were chosen
05  and others weren't.  But "highly likely" is pretty
06  strong.
```

**29.  PAGE 39:10 TO 39:14  (RUNNING 00:00:17.304)**

```
10      Q.   Did you have discussions with engineers
11  and others at Apple about closing the holes in
12  software that enabled -- or that permitted
13  RealNetworks to create interoperability through
14  Harmony?
```

**Case Clip(s) Detailed Report**
**Thursday, December 04, 2014, 5:39:09 PM**

## Apple Tying

---

**30. PAGE 39:17 TO 39:19  (RUNNING 00:00:07.771)**

```
17              THE WITNESS:  Well, if you're asking me
18   did I have -- did I talk with engineers about the
19   RealNetworks situation, I'm sure I probably did.
```

**31. PAGE 40:14 TO 40:20  (RUNNING 00:00:18.660)**

```
14              THE WITNESS:  Do you want me to read this?
15              MS. SWEENEY:  Yes, please.
16              And for the record, this is an Apple
17   document.  It's an e-mail from Mr. Jobs to Katie
18   Cotton, Jeff Robbin, and others regarding
19   RealNetworks' statement, and it's dated July 29,
20   2004.
```

**32. PAGE 42:03 TO 42:15  (RUNNING 00:00:36.868)**

```
03         Q.   Now, you sent this statement around to
04   others.  What discussions did you have at Apple
05   regarding RealNetworks' statement after July 29,
06   2004?
07         A.   I don't remember.  This is just a cut and
08   paste off of the Internet, so . . .  Just
09   circulating it around so everybody would see it, I
10   guess.
11         Q.   And what is ET -- looking at the "to" line
12   in Exhibit 12, it's Katie Cotton, Jeff Robbin, ET.
13         A.   It means executive team.
14         Q.   Executive team.  Okay.
15         A.   Mm-hmm.
```

**33. PAGE 46:03 TO 47:25  (RUNNING 00:02:32.137)**

```
03         Q.   And then the second paragraph says:
04              "'The more iPods they sell,
05              the better off Apple will
06              be . . . .'"
07              And you would agree with that; right?
08         A.   Sure.
09              The thing that you have to keep in mind,
10   though, is there are lots of hackers trying to hack
11   into these things so that they can do things that
12   would put us in non-compliance with the contracts we
13   have with the music companies.
14              And we were very scared of that.  So we
15   would constantly be revving iTunes and iPod
16   software, closing any -- any holes that might be in
17   it or any problems it might have.  And so this was a
18   moving target; and, you know, anybody trying to keep
19   up with that moving target would probably have a
20   hard time doing it.
21              And so we were very concerned with, you
22   know, somebody like Real promising customers that
23   they would have compatibility when, in the future,
24   they might not.
25              And that's not something we could
00047:01   guarantee.  So we could get sued by all these
02   people, you know?
03         Q.   By Real customers?
04         A.   Yeah.
05         Q.   You said that you were very concerned
06   about non-compliance with music companies.  In fact,
07   you said, ". . . we were very scared of that."
08              Did any of the labels ever threaten to
09   withhold music because of the RealNetworks Harmony
10   technology?
11         A.   Well, we got -- we got letters from time
```

Case Clip(s) Detailed Report
Thursday, December 04, 2014, 5:39:09 PM

## Apple Tying

```
      12   to time.  I don't remember any specific ones.  But
      13   we got letters from time to time from the music
      14   companies about a particular hack that had existed
      15   out there that just popped up, and they were very
      16   clear that they wanted it closed or they would
      17   revoke the license.
      18        Q.   But that wasn't the labels' response to
      19   Harmony; correct?
      20        A.   I don't know.  I don't know if we got them
      21   on Harmony or not.
      22             The labels -- there's a lot of people at
      23   the labels, and they -- sometimes some of the people
      24   working there don't speak for the whole label, you
      25   know.  You've got to be careful about that too.
```

**34. PAGE 48:01 TO 49:02  (RUNNING 00:01:24.022)**

