UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    *ORIGINAL*

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


THE APPLE IPOD ITUNES          )        NO. C 05-00037 YGR
ANTITRUST LITIGATION           )
                               )        PAGES 1101 – 1310
                               )
                               )        **JURY TRIAL VOLUME 6**
                               )
                               )
                               )        OAKLAND, CALIFORNIA
_____ )        MONDAY, DECEMBER 8, 2014


### REPORTERS' TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                  BY:  ALEXANDRA S. BERNAY,
                       JENNIFER N. CARINGAL,
                       PATRICK COUGHLIN,
                       STEVEN M. JODLOWSKI,
                       CHARLES MCCUE,
                       CARMEN A. MEDICI,
                       BONNY E. SWEENEY, ATTORNEYS AT LAW


                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                  BY:  FRANCIS J. BALINT, JR.
                       ATTORNEY AT LAW

              (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                      DIANE E. SKILLMAN, CSR NO. 4909

     PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.


*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

## A P P E A R A N C E S (CONT'D.)

```
FOR DEFENDANT:        BOIES, SCHILLER & FLEXNER LLP
                      5301 WISCONSIN AVENUE NW
                      WASHINGTON, D.C.  20015
                 BY:  WILLIAM A. ISAACSON,
                      KAREN L. DUNN,
                      MARTHA L. GOODMAN, ATTORNEYS AT LAW


                      BOIES, SCHILLER & FLEXNER LLP
                      1999 HARRISON STREET, SUITE 900
                      OAKLAND, CALIFORNIA  94612
                 BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                      JONES DAY
                      555 CALIFORNIA STREET, 26TH FLOOR
                      SAN FRANCISCO, CALIFORNIA  94104-1500
                 BY:  DAVID C. KIERNAN, ATTORNEYS AT LAW


                      APPLE
                      1 INFINITE LOOP, MS 169-2NYJ
                      CUPERTINO, CALIFORNIA  95014
                 BY:  SCOTT B. MURRAY,
                        SENIOR LITIGATION COUNSEL


                      --oOo--
```

## I N D E X

**PLAINTIFFS' WITNESSES**                          **PAGE**      **VOL.**

NOLL, ROGER

DIRECT EXAMINATION BY MS.SWEENEY              1123          6

CROSS-EXAMINATION BY MR. ISAACSON             1217          6

--oOo--

```
1    MONDAY, DECEMBER 8, 2014                          8:13 A.M.

2                      P R O C E E D I N G S

3        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

4    OF THE JURY:)

5            THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

6    COME TO ORDER.

7            THE COURT:  GOOD MORNING, EVERYONE.

8            THE CLERK:  CALLING CIVIL ACTION 05-037, APPLE IPOD

9    ITUNES ANTITRUST LITIGATION.

10       COUNSEL, PLEASE STATE YOUR APPEARANCES.

11           MS. SWEENEY:  GOOD MORNING, YOUR HONOR.

12       BONNY SWEENEY.  AND WITH ME AT COUNSEL TABLE ARE FRANK

13   BALINT, STEVE JODLOWSKI, ALEXANDRA BERNAY, AND PATRICK

14   COUGHLIN.

15           MR. ISAACSON:  GOOD MORNING, YOUR HONOR.

16       IT'S BILL ISAACSON FOR DEFENDANT, APPLE.  AT COUNSEL TABLE

17   IS KAREN DUNN, MEREDITH DEARBORN, MARTHA GOODMAN FROM BOIES

18   SCHILLER & FLEXNER; DAVID KIERNAN FROM JONES DAY; AND SCOTT

19   MURRAY FROM APPLE.

20           THE COURT:  ALL RIGHT.  GOOD MORNING.

21       LET'S GET OUR LIST OF THINGS TO DO.

22       I UNDERSTAND THAT I JUST -- THIS MORNING THERE WAS ANOTHER

23   BRIEF FILED ON THE STANDING ISSUE.  I'VE NOT -- I'VE READ

24   THROUGH PART OF IT.  I'VE NOT HAD A CHANCE TO READ THROUGH THE

25   ENTIRE THING.
```

1       **MR. ISAACSON:** UNDERSTOOD, YOUR HONOR.

2       **THE COURT:** SO WE'LL HAVE TO DEAL WITH THAT AT SOME

3   POINT.

4       WITH RESPECT TO THE -- THERE WERE A NUMBER OF FILINGS THIS

5   WEEKEND.  SO I DID GET THE BINDER.  THANK YOU.  THAT WAS

6   HELPFUL.

7       LET'S GET THE LIST.  PLAINTIFFS.

8       **MS. SWEENEY:** YOUR HONOR, MR. COUGHLIN HAS SOME

9   ISSUES THAT HE WANTS TO RAISE WITH RESPECT TO CONFIDENTIALITY

10  DESIGNATIONS.

11      WE -- AN ISSUE THAT I WANT TO RAISE PERTAINS TO

12  DEMONSTRATIVES WE RECEIVED LAST NIGHT AND THEN EARLY THIS

13  MORNING WHICH WEREN'T PREVIOUSLY DISCLOSED.

14      AND I DON'T KNOW IF THERE'S ANY OTHER ISSUES.

15      **MR. COUGHLIN:** I THINK THOSE ARE THE ISSUES FOR THIS

16  MORNING, YOUR HONOR.

17      **THE COURT:** ALL RIGHT.  DEFENSE.

18      **MR. ISAACSON:** WE'VE WRITTEN YOU ABOUT THE -- THE

19  KEYNOTE PRESENTATION AND THE -- PROVIDED YOU, I THINK, THE

20  TRANSCRIPT.

21      **THE COURT:** I'VE READ IT.

22      **MR. ISAACSON:** RIGHT.

23      **THE COURT:** ANYTHING ELSE?

24      **MR. ISAACSON:** I THINK EVERYTHING ELSE WE RAISED

25  RELATED TO THE JURY INSTRUCTIONS.

```
 1          THE COURT:  RIGHT.  AND EVERYONE SHOULD UNDERSTAND,

 2   THOSE ARE -- I'VE GOTTEN VARIOUS FILINGS WITH RESPECT TO JURY

 3   INSTRUCTIONS.  I NEEDED TO HAVE ONE DOCUMENT THAT I COULD WORK

 4   FROM.  SO HENCE THE COLOR CODING, THE BLACK IS -- THERE ARE

 5   CHANGES THAT I'VE MADE.  I DON'T THINK -- SOME OF THOSE ARE

 6   NOT REALLY -- THEY'RE STYLISTIC MORE THAN ANYTHING ELSE.  SO

 7   THEY DON'T LOOK EXACTLY LIKE THE ONES YOU SUBMITTED TO ME, BUT

 8   IT'S A WORKING DOCUMENT, AND WE CAN ARGUE -- OR YOU CAN ARGUE

 9   ABOUT THE VARIOUS POSITIONS LATER.

10      I DID GET THE BRIEFING ON THOSE ISSUES AS WELL.  AT LEAST

11   WITH RESPECT TO THE PRODUCT IMPROVEMENT.

12          MR. ISAACSON:  WE APPRECIATED HAVING THE DOCUMENT TO

13   WORK OFF OF, SO THANK YOU.

14          THE COURT:  THERE IS A REQUEST -- I WILL HAVE A COPY

15   OF THIS MADE -- FOR THE ACTUAL VIDEOTAPE OF THE DEPOSITION.

16   SO WE'LL HAVE TO TALK ABOUT THAT AS WELL.

17      SO THAT THE PRESS KNOWS, WE DON'T VIDEOTAPE ANY WITNESS --

18   ANY WITNESS'S TESTIMONY.  SO WE'VE HAD HALF A DOZEN WITNESSES

19   UP HERE OR MORE.  NONE OF THEIR TESTIMONY IS VIDEOTAPED.  IT'S

20   NEVER VIDEOTAPED.  SO IT'S NOT AN EXHIBIT.  THE EXHIBIT IS THE

21   TRANSCRIPT.

22      IT WAS NOT MY INTENTION TO HAVE THE JOBS VIDEO AND IT'S --

23   IT NEVER WORKS THAT WAY THAT THE ACTUAL VIDEOTAPE OF A

24   DEPOSITION GOES INTO EVIDENCE.  THAT'S WHY YOU DID NOT RECEIVE

25   IT.
```

```
 1        BUT I WILL DISCUSS YOUR REQUEST FOR THAT VIDEOTAPE WITH

 2   THE LAWYERS.  IT'S ON MY LIST.

 3        OKAY.  OTHER ISSUES?

 4            MR. ISAACSON:  THAT'S WHAT I'M AWARE OF, YOUR HONOR.

 5            THE COURT:  ALL RIGHT.  LET'S START WITH THINGS

 6   RELATED TO TODAY'S TRIAL EVIDENCE.

 7        IT DOESN'T SOUND LIKE I HAVE ANYTHING RELATIVE TO

 8   MR. NOLL'S TESTIMONY, CORRECT?  THAT'S FIRST UP.

 9            MS. SWEENEY:  ONE ISSUE, YOUR HONOR, WHICH IS THE

10   DEMONSTRATIVES THAT WE RECEIVED LATE LAST NIGHT AND THEN EARLY

11   THIS MORNING FROM APPLE.

12        WE HAVE A STIPULATION IN PLACE THAT REQUIRES THE PARTIES

13   TO EXCHANGE DEMONSTRATIVES 48 HOURS AHEAD OF TIME.  AND

14   LOOKING AT THESE DEMONSTRATIVES, THERE'S -- THERE'S NOTHING --

15   THERE'S NO REASON THAT THESE SHOULD HAVE BEEN PRODUCED AT THE

16   LAST MINUTE.

17        THE SET WE GOT THIS MORNING, I THINK AT 2:00 A.M., IS A

18   SERIES OF SLIDES ABOUT 7.0.  AND OBVIOUSLY 7.0 HAS BEEN A

19   SUBJECT OF A GREAT DEAL OF EVIDENCE SO THERE'S NO REASON APPLE

20   COULD NOT HAVE PRODUCED THIS TO US EARLIER.

21            MR. ISAACSON:  THAT'S NOT A CORRECT STATEMENT OF THE

22   STIPULATION, YOUR HONOR.  THE STIPULATION IS IN THE PRETRIAL

23   ORDER.  I THINK IT'S PARAGRAPH 40.  IT REQUIRES 48 HOURS'

24   DISCLOSURE OF DEMONSTRATIVES THAT ARE GOING TO BE USED IN THE

25   CASE-IN-CHIEF.  IT DOES NOT REQUIRE DISCLOSURE OF -- AND ALSO
```

1    AS OPENING SLIDES AND CLOSING SLIDES.

2        THERE'S NO REQUIREMENT OF DISCLOSURE OF DEMONSTRATIVES

3    THAT ARE GOING TO BE USED IN CROSS-EXAMINATION.  AS A MATTER

4    OF PRUDENCE, HOWEVER, I SENT THEM OVER LAST NIGHT SO THAT THEY

5    WOULD HAVE A CHANCE TO SEE THEM, AND IF THERE WERE ANY

6    SPECIFIC OBJECTIONS TO THEM, THEY'D HAVE A CHANCE TO SAY THAT

7    IN ADVANCE AS OPPOSED TO ME PUTTING THEM UP AND GOING THROUGH

8    THEM.

9        **MS. SWEENEY:**  YOUR HONOR, BECAUSE OF THE WAY THE

10   EVIDENCE HAS GONE IN, THAT IS, CROSS-EXAMINATION NOT LIMITED

11   TO THE SCOPE, WE HAVE INTERPRETED, AND APPLE HAS INTERPRETED,

12   THE AGREEMENT PREVIOUSLY AS --

13       **THE COURT:**  WELL, BUT THIS IS DIFFERENT.  THAT IS, NO

14   ONE -- WHILE MANY OF THE PERCIPIENT WITNESSES IN THIS CASE

15   WERE BOTH DEFENSE AND PLAINTIFF WITNESSES, MR. NOLL IS UNDER

16   NO WAY, SHAPE, OR FORM A DEFENSE WITNESS.

17       **MS. SWEENEY:**  I UNDERSTAND, YOUR HONOR.  BUT I THINK

18   APPLE HAS TAKEN ADVANTAGE OF THE -- THE RULE, AND WE CERTAINLY

19   DID NOT INTERPRET THE STIPULATION THE WAY APPLE HAS.

20       **MR. ISAACSON:**  IT'S -- IT SAYS IT IN PLAIN LANGUAGE.

21       **THE COURT:**  SO WHERE -- WHERE IS THE STIPULATION THAT

22   YOU'RE TALKING ABOUT?  BECAUSE I DON'T -- IT'S CERTAINLY NOT

23   PART OF MY GENERAL ORDER.

24                   (PAUSE IN THE PROCEEDINGS.)

25       **THE COURT:**  THIS WAS A STIPULATION BY THE PARTIES?

 1          **MR. ISAACSON:**  THIS IS PART OF THE PRETRIAL ORDER OF

 2   THE COURT, WHICH INCLUDES ALL THE -- THE WRITTEN STIPULATIONS.

 3          **MS. SWEENEY:**  AND I CAN REFERENCE THE -- THE PARTIES'

 4   PROPOSAL, WHICH IS ECF --

 5          **THE COURT:**  IF IT'S PART OF MY ORDER --

 6          **MS. SWEENEY:**  YEAH.

 7          **THE COURT:**  -- WHAT'S THE NUMBER?  I DON'T THINK IT'S

 8   IN MY ORDER.  BUT WHAT'S THE NUMBER IF YOU THINK IT IS?

 9          **MS. SWEENEY:**  838, PARAGRAPH 14, PAGE 3 OF 6.

10          **MR. ISAACSON:**  I DON'T KNOW.

11          **THE COURT:**  THAT'S NOT ONE I WROTE.

12          **MR. ISAACSON:**  RIGHT.

13          **MS. SWEENEY:**  YOUR HONOR'S ORDER DOESN'T ACTUALLY

14   HAVE THE LANGUAGE OF THE STIPULATION.  IT JUST APPROVES THE

15   STIPULATIONS OF THE PARTIES.

16          **THE COURT:**  THAT'S WHAT I SAID.  IT'S NOT ONE I

17   WROTE.

18                    (PAUSE IN THE PROCEEDINGS.)

19          **MS. SWEENEY:**  OKAY.  SO --

20          **THE COURT:**  HOLD ON.  LET ME GET IT.

21          **MS. SWEENEY:**  OKAY.

22          **THE COURT:**  WHAT PARAGRAPH?

23          **MS. SWEENEY:**  PARAGRAPH -- OF OUR STIPULATION OR YOUR

24   HONOR'S ORDER?  THE PARAGRAPH OF OUR STIPULATION IS 14.

25          **THE COURT:**  ALL RIGHT.

1    **MS. SWEENEY:**  IT'S ON PAGE 3.  AND YOUR HONOR'S ORDER

2    APPROVING IT IS --

3        **THE COURT:**  IT'S STAMPED.

4      THIS SAYS, "THE PARTIES STIPULATE THAT THEY WILL DISCLOSE

5    DEMONSTRATIVE AIDS TO BE USED DURING EACH CASE'S -- EACH

6    CASE-IN-CHIEF AND DURING CLOSING STATEMENTS NO LESS THAN

7    48 HOURS IN ADVANCE."

8        **MR. ISAACSON:**  I BELIEVE THAT'S PARAGRAPH 40.

9        **THE COURT:**  THAT'S 14.

10       **MR. ISAACSON:**  14?  THERE'S A --

11       **THE COURT:**  APPLE AND PLAINTIFFS STIPULATE THAT THEY

12   WILL DISCLOSE DEMONSTRATIVE AIDS TO BE USED DURING OPENING

13   STATEMENTS -- THAT'S NOT -- ALL RIGHT.

14     SO THIS IS NOT APPLE'S CASE-IN-CHIEF.  AND IT'S NOT THEIR

15   CLOSING STATEMENT.  IT'S IMPEACHMENT, MS. SWEENEY.

16       **MS. SWEENEY:**  UNDERSTOOD, YOUR HONOR.

17       **MR. ISAACSON:**  AND IT'S -- I'M SORRY -- IT'S THE

18   JOINT PRETRIAL CONFERENCE STATEMENT AT PARAGRAPH 40 HAS THE

19   SAME LANGUAGE.

20       **THE COURT:**  ALL RIGHT.

21     ALL RIGHT.  WHAT'S THE ISSUE WITH THE CONFIDENTIALITY

22   DESIGNATIONS?

23       **MR. COUGHLIN:**  YOUR HONOR, IT HAS TO DO WITH

24   DR. KELLY'S REPORT.

25       **THE COURT:**  SO THIS -- THIS GOES BACK.  I'M NOT SURE

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    I UNDERSTAND THIS ONE, MR. COUGHLIN.  RIGHT BEFORE THE -- THE

2    DAY BEFORE WE WERE SUPPOSED TO START TRIAL, APPLE CAME IN

3    HERE, THEY WANTED TO EXCLUDE A WHOLE BUNCH OF STUFF.  YOU SAID

4    YOU COULD NOT GO TO TRIAL.  I AGREED WITH YOU.  I SAID AND

5    ORDERED THAT THE ONLY THING TO BE EXCLUDED WAS SOURCE CODE.

6    THAT'S THE WAY I REMEMBER IT.

7            MR. COUGHLIN:  YES, YOUR HONOR, AND THEY WERE TO

8    PROVIDE US WITH A COPY OF THOSE SOURCE CODE REDACTIONS IN THE

9    DOCUMENTS.  AND WE GOT A COPY OF DOCUMENTS.  NOT INCLUDED IN

10   THAT DOCUMENT WAS THE DR. KELLY REPORT WHICH HAS SOURCE CODE

11   IN IT AND IT ALSO HAS DIAGRAMS IN IT.  OKAY?  THEY DIDN'T

12   PROVIDE US --

13           THE COURT:  DR. KELLY'S REPORT IS NOT EVIDENCE.

14           MR. COUGHLIN:  WELL, THEY'RE GOING TO --

15           THE COURT:  IT'S NOT COMING INTO EVIDENCE.

16           MR. COUGHLIN:  THEY'RE GOING TO SHOW THOSE -- THEY'RE

17   GOING TO SHOW THE -- THE REDACTED -- THEY HAD REDACTED THOSE

18   DIAGRAMS.  OKAY?  AND THEY HAVE SOURCE CODE UNDERNEATH THOSE

19   DIAGRAMS, OKAY?  AND THEY NEVER PROVIDED US A NEW REPORT WITH

20   WHAT THEY THOUGHT THEY WERE UNREDACTING.  AND THAT REMAINS

21   UNDER SEAL.  OKAY?

22      THOSE DIAGRAMS WERE -- TWO WEEKS BEFORE THAT HEARING THEY

23   HAD MOVED TO SEAL THAT WHOLE REPORT INCLUDING THOSE DIAGRAMS.

24           THE COURT:  OKAY.  BUT SEALING FOR PURPOSES OF -- OF

25   PRETRIAL MOTIONS IS A DIFFERENT STANDARD THAN SEALING

1    SOMETHING AND KICKING EVERY SINGLE PRESS MEMBER OUT OF HERE

2    DURING TRIAL.

3              **MR. COUGHLIN:**  AND I UNDER --

4         **THE COURT:**  WHICH IS WHY I TAKE A DIFFERENT

5    PERSPECTIVE DURING TRIAL, WHICH IS WHY I TOLD APPLE THEY COULD

6    ONLY REDACT THE SOURCE CODE.

7       I THEN SAID TO YOU, BECAUSE WE WERE TRYING TO GET TRIAL

8    STARTED, TO WORK IT OUT BETWEEN THE TWO OF YOU WITH RESPECT TO

9    ANY DOCUMENT THAT WAS GOING TO BE ADMITTED INTO EVIDENCE, ALL

10   OF THE SOURCE CODE HAD TO BE TAKEN OUT.

11      A REPORT OF AN EXPERT IS NOT EVIDENCE.  IT DOES NOT COME

12   INTO EVIDENCE.  NOW, IF THERE'S A DIAGRAM IN THERE, IT --

13   THAT'S WHAT WE'RE TALKING ABOUT?

14             **MR. COUGHLIN:**  THAT'S ALL WE'RE TALKING ABOUT.

15        **THE COURT:**  AND -- AND FOR -- WHO IS GOING -- WHO'S

16   GOING TO USE IT, IN WHAT FORM, AND IS IT BEING OFFERED FOR

17   ADMISSION?

18             **MR. COUGHLIN:**  DR. KELLY IS GOING TO USE IT.  AND I

19   IMAGINE HE JUST WANTS TO SHOW IT TO THE JURY.  YOU KNOW, I'M

20   NOT SURE IF THEY'RE GOING TO TRY TO ADMIT IT OR NOT, BUT

21   THAT'S PREJUDICIAL.  I REALLY THOUGHT WE WOULD GET A SET OF

22   DOCUMENTS WITH THEIR REDACTIONS, AND WE DID, AND THE ONLY

23   THING MISSING FROM THAT SET WAS DR. KELLY'S REPORT.

24      SO I ASSUME BECAUSE YOU SAID THAT'S HEARSAY, THAT'S NOT

25   COMING IN, THAT WE WEREN'T DEALING WITH ANY OF THAT ANYMORE.

```
 1        LAST NIGHT -- THEN OVER THE WEEKEND, WE GET A SET OF THEIR

 2   DEMONSTRATIVES TO USE WITH DR. KELLY.  THOSE DEMONSTRATIVES,

 3   LIKE EXHIBIT 13, HAVE SOURCE CODE UNDERNEATH THEM.  OKAY?  NOW

 4   THEY'RE NOT SHOWING THAT IN THE DIAGRAM THAT THEY'RE SHOWING

 5   TO THE JURY.  BUT I CERTAINLY -- I CERTAINLY AM UNDER THE

 6   IMPRESSION --

 7        THE COURT:  SO WHAT IS THE PROBLEM WITH THE

 8   DEMONSTRATIVE IF IT'S NOT GOING INTO EVIDENCE?  WHAT IS THE

 9   ISSUE?

10        MR. COUGHLIN:  I DON'T KNOW IF IT'S GOING INTO

11   EVIDENCE NOW.  I DON'T KNOW WHAT THEY INTEND TO DO WITH IT.

12   THEY SENT IT OVER TO US.  I ASSUME THEY WANT HIM TO EXPLAIN

13   IT.

14        WHAT I WOULD HAVE DONE IS I WOULD HAVE TAKEN THOSE

15   DOCUMENTS -- I THOUGHT THEY WERE UNDER SEAL WHEN WE WERE

16   MOVING FORWARD TO TRIAL -- I WOULD HAVE TAKEN THOSE DOCUMENTS

17   AND GONE THROUGH THEM WITH MR. FARRUGIA AND MR. ROBBIN BECAUSE

18   I WANTED TO SHOW THE DIFFERENCE BETWEEN WHAT DR. KELLY SAID

19   WAS ACTUALLY IMPLEMENTED AND THE EARLIER VERSIONS.

20        BUT I DIDN'T GET TO DO THAT BECAUSE I THOUGHT THEY WERE

21   REDACTED AND THAT I COULDN'T USE THEM.  IT'S AS SIMPLE AS

22   THAT.

23        MR. KIERNAN:  YOUR HONOR, MR. COUGHLIN HAS

24   MISCHARACTERIZED WHAT HAPPENED.

25        AT THE HEARING, WE HAD A LONG DISCUSSION ABOUT THIS VERY
```

1    ISSUE.  ON THE RECORD, I SAID APPLE WITHDREW ALL THE

2    REDACTIONS IN VOLUME 1 OF THE BINDER I BROUGHT, WHICH INCLUDED

3    DR. KELLY'S REPORT, EXCEPT TO THE EXTENT IT INCLUDED SOURCE

4    CODE.

5        I THEN ASKED TO REDACT THE DIAGRAMS OF THE KEYBAG.  YOU

6    MAY RECALL THAT DISCUSSION.

7        MR. COUGHLIN THEN ARGUED HE NEEDED ALL THE DIAGRAMS OF THE

8    KEYBAG UNREDACTED.  HE SAID "ALL OF THEM."

9        I THEN, ON THE RECORD, SAID I WITHDRAW ALL THE REDACTIONS

10    TO THE DIAGRAMS OF THE KEYBAG IN THAT BINDER.

11        CONSISTENT WITH YOUR HONOR'S RULINGS THAT DAY, AFTER THE

12    HEARING I WENT BACK, PERSONALLY, REDACTED ONLY SOURCE CODE

13    THAT WERE IN THE EXHIBITS THAT WE WERE -- THAT WE ASKED

14    PLAINTIFFS TO REDACT.

15        I SENT THOSE TO MR. MEDICI.  HE AGREED TO REVIEW OUR

16    REDACTIONS AND TO EITHER VOICE AN OBJECTION OR CONSENT.  HE

17    REVIEWED THEM, CONSENTED TO THEM.

18        WE THEN, PURSUANT TO YOUR ORDER, GAVE THEM A COPY, THE

19    TRIAL-STAMPED COPY OF THOSE EXHIBITS, AND PROVIDED THEM TO THE

20    COURTROOM DEPUTY.

21        THOSE REDACTIONS DID NOT INCLUDE DR. KELLY'S REPORT, NOR

22    DID THEY INCLUDE A NUMBER OF OTHER DOCUMENTS THAT PLAINTIFFS

23    OBJECTED TO OUR REDACTIONS.

24        SO -- WE'VE ALREADY HAD THIS DISCUSSION.  AND -- AND IN

25    PARTICULAR, WE HAD THE DISCUSSION ABOUT THE KEYBAG DIAGRAMS.

```
 1    MR. COUGHLIN SAID HE NEEDED TO USE THOSE WITH MR. FARRUGIA AND
 2    MR. ROBBIN.  IN FACT, HE USED KEYBAG DIAGRAMS WITH MR. ROBBIN
 3    IN OPEN COURT.
 4       SO THIS SEEMS TO BE DESIGNED ONLY TO PREJUDICE APPLE'S
 5    ABILITY TO PREPARE ITS CASE AND TO SHOW A KEYBAG DIAGRAM THAT
 6    MR. COUGHLIN WANTED TO USE AND ASKED YOUR HONOR NOT TO SEAL OR
 7    NOT TO REDACT.  AND WE AGREED NOT TO DO THAT.
 8       GIVEN THAT, WE SHOULD BE PERMITTED TO USE IT.
 9          MR. COUGHLIN:  YOUR HONOR, WE HAD THAT DISCUSSION.  I
10    SAID I NEEDED TO USE THOSE KEYBAGS BECAUSE I WANTED TO SHOW
11    THE DIFFERENCE.
12       YOUR HONOR SAID, AS YOUR HONOR HAS SAID THIS MORNING, THAT
13    REPORT IS HEARSAY, IT'S NOT COMING INTO EVIDENCE.  WE MOVED ON
14    FROM THAT.  WE GOT A SET OF NEW DOCUMENTS WITH THE REDACTIONS
15    TAKEN OFF.  DR. KELLY'S REPORT WAS NOT IN THERE.  OKAY?  I
16    ASSUMED THERE WERE GOING TO BE NO FURTHER REDACTIONS TO THAT.
17    MAYBE I GOT THE WRONG ASSUMPTION.  IT CERTAINLY SEEMED TO ME
18    THAT THAT'S WHERE WE LEFT IT AS FAR AS DR. KELLY'S REPORT.
19       AND IT DIDN'T COME OVER WITH THE DOCUMENTS WITH THE NEW
20    REDACTIONS.  THEY NEVER PROVIDED US A REPORT UNREDACTING THOSE
21    FIGURES.  AND THAT'S WHERE IT STOOD.
22          MR. KIERNAN:  BECAUSE WE WITHDREW THE REDACTIONS --
23          THE COURT:  WHO'S GOT A PHONE ON?
24          MR. KIERNAN:  -- TO ALL OF THEM.
25                 (SIMULTANEOUS COLLOQUY.)
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    **MR. KIERNAN:**  SORRY, YOUR HONOR.

2                      (PAUSE IN THE PROCEEDINGS.)

3         **THE COURT:**  WHAT IS THE --

4         **MR. KIERNAN:**  AND YOUR HONOR, WE'RE NOT ADMITTING THE

5    DIAGRAM IN EVIDENCE.  WE'RE USING IT AS A DEMONSTRATIVE, AS WE

6    EXPLAINED TO PLAINTIFFS.

7         **THE COURT:**  WELL, LIKE I SAID, DEMONSTRATIVES ARE

8    DIFFERENT.  A MULTI-PAGE REPORT -- AT THIS POINT,

9    MR. COUGHLIN, I CAN'T -- I CAN'T SEE HOW I CAN PRECLUDE THEM

10   FROM USING SOME DEMONSTRATIVE.  IF YOU NEED TO CALL FARRUGIA

11   BACK, YOU CAN CALL FARRUGIA BACK.

12        THERE ARE TIMES WHEN EMBEDDED WITHIN DOCUMENTS, AND

13   FRANKLY, IT'S ALREADY HAPPENED IN THIS TRIAL, THERE ARE

14   PORTIONS OF OTHER DOCUMENTS, BUSINESS RECORDS, WHERE A PAGE OR

15   A DIAGRAM OR SOMETHING GETS PULLED OUT AND IT GETS MARKED

16   SEPARATELY.  THAT'S A VERY DIFFERENT CIRCUMSTANCE FROM AN

17   EXPERT'S REPORT COMING INTO EVIDENCE.

18        SO AT THIS POINT, IT'S NOT EXCLUDED.

19        **MR. COUGHLIN:**  I UNDERSTAND, YOUR HONOR.  I'LL EITHER

20   CALL MR. FARRUGIA OR MR. ROBBIN BACK.  THANK YOU.

21        **THE COURT:**  ALL RIGHT.  THE ISSUE WITH THE VIDEO,

22   MR. ISAACSON, IT'S CLASSIC HEARSAY.

23        **MR. ISAACSON:**  YES.  BUT NOT -- NOT -- IT HAS TWO

24   PURPOSES FOR WHICH IT COULD BE USED FOR NOT FOR THE TRUTH.

25   ONE IS TO SHOW THE INFORMATION THAT WAS OUT IN THE MARKETPLACE

```
 1    THAT AN EXPERT SUCH AS DR. NOLL SHOULD BE AWARE OF WHEN HE'S

 2    DISCUSSING WHAT 7.0 IS.

 3            THE COURT:  WHAT IS THE -- HOW DO YOU INTEND TO USE

 4    THIS?  DO YOU MEAN YOU'RE GOING TO USE IT WITH MR. NOLL?

 5            MR. ISAACSON:  THAT WOULD BE -- THAT WOULD MY FIRST

 6    ATTEMPT TO USE IT, YES.  "THIS IS INFORMATION OUT IN THE

 7    MARKETPLACE.  DID YOU CONSIDER IT?"

 8            THE COURT:  NO.

 9      NEXT?

10            MR. ISAACSON:  MAY I USE SCREENSHOTS OF PICTURES OF

11    THE FEATURES OF 7.0 FROM THE KEYNOTE, SO NOT THE VIDEO, AS

12    DEMONSTRATIVES IN CROSS-EXAMINATION, JUST A SCREENSHOT?  FOR

13    EXAMPLE, A SCREENSHOT OF THE GAMES.  TO SAY, "DID YOU CONSIDER

14    THIS?  WERE YOU AWARE OF THIS?"  AS AN ILLUSTRATION OF MY

15    QUESTION.

16            THE COURT:  WHO'S -- ARE YOU -- DO YOU HAVE NOLLS

17    (PHONETIC)?

18            MR. COUGHLIN:  I WAS JUST --

19            THE COURT:  WHO'S GOT NOLL?

20            MS. SWEENEY:  I DO, YOUR HONOR.

21      WE -- WE WOULD OBJECT ON THE SAME GROUNDS.  IT'S -- IT'S

22    PART OF THE KEYNOTE.  IT'S STILL HEARSAY.  JUST BECAUSE --

23            THE COURT:  IT'S A DEMONSTRATIVE.  SO NOW YOU HAVE TO

24    CHANGE THE ARGUMENT BECAUSE WE AREN'T TALKING ABOUT

25    ADMISSIBILITY.  WE'RE TALKING ABOUT A DEMONSTRATIVE AND A
```

```
 1    SCREENSHOT.
 2            MR. ISAACSON:  CAN -- IN TERMS OF THE VIDEO, IN TERMS
 3    OF CROSS-EXAMINING DR. NOLL, THAT'S NOT AN ADMISSIBILITY ISSUE
 4    EITHER.
 5            THE COURT:  I'M STILL NOT GOING TO ALLOW IT.
 6            MR. ISAACSON:  RIGHT.  I JUST WANTED TO MAKE THAT --
 7    TAKE MY SHOT AT IT.
 8        SO BACK TO THE SCREENSHOT.
 9            MS. SWEENEY:  ALL RIGHT.  SO --
10            THE COURT:  AND DO I HAVE COPIES OF THE SCREENSHOTS?
11    LET ME SEE THEM.
12            MR. ISAACSON:  YES.  WE GAVE COPIES TO --
13            THE COURT:  SOMEONE ONLY SENT ME THE TRANSCRIPT OF
14    THE VIDEO.
15            MR. ISAACSON:  RIGHT.  SO I HAVE A COPY OF
16    SCREENSHOTS.  HOWEVER, I'M GOING TO HAND THESE UP, YOUR HONOR,
17    BUT THE TITLES ALL SAY "STEVE JOBS ITUNES 7.0 PRESENTATION" IN
18    THE ONES I'VE HANDED UP.  OVERNIGHT I HAD THAT TITLE TAKEN
19    OFF.  SO THE FIRST THING, IT WOULD JUST -- IT SAYS "GAMES," IT
20    WOULD JUST SAY "GAMES."
21                    (PAUSE IN THE PROCEEDINGS.)
22            THE COURT:  RESPONSE?
23            MS. SWEENEY:  YOUR HONOR, THE -- THE VERSION HANDED
24    UP TO YOUR HONOR IS A LITTLE DIFFERENT FROM THE ONES THAT
25    PLAINTIFF RECEIVED LATE LAST NIGHT OR EARLY THIS MORNING.
```

 1          **MR. ISAACSON:**  ONLY WE WOULD BE TAKING THIS OFF.

 2   OTHERWISE THEY'RE THE SAME.

 3          **MS. SWEENEY:**  IN THAT CASE, YOUR HONOR, WE WITHDRAW

 4   THE OBJECTION.

 5          **THE COURT:**  ALL RIGHT.  THEN YOU CAN USE THOSE.

 6      GIVEN THAT I'VE NOT HAD AN OPPORTUNITY YET TO READ THE

 7   LAST RESPONSE FROM APPLE ON THE STANDING ISSUE, AND GIVEN THAT

 8   THE MOTION ISN'T TECHNICALLY AT ISSUE UNTIL THE CLOSE OF

 9   EVIDENCE, AT LEAST OR -- OR AT LEAST THAT'S HOW I UNDERSTOOD

10   YOU WERE POSTURING IT; IS THAT CORRECT, MR. ISAACSON?

11          **MR. ISAACSON:**  YES.  YES, YOUR HONOR.  WE -- WE

12   HAD -- ONCE WE DISCOVERED THIS ISSUE, BECAUSE IT RELATES TO

13   SUBJECT MATTER JURISDICTION, WE HAD THE RESPONSIBILITY TO

14   BRING IT UP TO THE COURT.  WE DID NOT -- WE WERE NOT THRILLED

15   WITH THIS.  WE WANT TO WIN THIS CASE ON THE MERITS.  AND WE

16   THINK WE'RE GOING TO.

17      AND THE FIRST STAGE OF THAT IS THE FULL RULE 50 MOTION.

18   AND THE SECOND STAGE IS THE JURY VERDICT.  SO WE HAVE NOT

19   PUSHED TO HAVE THIS DECIDED BY THE TIME OF EITHER OF THOSE

20   DECISIONS.  AND WE -- AND WE APPRECIATE THE COURT'S DELIBERATE

21   REVIEW OF THIS AND CAREFUL REVIEW, AND WE THINK THE COURT

22   SHOULD HAVE THE TIME TO DO THAT.

23      AND FOR EXAMPLE, WE HAVE SAID IN OUR PAPERS THAT WE THINK

24   THERE'S A SUFFICIENT RECORD TO SHOW THAT THERE WERE NO DIRECT

25   PURCHASES HERE.  HOWEVER, IF THE COURT WANTS MORE EVIDENCE,

1    THE CREDIT CARD INFORMATION WOULD PERHAPS BE RELEVANT TO THE

2    COURT.

3        SO IT'S GOING TO BE UP TO THE COURT TO SET UP THE

4    PROCEDURE FOR HOW AND WHEN IT WANTS TO DECIDE THIS ISSUE.  AND

5    WE ARE CONTENT TO HAVE THIS PROCEEDING ON THE MERITS CONTINUE

6    WHILE THAT HAPPENS.

7            **THE COURT:**  ALL RIGHT.  WELL, LET'S GO AHEAD AND

8    CONTINUE WITH THE EVIDENTIARY PORTION OF THIS.

9        IS MY JURY HERE?

10           **THE CLERK:**  YES.

11           **THE COURT:**  ALL RIGHT.  LET'S CALL THE JURY IN.

12       I BELIEVE WE HAVE PROFESSOR NOLL.  I SAW HIM IN THE

13   COURTROOM.  HE SHOULD COME FORWARD.

14                    (PAUSE IN THE PROCEEDINGS.)

15       (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

16   THE JURY:)

17           **THE COURT:**  OKAY.  GOOD MORNING.

18       EVERYBODY CAN BE SEATED.

19       THE RECORD WILL REFLECT THAT THE JURY IS NOW BACK.

20   I HOPE EVERYBODY HAD A TERRIFIC WEEKEND.

21       I GOT TO LISTEN -- MY DAUGHTER SINGS FOR THE EAST BAY

22   CHILDREN'S CHOIR, WHICH IS A CHOIR THAT TRAVELS ALL OVER THE

23   WORLD.  MY SON WAS IN THE CHOIR.  AND THEY'VE GONE TO RUSSIA

24   AND ESTONIA AND ALL SORTS OF WONDERFUL PLACES.

25       SO I WAS DELIGHTED TO BE ABLE TO HAVE A CHANCE TO NOT

1    THINK ABOUT THESE MATTERS FOR A FEW HOURS AND LISTEN TO

2    AVANT-GARDE, CONTEMPORARY, GAELIC, HEBREW, ENGLISH, GERMAN,

3    ALL SORTS AND KIND OF MUSIC.  SO THAT WAS REALLY A WONDERFUL

4    THING.

5        EXCEPT THAT RIGHT AS WE WERE -- THE CONCERT WAS SUPPOSED

6    TO START, THE FIRE ALARM WENT OFF.  AND I THOUGHT OF ALL OF

7    YOU AND ALL OF US AS THERE WAS THIS SOUND.  IT JUST KEPT GOING

8    AND GOING.  AND OBVIOUSLY THEY, TOO, COULD NOT START THE

9    CONCERT WHILE THE THING WAS HAPPENING.  SO, YOU KNOW, WE HAD

10   TO WAIT FOR THE FIRE DEPARTMENT TO SHOW UP AND TURN OFF THE

11   FIRE ALARM.  IT, TOO, WAS A FALSE ALARM.

12       AND THE ONLY SOLACE WAS THAT THE CHOIRS THEN STARTED

13   BURSTING OUT AND JUST SINGING REALLY LOUD ALL OF THESE OTHER

14   SONGS THAT WEREN'T PART OF THE PROGRAM THAT NIGHT.  SO AT

15   LEAST WE HAD THAT TO DROWN IT OUT, UNLIKE OUR SITUATION HERE

16   LAST WEEK.

17       SO, ANYWAY, THAT WAS BOTH ENJOYABLE AND REMINDED ME OF OUR

18   TIME HERE IN COURT.

19       SO WE WILL GET STARTED AGAIN WHERE WE LEFT OFF ON FRIDAY.

20       EVERYBODY HAVE THEIR PENS AND PAPER AND READY TO GO?

21       OKAY.  TERRIFIC.

22       MS. SWEENEY, YOU MAY PROCEED.

23                          **ROGER NOLL**,

24   CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN PREVIOUSLY

25   DULY SWORN, CONTINUED TESTIFYING AS FOLLOWS:

1    **DIRECT EXAMINATION**

2    **BY MS. SWEENEY:**

3    **Q.**  GOOD MORNING, PROFESSOR NOLL.

4    **A.**  GOOD MORNING.

5    **Q.**  WHEN WE WERE HERE ON FRIDAY, YOU WERE JUST STARTING TO

6    TALK ABOUT YOUR OPINIONS.

7            **MS. SWEENEY:**  AND JUST TO REMIND THE JURY WHERE WE

8    WERE, LARRY, IF WE COULD LOOK AT DEMONSTRATIVE 48.

9               (DEMONSTRATIVE PUBLISHED TO JURY.)

10   **BY MS. SWEENEY:**

11   **Q.**  AND THIS IS THE SUMMARY OF YOUR OPINIONS THAT WE

12   PREVIOUSLY SHOWED TO THE JURY.  AND I BELIEVE WE WERE ON

13   RELEVANT MARKET.

14       IS THAT YOUR RECOLLECTION, PROFESSOR NOLL?

15   **A.**  MY RECOLLECTION THAT WE HAD GONE INTO THE DETAILS ABOUT

16   RELEVANT MARKET --

17               (PAUSE IN THE PROCEEDINGS.)

18           **THE COURT:**  NOW TRY IT.

19           **THE WITNESS:**  CAN YOU HEAR ME NOW?

20           **THE COURT:**  YES.

21           **THE WITNESS:**  OH, I CAN EVEN HEAR ME NOW.

22       OKAY.  I BELIEVE WE WERE JUST BEGINNING THE DISCUSSION OF

23   THE DETAILS OF RELEVANT MARKET, AND IT WAS THE NEXT

24   DEMONSTRATIVE WHICH I BELIEVE IS AN EXHIBIT, WE HAD JUST BEGUN

25   TO TALK ABOUT, WHICH IS THE ONE THAT THE PRICE COMMITTEE

 1   DOCUMENT DEALING WITH THE ORIGINAL IPOD THE -- WHAT IS NOW

 2   CALLED THE IPOD CLASSIC.

 3   **BY MS. SWEENEY:**

 4   **Q.**  OKAY.  AND IS THIS THE EXHIBIT THAT YOU HAD IN MIND --

 5   **A.**  YES.

 6   **Q.**  -- PROFESSOR NOLL?

 7                   (EXHIBIT PUBLISHED TO JURY.)

 8           **THE WITNESS:**  YES.

 9   **BY MS. SWEENEY:**

10   **Q.**  SO I THINK YOU WERE JUST STARTING TO TELL THE JURY --

11   WELL, LET ME BACK UP FOR A SECOND.

12       I THINK LAST WEEK YOU HAD TESTIFIED ABOUT THE KIND OF

13   INFORMATION ECONOMISTS LOOK AT TO DEFINE RELEVANT MARKET.  AND

14   CAN YOU TELL THE JURY HOW THIS PARTICULAR DOCUMENT FITS INTO

15   THAT ANALYSIS?

16   **A.**  YES.  THE -- THE ISSUE, RECALL, IN A RELEVANT MARKET, IS

17   WHICH PRODUCTS CONSTRAIN THE PRICING OF THE REFERENCED

18   PRODUCT, WHICH IN THIS CASE IS AN IPOD.  AND ONE OF THE

19   SOURCES OF INFORMATION THAT IS RELEVANT TO THE CONSIDERATION

20   OF THAT ISSUE IS INTERNAL COMPANY DOCUMENTS AND MEMORANDA AND

21   STUDIES ABOUT THE NATURE OF THEIR OWN -- OF THE COMPETITION

22   THEY FACE.

23       AND IN THIS CASE, THE PRICE COMMITTEE IS THE MOST RELEVANT

24   BODY BECAUSE IT'S -- IT CONSISTS OF THE PEOPLE WHO MAKE THE

25   DECISIONS ABOUT THE PRICES OF IPODS.

1    AND THESE DOCUMENTS PERTAIN TO THE INFORMATION THAT WAS

2    PRESENTED TO THEM FOR THEIR DELIBERATIONS ABOUT PRICE

3    DECISIONS.

4    **Q.**   OKAY.  AND CAN YOU TELL THE JURY WHAT IS CONTAINED IN

5    EXHIBIT 731?

6    **A.**   THE -- IT'S A -- IT'S A LONG DOCUMENT.  IT GOES ON FOR --

7    A LONG EXHIBIT.  IT GOES ON FOR TEN PAGES.  BUT IT'S A SERIES

8    OF DOCUMENTS PREPARED FOR THE PRICE COMMITTEE ABOUT THE

9    COMPETITORS THAT APPLE FACED.

10    SO THE VERY FIRST PAGE GOES ALL THE WAY BACK TO 2001 FOR

11    THE ORIGINAL VERSION OF THE IPOD, WHICH WAS THEN RENAMED AS

12    THE CLASSIC WHEN OTHER VERSIONS WERE PRODUCED.

13    AND SO IF YOU -- AS YOU GO ALONG HERE, THE VERY FIRST PAGE

14    SHOWS YOU SOME CHARACTERISTICS OF THE VARIOUS PRODUCTS THAT

15    THEY'RE COMPETING AGAINST.  AND IT ALSO SHOWS US -- SHOWS THE

16    PRICES.  THE -- THE 10G AND 20G REFER TO THE MEMORY CAPACITY

17    OF -- OF THE DEVICE SO -- AND THEN RELATED TO CAPACITY IS HOW

18    MANY SONGS YOU CAN LOAD ON IT.  SO THE IPOD HAS ROUGHLY HALF

19    THE CAPACITY IN TERMS OF NUMBER OF SONGS AS ITS COMPETITORS.

20    AND THEN THERE'S OTHER THINGS THAT THEY REGARD AS

21    IMPORTANT.

22    THIS PAGE ISN'T TERRIBLY INTERESTING BECAUSE THE FEATURES

23    PART DOESN'T HAVE MUCH IN IT.  BUT AS WE GO DOWN AND GET LATER

24    IN THE PROCESS, MORE AND MORE FEATURES GET ADDED.  AND IF WE

25    GO DOWN THREE OR FOUR PAGES, WE GET LATER IN THE PROCESS -- GO

1    MAYBE LIKE PAGE 7 OR 8, SOMETHING LIKE THAT.

2              (EXHIBIT PUBLISHED TO JURY.)

3         **THE WITNESS:**  THIS IS GOOD.

4       WE'RE -- WE'RE BOUND TO GET MORE STUFF.  WE CAN STOP.  ALL

5    I GOT TO DO IS FIGURE OUT A WAY TO READ IT.

6       IF YOU LOOK WAY AT THE BOTTOM, ALBUM ART, PHOTO, SIDESHOW,

7    TV, OUT, THEN -- THERE'S MORE AND MORE STUFF BEING ADDED TO

8    THESE PRODUCTS.

9       AND THAT'S -- THAT'S EXACTLY WHAT'S HAPPENING IN CONSUMER

10   ELECTRONICS.  IF YOU THINK ABOUT THE -- WHAT -- WHAT YOU HAD

11   ON A NOTEBOOK OR TABLET COMPUTERS AND WHAT YOU HAVE ON

12   SMARTPHONES, THERE WAS -- IN THE MID-2000'S, THERE WAS THIS

13   ENORMOUS RATE OF PROGRESS IN TERMS OF THE -- OF THE

14   FUNCTIONALITY OF CONSUMER ELECTRONIC DEVICES.

15      AND AS YOU SEE, AS TIME PROGRESSES, THE CHARACTERISTICS

16   LIST, THE FEATURES, GETS LONGER AND LONGER AND LONGER.

17      AND IN GENERAL, IF WE -- THERE'S SOME OTHER INTERESTING

18   THINGS.  IF WE WANT TO GO BACK TO THE WHOLE AS WELL, THERE'S

19   THE ISSUE ABOUT BATTERY AND WEIGHT AND SIZE.

20      SORT OF THE MIDDLE.

21              (EXHIBIT PUBLISHED TO JURY.)

22         **THE WITNESS:**  YEAH.

23      OKAY.  YOU CAN SEE THAT ONE OF THE ISSUES IS HOW LONG OF A

24   BATTERY LIFE DOES IT HAVE.  ANOTHER ISSUE IS WHAT IS THE SIZE

25   OF THE DISPLAY.  ANOTHER ISSUE IS HOW MUCH DOES IT WEIGH.

1    APPLE IS KNOWN FOR HAVING ESPECIALLY COMPACT, SMALL

2    DEVICES THAT DON'T TAKE UP A LOT OF SPACE IN TERMS OF THEIR

3    CUBIC INCHES AND DON'T WEIGH VERY MUCH.

4        AND SO THIS -- THAT'S WHY IT'S IMPORTANT TO THEM, AND THEY

5    COMPARE THEMSELVES -- YOU KNOW, THEY HAVE -- SAY, THEIR WEIGHT

6    IS 5.8 OUNCES, AND IF YOU LOOK ACROSS THIS LIST, MANY OF THEIR

7    COMPETITORS HAVE MORE, AND A FEW ARE IN THE SAME BALLPARK AND

8    ONE IS LESS.

9        SO THIS IS HOW THEY'RE COMPARING THEMSELVES.  SOMEHOW,

10   THIS INFORMATION IS BEING PRESENTED TO THE PRICE COMMITTEE AS

11   A COMPARISON.

12       AND EVEN IF WE LOOK ACROSS THE VERY TOP OF THE -- OF THE

13   COMPETITORS THAT ARE BEING COMPARED WITH, THEY'RE FREQUENTLY

14   THE -- THESE ARE COMPARISONS WITH PRODUCTS THAT HAVEN'T BEEN

15   PRODUCED -- AREN'T ON THE MARKET YET.  THESE ARE IN

16   ANTICIPATION OF PRODUCTS COMING OUT.

17               (EXHIBIT PUBLISHED TO JURY.)

18       **THE WITNESS:**  AND WE SEE THAT -- IN THIS -- IN THIS

19   PARTICULAR CASE, THEY HAVE AN ESTIMATED PRICE OF -- WAY OVER

20   HERE AT THE END OF THE TOSHIBA, THEY'RE NOT ABSOLUTELY CERTAIN

21   OF WHAT IT'S ACTUALLY GOING TO BE PRICED AT WHEN IT COMES OUT.

22   BY MS. SWEENEY:

23   **Q.**  PROFESSOR NOLL, WHAT DATA DID YOU RELY UPON TO CREATE

24   EXHIBIT 731?

25   **A.**  THIS IS -- THIS IS A COMPILATION OF THE PRICE COMMITTEE

1    DOCUMENTS THAT WERE PRODUCED IN DISCOVERY IN THIS CASE.

2    Q.  AND YOU TESTIFIED THAT THIS PARTICULAR EXHIBIT,

3    EXHIBIT 731, PERTAINED TO THE -- WHAT BECAME THE IPOD CLASSIC.

4    DID YOU CONDUCT A SIMILAR ANALYSIS FOR OTHER MODELS OF IPODS?

5    A.  YES.  THERE'S A SERIES OF EXHIBITS BEYOND THIS FOR -- ONE

6    FOR EACH OF THE MODELS OF IPOD.  AND AGAIN, IT PROBABLY MAKES

7    SENSE TO GO THROUGH THEM ONE BY ONE TO SEE --

8    Q.  OKAY.

9    A.  -- WITHOUT SPENDING A LOT OF TIME ON IT, JUST SO WE CAN

10   SEE WHAT THEY ARE.

11   Q.  OKAY.

12   A.  I THINK.

13   Q.  SO LARRY, I THINK, HAS PUT UP ON THE SCREEN EXHIBIT 181.

14       WHAT IS THIS?

15                   (EXHIBIT PUBLISHED TO JURY.)

16          THE WITNESS:  THIS IS A SIMILAR DIAGRAM FOR THE IPOD

17   SHUFFLE.  IT BEGINS IN 2004.

18       AND AGAIN, IT'S A SERIES OF THESE COMPARISONS OF THE PRICE

19   AND CHARACTERISTICS OF THE IPOD SHUFFLE IN COMPARISON WITH THE

20   OTHER PRODUCTS.  AND -- AND IT'S IMPORTANT TO NOTE, YOU KNOW,

21   THESE -- WHAT THE NAMES OF THESE COMPANIES ARE.  THESE ARE

22   THE -- FOR THE MOST PART, THE MAJOR CONSUMER ELECTRONICS

23   PRODUCTS AT THE TIME, CERTAINLY IN THE SPACE OF PORTABLE

24   DIGITAL MEDIA PLAYERS.

25

1    BY MS. SWEENEY:

2    **Q.**   OKAY.   LET'S HAVE A LOOK AT EXHIBIT 732.

3         AND THIS ALSO IS A CHART THAT YOU PREPARED?

4    **A.**   YES.   WHEN IT GETS UP HERE.

5                   (EXHIBIT PUBLISHED TO JURY.)

6            **THE WITNESS:**   THERE WE GO.

7    BY MS. SWEENEY:

8    **Q.**   WHAT'S THIS?

9    **A.**   THIS IS THE TOUCH, THE IPOD TOUCH.   AND THIS ONE -- NOTICE

10   THAT THE FIRST DATE HERE IS AUGUST OF 2007.   ONE OF THE

11   IMPORTANT -- THE TOUCH IS -- IS -- IS SORT OF LIKE AN IPHONE

12   IN -- IN TERMS OF ITS RANGE OF -- OF CHARACTERISTICS AND

13   FEATURES.   AND IT WAS ACTUALLY -- THE PRODUCTION OF IT BEGAN

14   IN THE CLASS PERIOD.

15        AND SO ALL OF ITS UNIQUE CHARACTERISTICS ARE EMBEDDED IN

16   ITS -- THE FACTS THAT IT'S A TOUCH.   THE -- THE -- THE MODEL

17   DESIGNATION TOUCH STANDS FOR NOT JUST A NAME BUT ALL THE

18   CHARACTERISTICS THAT ARE EMBEDDED IN IT.

19        AND SO THERE'S A -- THERE'S A NUMBER OF FEATURES TO A

20   TOUCH THAT ARE IN THESE VARIOUS PAGES THAT ARE TAKEN FROM THE

21   APPLE DOCUMENTS.

22   **Q.**   AND THIS DOCUMENT, EXHIBIT 732, WHAT DOCUMENTS OR MATERIAL

23   DID YOU RELY UPON TO CREATE THAT?

24   **A.**   AGAIN, THIS IS ALL FROM DISCOVERY DOCUMENTS FROM APPLE

25   THAT WERE PREPARED -- THAT -- OF DOCUMENTS THAT WERE PREPARED

1    FOR THE PRICE COMMITTEE.

2    Q.   OKAY.  ALL RIGHT.  THEN LET'S TURN TO EXHIBIT 733.

3         AND PROFESSOR NOLL, WHAT IS THIS?

4                   (EXHIBIT PUBLISHED TO JURY.)

5              THE WITNESS:  THIS IS FOR THE NANO.

6         AND AGAIN, THIS IS 2005.  THE FIRST NANO WAS PRODUCED IN

7    2005.  THE SECOND NANO WAS PRODUCED AT THE TIME THE ITUNES 7.0

8    PROGRAM WAS RELEASED.  SO ALL BUT ONE VERSION OF A NANO HAVE

9    BEEN PRODUCED IN THE CLASS PERIOD.  THIS IS -- THE FIRST

10   GENERATION NANO IS THE ONLY ONE THAT WAS NOT PRODUCED IN THE

11   CLASS PERIOD.

12        AND AGAIN, IT SHOWS THE MEMORIES, THE PRICES, AND THE

13   CHARACTERISTICS THAT APPLE WROTE DOWN AS USEFUL TO COMPARE

14   ACROSS MODELS.

15   BY MS. SWEENEY:

16   Q.   OKAY.  LET'S TURN TO 735.

17        AND WHAT IS THIS EXHIBIT?

18                   (EXHIBIT PUBLISHED TO JURY.)

19             THE WITNESS:  IPOD PHOTO, ANOTHER MODEL OF IPOD.

20   BY MS. SWEENEY:

21   Q.   AND WAS THIS EXHIBIT CREATED RELYING ON APPLE DOCUMENTS AS

22   WELL?

23   A.   THAT'S TRUE, YES.

24   Q.   OKAY.  AND PROFESSOR NOLL, WE'VE GONE THROUGH THIS SERIES

25   OF EXHIBITS THAT YOU PREPARED THE PRICE COMPARISONS FOR IPODS.

1    WHAT IS THE SIGNIFICANCE TO YOUR MARKET DEFINITION OPINION OF

2    THESE EXHIBITS?

3    **A.**  WELL, THEY -- THE SIGNIFICANCE OF IT IS THEY CONFIRM THE

4    IDEA THAT I EXPRESSED TO YOU EARLIER LAST WEEK THAT MISSING

5    FROM THESE DOCUMENTS, OF COURSE, IS ANYTHING ABOUT A

6    SMARTPHONE OR A PORTABLE CD PLAYER.  APPLE REGARDED THE

7    COMPETITORS OF THE IPOD -- THE PRINCIPAL COMPETITORS, AT

8    LEAST, OF THE IPOD AS BEING OTHER PORTABLE DIGITAL MEDIA

9    PLAYERS.

10        SO THIS IS THEIR OWN -- AND I ALSO SAID, I THINK I'LL

11   REPEAT AGAIN, NOT NECESSARILY ALL PORTABLE DIGITAL MEDIA

12   PLAYERS ARE REGARDED AS CLOSE COMPETITORS OF APPLE.  THIS IS A

13   LIST OF THE -- OF THE MODELS THAT THEY REGARDED AS

14   SUFFICIENTLY IMPORTANT THAT THEY SHOULD BE CONSIDERED IN

15   MAKING PRICING DECISIONS.

16   **Q.**  YOU -- YOU'VE MENTIONED MOBILE PHONES.  DID YOU REACH A

17   CONCLUSION AS TO WHETHER MOBILE PHONES ARE INCLUDED IN THE

18   MARKET?

19   **A.**  YES, I DID.

20   **Q.**  WHAT'S THAT OPINION?

21   **A.**  MY OPINION IS DURING THE CLASS PERIOD, NO.  ALTHOUGH AFTER

22   THE -- A COUPLE OF YEARS AFTER THE CLASS PERIOD, THE ANSWER

23   WOULD BE YES.

24   **Q.**  AND WHAT'S THE BASIS FOR THAT OPINION?

25   **A.**  THE BASIS FOR THAT OPINION IS TWO THINGS.  THE FIRST IS

1    THE FEATURES OF SMARTPHONES, TELEPHONES THAT ARE WIRELESS

2    TELEPHONES THAT ARE CAPABLE OF PLAYING DIGITAL FILES, THAT CAN

3    STORE OR PLAY DIGITAL FILES.

4        AND SECONDLY, THE –– THE RELATIVE SIZE OF THE SMARTPHONE

5    MARKET COMPARED TO THE IPOD MARKET OR –– OR SALE.  I SHOULDN'T

6    SAY MARKET.  THE SALES VOLUMES OF PHONES WITH THE CAPABILITY

7    OF PLAYBACK VERSUS PORTABLE DIGITAL MEDIA PLAYERS.

8        THE KEY POINTS HERE ARE, FIRST OF ALL, THAT THE

9    SMARTPHONES DID NOT HAVE –– WERE NOT QUALITATIVELY AS GOOD A

10    SOURCE.  IT WAS SORT OF REGARDED AS AN ADD-ON, AND ACCORDING

11    TO THE REVIEWS THAT ARE WRITTEN AT THE TIME, IT'S NOT REALLY

12    A –– SOMEONE WHO IS SERIOUSLY INTERESTED IN MUSIC WANTS TO

13    PLAY A LOT, YOU WOULDN'T REALLY RELY ON A SMARTPHONE DURING

14    THE CLASS PERIOD BECAUSE IT DIDN'T HAVE THE –– THE FEATURE

15    CHARACTERISTICS THAT WOULD SUPPORT SPENDING HOURS A DAY

16    LISTENING TO MUSIC.

17        AND THEN THE SECOND PART, OF COURSE, IS THAT THE SALE –– I

18    THINK THERE'S A DEMONSTRATIVE ON THIS.

19            (DEMONSTRATIVE PUBLISHED TO JURY.)

20    **BY MS. SWEENEY:**

21    **Q.**  THIS IS –– LARRY JUST PUT ON THE SCREEN EXHIBIT 736.

22        AND CAN YOU TELL THE JURY WHAT THIS IS, PROFESSOR NOLL?

23    **A.**  THIS IS –– THE RED BAR IS IPOD SALES.  THE GREEN BAR IS

24    THE ADD-ON OF OTHER PEOPLE'S PORTABLE DIGITAL MEDIA PLAYER

25    SALES.  AND THE BLUE LINE IS SALES OF IPHONES.

1      AND NOTICE THAT THE -- THE DAMAGES PERIOD HERE ENDS EARLY

2  IN JANUARY OF 2009.  SO IF YOU LOOK IN 2008, ABOUT -- THE

3  TOTAL SALES OF PORTABLE DIGITAL MEDIA PLAYERS IS ALMOST

4  80,000.  AND THE -- THIS IS -- YOU GOT TO ADD THAT'S IN

5  THOUSANDS SO IT'S 80 MILLION.  BUT THE IPHONE SALES ARE A

6  SMALL -- A VERY SMALL FRACTION OF THAT.  THEY'RE LESS THAN

7  20,000.

8      IF YOU -- IF YOU -- AND THEN WE ALSO KNOW FROM SURVEY DATA

9  THAT ARE TAKEN LATER THAT ROUGHLY 20 PERCENT TO -- AT A PEAK

10  OF 24 PERCENT IN 2011 OF SURVEY RESPONDENTS SAID THEY EVER

11  USED THEIR SMARTPHONE TO LISTEN TO MUSIC.

12      SO THAT MEANS A FRACTION OF THAT FRACTION ARE ACTUALLY

13  BEING USED AS A COMPETITIVE SUBSTITUTE.

14      NOW, IF WE GET TO 2011, 2012, 2013, AS YOU CAN SEE, SALES

15  OF SMARTPHONES GO THROUGH THE ROOF AND SALES OF IPODS ARE --

16  ARE DECLINING.

17      CERTAINLY BY 2010, SMARTPHONES ARE -- ARE DEFINITELY A

18  COMPETITIVE SUBSTITUTE FOR PORTABLE DIGITAL MEDIA PLAYERS.

19  AND IF WE WERE TRYING TO DEFINE A RELEVANT MARKET FOR, SAY,

20  2010 TO 2013 FOR PORTABLE DIGITAL MEDIA PLAYERS, WE WOULD HAVE

21  TO INCLUDE SMARTPHONES.

22  Q.  DURING THE PERIOD THAT'S REFLECTED IN THIS CHART, 2002 TO

23  2013, OR -- OR LET'S JUST START WITH WHERE THE BLUE LINE IS,

24  2007 FORWARD, DURING THAT PERIOD OF TIME, THE CLASS PERIOD,

25  WAS APPLE TAKING INTO CONSIDERATION THE -- THE PRICE AND

1    CHARACTERISTICS OF MOBILE PHONES IN PRICING IPODS?

2    **A.**  NO.  AT LEAST THERE'S NO EVIDENCE THAT THEY WERE.  LET'S

3    PUT IT THAT WAY.  I DON'T KNOW WHAT WENT ON INSIDE THE HEADS

4    OF THE PEOPLE ON THE PRICE COMMITTEE, BUT CERTAINLY THE

5    DOCUMENTS THAT WERE GIVEN TO THE PRICE COMMITTEE DO NOT

6    INDICATE THAT THEY WERE TAKING INTO ACCOUNT THE PRICE OF

7    SMARTPHONES.

8    **Q.**  AND IS THERE OTHER INFORMATION THAT YOU, AS AN ECONOMIST,

9    WOULD LOOK TO, TO SEE WHETHER MOBILE PHONES WERE IN THE MARKET

10   AT THAT TIME ASIDE FROM WHAT APPLE WAS CONSIDERING?

11   **A.**  YES.

12   **Q.**  AND WHAT IS THAT?

13   **A.**  THERE'S A FAIRLY LARGE TRADE PRESS ON CONSUMER

14   ELECTRONICS, SOME OF WHICH IS ORIENTED TOWARDS CONSUMERS, SOME

15   OF WHICH IS ORIENTED TOWARDS BUSINESSES IN THE -- IN THAT

16   SPACE.

17       ON THE CONSUMER ORIENTATION SIDE, WE HAVE PUBLICATIONS

18   THAT DO PRODUCT REVIEWS.  FIRST OF ALL, THEY'LL -- THEY'LL

19   SUMMARIZE WHAT'S CURRENTLY GOING ON IN AN ENTIRE PRODUCT

20   CATEGORY, TALK ABOUT WHAT THE NEW FEATURES ARE, AND WHETHER

21   IT'S WORTHWHILE TO UPGRADE.

22       ONE OF THE IMPORTANT ISSUES, AGAIN, ANYBODY WHO'S EVER

23   DABBLED IN CONSUMER ELECTRONICS KNOWS THAT TWO OR THREE YEARS

24   AFTER YOU BUY A DEVICE, IT'S STILL WORKING JUST FINE BUT IT

25   CAN'T DO ALL THE THINGS THAT THE NEW ONES CAN.  SO THERE'S

 1    ALWAYS A DECISION THAT HAS TO BE MADE IN REAL TIME BY A

 2    CONSUMER:  IS IT TIME FOR ME TO BUY A NEW ONE?  BECAUSE AS

 3    TECHNOLOGY PROGRESSES, THE CAPABILITIES GROW.

 4        WELL, ENTITIES LIKE CNET, YOU KNOW, *CONSUMER REPORTS* ALSO

 5    DOES THIS, THERE'S SEVERAL PUBLICATIONS OUT THERE THAT --

 6    THAT, FIRST OF ALL, REVIEW WHETHER IT'S TIME TO BUY ANOTHER

 7    ONE DEPENDING ON HOW OLD YOUR CURRENT DEVICE IS, AND SECONDLY,

 8    FROM AMONG THE ONES THAT ARE CURRENTLY ON THE MARKET, WHICH

 9    ARE THE -- WHICH ARE THE BEST AND -- AND WHICH ARE NOT SO HOT

10    AND WHAT ARE THE STRENGTHS AND WEAKNESSES OF THE BEST

11    CANDIDATES.  SO THAT IS THE PART THAT'S ORIENTED TOWARDS

12    CONSUMERS.

13        AND THERE'S ANOTHER PART THAT'S MORE ORIENTED TOWARDS

14    BUSINESSES, WHICH IS COMPANIES THAT WRITE REPORTS ON WHAT'S

15    GOING ON IN A PARTICULAR PRODUCT SPACE.  THEY -- THEY DO

16    SURVEYS OF SALES AND ESTIMATE MARKET SHARES AND TALK ABOUT

17    WHAT'S GOING ON IN PRICING.

18        AND AS CONTRASTED TO CNET, WHICH IS FREE, AND *CONSUMER*

19    *REPORTS*, WHICH DOESN'T COST THAT MUCH FOR A CONSUMER, THESE

20    OTHER GUYS WHO ARE WRITING THESE REPORTS CHARGE THOUSANDS OF

21    DOLLARS FOR THESE THINGS.  AND THEY -- BECAUSE THEY HAVE A

22    VERY SMALL MARKET WHICH IS JUST PEOPLE IN THE INDUSTRY.

23        AND SO WE CONSULTED BOTH OF THOSE SOURCES TO SEE WHAT THEY

24    WROTE ABOUT WHEN TALKING ABOUT PORTABLE DIGITAL MEDIA PLAYERS.

25    AND THEY ALMOST ALWAYS ARE JUST WRITING ABOUT PORTABLE DIGITAL

1    MEDIA PLAYERS.

2        THERE'S AN INTERESTING COUNTEREXAMPLE.  THERE WAS AN

3    ARTICLE WRITTEN IN THE SUMMER OF 2008 IS "WHY DO YOU STILL

4    NEED TO HAVE AN MP3 PLAYER?"  OR A PORTABLE DIGITAL MEDIA

5    PLAYER.

6        AND IT SAID, WELL, THE REASON YOU REALLY WANT TO HAVE ONE

7    OF THESE IS THAT SMARTPHONES DON'T WORK VERY WELL FOR THIS

8    PURPOSE SO YOU'RE STILL GOING TO WANT TO BUY ANOTHER ONE,

9    ALTHOUGH IN THE FUTURE YOU MAY NOT WANT TO.

10   **Q.**  OKAY.  AND DO YOU HAVE ANY OTHER CHARTS THAT ARE RELEVANT

11   TO YOUR OPINION THAT MOBILE PHONES ARE NOT INCLUDED IN THE

12   MARKET DURING THAT PERIOD?

13   **A.**  YEAH.  I BELIEVE THERE'S ONE MORE, ISN'T THERE?

14   **Q.**  YES.

15   **A.**  YES.

16   **Q.**  LET'S LOOK AT -- I'M SORRY.  FOR THE RECORD, THIS IS TRIAL

17   EXHIBIT 737.

18                  (EXHIBIT PUBLISHED TO JURY.)

19   **BY MS. SWEENEY:**

20   **Q.**  GO AHEAD.  WHAT'S THIS?

21   **A.**  AS I SAID TO YOU EARLIER, THIS IS -- THERE'S SALES DATA

22   THAT ARE AVAILABLE ON -- FROM THE -- IN THE CASE ON IPOD SALES

23   AND -- FROM APPLE.  AND THIS SHOWS THE -- THE HISTORICAL PATH

24   OF SALES OF IPODS.  AND YOU CAN SEE, YOU KNOW -- YOU COULD

25   ALMOST NOT SEE THE SALES EARLY ON IN THE HISTORY OF THE IPOD.

1    AND THEN YOU HAVE -- NOW, THESE ARE IN -- THESE ARE --

2    THESE ARE IN QUARTERS OF THE YEAR.

3    AND THEN ALL OF A SUDDEN, THERE'S THIS EXPONENTIAL GROWTH

4    STARTING IN -- IN 2003, 2004.  THIS IS THE CREATION OF DIGITAL

5    DOWNLOAD RETAIL STORES, MAINLY THE ITUNES STORE, THAT HAVE

6    LARGE CATALOGS OF RECORDED -- SOUND RECORDINGS AVAILABLE.

7    IN THIS EARLY PERIOD WHEN THE NUMBERS ARE REALLY LOW, THE

8    RECORD COMPANIES DID NOT ALLOW MOST OF THEIR PRODUCT TO BE

9    DISTRIBUTED OVER THE INTERNET.  AND THAT WAS AN IMPORTANT

10    PHENOMENON, WAS THE ABILITY TO DISTRIBUTE THINGS OVER THE

11    INTERNET.  AND THAT HUGE RUNUP IN THE SALES OF IPODS AND

12    PORTABLE DIGITAL MEDIA PLAYERS IN GENERAL OCCURRED WHEN LEGAL

13    DOWNLOADS COULD BE OBTAINED.

14    NOTICE THAT IN THIS PERIOD OF REALLY LOW SALES, THAT WAS

15    THE -- THE PERIOD OF THE HEIGHT OF ILLEGAL FILE SHARING,

16    NAPSTER AND GROKSTER AND THINGS LIKE THAT.  AND THAT DIDN'T

17    LEAD TO LOTS OF SALES OF PORTABLE DIGITAL MEDIA PLAYERS.

18    TECHNOLOGICAL PROGRESS IN THE DEVICES PLUS THE

19    AVAILABILITY OF DOWNLOAD STORES OCCURRED AT THE TIME THIS HUGE

20    EXPONENTIAL GROWTH TOOK PLACE.

21    AND THEN WE GET TO 2008, 2009.  THE -- THE SECOND QUARTER

22    OF 2009 IS THE FIRST QUARTER IN THE HISTORY OF THE IPOD WHERE

23    SALES WERE LOWER THAN IN THE SAME QUARTER A YEAR EARLIER.

24    AND SO YOU SEE THIS GRADUAL DECLINE STARTED THAT ACTUALLY

25    STARTS AT THE END OF THE CLASS PERIOD AND PERSISTS TO THE

1    PRESENT WHERE THE SALES OF IPODS AND OTHER PORTABLE DIGITAL

2    MEDIA PLAYERS HAVE DECLINED AS THE USE OF SMARTPHONES HAS

3    INCREASED.

4    **Q.**    LOOKING AT THIS CHART THAT IS EXHIBIT 737, WHAT ARE THOSE

5    VERY TALL SPIKES?

6    **A.**    THAT'S CHRISTMAS.

7    **Q.**    OKAY.  ALL RIGHT.

8    **A.**    I -- I'M IN THERE WITH MY GRANDDAUGHTER.

9    **Q.**    SO ARE THERE ANY OTHER PRODUCTS THAT YOU CONSIDERED AS

10    BEING PART OF THE RELEVANT MARKET OR THAT YOU REJECTED AS

11    BEING PART OF THE RELEVANT MARKET?

12    **A.**    NO.  THE -- THE THINGS THAT WE -- WE REJECTED ANYTHING

13    OTHER -- WE CONSIDERED PORTABLE CD PLAYERS WHICH HAD

14    DISAPPEARED FROM EVEN BEING REVIEWED BY ANYBODY BEFORE THE --

15    BEFORE THE ITUNES STORE WAS EVEN LAUNCHED.  AND THEN

16    SMARTPHONES.

17        SO THOSE ARE THE TWO CLOSEST -- THOSE ARE THE TWO BEST

18    CANDIDATES.  AND SO -- AND THERE'S NOTHING ELSE THAT'S

19    FUNCTIONALLY SIMILAR TO BE CONSIDERED.

20    **Q.**    OKAY.  SO THEN CAN YOU JUST SUMMARIZE YOUR RELEVANT MARKET

21    OPINION?

22    **A.**    YES.  THAT PORTABLE DIGITAL MEDIA PLAYERS ARE, IN FACT, A

23    PRODUCT MARKET THAT THE -- THE PRODUCTS THAT CONSTRAIN THE

24    PRICE OF IPODS WOULD -- ARE OTHER PORTABLE DIGITAL MEDIA

25    PLAYERS AND NOT OTHER KINDS OF CONSUMER ELECTRONICS DEVICES.

1    **Q.**  OKAY.

2    **A.**  DURING THE CLASS PERIOD.  I MAKE THAT AS AN IMPORTANT --

3    IT'S IMPORTANT TO MAKE THAT STATEMENT.  DURING THE CLASS

4    PERIOD.

5    **Q.**  OKAY.  SO LET'S TURN TO YOUR SECOND OPINION.

6          **MS. SWEENEY:**  AND, LARRY, IF YOU CAN PUT THE NEXT

7    DEMONSTRATIVE ON THE SCREEN.

8              (DEMONSTRATIVE PUBLISHED TO JURY.)

9    **BY MS. SWEENEY:**

10   **Q.**  ALL RIGHT.  WHAT IS MONOPOLY POWER?

11   **A.**  MONOPOLY POWER IS THE UNILATERAL ABILITY OF A FIRM TO

12   CONTROL PRICE OR EXCLUDE COMPETITORS.  AND IT'S IMPORTANT TO

13   KNOW THIS IS A NEUTRAL STATEMENT.  IT'S NOT A NORMATIVE OR

14   JUDGMENTAL STATEMENT, "OH, YOU'RE A MONOPOLY."  THIS IS SIMPLY

15   A CHARACTERIZATION OF THE DEGREE OF COMPETITION IN A

16   MARKETPLACE.

17       AND -- AND MONOPOLY POWER IS PRESENT WHEN A -- A SINGLE

18   FIRM ACTING ALONE HAS -- IS POWERFUL ENOUGH THAT IT CONTROLS

19   PRICES AND CAN EXCLUDE COMPETITORS EITHER FROM THAT MARKET OR

20   FROM A RELATED MARKET.

21   **Q.**  AND AS AN ECONOMIST, HOW DO YOU GO ABOUT FINDING OUT

22   WHETHER A FIRM HAS MONOPOLY POWER?

23   **A.**  THERE'S ESSENTIALLY TWO DIFFERENT WAYS TO APPROACH THE

24   PROBLEM.  ONE IS CALLED THE DIRECT EVIDENCE, WHICH IS:  DOES A

25   FIRM MAKE A LOT OF MONEY?  BASICALLY.  DO THEY MAKE MORE THAN

1    A COMPETITIVE RETURN ON THEIR INVESTMENTS?

2        PROFITS ARE EXTREMELY DIFFICULT TO MEASURE IN THAT

3    CONTEXT.  AND ECONOMISTS FOR THE MOST PART AVOID -- YOU SORT

4    OF SEEM OBVIOUS, YOU KNOW, WELL, LOOK AND SEE IF THEY'RE

5    MAKING A LOT OF MONEY.  BUT THE REALITY IS THAT LOOKING AT THE

6    PROFITABILITY AS AN INDICATOR OF MARKET POWER IS FULL OF

7    NOISE, PURE PROFITS.

8        SO WHAT INSTEAD ECONOMISTS DO IS LOOK AT SOMETHING CALLED

9    THE LERNER INDEX.  THE LERNER INDEX IS PRICE MINUS MARGINAL

10   COST OR AVERAGE INCREMENTAL COST, THAT IS TO SAY:  WHAT IS THE

11   ADDITIONAL COST OF PRODUCING AND SELLING ONE MORE UNIT OF

12   OUTPUT?  SO IT'S PRICE MINUS INCREMENTAL COST DIVIDED BY

13   PRICE.

14       IT'S A NUMBER THAT VARIES BETWEEN -- IT COULD BE NEGATIVE

15   OR IT COULD BE AS A MAXIMUM VALUE OF ONE.  IF MARGINAL COST IS

16   ZERO, THEN IT'S P OVER P AND THAT'S ONE.  THE HIGHEST IT COULD

17   EVER BE IS P.  IT COULD BE REALLY, REALLY LOW, IF YOUR PRICE

18   IS REALLY LOW COMPARED TO MARGINAL COST.  BUT IF THAT'S THE

19   WORLD YOU'RE IN, YOU'RE NOT GOING TO BE IN BUSINESS VERY LONG.

20   IF YOU CAN'T EVEN COVER YOUR INCREMENTAL COSTS OF A DEVICE,

21   THEN OBVIOUSLY YOU'RE NOT GOING TO BE IN BUSINESS VERY LONG.

22   **Q.**  AND WITH RESPECT TO THE WORK THAT YOU DID IN THIS CASE,

23   DID YOU INVESTIGATE WHETHER APPLE HAD THE KIND OF -- OR STRIKE

24   THAT.  DID YOU INVESTIGATE APPLE'S MARGINS?

25   **A.**  WE DID EXAMINE THE MARGINS AND -- THE PRICE COST MARGINS,

 1    YES.

 2    **Q.**    OKAY.  SO WE'LL COME BACK TO THIS SLIDE.

 3         BUT LET'S GO BRIEFLY TO EXHIBIT 942.

 4                   (EXHIBIT PUBLISHED TO JURY.)

 5    **BY MS. SWEENEY:**

 6    **Q.**    AND PROFESSOR NOLL, WHAT IS THIS?

 7    **A.**    THIS IS A COMPILATION OF DATA FROM, AGAIN, INFORMATION

 8    PRODUCED BY APPLE THAT CONTAINS ALL OF THE INFORMATION

 9    NECESSARY TO CALCULATE THE -- WHAT I SAID BEFORE, THE LERNER

10    INDEX, THE -- THE PRICE COST MARGIN, P MINUS -- PRICE MINUS

11    INCREMENTAL COST DIVIDED BY PRICE.

12         AND WHAT THIS SHOWS IS THE HISTORICAL PERFORMANCE OF

13    APPLE.

14         NOW, THE ABSOLUTE NUMBER IS NOT WHAT'S IMPORTANT BECAUSE

15    WHEN YOU GO FROM PRODUCT TO PRODUCT TO PRODUCT, THEY'RE VERY

16    DIFFERENT IN THEIR -- IN THEIR MAKEUP.  THEY CAN DIFFER

17    ENORMOUSLY IN THE FRACTION OF COSTS THAT ARE INCREMENTAL

18    VERSUS THE FRACTION THAT ARE FIXED COSTS.

19         SO, YOU KNOW, COMPARING IPODS TO CHEVROLETS TO BEEF STEAK

20    IS NOT TERRIBLY INTERESTING.  WHAT'S BETTER AND MORE RELIABLE

21    AND USEFUL IS TO COMPARE THE PRICE COST MARGINS THROUGH TIME

22    IN A PRODUCT -- IN THE SAME PRODUCT BECAUSE THEN THESE OTHER

23    SOURCES OF DIFFERENCES DON'T PERTAIN.

24         AND WHAT THIS SHOWS, OF COURSE, IS THAT THE -- THAT THE

25    PRICE COST MARGINS FOR IPODS, IT VARIES -- AND I'LL EXPLAIN

1    WHY IN A MINUTE -- IT VARIES THROUGH TIME, BUT IT'S

2    ESSENTIALLY STABLE UNTIL WE GET TO JUST BEFORE THE CLASS

3    PERIOD.  AND THEN IT GOES TO A NEW LEVEL AND IS STABLE AT THAT

4    NEW LEVEL.  AND THEN SUBSEQUENTLY IT FALLS BACK DOWN BUT NOT

5    ANYWHERE NEAR AS FAR AS IT HAD BEFORE.

6        SO THIS IS -- INDICATES THAT THE MARKET POWER OF APPLE

7    INCREASED IN -- IN THE PERIOD THAT WE'RE INTERESTED IN HERE,

8    WHICH IS THE CLASS PERIOD.

9    Q.  NOW, YOU SAID THAT THIS CHART REFERS TO IPODS.  AND CAN

10   YOU LOOK AT THE TOP OF THE PAGE AND IT SAYS "ALL PRODUCTS."

11   WHAT DOES THAT REFER TO?

12   A.  THIS IS THE -- THE ALL IPOD PRODUCTS.  AND THAT -- THAT

13   ACTUALLY ACCOUNTS FOR THE BOUNCING AROUND OF THE NUMBER, IS

14   THAT THE PROPORTION -- FIRST OF ALL, THE PRICE COST MARGINS

15   ARE NOT THE SAME FOR ALL IPODS.

16       SECONDLY, WHEN A NEW PRODUCT IS INTRODUCED, ESPECIALLY

17   WITH A SORT OF ICONIC COMPANY LIKE APPLE, YOU GET LOTS OF

18   SHORT-TERM SALES AND LOTS OF BUZZ ABOUT THE PRODUCT WHEN IT'S

19   FIRST ANNOUNCED.  AND SO YOU'LL GET A HUGE RUNUP IN SALES OF

20   THAT PARTICULAR MODEL.  AND DIFFERENCES IN THE PROFIT MARGIN

21   OF A SPECIFIC IPOD WILL THEN CAUSE THIS THING TO -- TO BOUNCE

22   AROUND.  BUT IT WOULD BE LESS SO IF YOU LOOK AT THE LEVEL OF

23   JUST A SINGLE MODEL.

24       THIS -- THE POINT IS THAT IT IS PRETTY STABLE DURING THIS

25   PERIOD.  THE UPS ARE THEN FOLLOWED BY DOWNS, AND THINGS LIKE

 1    THAT, SO IT STAYS PRETTY STABLE AT THAT -- ROUGHLY 35 PERCENT

 2    RANGE DURING THE CLASS PERIOD.

 3    **Q.**   AND THAT ROUGHLY 35 PERCENT RANGE DURING THE CLASS PERIOD,

 4    DOES THAT NUMBER HAVE ANY SIGNIFICANCE?

 5    **A.**   YES.   IT -- IT DOES IN THE SENSE THAT THIS SAYS THAT APPLE

 6    DID ENJOY CONSIDERABLE MARKET POWER IN THIS PERIOD THAT IT

 7    LACKED BEFORE.   THAT'S -- THAT'S SO THERE WAS THIS BIG --

 8    THERE WAS A MAJOR INCREASE IN THE MARKET POWER THAT IT ENJOYED

 9    IN SELLING IPODS DURING THIS PERIOD.

10    **Q.**   ALL RIGHT.   LET'S GO BACK TO THE -- THE PREVIOUS

11    DEMONSTRATIVE.

12    **A.**   YES.

13                  (DEMONSTRATIVE PUBLISHED TO JURY.)

14    **BY MS. SWEENEY:**

15    **Q.**   AND YOU WERE TALKING ABOUT HOW ECONOMISTS DETERMINE

16    WHETHER THERE'S MONOPOLY POWER.

17    **A.**   RIGHT.

18    **Q.**   AND CAN YOU JUST CONTINUE THE DISCUSSION?

19    **A.**   YES.   THE SECOND CATEGORY OF MEASURES OF MARKET POWER IS

20    CALLED THE INDIRECT EVIDENCE, AND THIS IS THE PLACE WHERE

21    DEFINING THE RELEVANT MARKET COMES IN.

22                  (DEMONSTRATIVE PUBLISHED TO JURY.)

23          **THE WITNESS:**   THIS IS THE ONLY PART OF MY ANALYSIS

24    THAT HINGES ON RELEVANT MARKET.   AND THAT IS THIS USE OF THE

25    INDIRECT METHOD, WHICH IS YOU LOOK AT THE CONCENTRATION OF

1    SALES IN THE RELEVANT MARKET TO DETERMINE WHETHER A SINGLE

2    FIRM HAS MONOPOLY POWER OR WHETHER A SMALL SET OF FIRMS

3    COLLECTIVELY ENJOY MARKET POWER.

4        AND THE -- THE BASIC MEASURE THAT ECONOMISTS USE FOR

5    MARKET -- FOR DETERMINING THE EXTENT OF MARKET POWER BY A FIRM

6    IS THE MARKET SHARE HELD BY THE LARGEST FIRM IN THE MARKET.

7    AND THE BASIC RULE OF THUMB IS THAT IF THAT SHARE IS OVER

8    50 PERCENT, THEN A FIRM HAS UNILATERAL MARKET POWER, MONOPOLY

9    POWER.

10       AND THEN THE OTHER INDICATOR IS SOMETHING CALLED THE

11   HIRSCHMAN-HERFINDAHL OR HERFINDAHL-HIRSCHMAN, AND WE

12   ECONOMISTS FIGHT ABOUT WHO SHOULD GET FIRST BILLING.  THAT'S

13   LITERALLY TRUE.  I'M A HIRSCHMAN-HERFINDAHL GUY.  BUT

14   UNFORTUNATELY IT'S WRITTEN THE OTHER WAY HERE.

15       THE HERFINDAHL-HIRSCHMAN INDEX IS THE SUM OF THE MARKET

16   SHARES OF ALL THE FIRMS IN THE MARKET.  SO IF THERE'S FIVE

17   FIRMS IN THE MARKET THAT SHARE IT EQUALLY, EACH HAS A

18   20 PERCENT MARKET SHARE, SQUARE 20, YOU GOT 400, MULTIPLY THAT

19   BY FIVE.  ALL RIGHT.  AND YOU GET THE HERFINDAHL INDEX, WHICH

20   WOULD BE 2000.

21       THE BASIC RULE OF THUMB HERE IS FROM THE MERGER GUIDELINES

22   THAT ARE PUBLISHED BY THE ANTITRUST DIVISION OF THE JUSTICE

23   DEPARTMENT AND THE FEDERAL TRADE COMMISSION HAVE A RULE OF

24   THUMB WHICH IS THAT IF A MERGER CAUSES THE HERFINDAHL INDEX TO

25   EXCEED 2500, THAT'S A PRESUMPTION AGAINST ALLOWING THE MERGER

1    BECAUSE IT WOULD LEAD TO A SUBSTANTIAL REDUCTION IN

2    COMPETITION.

3         AND THEN BETWEEN 1500 AND 2500, IT DEPENDS ON THE FACTS.

4    AND BELOW 1500, YOU DON'T WORRY.  ALL RIGHT.

5         SO, AGAIN, THE RULE OF THUMB IS IF THE HHI IS MORE THAN

6    2500, YOU WORRY ABOUT MARKET POWER.

7         NOTICE THAT THERE'S RELATIONSHIP BETWEEN THE FACT I GAVE

8    BEFORE ABOUT ONE FIRM HAVING 50 BECAUSE THE SQUIRE OF 50 IS

9    2500.  SO THAT FIRM, ALL BY ITSELF, WOULD CAUSE THE INDUSTRY

10   TO GO ABOVE THE 2500 LEVEL.

11        AND EVEN IF EVERYBODY ELSE WERE SO SMALL THE SQUARES OF

12   THEIR MARKET SHARES WOULD BE MEANINGLESS, ONE FIRM HAVING 50

13   IS ENOUGH TO CAUSE THERE TO BE A CONCERN, A SUFFICIENT

14   CONCERN, ABOUT COMPETITION AND YOU WOULD NEVER LET THAT LARGE

15   FIRM ACQUIRE ANY SMALLER FIRM.

16   **BY MS. SWEENEY:**

17   **Q.**  DID YOU INVESTIGATE APPLE'S MARKET SHARE IN THE –– IN THIS

18   RELEVANT MARKET?

19   **A.**  YES, I DID.

20   **Q.**  OKAY.  DO YOU HAVE A CHART FOR THAT?

21   **A.**  YES, I DO.

22   **Q.**  ALL RIGHT.  WE'RE LOOKING AT EXHIBIT 944.

23              (EXHIBIT PUBLISHED TO JURY.)

24   **BY MS. SWEENEY:**

25   **Q.**  IS THIS A CHART THAT YOU PREPARED?

1    **A.**   YES, IT IS.

2    **Q.**   OKAY.   CAN YOU TELL THE JURY WHAT IT IS?

3    **A.**   YES.   THIS DATA COMES FROM ONE OF THESE COMPANIES I WAS

4    TELLING YOU ABOUT THAT DOES SURVEYS OF THE MARKET.   IT'S

5    CALLED NPD.   AND THE REASON I USED NPD IS BECAUSE IT'S

6    GENERALLY REGARDED IN THE INDUSTRY AS THE MOST RELIABLE OF THE

7    HANDFUL OF COMPANIES THAT DO THIS, ALTHOUGH IT'S NOT A BIG

8    DIFFERENCE FROM ALL OF THEM.

9        BUT THERE ARE FIVE OR SIX COMPANIES THAT DO SURVEYS.   SOME

10   DO SURVEYS OF CONSUMERS, SOME DO SURVEYS OF RETAILERS, SOME DO

11   SURVEYS OF MANUFACTURERS TO DETERMINE WHAT MARKET SHARES OF

12   THE FIRMS IN THE INDUSTRY ARE.

13       AND THIS SHOWS THE -- TWO VERSIONS OF THE MARKET SHARE OF

14   IPODS IN THE PORTABLE DIGITAL MEDIA PLAYER MARKET.

15       NOTICE AGAIN THAT NPD DOES PORTABLE DIGITAL MEDIA PLAYERS

16   AS A MARKET.   AND SO THEY GIVE YOU THE MARKET SHARES OF THE

17   FIRMS IN THAT MARKET.

18       AND THE TWO WAYS OF MEASURING IT ARE IN TERMS OF QUANTITY

19   OF SALE, THAT IS, YOU JUST COUNT NOSES, YOU KNOW.   ONE IPOD

20   NANO, WHICH TYPICALLY HAS A RELATIVELY LOW PRICE EQUALS ONE

21   IPOD TOUCH WHICH TYPICALLY HAS A VERY HIGH PRICE.

22       ECONOMISTS TEND TO PREFER THE OTHER MEASURE WHICH IS TO

23   MEASURE MARKET SHARES IN TERMS OF SALES REVENUE.   AND AS YOU

24   CAN SEE, APPLE'S MARKET SHARE BY SALES REVENUE TENDS TO BE

25   HIGHER.   WELL, IT ALWAYS IS HIGHER THAN ITS -- THAN ITS MARKET

1    SHARE BY NOSE COUNTS, BY UNITS.  AND THAT'S BECAUSE THEIR

2    PRODUCTS, BY AND LARGE, ARE MORE EXPENSIVE THAN THE PRODUCTS

3    OF THEIR COMPETITORS.

4        SO IN ANY CASE, LOOKING AT THIS WE CAN TRACE THE MARKET

5    SHARE THROUGH TIME.  AGAIN, THE MARKET SHARE PRIOR TO THE

6    LAUNCH OF THE ITUNES STORE IS OVER HERE IN THE SORT OF FIRST

7    FIVE OR SIX OBSERVATIONS ON THE FAR LEFT SIDE.  AND IT BOUNCES

8    AROUND A BIT, BUT IT'S IN THE RANGE OF 30 PERCENT PRIOR TO THE

9    LAUNCH OF THE ITUNES STORE.

10       THEN THE LAUNCH OF THE ITUNES STORE CAUSES IT TO BEGIN

11   THIS HUGE TRAJECTORY UPWARDS UNTIL IT EVENTUALLY GETS UP OVER

12   80 PERCENT WHERE IT'S BEEN SINCE BEFORE THE CLASS PERIOD.

13       ALL RIGHT.  SO WHAT THIS SAYS IS THAT IPOD'S MARKET SHARE

14   BECAME SUFFICIENT TO GIVE APPLE MONOPOLY POWER IN THE MARKET

15   FOR PORTABLE DIGITAL MEDIA PLAYERS WITH THE LAUNCH OF THE

16   ITUNES STORE.  THAT'S THE EVENT THAT CAUSED THEM TO HAVE

17   MONOPOLY POWER.

18       AND THEN THAT MONOPOLY POWER CONTINUED TO GROW AND WAS

19   SUSTAINED CLEAR TO THE END OF THE DATA PERIOD HERE WHICH IS

20   THE END OF 2010.

21   **Q.**  CAN YOU RELY ONLY ON MARKET SHARE WHEN LOOKING AT INDIRECT

22   EVIDENCE OF MONOPOLY POWER?

23   **A.**  NO.

24   **Q.**  WHAT ELSE DO YOU NEED TO HAVE?

25   **A.**  THE HIGH MARKET SHARES ARE INDICATORS -- ARE RELIABLE

1    INDICATORS OF MARKET POWER ONLY IN THE PRESENCE OF, QUOTE,

2    BARRIERS TO ENTRY, UNQUOTE.  A BARRIER TO ENTRY IS SOME SORT

3    OF IMPEDIMENT THAT WOULD STAND IN THE WAY OF A COMPETITOR

4    EITHER ENTERING THE INDUSTRY TO BEGIN WITH OR EXPANDING THEIR

5    OUTPUT.  ALL RIGHT.

6            (DEMONSTRATIVE PUBLISHED TO JURY.)

7        **THE WITNESS:**  AND THE -- THE BASIC STORY OF BARRIERS

8    TO ENTRY IS THAT WE HAVE A NUMBER OF REASONS IN THE CASE OF

9    PORTABLE DIGITAL MEDIA PLAYERS WHY THERE ARE BARRIERS TO

10   ENTRY.

11       ONE REASON THERE ARE BARRIERS TO ENTRY IS THERE -- IS THE

12   RESEARCH INTENSITY.  NOTICE, AS IN ALL CONSUMER ELECTRONICS

13   PRODUCTS, THEY'RE RAPIDLY ADVANCING.  THEY'RE GETTING SMALLER

14   AND LIGHTER AND HAVE MORE CAPACITY AND PERFORM MORE FUNCTIONS

15   THROUGH TIME.  THIS IS BASICALLY DERIVED FROM MOORE'S LAW.

16   WHICH THOSE OF ANY OF YOU WHO'VE HAD AN ENGINEERING COURSE,

17   MOORE'S LAW SAYS THAT THE AMOUNT OF FUNCTIONALITY YOU CAN GET

18   ON A SEMICONDUCTOR DOUBLES EVERY 18 MONTHS.

19       AND WHAT THAT MEANS IS THAT THE -- THE CORE INTERNAL GUTS,

20   THE SORT OF REAL MOVING PARTS OF CONSUMER ELECTRONICS PRODUCTS

21   LIKE MICROPROCESSORS AND MEMORY CHIPS AND CONTROLLERS AND

22   THINGS LIKE THAT, ARE ALL DOUBLING IN THEIR CAPABILITIES EVERY

23   18 MONTHS.  SOME OF THAT TAKES THE FORM OF LOWER COST AND

24   PRICE REDUCTIONS.  SO A COMPUTER OF GIVEN CAPABILITY HAS

25   RAPIDLY DECLINING COSTS.  YOU KNOW, THEY SAY IF A CADILLAC

1    WERE MADE LIKE A CONSUMER ELECTRONICS PRODUCT, TODAY IT WOULD

2    COST 10 CENTS.  AND THAT'S BASICALLY MOORE'S LAW AT WORK.

3         SO THAT -- AND THEN THERE'S A SECOND PHENOMENA CALLED

4    LEARNING BY DOING, WHICH HAS TO DO WITH THE PRICES OF THE

5    SEMICONDUCTORS THEMSELVES FALLING AS YOU MANUFACTURE MORE OF

6    THEM.  BECAUSE THE KEY THING THAT DETERMINES THE COST OF

7    SEMICONDUCTOR MANUFACTURING IS HOW MANY OF THE CHIPS ARE BAD,

8    HOW MUCH DO YOU WASTE.  AND AS YOU MAKE MORE AND MORE AND MORE

9    OF THEM, THE NUMBER YOU WASTE GOES WAY DOWN ALMOST TO ZERO.

10   AND SO BECAUSE THERE'S LESS WASTE, THAT MEANS THE COST PER

11   GOOD SEMICONDUCTOR IS FALLING.

12        SO WHAT WE HAVE HERE IS FACTORS THAT REDUCE COST AND

13   INCREASE FUNCTIONALITY THAT ARE ESSENTIAL TO BEING PART OF THE

14   INDUSTRY.  BUT NOTICE IN ORDER TO TAKE ADVANTAGE OF THEM, (A)

15   YOU HAVE TO DO R&D, YOU HAVE TO BE ABLE TO INVENT THE PRODUCT;

16   AND SECONDLY, YOU HAVE TO MAKE ENOUGH OF THE PRODUCT SO YOU

17   COULD TAKE ADVANTAGE OF LEARNING BY DOING.  AND THAT IS AN

18   IMPORTANT SOURCE OF BARRIERS TO ENTRY.

19        A SECOND SOURCE OF BARRIERS TO ENTRY IS INTELLECTUAL

20   PROPERTY.  PATENTS AND COPYRIGHTS ON BOTH THE HARDWARE AND THE

21   SOFTWARE THAT GOES INTO THE -- THAT IS A -- A SERIOUS BARRIER

22   TO ENTRY BECAUSE IT MEANS YOU NOT ONLY HAVE TO FIGURE OUT HOW

23   TO MAKE IT, YOU HAVE TO FIGURE OUT HOW TO MAKE IT, PRODUCE IT,

24   AND SELL IT IN A WAY THAT DOESN'T STEP ON SOMEBODY ELSE'S

25   INTELLECTUAL PROPERTY RIGHTS.  AND SO YOU HAVE TO INVENT

1    AROUND THEM.  THAT'S MORE R&D EXPENDITURES.

2         SO THOSE ARE EXAMPLES OF BARRIERS TO ENTRY.

3         AND THE LAST IS LOCK-IN AND LOCK-OUT.  AND AGAIN WE'RE

4    SIMPLY TALKING ABOUT THE FACT HERE OF MONOPOLY POWER.

5         LOCK-IN CONSISTS OF A FEATURE OF A PRODUCT THAT SAYS ONCE

6    I'VE BOUGHT IT THE FIRST TIME, THEN IF I SWITCH BRANDS FOR MY

7    NEXT ONE, I EXPERIENCE A COST, A COST THAT IS SIGNIFICANT

8    ENOUGH THAT I WOULD THINK ABOUT IT.  ALL RIGHT?  THAT IS TO

9    SAY I HAVE TO CONSIDER NOT ONLY THE PRICE OF THE ALTERNATIVE

10   WHEN IT'S TIME TO UPGRADE AND TO BUY A NEW PIECE OF CONSUMER

11   ELECTRONICS, I HAVE TO THINK ABOUT NOT ONLY WHAT'S THE PRICE

12   OF THE ALTERNATIVE, BUT HOW MUCH COST DO I EXPERIENCE IN

13   SWITCHING.

14        LIKE, FOR EXAMPLE, WHEN YOU THINK ABOUT BUYING A NEW

15   OFFICE SOFTWARE PACKAGE TO GO ON A PERSONAL COMPUTER, WHEN YOU

16   UPGRADE YOUR PERSONAL COMPUTER.  IF YOU ALREADY KNOW HOW TO

17   USE WORD AND YOU ALREADY KNOW HOW TO USE EXCEL AND YOU ALREADY

18   KNOW HOW TO USE POWERPOINT, IT'S COSTLY TO LEARN A COMPETING

19   SUITE OF SOFTWARE.

20        AND SO IF LINUX-BASED COMPUTER COMES ALONG WITH A

21   LINUX-BASED NON-MICROSOFT OFFICE VERSION OF OFFICE SOFTWARE,

22   THE PRICE OF THE COMPUTER AND THE SOFTWARE IS NOT THE ONLY

23   COST TO CONSIDER.  IN ADDITION TO THAT, YOU HAVE TO CONSIDER

24   THE COST OF LEARNING TO USE A WHOLE NEW SET OF OFFICE

25   SOFTWARE.  AND YOU HAVE TO WORRY ABOUT BECOMING INCOMPATIBLE

1    WITH YOUR COLLEAGUES AT WORK WHO ARE STILL USING MICROSOFT

2    OFFICE.

3        WELL, THAT IS A -- THAT IS LOCK-IN.  THAT MEANS THAT

4    UNLESS THE COMPETING PRODUCT IS REALLY, REALLY, REALLY A LOT

5    BETTER, YOU'RE NOT GOING TO BUY IT BECAUSE THE -- THE COST OF

6    SWITCHING, THE SWITCHING COSTS FROM GOING FROM ONE BRAND TO

7    ANOTHER IS TOO HIGH.  IT WILL STOP YOU.  WELL, THAT'S LOCK-IN.

8    THAT'S WHAT "LOCK-IN" MEANS.

9    **BY MS. SWEENEY:**

10   **Q.**  AND DID YOU HAVE A CONCLUSION WITH RESPECT TO APPLE'S

11   MONOPOLY POWER DURING THE RELEVANT PERIOD?

12   **A.**  YES.

13   **Q.**  WHAT IS IT?

14            (DEMONSTRATIVE PUBLISHED TO JURY.)

15        **THE WITNESS:**  THAT INDEED APPLE DID POSSESS MONOPOLY

16   POWER DURING THE CLASS PERIOD AND -- BECAUSE OF THE HIGH

17   DEGREE OF MARKET POWER, MARKET CONCENTRATION, AND THE PRESENCE

18   OF BARRIERS TO ENTRY AND BECAUSE OF THE CHANGES THAT WERE

19   TAKING PLACE IN THE LERNER INDEX.

20   **BY MS. SWEENEY:**

21   **Q.**  OKAY.  AND WE LOOKED AT THE MARKET SHARE CHART.

22       WHAT ABOUT BARRIERS TO ENTRY?  WITH RESPECT TO APPLE'S

23   IPOD AND THAT MARKET, WHAT WERE THE BARRIERS TO ENTRY?

24   **A.**  WELL, THEY WERE -- THEY WERE ALL THE THREE THINGS I JUST

25   STATED.  I GAVE IT IN THE CONTEXT OF MICROSOFT OFFICE, BUT IT

1    WOULD BE EXACTLY THE SAME POINT WOULD BE MADE WITH REGARD TO

2    THE APPLE IPOD, THAT IT -- TO BE A MAJOR PLAYER IN THAT MARKET

3    REQUIRES DOING THE R&D TO GET INTO IT, IT INVOLVES INVENTING

4    AROUND NOT ONLY APPLE'S PATENTS AND CREATING NEW SOFTWARE THAT

5    MIGHT BE COPYRIGHTED OR PATENTED BY APPLE, BUT ALSO BY OTHERS

6    THAT ARE ALREADY IN THE MARKET, LIKE MICROSOFT AT THE TIME,

7    AND CREATIVE AND THE OTHER COMPANIES.

8        SO, AND THEN IN ADDITION TO THAT, IF YOU'RE COMING IN

9    LATE, YOU FACE THE LOCK-IN ISSUE, WHICH ARISES BECAUSE A

10    SIGNIFICANT FRACTION OF THE PEOPLE WHO USE IPODS ARE LOCKED

11    INTO IPODS BECAUSE THEY HAVE DOWNLOADED SOUND RECORDINGS FROM

12    THE ITUNES STORE THAT CANNOT BE PLAYED ON ANY OTHER DEVICE

13    WITHOUT UNDERGOING COSTS.

14    **Q.**   OKAY.  LET'S TURN TO THE NEXT DEMONSTRATIVE, WHICH IS

15    DEMONSTRATIVE 55.

16            (DEMONSTRATIVE PUBLISHED TO JURY.)

17    **BY MS. SWEENEY:**

18    **Q.**   SO WE'VE TALKED NOW ABOUT RELEVANT MARKET AND MONOPOLY

19    POWER.

20        AND CAN YOU EXPAND A LITTLE BIT ON YOUR DISCUSSION OF HOW

21    A FIRM ACQUIRES MONOPOLY POWER, AND PARTICULARLY HOW APPLE

22    ACQUIRED MONOPOLY POWER?

23    **A.**   YES.  THIS IS THE ISSUE THAT GETS TO WHETHER A FIRM

24    ENGAGED IN ANTICOMPETITIVE CONDUCT IN ORDER TO ENHANCE OR

25    OBTAIN THEIR MONOPOLY POWER.

1    AND SO THERE'S AGAIN -- I SAID BEFORE THAT THE PRESENCE OF

2    MONOPOLY POWER IS EITHER A GOOD THING OR A BAD THING BY

3    ITSELF.  ALL RIGHT.  AND THIS SLIDES ILLUSTRATES THE ISSUE TO

4    BE CONFRONTED.

5    MONOPOLY POWER CAN COME INTO EXISTENCE BECAUSE OF SUPERIOR

6    FORESIGHT AND EFFICIENCY.  BUT WHAT THAT MEANS IS IF YOU BUILD

7    A BETTER MOUSETRAP, YOU'RE ALLOWED TO BE A MONOPOLIST IN

8    MOUSETRAPS.  AND WE HAVE, YOU KNOW, THE MOST OBVIOUS POINT

9    WOULD BE A BLOCKING PATENT.  I HAVE A MOUSETRAP PATENT THAT

10   SAYS THE BEST POSSIBLE FORM OF MOUSETRAP CANNOT BE

11   MANUFACTURED BY ANYBODY WITHOUT MY APPROVAL.  AND I DECIDE NOT

12   TO LICENSE IT AND JUST TO BECOME THE MOUSETRAP MONOPOLY.

13   AND THAT IS A -- THAT IS SUPERIOR FORESIGHT AND

14   EFFICIENCY.  THE PURPOSE OF THE INTELLECTUAL PROPERTY SYSTEM

15   IS TO REWARD PEOPLE FOR INVENTING THE BETTER MOUSETRAP.

16   IT ALSO CAN BE OTHER THINGS AS WELL.  LIKE FIRST-IN

17   ADVANTAGE IS SOMETHING THAT'S VERY IMPORTANT IN THE

18   SEMICONDUCTOR INDUSTRY, FOR EXAMPLE, BECAUSE OF THE PHENOMENON

19   I SAID BEFORE ABOUT LEARNING BY DOING, THAT INDEED LEARNING BY

20   DOING IS SO IMPORTANT IN SEMICONDUCTOR MANUFACTURERS THAT MOST

21   CHIP MANUFACTURERS LOSE MONEY FOR THE FIRST FEW MONTHS THAT

22   ANY NEW CHIP IS BEING PRODUCED.  AND THE REASON FOR IS IT THAT

23   IT -- IT PAYS THEM TO SELL MORE THAN IS PROFITABLE.  ALL

24   RIGHT?  TO KEEP THE PRICE LOW AND TO SELL LOTS BECAUSE BY

25   SELLING LOTS, THAT MEANS THEY CAN MANUFACTURE LOTS.  AND IF

1    THEY MANUFACTURE LOTS, THEIR COSTS WILL FALL AND THEY'LL --

2    THE COSTS WILL ACTUALLY FALL SO THAT THEY WOULD JUSTIFY THE

3    PRICE LATER ON.  ALL RIGHT?

4        SO FIRST-IN ADVANTAGE, IF THERE'S LEARNING BY DOING, IS

5    EXTREMELY IMPORTANT.  IT COULD ALSO BE EXTREMELY IMPORTANT

6    BECAUSE IT BUYS YOU LOCK-IN.  THAT IS TO SAY, IF THERE'S

7    COMPLEMENTARY PRODUCTS THAT GO WITH THE PRODUCT YOU HAVE, THAT

8    ALL FIT TOGETHER AND THEY CAN'T REALLY BE USED SEPARATELY WITH

9    SOMETHING ELSE, THEN THE FIRST-IN ADVANTAGE GETS YOU A GROUP

10   OF CUSTOMERS THAT ARE LOCKED IN AND THAT WILL BUY YOUR PRODUCT

11   THE NEXT TIME AROUND EVEN IF IT'S NOT THE BEST AND NOT THE

12   CHEAPEST.

13       AND FINALLY THERE IS JUST -- THERE ARE SOME COMPANIES OUT

14   THERE THAT JUST MANAGE TO PRODUCE THINGS AT LOWER COSTS.  ONE

15   OF THE ICONIC CASES OF ALL TIME IS THE ALCOA CASE THAT WE

16   TEACH IN ECONOMICS ABOUT ILLUSTRATION OF THIS POINT.

17       IN THE PREWAR ERA AND UP THROUGH WORLD WAR II, FOR SOME

18   REASON, ALCOA COULD JUST MAKE ALUMINUM A LOT CHEAPER THAN

19   ANYBODY ELSE COULD MAKE IT.  NO ONE REALLY UNDERSTOOD WHY.  IT

20   WASN'T ABOUT ANYTHING PATENTS, IT WASN'T ANYTHING ABOUT A

21   FIRST-IN ADVANTAGE.  THEY JUST MADE IT CHEAPER.  AND THAT IS A

22   PERFECTLY -- THAT IS SUPERIOR EFFICIENCY.

23       AND IF YOU HAVE AN EXTREMELY HIGH MARKET SHARE BECAUSE YOU

24   CAN JUST MAKE IT BETTER AND CHEAPER, THERE'S NOTHING -- THAT'S

25   A PERFECTLY REASONABLE SITUATION.

1    THEN WE GET TO THE OTHER WAY THAT YOU CAN EITHER OBTAIN OR

2    INCREASE OR ENHANCE OR MAINTAIN MONOPOLY POWER, WHICH IS

3    ANTICOMPETITIVE CONDUCT, THE DEFINITION OF WHICH IS YOU

4    UNDERTAKE A COSTLY ACT, SOMETHING THAT COSTS YOU, AND IT

5    PROVIDES NO BENEFITS TO CONSUMERS, BUT IT REDUCES COMPETITION.

6    THIS IS ANTICOMPETITIVE.  ANYTHING THAT DOES THAT IS

7    ANTICOMPETITIVE CONDUCT.

8    AND THE TWO EXAMPLES I HAVE HERE ARE ILLUSTRATIVE HERE.

9    ONE IS PRICE COLLUSION, THAT IS TO SAY, WHEN HORIZONTAL

10   COMPETITORS, PEOPLE THAT MAKE SIMILAR PRODUCTS, SORT OF GET

11   TOGETHER IN A SMOKE-FILLED ROOM AND AGREE NOT TO ENGAGE IN

12   PRICE COMPETITION.  THAT IS A COSTLY ACTION.  IT REQUIRES EACH

13   OF THE FIRMS TO IGNORE THEIR INDIVIDUAL INCENTIVES, WHICH IS

14   TO ENGAGE IN PRICE CUTTING TO GET A LARGER MARKET SHARE AND

15   EARN MORE PROFITS FROM THAT LARGER MARKET SHARE.  AND IT HARMS

16   CONSUMERS WITHOUT PROVIDING THEM WITH ANY BENEFIT.

17   A SIMILAR EXAMPLE IS MERGER TO MONOPOLY, THAT IS TO SAY,

18   IF YOU, SAY, HAVE THREE OR FOUR FIRMS IN AN INDUSTRY SO IT'S

19   NOT VERY COMPETITIVE TO BEGIN WITH AND THEY ALL DECIDE TO

20   COMBINE AND BECOME A MONOPOLIST, OR EVEN IF JUST TWO OF THEM

21   DECIDE TO COMBINE AND GET A MARKET SHARE OVER 50 PERCENT, THEN

22   THAT WOULD BE A MERGER, TOO, THAT CREATED MONOPOLY POWER THAT

23   DIDN'T REALLY BENEFIT ANYBODY.  IT JUST MADE THEM MORE

24   PROFITABLE.  AND THAT WOULD BE THEN ANTICOMPETITIVE CONDUCT

25   THAT WAS THE SOURCE OF MONOPOLY POWER.

1  **Q.**  ALL RIGHT.  LET'S TURN TO THE -- THE NEXT SLIDE.

2      AND, PROFESSOR NOLL, YOU MENTIONED A LOCK-IN AND LOCK-OUT

3  BEFORE?

4  **A.**  YES.

5              (DEMONSTRATIVE PUBLISHED TO JURY.)

6  **BY MS. SWEENEY:**

7  **Q.**  CAN YOU -- CAN YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY

8  LOCK-IN AND LOCK-OUT?

9  **A.**  YEAH.  WELL, IT'S -- WHAT I HAVEN'T DEFINED YET IS

10 LOCK-OUT, AND THAT'S IMPORTANT.  ALL RIGHT?  LOCK-IN, YOU KNOW

11 WHAT IT IS, WHICH IS IT'S A SWITCHING COST WHEN I SWITCH

12 BRANDS.

13     BUT NOTICE THAT ONE OF THE INTERESTING THINGS THAT HAPPENS

14 IS THAT IF ALL THE PRODUCTS IN A MARKET HAVE THIS SAME

15 FEATURE, THEN WHEN YOU CREATE A PRODUCT WITH LOCK-IN, WITH

16 SPECIALIZED FEATURES, IT CAN ALSO BE THE CASE THAT YOU'RE

17 LOCKING OUT CUSTOMERS OF YOUR COMPETITORS, THAT IS TO SAY,

18 YOU'RE REDUCING YOUR ABILITY TO COMPETE EFFECTIVELY FOR THE

19 CONSUMERS OF OTHERS.  ALL RIGHT.

20     AND WHAT THAT MEANS IS YOU'VE CREATED A SWITCHING COST FOR

21 THEM.  IF THEY'RE GOING TO SWITCH FROM THE BRAND THEY'RE

22 CURRENTLY USING TO YOURS, THEY NOT ONLY HAVE TO PAY FOR YOUR

23 PRODUCT, BUT THEY HAVE TO PAY AN ADDITIONAL COST WHICH IS THE

24 SWITCHING COST.

25     AND NOTICE THAT LOCK-IN AND LOCK-OUT ARE SORT OF SYMMETRIC

1  HERE IN THAT THE INTENSITY OF COMPETITION AMONG FIRMS IN BOTH

2  DIRECTIONS IS REDUCED BY THE PRESENCE OF ONE FIRM HAVING

3  LOCK-IN, THAT THE LOCK-IN TO ONE FIRM IS THE LOCK-OUT TO

4  ANOTHER.

5      SO IF EACH OF THE FIRMS IN THE INDUSTRY CREATE TECHNICAL

6  FEATURES THAT LOCK PEOPLE IN, THE CHARACTERISTIC OF THAT

7  MARKET WILL BE IT'S LESS COMPETITIVE BECAUSE PEOPLE ARE LESS

8  LIKELY TO SWITCH IN EITHER DIMENSION -- IN EITHER DIRECTION.

9  Q.  NOW, PROFESSOR NOLL, YOU MENTIONED BRIEFLY ALREADY LOCK-IN

10  TO IPODS.

11      MS. SWEENEY:  AND CAN WE LOOK AT THE NEXT SLIDE,

12  LARRY.

13          (DEMONSTRATIVE PUBLISHED TO JURY.)

14  BY MS. SWEENEY:

15  Q.  AND IF YOU COULD EXPLAIN THIS SLIDE, PROFESSOR NOLL.

16  A.  THE -- OKAY.  I DIDN'T FINISH THE LAST ONE.

17  Q.  OKAY.  WHY DON'T YOU FINISH THE LAST ONE FIRST?

18  A.  THIS IS ILLUSTRATING WHAT THE LAST ONE IS.

19      OKAY.  THE WAY -- THE WAY THIS WORKS IN PORTABLE DIGITAL

20  MEDIA PLAYERS IS WHAT IS CALLED THE WALLED GARDEN.  RIGHT.

21  YOU BUY AN IPOD, OR IN THE CLASS PERIOD YOU BUY A MICROSOFT

22  ZUNE.  AND THEN YOU WANT -- WANT TO LOAD SONGS ON IT.  AND AT

23  THIS TIME IN HISTORY, AT THE BEGINNING OF THE CLASS PERIOD,

24  THE ONLY WAY YOU CAN BUY DIGITAL DOWNLOADS IS FROM A -- A

25  DOWNLOAD SITE THAT USES DIGITAL RIGHTS MANAGEMENT, THAT IS TO

1    SAY, THEY'RE ENCRYPTED, THE SOUND RECORDINGS ARE ENCRYPTED.

2    AND -- AND THERE'S THREE DIFFERENT ENCRYPTION TECHNOLOGIES OUT

3    THERE, AND ONE OF WHICH IS APPLE'S FAIRPLAY.

4        AND SO IF YOU ARE AN IPOD CUSTOMER, YOU CAN PUT SONGS ON

5    THAT IPOD IN FUNDAMENTALLY TWO WAYS.  RIGHT?  THE FIRST WAY IS

6    YOU CAN OBTAIN A FILE THAT DOESN'T HAVE THE ENCRYPTION.  AND

7    THE MOST OBVIOUS OF WHICH IS -- IS A CD.  AT THE TIME, THERE

8    WERE ALSO -- THERE ALSO HAVE BEEN SOME DIGITAL DOWNLOAD SITES

9    THAT SOLD -- HAD LEGAL SOUND RECORDINGS THAT YOU COULD BUY

10   THAT WERE NOT ENCRYPTED, THAT WERE JUST IN SOMETHING LIKE A --

11   WHAT IS CALLED AN MP3 FILE OR AN AAAC FILE WHICH DOESN'T HAVE

12   ENCRYPTION IN IT.  SOME INDEPENDENT ARTISTS, GARAGE BANDS HAD

13   UNPROTECTED VERSIONS OF THEIR SONGS AVAILABLE FOR DIGITAL

14   DOWNLOAD.

15       BUT IF YOU WANT TO HAVE A DIGITAL DOWNLOAD FOR A SOUND

16   RECORDING FROM THE VAST MAJORITY OF THE PEOPLE WHO PRODUCE

17   SOUND RECORDINGS, THE MAJOR DISTRIBUTION COMPANIES AND THE

18   MOST IMPORTANT INDEPENDENT LABELS WHICH GENERALLY TEND TO BE

19   DISTRIBUTED BY THE MAJOR DISTRIBUTION COMPANIES, THEN IT WOULD

20   HAVE TO BE ENCRYPTED BECAUSE THEY WOULD INSIST THAT IT BE

21   ENCRYPTED.

22       SO IF YOU ARE SOMEONE WHO DECIDES TO BUY DIGITAL

23   DOWNLOADS, WHICH IS ROUGHLY A THIRD OR SO OF PEOPLE WHO BUY

24   PORTABLE DIGITAL MEDIA PLAYERS DECIDE THEY'RE GOING TO PUT

25   DIGITAL DOWNLOADS ON THEIR PORTABLE DIGITAL MEDIA PLAYERS.

1   AND ONCE YOU'VE DECIDED TO DO THAT, YOU'RE LOCKED IN TO A

2   PORTABLE DIGITAL MEDIA PLAYER THAT WOULD -- IS ABLE TO PLAY A

3   SOUND RECORDING THAT IS ENCRYPTED IN THAT PARTICULAR FORMAT.

4       AND SO THE NEXT STEP IS YOU BUY SOME DIGITAL DOWNLOADS.

5   YOU START TO LISTEN TO THEM ON YOUR PORTABLE DIGITAL MEDIA

6   PLAYER.  AND NOW IT'S TIME, BECAUSE OF PRODUCT IMPROVEMENTS,

7   PRODUCT ENHANCEMENTS THROUGH TIME, THAT, YOU KNOW, IT'S TWO OR

8   THREE YEARS LATER AND YOU WANT TO BUY A NEW ONE.  OR MAYBE YOU

9   LOST YOURS OR MAYBE YOU DROPPED IT OR SOMETHING LIKE THAT.

10      AT THAT POINT WHEN YOU WANT TO REPLACE IT, IF YOU HAVE

11  THIS LIBRARY OF SOUND RECORDINGS THAT YOU'VE DOWNLOADED IN A

12  PARTICULAR DRM FORMAT, YOU PRETTY MUCH HAVE TO STICK WITH THE

13  PORTABLE DIGITAL MEDIA PLAYERS THAT USE THAT BECAUSE IF YOU

14  DON'T, YOU FACE A SIGNIFICANT COST OF SWITCHING.

15      AND OF COURSE, IN THE CASE OF FAIRPLAY, THE ONLY DEVICE

16  THAT IT WORKS ON IS AN IPOD.  SO WHAT THAT BASICALLY MEANS IS

17  YOU'RE NOT JUST LOCKED INTO FAIRPLAY.  YOU'RE LOCKED INTO

18  IPODS.

19      IF YOU ARE A CUSTOMER OF MICROSOFT ZUNE, YOU'RE LOCKED

20  INTO MICROSOFT ZUNE BECAUSE THEY DID THE SAME THING.

21      IF YOU'RE -- IF YOU USE WINDOWS MEDIA PLAYER, WHICH IS

22  ANOTHER MICROSOFT PRODUCT, OR YOU USE REALNETWORKS' PORTABLE

23  DIGITAL MEDIA PLAYER SOFTWARE AND ENCRYPTION, YOU HAVE

24  MULTIPLE COMPANIES THAT MAKE PORTABLE DIGITAL MEDIA PLAYERS

25  USING THOSE FORMATS SO YOU CAN SWITCH AMONG THAT GROUP, BUT

1    YOU CAN'T CROSS THE BOUNDARY AND GO INTO SOME OTHER ONE.

2        SO THAT'S THE BASIC STORY.  IPOD USERS, WHEN THEY -- IF --

3    THOSE IPOD USERS WHO BOUGHT DIGITAL DOWNLOADS FROM THE ITUNES

4    STORE WOULD BE IN THE POSITION OF NOT BEING ABLE TO SWITCH

5    WITHOUT INCURRING A COST.

6        AND THERE'S A SLIDE ABOUT THIS IF WE WANT TO GO TO IT.

7            **MS. SWEENEY:**  CAN WE GO TO THE NEXT SLIDE.

8            (DEMONSTRATIVE PUBLISHED TO JURY.)

9            **THE WITNESS:**  OKAY.  SO THIS IS A DEPICTION OF THE

10   DOWNLOAD FROM THE ITUNES MUSIC STORE, PLAYS ONLY ON APPLE

11   SOFTWARE.  A DOWNLOAD FROM COMPETING ONLINE STORES, EXCEPT FOR

12   THE MICROSOFT ZUNE.  MICROSOFT ZUNE WILL SORT OF LOOK LIKE THE

13   APPLE IPOD STORY.  BUT THE OTHER DIGITAL RIGHTS MANAGEMENT HAD

14   THE FEATURE THAT THEY WOULD -- THAT ANYTHING YOU HAD

15   DOWNLOADED FROM THOSE STORES WOULD PLAY ON MULTIPLE DEVICES.

16       SO THOSE -- THE OWNERS OF THOSE ENCRYPTION SOFTWARE

17   PROGRAMS -- FORMATS HAD A COMPETITIVE PORTABLE DIGITAL MEDIA

18   PLAYER THAT THEY SUPPORTED, A MARKET THAT THEY SUPPORTED.  BUT

19   IN THE CASE OF APPLE AND MICROSOFT ZUNE, THEY DID NOT.  IT WAS

20   ALL A WALLED GARDEN, A SINGLE WALLED GARDEN.  YOU HAD TO BUY

21   THAT PARTICULAR MEDIA PLAYER.

22   **BY MS. SWEENEY:**

23   **Q.**  ALL RIGHT.

24       LOOKING AT THE NEXT SLIDE, DEMONSTRATIVE 58.

25   **A.**  YES.

 1          (DEMONSTRATIVE PUBLISHED TO JURY.)

 2    **BY MS. SWEENEY:**

 3    **Q.**  IS THIS AN EXPLANATION OF WHAT YOU DESCRIBED EARLIER?

 4    **A.**  YES.  THIS IS TO ILLUSTRATE THE COSTS.  WHAT ARE THESE

 5    COSTS?  ALL RIGHT.

 6          NOW, NOTICE THAT IT'S A SWITCHING COST.  IT DOESN'T MEAN

 7    YOU CAN'T SWITCH.  ALL RIGHT?  IT'S IMPORTANT THAT IT DOESN'T

 8    MEAN YOU CAN'T SWITCH.  IT JUST MEANS IT'S A PRICE.  IT LIKE

 9    AN EXTRA TAX.

10          AND HOW DOES THIS TAX WORK?  WELL, ONE POSSIBILITY IS YOU

11    JUST STOP LISTENING TO THE MUSIC YOU DOWNLOADED.  YOU KNOW,

12    AND YOU SAY, 35 PERCENT OR SO OF PEOPLE DOWNLOADED MUSIC FROM

13    THE ITUNES STORE WHO OWNED AN IPOD, AND THE AVERAGE NUMBER OF

14    SONGS THEY HAD WAS ABOUT 70, ALL RIGHT, BY THE END OF THE

15    CLASS PERIOD.  SO YOU HAVE ON AVERAGE 70 SONGS AT A BUCK A

16    PIECE YOU CAN'T PLAY.

17          NOW, SO ONE THING TO DO IS YOU THROW THEM AWAY.  ALL

18    RIGHT?  AND THAT'S NOT A COST IF YOU THINK THEY'RE ALL PRETTY

19    MUCH VALUELESS.  BUT IF YOU VALUE THEM, THEN THAT WOULD BE A

20    SERIOUS COST BECAUSE YOU WOULD THEN HAVE TO GO TO ONE OF THE

21    OTHER POSSIBILITIES.  POSSIBILITY NUMBER 1 IS YOU CAN BURN THE

22    SONGS YOU LIKE ONTO A CD.  AND WHEN -- WHEN THE ITUNES PROGRAM

23    BURNS A CD FOR YOU, IT'S IN AN UNENCRYPTED FORMAT.  SO NOW YOU

24    HAVE A CD WITH THOSE SONGS ON IT, AND NOW YOU CAN LOAD THEM

25    BACK INTO SOME OTHER PORTABLE DIGITAL MEDIA PRODUCT.

1    HERE WHAT'S REQUIRED IS THAT YOU HAVE A DEVICE THAT CAN

2    BURN CD'S.  SOME PERSONAL COMPUTERS HAVE CD BURNING BUILT INTO

3    THEM.  SOME DON'T.

4        FOR THOSE OF YOU WHO DON'T HAVE A -- A CD BURNER BUILT

5    INTO YOUR PERSONAL COMPUTER, THEN YOU HAVE -- THERE'S ANOTHER

6    DEVICE YOU CAN BUY THAT WILL ENABLE YOUR COMPUTER TO BURN A

7    CD.

8        SO BURNING A CD REQUIRES THE COST OF HAVING THE CD BURNER.

9    IT REQUIRES HAVING THE -- THE COST OF THE BLANK CD'S.  AND

10   THEN IT HAS THE COST OF YOUR TIME FOR GOING THROUGH THE

11   PROCESS OF CREATING A CD FROM THE -- THE SOUND RECORDINGS THAT

12   YOU WANT TO SAVE.

13       AND THEN THE THIRD OPTION, OF COURSE, IF YOU SWITCH, YOU

14   CAN ALWAYS JUST REBUY THE MUSIC, EITHER IN AN UNPROTECTED

15   FORMAT OR IN SOME OTHER DRM-PROTECTED FORMAT.

16       YOU CAN, YOU KNOW, YOU -- IF YOU HAD 30 CD'S OR 30 SOUND

17   RECORDINGS YOU WANTED TO SAVE THAT COST YOU $30, YOU COULD PAY

18   THAT $30 AGAIN, DUPLICATE IT.  AND THAT WOULD BE -- THAT WOULD

19   ENABLE YOU TO PLAY THOSE SONGS ON YOUR NEW PORTABLE DIGITAL

20   MEDIA PLAYER.

21       AS YOU CAN SEE, THAT -- THOSE ARE -- THE KEY POINT ABOUT

22   THERE IS ALL OF THE ALTERNATIVES HAVE COSTS, AND THAT IS LIKE

23   A LITTLE TAX.  IF YOU WANT TO SWITCH FROM AN IPOD TO ONE OF

24   ITS COMPETITORS, YOU HAVE TO PAY A TAX.  AND THE MAGNITUDE OF

25   THAT TAX DIFFERS FROM CONSUMER TO CONSUMER.  BUT AMONG SOME

1    CONSUMERS, THOSE WHO HAVE DOWNLOADED A SIGNIFICANT NUMBER OF

2    SONGS FROM THE ITUNES STORE, THE TAX IS VERY HIGH.

3        THE EFFECT OF THE TAX IS TO REDUCE THE PRICE SENSITIVITY

4    IN THE MARKET THAT APPLE SEES FOR IPODS.  IT'S TO MAKE

5    CONSUMERS IN GENERAL LESS PRICE SENSITIVE.  THOSE WHO DIDN'T

6    DOWNLOAD ARE NOT ANY MORE PRICE SENSITIVE, BUT THOSE WHO DID

7    DOWNLOAD FROM THE ITUNES STORE ARE MORE PRICE SENSITIVE.

8        SO THE MARKET THAT APPLE FACES IS ONE THAT IS GENERALLY

9    LESS PRICE SENSITIVE BECAUSE OF THE LOCK-IN EFFECT FROM THE

10   WALLED GARDEN, FROM THE FACT THAT THE ITUNES STORE ONLY

11   WORKS -- SONGS FROM THE ITUNES STORE ONLY WORK ON AN IPOD.

12   **Q.**  ALL RIGHT.  LET'S TURN TO YOUR THIRD OPINION WHICH IS THAT

13   APPLE MAINTAINED AND ENHANCED MONOPOLY POWER BY INCLUDING 7.0

14   AND 7.4, DISABLING HARMONY.

15       AND BEFORE WE GET THERE, CAN YOU TALK A LITTLE BIT ABOUT

16   HOW APPLE ACQUIRED THE MONOPOLY POWER AND THEN --

17   **A.**  YES.

18   **Q.**  -- HOW IT MAINTAINED IT?

19            (DEMONSTRATIVE PUBLISHED TO JURY.)

20        **THE WITNESS:**  OKAY.  THIS IS BASICALLY THE BIG EVENT

21   IN THE HISTORY OF PORTABLE DIGITAL MEDIA PLAYERS AND IPODS IN

22   PARTICULAR.

23       STEP ONE, APPLE INTRODUCES THE IPOD AND VERY QUICKLY GETS

24   A 30 PERCENT MARKET SHARE.  AND INDEED, THAT'S NOT MONOPOLY

25   POWER.  BUT HAD IT BEEN 50 PERCENT, THAT WOULD HAVE BEEN FINE

1   BECAUSE OBTAINING THAT HIGH OF A MARKET -- A HIGH MARKET SHARE

2   QUICKLY MEANS YOU HAVE A GOOD PRODUCT.  THERE WASN'T ANY

3   LOCK-IN GOING ON AT THE TIME BECAUSE THE ONLY WAY TO PUT MUSIC

4   ON A PORTABLE DIGITAL MEDIA PLAYER AT THAT TIME WAS TO

5   EITHER -- WAS TO OBTAIN IT IN SOME DIGITAL RIGHTS

6   MANAGEMENT-FREE FORMATS, LIKE A CD OR THE SUBSET OF SOUND

7   RECORDING YOU COULD OBTAIN OVER THE INTERNET AT THAT TIME

8   WHICH WAS VERY SMALL IN A DRM-FREE FORM.

9       THEN AS I ARGUE -- AS I EXPLAINED EARLIER, APPLE LAUNCHED

10  THE ITUNES MUSIC STORE.  THE -- WHICH WAS AN INCREDIBLY

11  IMPORTANT EVENT.  THIS WAS THE CULMINATION OF A SIX-YEAR-LONG

12  BATTLE BETWEEN THE RECORD COMPANIES AND BASICALLY THE

13  SILICON VALLEY, THAT THE RECORD COMPANIES HAD DUG IN THEIR

14  HEELS ABOUT DIGITAL DISTRIBUTION OVER THE INTERNET.  THEY

15  CREATED THE ENVIRONMENT WHERE THE -- THE MAJOR ILLEGAL FILE

16  SHARING SERVICES COULD THRIVE, LIKE NAPSTER AND GROKSTER,

17  BECAUSE THERE WASN'T A LEGAL WAY TO OBTAIN IT.

18      AND THE NEAT THING ABOUT DIGITAL DOWNLOADS COMPARED TO THE

19  FORMAT OF THE RECORD COMPANIES WAS THAT, AT THE TIME AND EVEN

20  TODAY, IF YOU WANT TO BUY PHYSICAL COPIES, VERY -- THE VAST

21  MAJORITY OF MUSIC IS ONLY AVAILABLE ON A CD.  SO YOU'VE GOT TO

22  BUY IT, YOU KNOW, 8, 10, 12 SONGS AT A TIME.  AND DIGITAL

23  DOWNLOADS, YOU GET TO BUY ONE.  AND SO YOU GET TO MAKE YOUR

24  OWN CD.  AND SO IF YOU DON'T WANT EVERY SINGLE TRACK ON THE

25  LATEST U2 ALBUM, YOU DON'T HAVE TO BUY IT.  WHEREAS YOU CAN'T

1    GET SINGLES OF EVERY SINGLE TRACK ON THE LATEST U2.

2        SO CONSUMERS REALLY WANTED DIGITAL DOWNLOADS.

3        TOWER RECORDS TRIED TO GET INTO THE BUSINESS OF DIGITAL

4    DOWNLOADS, AND THE RECORD COMPANIES WOULDN'T LET THEM.  AND

5    THEY, AS YOU KNOW, THEY'RE DEFUNCT NOW.  THEY WENT OUT OF

6    BUSINESS.  THERE'S -- THERE ARE ALMOST NO STORES LEFT THAT

7    SPECIALIZE IN SELLING PHYSICAL COPIES OF SOUND RECORDINGS.

8        YOU FIND SECONDS OF IT AT CONSUMER ELECTRONICS PLACES LIKE

9    BEST BUY.  BUT FOR THE MOST PART, THE RECORD STORE BUSINESS

10   HAS ALMOST DISAPPEARED, WHICH IS PERSONAL BECAUSE MY PARENTS

11   WERE IN THE RECORD STORE BUSINESS.  AND THEY WENT OUT OF

12   BUSINESS LONG BEFORE DIGITAL TECHNOLOGY CAME ALONG.  BUT THE

13   POINT IS THE RECORD STORE BUSINESS HAS ESSENTIALLY DISAPPEARED

14   AND BEEN REPLACED BY THE DIGITAL DOWNLOAD BUSINESS.

15       AND WHAT'S REALLY IMPORTANT ABOUT THE ITUNES MUSIC STORE,

16   WHICH WAS THE ORIGINAL NAME OF THE ITUNES STORE, IS THAT IT

17   WAS THE FIRST PLACE THAT THE RECORD COMPANIES DECIDED THEY

18   WOULD GIVE ACCESS TO MOST OF THEIR RECORDINGS.  INITIALLY, IT

19   WASN'T EVEN ALL, BUT IT WAS MOST.  AND SO NOT ONLY CURRENT HIT

20   RECORDS, BUT WHAT IN THE INDUSTRY IS CALLED CATALOG.  THAT IS

21   THE MOST IMPORTANT HISTORICAL RELEASES.  SO IF YOU WANTED TO

22   BUY AN OLD RECORD PRODUCED IN THE 1970'S BY THE BEE GEE'S, YOU

23   COULD GET IT ON -- AS A DIGITAL DOWNLOAD.

24       SO THAT WAS REALLY CRUCIALLY IMPORTANT.  AND -- AND

25   BECAUSE THE IPOD WAS THE ONLY DEVICE THAT THE -- COULD PLAY

1    THE ONLY SOURCE OF LEGAL DIGITAL DOWNLOADS FROM THE MAJOR

2    RECORD COMPANIES, IT WAS EXTRAORDINARILY SUCCESSFUL.

3        AND IT WASN'T UNTIL SIX MONTHS LATER THAT TWO THINGS WERE

4    DONE.  THE FIRST IS THE ITUNES SOFTWARE THAT IS THE

5    INTERMEDIARY BETWEEN GETTING SOMETHING OFF THE ITUNES STORE

6    AND PUTTING IT ON YOUR IPOD, THAT SOFTWARE WAS ALLOWED TO BE

7    TRANSPORTED TO SOMETHING BESIDES AN APPLE PC.  INITIALLY YOU

8    HAD TO HAVE AN APPLE COMPUTER IN ORDER TO USE THE ITUNES

9    STORE.

10        SO IN OCTOBER, SIX MONTHS LATER IN 2003, APPLE IS ALLOWED

11   TO EXPAND ITS DOMAIN INTO THE WORLD OF PERSONAL COMPUTERS

12   WHICH BASICALLY AT THAT POINT MEANS THE -- THE -- THE

13   MICROSOFT WINDOWS WORLD, AND IN ADDITION TO THAT, OTHER

14   SOURCES OF DIGITAL DOWNLOADS OVER THE INTERNET ARE -- BEGIN TO

15   COME INTO BUSINESS.  THE RECORD COMPANIES BEGIN TO SIGN

16   LICENSES THAT ARE SIMILAR TO THE LICENSES WITH APPLE.  SO THAT

17   BY A YEAR AFTER THE ITUNES STORE HAS -- HAS BEEN LAUNCHED,

18   THERE ARE OTHER SOURCES.

19        BUT BY THAT TIME, WE'RE UP TO THIS HIGH MARKET SHARE,

20   THIS -- THE IPODS HAVING LIKE A 60 PERCENT OR 70 PERCENT

21   MARKET SHARE, AND SO THE LOCK-IN IS IN PLACE.  AND THAT --

22   THAT -- SO THAT'S -- THAT'S FOR (SIC) SOURCE OF LOCK-IN IS AN

23   EXAMPLE OF BEING FIRST IN AND HAVING A FIRST-IN ADVANTAGE,

24   BEING THE FIRST KID ON THE BLOCK WHO IS ALLOWED TO SELL THIS

25   PRODUCT AND WHO SUCCEEDS AT IT AND PRODUCES SOMETHING THAT

 1    PEOPLE WANT.  BUT THERE IT IS.  IT'S GOT A SECURE POSITION.

 2         THE NEXT STEP IS ITUNES 4.7, WHICH I'M NOT GOING TO TALK

 3    ABOUT MUCH OTHER THAN TO SAY IN 2004, REALNETWORKS PRODUCED --

 4    RELEASES HARMONY SOFTWARE, WHICH ALLOWS PEOPLE -- IT'S

 5    BASICALLY WANTING TO SELL MUSIC FROM A REALNETWORKS MUSIC

 6    STORE WHICH IS A COMPETITOR TO THE ITUNES STORE.  IT ALLOWS

 7    PEOPLE WHO OWN IPADS TO BUY MUSIC FROM THEM AND PLAY IT ON AN

 8    IPAD.

 9         4.7 IS A SET OF UPDATES FOR THE ITUNES SOFTWARE, AND IT

10    DISABLES HARMONY AND MAKES IT NOT ABLE TO WORK.  ALTHOUGH

11    REALNETWORKS EVENTUALLY OVERCOMES THAT AND BY A LITTLE LESS

12    THAN A YEAR LATER, HARMONY WORKS.

13         AND THEN THE LAST STEP IS ITUNES 7.0, 7.4, WHICH IS A

14    SIMILAR STORY.  HARMONY HAD BEEN UPGRADED OVER A YEAR EARLIER

15    SO THAT PEOPLE COULD BUY SONGS IN THE -- IN THE REALNETWORKS

16    DIGITAL RIGHTS MANAGEMENT FORMAT AND PLAY IT ON AN IPOD.  BUT

17    THE 7.0 AND 7.4 UPGRADES INCLUDE COMPONENTS OF THE SOFTWARE

18    THAT DISABLED HARMONY AND DID SO PERMANENTLY.

19         AND THE TEST -- I'M NOT THE PERSON TESTIFYING ABOUT THE

20    DIFFERENCES BETWEEN 7.0 AND 4.7.  THE ISSUE THERE IS:  WAS

21    THERE ANYTHING ABOUT THAT COMPONENT OF THE SOFTWARE THAT

22    PRODUCED VALUE OTHER THAN JUST DISABLING HARMONY?  AND LIKE

23    DR. MARTIN TESTIFIED ABOUT THAT AND SOME APPLE WITNESSES HAVE

24    TESTIFIED ABOUT THAT.  THAT IS THE CRUCIAL ISSUE.  IF THERE IS

25    NO GAINED BENEFIT FROM THE KVC AND DVC CODE THAT DISABLED

 1    HARMONY, THEN THE MAINTENANCE AND ENHANCEMENT OF MONOPOLY

 2    POWER WITH THAT SOFTWARE IS ANTICOMPETITIVE BECAUSE IT DIDN'T

 3    BENEFIT CONSUMERS.

 4    **BY MS. SWEENEY:**

 5    **Q.**  PROFESSOR NOLL, YOU JUST STARTED TALKING ABOUT WHAT IS

 6    ANTICOMPETITIVE CONDUCT, SO LET'S LOOK AT THE NEXT SLIDE.

 7                    (DEMONSTRATIVE PUBLISHED TO JURY.)

 8    **BY MS. SWEENEY:**

 9    **Q.**  AND WHAT, ABOUT APPLE'S CONDUCT, HARMED CONSUMERS?

10    **A.**  OKAY.  IT'S NOT ENOUGH TO SHOW THAT SOMETHING HAD NO

11    BENEFITS.  YOU HAVE TO ALSO GO SHOW THERE'S HARM, WHICH ARE

12    TWO SEPARATE THINGS.  THE COMPONENTS OF ANTICOMPETITIVE HARM

13    ARE -- THERE'S A BUNCH OF THEM, AND THE ONES THAT ARE RELEVANT

14    HERE ARE AS FOLLOWS:  FIRST OF ALL, BY INCREASING LOCK-IN, FOR

15    THE ARGUMENT I GAVE BEFORE, IT MAKES THE MARKET DEMAND FOR

16    YOUR PRODUCT BE LESS PRICE SENSITIVE, WHICH MEANS THE PROFIT

17    MAXIMIZING PRICE IS HIGHER.  SO THE FIRST RESULT OF THIS

18    PURPOSEFUL LOCK-IN ACTIVITY IS HIGHER PRICES.

19        THE SECOND IS RELATED, WHICH IS DEAD-WEIGHT LOSS.  AND

20    DEAD-WEIGHT LOSS REFERS TO THE FACT THAT IF SOMETHING IS

21    PRICED, SAY, AT TEN, MORE PEOPLE WILL BUY IT THAN IF IT'S

22    PRICED AT 11.  AND DEAD-WEIGHT LOSS REFERS TO THE HARM TO THE

23    CONSUMERS WHO WOULD HAVE BOUGHT IT AT 10 BUT ARE SHUT OUT OF

24    THE MARKET BECAUSE THE PRICE IS 11.  AND IN OTHER WORDS, IT'S

25    THE -- IT'S THE LOSS OF THE -- OF THE BENEFITS OF USING A

1    PORTABLE DIGITAL MEDIA PLAYER, A NEW PORTABLE DIGITAL MEDIA

2    PLAYER, BECAUSE THE HIGHER PRICE HAS CAUSED YOU TO BE OUT OF

3    THE MARKET.  YOU WOULD HAVE BEEN IN THE MARKET AT THE LOWER

4    PRICE.  YOU'RE NOT IN THE MARKET AT THE HIGHER PRICE.

5         AND THE SECOND HARM TO CONSUMERS IS THE SORT OF OBVERSE OF

6    THE -- OF THE LOCK-IN STORY, WHICH IS IF YOU DO SWITCH, YOU

7    DON'T -- YOU'RE NOT ABLE TO PLAY SOME PERFECTLY LEGAL

8    DOWNLOADED SOUND RECORDINGS THAT YOU HAVE.  AND SO YOU'RE LEFT

9    WITH THINGS THAT YOU'RE LEGALLY ENTITLED TO HAVE AND USE, THEY

10   WEREN'T OBTAINED ILLEGALLY, BUT THEY'RE -- THEY'RE LOST,

11   THEY'RE GONE UNLESS YOU UNDERTAKE SOME COST.

12   **Q.**  SO LET'S SUMMARIZE, PROFESSOR NOLL.

13        WHAT'S YOUR OPINION ABOUT APPLE'S MAINTENANCE MONOPOLY

14   POWER?  WHAT LED TO IT AND WHAT'S THE EXTENT OF IT?

15   **A.**  WELL, AS -- ALL OF THESE PHENOMENA THAT I'VE JUST

16   DESCRIBED WERE PRESENT.  AND THE -- THE IMPORTANT FACT IS TO

17   SHOW IN PARTICULAR THAT THE PRICES WERE HIGHER.  THAT'S THE --

18   THAT'S THE LYNCHPIN.  IF YOU CAN'T SHOW THE PRICES WERE

19   HIGHER, THEN THESE OTHER TWO ARE UNLIKELY TO HAVE OCCURRED

20   EITHER.  SO -- OR THE DEAD-WEIGHT LOSS CAN'T OCCUR IF THE

21   PRICES AREN'T HIGHER.

22        SO THE CRUCIAL LINK HERE IS TO SHOW THAT THE CONDUCT IN

23   QUESTION, THE LAUNCH OF 7.0, CAUSED PRICES OF IPODS TO BE

24   HIGHER.

25   **Q.**  AND DID YOU UNDERTAKE AN ANALYSIS TO DETERMINE WHETHER THE

1    CHALLENGED CONDUCT INCREASED IPOD PRICES?

2    **A.**  YES, I DID.

3    **Q.**  OKAY.  NOW, WHAT DID YOU DO?

4    **A.**  AGAIN, THERE'S A --

5                (DEMONSTRATIVE PUBLISHED TO JURY.)

6            **THE WITNESS:**  RIGHT HERE.  THE -- TOP OF THIS

7    DEMONSTRATIVE IS WHAT I DID.

8        IN ANTITRUST ECONOMICS, WHICH IS WHAT ECONOMISTS DO WHEN

9    THEY STUDY ANTITRUST OR ARE INVOLVED IN ANTITRUST LITIGATION,

10   THERE IS A METHOD FOR ESTIMATING DAMAGE -- HARM TO CONSUMERS

11   AND DAMAGES IN AN ANTITRUST CASE ARISING FROM HIGHER PRICES

12   CALLED THE BEFORE/AFTER METHOD.

13       AND WHAT YOU DO IN THAT METHOD IS YOU COMPARE THE MORE

14   COMPETITIVE PERIOD WITH THE LESS COMPETITIVE PERIOD.  ALL

15   RIGHT.  AND SEE IF THERE'S PRICE DIFFERENCES BETWEEN THE

16   PERIOD WHEN THE ANTICOMPETITIVE CONDUCT WAS UNDERWAY AND

17   PERIODS WHEN IT WAS NOT UNDERWAY OR NOT EFFECTIVE.

18       AND THIS IS THE SINGULARLY MOST COMMONLY USED METHOD TO

19   DEMONSTRATE HARM AND CALCULATE DAMAGES IN ANTITRUST

20   LITIGATION.

21   **BY MS. SWEENEY:**

22   **Q.**  AND HAVE YOU, YOURSELF, USED THIS METHOD IN ANTITRUST

23   LITIGATION?

24   **A.**  YES.  IN FACT, MOST OF THE ANTITRUST CASES THAT I HAVE

25   BEEN INVOLVED WITH, THE DAMAGES ARE DONE -- ARE CALCULATED ON

1    THE BASIS OF BEFORE AND AFTER, AND I'VE DONE THIS ON NUMEROUS

2    OCCASIONS MYSELF.

3    **Q.**   OKAY.  AND WHAT DID YOU DO IN PARTICULAR TO IMPLEMENT YOUR

4    BEFORE AND AFTER METHOD HERE?

5    **A.**   IN THIS PARTICULAR CASE, THE BASIC APPROACH IS SOMETHING

6    CALLED HEDONIC REGRESSION.  AND IF YOU THINK IT'S BEEN BAD SO

7    FAR, WAIT TILL YOU GET TO THIS, THIS IS GOING TO BE REALLY

8    BAD.

9        A HEDONIC REGRESSION MODEL IS ONE IN WHICH YOU TAKE DATA

10   ON THE PRICES OF ALL THE PRODUCTS AND TRY TO EXPLAIN THE

11   DIFFERENCES IN PRICES BASED ON THE ATTRIBUTES OF THE PRODUCT.

12   THE REASON IT'S CALLED HEDONIC, SORT OF FROM HEDONISM, ALL THE

13   THINGS THAT GIVE YOU JOY, ALL RIGHT.  AND BASICALLY WHAT YOU

14   DO IS YOU RUN A REGRESSION IN WHICH YOU'RE EXPLAINING

15   DIFFERENCES IN PRICES AMONG PRODUCTS ON THE BASIS OF THEIR

16   ATTRIBUTES.

17       AND THEN WHEN YOU'VE GOT AS GOOD AN EXPLANATION AS YOU

18   CAN -- AND BY "GOOD," I MEAN NOT ONLY DOES IT EXPLAIN THE

19   PRICES, BUT THE PROPERTIES OF THE EQUATION ARE RELIABLE --

20   THEN YOU ADD IN:  DOES KNOWLEDGE OF WHEN THE ANTICOMPETITIVE

21   CONDUCT WAS IN PLACE ADD EXPLANATORY VALUE?  DO YOU -- ARE YOU

22   ABLE TO EXPLAIN MORE OF THE PRICES THROUGH TIME IF YOU ALSO

23   ADD TO THE MODEL AN INDICATOR OF WHICH MODELS AND AT WHAT TIME

24   PERIODS WERE SUBJECT TO ANTICOMPETITIVE CONDUCT?

25       AND THAT -- THAT IS WHAT WE DID HERE IS LOOK AT THE --

1    CONSTRUCT AN ECONOMETRIC MODEL, A REGRESSION MODEL OF ALL OF

2    IPOD PRODUCTS FROM A PERIOD THAT WAS NINE AND A HALF YEARS

3    LONG, FROM LATE 2001 UNTIL EARLY 2011 AND EXPLAIN THE

4    VARIATIONS IN IPOD PRICES USING, AMONG THE EXPLANATORY

5    VARIABLES, THE PRESENCE OF THE OPERABILITY OF 7.0 AND 7.4 AS A

6    WAY TO BLOCK PEOPLE WHO WANTED TO PLAY SONGS IN THE

7    REALNETWORKS FORMAT.

8    **Q.**  YOU SAID YOU USED A REGRESSION ANALYSIS.  WHAT IS

9    REGRESSION ANALYSIS?

10   **A.**  OKAY.  REGRESSION ANALYSIS, THERE'S A DEMONSTRATIVE.

11   WE'LL GO THROUGH IT.  IT'S ESSENTIALLY AS FOLLOWS.

12                (DEMONSTRATIVE PUBLISHED TO JURY.)

13           **THE WITNESS:**  A REGRESSION ANALYSIS IS TO ESTIMATE

14   THE PARAMETERS OF AN EQUATION.  AND THIS -- IN THIS PARTICULAR

15   EQUATION, THERE'S A VARIABLE TO BE EXPLAINED WHICH IS WHY.  IN

16   THIS CASE, PRICE.  AND THEN THERE'S VARIABLES THAT EXPLAIN IT,

17   WHICH ARE X1 AND X2.  OF COURSE IN THIS CASE THERE ARE MANY

18   MORE, BUT THIS IS A SIMPLE VERSION.

19       AND THEN THERE'S SOMETHING CALLED THE RANDOM ERROR WHICH

20   IS LITTLE E, THE SQUIGGLY E, OR EPSILON, AT THE END OF IT.

21   THAT'S THE BASIC IDEA IS YOU USE A STATISTICAL TECHNIQUE TO

22   ESTIMATE BETA ZERO, BETA 1, AND BETA 2 IN THIS EQUATION

23   THAT -- TO MINIMIZE THE SQUARES OF THE ERRORS IN THE

24   ESTIMATION.  IN OTHER WORDS, YOU LOOK AT THE PREDICTED VALUE

25   OF THE DEPENDENT VARIABLE Y, AND SUBTRACT FROM THAT THE ACTUAL

1  VALUE AND SQUARE IT, AND THEN ADD UP THE SQUARES OF ALL THE

2  ERRORS AND DEVELOP A TECHNIQUE FOR MINIMIZING THAT SUM OF

3  SQUARES.  AND THE REGRESSION COEFFICIENTS IN THE MODELS, THE

4  BETAS, ARE THEN THOSE CALCULATE -- THOSE PARAMETERS THAT

5  MINIMIZE THE SUM OF SQUARES, THAT DO THE BEST CONCEIVABLE JOB

6  OF EXPLAINING THE SQUARES OF THE DEVIATIONS OF THE PREDICTIONS

7  FROM THE ACTUAL VALUES.

8  **BY MS. SWEENEY:**

9  **Q.**  AND CAN YOU TELL THE JURY WHAT KINDS OF VARIABLES YOU PUT

10  INTO YOUR EQUATION?

11  **A.**  YES.  WELL, FIRST OF ALL, Y IS THE PRICE.  IT'S THE

12  DEPENDENT VARIABLE.  THIS IS THE PRICE OF AN IPOD.  OKAY?

13      NEXT.

14                  (DEMONSTRATIVE PUBLISHED TO JURY.)

15        **THE WITNESS:**  INTERESTINGLY ENOUGH THERE'S REALLY

16  SORT OF A NEW VARIABLE OUT HERE CALLED X0 WHICH ALWAYS TAKES

17  THE VALUE OF ONE.  AND THAT IS THE INTERCEPT OF THIS LINEAR

18  EQUATION.  AND BETA ZERO IS CALLED THE INTERCEPT OF THE

19  REGRESSION LINE.

20      IN OUR REGRESSION, THE BETA ZERO IS THE PRICE OF THE IPOD

21  FOR WHICH ALL THE INDEPENDENT VARIABLES TAKE THE VALUE OF

22  ZERO.  AND IT TURNS OUT, AS YOU WILL SEE LATER, THIS IS

23  ACTUALLY THE PRICE OF AN IPOD TOUCH SOLD IN DECEMBER.  THAT

24  IS -- THAT IS REALLY WHAT BETA ZERO IS.

25                  (DEMONSTRATIVE PUBLISHED TO JURY.)

1          **THE WITNESS:**  OKAY.  THE X'S ARE CALLED THE

2    INDEPENDENT VARIABLES.  AND THE KINDS OF VARIABLES THAT

3    EXPLAIN PRICE ARE, FIRST OF ALL, COST.  THAT'S PROBABLY THE

4    SINGLE MOST IMPORTANT THING THAT EXPLAINS PRICE BECAUSE THE

5    PRICE HAS TO EXCEED THE COST BY AN AMOUNT SUFFICIENT TO COVER

6    THE FIXED COSTS LIKE THE RESEARCH AND DEVELOPMENT AND THE

7    THINGS THAT DON'T GO INTO THE INCREMENTAL COST OF PRODUCING

8    ONE MORE UNIT.  IT HAS TO BE SUFFICIENTLY ABOVE THE

9    INCREMENTAL COST TO COVER ALL THOSE FIXED COSTS.

10         SO OBVIOUSLY COST IS AN IMPORTANT DETERMINATIVE OF THE

11   PRICE.  FIRMS WON'T STAY IN THE MARKET UNLESS THEIR PRICES

12   COVER COST.

13         AND IN ADDITION, THE CHARACTERISTICS OF THE PRODUCT BEING

14   SOLD IN A HEDONIC REGRESSION ARE X'S.  LIKE, FOR EXAMPLE:  IS

15   IT A TOUCH, IS IT A NANO, WHATEVER MAKE, THAT IT BE OBVIOUS.

16   THE MEMORY CAPACITY, ONE OF THE THINGS YOU WILL SEE IN THE

17   LONG EXHIBITS THAT WE DID RIGHT AT THE BEGINNING OF THE -- ALL

18   THE VARIOUS APPLE MODELS IS THAT THEY HAVE, AT DIFFERENT

19   POINTS IN TIME, THEY HAVE DIFFERENT CAPACITIES, AND AS

20   MEASURED BY MEMORY CAPACITY.

21         AND DIFFERENT MODELS OF IPOD HAVE A CONCENTRATION OF WHICH

22   MEMORY -- WHAT THE RANGE OF MEMORIES IS IN THEM THAT -- THAT

23   VARIES FROM -- ONE EXTREME IS THE IPOD TOUCH, IT HAS VERY

24   LARGE MEMORY CAPACITY, AND RECENT VERSIONS OF THE IPOD

25   CLASSIC.  AT THE OTHER END ARE THE VERY SMALL VERSIONS OF

1    IPODS WHICH HAVE MUCH LESS CAPACITY.

2        SO MEMORY CAPACITY IS NOT ONLY AN INDICATOR OF THE

3    CAPABILITIES OF THE DEVICE, HOW MANY SOUND RECORDINGS IT CAN

4    HOLD AND WHAT OTHER FUNCTIONS IT CAN PERFORM BESIDES SIMPLY

5    PLAYING BACK SOUND RECORDINGS, BUT ITSELF IS AN IMPORTANT

6    CHARACTERISTIC OF THE –– IT STANDS IN THE CAPACITY –– IS AN

7    INDICATOR OF ALL THE FUNCTIONALITY THAT'S IN THAT PRODUCT.

8    IT'S A CAPACITY FOR STORING SONGS AND IT'S A CAPACITY FOR

9    DOING OTHER THINGS.

10        AND THEN THERE ARE ADDITIONAL FEATURES SUCH AS THE

11    PRESENCE OF VIDEO OR WHATEVER, ITS SIZE, THAT COULD –– THAT

12    COULD INFLUENCE CONSUMERS, INFLUENCE THE DEMAND FOR THE IPODS

13    INDEPENDENTLY OF WHAT WE PICK UP BY JUST MEASURING CAPACITY

14    AND COST.

15            (DEMONSTRATIVE PUBLISHED TO JURY.)

16    **BY MS. SWEENEY:**

17    **Q.**  AND ––

18    **A.**  BETA –– BETA.  YEAH, I'M SORRY.

19    **Q.**  GO AHEAD.  SO YOU WERE JUST ABOUT TO EXPLAIN THE BETAS.

20    **A.**  YES.

21        ASSOCIATED WITH EACH OF THESE INDEPENDENT VARIABLES LIKE

22    CAPACITY AND LIKE SIZE FEATURES ARE THE BETAS WHICH ARE THE

23    COEFFICIENTS.  AND WHAT THESE BASICALLY MEAN, IF I –– IF I ADD

24    ONE UNIT OF SOME MEASURE, SOME X1, WHAT IS THE EFFECT ON

25    PRICE.  SO BETA 1 TRANSLATES THE NUMBER OF UNITS OF X1 INTO

1    THE EFFECT OF X1 ON PRICE.  SO IF BETA 1 IS .05 IN A LINEAR

2    REGRESSION WHERE Y IS THE PRICE, THAT MEANS ONE MORE UNIT OF

3    X1 ADDS FIVE CENTS TO THE PRICE.

4              (DEMONSTRATIVE PUBLISHED TO JURY.)

5    BY MS. SWEENEY:

6    Q.  ALL RIGHT.  LAST ONE.

7        WHAT IS THE RANDOM ERROR HERE?

8    A.  EPSILON, OR THE SQUIGGLY E, IS THE UNEXPLAINED VARIANCE IN

9    PRICES, THAT WHICH YOU COULDN'T EXPLAIN WITH THE REGRESSION

10   MODEL.  AND BECAUSE NOTHING IS PERFECT, IT'S NEVER ITS MAXIMUM

11   VALUE -- I MEAN ITS MINIMUM VALUE.  IT'S NEVER ZERO.  IT'S

12   CONSISTENTLY ZERO FOR ALL OBSERVATIONS.  YOU NEVER EXPLAIN

13   EVERYTHING.  SO THERE WILL BE ERRORS IN PREDICTION FOR

14   INDIVIDUAL IPODS SOLD AT A GIVEN POINT IN TIME.  AND EPSILON

15   IS THE MAGNITUDE OF THAT ERROR.

16          THE COURT:  ALL RIGHT.  NOW THAT HE'S EXPLAINED THE

17   EQUATION, LADIES AND GENTLEMEN, WE'RE GOING TO GO AHEAD AND

18   TAKE OUR MORNING BREAK.

19       NOW, I DID WAKE UP A LITTLE EARLY.  I DID PICK UP A

20   GINGERBREAD QUICK BREAD THING SO I BAKED IT FOR YOU.  WE'LL

21   SEE IF IT'S ANY GOOD.  I'VE NEVER TRIED IT BEFORE.  SO I

22   CANNOT TELL YOU HOW GOOD IT IS OR NOT.  YOU'LL HAVE TO TELL ME

23   WHAT YOU THINK ABOUT IT.  ANYWAY, I'M HOPING IT IS IN THERE

24   FOR YOU.  IF NOT, WE'LL SEND IT RIGHT IN.

25       ENJOY YOUR 15-MINUTE BREAK.  WE'LL SEE YOU BACK HERE IN

 1    15 MINUTES.

 2        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

 3    OF THE JURY:)

 4            **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

 5    HAS LEFT.

 6        THERE IS NO WAY I WAS MAKING THAT FOR EVERYBODY.

 7    HOPEFULLY YOU BROUGHT YOUR OWN SNACK.

 8            **THE WITNESS:**  THERE'S ONLY ONE OF ME, YOUR HONOR.

 9            **THE COURT:**  NOT YOU EITHER.

10        ALL RIGHT.  IT'S 10:03.  10:18 BACK ON THE RECORD.

11        THANK YOU.

12        (RECESS TAKEN AT 10:03 A.M.; PROCEEDINGS RESUMED AT

13    10:19 A.M.)

14        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

15    OF THE JURY:)

16            **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

17    COME TO ORDER.

18            **THE COURT:**  ALL RIGHT.  LET'S BRING OUT THE JURY.

19        (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

20    THE JURY:)

21            **THE COURT:**  WE'RE BACK ON THE RECORD.

22        THE RECORD WILL REFLECT THAT JURY IS BACK.

23        HAVE A SEAT.

24        SO I CERTAINLY DON'T DO THINGS FROM SCRATCH IF YOU ADD

25    EGGS.  BUT IT IS -- IT'S THE WILLIAM SONOMA PACK.  SO IF YOU

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    WANT TO REPLICATE IT, THAT'S WHERE YOU CAN GET IT.

2        AND I HAVE TO AGREE WITH YOU BECAUSE I DID MAKE SOME FOR

3    MY STAFF, AND I THINK IT WORKED PRETTY WELL.  OKAY.

4    EXCELLENT.

5        LET US GO BACK TO THE TESTIMONY.

6        YOU MAY PROCEED, MS. SWEENEY.

7            **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

8    **Q.**  PROFESSOR NOLL, JUST BEFORE THE BREAK, YOU HAD JUST

9    FINISHED TALKING ABOUT YOUR REGRESSION EQUATION.

10       CAN YOU DESCRIBE IN A LITTLE MORE DETAIL WHAT WENT INTO

11   THOSE VARIABLES THAT YOU DESCRIBED THAT ARE IN THE EQUATION?

12   **A.**  YES, I CAN.

13   **Q.**  AND DO WE HAVE A DEMONSTRATIVE, MAYBE 68?

14           (DEMONSTRATIVE PUBLISHED TO JURY.)

15           **THE WITNESS:**  WELL, THE DEPENDENT VARIABLE PRICE IS

16   THE ACTUAL PRICE CHARGED IN EVERY TRANSACTION OF A SALE BY

17   APPLE FROM NOVEMBER 2001 UNTIL THE SPRING OF 2011.  SO IT'S

18   THAT INDIVIDUAL PRICE IN A TRANSACTION.

19       THE DATA RECORDS FROM APPLE DON'T LIST THE PRICE UNLESS

20   IT'S JUST ONE UNIT OF SALE.  INSTEAD, THEY LIST THE TOTAL

21   AMOUNT PAID, AND SO YOU HAVE TO DIVIDE THE AMOUNT PAID BY THE

22   QUANTITY.  AND THAT'S THE MEASURE OF PRICE IN MULTIPLE SALES.

23   **BY MS. SWEENEY:**

24   **Q.**  LET ME INTERRUPT YOU.

25       AND WHERE DID YOU GET THE DATA ON THE SALES?

1    **A.**    FROM APPLE'S TRANSACTIONS RECORDS.

2    **Q.**    OKAY.

3    **A.**    THE -- THEN WITH REGARD TO THE INDEPENDENT VARIABLES, WE

4    PUT IN ATTRIBUTES AND FEATURES, NOT ALL, BUT IMPORTANT

5    ATTRIBUTES AND FEATURES OF IPODS, WHETHER IT HAS PHOTOS -- BE

6    ABLE TO TAKE PHOTOS OR THE ABILITY TO DISPLAY PHOTOS, VIDEO

7    CAPABILITY; WE TOOK INTO ACCOUNT THE SIZE AND MEASURED IN

8    CUBIC INCHES OR CUBIC MILLIMETERS; THE MEMORY CAPACITY; AND

9    THERE'S A SPECIAL VARIABLE THERE TO INDICATE -- WELL, APPLE

10    ONCE PRODUCED AN IPOD THAT HAD AN IMAGE OF U2 ON IT, THE ROCK

11    BAND, AND SO WE HAD A SPECIAL INDICATOR FOR THAT BECAUSE -- TO

12    MEASURE THE DEGREE TO WHICH THE PRICE WAS INCREASED BECAUSE IT

13    HAD SOME SORT OF AN AGREEMENT GOING WITH U2 ABOUT PROMOTION.

14        SO THERE ARE THESE CHARACTERISTICS OR FEATURES OF THE IPOD

15    IN THE REGRESSION, NOT ALL, BUT MANY, SEVERAL.

16    **Q.**    CAN I JUST ASK YOU ABOUT THE VARIABLE CLASS?  WHAT'S THE

17    SIGNIFICANCE OF INCLUDING THE CLASS IN THE EQUATION?

18    **A.**    YEAH.  "CLASS" IS A TERM USED BY APPLE FOR "MODEL."  SO

19    INSTEAD OF CALLING A CLASSIC A MODEL, OR A NANO A MODEL, THEY

20    CALL IT A CLASS.  SO THE CLASS JUST MEANS MODEL.

21    **Q.**    OKAY.

22        CAN WE GO BACK TO --

23    **A.**    YOU SAID WHAT'S THE IMPORTANCE.

24    **Q.**    SORRY.

25    **A.**    I DIDN'T ANSWER THAT PART.

1    OF COURSE THE IMPORTANCE OF THAT IS THAT EACH OF THE

2    CLASSES, OR MODELS, OF IPODS HAVE DIFFERENT FEATURES

3    ASSOCIATED WITH THEM.  AND SO IT'S IMPORTANT.  THOSE VARIABLES

4    ARE STANDING IN FOR WHOLE BUNDLES OF FEATURES THAT DISTINGUISH

5    THAT MODEL FROM ALL THE OTHER MODELS.

6    **Q.**  AND WHAT ARE SOME OF THE OTHER VARIABLES THAT YOU LOOKED

7    AT?

8          (DEMONSTRATIVE PUBLISHED TO JURY.)

9          **THE WITNESS:**  THE THIRD CATEGORY CONSISTS OF THIS

10   INCREMENTAL COST.  REMEMBER THE NUMBER THAT WENT INTO THE

11   LERNER INDEX, WHAT ARE THE -- WHAT ARE THE VARIABLE COSTS OF

12   PRODUCING AND SELLING IPODS.

13        AND -- IN ADDITION TO THAT, WE HAVE FEATURES OF THE

14   TRANSACTIONS.  REMEMBER I SAID EARLIER THAT THE ACTUAL MEANING

15   OF BETA ZERO IS A TOUCH SOLD IN DECEMBER.  ONE OF THE

16   VARIABLES WE HAVE IN THERE IS THE MONTH OF THE TRANSACTION TO

17   CAPTURE SEASONALITY.  IF YOU RECALL, IN ONE OF THE GRAPHS I

18   SHOWED YOU, YOU SAW THAT SALES VARY ENORMOUSLY BY QUARTER.  SO

19   WE INCLUDED THE MONTH OF THE TRANSACTION TO INDICATE -- TRY TO

20   CAPTURE THE SEASONALITY DIFFERENCES IN PRICES.

21        IN ADDITION, WE INCLUDED THE NUMBER OF IPODS PURCHASED.

22   AND WE DID IT IN A SOMEWHAT DIFFERENT WAY BETWEEN TWO

23   CATEGORIES OF PURCHASERS.  FOR CONSUMERS WHO BUY FROM APPLE,

24   WHICH APPLE CALLS "DIRECT PURCHASERS," THE NUMBER IS THE

25   NUMBER IN THAT TRANSACTION.  SO IF YOU WALK INTO THE APPLE

 1    STORE IN A SHOPPING CENTER AND YOU BUY THREE IPODS, THREE

 2    WOULD BE THE NUMBER.

 3        FOR THE OTHER CATEGORY, WHICH IS RESELLERS, THAT'S

 4    WHOLESALERS AND RETAILERS WHO BUY FROM APPLE AND THEN RESELL

 5    IT EITHER TO OTHER PEOPLE OR TO, LIKE A DISTRIBUTOR WILL SELL

 6    IT TO A RETAILER OR A RETAILER WILL SELL IT TO A CUSTOMER, A

 7    CONSUMER.  FOR THOSE, WE MEASURED THE QUANTITY IN TERMS OF THE

 8    QUARTERLY PURCHASES.

 9        THE OBJECT OF THIS, OF COURSE, IS TO CAPTURE QUANTITY

10    DISCOUNTS.  APPLE SAYS THAT IT DOESN'T GIVE QUANTITY

11    DISCOUNTS, BUT WE INCLUDED QUANTITY IN THE REGRESSION ANYWAY

12    JUST TO SEE IF, IN FACT, THEY DO.  THEY MAY NOT CALL IT THAT,

13    BUT IN FACT THEY DO.  THE PRICES PAID ARE LOWER FOR PEOPLE WHO

14    BUY MORE.

15        THEN THERE IS -- THERE IS INDICATORS OF -- OF DISCOUNTS

16    FOR BOTH THE RESELLERS AND THE CONSUMERS.  IN THE -- IN THE

17    CASE OF THE RESELLERS, THESE ARE VARIOUS DISCOUNT PROGRAMS

18    THAT APPLE HAS LIKE THEY HAVE SOMETHING CALLED A BUSINESS

19    DEVELOPMENT FUND, WHICH IS A DISCOUNT THAT THEY GIVE TO PEOPLE

20    BASED ON THE EFFORTS THEY MAKE IN SELLING IPODS.  SO THOSE

21    DISCOUNTS ARE TAKEN INTO ACCOUNT IN THE PRICE REGRESSION.

22        AND FOR CONSUMERS, THE DISCOUNT, ONE FORM OF DISCOUNT IS

23    SOME SORT OF A COUPON THAT A CONSUMER MAY HAVE TO GIVE THEM A

24    DISCOUNT WHEN THEY BUY SOMETHING FROM THE APPLE STORE.

25

1  **BY MS. SWEENEY:**

2  **Q.**  DID YOU USE THE SAME REGRESSION ANALYSIS FOR BOTH THE

3  RESELLERS AND THE CONSUMERS?

4  **A.**  IT'S BASICALLY THE SAME, BUT IT HAS SOME DIFFERENCES

5  BECAUSE OF THE DIFFERENCES IN THE CHARACTERISTICS OF THE

6  CONSUMERS AND THE RESELLERS.  THE VARIABLES THAT MEASURE COST

7  AND THE FEATURES OF AN IPOD ARE THE SAME, BUT THE VARIABLES

8  THAT DEAL WITH DISCOUNTS AND NUMBER OF PURCHASES WERE

9  DIFFERENT BECAUSE, LIKE NUMBER OF PURCHASES, YOU KNOW, THERE'S

10  NO -- THERE'S NO COUNTERPART TO BEST BUY IN THE CONSUMER

11  DATABASE.  NO ONE COMES IN AND SAYS, "I'LL TAKE 20,000 IPODS,"

12  AT THE APPLE STORE.  SO YOU HAVE TO HAVE A DIFFERENT MEASURE

13  OF QUANTITY FOR THE RESELLERS THAN FOR THE CONSUMERS.

14  **Q.**  OKAY.  SO LET'S MOVE TO THE NEXT DEMONSTRATIVE.

15                (DEMONSTRATIVE PUBLISHED TO JURY.)

16  **BY MS. SWEENEY:**

17  **Q.**  AND WHAT DOES THIS CHART PORTRAY?

18  **A.**  WELL, ONE OF THE FACTORS THAT'S TAKEN INTO ACCOUNT IN

19  EXPLAINING PRICES ARE MARKET CONDITIONS, THINGS THAT ARE

20  HAPPENING IN THE MARKETPLACE THAT ARE LIKELY TO AFFECT PRICE,

21  AND IN PARTICULAR, EVENTS THAT WOULD EFFECT LOCK-IN WOULD BE

22  EXPECTED TO AFFECT PRICE.

23      SO WE HAVE VARIABLES TO INDICATE THESE THINGS THAT ARE

24  SHOWN ON THE SLIDE.  THESE ARE THE LAUNCH OF THE ITUNES MUSIC

25  STORE, WHICH THEN CHANGED ITS NAME TO THE ITUNES STORE; THE

1    RELEASE OF THE FIRST VERSION OF HARMONY; THE RELEASE OF ITUNES

2    4.7 THAT DISABLED HARMONY; THE RE-RELEASE OF HARMONY THAT GOT

3    AROUND THE 4.7 PROBLEMS; AND THEN THE RELEASE OF ITUNES 7.0.

4         AND THEN THERE'S TWO OTHER EVENTS HERE THAT ARE IMPORTANT

5    BECAUSE LOCK-IN, IN PORTABLE DIGITAL MEDIA PLAYERS BY VIRTUE

6    OF THE ENCRYPTION OF THE SOUND RECORDINGS, DEPENDS UPON THE

7    ENCRYPTION BEING THERE.  ALL RIGHT.  AND SO TWO OTHER

8    IMPORTANT EVENTS THAT TRANSPIRED IN THE MARKET WERE, FIRST OF

9    ALL, THAT THE RECORD COMPANIES ALLOWED APPLE'S COMPETITORS IN

10   THE PORTABLE DIGITAL -- EXCUSE ME -- IN THE DIGITAL DOWNLOAD

11   BUSINESS TO SELL DRM-FREE SOUND RECORDINGS BEGINNING IN EARLY

12   JANUARY -- WELL, LATE 2009, EARLY 2008 (SIC).  IT HAPPENED AT

13   SLIGHTLY DIFFERENT TIMES FOR DIFFERENT -- DIFFERENT FIRMS AND

14   FOR DIFFERENT RECORD COMPANIES.  BUT WE'RE USING JANUARY 1ST

15   AS APPROXIMATELY THE DATE THAT DRM-FREE MUSIC -- A COMPLETE

16   CATALOG OF DRM-FREE MUSIC WAS AVAILABLE FROM APPLE'S

17   COMPETITORS.  NOW, THAT MEANS AT THAT POINT YOU CAN BUY MUSIC

18   FROM ONE OF APPLE'S COMPETING DIGITAL DOWNLOAD SOURCES AND

19   PLAY IT ON AN IPOD.

20        AND THEN ITUNES ITSELF, THE ITUNES STORE ITSELF BECOMES --

21   NEGOTIATES THE RIGHT TO SELL DRM-FREE MUSIC IS -- THEY GET IT

22   FIRST FOR EMI, WHICH IS THE SMALLEST OF THE MAJOR RECORD

23   DISTRIBUTION COMPANIES AT THE TIME.  IT DOESN'T EXIST ANYMORE,

24   BUT AT THAT TIME IT WAS ONE OF THE FIVE MAJOR COMPANIES.  AND

25   THEY WERE ABLE TO GET THE -- THEY WERE ABLE TO SELL DRM-FREE

1    MUSIC FROM EMI IN 2008, EARLY IN THE SPRING OF 2008.  BUT THEY

2    DIDN'T OBTAIN THE RIGHT TO SELL THEM FROM THE OTHER MAJORS

3    UNTIL -- THEY NEGOTIATED THOSE AGREEMENTS IN DECEMBER OF 2008

4    AND JANUARY OF 2009.

5        AND BY -- THERE IS A PRESS RELEASE THAT SAYS 80 PERCENT OF

6    THE SOUND RECORDINGS AVAILABLE FROM ITUNES WERE DRM-FREE AS OF

7    JANUARY 6, 2009.  THERE'S OTHER DOCUMENTS THAT SAY THEY

8    WEREN'T COMPLETELY DRM-FREE UNTIL APRIL 1ST OF 2009.

9        WE DON'T ACTUALLY HAVE INFORMATION ABOUT THE PROPORTION OF

10   SALES FROM THE ITUNES STORE THAT WERE ACCOUNTED FOR BY

11   DRM-FREE MUSIC.  SO JUST TO BE CONSERVATIVE, WE JUST TOOK THE

12   80 PERCENT DATE, EVEN THOUGH THAT -- THAT MAY NOT BE THE RIGHT

13   NUMBER, IT MAY BE LATER.  IT DEPENDS ON WHETHER THAT'S

14   80 PERCENT OF TITLES OR 80 PERCENT OF SALES.  BECAUSE IF -- IF

15   IT'S 80 PERCENT OF TITLES, IT DOESN'T MEAN IT WAS 80 PERCENT

16   OF SALES.

17       SO, BUT WE DON'T KNOW FOR SURE.  THERE'S NO DATA ON THAT

18   IN THE RECORD.  SO WE'RE JUST TAKING THAT AS THE DATE THAT THE

19   ITUNES STORE IS SELLING DRM-FREE MUSIC.  AND OF COURSE AT --

20   AT THAT POINT, THERE'S NO LONGER A LOCK-IN EFFECT FROM BUYING

21   MUSIC FROM THE ITUNES STORE.

22   Q.  ALL RIGHT.  LET'S TURN TO THE NEXT SLIDE.

23            (DEMONSTRATIVE PUBLISHED TO JURY.)

24   BY MS. SWEENEY:

25   Q.  AND PROFESSOR NOLL, WHAT DOES THIS CHART DEPICT?

1    A.   THIS IS AN EXPLANATION OF HOW THESE VARIOUS EVENT

2    VARIABLES ENTER INTO THE REGRESSION, HOW THEY -- HOW THEY

3    TRANSLATE INTO THE INDEPENDENT VARIABLES.

4         ESSENTIALLY, THESE ARE CALLED INDICATOR VARIABLES, OR MY

5    FAVORITE WAY OF CALLING THEM IS CALLING THEM DUMMY VARIABLES,

6    AND THE REASON IS THEY ONLY TAKE TWO VALUES.  THEY TAKE A

7    VALUE OF ZERO WHEN IT -- IT DOESN'T MATTER WHEN IT'S NOT IN

8    PLACE, AND 1 WHEN IT IS IN PLACE.

9         SO IF WE JUST LOOK AT THE VERY FIRST ONE, THE VARIABLE TO

10   INDICATE THAT THE ITUNES MUSIC STORE IS DRM-FREE BECOMES 1 ON

11   JANUARY 6, 2009.  FOR ALL DATES BEFORE THAT, IT TAKES A VALUE

12   OF ZERO.  LIKELY WHEN WE GO DOWN TO 7.0, FOR UNAFFECTED

13   MODELS, THAT'S -- THOSE ARE THE MODELS, OR CLASSES, OF IPODS

14   FOR WHICH 7.0 WAS NEVER USED.  AND OF COURSE, THE -- THE 7.0

15   VARIABLE NEVER IS TURNED ON FOR THOSE.  WE JUST KEEP THE --

16   THE ITUNES 4.7 VARIABLE TURNED ON, TAKES THE VALUE OF 1 FOR

17   ALL THE UNAFFECTED MODELS RIGHT FROM THE TIME 4.7 IS LAUNCHED

18   TILL THE VERY END.

19        FOR THE ITUNES 7.0 VARIABLE ON THE AFFECTED MODELS, IT

20   CAN -- IT IS TURNED ON WHEN THOSE MODELS HAVE 7.0 OR 7.4 FIRST

21   INCORPORATED IN THEM, WHICH IS -- YOU KNOW, IT VARIES

22   DEPENDING ON THE MODEL.  IT'S DIFFERENT FOR NANOS THAN FOR

23   TOUCHES AND CLASSIFICATION.  BUT IS TURNED ON TO BE 1 FOR A

24   MODEL WHEN THAT MODEL BEGINS TO HAVE THIS SOFTWARE ON IT.

25        AND THEN WE HAVE THE TWO HARMONY VARIABLES, THE OLD

1    HARMONY AND THE NEW HARMONY.

2        AND WE HAVE THE -- THE LAST INDICATOR VARIABLE IS THE ONE

3    FOR THE -- WHEN THE ITUNES MUSIC STORE WAS ORIGINALLY

4    LAUNCHED, WHICH IS BACK IN APRIL OF 2003.

5    **Q.**  PROFESSOR NOLL, HOW DID YOU DETERMINE WHICH VARIABLES TO

6    INCLUDE IN YOUR REGRESSION EQUATION?

7    **A.**  THE BASIC STORY IS YOU USE JUDGMENT BASED UPON THE

8    MATERIALS YOU READ, BOTH FROM APPLE IN DISCOVERY AND FROM THE

9    TRADE PRESS ABOUT WHAT'S GOING ON IN THE PRODUCT REVIEWS, FOR

10   EXAMPLE, TO DECIDE WHAT THE CANDIDATES ARE.  AND THEN YOU KEEP

11   ADDING VARIABLES UNTIL ADDING MORE CAUSES MORE TROUBLE THAN

12   BENEFIT TO THE MODEL.

13       AND BY "TROUBLE," I MEAN IT CREATES ESTIMATION PROBLEMS

14   THAT OFFSET THE BENEFIT FROM INCREASING THE ABILITY TO EXPLAIN

15   VARIATIONS IN PRICE.

16   **Q.**  AND WE'LL TURN TO THAT ISSUE IN A LITTLE BIT.

17       BUT, SO, AFTER YOU PUT ALL THIS INFORMATION INTO YOUR

18   REGRESSION EQUATION, WHAT DID YOU DO?

19   **A.**  WELL, AT THIS POINT, WE HAVE A REGRESSION EQUATION TO --

20   TO ESTIMATE.  WE HAVE A BUNCH OF VARIABLES.

21               (DEMONSTRATIVE PUBLISHED TO JURY.)

22           **THE WITNESS:**  THIS IS ACTUALLY THE EQUATION.  IT'S

23   A -- IT'S A -- HAS THE CLASS, THIS INDICATOR VARIABLE FOR U2.

24   THE -- IT HAS A SERIES OF INDICATOR VARIABLES FOR MEMORY

25   CAPACITY.  WE DIDN'T ACTUALLY PUT IN THE MEMORY CAPACITY.  AND

 1    THE REASON IS BECAUSE YOU WOULDN'T EXPECT THAT THE PRICE

 2    EFFECT OF 8 GIGABITS WOULD BE EXACTLY TWICE THE PRICE EFFECT

 3    OF 4.  SO WHAT WE HAVE IS AN INDICATOR VARIABLE FOR WHAT THE

 4    MEMORY CAPACITY IS, STARTING WITH 512 MEGABYTES -- MEGABITS

 5    AND GOING ALL THE WAY UP TO 100 AND SOMETHING, 160 OR WHATEVER

 6    IT IS.  SO THERE'S AN INDICATOR VARIABLE THAT TAKES THE VALUE

 7    OF 1 FOR A TRANSACTION INVOLVING AN IPOD THAT HAS THAT MEMORY

 8    CAPACITY.  AND THERE ARE A LARGE NUMBER OF MEMORY CAPACITIES

 9    THROUGHOUT THE HISTORY OF THE PRODUCTION OF IPODS.

10    THE NEXT VARIABLE IS TIME, JUST SIMPLY THE NUMBER OF

11    MONTHS SINCE THE LAUNCH OF THE FIRST IPAD (SIC).  ONE WOULD

12    EXPECT THIS TO BE NEGATIVE, AND THE REASON IS MOORE'S LAW.

13    ONE EXPECTS THAT AS TIME PROGRESSES, ALL ELSE EQUAL, THE PRICE

14    OF CONSUMER ELECTRONIC PRODUCTS FALLS.

15    THEN WE HAVE THE MONTH OF THE TRANSACTION TO CAPTURE

16    SEASONALITY, AGAIN, VARIABLES FOR THE MONTHS.

17    WE HAVE THE INTERACTION BETWEEN TIME AND MEMORY CAPACITY.

18    MEMORY CAPACITY IS THE ONLY SEMICONDUCTOR PRODUCT THAT'S IN

19    THE REGRESSION.  SO IT'S ESPECIALLY LIKELY TO BE AFFECTED BY

20    MOORE'S LAW.  WE HAVE THE INDICATOR VARIABLE FOR PHOTO.

21    INDICATOR VARIABLE FOR PHOTO AND VIDEO.  INDICATOR VARIABLE

22    FOR THE SIZE AND CUBIC INCHES.  INDICATOR VARIABLES FOR THE

23    QUANTITY OF TRANSACTIONS.

24    NOW AGAIN, WE DIDN'T MEASURE QUANTITY LINEARLY.  WE DIDN'T

25    SAY IT'S ONE OR TWO OR THREE OR FOUR.  INSTEAD WE BROKE IT UP

1    INTO RANGES OF QUANTITIES BECAUSE TYPICALLY THE WAY FIRMS

2    GRANT DISCOUNTS IS NOT THE PRICE IS FALLING CONTINUOUSLY AS A

3    NUMBER, THEY TEND TO BE STEPS.  AND SO WE CLASSIFIED THE

4    QUANTITIES INTO RANGES AND HAD INDICATOR VARIABLES FOR EACH OF

5    THE RANGES.

6        WE ALSO HAVE MEASURES FROM APPLE OF THE INCREMENTAL COST,

7    THE VARIABLE COST IN SELLING AN IPOD.  THEN WE HAVE THESE

8    MARKETING FEATURES LIKE SALES, END OF LIFE SALE, REPRICING

9    SALE.  WE HAVE A -- AND THEN THERE'S ONE DOWN HERE FOR COUPON,

10   AS WELL.

11       AND THEN WE HAVE A MEASURE OF THE -- THE SIZE OF THE

12   ITUNES STORE ITSELF.  HOW MANY -- HOW MANY SOUND RECORDINGS

13   ARE AVAILABLE FOR SALE ON THE ITUNES STORE, TO MEASURE ITS

14   GROWTH IN IMPORTANCE THROUGH TIME.  AND WE HAVE THE INDICATOR

15   VARIABLES FOR THE MARKET CONDITIONS.

16       NOW, IT'S IMPORTANT HERE TO BEAR ONE POINT IN MIND.  IF

17   YOU HAVE A SERIES OF -- IF YOU HAVE A GROUP OF INDICATOR

18   VARIABLES WHERE ONE OF THEM IS ALWAYS 1 AND THE OTHERS ARE

19   ALWAYS ZERO, BUT WHICH ONE IS 1 DIFFERS FROM TIME TO TIME, SO

20   THERE'S ALWAYS EXACTLY ONE TURNED ON.  BUT EVERY SINGLE

21   OBSERVATION HAS EXACTLY ONE TURNED ON AND THE REST ARE ZERO.

22   YOU CANNOT PUT ALL THE VALUES IN THE REGRESSION.  YOU HAVE TO

23   TAKE ONE OUT.  AND THAT'S IN ORDER TO MAKE -- MAKE IT POSSIBLE

24   TO CALCULATE THE REGRESSION COEFFICIENTS, WHICH IS FOR -- IT'S

25   AN ARITHMETIC REASON HAVING TO DO WITH HOW YOU DO THE

1    CALCULATION TO MINIMIZE THE SUM OF SQUARES OF THE ERRORS.  ALL

2    RIGHT.

3        AND SO THAT MEANS LIKE FOR THE MONTH VARIABLES, YOU CAN

4    ONLY HAVE 11 MONTHS.  FOR THE CLASSES, YOU CAN'T HAVE EVERY

5    CLASS IN.  SO WE ELIMINATED DECEMBER.  WE ELIMINATED TOUCH.

6    ALL RIGHT?

7        AND LIKEWISE FOR THESE RANGES OF QUANTITIES, WE HAD TO

8    ELIMINATE ONE.  AND TYPICALLY, IT WAS A LOW-END ONE.  ALL

9    RIGHT?

10       SO WHAT WE HAVE HERE IS THE -- THE INTERCEPT IS A STRANGE

11   THING.  IT'S -- IT IS THE HYPOTHETICAL PRICE OF AN IPOD TOUCH

12   SOLD IN DECEMBER WITH -- AT A PARTICULAR QUANTITY THAT WAS

13   ELIMINATED.  WHAT ELSE?  AND WITH A MEMORY CAPACITY THAT'S

14   BEEN ELIMINATED.  OKAY?

15       SO THAT -- THAT IS A NECESSARY FEATURE OF THE REGRESSION,

16   BUT IT DOESN'T ELIMINATE TAKING INTO ACCOUNT THE

17   CHARACTERISTICS OF THAT CLASS OR THAT MONTH OR WHATEVER.  IT'S

18   JUST THAT ALL THOSE EFFECTS ARE JUST INCORPORATED INTO THE

19   INTERCEPT.

20            **MS. SWEENEY:**  CAN WE TURN TO EXHIBIT 754, PLEASE.

21                 (EXHIBIT PUBLISHED TO JURY.)

22   **BY MS. SWEENEY:**

23   **Q.**  AND PROFESSOR NOLL, IS THIS A -- IS THIS A DOCUMENT THAT

24   YOU CREATED?

25   **A.**  YES.  THIS IS WHAT I CALL THE PREFERRED REGRESSION RESULT.

1    WE –– WE ESTIMATED SEVERAL VERSIONS OF THE MODEL.  THE –– ONE

2    BIG DIFFERENCE IS, IS THE INDEPENDENT –– IS THE DEPENDENT

3    VARIABLE PRICE OR THE LOGARITHM A PRICE.  AND THE PREFERRED

4    EQUATION IS THE LOGARITHM A PRICE INSTEAD OF THE ACTUAL VALUE

5    A PRICE.  AND THAT'S BECAUSE THE ECONOMICS OF THE NATURE OF

6    THIS PARTICULAR PRODUCT AND THIS PARTICULAR HEDONIC PRICING

7    MODEL ARE SUCH THAT THE –– THAT THE LOGARITHMIC FORM MAKES

8    MORE SENSE ECONOMICALLY.

9        IN FACT, IF YOU USE LINEAR MODEL, YOU ACTUALLY GET A

10   HIGHER NUMBER FOR THE DAMAGES.  BUT I DON'T THINK IT'S

11   RELIABLE SO I USED THE LOGARITHMIC VERSION.

12       ANOTHER ISSUE HAS TO DO WITH THE NATURE OF THE DATA THAT

13   APPLE PRODUCED, BECAUSE I SAID I THINK ON FRIDAY, WE STARTED

14   OFF WITH ALMOST 50 MILLION OBSERVATIONS, AND WE ENDED UP USING

15   38 MILLION OR SOMETHING LIKE THAT.

16       A LOT OF THE DATA WAS ELIMINATED AND THE –– THERE'S TWO

17   CATEGORIES THAT ARE ESPECIALLY IMPORTANT THAT –– YOU KNOW, THE

18   ONES WHERE YOU ELIMINATE THEM BECAUSE THERE'S MISSING

19   OBSERVATIONS OR THE QUANTITY SOLD IS MINUS 2,000 OR SOMETHING

20   LIKE THAT.  THOSE ARE OBVIOUS AND YOU DON'T HAVE TO WORRY

21   ABOUT THAT.

22       BUT THE TWO THAT MATTER ARE, FIRST OF ALL, OUTLIERS, AND

23   THESE ARE OBSERVATIONS OF PRICE THAT DON'T MAKE SENSE.  ALL

24   RIGHT.  AND THE SECOND HAS TO DO WITH RETURNS AND

25   REPLACEMENTS.  FOR SOME OF THE DATA, WE WERE ABLE TO LINK A

1   RETURN TRANSACTION OR, YOU KNOW, WHEN SOMEBODY BUYS AN IPOD,

2   RETURNS IT, AND THEN BUYS ANOTHER TO SUBSTITUTE.  IN SOME

3   CASES, WE WERE ABLE TO LINK THE TWO SALES, AND WE ONLY COUNTED

4   IT ONCE IF WE COULD LINK IT.  BUT IN A SIGNIFICANT NUMBER, WE

5   COULDN'T LINK IT.

6        WE HAVE THE INDICATOR VARIABLE TURNED ON THAT THIS WAS

7   SORT OF A -- THIS WAS A REPURCHASE AFTER -- AFTER A RETURN,

8   BUT THE CODING THAT -- THE ACCOUNT NUMBERS DON'T -- DON'T

9   WORK.  THEY DON'T MATCH BACK TO WHAT THE ORIGINAL SALE WAS.

10  IT WAS APPLE'S BELIEF AS EXPRESSED TO US THAT THAT LINK WOULD

11  ALWAYS WORK, BUT IT DOESN'T.

12       AND SO THERE'S ROUGHLY, YOU KNOW, 6 MILLION TRANSACTIONS

13  WHERE WE COULDN'T MAKE THIS LINK.  AND THEN THERE'S THESE

14  OUTLIERS.

15       SO THIS PREFERRED REGRESSION, AS YOU SEE, HAS OUTLIERS

16  EXCLUDED.  AND THEN WE DID A -- WE DID REGRESSIONS WITH AND

17  WITHOUT THE UNLINKED RETURN TRANSACTIONS.  AND WE PUT THOSE IN

18  A THIRD CATEGORY BEYOND RESELLERS AND CONSUMERS.  WE HAVE

19  ANOTHER CATEGORY CALLED "OTHER."  AND YOU'LL SEE THAT LATER.

20       SO THIS IS THE PREFERRED REGRESSION BECAUSE IT EXCLUDE

21  ALL -- ALL OBSERVATIONS ON PRICE THAT ARE EITHER SOLO OR SO

22  LARGE THAT THEY'RE IMPLAUSIBLE.  AND IT TURNS OUT IF YOU

23  INCLUDE THE OUTLIERS, IT DOESN'T CHANGE THE RESULTS VERY MUCH,

24  BUT IT MUST BE WRONG.  YOU KNOW, NOBODY -- NOBODY PAID $2,000

25  FOR AN IPOD NANO.  AND SO WE HAVE -- WE HAVE RUN THE

1    REGRESSION WITH THOSE BEING INCLUDED AND EXCLUDED.  IT DOESN'T

2    MATTER VERY MUCH, BUT I THINK THE PREFERRED REGRESSION IS THE

3    ONE WHERE THEY'RE EXCLUDED.

4         AND SO THIS IS THE REGRESSION RESULTS FOR THE RESELLERS.

5         AND YOU CAN LOOK DOWN HERE AND SAY, WELL, YOU KNOW, WHAT

6    HAPPENED.  WELL, HARMONY REDUCED LOCK-IN AND CAUSED A SMALL

7    REDUCTION IN PRICE.

8         REMEMBER THESE ARE LOGARITHMIC NUMBERS.  THEY DON'T MEAN A

9    WHOLE LOT.  YOU'D HAVE TO RAISE EVERYTHING TO THE POWER OF E

10   TO FIGURE OUT HOW MUCH THAT WAS ACTUALLY WORTH.

11        BUT THE -- YOU WOULD EXPECT HARMONY TO REDUCE LOCK-IN,

12   AND, SURE ENOUGH, IT REDUCED -- CAUSED A PRICE REDUCTION.

13   HARMONY 2, YOU WOULD EXPECT IT TO REDUCE LOCK-IN, AND SURE

14   ENOUGH, IT LED TO A PRICE REDUCTION.  THE BLOCKING OF HARMONY

15   CAUSED A PRICE INCREASE BOTH IN THE 4.7 CASE AND IN THE 7.0

16   CASE.  THOSE -- WHAT THOSE POSITIVE COEFFICIENTS MEAN.

17        AND -- AND THEN WE HAVE A LONG LIST, AS YOU CAN SEE ALL

18   THESE CAPACITY VARIABLES DOWN HERE STARTING FROM 512 MEGABITS

19   DOWN TO, WHAT'S THE HIGHEST ONE?  123,000.  ALL RIGHT.

20   GIGABITS.

21   Q.  PROFESSOR NOLL, LET ME INTERRUPT YOU FOR A SECOND.

22        SO LOOKING AT THE LIST ON THE LEFT-HAND SIDE JUST ABOVE

23   THERE, WHAT DOES THAT INDICATE WHERE IT SAYS ITUNES 7.0?

24   A.  THAT IS THE INDICATOR VARIABLE I INDICATED -- I SAID

25   BEFORE FOR THOSE MODELS OF IPOD FOR WHICH 7.0 WAS TURNED ON,

1  WAS LOADED AND THAT HAD 7.0 ON THEM AND THAT WAS USED.  THAT

2  IS THE COEFFICIENT ON THE INDICATOR VARIABLE FOR THE NANO, THE

3  TOUCH, AND THE CLASSIC THAT HAD 7.0 RUNNING ON THEM.

4  **Q.**  AND WHAT DOES IT MEAN WHEN YOU SAYS THAT'S THE COEFFICIENT

5  ON THAT?

6  **A.**  IT'S THE BETA 1.  IT'S THE -- THE COEFFICIENT ON THE

7  INDICATOR VARIABLE IN THE REGRESSION WHERE THE DEPENDENT

8  VARIABLE IS THE LOGARITHM OF PRICE.

9  **Q.**  AND WHAT DOES THAT TELL YOU ABOUT APPLE'S PRICES THAT WERE

10  IN EFFECT AT THAT TIME?

11  **A.**  A POSITIVE COEFFICIENT MEANS THAT IT'S ASSOCIATED WITH

12  HIGHER PRICES.

13  **Q.**  OKAY.  ALL RIGHT.  LET'S TURN TO THE NEXT EXHIBIT WHICH IS

14  TRIAL EXHIBIT 735.

15                    (EXHIBIT PUBLISHED TO JURY.)

16          **THE WITNESS:**  YES.

17  **BY MS. SWEENEY:**

18  **Q.**  AND THIS A CHART THAT YOU PREPARED?

19  **A.**  YES.

20  **Q.**  AND WHAT IS THIS?

21  **A.**  THIS IS THE DIRECT SALES, WHAT APPLE CALLS THE DIRECT

22  SALES.

23     DIRECT SALES IS MAINLY SALES DIRECTLY TO CONSUMERS.  BUT

24  IT ALSO INVOLVES A FEW OTHER THINGS LIKE SALES TO GOVERNMENT

25  AGENCIES ARE IN DIRECT SALES, AND SALES TO UNIVERSITY BOOK

1    STORES.

2        WE PULLED OUT GOVERNMENT BECAUSE GOVERNMENT IS NOT A PARTY

3    TO THE CASE, IS NOT REPRESENTED IN THE PLAINTIFFS' CLASS.  SO

4    THERE -- THOSE TRANSACTIONS WERE ELIMINATED.

5        BUT THERE -- IT'S ALMOST TRUE THAT IT'S CONSUMERS, BUT NOT

6    QUITE.  THERE ARE OTHER TRANSACTIONS BESIDES CONSUMERS, DIRECT

7    SALES TO CONSUMERS.

8        THIS WOULD INCLUDE ALL THE SALES OVER -- OVER THE EITHER

9    THE WEBSITE OR THE APPLE STORES, THE SALES OF IPODS THROUGH

10   THOSE.

11   **Q.**  AND IS THIS THE RESULT OF THE REGRESSION FOR THE DIRECT

12   SALES?

13   **A.**  YES.  THIS IS THE RESULT.

14   **Q.**  OKAY.

15   **A.**  AND IT HAS, AS YOU CAN SEE, MOSTLY THE SAME VARIABLES, A

16   FEW THAT ARE DIFFERENT.

17   **Q.**  AND WHAT ABOUT THE COEFFICIENT FOR DIRECT SALES?  WHAT

18   DOES THAT TELL YOU?

19   **A.**  THE -- WELL, THE COEFFICIENT FOR ITUNES 7.0 AGAIN IS

20   POSITIVE.  IT'S A BIGGER NUMBER.  IT MEANS IT'S MORE OF AN

21   EFFECT ON CONSUMERS THAN ON RESELLERS.  AND IT SAYS THE PRICE

22   WAS ELEVATED FOR THOSE MODELS THAT CONTAINED 7.0.

23   **Q.**  ALL RIGHT.  LET'S TURN TO THE NEXT --

24   **A.**  THERE'S ONE FEATURE --

25   **Q.**  I'M SORRY.  GO AHEAD.

1    **A.**   ONE ADDITIONAL THING.  YOU NOTICE UP HERE, ADJUSTED R

2    SQUARED, WHAT THAT SAYS IS THAT 98 PERCENT OF THE VARIATION IN

3    PRICE IS EXPLAINED BY THIS MODEL, THAT IS TO SAY, THERE'S A

4    LITTLE LESS THAN 2 PERCENT LEFT OVER OF THAT -- THAT'S THAT

5    ERROR TERM.  SO THIS EXPLAINS 98 PERCENT OF THE DIFFERENCES IN

6    THE SQUARES, OF THE DIFFERENCES IN THE PRICES OF ALL THE

7    TRANSACTIONS.

8    **Q.**   AND WHAT IS R SQUARED?  IS THAT A TEST THAT ECONOMISTS OR

9    STATISTICIANS OR ECONOMETRICIANS USE FREQUENTLY?

10   **A.**   YES.  IT'S ADJUSTED R SQUARED IS THE STANDARD MEASURE FOR

11   MEASURING THE QUALITY OF AN EQUATION THAT ECONOMISTS AND

12   STATISTICIANS USE.

13   **Q.**   AND IN YOUR EXPERIENCE, ARE THE R SQUARED RESULTS THAT YOU

14   SEE HERE ON THESE EXHIBITS HIGH?

15   **A.**   WELL, THEY'RE -- YES, I MEAN, IT'S RARE THAT YOU GET THEM

16   THAT HIGH.  USUALLY -- YOU KNOW, USUALLY YOU FEEL PRETTY GOOD

17   ABOUT ANY REGRESSION THAT IS SUBSTANTIALLY MORE THAN .5.  BUT

18   THIS -- THESE ARE VERY HIGH COMPARED TO WHAT WE NORMALLY ARE

19   ABLE TO GET.

20   **Q.**   OKAY.  LET'S TURN TO THE NEXT DEMONSTRATIVE, WHICH IS 74.

21            (DEMONSTRATIVE PUBLISHED TO JURY.)

22   **BY MS. SWEENEY:**

23   **Q.**   AND IS THIS A CHART THAT YOU PREPARED?

24   **A.**   THIS IS A SUBSET.  THESE ARE SOME OF THE COEFFICIENTS IN

25   THE MODELS SINCE THOSE TABLES ARE -- ARE REALLY LONG.  THESE

1    ARE THE -- ARE THE KEY MARKET CHARACTERISTIC OR MARKET

2    CONDITION VARIABLES FOR THE RESELLERS AND THE CONSUMERS.

3        AND SO THEY'RE -- THIS IS -- REPRODUCES THE VALUES IN THE

4    TABLE THAT RELATE TO THESE MARKET CONDITIONS THAT WOULD HAVE

5    AFFECTED THE DEGREE OF LOCK-IN.

6    **Q.**  AND AGAIN, WHICH PLACE ON THE CHART WOULD YOU SEE THE

7    EFFECTS OF 7.0?

8    **A.**  IT'S -- AGAIN, IT SAYS ITUNES 7.0 IN BOTH LINES.  AND ONE

9    OF THEM IS THE PLUS 2.3 AND THE OTHER IS THE PLUS 7.2.  THOSE

10   ARE THE POSITIVE PRICE EFFECTS OF 7.0.

11   **Q.**  AND WHAT DOES THE COLUMN "STANDARD ERROR" REFER TO?

12   **A.**  THE STANDARD ERROR IS IF YOU MULTIPLY THAT BY TWO,

13   ROUGHLY, 95 PERCENT OF THE TRUE VALUES WILL FALL BETWEEN

14   THE -- THE ESTIMATED COEFFICIENT AND PLUS OR MINUS TWO TIMES

15   THE STANDARD ERROR.

16       SO WHAT IT GIVES YOU IS A CONFIDENCE REGION FOR WHERE THE

17   TRUE VALUE OF THE COEFFICIENT IS.  SO IF IT'S THE VERY FIRST

18   ONE, .559, AND THE STANDARD ERROR WAS .006, WE KNOW THAT THE

19   TRUE COEFFICIENT IS SOMEWHERE BETWEEN LIKE 54 AND 58,

20   SOMETHING LIKE THAT.

21   **Q.**  ALL RIGHT.

22       NOW, CAN YOU TELL THE JURY A LITTLE BIT ABOUT HOW YOU

23   COLLECTED THE DATA THAT YOU USED IN YOUR REGRESSION ANALYSIS.

24   **A.**  WELL, SOME OF THE DATA COMES FROM APPLE ITSELF, EITHER THE

25   TRANSACTIONS DATA, THE TRANSACTIONS RECORDS WHICH ARE

1    OBVIOUSLY HIGHLY PROPRIETARY INFORMATION INSIDE OF APPLE.

2         (DEMONSTRATIVE PUBLISHED TO JURY.)

3         **THE WITNESS:**  SOME OF THE INFORMATION IS PUBLIC

4    INFORMATION, SUCH AS THE TECHNICAL CHARACTERISTICS OF IPODS.

5         AND THEN OF COURSE, SOME OF IT IS THINGS THAT WE

6    CONSTRUCTED OURSELVES SUCH AS THE MARKET CONDITION VARIABLES

7    TO -- AND THE -- THAT MEASURE WHEN, YOU KNOW, THESE ZEROS AND

8    1 VARIABLES THAT MEASURE WHAT'S GOING ON, YOU KNOW, IN

9    DECEMBER VERSUS JANUARY AND THINGS LIKE THAT.

10        BUT SO IT'S A COMBINATION BASICALLY OF INDICATOR VARIABLES

11   ABOUT WHAT'S GOING ON IN THE MARKET THAT MIGHT AFFECT THINGS

12   PLUS PROPRIETARY DATA FROM APPLE PLUS PUBLIC INFORMATION THAT

13   IS ABOUT WHAT'S GOING ON IN THE PORTABLE DIGITAL MEDIA PLAYER

14   MARKET.

15   **BY MS. SWEENEY:**

16   **Q.**  YOU'VE MENTIONED A COUPLE OF TIMES THE NUMBER OF

17   OBSERVATIONS THAT YOU HAD IN THE TRANSACTION DATABASE.  IN

18   YOUR EXPERIENCE, IS THAT A LARGE NUMBER OF TRANSACTIONS?

19   **A.**  WELL, IT'S A LARGE NUMBER HISTORICALLY.  BECAUSE OF

20   ADVANCES IN COMPUTERS, ECONOMISTS HAVE BEEN ABLE TO HANDLE

21   LARGER AND LARGER AND LARGER DATA SETS AS TIME HAS PROGRESSED.

22   IT WOULD HAVE BEEN ESSENTIALLY IMPOSSIBLE TO DO THE ANALYSIS

23   THAT I'VE DONE HERE TEN YEARS AGO BECAUSE THE -- THE COMPUTER

24   POWER THAT I WOULD HAVE ACCESS TO IS JUST TOO GREAT.

25        IN FACT, IN ANOTHER CASE THAT I WAS INVOLVED IN RECENTLY,

1    WE HAD TO USE A SUPERCOMPUTER AT THE UNIVERSITY OF TEXAS TO DO

2    THE REGRESSION BECAUSE IT HAD EVEN MORE OBSERVATIONS THAN

3    THIS.

4        IT TAKES A COMPUTER A LONG TIME TO ESTIMATE A REGRESSION

5    THAT INVOLVES THIS MANY VARIABLES WITH THIS MANY OBSERVATIONS.

6    BUT WE WERE ABLE TO DO IT WITH THIS BECAUSE OF THE STATE OF

7    PERSONAL COMPUTERS THAT EXISTED AT THE TIME WE STARTED DOING

8    THIS, WHICH IS LIKE TWO AND A HALF YEARS AGO.

9        SO THIS IS A VERY LARGE NUMBER OF TRANSACTIONS.  THERE ARE

10    SOME PUBLISHED STUDIES IN THE LITERATURE NOW THAT USE

11    COMPARABLY SIZED DATA SETS.  SOME RETAIL COMPANIES HAVE

12    ALLOWED ECONOMISTS ACCESS TO THEIR TRANSACTIONS RECORDS.

13    THERE'S QUITE A FEW PAPERS WRITTEN IN THE LAST COUPLE OF

14    YEARS, FOR EXAMPLE, ABOUT SAFEWAY BECAUSE SAFEWAY DECIDED TO

15    MAKE ITS ENTIRE TRANSACTIONS RECORDS AVAILABLE TO ECONOMISTS.

16    AND SO THERE'S ALL KINDS OF STUDIES OUT THERE ABOUT HOW DO

17    PEOPLE PRICE NEW BRANDS OF CEREAL.

18        YOU KNOW, AND SO IT'S POSSIBLE TO DO THIS WORK NOW, AND IT

19    WASN'T POSSIBLE TO DO IT VERY LONG AGO.  SO THIS IS -- THIS IS

20    A BIG DEAL TO BE ABLE TO USE TRANSACTIONS RECORDS.  SO THAT'S

21    WHAT THIS WAS.

22    **Q.**  AND DID YOU USE ACTUAL TRANSACTION NUMBERS, OR DID YOU USE

23    AN AVERAGE?

24    **A.**  NO.  THESE -- THESE -- THE IMPORTANT POINT HERE OF COURSE

25    IS THAT IT'S NOT ANY KIND OF AVERAGE.  THE WAY WE WOULD HAVE

1    HANDLED THIS DATA SET TEN YEARS AGO WOULD HAVE BEEN TO TAKE

2    THINGS LIKE WEEKLY AVERAGES OR MONTHLY AVERAGES BECAUSE THAT

3    WOULD HAVE BEEN THE ONLY THING THE COMPUTER HAD THE POWER TO

4    ANALYZE.  WE WOULDN'T -- WE'D HAVE HAD TO TAKE THE 39 MILLION

5    AND MAKE IT SOMETHING MORE LIKE A FEW HUNDRED THOUSAND OR A

6    MILLION IN ORDER TO BE ABLE TO ESTIMATE IT.

7        SO THIS -- THIS IS -- IMPORTANCE BECAUSE IT DOES MEAN THAT

8    EVERY SINGLE MEMBER OF THE CLASS IS RIGHT THERE.  YOU CAN PULL

9    THEM UP AND SEE WHAT MODELS THEY BOUGHT, WHEN THEY BOUGHT

10   THEM, AND WHAT THE IMPACT OF ALL THESE THINGS WAS ON THAT

11   PARTICULAR CONSUMER.

12   **Q.**  AND HOW DID YOU DECIDE TO USE THE DATE THAT YOU USED?

13            **THE COURT:**  WAIT.  HOLD ON.

14            **MS. SWEENEY:**  I'M SORRY.

15            **THE WITNESS:**  WELL, THE --

16            **THE COURT:**  WAIT.  I SAID TO HOLD ON.

17            **THE WITNESS:**  I'M SORRY.  I DIDN'T HEAR YOU.

18                 (OFF-THE-RECORD DISCUSSION.)

19            **THE COURT:**  OKAY.  MS. SWEENEY, REPEAT YOUR QUESTION.

20   WE DIDN'T GET IT.

21            **MS. SWEENEY:**  OKAY.

22   **Q.**  HOW DID YOU DETERMINE WHICH DATA YOU WERE GOING TO USE?

23   **A.**  WELL, THE REASON FOR USING THE DATA SET THAT WE DID ARE

24   THE NEXT TWO LINES, RIGHT?

25        FIRST OF ALL, IT IS THE ENTIRE POPULATION OF TRANSACTIONS

1  RATHER THAN JUST A SAMPLE.

2      ONE WAY ONE COULD HAVE DONE IT IS TAKE EVERY HUNDREDTH

3  TRANSACTION, JUST RANDOMLY PICK TRANSACTIONS, THEREBY GET THE

4  SIDES OF THE DATA SET DOWN TO THIS HUNDREDS OF THOUSANDS OR

5  MAYBE A COUPLE OF MILLION OR SOMETHING LIKE THAT WOULD HAVE

6  SOMETHING YOU COULD RUN ON A DESKTOP PC IN THE MIDDLE 2000,

7  SAY.

8      THIS IS BETTER THAN THAT BECAUSE ONE OF THE SOURCES OF

9  ERROR THAT YOU INTRODUCE INTO A REGRESSION WHEN YOU DO

10  SAMPLING IS CALLED SAMPLING BIAS WHEN YOU -- LIKE WHEN YOU

11  READ PUBLIC OPINION POLLS IN THE NEWSPAPER ABOUT WHO'S AHEAD

12  RUNNING FOR PRESIDENT, THEY ALL WILL TELL THIS IS TRUE WITHIN

13  PLUS OR MINUS 4 PERCENT.

14      THAT PLUS OR MINUS 4 PERCENT IS THE SAMPLING ERROR.  IT'S

15  HOW MUCH UNCERTAINTY IN THE RESULTS IS DUE TO THE FACT THAT

16  THE PARTICULAR PEOPLE I DREW MAY NOT BE REPRESENTATIVE OF THE

17  ENTIRE POPULATION.  AND SINCE A GALLUP POLL WILL HAVE A FEW

18  THOUSAND PEOPLE IN IT, AND AN ELECTION WILL HAVE A HUNDRED

19  MILLION VOTERS, THAT'S A REALLY SMALL SAMPLE COMPARED TO ALL

20  THE PEOPLE.  SO THE SAMPLING ERROR COULD BE SIGNIFICANT AND BE

21  IMPORTANT.

22      THIS DOESN'T HAVE SAMPLING ERROR BECAUSE IT'S THE ENTIRE

23  POPULATION.  SO THAT SOURCE OF MISTAKE IS GONE.  WE WILL NOT

24  HAVE A SAMPLING ERROR MISTAKE.

25      THE SECOND, OF COURSE, IS THAT THIS IS A CLASS ACTION IN

1    WHICH WE WANT TO DEMONSTRATE HARM AND DAMAGES TO ALL MEMBERS

2    OF THE CLASS.  AND AGAIN, AN AVERAGE IS NOT AS GOOD A

3    MECHANISM FOR SHOWING THAT AS USING THE ACTUAL INDIVIDUALIZED

4    TRANSACTION DATA BECAUSE WE CAN PULL UP A SPECIFIC

5    TRANSACTION, IDENTIFY IT WITH A SPECIFIC MEMBER OF THE CLASS,

6    AND SAY HERE'S THE EFFECT.

7         SO THIS IS WHAT IT MEANS TO SAY THE RELEVANCE OF THE DATA

8    TO THE QUESTION BEING ASKED.  A POPULATION OF ALL INDIVIDUAL

9    TRANSACTIONS IS THE MOST RELEVANT DATA SET FOR ADDRESSING THE

10   QUESTIONS OF ANTICOMPETITIVE HARM AND DAMAGES.

11   **Q.**  NOW, WHEN YOU GOT THIS DATA SET FROM APPLE, WAS IT READY

12   TO PUT INTO YOUR EQUATION, OR DID YOU HAVE TO DO ANYTHING WITH

13   IT?

14   **A.**  NO.  IT -- IT WAS -- IT WAS FAR FROM READY.  IN FACT, WE

15   SPENT TWO AND A HALF YEARS FINDING ERRORS AND CLEANING THE

16   DATA.  THE -- THE FIRST THING THAT HAD TO BE DONE IS TO TRY TO

17   UNDERSTAND WHAT THE DATA ACTUALLY WAS SUPPOSED TO BE.  AND SO

18   THAT REQUIRED HELP FROM APPLE BECAUSE OBVIOUSLY THE WAY APPLE

19   STORES ITS DATA IS THERE'S A SERIES OF FIELDS THAT HAVE NAMES

20   THAT DON'T NECESSARILY COMPORT TO ANYTHING YOU COULD TRANSLATE

21   IMMEDIATELY INTO A MEANINGFUL ECONOMIC CONCEPT.  SO WE HAD TO

22   FIGURE OUT WHAT ALL THESE FIELDS WERE.

23        AND THEN THE DATA ENTRIES THEMSELVES WERE FREQUENTLY

24   NONSENSICAL.  AND SO, YOU KNOW, AND SOMETIMES, YOU KNOW, IF

25   YOU EVER WORKED WITH A COMPANY, SOMETIMES THEY HAVE A SPECIAL

1    CHARACTER THAT THEY USE WHEN THEY FORGOT TO ENTER SOMETHING.

2    LIKE THEY'LL -- YOU KNOW, THEY'LL SAY, STAR STAR STAR MEANS

3    "WHOOPS, I DIDN'T WRITE IT DOWN."  AND -- OR SOMETIMES IT WILL

4    JUST BE BLANK.

5        SO THE FIRST THING WE HAD -- ANOTHER THING WE HAD TO DO

6    WAS FIGURE OUT ALL THE -- ALL THESE SPECIAL CODES THAT

7    INDICATE SOMETHING SPECIAL ABOUT WHAT THE ENTRY SHOULD BE

8    OR -- OR THE BLANK DATA.  AND THAT MEANT THAT A LARGE NUMBER

9    OF THE OBSERVATIONS HAD TO BE ELIMINATED BECAUSE THE VARIABLES

10   THAT WE HAVE IN THE EQUATION COULDN'T BE SATISFIED,

11   COULDN'T -- WE COULDN'T USE THOSE IN THE EQUATION.  WE DIDN'T

12   HAVE WHAT THE -- WHAT THE CLASS WAS, WE DIDN'T HAVE WHAT THE

13   CAPACITY WAS, WE DIDN'T HAVE THE DATE OF THE TRANSACTION.  SO

14   THERE ARE -- ANY ONE OF THOSE THINGS WOULD CAUSE US NOT TO BE

15   ABLE TO HAVE A USEFUL OBSERVATION.

16       SO THE -- THEN OF COURSE, ONCE WE'VE CLEANED THE DATA, WE

17   END UP WITH, INSTEAD OF 50 MILLION, 39 MILLION, 38 MILLION

18   OBSERVATIONS.

19       AND AT THAT POINT, WE STILL HAVE TO ADD MORE STUFF, WHICH

20   IS THE TECHNICAL FEATURES OF THE IPOD IN QUESTION.  AND SO

21   THAT MEANT MERGING APPLE'S TRANSACTIONS DATA WITH THE

22   CHARACTERISTICS THAT WE HAD FOR EACH OF THE MODELS THAT WERE

23   TRANSACTED, EACH OF THE MODELS IN THE TRANSACTIONS.

24       AND THEN THE LAST THING IS WE HAD TO FIGURE OUT WAYS TO

25   ESTIMATE THE EQUATION.  THERE WERE MULTIPLE POSSIBILITIES.  I

1    ALREADY TOLD YOU ABOUT LOGARITHMIC VERSUS LINEAR.

2         ANOTHER ISSUE BASICALLY PERTAINS TO HOW DO YOU DEAL WITH

3    20,000 OBSERVATIONS OF SOMEBODY BUYING ONE IPOD AND ONE

4    OBSERVATION OF SOMEBODY BUYING 20,000, LIKE BEST BUY?  AND

5    OBVIOUSLY FOR OUR PURPOSES, THE 20,000-LEVEL TRANSACTION IS

6    ECONOMICALLY AS IMPORTANT AS THE 20,000 INDIVIDUALS.  IN OTHER

7    WORDS, WHEN YOU TALK ABOUT THE TOTAL REVENUES TO IPODS AND THE

8    TOTAL EFFECT ON PRICES, IT WOULD BE A MISTAKE TO JUST HAVE ONE

9    OBSERVATION WITH 20,000 AND THEN 20,000 OBSERVATIONS WITH ONE

10   BECAUSE YOU'D END UP EXPLAINING THE TRANSACTION WITH ONE IN IT

11   EXTREMELY WELL, BUT YOU WOULDN'T EXPLAIN THE TRANSACTION WITH

12   20,000 IN IT VERY WELL AT ALL.

13        AND SO THERE'S MULTIPLE WAYS TO DO THAT.  THERE'S

14   FREQUENCY WEIGHTING.  WHAT'S THE FREQUENCY WITH WHICH THOSE

15   TRANSACTIONS TAKE PLACE?  AND THEN THERE'S SOMETHING CALLED

16   QUANTITY WEIGHTING, WHICH IS YOU GIVE MORE WEIGHT TO LARGER

17   TRANSACTIONS.

18        WE ENDED UP DOING QUANTITY WEIGHTING.  BUT YOU CAN DO IT

19   WITH NO WEIGHTING AT ALL.  YOU CAN DO IT WITH QUANTITY

20   WEIGHTING.  AND YOU CAN DO IT WITH FREQUENCY WEIGHTING.  AND

21   WE DID ALL THREE AND ENDED UP USING THE QUANTITY WEIGHTING

22   ONE.

23        SO IN ANY CASE, MULTIPLE SPECIFICATIONS MEANS YOU HAVE TO

24   TRY VARIOUS WAYS OF RUNNING THE REGRESSION TO SEE WHERE --

25   WHAT THE MOST PLAUSIBLE RESULTS ARE -- AND USE THOSE.  BECAUSE

 1    THERE ISN'T REALLY A THEORETICAL REASON TO PREFER SOME

 2    SPECIFICATIONS OVER OTHERS.

 3    **Q.**  AND THEN YOU TALKED A LITTLE BIT ALREADY, PROFESSOR NOLL,

 4    ABOUT THE STATISTICAL SIGNIFICANCE OF YOUR RESULTS, AND IN

 5    PARTICULAR, R SQUARED.  WHAT ARE T-STATISTICS?

 6    **A.**  A T-STATISTIC IS A MEASURE OF THE RELIABILITY OF THE

 7    COEFFICIENT, AND WE ACTUALLY DID DISCUSS THAT WITHOUT USING

 8    THE WORD WHEN I SHOWED YOU THE STANDARD ERRORS AS WELL AS THE

 9    COEFFICIENT VALUES, THAT THE T-STATISTIC IS ESSENTIALLY THE

10    COEFFICIENT DIVIDED BY THE STANDARD ERROR, AND IF THAT NUMBER

11    IS GREATER THAN 2, IT'S HIGHLY SIGNIFICANT.

12    **Q.**  AND WHAT WERE THE -- WHAT CONCLUSION DID YOU DRAW FROM THE

13    R-SQUARED -- LET'S START WITH R-SQUARED.  WHAT CONCLUSION DID

14    YOU DRAW FROM THE R-SQUARED RESULTS?

15    **A.**  WELL, THE R-SQUAREDS ARE EXTREMELY HIGH, AS I SAID BEFORE.

16    THEY ARE IN THE RANGE OF 98 PERCENT.  AND THEY DIFFER SOMEWHAT

17    DEPENDING ON SPECIFICATION.  BUT THE -- BUT THE MODEL, THE

18    HEDONIC REGRESSION MODEL, DOES AN EXTREMELY GOOD JOB OF

19    ACTUALLY EXPLAINING THE ACTUAL TRANSACTION PRICES OF IPODS.

20    **Q.**  AND HOW ABOUT THE T-STATISTIC?

21    **A.**  THE T-STATISTICS FOR THE COEFFICIENTS ARE REALLY ONLY

22    IMPORTANT FOR THE ONES THAT MATTER IN THE CASE, THAT IS TO

23    SAY, THE OBJECT IS NOT TO FIGURE OUT WHAT THE -- HOW MUCH

24    VALUE TO AN IPOD IS ADDED BY HAVING VIDEO CAPABILITY.  THAT'S

25    REALLY NOT THE PURPOSE.  OR HOW MUCH VALUE IS ADDED BY MAKING

1    IT'S A LITTLE SMALLER.

2        INSTEAD, THE OBJECT IS TO FIGURE OUT WHAT WAS THE PRICE

3    ELEVATION EFFECT OF ITUNES 7.0 AND ITUNES 4.7 AND THE LAUNCH

4    OF THE ITUNES MUSIC STORE.  THOSE ARE THE THINGS THAT MATTER.

5    AND SO THAT WHEN THE T-STATISTIC INDICATES THAT THOSE ARE

6    HIGHLY SIGNIFICANT AND VERY PRECISELY ESTIMATED, THAT MEANS

7    THE EQUATION IS GOOD FOR THE PURPOSE WE'RE USING IT FOR.

8    **Q.**  AND DID YOU CONDUCT ANY TESTS TO SEE WHETHER THERE WERE

9    STATISTICAL PROBLEMS IN YOUR -- IN YOUR REGRESSION ANALYSIS?

10   **A.**  YES, WE DID, AND THERE WERE STATISTICAL PROBLEMS.  AND

11   THAT'S WHAT THESE WORDS -- THESE CRAZY WORDS MEAN.

12   "MULTICOLLINEARITY" MEANS WHEN SEVERAL INDEPENDENT VARIABLES

13   ARE HIGHLY CORRELATED.

14       JUST AS AN EXAMPLE, YOU WOULD EXPECT THAT IF YOU KNEW THE

15   SIZE OF AN IPOD IN CUBIC INCHES, YOU WOULD HAVE AN EXTREMELY

16   GOOD IDEA OF HOW MUCH IT WOULD WEIGH.  ALL RIGHT?  SO IF YOU

17   TRIED TO PUT BOTH THE WEIGHT OF AN IPOD AND THE CUBIC INCHES

18   OF AN IPOD IN THE SAME REGRESSION, YOU WOULD HAVE

19   MULTICOLLINEARITY, TWO VARIABLES THAT ARE ESSENTIALLY

20   MEASURING THE SAME THING THAT ARE HIGHLY CORRELATED.

21       WHEN TWO VARIABLES IN AN EQUATION ARE HIGHLY CORRELATED,

22   THEY DESTROY THE RELIABILITY OF THE ENTIRE ESTIMATE.  WHAT

23   THEY DO IS THEY -- THEY CAUSE THE -- THE ERROR TERM TO BECOME

24   THE PREDOMINANT FORCE DETERMINING COEFFICIENTS, AND INSTEAD OF

25   THE ACTUAL EFFECTS OF THOSE VARIABLES, THE -- IN -- IN THE --

1    SORT OF THE MATHEMATICAL TERM FOR IT IS THEY CAUSE THE MATRIX

2    OF OBSERVATIONS TO BECOME SINGULAR, WHICH MEANS WHEN YOU TRY

3    TO INVERT IT TO DO THE STATISTICAL PROCEDURE NECESSARY TO

4    ESTIMATE THE COEFFICIENTS, IT DOESN'T HAVE AN INVERSE.

5        A MATRIX OF OBSERVATIONS IN WHICH TWO OF THE OBSERVATIONS

6    ARE HIGHLY CORRELATED DOESN'T HAVE AN INVERSE.  AND THEREFORE

7    WHEN YOU TRY TO CALCULATE THE REGRESSION COEFFICIENTS, YOU

8    EITHER GET AN ERROR MESSAGE SAYING WE CAN'T DO THIS, YOU TRY

9    TO DIVIDE SOMETHING BY ZERO OR SOMETHING OR MULTIPLY SOMETHING

10   BY INFINITY, OR YOU GET COEFFICIENTS WITH LOW RELIABILITY,

11   EXTREMELY HIGH STANDARD ERRORS, OR BIASES IN THE COEFFICIENT

12   ESTIMATE.

13       AND SO YOU HAVE TO STOP ADDING VARIABLES BEFORE YOU GET

14   TOO MUCH MULTICOLLINEARITY.  YOU CANNOT PUT EVERYTHING IN THE

15   EQUATION BECAUSE YOU WILL FIND THAT MULTICOLLINEARITY WILL

16   DESTROY YOU.

17       THE SECOND THING IS CALLED HETEROSCEDASTICITY WHICH IS

18   SIMPLY A VERY FANCY WORD FOR A VERY SIMPLE IDEA, WHICH IS THE

19   VARIABILITY IN PRICES, SAY, FROM ONE MODEL OF IPOD TO ANOTHER

20   MAY DIFFER.  THAT -- THAT LITTLE EPSILON ERROR TERM MAY

21   HAVE -- TAKE, ON AVERAGE, MUST BIGGER VALUES FOR, SAY, A TOUCH

22   THAN IT DOES FOR A CLASSIC.  OR IT MAY TAKE BIGGER VALUES AT

23   CHRISTMASTIME THAN IT TAKES IN THE WINTER.  ALL RIGHT.

24       AND WHAT HAD -- SO HETEROSCEDASTICITY IS SOMETHING YOU CAN

25   ACTUALLY MEASURE, THESE ARE A VARIATION HERE, AND CORRECT FOR.

1    AND ACTUALLY WE HAVE HETEROSCEDASTIC-CORRECTED ESTIMATES.

2    THERE ARE HETEROSCEDASTICITY PROBLEMS IN THE DATA.  THE

3    DIFFERENCE IS IT'S NOT TRUE THAT THE ERROR TERM HAS THE SAME

4    DEGREE OF VARIATION FOR EVERY SINGLE OBSERVATION.

5    **Q.**  BASED ON THE WORK THAT YOU DID, DO YOU HAVE A CONCLUSION

6    AS TO WHETHER YOUR REGRESSION IS RELIABLE?

7    **A.**  YES, I DO.  I MEAN, WE'VE PUT FORTH ENORMOUS EFFORT OVER

8    SEVERAL YEARS TO PRODUCE THIS PREFERRED EQUATION, AND I THINK

9    IT IS THE MOST RELIABLE EQUATION THAT CAN BE PRODUCED.

10               (DEMONSTRATIVE PUBLISHED TO JURY.)

11   **BY MS. SWEENEY:**

12   **Q.**  OKAY.  ALL RIGHT.  LET'S TURN TO -- WELL, LET'S LOOK AT

13   THIS DEMONSTRATIVE THAT LARRY PUT ON THE SCREEN.

14       AND WHAT IS THIS, PROFESSOR NOLL?

15   **A.**  THIS IS NOT A SHOTGUN BLAST.  THIS IS THE COMPARISON OF

16   THE PREDICTED AND ACTUAL VALUES FOR THE PRICES OF ALL IPODS

17   BETWEEN 2001 AND 2010.

18       ALL RIGHT.  IN OTHER WORDS, THESE ARE THE -- AN

19   OBSERVATION THERE IS ON THE X AXIS, THE ACTUAL PRICE, AND ON

20   THE Y AXIS, THE PREDICTED PRICE.  AND OF COURSE, WHAT IT SHOWS

21   IS THERE'S LOTS AND LOTS OF VARIATION IN PRICE, AND IT LIES

22   ALONG A STRAIGHT LINE WHICH IS THE REGRESSION EQUATION.  AND

23   THE REGRESSION EQUATION ISN'T PERFECT.  THERE'S ERRORS

24   ASSOCIATED WITH THE OBSERVATIONS.  BUT THE REASON WE GET HIGH

25   R-SQUAREDS IS BECAUSE IT SORT OF LOOKS LIKE A STRAIGHT LINE.

1    THIS ONE IS FOR THE -- WHICH ONE IS IT?

2    (REVIEWING DOCUMENT.)

3  **Q.**  IT SAYS DIRECT SALES.

4  **A.**  YEAH, THIS IS THE SALES TO CONSUMERS, YEAH.

5  **Q.**  ALL RIGHT.  LET'S TURN TO THE NEXT ONE.

6    (DEMONSTRATIVE PUBLISHED TO JURY.)

7  **BY MS. SWEENEY:**

8  **Q.**  AND WHAT'S THIS?

9  **A.**  THIS IS THE SAME THING FOR THE RESELLER.  THIS IS

10  DISTRIBUTORS AND RETAILERS, THE BEST BUYS OF THE WORLD.

11  **Q.**  AND WHAT DOES THIS CHART SHOW?

12  **A.**  SAME THING.  IT SHOWS THE ACTUAL SALES PRICES AND THE

13  PREDICTED SALES PRICES FOR ALL -- EVERY SINGLE TRANSACTION

14  RECORD.

15  **Q.**  AND IN -- IN THIS CHART AND IN THE LAST ONE, WHAT DOES THE

16  SHAPE OF THAT LINE TELL YOU?

17  **A.**  WELL, IT LOOKS LIKE A STRAIGHT LINE, WHICH IS THE

18  REGRESSION LINE.

19    ALSO, I SHOULD ADD, YOU SEE THE LITTLE BUBBLES ALONG IT.

20  THOSE ARE INDICATORS OF LOTS OF OBSERVATIONS ON EXACTLY THE

21  SAME POINT.  THE BIGGER THE BUBBLE, THE MORE THINGS APPEARED

22  THERE.

23    SO, YEAH, BASICALLY WHAT THIS SHOWS IS IF YOU WERE TO DRAW

24  A STRAIGHT LINE THROUGH THAT, THAT WOULD BE THE REGRESSION

25  EQUATION BASICALLY.

1    **Q.**  ALL RIGHT.  LET'S TURN TO THE NEXT SLIDE, PLEASE.

2                    (DEMONSTRATIVE PUBLISHED TO JURY.)

3    **BY MS. SWEENEY:**

4    **Q.**  OKAY.  IS THIS A CHART THAT YOU PREPARED, PROFESSOR NOLL?

5    **A.**  YES.

6         THIS IS THE BOTTOM LINE, HOW MUCH WERE IPOD PRICES

7    ELEVATED DUE TO THE LAUNCH OF ITUNES 7.0.  AND THE FIRST ITEM

8    IS WHAT WAS THE WEIGHTED AVERAGE PRICE, WEIGHTED BY SALES

9    VOLUME, WEIGHTED AVERAGE PRICE OF ALL THE IPODS.  WHAT WAS THE

10   ESTIMATED PRICE ELEVATION EFFECT OF 7.0?  WHAT DOES THAT

11   TRANSLATE TO INTO THE MAGNITUDE OF THE OVERCHARGE.  AND THEN

12   IF WE MULTIPLY THAT BY THE UNITS SOLD, WHAT ARE THE -- THE

13   TOTAL DAMAGES?

14        AND THIS IS FIRST RESELLERS, THEN THE CONSUMERS, AND THEN

15   THESE ADDITIONAL ONES THAT I WAS TALKING ABOUT EARLIER THAT

16   THERE'S INDICATORS THAT THEY WERE REPURCHASES FROM SOMETHING

17   THAT HAD BEEN TRADED IN, HAD TO DO WITH RETURNS, BUT THERE WAS

18   NO ABILITY TO LINK THEM TO AN ACTUAL RETURN.  SO WE DON'T KNOW

19   WHETHER THE ERROR IS IN THE LINKING AND THERE REALLY WAS A

20   RETURN, OR WHETHER THE ERROR IS THAT THE -- THEY WEREN'T

21   REALLY A -- REPURCHASED AFTER A RETURN, THAT WAS JUST A

22   MISTAKE IN THE DATA.

23   **Q.**  NOW, YOU TALKED EARLIER ABOUT THE COEFFICIENTS, AND I

24   THINK WE LOOKED AT SOME OF THE COEFFICIENTS IN THE REGRESSION.

25   WHAT IS THE RELATIONSHIP BETWEEN THE PRICE OVERCHARGE

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    PERCENTAGE ON THIS CHART AND THE COEFFICIENTS?

2    **A.**  THEY'RE VERY SIMILAR BUT THEY'RE DIFFERENT BECAUSE OF

3    SOMETHING CALLED A SMEARING EFFECT.  WHEN YOU -- THE

4    COEFFICIENT IN A LOGARITHMIC REGRESSION IS SOMETHING

5    ECONOMISTS CALL THE ELASTICITY.  BUT -- SO IT'S VERY CLOSE TO

6    BEING THE PERCENTAGE INCREASE IN PRICE ARISING FROM THAT

7    INDICATOR VARIABLE.  BUT IT'S NOT QUITE.  AND THE REASON HAS

8    TO DO WITH COMPLEX STATISTICAL PROPERTIES ABOUT THE NATURE OF

9    THE ERROR TERM AND THE NATURE OF HOW YOU INVERT THE MATRIX.

10        SO THERE'S SOMETHING CALLED A SMEARING FACTOR.  SO WHEN

11    YOU GET A COEFFICIENT -- FOR EXAMPLE, THE COEFFICIENT WAS --

12    WAS 2.3 IN THE RESELLER REGRESSION.  BUT WHEN YOU ACCOUNT FOR

13    THE -- THIS -- THIS ADDITIONAL PROBLEM, INSTEAD OF BECOMING

14    2.3, IT BECOMES 2.4.

15        SO THERE'S A SLIGHT CHANGE IN THIS, BUT IT'S BASICALLY

16    VERY CLOSE TO BEING WHAT THE COEFFICIENT IS IN THE REGRESSION

17    EQUATION.

18    **Q.**  AND THIS DOCUMENT WHICH IS EXHIBIT 893, DOES THIS

19    REPRESENT YOUR CONCLUSIONS ABOUT WHETHER MEMBERS OF THE CLASS

20    WERE DAMAGED BY THE CHALLENGED CONDUCT?

21    **A.**  YES.  THIS -- THIS IS DIRECT MEASURE OF THE ELEVATION IN

22    PRICES DUE TO 7.0, WHICH IS THE AMOUNT OF DAMAGES ARISING FROM

23    7.0 TO CONSUMERS.

24    **Q.**  NOW, LOOKING AT THE PRICE OVERCHARGE COLUMN, THERE'S A --

25    THERE'S A PRICE OVERCHARGE OF 2.38 PERCENT FOR RESELLERS AND

1    7.45 PERCENT FOR THE CONSUMERS.  WHAT ACCOUNTS FOR THAT

2    DIFFERENCE?

3    **A.**  THE –– REMEMBER THE –– THE RESELLERS ARE INTERMEDIARIES SO

4    THERE'S NO –– THERE'S NO NECESSARY RELATIONSHIP BETWEEN THE

5    PRICE IMPACT ON THE INTERMEDIARIES AND THE PRICE IMPACT ON THE

6    FINAL CONSUMERS THAT –– FOR STARTERS, THE RESELLERS THEMSELVES

7    ARE NOT LOCKED IN.  THEY –– THEY SELL MULTIPLE BRANDS.  AND

8    SECONDLY, THEY HAVE TO HAVE CERTAIN PROFIT MARGINS TO BE

9    INDUCED TO CARRY A PRODUCT TO BEGIN WITH.

10       SO THERE'S NO REASON TO BELIEVE THEY WOULD BE THE SAME.

11   THEY COULD BE GREATER OR LESS.  THIS IS WHAT IS CALLED IN

12   ECONOMICS THE PASS-ON PROBLEM.  WHAT ULTIMATELY CONSUMERS WHO

13   BOUGHT FROM THE RETAILERS WHO BOUGHT FROM DISTRIBUTORS OR THE

14   RETAILERS WHO BOUGHT DIRECTLY FROM APPLE, THEY WOULD

15   ULTIMATELY PAY A PRICE INCREASE THAT IS COMPARABLE TO THE

16   PRICE INCREASE THAT APPLE ITSELF CHARGED.  BUT THERE COULD BE

17   DIFFERENCES AMONG THEM, WHERE THEY'RE LOCATED, GEOGRAPHIC

18   DIFFERENCES, SOCIOECONOMIC DIFFERENCES IN THE CUSTOMER BASE,

19   THAT WOULD CAUSE THE PRICE AT RETAIL TO BE A LITTLE DIFFERENT

20   BETWEEN, SAY, BEST BUY AND APPLE STORE.

21       AND THEN IN ADDITION, THERE'D BE THESE ADDITIONAL

22   PHENOMENA THAT THE PASS-THROUGH EFFECT WOULD NOT NECESSARILY

23   BE ONE WHEN YOU DEAL WITH THE RELATIONSHIP BETWEEN THE

24   MANUFACTURER AND THE INTERMEDIARY VERSUS THE INTERMEDIARY AND

25   THE CONSUMER.

1  **Q.**  SO WHAT IS YOUR OPINION THEN WITH RESPECT TO THE AMOUNT OF

2  DAMAGES SUFFERED BY THE CLASS?

3  **A.**  WELL, I GAVE TWO TOTAL AMOUNT NUMBERS HERE.  THE

4  DIFFERENCE BETWEEN THEM BEING SOLELY WHAT WE DO WITH THESE

5  THINGS THAT ARE INDICATED AS REPURCHASES AFTER RETURN BUT

6  WHICH MAY NOT BE.

7    SO THE FIRST NUMBER, THE 343 MILLION, IS THE ONE WITHOUT

8  THOSE TRANSACTIONS INCLUDED.  AND THE SECOND ONE IS THE ONE

9  WITH THOSE TRANSACTIONS INCLUDED.

10  **Q.**  AND DOES THIS REPRESENT ALL OF THE DAMAGES SUFFERED BY

11  CLASS MEMBERS?

12  **A.**  NO.

13  **Q.**  WHAT OTHER DAMAGES DID CLASS MEMBERS SUFFER?

14  **A.**  THERE'S A -- THE ADDITIONAL DAMAGE -- WELL, FIRST OF ALL,

15  THE --

16      **MR. ISAACSON:**  OBJECTION, YOUR HONOR.

17      **THE COURT:**  WHAT'S THE OBJECTION?

18      **MR. ISAACSON:**  THERE'S ONLY ONE CLAIM FOR DAMAGES IN

19  THIS CASE, AND IT'S BASED ON THE OVERCHARGES.

20      **THE COURT:**  I'LL SUSTAIN AS TO FORM OF QUESTION.

21  **BY MS. SWEENEY:**

22  **Q.**  OKAY.  PROFESSOR NOLL, YOU SAID BEFORE THAT THE DAMAGES

23  CALCULATION YOU DID WAS CONSERVATIVE.  WHAT DID YOU MEAN BY

24  THAT?

25  **A.**  BY "CONSERVATIVE," I MEAN THAT I MADE A SERIES OF

1    ASSUMPTIONS THAT LEAVE OUT SOME OF THE HARM TO CONSUMERS AND

2    SOME OF THE ACTUAL DIRECT FINANCIAL DAMAGES THEY MAY HAVE

3    SUFFERED BECAUSE I CAN'T ESTIMATE THEM.  ALL RIGHT?

4        AND SO IT'S CONSERVATIVE BECAUSE BOTH THE DAMAGES WOULD BE

5    HIGHER AND THE ESTIMATED HARM TO CONSUMERS FROM PRICE

6    ELEVATION WOULD BE -- WOULD BE HIGHER THAN THE ONE -- NUMBERS

7    I'VE PRODUCED.

8    **Q.**  ALL RIGHT.  LET'S TURN TO THE NEXT EXHIBIT, WHICH IS TRIAL

9    EXHIBIT 757.

10        AND IS THIS A CHART THAT YOU PREPARED, PROFESSOR NOLL?

11                  (EXHIBIT PUBLISHED TO JURY.)

12            **THE WITNESS:**  YES, IT IS.

13   **BY MS. SWEENEY:**

14   **Q.**  AND WHAT IS IT?

15   **A.**  THIS IS THE BEGINNING OF THE DISAGGREGATION OF THE DAMAGES

16   TO -- THIS STARTS WITH ALL IPOD PRODUCTS, GOES DOWN TO CLASSIC

17   NANO AND TOUCH WHICH WERE THE ONES THAT WERE AFFECTED BY 7.0,

18   AND THEN GOES DOWN TO THE VARIOUS GENERATIONS OF -- OF

19   CLASSIC, NANO, AND TOUCH THAT WERE -- GENERATION BEING A

20   REFURBISHED AND IMPROVED MODEL OF THE SAME BASIC CLASS DURING

21   THE CLASS PERIOD TO -- TO RESELLERS.

22   **Q.**  AND IF YOU LOOK AT THE RIGHT-HAND COLUMN UNDER "DAMAGES"

23   AND YOU SEE THE 148 MILLION-PLUS, IS THAT NUMBER REFLECTED IN

24   THE OTHER EXHIBIT THAT WE JUST LOOKED AT?

25   **A.**  YES.

1  **Q.**  OKAY.  HOW ABOUT THE NEXT EXHIBIT, WHICH IS EXHIBIT 894?

2                    (EXHIBIT PUBLISHED TO JURY.)

3  **BY MS. SWEENEY:**

4  **Q.**  AND IS THIS A CHART THAT YOU PREPARED?

5  **A.**  YES, IT IS.

6  **Q.**  AND WHAT IS THIS?

7  **A.**  THIS IS THE SAME THING AS THE PREVIOUS ONE ONLY THIS ONE

8  PERTAINS TO THE DIRECT SALES OR THE SALES TO CONSUMERS.

9  **Q.**  OKAY.  AND IS THE DAMAGES NUMBER THAT'S REFLECTED IN THE

10 RIGHT-HAND COLUMN, IS THAT ALSO ON THE DOCUMENT WE LOOKED

11 AT -- THE FIRST DOCUMENT ON DAMAGES WHICH WAS EXHIBIT --

12 EXCUSE ME -- 893?

13 **A.**  YES.

14 **Q.**  OKAY.  LET'S TURN TO THE NEXT EXHIBIT WHICH IS 869.

15                    (EXHIBIT PUBLISHED TO JURY.)

16 **BY MS. SWEENEY:**

17 **Q.**  AND WHAT IS THIS?

18 **A.**  THIS IS THE ALLOCATION -- SAME ALLOCATION FOR THESE

19 ADDITIONAL CONSUMER SALES WHERE THERE'S SOME AMBIGUITY ABOUT

20 RETURNS.

21 **Q.**  THESE ARE THE ONES THAT YOU MENTIONED BEFORE WHERE THE

22 DATA WAS UNCLEAR AS TO RETURNS?

23 **A.**  RIGHT.

24 **Q.**  OKAY.

25      OKAY.  AND LET'S LOOK AT THE NEXT EXHIBIT WHICH IS 760.

```
 1              (EXHIBIT PUBLISHED TO JURY.)

 2   BY MS. SWEENEY:

 3   Q.   AND IS THIS SOMETHING THAT YOU PREPARED?

 4   A.   YES, IT IS.

 5   Q.   AND WHAT IS IT?

 6   A.   I NEED TO READ IT FIRST.

 7        (REVIEWING DOCUMENT.)

 8        OKAY.  THIS IS STILL FURTHER DISAGGREGATION OF THE -- BY A

 9   FURTHER WAY OF DISAGGREGATING WHAT THE PRODUCTS ARE BY THIS

10   BEST, BETTER, GOOD PHENOMENON WHICH REFERS, I BELIEVE, TO THE

11   FAMILY THAT IT IS, THE FAMILY OF AN IPOD.

12   Q.   AND WHERE IT SAYS "PRICE OVERCHARGE" AND THE NUMBERS THERE

13   ARE DIFFERENT FROM LINE TO LINE, WHAT DOES THAT REFLECT?

14   A.   (REVIEWING DOCUMENT.)

15        IT REFLECTS THE FACT THAT THE AVERAGE PRICE IS DIFFERENT.

16   IN OTHER WORDS, THERE ARE PRICE DIFFERENT -- IF YOU LOOK OVER,

17   SOMEWHERE THERE OUGHT TO BE A WEIGHTED AVERAGE PRICE.  ALL

18   RIGHT.  SO LOOK AT THE VERY FIRST LINE.  WE HAVE THAT THE --

19   THE BETTER VERSION OF THE SIXTH GENERATION.

20            THE COURT:  WE DID NOT GET THAT.  YOU MOVED AWAY FROM

21   MIC.  CAN YOU SAY THAT AGAIN, PLEASE.

22            THE WITNESS:  OKAY.  I'M SORRY.  THE -- I CAN'T SEE

23   IT.  IT'S SO FUZZY.

24        THE SIXTH GENERATION IPOD CLASSIC BETTER, WHICH IS THE

25   FIRST LINE, HAS AN AVERAGE PRICE IN THE RESELLER DATABASE OF
```

1    298.70.  AND BY COMPARISON, THE NEXT ONE DOWN HAS AN AVERAGE

2    PRICE OF 212.29.  SO THE DAMAGES WILL BE DIFFERENT DEPENDING

3    ON WHETHER YOU BOUGHT THE FIRST ONE OR THE SECOND ONE.

4    **BY MS. SWEENEY:**

5    **Q.**  ALL RIGHT.  LET'S TURN TO THE NEXT EXHIBIT, 870.

6              (EXHIBIT PUBLISHED TO JURY.)

7    **BY MS. SWEENEY:**

8    **Q.**  AND IS THIS THE SAME CHART ONLY FOR THE CONSUMER SALES?

9    **A.**  YES, IT IS.

10   **Q.**  OKAY.  AND THEN FINALLY, EXHIBIT 761.

11       WHAT IS THIS?

12              (EXHIBIT PUBLISHED TO JURY.)

13         **THE WITNESS:**  THIS IS THE SAME DISAGGREGATION DONE

14   FOR THESE REPURCHASED RETURN, AMBIGUOUS DATA OBSERVATIONS.

15   **BY MS. SWEENEY:**

16   **Q.**  AND PROFESSOR NOLL, YOU'VE TESTIFIED ABOUT THE OPINIONS

17   THAT YOU'VE FORMED IN THIS CASE.  ARE -- ARE YOUR OPINIONS

18   BASED ON THE KINDS OF EVIDENCE THAT ECONOMISTS TYPICALLY LOOK

19   AT?

20   **A.**  YES.

21   **Q.**  AND ARE YOU FAMILIAR WITH THE CRITICISMS THAT APPLE HAS --

22   HAS MADE AGAINST YOUR CONCLUSIONS?

23   **A.**  YES.

24   **Q.**  AND DO THOSE CRITICISMS CAUSE YOU TO CHANGE ANY OF YOUR

25   OPINIONS?

 1    **A.**  NO.  I ACTUALLY -- THE REGRESSIONS THAT I'M REPORTING HERE

 2    ACTUALLY WERE CHANGED IN THE MIDDLE OF THIS PROCESS TO REFLECT

 3    SOME OF THE CRITICISMS.  THEY WEREN'T THINGS THAT I

 4    NECESSARILY AGREED WITH, BUT THEY WERE THINGS I DIDN'T HAVE A

 5    REAL DISAGREEMENT WITH EITHER.  SO I TOOK WHATEVER THEIR

 6    SUGGESTIONS WERE AND CHANGED THE MODEL TO INCORPORATE THEM.

 7    BUT THERE ARE A FEW CRITICISMS THAT I REGARD AS NOT VALID, AND

 8    SO I DIDN'T TAKE THOSE INTO ACCOUNT BECAUSE I DON'T BELIEVE

 9    THEY'RE CORRECT.

10          **MS. SWEENEY:**  OKAY.  I HAVE NO FURTHER QUESTIONS AT

11    THIS TIME.

12          **THE COURT:**  CROSS?

13              (PAUSE IN THE PROCEEDINGS.)

14                **CROSS-EXAMINATION**

15    BY MR. ISAACSON:

16    **Q.**  GOOD MORNING, DR. NOLL.

17    **A.**  GOOD MORNING.

18    **Q.**  LET ME START WITH SOME SIMPLE MATTERS.

19        WHEN -- AS AN ECONOMIST, FOR APPLE'S CONDUCT TO BE

20    ANTICOMPETITIVE IN YOUR OPINION, 7.0 WOULD HAVE TO PROVIDE NO

21    BENEFIT TO CONSUMERS.

22        DO I HAVE THAT RIGHT?

23    **A.**  THE COMPONENTS OF 7.0 THAT DISABLED HARMONY WOULD HAVE TO

24    HAVE NO BENEFIT TO CONSUMERS.

25    **Q.**  ALL RIGHT.  SO THE COMPONENTS OF 7.0 THAT DISABLED HARMONY

1    WOULD HAVE TO HAVE NO BENEFIT TO CONSUMERS.  OTHERWISE YOU

2    WOULD NOT HAVE AN OPINION ABOUT WHETHER THE CONDUCT HERE WAS

3    ANTICOMPETITIVE.

4        DO I HAVE THAT RIGHT?

5    **A**.  YES.

6    **Q**.  OKAY.  AND YOU DON'T KNOW, BASED ON YOUR BACKGROUND, WHAT

7    COMPONENTS OF 7.0 DISABLED HARMONY; IS THAT CORRECT?

8    **A**.  WELL, I DO KNOW WHAT THEY ARE.  YES.  IT'S THE KVC AND THE

9    DVC.  BUT I'M NOT A TECHNICAL EXPERT SO I WOULDN'T -- WHAT I

10   CAN'T DO IS TESTIFY ABOUT THE DETAIL -- THE TECHNICAL DETAILS

11   OF THOSE COMPONENTS OF 7.0 AND 7.4.

12   **Q**.  WASN'T IT YOUR VIEW THAT REALNETWORKS AND HARMONY WERE

13   THWARTED ALSO WHEN APPLE CHANGED ITS ENCRYPTION CODES TO

14   DEFEAT THE COMPATIBILITY BETWEEN HARMONY AND IPODS?

15   **A**.  YES, I DISCUSSED THAT IN MY DIRECT TESTIMONY.  4.7 HAD A

16   SIMILAR EFFECT.

17   **Q**.  ALL RIGHT.  SO CHANGING THE ENCRYPTION CODES IN 7.0 AND

18   7.4 DEFEATED THE COMPATIBILITY BETWEEN HARMONY AND IPODS, AS

19   YOU UNDERSTOOD IT, AND SO THE ISSUE WOULD BE WHETHER THAT

20   PROVIDED ANY BENEFITS TO CONSUMERS.

21       DO I HAVE THAT RIGHT?

22   **A**.  THAT'S MY UNDERSTANDING, YES, OF WHAT THE LEGAL STANDARD

23   IS.  I'M NOT A LAWYER EITHER SO -- BUT THAT'S MY UNDERSTANDING

24   OF THE LEGAL STANDARD.

25   **Q**.  I'M ONLY ASKING YOU AS AN ECONOMIST WHEN YOU'RE RENDERING

1   OPINIONS ABOUT WHAT'S ANTICOMPETITIVE.

2   **A.**  WELL, ECONOMISTS WOULDN'T NECESSARILY DEFINE IT THE SAME

3   WAY A LEGAL STANDARD IS.  THEY WOULD HAVE A BROADER DEFINITION

4   OF WHAT ANTICOMPETITIVE --

5                    (SIMULTANEOUS COLLOQUY.)

6   **BY MR. ISAACSON:**

7   **Q.**  I'M NOT ASKING YOU ABOUT COMPARING THE ECONOMIC STANDARDS

8   WITH THE LEGAL STANDARDS EITHER.

9        BUT AS AN ECONOMIST, IF 7.0 AND 7.4 CHANGED THE CODES AND

10  THAT DISABLED HARMONY AND THAT PROVIDED ANY BENEFIT TO

11  CONSUMERS, YOU WOULD NOT CONCLUDE THAT 7.0 WAS

12  ANTICOMPETITIVE.

13       DO I HAVE THAT RIGHT?

14  **A.**  AS AN ECONOMIST?

15  **Q.**  AS AN ECONOMIST.

16  **A.**  NO.  THERE ARE OTHER -- OTHER CIRCUMSTANCES UNDER WHICH AN

17  ECONOMIST WOULD REGARD AS ANTICOMPETITIVE, BUT THAT'S NOT THE

18  STANDARD BEING USED HERE.

19  **Q.**  OKAY.  SO UNDER THE STANDARD THAT YOU'RE USING HERE, DO I

20  HAVE IT RIGHT THAT IF 7.0 CHANGED THE CODES AND THAT DISABLED

21  HARMONY AND THAT PROVIDED ANY BENEFIT TO CONSUMERS, YOU WOULD

22  NOT HAVE AN OPINION ABOUT WHETHER IT WAS ANTICOMPETITIVE; IS

23  THAT CORRECT?

24  **A.**  WHEN YOU SAY "CHANGED THE CODE," IT HAS TO BE JUST THAT

25  PART OF THE CODE THAT HAS TO DO WITH KVC AND DVC.

NOLL - CROSS / ISAACSON

1   Q.   WELL --

2   A.   OTHER THINGS IN 7.0 THAT HAD NOTHING TO DO WITH DISABLING

3   HARMONY WOULD NOT HAVE ANY RELEVANCE TO THIS.

4   Q.   WELL, IF OTHER CODE DISABLED HARMONY, OTHER THAN 7. -- IF

5   OTHER CODES -- IF CODES IN 7.0 WERE CHANGED, OTHER THAN THE

6   KVC, AND THOSE OTHER CODE CHANGES DISABLED HARMONY AS WELL,

7   ALL RIGHT, YOU WOULD NOT BE ABLE TO MEASURE -- SORRY -- YOU

8   WOULD NOT BE ABLE TO MEASURE WHETHER THE KVC CAUSED INJURY OR

9   WHETHER THE CHANGING CODES CALLED (SIC) INJURY; IS THAT RIGHT?

10  A.   IT WOULD DEPEND ON WHETHER THE WAY IT WAS DISABLED, THERE

11  WAS A WORKAROUND OR NOT THAT -- YOU KNOW, THAT THAT WOULD --

12  IF IT PERMANENTLY DISABLED IT, YES, SO YOU WOULDN'T BE ABLE TO

13  TELL THE DIFFERENCE BETWEEN -- IF SOMETHING WAS A PERMANENT

14  BARRIER TO HARMONY IN THE SAME WAY THAT DVC AND KVC WERE, AND

15  THAT WAS -- AND THAT WAS SOMETHING IN THE CODE AND IT HAD SOME

16  OTHER EFFECT, YOU WOULDN'T BE ABLE TO SEPARATE THE -- THE

17  EFFECTS OF THE DVC/KVC COMPONENT WITH THE OTHER COMPONENT.

18  Q.   ALL RIGHT.  AND IF THE CHANGE IN CODES DISABLED HARMONY

19  FOR AN UNKNOWN PERIOD OF MONTHS, A CHANGE IN CODES THAT WAS

20  DIFFERENT FROM THE KVC, YOU DID NOT ATTEMPT TO MEASURE WHAT

21  THE EFFECT OF DISABLING THE KVC WAS VERSUS MEASURING -- VERSUS

22  THE DISABLING OF HARMONY BY CHANGING THE CODES; IS THAT

23  CORRECT?

24  A.   NO, BECAUSE I'M NOT AWARE OF ANY SUCH CODE.

25  Q.   YOU ARE NOT AWARE OF ANY -- OF APPLE CHANGING ITS

1    ENCRYPTION CODE TO DEFEAT THE COMPATIBILITY BETWEEN HARMONY

2    AND THE IPODS?

3    **A.**  OF COURSE I AM.  BUT I'M NOT -- OF THE THINGS THAT SATISFY

4    THE CONDITIONS YOU JUST PUT FORTH, I'M NOT AWARE.  I JUST

5    DON'T KNOW IF THERE ARE ANY SUCH THINGS.

6    **Q.**  ALL RIGHT.  SO IF, AS A HYPOTHETICAL MATTER, APPLE, IN

7    ADDITION TO THE KVC, CHANGED ITS SECURITY CODES IN 7.0 AND

8    THAT DEFEATED HARMONY FOR AN UNKNOWN PERIOD OF MONTHS, YOU

9    DON'T KNOW WHAT INJURY WAS CAUSED BY KVC ALONE; ISN'T THAT

10   CORRECT?

11   **A.**  I DON'T HAVE A NUMBER FOR IT, BUT I COULD DO ONE IN ABOUT

12   15 MINUTES.  I'D JUST ASK THE TECHNICAL EXPERTS HOW LONG IT

13   WOULD HAVE KEPT THEM OUT.  THEY'D COME UP WITH A NUMBER, AND

14   I'D HAVE SUBTRACTED THOSE NUMBERS FROM THE DAMAGES.

15   **Q.**  AND AFTER THIS TWO AND A HALF YEARS OF WORK, HERE TODAY

16   YOU DON'T HAVE A NUMBER; RIGHT?

17   **A.**  NO, BECAUSE I'VE NEVER -- AGAIN, I'M NOT AWARE OF ANY SUCH

18   CODE.

19   **Q.**  ALL RIGHT.

20   **A.**  AND IF I WERE AND I HAD THE RIGHT INFORMATION, IT COULD

21   HAVE BEEN INCORPORATED.  IT'S JUST THAT I WASN'T AWARE THAT

22   THERE WAS SUCH A CODE.

23   **Q.**  DID YOU READ ANY OF THE TRIAL TRANSCRIPTS LAST WEEK?

24   **A.**  I HAVE READ SOME OF IT, NOT ALL OF IT.

25   **Q.**  OKAY.  7.4.  7.4 WAS OCTOBER 2007.  WE AGREE ON THAT;

1   RIGHT?

2   **A.** I DON'T KNOW THE -- YES, SOMETHING LIKE -- MIGHT HAVE BEEN

3   LATE SEPTEMBER, BUT IT'S ROUGHLY RIGHT, YES.

4   **Q.** I'M SORRY.  I SAID OCTOBER.  YOU'RE RIGHT.  IT'S SEPTEMBER

5   ABSOLUTELY RIGHT.  SORRY.

6   **A.** YOU ALMOST GOT ME THERE.

7   **Q.** IT HAPPENS.

8       7.4 CHANGED THE CODES; YOU'RE AWARE OF THAT, BESIDES THE

9   DVC, RIGHT?

10  **A.** I'M -- WHAT AM I AWARE OF?

11  **Q.** ARE YOU AWARE THAT 7.4, IN ADDITION TO WHAT THE PLAINTIFFS

12  CALL THE DVC AND WE CALL THE DATABASE INTEGRITY CHECK, ALSO

13  CHANGED THE CODES IN A WAY THAT WOULD DISABLE HARMONY?

14  **A.** I KNOW THERE IS DISPUTED TESTIMONY ON THAT ISSUE.  I DON'T

15  HAVE ANY PERSONAL KNOWLEDGE OF WHETHER THAT'S TRUE OR NOT.

16  **Q.** IF HARMONY WAS DISABLED BY CODE CHANGES IN 7.4, YOU DON'T

17  KNOW HOW MUCH INJURY WAS CAUSED BY EITHER THE KVC OR THE DVC,

18  AS THE PLAINTIFFS CAUSE (SIC) THEM -- CALL THEM, CORRECT?

19  **A.** ANYTHING THAT DISABLED HARMONY WOULD HAVE HAD AN EFFECT

20  THAT WOULD BE IMPOSSIBLE TO DISENTANGLE IN THAT MOMENT IN

21  TIME.

22  **Q.** RIGHT.  ONCE ANYTHING OTHER THAN THE KVC OR THE DVC

23  DISABLED HARMONY, IT IS IMPOSSIBLE TO DISENTANGLE FROM YOUR

24  REGRESSION ANALYSIS WHAT INJURY WAS ATTRIBUTABLE TO THE KVC OR

25  THE DVC, CORRECT?

1    **A.**  ONLY IF IT'S PERMANENT.

2    **Q.**  WELL, NO.  I'M NOT ASKING YOU ABOUT PERMANENT.

3         WHAT IF IT'S A MATTER OF MONTHS?  IF -- IF THERE ARE OTHER

4    CHANGES, OTHER THAN THE KVC AND THE DVC, THAT DISABLED HARMONY

5    FOR A MATTER OF MONTHS, YOUR REGRESSION TODAY IS UNABLE TO

6    DISENTANGLE THE EFFECTS OF THE KVC AND THE DVC FROM THE OTHER

7    COMPONENTS OF 7.0 OR 7.4 THAT DISABLED HARMONY; ISN'T THAT

8    CORRECT?

9    **A.**  NOT IF IT'S SOMETHING THAT HAS A RELATIVELY EASY

10   WORKAROUND BECAUSE THEN IT WOULDN'T INCREASE LOCK-IN.  IF

11   REALNETWORKS IS GOING TO WORK AROUND IT IN A FEW MONTHS, IT

12   DOESN'T INCREASE LOCK-IN.

13   **Q.**  ALL RIGHT.  IF IT DOESN'T HAVE A RELATIVELY EASY

14   WORKAROUND -- YOU HAVEN'T ANALYZED WHETHER ANY OTHER CHANGES

15   HAD A RELATIVELY EASY WORKAROUND, HAVE YOU?

16   **A.**  THAT'S EXACTLY RIGHT.  THAT'S EXACTLY WHY I CAN'T ANSWER

17   THE QUESTION THE WAY YOU WANT ME TO ANSWER IT, IS BECAUSE IT

18   DEPENDS ON THINGS THAT I DON'T KNOW.

19   **Q.**  WELL, IF HARMONY WAS DISABLED FOR SIX MONTHS, WOULD -- ARE

20   YOU ABLE TO DIS -- BY CHANGES OTHER THAN THE KVC OR THE DVC,

21   ARE YOU ABLE TO DISENTANGLE THE EFFECTS OF THOSE CHANGES FROM

22   THE KVC AND THE DVC?

23   **A.**  THE DISABLING EFFECT WOULD HAVE TO BE LONGER THAN A FEW

24   MONTHS FOR IT TO HAVE A SIGNIFICANT EFFECT ON LOCK-IN AND

25   THEREFORE TO HAVE AN EFFECT ON THE PRICE ELEVATION.

1    Q.   HOW LONG WOULD IT HAVE TO BE?

2    A.   IT'S IMPOSSIBLE TO ANSWER WITHOUT DOING IT.  THE DATA

3    WOULD HAVE TO TELL YOU THAT.  BUT IT WOULDN'T BE A MATTER OF

4    MONTHS BECAUSE THE LOCK-IN EFFECT WOULDN'T HAVE HAPPENED THAT

5    FAST.  IF I WAS BUYING STUFF FROM REALNETWORKS, AND I COULD

6    IMAGINE THAT REALNETWORKS IN TWO OR THREE MONTHS IS GOING TO

7    PRODUCE WORKAROUNDS, THEN IT'S NOT GOING TO LOCK ME IN.

8    Q.   RIGHT.  BUT YOU WOULD HAVE TO IMAGINE THAT REALNETWORKS

9    WAS GOING TO DO WORKAROUNDS IN ONE OR TWO MONTHS.  YOU'RE

10   AWARE OF NO EVIDENCE IN THIS CASE THAT REALNETWORKS WOULD HAVE

11   BEEN ABLE TO IMPLEMENT ANY WORKAROUNDS DUE TO CHANGE IN CODES

12   THAT HAPPENED IN 7.0 AND 7.4 INDEPENDENT OF THE KVC OR DVC;

13   ISN'T THAT RIGHT?

14   A.   I'M AWARE OF NO EVIDENCE ONE WAY OR THE OTHER THESE THINGS

15   ACTUALLY HARMED REALNETWORKS SO THAT THEY COULDN'T HAVE WORKED

16   AROUND THEM OR THAT THEY WOULD HAVE, I DON'T KNOW.  AND -- I'M

17   NOT THE PERSON TO ASK THAT QUESTION.

18   Q.   OKAY.  AND NOW WHEN YOU SAY THE KVC AND THE DVC

19   PERMANENTLY DISABLED HARMONY, YOU DON'T ACTUALLY KNOW THAT, DO

20   YOU?  YOU DON'T KNOW THAT REALNETWORKS WAS INCAPABLE OF A

21   WORKAROUND, THEY COULD HAVE JUST DECIDED THIS WASN'T WORTH

22   BOTHERING WITH ANYMORE, RIGHT?

23   A.   THAT'S POSSIBLE.  I'M RELYING UPON DR. MARTIN.  I DON'T

24   HAVE AN INDEPENDENT ASSESSMENT OF THE NATURE OF THE DAMAGE

25   DONE BY THESE -- THIS CODE.

1    Q.  ALL RIGHT.  LET'S GO BACK TO WHAT YOU RELY ON WITH

2    DR. MARTIN.

3        FOR THE ASSUMPTION THAT 7 -- THAT THE DISABLING EFFECTS OF

4    7.0 PROVIDED NO BENEFIT TO CONSUMERS, IN YOUR REPORTS YOU

5    RELIED ON DR. MARTIN?

6    A.  THAT'S CORRECT.

7    Q.  ALL RIGHT.  YOU'RE NOT -- YOU'VE GOT NO -- YOU'RE A

8    WONDERFUL ECONOMIST, BUT YOU'VE GOT NO TECHNICAL BACKGROUND IN

9    THIS AREA.  YOU'RE NOT ABLE TO RENDER AN OPINION ABOUT WHETHER

10   7.0 PROVIDED ANY BENEFIT TO CONSUMERS, CORRECT?  YOU HAVE TO

11   RELY ON DR. MATTER?

12   A.  WELL, THE LATTER PART IS TRUE.  I HAVE NOT -- I AM NOT A

13   PERSON WHO IS AN EXPERT ON THE TECHNICAL DESIGN OF SOFTWARE.

14   Q.  RIGHT.  AND THE SAME IS TRUE OF 7.4.  YOU WOULD RELY ON

15   DR. MARTIN COMPLETELY TO CONCLUDE THAT THE -- THAT 7.4

16   PROVIDED NO BENEFIT TO CONSUMERS?

17   A.  WELL, NOT ENTIRELY.  THERE'S ALSO INTERNAL DOCUMENTS --

18                    (SIMULTANEOUS COLLOQUY.)

19   BY MR. ISAACSON:

20   Q.  I'M SORRY.  IN YOUR REPORT.

21   A.  IN MY REPORT, I RELIED ON -- ON DR. MARTIN.  IN MY EXPERT

22   REPORT, I RELIED ON DR. MARTIN.

23   Q.  OKAY.

24       NOW, ABOUT REALNETWORKS, A FEW -- LET ME CLARIFY A FEW

25   THINGS.

 1          NOW, YOU DON'T KNOW HOW MANY IPOD OWNERS PURCHASED MUSIC

 2     FROM REALNETWORKS, CORRECT?  OR AT LEAST BY -- AT THE TIME OF

 3     YOUR REPORT, YOU DID NOT KNOW HOW MANY IPOD OWNERS PURCHASED

 4     MUSIC FROM REALNETWORKS, CORRECT?

 5     **A.**  I'M NOT AWARE OF ANY DATA ABOUT THAT FACT.

 6     **Q.**  AND YOU DID NOT ASK THE LAWYERS IN THIS CASE TO SEND A

 7     SUBPOENA TO REALNETWORKS TO GET THAT INFORMATION, CORRECT?

 8     **A.**  WELL, I DIDN'T ASK THE LAWYERS TO SEND SUBPOENAS TO

 9     ANYBODY, BUT I DID ASK THEM TO SEE IF THEY COULD FIND SUCH

10     INFORMATION, AND THEY SAID THEY WERE UNABLE TO.  BUT I DON'T

11     KNOW ANY MORE THAN THAT.

12     **Q.**  WELL, YOU DIDN'T -- DID YOU ASK THEM FOR INFORMATION ABOUT

13     REALNETWORKS?

14     **A.**  YES.

15     **Q.**  WHAT DID YOU WANT FROM THEM -- WHAT TYPE OF INFORMATION

16     DID YOU WANT ABOUT REALNETWORKS?

17     **A.**  WELL, IT WOULD HAVE BEEN GREAT TO HAVE DISCOVERY FROM

18     REALNETWORKS IN THIS CASE ABOUT THE WHOLE ISSUE OF HARMONY AND

19     ITS RETAIL SALES OF -- FROM THE -- FROM THE REALNETWORKS MUSIC

20     STORE.  BUT WE JUST DIDN'T -- I DIDN'T HAVE THAT INFORMATION.

21     **Q.**  OKAY.  DID YOU ASK THE LAWYERS TO SEND A SUBPOENA OVER TO

22     REALNETWORKS TO GET THIS DISCOVERY THAT YOU THOUGHT WOULD BE

23     GREAT?

24     **A.**  I DIDN'T ASK THEM TO SEND A SUBPOENA TO ANYBODY.  THAT'S

25     NOT -- IT NEVER EVEN OCCURRED TO ME TO ASK TO SEND A SUBPOENA

1  TO ANYBODY.  I DID ASK FOR THE INFORMATION.  HOW THEY WOULD

2  CHOOSE TO GET IT IS UP TO THEM.  IT'S NOT UP TO ME.

3  **Q.**  OKAY.  WELL, LET ME ASK YOU ABOUT THAT.

4      YOU ASKED FOR THE INFORMATION, AND THEN IT'S UP TO THE

5  LAWYERS TO DECIDE WHAT TO GET, IT'S NOT UP TO YOU SO --

6  **A.**  NO, THAT'S NOT RIGHT.  THAT'S NOT WHAT I SAID.  I SAID

7  THEY HAVE TO FIGURE OUT THE WAY TO GET IT OR WHETHER IT CAN BE

8  GOTTEN.  I DON'T HAVE SUBPOENA POWER.  THEY DO.  I'M NOT THE

9  ONE WHO CAN APPROACH THEM AND ASK THEM FOR THE INFORMATION.

10  THEY ARE.

11  **Q.**  ALL RIGHT.  BUT YOU CAN ASK, WHEN YOU NEED INFORMATION

12  THAT WOULD BE GREAT TO HAVE FOR YOUR ANALYSIS, YOU KNOW HOW TO

13  ASK THE LAWYERS TO SEND A SUBPOENA AND ASK FOR IT, RIGHT?

14  **A.**  I DIDN'T ASK TO SEND A SUBPOENA.  I DID ASK FOR THE

15  INFORMATION, AND I WAS TOLD IT WAS UNAVAILABLE.

16  **Q.**  RIGHT.

17  **A.**  AFTER HAVING ASKED FOR IT A FEW MONTHS LATER.

18  **Q.**  NOW, IS IT THE CASE THAT THE IMPACT OF RENDERING HARMONY

19  UNABLE TO WORK WITH NEW IPODS DEPENDS ON HARMONY'S MARKET

20  SHARE?  AND I'M SPECIFICALLY REFERRING TO THE IMPACT ON DEMAND

21  FOR THE IPOD.

22  **A.**  IT DEPENDS ON THEIR PROSPECTIVE MARKET SHARE MORE THAN

23  THEIR CURRENT MARKET SHARE.  I MEAN, THE BIGGER THE -- THE

24  BIGGER THAT HARMONY -- LET ME START AGAIN.

25      THE LARGER THE FRACTION OF IPOD CUSTOMERS WHO BUY MUSIC

1  FROM REALNETWORKS, THE MORE PRONOUNCED THE LOCK-IN EFFECT IS.

2  Q.  ALL RIGHT.  SO LET ME UNDERSTAND THIS.

3  A.  THE MORE IT'S REDUCED, I SHOULD SAY.

4  Q.  SO REALNETWORKS' MARKET SHARE IS MORE IMPORTANT -- ITS

5  FUTURE MARK SHARE IS MORE IMPORTANT THAN ITS PAST MARKET

6  SHARE; IS THAT WHAT YOU'RE SAYING?

7  A.  WELL, ITS PAST MARKET SHARE IS IMPORTANT, BUT IT DEPENDS

8  IN PART ON THE PAST, AND IT ALSO DEPENDS ON THE FUTURE, THAT

9  THIS IS ABOUT BOTH LOCK-IN AND LOCK-OUT.  AND SO YOU WOULD

10  NEED TO KNOW HISTORICALLY WHAT THEIR -- WHAT THEIR SALES WERE,

11  WHAT THEIR CURRENT SALES AFTER HARMONY IS LAUNCHED ARE, AND

12  WHAT THE TRAJECTORY OF THEIR SALES WOULD HAVE BEEN HAD HARMONY

13  NOT BEEN DISABLED.

14  Q.  ALL RIGHT.  IN AUGUST 2006, RIGHT BEFORE 7.0 IN SEPTEMBER

15  2006, REALNETWORKS' MARKET SHARE -- IS THAT -- MUSIC STORE WAS

16  LESS THAN 5 PERCENT, RIGHT?

17  A.  IT WAS -- I'M NOT SURE THAT'S RIGHT, BUT IT IS SINGLE

18  DIGIT MARKET SHARE, YES.

19  Q.  IT WAS LESS THAN FIVE, RIGHT?

20  A.  I DON'T REMEMBER THE PRECISE NUMBER.  AND I -- I'M NOT

21  GOING TO TESTIFY TO A NUMBER UNLESS I'M ACTUALLY LOOKING AT

22  THE DOCUMENT THAT HAS IT.  I DON'T HAVE THE MARKET SHARES

23  MEMORIZED BY MONTH FOR ALL THE -- ALL THE DIGITAL MEDIA

24  COMPANIES.

25      I SAID MY RECOLLECTION IS IT'S SINGLE DIGITS.  IF YOU WANT

1    TO STIPULATE THAT IT'S LESS THAN 5 PERCENT, FINE.  I JUST

2    DON'T REMEMBER THE EXACT NUMBER.

3    **Q.**  ALL RIGHT.  NOW, THE TERM "EXCLUSION OF COMPETITORS" WHICH

4    YOU'VE USED, THAT MEANS THAT MARKET SHARES OF COMPETITORS WERE

5    SUBSTANTIALLY LESS THAN OTHERWISE WOULD HAVE BEEN THE CASE.

6    DO I HAVE THAT RIGHT?

7    **A.**  THAT'S CORRECT.

8    **Q.**  OKAY.  NOW, WHAT -- FOR PURPOSES OF -- AN EXCLUSION OF A

9    COMPETITOR, WHAT WOULD BE SUBSTANTIALLY LESS THAN A 3 PERCENT

10   MARKET SHARE?

11   **A.**  SUBSTANTIALLY LESS THAN A 3 PERCENT MARKET SHARE?

12   **Q.**  YES.

13   **A.**  IT WOULD BE SOMETHING THAT COULD STATISTICALLY RELIABLY BE

14   ESTIMATED THAT WOULD BE OUTSIDE THE RANGE OF THE SAMPLING

15   ERROR OF THE MARKET SHARE YOU WERE MEASURING.

16   **Q.**  ALL RIGHT.  THANK YOU.

17       NOW, DIGITAL DOWNLOADS, YOU WOULD AGREE, REFLECTED ONLY A

18   FRACTION OF THE MUSIC THAT CONSUMERS HAD ON THEIR IPODS DURING

19   THE CLASS PERIOD, CORRECT?

20   **A.**  I'M -- I'M NOT SURE I UNDERSTAND THE QUESTION.

21   **Q.**  SO CONSUMER IPODS DURING THE CLASS PERIOD, LESS THAN --

22   MOST OF THAT MUSIC CAME FROM CD'S THEY BURNED, CORRECT?

23   **A.**  MY RECOLLECTION IS ON THE ORDER OF TWO-THIRDS OF IT CAME

24   FROM EITHER CD'S OR DRM-FREE DOWNLOADS.

25   **Q.**  ALL RIGHT.  AND OF THE PORTION ON THE IPOD THAT WAS

1    ATTRIBUTABLE TO DIGITAL DOWNLOADS AND NOT BURNED CD'S, DO YOU

2    KNOW WHAT PORTION OF THAT CAME FROM REALNETWORKS MUSIC?

3    **A.**   I DON'T KNOW OF ANY DATA ABOUT THAT.  I DON'T KNOW WHAT

4    THE DATA WERE, WHAT THE DATA SHOW ON THAT.

5    **Q.**   ALL RIGHT.  YOU'RE UNAWARE OF ANY DATA SHOWING THE AMOUNT

6    OF REALNETWORKS' MUSIC ON IPODS DURING THE CLASS PERIOD,

7    CORRECT?

8    **A.**   WELL, THERE WOULD BE ALMOST NONE BECAUSE OF THE LOCKING OF

9    HARMONY.  THAT'S THE POINT.  YOU WOULDN'T OBSERVE MUCH IN THE

10   WAY OF REALNETWORKS ON IPODS BECAUSE THE ATTEMPT TO PUT IT ON

11   IT WOULD ESSENTIALLY ERASE THE FILES OF THE IPOD.  SO YOU

12   WOULDN'T OBSERVE PEOPLE USING A LOT OF REALNETWORKS' MUSIC ON

13   IPODS.

14   **Q.**   WELL, DURING THE CLASS PERIOD, MOST OF THE MUSIC WAS FROM

15   PEOPLE BURNING CD'S ONTO THE IPOD, RIGHT?

16   **A.**   AS I SAID -- WELL, CD'S PLUS THE DRM-FREE.

17   **Q.**   RIGHT.  AND AFTER HARMONY WAS DISABLED, I COULD PUT

18   REALNETWORK MUSIC ON A CD AND PUT IT ON MY IPOD, RIGHT?

19   **A.**   OH, YEAH, YOU COULD BURN CD'S ALL THE TIME, BUT WHAT YOU

20   WOULD BE MEASURING THERE WOULD BE MUSIC DOWNLOADED -- PUT ON

21   THE IPOD FROM A CD.

22   **Q.**   RIGHT.

23   **A.**   WHETHER YOU BURNED IT YOURSELF OR WHETHER YOU HAD BOUGHT

24   IT FROM SOMEBODY, IT WOULD STILL PUT ON A CD.

25   **Q.**   BUT WHEN YOU SAY THERE WOULD BE VIRTUALLY NO MUSIC ON THE

1   IPOD DURING TE- CLASS PERIOD BECAUSE OF THE DISABLING OF

2   HARMONY, YOU DON'T KNOW THAT EITHER, DO YOU?  PEOPLE COULD

3   HAVE -- IF PEOPLE WANTED REAL MUSIC, THEY COULD HAVE BEEN

4   PUTTING ON THE IPOD BY USING A -- BURNING A CD, RIGHT?

5   **A.**  I THINK THAT'S COMPLETELY IMPLAUSIBLE BECAUSE THE ACT OF

6   DOWNLOADING AND BURNING A CD AND THEN RELOADING IT IS SO MUCH

7   MORE CUMBERSOME THAN JUST DOWNLOADING IT DIRECTLY FROM THE

8   ITUNES STORE.  YOU DON'T HAVE TO DO THIS INTERMEDIATE STEP IF

9   YOU DOWNLOAD IT DIRECTLY FROM THE ITUNES STORE.

10      SO I CAN'T IMAGINE VERY MANY PEOPLE WANTING TO BURN CD'S

11  OFF OF REAL MUSIC SONGS RATHER THAN JUST TAKE THEM OFF THE

12  ITUNES STORE.

13      THAT'S WHAT THIS LAWSUIT IS ALL ABOUT.

14                  (SIMULTANEOUS COLLOQUY.)

15  **BY MR. ISAACSON:**

16  **Q.**  YOU THINK THAT'S CUMBERSOME.  HAVE YOU -- AWARE OF ANY

17  CONSUMER SURVEYS THAT SAY THAT'S CUMBERSOME?

18  **A.**  SWITCHING COSTS AFFECT CONSUMERS' DECISIONS.  THERE'S LOTS

19  OF STUDIES --

20                  (SIMULTANEOUS COLLOQUY.)

21                 (OFF-THE-RECORD DISCUSSION.)

22  **BY MR. ISAACSON:**

23  **Q.**  ARE YOU AWARE OF ANY CONSUMER SURVEYS DESCRIBING BURNING

24  ON CD -- TRANSFERRING MUSIC THROUGH BURNING CD'S AS

25  CUMBERSOME?

1    **A.**  I'M AWARE OF LOTS OF STUDY IN ECONOMICS THAT SAY SWITCHING

2    COSTS ARE IMPORTANT.  I DO NOT KNOW OF ANYBODY WHO STUDIED

3    THIS BECAUSE THE DATA ARE ALL PROPRIETARY AND YOU COULDN'T

4    STUDY IT IF YOU WANTED TO.

5    **Q.**  DO YOU KNOW WHETHER USING HARMONY WAS CUMBERSOME?

6    **A.**  AGAIN, ALL I KNOW IS WHAT'S WRITTEN ABOUT IT, WHICH IS IT

7    WAS A REASONABLE PORTABLE DIGITAL MEDIA PLAYER SOFTWARE

8    PROGRAM.

9    **Q.**  DO YOU KNOW HOW IT WORKED?

10   **A.**  BUT I DON'T KNOW HOW IT WORKS AND IT REALLY DOESN'T MATTER

11   TO ME HOW IT WORKS.  WHAT'S IMPORTANT IS WHAT CONSUMERS

12   THOUGHT ABOUT IT AND WHAT PEOPLE WHO REVIEW THE PRODUCTS THINK

13   ABOUT IT, AND THEY THOUGHT THEY WERE COMPETITIVE PRODUCTS

14   LIKE --

15                    (SIMULTANEOUS COLLOQUY.)

16   **BY MR. ISAACSON:**

17   **Q.**  WAIT, WAIT.  WE'RE TALKING ABOUT HARMONY NOW, NOT REAL?

18   **A.**  YES, I KNOW.

19   **Q.**  NOW, DO YOU KNOW WHAT A CONSUMER HAD TO GO THROUGH IN

20   ORDER TO MAKE HARMONY WORK RELATIVE TO WHAT YOU CALL THE

21   BURDEN OF BURNING CD'S?

22   **A.**  I CAN'T REPEAT IT BECAUSE I DON'T REMEMBER IT BECAUSE I'M

23   NOT THE ONE WHO ANALYZED THAT.  BUT I DO REMEMBER HAVING READ

24   THE DESCRIPTION OF WHAT THEY HAVE TO DO, YES.

25   **Q.**  DO YOU KNOW WHAT MANUAL SYNCING IS VERSUS --

1    **A.**   YES.

2    **Q.**   -- AUTOMATIC SYNCING?

3    **A.**   YES.

4    **Q.**   DO YOU KNOW THAT A CONSUMER USING HARMONY HAD TO CLICK AND

5    DRAG ALL THEIR SONGS OVER INDIVIDUALLY OR IN GROUPS?

6    **A.**   THAT'S WHAT MANUAL SYNCING IS.  IT'S MANUALLY TAKING

7    TITLES AND MOVING THEM INTO A FILE, JUST LIKE WE DO ON OUR PC

8    ALL THE TIME.

9            **MR. ISAACSON:**  WHAT EXHIBIT NUMBER IS THIS?  THIS

10   IS -- CAN WE PUT UP 2446?

11                   (EXHIBIT PUBLISHED TO JURY.)

12           **THE COURT:**  THEN WE'LL BE TAKING A BREAK SOON.

13           **MR. ISAACSON:**  THIS WOULD BE A FINE TIME.  THIS WILL

14   TAKE A FEW MINUTES.

15           **THE COURT:**  OKAY.

16      ALL RIGHT.  LADIES AND GENTLEMEN, IT'S 11:43.

17      SO IS THERE ANY QUICK BREAD LEFT?

18      YES, NO, MAYBE SO?  A LITTLE BIT.  ALL RIGHT.

19      WE'LL GO AHEAD AND TAKE OUR SECOND 15-MINUTE BREAK.

20      ANY QUESTIONS?

21      NO?  OKAY.  HAVE A GOOD BREAK.

22      (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

23   OF THE JURY:)

24           **THE COURT:**  ALL RIGHT, COUNSEL.  I'M SHOWING 11:44.

25   SO 15 MINUTES.

1                    (RECESS TAKEN AT 11:44 A.M.)

2

3

4

5            (CONTINUED NEXT PAGE; NOTHING OMITTED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NOLL – CROSS / ISAACSON

1    (PROCEEDINGS HELD AFTER RECESS AT 12 NOON.)

2    **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

3    COME TO ORDER.

4    **THE COURT:**  ALL RIGHT.  LET'S CALL THE JURY BACK OUT.

5    (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

6    **THE COURT:**  YOU MAY BE SEATED.  THE RECORD WILL

7    REFLECT THE JURY IS BACK.

8    OKAY.  READY FOR THE SECOND HAUL?

9    **MR. ISAACSON:**  I THINK TECHNICALLY I CAN SAY GOOD

10   AFTERNOON.

11   **THE COURT:**  YOU MAY.  YOU MAY PROCEED.

12   **BY MR. ISAACSON:**

13   **Q.**  SO, WE WERE TALKING BEFORE THE BREAK ABOUT IPOD USERS WHO

14   BOUGHT MUSIC FROM REALNETWORKS.

15   **A.**  RIGHT.

16   **Q.**  AND YOU INDICATED WHAT YOU THOUGHT WOULD BE THE CASE AFTER

17   SEPTEMBER 2006.

18   DO YOU HAVE ANY INFORMATION -- FOR YOUR REPORTS, DID YOU

19   HAVE ANY INFORMATION OR ANY ESTIMATE ABOUT HOW MANY IPOD USERS

20   HAD REALNETWORKS MUSIC ON THEIR IPODS BEFORE SEPTEMBER 2006?

21   **A.**  I DO NOT KNOW OF ANY ESTIMATE OUT THERE.  NO.

22   **Q.**  ALL RIGHT.

23   SO, FOR YOUR REPORTS, YOU WERE COMPLETELY UNAWARE OF ANY

24   REALNETWORKS STORE MUSIC ON IPODS BEFORE SEPTEMBER -- BEFORE

25   7.0; IS THAT RIGHT?

NOLL - CROSS / ISAACSON

1    **A.**  I DO NOT KNOW WHAT FRACTION OF IPOD OWNERS HAD MUSIC FROM

2    REALNETWORKS ON THEIR IPODS, NO.  I DON'T KNOW THAT.

3    **Q.**  AND -- NOW YOU HAVE GIVEN -- YOU HAVE GIVEN AN OPINION

4    THAT THE DISABLING OF HARMONY WOULD HAVE HAD THE EFFECT OF

5    INCREASING DEMAND FOR THE IPODS; IS THAT CORRECT?

6    **A.**  YES.  THAT'S THE LOCK-OUT PART.

7        IT INCREASES DEMAND -- IT MAKES IT POSSIBLE TO TAKE

8    CUSTOMERS AWAY FROM OTHERS AS WELL AS TO KEEP YOUR OWN

9    CUSTOMERS.  THERE'S TWO EFFECTS.  THERE'S THE EFFECT ON YOUR

10   OWN CUSTOMERS WHERE LOCKING OUT HARMONY INCREASES DEMAND AND

11   THEN THERE'S ALLOWING HARMONY TO WORK INCREASES DEMAND FROM

12   PEOPLE WHO USE OTHER PRODUCTS.  SO THERE'S TWO DIFFERENT

13   EFFECTS.

14   **Q.**  I WILL COME INTO THE DIFFERENT WAYS THAT YOU INCREASE

15   DEMAND, BUT I JUST WANT TO FOCUS ON THAT YOU CONCLUDE THERE

16   WAS AN INCREASE IN DEMAND.  AND BECAUSE OF THAT INCREASE IN

17   DEMAND, YOU HAVE THE DAMAGES ESTIMATES FOR RESELLERS AND

18   CONSUMERS THAT ADD UP TO $351 MILLION, CORRECT?

19   **A.**  IT'S NOT INCREASE IN DEMAND THAT'S RESPONSIBLE FOR THAT.

20   IT HAS TO DO WITH THE PRICE RESPONSIVENESS OF DEMAND.

21   **Q.**  ALL RIGHT.  I WILL USE THAT TERM.

22       BECAUSE OF THE PRICE RESPONSIVENESS TO DEMAND FROM THE

23   DISABLING OF HARMONY, YOU'VE ESTIMATED DAMAGES FROM CONSUMERS

24   AND RESELLERS TOGETHER OF $351 MILLION.

25       DO I HAVE THAT RIGHT?

NOLL – CROSS / ISAACSON

1    **A.**  YES.  I THINK THAT'S THE RIGHT -- AGAIN, I HAVEN'T GOTTEN

2    THE NUMBER MEMORIZED.  IT WAS IN MY EXHIBIT.  THAT'S ROUGHLY

3    RIGHT.

4    **Q.**  AND IN TERMS OF PRICE RESPONSIVENESS TO DEMAND, THAT PRICE

5    RESPONSIVENESS TO DEMAND COULD HAPPEN, IN PRINCIPLE, IF ONLY

6    THREE CUSTOMERS BOUGHT AN IPOD INSTEAD OF A NONIPOD BECAUSE OF

7    THE DISABLING OF HARMONY.  IN PRINCIPLE, THAT COULD HAPPEN,

8    RIGHT?

9    **A.**  IN PRINCIPLE IT COULD, YES.  IT DEPENDS ON WHAT THE --

10   WHAT THE PROFIT EFFECT OF A SMALL PRICE INCREASE WOULD BE WITH

11   AND WITHOUT HARMONY.

12       IF IT'S VERY CLOSE TO BEING PROFITABLE TO RAISE PRICES BUT

13   YOU ARE REALLY NOT THERE YET, THEN ANYTHING THAT MAKES THE

14   DEMAND LESS PRICE RESPONSIVE COULD TIP YOU OVER.

15       SO THE NUMBER OF PEOPLE WHO SWITCH IS NOT CRUCIAL IF

16   YOU'RE CLOSE ENOUGH TO WHAT IS A PROFIT-ENHANCING PRICE

17   INCREASE.

18   **Q.**  I'M HAVING A LITTLE TROUBLE HEARING YOU.  IF YOU CAN PULL

19   THE MIC A LITTLE CLOSER.

20   **A.**  I'M PRETTY CLOSE TO IT.

21       ARE WE HAVING THE SAME PROBLEM WE HAD BEFORE?

22   **Q.**  NO.  I CAN HEAR YOU NOW.

23   **A.**  OKAY.

24   **Q.**  AND SO THE NUMBER OF PEOPLE WHO SWITCH -- OKAY.  WHEN WE

25   TALK ABOUT THE NUMBER OF PEOPLE WHO SWITCH, WE ARE TALKING

1    ABOUT HARMONY GETS DISABLED AND WE ARE TALKING ABOUT THE

2    PEOPLE WHO HAVE IPODS, AND WE'RE TALKING ABOUT PEOPLE WHO

3    INSTEAD OF BUYING A NONIPOD STAY WITH THE IPOD.

4        DO I HAVE THAT RIGHT?  THAT'S --

5    **A.**  I'M -- I'M HAVING TROUBLE TRYING TO UNDERSTAND WHAT YOU

6    JUST SAID.  I'M NOT SURE I GET IT.

7    **Q.**  THE LOCK-IN EFFECT HAPPENS, IN YOUR VIEW, BECAUSE HARMONY

8    STOPS WORKING, PEOPLE HAVE IPODS, AND BECAUSE HARMONY IS NO

9    LONGER WORKING, INSTEAD OF -- WHEN THEY -- WHEN IT COMES TIME

10   TO BUY A NEW DEVICE, INSTEAD OF THINKING ABOUT ANOTHER DEVICE,

11   THEY ARE LOCKED IN SO THEY BUY ANOTHER IPOD; IS THAT A FAIR

12   SUMMARY OF LOCK-IN?

13   **A.**  THAT'S WHAT LOCK-IN MEANS, IS THAT THE SWITCHING COSTS

14   GOING TO ANOTHER BRAND ARE HIGHER BECAUSE MORE OF YOUR MUSIC

15   IS INCOMPATIBLE WITH THE NEW BRAND.

16   **Q.**  RIGHT.

17       AND IN PRINCIPLE, IF THAT -- THAT ONLY AMOUNTED TO THREE

18   PEOPLE BECAUSE OF THE PRICE RESPONSIVENESS OF DEMAND, YOU

19   COULD STILL HAVE A $351 MILLION EFFECT, DO I HAVE THAT RIGHT?

20   **A.**  WELL, IT COULD HAPPEN TO ZERO.  THE PRICE INCREASE COULD

21   BE EXACTLY THE NUMBER -- EXACTLY THE AMOUNT TO KEEP THE NUMBER

22   OF CUSTOMERS THE SAME.

23       THE -- THE THREE PEOPLE REFERS TO WHAT WOULD HAPPEN TO

24   THAT PRICE INCREASE IF HARMONY STILL WORKED.  AND ONCE -- ONCE

25   YOU DISABLE HARMONY, THERE MAY BE NO SWITCHES FROM THE PRICE

NOLL - CROSS / ISAACSON

1    INCREASE.  THE WHOLE POINT OF THE LOCK-IN IS TO PREVENT THE

2    SWITCHING.

3        SO THIS IS A SMALL BUT SIGNIFICANT PRICE INCREASE, AND IT

4    COULD HAVE LEAD TO ZERO PEOPLE SWITCHING.

5    **Q.**  SO IT COULD BE THREE PEOPLE SWITCHING AND YOU COULD

6    STILL -- THREE PEOPLE WHO -- IT COULD BE THREE PEOPLE WHO

7    BOUGHT AN IPOD RATHER THAN A NONIPOD DEVICE BECAUSE THEY NO

8    LONGER HAVE HARMONY AVAILABLE, AND UNDER YOUR MODEL, YOU WOULD

9    STILL CONCLUDE THERE WAS $351 MILLION OF INCREASED PRICES DUE

10   TO THE DISABLING OF HARMONY.

11       DO I HAVE THAT RIGHT?

12   **A.**  IN PRINCIPLE, BUT REMEMBER, IT DEPENDS ALSO ON WHAT YOU --

13   ON YOUR CALCULATION FOR HOW CLOSE A CALL IT WAS TO WHETHER YOU

14   WANT TO RAISE THE PRICE TO BEGIN WITH.

15       SO THERE'S A FACTUAL PREMISE TO YOUR QUESTION WHICH IS

16   NOT, TO MY KNOWLEDGE, SUPPORTED BY ANY EVIDENCE.  YOU ARE

17   ASSUMING THAT YOU COULD ALMOST MAKE THE PRICE INCREASE

18   PROFITABLE BEFORE, AND IT ONLY TAKES THREE PEOPLE TO BE LOCKED

19   IN TO MAKE IT PROFITABLE NOW.  AND THAT'S THE FACTUAL PREMISE.

20   **Q.**  I APPRECIATE YOU TELLING ME WHAT I'M ASSUMING.  I'M JUST

21   ASKING YOU SOME QUESTIONS, SIR.

22       NOW, WOULD YOU -- DOES IT AFFECT YOUR OPINION OF THE

23   $351 MILLION IN DAMAGES IF NO ONE WAS USING HARMONY BEFORE

24   SEPTEMBER 2006?

25   **A.**  WELL, FIRST OF ALL, I KNOW IT'S NOT TRUE THAT NO ONE WAS

NOLL – CROSS / ISAACSON

1    USING HARMONY, BUT ACTUALLY THE NUMBER WHO ACTUALLY USED IT IS

2    NOT THE CRUCIAL FACT.  THE -- BECAUSE APPLE COULD REDUCE ITS

3    PRICES IN SUCH A WAY THAT NOBODY WOULD USE IT.

4        SO THE -- THE ISSUE OF A PRICE EFFECT IS WHAT IS THE

5    RESPONSE OF A COMPANY TO MORE COMPETITION.  IT COULD BE THAT

6    THEY LOWER PRIOR TO PRESERVE THEIR SALES.  AND THAT -- THAT'S

7    CALLED PRESERVING MARKET SHARE, AND IT'S A STANDARD BUSINESS

8    STRATEGY WHEN YOU FACE MORE COMPETITION.

9        SO HOW MANY PEOPLE ACTUALLY USED IT ISN'T THE RELEVANT

10   QUESTION.  THE RELEVANT QUESTION IS HOW MANY WOULD USE IT IF

11   THERE WEREN'T THE PRICE RESPONSIVENESS.

12   Q.  I APPRECIATE YOU TELLING ME WHAT THE RELEVANT QUESTION IS,

13   BUT IT IS MY QUESTION AND I WOULD APPRECIATE AN ANSWER TO IT.

14       DOES IT AFFECT YOUR OPINION OF THE $351 MILLION IN DAMAGES

15   IF NO ONE WAS USING HARMONY BEFORE SEPTEMBER 2006?

16           **MS. SWEENEY:**  OBJECTION, ASKED AND ANSWERED.

17           **THE COURT:**  OVERRULED.

18           **THE WITNESS:**  NO, IT DOES NOT BECAUSE YOU NEED TO

19   KNOW MORE INFORMATION TO KNOW WHETHER THAT FACT MATTERS.

20   **BY MR. ISAACSON:**

21   Q.  ALL RIGHT.

22       DOES IT AFFECT YOUR OPINION ABOUT WHETHER THERE WAS

23   $351 MILLION IN DAMAGES DUE TO THE DISABLING OF HARMONY IF

24   VERY FEW PEOPLE KNEW ABOUT HARMONY'S EXISTENCE?

25   **A.**  AGAIN, WHETHER THAT MATTERS DEPENDS ON OTHER FACTS THAT WE

```
 1    HAVEN'T SPECIFIED.
 2    Q.  SO IT DOESN'T MATTER TO YOUR OPINION THAT IPOD PRICES WERE
 3    $351 MILLION IF NO ONE KNEW ABOUT HARMONY BEFORE
 4    SEPTEMBER 2006?
 5    A.  WELL, AS A FACTUAL MATTER I KNOW THAT'S FALSE, BUT, IN
 6    FACT, HOW -- IF IT WERE NOBODY EVER HEARD OF IT BEFORE OR
 7    SINCE, THEN IT WOULD BE HARD TO IMAGINE IT HAVING AN EFFECT.
 8    BUT IT WOULD BE HARD TO IMAGINE NOBODY KNOWING ABOUT IT IF
 9    THEY HAD OVER 10 PERCENT SALES IN AUGUST.
10    Q.  WHY DO YOU SAY "10 PERCENT SALES"?  I'M TALKING ABOUT
11    HARMONY, SIR.
12    A.  I KNOW, BUT REALNETWORKS HAD A HUGE INCREASE IN ITS MARKET
13    SHARE AFTER IT INTRODUCED HARMONY.  IT COULDN'T BE THE CASE IF
14    THOSE PEOPLE DIDN'T KNOW ABOUT IT IF IT INCREASED THEIR MARKET
15    SHARE.
16    Q.  ALL RIGHT.
17       THE PRICE COMMITTEE THAT YOU TALKED ABOUT -- AND YOU
18    REVIEWED A LOT OF APPLE PRICE COMMITTEE DOCUMENTS.
19    A.  YES, I DID.
20    Q.  WHERE THE -- AND YOU SHOWED THE JURY ALL THOSE CHARTS OF
21    WHAT APPLE CONSIDERED IT TALKED ABOUT IN THE PRICE COMMITTEE.
22       IN ALL THOSE PRICE COMMITTEE DOCUMENTS, DID YOU EVER SEE
23    HARMONY MENTIONED?
24    A.  NO.
25       THE PRICE COMMITTEE DOCUMENTS THAT I SAW ARE TABLES OF
```

NOLL – CROSS / ISAACSON

1    COMPETING PORTABLE DIGITAL MEDIA PLAYERS.

2    **Q.**  DID YOU EVER SEE NAVIO MENTIONED?

3    **A.**  NOT IN THE PRICE COMMITTEE DOCUMENTS.  BUT I HAVE SEEN

4    NAVIO MENTIONED, YES.

5    **Q.**  SORRY.  I SHOULD HAVE BEEN MORE SPECIFIC.

6        IN ALL THOSE PRICE COMMITTEE DOCUMENTS, DID YOU EVER SEE

7    NAVIO MENTIONED?

8    **A.**  NAVIO IS NOT A PORTABLE DIGITAL MEDIA PLAYER, SO IT

9    WOULDN'T BE IN THOSE DOCUMENTS.

10   **Q.**  DID YOU EVER -- DO YOU KNOW IF THE NAVIO PRODUCT WORKED?

11   **A.**  I PERSONALLY HAVE NO EXPERIENCE WITH NAVIO.

12   **Q.**  DID YOU, IN ALL THOSE PRICE COMMITTEE DOCUMENTS, DID YOU

13   EVER SEE ANY MENTION OF THIRD-PARTY SOFTWARE AS SOMETHING THAT

14   WOULD BE AFFECTING IPOD PRICES?

15   **A.**  I DON'T REMEMBER.  I DON'T THINK ANY DOCUMENTS I SAW.

16       I MEAN, IT WOULD HAVE TO BE THINGS OTHER THAN THE TABLES

17   THAT I SHOWED.  AND I DON'T THINK I EVER SAW IT, BUT I'M NOT

18   SURE OF THAT BECAUSE I JUST DON'T REMEMBER.

19   **Q.**  ALL RIGHT.

20       IN SEPTEMBER 2006, 7.0 COMES OUT.  AT THAT POINT

21   REALNETWORKS HAD A MUSIC STORE -- A DOWNLOAD SERVICE, CORRECT?

22   **A.**  I'M SORRY, WHO?

23   **Q.**  REAL, REALNETWORKS.

24   **A.**  YES.  REAL --

25   **Q.**  DO YOU KNOW WHAT THE NAME OF THE STORE WAS?

NOLL - CROSS / ISAACSON

1    **A.**  I THINK IT WAS REALNETWORKS MUSIC STORE.  I KNOW IT'S

2    CALLED RMS.  I THINK IT'S REALNETWORKS MUSIC STORE.

3    **Q.**  THEY LACKED -- THEY DID NOT HAVE THEIR OWN MUSIC PLAYER.

4    REAL DID NOT HAVE ITS OWN DIGITAL MUSIC PLAYER, CORRECT?

5    **A.**  IT DIDN'T HAVE A PORTABLE DIGITAL MEDIA PLAYER.  IT WAS A

6    SOFTWARE COMPANY AND A DOWNLOAD COMPANY.

7    **Q.**  IN SEPTEMBER 2006, THE SAME MONTH AS 7.0, REALNETWORKS

8    TEAMED UP WITH SANDISK WHICH BUILT THE SANSA LINE OF MP3

9    PLAYERS.

10        ARE YOU AWARE OF THAT?

11   **A.**  I REMEMBER THAT THEY HAD A DONE AGREEMENT WITH SANDISK,

12   YES.  I DON'T REMEMBER THE DETAILS OF IT.

13   **Q.**  LET ME ASK YOU TO LOOK AT 2428.

14        IT'S IN YOUR BINDER.  I WILL ALSO PUT IT ON YOUR SCREEN

15   FOR YOU.

16                    (EXHIBIT DISPLAYED.)

17   **A.**  I CAN'T READ THE SCREEN.  IT'S TOO FUZZY.

18   **Q.**  2428.  HOPEFULLY THERE'S A TAB THAT SAYS 2428.

19   **A.**  OKAY.

20   **Q.**  THIS IS AN APPLE DOCUMENT THAT CIRCULATES A NEWS

21   ANNOUNCEMENT.

22        AND YOU SEE IN THE THIRD PARAGRAPH, "REAL'S FORTUNES" --

23   THIS IS DATED SEPTEMBER 2006.

24            "REAL'S FORTUNES CHANGED SUDDENLY ON SEPTEMBER 18TH

25            WHEN IT TEAMED UP WITH SANDISK, A MAKER OF FLASH

```
 1              MEMORY CHIPS, THAT ALSO BUILT A SANSA LINE OF MP3

 2              PLAYERS."

 3         FROM YOUR INVESTIGATION IN THE INDUSTRY, DO YOU RECALL

 4    THAT THIS IS CORRECT INFORMATION?

 5              MS. SWEENEY:  OBJECTION, HEARSAY.

 6              THE COURT:  NOT TO -- NOT GIVEN HIS QUESTION.

 7         OVERRULED.

 8              THE WITNESS:  I HAVE -- I HAVE NO WAY OF KNOWING

 9    WHETHER THIS IS ACCURATE OR NOT.

10    BY MR. ISAACSON:

11    Q.   YOU TALKED ABOUT HARMONY BEING PERMANENTLY DISABLED.

12         DID YOU DO ANY INVESTIGATION OF WHAT REALNETWORKS DID FOR

13    ITS BUSINESS -- IN TERMS OF ITS BUSINESS AFTER SEPTEMBER 2006?

14    A.   WHAT DO YOU MEAN?  ASK AGAIN.  I'M NOT SURE --

15    Q.   HARMONY'S DISABLED IN SEPTEMBER 2006.

16    A.   GOT IT.

17    Q.   DID YOU DO ANY INVESTIGATION OF WHAT REALNETWORKS DID IN

18    ORDER TO IMPROVE AND BUILD ITS BUSINESS?

19    A.   YES.  I HAVE STUDIED REALNETWORKS' BUSINESS BEYOND THAT

20    DATE, BUT I DIDN'T DISCUSS IT IN MY TESTIMONY AND I DON'T

21    REMEMBER WHAT THE RESULTS OF THAT INQUIRY WERE.

22    Q.   WELL, AT THE BOTTOM OF THIS PAGE IS A REFERENCE TO

23    RHAPSODY BEING AVAILABLE AS A SUBSCRIPTION SERVICE?

24    A.   RHAPSODY IS THE STREAMING SERVICE.

25    Q.   CORRECT.
```

NOLL – CROSS / ISAACSON

1    **A.**   ON THE REALNETWORKS IT USED TO OFFER.  IT DOESN'T ANYMORE.

2    **Q.**   MUSIC –– IN SEPTEMBER 2006, RHAPSODY EXISTED, AND IT WAS

3    OFFERING A SUBSCRIPTION SERVICE FOR STREAMING, CORRECT?

4    **A.**   THAT'S CORRECT.

5    **Q.**   STREAMING –– RHAPSODY APPARENTLY DIDN'T SUCCEED YOU SAY,

6    BUT STREAMING BECAME A FAIRLY BIG DEAL, RIGHT?

7    **A.**   RHAPSODY WAS SOLD TO SOMEBODY ELSE.  I DON'T KNOW WHETHER

8    IT SUCCEEDED OR NOT.

9    **Q.**   OKAY.

10       AND MOVING DOWN ONTO PAGE 2 OF 4, FLIPPING THE PAGE,

11   THERE'S QUOTES FROM THE CEO OF REALNETWORKS, ROB GLASER.

12       YOU KNOW WHO HE IS, RIGHT?

13   **A.**   I DO.

14   **Q.**   AND HE SAYS IN THE MIDDLE OF THE SECOND FULL PARAGRAPH,

15   HE'S TALKING ABOUT THEY ARE MOVING TO THIS JUKEBOX IN THE SKY,

16   AND THAT'S RHAPSODY.

17       YOU KNOW THAT TERM, RIGHT?

18   **A.**   THAT'S THE WORD –– THAT'S THE BUZZ WORD FOR STREAMING

19   SERVICES.

20   **Q.**   RIGHT.

21       AND IN THE NEXT PARAGRAPH, MR. GLASER IS QUOTED AS SAYING:

22           "APPLE'S PARADIGM IS THE IPOD AND THAT HAS OBVIOUSLY

23           WORKED GREAT FOR THEM.  OUR PARADIGM IS THE JUKEBOX

24           IN THE SKY."

25       YOU KNEW –– YOU KNOW THAT FROM YOUR INVESTIGATION THAT IN

1    SEPTEMBER 2006, REALNETWORKS WAS SHIFTING ITS BUSINESS MODEL

2    TO -- TOWARDS THE JUKEBOX IN THE SKY, RIGHT?

3    **A.**  I WOULDN'T USE THE WORD "SHIFT".  I WOULD USE INSTEAD THEY

4    WERE INCREASING THEIR EMPHASIS ON STREAMING.

5    **Q.**  LET ME ASK YOU THIS.  IN THE LAST PARAGRAPH MR. GLASER IS

6    ASKED:

7              "SO YOU ARE NOT INTERESTED IN COMPETING HEAD TO HEAD

8              WITH APPLE?

9              "NO, THAT'S NOT WHAT WE'RE DOING.  IT'S MORE WHAT

10             MICROSOFT IS DOING WITH THE ZUNE PLAYER."

11        AT THIS POINT, REALNETWORKS WAS MAKING THE BUSINESS

12    DECISION TO MOVE AWAY FROM COMPETING WITH THE IPOD IN FAVOR OF

13    THE JUKEBOX IN THE SKY, RIGHT?

14    **A.**  WELL, THAT'S WHAT THIS QUOTE SAYS.

15    **Q.**  DID YOU KNOW THAT FROM YOUR INVESTIGATION?  DO YOU KNOW

16    THAT TO BE TRUE?

17    **A.**  WHAT I KNOW TO BE TRUE IS THAT THE STREAMING WAS DIVESTED

18    AND THE REST WASN'T.  IT'S NOT TRUE THEY EXITED THE BUSINESS.

19    **Q.**  BUT IN TERMS OF WHERE THEY WERE PLACING THEIR RESOURCES,

20    WHERE THEY WERE INNOVATING, DO YOU KNOW WHAT REALNETWORKS IS

21    DOING BEGINNING SEPTEMBER 2006?

22    **A.**  I DON'T THINK THE STATEMENT ACCURATELY CAN BE INTERPRETED

23    OR REFLECTS WHAT'S ACTUALLY GOING ON IN THE SENSE THAT I THINK

24    IT IS TRUE THEY SAW STREAMING AS AN IMPORTANT NEW BUSINESS

25    OPPORTUNITY.  I DON'T THINK IT WAS AT A SUBSTITUTE FOR

NOLL – CROSS / ISAACSON

1    EVERYTHING ELSE.

2    **Q.**  ALL RIGHT.

3        AND THEN ONE MONTH LATER, IN OCTOBER 2006, REALNETWORKS

4    ANNOUNCED A DEAL NOT ONLY WITH SANDISK, BUT WITH BEST BUY SO

5    THAT SANDISK AND REALNETWORKS RHAPSODY, THE STREAMING SERVICE,

6    COULD WORK WITH THE BEST BUY DIGITAL MUSIC STORE.

7        ARE YOU AWARE OF THAT FROM YOUR INVESTIGATION OF THE

8    INDUSTRY?

9    **A.**  YES.  I KNOW THAT RHAPSODY WAS MADE AVAILABLE ON NUMEROUS

10   PLATFORMS.  AND IT STILL IS BY ITS NEW OWNER, BUT IT'S NOT A

11   VERY IMPORTANT STREAMING SERVICE.

12   **Q.**  ULTIMATELY IT DID NOT BECOME AN IMPORTANT STREAMING

13   SERVICE, BUT WE DIDN'T KNOW THAT IN SEPTEMBER 2006, DID WE?

14   **A.**  WHAT WE KNEW IN SEPTEMBER OF 2006 IS THAT THERE WERE NO

15   SUCCESSFUL STREAMING SERVICES.

16   **Q.**  RIGHT.  AND LATER, RHAPSODY COMPETED AS A STREAMING

17   SERVICE AGAINST OTHER STREAMING COMPANIES.  STREAMING BECAME

18   SUCCESSFUL, AND RHAPSODY DIDN'T SUCCEED IN THAT COMPETITION;

19   IS THAT A FAIR SUMMARY?

20   **A.**  BUT MANY YEARS LATER.  LONG AFTER THE CLASS PERIOD ENDS.

21   **Q.**  YES.  YES.  I AM JUST TALKING ABOUT THE STATE OF

22   COMPETITION.

23       SO AFTER HARMONY WAS BLOCKED, REALNETWORKS ACTUALLY

24   INNOVATED.  THEY PUT OUT A STREAMING SERVICE.  THEY DID NEW

25   BUSINESS DEALS WITH SANDISK, A LARGE DIGITAL MUSIC PLAYER

1    COMPANY AND WITH A BEST BUY MUSIC STORE, AND OFFERED THAT TO

2    CONSUMERS.  THAT'S WHAT HAPPENED, RIGHT?

3    **A.**  SORT OF.  BUT THAT'S WAY OVERSTATED.  IT'S NOT -- THAT'S

4    NOT AN ACCURATE CHARACTERIZATION OF WHAT HAPPENED.

5    **Q.**  ALL RIGHT.  I WILL ACCEPT "SORT OF".

6        YOU HAVE GIVEN THE OPINION IN THIS CASE THAT DIGITAL

7    DOWNLOADS AND CD'S ARE NOT CLOSE SUBSTITUTES AND NOT IN THE

8    SAME MARKET, RIGHT?

9    **A.**  YES, I HAVE.

10    **Q.**  AND THE MARKET THAT YOU'RE TALKING ABOUT THERE WOULD BE

11    THE MARKET FOR DIGITALLY-DOWNLOADED MUSIC, RIGHT?

12        WHEN YOU SAY THEY ARE NOT IN THE SAME MARKET, WHAT MARKET

13    ARE YOU REFERRING TO?

14    **A.**  IT'S A MARKET I DIDN'T DEFINE IN MY TESTIMONY.  WE HAVE TO

15    START WITH THE REFERENCE PRODUCT, AND THE REFERENCE PRODUCT

16    WOULD BE THE DIGITAL DOWNLOAD.  AND THEN THE QUESTION IS

17    WHETHER THE CD'S ARE THE PRICE CONSTRAINT ON DIGITAL DOWNLOAD.

18    **Q.**  JUST SO THE JURY UNDERSTANDS, IN YOUR REPORTS, IN ADDITION

19    TO A DIGITAL PLAYER MARKET, YOU IDENTIFIED A DIGITAL DOWNLOAD

20    MARKET.  CORRECT?

21    **A.**  THAT'S CORRECT.

22    **Q.**  AND YOU SAID THAT -- AND YOU LOOKED AT WHETHER CD'S,

23    PHYSICAL CD'S BELONG IN THAT MARKET.  AND YOU FOUND THAT THEY

24    WERE NOT CLOSE SUBSTITUTES TO DIGITAL DOWNLOADS.  CORRECT?

25    **A.**  THAT'S CORRECT.

NOLL – CROSS / ISAACSON

```
1    Q.  AND YOU SAID --

2    A.  DURING THE CLASS PERIOD, YES.

3    Q.  DURING THE -- YES, DURING THE CLASS PERIOD 2006 TO 2009.

4        AND YOU ALSO FOUND THAT FROM THE RESEARCH LITERATURE, IT

5    DOESN'T APPEAR TO BE THE CASE THAT DOWNLOADS AND CD'S ARE

6    CLOSE SUBSTITUTES.  AGAIN, DURING THE CLASS PERIOD.

7    A.  THAT'S CORRECT.

8    Q.  NOW, YOU'RE AN EXPERT IN THIS LITIGATION CONSULTING WITH

9    THE PLAINTIFFS, AND THEY PAY YOUR BILLS FOR THE TWO AND A HALF

10   YEARS OF WORK THAT YOU DESCRIBE, RIGHT?

11   A.  YES.

12   Q.  PLAINTIFF COUNSEL.

13       AND YOU ARE ALSO AN EXPERT FOR THE SAME LAW FIRM, THE

14   FOLKS SITTING HERE, IN ANOTHER CASE IN RE DIGITAL MUSIC

15   ANTITRUST LITIGATION, RIGHT?

16   A.  I DON'T RECALL -- I THINK I WAS INVOLVED FOR A WHILE.  I

17   HAVEN'T HEARD ABOUT THAT CASE IN SO LONG I HAD FORGOTTEN ABOUT

18   IT.

19   Q.  CAN I ASK YOU TO LOOK AT -- THERE'S A TAB --

20   A.  YEAH.

21   Q.  -- SEE IF WE CAN HELP YOUR MEMORY HERE.

22       IT'S TAB 7 IN YOUR BINDER.

23   A.  WHICH ONE?  NUMBER 1?

24   Q.  NUMBER 7.

25           MR. ISAACSON:  YOUR HONOR --
```

1        **THE CLERK:** WHICH BINDER?

2        **THE COURT:** YOU CAN APPROACH. IS THERE A WHITE

3    BINDER?

4        **MR. ISAACSON:** YES. IT'S A WHITE BINDER.

5        **THE WITNESS:** GOT IT. OKAY. I REMEMBER THIS NOW. I

6    DIDN'T REMEMBER THAT THIS FIRM WAS INVOLVED WITH IT.

7    **BY MR. ISAACSON:**

8    **Q.** OKAY. BUT THE REPORT WE'RE LOOKING AT WAS FROM MARCH OF

9    THIS YEAR?

10   **A.** YES. I DIDN'T REMEMBER THEIR INVOLVEMENT. I STILL DON'T

11   REMEMBER THEIR INVOLVEMENT.

12   **Q.** THEY ARE -- ALL RIGHT. BUT THEY ARE THE ONES WHO RETAINED

13   YOU IN THIS *IN RE DIGITAL MUSIC ANTITRUST LITIGATION*, AND YOU

14   FILED A REPORT IN MARCH OF THIS YEAR IN THAT CASE, RIGHT?

15   **A.** I DON'T KNOW IF THEY WERE THE ONES WHO RETAINED ME. I

16   DON'T REMEMBER IT THAT WAY. BUT THEY MAY WELL HAVE BEEN, I

17   JUST DON'T REMEMBER.

18   **Q.** THE -- NOW THE DIGITAL DOWNLOADS CASE ALLEGES THAT THE

19   MAJOR RECORD LABELS ARE ENGAGED IN A CONSPIRACY TO INCREASE

20   DIGITAL MUSIC PRICES IN VIOLATION OF THE ANTITRUST LAWS FROM

21   DECEMBER 2001 TO THE PRESENT.

22       YOU REMEMBER THAT?

23   **A.** YES.

24   **Q.** AND SO THE CASE ACCUSES THE MAJOR LABELS, NAMES WE HAVE

25   HEARD, SONY, UNIVERSAL, WARNER, EMI OF CONSPIRING TO FIX THE

NOLL – CROSS / ISAACSON

1    PRICES OF INTERNET MUSIC AT 70 CENTS, RIGHT?

2    **A.**  RIGHT.

3    **Q.**  THAT'S THE PRICE THEY WERE SELLING TO COMPANIES LIKE

4    APPLE, RIGHT?

5    **A.**  WELL, PREDATES THAT.  THAT'S THE PRICE THEY WERE SELLING

6    TO THEMSELVES.  THAT'S HOW IT STARTED.

7    **Q.**  OKAY.  IT'S THE SAME PRICE THEY WERE SELLING TO APPLE,

8    RIGHT, AFTER THE ITUNES STORE?

9    **A.**  YES, BUT IT WAS –– THEY HAD ESTABLISHED THAT PRICE SEVERAL

10   YEARS BEFORE, MAYBE THREE YEARS BEFORE.

11   **Q.**  THE ALLEGATION IS THEY ESTABLISHED THAT PRICE BEFORE THE

12   ITUNES STORE BECAUSE OF PRICE–FIXING IN VIOLATION OF THE

13   ANTITRUST LAWS, AND THEY CONTINUED TO CHARGE APPLE THAT PRICE

14   AFTER THE ITUNES STORE WAS OPEN; IS THAT CORRECT?

15   **A.**  THEY –– YEAH.  THAT PRICE HAS BEEN THERE SINCE WHENEVER

16   THEY FIRST ESTABLISHED IT.  I DON'T REMEMBER THE EXACT DATE,

17   BUT IT'S LIKE 2000 OR 2001.  I GUESS IT'S 2001.

18   **Q.**  2001.

19       AND THE ALLEGATION IS THAT THAT ANTICOMPETITIVE CONDUCT

20   CAUSED MEMBERS OF THE CLASS TO PAY HIGHER PRICES FOR BOTH

21   DOWNLOADS AND CD'S, CORRECT?

22   **A.**  THAT'S CORRECT.

23   **Q.**  NOW, IN YOUR REPORT IN THAT CASE, YOU HAVE FOUND THAT

24   PHYSICAL CD'S AND DIGITAL DOWNLOADS OF SOUND RECORDINGS ARE

25   CLOSE SUBSTITUTES?

1    **A.**   IN THE EARLY PERIOD, YES.  I DON'T THINK THEY ARE CLOSE

2    SUBSTITUTES IN THE CLASS PERIOD, BUT IN THE EARLIER PERIOD,

3    YES.

4    **Q.**   WELL, THE CLASS PERIOD IS 2001 THROUGH THE PRESENT, RIGHT?

5    **A.**   THAT'S CORRECT.

6    **Q.**   ALL RIGHT.  AND, IN FACT, WHAT YOU FOUND WAS THAT THEY

7    ARE –– WELL, YOU –– WHAT EARLIER PERIOD DO YOU THINK YOU ––

8    YOU FOUND THEY WERE NOT CLOSE SUBSTITUTES?

9    **A.**   THIS CASE IS ABOUT TO THE SAME ISSUES THAT AROSE IN THE

10   NAPSTER CASE.  IT'S ABOUT THE FORMATION OF MUSICNET AND

11   PRESSPLAY ––

12   **Q.**   THAT'S NOT MY QUESTION, SIR.

13   **A.**   AND THAT'S WHEN I DEFINED THE RELEVANT MARKET, WHETHER

14   THERE WOULD BE AN EFFECT, WHETHER –– WHETHER IT WAS PLAUSIBLE

15   THAT FIXING THE PRICE OF DIGITAL DOWNLOADS WOULD AFFECT THE

16   PRICE OF CD'S, AND THE TIME THEY DID IT, 2001, 2002, 2003, IN

17   THAT ERA, IN THAT PERIOD.  THAT'S WHAT I WAS ANALYZING THERE.

18   **Q.**   BUT YOU DID THIS IN A REPORT WHERE THE PLAINTIFFS WERE

19   SEEKING A CLASS FOR 2001 TO PRESENT, CORRECT?

20   **A.**   YES.

21   **Q.**   AND YOU, IN YOUR REPORT, SAID THAT DIGITAL –– THAT CD'S

22   AND DIGITAL SOUND –– DIGITAL DOWNLOADS ARE CLOSE SUBSTITUTES,

23   CORRECT?

24   **A.**   I SAID AT THE TIME THEY ENGAGED IN THE PRICE-FIXING, YES,

25   THAT –– WHEN THE PRICE-FIXING CONSPIRACY STARTED, YES.

NOLL – CROSS / ISAACSON

1   **Q.**  WELL, THE PRICE-FIXING IS ALLEGED FROM 2001 TO PRESENT,

2   RIGHT?

3   **A.**  I THINK SO, BUT I DON'T REMEMBER THE COMPLAINT.  THE

4   CRUCIAL PART OF MY ANALYSIS IS THE MUSICNET, PRESSPLAY PART.

5   **Q.**  YOU WRITE YOUR OWN REPORTS, RIGHT?

6   **A.**  YES.

7   **Q.**  NOW, WHEN YOU WROTE YOUR DIGITAL MUSIC REPORT, YOU

8   ACTUALLY STARTED WITH PARTS OF YOUR REPORT IN THIS CASE AND

9   CUT AND PASTED THEM INTO THE NEW REPORT.

10  **A.**  SOME OF IT AND ALSO THE NAPSTER -- A LOT OF IT IS FROM THE

11  NAPSTER REPORT THAT I DID.

12  **Q.**  YOU LITERALLY JUST CUT AND PASTED THE SAME LANGUAGE.

13  **A.**  IN SOME PARTS, YES.

14  **Q.**  IN THE DIGITAL --

15  **A.**  WE WROTE IT TO MAKE IT RELEVANT TO THIS CASE, YES.

16  **Q.**  SO LET ME -- SO -- AND SPECIFICALLY, IN THE CASE THIS YEAR

17  AGAINST THE RECORD LABELS, YOU LOOKED AT THE ISSUE AS TO

18  WHETHER DIGITAL DOWNLOADS WERE A RELEVANT MARKET.  RIGHT?

19  **A.**  YES.

20  **Q.**  OKAY.  AND SO IF I CAN SHOW A SIDE BY SIDE.

21              (DOCUMENT DISPLAYED TO JURY.)

22      ON THE LEFT, SIR, IS YOUR REPORT IN THIS CASE AND ON THE

23  RIGHT IS YOUR REPORT IN *DIGITAL MUSIC*.  AND THIS IS -- THIS IS

24  PART OF YOUR RELEVANT MARKET ANALYSIS.

25      THIS IS AN EXAMPLE OF WHERE YOU CUT AND PASTED STATEMENTS

1   FROM THE REPORT IN THIS CASE AND PUT IT IN THE *DIGITAL MUSIC*

2   CASE, RIGHT?

3   **A.**   THAT'S ACTUALLY QUITE NOT TRUE BECAUSE THIS PARAGRAPH

4   COMES FROM A THIRD REPORT THAT HAD TO DO WITH A RATE HEARING

5   AT THE COPYRIGHT ROYALTY BOARD.

6   **Q.**   RIGHT.  BUT IT'S THE EXACT SAME LANGUAGE IN BOTH REPORTS?

7   **A.**   THAT'S RIGHT.

8   **Q.**   NOTHING WRONG WITH THAT.  IT'S YOU WRITING BOTH TIMES.

9   **A.**   UH-HUH.

10  **Q.**   YOU ARE ALLOWED TO PLAGIARIZE YOURSELF.  I DO IT ALL THE

11  TIME FROM MY LEGAL BRIEFS.  BUT I'M JUST TRYING TO EXPLAIN --

12  **A.**   I DON'T THINK IT'S PLAGIARISM, BY THE WAY.  I THINK THAT

13  WAS UNNECESSARY AND UNCALLED FOR, MR. ISAACSON.

14  **Q.**   I REFERRED TO IT AS MYSELF, TOO.  THE -- IT'S ABSOLUTELY

15  OKAY TO USE YOUR OWN WRITING TWICE.

16      AND THEN ON THE NEXT PAGE, AGAIN, IN YOUR MARKET ANALYSIS,

17  YOU USE THE SAME WORDS IN THAT CASE AND IN THIS CASE, RIGHT?

18  **A.**   AND IN THE SIRIUS XM RATE HEARING.

19  **Q.**   OKAY.  AND IN ANOTHER HEARING YOU USE THE SAME LANGUAGE.

20      NEXT SLIDE.

21              (DOCUMENT DISPLAYED TO JURY.)

22      THIS IS ANOTHER EXAMPLE OF YOU USING THE SAME LANGUAGE IN

23  BOTH CASES?

24  **A.**   THAT'S RIGHT.

25  **Q.**   NOW, WHEN YOU DID THE MARKET ANALYSIS, THOUGH, OF DIGITAL

NOLL - CROSS / ISAACSON

1    DOWNLOADS, WHEN YOU GOT TO THE ISSUE OF WHETHER CD'S IN

2    DIGITAL DOWNLOADS WERE CLOSE SUBSTITUTES, YOU HAD A DIFFERENT

3    CONCLUSION IN THE *DIGITAL MUSIC* CASE THAN YOU DID IN THIS.

4        IN THIS CASE YOU SAID THAT CD'S AND DIGITAL DOWNLOADS ARE

5    NOT CLOSE SUBSTITUTES, AND IN THAT CASE YOU SAID THEY WERE,

6    RIGHT?

7    **A.**  THAT'S RIGHT.  BECAUSE THE TIME PERIOD I WAS FOCUSED ON

8    WAS DIFFERENT.

9    **Q.**  ALL RIGHT.  WE WILL GET TO THAT --

10    **A.**  I ACTUALLY MENTIONED IT IN MY EXPERT REPORT IN THIS CASE.

11    I WAS TALKING ABOUT THE FIRST 4 MILLION DECLINE IN SALES -- OR

12    4 BILLION DECLINE IN CD'S WAS DURING THE PERIOD OF THE RISE OF

13    DIGITAL DOWNLOADS.

14    **Q.**  ALL RIGHT.

15    **A.**  BUT THE SUBSEQUENT DECLINES HAD NOTHING TO DO WITH DIGITAL

16    DOWNLOADS.

17    **Q.**  LET'S LOOK AT YOUR DECLARATION IN DIGITAL DOWNLOADS.

18        I WOULD LIKE TO PUT PAGE 19 AND 20 ON THE SCREEN, YOUR

19    HONOR.

20        DON'T SHOW IT TO THE JURY YET.

21            (DOCUMENT DISPLAYED ON SCREEN.)

22        **MR. ISAACSON:**  IS THERE ANY OBJECTION?

23        **THE COURT:**  I DON'T KNOW WHICH ONE YOU ARE TALKING

24    ABOUT.

25        **MR. ISAACSON:**  I'M SORRY, WE ARE AT TAB 7.

NOLL – CROSS / ISAACSON

```
 1            THE COURT:  AND YOU SAID WHAT PAGE?

 2            MR. ISAACSON:  PAGE 19, AND IT'S THE BOTTOM PARAGRAPH

 3    ON 19 CONTINUING ON TO PAGE 20.

 4            THE COURT:  GO AHEAD.

 5    BY MR. ISAACSON:

 6    Q.  NOW YOU SEE AT THE TOP OF THAT PARAGRAPH OF 19, THE FIRST

 7    ISSUE IN DEFINING THE RELEVANT MARKET IS WHETHER DIGITAL

 8    PHYSICAL COPIES AND DIGITAL DOWNLOADS ARE CLOSE COMPETITIVE

 9    SUBSTITUTES.  THEN YOU GO ON TO DISCUSS THE ISSUES THERE.

10        AND AT THE END OF THE PARAGRAPH, YOU CONCLUDE:

11            "THUS, IF A CONSUMER HAS THE NECESSARY ELECTRONIC

12            DEVICES, A CD AND DIGITAL DOWNLOAD ARE FUNCTIONALLY

13            EQUIVALENT IN THAT" NEITHER CAN BE CONVERTED -- I'M

14            SORRY, "IN THAT EITHER CAN BE CONVERTED TO THE OTHER

15            AT A SMALL COST.  FOR THIS REASON, CD'S AND DIGITAL

16            DOWNLOADS ARE FUNCTIONAL SUBSTITUTES."

17    A.  THAT'S TRUE.  THEY ARE FUNCTIONAL SUBSTITUTES.

18    Q.  RIGHT.  AND THEN YOU WENT ON --

19    A.  THAT'S WHY I HAD CD PLAYERS CONSIDERED IN THE RELEVANT

20    MARKET FOR PORTABLE DIGITAL MEDIA PLAYERS.  THEY PASSED THE

21    FUNCTIONAL SUBSTITUTE TEST.

22    Q.  YOU DID NOT SAY AT ANY POINT THAT YOU WERE LIMITING YOUR

23    ANALYSIS TO 2001 OR 2002?

24    A.  THE FUNCTIONAL PART IS THE SAME.  THE ISSUE IS THE NEXT

25    PART WHICH HAS DO WITH WHICH PRODUCTS CONSTRAIN THE PRICE OF
```

1    OTHERS.

2        AND, OF COURSE, THE REFERENCE PRODUCTS CAN BE DIFFERENT.

3    IF THE REFERENCE PRODUCT IS A CD, IT CAN BE THE CASE THAT

4    DIGITAL DOWNLOAD PRICES CONSTRAIN ITS PRICING, BUT IT WOULDN'T

5    NECESSARILY MEAN THE OPPOSITE, WHICH IS CD PRICES CONSTRAIN

6    THE PRICE OF DIGITAL DOWNLOAD.

7    **Q.**  LET'S GO TO THE NEXT POINT, PARAGRAPH 20.  LET'S TRY AND

8    EXPLAIN THIS.

9            "SO THE EXTENT TO WHICH FUNCTIONAL SUBSTITUTABILITY

10            OF PHYSICAL DIGITAL RECORDINGS AND DIGITAL DOWNLOADS

11            IMPLIES THAT THE TWO TYPES OF SOUND RECORDINGS ARE

12            CLOSE COMPETITIVE SUBSTITUTES DEPENDS ON THE EXTENT

13            TO WHICH CONSUMERS HAVE ACCESS TO BOTH TECHNOLOGIES."

14       THAT'S WHAT YOU ARE TALKING ABOUT, FUNCTIONAL SUBSTITUTES

15    VERSUS COMPETITIVE SUBSTITUTES, RIGHT?  THAT'S WHAT YOU WERE

16    JUST REFERRING TO?

17    **A.**  WELL, THIS IS THE NEXT STEP IN THE ANALYSIS.  YES.

18       THIS IS STILL HAS TO DO WITH WHETHER THE FUNCTIONAL

19    SUBSTITUTABILITY MEANS THEY ARE PHYSICAL -- PHYSICALLY

20    SUBSTITUTES, YES.

21    **Q.**  SO LET'S GO TO THIS NEXT STEP.

22       BUT IN TERMS OF CONSUMERS HAVING ACCESS TO BOTH

23    TECHNOLOGIES, THAT'S REFERRING TO COMPUTER -- I'M SORRY,

24    CONSUMERS HAVING ELECTRONIC DEVICES WHERE THEY CAN USE BOTH

25    THE CD AND A DIGITAL DOWNLOAD; IS THAT CORRECT?

NOLL – CROSS / ISAACSON

1    **A.**   WELL, WHAT IT SAID IS, YOU CAN PLAY A CD ON A -- ON A

2    COMPUTER, ALTHOUGH IT'S NOT SO GREAT IN THIS TIME PERIOD, OR

3    YOU CAN DOWNLOAD THEM ON TO A COMPUTER, SMART PHONE, OR

4    PORTABLE DIGITAL MEDIA PLAYER.

5    **Q.**   WHEN YOU SAY "IT'S NOT THAT GREAT IN THIS TIME PERIOD",

6    2006, 2009 DURING THAT PERIOD?  I AM AN IPOD USER SYNCING TO A

7    COMPUTER, THE COMPUTER DURING THOSE PERIOD HAD CD BURNERS IN

8    THEM, RIGHT?

9    **A.**   SOME DID, SOME DIDN'T.  CD BURNERS IS A DIFFERENT QUESTION

10   THAN CD'S THAT YOU PLAY.

11       THIS IS ABOUT PLAYING A CD ON A COMPUTER AS OPPOSED TO

12   BURNING A CD.

13   **Q.**   OKAY.  THE -- THEY HAD CD BURNERS ON THEM, RIGHT, DURING

14   THE 2006, 2009 PERIOD, ALMOST ALL OF THEM, RIGHT?

15   **A.**   I DON'T THINK THAT'S TRUE.  NEWLY MANUFACTURED PCS THAT

16   AREN'T LOW-END HAD THEM, YES.

17   **Q.**   AND DID YOU INVESTIGATE BETWEEN THE PERIOD 2006 AND 2009

18   WHAT PORTION OF COMPUTERS HAD CD BURNERS DURING THAT PERIOD?

19   **A.**   I -- NO, I DO NOT KNOW WHAT FRACTION OF COMPUTERS THAT

20   WERE MANUFACTURED IN THAT PERIOD HAD CD BURNERS.

21   **Q.**   SO FOR THE NEXT COUPLE OF PAGES, YOU LOOK AT DATA ABOUT

22   THE TRENDS IN DIGITAL DOWNLOADS VERSUS CD SALES.

23   **A.**   THAT'S RIGHT.

24   **Q.**   DO YOU REMEMBER DOING THAT?

25   **A.**   YES.

```
1    Q.  LET'S GO TO PAGE 23.

2                (DOCUMENT DISPLAYED TO JURY.)

3        AND IN THE FIRST FULL PARAGRAPH IN THE MIDDLE OF THE PAGE:

4            "THESE DATA REVEAL THAT OVER THE COURSE OF THE LAST

5            DECADE, DIGITAL DOWNLOADS HAVE SUBSTITUTED FOR SALES

6            OF PHYSICAL COPIES."

7        THEN YOU GO ON TO SAY IN THE NEXT PARAGRAPH:

8            "THESE DATA SHOW THAT DIGITAL DOWNLOADS HAVE

9            SUBSTITUTED FOR PHYSICAL COPIES IN GENERAL AND CD'S

10           IN PARTICULAR, BUT THIS PROCESS HAS BEEN PROTRACTED

11           OVER A DECADE, AND SO BOTH CD'S AND DIGITAL DOWNLOADS

12           CONTINUE TO EXIST IN THE MARKET."

13       YOU FOUND THAT THEY WERE COMPETITIVE SUBSTITUTES OVER THE

14   PREVIOUS DECADE, RIGHT?

15   A.  READ THE REST OF THE SENTENCE.  IT DOES NOT IMPLY THEY'RE

16   IN THE SAME RELEVANT MARKET.

17   Q.  YES.  I'M GOING TO GET TO THAT.

18       I'M ONLY ASKING YOU ABOUT CLOSE SUBSTITUTES.

19   A.  THAT'S RIGHT.

20   Q.  YOU FOUND THEY WERE COMPETITIVE SUBSTITUTES OVER THE

21   PREVIOUS TEN YEARS, CORRECT?

22   A.  YES.

23   Q.  OKAY.  NOW --

24   A.  THEY WERE SUBSTITUTING FOR EACH OTHER, BUT THE ISSUE IS

25   WHETHER THEY ARE IN THE RELEVANT MARKET FOR DIGITAL DOWNLOADS.
```

1    **Q.** THAT'S YOUR NEXT STEP IN *DIGITAL MUSIC*, AND WE WILL TALK

2    ABOUT THAT.  BUT AT THIS POINT LET'S JUST STOP.  ALL RIGHT?

3        IN YOUR REPORTS IN THIS CASE, YOU TOLD -- YOU FILED

4    REPORTS IN THIS CASE THAT SAID CD'S AND DIGITAL DOWNLOADS

5    MUSIC WERE NOT CLOSE SUBSTITUTES DURING 2006 TO 2009, AND IN

6    *DIGITAL MUSIC*, YOU FILED REPORTS THAT SAID THAT CD'S AND

7    DIGITAL DOWNLOADS WERE CLOSE SUBSTITUTES OVER THE PREVIOUS TEN

8    YEARS.  CORRECT?

9    **A.** FALSE.  I SAID THEY'RE FUNCTIONAL SUBSTITUTES, BUT THEY

10   (SIC) ISSUE IN RELEVANT MARKET IS WHETHER THEY ARE ECONOMIC

11   SUBSTITUTES.  THERE, AGAIN, THAT'S A DIFFERENT QUESTION.

12   **Q.** NO.  YOU WENT FARTHER THAN FUNCTIONAL SUBSTITUTES, DIDN'T

13   YOU, SIR?  YOU FOUND THAT THEY WERE COMPETITIVE SUBSTITUTES,

14   RIGHT?

15   **A.** NO.

16       WHAT YOU ARE READING HERE IS ALL ABOUT FUNCTIONALITY AND

17   ABOUT THE FACT THAT THEY HAVE THE SAME THING IN THEM.  IT'S

18   NOT ABOUT WHO CONSTRAINS WHOSE PRICE.  THAT'S WHAT WE SHOULD

19   DO NEXT.

20   **Q.** OKAY.  LET'S GO TO THE NEXT POINT.

21       THE -- AND DO I HAVE ACCESS TO A MARKER HERE?

22           **THE COURT:**  YOU SHOULD.

23       OKAY.  LOOK ON THE BACK SIDE.

24           (MARKERS HANDED TO COUNSEL.)

25

NOLL – CROSS / ISAACSON

1   **BY MR. ISAACSON:**

2   **Q.**  SO IN *DIGITAL MUSIC*, YOU FOUND THAT EVEN THOUGH CD'S AND

3   DIGITAL DOWNLOADS WERE FUNCTIONAL SUBSTITUTES AND HAD BEEN

4   SUBSTITUTING FOR ONE ANOTHER OVER THE PAST DECADE, THEY WERE

5   NOT NECESSARILY IN THE SAME RELEVANT MARKET.  CORRECT?

6   **A.**  YES.

7   **Q.**  NOW, THE REASON FOR THAT IS THAT YOU -- IN ORDER FOR THEM

8   TO NOT BE IN THE SAME MARKET DESPITE THE FACT THAT THEY'RE

9   FUNCTIONAL SUBSTITUTES AND HAVE BEEN SUBSTITUTING WITH ONE

10  ANOTHER FOR OVER A DECADE, THE WAY YOU FIND THAT THEY ARE NOT

11  IN THE SAME RELEVANT MARKET IS BY ASSUMING THE RECORD LABELS

12  HAVE GOTTEN TOGETHER AND ENGAGED IN PRICE-FIXING, CORRECT?

13  **A.**  NO.  THAT'S NOT -- YOU DON'T -- MARKET DEFINITION DOESN'T

14  DEPEND ON WHO IS COLLUDING WITH WHO.  MARKET DEFINITION IS

15  WHAT WOULD HAPPEN IF BOTH PRODUCTS WERE SOLD AT THE

16  COMPETITIVE PRICE.

17  **Q.**  LET'S LOOK AT PAGE 24 OF YOUR REPORT.

18                 (DOCUMENT DISPLAYED TO JURY.)

19      AND THIS IS -- NONE OF THIS STUFF IS EVER EASY, BUT THIS

20  IS WHERE YOU DISCUSS WHAT YOU CALL THE CELLOPHANE FALLACY.

21  **A.**  THAT'S RIGHT.

22  **Q.**  I WILL GO THROUGH THE FALLACY A LITTLE BIT AND SEE IF WE

23  CAN DO IT TOGETHER.

24      BUT YOUR CONCLUSION IS, ON PAGE 24, THAT -- YOU ARE

25  REFERRING TO A CIRCUMSTANCE IN THE MIDDLE OF THE PAGE.

1      "IF THIS CIRCUMSTANCE."

2           "IF THIS CIRCUMSTANCE PERTAINS TO THE RELATIONSHIP

3           BETWEEN CD'S AND DIGITAL DOWNLOADS, THEN DIGITAL

4           DOWNLOADS SHOULD BE REGARDED IN THE RELEVANT MARKET

5           THAT INCLUDES CD'S."

6      ALL RIGHT?

7  **A.**  YES.

8  **Q.**  (READING)

9           "BUT IF THE REFERENCE PRODUCT IS DIGITAL DOWNLOADS,

10          THEN THE LATTER ARE SOLD IN A DISTINCT RELEVANT

11          SUBMARKET THAT DOES NOT INCLUDE CD'S."

12 **A.**  THAT IS EXACTLY RIGHT.

13 **Q.**  (READING)

14          "WHETHER THIS CONCLUSION IS WARRANTED, HINGES ON

15          WHETHER THE PRICE OF DIGITAL DOWNLOADS CAN BE

16          ACCURATELY CHARACTERIZED AS A MONOPOLY PRICE, WHICH

17          WOULD BE THE CASE IF PLAINTIFFS ALLEGATION ABOUT

18          PRICE-FIXING AMONGST THE DEFENDANTS ARE TRUE."

19     FOR DIGITAL DOWNLOADS AND CD'S TO BE IN A DISTINCT MARKET

20 FROM ONE ANOTHER, YOU HAVE TO ASSUME THAT THE RECORD -- THAT

21 THE PLAINTIFFS' ALLEGATIONS IN THAT CASE ABOUT PRICE-FIXING

22 AMONGST THE RECORD LABELS ARE TRUE, RIGHT?

23 **A.**  NO, THAT'S FALSE.  THIS IS AN EXAMPLE OF A CIRCUMSTANCE IN

24 WHICH THEY WOULD BE DIFFERENT.  BUT IT'S NOT THE ONLY ONE.

25          IT JUST SAYS THAT IF IT'S TRUE THAT THEY CONSPIRED TO SET

NOLL – CROSS / ISAACSON

1   A MONOPOLY PRICE ON DIGITAL DOWNLOADS, THEN YOU CAN OBSERVE

2   THIS PHENOMENON WHERE DIGITAL DOWNLOADS ARE IN THE MARKET FOR

3   CD'S, BUT CD'S ARE NOT IN THE MARKET FOR DIGITAL DOWNLOADS.

4       THAT'S ONLY ONE CIRCUMSTANCE WHERE IT CAN BE TWO.  THERE

5   COULD BE OTHER CIRCUMSTANCES AS WELL.

6   **Q.**  YOU DIDN'T WRITE ABOUT THOSE OTHER CIRCUMSTANCES IN YOUR

7   REPORT, DID YOU?

8   **A.**  NO.  THIS IS SIMPLY AN ILLUSTRATIVE EXAMPLE.  IT SAYS THAT

9   IF THERE IS PRICE COLLUSION GOING ON IN DIGITAL DOWNLOADS, YOU

10  COULD OBSERVE THE CELLOPHANE FALLACY.  BUT THERE ARE OTHER

11  WAYS YOU CAN OBSERVE IT AS WELL.

12  **Q.**  THE ONLY EXAMPLE YOU GAVE IN THAT CASE THAT WOULD PERMIT

13  DIGITAL DOWNLOADS AND CD'S TO BE NOT SUBSTITUTES FROM ONE

14  ANOTHER FROM THE POINT OF VIEW OF AN ECONOMIST, AND TO BE

15  DIFFERENT FROM YOUR TESTIMONY IN THIS -- IN YOUR REPORTS IN

16  THIS CASE, WOULD BE IF THE RECORD COMPANIES WERE ENGAGED IN

17  PRICE-FIXING.  THAT'S WHAT HAPPENED IN THIS REPORT, RIGHT?

18  **A.**  I SAID THAT IS AN EXAMPLE OF ONE WAY THE CELLOPHANE

19  FALLACY COULD APPLY HERE, YES.  IT'S NOT THE ONLY EXAMPLE, BUT

20  THAT'S THE ONE -- THAT'S WHAT I USED AS AN EXAMPLE HERE.

21  **Q.**  WELL, ACTUALLY, SIR, YOU DIDN'T USE THE WORD "EXAMPLE".

22  YOU SAID --

23  **A.**  WHICH WOULD BE THE CASE.

24  **Q.**  MAY I?

25      YOU SAID, "WHETHER THIS CONCLUSION IS WARRANTED HINGES

1    ON" --

2    **A.**  NO.

3    **Q.**  -- "WHETHER THE PRICE OF DIGITAL DOWNLOADS CAN BE

4    ACCURATELY CHARACTERIZED AS A MONOPOLY PRICE, WHICH WOULD BE

5    THE CASE IF THE PLAINTIFFS' ALLEGATION ABOUT PRICE-FIXING

6    AMONGST THE DEFENDANTS ARE TRUE.

7    **A.**  IT CAN BE A MONOPOLY PRICE FOR OTHER REASONS.  THAT'S THE

8    ONE I SAID IS AN EXAMPLE OF HOW IT COULD BE TRUE HERE.

9    **Q.**  BUT --

10    **A.**  NOT JUST ONE.

11    **Q.**  I AM SORRY TO INTERRUPT.

12        BUT THIS CASE WAS ABOUT THE ACCUSATIONS OF RECORD LABEL

13    PRICE-FIXING, NOT ABOUT RECORD LABELS BEING MONOPOLIES, RIGHT?

14    **A.**  IT IS NOT ABOUT A RECORD LABEL BEING A MONOPOLY.  IT'S

15    ABOUT RECORD LABELS AND GETTING IN PRICE COLLUSION, BUT THAT

16    DOESN'T MEAN THAT THIS IS THE ONLY CIRCUMSTANCE.

17        THAT WAS INTENDED TO BE AN ILLUSTRATION OF HOW THE

18    CELLOPHANE FALLACY -- HOW THIS RESULT COULD COME ABOUT, WHICH

19    IS THAT DIGITAL DOWNLOADS ARE A SEPARATE RELEVANT PRODUCT

20    MARKET IF THE REFERENCE PRODUCT IS A DIGITAL DOWNLOAD.  BUT IF

21    THE REFERENCE PRODUCT IS A CD, THEN YOU HAVE TO CONSIDER

22    DIGITAL DOWNLOADS.

23    **Q.**  LET ME SEE IF I CAN EXPLAIN THE CELLOPHANE FALLACY

24    CORRECTLY.

25        YOU CAN HELP ME OUT HERE.  I'M GOING TO WRITE IN BIG

1    LETTERS --

2              **THE CLERK:**  IT'S GOING TO NEED TO COME THIS WAY AND

3    THAT CHART IN THE FRONT WILL FALL.

4                    (PAUSE IN THE PROCEEDINGS.)

5                  (COUNSEL WRITING AT WHITE BOARD.)

6    **BY MR. ISAACSON:**

7    **Q.**  SO SUPPOSE WE ASSUME A CD COSTS $15 AND --

8              **MS. SWEENEY:**  OBJECTION, YOUR HONOR.  I AM NOT SURE

9    THE WITNESS CAN SEE THE BOARD.

10              **THE COURT:**  CAN YOU SEE THE BOARD?

11              **THE WITNESS:**  I CAN SEE IT.

12   **BY MR. ISAACSON:**

13   **Q.**  AND A DOWNLOAD COSTS $10 FOR ONE ALBUM, RIGHT?

14   **A.**  YOU MEAN PRICE OR COST?

15   **Q.**  PRICE.

16   **A.**  OKAY.

17   **Q.**  SUPPOSE THE COST FOR THE DOWNLOAD IS $5.

18      NOW, IF THIS IS A COMPETITIVE MARKET, RIGHT, THERE'S NO

19   MONOPOLY OR PRICE-FIXING, THEN THE PRICE OF THE CD IS IMPOSING

20   SOME CONSTRAINT ON THE DIGITAL DOWNLOADS.

21      DO I HAVE THAT RIGHT?

22   **A.**  NO.

23   **Q.**  IS IT THE OTHER WAY AROUND?

24   **A.**  OTHER WAY AROUND.

25   **Q.**  THAT'S WHY I ASKED THE QUESTION.

1    THEN THE –– THE PRICE, THE $10 PRICE HAS SOME CONSTRAINT

2    ON THE PRICE OF THE CD'S IF IT IS A COMPETITIVE MARKET.

3    **A.**  IF IT'S A COMPETITIVE MARKET –– IF THEY WERE GENUINELY

4    CLOSE SUBSTITUTES, THE PRICE OF A CD WOULD HAVE TO FALL TO 10

5    IF THAT WAS WHAT THE DIGITAL DOWNLOAD PRICE WAS.  BUT, OF

6    COURSE, IT DOESN'T.

7    **Q.**  SO IF THERE'S PRICE-FIXING GOING ON, YOU WOULD HAVE

8    EXPECTED THE $10 TO FALL.  IF THERE'S PRICE-FIXING GOING ON,

9    IT RESULTS IN THIS $10 PRICE.  IN THE ABSENCE OF PRICE-FIXING,

10   YOU WOULD HAVE EXPECTED THE DOWNLOAD PRICE TO FALL TO

11   SOMETHING CLOSER TO $5?

12   **A.**  DEPENDS ON WHAT YOU MEAN BY "COST".

13       THERE'S A LOT OF FIXED COSTS IN MUSIC.  AND I THINK THE

14   DISCUSSION HERE HAD TO DO WITH THE ACTUAL DISTRIBUTION ITSELF.

15   IT'S ALMOST FREE TO DISTRIBUTE DOWNLOADS.  IN THE CASE OF

16   CD'S, YOU HAVE TO MANUFACTURE THEM.

17       THAT'S WHAT THE DISCUSSION WAS ABOUT.

18   **Q.**  IT'S JUST A HYPOTHETICAL.  PICK ANY COST.

19   **A.**  OKAY.

20       WELL, YOU STILL NEED A COST FOR THE CD THAT'S HIGHER THAN

21   THE COST OF THE DOWNLOAD.

22   **Q.**  YES.

23       BUT WHEN THE –– IF THIS IS THE PRICE-FIXING PRICE, $10,

24   AND THE ACTUAL COMPETITIVE PRICE WOULD HAVE BEEN CLOSER TO $5,

25   THEN, IF YOU ASSUME THIS IS THE COMPETITIVE MARKET, YOU WOULD

NOLL – CROSS / ISAACSON

1    NOT HAVE EXPECTED THE DOWNLOADS AND THE CD'S TO BE IN THE SAME

2    RELEVANT MARKET.  RIGHT?

3    **A.**  WELL, THEY CAN BE IN THE RELEVANT MARKET WITHOUT HAVING

4    IDENTICAL PRICES.  THE ISSUE IS, IS -- DID THE PRICE OF CD'S

5    GET DETERMINED IN PART BY THE PRICE OF DOWNLOADS.  THE ANSWER

6    TO THAT IS, YES BECAUSE THE PRICE OF CD'S FELL.

7        DID THE PRICE OF DOWNLOADS GET DETERMINED BY CD'S, THE

8    ANSWER IS NO BECAUSE THE PRICE IS SO MUCH LOWER AND THE COST

9    IS SO MUCH LOWER THEY WERE INDEPENDENTLY PRICED.

10   **Q.**  THE CELLOPHANE FALLACY IS ESSENTIALLY IF THIS ISN'T A

11   COMPETITIVE PRICE --

12   **A.**  YES.

13   **Q.**  -- THEN THE IDEA THAT -- THEN LOOKING AT THESE TWO PRICES

14   AND SAYING THEY ARE IN THE SAME RELEVANT MARKET IS A FALLACY

15   BECAUSE THIS IS A PRICE THAT'S FIXED BY COLLUSION.

16   **A.**  YEAH.  EXCEPT REMEMBER THAT THE THING YOU ARE MISSING IS

17   THE WHOLESALE PRICE VERSUS THE RETAIL PRICE.

18       YOU STARTED OFF BY TALKING ABOUT 70 CENTS AS OPPOSED TO A

19   DOLLAR, WHICH IS THE IMPLICIT PRICE HERE.  SO THE OTHER

20   CONFUSION YOU'VE GOT GOING ON IS THE DIFFERENCE BETWEEN A

21   WHOLESALE PRICE AND A RETAIL PRICE.  BUT THE BASIC STORY IS AS

22   YOU DESCRIBED IT; THAT IF THE CELLOPHANE FALLACY ARISES WHEN

23   YOU ASSUME THAT AT THE CURRENT PRICES THERE IS SUBSTITUTION

24   BETWEEN TWO PRODUCTS BUT AT THE COMPETITIVE PRICE THERE

25   WOULDN'T BE BECAUSE ONE WOULD BE DOMINANT AND THE THING THAT

NOLL – CROSS / ISAACSON

```
1    WOULD DETERMINE ITS PRICE IS PURELY COMPETITION AMONG THE
2    SUPPLIERS OF THAT PRODUCT, AND THE PRICE OF THE OTHER PRODUCT
3    WOULD BE IRRELEVANT BECAUSE IT COMPLETELY DOMINATES IT.  AND
4    THAT -- THE REASON DIGITAL DOWNLOADS WOULD DOMINATE HERE IS
5    BECAUSE IT'S ESSENTIALLY FREE TO DISTRIBUTE THEM WHEREAS THE
6    DISTRIBUTION COST OF CD'S IS SUBSTANTIAL.
7    Q.  I'M GLAD I GOT THE BASIC STORY RIGHT.
8    A.  YOU CAME CLOSE.
9    Q.  LET ME SEE IF I'VE GOT THIS RIGHT.
10          MR. ISAACSON:  MATT, CAN WE DO THE SIDE BY SIDES FROM
11   HIS TWO DIFFERENT REPORTS?  THE NEXT GROUP.
12          PAGE 40 OF THE ONE REPORT AND --
13                 (DOCUMENTS DISPLAYED TO JURY.)
14          YES.
15   BY MR. ISAACSON:
16   Q.  SO ON THE LEFT IS YOUR REPORT IN THIS CASE.
17               "THE CONTINUED DECLINE AFTER DOWNLOAD SALES STOPPED
18                GROWING INDICATES THAT CD'S ARE NOT CONSTRAINING
19                SALES OF DOWNLOADS.  IF THEY WERE, THE DOWNLOADS
20                SALES WOULD HAVE CAPTURED A LARGE SHARE OF THE DROP
21                IN CD SALES AFTER 2007, WHICH THEY HAVE NOT."
22          ON THE RIGHT IS YOUR REPORT IN DIGITAL MUSIC.
23               "THE INCREASED SALES OF SOUND RECORDINGS IN VARIOUS
24                DIGITAL FORMATS TOLLING ABOUT $4 BILLION IN 2012
25                OFFSET ABOUT 40 PERCENT OF THE DECLINE IN REVENUE
```

1              FROM THE SALE OF PHYSICAL COPIES.  THE MOST IMPORTANT

2              NEW SOURCE OF REVENUE IS SALES OF PERMANENT DIGITAL

3              DOWNLOADS."

4         THEN CONTINUING ON THE NEXT PAGE, AGAIN ON THE LEFT, YOUR

5    REPORT IN THIS CASE.

6              "FOR SEVERAL OTHER REASONS, PHYSICAL COPIES ARE NOT

7              CLOSE SUBSTITUTES FOR DOWNLOADS."

8         ON THE RIGHT, THE -- YOU TALK ABOUT HOW FOLKS CAN BURN

9    THINGS.

10              **MR. ISAACSON:**  AND, ACTUALLY, MATT, I WANT THE

11   PAGE -- I WANT TO SHOW THEM AGAIN PAGE 23 OF HIS DIGITAL --

12   DIGITAL DOWNLOAD REPORT -- *DIGITAL MUSIC* REPORT.

13                   (DOCUMENT DISPLAYED TO JURY.)

14              THE -- "THESE DATA SHOW THAT DIGITAL DOWNLOADS HAVE

15              SUBSTITUTED FOR PHYSICAL COPIES IN GENERAL AND CD'S

16              IN PARTICULAR, AND THAT PROCESS HAS BEEN PROTRACTED

17              OVER A DECADE."

18         WHEN YOU WROTE THESE TWO REPORTS, YOU WENT TO WRITE THE

19   RELEVANT MARKET SESSIONS, YOU CUT AND PASTE, DID SOME COMMON

20   MATERIAL, AND THEN YOU WROTE TWO ENTIRELY DIFFERENT REPORTS

21   ABOUT WHETHER CD'S AND DIGITAL DOWNLOADS WERE CLOSE

22   SUBSTITUTES OR BELONGED IN THE SAME MARKET.  RIGHT?

23   **A.**  YES.  I DID AN ANALYSIS OF THE RELEVANT MARKET IN BOTH

24   CASES, BUT THE IMPORTANT DIFFERENCE IS THE REFERENCE -- ONE OF

25   THE REFERENCE PRODUCTS IN THE REPORT THAT YOU BROUGHT UP IS

1    CD'S AND DOWNLOADS HAVE CONSTRAINED THE PRICE OF CD'S, BUT

2    CD'S HAVE NOT CONSTRAINED THE PRICE OF DOWNLOADS.

3    **Q.**  IN THIS CASE, YOU UNDERSTOOD THAT THE PLAINTIFFS WERE

4    ALLEGING THAT FROM 2006 TO 2009, CD'S AND DIGITAL DOWNLOADS

5    WERE NOT CLOSE SUBSTITUTES FOR ONE ANOTHER.

6        YOU UNDERSTOOD THAT, RIGHT?

7    **A.**  THEY ARE NOT IN THE SAME RELEVANT MARKET.  THAT'S WHAT I

8    ANALYZED.  THEY ARE FUNCTIONAL SUBSTITUTES, BUT THEY ARE NOT

9    IN THE SAME RELEVANT MARKET.  IT'S NOT A PRICE CONSTRAINT.

10       YES, IT'S TRUE, THAT THERE HAS BEEN SUBSTITUTION OF

11   DIGITAL DOWNLOADS FOR CD'S.  BUT IT IS NOT TRUE THAT IN THE

12   SAME -- THAT IN THE CLASS PERIOD, THE PRICE OF A CD IS THE

13   PRINCIPAL PRICE CONSTRAINT ON THE PRICE OF A DIGITAL DOWNLOAD.

14   **Q.**  WASN'T QUITE MY QUESTION, SIR.

15       YOU UNDERSTOOD THAT THE PLAINTIFFS THAT YOU ARE WORKING

16   FOR, IN THEIR COMPLAINT IN THIS CASE AND THEIR PLEADINGS, WERE

17   ALLEGING THAT CD'S AND DIGITAL DOWNLOADS WERE NOT CLOSE

18   SUBSTITUTES FOR ONE ANOTHER.  RIGHT?

19   **A.**  DURING THE CLASS PERIOD, YES.

20   **Q.**  YES.  AND YOU UNDERSTOOD --

21   **A.**  AND I UNDERSTAND IT TO BE ECONOMIC SUBSTITUTES.

22   **Q.**  CLOSE ECONOMIC SUBSTITUTES.

23       AND YOU UNDERSTOOD THAT IN THE *DIGITAL MUSIC* CASE, THE

24   ALLEGATION IS THE OPPOSITE; THAT DIGITAL DOWNLOADS AND CD'S,

25   INCLUDING DURING THE PERIOD OF 2006 TO 2009, ARE CLOSE

NOLL – CROSS / ISAACSON

1   SUBSTITUTES?

2   **A.**  NO.  THE ISSUE IN THE DIGITAL DOWNLOAD CASE, THIS OTHER

3   CASE, IS WHETHER COLLUSION ON DIGITAL DOWNLOADS RAISE THE

4   PRICE OF CD'S.  THAT'S A DIFFERENT QUESTION THAN WHETHER THE

5   PRICE OF CD'S AFFECTS THE PRICE OF DIGITAL DOWNLOADS.

6       I KNOW IT SOUNDS STRANGE, BUT IT'S PERFECTLY POSSIBLE FOR

7   PRICE CONSTRAINT TO WORK IN ONE DIRECTION BUT NOT THE OTHER.

8   AND THAT -- THIS CASE IS ABOUT NOT ONLY DID THEY CONSPIRE ON

9   DIGITAL DOWNLOADS, BUT DID THE ACT OF CONSPIRING ON DIGITAL

10  DOWNLOADS CAUSE THE PRICE OF CD'S TO BE HIGHER.

11      AND THAT'S THE QUESTION I'M ADDRESSING HERE.

12  **Q.**  THAT'S EXACTLY RIGHT, ISN'T IT, SIR?

13      IN ORDER TO CLAIM, WHICH IS WHAT IS HAPPENING IN THE

14  *DIGITAL MUSIC* CASE, THAT THE PRICES OF CD'S HAVE BEEN INFLATED

15  BY PRICE-FIXING, THE PLAINTIFFS NEEDED YOU TO REACH A

16  DIFFERENT CONCLUSION ABOUT WHETHER CD'S AND DIGITAL DOWNLOADS

17  WERE REASONABLE ECONOMIC SUBSTITUTES THAN YOU REACHED IN THIS

18  CASE.

19  **A.**  NO.  THAT'S FALSE.  THE TWO REPORTS ARE COMPLETELY

20  CONSISTENT.  THAT'S WHY THE WHOLE SECTION ON THE CELLOPHANE

21  FALLACY IS THERE; IS THAT I BELIEVED DIGITAL DOWNLOADS ARE NOT

22  CONSTRAINED BY THE PRICE OF CD'S, AND THAT'S THE CONCLUSION I

23  REACHED IN BOTH REPORTS.

24  **Q.**  AND WHAT YOU WROTE IN THE DIGITAL MUSIC REPORT WAS THAT

25  YOUR WHOLE CONCLUSION HINGED ON WHETHER THERE WAS PRICE-FIXING

NOLL – CROSS / ISAACSON

```
1   AMONGST THE RECORD LABELS, RIGHT?

2   A.  THAT'S WHAT YOU ARE MISREADING IT TO SAY.

3       IT SAYS IT HINGES ON THE PRICE BEING ELEVATED IN DIGITAL

4   DOWNLOADS, ANY ONE CAUSE OF WHICH COULD BE PRICE-FIXING.

5   ANOTHER CAUSE COULD BE MONOPOLY IN THE RETAIL MARKET.  ANOTHER

6   CAUSE COULD BE SOMETHING ELSE.  THERE ARE LOTS OF POTENTIAL

7   CAUSES.  I POINTED OUT THAT ONE BECAUSE THAT WAS THE ISSUE IN

8   THIS CASE, IS THAT COLLUSION COULD BE A SOURCE OF THIS

9   PHENOMENA.

10  Q.  EXACTLY.  YOU WROTE ABOUT THAT ONE BECAUSE IF THE CAUSE

11  WAS SOMETHING ELSE OTHER THAN PRICE-FIXING, THEN THE

12  PLAINTIFFS HAD NO CASE AND THEY WERE OUT OF COURT.

13      IF YOU WROTE IN YOUR EXPERT REPORT THAT -- THAT THERE WAS

14  SOME CAUSE, IF THIS HINGED ON SOMETHING OTHER THAN

15  PRICE-FIXING, THESE FOLKS WERE OUT OF COURT, RIGHT?

16  A.  THAT'S NOT TRUE.

17          MS. SWEENEY:  OBJECTION, ARGUMENTATIVE.

18          THE COURT:  OVERRULED.

19  BY MR. ISAACSON:

20  Q.  NOW, YOU WOULD AGREE WITH ME THAT -- YOU TALKED ABOUT

21  SWITCHING COSTS.  BURNING AND RIPPING CD'S CAN BE DONE FOR A

22  SMALL COST IF THE CONSUMER HAS THE NECESSARY ELECTRONIC

23  DEVICES.

24  A.  IT'S A -- YES, SMALL DIRECT COST.  IT'S ONLY -- THE ONLY

25  REAL COST IS THE TIME SPENT DOING IT.
```

NOLL – CROSS / ISAACSON

1  **Q.**  IN FACT, A CD AND A DIGITAL DOWNLOAD ARE FUNCTIONALLY

2  EQUIVALENT AND THAT EITHER CAN BE CONVERTED TO THE OTHER AT A

3  SMALL COST IF THE CONSUMER HAS THE NECESSARY ELECTRONIC

4  DEVICES.  CORRECT?

5  **A.**  THAT'S GREAT -- THAT'S TRUE.  IT IS A RELATIVELY SMALL

6  COST COMPARED TO THE COST OF THE FILE, YES.

7  **Q.**  THOSE WERE WORDS THAT YOU WROTE IN YOUR REPORT IN *DIGITAL*

8  *MUSIC*, BUT YOU CHOSE NOT TO PUT IN YOUR REPORTS IN THIS CASE,

9  RIGHT?

10  **A.**  I TALKED ABOUT BURNING AND WHAT THE COSTS ARE.  A BLANK CD

11  AND HAVING A CD BURNER PLUS THE TIME YOU SPENT.  IT IS EXACTLY

12  THE SAME.

13  **Q.**  YOU NEVER CALLED IT A SMALL COST IN YOUR REPORTS IN THIS

14  CASE, RIGHT?

15  **A.**  I JUST CALLED IT -- I DON'T KNOW WHETHER I CALLED IT A

16  SMALL COST, BUT IT IS A COST.

17  **Q.**  SMALL COST WAS NOT A TERM YOU USED IN YOUR DIRECT

18  TESTIMONY, RIGHT?

19  **A.**  I DON'T REMEMBER WHETHER I SAID SMALL COST.  I DID SAY THE

20  DIRECT COST IS SMALL.  I DID -- BUT THERE'S ALSO THE TIME

21  COST.

22  **Q.**  AND YOU DO HAVE PERSONAL EXPERIENCING RIPPING CD'S TO A

23  COMPUTER, NOT NECESSARILY MUSIC CD'S, BUT YOU DO HAVE THAT

24  EXPERIENCE, RIGHT?

25  **A.**  WELL, READING A CD, YES.  RIPPING IS A STRANGE WORD, BUT

NOLL – CROSS / ISAACSON

1   READING, YES.  I READ -- I USE MY COMPUTER TO READ COMPACT

2   DISKS DAILY.  YES.

3   **Q.**  AND YOU HAVE BURNED A CD INTO YOUR COMPUTER OR OUT OF YOUR

4   COMPUTER, RIGHT?

5   **A.**  I HAVE SAVED FILES ON A CD, BUT ONLY RELATIVELY -- PC, BUT

6   ONLY RELATIVELY RECENTLY.  I DIDN'T HAVE A PC THAT I COULD

7   SAVE FILES TO A COMPACT DISK ON UNTIL FAIRLY RECENTLY.  WITHIN

8   THE LAST THREE OR FOUR YEARS.

9   **Q.**  AND YOU AGREE THAT WHEN YOU HAVE CD'S WHICH ARE FREELY

10  TRANSFERABLE, YOU ARE NOT LOCKED IN, CORRECT?

11  **A.**  CD'S DO NOT LOCK YOU IN, NO.

12  **Q.**  NOW, LET'S GO BACK TO --

13  **A.**  I SHOULD SAY THEY DON'T LOCK YOU IN UNLESS FOR SOME REASON

14  THE FILES ARE ENCRYPTED.  THEN THEY COULD LOCK YOU IN.

15  **Q.**  LET'S GO BACK TO THOSE RECORD LABELS.

16      IT'S YOUR OPINION THAT THE -- FROM YOUR INVESTIGATION,

17  THAT THE RECORD COMPANIES JOINTLY DEVELOPED A BUSINESS PLAN

18  FOR DOWNLOADS WITH TWO KEY ELEMENTS, ONE OF WHICH WAS THE DRM,

19  RIGHT?

20  **A.**  WELL, THEY DID HAVE DRM, YES.  THAT DID CONTRIBUTE TO

21  LOCK-IN, YES.

22  **Q.**  I THINK YOU SAID --

23  **A.**  I'M NOT SURE WHAT YOU ARE AFTER, SO I CAN'T -- I DON'T

24  KNOW HOW TO ANSWER THE QUESTION.

25  **Q.**  LET ME WALK YOU THROUGH IT.

NOLL – CROSS / ISAACSON

1    I THINK YOU ARE IN AGREEMENT THAT THE LABELS REQUIRED

2  APPLE TO USE DRM, RIGHT?

3  **A.**  THAT'S RIGHT.  UNTIL ROUGHLY 2007, ALL THE LABELS REQUIRED

4  THAT ALL DIGITAL DOWNLOADS BE ENCRYPTED.

5  **Q.**  RIGHT.

6    IN FACT, THE RECORD COMPANIES, ACCORDING TO YOU, JOINTLY

7  DEVELOPED A BUSINESS PLAN THAT INCLUDED PROTECTING AUDIO FILES

8  BY USING DRM SYSTEMS, RIGHT?

9  **A.**  THEIR ORIGINAL PLAN WAS TO DEVELOP IT THEMSELVES AND HAVE

10  A PROPRIETARY INTEREST IN THE DRM SYSTEM.

11  **Q.**  ALL RIGHT.

12    NOW, THE CONSPIRACY THAT WE TALKED ABOUT THAT'S ALLEGED IN

13  THE *DIGITAL MUSIC ANTITRUST LITIGATION*, INCLUDES THAT THE

14  RECORD LABELS AGREED TO FIX THE TERMS OF SALE, INCLUDING THE

15  DRM, RIGHT?

16  **A.**  WELL, ORIGINALLY, WHEN IT WAS GOING TO BE THEIRS, YES.

17  BUT THAT'S NOT HOW THEY -- WHAT THEY ACTUALLY DID.

18    SO THE ORIGINAL IDEA WAS THEY WERE GOING TO PRODUCE THE

19  DRM AND CHARGE A LICENSE FEE FOR IT.  WHEN THAT DIDN'T WORK,

20  THEN THE NEXT STEP WAS WHERE THEY LICENSED THE DRM FROM TWO

21  COMPANIES, REALNETWORKS AND MICROSOFT.  AND THEY SET UP TWO

22  ONLINE DIGITAL DOWNLOAD STORES, MUSICNET AND PRESSPLAY THAT

23  USED THOSE DRM SYSTEMS.  AND THE ACTUAL PRICE-FIXING

24  CONSPIRACY WAS SETTING A COMMON PRICE FOR ALL OF THE FILES,

25  ALL OF THE SOUND RECORDING FILES ON BOTH OF THOSE DIGITAL

1    DOWNLOAD SITES.

2    **Q.**   LET'S BREAK THAT DOWN.

3        YOU, IN YOUR OPINION, THE MUSIC LABELS COLLUDED WITH ONE

4    ANOTHER AND THAT INCLUDED A JOINT VENTURE CALLED MUSICNET.

5    AND PART OF THAT COLLUSION WAS AGREEING TO FIX THE TERMS OF

6    SALE RELATING TO DRM; IS THAT RIGHT?

7    **A.**   TO DRM-PROTECTED SOUND RECORDINGS.  THE -- WHAT MUSICNET

8    AND PRESSPLAY DID IS ESTABLISH THE PRICE, THE WHOLESALE PRICE

9    AND THE RETAIL PRICE FOR DOWNLOADING SOUND RECORDINGS THAT

10   WERE ENCRYPTED IN EITHER THE REALNETWORK OR WINDOWS MEDIA

11   PLAYER DRM.

12   **Q.**   AND YOU'VE ALSO GIVEN THE OPINION IN THAT CASE THAT

13   SEVERAL PRACTICES AND CONDITIONS OF THE MUSIC LABELS LED TO

14   THE CONCLUSION THAT GREATER PROFIT MARGINS FOR DIGITAL

15   DOWNLOADS ARE DUE TO PRICE COLLUSION, RIGHT?

16   **A.**   YES.

17   **Q.**   AND THAT COLLUSION INCLUDED THE JOINT VENTURE MUSICNET?

18   **A.**   YES.  MUSICNET AND PRESSPLAY.

19   **Q.**   THE MUSICNET, THE JOINT VENTURE, PRESENTED THE OPPORTUNITY

20   TO ENGAGE IN COLLUSION AND ALSO CREATE A COMMON PRICING,

21   CORRECT?

22   **A.**   THAT'S CORRECT.

23   **Q.**   AND THE EFFECT OF THAT COLLUSION WAS TO INCREASE WHOLESALE

24   PRICES FOR EACH DIGITAL DOWNLOAD.

25   **A.**   YES.  THAT WAS THE PRICE FIX.  IT WASN'T ABOUT THE DRM

1    LICENSING, BECAUSE THEY WERE FROM OTHER PEOPLE.

2        THE PRICE-FIXING WAS THE WHOLESALE PRICE AND THE RETAIL

3    PRICE OF A SOUND RECORDING TRACK.

4    **Q.**  RIGHT.

5        AND IN YOUR OPINION, MUSICNET WAS A VEHICLE THROUGH WHICH

6    DEFENDANTS -- THE RECORD LABELS EXCHANGE PRICE INFORMATION AND

7    POLICE THEIR CARTEL, CORRECT?

8    **A.**  THAT'S CORRECT.

9    **Q.**  NOW MUSICNET WAS OWNED 40 PERCENT BY REALNETWORKS, RIGHT?

10   **A.**  THAT'S CORRECT.

11   **Q.**  AND THE CEO OF MUSICNET WAS THE CEO OF REALNETWORKS, ROB

12   GLASER?

13   **A.**  THAT'S CORRECT.

14   **Q.**  AND THE ALLEGED CONSPIRACY THAT YOU HAVE FOUND TO BE -- IN

15   YOUR OPINION WAS TRUE, AN ANTITRUST CONSPIRACY TO RAISE THE

16   PRICES OF DIGITAL DOWNLOADS AND CD'S INCLUDED THE CEO OF

17   REALNETWORKS, RIGHT?

18   **A.**  WELL, HE -- YES, HE WAS THE CEO OF THE COMPANY.  AND IN

19   THE PERIOD WHEN IT OPERATED, 2001, 2002, THE PRICE-FIXING TOOK

20   PLACE IN THE CONTEXT OF THE LABELS PLUS THE REALNETWORKS

21   PEOPLE SETTING A COMMON PRICE FOR THE SOUND RECORDINGS THAT

22   WERE MADE AVAILABLE FROM ALL THE MAJOR DISTRIBUTION COMPANIES.

23   **Q.**  ONE OF THE THINGS YOU SAID IN YOUR REPORTS WAS THAT

24   APPLE'S INTERNAL DOCUMENTS STATED THAT THE RECORD COMPANIES

25   WANTED INTEROPERABILITY AND HAVE NO PROBLEM WITH HARMONY.  DO

NOLL – CROSS / ISAACSON

1    YOU REMEMBER THAT?

2    **A.**   LATER.  THIS IS MUCH LATER.

3    **Q.**   IN YOUR REPORT, YOU REMEMBER THAT?

4    **A.**   YES.

5    **Q.**   OKAY.

6    **A.**   YES.

7    **Q.**   WHEN YOU SAY –– IN FACT, THE DOCUMENTS IN THIS CASE SHOW

8    THAT THE RECORD COMPANIES WANTED INTEROPERABILITY AND HAVE NO

9    PROBLEMS WITH HARMONY, ACCORDING TO THE PLAINTIFFS, THEIR

10   DOCUMENTS ARE FROM 2004; DO YOU KNOW THAT?

11   **A.**   YES.  THE –– THE RECORD COMPANIES WANTED DRM PROTECTION

12   INITIALLY.

13   **Q.**   RIGHT.

14   **A.**   AND EVENTUALLY, THEY DECIDED THAT WAS A MISTAKE AND

15   CHANGED THEIR MINDS.

16   **Q.**   MUSICNET EXISTED IN 2004, RIGHT?

17   **A.**   NOT AS A JOINT VENTURE AMONG THE RECORD COMPANIES.  THEY

18   BASICALLY SOLD THE NAME AND IT WAS A COMPLETELY DIFFERENT

19   COMPANY.

20   **Q.**   REALNETWORKS CONTINUED TO HOLD AN INTEREST IN MUSICNET IN

21   2004, RIGHT?

22   **A.**   YES, BUT NOT THE RECORD COMPANIES.  IT WAS NO LONGER A

23   VEHICLE FOR SETTING COMMON PRICES.

24   **Q.**   SO BEFORE, YOU SAID IN YOUR REPORT THAT THE RECORD LABELS

25   HAD NO PROBLEM WITH HARMONY AND WANTED INTEROPERABILITY, DID

NOLL - CROSS / ISAACSON

1    IT OCCUR TO YOU THAT YOU HAD CONCLUDED THAT MR. GLASER AND THE

2    RECORD LABELS WERE ALL IN ONE BIG CONSPIRACY TOGETHER TO FIX

3    PRICES, AND MAYBE THAT WAS A GOOD REASON WHY THOSE RECORD

4    LABELS WERE SAYING, YES, HARMONY IS FINE WITH US, WE ARE FINE

5    WITH ROB GLASER.

6        DID THAT EVER OCCUR TO YOU?

7    **A.**  WELL, FIRST OF ALL, THE WANTING THE INTEROPERABILITY

8    OCCURS LONG AFTER THE MUSIC COMPANIES NO LONGER OWNED ANYTHING

9    ABOUT MUSICNET OR PRESSPLAY.

10   **Q.**  OKAY.  LET'S ASSUME --

11   **A.**  THEY DIVESTED THEMSELVES OF THEIR INTEREST IN 2002.  SO

12   THE TIMING JUST IS OFF.

13   **Q.**  ALL RIGHT.  LET'S ASSUME WHAT YOU JUST SAID IS TRUE.

14       DID IT --

15   **A.**  IT IS TRUE.

16           **MS. SWEENEY:**  I WOULD ASK MR. ISAACSON NOT TO

17   INTERRUPT THE WITNESS.

18           **MR. ISAACSON:**  I DIDN'T MEAN TO.

19           **THE COURT:**  THEY ARE BOTH DOING IT.

20       GO AHEAD.  DID WE GET THE ANSWER ON THE RECORD?

21   **BY MR. ISAACSON:**

22   **Q.**  DID IT OCCUR TO YOU BEFORE YOU SAID IN YOUR REPORT THAT

23   THE RECORD LABELS WERE FINE WITH HARMONY AND WANTED

24   INTEROPERABILITY, THAT YOU HAD ACCUSED THESE PEOPLE IN

25   PREVIOUS YEARS IN BEING IN A PRICE-FIXING CONSPIRACY TOGETHER;

NOLL - CROSS / ISAACSON

1    THAT THEY ALL KNEW ONE ANOTHER, THEY WERE WORKING TOGETHER FOR

2    WHAT YOU CONSIDERED TO BE ILLEGAL, DID THAT CROSS YOUR MIND

3    THAT MAYBE THAT'S WHY THE RECORD LABELS WERE SAYING IT WAS

4    FINE WITH THEM?

5    **A.**   THERE'S NO CONNECTION BETWEEN WANTING INTEROPERABILITY AND

6    ENGAGING IN PRICE-FIXING.  THEY ENGAGED IN PRICE-FIXING

7    THROUGH MUSICNET AND PRESSPLAY WHEN THEY WERE ALL INSISTING ON

8    DRM PROTECTION.

9    **Q.**   THEY ALL KNEW ONE ANOTHER, RIGHT?

10   **A.**   STILL DO, I ASSUME.

11   **Q.**   RIGHT.

12       IN FACT, IT IS YOUR CONCLUSION THAT MUSICNET, THE JOINT

13   VENTURE THAT INCLUDED MR. GLASER, THAT WAS OWNED BY

14   REALNETWORKS AND INCLUDED THE RECORD LABELS, CONSTITUTED A

15   HORIZONTAL PRICE-FIXING AGREEMENT, RIGHT?

16   **A.**   IN 2001, 2002, YES.  NOT IN 2004.

17   **Q.**   ARE YOU AWARE OF ANY INFORMATION THAT THEY HAD -- THOSE

18   CONSPIRATORS HAD SOME SORT OF FALLING OUT AND WERE NO LONGER

19   GETTING ALONG WITH ONE ANOTHER?

20   **A.**   IS THIS ABOUT WHY THEY DIVESTED MUSICNET?  I KNOW WHY THEY

21   DIVESTED MUSICNET.

22   **Q.**   NO.  I'M TALKING ABOUT THE RELATIONSHIP AMONGST THE

23   CONSPIRATORS.  BECAUSE I'M TALKING ABOUT WHY THESE RECORD

24   LABELS, IN YOUR POINT OF VIEW, WOULD BE SAYING HARMONY WAS

25   OKAY.

1      AND I WANT TO KNOW IF, IN YOUR INVESTIGATION, YOU FOUND

2    OUT THERE WAS ANY SORT OF PERSONAL FALLING OUT BETWEEN

3    MR. GLASER AND THE RECORD LABELS.

4    **A.**   WELL, THERE WERE FIGHTS BETWEEN MR. GLASER AND PEOPLE FROM

5    RECORD COMPANIES, BUT THEY DIDN'T HAVE ANYTHING TO DO WITH

6    THIS.

7    **Q.**   ALL RIGHT.  LET ME ASK YOU ABOUT A DIFFERENT TOPIC.

8      NOW, YOU ARE AWARE THAT SOME HACKERS HAVE OFFERED PROGRAMS

9    FOR BREAKING FAIRPLAY'S ENCRYPTION, CORRECT?

10   **A.**   I AM AWARE THAT THERE HAVE BEEN HACKERS WHO HAVE ATTEMPTED

11   TO DISABLE FAIRPLAY.

12   **Q.**   AND YOU HAVE GIVEN -- SOME OF THESE PROGRAMS WERE NOT

13   WHOLLY SUCCESSFUL, CORRECT?

14   **A.**   YES.

15   **Q.**   AND YOU'VE EVEN SAID THAT IN -- AT LEAST IN SOME CASES,

16   THOSE PROGRAMS CAN BE ILLEGAL, RIGHT?

17   **A.**   THAT'S CORRECT.

18   **Q.**   AND YOU AGREE THAT APPLE HAD THE RIGHT TO PROTECT ITSELF

19   FROM HACKERS WHO WERE TRYING TO BREAK FAIRPLAY'S ENCRYPTION,

20   CORRECT?

21   **A.**   THAT'S CORRECT.

22   **Q.**   YOU AGREE THAT APPLE HAD THE RIGHT TO PROTECT ITS SYSTEM

23   FROM HACKERS, SOME OF WHOM MAY HAVE BEEN ACTING ILLEGALLY,

24   RIGHT?

25   **A.**   THAT'S CORRECT.

NOLL – CROSS / ISAACSON

1    **Q.**   DO YOU AGREE WITH THE STATEMENT:  THE CREATION OF

2    TECHNOLOGICAL INCOMPATIBILITIES WITHOUT MORE DOES NOT

3    FORECLOSE COMPETITION?

4    **A.**   YES.  SOMETIMES IT CAN, YES.  DESPITE -- IF THAT'S ALL YOU

5    KNEW, THAT WOULDN'T BE ENOUGH.

6    **Q.**   DO YOU AGREE THAT THE CREATION OF TECHNOLOGICAL

7    INCOMPATIBILITIES WITHOUT MORE INCREASES COMPETITION?

8    **A.**   I AM SORRY, THE "WITHOUT MORE" I DON'T UNDERSTAND.

9    EVERYTHING SOUNDED GOOD UNTIL YOU GOT TO "WITHOUT MORE".

10   **Q.**   IT WAS LIKE THE LAST QUESTION, BUT NOW I'M ASKING ABOUT

11   INCREASING COMPETITION.

12       DO YOU AGREE THAT THE CREATION OF TECHNOLOGICAL

13   INCOMPATIBILITIES, SETTING EVERYTHING ASIDE, THAT'S WHAT I

14   MEAN BY WITHOUT MORE, INCREASES COMPETITION?

15   **A.**   IT DOESN'T PARSE TO ME THE WAY IT'S WRITTEN.

16   **Q.**   LET ME ASK YOU THIS:  DO YOU AGREE THAT TECHNOLOGICAL

17   INCOMPATIBILITIES INCREASE COMPETITION BY PROVIDING CONSUMERS

18   WITH A CHOICE AMONG DIFFERING TECHNOLOGIES?

19   **A.**   WELL, THE FACT THAT THEY PROVIDE THEM WITH A CHOICE

20   DOESN'T MEAN THEY INCREASE COMPETITION.  SO THAT -- THAT'S A

21   NON SEQUITUR.  YOU NEED MORE.

22   **Q.**   DO YOU AGREE THAT TECHNOLOGICAL INCOMPATIBILITIES INCREASE

23   COMPETITION BY PROVIDING COMPETING MANUFACTURERS THE INCENTIVE

24   TO ENTER THE NEW PRODUCT MARKET BY DEVELOPING NEW PRODUCTS OR

25   TECHNOLOGY?

NOLL – CROSS / ISAACSON

1    **A.**  WELL, YES, THEY –– IF YOU CAN CREATE AN INCOMPATIBLE –– AN

2    INCOMPATIBLE SYSTEM, YOU HAVE, IN SOME CASES, A FINANCIAL

3    INCENTIVE TO DO SO.  BUT WHETHER THAT INCREASE OR DECREASES

4    COMPETITION, DEPENDS ON THE FACTS OF THE CASE.

5    **Q.**  NOW, ABOUT THIS ISSUE OF SWITCHING COSTS IN LOCK-IN.

6         NOW, PEOPLE WHO ARE DIE-HARD FANS OF THE IPOD, BECAUSE

7    THEY JUST LIKE IT AND THEY THINK IT'S COOL, WOULD NOT BE

8    INTERESTED IN ANOTHER PORTABLE DIGITAL MUSIC PLAYER, RIGHT,

9    AND THEY ARE RELEVANT TO YOUR ANALYSIS OF SWITCHING COSTS.

10   **A.**  THEY ARE RELEVANT TO SAY THEY ARE NOT PEOPLE WHO WOULD

11   SWITCH.  YES.  THEY ARE NOT THE MARGINAL CONSUMER THAT

12   ACTUALLY DETERMINES WHAT THE PRICE IS AND THE EXTENT OF

13   COMPETITION.  BENEFICIARIES OF COMPETITION.

14   **Q.**  AND PEOPLE WHO HAD LARGE LIBRARIES OF ITUNES MUSIC PRIOR

15   TO ITUNES 7.0, THEY WERE ALREADY LOCKED IN UNDER YOUR THEORY,

16   RIGHT?

17   **A.**  YES, THEY WERE.  UNTIL THEY COULD COME –– THEY COULD MAKE

18   THEM DRM FREE, YES.

19   **Q.**  PEOPLE WHO DIDN'T BUY DIGITAL DOWNLOADS, WHO JUST LIKED

20   PUTTING CD'S ON THEIR DEVICE, THEY ARE NOT LOCKED IN.

21   **A.**  THAT'S CORRECT.  WELL, YEAH.  THEY MAY DO OTHER THINGS

22   THAT WOULD LOCK THEM IN, BUT THEY CERTAINLY ARE NOT LOCKED IN

23   BY THE MUSIC.

24   **Q.**  RIGHT.

25        IF I'M A FIRST-TIME BUYER OF AN IPOD DURING THE CLASS

NOLL - CROSS / ISAACSON

1    PERIOD, I'M NOT BUYING THAT IPOD BECAUSE OF ANY LOCK-IN, AM I?

2    **A.**  YOU MIGHT BE.  IT DEPENDS.  BUT YOU COULD HAVE STUFF IN

3    THE -- YOU COULD HAVE BOUGHT DOWNLOADS FOR YOUR COMPUTER FROM

4    THE ITUNES STORE THAT WOULD ONLY -- IF YOU DECIDED YOU THEN,

5    AFTER YOU'VE DONE THAT FOR A WHILE, WANTED TO HAVE A PORTABLE

6    DIGITAL MEDIA PLAYER, YOU WOULD HAVE A LOWER TOTAL COST OF

7    BUYING AN IPOD THAN BUYING SOMETHING ELSE.

8    **Q.**  ALL RIGHT.  SO ASSUMING I'M NOT A PERSON IN THAT CATEGORY,

9    AN ITUNE USER WITHOUT AN IPOD, IF I'M A NEW IPOD BUYER DURING

10   THE CLASS PERIOD, YOU WOULDN'T ATTRIBUTE THAT TO ANY LOCK-IN,

11   RIGHT?

12   **A.**  WELL, IF YOU HAD A LIBRARY OF STUFF DOWNLOADED FROM THE

13   ITUNES STORE PRIOR TO BUYING YOUR IPOD, YOU COULD BE LOCKED

14   IN.  IF YOU DIDN'T HAVE SUCH A LIBRARY, YOU WOULDN'T BE.

15       IT'S NOT WHETHER YOU ARE THE FIRST-TIME BUYER ALONE, IT'S

16   ALSO WHETHER YOU HAVE FILES THAT CAN ONLY BE PLAYED ON AN

17   IPOD.

18   **Q.**  IF I GOT AN IPOD AS A GIFT DURING THE CLASS PERIOD,

19   THAT'S -- THE PRICE YOU WOULDN'T SAY THAT THAT HAD ANYTHING TO

20   DO WITH LOCK-IN, WOULD YOU?

21   **A.**  MAYBE.  BECAUSE IF SOMEONE IN YOUR FAMILY BOUGHT IT WHO

22   ALREADY HAS ONE, THEY MAY WANT TO SHARE THEIR FILES WITH YOU

23   AND THE ONLY DEVICE THEY CAN BUY FOR YOU IS AN IPOD.

24   **Q.**  ALL RIGHT.  JUST ASSUMING THEY ARE BEING NICE TO ME AND

25   THEY WANT ME TO HAVE AN IPOD AS OPPOSED TO FILE SHARING WITH

NOLL – CROSS / ISAACSON

1  ME, YOU WOULDN'T SAY THAT GIFT WAS DUE TO ANY LOCK-IN, WOULD

2  YOU?

3  **A.**  NO.

4  **Q.**  I THINK YOU SAID THAT RESELLERS DON'T -- THEY DON'T HAVE

5  ANY LOCK-IN, RIGHT?

6  **A.**  RIGHT.

7  **Q.**  BECAUSE THEY DON'T -- THEY'RE RESELLING.  THEY DON'T HAVE

8  ANY MUSIC ON THESE DEVICES?

9  **A.**  RIGHT.  THEIR DEMAND FOR IPODS IS DETERMINED BY LOCK-IN

10  ONLY INSOFAR AS THEY SEE IT IN THE MARKET FOR -- WHERE

11  CONSUMERS ARE BUYING IPODS.

12  **Q.**  AND YOU SAID THAT WOULD BE ONE EXPLANATION FOR WHY

13  RESELLERS HAVE -- WHY YOU HAVE FOUND THAT RESELLERS HAD A

14  LESSER PRICE EFFECT THAN CONSUMERS IN THIS CASE, RIGHT?

15  **A.**  JUST A DIFFERENT PRICE.  I MEAN, THERE IS NO GOOD REASON

16  TO BELIEVE THE PRICE EFFECTS WOULD BE THE SAME IN BOTH

17  MARKETS.  THAT'S WHAT I WAS SAYING.

18  **Q.**  ALL RIGHT.

19      AND WOULD YOU EXPLAIN FOR ME AGAIN -- YOU SAID THAT THE --

20  THERE IS SOME PRICE EFFECT DUE TO PASS-ON; IS THAT RIGHT?

21  **A.**  YES.  THE ISSUE HERE IS HOW MUCH -- HOW MUCH OF A PRICE

22  EFFECT AT THE WHOLESALE LEVEL IS PASSED ON TO THE CONSUMERS AT

23  THE RETAIL LEVEL.  WHAT DOES THE WHOLESALE PRICE HAVE TO BE

24  FOR APPLE TO NOT BE CONCERNED THAT IT WOULD LOSE A LOT OF

25  BUSINESS AT ITS ITUNES STORE AND FOR INTERNET SALES THROUGH

1    THE RETAIL PRICES THAT ARE CHARGED BY PEOPLE WHO BUY THROUGH

2    THE RESELLER CHAIN.

3    **Q.**  SO THERE'S NO -- THERE'S NO -- THERE WOULD BE A PRICE

4    EFFECT BECAUSE THE RESELLER IS PASSING ON -- IS PASSING ON THE

5    COST TO THE CONSUMER, IS THAT IT?

6    **A.**  WELL, YES OR NO.  I MEAN, APPLE IS SETTING BOTH PRICES.

7    BOTH THE -- THEY ARE SETTING THE RETAIL PRICE AT THE APPLE

8    STORES AND THEIR SALES OVER THE INTERNET AND THEY ARE SETTING

9    THE WHOLESALE PRICE FOR DISTRIBUTORS AND LARGE RETAILERS WHO

10   BUY DIRECTLY FROM THEM.

11       AND THEY -- THE OPTIMAL PRICE FOR THEM IN EACH OF THESE

12   CHANNELS DEPENDS ON WHAT THE PRICE IN THE OTHER CHANNEL IS.

13   SO THEY SET THEM JOINTLY, BUT THEY WOULDN'T HAVE THE PRICE

14   EFFECT BE THE SAME.  IT WOULD DEPEND ON WHAT ELSE IS HAPPENING

15   IN TERMS OF THE EXTENT TO WHICH WHOLESALE PRICES ARE PASSED

16   THROUGH TO END USERS, CONSUMERS.

17   **Q.**  MAYBE YOU ANSWERED MY QUESTION, SIR, BUT I DIDN'T

18   UNDERSTAND IT.

19       AM I RIGHT, THERE WOULD BE -- THAT YOU ARE SAYING THERE

20   WOULD BE A PRICE EFFECT BECAUSE THE RESELLER IS PASSING ON THE

21   COST TO THE CONSUMER?

22   **A.**  WELL, PASS THROUGH OF THE WHOLESALE PRICE TO THE -- THE

23   EXTENT OF PASS THROUGH IS A RELEVANT FACTOR FOR WHY THE PRICES

24   DIFFER.  YES.

25   **Q.**  OKAY.  AND YOU -- YOU'VE CONCLUDED IN THIS CASE THERE IS

NOLL – CROSS / ISAACSON

1    NO ANSWER TO THE QUESTION OF HOW MANY CONSUMERS WERE LOCKED

2    OUT DUE TO LARGE LIBRARIES OF REALNETWORKS MUSIC, RIGHT?

3    **A.**   THERE'S NO FACTS THAT I'M AWARE OF ABOUT WHAT THE

4    PROPORTION WAS.

5    **Q.**   RIGHT.  THERE'S NO FACTS ABOUT HOW MUCH LOCK-OUT THERE

6    WAS?

7    **A.**   WELL, LOCK-OUT IS HOW MANY PEOPLE WANTED TO BUY IPODS BUT

8    DIDN'T BECAUSE THEY HAD LIBRARIES FROM SOMEBODY ELSE.  LOCK-IN

9    IS HOW MANY PEOPLE WHO WOULD HAVE SWITCHED HAD THEY HAD ACCESS

10   TO REALNETWORKS.

11       YES, I AM NOT AWARE OF FACTS ABOUT EITHER SIDES -- SIDE OF

12   EITHER GROUP.

13   **Q.**   RIGHT.  YOU'VE ATTRIBUTED THINGS TO BOTH LOCK-IN AND

14   LOCK-OUT, AND I THINK I'M GOING TO GO OVER AGAIN WHAT THEY

15   BOTH ARE JUST SO WE HAVE IT STRAIGHT.

16       BUT YOU ARE AWARE OF NO FACTS, AS YOU SAY, THAT INDICATE

17   HOW MUCH LOCK-IN THERE WAS OR HOW MUCH LOCK-OUT THERE WAS?

18   **A.**   NO.  EXCEPT THE INDIRECT FACT OF WHAT THE PRICE EFFECT IS

19   OF LOCK-IN.  ALL OF THE FACTORS THAT AFFECTED LOCK-IN AND

20   LOCK-OUT, NOT JUST THE 7.0, BUT ALL THE OTHER FACTORS, HAVE

21   THE EXPECTED EFFECT ON PRICE THAT YOU WOULD EXPECT FROM A

22   LOCK-IN THEORY.

23   **Q.**   ALL RIGHT.  NOW, JUST TO CLARIFY, LOCK-IN ARE PEOPLE WITH

24   AN IPOD WHO HAVE REAL -- WHO WOULD HAVE REALNETWORK MUSIC

25   STORE -- I'M SORRY.

NOLL – CROSS / ISAACSON

1    YOU SAID LOCK-IN ARE PEOPLE WHO BUY MORE ITUNES MUSIC

2    STORE MUSIC AND GET LOCKED IN BECAUSE OF THAT, RIGHT?

3    **A.**   THAT'S RIGHT.   IT'S THE MORE FILES YOU HAVE IN THE APPLE

4    ENCRYPTED TECHNOLOGY, THE MORE LOCKED IN YOU ARE.

5    **Q.**   AND LOCK-IN INCREASES DEMAND FOR THE IPOD?

6    **A.**   YES.

7    MAKES IT LESS SENSITIVE TO PRICE.   INCREASE IN DEMAND

8    ISN'T QUITE THE RIGHT WAY TO PUT IT.   IT REDUCES THE PRICE

9    RESPONSIVENESS OF DEMAND.

10    **Q.**   ALL RIGHT.

11    AND LOCK-OUT ARE PEOPLE WHO HAVE A BUNCH OF REALNETWORKS

12    MUSIC STORE MUSIC, AND SO THEY ARE NOT GOING TO BUY AN IPOD

13    BECAUSE THEY CAN'T PUT THEIR MUSIC ON THE IPOD?

14    **A.**   THAT'S THE LOCK-OUT EFFECT.

15    **Q.**   THOSE PEOPLE ARE BUYING LESS IPODS, YOU ARE REDUCING

16    DEMAND FOR THE IPOD --

17    **A.**   YOU ARE REDUCING -- AGAIN, IT'S THE PRICE RESPONSIVENESS.

18    **Q.**   RIGHT.

19    **A.**   BECAUSE THEY ARE NOT PEOPLE YOU COULD GET FROM A PRICE

20    WAR.

21    **Q.**   SO IN THIS CASE, YOU WOULD GIVE OPINIONS THAT IT'S

22    PLAUSIBLE THAT THERE'S LOCK-IN, ALTHOUGH YOU DON'T KNOW HOW

23    MUCH, AND IT'S PLAUSIBLE THAT THERE'S LOCK-OUT, BUT YOU DON'T

24    KNOW HOW MUCH; IS THAT RIGHT?

25    **A.**   WELL, YOU DON'T KNOW HOW MANY PEOPLE ARE INVOLVED IN EACH

1    PUDDLE, ALL YOU KNOW IS WHAT THE NET EFFECT OF THE TWO IS.

2    **Q.**  LET ME PUT IT THAT WAY.

3        IN THIS CASE, YOU HAVE GIVEN THE OPINION THAT LOCK-IN IS

4    PLAUSIBLE, BUT YOU DON'T KNOW HOW MANY CONSUMERS ARE IN THAT

5    CATEGORY, AND YOU'VE GIVEN THE OPINION THAT IT'S PLAUSIBLE

6    THERE IS LOCK-OUT, YOU ALSO DON'T KNOW HOW MANY CONSUMERS ARE

7    IN THAT CATEGORY, RIGHT?

8    **A.**  THERE'S NO WAY TO KNOW.

9    **Q.**  YOU DON'T KNOW WHETHER THE NUMBER OF CONSUMERS WHO ARE

10   LOCKED IN ARE LARGER OR SMALLER THAN THE NUMBER OF CONSUMERS

11   WHO ARE LOCKED OUT, CORRECT?

12   **A.**  WELL, ACTUALLY YOU CAN INDIRECTLY INFER IT FROM THE MARKET

13   SHARES.

14       A FIRM WITH A VERY HIGH MARKET SHARE OF BOTH DIGITAL

15   DOWNLOADS AND PORTABLE DIGITAL MEDIA PLAYERS, THE LOCK-IN

16   EFFECT WILL BE BIGGER THAN THE LOCK-OUT EFFECT.

17       ANOTHER FIRM -- THIS IS WHY MICROSOFT ZUNE FAILED.  IF YOU

18   HAVE A FIRM WITH A LOW MARKET SHARE OF BOTH DIGITAL DOWNLOADS

19   AND PORTABLE DIGITAL MEDIA PLAYERS, THEN THE ATTEMPT TO CREATE

20   A WALLED GARDEN WILL BE CONTRARY TO THEIR INTEREST, AND THEY

21   WILL FAIL BECAUSE THEY ARE LOCKING OUT A VERY LARGE NUMBER OF

22   PEOPLE COMPARED TO THE NUMBER THEY ARE LOCKING IN.

23   **Q.**  YOU HAVE NOT SEEN ANY ACTUAL DATA COMPARING THE NUMBER OF

24   PEOPLE LOCKED IN OR LOCKED OUT?

25   **A.**  NO.  ALL WE CAN DO IS MAKE INFERENCES FROM (A), THE MARKET

1    SHARES OF THESE COMPANIES AND (B), WHAT HAPPENS TO THEM AND

2    WHAT HAPPENS TO THEIR PRICES.

3    **Q.** ALL RIGHT.

4       NOW IN TERMS OF -- LET ME BE CLEAR.  I ASKED YOU ABOUT THE

5    PRICE COMMITTEE.  BUT YOU HAVE NOT SEEN ANY EVIDENCE IN APPLE

6    DOCUMENTS THAT APPLE LOOKED AT LOCK-IN OR LOCK-OUT WHEN

7    SETTING PRICES, RIGHT?

8    **A.** I HAVE SEEN NO EVIDENCE ONE WAY OR THE OTHER.  ALL I HAVE

9    SEEN ARE THESE TABLES THAT I SHOWED.

10   **Q.** ALL RIGHT.  THE -- AND FOR -- YOU WORK WITH A FIRM IN THIS

11   CASE ECONOMISTS, INC. RIGHT?

12   **A.** YES.

13   **Q.** IN *DIGITAL MUSIC*, YOU WORKED WITH A DIFFERENT FIRM, OSKR,

14   O-S-K-R?

15   **A.** YES.

16   **Q.** IN THIS CASE, YOU RELIED ON ECONOMISTS, INC. TO CRUNCH THE

17   NUMBERS OF THE REGRESSION; IS THAT A FAIR SUMMARY?

18   **A.** THAT'S CORRECT.

19   **Q.** AND YOU DID NOT CHECK THEIR -- DOUBLE-CHECK THEIR WORK?

20   **A.** I DIDN'T.  I DIDN'T DO THE CALCULATIONS MYSELF, NO.  I

21   DON'T -- YOU KNOW, I ASSUME THEY KNOW HOW TO RUN THEIR

22   COMPUTERS.  YES.

23   **Q.** NOW, COUNSEL, I THINK, REVIEWED WITH YOU THAT YOU HAVE

24   WRITTEN OVER 180 SCHOLARLY PUBLICATIONS.  IS THAT ALL -- I

25   KNOW A LOT OF THEM ARE PEER REVIEWED, ARE THEY -- IS THAT YOUR

NOLL – CROSS / ISAACSON

1   PEER REVIEWED CATEGORY?

2   **A.**   NO.   SCHOLARLY PUBLICATIONS INCLUDES LAW REVIEWS.   AND I

3   PUBLISHED MAYBE 25 PERCENT OF MY ARTICLES ARE IN LAW REVIEWS

4   AND THEY ARE NOT PEER REVIEWED.   MY REVIEWS ARE RUN BY LAW

5   STUDENTS AND THEY ARE SORT OF NEGATIVELY PEER REVIEWED.

6   **Q.**   I'LL AGREE WITH YOU ON THAT.

7       NOW, OF YOUR SCHOLARLY PUBLICATIONS, HOW MANY INCLUDED A

8   REGRESSION MODEL THAT YOU DESIGNED?

9   **A.**   I DON'T KNOW.   I MEAN 25, 30.   I DON'T KNOW, SOMETHING ON

10  THAT ORDER.   YOU KNOW, NOT A MAJORITY, BUT I HAVE DONE

11  REGRESSIONS BEFORE IN PEER REVIEWED PLACES.

12  **Q.**   CAN YOU NAME ANY OF THE ARTICLES THAT THAT WOULD BE THE

13  CASE?

14  **A.**   OFF THE TOP OF MY HEAD, I REMEMBER RUNNING A BUNCH OF

15  REGRESSIONS FOR A BOOK CALLED "THE TECHNOLOGY PORK BARREL".

16  THERE'S A BUNCH OF REGRESSIONS IN THE "ECONOMIC ASPECTS OF

17  TELEVISION REGULATIONS".

18      AND THEN -- I JUST DON'T REMEMBER.   THERE'S "HOW TO VOTE

19  WHETHER TO VOTE".   THERE'S -- YOU KNOW, I CAN'T REMEMBER THEM

20  ALL BY MEMORY.

21  **Q.**   YOU NO LONGER TEACHING CLASSES, RIGHT?   YOU HAVE A

22  DISTINGUISHED RETIREMENT TITLE?

23  **A.**   ACTUALLY, IT'S LIKE AN ADDICTION.   I STILL TEACH A CLASS

24  EVERY YEAR.

25  **Q.**   BUT YOUR PRIMARY WORK NOW SINCE -- I DON'T KNOW YOUR

1    RETIREMENT TITLE.

2    **A.**   PROFESSOR EMERITUS.

3    **Q.**   PROFESSOR EMERITUS.

4        SINCE YOU BECAME PROFESSOR EMERITUS, YOUR PRIMARY WORK AND

5    INCOME IS FROM LITIGATION AND CONSULTING; IS THAT FAIR?

6    **A.**   WELL, MORE THAN HALF OF MY INCOME IS FROM CONSULTING

7    BECAUSE I DON'T HAVE MY STANFORD SALARY ANYMORE, BUT IT IS

8    JUST BARELY MORE THAN HALF.  BECAUSE I STILL GIVE LECTURES AND

9    I STILL WRITE THINGS, AND I, YOU KNOW, I HAVE MY RETIREMENT

10   INCOME AND ALL THAT.

11       WITH REGARD TO THE WAY I SPEND MY TIME, I STILL DEAL WITH

12   STUDENTS, AND WRITE PAPERS, AND DO RESEARCH.  SO I DON'T THINK

13   CONSULTING ACCOUNTS FOR A MAJORITY OF MY TIME.  I THINK

14   TRADITIONAL ACADEMIC WORK STILL ACCOUNTS FOR THE MAJORITY OF

15   MY TIME.

16   **Q.**   ALL RIGHT.  MOST OF YOUR TIME, BUT NOT MOST OF YOUR INCOME

17   ANYMORE?

18   **A.**   YEAH.  IT'S A HIGHER FRACTION OF MY TIME THAN -- THAT'S

19   ALWAYS BEEN THE CASE, THAT I SPENT MORE TIME ON ACADEMICS AND

20   IT'S A FRACTION OF MY INCOME.

21   **Q.**   WE HAVE A FEW MINUTES LEFT.  LET'S START A LITTLE BIT

22   ABOUT THE REGRESSION, BUT WE WILL END AT 1:30.

23       NOW, THE REGRESSION YOU SAID IS BEFORE AND AFTER.  THAT'S

24   BEFORE AND AFTER SEPTEMBER 2006, RIGHT?

25   **A.**   CORRECT.

NOLL – CROSS / ISAACSON

```
1    Q.  AND SO WHAT YOU ARE DOING THERE IS MEASURING WHAT AFFECTS
2    THE PRICES OF IPODS BEFORE SEPTEMBER 2006 AND WHAT AFFECTS THE
3    PRICES OF IPODS AFTER SEPTEMBER 2006; IS THAT FAIR?
4    A.  WELL, THEN THERE'S THE END OF THE PERIOD AS WELL,
5    JANUARY 2009.
6    Q.  IT RUNS THROUGH --
7                      (SIMULTANEOUS COLLOQUY.)
8    A.  BEFORE, DURING, AND AFTER.
9    Q.  SORRY.
10       WHAT YOU DID WAS YOU TRIED TO INCLUDE VARIABLES IN YOUR
11   MODEL FOR FACTORS YOU BELIEVED WOULD AFFECT PRICES IN THE
12   PERIODS BEFORE THE CLASS -- BEFORE SEPTEMBER 2006 AND AFTER
13   SEPTEMBER 2006, CORRECT?
14   A.  WITHOUT CAUSING THE REGRESSION TO CRASH DUE TO MULTIPLE
15   LINEARITY, YES.
16   Q.  AND THE IDEA OF THE REGRESSION IS TO ISOLATE THE FACTORS
17   THAT COULD AFFECT PRICE BEFORE AND AFTER SEPTEMBER 2006 AND
18   WHAT REMAINS SHOULD BE THE EFFECT, ACCORDING TO YOU, OF 7.0;
19   IS THAT RIGHT?
20   A.  THAT'S CORRECT.
21   Q.  AND SO YOUR REGRESSION HAS A VARIABLE THAT REFERS TO THE
22   EFFECT OF BLOCKING HARMONY; IS THAT RIGHT?
23   A.  THAT'S RIGHT.
24   Q.  CAN WE SHOW TX754 ON THE SCREEN?  YOU LOOKED AT THIS WITH
25   PLAINTIFFS' COUNSEL.
```

1          (EXHIBIT DISPLAYED TO JURY.)

2      ALL THESE NAMES -- I WANT TO ISOLATE HARMONY 7.0 REV.

3          **MR. ISAACSON:**  CAN WE HIGHLIGHT THAT?

4  **BY MR. ISAACSON:**

5  **Q.**  THAT IS THE VARIABLE FOR 7.0, RIGHT?

6  **A.**  YES.

7  **Q.**  I THINK YOU REFERRED TO THIS AS A DUMMY VARIABLE?

8  **A.**  UH-HUH.  THAT'S CORRECT.

9  **Q.**  AND ANY FACTORS THAT ARE -- THAT AFFECTED PRICES THAT ARE

10  NOT CONTROLLED FOR BY YOUR OTHER VARIABLES WILL BE PICKED UP

11  BY THE ITUNES 7.0 DUMMY VARIABLE, RIGHT?

12  **A.**  YES.  IF IT'S TRUE THAT THERE'S SOMETHING THAT IS

13  PERFECTLY CORRELATED WITH 7.0 AND IS NOT IN THE REGRESSION, IT

14  WILL BE INCLUDED IN THE COEFFICIENT FOR 7.0.

15  **Q.**  SO IF SOMETHING WAS HAPPENING IN 7.0 IN SEPTEMBER -- AND

16  IN -- OR IN SEPTEMBER 2006, AND IT'S NOT CAPTURED BY YOUR

17  OTHER VARIABLES, IT WILL BE CAPTURED BY YOUR ITUNES 7.0

18  VARIABLE?

19  **A.**  THAT'S CORRECT.

20          **MR. ISAACSON:**  AND I THINK -- I WOULD LIKE TO SHOW,

21  DO YOU HAVE THE DEPOSITIONS, YOUR HONOR?

22      I DON'T WANT TO IMPEACH HIM, I WANT TO SHOW HIM SOME

23  TESTIMONY AND HAVE HIM EXPLAIN IT.

24          **THE COURT:**  THAT'S FINE.  IT'S NOT IMPEACHMENT.

25          **MR. ISAACSON:**  SO MATT, CAN WE LOOK AT --

1          **THE COURT:**  GIVE ME THE DATE OF THE DEPOSITION.

2          **MR. ISAACSON:**  MAY 2013.  PAGE 34, BEGINNING AT

3     LINE 13 AND CONTINUING THROUGH LINE 5 OF THE NEXT PAGE.

4        MATT, WOULD YOU PLAY THAT?

5        (DEPOSITION PLAYED AS FOLLOWS:)

6             "QUESTION:  I'M ASKING YOU MORE IN THEORY AT THIS

7             POINT.  IF 7.0 DID SOMETHING MORE THAN WHAT YOU JUST

8             DESCRIBED.

9             "ANSWER:  LIKE, FOR EXAMPLE?

10            "QUESTION:  AND IT'S NOT CAPTURED IN ONE OF THESE

11            VARIABLES THAT YOU JUST REFERRED TO, CAPACITY,

12            WHETHER IT'S PHOTO OR VIDEO, OR THE SIZE OR THE COST,

13            THEN -- THEN THE COEFFICIENT FOR 7.0 WOULD PICK UP

14            THAT, RIGHT?

15            "ANSWER:  LIKE WHAT?  I MEAN, I DON'T UNDERSTAND WHAT

16            THE -- WHAT THE 7.0 IN PRINCIPLE COULD DO.  WHAT IS

17            IT IN PRINCIPLE IT COULD DO?

18            "QUESTION:  ANYTHING THAT'S NOT CAPTURED BY ONE OF

19            YOUR OTHER VARIABLES.  THE EFFECT OF THAT WOULD BE

20            CAPTURED IN YOUR 7.0 VARIABLE, CORRECT?  BY

21            DEFINITION.

22            "ANSWER:  SO IF YOU LICK YOUR IPOD IT TASTES LIKE

23            WINE?  IS THAT WHAT 7.0 DOES, SOMETHING LIKE THAT?

24            I'M JUST -- I HAVE NO CLUE WHAT YOU ARE TALKING

25            ABOUT, WHAT IT MIGHT BE.  IF THERE'S SOME WONDERFUL

1              ATTRIBUTE OF IPODS THAT CANNOT BE OBTAINED IN ANY WAY

2              OTHER THAN 7.0 AND THAT COMPONENT IS IN THERE, SURE,

3              IT WOULD AFFECT THE PRICE.  IT WOULD MAKE IT MORE

4              VALUABLE, ASSUMING IT'S A UNIQUE -- A UNIQUE

5              ATTRIBUTE THAT WASN'T OTHERWISE INCLUDED.  BUT I

6              DON'T KNOW WHAT IT IS, AND I'VE NEVER SEEN ANYBODY

7              DESCRIBE ANYTHING LIKE THAT.

8              "QUESTIONS:  AND THIS IS THE POINT OF MY QUESTION.

9              THE EFFECT OF THAT OTHER ATTRIBUTE WOULD BE INCLUDED

10             IN YOUR 7.0 VARIABLE, CORRECT?

11             "ANSWER:  IF THERE WAS ONE, YES."

12      **BY MR. ISAACSON:**

13      **Q.**  SO AM I CORRECT THAT AT LEAST AT THE TIME OF YOUR

14      DEPOSITION AND YOUR REPORT, YOU WERE UNAWARE OF ANY UNIQUE

15      ATTRIBUTES OR WONDERFUL CHARACTERISTICS OF 7.4 -- I'M SORRY,

16      7.0, ALL YOU WERE AWARE OF WAS THE DISABLING EFFECT OF

17      HARMONY?

18      **A.**  NO, THAT'S NOT TRUE.  THE THINGS THAT WERE NOT CAPTURED

19      OTHERWISE IN THE REGRESSION, I WAS NOT AWARE OF.

20      **Q.**  RIGHT.  THE IMPLICIT -- YOUR IMPLICIT ASSUMPTION IS THAT

21      THE ONLY PRICE ENHANCING EFFECT OF 7.0 IS THE DISABLING OF

22      HARMONY; IS THAT CORRECT?

23      **A.**  THAT'S NOT QUITE RIGHT.

24             IF THERE IS -- IF THERE ARE ATTRIBUTES OF 7.0 THAT ARE NOT

25      HIGHLY CORRELATED WITH ANY OF THE VARIABLES THAT ARE ALREADY

1    IN THERE, THEN THE EFFECT OF THAT ATTRIBUTE WOULD BE

2    ACCOUNTED -- WOULD BE PICKED UP IN THE 7.0 COEFFICIENT.

3        SO YOU WOULD OVER ESTIMATE THE EFFECT OF KVC, DVC BECAUSE

4    YOU WOULD BE USING THAT VARIABLE AS A WAY TO MEASURE THE

5    ATTRIBUTE THAT HAD -- THAT WAS NOT PART OF CAPACITY AND WASN'T

6    PART OF COST AND WASN'T PART OF THE SIZE, AND ALL THE OTHER

7    THINGS.  YES.

8        SO IT HAS TO HAVE THAT FEATURE THAT IT'S NOT ALREADY

9    ACCOUNTED FOR BY THE VARIABLES THAT ARE ALREADY IN THE

10   REGRESSION.

11   **Q.**  THE ASSUMPTION IN YOUR REGRESSION WAS THAT THE ONLY PRICE

12   ENHANCING EFFECT OF 7.0 WAS DUE TO THE DISABLING OF HARMONY,

13   CORRECT?

14   **A.**  NO.  IT'S THE ONLY -- IT'S THE ONLY THING THAT ISN'T IN

15   THE REGRESSION.  THE ONLY -- THE ONLY ATTRIBUTE THAT ISN'T

16   CAPTURED BY THE REGRESSION IS THAT.

17       AND IF THERE IS SOMETHING THAT ISN'T CAPTURED IN THE

18   REGRESSION, THEN INDEED IT'S REFLECT IN THE 7.0 COEFFICIENT.

19           **MR. ISAACSON:**  YOUR HONOR, I WOULD LIKE TO PLAY FROM

20   THE NOVEMBER 2011 DEPOSITION, AND THEN I'LL BE DONE FOR THE

21   DAY.  PAGE 120.

22           **MS. SWEENEY:**  OBJECTION, YOUR HONOR.  THIS IS THE

23   DEPOSITION FROM THE RELEVANT DEPOSITION FOR CLASS

24   CERTIFICATION.

25           **MR. ISAACSON:**  LINES 12, THROUGH 23.

1      **THE COURT:**  HOLD ON.  LET ME GET IT.

2         GO AHEAD AND PLAY IT.  THE OBJECTION IS OVERRULED.

3         (DEPOSITION PLAYED AS FOLLOWS:)

4              "QUESTION:  YOUR REGRESSION, IF IT HAD ANY VALIDITY,

5                   IS ATTRIBUTING THE PRICE IMPACT TO WHAT YOU REFER TO

6                   AS 7.0.  AND THAT WOULD INCLUDE ALL ASPECTS OF 7.0

7                   THAT HAD ANY IMPACT ON IPOD DEMAND, RIGHT?

8              "MS. SWEENEY:  OBJECTION VAGUE AND AMBIGUOUS.

9              "THE WITNESS:  THE QUESTION IS SO COMPLEX, I'LL JUST

10                  ANSWER THE WAY I THINK I UNDERSTAND IT, WHICH IS, THE

11                  IMPLICIT ASSUMPTION IS THAT THE ONLY PRICE ENHANCING

12                  EFFECT OF 7.0 IS THE DISABLING OF HARMONY.  THAT'S

13                  THE MAINTAINED ASSUMPTION IN THE REGRESSION BECAUSE

14                  THAT IS WHAT IT MUST BE IF I ASSUME THAT THE

15                  PLAINTIFFS' COMPLAINT IS TRUE, WHICH I DO."

16     **MR. ISAACSON:**  I'M DONE FOR THE DAY, YOUR HONOR.

17     **THE COURT:**  OKAY.  LADIES AND GENTLEMEN, AGAIN,

18     YOU'VE HEARD A VARIETY OF TESTIMONY TODAY, DIFFERENT KIND OF

19     TESTIMONY THAN YOU'VE HEARD LAST WEEK.  SO, AGAIN, MAKE SURE

20     YOU ARE NOT GOING OUT AND DOING ANY RESEARCH OR ANALYSIS OF

21     YOUR OWN.

22         NO TRYING TO BECOME EXPERTS ON REGRESSION ANALYSES

23     OVERNIGHT, ANYTHING LIKE THAT.  OKAY?  I WILL SEE WHAT

24     TOMORROW HOLDS.

25         MAKE SURE NOT TO HAVE ANY CONVERSATIONS WITH ANYONE ABOUT

1    ANYTHING THAT'S HAPPENED THUS FAR, AND WE WILL STAND IN RECESS

2    WITH YOU UNTIL 8:30 TOMORROW MORNING.  THANK YOU.

3         (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

4         **THE COURT:**  THE RECORD WILL REFLECT THE JURY HAS

5    GONE.  YOU MAY STEP DOWN PROFESSOR NOLL.

6         I HAVE JUST A COUPLE OF QUESTIONS.  EVERYONE CAN BE

7    SEATED.

8         OKAY.  WE HAVE JUST A NOTE FROM ONE OF THE JURORS.  I WILL

9    JUST READ IT TO YOU BECAUSE IT IS NOT A QUESTION THAT THEY

10   WANT TO ASK.

11        IT SAYS -- YOU WILL EACH GET COPIES.

12        "COUNSEL ON BOTH SIDES SHOWED EXHIBITS EXTREMELY HARD TO

13   READ, ESPECIALLY WHEN COMPARING DIFFERENT REPORTS OF DR. NOLL

14   HIGHLIGHTED IN YELLOW.  MR. ISAACSON KEPT REFERRING TO THEM AS

15   SIMILAR/IDENTICAL LANGUAGE.  I COULDN'T READ EITHER SIDE WELL

16   ENOUGH TO SEE IT FOR MYSELF.  LAST WEEK IT WAS EASIER TO

17   SEE/READ THE EXHIBITS ON THE SCREEN WHEN THEY WERE MAGNIFIED.

18        CAN ANYTHING BE DONE FOR FUTURE EXHIBITS?  BETTER

19   READABILITY."

20        YOU HAVE THAT IN TERMS OF YOUR OWN PRESENTATIONS.  WE WILL

21   GIVE YOU COPIES.  BUT YOUR TECH PEOPLE MAY ALSO WANT TO LOOK

22   AT THE SCREENS AND MAKE SURE THEY ARE ACTUALLY SHOWING AN

23   ACCURATE DEPICTION.

24        **MR. ISAACSON:**  WE WILL DO THAT.  AND I THINK, GIVEN

25   THAT, I WOULD JUST LIKE TO MARK AS EXHIBITS, WE WILL CREATE

1    AND SUBMIT THEM, THE EXCERPTS OF THE REPORTS THAT WERE

2    COMPARED.

3            **MS. SWEENEY:**  WE WILL OBJECT, YOUR HONOR.  THOSE ARE

4    HEARSAY.

5            **THE COURT:**  REQUEST DENIED.

6        OKAY.  AS YOU KNOW, I HAVE SOME MORE READING TO DO.  I

7    WOULD LIKE MS. SWEENEY -- MS. SWEENEY, COME ON UP.

8    MR. ISAACSON.

9        I WOULD LIKE FOR YOU BOTH TO GIVE ME YOUR THOUGHTS ON HOW

10   THE ISSUE OF STANDING PLAYS OUT AS I GO AND REFLECT AND READ

11   MORE ON THE TOPIC.

12       LET'S ASSUME, MR. ISAACSON, THAT YOU'RE RIGHT.  I HAVE

13   CLEARLY AN IDENTIFIABLE CLASS.  I HAVE A DISCERNIBLE CLASS OF

14   8 MILLION CONSUMERS PROVED BY APPLE'S OWN RECORDS.  I

15   UNDERSTAND THAT YOU HAVE SAID THAT IT'S APPLE'S POSITION THAT

16   IT WANTS TO HAVE A RESOLUTION ON THE MERITS AND THAT IT IS

17   WILLING TO WAIT.

18       HOWEVER, IF THE COURT DOESN'T HAVE SUBJECT MATTER

19   JURISDICTION, CAN THE COURT EVEN TAKE A VERDICT?  AND IF I

20   CAN'T TAKE A VERDICT, THEN HOW DOES THAT DEAL WITH THE ISSUE

21   ON THE MERITS?

22       I THINK EVERYBODY IS INTERESTED IN HAVING A JURY VERDICT

23   IN THIS CASE AND, LIKE I SAID, I CERTAINLY HAVE A DISCERNIBLE

24   CLASS EVEN IF WHAT YOU SAY IS TRUE, WHICH I HAVE NOT YET

25   DETERMINED.

1500

1          **MR. ISAACSON:**  SO, MY ANSWER TO THAT, YOUR HONOR,

2     WOULD BE THE ISSUE OF SUBJECT MATTER JURISDICTION CAN BE

3     DECIDED AT ANY TIME IN THE CASE.  AND SO IT'S A MATTER OF THE

4     COURT'S DISCRETION AS TO HOW IT WANTS TO MANAGE THAT, WHETHER

5     IT WANTS THAT DETERMINATION TO BE BEFORE OR AFTER A JURY

6     VERDICT.

7          IF THE COURT MAKES A DETERMINATION ON SUBJECT MATTER

8     JURISDICTION AND DECIDES THE COURT DOES NOT HAVE SUBJECT

9     MATTER JURISDICTION, THEN THE JURY VERDICT WILL BE NULL AND

10    VOID NO MATTER WHO WON.  BECAUSE THERE WOULD HAVE BEEN NO

11    SUBJECT MATTER JURISDICTION TO SUPPORT THAT.

12         **THE COURT:**  YOU HAVE AUTHORITY FOR THE PROPOSITION

13    THAT A VERDICT CAN BE TAKEN?  I DON'T THINK YOU HAVE CITED

14    ANY.

15         **MR. ISAACSON:**  NO.  I DO JUST VIEW THAT AS A MATTER

16    OF THE COURT'S DISCRETION IN TERMS OF THE COURT IS IN THE

17    PROCESS OF DELIBERATING AND REVIEWING MATERIALS TO DECIDE IF

18    IT HAS SUBJECT MATTER JURISDICTION.

19         IF THE COURT IS MOST -- BELIEVES THAT THAT PROCEDURE

20    REQUIRES EXTENDING BEYOND THIS WEEK -- AND WE ARE DEALING WITH

21    PRACTICALITIES.  WE ARE IN THE MIDDLE OF THIS TRIAL.  WE DON'T

22    WANT TO STOP AND DO A SUBJECT MATTER JURISDICTION PROCEEDING.

23    SO I VIEW THIS AS WITHIN THE COURT'S DISCRETION AS TO HOW IT

24    WANTS TO MANAGE THIS CASE AND MANAGE ITS DOCKET.

25         **THE COURT:**  ALL RIGHT.  FOR THE PLAINTIFFS --

1          **MS. SWEENEY:** YOUR HONOR --

2          **THE COURT:** HOLD ON. BECAUSE I HAVE A DIFFERENT

3    QUESTION FOR YOU. YOU CAN ANSWER THIS QUESTION, TOO.

4          AS YOU ALL KNOW, I RECEIVED AN EMAIL OVER THE WEEKEND

5    WHICH I THEN FORWARDED, I HAD MY LAW CLERK FORWARD TO THE

6    PARTIES, DO YOU HAVE ANOTHER PLAINTIFF?

7          AND ANSWER ME WHETHER IT IS YOUR POSITION THAT A NONLAWYER

8    CAN HAVE AN OWNERSHIP INTEREST IN A LAW FIRM.

9          **MS. SWEENEY:** AS TO THE LATTER QUESTION, YOUR HONOR,

10   I'M GOING TO ASK MR. BALINT TO ADDRESS THAT.

11         BUT WITH RESPECT TO THE FIRST QUESTION, OVER THE WEEKEND

12   AND ON FRIDAY, YOUR HONOR, WE RECEIVED A NUMBER OF INQUIRIES

13   FROM PEOPLE WHO THOUGHT THEY WERE MEMBERS OF THE CLASS. AND

14   WE INTERVIEWED MANY OF THEM, AND THERE ARE SEVERAL CLASS

15   MEMBERS WHO HAVE STEPPED FORWARD WHO BOUGHT AN AFFECTED IPOD

16   DURING THE CLASS PERIOD.

17         SO THE ANSWER TO THE FIRST QUESTION IS, YES, WE CERTAINLY

18   HAVE ANOTHER PLAINTIFF.

19         AND RELATED TO THE QUESTION YOU ASKED OF MR. ISAACSON,

20   PLAINTIFFS AGREE WITH YOUR HONOR THAT IT CREATES TREMENDOUS

21   DIFFICULTY IF THIS MOTION IS DEFERRED. SO WE THINK IT MAKES

22   SENSE TO DECIDE IT MORE PROMPTLY BEFORE THE VERDICT, AND THEN

23   IF NECESSARY, PLAINTIFFS CAN SUBSTITUTE IN ANOTHER CLASS

24   REPRESENTATIVE.

25         **THE COURT:** THE DIFFICULTY IS CLEARLY WITHIN MY

1502

```
1    DISCRETION, ISN'T IT, AT THIS POINT?

2           MS. SWEENEY:  WELL, PERHAPS, YOUR HONOR, BUT THERE IS

3    AN INEFFICIENCY IN PROCEEDING THAT WAY.

4           MR. ISAACSON:  ONE OTHER FACTOR I SHOULD INTRODUCE IS

5    MR. COUGHLIN TOLD ME TODAY PLAINTIFFS ARE CONSIDERING

6    RECALLING MARIANNA ROSEN.  SO IT'S POSSIBLE THE COURT MAY WANT

7    TO HEAR MORE OF HER TESTIMONY.

8           THE COURT:  DO YOU WANT TO ADDRESS MY OTHER QUESTION?

9      HOW CAN A NONLAWYER HAVE AN OWNERSHIP INTEREST IN A LAW

10   FIRM?

11          MR. BALINT:  YOUR HONOR, AS I UNDERSTAND THE LAW

12   FIRM, IT'S A PROFESSIONAL ASSOCIATION AND A NONLAWYER CANNOT

13   BE A MEMBER OF THE ASSOCIATION.  BUT THE MARITAL COMMUNITY,

14   THE ASSETS, THE STOCK IN THE COMPANY HELD BY THE HUSBAND IS

15   CONSIDERED A MARITAL ASSET IN FLORIDA.  AND, FOR EXAMPLE,

16   WOULD BE SOMETHING THAT WOULD BE ALLOCATED IN A DIVORCE

17   PROCEEDING, FOR EXAMPLE.

18          THE COURT:  YOU DON'T THINK IT WOULD BE LIQUIDATED?

19   SHE MAY HAVE --

20          MR. BALINT:  HER INTEREST WOULD BE QUANTIFIED IN SOME

21   WAY.

22          THE COURT:  IT WOULD HAVE TO BE QUANTIFIED.

23          MR. BALINT:  EXACTLY.

24          THE COURT:  A NONLAWYER CAN'T HOLD STOCK.

25          MR. BALINT:  NO.  THE STOCK IS HELD IN THE NAME OF
```

1503

```
1    THE HUSBAND, BUT IT'S A MARITAL ASSET.  AND SO IN THE EVENT --

2    THAT'S WHY IT WOULD HAVE TO BE QUANTIFIED IN THE EVENT OF A

3    DIVORCE.

4         THE COURT:  WELL, YOU'VE CERTAINLY CREATED A PROBLEM

5    ON THE PLAINTIFFS' SIDE.

6         ALL RIGHT.  IT'S 1:40.  I HAVE A SHORT 2:00 O'CLOCK

7    CALENDAR.  WE HAVE SOME OTHER THINGS TO DO.

8         GET SOME LUNCH.  WE WILL STAND IN RECESS UNTIL 2:45.

9         MR. BALINT:  THANK YOU, YOUR HONOR.

10        MR. ISAACSON:  THANK YOU, YOUR HONOR.

11        (RECESS TAKEN AT 1:40 P.M.; RESUMED AT 2:53 P.M.)

12        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

13        THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

14   COME TO ORDER.

15        THE COURT:  ALL RIGHT.  WE ARE BACK ON THE RECORD.

16   THE RECORD WILL REFLECT THAT THE JURY IS OBVIOUSLY NOT HERE.

17        I HAVE NOW HAD AN OPPORTUNITY TO FINISH MY REVIEW OF

18   APPLE'S LATEST FILING.  AS YOU ALL KNOW, I RECEIVED THE

19   INITIAL MOTION ON FRIDAY, HAD THOSE CASES WITH ME, AND THEN

20   RECEIVED THE BRIEFING IN CASES BY THE PLAINTIFFS OVER THE

21   WEEKEND.

22        IN LIGHT OF THE DOCUMENTATION PROVIDED BY APPLE, I AM

23   CONCERNED THAT MS. ROSEN DOES NOT POSSESS THE SAME INTEREST OR

24   SUFFER THE SAME INJURY AS THE ABSENT CLASS MEMBERS.  I AM

25   TROUBLED ABOUT HER FAILURE TO PREVIOUSLY DISCLOSE THE
```

1304

```
1    SPECIFICS OF THESE IPODS IN RESPONSES TO INTERROGATORIES
2    EARLIER IN THIS CASE AND THE FAILURE OF PLAINTIFFS' COUNSEL
3    THEMSELVES TO INVESTIGATE SUFFICIENTLY THE ADEQUACY OF THEIR
4    NAMED PLAINTIFFS BEFORE TRIAL.
5        NEVERTHELESS, THE COURT IS MINDFUL OF THE MILLIONS OF
6    ABSENT CLASS MEMBERS WHO PURCHASED A RELEVANT IPOD DURING THE
7    CLASS PERIOD, WHICH IS CONFIRMED BY APPLE'S DOCUMENTATION, AND
8    I DO NOT BELIEVE THAT APPLE DISPUTES THAT SUCH PEOPLE EXIST.
9        THE COURT HAS AN AFFIRMATIVE OBLIGATION AND DUTY TO
10   PROTECT THE INTEREST OF THE CLASS ABSENT CLASS MEMBERS.  THIS
11   IS A PRINCIPLE WELL-ESTABLISHED BY THE CASE LAW.
12       THE COURT REFERS TO SILBER VERSUS MABON, 957 F.2D AT 697,
13   701.  IT'S A NINTH CIRCUIT CASE 1992.  AND IT'S ALSO CONFIRMED
14   IN THE ROUND TREATISE ON NEWBERG ON CLASS ACTIONS SECTION 1-5,
15   FIFTH EDITION.
16       BASED UPON WHAT HAS BEEN PUT BEFORE THE COURT, THE COURT
17   FINDS THAT ROSEN HAD STANDING AS OF THE TIME OF CLASS, THE
18   INITIAL CLASS CERTIFICATION.  HOWEVER, DUE TO THE EVIDENCE
19   ADDUCED AT TRIAL, I FIND THAT SHE'S INADEQUATE TO REPRESENT
20   THE CLASS.
21       IN A 2011 OPINION IN PITTS VERSUS TERRIBLE HERBST, INC.,
22   THE NINTH CIRCUIT, CITING THE UNITED STATES SUPREME COURT
23   RECOGNIZED THE QUOTE, UPON CERTIFICATION, THE CLASS ACQUIRES A
24   LEGAL STATUS SEPARATE FROM THE INTEREST ASSERTED BY THE CLASS
25   REPRESENTATIVE, SO THAT AN ARTICLE III CONTROVERSY NOW EXISTS
```

1305

```
 1    BETWEEN THE NAMED DEFENDANT AND A MEMBER OF THE CERTIFIED

 2    CLASS.  IT'S A PARAPHRASED QUOTE.

 3        IN A 2007 DECISION IN BATES VERSUS UPS, THE NINTH CIRCUIT

 4    ALSO CITED THE SUPREME COURT FOR THE PROPOSITION THAT IF THE

 5    INITIAL CERTIFICATION WAS PROPER AND DECERTIFICATION NOT

 6    APPROPRIATE, THE CLAIMS OF THE CLASS MEMBERS WOULD NOT NEED TO

 7    BE MOOTED OR DESTROYED BECAUSE OF SUBSEQUENT EVENTS OR THE

 8    PROOF AT TRIAL HAS UNDERMINED THE NAMED PLAINTIFFS' INDIVIDUAL

 9    CLAIMS.  IT'S FOUND AT 511 F. 3D 974, 987.

10        HERE, THE COURT FINDS THE CLAIMS OF THE UNNAMED CLASS

11    MEMBERS REMAIN A LIVE CONTROVERSY FOR PURPOSES OF STANDING.

12    ONCE A CLASS HAS BEEN CERTIFIED, THE CLASS OF UNNAMED PERSONS

13    DESCRIBED IN THE CERTIFICATION ACQUIRED A LEGAL STATUS

14    SEPARATE FROM THE INTEREST ASSERTED BY THE NAMED PLAINTIFF SO

15    THAT AN ARTICLE III CONTROVERSY STILL EXISTS BETWEEN THE NAMED

16    DEFENDANT AND A MEMBER OF THE CERTIFIED CLASS.  THE COURT

17    CITES TO SOSNA VERSUS IOWA, 419 UNITED STATES 393 AT 399, A

18    1975 CASE.

19        BASED UPON THE RECORD BEFORE THE COURT AT THE TIME, ROSEN

20    WAS A MEMBER OF THE CLASS AT THE TIME CLASS CERTIFICATION

21    HAPPENED, WHICH IS A SNAPSHOT IN TIME FOR DETERMINING INITIAL

22    STANDING BASED ON THE AUTHORITY OF BATES.  STANDING IN THE

23    FIRST INSTANCE DOES NOT DEPEND UPON THE MERITS OF ROSEN'S

24    CLAIMS, BUT ON A DETERMINATION THAT SHE MADE ALLEGATIONS OF

25    DEMONSTRABLE PARTICULARIZED INJURY.  THE COURT REFERENCES
```

1306

1    *WARTH VERSUS SELDIN*, 422 U.S. 490 AT 508, 1975.  HOWEVER, AS

2    THE NINTH CIRCUIT HAS HELD, FAILURE OF PROOF AS TO THE NAMED

3    PLAINTIFF WOULD NOT BAR MAINTENANCE OF THE CLASS ACTION OR

4    ENTRY OF JUDGMENT AWARDING RELIEF TO THE MEMBERS OF THE CLASS,

5    CITING TO *GIBSON VERSUS LOCAL 40, SUPERCARGOES & CHECKERS, ET*

6    *CETERA*, 543 F.2D AT 1259, 1263, NINTH CIRCUIT CASE FROM 1976.

7        HERE, AFTER THAT SNAPSHOT IN TIME, THE CLASS DEFINITION

8    WAS CHANGED.  REGARDLESS OF THE REDRESSABILITY OF ROSEN'S

9    INDIVIDUAL CLAIMS, THE CLAIMS OF THE UNNAMED CLASS MEMBERS

10   REMAINED A LIVE CONTROVERSY FOR PURPOSES OF STANDING.  ONCE

11   THE CLASS WAS CERTIFIED, THE CLASS OF UNNAMED PERSONS

12   DESCRIBED IN THE CERTIFICATION, AS I INDICATED BEFORE,

13   ACQUIRED A LEGAL STATUS SEPARATE AND APART FROM THE NAMED

14   PLAINTIFF.

15       ONCE A CLASS HAS BEEN CERTIFIED, THE DISTRICT COURT HAS A

16   CONTINUING DUTY TO UNDERTAKE A STRINGENT EXAMINATION OF THE

17   ADEQUACY OF REPRESENTATIVES BY THE CLASS REPRESENTATIVE AND

18   THEIR COUNSEL AT ALL STAGES IN THE PROCEEDINGS TO PROTECT THE

19   ABSENT MEMBERS.

20       THERE ARE A NUMBER OF CIRCUIT OPINIONS THAT REAFFIRM THAT

21   POSITION INCLUDING *GENERAL MOTORS ENGINE INTERCHANGE*

22   *LITIGATION*, SEVENTH CIRCUIT CASE FROM 1979, *BARNEY VERSUS*

23   *HOLZER CLINIC*, A SIXTH CIRCUIT CASE FROM '97, AND *IN RE FINE*

24   *PAPER ANTITRUST LITIGATION*, A THIRD CIRCUIT CASE FROM 1980.

25       AS THE NINTH CIRCUIT HELD IN *BATES*, EVEN IF THE

1307

```
 1   PLAINTIFFS' CLAIM LATER BECAME MOOT OR NONREDRESSABLE, SO LONG

 2   AS ANOTHER MEMBER OF THE CLASS STEPS FORWARD TO REPRESENT THE

 3   CLASS, THE ENTIRE FEDERAL CLASS HAS STANDING.

 4       INDEED, THE COURT INDICATES THAT THE SUPREME COURT ALSO

 5   PROVIDED SOME GUIDANCE ON THIS QUESTION.  WHERE IT'S STATED IN

 6   EAST TEXAS MOTOR FREIGHTS SYSTEMS, INC. VERSUS RODRIGUEZ, 431

 7   U.S. 595, IF THE DISTRICT COURT HAD CERTIFIED A CLASS AND ONLY

 8   LATER HAD IT APPEARED THAT THE NAMED PLAINTIFFS WERE NOT CLASS

 9   MEMBERS OR WERE OTHERWISE INAPPROPRIATE CLASS REPRESENTATIVES,

10   THE CLASS CLAIMS WOULD HAVE ALREADY BEEN TRIED, AND, PROVIDED

11   THE INITIAL CERTIFICATION WAS PROPER AND DECERTIFICATION NOT

12   APPROPRIATE, THE CLAIMS OF THE CLASS MEMBERS WOULD NOT NEED TO

13   BE MOOTED OR DESTROYED BECAUSE SUBSEQUENT EVENTS OR PROOF AT

14   TRIAL HAD UNDERMINED THE NAMED PLAINTIFFS' INDIVIDUAL CLAIMS.

15       THE NINTH CIRCUIT RECOGNIZED AS MUCH IN BATES CITING TO

16   EAST TEXAS.  ACCORDINGLY, THE COURT WILL INTERVENE A MOTION TO

17   INTERVENE BY AN APPROPRIATE CLASS REPRESENTATIVE IN LIGHT OF

18   THE FACT THAT WE ARE IN THE MIDST OF TRIAL.

19       THE COURT WILL TAKE COMMENTS FROM THE PARTIES, BUT I

20   EXPECT TO SEE TOMORROW A POTENTIAL APPROPRIATE CLASS

21   REPRESENTATIVE.

22       IN LIGHT OF THE FACT THAT THE DEFENDANTS HAVE NOT HAD ANY

23   DISCOVERY ON THIS, AT THE CLOSE OF PROFESSOR NOLL'S TESTIMONY,

24   THE JURY WILL BE EXCUSED FOR THE DAY AND THE COURT WILL

25   CONDUCT AN EVIDENTIARY HEARING AT WHICH TIME THE DEFENSE CAN
```

1    QUESTION ANY WITNESS THAT THE PLAINTIFFS BRING IN.

2        MS. SWEENEY.

3            **MS. SWEENEY:**  YOUR HONOR, THERE IS A -- THERE ARE

4    PLAINTIFFS WHO STAND WILLING AND READY TO STEP IN, AND WE WILL

5    HAVE THEM IN COURT TOMORROW.

6            **THE COURT:**  YOU WILL TODAY --

7            **MS. SWEENEY:**  I'M SORRY, TODAY.

8            **THE COURT:**  YOU WILL TODAY GIVE THE DEFENSE THEIR

9    NAMES, SERIAL NUMBERS OF IPODS, ANY INFORMATION THAT YOU HAVE

10   SO THAT THEY CAN BEGIN THEIR INVESTIGATION.

11       DO YOU UNDERSTAND?

12           **MS. SWEENEY:**  YES, I DO, YOUR HONOR.

13           **THE COURT:**  MR. ISAACSON, IT WAS NOT AT ALL CLEAR TO

14   THE COURT THAT IT COULD TAKE A VERDICT WITHOUT ADDRESSING THIS

15   ISSUE.

16           **MR. ISAACSON:**  I ACTUALLY FILED SOME AUTHORITY FOR

17   YOU ON THAT, BUT -- IT HASN'T COME UP OFTEN, BUT IT HAS COME

18   UP.  BUT I THINK IN LIGHT OF YOUR RULING THAT'S --

19           **THE COURT:**  IT'S MOOT.

20           **MR. ISAACSON:**  THAT IS MOOT, YES.

21       AND I DON'T THINK IT'S A SUBJECT MATTER JURISDICTION

22   THING, SO IT'S NOT A MATTER OF PRESERVING ANY OBJECTIONS.

23       SO I THINK MY ONLY QUESTION IS, YOU CITED A *PITTS* CASE

24   FROM 2011, AND THAT IS THE ONLY ONE WHERE YOU DIDN'T SAY THE

25   CITATION.

1509

```
 1        THE COURT:  THERE WERE THREE I DIDN'T CITE THE

 2    CITATION.  LET ME GIVE IT TO YOU.

 3        THAT WOULD BE 653 F. 3D, 1081 AT 1090.

 4        THE CIRCUIT CASES THAT CAN I REFERENCED, THE SEVENTH

 5    CIRCUIT CASE IN RE GENERAL MOTORS IS 594 F.2D, 1106.  THE

 6    BARNEY SIXTH CIRCUIT CASE IS 110 F. 3D AT 1207, AND THE THIRD

 7    CIRCUIT 1980 CASE IS 617 F.2D 22.

 8        MR. ISAACSON:  ALL RIGHT.

 9        THE COURT:  MS. SWEENEY, YOU TELL ME WHAT

10    INVESTIGATION HAVE YOU -- DO YOU HAVE AT THIS JUNCTURE WITH

11    RESPECT TO THE NAMED PEOPLE THAT YOU HAVE INTERVIEWED?

12        MS. SWEENEY:  I PERSONALLY HAVEN'T INTERVIEWED THEM.

13    MS. BERNAY DID.  BUT WHAT WE HAVE IS WE HAVE NAMES, WE HAVE

14    THE SERIAL NUMBERS OF IPODS, WE HAVE THE DATE OF PURCHASE,

15    LOCATION OF PURCHASE.  THEY ARE DIRECT PURCHASERS FROM AN

16    APPLE STORE.  WE CAN PROVIDE ALL THAT INFORMATION TO DEFENSE

17    COUNSEL.

18        THE COURT:  ALL RIGHT.  WHY DON'T WE DO THIS.  IN

19    LIGHT OF WHAT NEEDS TO BE DONE, WE CAN RECESS FOR TODAY, DEAL

20    WITH JURY INSTRUCTIONS TOMORROW.

21        MS. BERNAY, YOU IMMEDIATELY GET THAT INFORMATION OVER TO

22    THE DEFENDANTS.  THAT WAY YOU TAKE THIS TIME NOW,

23    MR. ISAACSON, TO DEAL WITH THAT ISSUE.

24        MR. ISAACSON:  UNDERSTOOD, AND I APPRECIATE THAT.

25        WHAT HAPPENS TO PLAINTIFF ROSEN WITH RESPECT TO THE JURY?
```

1510

1   THE JURY HAS BEEN TOLD SHE IS THE CLASS REPRESENTATIVE.

2            **THE COURT:**  I UNDERSTAND.  I WILL ENTERTAIN

3   INSTRUCTIONS.  I CAN CREATE MY OWN, BUT IF YOU WANT TO HAVE A

4   ROLE IN THAT, THEN I WILL ENTERTAIN INSTRUCTIONS.

5            **MR. ISAACSON:**  ALL RIGHT.

6            **THE COURT:**  YOU SHOULD EXCHANGE THEM AMONGST

7   YOURSELVES IF YOU CAN AGREE ON SOME LANGUAGE.  THAT'S ALWAYS

8   BETTER.  IF NOT, I WILL DO THAT AS PART OF THE FINAL

9   INSTRUCTION.

10            **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

11            **THE COURT:**  ALL RIGHT.  WE WILL ADJOURN UNTIL

12   TOMORROW AT EIGHT A.M.

13            **MR. ISAACSON:**  THANK YOU, YOUR HONOR.

14

15            (PROCEEDINGS ADJOURNED AT 3:08 P.M.)

16

17

18

19

20

21

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**

1

2

3                    **CERTIFICATE OF REPORTERS**

4        WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, OFFICIAL

5    REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6    CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

7    TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

8    ABOVE-ENTITLED MATTER.

9

10   _____

11        RAYNEE H. MERCADO, CSR 8258, RMR, CRR, FCRR

12

13

14

15        DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

16              MONDAY, DECEMBER 8, 2014

17

18

19

20

21

22

23

24

25