UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    *ORIGINAL*

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE


| | | |
|---|---|---|
| THE APPLE IPOD ITUNES | ) | NO. C 05-00037 YGR |
| ANTITRUST LITIGATION | ) | |
| | ) | PAGES 1311 - 1529 |
| | ) | |
| | ) | **JURY TRIAL VOLUME 7** |
| | ) | |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| _____ | ) | TUESDAY, DECEMBER 9, 2014 |


### REPORTERS' TRANSCRIPT OF PROCEEDINGS


APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                   BY:   ALEXANDRA S. BERNAY,
                         JENNIFER N. CARINGAL,
                         PATRICK COUGHLIN,
                         STEVEN M. JODLOWSKI,
                         CHARLES MCCUE,
                         CARMEN A. MEDICI,
                         BONNY E. SWEENEY, ATTORNEYS AT LAW


                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CHAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                   BY:   FRANCIS J. BALINT, JR.
                         ATTORNEY AT LAW

              (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258
                    DIANE E. SKILLMAN, CSR NO. 4909

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

**A P P E A R A N C E S (CONT'D.)**

```
FOR DEFENDANT:          BOIES, SCHILLER & FLEXNER LLP
                        5301 WISCONSIN AVENUE NW
                        WASHINGTON, D.C.  20015
               BY:  WILLIAM A. ISAACSON,
                    KAREN L. DUNN,
                    MARTHA L. GOODMAN, ATTORNEYS AT LAW


                        BOIES, SCHILLER & FLEXNER LLP
                        1999 HARRISON STREET, SUITE 900
                        OAKLAND, CALIFORNIA  94612
               BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                        JONES DAY
                        555 CALIFORNIA STREET, 26TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94104-1500
               BY:  DAVID C. KIERNAN, ATTORNEYS AT LAW

                        APPLE
                        1 INFINITE LOOP, MS 169-2NYJ
                        CUPERTINO, CALIFORNIA  95014
               BY:  SCOTT B. MURRAY,
                      SENIOR LITIGATION COUNSEL


                        --O0O--
```

# I N D E X

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| NOLL, ROGER | | |
| CROSS-EXAMINATION BY MR. ISAACSON | 1330 | 7 |
| REDIRECT EXAMINATION BY MS. SWEENEY | 1371 | 7 |
| RECROSS-EXAMINATION BY MR. ISAACSON | 1384 | 7 |
| FURTHER RECROSS-EXAMINATION BY MR. ISAACSON | 1395 | 7 |
| FURTHER RECROSS-EXAMINATION BY MR. ISAACSON | 1400 | 7 |
| FURTHER REDIRECT EXAMINATION BY MS. SWEENEY | 1401 | 7 |

--OOO--

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 181 | | | 1414 | 7 |
| 731 | | | 1406 | 7 |
| 732 | | | 1414 | 7 |
| 733 | | | 1406 | 7 |
| 735 | | | 1406 | 7 |
| 736 | | | 1406 | 7 |
| 737 | | | 1407 | 7 |
| 754 | | | 1407 | 7 |
| 755 | | | 1407 | 7 |
| 757 | | | 1408 | 7 |
| 760 | | | 1408 | 7 |
| 761 | | | 1415 | 7 |
| 869 | | | 1414 | 7 |
| 870 | | | 1415 | 7 |
| 893 | | | 1408 | 7 |
| 894 | | | 1408 | 7 |
| 942 | | | 1407 | 7 |
| 944 | | | 1407 | 7 |

## E X H I B I T S

| DEFENDANT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2428 | | | 1408 | 7 |
| 2874 | | 1410 | 1411 | 7 |
| 2874A | | | 1413 | 7 |

## EVIDENTIARY HEARING

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| BENNETT, BARBARA | | |
| DIRECT EXAMINATION BY MS. BERNAY | 1419 | 7 |
| CROSS-EXAMINATION BY MR. ISAACSON | 1433 | 7 |
| REDIRECT EXAMINATION BY MS. BERNAY | 1449 | 7 |
| RECROSS-EXAMINATION BY MR. ISAACSON | 1452 | 7 |

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 1 | | 1422 | | 7 |
| 2 | | 1432 | | 7 |
| 4, 5, 6 | | 1455 | | 7 |

--oOo--

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

```
1    TUESDAY, DECEMBER 9, 2014                      8:03 A.M.

2                    P R O C E E D I N G S

3        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

4    OF THE JURY:)

5            THE CLERK:  CALLING CIVIL ACTION 05-0037, THE APPLE

6    IPOD ITUNES ANTITRUST LITIGATION.

7        COUNSEL, PLEASE STATE YOUR APPEARANCES.

8            MS. SWEENEY:  GOOD MORNING, YOUR HONOR.

9        BONNY SWEENEY.  WITH ME AT COUNSEL TABLE ARE PATRICK

10   COUGHLIN, ALEXANDRA BERNAY, STEVE JODLOWSKI, AND JENN

11   CARINGAL.

12           MR. ISAACSON:  GOOD MORNING, YOUR HONOR.

13       BILL ISAACSON FOR APPLE.  WITH ME AT COUNSEL TABLE IS

14   KAREN DUNN, MEREDITH DEARBORN.  I SEE SUZANNE JAFFE OF BOIES

15   SCHILLER IS HERE TODAY.  AND THEN SCOTT MURRAY OF APPLE.

16           THE COURT:  OKAY.  GOOD MORNING, EVERYONE.

17       I CHECKED ECF RIGHT BEFORE I GOT ON THE BENCH,

18   MR. ISAACSON.  I DID NOT SEE ANY OPPOSITION.

19           MR. ISAACSON:  WE JUST SAW IT AT 7:58, YOUR HONOR.

20           THE COURT:  OKAY.

21           MR. ISAACSON:  AND YOU'LL ALSO SEE A PRO HAC VICE

22   MOTION FOR MY PARTNER, JONATHAN SHERMAN, WHO IS ON A PLANE TO

23   BE HERE FOR THE 4:00 O'CLOCK DISCUSSION OF THAT ISSUE.

24           THE COURT:  HE'S GETTING ON A PLANE TO DO THIS?

25           MR. ISAACSON:  HE IS.  YES, WE -- WE CALLED IN SOME
```

```
 1    EXTRA HELP SO THAT THE TRIAL TEAM COULD FOCUS ON THE TRIAL.

 2          THE COURT:  SO YOU DON'T LIKE ME TO ACTUALLY HAVE

 3    ORAL ARGUMENT, THEN?  IF I DECIDE NOT -- THAT I DON'T NEED

 4    ORAL ARGUMENT?

 5          MR. ISAACSON:  THEN HE -- WE WOULD BE DELIGHTED.

 6    WE'RE ALWAYS DELIGHTED TO SEE JONATHAN.  SO --

 7          THE COURT:  OKAY.  ALL RIGHT.  THERE IS A

 8    HOUSEKEEPING ISSUE I WANT TO DEAL WITH BECAUSE I HAVE A NEW

 9    ROUND OF -- OF THESE MOTIONS TO SEAL, 965, 967, AND 969.

10       ARE THESE -- IS THERE GOING TO BE AN OBJECTION?  OR IS

11    THERE GOING TO BE A RESPONSE FILED BY APPLE ON THESE?  THE

12    FIRST ONE RELATES TO THE PARAGRAPH OF O'NEIL'S DEPOSITION

13    REGARDING THE POS SYSTEM.

14          MR. MEDICI:  THAT -- YOUR HONOR, THAT -- I BELIEVE WE

15    ORIGINALLY FILED THE ENTIRE DOCUMENT UNDER SEAL BECAUSE WE

16    COULDN'T COME TO AGREEMENT RIGHT BEFORE THE -- THE DEADLINE

17    BECAUSE APPLE WAS STILL REVIEWING IT.  SO THEN WE SUBSEQUENTLY

18    FILED AN UNREDACTED VERSION.  SO I BELIEVE THAT MOTION IS

19    PROBABLY MOOT.

20       APPLE GOT BACK TO US AND TOLD US THAT THEY NO LONGER HAD

21    ANY --

22          THE COURT:  OKAY.  BUT IN 969, WHICH I THINK YOU

23    FILED TRYING TO MOOT 965, WHAT WAS FILED -- THERE WERE STILL

24    REDACTIONS ON WHAT YOU FILED.  SO EXHIBITS *THREE STILL HAS

25    REDACTIONS ON IT.
```

1    **MR. MEDICI:**  I SEE.  SO WE OWE YOU AN ADMINISTRATIVE

2    MOTION FOR THOSE REDACTIONS?

3         **THE COURT:**  WHY DON'T YOU SEND ME A PROPOSED ORDER

4    CLEANING UP 965 AND 969.

5         **MR. MEDICI:**  OKAY.

6         **THE COURT:**  NOW, WHAT'S HAPPENING WITH 967?  THIS IS

7    THE KELLY REPORT, WHICH AGAIN WE'RE SEEKING TO FILE IT IN ITS

8    ENTIRETY INCLUDING CERTAIN DESIGNATED PORTIONS EVEN THOUGH

9    I'VE ALREADY ORDERED THAT NOTHING OTHER THAN SOURCE CODE IS

10   SUPPOSED TO BE REDACTED.

11      WHAT -- WHERE DO WE STAND ON THIS ONE?

12        **MR. COUGHLIN:**  WE AGREE.  NOTHING OTHER THAN SOURCE

13   CODE.  SO WE'LL -- WE'LL FIX THAT, YOUR HONOR.

14        **THE COURT:**  OKAY.  SO IF SOMEBODY COULD --

15   MR. MEDICI, IS THIS ON YOU?

16        **MR. COUGHLIN:**  THAT'S ME.

17        **THE COURT:**  OKAY.  ONE ORDER, ONE PROPOSED ORDER

18   CLEANING UP THOSE THREE DOCKET NUMBERS, OKAY?

19      ALL RIGHT.  I LEFT YOUR TIME ON YOUR DESKS SO LET ME KNOW

20   IF YOU HAVE AN ISSUE WITH ANY OF IT.

21      WHERE DO WE STAND ON THESE POTENTIAL PLAINTIFFS?

22        **MR. COUGHLIN:**  YOUR HONOR, WE -- WE'VE BEEN CONTACTED

23   BY AT LEAST FIVE.  WE HAVE AT LEAST THREE SHOWING UP IN

24   PERSON.  WE SET UP THE ABILITY TO DO VIDEO CONFERENCES ON THE

25   OTHER TWO FOR THIS AFTERNOON.  ALL WILL BE AVAILABLE FOR

1   DEPOSITIONS TOMORROW.  AND THEN WE --

2           **THE COURT:**  WHY NOT TODAY?

3           **MR. COUGHLIN:**  SOME TODAY.  THREE TODAY.

4           **THE COURT:**  OKAY.

5           **MR. COUGHLIN:**  AND THEN --

6           **MR. ISAACSON:**  YOUR --

7           **MR. COUGHLIN:**  AND THEN WE HAVE TO WORK OUT A

8   SCHEDULE AND HOW MANY WILL ACTUALLY TESTIFY OR NOT.

9   MR. ISAACSON AND I TALKED ABOUT IT LAST NIGHT, WHETHER IT'S --

10  PROBABLY TWO, MAYBE THREE WILL ACTUALLY BE SOUGHT TO INTERVENE

11  AND TESTIFY.  SO WE'LL WORK WITH HIM ON THE SCHEDULE.

12          **MR. ISAACSON:**  THERE'S A SEQUENCE YOU NEED TO

13  UNDERSTAND ABOUT THIS.  THREE NAMES WERE DISCLOSED AT 6:45

14  LAST NIGHT WITH SOME DOCUMENTATION.  WE RECEIVED AN EMAIL AT

15  ABOUT TEN TILL 8:00 THIS MORNING WITH TWO ADDITIONAL NAMES.

16  SO TWO OF THE NAMES -- I'M NOT SURE IF -- WHO'S HERE AND WHO'S

17  NOT -- DID NOT COMPLY WITH THE COURT'S ORDER OF YESTERDAY OF

18  BEING DISCLOSED TO US YESTERDAY WITH DOCUMENTS BEING PROVIDED

19  TO US YESTERDAY.

20      WE THINK THEY SHOULD BE IMMEDIATELY STRUCK FROM THESE

21  PROCEEDINGS.  THE ISSUE OF PREJUDICE IS BECOMING MORE AND MORE

22  SEVERE.  WE DID NOT RECEIVE NAMES WITHIN MINUTES OF THE

23  HEARING.  WE DID NOT RECEIVE NAMES WITHIN MINUTES OF THE PHONE

24  CALL WITH THE COURT.  WE GET THEM AT 6:45.  AND I DON'T KNOW,

25  OF THE THREE LAST NIGHT, HOW MANY OF THEM ARE ACTUALLY GOING

1     TO BE HERE TODAY.  I ASSUME SOME OF THEM ARE.

2          **MR. COUGHLIN:**  ALL THREE OF THOSE PEOPLE WILL BE

3     HERE.  AND LITERALLY HE'S GETTING THEM AS WE'RE -- WE ACTUALLY

4     HAVE TO TALK TO THESE PEOPLE, ALTHOUGH THEY SAY THEY HAVE

5     BOUGHT THESE IPODS, AND WE HAVE TO DO SOME BACKGROUND CHECK

6     BEFORE WE PROFFER THEM.

7        AND SO NOW WE THINK WE HAVE -- HE LITERALLY GOT THE NAMES

8     THIS MORNING ABOUT 25 MINUTES AFTER I GOT THE NAMES, YOU KNOW.

9     AND WE HAVE LAWYERS TALKING TO THESE PEOPLE IN OFFICES AROUND

10    THE COUNTRY AND WE'RE GETTING THEM HERE AS QUICK AS WE CAN.

11         SO WE'RE DOING EVERYTHING WE CAN AS QUICK AS WE CAN.  AND

12    THERE'S NO PREJUDICE, BECAUSE HE CAN FLIP THESE AROUND

13    LITERALLY QUICKER THAN WE CAN GET THE INFORMATION BECAUSE HE'S

14    GOT IT ON APPLE'S SYSTEM.

15         **MR. ISAACSON:**  WITH ALL DUE RESPECT --

16         **THE COURT:**  WELL, THERE IS PREJUDICE, BUT THE COURT

17    WILL DO WHAT IT CAN TO MINIMIZE THE PREJUDICE.  WE SHOULDN'T

18    HAVE BEEN HERE IN THE FIRST PLACE.

19         **MR. COUGHLIN:**  I AGREE, YOUR HONOR.

20         **MR. ISAACSON:**  ALL RIGHT.

21         **THE COURT:**  SO, ALL RIGHT.  SO WE HAVE AT LEAST THREE

22    THAT WERE DISCLOSED YESTERDAY.  HAVE YOU HAD -- WITH

23    DOCUMENTS?

24         **MR. ISAACSON:**  WITH SOME DOCUMENTS, YES.  WE HAVE

25    QUESTIONS FOR THOSE WITNESSES.

1    **MR. COUGHLIN:** AND THOSE -- ALL OF THEM ACTUALLY CAN

2    BE DEPOSED TODAY, I'VE JUST LEARNED.

3        **MR. ISAACSON:** I'M NOT SPEAKING SIMPLY OF THE

4    DEPOSITION.  THERE ARE THINGS WE HAVE TO CLARIFY ABOUT THE

5    PURCHASES.

6        **MR. COUGHLIN:** HE CAN DO THAT AT THE DEPOSITION.

7    WE'RE MAKING EVERYTHING THAT WE GET AVAILABLE.  SOME OF THEM

8    HAVE -- WE'RE GETTING AS MUCH DOCUMENTATION AS WE CAN FROM

9    THESE PEOPLE.

10       **MR. ISAACSON:** I'M NOT SPEAKING OF THE DEPOSITION.

11   I'M SPEAKING OF THE EVIDENTIARY HEARING THE COURT INDICATED WE

12   WOULD HAVE.  THE DEPOSITION WOULD HAVE A SEPARATE PURPOSE TO

13   DISCUSS ANY TRIAL TESTIMONY.

14       WE ARE CONCERNED, HOWEVER, ALSO ABOUT THIS ISSUE OF TRIAL

15   TESTIMONY.  I MEAN, THIS CASE HAS BEEN GOING FORWARD WITH NO

16   CONSUMERS THAT SUPPORT -- USE HARMONY, USE REALNETWORKS STORE.

17   THE JURY HAS ALREADY HEARD THERE'S NOBODY THAT'S GOING TO BE

18   IN FRONT OF THEM THAT HAS ANY OF THESE THINGS.

19       IF THEY'RE ALL OF A SUDDEN PULLING IN WITNESSES TO -- TO

20   BOLSTER THEIR CASE, WE NEED TO KNOW ABOUT THAT.  AND THAT'S

21   GOING TO BE SEVERELY PREJUDICIAL SEPARATE AND APART FROM THE

22   PREJUDICE OF ROLLING IN CLASS REPRESENTATIVES LATE LAST NIGHT

23   AND EARLY THIS MORNING.

24       THEY'RE ASKING FOR $351 MILLION.  THEY'RE -- I UNDERSTAND

25   THE COURT'S OBLIGATION TO ABSENT CLASS MEMBERS.  BUT THERE IS

1    A VERY SERIOUS ISSUE NOW OF PREJUDICE TO THE DEFENDANT AS --

2    AS NEW NAMES ARE COMING IN AT THE LAST MINUTE.

3        AND WE'RE GOING TO CONTINUE TO PUT THAT OBJECTION ON THE

4    RECORD BECAUSE THIS IS BECOMING A CIRCUS.

5            **THE COURT:**  WELL, YOU --

6            **MR. ISAACSON:**  AND NOT THROUGH ANY ACTIONS OF THE

7    COURT, BUT AS THESE -- AS THESE PEOPLE --

8            **THE COURT:**  YOU HAVE AN APPELLATE ISSUE NOW.

9            **MR. ISAACSON:**  YES.

10           **THE COURT:**  YOU HAVE AN APPELLATE ISSUE.

11           **MR. ISAACSON:**  UNDERSTOOD.

12           **THE COURT:**  SO WHAT ARE YOU ASKING FOR IN TERMS OF

13   RELIEF?  I CAN -- AFTER NOLL FINISHES, I CAN PUT THE TRIAL ON

14   HOLD FOR TWO DAYS.  SO WHAT -- WHAT RELIEF ARE YOU REQUESTING?

15           **MR. ISAACSON:**  ALL RIGHT.  SO THE -- THE RELIEF THAT

16   WE'RE REQUESTING IS BEING DENIED IS TO NOT GO FORWARD WITH THE

17   CLASS REPRESENTATIVES.  BUT ACCEPTING THE COURT'S ORDER OF

18   YESTERDAY, THE COURT ORDERED THAT NAMES BE DISCLOSED TO US

19   LAST NIGHT, THAT WE'D HAVE AN EVIDENTIARY HEARING TODAY, AND

20   THEN WE DISCUSSED HAVING DEPOSITIONS BEYOND THAT.

21       ANY NAMES DISCLOSED THIS MORNING SHOULD SIMPLY BE STRUCK.

22   THEY SHOULD BE OUT OF THE PICTURE.  THE COURT HAS BEEN STRICT

23   APPROPRIATELY ABOUT ALL OF ITS PRETRIAL RULES, FILINGS ON

24   TIME, THESE SORTS OF THINGS.  ROLLING IN NEW PEOPLE THIS

25   MORNING WAS AGAINST WHAT THE COURT ORDERED.

1      AND THERE'S NO EXCUSE FOR IT.  THIS ISSUE CAME UP LAST

2   WEEK.  THEY'VE BEEN SAYING, "WE HAVE PLAINTIFFS AVAILABLE."

3   THERE'S ABSOLUTELY NO REASON WHY THEY SHOULDN'T HAVE BEEN

4   SAYING -- IN THEIR PAPERS THEY'VE BEEN SAYING, "WE HAVE PEOPLE

5   AVAILABLE," WITHOUT SAYING NAMES.  YESTERDAY THEY SAID, "WE

6   HAVE PEOPLE AVAILABLE," WITHOUT SAYING NAMES.

7      WE DON'T GET ANY NAMES UNTIL 6:45 WHICH WAS MUCH AFTER THE

8   COURT SAID WE SHOULD HAVE THE NAMES.  BUT EVEN WITH THOSE

9   THREE PEOPLE, TWO FURTHER NAMES THIS MORNING IS COMPLETELY

10  CONTRARY TO THE COURT'S ORDER THAT IT HAD YESTERDAY.  AND

11  THERE SHOULD BE NO LATITUDE ON THAT.

12      **MR. COUGHLIN:**  YOUR HONOR, IF I MIGHT, WE WENT FOR

13  THREE YEARS WITH THE WRONG MODEL NUMBERS, PREPARED THIS WHOLE

14  CASE, HAD TO REDO ALL OF THE DAMAGES.  IT -- IT COST HUNDREDS

15  OF THOUSANDS OF DOLLARS WHEN THEY TOOK THOSE MODELS OUT AND

16  SAID THEY WERE NO LONGER AFFECTED.  THAT WAS SEVERAL YEARS

17  INTO THE DISCOVERY PROCESS.  DR. NOLL HAD DONE IT.

18      SO HE'S TALKING ABOUT PREJUDICE OF A COUPLE OF HOURS.

19  WELL, WE HAD A COUPLE OF YEARS OF PREJUDICE, AND IT WAS NOT

20  CURED.  SO --

21      **THE COURT:**  YOU KNOW, MR. COUGHLIN --

22      **MR. COUGHLIN:**  -- I THINK A COUPLE OF HOURS LEEWAY AS

23  WE INTERVIEW LITERALLY 20 AND 30 PEOPLE THAT HAVE --

24      **THE COURT:**  WELL, IT'S DONE.  I WILL CONSIDER THE

25  ADDITIONAL TWO, BUT IT'S DONE.  THERE'S NO -- THERE'S NO ONE

1    BEYOND THESE FIVE.

2        **MR. COUGHLIN:**  UNDERSTOOD, YOUR HONOR.

3        **THE COURT:**  AND THE ARGUMENT THAT YOU WERE PREJUDICED

4    YEARS AGO, UNPERSUASIVE.  IT'S UNPERSUASIVE BECAUSE YOU NEVER

5    CHECKED WHO ACTUALLY PURCHASED THE ROSEN IPODS.  SO DON'T TALK

6    TO ME ABOUT THE FACT THAT THE PLAINTIFFS WERE PREJUDICED HERE.

7        **MR. COUGHLIN:**  UNDERSTOOD, YOUR HONOR.

8        **THE COURT:**  THE COURT MAINTAINS THAT IT STILL HAS A

9    DUTY.  SO AT THIS POINT, THE REQUEST TO ELIMINATE THE LAST TWO

10   NAMES, I'M NOT GRANTING THAT.  I STILL NEED -- AFTER THE FIVE,

11   WE'RE DONE, MR. ISAACSON.  AND -- AND IF ONE OF THE THREE IS

12   SUFFICIENT, THEN I'M GOOD WITH THAT.  THEN I WILL STRIKE THE

13   OTHER TWO AND NOT ALLOW THEM TO TESTIFY.  BUT MUCH OF THIS

14   STEMS FROM THE COURT'S OWN DUTY TO THE ABSENT CLASS MEMBERS.

15       **MR. ISAACSON:**  AND I UNDERSTAND THE COURT'S POSITION

16   ON THAT.  WE HAVE NO ABILITY TODAY TO DO -- TO CONFIRM

17   ANYTHING ABOUT THESE ADDITIONAL PEOPLE THAT WERE DISCLOSED A

18   FEW MINUTES AGO.

19       **THE COURT:**  I UNDERSTAND THAT.  AND THAT'S WHY I SAID

20   I WILL PUT THE TRIAL ON HOLD IF THAT'S -- IF THAT'S YOUR

21   PREFERENCE.

22       **MR. COUGHLIN:**  YOUR HONOR, I THINK WE SHOULD -- I

23   THINK WE SHOULD PUT THE TRIAL ON HOLD FOR TWO DAYS AND GET

24   THIS SORTED OUT SO THAT WE'RE NOT BACK AND FORTH WITH THE

25   SKIRMISHES ABOUT IF THEY HAD ENOUGH TIME, IF THEY DIDN'T TALK

1    TO THEM ENOUGH.  I WANT THEM TO HAVE ENOUGH TIME.

2        WE BELIEVE THESE PEOPLE WILL SATISFY ALL THE REQUIREMENTS

3    TO BE ADEQUATE CLASS REPRESENTATIVES.  AND, YOU KNOW, WE WANT

4    TO GIVE THEM THAT TIME.  AND THE LAST THING THAT WE WANT TO DO

5    IS -- YOU SAY HE HAS AN APPELLATE ISSUE.  WELL, WE HAVE A DUTY

6    TO THIS CLASS, TOO, TO MAKE SURE THAT SOMEBODY'S HERE

7    REPRESENTING THEM AND TAKE THEM TO THE NEXT STEP.

8        MR. ISAACSON SAID HE WANTED TO GET TO A JURY VERDICT.  WE

9    WANT TO GET TO A JURY VERDICT.  THERE ARE ONLY THREE OR FOUR

10   WITNESSES IN THE MAIN CASE LEFT TO DO.  AND ONLY A COUPLE OF

11   REBUTTAL WITNESSES PROBABLY, AT MOST.  THREE TOPS.  WE CAN BE

12   DONE IN TWO DAYS NEXT WEEK.  I'M SURE OF IT.

13       SO I THINK THAT WE SHOULD GET THIS DONE, LET HIM DO THE

14   DISCOVERY HE WANTS, ALL THE DISCOVERY HE WANTS IN THE NEXT

15   DAY.  LET'S NOT RUSH THIS AT THIS IMPORTANT MOMENT.  A DAY OR

16   TWO, YOU KNOW, IS -- AN EXTRA TIME WILL GIVE HIM WHAT HE

17   NEEDS.  HE DOESN'T WANT THAT.  HE WANTS TO RUSH AND FINISH IT

18   AND HOPE THAT WE MAKE A MISTAKE AND HE GAINS A BETTER

19   APPELLATE ISSUE.  THAT'S NOT WHAT WE SHOULD BE DOING HERE.

20           MR. ISAACSON:  WE'RE ONLY HALFWAY THROUGH THIS TRIAL

21   IN TERMS OF OUR 20 -- OUR COLLECTIVE 20 HOURS.  THE -- SO

22   TAKING DAYS OFF IS GOING TO PUSH THIS JURY INTO THE -- GETTING

23   CLOSER AND CLOSER TO THE HOLIDAYS.  THE COURT KNOWS THAT.

24       THE -- WHAT WE WOULD SUGGEST IS THAT WE GO FORWARD WITH

25   THE EVIDENTIARY HEARING THAT WAS SCHEDULED TODAY WITH THE

1   THREE.  IF THE COURT DETERMINES THAT THERE IS AN ADEQUATE

2   CLASS REP OR REPS, THOSE PEOPLE SHOULD BE DEPOSED AND THE TWO

3   FROM THIS MORNING SHOULD BE STRUCK.

4         **MR. COUGHLIN:**  YOUR HONOR, HE IS FOR SURE GOING TO

5   CHALLENGE ANYBODY THAT'S PUT UP.  AND SO WE'VE GOT FIVE PEOPLE

6   THAT WE WOULD -- THAT WE HAVE BEEN VETTING SINCE LAST NIGHT.

7   YOU KNOW, A COUPLE OF NAMES WE HAD EARLIER, A COUPLE DROVE

8   DOWN FROM TAHOE THE DAY BEFORE.  THERE'S A WOMAN FLYING OUT

9   FROM BOSTON THIS MORNING ON A 6:00 A.M. -- 6:30 FLIGHT, WILL

10  BE HERE IN ABOUT A HALF AN HOUR.  THERE'S A PERSON FROM

11  CONNECTICUT WHO'S READY FOR A VIDEOTAPE.  THERE'S A WOMAN FROM

12  SAN DIEGO WHO'S READY TO FLY UP.  ALL OF THAT IS GOING TO TAKE

13  ABOUT A DAY AND A HALF TO SETTLE DOWN AND GET THE DISCOVERY

14  THAT HE NEEDS.

15     WE WERE PREPARED TO GO FORWARD, YOU KNOW, IF YOU WANT

16  TO -- IF ALL THIS IS HAPPENING -- WELL, WE'RE PREPARED TO GO

17  FORWARD, BUT I THINK THAT WE SHOULD GET THIS SETTLED IN THE

18  NEXT DAY AND A HALF.  IF WE CAN GO FRIDAY, THAT WOULD BE

19  GREAT.  I THINK WE SHOULD AT LEAST DELAY TILL FRIDAY AND THEN

20  FINISH UP THE TRIAL.

21     I WANT TO MAKE SURE THAT WE HAVE AN ADEQUATE

22  REPRESENTATIVE AS MUCH AS ANYBODY.  AND I THINK THE EXTRA TIME

23  IS NECESSARY TO DO THAT.

24         **MR. ISAACSON:**  YOU KNOW, I DON'T EVEN KNOW IF MY

25  WITNESSES ARE AVAILABLE NEXT WEEK.  I MEAN -- WE'VE GONE OVER

1    ALL THE SCHEDULES WITH EVERYBODY.  I CAN'T TELL YOU RIGHT NOW

2    THAT WE CAN DO THAT.

3            **THE COURT:**  WELL, LET'S SEE WHERE WE ARE.

4       IT MAY NOT BE AN ISSUE.

5            **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.

6            **THE COURT:**  ALL RIGHT.  ANY OTHER ISSUES?

7            **MR. ISAACSON:**  WE HAVE THE PROPOSED JURY INSTRUCTION

8    WHICH WE SENT TO THE PLAINTIFFS, BUT WE DON'T HAVE ANY

9    COMMENTS ON WITH REGARDS TO THE WITHDRAWAL OF -- WITH REGARDS

10   TO MARIANNA ROSEN.

11           **MS. SWEENEY:**  WELL, I DON'T THINK I RECEIVED THAT,

12   YOUR HONOR.

13           **MR. ISAACSON:**  WE EMAILED IT OVER TO YOU LAST NIGHT.

14           **THE COURT:**  OKAY.  WELL, WORK IT OUT.  AND I DON'T

15   NEED TO TELL THEM ABOUT THAT RIGHT THIS SECOND.

16           **MS. SWEENEY:**  I ALSO HAD AN ISSUE I WANTED TO RAISE,

17   YOUR HONOR, WITH RESPECT TO SOME DOCUMENTS THAT APPLE CALLS

18   DEMONSTRATIVES THAT THEY PLAN TO USE WITH PROFESSOR NOLL WHICH

19   WE GOT DURING COURT YESTERDAY.  AND IN FACT, THESE

20   DEMONSTRATIVES ARE LONG DOCUMENTS THAT IF THEY WANTED TO USE,

21   THEY SHOULD HAVE MARKED AS EXHIBITS MONTHS AGO.  THEY'RE --

22   THEY'RE RANK HEARSAY, AND FOR THEM TO CALL THEM DEMONSTRATIVES

23   SO THAT THEY CAN PUBLISH THEM TO THE JURY WHEN THEY'RE

24   OBVIOUSLY HEARSAY --

25           **THE COURT:**  WHAT ARE YOU TALKING ABOUT, MS. SWEENEY?

```
 1            MS. SWEENEY:  I CAN HAND IT UP, YOUR HONOR.

 2        DO WE HAVE ANOTHER COPY FOR THE COURT?

 3            MR. ISAACSON:  I DON'T KNOW WHICH ONES YOU'RE TALKING

 4    ABOUT.

 5            MS. SWEENEY:  ALL RIGHT.  I'LL -- LET ME DESCRIBE

 6    THEM, AND THEN I'LL HAND THEM UP, YOUR HONOR.

 7        THE ONE IS THE FOREMOST --

 8            MR. ISAACSON:  I'M NOT SHOWING THAT TO THE JURY OR

 9    EVEN ASKING DR. NOLL ABOUT IT.

10            MS. SWEENEY:  OKAY.  THEN I'M CONFUSED BECAUSE YOU

11    SENT THIS -- YOU GAVE THIS TO US AS A DEMONSTRATIVE.

12        SO I APOLOGIZE IF I --

13            MR. ISAACSON:  YOU'RE OPERATING OFF OF -- I'M SORRY

14    TO INTERRUPT.  YOU'RE OPERATING OFF THE WITNESS BINDER.  SO

15    THAT THAT'S THE BINDER THAT'S UP IN FRONT OF THE WITNESS.

16    FOREMOST SHOULDN'T HAVE BEEN IN THERE ANYWAY, BUT IT'S IN THE

17    BINDER.  I'M NOT COVERING IT.

18            MS. SWEENEY:  WELL, SOME OF THE DOCUMENTS THAT

19    MR. ISAACSON SAYS ARE IN THE WITNESS BINDER ARE DOCUMENTS THAT

20    HE DID PUBLISH TO THE JURY YESTERDAY.  AND SO I GUESS --

21            THE COURT:  WELL, THEY'RE IMPEACHMENT, MS. SWEENEY.

22            MS. SWEENEY:  BUT THE OTHERS ARE NOT, YOUR HONOR.

23            THE COURT:  WHEN --

24            MS. SWEENEY:  THE OTHERS ARE NOT STATEMENTS BY

25    PROFESSOR NOLL.
```

1           **THE COURT:**  OKAY.  WELL, THEN MAKE AN OBJECTION WHEN

2       IT'S TIMELY.

3          OTHER ISSUES?

4           **MR. ISAACSON:**  I THINK THAT'S ENOUGH FOR RIGHT NOW.

5           **THE COURT:**  IS MY JURY HERE?

6           **THE CLERK:**  YES.

7          IS MR. NOLL HERE?

8           **MR. COUGHLIN:**  YES.

9           **THE COURT:**  LET'S GET STARTED.

10         (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

11      THE JURY:)

12          **THE COURT:**  OKAY.  EVERYONE CAN BE SEATED.  WE ARE

13      BACK ON THE RECORD.

14         THE RECORD WILL REFLECT THAT THE JURY IS HERE.

15         YOU GUYS ARE LOOKING MORE AND MORE COMFORTABLE EVERY DAY.

16         EVERYBODY READY TO GO?

17         OKAY.  PROFESSOR NOLL, I'LL REMIND YOU YOU'RE STILL UNDER

18      OATH, SIR.

19          **THE WITNESS:**  YES.

20                       **ROGER NOLL**,

21      CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN PREVIOUSLY

22      DULY SWORN, CONTINUED TESTIFYING AS FOLLOWS:

23          **THE COURT:**  MR. ISAACSON, YOU MAY PROCEED.

24          **MR. ISAACSON:**  THANK YOU.

25

## CROSS-EXAMINATION

**BY MR. ISAACSON:**

**Q.**  GOOD MORNING, DR. NOLL.  YOU GOT THE MICROPHONE SET FOR YOURSELF?

**A.**  I HOPE SO.  IS IT WORKING?

**Q.**  SOUNDS GOOD.

      **THE COURT:**  IT WORKS.

**BY MR. ISAACSON:**

**Q.**  NOW, RETURNING TO THE ISSUE OF THE FEATURES OF 7.0 WHICH WE WERE DISCUSSING WHEN WE STOPPED YESTERDAY, AT THE TIME OF YOUR REPORT ON LIABILITY AND DAMAGES AND BY THE TIME OF YOUR MAY 2013 DEPOSITION, IT IS CORRECT THAT YOU DID NOT FULLY UNDERSTAND WHAT THE FEATURES OF 7.0 WERE, CORRECT?

**A.**  I DIDN'T HAVE THEM MEMORIZED, NO.

**Q.**  ALL RIGHT.  IN FACT, IT WAS YOUR UNDERSTANDING AT THAT TIME THAT THE WHOLE PURPOSE OF 7.0 WAS THE COMPATIBILITY ISSUE REFERRING TO THE HARMONY NOT WORKING AFTER 7.0.

**A.**  THAT THE WHOLE PURPOSE OF DVC AND KVC --

**Q.**  NO.

**A.**  -- WAS NOT --

**Q.**  NO.  NOT THE WHOLE PURPOSE OF DVC AND KVC.  YOU UNDERSTOOD THE WHOLE PURPOSE OF 7.0 WAS THE COMPATIBILITY ISSUE, CORRECT?

**A.**  NO, THAT'S NOT CORRECT.  I KNEW WHAT 7.0 WAS.  I MAY HAVE SAID IT IN A DEPOSITION IN THE CONTEXT OF A DISCUSSION OF THE -- OF THE KVC AND DVC.  BUT I KNEW THAT THERE WERE OTHER

1    THINGS IN 7.0 BESIDES KVC AND DVC.

2         **MR. ISAACSON:**  ALL RIGHT.  CAN WE -- YOUR HONOR, I'D

3    LIKE TO REFER HIM TO HIS MAY 2013 DEPOSITION, PAGE 33, LINES 4

4    THROUGH 25.

5         **THE COURT:**  I DON'T UNDERSTAND WHAT YOU MEAN BY

6    "REFER," MR. ISAACSON.

7         **MR. ISAACSON:**  I WANT TO SHOW IT TO HIM.

8         **THE COURT:**  YOU MAY PROCEED.

9         **MR. ISAACSON:**  MAY I JUST SHOW HIM THIS?

10        **THE WITNESS:**  IS IT IN THE BOOK?

11       (VIDEO EXCERPT FROM THE DEPOSITION OF ROGER NOLL PLAYING

12   IN OPEN COURT AS FOLLOWS:

13       "Q.  SOME FUNCTIONALITY THAT IS ADDED BY 7.0 OR SOMETHING

14   THAT AFFECTS IPOD DEMAND AND IT'S NOT CAPTURED IN THE

15   VARIABLES THAT YOU JUST REFERRED TO, THEN WHAT WOULD HAPPEN?

16       "A.  GIVE ME AN EXAMPLE BECAUSE I DON'T FULLY UNDERSTAND

17   WHAT IT IS THAT 7.0 ADDED THAT -- THAT IT -- I DON'T

18   UNDERSTAND.  WHAT -- WHAT IS -- MY UNDERSTANDING FROM FARRUGIA

19   IS THAT THE WHOLE PURPOSE OF 7.0 WAS THE -- THE COMPATIBILITY

20   ISSUE.

21       "Q.  GO ON.

22       "A.  SO I JUST RELIED UPON WHAT HE SAID AS BEING THE

23   PURPOSE OF THAT, AND THEN, YOU KNOW, IF THERE'S ALL OF A

24   SUDDEN SOME NEW WONDERFUL FEATURE TO IT, I DON'T KNOW WHAT IT

25   IS.  SO I CAN'T COMMENT ON IT.  I DON'T KNOW WHAT IT IS.")

1    **BY MR. ISAACSON:**

2    **Q.**  SIR, AT THE TIME OF YOUR MAY –– MAY 2013 DEPOSITION, YOU

3    UNDERSTOOD THAT THE WHOLE PURPOSE OF 7.0 WAS THE COMPATIBILITY

4    ISSUE AND YOU RELIED ON MR. FARRUGIA'S TESTIMONY FOR THAT;

5    ISN'T THAT RIGHT?

6    **A.**  IN THAT CLIP YOU JUST SHOWED, WHAT I –– WHAT I WAS

7    REFERRING TO WAS THE KVC, DVC COMPONENT OF 7.0.  I WAS TALKING

8    ABOUT THE SECURITY ASPECT OF IT.  I WAS NOT TALKING ABOUT THE

9    OTHER NEW FEATURES OF IPODS THAT WERE IMPLEMENTED WITH 7.0.

10    **Q.**  ALL RIGHT.  YOU TWICE REFERRED TO 7.0 IN THAT TESTIMONY

11    WITHOUT REFERRING TO THE KVC OR THE DVC, CORRECT?

12    **A.**  THAT'S RIGHT.  AND WHEN I USED THE TERM "7.0" IN THAT

13    AREA, THAT SNIPPET WHEN YOU WERE SHOWING, IT WAS IN THE

14    CONTEXT OF A DISCUSSION OF THE –– THE COMPONENT OF 7.0 THAT

15    HAD TO DO WITH BLOCKING OTHER KINDS OF FILES FROM GOING ONTO

16    AN IPOD.

17    **Q.**  AND YOU ACTUALLY CONCLUDED, "IF THERE'S ALL OF A SUDDEN

18    SOME NEW WONDERFUL FEATURE TO IT, I DON'T KNOW WHAT IT IS."

19    YOU DID NOT KNOW WHAT THE NEW WONDERFUL FEATURES OF 7.0 WERE

20    IN MAY 2013, DID YOU?

21    **A.**  I DO NOT KNOW AND I STILL DO NOT KNOW WHAT THE WONDERFUL

22    KEY FEATURES OF KVC AND DVC ARE OTHER THAN TO BLOCK FILES THAT

23    ARE NOT APPROVED BY APPLE.

24    **Q.**  AND ALL YOU TALKED ABOUT AT YOUR DEPOSITION WAS 7.0, NOT

25    KVC OR DVC, CORRECT?

1   **A.**   AND THAT'S RIGHT.   I USED THE TERM "7" -- LIKE I HAVE IN

2   MY TESTIMONY HERE, I USED THE TERM "7.0" TO REFER TO THESE

3   PARTICULAR FEATURES.   IT'S NOT THE ENTIRE SOFTWARE PACKAGE.

4   THEY'RE -- THEY'RE SEPARABLE, THE KVC, DVC COMPONENTS ARE

5   SEPARABLE FROM THE REST OF THE SOFTWARE.

6   **Q.**   ALL RIGHT.   NOW, WERE YOU AWARE THAT 7.0 INCLUDED A

7   FEATURE CALLED "ALBUM VIEW"?   AND THIS IS AT THE TIME OF YOUR

8   REPORT.   WERE YOU AWARE THAT 7.0 INCLUDED A FEATURE CALLED

9   "ALBUM VIEW" THAT PUT ALBUM ART UP AND PUT ALL THE TRACKS YOU

10   HAVE FROM THE ALBUM SO YOU CAN SCROLL THROUGH YOUR MUSIC

11   LIBRARY AND LOOK AT IT BY ALBUM; DID YOU KNOW THAT?

12   **A.**   I DON'T REMEMBER WHAT I KNEW -- WHAT I -- WHAT WAS AT THE

13   FRONT OF MY MIND AT THE DEPOSITION.   I MEAN, I KNOW THAT --

14   THAT ALBUM VIEW IS PART OF IT BECAUSE I'VE READ PRESS RELEASES

15   BY APPLE ABOUT THAT FEATURE.   BUT WHETHER I REMEMBERED IT AT

16   MY DEPOSITION, I DON'T REMEMBER.

17   **Q.**   ALL RIGHT.   YOU -- YOU ASSUMED THAT THAT FEATURE DID NOT

18   AFFECT THE PRICE OF IPODS IN YOUR REPORT, CORRECT?

19   **A.**   I DID NOT INCLUDE IT AS A VARIABLE TO EXPLAIN THE PRICE

20   BECAUSE IT WAS SO MULTICO -- SO COLLINEAR WITH THE OTHER

21   VARIABLES THAT WERE IN THERE.

22   **Q.**   MEANING YOU ASSUMED THAT IT DID NOT AFFECT THE PRICE OF

23   IPODS, CORRECT?

24   **A.**   I -- YES.   WELL, IF IT DOES AFFECT THE IPOD, IT WOULD NOT

25   BE SEPARABLE.   YOU COULDN'T MEASURE IT SEPARABLY FROM OTHER

NOLL – CROSS / ISAACSON

1    FEATURES.

2    **Q.**  AND SO --

3    **A.**  YOU CAN'T ASSIGN A SPECIFIC NUMBER TO THE PRICE EFFECT OF

4    MULTIPLE COMPONENTS THAT ALL WERE PUT ON THE MACHINE TOGETHER.

5    **Q.**  ALL RIGHT.

6                    (PAUSE IN THE PROCEEDINGS.)

7    **BY MR. ISAACSON:**

8    **Q.**  IT'S YOUR TESTIMONY WITH REGARDS TO THE FEATURES OF 7.0

9    YOU CAN'T ASSIGN A SPECIFIC NUMBER TO THE PRICE EFFECTS OF THE

10   MULTIPLE COMPONENTS THAT WERE ALL PUT ON ITUNES AND IPOD

11   TOGETHER, CORRECT?

12   **A.**  THAT'S CORRECT.  THAT'S THE QUINTESSENTIAL EXAMPLE OF

13   MULTICOLLINEARITY.  IF YOU'VE GOT ONE IN THERE, IF THERE WERE

14   FIVE PUT ON SIMULTANEOUSLY AND ONE IS IN THE MODEL, YOU CANNOT

15   SEPARATE THE EFFECTS OF ALL FIVE.  YOU'LL PICK UP ALL THE

16   EFFECTS IN A SINGLE VARIABLE.

17   **Q.**  ALL RIGHT.  THE 7.0 -- WERE YOU AWARE THAT IT ALSO

18   INCLUDED THE ADDITION OF ALBUM ART, THAT PREVIOUSLY IF YOU

19   RIPPED C -- IF YOU RIPPED MUSIC FROM YOUR OWN CD'S, YOU DIDN'T

20   HAVE ALBUM ART, AND THAT ITUNES 7.0 ANNOUNCED THAT THEY WERE

21   GOING TO BE -- GIVE CONSUMERS THE FREE MISSING ALBUM COVER ART

22   FOR ALL THE MUSIC IN THEIR LIBRARY AND THAT ITUNES WAS

23   OFFERING THREE AND A HALF MILLION SONGS' WORTH OF ALBUM ART

24   WORK FOR FREE FOR -- FOR MUSIC THAT HAD COME FROM CD'S; DID

25   YOU KNOW THAT?

1    **A.**   YES.

2    **Q.**   -- AT THE TIME OF YOUR REPORT.  ALL RIGHT.

3    **A.**   YES, I DID KNOW IT AT THE TIME OF MY REPORT.  WHETHER I

4    REMEMBERED IT AT THE TIME OF DEPOSITION, I DON'T REMEMBER.

5    BUT I DID KNOW THAT.

6    **Q.**   AND THIS?

7    **A.**   PUTTING THE MATERIALS THAT COME WITH BUYING A CD ON THE --

8    ON THE ITUNES SITE, I KNEW THAT APPLE HAD DONE THAT.

9    **Q.**   ALL RIGHT.  AND THIS WAS ANOTHER FACTOR THAT YOU -- THAT

10   YOU EXCLUDED FROM YOUR REGRESSION FOR THE REASONS YOU HAVE

11   EXPLAINED.  IT'S -- IT COULDN'T BE SORTED OUT FROM THE KVC OR

12   THE DVC; IS THAT RIGHT?

13   **A.**   NO.  IT COULDN'T BE SORTED OUT FROM OTHER QUALITATIVE

14   FEATURES OF THE IPOD.

15   **Q.**   OKAY.  ALL RIGHT.  IT WAS A VARIABLE THAT YOU EXCLUDED

16   FROM YOUR ANALYSIS.

17   **A.**   IT'S NOT IN THE REGRESSION ANALYSIS, NO.

18   **Q.**   ALL RIGHT.  7.0 ALSO INCLUDED -- INCLUDED FOR TV SHOWS

19   ARTWORK FOR EACH TV SHOW.  SO LIKE ALBUM VIEW, NOW ALL OF A

20   SUDDEN -- OH, AND WE HAVE PICTURES OF THIS.

21              (DEMONSTRATIVE PUBLISHED TO JURY.)

22   **BY MR. ISAACSON:**

23   **Q.**   THIS WOULD BE -- YES.  COVER FLOW VIEW FOR TV SHOWS.

24      SO 7.0 WAS NOW OFFERING, LIKE, THE ALBUM ART THAT YOU

25   COULD SEE THE -- THE PICTURES OF THE TV SHOWS.

1    DID YOU KNOW THAT?

2    **A.**  YES, I REMEMBER HAVING READ THAT IN THE PRESS RELEASE, BUT

3    I DON'T –– YOU KNOW, THERE –– THERE IT IS.  YOU CAN SEE

4    PICTURES OF THE STARS OF *FRIENDS*.

5    **Q.**  RIGHT.  IT WAS A VARIABLE THAT YOU EXCLUDED FROM YOUR

6    ANALYSIS?

7    **A.**  I DID NOT INCLUDE THAT IN THE REGRESSION ANALYSIS, NO.

8        **MR. ISAACSON:**  ALL RIGHT.  CAN WE LOOK AT –– SINCE I

9    SKIPPED THIS, CAN WE SHOW THE PICTURE OF THE ALBUM ART, MATT?

10    THERE WE GO.

11        (DEMONSTRATIVE PUBLISHED TO JURY.)

12    **BY MR. ISAACSON:**

13    **Q.**  7.0 ALSO ADDED –– WERE YOU AWARE THAT 7.0 ALSO ADDED A

14    DEAL WITH THE NFL NETWORK WHERE THEY BROUGHT A WHOLE NFL

15    SEASON OF NFL HIGHLIGHTS TO ITUNES, YOU COULD BUY PER GAME, OR

16    YOU COULD BUY A SEASON PASS WHERE YOU PICKED YOUR FAVORITE

17    TEAM AND THE HIGHLIGHTS FOR THAT TEAM'S GAMES ARE

18    AUTOMATICALLY DOWNLOADED INTO YOUR ITUNES LIBRARY; WERE YOU

19    AWARE OF THAT?

20    **A.**  I WAS AWARE THAT THERE WAS ALL KINDS OF VIDEO CONTENT THAT

21    WAS MADE AVAILABLE THROUGH THE ITUNES STORE, YES.

22    **Q.**  THIS WAS ANOTHER VARIABLE EXCLUDED FROM YOUR REGRESSION,

23    CORRECT?

24    **A.**  NO, THERE'S A VIDEO VARIABLE IN THE REGRESSION.

25    **Q.**  ALL RIGHT.  WE'LL COME BACK TO THAT.

1    BUT YOU DIDN'T HAVE A SPECIFIC VARIABLE RELATED TO THE

2    NFL, CORRECT?

3    **A.**    NO, I HAVE NO NFL VARIABLE.

4    **Q.**    ALL RIGHT.    THE -- THE RESOLUTION OFFER BY 7.0.

5    PREVIOUS RESOLUTION WAS 320 BY 240.    AND WERE YOU AWARE

6    THAT THEY INCREASED -- APPLE INCREASED THE RESOLUTION FOUR

7    TIMES WITH ALL VIDEO BEING DELIVERED BY 640 BY 480 INCLUDING

8    MUSIC VIDEOS, TV SHOWS, EVERYTHING?    DID YOU KNOW THAT AT THE

9    TIME OF YOUR REPORT?

10   **A.**    WELL, IF YOU RECALL, THE LARGE NUMBER OF PAGES SUMMARIZING

11   THE PRICE COMMITTEE DOCUMENTS HAVE PIXEL RESOLUTION AS ONE OF

12   THE ATTRIBUTES THEY LIST FOR NOT ONLY ALL THE APPLES BUT

13   EVERYBODY ELSE.

14   **Q.**    RIGHT.    DID YOU KNOW ABOUT THE HIGHER RESOLUTION FOR 7.0?

15   **A.**    IT'S ALL -- YEAH, IT'S IN THE -- IT'S IN THAT DOCUMENT.

16   **Q.**    ALL RIGHT.    AND THAT WAS A VARIABLE EXCLUDED FROM YOUR

17   REGRESSION, CORRECT?

18   **A.**    THAT'S TRUE.    I DID NOT HAVE VIDEO DISPLAY RESOLUTION AS A

19   VARIABLE IN MY REGRESSION.

20   **Q.**    ALL RIGHT.    AND THE -- SO WERE YOU AWARE THAT THE -- THAT

21   ITUNES 7.0 INCLUDED A NEW VIEW FOR YOUR IPOD PREFERENCES?

22   **MR. ISAACSON:**    WE CAN SHOW THAT SLIDE, MATT.

23   THIS WOULD BE --

24   YEAH, THERE WE GO.

25   (DEMONSTRATIVE PUBLISHED TO JURY.)

1    **BY MR. ISAACSON:**

2    **Q.**  SO THIS WAS A VIEW -- BEFORE, YOU HAD TO GO TO

3    "PREFERENCES" TO SET THINGS UP.  AND NOW WHEN YOU SYNC, YOU

4    JUST CLICK ON YOUR IPOD, AND, BOOM, IT WOULD GIVE YOU A

5    SUMMARY OF WHAT'S ON YOUR IPOD.

6        WERE YOU AWARE OF THAT FEATURE OF 7.0?

7    **A.**  I THINK SO.  IF IT'S IN THE PRESS RELEASE, I WAS AWARE OF

8    IT.

9    **Q.**  ALL RIGHT.  THE -- AND THAT'S A VARIABLE EXCLUDED FROM

10   YOUR ANALYSIS.

11   **A.**  YES.

12   **Q.**  ALL RIGHT.  AND WERE YOU AWARE OF THE NEW FEATURE OF 7.0

13   WHICH PROVIDED THE ABILITY TO MORE EASILY MOVE CONTENT THAT

14   YOU PURCHASE FROM THE ITUNES MUSIC STORE BETWEEN YOUR VARIOUS

15   COMPUTERS?  YOU COULD TAKE YOUR IPOD AND SYNC IT WITH YOUR

16   AUTHORIZED COMPUTER AT HOME, CARRY IT TO WORK, AND THAT

17   CONTENT WOULD AUTOMATICALLY SYNC BACK UP TO YOUR WORK COMPUTER

18   IF IT -- IF IT'S AUTHORIZED WITH THE SAME ACCOUNT.

19       SO YOU COULD TRANSFER CONTENT YOU'VE PURCHASED FROM THE

20   ITUNES MUSIC STORE BETWEEN AUTHORIZED COMPUTERS USING AN IPOD.

21   SO THE IPOD COULD MOVE FROM ONE AUTHORIZED COMPUTER TO ANOTHER

22   TRANSFERRING CONTENT.

23       WERE YOU AWARE OF THAT?

24   **A.**  YES.

25   **Q.**  OKAY.  THAT WAS NOT A VARIABLE INCLUDED IN YOUR

1    REGRESSION.

2    **A.**   NOT A VARIABLE IN THE REGRESSION.

3    **Q.**   ALL RIGHT.  GAPLESS PLAYBACK.

4              (DEMONSTRATIVE PUBLISHED TO JURY.)

5    **BY MR. ISAACSON:**

6    **Q.**   WERE YOU FAMILIAR WITH THE ADDITION OF A FEATURE FOR

7    GAPLESS PLAYBACK SO THAT YOU WOULD NOT HAVE GAPS BETWEEN

8    SONGS?  AND YOU WOULD START A SONG SUCH AS BEETHOVEN'S

9    SYMPHONY, AND AT THE END OF THE SYMPHONY, IT WOULD PROGRESS TO

10   THE NEXT TRACK SEAMLESSLY.  AND THAT WAS NOT JUST FOR THE NEW

11   MUSIC YOU BUY, BUT ITUNES 7 WENT THROUGH YOUR WHOLE LIBRARY,

12   FOUND THE SONGS THAT WERE MEANT TO BE PLAYED GAPLESS, AND

13   WOULD MAKE THEM WORK WITH GAPLESS PLAYBACK.

14        DID YOU KNOW THAT?

15   **A.**   YES, I DID.  AND AT THE TIME I READ ABOUT IT, I WONDERED

16   WHY ANYBODY WOULD WANT BEETHOVEN TO RUN INTO LLJ COOL J (SIC).

17   BUT NONETHELESS THAT WAS IN THERE.

18   **Q.**   AND THAT WAS NOT A VARIABLE IN YOUR REGRESSION.

19   **A.**   THAT WAS NOT A VARIABLE IN MY REGRESSION, NO.

20   **Q.**   ALL RIGHT.  THE MOVIE FEATURE OF 7.0.  WERE YOU AWARE THAT

21   PRIOR TO THE MOVIE FEATURE OF 7.0, THAT ITUNES HAD OFFERED TV

22   SHOWS THAT STARTED OUT WITH 6.0, IT STARTED OUT WITH FIVE

23   SHOWS IN ONE NETWORK?  IN LESS THAN A YEAR, THEY HAD 220 SHOWS

24   AND 40 NETWORKS, THE LARGEST SELECTION OF ONLINE TELEVISION

25   PROGRAMMING IN THE WORLD.

1      DID YOU KNOW THAT?

2    **A.**   I WAS AWARE THAT THEY HAD MOVIES AND TELEVISION PROGRAMS.

3    I'M NOT AT ALL SURE IT'S THE LARGEST SELECTION IN THE WORLD.

4    BUT NONETHELESS I KNOW THAT THEY HAD IT, AND THEY HAD MANY OF

5    THEM THERE.

6    **Q.**   DID YOU KNOW OF ANY OTHER —— ANY OTHER OFFERING WITH MORE

7    TELEVISION SHOWS ONLINE DURING THIS PERIOD?

8    **A.**   THE ISSUE IS WHETHER THE LIBRARY IS SIMILAR TO OTHERS, AND

9    I DON'T —— I DON'T KNOW.  I DON'T HAVE THE DATA FOR HOW MANY

10   TELEVISION PROGRAM CLIPS AND MOVIES WERE AVAILABLE ON OTHER

11   SOURCES OF VIDEOS THAT WERE AVAILABLE AT THAT TIME AND OVER

12   THE COURSE OF THE CLASS PERIOD.  I DON'T KNOW.

13   **Q.**   NOW, WITH RESPECT TO ITUNES 7.0, WERE YOU AWARE THAT THEY

14   STARTED OUT WITH THE FILMS FROM WALT DISNEY PICTURES, WHICH

15   INCLUDED PIXAR, TOUCHSTONE PICTURES, MIRAMAX FILMS, FOUR

16   STUDIOS OWNED BY THE WALT DISNEY COMPANY, AND THEY MADE

17   AVAILABLE OVER 75 FILMS ONLINE?

18       THEY WERE GOING —— THEY ANNOUNCED THEY WERE GOING TO BE

19   ADDING MORE EVERY WEEK AND EVERY MONTH, AND IT INCLUDED THE

20   NUMBER ONE AND NUMBER TWO MOVIES OF THE YEAR, OF THAT YEAR,

21   *PIRATES OF THE CARIBBEAN* AND *CARS*, AND THAT THOSE MOVIES WOULD

22   BE AVAILABLE THE SAME DAY THAT THEY WERE RELEASED ON DVD.

23       WERE YOU AWARE OF THAT ASPECT OF 7.0 AT THE TIME OF YOUR

24   REPORT?

25   **A.**   YES, I WAS AWARE THAT THEY HAD MOVIES AND TV SHOWS.  THE

1    SPECIFIC MOVIES AND TV SHOWS THAT THEY HAD AVAILABLE I

2    HAVEN'T -- I DON'T HAVE MEMORIZED.

3    **Q.**  ALL RIGHT.  AND THIS WAS A VARIABLE YOU EXCLUDED FROM YOUR

4    REGRESSION.

5    **A.**  I DID EXCLUDE THE AVAILABILITY OF *PIRATES OF THE CARIBBEAN*

6    ONTO -- ON YOUR IPOD NANO.

7    **Q.**  AND YOU RECOGNIZED THAT IF THE OTHER FEATURES OF 7.0 THAT

8    WE JUST WENT THROUGH INCREASED DEMAND FOR THE IPOD, IT WOULD

9    BE EXTREMELY DIFFICULT TO SEPARATE THE EFFECT OF THOSE

10   FEATURES FROM THE IMPACT THAT -- THAT -- THAT HARMONY OR -- OR

11   HURTING THE OPERABILITY OF HARMONY HAD ON PRICE?

12   **A.**  YES, IT MAKES IT DIFFICULT.  AND THAT'S -- BUT IF YOU HAVE

13   ONE ATTRIBUTE THAT WAS ADDED WITH 7.0, QUALITATIVE ATTRIBUTE,

14   THEN ALL OF THESE OTHER THINGS WILL BE PERFECTLY CORRELATED

15   WITH IT, AND THEY WILL NOT ADD ANYTHING TO THE REGRESSION.

16   **Q.**  NOT JUST DIFFICULT, EXTREMELY DIFFICULT, CORRECT?

17   **A.**  YES, IT'S DIFFICULT WHEN THINGS HAPPEN SIMULTANEOUSLY,

18   IT'S -- IT'S -- RANGES FROM DIFFICULT TO IMPOSSIBLE TO

19   SEPARATE THEIR EFFECTS DEPENDING ON WHAT INFORMATION YOU HAVE.

20   **Q.**  RIGHT.  AND YOU'RE NOT AWARE OF ANY DATA THAT EXISTS THAT

21   WILL ALLOW YOU TO SEPARATE OUT THE OTHER FEATURES OF ITUNES

22   7.0'S IMPACT ON IPOD PRICES FROM THE ALLEGED BREAKING OF

23   HARMONY, CORRECT?

24   **A.**  I'M NOT AWARE OF ANY EXCLUDED VARIABLES.  AS YOU KNOW, THE

25   ISSUE HERE IS ARE THE VARIABLES THAT ARE EXCLUDED HIGHLY

 1   CORRELATED WITH THE ONES THAT ARE -- ARE INCLUDED.

 2   **Q.**  I APPRECIATE YOU --

 3   **A.**  AND THAT'S --

 4   **Q.**  -- TELLING ME WHAT THE ISSUE IS.

 5   **A.**  BUT, YOU KNOW, THE POINT IS THAT, YES, THERE IS NO

 6   SPECIFIC -- OF ALL THE THINGS YOU'VE SAID TO ME YOU COULD --

 7   THE ISSUE IS, IS THERE A VARIABLE IN THERE WHICH FALLS INTO

 8   THE SAME CATEGORY WHICH IS ALREADY IN THE MODEL.

 9   **Q.**  NONE OF THAT WAS MY QUESTION.

10   **A.**  IF YOU ADD -- IF YOU ADD THESE, IT WILL -- IT WILL NOT ADD

11   EXPLANATORY POWER.

12   **Q.**  RIGHT.  MY QUESTION WAS ABOUT THE DATA, SIR.

13   **A.**  YES.

14                    (SIMULTANEOUS COLLOQUY.)

15   **BY MR. ISAACSON:**

16   **Q.**  PLEASE LET ME ASK MY QUESTION.  ALL RIGHT.

17       YOU'RE NOT AWARE OF ANY DATA THAT EXISTS THAT WOULD ALLOW

18   YOU TO SEPARATE OUT THE OTHER FEATURES OF ITUNES 7.0'S IMPACT

19   ON IPOD PRICES FROM THE ALLEGED BREAKING OF HARMONY'S IMPACT

20   ON PRICES; ISN'T THAT CORRECT?

21   **A.**  I'M AWARE OF NO ADDITIONAL DATA, NO, THAT I -- THAT ISN'T

22   ALREADY THERE.

23   **Q.**  NO.  YOU'RE NOT AWARE OF ANY DATA, CORRECT?

24   **A.**  NO.  I'M NOT AWARE OF OTHER VARIABLES THAT -- AGAIN, WHEN

25   I WAS ASKED THAT QUESTION BEFORE, WHAT I -- IT WAS INCREMENTAL

1    VARIABLES TO BE ADDED TO THE MODEL, AND I DON'T KNOW OF ANY.

2         **MR. ISAACSON:**  ALL RIGHT.  CAN WE -- YOUR HONOR, I

3    WOULD REQUEST PERMISSION TO SHOW HIM FROM THE MAY 2013

4    DEPOSITION PAGE 237, LINES 1 THROUGH 9.

5              (PAUSE IN THE PROCEEDINGS.)

6         **THE COURT:**  YOU MAY PROCEED.

7         **MR. ISAACSON:**  MATT, WOULD YOU PLAY THAT.

8      (VIDEO EXCERPT FROM THE DEPOSITION OF ROGER NOLL PLAYING

9    IN OPEN COURT AS FOLLOWS:

10      "Q.  HOW DO YOU SEPARATE OUT THE IMPACT OF VIDEO IN 7.0

11   FROM THE CODE THAT BLOCKED HARMONY IN 7.0?

12      "A.  WELL, IF IT WERE THE CASE THAT THE PRINCIPAL USE OF

13   7.0 VIDEO WAS ON AN IPOD AS OPPOSED TO ON A PC, THEN IT WOULD

14   BE EXTREMELY DIFFICULT TO SEPARATE THEM OUT BECAUSE THEY'D

15   OCCUR SIMULTANEOUSLY.  YOU'D HAVE TO HAVE SOME -- YOU'D HAVE

16   TO HAVE SOME WAY TO MEASURE THE DEGREE OF USE OF VIDEO ON

17   IPODS.  AND I'M NOT AWARE OF ANY DATA THAT EXISTS ON THAT.")

18   **BY MR. ISAACSON:**

19   **Q.**  ALL RIGHT.  LET ME ASK YOU ABOUT YOUR VARIABLE AGAIN.

20        **MR. ISAACSON:**  DO WE HAVE THE ITUNES REV SLIDE?  CAN

21   YOU PUT THAT UP?

22        **THE COURT:**  I COULDN'T HEAR YOU, MR. ISAACSON.

23        **MR. ISAACSON:**  I WAS SPEAKING TO MY COLLEAGUE.

24              (PAUSE IN THE PROCEEDINGS.)

25        **MR. ISAACSON:**  OR WHY DON'T YOU JUST CALL UP 754 FOR

1    ME.  WE HAD A PRETTIER PICTURE OF THIS BUT -- THIS IS -- IF

2    YOU HIGHLIGHT THE SIXTH ONE DOWN, ITUNES 7.0 REV.

3                    (EXHIBIT PUBLISHED TO JURY.)

4    **BY MR. ISAACSON:**

5    **Q.**  WE LOOKED AT THIS BEFORE, DR. NOLL.  THIS WAS YOUR DUMMY

6    VARIABLE FOR ITUNES 7.0, RIGHT?

7    **A.**  YES.

8    **Q.**  ALL RIGHT.  AND JUST SO I'M CLEAR, IF YOU HAD JUST CHANGED

9    THE NAME OF THAT VARIABLE AND CALLED IT "ITUNES 7.0 MOVIES,"

10   YOUR MODEL WOULD STILL SHOW -- YOU WOULD -- YOUR MODEL WOULD

11   SHOW $351 MILLION IN PRICE EFFECT FROM THE ITUNES 7.0 MOVIES.

12   RIGHT?

13   **A.**  THAT WOULD BE THE CASE IF THERE WERE NO OTHER VARIABLES IN

14   THERE THAT EXPLAINED MOVIES.

15   **Q.**  RIGHT.

16   **A.**  YES.

17   **Q.**  IF YOU -- AND THE SAME WOULD BE TRUE IF YOU CALLED IT

18   "ITUNES COVER FLOW ALBUM ART," YOU'D STILL GET $351 MILLION?

19   **A.**  IT WOULD STILL BE TRUE IF I CALLED IT THE STEVE JOBS

20   MEMORIAL ABOUT HIS SPEECH INTRODUCING THE 7.0.

21   **Q.**  ALL RIGHT.

22   **A.**  NO MATTER WHAT YOU CALL THE VARIABLE, THE INTERPRETATION

23   OF IT IS STILL THE SAME.

24   **Q.**  ALL RIGHT.  AND WE WENT OVER SOMETHING YESTERDAY, BUT WE

25   DID IT WITH NOT VERY GOOD PICTURES.

1      **MR. ISAACSON:** SO IF I CAN SHOW 672.

2         THIS IS DEMONSTRATIVE 672.  SORRY.

3                    (PAUSE IN THE PROCEEDINGS.)

4              (DEMONSTRATIVE PUBLISHED TO JURY.)

5   BY MR. ISAACSON:

6   **Q.** SO WE LOOKED AT THIS YESTERDAY.

7         **MS. SWEENEY:** OBJECTION, YOUR HONOR.  I OBJECT TO

8   PUBLISHING THIS TO THE JURY.  IT'S HEARSAY.

9         **MR. ISAACSON:** THIS WAS PUBLISHED TO THE JURY

10  YESTERDAY --

11        **THE COURT:** OVERRULED.

12        **MR. ISAACSON:** -- WITHOUT OBJECTION.

13  BY MR. ISAACSON:

14  **Q.** THESE ARE YOUR TWO REPORTS, THE REPORT IN THIS CASE AND A

15  REPORT IN *DIGITAL MUSIC*.  WE LOOKED AT THIS EXACT LANGUAGE

16  YESTERDAY, PROFESSOR, BUT WE DIDN'T HAVE IT LOOKING VERY

17  NICELY ON THE SCREEN SO PEOPLE HAD A HARD TIME READING IT.

18        672 IS SIMPLY AN EXAMPLE OF WHERE YOU USED A CUT-AND-PASTE

19  METHOD, YOUR OWN WORDS FROM THIS CASE, YOUR REPORT IN THIS

20  CASE, AND THEN USED THAT IN YOUR REPORT IN *DIGITAL MUSIC*,

21  CORRECT?

22  **A.** YEAH, THESE -- YES.  I DON'T KNOW IF THEY'RE IDENTICAL,

23  BUT, YES, I DID DO WHAT YOU SAY.  I USED MATERIAL IN ONE CASE

24  IN ANOTHER CASE.

25              (DEMONSTRATIVE PUBLISHED TO JURY.)

1   **BY MR. ISAACSON:**

2   **Q.**  ALL RIGHT.  AND 673 WOULD BE ANOTHER EXAMPLE OF THAT WHERE

3   YOU CUT AND PASTED YOUR PREVIOUS ANALYSIS OF *APPLE IPOD ITUNES*

4   LITIGATION TO THE *DIGITAL MUSIC* LITIGATION?

5   **A.**  WELL, YES, EXCEPT THAT --

6   **Q.**  AND --

7   **A.**  -- THE SECOND ONE IS EMBEDDED IN THE BIGGER PARAGRAPH.

8   BUT, YES, THOSE WORDS ARE THERE.

9   **Q.**  AND THIS WAS IN YOUR MARKET ANALYSIS SECTION OF BOTH

10  REPORTS, RIGHT?

11  **A.**  THAT'S CORRECT.

12  **Q.**  AND THEN ONE LAST EXAMPLE 674.

13                  (DEMONSTRATIVE PUBLISHED TO JURY.)

14  **BY MR. ISAACSON:**

15  **Q.**  THIS IS ANOTHER EXAMPLE OF YOU USING WORD FOR WORD YOUR

16  WORDS FROM THIS CASE AND PUTTING -- CUTTING AND PASTE THEM

17  INTO *DIGITAL MUSIC*, RIGHT?

18  **A.**  YES.  AND BOTH -- AND THE ACTUAL SOURCE OF THESE

19  PARAGRAPHS IS FROM THE SIRIUSXM RATE HEARING AT THE COPYRIGHT

20  ROYALTY BOARD.

21  **Q.**  ALL RIGHT.  AND THEN 675 IS LANGUAGE -- WE LOOKED AT IT

22  YESTERDAY.  IT'S TRUE THAT IN YOUR REPORT IN THE -- IN THIS

23  CASE, YOU WROTE THAT DOWNLOADS ARE NON-COMPETITIVE SUBSTITUTES

24  FOR EITHER CD'S OR STREAMING SERVICES.

25          AND IN *DIGITAL MUSIC* LITIGATION, YOU WROTE, "DIGITAL

1    DOWNLOADS ARE SUBSTITUTES FOR CD'S.  THESE DATA REVEAL THAT

2    OVER THE COURSE OF THE LAST DECADE, DIGITAL DOWNLOADS HAVE

3    SUBSTITUTED FOR SALES OF PHYSICAL COPIES."

4         YOU WROTE THOSE WORDS, RIGHT?

5    **A.**  YES, I DID.  CELLOPHANE FALLACY.

6    **Q.**  AND DEMONSTRATIVE 676.

7              (DEMONSTRATIVE PUBLISHED TO JURY.)

8    **BY MR. ISAACSON:**

9    **Q.**  IN THIS CASE, IT'S TRUE THAT YOU WROTE THE WORDS, "FOR

10   SEVERAL OTHER REASONS PHYSICAL COPIES ARE NOT CLOSE

11   SUBSTITUTES FOR DOWNLOADS."

12        AND IN THE *DIGITAL MUSIC* CASE, YOU WROTE, "THE KEY POINT

13   IN ESTABLISHING LIABILITY IS THAT PHYSICAL COPIES OF DIGITAL

14   SOUND RECORDINGS AND DIGITAL DOWNLOADS OF SOUND RECORDINGS

15   OVER THE INTERNET ARE CLOSE SUBSTITUTES BECAUSE FOR THE LARGE

16   MAJORITY OF CONSUMERS WHO OWN COMPUTERS AND HIGH-SPEED

17   INTERNET CONNECTIONS, THE TWO PRODUCTS ARE FUNCTIONALLY

18   EQUIVALENT."

19        YOU WROTE THOSE WORDS, DIDN'T YOU?

20   **A.**  YES.  DIGITAL DOWNLOADS ARE IN THE MARKET FOR CD'S, BUT

21   CD'S ARE NOT IN THE MARKET FOR DIGITAL DOWNLOADS.  THE

22   CELLOPHANE FALLACY REASON.

23   **Q.**  AND DEMONSTRATIVE 67 -- YOU HAD TO -- YOU -- PROFESSOR

24   NOLL, I'M JUST ASKING IF YOU WROTE THESE THINGS.

25        DEMONSTRATIVE 677.

1    (DEMONSTRATIVE PUBLISHED TO JURY.)

2    **BY MR. ISAACSON:**

3    **Q.**  YOU WROTE IN THIS CASE, "THE CONTINUED DECLINE AFTER

4    DOWNLOAD SALES STOPPED GROWING INDICATES THAT CD'S ARE NOT

5    CONSTRAINING SALES OF DOWNLOADS."

6         AND IN THE *DIGITAL MUSIC* CASE, YOU WROTE, "THE PRICE OF

7    CD'S IS CONSTRAINED BY THE PRICE OF DIGITAL DOWNLOADS."

8         CORRECT?

9    **A.**  YES, I WROTE THEM, AND THEY'RE BOTH TRUE.

10   **Q.**  ALL RIGHT.  AND IN FACT, YOU USED YOUR CONCLUSION THAT THE

11   PRICE OF CD'S IS CONSTRAINED BY THE PRICE OF DIGITAL DOWNLOADS

12   TO ESTIMATE DAMAGES IN THAT CASE OF 140 TO $200 MILLION.

13   RIGHT?

14   **A.**  THAT'S CORRECT.  FOR CD'S, YEAH.

15   **Q.**  ALL RIGHT.  NOW, YESTERDAY --

16        **MR. ISAACSON:**  CAN I LOOK AT PAGE -- I'D LIKE TO SHOW

17   HIM AND ASK HIM ABOUT WHAT HE TOLD ME AT PAGE 1259 OF THE

18   TRANSCRIPT YESTERDAY.

19        MATT, IF WE CAN PULL THAT UP.

20        BEGINNING -- AND HIGHLIGHT BEGINNING AT LINE 3 AND THROUGH

21   LINE 19.

22             (DEMONSTRATIVE PUBLISHED TO JURY.)

23   **BY MR. ISAACSON:**

24   **Q.**  YESTERDAY, THIS WAS A DIALOGUE WE HAD.

25        "IN YOUR REPORTS IN THIS CASE, YOU TOLD -- YOU FILED

1  REPORTS IN THIS CASE THAT SAID CD'S AND DIGITAL DOWNLOADS,

2  MUSICS, WERE NOT CLOSE SUBSTITUTES DURING 2006 TO 2009?

3      "AND IN *DIGITAL MUSIC*, YOU FILED REPORTS THAT SAID CD'S

4  AND DIGITAL DOWNLOADS WERE CLOSE SUBSTITUTES OVER THE PREVIOUS

5  TEN YEARS, CORRECT?"

6      YOU SAID, "FALSE.  I SAID THEY'RE FUNCTIONAL SUBSTITUTES.

7  BUT THEIR ISSUE IN RELEVANT MARKETS IS WHETHER THEY ARE

8  ECONOMIC SUBSTITUTES.  THERE, AGAIN, THAT'S A DIFFERENT

9  QUESTION."

10     I SAY, "NO.  YOU WENT FARTHER THAN FUNCTIONAL SUBSTITUTES,

11 DIDN'T YOU, SIR?  YOU FOUND THEY WERE COMPETITIVE SUBSTITUTES.

12     "NO."

13     AND YOU EXPLAIN.  YOU DREW THE DISTINCTION TO ME --

14 BETWEEN ME -- YESTERDAY BETWEEN FUNCTIONAL SUBSTITUTES AND

15 COMPETITIVE SUBSTITUTES.

16     DO YOU RECALL THAT?

17 **A.**  I REMEMBER WE WERE TALKING ABOUT DIGITAL DOWNLOADS AND

18 WHAT'S -- ARE CD'S CONSTRAINING THE PRICE OF DIGITAL

19 DOWNLOADS.  AND -- BUT THEY'RE FUNCTIONAL SUBSTITUTES BUT NOT

20 ECONOMIC SUBSTITUTES.

21 **Q.**  ALL RIGHT.  CAN WE LOOK AT YOUR DECLARATION IN THE *DIGITAL*

22 *MUSIC* CASE.  THIS IS TAB 7 OF THE BINDER AT PAGE 48 AND 49 AT

23 THE BOTTOM.

24     **MR. ISAACSON:**  HIGHLIGHT THE LAST SENTENCE THAT

25 STARTS ON 48 AND CONTINUES TO 49.

 1            (DEMONSTRATIVE PUBLISHED TO JURY.)

 2    **BY MR. ISAACSON:**

 3    **Q.**   YOU WROTE IN THAT SECOND SENTENCE THERE, "BECAUSE DIGITAL

 4    DOWNLOADS ARE FUNCTIONALLY SO SIMILAR TO CD'S, THEY ARE CLOSE

 5    COMPETITIVE SUBSTITUTES."  RIGHT?

 6    **A.**   YEAH, THAT'S ABOUT CD'S.  THIS A PARAGRAPH ABOUT CD'S.

 7    **Q.**   YESTERDAY --

 8    **A.**   IT'S NOT A PARAGRAPH -- YES.

 9    **Q.**   YESTERDAY YOU TOLD ME THAT IT WAS FALSE THAT IF CD'S AND

10    DIGITAL DOWNLOADS WERE FUNCTIONAL SUBSTITUTES, THEY WOULD

11    STILL BE COMPETITIVE SUBSTITUTES.  AND IN YOUR REPORT IN

12    *DIGITAL MUSIC*, YOU SAID THE OPPOSITE.  YOU SAID DIGITAL

13    DOWNLOADS ARE FUNCTIONALLY SO SIMILAR TO CD'S, THEY ARE CLOSE

14    COMPETITIVE SUBSTITUTES; ISN'T THAT CORRECT?

15    **A.**   DIGITAL DOWNLOADS ARE CLOSE COMPETITIVE SUBSTITUTES FOR

16    CD'S, BUT CD'S ARE NOT CLOSE COMPETITIVE SUBSTITUTES FOR

17    DIGITAL DOWNLOADS, THAT'S THE CONCLUSION.

18    **Q.**   RESPECTFULLY, SIR, I DON'T THINK YOU'RE ANSWERING MY

19    QUESTION.

20    **A.**   I AM ANSWERING YOUR QUESTION.  THIS IS WHAT IT'S ABOUT.

21    **Q.**   YESTERDAY YOU TOLD ME THAT JUST BECAUSE THESE TWO THINGS

22    WERE FUNCTIONALLY SUBSTITUTES, THAT DIDN'T MEAN THEY WERE

23    COMPETITIVE SUBSTITUTES.  AND IN YOUR REPORT IN *DIGITAL MUSIC*,

24    YOU SAID THE OPPOSITE, DIDN'T YOU?  YOU SAID BECAUSE DIGITAL

25    DOWNLOADS ARE FUNCTIONALLY SO SIMILAR TO CD'S, THEY ARE CLOSE

1  COMPETITIVE SUBSTITUTES, RIGHT?

2  **A.**   THAT'S CORRECT --

3           **MS. SWEENEY:**  OBJECTION.

4           **THE COURT:**  OVERRULED.

5           **THE WITNESS:**  -- I DID SAY THAT.

6  **BY MR. ISAACSON:**

7  **Q.**   LET'S TALK SOME MORE ABOUT YOUR VARIABLES IN YOUR

8  REGRESSION.

9           **MR. ISAACSON:**  AND I'M GOING TO TRY AND -- CAN WE

10 LOOK AT 2874, AND WE'RE GOING TO HAVE TO BLOW THIS UP.

11              (EXHIBIT PUBLISHED TO JURY.)

12 **BY MR. ISAACSON:**

13 **Q.**   NOW, WHAT I UNDERSTAND THIS TO BE --

14           **MR. ISAACSON:**  AND DO WE HAVE A -- IS THERE A HARD

15 COPY IN HIS BINDER?

16                (PAUSE IN THE PROCEEDINGS.)

17 **BY MR. ISAACSON:**

18 **Q.**   YES.  THERE'S A HARD COPY IN YOUR BINDER.

19    NOW, WHAT I UNDERSTAND THIS TO BE IS A DATA SET, A DATA

20 SET THAT YOU AND YOUR TEAM -- AN EXCERPT OF A DATA SET THAT

21 YOU AND YOUR TEAM RELIED ON IN DOING THE REGRESSION.

22    DO YOU GENERALLY RECOGNIZE THIS AS SUCH A DATA SET?

23 **A.**   I RECOGNIZE IT AS A DATA SET, BUT OBVIOUSLY I DON'T -- I

24 DON'T REMEMBER THE DETAILS OF WHAT EVERYTHING MEANS.

25 **Q.**   RIGHT.  AND I'M ONLY GOING TO FOCUS RUNNING ACROSS THE

1    TOP, OKAY.  AND I WANT TO DISCUSS THE DATA THAT YOU HAD AND

2    INCLUDED IN YOUR REGRESSION.

3        SO THIS IS AN ACTUAL COPY OF MATERIAL YOU HAD.  AND YOU

4    CAN SEE ALL THE DIFFERENT NAMES ACROSS THE TOP.

5        **MR. ISAACSON:**  AND I WANT TO SCROLL OVER TO WHERE IT

6    SAYS "BATTERY."  MATT, WILL YOU HELP ME OUT?

7    **Q.**  SO ALL OF THESE ARE DIFFERENT CATEGORIES OF THINGS THAT

8    YOU WERE CONSIDERING FOR YOUR REGRESSION.

9        NOW STOP AT "BATTERY."  ALL RIGHT.

10       SO WITHIN THE ORIGINAL DATA SET, THERE WAS DATA ON BATTERY

11   AND YOU EXCLUDED THIS FROM YOUR REGRESSION, RIGHT?

12   **A.**  FROM MY ULTIMATE REGRESSION.  BUT WE ACTUALLY RAN

13   REGRESSIONS WITH ALL THESE VARIABLES IN THEM.

14   **Q.**  ALL RIGHT.  AND THEN WHEN YOU SAY YOU EXCLUDED IT FROM

15   YOUR ULTIMATE REGRESSION, YOU MEAN THE REGRESSION THAT YOU'VE

16   PRESENTED IN COURT YESTERDAY AND TODAY?

17   **A.**  THE -- YEAH, THE MODEL THAT WE PRESENTED AS THE PREFERRED

18   EQUATION DOES NOT HAVE THESE VARIABLES IN IT.

19   **Q.**  RIGHT.  YOU HAD THE -- IN THE DATA SET, YOU HAD THE

20   INFORMATION FOR THE VARIABLE.  YOU -- YOU OMITTED IT FROM THE

21   REGRESSION, CORRECT?

22   **A.**  FROM THAT REGRESSION, BUT NOT FROM OTHER REGRESSIONS, BUT

23   THE PREFERRED REGRESSION AMIDST THESE AND SEVERAL OTHERS.

24   **Q.**  ALL RIGHT.  AND THEN THE -- YOU CAN SEE AT THE RIGHT-HAND

25   EDGE OF THE SCREEN "WEIGHT"?

1  **A.**  YES.

2  **Q.**  THAT REFERS TO THE WEIGHT OF THE DEVICE.  THAT WAS A

3  VARIABLE THAT WAS INCLUDED IN THE DATA SET YOU HAD THAT YOU

4  OMITTED FROM THE REGRESSION THAT YOU'VE PRESENTED IN COURT,

5  CORRECT?

6  **A.**  IT'S NOT IN THE REGRESSION I PRESENTED IN COURT.  IT IS IN

7  OTHER REGRESSIONS THAT I'VE RUN.

8  **Q.**  ALL RIGHT.  AND THEN RIGHT NEXT TO THAT IS "DISPLAY SIZE."

9  ALL RIGHT.

10  **A.**  THAT'S CORRECT.

11  **Q.**  THAT WAS A VARIABLE YOU HAD IN THE ORIGINAL DATA SET, BUT

12  YOU EXCLUDED FROM THE REGRESSION YOU PRESENTED IN COURT TO THE

13  JURY, CORRECT?

14  **A.**  THAT'S CORRECT.

15  **Q.**  "CONNECTIVITY" IS NEXT.  AND THAT REFERS TO THE SPEED OF

16  THE CONNECTIVITY WHEN YOU'RE SYNCING GENERALLY; IS THAT RIGHT?

17  **A.**  WELL, IT'S RELATED TO SPEED, BUT IT'S ACTUALLY THE

18  PHYSICAL MECHANISM OF CONNECTIVITY.

19  **Q.**  RIGHT.  THERE -- AT THAT TIME, YOU -- I MEAN, YOU HAD A

20  FIREWIRE OR USB CONNECTIONS, AND THAT WOULD AFFECT HOW FAST

21  YOU WERE SYNCING; DO I GENERALLY HAVE THAT RIGHT?

22  **A.**  THAT'S CORRECT.

23  **Q.**  ALL RIGHT.  AND THAT FEATURE WAS IN YOUR ORIGINAL DATA SET

24  AND WAS EXCLUDED FROM YOUR REGRESSION, CORRECT?

25  **A.**  THAT'S CORRECT.

1   Q.   AND THEN MOVING OVER TO THE RIGHT, YOU CAN SEE "RES IN

2   PIX," AND THAT WOULD BE THE RESOLUTION IN PIXELS.  YOU HAD

3   THAT IN THE ORIGINAL DATA SET, AND YOU EXCLUDED IT FROM THE

4   REGRESSION, CORRECT?

5   A.   THAT'S CORRECT.

6   Q.   YOU DID PUT A VARIABLE IN FOR U2, THE BAND, RIGHT?

7   A.   YES, WE DID INCLUDE THAT.

8   Q.   OKAY.  BECAUSE THERE WAS A U2 IPOD.  THAT WAS WORTH

9   PUTTING INTO YOUR REGRESSION.

10  A.   WELL, THEY WERE ALL PUT IN THERE.  THAT ONE HAD THE

11  PROPERTY THAT IT ACTUALLY ADDED SOMETHING.

12  Q.   RIGHT.  THE U2 IPOD ACTUALLY ADDED SOMETHING BECAUSE IT

13  WAS BRANDED WITH THE NAME "U2" ON IT, AND I THINK THEY SIGNED

14  THE IPOD, RIGHT?  THAT WAS WORTH PUTTING IN.

15  A.   WELL, ALL OF THESE WERE AT SOME POINT IN TIME PUT IN, YES.

16  AND THAT WAS ONE OF THE ONES THAT WAS PUT IN, YES.

17  Q.   ALL RIGHT.  NOW, I WANT TO TALK TO YOU ABOUT SCREEN

18  SIZE -- SIZE.

19       MR. ISAACSON:  CAN WE LOOK AT 601.

20            (EXHIBIT PUBLISHED TO JURY.)

21       MR. ISAACSON:  SORRY.  NO.  DEMONSTRATIVE 601.

22            (PAUSE IN THE PROCEEDINGS.)

23          (DEMONSTRATIVE PUBLISHED TO JURY.)

24       MR. ISAACSON:  ALL RIGHT.  601.  THAT'S 600.

25            (DEMONSTRATIVE PUBLISHED TO JURY.)

1    **MR. ISAACSON:**  THERE WE GO.

2    **Q.**  SO THESE ARE THE DIFFERENT SCREEN SIZES OFFERED BY THE

3    IPOD NANO THAT YOU CONSIDERED, RIGHT?

4    **A.**  WHAT DOES "YOU CONSIDERED" MEAN?  I DON'T --

5    **Q.**  THAT YOU WERE AWARE OF THESE WHEN YOU DID YOUR REPORT,

6    RIGHT?

7    **A.**  WELL, THESE -- YEAH, THE NUMERICAL VERSIONS OF WHAT SCREEN

8    SIZE ARE, ARE IN THE DATA SET YOU JUST SHOWED.

9    **Q.**  RIGHT.  AND THE IPOD, FOR EXAMPLE, ON THE LEFT IS THE NANO

10   SECOND GENERATION, ON THE RIGHT IS THE THIRD GENERATION, AND

11   YOU CAN SEE THE SIZE OF THE SCREEN DISPLAY GOT BIGGER BETWEEN

12   THE SECOND AND THE THIRD GENERATION, RIGHT?

13   **A.**  WELL, I THINK SO.  I'M NOT GOING TO TRUST VISUALLY BECAUSE

14   I'M NOT SURE THESE ARE SCALE PHOTOGRAPHS, BUT, YES, THE VIDEO

15   DISPLAY SIZE DID CHANGE OVER TIME.

16   **Q.**  OKAY.

17          **MR. ISAACSON:**  CAN WE LOOK AT 602, BATTERY LIFE.

18              (DEMONSTRATIVE PUBLISHED TO JURY.)

19   **BY MR. ISAACSON:**

20   **Q.**  THIS IS A CORRECT EXPRESSION OF THE INCREASE IN BATTERY

21   LIFE OFFERED BY THE DIFFERENT MODELS OF THE CLASSIC FROM 2004

22   TO 2008, CORRECT?

23   **A.**  WELL, I -- AGAIN, BECAUSE I DON'T HAVE THESE THINGS

24   MEMORIZED, I DON'T KNOW WHETHER IT'S CORRECT, BUT THAT'S WHAT

25   IT'S REPRESENTING TO BE, AND I DON'T HAVE ANY REASON TO

1    DISAGREE WITH IT.  IT'S JUST THAT I HAVEN'T MEMORIZED THOSE

2    NUMBERS SO I CAN'T AUTHENTICATE THEM.

3    **Q.**  RIGHT.  YOU DID GENERALLY KNOW THAT THE CLASSIC AS -- WITH

4    THE NEW MODELS WOULD HAVE INCREASED BATTERY LIFE, CORRECT?

5    **A.**  ALL IPODS HAD INCREASED BATTERY LIVES THROUGHOUT THE

6    HISTORY OF THE PRODUCT.

7    **Q.**  ALL RIGHT.  WEIGHT, 603.

8              (DEMONSTRATIVE PUBLISHED TO JURY.)

9    **BY MR. ISAACSON:**

10   **Q.**  THESE ARE THE WEIGHTS OF THE CLASSIC FOURTH THROUGH

11   SEVENTH GENERATION, 2004, 2008.  THIS IS ACCURATE, ISN'T IT?

12   **A.**  I DON'T KNOW WHETHER IT'S ACCURATE.  BUT, YES, THERE ARE

13   DATA IN THE DATA SET ABOUT WEIGHT.  AND SO -- AND I DON'T HAVE

14   ANY REASON TO DISAGREE WITH IT.

15   **Q.**  ALL RIGHT.  AND --

16   **A.**  I JUST HAVEN'T MEMORIZED IT SO I CAN'T AUTHENTICATE IT.

17   **Q.**  RIGHT.  THE DATA -- THE DATA THAT YOU REVIEWED INDICATED

18   THAT AS THE -- WITH NEWER IPOD MODELS, THEY BECAME -- THEY HAD

19   LESS WEIGHT, THEY WERE SLEEKER DEVICES, RIGHT?

20   **A.**  YES AND NO.  AS YOU CAN SEE, IT WENT UP.  THE WEIGHT OF

21   THE IPOD, HOLDING ALL ITS FEATURES CONSTANT, TENDS TO GO DOWN

22   OVER TIME.  BUT IF YOU -- IF YOU TRANSFORM AN IPOD MODEL TO

23   SOMETHING THAT IT WASN'T BEFORE, LIKE YOU ADD SOME NEW

24   FUNCTIONALITY THAT REQUIRES MORE ELECTRONICS OR A BIGGER

25   SCREEN SIZE OR WHATEVER, THEN THE WEIGHT CAN GO UP.  IT'S

1    GENERALLY TRUE THAT HOLDING CONSTANT THE ATTRIBUTES, THE

2    WEIGHTS GO DOWN OVER TIME FOR NOT ONLY IPODS BUT ALL OF THEIR

3    COMPETITORS.

4    **Q.**  ALL RIGHT.  AND THE -- I'LL GO BACK TO THE DISPLAY SIZE.

5    604.

6              (DEMONSTRATIVE PUBLISHED TO JURY.)

7    **BY MR. ISAACSON:**

8    **Q.**  THIS IS THE IPOD CLASSIC DISPLAY SCREEN RESOLUTION AND

9    SIZE.  IT'S CORRECT, ISN'T IT, THAT FOR THE IPOD CLASSIC, NOT

10   JUST THE NANO, YOU GOT INCREASED SCREEN RESOLUTION AS WELL AS

11   SIZE, RIGHT?

12   **A.**  THAT'S CORRECT.  THE SCREEN RESOLUTION TENDS TO IMPROVE

13   OVER TIME, AS WELL AS THE SCREEN SIZE.

14   **Q.**  ALL RIGHT.

15              (PAUSE IN THE PROCEEDINGS.)

16   **BY MR. ISAACSON:**

17   **Q.**  AND THESE VARIABLES, AS YOU'VE ALREADY TESTIFIED, DISPLAY

18   SIZE, SCREEN -- I'M SORRY, DISPLAY, BATTERY, WEIGHT, WERE --

19   AND RESOLUTION WERE VARIABLES YOU OMITTED FROM YOUR

20   REGRESSION, CORRECT?

21   **A.**  WELL, THE ONE THAT I REPORTED, THE PREFERRED REGRESSION,

22   THEY ARE OMITTED, YES.

23   **Q.**  ALL RIGHT.  NOW -- NOW, LET ME JUST SEE IF I CAN

24   UNDERSTAND A CONCEPT WITH YOU.

25        ASSUMING THAT YOU ARE TRYING TO ISOLATE THE IMPACT THAT

1   DISABLING HARMONY WOULD HAVE ON THE PRICE OF IPODS, YOU'RE

2   GOING TO COMPARE A WORLD WHERE HARMONY IS WORKING TO A WORLD

3   WHERE HARMONY IS NOT WORKING.  IS THAT GENERALLY CORRECT?

4   **A.**   THAT'S THE IDEA.

5   **Q.**   RIGHT.

6   **A.**   WELL, IT'S -- IT'S -- YES, THAT'S -- THE STORY IS IF IT

7   HAD AN IMPACT, IT'S WHETHER IT WORKS VERSUS WHETHER IT DOESN'T

8   WORK, YES.

9   **Q.**   AND YOU CALL -- AND THAT'S GENERALLY REFERRED TO AS THE

10   BUT-FOR WORLD.  BUT FOR THIS HAPPENING, THE WORLD WOULD BE

11   DIFFERENT.

12   **A.**   WELL, THE BUT-FOR WORLD IS ONE IN WHICH HARMONY IS NOT

13   DISABLED.

14   **Q.**   RIGHT.

15      SO -- RIGHT.  BUT FOR HARMONY BEING DISABLED, WE HAVE A

16   WORLD WHERE HARMONY IS NOT DISABLED.  THAT'S -- YOU CALL THAT

17   THE BUT-FOR WORLD.

18   **A.**   WELL, THERE WERE PERIODS WHEN HARMONY WASN'T DISABLED THAT

19   WERE IN THE REAL WORLD.  SO THAT'S NOT QUITE ACCURATE.

20   **Q.**   WELL --

21   **A.**   BUT DURING -- THE -- THE ISSUE HERE, I THINK, IS HARMONY

22   WAS DISABLED BY KVC/DVC, AND SO WE COULD IMAGINE THE BUT-FOR

23   WORLD AS BEING ONE IN WHICH THAT DIDN'T HAPPEN.

24   **Q.**   RIGHT.  SO, AND THAT'S SEPTEMBER 2006.  AND IN THAT

25   BUT-FOR WORLD, IF WE IMAGINE A WORLD WHERE HARMONY IS NOT

1    DISABLED IN SEPTEMBER 2006, YOU DON'T -- YOU GO BACK TO THE

2    WORLD WHERE YOU HAVE THE DRM THAT EXISTED BEFORE 7.0, CORRECT?

3    **A.**  I DON'T UNDERSTAND THE QUESTION.  YOU'RE CHANGING THE DRM

4    AS WELL IN THE BUT-FOR?  I DON'T THINK WE CHANGED THE DRM IN

5    THE -- WE -- WE TAKE ACCOUNT OF DRM WITH THE VARIABLE THAT

6    MEASURES WHETHER IT'S DM-FREE (SIC) MUSIC, BUT THE DRM PER SE

7    DOESN'T CHANGE.

8    **Q.**  WELL, IF YOU GET RID OF THE KVC AND THE DVC, YOU'VE GOT

9    DIFFERENT DRM, RIGHT?

10    **A.**  NO.  FAIRPLAY IS STILL FAIRPLAY.  IT'S -- IT'S -- MY

11    UNDERSTANDING OF KVC AND DVC IS THAT THEY'RE NOT PART OF

12    FAIRPLAY, THEY'RE SOMETHING SEPARATE.

13    **Q.**  WAIT.  CAN I STOP YOU THERE?  IT'S YOUR UNDERSTANDING THAT

14    KVC AND DVC ARE NOT PART OF FAIRPLAY?

15    **A.**  WELL, THE DRM -- WHAT I MEAN WHEN I REFER TO THE DRM IS

16    THE ENCRYPTION SYSTEM.  AND I -- SO AND THEN WHAT THE KVC AND

17    DVC ARE, ARE MECHANISMS TO TRY TO RECOGNIZE AND ELIMINATE

18    FILES THAT IT BELIEVES ARE NOT ENCRYPTED IN THAT CODE.  THAT'S

19    WHAT I THINK THE RELATIONSHIP IS.

20    **Q.**  SO YOU THINK KVC AND DVC ARE INDEPENDENT OF THE FAIRPLAY

21    DRM AND HAD AN EFFECT ON DISABLING HARMONY INDEPENDENT OF THE

22    DRM; IS THAT RIGHT?

23    **A.**  WELL, THEY'RE NOT INDEPENDENT OF THE DRM, BUT THEY'RE --

24    THIS IS A SEMANTIC DEBATE, I BELIEVE.  WHAT I MEAN BY WHEN

25    I'VE BEEN USING THE TERM "DRM," I MEAN THE ENCRYPTION OF THE

1    FILE THAT HAS THE SOUND RECORDING IN IT.  AND THEN THERE'S

2    ANOTHER FEATURE WHICH IS TO CHECK TO SEE IF THE DRM IS PRESENT

3    OR IF IT'S A DRM-FREE FILE.  BUT EITHER ONE CAN BE LOADED ON

4    AN IPOD.

5    **Q.**  ALL RIGHT.  YOU THOUGHT KVC AND DVC WERE NOT PART OF THE

6    FAIRPLAY DRM; IS THAT RIGHT?

7    **A.**  WELL, WHEN I USE THE TERM, I WAS REFERRING TO THE

8    ENCRYPTION FOR THE SOUND RECORDING.  WHATEVER YOU WANT TO CALL

9    IT, YOU CAN CALL IT, BUT WE JUST NEED TO MAKE A DISTINCTION

10   BETWEEN THAT WHICH IS THE SORT OF CHECKING DEVICE INSIDE

11   ITUNES VERSUS THAT WHICH IS THE ENCRYPTION CODE FOR THE FILE.

12   THAT'S ALL.  I'M JUST MAKING THAT DISTINCTION.

13   **Q.**  LET'S GO BACK TO THE BUT-FOR WORLD, BUT FOR WHAT -- WHAT

14   YOU'RE ASSUMING WOULD HAVE BEEN THE CASE.  SO WITHOUT THE KVC

15   AND THE DVC, DID YOU ASSUME THE FULL FAIRPLAY DRM WOULD

16   CONTINUE AFTER SEPTEMBER 2006?

17   **A.**  THE -- YES.  THE ENCRYPTED FILE WOULD STILL BE THERE, YES.

18   AND THERE WOULD HAVE TO BE SOME MECHANISM FOR TRANSLATING THEM

19   INSIDE ITUNES, OR THEY WOULDN'T BE ABLE TO PLAY.

20   **Q.**  SO FOR PURPOSES OF YOUR ANALYSIS AND YOUR REGRESSION,

21   YOU'RE ASSUMING THAT THE FULL FAIRPLAY DRM CONTINUED AFTER --

22   THAT EXISTED THE DAY BEFORE 7.0, YOU ASSUMED IT -- IT

23   CONTINUED THE DAY AFTER 7.0.

24   **A.**  THE -- THE ASSUMPTION IS THAT THE DRM SYSTEM IS THERE,

25   YES.  I'M -- I'M NOT SURE WHERE YOU'RE GOING SO -- I DON'T

```
 1   UNDERSTAND THE QUESTION, I GUESS.  BECAUSE, YES, I'M ASSUMING

 2   THAT THE ONLY CHANGE IS THAT KVC AND DVC DON'T HAPPEN.

 3                   (OFF-THE-RECORD DISCUSSION.)

 4                   (PAUSE IN THE PROCEEDINGS.)

 5   BY MR. ISAACSON:

 6   Q.  SO IN YOUR REGRESSION (INDICATING), THAT'S THE DATE OF

 7   7.0, SEPTEMBER 12TH, 2006.

 8       ON 9/11 (INDICATING), THERE'S FAIRPLAY DRM IN THE SYSTEM,

 9   RIGHT?

10   A.  YEAH, FAIRPLAY DRM IS ON THE SYSTEM BOTH DAYS.

11   Q.  AND ON 9/13, YOU'RE ASSUMING THERE'S FAIRPLAY DRM IN THE

12   SYSTEM FOR PURPOSES OF YOUR REGRESSION, CORRECT?

13   A.  YES.  THE FAIRPLAY DRM IS -- IS IN PLACE THROUGHOUT THE

14   DATA PERIOD UNTIL WE GET TO THE ITUNES STORE SELLING DRM-FREE

15   SOUND RECORDINGS.

16   Q.  RIGHT.  AND YOU ARE ASSUMING THAT IT'S THE SAME FAIRPLAY

17   DRM ON SEPTEMBER 11TH AND SEPTEMBER 13TH IN YOUR REGRESSION,

18   CORRECT?

19   A.  WELL, THERE'S NO REASON WHY THE -- THE DRM SYSTEM ITSELF

20   CAN'T BE EVOLVING THROUGH TIME.  IT CAN -- IT COULD BE

21   CHANGING.  BUT THERE'S NO -- THERE'S NO -- THERE'S NOTHING TO

22   SAY -- IT'S WHATEVER IS HAPPENING, WE'RE NOT -- THE ISSUE IS

23   NOT WHAT'S THE DRM.  IT'S JUST THAT THERE IS A DRM SYSTEM THAT

24   APPLE HAS AND THAT THE ITUNES PROGRAM IS THE MECHANISM FOR

25   CHECKING WHETHER A FILE HAS THAT ON IT AND FOR -- AND FOR
```

1   PLAYING THE SOUND RECORDING IF IT'S ENCRYPTED IN THAT DRM

2   SYSTEM.

3   **Q.**  OKAY.  SO THE ISSUE TO YOU IS NOT THE DRM.  WHAT I WANT TO

4   KNOW IS IF YOU THOUGHT THE DRM ON SEPTEMBER 11TH WAS THE SAME

5   AS ON SEPTEMBER 13TH.

6   **A.**  I ASSUME THAT THE DETAILS OF THE DRM WERE EVOLVING OVER

7   TIME.  I -- I'M NOT THE TECHNICAL EXPERT ABOUT EXACTLY WHAT

8   THE -- WHAT THE ENCRYPTION CODE IS AND WHAT THE ENCRYPTION

9   MECHANISM IS.  SO I CAN'T ANSWER THE QUESTION WHAT CHANGES

10  WERE MADE IN THE ENCRYPTION SYSTEM.

11  **Q.**  DO YOU KNOW IF ANY CHANGES IN FAIRPLAY WERE MADE ON

12  SEPTEMBER 12TH?

13  **A.**  AGAIN, I'M NOT THE TECHNICAL EXPERT.  I CAN'T TELL YOU HOW

14  FAIRPLAY AS A DRM -- YOU KNOW, THE ENCRYPTION OF THE FILES

15  CHANGED THROUGH TIME.

16  **Q.**  ALL RIGHT.  NOW, BEFORE 7.0, THERE WAS SOMETHING CALLED

17  4.7.

18  **A.**  YES.

19  **Q.**  DID YOU UNDERSTAND THAT 7. -- THAT 4.7 MADE CHANGES -- HAD

20  A -- MADE CHANGES IN THE DRM?

21  **A.**  WELL, WHAT 4. -- YES, 4.7 -- I WOULDN'T HAVE USED THAT

22  TERMINOLOGY.  WHAT 4.7 DID IS IT HAD SOME CHANGES IN HOW THE

23  ITUNES PROGRAM ITSELF DEALT WITH THE ENCRYPTED FILES, YES.

24  **Q.**  ALL RIGHT.  AND DID YOU UNDERSTAND FROM READING THE TRIAL

25  TESTIMONY LAST WEEK THAT MR. FARRUGIA LED A TEAM OF SECURITY

1    PEOPLE AT APPLE THAT WORKED ON A COMPLETE RE-ARCHITECTURE OF

2    THE FAIRPLAY DRM THAT WAS IMPLEMENTED ON SEPTEMBER 12TH, 2006;

3    DID YOU -- DID YOU KNOW THAT?

4    **A.**   I -- I -- I DID READ SOME OF THAT TESTIMONY, YES.  BUT

5    IT -- YOU KNOW, THERE'S OTHER MATERIAL AS WELL ABOUT THIS.

6    AND I'M NOT THE TECHNICAL EXPERT ABOUT THE DETAILS OF WHAT WAS

7    IN THE DRM SYSTEM --

8    **Q.**   RIGHT.

9    **A.**   -- THROUGH TIME.

10   **Q.**   YOU ARE THE EXPERT WHO'S DESCRIBING A BUT-FOR WORLD, A

11   BEFORE-AND-AFTER WORLD FOR SEPTEMBER 12TH, 2006.  SO I'M

12   TRYING TO UNDERSTAND WHAT YOU THOUGHT THAT BEFORE-AND-AFTER

13   WORLD WAS.  I UNDERSTAND YOU'RE NOT A TECHNICAL EXPERT.

14       SO DID YOU UNDERSTAND THAT THAT WHOLE -- ON

15   SEPTEMBER 13TH, DID YOU BELIEVE IN YOUR -- IN YOUR REGRESSION,

16   WERE YOU ASSUMING THAT THE COMPLETE FAIRPLAY DRM

17   RE-ARCHITECTURE THAT WAS IMPLEMENTED ON 7.0 CONTINUED ON

18   SEPTEMBER 13TH?

19   **A.**   WELL, I KNOW THAT THE SYSTEM DID EVOLVE THROUGH TIME, YES.

20   IT DIDN'T -- IF -- IF YOU -- IT WOULDN'T BE SOMETHING THAT

21   WOULD AFFECT THE DEMAND, ALL RIGHT, SO IT WASN'T SOMETHING I

22   ANALYZED.  BUT, YES, I'M AWARE OF THE DISPUTE THAT EXISTS HERE

23   ABOUT EXACTLY WHAT HAPPENED WITH REGARD TO THE DRM THROUGH

24   TIME, YES.  BUT I DON'T HOLD MYSELF AS THE ONE TO RESOLVE THAT

25   DISPUTE.

1    Q.   ALL RIGHT.  I'M JUST TRYING TO UNDERSTAND.  YOU DID A

2    BEFORE-AND-AFTER REGRESSION.  I'M TRYING TO UNDERSTAND WHAT'S

3    BEFORE AND WHAT'S AFTER.

4        THE COMPLETE RE-ARCHITECTURE OF THIS DRM SOFTWARE FOR

5    FAIRPLAY WAS IMPLEMENTED ON SEPTEMBER 12TH, 2006.  DID YOU

6    ASSUME FOR PURPOSES OF YOUR REGRESSION THAT IT CONTINUED AFTER

7    SEPTEMBER 12TH AND WAS IN EXISTENCE ON SEPTEMBER 13TH?

8    A.   WHAT -- WHAT I -- WHAT THE MODEL -- WHAT I BELIEVE IS THE

9    FAIRPLAY DRM WAS IN PLACE THROUGHOUT THE DATA PERIOD UNTIL

10   DRM-FREE MATERIAL IS RELEASED.

11   Q.   YOU'RE NOT QUITE ANSWERING MY QUESTION.  YOU'RE JUST

12   SAYING FAIRPLAY DRM EXISTED.  I WANT TO KNOW WHAT FAIRPLAY DRM

13   EXISTED.

14       YOU READ ABOUT A RE-ARCHITECTURE OF THE SYSTEM THAT TOOK

15   PLACE OVER 18 MONTHS, A WHOLE TEAM OF ENGINEERS IMPLEMENTED ON

16   SEPTEMBER 12TH, 2006.  YOU HAVE A BEFORE-AND-AFTER MODEL.

17       I WANT TO KNOW IF THAT COMPLETE RE-ARCHITECTURE IS PART OF

18   YOUR -- YOUR AFTER WORLD WHERE YOU ASSUME IT CONTINUES ON

19   SEPTEMBER 13TH?

20   A.   THE ASSUMPTION OF THE MODEL IS, YES, IT DOES -- THAT WHAT

21   THE CHANGES THAT WERE MADE, IF ANY, AND WHETHER IT WAS --

22   WHETHER THEY WERE SUBSTANTIAL OR NOT, REGARDLESS OF WHAT THEY

23   WERE, THE ASSUMPTION IS THAT THE -- THE -- THE BUT-FOR WORLD

24   IS ONE IN WHICH WHATEVER CHANGES WERE GOING ON, THE ONLY ONE

25   THAT DIDN'T HAPPEN IS KVC/DVC.

1   Q.   RIGHT.  AND IN FACT, YOU HAVE ASSUMED, I BELIEVE YOU JUST

2   SAID, THAT THE COMPLETE RE-ARCHITECTURE OF THE FAIRPLAY DRM

3   OVER THAT 18-MONTH PERIOD WOULD HAVE NO EFFECT ON DEMAND,

4   YOU -- FOR PURPOSES OF YOUR MODEL; THAT WAS YOUR ASSUMPTION?

5   A.   YES, THAT'S -- THE ISSUE IS PRECISELY THAT.  YES.

6   Q.   ALL RIGHT.

7        WHAT YOU CALL -- WHAT THE PLAINTIFFS CALL THE DVC, THE

8   DATABASE VERIFICATION CODE, ITUNES 7 -- THAT WAS PART OF

9   ITUNES 7.4; YOU KNOW THAT, RIGHT?

10  A.   YES, WELL, IT WAS -- MY UNDERSTANDING OF IT IS IT WAS IN

11  7.0 BUT IT WASN'T TURNED ON AND IT WASN'T ACTUALLY

12  IMPLEMENTED --

13  Q.   YES.

14  A.   -- UNTIL 7.4.

15  Q.   THANK YOU.  THAT IS MORE PRECISE.  THE DATABASE INTEGRITY

16  CHECK WAS ACTIVATED IN SEPTEMBER 2007 WITH ITUNES 7.4.  THAT

17  WAS YOUR UNDERSTANDING, CORRECT?

18  A.   THAT'S MY UNDERSTANDING.

19  Q.   RIGHT.  NOW, YOU DID NOT SEPARATELY ANALYZE THE IMPACT OF

20  ITUNES 7.4 ON THE PRICE OF IPODS, CORRECT?

21  A.   THAT'S CORRECT.

22  Q.   OKAY.  AND JUST VERY SIMPLY, YOU DID A BEFORE-AND-AFTER

23  ANALYSIS OF SEPTEMBER 12TH, 2006.  7.4 IS A YEAR LATER IN

24  SEPTEMBER 2007.  YOU DON'T -- YOU DIDN'T DO A BEFORE-AND-AFTER

25  ANALYSIS OF SEPTEMBER 2007 TO TELL YOU WHAT WAS THE EFFECT OF

1   7.4.

2   **A.**   NO, I DID NOT.

3   **Q.**   AND TESTIFYING HERE TODAY, YOU ARE NOT ABLE TO TELL THE

4   COURT ANY PRICE EFFECT INDEPENDENTLY OF 7.4, RIGHT?

5   **A.**   THAT'S CORRECT.

6   **Q.**   OKAY.

7        NOW, LOOKING AGAIN AT THAT DATE, SEPTEMBER 12TH, 2006,

8   IT'S YOUR OPINION THAT THE IMPACT ON PRICES THAT WAS CAUSED BY

9   7.0 WAS IMMEDIATE BECAUSE OF THE LOCK-OUT EFFECT, CORRECT?

10  **A.**   THAT'S CORRECT.

11  **Q.**   ALL RIGHT.

12       SO -- AND BY CONTRAST, ANY PRICE EFFECT OF LOCK-IN WOULD

13  BE GRADUAL.

14  **A.**   LOCK-IN EFFECT TAKES TIME TO HAPPEN.  LOCK-OUT EFFECT

15  HAPPENS IMMEDIATELY.

16  **Q.**   ALL RIGHT.  AND LET ME JUST ASK YOU ABOUT THE RESULTS OF

17  YOUR ANALYSIS.

18       I THINK WE -- YOU SHOWED THE COURT, WITH YOUR COUNSEL,

19  THAT YOU ESTIMATED AN OVERCHARGE -- DIFFERENT OVERCHARGES FOR

20  CONSUMERS AND FOR THE RESELLERS.  I THINK YOU HAVE A

21  7.45 PERCENT OVERCHARGE FOR CONSUMERS, RIGHT?

22  **A.**   YES.  7.445, I BELIEVE, IS THE NUMBER.

23  **Q.**   RIGHT.

24  **A.**   I DON'T HAVE IT MEMORIZED.  IF THAT'S WHAT IT SAYS.

25  **Q.**   AND THAT'S ABOUT $16.32 CENTS ON AVERAGE FOR THE DEVICES,

1   RIGHT?

2   **A.**   THAT'S CORRECT.

3   **Q.**   SO -- AND JUST SO WE UNDERSTAND WHAT THAT WOULD LOOK LIKE,

4   IF I HAD A DEVICE THAT COST 199, IF I HAVE MY MATH RIGHT AND

5   IF I'M REMEMBERING WHAT'S WRITTEN DOWN ON THE COURT -- ON MY

6   BOOK BACK THERE (INDICATING), INSTEAD OF AN IPOD -- INSTEAD OF

7   WALKING INTO AN APPLE STORE AND SEEING A PRICE OF 199, I'D SEE

8   A PRICE OF 184.68.  RIGHT?

9   **A.**   YEAH -- YES, EXCEPT FOR, REMEMBER, THAT THE NUMBER IS A

10   PROPORTION OF THE AVERAGE PRICE, NOT THE LIST PRICE.

11   **Q.**   OKAY.  BUT ASSUMING I'M BUYING -- I'M TALKING ABOUT I'M A

12   CONSUMER WHO'S BUYING AN IPOD AT THE RETAIL PRICE OF $199.  IN

13   YOUR -- BASED ON YOUR ANALYSIS, WHAT YOU THINK WOULD HAVE

14   HAPPENED IS I WOULD WALK INTO AN APPLE STORE AND I WOULD SEE A

15   PRICE TAG OF A $184.68.

16   **A.**   WELL, THAT WOULD BE THE BEST ESTIMATE, YES, BUT IF IT WERE

17   184 OR 185, THAT WOULDN'T BE INCONSISTENT WITH THE POINT

18   ESTIMATE OF THE COEFFICIENT BECAUSE OF THE STANDARD ERROR.

19   **Q.**   ALL RIGHT.

20        NOW, THE MARGINS.

21        **MR. ISAACSON:**  CAN WE LOOK AT HIS MARGINS SLIDE?  I

22   DON'T KNOW IF YOU HAVE THAT AVAILABLE.  WE LOOK -- PLAINTIFFS

23   HAD IT, AND WE LOOKED AT IT IN OPENING AS WELL.

24        WHILE MY COLLEAGUES GET THAT.

25        NOW, I'M RUNNING OUT OF SPACE ON THIS BOARD.  I DON'T KNOW

 1    IF THERE'S AN ERASER.

 2    Q.  I THINK I'VE GOT A MATHEMATICAL PRINCIPLE WE'LL AGREE ON.

 3              **THE COURT:**  YOU CAN LOOK ON THE BACK.  I DON'T KNOW

 4    IF THERE'S AN ERASER ON THE BACK.

 5                    (OFF-THE-RECORD DISCUSSION.)

 6                    (PAUSE IN THE PROCEEDINGS.)

 7    **BY MR. ISAACSON:**

 8    Q.  ALL RIGHT.  MARGIN -- MARGINS -- QUANTITY OF MARGINS

 9    VERSUS PERCENTAGE OF MARGINS, JUST THE MATH.

10                    (DEMONSTRATIVE PUBLISHED TO JURY.)

11    **BY MR. ISAACSON:**

12    Q.  COST $200, PRICE --

13                    (OFF-THE-RECORD DISCUSSION.)

14    **BY MR. ISAACSON:**

15    Q.  PRICE $200, COST 150, MARGIN 50.

16       SO WHAT PERCENT MARGIN DO I HAVE THERE, DOCTOR?

17    A.  THAT WOULD BE 50 DIVIDED BY 200 WHICH IS 25 PERCENT.

18    Q.  THANK YOU.

19       IF I HAVE A PRICE OF 100 AND A COST OF 50, I HAVE A MARGIN

20    OF $50, NOW I HAVE A 50 PERCENT MARGIN?

21    A.  THAT'S CORRECT.

22    Q.  SO JUST MATHEMATICALLY, ALL WE'RE ILLUSTRATING HERE IS YOU

23    CAN HAVE THE SAME DOLLAR MARGIN, BUT WHEN IT'S OFF OF HE

24    DIFFERENT NUMBERS AT THE TOP, THE PERCENTAGE IS DIFFERENT.

25    A.  THAT'S CORRECT.

1          **MR. ISAACSON:** DO WE HAVE THAT SLIDE?

2               (DEMONSTRATIVE PUBLISHED TO JURY.)

3      **BY MR. ISAACSON:**

4      **Q.** SO WHEN YOU LOOKED AT AVERAGE GROSS MARGINS, WERE YOU

5      LOOKING AT PERCENTAGES OR -- OR THE DOLLAR VOLUME OF THE

6      MARGINS?

7      **A.** (REVIEWING DOCUMENT.)

8          THIS IS EACH -- THIS IS THE MARGIN FOR EACH IPOD

9      WEIGHTED -- THE AVERAGE OF THE MARGINS FOR EACH OF THE IPODS

10     WEIGHTED BY THE DOLLAR SALES VOLUME OF THE IPODS.  SO IT'S --

11     IF YOU HAVE SOMETHING LIKE THIS, YOU WOULD HAVE THE 25 PERCENT

12     WEIGHTED BY THE FRACTION OF SALES ACCOUNTED FOR BY THE HIGHER

13     PRICED ONE AND THE 50 PERCENT WEIGHTED BY THE FRACTION OF THE

14     SALES ACCOUNTED FOR BY THE LOWER PRICED, HIGHER MARGIN ONE.

15     **Q.** ALL RIGHT.  LET'S TRY AND ANSWER THE QUESTION.

16         WHAT'S ON THE LEFT-HAND ACCESS -- AXIS?  THAT'S PERCENTAGE

17     MARGIN, RIGHT?

18     **A.** YES, THAT'S RIGHT.  AND IT'S THE AVERAGE -- IT'S THE

19     WEIGHTED AVERAGE OF THE 25 AND THE 50.

20               (DEMONSTRATIVE PUBLISHED TO JURY.)

21     **BY MR. ISAACSON:**

22     **Q.** RIGHT.  IN YOUR CHART, YOU'RE LOOKING AT THIS AND NOT THE

23     DOLLAR -- THE AMOUNT -- NOT THE AMOUNT OF THE MARGINS, RIGHT?

24     **A.** THAT'S RIGHT BECAUSE WHAT THE INDICATOR -- THE LERNER

25     INDEX IS WHAT ECONOMISTS USE TO MEASURE PROFITS AS PERCENTAGE

1    MARGIN, NOT ABSOLUTE MARGIN.

2    **Q.**  AND IN TERMS OF THIS CHART, YOU HAVE MADE NO EFFORT IN

3    THIS CASE TO LINK WHAT HAPPENED WITH 7.0 TO THOSE MARGINS,

4    CORRECT?  AT LEAST YOU DIDN'T BY THE TIME OF YOUR REPORT?

5    **A.**  NO, I HAVEN'T -- NO, I DID NOT.  ALL I'VE DONE IS

6    ILLUSTRATE THE FACT THAT THEY WERE HIGHER IN THE CLASS PERIOD

7    THAN THEY WERE BEFORE OR AFTER.

8    **Q.**  RIGHT.  THIS IS JUST AN ILLUSTRATION.  IT'S NOT -- YOU

9    HAVE NOT RELATED THIS TO ANY EVENT IN THIS CASE, CORRECT?

10   **A.**  WELL, THIS IS EVIDENCE IN SUPPORT OF THE PROPOSITION THAT

11   THE PROFIT MARGINS WERE HIGHER DURING THE CLASS PERIOD, YES.

12   **Q.**  ALL RIGHT.  BUT YOU HAVE NOT -- YOU HAVE NOT SAID THIS WAS

13   ATTRIBUTABLE TO ANY CAUSE AT ISSUE IN THIS CASE, CORRECT?

14   **A.**  THIS IS NOT PART OF THE ANTICOMPETITIVE HARM OR THE HARM

15   TO CONSUMERS, NO.  THIS IS -- THIS IS USED IN THE CONTEXT OF

16   THE PRESENCE OF MONOPOLY POWER.  AND IN THE DISCUSSION OF

17   MONOPOLY POWER, THERE'S NOTHING ABOUT CONDUCT OR WHY IT'S

18   TRUE.

19   **Q.**  IT'S MORE THAN THAT, SIR, ISN'T IT?  ALL YOU DID WAS CHART

20   THE MARGINS.  YOU DID NOT, IN YOUR REPORT, DO ANY ANALYSIS

21   RELATING THOSE MARGINS TO ANY SPECIFIC EVENT, CORRECT?

22   **A.**  NO.  I DID RELATE IT IN TERMS OF DETERMINING THE PRESENCE

23   OF MONOPOLY POWER, YES.  IN TERMS OF -- IT'S NOT -- THERE'S

24   NOTHING IN HERE ABOUT HARM TO CONSUMERS OR -- OR SOURCES OF

25   MARKET POWER, NO.  THIS SAYS NOTHING ABOUT THE SOURCES OF

 1    MARKET POWER, AND IT SAYS NOTHING ABOUT ANTICOMPETITIVE HARM.

 2    THIS IS SOLELY USED WITH REGARD TO THE PRESENCE OF MARKET

 3    POWER AND MONOPOLY POWER.

 4            MR. ISAACSON:  ALL RIGHT.  I WOULD LIKE TO HAVE HIM

 5    LOOK AT THE DEPOSITION FROM THE MAY 2013 DEPOSITION, PAGE 140,

 6    LINES 25 THROUGH 141 -- 141, LINE 8.

 7                    (PAUSE IN THE PROCEEDINGS.)

 8            THE COURT:  GO AHEAD.

 9      (VIDEO EXCERPT FROM THE DEPOSITION OF ROGER NOLL PLAYING

10    IN OPEN COURT AS FOLLOWS:)

11      "Q.  YOUR REPORT TALKS ABOUT A -- AN INCREASE IN GROSS

12    MARGINS ON IPODS IN FISCAL 2006.  ARE YOU DRAWING ANY

13    CAUSE-AND-EFFECT RELATIONSHIP BETWEEN THE ISSUANCE OF 7.0 AND

14    GROSS MARGINS ON IPODS?

15      "A.  I DIDN'T DO -- ALL THAT SECTION ABOUT -- IS ABOUT IS

16    SHOWING THAT THE MARKET POWER OF APPLE IN IPODS GREW DURING

17    THE WHOLE DATA PERIOD UNTIL ABOUT 2007 OR SO WHEN IT STOPPED.

18    I HAVEN'T RELATED IT TO ANY SPECIFIC EVENT."

19                    (PAUSE IN THE PROCEEDINGS.)

20            MR. ISAACSON:  NO FURTHER QUESTIONS.

21            THE COURT:  REDIRECT?

22                    **REDIRECT EXAMINATION**

23    BY MS. SWEENEY:

24    Q.  GOOD MORNING.

25    A.  GOOD MORNING.

1    **Q.** SO MR. ISAACSON ASKED YOU ABOUT A CASE IN WHICH YOU SERVED

2    AS AN EXPERT, THE *DIGITAL MUSIC* CASE. DO YOU RECALL THAT LINE

3    OF QUESTIONING?

4    **A.** YES, I DO.

5    **Q.** ALL RIGHT. AND ONE OF THE QUESTIONS MR. ISAACSON ASKED

6    YOU ABOUT WAS WHO WERE THE ATTORNEYS IN THAT CASE, AND HE

7    IDENTIFIED SOME OF THE COUNSEL FOR PLAINTIFFS IN THIS CASE.

8        AND MY QUESTION IS: HAVE YOU EVER WORKED ON ANY CASES

9    WHERE MR. ISAACSON WAS ONE OF THE ATTORNEYS?

10   **A.** YES.

11   **Q.** AND WHAT WAS THAT?

12   **A.** THE *O'BANNON* CASE, THE ANTITRUST CASE AGAINST THE NCAA.

13   **Q.** AND TURNING AGAIN TO THAT *DIGITAL MUSIC* CASE, FIRST OF

14   ALL, MR. ISAACSON ASKED YOU SOME QUESTIONS ABOUT REALNETWORKS'

15   ROLE IN MUSICNET. AND MUSICNET WAS FORMED BY THE -- BY THE

16   MUSIC LABELS; IS THAT CORRECT?

17   **A.** BOTH MUSICNET AND PRESSPLAY WERE FORMED BY LABELS. THREE

18   OF THE LABELS WERE IN MUSICNET AND TWO WERE IN PRESSPLAY. IN

19   ADDITION, MUSICNET HAD REALNETWORKS AS A PARTNER, AND

20   PRESSPLAY HAD MICROSOFT AS A PARTNER.

21   **Q.** SO PRESSPLAY HAD MICROSOFT AS A PARTNER. WAS THAT IN THE

22   SAME CONTEXT IN WHICH REALNETWORKS WAS A PARTNER WITH

23   MUSICNET?

24   **A.** THE STRUCTURES WERE ESSENTIALLY THE SAME, YES.

25   **Q.** OKAY.

1    **A.**   BUT -- ALTHOUGH OBVIOUSLY BILL GATES WAS NOT THE CEO OF

2    PRESSPLAY.  BUT MICROSOFT WAS PART OF PRESSPLAY, AND

3    REALNETWORKS WAS PART OF MUSICNET.

4    **Q.**   ALL RIGHT.  AND WHEN YOU WERE TALKING YESTERDAY ABOUT

5    THE -- THE INVESTIGATION INTO ANTICOMPETITIVE CONDUCT, WERE

6    MICROSOFT OR REALNETWORKS TARGETS OF THAT ANTICOMPETITIVE

7    INVESTIGATION?

8    **A.**   NO.  AND THEY'RE NOT --

9            **MR. ISAACSON:**  OBJECTION, YOUR HONOR, THERE WAS NO

10   TESTIMONY ABOUT AN INVESTIGATION.  THERE WAS JUST ABOUT HIS --

11   HIS OPINIONS ABOUT WHETHER THAT CONDUCT HAD HAPPENED.

12           **THE COURT:**  SUSTAINED.

13   **BY MS. SWEENEY:**

14   **Q.**   WERE -- MR. ISAACSON ASKED YOU SOME QUESTIONS ABOUT THE --

15   THE ALLEGATIONS IN THE *DIGITAL MUSIC* CASE, CORRECT?

16   **A.**   THAT'S CORRECT.

17   **Q.**   AND WAS REALNETWORKS A DEFENDANT IN THAT CASE?

18   **A.**   NO.

19   **Q.**   WAS MICROSOFT?

20   **A.**   NO.

21   **Q.**   ALL RIGHT.

22           **MS. SWEENEY:**  CAN WE LOOK AT DEMONSTRATIVES 672, 673,

23   674, 675, 676, AND 677.

24                      (OFF-THE-RECORD DISCUSSION.)

25                      (PAUSE IN THE PROCEEDINGS.)

1    (DEMONSTRATIVE PUBLISHED TO JURY.)

2    **BY MS. SWEENEY:**

3    **Q.**  ALL RIGHT.  THIS IS ONE OF THE SLIDES THAT MR. ISAACSON

4    SHOWED YOU TODAY, CORRECT?

5    **A.**  YES.

6    **Q.**  AND IS THIS A -- THIS SHOWS THAT YOU -- YOU USED SOME OF

7    YOUR PRIOR WORK IN THE -- IN ONE REPORT IN ANOTHER REPORT.

8    **A.**  YES.  IT DOES.  I'VE HAD A NUMBER OF CASES I'VE DONE WORK

9    ON IN THE LAST FIVE YEARS, ALL OF WHICH HAD ESSENTIALLY THE

10   SAME ISSUE ABOUT WHAT'S -- WHAT IS THE RELATIONSHIP BETWEEN

11   DIGITAL DOWNLOADS AND SALES OF CD'S.  IT ARISES IN DIFFERENT

12   CONTEXTS, BUT THAT ISSUE HAS BEEN PRESENT IN SEVERAL CASES

13   OVER THE LAST FIVE YEARS, FOUR OR FIVE CASES OVER THE LAST

14   FIVE YEARS.

15   **Q.**  AND MR. ISAACSON ACCUSED YOU OF PLAGIARISM FOR USING YOUR

16   OWN WORK?

17   **A.**  YES, HE DID.

18   **Q.**  IS THAT PLAGIARISM?

19   **A.**  NO, OF COURSE NOT.  AND I DON'T THINK HE THINKS IT IS

20   EITHER SINCE HE SAID HE DOES IT HIMSELF.  PLAGIARISM IS

21   REPRESENTING THE WORK OF SOMEONE ELSE AS YOUR OWN WITHOUT

22   ATTRIBUTION.

23        **MS. SWEENEY:**  OKAY.  CAN WE TURN TO DEMONSTRATIVE

24   675, PLEASE.

25        (DEMONSTRATIVE PUBLISHED TO JURY.)

1  BY MS. SWEENEY:

2  **Q.**  AND DO YOU REMEMBER WHEN MR. ISAACSON SHOWED YOU THIS

3  SLIDE?

4  **A.**  YES.

5  **Q.**  AND YOU WERE TRYING TO EXPLAIN IN RESPONSE TO

6  MR. ISAACSON'S QUESTIONS WHAT THE DIFFERENCE IS BETWEEN THESE

7  TWO CONCLUSIONS.  CAN YOU EXPLAIN WHAT THE DIFFERENCE IS IN

8  THE CONCLUSIONS YOU DREW IN THIS CASE VERSUS THE CONCLUSIONS

9  YOU DREW IN THE *DIGITAL MUSIC* CASE CONCERNING MARKET

10  DEFINITION?

11  **A.**  YES.  IT'S ALL IN THE CONTEXT OF THE CELLOPHANE FALLACY.

12  SUPPOSE YOU HAVE A MONOPOLY.  A MONOPOLIST RAISES THE PRICE

13  UNTIL NO FURTHER PRICE INCREASE IS PROFITABLE.  AND THAT'S

14  BECAUSE AT THAT PRICE, IT GETS SO HIGH THAT PEOPLE SUBSTITUTE

15  TO OTHER THINGS.  THEY SPEND THEIR MONEY ON SOMETHING ELSE,

16  WHICH IS WHAT SUBSTITUTION MEANS.

17      THE CELLOPHANE FALLACY CONFUSES MARKET DEFINITION WITH THE

18  FACT THAT THERE'S A CAP ON MONOPOLY PRICING.  MONOPOLY PRICING

19  IS CAPPED BY THE POINT WHEN CONSUMERS SAY, "I JUST WON'T BUY

20  THIS ANYMORE" IN SUFFICIENT NUMBERS THAT IT'S NO LONGER

21  PROFITABLE TO RAISE PRICES.

22      IN THAT CONTEXT, IF YOU HAVE ONE PRODUCT THAT'S A MONOPOLY

23  AND ANOTHER PRODUCT THAT IS COMPETITIVE, THE MONOPOLY PRODUCT

24  CAN HAVE ITS PRICE INCREASED TO THE POINT AT WHICH IT APPEARS

25  AS A COMPETITIVE SUBSTITUTE FOR THE OTHER PRODUCT.  BUT IN

 1    FACT, IT'S STILL A MONOPOLY WITH MONOPOLY PROFITS.  AND THE

 2    CELLOPHANE FALLACY CONSISTS OF GETTING THE MARKET DEFINITION

 3    WRONG BY SAYING THAT THE MARKET FOR THIS PRODUCT THAT IS

 4    MONOPOLIZED INCLUDES THE PRODUCTS THAT ARE COMPETITIVE WHEN IT

 5    DOESN'T BECAUSE THE MONOPOLY PRICE IS STILL BEING CHARGED.

 6         IT'S THAT CIRCUMSTANCE WHERE YOU WOULD SAY THE MONOPOLY

 7    PRODUCT IS PART OF THE RELEVANT MARKET FOR THE COMPETITIVE

 8    PRODUCT BECAUSE IT CONSTRAINS ITS PRICE, BUT THE COMPETITIVE

 9    PRODUCT IS NOT PART OF THE MONOPOLY PRODUCT BECAUSE IT'S

10    ALREADY CHARGING THE MONOPOLY PRICE.

11         THIS CAME UP IN THE CONTEXT OF AN ANTITRUST CASE MANY,

12    MANY DECADES AGO IN WHICH THE ISSUE WAS DID SOMEBODY

13    MONOPOLIZE THE -- THE -- THE CELLOPHANE MARKET, AND THE

14    DEFENSE WAS, WELL, THERE'S WAX PAPER AND THERE'S ALUMINUM FOIL

15    AND THEY ALL ARE USED TO WRAP FOOD SO THEY'RE COMPETITIVE

16    SUBSTITUTES FOR CELLOPHANE.

17         AND THE COURT ERRED BY SAYING, OH, THEY'RE ALL -- THERE'S

18    SOMETHING CALLED A FOOD WRAPPING MARKET -- A FOOD WRAPPER

19    MARKET.  AND EVER SINCE, THAT'S BEEN USED IN TEACHING

20    ANTITRUST ECONOMICS TO UNDERGRADUATE AND GRADUATE STUDENTS AS

21    AN EXAMPLE OF HOW YOU CAN GET MARKET DEFINITION WRONG.

22         AND -- AND IT'S EASY TO SEE WHY PEOPLE WOULD DO THAT

23    BECAUSE IT SOUNDS LIKE THERE OUGHT TO BE SYMMETRY.  IT SOUNDS

24    LIKE IF A COMPETES WITH B, THEN IT MUST BE THE CASE THAT B

25    COMPETES WITH A.  BUT IT TURNS OUT THAT'S NOT TRUE.

 1    Q.   AND THEN LET'S TURN TO THE NEXT DEMONSTRATIVE THAT

 2    MR. ISAACSON USED, WHICH IS 676.

 3    A.   YES.

 4              (DEMONSTRATIVE PUBLISHED TO JURY.)

 5    BY MS. SWEENEY:

 6    Q.   AND AGAIN, IS THERE AN INCONSISTENCY BETWEEN THESE TWO

 7    HIGHLIGHTED STATEMENTS THAT MR. ISAACSON SHOWED YOU?

 8    A.   NO.  AGAIN, IT'S THE -- THIS IS JUST TALKING ABOUT THE

 9    SYMMETRY, THE ASYMMETRY BETWEEN THE TWO.

10    Q.   AND LET'S HAVE A LOOK AT 677.

11              (DEMONSTRATIVE PUBLISHED TO JURY.)

12    BY MS. SWEENEY:

13    Q.   AND AGAIN, MR. ISAACSON SHOWED YOU THIS DOCUMENT WITH THE

14    HIGHLIGHTED TEXT.  CAN YOU EXPLAIN WHAT THE DIFFERENCE IS

15    BETWEEN THESE TWO STATEMENTS AND WHETHER THEY'RE INCONSISTENT.

16    A.   THE FIRST ONE IS ABOUT ONE DIRECTION, DOES A COMPETE WITH

17    B.  AND THE OTHER IS ABOUT THE OTHER DIRECTION, DOES B COMPETE

18    WITH A.  SO THEY'RE NOT INCONSISTENT.  THEY'RE TALKING ABOUT A

19    DIFFERENT REFERENCE PRODUCT AND, HENCE, WHO COMPETES WITH WHOM

20    IS DIFFERENT.

21         THE DIGITAL DOWNLOADS DO NOT CONSTRAIN -- DO CONSTRAIN THE

22    PRICE OF CD'S, BUT THE PRICE OF CD'S DO NOT CONSTRAIN THE

23    PRICE OF DIGITAL DOWNLOADS.

24    Q.   IN YOUR VIEW, IS THERE ANY INCONSISTENCY IN THE OPINIONS

25    YOU RENDERED IN THIS CASE COMPARED TO THE *DIGITAL MUSIC* CASE?

1   **A.**   NO, THERE'S NO INCONSISTENCY AT ALL.

2   **Q.**   OKAY.

3       NOW, MR. ISAACSON ASKED YOU YESTERDAY, I THINK, ABOUT THE

4   RESELLER PORTION OF THE CLASS, AND HE ASKED YOU WHETHER THEY

5   WERE LOCKED IN.  DO YOU RECALL THAT TESTIMONY?

6   **A.**   NO, I DON'T, ACTUALLY.

7   **Q.**   OH.

8       DO YOU RECALL MR. ISAACSON ASKING YOU WHETHER -- SO YOU

9   DON'T RECALL MR. ISAACSON ASKING YOU WHETHER RESELLERS WERE

10  LOCKED IN?

11  **A.**   I REMEMBER HIM ASKING THAT QUESTION.  I -- BUT I DON'T

12  REMEMBER THE CONTEXT.

13  **Q.**   OKAY.  MY -- MY QUESTION SIMPLY IS:  WITHOUT LOCK-IN, CAN

14  THE RESELLERS STILL HAVE SUFFERED DAMAGE?

15  **A.**   OH, OF COURSE, BECAUSE THEIR CUSTOMERS ARE LOCKED IN.  AND

16  THAT'S WHAT THE WHOLE ISSUE OF PASS-THROUGH IS ABOUT.  IT'S

17  ABOUT IF YOUR CUSTOMERS -- IF THE DEMAND FOR PRODUCTS HAS

18  SHIFTED BECAUSE OF LOCK-IN IN THE FINAL RETAIL MARKET, THEN

19  THAT MEANS YOUR DEMAND FOR YOUR PRODUCT TO SELL IT, IF YOU'RE

20  A RETAILER OR IF YOU'RE A DISTRIBUTOR SELLING TO A RETAILER,

21  IS GOING TO BE AFFECTED BY THE CHANGES AND THE PRICE

22  SENSITIVITY OF DEMAND THAT ARE OCCURRING IN THE FINAL PRODUCT

23  MARKET.  SO THAT'S GOING TO AFFECT HOW MUCH YOU'RE WILLING TO

24  PAY FOR THE -- THE MANUFACTURED PRODUCT.

25      AND THE NATURE OF ANTITRUST IS SUCH THAT WE ONLY LOOK AT

1    THE, WHAT IS CALLED THE DIRECT PURCHASER, THE ENTITY THAT

2    ACTUALLY BUYS THE PRODUCT FROM THE MONOPOLIST OR THE PERSON

3    THAT IS THE MANUFACTURER OF THE PRODUCT.  AND THAT -- THE

4    ABILITY TO CHARGE PRICES FOR YOUR PRODUCT DEPENDS ON HOW MUCH

5    COMPETITION IN THE FINAL PRODUCT MARKET YOU HAVE, AND THAT'S

6    PASSED THEN INTO THE CALCULUS, THE DECISION-MAKING OF THE

7    INTERMEDIARY ABOUT, FIRST OF ALL, WHAT THEY CAN CHARGE WHICH

8    IS GOING TO BE DETERMINED IN PART BY APPLE'S OWN RETAIL

9    PRICES, AND HOW MUCH THEY HAVE TO PAY FOR THE PRODUCT, BECAUSE

10   THEY HAVE TO EARN SOME SORT OF A MARGIN AS WELL IN ORDER TO BE

11   WILLING TO CARRY THE PRODUCT.

12        AND IF THE RETAIL PRICE THEY CAN GET IS HIGHER BECAUSE

13   APPLE'S PRICE IS HIGHER, THEN THEY'RE WILLING TO PAY MORE AT

14   WHOLESALE TO CARRY THAT LINE.

15   Q.  AND DID YOU REACH A CONCLUSION IN THIS CASE AS TO WHETHER

16   THE RESELLERS WERE HARMED?

17   A.  YES, THEY WERE.  THEIR PRICE WAS INCREASED.

18   Q.  NOW, MR. ISAACSON ALSO ASKED YOU SOME QUESTIONS ABOUT THE

19   ZUNE AND THE WALLED GARDEN APPROACH THAT MICROSOFT ADOPTED

20   IN -- WITH RESPECT TO THE ZUNE.

21        IN YOUR VIEW, IS THERE A DIFFERENCE BETWEEN THE WALLED

22   GARDEN WITH ZUNE AND MICROSOFT AND THE IPOD AND APPLE?

23   A.  YES.

24   Q.  AND WHAT IS THE DIFFERENCE?

25   A.  THE DIFFERENCE IS THAT AT THE TIME THE MICROSOFT ZUNE

1    PROJECT --

2           **MR. ISAACSON:**  OBJECTION, YOUR HONOR.  I DID NOT ASK

3    HIM ABOUT THE MICROSOFT ZUNE WALLED GARDEN.

4           **THE COURT:**  SUSTAINED.

5                (PAUSE IN THE PROCEEDINGS.)

6    BY MS. SWEENEY:

7    **Q.**  DO YOU RECALL TODAY WHEN MR. ISAACSON WAS ASKING YOU ABOUT

8    VARIABLES THAT YOU USED IN YOUR REGRESSION?

9    **A.**  YES.

10   **Q.**  OKAY.  AND HE ASKED YOU ABOUT A NUMBER OF FEATURES OF 7.0

11   SUCH AS A SCREEN RESOLUTION.  DO YOU RECALL THOSE QUESTIONS?

12   **A.**  I -- I DO.  THAT -- WHICH ISN'T REALLY A FEATURE OF 7.0.

13   IT'S A FEATURE OF THE IPOD THAT WAS RELEASED WHEN 7.0 WAS

14   RELEASED.

15   **Q.**  OKAY.  WELL, HOW ABOUT COVER FLOW?  AND YOU SAID THAT YOU

16   DIDN'T INCLUDE COVER FLOW AS A VARIABLE IN YOUR REGRESSION.

17   WHY NOT?

18   **A.**  WELL, THERE ARE A NUMBER OF ATTRIBUTES OF PRODUCTS THAT

19   ALL OCCUR SIMULTANEOUSLY.  SO SUPPOSE THAT -- SUPPOSE THAT

20   THERE ARE TEN NEW FEATURES OF THE SECOND GENERATION IPOD NANO.

21   IF YOU -- THE MORE -- IF YOU TRY TO PUT MORE THAN ONE OF THOSE

22   IN THE REGRESSION, OBVIOUSLY THEY'RE PERFECTLY CORRELATED IN

23   TIME SO YOU CAN'T POSSIBLY SEPARATE THE EFFECT OF THEM.

24        SO THE QUESTION THEN, FOR MODELING PURPOSES, FOR THE

25   RELIABILITY OF A MODEL, IS NOT WHETHER EVERYTHING THAT CAN

1    INFLUENCE THE PRICE IS IN THE MODEL, BUT WHETHER THE VARIABLES

2    YOU DO HAVE DO AS GOOD A JOB AS YOU CAN DO WITHOUT DESTROYING

3    THE RELIABILITY OF THE MODEL OF PRODUCING A RELIABLE PREDICTOR

4    OF PRICE.

5        OUR GOAL HERE IS NOT TO FIND OUT HOW MUCH CONSUMERS VALUE

6    LOOKING AT ALBUM COVERS.  THERE'S NO ISSUE IN THE CASE THAT

7    HINGES ON HOW MUCH THEY VALUE LOOKING AT ALBUM COVERS.

8    INSTEAD, THE ISSUE IS HOW MUCH OF THE PRICE OF AN IPOD IS

9    DETERMINED BY CHARACTERISTIC OF ITS PERFORMANCE THAT CONSUMERS

10   VALUE VERSUS INCREASES IN LOCK-IN.  THAT'S THE ONLY ISSUE THAT

11   I'M AWARE OF THAT IS -- YOU'RE AFTER.

12       SO SOLVING THE PROBLEM OF HOW MUCH OF IT SHOULD I

13   ATTRIBUTE TO ALBUM COVERS AND HOW MUCH OF IT SHOULD I

14   ATTRIBUTE TO LOOKING AT THE FACES OF THE STARS OF *FRIENDS* AND

15   HOW MUCH OF IT SHOULD I ATTRIBUTE TO OTHER THINGS THAT WENT ON

16   SIMULTANEOUSLY, I DON'T -- I'M NOT -- I DON'T CARE AS LONG AS

17   I HAVE ENOUGH OF THE VARIABLES IN THE MODEL THAT I CAN EXPLAIN

18   THE PRICE VARIATIONS THAT OCCURRED WITH THE INTRODUCTION OF A

19   MODEL THAT HAD ALL THOSE FEATURES.

20       AND THAT -- THAT IS -- THAT IS THE ANALYTIC PROBLEM IN

21   DECIDING WHAT THE FINAL SPECIFICATION OF THE MODEL WOULD BE.

22   YOU KEEP ADDING VARIABLES UNTIL THE ACT OF ADDING MORE DOES

23   NOT INCREASE THE EXPLANATORY POWER OF THE REGRESSION, BUT IT

24   DOES HAVE -- INTRODUCE COLLINEARITY AMONG THE INDEPENDENT

25   VARIABLES THAT REDUCES THE QUALITY OF THE ESTIMATE OF THE

1    COEFICIENTS IN THE MODEL, WHICH IS AN ARITHMETIC PROBLEM THAT

2    OCCURS WHEN THERE'S HIGH MULTICOLLINEARITY.

3    Q.  AND MR. ISAACSON SHOWED YOU SOME PICTURES OF THE DATA SET

4    THAT YOU USED.  DO YOU REMEMBER THAT?

5    A.  YES.

6    Q.  OKAY.  AND THERE WERE SOME VARIABLES ON THERE THAT YOU DID

7    NOT USE IN YOUR REGRESSION, AND I'D LIKE TO GO THROUGH THOSE.

8        SO THE FIRST ONE HE ASKED YOU ABOUT WAS BATTERY.  AND SO

9    WHY DIDN'T YOU INCLUDE BATTERY IN YOUR REGRESSION?

10   A.  I -- I HAVE TO ANSWER THE -- SINCE I DON'T HAVE MEMORIZED

11   PRECISELY WHAT THE FACTS ARE ON EACH ONE OF THOSE, ALL I CAN

12   DO IS SAY THE FOLLOWING.  WE HAVE RUN REGRESSIONS WITH LOTS OF

13   OTHER CHARACTERISTICS IN THEM, AND WITH A SINGLE EXCEPTION,

14   THEY ALL HAVE THIS PROBLEM OF EXTREME MULTICOLLINEARITY WITH

15   THE VARIABLES WE ALREADY HAVE THERE.

16       AND THE ONLY EXCEPTION IS ONE THAT HE ACTUALLY, I DON'T

17   THINK, MENTIONED, WHICH IS IN THE RESELLER REGRESSION, YOU

18   COULD -- THERE ISN'T SERIOUS MULTICOLLINEARITY ARISING WITH

19   CREATING AN INDICATOR VALUE FOR HEWLETT PACKARD AS THE

20   PURCHASER.  HEWLETT PACKARD, AS A COMPUTER COMPANY, ACTUALLY

21   SOLD IPODS THAT WERE MANUFACTURED SPECIAL FOR IT.  AND IF YOU

22   PUT THAT VARIABLE IN THE MODEL, IT DOES -- IT ISN'T HIGHLY

23   COLLINEAR, AND IT DOES HAVE A SIGNIFICANT EXPLANATORY POWER ON

24   PRICE.  HOWEVER, IT DOESN'T CHANGE, IT DOESN'T HAVE ANY EFFECT

25   ON THE AMOUNT OF DAMAGES THAT YOU CALCULATE.

1    **Q.**  AND YOU WERE TALKING ABOUT MULTICOLLINEARITY.  DID YOU

2    CONDUCT ANY TESTS ON WHETHER SOME OF THESE VARIABLES PRODUCED

3    MULTICOLLINEARITY?

4    **A.**  YES, WE DID.

5    **Q.**  AND WHAT DID YOU CONCLUDE FROM THOSE TESTS?

6    **A.**  WITH THE EXCEPTION OF THE HEWLETT PACKARD VARIABLE, THEY

7    ALL -- THEY ALL FAIL, ALL THE TESTS, FOR SEVERE

8    MULTICOLLINEARITY, YES.

9    **Q.**  MR. ISAACSON ALSO ASKED YOU ABOUT SOME FEATURES OF THE

10   IPOD THAT CHANGED OVER TIME.

11       NOW, HOW -- HOW DID YOU ACCOUNT IN YOUR REGRESSION

12   ANALYSIS FOR THE FEATURES THAT CHANGED OVER TIME?  SUCH AS,

13   LET'S TAKE SCREEN SIZE.

14   **A.**  WELL, THOSE -- SINGLE VARIABLE ACCOUNTS FOR IT.  THERE'S

15   MULTIPLE VARIABLES THAT ARE CORRELATED WITH IT BECAUSE OF

16   SIMULTANEOUS -- SIMULTANEOUS INTRODUCTION COMBINED WITH THE

17   GENERAL TIMEFRAME.  ALL RIGHT?  REMEMBER THAT WE HAVE TIME AS

18   A VARIABLE IN THERE BOTH BY ITSELF AND INTERACTIVE WITH

19   CAPACITY.  AND THEN WE HAVE THE CAPACITY VARIABLE, AS WELL, AS

20   ONE OF THE ATTRIBUTES.

21       AND I THINK IT'S EASY TO ILLUSTRATE.  YOU COULD GET A

22   SIMPLE ONE-TO-ONE CORRESPOND THAT'S EASIEST, I THINK, WITH

23   SIZE VERSUS WEIGHT, WHICH IS THAT IF YOU -- IF YOU KNOW HOW

24   MANY CUBIC INCHES AN IPOD IS, YOU CAN PREDICT EXTREMELY

25   CLOSELY HOW MUCH IT WEIGHS.

 1        MOST OF THEM ARE NOT LIKE THAT.  MOST OF THEM YOU -- IT'S

 2    SEVERAL VARIABLES THAT CONTRIBUTE TO EXPLAINING THE EXCLUDED

 3    VARIABLE.  BUT IN ALL OF THESE CASES, THE VARIABLES THAT ARE

 4    IN THE MODEL DO ACTUALLY EXPLAIN AN EXTREMELY HIGH PERCENTAGE

 5    OF THE VARIANCE -- OF THE VARIATION IN THE EXCLUDED VARIABLE

 6    LIKE SOMEWHERE BETWEEN 98 AND 99.9 PERCENT.

 7            **MS. SWEENEY:**  NO FURTHER QUESTIONS.

 8            **THE COURT:**  RECROSS LIMITED TO THE SCOPE OF REDIRECT.

 9                      **RECROSS-EXAMINATION**

10    **BY MR. ISAACSON:**

11    **Q.**  DR. NOLL, YOU WERE ASKED ABOUT WHEN YOU AND I FIRST MET IN

12    THE CASE CALLED *O'BANNON VERSUS NCAA*.  THAT'S WHERE YOU AND I

13    FIRST MET, RIGHT?

14    **A.**  SHE DIDN'T ASK ME WHEN WE FIRST MET RIGHT.  SHE JUST --

15                      (SIMULTANEOUS COLLOQUY.)

16            **THE WITNESS:**  -- ASKED IF I'D EVER WORKED WITH YOU

17    AND THE ANSWER IS YES.

18    **BY MR. ISAACSON:**

19    **Q.**  AND THAT WAS AT A TRIAL WHERE I WAS BROUGHT IN FOR THE

20    TRIAL TO REPRESENT COLLEGE ATHLETES AGAINST THE NCAA, AND YOU

21    WERE A TESTIFYING EXPERT, CORRECT?

22    **A.**  WELL, I DON'T KNOW WHEN YOU WERE BROUGHT IN.  I DON'T HAVE

23    KNOWLEDGE ABOUT THAT.  BUT, YES, I DID --

24    **Q.**  YOU --

25    **A.**  -- MEET YOU BEFORE THE TRIAL STARTED AT SOME PREPARATION

NOLL - CROSS / ISAACSON

1   MEETING.

2   **Q.**  RIGHT, RIGHT.  THAT CASE WENT ON FOR A NUMBER OF YEARS,

3   BUT WE ONLY MET AT THE TRIAL.

4   **A.**  WELL, BEFORE THE -- JUST BEFORE THE TRIAL.

5   **Q.**  JUST -- RIGHT.  RIGHT BEFORE THE TRIAL.  I WAS -- I'VE

6   NEVER HIRED YOU IN A CASE, CORRECT?

7   **A.**  YES.  AND ROBINS KAPLAN (SIC) DIDN'T HIRE ME IN THE

8   DIGITAL DOWNLOAD CASE EITHER.  IT WAS THE LOVELL FIRM.

9   **Q.**  IN THE DIGITAL DOWNLOAD CASE, THE ROBBINS FIRM, BEHIND ME,

10  ARE CO-LEAD COUNSEL FOR THE CLASS, CORRECT?

11  **A.**  YES, BUT I'VE NEVER HAD ANY CONTACT WITH THEM IN THAT

12  CASE.  ALL OF MY CONTACTS WERE WITH THE LOVELL FIRM.

13  **Q.**  BUT THEY ARE -- JUST THEY ARE LEAD COUNSEL FOR THE CLASS

14  IN THIS CASE, THEY HAD BEEN APPOINTED CO-LEAD COUNSEL TO

15  REPRESENT THE CLASS IN THE *DIGITAL MUSIC* CASE, CORRECT?

16  **A.**  WELL, YOU SAY SO, YES.  I PERSONALLY DID NOT KNOW THAT

17  BECAUSE I'VE NEVER HAD ANY CONTACT WITH THEM.  SO, YES, IT'S

18  TRUE, BUT I'VE NEVER HAD ANY CONTACT WITH THEM.

19  **Q.**  IF YOU LOOK AT TAB 6 OF YOUR BINDER.

20  **A.**  YES.

21  **Q.**  ALL RIGHT.  THAT WAS THEIR MEMORANDUM EARLIER THIS YEAR

22  ASKING FOR A CLASS TO BE GRANTED IN THAT CASE.  YOU COULD SEE

23  THEIR -- DOES THAT HELP YOU REMEMBER?  AND THAT'S THEIR FILING

24  THAT SUBMITTED YOUR REPORT TO THE COURT.

25      DOES THAT HELP YOU REMIND -- REMIND YOU THAT THEY WERE

1   CLASS COUNSEL THERE?

2   **A.**  I DIDN'T SAY I DIDN'T KNOW THEY WERE CLASS COUNSEL.  I

3   SAID I HAD NO CONTACT WITH THEM AT ALL, ZERO.

4   **Q.**  ALL RIGHT.  AND AT THE NCAA TRIAL WHEN YOU TESTIFIED IN

5   COURT, YOU DIDN'T TESTIFY ABOUT ANY REGRESSION ANALYSIS,

6   CORRECT?

7   **A.**  I'M TRYING TO REMEMBER WHAT EXACTLY HAPPENED.  I DON'T

8   BELIEVE SO.  I HAD SOME -- I THINK I MAY HAVE SOME IN EARLIER

9   REPORTS, BUT THAT WAS DONE, I BELIEVE, BY DAN RASHER.  SO I

10  THINK IT WAS NOT -- I DIDN'T TESTIFY ABOUT REGRESSION

11  ANALYSIS.

12  **Q.**  OKAY.  THE -- YOU SAID -- YOU JUST SAID IN RESPONSE TO

13  QUESTIONS BY COUNSEL THAT IF -- YOU TALKED ABOUT TEN NEW

14  FEATURES AND WHAT HAPPENS IF YOU PUT MORE THAN ONE IN A

15  REGRESSION.

16      LET ME BE MORE SPECIFIC.  IF THERE WERE TEN NEW FEATURES

17  OF 7.0, IF YOU PUT MORE THAN ONE IN THE REGRESSION, YOU CAN'T

18  POSSIBLY SEPARATE THE EFFECT OF THOSE FEATURES, CORRECT?

19  **A.**  YES.  IF THEY WERE PUT IN SIMULTANEOUSLY WITH THE DVC/KVC

20  CHANGE, AND THEN THEY DIDN'T CHANGE AT ANY TIME AFTER THAT,

21  THERE'D BE NO WAY TO SEPARATE IT.

22  **Q.**  SO IF YOU PUT IN AN ALLEGED HARMONY DISABLING FEATURE,

23  MOVIES, ALBUM ART, NFL, ALL THE OTHER DIFFERENT FEATURES WE

24  MENTIONED, YOU WOULDN'T POSSIBLY BE ABLE TO SEPARATE OUT THE

25  EFFECT OF THE DISABLING OF HARMONY FROM THE OTHER FEATURES,

NOLL – CROSS / ISAACSON

1  CORRECT?

2  **A.**  IF THERE WERE NO CHANGES AT ALL.  REMEMBER, THIS IS --

3  THAT YOU'VE GOT TO TAKE INTO ACCOUNT THIS PHENOMENON THAT THE

4  VARIABLE CAN'T CHANGE THROUGH -- THROUGH THE AFTER PERIOD.

5  IT'S GOT TO STAY FIXED.  ALL RIGHT.  AND SO, YEAH, THAT'S --

6  THAT'S THE CASE.  IF THERE'S NO INDEPENDENT MEASUREMENT OUT

7  THERE THAT CAN TAKE -- TAKE IT INTO ACCOUNT, WHICH IS IT SORT

8  OF LOOKS LIKE AN INDICATOR VARIABLE, AS OPPOSED TO LOOKING

9  LIKE THE NUMBER OF SONGS THAT ARE AVAILABLE ON THE ITUNES

10 STORE, WHICH IS A CONTINUOUS VARIABLE THAT INCREASES THROUGH

11 TIME, SO YOU CAN ACTUALLY SEPARATE OUT THE EFFECT OF THE

12 EXISTENCE OF THE ITUNES STORE FROM THE NUMBER OF SONGS THAT IT

13 CARRIES AS IS DONE IN THE MODEL BY PUTTING THAT IN IT.

14 **Q.**  THE ANSWER TO MY QUESTION IS YES, ISN'T IT?

15 **A.**  WELL, IT'S NOT -- IT'S PARTLY YES, PARTLY NO.  I MEAN, I

16 WAS -- I WAS TRYING TO DESCRIBE THE SITUATION IN WHICH IT'S

17 TRUE.

18 **Q.**  ALL RIGHT.  AND THE -- LET'S GO OVER THAT, THEN.

19      IT IS TRUE, ISN'T IT, THAT IF YOU PUT IN AN ALLEGED

20 HARMONY DISABLING FEATURE VARIABLE ALONG WITH VARIABLES FOR

21 MOVIES, ALBUM ART, THE NFL, AND VARIABLES FOR THE OTHER

22 FEATURES OF 7.0, YOU WOULDN'T BE -- YOU WOULDN'T POSSIBLY BE

23 ABLE TO SEPARATE OUT THE EFFECT OF THE DISABLING FEATURES OF

24 HARMONY -- OF THE DISABLING OF HARMONY FROM THE OTHER

25 FEATURES, CORRECT?

1    **A.**  IF THAT'S THE WAY YOU DID IT BY USING AN INDICATOR

2    VARIABLE, THE ANSWER IS YES.  BUT THAT WOULD BE THE WRONG WAY

3    TO DO IT.

4         **MR. ISAACSON:**  OKAY.  THANK YOU.

5      I HAVE NO FURTHER QUESTIONS.

6         **THE COURT:**  REDIRECT LIMITED TO THE SCOPE OF THE

7    RECROSS.

8         **MS. SWEENEY:**  NO REDIRECT, YOUR HONOR.

9         **THE COURT:**  ALL RIGHT.  PROFESSOR, YOU MAY STEP DOWN.

10        **THE WITNESS:**  OKAY.

11        **THE COURT:**  LADIES AND GENTLEMEN, I'M GOING TO TALK

12   TO THE LAWYERS A LITTLE BIT.  WHY DON'T WE GO AHEAD AND BREAK

13   AT THIS POINT WITH YOU.

14     REMEMBER, DO NOT TALK ABOUT THE CASE.

15     NO BAKED GOODS FOR YOU TODAY.  SORRY ABOUT THAT.

16     (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

17   OF THE JURY:)

18        **THE COURT:**  THE RECORD WILL REFLECT THAT THE JURY IS

19   GONE.  YOU MAY BE SEATED.

20     SO MR. COUGHLIN.  OH --

21              (PAUSE IN THE PROCEEDINGS.)

22        **THE COURT:**  YOU WANT TO ASK HIM -- IS HE GONE?  WHY

23   DON'T YOU GO GRAB HIM.

24              (PAUSE IN THE PROCEEDINGS.)

25        **THE COURT:**  ALL RIGHT.  COUNSEL, SEE YOU AT SIDEBAR.

```
 1              (SIDEBAR CONFERENCE OFF THE RECORD.)

 2        (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

 3    OF THE JURY:)

 4             THE COURT:  OKAY.  WHILE WE'RE WAITING TO SEE IF WE

 5    CAN GET HIM, OTHER THAN THE ANTICIPATED TESTIMONY OF POTENTIAL

 6    CLASS REPRESENTATIVE, AND SUBJECT TO THE COURT'S FURTHER

 7    DISCUSSION REGARDING WHICH EXHIBITS STILL NEED TO BE ADMITTED,

 8    ARE THE -- THE PLAINTIFFS FINISHED WITH ALL THEIR WITNESSES?

 9             MR. COUGHLIN:  THE -- YES, SUBJECT TO THAT.

10             THE COURT:  FOR YOUR CASE -- FOR YOUR CASE-IN-CHIEF?

11             MR. COUGHLIN:  THAT'S YES, YOUR HONOR.

12             THE COURT:  OKAY.

13             MR. ISAACSON:  THAT RAISES AN ISSUE AS TO THE TIME OF

14    TIMING OF OUR RULE 50 BRIEF.

15             THE COURT:  YES, I KNOW.

16                  (PAUSE IN THE PROCEEDINGS.)

17             THE COURT:  WELL, IS IT DONE?

18             MR. ISAACSON:  NOT AFTER DR. NOLL THIS MORNING.

19             THE COURT:  THEN I GUESS YOU'LL HAVE TODAY.  I THINK

20    EVERYBODY NEEDS TO BE READY TO PROCEED TOMORROW.  THAT'S --

21    YOU KNOW, THE REALITY IS THAT THESE CONSUMER -- THE TESTIMONY

22    FROM THE CONSUMERS SHOULD NOT LAST MORE THAN TEN MINUTES,

23    15 MINUTES, SOMETHING LIKE THAT.

24             MR. ISAACSON:  EACH, OR TOTAL?

25             THE COURT:  OKAY.  LET'S SAY EACH ON THE HIGH SIDE,
```

1  MR. ISAACSON.

2          **MR. ISAACSON:**  I JUST WANT TO KNOW WHAT THEY'RE

3  PLANNING SO --

4          **THE COURT:**  I JUST DON'T ANTICIPATE THAT IT'S GOING

5  TO BE A SIGNIFICANT AMOUNT OF TESTIMONY.

6          **MR. ISAACSON:**  RIGHT.

7          **THE COURT:**  SO AT THAT POINT -- AND, YOU KNOW, AGAIN,

8  THE REALITY IS I ONLY NEED ONE.

9      AT THAT POINT, I'LL ANTICIPATE THAT THE PLAINTIFFS WILL

10 REST.  YOU CAN FILE YOUR MOTIONS, BUT I DON'T REALLY WANT TO

11 LOSE TIME SO I WANT YOU TO BE PREPARED TO GO, MR. ISAACSON.

12         **MR. ISAACSON:**  YES.  WE'RE -- WE ASKED FOR THAT SO WE

13 ARE PLANNING ON THAT ASSUMPTION, YES.

14         **THE COURT:**  OKAY.  I JUST WANT TO MAKE SURE THAT

15 EVERYBODY'S ON THE SAME PAGE.

16         **MR. COUGHLIN:**  EXCUSE ME, YOUR HONOR.  I'D TURNED

17 AWAY.  WHAT WAS THE QUESTION?

18         **MR. ISAACSON:**  ARE WE READY TO GO -- PROCEED TOMORROW

19 AND THE ANSWER IS YES.

20         **MR. COUGHLIN:**  YES, YOUR HONOR.  I THINK THAT

21 TOMORROW WE START OFF WITH DR. KELLY.  THEN I THINK THAT WE

22 WERE GOING TO, BECAUSE OF MR. DONNELLY'S AVAILABILITY, WE WERE

23 GOING TO DO MURPHY, TOPEL, AND THEN DONNELLY.

24     AT SOME POINT IN THERE, WE HAVE TO INSERT ONE OR TWO OF

25 THESE NEW PLAINTIFFS AFTER THEY'RE VETTED AND THEY'VE BEEN

1    DEPOSED.  SO THAT'S THE LINEUP.  AND THAT'S REALLY THE WHOLE

2    CASE-IN-CHIEF.

3         THEN THERE ARE SOME REBUTTAL WITNESSES.  AND UNTIL THESE

4    OTHER WITNESSES TESTIFY, WE WON'T KNOW FOR SURE WHO THAT WILL

5    BE OR HOW LONG.  WE'VE GOT SOME LINED UP.  I'VE GIVEN THOSE

6    NAMES TO MR. ISAACSON.  AND THAT'S -- THAT'S WHERE WE ARE.

7         **MR. ISAACSON:**  YES.  HE'S GIVEN US NAMES.

8         NOW, HIS EXPERTS CLEARLY CAN BE CALLED BACK IN REBUTTAL,

9    AND THEY HAVE ONE EXPERT WHO WOULD ONLY BE A REBUTTAL EXPERT

10   AND THAT'S -- THAT'S CLEARLY LEGITIMATE.

11        THERE IS A THIRD PARTY NAMED MR. SCHULTZ WHO WAS

12   SUBPOENAED, AS I UNDERSTAND, A FORMER EMPLOYEE OF APPLE.  HE

13   WAS TOLD BY MR. COUGHLIN THAT THEY WERE NOT GOING TO CALL HIM.

14   I THINK THAT WAS OVER THE WEEK -- EARLIER OVER THE WEEKEND.

15   MAYBE IT WAS LATE LAST WEEK.  HE TOLD US HE WAS NOT GOING TO

16   CALL HIM.  AND NOW MR. COUGHLIN YESTERDAY SAID THEY WANT TO

17   RESERVE CALLING HIM.

18        SO I DON'T KNOW ABOUT THE AVAILABILITY OF THAT GENTLEMAN

19   OR HIS POSITION -- HE IS INDEPENDENTLY REPRESENTED -- IN LIGHT

20   OF THE FACT HE WAS TOLD HE DOESN'T HAVE TO COME TO TESTIFY.

21        **MR. COUGHLIN:**  YOUR HONOR, I -- HE REMAINED UNDER

22   SUBPOENA.  HIS ATTORNEY KNEW THAT.  IT'S TRUE.  HE'S GOT A

23   LITTLE OF BOTH, I THINK, GOOD FOR -- GOOD AND BAD FOR PROBABLY

24   BOTH SIDES.  AFTER RETHINKING IT, I THOUGHT, YOU KNOW, WE

25   MIGHT AS WELL CALL HIM.  I THINK THAT HE'D SHED SOME LIGHT ON

```
 1    SOME OF THE THINGS THAT MR. FARRUGIA TESTIFIED TO.  AND HE IS

 2    THE INVENTOR, THE ARCHITECT OF THE DVC, SO I THINK HE'S GOT

 3    SOME PERTINENT INFORMATION.

 4        AND SO I EMAILED HIS ATTORNEY THIS MORNING.  AND SAID THE

 5    SCHEDULE HAS CHANGED, YOU DON'T HAVE TO BE HERE TOMORROW AT

 6    8:30, AND I WILL GIVE YOU 24 HOURS' NOTICE IF I CAN, BUT IT

 7    MIGHT BE SHORTER.

 8        AND HIS ATTORNEY RESPONDED TO ME THAT HE AGREED TO THAT

 9    AND APPRECIATED THAT HE WOULDN'T HAVE TO SIT HERE FROM

10    WEDNESDAY, THURSDAY, FRIDAY, WHENEVER WE PUT HIM ON.  SO

11    THAT'S -- THAT'S WHAT WE'VE DONE.

12            MR. ISAACSON:  AND WE WILL BE VERY -- I THINK -- IT'S

13    NOT LIKE A REBUTTAL WITNESS I'VE EVER HEARD OF, IF YOU'RE

14    CLAIMING HE'S THE INVENTOR OF THE DVC.  BUT --

15            THE COURT:  WELL, AS I UNDERSTAND IT, HE'S A REBUTTAL

16    TO YOUR DIRECT ON FARRUGIA.

17            MR. ISAACSON:  RIGHT.

18            MR. COUGHLIN:  YES.

19            MR. ISAACSON:  RIGHT.  AND IT SHOULD BE CONFINED TO

20    THAT.

21            THE COURT:  WELL, IT -- IT WOULD HAVE TO BE IF IT'S A

22    REBUTTAL WITNESS.

23            MR. COUGHLIN:  UNDERSTOOD.

24            THE COURT:  WERE YOU ABLE TO FIND HIM?

25            THE CLERK:  YES, HE'S COMING UP THE ELEVATOR NOW.
```

1    **THE COURT:** ALL RIGHT. SO AS SOON AS WE FINISH WITH

2    THIS TESTIMONY --

3        PROFESSOR NOLL, YOU WERE -- I PREMATURELY LET YOU GO. WE

4    HAVE A COUPLE QUESTIONS FROM THE JURORS.

5        **THE WITNESS:** OKAY.

6        **THE COURT:** SO ONCE WE FINISH THIS, THEN, I'M GOING

7    TO EXCUSE THE JURY FOR THE DAY.

8        ALL RIGHT?

9        COME ON UP.

10       **MR. COUGHLIN:** OH, WE'RE COMING RIGHT BACK OUT?

11   OKAY.

12       **THE COURT:** OKAY. LET'S CALL THE JURY BACK OUT.

13                (PAUSE IN THE PROCEEDINGS.)

14   (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF

15   THE JURY:)

16       **THE COURT:** OKAY. EVERYBODY MAY BE SEATED. THE

17   RECORD WILL REFLECT THE JURY IS BACK IN THE COURTROOM.

18       PROFESSOR NOLL, I PREMATURELY TOLD YOU YOU COULD STEP

19   DOWN, BUT I ACTUALLY DIDN'T EXCUSE YOU. I DIDN'T USE THOSE

20   WORDS. YOU'RE STILL UNDER OATH. DO YOU UNDERSTAND?

21       **THE WITNESS:** YES.

22       **THE COURT:** OKAY. I HAVE TWO QUESTIONS FROM JURORS.

23   ANY MORE QUESTIONS OVER THERE?

24       NO? ALL RIGHT.

25       SO I HAVE TWO QUESTIONS.

1    THE FIRST IS:  WHY WOULD IT CHANGE YOUR REGRESSION

2    ANALYSIS IF CODE OTHER THAN KVC OR DVC WAS RESPONSIBLE FOR

3    DISABLING HARMONY?

4        **THE WITNESS:**  IT WOULDN'T CHANGE THE REGRESSION

5    ANALYSIS.  IT WOULD CHANGE THE INTERPRETATION, THAT IS TO SAY,

6    IF THE CHANGE -- CHANGES OTHER THAN KVC/DVC DID, IN FACT, MAKE

7    IT IMPOSSIBLE FOR REALNETWORKS' HARMONY TO WORK AGAIN ON

8    IPODS, THEN THE REGRESSION COEFFICIENT THAT I HAVE WOULD

9    INCLUDE THAT EFFECT.

10    HOWEVER, IF IT WAS JUST A -- IT WAS JUST A CONTINUATION OF

11    AN UPGRADE TO THE SYSTEM, WHICH OCCURRED IN SOME PREVIOUS

12    RELEASES LIKE THE 6.0 OR WHATEVER, THAT -- THAT CHANGED THE

13    NATURE OF THE VERSION SYSTEM IN SOME WAY OR THE DRM SYSTEM IN

14    SOME WAY, BUT THAT IT -- THERE WAS AN UPDATE THAT REALNETWORKS

15    COULD MAKE IN HARMONY RELATIVELY SOON THEREAFTER, THEN THE

16    COEFFICIENT WOULD BE THE KVC/DVC EFFECT.

17    SO THE ISSUE REALLY HINGES NOT ON WHETHER THERE WAS

18    OTHER -- WHETHER THERE WERE OTHER THINGS IN 7.0 THAT DISABLED

19    HARMONY, BUT WHETHER THEY WERE OF A SIMILAR NATURE TO THE

20    CONTINUATION OF CHANGES THAT HAD TAKEN PLACE THROUGHOUT THE

21    HISTORY OF ITUNES.

22        **THE COURT:**  OKAY.  ANY FOLLOW-UP QUESTION,

23    MS. SWEENEY?

24        **MS. SWEENEY:**  NO, YOUR HONOR.

25        **THE COURT:**  ON THIS ONE, MR. ISAACSON?

```
 1         MR. ISAACSON:  YES, YOUR HONOR.

 2         THE COURT:  GO AHEAD.

 3              (PAUSE IN THE PROCEEDINGS.)

 4              RECROSS-EXAMINATION

 5   BY MR. ISAACSON:

 6   Q.  CAN YOU SEE THAT, DR. NOLL (INDICATING)?

 7   A.  SORT OF.

 8   Q.  I'VE WRITTEN IN THE BOX "DISABLE HARMONY."

 9       SUPPOSE THAT WERE TRUE.  KVC, DVC, OTHER CODE.

10   A.  OKAY.

11   Q.  ALL RIGHT.  AND SO IF OTHER CODE -- NOW YOU HAVE -- YOU

12   HAVE PUT NO OPINIONS IN THIS CASE THAT ANY CODE OTHER THAN KVC

13   OR DVC HAD ANY ANTICOMPETITIVE EFFECT, YOU'VE DONE NO

14   ANTITRUST ANALYSIS OF OTHER CODE, CORRECT?

15   A.  I HAVE DONE -- WELL, IT'S NOT -- THERE'S NOTHING IN THE

16   REGRESSION ANALYSIS THAT WOULD DIFFERENTIATE THE OTHER CODE

17   FROM KVC AND DVC.

18   Q.  NO, NOT JUST THE REGRESSION ANALYSIS.  YOU HAVE DONE NO

19   ECONOMIC ANALYSIS AS TO WHETHER THE OTHER CODE WOULD HAVE

20   ANY -- WOULD RAISE ANY ANTITRUST ISSUES, CORRECT?  YOU HAVEN'T

21   LOOKED AT THAT ISSUE.

22   A.  I HAVE NOT EXAMINED -- BY -- EVEN THE OTHER TWO, I'M

23   RELYING UPON DAVID MARTIN FOR THE ANTITRUST ISSUE.  SO I'M NOT

24   SURE WHAT YOU'RE AFTER ABOUT ANTITRUST ANALYSIS.  WHAT

25   ANTITRUST ANALYSIS OF KVC AND DVC ARE YOU REFERRING TO?
```

1    Q.   WELL, I'M TALKING ABOUT OTHER CODE RIGHT NOW.

2    A.   NO, I KNOW, BUT I WANT TO MAKE A PARALLEL.  WHAT IS IT

3    THAT I HAVE DONE FOR KVC AND DVC THAT I HAVEN'T DONE FOR OTHER

4    CODE?

5    Q.   WELL, HAVE YOU CONCLUDED THAT THE KVC AND THE DVC HAD

6    ANTICOMPETITIVE EFFECTS?

7    A.   YES.

8    Q.   YOU HAVE NOT -- AND YOU RELIED ON DR. MARTIN FOR THAT?

9    A.   ON -- ON THE PART OF IT THAT THERE WAS NO BENEFIT TO

10   CONSUMERS, YES.  AND THEN THE CONCLUSION THAT IT ELEVATED THE

11   PRICES THEN MEANS IT WAS ANTICOMPETITIVE.

12   Q.   YOU HAVE REACHED NO -- YOU NEVER SAID IN YOUR REPORT THAT

13   ANY OTHER CODE HAD AN ANTICOMPETITIVE EFFECT, CORRECT?

14   A.   THAT IS CORRECT BECAUSE I'M NOT AWARE OF ANY EVIDENCE

15   THAT, A, IT BLOCKED HARMONY OR, B, THAT IT HAD -- IT WAS

16   ANTICOMPETITIVE.  SO I -- I JUST DON'T KNOW ANYTHING ABOUT THE

17   OTHER CODE.

18   Q.   RIGHT.  AND WHEN YOU REVIEWED DR. MARTIN'S REPORT, YOU DID

19   NOT SEE ANY DISCUSSION THAT ANY OTHER CODE HAD -- THAT ANY

20   OTHER CODE WAS NOT A GENUINE PRODUCT IMPROVEMENT OR HAD ANY

21   PRODUCTS?

22   A.   I DON'T RECALL WHAT HE SAYS ABOUT THE REST OF 7.0 IN

23   DETAIL.

24   Q.   AND IF OTHER CODE HAD THE EFFECT OF DISABLING HARMONY,

25   YOUR REGRESSION COEFFICIENT WHICH RESULTS IN $351 MILLION IN

1   DAMAGES WOULD BE CAPTURING THE EFFECT OF THAT OTHER CODE,

2   CORRECT?

3   **A.**  ONLY IF IT WERE PERMANENT, ONLY IF IT WERE LONG-TERM.

4   **Q.**  RIGHT.  YOU HAVE MADE NO EFFORT IN THIS CASE TO SORT OUT

5   THE ALLEGEDLY ILLEGAL KVC AND DVC, SOMETHING WHICH WE

6   VIGOROUSLY OPPOSE, BUT FROM THE OTHER CODE WHICH NO ONE HAS

7   SAID -- YOU MADE NO EFFORT TO SEGREGATE THOSE OUT, RIGHT?

8   **A.**  I HAVE NO -- I HAVE NOT SEGREGATED THEM OUT, NO.

9           **MR. ISAACSON:**  THANK YOU, YOUR HONOR.

10          **THE COURT:**  ANYTHING WITH RESPECT TO THAT,

11  MS. SWEENEY?

12          **MS. SWEENEY:**  NO, YOUR HONOR.

13          **THE COURT:**  OKAY.  THE NEXT QUESTION THEN IS:

14    IF SOME PORTION OF IPOD CONSUMERS DURING THE CLASS PERIOD

15  PURCHASED THEIR IPODS WITHOUT ANY PREEXISTING LOCK-IN

16  FEATURES, FOR EXAMPLE, THEY AND THEIR FAMILIES HAD NOT

17  PREVIOUSLY PURCHASED DIGITAL MUSIC, WOULD THAT MATTER TO YOUR

18  DAMAGES CALCULATION, GIVEN THOSE CONSUMERS ALSO PAID YOUR

19  CALCULATED HIGHER THAN PREDICTED PRICE?  OR ARE THERE OTHER

20  RELEVANT FACTORS TO CONSIDER?

21          **THE WITNESS:**  WHAT A GREAT QUESTION THAT IS.  THAT'S

22  LIKE A FINAL EXAM QUESTION.

23    THINK OF THE WORLD AS NOT ONE CONSUMER BUT A WHOLE BUNCH

24  OF TYPES OF CONSUMERS.  AND THERE ARE SOME THAT ARE TOTALLY

25  NOT LOCKED OUT OR LOCKED IN AT ALL BECAUSE THEY'VE NEVER

1   BOUGHT ANYTHING FROM A DIGITAL DOWNLOAD SITE.  AND IF THEY HAD

2   A PLAYER BEFORE, IT'S ALL IN UNPROTECTED FORMAT SO THEY CAN

3   PLAY IT ON ANYTHING.  AND AT THAT EXTREME, THERE'S NO LOCK-IN

4   AT ALL.  THEY -- THE ONLY REASON THAT THEY WOULD CONTINUE TO

5   BUY THE SAME PRODUCT ON MULTIPLE PURCHASE THROUGH TIME WAS

6   BECAUSE THEY LIKED IT, BECAUSE THEY COULD EASILY SWITCH.

7       AND THEN THERE'S A RANGE OF CONSUMERS WHO -- SOME OF WHOM

8   HAVE BOUGHT VERY FEW DIGITAL DOWNLOADS AND SOME HAVE BOUGHT A

9   LOT OF DIGITAL DOWNLOADS, ALL IN PROTECTED FORMAT.  THE EXTENT

10  OF WHICH THEY'RE LOCKED IN VARIES BECAUSE IF I'VE ONLY BOUGHT

11  FIVE SOUND RECORDINGS FROM A DIGITAL DOWNLOAD SITE IN

12  PROTECTED FORMAT, AND TWO OF THEM I REGRET HAVING BOUGHT THEM

13  BECAUSE THEY WERE FLASHES IN THE PAN AND I DON'T REALLY WANT

14  TO LISTEN TO THEM ANYMORE, THEN THE EXTENT OF LOCK-IN I HAVE

15  IS THE VALUE OF THREE RECORDINGS.  SO FOR $3, I CAN OVERCOME

16  THE LOCK-IN EFFECT BY BUYING A NEW PRODUCT AND DOWNLOADING

17  THOSE SONGS AGAIN IN THE NEW FORMAT.

18      ALL RIGHT.  ON THE OTHER HAND, IF I'VE BOUGHT 200 SONGS

19  FROM THE DIGITAL DOWNLOAD SITE, NOW I HAVE A $200 SWITCHING

20  COST, OR SOME FRACTION OF THAT DEPENDING ON HOW MANY I DON'T

21  CARE ABOUT ANYMORE.

22      SO THERE'S -- THERE'S A CONTINUUM OF LOCK-IN ACROSS THE

23  CONSUMERS.

24      APPLE DOESN'T SEE INDIVIDUAL CONSUMERS.  THEY DON'T KNOW

25  WHO YOU ARE IN THAT CONTINUUM.  ALL THEY SEE IS THE DEMAND FOR

```
 1    THEIR PRODUCT.  AND THE MORE LOCKED-IN CONSUMERS GET, THE LESS

 2    PRICE-RESPONSIVE THE DEMAND FOR THAT PRODUCT IS, AND HENCE THE

 3    HIGHER THE PRICE.

 4         SO THE PROFIT-MAXIMIZING PRICE FOR APPLE FOR AN IPOD RISES

 5    IN PROPORTION TO THE NUMBER OF PEOPLE WHO ARE SO SEVERELY

 6    LOCKED IN THAT AT NO REASONABLE PRICE DIFFERENTIAL BETWEEN AN

 7    IPOD AND, SAY, AN IRIVER OR SAMSUNG, WOULD THEY CONSIDER

 8    SWITCHING.

 9         SO THE -- THIS IS A WAY TO GET AT THE PRECISE ANSWER,

10    WHICH IS, YES, IT'S TRUE THAT THE HIGHER THE FRACTION OF

11    PEOPLE WHO ARE NOT LOCKED IN, THE MORE PRICE-RESPONSIVE THE

12    DEMAND CURVE IS, BUT AT THE SAME TIME, THE EXISTENCE OF PEOPLE

13    WHO ARE LOCKED IN MAKES THE DEMAND MORE INELASTIC, OR LESS

14    PRICE RESPONSIVE, AND SO THE NET EFFECT OF GREATER LOCK-IN

15    AMONG THOSE WHO ARE LOCKED IN IS TO CAUSE THE PRICE TO GO UP.

16    AND IT'S NOT BY A BIG AMOUNT BECAUSE THE NUMBER DOESN'T -- NO

17    ONE IS ARGUING IT'S A HUGE NUMBER.  IT'S JUST THAT THERE IS

18    THIS CONTINUOUS RELATIONSHIP, THE MORE -- THE MORE PEOPLE ARE

19    LOCKED IN, THE HIGHER THE PROFIT-MAXIMIZING PRICE FOR THE

20    IPOD.

21              THE COURT:  ANY FOLLOW-UP?

22              MS. SWEENEY:  NO, YOUR HONOR.

23              THE COURT:  MR. ISAACSON?

24              MR. ISAACSON:  VERY BRIEFLY.

25
```

1    **FURTHER RECROSS-EXAMINATION**

2    BY MR. ISAACSON:

3    **Q.**  YOU REFERRED TO THE CONTINUUM OF LOCK-IN AMONGST

4    CONSUMERS.  YOU HAD NO DATA ON THE CONTINUUM OF LOCK-IN OF

5    CONSUMERS, AS YOU CALL IT, BEFORE SEPTEMBER 2006, RIGHT?

6    **A.**  I DON'T UNDERSTAND WHAT YOU MEAN.  I DON'T -- I KNOW I

7    DO -- AT THE INDIVIDUAL CONSUMER LEVEL, DO I KNOW FOR EACH

8    PURCHASER OF AN IPOD HOW LOCKED IN THEY WERE?  THE ANSWER IS

9    NO.  I HAVE NO -- NO DATA THAT WOULD TELL ME THAT.

10    **Q.**  THE SAME IS TRUE AFTER SEPTEMBER 2006, YOU HAVE NO DATA ON

11    ANY LOCK-IN OF CONSUMERS, RIGHT?

12    **A.**  I HAVE NO DATA ABOUT THE EXTENT TO WHICH ANY CONSUMER IS

13    LOCKED IN.  ALL I HAVE IS AGGREGATE DATA ABOUT THE TOTAL

14    NUMBER OF PEOPLE WHO DOWNLOADED FROM SITES AND -- AND THE

15    AVERAGE NUMBER OF SONGS IN THEIR LIBRARY.  BUT ASIDE FROM

16    THAT, I DON'T HAVE ANY INFORMATION.

17    **Q.**  AND AS EMPIRICAL SUPPORT -- AND IN FACT, IT'S YOUR

18    ASSERTION THAT -- THAT THERE IS EMPIRICAL SUPPORT FOR LOCK-IN

19    BECAUSE OF YOUR REGRESSION ANALYSIS, CORRECT?

20    **A.**  THAT'S RIGHT.

21    **Q.**  ALL RIGHT.  YOUR CONCLUSIONS ABOUT WHETHER LOCK-IN

22    HAPPENED DEPEND ON WHETHER YOUR REGRESSION IS A USEFUL

23    ANALYSIS OR NOT, RIGHT?

24    **A.**  WELL, OF COURSE.

25        **MR. ISAACSON:**  OKAY.  THANK YOU.

 1          **THE COURT:**  MS. SWEENEY.

 2          **MS. SWEENEY:**  BRIEFLY.

 3                      **REDIRECT EXAMINATION**

 4   **BY MS. SWEENEY:**

 5   **Q.**  MR. ISAACSON ASKED YOU IF YOU KNEW HOW MANY PEOPLE WERE

 6   LOCKED IN BEFORE AND AFTER 7.0.  DOES -- DO YOU NEED TO KNOW

 7   HOW MANY PEOPLE WERE LOCKED IN BEFORE AND AFTER 7.0 TO REACH

 8   THE CONCLUSIONS YOU'VE REACHED IN THIS CASE?

 9   **A.**  NO.

10          **MS. SWEENEY:**  THANK YOU.

11          **THE COURT:**  MR. ISAACSON?

12          **MR. ISAACSON:**  NO FURTHER QUESTIONS.  THANK YOU.

13          **THE COURT:**  OKAY.  ANYTHING ELSE FROM THE JURY?

14          **THE WITNESS:**  IS THIS FOR REAL?

15          **THE COURT:**  ANYTHING ELSE?

16          **THE WITNESS:**  NO?

17      ALL RIGHT.  NOW YOU'RE EXCUSED.

18          **THE WITNESS:**  OKAY.

19          **THE COURT:**  THAT'S THE MAGIC WORD.

20      OKAY.  LADIES AND GENTLEMEN, WE ARE GOING TO BE SHIFTING

21   GEARS, SO OTHER THAN A SMALL AMOUNT OF TESTIMONY TOMORROW BY

22   PLAINTIFFS' WITNESS, WE ARE GOING TO BE SHIFTING TO THE

23   DEFENSE WITNESSES NOW.

24      AND BY THAT, I MEAN --

25      I UNDERSTAND, MR. ISAACSON, LET ME EXPLAIN.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    IN ORDER TO ACCOMMODATE A NUMBER OF THE CORPORATE

2    WITNESSES THAT CAME, WHEN THE DEFENDANTS GOT UP TO QUESTION

3    THEIR WITNESSES, THEY KIND OF HAD THEM ON WHAT WE CALL DIRECT,

4    THAT IS, THEY WERE PRESENTING THEIR CASE THROUGH THOSE

5    WITNESSES SO THAT THEY DIDN'T HAVE TO COME BACK AND TESTIFY,

6    AS OPPOSED THROUGH A CROSS-EXAMINATION.

7    SO THE DEFENSE HAS BEEN PUTTING ON THEIR CASE.  BUT NOW

8    WE'RE GOING TO BE SHIFTING TO -- TO THE POINT IN THE TRIAL

9    WHERE I'LL LOOK AT THE DEFENSE AND SAY "NEXT WITNESS."  SO

10   THEY'LL BE CALLING THE WITNESSES UP.

11   IN LIGHT OF THAT, I'M GOING TO RELEASE YOU FOR THE DAY AND

12   THEN WE'LL GET STARTED UP AGAIN TOMORROW.  OKAY?

13   NOW, SOMETHING ELSE I WANT TO GIVE YOU A HEADS-UP ON, AND

14   I MENTIONED THIS EARLIER.  BUT ONCE THE CASE IS SUBMITTED TO

15   YOU FOR DELIBERATION, WHICH I EXPECT WILL BE EARLY NEXT WEEK,

16   SO MONDAY, MAYBE TUESDAY, BUT EARLY NEXT WEEK IS MY

17   EXPECTATION, MY BEST GUESS -- YOU CAN'T HOLD ME TO IT, OKAY --

18   YOU'RE ABLE TO DELIBERATE ALL DAY.  AND SO YOU SHOULD THINK

19   ABOUT THAT IN TERMS OF YOUR SCHEDULES.

20   NOW, I WILL AUTHORIZE -- WE'LL BRING IN LUNCH FOR YOU.  OR

21   YOU DON'T HAVE TO HAVE LUNCH BROUGHT IN, BUT THAT WILL ALLOW

22   YOU TO, YOU KNOW, GET AS MUCH DELIBERATION IN AS POSSIBLE.

23   THE REASON THAT WE STOP, AS I'VE MENTIONED BEFORE, AT 1:30

24   IS THAT I HAVE MY OTHER CASES COME IN IN THE AFTERNOON SO I

25   CAN'T BE IN TRIAL ALL DAY LONG.  OKAY?

1    BUT I DO WANT YOU TO START THINKING ABOUT THAT.  AND ONCE

2    I SUBMIT THE CASE TO YOU, THEN YOU GUYS WILL TALK ABOUT WHAT

3    YOU WANT YOUR SCHEDULE TO BE IN TERMS OF WHEN YOU'RE GOING TO

4    GET HERE AND START DELIBERATING AND HOW LONG YOU'RE GOING TO

5    GO AND WHAT KIND OF BREAKS YOU'LL TAKE AND THAT KIND OF THING.

6    OKAY?  SO START THINKING ABOUT THAT BECAUSE NEXT WEEK WILL BE

7    UPON US SOON ENOUGH.

8    ALL RIGHT?  ANY QUESTIONS?

9    NO?  ALL RIGHT, THEN, I'M GOING TO EXCUSE YOU FOR THE DAY.

10    REMINDER AGAIN:  PLEASE DO NOT TALK TO ANYBODY ABOUT ANY OF

11    THE ISSUES THAT HAVE BEEN DISCUSSED.  DO NOT READ ANY NEWS

12    MEDIA REPORTS, WATCH OR LISTEN TO ANY COMMENTARIES OR

13    ACCOUNTS.  DO NOT DISCUSS THE MATTERS AMONGST YOURSELVES OR

14    WITH ANYONE ELSE.  DO NOT DO ANY RESEARCH.

15    AND WE WILL SEE YOU TOMORROW AT 8:30.  OKAY, THANK YOU.

16    (JURY EXCUSED FOR THE DAY.)

17    (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

18    OF THE JURY:)

19    **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

20    HAS LEFT THE COURTROOM.

21    HAVE A SEAT.

22    WE'LL GET A COPY OF THESE QUESTIONS, COUNSEL.

23    LET ME HAVE ONE FROM EACH SIDE.

24    I STILL HAD PLANNED ON TALKING ABOUT JURY INSTRUCTIONS

25    TODAY.  WHO DO YOU HAVE -- I MEAN, YOU EACH HAVE BIG TEAMS.

1    ARE WE GOING TO BE ABLE TO DO THAT TODAY, MR. ISAACSON?

2         **MR. ISAACSON:**  ON OUR PART, YES.

3         **MS. SWEENEY:**  YES, YOUR HONOR.

4         **THE COURT:**  ALL RIGHT.  WELL, LET'S GO AHEAD AND TAKE

5    A HALF-HOUR BREAK, YOU GUYS GET SOMETHING TO EAT.  AND WE'LL

6    STAND IN RECESS TILL 10:45.

7         **MR. COUGHLIN:**  THANK YOU, YOUR HONOR.

8      YOUR HONOR, COULD I ASK THAT WE STAND IN RECESS UNTIL

9    11:00 TO GIVE ME A LITTLE TIME TO TALK TO SOME OF THESE

10   WITNESSES THAT HAVE FLOWN IN FROM ACROSS THE COUNTRY?

11        **THE COURT:**  OKAY.  11:00.

12        **MS. SWEENEY:**  AND, YOUR HONOR, I –– WHEN ARE WE GOING

13   TO DO THE EXHIBITS?  I –– WE SHOULD HAVE PROBABLY DONE THAT

14   BEFORE WE RECESSED.  CAN WE DO THAT NOW, OR SHOULD WE DO IT

15   WHEN WE COME BACK?

16        **THE COURT:**  WE CAN DO IT NOW, BUT I'M NOT GOING PAST

17   11:00. SO MR. COUGHLIN ––

18                    (SIMULTANEOUS COLLOQUY.)

19        **MR. COUGHLIN:**  THEY CAN DO IT WITHOUT ME.

20        **THE COURT:**  YOU KNOW WHAT, MS. SWEENEY, COME BACK AT

21   10:50 AND WE'LL DO THE EXHIBITS THEN.

22      MR. COUGHLIN, BE HERE AT 11:00.

23      (RECESS TAKEN AT 10:20 A.M.; PROCEEDINGS RESUMED AT

24   10:54 A.M.)

25

1    (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

2    OF THE JURY:)

3        **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

4    COME TO ORDER.

5        **THE COURT:**  OKAY.  WE'RE BACK ON THE RECORD.

6     THE RECORD WILL REFLECT THE PARTIES ARE PRESENT, THE JURY

7    IS NOT.

8     THE ONLY THING WE HAVE ADMINISTRATIVELY, THEN, IS THESE

9    NOLL EXHIBITS.  SO LET'S GO THROUGH THOSE.

10    OKAY.  FIRST ONE I HAVE IS 731.  ANY OBJECTION?

11        (PAUSE IN THE PROCEEDINGS.)

12    YOU'RE OFFERING IT, CORRECT?

13        **MS. SWEENEY:**  YES, I AM, YOUR HONOR.  AND THERE

14    WAS -- THERE WAS NO OBJECTION PREVIOUSLY.

15        **THE COURT:**  WELL, IT WASN'T STIPULATED TO, THOUGH.

16        **MS. SWEENEY:**  THAT'S CORRECT.

17        **MR. ISAACSON:**  SO ARE WE ON --

18        **THE COURT:**  731.

19        **MR. ISAACSON:**  -- WITH NOLL.

20    AND THIS IS BEING ADMITTED AS A SUMMARY --

21        **THE COURT:**  IT'S BEING OFFERED.

22        **MR. ISAACSON:**  OFFERED.  I'M SORRY.  THIS IS BEING

23    OFFERED ON WHAT BASIS?  AS A SUMMARY EXHIBIT?

24    NO OBJECTION.

25        **THE COURT:**  OKAY.  731 IS ADMITTED.

1          (PLAINTIFFS' EXHIBIT 731 WAS RECEIVED IN EVIDENCE.)

2              **THE COURT:**  733.

3              **MS. SWEENEY:**  WE'RE OFFERING THAT AS WELL, YOUR

4      HONOR.

5              **THE COURT:**  OBJECTION?

6              **MR. ISAACSON:**  SAME TYPE OF EXHIBIT, NO OBJECTION.

7              **THE COURT:**  733 IS ADMITTED.

8          (PLAINTIFFS' EXHIBIT 733 WAS RECEIVED IN EVIDENCE.)

9              **THE COURT:**  735?

10             **MR. ISAACSON:**  NO OBJECTION.

11             **THE COURT:**  IT'S ADMITTED.

12         (PLAINTIFFS' EXHIBIT 735 WAS RECEIVED IN EVIDENCE.)

13             **THE COURT:**  736?

14             **MR. ISAACSON:**  NO OBJECTION.

15             **THE COURT:**  ADMITTED.

16         (PLAINTIFFS' EXHIBIT 736 WAS RECEIVED IN EVIDENCE.)

17             **THE COURT:**  737?

18             **MR. ISAACSON:**  NO OBJECTION.

19             **THE COURT:**  FEELS LIKE WE'RE PLAYING BINGO.

20             **MR. ISAACSON:**  YES.

21             **THE COURT:**  REMEMBER?

22     942.

23             **THE CLERK:**  SO 737 IS ADMITTED?

24             **THE COURT:**  YES, ADMITTED.

25

1          (PLAINTIFFS' EXHIBIT 737 WAS RECEIVED IN EVIDENCE.)

2              **THE COURT:**  942?

3              **MR. ISAACSON:**  NO OBJECTION.

4              **THE COURT:**  942 IS ADMITTED.

5          (PLAINTIFFS' EXHIBIT 942 WAS RECEIVED IN EVIDENCE.)

6              **THE COURT:**  944.

7                      (PAUSE IN THE PROCEEDINGS.)

8              **THE COURT:**  I GENERALLY DON'T WRITE THEM DOWN IF

9     THEY'RE NOT --

10             **MR. ISAACSON:**  YES.  NO OBJECTION.

11             **THE COURT:**  944 IS ADMITTED.

12         (PLAINTIFFS' EXHIBIT 944 WAS RECEIVED IN EVIDENCE.)

13             **THE COURT:**  754?

14             **MR. ISAACSON:**  NO OBJECTION.

15             **THE COURT:**  ADMITTED.

16         (PLAINTIFFS' EXHIBIT 754 WAS RECEIVED IN EVIDENCE.)

17             **THE COURT:**  755?

18             **MR. ISAACSON:**  NO OBJECTION.

19             **THE COURT:**  ADMITTED.

20         (PLAINTIFFS' EXHIBIT 755 WAS RECEIVED IN EVIDENCE.)

21             **THE COURT:**  893?

22                      (PAUSE IN THE PROCEEDINGS.)

23                      (OFF-THE-RECORD DISCUSSION.)

24             **MR. ISAACSON:**  NO OBJECTION.

25             **THE COURT:**  ADMITTED.

1          (PLAINTIFFS' EXHIBIT 893 WAS RECEIVED IN EVIDENCE.)

2              **THE COURT:**  757?

3              **MR. ISAACSON:**  NO OBJECTION.

4              **THE COURT:**  ADMITTED.

5          (PLAINTIFFS' EXHIBIT 757 WAS RECEIVED IN EVIDENCE.)

6              **THE COURT:**  894?

7              **MR. ISAACSON:**  NO OBJECTION.

8              **THE COURT:**  ADMITTED.

9          (PLAINTIFFS' EXHIBIT 894 WAS RECEIVED IN EVIDENCE.)

10             **THE COURT:**  760?

11             **MR. ISAACSON:**  NO OBJECTION.

12             **THE COURT:**  IT'S ADMITTED.

13         (PLAINTIFFS' EXHIBIT 760 WAS RECEIVED IN EVIDENCE.)

14             **THE COURT:**  NOW, I DIDN'T HAVE ON MY CHART -- I

15     THOUGHT I HEARD -- OH, WELL, MAYBE -- THAT'S LATER.

16         THERE WAS A 2446.  THIS WAS DURING THE CROSS.  OH,

17     THAT'S -- YEAH.

18             **MR. ISAACSON:**  I'M TOLD IT'S ALREADY IN EVIDENCE.

19             **THE COURT:**  YES.

20         AND THEN 2428, THERE WAS A STIPULATION.  SO 2428 IS

21     ADMITTED.

22         (DEFENDANT'S EXHIBIT 2428 WAS RECEIVED IN EVIDENCE.)

23             **THE COURT:**  THEN I HAVE THAT 672 WAS USED.

24             **MR. ISAACSON:**  OH, THAT'S A DEMONSTRATIVE NUMBER.

25             **THE COURT:**  OKAY.  AND THIS IS THE ONE I DIDN'T HAVE

1    ON MY LIST, A 2874?

2        IS THERE A NEW EXHIBIT LIST?  MY EXHIBIT LIST ENDS WITH

3    2854.

4            **MR. ISAACSON:**  THAT'S -- THAT'S THE TRANSCRIPT OF THE

5    KEYNOTE SO I THINK YOU'VE RULED ON THAT.

6            **MS. SWEENEY:**  2874 IS THE PRINTOUT OF THE DATA SET.

7            **MR. ISAACSON:**  OH.

8            **MS. SWEENEY:**  IT'S A NEW EXHIBIT.

9            **MR. ISAACSON:**  I'M SORRY.

10           **MS. SWEENEY:**  AND WE OBJECT ON COMPLETENESS GROUNDS.

11           **MR. ISAACSON:**  IT'S AN EXCERPT OF -- THAT'S THE

12   EXCERPT OF THE DATA SET THAT I SHOWED HIM, AND IF YOU BROUGHT

13   IN THE WHOLE DATA SET --

14           **THE COURT:**  RIGHT.  SO THERE ARE A COUPLE THINGS I

15   CAN DO WITH THIS.  ONE IS THAT, FOR COMPLETENESS, I CAN -- I

16   CAN ADMIT, BUT ONLY ON DIGITAL FORM, THE 2874, AND THEN I'LL

17   ADMIT A 2874A WHICH IS THE ONE PAGE IN THE EVENT YOU WANT TO

18   USE THAT.  BUT I DON'T KNOW IF YOU'RE EVEN REQUESTING THAT IT

19   BE ADMITTED.

20           **MR. ISAACSON:**  I WOULD REQUEST THAT IT BE ADMITTED.

21   I WOULD REQUEST THAT IT BE ADMITTED.  AND IF THEY WANT A DISK

22   FULL OF DATA, I DON'T HAVE ANY PROBLEM WITH THAT.  I HOPE THEY

23   DON'T GET CONFUSED AND START FLIPPING THROUGH IT.

24           **THE COURT:**  JUST SO YOU KNOW, THE JURY WILL HAVE, AND

25   I RESERVED IT, WILL HAVE ACCESSIBLE TO THEM A COMPUTER THAT

1    DOESN'T HAVE -- THAT HAS BEEN BASICALLY CLEANED SO THAT THEY

2    HAVE NO ACCESS TO ANY INTERNET CONNECTIONS.  SO ALL OF THESE

3    EXHIBITS THAT HAVE BEEN ADMITTED CAN BE ADMITTED TO THEM BOTH

4    IN DIGITAL FORM AND IN THE PAPER COPY.  THAT WAY THEY CAN

5    SEARCH FOR THINGS IF THEY CHOOSE TO SEARCH FOR THEM.

6            **MR. ISAACSON:**  RIGHT.  I THINK IT IS APPROPRIATE TO

7    ADMIT AN EXCERPT OF THE DATA SET SINCE IT WAS JUST USED FOR

8    THE TITLES.  AND --

9            **THE COURT:**  SO YOU WANT ONE PAGE, THAT'S FINE.  I'M

10   GOING TO HAVE IT MARKED 2874, WHATEVER PAGE IT IS.

11       (DEFENDANT'S EXHIBIT 2874 MARKED FOR IDENTIFICATION)

12           **MS. SWEENEY:**  YOUR HONOR, I RENEW MY OBJECTION.

13                   (SIMULTANEOUS COLLOQUY.)

14           **THE COURT:**  IT'S --

15           **MS. SWEENEY:**  IT'S NOT --

16           **THE COURT:**  ARE YOU OFFERING 2874 IN ITS ENTIRETY?

17           **MS. SWEENEY:**  WELL, IT'S INCOMPLETE FOR SEVERAL

18   REASONS, NOT JUST BECAUSE IT'S ONLY A PORTION OF THE DATABASE.

19   I'M NOT OFFERING IT AT ALL, YOUR HONOR.  I'M OBJECTING TO THE

20   DEFENDANT'S OFFERING IT.

21           **THE COURT:**  THE OBJECTION IS OVERRULED.  NOW DO YOU

22   WANT THE WHOLE THING IN?

23           **MS. SWEENEY:**  IN -- IN A DIGITAL DATABASE, THE WHOLE

24   TRANSACTIONAL DATABASE?  I'M NOT SURE YOU CAN FIT IT ON A --

25   ON A DISK.

 1          THE COURT:  OKAY.  SO WHAT DO YOU WANT?  YOUR

 2   OBJECTION IS OVERRULED.  NOW WHAT?

 3                 (OFF-THE-RECORD DISCUSSION.)

 4          MS. SWEENEY:  WELL, THEN I WANT TO PUT IN NOT ONLY

 5   THIS DATABASE, BUT THE OTHER DATA SOURCES THAT PROFESSOR NOLL

 6   RELIED UPON.

 7          THE COURT:  WELL, THEN YOU NEED TO CALL HIM BACK

 8   UNLESS THERE'S NO ISSUE WITH RESPECT TO AUTHENTICITY.  THIS IS

 9   THE ONLY ONE THAT WAS LOOKED AT.

10          MS. SWEENEY:  ALL RIGHT, YOUR HONOR.  THEN WE ASK

11   THAT THE ENTIRE DATABASE FROM WHICH THIS SAMPLE IS DRAWN BE

12   ADMITTED.

13          THE COURT:  OKAY.  SO THAT'S ADMITTED.

14      (DEFENDANT'S EXHIBIT 2874 WAS RECEIVED IN EVIDENCE.)

15          THE COURT:  NOW WHAT'S THE FORM?  DO I HAVE THE

16   ENTIRE COPY OF IT?  AT WHAT HAVE YOU PROVIDED TO THE COURT

17   WITH RESPECT TO 2874?

18          MS. SWEENEY:  I HAVEN'T PROVIDED ANYTHING TO THE

19   COURT, YOUR HONOR, WITH RESPECT TO 2874.

20          THE COURT:  OKAY.  WHAT DO I HAVE WITH RESPECT TO

21   2874?

22          MR. ISAACSON:  YOU HAVE THE EXCERPT.  AND I --

23          THE COURT:  WELL --

24          MR. ISAACSON:  I ALSO DON'T KNOW HOW VOLUMINOUS --

25   HOW TO -- I'LL HAVE TO GO ASK PEOPLE ABOUT CAN YOU PUT THIS ON

1    A DISK.  I DON'T KNOW.  IT IS VOLUMINOUS.  SO -- AND I JUST --

2          **THE COURT:**  WELL, OBVIOUSLY SOMEONE HAD IT BECAUSE IT

3    WAS SHOWN TO THE JURY.

4          **MR. ISAACSON:**  IT'S A ON A -- IT'S ON A COMPUTER.

5          **THE COURT:**  OKAY.

6          **MR. ISAACSON:**  AND IT WAS PRINTED -- AND I HAD THAT

7    PRINTED OUT.  NOW IT'S IN -- SO IT'S ON -- I GUESS IT'S ON --

8    I DON'T KNOW IF IT'S --

9          **THE COURT:**  DO YOU HAVE A PRINTED COPY?

10         **MR. ISAACSON:**  YEAH, THAT WAS THE EXHIBIT, THAT WAS

11   THE PHYSICAL EXHIBIT I GAVE.

12         **THE COURT:**  OKAY.  WHERE'S THE PRINTED COPY?

13         **MS. SWEENEY:**  IT'S A -- IT'S ONLY A TWO-PAGE

14   DOCUMENT.

15         **MR. ISAACSON:**  RIGHT.

16             (OFF-THE-RECORD DISCUSSION.)

17         **MR. ISAACSON:**  AND I HAVE A BIGGER COPY.  DO WE HAVE

18   THAT SOMEWHERE?

19             (OFF-THE-RECORD DISCUSSION.)

20         **MR. ISAACSON:**  IF THIS WILL HELP YOU, HERE'S A LARGER

21   COPY WHERE YOU CAN READ THE TOP.

22         **THE COURT:**  WELL, THEN, THAT'S THE ONE THAT SHOULD BE

23   MARKED AND ADMITTED.

24         **MR. ISAACSON:**  ALL RIGHT.  WE WILL SUBSTITUTE THE --

25   THE LARGER COPY.

```
 1            THE COURT:  OKAY.  DO YOU HAVE A COPY FOR THE

 2   PLAINTIFFS?

 3            MR. ISAACSON:  WE WILL GIVE A COPY TO THE PLAINTIFFS.

 4   I DON'T -- AS FAR AS I KNOW RIGHT NOW, THAT'S MY ONLY COPY.

 5            THE COURT:  ALL RIGHT.  WELL, THE COURT IS GOING TO

 6   NEED A COPY OF THAT, TOO.

 7            MR. ISAACSON:  YES.

 8            THE COURT:  THAT'S 2874A.

 9            MR. ISAACSON:  YES.

10            THE COURT:  WHICH IS ADMITTED.

11       (DEFENDANT'S EXHIBIT 2874A WAS RECEIVED IN EVIDENCE.)

12            THE COURT:  LET ME KNOW AS SOON AS POSSIBLE AS TO THE

13   DATABASE.

14            MR. ISAACSON:  YES.  WE WILL ASK AS SOON -- MAYBE

15   SOMEONE CAN EVEN EMAIL ABOUT THAT.

16            MS. SWEENEY:  YOUR HONOR, THERE ARE SEVERAL

17   ADDITIONAL EXHIBITS THAT PLAINTIFFS WANT TO MOVE IN THAT I

18   DIDN'T HEAR YOUR HONOR MENTION.

19            THE COURT:  OKAY.  THOSE WERE THE ONLY ONES THAT WERE

20   DISCUSSED.

21       GO AHEAD.

22            MS. SWEENEY:  181.

23                 (PAUSE IN THE PROCEEDINGS.)

24            MR. ISAACSON:  WAS THIS DISCUSSED?

25            MS. SWEENEY:  I ESTABLISHED, YOUR HONOR, THAT
```

 1    DR. NOLL CREATED ALL OF THESE CHARTS IN THE SAME WAY, AND I

 2    INTRODUCED EACH OF THEM AT THE TIME WHEN I WENT THROUGH THEM.

 3    I WENT THROUGH THE SUBSEQUENT ONES MORE QUICKLY THAN THE FIRST

 4    ONES, BUT HE TALKED ABOUT ALL OF THEM.

 5                    (PAUSE IN THE PROCEEDINGS.)

 6          MR. ISAACSON:  YES, IT WAS REFERRED —— REFERRED TO

 7    AND SHOWN TO THE JURY.  WE HAVE NO OBJECTION.

 8            MR. COUGHLIN:  ALSO 732.

 9            THE CLERK:  WAIT A MINUTE.

10            MS. SWEENEY:  I'M SORRY.

11            THE CLERK:  I DIDN'T HEAR THE ——

12            THE COURT:  ALL RIGHT.  181 IS ADMITTED.

13        (PLAINTIFFS' EXHIBIT 181 WAS RECEIVED IN EVIDENCE.)

14            MS. SWEENEY:  732.

15            MR. ISAACSON:  NO OBJECTION.

16            THE COURT:  ADMITTED.

17        (PLAINTIFFS' EXHIBIT 732 WAS RECEIVED IN EVIDENCE.)

18            MS. SWEENEY:  869.

19                    (PAUSE IN THE PROCEEDINGS.)

20            MR. ISAACSON:  NO OBJECTION.

21            THE COURT:  ADMITTED.

22        (PLAINTIFFS' EXHIBIT 869 WAS RECEIVED IN EVIDENCE.)

23            MS. SWEENEY:  870.

24            MR. ISAACSON:  NO OBJECTION.

25            THE COURT:  ADMITTED.

```
 1        (PLAINTIFFS' EXHIBIT 870 WAS RECEIVED IN EVIDENCE.)

 2            MS. SWEENEY:  AND 761.

 3            MR. ISAACSON:  NO OBJECTION.

 4            THE COURT:  ADMITTED.

 5        (PLAINTIFFS' EXHIBIT 761 WAS RECEIVED IN EVIDENCE.)

 6            THE COURT:  OKAY.  ALL RIGHT.  ARE WE READY FOR THE

 7    EVIDENTIARY HEARING?

 8            MR. ISAACSON:  JUST TWO LINGERING ISSUES, YOUR HONOR.

 9        IT'S JUST YOU HAVEN'T RULED ON -- THERE WERE TWO PHYSICAL

10    EXHIBITS USED WITH MR. SCHILLER, 2715, WHICH IS THE IPOD NANO

11    SECOND GENERATION, AND 2720, THE IPOD TOUCH FIRST GENERATION.

12        AND THEN OUR REQUEST TO ADMIT PARAGRAPH 66 OF THE

13    COMPLAINT, WHICH IS EXHIBIT 2593, IS STILL PENDING.

14        SO I'M NOT SAYING YOU HAVE TO RULE ON THOSE NOW, BUT I

15    DIDN'T WANT THOSE TO GET LOST IN THE SHUFFLE.

16            THE COURT:  NO, THEY WOULD -- OKAY.  I'LL DEAL WITH

17    THOSE LATER.

18                    (PAUSE IN THE PROCEEDINGS.)

19            THE COURT:  I HAVE BEEN THINKING OVER THE BREAK.

20    I'VE NOT BROACHED THIS WITH YOU.  I'VE NOT MADE A DECISION.

21    BUT I'LL THINK OUT LOUD IN FRONT OF YOU WITH RESPECT TO THE

22    ISSUE OF THESE NEW PLAINTIFFS AND APPLE'S STATEMENT REGARDING

23    PREJUDICE AND THE NEED FOR DEPOSITIONS, ET CETERA.

24        AND THE FOLLOWING -- AND SO MY -- WHAT I AM CONTEMPLATING

25    IS WHETHER, ONCE THE EVIDENTIARY HEARING HAPPENS, WHETHER THE
```

 1    COURT SHOULD MERELY -- ASSUMING FOR PURPOSES OF ARGUMENT THAT

 2    THEY'VE ESTABLISHED THAT ONE OF THESE PLAINTIFFS HAS PURCHASED

 3    ONE OF THE PRODUCTS DURING THE CLASS PERIOD AND THAT THERE IS

 4    NO DISPUTE ABOUT THAT -- SHOULD JUST ADVISE THE JURY IN A

 5    STATEMENT THAT SUCH FACT IS DEEMED BY THE COURT TO HAVE BEEN

 6    ESTABLISHED, AND NOT PROVIDE THE PLAINTIFFS WITH ANOTHER

 7    OPPORTUNITY TO PUT ON ADDITIONAL WITNESSES GIVEN THE

 8    PLAINTIFFS' OWN FAILURE.

 9         **MR. ISAACSON:**  WE WOULD AGREE WITH THAT APPROACH IN

10    TERMS OF THE -- THE PREJUDICE OF ADDITIONAL TESTIMONY AS

11    OPPOSED TO ADDITIONAL CLASS REPRESENTATIVES.

12         **THE COURT:**  WELL, THAT WOULD CERTAINLY DEAL WITH THE

13    DEPOSITION ISSUES, WOULDN'T IT?  I MEAN, LOOK, LIKE I SAID,

14    YOU STILL HAVE YOUR APPELLATE ISSUE.  BUT --

15         **MR. ISAACSON:**  NO, YOUR HONOR.  BECAUSE IN ORDER

16    FOR -- IT WOULD ALLOW YOU TO DEFER THE FINAL RULING ON THE

17    ADEQUACY OF THE CLASS REPRESENTATIVE.  BUT I DO NOT THINK THAT

18    THE EXAMINATIONS TODAY, WHICH WOULD ESTABLISH -- PRESUMABLY

19    WILL FOCUS ON WHETHER THEY WERE PURCHASERS, ARE A SUFFICIENT

20    RECORD TO DETERMINE THAT THEY ARE ADEQUATE CLASS

21    REPRESENTATIVES.  AND WE ARE ENTITLED TO EXPLORE THAT IN A

22    DEPOSITION.

23         WHETHER THE -- WHETHER THE PLAINTIFFS ARE ADEQUATE CLASS

24    REPRESENTATIVES IS AN ISSUE FOR THE COURT.  AND IT IS

25    SOMETHING YOU COULD FINALIZE AFTER TRIAL.  OR YOU COULD -- WE

1    CAN DO IT NOW AND GET THE DEPOSITIONS DONE, AND YOU CAN HEAR

2    ABOUT THAT.

3        BUT IT IS NOT -- IT'S NOT CORRECT THAT IT IS SUFFICIENT

4    TO -- FOR THE COURT TO DECLARE THEM TO BE ADEQUATE

5    REPRESENTATIVES JUST BASED ON SHORT EXAMINATIONS THAT

6    ESTABLISH THEY BOUGHT THE PURCHASED PRODUCT.

7            **MR. COUGHLIN:**  YOUR HONOR, I DISAGREE.  I THINK IF

8    YOU HAVE A -- A REPRESENTATIVE PLAINTIFF THAT PURCHASED THE

9    PRODUCT, NOW WHETHER THEY CAN BE ADEQUATE, YOU KNOW, LEAD

10   PLAINTIFF MIGHT BE A DIFFERENT ISSUE.

11       BUT I DON'T REALLY DISAGREE WITH MR. ISAACSON.  YOU CAN --

12   YOU CAN TAKE A LOOK AT THE DEPOSITION TO DETERMINE THAT.  IN

13   OTHER WORDS, ONCE WE HAVE AN AFFECTED PLAINTIFF, THE

14   DETERMINATION CAN BE MADE AFTER WHETHER THAT PERSON COULD LEAD

15   THE CLASS OR NOT, IF THAT'S WHAT MR. ISAACSON WANTS TO

16   EXPLORE.

17           **MR. ISAACSON:**  I THINK WE HAVE AN OBLIGATION TO

18   EXPLORE THAT AND THE COURT HAS AN OBLIGATION TO EXPLORE THAT.

19           **THE COURT:**  WHAT ABOUT THE TRIAL TESTIMONY?

20           **MR. COUGHLIN:**  I DON'T THINK THAT THERE NEEDS TO BE

21   ANY TRIAL TESTIMONY.  I THINK THAT THAT -- IF WE STIPULATE TO

22   THE FACT THAT YOU'RE GOING TO DO IT THIS WAY, YOUR HONOR, THEN

23   IT CAN BE DONE THAT WAY.  I'VE DONE SEVERAL CLASS TRIALS WITH

24   NO PLAINTIFFS EVER TESTIFYING, WITH JUST A STIPULATION WITH

25   THE OTHER SIDE ON THE ADEQUACY.

1    **MR. ISAACSON:** RIGHT. WE'RE NOT –– OBVIOUSLY WE'RE

2    NOT STIPULATING THAT THERE'S AN ADEQUATE OR –– OR A CORRECT

3    PLAINTIFF. BUT WE WOULD AGREE THAT AN APPROPRIATE ACTION AT

4    THIS POINT WOULD BE NO FURTHER TESTIMONY FROM PLAINTIFFS TO

5    TRY AND SUPPLEMENT THE RECORD.

6        **MR. COUGHLIN:** RIGHT. THE PROCESS IS WHAT I WAS

7    MEANING WHEN I SAID TO STIPULATE. THE PROCESS CAN BE THAT YOU

8    TAKE A LOOK AT THE DEPOSITION, THEN THE BRIEFING ON THE ISSUE.

9        **THE COURT:** OKAY.

10        ALL RIGHT. LET'S GET STARTED.

11                    **EVIDENTIARY HEARING**

12        **MR. COUGHLIN:** YOUR HONOR, WE WOULD CALL BARBARA

13    BENNETT.

14                    (PAUSE IN THE PROCEEDINGS.)

15                    (OFF-THE-RECORD DISCUSSION.)

16                    **BARBARA BENNETT,**

17    CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY

18    SWORN, TESTIFIED AS FOLLOWS:

19        **THE WITNESS:** YES.

20        **THE CLERK:** PLEASE BE SEATED.

21        **THE WITNESS:** THANK YOU.

22        **THE CLERK:** AND THEN IF YOU'D SCOOT UP TO THE

23    MICROPHONE AND ADJUST IT.

24        AND THEN PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST

25    NAME.

1      **THE WITNESS:**  IT'S BARBARA RAGAN BENNETT.  RAGAN IS

2   R-A-G-A-N.  BENNETT IS B-E-N-N-E-T-T.

3      **THE COURT:**  GOOD AFTERNOON.

4      **THE WITNESS:**  GOOD AFTERNOON.

5      **THE COURT:**  YOU MAY PROCEED.

6      **MS. BERNAY:**  THANK YOU, YOUR HONOR.

7                   **DIRECT EXAMINATION**

8   BY MS. BERNAY:

9   **Q.**  MS. BENNETT, GOOD MORNING TO YOU.  I KNOW YOU'VE HAD A

10  LITTLE BIT OF A JOURNEY TO GET HERE.

11  **A.**  OH, YES.

12  **Q.**  SO I'M JUST GOING TO ASK YOU A FEW QUESTIONS, AND THEN

13  COUNSEL FOR ONLY APPLE WILL PROBABLY ASK YOU A FEW QUESTIONS

14  AS WELL.  DO YOU UNDERSTAND THAT?

15  **A.**  YES.

16  **Q.**  GREAT.  AND THE COURT MAY HAVE SOME QUESTIONS FOR YOU AS

17  WELL.  DO YOU UNDERSTAND THAT?

18  **A.**  YES.

19  **Q.**  GREAT.

20      SO TELL ME, WHERE DO YOU LIVE?

21  **A.**  I LIVE IN MARSHFIELD, MASSACHUSETTS, JUST SOUTH OF BOSTON.

22  **Q.**  ABOUT HOW LONG HAVE YOU LIVED THERE?

23  **A.**  ABOUT 15, 16 YEARS.

24  **Q.**  OKAY.  AND WHAT DO YOU DO FOR A LIVING?

25  **A.**  AT THE MOMENT, I DO CONSULTING WORK.  I HAVE A BACKGROUND

1    IN FINANCE AND TECHNOLOGY.

2    **Q.**  AND YOU MENTIONED YOU DID CONSULTING WORK.  WHAT ABOUT

3    YOUR JOB PRIOR TO THAT?

4    **A.**  I WAS AT SUN MICROSYSTEMS.  MY HUSBAND WAS ILL, AND I TOOK

5    A LEAVE TO BE A FULL-TIME CAREGIVER.  AND BE -- BEFORE SUN, I

6    WAS AT FIDELITY INVESTMENTS IN BOSTON.

7    **Q.**  FIDELITY INVESTMENTS?

8    **A.**  IN THE E-BUSINESS, THE TECHNOLOGY GROUP.

9    **Q.**  AND WHAT WAS YOUR JOB TITLE THERE AT FIDELITY?

10   **A.**  SENIOR PROJECT MANAGER, SENIOR PROGRAM MANAGER, THE

11   LARGE-SCALE, CROSS-BUSINESS PROJECTS.

12   **Q.**  SO I UNDERSTAND THAT, YOU KNOW, YOU CONTACTED US; DO YOU

13   RECALL THAT?

14   **A.**  YES.

15   **Q.**  AND YOU ALSO, I THINK, SENT AN EMAIL TO THE COURT; IS THAT

16   CORRECT.

17   **A.**  I JUST FIGURED THERE -- THE CLOCK WAS TICKING, THERE WAS A

18   DEADLINE, AND SINCE IT WAS CLEAR FROM MY UNDERSTANDING OF WHAT

19   WAS IN THE PRESS, WHAT WAS NEEDED, AND I FIT ALL THE CRITERIA.

20   SO I THOUGHT IT WAS WORTH TOSSING MY NAME IN.

21   **Q.**  GREAT.  AND HOW DID YOU HEAR ABOUT THE CASE?

22   **A.**  A WEBSITE CALLED "ARS TECHNICA," I THINK, IS WHERE I READ

23   THAT THERE WAS -- WERE STANDING ISSUES.

24   **Q.**  AND THAT'S A TECHNOLOGY --

25   **A.**  RIGHT.

1  Q.  -- BLOG ON THE INTERNET?

2  A.  RIGHT.

3  Q.  AND NOW, YOU UNDERSTAND THAT YOU'RE HERE TODAY TO DISCUSS

4  SOME ISSUES RELATED TO YOUR PURCHASES OF IPODS?

5  A.  SURE.

6  Q.  IS THAT RIGHT?

7     SO HAVE YOU EVER OWNED AN IPOD?

8  A.  I'VE HAD TWO.  I HAD THE IPOD CLASSIC THAT I BOUGHT, I

9  BELIEVE, IN 2005.  AND THEN THIS -- THE ONE, THE IPOD NANO.

10 Q.  OKAY.  AND SO YOU MENTIONED THAT YOU BOUGHT AN IPOD

11 CLASSIC IN ABOUT 2005.  DID YOU BUY THAT FROM THE APPLE STORE?

12 A.  YES.

13 Q.  AND DO YOU STILL HAVE THAT IPOD?

14 A.  YES.

15 Q.  OKAY.  AND THEN YOU MENTIONED THIS IPOD NANO.  ABOUT WHEN

16 DID YOU PURCHASE THAT?

17 A.  2006, I THINK IT WAS IN NOVEMBER.  YOU HAVE MY CREDIT

18 STATEMENT THERE.

19 Q.  AND NOW THAT YOU'VE MENTIONED YOUR CREDIT STATEMENT, I'M

20 ACTUALLY GOING TO --

21       MS. BERNAY:  AND, YOUR HONOR, I'M NOT SURE HOW YOU

22 WANT TO HANDLE, BUT I'D LIKE TO MARK WHAT IS TITLED A

23 DUPLICATE RECEIPT.  AND THERE'S ACTUALLY -- WELL, THERE'S A

24 LITTLE BIT OF IDENTIFYING INFORMATION ON HERE, I BELIEVE.

25     BUT IF I COULD APPROACH THE WITNESS, YOUR HONOR.

 1          **THE COURT:**  YOU MAY.  IT WILL BE MARKED AS --

 2          **MS. BERNAY:**  THANK YOU.

 3          **THE COURT:**  -- EXHIBIT 1.

 4       **(PLAINTIFFS' EXHIBIT 1 MARKED FOR IDENTIFICATION)**

 5    **BY MS. BERNAY:**

 6    **Q.**  MS. BENNETT, HAVE YOU HAD A MOMENT TO LOOK NOW AT WHAT

 7    WE'VE MARKED AS EXHIBIT 1?

 8    **A.**  MM-HMM.

 9    **Q.**  WHAT IS THIS, IF YOU CAN TELL ME?

10    **A.**  IT'S A RECEIPT FROM THE DERBY STREET APPLE STORE IN

11    HINGHAM, MASSACHUSETTS WHERE I BOUGHT THE IPOD NANO.  IT'S

12    LISTING THE IPOD NANO AS A RED SPECIAL EDITION NANO.  PRICE

13    POINT WAS $199.  AND THEN I PICKED UP A TECH SUPPORT APP FOR

14    THE IPOD FOR $59 AT THE SAME TIME.  SO THE AMOUNT PAID BY MY

15    CREDIT CARD WAS 267.95, AND THE -- I'M TRYING TO FIND THE DATE

16    ON HERE.  NOVEMBER 5, 2006.

17    **Q.**  AND YOU'LL NOTICE THAT IT SAYS AMOUNT PAID VIA VISA; DO

18    YOU SEE THAT?

19    **A.**  YES.

20    **Q.**  AND IS THAT YOUR -- DO YOU RECOGNIZE THOSE LAST FOUR

21    DIGITS?

22    **A.**  YEAH, THAT'S MY CREDIT CARD.

23    **Q.**  AND TELL ME WHAT YOU REMEMBER ABOUT BUYING THIS -- THIS

24    PARTICULAR IPOD NANO?

25    **A.**  WELL, I LOVE THE APPLE STORES.  I MEAN, THEIR CUSTOMER

BENNETT – DIRECT / BERNAY

1   SERVICE AND THEIR PRODUCTS ARE GOOD.  AND I WENT IN.  I WAS

2   NOT LOOKING FOR A NEW IPOD.  BUT I WAS THERE TO GET SOME

3   APPLICATIONS FOR MY APPLE LAPTOP, AND I SAW THIS CUTE LITTLE

4   RED NANO AND DECIDED I SHOULD BUY IT SO I DID.

5   **Q.**  SURE.  AND HAVE YOU EVER PURCHASED ANYTHING ELSE FROM

6   APPLE?

7   **A.**  I'VE HAD A POWERBOOK G3.  I'VE HAD LACIE BACKUP SERVERS.

8   I'VE HAD SOFTWARE.  I'VE BOUGHT A FAIR NUMBER OF SOFTWARE APPS

9   THAT WOULD RUN ON THE -- ON THE MAC PLATFORM.

10  **Q.**  WHAT ABOUT ITUNES MUSIC, HAVE YOU EVER BOUGHT ANY --

11  **A.**  ITUNES, I'VE -- I'VE DONE THAT.  I CAN'T REMEMBER.  I

12  BELIEVE I DID THROUGH THE CARD SALES THAT THEY HAD WHERE YOU

13  WOULD BUY A CARD WITH A CERTAIN VALUE ON IT.  I MAY HAVE ALSO

14  DONE IT ONLINE WITH A -- A CREDIT CARD CHARGE.

15      BUT IT WAS -- I'VE BOUGHT A FAIR AMOUNT OF MUSIC OVER MY

16  OWNERSHIP OF THOSE TWO.

17  **Q.**  YOU REFERRED TO A CARD SALES.  DO YOU MEAN LIKE A GIFT

18  CARD?

19  **A.**  I THINK THEY WERE -- THEY HAD LIKE GIFT CARDS YOU COULD

20  BUY $15 OR $25, AND I WOULD PERIODICALLY BUY THOSE AND GIVE

21  THEM AS GIFTS AS WELL.

22  **Q.**  GREAT.  AND SO WHAT DID YOU USE OR DO YOU STILL USE THIS

23  IPOD NANO RED FOR?

24  **A.**  WELL, I PUT IT IN A DOCKING STATION ON THE VANITY IN MY

25  BATHROOM.

BENNETT – DIRECT / BERNAY

1  **Q.** AND --

2  **A.** I HAVEN'T LOGGED ONTO ITUNES ONCE THEY STARTED UPGRADING

3  AND MAKING CHANGES. I HAD MUSIC ON THE IPOD I DIDN'T WANT TO

4  LOSE. AND MY -- UNFORTUNATELY MY APPLE LAPTOP IS IN A STATE

5  OF SUSPENSION UNTIL I CAN FIGURE OUT HOW TO FIX IT. SO I

6  CAN'T GET TO REPLACING MUSIC UNTIL I CAN RESURRECT THAT

7  DEVICE.

8  **Q.** SO THE MUSIC ON YOUR IPOD NANO, WHERE DID THAT COME FROM?

9  **A.** IT'S A COMBINATION OF ITUNES AND SOME CD'S.

10 **Q.** WHAT ABOUT ANY OTHER ONLINE MUSIC SOURCES, DID YOU BUY ANY

11 MUSIC FROM ANYWHERE ELSE --

12                    (SIMULTANEOUS COLLOQUY.)

13         **THE WITNESS:** -- WORK. I CAN'T DOWNLOAD MUSIC FROM

14 OTHER SOURCES. OVER THE PERIOD OF TIME THEY WERE -- MY

15 HUSBAND WAS IN THE MUSIC BUSINESS, PROFESSIONAL MUSICIAN, AND

16 THERE WERE -- I GUESS I'LL CALL IT RARE PIECES OF MUSIC, NOT

17 YOUR STANDARD LADY GAGA OR MADONNA, AND SO THERE'S MUSIC I

18 COULDN'T -- UNLESS I COULD DOWNLOAD IT, MOVE IT TO A CD, AND

19 THEN UPLOAD IT BACK TO MY LAPTOP WHICH I COULD THEN SYNC MY

20 IPOD AND PULL ALL THAT MUSIC OVER. SO IT WAS VERY CUMBERSOME.

21 **BY MR. ISAACSON:**

22 **Q.** I SEE.

23 **A.** AND SOME OF IT DIDN'T WORK AT ALL BECAUSE OF THE FILE

24 FORMAT SO --

25 **Q.** WHEN YOU SAY SOME OF IT DIDN'T WORK AT ALL BECAUSE OF THE

 1   FILE FORMAT, WHAT DO YOU MEAN BY THAT?

 2   **A.**  WELL, WHETHER IT'S DIGITAL VIDEO OR DIGITAL AUDIO,

 3   EVERYBODY HAS FILE FORMATS THAT DO NOT NECESSARILY SPEAK THE

 4   SAME LANGUAGE TO EACH OTHER AND THEY'RE NOT NECESSARILY

 5   CONVERTIBLE.  THERE ARE SOME SOFTWARE APPS THAT WILL PURPORT

 6   TO CONVERT FROM ONE FILE FORMAT TO ANOTHER.

 7       THE ANALOGY I'LL USE IS MICROSOFT, WHEN THEY INTRODUCED

 8   MICROSOFT WORD, THEIR WORD DOCUMENT FILE FORMAT WAS A DOT DOC.

 9   THEN THEY UPGRADED AND THEY CHANGED THE FILE FORMAT TO A DOT

10   DOCX.  BUT THE PROBLEM IS IF YOU STILL HAVE AN OLD MICROSOFT

11   WORD APPLICATION, YOU CAN'T READ THE NEW FILE FORMAT.  SO YOU

12   HAVE TO HAVE SOMEBODY BASICALLY SAVE IT TO A -- A BACKWARD

13   COMPATIBLE FILE FORMAT.

14       AND I FOUND THE SAME PROBLEM WITH SOME OF THE -- THE MUSIC

15   FOR THE IPOD.

16   **Q.**  AND DID YOU EVER ACTUALLY GO TO -- TO ONE OF THESE THIRD

17   PARTIES?  CAN YOU -- CAN YOU REMEMBER SPECIFICALLY GOING TO

18   ANOTHER WEBSITE WHERE YOU COULD HAVE BOUGHT THIS WHAT YOU CALL

19   RARE MUSIC?

20   **A.**  YEAH.  THERE'S SOME -- TANGO MUSIC.  I HESITATED TO TELL

21   YOU WHAT I'VE TRIED TO BUY.  SOME TANGO MUSIC, SOME FOREIGN.

22   MY HUSBAND WAS HUNGARIAN SO THERE WERE SOME

23   HUNGARIAN-FORMATTED MUSIC.

24       THERE WAS ALSO -- AND I CAN'T SAY FOR SURE WHETHER IT WAS

25   REALNETWORKS OR THERE WAS ANOTHER ONE AT THE SAME TIME, TWO

1    DIFFERENT DOMESTIC MUSIC SERVER SYSTEMS, AND I CAN'T -- I

2    CAN'T REMEMBER FOR A FACT.  IT'S ON THE MACHINE, THE LAPTOP

3    THAT I HAVEN'T HAD THE ABILITY TO REOPEN.  BUT, YEAH.

4    **Q.**  YOU HAVE ANY PROBLEMS WITH YOUR IPOD EVER?

5    **A.**  YEAH, I DO.  I HAVE.  ON THE CLASSIC, PARTICULARLY, IT

6    WOULDN'T SHUT OFF.  IT -- IT KEPT RUNNING AND RUNNING AND

7    RUNNING.  AND THE CLICK WHEEL WASN'T -- WOULDN'T WORK.

8        AND ALSO ON THE CLASSIC, THE BATTERY WASN'T RECHARGING,

9    AND I'M TOLD THE BATTERIES WERE NOT REPLACEABLE ON THE IPODS.

10   **Q.**  SO DID YOU EVER CONSIDER MAYBE BUYING A DIFFERENT TYPE OF

11   MP3 PLAYER?

12   **A.**  I HAVE HAD A COUPLE THAT HAVE ENDED UP BEING GIFTS TO

13   YOUNGER SKATERS AND DANCERS AND PEOPLE THAT WANTED MUSIC THAT

14   WAS ON IT.  AND THEY -- THE PRICE POINT WAS -- WAS SUCH THAT

15   I'LL JUST -- I'LL GET ANOTHER ONE.  WHATEVER, SO.

16   **Q.**  AND I'M GOING TO GO TAKE A QUICK DETOUR BECAUSE YOU SAID

17   SKATERS, AND I JUST THINK THIS IS A PRETTY COOL STORY.  YOU

18   MENTIONED SOMETHING ABOUT WANTING TO LEARN HOW TO SKATE

19   BACKWARDS.  CAN YOU TALK A LITTLE BIT ABOUT THAT?

20   **A.**  WELL, AFTER MY HUSBAND PASSED AWAY -- I GREW UP IN A PART

21   OF THE COUNTRY WHERE WE DIDN'T HAVE INDOOR SKATING RINKS AND

22   YOU COULDN'T SKATE OUTDOORS BECAUSE IT WASN'T SAFE.  AND I

23   JUST FIGURED I NEEDED EXERCISE AND I AM SO NOT A GYM PERSON.

24   SO I TOOK -- LEARNED TO SKATE BECAUSE I WANTED TO LEARN HOW TO

25   SKATE BACKWARDS, AND I SORT OF GOT HOOKED SO I'M STILL

BENNETT – DIRECT / BERNAY

1    SKATING.

2    Q.   AND NOW YOU DO WHAT KIND OF FIGURE SKATING?

3    A.   WELL, I BELONG TO THE SKATING CLUB OF LAKE PLACID, AND

4    MOSTLY ICE DANCE NOW.  AT MY AGE, I'M NOT GOING TO DO A TRIPLE

5    AXEL, THANK YOU.

6    Q.   AND DO YOU DO ANY TRAVELING AS PART OF THIS ICE DANCING

7    THING?

8    A.   YEAH.  THERE'S A LOT OF RINKS AROUND THE COUNTRY.  WE'RE

9    FORTUNATE THAT, YOU KNOW, WHEREVER YOU GO -- I MEAN, THERE'S

10   RINKS HERE.  WHEREVER YOU GO, YOU CAN.  AND THERE'S A REALLY

11   GOOD -- FOR ADULTS, THERE'S A REALLY GOOD ADULT COMMUNITY

12   AROUND THE COUNTRY.  SO IT'S -- IT'S A GREAT WAY TO NETWORK.

13       AND A LOT OF THEM USE MUSIC ON DEVICES, WHETHER THROUGH

14   EARPHONES OR THROUGH LITTLE SPEAKER DEVICES THAT THEY HAVE.

15   AND IT'S BEEN A VERY USEFUL TOOL FOR -- FOR OUR SPORT, IN ANY

16   EVENT.

17   Q.   AND SO YOU MENTIONED THAT YOU HAD BOUGHT OTHER MP3

18   PLAYERS.  WHAT ABOUT FOR YOURSELF?  HAVE YOU EVER CONSIDERED

19   BUYING ANOTHER MP3 PLAYER FOR YOURSELF?

20   A.   I THINK MY NEXT PURCHASE IS GOING TO BE A SMARTER PHONE

21   THAN THE ONE I HAVE NOW, AND I'LL PROBABLY USE IT WITH -- WITH

22   A PHONE.

23   Q.   OKAY.

24       BUT WAS THERE, YOU KNOW, A REASON WHY YOU DIDN'T BUY AN

25   MP3 PLAYER AND YOU WOUND UP BUYING ANOTHER IPOD?

1    **A.**    THE NANO, ONLY BECAUSE I LIKED RED.

2    **Q.**    OKAY.

3    **A.**    I MEAN IN FAIRNESS, YEAH.

4    **Q.**    DO YOU KNOW WHAT DRM IS?

5    **A.**    YES.

6    **Q.**    WHAT IS THAT?

7    **A.**    DIGITAL RIGHTS MANAGEMENT.

8    **Q.**    AND DO YOU HAVE ANY OPINIONS ABOUT DRM OR --

9    **A.**    EVERYBODY USES IT OR TRIES TO USE IT.  I THINK IT'S A FAIR

10    ACTIVITY TO PROTECT INTELLECTUAL PROPERTY UNDER CERTAIN

11    CIRCUMSTANCES.  BUT THE TREND IN THE TECHNOLOGY WORLD IS TO

12    OPEN SOURCE.  WE ALL REMEMBER THE VHS AND THE BETA, AND THE

13    PROBLEMS WITH COMPATIBLE SYSTEMS.  AND I THINK THAT LITTLE BY

14    LITTLE, THAT THE RIGHTS MANAGEMENT, YOU WANT TO KNOW WHO'S

15    USING YOUR PRODUCT, BUT YOU DON'T NECESSARILY WANT TO RESTRICT

16    THE USE OF IT.

17    **Q.**    AND DID YOU FEEL THAT THE IPOD WAS RESTRICTIVE IN ANY WAY?

18    **A.**    WELL --

19    **Q.**    APPLE SYSTEM?

20    **A.**    -- I HAD PROBLEMS WITH IT AND ONLY BECAUSE I COULDN'T -- I

21    COULDN'T TAKE MUSIC OFF MY IPOD.  WHEN MY CLASSIC WAS

22    BEGINNING TO DIE, AND I HAD SOME MUSIC ON THERE, I COULDN'T

23    OFFLOAD IT TO SAVE IT TO BACK IT UP, BECAUSE I KNEW THAT ONE

24    WAS GOING.  AND NOW I DON'T KNOW WHAT THE NEWER IPODS, IF THEY

25    ARE -- HAVE ANY KIND OF EXECUTABLE SOFTWARE ON WHERE YOU CAN

1    OFFLOAD, DOWNLOAD --

2    **Q.**  FAIR ENOUGH.

3    **A.**  -- IMPORT.  I DON'T KNOW HOW THAT'S SET UP ON THE NEW ONES

4    BECAUSE I DON'T HAVE A NEW ONE.

5    **Q.**  SO DO YOU THINK YOU'VE BEEN PERSONALLY INJURED BY THE

6    CONDUCT THAT THE PLAINTIFFS ARE ALLEGING HERE?

7    **A.**  WELL, I KNOW THAT I'VE HAD TO BUY CD'S BECAUSE I COULDN'T

8    DOWNLOAD CERTAIN MUSIC.  ONE, BECAUSE IT WASN'T IN ITUNES.  SO

9    IT WASN'T EVEN AVAILABLE EVEN IF I HAD WANTED TO BUY IT.  SO

10   THAT COST ME MONEY THAT RATHER THAN BUYING A TRACK, ONE

11   SINGLE, I ENDED UP BUYING A WHOLE CD.

12   **Q.**  AND I KNOW IT'S BEEN A SHORT PERIOD OF TIME THAT WE'VE

13   KNOWN EACH OTHER, BUT YOU'VE HAD AT LEAST SOME CHANCE TO LOOK

14   AT SOME OF THE MATERIALS INVOLVED IN THE CASE.

15       CAN YOU JUST TELL ME A LITTLE BIT ABOUT WHAT YOU

16   UNDERSTAND THE CASE TO BE ABOUT?  AND WE KNOW YOU'RE NOT A

17   LAWYER.

18   **A.**  NO, NO, I'M TRYING TO DO THIS SUCCINCTLY.

19       IT -- IT BECOMES -- IT -- I DON'T WANT TO CALL IT

20   MONOPOLISTIC BEHAVIOR.  I'LL CALL IT RESTRICTIVE BEHAVIOR THAT

21   BECOMES ONEROUS THE BIGGER THE COMPANY IS, LIKE THE BANKS THAT

22   ARE TOO BIG TO FAIL.  THERE'S SOME BEHAVIOR THAT MIGHT HAVE

23   BEEN FINE WHEN APPLE WAS VERY SMALL.  OR I WORKED IN STARTUP

24   SOFTWARE COMPANIES THAT ARE FINE WHEN YOU'RE LITTLE AND YOU'RE

25   TRYING TO PROTECT YOURSELF WHERE YOU'RE TRYING TO PROTECT YOUR

1    ACTIVITY, BUT AS IT GETS BIGGER AND BIGGER, IT THEN SHUTS

2    OTHER USERS OR OTHER CUSTOMERS OUT OF A MARKET AND OUT OF A

3    USE.

4        AND MUSIC, BY AND OF ITSELF, IS OWNED IN THEORY BY THE

5    PEOPLE THAT WROTE IT, THAT COMPOSED IT, THAT ORCHESTRATED IT,

6    THAT PERFORM IT.  THERE'S SYNC LICENSES, THERE'S MECHANICAL

7    LICENSES.  THERE'S A LOT OF -- SO IF SOMEONE SAYS, "BUT WE'LL

8    PUT THIS IN A FILE FORMAT THAT YOU CAN'T USE OR LISTEN TO,"

9    THAT RESTRICTS NOT JUST THE OWNER OF THE IPOD BUT THE CREATIVE

10   SIDE, THE -- YOU KNOW, BMI AND ASCAP AND ALL THE -- AND THERE

11   ARE WAYS TO MANAGE LICENSING FEES AND -- AND PERFORMANCE FEES

12   THAT I DON'T THINK THIS PARTICULAR EXECUTION OF PROTECTIONS

13   DID ANY FAVORS TO THE MUSIC WORLD.

14   **Q.**  AND DO YOU UNDERSTAND WHAT IT MEANS TO BE A CLASS

15   REPRESENTATIVE HERE?

16   **A.**  YES.

17   **Q.**  AND WHAT DOES IT MEAN?

18   **A.**  IT MEANS THAT THERE ARE A CROWD OF PEOPLE AROUND ME, AND

19   I'M THE ONE WITH THE MOUTH THAT FLAPS.

20   **Q.**  THERE YOU GO.

21       AND DO YOU UNDERSTAND THAT YOU REPRESENT BOTH INDIVIDUALS

22   AND BUSINESSES IF -- IF THE COURT WAS TO APPOINT YOU AS A

23   CLASS REP?  AND ARE YOU WILLING TO DO WHATEVER DUTIES ARE

24   NECESSARY TO -- TO FULFILL YOUR ROLE AS A CLASS

25   REPRESENTATIVE?

1    **A.**   IT'S KIND OF A VAGUE QUESTION.

2                       (SIMULTANEOUS COLLOQUY.)

3    **BY MS. BERNAY:**

4    **Q.**   FOR EXAMPLE, ARE YOU WILLING TO LOOK OUT FOR THE BEST

5    INTERESTS OF THE CLASS?

6    **A.**   YES.

7    **Q.**   ARE YOU WILLING TO WORK WITH THE LAWYERS AND MAKE SURE

8    THAT, YOU KNOW, WE ARE PROTECTING ALSO THE RIGHTS OF THE

9    CLASS?

10   **A.**   YES.

11   **Q.**   ARE YOU WILLING TO STAY INFORMED AND BE ACTIVE AND TAKE AN

12   ACTIVE ROLE IN THIS CASE SIMILAR TO WHAT YOU'RE DOING RIGHT

13   NOW?

14   **A.**   YES.

15   **Q.**   AND SO YOU'RE WILLING TO DO MORE THAN WHAT YOU'VE DONE

16   RIGHT NOW WHICH IS FLY ACROSS THE COUNTRY AND COME GIVE THE

17   TESTIMONY, YOU'RE WILLING TO GIVE A DEPOSITION LATER TODAY?

18   **A.**   (NODS HEAD.)

19   **Q.**   AND PROVIDE DOCUMENTS?

20            **THE COURT:**   WHAT WAS THE ANSWER TO THE QUESTION?

21            **THE WITNESS:**   YES.

22   **BY MS. BERNAY:**

23   **Q.**   DO YOU GET ANYTHING FOR BEING A CLASS REPRESENTATIVE?

24   **A.**   NOT THAT I KNOW OF.

25   **Q.**   WERE YOU PROMISED ANYTHING --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1   **A.**   NO.

2   **Q.**   -- FOR COMING HERE?

3   **A.**   NO.

4   **Q.**   AND YOU DIDN'T AGREE TO TAKE PART IN THIS CASE SO THAT YOU

5   COULD GET A SERVICE AWARD OR ANYTHING LIKE THAT?

6   **A.**   NO.  JUST THE SATISFACTION THAT WE'RE ALLOWING PEOPLE TO

7   HEAR MUSIC THAT I THINK SHOULD BE AVAILABLE WIDELY.

8            **MS. BERNAY:**  GREAT.  AND I'M JUST GOING TO MARK

9   ANOTHER EXHIBIT.  THIS WILL BE EXHIBIT 2.  IT CONTAINS SOME

10  HIGHLY CONFIDENTIAL CREDIT CARD INFORMATION SO WE CAN REDACT

11  IT, BUT I WOULD LIKE TO SHOW IT TO THE WITNESS.

12           **THE COURT:**  GO AHEAD.

13     AND YOU HAVE A COPY FOR MR. --

14           **MS. BERNAY:**  YES.

15     **(PLAINTIFFS' EXHIBIT 2 MARKED FOR IDENTIFICATION)**

16           **THE COURT:**  WHO'S DOING THE MOTION?  MR. ISAACSON.

17                  (PAUSE IN THE PROCEEDINGS.)

18           **THE COURT:**  DO WE HAVE A COPY THAT'S NOT -- THAT'S

19  ACTUALLY COPIED PROPERLY?

20           **MS. BERNAY:**  THIS IS THE COPY THAT -- I'M SORRY.

21           **MR. ISAACSON:**  AND THIS WAS NOT PRODUCED LAST NIGHT

22  OR UNTIL NOW.

23           **MS. BERNAY:**  THAT'S CORRECT.  I JUST RECEIVED IT FROM

24  MS. BENNETT.  AND THIS WAS A COPY OF THE COPY THAT SHE HAD

25  WHICH IS IN FACT CUT OFF.  SO I APOLOGIZE FOR THAT.  AND WE

```
 1    SHOULD BE ABLE TO -- IF MR. ISAACSON WANTS TO GO ONLINE AND

 2    GET A CLEANER COPY, BUT I DID WANT TO AT LEAST HAVE THIS

 3    BEFORE THE COURT.

 4    BY MS. BERNAY:

 5    Q.  MS. BENNETT, CAN YOU IDENTIFY WHAT WE'VE MARKED AS

 6    EXHIBIT 2?

 7    A.  YES.

 8    Q.  WHAT IS IT?

 9    A.  IT IS MY CREDIT -- MY VISA CREDIT CARD WITH THE CHARGES

10    INCLUDING THE APPLE STORE CHARGE FOR 267.95.

11    Q.  AND DO YOU SEE THAT ABOUT THREE-QUARTERS OF THE WAY

12    THROUGH ON THE TRANSACTIONS?

13    A.  YES.

14    Q.  OKAY.  AND AGAIN, THIS IS YOUR PERSONAL CREDIT CARD, AND

15    YOU PAY THE BALANCE, YOUR NAME IS ON THE CARD?

16    A.  YES.

17         MS. BERNAY:  I HAVE NOTHING FURTHER AT THIS TIME.

18    THANK YOU, MS. BENNETT.

19         THE COURT:  MR. ISAACSON?

20         MR. ISAACSON:  ONE MOMENT, YOUR HONOR.

21              (PAUSE IN THE PROCEEDINGS.)

22                   CROSS-EXAMINATION

23    BY MR. ISAACSON:

24    Q.  GOOD MORNING, MS. BENNETT.

25         MY NAME --
```

1    **A.**  GOOD MORNING.

2    **Q.**  MY NAME IS BILL ISAACSON.  I HOPE THAT'S THE LAST TIME I

3    TALK OVER YOU.

4        LET ME STRAIGHTEN OUT YOUR NAME.  ARE YOU BARBARA BENNETT,

5    BARBARA RAGAN, BARBARA RAGAN BENNETT?

6    **A.**  RAGAN IS MY MAIDEN NAME AND BENNETT IS MY MARRIED NAME.

7    **Q.**  R-A-G-A-N.  AND SO SOMETIMES YOU GO BY EITHER NAME WHEN

8    YOU PURCHASE THINGS; IS THAT --

9    **A.**  I HAVE CREDIT CARDS IN BOTH NAMES.

10   **Q.**  OKAY.  THANK YOU.

11       NOW, YOU HAVE A CONSULTING BUSINESS RIGHT NOW, RIGHT?  IS

12   THAT WHAT YOU SAID --

13   **A.**  I'M DOING CONSULTING PROJECTS, YES.

14   **Q.**  ALL RIGHT.  DO YOU HAVE A BUSINESS NAME?

15   **A.**  NO.

16   **Q.**  ALL RIGHT.  YOU FORMERLY HAD A BUSINESS NAMED "AMBIT"; IS

17   THAT RIGHT?

18   **A.**  AMBIT, RIGHT.

19   **Q.**  A-M-B-I-T?

20   **A.**  RIGHT.

21   **Q.**  AND WHAT WAS THE BUSINESS OF AMBIT?

22   **A.**  IT WAS A TECHNOLOGY SOFTWARE STARTUP WITH SOME COLLEAGUES

23   FROM A COMPANY THAT THE VENTURE CAPITALISTS PULLED THE MONEY

24   ON CALLED "BUSINESS MATTERS" OUT OF WALTHAM, MASSACHUSETTS.

25   **Q.**  ALL RIGHT.  AND THE RECEIPT, EXHIBIT 1, THAT YOU HAVE --

1  DO YOU STILL HAVE THAT?

2  **A.**  THE APPLE?

3  **Q.**  YES.

4  **A.**  YES.

5  **Q.**  OKAY.  THERE'S NO NAME ON THAT, CORRECT?

6  **A.**  I HAD THEM PULL THIS BECAUSE I COULDN'T FIND MY RECEIPT AT

7  HOME.  I KNOW I HAVE IT IN MY TAX FOLDER.  BUT IN THE SHORT

8  TIME WE HAD, I KNEW THAT APPLE WOULD OR COULD PULL DOWN THE

9  RECEIPT BASED ON THE SERIAL NUMBER OF THE EQUIPMENT.  SO

10  THAT'S WHERE THIS CAME FROM.

11  **Q.**  RIGHT.  WHEN YOU SAY YOU HAVE YOUR RECEIPT IN YOUR TAX

12  FOLDER, CAN YOU TELL ME -- YOUR IPOD RECEIPT.  WOULD YOU

13  EXPLAIN TO ME -- AND I'M ONLY ASKING ABOUT THE IPOD RECEIPT.

14  WOULD YOU TELL ME WHAT YOU MEAN?

15  **A.**  I WORKED AS AN ACCOUNTANT.  I SAVE ALL MY RECEIPTS.

16  **Q.**  OKAY.

17  **A.**  SO I HAVE SEVERAL APPLE RECEIPTS IN MY FOLDERS.

18  **Q.**  ALL RIGHT.  AND LOOKING AT EXHIBIT 2, THE CARD IS CUT OFF,

19  AS HAS BEEN SAID.  THE PAYMENT ADDRESS, POST OFFICE BOX 15153,

20  IS THAT THE -- AMBIT WAS IN EXISTENCE AT THIS TIME, RIGHT?

21  **A.**  NOT OFFICIALLY, NO.

22  **Q.**  ALL RIGHT.  WHAT WAS THE -- WHAT IS POST OFFICE BOX 15153?

23  WHO --

24  **A.**  I HAVE NO IDEA.

25  **Q.**  IS THAT A BUSINESS ADDRESS?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **A.**   NO.  I'VE NEVER HAD A POST OFFICE BOX IN MY LIFE.

2    **Q.**   DO YOU KNOW WHAT CREDIT CARD THIS EXHIBIT 2 REFERS TO?

3    **A.**   THAT'S A PAYMENT ADDRESS.  THAT WOULD BE THE PAYMENT THAT

4    THE VISA CARD WOULD ACCEPT PAYMENTS FROM ME.  SO I ASSUME --

5    **Q.**   OH, I SEE.

6    **A.**   -- THIS IS PROBABLY CHASE BECAUSE I BELIEVE -- I DON'T

7    KNOW IF IT WAS CHASE AT THE TIME, BUT THIS IS NOW A CHASE

8    VISA.

9    **Q.**   I SEE.

10       WE DON'T HAVE ON THIS WHO HOLDS THE CARD OR WHO'S PAYING

11   FOR THIS CARD.

12   **A.**   I CAN PROVIDE THAT.  IT'S IN, AGAIN, THE TAX FOLDER.  THIS

13   IS BOUND INTO A FOLDER.

14   **Q.**   WHEN CAN YOU PROVIDE THAT?

15   **A.**   WHEN I GET BACK TO MASSACHUSETTS, I SUSPECT.  I DON'T

16   THINK THE -- I DON'T THINK I BROUGHT THE ORIGINALS WITH ME.

17   **Q.**   DO YOU KNOW THE CARDHOLDER NAME FOR EXHIBIT 2?

18   **A.**   PROBABLY BARBARA RAGAN OR BARBARA M. RAGAN.

19   **Q.**   WHEN YOU SAY "PROBABLY," DO YOU KNOW?

20   **A.**   IT MAY HAVE A MIDDLE INITIAL, IT MAY NOT.

21   **Q.**   ALL RIGHT.  WHAT ABOUT -- DID YOU HAVE BUSINESS CARDS?

22   **A.**   NO.

23   **Q.**   WHEN YOU -- SO YOU GOT IN TOUCH WITH THE COURT AND THE

24   LAWYERS.  WHAT DID YOU THINK THE CASE WAS ABOUT AT THE TIME

25   YOU CONTACTED THE COURT AND THE LAWYERS?

1    **A.**  I THINK IT -- THIS IS MY OPINION.  I THINK THIS CASE IS

2    ABOUT RESTRICTED USE BASED ON PROPRIETARY FILE FORMATS.

3    **Q.**  OKAY.  MEANING DRM?

4    **A.**  DRM AND YOUR -- THE VARIOUS AUTHENTICATION VERIFICATION

5    FORMATTING THAT WERE USED ON THESE FILES SO THAT ONLY AN IPOD

6    COULD ACCESS MUSIC OR USE MUSIC FROM ITUNES DATABASES.

7    **Q.**  ALL RIGHT.  AND THAT WAS -- SO WHEN YOU FIRST CONTACTED

8    THE COURT AND THE LAWYERS, YOU THOUGHT THIS WAS A CLASS ACTION

9    THAT SAID APPLE SHOULD NOT BE PUTTING DRM ON ITS MUSIC DURING

10   THIS PERIOD OF TIME THAT'S AT ISSUE; IS THAT CORRECT?

11   **A.**  THE MANNER IN WHICH APPLE HAS CHOSEN TO RESTRICT THE USE

12   OF MUSIC PURCHASED BY ITUNES IN THIS WINDOW -- AND THEY'VE

13   CHANGED OVER THE YEARS -- WAS PROBLEMATIC FOR ME.  IT COSTS ME

14   MONEY, IT RESTRICTED ACCESS TO CERTAIN KINDS OF MUSIC THAT I

15   COULDN'T GET.

16   **Q.**  ALL RIGHT.

17   **A.**  AND COULD NOT PUT ON MY MACHINE TO TAKE TO THE RINK.

18   **Q.**  ALL RIGHT.  LET ME UNDERSTAND THAT.  THE --

19        AND, AGAIN, I'M JUST FOCUSING ON WHEN -- BEFORE YOU TALKED

20   TO THE LAWYERS.  DID YOU -- WAS IT YOUR BELIEF THAT THIS CASE

21   WAS ABOUT THE FACT THAT APPLE HAD DRM ON ITS SYSTEM AND IT

22   SHOULDN'T HAVE DRM?

23   **A.**  IT'S THE IMPLEMENTATION OF A DIGITAL RIGHTS MANAGEMENT

24   PROTOCOL --

25   **Q.**  OKAY.

1    **A.**  -- THAT I HAVE PROBLEMS WITH, THAT I PERSONALLY HAD

2    PROBLEMS WITH IN TERMS OF USING THE DEVICE THAT I'D BOUGHT

3    FROM APPLE.

4    **Q.**  ALL RIGHT.  AND THE -- WOULD YOU EXPLAIN THE MUSIC THAT

5    YOU COULD NOT GET?  OH, I THINK YOU SAID THERE WAS MUSIC THAT

6    WAS NOT IN THE ITUNES STORE.  WAS THAT IT?

7         I'M SORRY.  THERE'S A COURT REPORTER SO YOU HAVE TO SAY AN

8    AUDIBLE WORD.

9    **A.**  YES.

10   **Q.**  THANK YOU.

11        SO DID YOU UNDERSTAND THAT THIS CASE WAS ABOUT THE FACT

12   THAT THERE WAS CERTAIN MUSIC THAT YOU WANTED THAT WASN'T IN

13   THE ITUNES STORE?

14   **A.**  THERE WAS CERTAIN MUSIC THAT WAS AVAILABLE FROM NON-ITUNES

15   SOURCES THAT I COULD NOT USE WITH MY IPOD.

16   **Q.**  OKAY.

17        AND THE SOURCE OF YOUR FRUSTRATION -- AND DID YOU

18   UNDERSTAND, THEN, THAT CONSUMERS IN THIS CASE WERE COMPLAINING

19   ABOUT LACK OF ACCESS TO MUSIC OR -- OR HIGHER MUSIC PRICES?

20   **A.**  I GOT CALLS FROM PEOPLE WHO WANTED HELP PUTTING MUSIC,

21   MOVING MUSIC, COPYING MUSIC, WITH THEIR IPODS.  YOU -- AND --

22   AND I LOOKED AT FILE CONVERSION PROGRAMS.  I TALKED TO

23   ENGINEERS THAT -- SOFTWARE ENGINEERS, LOOKING AT WHAT IS

24   RESTRICTING THIS DEVICE FROM USING MUSIC.  AND, YES.  SO THE

25   ANSWER TO THAT QUESTION IS YES.

```
 1    Q.  OKAY.  THAT WAS A VERY LONG ANSWER BEFORE WE GOT TO YES.

 2         JUST TO BE CLEAR, BY THE TIME YOU CALLED INTO THE -- YOU

 3    WROTE INTO THE COURT, YOU THOUGHT THIS CASE WAS ABOUT THE FACT

 4    THAT CONSUMERS WERE BEING DENIED MUSIC AND MAYBE MUSIC PRICES

 5    WERE HIGHER BECAUSE OF THAT?

 6              MR. COUGHLIN:  I OBJECT.

 7                   (SIMULTANEOUS COLLOQUY.)

 8         THE WITNESS:  I NEVER -- I NEVER SAID ANYTHING ABOUT

 9    PRICES.

10              THE COURT:  I HAVE AN OBJECTION.

11    BY MR. ISAACSON:

12    Q.  I'M JUST ASKING --

13              THE COURT:  SO HOLD ON.

14         SHE ANSWERED THE QUESTION.  THE OBJECTION IS MOOT.

15              MR. ISAACSON:  RIGHT.

16    Q.  SO DID YOU THINK WHAT THIS CASE WAS ABOUT WAS THE FACT

17    THAT PEOPLE WERE -- THAT CONSUMERS WERE BEING DENIED ACCESS TO

18    MUSIC, THAT THAT'S WHAT THE CASE WAS ABOUT?

19              MS. BERNAY:  OBJECTION, AGAIN MISSTATES THE PRIOR

20    TESTIMONY.

21              THE COURT:  OVERRULED.

22              THE WITNESS:  SHALL I ANSWER?

23              THE COURT:  YOU MAY.

24              THE WITNESS:  I THINK THE CASE IS ABOUT THE

25    RESTRICTION OF WHAT CONSUMERS CAN ACCESS AND LISTEN TO, MUSIC
```

1   THAT IS OUT AND AVAILABLE BUT NOT USABLE ON AN IPOD IN THE

2   FILE FORMAT THAT APPLE HAS RESTRICTED THE IPOD TO.  SO, YES, I

3   GUESS THE ANSWER TO THAT QUESTION IS A YES.

4   **BY MR. ISAACSON:**

5   **Q.**  OKAY.

6       THE –– SO THEN YOU TALKED TO THE LAWYERS BY PHONE?

7   **A.**  EMAIL.

8   **Q.**  EMAIL.  AND THEN WHEN –– WHEN DID YOU FIRST MEET WITH

9   THE –– WHEN DID YOU FIRST HAVE SUBSTANTIVE CONVERSATIONS WITH

10  THE PLAINTIFF LAWYERS?  VERBAL CONVERSATIONS, NOT EMAIL.

11  **A.**  I THINK YESTERDAY.  WE MAY HAVE HAD ONE QUICK QUESTION THE

12  DAY BEFORE, CAN I COME OUT HERE.

13  **Q.**  UM-HMM.

14  **A.**  BUT THE –– THE MOST CONVERSATIONS WE'VE HAD WERE

15  YESTERDAY, AND IT WAS MOSTLY ABOUT ARRANGING TRAVEL PLANS.

16  **Q.**  OKAY.  SO TWO DAYS AGO, YOU TALKED WITH THE PLAINTIFFS'

17  LAWYERS ABOUT COMING OUT HERE.  AND YESTERDAY YOU HAD

18  NONSUBSTANTIVE CONVERSATIONS, YOU TALKED ABOUT GETTING OUT

19  HERE; IS THAT A FAIR ––

20  **A.**  YES.

21  **Q.**  ALL RIGHT.  SO TODAY WOULD HAVE BEEN YOUR FIRST

22  SUBSTANTIVE CONVERSATIONS ABOUT THE CASE WITH THE LAWYERS.

23          **MS. BERNAY:**  OBJECTION, MISSTATES HER PRIOR

24  TESTIMONY.  SHE TESTIFIED THAT SHE HAD EMAIL CONVERSATION.

25          **THE COURT:**  OVERRULED.  NO COACHING.  SHE CAN ANSWER.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

 1        **THE WITNESS:**  I WOULDN'T CALL IT SUBSTANTIVE.  MAYBE

 2   WE HAD TEN MINUTES.  THE PLANE WAS LATE GETTING IN, AND WE

 3   STOOD OUT IN THE HALL FOR FIVE, TEN MINUTES.  I DON'T CALL

 4   THAT IN A CASE THIS COMPLEX SUBSTANTIVE.  BUT IT WAS A SUMMARY

 5   CONVERSATION, YES.

 6   **BY MR. ISAACSON:**

 7   **Q.**  I AGREE WITH THAT.

 8        SO THE CLOSEST YOU'VE COME TO HAVING A SUBSTANTIVE

 9   CONVERSATION WITH THE LAWYERS ABOUT THIS CASE IS A FIVE- TO

10   TEN-MINUTE CONVERSATION OUT IN THE HALLWAY, NOT THAT LONG -- A

11   FEW MOMENTS AGO; IS THAT FAIR?

12   **A.**  YES.  AND I'VE READ A FIVE-PAGE -- I WON'T CALL IT A

13   MEMORANDUM, BUT A FIVE-PAGE OVERVIEW SUMMARY OF WHAT HAS

14   HAPPENED TO DATE, A VERY HIGH VIEW, VERY HIGH LEVEL.

15   **Q.**  ALL RIGHT.  NOW, WHEN YOU SAY WHAT'S HAPPENED TO DATE, DID

16   YOU UNDERSTAND THIS PIECE OF PAPER TO BE SOMETHING THAT WAS

17   FILED WITH THE COURT?

18   **A.**  NO.

19   **Q.**  WHEN WERE YOU DELIVERED THIS PIECE OF PAPER?

20   **A.**  BY EMAIL LAST NIGHT AT 9:00 O'CLOCK EASTERN TIME.

21   **Q.**  ALL RIGHT.  AND BASED -- AFTER YOU READ THAT PIECE OF

22   PAPER -- OH, I'M SORRY.

23        DO YOU -- HAVE YOU ENTERED A RETAINER LETTER OR ENGAGEMENT

24   LETTER WITH PLAINTIFF COUNSEL?

25   **A.**  I HAVE SIGNED A LETTER THAT I WOULD BE WILLING TO STEP

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1   FORWARD AND REPRESENT A CLASS IF I WERE SO APPOINTED BY THE

2   COURT, YES.  BUT NOTHING WAS PROMISED TO ME.  THERE'S NO --

3   **Q.**  I'M ASKING -- I'M NOT SURE WE'RE TALKING ABOUT THE SAME

4   THING SO LET ME FIND OUT.

5       SO YOU'VE SIGNED A LETTER SAYING YOU'RE WILLING TO ACT AS

6   A CLASS REPRESENTATIVE?

7   **A.**  YES.

8   **Q.**  AND YOU'VE SAID THAT IN COURT TODAY.

9       DO YOU KNOW WHAT A -- HAVE YOU EVER RETAINED A LAWYER

10  BEFORE?

11  **A.**  I GREW UP WITH LAWYERS.

12  **Q.**  WELL, THEN YOU PROBABLY KNOW WHAT AN ENGAGEMENT LETTER

13  IS --

14  **A.**  YES.

15  **Q.**  -- AND A RETAINMENT LETTER IS.

16      HAVE YOU ENTERED --

17  **A.**  NO.

18  **Q.**  -- RETAINMENT LETTER?

19      OKAY.

20  **A.**  NO.

21                   (SIMULTANEOUS COLLOQUY.)

22          **MR. ISAACSON:**  SORRY.

23  **Q.**  SO AFTER YOU READ THE MEMO FROM COUNSEL -- AND I HAVE THAT

24  RIGHT, IT WAS A MEMO FROM COUNSEL, FIVE-PAGE MEMO?

25      AFTER YOU READ THAT --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

 1          THE COURT:  IS THAT A "YES"?

 2          THE WITNESS:  YES.

 3   BY MR. ISAACSON:

 4   Q.  AFTER YOU READ THAT MEMO, YOUR UNDERSTANDING OF THIS CASE

 5   THAT IT WAS ABOUT DENYING CONSUMERS ACCESS TO MUSIC.

 6   A.  NO.  THAT SIMPLIFIES IT DRAMATICALLY.  IT HAS TO DO WITH

 7   DRM.  IT HAS TO DO WITH -- WITH VERIFICATION OR VALIDATION, I

 8   FORGET THE -- THE KEYBAG AND THE DATABASE PROTOCOLS THAT --

 9   THAT WERE IN SOME UPGRADES THAT WERE CHANGES THAT WERE MADE TO

10   THE ITUNES FUNCTIONALITY.  THE QUESTION OF SHERMAN ANTITRUST

11   AND WHAT CONSTITUTES MONOPOLY BEHAVIOR AND WHAT DOESN'T.

12   IT -- I MEAN, AS I SAY, IT'S ALL VERY HIGH -- HIGH LEVEL, AND

13   I HAVEN'T HAD ACCESS OR RECEIVED ANY OF THE BACKUP

14   DOCUMENTATION OR ANY OF THE COURT FILINGS, WHICH, IF I

15   CONTINUE, I WOULD TAKE A LOOK AT.

16   Q.  RIGHT.  YOU WILL BE -- YOU WILL ACTUALLY BE REVIEWING WHAT

17   THIS CASE IS ABOUT PRETTY MUCH FOR THE FIRST TIME AFTER --

18   AFTER THIS TESTIMONY IF YOU'RE PERMITTED TO CONTINUE; IS THAT

19   A FAIR STATEMENT?

20          MS. BERNAY:  OBJECTION.

21          THE WITNESS:  NO.

22          MS. BERNAY:  MISSTATES --

23      GO AHEAD.

24          THE COURT:  IT CAN'T MISSTATE TESTIMONY.  THE

25   QUESTION WAS NEVER ASKED.  SHE SAID NO.

BENNETT – CROSS / ISAACSON

1        GO AHEAD.

2            MR. ISAACSON:   OKAY.

3   Q.   THE –– AT THIS JUNCTURE, IT'S YOUR UNDERSTANDING WHAT THIS

4   CASE IS ABOUT IS THAT DUE TO DRM AND SOMETHING CALLED A KVC,

5   THAT THAT'S DENYING CONSUMERS ACCESS TO MUSIC, AND THAT'S WHAT

6   THIS CASE IS ABOUT; IS THAT A FAIR SUMMARY OF WHAT YOUR VIEW

7   IS?

8   A.   I –– IT'S ONE LEG OF WHAT THE CASE IS ABOUT.   I BELIEVE

9   THERE'S OTHER PIECES THAT HAVE TO DO WITH CORPORATE BEHAVIOR,

10  POLICY, SETTING POLICIES OF –– OF HOW THE CONSUMER IS TREATED

11  OR EXPECTATION OR DISCLOSURE OF WHEN SOMEONE BUYS SOMETHING,

12  WHAT –– WHAT WILL OR WILL NOT HAPPEN.

13  Q.   DO YOU UNDERSTAND THIS TO BE SOME SORT OF DISCLOSURE CASE?

14  A.   I BELIEVE THAT WHEN YOU BUY SOMETHING AND IT IS NOT USABLE

15  ON ANYTHING BUT AN IPOD, THAT SHOULD HAVE BEEN DISCLOSED.   I

16  BELIEVE THAT THERE ARE OTHER DIGITAL ENTERTAINMENT DEVICES

17  THAT SAY "THIS FORMAT WILL ONLY WORK ON OUR DEVICE."   I DON'T

18  BELIEVE THAT I EVER SAW ANYTHING FROM APPLE ABOUT THAT.

19  Q.   ALL RIGHT.   BUT DO YOU UNDERSTAND THIS TO BE SOME SORT

20  OF –– I UNDERSTAND YOUR BELIEF ABOUT THIS.   DO YOU UNDERSTAND

21  THIS TO BE SOME SORT OF DISCLOSURE CASE?

22  A.   NO.   I THINK IT'S PART OF DISCLOSURE.   I THINK IT'S PART

23  OF SIZE, OF APPLE HAVING THE LION'S SHARE OF THE DIGITAL MUSIC

24  DEVICE MARKETPLACE AND DICTATING HOW THAT MARKETPLACE WORKED,

25  SHUTTING OUT COMPETITION BY SMALLER FISH.

1    **Q.** THE –– SO YOU KNOW LAWYERS, I GUESS, FROM YOUR FAMILY.

2    ARE YOU AWARE OF THE EXISTENCE OF OR THE POSSIBILITY OF

3    INCENTIVE FEES FOR CLASS REPRESENTATIVES?  HAVE YOU EVER HEARD

4    OF THAT?

5    **A.** YES.

6    **Q.** OKAY.

7      AND WHAT'S YOUR UNDERSTANDING OF WHAT THOSE ARE?

8    **A.** I THINK THERE ARE SOME CLASS-ACTION LAWSUITS THAT THE LEAD

9    PLAINTIFFS RECEIVE MORE MONEY FOR HAVING HELPED THE CASE ALONG

10    THAN THE OTHER CLASS PARTICIPANTS OF WHOM THERE MAY BE

11    THOUSANDS OR TENS OF THOUSANDS JOINING A CLASS.

12    **Q.** ALL RIGHT.  AND DO YOU HAVE THE UNDERSTANDING THAT YOU

13    MIGHT BE ELIGIBLE FOR THAT FOR THE –– YOUR WORK GOING FORWARD?

14    **A.** NO.

15    **Q.** ALL RIGHT.  AND DO YOU HAVE AN UNDERSTANDING OF HOW CLASS

16    INCENTIVE FEES ARE –– ARE SET, HOW ––

17    **A.** NO.

18    **Q.** –– HOW THEY'RE DONE?

19      ALL RIGHT.  AND ARE YOU –– YOU SAID, I THINK, YOU'RE

20    PREPARED TO BE DEPOSED TODAY.  ARE YOU ALSO PREPARED TO BE

21    DEPOSED TOMORROW IF THAT WAS WHAT WAS CALLED FOR?

22    **A.** IF I HAD TO STAY OVERNIGHT, I WOULD.  I HAVE COMMITMENTS

23    BACK ON THE EAST COAST TOMORROW AND THURSDAY, BUT IF WE CAN'T

24    DO IT REMOTELY, THEN I MAY HAVE NO CHOICE.

25    **Q.** ALL RIGHT.

BENNETT — CROSS / ISAACSON

```
 1                      (PAUSE IN THE PROCEEDINGS.)

 2    BY MR. ISAACSON:

 3    Q.   YOUR TAX FOLDER WITH YOUR RECEIPTS, IS THAT -- SO FOR

 4    PURPOSES OF COLLECTING YOUR BUSINESS EXPENSES?

 5    A.   I STATED BEFORE I WORKED AS AN ACCOUNTANT FOR A WHILE.  I

 6    AM A COMPULSIVE RECORD KEEPER.  I PUT EVERYTHING IN FILES

 7    BECAUSE I HAVE ROOM TO STORE IT, AND YOU NEVER KNOW WHAT YOU

 8    MIGHT NEED.

 9    Q.   ALL RIGHT.  BUT IS THAT YOUR FILE THAT YOU KEEP FOR

10    CLAIMING THINGS LIKE BUSINESS EXPENSES?

11    A.   ONLY IN THE TAX YEAR FOR WHICH THE RECEIPTS ARE IN A

12    FOLDER.

13    Q.   SURE.

14         YOU KEEP THEM IN THE RELEVANT TAX YEAR?

15    A.   UM-HMM.

16    Q.   YOU HAVE TO SAY "YES" --

17    A.   YES.

18    Q.   -- OR "NO."

19         SO YOUR RECEIPT FOR THIS IPOD WHICH IS 2008 -- DO I HAVE

20    IT RIGHT?

21    A.   I THOUGHT IT WAS 2006.

22    Q.   SORRY.  2006.  SORRY.  WE'VE BEEN SEEING A LOT OF IPODS

23    AND A LOT OF DATES LATELY.

24         THE -- YOUR IPOD RECEIPT FOR 2006 IS IN A FOLDER FOR 2006

25    RECEIPTS WHICH YOU MAINTAIN IN PART SO YOU CAN CLAIM YOUR
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1   BUSINESS EXPENSES; IS THAT FAIR?

2   **A.**  I MAINTAIN THESE FOR A VARIETY OF REASONS.  IN CASE I EVER

3   GET AUDITED.  IN CASE I HAVE TO REPLACE A PARTICULAR PRODUCT

4   THAT HAS THE NAME OF THE COMPANY THAT SOLD IT TO ME.  IF I

5   NEED TO HAVE A PIECE OF FURNITURE REUPHOLSTERED, IN THAT FILE

6   IS THE RECEIPT FROM JORDAN'S FURNITURE.  I -- I KEEP -- FOR A

7   VARIETY OF REASONS, I KEEP EACH YEAR'S ACTIVITY IN A FOLDER.

8   **Q.**  DO YOU KNOW SITTING HERE TODAY WHETHER YOU CLAIMED THE

9   2006 IPOD EXPENSE AS A BUSINESS EXPENDITURE?

10  **A.**  I WOULDN'T HAVE.

11  **Q.**  OKAY.

12  **A.**  IT HAD NO BUSINESS PURPOSE FOR ME OTHER THAN PERSONAL USE.

13  **Q.**  ALL RIGHT.

14      AND YOUR -- ALTHOUGH YOU'RE KEEPING IT IN THAT FOLDER WITH

15  YOUR BUSINESS EXPENSES, YOU'RE QUITE SURE THAT YOU DID NOT

16  CLAIM IT AS A BUSINESS EXPENSE FOR SOMETHING LIKE AMBIT?

17  **A.**  THE FOLDER ISN'T BUSINESS.  THE FOLDER IS PERSONAL 1040

18  TAX RETURN.  IT MAY HAVE A SCHEDULE, A BUSINESS SCHEDULE, ON

19  IT FOR SOME BUSINESS IF I OWNED A PIECE OF PROPERTY, I OWNED A

20  CONDOMINIUM, I HAD DEDUCTIBLES.  IT'S NOT STRICTLY A BUSINESS

21  FOLDER.

22  **Q.**  ALL RIGHT.  AND JUST SO I CAN CLARIFY ONE OTHER THING,

23  NOW -- BEFORE YOU GOT THE MEMO FROM COUNSEL, DID YOU ASK TO

24  REVIEW DOCUMENTS IN THE CASE?

25  **A.**  NO, BUT I DID GO ONLINE TO SEE WHAT WAS BEING WRITTEN

1  ABOUT THE CASE.

2  **Q.** MEANING NEWS ARTICLES?

3  **A.** NEWS ARTICLES, ARS TECHNICA, I HAD MENTIONED BEFORE, YES.

4  **Q.** RIGHT. BUT IN TERMS OF TALKING TO COUNSEL, DID YOU ASK

5  THEM FOR ANY DOCUMENTS ABOUT THE CASE?

6  **A.** NO. WHAT I HAVE IS JUST THE SUMMARY BECAUSE THE TIME WAS

7  SO SHORT, I WAS GETTING MYSELF ON A PLANE AT 3:30 IN THE

8  MORNING.

9  **Q.** ALL RIGHT. SO ALL YOU HAVE -- YOUR WHOLE KNOWLEDGE OF --

10  WELL, I THINK I'LL STOP THERE.

11         THE COURT: A FOLLOW-UP QUESTION.

12         MR. ISAACSON: ACTUALLY, MAY I -- GIVEN THE

13  SITUATION, MAY I ASK THE TABLE WHETHER I'VE MISSED SOMETHING?

14         THE COURT: SURE.

15              (PAUSE IN THE PROCEEDINGS.)

16  **BY MR. ISAACSON:**

17  **Q.** LET ME DOUBLE-CHECK JUST TO BE SURE. YOU GREW UP WITH

18  LAWYERS. DID YOU GROW UP WITH LAWYERS WHO HAD CONNECTIONS

19  WITH ANY OF THE LAWYERS WHO ARE WORKING ON THIS CASE?

20  **A.** NO.

21         MR. ISAACSON: OKAY. THANK YOU.

22         THE COURT: BACK IN NOVEMBER OF 2006, DID YOU HAVE

23  ANY CORPORATE CREDIT CARDS IN YOUR NAME?

24         THE WITNESS: NO. I'VE NEVER HAD A BUSINESS CREDIT

25  CARD THAT WAS NOT FROM A COMPANY WITH WHICH I WAS EMPLOYED.

1        **THE COURT:**  AND IS THERE ANY CHANCE THIS CREDIT CARD

2   WAS IN YOUR HUSBAND'S NAME?

3        **THE WITNESS:**  NO.

4        **THE COURT:**  WAS HE ALIVE BACK THEN?

5        **THE WITNESS:**  NO.

6        **THE COURT:**  OKAY.

7      GO AHEAD.

8        **MS. BERNAY:**  THANK YOU, YOUR HONOR.

9                        **REDIRECT EXAMINATION**

10  BY MS. BERNAY:

11  **Q.**  MS. BENNETT, DO YOU RECALL THAT YOU SIGNED WHAT I BELIEVE

12  I REFERRED TO AS A RETENTION AGREEMENT, AND YOU PDF'D IT, AND

13  WE HAD SOME TROUBLE WITH OUR EMAIL BACK AND FORTH?

14  **A.**  YES.

15  **Q.**  AND WHAT WAS THAT DOCUMENT?

16  **A.**  I HAVE IT IN A COPY, BUT IT WAS BASICALLY THAT I WOULD BE

17  WILLING TO STEP FORWARD AND REPRESENT THE CLASS, THAT I WAS

18  WILLING TO STATE MY EXPERIENCE WITH THIS PARTICULAR PRODUCT.

19  **Q.**  OKAY.  AND IT HAD A NUMBER OF PARAGRAPHS; IS THAT RIGHT?

20  **A.**  RIGHT.

21  **Q.**  AND SAID "ATTORNEY-CLIENT PRIVILEGED" UP AT THE TOP?

22  **A.**  RIGHT.

23        **MS. BERNAY:**  OKAY.  I HAVE NOTHING FURTHER.

24      THANK YOU, YOUR HONOR.

25      THANK YOU.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
 1              THE COURT:  MR. ISAACSON?

 2              MR. ISAACSON:  UNDER THE CIRCUMSTANCES, WE WOULD

 3    REQUEST PRODUCTION OF THE LETTER.  WE THINK THE COURT COULD

 4    REVIEW IT TO SEE IF THERE'S ANYTHING THE COURT REALLY THINKS

 5    IS PRIVILEGED, BUT GIVEN THE LAST-MINUTE NATURE OF THIS

 6    RETENTION, WE THINK IT'S APPROPRIATE THAT IT BE PRODUCED.

 7              MR. COUGHLIN:  WE'LL PRODUCE THE LETTER, YOUR HONOR.

 8              MR. ISAACSON:  CAN WE HAVE IT -- DO YOU HAVE IT NOW?

 9              MR. COUGHLIN:  WELL, SHE'S GOT IT.

10              MR. ISAACSON:  MAY WE -- MAY I REVIEW IT WHILE SHE'S

11    HERE?

12              THE COURT:  YOU MAY.

13              MS. BERNAY:  AND I GUESS WHILE WE'RE ON IT, WE

14    UNDERSTAND THAT APPLE HAS, YOU KNOW, A NUMBER OF DOCUMENTS --

15              THE WITNESS:  IT WOULD BE WITH MY LAPTOP.

16       EXCUSE ME.  MY LAPTOP HAS SOME FOLDERS, AND THAT'S WHERE

17    THE LETTER IS.

18              MS. BERNAY:  SURE.

19       WE UNDERSTAND THAT APPLE HAS CERTAIN DOCUMENTS REGARDING

20    ITS CUSTOMERS CALLED "360 VIEWS," AND WE DID ASK EARLIER IF

21    THEY WOULD PRODUCE THE DOCUMENTS RELATED TO THESE PEOPLE TO US

22    AS WELL.  WE HAVEN'T RECEIVED THEM YET, BUT MAYBE MR. ISAACSON

23    IS WILLING TO PROVIDE THOSE.

24              THE COURT:  DO YOU HAVE THEM YET?

25              MR. ISAACSON:  I THINK WE HAVE ONE FOR THIS --
```

```
 1                    (PAUSE IN THE PROCEEDINGS.)

 2          MR. COUGHLIN:  MR. ISAACSON, MR. O'NEIL IS BACK IN

 3   THE COURTROOM AGAIN TODAY.  WE TALKED --

 4                    (OFF-THE-RECORD DISCUSSION.)

 5          THE COURT:  WE'RE NOT GOING TO HAVE THIS ON THE

 6   RECORD BECAUSE YOU'RE NOT TALKING INTO MICS.  SO IF YOU WANT

 7   IT ON THE RECORD --

 8          MS. BERNAY:  THANK YOU.

 9          MR. ISAACSON:  COUNSEL HAS SAID THAT MR. O'NEIL

10   SHOULD NOT BE IN THE COURTROOM BECAUSE HE'S LISTED AS A TRIAL

11   WITNESS.  HE WAS LISTED AS A TRIAL WITNESS TO AUTHENTICATE THE

12   RECEIPTS OF THE PLAINTIFFS WHO ARE NO LONGER WITH US, AND WE

13   REQUIRE HIS ASSISTANCE FOR THIS PROCEEDING.

14          THE COURT:  HE CAN BE IN THE COURTROOM.

15                    (OFF-THE-RECORD DISCUSSION.)

16                    (PAUSE IN THE PROCEEDINGS.)

17          THE COURT:  ANY QUESTIONS?

18          MR. ISAACSON:  YES.

19          THE COURT:  ALL RIGHT.  LET ME HAVE A MOMENT.

20      THE COURTROOM DEPUTY WILL TAKE THAT AND GO MAKE THE COURT

21   A COPY, PLEASE.

22      MR. ISAACSON, IF YOU'LL HAND THAT TO MY COURTROOM DEPUTY.

23          MR. ISAACSON:  THE --

24          THE COURT:  SHE'LL GO MAKE ME A COPY, AND THEN WE'LL

25   GET STARTED.
```

1    (OFF-THE-RECORD DISCUSSION.)

2    (PAUSE IN THE PROCEEDINGS.)

3    **THE COURT:**  PERHAPS THE COPIER BROKE.

4    **MR. ISAACSON:**  I COULD ASK ONE QUESTION WHILE WE'RE

5    HERE.

6    **THE COURT:**  GO AHEAD.

7    HERE IT COMES.

8    <u>**RECROSS-EXAMINATION**</u>

9    **BY MR. ISAACSON:**

10   **Q.**  DO YOU ALSO GO BY THE NAME OF BARBARA -- OR AT SOME POINT

11   GO BY THE NAME BARBARA BENETSKY?

12   **A.**  MY HUSBAND WAS HUNGARIAN.  HIS NAME WAS BENETSKY.

13   BENETSKY, TO BE PROPERLY PRONOUNCED.  NO ONE COULD SPELL IT.

14   HE WAS A PROFESSIONAL MUSICIAN, CONDUCTOR, AND HE USED AS AN

15   AKA, AND LEGALLY, BENNETT.  SO --

16   **Q.**  DO YOU --

17   **A.**  YES, I COULD USE BENETSKY.

18   **Q.**  WOULD YOU SPELL IT, PLEASE.

19   **A.**  B-E-N-E-T-S-K-Y.

20   **Q.**  ALL RIGHT.  AND CAN YOU PRODUCE THE SERIAL NUMBER OF YOUR

21   IPOD FOR INSPECTION SO WE CAN JUST TAKE THAT DOWN.

22   **A.**  XAN HAS MY IPOD HERE.

23   **MR. ISAACSON:**  ALL RIGHT.

24   **THE COURT:**  YOU HAVE THE IPOD?  OKAY.

25   **MR. COUGHLIN:**  MR. ISAACSON, COULD YOU GIVE HER A

```
 1   COPY OF THAT IF YOU'RE GOING TO ASK QUESTIONS ABOUT IT.

 2              MR. ISAACSON:  I WAS -- DO WE HAVE MORE COPIES?

 3              THE COURT:  IS THAT -- IS THAT THE ONLY COPY?

 4              MR. ISAACSON:  IT'S THE ONLY COPY I WAS HANDED.

 5              THE WITNESS:  I'D LIKE TO HAVE MY COPY FOR MY FILE

 6   SO --

 7              MR. ISAACSON:  YES.

 8              THE COURT:  DO YOU HAVE THE --

 9              THE CLERK:  SORRY, THE MACHINE WENT HAYWIRE AND I'VE

10   GOT JUST THE ONE THERE.

11              THE COURT:  ALL RIGHT.  HERE, USE THIS ONE.

12              THE CLERK:  I HAVEN'T GOT PAGE 3.

13              THE COURT:  FRANCES, WHAT -- WHAT'S THE ISSUE?  JUST

14   GIVE HER THAT COPY.  IT'S 1, 2, AND 3.

15              THE CLERK:  I DON'T HAVE 3.

16              MR. ISAACSON:  IF IT'S ALLOWED, I COULD STAND NEXT TO

17   HER.

18              THE COURT:  ANY OBJECTION?

19              MS. BERNAY:  NO, YOUR HONOR, UNLESS THE WITNESS HAS

20   AN OBJECTION.

21              THE COURT:  HE WON'T BITE.  I PROMISE.

22              THE WITNESS:  I MIGHT.

23   BY MR. ISAACSON:

24   Q.  HERE'S THE LETTER, MS. BENNETT.  THIS WOULD BE EXHIBIT 3.

25   IS THIS THE -- THE RETAINER LETTER THAT YOU SIGNED AND YOU
```

1    TOLD US --

2    **A.**  YES.

3    **Q.**  -- IN REFERENCE TO COUNSEL.

4        AND JUST IN PARAGRAPH 9, YOU WERE ADVISED IN WRITING --

5    WELL, THAT IF A RECOVERY IS OBTAINED FOR THE CLASS IN ANY

6    CLASS ACTION, YOU MAY BE ELIGIBLE FOR A MODEST PAYMENT TO

7    COMPENSATE YOU FOR YOUR EFFORTS AND EXPENSES, IF ANY INCURRED,

8    IN ACTING AS A CLASS REPRESENTATIVE.

9        AND THEN THE PARAGRAPH GOES ON TO DISCUSS THAT FURTHER,

10   RIGHT?

11   **A.**  YES.  AND I ASSUME THAT MEANS THEY'LL PAY FOR MY PARKING

12   WHEN I GET BACK TO BOSTON AND I HAVE TO GET MY CAR OUT OF

13   LONG-TERM PARKING.

14   **Q.**  WELL, YOU UNDERSTOOD THAT THIS WAS A REFERENCE TO THESE

15   INCENTIVE PAYMENTS THAT YOU KNOW ABOUT?

16   **A.**  IT SAYS "EXPENSES."  I READ IT AS EXPENSES WHICH WOULD BE

17   OUT-OF-POCKET EXPENSES LIKE PARKING FEES.

18   **Q.**  THIS IS -- IT SAYS, "THIS IS COMMONLY KNOWN AS AN

19   INCENTIVE AWARD," RIGHT?

20   **A.**  THIS IS ALL NEW TO ME.  I READ THE WORD "EXPENSES" AND I

21   ASSUMED I'M BEING REIMBURSED FOR OUT-OF-POCKET EXPENSES.

22            **MR. ISAACSON:**  THIS IS EXHIBIT 3 THAT I NEED TO

23   PROVIDE SO I HAVE NO FURTHER QUESTIONS.

24            **THE COURT:**  ALL RIGHT.  ANYTHING ELSE?

25            **MS. BERNAY:**  I JUST -- PARDON ME.

1    THE DOCUMENTS THAT APPLE PRODUCED TO US, JUST TO HAVE A

2    COMPLETE RECORD, I'D LIKE TO ALSO MARK THOSE AS A 4, 5, AND 6.

3         **THE COURT:**  ALL RIGHT.

4         **MS. BERNAY:**  THERE'S NO OBJECTION TO THAT, I'M SURE.

5         **MR. ISAACSON:**  NO OBJECTION.

6     **(PLAINTIFFS' EXHIBITS 4, 5, 6 MARKED FOR IDENTIFICATION)**

7         **MR. COUGHLIN:**  YOUR HONOR, I HAVE A --

8         **THE COURT:**  WE CAN MAKE COPIES IF --

9         **MS. BERNAY:**  I HAVE THREE COPIES.

10        **THE COURT:**  -- YOU DON'T HAVE THEM, BUT LET'S HOLD

11   OFF SO.  JUST IDENTIFY THEM FOR ME, PLEASE.

12        **MS. BERNAY:**  YES.

13    EXHIBIT 4 WILL BE INTERNAL REPRINT COPY DATED

14   NOVEMBER 5TH, 2006.

15    EXHIBIT 5 WILL BE A DOCUMENT THAT SAYS "360-DEGREE VIEW"

16   ON THE TOP.  THEN RELATIONSHIP VIEWER, IT HAS THE NAME BARBARA

17   RAGAN.

18    AND THEN THE THIRD ONE WHICH WILL BE EXHIBIT 6 -- I MAY

19   HAVE LOST TRACK THERE, SORRY -- HAS THE FIRST WORD IS

20   "INSTALLED PRODUCT."

21        **THE COURT:**  OKAY.  ANY FURTHER QUESTIONS?

22        **MS. BERNAY:**  NO, YOUR HONOR.

23        **THE COURT:**  ANY FURTHER QUESTIONS, MR. ISAACSON?

24        **MR. ISAACSON:**  NO.  NOT FOR THIS PROCEEDING.

25   OBVIOUSLY WE RESERVE QUESTIONS FOR THE DEPOSITION.

1          **THE COURT:**  ALL RIGHT.  YOU MAY STEP DOWN.

2      MR. COUGHLIN.

3      THANK YOU.

4          **MR. COUGHLIN:**  YES, YOUR HONOR.  I HAVE A SUGGESTION.

5      MR. ISAACSON SAID HE'D RATHER NOT DO THAT, BUT I THINK WE

6  SHOULD JUST MOVE TO THE DEPOSITIONS OF THE OTHER PEOPLE.  I

7  THINK SHE'S AN ADEQUATE CLASS REP.  I THINK SHE'S SHOWN THAT

8  HE IS, UP HERE.  I THINK WE COULD MOVE FOR HER RIGHT NOW.

9      THEY WANT TO TAKE HER DEPOSITION.  I UNDERSTAND THAT.  BUT

10  I THINK THE OTHERS, IF THEY'RE GOING TO BE THIS EXTENSIVE,

11  THEY SHOULD JUST DO IT AT A DEPOSITION.  AND THAT'S -- THAT'S

12  WHAT -- I WOULD PROPOSE.

13      I MEAN, WE HAVE SOMEBODY -- WE HAVE TWO PEOPLE THAT WOULD

14  BE ON VIDEO IN THIS CASE.  THEY WERE THE TWO LATER PEOPLE.  WE

15  HAVE ANOTHER TWO PEOPLE THAT ARE DOWN THE HALL.  I DON'T SEE

16  MUCH REASON TO PUT THEM THROUGH THIS IN FRONT OF THE COURT.

17  I'D LIKE TO GO GET READY FOR THE REST OF THE TRIAL.  I HAVE

18  WITNESSES TOMORROW.

19      AND -- AND THAT'S WHAT -- THAT'S WHAT I WOULD PROPOSE,

20  THAT WE GO RIGHT TO THE DEPOSITIONS.

21          **MR. ISAACSON:**  WE -- WITH RESPECT TO -- YOU KNOW, I'M

22  NEVER SURE WHO WE'RE TALKING ABOUT -- THE REMAINING TWO PEOPLE

23  WHO WOULD -- WHO WERE DISCLOSED LAST NIGHT, WE WOULD HAVE

24  ISSUES WITH RESPECT TO WHETHER THEY ARE THE PURCHASERS WHICH

25  WOULD REQUIRE QUESTIONS TO BE ASKED, NOT -- WHICH WOULD GO TO

```
1    THE WHOLE ISSUE OF WHETHER THEY ARE THE IPOD PURCHASERS.
2         WITH RESPECT TO THE TWO PEOPLE THAT WERE DISCLOSED THIS
3    MORNING, WITH AT LEAST ONE OF THEM, WE ARE -- WE HAVE
4    QUESTIONS AS TO WHETHER THEY ARE THE PURCHASER.  AND WITH
5    RESPECT TO THE OTHER ONE, IT APPEARS TO BE A CLASS-ACTION
6    LAWYER WHO'S WORKED WITH MR. COUGHLIN'S LAWYER IN THE PAST --
7    PAST FIRM.  AND SO WE HAVE QUESTIONS AS TO WHAT HE'S DOING
8    HERE SEEKING TO BE A CLASS REPRESENTATIVE.
9         SO WE THINK THAT THERE ARE -- IF -- THERE ARE ISSUES THIS
10   COURT WOULD WANT TO KNOW ABOUT UNLESS THE COURT WANTS TO SAY
11   ONE-AND-DONE, THIS PERSON IS IT, AND WE'RE DONE.
12        BUT IF THESE OTHER PEOPLE ARE GOING TO BE OFF -- OFFERED
13   AS PLAINTIFFS, NOT JUST CLASS REPRESENTATIVES, I THINK THE
14   COURT NEEDS TO KNOW NOW, GIVEN THE WAY THESE PROCEEDINGS HAVE
15   HAPPENED, WHETHER THEY ARE ACTUALLY THE ACTUAL PURCHASERS.
16        MR. COUGHLIN:  WELL, THEY CAN CERTAINLY EXPLORE THAT
17   IN THE DEPOSITION.  AND THEY'RE GOING TO BRING THAT -- THOSE
18   ISSUES UP TO YOUR HONOR.
19        MR. ISAACSON:  THE --
20        MR. COUGHLIN:  THEY'RE GOING TO GO INTO GREAT DETAIL,
21   I ASSUME, FOR TWO OR THREE HOURS IN THESE DEPOSITIONS, WHICH
22   IS FINE.  I THINK WE ARE -- I THINK WE HAVE A SUFFICIENT REP,
23   AND WE COULD BE ONE-AND-DONE.  AND SO FRANKLY, I WOULD MOVE
24   RIGHT NOW FOR HER AND BE ONE-AND-DONE.
25        MR. ISAACSON:  ONE-AND-DONE MEANS THE OTHER FOUR GET
```

 1    STRICKEN.

 2          **MR. COUGHLIN:** WELL, WE DON'T PUT THEM UP.  THEY

 3    DON'T GET STRICKEN.

 4          **MR. ISAACSON:** THAT'S NOT WHAT I MEAN BY

 5    "ONE-AND-DONE."

 6          **THE COURT:** SO, GENTLEMEN, IS THERE A MOTION?

 7          **MR. COUGHLIN:** WELL, I'M MOVING THAT WE, YOU KNOW --

 8    WE PROFFERED ENOUGH HERE TODAY AT THIS EVIDENTIARY HEARING

 9    THAT WE HAVE A CLASS REPRESENTATIVE THAT WOULD SATISFY THE

10    REQUIREMENTS HERE.  SHE'S VERY KNOWLEDGEABLE ABOUT THE ISSUES.

11    THAT'S OBVIOUS.  AND SO WE HAVE A SUFFICIENT REPRESENTATIVE.

12       AND SO I -- I WOULD SAY THAT IF ANYTHING ELSE IS GOING TO

13    BE DONE, IT SHOULD BE DONE THROUGH A DEPOSITION.  AND IF NOT,

14    THEN WE'RE ONE-AND-DONE AND WE'RE WITH HER.

15          **THE COURT:** YOU'RE GOING TO HAVE TO CHOOSE WHO YOU

16    PROFFER.  I THINK THAT THERE'S ENOUGH HERE IN THE RECORD WITH

17    RESPECT TO MS. BENNETT.  I'M PREPARED TO LET YOU GO OFF AND DO

18    YOUR DEPOSITIONS.

19       THE TWO THAT WERE PROFFERED THIS MORNING ARE STRICKEN.

20    THAT LIMITS IT TO THE THREE.  BUT WE'RE ON THE RIGHT TRACK.

21          **MR. COUGHLIN:** YOUR HONOR --

22          **THE COURT:** AS I UNDERSTAND IT, NO ONE'S -- NEITHER

23    SIDE -- AND I -- ESPECIALLY APPLE.  NO ONE IS ASKING ME TO

24    MAKE A DETERMINATION RIGHT NOW.  ORIGINALLY WHEN WE TALKED

25    ABOUT THIS, I THOUGHT THE DEPOSITION AS -- I THOUGHT

1    MR. ISAACSON, YOU SAID ON THE RECORD YOU WANTED THE DEPOSITION

2    WITH RESPECT TO THE TRIAL TESTIMONY.

3        AND THAT'S WHY I RECOMMENDED NOT ISSUING SOME KIND OF

4    ORDER WITH RESPECT TO A PERSON, WITH RESPECT TO A PURCHASE,

5    AND NOT HAVING TRIAL TESTIMONY, TO ALLEVIATE THAT ADDITIONAL

6    TIME AND EFFORT.

7        YOU NOW HAVE INDICATED TODAY JUST A FEW MINUTES AGO THAT

8    YOU WANT THAT DEPOSITION TESTIMONY SO THAT YOU CAN, IT SOUNDS

9    TO ME, BRIEF THE ISSUE OF ADEQUACY, WHICH IS DIFFERENT THAN

10   WHAT YOU SAID YESTERDAY.  AND I'M PREPARED TO ALLOW YOU TO DO

11   THAT IN LIGHT OF THE CIRCUMSTANCES.

12           **MR. ISAACSON:**  RIGHT.

13           **THE COURT:**  BUT AT LEAST I THINK YOU'VE GOT AT LEAST

14   A PRIMA FACIE SHOWING THAT I'VE GOT SOMEONE HERE WHO'S MADE A

15   PURCHASE DURING THE RELEVANT TIME PERIOD WITH HER OWN FUNDS,

16   HAS SOME EXPERIENCE, AT LEAST FROM WHAT I CAN TELL, IS

17   INTELLIGENT AND CONCERNED AND NOT -- AND DOESN'T HAVE ANY

18   RELATIONSHIP TO THE LAWYERS AND REACHED OUT ON HER OWN ACCORD.

19       SO IN LIGHT OF THAT, I'M HAPPY TO HAVE YOU GO AND

20   INVESTIGATE FURTHER, BUT I'M PREPARED TO ALLOW YOU FOLKS TO GO

21   AND DO THAT AND WORK ON OTHER ISSUES.

22           **MR. ISAACSON:**  RIGHT.  SO I AGREE WITH THAT

23   DESCRIPTION OF WHAT'S GOING ON HERE THAT THE COURT IS

24   BASICALLY LOOKING AT WHETHER THIS PROPOSED PLAINTIFF HAS MADE

25   A PRIMA FACIE SHOWING.

1    AND I AGREE THAT OUR DEPOSITIONS WILL NOW BE SHORTER

2    BECAUSE THESE WITNESSES WON'T -- THESE -- THESE PLAINTIFFS

3    WON'T BE WITNESSES, AND THAT THE INTERMEDIATE ISSUE IS WHETHER

4    THEY'RE ADEQUATE CLASS REPRESENTATIVES.  AND I CAN'T PRETEND

5    THAT OVERNIGHT WE COULD HAVE PREPARED EVERYTHING TO LOOK AT

6    THAT ISSUE AND THAT'S WHY THE COURT'S PERMITTING THE

7    DEPOSITION.

8        HOWEVER, IF THERE'S GOING TO BE ADDITIONAL PROPOSED

9    PLAINTIFFS OF THESE OTHER TWO, I THINK THEY SHOULD MAKE THE

10   PRIMA FACIE SHOWING NOW IN FRONT OF YOUR HONOR BEFORE WE HAVE

11   TO GO TAKE DEPOSITIONS ABOUT WHETHER THEY'RE ADEQUATE CLASS

12   REPRESENTATIVES.

13        **THE COURT:**  WELL --

14        **MR. COUGHLIN:**  YOUR HONOR, I'LL SHORTCUT THAT.  WE'LL

15   JUST PUT UP THE ONE, WE WON'T PUT UP THE OTHER -- THE OTHER

16   TWO.

17        **THE COURT:**  YOU'RE WITHDRAWING THE OTHER TWO?

18        **MR. COUGHLIN:**  WITHDRAWING THE OTHER TWO.  AND WE'LL

19   GO WITH THE ONE AND -- AND DO THE ONE DEPOSITION.  I THINK

20   IT'S IN THE BEST INTERESTS OF THE CLASS TO JUST MOVE FORWARD

21   HERE.  I WOULD MOVE FOR HER RIGHT NOW AS AN ADEQUATE

22   REPRESENTATIVE AFTER WHAT YOUR HONOR HAS SEEN IN THE EXHIBITS

23   SUBMITTED, AND SHE BOUGHT AN AFFECTED -- PERSONALLY BOUGHT AN

24   AFFECTED IPOD.  AND SO I'D MAKE THAT MOTION EVEN THOUGH

25   THEY'RE GOING TO GO AND DO THE DEPOSITION AND EXPLORE FURTHER.

1   AND THEY CAN OF COURSE MAKE A MOTION TO DECERTIFY AT ANY TIME,

2   BUT THAT'S WHAT WE WOULD DO.

3        **THE COURT:**  WELL, I'M NOT GOING TO RULE ON THAT

4   MOTION RIGHT NOW.  I'M GOING TO GIVE APPLE AN OPPORTUNITY TO

5   EXPLORE THAT FURTHER IF THEY --

6        **MR. COUGHLIN:**  OKAY.

7        **THE COURT:**  IN LIGHT OF THE VARIOUS CONSIDERATIONS.

8   OKAY.  SO WHAT DO WE HAVE LEFT FOR RIGHT NOW?  I THINK

9   WE'RE GOING TO STAND IN RECESS UNTIL 4:00 O'CLOCK.  WE'VE GOT

10   THE ARGUMENT ON THE INTERVENOR'S MOTION.

11        **MR. ISAACSON:**  JURY INSTRUCTIONS, YOUR HONOR.

12        **THE COURT:**  OH, YEAH.  THAT LITTLE THING.

13   OKAY.  JURY INSTRUCTIONS.

14        **MR. ISAACSON:**  THOUGH -- I WOULDN'T MIND A TEN-MINUTE

15   BREAK IF I'M PERMITTED TO ASK THAT.

16        **THE COURT:**  YOU GOT 45 MINUTES JUST AN HOUR AGO.

17        **MR. ISAACSON:**  YES, WE DID, BUT --

18        **THE COURT:**  ALL RIGHT.  TEN MINUTES.

19        **MR. COUGHLIN:**  AND, YOUR HONOR, COULD WE -- SHE HAS

20   TO GET BACK EAST.  CAN WE DO THAT DEPOSITION RIGHT NOW?

21        **THE COURT:**  WELL, YOU HAVE BIG TEAMS.  THERE'S

22   SOMEONE ELSE WHO'S GOING TO BE DOING IT, I SUSPECT.

23        **MR. ISAACSON:**  THAT IS CORRECT.  AND I'M GOING TO GO

24   TALK TO HIM RIGHT THIS MOMENT.

25        **THE COURT:**  ALL RIGHT.

1      WE'LL STAND IN RECESS TILL 12:30.

2                 (RECESS TAKEN AT 12:30 P.M.)

3

4           (CONTINUED NEXT PAGE; NOTHING OMITTED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1463

```
1          (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

2          THE CLERK:  REMAIN SEATED.  COURT IS IN SESSION.

3     COME TO ORDER.

4          THE COURT:  ALL RIGHT.  LET'S GET GOING.  WE ARE BACK

5     ON THE RECORD.

6          JUST A -- MR. ISAACSON, I MENTIONED TO MS. DUNN, I

7     ACTUALLY NEED 2715 AND 2720.  I WOULD LIKE TO LOOK AT THEM.

8     AND, TWO, I NEED WHATEVER PROFFERED EXHIBIT YOU'RE SUGGESTING

9     WITH THE PARAGRAPH 66.  AND TO THE EXTENT THAT YOU HAVE A CASE

10    CITE THAT SHOWS THAT THAT WOULD BE ADMISSIBLE, THAT WOULD BE

11    HELPFUL.

12          MR. ISAACSON:  OKAY.

13          THE COURT:  I DON'T NEED IT RIGHT THIS SECOND.

14          MR. ISAACSON:  IN TERMS OF THE BASIS FOR ITS

15    ADMISSIBILITY IS A PARTY ADMISSION.  ALL I CAN SAY IS, I HAVE

16    SEEN IT -- I'VE BEEN IN COURTS BEFORE WHERE THAT HAPPENED.

17          THE COURT:  IF EVEN IF --

18          MR. ISAACSON:  I WILL SEE IF THERE'S A CASE.

19          THE COURT:  I GUESS -- YOU OFFERED IT WITH A PERSON

20    WHO'S NO LONGER A PARTY OR -- NO, I GUESS -- ANYHOW.

21          MR. ISAACSON:  IT'S A COMPLAINT.  IT'S GOT TO BE

22    SOMEBODY'S PARTY ADMISSION.

23          THE COURT:  I WANT TO MAKE SURE I HAVE THE RIGHT

24    COMPLAINT BECAUSE THERE HAVE BEEN MULTIPLE IN THIS CASE.

25    THAT'S WHY I WOULD LIKE YOU TO JUST GIVE ME THE EXHIBIT.
```

1464

1          **MR. ISAACSON:**  RIGHT.  WE WILL DO THAT.  I DON'T

2     THINK WE HAVE GIVEN YOU THE REDACTED EXHIBIT, SO WE WILL SEND

3     THAT OVER TO YOU.

4          ONE OTHER SCHEDULING ISSUE.  WITH NO MORE TESTIMONY FROM

5     THE PLAINTIFFS, I –– THE RULE 50 BRIEF, A DEADLINE FOR HAVING

6     THAT TO YOU.

7          YOU TALKED ABOUT TOMORROW WE WOULD BE MAKING OUR MOTION.

8     WE CAN MAKE THE ORAL MOTION NOW, BUT THE ––

9          **THE COURT:**  WHAT I –– I STILL NEED SOME AGREEMENT ––

10     IF WE ARE NOT GOING TO HAVE TESTIMONY, I WOULD LIKE TO HAVE

11     SOME AGREEMENT BETWEEN THE PARTIES AS TO THIS LAST PIECE WITH

12     RESPECT TO THIS PARTICULAR PLAINTIFF, TO THE EXTENT ANYTHING

13     IS NEEDED.

14          SO, THERE WAS –– MR. COUGHLIN SAID HE HAS HAD STIPULATIONS

15     BEFORE, SO I WOULD LIKE THE TWO OF YOU TO TALK ABOUT IT.

16     PLAINTIFFS HAVEN'T TECHNICALLY RESTED YET.  IF IT'S AN ORAL

17     MOTION, THAT'S FINE.  YOU NEED TO HAVE IT IN SOME WAY, SHAPE,

18     OR FORM TO PRESERVE IT.  SO IF YOU WANT TO DO IT ORALLY,

19     THAT'S FINE.

20          **MR. ISAACSON:**  IF WE HAVE IT TO YOU BEFORE EIGHT

21     A.M., DOES THAT FIT YOUR SCHEDULE?

22          **THE COURT:**  IT DOES BECAUSE THE PLAINTIFFS HAVEN'T

23     EVEN RESTED YET.

24          **MS. SWEENEY:**  THAT'S RIGHT, YOUR HONOR.

25          **MR. ISAACSON:**  ALL RIGHT.

1465

```
1         THE COURT:  OKAY.

2         MR. ISAACSON:  I THINK WE WILL ENDEAVOR TO DO THAT

3    AND MAYBE SEE IF WE CAN DO BETTER THAN 7:58.

4         THE COURT:  THAT'S FINE.  IF YOU DO IT AT 7:58 OR

5    8:00, I WILL NOT HAVE READ IT.

6         MS. DUNN:  AND THE OTHER TWO EXHIBITS YOU ASKED FOR

7    ARE ON THEIR WAY.

8         THE COURT:  ALL RIGHT.  LET'S GET GOING.

9      OKAY.  SO THE JURY, AS I THINK I'VE MENTIONED BEFORE, WILL

10   GET COPIES OF INSTRUCTIONS.  THEY WON'T HAVE AN INDEX.  I PUT

11   THE INDEX IN THERE MERELY FOR YOUR OWN EASE OF REFERENCE.

12     I BELIEVE THAT THE BEGINNING ONES -- WELL, LET ME ASK

13   THIS:  WE CAN GO -- LET'S GO PAGE BY PAGE.

14     THE DUTY OF THE JURY.  THERE'S NO OBJECTIONS ON THIS ONE,

15   RIGHT?

16        MS. SWEENEY:  NO.

17        MS. DUNN:  NO OBJECTION.

18        THE COURT:  OKAY.  WHAT IS EVIDENCE.  ANY OBJECTIONS?

19        MS. SWEENEY:  NO, YOUR HONOR.

20        MS. DUNN:  NO OBJECTION.

21        THE COURT:  WHAT IS NOT EVIDENCE.  ANY OBJECTION?

22        MS. SWEENEY:  NO, YOUR HONOR.

23        MS. DUNN:  NO.

24        THE COURT:  EVIDENCE FOR A LIMITED PURPOSE.  I

25   THOUGHT THAT IT WAS APPROPRIATE TO PUT THIS IN HERE GIVEN HOW
```

1466

```
1    MANY EXHIBITS WERE ADMITTED WITH THESE ARTICLES AND GIVEN THAT

2    MANY OF THEM WERE ADMITTED WHEN THE JURY WASN'T IN THE

3    COURTROOM.

4        ANY OBJECTION?

5            MS. DUNN:  NO OBJECTION.  INQUIRY WHETHER YOUR HONOR

6    INTENDS TO GIVE, AGAIN, YOUR LIMITING INSTRUCTION WITH REGARD

7    TO THE ARTICLES.

8            THE COURT:  ISN'T THAT WHAT THIS DOES?

9            MS. DUNN:  APOLOGIES.

10           THE COURT:  DO YOU SEE IT?

11           MS. DUNN:  YES.  THANK YOU.

12           THE COURT:  DIRECT AND CIRCUMSTANTIAL EVIDENCE.

13           MS. SWEENEY:  NO OBJECTION.

14           MS. DUNN:  NO OBJECTION.

15           THE COURT:  CREDIBILITY OF WITNESSES?

16           MS. DUNN:  NO OBJECTION.

17           MS. SWEENEY:  NO OBJECTION.

18           THE COURT:  JUST TO MAKE IT EASIER ON MY COURT

19    REPORTER, I WILL HEAR FROM MS. SWEENEY AND THEN FROM YOU,

20    MS. DUNN.

21        EXPERT WITNESS TESTIMONY.

22           MS. SWEENEY:  NO OBJECTION, YOUR HONOR.

23           MS. DUNN:  NO OBJECTION.

24           THE COURT:  ASSUMED FACTS, THE HYPOTHETICAL

25    QUESTIONS?
```

1467

```
 1          MS. SWEENEY:  NO OBJECTION.

 2          MS. DUNN:  NO OBJECTION.

 3          THE COURT:  CONFLICTING EXPERT TESTIMONY?

 4          MS. SWEENEY:  NO OBJECTION.

 5          MS. DUNN:  NO OBJECTION.

 6          THE COURT:  I INCLUDED ONE ON REDACTED DOCUMENTS.  I

 7    THINK SOME OF THE DOCUMENTS THAT WILL BE GOING IN WILL BE

 8    REDACTED.

 9       ANY OBJECTION?

10          MS. SWEENEY:  NO, YOUR HONOR.

11          MS. DUNN:  NO.

12          THE COURT:  NOTES AND QUESTIONS.  ANY OBJECTION?

13          MS. SWEENEY:  NO.

14          MS. DUNN:  NO.

15          THE COURT:  OKAY.  NOW, WE GET TO THE MEAT.

16       WERE THERE ANY OTHER INTRODUCTORY INSTRUCTIONS THAT YOU

17    WANTED?

18       SO, FOR INSTANCE, BEFORE WE MOVE TO THE ANTITRUST ONES,

19    I'M TRYING TO REMEMBER WHETHER THERE WAS SOMETHING ON CHARTS

20    AND SUMMARIES.  WERE THERE ANY EXHIBITS THAT HAVE BEEN

21    ADMITTED THAT ARE CHARTS AND SUMMARIES THAT WOULD REQUIRE A

22    FURTHER INSTRUCTION?

23          MS. DUNN:  YOUR HONOR, THERE WERE SEVERAL EXHIBITS

24    WITH PROFESSOR NOLL, AND WE ANTICIPATE ADDITIONAL SUMMARY

25    EXHIBITS OR CHART EXHIBITS WITH OUR EXPERTS.
```

1          **THE COURT:**  OKAY.  SO THERE IS A STANDARD INSTRUCTION

2     REGARDING CHARTS AND SUMMARIES IN EVIDENCE THAT I CAN INCLUDE.

3     I THINK THIS WAS ACTUALLY PROFFERED BY THE PARTIES --

4          **MS. SWEENEY:**  IT WAS, YOUR HONOR.  I AM SORRY.

5     NUMBER 23.

6          **THE COURT:**  YES.  AND THEN 22, THE SAME -- SAME

7     THING.  THERE HAVE BEEN -- CERTAINLY THERE HAVE BEEN CHARTS

8     THAT WON'T BE IN EVIDENCE.

9        SO I CAN GIVE 22 AND 23.  ANY OBJECTION?

10          **MS. SWEENEY:**  NO, YOUR HONOR.

11          **MS. DUNN:**  NO, YOUR HONOR.

12          **THE COURT:**  SO I WILL ADD 22 AND 23 THAT WERE

13     ORIGINALLY PROFFERED.

14        I'VE INSTRUCTED THE JURY ABOUT DEPOSITION TESTIMONY IN

15     LIEU OF LIVE TESTIMONY.  IS THERE A REQUEST THAT I GIVE THEM

16     THAT BASIC INSTRUCTION AGAIN?

17          **MS. SWEENEY:**  YOUR HONOR, THE ONLY QUESTION WE HAVE

18     WITH RESPECT TO THE DEPOSITION TESTIMONY INSTRUCTION IS THAT

19     DURING OPENING STATEMENT, MR. ISAACSON MADE REFERENCE TO THE

20     FACT THAT MR. JOBS DID NOT GIVE ANY TESTIMONY ABOUT THE PERIOD

21     IN INTEREST, THAT IS 2006 THROUGH 2009.  AND THE REASON FOR

22     THAT IS THERE WAS A COURT ORDER, PER THE REQUEST OF APPLE,

23     LIMITING MR. JOBS' TESTIMONY IN TIME AND IN SCOPE, SO THAT WE

24     COULD ONLY ASK ABOUT THE EVENTS SURROUNDING APPLE'S 4.7.

25        SO WE WOULD REQUEST IF -- AN INSTRUCTION TO THAT EFFECT

1469

```
1   THAT -- THAT THAT DEPOSITION WAS SO LIMITED.

2           MS. DUNN:  YOUR HONOR, IT IS TRUE THAT THE DEPOSITION

3   DID NOT COVER 7.0 AND 7.4 AND IT'S FAIR TO REPRESENT THAT

4   THERE WAS NO DEPOSITION TESTIMONY ON THAT ISSUE.

5       I DON'T KNOW THAT IT IS FURTHER EDIFYING TO THE JURORS TO

6   EXPLAIN THERE WAS A COURT ORDER IN PLACE --

7           THE COURT:  IT WOULD BE IF YOU ARE GOING TO ARGUE

8   THAT THOSE -- THAT THERE WASN'T TESTIMONY WHEN THEY COULDN'T

9   ASK THE QUESTIONS.

10          MR. ISAACSON:  I DON'T THINK, FRANKLY, WE KNOW.

11          MS. SWEENEY:  WE CAN PROVIDE THE ORDER.  IT WAS BY

12  MAGISTRATE LLOYD.

13          MR. ISAACSON:  AND I DON'T KNOW WHAT WAS AGREED TO.

14  WE WOULD LIKE TO --

15          MS. SWEENEY:  THERE WAS NO AGREEMENT, YOUR HONOR.  IT

16  WAS A COURT ORDER --

17          THE COURT:  SO GIVE ME A PROPOSED INSTRUCTION AND

18  ATTACH A COPY, OR AT LEAST IDENTIFY THE DOCKET NUMBER SO I CAN

19  CHECK THE ORDER.

20          MS. SWEENEY:  YES, YOUR HONOR.  WE WILL DO THAT LATER

21  THIS AFTERNOON.

22          THE COURT:  SO IF I'M GOING TO DO THAT, I WOULD BE

23  INCLINED TO GIVE THE BASIC INSTRUCTION ON DEPOSITIONS GIVEN

24  THAT DEPOSITIONS HAVE ALSO BEEN USED FOR IMPEACHMENT PURPOSES

25  IN THIS CASE.
```

1      OKAY.

2           **MS. DUNN:**  YOUR HONOR, ONE OF MY COLLEAGUES HAS

3    HANDED ME A QUESTION ABOUT YOUR LIMITING INSTRUCTION, WHICH

4    SEEMS LIKE A GOOD QUESTION TO ASK AT THIS POINT:  WHETHER YOU

5    WOULD LIKE TO SEND BACK A LIST OF TRIAL EXHIBITS TO WHICH THAT

6    PERTAINS.

7           **THE COURT:**  WELL, THE PARTIES WOULD HAVE TO AGREE TO

8    THAT.

9           **MS. DUNN:**  WE CAN DISCUSS IT.

10          **THE COURT:**  IF THE PARTIES WANT TO SEND BACK AN

11   EXHIBIT LIST, YOU'RE WELCOME TO DO IT, BUT IT WOULD HAVE TO

12   ONLY INCLUDE THINGS THAT WERE ADMITTED.

13      SO, JUST SO THAT THEY HAVE AN INDEX, BUT YOU CAN TALK

14   ABOUT IT.

15          **MS. SWEENEY:**  WE CAN TALK ABOUT IT.

16          **MS. DUNN:**  WE WILL DISCUSS IT.

17          **THE COURT:**  SO THE SHERMAN ACT.

18      THE PARTIES GAVE ME LONG SUMMARIES THAT THEY WANTED ME TO

19   GIVE THE JURY IN TERMS OF THEIR PARTICULAR ARGUMENTS.

20      FRANKLY, I'M NOT VERY INCLINED TO DO THAT.  I THINK YOU

21   CAN MAKE YOUR OWN ARGUMENTS.  I THINK THAT UNLESS -- UNLESS

22   IT'S VERY SIMPLE, YOU KNOW, NO MORE THAN THREE OR FOUR

23   SENTENCES, AND THEN I'M NOT SURE THAT IT DOES JUSTICE TO YOUR

24   RESPECTIVE POSITIONS.

25      SO, MY INCLINATION WOULD JUST BE TO NOT GIVE THEM A

```
1    SUMMARY, BUT JUST TELL THEM I'M GOING TO INSTRUCT THEM ON THE

2    ELEMENTS.

3         SO, ARGUMENT.

4              MS. SWEENEY:  YOUR HONOR, PLAINTIFFS ARE SATISFIED

5    WITH THE CURRENT VERSION THAT YOUR HONOR HAS CIRCULATED ON THE

6    SHERMAN ACT.

7              MS. DUNN:  SO ARE WE.

8              THE COURT:  OKAY.

9         I AM GOING TO GET AN ELECTRONIC VERSION UP.  HOLD ON A

10   SEC.

11                   (PAUSE IN THE PROCEEDINGS.)

12             THE COURT:  OKAY.  WITH RESPECT TO -- I MENTIONED

13   THIS TO YOU EARLIER.  I THINK IT'S IMPORTANT THAT EACH ELEMENT

14   THAT'S IDENTIFIED IN THE SYNOPSIS ENTITLED "FIRST CLAIM" BE

15   CONSISTENT WITH ALL OF THE INSTRUCTIONS THAT FOLLOW.

16        SO AS YOU CAN SEE, WHERE I HAVE "FIRST CLAIM SHERMAN ACT

17   SECTION 2", I USE THE NUMBERS FIRST, SECOND, THIRD, FOURTH,

18   AND FIFTH.  I THEN TRY TO MAINTAIN THOSE NUMBERS THROUGHOUT

19   THE INSTRUCTIONS, WHICH IS NOT SOMETHING THAT THE MODEL

20   INSTRUCTIONS DO AND IS NOT SOMETHING THAT YOU FOLKS DID.

21        AND I MAKE -- AND I TRY TO MAKE SURE THAT ALL OF THOSE

22   MATCH BECAUSE THE VERDICT FORM WILL TRACK THIS SUMMARY PAGE.

23   THAT'S THE INTENT.

24        EVERYBODY UNDERSTANDS THE STRUCTURE?

25                   (COUNSEL NOD)
```

1          **THE COURT:**  OKAY.  YOU ALL AND THE MODEL CODE USE THE

2     WORD "A VALID ANTITRUST MARKET", BUT THEN YOU NEVER EXPLAIN

3     WHAT VALID MEANS.

4        WHAT YOU SAY IS THAT A VALID MARKET INCLUDES PROOF OF,

5     ONE, A RELEVANT PRODUCT MARKET AND A RELEVANT GEOGRAPHIC

6     MARKET.

7        NOW, MAYBE THAT'S AN ACCURATE STATEMENT, BUT QUERY WHETHER

8     IT SHOULD BE A RELEVANT ANTITRUST MARKET.

9          **MS. SWEENEY:**  YOUR HONOR, WE HAD SUBMITTED, AND I

10    APOLOGIZE FOR ANY INCONSISTENCY, BUT WE HAD SUGGESTED THE WORD

11    "VALID" THINKING IT WAS A LITTLE EASIER TO UNDERSTAND THAN

12    RELEVANT, BUT PROFESSOR NOLL, FOR EXAMPLE, TALKED EXTENSIVELY

13    ABOUT RELEVANT MARKET, AS HAVE THE LAWYERS.  SO WE HAVE NO

14    OBJECTION TO TAKING OUT THE WORD "VALID" AND JUST USING THE

15    WORD "RELEVANT".

16         **THE COURT:**  I JUST DON'T WANT TO CONFUSE THEM.

17         **MS. SWEENEY:**  UNDERSTOOD.

18         **MS. DUNN:**  YOUR HONOR, MS. GOODMAN IS PREPARED TO

19    SPEAK TO THIS ONE.

20         **THE COURT:**  OKAY.

21         **MS. GOODMAN:**  DEFENDANT ALSO PREFERS THE TERM

22    "RELEVANT".

23         **THE COURT:**  SO THAT'S FINE IF WE USE "RELEVANT" AND

24    NOT "VALID"?

25         **MS. GOODMAN:**  YES.

1          **THE COURT:**  OKAY.

2      SO ANY COMMENTS ON THE PAGE IDENTIFIED "FIRST CLAIM"?

3          **MS. SWEENEY:**  NOT FROM PLAINTIFFS, YOUR HONOR.

4          **MS. GOODMAN:**  NONE FROM DEFENDANTS.

5          **THE COURT:**  OKAY.  NEXT PAGE.

6      IN GREEN, THAT DEFINITION COMES FROM APPLE'S -- APPLE'S

7   PROPOSED JURY INSTRUCTION.  AGAIN, I WANT TO MAKE SURE THAT WE

8   ARE KEEPING THIS -- I DO THINK IT'S IMPORTANT TO DEFINE IT,

9   BUT IT IS THE PLAINTIFFS' DEFINITION.  I DON'T KNOW IF THAT'S

10  AN ACCURATE STATEMENT OR IF YOU ARE SUGGESTING DIFFERENT

11  LANGUAGE IN TERMS OF WHAT THAT DEFINITION SHOULD BE.

12          **MS. SWEENEY:**  YOUR HONOR, I GUESS PLAINTIFFS THOUGHT

13  THAT "PORTABLE DIGITAL MEDIA PLAYER" IS ITSELF DEFINING.

14          **THE COURT:**  THE PROBLEM IS, IS THAT APPLE GOES ON TO

15  SAY THAT YOU HAVE DEFINED IT TOO NARROWLY.

16      SO WHAT IS IT?  IF THEIR ARGUMENT IS YOU HAVE DEFINED IT

17  TOO NARROWLY, THEN THE JURY HAS TO HAVE SOMETHING AGAINST

18  WHICH TO COMPARE IT UNLESS APPLE NEEDS TO IDENTIFY

19  SPECIFICALLY WHAT ELSE IT INCLUDES.

20          **MS. SWEENEY:**  AS I UNDERSTAND APPLE'S POSITION, IT IS

21  THAT CD PLAYERS OUGHT TO BE INCLUDED IN THE MARKET.  PERHAPS

22  LAPTOP COMPUTERS, DESKTOP COMPUTERS.  SO THAT'S WHY I THINK

23  THAT PORTABLE DIGITAL MEDIA PLAYER IS SUFFICIENTLY DEFINITE

24  AND REFLECTS PLAINTIFFS' ALLEGATIONS REGARDING THE RELEVANT

25  MARKET, WHICH IS, OF COURSE, WHAT WE ARE TALKING ABOUT HERE.

1174

```
1          THE COURT:  HOW IS IT TOO NARROW?

2          MS. GOODMAN:  THE WAY IN WHICH PLAINTIFFS' EVIDENCE

3    HAS COME IN IS THAT IT DOES NOT INCLUDE SMART PHONES.  AND

4    APPLE CONTENDS THAT IT DOES INCLUDE SMART PHONES.

5          THE COURT:  ALL RIGHT.  I WILL PUT A PERIOD AFTER

6    "PORTABLE DIGITAL MEDIA PLAYERS".  THE REST WILL BE STRICKEN.

7    AND THEN IT WILL READ, "BY CONTRAST, APPLE MAINTAINS THAT

8    PLAINTIFFS HAVE FAILED TO PROVE THE RELEVANT PRODUCT MARKET

9    BECAUSE PLAINTIFFS' DEFINITION OF THE ALLEGED MARKET IS TOO

10   NARROW AND FAILS TO INCLUDE REASONABLY INTERCHANGEABLE

11   SUBSTITUTE PRODUCTS; NAMELY, SMART PHONES?  IS THAT WHAT YOU

12   ARE SAYING?

13         MS. GOODMAN:  SMART PHONES, CAPABLE OF PLAYING MUSIC,

14   AND OTHER HAND-HELD DEVICES CAPABLE OF PLAYING MUSIC, AS THE

15   PHONE WASN'T NECESSARILY SMART DURING THIS ERA, BUT COULD

16   STILL PLAY MUSIC.

17         THE COURT:  SMART PHONES OR JUST PHONES?

18         MS. GOODMAN:  PHONES.

19         THE COURT:  OKAY.  "NAMELY, PHONES CAPABLE OF PLAYING

20   MUSIC AND OTHER HAND HELD -- "NAMELY, PHONES AND OTHER

21   HAND-HELD DEVICES CAPABLE OF PLAYING MUSIC?

22         MS. GOODMAN:  YES.

23      YOUR HONOR, I WOULD ALSO JUST LIKE TO DRAW YOUR ATTENTION

24   THAT THE GREEN LANGUAGE THAT APPLE INCLUDED IN ITS PROPOSED

25   INSTRUCTION IS FROM THE PLAINTIFFS' COMPLAINT.
```

1          **THE COURT:**  OKAY.  WELL, THAT DOESN'T MATTER.

2     ACTUALLY THAT WAS IN THERE.  SO -- THE LAST SENTENCE INCLUDED

3     THAT.  SO THE RELEVANT MARKET INCLUDES -- YOU WANT ME TO TAKE

4     OUT THE WORD "SMART"?

5          **MS. GOODMAN:**  THAT WOULD BE FINE, YOUR HONOR.

6          **THE COURT:**  OKAY.

7       OKAY.  NEXT PAGE.

8          **MS. GOODMAN:**  YOUR HONOR, I HAD ONE OTHER ISSUE ON

9     THE FIRST ELEMENT, WHICH IS IN THE SECOND FULL PARAGRAPH IN

10    THE FIRST SENTENCE.

11       THE MODEL INSTRUCTION SAYS, "THE BASIC IDEA OF A RELEVANT

12    PRODUCT MARKET IS THAT THE PRODUCTS WITHIN IT ARE REASONABLE

13    SUBSTITUTES FOR EACH OTHER FROM THE BUYER'S POINT OF VIEW."

14    AND APPLE BELIEVES THAT'S IMPORTANT LANGUAGE FOR THE JURY TO

15    UNDERSTAND THAT IT IS FROM THE BUYER'S POINT OF VIEW AND NOT

16    NECESSARILY ANYBODY ELSE'S POINT OF VIEW.

17         **THE COURT:**  ANY RESPONSE?

18         **MS. SWEENEY:**  I BELIEVE THE MODEL ALSO REFERENCES

19    SELLERS.  SO I THOUGHT THE LANGUAGE HERE WAS FINE.

20         **MS. GOODMAN:**  THE SECOND SENTENCE OF THE WAY THE

21    COURT HAS DRAFTED THE INSTRUCTION DOES REFERENCE SELLERS AND

22    THAT IS FROM THE MODEL AND THAT IS AN APPROPRIATE REFERENCE,

23    HOWEVER, THE FIRST SENTENCE SHOULD ALSO INCLUDE "FROM THE

24    BUYER'S POINT OF VIEW".

25         **MS. SWEENEY:**  YOUR HONOR, PLAINTIFFS ARGUE THAT IT'S

1    REDUNDANT, BUT IT'S ALREADY THERE, AND I DON'T THINK THAT ONE

2    DESERVES MORE EMPHASIS THAN THE OTHER.

3    　　　　　MS. GOODMAN:  YOUR HONOR, I CAN HAND YOU A COPY OF

4    THE MODEL IF THAT WOULD BE HELPFUL.

5    　　　　　THE COURT:  THEY ARE BRINGING IT TO ME.

6    　　　　　　　　(PAUSE IN THE PROCEEDINGS.)

7    　　　　　THE COURT:  OKAY.  I'LL INCLUDE IT.

8    　　NEXT ELEMENT.  THE INSTRUCTIONS THAT YOU GAVE ME AND THAT

9    ARE PART OF THE MODEL SEEM TO SUGGEST THAT THE JURY MUST FIRST

10   EVALUATE DIRECT PROOF -- THE DIRECT PROOF, AND ONLY AFTER IT

11   DOES DIRECT PROOF, MOVE TO INDIRECT PROOF.

12   　　I GENERALLY STAY AWAY FROM TELLING THE JURY, UNLESS THEY

13   MUST DO IT, THAT THEY HAVE TO DO IT THAT WAY.

14   　　ARE EITHER OF YOU AWARE OF ANY LAW THAT SAYS THAT THEY

15   MUST FIRST EVALUATE DIRECT PROOF?  AND IF NOT, THEN MOVE TO

16   INDIRECT PROOF?

17   　　　　　MS. SWEENEY:  I AM NOT, YOUR HONOR, AND PLAINTIFFS

18   ARE FINE WITH YOUR PROPOSAL.

19   　　　　　MS. GOODMAN:  I'M NOT AWARE OF ANY AUTHORITY ON THAT

20   SUBJECT EITHER, YOUR HONOR.  HOWEVER, I HAVE OTHER ISSUES I

21   WOULD LIKE TO DISCUSS WITH THIS INSTRUCTION.

22   　　　　　THE COURT:  IS THERE AN OBJECTION TO LETTING THE

23   JURY -- TO DESCRIBING IT THE WAY I HAVE DONE HERE?

24   　　　　　MS. GOODMAN:  NOT BETWEEN DIRECT PROOF AND INDIRECT

25   PROOF, NO.

1    **THE COURT:**  SO THAT WILL STAY THAT WAY.

2    THE NEXT ISSUE I HAVE IS PLAINTIFFS' REQUEST THAT I

3    INCLUDE THE WORD "OR HANDICAP" AS PART OF THESE INSTRUCTIONS.

4    THERE HAS BEEN NO EVIDENCE OF HANDICAP.  IT'S NOT A WORD

5    THAT PROFESSOR NOLL EVER USED IN HIS TESTIMONY, SO I DON'T

6    KNOW HOW I WOULD MAKE THAT INSTRUCTION.

7    **MS. SWEENEY:**  WE INCLUDED HANDICAP BECAUSE IT CAME

8    FROM THE *ASPEN SKIING* CASE.  WE ARE PREPARED TO TAKE THAT OUT.

9    TO STICK WITH "EXCLUDE".

10    **THE COURT:**  OKAY.  SO THAT'S DELETED.

11    THE NEXT REQUEST FROM THE PLAINTIFFS IS THE NEXT PHRASE

12    YOU SEE THERE IN RED, "THE ABILITY TO MAINTAIN AN EFFICIENT

13    BUSINESS OPERATION".

14    AGAIN, I HAVE NOT HEARD ANY EVIDENCE WITH RESPECT TO THAT

15    ISSUE.

16    **MS. SWEENEY:**  WE ARE HAPPY TO TAKE THAT OUT, TOO,

17    YOUR HONOR.

18    **THE COURT:**  OKAY.  NEXT PAGE "MARKET SHARE TRENDS".

19    IS THERE ARGUMENT ON THIS ONE?

20    **MS. SWEENEY:**  THIS, YOUR HONOR, CAME DIRECTLY FROM

21    THE MODEL.  I THINK THERE HAS BEEN EVIDENCE ON MARKET SHARE

22    TRENDS.

23    **THE COURT:**  RESPONSE?

24    **MS. GOODMAN:**  WE HAVE NO OBJECTION TO INCLUDING THIS

25    LANGUAGE.

1      **THE COURT:**  SO THAT WILL BE INCLUDED.

2      JUST SO THAT YOU KNOW, THAT TITLE HEADING WILL BE MOVED TO

3   THE LEFT TO BE CONSISTENT WITH THE OTHER SUBHEADINGS IN THIS

4   SECTION.

5      "BARRIERS TO ENTRY", THE NEXT PAGE, "HIGH FIXED COSTS AND

6   RESEARCH AND DEVELOPMENT AND THEN TECHNICAL INCOMPATIBILITY".

7   I'M TRYING TO REMEMBER WHETHER THERE WAS EVIDENCE WITH RESPECT

8   TO EITHER OF THOSE.  I THINK THERE MIGHT HAVE BEEN.

9      **MS. SWEENEY:**  I BELIEVE PROFESSOR NOLL TESTIFIED TO

10   BOTH, YOUR HONOR.

11      **THE COURT:**  IS THERE AN OBJECTION?

12      **MS. GOODMAN:**  THERE IS AN OBJECTION TO TECHNICAL

13   INCOMPATIBILITY BECAUSE IT CONFUSES THE ISSUES BEFORE THE

14   JURY.

15      AS PLAINTIFFS HAVE PUT ON EVIDENCE OF INCOMPATIBILITY WITH

16   RESPECT TO ANTICOMPETITIVE CONDUCT, THAT LANGUAGE INCLUDED IN

17   THIS INSTRUCTION, WHICH IS WITH RESPECT TO MONOPOLY POWER, IS

18   CONFUSING AND WOULD REQUIRE THE JURY TO CONSIDER WHETHER

19   TECHNICAL INCOMPATIBILITY FROM A USER'S PERSPECTIVE HAS

20   ANYTHING TO DO WITH MONOPOLY POWER.

21      BUT TECHNICAL INCOMPATIBILITY WITH RESPECT TO MONOPOLY

22   POWER, IF IT WERE AT ALL RELEVANT, WOULD ONLY BE AS TO OTHER

23   COMPETITORS TO APPLE BEING ABLE TO ENTER THE MARKET, WHICH IS

24   NOT THE EVIDENCE THAT PLAINTIFFS HAVE PUT ON.

25      **THE COURT:**  RESPONSE?

1          **MS. SWEENEY:**  PROFESSOR NOLL TESTIFIED AT LENGTH

2    ABOUT HOW TECHNICAL INCOMPATIBILITY CAN BE A BARRIER TO ENTRY.

3    I'M NOT SURE THAT I UNDERSTAND APPLE'S ARGUMENT, AND I BELIEVE

4    WE CITED SOME CASE LAW FOR THIS INSTRUCTION PROPOSAL.

5          **MS. GOODMAN:**  YOUR HONOR, APPLE IS AWARE OF NO CASE

6    LAW EVER SUPPORTING THE PHRASE "TECHNICAL INCOMPATIBILITY"

7    BEING INCLUDED IN THIS INSTRUCTION.

8          **THE COURT:**  ANYTHING ELSE?

9      MS. SWEENEY?

10          **MS. SWEENEY:**  SORRY, YOUR HONOR.  I WAS LOOKING FOR

11    THE CITATION.  I THINK, PERHAPS, WE TOOK IT FROM ANOTHER JURY

12    INSTRUCTION.

13          **THE COURT:**  SUBMITTED?

14      MS. SWEENEY, SUBMITTED?

15          **MS. SWEENEY:**  YES, YOUR HONOR.

16          **THE COURT:**  OKAY.  THAT PHRASE WILL COME OUT.  I DO

17    THINK IT CONFUSES THE ISSUE GIVEN THE CONTEXT OF THIS TRIAL

18    AND I'M JUST NOW LOOKING AT DR. NOLL'S POWER POINT UNDER

19    "BARRIERS TO ENTRY", AND THIS IS NOT ONE THAT'S LISTED THERE.

20      OKAY.  NEXT PAGE -- THOSE ARE MY COMMENTS WITH RESPECT TO

21    MY -- MY QUESTIONS.  ARE THERE OTHER THINGS PEOPLE WANT TO

22    DISCUSS WITH THIS SECOND ELEMENT?

23          **MS. SWEENEY:**  NO, YOUR HONOR.

24          **THE COURT:**  WE'LL START WITH THE PLAINTIFFS.

25    NOTHING?

1480

```
1    DEFENSE?

2          MS. GOODMAN:  NOTHING FROM APPLE.

3          THE COURT:  OKAY.

4     THIRD ELEMENT.  SO WHAT IS IN RED IS -- WE WILL JUST START

5  WITH THE FIRST THREE PAGES.  THE RED IS THE EXAMPLE THAT COMES

6  FROM THE MODEL INSTRUCTION THAT IS BEING ASKED TO BE INCLUDED

7  BY THE PLAINTIFFS.

8     MS. DUNN?

9          MS. DUNN:  YOUR HONOR, APPLE OBJECTS TO INCLUSION OF

10 THESE EXAMPLES FOR A NUMBER OF REASONS.

11    FIRST OF ALL, ALTHOUGH NOT MOST IMPORTANTLY, IT IS

12 CONFUSING TO GIVE THE JURY HYPOTHETICALS IN THE FIRST INSTANCE

13 AND HYPOTHETICALS THAT HAVE TO DO WITH TECHNOLOGY AND

14 COMPUTERS IN DIFFERENT INSTANCES.

15    MOST ESPECIALLY, HOWEVER, WE ARE CONCERNED WITH EXAMPLE

16 FIRM C BECAUSE WE BELIEVE THAT EXAMPLE FIRM C IS NO LONGER THE

17 LAW.

18    IN PARTICULAR, THIS EXAMPLE TALKS ABOUT A DESIGN THAT DOES

19 NOT PROVIDE ANY BENEFITS TO COMPETITION BECAUSE IT EXCLUDES

20 COMPETITORS.  SO THIS INSTRUCTION, AS CITED IN THE MODEL, IS

21 BASED ON A CASE THAT WAS DECIDED PRIOR TO *FOREMOST PRO* AND

22 PRIOR TO *TRINKO*.  AND THIS EXAMPLE REMAINS CONTRARY TO BOTH OF

23 THOSE PRECEDENTS.

24    SO, YOU KNOW, WE HAVE DISCUSSED PREVIOUSLY BEFORE THIS

25 COURT THAT *FOREMOST PRO* SAYS TECHNOLOGICAL INCOMPATIBILITY IS
```

1  PROCOMPETITIVE.  AND THAT IS NOT WHAT THIS EXAMPLE C SAYS.  WE

2  HAVE DISCUSSED, AND I PRESUME WE'LL IN THE FUTURE ALSO

3  DISCUSS, THE RELEVANCE OF *TRINKO* WHICH TALKS ABOUT HOW YOU

4  NEED A VOLUNTARY COURSE OF DEALING BEFORE ANY SORT OF

5  INCOMPATIBILITY CAN BE CONSIDERED TO BE A VIOLATION OF THE

6  ANTITRUST LAWS IN CONJUNCTION WITH SOME OTHER CONDUCT.

7      SO, I CAN DIRECT THE COURT TO THE NOTES IN THE MODELS

8  WHICH CITE A CASE THAT WAS DECIDED IN 1979.  *FOREMOST PRO* WAS

9  IN 1983.  *TRINKO* IN 2003, AND STRANGELY CITED ELSEWHERE IN

10 THESE SAME FOOTNOTES, BUT NOT TO SUPPORT THIS EXAMPLE WHICH WE

11 DO NOT BELIEVE IS LAWFUL, AND WE BELIEVE WOULD CONSIDERABLY

12 CONFUSE THE JURY.

13          **THE COURT:**  RESPONSE?

14          **MS. SWEENEY:**  YOUR HONOR, THIS IS -- (A), IT'S DRAWN

15 DIRECTLY FROM THE MODEL.  AND (B), IT DIRECTLY FOLLOWS *ALLIED*

16 *ORTHOPEDIC*, WHICH, I THINK, EVERYONE HAS ACKNOWLEDGED IS -- IS

17 THE CLOSEST PRECEDENT.

18     THE EXAMPLE SAYS, AND I'M QUOTING FROM THE MIDDLE OF IT:

19          "THE ALTERATION DOES NOT IMPROVE THE DESIGN OF FIRM

20          C'S COMPUTERS OR PROVIDE ANY BENEFITS TO COMPETITION

21          OR CONSUMERS."

22     WE WOULD BE WILLING TO TAKE OUT THE "TO COMPETITION", BUT

23 OTHERWISE IT PERFECTLY ALIGNS WITH THE *ALLIED ORTHOPEDIC*

24 DECISION.

25          **MS. DUNN:**  YOUR HONOR, THE CASES STAND FOR THE

1    PROPOSITION THAT TECHNOLOGICAL INCOMPATIBILITY ITSELF IS A

2    BENEFIT.

3        AND I WILL ALSO SAY THAT THE COURT IN *NOVELL* CORRECTLY

4    REALIZED THAT THIS WAS AN IMPROPER INSTRUCTION AND DROPPED ALL

5    THESE HYPOTHETICALS.

6        *ALLIED ORTHOPEDIC* IS NOT TO THE CONTRARY -- OR DOES NOT

7    SUPPORT THIS INSTRUCTION.  IF WHAT PLAINTIFFS WANT IS AN

8    INSTRUCTION BASED ON *ALLIED ORTHOPEDIC*, WE WOULD BE HAPPY TO

9    PUT ONE FORWARD FOR THE COURT BECAUSE WE BELIEVE THAT THE LAW

10   IN THAT CASE STRONGLY SUPPORTS US.

11        **MS. SWEENEY:**  I WOULD POINT OUT THE *NOVELL* CASE DID

12   NOT COME FROM THIS CIRCUIT, AND WE HAVE PROPOSED A NUMBER OF

13   INSTRUCTIONS THAT CLOSELY -- ARE -- CLOSELY FOLLOW THE *ALLIED*

14   DECISION.

15        **THE COURT:**  ALL RIGHT.  I WILL CONSIDER YOUR

16   ARGUMENTS.

17        ANYTHING ELSE ON THESE THREE PAGES?

18        **MS. SWEENEY:**  NOT FROM PLAINTIFFS, YOUR HONOR.

19        **MS. DUNN:**  NO, YOUR HONOR.

20        **THE COURT:**  OKAY.

21        WITH RESPECT TO THE NEXT ONE, I BELIEVE THAT I HAVE, AND I

22   RECEIVED A PROPOSED REDLINE FROM APPLE.  LET ME JUST HEAR SOME

23   GENERAL ARGUMENT FIRST.

24        MS. SWEENEY.

25        **MS. SWEENEY:**  YOUR HONOR, THIS -- WE ALSO SUBMITTED A

1    LETTER.  WE DID NOT SUBMIT A REDLINE, BUT THE -- OUR CONCERN

2    WITH THE PROPOSED INSTRUCTION AS DRAFTED, THAT IT DOES THE

3    SAME THING THAT THE PRE-INSTRUCTION TO WHICH PLAINTIFFS

4    OBJECTED DOES, THAT IS, IT CONFLATES ALL OF THE UNCHALLENGED

5    ASPECTS OF 7.0 AND 7.4 WITH THE CHALLENGED ASPECTS.  AND WE

6    THINK IT IS EVEN MORE CLEAR NOW, AS THE EVIDENCE HAS COME IN,

7    THAT ALL PARTIES VIEW THESE DIFFERENT ASPECTS OF 7.0 AND 7.4

8    AS SEPARABLE AND --

9         **THE COURT:**  MS. SWEENEY, YOU ARE GOING TO HAVE TO

10   ADDRESS THIS BECAUSE I THINK IT IS EXACTLY OPPOSITE.

11       YOUR ECONOMICS EXPERT SAT THERE AND TESTIFIED THAT THIS

12   WAS ALL BASED ON 7.0 AND 7.4, OR 7.0 AT LEAST.  NOW, HE HAD AN

13   EXPLANATION FOR HIS DEPOSITION TESTIMONY, BUT THE JURY IS

14   GOING TO HAVE TO MAKE THAT DETERMINATION.

15       AND I THINK THAT THE -- THAT, IF ANYTHING, THE EVIDENCE

16   THAT'S COME IN IS SIGNIFICANTLY DIFFERENT FROM THE POSITION

17   THAT YOU'RE ARGUING.

18       **MS. SWEENEY:**  WELL, I WOULD DISAGREE, YOUR HONOR, AND

19   I WOULD POINT OUT A COUPLE OF THINGS.

20       FIRST, PROFESSOR NOLL DID MAKE CLEAR THAT HE USED 7.0 AND

21   7.4 AS A SHORTHAND FOR KVC AND DVC.  AND HE SAID THAT A COUPLE

22   OF TIMES IN HIS TESTIMONY, AND IT'S CLEARLY IN HIS REPORT.

23       **THE COURT:**  RIGHT, BUT THAT'S WHAT HE SAID.  THE JURY

24   IS GOING TO HAVE TO BELIEVE HIM, BUT THEY DON'T -- TO ACCEPT

25   YOUR POSITION.  BUT THEY ARE NOT REQUIRED TO.

1          **MS. SWEENEY:**  AND ALSO, YOUR HONOR, THE -- BOTH

2     SIDES, WITH RESPECT TO THE REGRESSION ANALYSIS, HAVE TAKEN A

3     LOT OF TIME TO DISCUSS WHETHER THE UNCHALLENGED ASPECTS OF 7.0

4     ARE ACCOUNTED FOR IN THE MODEL.

5          AND THAT -- SO IT SEEMS TO ME IT WOULD NOT MAKE SENSE TO

6     SEPARATE THOSE TWO THINGS OUT FOR PURPOSES OF -- ON APPLE'S

7     SIDE, CRITICIZING THE MODEL AND THEN AT THE SAME TIME ASK THE

8     JURY TO CONSIDER THEM TOGETHER.  I THINK IT'S VERY CONFUSING

9     FOR THE JURY TO NOT HAVE AN INSTRUCTION THAT MAKES CLEAR TO

10    THEM THAT THEY ARE EVALUATING WHETHER KVC AND DVC IS A GENUINE

11    PRODUCT IMPROVEMENT.

12          **THE COURT:**  RESPONSE.

13          **MS. DUNN:**  YOUR HONOR, IT WON'T SURPRISE YOU THAT WE

14    HAVE A NUMBER OF POINTS TO MAKE ON THIS TOPIC.

15          FIRST THING I WILL SAY IS THAT WE AGREE WITH YOUR HONOR

16    ABOUT THE TESTIMONY OF PLAINTIFFS' EXPERT, PROFESSOR NOLL.

17    HIS REGRESSION IS BASED ON 7.0.  IN THE DOCUMENTS IT IS LISTED

18    AS 7.0.  REGRESSION -- IN THE CHARTS THAT PLAINTIFFS SHOWED

19    HIM ON THE STAND TO THE JURY, SO THAT'S HOW THE JURY

20    UNDERSTANDS IT.  TO THE EXTENT PROFESSOR NOLL DOESN'T HIMSELF

21    UNDERSTAND THE TECHNOLOGY, THAT IS NOT A GOOD REASON TO

22    MISLEAD THE JURY.

23          I WILL ALSO PROFFER AT THIS POINT THAT OUR EXPERTS HAVE

24    NOT TESTIFIED, INCLUDING OUR TECHNICAL EXPERTS.  SO TO THE

25    EXTENT THAT ANYONE BELIEVES THAT ALREADY THIS IS -- IT IS

1485

1    CLEAR THAT WE ARE TALKING ABOUT 7.0 AND 7.4, INCLUDING

2    NUMEROUS OTHER THINGS, OTHER THAN WHAT THE PLAINTIFFS REFERRED

3    TO AS KVC AND DVC, THAT WILL BE CONCLUSIVELY ANSWERED IN THE

4    REMAINING EVIDENCE, BUT APPEARS AS ALREADY CLEAR TO THE COURT.

5        THE FACT IS, THE KVC AND DVC, WHICH, YOU KNOW, APPLE

6    REFERS TO AS INTEGRITY CHECKS CANNOT BE JUST AGGREGATED FROM

7    THE REST OF 7.0 AND 7.4 IN A NUMBER OF RESPECTS.  SO, FIRST OF

8    ALL, THE KEYBAG INTEGRITY CHECK IS PART OF THE KEYBAG.  IT'S

9    PART OF A MUCH LARGER REDESIGN THAT HAD MANY COMPONENTS, A LOT

10   OF CODE, AND, IN FACT, NUMEROUS OTHER ELEMENTS THAT WOULD HAVE

11   RENDERED HARMONY INCOMPATIBLE.

12       THE -- YOU KNOW, YOUR HONOR SAID WHEN WE FIRST ARGUED

13   THIS, THAT THIS IS PLAINTIFFS' THEORY OF THE CASE, AND IS

14   OBVIOUSLY NOT OUR THEORY OF THE CASE.  WE HAVE NOW HEARD

15   EVIDENCE THAT 7.0 AND 7.4, IN PARTICULAR, INTRODUCED VIDEO

16   CONTENT.  AND WE HAVE HEARD THAT THE SECURITY IN FAIRPLAY WAS

17   IMPORTANT TO SECURING THAT VIDEO CONTENT.  SO EVEN PUTTING THE

18   TECHNOLOGY ASIDE, THE BUSINESS REASONS FOR THE SECURITY UPDATE

19   CERTAINLY INTERSECT WITH THE OTHER FEATURES IN 7.0 AND 7.4.

20       AS WE STATED IN OUR LETTER TO YOU, THE NINTH CIRCUIT

21   DOESN'T HANDLE THINGS THIS WAY.  IN *ALLIED ORTHOPEDIC*, WHICH

22   THE PLAINTIFFS JUST CITED A MOMENT AGO, THEY DID NOT TALK

23   SPECIFICALLY ABOUT THE CHIP.  THEY TALKED ABOUT THE ENTIRE

24   PRODUCT REDESIGN AND WHY IT WAS A PRODUCT IMPROVEMENT.

25       PRESUMABLY JUDGE WARE RECOGNIZED THIS AS HE ALSO REFERRED

1486

```
1    TO 7.0 AND 7.4 WHEN HE DECIDED ON SUMMARY JUDGMENT.

2         SO, YOUR HONOR, WE OPPOSE AT THIS POINT DEFINING FOR THE

3    JURY THE PRODUCT AS BEING THE KVC AND DVC, TWO THINGS THAT ARE

4    NOT AT ALL STANDALONE.

5              MS. SWEENEY:   YOUR HONOR, I WOULD JUST DISAGREE.

6         FOR EXAMPLE, THE COVER FLOW THAT -- THAT APPLE IS

7    CONSTANTLY POINTING TO, THAT'S A QUESTION THAT HAS ALWAYS BEEN

8    RAISED WITH RESPECT TO THE REGRESSION SEPARATELY.  IT HAS

9    ALWAYS BEEN CONSIDERED BY APPLE, CERTAINLY, TO BE SEPARATE.

10        I THINK JUDGE WARE, LIKE PROFESSOR NOLL, USED 7.0 AND 7.4

11   AS SHORTHAND.  I THINK IT'S CLEAR FROM THE WAY -- AND IT WILL

12   COME OUT THROUGH THE TESTIMONY OF APPLE'S EXPERTS, THAT

13   APPLE'S EXPERTS HAVE ALWAYS VIEWED THE CHALLENGED CONDUCT AS

14   BEING KVC AND DVC.

15        ALSO, I WOULD REFER YOUR HONOR AGAIN, AS WE DID IN OUR

16   LETTER, TO THE MICROSOFT DECISION ON WHICH THE ALLIED

17   ORTHOPEDIC DECISION RESTS, AND ALSO LANGUAGE IN THE ALLIED

18   ORTHOPEDIC DECISION ITSELF AT PAGE -- I AM SORRY, PAGE 4 OF --

19   I WILL FIND THE EXACT PAGE NUMBER IN A MOMENT.

20        BUT THE COURT, WHEN IT WAS TALKING ABOUT GENUINE PRODUCT

21   IMPROVEMENT, IT WAS TALKING ABOUT THE CHIP.  BUT THEN IT ALSO

22   TALKED ABOUT THE SYSTEM.  FOR THE SYSTEM, THE COURT DIDN'T

23   HAVE TO DECIDE BECAUSE IT WASN'T YET -- THERE WAS NOT YET ANY

24   EVIDENCE THAT IT WAS A PRODUCT IMPROVEMENT, BUT THERE COULD BE

25   IN THE FUTURE.
```

1    SO I THINK THAT THOSE DECISIONS STAND FOR THE PROPOSITION

2    THAT THE CONDUCT THAT IS CHALLENGED IS THE CONDUCT THAT SHOULD

3    BE THE SUBJECT OF THE QUESTION WHETHER IT'S A GENUINE PRODUCT

4    IMPROVEMENT.

5            **THE COURT:**  ANYTHING ELSE?

6            **MS. DUNN:**  YOUR HONOR, THE CITES IN *ALLIED ORTHOPEDIC*

7    ARE 1001 TO '04.  AND THE COURT IN THAT CASE DID LOOK AT THE

8    ENTIRE SYSTEM.

9    OF COURSE THEY ALSO CONSIDERED THE CHALLENGED ASPECTS IN

10   THAT CASE; THAT'S THE QUESTION THAT GOES TO THE COURT.  BUT IN

11   THIS CASE, WHICH IS EVEN MORE INTERESTING AND DEFEATING TO THE

12   PLAINTIFFS' POINT, THE OTHER ELEMENTS OF THE 7.0 AND 7.4

13   REDESIGN RENDER HARMONY INOPERABLE, WHICH IS THE FOUNDATION OF

14   THEIR CASE.

15   SO, THEY'RE NOT EVEN DEFINING -- YOU KNOW, THEIR THEORY

16   DOESN'T EVEN INCLUDE ALL OF THE THINGS THAT WOULD RENDER

17   HARMONY INOPERABLE, WHICH IS THE BASIS OF THEIR EXPERTS'

18   REGRESSION ANALYSIS AND THE BASIS OF THEIR ENTIRE THEORY OF

19   THEIR CASE.

20           **MS. SWEENEY:**  AND THAT -- THAT, YOUR HONOR, IS

21   DIFFERENT FROM THE QUESTION WHETHER THE COVER FLOW AND THOSE

22   KINDS OF FEATURES IN 7.0 ARE PART OF THE CHALLENGED CONDUCT

23   AND WHETHER THOSE ARE SEPARABLE IN PROFESSOR NOLL'S

24   REGRESSION.

25   I WOULD CITE YOUR HONOR TO THIS PAGE IN THE *ALLIED*

1    *ORTHOPEDIC* DECISION.  IT STARTS AT PAGE 994.  592 F.2 AT 994.

2          **MS. DUNN:**  I WOULD JUST SAY, YOUR HONOR, THE QUESTION

3    IS NOT AS MS. SWEENEY SAYS, DEFINING THE CHALLENGED CONDUCT.

4    THEY HAVE CHOSEN TO CHALLENGE WHAT THEY CALL THE KVC AND DVC.

5       THE QUESTION IS FOR THE JURY, IS THIS A PRODUCT

6    IMPROVEMENT AND WHAT IS THE PRODUCT.

7          **MS. SWEENEY:**  I WOULD JUST RETURN TO THE POINT I MADE

8    EARLIER, YOUR HONOR.  I THINK THE INSTRUCTION AS DRAFTED WILL

9    CONFUSE THE JURY AND I DON'T THINK THAT THEY WILL BE ABLE TO

10   TELL FROM THIS INSTRUCTION WHICH CONDUCT THEY ARE SUPPOSED TO

11   BE EVALUATING.

12      SO I WOULD URGE, AGAIN, IT BE LIMITED TO THE CONDUCT

13   THAT'S CHALLENGED BY THE PLAINTIFFS IN THE CASE WHO ARE, OF

14   COURSE, THE MASTERS OF THEIR COMPLAINT.

15         **THE COURT:**  WHAT CONFUSES ME IS, IF THAT IS THE CASE,

16   HOW IS IT THAT THE ECONOMIC ANALYSIS WHICH FORMS THE BASIS OF

17   YOUR DAMAGES DOESN'T SEGREGATE OUT THE TWO PIECES OF CODE THAT

18   YOU CHALLENGE AS OPPOSED TO THE ENTIRE UPDATE?

19         **MS. SWEENEY:**  PROFESSOR NOLL, IN HIS REPORT, WHICH,

20   OF COURSE, IS NOT EVIDENCE, HE USES IT AS A SHORTHAND FOR THE

21   CONDUCT THAT PLAINTIFFS CHALLENGE, THAT IS KVC AND DVC.

22      IN HIS REGRESSION ANALYSIS, HE SEPARATES OUT, AND HE

23   EXPLAINED TODAY HOW HE -- HOW THE VARIABLES IN HIS REGRESSION

24   ANALYSIS TAKE ACCOUNT OF THOSE OTHER FEATURES LIKE COVER FLOW,

25   LIKE VIDEO.  HE MADE A SPECIFIC REFERENCE TO VIDEO.

1    AND SO THOSE CHARACTERISTICS ARE ACCOUNTED FOR IN THE

2    REGRESSION, BUT PROFESSOR NOLL USED 7.0 AND 7.4 AS SHORTHAND.

3    **THE COURT:**  DIDN'T HE ALSO SAY THAT DVC AND KVC

4    WEREN'T PART OF THE FAIRPLAY?  DIDN'T HE ALSO TESTIFY TO THAT?

5    **MS. SWEENEY:**  I THINK WHEN MR. ISAACSON ASKED HIM

6    THAT QUESTION, I DON'T THINK PROFESSOR NOLL -- I'M NOT EXACTLY

7    REMEMBERING THE TESTIMONY, BUT I BELIEVE THAT IF HE SAID THAT

8    INITIALLY, HE CORRECTED HIMSELF.  HE -- I DON'T THINK THAT HE

9    SAID THAT, YOUR HONOR.

10    **MS. DUNN:**  YOUR HONOR, OUR RECOLLECTION IS THE

11    OPPOSITE OF THAT.  HE DID SAY THAT.  AND --

12    **THE COURT:**  HE DID SAY THAT.

13    **MS. DUNN:**  -- IT SEEMS LIKE HE MAY FUNDAMENTALLY

14    MISUNDERSTAND THE TECHNOLOGY, INCLUDING NOT MENTIONING AT ANY

15    POINT IN HIS REPORT THAT HE USED THIS AS A SHORTHAND.  HE

16    BELIEVED HE WAS ANALYZING 7.0 AND 7.4.

17    **MR. ISAACSON:**  SINCE NOLL IS MY WITNESS I'LL --

18    **THE COURT:**  NO.  SHE'S ARGUING, SO AS MUCH AS YOU

19    WOULD LIKE TO, MR. ISAACSON, YOU ARE NOT ALLOWED.

20    **MS. SWEENEY:**  WE WOULD BE HAPPY TO SUBMIT ADDITIONAL

21    TESTIMONIAL SUPPORT FOR OUR POSITION, YOUR HONOR, AS WELL AS A

22    PROPOSED DRAFT REDLINE.

23    **THE COURT:**  I DON'T KNOW WHAT YOU MEAN BY THAT,

24    MS. SWEENEY.  YOUR WITNESSES ARE DONE.

25    **MS. SWEENEY:**  I UNDERSTAND, YOUR HONOR, BUT MS. DUNN

```
1    MADE REFERENCE TO THE TESTIMONY OF PROFESSOR NOLL AND I'M JUST

2    SAYING THAT WE WOULD LIKE AN OPPORTUNITY AS WELL TO PUT IN

3    LINE TESTIMONY TO SUPPORT OUR POSITION.

4              THE COURT:  LINE TESTIMONY?  WHAT DO YOU MEAN BY

5    THAT?

6              MS. SWEENEY:  FROM THE CITATIONS TO THE TRANSCRIPT.

7              THE COURT:  ALL RIGHT.  WELL, YOU'RE WELCOME TO DO

8    IT.  I'M NOT GOING TO MAKE A DECISION RIGHT NOW ON THIS

9    PARTICULAR INSTRUCTION.  I'LL WAIT UNTIL THE CLOSE OF

10   EVIDENCE.

11             MS. DUNN:  YOUR HONOR?

12             MS. SWEENEY:  SORRY.

13             MS. DUNN:  SORRY.

14             THE COURT:  BUT I STILL HAVE CONCERNS ABOUT THE

15   PLAINTIFFS' APPROACH.

16      YES, MS. SWEENEY.

17             MS. SWEENEY:  PLAINTIFFS ALSO OBJECT TO THE

18   LANGUAGE --

19             MS. DUNN:  BEFORE WE MOVE ON, I ACTUALLY WOULD LIKE

20   TO SAY ONE LAST THING.

21      ARE YOU MOVING ON TO THE NEXT ISSUE?

22             THE COURT:  MS. DUNN.

23             MS. DUNN:  THANK YOU.

24      I JUST WANT TO DIRECT THE COURT'S ATTENTION TO PAGE 2 OF

25   PROFESSOR NOLL'S REPORT.  I CAN READ THE RELEVANT PART IN THE
```

```
1    RECORD.

2        UNDER OTHER "ASSIGNMENT", IT SAYS:

3            "ATTORNEYS FOR THE CLASS PLAINTIFFS IN THIS

4            LITIGATION WHO ASKED ME TO UNDERTAKE AN ANTITRUST

5            ECONOMICS ANALYSIS OF THE LIABILITY AND DAMAGES

6            ISSUES IN THIS LITIGATION.  I HAVE BEEN ASKED TO

7            DETERMINE WHETHER THE UPDATE TO THE ITUNES DIGITAL

8            MEDIA PLAYER SOFTWARE, KNOWN AS ITUNES 7.0, CAUSED

9            HARM TO COMPETITION IN A RELEVANT MARKET FOR PORTABLE

10           DIGITAL MEDIA PLAYERS."

11       MS. SWEENEY:  AND LATER ON IN THE REPORT HE EXPLAINS

12   THAT HE'S USING THAT AS A SHORTHAND, AND WE WILL PROVIDE THAT

13   CITATION AS WELL.

14           THE COURT:  ALL RIGHT.

15           MS. SWEENEY:  I HAD ANOTHER --

16           THE COURT:  OTHER ISSUES ON THIS INSTRUCTION?

17           MS. SWEENEY:  YES, YOUR HONOR.

18       THE MIDDLE OF PAGE 22, THIS IS THE ISSUE THAT WE DISCUSSED

19   PREVIOUSLY.  HERE, THE DRAFT SUGGESTS THAT THE JURORS FIRST

20   HAVE TO DETERMINE WHETHER WHATEVER IS BEING CONSIDERED,

21   WHETHER IT'S KVC, DVC, OR 7.0, THEY HAVE TO FIRST DETERMINE

22   WHETHER THAT IS A PRODUCT IMPROVEMENT.  AND THEN IF THEY FIND

23   THAT IT WAS NOT A GENUINE PRODUCT IMPROVEMENT, THEN THEY ARE

24   TO GO ON TO DETERMINE WHETHER APPLE HAD LEGITIMATE BUSINESS

25   REASONS FOR ISSUING THE UPDATE.
```

```
 1        NOW, AS WE DISCUSSED BEFORE, THIS GIVES APPLE TWO
 2   OPPORTUNITIES FOR THE EXACT SAME LEVEL OF PROOF.  THERE AREN'T
 3   ANY CASES THAT SAY THAT DEFENDANT FIRST GETS TO ADDRESS THE
 4   GENUINE PRODUCT IMPROVEMENT QUESTION AND THEN PUT IN A
 5   LEGITIMATE BUSINESS JUSTIFICATION DEFENSE.  AND THAT'S
 6   PARTICULARLY TRUE HERE WHEN THE EVIDENCE IS IDENTICAL.
 7        I DON'T KNOW WHAT BUSINESS JUSTIFICATION DEFENSE APPLE
 8   WOULD PUT IN OTHER THAN THE SAME EVIDENCE IT'S PUTTING IN TO
 9   SHOW THAT IT WAS A GENUINE PRODUCT IMPROVEMENT.
10             THE COURT:  RESPONSE?
11             MS. DUNN:  YOUR HONOR, APPLE BELIEVES THE COURT GOT
12   THIS RIGHT.
13        FIRST OF ALL, IN THEIR ARGUMENTS, PLAINTIFFS' THEORY IS
14   THAT APPLE HAD A LEGITIMATE BUSINESS JUSTIFICATIONS (SIC) FOR
15   WHAT IT DID.  AND IT SEEMS INAPPROPRIATE, MORE SO NOW EVEN
16   THAN BEFORE, THAT THEY WOULD ARGUE THAT APPLE CANNOT CONTEND
17   THAT IT HAD LEGITIMATE BUSINESS JUSTIFICATIONS.
18        SEPARATE AND APART FROM PRODUCT IMPROVEMENTS, THERE HAS
19   BEEN EVIDENCE SHOWN IN THIS CASE THAT MICROSOFT AND NAPSTER,
20   COMPETITORS TO APPLE, ATTACKED ITS DRM PUBLICLY AND SAID THAT
21   THEIR -- THAT APPLE'S DRM WAS NOT GOOD AND THAT THEY WERE
22   GOING TO BEAT APPLE.  COMPETING WITH MICROSOFT AND NAPSTER IS
23   LEGITIMATE BUSINESS JUSTIFICATION.
24        IN ADDITION, THERE'S TESTIMONY IN THE RECORD THAT OF THE
25   REPUTATIONAL HARM TO APPLE WITH PUBLIC COMMENTS ABOUT HACKS ON
```

1    THE INTERNET AND ABOUT CRITICISM OF ITS DRM BECAUSE IT

2    COMPROMISED APPLE'S ABILITY TO GET CONTENT FOR ITS MUSIC

3    STORE.  THAT'S ANOTHER ONE.  SO MORE SECURITY EQUALS MORE

4    CONTENT.

5        ANOTHER THING THAT WE DISCUSSED EARLIER IS THIS DMCA

6    ISSUE, WHICH, OBVIOUSLY RESPONDING TO CONDUCT THAT IS NOT

7    LEGAL AND A BREACH OF YOUR TERMS OF SERVICE WOULD ALSO BE A

8    LEGITIMATE BUSINESS JUSTIFICATION.

9        OF COURSE THERE IS NO CASE THAT PRECISELY GREETS THIS

10   ISSUE BECAUSE THERE HAS NEVER BEEN A PRODUCT IMPROVEMENT CASE

11   LIKE THIS GO TO TRIAL.  IN THE ABSENCE OF SUCH A PERFECT CASE,

12   WE WOULD POINT THE COURT TO *OAHU GAS*.  AND I CAN GIVE YOU THE

13   CITE.  BUT THEY SPECIFICALLY DISCUSS LEGITIMATE BUSINESS

14   JUSTIFICATION, AND THEY EXPLAIN THAT PRODUCT IMPROVEMENT --

15   THEY CALL IT PRODUCT INNOVATION LAW IS NOT DIRECTLY

16   CONTROLLING.  ALTHOUGH, OF COURSE, RELATED BECAUSE WE'RE IN

17   THE SAME SECTION 2 SPACE IN ANTITRUST LAW.

18       SO WE THINK THE COURT GOT THIS PRECISELY RIGHT AND WE HOPE

19   THAT THE INSTRUCTION AS WRITTEN ON THIS POINT IS MAINTAINED.

20           **THE COURT:**  WHAT IS THE CITE?

21           **MS. DUNN:**  IT IS *OAHU GAS* 838 F.2D 360.  AND THE

22   DISCUSSION IN GENERAL ABOUT LEGITIMATE BUSINESS JUSTIFICATION

23   IS IN AND AROUND 368 TO 369.

24           **MS. SWEENEY:**  MAY I RESPOND, YOUR HONOR?

25           **THE COURT:**  YOU MAY.

1194

1          **MS. SWEENEY:** THE ASSERTED BUSINESS JUSTIFICATION

2    THAT MS. DUNN JUST REFERRED TO ARE THE EXACT SAME KINDS OF

3    THINGS THAT THEY USED TO JUSTIFY THEIR UPDATE AS A PRODUCT

4    IMPROVEMENT.

5          COMPETITION, THEY SAY THAT THEY HAD TO MEET COMPETITION.

6    THAT'S A QUESTION THAT GOES TO WHETHER THERE'S SOME IMPROVED

7    PRODUCT.

8          HACKS, THEY TALKED A LOT ABOUT HACKS AND HOW IF THEY

9    DIDN'T STOP THE HACKS, THEY WOULD LOSE THEIR RIGHT TO THE

10   MUSIC.  THEY TALKED ABOUT THIS IN THE CONTEXT OF PRODUCT

11   IMPROVEMENT BECAUSE IF THEY DIDN'T HAVE THE SAME LIBRARY OF

12   MUSIC, THEY WOULDN'T HAVE THE SAME PRODUCT.

13         THEY RAISED AGAIN THE DMCA.  AND I'M NOT SURE WHERE THEY

14   ARE GOING WITH THIS, BUT IF THEY ARE GOING TO AGAIN RAISE THE

15   QUESTION OF WHETHER THE CONDUCT THAT REAL ENGAGED IN WAS

16   ILLEGAL, THEN WE ARE ENTITLED TO THE OPINION LETTERS ON WHICH

17   APPLE IS RELYING.  AND WE WILL MAKE THAT MOTION IF THEY ARE

18   GOING TO PURSUE THAT LINE.

19         **THE COURT:** ANYTHING ELSE ON THIS INSTRUCTION?

20         **MS. DUNN:** YOUR HONOR, IT IS PLAINTIFFS THEMSELVES

21   THAT HAVE PUT THE LEGITIMACY OF APPLE'S BUSINESS JUSTIFICATION

22   AT ISSUE.  THE QUESTION OF PRODUCT IMPROVEMENT, IS THE PRODUCT

23   BETTER?  IS IT AN IMPROVEMENT?  AND THEY PUT ON EVIDENCE AS TO

24   THIS AS WELL.

25         BUT THERE ARE OTHER QUESTIONS IN THIS CASE, OTHER

1    JUSTIFICATIONS THAT APPLE HAS PROFFERED.  AND, OF COURSE, IT

2    IS OUR BURDEN OF PRODUCTION AND THEIR BURDEN OF PROOF.  SO WE

3    HAVE PROFFERED THESE OTHER JUSTIFICATIONS.  THERE'S CLEAR

4    EVIDENCE IN THE RECORD OF THEM.  IT IS DISTINCT UNDER THE CASE

5    LAW.  AND WE BELIEVE THAT -- THAT THE COURT'S INSTRUCTION IS

6    CORRECT AS WRITTEN.

7         **MS. SWEENEY:**  IT JUST SEEMS SO FAR AFIELD FROM THE

8    LAW OF ANTITRUST TO SUGGEST THAT PLAINTIFFS HAVE THE BURDEN OF

9    PROOF ON REBUTTING TWO DEFENSES, ESPECIALLY WHERE THE

10   DEFENDANT IS PUTTING THE EXACT SAME EVIDENCE IN SUPPORT OF

11   THOSE DEFENSES.  IT'S -- IT'S -- IT'S --

12        **THE COURT:**  I LOOKED FOR CASES ON THE BURDEN OF

13   PROOF.  DO YOU HAVE A CASE TO SUPPORT YOUR PERSPECTIVE?

14        **MS. SWEENEY:**  WELL, WE CITED THE *WILLIAM INGLIS* CASE

15   FROM THE NINTH CIRCUIT ON THE BURDEN OF PROOF THAT APPLE BEARS

16   THE BURDEN OF PROOF ON ITS DEFENSES.

17      IN RESPONSE, APPLE CITED A NUMBER OF ESSENTIAL FACILITIES

18   CASES WHICH ARE QUITE DIFFERENT FROM A -- THIS PARTICULAR KIND

19   OF SECTION 2 CASE.  IN AN ESSENTIAL FACILITIES CASE, OF

20   COURSE, YOU HAVE TO SHOW AT THE OUTSET THE PLAINTIFF DOES THAT

21   THERE WAS SOME UNUSUAL CIRCUMSTANCE WHICH REQUIRED THE

22   DEFENDANT TO MAKE ITS FACILITIES AVAILABLE TO COMPETITORS.

23        **MS. DUNN:**  THE LAST TIME WE DISCUSSED THIS,

24   DEFENDANTS CITED *CITY OF VERNON V. SOUTHERN CALIFORNIA EDISON*

25   *COMPANY*, 955 F.2D 1361, WHICH MAKES VERY CLEAR WHAT THE --

1496

```
1    WHOSE BURDEN IS WHAT, SAYING THAT IT'S OUR BURDEN TO IDENTIFY

2    LEGITIMATE BUSINESS JUSTIFICATION AND THE PLAINTIFFS' BURDEN

3    TO REBUT THAT JUSTIFICATION.

4              MS. SWEENEY:  AND --

5              MS. DUNN:  BUT, AGAIN, IT IS THE PLAINTIFFS THAT HAVE

6    PUT BUSINESS JUSTIFICATION AT ISSUE.  IT IS VERY CENTRAL TO

7    THEIR CASE.  AND IT IS -- IT IS IRONIC THAT THEY ARE NOW

8    DISPUTING APPLE'S ABILITY TO SAY THAT ITS BUSINESS

9    JUSTIFICATIONS WERE LEGITIMATE.

10             MS. SWEENEY:  AND I BELIEVE THE CASE THAT MS. DUNN

11   JUST CITED ALSO IS AN ESSENTIAL FACILITIES CASE.

12             MS. DUNN:  AND THE CASE MS. SWEENEY HAS CITED IS A

13   PREDATORY PRICING CASE, WHICH COMES WITH ITS OWN SPECIAL

14   BURDEN, A BURDEN THAT DOES NOT EXIST HERE.

15             THE COURT:  GOING BACK TO THE THIRD ELEMENT, WHICH

16   EVERYBODY SEEMS TO AGREE IS PROPER, THE THIRD ELEMENT

17   INDICATES THAT A MONOPOLIST'S CONDUCT ONLY BECOMES UNLAWFUL

18   WHERE IT INVOLVES ANTICOMPETITIVE ACTS.  AND THAT THE

19   DIFFERENCE BETWEEN ANTICOMPETITIVE CONDUCT AND CONDUCT -- IT

20   IS THE OPPOSITE SIDE OF THE SAME COIN.  THAT IS, THAT THE

21   LEGITIMATE BUSINESS PURPOSE -- THE DIFFERENCES BETWEEN THOSE

22   TWO THINGS ARE DIFFICULT.

23       THAT'S WHAT IT SAYS HERE.  THAT'S THE REALITY OF THE

24   SITUATION.  THE PLAINTIFF HAS THE BURDEN OF PROOF WITH RESPECT

25   TO THE THIRD ELEMENT.  SO IT'S -- I DON'T SEE A LEGITIMATE
```

```
1    BUSINESS PURPOSE AS BEING A SEPARATE AND DISTINCT AFFIRMATIVE

2    DEFENSE.  IT IS JUST EVIDENCE TO COUNTERACT THE PLAINTIFFS'

3    BURDEN UNDER THE THIRD ELEMENT.

4              MS. SWEENEY:  UNDER THIS KIND OF CASE, YOUR HONOR, WE

5    HAVE THE AFFIRMATIVE BURDEN TO PROVE THAT IT WAS NOT A GENUINE

6    PRODUCT IMPROVEMENT.  BUT THEN APPLE SHOULD NOT HAVE THE

7    OPPORTUNITY, USING THE SAME EVIDENCE, TO SAY THAT THAT -- THAT

8    WE HAVE THE BURDEN OF SHOWING THAT IT DOESN'T HAVE A

9    LEGITIMATE BUSINESS JUSTIFICATION FOR ITS CONDUCT.

10             THE COURT:  WELL, THAT IS ALL -- THE EVIDENCE HERE IS

11   ALL BEING SUBMITTED TO THE JURY TO DETERMINE WHAT IS THE

12   ANTICOMPETITIVE CONDUCT.  THAT'S THE QUESTION.  THE QUESTION

13   THAT THEY ARE GOING TO BE ASKED ON THE JURY FORM IS, WAS THERE

14   ANTICOMPETITIVE CONDUCT.

15        THE BURDEN OF PROOF ON WHETHER OR NOT THERE'S

16   ANTICOMPETITIVE CONDUCT IS THE PLAINTIFFS' BURDEN.  THEY ARE

17   NOT GOING TO BE ASKED A SEPARATE QUESTION ABOUT WHETHER OR NOT

18   THERE WAS A LEGITIMATE BUSINESS JUSTIFICATION, BUT THEY ARE

19   BEING INSTRUCTED THAT LEGITIMATE BUSINESS PURPOSES DO NOT

20   CONSTITUTE ANTICOMPETITIVE CONDUCT.

21        HAVE I STATED THE LAW WRONG?

22             MS. SWEENEY:  WHEN THOSE TWO ELEMENTS ARE COMBINED IN

23   THE SAME JURY INSTRUCTION, TO SUGGEST THAT PLAINTIFFS HAVE TO

24   JUMP OVER BOTH THOSE HURDLES, I DON'T BELIEVE THAT IS AN

25   ACCURATE REPRESENTATION OF THE LAW.
```

1            **THE COURT:**  YOU UNDERSTAND AND AGREE THAT THE BURDEN

2   TO SHOW ANTICOMPETITIVE CONDUCT IS THE PLAINTIFFS', CORRECT?

3            **MS. SWEENEY:**  YES, YOUR HONOR.

4            **THE COURT:**  AND YOU AGREE THAT LEGITIMATE BUSINESS

5   CONDUCT IS NOT ANTICOMPETITIVE CONDUCT, RIGHT?

6            **MS. SWEENEY:**  I AGREE WITH THAT.

7            **THE COURT:**  YOU ALSO AGREE THAT A GENUINE PRODUCT

8   IMPROVEMENT IS NOT ANTICOMPETITIVE CONDUCT, RIGHT?

9            **MS. SWEENEY:**  WELL, IT DEPENDS.  *ALLIED* SETS OUT --

10  WE ARE NOT IN THAT CATEGORY HERE, BUT *ALLIED* DOES SET OUT A

11  SITUATION WHERE THERE CAN BE A GENUINE PRODUCT IMPROVEMENT AND

12  IF THERE IS OTHER ANTICOMPETITIVE CONDUCT, YES, THERE CAN

13  ANTICOMPETITIVE CONDUCT, BUT WE ARE NOT TALKING ABOUT THAT

14  HERE.

15           **THE COURT:**  YOU ARE SAYING THERE ARE TWO HURDLES.

16  WHAT YOU JUST SAID WAS THAT THERE ARE TWO HURDLES.

17           **MS. SWEENEY:**  NO, YOUR HONOR.  PERHAPS I WASN'T

18  CLEAR.

19     I DON'T SEE WHY PLAINTIFFS SHOULD HAVE TO PROVE TWICE THAT

20  THERE WAS NO GENUINE PRODUCT IMPROVEMENT AND THAT'S WHAT THIS

21  INSTRUCTION, AS DRAFTED, CONTEMPLATES.  BECAUSE IT IS THE SAME

22  EVIDENCE, GOING TO THE SAME ISSUE, AND REQUIRING PLAINTIFFS TO

23  PROVE IT TWICE.

24           **THE COURT:**  WELL, I DON'T KNOW WHAT YOU MEAN IN SOME

25  WAYS BY FORCING YOU TO PROVE IT TWICE.

```
 1        AS I TOLD YOU AT THE OUTSET, THE VERDICT FORM IS GOING TO

 2   HAVE -- IS GOING TO MIRROR THE ELEMENTS.  AND THE ELEMENTS --

 3   THE JURY IS GOING TO BE ASKED THE QUESTION WHETHER YOU

 4   PROVED -- WHETHER THE PLAINTIFFS PROVED BY A PREPONDERANCE OF

 5   THE EVIDENCE THAT APPLE WILLFULLY MAINTAINED MONOPOLY POWER IN

 6   THAT MARKET BY ENGAGING IN ANTICOMPETITIVE CONDUCT.  PERIOD.

 7   THAT'S WHAT YOU ARE GOING TO HAVE TO PROVE.  THAT'S WHAT THE

 8   JURY IS GOING TO BE ASKED TO DECIDE.

 9        THEY ARE GOING TO LOOK AT A LOT OF EVIDENCE; ALMOST 20

10   HOURS' WORTH TO MAKE THAT DETERMINATION.  THAT IS THE CRUX AND

11   HEART OF THIS CASE.  AND IT IS COMPLICATED.  BUT IT IS ONLY

12   ONE ELEMENT, AND IT IS YOUR BURDEN.

13        I'LL THINK MORE ABOUT IT.

14        ANYBODY ELSE WANT TO COMMENT?

15        MS. DUNN:  YOUR HONOR, I ONLY WANT TO COMMENT TO GIVE

16   YOU A CITE I NEGLECTED TO MENTION IN ADDITION TO CITY OF

17   VERNON.  IF YOU COULD LOOK AT IMAGE TECH, 903 F.2D 612,

18   PAGE 20, NOTE 9, ON THE TOPIC OF BURDENS NOT HAVING TO DO WITH

19   THIS IMMEDIATE ISSUE OF LEGITIMATE BUSINESS PURPOSE.

20        OUR RESPONSE TO THAT WOULD BE THAT YOUR HONOR HAS THE LAW

21   CORRECT ON THIS.  AND THAT I GUESS THE ONE LAST THING I WOULD

22   SAY IS, I REMEMBER A DIFFERENT ARGUMENT WHERE PLAINTIFFS

23   FOUGHT VERY HARD NOT TO LIMIT THE QUESTION IN THIS CASE TO IS

24   THIS PRODUCT BETTER OR WORSE, BUT TO PLACE THAT ISSUE, APPLE'S

25   BUSINESS JUSTIFICATIONS, WHICH OBVIOUSLY THEY DO NEED TO PROVE
```

1500

1    TO PROVE THAT THERE WAS ANTICOMPETITIVE CONDUCT HERE.

2        SO WE APPRECIATE THE COURT'S CONSIDERATION.

3            **THE COURT:**  ALL RIGHT.  THERE IS OBVIOUSLY NO

4    OBJECTION ON THE FOURTH ELEMENT.

5            **MS. DUNN:**  YOUR HONOR, BEFORE WE MOVE ON,

6    UNFORTUNATELY, ON THE INSTRUCTION THAT IS ENTITLED "GENUINE

7    PRODUCT IMPROVEMENTS AND LEGITIMATE BUSINESS PURPOSES", WE DID

8    GIVE YOU A REDLINE.  I WANTED TO ASK YOUR HONOR IF YOU NEED US

9    TO HAVE ANY ADVOCACY ON THE REDLINE.

10        IN ADDITION TO THE KVC, DVC, 7.0, AND 7.4 ISSUE THAT WE

11    HAVE DISCUSSED, THE FIRST PARAGRAPH SEEM TO SET FORTH

12    PLAINTIFFS' CLAIMS AND THEN THE SECOND PARAGRAPH WAS A

13    SENTENCE ABOUT APPLE'S CLAIMS.

14        SO, WE TRIED TO MATCH THEIR REAL ESTATE IN THIS

15    INSTRUCTION.  I KNOW YOUR HONOR PREVIOUSLY SAID THAT YOU

16    DIDN'T WANT TO RESTATE THE CLAIMS.  THAT'S ALSO FINE.  BUT IF

17    YOU CHOOSE TO, WE WOULD LIKE YOU TO CONSIDER GIVING APPLE THE

18    OPPORTUNITY TO STATE ITS CONTENTIONS AS WELL.

19        AND THE OTHER EDITS THAT APPEAR HERE, WE DID FOR THE SAKE

20    OF ACCURACY IN CHARACTERIZING THE CLAIMS.  AND I'M HAPPY TO

21    TALK ABOUT THOSE MORE, BUT IT'S POSSIBLE THAT YOU WILL JUST

22    DECIDE TO REMOVE THIS AND THEN WE DON'T NEED TO TALK ABOUT IT.

23            **THE COURT:**  MS. SWEENEY, DO YOU HAVE APPLE'S REDLINE?

24            **MS. SWEENEY:**  I THOUGHT I DID, YOUR HONOR.

25            **MS. DUNN:**  I THINK IT'S ATTACHMENT 2 TO OUR LETTER.

1501

```
 1    I CAN ALSO SHOW YOU MINE.

 2            MS. SWEENEY:  THAT HELPS.

 3            THE COURT:  HAVE YOU TAKEN A LOOK AT THEIR FIRST

 4    PARAGRAPH THAT DESCRIBES -- PURPORTS TO DESCRIBE YOUR

 5    PERSPECTIVE?

 6        WE HAVE BEEN IN TRIAL.  IF YOU HAVEN'T HAD AN OPPORTUNITY

 7    TO REFLECT ON IT --

 8            MS. SWEENEY:  I DID READ IT, YOUR HONOR.  AND I --

 9    PLAINTIFFS DO NOT AGREE WITH THE WAY THAT APPLE HAS RESTATED

10    PLAINTIFFS' CLAIMS.

11            THE COURT:  ALL RIGHT.  WELL, WHY DON'T YOU GIVE ME

12    YOUR OWN PARAGRAPH.  I WILL CONSIDER IT AS PART OF THE WHOLE.

13    I'M NOT SAYING I WILL DO IT ONE WAY OR THE OTHER, BUT AT LEAST

14    WHEN I GO BACK I'LL HAVE IT.

15            MS. SWEENEY:  YES, YOUR HONOR.

16            MS. DUNN:  OH.  ONE OTHER QUESTION.

17        AND, FRANKLY, WE'RE A LITTLE BIT AGNOSTIC ABOUT THIS.  IN

18    YOUR PRE-INSTRUCTIONS, AFTER THE SENTENCE ABOUT PRETEXT, YOU

19    HAD INCLUDED THE SENTENCE THAT TELLS THE JURY THEY ARE NOT

20    PERMITTED TO BALANCE.  AND THAT SENTENCE IS NOT IN THIS

21    PARAGRAPH.

22        SO, WE JUST WANTED TO INQUIRE WHETHER THAT WAS PURPOSEFUL.

23            MS. SWEENEY:  YOUR HONOR, PLAINTIFFS' POSITION WOULD

24    BE THAT IT'S NOT NECESSARY OR APPROPRIATE.  IT'S ALREADY BEEN

25    PROVIDED TO THE JURY.  IT DOESN'T NEED TO GO HERE AS WELL.
```

1          **MS. DUNN:** OUR UNDERSTANDING WAS THAT THE COURT HAD

2    PROVIDED IT AFTER THE STATEMENT ABOUT PRETEXT TO HAVE THEM BE

3    TOGETHER BEFORE THE JURY.

4          **THE COURT:** I WILL HAVE TO GO BACK AND LOOK AT IT.

5          **MS. DUNN:** OKAY.

6          **THE COURT:** CAN WE MOVE TO THE FOURTH ELEMENT?

7          **MS. SWEENEY:** NO OBJECTION, YOUR HONOR.

8          **MS. DUNN:** NO OBJECTION.

9          **THE COURT:** AND THEN MY RECOMMENDATION WAS TO NOT --

10   WAS TO WAIT ON INJURY UNTIL -- AND DO IT AT THE SAME TIME FOR

11   BOTH.

12      ANY OBJECTION TO THAT APPROACH?

13         **MS. SWEENEY:** THAT MAKES SENSE, YOUR HONOR.

14         **MS. DUNN:** NO OBJECTION.

15         **THE COURT:** OKAY. NOW, WITH RESPECT TO THE SECOND

16   CLAIM, AS YOU CAN TELL I CROSS-REFERENCED SOME OF THE

17   INSTRUCTIONS SO THAT I WOULD NOT HAVE TO REPEAT THEM IN WHOLE.

18      I DID THAT BECAUSE I CAN'T TELL YOU HOW MANY TIMES I'VE

19   HAD TO RE-READ INSTRUCTIONS, AND I'M LOOKING OVER AT THE

20   JURORS AND THEIR EYES TOTALLY GLAZED OVER, THEY HAVE TOTALLY

21   LOST INTEREST.

22      THAT SAID, THIS IS COMPLICATED. SO, DO YOU HAVE

23   PERSPECTIVES? DO YOU WANT THEM REPEATED? I COULD PUT THEM IN

24   BRACKETS AND NOT READ THEM ORALLY, BUT LET THEM KNOW THAT THEY

25   ARE THERE IN BRACKETS SO THAT THEY DON'T HAVE TO GO

1503

1    CROSS-REFERENCE LATER?

2        ANY PERSPECTIVES ON THE APPROACH YOU WANT ME TO TAKE?

3            **MS. SWEENEY:**  YOUR HONOR, WE PREFER YOUR HONOR'S

4    APPROACH.  I THINK IT'S MORE CONFUSING TO HAVE MORE REPETITIVE

5    LANGUAGE IN HERE.

6            **MS. GOODMAN:**  NO OBJECTION TO YOUR HONOR'S APPROACH.

7            **THE COURT:**  I THINK THE OTHER BENEFIT OF THAT, BY THE

8    WAY, IS THAT THE LIKELIHOOD OF HAVING INCONSISTENT FINDINGS ON

9    TWO SEPARATE CLAIMS THAT INVOLVE THE SAME LAW IS PROBABLY

10    LESS.

11            **MS. DUNN:**  VERY REASONABLE.

12            **THE COURT:**  OKAY.  SO ANY STATEMENT WITH RESPECT TO

13    THE OUTLINE OF THE ELEMENTS FOR THE SECOND CLAIM?

14            **MS. SWEENEY:**  NO, YOUR HONOR.

15            **MS. GOODMAN:**  NONE FROM APPLE.

16            **THE COURT:**  OKAY.  THE FIRST ELEMENT?

17            **MS. SWEENEY:**  PLAINTIFFS ARE OKAY WITH THIS, YOUR

18    HONOR.

19            **MS. GOODMAN:**  SAME FOR APPLE.

20            **THE COURT:**  OKAY.  THE SECOND ELEMENT, AGAIN, I HAD

21    THE "HANDICAP", SO THAT WILL COME OUT LIKE THE OTHER ONE.

22        NOW HERE IT SAYS "EXCLUDE OR DESTROY".

23        IS THERE A PERSPECTIVE ON THAT ISSUE?  IT WAS ONLY

24    PROFFERED BY ONE SIDE.

25            LET'S SEE.  THE COLOR IS -- "OR DESTROY" WAS PROFFERED BY

1504

```
1    APPLE.

2              THE COURT:  MS. SWEENEY?

3              MS. SWEENEY:  IT'S NOT IN THE MODEL.  I DON'T HAVE

4    ANY PARTICULAR OBJECTION TO IT.  IT'S PROBABLY UNNECESSARY

5    WITH EXCLUDE.

6              THE COURT:  STILL REQUESTING IT, APPLE?

7              MS. GOODMAN:  YOUR HONOR, MY UNDERSTANDING IS IT IS

8    IN THE MODEL, BUT WE'RE AGNOSTIC ON ITS INCLUSION, SO LONG AS

9    YOUR HONOR STATED "HANDICAP" IS TAKEN OUT, AS I UNDERSTAND IT

10   TO BE.

11             THE COURT:  THE MODEL DOES INCLUDE IT.

12             MS. SWEENEY:  THEN -- THEN I HAVE NO OBJECTION, YOUR

13   HONOR.  I'M LIKE APPLE, AGNOSTIC ON IT.

14             THE COURT:  SO WE WILL INCLUDE THAT.

15         ANYTHING ELSE ON THE SECOND ELEMENT?

16             MS. SWEENEY:  NO, YOUR HONOR.

17             THE COURT:  OKAY.  THE THIRD ELEMENT, AGAIN, I WILL

18   TAKE OUT "OR HANDICAP".

19         A COUPLE OF ISSUES.  YOU CAN GIVE ARGUMENT ON.  ONE IS

20   WHETHER I SHOULD PROVIDE THE JURY WITH FACTORS TO BE

21   CONSIDERED.  I'M DISINCLINED TO USE THE WORD "SHOULD".  I'M

22   MORE INCLINED TO USE THE WORD "MAY" TO THE EXTENT THAT I GIVE

23   IT.

24         COMMENTS.

25             MS. SWEENEY:  PLAINTIFFS AGREE WITH YOUR HONOR THAT
```

1    IF THESE FACTORS ARE INCLUDED, THE WORD SHOULD BE "MAY" AS

2    OPPOSED TO "SHOULD".

3         **THE COURT:**  I SHOULD ALSO SAY NUMBER 5 IS NOT IN THE

4    MODEL.

5         **MS. GOODMAN:**  YOUR HONOR, THE MODEL SAYS THAT THE

6    COURT CAN EXPAND OR CONTRACT TO LESSEN OR ADD OTHER FACTORS AS

7    APPROPRIATE TO THE FACTS OF THE CASE.  AND BECAUSE APPLE HAS

8    PUT ON EVIDENCE THAT FACTORS OTHER THAN THE ALLEGED

9    ANTICOMPETITIVE CONDUCT HAVE CONTRIBUTED TO APPLE'S MARKET

10   SHARE, THERE SHOULD BE GUIDANCE TO THE JURY THAT THEY SHOULD

11   CONSIDER SUCH EVIDENCE IN ADDITION TO THE FIRST FOUR ITEMS

12   THAT ARE LISTED.

13        **THE COURT:**  MS. SWEENEY?

14        **MS. SWEENEY:**  WELL, IT SEEMS TO ME THAT THAT

15   JUSTIFICATION SUGGESTS WHY NUMBER 5 OUGHT TO BE EXCLUDED HERE.

16   WE ARE ONLY TALKING ABOUT DANGEROUS PROBABILITY OF ACHIEVING

17   MONOPOLY POWER AND NOT ABOUT THE ANTICOMPETITIVE INTENT

18   ELEMENT.

19      SO I WOULD PROPOSE INCLUDING THE FACTORS EXCEPT FOR NUMBER

20   5.

21        **MS. GOODMAN:**  I THINK MS. SWEENEY IS MISSTATING A BIT

22   WHAT I SAID.

23      THE FACTORS THAT THE JURY SHOULD CONSIDER ARE BOTH THINGS.

24   AS NUMBER 4 SAYS, THE LIKELY EFFECT OF ANY ANTICOMPETITIVE

25   CONDUCT THAT PLAINTIFFS HAVE PUT ON EVIDENCE OF.  BY SAME

```
1    TOKEN, THEY SHOULD CONSIDER WHETHER APPLE HAS HAD A DANGEROUS

2    PROBABILITY OF SUCCESS IN ACHIEVING MONOPOLY POWER BY

3    CONSIDERING EVIDENCE THAT THEY HAVEN'T ENGAGED IN

4    ANTICOMPETITIVE CONDUCT BUT HAVE ENGAGED IN OTHER ACTIVITIES

5    THAT COULD CONTRIBUTE TO MONOPOLY POWER.

6            THE COURT:  ALL RIGHT.  THE COURT WILL GIVE 1 THROUGH

7    4, NOT 5.

8        NEXT PAGE.  NO OBJECTION?

9            MS. SWEENEY:  NO OBJECTION, YOUR HONOR.

10           THE COURT:  THEN WE MOVE TO DAMAGES.

11           MR. COVE:  GOOD AFTERNOON, YOUR HONOR, JOHN COVE.

12           THE COURT:  GOOD AFTERNOON.

13       SO WITH RESPECT TO THIS, LET'S START WITH JUST THE BLACK,

14   NOT THE GREEN OR RED.  ANYBODY HAVE OBJECTIONS TO THE BLACK

15   TYPE?

16           MS. SWEENEY:  NO, YOUR HONOR.

17           MR. COVE:  ON JUST THE FIFTH ELEMENT?

18           THE COURT:  YES.

19           MR. COVE:  NO OBJECTION, YOUR HONOR.

20           THE COURT:  OKAY.  SO NOW ARGUMENT REGARDING THE

21   PROFFERED LANGUAGE FROM BOTH SIDES, THE GREEN BEING APPLE, RED

22   BEING PLAINTIFFS.

23       MS. SWEENEY.

24           MS. SWEENEY:  YOUR HONOR, I BELIEVE THAT THIS PORTION

25   OF THE INSTRUCTION, WHICH IS APPLE'S LANGUAGE, APPEARS
```

1507

1    ELSEWHERE, AND SO PLAINTIFFS WOULD OBJECT AT THE REPETITION OF

2    THIS MATERIAL.

3           **THE COURT:**  WHAT ABOUT YOUR OWN?

4           **MS. SWEENEY:**  WELL, THAT HAS TO GO IN HERE SOMEWHERE.

5    AND IF IT DOESN'T GO INTO THIS INSTRUCTION, IT HAS TO GO INTO

6    ONE OF THE OTHERS BECAUSE IT'S CERTAINLY THE LAW THAT

7    PLAINTIFFS ARE NOT REQUIRED TO SHOW THAT THE ANTITRUST

8    VIOLATION WAS THE SOLE CAUSE OF THEIR INJURY OR ELIMINATE

9    OTHER POSSIBLE CAUSES OF INJURY.

10          **THE COURT:**  I THINK APPLE HAD A -- THERE'S A -- IF

11   YOU GO BACK A FEW PAGES TO 44B, APPLE'S PROPOSED INSTRUCTION

12   44B, WHAT IS IN BLACK THERE IS STANDARD LANGUAGE.  I WILL HAVE

13   TO GO BACK AND READ THEM AS A WHOLE, BUT I DON'T LIKE TO

14   REPEAT MYSELF.  THAT'S CERTAINTY.

15      MR. COVE, BACK ON FIFTH ELEMENT.

16          **MR. COVE:**  YES.  WELL, I THINK IF WE PUT 44B IN THERE

17   AS WE PROPOSED IT, MS. SWEENEY IS CORRECT THAT SOME OF THAT

18   WOULD BE REPETITIVE.

19      AS FAR AS THE RED MATERIAL GOES, THERE'S TWO THAT I --

20   THERE ARE ONLY TWO.

21      THE FIRST IS THE STATEMENT THAT THE PLAINTIFFS ARE NOT

22   REQUIRED TO PROVE THAT THE ALLEGED ANTITRUST VIOLATION WAS THE

23   SOLE CAUSE TO CLASS MEMBERS' INJURY.  I THINK WE HAVE GOT A

24   LOT OF DIFFICULTY HERE ESPECIALLY IN LIGHT OF DR. NOLL'S

25   TESTIMONY TODAY, THAT THEY DO HAVE TO PROVE THAT.  THERE WERE

1508

```
 1    A LOT OF FACTORS THAT CAUSED DEMAND TO INCREASE AFTER 7.0 WAS

 2    RELEASED, AND YOU HEARD SOME OF THEM TODAY.  AND --

 3         THE COURT:  THEY HAVE TO PROVE DAMAGE WITH SOME

 4    AMOUNT -- IT CANNOT BE SPECULATIVE.  THAT DOESN'T -- NOT

 5    HAVING SPECULATIVE DAMAGES IS VERY DIFFERENT FROM SAYING IT'S

 6    THE SOLE CAUSE.

 7         MR. COVE:  WELL, THEY CANNOT --

 8         THE COURT:  DO YOU HAVE ANY AUTHORITY FOR THAT

 9    PROPOSITION?

10         MR. COVE:  YES, I DO, YOUR HONOR.  THE COMCAST CASE

11    IS VERY IMPORTANTLY.  ADMITTEDLY IT IS A DAMAGES CASE, BUT IT

12    MAKES CLEAR THAT IT -- A MODEL PURPORTING TO SERVE AS EVIDENCE

13    OF DAMAGES IN THE CLASS ACTION MUST MEASURE ONLY THOSE DAMAGES

14    ATTRIBUTABLE TO THAT THEORY.

15         AND DR. NOLL'S ANALYSIS PURPORTS TO IDENTIFY DAMAGES THAT

16    ARE SOLELY THE RESULT OF THE ALLEGED ILLEGAL CONDUCT, AND HE

17    CLAIMS TO HAVE ISOLATED ALL THE PROCOMPETITIVE FACTORS, LIKE

18    VIDEO, AND CAPACITY, AND SO FORTH.

19         SO I THINK THERE'S A DANGER OF CONFUSION HERE BECAUSE

20    DR. NOLL'S TESTIMONY, I THINK THE JURY IS GOING TO UNDERSTAND,

21    DID NOT DISTINGUISH BETWEEN LEGAL AND ILLEGAL CONDUCT.  AND --

22         THE COURT:  THAT'S YOUR ARGUMENT.

23         MR. COVE:  I UNDERSTAND THAT, BUT I WOULDN'T WANT --

24    I -- I -- A JURY INSTRUCTION THAT GAVE THEM AN OUT FROM TRYING

25    TO RESOLVE THAT VERY DIFFICULT QUESTION.
```

1509

1              **THE COURT:** RESPONSE.

2              **MS. SWEENEY:** YOUR HONOR, THE LAW IS CLEAR THAT

3    PLAINTIFFS DO NOT HAVE TO SHOW THAT THE ANTITRUST VIOLATION

4    WAS THE SOLE CAUSE OF PLAINTIFFS' INJURY.  AND THE CITATION TO

5    *COMCAST* IS COMPLETELY INAPPROPRIATE.

6         APPLE HAS THE RIGHT TO, AND I'M SURE WILL, MAKE YET

7    ANOTHER MOTION TO DECERTIFY THE CLASS.  THEY CAN CITE *COMCAST*

8    AT THAT TIME.  BUT *COMCAST* IS -- IS NOT A DAMAGES CASE, IT'S A

9    CLASS CERTIFICATION CASE, AND IT'S COMPLETELY INAPPOSITE HERE.

10             **MR. COVE:** IT WAS, OF COURSE -- PROCEDURAL CONTEXT

11   WAS A CLASS CERTIFICATION, BUT IT SET OUT THE REASON THE CLASS

12   WAS DECERTIFIED IS BECAUSE THEY COULDN'T PROVE THE PROPER

13   ELEMENTS ON A CLASS-WIDE BASIS.  AND THE COURT DISCUSSED THE

14   PROPER ELEMENTS AND THE PROPER STANDARDS FOR DAMAGES.  SO....

15             **MS. SWEENEY:** I WOULD POINT OUT THAT NOTHING -- THE

16   COURT IN *COMCAST* DID NOT SAY ANYTHING ABOUT HOW PLAINTIFFS

17   HAVE TO SHOW THAT THEIR DAMAGES -- THAT THE ANTICOMPETITIVE

18   CONDUCT WAS THE SOLE CAUSE OF THEIR DAMAGES.

19             **MR. COVE:** I -- I DISAGREE WITH THAT.  I WILL -- LET

20   ME GIVE THE SPECIFIC CASE.  IT'S *COMCAST* AT 133 SUPREME COURT

21   1426.  AND THIS IS PAGE -- PAGE -- EXCUSE ME.  I AM SORRY.

22        PAGE 1433.  A MODEL PURPORTING TO SERVE AS EVIDENCE OF

23   DAMAGES IN A CLASS ACTION, THIS IS A CLASS ACTION, MUST

24   MEASURE ONLY THOSE DAMAGES ATTRIBUTABLE TO THAT THEORY.

25             **MS. SWEENEY:** AGAIN, THE COURT IS TALKING ABOUT THE

```
 1   MODEL USED BY PLAINTIFFS' EXPERT AT THE CLASS CERTIFICATION

 2   STAGE, WHICH SEEMS WHOLLY DIFFERENT THAN THE QUESTION WE ARE

 3   NOW ADDRESSING, WHICH IS -- IS DAMAGES.

 4       AND IT CERTAINLY HAS -- THE ANTICOMPETITIVE CONDUCT, OF

 5   COURSE, HAS TO BE A MATERIAL CAUSE OF THE PLAINTIFFS' DAMAGES,

 6   BUT THERE WOULD NEVER BE A PLAINTIFFS' VERDICT WITH DAMAGES IF

 7   MR. COVE'S INTERPRETATION OF THE LAW WERE CORRECT.

 8           THE COURT:  ANYTHING ELSE?

 9           MR. COVE:  I DON'T HAVE ANYTHING ON THIS POINT, BUT I

10   HAVE SOMETHING ON THE NEXT RED INSERT AS WELL.

11           THE COURT:  OKAY.  GO AHEAD.

12           MR. COVE:  MY CONCERN WITH THAT, YOUR HONOR, IS

13   READING THE SECOND SENTENCE UNDER 3.

14       "IF PLAINTIFFS' INJURIES WERE CAUSED BY A REDUCTION IN

15   COMPETITION OR ACTS THAT WOULD LEAD TO A REDUCTION IN

16   COMPETITION", THAT IS AN ACCURATE STATEMENT OF ANTITRUST

17   INJURY.

18       BUT THE RED PART THAT GOES ON, "OR ACTS THAT WOULD

19   OTHERWISE HARM CONSUMERS".

20       IN THIS CASE, WE HAVE HEARD A VARIETY OF COMPLAINTS ABOUT

21   VARIOUS THINGS.  MS. ROSEN, FOR EXAMPLE, COMPLAINED ABOUT FOUR

22   OR FIVE THINGS THAT -- PROBLEMS THAT SHE HAD WITH APPLE'S

23   PRODUCTS.  WE HEARD ABOUT NOT BEING ABLE TO TAKE MUSIC FROM

24   THE ITUNES STORE AND PLAY IT ON ANY OTHER DEVICE, AND THAT HAS

25   NOTHING TO DO WITH THEIR THEORY OF THE CASE HERE.
```

1511

1    THE LAW IS CLEAR THAT IT DOESN'T -- IT TAKES MORE THAN

2    CAUSAL INJURY TO HAVE ANTITRUST STANDING UNDER THE SHERMAN ACT

3    AS -- AS -- UNDER THE SECTION 4 OF THE CLAYTON ACT FOR A

4    VIOLATION OF THE SHERMAN ACT.

5    SO IN THE SEMINAL CASE OF *BRUNSWICK V. PUEBLO BOWL-O-MAT*

6    WHERE THE SUPREME COURT ARTICULATED THE ANTITRUST INJURY

7    STANDARD, WHICH IS 429 U.S. 477, THE COURT MADE CLEAR THAT

8    THEY MUST PROVE MORE THAN INJURY CAUSALLY LINKED TO AN ILLEGAL

9    PRESENCE IN THE MARKET.  THEY MUST PROVE ANTITRUST INJURY

10    WHICH IS TO SAY THE TYPE -- THE INJURY OF THE TYPE THAT THE

11    ANTITRUST LAWS WERE INTENDED TO PREVENT AND THAT FLOW FROM

12    WHAT -- THAT WHICH MAKES THE DEFENDANT'S ACT UNLAWFUL.

13    SO THEY HAVE A THEORY HERE, WHICH IS THE LOCK-IN THEORY

14    CAUSED A CHANGE IN DEMAND, AND THAT ELEVATED THE PRICE OF

15    IPODS.  THAT'S THE DAMAGES THEY ARE CLAIMING.  THEY ARE NOT

16    ENTITLED TO DAMAGES OR TO HAVE THE JURY CONSIDER EVERY OTHER

17    THING, EVERY BUG THAT APPLE MAY HAVE DONE, AND WHETHER THAT

18    INJURED CONSUMERS.

19    AND THIS INSTRUCTION, BY NOT LIMITING THEM TO INJURIES

20    THAT ARE CAUSED BY A REDUCTION IN COMPETITION OR ACTS THAT

21    WOULD LEAD TO A REDUCTION IN COMPETITION, YOU KNOW, GIVES

22    THEM -- IS AN END RUN AROUND THE ANTITRUST INJURY STANDING,

23    ESPECIALLY THE REQUIREMENT THAT THERE BE ANTITRUST INJURY, NOT

24    SIMPLY CAUSAL INJURY.

25    **THE COURT:**  MS. SWEENEY, YOU CITED A NUMBER OF CASES

1512

1    IN YOUR PROPOSAL FOR 43B.  DO ANY OF THESE CASES USE THAT

2    PRECISE LANGUAGE?

3           **MS. SWEENEY:**  ONE SECOND, YOUR HONOR.

4           **THE COURT:**  NOW I'M LOOKING AT YOUR PRIOR SUBMISSIONS

5    TO THE COURT.

6           **MS. SWEENEY:**  YOUR HONOR, I CAN'T RECALL.  AND I

7    WOULD -- MR. JODLOWSKI WILL TELL ME IF I MISSED SOMETHING, BUT

8    I BELIEVE THAT THE PURPOSE OF ADDING IN THAT LANGUAGE WAS

9    REALLY JUST TO -- TO MAKE CLEAR THAT WE'RE -- WE ARE TALKING

10   ABOUT REDUCTION IN COMPETITION.  AND THE CITATION TO *BRUNSWICK*

11   *VERSUS PUEBLO BOWL-O-MAT*, I THINK, ONLY SUPPORTS PLAINTIFFS'

12   POSITION THAT YOU HAVE TO HAVE HARM TO COMPETITION, REDUCTION

13   IN COMPETITION RESULTS IN HARM TO CONSUMERS.  THAT'S THE

14   LITMUS TEST FOR AN ANTITRUST VIOLATION.

15      SO I DON'T -- WE WEREN'T INTENDING TO USE THIS LANGUAGE

16   TO -- TO ALLOW THE JURY TO AWARD DAMAGES FOR ANY HARM THAT WAS

17   NOT A RESULT OF REDUCTION IN COMPETITION.

18          **THE COURT:**  ALL RIGHT.  WELL, THAT'S THEN CONFUSING.

19   I WON'T INCLUDE THAT LANGUAGE.

20          **MR. COVE:**  THANK YOU, YOUR HONOR.

21          **THE COURT:**  I WILL GO BACK AND CONSIDER THE OTHER

22   ISSUES.

23      OKAY.  NOW, AGAIN, WITH THE NEXT PAGES, IS THE

24   INTRODUCTION, GREEN AND RED.  I WILL SAY THAT I FOUND APPLE'S

25   PROPOSAL TO TRACK MORE CLOSELY THE ABA MODEL.  I THOUGHT THAT

1  THERE WAS SOME REPETITION.  MAYBE WE SHOULD CONSIDER THESE IN

2  CONJUNCTION.

3      MS. SWEENEY.

4          **MS. SWEENEY:**  THAT WAS OUR POSITION, YOUR HONOR,

5  SIMPLY NOT THAT THE LANGUAGE WAS INCORRECT, JUST THAT IT WAS

6  REPETITIVE.  AND WE DO BELIEVE THAT THE SHORTER AND MORE CLEAR

7  THE JURY INSTRUCTIONS, THE BETTER OFF WE ALL WILL BE.  SO THAT

8  WAS THE REASON FOR OUR MAKING IT SHORTER.

9          **THE COURT:**  COUNSEL?

10         **MR. COVE:**  WELL, WE ALSO AGREE THAT, OF COURSE, THAT

11  BREVITY IN PRINCIPLE IS BETTER.  I THINK OUR GREEN PARAGRAPH

12  THERE IS USEFUL TO THE JURY IN HELPING THEM UNDERSTAND.

13      I THINK THAT THE RED PARAGRAPH, I HAVE SOME SPECIFIC

14  ISSUES WITH IT THAT I CAN DISCUSS, BUT IN GENERAL IS

15  UNNECESSARY.  BUT I WOULD LIKE THE OPPORTUNITY TO RAISE

16  SPECIFIC ISSUES IF YOUR HONOR IS CONSIDERING THAT.

17         **THE COURT:**  WELL, I'M MORE INCLINED TO GO SHORT.  I

18  THINK BY CONTRAST YOUR 44B IS MUCH LONGER THAN IT HAS TO BE

19  ABOUT SPECULATION.

20         **MR. COVE:**  WE WOULD BE GLAD TO TAKE THIS BACK IN

21  LIGHT OF WHAT'S ALREADY IN THE INSTRUCTIONS, SEE IF WE CAN

22  SHORTEN IT AND MAKE SURE IT DOESN'T REPEAT ANYTHING THAT'S

23  ALREADY BEEN SAID.

24         **THE COURT:**  WHAT ARE YOUR PARTICULAR ISSUES WITH THE

25  RED ON THE INTRODUCTION?

1514

```
 1        MR. COVE:  THE RED, FIRST OF ALL, WE DON'T THINK IT'S

 2   APPROPRIATE TO SAY PLAINTIFFS ARE PERMITTED TO RELY SOLELY ON

 3   EXPERT TESTIMONY TO PROVE THE AMOUNT OF DAMAGES.  WE DON'T

 4   THINK THAT'S NECESSARY TO CULL OUT.

 5        SECOND, THE PARAGRAPH BEGINNING AT THE BOTTOM OF THE PAGE

 6   BEGINNING "UNDER THE APPLICABLE FEDERAL LAW", SAYS "CLASS

 7   MEMBERS ARE THE ONLY PERSONS ALLOWED TO SUE AND RECOVER".

 8        THAT HAS THE IMPLICATION THAT PEOPLE COULDN'T SUE OUTSIDE

 9   THE CLASS, WHICH, OF COURSE, IS INCORRECT.  MAYBE COUNSEL --

10   I'M SURE THEY DIDN'T MEAN IT.

11        BUT IF THIS IS GOING TO GO IN THERE, IT SHOULD SAY "DIRECT

12   PURCHASERS".  BECAUSE CLASS COUNSEL -- ANYONE WHO CARED TO

13   HAVE BROUGHT A SUIT BASED ON THESE ALLEGATIONS, COULD HAVE

14   DONE SO, COULD HAVE OPTED OUT.  SO PUTTING "CLASS MEMBERS" IN

15   THERE IS NOT RIGHT.  DIRECT PURCHASES -- DIRECT PURCHASERS IS

16   A CORRECT STATEMENT OF THE LAW.

17        AND IF NECESSARY, WE CAN DEFINE IT AS PERSONS WHO

18   PURCHASED AN AFFECTED IPOD DIRECTLY FROM APPLE.

19        THE COURT:  ANY COMMENTS?

20        MS. SWEENEY:  I WOULD CERTAINLY BE WILLING TO

21   CONSIDER MR. COVE'S SECOND SUGGESTION ABOUT PERSONS ALLOWED TO

22   SUE.  NO OBJECTION IN PRINCIPLE TO THAT.

23        I DO BELIEVE, THOUGH, THAT THE -- THE REFERENCE TO

24   PLAINTIFFS BEING PERMITTED TO RELY SOLELY UPON EXPERT

25   TESTIMONY IS AN ACCURATE STATEMENT OF THE LAW AND IT BELONGS
```

1515

```
1    HERE IN THIS INSTRUCTION.  WE CITED A NUMBER OF CASES IN

2    SUPPORT OF THAT PRINCIPLE, YOUR HONOR, INCLUDING YOUR HONOR'S

3    SUMMARY JUDGMENT RULING IN THIS CASE.

4         MR. COVE:  WE DON'T DISAGREE THAT IS A CORRECT

5    STATEMENT OF THE LAW.  WE JUST THINK IT'S UNNECESSARY.

6    CERTAINLY THE JURY WILL HAVE NOT HEARD ANYTHING BESIDES THAT.

7         THE COURT:  THIS IS AN INTRODUCTION.  SO WHAT I'M

8    INCLINED TO DO IS GIVE THE FIRST BLACK PARAGRAPH, THE SECOND

9    PARAGRAPH WHICH TRACKS CLOSELY THE MODEL ABA CODE.  I THINK

10   IT'S FINE TO GIVE THE ONE SENTENCE ABOUT RELIANCE ON EXPERT

11   TESTIMONY.  IT IS KIND OF A -- I THINK IT'S IMPORTANT FOR THEM

12   TO KNOW THAT SPECIFICALLY.

13       I'M NOT, AT LEAST AT THIS JUNCTURE, INCLINED TO START

14   EXPLAINING THE PLAINTIFFS' THEORY OR THE BASIS FOR THEIR

15   DAMAGES.  YOU CAN DO THAT YOURSELVES.

16        MR. COVE:  ONE THING I NEGLECTED TO NOTE, YOUR HONOR,

17   IS THE LAST SENTENCE I THINK IS OBJECTIONABLE.

18       "THE COURT INSTRUCTS YOU NOT TO CONSIDER WHETHER THE CLASS

19   MEMBERS BENEFITED BY THE ALLEGEDLY ILLEGAL CONDUCT."

20       IF WHAT THEY ARE TRYING TO GET ON HERE -- GET TO HERE IS

21   WHETHER THE JURY IS NOT ENTITLED TO CONSIDER PASS ON, YOUR

22   HONOR HAS, OF COURSE, ALREADY RULED ON THAT.  WE DON'T INTEND

23   TO ARGUE IT.

24       I THINK THE --

25        THE COURT:  I AM NOT INCLINED TO GIVE WHAT'S LEFT.
```

```
1    SO I WILL GIVE THE STATEMENT THAT THE PLAINTIFFS CAN RELY ON

2    EXPERT TESTIMONY, AND THEN THAT WILL BE THE END TO THE

3    INTRODUCTION.

4        THEN WE WILL MOVE OVER TO SPECULATION.  AGAIN, I THINK

5    THIS IS MUCH LONGER THAN IS NECESSARY.  I'M ONLY INCLINED TO

6    JUST TELL THEM, PERIOD, YOU CAN'T -- THERE HAS TO BE A

7    REASONABLE BASIS FOR THE EVIDENCE.  YOU ALL CAN ARGUE WHAT

8    THAT MEANS.

9        MR. COVE:  YOUR HONOR, WE'LL TRY AND SUBMIT A BRIEFER

10   VERSION OF THIS, AND YOU CAN CONSIDER IT IF YOU WOULD LIKE, OF

11   COURSE.

12       THE COURT:  THE NEXT INSTRUCTION ON CAUSATION AND

13   THIS AGGREGATION, YOU DO HAVE A GREEN AND THEN A HIGHLIGHT,

14   CORRECT?

15       MS. SWEENEY:  YES.

16       MR. COVE:  YES.

17       THE COURT:  SO THE GREEN TRACKS THE -- WHAT'S IN THE

18   ABA MODEL CODE OR MODEL INSTRUCTIONS.  THE GREEN IS ALL NEW

19   INCLUDED BY APPLE.

20       ARGUMENT ON WHY I NEED TO HAVE THIS.

21       MR. COVE:  YOUR HONOR, WE BELIEVE THAT THIS IS --

22   THAT IT IS VERY IMPORTANT TO CLARIFY EXACTLY WHAT IS AT ISSUE

23   IN THE CASE.

24       THE PLAINTIFFS HAVE GOTTEN IN A LOT OF EVIDENCE THAT --

25   THAT -- UNDER THE RUBRIC OF PRETEXT, WHICH IS -- WHICH IS
```

1    FINE, BUT -- THEY HAVE A VERY SPECIFIC AND LIMITED DAMAGES

2    THEORY.  AND I THINK IT'S VERY IMPORTANT TO FOCUS THE JURY ON

3    EXACTLY WHAT THE CLAIM IS, HOW THEY ARE SUPPOSED TO BE

4    EVALUATING THE DAMAGES, WHICH IS BASED ON ALLEGED OVERCHARGE

5    AS TO THESE SPECIFIC MODELS.

6        AND NOT TO, PERHAPS, GO OFF IF THEY HAVE BEEN DISTRACTED

7    BY SOME OF THE SIDE ISSUES ON PEOPLE WHO LOST THEIR MUSIC OR

8    THAT SORT OF THING, TO REALLY FOCUS THEM IN.

9        I THINK IT WOULD BE VERY IMPORTANT TO DO THAT.  YOU KNOW,

10   I'M HOPING THEY WILL DO IT WITHOUT THIS -- WITHOUT A FIRM

11   GUIDEPOST, BUT I THINK THAT THE SLIGHT ADDITIONAL TIME TO GIVE

12   THEM A VERY CLEAR GUIDEPOST HERE IS WORTHWHILE IN LIGHT OF THE

13   WIDE RANGING EVIDENCE THAT'S BEEN PRESENTED HERE, AND THE, YOU

14   KNOW, VERY SPECIFIC CLAIM FOR DAMAGES THAT THEY HAVE TO

15   EVALUATE.

16           **THE COURT:**  RESPONSE?

17           **MS. SWEENEY:**  YOUR HONOR, I THINK THE EVIDENCE THAT

18   PLAINTIFFS PRESENTED, IT ADDRESSES THE QUESTION WHETHER THERE

19   WAS A GENUINE PRODUCT IMPROVEMENT.  IT ADDRESSES THE THEORY OF

20   LOCK-IN, BUT THE DAMAGES ANALYSIS HAS BEEN PRESENTED CLEARLY

21   ONLY BY PROFESSOR NOLL WITH RESPECT TO THE ANTITRUST

22   VIOLATION.

23        SO THIS LANGUAGE IS UNNECESSARY.  IT'S UNSUPPORTED BY ANY

24   LEGAL AUTHORITY, AND IT'S REPETITIVE OF -- PARTS OF IT ARE

25   JUST REPETITIVE OF OTHER INJURY INSTRUCTIONS AND IT IS SLANTED

1    IN APPLE'S FAVOR IN A WAY THAT'S PREJUDICIAL TO PLAINTIFFS.

2        SO WE OPPOSE THE INCLUSION OF ANY OF THIS GREEN LANGUAGE

3    IN THIS INSTRUCTION.

4            **MR. COVE:**  YOUR HONOR, I'M SORRY.

5        BUT, YOU KNOW, LOOKING AT THE LAST PARAGRAPH IN YELLOW,

6    "IN THE NORMAL COURSE OF BUSINESS ACTIVITY," IF THERE IS A --

7    I THINK THESE ARE IMPORTANT FOR THE JURY TO CONSIDER, BUT I'M

8    NOT SURE THEY ARE EXPRESSLY COVERED BY OTHER INSTRUCTIONS.

9    THEY ARE PERHAPS IMPLICITLY COVERED.

10        YOU KNOW, WHAT IS REALLY IMPORTANT IS GIVING THEM THE

11   GUIDANCE IN THE TOP -- THE HIGHER PART OF THAT YELLOW; THAT WE

12   CAN PROBABLY DO WITHOUT THE LAST PARAGRAPH BEGINNING "IN THE

13   NORMAL COURSE OF BUSINESS".  BUT THE SPECIFIC GUIDANCE AS TO

14   THE SPECIFIC CLAIMS OF DAMAGES, I THINK IS EXTREMELY

15   IMPORTANT.

16            **THE COURT:**  WHAT -- WHAT LANGUAGE ARE YOU TALKING

17   ABOUT?

18            **MS. SWEENEY:**  YOUR HONOR, I WAS TALKING ABOUT THE

19   GREEN PART BELOW THE YELLOW.  MAYBE MR. COVE AND I ARE NOT

20   TALKING ABOUT THE SAME SECTION.

21            **MR. COVE:**  I WAS REFERRING, I AM SORRY I WASN'T

22   CLEAR.  I WAS REFERRING TO THE PARAGRAPH BEGINNING "IN THE

23   NORMAL COURSE OF BUSINESS ACTIVITY", WHICH IS UNDER THE LIST

24   OF "ALLEGEDLY AFFECTED PRODUCTS".

25            **THE COURT:**  YOU THINK THAT'S IMPORTANT OR LESS

1    IMPORTANT?

2         **MR. COVE:**  I THINK IT'S IMPORTANT, BUT IF, IN THE

3    INTEREST OF BREVITY, WE NEED TO TAKE IT OUT, IT IS NOT AS

4    IMPORTANT AS GIVING THE SPECIFIC GUIDANCE AS TO THE SPECIFIC

5    CLAIMS THAT IS FOUND ABOVE THAT PARAGRAPH.

6         **THE COURT:**  SO WHAT YOU THINK IS MOST IMPORTANT IS

7    THE FIRST TWO PARAGRAPHS?

8         **MR. COVE:**  YES.

9      I THINK IT, YOU KNOW -- I DON'T MEAN TO GIVE IT UP,

10   BECAUSE I THINK IT IS VERY IMPORTANT, THE THIRD PARAGRAPH, "IN

11   THE NORMAL BUSINESS ACTIVITY" --

12        **THE COURT:**  I WILL LIKELY NOT GIVE THAT.

13     I GUESS I'M NOT -- I'M NOT EXACTLY UNDERSTANDING WHY YOU

14   THINK THIS IS SO CRITICAL.  THAT IS, I THOUGHT THE TESTIMONY

15   WAS PRETTY CLEAR THAT THEIR ECONOMIST HAS A THEORY.  THEY HAVE

16   BEEN GIVEN TWO NUMBERS.

17        **MR. COVE:**  AND --

18        **THE COURT:**  AND THEY -- AND I WILL NOT PUT ON A

19   VERDICT FORM ALL OF THESE VARIOUS PRODUCTS.

20        **MR. COVE:**  OKAY.

21        **THE COURT:**  IT'S NOT THE WAY THE EVIDENCE HAS COME

22   IN.  IT'S CONFUSING.  IT'S MUCH LONGER.

23        **MR. COVE:**  RIGHT.  WE HAVEN'T PROPOSED THAT WITH THE

24   VERDICT FORM.

25        **THE COURT:**  I KNOW, BUT YOU'VE GOT IT IN HERE.  I'M

1520

```
 1    NOT INCLINED TO DO THAT EITHER.

 2         SO WHAT IS -- WHAT IS SO IMPORTANT?  I MEAN --

 3            MS. DUNN:  WE HAVE --

 4            THE COURT:  YOU HAVE THE CLASS PERIOD, AND I JUST AM

 5    NOT SEEING WHAT YOU THINK IS SO IMPORTANT.

 6            MR. COVE:  YOU KNOW, MAYBE I'M BEING OVER CONSCIOUS.

 7    ALL THE COUNSEL, AND YOUR HONOR, OF COURSE, HAVE BEEN

 8    LISTENING VERY CAREFULLY, JURORS HAVE BEEN LISTENING VERY

 9    CAREFULLY, AND THEY APPEAR TO BE A VERY CONFIDENT BUNCH.  IT'S

10    JUST --

11                   (SIMULTANEOUS COLLOQUY.)

12            THE COURT:  THAT'S ALSO WHAT CLOSINGS ARE FOR,

13    MR. COVE.

14            MR. COVE:  I AM SORRY?

15            THE COURT:  THAT'S ALSO WHAT CLOSINGS ARE FOR.

16      MY JOB IS TO TELL THEM WHAT THE LAW IS.  YOUR JOB IS TO

17    TELL THEM WHAT THE EVIDENCE IS IN THE CONTEXT OF THE LAW.

18         I WILL THINK ABOUT IT.  IT IS UNLIKELY.

19            MR. COVE:  THANK YOU, YOUR HONOR.

20            THE COURT:  OKAY.  THIS PROPOSED 45 SEEMS REPETITIVE

21    OF WHAT -- OF WHAT I'M ALREADY TELLING THEM IN THE

22    PRE-INSTRUCTIONS.  I'M NOT GOING TO SEPARATE OUT SOME

23    INSTRUCTION REGARDING EXPERT TESTIMONY THAT DEALS JUST WITH

24    DAMAGES.  THAT INSTRUCTION IS IMPORTANT WITH RESPECT TO ALL

25    EXPERTS.  SO, I'M NOT INCLINED TO GIVE THIS.
```

1          **MR. COVE:**  UNDERSTOOD, YOUR HONOR.

2          **THE COURT:**  OKAY.  MITIGATION?

3          **MR. COVE:**  YES, YOUR HONOR.

4      THERE IS AN EVIDENTIARY BASIS FOR THIS IN THIS CASE IN

5   THAT THE EVIDENCE SHOWS THAT ANYONE WHO FELT THEY WERE

6   AFFECTED BY LOCK-IN COULD BURN AND RIP AND MITIGATE, YOU KNOW,

7   NOT BEING LOCKED IN.  AND THIS IS THE STANDARD MITIGATION

8   INSTRUCTION FROM THE MODEL INJURY INSTRUCTIONS.

9          **THE COURT:**  ALL 8 MILLION OF THEM.

10         **MR. COVE:**  WELL, YOU KNOW --

11         **THE COURT:**  IS YOUR EXPERT -- HAS YOUR EXPERT DEALT

12   WITH THIS ISSUE?

13         **MR. COVE:**  HE'S GOING TO TALK ABOUT BURNING AND

14   RIPPING.  THAT IS CERTAINLY AN OPTION THAT PEOPLE CAN ENGAGE

15   IN.  IF THEY --

16         **THE COURT:**  HE'S QUANTIFIED THAT?

17         **MR. COVE:**  WELL, THEY ALL COULD HAVE.

18         **THE COURT:**  DID HE.

19         **MR. COVE:**  NO, HE DID NOT DO THAT.  I MEAN, DR. NOLL

20   ADMITTED THAT IT WAS A SMALL COST TO BURN AND RIP.

21         **THE COURT:**  IF THERE'S GOING TO BE NO EVIDENCE

22   SUBMITTED BY THE DEFENSE THAT THEY HAVE SOMEHOW QUANTIFIED THE

23   MITIGATION EFFECT OF BURNING AND RIPPING OF 8 MILLION

24   CONSUMERS, I'M NOT GIVING THIS INSTRUCTION.

25         **MR. COVE:**  OKAY, YOUR HONOR.  LET ME -- OBVIOUSLY WE

1522

```
1    HAVE A CLASS HERE.  AND NOT ALL THE CLASS WAS GOING TO BE

2    INCLINED TO BURN AND RIP, BUT THE FACT THAT THERE IS A CLASS I

3    DON'T THINK SHOULD PRECLUDE US FROM PRESENTING A DEFENSE THAT

4    IS -- THAT COULD HAVE AFFECTED SOME CONSUMERS WITHIN THE

5    CLASS.

6            THE COURT:  WELL, I UNDERSTAND THAT.  THAT IS WHY I'M

7    ASKING WHAT THE EVIDENCE IS GOING TO BE.  BECAUSE IT SEEMS

8    INCREDIBLY CONFUSING AND NOT APPROPRIATE.

9            MR. COVE:  I THINK THE EVIDENCE WILL BE THAT BURNING

10   AND RIPPING WAS EASY TO DO, AND THAT MANY PEOPLE DID IT.  BUT

11   YOU'RE CORRECT, THAT WE WILL NOT BE ABLE TO QUANTIFY THAT IN

12   ANY WAY.

13           THE COURT:  RESPONSE?

14           MS. SWEENEY:  WE DON'T THINK THAT ANY MITIGATION

15   INSTRUCTION IS APPROPRIATE IN THIS CASE.  IT'S AN OVERCHARGE

16   CASE.

17       PLAINTIFFS' THEORY IS THAT LOCK-IN OF SOME PORTION OF THE

18   CLASS INCREASED THE PRICE OF IPODS FOR EVERYONE IN THE CLASS.

19   NOW, OF COURSE, NO RESELLER COULD HAVE MITIGATED ITS DAMAGES.

20   IT PAID AN INCREASE PRICE AS A RESULT OF OTHERS LOCK-IN.

21       AND AS YOUR HONOR POINTED OUT, THERE IS NO EVIDENCE

22   WHATSOEVER OF THE QUANTIFICATION OF CLASS MEMBERS WHO COULD

23   BURN AND RIP.

24       BUT I THINK IT'S MORE IMPORTANT TO NOTE IT IS SIMPLY

25   IRRELEVANT TO THE THEORY OF THE CASE AND BECAUSE IT IS AN
```

1  OVERCHARGE CASE, IT'S INAPPROPRIATE IN THIS CASE.

2      AND I WOULD JUST REFER YOUR HONOR TO THE *TFT-LCD*

3  LITIGATION FROM THIS DISTRICT IN A PRICE-FIXING CASE, ALSO AN

4  OVERCHARGE CASE, DECLINING TO ALLOW DEFENDANTS TO HAVE A

5  MITIGATION INSTRUCTION.  ALSO THE *IN RE:  AIRLINE TICKET*

6  *ANTITRUST LITIGATION*, 918 F.SUPP. 283.

7      SO IT'S SIMPLY NOT APPROPRIATE IN THIS CASE.

8          **THE COURT:**  WELL, I WILL WAIT UNTIL YOU PUT ON YOUR

9  EVIDENCE.  YOU HAVE THE BURDEN OF PROOF.  BUT SO FAR FROM WHAT

10  I'VE SEEN, IT'S PROBABLY NOT GOING TO COME IN.

11      ALL RIGHT.  NEXT.

12          **MR. COVE:**  THE NEXT ISSUE WE HAVE, YOUR HONOR, IS

13  TREBLING OF DAMAGES.  WE BELIEVE THAT IT IS PRUDENT TO GIVE

14  THE JURY AN INSTRUCTION ON THIS.  THEY MAY KNOW SOMETHING

15  ABOUT TREBLING.  THEY MAY NOT.  THEY MAY UNDERSTAND THAT IT IS

16  IN THEIR -- THEY MAY NOT KNOW WHAT THEIR ROLE IS BY TREBLING.

17  JUDGE ILLSTON GAVE THIS --

18          **THE COURT:**  YOUR REQUEST IS NOTED.  IT IS DENIED.

19  I'M NOT GIVING IT.

20      ALL RIGHT.  NOW, IT WAS AT THIS POINT I WAS GOING TO

21  SUGGEST, JUST TO LET YOU KNOW, INVITE THE PARTIES TO GIVE

22  THEIR CLOSING ARGUMENTS.  AFTER YOU FINISH THAT, I'LL MOVE TO

23  THE FINAL INSTRUCTIONS.

24      ANY STATEMENTS ON THE LAST SET OF INSTRUCTIONS?  THAT

25  IS -- AND THEN WE WILL GET TO THE OTHER ONES THAT WERE THERE

1524

BY THE SERIES FROM APPLE.

ANY STATEMENTS ON MY LAST SET OF CLOSING INSTRUCTIONS?

**MS. SWEENEY:**  NO, YOUR HONOR.

**MS. DUNN:**  NO, YOUR HONOR.

**THE COURT:**  ALL RIGHT.

**MS. DUNN:**  THERE IS ONE THING I WANTED TO MAKE CLEAR JUST FOR THE RECORD.  I AM NOT SURE IF I CONVEYED THIS.

WHEN WE SPOKE ABOUT THE THIRD ELEMENT INSTRUCTION WITH REGARD TO THOSE HYPOTHETICALS, I JUST WANT TO MAKE CLEAR THAT APPLE OBJECTS NOT JUST TO THE FIRM C HYPOTHETICAL AS BEING CONTRARY TO LAW AND NOT SUPPORTED BY THE CITE THAT IT'S CITED TO, BUT ALSO TO USING ALL OF THE HYPOTHETICALS.  I THINK AT THIS POINT WE CAN ALL AGREE THAT THIS IS NOT EASILY ANALOGIZED TO ANY OTHER CASE.

AND IN THE JUROR'S BOX OF EVIDENCE, IT IS HARD, I THINK, TO PUT HYPOTHETICALS.  AND I THINK I DID MENTION, ESPECIALLY HYPOTHETICALS THAT HAVE TO DO WITH COMPUTERS AND SOFTWARE.  I JUST ALSO WANTED TO NOTE THAT FOR THE RECORD.

**THE COURT:**  OKAY.  THE ONES THAT THEN ARE AT THE END ARE A SERIES OF INSTRUCTIONS THAT RELATED TO REALNETWORKS THAT WERE PROFFERED BY APPLE.  I THINK SOME OF THESE HAVE BEEN WITHDRAWN, BUT LET'S JUST GO THROUGH THEM.

SO THE FIRST ONE THAT'S THERE WAS APPLE'S NUMBER 38.

**MS. DUNN:**  THIS IS NOT WITHDRAWN.  WE STILL PROFFER THIS, AND ALSO NOTE THAT WE HAVE NOT YET PUT ON OUR CASE.  SO

1    IT MAY BE EARLY TO DISCUSS.

2            **THE COURT:**  AGAIN, I TAKE IT YOU ARE NOT GOING TO

3    HAVE ANYONE FROM REALNETWORKS TO TESTIFY AS TO THIS ISSUE.

4            **MS. DUNN:**  WE WILL NOT CALL ANYBODY FROM

5    REALNETWORKS.

6            **THE COURT:**  39?

7            **MS. SWEENEY:**  CAN I RESPOND TO THAT ONE, YOUR HONOR?

8            **THE COURT:**  YOU CAN.  I MEAN, I HAVEN'T HEARD THEIR

9    CASE.  I SAID BEFORE, I THINK, IS THE REASON THAT THESE ARE AT

10   THE BACK.

11           **MS. SWEENEY:**  THEN I WILL JUST REFER YOUR HONOR TO

12   OUR PREVIOUS OBJECTIONS TO -- TO APPLE'S PROPOSED INSTRUCTION

13   NUMBER 38.

14           **THE COURT:**  OKAY.

15       39?

16           **MS. DUNN:**  39 IS WITHDRAWN.

17           **THE COURT:**  40?

18           **MS. DUNN:**  40 WE MAINTAIN AND NOTE THAT THERE IS

19   ALREADY SOME EVIDENCE IN THE RECORD ABOUT ITUNES TERMS OF USE,

20   WHICH I AM HAPPY TO GO THROUGH, BUT ALSO HAPPY TO TABLE UNTIL

21   THE END OF OUR CASE.

22           **THE COURT:**  YOU WILL HAVE TO.

23       41?

24           **MS. DUNN:**  41 IS WITHDRAWN.

25           **THE COURT:**  42?

1      **MS. DUNN:**  42 IS ALSO WITHDRAWN.

2      **THE COURT:**  OKAY.

3      UPHILL BATTLE ON THOSE, MS. DUNN.

4      **MS. DUNN:**  I'M SORRY?

5      **THE COURT:**  IT IS AN UPHILL BATTLE.

6      **MS. DUNN:**  I UNDERSTAND.

7      **THE COURT:**  I HAVE NO ONE FROM REALNETWORKS HERE.

8   YOU ARE TRYING TO DO ALL SORTS OF THINGS WITH RESPECT TO

9   ADMISSIONS WITH RESPECT TO THEM AND THEY HAVE NOT HAD ANY

10  OPPORTUNITY TO RESPOND.  YOU DIDN'T TAKE ANY DISCOVERY.

11  THERE'S NO DEPOSITIONS.  THERE'S NOTHING.

12      AS YOU PREPARE FOR YOUR CLOSINGS, I JUST NOT PUT MONEY ON

13  THE BANK ON THAT ONE.

14      **MS. DUNN:**  I UNDERSTAND, YOUR HONOR.  I APPRECIATE

15  YOUR ADVISING US AS TO THAT.

16      **THE COURT:**  ANYTHING ELSE WITH RESPECT TO

17  INSTRUCTIONS THAT YOU WANT TO DISCUSS AT THIS JUNCTURE?

18      **MS. DUNN:**  YES, YOUR HONOR.

19      WE HAVE, AND HAVE SENT TO PLAINTIFFS, AN INSTRUCTION AS TO

20  MARIANNA ROSEN AND MELANIE TUCKER.

21      **THE COURT:**  OKAY.

22      **MS. DUNN:**  DOES THE COURT HAVE A COPY?

23      **MS. SWEENEY:**  YOUR HONOR, I THOUGHT THAT WE HAD

24  AGREED EARLIER TODAY THAT WE WERE GOING TO MEET AND CONFER

25  ABOUT THAT.  WE HAVEN'T HAD A CHANCE YET TO EXCHANGE AN

1    INSTRUCTION.

2              **MS. DUNN:**  THAT'S FINE WITH US, YOUR HONOR.

3              **THE COURT:**  OKAY.

4        OTHERS?  OTHER ISSUES?

5              **MS. SWEENEY:**  NOT FROM PLAINTIFFS, YOUR HONOR.

6              **MR. ISAACSON:**  ONE POINT ON THE ISSUE ABOUT STEVE

7    JOBS ON THE INSTRUCTION THAT THEY ARE REQUESTING?

8        THE ORDER IS DOCKET NUMBER 543 THAT COUNSEL WAS REFERRING

9    TO.

10       THE ARGUMENT IS THAT THERE WAS A COURT ORDER THAT STEVE

11   JOBS COULD ONLY TALK ABOUT CERTAIN TOPICS.

12       NOW, IN OPENING, I SAID HE WOULD NOT BE ASKED ANY

13   QUESTIONS ABOUT 7.0 OR 7.4, WHICH WAS ACCURATE.

14       NOW WHAT'S REFLECTED IN THE ORDER, IS THAT EACH OF THE

15   TOPICS THAT ARE BEING DISCUSSED ARE TOPICS PLAINTIFFS SEEK TO

16   DEPOSE HIM ON.

17       IT'S -- THERE'S THREE TOPICS, AND THE COURT SAYS

18   PLAINTIFFS FIRST SEEK TO DEPOSE JOBS ON THE FIRST TOPIC,

19   PLAINTIFFS NEXT SEEK TO -- TO DEPOSE, AND PLAINTIFFS ALSO SEEK

20   TO DEPOSE.  SO, THE PLAINTIFFS NEVER APPLIED TO DEPOSE STEVE

21   JOBS ABOUT 7.0 OR 7.4.  IT'S THEY NEVER SOUGHT TO ASK HIM ANY

22   QUESTIONS ABOUT 7.0 OR 7.4.

23       IT'S ALSO RELEVANT THAT EVEN WITH THE TOPICS THAT THEY DID

24   SEEK TO DEPOSE HIM ON, THE STANDARD THAT THE COURT APPLIED AND

25   TO WHETHER THE DEPOSITION COULD HAPPEN ON THOSE TOPICS WAS

```
1    WHETHER MR. JOBS HAS UNIQUE NONREPETITIVE FIRSTHAND KNOWLEDGE.

2       SO THERE COULD BE NO IMPLICATION THAT MR. JOBS, WITH

3    RESPECT TO 7.0 OR 7.4, HAD UNIQUE NONREPETITIVE FIRSTHAND

4    KNOWLEDGE.

5       SO I WANTED TO BRING THAT TO THE COURT'S ATTENTION.

6          MS. SWEENEY:  YOUR HONOR, I WOULD JUST SAY THAT

7    MR. ISAACSON IS INCORRECT.  HE'S READING FROM THE ORDER WHICH

8    RESULTED AFTER AN EXTENDED PERIOD OF MOTION PRACTICE AND

9    NEGOTIATION BETWEEN COUNSEL FOR THE PARTIES.

10      AND PLAINTIFFS INITIALLY SOUGHT JUST TO DEPOSE MR. JOBS.

11   APPLE MADE CLEAR THAT THEY WOULD STRENUOUSLY OPPOSE ANY

12   DEPOSITION.  SO THERE WAS AN EXTENSIVE PERIOD.  WE WILL HAVE

13   TO PROVIDE, I GUESS, ALL OF THE RELEVANT BRIEFING ON THAT.

14         THE COURT:  WELL, BEFORE YOU ENGAGE IN THE LABORIOUS

15   NECESSITY OF DOING THAT, I WOULD SUGGEST THAT PERHAPS YOU

16   CRAFT AN INSTRUCTION THAT YOU WANT ME TO GIVE, AND SEE IF

17   THERE'S AN OBJECTION, AND IDENTIFY FOR THEM WHAT YOU HAVE IN

18   TERMS OF YOUR SUPPORT, AND SEE IF YOU CAN WORK IT OUT.  IF

19   NOT, I WILL HAVE TO RESOLVE IT.

20         MS. SWEENEY:  YES, YOUR HONOR.

21         MS. DUNN:  THAT SOUNDS REASONABLE.

22         THE COURT:  I MEAN, YOU KNOW, JUST TRYING TO BE FAIR

23   HERE.  SO IF I'M GOING TO BE FAIR, YOU GUYS CAN BE FAIR AND

24   SAVE YOURSELVES SOME TIME.  THAT'S PROBABLY BETTER FOR YOU.

25         MS. DUNN:  WE APPRECIATE THAT.
```

1          **THE COURT:**  OKAY.  OTHER ISSUES WHO INSTRUCTIONS?

2      MS. DUNN?

3          **MS. DUNN:**  NONE FROM APPLE.

4          **THE COURT:**  MS. SWEENEY?

5          **MS. SWEENEY:**  NO, YOUR HONOR.

6          **THE COURT:**  OKAY.  THEN WE WILL STAND IN RECESS UNTIL

7   4:00 O'CLOCK WHEN I HAVE ARGUMENT.

8          **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

9          **MR. ISAACSON:**  YES, YOUR HONOR.  MY -- OUR PARTNER

10  JONATHAN SHERMAN WILL BE HERE ALONG WITH MEREDITH DEARBORN.

11  WE WILL SEE YOU TOMORROW MORNING.

12          **THE COURT:**  ALL RIGHT.

13          **MS. DUNN:**  THANK YOU VERY MUCH.

14          **THE COURT:**  THANK YOU.

15      (PROCEEDINGS ADJOURNED AT 2:20 P.M.; MOTION HEARING

16  PRODUCED SEPARATELY.)

17

18

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTERS**

3          WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, OFFICIAL

4     REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

5     CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

6     TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

7     ABOVE-ENTITLED MATTER.

8

9          _____

10              RAYNEE H. MERCADO, CSR 8258, RMR, CRR, FCRR

11

12

13          _____

14              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

15                  TUESDAY, DECEMBER 9, 2014

16

17

18

19

20

21

22

23

24

25