UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*ORIGINAL*

BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

| | | |
|---|---|---|
| THE APPLE IPOD ITUNES | ) | NO. C 05-00037 YGR |
| ANTITRUST LITIGATION | ) | |
| | ) | PAGES 1728 - 1965 |
| | ) | |
| | ) | **JURY TRIAL VOLUME 9** |
| | ) | |
| | ) | |
| | ) | OAKLAND, CALIFORNIA |
| _____) | | THURSDAY, DECEMBER 11, 2014 |

<u>**REPORTERS' TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

FOR PLAINTIFFS:          ROBBINS GELLER RUDMAN & DOWD LLP
                         655 WEST BROADWAY, SUITE 1900
                         SAN DIEGO, CALIFORNIA  92101
                   BY:  ALEXANDRA S. BERNAY,
                        JENNIFER N. CARINGAL,
                        PATRICK COUGHLIN,
                        STEVEN M. JODLOWSKI,
                        CHARLES MCCUE,
                        CARMEN A. MEDICI,
                        BONNY E. SWEENEY, ATTORNEYS AT LAW

                         BONNETT FAIRBOURN FRIEDMAN & BALINT PC
                         4023 CAIN BRIDGE ROAD
                         FAIRFAX, VIRGINIA 22030
                   BY:  FRANCIS J. BALINT, JR.
                        ATTORNEY AT LAW

                  (APPEARANCES CONTINUED NEXT PAGE)

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                      DIANE E. SKILLMAN, CSR NO. 4909

     PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

## A P P E A R A N C E S (CONT'D.)

```
FOR DEFENDANT:          BOIES, SCHILLER & FLEXNER LLP
                        5301 WISCONSIN AVENUE NW
                        WASHINGTON, D.C.  20015
                BY:  WILLIAM A. ISAACSON,
                     KAREN L. DUNN,
                     MARTHA L. GOODMAN, ATTORNEYS AT LAW


                        BOIES, SCHILLER & FLEXNER LLP
                        1999 HARRISON STREET, SUITE 900
                        OAKLAND, CALIFORNIA  94612
                BY:  MEREDITH R. DEARBORN, ATTORNEYS AT LAW


                        JONES DAY
                        555 CALIFORNIA STREET, 26TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94104-1500
                BY:  DAVID C. KIERNAN, ATTORNEYS AT LAW


                        APPLE
                        1 INFINITE LOOP, MS 169-2NYJ
                        CUPERTINO, CALIFORNIA  95014
                BY:  SCOTT B. MURRAY,
                       SENIOR LITIGATION COUNSEL


                        --OOO--
```

# I N D E X

KELLY, JOHN

EXAMINATION BY THE COURT (JURORS' QUESTIONS) 1750      9

FURTHER RECROSS-EXAMINATION BY MR. COUGHLIN  1752      9


MURPHY, KEVIN

DIRECT EXAMINATION BY MR. ISAACSON          1757      9

CROSS-EXAMINATION BY MS. SWEENEY            1782      9

REDIRECT EXAMINATION BY MR. ISAACSON        1806      9

RECROSS-EXAMINATION BY MS. SWEENEY          1812      9

REDIRECT EXAMINATION BY MR. ISAACSON        1815      9


TOPEL, ROBERT

DIRECT EXAMINATION BY MR. ISAACSON          1822      9

CROSS-EXAMINATION BY MS. SWEENEY            1876      9

REDIRECT EXAMINATION BY MR. ISAACSON        1895      9


DONNELLY, MARK

DIRECT EXAMINATION BY MS. DEARBORN          1898      9

CROSS-EXAMINATION BY MR. MEDICI             1926      9

FURTHER REDIRECT EXAMINATION BY MS. DEARBORN 1808     9

## E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 950 | | | 1952 | 7 |
| 951 | | | 1952 | 7 |
| 952 | | | 1952 | 7 |

| DEFENDANT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2593 | | | 1951 | 7 |
| 2874 | | | 1949 | 7 |
| 2874A | | | 1949 | 7 |

--oOo--

```
 1   DECEMBER 11, 2014                              8:09 A.M.

 2                    P R O C E E D I N G S

 3       (THE FOLLOWING PROCEEDINGS WERE HEARD OUTSIDE THE PRESENCE

 4   OF THE JURY.)

 5           THE CLERK:  CALLING CIVIL ACTION 05-0037, THE APPLE

 6   IPOD ITUNES ANTITRUST LITIGATION.

 7       COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES.

 8           MS. SWEENEY:  GOOD MORNING, YOUR HONOR.

 9       BONNY SWEENEY.  WITH ME AT COUNSEL TABLE IS MR. COUGHLIN

10   AND MS. BERNAY AND MR. MEDICI.

11           THE COURT:  GOOD MORNING.

12           MR. ISAACSON:  GOOD MORNING, YOUR HONOR.

13       BILL ISAACSON FOR DEFENDANT APPLE.  AT COUNSEL TABLE,

14   KAREN DUNN, MEREDITH DEARBORN, MARTHA GOODMAN, ALONG WITH

15   SCOTT MURRAY FROM APPLE.

16           THE COURT:  ALL RIGHT.  AT THE END OF THE DAY

17   YESTERDAY, WE HAD A QUESTION FROM ONE OF THE JURORS.

18       WERE YOU ABLE TO CONTACT DR. KELLY?

19           MR. ISAACSON:  YES.  OUR PLAN IS THAT HE WOULD START

20   THE DAY, THOUGH WE HAVEN'T SEEN HIM YET.  BUT HE WILL BE HERE.

21   BUT IF IT TURNS OUT THAT HE'S DELAYED BECAUSE OF THE WEATHER,

22   WE'LL PUT HIM ON AFTER PROFESSOR MURPHY.

23           THE COURT:  AS I UNDERSTAND IT, I'VE GOT SEVEN OF MY

24   JURORS ALL READY.  SO WE'LL BE IN GOOD SHAPE.

25       I ALSO UNDERSTAND THAT SOME DOCUMENTS GOT FILED LAST NIGHT
```

1    AGAIN.  SO I'VE NOT READ THEM.  THEY WERE JUST HANDED TO ME

2    THIS MORNING.

3        MS. SWEENEY?

4            **MS. SWEENEY:**  YES, YOUR HONOR.

5        WE FILED A LETTER THAT, AS WE TALKED ABOUT THE OTHER DAY,

6    WITH RESPECT TO THE JURY INSTRUCTIONS, AGAIN, FOCUSING ON THE

7    JURY INSTRUCTION PERTAINING TO GENUINE PRODUCT IMPROVEMENTS.

8        WE ALSO PROPOSED AN INSTRUCTION WITH RESPECT TO MR. JOBS'

9    DEPOSITION TESTIMONY.

10        AND THEN WE ALSO FILED A MOTION TO COMPEL PRODUCTION OF

11    THE OPINION LETTERS AS APPLE HAS NOT YET WITHDRAWN THEIR

12    PROPOSED JURY INSTRUCTION ON THE DMCA.

13            **MR. ISAACSON:**  ONE OTHER ISSUE RAISED BY THE LETTER

14    WAS THE INSTRUCTION WITH RESPECT TO THE NEW PLAINTIFF.

15    THEY -- WE -- THEY PROPOSED THEIR INSTRUCTION.  WE PROPOSED AN

16    INSTRUCTION, THEY PROPOSED AN INSTRUCTION.  WE GAVE THEM A

17    COUNTEROFFER.  AND THEN THEY FILED THEIR ORIGINAL INSTRUCTION.

18    SO YOU DON'T HAVE A COPY OF OUR COMPETING INSTRUCTION.  SO

19    THAT -- I HAVE COPIES OF THAT FOR YOU.

20            **THE COURT:**  OKAY.  THANK YOU.

21            **MR. ISAACSON:**  WITH RESPECT TO THE -- THE ISSUE OF

22    MR. JOBS, IF YOU WANT ME TO START THERE, AS I SORT OF

23    PREVIEWED YESTERDAY, WE DON'T THINK AN INSTRUCTION IS

24    APPROPRIATE.  THE ORDER INDICATES THAT THE PLAINTIFFS SOUGHT

25    THREE DIFFERENT THINGS, AND THEY DID NOT SEEK ANYTHING ABOUT

1   7.0.

2       AND SPECIFICALLY WHAT HAPPENED WAS APPLE MOVED FOR A

3   PROTECTIVE ORDER, AND THEN THERE WAS BRIEFING ON THE ISSUE OF

4   WHAT ISSUES DID MR. JOBS HAVE UNIQUE, FIRSTHAND,

5   NON-REPETITIVE KNOWLEDGE.

6       **THE COURT:**  CAN I ASK, ARE YOU PLANNING TO ARGUE THIS

7   POINT IN CLOSING?

8       **MR. ISAACSON:**  I'M HAPPY TO NOT ARGUE IT.

9       THE -- SO THE PLAINTIFFS ASKED -- CLAIMED THAT THERE WERE

10  THREE AREAS OF -- OF FIRSTHAND, NON-REPETITIVE, UNIQUE

11  KNOWLEDGE.

12      NOW, FIRST OF ALL, GIVEN THAT THAT'S THE STANDARD, IF ANY

13  INSTRUCTION WERE GIVEN, IT WOULD HAVE TO -- THE COURT WOULD

14  HAVE TO SAY THAT -- IT WOULD HAVE TO USE THAT PHRASE, THAT IT

15  WAS DETERMINED THAT HE HAD NO FIRSTHAND, UNIQUE,

16  NON-REPETITIVE KNOWLEDGE OF ANY ISSUES OTHER THAN -- AND SO

17  YOU CAN'T ARGUE THAT HE HAD SOME SORT OF UNIQUE, FIRSTHAND

18  KNOWLEDGE OF 7.0 OR 7.4, BASED ON THE ORDER.

19      SECONDLY, IN RESPONSE TO THE MOTION, PLAINTIFFS ASKED FOR

20  THREE THINGS.  THEY DIDN'T ASK FOR ANY TESTIMONY ABOUT 7.0 OR

21  7.4.  IN FACT, THEY WERE QUITE SPECIFIC WHEN THEY RAISED THE

22  ISSUE OF HARMONY, THEY WANTED IT WITH RESPECT TO 4.7.  THEY

23  ACTUALLY -- THAT'S ACTUALLY IN THEIR -- IN THEIR PAPERS.  AND

24  THE COURT GRANTED THAT WITH RESPECT TO 4.7.

25      AND AT THE HEARING, THEY WERE -- THEY WERE -- THE

1    TRANSCRIPT REFLECTS THAT THEY -- THEY WERE ASKED:

2        IS THIS ENOUGH?

3        AND MS. BERNAY SAID, YES, YOUR HONOR.  WITH RESPECT TO

4    MR. JOBS, HE ACTUALLY DRAFTED THE STATEMENT -- THIS IS

5    REFERRING TO THE JULY 2004 STATEMENT THAT CRITICIZED REAL AS

6    HACKERS -- THAT EVENTUALLY MADE ITS WAY TO THE PUBLIC ALMOST

7    VERBATIM, THE WORDS THAT HE USED CALLING THIS COMPETITOR IN

8    THE DIGITAL MARKET SPACE A HACKER, MAKING THE THREAT THAT

9    THESE UPDATES MIGHT MAKE PURCHASES, MUSIC PURCHASED THROUGH

10   REAL, NO LONGER WERE ACTUALLY WRITTEN BY MR. JOBS.

11       AFTER THAT, JUDGE LLOYD HELD THAT THE STANDARD WAS WHETHER

12   THE DEPONENT HAD UNIQUE, FIRST-HAND, NON-REPETITIVE KNOWLEDGE

13   OF FACTS.  HE WENT THROUGH EACH OF THE ISSUES, SAYING

14   PLAINTIFF SEEKS, PLAINTIFF SEEKS, PLAINTIFF SEEKS.  THEY NEVER

15   SOUGHT TO DEPOSE MR. JOBS ABOUT 7.0 OR 7.4.

16       SO IT WAS PERFECTLY FAIR FOR ME TO SAY IN OPENING HE WAS

17   NOT ASKED A QUESTION ABOUT 7.0 OR 7.4 SINCE THE RECORD

18   REFLECTS THAT PLAINTIFFS DID NOT SEEK TO ASK HIM ABOUT ANY

19   QUESTIONS ABOUT 7.0 OR 7.4 BEFORE THE DEPOSITION OR DURING IT.

20       AND WE HAVE COPIES, IN CASE YOU DON'T HAVE IT, OF THE --

21   OF THE RELEVANT PLEADINGS AND HEARING TRANSCRIPT.

22            **THE COURT:**  WELL, IT'S ALWAYS EASIER TO JUST HAVE YOU

23   GIVE THEM TO US.

24            **MR. ISAACSON:**  ALL RIGHT.

25            **THE COURT:**  MS. SWEENEY, IF IT'S NOT GOING TO BE AN

```
 1   ISSUE DURING CLOSING, WHY SHOULD I ADDRESS IT AT ALL?

 2        MS. SWEENEY:  BECAUSE MR. ISAACSON ALREADY RAISED THE

 3   ISSUE IN OPENING.

 4        THE COURT:  AND YOU THINK THEY'RE GOING TO REMEMBER

 5   EVERYTHING YOU FOLKS SAID IN OPENING?

 6        MS. SWEENEY:  I DON'T THINK THEY'LL REMEMBER

 7   EVERYTHING EVERYONE SAID IN OPENING.  HOWEVER, YOUR HONOR,

 8   THIS CASE HAS FOCUSED ON 7.0 AND 7.4, AND THEY MAY WELL

 9   REMEMBER MR. ISAACSON'S STATEMENT.  IT WAS MISLEADING AT THE

10   TIME.  IT'S STILL MISLEADING.

11        AND I WOULD LIKE TO RESPOND TO MR. ISAACSON'S --

12                  (SIMULTANEOUS COLLOQUY.)

13        THE COURT:  I'M GOING TO LET YOU RESPOND.  BUT IF I

14   GIVE AN INSTRUCTION, IT WILL BE COMPREHENSIVE.  AND SO FAR IT

15   DOESN'T SEEM AS IF SUCH A COMPREHENSIVE INSTRUCTION WILL DO

16   YOU ANY GOOD, BUT THAT'S OBVIOUSLY YOUR CHOICE.

17        YOU CAN RESPOND.

18        MS. SWEENEY:  IT'S NOT TRUE WHAT MR. ISAACSON SAID

19   THAT PLAINTIFFS LIMITED THEIR REQUEST FOR A --

20        THE COURT:  COULD I HAVE THE DOCUMENTS?

21   MR. ISAACSON?

22                  (PAUSE IN THE PROCEEDINGS.)

23        THE COURT:  I REALLY THINK YOU GUYS THINK WAY TOO

24   MUCH ABOUT --

25        MR. ISAACSON:  YEAH.
```

1        **THE COURT:**  -- WHAT JURORS WILL REMEMBER.  NONE OF

2    THOSE JURORS EVEN TOOK NOTES.

3        COULD I --

4        **MR. ISAACSON:**  I'M HANDING YOU UP THE ORDER WHICH IS

5    DOCKET NO. 543, PLAINTIFFS' OPPOSITION TO THE MOTION FOR

6    PROTECTIVE ORDER, AND THE HEARING TRANSCRIPT WHICH IS

7    DOCKET 544.

8        **MS. SWEENEY:**  I'M SORRY.  WHAT DID YOU HAND UP?

9        **MR. ISAACSON:**  THE ORDER, THE HEARING TRANSCRIPT, AND

10   YOUR --

11       **THE COURT:**  WHERE'S THE MOTION?

12       **MR. ISAACSON:**  I HAVE A COPY OF THAT AS WELL.

13    THIS IS DOCKET NO. 396, THE MOTION AND THE OPPOSITION.

14       **THE COURT:**  WHERE'S THE ORIGINAL SUBPOENA OR NOTICE?

15   WHERE'S THE ORIGINAL NOTICE FOR THE -- FOR THE DEPOSITION?

16       **MR. ISAACSON:**  I DON'T KNOW.

17       **MS. SWEENEY:**  IT WAS AN ORDINARY OPEN-ENDED NOTICE,

18   YOUR HONOR.  IT WASN'T LIMITED IN ANY WAY.  AND SO

19   MR. ISAACSON'S SUGGESTION THAT --

20       **THE COURT:**  DO YOU HAVE THE NOTICE OR NOT?

21       **MS. SWEENEY:**  EXCUSE ME?

22       **THE COURT:**  DO YOU HAVE A NOTICE OR NOT?

23       **MS. SWEENEY:**  NOT WITH ME IN COURT TODAY, YOUR HONOR.

24       **THE COURT:**  WAS ONE ISSUED?

25       **MS. SWEENEY:**  I CAN'T REMEMBER WHETHER WE ISSUED A

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
1   NOTICE OR WHETHER WE FIRST CONSULTED APPLE AS WE WERE REQUIRED

2   TO DO TO -- TO TALK ABOUT DATES.

3       AND IT MAY BE THAT AFTER WE CONTACTED APPLE TO TALK ABOUT

4   DATES, THEY FILED THE MOTION FOR PROTECTIVE ORDER.

5               (PAUSE IN THE PROCEEDINGS.)

6           MS. SWEENEY:  YOUR HONOR, MS. BERNAY JUST HANDED ME

7   THE -- WE HAVE A COMPUTER VERSION OF THE NOTICE WE SERVED.  WE

8   DID SERVE A DEPOSITION NOTICE ON APRIL 7TH, 2011.

9           THE COURT:  ALL RIGHT.  YOU CAN SEND IT TO MY EMAIL.

10  MAKE SURE TO COPY THE DEFENSE.

11      ALL RIGHT.  YOU MAY RESPOND.

12          MS. SWEENEY:  SO PLAINTIFFS DID NOT LIMIT THEIR

13  DEPOSITION NOTICE WHEN THEY SERVED NOTICE THAT THEY WANTED TO

14  DEPOSE MR. JOBS.  IT WAS AN OPEN-ENDED DEPOSITION NOTICE.

15      IN RESPONSE, APPLE MOVED FOR A PROTECTIVE ORDER.  AND

16  PLAINTIFFS RESPONDED BY SAYING EVEN THOUGH MR. JOBS -- THE

17  BASIS OF THEIR MOTION, OF COURSE, WAS THE APEX DOCTRINE THAT

18  HE WAS AN IMPORTANT MEMBER OF APPLE.  SO PLAINTIFFS POINTED

19  OUT THAT MR. JOBS HAD UNIQUE, NON-REPETITIVE KNOWLEDGE ABOUT

20  EVENTS CONCERNING INTEROPERABILITY.  AND WE INCLUDED SPECIFIC

21  EXAMPLES OF THAT UNIQUE, NON-REPETITIVE KNOWLEDGE, INCLUDING

22  WE ATTACHED SOME EMAILS THAT WERE IN 2006 AND 2007.  WE NEVER

23  LIMITED OUR SCOPE OF INQUIRY TO 2004.

24          THE COURT:  WHAT'S THE DOCKET NUMBER FOR YOUR -- I

25  HAVE A COPY OF YOUR OPPOSITION.  I DON'T -- IT DOESN'T HAVE A
```

1    DOCKET NUMBER ON IT.  WHAT IS THE DOCKET NUMBER?

2            **MS. SWEENEY:**  I BELIEVE IT'S ECF 483.

3            **THE COURT:**  MS. BERNAY; IS THAT RIGHT?

4            **MS. BERNAY:**  I'M SORRY.  I DON'T HAVE THAT OPEN RIGHT

5    NOW.

6            **MR. ISAACSON:**  I HAVE A NOTE THAT IT'S 404.

7            **MS. SWEENEY:**  IT MAY BE THAT 483 IS OUR REPLY.

8        WE WOULDN'T HAVE HAD --

9                    (PAUSE IN THE PROCEEDINGS.)

10           **MS. SWEENEY:**  I GUESS THAT WAS A SEPARATE MOTION TO

11   FILE ADDITIONAL EVIDENCE IN OPPOSITION TO THE MOTION FOR

12   PROTECTIVE ORDER.  THAT IS WHAT I'M REFERRING TO AS 483.

13       OUR OPPOSITION IS 404.

14           **MR. ISAACSON:**  RIGHT.

15           **THE COURT:**  OKAY.

16           **MR. ISAACSON:**  AND THE ORDER REFLECTS, YOUR HONOR, SO

17   THAT THIS --

18           **THE COURT:**  SO LET HER FINISH.

19           **MR. ISAACSON:**  I'M SORRY.  I THOUGHT SHE WAS.

20           **MS. SWEENEY:**  JUDGE LLOYD, IN RESPONSE TO APPLE'S

21   REQUEST, LIMITED THE DEPOSITION FAR MORE THAN PLAINTIFFS HAD

22   REQUESTED.  WE WANTED A FULL DEPOSITION OF MR. JOBS.  WE WERE

23   LIMITED IN TIME AND IN SCOPE.  WE TOOK A TWO-HOUR DEPOSITION

24   LIMITED VERY NARROWLY TO THE TOPICS THAT JUDGE LLOYD PERMITTED

25   US TO QUESTION MR. JOBS ABOUT.  IT WAS OVER OUR OBJECTION.

1    AND EVEN DURING THE DEPOSITION, APPLE'S COUNSEL OBJECTED THAT

2    WE WERE GOING BEYOND THE SCOPE OF THAT ORDER.

3        SO FOR APPLE TO SAY NOW THAT WE NEVER SOUGHT TO DEPOSE

4    MR. JOBS ABOUT THE EVENTS OF 2005, 2006, AND 2007 IS

5    ABSOLUTELY INCORRECT.

6            **MR. ISAACSON:**  I THINK THAT MISSTATES THE RECORD,

7    YOUR HONOR.

8        IF I MAY.  AS REFLECTED --

9            **THE COURT:**  YOU MAY RESPOND.

10           **MR. ISAACSON:**  AS REFLECTED IN JUDGE LLOYD'S ORDER

11   THAT THE ISSUE OF INTEROPERABILITY, WHICH WAS THE THIRD TOPIC,

12   THE EVIDENCE THAT WAS SUBMITTED ON WHICH MR. JOBS WAS ALLEGED

13   TO HAVE UNIQUE, NON-REPETITIVE, FIRSTHAND KNOWLEDGE WAS

14   LIMITED TO EVENTS IN 2004, INCLUDING THE OCTOBER 2004 UPDATE.

15       THE MOTION -- THE PLAINTIFFS' OPPOSITION TO -- TO THE APEX

16   MOTION DOES NOT MENTION 7.0.  IT MENTIONS 4.7.  AT THE

17   HEARING, THE TRANSCRIPT PAGE 6, LINES 23 THROUGH PAGE 7 AT

18   LINE 4, COUNSEL WAS ASKED, AS I READ, WERE THESE -- THESE 2004

19   TOPICS SATISFACTORY, AND THE ANSWER WAS, YES, YOUR HONOR.

20   THEY WERE SEEKING TO DEPOSE MR. JOBS ABOUT EVENTS IN 2004.

21   AND JUDGE LLOYD'S ORDER CONFORMED TO THAT.

22           **MS. SWEENEY:**  I THINK, YOUR HONOR, THE PROBLEM HERE

23   IS MR. ISAACSON IS NOT REFERRING TO THE ADDITIONAL EVIDENCE

24   THAT PLAINTIFFS SUBMITTED IN ECF 483 WHERE WE ATTACHED EMAILS

25   FROM 2007, INCLUDING AN EMAIL FROM UNIVERSAL MUSIC TO STEVE

1    JOBS REGARDING THE INDUSTRY MOVE TO DRM-FREE MUSIC.  AND THEN

2    THERE WERE SOME ADDITIONAL MARCH 2007 EMAILS.

3        AND MOREOVER, FOR MR. ISAACSON TO SUGGEST THAT WE SHOULD

4    HAVE PRODUCED OUR ENTIRE -- THE ENTIRE RECORD OF DOCUMENTS

5    THAT WE PROPOSED DEPOSING MR. JOBS ABOUT IS -- THAT'S NOT THE

6    LAW CERTAINLY.  WE IDENTIFY -- WE WANTED AN OPEN-ENDED

7    DEPOSITION, AND WHEN APPLE MOVED FOR PROTECTIVE ORDER, WE

8    PROVIDED EXAMPLES OF THE KINDS OF AREAS IN WHICH MR. JOBS HAD

9    UNIQUE, NON-REPETITIVE KNOWLEDGE.

10       AND THE 2004 EVENT, AS THIS TRIAL HAS MADE VERY CLEAR,

11   CLEARLY WERE THE CONTEXT FOR 7.0 AND 7.4.  SO THE FACT THAT WE

12   DID DEPOSE MR. JOBS ABOUT EVENTS IN THAT TIME PERIOD IN NO WAY

13   SUGGESTS THAT WE WERE NOT ATTEMPTING TO DEPOSE MR. JOBS ON THE

14   EVENTS OF 2005, 2006, AND 2007.

15           THE COURT:  ALL RIGHT.  I'LL TAKE A LOOK AT IT.

16           MR. ISAACSON:  ONE FINAL, JUST, NOTE.  I'M TOLD THAT

17   THE NOTICE OF DEPOSITION IS DATED APRIL 2011 WHICH POSTDATES

18   THE HEARING AND THE ORDER.

19           THE COURT:  WHY IS THAT?

20           MS. SWEENEY:  I'M NOT SURE.  WE JUST LOOKED AT THAT.

21   PERHAPS WE ISSUED A NOTICE AFTER THE ORDER, BUT I -- WE'LL

22   CHECK AND FIND THE EARLIER NOTICE, YOUR HONOR.

23           THE COURT:  OKAY.

24       ANYTHING ELSE YOU WANT TO TALK ABOUT IN THE THREE MINUTES

25   THAT WE HAVE?  IF NOT, WE'LL TALK ABOUT IT AFTERWARDS.

1          **MR. ISAACSON:**  WE CAN -- IF YOU WOULD LIKE TO KNOW

2    OUR -- WHAT WE -- OUR DISCUSSION ON SCHEDULE FOR BRIEFING.

3          **THE COURT:**  GO AHEAD.

4          **MR. ISAACSON:**  THE RESPECTIVE POSITIONS ARE:  WITH

5    RESPECT TO THE RULE 50 MOTION, APPLE HAS SAID IN ITS PAPERS

6    THAT THIS -- THAT NO CASE LIKE THIS HAS GONE TO A JURY

7    VERDICT.

8          **THE COURT:**  YEAH, WELL, I HAVEN'T SEEN ANY CASE LIKE

9    THIS FROM MY RESEARCH THAT HAS GONE.  GONE.  THE -- THE *NOVELL*

10   CASE WASN'T A PRODUCT IMPROVEMENTS CASE, WAS IT?

11         **MR. ISAACSON:**  IT'S AN INCOMPATIBILITY CASE, YES.

12         **THE COURT:**  IT WASN'T A GENUINE PRODUCT IMPROVEMENTS

13   CASE; IS THAT RIGHT?

14         **MR. ISAACSON:**  THAT IS CORRECT.  BUT I DON'T -- THERE

15   IS NO SUCH THING AS A GENUINE PRODUCT IMPROVEMENT CASE WHERE

16   THE PRODUCT IS ALLEGED TO CREATE INCOMPATIBILITY THAT DOES

17   NOT -- THAT DOES NOT FALL SQUARELY WITHIN THE DUTY TO DE-ALIGN

18   CASES.

19        BUT IN ANY EVENT, THE -- JUST THE RESPECTIVE POSITIONS OF

20   THE PARTIES IS WE WOULD LIKE THIS TO BE ARGUED ON FRIDAY AFTER

21   COURT, AFTER EVIDENCE.  AND THE PLAINTIFFS WOULD LIKE TO HAVE

22   IT ARGUED ON MONDAY WHILE THE JURY DELIBERATES.

23        WE WOULD -- SO THE ISSUE ON BRIEFING -- WE WOULD QUICKLY

24   AGREE TO A BRIEFING SCHEDULE IF THE COURT RULES ON THAT ISSUE.

25        BUT SECONDLY, WITH RESPECT TO THAT, OUR POSITION IS THAT

1    7.4 CAN BE RULED UPON NOW.  DR. NOLL SAID ON THE STAND THAT HE

2    DID NOT DO ANY ANALYSIS OF ANY SEPARATE INJURY FROM 7.4.  HE

3    SAID IT CLEARLY.  I CAN SHOW YOU THE TRANSCRIPT NOW IF YOU

4    WOULD LIKE TO SEE IT AGAIN.

5        THERE IS NO INJURY CLAIM FROM 7.4.

6        THE COURT SHOULD PROMPTLY DECIDE THAT ISSUE BECAUSE IT

7    WILL STREAMLINE THE REBUTTAL CASE.  7.4 SHOULD BE OUT OF THE

8    CASE BECAUSE YOU'RE GOING TO BE HEARING REBUTTAL EVIDENCE

9    ABOUT 7.4 INCLUDING THE THIRD-PARTY WITNESS, THE SO-CALLED --

10            **MR. COUGHLIN:**  ARCHITECT.

11            **MR. ISAACSON:**  THE SO-CALLED ARCHITECT OF THE DVC

12   THAT THEY WANT -- THE THIRD PARTY WANTS TO BE BROUGHT IN HERE

13   TO TALK ABOUT WHAT IS NOW CLEARLY AN IRRELEVANT ISSUE BECAUSE

14   THEY DID NOT PUT ON A CASE THAT THERE WAS ANY INJURY

15   ATTRIBUTABLE TO 7.4.

16            **MR. COUGHLIN:**  YOUR HONOR, WE DON'T THINK THAT'S TRUE

17   AT ALL.  WHAT HAPPENED HERE IS THEY PUT -- IN 7.0, THEY PUT

18   BOTH THE KVC AND DVC IN 7.0.  THEY DIDN'T SWITCH ON THE DVC

19   WHICH INDICATES THAT IT -- OF COURSE IT WAS SEPARATE AND COULD

20   BE SEPARATED OUT FROM THE -- FROM THE OTHER PRODUCTS AS COULD

21   BE THE KVC.

22       BOTH OF THOSE PRODUCTS WERE IN THE 7.0.  SO DR. NOLL'S

23   ANALYSIS IS VALID.  THE FACT THAT THEY THEN LATER TURN IT ON,

24   IT ALL GOES TO WHAT THEY WERE DOING WITH BOTH THOSE PRODUCTS.

25   THEY INCLUDED THEM.  IT'S PART OF OUR CASE.  IT ALL COMES IN

1    ON 7 -- YOU KNOW, WITH THE 7.0.  THEY'RE BOTH IN THE 7.0.

2        AND AS FAR AS ROD SCHULTZ --

3            **THE COURT:**  SO DOES IT MATTER IF IT WAS IN OR OUT --

4    ON OR OFF, I MEAN?

5            **MR. COUGHLIN:**  IT DOESN'T MATTER AT ALL.

6            **THE COURT:**  SO THEN WHY DO YOU NEED 7.4?

7            **MR. COUGHLIN:**  WE NEED 7.4 BECAUSE IT INDICATES WHAT

8    THEY WERE DOING, YOU KNOW, WITH COMPETITORS AT THAT TIME.

9    THEY PUT BOTH OF THOSE, WE WOULD CALL THEM WEAPONS,

10   ESSENTIALLY, AGAINST COMPETITION, IN THE 7.0.  AND IT WAS JUST

11   A MATTER OF TIME ABOUT WHEN THEY TURNED IT ON.

12       BUT BOTH OF THEM WERE IN THERE, AND IT SHOWS WHAT THEY

13   WERE DOING AT THE TIME, AND THAT IS RELEVANT FOR WHAT THEY --

14   FOR WHAT THEY WERE TRYING TO DO.  BOTH OF THOSE PRODUCTS WERE

15   TALKED ABOUT IN 2006.

16       ROD SCHULTZ, YES, HE DEVELOPED THE DATABASE VERIFICATION

17   IN 2006.  ALL OF THIS HAPPENS BEFORE THEY TURN ON 7.0.  AND SO

18   THEY'RE -- THEY'RE TIED TOGETHER, THEY'RE RELEVANT, THEY GO

19   INTO IT TOGETHER.  AND IT GOES INTO THEIR -- OUR WHOLE

20   ARGUMENT THAT THIS CORRUPTION ARGUMENT IS A PRETEXT.  THAT

21   SHOWS THE FACT THAT THEY DIDN'T TURN IT ON.  IT'S A PRETEXT

22   FOR CORRUPTION.

23       THE FACT THAT DR. KELLY GOT UP HERE YESTERDAY AND SAID,

24   OH, WELL, WE DIDN'T GO BACKWARDS, WE DIDN'T RETROACTIVE GO

25   BACKWARDS TO THE OTHER FIRMWARE, WHICH THEY DID IN 4.7, SHOWS

1  THAT THEY WEREN'T REALLY WORRIED ABOUT CORRUPTION.  THEY WERE

2  WORRIED ABOUT COMPETITION ONGOING WITH THE NEW PRODUCTS.  SO

3  IT'S ALL WRAPPED TOGETHER AND TIED IN AS ONE.

4      AND ROD SCHULTZ, HE IS AN AUTHOR OF EXHIBIT 0002, THE KEY

5  DOCUMENT IN THE CASE.  OKAY?  HE HAD NUMEROUS SUBMISSIONS THAT

6  WERE INSERTED INTO THAT DOCUMENT, AND HE'S GOING THE TALK

7  ABOUT THAT.  HE IS NOT JUST GOING TO TALK ABOUT THE DVC.  HE

8  WAS A KEY MEMBER OF THAT FAIRPLAY DESIGN TEAM DURING THIS TIME

9  FRAME.  IT'S NOT -- HE'S NOT LIMITED TO 7.0 -- I MEAN, HE'S

10 NOT LIMITED TO THE DVC, WHICH IS IN 7.0.

11     BY USING THESE NUMBERS, 7.0 AND 7.4, WE'VE GOTTEN AWAY

12 FROM THE ACTUAL PRODUCTS AT ISSUE, THE KVC AND DVC, WHICH WERE

13 BOTH IN 7.0.  SO IT'S ALMOST A MISNOMER TO SAY 7.0 AND 7.4.

14 THAT'S WHEN IT WAS ACTUALLY TURNED ON.  BUT THEY'RE BOTH IN --

15 IN THE FIRST RELEASE OF ITUNES 7.0.

16         MR. ISAACSON:  LET'S BE CLEAR ON WHAT MR. COUGHLIN IS

17 NOW SAYING.  WHAT I'VE SAID IS THAT THEY HAVE NO CLAIM BASED

18 ON 7.4 BECAUSE, AS HE SAYS, IT'S ACTIVATED A YEAR LATER, IT

19 HAS NO EFFECT ON ANYBODY, THERE'S NO INJURY CLAIM.

20     ALL THE JURY INSTRUCTIONS THAT HAVE BEEN SUBMITTED HAVE

21 SAID 7.0 AND 7.4.  WHAT HE IS NOW ARGUING IS THE 7.4 EVIDENCE

22 IS RELEVANT TO THE 7.0 CLAIM.  AND YOU CAN DECIDE THAT

23 QUESTION BY QUESTION WITH WITNESSES UP HERE.  BUT THERE IS NOT

24 A SINGLE WORD THE GENTLEMAN SAID THAT SAYS THEY HAVE A LEGAL

25 CLAIM LEFT FOR 7.4.  ALL OF THE INSTRUCTIONS NEED TO BE

1   CHANGED TO SAY THIS CASE IS NOW ONLY ABOUT 7.0.

2           **MR. COUGHLIN:**  IT'S NOT -- NOT AT ALL.  THEY TURN IT

3   ON IN 7.0 --

4           **THE COURT:**  I GUESS THE PROBLEM THAT I HAVE WITH THE

5   WAY THE EVIDENCE HAS COME IN IS THAT THE ECONOMIC ANALYSIS

6   WITH RESPECT TO DAMAGES MAKES NO DISTINCTION BETWEEN 7.0 AND

7   7.4.  THERE'S NO DISTINCTION.

8           **MR. COUGHLIN:**  IT --

9           **THE COURT:**  AND YOU WOULD AGREE WITH ME THERE'S NO

10  DISTINCTION THERE, CORRECT?

11          **MR. COUGHLIN:**  AND NOR SHOULD THEY BE, THEY WERE BOTH

12  IN 7.0.

13          **THE COURT:**  THEN IT SHOULD ONLY BE 7.0.  THEN WHO

14  CARES ABOUT 7.4?  IF THE THEORY IS THAT THEY WERE BOTH IN 7.0

15  AND IT DIDN'T MATTER IF IT WAS ON OR OFF, AND THE ECONOMIC

16  ANALYSIS RUNS FROM 7.0, AND 7.4 IS IRRELEVANT TO THAT

17  ANALYSIS, EVEN IF WHAT YOU'RE SAYING THAT IT MAY BE RELEVANT

18  EVIDENCE, AND PERHAPS IT IS, THE DAMAGES ANALYSIS WHICH IS

19  PART AND PARCEL OF THE CASE MAKES NO DISTINCTION BETWEEN THOSE

20  TWO UPDATES.

21          **MR. COUGHLIN:**  AND, YOUR HONOR, WE COULDN'T AGREE

22  WITH YOU MORE.  THAT'S WHY WE THINK THAT IT'S WRONG JUST TO

23  SAY 7.0 AND 7.4.  WE'RE TALKING ABOUT TWO PRODUCTS.

24          **THE COURT:**  -- CONFUSING.

25          **MR. COUGHLIN:**  WE'RE --

1          THE COURT:  IT'S CONFUSING.  NO, YOU'RE NOT -- IF

2    YOU'RE TALKING ABOUT TWO PRODUCTS, THEN YOU HAVE TO HAVE TWO

3    SEPARATE DAMAGES ANALYSES, AND YOU DON'T.

4          MR. COUGHLIN:  BECAUSE THEY WERE BOTH IN AT THE 7.0

5    RELEASE.  AND WE DON'T HAVE TO HAVE TWO SEPARATE DAMAGE

6    ANALYSES BECAUSE WHAT THEY DID WAS THEY WERE BOTH AVAILABLE.

7    THE FACT THAT THEY SWITCH IT ON LATER IS IRRELEVANT TO THE

8    REGRESSION ANALYSIS.

9          MR. ISAACSON:  YOU CAN'T HAVE A DAMAGES CLAIM BASED

10   ON INACTIVE SOFTWARE.  IT HAS NO IMPACT IN SEPTEMBER 2006.

11   THAT'S THE EVIDENCE.

12         MR. COUGHLIN:  THE IMPACT -- THE IMPACT DOES START

13   WITH THE KVC.  THAT'S CORRECT.  RIGHT?  AND THE IMPACT THERE

14   BASICALLY FLOWS FROM THE FACT THAT THEY TURN IT ON, THE KVC,

15   IT KNOCKS OUT THE DRM SONGS.  LATER THEY TURN ON THE DATABASE.

16   IT'S ALL PART AND PARCEL OF ONE CONTINUOUS, LITERALLY, ACT

17   AGAINST COMPETITION.

18         MR. ISAACSON:  THIS ANTITRUST CASE RIGHT NOW IS ONLY

19   7.0.  SO IN ANALYZING GENUINE PRODUCT IMPROVEMENT, YOU HAVE TO

20   SAY IT'S ABOUT 7.0 AND WHETHER -- AND IF THEY WANT TO ARGUE

21   7.4 IS RELEVANT TO THAT, THEY HAVE TO SAY THAT INACTIVE

22   SOFTWARE WAS -- WAS SOMEHOW NOT A GENUINE PRODUCT IMPROVEMENT

23   AND DID SOME DAMAGE, AND THEY CANNOT DO THAT.

24         MR. COUGHLIN:  THAT'S NOT CORRECT, YOUR HONOR.  WE

25   HAVE ARGUED ALL THE WAY THROUGH THIS CASE THAT BOTH OF THOSE

1    WERE IN THE FIRMWARE OF THE 7.0 RELEASE.  THE FACT OF THE

2    TIMING OF WHEN THEY TURN IT ON IS LATER, THAT'S -- THAT'S

3    CORRECT.  BUT IT GOES TO THE WHOLE PRETEXT OF "HEY, THIS IS

4    FOR CORRUPTION."

5         THEY DON'T TURN THE SECOND ONE ON, OF COURSE, UNTIL THEY

6    GET DONE WITH THE DEAL WITH AMAZON, AND THEN THEY KNOCK OFF

7    ALL THE THIRD-PARTY PLAYERS.  OKAY?  THEY'RE ALL WRAPPED IN

8    ONE ISSUE.  THEY COME OUT IN 7.0, BOTH OF THEM, SO WE SHOULD

9    BE ALLOWED TO TALK ABOUT BOTH OF THEM.

10             **THE COURT:**  WELL, I'M NOT SAYING THAT YOU CAN'T BE

11   ALLOWED TO TALK ABOUT BOTH OF THEM.  I'M SAYING THAT YOUR

12   DAMAGES ANALYSIS FLOWS FROM 7.0 AND IT DOESN'T ADDRESS 7.4.

13             **MR. COUGHLIN:**  AND I DON'T MIND NOT TALKING ABOUT,

14   QUOTE, 7.4 AS LONG AS WE GET TO TALK ABOUT THE KVC AND DVC AND

15   WHAT THEY DID AND WHEN THEY OCCURRED.

16        HE'S NOT SAYING THAT.  HE'S TRYING TO LIMIT US FROM NOT

17   TALKING ABOUT THE DVC.

18             **MR. ISAACSON:**  I'M SAYING EVERY ONE OF THEIR LEGAL

19   CLAIMS IN 7.4 AS PRESENTED IN THE JURY INSTRUCTIONS AND THE --

20   AND THE VERDICT FORM ARE NOW INCORRECT.

21             **MR. COUGHLIN:**  IT -- IT'S NOT TRUE BECAUSE --

22             **THE COURT:**  WE'RE GOING -- WE'RE GOING TO HAVE TO

23   HAVE THIS DISCUSSION LATER.

24             **MR. COUGHLIN:**  OKAY.

25             **THE COURT:**  I'VE GOT A JURY WHO WORKED VERY HARD TO

```
 1   GET HERE THIS MORNING.  IT'S ALREADY PAST OUR DEADLINE TO
 2   START.
 3           MR. ISAACSON:  CAN I GIVE YOU JUST THE TRIAL
 4   TRANSCRIPT CITE WHERE DR. NOLL GIVES THE CONCESSION ABOUT 7.4?
 5   IT WOULD BE 1365, LINE 19 THROUGH 1366, LINE 5.
 6       AND WE CAN ADDRESS ANY OTHER TOPICS LATER.
 7               (PAUSE IN THE PROCEEDINGS.)
 8       (THE FOLLOWING PROCEEDINGS WERE HEARD IN THE PRESENCE OF
 9   THE JURY:)
10           THE COURT:  GOOD MORNING.  EVERYBODY MAY BE SEATED.
11   WE'RE BACK ON THE RECORD.  THE RECORD WILL REFLECT THE JURY IS
12   HERE.
13       SO MY TIP FOR THE DAY.  I WAS FEELING REALLY BAD THIS
14   MORNING AS ALL THE NEWS STATIONS WERE TALKING ABOUT HOW
15   TERRIBLE THE STORM WAS.  AND I GREW UP IN TEXAS.  WE HAD
16   THUNDERSTORMS ALL THE TIME.  WE HAD FLASH FLOODS ALL THE TIME.
17   WE DIDN'T CLOSE DOWN SCHOOLS.  NO ONE WORRIED ABOUT IT.  YOU
18   JUST DROVE SLOWER.  IT'S NOT A BIG DEAL.
19       I GUESS THEY'RE NOT SO USED TO IT UP HERE IN NORTHERN
20   CALIFORNIA.  I'VE BEEN HERE FOR A FEW DECADES NOW, BUT YOU
21   DON'T GET THESE KINDS OF STORMS.  SO I WAS FEELING BAD.
22       SO I TOLD MY KIDS, "I'M LEAVING EARLY.  YOU GUYS SET YOUR
23   ALARMS.  YOU KNOW, BREAKFAST DOWNSTAIRS.  GET YOURSELVES TO
24   SCHOOL."
25       AND I STOPPED AT NOAH'S TO GET YOU GUYS SOME BAGELS
```

```
 1    BECAUSE I DIDN'T KNOW WHEN YOU WERE GOING TO GET ON THE ROAD
 2    AND WHEN YOU WERE GOING TO GET HERE.  AND I THOUGHT, GOSH, I'M
 3    GOING TO HAVE ALL THESE BAGELS, MY HANDS ARE GOING TO BE FULL.
 4    SO I DIDN'T LOCK MY VEHICLE.  WHEN I GOT BACK, LITERALLY NOT
 5    EVEN TEN MINUTES, MY BAG WAS STOLEN FROM MY CAR.  I THOUGHT,
 6    IT WAS RAINING, NO ONE'S GOING TO BE OUT THERE.
 7        SO THE TIP IS:  IN THE RAIN, STILL LOCK YOUR CAR.  LUCKILY
 8    THEY DIDN'T TAKE THE DOG.  I CAN'T BELIEVE -- MY DOG IS HUGE.
 9    I DON'T KNOW WHY HE DIDN'T BITE THEM.  I TELL YOU IT WOULD
10    HAVE BEEN OKAY WITH ME.
11        BUT ANYHOW, SO I HOPE YOU'RE REALLY ENJOYING THOSE BAGELS.
12    AND EVEN IN THE RAIN, LOCK YOUR CAR.
13        SO NOT THE BEST WAY TO START THE DAY.  BUT I AM VERY GLAD
14    TO SEE YOU, VERY GLAD THAT YOU GUYS BRAVED YOUR WAY IN.  I --
15    IT FEELS TO ME LIKE THE COURTROOM IS A LITTLE WARMER, SO
16    HOPEFULLY YOU GUYS WON'T HAVE TO COME IN HERE IN YOUR PARKAS.
17    BY THE TIME WE GET OUT, I UNDERSTAND THE WORST OF IT SHOULD
18    HAVE PASSED.  SO WE SHOULD BE OKAY.  BUT ANYHOW.
19        DO WE HAVE DR. KELLY HERE.  OKAY.  WE WERE ABLE TO TRACK
20    HIM DOWN.
21        SO IN THE FUTURE, IF YOU HAVE A QUESTION, RAISE YOUR HAND
22    SO I DON'T FORGET TO ASK, AND WE'LL MAKE SURE TO GET YOUR
23    QUESTIONS ANSWERED.
24        DR. KELLY, COME ON BACK.  WE'LL HAVE TO PUT YOU BACK UNDER
25    OATH.
```

1            (PAUSE IN THE PROCEEDINGS.)

2                    **JOHN KELLY,**

3    RE-CALLED AS A WITNESS FOR THE DEFENDANT, HAVING BEEN DULY

4    SWORN, TESTIFIED AS FOLLOWS:

5            **THE WITNESS:**  I DO.

6            **THE CLERK:**  PLEASE BE SEATED.

7            **THE COURT:**  OKAY.  WELCOME BACK.

8            **THE WITNESS:**  THANK YOU, YOUR HONOR.

9            **THE COURT:**  HERE'S THE QUESTION.  IT SAYS:

10    "FOR WHAT SPECIFIC TECHNICAL PURPOSE OR PURPOSES WERE

11    APPLE CUSTOMERS' MUSIC AND/OR OTHER FILES ERASED BY THE

12    DATABASE INTEGRITY CHECK OR DVC" -- WITH A SMILEY FACE, THIS

13    IS GOOD, JURORS AREN'T TAKING POSITIONS ON WHICH OF THE TWO

14    TERMS TO CALL IT -- "IF THE WARNING ARE IGNORED" -- "IF THE

15    WARNING THAT THIS WILL HAPPEN ARE IGNORED BY THE CUSTOMER?"

16    DO YOU NEED ME TO SAY IT AGAIN?

17            **THE WITNESS:**  YES, PLEASE YOUR HONOR.

18            **THE COURT:**  WHAT SPECIFIC TECHNICAL PURPOSE OR

19    PURPOSES WERE APPLE CUSTOMERS' MUSIC FILES AND/OR OTHER FILES

20    ERASED BY THE DVC IF THE WARNINGS THAT THIS WILL HAPPEN ARE

21    IGNORED BY THE CUSTOMER?

22            **THE WITNESS:**  THANK YOU.

23    THANK YOU FOR THAT QUESTION.  THAT -- THAT'S A REALLY

24    IMPORTANT QUESTION.

25    THIS HAPPENS WHEN THE DATABASE INTEGRITY CHECK HAS FAILED.

1    AND SO THE FIRST POINT IS THAT AT THAT TIME, NOTHING HAS BEEN

2    ERASED.  THEN THE CUSTOMER HOOKS UP THE IPOD BACK UP TO THE

3    DESKTOP COMPUTER AND HAS THE OPPORTUNITIES TO REMOVE THEIR

4    FILES BECAUSE NOTHING HAS BEEN ERASED AT THAT POINT.

5        THEN WHEN THEY GET TO THE RESTORE SCREEN THAT –– THAT I

6    SHOWED YESTERDAY, AT THAT POINT, AGAIN, THE ITUNES WILL NOT

7    ERASE ANYTHING UNTIL THE USER ACTUALLY SELECTS THE RESTORE

8    AFTER ALL OF THE WARNINGS.

9        AND THE TECHNICAL PURPOSE THEN FOR DOING THAT IS TO

10   RESTORE THE –– IS TO PUT THE IPOD BACK INTO A KNOWN STATE, A

11   FACTORY-FRESH STATE.  SO THAT IS A KNOWN CONDITION WHERE IT'S

12   UNDERSTOOD THAT THE IPOD IS PRISTINE.  IT'S JUST THE WAY IT

13   CAME FROM THE FACTORY.

14       AND THAT RESTORE PROCESS IS DONE FOR OTHER REASONS AS

15   WELL.  IT COULD BE THE FILE SYSTEM IS DAMAGED.  OR IT COULD BE

16   THE FIRMWARE ON THE IPOD IS DAMAGED.  BUT THIS IS THE

17   TECHNICAL REASON IS TO GET IT BACK TO A KNOWN STATE.

18           **THE COURT:**  MS. DUNN, MR. ISAACSON.  I CAN'T REMEMBER

19   WHOSE WITNESS.

20       DO YOU HAVE ANY FOLLOW-UP QUESTIONS ON THIS ONE?

21           **MS. DUNN:**  NO QUESTIONS, YOUR HONOR.

22           **THE COURT:**  ANY FOLLOW-UP QUESTIONS, MR. COUGHLIN?

23         **MR. COUGHLIN:**  I DO HAVE SOME FOLLOW-UP QUESTIONS,

24   YOUR HONOR.

25           **THE COURT:**  JUST ON THIS QUESTION.

1                    **RECROSS-EXAMINATION**

2    **BY MR. COUGHLIN:**

3    **Q.**  DR. KELLY, IS IT POSSIBLE TO HAVE BEEN MORE SELECTIVE

4    IN -- IN WHAT WAS ERASED OR WHAT WAS DELETED?  IN OTHER WORDS,

5    COULD YOU DELETE WHAT YOU THOUGHT WAS CORRUPTED VERSUS THE

6    WHOLE FILE?  I MEAN, THE QUESTION WAS WHETHER, SUPPOSE A

7    CONSUMER IGNORES THE WARNINGS OR DOESN'T UNDERSTAND THEM AND

8    HITS RESTORE, AND THEN ALL OF THEIR FILES ARE ERASED BECAUSE

9    THEY DIDN'T DRAG THEM ALL OVER.  IS THERE ANY WAY YOU COULD

10   HAVE, LET'S SAY, BEEN MORE SELECTIVE IN YOUR DESTRUCTION?

11        COULD YOU HAVE JUST -- YOU SAID THE DATABASE -- I'LL BE --

12   I'LL BE BETTER.

13        YOU SAID THE DATABASE -- YOU GOT THIS QUESTION LAST NIGHT,

14   RIGHT?

15   **A.**  I DID, YES.

16   **Q.**  RIGHT.  SO YOU'VE SEEN IT FOR HOURS, RIGHT?

17   **A.**  WELL, I SAW THE QUESTION LAST NIGHT, YES.

18   **Q.**  YOU TALKED TO YOUR COUNSEL FOR A NUMBER OF HOURS ABOUT IT,

19   RIGHT?

20   **A.**  I CERTAINLY DIDN'T, NO.

21   **Q.**  DID YOU TALK TO THEM AT ALL?

22   **A.**  I DID TALK TO THEM, YES.

23                    (SIMULTANEOUS COLLOQUY.)

24   **BY MR. COUGHLIN:**

25   **Q.**  ABOUT THIS --

 1   **A.**   THEY TOLD ME WHAT THE QUESTION WAS.

 2           **THE COURT:**  ONE AT A TIME.

 3   BY MR. COUGHLIN:

 4   **Q.**   OKAY.  SO YOU DIDN'T NEED TO REALLY HAVE IT REPEATED TWICE

 5   TO YOU THIS MORNING, RIGHT?

 6   **A.**   NO.  I WANTED TO MAKE SURE I HEARD THE QUESTION PROPERLY.

 7   **Q.**   YOU SAW IT WRITTEN DOWN LAST NIGHT, RIGHT?

 8   **A.**   I DID, YES.

 9   **Q.**   OKAY.  SO YOU WERE HANDED THE QUESTION?

10   **A.**   I WAS.

11   **Q.**   OKAY.  SO MY QUESTION IS YOU SAID THE DATABASE WAS AN

12   INDEX, RIGHT?

13   **A.**   YES, IT'S LIKE AN INDEX.

14   **Q.**   COULD YOU HAVE JUST DELETED THE INDEX, THE DATABASE

15   WITHOUT THE FILES, IF SOMEBODY HIT -- IF SOMEBODY HAD GONE AND

16   SAID, HEY, I'VE GOT TO GO RESTORE.  COULD YOU HAVE JUST

17   DELETED THE INDEX AND NOT ALL THE OTHER FILES?

18   **A.**   RIGHT.  I THINK I UNDERSTAND THE QUESTION.

19       SO THE DATABASE ITSELF, THE DATABASE IS A SINGLE FILE, A

20   DATABASE FILE ON THE IPOD.  BUT IT POINTS TO ALL SORTS OF

21   INFORMATION, AND -- AND IT KEEPS TRACK OF ALL SORTS OF

22   INFORMATION.  AND THE FACT THAT THAT DATABASE IS NOW CORRUPTED

23   MEANS YOU CAN'T TRUST WHAT'S ON THAT IPOD.

24       NOW, AND SO THE SAFE THING TO DO AT THAT POINT IS TO

25   RETURN IT TO THAT --

 1          (SIMULTANEOUS COLLOQUY.)

 2          **THE WITNESS:** -- STATE, CORRECT.

 3   **BY MR. COUGHLIN:**

 4   **Q.**  YOU DON'T KNOW IF THERE WAS ANY CORRUPTION, RIGHT?  IT'S

 5   JUST A TOUCH ON THE DATABASE.  IN OTHER WORDS, IT COULD BE

 6   JUST A THIRD-PARTY PLAYER THAT A CUSTOMER HAS PLAYED FOR YEARS

 7   ON THEIR OLDER IPODS TRYING TO PUT SOME SONGS AND MANAGE SOME

 8   SONGS ON THE IPOD, RIGHT?  YOU DON'T KNOW IF THERE'S ANY

 9   CORRUPTION, YOU GET THIS MESSAGE IF ANYBODY TOUCHES THE

10   DATABASE, CORRECT?

11   **A.**  WELL, NO, THAT'S NOT TRUE.  THIS HAPPENS WHEN -- WHEN THE

12   DATABASE IS ALTERED.  THE DATABASE -- SOME THIRD PARTY OR --

13   OR EVEN APPLE SOFTWARE, SOMETHING HAS GONE IN AND HAS TAMPERED

14   WITH THE DATABASE, OR THE DATABASE HAS BEEN CORRUPTED IN SOME

15   OTHER WAY.

16          BUT WHAT -- WHAT THE SOFTWARE KNOWS AT THAT POINT IS THAT

17   THE DATABASE INTEGRITY CHECK HAS FAILED BECAUSE THE DATABASE

18   HAS BECOME CORRUPTED, HOWEVER IT -- HOWEVER IT HAPPENED.

19   **Q.**  AND YOU SAY "TAMPERED," YOU USED THE WORD "TAMPER," BUT IT

20   COULD BE JUST A THIRD-PARTY PLAYER THAT SOMEBODY HAS USED

21   SINCE 2003 TRYING TO MANAGE THEIR MUSIC, IT COULD BE JUST A

22   THIRD-PARTY PLAYER THAT SOMEBODY'S TRYING TO HAVE MANAGE ON

23   THEIR NEW IPODS, RIGHT?

24   **A.**  IT COULD BE.  IT CERTAINLY COULD BE ANY THIRD-PARTY

25   APPLICATION WITH A MALICIOUS INTENT OR BENIGN INTENT, BUT THE

1  END RESULT IS THE DATABASE HAS BEEN CORRUPTED.

2  **Q.**  OKAY.

3     IN YOUR WORDS, IT'S CORRUPTED IF A THIRD-PARTY PLAYER IS

4  TRYING TO OPERATE ON IT?

5  **A.**  IN MY WORDS, IF THE DATABASE HAS BEEN ALTERED -- IF THE

6  DATABASE HAS BEEN ALTERED, AS I EXPLAINED YESTERDAY AT SOME

7  LENGTH, THE RESULTS OF THAT ALTERATION, WHEN IT'S DONE BY A

8  THIRD PARTY WITH IMPERFECT KNOWLEDGE OF HOW THE IPOD OPERATES

9  AND -- AND HOW ALL OF THE SOFTWARE ON ITUNES AND THE IPOD

10  OPERATES, IS A CORRUPTION OF THE DATABASE.

11  **Q.**  NOW, 4.7, WHEN 4.7 CAME IN AND WE HAD THE -- THE RSA

12  TECHNOLOGY --

13          **MS. DUNN:**  OBJECTION, YOUR HONOR, SCOPE.

14          **MR. COUGHLIN:**  I'M GOING TO TIE IT UP.

15          **THE COURT:**  WELL, I NEED TO HEAR THE QUESTION FIRST,

16  MS. DUNN.

17          **MS. DUNN:**  UNDERSTOOD.

18  **BY MR. COUGHLIN:**

19  **Q.**  WHEN IT HAD THE RSA TECHNOLOGY, THE PUBLIC AND PRIVATE

20  KEY, THAT TECHNOLOGY WAS MADE RETROACTIVE AND WENT BACKWARDS,

21  IN OTHER WORDS, EVERYBODY GOT ITUNES 4.7; IS THAT CORRECT?

22          **MS. DUNN:**  OBJECTION, SCOPE.

23          **THE COURT:**  OVERRULED.

24          **THE WITNESS:**  YES, THE -- EVERYBODY GETS THE LATEST

25  VERSION OF ITUNES AS -- AS A -- AS A NORMAL PRACTICE.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    BY MR. COUGHLIN:

2    Q.   RIGHT.

3    A.   SO EVERYBODY GOT 4.7.

4    Q.   RIGHT.  AND IN ITUNES 7.0, NOT EVERYBODY GOT THE KVC OR

5    THE DVC, IN OTHER WORDS, THE 90 MILLION MODELS -- AND I GUESS

6    THE BATTERY HAS PROBABLY RUN OUT ON 30 OR 40 MILLION OF

7    THOSE -- BUT THE 40 MILLION MODELS THAT YOU'RE WORRIED ABOUT,

8    QUOTE, THIS CORRUPTION, THEY DIDN'T GET THIS UPDATE, RIGHT?

9    THE KVC AND DVC, IT DIDN'T GO BACKWARDS, IT WAS NOT

10   RETROACTIVE, RIGHT?

11   A.   THE -- THE ITUNES CODE ON THE DESKTOP HAD THE CODE IN IT.

12   BUT IT RECOGNIZED THAT FOR EARLIER IPOD MODELS THAT IT DIDN'T

13   APPLY THOSE CHECKS.

14   Q.   SO YOU REALLY WEREN'T WORRIED ABOUT CORRUPTION IN THOSE

15   EARLIER MODELS.

16   A.   WELL, WHAT I CAN TELL YOU IS THAT THE PURPOSE OF THE -- OF

17   THE CHECKS, THE INTEGRITY CHECKS ON THE KEYBAG AND THE

18   DATABASE, WAS TO DETECT TAMPERING OR CORRUPTION.

19   Q.   IT WAS --

20   A.   AND THAT WAS NOT DONE ON THE EARLIER MODELS.

21   Q.   IT WAS REALLY TO DETECT A THIRD PARTY PUTTING IN FREE DRM

22   SONGS AND MANAGE THEM ON THE IPOD, IT WAS AGAINST COMPETITION;

23   ISN'T THAT CORRECT?

24   A.   WELL, YOU KNOW, I DISCUSSED THIS AT LENGTH YESTERDAY.  THE

25   TECHNICAL PURPOSE FOR THIS IS TO DETECT TAMPERING OR

1   CORRUPTION.

2           **MR. COUGHLIN:**  NO FURTHER QUESTIONS.

3           **THE COURT:**  ANY FOLLOW-UP ON THIS?

4           **MS. DUNN:**  NO, YOUR HONOR.  THANK YOU.

5           **THE COURT:**  OKAY.  ANY MORE QUESTIONS FOR THE JURY?

6   OTHERWISE I'LL RELEASE HIM INTO THE STORM.

7        ALL RIGHT.  YOU'RE EXCUSED.  THANK YOU.

8           **THE WITNESS:**  THANK YOU, YOUR HONOR.

9           **THE COURT:**  JUROR, CAN WE GET YOU SOME WATER?  WOULD

10   THAT BE HELPFUL?  JUROR NO. 1, ARE YOU SURE?  IF YOU NEED

11   WATER OR ANYTHING, LET ME KNOW.

12        ALL RIGHT.  DO WE HAVE OUR WITNESS BACK?

13           **MR. ISAACSON:**  YES.  PROFESSOR MURPHY.

14                        **KEVIN MURPHY,**

15   CALLED AS A WITNESS FOR THE DEFENDANT, HAVING BEEN PREVIOUSLY

16   DULY SWORN, CONTINUED TESTIFYING AS FOLLOWS:

17                   (PAUSE IN THE PROCEEDINGS.)

18           **THE COURT:**  MR. MURPHY, WELCOME BACK.

19        YOU, SIR, ARE STILL UNDER OATH.  DO YOU RECALL THAT?

20           **THE WITNESS:**  YES, I DO.  THANK YOU.

21        ALL RIGHT YOU MAY PROCEED.

22                **DIRECT EXAMINATION (CONTINUED)**

23   BY MR. ISAACSON:

24   **Q.**  ALL RIGHT.  JUST TO EXPLAIN WHERE WE WERE, 576, WE WERE

25   TALKING ABOUT THE GENERAL TOPIC OF HOW THE USE OF AN

1    INTEGRATED SYSTEM WAS PROCOMPETITIVE, AND YOU TALKED ABOUT

2    THESE POINTS YESTERDAY.

3        PROFESSOR MURPHY -- AND GOOD MORNING.

4    **A.**   GOOD MORNING.

5    **Q.**   THE -- ARE THERE OTHER EXAMPLES OF FIRMS IN OUR ECONOMY

6    WHO COMPETE WITH INTEGRATED SYSTEMS?

7    **A.**   YES.  THERE ARE MANY EXAMPLES OF INTEGRATED SYSTEMS.  I

8    THINK WE'VE TALKED ABOUT SOME OF THEM ALREADY.  WE TALKED

9    ABOUT THE -- VIDEO GAME SYSTEMS ARE TYPICALLY INTEGRATED

10   SYSTEMS, THE XBOX PLAYS XBOX GAMES, THE PLAYSTATION PLAYS

11   PLAYSTATION GAMES --

12   **Q.**   MAYBE WE CAN LOOK AT 577.  I'M SORRY TO INTERRUPT.

13                (DEMONSTRATIVE PUBLISHED TO JURY.)

14       **THE WITNESS:**  WELL, THOSE ARE MY THREE EXAMPLES.

15   PERFECT.

16       THE XBOX PLAYS THE XBOX GAMES.  PLAYSTATION PLAYS THE

17   PLAYSTATION GAMES.  AND NINTENDO PLAYS THE NINTENDO GAMES.

18   SOME OF THE TITLES WILL BE THE SAME ACROSS SYSTEMS, BUT THE

19   ACTUAL THING YOU PURCHASE WOULD WORK ON ONE OR THE OTHER.

20   SOME OF THEM HAVE UNIQUE TITLES THAT ONLY PLAY ON ONE OF THE

21   SYSTEMS.  SO IT'S -- YOU KNOW, THE LEVEL AT WHICH THEY'RE

22   INTEGRATED VARIES.

23       AND THAT WAS SOMETHING I TALKED ABOUT YESTERDAY, THAT

24   INTEGRATION IS NOT A ALL-OR-NONE THING.  IT IS VARYING LEVELS

25   OF INTEGRATION.  AND WE TALKED ABOUT, YOU KNOW, PC PLATFORMS

```
 1    VARYING IN THEIR LEVELS OF INTEGRATION.  YOU KNOW, KINDLE WAS

 2    AN EXAMPLE, I THINK PEOPLE HAVE TALKED ABOUT, AS AN INTEGRATED

 3    SYSTEM.  ALTHOUGH AGAIN, KINDLE SOFTWARE RUNS ON OTHER

 4    SYSTEMS, TOO.  IT WILL RUN ON YOUR DESKTOP.  SO DEPENDS ON HOW

 5    YOU LOOK AT IT.

 6        BUT VARYING LEVELS OF INTEGRATION, AS WE TALKED ABOUT

 7    BEFORE, HAVE THEIR ADVANTAGES AND DISADVANTAGES.  BIG

 8    ADVANTAGE IS MAKES IT EASIER TO MAKE IT WORK WELL TOGETHER.

 9    DISADVANTAGES, THERE'S LESS FLEXIBILITY, GENERALLY.  AND

10    THERE'S A TRADE-OFF THERE, AND WE DON'T KNOW WHICH ONE'S GOING

11    TO DO BETTER, AND THAT'S WHY COMPETITION BETWEEN INTEGRATED

12    AND -- AND -- AND MORE OPEN SYSTEMS TENDS TO BE A GOOD THING.

13    BY MR. ISAACSON:

14    Q.  WELL, ON THAT TOPIC, WHY DON'T WE LOOK AT 578.

15              (DEMONSTRATIVE PUBLISHED TO JURY.)

16    BY MR. ISAACSON:

17    Q.  AND WOULD YOU -- NOW WE'RE TALKING ABOUT APPLE COMPETITION

18    WITH OTHER INTEGRATED SYSTEMS AND WITH OPEN SYSTEMS.  CAN YOU

19    DESCRIBE WHAT THIS SLIDE ILLUSTRATES?

20    A.  YEAH, THIS ILLUSTRATES THE APPLICATION OF THAT IDEA I JUST

21    TALKED ABOUT TO THE VIDEO -- I MEAN, TO THE MUSIC, GAME --

22    MUSIC PLAYERS.

23        AND SO ON THE LEFT, WE HAVE EXAMPLES OF THREE DIFFERENT

24    INTEGRATED SYSTEMS, THE APPLE IPOD ALL THE WAY ON FAR LEFT,

25    MICROSOFT ZUNE IN THE MIDDLE, THE -- THE THIRD ONE OVER IS
```

1    SONY'S INTEGRATED SYSTEM THAT THEY OFFERED IN COMPETITION AT

2    VARIOUS POINTS IN TIME.

3        AND THEN ON THE RIGHT, WE HAVE VARIOUS LEVELS OF OPEN

4    SYSTEMS BY MICROSOFT, IRIVER, CREATIVE.  THERE WAS A BUNCH OF

5    THEM.  AND THEY VARIED AGAIN IN -- IN EXACTLY HOW THEY DID IT.

6    BUT AGAIN, THERE WERE LOTS OF OPTIONS AVAILABLE TO CONSUMERS

7    OF DIFFERENT TYPES OF SYSTEMS.

8    **Q.**  ALL RIGHT.  WELL, LET'S -- LET'S NOW TALK ABOUT

9    COMPETITION WITH DIGITAL MUSIC PLAYERS.

10            **MR. ISAACSON:**  CAN WE LOOK AT 579.

11                (DEMONSTRATIVE PUBLISHED TO JURY.)

12            **THE WITNESS:**  YEAH, I MEAN, THIS IS JUST A VERY

13   SIMPLE CHART.  ALL IT DOES IS GIVE YOU SOME OF THE NAMES OF

14   THE PROVIDERS OF THE OTHER DIGITAL MUSIC PLAYERS.

15       WHAT'S THE TAKEAWAY HERE?  THESE ARE PRETTY SOPHISTICATED

16   ELECTRONICS -- CONSUMER ELECTRONICS COMPANIES, COMPANIES LIKE

17   SONY, SAMSUNG, SANDISK, LG, MICROSOFT, TOSHIBA, NOKIA,

18   COMPANIES WE'VE ALL HEARD OF AND WERE VERY SUCCESSFUL AT

19   SELLING PRODUCTS TO CONSUMERS IN THIS AREA, THAT IS, CONSUMER

20   ELECTRONICS, MANY WITH LINKS TO VIDEO, AUDIO, ALL THOSE

21   DIFFERENT COMPONENTS, OTHER COMPUTERS AND SOFTWARE, THE KIND

22   OF COMPANIES YOU WOULD EXPECT CONSUMERS WOULD BE WILLING TO

23   PURCHASE PRODUCTS FROM.  AND THESE WERE IN COMPETITION WITH

24   THE IPOD ITUNES PLATFORM.

25

1    BY MR. ISAACSON:

2    Q.  AND SOME OF THESE WERE COMPETING IN 2006 TO 2009?

3    A.  YES.  I MEAN, THEY -- THEY COMPETED OFF AND ON THROUGHOUT.

4    SOME WERE IN THERE LONGER.  SOME WERE THERE IN FOR LESS.  BUT

5    THE POINT IS THEY WERE ALL THERE AND THEY WERE ALL THERE OVER

6    TIME.  AND APPLE'S IPOD ITUNES SOFTWARE COMPETED AGAINST THESE

7    SYSTEMS AT VARIOUS TIMES AS WE GO THROUGH.

8    Q.  ALL RIGHT.  NOW, THE JURY HAS SEEN DOCUMENTS IN THIS CASE,

9    APPLE DOCUMENTS, SAYING THINGS LIKE 70 PERCENT MARKET SHARE OF

10   DIGITAL PLAYERS, 80 PERCENT.

11       WHAT DO YOU SAY IN YOUR REPORT ABOUT WHETHER MARKET SHARE

12   PERCENTAGES LIKE THAT MAKE APPLE A MONOPOLY?

13   A.  I THINK, AGAIN, THERE'S NOT -- THERE'S NOT NECESSARILY

14   MONOPOLY BECAUSE YOU HAVE A LARGE MARKET SHARE, PARTICULARLY

15   IN A MARKET WHERE THE MARKET IS GROWING AND THERE ARE LOTS OF

16   NEW CUSTOMERS COMING IN, BECAUSE THE FACT THAT YOU WERE

17   SUCCESSFUL SELLING TO THE LAST GENERATION OF PEOPLE DOESN'T

18   MEAN YOU'RE GOING TO SELL TO THE NEXT GENERATION.  THAT IS,

19   THE NEW PEOPLE COMING IN ARE GOING TO MAKE THEIR OWN CHOICES,

20   PICK WHAT SOFTWARE THEY -- OR PLATFORM THEY LIKE THE BEST, AND

21   THAT'S CERTAINLY THE CASE OF WHAT WE HAD HERE.

22       A GREAT HISTORICAL EXAMPLE OF THAT WAS WHEN -- WHEN THE

23   IPOD BECAME AVAILABLE TO WINDOWS USERS.  THE ONLY EXPERIENCE

24   WINDOWS USERS HAD BEFORE THAT WAS WITH OTHER MEDIA PLAYERS SO

25   ACTUALLY MICRO -- I MEAN, APPLE'S ITUNES AND IPOD WAS THE NEW

1    KID ON THE BLOCK IN THAT CASE, HAD BEEN VERY SUCCESSFUL ON THE

2    MAC, AND REALLY TOOK OFF AND APPEALED TO THOSE CUSTOMERS.

3         THEY -- YOU KNOW, THAT KIND OF ILLUSTRATES.  AND THEY GOT

4    A PRETTY BIG SHARE PRETTY QUICKLY.  BUT THEY DIDN'T GET THAT

5    SHARE BECAUSE THEY JUST HAD A BIG SHARE ON THE MAC.  THEY GOT

6    IT BECAUSE CONSUMERS CHOSE THE PRODUCT VERSUS THE OTHER

7    PRODUCTS AVAILABLE ON THE MARKET.

8    **Q.**  AND WHAT DO ECONOMISTS SAY ABOUT THE CONTENTION THAT YOU

9    HAVE A VERY HIGH MARKET SHARE FOR A VERY POPULAR PRODUCT,

10   YOU'RE A MONOPOLY?

11   **A.**  WELL, I THINK -- THE QUESTION IS, IS DO -- DO CONSUMERS

12   HAVE THE -- COULD THEY CHOOSE SOMETHING ELSE IF THEY FOUND IT

13   MORE ATTRACTIVE AND THROUGH THOSE OTHER SUPPLIERS.  AND ONE OF

14   THE THINGS WE TEND TO FOCUS ON IN ECONOMICS IS THE ABILITY OF

15   OTHER FIRMS TO EXPAND IF CONSUMERS WANTED THOSE OTHER

16   PRODUCTS.  IS THERE A CAPACITY THERE TO PRODUCE THOSE EXTRA

17   PRODUCTS?

18        AND THAT'S ONE THING ABOUT SOFTWARE AND ELECTRONICS.  IT'S

19   TYPICALLY AN AREA WHERE, IF THE DEMAND IS THERE, IF YOUR

20   PRODUCT IS POPULAR, YOU CAN GROW VERY QUICKLY.  IN FACT, WE'LL

21   SEE WHEN WE LOOK AT THE CHARTS BOTH THE IPOD AND THE OTHER

22   PLAYERS GREW VERY QUICKLY BECAUSE THEY CAN -- YOU KNOW, YOU

23   CAN BUY THE COMPONENTS NEEDED TO MAKE THESE THINGS, AND YOU

24   CAN DESIGN YOUR SOFTWARE AND EXPAND YOUR MARKET.  AND THAT

25   MEANS EVEN A FIRM THAT STARTS OUT SMALL CAN BECOME VERY LARGE.

1   **Q.**  ALL RIGHT.  LET'S MOVE TO A DIFFERENT TOPIC.

2        SLIDE 581.

3              (DEMONSTRATIVE PUBLISHED TO JURY.)

4   **BY MR. ISAACSON:**

5   **Q.**  LET'S TALK ABOUT BUSINESS REASONS FOR THE ITUNES UPDATE.

6        WHAT ARE YOUR CONCLUSIONS HERE?

7   **A.**  WELL, FIRST THING TO REMEMBER, THERE ARE A COUPLE THINGS,

8   AS AN ECONOMIST, I WOULD FOCUS ON.  ONE IS THE UPDATING OF

9   ITUNES WAS A REGULAR PROCESS, THAT IS, ITUNES WAS NOT A STATIC

10  SOFTWARE PROGRAM THAT WAS THE SAME YEAR AFTER YEAR AND IT JUST

11  CHANGED AT THIS TIME IN THIS PARTICULAR CASE.  IT'S SOMETHING

12  THAT EVOLVED OVER TIME.  NEW FEATURES WERE BROUGHT IN.

13  CHANGES WERE MADE TO THE SYSTEM.

14      WE TALKED ABOUT CHANGES TO WHAT YOU COULD DO IN TERMS OF

15  FUNCTIONALITY, ADDING VIDEO, ADDING COVER ART, ADDING VARIOUS

16  THINGS THAT CAME IN OVER TIME.  WE TALKED ABOUT IMPROVEMENTS

17  TO THE VIDEO IT HAD.  WE TALKED ABOUT OTHER THINGS LIKE

18  WHEN -- WHEN THE DRM WAS CHANGED OVER TIME.  IT CHANGED BACK

19  IN 2004 TO ADDRESS SOME SECURITY ISSUES, CHANGES COMING UP IN

20  THESE.  THERE WAS CHANGES ACROSS THE SYSTEM.

21      AND, YOU KNOW, I THINK WE'RE SOMETHING LIKE ITUNES 12 NOW.

22  RIGHT?  THAT IS, WE STARTED, I THINK, AT 1 AND NOW WE'RE AT

23  12.  AND THEY BASICALLY DIDN'T SKIP ANY NUMBERS IN BETWEEN.

24  SO THERE HAVE BEEN A LOT OF UPDATES TO ITUNES.  SO THAT'S --

25  THAT'S NUMBER ONE.

1    NUMBER TWO, WELL, WHY DO YOU UPDATE?  WELL, YOU UPDATE TO

2    PROVIDE MORE -- MORE FEATURES.  YOU UPDATE TO MAINTAIN

3    SECURITY.  AND I TALKED YESTERDAY ABOUT WHY MAINTAINING

4    SECURITY IS IMPORTANT.  IT'S DIRECTLY RELEVANT TO THE

5    CONSUMER.  THE CONSUMER WANTS HIS CONTENT TO BE SECURE,

6    DOESN'T WANT MALICIOUS SOFTWARE TO GET ON THAT -- ON HIS IPOD

7    AND POSSIBLY INFECT HIS COMPUTER AS WELL.  DOESN'T WANT THAT.

8    AT THE SAME TIME, YOU -- YOU WANT TO PRESERVE THE COPY

9    PROTECTION, NOT SO MUCH BECAUSE THAT'S WHAT MATTERS DIRECTLY

10   TO CONSUMERS, BUT CONSUMERS WANT TO BE ABLE TO BUY THE

11   CONTENT, AND THE RECORD COMPANIES WON'T PROVIDE THE CONTENT

12   UNLESS YOU PROVIDE COPY PROTECTION.  SO MAINTAINING THAT COPY

13   PROTECTION IS IMPORTANT.

14   SO ONE OF THE REASONS YOU HAVE TO UPDATE IS TO MAINTAIN

15   SECURITY.

16   NOW, THE THING ABOUT SECURITY IS WHEN YOU UPDATE SECURITY,

17   YOU CAN'T SAY, WELL, THIS GUY HE DOESN'T WANT TO DO ANYTHING

18   WRONG SO I DON'T HAVE TO UPDATE.  BECAUSE THERE MIGHT BE OTHER

19   PEOPLE WHO DO WANT TO DO SOMETHING BAD.  AND WHEN YOU UPDATE

20   TO PREVENT THE BAD GUYS FROM GETTING IN YOUR HOUSE, THAT MIGHT

21   PREVENT -- IT MAY BE MORE DIFFICULT FOR SOMEBODY ELSE TO GET

22   IN YOUR HOUSE.  BUT THAT'S PART OF THE STORY.  THAT'S THE WAY

23   THINGS WORK.

24   Q.  AND WHAT'S -- SO WHAT'S YOUR TIME AND EXPENSE POINT WITH

25   RESPECT TO CUSTOMERS OF THIRD-PARTY SOFTWARE?

1    **A.**   WELL, THAT -- THAT COMES IN TWO WAYS.  ONE IS -- AND I

2    TALKED ABOUT THIS A LITTLE BIT YESTERDAY.  YOU KNOW, ONE OF --

3    ONE OF THE ISSUES OF HAVING AN OPEN PLATFORM IS YOU GET TO

4    TAKE ADVANTAGE OF THE FACT THAT CUSTOMERS CAN USE ALL THESE

5    DIFFERENT THINGS WITH IT.  THIS IS SORT OF LIKE THE WINDOWS

6    PLATFORM HAD TONS OF DIFFERENT HARDWARE, SOFTWARE YOU COULD

7    USE, BUT THEN AS THE MANAGER OF THE OPERATING SYSTEM, IT MADE

8    IT MUCH MORE DIFFICULT BECAUSE YOU HAD TO SAY, JEEZ, WHEN I

9    UPDATE MY OPERATING SYSTEM, I GOT TO WORRY ABOUT IS IT GOING

10   TO MAINTAIN COMPATIBILITY WITH THAT VIDEO CARD THAT THE GUYS

11   HAD OUT THERE, IS IT GOING TO MAINTAIN COMPATIBILITY WITH THAT

12   SOFTWARE PROGRAM THAT A BUNCH OF PEOPLE ARE USING.

13   **Q.**   AND SO HOW DOES THAT AFFECT CUSTOMER SUPPORT?

14   **A.**   WELL, RAISE IT -- YOU GOT TWO CHOICES.  ONE IS HAVE HIGHER

15   CUSTOMER SUPPORT COSTS BECAUSE YOU HAVE TO SUPPORT A WIDER

16   RANGE OF APPLICATIONS.  OR, TWO, TRY TO DO LESS.  BUT THEN

17   THAT HURTS ALL THE PEOPLE WHO DON'T USE ALL THAT OTHER

18   SOFTWARE BECAUSE THEY GET A LESS FUNCTIONAL PRODUCT THAN THEY

19   OTHERWISE WOULD.

20   **Q.**   ALL RIGHT.  WHAT ABOUT YOUR FOURTH POINT THERE?

21   **A.**   THAT -- AND -- IN THIS CASE, ONE OF THE THINGS THAT YOU

22   WANTED TO DO BY MAINTAINING THE MORE PROPRIETARY, CLOSED, YOU

23   KNOW, INTEGRATED, WHATEVER YOU WANT TO CALL IT, BY MAINTAINING

24   THAT SYSTEM, THAT'S PART OF WHAT CREATED VALUE, PARTICULARLY

25   IN THIS CASE, BECAUSE ALL THE -- THE REVIEWS TELL US THE --

MURPHY – DIRECT / ISAACSON

1    THE CONSUMER RESPONSE TELLS US WHAT DO THEY -- WHAT DO THEY

2    LIKE ABOUT THE IPOD, THEY LIKE THE FACT THAT YOU COULD JUST

3    PLUG IT IN, IT WAS SEAMLESS, SOFTWARE WORKED, I DIDN'T HAVE TO

4    KNOW A LOT ABOUT HOW TO WORK WITH DIGITAL FILES TO ACTUALLY

5    MAKE IT PLAY MUSIC.  AND MAINTAINING THAT WAS AN IMPORTANT

6    PRIORITY FOR ECONOMIC SUCCESS, AND THAT TURNED OUT TO BE VERY

7    VALUABLE IN THIS MARKETPLACE.

8    **Q.**  AND WHAT DID YOU FIND FROM YOUR INVESTIGATION ABOUT HOW

9    OFTEN APPLE UPGRADED ITS SOFTWARE?

10   **A.**  WELL, I THINK I SAID -- I SAID THAT A BIT AGO.  I SAID

11   THEY UPDATED IT BASICALLY CONTINUOUSLY.  THEY HAD MAJOR

12   UPDATES.  THAT'S THAT ONE, TWO, THREE, FOUR, FIVE.  AND THEN

13   YOU HAD SMALLER NUMBERS WITHIN THERE THAT HAD LESSER DEGREES

14   OF IMPORTANT UPDATE.  THAT'S VERY COMMON IN THE SOFTWARE

15   BUSINESS TO HAVE MAJOR REVISIONS, AND USUALLY THAT'S THE FIRST

16   NUMBER BEFORE THE DECIMAL PLACE, AND THEN AFTER THE DECIMAL

17   PLACE IS SMALLER EDITIONS, ALTHOUGH SOMETIMES THOSE SMALLER

18   ONES TURN OUT TO BE IMPORTANT.

19   **Q.**  ALL RIGHT.  LET'S TALK ABOUT A DIFFERENT TOPIC.

20       HAVE YOU REACHED AN OPINION ON THIS CASE ON WHETHER THERE

21   WAS AN ANTICOMPETITIVE IMPACT FROM APPLE'S 7.0 OR 7.4 UPDATES?

22   **A.**  YEAH.  HERE, I THINK IT'S IMPORTANT TO REMEMBER AND GO

23   BACK TO WHAT THE PLAINTIFFS' THEORY AS ARTICULATED BY DR. NOLL

24   WAS.

25       THE THEORY WAS THAT THE UPDATES HAD THE EFFECT OF REDUCING

1   THE ABILITY OF PEOPLE TO USE OTHER MUSIC ON THE IPOD AND

2   THEREBY CHANGED APPLE'S INCENTIVES VIS-A-VIS PRICING OF IPODS.

3   OKAY?

4       IT'S NOT REALLY ABOUT THE LEVEL OF -- IT'S NOT REALLY

5   ABOUT WHETHER THE -- THE BASELINE WE WERE AT.  IT'S WHETHER

6   THERE WAS A CHANGE, WHETHER IN FACT THESE NEW UPDATES HAD THE

7   EFFECT OF REDUCING THE ABILITY TO USE AND THEREFORE CHANGING

8   APPLE'S INCENTIVES.

9       AND IN ORDER FOR THAT TO HAPPEN, IT HAS TO BE THAT A

10  SUBSTANTIAL NUMBER OF PEOPLE, AT LEAST A REASONABLY LARGE

11  NUMBER OF PEOPLE, WANTED TO DO THAT.  IF NOBODY WANTED TO USE

12  THAT OTHER SOFTWARE, IF NOBODY WAS USING THE OTHER SOFTWARE

13  TO -- ON THE IPOD, THEN IT WOULDN'T HAVE AN EFFECT.  AND FOR

14  ALL OF THOSE FOR -- APPLE'S IPODS THAT WEREN'T AFFECTED, THAT

15  ALSO WOULDN'T HAVE AN EFFECT.  SO WE'RE GOING TO LOOK AT THAT

16  IN THOSE VARIOUS ISSUES.

17  Q.  YEAH, WE WERE JUST -- ALL RIGHT.  SO LET'S GO THROUGH

18  THOSE.

19      LET'S LOOK AT 589.

20          (DEMONSTRATIVE PUBLISHED TO JURY.)

21      **THE WITNESS:**  YEAH.  SO THE FIRST THING TO REMEMBER

22  IS YOU COULD ALWAYS MOVE DRM-FREE MUSIC ON AND OFF THE IPOD

23  AND PUT THAT SAME MUSIC ONTO OTHER THINGS.  SO THE SAME

24  DRM-FREE MUSIC YOU COULD PUT ON YOUR IPOD, YOU COULD PUT

25  SOMEWHERE ELSE.  THAT MUSIC WAS THE KIND OF MUSIC THAT WAS,

```
1    YOU KNOW, NOT -- NOT -- NOT RESTRICTED.  IT WOULD BE SOMETHING
2    THAT YOU COULD MOVE AROUND BECAUSE IT WAS DRM-FREE.  APPLE
3    ALWAYS ALLOWED PEOPLE TO PUT DRM-FREE, REGARDLESS OF WHERE YOU
4    GOT IT, ON THE IPOD.  AND IMPORTANTLY, THAT WAS ABOUT
5    75 PERCENT OF THE MUSIC PEOPLE HAD.
6    Q.  ALL RIGHT.  WELL, LET'S LOOK AT 590.
7    A.  SO LET ME JUST SAY THAT MEANS THAT 75 PERCENT OF THE MUSIC
8    THE STORY JUST CAN'T -- DOESN'T APPLY TO.  IT'S JUST NOT THE
9    STORY FOR 75 PERCENT.
10   Q.  ALL RIGHT.  SO THEN WITH RESPECT TO THE 25 PERCENT, WHAT
11   DOES 590 SHOW?
12   A.  WELL, WITHIN THE 25, HOW MUCH OF THAT MUSIC WAS
13   REALNETWORKS MUSIC, THAT IS, MUSIC THAT WOULD POTENTIALLY BE
14   AFFECTED BY THE UPDATE?  THE ANSWER IS 3 PERCENT OF ALL
15   DOWNLOADS WERE ROUGH -- WERE FOR REALNETWORKS MUSIC, THAT IS,
16   3 PERCENT OF THAT 25 PERCENT.  BUT THAT'S NOT FOR THE IPOD.
17   THAT'S ACROSS ALL PLATFORMS INCLUDING OTHER PLAYERS.
18       LOGIC TELLS US THAT IF ANYTHING, THAT 3 PERCENT WOULD BE A
19   SMALLER NUMBER ON THE IPOD WHERE THE ITUNES WAS A VERY, VERY
20   POPULAR SOURCE OF DIGITAL DOWNLOADS.  BUT EVEN IF WE ASSUME
21   THAT 3 PERCENT APPLIES TO IPODS, 3 PERCENT OF 25 PERCENT IS
22   0.75 PERCENT, LESS THAN 1 PERCENT OF THE MUSIC WOULD HAVE BEEN
23   MUSIC AT THE TIME COMING FROM REALNETWORKS.
24       AND THAT THEREFORE TELLS US, FOR THE IPODS THAT WERE
25   AFFECTED, THE EFFECT WOULD BE, YOU KNOW, JUST BASICALLY
```

1    NOTHING, THAT IS, THAT IT WOULD HAVE AFFECTED ALMOST NONE OF

2    THE MUSIC THAT PEOPLE HAD OR THE MUSIC THAT PEOPLE WERE

3    PURCHASING.  IT JUST WAS NOT A IMPORTANT SOURCE OF MUSIC FOR

4    THE IPOD.

5    Q.  AND WHAT DOES THE SHADED -- WHAT DOES THE SHADED RED AREA

6    THERE ILLUSTRATE?

7    A.  THAT'S INTENDED TO BE THE 3 PERCENT OF THE 25 PERCENT.  SO

8    THAT'S -- THAT LITTLE SLIVER OF ALL MUSIC.  YOU HAVE THE

9    75 PERCENT WHICH IS NON-DIGITAL DOWNLOADS.  YOU HAVE THE MOST

10   OF THE DIGITAL DOWNLOADS IN THE BLUE AREA.  AND THAT ONE

11   LITTLE SLICE WOULD BE REALNETWORKS MUSIC.  THE IMPACT OF THIS

12   WOULD HAVE TO COME THROUGH THAT, THAT SMALL FRACTION OF MUSIC.

13   Q.  ALL RIGHT.  AND SO IF THAT'S -- AND WHAT EVIDENCE DID YOU

14   SEE THAT DR. NOLL HAD ABOUT THE NUMBER OF IPOD OWNERS WHO

15   ACTUALLY PURCHASED MUSIC FROM REALNETWORKS, THE REALNETWORKS

16   TO IPOD RED LINE THERE?

17   A.  IN FACT, HE HAD NO EVIDENCE ON THAT.  NO EVIDENCE THAT

18   PEOPLE WERE PURCHASING REALNETWORKS MUSIC.  NO DIRECT EVIDENCE

19   OF THAT.

20   Q.  WELL, IN YOUR OPINION, WOULDN'T THE -- JUST THE VERY

21   EXISTENCE OF HARMONY CONSTRAIN APPLE'S PRICES FOR THE IPOD?

22   A.  NO.  I MEAN, AGAIN, JUST ITS PURE EXISTENCE WOULD NOT HAVE

23   THAT TYPE OF EFFECT BECAUSE THE -- THE WAY IN WHICH IT HAS AN

24   EFFECT IS IT CAUSES PEOPLE WHO OTHERWISE WOULD WANT TO BUY AN

25   IPOD TO NOT BUY AN IPOD, OR ONE WAY OR THE OTHER.

 1      AND THE ONLY WAY IT CAN AFFECT MY WILLINGNESS TO CHOOSE AN

 2   IPOD VERSUS ANOTHER PLAYER IS IF I PLAN TO USE THAT MUSIC.  IF

 3   I DIDN'T PLAN TO USE THAT MUSIC ON AN IPOD, IF I BOUGHT AN

 4   IPOD, IT'S IRRELEVANT.  IF I'M SOMEBODY WHO SAID I'M NOT USING

 5   REALNETWORKS MUSIC ON THE IPOD, THEN THE CHANGE THAT SAID

 6   THAT'S NO LONGER THERE WOULDN'T HAVE ANY EFFECT.  SO THE

 7   MAGNITUDE OF ANY IMPACT IS GOING TO BE DIRECTLY RELATED TO

 8   THIS NUMBER.

 9      THIS .75 PERCENT IS TELLING US HOW IMPORTANT THAT COULD

10   EVEN BE FOR THE IPODS THAT ARE AFFECTED.  AND I'M GOING TO GET

11   TO THAT IN A MOMENT.

12   **Q.**  ALL RIGHT.  LET'S TALK ABOUT ANOTHER ISSUE OF

13   ANTICOMPETITIVE IMPACT.

14      SLIDE 583.

15          (DEMONSTRATIVE PUBLISHED TO JURY.)

16   **BY MR. ISAACSON:**

17   **Q.**  ALL RIGHT.  CAN YOU EXPLAIN WHAT THIS CHART IS

18   ILLUSTRATING.

19   **A.**  ALL RIGHT.  SO, REMEMBER, OF THE MUSIC THAT PEOPLE HAVE,

20   WE'RE THINKING ABOUT LESS THAN 1 PERCENT IS, AT MOST, IS

21   COMING FROM REALNETWORKS.

22      AND YOU SAY, OKAY, WELL, IF IT AFFECTED ALL IPODS, THEN

23   THAT LESS THAN 1 PERCENT WOULD MEASURE HOW BIG OF AN IMPACT IT

24   HAS.  BUT IN FACT, THE CHANGE THAT OCCURRED WITH 7.0 AND 7.4,

25   IF WE'RE TALKING ABOUT BOTH OF THOSE, DIDN'T AFFECT ALL IPODS.

1    FIRST, IT HAD NO EFFECT AT ALL ON EXISTING IPODS.  PEOPLE WHO

2    WANTED TO USE HARMONY TO BUY MUSIC COULD CONTINUE TO DO IT ON

3    EXISTING IPODS.

4         IN -- IN SEPTEMBER OF 2006 WHEN 7.0 COMES OUT, IT DIDN'T

5    AFFECT THE IPOD SHUFFLE, IT DIDN'T AFFECT THE IPOD CLASSIC.

6    THE ONLY MODEL AFFECTED WAS THE NANO.  OKAY?

7         EVEN IN 2007, IT THEN AFFECTED THE TOUCH, THE CLASSIC, AND

8    NOW THE THIRD GENERATION NANO, BUT STILL DIDN'T AFFECT THE

9    SHUFFLE.  IN FACT, IT NEVER AFFECTED THE SHUFFLE.  SO IF YOU

10   WERE GOING TO BUY A SHUFFLE, ZERO IMPACT.  ZERO IMPACT.

11        SO NOW, IT'S EVEN SMALLER THAN THAT, THOUGH.  SO IT'S

12   THREE-QUARTERS OF A PERCENT ON THE ONES TO WHICH IT APPLIED.

13   IT APPLIED TO NONE OF THE OLD IPODS, ONLY TO SOME OF THE NEW

14   ONES.

15        BUT HERE'S THE -- HERE'S THE RUB.  THE THEORY HE HAD OF

16   LOCK-OUT WORKED AS FOLLOWS:  YOU COME IN WITH A NEW -- THE

17   CHANGES MADE.  IMMEDIATELY IT DOESN'T DO ANYTHING TO CHANGE

18   THE MUSIC YOU HAVE.  THE MUSIC LIBRARY YOU HAVE ON

19   SEPTEMBER 12TH IS THE SAME MUSIC LIBRARY YOU HAD ON

20   SEPTEMBER 11TH.

21        THE ONLY WAY IT CHANGES MY WILLINGNESS TO BUY AN IPOD

22   WOULD BE SOMEBODY WHO HAD A LOT OF REALNETWORKS MUSIC WOULD

23   ACTUALLY SAY NOW, JEEZ, I SHOULD GO BUY SOMETHING ELSE, NOT AN

24   IPOD.  SO IT ACTUALLY WOULD REDUCE THE DEMAND FOR IPOD, NOT

25   INCREASE THE DEMAND.

1    **Q.**   AND LET ME GO OVER THAT SO WE GET THAT ABSOLUTELY CLEAR.

2        THE SO-CALLED KVC, THE INTEGRITY CHECK IN SEPTEMBER 2006,

3    I OWNED AN -- AN OLDER IPOD THEN, NOT -- NOT A NEW IPOD.  KVC

4    IS NOT ON THAT IPOD, IT DOESN'T AFFECT ME, RIGHT?

5    **A.**   THAT'S CORRECT.  MY OLD IPOD, I CAN CONTINUE TO USE THE

6    MUSIC EXACTLY AS I DID THE DAY BEFORE, NO CHANGE.

7    **Q.**   I'M NOT --

8    **A.**   AS LONG AS I OWN THAT IPOD, I CAN KEEP DOING WHAT I WAS

9    DOING.

10   **Q.**   I'M NOT GOING TO BE AFFECTED UNTIL LATER, UNTIL I BUY A

11   NEW -- NEW IPOD?

12   **A.**   YES.  BUT YOU WON'T EVEN BE AFFECTED NECESSARILY EVEN WHEN

13   YOU BOUGHT THE NEW ONE.

14   **Q.**   RIGHT.  THAT -- EXPLAIN THAT.

15   **A.**   OKAY.  SO I'M A PERSON.  I HAVE AN IPOD.  IF I HAVE NO

16   HARMONY MUSIC, NEVER PLANNED TO BUY ANY HARMONY MUSIC, THEN

17   I'M -- THIS DOESN'T AFFECT ME AT ALL EVER.  I'M JUST -- IT'S

18   IRRELEVANT FROM MY POINT OF VIEW.

19       NOW LET'S SAY I'M SOMEBODY WHO HAD AN IPOD AND I HAD SOME

20   HARMONY MUSIC.  BEFORE -- AND I -- AND I WAS GOING TO BUY A

21   NANO.  BEFORE SEPTEMBER 2006, IF I WERE TO BUY AN IPOD, I

22   COULD PLAY BOTH HARMONY MUSIC AND -- AND ITUNE MUSIC.  AFTER

23   SEPTEMBER 2006, IF I WANTED TO PLAY MY HARMONY MUSIC, I'D HAVE

24   TO BURN AND RIP.  SO IN FACT, IF I'M WILLING TO BURN AND RIP,

25   AGAIN, NO EFFECT FOR ANYBODY BECAUSE I CAN STILL USE ALL THE

1   MUSIC HOW I WANT.

2       THE ONLY THING IT WOULD SAY WAS IF I DIDN'T WANT TO BURN

3   AND RIP, I WOULD THEN BE ACTUALLY INCENTIVIZED TO BUY A

4   DIFFERENT PLAYER, NOT AN IPOD.  I WOULD ACTUALLY WANT TO BUY

5   SOMETHING ELSE RATHER THAN BUY AN IPOD.  SO IF ANYTHING, THAT

6   WOULD REDUCE THE DEMAND FOR IPODS.  BECAUSE THAT OTHER PLAYER

7   WILL STILL PLAY WHATEVER IT WOULD HAVE PLAYED.  THE ONLY THING

8   THAT'S HAPPENED IS NOW WHAT WOULD HAVE PLAYED ON THE IPOD NO

9   LONGER DOES.  IT ACTUALLY WOULD HAVE REDUCED DEMANDS FOR IPOD

10  AT THAT POINT.

11  Q.  AND WHAT DO YOU EXPECT TO HAPPEN TO IPOD PRICES WHEN YOU

12  REDUCE DEMAND FOR IPOD?

13  A.  WELL, IN GENERAL THAT EFFECT IS GOING TO WORK IN THE

14  DIRECTION OF PUSHING PRICES DOWN, NOT UP.

15      NOW, NONE OF THIS IS REALLY GOING TO BE AN EFFECT BECAUSE

16  WE ALREADY KNOW IT'S LESS THAN 1 PERCENT OF TOTAL PURCHASES.

17  AND WE KNOW IT'S ONLY AFFECTING SOME IPODS.  BUT IF IT HAD AN

18  EFFECT, THAT PART OF THE STORY TELLS US IT WOULD ACTUALLY BE

19  IN THE OPPOSITE DIRECTION.  I'M NOT TELLING YOU WE WOULD

20  EXPECT PRICES TO FALL.  I'M JUST SAYING HIS THEORY DOESN'T

21  HOLD WATER.  THAT'S REALLY WHAT I'M SAYING.

22  Q.  ALL RIGHT.  NOW THERE'S A PART OF YOUR CHART AT THE

23  BOTTOM, JANUARY 1ST, 2008, COMPETITORS DRM-FREE.

24      WILL YOU EXPLAIN WHAT THAT'S ABOUT.

25  A.  YEAH.  WHEN COMPETITORS WENT DRM-FREE IN -- IN 2008, AT

1    THAT POINT, PEOPLE COULD GET MUSIC ON DOWNLOADS FROM ANYWHERE.

2    THEY COULD GET -- I MEAN, THEY COULD GET DRM-FREE MUSIC,

3    PARTICULARLY FROM AMAZON, AND THEY COULD IT ON AN IPOD, THEY

4    COULD PUT IT SOMEWHERE ELSE.  AND SO THAT POINT -- AT THAT

5    POINT IN TIME, THERE'S NO ISSUE ABOUT WHERE YOU CAN GO TO GET

6    MUSIC OTHER THAN THEN AND PUT IT ON YOUR IPOD.  IF YOU WANT TO

7    PUT MUSIC ON A IPOD THAT YOU CAN PUT SOME -- MOVE SOMEWHERE

8    ELSE, YOU CAN BUY IT FROM AMAZON, YOU COULD PUT IT DIRECTLY

9    INTO ITUNES.  YOU CAN ALSO TAKE THAT SAME MUSIC AND PUT IT ON

10   ANOTHER PLAYER.  THIS ISSUE IS LARGELY -- LARGELY -- LARGELY

11   GOES AWAY.

12   **Q.**  ALL RIGHT.  AND SO HOW DOES THAT RELATE TO YOUR OPINIONS

13   ON LOCK-OUT OR LOCK-IN?

14   **A.**  WELL, IT'S IMPORTANT BECAUSE IF THERE WAS GOING TO BE AN

15   EFFECT, IT WOULD HAVE TO -- OF THE LOCK-IN STORY, IT SORT

16   OF -- IT SORT OF WORKS LIKE THIS:  I BUY A NANO.  I CAN NO --

17   I'M NO LONGER BUYING HARMONY MUSIC SO OVER TIME I ACCUMULATE

18   MORE ITUNES MUSIC.

19      BUT THAT DOESN'T HAVE AN EFFECT UNTIL I GO TO REPLACE THE

20   NANO.  AND WE KNOW THAT WHEN YOU REPLACE YOUR PLAYER --

21   USUALLY EVERY 18 TO 24 MONTHS.  SO EVEN IF IT HAD -- IF IT

22   STARTED AFFECTING PEOPLE IN SEPTEMBER 2006, THE EFFECT ON THE

23   LOCK-IN WOULDN'T SHOW UP UNTIL ABOUT 18 MONTHS LATER WHEN THEY

24   ACTUALLY WENT TO REPLACE THAT NANO.  AND THAT WOULD BE ALMOST

25   AT THE END OF THE PERIOD HERE.  THAT WOULD BE PAST THAT 2008

1  DATE WHEN THEIR COMPETITORS HAVE GONE DRM-FREE.

2  **Q.**  ALL RIGHT.  LET'S LOOK AT A -- THE NEXT SLIDE, 586.

3            (DEMONSTRATIVE PUBLISHED TO JURY.)

4  **BY MR. ISAACSON:**

5  **Q.**  WOULD YOU EXPLAIN HOW THIS RELATES TO YOUR ANALYSIS OF

6  ANTICOMPETITIVE EFFECT AND -- AND LOCK-IN.

7  **A.**  YEAH.  THIS IS -- THIS IS A PRETTY SIMPLE STORY BECAUSE

8  HERE WE'RE JUST LOOKING AT SALES OF ITUNES SOFTWARE.  AND

9  WE'RE TRACING ITUNES SOFTWARE -- I MEAN, ITUNES MUSIC OVER

10  TIME.  AND THAT FIRST DATE IS WHEN ITUNES 7 IS RELEASED.

11      AND YOU CAN SEE THERE'S A SEASONAL PATTERN HERE, WHICH IS

12  CHRISTMAS IS A BIG DEAL IN THIS BUSINESS, THAT IS, PEOPLE TEND

13  TO BUY NEW PLAYERS AND SONGS AND THINGS RELATED TO SEASONALS.

14      BUT WHAT HAD YOU SEE HERE IS THAT UPWARD TREND WITH THE

15  SEASONAL JUST KEEPS GOING RIGHT LONG.  IT WAS RISING BEFORE WE

16  HIT ITUNES 7.  IT WAS RISING AFTERWARD.

17      SO IN FACT, THERE'S NO EVIDENCE AT ALL OF THIS STORY OF,

18  WELL, THIS SUDDENLY CAUSED A BIGGER INCREASE IN ITUNES MUSIC

19  THAN WOULD HAVE HAPPENED BEFORE.  YOU SEE THE SAME UPWARD

20  TREND WITH THE SEASONAL PATTERN AND AFTER ITUNES 7 IS

21  RELEASED.

22      THE CORE OF DR. NOLL'S THEORY THAT THIS CAUSED PEOPLE TO

23  HAVE MORE ITUNES MUSIC WHICH CAUSED THEM TO BE MORE LOCKED IN

24  JUST SIMPLY DOESN'T COME OUT, OR YOU DON'T SEE IT AT ALL IN

25  THIS PICTURE.

1    Q.   ALL RIGHT.  WHAT ABOUT LOCK-OUT?  WHAT EVIDENCE HAVE YOU

2    SEEN OF THAT?  THAT'S WHERE DR. NOLL SAYS THAT REAL -- PEOPLE

3    USING THE REALNETWORKS LIBRARY CAN'T BUY A NEW IPOD.

4    A.   WELL, AGAIN, YOU DON'T SEE ANY EVIDENCE FOR THAT EITHER.

5    BECAUSE WHAT YOU WOULD -- UNDER THAT THEORY, YOU KNOW, HIS --

6    HIS LOCK-OUT THEORY IS THAT YOU WOULD SEE LESS SALES OF IPODS

7    AS SOON AS THAT -- THIS HAPPENS AND PEOPLE WOULD SHIFT TO THE

8    OTHER PLAYERS.  AGAIN, NO EVIDENCE OF THAT AT ALL.

9    Q.   AND SO THERE'S NO EVIDENCE, IN YOUR OPINION, OF LOCK-IN OR

10   LOCK-OUT, BUT WHAT DOES IT SAY ABOUT THIS THEORY THAT THERE'S

11   A LOCK-IN CONTENTION THAT SAYS IT INCREASES DEMAND AND A

12   LOCK-OUT CONTENTION THAT SAYS IT DECREASES DEMAND?

13   A.   WELL, I THINK IT TELLS US THAT HIS THEORY ISN'T VERY --

14   VERY COHERENT, AT LEAST AS IT'S LAID OUT.  HE DOESN'T REALLY

15   TALK IN A VERY GOOD WAY ABOUT AT WHAT THE UNDERLYING ECONOMICS

16   IS.  IN FACT, IN MANY CASES, THE ECONOMICS TELLS US IT WILL GO

17   THE OPPOSITE WAY.

18      BUT I THINK THAT'S KIND OF MISSING THE POINT.  I THINK THE

19   BASIC POINT HERE IS IN ORDER FOR ANY OF THESE THEORIES TO

20   OPERATE, YOU HAVE TO DO SOMETHING THAT HAS A SUBSTANTIAL

21   IMPACT ON THE MARKETPLACE.

22      AND THE THING YOU WANT TO REMEMBER IS IT DIDN'T AFFECT THE

23   OLD IPODS, IT ONLY AFFECTED SOME OF THE NEW IPODS.  MOST OF

24   THE EFFECTS, IF THEY WERE GOING TO BE THERE, WOULDN'T COME

25   TILL YOU WENT TO REPLACE THOSE IPODS.  SO WE'RE NOW TALKING

MURPHY - DIRECT / ISAACSON

1   WAY OFF.

2       AND MOST IMPORTANTLY, REALNETWORKS WAS A VERY, VERY SMALL

3   PART OF THE OVERALL MUSIC PLACE -- MUSIC MARKETPLACE, WHERE

4   PEOPLE GOT THEIR MUSIC FROM.  AND WITHOUT THAT, THERE'S NO

5   REASON TO BELIEVE THERE WOULD BE AN EFFECT ON PRICES.  IN

6   FACT, THE REASON TO BELIEVE THERE WOULD BE NO EFFECT ON PRICES

7   BECAUSE WHEN YOU CHANGE SOMETHING THAT AFFECTS LESS THAN

8   1 PERCENT OF MUSIC, THAT'S JUST NOT GOING TO -- NOT GOING TO

9   DRIVE THE BUS.

10  **Q.**  ALL RIGHT.  SLIDE 592 WAS YOUR SUMMARY -- IS THIS A

11  SUMMARY OF YOUR OPINIONS ABOUT THE MONOPOLY POWER ISSUE?

12  **A.**  YES, IT IS.

13  **Q.**  AND I THINK YOU'VE TOUCHED ON ALL OF THESE, BUT IS IT YOUR

14  OPINION THAT APPLE DID NOT HAVE MONOPOLY POWER FOR THE THREE

15  REASONS HERE, THAT APPLE IS SUCCESSFUL, BECAUSE IT OFFERED A

16  PRODUCT THAT CONSUMERS WANTED, THE LARGE MARKET SHARE DOES NOT

17  MEAN MONOPOLY POWER, AND APPLE'S SUCCESS WITH NEW PURCHASERS

18  DEMONSTRATES CONSUMER DEMAND RESULTING FROM PRODUCT QUALITY

19  AND VALUE, NOT LOCK-IN?

20  **A.**  YES, IT -- YES, IT DOES.  I THINK WE'VE TALKED ABOUT ALL

21  OF THOSE.  AGAIN, I THINK THE MOST IMPORTANT ONE IS WHAT

22  EVIDENCE DO WE LOOK AT TO SEE THAT THIS IS THE CASE?  I THINK

23  YOU LOOK AT THE HISTORY OF SALES.

24  **Q.**  ALL RIGHT.

25  **A.**  YOU SEE THAT THIS WAS A RAPIDLY GROWING -- I THINK WE HAVE

1   A SLIDE ON THAT.

2   **Q.**   YEAH.  LET'S LOOK, SLIDE 91.

3          (DEMONSTRATIVE PUBLISHED TO JURY.)

4          **THE WITNESS:**  I THINK THIS SLIDE REALLY HELPS YOU

5   UNDERSTAND THE PICTURE.

6       SO THIS IS SALES OF IPOD PLAYERS WHICH IS IN BLUE, SALES

7   OF OTHER PLAYERS WHICH IS IN RED.  AND YOU CAN SEE JUST HOW

8   WHEN THIS MARKET EXPLODED BETWEEN 2003 AND 2006, THERE WAS

9   SUBSTANTIAL GROWTH IN THE SALES OF BOTH THE IPOD AND OTHER

10  PLAYERS, THAT IS, WE'RE NOT JUST SHIFTING CUSTOMERS FROM ONE

11  TO THE OTHER.  RIGHT?  THIS ISN'T A BATTLE FOR A STAGNANT

12  MARKETPLACE.  THIS IS A RAPIDLY GROWING MARKETPLACE WITH NEW

13  BUYERS COMING IN.

14      AND THOSE NEW BUYERS ARE MAKING CHOICES WHICH PLAYER LOOKS

15  BETTER, WHAT'S THE PRICE, WHAT'S THE QUALITY, HOW CAN I MAKE

16  THE RIGHT CHOICE HERE.  SO THEY HAD TO COMPETE FOR ALL THOSE

17  NEW PLAYERS.  BEING SUCCESSFUL WITH THE OLD ONES, THAT DOESN'T

18  NECESSARILY BUY YOU SUCCESS WITH THE NEW PEOPLE COMING IN.  SO

19  I THINK THAT'S THE KEY.

20      LOOK AT 2003.  THAT'S WHEN WE GOT IT -- WHEN -- WHEN --

21  WHEN THE WINDOWS AUDIENCE COMES IN.  THERE YOU SEE THAT'S WHAT

22  REALLY ALLOWED ITUNES AND IPOD TO TAKE OFF.  THE INTRODUCTION

23  OF THE STORE TOGETHER WITH WINDOWS REALLY HAD AN EXPLOSIVE

24  EFFECT ON IPOD SUCCESS.

25

1   BY MR. ISAACSON:

2   Q.   ALL RIGHT.  LATER TODAY, WE'RE GOING TO BE TALKING AT SOME

3   LENGTH WITH YOUR COLLEAGUE, PROFESSOR TOPEL, ABOUT THE

4   REGRESSION ANALYSIS IN THIS CASE BY DR. NOLL.

5       YOU ALSO LOOKED AT THAT REGRESSION ANALYSIS, CORRECT?

6   A.   YES, I DID.

7   Q.   OKAY.  AND DID YOU HAVE AN OPINION ABOUT WHETHER THAT

8   REGRESSION CAN BE USED TO RELIABLY ESTABLISH INJURY OR IMPACT?

9   A.   YES, I DO.

10  Q.   AND WHAT WAS YOUR OPINION?

11  A.   MY OPINION IS IT CANNOT BE USED TO DO THAT, AND THERE ARE

12  SEVERAL REASONS.  DR. TOPEL WILL TALK ABOUT MOST OF THEM.

13  THERE'S A FEW MAYBE I WOULD MENTION.

14  Q.   WELL, WHY DON'T YOU MENTION WHAT'S ON YOUR MIND ABOUT THE

15  REGRESSION?

16  A.   OKAY.  ONE OF THE BIG PROBLEMS THAT DR. NOLL HAS IS THAT

17  HE CANNOT SEPARATE OUT THE IMPACT OF THE OTHER FEATURES OF

18  ITUNES 7.0 FROM ANY IMPACT OF, CALL IT THE KVC, CALL IT

19  DISABLING HARMONY, WHATEVER YOU WANT TO CALL IT, HE CAN'T

20  SEPARATE OUT THE OTHER THINGS THAT GENERATED VALUE FROM

21  CONSUMERS FROM THE ONES -- FROM THE THINGS HE'S TRYING TO

22  MEASURE.

23      AND IT'S EASY TO SEE WHY.  LET'S -- WE KNOW WHEN 7.0 COMES

24  OUT, IT HAS LOTS OF FEATURES.  THINK OF THAT IPOD NANO IN --

25  IN -- COMING OUT IN SEPTEMBER 2006.  THAT NEW NANO, THE

1    ALLEGATION IS IT HAD KVC ON IT AND THAT HAD AN EFFECT.  IT

2    DISABLED HARMONY.  THAT HAD AN EFFECT.

3        BUT IT ALSO HAD MANY OTHER FEATURES.  FOR EXAMPLE, HAD THE

4    REVERSE SYNC FEATURE WHERE YOU COULD TAKE AND SYNC SONGS THAT

5    ARE ON YOUR IPOD BACK TO YOUR COMPUTER.  THAT'S A VERY

6    VALUABLE FEATURE.  OKAY?  HAD COVER FLOW, OTHER THINGS.

7        SO LET'S ASSUME FOR THE MOMENT THAT DR. NOLL IS RIGHT,

8    THAT ALL THE IMPACT OF THAT WAS BECAUSE OF KVC.  THAT WAS IT.

9    THAT WAS WHAT CAUSED ALL THE CHANGES IN PRICES.  AND HE HAD --

10   RUNS HIS REGRESSION AND HE GETS HIS ESTIMATE.  AND THE

11   ESTIMATE IS WHATEVER IT IS, 7.2 AND 2.4, WHATEVER THE NUMBERS

12   ARE, HE GETS THAT REGRESSION.  OKAY.  SO THOSE ARE THE

13   NUMBERS, THEY'RE THERE, THAT HE'S ESTIMATED IN HIS REGRESSION.

14   OKAY.

15       NOW LET'S CHANGE THE WORLD.  AND THE ONLY THING THAT

16   MATTERED IN 7.0 IS THE KVC IN THAT WORLD.  HE GETS HIS

17   REGRESSION ESTIMATES.  I NOW SAY, OKAY, WHAT IF THE ONLY THING

18   THAT MATTERED TO CONSUMERS WAS REVERSE SYNC?  KVC IS

19   IRRELEVANT, DOESN'T HAVE ANY EFFECT ON PRICES.  IT'S ALL FROM

20   REVERSE SYNC.

21       PRICES IN THE MARKETPLACE ARE THE SAME BECAUSE IT GETS THE

22   SAME VALUE.  IT'S JUST COMING FROM A DIFFERENT FEATURE, BUT

23   THE IPOD HAS BOTH.  SO YOU -- THE VALUE OF THE IPODS DOESN'T

24   CHANGE.  PRICES ARE THE SAME.  HIS VARIABLES IN HIS REGRESSION

25   ARE EXACTLY THE SAME.  HE RUNS HIS REGRESSION ON HIS COMPUTER.

1    HE GETS EXACTLY THE SAME ESTIMATES.

2         IN THAT CASE, HE STILL CLAIMS IT'S ALL FROM THE KVC EVEN

3    THOUGH WE KNOW IT'S ALL FROM, BY ASSUMPTION, THE OTHER ONE.

4    IT'S ALL FROM THE REVERSE SYNC.

5         SO BECAUSE HIS REGRESSION CAN'T TELL THE DIFFERENCE

6    BECAUSE IT'S GOING TO GET THE SAME OUTPUT EITHER WAY, IT

7    DOESN'T MATTER WHY THE PRICE WENT UP.  HIS REGRESSION CAN'T

8    TELL YOU WHY.  REGRESSION JUST SUMMARIZES THE DATA.  IT

9    DOESN'T TELL YOU WHY IT HAPPENED.  SO IT'S BECAUSE THE DATA'S

10   THE SAME AND THE VARIABLES ARE THE SAME, THE COEFFICIENTS ARE

11   THE SAME.  AND NOW HE'S MISLABELED WHAT WAS IN FACT THE VALUE

12   OF THESE OTHER FEATURES.

13        NOW LET'S SAY IT'S 50/50 BETWEEN THE TWO OF THEM.  HE

14   CAN'T TELL THAT EITHER.  IT SIMPLY CANNOT SEPARATE OUT --

15   **Q.**  AND IS THAT --

16   **A.**  -- WHERE IT'S COMING FROM.

17   **Q.**  AND IS THAT SUFFICIENT FOR YOU TO -- WHAT YOU JUST

18   EXPLAINED, WAS THAT SUFFICIENT FOR YOU TO CONCLUDE AND TO

19   REACH THE OPINION THAT THE REGRESSION WAS NOT RELIABLE TO SHOW

20   ANY INJURY OR ANYTHING ELSE?

21   **A.**  IT CAN'T BE RELIABLE IF IT COMES UP WITH THE SAME

22   ESTIMATES WHETHER THEY'RE -- THE KVC HAD AN EFFECT OR NOT.

23   **Q.**  OKAY.

24   **A.**  I MEAN, THAT'S -- BY DEFINITION, THAT COULDN'T BE

25   RELIABLE.

1    **Q.**  THANK YOU.

2    **A.**  BECAUSE IF IT WAS ALL DUE TO THE REVERSE SYNC OR IT WAS

3    ALL DUE TO THE KVC, HE'D GET THE SAME NUMBERS.  AND THAT CAN'T

4    POSSIBLY BE A RELIABLE ESTIMATE.

5         **MR. ISAACSON:**  THANK YOU, PROFESSOR.

6         **THE COURT:**  CROSS?

7              (PAUSE IN THE PROCEEDINGS.)

8                    **CROSS-EXAMINATION**

9    **BY MS. SWEENEY:**

10   **Q.**  GOOD MORNING.

11   **A.**  GOOD MORNING.

12   **Q.**  NOW WHEN YOU STARTED TESTIFYING YESTERDAY, YOU TALKED A

13   LITTLE BIT ABOUT YOUR EXPERIENCE.  DO YOU REMEMBER THAT?

14   **A.**  YES, I DID.

15   **Q.**  AND I DON'T THINK THAT MR. ISAACSON WENT INTO ANY GREAT

16   DETAIL ON YOUR LITIGATION CONSULTING WORK, BUT YOU DO SOME --

17   QUITE A BIT OF LITIGATION CONSULTING, CORRECT?

18   **A.**  I DO, YES.

19   **Q.**  AND YOU'VE DONE A LOT OF WORK FOR APPLE IN THE PAST THREE

20   YEARS, HAVEN'T YOU?

21   **A.**  I'VE WORKED FOR APPLE ON A COUPLE OF MATTERS, YES.

22   **Q.**  YOU WORKED -- YOU WERE THE EXPERT IN THE *UNITED STATES V.*

23   *APPLE* CASE, CORRECT?

24   **A.**  WHICH -- IN THE -- WHICH ONE IS THAT?

25   **Q.**  *UNITED STATES V. APPLE* IN NEW YORK.

1   **A.**   OH, THAT.   IN THE NEW YORK CASE, I WAS ONE OF THE EXPERTS,

2   YES.   THERE WERE SEVERAL EXPERTS FOR APPLE IN THAT CASE.   I

3   WAS ONE.

4   **Q.**   AND YOU -- YOU GAVE TRIAL TESTIMONY IN THAT CASE?

5   **A.**   YES, I DID.

6   **Q.**   AND YOU GAVE A DEPOSITION IN THAT CASE?

7   **A.**   YES, I DID.

8   **Q.**   AND YOU WROTE A REPORT?

9   **A.**   YES, I DID.

10  **Q.**   AND HOW ABOUT HERE IN CALIFORNIA, WEREN'T YOU AN EXPERT

11  FOR APPLE QUITE RECENTLY IN THE *IN RE HIGH-TECH EMPLOYEES*

12  *ANTITRUST LITIGATION*?

13  **A.**   I WAS AN EXPERT IN THE CLASS CERTIFICATION PHASE FOR THAT

14  TRIAL, YES.

15  **Q.**   OKAY.   AND IN THAT CASE, YOU GAVE A DEPOSITION, CORRECT?

16  **A.**   YES, I DID.

17  **Q.**   AND YOU WROTE A REPORT?

18  **A.**   YES, I DID.

19  **Q.**   ALL RIGHT.   AND THE WORK THAT YOU'VE DONE FOR APPLE IS NOT

20  THE ONLY CONSULTING -- LITIGATION CONSULTING WORK YOU'VE DONE

21  IN THE PAST YEAR, RIGHT?

22  **A.**   NO.

23  **Q.**   IN FACT, IN THE LAST FOUR YEARS, YOU HAVE WORKED ON HOW

24  MANY MATTERS?

25  **A.**   I DON'T KNOW THE NUMBER.   BE QUITE A FEW.

1    **Q.**  IS IT FAIR TO SAY THAT IN THE LAST FOUR YEARS, THERE HAVE

2    BEEN OVER 100 INSTANCES WHERE YOU'VE GIVEN TRIAL TESTIMONY OR

3    A REPORT OR A DEPOSITION?

4    **A.**  YEAH.  MANY OF THOSE WOULD BE FOR THE SAME CASE OVER

5    AND -- BECAUSE USUALLY WHAT HAPPENS IS YOU WRITE A REPORT, YOU

6    GIVE A DEPOSITION, YOU MIGHT TESTIFY, YOU MIGHT EVEN HAVE MORE

7    THAN ONE REPORT OR MORE THAN ONE DEPOSITION.

8        SO, YEAH, THAT WOULD NOT BE THE NUMBER OF MATTERS, BUT

9    THAT WOULD BE THE NUMBER OF DIFFERENT EVENTS, LET'S CALL IT

10   THAT.

11   **Q.**  OKAY.  AND THEN HOW ABOUT THE NUMBER OF REPORTS OR

12   DECLARATIONS OR STATEMENTS THAT YOU'VE GIVEN, WOULD YOU AGREE

13   THAT IN THE LAST FOUR YEARS YOU'VE GIVEN 74 OF THOSE?

14   **A.**  THAT SOUNDS PROBABLY ABOUT RIGHT.

15   **Q.**  AND HOW ABOUT TRIAL TESTIMONY, IS IT FAIR TO SAY IN THE

16   LAST FOUR YEARS, YOU'VE GIVEN TRIAL TESTIMONY ON AT LEAST

17   14 OCCASIONS?

18   **A.**  THAT SOUNDS ABOUT RIGHT.

19   **Q.**  AND HOW ABOUT DEPOSITIONS, YOU'VE GIVEN 25 DEPOSITIONS IN

20   THE LAST FIVE YEARS?

21   **A.**  YEAH.  I THINK THAT'S PROBABLY RIGHT.

22   **Q.**  OKAY.  AND IN THE WORK THAT YOU'VE DONE FOR APPLE, YOU'RE

23   PAID -- OR STRIKE THAT.

24       YOU WORK WITH A COMPANY CALLED CRA, RIGHT?

25   **A.**  I'M NOW WITH CRA.  MY ORIGINAL WORK I DID WITH APPLE WAS

1    WHEN I WAS WITH A DIFFERENT COMPANY CALLED NAVIGANT.

2    Q.   OKAY.  AND YOU STARTED WORKING ON THIS CASE IN 2010,

3    CORRECT?

4    A.   YES.  I WOULD HAVE BEEN AT NAVIGANT AT THE TIME I STARTED

5    WORKING ON THIS CASE.

6    Q.   OKAY.  AND AS PART OF YOUR RELATIONSHIP WITH NAVIGANT AND

7    NOW CRA, YOU RECEIVE YOUR FULL BILLING RATE PLUS A PERCENTAGE

8    OF THE STAFF WHO WORK ON THESE CASES WITH YOU; IS THAT RIGHT?

9    A.   NO.  THAT'S MY CURRENT ARRANGEMENT AT CRA.  AT NAVIGANT, I

10   RECEIVED A PORTION OF MY BILLINGS PLUS SOMETHING BASED ON

11   OTHER PEOPLE'S BILLINGS ON THE CASE, SOME OTHER PEOPLE'S

12   BILLINGS ON THE CASE.

13   Q.   OKAY.  SO LET'S ON CRA THEN.  SO WITH CRA, YOU RECEIVED

14   YOUR FULL HOURLY RATE PLUS A PERCENTAGE OF THE BILLINGS BY

15   OTHER STAFF WHO WORK ON YOUR CASES, RIGHT?

16   A.   YES, THAT'S CORRECT.

17   Q.   AND THIS CASE HAS BEEN ONGOING SINCE 2010, RIGHT?

18   A.   YES.

19   Q.   AND YOU -- YOU ALSO TEACH, RIGHT?  YOU DON'T JUST DO

20   LITIGATION CONSULTING?

21   A.   WELL, TWO OF THOSE FOUR YEARS, I THINK I WAS ON LEAVE FROM

22   SCHOOL.  SO THERE WAS TWO YEARS I WAS ON LEAVE FROM THE

23   UNIVERSITY.  I'M NOT SURE HOW THAT FITS INTO THE FOUR, BUT

24   THERE WERE TWO YEARS I WAS ON LEAVE, AND THEN I'VE BEEN BACK

25   AT THE UNIVERSITY FOR A COUPLE OF YEARS.

1    **Q.**   OKAY.  AND SO OVER THE COURSE OF THE YEARS THAT YOU'VE

2    WORKED ON THIS PARTICULAR CASE FOR APPLE, YOU'VE EARNED QUITE

3    A BIT OF MONEY; IS THAT FAIR?

4    **A.**   YEAH.  I'VE -- I'VE -- I'VE DONE PRETTY WELL.  I'VE EARNED

5    QUITE -- I DO WELL WITH THE UNIVERSITY.  I DO WELL IN ALL THE

6    DIFFERENT VENTURES I DO.

7    **Q.**   AND HOW MUCH HAVE YOU BEEN PAID BY APPLE TO DATE IN THIS

8    CASE?

9    **A.**   I DON'T KNOW.  I HAVEN'T KEPT TRACK.  I DON'T GET A

10   SEPARATE -- I DON'T LOOK AT IT SEPARATELY.

11   **Q.**   HOW ABOUT OVER 250,000?

12   **A.**   I DON'T KNOW FOR SURE.  THAT DOESN'T SOUND TOO FAR OFF.

13   **Q.**   AND IS YOUR HOURLY RATE STILL $1,250 AN HOUR?

14   **A.**   YES, IT IS.

15   **Q.**   NOW, IN PUTTING TOGETHER THE REPORTS THAT YOU SUBMITTED IN

16   THIS CASE AND PREPARING FOR DEPOSITION AND GETTING READY FOR

17   TRIAL, YOU HAD A LOT OF PEOPLE WORKING WITH YOU, CORRECT?

18   **A.**   YES.  I WORK WITH A STAFF OF PEOPLE, MANY OF WHOM I'VE

19   WORKED WITH FOR A VERY LONG TIME.

20   **Q.**   AND THEY PREPARED MANY OF THE CHARTS THAT YOU RELIED UPON?

21   **A.**   YEAH.  WE WORK TOGETHER.  THAT'S -- THAT'S THE WAY IN

22   WHICH I WORK ON THESE, AS WELL AS MY ACADEMIC WORK.

23   **Q.**   AND YOU RELIED ON THEIR WORK?

24   **A.**   WELL, I THINK WE WORK -- THE BEST WAY TO THINK ABOUT IT IS

25   I WORK AS A TEAM.  I RELY ON THEM TO WORK WITH ME AND HELP ME

1    ON THIS PROJECT AS WELL AS MY OTHER PROJECTS.

2    Q.  NOW, YOU'RE NOT OFFERING AN OPINION IN THIS CASE, ARE YOU,

3    ON THE CORRECT MARKET DEFINITION?

4    A.  I THINK WE -- WHAT I SAID, I WAS WILLING TO WORK WITH

5    DR. NOLL'S MARKET DEFINITION FOR THE PRODUCT IN QUESTION HERE,

6    WHICH WAS DIGITAL MEDIA PLAYERS.  ALTHOUGH I SHOULD MAKE CLEAR

7    THAT AS WE GET TO THE END -- AND I THINK DR. NOLL SAID THE

8    SAME THING -- AS WE GET TOWARD THE END, YOU GOT TO START

9    THINKING ABOUT SMARTPHONES AS PART OF THE STORY.

10        AND EXACTLY WHEN YOU SAY SMARTPHONES ARE IMPORTANT, YOU

11   KNOW, I THINK THAT'S HARDER TO SAY.  BUT YOU DO WANT TO

12   DEFINITELY -- THE FURTHER ON IN TIME YOU GOT, THE MORE YOU

13   WANT TO THINK THAT SMARTPHONES PLAY A ROLE.  SO THAT -- THAT

14   WOULD BE THE CAVEAT I WOULD ADD.

15   Q.  AND THAT'S WHAT DR. NOLL TESTIFIED TO; ISN'T THAT RIGHT?

16   A.  YEAH.  I DON'T THINK THERE'S A BIG DISAGREEMENT THERE IN

17   TERMS OF -- YOU KNOW, THINK ABOUT DIGITAL MEDIA PLAYERS, WHERE

18   THE COMPETITION HAPPENS.  LATER ON SMARTPHONES BECOME VERY

19   IMPORTANT.  IT DOESN'T MEAN THE ONLY WAY YOU CAN LISTEN TO

20   MUSIC.  YOU CAN LISTEN TO MUSIC IN OTHER WAYS.  AND THERE'S

21   SOME COMPETITION FROM THOSE OTHER WAYS.  BUT I THINK THAT'S A

22   REASONABLE WAY TO LOOK AT THE MARKET.

23   Q.  AND YOU LOOKED AT THE IPOD MARKET, CORRECT, THE MARKET IN

24   WHICH IPODS ARE SOLD?

25   A.  YEAH.

1    Q.   IN TERMS OF MARKET SHARE?

2    A.   YEAH, THE IPOD -- WELL, IT'S CHANGED OVER TIME.  IPOD

3    STARTED OUT WITH A PRETTY SMALL SHARE, AND THEY GREW AND

4    ULTIMATELY WERE VERY SUCCESSFUL.

5    Q.   AND YOU WOULD AGREE THAT IN LATE 2003, THE -- THE IPOD'S

6    SHARE OF THE PORTABLE DIGITAL PLAYER MARKET WAS ROUGHLY

7    ONE-THIRD, RIGHT?

8    A.   YEAH.  IN THAT -- IN THAT BALLPARK, ABOUT A THIRD BACK

9    THEN IN MIDDLE-LATE 2003.

10   Q.   OKAY.  AND THEN IT ROUGHLY DOUBLED BY THE END OF 2004,

11   RIGHT?

12   A.   THAT SOUNDS ABOUT RIGHT.  SHOULD BE ABOUT 60 PERCENT OR

13   SO.  YEAH, IT WAS QUITE SUCCESSFUL.

14   Q.   OKAY.  AND THEN YOU WOULD AGREE THAT --

15   A.   BUT --

16   Q.   I'M SORRY.

17   A.   I TALKED ABOUT THAT A BIT AGO.  I MEAN, THAT WAS THE

18   PERIOD OVER WHICH IT BECAME AVAILABLE ON THE WINDOWS PLATFORM,

19   THE ITUNES STORE BECAME AVAILABLE.  IT WAS A MUCH MORE

20   ENHANCED PRODUCT AVAILABLE TO MORE PEOPLE.

21   Q.   AND IN THAT, THAT HIGH MARKET SHARE OF AROUND 75 PERCENT

22   PERSISTED THROUGH THE CLASS PERIOD; IS THAT RIGHT?

23   A.   YEAH.  THE MARKET SHARE FOR THE IPOD KIND OF WAS HIGH, IT

24   STAYED IN THAT GENERAL LEVEL.  REMEMBER, THOUGH, THERE'S NEW

25   CUSTOMERS COMING IN ALL THE TIME.  THAT'S AN IMPORTANT THING

1   TO KEEP IN MIND.

2       AT THE VERY END, ACTUALLY, YOU KNOW, AFTER THINGS GO

3   DRM-FREE, ACTUALLY, IF ANYTHING, IT WENT UP A LITTLE BIT.

4   **Q.**  BUT YOU -- I'M SORRY.

5   **A.**  YEAH.  ACTUALLY, IF ANYTHING, AFTER WORKING WITH

6   DRM-FREE --

7   **Q.**  THERE'S NO QUESTION, DR. MURPHY.

8   **A.**  NO.  YOU ASKED ME IF IT WOULD HAVE STAYED HIGH, AND I'M

9   DESCRIBING WHAT HAPPENED TO IT.  I'M SORRY IF THAT'S -- I

10  WOULD ASSUME -- YOU ASKED ME IF IT REMAINED HIGH.  I WAS

11  TRYING TO EXPLAIN WHAT HAPPENED.

12  **Q.**  DURING THE CLASS PERIOD, WOULD YOU AGREE THAT THE IPOD'S

13  SHARE OF THE PORTABLE DIGITAL PLAYER MARKET STAYED HIGH AT

14  ROUGHLY AROUND 75 PERCENT?

15  **A.**  THAT'S -- THAT'S A REASONABLE STATEMENT, YES.

16  **Q.**  OKAY.  SO YOU DON'T -- YOU DON'T DISAGREE WITH PROFESSOR

17  NOLL ON THAT POINT, RIGHT?

18  **A.**  I WOULD SAY THE SHARE OF THE IPOD WAS ROUGHLY STABLE OVER

19  THOSE LATER YEARS, YEAH.

20  **Q.**  OKAY.

21  **A.**  AND THEN AGAIN, UNTIL WE GET AFTER THE PERIOD WHICH IS

22  AFTER THINGS GO DRM-FREE, AND THEN THINGS, IF ANYTHING, WENT

23  THE OTHER WAY.  APPLE'S SHARE EVEN WENT UP A LITTLE BIT.

24  **Q.**  AND YOU WOULD AGREE THAT ONE OF THE INDICATORS THAT

25  ECONOMISTS LOOK AT TO DETERMINE WHETHER THERE'S MONOPOLY POWER

1    IS MARKET SHARE, RIGHT?

2    **A.**   I THINK THE -- THE RIGHT WAY TO THINK ABOUT THAT IS IF YOU

3    DON'T HAVE A SIGNIFICANT MARKET SHARE, WE DEFINITELY WOULDN'T

4    THINK YOU HAVE MONOPOLY POWER.  SORT OF LIKE IT'S A

5    NECESSARY -- YOU KNOW, PEOPLE KNOW THINGS ABOUT NECESSARY AND

6    SUFFICIENT CONDITIONS.  HAVING A LARGE MARKET SHARE IS USUALLY

7    THOUGHT OF NECESSARY.  IT'S FAR FROM BEING SUFFICIENT.  I

8    THINK THAT'S THE MOST USEFUL WAY TO THINK ABOUT IT.  IN OTHER

9    WORDS, IF YOU HAVE 10 PERCENT OF THE MARKET, YOU'RE NOT GOING

10   TO BE A MONOPOLY, YOU KNOW.  THAT DOESN'T MEAN IF YOU HAVE

11   70 PERCENT YOU ARE A MONOPOLY.  IT'S JUST -- YOU KNOW, IT'S --

12   IT'S KIND OF A NECESSARY BUT NOT SUFFICIENT CONDITION, I

13   THINK, WE THINK OF IN ECONOMICS.

14   **Q.**   BUT IT IS ONE -- ONE INDICATOR THAT ECONOMISTS TYPICALLY

15   LOOK AT; ISN'T THAT RIGHT?

16   **A.**   WELL, AGAIN, HOW MUCH YOU WANT TO LOOK AT IT GETS TO WHAT

17   I SAID BEFORE.  IF THIS IS A CAPACITY-DRIVEN MARKET WHERE IT'S

18   LIKE OIL AND I'M OPEC AND I CONTROL SOME FRACTION OF THE OIL,

19   THEN -- THEN SHARE MATTERS A LOT BECAUSE A 10 PERCENT

20   REDUCTION IN MY OUTPUT IS A BIG REDUCTION IN MARKET OUTPUT AND

21   THAT CAN RAISE PRICE.  IN THE OIL INDUSTRY, MARKET SHARE WOULD

22   MATTER A LOT.

23       IN AN INDUSTRY WHERE THE OTHER PEOPLE CAN EXPAND OUTPUT

24   AND SELL MORE, IF I CHARGE A HIGHER PRICE OR DON'T OFFER THE

25   PRODUCT THAT PEOPLE WANT, MARKET SHARE DOESN'T MEAN VERY MUCH.

1   SO IT REALLY DEPENDS ON THE SCALABILITY OF THE OTHER PLAYERS

2   IN THE MARKET WHETHER YOU THINK ABOUT THIS AS REALLY BEING --

3   TELLING YOU MUCH AT ALL.

4   **Q.**  PROFESSOR MURPHY, YOU TALKED ABOUT THE WALLED GARDEN

5   APPROACH IN YOUR REPORT, RIGHT?

6   **A.**  YEAH.  I THINK THAT WAS THE TERM WE USED THERE.  IT'S

7   ANOTHER WAY OF TALKING ABOUT THE KIND OF CLOSED VERSUS OPEN OR

8   INTEGRATED VERSUS NON-INTEGRATED.  THERE'S VARIOUS TERMS USED

9   TO DESCRIBE THE SAME CONCEPT.

10  **Q.**  RIGHT.  NOW YOU CALLED THE WALLED GARDEN THE INTEGRATED

11  SYSTEM, RIGHT?

12  **A.**  WE COULD CALL IT THE WALLED GARDEN IF YOU LIKE.  I MEAN,

13  SEMANTICS SHOULDN'T PLAY A ROLE HERE.

14  **Q.**  OKAY.  AND YOU WOULD AGREE THAT THERE CAN BE

15  ANTICOMPETITIVE CONDUCT ASSOCIATED WITH BOTH WALLED GARDEN

16  APPROACHES AND OPEN APPROACHES, RIGHT?

17  **A.**  YEAH.  I MEAN, I DON'T THINK THAT THAT CUTS ONE WAY OR THE

18  OTHER.  YOU COULD HAVE ANTICOMPETITIVE CONDUCT IN MARKETS THAT

19  DON'T HAVE EITHER OF THOSE APPROACHES.

20  **Q.**  SO --

21  **A.**  AND SO --

22  **Q.**  I'M SORRY.  SO YOU'RE NOT TESTIFYING THAT JUST BECAUSE

23  APPLE HAD A WALLED GARDEN APPROACH, ITS -- ITS BUSINESS

24  PRACTICES WERE PRO-COMPETITIVE?

25  **A.**  I -- I CERTAINLY HOPE I DIDN'T SAY THAT BECAUSE THAT --

1    YOU WOULDN'T WANT TO SAY THAT THAT'S A SUFFICIENT CONDITION TO

2    GO IN EITHER DIRECTION, TO SAY IT MEANS THEY HAD AN

3    ANTICOMPETITIVE OR THEY HAD A PRO-COMPETITIVE.  YOU HAVE TO

4    LOOK AT WHAT DROVE THE MARKET, WHAT WAS IMPORTANT.

5        AND HERE, WE HAVE GOOD REASONS TO BELIEVE THAT THAT

6    INTEGRATED WALLED GARDEN, WHATEVER YOU WANT TO CALL IT,

7    PROVIDED THE KIND OF PRODUCT THAT PEOPLE WANTED, AND THAT'S

8    WHAT GENERATED THE OUTCOMES WE SAW.

9    **Q.**  NOW, YOU TALKED A LITTLE BIT ABOUT THE REGRESSION

10   ANALYSIS, AND YOU MENTIONED REVERSE SYNC.  DO YOU REMEMBER

11   THAT TESTIMONY?

12   **A.**  YES.

13   **Q.**  NOW, YOU'RE FAMILIAR WITH THE CONCEPT THAT SOME VARIABLES

14   CAN BE CORRELATED WITH OTHER VARIABLES IN A REGRESSION?

15   **A.**  YES.  IN -- IN GENERAL, WHEN YOU RUN A REGRESSION, THE

16   VARIABLES TEND TO BE CORRELATED UNLESS YOU HAVE SOME KIND OF,

17   LIKE, EXPERIMENTAL DESIGN THAT, BY CONSTRUCTION, MAKES THEM

18   NOT CORRELATED.

19   **Q.**  BUT YOU WOULD AGREE THAT GENERALLY, IF YOU HAVE A VARIABLE

20   IN YOUR REGRESSION EQUATION THAT ALSO MEASURES SOMETHING

21   OUTSIDE THE EQUATION AND TAKES ACCOUNT OF IT, THEN THAT'S AN

22   APPROPRIATE WAY TO DO A REGRESSION ANALYSIS?

23   **A.**  IT'S AN APPROPRIATE WAY TO ESTIMATE THE COMBINED EFFECT.

24   SO WHAT YOU'RE GOING TO ESTIMATE IS THE COMBINED EFFECT OF

25   THOSE TWO THINGS.  IT'S JUST LIKE I SAID, YOU'RE GOING TO

1    ESTIMATE THE EFFECT OF DVC OR KVC COMBINED WITH REVERSE SYNC,

2    AND YOU WON'T BE ABLE TO TELL WHICH ONE YOU'RE GETTING.

3    IT'S -- YOU GET -- SAY YOU GET 7 PERCENT.  IT COULD BE

4    7 PERCENT ONE, ZERO PERCENT THE OTHER, 3-1/2 PERCENT EACH, THE

5    REGRESSION CAN'T TELL YOU.  THAT'S THE PROBLEM.

6    **Q.**  NOW --

7    **A.**  IT'S -- SO IT'S --

8    **Q.**  EXCUSE ME.  EXCUSE ME.

9    **A.**  CAN I FINISH?

10   **Q.**  YOU NEED TO ANSWER MY QUESTION.

11   **A.**  I AM FINISHING.  YOU ASKED ME IS IT AN APPROPRIATE WAY TO

12   RUN A REGRESSION.  AND THE QUESTION IS WHEN YOU TALK ABOUT

13   APPROPRIATE, IT'S ALWAYS APPROPRIATE FOR WHAT.  RIGHT?

14   REMEMBER THAT.  I TEACH MY STUDENTS THAT ALL THE TIME.  IS

15   THIS A GOOD METHOD?  WELL, IT'S GOOD FOR WHAT.  IT, YOU KNOW,

16   MIGHT BE GOOD FOR ONE THING AND NOT GOOD FOR ANOTHER.  A

17   HAMMER IS GOOD FOR HAMMERING NAILS, NOT SO GOOD FOR TAKING OUT

18   YOUR TEETH.  OKAY?

19   **Q.**  PROFESSOR MURPHY.

20   **A.**  LET ME -- CAN I FINISH, PLEASE?  OR NO?  IF YOU DON'T ME

21   THE FINISH, THAT'S FINE.

22   **Q.**  I WANT YOU TO ANSWER MY QUESTIONS.

23       ALL RIGHT.  AND YOU, YOURSELF, DIDN'T -- YOU DIDN'T,

24   YOURSELF, RUN A REGRESSION ON THESE OTHER VARIABLES TO SEE IF

25   THERE WAS AN IMPACT, LIKE SYNCING, CORRECT?

1    **A.**   YOU CAN'T DO THAT.  AND THAT'S THE WHOLE POINT.  THEY

2    HAPPENED AT THE SAME TIME.  THEY WERE BOTH PARTS OF 7.0.  SO

3    BECAUSE THEY'RE BOTH PARTS OF 7.0, THE DATA ON PRICING OF

4    IPODS THAT HAD 7.0 VERSUS DIDN'T HAVE 7.0 IS GOING TO REFLECT

5    THE IMPACT OF BOTH.

6        HIS EMPIRICAL METHODOLOGY CAN'T SEPARATE THE TWO OUT

7    BECAUSE THE KIND OF DATA AND VARIABLES YOU'D HAVE WOULD BE THE

8    SAME IN EITHER CASE.  IT'S REALLY QUITE SIMPLE.

9    **Q.**   NOW, YOU -- YOU AGREED THAT THE PRODUCT ATTRIBUTES THAT

10   PROFESSOR NOLL DID LOOK AT WERE APPROPRIATE; ISN'T THAT RIGHT?

11   **A.**   UM --

12   **Q.**   JUST ANSWER MY QUESTION, PLEASE, FIRST, AND THEN I'LL

13   FOLLOW UP.

14   **A.**   I DON'T --

15                    (SIMULTANEOUS COLLOQUY.)

16   **BY MS. SWEENEY:**

17   **Q.**   -- FOLLOW UP WITH YOUR ATTORNEY, IF YOU LIKE.

18   **A.**   NO, I DON'T THINK I WOULD AGREE THAT THEY WERE NECESSARILY

19   ALL APPROPRIATE.  I THOUGHT -- I DIDN'T SEE -- I KNOW HE

20   DIDN'T PUT THINGS IN I THOUGHT HE SHOULD HAVE, BUT --

21   **Q.**   OKAY.  STOP THERE AND LET ME ASK ANOTHER QUESTION.

22       SO I UNDERSTAND THAT YOU THINK HE DIDN'T PUT THINGS IN

23   THAT YOU THOUGHT HE SHOULD HAVE, BUT AS TO THOSE PRODUCT

24   ATTRIBUTES THAT PROFESSOR NOLL DID PUT IN HIS REGRESSION

25   ANALYSIS, YOU AGREE THAT THOSE WERE APPROPRIATE; ISN'T THAT

```
1    RIGHT?  ISN'T THAT WHAT YOU TESTIFIED TO IN YOUR DEPOSITION?

2    A.  I THINK I WOULD SAY I DIDN'T CHALLENGE WHAT HE PUT IN THAT

3    REGRESSION, THAT I THOUGHT IF -- THE EXTENT I WOULD IDENTIFY

4    PROBLEMS WITH CHARACTERISTICS, IT WOULD BE THINGS HE LEFT OUT

5    AS OPPOSED TO THINGS HE PUT IN.

6    Q.  AND YOU WOULD AGREE THAT A HEDONIC REGRESSION IS AN

7    APPROPRIATE WAY TO MEASURE IMPACT OF ANTICOMPETITIVE CONDUCT

8    IN LITIGATION; ISN'T THAT RIGHT?

9    A.  YEAH.  I THINK YOU HAVE TO BE CAREFUL, THOUGH.  I WOULD

10   SAY, AGAIN, AS IN ALL EMPIRICAL TECHNIQUES, IT'S ALL IN HOW

11   YOU DO IT.  AND YOU HAVE TO BE CAREFUL.  AND THAT, YOU KNOW --

12   LIKE I SAID BEFORE, TOOLS ARE TOOLS, BUT WHAT REALLY

13   DETERMINES THE QUALITY OF THE PRODUCT YOU GET IS HOW YOU USE

14   THEM.

15   Q.  SURE.  YOU DON'T DISAGREE WITH THE PROPOSITION, THOUGH,

16   THAT IT IS AN APPROPRIATE KIND OF METHOD TO USE TO ISOLATE THE

17   EFFECT OF ANTICOMPETITIVE CONDUCT IN LITIGATION.  IN FACT,

18   YOU'VE USED IT YOURSELF; ISN'T THAT RIGHT?

19   A.  IF DONE PROPERLY, YOU CAN IDENTIFY EFFECTS.  YOU HAVE TO

20   BE CAREFUL TO MAKE SURE YOU'VE DONE IT PROPERLY.  AND THAT'S

21   THE POINT OF THE CRITIQUE THAT WAS IN MY REPORT.  THAT WAS

22   PART OF THE CRITIQUE WE TALKED ABOUT TODAY, IS THAT IF YOU

23   HAVE AN IMPROPER INTERPRETATION, YOU'LL STILL HAVE PROBLEMS

24   EVEN USING A PROPER TECHNIQUE.

25   Q.  ALL RIGHT.  YOU SAID -- I THINK YOU TESTIFIED THAT IT'S
```

```
 1   NOT POSSIBLE THAT THE IMPACT OF KVC COULD HAVE BEGUN ON THE

 2   DAY THAT THE NANO SECOND-GENERATION IPOD WAS RELEASED ALONG

 3   WITH 7.0; ISN'T THAT RIGHT?

 4   A.  I WOULD SAY HIS LOCK-OUT THEORY THAT WORKED THROUGH --

 5   THIS IS -- REMEMBER, THIS IS THE ONLY THEORY HE HAD IN HIS

 6   ORIGINAL REPORT.

 7   Q.  I'M GOING TO STOP YOU THERE, PROFESSOR MURPHY, BECAUSE LET

 8   ME REASK MY QUESTION.  MAYBE YOU DIDN'T UNDERSTAND IT.

 9       DIDN'T YOU TESTIFY THAT IT'S IMPOSSIBLE THAT THE IMPACT OF

10   KVC COULD HAVE BEGUN ON THE DAY THAT ITUNES 7.0 AND THE NANO

11   SECOND GENERATION WERE RELEASED?

12   A.  I SAID THAT IN -- WITH RESPECT TO HIS LOCK-OUT THEORY AS

13   HE ARTICULATED IT, YES.

14   Q.  SO YOU WOULD -- THAT'S WHAT YOU TESTIFIED TO, YOU SAID IT

15   WAS NOT POSSIBLE, RIGHT?

16   A.  YOU SHOULD SHOW ME THE TESTIMONY.

17   Q.  IT IS IN YOUR REPORT, PAGE 5, THE FIRST REPORT.

18   A.  (REVIEWING DOCUMENT.)

19       WHICH TAB?  I ASSUME IT'S IN ONE OF THESE TABS.

20                   (PAUSE IN THE PROCEEDINGS.)

21          MS. SWEENEY:  CAN I APPROACH, YOUR HONOR?

22          THE COURT:  YOU MAY.

23          THE WITNESS:  OKAY.

24          MS. SWEENEY:  (HANDING DOCUMENT.)

25          THE WITNESS:  WHERE ARE WE AT?
```

1    BY MS. SWEENEY:

2    **Q.**  THE FIRST REPORT, PAGE 5, YOU SAY IT'S NOT POSSIBLE THAT

3    THE IMPACT OF KVC COULD HAVE BEGUN ON THE DAY THAT ITUNES 7.0

4    WAS RELEASED.

5          **THE COURT:**  CAN YOU GIVE ME THE SUBSECTION?  I'M

6    LOOKING AT PAGE 5, TRYING TO FIND IT.  IS THERE A -- IS THERE

7    A PARAGRAPH NUMBER?

8          **MS. SWEENEY:**  12B.

9          **THE WITNESS:**  YES.  AND IT IS --

10          **THE COURT:**  12B.

11          **THE WITNESS:**  12B, YEAH, I SEE IT.  ON PARAGRAPH --

12    IT'S ON PAGE 5.

13    BY MS. SWEENEY:

14    **Q.**  OKAY.

15    **A.**  AND -- AND I JUST WANT TO MAKE SURE -- OKAY.  THIS IS --

16    THIS IS IMPORTANT BECAUSE REMEMBER WHAT I JUST TALKED ABOUT --

17    **Q.**  PROFESSOR MURPHY, THE QUESTION IS:  DID YOU SAY THAT IT

18    WAS IMPOSSIBLE THAT KVC COULD HAVE HAD AN IMMEDIATE IMPACT

19    UPON THE RELEASE OF 7.0 AND THE NANO SECOND GENERATION?

20    **A.**  UNDER DR. NOLL'S THEORY.

21    **Q.**  OKAY.  THANK YOU.  THAT'S ALL.

22                    (SIMULTANEOUS COLLOQUY.)

23          **THE WITNESS:**  -- PART OF PARAGRAPH OUT.

24    BY MS. SWEENEY:

25    **Q.**  YOUR ATTORNEY WILL HAVE AN OPPORTUNITY TO ASK YOU ABOUT

1    THE REST OF THE PARAGRAPH.

2        OKAY.  SO I JUST HAVE SOME MORE QUESTIONS ON THIS TOPIC.

3        SO WHO SETS PRICES AT APPLE?

4    **A.**  WELL, THERE'S A PRICING COMMITTEE WHO DETERMINES WHAT

5    PRICING PATTERN -- POLICY THEY'LL ULTIMATELY HAVE.  I'M NOT

6    SURE OF THE NAME OF PERSON WHO SETS PRICING IN APPLE.  BUT I

7    KNOW THEY HAVE A PRICING COMMITTEE WHO'S CHARGED WITH DECIDING

8    PRICING FOR THE IPOD PRODUCTS.

9    **Q.**  AND YOU DON'T KNOW WHO WAS ON THE PRICING COMMITTEE IN

10   2006?

11   **A.**  I DON'T REMEMBER THE NAMES, NO.  BECAUSE AN ECONOMIST, I

12   MEAN, THE NAMES DON'T REALLY AFFECT.  I MEAN, YOU HAD A

13   PRICING COMMITTEE, THEY SET PRODUCTS.  I'M AN ECONOMIST.  I

14   WOULD ADDRESS THE FACTORS THEY WOULD LOOK AT AND WHAT WOULD BE

15   IMPORTANT.  BUT THE NAMES -- I MEAN, ECONOMICS DOESN'T HAVE A

16   DIFFERENT THEORY FOR FRED AND JIM.

17   **Q.**  SO IT'S --

18                      (SIMULTANEOUS COLLOQUY.)

19   **BY MS. SWEENEY:**

20   **Q.**  I'M SORRY.  SO IT'S IRRELEVANT TO YOUR ANALYSIS WHO WAS ON

21   THE PRICING COMMITTEE IN 2006?

22   **A.**  THE EXACT NAME OF THE PERSON ON THE COMMITTEE?  I DON'T --

23   I DON'T SEE ANY REASON IN ECONOMICS.  WE WOULD EXPECT, IF YOU

24   HAD TWO DIFFERENT PEOPLE ON THE COMMITTEE, THEY WOULD COME UP

25   WITH A DIFFERENT DECISION.

1    NOW, PEOPLE ARE DIFFERENT.  SO PEOPLE MIGHT MAKE DIFFERENT

2    DECISIONS.  BUT ECONOMICS ISN'T GOING TO MAKE A DIFFERENT

3    PREDICTION IF YOU TELL ME HIS NAME WAS FRED OR IF YOU TELL ME

4    HIS NAME WAS –– OR HER NAME WAS SALLY.  THEY'RE GOING TO

5    MAKE –– ECONOMICS PREDICTS THE SAME BEHAVIOR BY FRED AND

6    SALLY.  IT'S JUST WE DON'T HAVE A THEORY THAT LINKS NAMES TO

7    OUTCOMES.

8    **Q.**  DO YOU KNOW ANYTHING ABOUT THE MAKEUP OF THE COMMITTEE IN

9    TERMS OF WHAT THEIR ROLE WAS AT APPLE?

10   **A.**  I DON'T –– I DON'T RECALL EXACTLY WHAT THEIR ROLES WERE.

11   I ASSUME THAT APPLE WOULD CHOOSE THE APPROPRIATE PEOPLE TO BE

12   ON THEIR PRICING COMMITTEE.  THEY'RE A BETTER JUDGE OF WHO

13   OUGHT TO BE ON THE PRICING COMMITTEE THAN I WOULD BE.

14   **Q.**  SO YOU THINK THEY WERE LOW-LEVEL PEOPLE AT APPLE?

15   **A.**  I WOULD THINK THAT THEY WERE THE APPROPRIATE PEOPLE.

16   THAT'S WHAT I WOULD SAY.  THAT'S WHAT ECONOMICS TELLS US.

17   THEY WOULD –– THEY WOULD PICK PEOPLE WHOSE TIME WAS WORTH

18   PUTTING ON THE COMMITTEE AND WHO HAD SOME EXPERTISE TO GO ON

19   THE COMMITTEE.

20   YOU ALWAYS HAVE THAT TRADE-OFF, RIGHT?  WHEN YOU DECIDE

21   WHO YOU'RE GOING TO PUT ON A COMMITTEE, YOU WANT TO PUT THE

22   BEST QUALIFIED PEOPLE YOU CAN SUBJECT TO THE FACT THAT YOU GOT

23   TO BE MINDFUL OF EVERYBODY'S TIME.

24   **Q.**  OKAY.  LET'S ––

25   **A.**  EXCEPT FOR IF YOU'RE AT A UNIVERSITY, THEN THEY WASTE YOUR

```
 1    TIME ALL THE TIME.  BUT --

 2           MS. SWEENEY:  LET'S LOOK IF WE COULD, LARRY, AT

 3    EXHIBIT NO. 267.

 4                  (EXHIBIT PUBLISHED TO JURY.)

 5    BY MS. SWEENEY:

 6    Q.  AND THIS IS A -- IT'S A FORWARDED ARTICLE, FORWARDED TO

 7    STEVE JOBS IN NOVEMBER 2005, AND IT'S ABOUT A COMPANY CALLED

 8    NAVIO.  AND THEN THERE'S AN EMAIL AT THE TOP WHICH IS MR. JOBS

 9    FORWARDING THIS ARTICLE TO JEFF ROBBIN.  THE DATE IS NOVEMBER

10    2005.

11       AND HE SAYS, "JEFF, WE MAY NEED TO CHANGE THINGS HERE.

12    STEVE."

13       NOW THIS ISN'T A DOCUMENT THAT YOU CONSIDERED IN YOUR

14    ANALYSIS, IS IT?

15    A.  I'VE SEEN THIS DOCUMENT BEFORE SO IT'S SOMETHING THAT CAME

16    TO MY ATTENTION.  I DON'T THINK I ULTIMATELY CITED IT IN MY

17    ANALYSIS, NO.

18    Q.  OKAY.

19           MS. SWEENEY:  AND THEN IF WE COULD, LARRY, LOOK AT

20    EXHIBIT 269.

21                  (EXHIBIT PUBLISHED TO JURY.)

22    BY MS. SWEENEY:

23    Q.  AND THIS IS AN I.M. CHAT A COUPLE DAYS LATER, AND IT'S

24    FROM JEFF ROBBIN TO AUGUSTIN FARRUGIA.

25       AND IT SAYS, "I THINK WE NEED TO TALK WITH GUY ABOUT DOING
```

1    A SIMPLE AUTHENTICATION IN 6.0.2 FOR IPOD."  AND THEN HE GOES

2    ON TO SAY, "NOTHING WITH THE DB" -- THAT'S DATABASE -- "BUT

3    LOCK DOWN THE KEYBAG."

4        AND THIS DOCUMENT WAS NOT CONSIDERED BY YOU IN YOUR

5    ANALYSIS, WAS IT?

6    **A.**  IT WAS NOT SOMETHING I CITED.  I'VE SEEN THIS BEFORE.

7    I -- AGAIN, AS AN ECONOMIST, I WOULD THINK THE BEST THING

8    WOULD BE TO ASK THE PARTICIPANTS IN THIS DISCUSSION WHAT THEY

9    WERE THINKING.  I -- I CAN'T, AS AN ECONOMIST, ADD INSIGHT TO

10   THAT.

11   **Q.**  OKAY.  LET'S TURN, THEN, TO EXHIBIT 304.

12                (EXHIBIT PUBLISHED TO JURY.)

13   **BY MS. SWEENEY:**

14   **Q.**  AND THIS IS AN EMAIL EXCHANGE THAT OCCURRED IN MARCH OF

15   2006, AND THIS IS CONFIRMATION THAT THE REAL HARMONY PROGRAM

16   WAS OPERATIONAL AGAIN.

17       AND IS THIS A DOCUMENT THAT YOU CONSIDERED IN YOUR

18   ANALYSIS?

19   **A.**  I'VE SEEN THIS DOCUMENT BEFORE.  I DON'T BELIEVE I CITED

20   IT FOR ANYTHING IN MY REPORT.  BUT I KNOW I'D SEEN IT.

21   **Q.**  OKAY.

22       AND THEN LET'S LOOK AT EXHIBIT 333.

23                (EXHIBIT PUBLISHED TO JURY.)

24   **BY MS. SWEENEY:**

25   **Q.**  AND THIS IS ANOTHER EMAIL FORWARDING AN ARTICLE ABOUT

1   NAVIO, AND IT'S FORWARDED FROM STEVE JOBS WHERE HE WRITES,

2   "NAVIO MAKES GOOD ON PROMISE TO UNLOCK IPOD."  AND IT'S DATED

3   MAY 23RD, 2006.

4        AND THEN JEFF ROBBIN RESPONDS, AND HE SAYS, "WE'VE SEEN

5   REPORTS OF THIS THE LAST FEW DAYS, BUT NOTHING CONCRETE FOR US

6   TO LOOK AT.  REGARDLESS, THIS WILL NOT WORK WITH THE NEW

7   NANOS."

8        AND THIS ISN'T SOMETHING THAT YOU TOOK INTO ACCOUNT IN

9   YOUR ANALYSIS EITHER, IS IT?

10  **A.**  WELL, I MEAN, NAVIO IS NOT SOMETHING I EVER FOUND ANY

11  EVIDENCE THAT ANYBODY USED.  I -- I HAD SEEN NO EVIDENCE

12  ANYBODY EVER USED THIS NAVIO PRODUCT.

13  **Q.**  SO YOU DIDN'T TAKE IT INTO ACCOUNT.

14  **A.**  WELL, I TOOK IT INTO THE ACCOUNT TO THE EXTENT THAT THERE

15  WAS NO EVIDENCE THAT ANYBODY EVER USED IT.  HAD THERE BEEN

16  EVIDENCE THAT PEOPLE USED IT, THEN THAT MIGHT HAVE BEEN

17  SOMETHING I WOULD HAVE CONSIDERED, BUT THERE WAS NO EVIDENCE

18  THAT ANYBODY EVER USED THIS PRODUCT.

19  **Q.**  OKAY.  AND THEN LET'S LOOK AT EXHIBIT 375.

20            (EXHIBIT PUBLISHED TO JURY.)

21  **BY MS. SWEENEY:**

22  **Q.**  AND THIS IS AN EMAIL EXCHANGE AFTER 7.0 AND THE NANO

23  SECOND GENERATION WAS RELEASED IN SEPTEMBER 2006.

24       AND IT'S AN EMAIL JUST CONFIRMING -- IT SAYS, "THE ATTACK

25  BY INJECTING CONTENTS IN THE IPOD...NO LONGER WORK ON N36."

1        N36 WAS A CODE NAME FOR THE NANO SECOND GENERATION, RIGHT?

2   **A.**   I DON'T REMEMBER THE NUMBERS, BUT IT SOUNDS RIGHT.

3   **Q.**   ALL RIGHT.  AND SO IT'S JUST CONFIRMING IT NO LONGER

4   WORKS.

5        IS THIS A DOCUMENT YOU TOOK INTO ACCOUNT IN YOUR ANALYSIS?

6   **A.**   I DON'T REMEMBER CITING IT.  I THINK I'VE SEEN DOCUMENTS,

7   EITHER THIS OR SOMETHING SIMILAR TO IT.  YEAH, WE DISCUSS --

8   IN MY REPORT, WE DISCUSS THE ISSUES REGARDING PEOPLE INJECTING

9   CONTENT INTO THE IPOD.  I DON'T REMEMBER IF THIS IS A DOCUMENT

10  WE CITED IN THAT REGARD OR NOT.

11  **Q.**   OKAY.  AND THEN YOU KNEW, DIDN'T YOU, THAT THERE WAS A

12  PRICE COMMITTEE MEETING IN AUGUST OF 2006?

13  **A.**   I CAN'T SAY I REMEMBER THAT DATE.  BUT I KNOW THERE WERE

14  PRICE COMMITTEE MEETINGS FROM TIME TO TIME.  I DON'T COMMIT TO

15  MEMORY THE DATES OF THOSE VARIOUS MEETINGS.

16  **Q.**   WELL, LET'S HAVE A LOOK AT EXHIBIT 2844.

17              (EXHIBIT PUBLISHED TO JURY.)

18  **BY MS. SWEENEY:**

19  **Q.**   AND THIS IS AN EMAIL DATED, I THINK IT'S AUGUST 23RD -- OR

20  EXCUSE ME -- AUGUST 21ST, 2006.  AND IT'S ATTACHING SLIDES FOR

21  THE -- THE UPCOMING PRICE COMMITTEE MEETING.

22       AND I JUST WANT TO ASK YOU WHETHER THIS HELPS YOU

23  RECOLLECT THAT THERE WAS A PRICE COMMITTEE MEETING IN AUGUST

24  OF 2006?

25  **A.**   YEAH.  THIS SEEMS TO SAY IT WAS IN AUGUST OF 2006.  I

1    WOULDN'T HAVE REMEMBERED THE MONTH.

2    Q.  ALL RIGHT.  NOW, DID YOU LOOK AT ANY OF THE PRICE

3    COMMITTEE DOCUMENTS?

4    A.  YES, I DID.

5    Q.  AND THERE WERE NO MINUTES OF THOSE MEETINGS THAT RECORDED

6    WHAT DISCUSSIONS WERE HELD AT THOSE MEETINGS; IS THAT RIGHT?

7    A.  I DON'T KNOW IF THERE WERE MINUTES OR NOT.  I DON'T RECALL

8    SEEING MINUTES.  I REMEMBER SEEING PRICE COMMITTEE DOCUMENTS

9    WHERE THEY DISCUSSED VARIOUS FEATURES AND PRICING FOR IPODS.

10   THAT WAS THE MAIN CONTENT I LOOKED AT.

11   Q.  AND YOU HEARD MR. SCHILLER'S TESTIMONY THAT THEY DIDN'T

12   TAKE MINUTES AT THOSE MEETINGS?

13   A.  I DON'T RECALL HIS SPECIFIC TESTIMONY.  BUT I'LL TAKE HIS

14   WORD FOR IT.

15   Q.  AND YOU SAID A MOMENT AGO THAT YOU NEED TO INTERVIEW

16   PARTICIPANTS.  DID YOU AT ANY TIME PRIOR TO SUBMITTING YOUR

17   REPORTS IN THIS CASE INTERVIEW ANY APPLE MEMBERS OF THE PRICE

18   COMMITTEE?

19   A.  DO YOU HAVE MY -- YOU CITED SOME TESTIMONY OF MINE WHERE I

20   SAID YOU NEED TO INTERVIEW PARTICIPANTS?

21   Q.  NO.  I'M JUST REFERRING TO YOUR TESTIMONY A FEW MOMENTS

22   AGO WHEN YOU -- YOU JUST MENTIONED SOMETHING ABOUT

23   INTERVIEWING PEOPLE.  AND SO MY QUESTION IS:  DID YOU

24   INTERVIEW ANY MEMBERS OF THE PRICING COMMITTEE BEFORE YOU

25   SUBMITTED THE OPINIONS THAT YOU SUBMITTED IN THIS CASE?

1    **A.**  I JUST WANT TO MAKE SURE I DIDN'T MISSPOKE (SIC).  I

2    DIDN'T -- I DIDN'T REALIZE I SAID SOMETHING ABOUT INTERVIEWING

3    PEOPLE.  YOU CITED SOME TESTIMONY OF MINE WHERE I SAID THAT?

4    **Q.**  I'M JUST TALKING ABOUT WHAT YOU SAID HERE TODAY.

5    **A.**  DID I SAY THAT TODAY?

6    **Q.**  YES.

7    **A.**  OH.  I DIDN'T REMEMBER SAYING THAT SO HOPEFULLY I DIDN'T

8    MISSPOKE (SIC).  BUT ANYWAY.  NO, I DID NOT.  AS AN ECONOMIST,

9    GENERALLY THE WAY WE PROCEED IS WE TRY TO UNDERSTAND THE

10   MARKETPLACE, WE LOOK AT MARKET OUTCOMES BECAUSE THAT'S WHAT

11   ECONOMIC THEORIES SPEAKS MOST CLOSELY TO.  DOCUMENTS CAN

12   SOMETIMES HELP BECAUSE THEY GIVE US THE KIND OF DATA THAT

13   PEOPLE HAD IN THE MARKETPLACE.

14       IN SOME CASES, TALKING TO PARTICIPANTS CAN BE HELPFUL.  I

15   DIDN'T SEE A PARTICULAR NEED FOR THAT IN THIS CASE.

16   **Q.**  SO YOU DIDN'T INTERVIEW ANY APPLE EMPLOYEES BEFORE YOU

17   SUBMITTED THE EXPERT OPINIONS THAT YOU'RE RENDERING IN THIS

18   CASE, RIGHT?

19   **A.**  I FIGURED THEY WOULD TESTIFY FOR THEMSELVES IN COURT.  AND

20   I THOUGHT AS AN ECONOMIST, I DIDN'T, IN THIS CASE, HAVE MUCH

21   TO ADD IN TERMS OF ME INTERVIEWING THEM SEPARATELY FROM THAT.

22   THEY -- YOU KNOW, I'M NOT SAYING THAT PEOPLE SHOULD ONLY PAY

23   ATTENTION TO ME.  I'M SAYING -- BUT I -- YOU KNOW, I CAN

24   PROVIDE INSIGHT ON THE ECONOMICS.  THAT'S REALLY WHERE I CAN

25   HELP.

1    **Q.**  AND WHEN YOU –– SO, BUT YOU'VE WORKED ON AT LEAST THREE

2    CASES FOR APPLE OVER THE PAST THREE YEARS, RIGHT?

3    **A.**  YES.

4    **Q.**  AND HAVE YOU DONE OTHER WORK FOR APPLE?

5    **A.**  I'VE –– I'VE DONE SOME OTHER WORK FOR APPLE, NOT MUCH.

6    JUST SMALL THINGS I'VE DONE OVER THE YEARS.

7    **Q.**  OKAY.  AND IN ONE OF THE CASES THAT YOU WORKED FOR APPLE

8    ON THIS YEAR, THE *IN RE HIGH-TECH EMPLOYEES ANTITRUST*

9    *LITIGATION*, YOU DID INTERVIEW SOME APPLE –– OR SOME EMPLOYEES

10   OF THE DEFENDANTS IN THAT CASE, DIDN'T YOU?

11   **A.**  I DID.

12   **Q.**  OKAY.  AND YOU THOUGHT IT WAS IRRELEVANT IN THIS CASE TO

13   INTERVIEW MEMBERS OF THE PRICE COMMITTEE WHO SAT ON THE PRICE

14   COMMITTEE IN AUGUST OF 2006 BEFORE THE NANO WAS RELEASED IN

15   2000 –– SEPTEMBER 2006 ALONG WITH 7.0; IS THAT RIGHT?

16   **A.**  I –– I DIDN'T SAY IT WAS IRRELEVANT.  I SAID IT WAS NOT

17   SOMETHING THAT I THOUGHT WAS IMPORTANT FOR ME TO DO.

18   **Q.**  OKAY.

19        **MS. SWEENEY:**  NO FURTHER QUESTIONS.

20        **THE COURT:**  YOU –– DON'T WE GO AHEAD AND JUST –– OH

21   YOU HAVE ONE QUESTION?  OKAY.

22                    <u>**REDIRECT EXAMINATION**</u>

23   BY MR. ISAACSON:

24   **Q.**  PROFESSOR, YOU MENTIONED IN ONE OF YOUR ANSWERS THAT WHEN

25   MUSIC WENT DRM-FREE IN MARCH OF 2009, APPLE'S MARKET SHARE FOR

1   DIGITAL PLAYERS WENT UP.  WOULD YOU EXPLAIN YOUR ANSWER?

2   **A.**  YEAH.  I -- THAT -- THAT'S WHAT THE DATA SHOW, THAT IF

3   ANY -- YOU KNOW, TO THE EXTENT IT CHANGED, IT WENT UP.

4       AND THAT HAS SOME BEARING ON THIS -- ON THIS ANALYSIS

5   BECAUSE UNDER THE LOCK-IN THEORY, THE REASON PEOPLE WERE

6   CONTINUING TO BUY IPOD IS THAT THEY WERE LOCKED IN.  THE

7   AVAILABILITY THEN OF DRM-FREE MUSIC SHOULD HAVE ALLOWED PEOPLE

8   TO SHIFT AWAY FROM APPLE.  THE FACT THAT THEIR MARKET SHARE

9   ACTUALLY WENT UP WHEN THINGS WENT DRM-FREE RATHER THAN WENT

10  DOWN IS AGAIN EVIDENCE AGAINST THE LOCK-IN THEORY.  BECAUSE

11  UNDER THE LOCK-IN THEORY, THAT UNLOCKED THE DOOR, PEOPLE

12  SHOULD HAVE LEFT.  AND IN FACT, WHAT ACTUALLY HAPPENED IS

13  APPLE'S SHARE, IF ANYTHING, WENT UP.

14          **MR. ISAACSON:**  THANK YOU.

15          **THE COURT:**  ANYTHING ON THAT ONE QUESTION?

16          **MS. SWEENEY:**  NO, YOUR HONOR.

17          **THE COURT:**  OKAY.  THE -- DO ANY OF YOU HAVE

18  QUESTIONS?  DO YOU -- EXCELLENT.  LET ME TAKE THE QUESTION.  A

19  COUPLE OF QUESTIONS.

20              (PAUSE IN THE PROCEEDINGS.)

21          **THE COURT:**  THERE'S ANOTHER ONE THERE, AND I'LL MEET

22  COUNSEL AT SIDEBAR.

23      OKAY.  I TELL YOU WHAT.  WHY DON'T WE GO AHEAD, TAKE OUR

24  BREAK.

25      YOU'RE NOT EXCUSED.

MURPHY – REDIRECT / ISAACSON

1      I'M GOING TO GO CHANGE A BUNCH OF PASSWORDS.

2      ENJOY YOUR BREAK, 15 MINUTES.

3      (THE FOLLOWING PROCEEDINGS WERE HEARD OUT OF THE PRESENCE

4   OF THE JURY:)

5              (SIDEBAR CONFERENCE OFF THE RECORD.)

6              (RECESS TAKEN AT 10:00 A.M.)

7

8          (CONTINUED NEXT PAGE; NOTHING OMITTED.)

1810

1       (PROCEEDINGS RESUMED AFTER RECESS AT 10:13 A.M.)

2              **THE COURT:**  LET'S CALL THEM BACK.

3       (PROCEEDINGS HELD IN THE PRESENCE OF THE JURY.)

4              **THE COURT:**  YOU MAY BE SEATED.  WE ARE BACK ON THE

5       RECORD.  THE RECORD WILL REFLECT THE JURY IS BACK.

6              SO I DO HAVE THIS ONE QUESTION FOR YOU.

7              AND SO THE JURY KNOWS, BECAUSE WE TOOK THE BREAK, I

8       INSTRUCTED THE LAWYERS NOT TO GIVE HIM THE QUESTION OR TALK TO

9       HIM ABOUT THE QUESTION.

10             SO THE QUESTION IS, WHAT VARIABLES DO YOU THINK DR. NOLL

11      SHOULD HAVE PUT IN HIS REGRESSION ANALYSIS?

12             AND DO YOU KNOW IF THEY WERE TESTED FOR COLINEARITY?

13             **THE WITNESS:**  YES.  IN FACT, IN MY REPORT AND

14      DR. TOPEL IS GOING TO COVER THIS IN MORE DETAIL, SO I WILL DO

15      IT BRIEFLY, THERE WERE VARIABLES THAT WERE AVAILABLE THAT

16      MEASURED, FOR EXAMPLE, BATTERY LIFE, WHICH IS SOMETHING THAT

17      THE PRICE COMMITTEE DOCUMENTS SAY PEOPLE CARE ABOUT; RECHARGE

18      TIME, HOW LONG IT TAKES TO RECHARGE; SCREEN RESOLUTION, AND A

19      COUPLE OF OTHERS.  THEY WERE IN MY REPORT.

20             THOSE KINDS OF VARIABLES THAT WERE AVAILABLE SHOULD HAVE

21      BEEN CONSIDERED BECAUSE ONE OF THE DANGERS YOU HAVE IN RUNNING

22      A REGRESSION IS THAT IF YOU OMIT VARIABLES, THE VARIABLES YOU

23      INCLUDE IN YOUR ANALYSIS WILL CAPTURE THE EFFECT OF THE

24      OMITTED VARIABLES.  WELL-KNOWN TERM CALLED OMITTED VARIABLES

25      BIAS.

1811

1         AND SO THAT -- THAT WAS SOMETHING THAT WE -- WE THOUGHT

2    SHOULD BE INCLUDED.  WE INCLUDED THEM.  THEY DID NOT CREATE A

3    MULTICOLINEARITY PROBLEM.  IN PARTICULAR, A MULTICOLINEARITY

4    PROBLEM FOR THE PURPOSES OF ESTIMATING THE EFFECT OF THE

5    ITUNES VARIABLE.

6         IN MY REPORT, I CITED THE BOOK BY ARTHUR GOLDBERGER, A

7    WELL-KNOWN ECONOMETRICIAN.  AND HE CORRECTLY STATED AND VERY

8    SIMPLY IN THE O'BRIAN PAPER, WHICH DR. NOLL ALSO CITES, COVERS

9    THE SAME GROUND.

10        BASICALLY, YOU CAN SEE IF YOU HAVE A MULTICOLINEARITY

11   PROBLEM BY WHAT HAPPENS TO THE STANDARD ERRORS OF YOUR

12   ESTIMATES.  THAT IF THERE IS A MULTICOLINEARITY PROBLEM,

13   THAT'S ONE OF THE REASONS YOU CAN GET A LARGE STANDARD ERROR.

14   THE PROBLEM ARISES BECAUSE YOU CAN'T ESTIMATE THE COEFFICIENT

15   AS PRECISELY AS YOU COULD OTHERWISE.

16        WHAT WE FIND IS WHEN WE ADD THOSE ADDITIONAL

17   CHARACTERISTICS, YOU FIND THAT THE STANDARD ERRORS THAT YOU

18   GET DON'T GO UP.  THAT IS, YOU CAN ESTIMATE IT JUST AS

19   PRECISELY.  THAT MEANS YOU HAVEN'T CREATED A MULTICOLINEARITY

20   PROBLEM IN THE SENSE OF CREATING AN IMPRECISION ISSUE.  ON THE

21   OTHER HAND, THE COEFFICIENT ESTIMATES CHANGE, WHICH MEANS

22   THERE WAS AN OMITTED VARIABLES PROBLEM.

23        SO I THINK IT'S PRETTY CLEAR HE NEEDED TO ADD THOSE

24   VARIABLES TO HIS REGRESSION BECAUSE IT DIDN'T CREATE THE

25   SYMPTOM OF THE MULTICOLINEARITY PROBLEM, WHICH IS THE INCREASE

MURPHY - RECROSS / SWEENEY

1    IN -- DECREASE IN PRECISION.  IN FACT, THE PRECISION STAYS

2    ALMOST EXACTLY THE SAME, BUT AT THE SAME TIME THE COEFFICIENT

3    ESTIMATES MOVE, WHICH TELLS US THERE WERE OMITTED VARIABLES.

4        I THINK IT'S A PRETTY CLEAR CASE, PRETTY SIMPLY

5    ECONOMETRICS.  CERTAINLY WHAT WE TEACH OUR STUDENTS ON A

6    REGULAR BASIS.

7            **THE COURT:**  ANY FOLLOW UP?  MR. ISAACSON?

8            **MR. ISAACSON:**  NO FOLLOW UP.

9            **THE COURT:**  ANY CROSS ON THAT QUESTION?

10           **MS. SWEENEY:**  YES, YOUR HONOR.

11                    **RECROSS-EXAMINATION**

12   **BY MS. SWEENEY:**

13   **Q.**  NOW, YOU -- YOU SAID THAT PROFESSOR TOPEL IS GOING TO

14   ADDRESS THIS IN MORE DETAIL, BUT YOU MENTIONED A COUPLE OF

15   VARIABLES THAT YOU SAID WERE IN THE DATA AND THAT PROFESSOR

16   NOLL DID NOT TAKE INTO ACCOUNT IN HIS REGRESSION ANALYSIS.

17       ARE YOU FAMILIAR WITH MOORE'S LAW?

18   **A.**  YES, I AM FAMILIAR WITH MOORE'S LAW.

19   **Q.**  WHAT IS MOORE'S LAW?

20   **A.**  MOORE'S LAW IS REALLY -- THE SIMPLEST VERSION OF MOORE'S

21   LAW IS ABOUT THE NUMBER OF SEMICONDUCTORS YOU CAN PUT ON A

22   CHIP, SORT OF THE DENSITY OF SEMICONDUCTORS.

23       BASIC IDEA IS THE NUMBER OF TRANSISTORS YOU CAN PUT ON A

24   CHIP DOUBLES EVERY 18 MONTHS.

25   **Q.**  AND ISN'T -- SO WHEN ECONOMISTS TALK ABOUT MOORE'S LAW,

1  THEY ARE TALKING ABOUT THE INCREASING CAPACITY OF ELECTRONIC

2  PRODUCTS OVER TIME, CORRECT?

3  **A.**   IT'S SPECIFICALLY ABOUT SEMICONDUCTORS.  I MEAN, THAT'S

4  REALLY WHERE MOORE'S LAW CAME FROM.  IN FACT, IT'S FROM MOORE

5  WHO WAS ONE OF THE INTEL PEOPLE.

6  **Q.**   BUT IT'S NOT LIMITED TO SEMICONDUCTORS, RIGHT?

7  **A.**   THE LITERAL VERSION OF MOORE'S LAW IS ABOUT

8  SEMICONDUCTORS.  PEOPLE TALK GENERICALLY ABOUT MOORE'S LAW FOR

9  A BROAD -- BROADER RANGE OF ELECTRONICS PRODUCTS, BUT, YOU

10  KNOW, IT PROBABLY APPLIES BEST WHERE IT STARTED, WHICH IS IN

11  THE SEMICONDUCTOR BUSINESS.

12  **Q.**   THEN YOU ALSO KNOW, DON'T YOU, THAT PROFESSOR NOLL'S

13  REGRESSION HAS VARIABLES FOR THE PRODUCT CLASS.  IN OTHER

14  WORDS, WHETHER IT'S A CLASSIC OR A NANO.

15      YOU KNEW THAT, RIGHT?

16  **A.**   YEAH, BUT THOSE ARE -- THOSE ARE WHAT WE CALL DUMMY

17  VARIABLES AND THEY HAVE FIXED EFFECTS FOR THOSE OVER TIME.  SO

18  THEY WOULDN'T CAPTURE CHANGES WITHIN THE NANO --

19  **Q.**   THAT WASN'T MY QUESTION.  JUST ANSWER MY QUESTION.

20      DID YOU KNOW THAT PROFESSOR NOLL'S REGRESSION ANALYSIS HAD

21  VARIABLES FOR PRODUCT CLASS SUCH AS THE DIFFERENCE BETWEEN A

22  CLASSIC AND A NANO?  YES OR NO.

23  **A.**   A FIXED DIFFERENCE BETWEEN A CLASSIC AND A NANO COULD BE

24  CAPTURED BY HIS REGRESSION.

25  **Q.**   OKAY.

1   **A.**   AND -- BE CAREFUL.  YOU ASK --

2   **Q.**   MR. MURPHY, LET ME ASK MY QUESTION.  THEN YOU CAN ANSWER.

3   OKAY?

4        IF MR. ISAACSON HAS ANY FOLLOW-UP, HE CAN PROBABLY ADDRESS

5   THAT, TOO.

6        AND THEN ISN'T IT TRUE THAT DIFFERENT MODELS AND DIFFERENT

7   CLASSES OF IPODS HAD DIFFERENT BATTERY LIFE, DIFFERENT

8   RECHARGE, AND DIFFERENT SCREEN RESOLUTION?

9   **A.**   THOSE VARIED WITHIN A FAMILY OVER TIME AND VARIED ACROSS

10  FAMILIES, BOTH.

11  **Q.**   OKAY.

12       AND THEN YOU SAID THAT -- YOU DIDN'T THINK THERE WAS A

13  MULTICOLINEARITY PROBLEM.  DID YOU CONDUCT AN AUXILIARY

14  REGRESSION TO DETERMINE WHETHER THERE WAS A MULTICOLINEARITY

15  PROBLEM?

16  **A.**   NO.  YOU DON'T HAVE TO RUN THE AUXILIARY REGRESSION.  THE

17  STANDARD ERRORS OF THE REGRESSION ACTUALLY REFLECT THE RESULTS

18  OF THAT AUXILIARY REGRESSION.

19       YOU SHOULD REALLY READ THE GOLDBERGER PIECE.  HE

20  SUMMARIZES IT EXTREMELY WELL, THAT THE ISSUE --

21  **Q.**   PROFESSOR MURPHY --

22                    (SIMULTANEOUS COLLOQUY.)

23  **A.**   -- MULTICOLINEARITY SHOWS UP IN THE ESTIMATED STANDARD

24  ERRORS.

25  **Q.**   DID YOU RUN A VARIANCE INFLATION FACTOR TEST TO DETERMINE

1    WHETHER THERE WAS MULTICOLINEARITY?

2    **A.**  I DIDN'T DO IT SEPARATELY.  YOU CAN JUST BACK IT RIGHT OUT

3    FROM THE REGRESSION.

4    **Q.**  DID YOU RUN A CONDITION NUMBER TEST TO DETERMINE WHETHER

5    THERE WAS MULTICOLINEARITY?

6    **A.**  I DID NOT BECAUSE IT'S NOT NEEDED.

7         **MS. SWEENEY:**  NO FURTHER QUESTIONS.

8         **THE COURT:**  ANY FOLLOW UP?

9              **FURTHER REDIRECT EXAMINATION**

10    **BY MR. ISAACSON:**

11    **Q.**  SO YOU WERE JUST ASKED ABOUT TWO TESTS THAT YOU RAN.  DO

12    YOU REMEMBER THE NAME OF THE FIRST ONE?

13         **MS. SWEENEY:**  OBJECTION.  I ASKED HIM ABOUT TESTS HE

14    DID NOT RUN.

15    **BY MR. ISAACSON:**

16    **Q.**  I AM SORRY, TESTS YOU DID NOT RUN.

17    **A.**  YES.

18    **Q.**  THE NAME OF THE FIRST ONE WAS?

19    **A.**  THE VARIANCE INFLATION FACTOR -- OR I CAN'T REMEMBER WHICH

20    WAS FIRST, OR THE CONDITION NUMBER, VARIANCE INFLATION FACTOR.

21    **Q.**  OKAY.  THE CONDITION NUMBER TEST, YOU SAID YOU DIDN'T RUN

22    THAT, YOU COULD BACK IT OUT.  CAN YOU EXPLAIN WHAT YOU MEANT?

23    **A.**  NO.  IT'S ACTUALLY THE VARIANCE INFLATION FACTOR.  THE

24    BASIC IDEA IS THIS:  AS YOU ADD MORE VARIABLES TO A

25    REGRESSION, YOU REDUCE THE AMOUNT OF INDEPENDENT VARIATION

1  THAT'S THERE FOR ALL THE OTHER VARIABLES.  BECAUSE SOME OF --

2  THIS IS KIND OF TECHNICAL, I AM SORRY.

3       SOME OF THE VARIATION FOR THAT VARIABLE THAT'S THERE IS

4  GOING TO BE ABSORBED BY THE VARIABLES YOU'RE ADDING.  THAT'S

5  GOING TO TEND TO MAKE YOUR ESTIMATE A LITTLE LESS PRECISE.  ON

6  THE OTHER HAND, YOU ARE EXPLAINING MORE OF THE NOISE IN THE

7  REGRESSION, WHICH IS GOING TO MAKE YOUR VARIABLE MORE PRECISE.

8       WHAT YOU CARE ABOUT IS THE NET IMPACT OF THOSE TWO THINGS.

9  THE NET IMPACT OF THOSE IS EXACTLY CAPTURED BY THE STANDARD

10  ERROR.  IT'S IN FACT, MEASURES THE INCREASE DUE TO THE

11  VARIANCE INFLATION FACTOR, WHICH IS THE FIRST THING I TALKED

12  ABOUT, AND THE REDUCTION DUE TO THE INCREASED REDUCED ERROR,

13  WHICH IS THE SECOND FACTOR.

14       AND THIS IS BOTH THE O'BRIAN ARTICLE HE CITES AND THE

15  GOLDBERGER ARTICLE MAKE VERY CLEAR THAT THE SOURCE OF THE

16  ISSUE HERE IS DOES IT AFFECT THE PRECISION OF YOUR ESTIMATES.

17       AND THAT'S WHAT I LOOKED AT, AND IT DID NOT REDUCE THE

18  PRECISION OF OUR ESTIMATES.  IN PARTICULAR, THE ONE WE CARE

19  ABOUT FOR PURPOSES OF THIS CASE IS THE ITUNES 7 COEFFICIENT.

20  STANDARD ERROR ON THAT WAS NOT INCREASED, WHICH TELLS US WE

21  DIDN'T HAVE A PROBLEM WITH MULTICOLINEARITY MAKING OUR

22  REGRESSION OR CAUSING PROBLEMS, FOR INSTANCE, ABOUT ITUNES 7

23  TAKING ACCOUNT OF WHATEVER IMPACT THE VARIANCE INFLATION

24  FACTOR HAD.

25  Q.  WHAT'S THE GOLDBERGER ARTICLE?

MURPHY – FURTHER REDIRECT / ISAACSON

1    **A.**  IT'S A BOOK.  IT'S A -- IT'S A -- IT'S A TEXTBOOK ON

2    ECONOMETRICS.  BUT THIS IS NOT UNIQUE TO HIM.  THIS IS, YOU

3    KNOW, THE WAY YOU THINK ABOUT IT.

4        BECAUSE THE WHOLE GOAL IN ESTIMATING A REGRESSION IS TO

5    GET AN UNBIASED, THAT IS, AN ACCURATE ESTIMATE, SOMETHING THAT

6    MEASURES WHAT YOU WANT AND ESTIMATE IT PRECISELY.

7        PROBLEM WITH OMITTING VARIABLES, IT WILL CAUSE YOU TO

8    ESTIMATE, MISESTIMATE YOUR ESTIMATE.  ADDING VARIABLES HAS THE

9    POTENTIAL TO REDUCE YOUR PRECISION, BUT IF IT DOESN'T REDUCE

10   YOUR PRECISION, IT'S GOING TO HELP YOU CUT DOWN THE OMITTED

11   VARIABLES BIAS AND, THEREFORE, IS GOING TO BE A GOOD THING TO

12   DO.  AND THAT'S WHAT WE DID IN THIS CASE.

13   **Q.**  ALL RIGHT.

14       AND THEN YOU WERE ASKED ABOUT THE OTHER TEST, DID YOU CALL

15   IT THE VARIANCE TEST?

16   **A.**  THE OTHER ONE WAS THE CONDITION NUMBER.

17   **Q.**  CONDITION NUMBER.  WILL YOU EXPLAIN YOUR TESTIMONY ABOUT

18   THAT?

19   **A.**  THE CONDITION NUMBER IS ABOUT THE -- IT'S A CHARACTERISTIC

20   OF THE MATRIX ITSELF AS OPPOSED TO A CHARACTERISTIC OF YOUR

21   ABILITY TO ESTIMATE ANY PARTICULAR COEFFICIENT.

22       IT'S USEFUL IF YOU'RE THINKING ABOUT THE -- LIKE THE

23   STABILITY OF A NUMERICAL ALGORITHM USED TO CALCULATE THE

24   INVERSE OF A MATRIX.

25       IF YOU'RE INTERESTED IN JUST LIKE HOW ACCURATELY CAN I

1   ESTIMATE A COEFFICIENT OF INTEREST, IT DOESN'T TELL YOU VERY

2   MUCH DIRECTLY ABOUT THAT BECAUSE THE ISSUE ABOUT

3   MULTICOLINEARITY IS IT CAN HAVE A BIG EFFECT ON SOME VARIABLES

4   AND NOT EFFECT OTHER VARIABLES AT ALL.  AND THE CONDITION

5   NUMBER DOESN'T TAKE THAT INTO ACCOUNT AT ALL.  DOESN'T ASK

6   WHERE IS THE ISSUE.

7       THE GREATEST EXAMPLE OF THAT IS IF I HAD SOME PERFECTLY

8   COLINEAR VARIABLES; I CAN'T PUT THEM ALL IN.  THAT HAS AN

9   EFFECT ON INTERPRETING THOSE VARIABLES.  BUT NO MATTER WHICH

10  ONES I PUT IN, I'LL GET THE SAME ANSWER FOR THE OTHER

11  VARIABLES IN THE REGRESSION.  IT DOESN'T -- THAT COLINEARITY

12  DOESN'T AFFECT THE IDENTIFICATION OF THE OTHER VARIABLES.

13  **Q.**  AS YOU SAID, THE -- WE WILL HEAR ABOUT THIS MORE FROM

14  DR. TOPEL, BUT DO I UNDERSTAND IT, THAT WHEN YOU DID

15  ADJUSTMENTS TO THE REGRESSION, YOU PUT IN ADDITIONAL

16  VARIABLES, SUCH AS BATTERY LIFE, THAT WERE NOT -- THAT DIDN'T

17  RAISE COLINEARITY PROBLEMS, BUT YOU COULDN'T SOLVE THE

18  PROBLEMS OF THE OTHER VARIABLES -- OTHER POSSIBLE VARIABLES,

19  THE OTHER FEATURES OF 7.0?

20  **A.**  WELL, THERE'S TWO THINGS.

21      ONE, THERE COULD STILL BE ADDITIONAL FEATURES THAT WE

22  DIDN'T HAVE.  RIGHT?  WE IDENTIFIED SOME FEATURES THAT HE LEFT

23  OUT, AND THOSE ALREADY MADE A DIFFERENCE.

24      SECONDLY, SO YOU HAVE THE PROBLEM I TALKED ABOUT EARLIER

25  TODAY, WHICH IS, EVEN IF YOU HAD ALL THE CHARACTERISTICS,

1    YOU'D HAVE THIS PROBLEM THAT WHILE YOU COULD ESTIMATE THE

2    EFFECT OF 7.0, YOU WOULD HAVE NO WAY OF ATTRIBUTING IT TO

3    REVERSE SYNC VERSUS KVC VERSUS ANY OF THE OTHER THINGS THAT

4    CAME IN AT THAT TIME.  YOU ARE GOING TO GET THE EXACT SAME

5    REGRESSION ESTIMATES NO MATTER WHICH OF THOSE THINGS CAUSED

6    IT.

7        DOESN'T -- ALL YOU CAN TELL ME IS 7.0 DID SOMETHING.  YOU

8    CAN'T TELL ME WHICH OF THE COMPONENTS DID.  YOU HAVE THE SAME

9    DATA, SAME -- SAME PRICES, SAME CONTROL VARIABLES.  YOU'RE

10   GOING TO GET EXACTLY NUMERICALLY IDENTICAL REGRESSION

11   COEFFICIENTS, BUT IN ONE CASE IT WILL BE DUE TO KVC.  IN

12   ANOTHER CASE IT'S DUE TO -- DUE TO REVERSE SYNC, YOU JUST

13   CAN'T TELL WHICH ONE IT IS.  AND THAT PROBLEM HE CANNOT SOLVE.

14   **Q.**  ALL RIGHT.

15       YOU WERE ASKED ABOUT DR. NOLL'S CAPACITY VARIABLE.  WOULD

16   YOU EXPLAIN WHAT THAT WAS?

17   **A.**  YEAH.  WELL, HIS CAPACITY VARIABLE IS A VARIABLE THAT

18   IS -- THAT MEASURES HOW MUCH -- HOW -- THE SIZE OF THE

19   HARDWARE OR FLASH MEMORY, IF IT'S A FLASH DEVICE, IT TELLS ME

20   HOW MANY SONGS I CAN PUT ON THE DEVICE.  IF IT'S 60 GIGABYTE,

21   120 GIGABYTE, WHATEVER THE SIZE IS, IT'S A MEASURE.  I THINK

22   YOU GUYS ARE ALL FAMILIAR WITH THAT.  IT IS A MEASURE OF HOW

23   MUCH.

24       YOU'RE ALSO FAMILIAR WITH DIGITAL CAMERA WHERE YOU GET THE

25   DIFFERENT LITTLE THINGS YOU PUT IN YOUR DIGITAL CAMERA AND IT

1   TELLS YOU HOW MANY PHOTOS YOU CAN PUT ON IT.  IT'S A MEASURE

2   OF THE CAPACITY IN THIS CASE FOR SONGS.

3   **Q.**  WHY DOESN'T THAT VARIABLE CAPTURE THINGS LIKE BATTERY

4   LIFE, SCREEN SIZE, RESOLUTION, CONNECTIVITY?

5   **A.**  BECAUSE YOU COULD HAVE TWO IPODS THAT HAVE THE SAME

6   CAPACITY BUT DIFFER ON THOSE OTHER DIMENSIONS.

7       AND THE VALUE TO CONSUMERS WILL VARY ON THOSE -- WITH

8   THOSE OTHER DIMENSIONS, LIKE BATTERY LIFE, RECHARGE TIME EVEN

9   FOR A GIVEN LEVEL OF CAPACITY.

10  **Q.**  FROM YOUR INVESTIGATION IS THAT WHAT ACTUALLY HAPPENED?

11  THERE WERE IPODS WITH THE SAME CAPACITY THAT HAD DIFFERENT

12  FEATURES?

13  **A.**  YES.  IN FACT, WE KNOW THAT FOR SURE BECAUSE THAT'S WHAT

14  ALLOWS A REGRESSION TO RUN.

15  **Q.**  YOU WERE ASKED ABOUT A PRODUCT CLASS VARIABLE FROM

16  DR. NOLL.

17      WILL YOU EXPLAIN WHAT THAT WAS?

18  **A.**  YES.  HE PUT IN HIS REGRESSION -- THERE'S THESE THINGS --

19  I THINK HE -- DR. NOLL EXPLAINED IT, WHICH ARE THINGS CALLED

20  DUMMY VARIABLES.  AND DUMMY VARIABLES ARE JUST -- THEY ARE

21  CALLED DUMMY VARIABLES BECAUSE THEY ONLY DO -- ONLY KNOW ONE

22  THING.  THEY'RE EITHER A ZERO OR A ONE.

23      AND, YOU KNOW, IF YOU HAVE A DUMMY VARIABLE FOR A SHUFFLE,

24  THEN FOR ALL THE IPODS THAT ARE NOT SHUFFLES, IT WILL BE ZERO.

25  AND FOR ALL THE IPODS THAT ARE SHUFFLES, IT WILL BE ONE.

1    AND YOU PUT THAT IN THE REGRESSION, AND IT SAYS, WHAT'S

2    THE IMPACT OF IT BEING A SHUFFLE VERSUS NOT A SHUFFLE.  THAT'S

3    REALLY WHAT IT MEASURES, THE DIFFERENCE BETWEEN THAT AND

4    WHATEVER THE OMITTED GROUP IS FOR THAT CHARACTERISTIC.

5    **Q.**  AND DOES THE PRODUCT CLASS VARIABLE CAPTURE THIS ISSUE OF

6    THE OMITTED VARIABLES BIAS THAT YOU TALKED ABOUT?

7    **A.**  NO.  BECAUSE THAT IS A VARIABLE THAT'S THE SAME FOR ALL

8    SHUFFLES IN ALL YEARS.  IT COULDN'T POSSIBLY CAPTURE ANYTHING

9    THAT CHANGES WITHIN THE SHUFFLE OVER TIME.  THAT VARIABLE JUST

10   CANNOT CAPTURE CHANGES THAT HAPPEN WITHIN A MODEL, WHETHER

11   IT'S A NANO, A CLASSIC, A TOUCH, A SHUFFLE, BECAUSE IT'S A

12   CONSTANT.  SOMETHING THAT DOESN'T CHANGE CAN'T EXPLAIN

13   SOMETHING THAT DOES CHANGE.

14        **MR. ISAACSON:**  I HAVE NO FURTHER QUESTIONS.

15        **MS. SWEENEY:**  NO FURTHER REDIRECT (SIC), YOUR HONOR.

16        **THE COURT:**  OKAY.  ANY OTHER FOLLOW UPS FROM THE

17   JURORS?

18     NO?  WE ARE ALL GOOD?

19        **JURORS:**  (JURORS NOD.)

20        **THE COURT:**  OKAY.  YOU ARE EXCUSED THEN.

21     NEXT WITNESS.

22        **MR. ISAACSON:**  YOUR HONOR, WE CALL PROFESSOR TOPEL.

23     (**ROBERT TOPEL,** CALLED AS A WITNESS FOR THE DEFENDANT,

24   HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

25        **THE WITNESS:**  I DO.

 1          **THE CLERK:**  PLEASE BE SEATED.  AND THEN AFTER YOU'RE

 2    SEATED, PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME.

 3          **THE WITNESS:**  OKAY.  I'M ROBERT HARRY TOPEL,

 4    T-O-P-E-L.

 5          **THE COURT:**  GOOD MORNING.

 6          **THE WITNESS:**  GOOD MORNING.  HOW ARE YOU?

 7          **THE COURT:**  YOU MAY PROCEED.

 8          **MR. ISAACSON:**  THANK YOU, YOUR HONOR.

 9                        <u>**DIRECT EXAMINATION**</u>

10    **BY MR. ISAACSON:**

11    **Q.**  GOOD MORNING, PROFESSOR.

12        WHY DON'T YOU INTRODUCE YOURSELF.

13    **A.**  HI.  I'M BOB TOPEL.  I'M FROM THE UNIVERSITY OF CHICAGO,

14    AND I'M HERE TO TESTIFY ABOUT SOME MATTERS ABOUT DR. NOLL'S

15    REGRESSIONS.

16    **Q.**  ALL RIGHT.

17        WHAT IS YOUR AREA OF EXPERTISE IN ECONOMICS?

18    **A.**  I'M A MICRO ECONOMIST.  I STUDY MARKETS AND PRICES.  I

19    STUDY EMPIRICAL WORK.  I STUDY LABOR MARKETS, INDUSTRIAL

20    ORGANIZATION, HEALTH, NATIONAL SECURITY, ENERGY, A FEW OTHER

21    THINGS.

22    **Q.**  WHAT IS YOUR BACKGROUND IN ANTITRUST ECONOMICS?

23    **A.**  WELL, I FIRST TAUGHT ANTITRUST ECONOMICS BACK IN -- WHEN I

24    WAS AT -- FIRST AT THE UNIVERSITY OF CHICAGO.  I TAUGHT AN

25    ANTITRUST REGULATION COURSE FOR SEVERAL YEARS.  I ALSO TAUGHT

TOPEL – DIRECT / ISAACSON

1    IT WHEN I WAS AT U.C.L.A.  I SPENT A YEAR THERE.

2        I CAME BACK TO THE UNIVERSITY.  IT HAS BEEN PART OF ALL MY

3    COURSES OVER TIME.  FROM TIME TO TIME IN THE BUSINESS SCHOOL,

4    I TEACH A COURSE CALLED LAW BUSINESS AND ECONOMICS THAT

5    BASICALLY INTRODUCES BUSINESS STUDENTS TO WHAT THEY HAVE TO

6    KNOW ABOUT THE LAW, INCLUDING SEVERAL WEEKS OF ANTITRUST.

7    **Q.**  ALL RIGHT.

8        WHAT IS ECONOMETRICS?

9    **A.**  ECONOMETRICS IS THE APPLICATION OF STATISTICS TO ECONOMIC

10   DATA.  IT'S THE TOOL THAT ECONOMISTS AND OTHER PEOPLE USE TO

11   TRY TO TESTS HYPOTHESES.  DID SOMETHING -- DID SOME VARIABLE

12   CAUSE SOMETHING ELSE TO HAPPEN?

13       NOW, THE IMPORTANT POINT TO UNDERSTAND ABOUT ECONOMETRICS

14   AND REGRESSION ANALYSIS IS THAT REGRESSIONS AND ECONOMETRICS

15   CAN SUMMARIZE THE DATA, THEY CAN TELL YOU WHAT HAPPENED, THEY

16   DON'T REALLY TELL YOU, AS I THINK YOU HEARD PROFESSOR MURPHY

17   SAY, THEY DON'T TELL YOU WHY IT HAPPENED.

18   **Q.**  ALL RIGHT.

19       WHAT'S YOUR BACKGROUND IN ECONOMETRICS?

20   **A.**  WELL, I SPECIALIZED IN ECONOMETRICS AS ONE OF MY

21   SPECIALTIES WHEN I WAS A GRADUATE STUDENT.  OVER TIME, I HAVE

22   APPLIED -- PROBABLY USED IN MOST OF THE PAPERS I'VE WRITTEN.

23   AND IT ALSO APPLIES IN SOME OF MY OTHER PROFESSIONAL

24   ACTIVITIES WHERE MY JOB HAS BEEN OVER MANY YEARS TO EVALUATE

25   THE ECONOMETRIC WORK AND ESTIMATES AND REGRESSIONS, IF YOU

1   LIKE, OF OTHER ECONOMISTS WHO SUBMIT PAPERS TO JOURNALS.

2   **Q.**  WE PUT TOGETHER A FEW SLIDES TO SHOW YOUR BACKGROUND.

3          **MR. ISAACSON:**  621, MATT.

4          (DEMONSTRATIVE DISPLAYED TO JURY.)

5   **BY MR. ISAACSON:**

6   **Q.**  TAKE US THROUGH THIS BRIEFLY.

7   **A.**  WELL, THERE'S MY TITLE.

8          THE BROWN FAMILY WOULD LIKE ME TO SAY THAT I'M THE ISIDORE

9   BROWN AND GLADYS J. BROWN DISTINGUISHED SERVICE PROFESSOR OF

10  ECONOMICS, AND I HAVE BEEN THERE FOR ABOUT 35 YEARS WITH THE

11  EXCEPTION OF ONE YEAR WHEN I WENT TO U.C.L.A.

12         I'VE TAUGHT THE COURSES YOU SEE LISTED THERE.  MANY OF

13  THEM HAVE ISSUES ADDRESSED IN THEM THAT ARE RELEVANT TO THIS

14  CASE.

15         I HAVE FOR A LONG TIME BEEN ASSOCIATED WITH THE NATIONAL

16  BUREAU OF ECONOMIC RESEARCH, WHICH IS AN ORGANIZATION WITHIN

17  WHICH MANY, MANY ECONOMISTS FROM ACROSS THE COUNTRY AND AROUND

18  THE WORLD, FRANKLY, HAVE AFFILIATIONS.  AND I HAVE BEEN A

19  RESEARCH ASSOCIATE THERE, WHICH IS THE MOST SENIOR POSITION

20  WITHIN THE ORGANIZATION, FOR PROBABLY THE LAST 30 YEARS, I

21  THINK.

22         FOR SEVERAL YEARS NOW, SINCE THE MID 2000'S, I HAVE BEEN

23  THE DIRECTOR AT THE UNIVERSITY OF CHICAGO OF THE GEORGE J.

24  STIGLER CENTER FOR THE STUDY OF THE ECONOMY AND THE STATE.

25  THAT'S A RESEARCH CENTER THAT SUPPORTS, BRINGS TO THE

1    UNIVERSITY, PROMOTES RESEARCH ON MARKETS, PRICES, OFTEN LAW

2    AND ECONOMICS.

3        GEORGE STIGLER WAS A FAMOUS ECONOMIST AT THE UNIVERSITY

4    WHO HAPPENED TO WIN THE NOBEL PRIZE FOR HIS WORK ON REGULATION

5    AND INDUSTRIAL ORGANIZATION.

6    **Q.**  LET'S GO TO THE NEXT SLIDE 622.

7            (DEMONSTRATIVE DISPLAYED TO JURY.)

8        THIS IS A SUMMARY OF AWARDS AND HONORS YOU'VE RECEIVED IN

9    YOUR ECONOMICS CAREER?

10   **A.**  YES.  THOSE ARE SOME OF THEM.  THERE THEY ARE.  I DON'T

11   REALLY FEEL LIKE GOING OVER EACH ONE.

12   **Q.**  ALL RIGHT.  WELL, MAYBE LET'S GO TO 623.

13           (DEMONSTRATIVE DISPLAYED TO JURY.)

14       WHAT ARE YOUR AFFILIATIONS HERE AND YOUR EDUCATION?

15   **A.**  WELL, MY EDUCATION IS AT THE BOTTOM OF THIS PAGE.  I WAS

16   AN UNDERGRADUATE.  I GREW UP HERE IN CALIFORNIA.  I WENT TO UC

17   SANTA BARBARA AS AN UNDERGRADUATE.  AFTER THAT I GOT MY PH.D.

18   AT U.C.L.A. IN 1979, SOMEWHERE BACK THERE.  AND FROM THERE I

19   WENT TO THE UNIVERSITY OF CHICAGO IN 1979.

20       THEN THE OTHER AFFILIATIONS ARE JUST SOME OF THE OTHER

21   AFFILIATIONS THAT I HAVE CURRENTLY OR I HAVE HAD IN VARIOUS

22   YEARS.  AND IT'S A SUBSET.  I HAVE ALSO BEEN AT THE BOARD OF

23   GOVERNORS OF THE FEDERAL RESERVE.  I'VE DONE WORK FOR THE

24   NATIONAL SCIENCE FOUNDATION, AND SO ON.

25   **Q.**  ALL RIGHT.

1        AND THEN THE NEXT SLIDE, 624.

2                    (DEMONSTRATIVE DISPLAYED TO JURY.)

3        WOULD YOU EXPLAIN WHAT THESE EDITORIAL POSITIONS ARE?

4   **A.**   SURE.

5        I'VE BEEN IN SEVERAL INSTANCES OVER MY CAREER, MORE OR

6   LESS CONTINUOUSLY OVER MY CAREER UNTIL THE EARLY 2000'S I

7   EDITED JOURNALS IN ECONOMICS.

8        THE FIRST TWO LISTED THERE, *THE JOURNAL OF POLITICAL*

9   *ECONOMY* AND *THE AMERICAN ECONOMIC REVIEW* ARE TWO OF THE

10  PROMINENT JOURNALS IN THE FIELD OF ECONOMICS.

11       I STARTED EDITING AT *THE JOURNAL OF LABOR ECONOMICS* BACK

12  IN 1982.  I DID THAT FOR TEN YEARS.  I DID *THE AMERICAN*

13  *ECONOMIC REVIEW FOR* A COUPLE OF YEARS.  AND THEN FOR 11 YEARS,

14  I THINK IT IS, I WAS AT *THE JOURNAL OF POLITICAL ECONOMY*.

15       AND MY JOB WAS TO EVALUATE RESEARCH THAT WAS SUBMITTED TO

16  THE JOURNAL, AND DECIDE WHETHER IT SHOULD BE PUBLISHED IN THE

17  JOURNAL.

18  **Q.**   HOW MUCH -- HOW MANY OF THE SUBMISSIONS GET PUBLISHED?

19  **A.**   AT *THE JOURNAL OF POLITICAL ECONOMY*, WELL LESS THAN

20  10 PERCENT IN THE YEARS THAT I WAS THERE.

21       SO WE HAD TO EVALUATE THEM -- THE JOB WAS YOU LOOKED AT

22  THE PAPER, YOU READ IT OVER, YOU SENT IT OUT TO OTHER

23  PROFESSIONAL ECONOMISTS AND ASKED FOR THEIR EVALUATIONS.  THEY

24  SENT LETTERS BACK DESCRIBING WHAT THEY THOUGHT OF THE PAPER,

25  AND THEN THE ULTIMATE DECISION WOULD BE MINE.  I WOULD DECIDE

1    WHETHER WE ARE GOING TO PUBLISH IT OR WE'RE NOT GOING TO

2    PUBLISH IT.  SOMETIMES I HAD TO OVERRULE THE REFEREES,

3    SOMETIMES I DIDN'T.  MORE OFTEN THAN NOT I DIDN'T.

4    **Q.**  AND WAS PART OF WHAT YOU WERE REFEREEING WERE YOU

5    EVALUATING REGRESSIONS TO SEE WHETHER THEY SHOULD BE

6    PUBLISHED?

7    **A.**  YES.  PROBABLY IN THE MAJORITY OF THE PAPERS THAT CAME MY

8    WAY OUT OF ALL OF THE SUBMISSIONS, I WOULD GET ABOUT A HUNDRED

9    PAPERS A YEAR.  AND MOST OF THEM WOULD HAVE REGRESSIONS OF

10   SOME SORT THAT WERE SEEKING TO TEST SOME HYPOTHESIS.  SO THAT

11   WAS BASICALLY MY JOB FOR A LONG TIME.

12   **Q.**  WHAT ABOUT YOUR OWN PUBLICATIONS; CAN YOU TELL US ABOUT

13   THAT?

14   **A.**  WELL, I'VE BEEN WRITING ARTICLES SINCE BACK IN THE 1970'S.

15   I GUESS MOST OF THEM PROBABLY HAVE REGRESSIONS IN THEM.

16        THIS IS BOTH IN PROFESSIONAL JOURNALS AND IN BOOKS.  AND

17   MY CLASSES ALSO HAVE THAT KIND OF THING IN THERE.  SO, IT'S --

18   IT'S A MAJOR PART OF WHAT I DO.

19   **Q.**  ALL RIGHT.

20        **MR. ISAACSON:**  YOUR HONOR, WE WOULD OFFER PROFESSOR

21   TOPEL AS AN EXPERT IN ECONOMICS, INCLUDING INDUSTRIAL

22   ORGANIZATION, ANTITRUST ECONOMICS, AND ECONOMETRICS.

23        **MS. SWEENEY:**  NO OBJECTION, YOUR HONOR.

24        **THE COURT:**  HE IS ADMITTED FOR SUCH.

25        **MR. ISAACSON:**  ALL RIGHT.

1    **BY MR. ISAACSON:**

2    **Q.**   LET'S SUMMARIZE WHAT YOU ARE GOING TO TALK ABOUT TODAY.

3         SLIDE 625.

4                   (DEMONSTRATIVE DISPLAYED TO JURY.)

5         CAN YOU TOUCH ON THESE POINTS THAT WE ARE GOING TO BE

6    GOING OVER TODAY?

7    **A.**   SURE.

8         LET ME JUST READ THEM, AND THEN I WILL GIVE A REAL BRIEF

9    DESCRIPTION OF EACH ONE, WHAT EACH ONE MEANS.

10        THE FIRST ONE IS SIMPLY AN OVERALL, AN OVERARCHING POINT,

11   AND THAT IS THAT DR. NOLL'S CLAIM THAT HE ESTIMATED AN

12   OVERCHARGE THAT WAS CAUSED BY WHAT WE ARE CALLING HERE THE

13   INTEGRITY CHECK FEATURES OF ITUNES 7 IS JUST DEMONSTRABLY

14   WRONG.

15   **Q.**   THE INTEGRITY CHECK, WE ARE ALSO CALLING IT KVC AND DVC;

16   YOU RECOGNIZE ALL THOSE TERMS?

17   **A.**   I RECOGNIZE THEM ALL.  WE CAN CALL THEM JOE AND SALLY IF

18   WE WANT.  IT'S NOT MATERIAL TO WHAT I'M DOING.

19   **Q.**   OKAY.  PLEASE CONTINUE.

20   **A.**   NOW, THE BELOW THAT IS ONE OF THE ISSUES, IS ANOTHER

21   OVERARCHING POINT.  IT SAYS THAT DR. NOLL'S REGRESSION MODEL

22   OF IPOD PRICES CONTAINS SOME PRETTY SERIOUS ERRORS.

23        AND THE ERRORS ARE IN THREE IMPORTANT AREAS.  ONE IS THAT

24   HIS -- HIS ITUNES 7 INDICATOR VARIABLE CONFLATES THE EFFECTS

25   OF THE ALLEGED ILLEGAL CONDUCT WITH ALL THE OTHER THINGS THAT

1    ARE IN ITUNES 7, ALL THE OTHER FEATURES THAT WERE IN --

2    WERE -- WERE ADDED TO ITUNES 7.  THAT WAS A MAJOR UPDATE, AS I

3    UNDERSTAND THINGS.

4        SO THERE'S NO WAY TO IDENTIFY FROM THE ANALYSIS THAT HE

5    DID OR THE DATA THAT WE HAVE ANY SEPARATE IMPACT OF THE

6    INTEGRITY CHECK, THE KVC, THE DVC, WHATEVER YOU WANT TO CALL

7    IT, FROM THE OTHER FEATURES IN ITUNES 7.  THAT'S JUST AN

8    ECONOMETRIC FACT.

9        THE SECOND ERROR, AND I DON'T KNOW IF I HAVE THESE IN THE

10   SAME ORDER LATER ON, IS THAT HE CLAIMS TO DO A

11   BEFORE-AND-AFTER ANALYSIS, WHICH MEANS THAT HIS CONCEPTUAL

12   EXPERIMENT, IT'S ALMOST LIKE A LABORATORY EXPERIMENT THAT HE'S

13   TRYING TO REPRODUCE -- HIS CONCEPTUAL EXPERIMENT IS TO SAY,

14   WELL, WHEN THE KVC AND THE DVC CAME IN, PRICES WERE AT SOME

15   LEVEL, AND IF THEY WERE ELEVATED, THEY WOULD BE ELEVATED TO

16   WHAT THEY -- RELATIVE TO WHAT THEY WERE BEFORE.

17       AND SO THERE'S BEFORE AND THERE'S AFTER, IF THEY ACTUALLY

18   DID GO UP, AND YOU'RE (SIC) KIND OF SUBTRACT ONE FROM THE

19   OTHER.  SO IT'S THE INCREMENTAL EFFECT OF HAVING THE INTEGRITY

20   CHECK SOFTWARE IN ITUNE 7 THAT'S THE ISSUE.

21       HE MISCHARACTERIZES WHAT THE BEFORE IS.  HE DOESN'T

22   ACTUALLY USE THE BEFORE.  HE USES SOMETHING ELSE.  AND THAT

23   CAUSES HIM TO VASTLY OVERSTATE EVEN THE IMPACT OF ITUNES 7 AND

24   ALL OF THE THINGS THAT ARE CONFLATED WITH IT, THAT'S GOING TO

25   BE OVERSTATED.

1    **Q.**  THE --

2    **A.**  THERE'S ONE OTHER POINT, AND THAT IS --

3    **Q.**  YES.

4    **A.**  -- AS YOU'VE HEARD SOME OF THIS IN KEVIN'S TESTIMONY,

5    THERE ARE A NUMBER OF OMITTED VARIABLES -- OMITTED FEATURES OF

6    ITUNES OR OF IPODS THAT DID NOT APPEAR IN HIS ANALYSIS, AND

7    THEY HAVE A VERY IMPORTANT EFFECT ON HIS INFERENCES.

8    **Q.**  LET ME TAKE A MOMENT TO TALK ABOUT THE WORK YOU DID IN

9    PREPARATION FOR WHAT'S ABOUT TO FOLLOW.

10       YOU DID SEVERAL REPORTS, LONG REPORTS IN THIS CASE; IS

11   THAT RIGHT?

12   **A.**  I DON'T KNOW HOW MANY THERE WERE, BUT LET'S CALL IT

13   SEVERAL.

14   **Q.**  YES.  AND THEN PROFESSOR MURPHY DID REPORTS AND DR. NOLL

15   DID REPORTS?

16   **A.**  YES.

17   **Q.**  ALL RIGHT.  AND WHEN -- AS PART OF YOUR WORK, YOU REVIEWED

18   THOSE REPORTS?

19   **A.**  YES.

20   **Q.**  ALL RIGHT.

21       AND THEN AS PART OF YOUR REPORT, YOU ATTACHED A SCHEDULE,

22   AN APPENDIX OF EVERYTHING YOU HAD REVIEWED OR CONSIDERED FOR

23   YOUR REPORT, RIGHT?

24   **A.**  THAT'S MY RECOLLECTION, YES.

25   **Q.**  DO YOU HAVE -- HAVE WE GIVEN YOU A COPY OF YOUR REPORTS?

1   **A.**   I ACTUALLY HAVE KEVIN'S MATERIALS UP HERE IN FRONT OF ME.

2         **MR. ISAACSON:**   LET ME GET YOURS.   YOU SHOULD HAVE

3   YOURS.   LET ME GET KEVIN'S.

4         **THE WITNESS:**   IS THIS --

5         **MR. ISAACSON:**   THIS IS KEVIN-RELATED.   IT'S NOT YOU.

6   LET'S CLEAN OFF YOUR DESK.

7              (BINDER HANDED TO WITNESS.)

8   **BY MR. ISAACSON:**

9   **Q.**   APPENDIX B.   JUST TAKE YOUR FIRST REPORT.

10  **A.**   OKAY.

11  **Q.**   ARE YOU ABLE TO FIND THAT?   THAT IS TOWARDS THE END.

12  APPENDIX B, LIST OF MATERIALS RELIED UPON?

13  **A.**   I SEE IT.

14  **Q.**   ALL RIGHT.

15     I KNOW WE ARE NOT GOING TO SHOW ALL THIS TO THE JURY, BUT

16  MAYBE WHAT I WILL DO IS WAVE AROUND, WHILE YOU LOOK AT IT, HOW

17  MANY PAGES IT IS OF MATERIALS.

18     AND IT INCLUDED MANY DEPOSITIONS, RIGHT?   THERE WERE

19  DEPOSITIONS IN THIS CASE?

20  **A.**   YES.

21  **Q.**   OKAY.   AND YOU HAD THE CHANCE TO REVIEW DEPOSITIONS OF

22  BOTH THE EXPERT WITNESSES AND THE APPLE WITNESSES, RIGHT?

23  **A.**   YES.

24  **Q.**   AND THEN PAGES AND PAGES OF APPLE DOCUMENTS, RIGHT?

25  **A.**   NOW WE ARE DOWN TO THE BATES NUMBERED DOCUMENTS?

TOPEL – DIRECT / ISAACSON

1    **Q.**  YES.

2    **A.**  NO, NO, DON'T ASK ME WHAT ONE OF THOSE IS.

3    **Q.**  RIGHT.  YOU CAN'T TELL BY THE NUMBERING, BUT YOU REVIEWED

4    LIKE A WHOLE LOT OF APPLE DOCUMENTS.

5    **A.**  YEP.

6    **Q.**  AND YOU SAW THAT -- WHEN YOU SAW PROFESSOR MURPHY'S

7    REPORT, YOU SAW HE HAD DONE THE SAME THING; HE REVIEWED

8    DEPOSITIONS OF APPLE FOLKS, HE REVIEWED APPLE DOCUMENTS, BOTH

9    OF YOU DID ALL THAT WORK, RIGHT?

10    **A.**  YES.

11    **Q.**  ALL RIGHT.  LET'S GO TO YOUR CONCLUSION -- LET'S GO TO THE

12    DETAILS OF YOUR CONCLUSIONS.

13        LET'S START WITH --

14                    (SIMULTANEOUS COLLOQUY.)

15    **A.**  ARE WE STILL ON THE SAME SLIDE?

16    **Q.**  NO, I THINK WE ARE THROUGH THAT.

17        LET ME SHOW YOU 626.

18                (DEMONSTRATIVE DISPLAYED TO JURY.)

19    **A.**  OKAY.

20    **Q.**  ALL RIGHT.  LET'S TALK ABOUT THE FIRST ONE OF YOUR

21    CONCLUSIONS.

22        WOULD YOU TELL ME WHAT POINT YOU ARE MAKING HERE?

23    **A.**  SURE.

24        THE TITLE HERE IS:

25            "IS IT TRUE THAT THE INTEGRITY CHECK FEATURE OF

1          ITUNES 7 QUOTE 'ENABLED APPLE TO CHARGE HIGHER PRICES

2          FOR IPODS?'"  CLOSE QUOTE.

3      THAT IS A QUOTE FROM ONE OF DR. NOLL'S REPORTS THAT

4  INDICATES, YES, IT ENABLED APPLE TO CHARGE HIGHER PRICES FOR

5  IPODS.

6      NOW, ACCORDING TO DR. NOLL, LOCK-IN -- HIS LOCK-IN THEORY

7  WHICH, IF YOU WILL RECALL, MEANS THAT PEOPLE HAVE ALL THIS

8  MUSIC THAT IS NOT PORTABLE TO SOME OTHER SYSTEM THAT THEY

9  ALLEGEDLY ACCUMULATED SOMEWHERE ELSE, IT DOESN'T MEAN THAT --

10 IN HIS THEORY, AS HE PHRASED IT, APPLE -- IT DOESN'T MEAN THAT

11 APPLE NECESSARILY CHARGED HIGHER PRICES FOR IPODS.  THEY COULD

12 HAVE GONE UP.  THEY COULD HAVE GONE DOWN, STAYED THE SAME, BUT

13 HE PHRASES IT AS THIS IS AN EMPIRICAL QUESTION; THAT THE ISSUE

14 OF IMPACT IS AN EMPIRICAL QUESTION.  DO YOU FIND THAT THERE

15 WAS IMPACT VIA SOME COEFFICIENT ON WHAT HE CALLS HIS ITUNES 7

16 INDICATOR.

17     SO HE CLAIMS TO ANSWER THAT WITH THIS BEFORE AND AFTER

18 MINI REGRESSION MODEL WHERE HE'S COMPARING ALLEGEDLY PRICES

19 AFTER TO PRICES BEFORE THE ADVENT OF THE KVC AND THE DVC.

20 **Q.**  ALL RIGHT.

21     AND LET'S TALK ABOUT THAT EMPIRICAL EVIDENCE OR

22 INFORMATION.

23     627.

24          (DEMONSTRATIVE DISPLAYED TO JURY.)

25 WHAT DOES THIS ILLUSTRATE?

1    **A.**  WELL, THIS ILLUSTRATES THAT PRICES FOR IPODS WERE ACTUALLY

2    FALLING OVER THIS PERIOD.  AND THEY WERE FALLING IN A COUPLE

3    OF RELEVANT SENSES.

4        ONE, THEY WERE FALLING, AS YOU SEE HERE, BY -- LET'S LOOK

5    AT THE TRANSITION FROM SEPTEMBER 2005 TO SEPTEMBER 2006 WHERE

6    THE CONFIGURATION OF THE NANO CHANGES SOMEWHAT.  AND FOR FOUR

7    GIGABYTES OF CAPACITY OR MEMORY, THE PRICE WAS CUT FROM $249

8    TO $199.  SO THAT'S ABOUT WHAT, A -- 25 PERCENT REDUCTION IN

9    PRICE.

10       SO -- AND THEN SUBSEQUENTLY IN 2007, AGAIN FOR FOUR

11   GIGABYTES, THE PRICE FELL BY ANOTHER $50.

12       SO THE PRICE IS GOING DOWN OVER TIME FOR THE SAME AMOUNT

13   OF MEMORY.  SO, THE FIRST FACT IS PRICES ARE FALLING.

14       SECOND FACT THERE IS -- AND THIS IS GOING TO COME UP --

15                  (SIMULTANEOUS COLLOQUY.)

16   **Q.**  BY "MEMORY", YOU MEAN THE FOUR GIGABYTES, THE 4G --

17   **A.**  FOUR GIGABYTES WAS HELD CONSTANT HERE, BUT, YOU KNOW,

18   OTHER FEATURES WERE NOT HELD CONSTANT.

19       THE -- THE CONFIGURE -- THE SIZE AND FEATURES OF THE NANO

20   WERE IMPROVING OVER TIME.  AND THAT COMES TO ANOTHER POINT

21   THAT ECONOMISTS OFTEN EMPHASIZE, AND THAT IS THAT EVEN IF

22   PRICES WERE HELD CONSTANT, WHEN FEATURES ARE GETTING MORE AND

23   MORE -- GREATER AND GREATER AND GREATER, THAT MEANS THAT THE

24   REAL PRICE PER UNIT OF THE QUALITY OF THE PRODUCT IS GOING

25   DOWN OVER TIME.  THAT'S LARGELY PART OF THE POINT OF THE

1    SO-CALLED HEDONIC-TYPE OF REGRESSION THAT PROFESSOR NOLL

2    OFFERS.

3        NOW, OVER THIS TIME, THIS IS JUST ONE EXAMPLE.

4    **Q.**  I WILL SHOW YOU SOME OTHER EXAMPLES.

5    **A.**  OKAY.

6    **Q.**  LET ME MAKE -- SEE IF I HAVE THIS RIGHT.

7        IN SEPTEMBER 2006, THE SAME MONTH AS 7.0, APPLE CUT THE

8    PRICES OF THE NANO BY 25 PERCENT AND INCREASED THE QUALITY?

9    **A.**  YES.

10   **Q.**  ALL RIGHT.

11   **A.**  I THINK IT'S 20 PERCENT.

12   **Q.**  20 PERCENT?  SORRY.  YOU ARE BETTER AT THIS MATH THAN I

13   AM.

14       ALL RIGHT.  LET ME SHOW YOU SOME OTHER DEVICES.

15       629.

16            (DEMONSTRATIVE DISPLAYED TO JURY.)

17   **A.**  THIS IS THE NANO AGAIN.  AND ALTHOUGH IT'S CHANGED COLORS

18   HERE, YOU WILL NOTICE IT IS THE SAME CONFIGURATION, THE SAME

19   GENERATION OF NANO AS ON THE LAST SLIDE.

20       AND THE -- OR IT'S THE SAME CONFIGURATION, LET ME PUT IT

21   THAT WAY.

22       IN SEPTEMBER 2006, FOR EIGHT GIGABYTES OF CAPACITY, NOW,

23   REMEMBER, THAT WAS $199 FOR A FOUR-GIGABYTE CAPACITY ON THE

24   PREVIOUS SLIDE, THIS IS EIGHT, THAT'S WHY IT STARTS -- IT'S

25   GOT A HIGHER NUMBER AT 249.

1    THEN IN 2007, WHEN –– IN SEPTEMBER 2007, AND THAT WOULD BE

2    ABOUT THE TIME THE KVC –– THE DVC COMES OUT, YOU WILL NOTICE

3    THE SAME AMOUNT OF CAPACITY.  THE PRICE IS CUT BY $50 AGAIN,

4    FROM 249 TO 199.

5        AND IN ADDITION TO THE SAME AMOUNT OF CAPACITY, NOW YOU

6    GET A LARGER SCREEN, HIGHER RESOLUTION, ENHANCED VIDEO USER

7    INTERFACE, IT SUPPORTS VIDEO, SO IT'S GETTING MORE FEATURES,

8    LOWER PRICE, SAME CAPACITY.  THAT'S THE POINT.

9    Q.  ALL RIGHT.

10   A.  SO REAL PRICES, KIND OF QUALITY ADJUSTED PRICES, AND,

11   AGAIN, THAT'S THE POINT OF A HEDONIC REGRESSION, REAL PRICES

12   ARE FALLING.

13   Q.  LET'S TALK ABOUT THE CLASSIC.  THAT WAS THE NANO.  LET'S

14   TALK ABOUT THE CLASSIC.

15       628.

16           (DEMONSTRATIVE DISPLAYED TO JURY.)

17   A.  YES.  THIS SHOWS A SIMILAR PATTERN, A SIMILAR SEQUENCE OF

18   EVENTS FOR THE CLASSIC.

19       FOR THE SAME –– SAME –– ACTUALLY INCREASING AMOUNT OF

20   MEMORY, BETWEEN 2005 AND 2006, THE PRICE WENT FROM 399 TO 349,

21   A 50-DOLLAR REDUCTION, AND YOU GOT MORE STORAGE.  YOU GOT 60

22   GIGABYTES BEFORE, IT WENT UP BY 20 TO 80.

23       AND THEN IN SEPTEMBER 2007, FOR THE SAME SIZE, 80

24   GIGABYTES, IT WENT TO 249.  AND THEN FOR THE SAME 249, IN

25   SEPTEMBER 2008, THEN YOU GOT 120 GIGABYTES OF STORAGE.

TOPEL – DIRECT / ISAACSON

1      SO, AGAIN, IT'S THAT QUALITY ADJUSTED PRICE IS FALLING

2   OVER TIME THAT IT REFLECTS THE IMPROVED QUALITY AND FEATURES

3   OF THE PRODUCT.

4   **Q.**  AGAIN, FOR THE IPOD CLASSIC FIFTH GENERATION, ON

5   SEPTEMBER 2006, THE MONTH OF 7.0, PRICES FELL AND QUALITY

6   INCREASED; IS THAT RIGHT?

7   **A.**  MEASURING HERE QUALITY BY CAPACITY, YES.

8   **Q.**  ALL RIGHT.  SLIDE 630.

9           (DEMONSTRATIVE DISPLAYED TO JURY.)

10      THIS IS, AGAIN, THE CLASSIC.  WOULD YOU EXPLAIN THIS?

11  **A.**  THIS IS THE MOVE FROM SEPTEMBER 2006 TO 2007 AND JUST

12  SHOWING YOU THAT FOR THIS -- WHEN WE JUST THINK ABOUT

13  HOLDING -- FINDING A PRODUCT WHERE A PRICE WAS HELD CONSTANT

14  OR A PAIR OF PRODUCTS THAT BOTH SOLD FOR $249, THE 249 PRODUCT

15  IN SEPTEMBER OF 2006 HAD 30 GIGABYTES OF CAPACITY, BUT THE

16  249 -- $249 CLASSIC IN 2007 HAD 80.  SO IT'S MORE THAN

17  DOUBLED.

18      AND ALSO YOU'VE GOT LONGER BATTERY LIFE WAS AN ADDITIONAL

19  FEATURE THAT WENT ALONG WITH THAT IPOD.

20  **Q.**  LET'S TALK ABOUT OTHER EMPIRICAL EVIDENCE.

21      SLIDE 631.

22          (DEMONSTRATIVE DISPLAYED TO JURY.)

23      WOULD YOU TAKE -- WOULD YOU TRY AND EXPLAIN REGRESSION

24  ANALYSIS TO US?

25  **A.**  SURE.

1    A REGRESSION IS A STATISTICAL TOOL THAT TRIES TO RELATE AN

2    OUTCOME VARIABLE.  WE OFTEN CALL IT Y, BUT HERE IT'S THE

3    LOGARITHM OF THE PRICE CHARGED FOR A PARTICULAR IPOD, TO A

4    GROUP OF OTHER VARIABLES THAT ARE MEANT TO BE -- THOUGHT TO BE

5    ASSOCIATED WITH THAT PRICE.

6    IN THE CONTEXT OF THE WAY PROFESSOR NOLL IS USING IT, IT

7    IS ESSENTIALLY COMPARING AVERAGES.  IT IS SAYING WHAT WAS THE

8    AVERAGE PRICE AFTER?  WHAT WAS THE AVERAGE PRICE BEFORE?  WHAT

9    WAS THE INCREMENT, IF THERE WAS AN INCREMENT, BETWEEN BEFORE

10   AND AFTER.

11   SO, I GIVE YOU SOME EXAMPLES HERE OF THE COMPARING

12   AVERAGES KIND OF WAY OF THINKING ABOUT IT, WHICH IS, DO MEN

13   TEND TO BE TALLER THAN WOMEN?  WELL, WE WOULD COULD GET A --

14   DRAW A SAMPLE OF WOMEN AND A SAMPLE OF MEN AND MEASURE THEIR

15   HEIGHTS.

16   IF WE DREW A RANDOM SAMPLE OF THE POPULATION, IF I HAVE MY

17   NUMBERS RIGHT, MEN ON AVERAGE IN THE UNITED STATES ARE ABOUT

18   5'9.  WOMEN ON AVERAGE IN THE UNITED STATES ARE ABOUT 5'4.

19   YOU WOULD GET A 5-INCH DIFFERENCE.  NOW, YOU BETTER MAKE SURE

20   YOU DIDN'T DRAW A SAMPLE OF FEMALE BASKETBALL PLAYERS OR

21   SOMETHING LIKE THAT BECAUSE THEN YOU ARE GOING TO GET A BIASED

22   ESTIMATE OF WHAT THE TRUE POPULATION DIFFERENCE IS.

23   ANOTHER ONE, FOR THOSE OF YOU WHO FOLLOW BASEBALL OR

24   FOOTBALL, THE INTRODUCTION OF VIDEO APPEALS WHERE THE GUY'S

25   CALLED OUT AND THE MANAGER RUNS OUT AND SAYS, NO, I DON'T

1    THINK HE WAS OUT.  I APPEAL THAT.  THEN THEY GO UPSTAIRS, AND

2    ALL THE GUYS LOOK AT THE VIDEO AND EVERYTHING.  DID THAT LEAD

3    TO LONGER BASEBALL GAMES?

4        YOU CAN DO A BEFORE AND AFTER ANALYSIS IF YOU ASSUME THAT

5    THE ONLY THING THAT IS RELEVANT THAT CHANGED WAS THE VIDEO

6    APPEALS, YOU CAN DO A BEFORE AND AFTER ANALYSIS.  YOU CAN

7    MEASURE THE AVERAGE LENGTH OF BASEBALL GAMES AFTER COMPARED TO

8    THE AVERAGE LENGTH OF BASEBALL GAMES BEFORE, TAKE THE

9    DIFFERENCE AND SAY THAT'S AT LEAST A POINT ESTIMATE.  WE

10   HAVEN'T SAID ANYTHING ABOUT THE PRECISION OF THAT ESTIMATE OF

11   WHAT THE DIFFERENCE MIGHT BE.

12   **Q.**  ALL RIGHT.  AND WE'LL LOOK AT A LITTLE BIT OF MATH HERE.

13   632.

14               (DEMONSTRATIVE DISPLAYED TO JURY.)

15       THE POINT HERE IS FOR YOU TO EXPLAIN HOW A REGRESSION

16   WORKS IN LAY TERMS.

17   **A.**  IN LAY TERMS.  OKAY.

18       THIS IS AN EQUATION THAT WAS WRITTEN IN A VERY SIMILAR

19   FORM BY DR. NOLL WHERE HE SAID, OKAY, I'VE GOT THIS VARIABLE

20   "Y".  WE HAVE A WHOLE BUNCH OF OTHER FACTORS THAT ARE

21   ASSOCIATED WITH "Y".  THOSE ARE THE "X'S" ON THE RIGHT-HAND

22   SIDE OF THE EQUAL SIGN.  AND OUR HYPOTHESIS HERE IS THAT THEY

23   ARE RELATED TO EACH OTHER IN THIS LINEAR WAY.

24       THE "B'S" THERE ARE CALLED COEFFICIENTS.  AND THEY ARE --

25   THEY REPRESENT, WELL, WHEN "X1" GOES UP BY ONE UNIT AND ALL

1  THE OTHER THINGS ARE HELD CONSTANT, THEN THE -- THE MODEL SAYS

2  THAT "Y" WILL GO UP BY "B1" UNITS BECAUSE IT'S THE ONLY --

3  BECAUSE "X1" BY HYPOTHESIS IS THE ONLY THING THAT CHANGES.

4      AND THE GOAL OF THE REGRESSION ANALYSIS IS TO, TO BE

5  HONEST, IS TO JUST ESTIMATE THOSE THINGS.  HOW BIG ARE THE

6  "B'S"?  WHAT ARE THEIR NUMERICAL VALUES FROM SOME SET OF DATA

7  THAT ONE HAS.

8  **Q.**  CAN YOU RELATE THAT TO THE BASEBALL GAME AND VIDEO

9  APPEALS?

10  **A.**  SURE.  THAT WOULD BE A VERY SIMPLE REGRESSION.

11      SO, IF I DID THE BASEBALL GAMES, I WOULD ONLY HAVE, FOR

12  THE WAY I DESCRIBED IT, EVERYTHING ELSE IN THE WORLD REMAINED

13  THE SAME, THEN "X1" WOULD JUST BE AN INDICATOR THAT TAKES THE

14  VALUE 1, THAT DUMMY VARIABLE, BECAUSE, AGAIN, IT ONLY KNOWS 0

15  AND 1.

16      IT WOULD TAKE THE VALUE 1 FOR THE PERIOD WHERE THERE WERE

17  VIDEO APPEALS, AND WHAT "B1" -- AND THEN Y WOULD BE THE LENGTH

18  OF A BASEBALL GAME.  IF YOU APPLIED THAT TO DATA ON, YOU KNOW,

19  A COUPLE SEASONS BEFORE AND A COUPLE SEASONS AFTER, THE

20  COEFFICIENT "B1" WOULD MEASURE THE DIFFERENCE IN THE AVERAGE

21  LENGTH OF A BASEBALL GAME FROM THE BEFORE PERIOD TO THE AFTER

22  PERIOD.  THAT'S THE WAY IT WOULD WORK.

23  **Q.**  IF YOU WERE DOING THAT, WHAT OTHER VARIABLES MIGHT YOU

24  LOOK AT TO SEE IF THE VIDEO APPEALS WERE CAUSING THE DELAY?

25  **A.**  WELL, I HYPOTHESIZED WHEN I STATED THAT EVERYTHING ELSE

1    WAS THE SAME, BUT, YOU KNOW, MAYBE EVERYTHING ELSE ISN'T THE

2    SAME.  SO MAYBE THEY WENT DOWN TO THE UMPIRES AND SAID, LOOK,

3    WE ARE PUTTING IN THIS VIDEO APPEALS THING, AND WE WANT THE

4    PURE EFFECT OF VIDEO APPEALS.  BUT THEN THEY WENT TO THE

5    UMPIRES AND SAID YOU'LL HAVE TO HURRY UP SOME OTHER STUFF SO

6    DON'T LET THE MANAGER TALK TO THE UMPIRES AS LONG, LET'S NOT

7    HAVE GUYS STANDING OUTSIDE THE BATTER'S BOX FOR A LONG TIME

8    BECAUSE FANS ARE GOING TO GET ANNOYED.

9        WELL, THOSE WOULD, IN SOME SENSE, BE IN THE OTHER "X'S".

10   IF YOU LEFT THAT OUT, YOU WOULD MISS OUT ON THE PURE EFFECT OF

11   CHANGING THE VIDEO GAME -- THE VIDEO APPEALS RULE.

12   **Q.**  WHAT IF YOUR TELEVISION CONTRACT CALLED FOR MORE

13   COMMERCIALS OR YOU WERE PLAYING BASEBALL IN CALIFORNIA AND YOU

14   FINALLY HAD A WHOLE LOT OF RAIN?

15   **A.**  ALL KIND OF THINGS COULD AFFECT THIS.  SO IT COULD BE THE

16   LOCAL WEATHER THAT MADE THINGS LONGER.  IT DEPENDS ON HOW

17   THOSE THINGS ARE DISTRIBUTED.

18       SO, IF YOU HAD MEASURES OF THOSE THINGS, YOU SHOULD PUT

19   THEM IN.  ANYTHING THAT YOU THINK THAT YOU COULD MEASURE,

20   SHOULD GO IN THIS REGRESSION.

21   **Q.**  WHAT IS "OMITTED FACTORS" REFER TO THERE?

22   **A.**  YEAH.  THE -- THAT'S AN IMPORTANT THING.

23       BECAUSE IF YOU REMEMBER THE WAY DR. NOLL WROTE THIS, HE

24   WROTE THE "X'S" TIMES THE "B'S", AND THEN HE WROTE ABOUT THIS

25   FACTOR EPSILON THAT HE CALLED THE ERROR.  SOME PEOPLE WOULD

1    CALL IT THE RESIDUAL.

2         IN MOST CASES, WE THINK OF IT AS OTHER FACTORS THAT WOULD

3    ALSO AFFECT THE OUTCOME "Y", SAY THE LENGTH OF BASEBALL GAMES,

4    BUT THERE ARE THINGS THAT WE DON'T HAVE IN OUR DATA OR WE

5    CAN'T MEASURE.  AND WE KNOW THEY ARE OUT THERE, SO -- AND SO

6    WE NEVER HAVE A COMPLETE MODEL, IF YOU WILL, BECAUSE WE DON'T

7    HAVE THOSE OTHER "X'S" OR SOMETIMES YOU WILL CALL THEM "Z".

8    THEY ARE ALL WRAPPED UP IN THE ERROR TERM.

9         THE EPSILON, AS HE CALLED IT, HAS TO HAVE SOME IMPORTANT

10   PROPERTIES.  ONE OF THEM IS THAT THE OMITTED FACTORS HAVE TO

11   BE INDEPENDENT OF THE INCLUDED FACTORS.  SO THAT THE EPSILON

12   IS INDEPENDENT OR, WE WOULD SAY, ORTHOGONAL --

13                **THE REPORTER:**  I'M SORRY.

14                **THE WITNESS:**  I AM SORRY, I HAVE MY EYES GOING IN TWO

15   DIRECTIONS.

16        REMEMBER THAT THE OMITTED FACTORS IS THAT EPSILON.  AND

17   ONE OF THE ASSUMPTIONS OF THE STANDARD LINEAR MODEL IS THAT

18   THOSE EPSILONS HAVE TO BE ORTHOGONAL TO, WHICH IS, IN LAY

19   TERMS, WE'LL CALL IT, UNCORRELATED WITH THE "X'S" THAT ARE IN

20   THERE.

21        SO IF THERE ARE FACTORS LEFT OUT, THOSE NEED TO BE

22   UNCORRELATED WITH THE FACTORS THAT ARE LEFT IN.  OTHERWISE

23   YOUR ESTIMATES OF THE "B1", "B2", "BK" ARE GOING TO BE, AT

24   LEAST SOME OF THEM, ARE GOING TO BE WHAT WE WILL CALL BIASED.

25   THAT IS, THEY DON'T ESTIMATE THE TRUE VALUE OF THAT PARAMETER

1   THAT WE ARE LOOKING FOR.

2   **BY MR. ISAACSON:**

3   **Q.**  ALL RIGHT.  SO YOU DISCUSSED OMITTED FACTORS AS A

4   POTENTIAL MISTAKE IN A REGRESSION.  WHAT OTHER IMPORTANT

5   MISTAKES CAN HAPPEN IN A REGRESSION?

6   **A.**  WELL, THERE ARE SEVERAL.

7       YOU CAN -- YOUR MODEL CAN JUST BE BADLY SPECIFIED SO THAT

8   THE MEASURES YOU CONSTRUCT DON'T REPRESENT THE HYPOTHESIS YOU

9   ARE TRYING TO TEST.

10  **Q.**  WHAT DO YOU MEAN BY "BADLY" -- WHAT DO YOU MEAN BY

11  "SPECIFIED"?

12  **A.**  WHAT YOU SEE BEFORE YOU HERE IS WHAT WE WOULD CALL A

13  SPECIFICATION.  IT SPECIFIES THE RELATIONSHIP BETWEEN THE

14  OUTCOME VARIABLE "Y" AND WE'LL CALL THEM THE INDEPENDENT

15  VARIABLES THE "X'S".

16      NOW, EACH ONE OF THOSE "X'S" HAS TO BE -- IS SOME MEASURE

17  OF SOMETHING.  AND IF YOU SPECIFIED THAT THING WRONG, THEN

18  YOU'RE NOT GOING TO GET USEFUL OUTPUT FROM YOUR REGRESSION.

19      SO, IT'S THE OLD STORY YOU MIGHT HAVE HEARD, GARBAGE IN,

20  GARBAGE OUT.  IF YOU DO IT -- IF YOU DON'T SET IT UP RIGHT,

21  YOU ARE NOT GOING TO GET A USEFUL ANSWER OUT OF THE DATA YOU

22  ARE APPLYING THIS TOOL -- TO WHICH YOU ARE APPLYING THIS TOOL.

23  **Q.**  SO, IN YOUR OPINION IN THIS CASE, DID DR. NOLL'S

24  REGRESSION RELIABLY MEASURE THE IMPACT OF THE ALLEGED EFFECT

25  OF DISABLING HARMONY ON IPOD PRICES BY 7.0?

TOPEL – DIRECT / ISAACSON

1    **A.**   ABSOLUTELY NOT.

2    **Q.**   CAN WE LOOK AT 633.

3                    (DEMONSTRATIVE DISPLAYED TO JURY.)

4    **A.**   YES.

5    **Q.**   ALL RIGHT.

6         YOU SUMMARIZED SOME ERRORS HERE.  WOULD YOU JUST TOUCH ON

7    THESE AND THEN WE WILL GO THROUGH THEM?

8    **A.**   SURE.

9         THE FIRST ONE HERE IS THAT DR. NOLL CONFLATES THE

10   CHALLENGED CONDUCT WITH THE MANY OTHER FEATURES OF ITUNES 7,

11   SO THAT -- I THINK AS YOU'VE HEARD BEFORE, THERE ARE OTHER

12   FEATURES IN ITUNE 7 THAT COULD EFFECT THE WAY PEOPLE VALUE AN

13   IPOD.

14        AND IF THOSE VALUATIONS SHOW UP IN THE WAY IPODS ARE

15   PRICED, THERE IS NO WAY THAT HE CAN DISENTANGLE THE EFFECT --

16   THE ALLEGED EFFECT OF THE KVC THAT CAME IN WITH -- KVC THAT

17   CAME IN WITH ITUNES 7 FROM THE EFFECTS OF THOSE OTHER FACTORS.

18        SO YOU'VE HEARD ABOUT REVERSE SYNCING, YOU'VE HEARD ABOUT

19   IMPROVED RESOLUTION, YOU'VE HEARD ABOUT CHANGES IN BATTERY

20   LIFE, AND SO ON.

21   **Q.**   THE SECOND POINT, THE OMITTED VARIABLES.

22   **A.**   YEAH.  IN FACT, I THINK I MENTIONED ONE OF MY OMITTED

23   VARIABLES THERE THAT WAS NOT ACTUALLY A FEATURE OF ITUNES 7,

24   IT WAS A FEATURE OF IPODS.

25        THERE ARE IMPORTANT FEATURES OF IPODS THAT WERE IN

1    DR. NOLL'S DATA SET THAT WERE CONSIDERED BY THE PRICING

2    COMMITTEE AND THAT HE CHOSE TO OMIT FROM HIS ANALYSIS.

3        THOSE WERE IN THAT THING THAT I CALLED THE OMITTED FACTORS

4    THAT I TOLD YOU HAD TO BE UNCORRELATED WITH THE STUFF THAT WAS

5    LEFT IN IN ORDER TO HAVE A USEFUL ANALYSIS.  AND IT TURNS OUT

6    THAT THOSE THINGS THAT ARE LEFT OUT ARE NOT UNCORRELATED.

7    THEY ARE NOT ORTHOGONAL TO THE THINGS THAT WERE LEFT IN IN THE

8    ANALYSIS.  THAT HAS AN VERY IMPORTANT IMPACT ON HIS RESULTS.

9    IT CAUSES HIM TO OVER ESTIMATE EVEN WITH HIS -- WITHIN THIS

10   CONTEXT OF HIS CONFLATED VALUE OF -- ESTIMATE OF THE EFFECTIVE

11   ITUNES 7, IT INCLUDES ALL THESE THINGS, CAUSED HIM TO OVER

12   ESTIMATE EVEN THAT IMPACT.

13   **Q.**  ALL RIGHT.  LET'S TALK ABOUT THE FIRST ONE OF THESE.

14       IF WE CAN TURN TO THE NEXT SLIDE, WHICH I BELIEVE IS 636.

15            (DEMONSTRATIVE DISPLAYED TO JURY.)

16   WOULD YOU EXPLAIN THIS SLIDE FOR THE JURY AND HOW IT

17   RELATES TO YOUR ANALYSIS?

18   **A.**  SURE.

19       THESE ARE THE -- MY UNDERSTANDING IS THAT ITUNES 7 IS WHAT

20   SOME PEOPLE HERE HAVE CALLED A MAJOR UPDATE TO ITUNES, AND IT

21   HAD A NUMBER OF FEATURES IN IT, ONE OF WHICH WAS THE KVC.

22       AND SO WHAT YOU SEE HERE IS ALL THE OTHER THINGS THAT YOU

23   CAN THINK OF AS FLOWING INTO THE VALUE OF ITUNES 7 AND,

24   THEREFORE, FEEDING ONTO THE VALUE THAT PEOPLE MIGHT PUT ON

25   THEIR IPODS.

1      SO, THE VIDEO IS DELIVERED IN FOUR TIMES HIGHER

2  RESOLUTION.  THE SOFTWARE SUPPORTED THAT WHEN IT WENT TO

3  ITUNES 7.  HAS THE COVER FLOW.  ONE THAT'S PARTICULARLY --

4  MAKES ME PARTICULARLY FEEL GOOD IS THE TRANSFERS CONTENT TO

5  THE COMPUTER.  BECAUSE I -- I LOST A MARK NOT FOR A CONCERT

6  (PHONETIC) ONE TIME ON MY HARD DRIVE, AND I WAS LUCKY ENOUGH

7  TO FIND IT ON MY IPOD AND I GOT IT BACK.  SO IT WORKED GREAT

8  FOR THAT.  AND THAT WAS WORTH --

9  **Q.**  OTHERS OF US --

10  **A.**  -- A HUNDRED BUCKS.

11  **Q.**  OTHERS OF US PROBABLY WOULD PREFER "PIRATES OF THE

12  CARIBBEAN".

13  **A.**  THAT WOULD HAVE BEEN IN VIDEOS AND YOU CAN SEE FULL-LENGTH

14  MOVIE DOWNLOADS, AND THINGS LIKE THAT.

15  **Q.**  LET ME ASK YOU, IN THE MIDDLE, ITUNES 7.0, IS THAT THE

16  DUMMY VARIABLE?

17  **A.**  THAT IS THE DUMMY VARIABLE.

18      SO ITUNES 7.0 IS THE THING THAT TURNS ON.  IT'S 1 WHEN

19  ITUNES 7.0 EXISTS AND IT CAN BE APPLIED TO A PARTICULAR MODEL

20  OF IPOD, AND IT IS 0 OTHERWISE.

21  **Q.**  LET ME SIDETRACK YOU ON ONE OTHER THING.

22      DOWN AT THE BOTTOM ON IPOD DATABASE KEYBAG, IT SAYS

23  "KEYBAG AND DATABASE INTEGRITY CHECK".

24      NOW, THERE'S TESTIMONY IN THIS CASE THAT THE DATABASE

25  INTEGRITY CHECK WAS IN 7.0 BUT WAS NOT ACTIVATED UNTIL A YEAR

TOPEL – DIRECT / ISAACSON

1   LATER IN 7.4.

2       DID DR. NOLL'S REGRESSION ISOLATE ANY EFFECT OF 7.4 AND

3   THE ACTIVATION OF THE DATABASE INTEGRITY CHECK?

4   **A.**  NO.

5           **MS. SWEENEY:**  OBJECTION, OUTSIDE THE SCOPE.

6           **THE COURT:**  OUTSIDE THE SCOPE OF HIS REPORT?

7           **MS. SWEENEY:**  YES.

8           **THE COURT:**  WHAT PARAGRAPH OF HIS REPORT?

9           **MR. ISAACSON:**  I WON'T DELAY.  I WILL WITHDRAW THE

10  QUESTION.

11          **THE COURT:**  THE ANSWER IS STRICKEN, LADIES AND

12  GENTLEMEN.

13  **BY MR. ISAACSON:**

14  **Q.**  ALL RIGHT.  SO RETURNING TO THE SLIDE.

15  **A.**  SURE.

16  **Q.**  THE --

17          **MR. ISAACSON:**  SO, MATT, COULD YOU --

18              (SLIDE MANIPULATED)

19  **BY MR. ISAACSON:**

20  **Q.**  EXPLAIN WHAT THAT JUST ILLUSTRATED.

21          **MR. ISAACSON:**  MATT, DO IT AGAIN.

22              (SLIDE MANIPULATED)

23          **THE WITNESS:**  ALL OF IT -- IN THE INTERPRETATION

24  OFFERED BY DR. NOLL, THE EFFECTS OF ALL THOSE OTHER FEATURES

25  ARE LOADED ON TO THE -- HIS INTERPRETATION OF THE KEYBAG --

1    THE KVC FEATURE OF ITUNES 7.

2        SO ANY EFFECT THAT THOSE THINGS HAD GETS LOADED INTO

3    THERE.  SO, YOU KNOW, IMAGINE THAT THE -- JUST ASSUME WITH ME

4    THAT THE KVC HAD ZERO IMPACT ABOUT THE REVERSE SYNC THAT WAS

5    VALUABLE TO FOLKS LIKE ME RAISED THE VALUE OF IPODS IN

6    WILLINGNESS TO PAY FOR IPODS AND -- AND AFFECTED THE PRICE AT

7    SOME AMOUNT.

8        WELL, YOU'D FIND A POSITIVE IMPACT OF ITUNES 7 IN THE

9    SCENARIO I JUST DESCRIBED.  AND IT'S NOT DUE TO KVC THAT BY

10   ASSUMPTION, IT IS DUE TO SOMETHING ELSE.  OR IT COULD BE A

11   COMBINATION OF THE THINGS IN THERE.

12       SO, EVEN IF IT WAS 0, YOU CAN FIND A POSITIVE EFFECT.  IN

13   FACT, EVEN IF IT WAS NEGATIVE, YOU CAN FIND A POSITIVE EFFECT.

14       THERE'S NO WAY TO IDENTIFY FROM THE DATA THAT WE HAVE WHAT

15   THE INDEPENDENT EFFECT OF EACH ONE OF THOSE FEATURES ARE

16   BECAUSE THEY ALL HAPPEN AT EXACTLY THE SAME TIME.

17   **Q.**  ALL RIGHT.

18   **A.**  THERE IS NO WAY TO TELL THEM APART.  THEY ALL HAPPEN AT

19   EXACTLY THE SAME TIME.

20           **MR. ISAACSON:**  MATT, TAKE IT OUT AGAIN.

21                   (SLIDE MANIPULATED)

22   **BY MR. ISAACSON:**

23   **Q.**  LOOKING AT THE KEYBAG AND DATABASE INTEGRITY CHECK, WHAT

24   DID DR. NOLL DO TO ISOLATE THE EFFECTS OF 7 POINT -- THOSE

25   FEATURES OF 7.0 FROM THE OTHER FEATURES OF 7.0 IN HIS

1    ANALYSIS?

2    **A.**   NOTHING AS FAR AS I CAN TELL.

3    **Q.**   ALL RIGHT.

4    **A.**   LET ME PUT IT ANOTHER WAY.  IT CAN'T BE DONE.  SO DOING

5    NOTHING IS LIKE KIND OF WHAT YOU'RE LEFT WITH.

6    **Q.**   EXPLAIN THAT.  WAS THERE A WAY THAT DR. NOLL COULD HAVE

7    SPECIFIED HIS MODEL TO ACCOUNT FOR THESE OTHER FEATURES OF

8    7.0?

9    **A.**   NO.  BECAUSE THESE WERE IMPORTANT ADDITIONAL FEATURES THAT

10   WENT ALONG WITH 7.0.  THEY EXISTED FOR THE ENTIRE PERIOD AFTER

11   7.0, JUST AS 7.0 DID.  SO THEY ARE CONFLATED TOGETHER AND THEY

12   CAN'T BE DISENTANGLED BY THE DATA THAT WE HAVE.

13        IT'S -- IT'S JUST A FACTOR OF THE DATA.  THE DATA NEED

14   INDEPENDENT VARIATION IN THESE FEATURES.  SO THEY HAVE TO HAVE

15   THEM OCCURRING AT DIFFERENT TIMES OR ON DIFFERENT MODELS,

16   WHATEVER, HAVE TO HAVE INDEPENDENT VARIATION IN THESE

17   FEATURES.  AND SO LONG AS IT IS SPECIFIED SO THAT IT'S JUST AN

18   ITUNE 7 INDICATOR, YOU HAVEN'T DISENTANGLED ANY OF THOSE

19   THINGS.

20   **Q.**   ALL RIGHT.  THE TERM "COLINEAR" AND "COLINEARITY" HAS BEEN

21   USED, CAN YOU GIVE US A SIMPLE ILLUSTRATION OF THAT THAT

22   RELATES TO YOUR ANALYSIS HERE?

23   **A.**   I WILL USE THESE EXAMPLES.

24        IF I CREATED INDICATORS FOR EACH ONE OF THESE THINGS THAT

25   TURNED ON WHEN ITUNES WOULD SUPPORT SAY THE TRANSFERS CONTENT

TOPEL – DIRECT / ISAACSON

1  BACK TO THE COMPUTER, THE SO-CALLED REVERSE SYNC.  THAT WOULD

2  TURN ON AT EXACTLY THE SAME TIME ITUNES 7 TURNS ON.

3      IF I CREATED ANOTHER INDICATOR VARIABLE, ANOTHER DUMMY

4  VARIABLE FOR FULL-LENGTH MOVIE DOWNLOADS AVAILABLE, THAT WOULD

5  TURN ON ON THE SAME DATE AS THE SYNC AND THE SAME DATE AS THE

6  KVC AND THE SAME DATE AS THE VIDEO, SO THEY WOULD ALL HAVE THE

7  SAME -- IN THE DATA, THEY WOULD ALL LOOK EXACTLY THE SAME.

8  THEY ARE A SEQUENCE OF ZEROS AND THEY ARE A SEQUENCE OF ONES

9  AFTER SEPTEMBER 12TH, 2006.

10      SO, THOSE THINGS ARE PERFECTLY COLINEAR IN THE FOLLOWING

11  SIMPLE SENSE.  YOU'VE SEE ONE, YOU'VE SEEN THEM ALL.  ONCE YOU

12  KNOW ONE OF THEM, YOU KNOW WHAT ALL THE OTHER ONES DO, WHICH

13  MEANS YOU HAVE NO INDEPENDENT VARIATION IN THOSE -- IN THOSE

14  VARIABLES THAT WOULD ENABLE YOU TO ESTIMATE THEIR INDEPENDENT

15  EFFECTS.

16          **MR. ISAACSON:**  YOUR HONOR, I HAVE LOCATED MY

17  CITATION.  IF YOU COULD LOOK AT PARAGRAPH 54 OF HIS REPORT,

18  THE LAST SENTENCE.

19          **THE COURT:**  WHY DON'T YOU GO AHEAD AND ASK THE

20  QUESTION.  I DON'T REMEMBER THE PRECISE QUESTION YOU ASKED,

21  BUT I NOW HAVE THIS IN FRONT OF ME.

22          **THE WITNESS:**  I ALWAYS MAKE THE MISTAKE --

23          **MR. ISAACSON:**  YOU DON'T NEED TO LOOK AT IT, DOCTOR.

24  I JUST NEED TO ASK YOU A QUESTION.

25          **THE WITNESS:**  OKAY.

TOPEL – DIRECT / ISAACSON

1    **BY MR. ISAACSON:**

2    **Q.**  DID DR. NOLL'S REGRESSION MAKE ANY ATTEMPT TO MEASURE THE

3    IMPACT OF THE INTRODUCTION OF THE DVC?

4    **A.**  WELL, I THINK HE WOULD CLAIM THAT HE MADE AN ATTEMPT TO

5    FIND IT, BUT HE COULDN'T BECAUSE IT'S PERFECTLY COLINEAR WITH

6    ALL THESE OTHER THINGS THAT WE JUST TALKED ABOUT.

7    **Q.**  WOULD YOU EXPLAIN THAT ANSWER?

8    **A.**  YES.

9        BECAUSE EVERYTHING GETS LOADED INTO THIS ONE VARIABLE

10   ITUNE 7 THAT TAKES THE VALUE 1 AFTER ITUNES 7 WAS INTRODUCED.

11   AND SO THAT ITUNE 7 VARIABLE MUST CONTAIN ALL OF THE EFFECTS.

12       WHEN YOU HAVE A VARIABLE THAT'S A SET OF VARIABLES THAT

13   ARE PERFECTLY COLINEAR WITH EACH OTHER, THE MODEL IS ABLE TO

14   ESTIMATE THE SUM OF THEIR EFFECTS, BUT NOT THEIR INDIVIDUAL

15   EFFECTS.  AND THAT'S THE PROBLEM THAT WE HAVE.

16   **Q.**  ALL RIGHT.

17       LET'S GO TO THE SECOND ERROR, OMISSION OF PRODUCT

18   CHARACTERISTICS.

19       SLIDE 637.

20            (DEMONSTRATIVE DISPLAYED TO JURY.)

21   **A.**  SURE.

22   **Q.**  WOULD YOU EXPLAIN YOUR CONCLUSION HERE?

23   **A.**  I'M TELLING YOU HERE JUST AN ECONOMETRIC FACT, THAT WHEN

24   SOME VARIABLE "Z" -- THESE ARE THE THINGS THAT WERE IN THE

25   BRACKETED OMITTED VARIABLES THING THAT I SHOWED YOU A FEW

TOPEL - DIRECT / ISAACSON

1   SLIDES AGO -- IS OMITTED FROM A REGRESSION, THE INCLUDED

2   VARIABLE IS "X".  THOSE ARE THINGS, THE "X1", "X2", AND SO ON,

3   INCLUDING HERE THE ONE OF INTEREST TO US HERE, IS THE

4   INDICATOR FOR ITUNES 7.  THE INCLUDED VARIABLES "X" THAT ARE

5   CORRELATED WITH "Z" WILL PICK UP THE EFFECT OF "Z".  OKAY?

6       SO IT'S LEFT OUT AND -- BUT IT'S REALLY CORRELATED WITH

7   THE STUFF THAT'S LEFT IN.  SO INEVITABLY THE EFFECTS OF THE

8   THINGS THAT ARE LEFT OUT GET LOADED ONTO -- GET PICKED UP BY

9   THE THINGS THAT ARE LEFT IN.

10  **Q.**  CAN YOU GIVE US --

11  **A.**  THAT'S CALLED -- SOMETIMES IT IS CALLED SPECIFICATION

12  BIAS.  SOMETIMES IT'S CALLED HERE, AS I CALL IT, OMITTED

13  VARIABLES BIAS.

14  **Q.**  CAN YOU GIVE US AN ILLUSTRATION OF THAT PRINCIPLE?

15  **A.**  WELL, SURE.  LET'S DO IT WITHIN THE CONTEXT OF THIS CASE.

16  WE COULD --

17  **Q.**  GIVE US AN EXAMPLE OUTSIDE THIS CASE.

18  **A.**  SURE.

19      I WILL GIVE YOU AN EXAMPLE THAT DOES THIS IN -- IT WILL

20  BOTH HAVE THE PERFECT COLINEARITY THING AND THE OMITTED

21  VARIABLES BIAS.

22      SUPPOSE WE HAVE AN ITALIAN RESTAURANT.  AND WE'RE -- THE

23  ITALIAN RESTAURANT CHANGES ITS MENU.  AND IT CHANGES IN THE

24  FOLLOWING WAY.  IT CHANGES THE PRINT ON THE MENU.  MAKES IT

25  EASIER TO READ.  THEY WANT TO KNOW WHETHER THE PRINT ON THE

1    MENU AFFECTS SALES.

2        SO THEY DO A BEFORE-AND-AFTER ANALYSIS OF WHEN THE PRINT

3    ON THE MENU CHANGED, AND THEY FIND THAT AVERAGE WEEKLY SALES

4    AFTER THE PRINT ON THE MENU WAS EASIER TO READ CHANGED WAS --

5    THE SALES WENT UP BY 2 PERCENT.  THEY SAY, AH, THAT'S THE

6    EFFECT OF THE PRINT ON THE MENU.

7        THEN SOMEBODY SAYS, NO, NO, WE HAD A MAJOR UPGRADE OF THE

8    MENU.  SO WE DIDN'T JUST CHANGE THE PRINT ON MENU, WE CHANGED

9    WHAT'S ON THE MENU.  SO WE GOT BETTER LINGUINI AND BETTER

10   FETTUCCINI AND GOT -- ALSO WE HIRED A BETTER CHEF.  ALL THOSE

11   THINGS ARE CONFLATED WITH CALLING IT THE PRINT.  IF YOU CALL

12   IT THE PRINT, YOU COULD HAVE CALLED IT THE LINGUINI, YOU COULD

13   HAVE CALLED IT THE QUALITY OF THE FOOD, WHATEVER.

14       THOSE ARE -- THOSE THINGS THAT ARE PERFECT COLINEAR,

15   THAT'S THE PREVIOUS SLIDE WHERE WE WERE TALKING ABOUT THE

16   OTHER FEATURES OF ITUNES 7.

17       NOW, REMEMBER WE ARE DOING A BEFORE-AND-AFTER ANALYSIS

18   HERE.  SO THERE COULD BE OTHER VARIABLES.  SO, FOR EXAMPLE,

19   THE RESTAURANT GOT A POSITIVE RESTAURANT REVIEW IN THE LOCAL

20   NEWSPAPER THREE MONTHS AFTER THEY MADE THIS CHANGE.

21       NOW, THAT, THAT EVENT ONLY OCCURS IN THE PERIOD AFTER THE

22   CHANGE.  SO IT'S CORRELATED WITH THE VARIABLE THAT SAYS "AFTER

23   THE MENU CHANGE".

24       SO IF YOU DON'T HAVE IT IN THE ANALYSIS AND IT REALLY

25   AFFECTS SALES, THEN THE AFTER-THE-MENU-CHANGE VARIABLE IS

1    GOING TO PICK UP THE EFFECT OF THE POSITIVE REVIEW BECAUSE

2    SALES ARE HIGHER NOT BECAUSE SOME OF THE INCREASE IN SALES IS

3    HIGHER, NOT BECAUSE OF THE MENU CHANGE, BUT BECAUSE OF

4    SOMETHING THAT WAS CORRELATED WITH THE MENU CHANGE THAT WAS

5    LEFT OUT.  AND THAT'S THE INCREASE IN SALES FROM THE POSITIVE

6    RESTAURANT REVIEW THAT OCCURRED WITHIN THE PERIOD AFTER THE

7    MENU CHANGED.  THAT'S OMITTED VARIABLES BIAS.

8    **Q.**  LET'S TALK ABOUT THE OMITTED VARIABLES IN THIS CASE.

9        639.

10                   (DEMONSTRATIVE DISPLAYED TO JURY.)

11       WOULD YOU DISCUSS THIS WITHIN THIS -- THE CONTEXT OF THE

12   OMITTED VARIABLES?

13   **A.**  YEAH.  THE -- AS YOU SEE THE TITLE UP HERE, "IT'S NANO

14   DISPLAY SIZE".

15       SO ON THE FIRST GENERATION NANO BACK THERE, IT WAS ONE AND

16   A HALF INCHES.  IN THE SECOND ONE, IT WAS ONE AND A HALF

17   INCHES, BUT THEN IT GREW.  IT ALSO GREW IN RESOLUTION TO

18   2 INCHES.  AND THE PRODUCT GOT SMALLER, AND SO ON.  BUT THE

19   LAST TWO HAVE 2-INCH SCREENS.

20       SO WHAT THIS TELLS YOU, THIS IS ACTUALLY AN IMPORTANT

21   SLIDE.  BECAUSE, YOU KNOW, DR. NOLL WOULD SAY, WELL, I'VE GOT

22   THESE PRODUCT INDICATORS IN THERE.

23       WELL, THE PRODUCT INDICATORS ARE JUST -- THEY ARE THE SAME

24   FOR ALL OF THIS.  IT IS 1 IF YOU ARE A NANO.  ALL RIGHT?  BUT

25   WHAT HAPPENS, AND THIS HAPPENS OVER AND OVER AND OVER AGAIN,

1    IS THAT THIS VARIATION THAT YOU SEE HERE IN THE DISPLAY SIZE

2    IS WITHIN THE NANO.  AND THE -- THE EFFECT -- JUST THE NANO

3    INDICATOR, WHICH IS, AGAIN, A DUMMY VARIABLE FOR BEING A NANO,

4    CAN'T PICK IT UP BECAUSE IT DOESN'T CHANGE THIS -- THIS --

5    THIS DISPLAY SIZE CHANGES WITHIN THE NANO PRODUCT LINE WITHIN

6    THAT FAMILY OF PRODUCTS.  SO THIS -- THIS VARIATION IS, IN

7    THAT SENSE, IGNORED.

8    **Q.**  AND YOU'VE SAID DUMMY VARIABLE 1 OR 0 A COUPLE OF TIMES.

9        IN THIS CASE, THAT WOULD JUST MEAN SO IF YOU HAD A DUMMY

10   VARIABLE FOR IPOD NANO, IT WOULD BE 1 IF IT'S -- IF THERE IS

11   AN IPOD NANO, AND IT WOULD BE 0 IF THERE'S NOT ONE; IS THAT

12   RIGHT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  IT JUST TELLS YOU IF THERE'S A NANO OR NOT.

15   **A.**  (NODS).

16   **Q.**  THAT 1 OR 0 DOESN'T TELL YOU ANYTHING ABOUT THE QUALITIES

17   OF THE NANO; IS THAT FAIR?

18   **A.**  ANYTHING THAT'S A FIXED QUALITY OF THE NANO --

19   **Q.**  RIGHT.

20   **A.**  -- IS ABSORBED INTO THE NANO THING.  THE -- THE NANO 0 1

21   DUMMY.  ANYTHING THAT CHANGES ABOUT A NANO, IS NOT PICKED UP

22   BY THAT 0 1 DUMMY.

23   **Q.**  ALL RIGHT.  THANK YOU.

24       640.

25                 (DEMONSTRATIVE DISPLAYED TO JURY.)

1    WOULD YOU EXPLAIN HOW THIS RELATES TO YOUR ANALYSIS?

2    **A.**  SURE.  I THINK THIS IS ACTUALLY BUILT OFF OF ONE OF THE

3    DEMONSTRATIVES THAT DR. NOLL OFFERED.

4        SO THESE ARE THE REGRESSION VARIABLES.  THE CLASS HERE IS

5    THE CLASSES -- CLASSIC MINI, NANO, SHUFFLE, TOUCH.  THOSE ARE

6    THE PRODUCT FAMILIES THAT WE HAD -- PRODUCT CLASSES, I GUESS,

7    THAT WE HAD FAMILIES OF SLIGHTLY MORE DISAGGREGATED LEVEL.

8        SO, THE THINGS THAT YOU SEE HERE ARE THE ATTRIBUTES OF

9    IPODS THAT WERE CONSIDERED BY DR. NOLL.  SO THE NUMBER OF

10   SONGS AVAILABLE ON ITUNES.  HE HAD THAT IN THERE AS AN

11   EXPLANATORY VARIABLE.

12       WHETHER THE THING HAD PHOTO AND VIDEO CAPACITY.  HE HAD

13   THAT IN THERE.

14       HE HAD THE SIZE OF THE IPOD.

15       HE HAD WHETHER IT WAS A YOUTUBE SPECIAL EDITION WITH

16   BONO'S SIGNATURE SCRATCHED ON THE BACK AND MEMORY CAPACITY OF

17   THE LITTLE HARD DRIVE -- OR SOMETIMES A FLASH DRIVE THAT'S

18   INSIDE THE -- THE -- THE IPOD.

19   **Q.**  SO WHAT ABOUT FEATURES THAT WERE OMITTED -- OR ATTRIBUTES

20   THAT WERE OMITTED?

21   **A.**  WELL, THERE WERE A NUMBER OF FEATURES THAT ARE IN

22   DR. NOLL'S DATA SET, AND HE CHOSE NOT TO PUT IN.  SOME OF

23   THOSE HERE WE'VE INDICATED -- THESE ARE THE ONES WE'VE

24   INDICATED.  THESE ARE ALSO THINGS THAT IN EACH CASE WERE

25   CONSIDERED BY THE PRICING COMMITTEE.

1    SO THE SIZE OF THE SCREEN WAS CONSIDERED BY THE PRICING

2    COMMITTEE, THE RESOLUTION OF THE SCREEN WAS CONSIDERED BY THE

3    PRICING COMMITTEE, THE BATTERY LIFE WAS CONSIDERED, AND

4    RECHARGE TIME.

5    NOW, I SHOULD POINT OUT THAT RECHARGE TIME WAS NOT IN

6    PROFESSOR NOLL'S DATA SET.  WE WENT ON AND COLLECTED THAT

7    INFORMATION OURSELVES.  AND WHETHER THE TYPE OF CONNECTOR,

8    WHETHER IT HAD A FIREWIRE OR A USB CONNECTOR.

9    EARLY ON, IPODS HAD FIREWIRE CONNECTORS.  THOSE PROVED TO

10   BE MUCH LESS POPULAR, ESPECIALLY WHEN THEY MOVED OVER TO BEING

11   COMPATIBLE WITH THE WINDOWS PLATFORM.  SO USB CONNECTIONS

12   PROVED TO BE MUCH MORE POPULAR.

13   **Q.** YOU MENTIONED THE PRICING COMMITTEE AND FEATURES REVIEWED

14   BY THEM.  CAN WE LOOK AT EXAMPLE TX2493 AT PAGE 6?

15                     (EXHIBIT DISPLAYED TO JURY.)

16   I JUST WANTED AN ILLUSTRATION FOR YOU.  THIS IS ONE OF THE

17   PRICING COMMITTEE DOCUMENTS.

18   WOULD YOU TELL -- TELL US HOW THIS RELATES TO YOUR

19   ANALYSIS?

20   **A.** WELL, NOTICE IT SAYS "N25 COMPETITION".  SO THERE, THE

21   N25, IF I RECALL MY NUMBERS CORRECTLY, IS A -- THAT'S A

22   CLASSIC.

23   AND IT'S OFFERING TWO CAPACITIES HERE, 249, 349, AND SO

24   ON.

25   WHAT PLAYBACK SUPPORT DOES IT HAVE?  MUSIC, PHOTO, VIDEO.

1       IT'S GOT A -- THE SCREEN RESOLUTION THERE IS 320 PIXELS BY

2    240, SO THAT'S THE SIZE OF THE SCREEN.  THOSE THINGS WERE

3    CHANGING OVER TIME WITHIN THIS PRODUCT CATEGORY.

4       HOW LONG THE BATTERY COULD PLAY MUSIC?  WHAT WEIGHT WAS

5    IT?  WHAT SIZE WAS IT?  AND WHAT STUFF IT COULD SORT OF DO, IF

6    YOU -- IF YOU UNDERSTAND.

7       SO THOSE THINGS WERE ALL CONSIDERED BY THE PRICING

8    COMMITTEE.  THEY ALSO CONSIDERED WHETHER THE RIVALS HAD THAT

9    KIND OF STUFF.

10      THEN YOU WILL SEE BELOW, THE N45, SO ON.  THIS IS THE FORM

11   IN WHICH THESE THINGS COME UP.

12      AND THEN IN OTHER PRICING DOCUMENTS, THEY'LL SAY, WELL, WE

13   HAVE OPTION ONE, WE CAN PRICE IT THIS WAY.  WE HAVE OPTION

14   TWO, WE CAN PRICE IT THIS WAY.  WHAT DO YOU THINK?  THEN I

15   THINK IT IS UP TO THE PRICING COMMITTEE TO MAKE THAT DECISION.

16   **Q.**  SO WHAT IS THE -- CAN WE GO BACK TO THE PREVIOUS SLIDE

17   WITH THE RED ITEMS.

18                (DEMONSTRATIVE DISPLAYED TO JURY.)

19      SO WHAT'S THE RESULT OF OMITTING THE VARIABLES FOR BATTERY

20   LIFE, SCREEN SIZE, RESOLUTION, WEIGHT, RECHARGE TIME, AND THE

21   CONNECTIVITY?

22   **A.**  WELL, REMEMBER WHAT -- NOW, DR. NOLL DESCRIBED HIS HEDONIC

23   REGRESSION.  HE TOLD YOU THAT HEDONIC REFERS TO HEDONISM.

24   HE'S TALKING ABOUT ALL OF THE THINGS THAT GIVE YOU PLEASURE.

25      WELL, THESE ARE THINGS THAT IN THE VIEW OF THE PRICING

1    COMMITTEE AFFECTED THE VALUE OF IPODS TO CONSUMERS.  SO,

2    RECHARGE TIME, IF IT DIDN'T TAKE YOU LONG TO RECHARGE, OR

3    BATTERY LIFE, IF IT LASTED A LONG TIME, THAT MAKES AN IPOD

4    MORE VALUABLE.  THOSE ARE AMONG THE THINGS THAT GIVE JOY TO,

5    AS HE PHRASED IT, TO CONSUMERS.  AND THEY ARE AVAILABLE.

6        SO IN A PROPERLY SPECIFIED HEDONIC MODEL, THEY SHOULD BE

7    IN THE MODEL.

8    **Q.**  ALL RIGHT.

9        NOW, DR. NOLL HAS SAID HE DID NOT INCLUDE AT LEAST SOME OF

10   THESE VARIABLES BECAUSE OF THE MULTICOLINEARITY ISSUE.  WHAT

11   DID YOU SAY IN YOUR REPORTS ABOUT THAT?

12   **A.**  WE SAID, NO, THE MULTICOLINEARITY -- EVERYTHING YOU NEED

13   TO KNOW ABOUT MULTICOLINEARITY IN THIS MODEL IS SUMMARIZED IN

14   WHAT ECONOMISTS WOULD CALL, FORGIVE ME, THE

15   VARIANCE/COVARIANCE MATRIX OF THE ESTIMATOR.  SO IT TELLS YOU

16   THE PRECISION FOR WHICH THINGS ARE ESTIMATED.

17       AND THE REAL QUESTION COMES DOWN TO ARE -- DO THESE

18   VARIABLES, WHICH WE THINK AFFECT THE VALUE OF IPODS, GIVE JOY

19   TO CONSUMERS IN THIS HEDONIC SENSE, DO THESE THINGS WHEN ADDED

20   TO THE MODEL, SUBSTANTIALLY IMPROVE THE MODELS FIT?  DOES IT

21   SUBSTANTIALLY REDUCE THE UNEXPLAINED VARIANCE IN THE PRICE

22   VARIABLES.

23       AND THE ANSWER IS UNQUESTIONABLY YES.  THERE'S A FORMAL

24   TEST FOR THAT.  AND IN THIS CONTEXT, IT'S CALLED AN F TEST.

25   IT SAYS, DO THE DATA SUPPORT THE IDEA THAT THESE THINGS SHOULD

1    BE EXCLUDED.

2        AND THE -- THE -- THE ANSWER IS, NO, WITH A SUPREME LEVEL

3    OF CONFIDENCE, SUPREME LEVEL OF CONFIDENCE, ESPECIALLY THE WAY

4    DR. NOLL MEASURES HIS PRECISION.

5        SO, IN FACT, THESE VARIABLES, WHEN ADDED TO HIS MODEL, ARE

6    JUST AS STATISTICALLY SIGNIFICANT AS THE FEATURES THAT HE DOES

7    PUT INTO HIS MODEL.

8    **Q.**  ALL RIGHT.

9    **A.**  SO THEY'VE GOT JUST AS MUCH EXPLANATORY POWER AS THOSE

10   THINGS DO.

11   **Q.**  LET'S BREAK THAT DOWN.

12       YOU DID A TEST OF THIS MULTICOLINEARITY ISSUE, AND WHAT

13   WAS THE NAME OF THAT TEST?

14   **A.**  THE TEST WAS FOR EXCLUSION OF THESE THINGS FROM THE

15   REGRESSION.

16   **Q.**  RIGHT.

17   **A.**  IF MULTICOLINEARITY WAS A SERIOUS ISSUE, THE MOST

18   IMPORTANT THING WOULD HAPPEN, IF IT WAS MULTICOLINEAR WITH

19   REGARD TO THE ITUNES 7 VARIABLE, THEN DR. NOLL'S PRECISION IN

20   ESTIMATING THE ITUNES 7 INDICATOR WOULD HAVE SUBSTANTIALLY

21   DETERIORATED.  AND THE FACT IS, IT DID NOT.

22       WHAT CHANGED WAS THE MAGNITUDE OF HIS ESTIMATE.  IT DIDN'T

23   EFFECT THE PRECISION WITH WHICH IT ESTIMATED, IT EFFECTED THE

24   MAGNITUDE OF THE ESTIMATE.  AND THAT'S THE HALLMARK OF TELLING

25   YOU THAT MULTICOLINEARITY IS NOT AN ISSUE FOR ESTIMATING WHAT

1    HE WOULD REGARD AS THE IMPACT OF THE ITUNES 7 INDICATOR.

2    **Q.**  ALL RIGHT.

3        WITH RESPECT TO -- TO THESE FEATURES WITH THE RED -- THAT

4    ARE IN RED YOU'RE TALKING ABOUT?

5    **A.**  RIGHT.  AND WERE THESE THINGS SO COLINEAR -- SO EXPLAINED

6    BY ALL THE OTHER THINGS THAT ARE IN THE MODEL, YOU WOULD NOT

7    FIND THAT THEY ARE STATISTICALLY SIGNIFICANT PREDICTORS OF THE

8    OUTCOME VARIABLE, THE LOG OF PRICE.

9        SO THE F TEST IS TELLING US THAT THOSE THINGS ARE --

10   THERE'S PLENTY OF VARIATION LEFT FOR THOSE THINGS THAT'S

11   INDEPENDENT OF THE OTHER THINGS IN THE MODEL THAT ALLOWS US TO

12   ESTIMATE WHAT THE EFFECTS OF THOSE THINGS ARE, WHAT THE

13   PREDICTIVE POWER OF THEM IS ON THE -- ON THE OUTCOME VARIABLE,

14   THE LOG OF PRICE.

15   **Q.**  YOU SAID YOUR F TEST WAS STATISTICALLY SIGNIFICANT IF I

16   HAVE THAT RIGHT.  CAN YOU EXPLAIN THAT?

17   **A.**  YES.

18       IN STATISTICS, IN REGRESSION ANALYSIS, IN ECONOMETRICS,

19   STATISTICIANS HAVE PARTICULAR TESTS IN WHICH, IN EFFECT, ASK

20   HOW MUCH DID THE VARIABLE OR VARIABLES IN QUESTION IMPROVE THE

21   MODEL'S FIT.

22       AND WHEN APPLIED TO A SINGLE VARIABLE, THAT'S TYPICALLY

23   CALLED A TEASE STATISTIC.  WHEN APPLIED TO A NUMBER OF

24   VARIABLES WHICH ARE TESTING THE HYPOTHESIS OF REMOVING THEM

25   FROM THE MODEL JOINTLY, IT'S CALLED AN F TEST, SOMETIMES A LOG

TOPEL – DIRECT / ISAACSON

1    TEST, IN DIFFERENT MODELS, IT'S A LIKELIHOOD-RATIO TEST, BUT

2    THE -- THE POINT IS, DID THE REMOVAL OF THOSE THINGS FROM THE

3    MODEL SUBSTANTIALLY HARM THE MODEL'S FIT.

4        AND WHAT THE DATA TELL US IS THAT, YES, REMOVING THESE

5    THINGS OR LEAVING THESE THINGS OUT SUBSTANTIALLY HARMS THE

6    MODEL'S FIT.  PUT IT THE OTHER WAY:  PUTTING THEM IN HAS A

7    STATISTICALLY SIGNIFICANT EFFECT IN IMPROVING THE MODEL'S FIT.

8    **Q.**  DR. NOLL SAID THAT HIS REGRESSION HAD A HIGH R-SQUARE OR

9    ADJUSTED R-SQUARE.

10       WOULD YOU EXPLAIN THAT?

11   **A.**  IT MEANS THAT HIS MODEL, WITH HIS FIXED EFFECTS FOR

12   PRODUCT CLASS WITH A TIME TREND EXPLAINS, IS CORRELATED

13   WITH -- IS HIGHLY CORRELATED -- THINGS ON THE RIGHT-HAND SIDE

14   ARE HIGHLY CORRELATED WITH THE THING ON THE LEFT-HAND SIDE.

15   SO THE LINEAR COMBINATION OF THOSE "X'S" IS HIGHLY CORRELATED

16   WITH THE OUTCOME VARIABLE "Y".

17       WE HAVE TO BE CAREFUL BECAUSE HE MAKES A BIG DEAL OF

18   R-SQUARED INDICATING THE RELIABILITY IN SOME SENSE OF HIS

19   MODEL.  AND I CAN ASSURE YOU THAT A HIGH R-SQUARE IS NOT AN

20   INDICATOR OF A RELIABLE MODEL.  YOU HAVE TO KEEP IN MIND WHERE

21   WE'RE STARTING FROM.

22       LET ME GIVE YOU AN EXAMPLE.  SUPPOSE WE WERE STUDYING FORD

23   CARS.  I WILL DO GENERAL MOTORS CARS.  I CAN REMEMBER SOME

24   MODELS.  AND WE WANTED TO STUDY SOMETHING TO DO WITH PRICES.

25   SO THE FIRST THING WE PUT IN IT, WE HAVE THE OUTCOME

1    VARIABLES, THE PRICE OF A GENERAL MOTORS CAR.  BUT THEN WE ARE

2    GOING, AS WE DO HERE, PUT IN INDICATORS FOR THE MODEL OF CAR

3    IT IS.

4        NOW, JOE'S GENERAL MOTORS CARS GO FROM -- I HAVE TO

5    REMEMBER MY CARS -- FROM A VERY LOW PRICED CHEVY ARROW, ALL

6    THE WAY UP TO A GIANT ALL-DECKED-OUT CADILLAC ESCALADE, AND

7    THE ARROW IS GOING TO HAVE A PRICE LIKE $12,000 AND THE

8    ESCALADE IS GOING TO HAVE A PRICE LIKE $80,000, AND THERE'S

9    ALL KIND OF CARS IN BETWEEN.

10       WELL, JUST PUTTING IN THOSE, WHICH EFFECTIVELY PUT IN THE

11   AVERAGE PRICE OF THAT MODEL ON THE RIGHT-HAND SIDE IS GOING TO

12   GIVE YOU A REALLY BIG R-SQUARED.  AND THEN YOU PUT IN THE FACT

13   THAT OVER TIME, ALL THOSE CAR PRICES HAVE BEEN EITHER GOING UP

14   OR DOWN TOGETHER, AS THEY HAVE BEEN HERE FOR IPODS, NOW WE ARE

15   UP OVER 95, 96, 97 PERCENT.

16       SO, YOU KNOW, HIS 98 PERCENT THAT HE SAYS, THAT'S NOT LIKE

17   THE FINISH LINE, THAT'S THE STARTING LINE.  EVERYTHING ABOUT

18   THIS CASE IS IN THAT LAST 2 PERCENT, BETWEEN 98 AND A HUNDRED.

19       SO WHEN YOU DO THESE F TESTS OR T TESTS FOR ANY OF THESE

20   VARIABLE, INCLUDING THE ONES HE DO -- HE DOES, IT'S SAYING HOW

21   MUCH DOES THIS VARIABLE EXPLAIN OF WHAT'S LEFT?  HOW FAR DOES

22   IT GET YOU FROM ABOVE 98, WHICH IS ANOTHER WAY OF SAYING HOW

23   MUCH DOES IT REDUCE THE UNEXPLAINED VARIATION IN THE -- IN

24   THE -- IN PRICES.

25   Q.  ALL RIGHT.

1        LET'S MOVE TO THE THIRD ERROR.  640 -- I'M SORRY, TO WRAP

2    THIS UP, 638.

3              (DEMONSTRATIVE DISPLAYED TO JURY.)

4    **A.**  YES.

5    **Q.**  THIS IS A SUMMARY OF THE OMITTED VARIABLES; IS THAT RIGHT?

6    **A.**  THOSE ARE THEM.  THE ONLY ONE I HAVEN'T MENTIONED DOWN

7    THERE IS THAT IN THE RESELLER CHANNEL, SOME THINGS WERE SOLD

8    TO HEWLETT-PACKARD AND BRANDED AS A HEWLETT-PACKARD IPOD.

9        AND TO THE EXTENT CONSUMERS CARED ABOUT THAT, JUST LIKE

10   THE U2 MODEL, WE THOUGHT THAT SHOULD BE IN THERE BECAUSE IT

11   WOULD BE A DISTINGUISHING CHARACTERISTIC THAT SOME PEOPLE

12   MIGHT VALUE, SOME PEOPLE MIGHT NOT VALUE, SO WE PUT THAT IN.

13   **Q.**  LET'S LOOK AT 643, THE THIRD ERROR.

14             (DEMONSTRATIVE DISPLAYED TO JURY.)

15       WOULD YOU EXPLAIN THE THIRD ERROR?

16   **A.**  SURE.

17       DR. NOLL CLAIMS TO BE PERFORMING WHAT WE DESCRIBED EARLIER

18   AS SORT OF A BEFORE-AND-AFTER EXPERIMENT, TO COMPARE PRICES

19   AFTER SOME EVENT HERE, WITH THE ADVENT OF ITUNES 7 TO PRICES

20   BEFORE THAT AFTER CONTROLLING FOR LOTS OF THINGS.

21       NOW, THE CENTRAL QUESTION IN DOING THIS BEFORE AND AFTER

22   ANALYSIS IS TO ASK OURSELVES, WELL, IF APPLE -- WHAT DRM

23   TECHNOLOGY WOULD APPLE HAVE USED HAD IT NOT IMPLEMENTED THOSE

24   INTEGRITY CHECK FEATURES THAT WERE IN ITUNES 7.0.

25   **Q.**  MAYBE IT WOULD HELP THE JURY IF WE LOOKED AT YOUR SUMMARY

1    OF THE ERROR, WHICH IS 646.

2                (DEMONSTRATIVE DISPLAYED TO JURY.)

3    **A.**   SURE.  SO SUMMARY OF THE ERROR.  HE ASSUMES THAT APPLE

4    WOULD NOT HAVE CONTINUED TO USE THE DRM TECHNOLOGY OF ITUNES

5    4.7.  AND THAT TECHNOLOGY WAS IN ITUNES 4.7, AND IT WENT

6    FORWARD IN SUBSEQUENT VERSIONS PRIOR TO ITUNES 7.0.

7        AND -- AND SO -- BUT WHEN APPLE DID NOT USE THE INTEGRITY

8    CHECK, IT ACTUALLY DID CONTINUE TO USE THE DRM TECHNOLOGY.

9    LET'S GO BACK TO SOME OF THESE MODELS.

10       AND I THINK YOU HEARD THIS IN PRIOR TESTIMONY, THAT WHEN

11   THE -- WHEN 7.0 CAME OUT, THE ONLY MODEL THAT COULD, I MIGHT

12   USE THE RECORD VERB HERE, INVOKE THE -- THE KVC FEATURE OF

13   ITUNES 7.0 WAS THE NANO.  THE TOUCH HADN'T COME ALONG YET, THE

14   CLASSIC COULDN'T USE IT AND THE SHUFFLE COULDN'T USE IT.

15       SO IF WE ASK OURSELVES WHAT IS -- SOMEBODY MENTIONED THE

16   BUT-FOR WORLD YESTERDAY.  WELL, WHAT'S THE BEFORE PERIOD?

17   WHAT WOULD HAVE BEEN USED HAD THE -- HAD THE KVC NOT BEEN ABLE

18   TO BE HAD.  SOMEBODY CAME ALONG, STICK THEM UP, YOU CAN'T USE

19   THAT.  WELL, THEY WOULD HAVE USED WHAT THEY HAD BEEN USING.

20   IT'S NOT JUST A HYPOTHETICAL, IT'S WHAT THEY DID WHEN THEY

21   COULDN'T USE THE TECHNOLOGY THAT WAS IN -- IN 7.0, THE

22   INTEGRITY CHECK SOFTWARE THAT WAS IN 7.0, WHAT THEY ACTUALLY

23   USED WAS THE TECHNOLOGY THAT WAS IN 4.7.

24   **Q.**  LET ME WRITE THREE DATES ON THE BOARD THAT WE WROTE

25   BEFORE.

TOPEL – DIRECT / ISAACSON

1        (COUNSEL WRITES ON WHITE BOARD.)

2        SO FOR THE IPOD, IN TERMS OF WHAT WAS ACTIVE ON

3    SEPTEMBER 11, WE HAVE GOT 4.7, AND SEPTEMBER 12, 7.0 IS

4    LAUNCHED, AND SEPTEMBER 13TH YOU HAVE 7.0 THAT'S ACTIVE.

5        SO WHAT IS DR. NOLL'S MODEL DOING FOR THIS BEFORE AND --

6    WITH THIS BEFORE AND AFTER PICTURE?

7    **A.**  WELL, LET'S THINK ABOUT THE NANO.  THIS WOULD BE A

8    SEQUENCE OF EVENTS THAT APPLIES TO THE NANO.

9        HE'S -- IF WHEN WE LOOK HERE AT SEPTEMBER 12, WHEN THE NEW

10   NANOS CAN USE THE TECHNOLOGY IN 7.0, THEN THE BEFORE-AND-AFTER

11   EXPERIMENT, THIS IS WHAT YOU WOULD EXPECT WHEN YOU READ HIS

12   PAPER OR HIS REPORTS, THE BEFORE AND AFTER THE EXPERIMENT?

13       WHAT WERE YOU USING BEFORE?  4.7.  WHAT ARE YOU USING

14   AFTER?  7.0.

15       AND THEN THE HYPOTHESIS WOULD BE WELL, WHAT'S THE

16   INCREMENTAL EFFECT ON HIS OUTCOME, WHICH IS PRICES, OF THE

17   TRANSITION FROM 4.7 TO 7.0.  THAT'S NOT WHAT HE DID.

18       HE ASSUMED THAT 4.7 WOULD NOT EXIST.  IN A WORLD WHERE 7.0

19   COULD NOT OCCUR, HE ASSUMED 4.7 COULDN'T EXIST EITHER.  AND

20   THAT CAUSES HIM TO OVERSTATE ESPECIALLY FOR THE DIRECT SALES

21   CHANNEL, IT CAUSES HIM TO GREATLY OVERSTATE THE IMPACT OF

22   TRANSITING FROM 4.7 TO 7.0.  HE'S MEASURING THE INCREMENTAL

23   EFFECT.

24   **Q.**  4.7 WAS A DUMMY VARIABLE IN HIS ANALYSIS?

25   **A.**  YES.

TOPEL – DIRECT / ISAACSON

1    **Q.**  AND ON SEPTEMBER 12TH WHAT DOES –– IT IS EITHER A 1 OR 0.

2    **A.**  YES.

3    **Q.**  WHAT DOES HE DO WITH 4.7?

4    **A.**  HE TURNS IT OFF.  AS AN ECONOMETRIC MATTER, THAT MEANS

5    THAT WHATEVER EFFECT HE'S FINDING HERE (INDICATING) IS NOT

6    SUBTRACTING OFF OF WHAT THE EFFECT OF HERE, IT IS NOT

7    INCREMENTAL.

8        WHAT HE DID WAS, HE WENT BACK TO SOME OTHER PERIOD WHERE

9    4.7 DIDN'T EXIST.  AND THE CONSEQUENCE OF THAT, AS I SAID, IT

10   MORE THAN DOUBLES THE MAGNITUDE OF HIS ESTIMATED EFFECT.

11       REMEMBER WHAT I AM SAYING ABOUT THAT ESTIMATED EFFECT, IT

12   CONFLATES ALL OTHER KINDS OF THINGS.  IT MORE THAN DOUBLES

13   THAT WITHIN THE DIRECT PURCHASES PRICE.

14   **Q.**  I HAVE GOT YOU STANDING UP THERE, CAN YOU GIVE US AN

15   ILLUSTRATION OF THIS?

16   **A.**  SURE.

17   **Q.**  AND SPEAK UP FOR THE COURT REPORTER.

18   **A.**  I HAVE A SOFT VOICE AND A COLD THIS WEEK, SO I APOLOGIZE.

19       LET'S DO A SIMPLE EXAMPLE.  IT HAS –– IT'S –– IT'S –– I'LL

20   DO CARS AGAIN.

21       I WILL SHIFT FROM GENERAL MOTORS TO FORD.  SO FORD CHANGES

22   THE TIRE BRAND ON NEW CARS.  AND WHAT WE WANT TO KNOW IS DID

23   MILEAGE INCREASE.  THAT'S THE AMOUNT OF MILES THAT A SET OF

24   TIRES GETS ON THE NEW FORD CARS BEING SOLD.

25       AND WE'VE GOT THE FOLLOWING DATA.  I AM GOING TO GIVE YOU

TOPEL – DIRECT / ISAACSON

1    THREE DIFFERENT BRANDS OF TIRES.

2         SO FROM, LET US SAY 2000 TO 2005, WE USE GOODYEAR.  AND

3    THEN THEY SWITCHED FROM 2006 TO 2010, LET'S SAY THEY USED

4    FIRESTONE.  AND THEN -- PUT A 1 OVER HERE.

5         THEN THEY MADE A SECOND TRANSITION FROM 2011 TO 2014, UP

6    TO TODAY, THEY USE BRIDGESTONE.

7         HERE'S OUR DATA.  MILEAGE -- I'M GETTING A LITTLE CROWDED

8    HERE.  ERASE THAT.

9    **Q.**  YOU HAVE AN ERASER BEHIND YOU, TOO.

10   **A.**  I ALWAYS USE MY HAND IN CLASS.  THEN IT IS BLUE AT THE

11   END.

12        SO MILEAGE, AND ON GOODYEAR'S THEY WERE GETTING

13   20,000 MILES ON A SET.  AND ON FIRESTONE'S THEY GOT

14   30,000 MILES ON A SET.  AND ON BRIDGESTONE'S, AFTER THEY

15   CHANGED, THEY GOT A LITTLE BUMP, THEY GOT 32,000 MILES.

16        AND NOW WE WANT TO KNOW WHAT'S THE INCREMENTAL EFFECT OF

17   THE CHANGE.

18        WELL, LET'S FIRST DO THE FIRESTONE TO -- THE TRANSITION

19   FROM GOODYEAR TO FIRESTONE.  THAT WOULD BE THE DIFFERENCE

20   BETWEEN 30,000 AND 20,000, SO THE INCREMENT IS -- HERE THERE'S

21   NO INCREMENT BECAUSE THAT'S WHAT WE STARTED WITH.

22        HERE THE INCREMENT IS 10,000 BECAUSE THAT'S THE 30 MINUS

23   20.  I LEFT OFF THE THREE ZEROS AFTERWARDS.  OKAY.

24        THEN DOWN HERE, WHAT'S THE INCREMENT?  WELL, WE HAD 30,000

25   BEFORE WHEN WE WERE USING FIRESTONE, NOW WE'VE GOT 32,000, SO

1    THE INCREMENT IS GOING TO BE 2,000.

2         SO THE EFFECT ON MILEAGE FROM SWITCHING FROM FIRESTONE'S

3    TO BRIDGESTONE'S IS 2,000 ADDITIONAL MILES OF MILEAGE BECAUSE

4    OF THAT CHANGE IN TIRE BRAND.  SO THAT'S OBVIOUSLY THEN 32

5    MINUS 30, JUST TO BE COMPLETE.

6         OKAY.  NOW HERE'S WHAT PROFESSOR NOLL ACTUALLY DOES.

7    BECAUSE THE METAPHOR HERE, OR THE ANALOGY TO THIS CASE -- TO

8    THIS CHANGING THE -- THE KVC ON ITUNES 7.0 IS THAT THIS SWITCH

9    FROM FIRESTONE TO BRIDGESTONE.

10        IF WE LOOK HERE, HOW WOULD HE MEASURE IT?  THERE IS NO

11   INCREMENT HERE.  ACTUALLY, IN HIS DATA, HE WOULD TAKE THE

12   FIRESTONE MINUS GOODYEAR THING, HE'D PRETTY MUCH GET THAT ONE

13   RIGHT.  HE WOULD SAY 10,000.

14        BUT THEN HE SAYS, AND THIS IS A MATTER OF HOW PEOPLE SET

15   UP THEIR MODEL, HE DOESN'T SAY, LET'S TAKE THE INCREMENT FROM

16   FIRESTONE TO BRIDGESTONE, WHICH WE ALREADY FOUND WAS 2,000

17   MILES, HE SAYS I'M GOING TO PRETEND THAT FIRESTONE DOESN'T

18   EXIST.  SO THAT'S 4.7.  THAT IF THEY HADN'T SWITCHED TO

19   BRIDGESTONE'S, HE'S ASSUMING THEY WOULDN'T HAVE USED

20   FIRESTONES.  HE IS ASSUMING THEY WOULD HAVE USED GOODYEAR'S.

21        SO HIS INCREMENT, THE WAY PROFESSOR NOLL DOES IT IN THIS

22   PLACE DOWN HERE, HE PUT 32,000 MINUS 20,000.  HE PUT

23   12,000 MILES BECAUSE HE'S TAKING 32 NOT MINUS 20 -- NOT MINUS

24   30, HE'S TAKING 32 MINUS 20.

25        SO THAT'S THE WAY HIS REGRESSION MEASURES THE TRANSITION

TOPEL – DIRECT / ISAACSON

1    FROM FIRESTONE TO BRIDGESTONE.

2        SO THE ANALOGY WOULD BE, HAD THEY NOT SWITCHED TO

3    BRIDGESTONE, WHAT WAS THE BEFORE?  IT WAS FIRESTONE'S.  AND

4    THEY WOULD HAVE KEPT USING FIRESTONE'S, BUT WHAT THEY DID --

5    AND THEY ACTUALLY DID USE BRIDGESTONE'S, SO WE ARE SAYING WHAT

6    WAS THE INCREMENT, THE BEFORE AND AFTER CHANGE FROM

7    FIRESTONE'S TO BRIDGESTONE'S 2,000.  THAT'S THE RIGHT ANSWER.

8    **Q.**  IN YOUR EXAMPLE --

9    **A.**  THIS IS THE WRONG ANSWER.

10   **Q.**  IN YOUR EXAMPLE, FIRESTONE IS -- WOULD BE THE 4.7 VARIABLE

11   AND DR. NOLL TURNED OFF FIRESTONE AND MADE IT ZERO?

12   **A.**  THAT'S EXACTLY RIGHT.  AND WHEN YOU TURN IT OFF, THE

13   CONSEQUENCE IS THAT BRIDGESTONE IS GOING TO PICK UP BOTH THE

14   EFFECT OF FIRESTONE AND BRIDGESTONE.

15       IT'S KIND OF LIKE AN OMITTED VARIABLE BIAS WE TALKED ABOUT

16   BEFORE, NOT JUST THE INCREMENT OF TRANSITING TO BRIDGESTONE.

17   **Q.**  LET'S LOOK AT THE OVERALL EFFECT OF THIS ERROR.

18       647.

19               (DEMONSTRATIVE DISPLAYED TO JURY.)

20       647.  THERE WE GO.  NO, THAT'S 650.

21               (DEMONSTRATIVE DISPLAYED TO JURY.)

22       THERE YOU GO.

23       DISCUSS THE EFFECT OF THIS ERROR.

24   **A.**  WELL, THE CONSEQUENCE IS JUST -- I'VE DEMONSTRATED HERE.

25       HIS METHOD OF DOING BEFORE AND AFTER OF SEEING WHAT THE

TOPEL – DIRECT / ISAACSON

1    BUT-FOR WORLD IS, IF YOU HADN'T BEEN ABLE TO INVOKE ITUNES 7.0

2    IS TO OVERSTATE THAT IMPACT.  BECAUSE HE ALSO FOUND THAT THE

3    PREVIOUS VERSION HAD A POSITIVE IMPACT ON PRICE.

4        THE REASON'S THE SAME HERE.  HE DOESN'T ESTIMATE THE

5    INCREMENTAL CHANGE IN APPLE'S TECHNOLOGY.  HE INCREMENTS THE

6    TOTAL EFFECT OF THE LEGAL TECHNOLOGY THAT WAS IN 4.7, THE

7    UNDISPUTED LEGAL TECHNOLOGY THAT WAS IN 4.7 AND WHAT'S IN

8    DISPUTE HERE, WHICH IS 7.0.  SO THAT'S WRONG.

9        THE FACTS ARE, WHEN APPLE COULD NOT USE THE INTEGRITY

10   CHECK FEATURE OF ITUNES 7, IT CONTINUED TO USE THE TECHNOLOGY

11   THAT WAS IN 4.7.

12   **Q.**  ALL RIGHT.  IF WE CAN LOOK AT 651.

13                (DEMONSTRATIVE DISPLAYED TO JURY.)

14       CAN YOU EXPLAIN WHAT THIS IS?

15   **A.**  SURE.  THIS SORT OF PUTS TOGETHER THE THINGS I HAVE BEEN

16   TALKING ABOUT.

17       SO THE -- THE FIRST ROW UP THERE, I'VE MEASURED THESE

18   THINGS AS 7.2 PERCENT.  THESE ARE ACTUALLY THE COEFFICIENTS

19   FROM DR. NOLL'S REGRESSION.

20       SO 7.2 PERCENT, .072, MORE PROPERLY, IS THE COEFFICIENT HE

21   FINDS IN HIS DIRECT PURCHASERS REGRESSION ON HIS ITUNE 7

22   VARIABLE.

23       SO HIS CLAIM WOULD BE THAT THE ADVENT OF ITUNES 7, ALL

24   OTHER THINGS EQUAL, RAISED PRICES IN THE DIRECT PURCHASERS

25   CHANNEL BY 7.2 PERCENT.

1      NOW, MUCH OF THAT COMES FROM THE FACT THAT HE ALSO FINDS

2   IN HIS REGRESSION THAT THE FEATURES AND WHATEVER WENT ALONG

3   WITH 4.7 HAD AN IMPACT OF 3.9.  SO WHEN YOU ACCOUNT FOR THAT

4   3.9, YOU HAVE TO SUBTRACT IT OFF AS 7.2 TO GET THE RIGHT

5   INCREMENT.  THAT'S THE 3.3 PERCENT YOU SEE THERE.

6      SO WHEN HE ACTUALLY DOES THE RIGHT BUT-FOR WORLD WITHIN

7   THE CONTEXT OF HIS MODEL THAT I'M NOT ADVOCATING, WITHIN THE

8   CONTEXT OF HIS MODEL, THE IMPACT IN THE DIRECT PURCHASERS

9   REGRESSION WOULD ONLY BE 3.3 PERCENT.  SO THAT'S MORE THAN

10  HALF OF THE 7.2 THAT HE GOT OVERALL.

11     NOW, IF YOU GO TO THE RESELLERS REGRESSION, THAT

12  PARTICULAR ERROR DOESN'T HAVE SUCH A BIG IMPACT.  IN PREVIOUS

13  MODELS THAT HE RAN IT DID, BUT IN THIS ONE IT DOESN'T.

14     NOW, WHEN WE GO DOWN TO THE ADDITIONAL FEATURES THAT WE

15  TALKED ABOUT -- REMEMBER THE THINGS THAT WERE DISCUSSED IN THE

16  PRICING COMMITTEE REPORTS AND THAT WERE STATISTICALLY

17  SIGNIFICANT CONTRIBUTORS TO THE FIT OF THIS MODEL, WHEN YOU

18  ADD THOSE IN, YOU'RE NO LONGER EVEN WITHIN THE CONTEXT OF HIS

19  MODEL GET A POSITIVE IMPACT.

20     SO, NOW ITUNE 7 HAS A COEFFICIENT OF MINUS .008.  SO

21  SLIGHTLY SMALLER THAN 1 PERCENT.  AND IN THE DIRECT RESELLERS

22  CHANNEL, IT'S MINUS 1.2 PERCENT.  SO AT THE END OF THE DAY,

23  THERE'S NO EVIDENCE THAT EVEN THE CONFLATED ITUNE 7 INDICATOR

24  IS ASSOCIATED WITH HIGHER PRICES.

25  Q.  ALL RIGHT.  ONE OTHER TOPIC I WANTED TO TOUCH ON --

1    **THE COURT:**  WE ARE GOING TO TAKE A BREAK SOON.  IS

2    THIS A GOOD TIME OR DO YOU NEED TO FINISH THIS UP?

3    **MR. ISAACSON:**  I CAN FINISH IN FIVE MINUTES OR LESS,

4    SO IT'S UP TO YOU.

5    **THE COURT:**  OKAY.  ARE YOU MOVING TO A NEW TOPIC?

6    **MR. ISAACSON:**  YES.

7    **THE COURT:**  LET'S GO AHEAD AND TAKE OUR BREAK.

8    THIS IS THE SECOND BREAK, LADIES AND GENTLEMEN.  IT'S

9    11:47, SO WE'LL BE BACK ON THE RECORD RIGHT AFTER NOON.

10   ANY QUESTIONS THUS FAR?  MAKE SURE TO JUST HAND THEM TO

11   FRANCES.

12   (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)

13   **THE COURT:**  OKAY.  THE RECORD WILL REFLECT THE JURY

14   IS GONE.  GO AHEAD, TAKE YOUR BREAK.

15   (RECESS TAKEN AT 11:47 A.M; RESUMED AT 12:05 P.M.)

16   **THE CLERK:**  REMAIN SEATED.  COURT IS IN SESSION.

17   COME TO ORDER.

18   **THE COURT:**  OKAY.

19   OKAY.  WE'RE BACK ON THE RECORD.  THE RECORD WILL REFLECT

20   THE JURY IS BACK.  YOU MAY CONTINUE, MR. ISAACSON.

21   **BY MR. ISAACSON:**

22   **Q.**  PROFESSOR, WHAT LEVEL OF STATISTICAL CERTAINTY IS

23   PROFESSOR NOLL CLAIMING FROM HIS REGRESSION?

24   **A.**  ONE WAY TO PUT IT IS AN ASTONISHING HIGH LEVEL OF

25   PRECISION.  IF YOU TAKE HIS EFFECT OF .072 THAT HE HAS IN THE

TOPEL – DIRECT / ISAACSON

1   DIRECT SALES CHANNEL --

2   **Q.**   THE .072, THAT'S A 7.2 PERCENT INCREASE IN CONSUMER --

3   7.2 PERCENT OF PRICES FOR CONSUMERS ATTRIBUTABLE TO WHAT

4   DR. NOLL SAYS THEY ARE ATTRIBUTABLE TO?

5   **A.**   APPROXIMATELY A 7.2 PERCENT INCREASE IN THE PRICE HE'S

6   CLAIMING ATTRIBUTABLE TO THE ADVENT OF ITUNE 7.

7       NOW, KEEP IN MIND ALL THINGS I SAID ABOUT THAT CONFLATING

8   OTHER THINGS.  LET'S CALL IT ITUNES 7.

9       THE -- GIVEN THE PRECISION THAT HE'S CLAIMING, WE MIGHT

10  ASK, WELL, THERE'S GOT TO BE SOME STATISTICAL UNCERTAINTY.

11      LIKE REMEMBER WHEN HE TALKED ABOUT THE --

12  **Q.**   LET ME INTERRUPT YOU.

13      YOU SAID ASTONISHINGLY HIGH.  WOULD YOU DEFINE THAT?

14  **A.**   LET ME GET THERE.

15  **Q.**   OKAY.

16  **A.**   LET ME GET THERE.

17      NUMBER ONE HE TALKED ABOUT A CONFIDENCE BANDING IN A POLE,

18  SAY.  SO LET'S SAY PLUS OR MINUS 3 PERCENT.  WELL, THAT'S

19  TYPICALLY A CONFIDENCE INTERVAL THAT SAYS THERE'S A 95 PERCENT

20  CHANCE THAT THE TRUE VALUE LIES WITHIN THAT INTERVAL GIVEN THE

21  WAY THINGS HAVE BEEN -- THE DATA HAS BEEN COLLECTED AND THE

22  NATURE OF THE DATA.

23      HERE, WHAT HE IS CLAIMING IS THAT HIS DATA -- HIS METHODS

24  ARE SO PRECISE THAT THERE'S VIRTUALLY NO VARIABILITY IN IT.

25  THERE'S NO CONFIDENCE.

1        IF YOU ASK WHAT'S THE PROBABILITY -- REMEMBER, I SAID

2    .072.  WHAT IS THE PROBABILITY THAT IT COULD BE LARGER THAN

3    .073 OR SMALLER THAN .071.  OKAY?  IT'S VANISHINGLY SMALL.

4    THAT IS VANISHINGLY SMALL IS MY ASTONISHINGLY AMOUNT OF

5    CERTAINTY THAT HE HAS.

6        SO, I THINK -- I DID THE CALCULATION THE OTHER DAY ON MY

7    LAPTOP PRETTY QUICK.  I THINK IT IS ABOUT ONE IN A 30,000

8    CHANCE THAT IT COULD BE A LITTLE TINY BIT HIGHER OR A LITTLE

9    TINY BIT SMALLER.  WHEN I SEE SOMETHING LIKE THAT, I JUST

10   THINK, NO, THAT CAN'T -- THAT'S JUST IMPLAUSIBLE LEVEL OF

11   CERTAINTY TO BE ATTRIBUTING TO THIS ESTIMATE.

12       NOW, NONE OF THAT EFFECTS MY CONCLUSIONS THAT I'VE SHOWN

13   YOU UP TO NOW BECAUSE I HAVE SHOWED YOU HOW HIS POINT

14   ESTIMATES HAVE CHANGED, NOT THE AMOUNT OF PRECISION THAT HE'S

15   ASSIGNING TO THEM.

16   **Q.**  SO JUST AS AN EXAMPLE....

17                  (COUNSEL AT WHITE BOARD)

18       ...IF WE HAD AN IPOD THAT COST $199 AND DR. NOLL'S

19   REGRESSION SHOWED THAT IN THE BUT-FOR WORLD, IT WOULD COST

20   $184.68.  WHAT ARE THE ODDS -- BASED ON THE RESULTS HE'S --

21   THE PRECISION THAT HE'S CLAIMING OR THE STATISTICAL CERTAINTY,

22   WHAT ARE THE CHANCES IT WAS $184.70?

23   **A.**  WELL, I HAVEN'T DONE THAT PRECISE CALCULATION.  I CAN TELL

24   YOU THAT HIS DEGREE OF CERTAINTY IS IT'S NOT 184 AND IT'S NOT

25   185.  THAT'S -- AND WITH REALLY, REALLY HIGH CONFIDENCE, HE

TOPEL – CROSS / SWEENEY

1  WOULD CLAIM IT CAN'T BE THOSE THINGS.

2      I WANT TO KEEP IN MIND, THAT HE'S SAYING THAT THAT

3  DIFFERENCE FROM 199 TO 184 IS A CAUSAL IMPACT.  HE'S TRYING TO

4  SAY THAT THAT'S A CAUSAL IMPACT OF THE ADVENT OF 7.0.

5  **Q.**  WHAT IS YOUR OVERALL CONCLUSION ABOUT THE RELIABILITY OF

6  DR. NOLL'S REGRESSION?

7  **A.**  HIS REGRESSION IS NOT RELIABLE IN ANY WAY.  IT'S IN

8  LAYMEN'S TERMS, IT IS A BIT OF A HOUSE OF CARDS.

9          **MR. ISAACSON:**  ALL RIGHT.  NO FURTHER QUESTIONS.

10         **THE COURT:**  CROSS.

11         **MS. SWEENEY:**  THANK YOU, YOUR HONOR.

12                    **CROSS-EXAMINATION**

13  BY MS. SWEENEY:

14  **Q.**  GOOD MORNING -- OR GOOD AFTERNOON.

15  **A.**  GOOD AFTERNOON.  NICE TO SEE YOU AGAIN.

16  **Q.**  NOW I WAS LISTENING TO YOUR TESTIMONY AND I WAS -- I HEARD

17  YOU SAY THAT YOU READ SOME OF PROFESSOR MURPHY'S REPORTS; IS

18  THAT RIGHT?

19  **A.**  YES.

20  **Q.**  AND, IN FACT, YOU WORKED VERY CLOSELY WITH PROFESSOR

21  MURPHY IN THIS PROJECT, RIGHT?

22  **A.**  WE HAD A LOT OF MEETINGS TOGETHER.  WE WERE IN THE SAME

23  ROOM.  WE TALK.

24  **Q.**  YOU COLLABORATED WITH HIM IN PUTTING TOGETHER YOUR REPORT?

25  **A.**  WE HAVE ONE JOINT REPORT.  THAT'S TRUE.

1    **Q.**  YOU WROTE TWO REPORTS, ONE WAS SEPARATE AND ONE WAS JOINT,

2    RIGHT?

3    **A.**  I DON'T REMEMBER HOW MANY HAVE BEEN WRITTEN, BUT I KNOW

4    THERE WAS ONE THAT I HAD THAT WAS SEPARATE AND MUCH SHORTER

5    ONE THAT WAS JOINT.

6    **Q.**  MANY OF THE EXHIBITS IN THE ORIGINAL TWO REPORTS, ONE BY

7    YOU AND ONE BY PROFESSOR MURPHY, WERE IDENTICAL, CORRECT?

8    **A.**  YES.  WE WERE WORKING WITH THE SAME STAFF AND WE HAD TO

9    ESTABLISH SOME OF THE SAME FACTS.

10   **Q.**  OKAY.

11       NOW, DO YOU KNOW HOW MANY OBSERVATIONS WERE IN THE

12   DATABASE THAT PROFESSION NOLL USED?

13   **A.**  I DID KNOW.  THE -- AND IT DEPENDS ON HOW YOU COUNT

14   THINGS.

15       AT ONE POINT HE WAS COUNTING, SAY IN HIS RESELLERS

16   REGRESSION?  YES, HIS RESELLERS REGRESSION, AT ONE POINT HE

17   WAS COUNTING 112 MILLION.  LATER HE HAD, WHEN HE STOPPED

18   COUNTING ALL THE IPODS IN ONE STORE THAT SOLD FOR THE SAME

19   PRICE -- OR IN ONE SHIPMENT AS 7,000 DIFFERENT IPOD

20   TRANSACTIONS.

21   **Q.**  PROFESSOR --

22                     (SIMULTANEOUS COLLOQUY.)

23   **A.**  LET ME --

24   **Q.**  -- I'M ASKING YOU ABOUT THE REGRESSION.  AND MAYBE I

25   SHOULD HAVE PREFACED MY QUESTION SO YOU COULD UNDERSTAND IT,

TOPEL – CROSS / SWEENEY

1    BUT I'M ASKING ABOUT THE REGRESSION ANALYSIS THAT PROFESSOR

2    NOLL PERFORMED AND TESTIFIED ABOUT IN THIS CASE.

3        DO YOU KNOW HOW MANY OBSERVATIONS OF DATA HE USED IN THAT

4    REGRESSION?

5    **A.**  YES.  HE HAD OVER 2 MILLION.

6    **Q.**  FOR THE RESELLER PORTION?

7    **A.**  FOR THE RESELLERS, YES.

8    **Q.**  AND THE CONSUMER PORTION?

9    **A.**  I DON'T REMEMBER THE NUMBER.  IT'S A BIG NUMBER.

10   **Q.**  A BIG NUMBER RIGHT?

11   **A.**  BIG NUMBER.

12   **Q.**  39 MILLION, 40 MILLION, THAT RANGE?

13   **A.**  I DON'T REMEMBER.

14   **Q.**  IT'S A LOT OF DATA, RIGHT?

15   **A.**  YES, IT IS.

16   **Q.**  OKAY.

17       AND YOU WOULD AGREE, WOULDN'T YOU, THAT TYPICALLY THE

18   LARGER THE SIZE OF THE DATABASE THAT YOU'RE WORKING FROM, THE

19   SMALLER THE STANDARD ERRORS, RIGHT, WHEN YOU ARE CONDUCTING A

20   REGRESSION?

21   **A.**  IF THE -- IF THE DATA ARE INDEPENDENT OBSERVATIONS, YOU'LL

22   TYPICALLY GET THAT.

23   **Q.**  ALL RIGHT.

24       AND IS IT ANOTHER WAY TO TALK ABOUT THE PRECISION OF A

25   COEFFICIENT -- YOU MENTIONED STANDARD ERRORS.  ANOTHER WAY IS

1   TO TALK ABOUT IT IS THROUGH THE T STATISTIC, CORRECT?

2   **A.**  WELL, THE T STATISTIC IS THE RATIO OF THE COEFFICIENT TO

3   THE STANDARD ERROR.

4   **Q.**  RIGHT.

5       SO YOU JUST DIVIDE THE COEFFICIENT BY THE STANDARD ERROR,

6   RIGHT?

7   **A.**  THAT'S RIGHT.

8   **Q.**  AND SO ANOTHER WAY OF STATING YOUR CRITICISM OF PROFESSOR

9   NOLL WOULD BE THAT THE T STATISTIC IS TOO BIG, RIGHT?

10  **A.**  I DON'T KNOW WHAT YOU MEAN BY "TOO BIG".  I MEAN, THAT

11  HE'S GOT A VERY, VERY HIGH DEGREE OF PRECISION IN HIS

12  ESTIMATE.

13  **Q.**  WELL, WHAT DID YOU MEAN WHEN YOU SAID "TOO SMALL"?

14      YOU SAID THE STANDARD ERRORS --

15                      (SIMULTANEOUS COLLOQUY.)

16  **A.**  HE'S --

17  **Q.**  -- WERE ASTONISHINGLY SMALL; ISN'T THAT WHAT YOU SAID?

18  **A.**  YES.

19  **Q.**  OKAY.

20      SO MY QUESTION IS, IF YOU ARE JUST TALKING ABOUT THE T

21  STATISTIC, WHICH IS A RATIO OF THE COEFFICIENT TO THE STANDARD

22  ERRORS, WOULDN'T YOU HAVE THE SAME OBSERVATION THAT A T

23  STATISTIC THAT IS VERY LARGE MIGHT BE A SURPRISING RESULT?  IS

24  THAT THE --

25                      (SIMULTANEOUS COLLOQUY.)

TOPEL – CROSS / SWEENEY

1    **A.**  IT CAN BE A SURPRISING RESULT.  I HAVE HAD SOME MYSELF

2    THAT ARE SURPRISINGLY LARGE.

3    **Q.**  ALL RIGHT.

4        AND SO HAS PROFESSOR MURPHY; ISN'T THAT RIGHT?

5    **A.**  I DON'T KNOW THE ANSWER TO YOUR QUESTION.

6    **Q.**  YOU'RE FAMILIAR WITH AN ARTICLE THAT HE WROTE IN 1993 WITH

7    MANY FEWER DATA OBSERVATIONS THAN PROFESSOR NOLL, AND CAME UP

8    WITH A T STATISTIC THAT WAS EVEN HIGHER THAN THE ONE PROFESSOR

9    NOLL CAME UP WITH IN HIS REGRESSION?

10   **A.**  IF YOU ARE EXPECTING ME TO REMEMBER EVERYTHING, EVERY T

11   STATISTIC, EVERY PARAMETER THAT'S IN SOMEBODY ELSE'S PAPERS, I

12   DON'T REMEMBER THEM ALL IN MY PAPERS.

13   **Q.**  ALL RIGHT.  WELL, I'LL COME BACK TO THAT AND WE CAN SHOW

14   YOU THAT PAPER.

15       DO YOU REMEMBER WHAT THE T STATISTIC IS IN THE CASE OF

16   PROFESSOR NOLL'S REGRESSION?

17   **A.**  WE CAN LOOK HERE.  IT HAS CHANGED FROM ONE REPORT TO THE

18   NEXT.  I THINK IT'S LIKE -- I THINK IT'S OVER A HUNDRED.

19       I CAN'T REMEMBER.  I DIDN'T PAY SO MUCH ATTENTION TO THE T

20   STATISTIC.  IN FACT, I THINK WHEN YOU PUT THE RESULTS UP ON

21   THE BOARD, YOU DIDN'T SHOW THE T STATISTIC.  I MIGHT BE WRONG.

22   **Q.**  NOW, YOU AGREE THAT IN LITIGATION, A HEDONIC REGRESSION

23   ANALYSIS CAN BE AN APPROPRIATE WAY TO ISOLATE THE

24   ANTICOMPETITIVE CONDUCT AND ESTIMATE DAMAGES, CORRECT?

25   **A.**  IT'S A METHOD FOR DOING WHAT'S HERE BEFORE AND AFTER,

1    AFTER CONTROLLING FOR VARIOUS FEATURES OF A MODEL.  IT'S GOT

2    TO BE A CLEAN EXPERIMENT.  IT'S GOT TO BE ESTIMATED IN

3    APPROPRIATE WAYS.  SPECIFICATION HAS GOT TO BE RIGHT, BUT IT

4    CAN BE INFORMATIVE.

5    **Q.**  OKAY.

6        AND YOU TALKED ABOUT PROFESSOR NOLL'S REGRESSION AND YOU

7    TALKED ABOUT MULTICOLINEARITY.  YOU SAID THAT THERE WAS NO

8    MULTICOLINEARITY PROBLEM WITH THE ADDITIONAL IPOD ATTRIBUTES

9    THAT YOU SAID SHOULD BE INCLUDED, RIGHT?

10   **A.**  SAID THAT THE MULTICOLINEARITY PROBLEM OR AS EVIDENCED BY

11   THE CHANGE IN THE STANDARD ERROR ON -- ON THE ITUNES 7

12   INDICATOR DID NOT INDICATE THAT PUTTING THOSE THINGS INTO THE

13   MODEL CAUSED A MATERIAL CHANGE IN THE PRECISION WITH WHICH

14   THAT PARAMETER WAS ESTIMATED.

15   **Q.**  BUT YOU DIDN'T CONDUCT THOSE THREE TESTS THAT I

16   DISCUSSED -- WERE YOU HERE WHEN PROFESSOR MURPHY WAS

17   TESTIFYING?

18   **A.**  YES.

19   **Q.**  SO YOU DIDN'T CONDUCT THE VIF TEST, THE VARIANCE -- TELL

20   ME WHAT THAT STANDS FOR?  VARIANCE INDICATOR FACTOR?

21   **A.**  NO.  I THINK YOUR CONFLATE HAS BEEN A WORD THAT WE'VE BEEN

22   THROWING AROUND HERE.  YOU CONFLATED TWO THINGS.

23       ONE, YOU ASKED HIM ABOUT THE SUM INDICATOR FACTOR, AND

24   THIS IS -- YOU HAD THE VARIANCE INFLATION FACTOR, WHICH IS

25   WHAT I THINK YOU ARE REFERRING TO.

1    **Q.**   THANK YOU.

2        YOU DIDN'T CONDUCT THAT TEST, RIGHT?

3    **A.**   WELL, YOU KNOW, WE DID, AS HE POINTED OUT IN THAT QUOTE

4    FROM PROFESSOR GOLDBERGER, EVERYTHING THERE IS TO KNOW ABOUT

5    COLINEARITY IS IN THE VARIANCE/COVARIANCE MATRIX OF THE

6    ESTIMATORS.

7    **Q.**   CAN YOU ANSWER MY QUESTION?

8    **A.**   YES.  I AM GETTING THERE.

9        THE VARIANCE OF, LET US SAY, THE ESTIMATE ON ITUNE 7 IS ON

10   THE DIAGONAL OF THAT MATRIX, AND IT'S THE PRODUCT OF THE

11   VARIANCE INFLATION FACTOR AND ANOTHER NUMBER.

12       SO, YES, WE CALCULATED IT.  IT DEPENDS –– OURS, THE

13   R-SQUARED FROM THE AUXILIARY REGRESSION OF THE VARIABLE IN

14   QUESTION ON ALL THE OTHER THINGS.

15       GO AHEAD.  THAT'S MY ANSWER.

16   **Q.**   BUT YOU DIDN'T CONDUCT THAT AUXILIARY REGRESSION, DID YOU?

17   **A.**   WE DID BECAUSE IT'S IN THERE.  IN ORDER TO CALCULATE THE

18   STANDARD ERRORS, YOU HAVE IMPLICITLY CALCULATED THAT –– THAT

19   AUXILIARY REGRESSION.  AND THE FACT OF THE MATTER IS, THERE IS

20   PLENTY OF VARIATION LEFT OVER AFTER INCLUDING THE VARIABLES WE

21   WERE TALKING ABOUT TO GET AN ESTIMATE OF THE ITUNE 7 INDICATOR

22   WITH THE SAME LEVEL OF PRECISION THAT DR. NOLL HAD.

23   **Q.**   WOULD YOU AGREE THAT WHEN SPECIFYING A REGRESSION MODEL,

24   YOU HAVE TO TAKE INTO ACCOUNT ECONOMIC THEORY?  YOU HAVE TO

25   HAVE AN ECONOMIC THEORY BEHIND YOUR DECISION ABOUT WHICH

1    VARIABLES TO PUT IN THE MODEL?

2    **A.** WELL, YOU KNOW, IF YOU'RE CONSTRUCTING AN ECONOMIC MODEL,

3    THE -- YOU SHOULD HAVE AN ECONOMIC THEORY BEHIND WHAT GOES IN

4    THERE.

5    **Q.** WHEN YOU --

6    **A.** I SHOULD SAY THAT YOU'RE CHOOSING CERTAIN VARIABLES AND

7    THEN, YOU KNOW, OTHER VARIABLES AS CONTROLS CAN BE PUT IN

8    THERE AS, YOU KNOW, NOT RELATED TO ANY PARTICULAR ECONOMIC

9    THEORY.

10    **Q.** WELL, LET'S TALK ABOUT THE VARIABLES THAT YOU CALL THE

11    OMITTED VARIABLES.

12    **A.** YES.

13    **Q.** OTHER THAN THE RECHARGE VARIABLE WHICH YOU IDENTIFIED, ALL

14    OF THOSE ATTRIBUTES ARE IN THE DATA SET, RIGHT?

15    **A.** YES.

16    **Q.** AND THAT'S HOW YOU CHOSE THEM; ISN'T THAT RIGHT?

17    **A.** WELL, WE LOOKED AT THE PRICING COMMITTEE REPORTS.  THEY

18    ARE IN THE PRICING COMMITTEE REPORTS.  REMEMBER I TESTIFIED TO

19    THAT.

20    **Q.** BUT YOU DIDN'T CONDUCT ANY ANALYSIS TO DETERMINE OR

21    ANALYZE WHETHER THOSE ATTRIBUTES WERE LIKELY TO HAVE AN

22    INDEPENDENT EFFECT ON PRICE, RIGHT?

23    **A.** YOU MEAN OUTSIDE OF THE ANALYSIS THAT IS REFLECTED IN THE

24    REGRESSION?

25    **Q.** CAN YOU ANSWER MY QUESTION?

TOPEL – CROSS / SWEENEY

1   **A.**  WELL, I –– I DON'T UNDERSTAND THE QUESTION THEN.

2   **Q.**  DID YOU CONDUCT ANY ANALYSIS OTHER THAN PUTTING THEM INTO

3   YOUR REGRESSION TO DETERMINE WHETHER THEY ARE THE KINDS OF

4   ATTRIBUTES THAT WOULD BE LIKELY TO AFFECT THE PRICING?

5   **A.**  WELL, THE –– FIRST, AS AN ECONOMIST, I LOOK AT THESE

6   THINGS.  ANOTHER AS A USER, I LOOK AT THESE THINGS.

7       FOR EXAMPLE, REMEMBER I SAID A LITTLE WHILE AGO HOW

8   VALUABLE THE REVERSE SYNC WAS IN MY PARTICULAR INSTANCE.  THAT

9   WAS VALUE ENHANCING.  AND I LOOKED AT THAT AND SAID, GEE,

10  THAT'S AN INTERESTING THING THEY HAVE GOT –– THEY'VE ADDED ON

11  HERE.  AND RESOLUTION, I LIKE HIGHER RESOLUTION ON MY SCREENS.

12  THAT'S AT A PERSONAL LEVEL JUST BEING A HUMAN.

13      THEN YOU LOOK AT THE PRICING DOCUMENTS, AND THEY SAY THESE

14  ARE THE CHARACTERISTICS OF THE PRODUCT THAT WE'RE LISTING IN

15  OUR PRICING COMMITTEE MEETINGS THAT ARE GOING TO DETERMINE

16  WHAT THE PRICES ARE.  THESE ARE THE FEATURES THEY ARE USING TO

17  COMPARE THEMSELVES TO THEIR COMPETITORS THAT ARE PRODUCED BY

18  RIO, OR SAMSUNG, OR WHATEVER IT IS.

19      SO, YES, AS AN ECONOMIST, I LOOK AT THOSE PRICING

20  COMMITTEE DOCUMENTS AND I SAY, THESE ARE THE GUYS SETTING THE

21  PRICES.  THEY ARE MAKING THE IPODS.  IT'S NOT MY BUSINESS TO

22  BE IN THE ROOM WITH THEM AND DECIDE WHICH FEATURE'S WHICH,

23  THESE ARE THE FEATURES THEY LOOKED AT.

24  **Q.**  ALL RIGHT.

25      SO YOU MENTIONED RESOLUTION.  DO YOU HAVE ANY OPINION AS

1    TO WHETHER RESOLUTION, A HIGHER RESOLUTION MIGHT BE ASSOCIATED

2    WITH COST?

3    **A.**   IT CAN BE MORE COSTLY TO MAKE HIGHER RESOLUTION.

4    **Q.**   ARE YOU FAMILIAR WITH THE DIFFERENT CHARACTERISTICS,

5    ATTRIBUTES, VARIABLES THAT MR. -- THAT PROFESSOR NOLL PUT IN

6    HIS MODEL?

7    **A.**   I SHOULD, IN MY LAST ANSWER, I SHOULD SAY AT A POINT IN

8    TIME MORE RESOLUTION CAN BE MORE COSTLY THAN LESS RESOLUTION.

9    THE COST OF RESOLUTION CAN BE CHANGING OVER TIME AS WELL.

10   **Q.**   AS A GENERAL --

11   **A.**   SORRY TO INTERRUPT YOUR QUESTION.

12   **Q.**   AS A GENERAL MATTER, THE COSTS OF ELECTRONIC -- CONSUMER

13   ELECTRONIC GOODS HAS DECREASED OVER TIME; IS THAT RIGHT?

14   **A.**   MANY OF THEM, YES.

15   **Q.**   ALL RIGHT.  YOU LOOKED AT A BUNCH OF SLIDES.

16        DID YOU PREPARE THOSE SLIDES YOURSELF?

17   **A.**   YES.

18   **Q.**   OKAY.

19        AND IN ONE OF YOUR SLIDES, YOU SAY THAT PROFESSOR NOLL

20   SAID THAT LOCK-IN -- WHETHER LOCK-IN HAD AN EFFECT ON PRICE IS

21   AN EMPIRICAL QUESTION, AND PRICES COULD HAVE GONE UP, DOWN, OR

22   STAYED THE SAME.

23        DO YOU REMEMBER THAT TESTIMONY?

24   **A.**   YES.

25   **Q.**   WHAT HE WAS TALKING ABOUT IS WHETHER THE PRICES WERE

1    HIGHER THAN A COMPETITIVE PRICE; IS THAT RIGHT?

2    **A.**  I THINK HIS OPINION IS THAT THE PRICE IS ABOVE A

3    COMPETITIVE PRICE.

4    **Q.**  THAT'S IMPORTANT, ISN'T IT?  ABOVE A COMPETITIVE PRICE.

5    THAT'S WHAT AN ECONOMIST IN THIS KIND OF CASE IS LOOKING AT,

6    RIGHT?

7    **A.**  WELL, HE SAID IT WAS AN EMPIRICAL QUESTION.

8    **Q.**  ALL RIGHT.

9        AND THEN YOU PUT UP ON THE SCREEN, OR YOUR LAWYER DID, A

10   BUNCH OF SLIDES THAT SHOWED HOW THE REAL PRICES OF IPODS FELL

11   OVER TIME.

12   **A.**  THE REAL AND THE NOMINAL PRICES, YES.

13   **Q.**  OKAY.  AND THAT DOESN'T HAVE ANY BEARING ON THE QUESTION

14   WHETHER THE PRICE PAID WAS A COMPETITIVE PRICE, DOES IT?

15   **A.**  NO.  THE PRICE -- THE COMPETITIVE PRICE COULD BE FALLING

16   OVER TIME, AND EVIDENTLY IT WAS.  I THINK AS I'VE SAID

17   ELSEWHERE, PROFESSOR NOLL'S TESTIMONY APPEARS TO ME TO BE THAT

18   PRICES WERE FALLING, BUT THEY SHOULD HAVE FALLEN BY MORE.

19   **Q.**  OKAY.

20       AND THEN YOU ALSO PUT ON A SLIDE THAT SHOWED THE IPOD NANO

21   DISPLAY SIZE.  AND YOU HAD DIFFERENT GENERATIONS OF THE NANO,

22   FIRST, SECOND, THIRD, AND FOURTH WITH DIFFERENT DISPLAY SIZES.

23       DO YOU REMEMBER THAT SLIDE?

24   **A.**  YES, I DO.

25   **Q.**  DID YOU PUT THAT TOGETHER?

TOPEL – CROSS / SWEENEY

1   **A.** WITH PEOPLE THAT I WAS WORKING WITH, YES.

2   **Q.** OKAY.

3       AND YOU KNOW, DON'T YOU, THAT PROFESSOR NOLL'S MODEL TAKES

4   INTO ACCOUNT NOT ONLY CLASS, THAT IS WHETHER IT'S A NANO, OR A

5   CLASSIC, OR A SHUFFLE, BUT ALSO GENERATION?

6       DID YOU KNOW THAT?

7   **A.** HE HAS FIXED EFFECTS FOR CLASS, I BELIEVE.  SO, YOU KNOW,

8   I DON'T REMEMBER WHETHER HE HAS GOT GENERATION IN THERE OR

9   NOT.

10  **Q.** NOW ONE OF THE ATTRIBUTES YOU SAY WAS IGNORED BY PROFESSOR

11  NOLL IS THE USB VERSUS FIREWIRE.  AND DO YOU HAVE ANY

12  INFORMATION AS TO WHAT PROPORTION OF THE IPODS SOLD OVER THE

13  DATA PERIOD HAD FIREWIRE AS OPPOSED TO USB CAPABILITY?

14  **A.** PROBABLY A PRETTY SMALL NUMBER.

15  **Q.** YOU ALSO SAID THAT THE EFFECT OF ADMITTING THOSE PRODUCT

16  ATTRIBUTES, AGAIN, THE PRODUCT ATTRIBUTES WE ARE TALKING

17  ABOUT, USB, FIREWIRE, WEIGHT, DISPLAY, RESOLUTION, BATTERY,

18  RECHARGE, AND OEM SALE -- ACTUALLY, BEFORE I GET TO THAT

19  QUESTION, LET ME ASK YOU.

20      SO, IS IT YOUR OPINION THAT THE WEIGHT OF AN IPOD IS

21  UNRELATED TO THE SIZE OF AN IPOD?

22  **A.** NO.

23  **Q.** OKAY.

24      NOW, YOU SAID THAT THE EFFECT OF OMITTING THOSE PRODUCT

25  CHARACTERISTICS FROM THE REGRESSION CAUSED PROFESSOR NOLL'S

1    DAMAGES TO COMPLETELY VANISH, RIGHT?  IS THAT WHAT YOU SAID?

2    **A.**  ALONG WITH CORRECTING THE BUT-FOR WORLD.

3    **Q.**  I DON'T THINK THAT'S WHAT YOU SAID.

4         YOU SAID WHEN THESE FACTORS ARE INCLUDED IN DR. NOLL'S

5    REGRESSION, HIS ESTIMATE OF OVERCHARGE COMPLETELY VANISHES.

6         IS THAT TRUE?

7    **A.**  YOU'RE READING FROM THAT POINT THERE.  AND THE -- IT

8    TAKES, AS I THINK I SAID IN MY TESTIMONY WHEN I WAS TALKING

9    ABOUT THAT SLIDE, I SAID WHEN YOU DO BOTH OF THOSE THINGS,

10   ADDING THOSE THINGS IN, CAUSES THE ESTIMATES TO VANISH.

11   THAT'S WHAT MY TABLE AT THE END ACTUALLY SHOWS.

12   **Q.**  SO THAT SLIDE IS INCORRECT; IS THAT WHAT YOU ARE SAYING?

13   **A.**  WELL, IT'S INCOMPLETE.  AND I NOTICED IT WAS INCOMPLETE

14   WHEN I SAID IT -- WHEN I SAW IT.  SO I SAID WHEN I TESTIFIED

15   TO IT THAT IT WOULD TAKE BOTH THE CORRECTION OF HIS BEFORE AND

16   AFTER EXPERIMENT AND THE ADDITION OF THOSE VARIABLES.

17        WHEN YOU DO BOTH OF THOSE THINGS, HIS ESTIMATES OF DAMAGE

18   VANISH.

19   **Q.**  CAN WE --

20                    (DOCUMENT HANDED TO COUNSEL)

21            **MS. SWEENEY:**  CAN WE LOOK AT DEMONSTRATIVE 92,

22   PLEASE?

23                 (DEMONSTRATIVE DISPLAYED TO JURY.)

24   **BY MS. SWEENEY:**

25   **Q.**  THIS IS A SLIDE THAT WE PREPARED FROM ONE OF YOUR

1    APPENDICES.  IT WAS APPENDIX D3C2 IN YOUR JOINT SUPPLEMENTAL

2    REPORT.  AND LET'S HAVE A LOOK AT THIS.

3        SO ON THE LEFT-HAND SIDE WE HAVE RESELLERS SALES AND ON

4    THE RIGHT-HAND SIDE DIRECT SALES.  AND THIS IS YOUR SO-CALLED

5    CORRECTIONS TO PROFESSOR NOLL'S REGRESSION.

6        AND LET'S START WITH THE LEFT-HAND SIDE.  SO ON THE

7    LEFT-HAND SIDE IT HAS THE COEFFICIENT --

8    **A.**  UH-HUH.

9    **Q.**  -- RIGHT?

10       I THINK YOU MENTIONED THAT THAT OTHER SLIDE YOU HAD THAT

11   SHOWED YOUR CORRECTIONS TO THE DAMAGES, IT CALLED IT AN

12   OVERCHARGE, BUT THERE'S A DIFFERENCE BETWEEN THE COEFFICIENT

13   AND THE OVERCHARGE.  IT'S SLIGHT, BUT THERE'S A LITTLE

14   DIFFERENCE, RIGHT?

15   **A.**  REMEMBER THE REGRESSION IS -- SORRY.  IT'S MATH.

16       THE REGRESSION HAS THE LOG OF PRICE REGRESSED ON A BUNCH

17   OF THINGS.  AND THE COEFFICIENTS ARE DETERMINED -- ARE

18   INTERPRETED AS THE CHANGE IN THE LOGARITHM OF THE PRICE WHEN

19   THIS VARIABLE CHANGES.

20       SO .072 WHERE HE HAD IN THE DIRECT SALES THING, WAS THE

21   COEFFICIENT -- IT'S THE CHANGE IN THE LOG.  FOR SMALL

22   PERCENTAGE CHANGES, THAT IS APPROXIMATELY THE PERCENTAGE

23   CHANGE IN THE -- NOT THE LOG, BUT APPROXIMATELY THE

24   PERCENTAGE.  THAT'S THE PROPERTY OF LOGARITHMS.

25       SO WHEN YOU GET UP TO .072, ACTUALLY WHEN HE DOES HIS

1    PERCENTAGE CHANGE, HE CALCULATES IT AS .0745, OR SOMETHING.

2    SO, IT'S A -- THE APPROXIMATION IS BETTER THE SMALLER THE

3    PERCENTAGE CHANGES -- OR THE CHANGE IN THE LOGARITHM THAT YOU

4    ARE TALKING ABOUT.

5    **Q.**   AND YOU AGREE THAT THAT ADJUSTMENT TO TAKE ACCOUNT OF THE

6    FACT TO SAY IT'S A LOGARITHMIC EQUATION IS THE CORRECT ONE,

7    RIGHT?

8    **A.**   I HAVE NO PROBLEM WITH THAT.

9    **Q.**   OKAY.  SO LET'S LOOK AT -- THE FIRST LINE, OF COURSE, IS

10   PROFESSOR NOLL'S REPORTED DAMAGE CALCULATIONS.  THE LEFT MOST

11   COLUMN IS THE COEFFICIENT.  THEN WE HAVE THE PERCENTAGE

12   OVERCHARGE FOR RESELLERS, THE .023 AND THEN 2.38 PERCENT

13   OVERCHARGE, THEN THE DAMAGES, AND ON THE RIGHT-HAND SIDE WE

14   HAVE THE COEFFICIENT FOR THE DIRECT SALES, .072, WHICH

15   TRANSLATES INTO AN OVERCHARGE OF 7.45 PERCENT.  AND THEN WE

16   HAVE THE TOTAL DAMAGES OVER ON THE RIGHT-HAND SIDE.

17   **A.**   UH-HUH.

18   **Q.**   THEN LET'S LOOK AT YOUR -- IF YOU ADD THE VARIABLES THAT

19   YOU CALLED THE OMITTED VARIABLES, YOU HAVE A -- YOU GET A

20   COEFFICIENT -- YOU HAVE THE SAME COEFFICIENT FOR THE

21   RESELLERS; IS THAT RIGHT, .023?

22   **A.**   WELL, IT -- IT CAN'T BE EXACTLY BECAUSE WE'VE PUT --

23   THERE'S SOME ROUNDING THAT GOES DOWN TO .023.  BECAUSE IF YOU

24   LOOK AT THE PERCENTAGE OVERCHARGE OVER HERE IN -- WE ARE USING

25   THE SAME NUMBER OF SIGNIFICANT DIGITS THAT PROFESSOR NOLL WAS

1    USING.  I RECALL.

2        AND THIS -- NOTICE THAT THE FIRST .023 TRANSLATES INTO

3    2.38 PERCENT AND THE SECOND ONE TRANSLATES INTO POINT -- 2.28

4    PERCENT.

5    **Q.**  OKAY.  THANKS --

6                        (SIMULTANEOUS COLLOQUY.)

7    **A.**  IT'S A LITTLE DIFFERENT.

8    **Q.**  SORRY.

9        SO YOU GET A 2.28 PERCENT OVERCHARGE, WHICH TRANSLATES

10   INTO -- THERE SHOULD HAVE BEEN AN "M" HERE, BUT $142.6 MILLION

11   FOR THE RESELLERS?

12   **A.**  IF I LOOK AT THIS --

13   **Q.**  EXCUSE ME.

14   **A.**  I JUST WANT TO CORRECT A NUMBER.

15       THE -- I SEE .023 IN BOTH PLACES.  IT'S PROBABLY THE CASE

16   THAT BASED ON WHAT I SHOWED IN MY TESTIMONY, THE SECOND ONE

17   OUGHT TO BE .022.  AND THAT WOULD BE CONSISTENT WITH THE 2.38

18   VERSUS THE 2.28.

19       GO AHEAD.

20   **Q.**  DO YOU WANT TO HAVE A LOOK AT YOUR APPENDIX TO CHECK?

21   THAT'S WHERE THESE NUMBERS CAME FROM.

22   **A.**  I'M FINE WITH IT.  I JUST -- WE CAN KEEP GOING ALONG

23   WHATEVER PATH YOU WANT TO GO ON HERE.

24   **Q.**  RIGHT.

25       AND THEN FOR THE DIRECT SALES, THERE'S A COEFFICIENT OF

1892

TOPEL – CROSS / SWEENEY

1  .057, AN OVERCHARGE OF 5.56, AND THEN TOTAL DAMAGES OF

2  145 MILLION –– 145.4 MILLION, RIGHT?

3  **A.**  YOU'RE –– YOU'RE MOVING AROUND.  YOU JUST HAD TOTAL

4  ESTIMATED –– OKAY.  ESTIMATED DAMAGES THERE.  YEAH.

5  **Q.**  OKAY.

6      SO –– SO WHAT I'M GETTING AT IS THIS SHOWS THAT IF YOU

7  MAKE THE CORRECTIONS, EVEN IF YOU THINK THAT YOUR ATTRIBUTES

8  SHOULD HAVE BEEN ADDED, THE DAMAGES DO NOT VANISH, RIGHT?

9  **A.**  IF YOU DON'T CORRECT THE BEFORE AND AFTER, YES.

10  **Q.**  THEN LET'S GO TO THE BEFORE AND AFTER.

11      SO IF YOU MAKE THE BEFORE AND AFTER CORRECTION THAT YOU

12  RECOMMEND, THE RESELLER DAMAGES ARE 137.9 MILLION, RIGHT?

13  **A.**  YES.

14  **Q.**  AND THEN THE CONSUMER DAMAGES ARE 83.7 MILLION, RIGHT?

15  **A.**  THAT'S RIGHT.

16  **Q.**  OKAY.

17      SO, IN ORDER TO GET WHERE YOU SAID DAMAGES DISAPPEAR, YOU

18  HAVE TO AGREE WITH ALL OF YOUR CORRECTIONS, RIGHT?

19  **A.**  THAT'S WHAT I SAID.  YES.

20  **Q.**  NOW I WOULD LIKE TO LOOK AT ONE OF THE SLIDES THAT YOU

21  CREATED AND THAT YOU TALKED ABOUT EARLIER.

22      DEMONSTRATIVE 649?

23          (DEMONSTRATIVE DISPLAYED TO JURY.)

24      **MR. ISAACSON:**  THIS WAS NOT SHOWN TO THE WITNESS.

25      **THE COURT:**  CROSS-EXAMINATION.  OVERRULED.

1    **BY MS. SWEENEY:**

2    **Q.**  IS THIS A SLIDE THAT YOU PREPARED?

3    **A.**  YES.

4    **Q.**  OKAY.  AND THIS IS TO ILLUSTRATE YOUR BEFORE AND AFTER

5    CRITICISM, RIGHT?

6    **A.**  WELL, IT ILLUSTRATES THE WAY I UNDERSTAND THAT PROFESSOR

7    NOLL CONSTRUCTED HIS VARIABLES.

8    **Q.**  OKAY.

9       SO THIS ILLUSTRATES THE WAY YOU UNDERSTAND PROFESSOR NOLL

10   CONSTRUCTED HIS VARIABLES?

11   **A.**  YES.

12   **Q.**  ALL RIGHT.  LET'S LOOK AT THE -- WHICH ONE IS --

13   REPRESENTS 7.0?

14   **A.**  THE PURPLE ONE.

15   **Q.**  OKAY.  THE ONE AT THE TOP?

16      HOW ABOUT 4.7?

17   **A.**  THE RED ONE.

18   **Q.**  IS IT YOUR UNDERSTANDING THAT PROFESSOR NOLL TURNED OFF

19   4.7 FOR ALL MODELS OF IPOD AFTER SEPTEMBER 12TH, 2006?

20   **A.**  NO.  IF YOU LOOK AT THE HEADING ON THE TABLE, IT SAYS

21   "IPOD NANO" BECAUSE THAT'S THE ONE THAT THIS SEQUENCE OF

22   EVENTS APPLIES TO.

23   **Q.**  OKAY.  AND THE NANO, IS IT YOUR UNDERSTANDING THAT 4.7

24   COULD STILL RUN ON THE NANO?

25   **A.**  THE 4.7 WAS IN THE ITUNES THAT -- MY UNDERSTANDING IS THAT

1    THE DRM TECHNOLOGY THAT WAS IN 4.7 WAS STILL THERE IN ITUNES.

2        AND MY UNDERSTANDING IS THAT ON MODELS THAT COULD NOT

3    INVOKE 7.0, WHERE I'M USING MY LAYMAN'S TECHNOLOGY SAYING --

4    MY LAYMAN'S LANGUAGE SAYING INVOKE, THOSE CONTINUE TO USE THE

5    TECHNOLOGY THAT WAS IN 4.7.

6    **Q.**  LET'S LOOK AT DEMONSTRATIVE 72.

7             (DEMONSTRATIVE DISPLAYED TO JURY.)

8        AND THIS IS A DEMONSTRATIVE THAT WE USED THAT PROFESSOR

9    NOLL CREATED.

10       NOW, IF YOU LOOK AT THE HARMONY BLOCKED 4.7 LINES, YOU CAN

11   SEE THAT FOR MODELS THAT HAD 7.0, IT'S TURNED OFF BUT NOT FOR

12   MODELS THAT DIDN'T HAVE 7.0, RIGHT?

13   **A.**  YES.  THAT'S WHAT HE DID.

14   **Q.**  THAT'S WHAT HE DID.

15       AS YOU UNDERSTAND IT, 4.7 CONTINUED TO OPERATE ON MODELS

16   OTHER THAN THE NANO AFTER SEVEN -- AFTER 7.0 IN

17   SEPTEMBER 2006, RIGHT?

18   **A.**  IF WE DEFINE "AFTER" UNTIL SEPTEMBER OF 2007 AND ALL THE

19   WAY -- FOR THE -- FOR THE CLASSIC AND THE TOUCH THAT CAME OUT

20   AT THAT TIME.  FOR THE SHUFFLE, 4.7 WAS THE TECHNOLOGY

21   THROUGHOUT.

22           **MS. SWEENEY:**  I HAVE NO FURTHER QUESTIONS AT THIS

23   TIME.

24           **THE COURT:**  REDIRECT LIMITED TO THE SCOPE OF CROSS.

25           **MR. ISAACSON:**  MATT, CAN WE PUT UP THE FULL APPENDIX

1    D3C2?

2                    **REDIRECT EXAMINATION**

3    **BY MR. ISAACSON:**

4    **Q.**  YOU WERE SHOWN A DEMONSTRATIVE THAT WAS AN EXCERPT FROM

5    THIS, RIGHT?

6                    (DEMONSTRATIVE DISPLAYED TO JURY.)

7    **A.**  YES, I WAS.

8    **Q.**  ALL RIGHT.

9         CAN YOU BLOW UP THE BOTTOM LINE?

10   **A.**  I THINK YOU WANT TO ACTUALLY GO UP ONE.

11   **Q.**  WELL, THOSE LAST TWO.

12   **A.**  UH-HUH.

13   **Q.**  ALL RIGHT.

14        WERE THESE TWO LINES INCLUDED IN THE DEMONSTRATIVE YOU

15   WERE SHOWN?

16   **A.**  IT'S INCLUDED IN THIS TABLE THAT WAS GIVEN.

17   **Q.**  THE DEMONSTRATIVE THAT YOU WERE SHOWN.

18   **A.**  NO, THEY DIDN'T SHOW ME THAT.

19   **Q.**  THEY DIDN'T SHOW YOU THAT, DID THEY.

20        AND SO THEY CREATED AN EXHIBIT OFF OF YOUR APPENDIX D3C2

21   AND THEY OMITTED THIS.  WHAT DOES IT SHOW?

22   **A.**  IT SHOWS THAT WHEN WE CONTROL FOR ADDITIONAL

23   CHARACTERISTICS AND WHEN WE PROPERLY DO THE BEFORE AND AFTER,

24   SO THAT THE ALTERNATIVE TECHNOLOGY IS FROM 4.7, THAT THERE ARE

25   NO POSITIVE DAMAGES.

1    NOW, LOOK, IT SAYS 95 MILLION.  THAT PARENTHESES MEANS

2    IT'S A NEGATIVE NUMBER.  I AM NOT ARGUING THAT THE CLASS OWES

3    APPLE MONEY.  IT'S JUST THAT THERE IS NO EVIDENCE OF HARM.

4    **Q.**  AND YOU WERE ASKED THE QUESTION ABOUT WHETHER YOUR OPINION

5    WOULD BE THAT DAMAGES WERE ZERO.

6    CAN WE LOOK AT 636 FROM THE DIRECT EXAMINATION?

7    (DEMONSTRATIVE DISPLAYED TO JURY.)

8    ALL RIGHT.  AND LET'S CONFLATE THOSE AGAIN INTO THE IPOD

9    DATABASE.  YOU EXPLAINED THIS BEFORE.

10    BASED ON DR. NOLL'S TREATMENT OF THESE ITUNE 7.0 FEATURES

11    THAT ALL CAME OUT IN SEPTEMBER 2006, WHAT IS YOUR OPINION

12    ABOUT WHAT'S BEEN PROVEN ABOUT DAMAGES IN THIS CASE?

13    **A.**  ALL RIGHT.  AS I THINK I SAID BEFORE, THERE IS NO EVIDENCE

14    THAT ITUNES 7 CAUSED DAMAGES.

15    **Q.**  JUST BASED ON THIS ANALYSIS ALONE?

16    **A.**  THIS ANALYSIS ALONE.

17    **Q.**  AND YOU WERE ASKED ABOUT DR. NOLL'S HIGH T'S STATISTIC.

18    IS THAT RELEVANT TO YOUR CONCLUSIONS?

19    **A.**  NONE OF THE CONCLUSIONS THAT I STATED ON THE FIRST PAGE,

20    NO.

21    **Q.**  WHAT ABOUT YOUR OTHER CONCLUSIONS?

22    **A.**  NO.

23    **Q.**  OKAY.  WHY?

24    **A.**  BECAUSE THE, YOU KNOW, WHATEVER YOU THINK OF AS CLAIMED

25    PRECISION, WHAT MATTERS IS WHAT THE POINT ESTIMATES ARE.  IF

1    YOU REMEMBER WHEN MS. SWEENEY WAS ASKING ME ABOUT A T

2    STATISTIC IS THE POINT ESTIMATE DIVIDED BY THE STANDARD ERROR.

3        SO ALL THE CALCULATIONS OF DAMAGES THAT WE PUT IN THAT

4    TABLE, OR HE HAS IN HIS TABLE, ARE BASED ON AN ENUMERATOR, THE

5    TOP OF THAT RATIO.  THE POINT ESTIMATE.  NONE OF THEM ARE

6    BASED ON THE STANDARD ERROR.

7        NOW, WE DID A LITTLE CORRECTION FOR THE STANDARD ERROR,

8    BUT THAT WASN'T IN ANYTHING THAT MS. SWEENEY SHOWED ME.

9    **Q.**  ALL RIGHT.

10           **MR. ISAACSON:**  THANK YOU.

11           **THE COURT:**  ANY RECROSS ON THOSE TOPICS ONLY?

12           **MS. SWEENEY:**  NO, YOUR HONOR.

13           **THE COURT:**  OKAY.  I'M GETTING THIS DOWN.  ANY

14    QUESTIONS FROM THE JURY?

15                    (NO RESPONSE.)

16        NONE?

17        ALL RIGHT.  THEN YOU ARE EXCUSED.

18           **THE WITNESS:**  THANK YOU.

19           **THE COURT:**  NEXT WITNESS.

20           **MS. DEARBORN:**  APPLE CALLS MARK DONNELLY.

21        (**MARK DONNELLY,** CALLED AS A WITNESS FOR THE DEFENDANT,

22    HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

23           **THE WITNESS:**  I DO.

24           **THE CLERK:**  PLEASE BE SEATED.

25        THEN WILL YOU PLEASE STATE YOUR FULL NAME AND SPELL YOUR

1    LAST NAME.

2             **THE WITNESS:**  MY NAME IS MARK A. DONNELLY.  MY LAST

3    NAME IS SPELLED D-O-N-N-E-L-L-Y.

4             **THE COURT:**  GOOD AFTERNOON.

5             **THE WITNESS:**  GOOD AFTERNOON.

6             **THE COURT:**  YOU MAY PROCEED.

7                     <u>**DIRECT EXAMINATION**</u>

8    BY MS. DEARBORN:

9    **Q.**  GOOD AFTERNOON, MR. DONNELLY.  WILL YOU PLEASE INTRODUCE

10   YOURSELF TO THE JURY?

11   **A.**  I AM MARK DONNELLY.  I'M RETIRED FROM APPLE.  WORKED THERE

12   FOR ABOUT 25 YEARS.  RETIRED LAST OCTOBER.

13       BEFORE THAT I WORKED SEVERAL YEARS AT LOCKHEED AND –– AND

14   SINCE I RETIRED, I HAVE BEEN WORKING WITH SOME NONPROFITS,

15   INCLUDING BEING A VOLUNTEER PILOT FOR ANGEL FLIGHT.

16             **THE CLERK:**  CAN YOU MOVE THE MIC?

17   BY MS. DEARBORN:

18   **Q.**  WHAT WAS YOUR FIRST JOB AT APPLE?

19   **A.**  I WAS A FINANCIAL CONTROLLER FOR THE ADVANCE TECHNOLOGY

20   GROUP.

21   **Q.**  AND HOW DID YOU WORK YOUR WAY UP FROM THERE?

22   **A.**  I TOOK A VARIETY OF JOBS IN THE COMPANY.

23       I WORKED IN SALES.  I WORKED IN OPERATIONS.  I WORKED IN

24   MARKETING.  AND GATHERED A LOT OF EXPERIENCE THROUGHOUT

25   DIFFERENT DIVISIONS IN THE COMPANY, BUT MOSTLY IN A FINANCIAL

DONNELLY - DIRECT / DEARBORN

1   ROLE AND SOMETIMES IN A MARKETING ROLE.

2   **Q.**   WHAT WERE YOUR JOB RESPONSIBILITIES FROM 2006 TO 2009?

3   **A.**   IN 2006 TO 2009, IN THAT PERIOD, I WAS THE VICE PRESIDENT

4   FOR PRODUCT MARKETING BUSINESS MANAGEMENT.  AND FOR FINANCE

5   FOR A NUMBER OF RESEARCH AND DEVELOPMENT DIVISIONS AT APPLE.

6   **Q.**   DID YOUR JOB RESPONSIBILITIES INCLUDE SETTING PRICES FOR

7   APPLE'S PRODUCTS?

8   **A.**   IT DID.

9   **Q.**   WHAT PRODUCTS WERE YOU RESPONSIBLE FOR?

10  **A.**   ALL THE HERO PRODUCTS, THE ONES YOU WOULD KNOW BY BRAND.

11  IPAD, IPOD, IPHONE, IMAC'S, THAT SORT OF THING.

12  **Q.**   YOU MENTIONED THAT YOU WERE FOCUSING ON YOUR SERVICE AND

13  YOU'RE CURRENTLY A PILOT.  WOULD YOU TELL THE JURY A LITTLE

14  BIT MORE ABOUT YOUR SERVICE RIGHT NOW?

15  **A.**   I'M VICE CHAIRMAN OF THE BOARD FOR HOME FIRST, WHICH IS A

16  CHARITY NONPROFIT IN SANTA CLARA COUNTY WORKING TO END

17  HOMELESSNESS, AND FIND A WAY TO GET PEOPLE HOUSED.  IT'S A

18  PRETTY TOUGH PROBLEM.

19      AND THEN THE OTHER JOB I DO IS I'M A COMMAND PILOT FOR

20  ANGEL FLIGHT WEST WHICH FLIES INDIGENT PATIENTS FROM REMOTE

21  AREAS OF CALIFORNIA AND NEVADA AND PLACES LIKE THAT TO GET

22  MEDICAL CARE, PALO ALTO, HEWLETT-PACKARD -- I MEAN, LUCILLE

23  PACKARD CHILDREN'S HOSPITAL AND OAKLAND CHILDREN'S HOSPITAL.

24  **Q.**   TELL US A LITTLE BIT ABOUT YOUR EDUCATIONAL BACKGROUND.

25  **A.**   I HAVE A BACHELORS DEGREE IN ECONOMICS FROM STANFORD

1    UNIVERSITY AND I HAVE A MASTERS IN BUSINESS ADMINISTRATION

2    FROM SANTA CLARA.

3    **Q.**  ARE YOU MARRIED?

4    **A.**  YES.

5    **Q.**  DO YOU HAVE KIDS?

6    **A.**  YES.

7    **Q.**  HOW OLD ARE YOUR KIDS?

8    **A.**  I HAVE THREE CHILDREN.  I HAVE A SON WHO IS 27 YEARS OLD.

9    HE'S A SKI INSTRUCTOR IN UTAH.  AND TWO DAUGHTERS WHO ARE

10   TWINS, THEY'RE 23, AND THEY ARE IN SAN FRANCISCO ATTENDING

11   ACADEMY OF ART UNIVERSITY.

12   **Q.**  SO YOU TESTIFIED THAT YOU WERE INVOLVED IN SETTING PRICES

13   FOR IPODS.  CAN YOU BRIEFLY DESCRIBE YOUR INVOLVEMENT IN THAT

14   PROCESS?

15   **A.**  MY TEAM WAS INVOLVED IN PULLING TOGETHER ALL THE

16   INFORMATION THAT THE PRICE COMMITTEE WANTED TO CONSIDER FOR

17   SETTING THE PRICES AND PUT TOGETHER PACKAGES THAT WE WOULD

18   DISCUSS AT THE MEETINGS.

19       WE WOULD PREVIEW THESE THINGS WITH THE DIFFERENT

20   EXECUTIVES AND THEN WE WOULD HAVE A MEETING, FORMAL MEETING

21   WITH THE GROUP TO DISCUSS THOSE THINGS AND MAKE DECISIONS ON

22   PRICES.

23   **Q.**  THE JURY HAS HEARD A LITTLE BIT ABOUT THE PRICE COMMITTEE.

24   CAN YOU TELL US WHAT THE PRICE COMMITTEE IS?

25   **A.**  THE PRICE COMMITTEE IS SOMETHING THAT -- I WORKED FOR PHIL

1    SCHILLER.  I THINK HE TESTIFIED TO YOU BEFORE.  HE WAS MY BOSS

2    FOR SEVERAL YEARS.

3         AND ONE OF THE THINGS HE DIRECTED ME TO DO IS TO SET UP

4    THE PRICE COMMITTEE, WHICH IS A WAY TO MANAGE PRICES ACROSS

5    APPLE.

6         AND IT WAS COMPOSED OF SENIOR EXECUTIVES, DECISION MAKERS,

7    AND WE WOULD HAVE A MEETING TO GO OVER THE DETAILS AND MAKE

8    DECISIONS BEFORE PRODUCT LAUNCHES SO WE CAN HAVE A CONTROLLED

9    WAY OF RELEASING OUR PRICES AROUND THE WORLD.

10   **Q.**  HOW OFTEN DID THE PRICE COMMITTEE MEET?

11   **A.**  AS NEEDED.  SO IT DEPENDED -- IT WAS USUALLY DRIVEN BY THE

12   RHYTHM OF PRODUCT INTRODUCTIONS.

13   **Q.**  WERE THOSE MEETINGS ALWAYS IN PERSON?

14   **A.**  NOT ALWAYS.  MOST OF THE TIME, BUT NOT ALWAYS.

15   **Q.**  HOW DID THE PRICE COMMITTEE COME TO DECISIONS?

16   **A.**  GENERALLY A LOT OF DEBATE.  DIFFERENT PEOPLE WOULD EXPRESS

17   DIFFERENT OPINIONS ABOUT DIFFERENT FEATURE SETS AND HOW

18   VALUABLE THEY WERE OR WHETHER OR NOT WE WERE MAKING ENOUGH

19   MARGIN OR NOT.

20        SO PEOPLE LIKE PHIL SCHILLER, STEVE JOBS, TIM COOK, PETER

21   OPPENHEIMER WOULD WEIGH IN AND EXPRESS THEIR OPINION, SO WOULD

22   I AND SO WOULD OTHER PEOPLE THAT WERE IN THE MEETING, AND THEN

23   COME TO A CONSENSUS DECISION GENERALLY.

24   **Q.**  YOU MENTIONED EARLIER THAT YOU WOULD PREPARE A PACKAGE FOR

25   THE PRICE COMMITTEE.

1    I WOULD LIKE TO IDENTIFY A NUMBER OF THESE PACKAGES AND

2    HAVE YOU DESCRIBE THEM VERY BRIEFLY TO THE JURY.

3    **A.**  OKAY.

4    **Q.**  SO THERE'S A BINDER IN FRONT OF YOU.  WE CAN ALSO SHOW

5    SOME OF THESE ON THE SCREEN.

6    SO THE FIRST -- I WOULD LIKE YOU TO IDENTIFY TRIAL

7    EXHIBIT --

8    **THE COURT:**  YOU'RE GOING TO HAVE TO SLOW DOWN.

9    **MS. DEARBORN:**  YES, YOUR HONOR.

10    **BY MS. DEARBORN:**

11    **Q.**  I WOULD LIKE YOU TO IDENTIFY TRIAL EXHIBIT 2344.

12    **A.**  2344.

13    **Q.**  IF WE CAN LOOK AT PAGE 2 OF THIS DOCUMENT.

14    (EXHIBIT DISPLAYED TO JURY.)

15    WHAT IS THE DATE LISTED HERE?

16    **A.**  JANUARY 20TH, 2006.

17    **Q.**  GREAT.

18    AND TURNING TO PAGE 3.  WHAT IPODS ARE IDENTIFIED HERE?

19    **A.**  THIS PRICE COMMITTEE WAS TO DISCUSS PRICING FOR THE NEW

20    IPOD, YOU KNOW, ONE GIG CONFIGURATION IPOD NANO AND TO

21    RE-PRICE THE SHUFFLE, WHICH IS THE REALLY SMALL IPOD.

22    **Q.**  WERE YOU INVOLVED IN PREPARING THIS DOCUMENT?

23    **A.**  YES, I WAS.

24    **Q.**  OKAY.

25    NEXT, LET'S TURN TO TRIAL EXHIBIT 2844.

```
1              (EXHIBIT DISPLAYED TO JURY.)

2         AND ON THE FIRST PAGE, WHAT'S THE DATE ON THIS EMAIL?

3    A.   THIS IS AUGUST 21ST, 2006.

4    Q.   AND TURNING TO PAGE 4.

5         CAN YOU IDENTIFY WHAT THIS DOCUMENT IS?

6    A.   THIS IS WHAT WE CALL THE IPOD SITUATION SUMMARY.

7         SO MOST OF OUR PRICE COMMITTEE PACKAGES HAD THIS PAGE TO

8    KIND OF TEE IT UP FOR THE EXECUTIVES, WHAT WE WERE GOING TO

9    TALK ABOUT THAT DAY.

10        SO THIS ONE WAS ABOUT THE INTRODUCTION FOR THREE NEW IPODS

11   WE WERE GOING TO INTRODUCE ON SEPTEMBER 12TH OF THAT YEAR,

12   WHICH WAS 2006.

13   Q.   AND YOU WERE INVOLVED IN PREPARING THIS PACKAGE AS WELL?

14   A.   YES, I WAS.

15   Q.   OKAY.  NEXT LET'S TURN TO TRIAL EXHIBIT 2493.

16              (EXHIBIT DISPLAYED TO JURY.)

17   Q.   LET'S TURN TO PAGE 2 OF 9.

18   A.   ONE SECOND.

19   Q.   IT SHOULD BE UP ON THE SCREEN IN FRONT OF YOU AS WELL.

20   A.   THERE WE GO.  I FOUND IT.

21        WHICH PAGE WOULD YOU LIKE ME TO LOOK AT?

22   Q.   START WITH PAGE 2 OF 9.

23   A.   YES.

24   Q.   AND CAN YOU TELL THE JURY A BIT ABOUT WHAT THIS PRICE

25   COMMITTEE DOCUMENT IS ABOUT?
```

DONNELLY – DIRECT / DEARBORN

1    **A.**   THIS IS AUGUST 16TH, 2007 PRICE COMMITTEE, AND IT'S ABOUT

2    MAKING A DECISION FOR IPOD, IPOD NANO, AND IPOD SHUFFLE.

3    **Q.**   TURNING TO PAGE 3, WHEN WILL THESE IPODS BE RELEASED?

4    **A.**   THE PLANNED INTRODUCTION DATE IS SEPTEMBER 5TH, 2007.

5    **Q.**   NEXT, TRIAL EXHIBIT 2556.

6                   (EXHIBIT DISPLAYED TO JURY.)

7        AND THE COVER EMAIL, WHAT IS THE DATE ON THIS DOCUMENT?

8    **A.**   AUGUST 22ND, 2008.

9    **Q.**   AND TURNING TO PAGE 4 OF 10, CAN YOU HELP THE JURY

10   IDENTIFY WHAT THIS DOCUMENT IS?

11   **A.**   OKAY.  THIS IS ANOTHER ONE OF THOSE SITUATION SUMMARIES.

12   IT'S ABOUT AN IPOD INTRODUCTION TO OCCUR ON SEPTEMBER 9TH,

13   2008.

14   **Q.**   OKAY.  ARE ALL OF THESE DOCUMENTS EXAMPLES OF THE PACKAGES

15   YOU PREPARED FOR THE PRICE COMMITTEE?

16   **A.**   YES, THEY ARE.

17   **Q.**   ARE THESE FAIRLY TYPICAL OF THE PACKAGES THAT YOU

18   PREPARED?

19   **A.**   IT'S A VERY GOOD REPRESENTATION.

20   **Q.**   DID THE PRICE COMMITTEE USE THESE DOCUMENTS IN SETTING

21   PRICES FOR IPODS?

22   **A.**   ABSOLUTELY.

23   **Q.**   OKAY.

24       WE DON'T HAVE TIME TO GO THROUGH ALL OF THESE DOCUMENTS,

25   BUT I WOULD LIKE TO GIVE THE JURY A SENSE OF WHAT THESE

1    PRESENTATIONS LOOK LIKE.

2         SO, TAKING TRIAL EXHIBIT 2844 AS AN EXAMPLE, YOU

3    PREVIOUSLY TESTIFIED THAT THIS PRICE COMMITTEE DOCUMENT

4    PERTAINS TO IPODS TO BE RELEASED IN SEPTEMBER OF 2006.

5              (EXHIBIT DISPLAYED TO JURY.)

6         SO, LET'S TURN TO PAGE 8.

7         CAN YOU PLEASE TELL THE JURY WHAT THEY ARE SEEING ON THIS

8    SLIDE?

9    **A.**  IT'S PRETTY SMALL PRINT.  I HOPE YOU ALL CAN SEE IT.

10         THIS IS WHAT WE WOULD CALL OUR COMPETITIVE OUTLOOK PAGE.

11   SO THIS SHOWS FOR THE IPOD NANO AND IPOD SHUFFLE SOME

12   REPRESENTATIVE COMPETITIVE PRODUCTS THAT WE WERE LOOKING AT AT

13   THE TIME WE WERE DOING OUR PRICING FOR THE IPOD NANO AT THAT

14   TIME.

15   **Q.**  SO, TO WHAT EXTENT, IF AT ALL, IS THIS SLIDE COMPARING

16   IPOD NANO AND SHUFFLE FEATURES IN PRICES AGAINST THE

17   COMPETITION?

18   **A.**  IT IS DOING THAT.

19   **Q.**  NOW, LOOKING AT THE NANO, IN THE TITLE -- IN THE COLUMN

20   TITLED "VENDOR", I SEE NAMES LIKE SANDISK, SAMSUNG, AND

21   CREATIVE.  WHO ARE THOSE COMPANIES?

22   **A.**  THOSE WERE COMPETITORS IN THE MARKETPLACE AT THAT TIME WHO

23   MADE MP3 PLAYERS.

24   **Q.**  OKAY.  AND WHAT IS REPRESENTED IN THE PRODUCT COLUMN RIGHT

25   NEXT TO IT?

1    **A.**    IN THERE WE HAVE THE BRAND NAME OF THE COMPETITIVE PRODUCT

2    AND −− THAT WE WERE LOOKING AT.

3    **Q.**    HOW DO YOU DETERMINE WHAT COMPETITOR PRODUCTS TO LIST IN

4    THESE TYPES OF SLIDES?

5    **A.**    WELL, AT IN THAT POINT IN TIME THERE WERE A WHOLE BUNCH OF

6    COMPETITORS POPPING UP ALL THE TIME.  WE WOULD TRY TO ZERO IN

7    ON THE ONES THAT WERE MOST POPULAR THAT THE COMPETITORS HAD.

8         WE WOULDN'T PUT −− I COULDN'T BRING A THING INTO THE

9    EXECUTIVE MEETING THAT HAD 50 PRODUCTS LISTED, BUT WE WERE

10    FACING THAT.  WE WOULD LOOK AT THE ONES MOST POPULAR.

11    **Q.**    AND I SEE A NUMBER OF FEATURES LISTED ACROSS THE COLUMNS

12    HERE, LIKE CAPACITY, DISPLAY, BATTERY, AND WEIGHT.

13         HOW DID YOU DECIDE WHAT FEATURES TO LIST HERE?

14    **A.**    WELL, WE VIEWED THESE AS IMPORTANT FEATURES THAT

15    DIFFERENTIATED THE PRODUCTS FROM EACH OTHER AND THE MODELS

16    WITHIN A PRODUCT LINE.

17         A LOT OF THESE FEATURES WERE THINGS YOU COULD SEE ON THE

18    BOX.  SO WHEN SOMEONE WAS IN THE STORE, AND THEY WOULD GO LOOK

19    AT ONE THING ON THE SHELF, NEXT TO THE OTHER THEY WOULD SEE,

20    YOU KNOW, THIS IS A FOUR GIG, THAT'S A FOUR GIG, ARE THESE THE

21    SAME?  THIS ONE HAS A BATTERY LIFE THAT'S FOUR HOURS, THIS ONE

22    THAT HAS A BATTERY LIFE OF EIGHT.  WHAT'S BETTER?

23         SO WE PUT THOSE KIND OF COMPETITOR THINGS UP FOR FOLKS FOR

24    PEOPLE TO CONSIDER.

25    **Q.**    I THINK YOU MENTIONED THIS JUST A MINUTE AGO, WERE THESE

DONNELLY – DIRECT / DEARBORN

1    THE ONLY COMPETITORS IN THE MARKETPLACE AT THE TIME?

2    **A.**    ABSOLUTELY NOT.

3    **Q.**    HOW, IF AT ALL, DID THE ROYAL OF COMPETITION CHANGE OVER

4    TIME IN PRICING IPODS?

5    **A.**    WELL, THE COMPETITORS WE WOULD SEE THAT WERE POPULAR AT

6    THE TIME WOULD CHANGE OVER TIME.  SOMEONE MAY COME UP WITH A

7    DIFFERENT FEATURES THAT WOULD HELP GIVE THEM TEMPORARY

8    ADVANTAGE IN THE MARKETPLACE, BUT THIS IS SOMETHING THAT KEPT

9    OUR TEAM AWAKE AT NIGHT KEEPING TRACK OF WHAT WAS GOING ON.

10    **Q.**    GREAT.

11        LET'S GO THROUGH SOME OF THESE FEATURES.  WHAT DOES

12    CAPACITY MEAN?

13    **A.**    CAPACITY HAS TO DO WITH THE STORAGE CAPACITY OF THE DEVICE

14    AND HOW MANY SONGS COULD IT HOLD, OR HOW BIG WAS THE HARD

15    DRIVE, HOW BIG WAS THE FLASH DRIVE THAT WAS IN THERE.

16    **Q.**    AND WHY DID YOU LIST THAT FEATURE FOR THE PRICE COMMITTEE?

17    **A.**    IT WAS REALLY IMPORTANT IN TERMS OF HOW MUCH, YOU KNOW,

18    THE PRODUCT COULD HOLD IN TERMS OF THE SONG.  ONE OF OUR TAG

19    LINES WHEN WE STARTED SELLING THE IPOD.  THE ORIGINAL ONE WAS

20    A THOUSAND SONGS IN YOUR POCKET.  THAT WAS A BIG DEAL.  SO

21    HAVING MORE CAPACITY IS GENERALLY BETTER.

22    **Q.**    WHAT DOES DISPLAY MEAN?

23    **A.**    IN THIS CASE WE ARE TALKING ABOUT THE SIZE OF THE DISPLAY.

24    AND A FEATURE OF THE DISPLAY, I GUESS, ALL THESE HERE HAVE

25    COLOR, BUT THE SHUFFLE, SOME OF THEM HAVE LED DISPLAYS THAT

1    MIGHT HAVE BEEN BLACK AND WHITE.  BUT THE QUALITY OF THE

2    DISPLAY WAS SOMETIMES VERY IMPORTANT.

3    **Q.**  HOW ABOUT BATTERY?

4    **A.**  WELL, YOU WANT TO CARRY THIS DEVICE AROUND IN YOUR POCKET.

5    YOU DON'T WANT TO CHARGE IT UP EVERY FEW MINUTES, SO THE

6    LONGER IT LASTED, THE BETTER IT WAS.  BATTERY LIFE WAS VERY

7    IMPORTANT WE FELT.

8    **Q.**  I'M GOING TO GO BACK TO DISPLAY FOR ONE QUESTION.

9        WHAT –– WHY WAS THAT AN IMPORTANT FEATURE TO LIST FOR THE

10   PRICE COMMITTEE?

11   **A.**  WELL, A LOT OF TIMES IT HAD TO DO WITH, AS WE PROGRESSED,

12   YOU KNOW, THE CAPABILITY OF THESE DISPLAYS GOT BETTER AND WE

13   COULD DO MORE WITH THEM.

14       YOU CAN SHOW MORE OF THE PLAYLIST, IF YOU ARE LOOKING AT

15   YOUR MUSIC LIBRARY, AND THEN YOU CAN SHOW PICTURES, YOU CAN

16   SHOW VIDEO, AND THEN THE DISPLAYS GOT BETTER AND YOU CAN SHOW

17   MOVIES.  SO WE KEPT TRYING TO WORK ON PUTTING NEW FEATURES ON

18   THERE.

19       SO WHAT YOU COULD DO WITH THE DISPLAY WAS REALLY IMPORTANT

20   AND HOW MUCH BATTERY LIFE THAT IT USED, TOO.  SO THE BIGGER

21   THE DISPLAY, THE MORE IT USED THE BATTERY, SO –– WE WERE

22   CONCERNED ABOUT HOW MUCH BATTERY LIFE WOULD GET USED UP BY THE

23   DISPLAY.

24   **Q.**  HOW ABOUT WEIGHT?  WHAT DOES WEIGHT MEAN?

25   **A.**  THIS WOULD BE THE WEIGHT OF THE PRODUCT OUTSIDE THE

1    PACKAGE.  SO HOW MUCH DID IT FEEL IN YOUR POCKET.

2    **Q.**   WHY DID YOU LIST THAT FEATURE FOR THE PRICE COMMITTEE?

3    **A.**   SINCE IT WAS A PORTABLE MUSIC PLAYER, IT WAS REALLY

4    IMPORTANT HOW HEAVY IT WAS.  AND SO THE LIGHTER IT WAS WITH

5    THE SAME CAPABILITIES, ALL OF IT BEING EQUAL, GENERALLY IT'S

6    BETTER.

7    **Q.**   HOW ABOUT SIZE?

8    **A.**   FOR SIMILAR REASONS, SIZE WAS REALLY IMPORTANT BECAUSE YOU

9    WANTED IT TO FIT IN YOUR POCKET OR A SMALLER SPOT.  SO IF IT

10   GOT REALLY BIG, IT WASN'T AS USEFUL.

11   **Q.**   I SEE A COLUMN HERE CALLED "ADDITIONAL FEATURES".

12       WHAT KINDS OF THINGS DID YOU TYPICALLY LIST IN THAT

13   COLUMN?

14   **A.**   WE LOOKED FOR THINGS THAT MAY DIFFERENTIATE THE PRODUCT

15   THAT COULDN'T JUST BE QUANTIFIED EXACTLY, BUT THEY WERE CHECK

16   BOXES.  WE CALLED THEM CHECK BOX ITEMS.

17       LIKE A PHOTO VIEWER, VOICE RECORDING, NICE FEATURES THAT

18   THE PRODUCT HAD THAT WE HAD ADDED PERHAPS FROM THE LAST MODEL.

19   **Q.**   GREAT.

20       AND IF WE COULD TURN TO THE NEXT PAGE, PAGE 9.

21       CAN YOU TELL US WHAT IS GOING ON ON THIS PAGE?

22   **A.**   PAGE 9, THIS IS LISTING THE IPOD COMPETITIVE OUTLOOK.  SO

23   THE IPOD IN THIS CASE IS WHAT WE WOULD HAVE CALLED THE

24   CLASSIC, LATER ON CALLED THE CLASSIC IPOD.

25   **Q.**   AND I SEE A COLUMN HERE THAT WASN'T IN THE PREVIOUS SLIDE.

1    IT'S CALLED PLAYBACK SUPPORT.  WHAT DOES THAT MEAN?

2    **A.**  THIS HAS TO DO WITH THE TYPE OF MEDIA THAT THE DEVICE CAN

3    PLAY BACK.  SO, THIS WAS 2006.  SO IN THIS CASE WE ADDED VIDEO

4    PLAYBACK.

5    **Q.**  DID YOU SOMETIMES REFER TO THIS IPOD AS THE IPOD VIDEO?

6    **A.**  YES, WE DID.

7    **Q.**  THE JURY HAS HEARD A LOT ABOUT ITUNES 7.0 IN THIS TRIAL.

8    THAT'S A RELEASE OF ITUNES IN SEPTEMBER OF 2006.  DO YOU

9    REMEMBER WHETHER VIDEO CONTENT WAS A FEATURE OF ITUNES 7.0?

10   **A.**  IT WAS.

11   **Q.**  DO YOU REMEMBER WHAT CONTENT WAS AVAILABLE?

12   **A.**  WE GOT SOME -- SOME MOVIE CONTRACTS WITH DISNEY, PIXAR,

13   AND OTHERS, AND DID A BIG DEAL ABOUT THE PIRATES OF THE

14   CARIBBEAN BEING RELEASED AT THAT TIME.

15   **Q.**  DID YOU OWN AN IPOD?

16   **A.**  YES, I DID.

17   **Q.**  DID YOU WATCH MOVIES ON YOUR IPOD?

18   **A.**  YES, AND I STILL DO.

19   **Q.**  DID YOU REGULARLY LIST THESE KINDS OF FEATURES FOR THE

20   PRICE COMMITTEE OVER TIME?

21   **A.**  YES.

22   **Q.**  OKAY.

23       I WOULD LIKE TO LOOK AT ANOTHER PRICE COMMITTEE DOCUMENT.

24   THIS ONE IS 2493.  LET'S GO TO 3 OF 9.

25                 (EXHIBIT DISPLAYED TO JURY.)

1    JUST TO ORIENT US, YOU PREVIOUSLY TESTIFIED THAT THIS

2    DOCUMENT PERTAINS TO IPODS TO BE RELEASED ON SEPTEMBER -- IN

3    SEPTEMBER OF 2007.

4    **A.**  YES.

5    **Q.**  THIS HAS TWO PRODUCTS LISTED UNDER IPOD.  WHAT ARE THOSE

6    PRODUCTS?

7    **A.**  LET ME MAKE SURE I GOT THE RIGHT PAGE.

8    **Q.**  PAGE 3 OF 9.  IT IS ALSO UP ON THE SCREEN IN FRONT OF YOU.

9    **A.**  OKAY.  YES.  IT LISTS TWO PRODUCTS ON IPOD, THE N25 AND

10   THE N45.

11   **Q.**  DO YOU KNOW WHAT THOSE CODE NAMES REFER TO?

12   **A.**  AT THIS POINT IN TIME, N45 WAS THE INTRODUCTION OF THE

13   IPOD TOUCH.

14   **Q.**  WHAT WAS THE IPOD TOUCH?

15   **A.**  IT'S VERY MUCH LIKE AN IPHONE.  IT'S A TOUCH SCREEN

16   WITH -- WITH A DISPLAY OF APPLICATIONS ON THE FRONT, MUCH LIKE

17   YOU SEE ON AN IPHONE TODAY.

18   **Q.**  AND LET'S TURN TO PAGE 6.  WHAT IS THIS PAGE SHOWING?

19   **A.**  THIS IS SHOWING COMPETITION FOR N25 AND N45N25, BEING THE

20   LIKE IPOD CLASSIC AND N45 BEING THE IPOD TOUCH FORM FACTOR.

21   **Q.**  THANK YOU.

22   UNDER N45, WHICH YOU SAID WAS THE TOUCH, I SEE THE WORD

23   "MULTITOUCH" IN THE DISPLAY COLUMN.  WHAT IS MULTITOUCH?

24   **A.**  MULTITOUCH IS THE ABILITY TO TOUCH THE SCREEN AND HAVE IT

25   DO DIFFERENT THINGS AND USE ONE OR TWO FINGERS, AND PINCH AND

1    ZOOM, AND THAT SORT OF STUFF.

2    **Q.**  DID ANY OF YOUR COMPETITORS HAVE THAT FEATURE AT THIS

3    TIME?

4    **A.**  NO, THEY DID NOT.

5    **Q.**  LOOKING AT SOME OF THE OTHER FEATURES HERE UNDER N45, I

6    SEE WI-FI LISTED THERE.  WHAT IS THAT?

7    **A.**  SO THIS PRODUCT WAS ALSO ABLE TO CONNECT TO THE INTERNET

8    DIRECTLY VIA WI-FI.

9    **Q.**  DID SOME OF YOUR COMPETITORS HAVE WI-FI CAPABILITY?

10   **A.**  YES, THEY DID.

11   **Q.**  BUT NOT ALL OF THEM?

12   **A.**  NOT ALL OF THEM.

13   **Q.**  AND TO WHAT EXTENT WOULD THE FEATURES THAT YOU LISTED ON

14   THESE SLIDES THINGS THAT THE PRICE COMMITTEE TOOK INTO ACCOUNT

15   WHEN SETTING PRICES FOR NEW IPODS?

16   **A.**  WE DISCUSSED MOST OF THESE FEATURES IN THE MEETING.

17   **Q.**  AGAIN, THESE ARE TYPICAL OF THE THINGS YOU LISTED BETWEEN

18   2006 AND 2009?

19   **A.**  YES, THEY ARE.

20   **Q.**  OKAY.

21       SO STICKING WITH THIS DOCUMENT, LET'S TURN TO PAGE 4.

22       THIS SAYS "PLAN OF RECORD" AT THE TOP.  WHAT IS THE PLAN

23   OF RECORD?

24   **A.**  THE PLAN OF RECORD IS THE PRICING PLAN THAT I WOULD HAVE

25   HAD IN PLACE WHEN WE WERE WORKING ON FORECASTS FOR THE

1    COMPANY.  MY TEAM WORKED ON THOSE -- ON THE TARGETING

2    EXERCISES WITH THE FINANCE GUYS.

3        AND WE WOULD GO IN WITH THIS PLAN OF RECORD, WHICH WAS THE

4    ESTIMATED PRICES FOR THE NEW PRODUCTS, AND PROPOSE IT TO THE

5    PRICE COMMITTEE, SEE IF THEY STILL LIKED IT.

6    **Q.**  IF THIS PLAN WAS ADOPTED, WHO WOULD SEE THE PRICES HERE?

7    SPECIFICALLY IN THE ROW THAT SAYS "DIRECT".

8    **A.**  IN THE ROW THAT SAYS "DIRECT", THAT WOULD BE THE EXPECTED

9    PRICE THAT APPLE WOULD BE USING AS THE SUGGESTED RETAIL PRICE

10   THE CONSUMERS WOULD SEE IN THE MARKETPLACE AND WE WOULD

11   ANNOUNCE ON STAGE WHEN WE INTRODUCED THE PRODUCT.

12   **Q.**  AND DO MOST CONSUMERS WHO BUY PRODUCTS DIRECTLY FROM APPLE

13   PAY THOSE PRICES?

14   **A.**  MOST CONSUMERS -- YES.  PURCHASE FROM APPLE DIRECTLY, YES,

15   WOULD PAY THAT PRICE.

16   **Q.**  AND I NOTICE FOR EACH OF THESE MODELS, THE PRICES END IN A

17   "9".  IS THAT TYPICAL FOR APPLE?

18   **A.**  YES, IT IS REALLY TYPICAL.

19       ONE OF THE THINGS WE TRIED TO DO IS WHAT WE CALL PRETTY

20   PRICE POINTS.  IT WAS IN OUR OPINION.  SO WE LIKED 99'S, WE

21   LIKED 79'S, WE LIKED 29'S, BUT WE DIDN'T LIKE 18'S OR 08'S, OR

22   23'S, THAT KIND OF STUFF.  SO 9'S ARE PRETTY TYPICAL.

23   **Q.**  I ALSO NOTICED THAT THERE'S NO CENTS.  SO IT'S NOT 79.99

24   FOR EXAMPLE.  IS THAT TYPICAL FOR APPLE?

25   **A.**  YES.  FOR OUR HERO PRODUCTS IN PARTICULARLY, BECAUSE IT

DONNELLY - DIRECT / DEARBORN

1    DOESN'T LOOK GOOD IN ADVERTISING.  SO WE WOULD DO 399 INSTEAD

2    OF STARTING AT 199.99.  IT DIDN'T LOOK LIKE.

3    **Q.**  YOU USED THE TERM "HERO" PRODUCTS.  CAN YOU EXPLAIN WHAT

4    THAT IS?

5    **A.**  HERO PRODUCTS WERE THOSE THAT WE KIND OF, YOU KNOW, PUT A

6    LOT OF OUR EFFORT AND ENERGY AGAINST AND VIEWED THEM ICONIC

7    FOR THE APPLE BRAND.  SO THAT WOULD BE IMAC, IPOD, IPAD,

8    IPHONE TODAY PRETTY MUCH.

9    **Q.**  AND ARE THESE PRETTY PRICE POINTS UNIQUE TO THIS PRICE

10   COMMITTEE PACKAGE?

11   **A.**  NO.  IF YOU WERE TO LOOK AT PRICE COMMITTEE PACKAGES FOR

12   OUR PORTABLE COMPUTERS, FOR EXAMPLE, THEY WOULD END WITH 99'S

13   USUALLY.  LIKE 1199, OR 999 OR 1299.  IT WAS JUST A HABIT.

14   **Q.**  WHY DID APPLE SET PRETTY PRICE POINTS?

15   **A.**  IT WAS IMPORTANT FOR US TO ESTABLISH A VALUE PROPOSITION

16   IN THE CUSTOMERS' MINDS ABOUT WHAT OUR PRODUCTS WERE WORTH AND

17   MAKE THEM KIND OF MEMORABLE INSTEAD OF CHANGING THEM EVERY

18   TIME AND HAVING 35 MODELS OF SOMETHING.  WE SIMPLIFIED IT DOWN

19   TO HAVE A FEW MODELS WITH SOME DISTINCTIVE AND MEMORABLE

20   PRICES.  WHEN SOMEONE WALKED IN THE STORE, THEY WOULD GO,

21   YEAH, I WANT THAT 1299 OR I WANT THAT 399 IPOD.

22       IT WOULDN'T BE COOL IF THEY CAME IN AND FOUND OUT IT WAS,

23   YOU KNOW, 418 AFTER THEY HAD BEEN TOLD IT WAS 399 IF A NEW

24   MODEL CAME OUT.

25   **Q.**  IS THIS STRATEGY ONLY TRUE OF IPODS?

1   **A.**  IT IS PRETTY TYPICAL FOR APPLE ACROSS THE PRODUCT LINES.

2   **Q.**  IF, ACCORDING TO YOUR CALCULATIONS, A PARTICULAR PRODUCT

3   SHOULD BE PRICED AT SAY $308, WOULD YOU HAVE RECOMMENDED TO

4   THE PRICE COMMITTEE A PRICE OF 308?

5   **A.**  NOT IF I WANTED TO KEEP MY JOB.

6   **Q.**  WHAT WOULD YOU HAVE DONE?

7   **A.**  I WOULD HAVE RECOMMENDED 299.

8   **Q.**  DID APPLE ALWAYS ROUND DOWN?

9   **A.**  NO.

10  **Q.**  DID APPLE ALWAYS ROUND UP?

11  **A.**  NO.

12  **Q.**  HOW LIKELY, IF AT ALL, IS IT THAT AN IPOD APPLE PUT ON THE

13  MARKET IN 2007 WOULD BE SUBJECT TO THE SAME ROUNDING AS AN

14  IPOD THAT APPLE PUT ON THE MARKET IN 2008?

15  **A.**  WE WOULD HAVE FOLLOWED PRETTY MUCH THE SAME PRACTICE, YOU

16  KNOW, YEAR TO YEAR.

17  **Q.**  NOW WE TALKED ABOUT THE PRICES MOST CONSUMERS PAID.  WHAT

18  PRICES DID RESELLERS PAY?

19  **A.**  RESELLERS ARE FOLKS THAT, YOU KNOW, YOU GO TO A SHOP AND

20  YOU BUY IT, IT'S NOT AN APPLE SHOP BUT SOMEBODY SELLING OUR

21  PRODUCTS, BEST BUY OR WAL-MART, AND THEY WOULD BUY IT AT

22  DISCOUNT.

23  **Q.**  WHY ARE THOSE PRICES DIFFERENT THAN THE LIST PRICE?

24  **A.**  BECAUSE THE RESELLER'S GOT TO MAKE SOME MONEY.  SO THEY

25  GET TO DO THE DISCOUNT AND SELLS IT AT OR NEAR OUR PRICE.  HE

DONNELLY – DIRECT / DEARBORN

1  CAN SELL IT AT WHATEVER PRICE HE WANTED TO, BUT WE GIVE THEM

2  AN OPPORTUNITY THERE.

3  **Q.**  OKAY.  AND DID THOSE RESELLERS HAVE CONTRACTS WITH APPLE?

4  **A.**  YES.

5  **Q.**  DID SOME RESELLERS HAVE DIFFERENT TERMS AND CONDITIONS IN

6  THEIR CONTRACTS WITH APPLE FROM OTHER RESELLERS?

7  **A.**  YES, THEY DID.

8  **Q.**  WHAT ARE THE KINDS OF TERMS AND CONDITIONS THAT MIGHT

9  DIFFER?

10  **A.**  USUALLY THEY GET THE SAME UP-FRONT DISCOUNT, BUT THEY

11  WOULD ALSO GET SOME POINTS BACK AS MARGIN THAT THEY WOULD GET

12  FOR PERFORMING OTHER THINGS, LIKE TRAINING THEIR SALES FORCE,

13  IF THEY TRAINED 80 PERCENT OF THEIR SALES FORCE, FOR EXAMPLE,

14  THEY MAY GET COUPLE EXTRA POINTS.

15     IF THEY PUT SUNDAY CIRCULARS OUT, AND ADVERTISED THE APPLE

16  PRODUCTS IN THE SUNDAY CIRCULARS THAT YOU GET IN THE

17  NEWSPAPER, THEY GET POINTS FOR THAT.

18     IF THEY SIGNED UP TO PERFORM SOME OF THESE THINGS THEY GET

19  EXTRA DISCOUNTS.

20  **Q.**  NOW IN GENERAL, TO WHAT EXTENT DID APPLE ADD FEATURES TO

21  ITS PRODUCTS?

22  **A.**  WE TRY -- MY REMEMBRANCE AT APPLE IS WE'RE ALWAYS TRYING

23  TO ADD FEATURES TO OUR PRODUCTS.

24  **Q.**  DID YOU RECEIVE INPUT FROM MARKETING ON PRICING?

25  **A.**  YES.

1    **Q.**  WHAT GUIDANCE DID THE MARKETING DEPARTMENT GIVE YOU IN

2    REGARDS TO BALANCING THE PRICE OF THE IPOD AGAINST ADDING NEW

3    FEATURES?

4    **A.**  WHAT MARKETING WAS ALWAYS TRYING TO DO IS ADD MORE

5    FEATURES AT THE SAME PRICE OR TRY TO GET THE PRICE LOWER.

6    THEY WANTED THEIR PRODUCTS TO BE MORE AND MORE POPULAR.

7        SO THAT'S -- IT WAS KIND OF THE YIN AND YANG.  I ACTUALLY

8    REPORTED TO FINANCE ON ONE SIDE AND MARKETING ON THE OTHER.

9    SO WHEN I GO TO A FINANCE MEETING, I WAS THE MARKETING GUY

10   ARGUING ABOUT MORE FEATURES.  THEN WHEN I GO TO THE MARKETING

11   MEETINGS, I WOULD BE ARGUING WITH THE MARKETING GUYS ABOUT THE

12   MARGINS THEY HAD TO MAKE BECAUSE I'D BRING MY FINANCE HAT

13   THERE.  SO IT WENT BACK AND FORTH.

14   **Q.**  HOW DID THE FEATURES IN PRICE OF THE PREVIOUS IPOD

15   GENERATION FACTOR INTO THE NEW PRODUCT PRICING DECISION?

16   **A.**  WELL, AS I SAID EARLIER, WE KIND OF LIKE TO CREATE

17   MEMORABLE PRICE POINTS.  SO WHEN WE GO FROM ONE GENERATION TO

18   THE NEXT, WE WOULD TRY TO HOLD ON TO THOSE PRICE POINTS WITH

19   PACKING IN MORE FEATURES, MORE CAPACITY, MORE, YOU KNOW,

20   BIGGER SCREENS OR WHATEVER, TO GIVE PEOPLE A GREAT VALUE AT

21   THE PRICE POINT THEY HAD SEEN WITH THE PREVIOUS GENERATION.

22   **Q.**  I WOULD LIKE TO ASK YOU A FEW QUESTIONS ABOUT THE NANO.

23       SO, FIRST, LET'S START WITH THE NANO IN 2006.  SO THIS IS

24   NOW, AGAIN, TRIAL EXHIBIT 2844.

25               (EXHIBIT DISPLAYED TO JURY.)

1    AND LET'S LOOK AT PAGE 8.  SO HOW BIG IS THE DISPLAY ON

2    THE NANO TO BE INTRODUCED IN SEPTEMBER 2006?

3    **A.**  1.5 INCHES.

4         **MS. DEARBORN:**  AND THEN, MATT, IF WE CAN PUT THAT OFF

5    TO ONE SIDE, BUT KEEP IT ON THE SCREEN.

6    LET'S TURN TO TRIAL EXHIBIT 2493, PAGE 5.

7         (EXHIBIT DISPLAYED TO JURY.)

8    **BY MS. DEARBORN:**

9    **Q.**  AND TO REMIND THE JURY, THIS IS THE -- YOU PREVIOUSLY

10   TESTIFIED THAT THIS IS THE PRICE COMMITTEE DOCUMENT FOR THE

11   NANOS TO BE RELEASED A YEAR LATER, IN SEPTEMBER OF 2007?

12   **A.**  OKAY.

13   **Q.**  SO LET'S LOOK AT THE DISPLAY ON THIS NANO.  HOW DOES IT

14   COMPARE TO THE ONE RELEASED A YEAR EARLIER?

15   **A.**  THIS ONE SHOWS A 2-INCH SCREEN COMPARED TO THE ONE AND A

16   HALF INCH THE YEAR PRIOR.

17   **Q.**  HOW DID THE BATTERY LIFE COMPARE ON THESE TWO NANOS?

18   **A.**  24 HOURS MUSIC, FIVE HOURS VIDEO, 24 HOURS MUSIC UP TO

19   FIVE HOURS WITH A SLIDE SHOW.  SO THE NEW ONE COULD SHOW VIDEO

20   FOR FIVE HOURS INSTEAD OF JUST A PICTURE SHOW.

21   **Q.**  I BELIEVE YOU TESTIFIED THAT BIGGER DISPLAYS MEAN MORE

22   BATTERY POWER?  DO I HAVE THAT RIGHT?

23   **A.**  ALL THINGS BEING EQUAL, IF TWO ARE OF THE SAME TECHNOLOGY,

24   A BIGGER DISPLAY GENERALLY WOULD USE MORE BATTERY LIFE IS WHAT

25   I WAS TOLD BY ENGINEERING.

1    **Q.**  GOT IT.  SO YOU INCREASED THE DISPLAY ON THESE NANOS, BUT

2    MAINTAINED THE SAME BATTERY LIFE?

3    **A.**  THEY WERE ABLE TO DO THAT, YES.

4    **Q.**  IF YOU RECALL, HOW DID THE PRICES OF NANOS IN 2007 COMPARE

5    TO THE PRICES OF NANOS A YEAR EARLIER?

6    **A.**  THEY WERE THE SAME.

7    **Q.**  OKAY.  NOW LET'S GO ONE YEAR LATER.

8        I WOULD LIKE TO DRAW YOUR ATTENTION TO TRIAL EXHIBIT 2556.

9                (EXHIBIT DISPLAYED TO JURY.)

10       LET'S LOOK AT PAGE 5 OF 10.

11       I BELIEVE YOU PREVIOUSLY TESTIFIED THAT THIS IS THE PRICE

12   COMMITTEE DOCUMENT FOR THE PRODUCTS TO BE RELEASED IN

13   SEPTEMBER OF 2008.

14       SO CAN YOU READ THE JURY WHAT THIS SAYS ABOUT THE PRICE

15   AND CAPACITY OF THE NANOS TO BE INTRODUCED THAT YEAR?

16   **A.**  OKAY.  IN THE MIDDLE OF THE PAGE, THERE'S A FOUR GIG AND

17   AN EIGHT GIG NANO LISTED.  AND THE PRICE IS 149 FOR A FOUR GIG

18   AND THE PROPOSED PRICE IS 179 FOR AN EIGHT GIG.

19   **Q.**  AND LOOKING BACK ON PAGE 1 OF THIS DOCUMENT, CAN YOU

20   REMIND US OF THE DATE?

21   **A.**  AUGUST 22, 2008.

22   **Q.**  GREAT.

23       NOW, LET'S LOOK AT ANOTHER DOCUMENT.  TRIAL EXHIBIT 2561.

24                (EXHIBIT DISPLAYED TO JURY.)

25       THIS SHOULD BE THE VERY NEXT DOCUMENT IN YOUR BINDER.

DONNELLY – DIRECT / DEARBORN

1    **A.**   THANK YOU.

2    **Q.**   NOW WHAT'S THIS?

3    **A.**   IT'S A NEWS RELEASE FOR THE INTRODUCTION OF THE IPOD NANO.

4    **Q.**   AND LOOKING AT THE FIRST PARAGRAPH UNDER THE HEADER

5    PRICING AND AVAILABILITY, WHAT DOES THAT INDICATE ABOUT THE

6    CAPACITY AND PRICE OF THE NANOS THAT WERE, IN FACT, RELEASED

7    IN SEPTEMBER OF 2008?

8    **A.**   IT SHOWS THAT THE NEW IPOD NANO IS IMMEDIATELY AVAILABLE

9    FOR A SUGGESTED PRICE OF 149 FOR THE EIGHT GIG MODEL AND 199

10   FOR THE 16 GIG MODEL.

11   **Q.**   WHAT WAS THE DATE ON THIS PRESS RELEASE?

12   **A.**   THIS WAS SEPTEMBER 9TH, 2008.  SO IT WAS A COUPLE OF WEEKS

13   AFTER THE PRICE COMMITTEE.

14   **Q.**   SO WHY ARE THE MODELS LISTED IN THE PRICE COMMITTEE

15   DOCUMENT DIFFERENT IN CAPACITY AND PRICE FROM THE MODELS --

16        **MR. MEDICI:**  OBJECTION, YOUR HONOR, HE

17   MISCHARACTERIZED THE DOCUMENT.

18        **THE COURT:**  I CAN'T HEAR YOU, MR. MEDICI.

19        **MR. MEDICI:**  HE MISCHARACTERIZED THE DATE OF THE

20   DOCUMENT.

21      I AM SORRY, I'M LOOKING IN THE BOTTOM RIGHT CORNER.  I

22   APOLOGIZE.

23        **THE COURT:**  OBJECTION IS WITHDRAWN.  YOU MAY PROCEED.

24        **THE WITNESS:**  THANK YOU, YOUR HONOR.

25      YOU WERE ASKING ME A QUESTION?

1    **BY MS. DEARBORN:**

2    **Q.**  YES.  I WILL RESTATE IT.

3        WHY ARE THE MODELS LISTED IN THE PRICE COMMITTEE DOCUMENT

4    DIFFERENT THAN THE CAPACITY OF THE MODELS THAT APPLE ACTUALLY

5    OFFERED JUST THREE WEEKS LATER?

6    **A.**  THIS IS ACTUALLY KIND OF A FUNNY STORY, BUT IT'S PRETTY

7    COOL.

8        WE HAD MADE THIS DECISION AT PRICE COMMITTEE TO DO THIS,

9    BUT WHEN I WAS WALKING ACROSS THE CAMPUS AT APPLE SOME DAYS

10   LATER, I RAN INTO JEFF WILLIAMS WHO'S THE HEAD OF OPERATIONS

11   FOR IPOD AND IPHONE AT THE TIME.

12       JEFF SAID, MARK, WE ARE REALLY GETTING LOTS BETTER PRICES

13   ON THE FLASH.  WE CAN ACTUALLY DO BETTER.  WE CAN DOUBLE THE

14   MEMORY IN THESE IPOD NANOS.  WE CAN DO IT.

15       I SAID, HOW CAN WE DO THAT?  WE'VE ALREADY MADE THE

16   DECISION, WE'RE ALREADY BUILDING THEM.  WE'VE ALREADY BUILT

17   MILLIONS OF THESE THAT ALREADY HAVE BEEN BUILT FOR THAT

18   CONFIGURATIONS.  HE GOES, NO, WE CAN MAKE IT HAPPEN.

19       SO I GOT TOGETHER WITH GREG JOSWIAK, THIS GUY JOS HERE AND

20   PHIL, AND WE WORKED ON A PROPOSAL AND GOT APPROVAL TO DOUBLE

21   THE MEMORY AND BRING THEM UP TO EIGHT AND 16 INSTEAD OF FOUR

22   AND EIGHT, AND PULLED IT OFF.

23       WE SENT THOSE LOWER CONFIGURED PRODUCTS TO SOME OTHER

24   MARKETS OUTSIDE OF THE U.S.  AND SO NOBODY EVER REALLY KNEW WE

25   HAD DONE THAT.  IT WAS A LOT OF FUN AND WE DELIVERED A LOT

1    MORE TO OUR CUSTOMERS FOR THE SAME PRICE.

2    **Q.**  YOU SOUND VERY PROUD.

3    **A.**  IT WAS A GREAT MOMENT.  WE REALLY ENJOYED THAT WE ABLE TO

4    PULL IT OFF.

5    **Q.**  AS PART OF THE YOUR JOB AT APPLE, DID YOU ALSO HAVE

6    INVOLVEMENT WITH FINANCE FOR ITUNES?

7    **A.**  I DID.

8    **Q.**  WHAT WAS YOUR INVOLVEMENT?

9    **A.**  WHEN ITUNES ORIGINALLY STARTED, I WAS THE FIRST FINANCE

10   GUY ON ITUNES.  AND THEN I GOT -- AFTER ABOUT A SHORT WHILE, I

11   HAD A TEAM OF FOLKS WORKING THERE.

12       AND DIRECTORS AND SENIOR DIRECTORS OF FINANCE FOR ITUNES

13   REPORTED TO ME CONTINUOUSLY FROM THAT TIME ON.

14   **Q.**  AS PART OF THOSE JOB RESPONSIBILITIES, DID YOU REVIEW

15   APPLE'S CONTRACT WITH THE MAJOR RECORD LABELS?

16   **A.**  I DID.  THE INITIAL CONTRACTS ESPECIALLY.

17   **Q.**  I WOULD LIKE TO POINT YOU TO 2379 IN YOUR BINDER.

18       CAN YOU IDENTIFY WHAT THIS DOCUMENT IS?

19                     (EXHIBIT DISPLAYED TO JURY.)

20       CAN YOU IDENTIFY WHAT THIS DOCUMENT IS?

21   **A.**  YES, I CAN.

22            **MR. MEDICI:**  THIS IS NOT LISTED AS A SPONSORING

23   WITNESS FOR THIS DOCUMENT.  FOUNDATION.

24            **THE COURT:**  LET'S SEE IF HE CAN LAY A FOUNDATION.

25            **MS. DEARBORN:**  HE JUST TESTIFIED HE SAW THESE IN HIS

1    ORDINARY COURSE OF BUSINESS, YOUR HONOR.

2            **THE COURT:**  LET'S KEEP GOING.

3            **THE WITNESS:**  YES.  I HAVE SEEN THIS DOCUMENT.

4    **BY MS. DEARBORN:**

5    **Q.**  ARE YOU FAMILIAR WITH ITS CONTENTS?

6    **A.**  YES, I AM.

7    **Q.**  OKAY.  CAN YOU IDENTIFY WHAT THIS DOCUMENT IS?

8    **A.**  IT'S AN AGREEMENT WITH UNIVERSAL SOUND RECORDINGS AND

9    APPLE, AND IT'S KIND OF AN AMENDMENT TO AN AGREEMENT WE

10   ENTERED BACK IN 2002, AND THEN SUBSEQUENTLY UPDATED.

11   **Q.**  OKAY.  YOU CAN SET THAT TO ONE SIDE.

12       NOW AS PART OF YOUR RESPONSIBILITIES INVOLVED IN ITUNES

13   FINANCE, DID YOU REVIEW ITUNES MARKET SHARE FIGURES?

14   **A.**  I WOULD SEE THEM FROM TIME TO TIME, YES.

15   **Q.**  DID APPLE TRACK ITS MARKET SHARE IN ITUNES IN MORE THAN

16   ONE WAY?

17   **A.**  ABSOLUTELY.

18   **Q.**  WHAT WAYS DID APPLE TRACK ITS MARKET SHARE IN ITUNES?

19   **A.**  SO PART OF IT WAS DEFINING THE MARKET.  SO WE WOULD LOOK

20   AT OUR MARKET SHARE FOR -- IN THE DIGITAL DOWNLOAD MARKET, YOU

21   KNOW, WE WERE REALLY INTERESTED IN THAT, HOW WE WERE DOING,

22   AND WE WOULD ALSO TRACK OUR MARKET SHARE ACROSS THE WHOLE

23   MUSIC SALES MARKET.  AT THAT TIME CD SALES WERE TANKING, AND

24   SO WE WERE SEEING HOW WE WERE DOING AGAINST THAT AS WELL.

25   **Q.**  DID ITUNES ALSO COMPETE WITH PIRACY?

DONNELLY – DIRECT / DEARBORN

1   **A.**   ABSOLUTELY.

2   **Q.**   COULD YOU TRACK THAT?

3   **A.**   NO, I COULD NOT.

4   **Q.**   ARE YOU FAMILIAR WITH A COMPANY CALLED REALNETWORKS?

5   **A.**   YES.

6   **Q.**   ARE YOU FAMILIAR WITH A PROMOTIONAL SALE THAT REALNETWORKS

7   HAD IN 2004?

8   **A.**   YES.

9   **Q.**   CAN YOU BRIEFLY DESCRIBE THAT SALE?

10   **A.**   BACK THEN IN 2004, THEY DID A SALE WHERE THEY OFFERED TO

11   SELL THEIR SONGS FOR A PERIOD OF TIME FOR 49 CENTS INSTEAD OF

12   THE PREVAILING 99 CENTS AT THAT TIME, HALF PRICE.

13   **Q.**   AND IF YOU KNOW, WHAT PRICE DID THE RECORD LABELS CHARGE

14   APPLE FOR SONGS IN THIS TIME FRAME?

15   **A.**   SEVENTY CENTS PER TRACK, GIVE OR TAKE A PENNY OR TWO

16   DEPENDING ON THE LABEL.

17   **Q.**   TO THE BEST OF YOUR RECOLLECTION, WHAT IMPACT, IF ANY, DID

18   THE RELEASE OF REALNETWORKS HARMONY IN APRIL OF 2005 HAVE ON

19   ITUNES MARKET SHARE?

20   **A.**   NOT A VERY LARGE EFFECT.

21   **Q.**   DO YOU REMEMBER ANY EFFECT AT ALL?

22   **A.**   MAYBE A POINT OR TWO.

23   **Q.**   OKAY.  ARE YOU FAMILIAR WITH THE EVENTS RELATING TO

24   APPLE'S RELEASE OF MUSIC DRM FREE?

25   **A.**   YES.  I'M FAMILIAR WITH THAT.

1    **Q.**  AND WHY DID APPLE RELEASE MUSIC WITHOUT DRM?

2    **A.**  MY REMEMBRANCE IS WE WANTED TO HAVE DRM FREE MUSIC

3    FOREVER.  THE LABELS WERE REALLY AFRAID OF PIRACY AND COPYING.

4    AND SO WE ARGUED WITH THEM FOR A LONG TIME TO BE ABLE TO DO

5    DRM FREE MUSIC.  EVENTUALLY WE GOT TO THE POINT WE GOT TO A

6    CONTRACT WITH THEM WHERE THEY ALLOWED US TO DO DRM FREE MUSIC.

7    **Q.**  WHY DIDN'T APPLE GO DRM FREE SOONER?

8    **A.**  WE DIDN'T HAVE THE CONTRACTUAL AUTHORITY TO DO SO.

9    **Q.**  NOW, TURNING -- GOING BACK TO THE PRICE COMMITTEE.

10   MR. DONNELLY, YOU WORKED FOR THE PRICE COMMITTEE FOR HOW

11   MANY YEARS?

12   **A.**  SIXTEEN YEARS.

13   **Q.**  OKAY.  DID YOU ATTEND PRICE COMMITTEE MEETINGS FOR ALL 16

14   YEARS?

15   **A.**  VIRTUALLY ALL OF THEM.

16   **Q.**  AND IN THOSE 16 YEARS, DID THE PRICE COMMITTEE EVER

17   CONSIDER WHETHER IPOD USERS WERE LOCKED IN BY THEIR IPOD

18   LIBRARIES IN SETTING PRICES FOR IPODS?

19   **A.**  THEY DID NOT.

20   **Q.**  DID THE PRICE COMMITTEE EVER DISCUSS REALNETWORKS IN

21   SETTING PRICES FOR IPODS?

22   **A.**  THEY DID NOT.

23        **MS. DEARBORN:**  NO FURTHER QUESTIONS, YOUR HONOR.

24        **THE COURT:**  CROSS.

25        THE BOTH OF YOU GOT A WITNESS.  YOU MAY PROCEED,

```
1    MR. MEDICI.

2                        CROSS-EXAMINATION

3    BY MR. MEDICI:

4    Q.   GOOD AFTERNOON, MR. DONNELLY.

5    A.   GOOD AFTERNOON.

6    Q.   WHAT KIND OF IPOD DID YOU HAVE THAT YOU WATCH MOVIES ON?

7    A.   VIDEO IPOD.

8    Q.   DO YOU KNOW WHAT VERSION IT WAS?

9    A.   I RECEIVED A VERSION OF EVERY SINGLE ONE THAT APPLE

10   RELEASED.

11   Q.   SO YOU WATCH MOVIES ON SEVERAL DIFFERENT IPODS?

12   A.   YES, I DID.

13   Q.   YOU STILL DO, YOU SAID?

14   A.   I WATCH THEM ON MY IPHONE NOW.

15   Q.   OKAY.

16        SO, ONE OF YOUR ROLES WAS ON THE PRICING COMMITTEE; IS

17   THAT CORRECT?

18   A.   YES.

19   Q.   AND AT THE TIME, BETWEEN 2006 AND 2009, YOU TESTIFIED THAT

20   YOU COLLECTED INFORMATION AND THEN PROVIDED RECOMMENDATION TO

21   THE PRICING COMMITTEE; IS THAT RIGHT?

22   A.   THAT IS CORRECT.

23   Q.   AND WERE YOU -- WERE YOU OFFICIALLY A MEMBER OF THE

24   PRICING COMMITTEE?

25   A.   NO, I WASN'T.
```

1   **Q.**  SO YOUR ROLE WAS JUST TO PROVIDE RECOMMENDATIONS, GATHER

2   INFORMATION FROM YOUR TEAM, AND THEN GIVE THAT TO THE PRICING

3   COMMITTEE?

4   **A.**  AND TO PARTICIPANT IN THE DISCUSSION, YES.  THAT AND

5   PARTICIPATE.

6   **Q.**  SO WHAT'S THE DIFFERENCE BETWEEN PARTICIPATING IN THE

7   DISCUSSION AND BEING ON THE ACTUAL COMMITTEE?

8   **A.**  WE CONSTITUTED THE COMMITTEE SO IT WAS PEOPLE ON THE

9   EXECUTIVE TEAM.  AND I WAS ONE LEVEL BELOW THAT.  I REPORTED

10  TO TWO MEMBERS OF THE EXECUTIVE TEAM.

11  **Q.**  WOULD YOU SAY THAT THE PRICING COMMITTEE WAS MADE UP OF

12  THE CEO, CFO, CMO, AND COO?

13  **A.**  THE C SUITE, YES, MOSTLY.

14  **Q.**  AT THE TIME THAT WAS STEVE JOBS, TIM COOK, PHIL SCHILLER,

15  AND PETER OPPENHEIMER, IS THAT RIGHT, DURING 2006 AND 2009

16  TIME PERIOD?

17  **A.**  YES.  AND ALSO OCCASIONALLY WE WOULD HAVE RON JOHNSON

18  PARTICIPATE AS THE HEAD OF RETAIL SALES AND WE WOULD HAVE ALSO

19  SOMETIMES THE HEAD OF ENGINEERING, YOU KNOW, THE SVP OF

20  ENGINEERING WOULD ATTEND AS WELL, LIKE JOHN RUBENSTEIN.  HE

21  WAS THE GUY THAT HEADED UP ENGINEERING AT THE TIME.

22  **Q.**  DID JEFF ROBBIN HEAD UP ENGINEERING DURING THAT TIME

23  PERIOD AT ALL?

24  **A.**  NO.  HE WASN'T THE CHIEF OF ENGINEERING.  HE RAN A PART OF

25  IT.

DONNELLY – CROSS / MEDICI

1    **Q.** OKAY.

2       SO WHEN YOU ARE PUTTING TOGETHER THESE MATERIALS FOR THE

3    PRICING COMMITTEE, WHAT -- WHAT SORT OF THINGS DO YOU CONSIDER

4    ASIDE FROM THE MATERIALS THAT WE JUST SAW?

5       SO I THINK YOU TESTIFIED THAT MARKETING GIVES YOU

6    MATERIALS THAT YOU INCLUDE.  IS THERE ANYTHING ELSE THAT YOU

7    INCLUDE?

8    **A.** WELL, I ADOPTED THE PRICE COMMITTEE PACKAGE OVER TIME TO

9    MAKE SURE THAT IT INCLUDED THE MOST IMPORTANT THINGS THAT THE

10   EXECUTIVES WANTED TO LOOK AT.

11      SO, YOU KNOW, WE -- IT EVOLVED OVER TIME TO INCLUDE THE

12   THINGS THEY CONSIDERED TO BE MOST IMPORTANT FOR THE

13   DELIBERATION.

14      SO, YEAH, I LOOKED AT OTHER THINGS, BUT THAT'S IT.  THE

15   PACKAGE IS WHAT I TOOK IN.  THAT'S WHAT WE TALKED ABOUT.

16   **Q.** YOU WOULD CONSIDER A VARIETY OF DIFFERENT THINGS WHEN YOU

17   WERE PUTTING TOGETHER THAT PACKAGE, YOU WOULD CONSIDER

18   MARKETING'S INPUT; IS THAT RIGHT?

19   **A.** I WOULD.

20   **Q.** YOU WOULD CONSIDER THE ITUNES COMPETITORS, I BELIEVE YOU

21   TESTIFIED, LIKE REALNETWORKS; IS THAT CORRECT?

22          **MS. DEARBORN:**  OBJECTION, MISSTATES HIS TESTIMONY.

23          **THE COURT:**  OVERRULED.

24          **MR. MEDICI:**  I AM SORRY.

25          **THE WITNESS:**  REPEAT THE QUESTION, PLEASE.

1    **BY MR. MEDICI:**

2    **Q.**  YOU SAID YOU TAKE A LOT OF THINGS INTO CONSIDERATION WHEN

3    YOU'RE PUTTING TOGETHER THAT PACKET; IS THAT CORRECT?

4    **A.**  I DO.

5    **Q.**  AND IS ONE OF THOSE THINGS THE COMPETITIVE ATMOSPHERE, NOT

6    BOTH -- NOT ONLY WITH THE DIGITAL MUSIC PLAYER, BUT ALSO ON

7    THE ITUNES SPACE?

8    **A.**  NOT FOR SETTING PRICE ON THE IPODS, NO.  I DID NOT

9    CONSIDER THAT.

10   **Q.**  IS THAT SOMETHING -- IS THERE ANY KIND OF INFORMATION THAT

11   YOU USED, ASIDE FROM THE MARKETING MATERIAL AND ASIDE FROM THE

12   OTHER PORTABLE DIGITAL DEVICES TO CREATE THAT PRESENTATION, DO

13   YOU USE KNOWLEDGE GAINED OVER THE YEARS?  DO YOU USE YOUR

14   EXPERIENCE?

15   **A.**  I USE MY EXPERIENCE, BUT I ALSO USE -- I WOULD USE -- I

16   WOULD BE KNOWLEDGEABLE ABOUT MARKET SHARE DATA, APPLE IPOD

17   MARKET SHARE.

18   **Q.**  SO THERE IS A LOT OF INFORMATION THAT YOU WOULD TAKE AND

19   YOUR EXPERIENCE, PUT IT TOGETHER AND YOU WOULD MAKE THIS

20   PACKET AND GIVE IT TO THE PRICING COMMITTEE; IS THAT RIGHT?

21   **A.**  THERE WAS SOME INFORMATION I CONSIDERED.  AND I PUT IN THE

22   PACKAGE THE THINGS THAT THE PRICE COMMITTEE MEMBERS HAD TOLD

23   ME THEY WANTED TO MAKE SURE WERE IN THERE SO THEY CAN TALK

24   ABOUT THEM AND MAKE A DECISION.

25   **Q.**  ONCE THE PRICING COMMITTEE SET A PRICE, WOULD THEY

1    FREQUENTLY CHANGE THE PRICE?

2    **A.**  RARELY.

3    **Q.**  SO IT IS SAFE TO SAY THAT WHEN A PRICING DECISION WAS MADE

4    ON AN IPOD, THAT WAS THE -- THAT WAS THE FINAL SAY GENERALLY

5    SPEAKING?

6    **A.**  GENERALLY SPEAKING.  MY JOB, AFTER THEY MADE THE DECISION

7    AT PRICE COMMITTEE, WAS TO GET OUT THERE AND PUT UP THE PRICE

8    LIST WITH THOSE PRICES.

9    **Q.**  WOULD YOU SAY THAT STEVE JOBS HAD THE STRONGEST VOICE IN

10    THE PRICING COMMITTEE?

11    **A.**  STEVE JOBS HAD A STRONG VOICE.  SO DID PHIL SCHILLER.  SO

12    DID TIM COOK.  I SAW AND PARTICIPATED IN ARGUMENTS WITH THESE

13    GENTLEMAN ON A REGULAR BASIS AT THESE COMMITTEE MEETINGS.

14    **Q.**  ALL RIGHT.

15          **MR. MEDICI:**  LARRY, CAN YOU PUT UP EXHIBIT 2438?

16             (EXHIBIT DISPLAYED TO JURY.)

17          **THE WITNESS:**  DO I HAVE THAT ONE IN MY BOOK OR JUST

18    ON THE SCREEN?

19    **BY MR. MEDICI:**

20    **Q.**  NO.  I JUST WANT TO KNOW IF THIS IS THE KIND OF BACKGROUND

21    INFORMATION THAT YOU WOULD USE TO INFLUENCE WHAT YOU INCLUDED

22    OR IF THIS IS SOMETHING YOU WOULD HAVE -- THAT YOU MIGHT HAVE

23    IN YOUR MIND WHEN YOU ARE PUTTING TOGETHER THE PACKET.

24        SO THIS IS A MUSIC WATCH DIGITAL PRESENTATION PREPARED IN

25    OCTOBER OF 2006 FOR APPLE.

```
1         CAN YOU GO TO PAGE 6, PLEASE?
2              MS. DEARBORN:  YOUR HONOR, I ASK THE WITNESS BE GIVE
3    THE ENTIRE DOCUMENT.
4              THE COURT:  GRANTED.
5              MR. MEDICI:  MAY I APPROACH?
6                   (DOCUMENT HANDED TO WITNESS.)
7              THE COURT:  YOU MAY.
8              THE WITNESS:  THANK YOU.  I DIDN'T GET YOUR NAME.
9              MR. MEDICI:  CARMEN MEDICI.
10             THE WITNESS:  THANK YOU.
11   BY MR. MEDICI:
12   Q.   SO THIS IS PAGE 6 OF THAT PRESENTATION.
13   A.   OKAY.
14   Q.   SO, IS THIS KIND OF THE INFORMATION, THIS KIND OF
15   PRESENTATION SOMETHING THAT MARKETING MIGHT GIVE YOU THAT YOU
16   MIGHT LOOK AT DURING THE COURSE OF YOUR DUTIES AT APPLE?
17   A.   I DON'T RECALL SEEING THIS DOCUMENT, BUT I MIGHT HAVE
18   GOTTEN SOMETHING LIKE THIS DISTRIBUTED TO ME, AND POSSIBLY.
19   Q.   IS THIS THE SORT OF INFORMATION YOU WOULD COME ACROSS,
20   MAYBE NOT THIS PARTICULAR DOCUMENT, BUT THIS SORT OF
21   INFORMATION?
22   A.   THIS SORT OF INFORMATION BEING ITUNES MUSIC SHARE ON THE
23   ALA CARTE SONG SHARE?
24   Q.   I'M TALKING MORE GENERALLY ABOUT THE TYPE OF PRESENTATION,
25   THE INDUSTRY DATA, AND THE BACKGROUND, AND, YES, THE ITUNES
```

DONNELLY – CROSS / MEDICI

```
1    MARKET SHARE AS WELL.

2    A.   AS A VICE PRESIDENT AT APPLE, I RECEIVED A LOT OF REPORTS.

3    Q.   OKAY.  LET'S GO TO EXHIBIT 2405.

4                   (EXHIBIT DISPLAYED TO JURY.)

5    A.   SHOULD I HOLD ON TO THIS OR GIVE IT BACK?

6         JUST LEAVE IT HERE?

7    Q.   I'M NOT GOING TO TALK ABOUT IT ANY LONGER.

8              MR. MEDICI:  CAN YOU BLOW UP THE TOP PART WHERE THE

9    EMAILS ARE?

10   BY MR. MEDICI:

11   Q.   YOU SEE THIS IS AN EMAIL, SUBJECT LINE:  MICROSOFT ZUNE

12   WILL HIT STORES AT 299.

13        IT'S TO JOSWIAK, JOBS, SCHILLER, COOK, CUE, AND WILLIAMS.

14             MR. MEDICI:  THEN CAN YOU FLIP TO THE SECOND PAGE?

15   ZOOM OUT.

16   BY MR. MEDICI:

17   Q.   DO YOU SEE THIS IS AN ARTICLE FROM AUGUST 2006 SAYING ZUNE

18   WILL HIT STORES AT 299.  IF YOU WILL SCROLL UP?

19   A.   I'M TRYING TO KEEP UP WITH YOU.  NOW I UNDERSTAND WHAT YOU

20   HAVE BEEN GOING THROUGH.

21   Q.   SO YOU'LL SEE AT THE TOP THERE'S AN EMAIL FROM STEVE JOBS

22   RESPONDING TO THIS MICROSOFT ZUNE ARTICLE, SAYING:

23        "THIS SOUNDS REAL.  SHOULD WE GO TO 249 OR STAY AT 299?"

24        WHAT'S HE TALKING ABOUT?

25   A.   HE'S PROBABLY TALKING ABOUT THE PRICE OF AN IPOD.  I DON'T
```

1933
DONNELLY – CROSS / MEDICI

1  KNOW.

2  **Q.**  THAT'S SOMETHING THAT WOULD -- THAT WOULD TYPICALLY

3  HAPPEN, YOU WOULD RESPOND TO MARKET INFORMATION OR OTHERS ON

4  THE PRICING COMMITTEE WOULD RESPOND TO MARKET INFORMATION, AND

5  DISCUSS CHANGING THE PRICE OF THE IPOD?

6  **A.**  FOR A DIRECTLY COMPARABLE PRODUCT LIKE MICROSOFT ZUNE,

7  THAT'S POSSIBLE.

8  **Q.**  LET'S LOOK AT 2493, WHICH IS IN YOUR BINDER.

9  **A.**  IT IS?

10  **Q.**  SOMETHING MS. DEARBORN SHOWED YOU.

11  **A.**  OKAY.

12  **Q.**  IF YOU GO TO EXHIBIT 2493, PAGE 4.

13                    (EXHIBIT DISPLAYED TO JURY.)

14  **A.**  YES.

15  **Q.**  DO YOU REMEMBER LOOKING AT THIS SLIDE WITH MS. DEARBORN?

16  **A.**  I DO.

17  **Q.**  OKAY.  I WOULD LIKE TO ASK YOU A FEW QUESTIONS.

18      YOU TESTIFIED THAT THE DIRECT PURCHASERS OF IPODS, I

19  BELIEVE, IT WAS, YOU SAID MOST OF THE TIME PAY THE PRICE

20  LISTED THERE.

21      CAN YOU GIVE ME SOME TIMES WHEN THEY WOULDN'T PAY THAT

22  PRICE?

23  **A.**  SURE.  IF APPLE RAN A PROMOTION.  I DON'T REMEMBER WHAT

24  PROMOTIONS MAY OR MAY NOT HAVE BEEN GOING ON AT THAT TIME, BUT

25  THEY PERHAPS MIGHT HAVE GOTTEN A DISCOUNT.

1    **Q.**  DOES APPLE ISSUE COUPONS THAT MIGHT BE –– THAT MIGHT GIVE

2    MONEY OFF ON IPODS?

3    **A.**  VERY RARELY.

4    **Q.**  DOES IT HAPPEN?

5    **A.**  THERE WOULD BE PROMOTIONS FROM TIME TO TIME.  USUALLY WE

6    DO A BLACK FRIDAY PROMOTION AROUND THANKSGIVING AND WE'D DO A

7    BACK-TO-SCHOOL PROMOTION IN THE JUNE TIME FRAME, KIND OF DAD'S

8    AND GRADS THING.  IT WAS PRETTY MUCH LIMITED TO THOSE TWO

9    TIMES IN THE UNITED STATES.

10   **Q.**  THERE IS ALSO RESELLER PRICING OVER HERE; IS THAT RIGHT?

11   **A.**  YES.

12   **Q.**  AND I BELIEVE YOU TESTIFIED THAT THERE WERE CERTAIN, I

13   DON'T KNOW, DID YOU SAY THAT THERE WERE REBATES PROVIDED TO

14   SOME RESELLERS BASED ON ADVERTISING; IS THAT RIGHT?

15   **A.**  THAT WAS ONE OF THE FACTORS WE WOULD CONSIDER.  WE CALLED

16   IT MARKET DEVELOPMENT FUNDS.

17   **Q.**  WHAT IS A BUSINESS DEVELOPMENT FUND?  IS THAT SOMETHING

18   SIMILAR?

19   **A.**  I'VE USED THE –– I'VE HEARD THE TERMS USED INTERCHANGEABLY

20   IN MY CAREER.

21   **Q.**  AND ABOUT WHAT PERCENTAGE OF THE RESELLERS ARE GIVEN

22   MARKETING DEVELOPMENT FUNDS OR BUSINESS DEVELOPMENT FUNDS?

23   **A.**  I DON'T KNOW.

24   **Q.**  IS IT A LARGE PERCENTAGE?

25   **A.**  I DON'T KNOW.  I DIDN'T HANDLE THE ACTUAL SALES AGREEMENTS

1    WITH THE RESELLERS.

2    **Q.**  JUST THE LARGER ONES, ISN'T IT, THE LARGER RESELLERS

3    RECEIVE THESE KINDS OF FUNDS, RIGHT?

4    **A.**  THERE WERE CRITERIA THAT MANY DIFFERENT CLASSES OF

5    RESELLERS HAD TO GET REBATE FUNDS BACK.  I'M NOT FAMILIAR WITH

6    THE FULL GAMUT, BUT A LOT OF PEOPLE HAD OPPORTUNITIES TO

7    PARTICIPATE.

8    **Q.**  CAN YOU EXPLAIN TO ME -- HAVE YOU EVER HEARD OF THE TERM

9    END-OF-LIFE PRICING?

10   **A.**  YES.

11   **Q.**  CAN YOU EXPLAIN WHAT THAT IS?

12   **A.**  END-OF-LIFE PRICING IS TYPICALLY FOR US AT APPLE IS WHEN

13   WE WERE TRANSITIONING FROM ONE PRODUCT LINE TO ANOTHER, OR

14   REPLACING IT WITH A FOLLOW-ON PRODUCT.  JUST LIKE WE RECENTLY

15   WENT THROUGH WITH THE IPHONE 6 CAME OUT TO REPLACE THE IPHONE

16   5S.

17       SO IN THIS CASE, THE IPHONE 5S WOULD BE THE END-OF-LIFE

18   PRODUCT AND THE IPHONE 6 WOULD BE THE NEW PRODUCT, JUST TO PUT

19   IT IN MORE CURRENT TERMS.

20           **THE COURT:**  HOW MUCH DO YOU HAVE, MR. MEDICI?

21           **MR. MEDICI:**  I'VE GOT MORE.

22           **THE COURT:**  OKAY.  SOUNDED LIKE A SLIGHTLY DIFFERENT

23   TOPIC.  WOULD NOW BE A GOOD TIME TO BREAK?

24           **MR. MEDICI:**  PERFECT.

25           **THE COURT:**  LADIES AND GENTLEMEN, WE ARE GOING TO GO

```
 1   AHEAD AND BREAK FOR THE DAY.  I JUST CHECKED THE WEATHER.  SO
 2   IT LOOKS LIKE, AT LEAST IN OAKLAND, THE WINDS ARE CONTINUING
 3   KIND OF IN A 20 MILES AN HOUR RANGE UNTIL ABOUT THREE.  SO, IF
 4   YOU WANT TO HANG OUT, YOU'RE WELCOME TO, OR SLOWLY MAKE YOUR
 5   WAY HOME.
 6        LUCKILY, NONE OF YOU LIVE IN SAN FRANCISCO.  I UNDERSTAND
 7   SAN FRANCISCO HAS LOST POWER.  SO WE SHUT THE FEDERAL
 8   COURTHOUSE DOWN IN SAN FRANCISCO, BUT NONE OF YOU ARE GOING TO
 9   SAN FRANCISCO.
10        SO, AGAIN, STAY SAFE.  DRIVE SLOWLY.  JUST A LITTLE RAIN.
11   LITTLE WIND.  BUT, WE WILL SEE YOU TOMORROW.  YES, TOMORROW IS
12   FRIDAY STILL.  SO WE WILL SEE YOU TOMORROW.  WE WILL START UP
13   AGAIN.  WE'LL BE IN RECESS UNTIL 8:30 TOMORROW.
14        THANK YOU SO MUCH FOR WEIGHTING THE STORM.
15        (PROCEEDINGS HELD OUTSIDE THE PRESENCE OF THE JURY.)
16            THE COURT:  MR. DONNELLY, YOU MAY STEP DOWN.
17        THE RECORD WILL REFLECT THE JURY IS GONE.
18            THE WITNESS:  THANK YOU, YOUR HONOR.
19            THE COURT:  ALL RIGHT.  HOW ARE YOU DOING?
20        WHEN AM I GOING TO GET BRIEFING ON -- TO THE EXTENT YOU
21   WANT IT OR UNLESS YOU ARE GOING TO DO IT ORALLY -- ON THE
22   MOTIONS FOR JUDGMENT.
23        LET ME GIVE YOU SOME TENTATIVE IMPRESSIONS.  AGAIN, I JUST
24   READ THE MOTION LAST NIGHT.  MY TENTATIVE IMPRESSION IS THAT
25   APPLE HAS ARGUED ITS CASE AND NOT GIVEN SUFFICIENT WEIGHT TO
```

1937

1   THE EVIDENCE AS PRESENTED BY THE PLAINTIFFS.  AND IT IS NOT

2   UNCOMMON, BUT FOR MOST OF THE MOTION, I WOULD BE INCLINED TO

3   DENY WITHOUT PREJUDICE UNTIL THE END OF THE TRIAL.

4       WITH RESPECT TO THE FIFTH GENERATION, I AM EXPECTING A

5   CONCESSION THAT THERE ARE NO DAMAGES AND SO THERE IS NO

6   OPPOSITION TO THAT.

7           **MR. COUGHLIN:**  YOUR HONOR, I CONCEDE THAT, THAT WE

8   HAVEN'T PROVED ANY DAMAGES THERE.  WE THINK THEY ARE AFFECTED.

9   WHERE IT COMES INTO PLAY MAYBE IS FOR THE RESTITUTION, THE

10  17200 VIOLATION.  WE CAN BRIEF THAT BRIEFLY BUT THAT'S -- IT

11  IS A SMALL ISSUE.

12          **THE COURT:**  FOR PURPOSES OF THE SHERMAN ACT, YOU

13  WOULD CONCEDE THAT YOU HAVE NO DAMAGES.

14          **MR. COUGHLIN:**  WE WOULD CONCEDE THAT WE DIDN'T PROVE

15  ANY DAMAGES.  CORRECT.

16          **THE COURT:**  SO THAT PORTION -- I WILL LET THEM HAVE

17  AN OPPORTUNITY TO LOOK AT IT, BUT TENTATIVELY I WOULD GRANT

18  THAT.

19      AND THE ONLY ISSUE THAT I'M KIND OF CURRENTLY WEIGHING IN

20  TERMS OF GRANTING THE MOTION AND -- AT THIS JUNCTURE IS THIS

21  ISSUE OF 7.4.  YOU KNOW, I CAN UNDERSTAND THE ARGUMENT, AND I

22  DON'T KNOW THAT A RULING WOULD DENY YOU THE OPPORTUNITY TO

23  ARGUE THAT THE ISSUE HERE IS 7.0 AS IT CONTINUED THROUGH 7.4,

24  BUT I CAN'T GIVE, FOR INSTANCE, THE JURY A VERDICT FORM THAT

25  WOULD SEPARATE OUT 7.0 AND 7.4 BECAUSE THERE ARE -- THERE IS

1938

```
 1    NO EVIDENCE THAT THE DAMAGES CALCULATION HAS BEEN SEGREGATED

 2    IN THAT WAY.

 3       AND GIVEN THAT 7.4 DIDN'T EXIST AT THE TIME OF 7.0, I

 4    CANNOT SEE -- I CAN'T FIGURE OUT HOW IT IS I'M SUPPOSED TO

 5    INSTRUCT THE JURY IN THAT WAY, MR. COUGHLIN.  I DON'T SEE IT.

 6    I MEAN, I THINK YOU CAN ARGUE IT.  BUT IN TERMS OF THE DAMAGES

 7    EVIDENCE THAT HAS BEEN PRODUCED, IT STARTS AT 7.0.  THERE IS

 8    NOTHING SEPARATE AND DISTINCT ABOUT 7.4.

 9            MR. COUGHLIN:  I UNDERSTAND, YOUR HONOR.  IT HAS

10    ALWAYS BEEN USED REALLY AS A MARKER.  BOTH OF THEM WERE IN

11    7.0.  AND IT WAS JUST FLICKED ON THEN.  IT KEPT THE LOCK-OUT

12    AND LOCK-IN GOING ON.  THEY WERE PART AND PARCEL, SO --

13            THE COURT:  I UNDERSTAND THAT YOU ARE MAKING THAT

14    ARGUMENT, BUT DESPITE ALL OF BILLIONS OR MILLIONS OF DATA SETS

15    THAT HAS BEEN OUT, THERE HAS BEEN NO REGRESSION ANALYSIS THAT

16    SAYS WE GOT FROM 7.0 TO 7.4 AND THIS IS THE NUMBER AND, THEN

17    THE COMPUTER GENERATED A SEPARATE NUMBER THAT GETS TACKED ON

18    AT 7.4.  THERE HAS BEEN NO DELINEATION.

19            MR. COUGHLIN:  THAT'S RIGHT.

20            THE COURT:  SO I CAN'T -- BECAUSE I CAN'T DELINEATE

21    IT IN A VERDICT FORM, IT DOESN'T SEEM TO ME APPROPRIATE TO

22    INSTRUCT IT IN THAT WAY.  I HAVE TO FIGURE OUT SOMETHING ELSE,

23    IT IS NOT TWO SEPARATE ISSUES.

24            MR. COUGHLIN:  THAT'S CORRECT, YOUR HONOR, IT IS NOT.

25            THE COURT:  SO, IN THAT SENSE, I AM TENTATIVELY
```

1939

1    INCLINED TO GRANT THAT PART OF THE MOTION.

2              **MR. COUGHLIN:**  AND WE'RE FINE WITH THAT, YOUR HONOR.

3         WE INTEND TO ARGUE, OF COURSE, THAT -- AND WHEN THEY --

4    WHEN -- YOU KNOW, WHAT WAS ACTIVATED AND WHEN BECAUSE WE

5    BELIEVE THEY WERE BOTH IN 7.0, AND THEY GO TO INTENT -- INTENT

6    EVIDENCE AND ALSO THE IMPACT OF THE LOCK-IN AND LOCK-OUT.

7              **MR. ISAACSON:**  I DON'T UNDERSTAND HOW IT CAN GO INTO

8    THE IMPACT OF LOCK-IN AND LOCK-OUT.  THE LOCK-IN AND LOCK-OUT

9    ANALYSIS, THE ONLY EMPIRICAL ANALYSIS IS BASED BEFORE

10   SEPTEMBER 2006 AND AFTER.

11             **MR. COUGHLIN:**  THAT --

12             **MR. ISAACSON:**  THERE IS NO EVIDENCE IN THIS CASE OF

13   LOCK-IN OR LOCK-OUT OTHER THAN DR. NOLL'S REGRESSION.

14             **MR. COUGHLIN:**  THAT'S CORRECT.  AND THAT INCLUDES

15   THAT REGRESSION IS TURNED ON ON 7 AND IT'S REINFORCED AS THE

16   DVC COMES ON LATER.  FIRST IT STARTS WITH THE KVC.  BOTH OF

17   THEM ARE IN THERE AT THE SAME TIME.  THE REGRESSION ANALYSIS

18   TAKES INTO ACCOUNT WHAT -- THE OVERALL IMPACT AS IT GOES

19   FORWARD.

20             **MR. ISAACSON:**  THERE IS NO SUCH THING AS REINFORCING.

21   IN THIS REGRESSION ANALYSIS.

22             **THE COURT:**  WELL, MR. ISAACSON, YOUR EXPERTS HAVE

23   CLEARLY TESTIFIED THAT THE ENTIRE ANALYSIS IS FLAWED.

24             **MR. ISAACSON:**  RIGHT.

25             **THE COURT:**  AND THIS IS JUST ANOTHER FLAW, FRANKLY.

```
1    I MEAN, IT'S ONE IN THE LITANY THAT YOUR EXPERTS HAVE

2    IDENTIFIED.  TO SUGGEST THAT I DON'T SEND IT ALL TO THE JURY

3    ON THAT BASIS, I'M NOT SURE I'M WILLING TO GO THAT FAR AT THIS

4    JUNCTURE.

5          MR. ISAACSON:  I THINK IT'S IMPORTANT AS TO WHAT

6    ASPECTS OF THIS GO TO THE JURY.  AND -- YOU KNOW, FOR EXAMPLE,

7    TO SAY THAT THERE IS EVIDENCE OF IMPACT OF LOCK-IN OR LOCK-OUT

8    DUE TO 7.4 IN THIS CASE IS FACTUALLY WRONG.  THERE IS NO

9    RECORD TO SUPPORT THAT ARGUMENT.

10          MR. COUGHLIN:  IT IS THE -- IT IS THE FEATURE THAT

11    WAS IN -- THE FEATURES THAT WERE BOTH IN 7.0, AND THAT'S

12    REALLY WHAT GOES TO THE JURY.  AND THESE ARE THE FEATURES WE

13    INTEND TO DISCUSS.  IF WE JUST WANT TO USE IT 7.0, THAT'S

14    FINE.  THAT IS WHAT THE REGRESSION ANALYSIS WAS BASED ON.

15    THESE ARE THE FEATURES THAT CAUSED THE IMPACT AND CAUSED THE

16    REGRESSION ANALYSIS TO ACT THE WAY IT DID.  IT WAS ALWAYS

17    BASED ON THE FIRST DATA 7.0 AND STARTED OFF WITH KEYBAG

18    VERIFICATION AND ALSO WITH THE KEYBAG AND THE DATABASE

19    VERIFICATION TURNED ON AT THE SAME TIME.

20          REALLY, THIS ARGUMENT IS BEING MADE FOR THE FIRST TIME

21    HERE NOW BECAUSE MR. SCHULTZ IS COMING TOMORROW AND HE DOESN'T

22    WANT THAT PART OF THE CASE, YOU KNOW, IN THE CASE.  IT IS IN

23    THE CASE.  IT HAS BEEN IN THE CASE FOR ALL OF THESE YEARS, AND

24    IT SHOULD GO TO THE JURY.  WE CERTAINLY PRESENTED ENOUGH

25    EVIDENCE.
```

1941

```
 1          THE COURT:  THE TWO OF YOU OBVIOUSLY HAVE MUCH MORE

 2    INFORMATION ON THIS ISSUE THAN I DO.  SO I DON'T KNOW WHAT

 3    SCHULTZ IS GOING TO SAY.  I DON'T KNOW WHAT YOU THINK HE IS

 4    GOING TO SAY, AND I DON'T KNOW WHAT YOU THINK HE IS GOING TO

 5    SAY.  BUT, OBVIOUSLY, ALL OF YOU ARE OPERATING UNDER SOME

 6    ASSUMPTION ABOUT WHAT IS GOING TO HAPPEN TOMORROW.  AND I'M

 7    SURE YOU'VE HAD HUGE DEBATES IN OUR WAR ROOMS ABOUT WHAT IS

 8    GOING TO HAPPEN TOMORROW LEAVING ME BLIND.

 9       SO YOU CAN EITHER EXPLAIN IT TO ME OR WE MOVE FORWARD AND

10    ACTUALLY I HEAR TOMORROW WHAT IS GOING TO HAPPEN AND THEN, YOU

11    KNOW, I CAN MAKE DECISIONS.  BUT I DON'T HAVE THE INFORMATION

12    YOU HAVE.

13          MR. ISAACSON:  I DON'T HAVE ANY BASIS FOR TELLING YOU

14    YOU CAN'T HEAR FROM MR. SCHULTZ TOMORROW.  WE HAVE TO GO

15    QUESTION BY QUESTION.  I AM NOT HERE TALKING ABOUT THAT.  I AM

16    TALKING ABOUT WHAT YOUR HONOR IS TALKING ABOUT, IS THAT THE

17    VERDICT FORM WOULD BE WRONG, THE INSTRUCTIONS ARE WRONG, AND

18    IT WOULD BE WRONG FOR PLAINTIFFS' COUNSEL TO STAND UP IN

19    CLOSING AND ARGUE THAT 7.4 HAD IMPACT ON LOCK-IN OR LOCK-OUT

20    OR THAT THERE IS ANY EVIDENCE OF THAT BECAUSE THERE IS NOT,

21    AND --

22          THE COURT:  WELL, HE IS ARGUING -- SO TELL ME -- YOU

23    KNOW, WE HAVE BEEN -- THESE TRIALS ARE ALWAYS INTERESTING

24    BECAUSE YOU KNOW SO MUCH MORE AT THE END OF IT AND YOU HAVEN'T

25    NECESSARILY BEEN FOCUSED ON TRYING TO CATALOG THE INFORMATION
```

1942

1    AS IT CAME UP IN BECAUSE YOU DIDN'T KNOW THE ISSUES UNTIL

2    AFTERWARDS.

3        SO IS THERE EVIDENCE THAT 7.4 WAS -- OR NOT 7.4 -- THAT

4    BOTH COMPONENTS, THE KVC AND DVC, THE SOFTWARE, WAS IN 7.0?

5            **MR. COUGHLIN:**  YES.

6            **MR. ISAACSON:**  YES.  7.4 WAS IN 7.0, IT WAS NOT

7    ACTIVATED.  I THINK WE ARE IN COMMON GROUND ON THAT.

8            **THE COURT:**  OKAY.

9            **MR. ISAACSON:**  BUT THAT IS WHY I'M SAYING "NO

10    IMPACT," BECAUSE ANY IMPACT OF 7.4 HAPPENS A YEAR LATER.  AND

11    THERE IS NO EVIDENCE OF LOCK-IN OR LOCK OUT OF ANYONE A YEAR

12    LATER IN THIS CASE.

13            **MR. COUGHLIN:**  NOW, THAT IS THE FIRST TIME THAT HE

14    HAS JUST SAID 7.0 IS JUST ABOUT THE DATABASE VERIFICATION BAG

15    AND SAID 7.4 WAS IN 7.0.  THE DATABASE VERIFICATION, CODE,

16    CHECK, WHATEVER PEOPLE ARE CALLING IT, AND THE KEYBAG

17    VERIFICATION WERE BOTH IN 7.0 WHERE THE REGRESSION STARTS.

18        WHAT HAPPENS WHEN THOSE ARE TURNED ON OR OFF CERTAINLY

19    PROBABLY IMPACTS THE WAY THE REGRESSION, YOU KNOW, WENT.  BUT,

20    LATER ON -- AND I THINK INCREASED THE LOCK-IN AND LOCK-OUT.

21    AND DR. NOLL CAN COME TESTIFY ABOUT THAT, AND WE WILL BE BACK

22    HERE TOMORROW TO TALK -- YOU KNOW, TO RESPOND TO SOME OF THE

23    THINGS THAT THEY SAID AND GO FURTHER.

24            **MR. ISAACSON:**  NO, YOUR HONOR -- I AM SORRY.  ARE YOU

25    DO NOT?

1          **MR. COUGHLIN:**  YES.

2          **MR. ISAACSON:**  NO, YOUR HONOR.  THERE IS NO 7.4

3     VARIABLE.  THIS ALSO REBUTTAL.  DR. NOLL DID NOT TESTIFY AS TO

4     ANY IMPACT, AND IF HE IS GOING TO TRY TO GIN UP A THEORY RIGHT

5     NOW, IT IS TOO LATE.

6          **MR. COUGHLIN:**  HE IS NOT GINNING UP A THEORY.  IT ALL

7     STARTED WITH 7.  THAT IS WHERE WE ARE.  IT IS THESE TWO

8     PRODUCTS THAT WERE BOTH IN 7.  REALLY, THEY NEVER COMPLAINED

9     ABOUT USING THAT AS A MARKER FOR ALL OF THESE YEARS.  FOR

10    YEARS, THIS HAS BEEN THE WAY IT IS.  AND NOW, AT THE LAST

11    MINUTE, TO BRING IT UP AS AN ISSUE, IT'S NOT --

12         **THE COURT:**  WELL, AGAIN, THERE ARE NO MORE NEW

13    THEORIES.  WHERE IS IT IN HIS REPORT THAT HE SAYS -- WELL, HE

14    CAN'T TESTIFY BECAUSE I DON'T THINK THERE IS ANYTHING IN HIS

15    REPORT THAT HAS -- THAT SHOWS ANY CORRELATION TO 7.4.

16         **MR. COUGHLIN:**  IT'S NOT -- IT HAS -- YOU'RE RIGHT.

17    HE'S RIGHT.  BUT HE IS TALKING ABOUT THE KVC AND DVC AND THE

18    IMPACT, AND THOSE WERE BOTH IN 7, OKAY?  WE HAVE ALWAYS SAID

19    THIS IS JUST ABOUT KVC AND DVC.  THEY HAVE ALWAYS TRIED TO

20    LABEL IT 7.0 AND 7.4.

21      WE ARE JUST TALKING ABOUT THESE TWO PRODUCTS.  THEY WANT

22    TO TALK ABOUT 7.0 AND 7.4 BECAUSE THEY WANT TO SAY IT IS THE

23    VIDEO, IT'S THE SCREENS, IT'S THE MOVIES, YOU KNOW, AND THEY

24    HAVE NEVER MADE THIS ARGUMENT BECAUSE THEY WANTED THAT

25    EXPANSIVE ARGUMENT AND THEY WANTED TO TALK ABOUT IT.

1944

|    |                                                                            |
|----|----------------------------------------------------------------------------|
| 1  | **THE COURT:** IT IS NOT AS IF THEY HAVE IT.  IT IS IN                      |
| 2  | THE REPORTS.  THAT IS WHY ALL THE EVIDENCE CAME IN.  SO THIS                |
| 3  | ISN'T NECESSARILY -- THIS ISN'T A NEW ARGUMENT, MR. COUGHLIN.               |
| 4  | YOU KNOW, WE HAVE THIS ISSUE IN PATENT CASES.  AND WITHIN                   |
| 5  | THE LAST YEAR, A PATENT CASE CAME DOWN WHERE PLAINTIFFS COME                |
| 6  | IN AND THEY WANT TO TALK ABOUT A PIECE OF SOMETHING.  AND THEY              |
| 7  | FAIL TO TALK ABOUT THE PIECE IN RELATIONSHIP TO THE WHOLE.                  |
| 8  | BRAND-NEW SUPREME COURT CASE SAYS YOU CAN'T DO THAT.                        |
| 9  | AND I'M STRUGGLING WITH THE PLAINTIFFS' APPROACH IN TRYING                  |
| 10 | TO DO THAT HERE.  AND SO I DON'T FAULT THE DEFENDANTS FOR                   |
| 11 | THEIR APPROACH BECAUSE IT IS AN APPROACH THAT IS USED IN OTHER             |
| 12 | AREAS OF THE LAW.                                                           |
| 13 | NOW, I'M GOING TO LET YOU MAKE THE ARGUMENT THAT THIS                       |
| 14 | ANALYSIS IS SUFFICIENT TO EXPLAIN IT.  THEY ARE GOING TO ARGUE             |
| 15 | AS THE REPORTS HAVE INDICATED THAT IT IS INCREDIBLY FLAWED.                 |
| 16 | **MR. COUGHLIN:** I UNDERSTAND.                                             |
| 17 | **THE COURT:** BUT TO CLAIM THAT THERE IS -- THERE IS NO                    |
| 18 | EVIDENCE OF IMPACT OF 7.4.  IT'S -- AT LEAST ALONE.  I MEAN,                |
| 19 | IT ALL IT ALL GOES BACK TO 7.0.                                            |
| 20 | **MR. COUGHLIN:** ABSOLUTELY.  ABSOLUTELY.                                  |
| 21 | **MR. ISAACSON:** DR. NOLL SHOULD NOT BE ALLOWED TO                         |
| 22 | TESTIFY THAT HE ANALYZED ANY IMPACT OF 7.4.  THAT IS NOT IN                 |
| 23 | HIS REPORTS.  THE REBUTTAL -- THE EXPERTS ARE BEING CALLED                  |
| 24 | BACK.  THEY CAN REBUT OUR EXPERTS BASED ON THINGS THAT ARE IN              |
| 25 | THEIR REPORTS, BUT NEW, UNDISCLOSED CONTENTIONS OR ANALYSIS                 |

```
 1   ARE NOT PROPERLY PART OF REBUTTAL.

 2            MR. COUGHLIN:  I WOULD AGREE.

 3            THE COURT:  I WOULD AGREE.  SO IN LIGHT OF WHAT I

 4   HAVE TENTATIVELY SAID, DO YOU WANT TO RESPOND IN WRITING?

 5            MR. COUGHLIN:  YES.

 6            THE COURT:  OKAY.

 7            MR. COUGHLIN:  WE WOULD LIKE TO A CHANCE TO RESPOND

 8   IN WRITING.  WE ARE PUTTING WITNESSES ON, SO IT IS HARD TO

 9   RESPOND IN WRITING.  WE WOULD RESPOND IN WRITING WE'D

10   HOPEFULLY REQUEST BY MONDAY, BUT -- THAT'S WHAT WE WOULD

11   REQUEST.

12            THE COURT:  WELL, THE PROBLEM IS IF I'M INSTRUCTING

13   THE JURY, I NEED SOMETHING SOONER THAN THAT.  AND BY THE WAY,

14   I HAVE TO LOOK AT IT.  I MEAN, AT SOME POINT, I NEED TO READ

15   THESE THINGS.

16            MR. COUGHLIN:  YOUR HONOR, WE WILL GET IT TO YOU BY

17   SATURDAY AFTERNOON.

18            THE COURT:  AND THEN YOU GO OUT AND HAVE A NICE CAB

19   WITH YOUR SATURDAY DINNER.

20            MR. COUGHLIN:  YOUR HONOR, WE WILL GET IT TO YOU --

21            THE COURT:  IT'S FINE.  SATURDAY BY NOON.

22            MR. COUGHLIN:  OKAY.

23            THE COURT:  SATURDAY BY NOON.

24       OKAY.  HOW LONG DO WE EXPECT THESE WITNESSES TO GO ON

25   TOMORROW?
```

1946

```
 1          MR. COUGHLIN:  I WOULD EXPECT NO MORE --

 2          THE COURT:  LET ME TELL YOU, AT THE END OF THE DAY

 3   YESTERDAY -- SORRY, I WAS DISTRACTED THIS MORNING.  I DID NOT

 4   PRINT THIS FOR YOU.

 5          MR. ISAACSON:  THE ORDER OF WITNESSES, TOO, WILL BE

 6   HELPFUL.

 7          THE COURT:  AT THE END OF THE DAY YESTERDAY,

 8   DEFENDANTS WERE LEFT WITH 6 HOURS 40, ACCORDING TO MY

 9   CALCULATION; AND PLAINTIFFS, 5 HOURS 54.  I'VE GOT PLAINTIFFS

10   TODAY AT ABOUT AN HOUR 15 OR SO, SO THAT WOULD BRING YOU DOWN

11   TO 4:30, AND DEFENDANTS, I THINK YOU ARE AT ABOUT 4:40,

12   SOMETHING LIKE THAT.

13          MR. ISAACSON:  WE'RE BOTH PRETTY CLOSE RIGHT NOW.

14          THE COURT:  SO, WE HAVE --

15          MR. COUGHLIN:  WE HAVE CUT DOWN THE WITNESSES.

16   MR. ISAACSON CALLED ME LAST NIGHT, SO WE'VE CUT DOWN DR.

17   WOOLDRIDGE, AND ALSO I DON'T BELIEVE THAT I NEED TO PUT ON

18   DR. MARTIN TO RESPOND TO DR. KELLY.  SO I THINK WE WOULD JUST

19   HAVE NOLL AND SCHULTZ AND BE DONE.

20          THE COURT:  AND WOOLDRIDGE.

21          MR. COUGHLIN:  NO, THEY DIDN'T PUT ON THE CLUSTERING.

22   THEY CALLED US LAST NIGHT.  THEY CUT OFF PART OF THEIR

23   TESTIMONY WHICH EXCUSED HIM.

24          THE COURT:  OKAY.

25          MR. ISAACSON:  SEEMED LIKE A TOUGH ISSUE TO EXPLAIN
```

1947

```
1    TO A JURY.
2           THE COURT:  I WAS ACTUALLY LOOKING FORWARD TO HEARING
3    THAT EXPLANATION MYSELF, BUT I GUESS I'LL GET IT IN SOME OTHER
4    ANTITRUST CASE.
5           MR. COUGHLIN:  HE'S HERE IF YOU WOULD LIKE TO TALK TO
6    HIM.
7           THE COURT:  OKAY.  SO, THEN WHAT I THINK PROBABLY
8    MAKES SENSE IS WE WILL FINISH OFF TOMORROW, AND WHAT I MIGHT
9    DO SINCE -- I COULD HAVE THE JURY JUST COME IN LATE ON MONDAY
10   SO WE HAVE AN OPPORTUNITY -- A LONGER OPPORTUNITY TO TALK AND
11   THEN INSTRUCT THEM THAT THEY WOULD BE GETTING THE CASE AFTER
12   LUNCH AND TO BE PREPARED TO STAY THE REST OF THE DAY IF THEY
13   CHOOSE.
14       THE OTHER OPTION IS JUST HAVE THEM COME BACK ON TUESDAY.
15   THEN I WOULD HAVE AN OPPORTUNITY TO HAVE ARGUMENT FROM ALL OF
16   YOU AND FINALIZE INSTRUCTIONS WITHOUT BEING RUSHED.  SO I'M
17   HAPPY TO DO IT -- I CAN DO IT EITHER WAY.  IF THEY ARE HERE
18   ALL DAY ON MONDAY THEN THAT WOULD WORK TO DO IT THAT WAY.  BUT
19   I THINK I NEED A FEW HOURS WITH YOU ON MONDAY.
20       ANY PERSPECTIVES?
21           MR. COUGHLIN:  WE ARE FINE EITHER WAY.
22           MR. ISAACSON:  WHATEVER YOU WANT, YOUR HONOR.
23           THE COURT:  ALL RIGHT.  WELL, LET ME CHEW ON THAT.
24       YOU WANT TO DO EXHIBITS?  IS THERE ANYTHING BEING OFFERED?
25           MR. ISAACSON:  MS. DEARBORN WILL SHALL OFFERING SOME
```

1948

```
1    EXHIBITS.

2        JUST A LITTLE BIT MORE CLEAN UP WE DIDN'T GET TO THIS

3    MORNING.

4        I THINK YOU HAVE -- THERE WAS THE DATA SET I THINK YOU

5    HAVE -- BUT WE HAVE THE ONE PAGE YOU WANTED A LARGER COPY OF

6    SO THE JURY COULD READ.  WE CREATED THAT.  AND THERE IS A

7    THUMB DRIVE WITH THE DATA SET.

8            THE COURT:  HOLD ON JUST A MINUTE.

9        I THINK WE WILL PROBABLY BE ANOTHER HALF HOUR.  DO YOU

10   WANT TO SWITCH?

11           THE REPORTER:  THAT'S FINE.

12           THE COURT:  THAT'S FINE.  OKAY.  ALL RIGHT.  SO,

13   THANKS, RAYNEE.  SHE WILL STAY ON.  IT'S PROBABLY, I THINK,

14   JUST HALF HOUR.

15       ALL RIGHT.  SO THE DATA SET, THE ONE PAGE --

16           MR. ISAACSON:  HAS BEEN BLOWN UP SIMILAR TO THE ONE

17   YOU SAW THAT WAS EASIER TO READ.

18           THE COURT:  OKAY.  AND THAT EXHIBIT, THE BATES

19   EXHIBIT NUMBER ON THAT ONE?

20           MR. ISAACSON:  THAT ONE PAGER IS 2874A.

21           THE COURT:  2874A?

22           MR. ISAACSON:  YES.  AND THE THUMB DRIVE WOULD BE

23   2874.

24           THE COURT:  ALL RIGHT.  BOTH OF THOSE ARE ADMITTED.

25
```

1949

```
 1        (DEFENDANT'S EXHIBITS 2874AA AND 2874 RECEIVED IN

 2   EVIDENCE)

 3           MS. SWEENEY:  YOUR HONOR, I HAVE TO RESPOND TO THAT.

 4   SO WE HAVE BEEN LOOKING AT THE THUMB DRIVE THAT COUNSEL SENT

 5   OVER YESTERDAY.  AND IT'S NOT THE RIGHT ONE.  IT DOESN'T HAVE

 6   THE RIGHT INFORMATION ON IT, SO I BELIEVE THAT THEY'RE WORKING

 7   IT OUT, WHICH IS THE RIGHT DATA SET.

 8           THE COURT:  OKAY.

 9           MR. ISAACSON:  I'M TOLD IT IS CORRECTED, BUT LET'S

10   MAKE SURE YOU ARE COMFORTABLE WITH THAT.

11           THE COURT:  LET'S MEET AND CONFER ON THAT, AND IF

12   THERE IS AN ISSUE LET ME KNOW.

13           MR. ISAACSON:  I THINK THE MAIN THING WE FOUND OUT IS

14   IT FITS ON A THUMB DRIVE --

15           THE COURT:  WELL, I HAVE A CASE ON THUMB DRIVES, TOO.

16   SO I GUESS THEY ARE BIG ENOUGH.

17           MR. ISAACSON:  WHY WE WANT THE JURY TO HAVE A THUMB

18   DRIVE FULL OF A DATA SET AND NOT IPODS, I'M STILL STRUGGLING

19   WITH, BUT --

20           THE COURT:  I HAVE GOT ENGINEERS.

21           MR. ISAACSON:  THEN THERE WAS THE ISSUE OF THE

22   REDACTED COMPLAINT WHICH WE GAVE A COPY TO PLAINTIFFS.  I AM

23   NOT SURE WE HAVE GIVEN IT TO THE COURT.

24           THE COURT:  NO, I DON'T THINK I HAVE SEEN IT.  AND

25   THEN YOU WERE GOING TO GIVE ME A CASE CITE.
```

1          MR. ISAACSON:  WHAT I HAVE HERE IS THE RUTTER GROUP

2     "PRACTICE GUIDE FEDERAL CIVIL TRIALS ON EVIDENCE", HORNBOOK,

3     THAT SAYS:

4               IF OPPOSING PARTIES' PLEADINGS CONTAINS SIGNIFICANT

5               OMISSIONS, SIMPLY READING THEM INTO THE RECORD OFTEN

6               DOES NOT CONVEY ENOUGH PUNCH.  THE BETTER PRACTICE IS

7               TO OFFER THE PLEADING INTO EVIDENCE AS AN EXHIBIT SO

8               IT IS ELIGIBLE TO BE TAKEN INTO THE JURY ROOM DURING

9               DELIBERATIONS.  TO FACILITATE SUBMISSION TO THE JURY,

10              OFFER TO EXCISE ANY INADMISSIBLE PORTIONS OF THE

11              PLEADINGS BEFORE THE JURY IS ALLOWED TO REVIEW THEM."

12     I THINK THAT'S A STRAIGHTFORWARD AND CORRECT STATEMENT OF

13     THE LAW.  THE PARAGRAPH 66 IS ADMISSIBLE.  THE REST OF THE

14     COMPLAINT IS NOT.

15          MR. COUGHLIN:  YOUR HONOR, IT IS ALSO A RULE OF LAW

16     THAT ANYTHING THAT IS NECESSARY TO COMPLETE A STATEMENT IS

17     ADMISSIBLE.  AND WE THINK THE ENTIRE -- IF HE IS GOING TO USE

18     A PARAGRAPH JUST PULLED OUT OF IT, THAT DOESN'T -- THAT

19     DOESN'T WORK.

20          THERE IS ALSO TWO INTERROGATORIES THAT DEAL WITH THAT

21     SPECIFIC PARAGRAPH.  AND THE FIRST INTERROGATORY IS BEFORE

22     DISCOVERY, AND THE SECOND ONE SAYS THAT WE ARE NO LONGER

23     RELYING ON THAT PARAGRAPH.  WE THINK THOSE TWO INTERROGATORIES

24     SHOULD GO BACK WITH THE COMPLAINT.

25          MR. ISAACSON:  THIS WAS PART OF CROSS-EXAMINATION OF

1951

```
 1    THEIR THEN PLAINTIFF, AND THE INTERROGATORIES WERE NOT USED

 2    WITH THAT PLAINTIFF ON REDIRECT.  THEY CERTAINLY HAD THE

 3    OPPORTUNITY TO DO THAT AND CHOSE NOT TO DO IT.

 4           MR. COUGHLIN:  WE ARE NOT DOING IT FOR THE PLAINTIFF.

 5    WE'RE DOING IT FOR COMPLETENESS.  YOU WANT TO PUT IN A

 6    PARAGRAPH THAT IS OTHERWISE INADMISSIBLE AND PULLED OUT.  WE

 7    THINK THE INTERROGATORY ANSWERS DEALING WITH THAT PARAGRAPH

 8    SHOULD ALSO GO IN WITH THE COMPLAINT.

 9           THE COURT:  ALL RIGHT.  LET ME HAVE THE EXHIBITS.

10           MR. COUGHLIN:  HERE, HERE'S MINE.

11           THE COURT:  SO THE PARAGRAPH 66 IS IDENTIFIED AS

12    WHAT?

13           MR. ISAACSON:  2593.

14      (DEFENDANT'S EXHIBIT 2593 MARKED FOR IDENTIFICATION)

15           THE COURT:  AND THEN THE INTERROGATORIES ARE

16    IDENTIFIED AS --

17           MR. COUGHLIN:  THEY ARE NOT IDENTIFIED, YOUR HONOR.

18           THE COURT:  SO YOUR LAST -- DO YOU HAVE -- 927 IS THE

19    LAST ONE FOR YOU?  HOLD ON.

20      NO.  WHAT IS THE LAST MARKED EXHIBIT FOR PLAINTIFFS?

21           MR. COUGHLIN:  WE ARE GETTING IT.

22                (PAUSE IN THE PROCEEDINGS.)

23           MR. COUGHLIN:  949 IS OUR LAST ONE, YOUR HONOR.  I

24    WOULD MARK THE INTERROGATORIES DATED DECEMBER 21, 2010 --

25           THE COURT:  HOLD ON.
```

1952

1          (PAUSE IN THE PROCEEDINGS.)

2          **THE COURT:**  ALL RIGHT.  SO THAT WILL BE 950.

3      (PLAINTIFFS' EXHIBIT 950 MARKED FOR IDENTIFICATION)

4          **MR. COUGHLIN:**  AND THEN THE INTERROGATORIES DATED

5   MARCH 7, 2011.

6          **THE COURT:**  951.

7      (PLAINTIFFS' EXHIBIT 951 MARKED FOR IDENTIFICATION)

8          **MR. COUGHLIN:**  YOUR HONOR, I THINK WE SHOULD MARK THE

9   WHOLE COMPLAINT, WHICH I HAVE HANDED UP TO YOU.  THAT CAN BE

10  952.

11     (PLAINTIFFS' EXHIBIT 952 MARKED FOR IDENTIFICATION)

12         **MR. ISAACSON:**  OUR POSITION IS BOTH THE INTERROGATORY

13  ANSWER AND THE OTHER PORTIONS OF THE COMPLAINT WOULD BE

14  INADMISSIBLE HEARSAY.

15         **THE COURT:**  I UNDERSTAND.

16     ALL RIGHT.  NEXT ISSUE.

17         **MR. ISAACSON:**  WE HAVE MOVED DR. KELLY'S IPODS INTO

18  EVIDENCE, AND YOU HAVE THOSE, TX2712 AND 2743, AND YOU'LL HAVE

19  TO MAKE A RULING ON THAT.

20         **THE COURT:**  RIGHT.

21         **MR. ISAACSON:**  AND THEN PLAINTIFFS LAST NIGHT FILED A

22  MOTION TO COMPEL, I GUESS, FOR PRIVILEGED DOCUMENTS THAT HAVE

23  BEEN ON A PRIVILEGE LOG FOR FIVE YEARS.  THIS RELATES TO THE

24  DMCA ISSUE.

25         **MR. COUGHLIN:**  WE WILL WITHDRAW THAT IF THEY WITHDRAW

1    THEIR REQUEST FOR THAT INSTRUCTION.

2              **MR. ISAACSON:**  WE DON'T THINK THAT THAT IS NECESSARY

3    BECAUSE THE PREMISE FOR THE DMCA INSTRUCTION IS THE TESTIMONY

4    OF DR. KELLY AND NOT -- WE HAVE NOT PUT ON ANY APPLE WITNESSES

5    WHO HAVE TESTIFIED ABOUT STATE OF MIND RELATING TO THE DMCA

6    MUCH LESS RELIANCE ON COUNSEL.

7         DR. KELLY IN OBJECTIVE EVIDENCE TESTIFIED THAT HARMONY

8    STRIPPED FAIRPLAY DRM WHEN MUSIC WAS GOING TO BE PLAYED ON A

9    NONIPOD DEVICE, WHICH TRIGGERS THE PROVISIONS OF THE DMCA.

10   THERE HAS BEEN NO -- THERE IS A FAIR USE DEFENSE FOR THE DMCA.

11   THERE HAS BEEN NO EVIDENCE FROM REAL TO INDICATE THERE HAS

12   BEEN ANY FAIR USE.

13        SO STRICTLY BASED ON OBJECTIVE EVIDENCE, WE HAVE A

14   LEGITIMATE BUSINESS JUSTIFICATION FOR OUR CONDUCT BASED ON THE

15   TESTIMONY OF DR. KELLY.

16             **MR. COUGHLIN:**  YOUR HONOR, I WOULD DISAGREE.  THE

17   HELLER EMAIL WHERE HE EXAMINED EXACTLY WHAT FAIRPLAY -- WHAT

18   HELIX AND HARMONY DO WITH FAIRPLAY INDICATES THAT IT IS NOT

19   STRIPPING, THAT IT IS ADDING DRM MATERIAL.  THERE IS NO

20   EVIDENCE IN THIS RECORD THAT THERE HAS BEEN A VIOLATION OF THE

21   DMCA.

22             **MR. ISAACSON:**  LET'S BE VERY CLEAR.  MR. HELLER WAS

23   LOOKING AT THE USE OF HARMONY TO PUT MUSIC ON THE IPOD FROM

24   REAL.

25        DR. KELLY TESTIFIED THAT YOU HAD TO STRIP FAIRPLAY --

1954

```
1    HARMONY WORKED WITH ANY NUMBER OF DEVICES, NOT JUST THE IPOD.

2    DR. KELLY TESTIFIED THAT WHEN YOU TOOK AN ITUNES SONG WITH

3    FAIRPLAY AND HARMONY TRANSFERRED IT TO ANOTHER DEVICE, IT HAD

4    TO STRIP FAIRPLAY.  THAT IS UNREBUTTED TESTIMONY.

5              THE WITNESS:  YOUR HONOR --

6              THE COURT:  IT'S YOUR POSITION.

7              MR. ISAACSON:  YES.  AND SO IT HAS A BASIS FOR --

8    THERE'S AN EVIDENTIARY BASIS, BASED ON OBJECTIVE EVIDENCE, FOR

9    A JURY INSTRUCTION.

10             MR. COUGHLIN:  THERE IS NO BASIS.  HE COULDN'T

11   EVEN -- HE DIDN'T HAVE HARMONY'S HELIX AND SO HE COULDN'T DO

12   ANY EXPERIMENTS.  HE LOOKED AT A HELP PAGE.  WELL, WE HAVE A

13   ACTUAL STATEMENT ISSUED BY REAL THAT IS -- THAT SETS FORTH

14   THAT THEY DIDN'T STRIP ANY DRM.  AND, IN FACT, WE THINK THAT

15   WHEN HELLER DID HIS EXPERIMENTS, THAT IS THE BEST EVIDENCE

16   THAT'S IN THE RECORD ABOUT EXACTLY WHAT HARMONY DOES.

17        AND THERE'S NO EVIDENCE IN THE RECORD THAT -- THAT WOULD

18   SUPPORT THAT STRIPPING SINCE HE NEVER HAD THAT.  HE ASSUMED

19   BUT HE DIDN'T KNOW BECAUSE HE TESTIFIED THAT HE NEVER WAS ABLE

20   TO GET HOLD OF THAT.  AND SO THERE IS NO EVIDENCE IN THE

21   RECORD TO DO IT.  AND THERE IS CERTAINLY NO -- THERE IS AN

22   EXCEPTION FOR INTEROPERABILITY IN THE DMCA, AND SO WE HAVE NOT

23   EXPLORED A VIOLATION OF THE DMCA OR THE EXCEPTION AT ANY POINT

24   IN THIS TRIAL.

25        HIS STATEMENT UP THERE DOES NOT MAKE A DMCA VIOLATION AND
```

1    CERTAINLY DOESN'T WARRANT A JURY INSTRUCTION ALONG THOSE

2    LINES.

3            **MR. ISAACSON:**  FOR FEAR OF REPEATING MYSELF,

4    MR. COUGHLIN, REFERRING TO MR. HELLER'S DOCUMENT AND THE REAL

5    HARMONY DOCUMENT HE IS CITING TALKING ABOUT TRANSFERRING MUSIC

6    REALPLAYER MUSIC WITH HELIX TO THE IPOD.  THAT'S NOT WHAT I'M

7    TALKING ABOUT.

8      I'M TALKING ABOUT TRANSFERRING ITUNES STORE MUSIC WITH

9    FAIRPLAY DRM TO A NONIPOD DEVICE.  THAT IS WHAT DR. KELLY

10   TALKED ABOUT IN TERMS OF STRIPPING OF DRM.

11           **MR. COUGHLIN:**  YOUR HONOR, EVEN IF THAT WERE TRUE,

12   AND I DISAGREE THAT HE ESTABLISHED THAT -- EVEN IF THAT WERE

13   TRUE, IT CERTAINLY DIDN'T ESTABLISH IT FOR A JURY INSTRUCTION.

14   THERE IS AN EXCEPTION TO THE DMCA FOR INTEROPERABILITY THAT

15   YOU CAN REVERSE-ENGINEER SOMETHING TO MAKE IT INTEROPERABLE.

16   THIS IS A BIG ISSUE THAT TRIALS EXIST OVER, AND IT SHOULDN'T

17   BE IN THIS CASE.

18      AND IF IT IS IN THIS CASE, AND SOMEHOW WE ARE GOING TO

19   GIVE THAT INSTRUCTION, WELL -- I WILL JUST LEAVE IT AT THAT.

20   WE SHOULD GET THE DOCUMENT THAT HE SAYS -- WE ARE STILL IN OUR

21   REBUTTAL CASE, AND WE SHOULD GET THE DOCUMENT THAT APPLE

22   RECEIVED FROM COUNSEL WHICH OBVIOUSLY SAYS IT'S NOT A DMCA

23   VIOLATION.

24           **THE COURT:**  ANYTHING ELSE?

25           **MR. ISAACSON:**  NO, JUST IN TERMS OF THE WAIVER ISSUE.

1    AGAIN, THIS HAS BEEN -- WE GAVE YOU IN AN EARLIER PLEADING THE

2    WHOLE HISTORY OF THE DMCA ISSUE BEING RAISED THROUGHOUT THE

3    CASE.  YOU HAD ASKED FOR THAT FILING, AND WE GAVE IT TO YOU.

4        WE HAVE BEEN CONSISTENTLY RAISING THIS ISSUE THROUGHOUT

5    THE CASE.  THESE DOCUMENTS HAVE BEEN ON THE PRIVILEGE LOG

6    THROUGHOUT THE ENTIRE TIME.  THE CASE LAW CLEARLY ESTABLISHES

7    THAT CHALLENGING THAT PRIVILEGE LOG AT THIS POINT HAS BEEN

8    WAIVED.

9        IN ADDITION, EVEN IN THE ABSENCE OF WAIVER, OUR -- WE HAVE

10   NOT PUT OUR STATE OF MIND AT ISSUE WITH RESPECT TO THIS ISSUE

11   AND WE HAVE NOT PUT IN RELIANCE OF COUNSEL DEFENSE.

12       I THINK THAT IS SUFFICIENT, BUT WE HAVE CASE LAW, OF

13   COURSE, TO SUPPORT WHAT I'M SAYING.

14           MR. COUGHLIN:  WELL, THEY DID PUT IT AT ISSUE.

15   MR. FARRUGIA TESTIFIED ABOUT IT, AND SO THEY DID PUT IT AT

16   ISSUE IF THEY ARE GOING TO MAKE THAT ARGUMENT, AND WE WILL

17   JUST ASK MR. DONNELLY, WHO I THINK RECEIVED THE PRIVILEGE --

18   THE PRIVILEGED DOCUMENT.  I DON'T KNOW IF HE IS ON THE

19   PRIVILEGE LOG OR NOT, BUT HE IS VICE PRESIDENT AT APPLE.  WE

20   CAN TALK TO HIM ABOUT IT.  HE IS STILL ON THE STAND.

21           THE COURT:  ANYTHING ELSE?  WHAT AUTHORITY DO YOU

22   HAVE?  OR IS IT THE AUTHORITY THAT IS LISTED ON THE JURY

23   INSTRUCTION?

24           MR. ISAACSON:  DMCA AUTHORITY OR WAIVER AUTHORITY?

25   OR I AM SORRY.  DMCA AUTHORITY OR THIS ATTORNEY-CLIENT

1    PRIVILEGE AUTHORITY?

2            **THE COURT:**  ON THE DMCA.

3            **MR. ISAACSON:**  ON THE DMCA, THAT WOULD BE IN THE JURY

4    INSTRUCTION.

5            **THE COURT:**  ALL RIGHT.  ANYTHING ELSE ON THIS TOPIC?

6            **MR. ISAACSON:**  NOT RIGHT NOW.  I GUESS JUST WE NEED

7    YOUR GUIDANCE IF YOU WANT ANYTHING IN WRITING IN TERMS OF

8    ACTUAL RESPONSE TO THEIR MOTION.

9            **THE COURT:**  IT IS JUST -- LIKE I SAID, JUST GIVEN TO

10   ME THIS MORNING, SO I STILL NEED TO READ IT.

11      OKAY.  OTHER ISSUES FROM YOU, MR. ISAACSON?

12           **MR. ISAACSON:**  THE LAST POINT IN MS. SWEENEY'S LETTER

13   OF LAST NIGHT ON JURY INSTRUCTIONS HAS TO DO WITH THE PRETEXT

14   LEGITIMATE BUSINESS JUSTIFICATION.  I DON'T KNOW IF WITH YOU

15   WANT TO HEAR ABOUT THAT TODAY OR AS WE ARE MOVING -- OR LATER

16   AS WE ARE MOVING TOWARDS THE JURY INSTRUCTIONS.

17           **THE COURT:**  NO, NOW IS GOOD.  I'M TRYING TO GET THIS

18   STUFF ALL FINISHED UP.

19           **MR. ISAACSON:**  MS. DUNN WILL ADDRESS THAT.

20           **MS. DUNN:**  YOUR HONOR, MY UNDERSTANDING -- FIRST OF

21   ALL, THIS IS IN MS. SWEENEY'S LETTER UNDER THE HEADING

22   "PRETEXT."  BUT I THINK THE ISSUE IS REALLY THE ISSUE THAT WAS

23   RAISED THE OTHER DAY ABOUT WHAT TO DO WITH LEGITIMATE BUSINESS

24   JUSTIFICATION.

25      AND MY UNDERSTANDING OF WHAT THE COURT HAS ALREADY

1958

```
1   INSTRUCTED AND WHAT YOUR HONOR SAID THE OTHER DAY IS THAT WHEN

2   YOU HAVE TOLD THE JURY THAT YOU CAN CONSIDER EVIDENCE THAT

3   SUGGESTS APPLE'S PURPORTED REASONS FOR 7.0 AND 7.4 WERE

4   PRETEXTUAL IN DETERMINING PRODUCT IMPROVEMENT IF YOU ARE

5   TELLING THEM THEY CAN CONSIDER THAT EVIDENCE IN THE CONTEXT OF

6   CONSIDERING PRODUCT IMPROVEMENT.

7       SO IN OTHER WORDS, THE PRETEXT IS SAYING, WELL, IS THIS

8   REALLY ABOUT COMPETITORS.  AND SO AT THAT POINT THE JURY

9   DECIDES IS THIS A PRODUCT IMPROVEMENT.  IF YES, DONE.  AND IF

10  NO, THEN YOU MOVE ON TO THINK ABOUT THE QUESTION OF WHETHER

11  THIS IS EXCLUSIONARY CONDUCT.

12      SO IN OTHER WORDS, IS THIS ABOUT COMPETITORS.  IF THIS

13  GOES ABOUT COMPETITORS, THEN THE QUESTION IS WHETHER IT IS

14  ANTICOMPETITIVE UNDER THE LAW AS DISTINGUISHED FROM THE MANY

15  THINGS THAT BUSINESSES DO THAT ARE ABOUT COMPETITORS BUT THAT

16  ARE NOT ANTICOMPETITIVE UNDER THE LAW.

17      THIS IS WHAT I TAKE YOUR HONOR TO BE REFERRING TO WHEN YOU

18  POINT TO THE THIRD ELEMENT.  AND WE TALKED ABOUT THAT THE

19  OTHER DAY.

20      SO I'M -- THAT'S MY UNDERSTANDING OF YOUR POSITION.

21  UNDERSTANDING THAT OBVIOUSLY WE PREVIOUSLY OPPOSED PRETEXT,

22  BUT IF WE TAKE YOUR HONOR'S INSTRUCTION AND BRING IT FORWARD,

23  WE THINK THAT YOU HAVE CORRECTLY UNDERSTOOD THIS ISSUE AND

24  REFLECTED IT IN THE JURY INSTRUCTIONS.

25      SO, WE WOULD ASK FOR IT TO BE MAINTAINED, BUT I THINK IT
```

```
1    IS WORTH RAISING BECAUSE IT IS AN ISSUE OF SOME COMPLEXITY.

2    AS YOUR HONOR POINTED OUT THE OTHER DAY, THERE HAS NEVER BEEN

3    A PRODUCT IMPROVEMENT CASE INJECTED INTO THIS OTHER AREA OF

4    THE LAW.

5         AND THE ONLY CASE THAT -- YOU KNOW, THAT THE PLAINTIFFS

6    HAVE RELIED UPON REALLY FOR PRETEXT IN THE INSTANCE THAT HAS

7    ALREADY BEEN DESCRIBED IS ALLIED ORTHOPEDIC, WHICH OF COURSE

8    ONLY DISCUSSES THIS IN THE CONTEXT OF A PRODUCT IMPROVEMENT.

9         I ALSO THINK THE LANGUAGE THAT PLAINTIFFS SUGGEST SORT OF

10   ILLUSTRATES WHY THEIR POSITION IS NOT TENABLE BECAUSE IT SAYS

11   IF YOU FIND PRETEXTUAL APPLE'S CONTENTION THAT THE UPDATES

12   WERE GENUINE PRODUCT IMPROVEMENT AND THAT IT HAD LEGITIMATE

13   BUSINESS REASONS FOR THEM, THEN YOU MAY FIND APPLE'S CONDUCT

14   ANTICOMPETITIVE.

15        AND SO IT DOESN'T REALLY MAKE SENSE TO ME TO FIND

16   PRETEXTUAL LEGITIMATE BUSINESS REASONS.  I THINK YOUR HONOR IS

17   CORRECT THIS IS TWO-STEP PROCESS.

18        MS. SWEENEY:  YOUR HONOR, AS WE POINTED OUT IN THE

19   LETTER, WE THINK THAT -- AS DRAFTED, WE PLAINTIFFS SEEM TO

20   HAVE THE BURDEN THREE TIMES.  AND AS WE HAVE ARGUED SEVERAL

21   TIMES NOW ALREADY, YOU CAN'T SEPARATE OUT THESE DIFFERENT

22   ISSUES AND FORCE PLAINTIFFS TO JUMP OVER THAT HURDLE AGAIN AND

23   AGAIN.

24        WHETHER THE PRODUCT WAS A GENUINE -- WHETHER THE CHANGE

25   WAS A GENUINE PRODUCT IMPROVEMENT REQUIRES ANALYSIS OF WHETHER
```

1    THERE WAS PRETEXT, AND THAT -- WE DON'T THINK THERE'S ANY

2    BASIS IN THE LAW FOR APPLE SAYING THEY GET A SECOND

3    OPPORTUNITY OR THIRD OPPORTUNITY TO CHALLENGE PLAINTIFF'S

4    EVIDENCE ON THAT POINT.

5         AND I THINK THAT WE'VE LAID OUT IN OUR LETTER AND IN OUR

6    PROPOSED JURY INSTRUCTION THE CORRECT INTERPRETATION OF THE

7    FEW CASES THAT ARE OUT THERE THAT DO BEAR ON THIS ISSUE.

8         **MS. DUNN:**  I DON'T ACTUALLY SEE ANY CASES CITED IN

9    MS. SWEENEY'S LETTER, ALTHOUGH I WILL BE HAPPY TO ADDRESS THEM

10   IF SHE HAS THEM.

11        **MS. SWEENEY:**  YOUR HONOR --

12        **MS. DUNN:**  BUT WHAT SHE IS SAYING DOES NOT GO THE

13   DISTANCE TO FINDING ANTICOMPETITIVE CONDUCT.  AND IN ORDER --

14        IF YOU SAY, WE DID THIS PRODUCT IMPROVEMENT OR WE DID THIS

15   PRODUCT DESIGN CHANGE AND YOU SHOW THAT THE REASONS ARE

16   PRETEXTUAL FOR THAT, WHAT YOU ARE SAYING IS ACTUALLY WE DID IT

17   BECAUSE IT IS AIMED AT COMPETITORS.  BUT IT DOES NOT EXPLAIN

18   WHETHER THAT WAS ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT.

19        FOR EXAMPLE, IF IT IS AIMED AT COMPETITORS BUT YOU WANTED

20   TO COMPETE WITH YOUR DRM OR YOU WERE WORRIED ABOUT

21   REPUTATIONAL HARM IN THE MARKET OR ANY OF THE OTHER THINGS I

22   MENTIONED THE OTHER DAY THAT ARE IN EVIDENCE, THOSE WOULD BE

23   LEGITIMATE BUSINESS JUSTIFICATIONS.

24        AND SO, YOU KNOW, I'M HAPPY TO TALK ABOUT ANY CASE.  I

25   KNOW THAT PREVIOUSLY PLAINTIFFS HAVE CITED *IMAGE CHECK* VS.

1   *KODAK*.  EVEN THAT CASE, FRANKLY, WHICH SUBSEQUENTLY HAS BEEN

2   LIMITED BY THE NINTH CIRCUIT, SAYS THAT THIS IS REALLY A

3   TWO-STEP PROCESS WHERE LEGITIMATE BUSINESS JUSTIFICATION

4   FOLLOWS THE DETERMINATION OF THE CONDUCT, WHICH IS REALLY THE

5   PRODUCT IMPROVEMENT ANALYSIS THAT YOUR HONOR HAS DISCUSSED.

6       SO THE REASON WE RAISE IT ORALLY IS BECAUSE IF -- WE WANT

7   TO MAKE SURE WE SATISFY YOU ON THE LAW IF WE NEED TO DO

8   ANYTHING IN ADDITION.

9       **MS. SWEENEY:**  YOUR HONOR, BRIEFLY, THE CASES THAT I

10  WAS REFERRING TO ARE ALL IN THE RECORD.  WE HAVE CITED THIS --

11  THE CASES OVER AND OVER AGAIN.  WE HAVE ARGUED THIS OVER AND

12  OVER AGAIN.

13      AND ONCE AGAIN, I HEAR MS. DUNN USING THE SAME KIND OF

14  EVIDENCE THAT SHE IS GOING TO USE TO REBUT THE ARGUMENT THAT

15  IT WAS NOT A PRODUCT DEVELOPMENT, THAT IS, YOU KNOW, WE HAD

16  BETTER DRM, TO TRY TO SUPPORT THE BUSINESS JUSTIFICATION

17  DEFENSE.  AND THEY SHOULDN'T HAVE THE OPPORTUNITY TO USE THE

18  SAME EVIDENCE TO TRY AND FORCE PLAINTIFF THREE TIMES TO PROVE

19  UP THE ANTICOMPETITIVE CONDUCT ELEMENT.  AND THERE IS NO

20  SUPPORT IN THE LAW FOR THAT.

21      WE RELY ON *ALLIED*.  WE RELY ON *MICROSOFT*.  AND MS. DUNN

22  HAS NOT CITED ANY CASE THAT SUPPORTS HER POSITION THAT WE HAVE

23  TO PROVE THREE TIMES THAT THERE WAS WILLFUL CONDUCT AND THAT

24  APPLE HAS NO LEGITIMATE BUSINESS JUSTIFICATION.  THE PRODUCT

25  IMPROVEMENT PART OF THIS IS THE BUSINESS JUSTIFICATION.  SO WE

1962

1    SHOULDN'T HAVE TO ARGUE IT AND OVER AND OVER AGAIN.

2            **THE COURT:**  ALL RIGHT.  I'VE HEARD ENOUGH.  I HAVE

3    HEARD IT MULTIPLE TIMES.  I KNOW THAT YOU ALL DISAGREE WITH ME

4    IN VARIOUS WAYS ON VARIOUS ISSUES.  IF YOU DON'T LIKE THE

5    RESULT, YOU CAN TAKE IT UP WITH THE NINTH CIRCUIT.  BUT I'VE

6    READ THE CASES, AND I HAVE THOUGHT ABOUT IT A LOT.  AND I

7    DON'T THINK IT IS THREE TIMES.  I THINK THAT IT'S TWICE, AND I

8    DO THINK IT IS APPROPRIATE.

9        YOU HAVE TO BE ABLE TO SHOW AS A THRESHOLD MATTER, IN MY

10    VIEW BASED UPON MY READING OF ALL THE CASES, THAT THIS WAS NOT

11    A GENUINE PRODUCT IMPROVEMENT.  IF YOU CANNOT SHOW THAT, THEN

12    YOU DON'T GET TO THE OTHER ISSUES.

13        THE TEST IS DIFFERENT.  THEIR INTENT DOESN'T MATTER.  AND

14    I HAVE TO TELL YOU, GIVEN THE ARGUMENTS THAT HAVE BEEN MADE,

15    MY PRIMARY WORRY IS THAT THE PLAINTIFFS ARE GOING TO USE IT IN

16    THE WRONG WAY.  SO THE JURY WILL BE INSTRUCTED TO -- SO THAT

17    THEY ARE NOT DOING THE INAPPROPRIATE BALANCING THAT I AM SO

18    FINELY TRYING TO NAVIGATE HERE.

19        THEY WILL BE INSTRUCTED THAT THEY HAVE TO FIND OR

20    DETERMINE WHETHER OR NOT IT WAS A GENUINE PRODUCT IMPROVEMENT.

21    IF IT WAS NOT A GENUINE PRODUCT IMPROVEMENT, THEN THEY WILL

22    CONDUCT THE ANALYSIS UNDER THE ELEMENTS AS SET FORTH.  AND THE

23    ELEMENT THAT TALKS ABOUT WILLFULNESS CONDUCT INCORPORATES

24    LEGITIMATE BUSINESS REASONS.

25        SO YOU MAY THINK IT'S TWICE IN THERE, BUT THAT'S WHAT THE

1963

```
1   LAW SAYS.  THAT IS WHAT THE ELEMENT READS.  AND THAT IS THE
2   WAY I AM GOING TO INSTRUCT.
3       SO, I UNDERSTAND YOU DON'T LIKE IT.  YOU ARE GOING TO HAVE
4   TO FIGURE OUT WHAT YOU ARE GOING TO DO IT ABOUT IT BECAUSE
5   THAT IS WHAT IS GOING TO HAPPEN.
6           MS. SWEENEY:  CAN I RESPOND --
7           THE COURT:  NO, YOU CAN'T BECAUSE YOU GUYS HAVE
8   ARGUED THIS AD NAUSEAM.  YOU HAVE PLENTY IN THE RECORD, AND AT
9   THIS POINT, I HAVE HEARD NOTHING NEW.  SO I COULD BE WRONG AND
10  THE NINTH CIRCUIT CAN TELL ME I'M WRONG, BUT I'M NOT LISTENING
11  TO ANY MORE ARGUMENT.  THERE IS NOTHING NEW ANYBODY HAS ADDED.
12      I AM TENTATIVELY, BY THE WAY --
13      WELL, I'LL LEAVE -- LET ME GO LOOK AT THESE OTHER THINGS.
14  BUT YOU SHOULD PLAN ON THAT.
15      SO LET'S SEE, WHAT ELSE IS LEFT?
16              (PAUSE IN THE PROCEEDINGS.)
17          THE COURT:  ANYTHING FROM THE PLAINTIFFS ON THE LIST?
18  OTHERWISE, I WILL START GOING TO THE BACK AND START MAKING
19  DECISIONS.
20          MR. COUGHLIN:  NO, YOUR HONOR.
21          THE COURT:  MR. ISAACSON?
22          MR. ISAACSON:  I DON'T SEE ANYTHING ELSE.
23          THE COURT:  ALL RIGHT.  WE WILL STAND IN RECESS IN
24  EIGHT A.M. TOMORROW.
25              (OFF-THE-RECORD DISCUSSION.)
```

1964

```
 1              MR. ISAACSON:  MS. DEARBORN, EXHIBITS.

 2              THE COURT:  EXHIBITS.

 3                    (PAUSE IN THE PROCEEDINGS.)

 4              THE COURT:  IS THERE ANY OFFER OF ANYTHING FROM

 5       KELLY?

 6              MS. DEARBORN:  OTHER THAN TWO PHYSICAL EXHIBITS, I

 7       DON'T BELIEVE SO, YOUR HONOR, BUT --

 8              MS. DUNN:  NOTHING EXCEPT THE IPOD.

 9              THE COURT:  ANYTHING BEING OFFERED FROM MURPHY?

10              MR. ISAACSON:  WE ARE NOT OFFERING ANY OF THOSE.

11              THE COURT:  ANYTHING BEING OFFERED FROM TOPEL?

12              MR. ISAACSON:  NO.

13              THE COURT:  DONNELLY IS NOT OVER YET SO WE WILL DO

14       DONNELLY ONCE HE IS DONE.

15              MS. DEARBORN:  OKAY.

16              THE COURT:  EVERYBODY STAY DRY.  BE SAFE.  STAND IN

17       RECESS.

18              MR. ISAACSON:  AND --

19              THE COURT:  HOLD ON, MR. COUGHLIN.

20              MR. ISAACSON:  I AM ASSUMING THE REBUTTAL CASE MAY

21       NOT GO ALL DAY TOMORROW?

22              MR. COUGHLIN:  IT IS NOT GOING ALL DAY.

23              MR. ISAACSON:  IF IT DOESN'T GO ALL DAY, WE WILL STOP

24       AND COME BACK ON MONDAY FOR CLOSING ARGUMENT.

25              THE COURT:  I STILL HAVE TO DEAL WITH THESE OTHER
```

1965

1    ISSUES, BUT I THINK THAT THAT'S -- WE CAN TRY TO PLAN ON THAT.

2              **MR. ISAACSON:**  THANK YOU.

3              **THE COURT:**  ALL RIGHT.  WE WILL SEE YOU ALL TOMORROW.

4              (PROCEEDINGS ADJOURNED AT 2:15 P.M.)

5

6

7

8                     **CERTIFICATE OF REPORTERS**

9       WE, RAYNEE H. MERCADO AND DIANE E. SKILLMAN, OFFICIAL

10   REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

11   CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

12   TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15   _____

16       RAYNEE H. MERCADO, CSR 8258, RMR, CRR, FCRR

17

18

19   _____

20       DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

21            THURSDAY, DECEMBER 11, 2014

22

23

24

25

**DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930**