```
00048:01        Q.   Well, you recall the exhibits we looked at
      02   earlier today where there was an exchange between
      03   you and Mr. Horowitz at Universal.  Do you recall
      04   that?
      05        A.   Mm-hmm.
      06        Q.   And you were upset because an executive at
      07   Universal had actually applauded Harmony; right?
      08   Mr. Larry Kenswil.
      09        A.   Okay.
      10        Q.   So you can't think of any instances, can
      11   you, where a label complained to Apple about
      12   RealNetworks' Harmony product?
      13        A.   But it doesn't really matter because in
      14   fixing holes for DRM hacks, it might screw up the
      15   Real technology anyway, as collateral damage.
      16        Q.   Did --
      17        A.   One would have to be very careful about
      18   that.  And since we didn't own the Real technology
      19   and probably didn't have access to it, that's not a
      20   burden we would want to take on.
      21        Q.   And from time to time, there were DRM
      22   hacks.  And that's the phrase that you used.  And
      23   these are hacks that stripped DRM from iTunes music;
      24   correct?
      25        A.   No.  They would just find ways to get at
00049:01   stuff that would put us in non-compliance with the
      02   agreements.
```

**35. PAGE 49:03 TO 49:17  (RUNNING 00:00:32.670)**

```
      03        Q.   And did any of the labels ever withhold
      04   music because of a DRM hack?
      05        A.   No, because we were very responsive in
      06   fixing them.
      07        Q.   Did any of the labels ever threaten to
      08   withhold music from Apple because of a DRM hack?
      09        A.   Yes.
      10        Q.   Who?
      11        A.   I don't know.  I remember we would get
      12   letters from time to time.
      13        Q.   You would get letters asking you to fix
      14   the holes or actually threatening to withhold music
      15   from Apple?
      16        A.   Well, they would say both.  Fix the holes
      17   or else.  So . . .
```

**36. PAGE 51:11 TO 51:15  (RUNNING 00:00:17.984)**

```
      11        Q.   After the RealNetworks episode with
      12   Harmony in July of 2004, was there ever an instance
      13   in which a company other than RealNetworks
```

CONFIDENTIAL

**Case Clip(s) Detailed Report**
**Thursday, December 04, 2014, 5:39:09 PM**

## Apple Tying

```
     14  successfully created interoperability between its
     15  digital music store and Apple's iPods?
```

**37. PAGE 51:21 TO 51:23  (RUNNING 00:00:10.448)**

```
     21          I don't recall, but I would imagine so.
     22  People have tried to hack iTunes for a long time,
     23  and they're still trying.
```

**38. PAGE 56:04 TO 56:10  (RUNNING 00:00:15.162)**

```
     04      Q.   Did you leak that e-mail of April 2004
     05  from Mr. Glaser to The New York Times?
     06      A.   I don't even remember the e-mail of 2004.
     07  I don't remember leaking any e-mail to The New York
     08  Times.
     09      Q.   Okay.
     10      A.   Ever in my life.
```

**39. PAGE 57:02 TO 57:03  (RUNNING 00:00:05.455)**

```
     02      Q.   Can you go back to Exhibit 4, please.
     03      A.   Yeah.
```

**40. PAGE 57:04 TO 57:21  (RUNNING 00:00:43.193)**

```
     04      Q.   And again, this is an e-mail from you to
     05  others at Apple dated July 26, 2004 regarding the
     06  draft press release about RealNetworks' Harmony.
     07      A.   Mm-hmm.
     08      Q.   And then we already discussed the first
     09  sentence in that e-mail.  And the second one says:
     10          "I propose going with this:"
     11          And then below that in quotes you say:
     12          "We are stunned that Real has
     13          adopted the tactics and ethics
     14          of a hacker to break into the
     15          iPod, and we are investigating
     16          the implications of their
     17          actions under the DMCA and other
     18          laws."
     19          And it goes on.  And is that the language
     20  that you proposed for the press release regarding
     21  Harmony?
```

**41. PAGE 57:22 TO 58:08  (RUNNING 00:00:37.850)**

```
     22      A.   Well, I think it's a conglomeration of
     23  what I and other people have proposed or did
     24  propose, would be my guess.  I mean, somebody might
     25  have -- else might have proposed it and I might have
  00058:01  been the one to just edit it.  I don't know who
     02  proposed it.  It's hard to --
     03      Q.   But you did --
     04      A.   -- hard to say.
     05      Q.   -- agree that this was a possible press
     06  release that you could issue; correct?
     07      A.   Well, I said I -- I say in this e-mail:
     08          "I propose going with this:"
```

**42. PAGE 58:12 TO 58:22  (RUNNING 00:00:32.719)**

```
     12          When did you learn -- when did you first
     13  learn that the redesign of FairPlay that culminated
     14  in iTunes 4.7 would disable Harmony?
     15      A.   I don't recall.
     16      Q.   Can you give me your best estimate.
     17      A.   I don't have a clue.
     18      Q.   Did you --
     19      A.   I mean, just about every release of iTunes
```

## Apple Tying

```
20  enhanced the DRM.  So I probably would have just
21  assumed that the next release would.  But I don't
22  remember at all.
```

| TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:27:13.143) |
| --- |